1  MICHAEL W. BIEN – 096891
   GAY CROSTHWAIT GRUNFELD – 121944
2  MICHAEL FREEDMAN – 262850
   SUMANA COOPPAN WOLF – 267967
3  ROSEN BIEN GALVAN & GRUNFELD LLP
   315 Montgomery Street, Tenth Floor
4  San Francisco, California  94104-1823
   Telephone:   (415) 433-6830
5  Facsimile:   (415) 433-7104
   Email:       mbien@rbgg.com
6               ggrunfeld@rbgg.com
                mfreedman@rbgg.com
7               scooppanwolf@rbgg.com

8  JAMES EGAR – 065702
   Public Defender
9  DONALD E. LANDIS, JR. – 149006
   Assistant Public Defender
10 OFFICE OF THE PUBLIC DEFENDER
   COUNTY OF MONTEREY
11 111 West Alisal Street
   Salinas, California  93901-2644
12 Telephone:   (831) 755-5806
   Facsimile:   (831) 755-5873
13 Email:       EgarJS@co.monterey.ca.us

14 Attorneys for Plaintiffs

15                UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17                                        CV 13 2354

18  JESSE HERNANDEZ; ROBERT          Case No.
    YANCEY; RICHARD MURPHY;
19  SARAB SARABI; and GLENDA         CIVIL CLASS ACTION COMPLAINT
    HUNTER, on behalf of themselves and all   FOR DECLARATORY AND
20  others similarly situated,       INJUNCTIVE RELIEF:

21           Plaintiffs,             (1)  **Failure to Protect Prisoners From
                                          Violence:** Violations of 8th and 14th
22       v.                               Amendments of U.S. Constitution,
                                          and Article 1, Sections 7 and 17 of
23  COUNTY OF MONTEREY;                   California Constitution
    MONTEREY COUNTY SHERIFF'S
24  OFFICE; CALIFORNIA FORENSIC     (2)  **Failure to Provide Adequate
    MEDICAL GROUP, INCORPORATED, a       Medical Care:** Violations of 8th and
25  California corporation; and DOES 1 to 20,   14th Amendments of U.S.
    inclusive,                            Constitution, and Article 1, Sections
26                                        7 and 17 of California Constitution
             Defendants.
27

28

[716216-20]

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    (3)    **Failure to Provide Adequate Mental Health Care:** Violations of 8th and 14th Amendments of U.S. Constitution, and Article 1, Sections 7 and 17 of California Constitution

    (4)    **Failure to Provide Reasonable Accommodations to Prisoners with Disabilities:** Violations of Americans with Disabilities Act, Rehabilitation Act, and California Government Code § 11135

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**NATURE OF ACTION**

1.     The Monterey County Jail complex in Salinas, California (the "Jail") is broken in every way. Severe overcrowding, outdated facilities, and chronic understaffing have created dangerous conditions in the Jail, placing prisoners and staff at serious risk of injury and death. Violent incidents between prisoners occur regularly, often resulting in grave injuries that require medical treatment and even hospitalization. Prisoners in the Jail, many of whom are pre-trial detainees or charged with violations of parole or probation, receive woefully inadequate medical care, including significant delays in evaluation and treatment, failure to provide necessary procedures, discontinuation of needed medications, and poor post-operative follow up care. Mental health care at the Jail is similarly deficient and lacking in sufficient use of therapy and provision of psycho-tropic medications. When such medications are prescribed, they are provided to prisoners in an inconsistent and ineffective manner. Defendants lack adequate policies to identify and supervise prisoners who are at risk for suicide, relying instead on the disturbing practice of placing such prisoners in isolation rooms called "rubber rooms." These "rubber rooms" lack any furniture or features save for a grate in the floor which serves as a toilet. In the last three years alone, there have been three completed and more than a dozen attempted suicides at the Jail. Defendants also fail to provide reasonable accommoda-tions to prisoners with disabilities, including the denial of sign language interpreters to prisoners with hearing impairments, failure to provide canes and walkers to prisoners with mobility impairments, and placement in inaccessible and dangerous housing units and bathrooms.

2.     Defendants' failures to protect prisoners from violence, to provide minimally adequate medical and mental health care, and to accommodate prisoners with disabilities are particularly egregious given that Defendants have been aware of these problems and their causes for years and yet failed to take the necessary actions to ameliorate the unconstitutional conditions. In 2007, the County commissioned a third-party evaluation of the Jail, which resulted in a report, dated June 19, 2007, entitled "County of Monterey,

1

1   Office of the Sheriff, Needs Assessment." The 2007 report concluded that "[t]he current

2   combination of insufficient beds, an inadequate detention facility and understaffing has

3   resulted in an almost untenable situation." In 2011, the County asked the third-party

4   consultant to update the 2007 report to reflect amendments to state law and changes within

5   the Sheriff's Office and the Jail population. This updated report, dated December 30,

6   2011, reached the exact same, word-for-word conclusion: "The current combination of

7   insufficient beds, an inadequate detention facility and understaffing has resulted in an

8   almost untenable situation." County of Monterey, Office of the Sheriff, Jail Needs

9   Assessment, December 30, 2011 (hereinafter, "2011 Jail Needs Assessment" or

10  "Assessment"), at Ex. 2. The situation that was deemed "untenable" in December 2011

11  appears only to have worsened in the last year and half, despite Defendants' knowledge of

12  the risks this situation poses. Defendants' deliberate indifference to prisoners' safety,

13  medical and mental health, and disability needs is unconscionable, and must be stopped to

14  prevent additional unnecessary loss of life, pain, and suffering.

15      3.      This civil rights class action lawsuit seeks to remedy the profoundly

16  dangerous, wasteful, overcrowded, discriminatory, and unconstitutional conditions in the

17  Jail. The Plaintiffs—five prisoners detained in the Jail—bring this action against the

18  Defendants—the County of Monterey, the Monterey County Sheriff's Office, and the

19  California Forensic Medical Group—on behalf of themselves and those similarly situated.

20      4.      Plaintiffs seek declaratory and injunctive relief under the United States and

21  California Constitutions against Defendants' deliberate indifference to the exceedingly

22  high levels of inmate violence in the Jail. The causes of the violence—understaffing,

23  overcrowded housing units, antiquated and poorly designed Jail facilities, and an

24  inadequate prisoner classification system—are well-known to and tolerated by Defendants.

25  Violent incidents between prisoners occur with alarming frequency and in nearly every

26  area of the Jail. According to Defendants' own incident reports from 2011 and January to

27  early-September 2012, there were more than 150 separate incidents of violence between

28  prisoners. In more than 100 of these incidents, at least one prisoner required some medical

treatment.  Violent incidents were reported in 26 out of 29 housing units.  Violence at the Jail is not an anomaly; it is a way of life.  Forcing prisoners to live under ongoing threats of serious bodily injury is cruel and inhumane, especially when Defendants have the ability to prevent and reduce such violence.

5.     Plaintiffs seek declaratory and injunctive relief under the United States and California Constitutions against Defendants' deliberate indifference to their failure to provide prisoners with minimally adequate medical care.  Monterey County outsources the provision of medical care to prisoners in the Jail to California Forensic Medical Group ("CFMG"), a private corporation, which provides deficient medical care in nearly every respect.  Prisoners are not adequately screened for serious medical problems upon arrival at the Jail, and Defendants lack an effective system for requesting care.  When prisoners do receive care, it is often after a delay of weeks or even months.  The medical care staff employed by CFMG are insufficient in number to care for the more than 1,100 prisoners in the severely overcrowded Jail.  Both prisoners who arrive at the Jail with existing medical care needs and those who develop conditions in the Jail fail to receive timely or appropriate treatment, resulting in unnecessary and prolonged pain, suffering, and worsening of their conditions.  As a result of Defendants' failure to provide minimally adequate medical care, Defendants are deliberately indifferent to the substantial risk of harm faced by all prisoners.

6.     Plaintiffs also seek declaratory and injunctive relief under the United States and California Constitutions against Defendants' deliberate indifference to their failure to provide prisoners with minimally adequate mental health care.  Monterey County also outsources the provision of mental health care to prisoners in the Jail to CFMG, which provides deficient mental health care in nearly every respect.  Prisoners are not adequately screened for serious mental health problems upon arrival at the Jail.  Defendants lack an effective system for prisoners to request care.  When prisoners do receive mental health care, it is often after a delay of weeks or even months, and may not include therapy.  Both prisoners who arrive at the Jail with existing mental health concerns and those who

[716216-20]

1   develop conditions in the Jail rarely receive appropriate treatment.  Defendants' approach

2   to prisoners with serious mental health problems (including suicidality) involves placing

3   such prisoners in unsanitary rubber rooms, which only exacerbates and prolongs their

4   already dire mental health crises.  As a result of Defendants' failure to provide minimally

5   adequate mental health care, Defendants are deliberately indifferent to the substantial risk

6   of harm faced by all prisoners.

7       7.      Under the Americans with Disabilities Act ("ADA"), Section 504 of the

8   Rehabilitation Act ("Rehabilitation Act"), California Government Code Section 11135,

9   and the United States and California Constitutions, Plaintiffs seek declaratory and

10  injunctive relief against Monterey County,  the Monterey County Sheriff's Office, and

11  CFMG as a remedy for Defendants' systemic and willful discrimination against and failure

12  to provide reasonable accommodations to prisoners in the Jail who have disabilities.

13      8.      Defendants lack adequate policies and practices for accurately identifying

14  and tracking prisoners with disabilities and the accommodations those prisoners require.

15  Defendants have no adequate administrative grievance process available to prisoners to

16  request reasonable accommodations.  Defendants do not provide effective communication

17  or basic and reasonable accommodations, such as sign language interpreting services and

18  hearing aids, to prisoners with hearing, speech and other communication impairments,

19  even for critical interactions with Jail staff, including for disciplinary hearings and medical

20  and mental health appointments.  Many areas of the Jail are physically inaccessible to

21  prisoners with disabilities, both because Defendants refuse to permit prisoners to possess

22  needed assistive devices and fail to house prisoners with disabilities in accessible parts of

23  the Jail.  Defendants' systemic failure to accommodate prisoners with disabilities results in

24  the widespread exclusion of prisoners with disabilities from many of the programs,

25  services and activities offered by the Jail, including health care services, exercise, religious

26  services, sleeping, and educational and vocational programs.  Moreover, Defendants' lack

27  of adequate policies and procedures makes prisoners with disabilities vulnerable to

28  exploitation and violence by other prisoners and increases their risk of serious injury or

[716216-20]

1  death.

2      9.      As a remedy for the statutory and constitutional violations described herein,

3  Plaintiffs seek a declaration that Defendants are violating federal and state law and an

4  injunction compelling Defendants to provide prisoners with adequate protection from

5  violence and assault from other prisoners, to provide prisoners with adequate medical and

6  mental health care, and to provide reasonable accommodations to and cease discriminating

7  against prisoners with disabilities.

8                              **JURISDICTION**

9      10.     This Court has jurisdiction over the claims brought under federal law

10  pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over the claims

11  brought under California law pursuant to 28 U.S.C. § 1367.  Plaintiffs seek declaratory and

12  injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202, 29 U.S.C. § 794a, 42 U.S.C.

13  §§ 1983 and 12117(a), California Government Code § 11135, and Article 1, §§ 7 and 17 of

14  the California Constitution.

15                              **VENUE**

16      11.     Venue is properly in this Court, pursuant to Title 28 U.S.C. § 1391(b)(1), in

17  that Plaintiffs' claims for relief arose in this District and one or all of the Defendants reside

18  in this District.

19                              **PARTIES**

20      12.     PLAINTIFF JESSE HERNANDEZ was detained at Monterey County Jail on

21  April 28, 2012.  Prior to his incarceration, Plaintiff HERNANDEZ underwent a colostomy.

22  Despite his repeated requests over an eight-month period for colostomy reversal surgery,

23  Defendants provided untimely and inadequate medical care, including, but not limited to

24  repeated failures to remove the colostomy bag and failures to transfer Plaintiff

25  HERNANDEZ to a medical facility that would perform the surgery.  Even after Plaintiff

26  HERNANDEZ finally received the colostomy reversal surgery in December 2012,

27  Defendants failed to provide adequate medical care, including, but not limited to proper

28  post-operative follow-up care.  As a result of Defendants' delayed and inadequate medical

1  care, Plaintiff HERNANDEZ has suffered from unnecessary and avoidable pain and

2  symptoms, including, but not limited to intestinal swelling, bleeding, severe stomach pain,

3  fevers, cold sweats, and obstructed bowels.  Plaintiff HERNANDEZ is a person with a

4  disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California

5  Government Code § 12926(l).

6          13.    PLAINTIFF ROBERT YANCEY was detained at Monterey County Jail on

7  December 2, 2012.  He has a hearing impairment and has been completely deaf since birth.

8  Plaintiff YANCEY also has a speech impairment that makes it impossible for him to be

9  understood when speaking.  His primary method of communication is American Sign

10 Language.  Plaintiff YANCEY ordinarily is somewhat able to communicate in a limited

11 manner using written notes; however, for much of his time in the Jail, his right hand was in

12 a cast, making it difficult and painful for him to write legibly.  Despite multiple requests,

13 Plaintiff YANCEY did not receive reasonable accommodations from Defendants to allow

14 him to access the programs and services offered by the Jail.  Defendants never provided

15 Plaintiff YANCEY with a sign language interpreter at any time during his time in the Jail.

16 Plaintiff YANCEY is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C.

17 § 705(9)(B), and California Government Code § 12926(l).

18         14.    PLAINTIFF RICHARD MURPHY was detained at Monterey County Jail on

19 January 18, 2013.  Plaintiff MURPHY has a mobility impairment and requires a cane or

20 walker to ambulate without significant pain.  Despite repeated requests, Plaintiff

21 MURPHY has not received reasonable accommodations from Defendants to allow him to

22 walk without pain, and to access the programs and services offered by the Jail.  Plaintiff

23 MURPHY also has nerve damage in his back, and requires pain medication as well as

24 cortisone shots.  Despite his repeated requests, Plaintiff MURPHY has not received timely

25 or adequate medical care, including but not limited to, necessary medications at the Jail.

26 Plaintiff MURPHY has been diagnosed with mental illness and has been prescribed and

27 requires various prescription psychiatric medications to treat his illness and alleviate his

28 symptoms.  Despite repeated requests, Defendants have failed to provide timely and

[716216-20]

1  appropriate mental health care, including, but not limited to, the failure to provide correct

2  dosages of the medications Plaintiff MURPHY requires and the failure to adequately

3  monitor the administration of medications.  As a result, Plaintiff MURPHY is experiencing

4  unnecessary and avoidable pain and symptoms, including, but not limited to, hearing

5  voices, seeing shadows,  depression and suicidality, and inability to sleep more than a few

6  hours per night.  Plaintiff MURPHY is a person with a disability as defined in 42 U.S.C.

7  § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (l).

8      15.    PLAINTIFF SARAB SARABI was detained at Monterey County Jail on

9  February 2, 2013.  Plaintiff SARABI has a mobility impairment as a result of a serious

10  injury he sustained to his right leg when he was attacked by another inmate at the Jail.

11  Plaintiff SARABI did not receive timely or adequate medical care for his injury.  Plaintiff

12  SARABI has sustained nerve damage, and must use crutches to walk.  Despite Plaintiff

13  SARABI's requests, Defendants have not provided Plaintiff SARABI with reasonable or

14  appropriate accommodations to allow him to walk without falling, or to access the

15  programs and services offered by the Jail.  Plaintiff SARABI is a person with a disability

16  as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code

17  § 12926(l).

18      16.    PLAINTIFF GLENDA HUNTER was detained at Monterey County Jail on

19  March 16, 2013.  Plaintiff HUNTER has been diagnosed with numerous medical

20  conditions, including diabetes, fibromyalgia, high blood pressure, chronic back pain, bone

21  cancer, and seizures, and she has been prescribed and requires various medications to treat

22  her illnesses and alleviate her symptoms.  Despite repeated requests, Defendants have

23  failed to provide timely and appropriate medical care, including, but not limited to, failing

24  to provide Plaintiff HUNTER with necessary prescription medications.  Plaintiff HUNTER

25  has also been diagnosed with mental illness, including manic depression, dementia, anxiety

26  and panic attacks.  Plaintiff HUNTER requires mental health treatment to alleviate her

27  symptoms and to function.  Defendants have failed to provide timely and appropriate

28  mental health care to Plaintiff HUNTER, including, but not limited to, appropriate

[716216-20]

7

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  medications (which Plaintiff HUNTER brought with her to the Jail but which were taken
2  from her by Defendants). As a result of Defendants' inadequate medical and mental health
3  care, Plaintiff HUNTER is experiencing unnecessary and avoidable pain and symptoms,
4  including, but not limited to nightmares, anxiety, panic attacks, and aural hallucinations.
5  Plaintiff HUNTER is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C.
6  § 705(9)(B), and California Government Code § 12926(j).

