| | |
|---|---|
| MICHAEL W. BIEN – 096891 | ALAN SCHLOSSER – 049957 |
| GAY C. GRUNFELD – 121944 | MICAELA DAVIS – 282195 |
| VAN SWEARINGEN – 259809 | AMERICAN CIVIL LIBERTIES UNION |
| MICHAEL FREEDMAN – 262850 | FOUNDATION OF NORTHERN |
| SARAH P. ALEXANDER – 291080 | CALIFORNIA, INC. |
| ROSEN BIEN | 39 Drumm Street |
| GALVAN & GRUNFELD LLP | San Francisco, California  94111-4805 |
| 315 Montgomery Street, Tenth Floor | Telephone:   (415) 621-2493 |
| San Francisco, California  94104-1823 | Facsimile:    (415) 255-8437 |
| Telephone:   (415) 433-6830 | Email:          aschlosser@aclunc.org |
| Facsimile:    (415) 433-7104 |                     mdavis@aclunc.org |
| Email:          mbien@rbgg.com | |
|                     ggrunfeld@rbgg.com | |
|                     vswearingen@rbgg.com | |
|                     mfreedman@rbgg.com | |
|                     spalexander@rbgg.com | |
| JAMES EGAR – 065702 | ERIC BALABAN* |
| Public Defender | CARL TAKEI* |
| DONALD E. LANDIS, JR. – 149006 | ACLU NATIONAL PRISON PROJECT |
| Assistant Public Defender | 915 15th Street N.W., 7th Floor |
| OFFICE OF THE PUBLIC DEFENDER | Washington, D.C.  20005-2302 |
| COUNTY OF MONTEREY | Telephone:   (202) 393-4930 |
| 111 West Alisal Street | Facsimile:    (202) 393-4931 |
| Salinas, California  93901-2644 | Email:          ebalaban@npp-aclu.org |
| Telephone:   (831) 755-5806 |                     ctakei@npp-aclu.org |
| Facsimile:    (831) 755-5873 | |
| Email:          EgarJS@co.monterey.ca.us | *Admitted *Pro Hac Vice* |
|                     LandisDE@co.monterey.ca.us | |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. CV 13 2354 PSG<br><br>**DECLARATION OF CLYDE WHITFIELD IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**EXHIBITS FILED SEPARATELY UNDER SEAL**<br><br>Judge:  Hon. Paul S. Grewal<br>Date:    June 3, 2014<br>Time:    10:00 A.M.<br>Crtrm.:  5, 4th Floor<br><br>Trial Date:       None Set |

[1122212-2]

CV 13 2354 PSG

DECLARATION OF CLYDE WHITFIELD IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Clyde Whitfield, declare:

1. I am a party in the above-entitled action. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify. I make this declaration in support of Plaintiffs' Motion For Class Certification.

2. I am currently a prisoner in the Monterey County Jail ("the Jail"), where I have been housed as a pretrial detainee since November 30, 2013. My charges have not yet been resolved, and I have not been sentenced.

3. In 2001, I was diagnosed with narcolepsy, which causes sudden sleep attacks that occur with little or no warning. I also suffer from cataplexy, a symptom of narcolepsy, which causes sudden episodes of muscle weakness while I am still awake. When I experience a narcoleptic or cataplexic attack, I collapse wherever I happen to be. This means that if I am standing or walking, I fall down without any ability to cushion my fall and am at great risk of injuring myself. Attached hereto as **Exhibit A** is a true and correct copy of a sleep latency test report performed in 2008 by Dr. Richard Kanak, an expert in sleep disorders, which discusses my condition in depth. I also have sleep apnea.

4. The main treatment I have received over the years to manage my condition is a combination of three medications: Provigil (200 mg three times a day); Xyrem (two liquid 4 mg doses at night); and Loratadine to control my allergic reaction to Provigil. The Provigil helps me stay awake during the day and the Xyrem helps me stay asleep at night. Xyrem also helps treat my cataplexy. With Provigil, I can participate in classes or other activities, whether at the Jail or outside of the Jail. But when I don't take Provigil, I cannot stay awake during the day and may spend upwards of 20 hours a day in bed. I then get depressed from being stuck in bed and being unable to perform any basic daily tasks or activities. Because my cataplexy is induced by strong emotions, such as depression or anxiety, I am more like to have cataplexic episodes when I do not take Xyrem.

