MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
KRISTA STONE-MANISTA – 269083
SARAH P. ALEXANDER – 291080
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:    mbien@rbgg.com
    ggrunfeld@rbgg.com
    vswearingen@rbgg.com
    mfreedman@rbgg.com
    kstone-manista@rbgg.com
    spalexander@rbgg.com

JAMES EGAR – 065702
Public Defender
DONALD E. LANDIS, JR. – 149006
Assistant Public Defender
OFFICE OF THE PUBLIC DEFENDER
COUNTY OF MONTEREY
111 West Alisal Street
Salinas, California 93901-2644
Telephone:    (831) 755-5806
Facsimile:    (831) 755-5873
Email:    EgarJS@co.monterey.ca.us
    LandisDE@co.monterey.ca.us

ALAN SCHLOSSER – 049957
MICAELA DAVIS – 282195
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone:    (415) 621-2493
Facsimile:    (415) 255-8437
Email:    aschlosser@aclunc.org
    mdavis@aclunc.org

ERIC BALABAN*
CARL TAKEI*
ACLU NATIONAL PRISON PROJECT
915 15th Street N.W., 7th Floor
Washington, D.C. 20005-2302
Telephone:    (202) 393-4930
Facsimile:    (202) 393-4931
Email:    ebalaban@npp-aclu.org
    ctakei@npp-aclu.org

*Admitted *Pro Hac Vice*

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. CV 13 2354 PSG<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:  Hon. Paul S. Grewal<br>Date:  September 30, 2014<br>Time:  10:00 a.m.<br>Crtrm.:  5, 4th Floor<br><br>Trial Date:  September 8, 2015 |

[1272588-7]

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 2

    A.    PLAINTIFFS ARE AT SERIOUS RISK OF CONTRACTING AND SPREADING TUBERCULOSIS ........................................................... 2

    B.    PLAINTIFFS ARE AT SERIOUS RISK OF SUICIDE AND SELF HARM IN THE JAIL'S ADMINISTRATIVE SEGREGATION UNITS ........................................................................................................ 5

    C.    PLAINTIFFS ARE AT SERIOUS RISK OF INADEQUATE TREATMENT FOR ALCOHOL AND DRUG DETOXIFICATION .......... 9

    D.    PLAINTIFFS ARE AT SERIOUS RISK OF HAVING THEIR COMMUNITY-PRESCRIBED MEDICATIONS DISRUPTED ................. 13

    E.    DEFENDANTS DENY PRISONERS WITH DISABILITIES ACCESS TO CRITICAL JAIL PROGRAMS AND SERVICES ............... 17

        1.    Defendants Deny Prisoners Unable to Climb Stairs Access to the Exercise Yard, Religious Services, and Educational and Rehabilitative Programs ........................................................ 17

        2.    Defendants Never Provide Sign Language Interpreters to Prisoners Who Use Sign Language as Their Primary Method of Communication ................................................................... 20

ARGUMENT ...................................................................................................... 22

I.    PLAINTIFFS MEET THE STANDARD FOR A PRELIMINARY INJUNCTION .................................................................................................. 22

II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS UNDER THE CONSTITUTION AND THE AMERICANS WITH DISABILITIES ACT ......................................................................................... 23

    A.    Plaintiffs Are Likely to Prevail on Their Constitutional Claims ................. 23

        1.    Defendants Are Deliberately Indifferent to the Serious Risk of Harm Posed by Their Deficient TB Program .................................... 25

        2.    Defendants Are Deliberately Indifferent to Administrative Segregation Prisoners' Risk of Suicide and Self-Harm ..................... 26

        3.    Defendants Are Deliberately Indifferent to Prisoners Suffering from Known and Suspected Alcohol and Drug Withdrawal ............. 27

        4.    Defendants Are Deliberately Indifferent to Prisoners Who Enter the Jail on Community-Prescribed Medications ....................... 28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

B.    Plaintiffs Are Likely to Prevail on Their ADA Claims.................................. 30

    1.    The County Defendants Violate the ADA by Denying Prisoners with Difficulty Climbing Stairs Access to Exercise, Religious Services, and Other Programs.............................................. 30

    2.    All Three Defendants Violate the ADA by Never Providing Sign Language Interpreters to Prisoners Who Use Sign Language as Their Primary Method of Communication................... 33

III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF.................................................. 35

IV.    THE BALANCE OF HARDSHIPS TIPS HEAVILY IN PLAINTIFFS' FAVOR................................................................................................ 37

V.    A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST ................... 38

VI.    THE COURT SHOULD WAIVE BOND................................................ 38

VII.    THE RELIEF REQUESTED IS CONSISTENT WITH THE PLRA..................... 39

CONCLUSION.................................................................................... 40

CV 13 2354 PSG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ahktar v. Mesa*,
    698 F.3d 1202 (9th Cir. 2012) ........................................................................... 24

*Aikins v. St. Helena Hosp.*,
    843 F. Supp. 1329 (N.D. Cal. 1994) ................................................................... 34

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ........................................................................... 22

*Amoco Prod. Co. v. Gambell*,
    480 U.S. 531 (1987) ......................................................................................... 37

*Arbuckle v. Ahern*,
    No. C- 12-2076, 2014 WL 2038316 (N.D. Cal. May 16, 2014) ............................ 29

*Armstrong v. Brown*,
    939 F. Supp. 2d 1012 (N.D. Cal. 2013) ......................................................... 33, 34

*Armstrong v. Davis*,
    275 F.3d 849 (9th Cir. 2001) ............................................................................. 39

*Armstrong v. Schwarzenegger*,
    622 F.3d 1058 (9th Cir. 2010) ......................................................... 30, 31, 34, 40

*Bahl v. County of Ramsey*,
    695 F.3d 778 (8th Cir. 2012) ............................................................................. 33

*Balla v. Idaho State Bd. of Corrections*,
    595 F. Supp. 1558 (D. Idaho 1984), *rev'd in part on other grounds*, 869 F.2d
    461 (9th Cir. 1989) ........................................................................................... 28

*Brown v. Plata*,
    131 S. Ct. 1910 (2011) ...................................................................................... 26

*Burriola v. Greater Toledo YMCA*,
    133 F. Supp. 2d 1034 (N.D. Ohio 2001) ............................................................ 37

*Caiozzo v. Koreman*,
    581 F.3d 63 (2d Cir. 2009) ................................................................................ 27

*Cal. Council of the Blind v. County of Alameda*,
    985 F. Supp. 2d 1229 (N.D. Cal. 2013) ............................................................. 30

*California ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
    766 F.2d 1319 (9th Cir. 1985), *amended*, 775 F.2d 998 (9th Cir. 1985) ............. 39

*Carrillo v. Schneider Logistics, Inc.*,
    823 F. Supp. 2d 1040 (C.D. Cal. 2011) .............................................................. 39

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

[1272588-7]

*Clarkson v. Coughlin,*
898 F. Supp. 1019 (S.D.N.Y. 1995) .................................................................. 33, 34

*Cody v. Hillard,*
599 F. Supp. 1025 (D.S.D. 1984) ........................................................................ 25

*Cohen v. City of Culver City,*
754 F.3d 690 (9th Cir. 2014) .............................................................................. 30

*Coleman v. Brown,*
— F. Supp. 2d —, 2014 WL 1400964 (E.D. Cal. Apr. 10, 2014) ......................... 26

*Coleman v. Brown,*
938 F. Supp. 2d 955 (E.D. Cal. 2013) ................................................................. 26

*Cupolo v. Bay Area Rapid Transit,*
5 F. Supp. 2d 1078 (N.D. Cal. 1997) ................................................................... 37

*D.R. v. Antelope Valley Union High Sch. Dist.,*
746 F. Supp. 2d 1132 (C.D. Cal. 2010) ............................................................... 36

*Duffy v. Riveland,*
98 F.3d 447 (9th Cir. 1996) ................................................................................. 33

*E.E.O.C. v. Chrysler Corp.,*
733 F.2d 1183 (6th Cir. 1984) ............................................................................. 37

*Elrod v. Burns,*
427 U.S. 347 (1976) ............................................................................................ 35

*Enyart v. Nat'l Conference of Bar Examiners, Inc.,*
630 F.3d 1153 (9th Cir. 2011) ............................................................................. 38

*Estate of Miller ex rel. Bertram v. Tobiasz,*
680 F.3d 984 (7th Cir. 2012) ............................................................................... 26

*Farmer v. Brennan,*
511 U.S. 825 (1994) ............................................................................................ 24

*Farris v. Seabrook,*
677 F.3d 858 (9th Cir. 2012) ............................................................................... 22

*Fields v. Smith,*
653 F.3d 550 (7th Cir. 2011) ............................................................................... 23

*Foelker v. Outagamie County,*
394 F.3d 510 (7th Cir. 2005) ............................................................................... 27

*Gomez v. Vernon,*
255 F.3d 1118 (9th Cir. 2001) ............................................................................. 39

*Gonzalez v. Cecil County,*
221 F. Supp. 2d 611 (D. Md. 2002) ................................................................. 27, 28

iv                                                                CV 13 2354 PSG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

*Graves v. Arpaio,*
    No. CV-77-0479-PHX-NVW, 2008 WL 4699770 (D. Ariz. Oct. 22, 2008).......... 29

*Hagen v. Jabar,*
    56 Fed. Appx. 302 (9th Cir. 2002) ................................................. 32

*Harper v. Lawrence County,*
    592 F.3d 1227 (11th Cir. 2010) ..................................................... 27

*Harris v. Bd. of Supervisors, L.A. Cnty.,*
    366 F.3d 754 (9th Cir. 2004) ................................................... 37, 38

*Helling v. McKinney,*
    509 U.S. 25 (1993) ............................................................. 24, 25

*Hoptowit v. Ray,*
    682 F.2d 1237 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995) ..................................................... 24

*Hutchinson v. United States,*
    838 F.2d 390 (9th Cir. 1988) ....................................................... 24

*Hydrick v. Hunter,*
    500 F.3d 978 (9th Cir. 2007) ....................................................... 24

*Johnson v. California,*
    543 U.S. 499 (2005) ................................................................ 40

*Jolly v. Badgett,*
    144 F.3d 573 (8th Cir. 1998) ....................................................... 29

*Jones 'El v. Berge,*
    164 F. Supp. 2d 1096 (W.D. Wis. 2001) ........................................ 35, 39

*Lancaster v. Monroe County,*
    116 F.3d 1419 (11th Cir. 1997) ..................................................... 27

*Lareau v. Manson,*
    651 F.2d 96 (2d Cir. 1981) ......................................................... 25

*Lavender v. Lampert,*
    242 F. Supp. 2d 821 (D. Or. 2002) ................................................. 29

*LeMaire v. Maass,*
    12 F.3d 1444 (9th Cir. 1993) ....................................................... 32

*Liscio v. Warren,*
    901 F.2d 274 (2d Cir. 1990), *overruled in part on different grounds by Caiozzo*, 581 F.3d 63 ............................................................. 27

*Lonberg v. City of Riverside,*
    EDCV970237SGLAJWX, 2007 WL 2005177 (C.D. Cal. May 16, 2007) ............. 36

*Lopez v. Heckler,*
    713 F.2d 1432 (9th Cir. 1983) ................................................. 37, 38

CV 13 2354 PSG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

[1272588-7]

*M.H. v. County of Alameda*,
 No. 11-cv-02868, 2014 WL 1429720 (N.D. Cal. Apr. 11, 2014) ........................... 27

*M.R. v. Dreyfus*,
 697 F.3d 706 (9th Cir. 2012) ............................................................................ 23

*Madrid v. Gomez*,
 889 F. Supp. 1146 (N.D. Cal. 1995)............................................................. 25, 26

*Mayweathers v. Newland*,
 258 F.3d 930 (9th Cir. 2001) ........................................................................... 39

*McNally v. Prison Health Servs.*,
 28 F. Supp. 2d 671 (D. Me. 1998)..................................................................... 29

*Melendres v. Arpaio*,
 695 F.3d 990 (9th Cir. 2012) ...................................................................... 35, 38

*Miller v. Carlson*,
 768 F. Supp. 1331 (N.D. Cal. 1991) ................................................................. 39

*Morales Feliciano v. Rosselio Gonzalez*,
 13 F. Supp. 2d 151 (D.P.R. 1998) .................................................................... 25

*Morrison v. Washington County*,
 700 F.2d 678 (11th Cir. 1983).......................................................................... 27

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*,
 422 F.3d 782 (9th Cir. 2005) ........................................................................... 23

*Nieves-Marquez v. Puerto Rico*,
 353 F.3d 108 (1st Cir. 2003) ........................................................................... 23

*Pa. Dep't of Corr. v. Yeskey*,
 524 U.S. 206 (1998) ....................................................................................... 31

*Pierce v. County of Orange*,
 526 F.3d 1190 (9th Cir. 2008) ................................................................ 31, 32, 40

*Plata v. Schwarzenegger*,
 No. C01-1351, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ................................. 25

*Republic of the Philippines v. Marcos*,
 862 F.2d 1355 (9th Cir. 1988) ......................................................................... 23

