MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
KRISTA STONE-MANISTA – 269083
SARAH P. ALEXANDER – 291080
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email:  mbien@rbgg.com
        ggrunfeld@rbgg.com
        vswearingen@rbgg.com
        mfreedman@rbgg.com
        kstone-manista@rbgg.com
        spalexander@rbgg.com

ALAN SCHLOSSER – 049957
MICAELA DAVIS – 282195
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 255-8437
Email:  aschlosser@aclunc.org
        mdavis@aclunc.org

JAMES EGAR – 065702
Public Defender
DONALD E. LANDIS, JR. – 149006
Assistant Public Defender
OFFICE OF THE PUBLIC DEFENDER
COUNTY OF MONTEREY
111 West Alisal Street
Salinas, California 93901-2644
Telephone: (831) 755-5806
Facsimile: (831) 755-5873
Email:  EgarJS@co.monterey.ca.us
        LandisDE@co.monterey.ca.us

ERIC BALABAN (*admitted pro hac vice*)
CARL TAKEI – 256229
NATIONAL PRISON PROJECT of the
AMERICAN CIVIL LIBERTIES UNION
915 15th Street N.W., 7th Floor
Washington, D.C. 20005-2302
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
Email:  ebalaban@npp-aclu.org
        ctakei@npp-aclu.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. CV 13 2354 PSG<br><br>**REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION AND FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. Paul S. Grewal<br>Date: October 29, 2014<br>Time: 1:00 p.m.<br>Crtrm.: 5, 4th Floor<br><br>Trial Date: September 8, 2015 |

[1329839-3]

CV 13 2354 PSG
REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
CLASS CERTIFICATION AND FOR PRELIMINARY INJUNCTION

I, Gay Crosthwait Grunfeld, declare:

1. I am an attorney admitted to practice law in California, a member of the bar of this Court, and a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP ("RBGG"), counsel of record for Plaintiffs. I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify. I make this reply declaration in support of Plaintiffs' Motion for Class Certification and Plaintiffs' Motion for Preliminary Injunction.

**Defendants Have Been Aware of Serious Concerns About Medical and Mental Health Care for Named Plaintiffs and Clients of Plaintiffs' Counsel Since at Least June 2013**

2. On April 15, 2013, prior to filing this lawsuit, co-counsel and I sent a demand letter to the Sheriff and each of the Supervisors of Monterey County informing them of the illegal conditions in the Monterey County Jail and asking that they enter into a remedial process to address those concerns, including hiring neutral experts. Attached hereto as **Exhibit A** is a true and correct copy of my April 15, 2013 letter.

3. County Counsel Susan K. Blitch responded to my letter through a letter dated May 15, 2013, a true and correct copy of which is attached hereto as **Exhibit B**. In her letter, Ms. Blitch asserts that "[w]hen a custodial staff person is notified of a medical problem, they notify CFMG who is contracted to provide medical care to jail inmates." *Id.* at 1. Ms. Blitch states that the County "would like to know if you have specific concerns about particular prisoners not getting medical attention or who are in urgent need of accommodation," and states "should you provide specific information, the County is prepared to immediately look into any such matters." *Id.* at 1-2.

4. As our investigation into conditions at the Jail continued, and in response to Ms. Blitch's May 15 letter, I and my co-counsel began sending letters informing the County and CFMG of serious medical and mental health concerns. Although Plaintiffs marked these letters as privileged and confidential when they were sent, and marked many of them "Confidential Information" upon production to Defendants, Plaintiffs now de-designate them after reviewing these documents and determining that they cannot "make a

[1329839-3]

1   CV 13 2354 PSG
REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION AND FOR PRELIMINARY INJUNCTION

1  showing to the Court sufficient to justify the filing of the document or portion thereof
2  under seal." Dkt. No. 305, ¶ 3.

3      5.     On June 10, 2013, my colleague Michael Freedman sent Ms. Blitch a letter
4  regarding named Plaintiff Ha Cobb, who at the time was experiencing extraordinary pain
5  and had not been examined by medical staff, and also discussing one other non-Plaintiff
6  prisoner. A true and correct copy of Mr. Freedman's June 10, 2013 letter is attached
7  hereto as **Exhibit C**. Attached hereto as **Exhibit D** is a true and correct copy of
8  Ms. Blitch's June 21, 2013 response in which she states that Ms. Cobb and the other
9  inmate mentioned in Mr. Freedman's letter "had received appropriate medical care."

