1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| JESSE HERNANDEZ, et al., | ) | Case No.:  5:13-cv-2354-PSG |
| | ) | |
| Plaintiffs, | ) | **ORDER GRANTING MOTION FOR** |
| | ) | **PRELIMINARY INJUNCTION** |
| v. | ) | |
| | ) | |
| COUNTY OF MONTEREY, et al., | ) | **(Re:  Docket No. 108)** |
| | ) | |
| Defendants. | ) | |
| | ) | |

In the midst of this litigation over the conditions of confinement at the Monterey County

Jail, the parties did something different.  They did something commendable.  They cooperated.

Their cooperation took the form of an agreement to retain four neutral experts.[1]  The

experts were asked to evaluate whether jail inmates are adequately protected from injury and

violence, and whether the jail's system of medical care is adequate.[2]  The experts identified a

variety of deficiencies and hazards, including:  an inadequate tuberculosis screening program;

---

[1] *See* Docket No. 9.

[2] *See* Docket No. 349 at 1.

1

United States District Court
For the Northern District of California

inadequate policies and practices for continuing prescription medication for newly-booked inmates; substandard policies and practices for identifying and treating newly-booked inmates for drug and alcohol withdrawal; administrative segregation unit conditions that put inmates at unacceptable risk of suicide and self-harm; exclusion of inmates from exercise, religious, rehabilitative and educational programs based on physical disability and failure to provide inmates with any sign-language interpreters.[3]

The cooperation ended, however, when it came to implementing the experts' proposed solutions. Representing a class of pretrial detainees and sentenced inmates in the jail and a subclass with disabilities, Plaintiffs now move for a preliminary injunction.[4] The injunction they seek targets the discrete conditions identified above as deliberate indifference in violation of the Eighth and Fourteenth Amendments and failure to accommodate in violation of the Americans with Disabilities Act.

Despite its reluctance to inject itself into decisions made in running a public facility that has served the people of Monterey County for decades, the court cannot deny that Plaintiffs have shown that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in the public interest."[5] Under such circumstances, the court has little choice but to GRANT Plaintiffs' motion, as set forth below.

---

[3] *See* Docket No. 49-3 Exs. I, J; Docket No. 49-4 Ex. K; Docket No. 49-5 Ex. M.

[4] *See* Docket Nos. 41, 48, 108.

[5] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

2

United States District Court
For the Northern District of California

# I.

The United States Constitution affords pretrial detainees greater protection from dangerous conditions of confinement than those sentenced after conviction.[6]  Courts evaluating the claims of pretrial detainees under the Fourteenth Amendment may nevertheless rely on the same analytical framework for those sentenced under the Eighth Amendment.[7]  A jail violates both Amendments if it incarcerates inmates under conditions posing a substantial risk of serious harm to their health or safety (the objective prong), and if Defendants acted with deliberate indifference, that is, with conscious disregard for that risk (the subjective prong).[8]  Unsafe conditions that "pose an unreasonable risk of serious damage to [an inmate's] future health" may satisfy this objective prong, even if the damage has not yet occurred and may not affect every inmate exposed to the conditions.[9]  Inmates have a right to adequate care for serious medical and mental health needs.[10]  Conditions that significantly affect an inmate's daily activities or cause chronic and substantial pain constitute serious medical needs, even if they are not life-threatening.[11]

---

[6] See Hydrick v. Hunter, 500 F.3d 978, 994 (9th Cir. 2007), judgment vacated on other grounds, 556 U.S. 1256 (2009).

[7] See Simmons v. Navajo County, 609 F.3d 1011, 1017 (9th Cir. 2010).

[8] See Farmer v. Brennan, 511 U.S. 825, 834, 839-40 (1994); see also Wilson v. Seiter, 501 U.S. 294, 296-97 (1991) (applying the Eighth Amendment to the states through the Fourteenth Amendment).

[9] See Helling v. McKinney, 509 U.S. 25, 35 (1993).

[10] See Hoptowit v. Ray, 682 F.2d 1237, 1252-54 (9th Cir. 1982), abrogated on other grounds by Sandin v. Conner, 515 U.S. 472 (1995); Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988) (holding that officials may be deliberately indifferent if they "deny, delay or intentionally interfere with medical treatment," or if the method by which they provide care is inadequate).

[11] See, e.g., Ahktar v. Mesa, 698 F.3d 1202, 1213-14 (9th Cir. 2012) (rejecting officials' claims that inmate had not alleged sufficiently serious medical needs when officials allegedly repeatedly ignored his disability, causing him to suffer a broken wrist as well as "humiliation and embarrassment").

3

United States District Court
For the Northern District of California

1     Pursuant to Title II of the ADA, a "qualified individual with a disability" cannot, "by

2    reason of such disability, be excluded from participation in or be denied the benefits of the

3    services, programs, or activities of a public entity, or be subjected to discrimination by any such

4    entity."[12]  The Department of Justice has promulgated regulations to enforce this general

5    mandate.[13]  "To prevail under Title II [of the ADA], [a] plaintiff must show that:  (1) he is a

6    qualified individual with a disability; (2) he was either excluded from participation in or denied the

7    benefits of a public entity's services, programs, or activities, or was otherwise discriminated

8    against by the public entity; and (3) this exclusion, denial, or discrimination was by reason of his

9    disability."[14]  Violations of Title II are largely defined by its implementing regulations, which

10   "flesh out public entities' statutory obligations with more specificity," and are controlling authority

11   "'unless they are arbitrary, capricious, or manifestly contrary to the statute.'"[15]  A public entity

12   must "make reasonable modifications in policies, practices, or procedures when the modifications

13   are necessary to avoid discrimination on the basis of disability, unless the public entity can

14   demonstrate that making the modifications would fundamentally alter the nature of the service,

15   program, or activity."[16]

---

[12] 42 U.S.C. § 12132.

[13] *See, e.g.*, 28 C.F.R. § 35.150(a) (requiring that public services, programs, and activities be "readily accessible to and usable by individuals with disabilities."); *see also id.* § 35.149 (mandating that public facilities be accessible to people with disabilities).

[14] *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014); *see also* 42 U.S.C. § 12132.

[15] *Cohen*, 754 F.3d at 695 (quoting *Armstrong v. Schwarzenegger*, 622 F.3d 1058,1065 (9th Cir. 2010).

[16] 28 C.F.R. § 35.130(b)(7); *see also Pierce v. County of Orange*, 526 F.3d 1190, 1215 (9th Cir. 2008).

4

United States District Court
For the Northern District of California

The Title II regulations also include specific requirements for correctional facilities.[17]

Among other requirements, jails must "ensure that qualified inmates or detainees with disabilities

shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be

excluded from participation in, or be denied the benefits of, the services, programs, or activities of

a public entity, or be subjected to discrimination by any public entity."[18] Jails also must "ensure

that each inmate with a disability is housed in a cell with the accessible elements necessary to

afford the inmate access to safe, appropriate housing."[19] Correctional facilities also must

implement "some form of [disability] tracking system . . . to enable [them] to comply with the

[ADA]."[20] Public entities must make changes necessary to provide programmatic access, including

structural modifications and reasonable accommodations.[21] Because of the unique nature of

correctional facilities, in which jail staff control nearly all aspects of inmates' daily lives, most

everything provided to inmates is a public service, program or activity, including sleeping, eating,

showering, toileting, communicating with those outside the jail by mail and telephone, exercising,

entertainment, safety and security, the jail's administrative, disciplinary, and classification

---

[17] *See* 28 C.F.R. § 35.152.

[18] 28 C.F.R. § 35.152(b)(1).

[19] 28 C.F.R. § 35.152(b)(3); *see also* 28 C.F.R. § 35.152(b)(2)(i)-(iv) (prohibiting public entities from, because of an inmate's disability, placing him or her in inappropriate security classifications, in designated medical areas unless they are actually receiving medical care or treatment, in facilities that do not offer the same programs as the facilities where they would otherwise be housed, and in facilities where visitation with family is difficult).

[20] *Armstrong v. Davis*, 275 F.3d 849, 876 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504-5 (2005).

[21] *See* 28 C.F.R. § 35.150(a), (b).

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

proceedings, medical, mental health and dental services, the library, educational, vocational, substance abuse and anger management classes and discharge services.[22]

As this court has previously noted, Defendant the County of Monterey has promulgated extensive policies governing inmates' health care and conditions of confinement.[23]  These policies apply to all inmates in its custody and all staff throughout its main jail in Salinas.[24]  Since 1984, the County has contracted with Defendant California Forensics Medical Group, Inc., a private health care provider, to provide medical, dental and mental-health care services to inmates.[25]  Under the terms of its contract, CFMG agreed to follow all County policies and to work with the County to implement additional policies governing such matters as health care staffing, access to prescriptions, emergency care and mental health services.[26]  The County regularly monitors CFMG's compliance with these policies.[27]

Plaintiffs allege a variety of jail policies and practices "fail to keep [inmates] safe from violence, to deliver adequate medical and mental health care or to provide required assistance to

---

[22] *See* 28 C.F.R., Pt. 35, App. A (explaining that "correctional facilities are unique facilities under title II" because inmates "cannot leave the facilities and must have their needs met by the corrections system," and explaining that the ADA-related needs of inmates, "include, but are not limited to, proper medication and medical treatment, accessible toilet and shower facilities, devices such as a bed transfer or a shower chair, and assistance with hygiene methods for [inmates] with physical disabilities"); *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the [inmates]."); *Armstrong v. Schwarzenegger*, 622 F.3d at 1068 (noting that jails provide inmates "with various positive opportunities, from educational and treatment programs, to opportunities to contest their incarceration, to the fundamentals of life, such as sustenance, the use of toilet and bathing facilities, and elementary mobility and communication"); *see also Pierce*, 526 F.3d at 1214-17.

[23] *See, e.g.*, Docket No. 431 at 2.

[24] *See, e.g.*, Docket No. 41 at ¶¶ 1, 4, 5, 39, 208, 359, 360.

[25] *See id.* at ¶¶ 32, 33; Docket No. 49-16 Ex. GG.

[26] *See* Docket No. 49-17 Ex. HH.

[27] *See id.*

6

[inmates] with disabilities."[28]  Plaintiffs support these general allegations with detailed references to dozens of specific jail policies and practices, including inadequate staffing, training, space, inmate classification, intake health screening, care scheduling, medication, infection control, emergency response and suicidal inmate segregation.[29]  Plaintiffs also claim that inmates are routinely denied reasonable accommodation for their disabilities.[30]  They allege, for example, that inmates who cannot climb stairs spend months without going outside because the exercise yard can only be accessed up a flight of stairs.[31]  Inmates who use sign language to communicate are not provided interpreters for the intake process, doctors' appointments and disciplinary hearings.[32]  Defendants are further alleged not to maintain any central list, electronic or otherwise, of inmates with disabilities and the accommodations they require.[33]  The result, say Plaintiffs, is that "[b]ecause Defendants completely lack policies and practices for evacuating and communicating with [inmates] with disabilities in case of emergencies, including natural disasters and security incidents, [inmates] with disabilities are at increased risk of injury in such circumstances."[34]

Not long after Plaintiffs filed their complaint on May 23, 2013, the case was stayed at the request of the parties.[35]  The idea was to explore the possibility of a consensus on how best to implement changes at the jail to address Plaintiffs' concerns.  In addition to retaining their own experts, the parties agreed to retain independent experts to present opinions on the key issues in

---

[28] Docket No. 56 at 1.