7      17.    DEFENDANT COUNTY OF MONTEREY (the "COUNTY" or
8  "MONTEREY COUNTY") is a public entity, duly organized and existing under the laws
9  of the State of California. Under its authority, Defendant COUNTY operates and manages
10  the Jail and is, and was at all relevant times mentioned herein, responsible for the actions
11  and/or inactions and the policies, procedures, practices, and customs of the MONTEREY
12  COUNTY SHERIFF'S OFFICE and its respective employees and/or agents. The Board of
13  Supervisors for the COUNTY authorized and approved the contract between
14  DEFENDANT MONTEREY COUNTY SHERIFF'S OFFICE and DEFENDANT
15  CALIFORNIA FORENSIC MEDICAL GROUP INCORPORATED ("CFMG") for
16  CFMG to provide medical and mental health care to prisoners in the Jail. The COUNTY
17  by law retains the ultimate authority over and responsibility for the health care, treatment,
18  and safekeeping of Plaintiffs and the class they seek to represent. The COUNTY employs
19  50 or more persons.

20      18.    DEFENDANT MONTEREY COUNTY SHERIFF'S OFFICE (the
21  "SHERIFF'S OFFICE") is a public entity, duly organized and existing under the laws of
22  the State of California. Sheriff Scott Miller is the elected Sheriff of the County of
23  Monterey. The SHERIFF'S OFFICE is responsible for the day-to-day operations of the
24  Jail facilities, including promulgating policies and procedures for the operation of the
25  facilities. The SHERIFF'S OFFICE has contracted with CFMG to provide all health care
26  services in the Jail, but by law retains the ultimate authority over and any responsibility for
27  the health care, treatment, and safekeeping of Plaintiffs and the class they seek to
28  represent. The SHERIFF'S OFFICE employs 50 or more persons.

[716216-20]

19. DEFENDANT CFMG is a corporation organized under the laws of the State of California and operating under a contract with the SHERIFF'S OFFICE to provide health care services to prisoners in the Jail, including medical and mental health care. The current contract extends from April 1, 2012 through June 30, 2015. At all times when CFMG and its employees provide medical and mental health care to prisoners in the Jail, CFMG and its employees have acted and continue to act under color of state law. CFMG employs 50 or more persons.

20. Plaintiffs are ignorant of the true names and capacities of defendants sued in this complaint as DOES 1 through 20, inclusive, and therefore sue these defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences, and the discrimination against Plaintiffs, alleged in this complaint.

21. At all times mentioned in this complaint, each Defendant was the agent of the others, was acting within the course and scope of this agency, and all acts alleged to have been committed by any one of them was committed on behalf of every other Defendant.

## CLASS ACTION ALLEGATIONS

### Plaintiff Prisoner Class

22. Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all others similarly situated. Plaintiffs bring the claims articulated herein on behalf of all adult men and women who are now, or will be in the future, incarcerated in Monterey County Jail ("Prisoner Class"). All prisoners are at risk of substantial harm due to the following policies and practices:

      a.    Denial of protection from injury and violence from other prisoners,

      b.    Denial of minimally adequate medical care,

      c.    Denial of minimally adequate mental health care,

1        d.       Denial of reasonable accommodations and equal access to programs

2   and services.

3        23.      There are questions of law and fact common to the class, including:

4                a.       Whether Defendants' failure to protect prisoners from violence from

5   other prisoners violates the Due Process Clause of the Fourteenth Amendment and the

6   Cruel and Unusual Punishment Clause of the of the Eighth Amendment to the United

7   States Constitution, and Article 1, Sections 7 and 17 of the California Constitution;

8                b.       Whether Defendants' failure to provide minimally adequate medical

9   care to prisoners violates the Due Process Clause of the Fourteenth Amendment and the

10  Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States

11  Constitution, and Article 1, Sections 7 and 17 of the California Constitution; and

12               c.       Whether Defendants' failure to provide minimally adequate mental

13  health care to prisoners violates the Due Process Clause of the Fourteenth Amendment and

14  the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States

15  Constitution, and Article 1, Sections 7 and 17 of the California Constitution;

16               d.       Whether Defendants' failure to ensure that prisoners are able to

17  communicate effectively with medical and mental health care staff violates the Due

18  Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment

19  Clause of the Eighth Amendment of the United States Constitution, and Article 1, Sections

20  7 and 17 of the California Constitution;

21               e.       Whether Defendants' failure to ensure that prisoners are able to access

22  all programs and services at the Jail and communicate effectively during classification,

23  disciplinary hearings, and all programs and services, including chapel, law library,

24  education and visiting, violates the Americans with Disabilities Act, Section 504 of the

25  Rehabilitation Act, and Government Code Section 11135; and

26               f.       Whether Defendants' failure to reasonably accommodate prisoners

27  with disabilities violates the Americans with Disabilities Act, Section 504 of the

28  Rehabilitation Act, and Government Code Section 11135.

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[716216-20]

24.     The proposed class as defined is sufficiently numerous that joinder of all members of the class is impracticable and unfeasible.  There are currently more than 1,150 prisoners in the Jail.  All prisoners at the Jail are at risk of injury and violence from other prisoners as a result of Defendants' deliberate indifference toward violence in the Jail.  All prisoners are at risk of developing serious medical or mental health conditions or disabilities while in the Jail, and while the exact number is unknown, Plaintiffs believe there are hundreds of prisoners at any given time who already have serious medical and/or mental health conditions and/or disabilities.

25.     The claims of the named Plaintiffs are typical of the claims of the members of the proposed class.  Plaintiffs and all other members of the class have sustained similar injuries arising out of and caused by Defendants' common course of conduct in violation of the law as alleged herein.

26.     Plaintiffs are members of the class and will fairly and adequately represent and protect the interests of the putative class members because they have no disabling conflict(s) of interest that would be antagonistic to those of the other class members. Plaintiffs have retained counsel who are competent and experienced in complex class action litigation.

27.     Since the number of class members is more than 1,000, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for the Defendants.

28.     Defendants have acted and refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class.

## FACTUAL ALLEGATIONS

### I.     DEFENDANTS FAIL TO PROTECT PRISONERS FROM INJURY OR VIOLENCE FROM OTHER PRISONERS

29.     Defendants have created a jail environment in which prisoners in all areas of the Jail face a substantial risk of being injured and intimidated by violence from other

[716216-20]

1  prisoners.  Defendants have been aware of these risks since at least 2007, when the

2  SHERIFF'S OFFICE and the Monterey County Board of Supervisors contracted with TRG

3  Consulting to produce a needs assessment for the Jail.  TRG Consulting completed its

4  report, entitled County of Monterey, Office of the Sheriff, Needs Assessment (hereinafter,

5  "2007 Needs Assessment"), on June 19, 2007.  The Monterey County Board of

6  Supervisors explicitly accepted the report that same day by unanimous vote.  In the report,

7  TRG acknowledged that "this needs assessment would not have been possible without the

8  assistance of a number of professionals from Monterey County," and specifically

9  recognized a number of people "who helped make this planning effort a success."  Among

10  the people listed are two current members Monterey County Board of Supervisors, former

11  Sheriff-Coroner-Marshall Mike Kanalakis, former Undersheriff Nancy Cuffney, and

12  former Custody Bureau Chief, Bert Liebersbach.

13      30.     Upon information and belief, in 2011, Sheriff Scott Miller requested that

14  TRG Consulting update the 2007 Needs Assessment.  As a result, TRG Consulting

15  produced the 2011 Jail Needs Assessment, dated December 30, 2011.  Upon information

16  and belief, the 2011 Jail Needs Assessment was transmitted to Sheriff Miller and other

17  officials in Monterey County on or around December 30, 2011.  In the 2011 Jail Needs

18  Assessment, TRG Consulting recognized by name "the primary contributors who helped

19  make this planning effort a success."  Assessment at 1.  The list includes all five members

20  of the Monterey County Board of Supervisors, all of whom remain in their elected

21  positions as of the filing of this complaint.  The list also includes Sheriff Miller and former

22  Custody Bureau Chief Jeffrey J. Budd.

23      31.     Both the  2007 Needs Assessment and the 2011 Jail Needs Assessment

24  concluded that, "[t]he current combination of insufficient beds, an inadequate detention

25  facility and understaffing has resulted in an almost untenable situation."  Assessment at

26  Ex. 2.  Both reports find that the conditions in the Jail and policies and practices of the

27  SHERIFF'S OFFICE create an unreasonable risk of violence between prisoners.  The

28  situation that was untenable in December 2011 appears to have only worsened in the last

1  year and a half.  Because Defendants are aware of the unreasonable risk of violence and
2  have not acted to reduce the risk, Defendants are deliberately indifferent to the danger of
3  assault faced by all prisoners.

4  **A.    Defendants' Deliberate Understaffing of the Jail Creates an
         Environment in Which Violence Flourishes**
5

6      32.    Defendants staff the Jail in a manner that makes it impossible for Defendants
7  to keep prisoners safe from assault from other prisoners.  For the past few years the Jail has
8  routinely housed more than 1,100 prisoners.  Defendants generally staff the Jail with as
9  few as 24 and no more than 26 officers.  A significant number of officers are required to
10 staff other areas of the Jail, like the booking area, visitor processing areas, and kitchen.
11 Thus, usually no more than a handful of officers are responsible for directly supervising
12 most of the more than 1,100 prisoners in the jail.  The current authorized staffing for the
13 Jail has been described as "woefully inadequate."  Assessment at Ex. 7.

14     33.    The minimum staffing plan utilized by the SHERIFF'S OFFICE does not
15 provide for a sufficient number of officers to safely operate the Jail.  As the 2011 Jail
16 Needs Assessment explained, "[i]t appears that the staffing provided by the County salary
17 ordinance is based on the rated capacity of [the Jail], not on how many inmates are actually
18 in custody."  Assessment at Ex. 6.  Currently, the population in the Jail is 33% above the
19 facility's rated capacity.

20     34.    Though the staffing plan being used by Defendants is not sufficient on its
21 face, Defendants have not even hired staff to fill all of the authorized positions.  As the
22 2011 Jail Needs Assessment stated, "[v]acancies, extended periods of leave, and normal
23 staff attrition have resulted in a significant amount of vacant … positions.  The jail has an
24 increased reliance on overtime to meet minimum staffing."  Assessment at Ex. 7.

25     35.    The 2011 Jail Needs Assessment noted that "[b]aseline staffing should be
26 above minimum staffing," but "[d]ue to vacancies and other factors, the Monterey County
27 Jail constantly is using overtime to staff *up* to their self-imposed minimum staffing.  **This
28 level is *not* adequate to provide basic safety and security for staff and inmates.**"

1   Assessment at Ex. 7 (bolded emphasis added).

2       36.     Typically, staff in the Jail work 12-hour shifts.  Because of the insufficient

3   staff employed by the Jail, Defendants often utilize a system of mandatory overtime, where

4   staff are required to work an additional four hours before or after their 12-hour shifts to

5   cover a vacancy during another shift.  This dangerous practice may result in staff being

6   exhausted, unfocused, and unable to properly handle the duties required of them.

7   Moreover, even when mandatory overtime is used, the extra 4 hours of coverage on either

8   end of a 12-hour shift leaves a 4-hour gap uncovered in the middle of the shift.  As the

9   2011 Jail Needs Assessment explained, "[u]nderstaffing has resulted in insufficient staff

10  coverage.... At times the middle of a shift may be as many as three or four officers short.

11  This has been exacerbated by recent staff reductions.  As a result there are not enough

12  officers present in the jail to respond to a major crisis or natural disaster....  There are

13  insufficient staff on some shifts to make the required safety checks."  Assessment at Ex. 3.

14  Clearly, the staffing at the Jail is not adequate to keep prisoners safe.

15      37.     The staff shortages are particularly acute in the housing units and for escort

16  officers.  As described in the 2011 Jail Needs Assessment, "[a] review of the current

17  staffing pattern as practiced by the Monterey County Jail and the best practices staffing

18  plan included in the 2006 *Staffing Analysis* indicates that the critical needs are for the extra

19  staffing in the housing units and for facility-wide escort deputies.  These positions will

20  ensure required safety checks are made, there is some level of supervision in the kitchen,

21  laundry and medical areas and adequate staffing is available to respond to emergencies and

22  unusual situations.  Recent cuts in staffing have made this situation much worse ...."

23  Assessment at Ex. 7.

24      38.     For example, when Plaintiff SARABI was attacked by another prisoner, the

25  other prisoner hit him 10-15 times with a fist in Plaintiff SARABI's head and legs,

26  knocking him unconscious.  The two guards who were supposed to be monitoring the

27  dorm did not intervene or otherwise attempt to stop the attack.  Plaintiff SARABI's only

28  recollection of guard involvement was when he awoke from his unconscious state as he

[716216-20]

1   was being dragged by a guard to a holding room, well after the attack had finished.

2        39.    The severe understaffing creates a high risk of violence any time inmates are

3   escorted out of their housing units and in the presence of inmates from incompatible

4   classifications.  In an incident report, a deputy described visiting as a "time of disorder"

5   with the deputy expected to maintain order "with as many as 9-18 inmates filing into three

6   rooms," even though "differing and often conflicting classifications [are] present at the

7   same time."  In the visiting area, lock-down inmates are moved as a group and are

8   unsecured.  On April 1, 2012, according to an incident report prepared by employees of the

9   SHERIFF'S OFFICE, three or four prisoners classified as Administrative Segregation-

10  Sophisticated Sureño forced their way into an unlocked room of Administrative

11  Segregation-Sensitive Needs prisoners.  The Sophisticated Sureño prisoners were leaving

12  the visiting area as the Sensitive Needs prisoners were arriving.  One deputy failed to lock

13  the visiting room door to secure the Sensitive Needs prisoners, because it would have

14  forced him to lose visual contact with another deputy who was responsible for escorting

15  the seven Administrative Segregation-Sophisticated Sureño prisoners out of the visiting

16  area.  Three or four of the Sureño prisoners rushed past the deputies and into the unlocked

17  room.  Then, one prisoner blocked the visiting room door while the others assaulted a

18  prisoner inside the room and outside of the deputies' sight.  The deputies let the assault

19  continue until back-up arrived.  In addition, according to another incident report prepared

20  by employees of the SHERIFF'S OFFICE, in February 2012, two Norteño gang members

21  assaulted an inmate while being escorted through the Rehabilitation Infirmary.

22       40.    Upon information and belief, Defendants do not adequately train custody

23  staff in how to prevent and appropriately respond to prisoner violence.  Such training is of

24  even greater import given the chronic understaffing at the Jail.

25  **B.     The Jail Is Severely Overcrowded, But Defendants Have Not Utilized
            Available Solutions to Ameliorate the Problem**
26

27       41.    The Jail is severely overcrowded.  The Jail has a rated capacity for 829

28  prisoners, but has in the recent past housed as many as 1,200 prisoners, nearly 150 percent

15

1    of capacity.  The Jail population has not dropped below 1,000 prisoners in many years.

2    Some areas of the Jail are considerably more overcrowded than the Jail as a whole,

3    especially the women's section.

4        42.    The Jail has been so overcrowded that for many years now, Monterey

5    County applies on a monthly basis to the Superior Court for the County of Monterey for an

6    order to release prisoners on an accelerated basis pursuant to California Penal Code section

7    4024.1.  To support the application, the former Chief Deputy Sheriff for the County swore

8    on multiple occasions that unless the Jail is able to release some inmates, the overcrowding

9    in the Jail would "compromise[] the inmate classification plan as well as the safety and

10   security of the detention facilities."  In addition, in support of the application, Dr. Taylor

11   Fithian (Director of Defendant CFMG) "advised that the excessive number of inmates

12   housed in the Jail compromises the health of the inmates and the staff working at the

13   facility."

14       43.    Defendants also admitted to the dangerously overcrowded conditions in

15   public statements regarding potential new jail construction.  As recently as October 5,

16   2012, in a press release, Monterey County Sheriff Miller stated that "[o]vercrowding has

17   been a serious problem at the jail for many years, creating a dangerous situation for

18   inmates, jail staff and the community."

19       44.    The severe overcrowding was also identified in the 2011 Jail Needs

20   Assessment.  Specifically, the Assessment found that "[t]here are not enough beds to meet

21   the current adult detention needs, let alone the needs in the near future....The jail is so

22   overcrowded that no allowance can be made for peaking and classification or the routine or

23   emergency maintenance required in inmate housing areas.  Severe overcrowding has

24   resulted in inmates being held in the intake area for up to forty-eight hours.  This is not

25   permitted by the California Code of Regulations.  Severe overcrowding has forced the

26   Sheriff to use areas for housing that were not designed or intended for that use (e.g., the

27   rotunda area).  This makes these areas much more difficult for officers to manage and

28   control.  Overcrowding has forced the Sheriff to operate the jail as an indirect supervision

16

1  facility, while the jail was designed for direct supervision.  This creates significant
2  command, control and management problems." Assessment at Ex. 2.

3      45.    The 2011 Jail Needs Assessment further noted that "[o]vercrowding creates a
4  number of issues that affect staff and inmates, and put the County at risk.  Overcrowding
5  causes stress on both inmates and staff.  Inmate vs. inmate assaults typically occur more
6  frequently, as do other disciplinary infractions." Assessment at Ex. 9.