5. The Jail is well aware of my condition, both from my many previous and current stays at the Jail. Attached hereto as **Exhibit B** and **Exhibit C** are true and correct copies of my Intake Health Screening Form and Intake Triage Assessment, both dated

1  November 30, 2013, and found respectively in my Jail custody and Jail medical records.
2  The nurse who conducted the Intake Triage Assessment wrote that I have not been
3  receiving medication for my narcolepsy for months. I do not know why she wrote that, as
4  it is different from what I told her. What I actually told the nurse was that I had missed my
5  last medical appointment and so had not taken my medication for a couple of weeks.

6. When I entered the Jail on November 30, 2013, I was placed in a booking cell. This cell was very cold and I was left there without a blanket or a mattress. After many hours, I complained to the custody staff that I was freezing and wished to move. The Jail staff decided to move me to a Safety Cell, which I refer to as a "rubber room." Attached hereto as **Exhibit D** is a true and correct copy of a page from my custody file showing that I was moved to a "single cell pending review." Attached hereto as **Exhibit E** is a true and correct copy of the Sobering/Safety Cell/Restraints Log showing that I was booked into a rubber room "as single." I was not assessed by any medical staff while I was there. I can see from reviewing my file that the Jail staff marked on the Log that they did not assess my condition because "custody [was] busy."

7. The rubber rooms are completely empty cells. They have nothing but a door, tray slot, light, and grate in the floor to be used as a toilet. Since I am in danger of falling down at any moment, being housed in such an environment is extremely dangerous and unsanitary. I have no way to protect myself from the urine and feces that are often on the floor and walls of these rubber rooms. I felt terrible in the rubber room—it made me nauseous and on edge.

8. When custody staff was finally able to evaluate my file, the Jail inappropriately decided to place me in the C-Wing after booking. I am constantly at risk for falling out of my bed; however, the Jail failed to assign me to a lower bunk. Without a definite bunk assignment, I was stuck with whatever bunk was available and was assigned to me by the other prisoners. I ended up in a middle bunk, which was approximately 4 feet off of the ground. This was very dangerous for me.

9. On December 5, 2013, I was seen by Dr. Garcia, one of the doctors at the Jail. I told him about my narcolepsy diagnosis and the medications I needed to control it. Attached hereto as **Exhibit F** is a true and correct copy of Dr. Garcia's notes from his examination of me. About two days after meeting with Dr. Garcia, I was moved from C-Wing to the Rotunda.

10. On December 6, 2013, a full week after I was booked into the Jail, Dr. Garcia called Dr. Kanak. Attached hereto as **Exhibit G** is a true and correct copy of the page from my medical file recording Dr. Garcia's notes from his call with Dr. Kanak. Dr. Kanak confirmed that I have severe narcolepsy. Dr. Garcia wrote that Dr. Kanak told him I would be okay taking Provigil twice a day instead of three times a day. Dr. Garcia also noted that if I could not find a family member to bring in my supply of Provigil, I would be "OK" without it.

11. On December 6, 2013, Dr. Garcia issued a memo, addressed to Commander Bass, as well as transportation and custody staff, about my condition. Attached hereto as **Exhibit H** is a true and correct copy of this memo from my Jail custody file. Dr. Garcia wrote that I should be treated like a "pregnant female" because I have a condition of "extreme somnolence." Dr. Garcia also alerted custody staff that I was at increased risk of violence or other abuse from other people in the Jail because I slept for up to 20 hours a day.

12. On December 6, 2013, Dr. Garcia ordered Provigil 200 mg for me twice a day for 90 days. Attached hereto as **Exhibit I** is a true and correct copy of a page from my medical file with Dr. Garcia's orders.

13. The Jail did not provide me with Provigil until on or around February 1, 2014, or approximately 8 weeks after Dr. Garcia first ordered I receive the medication. I am unable to verify the exact date because, after searching my medical file, I am unable to find any Medication Administrative Records from my most recent stay at the Jail.