*Rodde v. Bonta*,
 357 F.3d 988 (9th Cir. 2004) ........................................................................... 37

*Schuenke v. Wis. Dep't of Corr.*,
 No. 13-cv-217, 2013 WL 2558251 (W.D. Wis. June 11, 2013) ............................ 29

*Simmons v. Navajo County*,
 609 F.3d 1011 (9th Cir. 2010) ......................................................................... 24

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

*Stefan v. Olson*,
    497 Fed. App'x 568 (6th Cir. 2012) ........................................................ 27

*Thomas v. Kippermann*,
    846 F.2d 1009 (5th Cir. 1988) ............................................................... 29

*Toussaint v. Rushen*,
    553 F. Supp. 1365 (N.D. Cal. 1983), *aff'd in part sub nom. Toussaint v.*
    *Yockey*, 722 F.2d 1490 (9th Cir. 1984) ............................................. 22, 39

*Von Colln v. County of Ventura*,
    189 F.R.D. 583 (C.D. Cal. 1999) ....................................................... 23, 35

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .............................................................................. 22, 37

*Zukle v. Regents of Univ. of Cal.*,
    166 F.3d 1041 (9th Cir. 1999) ................................................................ 30

## **STATUTES**

18 U.S.C. § 3626(a)(2) ............................................................................ 39, 40

42 U.S.C. § 12131(2) .................................................................................... 32

42 U.S.C. § 12132 ........................................................................................ 30

## **REGULATIONS**

28 C.F.R. § 35.104 ................................................................................. 32, 33

28 C.F.R. § 35.130(b) ................................................................................... 34

28 C.F.R. § 35.130(b)(7) ............................................................................... 31

28 C.F.R. § 35.149 ........................................................................................ 31

28 C.F.R. § 35.150(a) ................................................................................... 31

28 C.F.R. § 35.152(b)(1) ......................................................................... 31, 34

28 C.F.R. § 35.160(b)(1) ............................................................................... 33

28 C.F.R. § 35.160(b)(2) ......................................................................... 33, 34

28 C.F.R. § 36.303(c)(1) ............................................................................... 34

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1

# <u>OTHER AUTHORITIES</u>

Am. Psychiatric Assn., *Position Statement: Segregation of Prisoners with Mental Illness* (2012),
*available at* http://www.psychiatry.org/advocacy--newsroom/position-statements ................................................................................................ 6

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1

**INTRODUCTION**

2      Almost a year ago, the parties' neutral experts issued their reports on conditions at

3  the Monterey County Jail. They documented a host of deficiencies and hazards. Some of

4  these problems were modest, others life-threatening. The experts also proposed remedies.

5  Some were easy fixes, such as changing policies. Others required fundamental changes in

6  the way the Jail is run.

7      Plaintiffs recently have learned that Defendants have done nothing to remedy some

8  of the most serious problems identified by the experts. They therefore ask that the Court

9  enter a preliminary injunction. Absent such relief, every day, the men and women held at

10  the Monterey County Jail face intolerable and illegal risks to their lives and health.

11  Plaintiffs seek this narrow preliminary injunction to ameliorate six of the most egregious

12  problems at the Jail: (1) Defendants' inadequate tuberculosis screening program;

13  (2) Defendants' inadequate policies and practices for continuing necessary and life-saving

14  prescription medications for prisoners newly-booked into the Jail; (3) Defendants'

15  substandard policies and practices for identifying and treating newly booked prisoners

16  experiencing withdrawal from drugs or alcohol; (4) the dangerous conditions in

17  administrative segregation units that place prisoners at extraordinary risk of suicide and

18  self-harm; (5) Defendants' exclusion of prisoners from outdoor exercise, religious services,

19  rehabilitative and educational programs, solely because they cannot climb stairs; and

20  (6) Defendants' policy of never providing sign language interpreters to any prisoners who

21  use sign language as their primary means of communication.

22      All six of these problems place prisoners' lives at risk, trample prisoners'

23  constitutional and statutory rights, and were identified and documented close to a year ago

24  by the neutral experts the parties agreed to in this case. Yet Defendants to date have taken

25  no steps to provide a remedy. Therefore, Plaintiffs seek a preliminary injunction ordering

26  Defendants to take immediate action to end these policies and practices that daily threaten

27  the lives, health, and safety of Plaintiffs and all prisoners in the Jail.

28

1

2

3

**STATEMENT OF FACTS**

**A.     PLAINTIFFS ARE AT SERIOUS RISK OF CONTRACTING AND
SPREADING TUBERCULOSIS**

4     Tuberculosis ("TB") remains a significant public health challenge in the United

5 States.  *See* Decl. of Eric Balaban ("Balaban Decl."), filed herewith, Ex. A (Ctrs. for

6 Disease Control and Prevention ("CDC"), *Prevention and Control of Tuberculosis in*

7 *Correctional and Detention Facilities:  Recommendations from CDC* (June 2006) ("CDC

8 Guidelines")), at 1.  Tuberculosis is spread by droplets in the air produced by the sneezes

9 or coughs of persons with active infection which can remain in the air for long periods of

10 time.  *Id*. at 4, 49.  Symptoms of TB include prolonged coughing, chest pain, and coughing

11 up blood, as well as fever, chills, night sweats, fatigue, loss of appetite, and weight loss.

12 *Id*. at 5.  If not treated properly, TB can be fatal.  *See id.* at 29 ("[P]rogression from

13 exposure to death can be rapid among HIV-infected persons.").

14     Monterey County and California have incidence rates of TB that are higher than the

15 national average.[1]  The risks of TB exposure and infection are particularly high in

16 correctional facilities, where close living arrangements and prolonged exposure result in

17 more common TB outbreaks.  *See* Decl. of Gay Crosthwait Grunfeld ("Grunfeld Decl."),

18 Dkt. No. 49-3, Ex. J (Expert Report of Michael Puisis, D.O. ("Puisis Report")), at 18; *see*

19 *also* Balaban Decl., Ex. E (Transcript of June 16, 2014, Deposition of Michael Puisis

20 ("Puisis Depo.")), at 128:25-129:9; CDC Guidelines at 4 ("One highly infectious person

21 can infect inmates, correctional staff, and visitors who share the same air space."); Balaban

22 Decl., Ex. F (serious outbreak of TB in Alabama prisons).  Those risks are more acute in

23

24

_____

25 [1] *See* Balaban Decl., Ex. B, tbl. 4 (data re: incidence of tuberculosis in California); *id.*,
Ex. C (Cal. Dep't of Public Health, *TB in California:  A Snapshot*); *id.*, Ex. D (CDC,
26 *Trends in Tuberculosis United States*) (noting a national rate of 3 per 100,000 nationally);
*id.*, Ex. AA, (Monterey County Health Department, *Monterey County 2013 Community*
27 *Health Assessment*) (noting a rate of 4.8 per 100,000 in Monterey County) at 83.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

an overcrowded facility like MCJ, where the population ran at 136% of its rated capacity as of last year, and was operating at 120% as of June 2014.  *See* Decl. of Robert Cohen in Supp. of Pls.' Mot. for Preliminary Injunction ("Cohen Decl."), filed herewith, ¶¶ 9-11; Puisis Report at 5; Grunfeld Decl. ¶¶ 25-33 & Ex. I, ¶¶ 1.1, 1.4, 1.5C, 1.7; *id.*, Ex. Y; *id.*, Ex. Z; *id.*, Ex. AA; Second Am. Compl., Dkt. No. 41-4, Ex. B (2011 Jail Needs Assessment by TRG Consulting ("2011 Assessment")), at EX.2, at 9; Balaban Decl., ¶¶ 10, 14 & Ex. H (average daily population in Jail for June 2014 was 986).  As a result, correctional facilities must implement robust tuberculosis screening and prevention programs in order to protect against unnecessarily exposing prisoners to tuberculosis.  *See generally* CDC Guidelines; Balaban Decl., Ex. I (detailed tuberculosis prevention policies and practices in the California Department of Corrections and Rehabilitation).

Despite the higher than average risk of TB exposure in the Jail, Defendants have a tuberculosis screening and treatment program that falls far below the recognized standard of care.  In October 2013, Michael Puisis, D.O.,[2] toured MCJ to evaluate its medical care system as the parties' joint expert.  *See* Grunfeld Decl. ¶ 8 & Ex. B.  Dr. Puisis found numerous, serious problems with MCJ's tuberculosis management program that place the lives and health of prisoners, staff, and visitors at risk:

- Under MCJ's policies, corrections officers—not health care staff—perform symptom screening for TB on intake; health care staff are not required to conduct any TB screening until 14 days after intake.  *See* Puisis Report at 12, 18.  This is inadequate.  The CDC recommends TB symptom screening by a health care professional at facilities like MCJ which are at least medium-sized and have greater than minimal risk of exposure.  *See id*. at 18; Puisis Depo. 128:25-129:10, 171:19-174:3; Cohen Decl. ¶¶ 10-11.

- Effective TB symptom screening must include a series of questions about symptoms that may indicate the prisoner has been exposed to the disease.  *See* Puisis Depo. 164:19-22.  At MCJ, no policy guides officers in conducting TB symptom screening at

_____

[2] Dr. Puisis is an experienced correctional health care administrator and expert, having served as the medical director for the Cook County, IL Jail, and the New Mexico and Illinois Departments of Corrections; and as a court-appointed expert who has assessed jail and prison health care systems in Alabama, California, Ohio, Delaware, and Texas.  *See* Balaban Decl., Ex. J (curriculum vitae of Dr. Puisis).  Dr. Puisis has also worked and published extensively on the detection and control of TB in correctional facilities.  *See id*.

1    intake. Puisis Report at 12. Moreover, Dr. Puisis found that the responsibilities of
officers who conduct health screening at intake "are well beyond their ability to
2    perform," and are performed under conditions that compromise their quality and
reliability. *Id.* at 15. As observed by Dr. Puisis: "Prisoners are lined up in a line
3    listening to what the questions are. Officers perform the test standing up. ... [I]t's done
under conditions of time stress." Puisis Depo. 165:11- 20; *see* Cohen Decl. ¶ 12
4    ("[s]uch an environment is completely inappropriate for a medical evaluation …").

5    •  Individuals who screen positively for TB symptoms should be placed in isolation until
TB is ruled out or, if diagnosed, until it can be treated. *See* CDC Guidelines at 2, 5;
6        Puisis Report at 18. The Jail's TB policy, however, does not require the isolation of
prisoners with positive TB screens. *See* Puisis Report at 18.
7
•  Skin tests for TB should be, but are not, administered promptly to all prisoners. *See*
8        Puisis Depo. 168:1-12. CDC Guidelines recommend tuberculin skin tests of all
inmates within seven days of admission. *See* CDC Guidelines at 8. However, given
9        the high rate of TB in Monterey County and California, MCJ's intake screening
"should be very aggressive." Cohen Decl. ¶ 13. Dr. Puisis agrees that the best practice
10       would be administer TB skin tests on intake, with the results read by a nurse within 72
hours. Puisis Depo. 167:1-168:2. Defendants adhere to neither these more stringent
11       recommendations nor the CDC guidelines. *See* Puisis Report at 12. Under MCJ
policy, **skin tests are administered 14 days after admission, double the seven-day**
12       **timeline recommended by the CDC.** *Id.* at 12. Perhaps more troublingly, rather than
conducting skin tests on all prisoners, MCJ only performs skin testing on
13       approximately a quarter of incoming prisoners. *Id.* at 18.

14   •  MCJ does not require those with positive skin tests to receive chest x-rays within 72
hours, and those with positive x-rays are not required to be medically isolated, as the
15       CDC Guidelines require. *See, e.g.*, *id.* at 12; Puisis Depo. 167:17-21, 168:16-22; CDC
Guidelines at 6. Chest x-rays are thus sometimes performed two or three weeks after a
16       positive skin test reading, or sometimes not performed at all. *See* Puisis Report at 71;
Puisis Depo. 168:17-22.
17
•  There is no evidence of infection control surveillance for TB within MCJ, including
18       tracking TB prevalence, rates, positivity numbers, or employee skin tests. *See* Puisis
Report at 23-24; Puisis Depo. 238:8-17. MCJ medical staff is thus unaware of whether
19       there might be a TB problem within the facility—enhancing the risk that TB can spread
from prisoners to MCJ employees to persons in the community. Puisis Report at 24;
20       Cohen Decl. ¶ 14 ("A primary responsibility of a correctional medical program is to
ensure the continued safety and health of inmates and staff, which is impossible
21       without any effective method of tracking communicable diseases and the efforts of staff
to treat and control them.").
22
23            Dr. Puisis's review of prisoner medical records found repeated examples of

24   potentially dangerous and substandard monitoring and treatment for suspected cases of

25   tuberculosis. On September 9, 2013, Patient 18 experienced night sweats and wheezing

26   and was evaluated by the physician's assistant and given asthma medication without any

27   staff conducting a tuberculin skin test or chest x-ray. *See* Puisis Report at 62. Patient 25

28   was given a tuberculin skin test on September 13, 2012, 16 days after arriving at MCJ,

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

which tested negative. *Id.* at 71. Thirteen months later, on October 15, 2013, during that patient's physical examination, a tuberculin skin test was positive, indicating either that the prisoner was exposed to or infected with TB during his time in the Jail or that the nurse performed the initial skin test inaccurately. *Id.* As of October 24, 2013, nine days later, there had been no follow-up evaluation, x-ray, or symptom history check. *Id.* Patient 26 reported experiencing major symptoms of TB, including night sweats, cough, and sputum production, on August 31, 2013. *Id.* A skin test performed three days later read positive for TB infection. *Id.* A chest x-ray was not ordered until seventeen days later, on September 19, and as of October 24, nearly two full months after the positive symptoms and skin test, no follow-up evaluation had occurred at all. *See id.* Patient 27 had a tuberculin skin test on August 30, 2013, twenty-eight days after arrival at MCJ, which showed positive. *Id.* Patient 28 similarly received a tuberculin skin test twenty days after arriving at MCJ, on October 2, 2013, which showed positive for TB. *Id.* at 72.