10     6.     Attached hereto as **Exhibit E** is a true and correct copy of a letter my
11 colleague Krista Stone-Manista sent on July 15, 2013, concerning Ms. Cobbs's post-
12 operative fever and severe pain. In that same letter, Ms. Stone-Manista informed
13 Ms. Blitch that named Plaintiff Richard Murphy had not received the daily medication he
14 needed. In response, Sheriff Miller wrote to Ms. Stone-Manista that he was "passing along
15 the information immediately." A true and correct copy of that response is attached hereto
16 as **Exhibit F**. We received no further response to this letter.

17     7.     Attached hereto as **Exhibit G** is a true and correct copy of a letter my
18 colleague Krista Stone-Manista sent to Ms. Blitch on August 27, 2013 informing her of a
19 blind prisoner who was not receiving proper medical care. We received no response to
20 that letter.

21     8.     Attached hereto as **Exhibit H** is a true and correct copy of a letter my
22 colleague Sarah P. Alexander sent to Ms. Blitch and Mr. Bertling on January 24, 2014,
23 regarding the need for improved mental health care for named Plaintiff Brandon Mefford.
24 We received no response to that letter.

25     9.     Attached hereto as **Exhibit I** is a true and correct copy of an e-mail my
26 colleague Michael Freedman sent to Ms. Blitch and CFMG counsel Peter G. Bertling on
27 January 30, 2014 regarding named Plaintiff Sean Esquivel's urgent need for a C-PAP
28 machine. We received no response to that e-mail.

10. Attached hereto as **Exhibit J** is a true and correct copy of a letter my colleague Sarah P. Alexander sent to Ms. Blitch and Mr. Bertling on February 27, 2014, regarding named Plaintiff Jesse Hernandez and his need for surgery, and reporting that a Jail nurse had informed a probation officer and Jail sergeant that Mr. Hernandez had "already cost the County too much money." Attached hereto as **Exhibit K** is a true and correct copy of a March 5, 2014 response by County counsel Irven Grant.

11. Attached hereto as **Exhibit L** is a true and correct copy of a letter I sent to Ms. Blitch and Mr. Bertling on April 14, 2014, concerning the need for immediate surgery for named Plaintiff Angel Perez. Our co-counsel, Public Defender James Egar, also contacted Ms. Blitch on Mr. Perez's behalf on April 16, 2014. County counsel Michael Philippi responded to Mr. Egar's letter on April 17, 2014, informing him that a physician "who is knowledgeable about, and willing to treat, Mr. Perez'[s] particular form of cancer" had not yet been located. A true and correct copy of that response is attached hereto as **Exhibit M**.

12. Attached hereto as **Exhibit N** is a true and correct copy of a letter I sent to Ms. Blitch on May 6, 2014, regarding Plaintiff Clyde Whitfield, who was experiencing concussion symptoms after falling and hitting his head. I informed Ms. Blitch that because Mr. Whitfield has narcolepsy and cataplexy, he is at risk for "sudden sleep or collapse." Mr. Grant responded that "Mr. Whitfield was seen in the infirmary on Saturday and will be seen again today." A true and correct copy of that response is attached hereto as **Exhibit O**.

13. Documents produced by Defendants indicate that our various letters were received and circulated among senior County and Jail staff. For example, attached hereto as **Exhibit P** is a true and correct copy of an e-mail chain Defendants produced on October 6, 2014, in response to a Notice of Deposition of Commander James Bass ("October 6 Production"). In this e-mail chain, Dr. Fithian provided Sheriff Miller with specific responses on July 16, 2013, to our July 15, 2013 letter regarding the care that had been provided to Plaintiffs Cobb and Murphy. This e-mail chain indicates that our

1 individual advocacy letters may have resulted in some treatment actions being taken for
2 specific named Plaintiffs on specific dates.  This is positive; having a line of
3 communication between Plaintiffs' counsel and Defendants' counsel may have reduced
4 suffering and improved the care of certain individual Plaintiffs.  However, advocacy letters
5 from Plaintiffs' counsel as part of a federal court lawsuit cannot be a substitute for an
6 effective medical system that identifies and ameliorates its own failures in treatment.

**Dr. Fithian's Assertion That There Have Been No Writs of Habeas Corpus Filed at the Jail Since 1984 Is Irrelevant and Ignores the Cases That Have Been Filed in This Court**

9    14.    Dr. Fithian asserts in Paragraph 25 of his public declaration, Dkt. No. 331,
10 that "[t]here has never been a writ of habeas corpus regarding the care and treatment of
11 those individuals incarcerated at the MCJ since 1984."  While this statement may be
12 technically true, Dr. Fithian has chosen to ignore several cases that have been filed in this
13 Court in the last five years alleging that the Jail and CFMG failed to provide adequate
14 health care.