[29] *See* Docket No. 41, *passim.*

[30] *See, e.g.,* Docket No. 41 at 98-118.

[31] *See* Docket No. 52-8 at ¶ 12; Docket No. 109-2 Ex. W at 70:11-24.

[32] *See* Docket No. 49-4 at 7.

[33] *See, e.g.,* Docket No. 41 at 194; Docket No. 49-4 Ex. K at 28, 34.

[34] *See* Docket No. 56 at 19.

[35] *See* Docket No. 9.

7

Case No.: 5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

dispute.  Under the terms of the parties' agreement, the court ordered "a process of mutually agreeing to experts who will review and analyze the conditions at the Monterey County Jail and issue reports" in four areas:  medical care, mental health care, corrections and security and disability accommodations and access.[36]  The parties agreed that the resulting reports and recommendations would provide the framework for negotiating a remedial plan and consent decree.[37]  If settlement negotiations were unsuccessful, the parties agreed that the reports would be admissible evidence in the litigation.[38]  The parties exchanged nominations and conferred to identify neutral experts that were mutually acceptable.[39]

The parties jointly retained Michael Hackett as a neutral expert to evaluate "whether Defendants adequately protect [inmates] from injury and violence in the [j]ail."[40]  Hackett reported that staffing and housing is inadequate, the jail population is overcrowded and the old physical plant is not adequate for safety monitoring, therefore inciting violence.[41]  While he conceded that "inmate services currently meet the requirements of California jails despite overcrowded and understaffed conditions," he concluded that Defendants operate the jail in a dangerous manner, placing all inmates at serious risk of harm.[42]

The parties jointly retained Dr. Michael Puisis, D.O. as a neutral expert to evaluate "the adequacy of the medical care being provided to inmates at the Monterey County Jail."[43]  Puisis

---

[36] *Id.* at 1; *see also* Docket No. 349 at 1.

[37] *See* Docket No. 9 at 1.

[38] *See* Docket No. 349 at ¶ 2.

[39] *See id.* at ¶ 4.

[40] Docket No. 49-1 Ex. A at 10.

[41] *See* Docket No. 49-3 Ex. I at 4, 6-9, 11, 17, 32.

[42] *Id.*

[43] Docket No. 49 at ¶ 8; *see also* Docket No. 49-1 Ex. B; Docket No. 49-3 at Ex. J.

Case No.: 5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

wrote that the jail's medical staffing is 40-70% less than it should be at all levels, leading to inadequate intake, evaluation, care, management and surveillance.[44]   Puisis also found the spaces of care delivery were unhygienic, inadequate and small, discouraging proper examinations.[45] Almost every important policy governing medical care suffered from serious infirmities:  intake, requests, emergency services, continuing medications, scheduling care, segregation and special needs.[46]   Puisis concluded that Defendants' system-wide policies and practices for providing medical care harmed inmates or placed them at great risk of serious harm due to inadequate diagnoses, treatment infection control, drug and alcohol withdrawal policies, and medical records.[47]

The parties jointly retained Dr. Richard Hayward, Ph.D. as a neutral expert to evaluate "whether Defendants' system for providing mental health care in the jail is adequate."[48]   Hayward produced a draft report finding that Defendants' system-wide policies and practices for providing mental health care place inmates at risk of serious harm.[49]

The parties jointly retained SZS Consulting as a neutral expert to evaluate Defendants' compliance with the ADA and other disability rights laws.[50]   SZS Consulting's detailed report found that Defendants operate the jail in violation of the rights and needs of inmates with disabilities.[51]   SZS identified 119 overarching architectural elements that do not comply with the

---

[44] *See* Docket No. 49-3 Ex. J at 6.

[45] *Id.* at 8, 10.

[46] *Id.* at 11-16.

[47] *Id.* at 18, 20, 27-31.

[48] Docket No. 49 at ¶ 9; Docket No. 49-1 Ex. C.

[49] Docket No. 49-7 Ex. M at 8, 10, 12-15.  *See also* Docket No. 109-2 Ex. L (May 30, 2014 Review of Mental Health Services at Monterey County Jail; Final Hayward Report).

[50] Docket No. 49 at ¶ 10; Docket No. 49-1 Ex. D.

[51] *See* Docket Nos. 49-4, 49-5, 49-6 Ex. K.

9

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

relevant guidelines.[52]   Some of these barriers violate the requirements of federal and state law in multiple ways.[53]   The problems SZS identified include the following:  the jail has far fewer housing areas and cells available to inmates in wheelchairs than required by the relevant state and federal laws.[54]   None of the areas in which inmates are housed, either temporarily (e.g., holding cells, isolation cells and safety cells) or more permanently (housing units), are fully accessible to inmates in wheelchairs.[55]   Many areas of the jail in which Defendants offer programs, including housing, health care and exercise, are partially or completely inaccessible to inmates with mobility impairments, including those in wheelchairs.  Not one medical exam room has adequate clearances for inmates in wheelchairs.[56]   Moreover, the exercise facilities for all inmates housed in Pods AJ, K-Pod, the Women's Section, the Rotunda and the Infirmary were at least for some inmates located on the roof of the jail, up a long flight of stairs; "[t]he result is that no accessible exercise areas are provided in the facility for female inmates and male inmates have access to exercise areas only if they are housed in dorms A, B, C or D."[57]

Concerned with the pace of negotiations over how best to address these findings by the neutral experts, Plaintiffs seek a preliminary injunction as to the following  specific conditions:  TB identification and control; identifying, monitoring and treating inmates at risk of withdrawal; suicide prevention to those housed in the jail's segregation units; medication continuity; access to recreation and other programs for people with disabilities and access to sign language interpreters

[52] *See id.* at 98-691.  Parking elements further do not comply with guidelines.  *See id.* at 38-97.

[53] *See id.*

[54] *See id.* at 7-10.

[55] *See id.* at 7- 9; Docket No. 50 at ¶¶ 18-19.

[56] *See* Docket No. 49-4 at 8-9.

[57] *Id.* at 9; *see* Docket No. 52-8 at ¶ 12; Docket No. 109-2 Ex. W at 70:11-24.

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

for inmates who need them.[58]  In particular, Plaintiffs ask the court to order Defendants to develop

a plan within 30 days to remedy the constitutional and statutory violations that at minimum

includes the following elements:

> a.  Defendants' tuberculosis identification, control, and treatment program at the [j]ail shall comply with the standards laid out in the Centers for Disease Control and Prevention ("CDC"), *Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC* (June 2006);

> b.  All [inmates] newly booked into the [j]ail shall receive a timely tuberculosis symptom screening administered by adequately trained health care staff (nurse or higher level staff);

> c.  Defendants shall have a reliable system to track whether all newly booked [inmates] have received tuberculosis screening and appropriate follow-up testing and treatment;

> d.  Medical staff shall timely conduct the initial evaluation to determine if [an inmate] is intoxicated and/or suffering from withdrawal or at high risk for withdrawal;

> e.  Medical staff shall make the decision on who should be placed in a sobering cell and who should be transferred to the hospital to be treated for possible or actual withdrawal;

> f.  Medical providers (physicians, physicians assistants and/or nurse practitioners) shall be timely involved in assessing and treating [inmates] potentially undergoing withdrawal, and non-provider medical staff shall timely refer to providers those [inmates] undergoing withdrawals when clinically indicated;

> g.  Detoxifying [inmates] shall be adequately monitored using the CIWA protocol or equivalent validated monitoring protocol, shall receive pharmacological treatment as indicated, and be appropriately housed based on their clinical condition;

> h.  Defendants shall develop separate treatment protocols for opiate, alcohol and benzodiazepine withdrawal;

> i.  All [inmates] newly booked into the [j]ail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment;

---

[58] *See* Docket No. 108-1.

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

j. [Inmates] who, at the time of booking, report to Defendants that they are taking community-prescribed medications, but whose medications cannot be verified by Defendants, shall be timely assessed by a medical provider and timely prescribed medications necessary to treat their health needs;

k. Defendants shall remove all hanging points and other hazards in the [j]ail's administrative segregation units that pose a risk of being used by [inmates] to harm themselves or attempt suicide;

l. Defendants shall conduct health and safety checks of all [inmates] housed in segregation at least once every 30 minutes at irregular and unpredictable intervals;

m. Defendants shall design and implement a system for identifying and tracking all [inmates] who are qualified individuals with disabilities, as that term is defined by the ADA and its implementing regulations, including but not limited to [inmates] with mobility impairments or who are deaf, hard of hearing or unable to speak. Defendants shall also design and implement a system for identifying and tracking the reasonable accommodations necessary for qualified [inmates] with disabilities to participate in programs, services and activities offered by Defendants at the [j]ail, including but not limited to [inmates] who must be provided access to programs, services and activities in spaces that do not require climbing stairs and who require sign language interpreters in order to have an equal opportunity to participate in, and enjoy the benefits of, programs, services and activities offered by Defendants;

n. The County Defendants shall offer all programs, services and activities, including but not limited to outdoor exercise, religious services, Choices and Pride classes and Narcotics and Alcoholics Anonymous meetings, in locations that do not require [inmates] to climb stairs in order to access the programs, services, and activities;

o. Defendants shall furnish qualified sign language interpreters to any [inmates] for whom sign language is their only or primary method of communication, in all circumstances where a qualified sign language interpreter is necessary to ensure [an inmate] has an equal opportunity to participate in, and enjoy the benefits of, programs, services, and activities offered by Defendants. The interactions for which Defendants must furnish qualified sign language interpreters include but are not limited to the intake process, classification hearings, disciplinary hearings, all medical, mental health, and dental treatment, religious services, educational classes, Choices and Pride classes, Narcotics and Alcoholics Anonymous meetings and any other interactions with staff that implicate [an inmate's] due process rights; and

p. Defendants shall implement a system to document that Defendants have provided qualified sign language interpreters to [inmates] who need them and that

12

the [inmate] understood the information conveyed by the qualified sign language interpreter.[59]

Under Plaintiffs' proposed terms, Plaintiffs would file objections to Defendants' proposed plan for implementing the provisions of the order within 10 days, and request that the court then revise the plan and enter an order adopting it.[60]  Plaintiffs also request that they be entitled to conduct reasonable monitoring of Defendants' compliance with this order, including the right to inspect the jail, interview staff and inmates, review relevant records and observe practices related to Defendants' compliance with the provisions of this order.[61]  Plaintiffs further request that the bond requirement be waived.[62]

## II.

This court has jurisdiction under 28 U.S.C. § 1331.  The parties further consented to the jurisdiction of the undersigned magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 72(a).[63]

The Prison Litigation Reform Act[64] mandates that the scope of preliminary injunctive relief "heel close to the identified violation,"[65] must not be overly "intrusive and unworkable" and must

---

[59] *See* Docket No. 108-2 at 3-5.  Plaintiffs seek an injunction on behalf of the class and subclass certified by the court on January 29, 2015.  *See* Docket No. 431.

[60] *See* Docket No. 108-1 at 5-6.

[61] *See id.*

[62] *See* Docket No. 108-2 at 38-39.

[63] *See* Docket Nos. 8, 34, 46.

[64] *See* 18 U.S.C. § 3626(a)(2) ("Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means to correct that harm.  The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief.").

[65] *Gilmore v. People of the State of California*, 220 F.3d 987, 1005 (9th Cir. 2000); *see also Armstrong v. Davis*, 275 F.3d at 872.