7      46.    Despite the profound and persistent overcrowding, Defendants have not
8  availed themselves of numerous available opportunities to safely relieve the population
9  pressures in the Jail.  For example, Defendants have failed to utilize any form of pre-trial
10 risk assessment for all but a handful of detained defendants, have refused to expand
11 capacity for their existing work release program for sentenced individuals, and have failed
12 to investigate opportunities for collaboration between agencies and to expand their
13 capacity to supervise individuals on mandatory community supervision as part of a split
14 sentence.  Defendants have also failed to implement alternatives to incarceration found
15 safe and effective in other jurisdictions, including but not limited to diversion and use of
16 home and GPS monitoring.

17 **C.    The Jail's Physical Structure is Inadequate, Makes It More Difficult for
         Staff to Safely Monitor Prisoners, and Increases the Risk of Inmate
18       Violence**

19     47.    The Jail, which consists of two primary buildings—the Rehabilitation Center
20 and the Main Jail Building—constructed over the past 42 years, is a patchwork of
21 makeshift spaces, thrown together to keep up with Monterey's fast-growing Jail
22 population.  Throughout the housing units and other spaces, there are numerous blind spots
23 where staff cannot safely monitor prisoners.  As found in the 2011 Jail Needs Assessment,
24 "[t]he design of the jail and the manner in which additions have been constructed results in
25 a physical plant that is difficult to manage and control and unnecessarily expensive to
26 operate.…  There is poor observation from most deputy stations.  Officers cannot observe
27 inmates areas in Pods A through J.  The wing walls in the dormitories are approximately
28 four feet high and provide a number of areas where inmates cannot be observed.  The

1  manner in which additions have been constructed has resulted in a facility that lacks any

2  real central control or command post that would be used in the event of a major

3  disturbance or disaster." Assessment at Ex. 2.

4        48.    The 2011 Jail Needs Assessment further noted that "visual supervision is

5  problematic in the existing jail," and "[a]t best there is intermittent observation of the

6  inmates. In the Rehabilitation Facility, a Deputy Sheriff must walk into the inmate

7  housing area to see the entire living and shower area. It appears there is an attempt to

8  remedy the problem with the use of cameras. Unfortunately, this is not working."

9  Assessment at Ex. 8. These physical limitations, especially when combined with the

10  severe understaffing and overcrowding in the Jail, compromise the safety and security of

11  staff, visitors, volunteers and inmates.

12        49.    Upon information and belief, on or around April 29, 2013, the Jail was under

13  lockdown due to several beatings in the K-Pod. These beatings took place behind a pillar

14  in the K-Pod that blocks the view of Jail staff (both from camera and window

15  perspectives). Upon information and belief, one prisoner was injured so badly in these

16  beatings that he was airlifted out of the Jail and taken to a hospital in San Jose where he

17  received treatment for a cracked skull.

18        50.    According to incident reports prepared by employees of the SHERIFF'S

19  OFFICE, cell doors in many pods throughout the jail can be easily popped open by

20  prisoners, allowing prisoners to leave their cells without authorization at any time. This

21  includes cell doors in lockdown units that house active gang members. Numerous incident

22  reports recount assaults on prisoners who are on their authorized out-of-cell time or are in

23  a unit for kitchen work, times when all other prisoners should be locked in their cells. In

24  one example, an inmate on his out-of-cell hour in a lockdown unit told a nearby deputy

25  who was passing out medication with a nurse that particular inmates in his unit were

26  planning to "pop" their doors to fight him. Before the deputy could get back-up or enter

27  the unit himself, two cell doors were "popped," and two inmates chased the first inmate

28  into a cell on the top tier to assault him, just as he had predicted.

51.     As another example from an incident report prepared by an employee of the SHERIFF'S OFFICE, a prisoner housed in G-Pod was recently assaulted by another prisoner in the pod.  G-Pod is a celled housing unit, meaning all prisoners are housed in cells with doors.  Prior to the assault, the prisoner had informed the classification unit that the assailant had been threatening him, had demonstrated to the prisoner that the assailant could open his cell door at will, and had shown the prisoner a large jail-made shank that he possessed.  The prisoner requested that the assailant be moved to a different pod, but Defendants took no action to move the assailant to another housing unit.  The following day the prisoner was alone in the common area of G-Pod for his hour of daily recreation; all of the other prisoners in G-Pod were in their cells with their doors closed and purportedly locked.  The prisoner then saw the assailant use the shank to attempt to open the door to his cell.  To protect himself, the prisoner ran to the assailant's door and used his body to keep the door from opening; he was forced to remain in that position for the remainder of his hour outside of his cell.  The assailant was, however, able to cut the prisoner multiple times in his upper stomach area with the shank.

52.     Poor jail design also exacerbates the dangers of understaffing.  According to another incident report prepared by an employee of the SHERIFF'S OFFICE, in September 2011, one deputy opened a secure door to a Norteño unit to escort a single prisoner to different part of the jail while six prisoner workers and three other employees were in the area.  Three prisoners classified as Norteños pushed past the deputy when he opened the door and all four prisoners proceeded to assault a single inmate worker. Another deputy from the control tower heard the fighting but could not see what was happening.  He opened the secured K-1 door to allow back-up to arrive, but in doing so, he revealed another deputy who was escorting three prisoners classified as Norteños to the infirmary. All three attempted to join the fight when the door opened, because of their gang allegiances.  Two were able to enter the area where the fight was continuing and the deputies had to repeatedly deploy their Tasers to get control of the situation until back-up could arrive.

53.     Upon information and belief, Defendants fail to adequately train custody staff in how to prevent and appropriately respond to prisoner violence.  Such training is of even greater import given the inadequate physical structure of the Jail.

**D.     Defendants Routinely Fail to Adequately Classify and Assign Prisoners to Housing Locations Where Prisoners Will Be Safe From Violence and Injury**

54.     Defendants fail to adequately classify and assign prisoners to housing locations in the Jail where they will be safe from injury and violence.  Before prisoners are assigned to certain housing locations in the Jail, they are "classified" based on a number of factors including their criminal charges, gang affiliation, race, and history of violence.  These classification procedures are inappropriate and ineffective, however, and prisoners who are incompatible for various reasons, including rival gang memberships and/or histories of assaultive behaviors, are housed together in the Jail.  Moreover, the severe overcrowding at the Jail makes proper and accurate classifications next to impossible.  As the 2011 Jail Needs Assessment found, "[a]dequate separation and segregation resulting from classification of inmates cannot occur because of the severe overcrowding and lack of a sufficient number of single and double cells.  Thus, while the staff has the ability to classify, they do not have the ability to physically segregate those inmates who should be separated because of their classification.  This creates an environment that is unsafe for officers, inmates and visitors." Assessment at Ex. 2.

55.     The 2011 Jail Needs Assessment further noted that, "[i]t is obvious that the system is dangerously out of balance in terms of the types of beds available and the classification of inmates held.... In Monterey County there is the possibility of misclassifying inmates based on space rather than security level.  Overcrowding reduces the ability to classify.  This is further compounded by the dormitory design.  Normally, 10%-15% of the beds should be empty and available for classification spikes and maintenance.... Proper separation and segregation of inmates as envisioned in the Sheriff's classification plan is very difficult because of insufficient staff, an inadequate physical plant layout and ... severe overcrowding ...." Assessment at Ex. 4-5.

56.     For example, Plaintiff SARABI was attacked by a fellow prisoner on or around March 6, 2013 in the B-Dorm of the Jail.  After the attack, Plaintiff SARABI was moved to C-Dorm so he would not be in the same housing areas as the prisoner who attacked him.  However, on or around April 11, 2013, the Jail moved his attacker into Plaintiff SARABI's C-Dorm, so the person who attacked him just 5 weeks prior would be sleeping just 5 beds away from him.  The Jail did not remove Plaintiff SARABI's attacker until the attacker himself was assaulted by other prisoners in the dorm a few hours later.

57.     Upon information and belief, Defendants fail to adequately train custody staff in how to adequately classify and assign prisoners to housing locations in the Jail where prisoners will be safe from injury and violence.  Such training is of even greater import given the chronic understaffing and overcrowding at the Jail.

### E.     Defendants Are Deliberately Indifferent to the Constitutionally Unacceptable Risk of Violence Prisoners Face

58.     Violent incidents between prisoners occur regularly, most of which involve injury to at least one participant that requires medical attention at the Jail or even at the local hospital.  In more than 100 of the reported incidents from 2011 and January through early-September 2012, at least one prisoner involved in the altercation required some medical treatment.  In 13 of the incidents, the injuries suffered by at least one of the participants were so severe that they had to be taken to an outside medical facility for treatment.

59.     Violent incidents between prisoners occur in nearly every area of the Jail.  Violent incidents were reported in 26 of the 29 housing units in the Jail from 2011 and January through early-September 2012.  There were multiple reports of violent incidents in 21 of the 29 housing units.  In the A-Dorm of the Main Jail alone, there were 19 incidents, while in the C-Wing of the Rehabilitation Center, there were 15 incidents.  Violent incidents also occurred in the booking area, the kitchen where prisoners work, the infirmary, and the visiting area.

60.     Violent incidents occur at approximately equivalent per prisoner rates in the

1 portions of the Jail that house men and women.  Twenty-one of the more than 150

2 incidents involved female prisoners, while another 137 incidents involved male prisoners.

3      61.    Prisoners with disabilities are at increased risk of being the victims of

4 violence because of their perceived or actual inability to defend themselves.  For example,

5 in many of the incidents described in incident reports, prisoners with mental health

6 problems were attacked by other prisoners because of behavior attributable to their mental

7 illness.

8      62.    Defendants have known of these conditions and the violence they create for

9 some time, including through their own incident reports and 2007 and 2011 Jail Needs

10 Assessments.

11      63.    According to Defendants' own incident reports from 2011 and January to

12 early September 2012, there were more than more than 150 separate incidents of violence

13 between prisoners.  Some of the incident reports were incomplete and lack important

14 pieces of information.  Upon information and belief, there are many more incidents of

15 violence that were not captured in Defendants' incident reports.

16      64.    In more than 65 of the incidents for which there was a full report, upon

17 information and belief, jail staff failed to intervene to stop the incident before it was

18 completed.  If Defendants were not deliberately indifferent of the risk of prisoner violence,

19 Defendants would be able to stop more violent incidents before they run their course,

20 preventing further injury to the victims.  For example, when Plaintiff SARABI was

21 attacked on March 6, 2013 by another prisoner, no guards intervened or otherwise

22 attempted to stop the attack.

23      65.    In more than 35 of the incidents with full reports, Defendants were not able

24 to identify the assailant.  Though Defendants have installed cameras in the Jail, upon

25 information and belief, only two cameras monitoring two units that house few prisoners

26 have recording capabilities.  The understaffing of the Jail means that officers are rarely in a

27 position to identify the attackers visually.  Moreover, because the conditions in the Jail are

28 so unsafe, the victims of attacks frequently refuse to volunteer the name of their assailants

1  for fear of retaliatory attacks.  If Defendants were not deliberately indifferent in their

2  monitoring of prisoner safety, they would sufficiently staff the Jail and have other policies

3  in place that would (1) result in the staff identification of assailants in a far greater number

4  of attacks, and (2) create an environment in which victims feel sufficiently safe such that

5  they identify their attackers.

6      66.    Weapons are readily available inside the Jail, greatly increasing the danger to

7  inmates and staff.  In addition to the incident discussed above involving a shank, inmate

8  assaults have also involved the use of a "Tomahawk" made from a razor and a 13 to 19-

9  inch long copper pipe.

10     67.    Upon information and belief, Defendants fail to adequately train custody

11 staff in how to timely and appropriately intervene to stop violent incidents, and how to

12 identify and confiscate weapons before they are used in an altercation.

13 **II.    DEFENDANTS FAIL TO PROVIDE ADEQUATE MEDICAL CARE TO
14          PRISONERS**

15     68.    Defendants are not meeting their constitutional obligation to provide

16 adequate medical care to prisoners in the Jail.  Prisoners are entirely dependent on

17 Defendants for all medical care.  The medical care provided by Defendants in the Jail is

18 woefully inadequate and subjects prisoners to a substantial risk of serious injury or death.

19     **A.    Defendants Routinely and Systematically Fail to Maintain Sufficient
20             Numbers of Health Care Professionals**

21     69.    All health care in the Jail, including medical and mental health care, is

22 provided by Defendant CFMG and its employees.  CFMG provides these services pursuant

23 to its contract with Monterey County.  CFMG is a for-profit corporation.

24     70.    Upon information and belief, Defendants maintain insufficient numbers of

25 health care professionals to provide minimally adequate care to the more than 1,000

26 prisoners in the Jail.  There are not sufficient health care staff to timely respond to

27 prisoners' requests for medical evaluations and treatment, or to adequately screen, monitor,

28 and provide follow-up care to prisoners who are suffering from serious and chronic

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  illnesses.

2      71.    For example, when Plaintiff SARABI was attacked by another prisoner the

3  night of March 6, 2013, he was seen by a nurse who placed an ACE bandage on his right

4  foot and ankle and gave him a wheelchair.  Plaintiff SARABI complained for the next

5  several hours about the serious pain in his foot and a possible concussion, but his repeated

6  requests for help and medical care were ignored.  When a nurse finally brought him back

7  to the infirmary at approximately 3:00 a.m., she informed Plaintiff SARABI that there was

8  no qualified medical staff present at that hour to evaluate and help him, so he would have

9  to wait until 6:00 a.m. to receive his needed pain medications.

10     72.    The insufficient number of custody staff makes it even more difficult for

11  Defendants to provide minimally adequate health care.  Within the Jail, any time that a

12  prisoner must be transferred to or from a housing unit to another area of the Jail for health

13  care services, at least one custody officer must accompany and transport the prisoner.

14  Similarly, anytime that a prisoner requires transport to an outside medical facility for

15  treatment, at least one custody officer must accompany the prisoner and remain present for

16  the duration of time that the prisoner is at the outside medical facility.  To timely transport

17  all prisoners to and from all health care services would require Defendants to hire and staff

18  the jail with additional custody officers, something Defendants refuse to do.

19  **B.     Defendants Routinely and Systematically Fail to Properly Train and
       Supervise the Conduct of Health Care Staff**

20

21     73.    Upon information and belief, the small number of health care staff that

22  Defendants do employ are not sufficiently trained to provide the care required of them.

23  Licensed Vocational Nurses ("LVNs") and Licensed Psychiatric Technicians ("LPTs") are

24  entry level health care providers who must only practice under the direct supervision of

25  physicians, psychologists, registered nurses, social workers, or other qualified

26  professionals, and are not qualified to do their own patient evaluations or assessments.

27  Yet, upon information and belief, Defendants improperly allow untrained entry-level

28  providers such as LVNs and LPTs to practice outside of the scope of their licensure and

[716216-20]

24

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   perform medical gatekeeping functions, including independently assessing and responding

2   to prisoners' health care requests and correctional officers' referrals for health care.

3         74.      For example, Plaintiff SARABI suffered a serious leg injury when he was

4   attacked by another prisoner on March 6, 2013.  Plaintiff SARABI was initially seen and

5   treated by nurses only for the first two weeks following the injury.  The nurses wrapped his

6   injured foot and ankle in an ACE bandage immediately after the attack, then approximately

7   a week later placed a splint on his right foot and ankle.  The splint was placed too low,

8   resulting in discomfort and continued pain for Plaintiff SARABI.  When Plaintiff SARABI

9   finally saw a doctor for the first time (nearly two weeks after his date of injury), the doctor

10  informed him that he likely had a peroneal nerve injury that required specific nerve

11  medication and would take at least a month if not longer to heal.  When Plaintiff SARABI

12  asked why it took medical staff so long to diagnose the nerve injury, the doctor replied that

13  it was a "staff problem" because the staff erroneously diagnosed Plaintiff SARABI's nerve

14  damage as a sprain.

15        75.      Upon information and belief, Defendants fail to adequately train their

16  medical staff in how to properly follow the Jail's medical policies and procedures.

17        76.      Defendants also fail to maintain medical accreditations.  Specifically, the

18  Institute for Medical Quality ("IMQ") offers voluntary accreditation to correctional and

19  detention facilities throughout California based upon meeting standards developed by the

20  IMQ.  Monterey County Jail's IMQ accreditation expired on November 17, 2011.

21        **C.      Defendants Lack Sufficient Facilities to Provide Adequate Medical Care**

22        77.      The physical spaces in the Jail used to deliver medical care are not sufficient

23  for the population of prisoners.  As the 2011 Jail Needs Assessment found,

24  "Medical/mental health treatment spaces are not adequate for the rated beds, let alone the

25  actual number of inmates held."  Assessment at Ex. 3.  The Assessment further noted the

26  direct impact of overcrowding on prisoners' overall health: "Overcrowding affects

27  inmates' mental and physical health by increasing the level of uncertainty with which they

28  regularly cope."  Assessment at Ex. 9.  The lack of sufficient treatment space places

[716216-20]

1  prisoners at an unreasonable risk of harm from inadequate medical care, compromises the

2  delivery of medical care, and fails to ensure confidentiality and safety during the delivery

3  of such care.