14. Around January 10, 2014, I filed a grievance with the Jail about my lack of medication. I have reviewed my Jail custody and medical files and the grievance is not in

either file. On January 17, 2014, I received this grievance back, which was marked as "resolved." I kept a copy of the grievance that was returned to me via the institutional mail system, and a true and correct copy of it is attached as **Exhibit J**. The "Findings" section stated that I was supposed to provide my own medication. I don't know why Dr. Garcia ordered Provigil for me if I was expected to provide my own. The grievance was marked as "Resolved" by Commander Bass on January 17, 2014. It's not true that this grievance was resolved. The Jail did nothing to provide me the medication I needed. I was suffering serious limitations in my daily activities as a consequence.

15. By January 23, 2014, the Jail still had not provided me with Provigil. That day, I filed another grievance requesting my medication. I wrote: "On 1-17-14, I received a grievance back from your staff which I had submitted concerning medicinal treatment for my narcolepsy. That grievance stated that the issue was resolved. That is not correct since today is one week later and I still am not receiving any medication. I would greatly appreciate it if this matter could 'truly be resolve[d].' Thank you for your time and consideration." A true and correct copy of this grievance is attached hereto as **Exhibit K**. In the "Findings" section of this grievance form, some member of the Jail staff wrote: "The medication that you cannot get has been ordered and you should be receiving that med twice daily." This is signed and dated January 29, 2014. There is no marking on this grievance on either the "resolved" or "unresolved" boxes. It was not true that I was receiving Provigil when this grievance was returned to me. I only started receiving Provigil approximately three days later, or somewhere around February 1, 2014.

16. I also requested medication through other means besides grievances. I orally requested Provigil from Jail nurses. I can see from reviewing my medical records that a nurse wrote in my progress notes on January 22, 2014, that I was "requesting medication for narcolepsy. Chart to be reviewed by MD to evaluate and advise." A true and correct copy of this page from my Jail medical records is attached hereto as **Exhibit L**. I do not know why a doctor had to review my chart again if, as the Jail claimed, my medication had already been ordered.

17. I can see from reviewing my medical file that Dr. Garcia ordered Provigil again for me on January 24, 2014, or the day after I filed this second grievance. Attached hereto as **Exhibit M** is a true and correct copy of a page from my medical file showing this prescription order. I do not believe that I should have had to file two grievances and wait almost two months to receive the Provigil I needed to manage my disability.

18. Between when I was booked in the Jail on November 30, 2013, and when the Jail finally provided me with Provigil, my narcolepsy was very bad. I would have a narcoleptic attack five or six times a day if I was out of bed. To avoid that risk, I was forced to stay in bed.

19. Even when I finally got Provigil twice a day, it was first given to me in an inappropriate manner. Provigil is an "upper" which heightens my alertness so I do not fall asleep. When I was housed in the Rotunda and then in I-Pod, the Jail gave me Provigil at 3am and 3pm. Taking Provigil at 3am wakes me up and keeps me just awake enough that I am unable to rest and therefore my cycle of exhaustion and sleeplessness is made worse. Now that I am in C-Wing, medication rounds are done a little later in the day, which helps a bit.

20. Being in the Jail without Xyrem also increases my risk of hurting myself in a cataplexic attack. My cataplexic attacks are often triggered by strong emotions. My fear of falling sends me into a downward spiral where I am more at risk for falling because I am afraid I might have an attack. Usually, when I am given my prescribed Xyrem, I have approximately one cataplexic episode every six months. Since I've been in the Jail, I have had at least four episodes of cataplexy. When I have an attack, I can be asleep for between three and thirty minutes. In December 2014, I fell down in the Rotunda. On or around February 15, 2014, I was moved out of the Rotunda to a single cell in I-Pod. Being in a single cell is very dangerous for me, as I'm scared of falling with no one around. Living with this fear only makes my psychiatric conditions worse and makes it more likely that my cataplexy will occur again. I fell again at least three times while I was housed in I-Pod. Once when I fell, no one knew or woke me up. It's scary to wake up on the ground with

no one around to help. Another time, I fell while out of my cell in the general area. Then, other prisoners saw me fall and banged on their doors until custody staff noticed. Still another time, I fell in my cell and was found on the floor by medical staff coming to bring me my medication as part of the regular medical rounds. Not one of the medical staff asked if I was alright, even though they found me collapsed on the floor. If I had had a cellmate, then someone could have been there to wake me up, which would have made me feel a lot safer.