Despite Dr. Puisis's findings, the Chief Operating Officer of Defendant California Forensic Medical Group ("CFMG"), the private, for-profit company that provides medical care within the Jail, testified in July that the Jail's TB policies have not changed since Dr. Puisis issued his report ten months ago. *See* Balaban Decl., Ex. K (Transcript of July 16, 2014 Deposition of Elaine Hustedt ("Hustedt Depo.")), at 9:16-21, 49:14-25. Failure to comply with the CDC standards, and the demonstrated inadequacy of TB control, creates a significant risk of harm to the prisoners and staff of MCJ and the community of Monterey County. *See* Puisis Depo. 239:6-8.

**B.   PLAINTIFFS ARE AT SERIOUS RISK OF SUICIDE AND SELF HARM IN THE JAIL'S ADMINISTRATIVE SEGREGATION UNITS**

Since 2010, three prisoners have committed suicide in the Jail, resulting in a suicide rate that is nearly twice the national average for jail populations. *See* Decl. of Pablo Stewart in Supp. of Pls.' Mot. for Class Certification, Dkt. No. 51, ¶ 72. All three of those suicides occurred in the Jail's administrative segregation units, which have particularly harsh conditions. *Id.* ¶¶ 93-96. Prisoners are typically locked in their cells for 23 hours a

day, isolated from fellow prisoners and staff.  *See* Grunfeld Decl., Ex. G, at 217; Balaban

Decl., Ex. G (Transcript of July 23, 2014 Deposition of James Bass ("Bass Depo.")), at

181:22-183:20.  The one hour these prisoners are let out of their cells is their only

opportunity to shower, use the telephone, or exercise. *See* Stewart Decl. ¶ 62; Bass Depo.

181:22-182:2.  On average, 178 prisoners are housed in segregation daily.  *See* Balaban

Decl. ¶ 16 & Ex. H.

      The conditions in segregation increase the risk that prisoners may harm themselves

or attempt suicide.  Approximately half of all suicides committed in correctional facilities

take place in administrative segregation units.  *See* Stewart Decl. ¶ 69.  While housed in

segregation, the mentally ill are likely to deteriorate, and their mental health symptoms—

including depression, psychosis, and self-harm—grow more severe.  *See id.* ¶¶ 63-67; *see

also* Decl. of Robyn Woods in Supp. of Pls.' Mots. for Preliminary Injunction and Class

Certification ("Woods Decl."), filed herewith, ¶ 11.  For these reasons, professional health

organizations have called for the end of solitary confinement of the seriously mentally ill,

or, at a minimum, to limit its use to a last resort, and only under strict controls with

enhanced monitoring and significant out-of-cell time.  *See* Am. Psychiatric Assn., *Position

Statement: Segregation of Prisoners with Mental Illness* (2012), *available at*

http://www.psychiatry.org/advocacy--newsroom/position-statements.

      Prisons and jails around the country have likewise recognized these risks, and have

adopted various safeguards.  These include categorically excluding the mentally ill from

segregation units, screening out prisoners whose placement in segregation is clinically

contraindicated, providing enhanced monitoring to prisoners in segregation to see if they

are manifesting signs or symptoms of suicidality or of emergent mental illness, and

ensuring that the segregation cells are free of hanging points and other hazards that a

prisoner could use to harm himself.  *See* Stewart Decl. ¶¶ 65-66; Puisis Report at 16.

      Rather than seek to protect prisoners from the risks posed by administrative

segregation, Defendants use administrative segregation in ways that markedly increase the

risk that prisoners will harm themselves.  As a matter of policy and practice, Defendants

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1   house the prisoners with the most serious mental illness and who are most clinically

2   unstable in segregation units *because* of their mental illness.  *See* Stewart Decl. ¶ 67;

3   Balaban Decl., Ex. L (May 30, 2014 Review of Mental Health Services at Monterey

4   County Jail ("Final Hayward Report")), at 7-8; Bass Depo. 187:25-188:1-3 (identifying A

5   pod, B pod, R pod and S pod as the locations where prisoners with mental illness are

6   generally held).[3]  And Defendants fail to engage in practices—conducting pre-segregation

7   screening, providing adequate structured and unstructured out-of-cell time, utilizing a

8   suicide risk assessment tool—known to reduce the risks created by administrative

9   segregation.  *See* Final Hayward Report at 8, 16, 18; Stewart Decl. ¶ 75; Balaban Decl.,

10  Ex. M (Transcript of July 8, 2014 Deposition of Dr. Pablo Stewart ("Stewart Depo.")), at

11  9:3-12.

12          Of greatest relevance to this motion, two easily remedied problems pose

13  tremendous risks to prisoners in administrative segregation.  First, correctional standards

14  require that health and safety checks—which have as an explicit purpose to prevent

15  suicides—occur twice every hour at intervals no longer than 30 minutes at unpredictable

16  and intermittent times.  *See* Stewart Decl. ¶ 70.  Defendants' policy requires checks only

17  once per hour and does not require that the checks occur intermittently at unpredictable

18  times.  *See id.*; Grunfeld Decl., Ex. E., § 1106.04.  This places "all prisoners, especially

19  those with serious mental illness, at risk of serious harm."  Stewart Decl. ¶ 70.

20          Second, the cells in administrative segregation are rife with hanging points and

21  other hazards that increase the risk of suicide or self-harm.  In 2007, 2011, and 2013,

22  independent experts found that suicide hazards plague the Jail.  *See* Final Hayward Report

23  at 18; 2011 Assessment, at EX.3 (finding that "[s]uicide hazard elimination is not as

24  

25  _____

26  [3] Indeed, some mentally ill prisoners may even end up in segregation units not specifically
    designated for housing mentally ill prisoners.  *See* Stewart Decl. ¶ 93 (seriously mentally
27  ill prisoner Lariviere committed suicide in I Pod, which is not one of the designated
    "mental health" segregation units).

28

1   stringent as it should be to prevent self-harm and the attendant liability"); Second Am.

2   Compl., Dkt. No. 41-1-3, Ex. A (2007 Jail Needs Assessment by TRG Consulting ("2007

3   Assessment")), at EX.2 (same as 2011 Assessment).

4        These two, specific shortcomings in Defendants' administrative segregation policies

5   and practices have had fatal consequences, as they were contributing factors in all three of

6   the suicides in the Jail since 2010.  Each of the three suicides occurred in administrative

7   segregation cells, including one that occurred in A Pod (one of the units in which

8   Defendants specifically house prisoners with serious, unstable mental illness).  *See* Stewart

9   Decl. ¶¶ 93-96.  Each prisoner committed suicide by attaching sheets or other fabric in

10   their cell to easily accessible hanging points.  *Id.*  By the time that custody staff conducting

11   health and welfare checks discovered that the prisoners were attempting suicide by

12   hanging, two of the prisoners had already died and another had inflicted injuries so severe

13   that he never regained consciousness.  *See* Grunfeld Decl., Dkt. No. 49-16, Exs. DD-GG,

14   at 4-5, 72-77, 84-91 of 97.  In the hours before one of the suicides, the hourly health and

15   welfare checks were conducted at regular, predictable intervals.  *See* Stewart Decl. ¶ 94.

16   Had Defendants' health and welfare checks comported with correctional standards and had

17   Defendants eliminated the suicide hazards about which they have been aware since 2007,

18   all three men may have lived.

19        Plaintiffs with mental illness are continuously placed at serious risk as a result of

20   Defendants' decision to house them in segregation units.  For example, Plaintiff Mefford

21   suffers from numerous serious and chronic psychiatric conditions, including borderline

22   personality disorder, severe depression and anxiety, and attention deficit hyperactivity

23   disorder.  Decl. of Brandon Mefford in Supp. of Pls.' Mot. for Class Certification

24   ("Mefford Decl."), Dkt. No. 52-24, ¶ 3.  He also has a history of suicide attempts and of

25   self-mutilation.  *Id.*  Despite Defendants' knowledge of his mental illness, they placed

26   Plaintiff Mefford in a segregation lockdown unit where he spent at least 23 hours per day

27   in a cell with windows covered by a metal plate.  *Id.* ¶ 4; *see also* Balaban Decl., Ex. N

28   (Transcript of May 22, 2014 Deposition of Brandon Mefford) ("Mefford Depo.")), at

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

41:14-23 (describing being psychiatrically deprived "because I was in a little cell where they blocked the outside window so not knowing what time of the day it was or being able to see the sun outside").  Without exposure to light or social interaction, Plaintiff Mefford felt disoriented and depressed, and developed suicidal ideations.  *See* Mefford Decl. ¶ 7. Despite numerous complaints to staff that the deprivation of human contact and natural light was harming him, he was forced to remain in segregated housing.  *Id.* ¶¶ 35-37.  In response to his grievance explaining that he is "constantly left in a state of sever[e] depression and anxiety and dealing with feelings of cl[a]ustrophobic panic attacks and even suicidal thoughts," Dr. Fithian recommended no change and responded that "We will continue to provide you with as much care and treatment as we can, you need and deserve."  *Id.* ¶ 37 & Ex. NN.  Other prisoners with serious mental illness have similarly been placed in these dangerous lockdown cells.  *See, e.g.*, Decl. of Martha Gomez in Supp. of Pls.' Mot. for Class Certification ("Gomez Decl."), Dkt. No. 52-16, ¶¶ 7, 11; Balaban Decl., Ex. O (Transcript of May 20, 2014 Deposition Martha Gomez ("Gomez Depo.")), at 34:23-35:4; Woods Decl. ¶ 4.

Despite these tragic consequences, Defendants remain committed to their failed approach to suicide prevention in segregation.  CFMG's Chief Operating Officer testified recently that there have been no changes to any of CFMG's suicide prevention policies, including health care checks on persons on suicide watch, nor have there been any discussions to change the policies.  *See* Hustedt Depo. 82:20-83:25, 157:2-13 (CFMG's policies have "worked for us[] [a]nd so we're not anticipating any changes").  And a Commander at the Jail, testifying on behalf of the County, stated that Defendants have done nothing to eliminate suicide hazards in the administrative segregation cells.  *See* Bass Depo. 281:12-282:1.  Defendants' commitment to their failed and dangerous suicide prevention program places prisoners at serious risk of harm.

## C.   PLAINTIFFS ARE AT SERIOUS RISK OF INADEQUATE TREATMENT FOR ALCOHOL AND DRUG DETOXIFICATION

Defendants' policies and practices for identifying and treating prisoners withdraw-

ing from drugs and alcohol place prisoners at substantial risk of harm.  Treating newly

admitted prisoners suffering from drug or alcohol withdrawal is a critical element of ade-

quate medical care in jails nationwide.  *See* Cohen Decl. ¶ 19.  Nationwide, approximately

80% of individuals incarcerated in jails have a history of drug or alcohol dependence.

Balaban Decl., Ex. P, at 1 (CDC, *Substance Abuse Treatment for Drug Users in the Crimi-*

*nal Justice System*).  Approximately 12% and 4% of arrestees are dependent, respectively,

on alcohol and opiates.  *Id.*, Ex. Q (*Alcohol and Opiate Withdrawal in US* Jails), at 1.

There were 73 drug and alcohol intoxication-related deaths nationwide in local jails in

2011, an increase from 54 in 2010.  *See Id.*, Ex. R, at 7 tbl. 1.

Withdrawal from alcohol is a serious and potentially deadly medical condition, with

symptoms including seizures, hallucinations, agitation, and increased blood pressure.  *See*

Cohen Decl. ¶ 18.  One of the most serious manifestations of alcohol withdrawal is

delirium tremens, with symptoms including very rapid pulse, hallucinations, fever, and

hypertension, and a high risk of death.  *Id.*  Delirium tremens requires hospitalization and

careful medical monitoring.  *Id.*  Treatment methods, including detoxification, should be

determined by medical staff.  *See id.* ¶ 20; Puisis Report at 29.