15    15.    Attached hereto as **Exhibit Q** is a true and correct copy of a complaint
16 seeking damages filed *pro se* by Harvey D. Blackburn, a prisoner incarcerated at North
17 Kern State Prison, in this Court on April 5, 2010, naming the Monterey County Jail and
18 Terri Whiting, the former Physician's Assistant at the Jail, as a Defendant.  *See generally*
19 Puisis Report, Ex. J to Declaration of Gay Grunfeld in Support of Plaintiffs' Motion for
20 Class Certification, Dkt. No. 49-3, at 7, 37-38 (describing failures of care by PA Whiting).
21 Mr. Blackburn alleges that the Jail improperly provided him with Motrin for a hurt wrist.
22 Mr. Blackburn further alleges that he has no spleen, which means that Motrin is medically
23 contraindicated.  Mr. Blackburn suffered severe nosebleeds and blisters as a result of the
24 Motrin, but when he requested treatment for these symptoms, he was denied a blood test.
25 Mr. Blackburn had to be rushed to Natividad Medical Center, and was ultimately
26 transferred to Salinas Valley Memorial Hospital for several blood transfusions.  Attached
27 hereto as **Exhibit R** is a true and correct copy of Judge Koh's Order regarding
28 Mr. Blackburn's complaint.  Judge Koh concluded that Mr. Blackburn "stated a cognizable

1  claim of deliberate indifferen[ce] to serious medical needs against Defendant Whiting."
2  *See id.* at *1.  Judge Koh later granted Defendant's Motion for Summary Judgment, to
3  which Mr. Blackburn had responded *pro se*.  A true and correct copy of Judge Koh's Order
4  is attached hereto as **Exhibit S**.  Although granting summary judgment on Mr. Blackburn's
5  Eighth Amendment claims, Judge Koh noted that Ms. Whiting "should have been aware of
6  the risk" of prescribing Motrin to Mr. Blackburn.  *Id.* at 6.

7       16.   Attached hereto as **Exhibit T** is a true and correct copy of an amended
8  complaint filed *pro se* by Troyce Braninburg, a prisoner incarcerated at Coalinga State
9  Hospital, in this Court on August 4, 2009, naming Dr. Fithian and County defendants.
10 Ms. Braninburg alleged that the Jail failed to provide her with HIV/AIDS anti-viral
11 medications for four months.  Ms. Braninburg further alleged that she received insufficient
12 mental health treatment despite having psychiatric conditions, being housed in solitary
13 confinement, and being a preoperative transgender woman.  Attached hereto as **Exhibit U**
14 is a true and correct copy of Judge Wilken's Order granting the defendants' summary
15 judgment motions in this case on February 23, 2011.  *Id.* at *1 ("the Court found that
16 Plaintiff stated a cognizable claim for deliberate indifference to her serious medical needs
17 against Dr. Fithian.")  Judge Wilken's order does not specifically address Ms.
18 Braninburg's claim that she had been denied anti-viral medications, but does mention that
19 the *pro se* plaintiff had conducted no discovery before filing her oppositions to
20 Defendants' motions for summary judgment.  *Id.* at *7, *2 n.1.

21      17.   Several other *pro se* prisoners have filed cases in this Court specifically
22 alleging harms arising from denial of needed medications and medical and mental health
23 treatment during incarcerations at the Monterey County Jail.  *See Palomino v. Monterey*
24 *County Jail*, Case No. 3:14-cv-02745-EDL (N.D. Cal., filed July 1, 2014); *Hurst v. CDC*
25 *San Quentin et al.*, Case No. 3:10-cv-05169-CRB (N.D. Cal., filed November 16, 2010);
26 *Wilson v. Monterey County Jail et al.*, 3:09-cv-01491-MHP (N.D. Cal., filed April 6,
27 2009).
28

[1329839-3]

**The Phantom of Future Jail Construction Is No Remedy for Today's Emergent Problems at the Jail, Including Overcrowding**

18. Attached hereto as **Exhibit V** is a true and correct copy of the Meeting Agenda for the September 24, 2014 meeting of Monterey County's Budget Committee, available via the Monterey County Board of Supervisor's Website at https://monterey.legistar.com, and Attachment D ("Milestone Schedule") to that Meeting Agenda. This report to the Budget Committee indicates that as of September 24, 2014, the earliest possible completion date for the Jail Housing Addition was February 4, 2019. *See id.*, Attachment D. In his declaration in opposition to Plaintiffs' Motion for Class Certification, Commander James Bass testified that the jail expansion project would be done by December 2018. *See* Dkt. No. 134, at 2. Michael Philippi, in his declaration in opposition to Plaintiffs' Motion for Class Certification, provided still a third date. *See* Dkt. No. 135, at 1 ("[T]he jail expansion program … is expected to be completed by the end of October 2017."). The fact that Defendants themselves cannot agree on a completion date suggests exactly how far this construction project is from completion. And regardless of which of these three divergent dates is correct—February 2019, December 2018, or October 2017—this far-distant project is no solution to the current crisis at the Jail.