13

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

not require continuous supervision by the federal court over the conduct of a state agency or its officers.[66] "Section 3626(a) . . . operates simultaneously to restrict the equity jurisdiction of federal courts and to protect the bargaining power of prison administrators—no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum."[67] The PLRA also imposes a ninety-day time limit on the length of preliminary injunctions.[68] While the PLRA does not substantially change the standards for issuance of an injunction,[69] preliminary or otherwise, the injunction must closely track the established violations[70] and account for changing conditions in prison.[71] Here, the PLRA imposes no further restriction, because even under its broadest reading, the injunction sought by Plaintiffs hews to the specific conditions challenged.

## III.

To secure a preliminary injunction here in the Ninth Circuit, Plaintiffs must pass either the *Winter* test[72] or the *Farris* test.[73] Under *Winter*, Plaintiffs must show (1) they are likely to succeed

---

[66] *See O'Shea v. Littleton*, 414 U.S. 488, 500-01 (1974); *see also Armstrong v. Davis*, 275 F.3d at 872.

[67] *Gilmore*, 220 F.3d at 99.

[68] *See* 18 U.S.C. § 3626(a)(2).

[69] *See Armstrong v. Davis*, 275 F.3d at 872 (citing *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001)).

[70] *See Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014).

[71] *See Armstrong v. Schwarzenegger*, 622 F.3d at 1071 ("Allowing defendants to develop policies and procedures to meet the ADA's requirements is precisely the type of process that the Supreme Court has indicated is appropriate for devising a suitable remedial plan in a prison litigation case."); *see also Pierce v. County of Orange*, 761 F. Supp. 2d 915, 954 (C.D. Cal. 2011) ("[T]he least intrusive means to compel the County to remedy the physical barriers and disparate provision of programs, services, and activities to disabled detainees is to allow the County to draft a proposed plan that will address and correct each and every physical barrier identified in this Order.").

[72] *See Winter*, 555 U.S. at 20.

[73] *See Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).

Case No.: 5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

on the merits of their claims, (2) they will suffer irreparable harm absent preliminary injunctive relief, (3) the balance of hardships tips in Plaintiffs' favor and (4) a preliminary injunction is in the public interest.[74]  Under *Farris*, Plaintiffs must show "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."[75] Often described as a "sliding scale" approach, *Farris* holds that "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."[76]  Under either approach, with respect to each of the challenged conditions, an injunction is warranted.

  *First*, Plaintiffs are likely to succeed on the merits.  To establish this likelihood, Plaintiffs need only show "a fair chance of success" on their specific constitutional and statutory challenges.[77]

---

[74] *See Winter*, 555 U.S. at 20.

[75] *Farris*, 677 F.3d at 864 (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted)).

[76] *Alliance for the Wild Rockies*, 632 F.3d at 1131.  Under either approach, there must be proof of an ongoing or future problem which will not be remedied absent an injunction; speculation or possibility is not enough.  *See Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999) (en banc) ("The Supreme Court has repeatedly cautioned that, absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to conduct its business in a particular way."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 112 (1983) ("[R]ecognition of the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the states' criminal laws in the absence of irreparable injury which is both great and immediate."); *O'Shea*, 414 U.S. at 502 ("Respondents have failed, moreover, to establish the basic requisites of the issuance of equitable relief in these circumstances—the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law.").

[77] *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 794 (9th Cir. 2005) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc)).  The Ninth Circuit has noted that although the same general principles inform the court's analysis, where "a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo

Case No.: 5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

*TB Screening*.  The risks of TB exposure and infection are particularly high in correctional facilities, where close living arrangements and prolonged exposure result in more common TB outbreaks.[78]  The risks are even greater in an overcrowded facility like the jail here, where the population ran at 136% of its rated capacity in 2013, and was well over 100% capacity as of August 2014.[79]  As a result, it is generally recognized that correctional facilities must implement robust TB screening and prevention programs in order to protect against unnecessarily exposing inmates to TB.[80]

Plaintiffs provide significant evidence that Defendants' TB screening, isolation, skin testing, monitoring and tracking policies and practices do not confirm to the standards of the CDC and others, creating an excessive risk of harm to all inmates as well as other community members.[81]  The CDC guidelines are just that, guidelines.  They are not mandatory regulations or

---

*pendente lite*, courts should be extremely cautious about issuing a preliminary injunction." *Martin v. International Olympic Committee*, 740 F.2d 670, 675 (9th Cir. 1984).

[78] *See* Docket No. 49-3 Ex. J at 18; *see also* Docket No. 109-1 Ex. E at 128:25-129:9; Docket No. 109-1 Ex. A at 4 (CDC Guidelines) ("One highly infectious person can infect inmates, correctional staff, and visitors who share the same air space.").

[79] *See* Docket No. 108-8 at ¶¶ 9-11; *see also* Docket No. 49-3 at 5; Docket No. 49 at ¶¶ 25-33; Docket No. 49-3 Ex. I at ¶¶ 1.1, 1.4, 1.5C, 1.7; Docket No. 49-8 Ex. Y; Docket Nos. 49-10, 49-11, 49-12 Ex. Z; Docket No. 49-13 Ex. AA; Docket No. 41-4 Ex. B at Ex. 2, 9 (2011 Jail Needs Assessment by TRG Consulting); Docket No. 109 at ¶¶ 10, 14.

[80] *See generally* Docket No. 109-1 Ex. A; Docket No. 109-1 Ex. I (detailing TB prevention policies and practices in the California Department of Corrections and Rehabilitation).

[81] *See* Docket No. 108-2 at 25-26; *Lareau v. Manson*, 651 F.2d 96, 109 (2d Cir. 1981) (failure to adequately to screen newly admitted inmates for infectious diseases constituted a serious threat to the health of inmates "sufficiently harmful to evidence deliberate indifference to serious medical needs") (internal citations omitted); *Morales Feliciano v. Rosselio Gonzalez*, 13 F. Supp. 2d 151, 210 (D.P.R. 1998) ("The failure to screen incoming [inmates] for infectious diseases including tuberculosis" violates the Constitution); *Madrid v. Gomez*, 889 F. Supp. 1146, 1257 (N.D. Cal. 1995) ("Screenings for communicable diseases should be sufficient to protect other [inmates] from infectious diseases."); *Cody v. Hillard*, 599 F. Supp. 1025, 1059 (D.S.D. 1984) ("[P]roper screening of inmates is a vital element of adequate medical services.") (internal citations and quotation marks omitted); *Plata v. Schwarzenegger*, Case No. 3:01-cv-1351-TEH, 2005 WL 2932253, at *12 (N.D. Cal. Oct. 3, 2005) ("This intake process is supposed to allow medical staff

16

Case No.: 5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

standards. But known noncompliance with generally accepted guidelines for inmate health strongly indicates deliberate indifference to a substantial risk of serious harm.[82] At least since the CDC released its guidelines, and since Puisis issued his report showing Defendants' policies and practices fell below the constitutional standard of care, Defendants have known about the risks of harm but have not changed their practices:

- Under the jail's policies and practices, corrections officers—not health care staff—perform symptom screening for TB on intake; health care staff are not required to conduct any TB screening until 14 days after intake.[83] The CDC recommends TB symptom screening by a health-care professional at facilities like the jail here that are at least medium-sized and have greater than minimal risk of exposure.[84]

- No jail policy guides officers in conducting TB symptom screening at intake.[85] Moreover, the responsibilities of officers who conduct health screening at intake "are well beyond their ability to perform," and are performed under conditions that compromise their quality and reliability.[86] "[Inmates] are lined up in a line listening to what the questions are. Officers perform the test standing up. . . . [I]t's done under conditions of time stress."[87]

---

to identify the medical problems, in particular communicable diseases such as syphilis and tuberculosis, that pose a risk of transmission to other [inmates].").

[82] *See Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988) (holding that in the context of a deliberate indifference claim, a plaintiff must prove that the defendant's deliberate indifference was the actual and proximate cause of the deprivation); *see also Wong v. United States*, 373 F.3d 952, 966 (9th Cir. 2004) (holding that while direct, personal participation is not required, "[t]he critical question is whether it was reasonably foreseeable that the actions of the particular . . . defendants would lead to the rights violations alleged to have occurred.").

[83] *See* Docket No. 49-3 Ex. J at 12, 18; *see also* Docket No. 109-1 Ex. A at 4.

[84] *See* Docket No. 109-1 Ex. A at 4, 6, 10, 18, 23, 39; Docket No. 109-1 Ex. E at 128:25-129:10, 171:19-174:3; Docket No. 108-8 at ¶¶ 10-11; Docket No. 49-3 at 18; Docket No. 358-4 Ex. TT at 250:17-251:14 (Defendants' expert conceding that the CDC recommends medical staff conduct symptom screening at facilities housing more than a minimal number of inmates, and that 1,000 inmates is a "significant" number).

[85] Docket No. 49-3 Ex. J at 12.

[86] *Id.* at 15.

[87] Docket No. 109-1 Ex. E at 165:11- 20; *see also* Docket No. 108-8 at ¶ 12 ("Such an environment is completely inappropriate for a medical evaluation.").

17

Case No.: 5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

- The jail's TB policy does not require the isolation of inmates with positive TB screens.[88] Under the guidelines, individuals who screen positively for TB symptoms should be placed in isolation until TB is ruled out or, if diagnosed, until it can be treated.[89]

- Skin tests are administered 14 days after admission, double the seven-day timeline recommended by the CDC.[90] Rather than conducting skin tests on all inmates, however, the jail only performed skin testing on approximately a quarter of incoming inmates for the first nine months of 2013.[91] CDC Guidelines recommend tuberculin skin tests of all inmates within seven days of admission.[92] Given the high rate of TB in Monterey County and California, MCJ's intake screening "should be very aggressive."[93] Puisis agrees that the best practice would be to administer TB skin tests on intake, with the results read by a nurse within 72 hours.[94]

- The jail does not require those with positive skin tests to receive chest x-rays within 72 hours, and those with positive x-rays are not required to be medically isolated, as the CDC Guidelines require.[95] Chest x-rays are thus sometimes performed one or two weeks after a positive skin test reading, or sometimes not performed at all.[96]

- There is no evidence of infection control surveillance for TB within the jail, including tracking TB prevalence, rates, positivity numbers or employee skin tests.[97] Medical staff is thus unaware of whether there might be a TB problem within the facility—enhancing the risk that TB can spread from inmates to MCJ employees to persons in the community.[98]

---

[88] *See* Docket No. 49-3 Ex. J at 18.

[89] *See* Docket No. 109-1 Ex. A at 2, 5; Docket No. 49-3 Ex. J at 18.

[90] *Id.* at 12.

[91] *Id.* at 18.

[92] *See* Docket No. 109-1 Ex. A at 8.

[93] Docket No. 108-8 at ¶ 13.

[94] Docket No. 109-1 Ex. E at 167:1-168:2.

[95] *See, e.g.,* Docket No. 49-3 Ex. J at 12; *see also* Docket No. 109-1 Ex. E at 167:17-21, 168:16-22; Docket No. 109-1 Ex. A at 6.

[96] *See* Docket No. 49-3 Ex. J at 71; Docket No. 109-1 Ex. E at 168:17-22.

[97] *See* Docket No. 49-3 Ex. J at 23-24; Docket No. 109-1 Ex. E at 238:8-17.