4      **D.   Defendants' Inadequate Screening and Intake Process Fails to Identify
           and Treat Medical Care Problems of Newly Arriving Prisoners**

5

6      78.    Defendants fail to adequately identify and treat the medical problems of

7  newly arriving prisoners during the screening and intake process. Defendants' policies and

8  practices for medical screening are inadequate. Upon information and belief, Defendants

9  fail to adequately train custody staff in how to timely and appropriately identify medical

10 problems during the screening and intake process. When a prisoner is newly booked into

11 the Jail, medical staff may not even play a role in screening the prisoner. Upon

12 information and belief, custody staff (who are not sufficiently trained to identify medical

13 needs) complete a brief one-page health screening form during a cursory interview with

14 the prisoner in a non-confidential space. Medical staff only evaluate prisoners at intake if

15 the custody staff note a problem on the screening form. Upon information and belief,

16 Defendants fail to take every prisoner's vital signs (including blood pressure and

17 temperature), and only take them for prisoners whom custody staff refer to medical staff

18 for assessment. Upon information and belief, comprehensive intake evaluations by

19 medical staff, when they occur at all, frequently do not take place until days or weeks after

20 a prisoner is booked into the jail.

21     79.    Because the screening process is inadequate to identify prisoners with

22 serious or chronic health care problems, prisoners are at a significant risk of serious harm.

23 For example, prior to being booked into the Jail, Plaintiff MURPHY had permanent nerve

24 damage that was caused by a bulge in his L4 and L5 vertebrae. When he went through the

25 screening process, Plaintiff MURPHY was experiencing significant pain from the nerve

26 damage because he had not taken his pain medication and did not have a cane to assist him

27 in walking. The screening form for Plaintiff MURPHY does not indicate that he had any

28 potential or existing nerve damage or back problems.

[716216-20]

80.     Another example is a prisoner whose colon had begun to rupture prior to his being booked into the Jail.  When he went through the screening process, this prisoner was already experiencing symptoms from his condition, including a fever and significant abdominal pain.  The screening form for this prisoner does not indicate that he had any potential health problems.

**E.      Defendants Fail to Provide Prisoners with a Reliable and Timely Way to Alert Health Care Staff of Their Medical Needs**

81.     Defendants fail to provide a reliable way for prisoners to alert health care staff of their need for evaluation of medical problems.  Defendants' policies and practices for providing prisoners with a means for alerting health care staff of medical needs are inadequate.  Upon information and belief, Defendants fail to adequately train medical staff in how to properly process and timely respond to prisoners' requests for medical evaluation.

82.     To request medical care, prisoners are supposed to submit a "sick call slip" to medical staff when medical staff come through a housing unit to distribute medications.  Once a sick call slip is received by medical staff, the prisoner is supposed to be seen by medical staff on the next available sick call day.  Though prisoners report little difficulty submitting sick call slips to medical staff, they frequently receive no response to their requests for medical care.

83.     Other times, when prisoners do receive a response to a sick call slip, it is not until many days after the sick call slip was submitted.  These delays in response from medical staff place prisoners in danger.  For example, one prisoner submitted a sick call slip to seek medical attention after falling in the yard.  He was not seen by anyone from the medical department for 6-7 days after he submitted the sick call slip.

84.     Upon information and belief, the failure to timely respond to sick call slips is caused, at least in part, by Defendants' failure to create an effective tracking and scheduling system for health care appointments.  Upon information and belief, another contributing factor is that there are no standardized protocols dictating when prisoners

[716216-20]

1   should receive a face-to-face appointment with a nurse or other medical or mental health

2   care clinician.  Consequently, health care providers arbitrarily determine whether the

3   content of a sick call slip, often written by a prisoner who can barely read or write,

4   warrants an examination.  Upon information and belief, Defendants do not adequately train

5   health care providers in how to review, process, and respond to sick call slips submitted by

6   prisoners.

7          85.    In emergency situations, prisoners sometimes request health care from

8   custody staff when medical staff are not immediately available.  Rather than immediately

9   contact health care staff to determine whether emergency care is required, custody staff

10  often dismiss the prisoner's request and instruct prisoners to fill out a sick call slip.  For

11  example, Plaintiff HERNANDEZ was experiencing significant pain, cold sweats, and a

12  fever after his colostomy reversal surgery.  Although other prisoners in his pod began

13  yelling "Man down!" to alert the Jail staff that Plaintiff HERNANDEZ was in serious

14  distress and incapable of ambulating, at least 30-60 minutes passed between when the

15  guard was first alerted to Plaintiff HERNANDEZ's "man down" status and when Plaintiff

16  HERNANDEZ actually began receiving any medical assistance.

17         86.    When Plaintiff SARABI was complaining about intense pain in his right

18  foot/ankle, and his concern about a broken ankle and a possible concussion one hour after

19  he was attacked by another prisoner, one of the guards outside his room said, "You're a

20  tough guy, suck it up, if you had broken your ankle you would be in more pain."  Delays in

21  treating Plaintiff SARABI and other prisoners have created unnecessary suffering and

22  worsened health outcomes.

23         87.    Upon information and belief, Defendants do not adequately train custody

24  staff in how to respond to prisoners' requests for emergency medical attention.

25  **F.     Defendants Routinely and Systematically Fail to Provide Adequate
        Medical Care**

26

27         88.    Defendants fail to provide timely access to medical care.  Defendants'

28  policies and practices for providing timely access to medical care are inadequate.  Upon

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[716216-20]

1   information and belief, Defendants fail to adequately train medical staff in how to provide

2   timely access to medical care.  If prisoners are seen by medical care providers at all, they

3   often experience substantial delays in receiving those appointments.  Prisoners commonly

4   wait several weeks, sometimes several months, before they are evaluated by clinicians for

5   medical symptoms.  For example, Plaintiff HERNANDEZ was supposed to have his

6   colostomy reversed in June 2012.  However, Jail medical staff repeatedly refused to

7   perform the colostomy reversal surgery, at first claiming that it was improper for Jail

8   doctors to do so when an outside doctor had performed the original colostomy, and then

9   claiming that the procedure was "non-emergency" so could not be done at the Jail.  The

10  Jail also refused to transfer Plaintiff HERNANDEZ to a facility where he could receive the

11  reversal surgery, and in August 2012 denied Plaintiff HERNANDEZ the day pass

12  necessary to go to Natividad Medical Center for the surgery.  In total, Plaintiff

13  HERNANDEZ had to wait eight months to have his colostomy surgery after he arrived at

14  the Jail, during which time he suffered from intestinal swelling, bleeding, and pain.

15          89.     Other prisoners have repeatedly been denied necessary medical treatments or

16  experienced significant delays in receiving what they needed, or had been prescribed prior

17  to arriving at the Jail, resulting in significant physical pain and discomfort, as well as

18  increased anxiety and panic.  For example, another prisoner repeatedly requested

19  colostomy reversal surgery for three months, but was informed by the Jail that he could not

20  receive the surgery because it was an "elective," as opposed to emergency, procedure.

21  During these three months, this prisoner suffered from infections, bloody discharge,

22  fainting, and vomiting.  Another prisoner was not timely provided with appropriate

23  colostomy supplies, and when he appeared in court, he was leaking feces over his body.

24  The judge ordered him to be sent immediately to the hospital in an ambulance.

25          90.     Another prisoner suffered a miscarriage immediately before being booked

26  into the Jail, and experienced heavy vaginal bleeding for at least 7 weeks afterward.

27  Despite repeated requests, this prisoner did not see a women's health specialist for 7

28  weeks.  After 7 weeks of bleeding and the filing of multiple grievances (most of which

[716216-20]

went unanswered), this prisoner was finally taken to Natividad Medical Center for an evaluation by a women's health specialist. This prisoner did not receive timely and appropriate care for her condition.

91.     Upon information and belief, CFMG medical staff inform prisoners that they will not receive medically necessary treatments, procedures, or medications while in the Jail because their release from the Jail or transfer to state prison or another institution is imminent. For example, when a prisoner's colostomy repeatedly became infected, he was told that reversal surgery would not be provided while he was in the Jail because of the expense, and that he would need to obtain the surgery once he was released.

92.     In interactions with medical staff, Defendants fail to ensure that hearing and speech impaired prisoners who use American Sign Language as their primary method of communication are provided with sign language interpreters to ensure effective communication. Without sign language, such prisoners are not able to explain to medical care providers the symptoms they are experiencing, and medical staff are not able to explain the benefits and risks of treatments, medications, and procedures such that prisoners can provide their informed consent. The lack of sign language interpretation services results in Defendants making medical treatment decisions without all of the necessary and pertinent information they need, which increases the risk of misdiagnosis and mistreatment for the prisoner.

93.     For example, Plaintiff YANCEY was examined by a Physician's Assistant ("PA") on December 4, 2012, two days after he was discharged from the hospital with a fractured right arm and fractured left tibia. Defendants did not provide Plaintiff YANCEY with a sign language interpreter for the examination. Though Plaintiff YANCEY presented with multiple, complex trauma issues, the PA's Progress Note admits that the "[e]xam [was] limited due to decreased verbal communication ...." Because of Defendants' failure to provide Plaintiff YANCEY with a sign language interpreter, he was unable to explain the extent of his pain and other symptoms. As a result, he suffered from needless and unnecessary pain. Defendants also failed to provide Plaintiff YANCEY with

[716216-20]

1   sign language interpreters at other medical appointments.  The lack of a sign language

2   interpreter at other medical appointments similarly resulted in Plaintiff YANCEY's

3   inability to communicate his symptoms to medical staff and to understand medical staff.

4   Through their failure to provide sign language interpreters, Defendants are deliberately

5   indifferent to the medical needs of prisoners who require assistance to communicate.

6         94.     Upon information and belief, Defendants fail to provide foreign language

7   interpretation services to prisoners whose primary language is not English during medical

8   clinical evaluations.  This is particularly true for prisoners who cannot speak either English

9   or Spanish.  Without foreign language interpretation, such prisoners are not able to explain

10   to doctors the symptoms they are experiencing, and medical staff are not able to explain

11   the benefits and risks of treatments, medications, and procedures such that prisoners can

12   provide their informed consent.  The lack of foreign language interpretation services

13   results in Defendants making medical treatment decisions without all of the necessary and

14   pertinent information they need, which increases the risk of misdiagnosis and mistreatment

15   for the prisoner.  Through their failure to provide foreign language interpreters, Defendants

16   are deliberately indifferent to the medical needs of prisoners who require assistance to

17   communicate.

18   **G.     Defendants Fail to Continue Medically Necessary Treatments for
            Prisoners Upon Their Arrival at the Jail**
19

20         95.     Defendants fail to continue medically necessary treatments for prisoners who

21   were in the process of undergoing care for chronic or serious conditions immediately prior

22   to being booked into the Jail.  Defendants' policies and practices for continuing medically

23   necessary treatments for prisoners who arrive at the Jail are inadequate.  Upon information

24   and belief, Defendants do not adequately train medical staff in how to evaluate and treat

25   prisoners who were undergoing care for chronic or serious conditions immediately prior to

26   being booked into the Jail.

27         96.     Defendants routinely refuse to provide medications that prisoners have been

28   using to treat conditions outside of the Jail, even when the prisoners themselves, doctors,

[716216-20]

1   family members, or other entities bring their medications and/or valid prescriptions to the

2   Jail.

3       97.    For example, prior to his incarceration, Plaintiff MURPHY was taking

4   various pain medications at least four times a day as treatment for the nerve damage in his

5   back. However, despite his repeated requests, Plaintiff MURPHY has not received the

6   necessary medications at the appropriate times, and he is in constant pain every day while

7   at the Jail.

8       98.    Prior to her incarceration, Plaintiff HUNTER was taking various medications

9   to treat her diabetes, fibromyalgia, high blood pressure, chronic back pain, bone cancer,

10  seizures, bipolar disorder, manic depression, anxiety, and panic attacks. Plaintiff

11  HUNTER had many of these medications with her upon her arrival at the Jail, but they

12  were confiscated during the booking process. Plaintiff HUNTER was not provided with

13  all of her necessary medications for two weeks, even though she brought them to the Jail.

14  Upon information and belief, Plaintiff HUNTER still has not been provided with all of the

15  medications that she requires.

16      99.    Defendants place prisoners who arrive at the Jail and who are prescribed pain

17  medications on what Defendants call a "detoxification treatment." This "detoxification

18  treatment" involves refusing, for up to 90 days, to provide prisoners with the pain and

19  other medications they were taking before they were booked into the Jail. This practice of

20  removing prisoners from prescribed medications is dangerous, inhumane, and does not

21  meet the standard of care. Prisoners placed on the "detoxification treatment" and removed

22  from pain medications suffer extreme pain, withdrawal symptoms, and degeneration of

23  conditions the medication was designed to treat. For example, one prisoner was taking

24  significant dosages of pain medications for injuries stemming from gunshot wounds,

25  including a Fentanyl patch, Oxycontin, and Oxycodone. However, when he arrived at the

26  Jail, he was taken off all his pain medications and immediately subjected to the

27  detoxification treatment. As a result of the detoxification treatment, this prisoner suffered

28  through an extremely painful withdrawal.

[716216-20]

**H.    Defendants Fail to Maintain Adequate, Accurate, and Complete Medical Care Records**

100.    Upon information and belief, Defendants fail to maintain adequate, accurate, and complete medical care records.  Defendants' policies and practices for maintaining adequate medical care records are inadequate.  Upon information and belief, Defendants fail to adequately train medical staff in how to maintain adequate medical care records. For example, physicians change prisoners' medications without documenting explanations. As a result of Defendants' failure to maintain adequate medical care records, prisoners suffer from a substantial risk of misdiagnosis, dangerous mistakes, and unnecessary delays in care.  For example, certain Progress Notes from November 28, 2012 and January 29, 2013, are missing from Plaintiff YANCEY's medical file, placing him at increased risk of misdiagnosis and mistreatment.

101.    Upon information and belief, Defendants fail to obtain medical files from outside providers for significant periods of time after the prisoner's arrival at the Jail (if at all).  This lack of information reduces the quality of medical care, as medical staff treat prisoners without reviewing pertinent medication background information and history, which increases the risk of misdiagnosis and mistreatment.

**I.    Defendants Fail to Provide Adequate Medical Care and Follow Up Treatment to Prisoners**

102.    Upon information and belief, Defendants fail to order diagnostic testing when medically necessary.  Defendants' policies and practices for ordering diagnostic testing are inadequate.  Upon information and belief, Defendants fail to adequately train medical staff in when it is appropriate to order diagnostic testing.  For example, when Plaintiff SARABI sustained an injury to his right ankle/foot after he was attacked by another prisoner, he did not timely receive tests to determine the extent of the muscle and nerve damage.  Other prisoners do not receive medically indicated diagnostic tests such as a colonoscopy or an ultrasound in a timely manner.

103.    Defendants also fail to refer prisoners to medical specialists or to an outside

medical center when medically necessary. Defendants' policies and practices for referring prisoner to specialist or outside providers are inadequate. Upon information and belief, Defendants fail to adequately train medical staff in when it is appropriate to refer prisoners to medical specialists or outside medical centers. For example, Plaintiff HERNANDEZ required colostomy reversal surgery, but Defendants refused for eight months to perform or provide the surgery.

104. Upon information and belief, another prisoner in the Jail recently suffered a miscarriage due to the Jail's failure to timely take her to a hospital. While pregnant, this prisoner began to experience uterine cramping and bleeding, but was informed by Jail medical staff to go on bed rest. The Jail staff did not transport her to a hospital until at least two days later, and by that time she had lost her baby. Between 2012-2013, at least three women in the Jail suffered from miscarriages.

105. Defendants fail to adequately monitor prisoners discharged from the hospital or Jail infirmary. Defendants' policies and practices for monitoring prisoners discharged from the hospital or infirmary are inadequate. Upon information and belief, Defendants fail to adequately train medical staff in how to appropriately and effectively monitor prisoners discharged from the hospital or infirmary. For example, Plaintiff HERNANDEZ received colostomy reversal surgery in December 2012, and had to return to the hospital one day after surgery due to post-operative complications. Since his discharge from Natividad Medical Center, Plaintiff HERNANDEZ has received inadequate care from Jail medical staff. Specifically, Plaintiff HERNANDEZ's gauze at the surgery site was not changed every 24 hours as is required, he did not receive the antibiotics that had been prescribed for him, and when he experienced fever and severe pain, Jail staff failed to contact staff at the Natividad Medical Center (as they had been instructed to do). When Plaintiff HERNANDEZ went "man down" due to the worst pain of his life, a fever, and cold sweats, he did not receive medical assistance for 30-60 minutes, despite his recent discharge from the hospital. Plaintiff HERNANDEZ was most recently discharged from Natividad Medical Center on or around February 28, 2013, and since then has only been

[716216-20]

1    seen rarely by a doctor or even by nurses.  Plaintiff HERNANDEZ was promised physical

2    therapy for his stomach and periodic checkups for his various medical conditions, none of

3    which have occurred.  Plaintiff HERNANDEZ continues to suffer from bowel obstructions

4    and stomach pain.

5         106.    Another prisoner suffered a ruptured colon and had to undergo colostomy

6    surgery in August 2012.  After he was discharged from the Jail infirmary following the

7    surgery, the Jail failed to timely provide him with supplies to change his colostomy bag,

8    and when such supplies were provided, they were often improper (e.g., the wrong size

9    colostomy bag).  In November 2012, an infection developed around his suture from the

10   colostomy surgery and the prisoner suffered from bloody discharge from his colon, but Jail

11   staff refused to perform the overdue colostomy reversal (which was originally scheduled

12   for October 2012).  Despite his dire health complications after the colostomy surgery and

13   his need for the reversal, this prisoner was not seen by a doctor for over three weeks in

14   January 2013.

15        107.    Upon information and belief, Defendants routinely release prisoners with

16   serious medical conditions from the Jail without providing them with services to ensure

17   that their medical care is not disrupted.  Defendants' policies and practices for the

18   provision of continuing medical care services upon a prisoner's release are inadequate.