21. Knowing the serious risk of falling, I was too scared to leave my bed except when absolutely necessary. This meant, for example, that I only went to the exercise yard approximately four times before the Jail started giving me the Provigil I need. The yard for the Rotunda is up flights of stairs, and I was too scared of falling down them to risk going to the yard. The few times I went to the yard I only did so because other prisoners were willing to surround me to make sure I didn't fall down the stairs. Even after I started receiving Provigil, I am nervous about stairs without Xyrem. Thus, while I was housed in I-Pod—where the yard is also upstairs—I only went to the yard a little bit more frequently than before. If I had the medication I needed, like Xyrem, or if the yard was not up a flight of stairs, I would have gone more frequently. My mental and physical health have suffered without access to exercise and the outdoors. In particular, my anxiety and depression are worse without a little sunlight and fresh air.

22. I am now housed in C-Wing, in the Rehabilitation Wing of the Jail. There are a lot of obstacles here which make me very nervous about falling. There are many benches and shelves everywhere, and I do not feel safe walking around in C-Wing with my condition. I have asked many times to be moved back to the Rotunda, which feels relatively safer, but I have not yet gotten a response.

23. Since I sleep so much of the day, I am unable to watch out for myself in the Jail. I worry about theft and being the victim of violence while I'm asleep. I am also nervous about missing meals. I've missed approximately twenty meals since I've been in the Jail simply because I was asleep. No Jail staff came to help me get to chow or brought

me meals. Mostly, I worry about falling and what would happen if I fell and really hurt myself. I fear that the Jail would be too slow to respond, particularly in C-Wing. There's no way to get help immediately in C-Wing. In the Rotunda, at least there was a button that you could press. Here, there's nothing and you have to rely on the chance that a guard is close by.

24. I feel scared and frustrated being in a place where I have no control over my ability to access the medication and medical treatment I need. It is stressful to know that I may not be able to access medical care, even when I really need it.

25. At the same time that I was experiencing problems receiving the care I needed for my narcolepsy, I was dealing with an infected and fractured wisdom tooth. I filed my first sick call slip about it on December 27, 2013, noting my "excruciating pain." Attached hereto as **Exhibit N** is a true and correct copy of this sick call slip. I was not seen in response to this sick call request. I can see from reviewing my medical file that my sick call slip is marked "sc 12-27-13 @ 1400" but I did not see any member of the Jail staff at 2 pm on December 27, 2013. After reviewing my medical record, there are also no progress notes from December 27, 2013. I was finally seen by Physician's Assistant Terri Whiting ("PA Whiting") on January 2, 2014, but not a dentist. PA Whiting insisted on charging me the three dollar co-pay the Jail charges prisoners every time we go to sick call. The Jail charges this co-pay regardless of what kind of insurance prisoners may have. As a fully disabled person, I receive Medi-Cal insurance. I often have to pay a co-pay in Jail for doctor visits for which I would not have to pay a co-pay if I were not in Jail. I told PA Whiting about my pain and she examined my tooth. Attached hereto as **Exhibit O** is a true and correct copy of her notes from this visit from my Jail medical file.

26. I did not receive any treatment—either medication or a dental evaluation—after this visit with PA Whiting. I was still in horrible pain. Eventually, I had to file an additional four sick call slips to receive medication for my pain and dental care. Attached hereto as **Exhibit P** are true and correct copies of the additional sick call slips I filed, which are dated January 5, 9, 10, and 21, 2014. I also had to file two grievances when I

failed to receive the ibuprofen that was eventually ordered for me. Attached hereto as **Exhibit Q** are true and correct copies of the grievances I filed. I finally had my wisdom tooth extracted on January 30, 2014. Attached hereto as **Exhibit R** is a true and correct copy of a page from my medical file discussing this extraction. After this extraction I felt much better and was no longer in pain. It ultimately took 34 days, five sick call slips, and two grievances to get the care I needed.