Dr. Puisis identified a host of practices that place detoxifying prisoners at risk at the

Jail.  Defendants use custody staff to perform intake screenings to identify those who

might be at risk for withdrawal symptoms when they are first booked into the Jail.  *See*

Puisis Report at 15, 19-20.  While the Jail's screening procedures do not specify who

should decide if a newly admitted prisoners should be placed in a sobering or

detoxification cell, in practice custody officers also routinely make this decision.  *Id.*

Medical staff should be, but are not, responsible for initial evaluations and

placement of persons into sobering or detoxification cells.  *Id.* at 29.  As Dr. Puisis found,

it is "a major problem" that correctional officers conduct intake screenings.  Puisis Depo.

32:14-15.  "Officers are not trained to identify persons at risk for withdrawal, to evaluate

persons who appear to be intoxicated, or to make medical decisions with respect to

isolation for this purpose.  This should be done by medical professionals not custody

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1  officers."  Puisis Report at 20; *see also* Cohen Decl. ¶ 20 ("use of custody staff to identify

2  these [withdrawal] risks is inappropriate and dangerous," noting that they are not trained to

3  do so, and that incoming prisoners are likely to underreport drug and alcohol use to an

4  officer); Stewart Depo. 61:7-12 (criticizing practice of correctional officers making the

5  decision to place prisoners in sobering cells, noting "[t]hat is a medical decision,

6  necessarily a medical decision because a lot of complexity there.  Lot of things going on

7  that could have potentially very dangerous situation putting people at harm."); Puisis

8  Depo. 131:5-20 ("Officers are just not trained to identify what medical conditions the

9  patient has.  They don't do it well. …  Furthermore, many of the conditions which people

10  come in with are related to drug or alcohol use.  Those may be connected to their charge

11  for which they are being arrested. …  [I]f someone is arrested for alleged driving under

12  the influence, they are probably not going to admit that they're alcoholic.  So you will

13  not—you'll be less likely to get an accurate response if the person asking the question is a

14  custody official who can be perceived as a person who could represent the court,

15  something that would be harmful to you."); *id.* at 243:11-16 ("[A]ssessment … should be

16  made by a clinical person.  I think. …  it's just misplaced to have officers do that, I think

17  it's dangerous, and I think it puts the Sheriff at liability.").  All prisoners who are

18  detoxifying should be, but are not, examined by a physician as soon as possible after being

19  placed in a sobering cell.  *See* Puisis Report at 15.[4]

20      The Jail does not reliably monitor prisoners as they detoxify.  Though Defendants'

21  policy requires that nurses consult with a physician if a patient displays any one of eight

22

---

23  [4] One reason a physician must assess prisoners possibly undergoing withdrawal is that

24  "[t]he altered mental status of alcoholism or drug withdrawal can mask serious injury or
other medical conditions."  *Id.* at 20.  For example, diabetic ketoacidosis, a potentially life-

25  threatening complication, can be confused with the smell of alcohol to those untrained or
unqualified to recognize the condition.  *Id.*  However, Dr. Puisis found numerous instances

26  of diabetic prisoners who were not checked for ketoacidosis at intake or subsequent

27  medical evaluation and instead were presumed to be intoxicated.  *See id.* at 41, 48.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

abnormal signs, Dr. Puisis found based on chart review this does not happen.  *See id.* at 20. Though he was told that physicians are supposed to see all withdrawing patients within 24 hours, Dr. Puisis found this also did not happen.  *See id.*  He concluded, "[b]ased on chart reviews, alcohol and other drug withdrawal syndromes are managed by officers and nurses without physician supervision." *Id.* at 20; *see also id.* at 69-70 (patient placed in and a few hours later removed from a sobering cell by custody officers without physician supervision, despite vital signs indicating he might be in withdrawal); Cohen Decl. ¶ 21 (treatment decisions, "particularly concerning use of medication during withdrawal, should be made by mid-level providers or physicians."); Puisis Depo. 141:10-14 ("[N]urses were kind of on their own to figure out what medications to put people on and would just write the orders for them.").

The Jail does not use the widely accepted and clinically validated Clinical Institute Withdrawal Assessment for alcohol scale, revised ("CIWA") to assess prisoners under-going alcohol withdrawal.  *See* Puisis Report at 20.  The Jail uses a different scale (called AWS), which does not track CIWA, and has not been validated.  *See id.*  Dr. Puisis found that "[r]isk factors and treatment protocols in the CFMG procedure are not consistent with contemporary standards." *Id.*  Moreover, nurses routinely failed to follow even this highly flawed procedure.  *See id.* at 54-55 (for one patient with vital signs consistent with with-drawal, multiple nurses saw the patient but failed to use the AWS flow sheet); *id.* at 56 (for another patient the nurse failed to use the AWS Flow Sheet, did not document the reason for placing the patient on alcohol withdrawal protocol, and indicated that he was at Level 1 detoxification without documenting what medications he was given); *id.* at 63 (a nurse placed a patient on Alcohol Withdrawal Protocol for Level 0 on June 21, 2013 but did not use the AWS form to document the reasoning, then later a nurse elevated the patient to Level 1 but again did not document use of the AWS form or even vital signs); *id.* at 65 (a nurse diagnosed a patient with Level 1 alcohol withdrawal a day after he was incarcerated, but failed to use an AWS form to document how the nurse came to that conclusion). Dr. Puisis concluded, "[t]he use of an un-validated form by nurses, who incompletely

1  follow policy, and perform without proper physician oversight results in nurses managing

2  withdrawal in a serendipitous fashion based on individual nurse practice rather than a

3  clinically based consistent practice." *Id.* at 20.  Dr. Cohen agreed that "[t]he current

4  practices at MCJ of determining the treatment protocol first by the decision of a custody

5  officer and then by a nurse is wholly below the standard of care and can lead to severe

6  consequences.  This is not a theoretical concern.  **Death from inappropriately treated**

7  **alcohol withdrawal happens in jails throughout the United States**."  Cohen Decl. ¶ 22

8  (emphasis added).

9          The Jail also utilizes a single drug protocol for alcohol, benzodiazepine, and opiate

10  withdrawal, even though these are distinct conditions requiring different medications and

11  dosing periods for each.  Puisis Report at 28, 41-42.  Under the protocol, nursing staff—

12  not a physician—makes the decision whether to medicate a withdrawing prisoner.

13  Dr. Puisis found, "[p]lacing all individuals who are withdrawing into a single protocol will

14  invariably result in inappropriate treatment for individual patients." *Id.* at 41.  Moreover,

15  "[g]iving the patient unnecessary medications places the patient at risk of harm." *Id.* at 61.

16          Notwithstanding these life-threatening risks, CFMG has not changed any of its poli-

17  cies and practices regarding chemically dependent or intoxicated prisoners or those addres-

18  sing detoxification since Dr. Puisis issued his report.  *See* Hustedt Depo. 56:15-57:20.

19      **D.      PLAINTIFFS ARE AT SERIOUS RISK OF HAVING THEIR**
              **COMMUNITY-PRESCRIBED MEDICATIONS DISRUPTED**
20

21          It is critical for correctional facilities to maintain continuity of treatment for newly

22  admitted prisoners.  Cohen Decl. ¶¶ 25-27, 31; Puisis Report at 23; Stewart Decl. ¶¶ 34-35.

23  Men and women entering the facility with existing prescriptions for medical conditions,

24  chronic illnesses, and mental illness must all be treated and ensured uninterrupted access to

25  medication.  *See* Puisis Report at 13, 23; Cohen Decl. ¶¶ 25-27, 31-32; Stewart Decl. ¶ 34-

26  35.  In particular, there are a number of chronic conditions for which there should be

27  absolutely no delays for continuation of medication.  These include HIV/AIDS, hyper-

28  tension, kidney disease, epilepsy, cardiac arrest, and asthma/chronic obstructive pulmonary

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1   disease, as well as serious mental illness.  Cohen Decl. ¶ 27.  Defendants' failure to pro-

2   vide medication continuity through immediate verification of prescriptions with a patients'

3   pharmacist or physician, or if that is not possible, evaluation by a physician at the Jail,

4   creates a significant risk of serious harm to patients.  Puisis Report at 13, 23; Cohen Decl.

5   ¶¶ 26, 31; Stewart Decl. ¶¶ 36-37.

6          Dr. Puisis identified systemic problems with medication continuity at the Jail,

7   particularly for those with chronic illnesses.  Puisis Report at 23.  As Dr. Puisis noted:  "At

8   the MCJ if a detainee does not remember the name of his medication or if the health staff

9   can not verify a prescription of medication at a local pharmacy, no medication is provided

10  even when medication is medically necessary."  *Id.*  This places newly admitted prisoners

11  at an unreasonable risk of having life-saving medications disrupted.  Similarly, Defendants

12  lack any "formal mechanism for ... how a patient who brought medication in would then be

13  allowed to keep it."  Puisis Depo. 22:10-14.  Dr. Puisis particularly noted that prisoners

14  suffering from hypertension and asthma did not get their community prescriptions timely

15  continued.  *Id.*  Even a short-term disruption in these medications can potentially be life-

16  threatening.  Cohen Decl. ¶¶ 26, 31.

17         Dr. Puisis recommended that the Jail's policy for continuation of medication be

18  rewritten.  Puisis Report at 13.  The current policy inappropriately restricts medications

19  that should be continued without interruption after booking.  *Id.*  Under CFMG's policy,

20  when a new prisoner cannot remember the name of his medication, or where he got it, the

21  nurse is not required to call a physician to determine if a bridge order for medications or

22  other treatment should be offered.  *See id.*  In these circumstances, "MCJ must ensure that

23  when necessary medication can't be verified, a physician must timely evaluate the patient

24  to ensure continuity of necessary medication."  *Id.*  Across the county, prisons and jails

25  authorize physicians to write bridge orders to ensure continued medication upon

26  incarceration, until such time as medical staff can verify prescriptions.  *See* Cohen Decl.

27  ¶ 33.  This does not happen at the Jail.  Yet Ms. Hustedt, the Chief Operating Officer of

28  CFMG, recently testified that the company has made no changes to its flawed medication

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1   policies despite Dr. Puisis' findings.  *See* Hustedt Depo. 50:25-51:5.

2        Dr. Puisis noted repeated examples of medical staff failing to verify and adequately

3   continue provision of vital medications to newly admitted prisoners.  Patient 1 entered

4   MCJ on August 22, 2013, and immediately informed custody and medical staff that he was

5   taking blood pressure medication and was under physician care for high blood pressure.

6   Puisis Report at 32.  Medical staff failed to verify or provide him with his medications.  *Id.*

7   He did not receive his first dose of hypertension medication until September 2, and only

8   then when his blood pressure was 190/126, he started suffering from headache, blurry

9   vision, vomiting, and drooling, and had to be taken to the hospital.  *Id.*  Such hospitaliza-

10  tion could have been prevented if the patient had timely received medication—within 24

11  hours of incarceration.  *Id.*

12       On July 11, 2013, Patient 18 entered the Jail, and informed custody and medical

13  staff that he suffered from asthma, emphysema, lung disease, and chronic obstructive

14  pulmonary disease, and took albuterol for it.  *Id.* at 60.  Without consulting a physician, the

15  nurse ordered albuterol, though only for a single day.  *Id.* at 61.  On July 16, a physician's

16  assistant saw the patient and ordered flovent and an albuterol nebulizer treatment for seven

17  days, though no hand-held inhaler despite that being the prescription the patient had upon

18  entering the Jail.  *Id.*  On August 2, three weeks after the initial intake, the patient was

19  evaluated emergently by a nurse for shortness of breath, and only then did the physician's

20  assistant order albuterol and flovent inhalers.  *Id.* at 61-62.

21       On September 15, 2013, Patient 24 arrived at the Jail and was placed in a sobering

22  cell, with no assessment for medication history or needs.  *Id.* at 69.  Two weeks later, on

23  October 1, the patient's family brought his blood pressure medications to the Jail, but

24  medical staff did not prescribe or administer these medications to the patient.  *Id.*  On

25  October 7, a doctor saw the patient and observed an abnormal blood pressure of 142/93,

26  but did not take a medication history and did not prescribe blood pressure medication.  *Id.*

27  at 70.  On October 14, **almost a month after arriving at MCJ** and not being placed on

28  any medications, a nurse emergently responded to the patient for life-threateningly high

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

blood pressure of 250/140.  *Id.*  Only then did a doctor note that as an outpatient the inmate had taken amlodipine, simvastatin, and Flomax for blood pressure, and finally ordered HCTZ, amlodipine, atenolol, Flomax, and simvastatin.  *Id.*  In other words, the patient was not prescribed necessary blood pressure medication until a blood pressure-related crisis occurred nearly a month into his incarceration.