19. The Jail's overcrowding problem has not abated since Plaintiffs filed this suit. Attached hereto as **Exhibit W** is a true and correct copy of the Monterey County Community Corrections Partnership's AB 109 Statistical Report for Fiscal Year 2013/2014, 3rd Quarter: January 2014-March 2014, published May 9, 2014, and showing the average daily population at the Jail for January through March 2014.

20. Attached hereto as **Exhibit X** is a true and correct copy of the Monterey County Community Corrections Partnership's AB 109 Statistical Report for Fiscal Year 2013/2014, 4th Quarter: April 2014-June 2014, published August 7, 2014, and showing the average daily population at the Jail for April through June 2014.

21. Attached hereto as **Exhibit Y** is a true and correct copy of documents produced by the County to Plaintiffs pursuant to a 30(b)(6) deposition notice served on

May 20, 2014, which show the Jail's population on each day of June 2014. These documents were introduced as part of Exhibit 34 to the Deposition of Commander James Bass, one of the County's Rule 30(b)(6) designees, which occurred on July 23, 2014, and are Bates-numbered COUNTY000443-472. On June 13, 14, 15, 17, 22, and 29, the population of the Jail was at or over 1,000 inmates. *See id.* at COUNTY000455, 456, 457, 459, 464, and 471.

22. These population figures do not include prisoners Defendant County has placed in the Alameda County Jail pursuant to contract. Attached hereto as **Exhibit Z** is a true and correct copy of a quarterly report reflecting that 49 prisoners were housed in Alameda County Jail in October 2013, 45 in November 2013, and 51 in December 2013. The Quarter 3 and Quarter 4 reports, cited above at Paragraphs 19-20 and Exhibits W and X, now report data regarding the number of prisoners at Alameda County Jail as the "[n]umber of inmates being housed in other facilities at the end of each month." In the first quarter of 2014, between 64 and 66 prisoners were housed in Alameda each month. *See* Ex. W at 7. In the second quarter of 2014, between 59 and 67 prisoners were housed in Alameda each month. *See* Ex. X at 7.

**Commander Bass's Testimony Supports Plaintiffs' Allegations Regarding Serious Problems at the Jail That Have Yet to Be Addressed**

23. Attached hereto as **Exhibit AA** is a true and correct copy of excerpts of the Rule 30(b)(6) deposition of Jail Commander James Bass, taken on July 23, 2014.

24. Attached hereto as **Exhibit BB** is a true and correct copy of an article by Julia Reynolds that appeared in the Monterey County Herald entitled "Four accused in attack on Monterey County jail deputy," dated June 17, 2014, and which is available at http://www.montereyherald.com/localnews/ci_25983270/four-accused-attack-monterey-county-jail-deputy. This article describes an attack on a Sheriff's deputy in the Jail on May 24, 2014. The article also quotes Sheriff's spokesman John Thornburg saying that since the assault, "All [prisoners] are belly-chained and (there's) a limit on how many inmates can be moved at one time" (second alteration in original). This assault is also

described in the Quality Assurance Minutes of May 29, 2014, *see* Exhibit MM, *infra*, at CFMG_00012380.

25. Commander Bass confirmed during his Rule 30(b)(6) deposition that this assault resulted in a significant change in the policy and procedure for transporting inmates in the Jail, including requiring that they be handcuffed and restricted to groups of four inmates who could be outside their housing unit at any given time. *See* ¶ 23 & Ex. AA, *supra*, at 97:11-116:19. Commander Bass testified regarding the additional time required to transport prisoners from housing units to exercise or medical care. *See id.* at 115:14-116:8.

26. Attached hereto as **Exhibit CC** is a true and correct copy of emails forwarded by Ms. Blitch to my colleague Michael Freedman on July 23, 2014, and entered as Exhibits 36 and 37 during Commander Bass's Rule 30(b)(6) deposition. These emails reflect that the shackling policy is onerous and puts pressure on Jail staff and on inmates' access to medical care, including that "movements for medical treatments are also being reviewed, however, nothing has changed at this time." *See id.* at Ex. 37 p. 1.

27. Commander Bass also testified during his Rule 30(b)(6) deposition that memoranda that are issued regarding jail policies but that are not included in the custody operations procedures manual are "temporary" and are not part of the "complete written policies and procedures currently governing the operation of the Monterey County Jail." Ex. AA, *supra*, at 43:23-46:7, 53:2-7, 91:2-92:24. This testimony supports Plaintiffs' position, explained in more detail below, *see* ¶¶ 28-39, and in Plaintiffs' Reply in Support of Plaintiffs' Motion for Preliminary Injunction, that the modest and incomplete changes to the Jail's management of inmates with disabilities do not provide a remedy to Plaintiffs' ADA claims.