[98] Docket No. 49-3 Ex. J at 24; Docket No. 108-8 at ¶ 14 ("A primary responsibility of a correctional medical program is to ensure the continued safety and health of inmates and staff, which is impossible without any effective method of tracking communicable diseases and the efforts of staff to treat and control them."). Puisis' review of inmate medical records found repeated examples of potentially dangerous and substandard monitoring and treatment for

18

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

Defendants do not seriously dispute their TB screening policies and practices or their

knowledge of the circumstances.[99] They argue instead that the rate of TB in Monterey County in

2013 was low, the rate of the TB in the jail was zero and that especially under these conditions, the

CDC guidelines themselves allow for discretion.[100] The short answer is that, as the Supreme Court

stated in *Helling v. McKinney*, prison officials may not "ignore a condition of confinement that is

sure or very likely to cause serious illness and needless suffering the next week or month or year,"

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

suspected cases of TB. On September 9, 2013, Patient 18 experienced night sweats and wheezing
and was evaluated by the physician's assistant and given asthma medication without any staff
conducting a tuberculin skin test or chest x-ray. *See* Docket No. 49-3 Ex. J at 62. Patient 25 was
given a tuberculin skin test on September 13, 2012, 16 days after arriving at MCJ, which tested
negative. *Id.* at 71. Thirteen months later, on October 15, 2013, during that patient's physical
examination, a tuberculin skin test was positive, indicating either that the inmate was exposed to or
infected with TB during his time in the jail or that the nurse performed the initial skin test
inaccurately. *Id.* As of October 24, 2013, nine days later, there had been no follow-up evaluation,
x-ray, or symptom history check. *Id.* Patient 26 reported experiencing major symptoms of TB,
including night sweats, cough, and sputum production, on August 31, 2013. *Id.* A skin test
performed three days later read positive for TB infection. *Id.* A chest x-ray was not ordered until
seventeen days later, on September 19, and as of October 24, nearly two full months after the
positive symptoms and skin test, no follow-up evaluation had occurred at all. *See id.* Patient 27
had a tuberculin skin test on August 30, 2013, twenty-eight days after arrival at the jail, which read
positive for TB infection. *Id.* Patient 28 similarly received a tuberculin skin test twenty days after
arriving, on October 2, 2013, which showed positive for TB. *Id.* at 72.

[99] With respect to each of the challenged conditions, Defendants are aware of these conditions and
tolerate the resulting risk to which inmates are exposed. For example, in 2007, the County
commissioned a third-party evaluation of the jail, which resulted in a June 19, 2007 report called
"County of Monterey, Office of the Sheriff, Needs Assessment." The 2007 report concluded that
"[t]he current combination of insufficient beds, an inadequate detention facility and understaffing
has resulted in an almost untenable situation. In 2011, the County asked the third-party consultant
to update the 2007 report to reflect amendments to state law and changes within the Sheriff's
Office and the jail population. This updated report, dated December 30, 2011, reached the exact
same, word-for-word conclusion: "The current combination of insufficient beds, an inadequate
detention facility and understaffing has resulted in an almost untenable situation." Docket No. 41-
1-3 Ex. A at Ex. 2; Docket No. 41-4, Ex. B at Ex. 2, 9. *See Farmer*, 511 U.S. at 842 ("Whether a
prison official had the requisite knowledge of a substantial risk is a question of fact subject to
demonstration in the usual ways, including inference from circumstantial evidence.").

[100] *See* Docket No. 325 at 10.

19

merely because no harm has yet occurred.[101]  Even if the numbers could be trusted despite the

inadequacies of Defendants' tracking, that no TB has yet infected the jail does not overcome the

finding of a neutral expert that the risk of such infection is unacceptably high.[102]

Defendants also argue that their comprehensive policies and practices of screening, testing,

tracking, and treating inmates with TB are in compliance with the State of California's "Title 15"

regulations and the Institute for Medical Quality Health Care Accreditation Standards for Adult

Detention Facilities.[103]  But that argument does not work.  There is nothing inconsistent in

complying with both the Constitution and Title 15, and Defendants have not suggested any manner

in which complying with the former might violate the latter.[104]  And even if there were a conflict,

the Supremacy Clause makes it very simple: the Constitution controls.[105]

---

[101] *Helling*, 509 U.S. at 33.

[102] *Cf. Toussaint v. Rushen*, 553 F. Supp. 1365, 1385 (N.D. Cal. 1983), *aff'd in part sub nom. Toussaint v. Yockey*, 722 F.2d 1490 (9th Cir. 1984) (granting thirteen elements of relief to inmates in administrative segregation in California prisons, including requiring defendants to "provide adequate and competent medical, surgical, psychiatric and dental services to meet the bona fide needs of [inmates] . . . [and] maintain adequate facilities and staff for such service."); *see also Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011) (upholding preliminary injunction striking down, under the Eighth Amendment, state law that prohibited provision of certain medical treatments to transgender inmates); *Von Colln v. County of Ventura*, 189 F.R.D. 583, 598-99 (C.D. Cal. 1999) (granting preliminary injunction under Eighth Amendment prohibiting use of restraint chair); *M.R. v. Dreyfus*, 697 F.3d 706, 739 (9th Cir. 2012) (en banc) (reversing in ADA case denial of preliminary injunction seeking to block decreases in state Medicaid expenditures for in home personal care services provided to disabled individuals); *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 122 (1st Cir. 2003) (upholding preliminary injunction under ADA and Rehabilitation Act requiring that Puerto Rico Department of Education furnish sign language interpreter to hard of hearing teenager).

[103] *See* Docket No. 325 at 24; Docket No. 335 at 2; *see also Toussaint v. Rushen*, 553 F. Supp. at 1385; *Fields*, 653 F.3d at 559; *Von Colln*, 189 F.R.D. at 598-99; *M.R.*, 697 F.3d at 739; *Nieves-Marquez*, 353 F.3d at 122.

[104] Considering the evidence that the jail lacks IMQ accreditation, *see* Docket No. 358-4 Ex. TT, there is even some question whether Defendants are in fact in compliance with these regulations and standards.

[105] *See Spain v. Mountanos*, 690 F.2d 742, 746 (9th Cir. 1982) ("Under the Supremacy Clause of the United States Constitution, a court, in enforcing federal law, may order state officials to take actions despite contravening state laws.").

Case No.: 5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

***Suicide and Self-Harm Prevention.***  Approximately half of all suicides committed in correctional facilities take place in administrative segregation units.[106]  While housed in segregation, the mentally ill are especially vulnerable, and their mental health symptoms—including depression, psychosis, and self-harm—are especially likely to grow more severe.[107]

Once again, Plaintiffs provide significant evidence that Defendants' policies and practices constitute deliberate indifference to Plaintiffs' serious medical needs, particularly for the mentally ill.  Since 2010, four inmates have committed suicide in the jail, and from 2010 to 2013, the jail had a suicide rate that is nearly twice the national average for jail populations in 2011.[108]  All four of those suicides occurred in the jail's administrative segregation units.[109]  As a matter of policy and practice, Defendants house the inmates with the most serious mental illness and who are most clinically unstable in segregation units *because* of their mental illness.[110]  And Defendants fail to

---

[106] *See* Docket No. 51 at ¶ 69.

[107] *See id.* at ¶¶ 63-67; *see also* Docket No. 108-7 at ¶ 11.

[108] *See* Docket No. 51 at ¶ 72; Docket No. 444-1 at ¶¶ 3-12; Docket No. 444-3 at ¶ 3, 5.

[109] Docket No. 51 at ¶¶ 93-96; Docket No. 444-1 at ¶¶ 3-12; Docket No. 444-3 at ¶ 3, 5.

[110] *See* Docket No. 51 at ¶ 67; Docket No. 109-2 Ex. L at 7-8; Docket No. 109-1 Ex. G at 187:25-188:1-3 (identifying A-Pod, B-Pod, R-Pod and S-Pod as the locations where inmates with mental illness are generally held).

*See* Docket No. 52-24 at ¶ 3.
*See id.*

*See id.* at ¶¶ 5-7; *see also* Docket No. 109-2 Ex. N at 41:14-23 (describing being psychiatrically deprived "because I was in a little cell where they blocked the outside window so not knowing what time of the day it was or being able to see the sun outside").

*See* Docket No. 52-24 at ¶ 7.

*See id.* at ¶¶ 35-37.

*Id.* at ¶ 37; Docket No. 52-24 Ex. NN.  Other inmates with serious mental illness have similarly been placed in these risky lockdown cells. *See, e.g.,* Docket No. 52-16 at ¶¶ 7, 11; Docket No. 109-2 Ex. O at 34:23-35:4; Docket No. 108-7 at ¶¶ 4-6.

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

engage in practices—conducting pre-segregation screening, providing adequate structured and unstructured out-of-cell time, utilizing a suicide risk assessment tool—known to reduce the risks created by administrative segregation.[111]

Plaintiffs focus on two particular risks.  First, correctional standards require that health and safety checks—which have as an explicit purpose to prevent suicides—occur twice every hour at intervals no longer than 30 minutes at unpredictable and intermittent times.[112]  Defendants' policy requires checks only once per hour and does not require that the checks occur intermittently at unpredictable times.[113]  This places "all [inmates], especially those with serious mental illness, at risk of serious harm."[114]  Second, the cells in administrative segregation include various hanging points and other hazards that increase the risk of suicide or self-harm.[115]

These two, specific shortcomings in Defendants' administrative segregation policies and practices were present in all four of the suicides in the jail since 2010.  Each of the suicides occurred in administrative segregation cells, including at least one that occurred in A-Pod (one of the units in which Defendants specifically house inmates with serious, unstable mental illness).[116] Each inmate committed suicide by attaching sheets or other fabric in their cell to easily accessible hanging points.[117]  By the time that custody staff conducting health and welfare checks discovered that the inmates were attempting suicide by hanging, two of the inmates had already died and two

---

[111] See Docket No. 109-2 Ex. L at 8, 16, 18; Docket No. 51 at ¶ 75.

[112] See Docket No. 51 at ¶ 70.

[113] See id.; Docket No. 49-1 Ex. E., § 1106.04.

[114] Docket No. 51 at ¶ 70.

[115] See Docket No. 109-2 Ex. L at 18; Docket No. 49-4 Ex. K at 6, 18; Docket No. 41-1-3, Ex. A at Ex. 2; Docket No. 41-4, Ex. B at Ex. 3 (finding that "[s]uicide hazard elimination is not as stringent as it should be to prevent self-harm and the attendant liability").

[116] See Docket No. 51 at ¶¶ 93-96; Docket No. 444-1 at ¶¶ 3-12; Docket No. 444-3 at ¶ 3, 5.

[117] Id.

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

others inflicted injuries so severe that they never regained consciousness.[118]  In the hours before at least one of the suicides, the hourly health and welfare checks were conducted at regular, predictable intervals.[119]

Defendants' response is largely to insist that protecting against inmate suicide and self-harm necessarily involve individual medical assessments, rather than a "one size fits all" policy.[120] But this is largely non-responsive:  Plaintiffs are not disputing the need for individualized assessments.  What is disputed are inadequate "one size fits all" policies that Defendants apply to each inmate.[121]

Defendants also respond that the statistical evidence offered by Plaintiffs from Stewart is flawed and suggest that rate of suicides in the jail is actually relatively low.[122]  But Stewart calculated the suicide risk properly, using the same method that the U.S. Department of Justice's Bureau of Justice Statistics ("BJS") uses to calculate mortality rates at U.S. jails.  Where $R$ is the mortality rate, $d$ is the number of deaths per year, and $p$ is the average daily population of the jail, $R = d/p \times 100,000$.[123]  At the jail, there were 3 suicides in the four-year period between 2010 and 2013, yielding an average of 0.75 suicides per year.  Based on an average daily population of 1,000 inmates, this translates to a suicide rate at the jail over this time period of 75 per 100,000, which is 74% above the national average of 43 suicides per 100,000.[124]  Plaintiffs further provide

---

[118] *See* Docket No. 49-16, Exs. DD-GG at 4-5, 72-77, 84-91; Docket No. 444-1 at ¶¶ 3-12; Docket No. 444-3 at ¶ 3, 5.