19   Upon information and belief, Defendants fail to adequately train custody and medical staff

20   in how to appropriately release prisoners with serious medical concerns so that such

21   prisoners can continue their medical care.  Upon information and belief, for those prisoners

22   who are prescribed medications in the Jail, they are released without either a supply of or a

23   prescription for them to fill those medications at a community pharmacy.  Defendants do

24   not schedule follow-up appointments in the community, nor are prisoners provided with

25   sufficient referrals or information about where they may receive medical care services or

26   medications.

27

28

[716216-20]

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

III.   **DEFENDANTS FAIL TO PROVIDE MINIMALLY ADEQUATE MENTAL HEALTH CARE TO PRISONERS**

108.   Defendants are not meeting their constitutional obligation to provide adequate mental health care to prisoners in the Jail.  Prisoners are entirely dependent on Defendants for all mental health care.  The mental health care provided by Defendants in the Jail is woefully inadequate and subjects prisoners to a substantial risk of deteriorating psychiatric conditions, extreme anguish and suffering, and in some cases, even death. Defendants' mental health care system falls far short of all of the minimum elements of a constitutional mental health system.

**A.   Defendants Fail to Identify and Track Prisoners in Need of Mental Health Care**

109.   Defendants fail to adequately identify, track and treat the mental health problems of newly arriving prisoners during the screening and intake process.  Defendants' policies and practices for mental health screening and tracking are inadequate.  Upon information and belief, Defendants fail to adequately train custody staff in how to timely and appropriately identify mental health problems during the screening and intake process. When a prisoner is newly booked into the Jail, mental health staff play no role in the initial screening of the prisoner.  Upon information and belief, custody staff (who are not sufficiently trained to identify mental health concerns) complete a brief one-page general health screening form through a cursory interview conducted with the prisoner in a non-confidential area of the Jail.  Mental health staff only evaluate prisoners at intake if the custody staff refer the prisoner to mental health care staff.  Upon information and belief, comprehensive intake evaluations by mental health staff, when they occur at all, frequently do not take place until days or weeks after a prisoner is booked into the Jail.

110.   Because the screening process is inadequate to identify prisoners with serious mental health care problems, prisoners are at a significant risk of serious harm.  For example, Plaintiff HUNTER arrived at the Jail on March 16, 2013 with psychiatric medications to treat her bipolar disorder, manic depression, anxiety, and panic attacks.

[716216-20]

Plaintiff HUNTER also brought with her a hard copy of her medical history, which documents the medications she requires. However, during the booking process, Plaintiff HUNTER's psychiatric medications were confiscated, and she did not receive any of her needed psychiatric medications for at least 2 weeks, despite repeated requests and grievances asking for the medications. As a result of not receiving her psychiatric medications, Plaintiff HUNTER suffered from unnecessary and avoidable pain and symptoms, including, but not limited to, nightmares, anxiety, panic attacks, and hallucinations for this two week period.

111. Defendants fail to provide adequate treatment to prisoners who arrive at the Jail and have been prescribed psychotropic medications. Defendants' policies and practices for prisoners who have been taking prescribed psychotropic medications are inadequate. Upon information and belief, Defendants fail to adequately train mental health staff in how to evaluate and treat prisoners who arrive at the Jail and have been taking prescribed psychotropic medications. Defendants sometimes place prisoners who arrive at the Jail and who are prescribed psychotropic medications on what Defendants call a "detoxification treatment." This "detoxification treatment" involves refusing, for up to 90 days, to provide prisoners with the psychotropic medications they were taking before they were booked into the Jail. This practice of removing prisoners from prescribed medications is dangerous, inhumane, and does not meet the standard of care. Prisoners placed on the "detoxification treatment" and removed from psychotropic medications experience unnecessary pain and increases in psychiatric symptoms including paranoia, hallucinations, and suicidality. Such individuals are at increased risk of attempting to commit suicide.

112. Upon information and belief, Defendants do not maintain any central list, electronic or otherwise, of prisoners with mental illness and the treatment they require. Defendants do not maintain adequate information about prisoners' mental health needs in the prisoners' custody and/or medical files. Moreover, upon information and belief, to the extent that Defendants maintain information about a prisoner's mental health needs in any

[716216-20]

1   form, custody, medical, and clerical staff are not provided with access to the information in

2   a manner that would timely and effectively inform them of a prisoner's mental health

3   concerns and treatment needs.

4          113.   Upon information and belief, Defendants fail to adequately train mental

5   health staff in how to track and monitor prisoners with mental illness and the treatment

6   they require.

7   **B.     Defendants Lack Adequate Policies and Procedures to Identify, Treat,
           Track and Supervise Prisoners at Risk for Suicide**

8

9          114.   Defendants fail to identify, treat, track and supervise prisoners who are at

10  risk for suicide.  Defendants' policies and practices for screening, supervising, and treating

11  prisoners at risk for suicide are inadequate.  These shortcomings in the Jail's suicide

12  prevention and treatment program have had tragic consequences.  Over the past three

13  years, there have been three completed and more than a dozen attempted suicides.  The

14  rate of completed suicides at the Jail significantly exceeds the national average for local

15  jails.

16         115.   The very design of the Jail itself presents a risk to suicidal prisoners.  As

17  noted in the 2011 Jail Needs Assessment, "The older design of the cells and dormitories

18  constructed prior to 1993 does not meet today's minimum standards for detention

19  facilities.  Examples include:  Suicide hazard elimination is not as stringent as it should be

20  to prevent self-harm and the attendant liability." Assessment at Ex. 3.

21         116.   Upon information and belief, Defendants do not adequately train custody

22  staff to identify prisoners who are at risk of suicide and respond adequately to prisoners

23  who are exhibiting suicidal tendencies.  This is especially problematic because custody

24  staff, both during the intake process and for the duration of a prisoner's time in the Jail,

25  have the primary responsibility for alerting mental health staff when a prisoner is suicidal.

26         117.   Defendants routinely fail to identify and track prisoners who are at risk for

27  suicide.  For example, a prisoner named Joshua Claypole who recently arrived at the Jail

28  was suicidal, and his attorney asked Jail staff to place this prisoner on suicide watch on the

[716216-20]

1   day of his arrest.  Mr. Claypole was apparently initially placed on suicide watch, but was

2   soon taken off and cleared to go into the jail's general population.  He was then housed in

3   a single cell, but upon information and belief did not receive any increased monitoring or

4   medication.  Mr. Claypole attempted suicide by hanging in his cell, and was air-lifted to a

5   San Jose hospital where he was placed on life support.  Five days later, he was taken off

6   life support and died.  Another prisoner had attempted suicide at least twice before his

7   incarceration and spent 6-8 months at Atascadero State Hospital before coming to the Jail.

8   Despite this prisoner's suicidal history, the Jail failed to identify him as at risk for suicide

9   and failed to take steps to safely house, track, and treat him to reduce the risk of suicide.

10  This prisoner attempted suicide by jumping off the second floor of the housing pod, and

11  had to be airlifted to Santa Clara Hospital, where he was treated for trauma to his head and

12  broken ribs.

13      118.    There are many examples of attempted suicides where deputies did not

14  identify warning signs or did not appropriately track the inmate to protect him once the

15  risk was apparent.  For example, in May 2012, an inmate was placed in a safety cell

16  because he had been kicking his cell door, yelling and screaming.  While serving the

17  afternoon meal, a deputy noticed the inmate was bleeding from the head in his safety cell.

18  While removing the inmate from the safety cell, he was placed in a safety chair which was

19  inoperative. As deputies moved him to operative safety chair, the inmate was able to throw

20  himself to the ground head first, and had to be transported to the ER.

21      119.    Defendants routinely house suicidal prisoners in conditions that result in

22  further deterioration of their mental health.  Defendants' policies and practices for housing

23  suicidal prisoners are inadequate.  Rather than individually determine the most integrated

24  environment in which a suicidal prisoner can be safely housed, Defendants have a policy

25  and practice of placing prisoners with serious mental health concerns in the "rubber

26  rooms."  The rubber rooms are single cells with no furnishings, toilets, or (in most cases)

27  windows for outside light.  The only features of the cell are the door, which has a slot

28  through which food can be delivered, and a grate in the floor that serves as the toilet for

1  feces and urine.  When housing a prisoner in a rubber room, Defendants routinely remove

2  all of the prisoner's clothing, leaving them naked in the room.  In some instances,

3  Defendants permit a prisoner to have a tear-proof smock for clothing and nothing else.

4  There is no mattress or pad, let alone a bed, in any of the rubber rooms for prisoners to sit

5  or sleep on.  Prisoners are thus forced to sit and sleep on the same cold, dirty floor in

6  which the grate for the toilet is located.

7      120.   Upon information and belief, the rubber rooms are rarely cleaned when a

8  prisoner is being housed in one of the cells and are not cleaned sufficiently once a prisoner

9  is released from the cell.  The walls and floor of the rubber rooms are soiled by feces

10  because of the inadequate toilet and non-existent sink.  These conditions are traumatic for

11  all prisoners, but especially for those who are already experiencing mental health

12  symptoms.  Suicidal prisoners may perceive the rubber rooms as a method of punishment

13  (as opposed to treatment), which may dissuade them from self-identifying as suicidal.

14      121.   Defendants exacerbate the psychological trauma experienced by suicidal

15  prisoners who are housed in rubber rooms by failing to provide them with necessary

16  mental health care.  These prisoners do not receive sufficient contact with mental health

17  providers (if they receive mental health care at all).  As a result, their suicidality may

18  escalate and they are forced to stay in the rubber room even longer.  For example, one

19  prisoner woke up screaming from a nightmare, and was sent to the rubber room.  She was

20  given a filthy blanket, and forced to use a bathroom consisting of a grate in the floor as she

21  was simultaneously vomiting green bile.  During her time in the rubber room, the mental

22  health staff did not visit this prisoner or provide her with any mental health treatment,

23  aside from asking her if she was suicidal.  Another prisoner was kept in the rubber room

24  for five full days, and described feeling as though the walls were closing in on him the

25  entire time.  After he was released from the rubber room, this prisoner did not receive

26  adequate follow-up to evaluate his mental health state and risk of suicidality.  While

27  Defendants may consider rubber rooms "safe" for suicidal prisoners, in fact the rubber

28  rooms lack any therapeutic value, and certainly do not replace the need for psychiatric

[716216-20]

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  hospitalization and treatment.

2      122.   Upon information and belief, Defendants fail to sufficiently observe

3  prisoners who have been identified as being at risk of suicide, including prisoners who

4  have been placed in rubber rooms.  Specifically, Defendants lack any policy or procedure

5  for, and therefore fail to provide, uninterrupted, constant, one-on-one observation of

6  prisoners who are actively suicidal, either threatening to or engaging in the act of suicide.

7      123.   Defendants have knowledge of the substantial risk of harm caused by

8  inadequate suicide prevention and treatment policies and practices in the Jail, but have

9  failed to take steps to prevent, or even to diminish, the harmful effects of these unlawful

10  policies and practices.  Defendants are thus deliberately indifferent to the risk of harm to

11  prisoners created by their failure to operate a constitutionally adequate suicide prevention

12  and treatment program.

13  **C.    Defendants Lack Sufficient  Facilities to Provide Adequate Mental**
        **Health Care**

14

15      124.   The outdated facility and overcrowding at the Jail only exacerbate the

16  inadequate mental health conditions and treatment at the Jail.  As the 2011 Jail Needs

17  Assessment found, "Medical/mental health treatment spaces are not adequate for the rated

18  beds, let alone the actual number of inmates held…. Overcrowding forces the entire

19  facility to operate as an indirect supervision facility.  Mental health issues are considerably

20  more difficult to recognize, manage and treat in an indirect supervision facility."

21  Assessment at Ex. 3.  The Assessment further noted the direct impact of overcrowding on

22  prisoners' mental health conditions:  "Overcrowding affects inmate' mental and physical

23  health by increasing the level of uncertainty with which they regularly cope."  Assessment

24  at Ex. 9.  The lack of sufficient treatment space places prisoners at an unreasonable risk of

25  harm from inadequate mental health care.  Inadequate mental health offices and treatment

26  spaces compromise the delivery of mental health care, and fail to address the

27  confidentiality and safety concerns that arise in delivery of such care.  Defendants have not

28  sufficiently eliminated suicide hazards through the Jail.

[716216-20]

**D.    Defendants' Mental Health Treatment Program Involves Little More than Segregation and Supervision**

125.    Defendants routinely discriminate against prisoners with serious mental illness by isolating them from and denying them privileges granted to other prisoners. Defendants' policies and practices for housing prisoners with serious mental illness are inadequate.  Upon information and belief, Defendants fail to adequately train mental health staff in how to appropriate house prisoners with serious mental illness.  Prisoners with serious mental illness are generally housed by Defendants in celled housing units (in the A and B Pods), as opposed to in dorm housing units.  When housed in a cell, as opposed to dorm, prisoners have far less freedom to move around and to interact with other prisoners. Defendants refer to celled housing units as "lockdown" units.  Prisoners housed in lockdown units generally only are permitted outside of their cells for one hour per day. During that one hour per day, prisoners are expected to shower, exercise, and use the telephone.  In contrast, prisoners in dorm housing units are free to access most areas of the dorm unit, including the common area, showers, telephones, and yard, as they please during most of the day.  Prisoners with severe mental health concerns may also be housed by Defendants in isolation cells.  When housed in an isolation cell, prisoners have limited freedom to move around and interact with other prisoners, and they have extremely limited access to programs and services at the Jail.  Accordingly, prisoners with serious mental illnesses are denied access to programs and services because Defendants place prisoners with serious mental illness in lockdown units or isolation cells.

126.    Defendants routinely fail to provide medically necessary psychotropic medications to prisoners with psychiatric illnesses.  Defendants' policies and practices for providing psychotropic medications to prisoners are inadequate.  Upon information and belief, Defendants fail to adequately train mental health staff in the proper administration of psychotropic medications.  Defendants fail to provide psychotropic medications even when provided with valid prescriptions from the California Department of Mental Health, community providers, or family members.  Especially during the first 90 days of

[716216-20]

incarceration, prisoners may be labeled by medical staff as drug seekers and malingerers, and use those labels to deny needed medications.

127.    As a result of Defendants' failure to provide medically necessary psychotropic medications, prisoners with mental illness suffer from the following: (1) withdrawal symptoms when the medications they were prescribed before admission to the Jail are abruptly terminated; (2) recurrence of debilitating symptoms such as hallucinations and suicidality; and (3) in some cases, decompensation to the point of being found incompetent to stand trial and/or being sent to the State Hospital until they are stable enough to return to the Jail.

128.    Upon information and belief, Defendants fail to provide sign language interpretation services to prisoners whose primary language is American Sign Language during mental health clinical evaluations.  Without sign language interpretation, such prisoners are not able to explain to mental health staff the symptoms they are experiencing, and mental health staff are not able to explain the benefits and risks of treatments and medications such that prisoners can provide their informed consent.  The lack of sign language interpretation services results in Defendants making mental health treatment decisions without all of the necessary and pertinent information they need, which increases the risk of misdiagnosis and mistreatment for the prisoner.

129.    Upon information and belief, Defendants fail to provide foreign language interpretation services to prisoners whose primary language is not English during mental health clinical evaluations.  This is particularly true for prisoners who cannot speak either English or Spanish.  Without foreign language interpretation, such prisoners are not able to explain to mental health staff the symptoms they are experiencing, and mental health staff are not able to explain the benefits and risks of treatments and medications such that prisoners can provide their informed consent.  The lack of foreign language interpretation services results in Defendants making mental health treatment decisions without all of the necessary and pertinent information they need, which increases the risk of misdiagnosis and mistreatment for the prisoner.

[716216-20]

130.    Defendants provide little to no individual or group treatment to prisoners with mental health problems, even for prisoners with the most severe issues.  For example, Plaintiff HUNTER's anxiety and panic attacks are exacerbated when she is in the overcrowded Jail environment, but she been denied therapy sessions since her arrival at the Jail.  Another prisoner, who had attempted suicide twice prior to his arrival at the Jail and once while at the Jail in December 2012, did not receive one-on-one therapy sessions, but rather only medications (provided by nurses to the prisoner in his isolation cell).  Plaintiff MURPHY had been seeing an outside psychiatrist who provided him with therapy, but the Jail failed to transport him to his April appointment with his outside psychiatrist.  As a result, Plaintiff MURPHY is not receiving adequate mental health care.

131.    Upon information and belief, Defendants' disciplinary process fails to take into account behavior which results from inadequate mental health care.  For example, as a result of Defendants' denial of medically necessary psychotropic medications and little or no individual or group treatment, prisoners with serious mental conditions may be unable to conform to Jail rules or be safely housed in cells with other prisoners.  In response, rather than provide them with the medications or treatment they need, Defendants selectively house these prisoners in isolation in the "rubber rooms."