27. On or around January 23, 2014, I also complained directly to a member of the medical staff at the Jail I know as "Dr. Dave," whom I am informed and believe to be Dave Harness, a member of the CFMG staff, about my problems obtaining the pain medication I needed for my tooth. Dr. Dave told me that, as a prisoner, I obviously was someone who could not follow directions. I told Dr. Dave that it was not my fault that the Jail was failing to provide me with the medication I needed and that I was filing a grievance about it. Dr. Dave swore at me and told me to file all the grievances I wanted. I proceeded to file another grievance about Dr. Dave's treatment of me, which I did not like. I have examined my custody and medical records, and have not found a copy of this grievance. I received no response to this grievance. I then submitted another grievance about Dr. Dave's conduct on February 4, 2014. A true and correct copy of this grievance, which I kept for my own file, is attached hereto as **Exhibit S**. Therein, I asked why I had not received a response to my previous grievance when "[i]t is my understanding that the response time for a grievance is ten days." In the "Findings" section of this grievance, Commander Bass wrote that he would "look into" it, and marked the grievance as "Resolved." As I still have not gotten a response about my complaint about Dr. Dave, I do not believe that grievance was resolved.

28. During my current stay in the Jail, my mental health has been pretty bad. Because I could not get out of bed safely, I was feeling an unusual amount of depression, stress, and anxiety before I got Provigil. It is depressing to lie in bed all day. I filed a sick call slip on January 26, 2014, to request psychiatric care, a true and correct copy of which is attached hereto as **Exhibit T**. I received no response to that sick call slip. Because I

was feeling worse and worse, I filed another sick call slip on January 27, 2014, a true and correct copy of which is attached hereto as **Exhibit U**, where I once again told the Jail that I was experiencing "a lot of stress and anxiety" and that "I have been on edge and my mood drastically shifts at times." In response to this second sick call slip, Dr. Fithian, a Jail psychiatrist, came to talk with me in the hallway in the Rotunda. There was a deputy standing with him who could hear and see everything that happened during our conversation. However, Dr. Fithian did not do anything to help me. I can see from reviewing his notes in my medical file that all he wrote was that I was on Provigil, and that I should be allowed to continue on it. He did not mention the reason for our conversation—my depression and anxiety. Attached hereto as **Exhibit V** and **Exhibit W** are true and correct copies of Dr. Fithian's notes from his conversation with me. He did not prescribe me any medication or recommend that I receive any therapy. Finally, after submitting additional sick call slips, I saw a psychiatric nurse. Again, this conversation took place in the hallway (although I was then housed in I-Pod). This nurse gave me a questionnaire about my mood but did not provide me with any treatment or medication. After an additional visit with this same nurse, I was referred to Dr. Garcia. I then finally started receiving medication for anxiety sometime in the middle of March 2014.

29. I have a long history of psychiatric conditions, as Dr. Fithian is well aware. For example, in 2008, I spoke with Dr. Fithian after the Jail refused to provide me Abilify (an antidepressant). Attached hereto as **Exhibit X** is a true and correct copy of Dr. Fithian's notes from this conversation. I attempted suicide at least once in 2003. I have previously been on suicide watch while at the Jail and placed in a safety cell. A true and correct copy of the record of this incident, found in my medical file, is attached hereto as **Exhibit Y**.

30. In addition to my medical and psychiatric concerns, I do not believe the Jail is a safe place to be. I have seen a lot of fights since I have been here. Since I was moved into C-Wing on approximately March 8, 2014, I have witnessed around five fights. Prisoners break up their own fights and the guards do not intervene. As mentioned, I am

particularly scared of being assaulted while I am asleep and am scared that no one will be there to protect me.

31. I agreed to be a named plaintiff in this case because I would like to represent other prisoners who have had problems similar to what I have experienced while in Monterey County Jail. I want to help improve the medical care, the mental health care, the safety for prisoners, and the assistance available to prisoners with disabilities. I have been cooperating fully with my counsel and am responding to all requests for information to the best of my ability and recollection, and will continue to do so in the future. My lawyers keep me updated on the progress of this case, and I will review all materials provided to me and provide my input to the best of my ability. When I have questions about the case, I will ask the attorneys for help to understand everything to the best of my ability.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at Salinas, California this 17 day of April, 2014.

_____
Clyde Whitfield

# Exhibits A - Y

# Filed Under Seal