In addition, numerous Plaintiffs experienced disruptions to community-prescribed medications for medical conditions, chronic illnesses, and mental illness that were crucial to their day-to-day functioning and comfort.  *See, e.g.*, Decl. of Ramona Gist in Supp. of Pls.' Mot. for Class Certification ("Gist Decl."), Dkt. No. 52-14, ¶¶ 3-12 (prisoner with longstanding history of mental illness repeatedly denied psychiatric medications, including because she "needs to be clean and sober for 90 days") & Exs. A-O (same); Balaban Decl., Ex. S (Transcript of May 15, 2014 Deposition of Ramona Gist ("Gist Depo.")), at 51:23-52:6 (same); Gomez Decl. ¶ 7 (deprived of mental health medications for a month) & Ex. C (physician progress note stating that, after over a month, Ms. Gomez would be given medication); Gomez Depo. 75:25-76:16 (same); Decl. of George Greim in Supp. of Pls.' Mot. for Class, Dkt. No. 52-18, ¶¶ 4-18 & Exs. D-W (ordered 90 day "clean and sober" period before being "considered for any type of psychiatric medication," and denied medication even after expiration of that time); Balaban Decl., Ex. T (Transcript of May 20, 2014 Deposition of Glenda Hunter ("Hunter Depo.")), at 17:15-24, 26:8-19 (explaining that "I don't know what's going on, I am hearing voices, now I am thinking people [are] talking about me, I feel scared, I feel threatened in here" as a result of the Jail taking "me completely off every psych med" she was prescribed prior to incarceration); Decl. of Jason Hobbs in Supp. of Pls.' Mot. for Class Certification ("Hobbs Decl."), Dkt. No. 52-22, ¶ 23 & Ex. I (denied numerous psychiatric and pain medications despite verification of prescriptions by Jail nurse); Mefford Decl. ¶¶ 8-9 (describing how a change in prescribed medications did not help with symptoms and upset his stomach); *id.* ¶ 39 & Ex. PP (asthma inhaler taken during a custody raid and medical staff refused to return it because "no record" of asthma); Decl. of Clyde Whitfield in Supp. of Pls.' Mot. for Class Certifica-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

[1272588-7]

1   tion ("Whitfield Decl."), Dkt. No. 52-28, ¶¶ 3-5, 13-16, 18 & Exs. J-M (Plaintiff denied his

2   prescribed medication for narcolepsy for the first eight weeks of his incarceration);

3   Balaban Decl., Ex. U  (Transcript of May 21, 2014 Deposition of Clyde Whitfield

4   ("Whitfield Depo.")), at 9:10-13; 18:25-19:2 (same); *id.*, Ex. V (Transcript of June 26,

5   2014 Deposition of Richard Murphy ("Murphy Depo.")), at 7:5-15 (describing how

6   Plaintiff's prescribed psychiatric medications were discontinued for the first ten days of his

7   incarceration; thereafter, he received the wrong medication that did not work and had to

8   wait another eight to ten days before even seeing a doctor); Decl. of Sean Esquivel in

9   Supp. of Pls.' Mot. for Class Certification ("Esquivel Decl."), Dkt. No. 52-12, ¶¶ 11-12, 24

10  & Ex. I (describing how the Jail failed to provide him with a CPAP machine for his sleep

11  apnea, and refused to refill his asthma inhalers when they run out of medication); *see also*

12  Decl. of Bradley Buell in Supp. of Pls.' Mots. for Preliminary Injunction and Class

13  Certification, filed herewith, at 3, 6 (prisoner at the jail describing how the Jail failed to

14  continue his prescriptions for Norco and Valium).

### E.   DEFENDANTS DENY PRISONERS WITH DISABILITIES ACCESS TO CRITICAL JAIL PROGRAMS AND SERVICES

#### 1.   Defendants Deny Prisoners Unable to Climb Stairs Access to the Exercise Yard, Religious Services, and Educational and Rehabilitative Programs

19       In Fall 2013, the parties jointly retained SZS Consulting as a neutral expert to

20  evaluate Defendants' compliance with the Americans with Disabilities Act and other disa-

21  bility rights laws.  *See* Grunfeld Decl. ¶ 10 & Ex. D.  SZS Consulting's detailed report

22  found that Defendants County of Monterey and Monterey County Sheriff's Office ("the

23  County Defendants") operate the Jail in violation of the rights and needs of prisoners with

24  disabilities, including through 119 structural barriers.  *See id.*, Ex. K ("SZS Report").

25  These barriers harm prisoners with disabilities in multiple ways.  Perhaps most egre-

26  giously, Defendants deny those with mobility impairments access to important Jail

27  programs and services—exercise, religious services, and rehabilitative and educational

28  programs—by offering those programs in locations that are inaccessible to prisoners who

1    cannot climb stairs.

2        Defendants house approximately 430 prisoners—all of the approximately 140

3    women prisoners and approximately 290 of the male prisoners in the Jail—in areas of the

4    Jail for which the only exercise yards are located on the roof of the Jail.  *See* SZS Report at

5    9, 695; Bass Depo. 283:10-284:23; *see* Balaban Decl. ¶¶ 9-13 & Exs. G, H.  Among these

6    430 prisoners are numerous prisoners who have trouble walking and climbing stairs, as

7    well as many of the named plaintiffs in this action.  *See* Bass Depo. 191:7-22 (Cmdr. Bass

8    testifying that Defendants house prisoners with who are able to ambulate, but for whom it

9    is difficult or painful for them to walk, in all housing units in the Jail).

10       The only way for these 430 prisoners to access the rooftop exercise yards is to

11   climb a set of stairs, *see* SZS Report at 9; Bass Depo. 283:10-284:4, and there is no alter-

12   native space in which the County Defendants offer exercise to those prisoners, *see* Bass

13   Depo. 284:5-23.  As a result, for these 430 prisoners, outdoor exercise is completely inac-

14   cessible if they are unable to climb stairs.  As SZS Consulting concluded:  "[N]o accessible

15   exercise areas are provided in the facility for female inmates and male inmates have access

16   to exercise areas only if they are housed in dorms A, B, C, or D."  SZS Report at 9.

17       The County Defendants also offer religious services, at least one educational

18   program called Choices and Pride (completion of which results in a five-day reduction in a

19   prisoner's sentence), and Narcotics and Alcoholics Anonymous meetings to prisoners in

20   indoor spaces located up the same inaccessible flight of stairs that provides access to the

21   rooftop exercise yards.  *See* Decl. of Susan Dilley in Supp. of Pls.' Mot. for Class

22   Certification ("Dilley Decl."), Dkt. No. 52-8, ¶¶ 13, 15; Gist Decl. ¶ 25.

23       Plaintiffs have been and continue to be excluded from these programs solely

24   because of their disabilities.  For example, Plaintiff Susan Dilley, who is currently housed

25   in Q Pod but has also been housed in T and U Pods and has trouble walking because of

26   multiple sclerosis, cannot climb more than one or two stairs without serious pain.  *See*

27   Dilley Decl. ¶ 4; Balaban Decl., Ex. W (Transcript of May 13, 2014 Deposition of Susan

28   Dilley ("Dilley Depo.")), at 74:10-13.  In addition, it took the Jail many months to give

1  Plaintiff Dilley the cane she requested, thereby further limiting her ability to climb stairs or

2  otherwise access programs.  *See* Dilley Decl., Exs. F (November 11, 2013 order for cane)

3  & G (November 25, 2013 doctor's note that Dilley had not yet received cane).  As a result,

4  she has not been to the exercise yard since she was booked into the Jail in June 2013, and

5  the only times she has gone outside have been to go to court and for medical appointments

6  at facilities outside of the Jail.  *See* Dilley Decl. ¶ 12; *see* Dilley Depo. 70:11-24.  She has

7  also been unable to attend the religious services offered by the Jail because of the pain

8  caused by climbing the stairs.  Dilley Decl. ¶ 13; Dilley Depo. 70:25-71:10.  Though

9  Plaintiff Dilley attended one session of the Choices and Pride program because of her

10  desire to receive a five-day reduction to her sentence, the pain caused by climbing the

11  stairs was so severe that she was uncertain whether she would be able to attend any other

12  sessions.  Dilley Decl. ¶ 15.

13       Other Plaintiffs have been also been denied access to exercise, Choices and Pride,

14  and Alcoholics and Narcotics Anonymous meetings because the programs are offered only

15  up the flight of stairs.  *See* Esquivel Decl. ¶¶ 3, 10 & Exs. F, G (Plaintiff in wheelchair

16  unable to access rooftop exercise yards and was additionally denied services by being

17  given a broken wheelchair); Gist Decl. ¶¶ 17, 23, 25 (Plaintiff who requires a cane has

18  great difficulty accessing the rooftop exercise yard and Narcotics and Alcoholic

19  Anonymous meetings); Gist Depo. 62:10-21 (same); Hobbs Decl. ¶¶ 9-10 (Plaintiff with

20  back problems did not access rooftop exercise yard as frequently as he would have because

21  of pain caused by climbing stairs); Balaban Decl., Ex. X (Transcript of May 14, 2014

22  Deposition of Jason Hobbs ("Hobbs Depo.")), at 40:16-41:6 (same); Whitfield Decl. ¶¶ 3,

23  20-21 (Plaintiff with narcolepsy afraid to climb stairs to access yard because of risk of

24  falling); Decl. of Connie Dobbs in Supp. of Pls.' Mot. for Class Certification ("Dobbs

25  Decl."), Dkt. No. 52-10, ¶ 10 (Plaintiff with chronic leg pain that makes climbing stairs

26  difficult); *see also* Gomez Decl. ¶ 4 (Plaintiff uses a walker to assist walking); Gomez

27  Depo. 53:7-11 (same); Decl. of Angel Perez in Supp. of Pls.' Mot. for Class Certification

28  ("Perez Decl."), Dkt. No. 52-26, ¶ 7 (Plaintiff uses a cane to assist walking); Balaban

1  Decl., Ex. Y (Transcript of May 21, 2014 Deposition of Angel Perez ("Perez Depo.")), at

2  47:18-20 (same); Buell Decl. at 8-9 (Jail prisoner has a prosthetic leg that is falling apart

3  and has pain walking).  Plaintiffs' exclusion from these programs has not just resulted in

4  discrimination, but has also harmed Plaintiffs' mental health, causing anxiety and

5  depression.  *See* Whitfield Decl. ¶ 21; Dilley Decl. ¶ 12.

### 2. Defendants Never Provide Sign Language Interpreters to Prisoners Who Use Sign Language as Their Primary Method of Communication

8  Defendants leave prisoners in the Jail who use sign language as their primary

9  method of communication to fend for themselves.  SZS Consulting found that Defendants

10  **never** provide sign language interpreters to prisoners who use sign language as their

11  primary method of communication.  *See* SZS Report at 7.  This means that prisoners may

12  not be able to communicate effectively with staff during critical interactions, including

13  during the booking and intake process (during which prisoners are assigned housing and

14  make staff aware of medical problems) and for appointments with medical, mental health,

15  and dental staff.  *Id.* at 7, 9.  Defendants do not have **any** policies, including policies

16  regarding sign language interpreters, to ensure effective communication with prisoners

17  with disabilities that affect communication.  *See id.* at 7 ("We were unable to identify the

18  use of any policy or practice implemented through interviews with facility personnel that

19  would enable effective communication between personnel and inmates in the receiving

20  area with hearing or speech impairments."); *id.* at 19-20, 22-24 (indicating where CFMG

21  Policy and Procedure manual should, but did not, include provisions to ensure effective

22  communication with individuals who have hearing and speech impairments).

23  Defendants' complete failure, in both policy and practice, to provide sign language

24  interpreters can and has had serious consequences.  For example, Plaintiff Robert Yancey

25  is deaf and uses sign language as his primary method of communication.  *See* Decl. of

26  Robert Yancey in Supp. of Pls.' Mot. for Class Certification ("Yancey Decl."), Dkt. No.

27  52-30, ¶ 4.  Among the many ways the Jail violated his rights, Defendants **never provided**

28  **him with a sign language interpreter**, including for the intake process, for medical

1   appointments, for disciplinary hearings, and for church services.  *Id.* ¶¶ 6-8, 11-13, 23;

2   Balaban Decl., Ex. Z (Transcript of May 27, 2014 Deposition of Robert Yancey ("Yancey

3   Depo.")), at 6:23-7:6, 21:25-22:16, 46:6-14, 63:25-64:3.  Defendants did not provide him

4   with a sign language interpreter even though for much of his time in the Jail, Plaintiff

5   Yancey's writing hand was in a cast, which precluded him from using written notes as a

6   secondary method of communication.  *See* Yancey Decl. ¶ 9; Yancey Depo 6:25-7:6.

7   Without a sign language interpreter, Plaintiff Yancey had serious problems communicating

8   with custody and medical staff, which placed his health in danger at medical appointments

9   and caused him to experience unnecessary pain and suffering, Yancey Decl. ¶¶ 16, 23;

10  Yancey Depo. 22:9-25, prevented him from using the TDD phone, Yancey Decl. ¶¶ 11, 14,

11  15; Yancey Depo. 45:20-46:5, 58:6-60:4, interfered with communication and

12  comprehension at two disciplinary hearing at which he was found to have violated Jail

13  rules and punished with loss of privileges, Yancey Decl. ¶¶ 11-13, and resulted in his

14  inability to participate in and understand religious services, *id.* ¶ 17; Yancey Depo. 46:6-

15  19.  At one medical appointment two days after he was booked into the Jail, Plaintiff

16  Yancey attempted to receive treatment for a leg injury that was so painful he could not

17  bear any weight on the leg.  Because Defendants did not provide Plaintiff Yancey with a

18  sign language interpreter, the physician's assistant who conducted the evaluation noted that

19  the "[e]xam is limited due to decreased verbal communication ...," and did not provide him

20  with adequate treatment for his pain.  Yancey Decl. ¶ 23 & Ex. N.