**The County's Limited and Recent Policy Changes Regarding Prisoners with Disabilities Are Inadequate and Do Not Moot Plaintiffs' Claims**

28. Documents recently produced by Defendants demonstrate that they began working on some ADA policies only in response to and after Plaintiffs filed our motion for

1  class certification.  These emails, produced in the October 6 document production by
2  Defendants which comprised, in relevant part, Bates numbers COUNTY003124 through
3  COUNTY004317, also demonstrate that some of the changes on which Defendants'
4  opposition to Plaintiffs' preliminary injunction motion relies were enacted only days
5  before Defendants filed their oppositions.  For example, attached here to as **Exhibit DD** is
6  a true and correct copy of an email, Bates numbered COUNTY003808, sent by
7  Commander James Bass on September 26, 2014, suggesting location changes for some
8  women's programs emphasized in the County's preliminary injunction opposition.  *See*
9  Dkt. No. 325 at 15-16.

10        29.  With respect to Defendants' new policies for hearing impaired inmates,
11  attached hereto as **Exhibit EE** is a true and correct copy of an email chain between
12  Edward Laverone, Chief of the Monterey County Corrections Operations Bureau,
13  Commander Bass, and others. This email chain reflects that Mr. Laverone sent an email on
14  May 2, 2014 to a Captain in the Santa Clara County Sheriff's Office for a copy of their
15  ADA/hearing impaired policy.  There is no document in Defendants' document production
16  indicating that Defendants had begun working on any policies regarding hearing impaired
17  prisoners any earlier than this email, sent three days after Plaintiffs filed our motion for
18  class certification.

19        30.  Several days later, on May 8, 2014, Mr. Laverone sent an email to the Jail's
20  commanders and sergeants stating that the Sheriff had directed him to "immediately
21  develop Action plans and implement them to address issues that are either obvious to us
22  (all staff) and/or identified in litigation and/or expert reports commissioned by County
23  Counsel.  My first three months **I have been making changes at a snail's pace**, that has
24  changed."  (emphasis added.)  Attached hereto as **Exhibit FF** is a true and correct copy of
25  that email.

26        31.  Mr. Laverone then sent an email to all Corrections Commanders on June 6,
27  2014, attaching a work plan titled "COB [Corrections Operations Bureau] 60 day
28  assignments."  Attached hereto as **Exhibit GG** is a true and correct copy of that email and

1  attachment. On page COUNTY0003924, there is a task for Commander Bass regarding

2  the "[Hea]ring Impaired Policy," which directs him to "[r]eview other policies, develop

3  draft and submit to Counsel for review, identify any contracts needed to comply with

4  policy – i.e.: ASL interpreters, Due by 6/20/14."

5      32.    In response to this directive, a "draft of what our new Hearing impaired

6  policy may look like" was sent to Commander Bass by Sergeant Jasper DeFranco, a

7  member of his staff, on June 9, 2014. A true and correct copy of the email sending this

8  draft policy, and Commander Bass's response, is attached hereto as **Exhibit HH**.

9      33.    Notwithstanding Chief Laverone's directive that the policy be finalized by

10 June 20, 2014, work on the policy continued at a "snail's pace" over the summer. On

11 September 22, 2014, Commander Bass sent an email to Sarafina Tomaselli, the Jail's

12 Ombudsman, and others, responding to Ms. Tomaselli's questions about how ADA needs

13 would be identified. A true and correct copy of this email chain is attached hereto as

14 **Exhibit II**. In his response, Commander Bass explained a new classification form that

15 would "[h]opefully" allow the identification of inmates in need of accommodation but that

16 had not yet been implemented.

17     34.    On September 26, 2014, Commander Bass sent an email to Charles DaSilva,

18 asking him to find out where SVSP [Salinas Valley State Prison] "order[s] their Hearing

19 Impaired Inmate vest from" so that the Jail could "order some in preparation for our new

20 Hearing Impaired Inmate policy going out." A true and correct copy of this email is

21 attached hereto as **Exhibit JJ**.

22     35.    The new policy regarding hearing impaired inmates was not circulated to the

23 "Corrections Everyone" mailing list by Commander Bass until **October 4, 2014**, more

24 than five months after Plaintiffs filed our motion for class certification. A true and correct

25 copy of Commander Bass's email, attaching the October 4, 2014 policy, is attached hereto

26 as **Exhibit KK**.