[119] *See* Docket No. 51 at ¶ 94.

[120] *See, e.g.*, Docket No. 325 at 13, 19.

[121] *See, e.g.* Docket No. 335 at 27; Docket No. 361 at 16.

[122] *See* Docket No. 325 at 14.

[123] Docket No. 356 at ¶¶ 60-61.

[124] *See* Docket No. 51 at ¶ 72; Docket No. 356 at ¶ 61.

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

supplemental evidence of two suicide attempts a little over one month ago, one of which ultimately resulted in in the inmate's death.[125]

Officials at facilities where there are known suicide risks "are required to take all reasonable steps to prevent the [serious] harm of suicide."[126] Other federal courts have recognized the elevated risk of harm to mentally ill inmates housed in segregation or isolation.[127] Plaintiffs are likely to show that awareness plus inaction constitutes deliberate indifference.

*Alcohol and Drug Withdrawal*.   Nationwide, approximately 80% of individuals incarcerated in jails have a history of drug or alcohol abuse.[128] Approximately 12% and 4% of arrestees are dependent, respectively, on alcohol and opiates.[129] Withdrawal is a serious and potentially deadly medical condition, with symptoms including seizures, hallucinations, agitation and increased blood pressure.[130] Opiate withdrawal[131] and alcohol withdrawal[132] constitute serious

---

[125] *See* Docket No. 444-1 at ¶¶ 3-12; Docket No. 444-3 at ¶ 3, 5.

[126] *Coleman v. Brown*, 938 F. Supp. 2d 955, 975 (E.D. Cal. 2013) (finding ongoing deliberate indifference for failure to improve suicide prevention); *cf. Brown v. Plata*, 131 S. Ct. 1910, 1934 (2011) (describing evidence of two suicides by hanging that occurred in cells "identified as requiring a simple fix to remove attachment points that could support a noose").

[127] *See, e.g., Madrid*, 889 F. Supp. at 1265-66 ("For [seriously mentally ill] inmates, placing them in [segregation] is the mental equivalent of putting an asthmatic in a place with little air to breathe."); *see also Coleman v. Brown*, Case No. 90-cv-520-LKK/DA, 2014 WL 1400964, at *24 (E.D. Cal. Apr. 10, 2014) ("[P]lacement of seriously mentally ill inmates in the harsh, restrictive and non-therapeutic conditions of California's administrative segregation units for non-disciplinary reasons for more than a minimal period . . . violates the Eighth Amendment.").

[128] Docket No. 109-2 Ex. P at 1.

[129] Docket No. 109-2 Ex. Q at 1522.

[130] *See* Docket No. 108-8 at ¶ 18.

[131] *See Foelker v. Outagamie Cnty.*, 394 F.3d 510, 513 (7th Cir. 2005) (finding opiate withdrawal amounts to a serious medical need); *Gonzalez v. Cecil Cnty.*, 221 F. Supp. 2d 611, 616 (D. Md. 2002) (finding that heroin withdrawal is a serious medical need).

[132] *See Stefan v. Olson*, 497 Fed. App'x 568, 577 (6th Cir. 2012); *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009); *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1427 (11th Cir. 1997).

24

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

medical needs under the Eighth Amendment and require appropriate medical care.[133]   Medically

inappropriate medication protocols thus may constitute deliberate indifference to a serious

healthcare need.[134]

Plaintiffs provide significant evidence of practices that place detoxifying inmates at risk.

Defendants use custody staff to perform intake screenings to identify those who might be at risk for

withdrawal symptoms when they are first booked into the jail.[135]   While the jail's screening

procedures do not specify who should decide if a newly admitted inmate should be placed in a

sobering or detoxification cell, in practice custody officers also routinely make this decision.[136]

Medical staff is not responsible for initial evaluations and placement of persons into sobering or

detoxification cells.[137]   As Puisis found, it is "a major problem" that correctional officers conduct

---

[133] *See M.H. v. Cnty. of Alameda*, Case No. 11-cv-02868-JST, 2014 WL 1429720, at *20-21 (N.D. Cal. Apr. 11, 2014) (finding deliberate indifference after defendant was "subjectively aware of the risk of alcohol withdrawal, but failed nevertheless to fill out a CIWA form, initiate the CIWA protocol, or otherwise ensure [plaintiff] would receive medical help"); *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1237 (11th Cir. 2010) (explaining that delayed or inadequate treatment of alcohol withdrawal is "unlawful"); *Liscio v. Warren*, 901 F.2d 274, 275-77 (2d Cir. 1990) (finding deliberate indifference when staff-ordered withdrawal regimen was inadequate because provider failed to examine inmate for three days), *overruled in part on different grounds by Caiozzo*, 581 F.3d at 66, n.1; *Morrison v. Washington Cnty.*, 700 F.2d 678, 686 (11th Cir. 1983) (concluding that a deliberate indifference finding could be made where prison officials place or keep a chronic alcoholic in jail without any medical supervision when defendants are aware that the alcoholic is suffering from a severe form of alcohol withdrawal); *Gonzalez*, 221 F. Supp. 2d at 617 (stating that a policy of refusing meaningful treatment for heroin withdrawal could lead to a finding of deliberate indifference).

[134] *See Balla v. Idaho State Bd. of Corrections*, 595 F. Supp. 1558, 1577 (D. Idaho 1984) ("[P]rescription and administration of behavior-altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision and periodic evaluation, is an unacceptable method of treatment.") (citation omitted), *rev'd in part on other grounds*, 869 F.2d 461 (9th Cir. 1989).

[135] *See* Docket No. 49-3 Ex. J at 15, 19-20.

[136] *See id.*

[137] *See id.* at 29.

25

United States District Court
For the Northern District of California

intake screenings.[138]  "Officers are not trained to identify persons at risk for withdrawal, to evaluate

persons who appear to be intoxicated, or to make medical decisions with respect to isolation for

this purpose.  This should be done by medical professionals[,] not custody officers."[139]

The jail does not reliably monitor inmates as they detoxify.  Though Defendants' policy

requires that nurses consult with a physician if a patient displays any one of eight abnormal signs,

Puisis found based on chart review this does not happen.[140]  Though he was told that physicians are

supposed to see all withdrawing patients within 24 hours, Puisis found this also did not happen.[141]

He concluded, "alcohol and other drug withdrawal syndromes are managed by officers and nurses

without physician supervision."[142]

The jail does not use the widely accepted and clinically validated Clinical Institute

Withdrawal Assessment for alcohol scale, revised to assess inmates undergoing alcohol

---

[138] Docket No. 109-1 Ex. E at 32:10-15.

[139] Docket No. 49-3 Ex. J at 20; *see also* Docket No. 108-8 at ¶ 20 ("[U]se of custody staff to identify these [withdrawal] risks is inappropriate and dangerous," noting that they are not trained to do so, and that incoming inmates are likely to underreport drug and alcohol use to an officer); Docket No. 109-2 Ex. M at 61:7-12 (criticizing practice of correctional officers making the decision to place inmates in sobering cells, noting "[t]hat is a medical decision, necessarily a medical decision because a lot of complexity there.  Lot of things going on that could have potentially very dangerous situation putting people at harm."); Docket No. 109-1 Ex. E at 131:5-20 ("Officers are just not trained to identify what medical conditions the patient has.  They don't do it well. . . .  Furthermore, many of the conditions which people come in with are related to drug or alcohol use.  Those may be connected to their charge for which they are being arrested. . . .  [I]f someone is arrested for alleged driving under the influence, they are probably not going to admit that they're alcoholic.  So you will not—you'll be less likely to get an accurate response if the person asking the question is a custody official who can be perceived as a person who could represent the court, something that would be harmful to you."); *id.* at 243:14-24 ("This is a dangerous practice . . . I don't think they have training for what they are doing . . . officers don't know the presentation of the patient and what it could be confused with").

[140] *See* Docket No. 49-3 Ex. J at 20.

[141] *See id.*

[142] *Id.*; *see also id.* at 69-70 (patient placed in and a few hours later removed from a sobering cell by custody officers without physician supervision, despite vital signs indicating he might be in withdrawal); Docket No. 108-8 at ¶ 21 (treatment decisions, "particularly concerning use of medication during withdrawal, should be made by mid-level providers or physicians."); Docket No. 109-1 Ex. E at 141:10-14 ("[N]urses were kind of on their own to figure out what medications to put people on and would just write the orders for them.").

Case No.: 5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

withdrawal.[143]   The jail uses a different scale (called Alcohol Withdrawal Scale), which does not

track CIWA, and has not been validated.[144]   Puisis found that "[r]isk factors and treatment

protocols in the CFMG procedure are not consistent with contemporary standards for outpatient

alcohol detoxification."[145]   Moreover, nurses routinely failed to follow even this procedure.[146]

Puisis concluded that "[t]he use of an un-validated form by nurses, who incompletely follow

policy, and perform without proper physician oversight results in nurses managing withdrawal in a

serendipitous fashion based on individual nurse practice rather than a clinically based consistent

practice."[147]   Plaintiffs' expert Dr. Robert L. Cohen agreed that "[t]he current practices at MCJ of

determining the treatment protocol first by the decision of a custody officer and then by a nurse is

wholly below the standard of care and can lead to severe consequences."[148]

　　　　　The jail also practices a single drug protocol for alcohol, benzodiazepine and opiate

withdrawal, even though these are distinct conditions requiring different medications and dosing

periods for each.[149]   Under the protocol, nursing staff—not physicians—decide whether to

---

[143] *See* Docket No. 49-3 Ex. J at 20.

[144] *See id.*

[145] *See id.*

[146] *See id.* at 54-55 (for one patient with vital signs consistent with withdrawal, multiple nurses saw the patient but failed to use the AWS flow sheet); *id.* at 56-57 (for another patient the nurses failed to use the AWS Flow Sheet, did not document the reason for placing the patient on alcohol withdrawal protocol, and indicated that he was at Level 1 detoxification without documenting what medications he was given); *id.* at 63 (a nurse placed a patient on alcohol withdrawal protocol for Level 0 on June 21, 2013 but did not use the AWS form to document the reasoning, then later a nurse elevated the patient to Level 1 but again did not document use of the AWS form or even vital signs); *id.* at 65 (a nurse diagnosed a patient with Level 1 alcohol withdrawal a day after he was incarcerated, but failed to use an AWS form to document how the nurse came to that conclusion).

[147] *Id.* at 20.

[148] Docket No. 108-8 at ¶ 22.

[149] Docket No. 49-3 Ex. J at 15, 28, 41-42.