132.    Upon information and belief, prisoners with serious mental health conditions may be placed in rubber rooms as punishment for an inability to follow Jail rules.  But many of these prisoners would not have violated Jail rules had they been receiving adequate mental health treatment.

133.    When mental illness is inhibiting an inmate's ability to follow directions or interact with others, many incident reports show no effort by staff to involve mental health professionals who might be able to calm the inmate down and address the underlying psychiatric issue without resorting to use of physical force.  Instead, staff who do not have adequate training regarding how to treat mental health issues, attempt to interact with the prisoner on their own, and end up resorting to use of physical force and/or violence to control the prisoners.  Sometimes, the use of force results in larger prisoner-on-prisoner

[716216-20]

1   fights in the unit.

2        134.   Upon information and belief, Defendants fail to provide adequate training to

3   custody staff regarding how to respond to mentally ill prisoners whose non-conforming

4   behaviors are a product of their mental illness.

5        135.   Upon information and belief, Defendants place prisoners in the rubber room

6   when they request mental health care from Defendants.  For example, one prisoner was

7   suffering from mental health symptoms because he had not been provided with prescribed

8   medications for preexisting medical conditions.  Rather than attempt to treat his psychiatric

9   distress, Defendants placed him naked in the rubber room without even a blanket for the

10  first few hours.

11       136.   Upon information and belief, Defendants exacerbate the psychological

12  trauma experienced by prisoners with serious mental health conditions who are housed in

13  rubber rooms by failing to provide them with necessary mental health care.  These

14  prisoners do not receive sufficient contact with mental health providers.  As a result, their

15  nonconforming behaviors may escalate and they are forced to stay in the rubber room even

16  longer.

17       **E.      Defendants Fail to Employ a Sufficient Number of Properly Trained
               Mental Health Professionals**

18

19       137.   Upon information and belief, Defendants fail to maintain sufficient numbers

20  of mental health care professionals to provide minimally adequate care to the more than

21  1,100 prisoners in the Jail.  Defendants' policies and practices for mental health care

22  staffing are inadequate.

23       138.   The Jail's low staffing levels result in a mental health care staff being unable

24  to timely respond to prisoners' requests for psychiatric evaluations and treatment, or to

25  adequately screen, track, monitor, and provide follow-up care to prisoners who are

26  suffering from serious mental illnesses.  For example, during an attorney interview, one

27  prisoner was incapable of conversation, had feces in his hair, ranted obscene comments,

28  and frequently exposed his genitals.  When alerted to this prisoner's deteriorated mental

1  health state by the attorney, Jail staff informed the attorney that the prisoner would be seen

2  the next day because mental health staff had gone for the day.

3     139.   Upon information and belief, Defendants fail to adequately train mental

4  health staff to timely respond to prisoners' requests for psychiatric evaluations and

5  treatment, and to adequately screen, track, monitor, and provide follow-up care to

6  prisoners who are suffering from serious mental illness.

7     **F.     Defendants Fail to Maintain Accurate, Complete and Confidential
            Mental Health Treatment Records**

8

9     140.   Upon information and belief, Defendants fail to maintain adequate, accurate,

10  and confidential mental health care records.  For example, upon information and belief,

11  psychiatrists often change prisoners' medications without documenting explanations.

12  Upon information and belief, psychiatrists also fail to document their justification and

13  reasoning for changing the diagnoses and treatment plans for prisoners returning to the Jail

14  from psychiatric hospitals.  As a result of Defendants' failure to maintain adequate mental

15  health care records, prisoners suffer from a substantial risk of misdiagnosis, dangerous

16  mistakes, and unnecessary delays in care.

17     141.   Upon information and belief, Defendants fail to obtain medical files from

18  outside providers for lengthy periods of time after the prisoner's arrival at the Jail (if at

19  all).  This lack of information reduces the quality of mental health care.  For example,

20  Plaintiff MURPHY was arrested and booked into the Jail on January 18, 2013.  During an

21  intake triage assessment that same day, Jail staff was informed that Plaintiff MURPHY's

22  psychiatric medications were prescribed by a physician at the Monterey County Veteran's

23  Administration clinic.  Plaintiff MURPHY was not seen by any mental health staff until

24  January 21, 2013, when he had an appointment with a licensed psychiatric technician, who

25  did not prescribe him medications.  Upon information and belief, the licensed psychiatric

26  technician made only one request for Plaintiff MURPHY's medical records from the

27  Monterey County Veteran's Affairs office ("VA") on January 21, 2013, and made no

28  effort to follow up after that date.  On January 28, 2013, at least in part because he was not

1  provided with any psychiatric medications, Plaintiff MURPHY was placed in a "rubber

2  room" where he remained for at least 18 hours.  As of at least April 19, 2013, Defendants

3  still had not obtained Plaintiff MURPHY's psychiatric records from the VA.

4      142.   Upon information and belief, Defendants fail to adequately train mental

5  health staff in how to maintain accurate mental health records, including the timely request

6  of prisoners' prior mental health records.

7  **G.    Defendants Administer Psychotropic Medications Without Appropriate**
   **Supervision and Periodic Evaluation**

8

9      143.   Upon information and belief, Defendants fail to evaluate prisoners before

10  making treatment decisions, including whether to prescribe psychotropic medications.

11  Upon information and belief, Defendants fail to adequately train mental health staff in how

12  to appropriately evaluate prisoners before making mental health treatment decisions.

13      144.   When Defendants do administer psychotropic medications to prisoners in the

14  Jail, they routinely fail to monitor or follow up with these prisoners after such medications

15  are prescribed.  For example, Plaintiff MURPHY is taking a number of psychiatric

16  medications to address his aural and visual hallucinations.  However, he is not receiving

17  the correct dosages of the medications, and continues to see shadows and hear voices.  The

18  hallucinations are so frequent and intense that he can only sleep for a few hours at night.

19  Despite his repeated requests, mental health staff have not adjusted his dosages or

20  otherwise followed up with him to evaluate the efficacy of the medications.

21      145.   Upon information and belief, Defendants routinely release prisoners with

22  serious mental health conditions from the Jail without providing them with any services to

23  ensure that their mental health care is not disrupted.  Defendants' policies and practices for

24  the provision of continuing mental health care services upon a prisoner's release are

25  inadequate.  Upon information and belief, Defendants fail to adequately train custody and

26  mental health staff in how to appropriately release prisoners with serious mental health

27  concerns so that such prisoners can continue their mental health care.  Upon information

28  and belief, for those prisoners who are prescribed psychiatric medications in the Jail, they

[716216-20]

1   are released without either a supply of or a prescription for them to fill those medications

2   at a community pharmacy.  Defendants do not schedule follow-up appointments in the

3   community, nor are prisoners provided with sufficient referrals or information about where

4   they may receive mental health care services or medications.

5   **IV.   DEFENDANTS DISCRIMINATE AGAINST, FAIL TO ACCOMMODATE, AND VIOLATE THE CONSTITUTIONAL AND STATUTORY RIGHTS OF PRISONERS WITH DISABILITIES**

6

7        146.   Defendants currently incarcerate in Monterey County Jail significant

8   numbers of individuals with disabilities, as that term is defined in the ADA, the

9   Rehabilitation Act, and California disability rights law.  Defendants routinely fail to

10  provide these prisoners with basic reasonable accommodations to ensure equivalent access

11  to all of the programs and services offered by the Jail.  Defendants' failure to

12  accommodate prisoners with disabilities not only denies them access to prison programs

13  and services, but also substantially increases the risk that they are injured in an emergency

14  and are the victim of violence or abuse from other prisoners.  Moreover, Defendants'

15  refusal to accommodate prisoners with disabilities results in the provision of inadequate

16  medical and mental health care and the trampling of prisoners' due process rights in Jail

17  disciplinary proceedings.

18      **A.   Defendants Lack Adequate Policies and Practices to Identify and Track Prisoners with Disabilities**

19

20       147.   Under the ADA, the Rehabilitation Act, and California disability rights law,

21  Defendants must create and maintain a system to identify and track individuals with

22  disabilities and the accommodations they require.  Defendants, however, lack adequate

23  policies and practices for identifying individuals with disabilities and the reasonable

24  accommodations they require.

25       148.   Defendants routinely fail to identify prisoners with disabilities.  During

26  Defendants' intake process, custody officers collect various pieces of information about

27  new prisoners.  Defendants use the information to make a number of determinations,

28  including how to classify a prisoner.  A prisoner's classification determines with which

[716216-20]

1  other prisoners the new prisoner can share space and in what parts of the prison the new

2  prisoner can be housed.

3      149.    Upon information and belief, the officers who are responsible for conducting

4  the intake process are not adequately trained by Defendants regarding how to identify and

5  track individuals with disabilities, and therefore frequently fail to identify prisoners with

6  disabilities or the accommodations they need to access Jail programs and services.  Upon

7  information and belief, the forms and system that Defendants use to capture the

8  information gathered during the intake process lack adequate fields and space to document

9  if a prisoner has a disability and requires accommodations.

10     150.    Defendants' failures to accurately identify new prisoners' disabilities and

11 needed accommodations during the intake process result in the denial of accommodations

12 mandated by the ADA, Rehabilitation Act, and California disability rights law, placing

13 prisoners at risk of discrimination, injury, and/or exploitation.  For example, during

14 booking into the Jail in August 2012 and again in December 2012, staff completed

15 Monterey County Sheriff's Office Intake Health Screening forms for Plaintiff YANCEY.

16 Despite Plaintiff YANCEY's complete hearing impairment, staff did not indicate on the

17 forms that Plaintiff YANCEY had a hearing disability.  Accordingly, staff throughout the

18 Jail were unable to identify Plaintiff YANCEY as hearing impaired, resulting in a lack of

19 accommodations for his disability.

20     151.    Plaintiff MURPHY was booked into the Jail in January 2013 with a

21 permanent back injury that requires him to use a walker or cane to ambulate without pain.

22 During the intake process, the Jail failed to identify him as having a mobility impairment

23 requiring an accommodation, and he was not provided with a walker or a cane.  Without a

24 walker or cane, Plaintiff MURPHY avoids leaving his bed in order to reduce the pain that

25 accompanies any attempt to walk.

26     152.    Another prisoner who was booked into the Jail in January 2012 with a

27 mobility impairment required a cane to help him safely ambulate and access his housing

28 unit and also required a lower bunk housing assignment to safely access a bed.  During the

[716216-20]

intake process, the Jail failed to identify him as having a mobility impairment requiring those accommodations; he was not provided with a cane and the only available bed in his housing unit was on the upper bunk of a triple bunk. Without a cane, the prisoner fell and injured himself on a number of occasions. He has slept on the floor because it was too difficult for him to access his bunk.

153.   Upon information and belief, Defendants do not maintain any central list, electronic or otherwise, of prisoners with disabilities and the accommodations they require. Defendants do not maintain adequate information about prisoners' disabilities and related accommodations in the prisoners' custody and/or medical files. Upon information and belief, to the extent that Defendants maintain information about a prisoner's disabilities in any form, custody, medical, and clerical staff are not provided with access to the information in a manner that would timely and effectively inform them of a prisoner's disabilities and required accommodations. Upon information and belief, Defendants do not adequately train staff to maintain records or information about prisoners' disabilities and related accommodations.

154.   The lack of an adequate disability and accommodation tracking system results in substantial injuries to prisoners with disabilities. Without an adequate tracking system, medical and custody staff have no easily accessible means to determine whether a prisoner has a disability, and what, if any, accommodations that prisoner requires. Consequently, Defendants fail to provide prisoners with accommodations or withdraw accommodations that have already been provided without justification.

155.   For example, Plaintiff YANCEY is deaf, cannot hear, and uses American Sign Language as his primary form of communication. Plaintiff YANCEY was not provided with a sign language interpreter for his communications with Jail staff, including at medical appointments, at a disciplinary hearing, and during the booking and classification process.

156.   Plaintiff SARABI was provided with crutches after he sustained an injury to his right leg when he was attacked by another prisoner on or around March 6, 2013.

1   However, on or around April 8, 2013, Plaintiff SARABI was called in for an unsolicited

2   medical exam at which his crutches were prematurely taken away from him with no

3   explanation, despite the fact that his right leg was not healed.  Plaintiff SARABI could not

4   use the restroom or shower without his crutches, and had to crawl around or hop on one

5   foot to get around the Jail until his attorney contacted the Jail to request that the crutches

6   be provided.

7        157.   As another example, one prisoner whom the Jail identified as being a full-

8   time wheelchair user had his wheelchair taken away from him for at least 14 hours.  As a

9   result of being denied the needed assistive device, he was rendered immobile, was unable

10  to access the showers and restrooms, was forced to rely upon other prisoners for assistance,

11  and was therefore placed at increased risk of being manipulated or attacked by other

12  prisoners.

13       **B.    Defendants Lack an Effective Grievance Procedure for Prisoners to
           Request Reasonable Disability Accommodations**
14

15       158.   Defendants do not provide an effective or functional grievance system for

16  prisoners with disabilities as required by the ADA and Rehabilitation Act.

17       159.   Defendants do not provide prisoners with adequate notice of how to request

18  reasonable accommodations for their disabilities.  Upon information and belief, the only

19  formal notice prisoners receive regarding any Jail grievance procedure comes from the

20  "Monterey County Adult Detention Facility Inmate Information Booklet" (hereinafter

21  "Inmate Information Booklet"), which is provided to each prisoner when booked into the

22  Jail.  Yet the Inmate Information Booklet does not discuss disabilities or the process for

23  requesting disability accommodations.  As a result, prisoners are not informed of any

24  specific process for complaining about disability discrimination or requesting disability

25  accommodations.

26       160.   Defendants routinely deny prisoners access to grievance forms.  Each

27  prisoner is provided with only one grievance form which is attached to the Inmate

28  Information Booklet provided during booking.  Upon information and belief, grievance

1  forms are not freely available in the housing units.

2      161.   Even when prisoners are able to submit grievances, Defendants frequently do

3  not provide any response.  For example, Plaintiff YANCEY submitted a grievance on

4  December 20, 2012, requesting a number of accommodations relating to his serious

5  hearing impairment, but he did not receive a response to the grievance.  Plaintiff SARABI

6  submitted a grievance on April 4, 2013, requesting to see a doctor for the intense pain he

7  was experiencing in his foot (the source of his mobility impairment), but he also did not

8  receive a response to the grievance.  Plaintiff MURPHY submitted a grievance on April 4,

9  2013, requesting a cane or walker as an accommodation for his mobility impairment; he

10  did not receive a response to the grievance either.  Plaintiff HERNANDEZ has submitted

11  at least four grievances regarding inadequate medical care since February 28, 2013, but did

12  not receive responses.

13      162.   Even when prisoners are able to submit a grievance and Defendants provide

14  a response, Defendants' responses are not adequate or comprehensive, and may be

15  arbitrary and counterproductive.  For example, a prisoner filed a grievance requesting a

16  walking cane to assist her in moving around the dorm, shower, and going to court.  The

17  response stated only that "you did not have a 'cane' when you came in to the facility.  If

18  you are having problems go on sick call."

19      163.   Upon information and belief, Defendants lack adequate policies and

20  procedures instructing health care or correctional officers how to respond if prisoners

21  request accommodations through means other than the grievance process.

22      164.   Upon information and belief, Defendants do not adequately train staff in how

23  to provide, appropriately process, and timely respond to grievance forms.

24  **C.   Defendants Fail to Accommodate Prisoners with Hearing and Speech
     Impairments**

25

26      165.   Prisoners with hearing, speech, and other communication impairments have

27  problems effectively communicating with Jail staff.  Prisoners with disabilities that impair

28  communication require accommodations to ensure effective communication with prison

[716216-20]

1   staff and equal access to programs and services offered by the Jail.  Defendants fail to

2   provide such accommodations.  Upon information and belief, Defendants fail to

3   adequately train staff in how and when to provide such accommodations.

4       166.    Defendants fail to provide prisoners with hearing and speech impairments

5   with sign language interpreters, hearing aids, or other auxiliary aids.  Plaintiff YANCEY

6   has been booked into the Jail numerous times over the past three to five years.  Plaintiff

7   YANCEY is completely deaf, and also has a speech impairment that makes it difficult or

8   impossible for him to communicate through spoken words.  Plaintiff YANCEY uses

9   American Sign Language (ASL) as his primary form of communication.  Plaintiff

10  YANCEY was not provided with a sign language interpreter by the Jail during his

11  incarcerations in the Jail.

12      167.    Defendants do not provide prisoners with hearing and speech impairments

13  with sign language interpreters, hearing aids, or other auxiliary aids during the booking

14  and intake process, which harms these prisoners by preventing them from communicating

15  specific concerns, including emergency medical issues, and understanding Jail policies and

16  practices.

17      168.    For example, Defendants never provided Plaintiff YANCEY with a sign

18  language interpreter during the booking process.  When he was booked into the Jail for his

19  most recent term, Plaintiff YANCEY's right arm was in a cast, making it impossible for

20  Plaintiff YANCEY to communicate through written notes.  Accordingly, he essentially

21  lacked any means of communicating with the custody officers conducting the intake

22  process.

23      169.    Defendants fail to provide equal access to telephone services to prisoners

24  who require the use of a Telecommunications Device for the Deaf/Teletype ("TDD/TTY").