21      Defendants have been aware, since May 2013 (when Plaintiffs filed their initial

22  Complaint) and certainly since SZS Consulting issued its report in November 2013, of the

23  problems posed by their failure to provide sign language interpreters to prisoners.  Yet

24  Defendants have not made changes to any relevant policies or practices to ensure sign

25  language interpreters are furnished when needed.  *See* Bass Depo. 280:2-7 (Cmdr. Bass

26  testifying that the County has made no changes to "any of its policies or practices

27  regarding obtaining sign language interpreters to interpret for prisoners in the Monterey

28  County Jail who use sign language as their primary method of communication"); Hustedt

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

Depo. 9:16-21, 88:2-18 (Chief Operating Officer for CFMG testifying that CFMG had not made "any changes in the policies, practices, or procedures regarding the provision of sign language interpreters for hearing-impaired inmates during medical appointments").  Thus, any prisoner who uses sign language as his or her primary method of communication is certain to be denied access to a sign language interpreter while in the Jail.

**ARGUMENT**

## I.   PLAINTIFFS MEET THE STANDARD FOR A PRELIMINARY INJUNCTION

In seeking a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Ninth Circuit has "also articulated an alternate formulation of the *Winter* test, under which serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted)).  Under this "sliding scale" approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Alliance for the Wild Rockies*, 632 F.3d at 1131. Plaintiffs here have met either formulation of the test.

Plaintiffs' motion is consistent with prior decisions granting preliminary injunctions to protect prisoners from unconstitutional and illegal conditions of confinement that threaten prisoners' health and safety.  For example, in *Toussaint v. Rushen*, 553 F. Supp. 1365, 1385 (N.D. Cal. 1983), *aff'd in part sub nom. Toussaint v. Yockey*, 722 F.2d 1490 (9th Cir. 1984), the district court granted thirteen elements of relief to prisoners in administrative segregation in California prisons, including requiring defendants to

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR<br>PRELIMINARY INJUNCTION

1    "provide adequate and competent medical, surgical, psychiatric and dental services to meet

2    the bona fide needs of prisoners … [and] maintain adequate facilities and staff for such

3    service."  *See also Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011) (upholding

4    preliminary injunction striking down, under Eighth Amendment, state law that prohibited

5    provision of certain medical treatments to transgender prisoners); *Von Colln v. County of*

6    *Ventura*, 189 F.R.D. 583, 598-99 (C.D. Cal. 1999) (granting preliminary injunction under

7    Eighth Amendment prohibiting use of restraint chair).  And courts have also approved

8    preliminary injunctive relief under the ADA to protect the rights of individuals with

9    disabilities.  *See, e.g.*, *M.R. v. Dreyfus*, 697 F.3d 706, 739 (9th Cir. 2012) (en banc)

10   (reversing in ADA case denial of preliminary injunction seeking to block decreases in state

11   Medicaid expenditures for in home personal care services provided to disabled

12   individuals); *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 122 (1st Cir. 2003) (upholding

13   preliminary injunction under ADA and Rehabilitation Act requiring that Puerto Rico

14   Department of Education furnish sign language interpreter to hard of hearing teenager).

15   As shown below, Plaintiffs satisfy each requirement for and should be granted a

16   preliminary injunction.

17   **II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
18         CLAIMS UNDER THE CONSTITUTION AND THE AMERICANS WITH
         DISABILITIES ACT**

19          To establish a substantial likelihood of success on the merits, Plaintiffs are only

20   obligated to show "a fair chance of success."  *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries*

21   *Serv.*, 422 F.3d 782, 794 (9th Cir. 2005) (quoting *Republic of the Philippines v. Marcos*,

22   862 F.2d 1355, 1362 (9th Cir. 1988) (en banc)).  Here, Plaintiffs clearly exceed this

23   threshold.

24          **A.    Plaintiffs Are Likely to Prevail on Their Constitutional Claims**

25          The Monterey County Jail holds both pretrial detainees as well as sentenced

26   inmates—on average, about three quarters of the population are pretrial, while the

27   remaining quarter are sentenced.  *See* Balaban Decl., Ex. H.  Though the United States

28   Constitution affords pretrial detainees greater protection from dangerous conditions of

confinement than sentenced prisoners, *see Hydrick v. Hunter*, 500 F.3d 978, 994 (9th Cir. 2007), courts evaluating the claims of pretrial detainees under the Fourteenth Amendment have used the Eighth Amendment's analytical framework. *See Simmons v. Navajo County*, 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants violate the Eighth Amendment if they incarcerate Plaintiffs under conditions posing a substantial risk of serious harm to Plaintiffs' health or safety (the objective prong), and Defendants acted with deliberate indifference, that is, with conscious disregard for that risk (the subjective prong). *See Farmer v. Brennan*, 511 U.S. 825, 834, 839-40 (1994). Unsafe conditions that "pose an unreasonable risk of serious damage to [a prisoner's] future health" may satisfy this objective prong and show violation of the Eighth Amendment, even if the damage has not yet occurred and may not affect every prisoner exposed to the conditions. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993). As the Supreme Court stated in *Helling*, prison officials may not "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," merely because no harm has yet occurred. *Id.* at 33.

Both prisoners and pretrial detainees have a right to adequate care for serious medical and mental health needs. *See Hoptowit v. Ray*, 682 F.2d 1237, 1252-54 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (officials may be deliberately indifferent if they "deny, delay or intentionally interfere with medical treatment," or if the method by which they provide care is inadequate). Conditions that significantly affect a person's daily activities or cause chronic and substantial pain constitute serious medical needs, even if they are not life-threatening. *See*, *e.g.*, *Ahktar v. Mesa*, 698 F.3d 1202, 1213-14 (9th Cir. 2012) (rejecting officials' claims that prisoner had not alleged sufficiently serious medical needs when officials repeatedly ignored his disability, causing him chronic pain and humiliation).

1.  **Defendants Are Deliberately Indifferent to the Serious Risk of Harm Posed by Their Deficient TB Program**

By failing adequately to screen incoming prisoners for tuberculosis, Defendants are deliberately indifferent to Plaintiffs' serious medical needs.  *See Lareau v. Manson*, 651 F.2d 96, 109 (2d Cir. 1981) (failure adequately to screen newly admitted prisoners for infectious diseases constituted a serious threat to the health of prisoners "sufficiently harmful to evidence deliberate indifference to serious medical needs"); *Morales Feliciano v. Rosselio Gonzalez*, 13 F. Supp. 2d 151, 210 (D.P.R. 1998) ("The failure to screen incoming prisoners for infectious diseases including tuberculosis" violates the Constitution.); *Madrid v. Gomez*, 889 F. Supp. 1146, 1257 (N.D. Cal. 1995) ("Screenings for communicable diseases should be sufficient to protect other prisoners from infectious diseases."); *Cody v. Hillard*, 599 F. Supp. 1025, 1059 (D.S.D. 1984) ("[P]roper screening of prisoners is a vital element of adequate medical services." (internal citations and quotation marks omitted)); *Plata v. Schwarzenegger*, No. C01-1351, 2005 WL 2932253, at *12 (N.D. Cal. Oct. 3, 2005) ("This intake process is supposed to allow medical staff to identify the medical problems, in particular communicable diseases such as syphilis and tuberculosis, that pose a risk of transmission to other prisoners.").

Plaintiffs need not show that prisoners have actually contracted tuberculosis as a result of Defendants' acts or omissions to establish constitutional liability.  *Lareau*, 651 F.2d at 109 ("[I]t is unnecessary to require evidence that an infectious disease has actually spread in an overcrowded jail before issuing a remedy.").  As the Supreme Court held in *Helling*, "[n]or can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms ... a remedy for unsafe conditions need not await a tragic event."  509 U.S. at 33.

Defendants' tuberculosis screening and control program creates an excessive risk of harm, both to prisoners who may have the disease and for those who risk being exposed to it.  *See* Statement of Facts, *supra*, at 2-5.  Defendants' use of custody staff instead of

1  trained health care professionals to screen for tuberculosis symptoms at intake, their failure

2  to isolate prisoners with suspected TB, to timely conduct skin tests to detect the disease, to

3  test and monitor the entire Jail population, and to monitor and track their TB control

4  program all place the prisoner population and the community as a whole at an

5  unreasonable risk.  *See id.*  Such practices violate CDC guidelines for tuberculosis

6  screening and treatment, and fall well below the standard of care articulated by the parties'

7  joint medical expert, Dr. Puisis. Though Defendants have known about these risks since

8  Dr. Puisis issued his report last year, they have failed to remedy them.  Their failure to act

9  constitutes deliberate indifference.

10         **2.    Defendants Are Deliberately Indifferent to Administrative
                    Segregation Prisoners' Risk of Suicide and Self-Harm**

11

12         "To state the obvious, 'suicide is a serious harm.'"  *Coleman v. Brown*, 938 F.

13  Supp. 2d 955, 975 (E.D. Cal. 2013) (quoting *Estate of Miller ex rel. Bertram v. Tobiasz*,

14  680 F.3d 984, 989 (7th Cir. 2012)).  Officials at facilities where there are known suicide

15  risks "are required to take all reasonable steps to prevent the harm of suicide." *Coleman*,

16  938 F. Supp. 2d at 975 (finding ongoing deliberate indifference for failure to improve

17  suicide prevention); *cf. Brown v. Plata*, 131 S. Ct. 1910, 1934 (2011) (describing evidence

18  of two suicides by hanging that occurred in cells "identified as requiring a simple fix to

19  remove attachment points that could support a noose").

20         Federal courts have repeatedly recognized the severe risk of harm to seriously

21  mentally ill prisoners housed in segregation or isolation.  *See*, *e.g.*, *Madrid*, 889 F. Supp. at

22  1265-66 ("For [seriously mentally ill] inmates, placing them in [segregation] is the mental

23  equivalent of putting an asthmatic in a place with little air to breathe."); *see also Coleman*

24  *v. Brown*, — F. Supp. 2d —, 2014 WL 1400964, at *24 (E.D. Cal. Apr. 10, 2014)

25  ("[P]lacement of seriously mentally ill prisoners in the harsh, restrictive and non-

26  therapeutic conditions of California's administrative segregation units for non-disciplinary

27  reasons for more than a minimal period ... violates the Eighth Amendment.").

28         Defendants, from the three completed suicides and from the 2007, 2011, and 2013

1  expert reports, have been well aware of the grave risk of self-harm and suicide posed by

2  the suicide hazards in the administrative segregation cells and by Defendants' failure to

3  conduct twice hourly safety checks on prisoners in administrative segregation.  Yet,

4  Defendants have disregarded these known risks.  *See* Statements of Facts, *supra*, at 5-9.

5  Their acts and omissions constitute deliberate indifference to the risk of suicide and self-

6  harm for prisoners in segregation.

7         **3.     Defendants Are Deliberately Indifferent to Prisoners Suffering
                    from Known and Suspected Alcohol and Drug Withdrawal**

8

9         Both opiate withdrawal, *Foelker v. Outagamie County*, 394 F.3d 510, 513 (7th Cir.

10  2005) (finding opiate withdrawal amounts to a serious medical need); *Gonzalez v. Cecil*

11  *County*, 221 F. Supp. 2d 611, 616 (D. Md. 2002) (finding that heroin withdrawal is a

12  serious medical need), and alcohol withdrawal, *Stefan v. Olson*, 497 Fed. App'x 568, 577

13  (6th Cir. 2012); *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009); *Lancaster v. Monroe*

14  *County*, 116 F.3d 1419, 1427 (11th Cir. 1997), are serious medical needs under the Eighth

15  Amendment.  Accordingly, the Eighth Amendment requires that prisoners who are

16  suffering from withdrawal receive appropriate medical care.  *See M.H. v. County of*

17  *Alameda*, No. 11-cv-02868, 2014 WL 1429720, at *20-21 (N.D. Cal. Apr. 11, 2014) (find-

18  ing deliberate indifference after defendant was "subjectively aware of the risk of alcohol

19  withdrawal, but failed nevertheless to fill out a CIWA form, initiate the CIWA protocol, or

20  otherwise ensure [plaintiff] would receive medical help"); *Harper v. Lawrence County*,

21  592 F.3d 1227, 1237 (11th Cir. 2010) (explaining that delayed or inadequate treatment of

22  alcohol withdrawal is "unlawful"); *Liscio v. Warren*, 901 F.2d 274, 275-77 (2d Cir. 1990)

23  (finding deliberate indifference when staff-ordered withdrawal regimen was inadequate

24  because provider failed to examine prisoner for three days), *overruled in part on different*

25  *grounds by Caiozzo*, 581 F.3d 63; *Morrison v. Washington County*, 700 F.2d 678, 686

26  (11th Cir. 1983) (concluding that a deliberate indifference finding could be made where

27  prison officials place or keep a chronic alcoholic in jail without any medical supervision

28  when defendants are aware that the alcoholic is suffering from a severe form of alcohol

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1  withdrawal); *Gonzalez*, 221 F. Supp. 2d at 617 (stating that a policy of refusing meaningful

2  treatment for heroin withdrawal could lead to a finding of deliberate indifference).