27     36.    To date, the County has produced no evidence that these recent emailed

28 policies are permanent or funded or apply to CFMG. The purported contract for provision

1  of sign language interpreter services, submitted in connection with Defendants' Opposition
2  filings, has not even been signed by the County.  *See* Declaration of Michael R. Philippi in
3  Support of Opposition of Defendants County of Monterey and Monterey County Sheriff's
4  Office to Plaintiffs' Motion For Preliminary Injunction, Dkt. No. 325-3, Ex. E, at 2.  In
5  addition, Defendants have produced no evidence that they intend to fund the staff
6  necessary to implement the policies or to provide training on working with Deaf and hard
7  of hearing prisoners and otherwise meeting the requirements of the ADA and other
8  disability statutes and regulations.

9        37.      I am counsel of record in *Armstrong v. Brown*, No. C 94-2307 CW (N.D.
10 Cal.), a statewide class action on behalf of prisoners with disabilities currently pending
11 before this Court.  In that case, Judge Wilken found systemic violations of the ADA across
12 California's prisons, and approved a remedial order and injunction against those violations.

13       38.      The provision of effective communication for hearing-impaired inmates,
14 including through the use of sign language interpreters ("SLIs"), was a subject that
15 featured prominently in the *Armstrong* Remedial Plan developed and put into place by the
16 State in response to court orders.  Attached hereto as **Exhibit LL** is a true and complete
17 copy of the relevant pages of that Remedial Plan.  *See also Armstrong v. Brown*, 939 F.
18 Supp. 2d 1012 (N.D. Cal. 2013).

19       39.      The *Armstrong* experience teaches that a good written policy is an important
20 first step toward providing ADA rights to prisoners.  However, it is only one step in a
21 complex and sustained process that includes implementation, adequate staffing and
22 funding, training, monitoring, and accountability.  *See Armstrong v. Brown*, —F.3d—,
23 2014 WL 4783091 (9th Cir. Sept. 26, 2014).  The County's minimal, recent attempts to
24 begin complying with certain of the many applicable ADA requirements without funding
25 and training do not obviate the need for Court intervention and oversight.
26 / / /
27 / / /
28 / / /

[1329839-3]

11   CV 13 2354 PSG
REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
CLASS CERTIFICATION AND FOR PRELIMINARY INJUNCTION

**CFMG Has Recognized That Tuberculosis Is a Serious Public Health Problem in Monterey County; Its Policies and Procedures Are Inadequate to Protect Prisoners From Harm**

40. Attached hereto as **Exhibit MM** is a true and correct copy of Minutes from the Quality Assurance/Peer Review Committee Meetings of the Monterey County Jail and Juvenile Hall Medical Services of CFMG (the "Minutes") from March 18, 2010 through May 29, 2014. These Minutes were produced by CFMG in response to Plaintiffs' Request for Production of Documents Nos. 28 and 29, on September 19, 2014. The Minutes have been heavily redacted and the supporting documentation has been removed, issues which are the subject of a discovery motion to be heard by this Court on October 29, 2014. Dkt. 353. CFMG produced these documents without Bates numbers; for the Court's convenience and ease of citation, Plaintiffs have added Bates numbers beginning with the prefix CFMG.

41. Even redacted, the Minutes show that CFMG has long been aware of serious concerns regarding Tuberculosis ("TB") in Monterey County. For example, the Minutes of August 8, 2013 recognize that there were twelve active cases of TB in the community at that time. Ex. MM at CFMG_00012365. The Minutes from August 30, 2012 state that the Public Health Department is following eleven active cases of TB in the community. *Id.* at CFMG_00012346. The Minutes of November 17, 2011 include a public health update: "TB remains fairly prevalent in Monterey County. There has been 22 active cases in 2011 to date." *Id.* at CFMG_00012331. The Minutes of January 27, 2011 mention a peer review of a positive TB test and an inconclusive x-ray. *Id.* at CFMG_00012317. And on July 8, 2010, the Minutes mention a TB meningitis case and 17 active TB cases in Monterey County. *Id.* at CFMG_00012309.

42. Defendants have introduced no evidence to contradict the assumption that CFMG follows the same TB policies and procedures at all of the 27 counties in which it operates. *See* Exhibit GG to Declaration of Gay Grunfeld in Support of Plaintiffs' Motion for Class Certification, Dkt. No. 49-16, at 95-97 (CFMG website listing all facilities). The Declaration of Michael R. Philippi in Support of Opposition of Defendants County of