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

medicate a withdrawing inmate.  Puisis found that "[p]lacing all individuals who are withdrawing into a single protocol will invariably result in inappropriate treatment for individual patients."[150]

Defendants again decry the "one-size-fits-all" approach of the proposed injunction, but again ignore that the policies challenged are those Defendants choose to apply uniformly.[151]  For example, although the reasoning of the nurse was not clear, she placed diabetic Patient 6, whose breath smelled of alcohol, on an opiate withdrawal protocol.[152]  Patient 6 was therefore unnecessarily given vistaril, clonidine, immodium and Maalox, instead of a long acting benzodiazepine and thiamine.[153]  Puisis stresses the danger of this singular treatment.  "Opiate, benzodiazepine, and alcohol withdrawal syndromes are entirely different clinical entities. . . .  This placed the patient at risk."[154]

Defendants also take issue on a number of Puisis' findings.  For example, CFMG contends it is "completely inaccurate" to say that custody staff performs an initial assessment of alcohol or opiate withdrawal risk, and that custody staff merely "physically place the inmate in the sobering cell."[155]  In fact, both Puisis and Cohen reviewed the same policy documents and the named Plaintiffs' medical records to confirm that Defendants use custody staff to perform intake screenings to identify those who might be at risk for withdrawal—and to decide, based on these screening interviews, whether to place these individuals in sobering or detoxification cells.[156]

---

[150] *Id.* at 41.

[151] *See* Docket No. 325 at 13.

[152] Docket No. 49-3 Ex. J at 41.

[153] *Id.*

[154] *Id.* at 41-42.

[155] *See* Docket No. 335 at 16.

[156] Docket No. 49-3 Ex. J at 15, 19-20; Docket No. 360 at ¶ 73.

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

1

2

CFMG's own policies provide that a nurse does not conduct an assessment until *after* custody staff has placed the inmate in the sobering cell and notified medical staff.[157]

3

4

5

6

7

8

9

10

11

12

13

CFMG defends its reliance on nurses for alcohol and drug withdrawal treatment by stating that its Standardized Nursing Procedures comply with California practice regulations and describing why CFMG selected a nonstandard protocol for identifying and treating withdrawal.[158] But this nonstandard protocol is not referenced in any recent academic literature, does not appear to have been validated for the uses to which it is being put and inappropriately conflates treatment approaches for alcohol, opiate and benzodiazepine withdrawal.[159] Nor does the protocol address the lack of training these nurses have received to make on-the-spot complex determinations of drug interactions and contraindications on RNs.[160] In any event, the evidence presented suggests that nurses often depart from the protocol.[161] The result is what Cohen describes as a "dangerous and substandard" withdrawal program.[162]

14

15

16

17

[157] *See* Docket No. 326-2 Ex. H at ¶ 1

; Docket No. 326-2 Ex. I at ¶ 3

18

[158] *See* Docket No. 335 at 13, 15-16, 20, 27-29, 33.

19

[159] Docket No. 360 at ¶¶ 62-65, 82.

20

[160] *Id.* ¶¶ 68-70.

21

[161] Docket No. 49-3 Ex. J at 3, 20, 54-56; Docket No. 108-8 at ¶ 21.

22

23

24

25

26

27

28

[162] Docket No. 360 at ¶ 79. One particular graphic example is the treatment received by Plaintiff Gomez when she was in extreme distress. *See id.* at ¶¶ 85-88. Gomez was admitted on January 13, but was not examined by a physician' further her treatment for alcohol and heroin withdrawal consisted of only one day in a sobering cell. *See id.* at ¶ 85. On January 15, when Gomez's blood pressure rose to 172/100, she was prescribed medication without any examination. The following day, no one conducted any clinical observation. *See id.* at ¶ 86. On January 17, a nurse made these observations: "Pt. seen by RN in room after reports from deputies that pt's room took 2 hrs to clean from vomit and diarrhea all over the place. RN found pt on bed frail audible congestion. Green mucous from nose. Vomit and diarrhea in toilet. Soiled diaper soaked through to clothes and linen." Without examining Gomez, the PA ordered IV fluids and an anti-emetic. The RN tried twice to start the IV line, but was unsuccessful and offered Gomez (who was vomiting) a pitcher of

29

1      ***Continuing Medical Prescriptions***.  The parties agree that inmates require access to

2   medication to treat existing medical conditions.  It is critical for correctional facilities to maintain

3   continuity of treatment for newly admitted inmates.[163]  This is especially true for various chronic

4   conditions, including HIV/AIDS, hypertension, kidney disease, epilepsy, cardiac arrest and

5   asthma/chronic obstructive pulmonary disease, as well as serious mental illness.[164]

6          Plaintiffs provide significant evidence that Defendants' failure to provide medication

7   continuity through immediate verification of prescriptions with a patient's pharmacist or physician,

8   or if that is not possible, evaluation by a physician at the jail, creates a significant risk of serious

9   harm.[165]  Puisis identified systemic problems with medication continuity at the jail, particularly for

10  those with chronic illnesses.[166]  "At the MCJ if a detainee does not remember the name of his

11  medication or if the health staff can not verify a prescription of medication at a local pharmacy, no

12  medication is provided even when medication is medically necessary."[167]  Defendants lack any

13  "formal mechanism for . . . [h]ow a patient who brought medication in would then be allowed to

14  keep it."[168]  Puisis particularly noted that inmates suffering from hypertension and asthma did not

15  get their community prescriptions timely continued.[169]

---

water instead.  Two hours later, Gomez "vomited all over floor, bilious . . . Large puddle size of
bed.  Brown in color.  Diarrhea—yellowish feces down legs on bed."  *Id.* at ¶ 87.  After yet another
unsuccessful IV start attempt, the RN called the PA again, who finally ordered Gomez sent to
Natividad Medical Center.  *See id.*  The doctor at the hospital concluded that Gomez had been
vomiting for three days because she had a small bowel obstruction.  *See id.* at ¶ 88.

[163] Docket No. 108-8 at ¶¶ 25-27, 31; Docket No. 49-3 Ex. J at 23; Docket No. 51 at ¶¶ 34-37.

[164] Docket No. 108-8 at 27.

[165] *See* Docket No. 49-3 Ex. J at 13, 23; Docket No. 108-8 at ¶¶ 26, 31; Docket No. 51 at ¶¶ 36-37.

[166] Docket No. 49-3 Ex. J at 23.

[167] *Id.*

[168] Docket No. 109-1 Ex. E at 22:10-14.

[169] *See* Docket No. 49-3 Ex. J at 14, 17, 23.

30

Case No.: 5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

Under CFMG's policy, when a new inmate cannot remember the name of his medication,

or where he got it, the nurse is not required to call a physician to determine if a bridge order for

medications or other treatment should be offered.[170] In these circumstances, "MCJ must ensure

---

[170] *See id.* at 13-14. Puisis noted repeated examples of medical staff failing to verify and
adequately continue provision of vital medications to newly admitted inmates.

Patient 1 entered MCJ on August 22, 2013, and immediately informed custody and medical
staff that he was taking blood pressure medication and was under physician care for high blood
pressure. *See id.* at 32. Medical staff failed to verify or provide him with his medications. *See id.*
He did not receive his first dose of hypertension medication until September 2, and only then when
his blood pressure was 190/126, he started suffering from headache, blurry vision, vomiting and
drooling, and had to be taken to the hospital. *See id.*

On July 11, 2013, Patient 18 entered the jail, and informed custody and medical staff that
he suffered from asthma, emphysema, lung disease, and chronic obstructive pulmonary disease,
and took albuterol for it. *See id.* at 60. Without consulting a physician, the nurse ordered albuterol,
though only for a single day. *See id.* at 61. On July 16, a physician's assistant saw the patient and
ordered flovent and an albuterol nebulizer treatment for seven days, though no hand-held inhaler
despite that being the prescription the patient had upon entering the jail. *See id.* On August 2,
three weeks after the initial intake, the patient was evaluated emergently by a nurse for shortness of
breath, and only then did the physician's assistant order albuterol and flovent inhalers. *See id.* at
61-62.

On September 15, 2013, Patient 24 arrived at the jail and was placed in a sobering cell, with
no intake triage assessment for medication history or needs. *See id.* at 69. Two weeks later, on
October 1, the patient's family brought his blood pressure medications to the jail, but medical staff
did not prescribe or administer these medications to the patient. *See id.* On October 7, a doctor
saw the patient and observed an abnormal blood pressure of 142/93, but did not take a medication
history and did not prescribe blood pressure medication. *See id.* at 70. On October 14, almost a
month after arriving at MCJ and not being placed on any medications, a nurse emergently
responded to the patient for life-threateningly high blood pressure of 250/140. *See id.* Only then
did a doctor note that as an outpatient the inmate had taken amlodipine, simvastatin, and Flomax
for blood pressure, and finally ordered HCTZ, amlodipine, atenolol, Flomax and simvastatin. *See
id.* In other words, the patient was not prescribed necessary blood pressure medication until a
blood pressure-related crisis occurred nearly a month into his incarceration.

In addition, numerous Plaintiffs experienced disruptions to community-prescribed
medications for medical conditions, chronic illnesses and mental illness that were crucial to their
day-to-day functioning and comfort. *See, e.g.*, Docket No. 52-14 Exs. A-O (inmate with
longstanding history of mental illness repeatedly denied psychiatric medications, including because
she "needs to be clean and sober for 90 days"); Docket No. 52-14 at ¶¶ 3-12 (same); Docket No.
109-2 Ex. S at 51:23-52:6 (same); Docket No. 52-16 at ¶ 7 (deprived of mental health medications
for a month); Docket No. 52-16 Ex. C (physician progress note stating that, after over a month,
patient would be given medication); Docket No. 109-2 Ex. O at 75:25-76:16 (same); Docket No.
52-18 at ¶¶ 4-18; Docket No. 52-18 Exs. D-W (ordered 90 day "clean and sober" period before
being "considered for any type of psychiatric medication," and denied medication even after
expiration of that time); Docket No. 109-2 Ex. T at 17:15-24, 26:8-19 (explaining that "I don't
know what's going on, I am hearing voices, now I am thinking people [are] talking about me, I feel

Case No.: 5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

that when necessary medication can't be verified, a physician must timely evaluate the patient to ensure continuity of necessary medication."[171]   Across the country, prisons and jails authorize physicians to write bridge orders to ensure continued medication upon incarceration, until such time as medical staff can verify prescriptions.[172]   This does not happen at the jail.

Defendants respond that named Plaintiffs' medical records demonstrate that CFMG has ensured uninterrupted access of essential medications.[173]   But the medical records themselves show serious lapses in medication continuity that were consistent with Puisis' conclusions based on his review of other medical records, and which caused similarly prolonged pain and suffering.[174]   As to the larger policies and practices, Defendants claim that because a process for making bridge orders exists, their policies and procedures "fully meet[] the needs of the patient population entering the

---

scared, I feel threatened in here" as a result of the jail taking "me completely off every psych med" she was prescribed prior to incarceration); Docket No. 52-22 at ¶ 23 (denied numerous psychiatric and pain medications despite verification of prescriptions by jail nurse); Docket No. 52-22 Ex. I (same); Docket No. 52-24 at ¶¶ 8-9 (describing how a change in prescribed medications did not help with symptoms and upset his stomach); *id.* at ¶ 39; Docket No. 52-24 Ex. PP (asthma inhaler taken during a custody raid and medical staff refused to return it because "no record" of asthma); Docket No. 52-28 at ¶¶ 3-5, 13-16, 18; Docket No. 52-28 Exs. J-M (denied his prescribed medication for narcolepsy for the first eight weeks of his incarceration); Docket No. 109-2 Ex. U at 9:10-13; 18:25-19:2 (same); Docket No. 109-2 Ex. V at 7:5-15 (describing how Plaintiff's prescribed psychiatric medications were discontinued for the first ten days of his incarceration; thereafter, he received the wrong medication that did not work and had to wait another eight to ten days before even seeing a doctor); Docket No. 52-12 at ¶¶ 11-12, 24 (describing how the jail failed to provide him with a CPAP machine for his sleep apnea, and refused to refill his asthma inhalers when they run out of medication); Docket No. 52-12 Ex. I (same); *see also* Docket No. 108-3 at 3, 6 (inmate at the jail describing how the jail failed to continue his prescriptions for norco and valium).