25  Non-TDD/TTY telephones are located in the housing units.  Upon information and belief,

26  prisoners without disabilities have access to non-TDD/TTY telephones any time the

27  prisoner is permitted in the common area of his or her housing unit.  Upon information and

28  belief, telephone calls are limited to 30 minutes in length, though there is no limit to the

1  number of telephone calls a prisoner may make so long as he or she does not abuse or

2  monopolize the telephone.

3      170.   In contrast, there is one TDD/TTY for the entire Jail.  Prisoners who require

4  the use of the TDD/TTY must ask an officer to transport them to the office where the

5  TDD/TTY is located.  Officers frequently refused to transport Plaintiff YANCEY to the

6  TDD/TTY, claiming that they were too busy to do so.  Even when allowed to use the

7  TDD/TTY, Plaintiff YANCEY was denied sufficient time to conduct a conversation, since

8  using a TDD/TTY takes longer than using a telephone.

9      171.   Defendants' policies and practices for equal access to telephone services are

10  inadequate.  Upon information and belief, Defendants fail to adequately train staff in how

11  to provide equal access to telephone services.

12      172.   Defendants fail to provide prisoners with hearing or speech impairments with

13  sign language interpreters, hearing aids, or other auxiliary aids to permit participation in

14  other Jail programs and services, including religious services and educational and

15  vocational classes.  For example, Plaintiff YANCEY was not provided with a sign

16  language interpreter when attending religious services on a weekly basis at the Jail.  As a

17  result, he was not able to understand what was being said by the chaplain and other

18  participants, and could not participate in the services himself.

19      173.   Defendants do not provide equal access to television to prisoners who are

20  hearing impaired.  Upon information and belief, most non-disciplinary housing units have

21  televisions installed for prisoners to watch, but Plaintiff YANCEY was not able to

22  understand what was being said on the television.  Either Defendants have not installed

23  televisions with the capability to display closed captioning or they refuse to alter the

24  settings to the televisions to display closed captioning.

25      174.   Defendants fail to provide sign language interpreters, hearing aids, and other

26  auxiliary aids at disciplinary hearings even though prisoners risk a loss of credits and

27  privileges if they are found guilty of disciplinary infractions.  For example, Plaintiff

28  YANCEY was charged with a rule violation on December 16, 2012.  At the disciplinary

[716216-20]

1   hearing, Plaintiff YANCEY was found guilty of the violation and punished with two

2   weeks without visitation, canteen, or yard privileges.  Plaintiff YANCEY was not provided

3   with a sign language interpreter at the disciplinary hearing, and therefore was not able to

4   defend himself or explain his version of the events.  Without an interpreter, Plaintiff

5   YANCEY also had difficulty understanding what the hearing officer and other Jail staff

6   were saying.

7        175.   By failing to provide Plaintiff YANCEY and other hearing impaired

8   prisoners with sign language interpreters, hearing aids, or other auxiliary aids at

9   disciplinary hearings, Defendants deny such prisoners the same opportunity to participate

10   in the hearing regarding their guilt or innocence of the disciplinary charge and to present

11   their views to the hearing officer that prisoners without disabilities have.

12   **D.   Defendants Knowingly Subject Prisoners with Disabilities to Dangerous
         Conditions in the Jail**

13

14        176.   Defendants fail to provide prisoners with hearing and speech impairments

15   with sign language interpreters, hearing aids, or other auxiliary aids for interactions with

16   Jail medical and mental health care staff, despite the grave importance of the interactions.

17   Defendants fail to provide these accommodations despite knowledge that such prisoners

18   cannot effectively communicate with staff without the accommodations and that the failure

19   to communicate effectively places such prisoners at an increased risk that medical or

20   mental health issues will not be not be diagnosed or will be misdiagnosed.

21        177.   For example, during his most recent booking in the Jail, Plaintiff YANCEY

22   had at least six medical appointments.  Plaintiff YANCEY was not provided with a sign

23   language interpreter at any of his appointments.  Because there was no sign language

24   interpreter to help him communicate with the medical staff, Plaintiff YANCEY was not

25   able to explain that the pain medication he was being provided was insufficient to treat his

26   pain.  Accordingly, Plaintiff YANCEY's pain symptoms were not adequately treated.

27        178.   Defendants endanger prisoners with hearing impairments by failing to

28   institute any system for visually identifying prisoners with hearing impairments.  If a fight

[716216-20]

breaks out in a housing unit, prison staff may order all prisoners to get down on the ground or to line up against a wall. For any number of reasons, prison staff may also order a specific prisoner to cease or engage in certain behavior. Upon information and belief, Jail staff are authorized to initiate disciplinary proceedings and/or use force against prisoners who fail to comply with orders. Upon information and belief, the use of force for failure to comply with an order can include the use of Tasers, non-lethal firearms (like "flash bang" grenades) and lethal firearms.

179.  Prisoners with communication impairments, like Plaintiff YANCEY, are not capable of understanding and therefore are less likely to comply with alarms and oral orders from jail staff. Without a visual identification system by which staff can identify prisoners with communication impairments (*e.g.*, vests), there is an increased risk that staff will not recognize that a prisoner has a hearing impairment and will interpret such prisoner's actions as a failure to comply with an order, rather than as a failure to hear and/or understand the order. As a result, prisoners with hearing impairments are at increased risk that staff will initiate disciplinary proceedings and/or use force for failure to comply with an order that they have not heard.

180.  Upon information and belief, Defendants lack any policy, practice, or system for notifying prisoners with disabilities of emergencies, including alarms, fires, and earthquakes. Upon information and belief, Defendants fail to adequately train staff in how to notify prisoners with disabilities of emergencies. Upon information and belief, the Jail does not have a visual or tactile alarm system installed to alert prisoners with disabilities. Because Defendants lack a system for identifying prisoners with disabilities, including those with hearing impairments, or notifying prisoners with disabilities of an emergency, these prisoners may not be aware of an emergency, or may need assistance during the emergency, and are therefore at increased risk of injury or death should one occur.

181.  Upon information and belief, Defendants lack any policies or practices to ensure that prisoners with difficulty walking, including prisoners in wheelchairs, are safely evacuated from the Jail in the event of an emergency. Upon information and belief,

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[716216-20]

1  Defendants fail to adequately train staff in how to ensure that prisoners with mobility

2  impairments are safely evacuated from the Jail in an emergency.  Upon information and

3  belief, the emergency exits in the Jail, to the extent they exist, are not accessible to

4  prisoners in wheelchairs.  As a result, prisoners with difficulty ambulating are at increased

5  risk of injury or death if an emergency, like a fire or earthquake, were to occur.

6       182.   Defendants endanger prisoners with mobility impairments by failing to

7  institute any system for staff to visually identify prisoners with mobility impairments.

8  Upon information and belief, Defendants fail to adequately train staff in how to visually

9  identify prisoners with mobility impairments.  Upon information and belief, in response to

10  alarms or other incidents in the Jail, custody staff frequently order prisoners to "prone out,"

11  *i.e.*, lay down on the ground, face down.  Upon information and belief, jail staff are

12  authorized to initiate disciplinary proceedings and/or use force against prisoners who fail

13  to prone out when ordered to do so.  Upon information and belief, the use of force for

14  failure to comply with an order to prone out can include the use of Tasers, non-lethal

15  firearms (like "flash bang" grenades) and lethal firearms.

16       183.   Some prisoners with mobility impairments, like Plaintiff SARABI, are

17  incapable of complying with an order to prone out because of their mobility impairments.

18  Without a visual identification system by which staff can identify prisoners with such

19  mobility impairments (*e.g.*, a vest or certain color of clothing), there is an increased risk

20  that custody staff will not recognize that a prisoner has a mobility impairment and will

21  interpret such a prisoner's failure to prone out as a failure to comply with an order, rather

22  than an inability to comply with the order.  As a result, prisoners with mobility

23  impairments are at increased risk that staff will initiate disciplinary proceedings and/or use

24  force for failure to comply with an order to prone out with which they cannot comply

25  because of their disability.

26  **E.    Defendants Routinely Fail to Provide Prisoners with Disabilities with**
        **Needed Assistive Devices**

27

28       184.   Defendants lack policies and practices to ensure that prisoners with

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[716216-20]

1    disabilities who require assistive devices, including, but not limited to, wheelchairs,

2    walkers, crutches, canes, braces, tapping canes, hearing aids, and pocket talkers, as

3    accommodations are provided with and are allowed to retain those devices.  Upon

4    information and belief, Defendants fail to adequately train staff in how to timely and

5    appropriately provide assistive devices to prisoners with disabilities.

6         185.   Because of Defendants' deficient disability screening procedure and

7    inadequate grievance process, prisoners who require assistive devices to access Jail

8    programs are frequently not identified.  As a result, those prisoners do not receive needed

9    assistive devices and cannot access the programs and services offered by the Jail.

10        186.   Upon information and belief, Defendants deny prisoners certain assistive

11   devices, claiming that such items are not permitted in the Jail.  For example, Plaintiff

12   MURPHY, who uses a cane to ambulate and required a lower bunk housing assignment

13   while at the California Department of Corrections and Rehabilitation, requested during the

14   booking process that he be provided with a cane or walker.  He was informed by Jail staff

15   that canes and walkers were not allowed in the Jail.

16        187.   Upon information and belief, Defendants have refused to provide some

17   prisoners with assistive devices as an accommodation for a disability, even after

18   Defendants have identified the person as a qualified individual with a disability and as

19   needing a particular assistive device.  Upon information and belief, Defendants have

20   informed such prisoners that they are permitted to possess certain assistive devices, but

21   only if someone from outside of the Jail, like a family member, friend, or community

22   organization provides the assistive device.  Unless the assistive device is provided by a

23   third party, such prisoners may be denied reasonable accommodations necessary for them

24   to access programs and services offered by the Jail.

25        188.   Even when the Jail provides a prisoner with an assistive device, Defendants

26   unjustifiably remove these devices from prisoners, as alleged in paragraph 156, *supra*.

27

28

[716216-20]

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**F.    Defendants Fail to Provide Prisoners with Disabilities with Safe and Accessible Housing**

189.    Defendants fail to ensure that prisoners with disabilities are assigned to and are actually housed in housing units and bed assignments that are accessible and safe. Upon information and belief, Defendants fail to adequately train staff in how to house prisoners with disabilities in accessible and safe housing.

190.    The Jail consists of five main housing areas—the Rehabilitation Center, the Men's Section, K-Pod, the Dorm Section, and the Women's Section.

191.    Each housing area is separated into a number of smaller housing units. The housing units differ in their design, and importantly, in their accessibility to prisoners with disabilities. Some of the housing units are dorm housing units, where many beds, including triple bunks, are placed in an open area together that is shared by the prisoners. Other housing units consist of celled housing, where the unit is divided into a number of cells with doors in which one or two prisoners are housed. Cells that house two prisoners typically have bunk beds in them.

192.    Some of the housing units in the Jail are located up flights of stairs, while others are on the ground floor.

193.    Defendants control housing unit assignments. In housing units with celled housing, Defendants also assign prisoners to a particular cell.

194.    Upon information and belief, Defendants make decisions regarding where to house a particular prisoner without taking into account the prisoner's disability-related limitations. Because of Defendants' general failure to identify and track prisoners with disabilities, Defendants decide where to house a prisoner without sufficient information regarding the prisoner's limitations; this practice significantly increases the risk that a prisoner will be assigned to a housing unit that is not accessible to him or her, because it lacks adequate toilets or grab bars in the shower, or because it is up a flight of stairs or lacks space for a wheelchair, or other reasons.

195.    One prisoner who was housed in the Jail for a significant period of time was

[716216-20]

1   a full-time wheelchair user. Defendants generally permitted this prisoner to retain his
2   wheelchair in the Jail, meaning that Defendants were aware of his mobility impairment.
3   Nonetheless, Defendants housed this prisoner in the C-Dorm and D-Dorm within the Dorm
4   Section. The C-Dorm and D-Dorm are not wheelchair accessible, do not have toilets and
5   showers with grab bars, do not have shower chairs, and have lips between the housing
6   areas and the showers. This prisoner fell four times while housed in those dorms when
7   attempting to access the toilets and showers, injuring himself each time he fell. He also
8   was frequently forced to rely on other prisoner's for assistance to access the toilets and
9   showers.

10       196.   Another prisoner who was a full-time wheelchair user was permitted to
11  retain his wheelchair, indicating that Defendants were aware of his mobility impairment.
12  Nevertheless, Defendants housed this prisoner in the B-Dorm for 30-45 days. This
13  prisoner had difficulty accessing almost every feature of B-Dorm, including the bathroom.
14  Specifically, this prisoner was forced to shower while sitting in his wheelchair due to the
15  lack of a shower chair, and had to rely on other inmates to press the shower button for him
16  because he could not reach it. This prisoner also had to rely on other prisoners to lift him
17  onto the toilet.

18       197.   Defendants house many of the prisoners with disabilities in the Rotunda
19  housing unit within the Men's Section. The recreation yards for the Men's Section
20  (including the Rotunda), the Women's Section, and K-Pod are located on the roof of the
21  Jail. In order to access the yards, prisoners must walk up one long flight of stairs and then
22  down a smaller flight of stairs. The stairways are the only means of reaching the yard.
23  Because the yard is located on the roof, prisoners who are housed in the Men's Section,
24  Women's Section, or K-Pod and who have mobility or vision impairments that make
25  walking up or down stairs difficult, painful, impossible, or dangerous are denied access to
26  the recreation yard.

27       198.   For example, because of the severe pain Plaintiff MURPHY experiences
28  when walking without a cane, Plaintiff MURPHY has rarely accessed the yard since he

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[716216-20]

1   arrived at the Jail on January 18, 2013. If the yard for the Men's Section was not up a

2   flight of stairs, and if he had a cane to ambulate, Plaintiff MURPHY would have gone to

3   the yard most times that it was offered to him.

4        199.   Another prisoner who has a mobility impairment that makes walking up

5   stairs extremely difficult and painful was assigned to F-Pod. This prisoner declined to go

6   to yard every time that it was offered because the pain and difficulty of climbing the stairs

7   was too great. On at least one occasion, despite this prisoner's mobility impairments,

8   Defendants forced him to climb the stairs to the yard when Defendants were conducting

9   searches of cells in F-Pod. The prisoner specifically requested that he be excused from the

10   need to go to the yard; Defendants denied his request. When he had to walk up to the yard,

11   it caused him great pain and placed him at serious risk of falling and further injuring

12   himself.

13        200.   Upon information and belief, Defendants lack policies and practices for

14   ensuring the prisoners who require lower bunk bed assignments actually receive lower

15   bunk bed assignments. Upon information and belief, in many housing units, Defendants

16   have essentially no system for assigning particular prisoners to specific beds. Instead,

17   especially in dorm housing units, Defendants typically abdicate the assignment and

18   selection of beds in the housing unit to the prisoners themselves, who will be assigned to

19   the newly-vacated bed. In some dorm housing units, bed assignments and selection are

20   determined by who has been in the unit for the longest period of time. In units that include

21   a significant number of gang members, bed assignments may be determined by the leaders

22   of the gang within the unit.

23        201.   Upon information and belief, Defendants have no means for ensuring that

24   prisoners who require lower bunk bed assignments are actually able to sleep in lower

25   bunks, and have no mechanism for guaranteeing that prisoners who should not be housed

26   in triple bunks avoid such bed placements. As a result, prisoners who require lower bunk

27   and non-triple bunk bed assignments as accommodations for their disabilities may be

28   forced to sleep on upper bunks and in triple bunks rather than experience the pain and

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[716216-20]

1   danger of sleeping in an inaccessible bed.

2      202.   A prisoner booked into the jail in January 2012 with a mobility impairment

3   required a lower bunk housing assignment to safely access a bed.  During the intake

4   process, the Jail failed to identify him as having a mobility impairment requiring that

5   accommodation.  In the housing unit to which he was assigned, the only available bed was

6   on the upper bunk of a triple bunk.  No prisoner in the unit would agree to switch bed

7   assignments with him.  Rather than sleep on the upper bunk, he slept on the floor because

8   it was too difficult and dangerous for him to access the available bed.

9      **G.      Defendants Fail to Provide Prisoners with Disabilities with Equal Access
            to Programs and Services Offered by the Jail**

10

11     203.   Defendants house prisoners with serious mental illness in lockdown units,

12  isolation cells, and/or rubber rooms.  Prisoners who are housed in "lockdown" units have

13  far less freedom to move around and to interact with other prisoners, and generally only

14  are permitted outside of their cells for one hour per day.  During that one hour per day,

15  prisoners are expected to shower, exercise, and use the telephone.  This leaves little to no

16  time for program participation.  Prisoners who are housed in isolation cells lack freedom to

17  move around and interact with other prisoners, and have extremely limited (if any) access

18  to programs and services at the Jail.  Prisoners who are housed in rubber rooms do not

19  leave the room, do not interact with other prisoners, do not receive mental health

20  treatment, and do not access any programs or services for the duration of their time in the

21  rubber room.  Accordingly, prisoners with serious mental health illnesses are denied equal

22  access to programs and services offered by the Jail through Defendants' discriminatory

23  housing practices.