3          Medically inappropriate medication protocols may constitute deliberate indifference

4  to a serious health care need.  *Balla v. Idaho State Bd. of Corrections*, 595 F. Supp. 1558,

5  1577 (D. Idaho 1984) ("[P]rescription and administration of behavior-altering medications

6  in dangerous amounts, by dangerous methods, or without appropriate supervision and

7  periodic evaluation, is an unacceptable method of treatment." (citation omitted)), *rev'd in*

8  *part on other grounds*, 869 F.2d 461 (9th Cir. 1989).

9          Defendants have utterly failed to implement a reliable system to identify, treat, and

10 safely house persons suffering from withdrawals.  They inappropriately rely on

11 nonmedical staff to identify intoxicated and withdrawing prisoners, and to move them to

12 sobering cells, a dangerous and indefensible practice that places the lives of withdrawing

13 prisoners at risk.  *See* Statement of Facts, *supra*, at 9-13.  And if treatment is provided, it is

14 typically left in the hands of nursing staff:  Physicians play hardly any role in treating

15 prisoners for withdrawal, even when at high-risk.  Nursing staff regularly violate the Jail's

16 own treatment protocols requiring them to refer clinically unstable prisoners to a physician

17 undergoing withdrawals.  The use of a clinically inappropriate medication protocol that is

18 one-size-fits-all by design, and the practice of halting the withdrawing patient's other

19 necessary medications, including psychotropic medications, are punitive, medically

20 contraindicated, and dangerous.  *See id.*

21         MCJ's practices and policy for withdrawal and detoxification thus subject prisoners

22 to serious risk of harm.  Defendants know about these risks, but have consciously

23 disregarded them.  Their acts and omissions constitute deliberate indifference to prisoners

24 who are undergoing and at risk of withdrawals.

25         **4.**      **Defendants Are Deliberately Indifferent to Prisoners Who Enter**
                      **the Jail on Community-Prescribed Medications**

26

27         The failure to provide vital medication to prisoners exposes them to serious risk of

28 pain, injury, or death and is a violation of the Eighth Amendment.  "Deliberate

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

indifference may occur when prison officials deny, delay, or intentionally interfere with medical treatment …." *Lavender v. Lampert*, 242 F. Supp. 2d 821, 842 (D. Or. 2002); *see also Graves v. Arpaio*, No. CV-77-0479-PHX-NVW, 2008 WL 4699770, at *32 (D. Ariz. Oct. 22, 2008) ("Providing pretrial detainees' prescription medication without interruption is essential to constitutionally adequate medical care."). Chronic conditions like asthma and hypertension are serious medical needs that must be adequately treated through the continuous supply of necessary medications. *Schuenke v. Wis. Dep't of Corr.*, No. 13-cv-217, 2013 WL 2558251, at *1 (W.D. Wis. June 11, 2013) (prison staff failed to provide plaintiff with his asthma medications); *Jolly v. Badgett*, 144 F.3d 573, 573 (8th Cir. 1998) ("It is uncontroverted that [plaintiff] had a serious medical need, as he was diagnosed with epilepsy and hypertension and was on medication to prevent the life-threatening consequences of these diseases."); *Arbuckle v. Ahern*, No. C- 12-2076, 2014 WL 2038316, at *4 (N.D. Cal. May 16, 2014) (diabetes and hypertension are serious medical needs).

In particular, knowing that an inmate's condition requires medication but failing to take action to provide that medication rises to the level of deliberate indifference. *See Thomas v. Kippermann*, 846 F.2d 1009, 1010-11 (5th Cir. 1988) (the plaintiff's claim was viable "if he told jail authorities that he needed his prescribed medication ... and if they did not have him examined or otherwise adequately respond to his requests"); *McNally v. Prison Health Servs.*, 28 F. Supp. 2d 671, 674 (D. Me. 1998) (finding that the plaintiff sufficiently alleged deliberate indifference when he told prison health services of his HIV status and strict medication regimen, but was refused medication during his three days in custody).

Defendants' routine failure to verify and continue inmates' medications prescribed prior to incarceration is the very definition of deliberate indifference: conscious disregard of a substantial risk of harm. As Dr. Puisis found in his review of patient records, Defendants have delayed vital medication to some patients for weeks, resulting in life-threatening emergency situations, and unnecessary suffering *See* Statement of Facts, *supra*, at 13-17. In the face of these known risks, Defendants have failed to remedy problems that

29

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1  Dr. Puisis identified close to a year ago.

2      **B.      Plaintiffs Are Likely to Prevail on Their ADA Claims**

3          **1.      The County Defendants Violate the ADA by Denying Prisoners
          with Difficulty Climbing Stairs Access to Exercise, Religious
4          Services, and Other Programs**

5      In violation of the ADA, the County Defendants blatantly discriminate against

6  prisoners who cannot climb stairs by excluding them from programs, including exercise

7  and a class that can reduce a prisoner's sentence by five days, exclusively offered in spaces

8  accessible only by climbing stairs.[5]  "To prevail under Title II [of the ADA], [a] plaintiff

9  must show that:  (1) he is a qualified individual with a disability; (2) he was either

10  excluded from participation in or denied the benefits of a public entity's services,

11  programs, or activities, or was otherwise discriminated against by the public entity; and

12  (3) this exclusion, denial, or discrimination was by reason of his disability."  *Cohen v. City*

13  *of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014); *see* 42 U.S.C. § 12132.

14      Violations of Title II are largely defined by its implementing regulations, which

15  "flesh out public entities' statutory obligations with more specificity," and are controlling

16  authority "'unless they are arbitrary, capricious, or manifestly contrary to the statute.'"

17  *Cohen*, 754 F.3d at 695 (quoting *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1065 (9th

18  Cir. 2010)).

19      Pursuant to the regulations, "no qualified individual with a disability, shall, because

20  a public entity's facilities are inaccessible to or unusable by individuals with disabilities,

21  be excluded from participation in, or be denied the benefits of the services, programs, or

22  activities of a public entity, or be subjected to discrimination by any public entity."  28

---

24  [5] Defendants' conduct also violates Section 504 of the Rehabilitation Act and California

25  Government Code Section 11135.  *See Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041,
    1045 n.11 (9th Cir. 1999) ("There is no significant difference in analysis of the rights and

26  obligations created by the ADA and the Rehabilitation Act."); *Cal. Council of the Blind v.*

27  *County of Alameda*, 985 F. Supp. 2d 1229, 1245 (N.D. Cal. 2013) ("[A] violation of Title
    II of the ADA is a violation of § 11135").

28

1   C.F.R. § 35.149.  In this same vein, "[a] public entity shall operate each service, program,

2   or activity so that the service, program, or activity, when viewed in its entirety, is readily

3   accessible to and usable by individuals with disabilities."  *Id.* § 35.150(a).  A public entity

4   must "make reasonable modifications in policies, practices, or procedures when

5   modifications are necessary to avoid discrimination on the basis of disability, unless the

6   public entity can demonstrate that making the modifications would fundamentally alter the

7   nature of the service, program, or activity."  *Id.* § 35.130(b)(7); *see Pierce v. County of*

8   *Orange*, 526 F.3d 1190, 1215 (9th Cir. 2008).

9       The Department of Justice promulgated Title II regulations that specifically apply to

10  correctional facilities and make clear a public entity "shall not, because a  [correctional]

11  facility is inaccessible to or unusable by individuals with disabilities," exclude prisoners

12  from participating in a program offered by the correctional facility.  28 C.F.R.

13  § 35.152(b)(1).  The programs and services at issue here—exercise, religious services,

14  Choices and Pride, and Narcotics and Alcoholics Anonymous meetings—are covered by

15  the ADA.  *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons

16  provide inmates with many recreational 'activities,' medical 'services,' and educational

17  and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners ....");

18  *Armstrong*, 622 F.3d at 1068 (jails provide prisoners "with various positive opportunities,

19  from educational and treatment programs, to opportunities to contest their incarceration, to

20  the fundamentals of life, such as sustenance, the use of toilet and bathing facilities, and

21  elementary mobility and communication").

22      Plaintiffs have a very high likelihood of succeeding on their claim that the County

23  Defendants violate the ADA.  Plaintiffs Dilley, Dobbs, Esquivel, Gist, Gomez, Hobbs, and

24  Whitfield, as well as numerous members of the putative Prisoners with Disabilities

25  Subclass, are qualified individuals with disabilities,[6] as each of them has a disability that

---

[6] The ADA defines a "qualified individual with a disability" as "an individual with a
(footnote continued)

[1272588-7]

makes it impossible, difficult, painful, or dangerous for them to climb stairs.  *See* Dilley Decl. ¶¶ 4, 13; Dobbs Decl. ¶ 10; Esquivel Decl. ¶¶ 3, 10; Gist Decl. ¶¶ 4, 13, 15, 25; Gomez Decl. ¶ 4; Hobbs Decl. ¶ 9; Whitfield Decl. ¶ 3, 21.  The County Defendants, by offering exercise, religious services, Choices and Pride classes, and Narcotics and Alcoholic Anonymous meetings solely in a location inaccessible to prisoners who cannot climb stairs, exclude such prisoners from those programs.  If these programs were offered in accessible locations, Plaintiffs and members of the Subclass they seek to represent would be able to participate in them.  This could be accomplished by offering the programs in accessible, alternative spaces in the Jail that do not require prisoners to climb stairs or by devising some safe means for transporting prisoners up the flight of stairs, such as a mechanical lift.  The County Defendants already offer exercise to prisoners in other parts of the Jail in accessible locations that do not require climbing stairs.  *See* SZS Report at 9 (outdoor exercise areas for A, B, C, and D Dorms were accessible to people with mobility impairments); Bass Depo. 284:5-16 (testifying that an alternate exercise yard has been established for women prisoners in Q Pod).  Accordingly, Plaintiffs have presented a strong, prima facie case that the County Defendants have violated the ADA.  *See Pierce*, 761 F. Supp. 2d at 950-51 (structural barriers that exclude prisoners at Orange County Jail facilities from equal access to exercise yard and other classes and programs offered violate the ADA).  Defendants' exclusion of prisoners with disabilities from outside exercise also violates the Eighth Amendment, *see LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993) ("[L]ong term denial of outside exercise" violates the Eighth Amendment.), while Defendants' exclusion of prisoners with disabilities from religious services also violates the First Amendment, *see Hagen v. Jabar*, 56 Fed. Appx. 302, 303 (9th Cir. 2002).

─────────────────────

disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  *See also* 28 C.F.R. § 35.104.

2.      **All Three Defendants Violate the ADA by Never Providing Sign Language Interpreters to Prisoners Who Use Sign Language as Their Primary Method of Communication**

Defendants' complete failure to furnish sign language interpreters to prisoners who use sign language as their primary method of communication is a brazen violation of the ADA. Title II's regulations require that public entities must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities ... an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1). Though "the type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual[,] the nature, length, and complexity of the communication involved[,] and the context in which the communication is taking place," a public entity must "give primary consideration to the requests of individuals with disabilities. *Id.* § 35.160(b)(2). "Auxiliary aids" include "[q]ualified interpreters on-site or through video remote interpreting (VRI) services." *Id.* § 35.104.

Under the ADA, Defendants must furnish a qualified sign language interpreter to a prisoner whenever important rights are at stake. For example, the County Defendants must provide a qualified sign language interpreter where a governmental program implicates a prisoner's due process rights. *See Duffy v. Riveland*, 98 F.3d 447, 455-56 (9th Cir. 1996) (sign language interpreter required for disciplinary and classification hearings for state prisoner); *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1045- 46, 1050 (S.D.N.Y. 1995) (holding that failure to provide deaf prisoners with sign language interpreters for reception, classification, disciplinary, and grievance processes violates ADA); *Bahl v. County of Ramsey*, 695 F.3d 778, 787-88 (8th Cir. 2012) (post-arrest custodial interview without sign language interpreter violates ADA). These failures also violate prisoners' due process rights. *See Clarkson*, 898 F. Supp. at 1049-50.

Defendants must also furnish sign language interpreters for medical and mental health care interactions, especially where informed consent is at issue. *See Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1019-22 (N.D. Cal. 2013) (requiring sign language

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1   interpreter for psychiatric rounds made on prisoners held in administrative segregation);

2   Defendant CFMG's failure to provide sign language interpreters to prisoners in the Jail

3   violates Title III of the ADA.  *See* 28 C.F.R. § 36.303(c)(1) (requiring that public

4   accommodations, like CFMG, "furnish appropriate auxiliary aids and services where

5   necessary to ensure effective communication with individuals with disabilities"); *Aikins v.*

6   *St. Helena Hosp.*, 843 F. Supp. 1329, 1335-36 (N.D. Cal. 1994).  Moreover, because the

7   County Defendants contract with CFMG to provide public services to prisoners, the

8   County Defendants are liable for any conduct engaged in by CFMG that violates Title II.

9   *See* 28 C.F.R. § 35.130(b) (providing that "[a] public entity, in providing any aid, benefit,

10  or service, may not, directly **or through contractual, licensing, or other arrangements**"

11  discriminate against individuals with disabilities (emphasis added)); *Armstrong*, 622 F.3d

12  at 1065-67.  Defendants' denial of sign language interpreters for medical and mental health

13  appointments also violates prisoners' due process rights.  *Clarkson*, 898 F. Supp. at 1048-

14  49.