1  Monterey and Monterey County Sheriff's Office to Plaintiffs' Motion For Preliminary
2  Injunction, Dkt. No. 325-3, at Exhibit B includes a list of TB cases in California
3  Correctional Institutions by county by year.
4        43.    My office has carried out a comparison of the data contained within the list
5  of TB cases (Dkt. No. 325-3, Ex. B) against the list of the counties in which CFMG has a
6  medical program.  *See* Dkt. No. 49-16 at 95-97.  This comparison shows the following:  In
7  Ventura County Jail, there was one active case of TB in 2011; in Imperial County Jail
8  there was one active case of TB in 2009, four active TB cases in 2010, two active TB cases
9  in 2011, one active TB case in 2012, and four active TB cases in 2013; in San Diego
10 County Jail, there were seven active TB cases in 2009, twelve active TB cases in 2010,
11 eight active TB cases in 2011, three active TB cases in 2012, and seven active TB cases in
12 2013; and in Stanislaus County Jail, there was one active TB case in 2009.  As this
13 comparison shows, CFMG Policy and Procedure has not prevented prisoners from
14 contracting TB at other jail facilities in which CFMG provides medical care.
15       44.    Attached hereto as **Exhibit NN** is a true and correct copy of excerpts from
16 the Institute for Medical Quality's Corrections and Detentions Health Care Accreditation
17 Standards for Adult Detention Facilities, produced to Plaintiffs by the Institute for Medical
18 Quality ("IMQ") on August 5, 2014, pursuant to a subpoena served by Plaintiffs on IMQ.
19 "Standard 307" provides guidelines for "Health Inventory & Communicable Disease
20 Screening."
21       45.    Attached hereto as **Exhibit OO** is a true and correct copy of a report
22 published by the California Department of Public Health, Tuberculosis Control Branch,
23 entitled "Report on Tuberculosis In California, 2008," and available at
24 http://www.cdph.ca.gov/data/statistics/Documents/TB_Report_2008.pdf.

**IMQ Has Declined to Accredit the Monterey County Jail and in Fact Has Not Accredited the Majority of CFMG Institutions Statewide**

27       46.    Attached hereto as **Exhibit PP** is a true and correct copy of a page from the
28 Institute for Medical Quality website, available at http://www.imq.org/

CorrectionsDetentions.aspx and last accessed on October 20, 2014. According to the page entitled "Corrections and Detentions Health Care Program," IMQ runs a "Corrections and Detentions Health Care Program (CDHCP) [that] offers voluntary accreditation to health care services provided in both adult and juvenile detention facilities." IMQ surveyors conduct "an independent review of delivered health services[] … [to] support[] detention facilities in providing constitutionally adequate and regulation compliant health care services for inmates/detainees." *Id.* IMQ's website lists the facilities currently accredited by IMQ. *Id.* Neither Monterey County nor 17 other CFMG programs are IMQ approved. *See id.*; *see also* Exhibit GG to Grunfeld Decl., Dkt. No. 49-16 at 95-97 (providing a list of all CFMG facilities). In other words, only 9 out of CFMG's 27 programs in jails across the state are currently IMQ accredited.

47. Attached hereto as **Exhibit QQ** is a true and correct copy of the IMQ's Accreditation Presurvey Report to the Corrections and Detentions Health Care Committee of the Monterey County Adult Detention facility dated October 19, 2012. The Accreditation Presurvey Report was provided to Plaintiffs' counsel in response to a subpoena on August 5, 2014. The Accreditation Presurvey Report noted a number of problems at the Jail, both with regard to "essential standards of concern" and "important standards of concern." *See id.* at 30-31. Of special relevance here, the Report criticized the quality management process for not closing the loop on identified problems or using corrective actions plans and reaudits. *Id*. at 2-3. The Report further noted the lack of psychiatry peer review by an outside audit evaluator (*id*. at 3-4), found expired licenses and credentials for clinical staff (*id*. at 6), recommended thorough audits to determine if custody and medical checks of sobering cells were occurring frequently enough (*id*. at 11-12), critiqued the unavailability for health care request slips and the lack of a locked health care request box in the housing units (*id*. at 13, 17), recommended audits for medical and custody logs of the safety cells (*id*. at 19), and recommended audits of the administrative segregation and isolation cell inmates' exercise time to prove that they were receiving the recommended seven hours of large muscle activity per week (*id*. at 21). Rather than

complete the accreditation process Defendants Monterey County and CFMG abandoned the effort and remain unaccredited by the IMQ. *See* Quality Assurance Minutes, Ex. MM, *supra*, at CFMG_00012363.

48.     The IMQ Presurvey Report notes that the Jail had experienced three deaths in the two years preceding the October 19, 2012 report.  Ex. QQ, *supra*, at 3.