[171] *See* Docket No. 49-3 Ex. J at 13.

[172] *See* Docket No. 108-8 at ¶¶ 30, 33.

[173] *See* Docket No. 319-3 at ¶ 44; Docket No. 335 at 17.

[174] *See* Docket No. 360 at ¶¶ 44-61.

32

United States District Court
For the Northern District of California

MCJ."[175]  But Puisis' record reviews demonstrate that bridge orders are either unused or used inappropriately, resulting in serious lapses in medication continuity.[176]

Defendants offer no real defense of their policy of automatically denying psychiatric medications for up to 90 days for inmates with substance abuse problems.[177]  While the evidence suggests that it can be appropriate to briefly discontinue certain psychiatric medications for some inmates when they start detoxification treatment, such denials should be based on patient-specific clinical judgment and not last nearly as long as 90 days without clear and well-documented clinical justification.[178]  Disruptions of psychiatric medications are risky because they can cause patients to decompensate, leading to increased symptoms and suicide risks; they also can exacerbate the underlying mental illness and make it more difficult to treat.[179]

***Disabled Access.***  Under the DOJ regulations, "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."[180]  In this same vein, "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[181]

---

[175] Docket No. 335 at 28.

[176] *See* Docket No. 49-3 Ex. J at 32, 48-53 (discussing Patients 1, 11 and 12).

[177] *See, e.g.*, Docket No. 356 at ¶¶ 27, 29-30.

[178] *Id.* at ¶ 36.

[179] *See, e.g., id.* at ¶¶ 23, 59.

[180] 28 C.F.R. § 35.149.

[181] 28 C.F.R. § 35.150(a).

Case No.: 5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

1   Plaintiffs provide significant evidence that Defendants violate the ADA by offering

2   exercise, religious services, Choices and Pride classes and Narcotics and Alcoholic Anonymous

3   meetings solely in a location inaccessible to inmates who cannot climb stairs, excluding such

4   inmates from those programs.  Various Plaintiffs, as well as various members of the inmates with

5   disabilities subclass, are qualified individuals with disabilities, as each of them has a disability that

6   makes it impossible, difficult, painful or dangerous for them to climb stairs.[182]  If these programs

7   were offered in accessible locations, Plaintiffs and members of the subclass they seek to represent

8   would be able to participate in them.  The County Defendants already offer exercise to inmates in

9   other parts of the jail in accessible locations that do not require climbing stairs.[183]  Accordingly,

10  Plaintiffs have presented a strong, prima facie case that the County Defendants have violated the

11  ADA.[184]  Defendants' exclusion of inmates with disabilities from outside exercise also violates the

12  Eighth Amendment,[185] while Defendants' exclusion of inmates with disabilities from religious

13  services also violates the First Amendment.[186]

14      Plaintiffs also provide significant evidence that Defendants violate the ADA by failing to

15  furnish sign language interpreters to inmates who use sign language as their primary method of

---

[182] *See* Docket No. 52-8 at ¶¶ 4, 13; Docket No. 52-10 at ¶ 10; Docket No. 52-12 at ¶¶ 3, 10; Docket No. 52-14 at ¶¶ 4, 13, 15, 25; Docket No. 52-16 at ¶ 4; Docket No. 52-22 at ¶ 9; Docket No. 52-28 at ¶ 3, 21.

[183] *See* Docket No. 49-4 Ex. K at 9 (outdoor exercise areas for A, B, C and D Dorms were accessible to people with mobility impairments); Docket No. 109-1 Ex. G at 284:5-16 (testifying that an alternate exercise yard has been established for women inmates in Q-Pod).

[184] *See Pierce*, 761 F. Supp. 2d at 950-51 (structural barriers that exclude inmates at Orange County Jail facilities from equal access to exercise yard and other classes and programs offered violate the ADA).

[185] *See LeMaire v. Maass*, 12 F.3d 1444, 1457-58 (9th Cir. 1993) ("[L]ong-term denial of outside exercise" violates the Eighth Amendment.).

[186] *See Hagen v. Jabar*, 56 Fed. Appx. 302, 303-04 (9th Cir. 2002).

34

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

communication.[187] Title II's regulations require that public entities must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."[188] Though "the type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual[,] the nature, length, and complexity of the communication involved[,] and the context in which the communication is taking place," a public entity must "give primary consideration to the requests of individuals with disabilities."[189] "Auxiliary aids" include "[q]ualified interpreters on-site or through video remote interpreting (VRI) services."[190] Here, until challenged by this motion, Defendants offered no inmate any sign language interpreters under any circumstances.

Defendants urge that Plaintiffs' disability access claims are moot, in light of several recent changes to their access policies and practices. To be fair, during the briefing on Plaintiffs' motion, Defendants did change the location of certain programs, including exercise, offered to inmates who cannot climb stairs.[191] They also adopted a new policy for inmates with hearing impairments.[192]

---

[187] Because the County contracts with CFMG to provide public services to inmates, the County also is liable for any conduct engaged in by CFMG. *See* 28 C.F.R. § 35.130(b) (providing that "[a] public entity, in providing any aid, benefit, or service, may not, directly or through contractual licensing, or other arrangements" discriminate against individuals with disabilities); *Armstrong v. Schwarzenegger*, 622 F.3d at 1065-67.

[188] 28 C.F.R. § 35.160(b)(1). *See Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1022-26 (N.D. Cal. 2013) (requiring sign language interpreters for all education classes); *see also* 28 C.F.R. § 35.160(b)(2).

[189] *Id.* § 35.160(b)(2).

[190] *Id.* § 35.104. *See also Duffy v. Riveland*, 98 F.3d 447, 455-56 (9th Cir. 1996) (sign language interpreter required for disciplinary and classification hearings for state inmate); *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1045-46, 1050 (S.D.N.Y. 1995) (holding that failure to provide deaf inmates with sign language interpreters for reception, classification, disciplinary and grievance processes violates ADA); *Bahl v. Cnty. of Ramsey*, 695 F.3d 778, 787-88 (8th Cir. 2012) (post-arrest custodial interview without sign language interpreter violates ADA); *Armstrong v. Brown*, 939 F. Supp. 2d at 1019-22 (requiring sign language interpreter for psychiatric rounds made on inmates held in administrative segregation).

[191] *See, e.g.*, Docket No. 325-3 Ex. F at 1 (offering programs for women on a ground floor instead up a flight of stairs); Docket No. 325-3 Ex. G at 1 (providing access to alternative exercise yards).

35

But "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."[193]  Defendants have a "heavy burden" to show "that the challenged conduct cannot reasonably be expected to start up again."[194]

Defendants have not produced any evidence that these changes have resulted in the accommodation of some or all inmates with disabilities; that any funding has been provided for these changes; that staff have been trained on the changes; that Defendants are monitoring staff's compliance with the changes or that the changes are permanent.[195]  A more fundamental problem is that the new policies are incomplete.  They only address access for women inmates but not similarly disabled male inmates—for whom education, rehabilitation and religious programs are still offered up the same, inaccessible flight of stairs.[196]  Similarly, the new policy regarding inmates with hearing impairments makes no provision for allowing inmates with disabilities access to education and other programs through use of SLIs, instead limiting use of interpreter services to "complex, confidential, or important communications such as booking, classification, medical,

---

[192] *See, e.g.*, Docket No. 325-3 Ex. D at 1-3.

[193] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (internal citations and quotations omitted).

[194] *Id.*; *see also Prison Legal News v. Cnty. of Ventura*, Case No. 14-cv-0773-GHK, 2014 WL 2736103, at *9 (C.D. Cal. June 16, 2014) (holding that because the defendants failed to make a "sufficient showing that there is no longer any threat of continuing . . . violations, a court order is necessary to ensure that Defendants will not revert to their past practices"); *Bell v. City of Boise*, 709 F.3d 890, 900 (9th Cir. 2013) (noting that "a case is not easily mooted where the government is otherwise unconstrained should it later desire to reenact the provision"); *Sefick v. Gardner*, 164 F.3d 370, 372 (7th Cir. 1998) (holding claim not moot where a "policy, adopted after the commencement of this suit, is not implemented by statute or regulation and could be changed again").

[195] Docket No. 358 at ¶¶ 28, 33-39.

[196] Docket No. 325-3 Ex. F at 1.

36

mental health, or disciplinary hearings."[197]  Nor is there any evidence of any system to track and identify inmates with disabilities and the accommodations they require,[198] or of any system for monitoring compliance.[199]

*Second*, Plaintiffs are likely to suffer irreparable harm absent preliminary injunctive relief. The court must consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, particularly attending to whether the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury."[200] Irreparable injury must be shown to be "*likely* in the absence of an injunction"; the mere possibility of an irreparable injury will not suffice.[201] "[P]ain, suffering and the risk of death constitute 'irreparable harm' sufficient to support a preliminary injunction in prison cases."[202]  Further, as the Ninth Circuit has held, "[i]t is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury."[203]

Inmates and community members are at risk without proper TB identification, isolation, diagnosis and treatment.[204]  Despite four suicides in administrative segregation, Defendants continue to place clinically unstable mentally ill patients in segregation and fail to eliminate

---

[197] Docket No. 358-2 Ex. KK.  The new contract for sign language interpreters has not even been completed and signed by the County.  *See* Docket No. 325-3 Ex. E at 27.14.

[198] *Cf. Armstrong v. Davis*, 275 F.3d at 876.

[199] *Cf. Armstrong v. Brown*, 768 F.3d 975, 983-84 (9th Cir. 2014).

[200] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

[201] *Winter*, 555 U.S. at 22; *Lyons*, 461 U.S. at 103; *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441, (1974); *O'Shea*, 414 U.S. at 502.

[202] *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1112 (W.D. Wisc. 2001); *Von Colln*, 189 F.R.D. at 598 ("Defendants do not argue that pain and suffering is not irreparable harm, nor could they.").

[203] *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (internal quotation marks omitted).

[204] *See, e.g.*, Docket No. 360 at ¶¶ 10, 25.

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

potential suicide hazards.[205]  Failure to continue community medications, and failure to properly treat inmates withdrawing from drugs and alcohol have caused medical emergencies and hospitalizations[206] and likely will continue without reform.  Plaintiffs with disabilities continue to suffer irreparable harm through access exclusion and lack of sign language interpreters.[207]  Plaintiffs also will suffer irreparable harm unless Defendants cease excluding Plaintiffs from exercise, religious services, Choices and Pride classes and Narcotics and Alcoholics Anonymous meetings, and begin providing sign language interpreters to inmates who use sign language as their primary method of communication.[208]

With no direct substantial opposition from Defendants on this point, Plaintiffs sufficiently show the risks of irreparable harm here are not speculative or remote for existing inmates and the roughly 1,000 new inmates the jail books each month.

*Third*, the balance of hardships tips sharply in Plaintiffs' favor.  Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or

---

[205] *See, e.g.*, Docket No. 51 at ¶¶ 67, 72, 93-96; Docket No. 444-1 at ¶¶ 3-12; Docket No. 444-3 at ¶ 3, 5.

[206] *See, e.g.*, Docket No. 49-3 Ex. J at 32, 37, 38-39, 40, 67.