24     204.   Defendants' failure to provide prisoners with medically necessary treatment

25  (including mental health care and all medications) not only exposes prisoners to an

26  unreasonable risk of harm, but it also denies these prisoners equal access to programs and

27  services offered by the Jail.  For example, prisoners who have not received adequate

28  medical care may be not be physically capable of accessing services offered by the Jail'

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[716216-20]

precisely because their medical needs have not been adequately addressed.  Prisoners who have not received adequate mental health care may not be psychologically capable of participating in programs offered by the Jail because their mental health needs have not been appropriately treated.  By failing to provide prisoners with adequate medical and mental health care, Defendants deny equal access to Jail programs and services.

205.   Upon information and belief, Defendants fail to adequately train staff in how to provide equal access to Jail services and programs.

**H.   By Failing to Provide Disability Accommodations, Defendants Place Prisoners with Disabilities at Increased Risk of Exploitation and Harm**

206.   Prisoners with disabilities that are not accommodated are susceptible to exploitation by other prisoners.  For example, in exchange for help getting to the toilet, shower, or meals, or communicating with prison staff, prisoners with disabilities may be required to pay other prisoners, potentially leading to increased risk of violence or even rape.

**FIRST CAUSE OF ACTION**
**(Eighth Amendment to the United States Constitution, 42 U.S.C. § 1983)**
**By the Prisoner Class Against Defendants Monterey County, Monterey County Sheriff's Office, and California Forensic Medical Group**

207.   Plaintiffs re-allege and incorporate by reference herein all allegations previously made in paragraphs 1 through 206, above.

208.   By their policies and practices described above, Defendants subject Plaintiffs HERNANDEZ, YANCEY, MURPHY, SARABI, and HUNTER and the Prisoner Class they represent to a substantial risk of harm and injury from violence from other prisoners and inadequate medical and mental health care.  These policies and practices have and continue to be implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Plaintiff class' ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

209.   Defendants have been and are aware of all of the deprivations complained of

[716216-20]

1  herein, and have condoned or been deliberately indifferent to such conduct.

2      WHEREFORE, Plaintiffs and the Class they represent request relief as outlined

3  below.

### SECOND CAUSE OF ACTION
**(Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983)**
**By the Prisoner Class Against Defendants Monterey County, Monterey County**
**Sheriff's Office, and California Forensic Medical Group**

7      210.   Plaintiffs re-allege and incorporate by reference herein all allegations

8  previously made in paragraphs 1 through 209, above.

9      211.   By their policies and practices described above, Defendants subject Plaintiffs

10  HERNANDEZ, YANCEY, MURPHY, SARABI, and HUNTER and the Prisoner Class

11  they represent to a substantial risk of harm and injury from violence from other prisoners

12  and inadequate medical and mental health care.  These policies and practices have and

13  continue to be implemented by Defendants and their agents or employees in their official

14  capacities, and are the proximate cause of Plaintiffs' and the Plaintiff class' ongoing

15  deprivation of rights secured by the United States Constitution under the Fourteenth

16  Amendment.

17      212.   Defendants have been and are aware of all of the deprivations complained of

18  herein, and have condoned or been deliberately indifferent to such conduct.

19      WHEREFORE, Plaintiffs and the Class they represent request relief as outlined

20  below.

### THIRD CAUSE OF ACTION
**(Article 1, Section 7 of the California Constitution)**
**By the Prisoner Class Against Defendants Monterey County, Monterey County**
**Sheriff's Office, and California Forensic Medical Group**

24      213.   Plaintiffs re-allege and incorporate by reference herein all allegations

25  previously made in paragraphs 1 through 212, above.

26      214.   Defendants subject Plaintiffs HERNANDEZ, YANCEY, MURPHY,

27  SARABI, and HUNTER and the Prisoner Class they represent to a substantial risk of harm

28  and injury from violence from other prisoners and inadequate medical and mental health

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[716216-20]

1    care. These policies and practices have and continue to be implemented by Defendants

2    and their agents or employees in their official capacities, and are the proximate cause of

3    Plaintiffs' and the Plaintiff class' ongoing deprivation of rights secured by the California

4    Constitution, Article 1, Section 7.

5         215.   Defendants have been and are aware of all of the deprivations complained of

6    herein, and have condoned or been deliberately indifferent to such conduct.

7         WHEREFORE, Plaintiffs and the Class they represent request relief as outlined

8    below.

9                          **FOURTH CAUSE OF ACTION**
                    **(Article 1, Section 17 of the California Constitution)**
10   **By Prisoner Class Against Defendants Monterey County, Monterey County Sheriff's**
                    **Office, and California Forensic Medical Group**
11

12        216.   Plaintiffs re-allege and incorporate by reference herein all allegations

13   previously made in paragraphs 1 through 215, above.

14        217.   Defendants subject Plaintiffs HERNANDEZ, YANCEY, MURPHY,

15   SARABI, and HUNTER and the Prisoner Class they represent to a substantial risk of harm

16   and injury from violence from other prisoners and inadequate medical and mental health

17   care. These policies and practices have and continue to be implemented by Defendants

18   and their agents or employees in their official capacities, and are the proximate cause of

19   Plaintiffs' and the Plaintiff class' ongoing deprivation of rights secured by the California

20   Constitution, Article 1, Section 17.

21        218.   Defendants have been and are aware of all of the deprivations complained of

22   herein, and have condoned or been deliberately indifferent to such conduct.

23        WHEREFORE, Plaintiffs and the Class they represent request relief as outlined

24   below.

25                          **FIFTH CAUSE OF ACTION**
                    **(Americans with Disabilities Act, 42 U.S.C. § 12132)**
26   **By Prisoner Class Against Defendants Monterey County and Monterey County**
                              **Sheriff's Office**
27

28        219.   Plaintiffs re-allege and incorporate by reference herein all allegations

[716216-20]

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  previously made in paragraphs 1 through 218, above.

2      220.   The ADA prohibits public entities, including the COUNTY and the

3  SHERIFF'S OFFICE from denying "a qualified individual with a disability ... the benefits

4  of the services, programs, or activities of [the] public entity" because of the individual's

5  disability.  42 U.S.C. § 12132.

6      221.   The COUNTY and SHERIFF'S OFFICE are legally responsible for all

7  violations of the ADA committed by CFMG in the course of performing its duties under its

8  contractual arrangement with the SHERIFF'S OFFICE to provide medical and mental

9  health care services to prisoners in the Jail.  *See* 28 C.F.R. § 35.130(b)(1).

10      222.   The ADA defines "a qualified individual with a disability" as a person who

11  suffers from a "physical or mental impairment that substantially limits one or more major

12  life activities," including, but not limited to, "caring for oneself, performing manual tasks,

13  seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing,

14  learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C.

15  § 12102(1)(A), (2)(A).  All Plaintiffs are qualified individuals with disabilities as defined

16  in the ADA, as they have impairments that substantially limit one or more major life

17  activities.

18      223.   The programs, services, and activities that Defendants provide to prisoners

19  include, but are not limited to, sleeping, eating, showering, toileting, communicating with

20  those outside the Jail by mail and telephone, exercising, entertainment, safety and security,

21  the Jail's administrative, disciplinary, and classification proceedings, medical, mental

22  health, and dental services, the library, educational, vocational, substance abuse, and anger

23  management classes, and discharge services.  Defendants' programs, services and

24  activities are covered by the ADA.

25      224.   Under the ADA, Defendants must provide prisoners with disabilities

26  reasonable accommodations and modifications so that they can avail themselves of and

27  participate in all programs and activities offered by the Jail.

28      225.   By failing to reasonably accommodate prisoners with disabilities as

1    described above, Defendants violate the ADA including by:

2          a.    failing to "ensure that qualified inmates or detainees with disabilities

3    shall not, because a facility is inaccessible to or unusable by individuals with disabilities,

4    be excluded from participation in, or be denied the benefits of, the services, programs, or

5    activities of a public entity, or be subjected to discrimination by any public entity." 28

6    C.F.R. § 35.152(b)(1);

7          b.    failing to "ensure that inmates or detainees with disabilities are

8    housed in the most integrated setting appropriate to the needs of the individuals." 28

9    C.F.R. § 35.152(b)(2);

10         c.    failing to "implement reasonable policies, including physical

11   modifications to additional cells in accordance with the 2010 [accessibility] Standards, so

12   as to ensure that each inmate with a disability is housed in a cell with the accessible

13   elements necessary to afford the inmate access to safe, appropriate housing." 28 C.F.R.

14   § 35.152(b)(3);

15         d.    failing or refusing to provide the Prisoner Class with reasonable

16   accommodations and other services related to their disabilities, *see generally* 28 C.F.R.

17   § 35.130(a);

18         e.    failing or refusing to provide equally effective communication, *see*

19   *generally* 28 C.F.R. § 35.160(a);

20         f.    denying Plaintiffs and the Prisoner Class they represent "the

21   opportunity to participate in or benefit from [an] aid, benefit, or service" provided by

22   Defendants, 28 C.F.R. § 35.130(b)(1)(i);

23         g.    failing to make "reasonable modifications in policies, practices, or

24   procedures when the modifications are necessary to avoid discrimination on the basis of

25   disability ...." 28 C.F.R. § 35.130(b)(7);

26         h.    failing to make available information to the Prisoner Class about their

27   rights under the ADA while detained in the Jail, 28 C.F.R. § 35.106;

28         i.    failing to "adopt and publish grievance procedures providing for

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[716216-20]

1  prompt and equitable resolution of complaints alleging any action that would be prohibited

2  by … [the ADA]." 28 C.F.R. § 35.107(b);

3         j.     failing to "maintain in operable working condition those features of

4  facilities and equipment that are required to be readily accessible to and usable by persons

5  with disabilities by the [ADA]." 28 C.F.R. § 35.133(a); and

6         k.     failing to "furnish appropriate auxiliary aids and services where

7  necessary to afford individuals with disabilities … an equal opportunity to participate in,

8  and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R.

9  § 35.160(b)(1).

10       226.  As a result of Defendants' policy and practice of discriminating against and

11 failing to provide reasonable accommodations, Plaintiffs and the Prisoner Class they

12 represent do not have equal access to Jail activities, programs, and services for which they

13 are otherwise qualified.

14       WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as

15 outlined below.

16                         **SIXTH CAUSE OF ACTION**
   **(Americans with Disabilities Act, 42 U.S.C. 12188)**
17             **By Prisoner Class Against Defendant CFMG**

18       227.  Plaintiffs re-allege and incorporate by reference herein all allegations

19 previously made in paragraphs 1 through 226, above.

20       228.  CFMG is a public accommodation that owns, leases, leases to, or operates a

21 professional office of a health care provider, hospital, or other service establishment within

22 the meaning of 42 U.S.C. §§ 12181(7)(F), and Title III of the ADA's implementing

23 regulations, 28 C.F.R. § 36.104.

24       229.  Plaintiffs are all individuals with a disability and covered by Title III of the

25 ADA, 42 U.S.C. § 12102(1), 12182(b); 28 C.F.R. § 36.104.

26       230.  By its policies and practices described above, Defendant CFMG violates

27 Title III of the ADA, 42 U.S.C. §§ 12181-12189, by discriminating against individuals

28 with disabilities on the basis of disability, in the full and equal enjoyment of CFMG's

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[716216-20]

goods, services, facilities, privileges, advantages, or accommodations.  42 U.S.C.
§ 12182(a); 28 C.F.R., Part 36.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

**SEVENTH CAUSE OF ACTION**
**(Rehabilitation Act, 29 U.S.C. § 794)**
**By Prisoner Class Against Defendants Monterey County and Monterey County**
**Sheriff's Office**

231.   Plaintiffs re-allege and incorporate by reference herein all allegations previously made in paragraphs 1 through 230, above.

232.   By their policy and practice of discriminating against and failing to reasonably accommodate prisoners with disabilities, Defendants violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

233.   Plaintiffs and the Prisoner Class they represent are qualified individuals with disabilities as defined in the Rehabilitation Act.

234.   At all times relevant to this action, Defendants were recipients of federal funding within the meaning of the Rehabilitation Act.  As recipients of federal funds, they are required to reasonably accommodate inmates with disabilities in their facilities, program activities, and services, and to provide a grievance procedure.

235.   As a result of Defendants' discriminating against and failing to provide a grievance procedure and reasonable accommodations, Plaintiffs and the Prisoner Class they represent do not have equal access to Jail activities, programs, and services for which they are otherwise qualified.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

/ / /
/ / /
/ / /
/ / /

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[716216-20]

**EIGHTH CAUSE OF ACTION**
(Cal. Gov't Code § 11135)
**By Prisoner Class Against Defendants Monterey County, Monterey County Sheriff's Office, and California Forensic Medical Group**

236.   Plaintiffs re-allege and incorporate by reference herein all allegations previously made in paragraphs 1 through 235, above.

237.   Defendants receive financial assistance from the State of California as part of Realignment Legislation, Government Code §§ 30025, 30026, and 30029, and through other statutes and funding mechanisms.  Plaintiffs and the Prisoner Class they represent are all persons with disabilities within the meaning of Government Code § 11135.

238.   As described in this Complaint, Defendants deny all Plaintiffs full access to the benefits of the Jail's programs and activities which receive financial assistance from the State of California and unlawfully subject Plaintiffs and the Prisoner Class they represent to discrimination within the meaning of Government Code § 11135(a) on the basis of their disabilities.

239.   From February 2012 through May 2013, through their counsel and through grievances submitted to the Jail, Plaintiffs and the Prisoner Class they represent demanded that Defendants stop their unlawful discriminatory conduct described above, but Defendants refused and still refuse to refrain from that conduct.

240.   Defendants' unlawful and discriminatory conduct, described above, unless and until enjoined and restrained by order of this Court, will cause great and irreparable injury to all Plaintiffs and the Prisoner Class they represent in that Plaintiffs and the Prisoner Class are repeatedly subjected to discrimination, risk of injury, and denial of full and equal access to the benefits, programs and services provided by the Jail.

241.   Plaintiffs and the Prisoner Class they represent have no adequate remedy at law for the injuries described above in that they are continually subjected to discrimination on the basis of their disabilities and at increased risk for danger and injury and denied full and equal access to programs, services and activities offered at the Jail.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[716216-20]

1 | outlined below.

2 | ## PRAYER FOR RELIEF

3 |     Plaintiffs and the class they represent have no adequate remedy at law to redress the

4 | wrongs suffered as set forth in this complaint.  Plaintiffs have suffered and will continue to

5 | suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices

6 | of the Defendants as alleged herein, unless Plaintiffs are granted the relief they request.

7 | The need for relief is critical because the rights at issue are paramount under the

8 | Constitution and laws of the United States and the State of California.

9 |     WHEREFORE, Plaintiffs HERNANDEZ, YANCEY, MURPHY, SARABI, and

10 | HUNTER, on behalf of themselves, the proposed Prisoner Class, and all others similarly

11 | situated, pray for judgment and the following specific relief against Defendants

12 | MONTEREY COUNTY, MONTEREY COUNTY SHERIFF'S OFFICE, CALIFORNIA

13 | FORENSIC MEDICAL GROUP, and DOES 1 through 20 as follows:

14 |     1.    An order certifying that this action may be maintained as a class action

15 | pursuant to Federal Rule of Civil Procedure 23;

16 |     2.    A finding that the conditions, acts, omissions, policies, and practices

17 | described above are in violation of the rights of Plaintiffs and the class they represent

18 | under the ADA, Rehabilitation Act, the Eighth and Fourteenth Amendments to the United

19 | States Constitution, Government Code § 11135, and Article 1, Sections 7 and 17 of the

20 | California Constitution;

21 |     3.    An order requiring Defendants, their agents, officials, employees, and all

22 | persons acting in concert with them under color of state law or otherwise to protect

23 | prisoners from substantial risk of harm from other prisoners, to provide minimally

24 | adequate health care to prisoners, to provide minimally adequate mental health care to

25 | prisoners, and to cease discriminating against and failing to provide accommodations to

26 | prisoners with disabilities and violating their due process rights;

27 |     4.    An order enjoining Defendants, their agents, officials, employees, and all

28 | persons acting in concert with them under color of state law or otherwise, from continuing

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[716216-20]

1   the unlawful acts, conditions, and practices described in this Complaint;

2       5.      An award to Plaintiffs, pursuant to 29 U.S.C. § 794a, 42 U.S.C. §§ 1988,

3   12205, and California Code of Civil Procedure § 1021.5, of the costs of this suit and

4   reasonable attorneys' fees and litigation expenses;

5       6.      An order retaining jurisdiction of this case until Defendants have fully

6   complied with the orders of this Court, and there is a reasonable assurance that Defendants

7   will continue to comply in the future absent continuing jurisdiction; and

8       7.      An award to Plaintiffs of such other and further relief as the Court deems just

9   and proper.

10

11  DATED:  May 23, 2013                Respectfully submitted,

12                                      ROSEN BIEN GALVAN & GRUNFELD LLP

13

14                                      By: _____

15                                          Gay Crosthwait Grunfeld

16

17  DATED:  May 23, 2013                OFFICE OF THE PUBLIC DEFENDER
                                        COUNTY OF MONTEREY

18

19                                      By: _____

20                                          James Egar
                                            Public Defender

21                                      Attorneys for Plaintiffs

22

23

24

25

26

27

28