15      Finally, the County Defendants must provide sign language interpreters for

16  education classes or other programs if the lack of interpreters precludes the prisoner from

17  equal participation in the program.  *See id.* at 1045-46 (failure to provide deaf prisoners

18  with sign language interpreters "for various aspects of reception and classification"

19  violates the ADA); *Armstrong*, 939 F. Supp. 2d at 1022-26 (requiring sign language

20  interpreters for all education classes); *see also* 28 C.F.R. § 35.160(b)(2).

21      The strength of Plaintiffs' claims regarding sign language interpreters requires little

22  explanation.  **Defendants do not provide sign language interpreters to prisoners under**

23  **any circumstances.**  Thus, Defendants violate the rights of all prisoners, like Plaintiff

24  Yancey, who require sign language in order to participate in any Jail programs or services.

25  *See* 28 C.F.R. § 35.160(b)(1); *Id.* § 36.303(c)(1). And Defendants will continue to violate

26  the rights of prisoners who use sign language until the Court orders them to alter their

27  policies and practices.

28

## III.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF

Defendants' policies and procedures create a serious and ongoing threat of harm to prisoners and detainees in violation of their constitutional right to adequate health care. These risks constitute irreparable injury. *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1123 (W.D. Wis. 2001) ("Put more specifically, pain, suffering and the risk of death constitute 'irreparable harm' sufficient to support a preliminary injunction in prison cases."); *Von Colln*, 189 F.R.D. at 598 ("Defendants do not argue that pain and suffering is not irreparable harm, nor could they."). As the Ninth Circuit has held, "[i]t is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The risks posed to the prisoners at the Jail are not speculative or remote. They are immediate and real. Every month, close to 1000 men and women are booked into the Jail. *See* Balaban Decl., Ex. H. Every newly admitted detainee with tuberculosis is at risk of not being timely identified, isolated, diagnosed, and treated. And those who do not have the disease are placed at risk of contracting it because of the crowded conditions in the Jail. The spread of the disease threatens all persons who are confined and who work at the Jail, as well as the larger community. If left untreated, tuberculosis can attack virtually every vital organ, and can be fatal. In recognition of these serious public health risks, the CDC issued detailed guidelines for the detection and treatment of the disease. Having chosen to disregard the Guidelines, Defendants have placed all prisoners and staff at imminent risk.

The risk of self-harm and suicide in the Jail's segregation units is likewise real and immediate. **The Jail has a suicide rate that is close to twice the national average.** Nationally, half of all suicides in correctional facilities occur in segregation units. In Monterey, each of the past three suicides occurred in segregation. Each suicide illustrates ongoing problems in the Jail's suicide prevention program. Rather than remedying these problems, Defendants have chosen to amplify them by placing seriously mentally ill pris-

[1272588-7]

1   oners who are clinically unstable in solitary confinement cells in segregation.  This is akin

2   to pouring gasoline on an open flame.  The conditions in those units predictably exacerbate

3   their mental illness:  Prisoners grow more symptomatic, and they are more prone to engage

4   in destructive behavior.  Defendants have disregarded these risks, and failed to follow the

5   lead of prisons and jails around the country that have adopted safeguards to prevent

6   mentally ill prisoners from unnecessarily suffering in isolated confinement.

7        In case after case, Dr. Puisis found that prisoners who reported community

8   prescriptions when they were booked were not continued on those medications.  These

9   include life-saving medications to treat chronic conditions like asthma and hypertension.

10   Dr. Puisis found the Defendants' failure to continue prisoners on medications caused

11   medical emergencies and hospitalizations.  He implored Defendants to revise their policies

12   and practices to ensure continuity of medications.  Defendants disregarded Dr. Puisis's

13   recommendations, and newly admitted prisoners who are on community prescriptions

14   continue to be at risk of being denied these medications.

15        Defendants themselves recognize the real risk of irreparable harm from failing

16   adequately to treat prisoners withdrawing from drugs and alcohol:  They have sobering

17   cells, a policy on withdrawal, and treatment protocols for detoxification.  But, as Dr. Puisis

18   found, their policies and practices are flawed, incomplete, potentially dangerous, and not

19   even faithfully followed by health care staff.  The risks of prisoners suffering or dying

20   from untreated withdrawal are real and imminent.

21        Plaintiffs will also suffer irreparable harm unless Defendants cease excluding

22   Plaintiffs from exercise, religious services, Choices and Pride classes, and Narcotics and

23   Alcoholics Anonymous meetings, and begin providing sign language interpreters to

24   prisoners who use sign language as their primary method of communication.  *See D.R. v.*

25   *Antelope Valley Union High Sch. Dist.*, 746 F. Supp. 2d 1132, 1145-46 (C.D. Cal. 2010)

26   (holding that student suffered irreparable harm by missing 10-45 minutes of education

27   classes per day because of structural barriers); *Lonberg v. City of Riverside*,

28   EDCV970237SGLAJWX, 2007 WL 2005177, at *8 (C.D. Cal. May 16, 2007) (non-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

[1272588-7]

compliant curb ramps and sidewalks cause irreparable harm to wheelchair user); *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997) (holding, in case regarding inoperable elevators in rapid transit system, that "injuries to individual dignity and deprivations of civil rights constitute irreparable injury"); *see also Burriola v. Greater Toledo YMCA*, 133 F. Supp. 2d 1034, 1040 (N.D. Ohio 2001) ("[T]he irreparable harm requirement is met when the injuries plaintiff would incur are 'the very type of injuries Congress tried to avoid.'" (quoting *E.E.O.C. v. Chrysler Corp.*, 733 F.2d 1183, 1186 (6th Cir. 1984))).

## IV.   THE BALANCE OF HARDSHIPS TIPS HEAVILY IN PLAINTIFFS' FAVOR

Courts "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).  The Ninth Circuit has held that the interest in protecting individuals from physical harm outweighs monetary costs to government entities.  *See Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) ("[F]aced with[ ] a conflict between financial concerns and preventable human suffering, [the court has] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." (second two alterations in original) (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983))); *see also Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (affirming ADA preliminary injunction in favor of plaintiffs with disabilities challenging the county's decision to close specialty medical facility without providing alternatives; balance of hardships tipped in favor of plaintiffs, who would be deprived of necessary treatment and suffer increased pain and medical complications).

The balance of hardships here tips sharply in Plaintiff's favor.  Prisoners within MCJ continue to suffer serious risks from Defendants' inadequate healthcare practices: They will remain at heightened risk of contracting tuberculosis, or of their TB not being timely detected and treated.  Those housed in segregation will remain at unnecessary risk of committing suicide or harming themselves.  Those booked into the Jail on medications

1   are at unreasonable risk of having those medications stopped and not restarted for weeks

2   and months.  Mobility impaired prisoners will continue to be denied fresh air and exercise,

3   as well as access to vital programs that could shorten their jail stays, for no reason other

4   than they have a disability.  And prisoners who use sign language as their primary method

5   of communication will continue to be discriminated against every time they need to

6   communicate with staff at the Jail.

7        In the face of these hardships, Defendants will merely be required to devise a plan

8   to bring them in line with CDC Guidelines, professional health care standards, the ADA,

9   and the practices of jails and prisons around the country.  While they may incur some costs

10  to retain additional staff to perform the necessary functions, the Ninth Circuit has held that

11  financial concerns cannot outweigh serious risk of harm to plaintiffs.  *See Harris*, 366 F.3d

12  at 766.  Moreover, given the high cost of emergency care, hospitalization, and treatment

13  for diseases, requiring Defendants to improve healthcare practices may result in future cost

14  saving, not burden.

15  **V.    A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST**

16       The Ninth Circuit has made clear that "it is always in the public interest to prevent

17  the violation of a party's constitutional rights."  *Melendres*, 695 F.3d at 1002 (internal

18  quotation marks omitted); *see also Lopez*, 713 F.2d at 1437 ("Our society as a whole

19  suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of

20  their rights or privileges.").  Applying this bright-line rule is straightforward:  Protection of

21  Plaintiffs' constitutional right to adequate healthcare is in the public interest.  Given the

22  risk to Jail staff and the community from the spread of communicable diseases, the public

23  interest is protected by the grant of a preliminary injunction.  A preliminary injunction

24  enjoining Defendants' violations of the ADA would "serve[] the public's interest in

25  enforcement of the ADA and in elimination of discrimination on the basis of disability."

26  *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011).

27  **VI.   THE COURT SHOULD WAIVE BOND**

28       Plaintiffs request that the Court waive the security requirement for preliminary

1   injunctive relief under Federal Rule of Civil Procedure 65(c).  The Ninth Circuit has held

2   that "[t]he court has discretion to dispense with the security requirement ... where requiring

3   security would effectively deny access to judicial review."  *California ex rel. Van De*

4   *Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985), *amended*,

5   775 F.2d 998 (9th Cir. 1985); *see also Miller v. Carlson*, 768 F. Supp. 1331, 1340-41

6   (N.D. Cal. 1991); *Toussaint*, 553 F. Supp. at 1378 (N.D. Cal. 1983); *Carrillo v. Schneider*

7   *Logistics, Inc.*, 823 F. Supp. 2d 1040, 1047 (C.D. Cal. 2011).  Plaintiffs are a proposed

8   class and subclass of prisoners who seek preliminary relief from violations to their

9   constitutional and statutory rights, the granting of which is in the public interest.

10  Therefore, the Court should excuse its discretion to waive the security requirement in its

11  issuance of a preliminary injunction.

12  **VII.   THE RELIEF REQUESTED IS CONSISTENT WITH THE PLRA**

13          The Prison Litigation Reform Act ("PLRA") authorizes preliminary injunctive

14  relief for conditions of confinement in correctional facilities.  *See* 18 U.S.C. § 3626(a)(2).

15  "Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to

16  correct the harm the court finds requires preliminary relief, and be the least intrusive

17  means to correct that harm."  *Id.*  The Ninth Circuit has held that the PLRA does not

18  change the standards for issuance of an injunction.  *Armstrong v. Davis*, 275 F.3d 849, 872

19  (9th Cir. 2001) (citing *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001)).  This

20  principle applies to preliminary injunctions as well.  *Jones 'El*, 164 F. Supp. 2d at 1116.

21  Furthermore, the PLRA's ninety-day time limitation imposed on the length of preliminary

22  injunctions, *see* § 3626(a)(2), does not affect the ability of a court to enter a series a

23  preliminary injunctions, as long as relief is specifically re-entered at the appropriate times.

24  *Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001).

25          The relief requested by Plaintiffs is an order requiring Defendants to devise

26  remedial plans, so it intrinsically meets the PLRA requirement that an order be narrowly

27  drawn, no broader than necessary, and the least intrusive means to correct the violations.

28  "Allowing defendants to develop policies and procedures to meet [their constitutional and

1  statutory] requirements is precisely the type of process that the Supreme Court has

2  indicated is appropriate for devising a suitable remedial plan in a prison litigation case."

3  *Armstrong*, 622 F.3d at 1071; *see also Pierce*, 761 F. Supp. 2d at 954 ("[T]he least

4  intrusive means to compel the County to remedy the physical barriers and disparate

5  provision of programs, services, and activities to disabled detainees is to allow the County

6  to draft a proposed plan that will address and correct each and every physical barrier

7  identified in this Order ….")

8         The PLRA requires the court to "give substantial weight to any adverse impact on

9  public safety or the operation of the criminal justice system caused by the preliminary

10  relief."  18 U.S.C. § 3626(a)(2).  The proposed order would only serve to enhance public

11  safety.  The risk to the community of a tuberculosis outbreak emanating from the Jail

12  would be substantially reduced, as would prisoner unrest emanating from unmet medical

13  and mental health needs and lack of accommodations for disabilities.  *Cf. Johnson v.*

14  *California*, 543 U.S. 499, 507-08 (2005) (unconstitutional racial segregation may

15  exacerbate hostility and violence among prisoners).

16                                    **CONCLUSION**

17         For the reasons set forth above, Plaintiffs respectfully request that this Court issue

18  the Proposed Order for Preliminary Injunctive Relief, filed herewith.

19

20  DATED:  August 26, 2014          Respectfully submitted,

21                                   ROSEN BIEN GALVAN & GRUNFELD LLP

22                                   OFFICE OF THE PUBLIC DEFENDER COUNTY OF
                                     MONTEREY

23                                   AMERICAN CIVIL LIBERTIES UNION
                                     FOUNDATION OF NORTHERN CALIFORNIA, INC.
24

25                                   ACLU NATIONAL PRISON PROJECT

26                                   By:   */s/ Eric Balaban*
                                           Eric Balaban
27
                                     Attorneys for Plaintiffs
28