49.     Attached hereto as **Exhibit RR** is a true and correct copy of the IMQ's Accreditation Survey Report of September 15, 2009 in which Dr. Richard Hayward, a neutral expert in this case, participated.  Although the 2009 Report did accredit Monterey County Jail, the Report includes reservations that relate to some of the very issues that are still major problems.  As that Report found, "[d]ocumentation of sobering cells is inconsistent and hard to follow as custody and health do not use the same forms." *Id*. at 29.  In addition, the Report noted, with regard to the management of intoxicated prisoners, "[c]hecks are inconsistent and in some cases were not documented at all." *Id*. at 11.  The Report recommended a 90 day accreditation "with expectation that this facility supply copies of sobering cell logs to show that checks are being made on a consistent basis and in accord with their policy and Title 15." *Id*. at 29.  The Report also urges the Jail to "improve documentation on inmates in high risk areas, sobering cells, safety cells, and restraints." *Id.*

50.     One issue referred to in both IMQ reports is the need for the Jail to maintain a contract for services with a hospital.  In the 2012 Presurvey Report, the auditors state that the "[c]ontract with the Sheriff's Office states CFMG will use Natividad Hospital for both psychiatric and [m]edical acute care."  Ex. QQ, *supra*, at 1.  The auditors ask that CFMG "have current signed contract available for survey team review."

51.     In fact, however, Natividad does not provide for full access to acute psychiatric care.  Attached hereto as **Exhibit SS** is a true and correct copy of Natividad Medical Center's Mental Health Unit Admission Policy, last revised May 2014, which was produced to Plaintiffs pursuant to a subpoena on August 29, 2014, and was Bates-numbered by Plaintiffs NMC_000139-NMC_000142.  According to this policy,

1  Natividad's Mental Health Unit "will only accept patients from the [J]ail between the
2  hours of 0800-1330 Monday through Thursday." *Id.* at NMC_000141.

**Defendants Continue to Experience Severe Staffing Shortages That Affect the Access to Medical Care and Programs and Services for Those With Disabilities**

5    52.    As described in the Quality Assurance Minutes of August 8, 2013, *see* Ex.
6  MM, *supra*, at CFMG_00012364, Commander Bass indicates that there were severe
7  custody staffing problems at that time, making it difficult for custody to fulfill its
8  obligations to assist with medical and mental health care. According to the minutes, "It
9  has become more and more difficult to access inmates for treatment." *Id.*

10   53.    As reflected in the Quality Assurance Minutes of November 14, 2013, *see*
11 Ex. MM, *supra*, at CFMG_00012370, Commander Bass has attempted to obtain funding
12 for "a special housing unit for mental health patients [to] … help to address the increasing
13 number of patients and provide a treatment modality that currently does not exist."
14 Instead, according to the minutes, "[i]nmates with mental health problems are now being
15 placed mostly in Adam and Boy Pod for close observation." *Id.* In other words, without
16 adequate staffing and funding, those with mental illness are simply segregated. As of the
17 January 2014 Quality Assurance Minutes, Commander Bass had been unsuccessful in
18 obtaining funding for the skilled housing unit for the mentally ill. *See id.* at
19 CFMG_00012373.

**Defendants' Experts' Methodology and Conclusions Are Seriously Flawed**

21   54.    Attached hereto as **Exhibit TT** are true and correct excerpts of the deposition
22 of Defendants' expert Kathryn Wild, taken on September 23, 2014, in Ontario, California.
23   55.    Attached hereto as **Exhibit UU** are true and correct excerpts of the
24 deposition of Jason Roof, taken on October 3, 2014, in Sacramento, California.
25 / / /
26 / / /
27 / / /
28 / / /

[1329839-3]

16                                                                                                        CV 13 2354 PSG
REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
CLASS CERTIFICATION AND FOR PRELIMINARY INJUNCTION

**Recently Decided Caselaw Supports Plaintiffs' Arguments for Class Certification**

56. Attached hereto as **Exhibit VV** is a true and correct copy of a recently filed Class Certification Order in *Gray et al. v. County of Riverside*, No. 5:13-cv-00444-VAP-OP, Dkt. No. 131 (C.D. Cal. Sept. 2, 2014).

**California Tuberculosis Guidelines Support Plaintiffs' Preliminary Injunction Motion**

57. Attached hereto as **Exhibit WW** is a true and correct copy of guidelines for the continuity of care of tuberculosis patients in correctional facilities, published by the California Tuberculosis Controllers Association, entitled "Correctional Facility Tuberculosis Patient Plan: Instructions," and which an attorney in my office accessed on October 21, 2014, by going to http://www.ctca.org/fileLibrary/file_53.pdf.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 21st day of October, 2014.

*/s/ Gay Crosthwait Grunfeld*
Gay Crosthwait Grunfeld

[1329839-3]

17    CV 13 2354 PSG
REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION AND FOR PRELIMINARY INJUNCTION