[207] *See D.R. v. Antelope Valley Union High Sch. Dist.*, 746 F. Supp. 2d 1132, 1145-46 (C.D. Cal. 2010) (holding that student suffered irreparable harm by missing 10-45 minutes of education classes per day because of structural barriers); *Lonberg v. City of Riverside*, Case No. EDCV970237SGLAJWX, 2007 WL 2005177, at *8 (C.D. Cal. May 16, 2007) (non-compliant curb ramps and sidewalks cause irreparable harm to wheelchair user); *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997) (holding, in case regarding inoperable elevators in rapid transit system, that "injuries to individual dignity and deprivations of civil rights constitute irreparable injury"); *see also Burriola v. Greater Toledo YMCA*, 133 F. Supp. 2d 1034, 1040 (N.D. Ohio 2001) ("[T]he irreparable harm requirement is met when the injuries plaintiff would incur are 'the very type of injuries Congress tried to avoid.'") (quoting *E.E.O.C. v. Chrysler Corp.*, 733 F.2d 1183, 1186 (6th Cir. 1984)).

[208] *See D.R.*, 746 F. Supp. 2d at 1145-46; *Lonberg*, 2007 WL 2005177, at *8; *Cupolo*, 5 F. Supp. at 1078, 1084; *see also Burriola*, 133 F. Supp. 2d at 1040.

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

withholding of the requested relief."[209]  The Ninth Circuit has held that the interest in protecting

individuals from physical harm outweighs monetary costs to government entities.[210]

Absent an injunction, Plaintiffs will continue to suffer serious risks from Defendants'

inadequate healthcare practices:  They will remain at heightened risk of contracting TB, or of their

TB not being timely detected and treated.  Those housed in segregation will remain at unnecessary

risk of committing suicide or harming themselves.  Those booked into the jail on medications are at

unreasonable risk of having those medications stopped and not restarted for weeks and months.

Mobility impaired inmates will continue to be denied fresh air and exercise, as well as access to

vital programs that could shorten their jail stays, for no reason other than they have a disability.

And inmates who use sign language as their primary method of communication will continue to be

discriminated against every time they need to communicate with staff at the jail.

In the face of these hardships, Defendants will be required to devise a plan to bring their

policies and procedures in line with CDC Guidelines, professional health care standards, the ADA

and the constitutional practices of jails and prisons around the country.  While they may incur

substantial costs to retain additional staff to perform the necessary functions, the Ninth Circuit has

held that financial concerns cannot outweigh serious risk of harm to Plaintiffs.[211]

---

[209] *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).

[210] *See Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) ("[F]aced with []
a conflict between financial concerns and preventable human suffering, [the court has] little
difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor.") (second two
alterations in original) (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)); *see also
Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (affirming ADA preliminary injunction in favor
of plaintiffs with disabilities challenging the county's decision to close specialty medical facility
without providing alternatives; balance of hardships tipped in favor of plaintiffs, who would be
deprived of necessary treatment and suffer increased pain and medical complications).

[211] *See Harris*, 366 F.3d at 766.

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

Defendants also raise concerns about encouraging drug-resistant TB strains and housing mentally-ill inmates unprotected in the general population.[212]  But the jail has an obligation to provide newly-released inmates medicinal supplies "sufficient to ensure that he has that medication available during the period of time reasonably necessary to permit him to consult a doctor and obtain a new supply."[213]  In addition, the injunction does not require that mentally ill patients be placed in general population—just not in punitive administrative segregation, and that suicide hazards be removed and regular health and safety checks conducted.[214]

*Fourth*, a preliminary injunction is in the public interest.  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."[215]

Defendants argue Plaintiffs are asking for relief that exceeds Title 15, beyond the constitutional minimum and relief beyond the requisite freedom from "unnecessary and wanton infliction of pain . . . totally without penological justification."[216]  But given the risk to jail staff and the community from the spread of communicable diseases, and the public's interest in enforcement of the ADA and in elimination of discrimination on the basis of disability, [217] the public interest is advanced by a preliminary injunction.  While Defendants may be right that putting more funds into the jail may undermine the public's interest in devoting funds to other County projects, this does not justify violating Plaintiffs' constitutional and statutory rights.

---

[212] *See id.*

[213] *Wakefield v. Thompson*, 177 F.3d 1160, 1164 (9th Cir. 1999).

[214] *See* Docket No. 108-1 at 4; Docket No. 361 at 3, 12-13.

[215] *Melendres*, 695 F.3d at 1002 (internal quotation marks omitted); *see also Lopez*, 713 F.2d at 1437 ("Our society as a whole suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of their rights or privileges.").

[216] Docket No. 325 at 19; *Gregg v. Georgia*, 428 U.S. 153, 173, 183 (1976); *Gilmore*, 220 F.3d at 999; *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).

[217] *See Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011).

40

United States District Court
For the Northern District of California

A final point. "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."[218] However, the Ninth Circuit has held that "[t]he court has discretion to dispense with the security requirement . . . where requiring security would effectively deny access to judicial review."[219] A bond waiver is supported when a preliminary injunction serves the public interest,[220] when Plaintiffs are likely to prevail on the merits,[221] and where a suit is brought on behalf of poor persons.[222]

Defendants request $227,351 to add the staffing Plaintiffs have requested, and argue Plaintiffs do not support their request for waiver of the bond.[223] But Plaintiffs show they are protecting constitutional rights in the public interest, and they are likely to succeed on the merits. Sentenced inmates lack any source of income by virtue of their incarceration and pretrial detainees

---

[218] Fed. R. Civ. P. 65(c); *see also Washington Capitols Basketball Club, Inc. v. Barry*, 304 F. Supp. 1193, 1203 (N.D. Cal 1969), *aff'd* 419 F.2d 472 (9th Cir. 1969); *see* Docket No. 329 at 34.

[219] *California ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985), *amended*, 775 F.2d 998 (9th Cir. 1985); *see also Miller v. Carlson*, 768 F. Supp. 1331, 1340-41 (N.D. Cal. 1991); *Toussaint v. Rushen*, 553 F. Supp. at 1378; *Carrillo v. Schneider Logistics, Inc.*, 823 F. Supp. 2d 1040, 1047 (C.D. Cal. 2011); *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).

[220] *See Melendres*, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (internal citations and quotations omitted); *Barahona-Gomez*, 167 F.3d at 1237 (affirming nominal bond because, among other things, of "the public interest underlying the litigation and the unremarkable financial means of the class as a whole").

[221] *See California ex rel. Van De Kamp*, 766 F.2d at 1326.

[222] *See Toussaint v. Rushen*, 553 F. Supp. at 1383 (granting waiver of bond for plaintiff class of inmates in administrative segregation); *Barahona-Gomez*, 167 F.3d at 1237 (affirming nominal bond for class of immigrants with "unremarkable financial means").

[223] *See* Docket No. 325-1 at 2.

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

1    are in jail largely because they lack enough money to post bail.[224]  The court therefore waives the

2    security requirement.

3                                                    **IV.**

4           Plaintiffs' motion for summary judgment is GRANTED.  Within 60 days, Defendants must

5    file a plan to remedy the constitutional and statutory violations described above, that includes, at a

6    minimum, the following elements:

7
- Defendants' tuberculosis identification, control and treatment program at the jail
8        shall comply with the standards laid out in *Prevention and Control of Tuberculosis*
9        *in Correctional and Detention Facilities: Recommendations from CDC* (June 2006);

10
- All inmates newly booked into the jail shall receive a timely tuberculosis symptom
11       screening administered by adequately trained health care staff (nurse or higher level
         staff);
12
- Defendants shall have a reliable system to track whether all newly booked inmates
13       have received tuberculosis screening and appropriate follow-up testing and
         treatment;
14
- Medical staff shall timely conduct the initial evaluation to determine if an inmate is
15       intoxicated and/or suffering from withdrawal or at high risk for withdrawal;
16
- Medical staff shall make the decision on who should be placed in a sobering cell and
17       who should be transferred to the hospital to be treated for possible or actual
         withdrawal;
18
- Medical providers (physicians, physicians assistants, and/or nurse practitioners) shall
19       be timely involved in assessing and treating inmates potentially undergoing
20       withdrawal, and non-provider medical staff shall timely refer to providers those
         inmates undergoing withdrawals when clinically indicated;
21
- Detoxifying inmates shall be adequately monitored using the CIWA protocol or
22       equivalent validated monitoring protocol, shall receive pharmacological treatment as
23       indicated and be appropriately housed based on their clinical conditions;
24
- Defendants shall develop separate treatment protocols for opiate, alcohol and
         benzodiazepine withdrawal;
25

26   [224] *See, e.g.*, Docket No. 108-3 at 2 (stating that Buell is an amputee who has been classified as
     100% disabled by Social Security Disability Insurance since 1994); Docket No. 108-4 at 1 (stating
27   that Lewis has been detained pretrial since June 21, 2014); Docket No. 108-5 at 1 (stating that
     Sanchez has been detained pretrial since April 18, 2014).
28

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
For the Northern District of California

- All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment;

- Inmates who, at the time of booking, report to Defendants that they are taking community-prescribed medications, but whose medications cannot be verified by Defendants, shall be timely assessed by a medical provider and timely prescribed medications necessary to treat their health needs;

- Defendants shall remove all hanging points and other hazards in the jail's administrative segregation units that pose a risk of being used by inmates to harm themselves or attempt suicide;

- Defendants shall conduct health and safety checks of all inmates housed in segregation at least once every 30 minutes at irregular and unpredictable intervals;

- Defendants shall design and implement a system for identifying and tracking all inmates who are qualified individuals with disabilities, as that term is defined by the ADA and its implementing regulations, including but not limited to inmates with mobility impairments or who are deaf, hard of hearing or unable to speak. Defendants shall also design and implement a system for identifying and tracking the reasonable accommodations necessary for qualified inmates with disabilities to participate in programs, services and activities offered by Defendants at the jail, including but not limited to inmates who must be provided access to programs, services and activities in spaces that do not require climbing stairs and who require sign language interpreters in order to have an equal opportunity to participate in, and enjoy the benefits of, programs, services and activities offered by Defendants;

- The County Defendants shall offer all programs, services and activities, including but not limited to outdoor exercise, religious services, Choices and Pride classes and Narcotics and Alcoholics Anonymous meetings, in locations that do not require inmates to climb stairs in order to access the programs, services and activities;

- Defendants shall furnish qualified sign language interpreters to any inmates for whom sign language is their only or primary method of communication, in all circumstances where a qualified sign language interpreter is necessary to ensure an inmate has an equal opportunity to participate in, and enjoy the benefits of, programs, services and activities offered by Defendants. The interactions for which Defendants must furnish qualified sign language interpreters include but are not limited to the intake process, classification hearings, disciplinary hearings, all medical, mental health and dental treatment, religious services, educational classes, Choices and Pride classes, Narcotics and Alcoholics Anonymous meetings and any other interactions with staff that implicate an inmates' due process rights and

Case No.:  5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

- Defendants shall implement a system to document that Defendants have provided qualified sign language interpreters to inmates who need them and that the inmates have understood the information conveyed by the qualified sign language interpreter.

Plaintiffs shall file any objections to Defendants' proposed plan within 10 days. The court will then make any necessary plan revisions and enter an order. Plaintiffs are entitled to conduct reasonable monitoring of Defendants' compliance with this order, including the right to inspect the jail, interview staff and inmates, review relevant records and observe practices related to Defendants' compliance with the provisions of this order. As noted above, the bond requirement is waived.

**SO ORDERED.**

Dated: April 14, 2015

Paul S. Grewal
PAUL S. GREWAL
United States Magistrate Judge

44

Case No.: 5:13-cv-2354-PSG
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION