MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
KRISTA STONE-MANISTA – 269083
SARAH P. ALEXANDER – 291080
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California 94105
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:    mbien@rbgg.com

ALAN SCHLOSSER – 049957
MICAELA DAVIS – 282195
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (415) 621-2493
Facsimile:    (415) 255-8437
Email:    aschlosser@aclunc.org
          mdavis@aclunc.org

JAMES EGAR – 065702
Public Defender
DONALD E. LANDIS, JR. – 149006
Assistant Public Defender
OFFICE OF THE PUBLIC DEFENDER
COUNTY OF MONTEREY
111 West Alisal Street
Salinas, California  93901-2644
Telephone:    (831) 755-5806
Facsimile:    (831) 755-5873
Email:    EgarJS@co.monterey.ca.us
          LandisDE@co.monterey.ca.us

ERIC BALABAN (admitted pro hac vice)
CARL TAKEI – 256229
NATIONAL PRISON PROJECT of the
AMERICAN CIVIL LIBERTIES UNION
915 15th Street N.W., 7th Floor
Washington, D.C.  20005-2302
Telephone:    (202) 393-4930
Facsimile:    (202) 393-4931
Email:    ebalaban@npp-aclu.org
          ctakei@npp-aclu.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. CV 13 2354 PSG<br><br>**DECLARATION OF KRISTA STONE-MANISTA IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR APPROVAL OF IMPLEMENTATION PLANS**<br><br>Judge:   Hon. Paul S. Grewal<br>Date:    February 23, 2016<br>Time:    10:00 a.m.<br>Crtrm.:  5, 4th Floor |

1      I, Krista Stone-Manista, declare:

2      1.    I am an attorney admitted to practice law in California, a member of the bar

3  of this Court, and an associate at the law firm of Rosen Bien Galvan & Grunfeld LLP,

4  counsel of record for Plaintiffs.  I have personal knowledge of the matters set forth herein,

5  and if called as a witness I could competently testify.  I make this declaration in support

6  of Plaintiffs' Response to Defendants' Motion for Approval of the Implementation Plans.

7      2.    The purpose of this Declaration is to provide an offer of proof regarding

8  what the evidence will show if the Court receives briefing on the adequacy of the dental

9  implementation plan.

10      3.    Attached hereto as **Exhibit A** is a true and correct copy of Plaintiffs' October

11  16, 2015 letter providing Plaintiffs' initial comments on Defendants' first draft dental

12  implementation plan.  Attached hereto as **Exhibit B** is a true and correct copy of Plaintiffs'

13  November 19, 2015 letter providing Defendants with additional information regarding

14  Plaintiffs' dental expert's findings and recommendations.

15      4.    Plaintiffs have retained Dr. Donald Sauter as their dental expert.  I drafted

16  the letters attached hereto as Exhibit A and B based on Dr. Sauter's findings and expert

17  opinions, which are based on his intensive review of conditions at the Monterey County

18  Jail ("the Jail"), including an on-site visit on March 23, 2015, his review of class member

19  records, and his review of the draft dental implementation plans.

20      5.    Defendants provided a revised draft dental plan to Plaintiffs on January 4,

21  2016 that was substantially similar to the dental provisions of the Implementation Plan

22  submitted to the Court by Defendant California Forensic Medical Group ("CFMG") on

23  January 12, 2016 (hereinafter, "CFMG Plan").  I spoke at length with Dr. Sauter on

24  January 7, January 9, and January 12, 2016 regarding his review of the revised draft plan

25  and the remaining deficiencies that he identifies as necessary to meet the Settlement

26  Agreement's requirements regarding the provision of dental care at the Jail.  The following

27  are the primary concerns that Dr. Sauter has identified with respect to Defendants'

28  Implementation Plans for dental care.

Dental Staffing Is Inadequate

6.     Evidence shows that Defendants' current contractual provision with the County as to dental staffing is inadequate, and is likely not being met.

7.     On September 30, 2014, Defendants filed a copy of an amendment to the County's contract with CFMG, dated September 26, 2014, in connection with their Opposition to Plaintiffs' Motion for Class Certification. *See* Dkt. No. 140-1 at Ex. A-1. The "Minimal County Staffing Pattern Upgrade" attached thereto provided for a Dentist and Dental Assistant, each to be scheduled for "16 Hours To Be Determined." *See id.* at PDF pg. 8.

8.     Attached as **Exhibit C** is a true and correct copy of the April 8, 2015 Transcript of Plaintiffs' Deposition of Dr. Kevin Coolidge.  Dr. Coolidge, the Jail's only dentist, testified during his deposition on April 8, 2015 that he worked one 12-hour shift at the Jail each week, with no plans at that time to change his work schedule.  (*See* Exhibit C, at 15:16-16:4, 22:8-16.)  Dr. Coolidge did not specify the schedule worked by the dental assistant, but testified that he worked closely with one assistant during his one-day-per-week shift, and did not work with any other assistants.  (*See id.* at 20:1-24.)  There is no evidence that the 16 hours of dentist and dental assistant services provided for in the September 26, 2014 amendment were ever actually achieved.

9.     The staffing plan submitted by CFMG as Exhibit I to its implementation plan provides for identical levels of dentist and dental assistant staffing as in the aspirational September 26, 2014 amendment—a 16 hour per week dentist and dental assistant—and for 8 hours of hygienist services every two weeks.  (CFMG Plan at 94.)  However, the plan also states that "professional dental hygiene services are currently not provided," CFMG Plan at 92, so it is unclear whether there is a real commitment to providing dental hygienist services.  Even as stated on Plan page 94, however, these staffing levels are inadequate. As of March 20, 2015 (a few days before Dr. Sauter's visit to the Jail), the Jail population was 913, of which 103 had been at MCJ for greater than twelve months.  For a population of 913 jail inmates, accepted standards dictate staffing by at least one full-time equivalent

1   dentist as well as one dental assistant.  *See, e.g.*, Makrides, N.S. et al. (2006) Corr. Dental

2   Servs., in M. Puisis (ed.), Clinical Practice in Corr. Med. (2d ed., pp. 556-563).

3         10.   CFMG has not provided any staffing analysis justifying its dental staffing

4   levels.  In fact, CFMG's internal documents, provided in discovery, demonstrate that the

5   Jail's own dentist:  1) identified the need for a full-time dentist, and 2) acknowledged his

6   inability to meet the dental care needs of the Jail population.  (*See* Exhibit B at Exs. A-C.)

7         <u>Unjustifiable Limitations on Care</u>

8         11.   Defendants agreed to an Implementation Plan that would guarantee "access

9   to care other than extractions" and "periodic dental care for long-term prisoners," with no

10  distinction between sentenced and unsentenced inmates.  (Settlement Agreement ¶ 31(j).)

11  However, Defendants' Implementation Plan refers to "services for inmates with jail terms

12  less than one year" and to "services for inmates with jail terms of greater than one year."

13  (*See* CFMG Plan at 92.)  The plan also contains various provisions limiting the availability

14  of certain types of care to only those prisoners with a "verifiable sentence" of 12 months or

15  longer.  (*See* CFMG Plan at 95, 96, 97, 99, 101, 103. ) In other provisions, the plan refers

16  to a requirement that a patient have 6 or 12 months of "verifiable, continuous incarceration

17  remaining" without reference to sentencing status.  (*See* CFMG Plan at 98.)  The

18  Settlement Agreement does not allow Defendants to limit necessary care to only those

19  class members serving sentences at the Jail and there is no legal or factual basis for

20  limiting care to only sentenced prisoners.

21        12.   CFMG's internal documents demonstrate their acknowledgement that a

22  prisoner's length of time in custody, not his or her legal status, is what must govern access

23  to care.  CFMG's May 29, 2014 Quality Assurance meeting minutes state: "Dr. Fithian

24  noted that a dental committee including Dr. Coolidge has gathered and provided

25  recommendations for inmate care for those in custody longer than twelve months.  He said

26  that CFMG staff are currently reviewing those recommendations and will have those out

27  soon." (*See* Exhibit B at Ex. E.)

28

Dental Clinic Deficiencies

13.     With respect to the Settlement Agreement's requirement of a "safe and sanitary" dental care facility, Dr. Sauter's inspection revealed numerous safety and sanitation hazards, which are not addressed at all in Defendants' Implementation Plan. (*See* Exhibit A ¶ 5; Exhibit B ¶ 23.)  These hazards include the inappropriate placement of equipment for sterilization of instruments, numerous deficiencies in the sterilization set up and protocols in the dental clinic, and lack of adequate backup sterilization equipment. (*See id.*)  The implementation plan contains no provisions to remediate these deficiencies. The plan also does not remedy deficiencies in the availability of necessary materials and equipment in the dental clinic.  (*See* Ex. B ¶¶ 22, 23(c).)

Dental Intake Issues

14.     The Settlement Agreement requires assessment of dental needs during the initial health screening and initial health assessment.  (Settlement Agreement ¶¶ 31(a), 31(j).)  The implementation plan provides that the intake health screening, to be conducted by a nurse, will include initial assessment of dental needs, but does not require that the dentist provide training or supervision to intake nurses to ensure that such screenings are adequate.  (*See* CFMG Plan at 91.)

15.     With respect to the initial health screening (see CFMG Plan at 92), the plan lacks adequate provisions to remedy the systemic failures to adequately assess dental needs at Jail intake that Dr. Sauter identified during his review.  (*See* Ex. A ¶ 1; Ex. B ¶¶ 6-8.) Among other critical deficiencies, a medical professional other than a dentist may conduct such initial dental screenings, but must be adequately trained and their findings regularly reviewed by the dentist.  National Commission on Correctional Health Care (NCCHC) Standard J-E-06 requires that oral screening be conducted by the dentist or "qualified health care professionals trained by the dentist."  The implementation plan does not provide for such training, and evidence obtained during discovery and reviewed by our dental expert demonstrates the inadequacy of the Jail's present dental training system. (*See* Ex. B ¶¶ 9-12.)

16.     Defendants' Implementation Plan lacks necessary provisions to remedy critical and systemic deficiencies in dental record-keeping identified during Dr. Sauter's review.  For example, Jail medical files had little to no evidence of the completion of dental radiographs, which must be a part of any comprehensive dental examination and completed before any extraction.  (*See* Ex. B ¶ 18.)  All radiographs must be filed in the dental record or a place they can easily be retrieved for review.

17.     Defendants' Implementation Plan has several critical deficiencies that must be remedied to ensure compliance with the Settlement Agreement's requirements of "access to care other than extractions" and "periodic dental care for long-term prisoners," Settlement Agreement ¶ 31(j).

a.     Defendants' Implementation Plan lacks adequate provisions for access to specialty dental care services.  For example, it has no provision regarding oral pathology services.

b.     Defendants' Implementation Plan lacks adequate protocols for management of the dental needs of  chronic disease patients.  For example, diabetic and HIV-positive patients may require dental cleanings and other prophylactic care, regardless of length of stay in the jail.

c.     Defendants' Implementation Plan does not adequately provide for repair of full dentures needed to masticate food if necessary to restore dental function and mitigate substantial risks of serious harm to class members who use dentures.  The plan also does not contain adequate provisions for providing dentures and/or prostheses to inmates whose teeth are extracted at the Jail.

d.     Defendants' Implementation Plan limits access to dental prosthesis care by applying a "medically necessary" standard that is legally inappropriate and at odds with community correctional standards.  (*See* CFMG Plan at 97.)

e.     Defendants' Implementation Plan provides for palliative endodontic therapy, CFMG Plan at 101, but has no provision for completing root canal therapy if the patient remains at the Jail following the palliative care.  The plan also limits endodontic

1  care when a tooth can "easily be replaced by an addition to an existing or proposed

2  prosthesis in the same arch," CFMG Plan at 101, while simultaneously severely restricting

3  access to prosthetic services.  Finally, the plan does not contain adequate provisions for

4  root canal therapy for front teeth.  These limitations and omissions are at odds with

5  community standards of practice.

6        f.    Defendants' Implementation Plan imposes an oral hygiene standard

7  that a patient have a 20% plaque index score as a criteria for root canal therapy, CFMG

8  Plan at 102, but there is no basis for denying acute care services based on this criterion.

9      I declare under penalty of perjury under the laws of the United States and the State

10  of California that the foregoing is true and correct, and that this declaration is executed at

11  San Francisco, California this 26th day of January, 2016.

12

13            */s/ Krista Stone-Manista*

          Krista Stone-Manista

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF KRISTA STONE-MANISTA ISO PLS' RESP TO DEFS' MOTION FOR APPROVAL

# Exhibit A



ROSEN BIEN
GALVAN & GRUNFELD LLP

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Krista Stone-Manista
Email:  kstone-manista@rbgg.com

October 16, 2015

VIA ELECTRONIC MAIL

Susan K. Blitch                          Peter G. Bertling
Senior Deputy County Counsel             Bertling & Clausen, LLP
Office of the County Counsel             pgb@bertling-clausen.com
blitchsk@co.monterey.ca.us

   Re: *Hernandez et al. v. County of Monterey, et al.*
     U.S. District Court (N.D. Cal.) No. C 13-02354 PSG
     <u>Our File No. 1187-6</u>

Dear Counsel:

   We write to provide our comments on Defendants' implementation plan pertaining to dental care ("the Plan").  The Settlement Agreement contains several requirements regarding dental care:

   **Paragraph 27:**  "Initial Health Screening" is a face-to-face interview conducted by nursing staff with the arriving individual that identifies immediate medical, mental health and/or **dental needs** and provides for medication continuity.

   **Paragraph 28:**  "Initial Health Assessment" is a medical, mental health, **dental** and communicable diseases screening which includes a history and physical examination by appropriate clinical staff.

   **Paragraph 31(a):**  The [Intake Screening] Implementation Plan shall also include standards and timelines for **Dental Evaluation**.

   **Paragraph 31(j):**  Defendants shall develop and implement a **Dental Care Implementation Plan** to ensure timely access to necessary treatment for dental and oral health conditions, including but not limited to Intake Screening, access to care other than extractions, a safe and sanitary on or

[2860254-1]

Susan K. Blitch
Peter G. Bertling
October 16, 2015
Page 2

off-site facility for necessary dental care, periodic dental care for long-term
prisoners, and access to dental hygiene supplies.

Plaintiffs provide the following comments, based on the review and evaluation of
our dental expert, in order to facilitate a productive meet and confer on these topics,
tentatively scheduled for October 29, 2015.  These comments do not waive any of
Plaintiffs' objections to the draft dental remedial plan.

**Dental Staffing**

The Plan does not include any analysis of dental staffing needs, but simply
assumes that present staffing is adequate.  Dental staffing is not adequate for the Jail's
population.  Our dental expert's review showed that functionally MCJ operates with
dentist hours equivalent to between 0.23 and 0.27 FTE, and a similar FTE level for dental
assistant hours.  This works out to a staffing ratio of 1 dentist to approximately 3,800
inmates.  This ratio is understated because of the high number of people flowing through
the jail.  There were over 11,700 dental intakes in 2014.  Current dental staffing is clearly
inadequate.  The jail needs at least one FTE dentist and one FTE dental assistant.  If you
have any staffing analysis to show otherwise, please share it.

**Dental Screening**

The Plan currently lacks but must include specific provisions related to the
assessment of dental needs at intake.  The Plan must provide for full implementation of a
system for assessment and prioritization of dental needs at the time of intake (e.g.,
emergency, urgent, interceptive, routine).  As an example, CDCR's "dental priority
classification" system, which Dr. Coolidge testified he uses, is available at
http://www.cdcr.ca.gov/DHCS/docs/2010-August-PP.pdf at 96.

The plan must also provide for the following:

**1.      Initial Health Screening- Dental Issues by RN**

    a.      The screening form must be amended in connection with the classification
system, and must ask at a minimum whether a person presently has serious
dental pain or signs of infection, is currently undergoing a dental procedure
or receiving dental treatment, incurred any recent mouth trauma, has any
mouth lesions or abscesses, or has difficulty chewing or swallowing.

Susan K. Blitch
Peter G. Bertling
October 16, 2015
Page 3

    b.      Training for the Booking RN on the assessment of dental needs in accordance with the classification policy.

    c.      Urgent dental needs found at Initial Health Screening shall be referred to and evaluated by a dentist within one (1) business day.

    d.      The Initial Health Screening must require a full RN assessment of basic dental needs, including documentation of any fillings, broken teeth, evidence of periodontal disease, or appearance of potential oral cancer. Any findings of infection or functional impairment should be immediately referred to a dentist.

    e.      The RN performing the Initial Health Screening must properly complete an odontogram to document all findings.   The dentist must regularly review completed odontograms and provide training to RNs where deficiencies are found.

    f.      When individuals report current use of psychotropic medication at Initial Health Screening, the Booking RN must check for xerostomia, or dry mouth, and document the findings.

    g.      When individuals self-report chronic illness, or medical records of prior stays show chronic illness, the Booking RN must document if this chronic illness is accompanied by evidence of serious dental conditions.

**2.**     **Initial Health Assessment by Dentist**

In addition to the RN-conducted Initial Health Screening, all prisoners must have a face-to-face dental evaluation conducted by a dentist within 14 days.

The evaluation should include the following:

    a.      A complete extraoral head and neck examination, charting of teeth on an odontogram, appropriate diagnostic radiographs to detect caries and bony abnormalities, a periodontal examination, and the examination of the hard and soft tissues of the oral cavity with a mouth mirror and explorer using adequate illumination.

    b.      An oral cancer screening, involving the evaluation of the hard and soft tissues of the oral cavity and head and neck.

[2860254-1]

Susan K. Blitch
Peter G. Bertling
October 16, 2015
Page 4

    c.      A review of the dental priority classification code assigned to the prisoner, adequate and timely follow up for these needs as indicated by the classification system.

    d.      Periodontal screening in accordance with the Settlement Agreement's requirement of access to care (and the recommendations of the CFMG Dental Task Force Group, Chapter 2.4, to implement a Periodontal Disease Program) must be provided at the time of the dentist's initial 14-day evaluation.   Treatment should be based on periodontal disease classification, dental priority classification code, and special medical needs (i.e. pregnancy, diabetes, or HIV/AIDS).

**3.     Care Other than Extractions**

The Plan lacks adequate provision to ensure compliance with the Settlement Agreement's requirement that prisoners at the Jail have "access to care other than extractions."  The Plan must provide for the following:

    a.      In order to ensure that extractions are only performed for teeth that cannot be restored, temporary restorative services must be made available to all prisoners.  The Plan must require a radiogram of any damaged tooth before making the decision whether it is restorable or not and must require documentation of the radiogram and restoration assessment.

    b.      The Plan must provide for timely extractions of teeth deemed non-restorable.  Our expert recommends that the dentist extract any tooth deemed non-restorable at the time of the evaluation.  If the dentist deems that an oral surgeon's services are necessary to perform an extraction, a referral must be made in a timely manner and not exceed two weeks.

    c.      Permanent restorative services must be made available at the Jail for prisoners with verifiable sentences longer than three months.  The Jail must ensure that the dental clinic has sufficient materials and supplies to allow for permanent restorations.

    d.      Prisoners with verifiable sentences of longer than three months must receive dental prostheses if it is determined by a dentist that such prostheses are medically necessary to alleviate pain, allow for proper mastication, or prevent significant illness or disability.  The dental priority classification system must establish timeframes for such prostheses.

Susan K. Blitch
Peter G. Bertling
October 16, 2015
Page 5

     e.     The Plan must ensure regular audits of dental records to ensure that prisoners are treated in timeframes matching their priority classification codes, and must provide for a systemic review of obstacles to care if they are not.

**4.     <u>Access to Dental Care</u>**

The Plan lacks adequate specificity as to the evaluation and triage of requests for dental care.  The following provisions must be included:

     a.     Any prisoner submitting a request for dental care must be evaluated by a Qualified Medical Professional with specific training and qualifications in dental and oral health diagnosis within 24 hours of the date of the prisoner's complaint.

     b.     Patients must be referred to see a dentist within one calendar day for urgent needs (therefore, weekly Dental Sick call is inadequate) and within seven days for all other needs.

     c.     The Plan must include a timeframe for referrals to the oral surgeon for "complicated dental problems," e.g., root canals.  The Plan must provide a system for ensuring timely follow-up on such referrals.

**5.     <u>Dental Treatment Space Issues</u>**

The plan includes no provision for correcting deficiencies in the available dental space and equipment, including deficiencies preventing adequate sterilization and sanitization practices.  Our dental expert's inspection revealed the following safety and sanitation hazards, which are not addressed at all in the plan:

     a.     The autoclave and the space around it for removal of sterilized instruments is just inches from the head of the dental chair when it is reclined.  The area around the head of the dental chair is an active operating field, in which large particle spatter and aerosols of blood and bodily fluids are dispersed during dental procedures[1].  It is not safe to put the autoclave and the

---

[1] http://www.cdc.gov/oralhealth/infectioncontrol/faq/aerosols.htm

Susan K. Blitch
Peter G. Bertling
October 16, 2015
Page 6

autoclave work area inside this operating field.  This inevitably leads to contamination of instruments.

b.      The entire sterilization set up is dangerous for several reasons.  First, instruments are hand-scrubbed, without the use of the types of gloves recommended by the CDC for hand-scrubbing.  This hazard can be remediated by switching to ultrasonic pre-cleaning.  Second, the entire area lacks biohazard labelling where needed.  Third, and worst of all, the clinic is set up so that clean instruction and work area around the autoclave is set up such that clean instruments—which must be near the chair so the assistant can hand them to the dentist—must be passed across the path where dirty instruments are transported.  This is contrary to the standard of care and risks cross-contamination, placing the patient at increased risk of infection.

c.      The dentist relies on an ADEC PAC 1 handpiece delivery system that is suitable for temporary use in a mobile clinic, but is not suitable for long-term use.  (It appears to have been in use at the jail since 2007.)  Dr. Coolidge testified that the system cannot maintain enough air pressure to run drilling tools consistently.  This machine must be  replaced.  The existing unit cannot be used for providing care beyond extractions.

d.      The backup autoclave system—a machine in Dr. Coolidge's trunk for which there are no sterilization monitoring records—is not consistent with minimal infection control practices.

**6.      Access to Dental Hygiene Supplies**

The Settlement Agreement requires the Plan to address "access to dental hygiene supplies" but the Plan as drafted does not provide for any improvements in prisoners' access to supplies.  While we acknowledge that there are security reasons for limiting the availability of floss, the following provisions would improve access to dental hygiene supplies without security risks:

a.      The Jail must lower the price of floss loops, toothbrushes, and toothpaste in commissary to be the same as the cost of the product.

b.      The Jail must adopt a policy to ensure that oral hygiene products are available to indigent prisoners.

Susan K. Blitch
Peter G. Bertling
October 16, 2015
Page 7

    c.    The Jail must ensure that the toothpaste provided at commissary and at intake contains fluoride.

**7.**    <u>**Peer Review and Audit of Dental Staff**</u>

The plan lacks any provision for peer review and audit of dental staff, and must provide for the following:

    a.    The Jail must implement a dental peer review system using the "CFMG External Peer Review Dental Chart Audit Tool," and must document the external peer review of at least ten dental charts per quarter.

    b.    The Jail medical staff and dental staff shall work together to correct documented failures discovered in these audits.

    c.    These audits must be used to compile annual data regarding the quality of the dental care at the Jail.

    d.    The plan must include specific audit criteria for measuring whether health inventories for dental problems are correctly completed.  The plan must set forth a time frame for follow up for concerns noted at intake and at the time of the health inventory, based on the dental priority classification system discussed above.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Krista Stone-Manista*

By:   Krista Stone-Manista

KSM:cg

# Exhibit B

*Confidential - Subject to Protective Order*



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Krista Stone-Manista
Email:  kstone-manista@rbgg.com

November 19, 2015

Susan K. Blitch                                    Peter G. Bertling
Senior Deputy County Counsel          Bertling & Clausen, LLP
Office of the County Counsel             pgb@bertling-clausen.com
blitchsk@co.monterey.ca.us

Re:    **Additional Comments and Evidence Re Dental Plan Issues**
        *Hernandez et al. v. County of Monterey, et al.*
        U.S. District Court (N.D. Cal.) No. C 13-02354 PSG
        Our File No. 1187-6

        This letter is to provide additional information regarding our dental expert's findings and recommendations as to necessary elements of the dental remedial plan.  This letter supplements and incorporates our October 16, 2015 letter regarding specific aspects of the dental remedial plan that must be revised, and sets forth additional evidence regarding the necessity of those recommendations.

**Dental Staffing**

        1.       Dental staffing is not adequate for the Jail's population. Specifically, at the time of our expert's review, the MCJ population was 913 on March 20, 2015, of which 103 had been at MCJ for greater than 12 months.  For a population of 913 jail inmates, accepted standards dictate staffing by at least one full-time equivalent dentist as well as one dental assistant.[1]  This may in fact underestimate the need for dental services at the Jail given that there were 11,743 intakes to MCJ in 2014.

        2.       CFMG's own documents acknowledge the need for more dental staffing than the Jail presently has.  As far back as the minutes of the April 21, 2011 Quality

---

        [1] Makrides, N.S. et al. (2006) Corr. Dental Servs., in M. Puisis (ed.), Clinical Practice in Corr. Med. (2d ed., pp. 556-563).

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 2

Assurance meeting minutes, Dr. Coolidge has informed CFMG and Monterey County personnel "that there are enough dental needs among the adult population to require a full time dentist.  Apparently there is no end to the dental needs for this population."  Exhibit A.  This need is borne out by comments made by Dr. Coolidge and other CFMG personnel in other Quality Assurance meetings.  On August 30, 2012, for example, the minutes state, "There are approximately 40 plus on his [Dr. Coolidge's] list every week; of that he is able to see 25 inmates in his single day a week practice here at Monterey County Jail.  Of those 25, he is noting seven are AB 109 patients."  Exhibit B.  On September 18, 2014, "Dr. Coolidge stated that there are a typical number of 40 patients on his weekly list, and currently he is able to see about 20 of them," which are approximately the same numbers he gave in 2012.  Exhibit C.  CFMG has yet to provide any staffing analysis indicating that Dr. Coolidge is wrong about his recommendation for a full time dentist.

**<u>Dental Screening</u>**

       3.     CFMG's policies lack a clear and detailed dental priority classification system that would enable its providers at all levels to correctly prioritize and schedule patients requiring dental care.  CFMG's two-priority system lacks adequate specificity for timelines and does not set prioritization levels for long-term, non-urgent dental needs.  (*See* CFMG Standardized Nursing Procedure at 33-34.)  Nor is the nursing prioritization system consistent with the more detailed system used by Dr. Coolidge, who testified that he uses the Dental Priority Classification ("DPC") system used by the California Department of Corrections and Rehabilitation ("CDCR") to categorize the patients' needs and to set a deadline by which patients should be treated.  (Coolidge Depo Trans. 99:14-100:17.)

       4.     The DPC system lays out treatment deadlines for dental patients based on the nature of their dental need.  Title 15 § 3354(f) provides additional detail regarding the DPC system:

       Inmates requesting dental treatment shall be evaluated and scheduled into one of the following categories:

       (1) Emergency care category: A dental emergency, as determined by health care staff, includes any medical or dental condition for which evaluation and treatment are necessary to prevent death, severe or permanent disability, or to alleviate disabling pain. Immediate treatment shall be

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 3

provided and will be available to such inmates 24 hours a day, 7 days a week.

(2) Urgent care category: Treatment of a dental condition of sudden onset or severe pain which prevents the inmate from carrying out essential activities of daily living; or sub-acute or unusual hard or soft tissue condition or pathology requiring early intervention. This category includes:

(A) DPC 1A: Such inmates shall receive treatment within one calendar day of diagnosis.

(B) DPC 1B: Such inmates shall receive treatment within 30 calendar days of diagnosis.

(C) DPC 1C: Such inmates shall receive treatment within 60 calendar days of diagnosis.

(3) DPC 2 Interceptive care category: Treatment of advanced caries, moderate or advanced periodontal pathology, or the provision of dentures. This category requires that inmates have over 6 months remaining to serve on their sentence within the department at the time DPC 2 care is initiated, and provides eligibility for DPC 2 care regardless of oral hygiene status. Such inmates shall receive treatment within 120 calendar days of diagnosis.

(4) DPC 3 Routine Rehabilitative care category: Treatment of caries not likely to become advanced within one year, mild periodontal pathology, or the provision of removable partial dentures. This category requires that inmates have over 12 months remaining to serve on their sentence within the department at the time DPC 3 care is initiated, and meet oral hygiene requirements. Such inmates shall receive treatment within one year of diagnosis.

(5) DPC 4 No dental care needed: Inmates not appropriate for inclusion in DPC 1, 2, 3 or 5.

(6) DPC 5 Special needs care: Inmates with special needs. These include inmates requiring dental care that is a deviation from treatment policy as well as treatments that may require a contract specialist or that cannot be accomplished at the institution.

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 4

     5.     While the Dental Plan need not incorporate the CDCR DPC system word-for-word, it must establish a consistent DPC system that will be used by all CFMG personnel who screen and provide dental care at the Jail.

**Initial Screening**

     6.     The initial screening form should incorporate the DPC system, and ensure that booking nurses accurately categorize patients according to standardized dental priorities for follow-up by the dentist.  The implementation plan must provide for a system by which to track and monitor compliance with follow-up timeframes.

     7.     The screening form also lacks adequate detail to ensure a full RN assessment of basic dental needs.  Presently, the Medical Intake Questionnaire fails to ask any questions to identify immediate and/or urgent dental needs. The only dental-related question is whether the person has dentures.  The Medical Intake Questionnaire should also ask at a minimum whether a person presently has serious dental pain or signs of infection, is currently undergoing a dental procedure or receiving dental treatment, incurred any recent mouth trauma, has any mouth lesions or abscesses, or has difficulty chewing or swallowing.

     8.     The booking RN will need additional training in how to assess basic dental needs in order to correctly apply the DPC system and to identify immediate and/or urgent dental needs.

**Initial Dental Health Assessment**

     9.     Our October 16 letter at pages 3-4 described various aspects of an initial dental screening to be completed for all prisoners by a dentist within 14 days.  In light of feedback from CFMG and after consulting further with our expert, we would agree to an initial dental screening that complies with NCCHC standard J-E-06: "Oral screening by the dentist or qualified health care professionals trained by the dentist is performed within 14 days of admission."  The oral screening must include "visual observations of the teeth and gums, and notation of any obvious gross abnormalities requiring immediate referral to the dentist."  *See id.*  Such screenings are necessary to identify patients that may suffer

[2891284-1]

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 5

harm by delaying dental care.[2]  The initial health inventory must be amended to specifically require a complete oral screening and to align with the established DPC code.

10.     In order for a non-dentist provider to adequately conduct this screening in lieu of the dentist, he or she must be thoroughly trained by the dentist and the dentist must review and supervise the results of these screenings on an ongoing basis.  During his deposition, Dr. Coolidge testified that aside from a PowerPoint presentation in 2010 or 2011, he has conducted no formal training of CFMG staff.  (Coolidge Depo Transcript, p. 25).  Lola Bayer, the Director of Nursing for the Jail, also testified that nursing staff receive no specialized training in recognizing and triaging dental complaints from CFMG.  (Bayer Depo Trans. 72:4-20.).  If CFMG is not willing to agree to an oral screening by a dentist for all prisoners, it must agree to adequately train those providers who will be completing the initial health inventory to comply with NCCHC standards.

11.     The dentist must also adequately supervise and conduct regular reviews of completed Health Inventory forms to ensure that mid-level providers are conducting appropriate and adequate oral screenings.  The implementation plan must include a requirement for regular chart audits and review.

12.     Our dental expert identified systemic deficiencies in completion of the health inventory forms, which support the need for further training and closer review if non-dentists who are to perform oral screenings.  Few of the records had anything noted on this odontogram and **none** had adequate notations describing the patient's oral health or diseases such as decay or soft tissue lesions or reasons for referral to the dentist.  Of those with notations, the notations were often incorrect.  For example, Patient No. 1402397 was eventually seen by the dentist for pain in tooth numbers 3 and 14.  But his Re-Admission Health Appraisal Form, dated 3/24/14, has tooth numbers 2 and 15 marked as "cracked."  It is likely that the screener did not correctly chart the number of the "cracked" tooth because he or she lacked adequate dental training.  Furthermore, there was no indication in this patient's record that this finding, erroneous though it may be, led to any follow-up care—Patient No. 1402397 was not seen by a dentist until four months later, after the patient complained of dental pain through the sick call process (see above discussion).

         //

---

[2] Stefanac, S.J., Nesbit, S.P. *Treatment Planning in Dentistry*, St.Louis, 2001,Mosby pp: 41-55.

[2891284-1]

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 6

### Access to Dental Care

13.     Per our expert's review, responses to sick call slips presenting dental needs were untimely and inadequate.  Of the dental records reviewed, eight out of seventeen patients (47%) were not assessed by a nurse within 24 hours of the submitting a sick slip complaining of pain falling below published standards of care.[3]  Ten (58%) apparently did not have their pain managed or stabilized adequately with the medications prescribed by the medical staff, as they later filed additional sick call slips.  Nine (52%) waited more than one week from the submission of a sick slip to be evaluated by the dentist, causing unnecessary suffering, risk of infection, and deterioration of their health due to a decreased ability to chew food due to inability to put pressure on the painful tooth.

14.     Twelve out of the fifteen patients who accepted care (or 80%) did not have their problem resolved during the first visit with the dentist.  These repeated delays in the management of urgent care patients complaining of dental pain and/or infection places the patients at risk for serious harm as urgent problems remain unaddressed.

15.     As discussed above, CFMG must fully implement a dental classification priority code (DPC) system.  Dr. Coolidge testified that he is familiar with the system used for this purpose by the CDCR.  However, Dr. Coolidge testified that he does not audit the dental records to make sure that patients are treated within the timeframe created by the DPC system, but that he does maintains a calendar of dental patients to create a list of patients who need to be seen by a certain date based on their DPC code. (Coolidge Depo 106:16-107:4.).

16.     In practice, however, CFMG lacks the dental resources to meet the standards set forth by the DPC system.  The following are examples of egregious delays in accessing care found by our dental expert.

- Patient No. 1402397 submitted a sick slip on 7/2/14 requesting to have "3 broken molars removed."

    - There was a nurse note in the progress notes dated 7/3/14 that this patient requested treatment for "3 broken molars" with pain rated at "7/10."  This patient was assigned as Priority 2 under the CFMG Standardized Nursing

---

[3] Shulman J.D., Sauter D.T. Treatment of Odontogenic Pain, in a Corr. Setting in J. Corr. Health Care (2012) 18:1, 58 – 65.

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 7

Procedures (SNP), which specifies the patients should be seen within two to three weeks.  An assignment of Priority 2 is inconsistent with CFMG's SNP for this level of pain.  Priority 1 would be more appropriate, as it includes "Patient complains of constant severe pain" as a criteria for "next dental line."  The nurse prescribed Tylenol 325 mg two tablets twice per day for 10 days.  This prescription had to be renewed on 7/16/14 because the patient was still waiting to see the dentist.

- The patient was finally evaluated by the dentist on 7/17/14, or 15 days after filing his initial complaint.  The dentist's note stated that tooth "#s 3, 14 are fractured to the gum line, gross decay present."  The dentist further indicated that these teeth were non-restorable and noted "NV: Exts" (next visit: extractions).

- The patient again submitted a sick slip to be seen for a complaint of dental pain on 11/17/14 and was evaluated by an MLP on 11/18/14.  The MLP prescribed ibuprofen for his pain complaint.  The patient was seen and evaluated by the dentist on 11/20/14.  The dentist once again determined that tooth #3 and #14 needed to be extracted but did not perform the extraction that day.  Instead, the dentist opted to refer the patient to an oral surgeon, a referral which the dentist did not deem necessary back in July.

- The patient continued to have pain and requested ibuprofen multiple times before the oral surgeon finally extracted the tooth on 12/14/14, 27 days following the complaint on 11/17/14, and 165 days after the patient's initial complaint of pain.  This patient was forced to endure pain and potential serious harm from a dental infection for over 5 months due to an unnecessary delay in receiving dental treatment.[4]

- Patient No. 1411990 was examined by Dr. Coolidge on January 5, 2015 and given the DPC code "1B."  A patient with a DPC code of "1B" is supposed to be seen within 30 calendar days.  Dr. Coolidge's calendar has this patient scheduled for a follow up by February 6, or 32 days after his triage appointment.

---

[4] Shulman J.D., Sauter D.T. Treatment of Odontogenic Pain, in a Corr. Setting in J. Corr. Health Care (2012) 18:1, 58 – 65.

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 8

- However, the dental progress notes indicate that Patient No. 1411990 was not seen again until March 5, or 59 days after his original triage appointment. At this next visit, Dr. Coolidge did not perform the extraction, but instead reexamined the patient, taking an x-ray this time, and determined that he should be sent to an oral surgeon. The "Treatment Plan" for this March 5 visit states "NV [Next Visit]: Refer to OS [oral surgeon]" with the DPC code "1C," which requires follow up within 60 calendar days.

- In other words, Patient No. 1411990 was seen in January, determined to have a dental need that required treatment by February, not seen again until March, and then had his dental issue pushed off yet again. It appears that Patient No. 1411990 was treated by the oral surgeon on March 19, 2015, or **73** days after his January 5 triage appointment.

- Patient No. 1409993 submitted a request to be seen for a complaint of dental pain on 10/20/14. A nursing note indicated on 10/20/14: "no show for sick call per deputy". The patient submitted subsequent sick slips complaining of dental pain on 11/19/14, 11/23/14, and 12/3/14.

  - The patient's record shows that he was not seen until 11/21/14, or more than a month after submitting his first sick call slip. When he was finally seen the nurse noted "severe pain," "without [symbol] significant swelling." His vital signs indicated no fever. There was also no note discussing examination for lymphadenopathy, another marker for dental infection. Despite the insufficient documentation in the record to support the prescription of antibiotics, the patient was prescribed Pen V K 1Gram twice per day for 7 days, Flagyl 500 mg twice per day for 3 days, and ibuprofen 600 mg twice per day for 14 days.

  - The medications obviously failed to stabilize the patient's dental pain, as he submitted an additional sick slip complaint on 12/3/14, twelve days after receiving the medications. On 12/4/14, he was prescribed Augmentin 875mg twice per day for 10 days, Flagyl 500 mg twice per day for 10 days, ibuprofen 800 mg twice per day for 14 days to follow with ibuprofen 600 mg twice per day for 7 days, and Prilosec 20 mg once per day for 21 days.

  - The dentist saw this patient again on 11/26/14, 37 days after the patient's initial complaint. The dentist determined tooth #14 needed extraction. He

[2891284-1]

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 9

      also stated that #18 and #30 were grossly decayed and drew a line through the teeth on the odontogram indicating they too needed to be extracted.

- Tooth #14 was finally extracted on 12/30/14, or fully 71 days following the initial complaint.  There is no record that tooth #s 18 or 30 were extracted before our expert reviewed the record on March 23, 2015, despite the dentist's finding that they were non-restorable.

**<u>Care Other than Extractions</u>**

      17.    Our October 16 letter at pages 4-5 described specific standards for the provision of dental care other than extractions.  In particular, the NCCHC requires an oral examination by a dentist within 12 months of admission.  *See* NCCHC Standaard J-E-06. However, of the records reviewed none of the patients who had been at MCJ twelve or more months had a full dental/oral examination.

      18.    The following findings from our dental expert's survey support of our detailed comments in the October 16 letter and our position that the Jail lacks adequate procedures to ensure that it complies with constitutional and correctional standards requiring the provision of routine care other than extractions.  The implementation plan must address these issues.

- Patient No. 1304572 exemplifies the lack of necessary routine care for long-term inmates at MCJ.  The following are the findings of our dental expert's review of this patient:

  - This patient's most recent intake screening form was completed on 5/23/13.  No notation of dental problems exists on the intake assessments.  Yet within five days of entering the Jail, or on 5/28/13, the patient submitted a sick slip complaining of dental pain.  This complaint went unaddressed, and the patient was forced to submit subsequent sick slips on 5/31/13 and 6/7/13.

  - The patient was finally evaluated by the PA 6/11/13 and referred as "dental level 1."  CFMG's Standardized Nursing Procedures dictate that a Dental Level 1 referral should be seen at the next dental sick line.  Yet, the patient was not offered a dental appointment until 7/11/13, or one month later.  In the meantime, the patient submitted two additional sick slips, on 6/28/13 and 7/3/13 (written on notebook

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 10

paper), complaining of dental pain.  The patient refused the 7/11/13 dental visit, because, according to the record, the patient was on the phone to his mother at the time he was called by the custody staff to see the dentist.  The patient then filed another sick slip on 7/17/13.

- He was seen by the dentist on 7/25/13 and complained of pain in teeth #s 2, 3 and 4.  The progress note from this visit noted "no decay," but no radiographs were taken to confirm the diagnosis.  No definitive treatment was provided.  The patient was not scheduled for any follow-up visit.

- The patient once again submitted a sick slip on 8/29/13 and 9/12/13 complaining of dental pain.  Again, there is no indication in the record why the patient was not seen after the 8/29/13 sick slip.  The dentist saw him on 9/19/13.  The progress notes from this visit are extremely difficult to read.  On 9/26/13, the dentist's progress notes indicated that he placed "temporary fillings" in tooth #3 MO, #4 DO, #5 DO.  The letters next to the numbers indicate the surfaces of the teeth restored.

- On 5/16/14, or almost a year after his first sick slip, the patient again submitted a sick slip complaining of dental pain.  He was seen by the dentist on 5/22/14, who recorded in the progress notes that the patient complained, "My gums are bleeding and sensitive."

- The patient was seen on 7/31/14 and the dentist scaled the upper teeth to remove plaque.  Since he did not scale the lower teeth or polish the teeth this does not qualify as a dental prophylaxis, which is a multi-step process.  No exam with radiographs was performed even though the patient had been in custody over 12 months at this time.  The NCCHC requires an oral examination by a dentist within 12 months of admission.  *See* NCCHC Standaard J-E-06.

- The patent submitted a sick slip on 12/24/14 complaining his teeth hurt.  He was seen on 1/5/15 and the dentist noted that the temporary filling placed in 2013 was loose.  He scheduled the patient to return on 1/29/15 and replaced the temporary filling with **another** temporary filling.  The dentist performed no exam nor did he indicate that any radiographs were taken at this visit.

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 11

- This patient was in custody for 22 months at the time of our expert's review. As of that day, he had yet to receive a full dental exam, appropriate full mouth diagnostic radiographs, a full dental prophylaxis, or any fillings other than temporary ones—which failed to last him through his detention at MCJ. This patient's record noted no oral cancer screening or PSR. The recent progress notes had no discussion about the patient's dental hygiene or the status of the periodontitis diagnosed in 2014.

- The dental treatment received by Patient No. 1308830 illustrates many of the inadequacies of MCJ's extraction policy.

  - This patient's chart contained a blue sick slip dated 10/4/13 and drafted by a MLP referring the patient to see the dentist for "Dental #1." The dentist saw Patient No. 1308830 on 10/10/13 and again 11/1/13 to evaluate his broken teeth. Lines were drawn on the odontogram through tooth #s 1, 29, 30, and 31, indicating the need to extract all four teeth. However, the record contains no radiographs that could verify whether the teeth were non-restorable.

  - On 11/1/13, the dentist extracted tooth #s 1 and 31, per the patient's request. On 11/14/13, or 41 days after the blue sick slip was created, the patient returned to the dental clinic complaining, according to the dentist's progress notes, that "it still doesn't feel like it's gotten better." The dentist noted that the "ext(raction) site #31 was red, bossy and had purulent exudate coming from the socket when palpated." This suggests an infection. The dentist prescribed antibiotics. Once again, there were no radiographs in the patient's record and no notation of any taken. The standard of dental care dictates that a radiograph should be taken if these sorts of symptoms appear after an extraction. A radiograph can determine if a root tip or other abnormality had developed, which can indicate conditions requiring further treatment.

  - The patient received no follow up dental care for this post-operative infection or for the two teeth that had been identified as needing extraction but that remained.

  - The patient did not see the dentist again until 10/23/14. The patient again complained about tooth #s 29 and 30, which had been identified as

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 12

problematic a year previously.  One month later, or on 11/20/14, the dentist's progress notes documented that tooth #s 12 and 14 now needed extraction in addition to #s 29 and 30.  No decay was charted for these teeth on the odontogram from 2013; a year later they were deemed non-restorable.

- The patient chart indicated that the dentist referred the patient to an oral surgeon on 11/20/14 for the extractions, more than a year after the initial referral.  The patient saw the oral surgeon on 12/9/14.  The oral surgeon prescribed amoxicillin (500 mg three times a day for seven days), ibuprofen (600 mg three times a day for five days), and Norco 5/325 (once a day for three days).  According to the patient's medication administration records that the Jail failed to provide the Norco 5/325, despite the oral surgeon's prescription.

- Patient No. 1400306 provides another example of MCJ's deficient long-term care.

  - This patient entered the Jail on 1/10/14.  His intake forms recorded that he had 8 teeth removed just prior to intake at MCJ.  Yet the odontogram completed on 1/16/14 does not indicate this.  There are circles around teeth #s 17-21 and 28-32—but the diagnostic code below the odontogram in the patient's record does not indicate what a "circle" is supposed to mean.  A missing tooth is supposed to be indicated by an "x."  A subsequent Jail Re-Admission Health Appraisal form is dated 1/23/14 and has "N/A" written in the dental section, with no other notations in the dental portion.

  - This patient had several dental sick slips in his record.  He was seen and evaluated by the dentist on 1/16/14, 3/13/14, 3/27/14, 4/10/14 and 9/25/14.  Extractions were offered of tooth #s 25 and 27 and a radiograph was present in the record.  The dentist considered the teeth non-restorable.  The patient refused the extraction of lower front teeth #25 and #27 on 4/17/14.  The patient was offered extraction of upper front tooth #7 on 9/25/14.  No radiograph was present of this tooth.  The patient refused the extraction.

  - There is no evidence that patient was offered replacement of lost teeth once he had served over 12 months.  Although the patient refused episodic care in the form of extraction of teeth it cannot be

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 13

assumed that the patient would not have wanted more
comprehensive care to include the restoration of salvageable teeth
along with the replacement of those that are needed to chew and
speak. This patient's records had no documentation of a full dental
examination, full dental diagnostic radiographs, oral cancer
screening, PSR, dental prophylaxis, restorative care in the form of
permanent fillings and replacement of teeth needed to eat and speak.

19.     Dr. Coolidge testified that he performs oral cancer screenings and
periodontal screenings.  (Coolidge Depo Transcript, p. 128.)  However, none of the
records that our expert reviewed contained any evidence that MCJ had actually
performed these screenings for any patient.

20.     CFMG's own documents reveal that it has long been aware of the unmet
need for dental care in its facilities. Other dentists from other CFMG facilities have
expressed grave concern over the working conditions created by CFMG's dental policies
and procedures.  An April 4, 2014 email from CFMG dentist William M. Reuss DDS to
Taylor Fithian MD stated:

Ronni, Kevin [Coolidge], and I are in full agreement that it is urgent to
initiate tangible progress in updating our policies and procedures for the
delivery of dental care in all CFMG facilities. **Inmates with sentences
greater than six months need dental care beyond the scope of our
current policy/procedures.  Each week I see urgent needs that beg
attention but go untreated because of current policy.  This fact
heightens our professional/corporate risk exposure.**  Our
recommendation is to immediately initiate three pilot programs to
develop/test/document updated dental policy/procedures.  At Shasta that
would include dental screening by RDA.

I am feeling the pressure of professional liability risks due to escalating
numbers of dental visits each week.  In all my professional dental career
(42 years), **I have never worked harder.  Melinda my RDA feels the
same.  We need more hours to provide timely care to urgent dental
needs.**

Exhibit D.

[2891284-1]

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 14

21.     Drs. Coolidge and Reuss were members of a CFMG Dental Task Force, which was formed sometime in 2013.  After significant delays, the group submitted strong recommendations to improve the access and levels of dental care provided at CFMG staffed facilities to include MCJ.  During the May 29, 2014 quality assurance meeting, "Dr. Fithian noted that a dental committee including Dr. Coolidge has gathered and provided recommendations for inmate care for those in custody longer than twelve months.  He said that CFMG staff are currently reviewing those recommendations and will have those out soon."  Exhibit E.  Despite Dr. Fithian's promise that these recommendations will be "out soon," no documents were produced in discovery reflecting any change to dental policy has occurred at MCJ in the year since the Dental Task Force submitted their recommendations.  Nor does the draft dental implementation plan address these concerns.

**Facilities and Material Issues**

22.     During our dental expert's tour, there were no materials present in the Dental Clinic would allow for permanent restoration of the chewing surfaces of the teeth such as composite or amalgam.  There also was not a curing light in the dental room, which is necessary to cure composite fillings when they are placed.  The Dental Inventory List did not include a curing light or permanent filling materials.  The clinic did have glass ionomer and IRM ("Intermediate Restorative Material" made up of zinc oxide and eugenol) materials.  These are sufficient for temporary fillings of chewing surfaces— but not for permanent fillings, due to their lack of compressive strength and wear resistance.[5]  Temporary fillings may be adequate to respond to urgent needs of short-term inmates who will be released within a few days or weeks.  But longer-term inmates will have recurring problems, which will simply not be solved by the IRM or glass ionomer filling materials present in the dental area.

23.     As detailed in our letter of October 16, our dental expert's review identified several urgent deficiencies in the available dental treatment space and equipment.  The implementation plan remains silent on these issues.

---

[5] Anusavice, K.J., Shen, C., Rawls, H.R. Phillips' Science of Dental Materials, Elsevier-Saunders, 2013, pp: 270-271.

Roberson, T. M., Heymann, H.O., Swift, E.J., Sturdivant's Art and Science of Operative Dentistry, Mosby-Elesvier, 2006, pp: 503-504.

[2891284-1]

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 15

       a.    The autoclave and the space around it for removal of sterilized instruments are just inches from the head of the dental chair when it is reclined.  The area around the head of the dental chair is an active operating field, in which large particle spatter and aerosols of blood and bodily fluids are dispersed during dental procedures[6].  It is not safe to put the autoclave and the autoclave work area inside this operating field.  This inevitably leads to contamination of instruments.

       b.    The entire sterilization set up is dangerous for several reasons.  First, instruments are hand-scrubbed, without the use of the types of gloves recommended by the CDC for hand-scrubbing.  This hazard can be remediated by switching to ultrasonic pre-cleaning.  Second, the entire area lacks biohazard labelling where needed.  Third, and worst of all, the clinic is set up so that clean instruction and work area around the autoclave is set up such that clean instruments—which must be near the chair so the assistant can hand them to the dentist—must be passed across the path where dirty instruments are transported.  This is contrary to the standard of care and risks cross-contamination, placing the patient at increased risk of infection.

       c.    The dentist relies on an ADEC PAC 1 handpiece delivery system that is suitable for temporary use in a mobile clinic, but is not suitable for long-term use.  (It appears to have been in use at the jail since 2007.)  Dr. Coolidge testified that the system cannot maintain enough air pressure to run drilling tools consistently.  This machine must be  replaced.  The existing unit cannot be used for providing care beyond extractions.

       d.    The backup autoclave system—a machine in Dr. Coolidge's trunk for which there are no sterilization monitoring records—is not consistent with minimal infection control practices.

    24.    The plan still does not address adequate access to dental hygiene supplies.  To more specifically explain our position on access to supplies: Floss Loops are on the Jail's commissary list, with a pack of 30 loops listed at $7.29.  Our expert consulted the manufacturer of Floss Loops and determined that MCJ can purchase them for $1.78 per package of 30 delivered, or $5.51 less than the cost to prisoners.  Inmates need access to basic oral hygiene products like Floss Loops in order to clean in between their teeth and around and under the gums.  The MCJ price for Floss Loops seems excessive and provides a strong disincentive for inmates to exercise proper preventive dental self-care.

---

[6] http://www.cdc.gov/oralhealth/infectioncontrol/faq/aerosols.htm

Susan K. Blitch
Peter G. Bertling
November 19, 2015
Page 16

       Thank you for your attention to these issues.

                           Sincerely,

                           ROSEN BIEN
                           GALVAN & GRUNFELD LLP

                           */s/ Krista Stone-Manista*

                  By:   Krista Stone-Manista

KSM:ksm

[2891284-1]

# Exhibit A



**MINUTES**
**QUALITY ASSURANCE / PEER REVIEW COMMITTEE MEETING**
**MONTEREY COUNTY JAIL & JUVENILE HALL MEDICAL SERVICES**

April 21, 2011

**Members Present:**

- Jeff Budd, Chief of Detention, Monterey County Sheriff's Department
- Jose Ramirez, Probation Department / Juvenile Hall
- Tim Gregory, Probation Department / Youth Center
- Mary Gustus, R.N., Monterey County Public Health Department
- Monica Sweeney, R.N., Monterey County Juvenile Hall, CFMG
- Sandra Gonzales, R.N., Public Health Department
- Scott Miller, Sheriff, Monterey County
- Terri Whiting, PA, CFMG
- Maureen Hollcroft, R.N., Director of Nurses, CFMG
- Kevin Coolidge, DDS, CFMG
- Taylor Fithian, M.D., CFMG
- Kim Spano, LMFT, Mental Health Services, CFMG
- Elaine Hustedt, CFMG Vice President, Operations and Personnel
- Eliud Garcia, M.D., Onsite Medical Director, CFMG
- Dave Harness, R.N., Program Manager, CFMG

The minutes of the previous meeting were reviewed.

**Today's Agenda**

**In-Custody Deaths**

There were no in-custody deaths during the past quarter. Dr. Fithian discussed a recent death that occurred at another contract site involving an individual who probably had methamphetamine toxicity, which resulted in excited delirium and sudden in-custody death.

**Statistical Review**

Program Manager Dave Harness reviewed the statistics for the past quarter. Handouts were disseminated for the adult facility, juvenile hall and youth center. The statistics are attached to the minutes.

**Mental Health Services**

Dr. Fithian gave an overview of mental health services over the past quarter. The socialization program is up and running and meeting the needs of the chronically mentally ill who are in isolation.  The program has proven to be very effective in decreasing management problems and addressing socialization needs for the chronically mentally ill.

Dr. Fithian expressed continued support and appreciation for the relationship with Monterey County Behavioral Health and the Natividad Medical Center Mental Health Unit.  Access to care and continuity of care is facilitated by that cooperation and longstanding partnership.

Dr. Fithian also reviewed two patients who returned from Atascadero State Hospital as trial competent under P.C. 1370.  Those patients remain compliant on treatment.

There was one 5150 that was referred offsite during the past quarter, and one individual who was transferred offsite under P.C. 4011.6.

At all times a number of inmates remain in custody who are pending transfer either to the state hospital system under P.C. 1368 or to the Natividad Medical Center Behavioral Health Unit under P.C. 1370.

**Public Health**

Mary Gustus noted that there is an increase in contact investigations involving tuberculosis.

Sandra Gonzales talked about an increased prevalence of measles.  She also stated that a Tdap clinic would be instituted.

Monica Sweeney stated that minors are given Tdap at the time of their 96-hour assessment.  The vaccines are received from Public Health once a week and those that are not utilized are returned to Public Health.

Dr. Fithian discussed a case that he is involved with as an expert regarding tuberculosis.  Dr. Fithian emphasized the importance of dating and timing the application of TB skin tests and when they are read.  A minimum of 48 hours between application and reading of tests is mandatory.

**Pharmacy**

Dave Harness reported that the annual pharmaceutical inspection occurred in February at all three facilities, the jail, juvenile hall, and youth center.  The report has been provided to Probation and will be given to Chief Budd.

CFMG 002536

**Sheriff's Department**

Sheriff Miller stated that from his standpoint things are going well. He reported that the suit that was pending regarding an in-custody death involving Mr.        as gone to a claim against the county.

Chief Budd also noted that things are going well and he is not aware of any significant issues at this time.

**Probation:**



**Dental:**

Dr. Kevin Coolidge had no issues to report. He stated that there are enough dental needs among the adult population to require a fulltime dentist. Apparently there is no end to the dental needs for this population. Those needs that are urgent and emergent are addressed. Protocols are utilized to treat those individuals who complain of dental pain until the dentist can see them.

Dr. Coolidge briefly discussed what he called a "dental crisis" throughout California in addressing the dental needs of youth.

**Grievances**

Dave Harness discussed the grievances for the past quarter. There were a total of 70 grievances for the past three months. Two of those were sustained. There were no trends or patterns.

**CQI**

Internal audits continue to be done by our medical providers.

Dave Harness reported that a joint audit between medical and custody staff addressing sobering cells and safety cell placement was done and there were no major issues. He stated that a couple of cases were reviewed in which the mental health provider was not contacted. He will address that in a corrective action plan.

There was no additional business and the meeting was adjourned.

Taylor Fithian, M.D.

CFMG 002537

**PEER REVIEW**
**Monterey County**

April 21, 2011


Dr. Fithian reviewed several psychiatric cases.

Dr. Eliud Garcia, Onsite Medical Director, reviewed two cases.

      – This was an individual with a history of alcohol abuse and addiction who had what was probably an alcohol withdrawal seizure. He was transferred to Natividad Medical Center and was in the ICU from 2-13 to 2-23-11. While in the ICU he apparently developed an aspirating pneumonia.

Action/Discussion:

The patient's care onsite was felt to be appropriate. Of note is that the inmate returned to the jail and was bailed out the same day.

      – This individual was booked into the Monterey County Jail on      i. He had a history of an astrocytoma and had been resected and was under the care of a local oncologist. Over the course of his incarceration and over the last two to three weeks there were some mental status changes that were addressed. He had several seizures, which were also addressed. Ultimately      developed some changes in mentation that were unusual. Dr. Garcia and Dave Harness facilitated      being transferred to Salinas Valley Memorial Hospital. He has subsequently been released from custody.

There was no further business and the meeting was adjourned.

Taylor Fithian, M.D.

CFMG 002538



**CFMG**
California Forensic Medical Group
I N C O R P O R A T E D

# AGENDA

## QUALITY ASSURANCE/PEER REVIEW COMMITTEE MEETING

### MONTEREY COUNTY JAIL AND JUVENILE HALL SERVICES

**April 21, 2011**

**12:00 noon**

**A.  QUALITY ASSURANCE**

1.  Introduction

2.  Review of Previous Minutes

3.  Review of Inmate/Minor Deaths

4.  Hospitalized Patients

    a.  Adults
    b.  Juvenile Inmate/Minor Deaths

5.  Statistical Report

6.  Mental Health

7.  Public Health/Infectious Disease

8.  Pharmacy

9.  Sheriff

10.  Probation

11.  Dental Services

12.  Grievances

13.  CQI

14.  Other

**B.  PEER REVIEW**

1.  Review of Medical Records

CFMG 002539

_(Depts)_

care of roots
_____ done

_(state)_

See Herbert
Phull
Sll

_(MW)_

_[illegible handwritten notes]_

CFMG 002540

AJ72 retinee

NJ18 12/7/10 → 2/2/11
[illegible] [illegible]
[illegible]
[illegible]

AJ72 12/7/10 – 2/2/11
[illegible] [illegible]
[illegible]

CFMG 002541

CFMG 002542

CFMG 002543

**CfMG**
California Forensic Medical Group
I N C O R P O R A T E D

## CONFIDENTIALITY AGREEMENT PG 1

Date _____4/21/11_____

Effective peer review and quality assurance cannot be achieved unless the confidentiality of all discussions, deliberations, records and other information generate connection with these activities is maintained. Such confidentiality is necessary to ensure the candid participation of members in these activities, which are critic important for the evaluation and improvement of the quality of care rendered.

Please respect and maintain the confidentiality of all discussion, deliberations, records and information related to these activities and do not disclose voluntarily any information to anyone, except to persons authorized to receive it in the conduct of Quality Assurance affairs or as directed by this committee. Any questions regard whether information is confidential may be directed to the Chairman of the Quality Assurance Committee.

The Quality Assurance and Peer Review Committee is entitled to take such action as deemed appropriate to ensure that the confidentiality of all such informatic preserved. Any breach of this agreement or threatened breach of this agreement may subject the individual to legal action to prevent such disclosure, as wel corrective action.

| Print Name | Department | E-mail Address | Phone # | Signature |
|---|---|---|---|---|
| Dave Harness | CFMG | dharness@cfmg.com | 831-755-3885 | |
| Davithia Salisbury | MCHD | salisburydm@co.monterey.ca.us | 831-755-4718 | |
| ~~Doug Rieffel~~ | ~~Probation / JH~~  RETIRED | rieffeld@co.monterey.ca.us | 831-759-7276 | |
| Elaine Finnberg | CFMG | finnberg@sbcglobal.net | 831-772-0158 | |
| Elaine Hustedt | CFMG | elaine@cfmg.com | 831-649-8994 | Elaine Hustedt |
| Eluid Garcia | CFMG | elgarcia@montereybay.com | | |
| Fabian Barrera | MCSO | barreraf@co.monterey.ca.us | | |
| Jeff Budd | MCSO | buddj@co.monterey.ca.us | 831-755-3858 | Chief Dep. 753-3943 |
| Jose Ramirez | Probation | Ramirezj2@co.monterey.ca.us | ~~831-796-1253~~ | |
| Kevin Coolidge | CFMG | Kevin.coolidge@gmail.com | ~~415-730-2819~~ | 415-730-2814 |
| Kim Spano | CFMG | kimspano@aol.com | 831-755-3885 | Kim Sp |
| Marcela Broe | MCHD | broeme@co.monterey.ca.us | 831-796-1279 | |
| Mary Gustus | MCHD | gustusmd@co.monterey.ca.us | 831-796-1298 | Mary W Gustus |
| ~~Mike McNew~~ | ~~Probation~~ | mcnewm@co.monterey.ca.us | 831-277-3099 | |
| Monica Sweeny | MCJH | | 831-755-3925 | m Sweeny P |
| Pat Hunton | MCSO | huntonp@co.monterey.ca.us | 831-755-3879 | RETIRED |
| Richard Gray | Probation | grayr@co.monterey.ca.us | | |
| Sandra Gonzales | MCHD - Communicable Disease | sandraf.g@co.monterey.ca.us | 831-755-8973 | Sandra Gay |



**CFMG**
California Forensic Medical Group
I N C O R P O R A T E D

## CONFIDENTIALITY AGREEMENT PG 2

Date _____4/4/14_____

Effective peer review and quality assurance cannot be achieved unless the confidentiality of all discussions, deliberations, records and other information generate
connection with these activities is maintained. Such confidentiality is necessary to ensure the candid participation of members in these activities, which are critic
important for the evaluation and improvement of the quality of care rendered.

Please respect and maintain the confidentiality of all discussion, deliberations, records and information related to these activities and do not disclose voluntarily any
information to anyone, except to persons authorized to receive it in the conduct of Quality Assurance affairs or as directed by this committee. Any questions regard
whether information is confidential may be directed to the Chairman of the Quality Assurance Committee.

The Quality Assurance and Peer Review Committee is entitled to take such action as deemed appropriate to ensure that the confidentiality of all such informatic
preserved. Any breach of this agreement or threatened breach of this agreement may subject the individual to legal action to prevent such disclosure, as well as correc
action.

| Print Name | Department | E-mail Address | Phone # | Signature |
|---|---|---|---|---|
| Scott Miller | MCSO | millersk@co.monterey.ca.us | | _Miller_ |
| Taylor Fithian | CFMG | taylor@cfmg.com | 831-649-8994 | |
| Terry Whiting | CFMG | Botoxgirl1@gmail.com | 951-796-3536 | |
| TIM GREGORY | PROBATION YOUTH CENTER | gregoryT@co.monterey.ca.us | 831-786-1253 | |
| MAUREEN HOLLERAN | CFMG | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CFMG 002544

# Exhibit B



MINUTES
**QUALITY ASSURANCE / PEER REVIEW COMMITTEE MEETING**
**MONTEREY COUNTY JAIL & JUVENILE HALL MEDICAL SERVICES**

August 30, 2012

**Members Present:**

- Maureen Hollcraft, RN, Director of Nurses, CFMG
- Monica Sweeny, Monterey County Juvenile Hall
- Robert Jackson, Monterey County Behavioral Health
- Sandra Gonzales, Monterey County Health Department
- Tamera DeLeon, CFMG
- Terry Whiting, PA, CFMG
- Troy Banuelos, Monterey County Probation Department
- Zonelle Cantu, Monterey County Health Department
- Joe Grammatico, Monterey County Probation Department
- Jose Ramirez, Monterey County Probation Department
- Kevin Coolidge, DDS, CFMG
- Taylor Fithian, MD, CFMG
- Kim Spano, LMFT, Mental Health Services, CFMG
- Mary Gustus, RN, Monterey County Health Department
- Elaine Finnberg, Ph.D., CFMG Mental Health Services
- Eliud Garcia, M.D., Onsite Medical Director, CFMG
- Jeff Budd, Chief of Detention, Monterey County Sheriff's Department
- Dave Harness, RN, Program Manager, CFMG

Introductions were made, and the confidential nature of the meeting was reviewed with all in attendance.

The minutes of the previous meeting were reviewed and the following was noted.

**Old Business:**

1. Update – CMA IMQ Accreditation

Barbara Cotton is here today, doing her pre-survey evaluation.  The findings will be addressed after their receipt.

2. Fulltime Psychiatric RN

CFMG 002583

A candidate has been selected for the fulltime psychiatric RN position. It was noted that the candidate has experience in the correctional mental health setting, and is currently just pending a background check.

<u>Today's Agenda</u>

**In-Custody Deaths:**

There were no in-custody deaths during the past quarter.

**Hospitalized Patients:**

The case of (             , who is currently an in-patient at Natividad Medical Center with a polydrug ingestion and overdose, was reviewed. His case brought up the point from Mr. Harness that an investigation regarding his medications is being looked into, and that a need to enhance both medical and custody staff assistance in checking that patients are ingesting their medications was stated.

**Statistical Review**

Handouts were disseminated for the facilities and they are attached in the minutes. Of note were a couple of statistics that stood out, including the doubling of reported ectoparasites/scabies for the month of July, and this was discussed.

**Mental Health Services**

Elaine Finnberg remarked about the busy nature of our services requests. She noted that a particular problem was inmates coming to jail on psychiatric meds after usually single doctor visits on the outside, and that often these meds require detox treatment. She noted that most of the inmates she sees were felt to have an adjustment problem more than a psychiatric disorder. Kim Spano supported those thoughts, noting the difficulty of patients feeling entitled to non-necessary medications.

**Public Health / Infectious Disease**

Mary Gustus reported that Jacqueline Sedgwick, MD, has taken over in the position of the recently retired Dr. Tezak. She noted that other staffing is unchanged. Mary also noted that her TB department is following eleven active cases with several contacts each. Sandra Gonzales noted that her STD/Communicable Disease department has seen an increase in active syphilis cases, particularly in males having sex with males population. Dr. Garcia reviewed the newly released treatment guidelines from the CDC on gonorrhea. In particular those guidelines state that for uncomplicated genital, rectal, and pharyngeal gonorrhea, the CDC recommends a combination therapy with Ceftriaxone 250 mg. as a single IM dose, plus Azithromycin one gram orally in a single dose. It is noted that Cefixime 400 mg orally can be used in place of Ceftriaxone if not available, but because of increased resistance with Cefixime, Ceftriaxone is preferred, and that Doxycycline 100

CFMG 002584

mg. twice a day for seven days can be used in place of the Azithromycin one gram orally as a single dose, but again the Azithromycin is preferred.  In the case where an allergy exists to cephalosporins, the CDC recommends a single two-gram dose of Azithromycin orally.  Also in the guidelines is a new suggested requirement testing for cure one week after treatment.   This can be done with standard urine testing for asymptomatic individuals, but in symptomatic individuals' pre-treatment, a culture should be obtained one week after treatment to again test for cure.

**Pharmacy:**

New pharmaceutical services from the Diamond Corporation of Pennsylvania will be starting September 1, 2012.  The change was made because of an improved pricing structure.  The challenges that may exist would be a need to improve our ordering as the next day receipt of medications that we have been used to with ANB Pharmacy will not be as likely with this new service.

**Sheriff's Department**

Captain Jeff Budd presented several issues.  The number of AB 109 inmates has reached 185.  Of those, most are 1170H inmates long-term at half time sentences, the so-called non non nons; however, there are currently several 3056 (parole violators), 47 of them unsentenced, 55 doing 90 days.  The other class of AB 109, the 3454 and 3455 so-called flash incarcerations has not been a problem as there are very few.

Captain Budd noted that there are three long-term sentenced inmates serving 7 ½ year sentences here at Monterey County Jail, and he will hopefully be transferring those to Delano when an agreement has been worked out.

Captain Budd also noted a newly passed assembly bill that allows for an early release kick of ten percent up to a maximum of 30 days for those inmates sentenced for a year or more.  He anticipates going through the rolls and taking those inmates out of custody as soon as possible.

In a review of the grievance process, Captain Budd stated that he feels the EEOC is being used as an extension of the grievance process without any other benefit, and will look into whether its use will be further continued.

Captain Budd stated that forty million dollars in funding has been secured for a new 288-bed medium to maximum security wing here at Monterey County Jail.  It is expected to be two tiers with double cells.  A medical treatment room will be in the wing and he expects that it will be built in approximately four years.

An ending note from Captain Budd was that he will be retiring on December 28, 2012 and is looking forward to that.
**Probation:**

**Dental Services:**

Dr. Kevin Coolidge commented on his own statistics.  There are approximately 40 plus on his list every week; of that he is able to see about 25 inmates in his single day a week practice here at Monterey County Jail.  Of those 25, he is noting seven are AB 109 patients.  Also of note is that Dave Harness and Dr. Coolidge have changed the standardized procedure for treatment of dental abscesses to include a bid versus qid dosing schedule for penicillin, and again those will be instituted in the nursing standardized procedure manual.

**Grievances**

The month of July saw a doubling up to 42 grievances.  Most of those were felt to be non-sustainable grievances that relate to issues already discussed.  The possibility of a special session to address particularly difficult inmates and grievances is being investigated by Dr. Garcia with Mr. Harness and other members of the medical staff to hopefully include custody commander staff as well.

**CQI**

As mentioned earlier, Barbara Cotton is here on August 30, 2012 doing her pre-survey IMQ evaluation.  Also of note is that monthly audits continue to be done by Dr. Garcia for medical, Dr. Fithian for psychiatric, and Maureen jointly with custody staff.  Ida Parker also does general chart audits on a monthly basis as well.  Dr. Castellanos, who does peer review, is being scheduled for this next quarter.

**Other:**

Robert Jackson from Behavioral Health was in attendance and gave a follow-up report of a prior inmate patient of ours, _____, who again currently is at Patton State Hospital with two to one staffing, maintained in chains, and placed to sleep in five-point restraints.  Despite this and what is considered maximum dosing of medications, he has assaulted 28 staff members and is being transferred to a different facility as they feel they are unable to care for him there.

Mr. Jackson also noted that two grants have been received, one to establish a physical medical practitioner at the behavioral health clinic, and the second to start an early intervention program with acronym PREP for first break psychiatric patients in the 15 to

27-year-old age group to initiate early treatment. He also noted that in response to AB 109 there has been increased staffing at the probation department clinic where they operate psych services.

Dr. Garcia announced that CFMG had been awarded the contract in Santa Cruz County for medical services, and that that was due to start on September 14, 2012, which makes 26 counties where CFMG is the provider.

Also noted was that Stanislaus County, which had been a long-term 20-year contact with CFMG that had been changed with the advent of a new sheriff four years ago, is currently up for bid and CFMG has been invited to enter that process.

The third item noted was that STC training has started, two sessions, July 23 and August 6, 2012 have been completed, with four remaining sessions on September 25, October 8 and 9, 2012, and a final January 7, 2013.

There being no further business the meeting was adjourned.

Eliud Garcia, M.D.


Attachments:
Statistics



**CFMG**
California Forensic Medical Group
I N C O R P O R A T E D

# AGENDA

### QUALITY ASSURANCE/PEER REVIEW COMMITTEE MEETING

### MONTEREY COUNTY JAIL AND JUVENILE HALL SERVICES

**August 16, 2012**

**12:00 noon**

---

**A.    QUALITY ASSURANCE**

1.    Introduction

2.    Review of Previous Minutes

3.    Review of Inmate/Minor Deaths

4.    Hospitalized Patients

      a.    Adults
      b.    Juvenile Inmate/Minor Deaths

5.    Statistical Report

6.    Mental Health

7.    Public Health/Infectious Disease

8.    Pharmacy

9.    Sheriff

10.    Probation

11.    Dental Services

12.    Grievances

13.    CQI

14.    Other

**B.    PEER REVIEW**

1.    Review of Medical Records

CFMG 002588



**CFMG**
California Forensic Medical Group
INCORPORATED

*next QA 11/15*

## CONFIDENTIALITY AGREEMENT PG 1
### Date  8/16/10

Effective peer review and quality assurance cannot be achieved unless the confidentiality of all discussions, deliberations, records and other information generated in connection with these activities is maintained.  Such confidentiality is necessary to ensure the candid participation of members in these activities, which are critically important for the evaluation and improvement of the quality of care rendered.

Please respect and maintain the confidentiality of all discussion, deliberations, records and information related to these activities and do not disclose voluntarily any such information to anyone, except to persons authorized to receive it in the conduct of Quality Assurance affairs or as directed by this committee.  Any questions regarding whether information is confidential may be directed to the Chairman of the Quality Assurance Committee.

The Quality Assurance and Peer Review Committee is entitled to take such action as deemed appropriate to ensure that the confidentiality of all such information is preserved.  Any breach of this agreement or threatened breach of this agreement may subject the individual to legal action to prevent such disclosure, as well as corrective action.

| Print Name | Department | E-mail Address | Phone # | Signature |
|---|---|---|---|---|
| Dave Harness | CFMG | dharness@cfmg.com | 831-755-3885 | |
| Davithia Salisbury | MCHD | salisburydm@co.monterey.ca.us | 831-755-4718 | |
| Elaine Finnberg | CFMG | finnberg@sbcglobal.net | 831-772-0158 | |
| Elaine Hustedt | CFMG | elaine@cfmg.com | 831-649-8994 | |
| Eluid Garcia | CFMG | ~~elgarcia@montereybay.com~~ eluid 524 @ gmail.com | 755-3885 | |
| Fabian Barrera | MCSO | barreraf@co.monterey.ca.us | | |
| Jeff Budd | MCSO | buddj@co.monterey.ca.us | 831-755-3859 | |
| Joe Grammatico | Probation | grammaticoj@co.onterey.ca.us | 831-796-1253 | |
| Jose Mendoza | MCSO | mendozajl@co.monterey.ca.us | 831-755-3878 | |
| Jose Ramirez | Probation | Ramirezj2@co.monterey.ca.us | 831-759-7276 | |
| Kevin Coolidge | CFMG | Kevin.coolidge@gmail.com | | |
| Kim Spano | CFMG | kimspano@aol.com | 831-755-3885 | |
| Lynn Maddox | | maddoxlc@co.montery.ca.us | | |
| Marcela Broe | MCHD | broeme@co.monterey.ca.us | 831-796-1279 | |
| Maureen Hollcraft | CFMG | | 831-755-3886 | |
| Mary Gustus | MCHD | gustusmd@co.monterey.ca.us | 831-796-1298 | |
| Max Houser | MCSO | houserma@co.monterey.ca.us | 831-755-3753 | |



CFMG 002589



CFMG
**California Forensic Medical Group**
INCORPORATED

## CONFIDENTIALITY AGREEMENT PG 2

Date _____

Effective peer review and quality assurance cannot be achieved unless the confidentiality of all discussions, deliberations, records and other information generated in connection with these activities is maintained. Such confidentiality is necessary to ensure the candid participation of members in these activities, which are critically important for the evaluation and improvement of the quality of care rendered.

Please respect and maintain the confidentiality of all discussion, deliberations, records and information related to these activities and do not disclose voluntarily any such information to anyone, except to persons authorized to receive it in the conduct of Quality Assurance affairs or as directed by this committee. Any questions regarding whether information is confidential may be directed to the Chairman of the Quality Assurance Committee.

The Quality Assurance and Peer Review Committee is entitled to take such action as deemed appropriate to ensure that the confidentiality of all such information is preserved. Any breach of this agreement or threatened breach of this agreement may subject the individual to legal action to prevent such disclosure, as well as corrective action.

| Print Name | Department | E-mail Address | Phone # | Signature |
|---|---|---|---|---|
| Monica Sweeny | MCJH | | 831-755-3925 | |
| Richard Gray | Probation | grayr@co.monterey.ca.us | | |
| Robert Jackson | Behavioral Health | jacksonrl@co.monterey.ca.us | 755-6351 | |
| Sandra Gonzales | MCHD | sandraf.g@co.monterey.ca.us | 831-755-8973 | |
| Scott Miller | MCSO | millersk@co.monterey.ca.us | 831-755-3750 | |
| Tamera Deleon | CFMG | | 831-796-1254 | |
| Taylor Fithian | CFMG | taylor@cfmg.com | 831-649-8994 | |
| Terry Whiting | CFMG | Botoxgirl1@gmail.com | 951-796-3536 | |
| Tim Gregory | Probation | gregoryt@co.monterey.ca.us | 831-796-1253 | |
| Troy Banuelos | Probation | banuelost@co.montry.ca.us | | |
| Zerelle Carter | MCHD | carter2c@co.monterey.ca.us | 831 755 4552 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CFMG 002590

# Exhibit C



**MINUTES**
**QUALITY ASSURANCE / PEER REVIEW COMMITTEE MEETING**
**MONTEREY COUNTY JAIL & JUVENILE HALL MEDICAL SERVICES**

September 18, 2014

**Members Present**

- Lola Bayer, RN, Director of Nurses, CFMG
- Kevin Coolidge, DDS, Dental Services, CFMG
- Monica Sweeny, Monterey County Juvenile Hall
- Jaimey Lee, CFMG
- Dave Harness, RN, Program Manager, CFMG
- Troy Banuelos, Monterey County Probation Department
- Elaine Hustedt, CFMG
- Irv Grant, County Counsel
- Eliud Garcia, MD, Onsite Medical Director
- Jim Bass, Commander, Monterey County Sheriff's Office
- Tneia Tipton, Juvenile Hall / Youth Center
- Charlotte Gage, RN, CFMG Mental Health Services
- Simone Mevs, CFMG

The attendees were asked to sign the confidentiality agreement and the confidential nature of the meeting was expressed to all in attendance.

The minutes of the prior meeting were reviewed.

**Old Business:**

The case of a five-month pregnant gestational diabetic female who had refused all medical/obstetric care and had been brought up in the last quarter's meeting for possible referral to an administrative law judge was brought up with Mr. Grant from County Counsel. He indicated he had not sought further legal investigation as the patient had been released. In general it was felt that future similar situations would support use of County Counsel for legal support and directing care.

Commander Bass noted that the two civilian positions; an ombudsman, and a re-integration facilitator, mentioned at the last meeting had been filled. Many of us have met both individuals and look forward to having them attend future QA Meetings.

**In-custody Deaths:**

There were no inmate deaths during the past quarter.

**Hospitalized Patients:**

Two cases were briefly reviewed.  One involved a female currently in the obstetrics unit at Natividad Medical Center, who had had a c-section and was due for release back to jail on September 19.  The other is a patient scheduled for an eighteen-week therapeutic AB scheduled at Stanford.

Commander Bass noted that he and the jail chief had a recent meeting with Monterey County Social Services members hoping to facilitate inmate enrollment to Medi-Cal for those hospitalized inmate patients.  This could likely result in significant revenue remuneration for the sheriff's office.  Additionally, future efforts for inmates' Medi Cal enrollment upon release from custody would be a program that would hope to garner support.

**Statistics:**

Dave Harness provided workload statistics and offsite usage numbers for the past quarter. Notable was a sharp rise in EMT referrals related to facial trauma and due to fights and assaults.

Statistical review showed average range of patients seen to be:
65 to 100 patients per workday for medical department's three providers
30 to 40 patients per workday for psychiatric services three to four providers
Average of 45 patients per workday for nursing procedures

The above numbers are done with the custody assistance of one daytime medical deputy and about a three-hour psych dedicated deputy in the morning.  Unfortunately those deputies are sometimes called away.  Commander Bass provided welcome news in light of the obvious need for further deputy assistance, an issue that has frequently been commented on in these QA meetings, that the Board of Supervisors on September 17th voted to fund eleven new deputy positions largely for medical staff support.  Elaine Hustedt noted that Telepsych and Telemed services for infectious diseases and dermatology has been approved by jail staff and will be available in the future further reducing the requirement for off-site transportation need.

**Mental Health:**

Charlotte, Gage, Psychiatric RN provided more specific numbers for the past quarter related to psych services including 831 psychiatrist/psychologist contacts, 1,289 mental health worker contacts.

CFMG 002664

Safety cell placement and clearances of 148 suicide watch, 104 single cell, 40 combative behavior, in addition to others. Also noted were 21 returning patients from the state hospital system in the past quarter. Of particular note is that 17% of Monterey County's jail inmate population is receiving psychiatric medications.

Natividad Medical Center's new policy requiring jail inmate referred patients to their psychiatric inpatient service have 24-hour security and first go through the emergency department for screening was commented on. This has caused significant effect to the jail, in particular custody staff and usually the medical deputy is the person who has recently been asked to provide security for Natividad's hospitalized patients. We are hopeful that relative to Mr. Jackson's prior comments that future policy could be individualized in that all patients certainly are not in need of such security.

Also commented was the fact that Dr. Fithian had stopped doing Court evaluations as of July 1, 2014. However, he has been pressed into service twelve times since July first, as no other professional staff was available to assist with Court evaluations.

**Public Health / Infectious Disease:**

No representatives from Monterey County Public Health Department were present. Lola Bayer, RN, noted that she has reviewed our TB screening program and it is compliant with county public health standards. Also noted was that the May 2014 gastroenteritis outbreak was determined to be Noro Virus. Lola then introduced Simone Mevs, our new physician assistant, and all members welcomed her.

Dave Harness noted that seasonal flu shots have been ordered and should arrive soon.

Monica, RN from juvenile hall noted that the public health department provides flu vaccine for minors and will ask if that could be extended to adults as well.

**Pharmacy**

Dave Harness passed on that Diamond Corporation, our pharmaceutical supplier, has informed him of a pending Haldol Decanoate shortage. He also noted that there are ten inmates on FEQ medications. Most are HIV patients or renal failure patients with specialized medication needs.

**Sheriff's Office**

Commander Bass stated that the grievance process is changing to "an appeal process with medical and non-medical forms." These have recently been provided after careful review by County Counsel, in particular Mr. Grant. Responses from these forms will go to Mr. Da Silva who will process them further taking custody staff out of the appeal/grievance process.

Monterey Co. QA Meeting Minutes 9-30-2014                    Page 3

CFMG 002665

Commander Bass noted that there are nine inmates pending 1368 evaluations, which will tax deputy staffing further.

**Probation/Juvenile Hall**

**Dental**

Dr. Coolidge stated that there are a typical number of 40 patients on his weekly list, and currently he is able to see about 20 of them.

He and his wife are expecting a baby soon and we all wished them very well.

Elaine Hustedt thanked Dr. Coolidge for his work on a dental panel that reviewed and suggested standards for dental services at our jails. Currently questionnaires are out to the counties for input with a hope to have dental care outlines available by December. At the present time Title 15 does not address dental services.

**Grievances**

Dave Harness noted that grievances have been constant at about 30 per month during the past quarter, which equates to a three percent rate. Notable was an increase in grievances specifically related to timeliness and "attributable to access and availability."

**CQI**

Lola thanked custody for "doing what they can" with short staffing. She noted that her audits have demonstrated good outcome numbers.

**Other**

The Sacramento Bee article of September 8, 2014 was summarized for the group. The article related to medical costs from AB 109 inmates, which have both increased the number of inmates in county jails and the number of inmate days in county jails with an associated increase in chronic care and complexity of problems. The article investigators claimed an average for the 58 California counties having an increased cost of medications of 21%, an increased cost of off-site utilization of 32%, equating to an average 53% increase in medical costs, according to the article.

CFMG 002666

Elaine Hustedt commented that in addition to a vote to provide funding for deputy staff at the September 17th Board of Supervisors meeting, the Board of Supervisors also agreed to fund CFMG's  increased positions, which have already been staffed and implemented.

There being no further business the meeting was adjourned.

Respectfully,

Eliud Garcia, MD

Attachments:  None

CFMG 002667

CFMG 002668



**CFMG**
California Forensic Medical Group
INCORPORATED

# AGENDA

## QUALITY ASSURANCE/PEER REVIEW COMMITTEE MEETING

### MONTEREY COUNTY JAIL AND JUVENILE HALL SERVICES

#### September 18, 2014

#### 12:00 noon

---

**A.  QUALITY ASSURANCE**

  1.  Introduction

  2.  Review of Previous Minutes

  3.  Review of Inmate/Minor Deaths

  4.  Hospitalized Patients

    a.  Adults
    b.  Juvenile Inmate/Minor Deaths

  5.  Statistical Report

  6.  Mental Health

  7.  Public Health/Infectious Disease

  8.  Pharmacy

  9.  Sheriff

  10.  Probation

  11.  Dental Services

  12.  Grievances

  13.  CQI

  14.  Other

*Minutes dictated To Julie 9-18-14*

**B.  PEER REVIEW**

  1.  Review of Medical Records

CFMG 002669

# CFMG
**California Forensic Medical Group**
INCORPORATED

## CONFIDENTIALITY AGREEMENT PG 1
Date 9/18/14

Effective peer review and quality assurance cannot be achieved unless the confidentiality of all discussions, deliberations, records and other information generated in connection with these activities is maintained. Such confidentiality is necessary to ensure the candid participation of members in these activities, which are critically important for the evaluation and improvement of the quality of care rendered.

Please respect and maintain the confidentiality of all discussion, deliberations, records and information related to these activities and do not disclose voluntarily any such information to anyone, except to persons authorized to receive it in the conduct of Quality Assurance affairs or as directed by this committee. Any questions regarding whether information is confidential may be directed to the Chairman of the Quality Assurance Committee.

The Quality Assurance and Peer Review Committee is entitled to take such action as deemed appropriate to ensure that the confidentiality of all such information is preserved. Any breach of this agreement or threatened breach of this agreement may subject the individual to legal action to prevent such disclosure, as well as corrective action.

| Print Name | Department | E-mail Address | Phone # | Signature |
|---|---|---|---|---|
| Angela Gladstone | Public Health | GladstoneA@co.monterey.ca.us | | |
| Charles DaSilva | MCSO | DaSilvaC@co.monterey.ca.us | | |
| Charlotte Gage | CFMG | cargage@gmail.com | 831-755-3845 | |
| Dave Harness | CFMG | dharness@cfmg.com | 831-755-3885 | |
| Davithia Salisbury | MCHD | salisburydm@co.monterey.ca.us | 831-755-4718 | |
| Edward Laverone | MCSO | LaveroneER@co.monterey.ca.us | | |
| Elaine Finnberg | CFMG | finnberg@sbcglobal.net | 831-772-0158 | |
| Elaine Hustedt | CFMG | elaine@cfmg.com | 831-649-8994 | |
| Eluid Garcia | CFMG | eliud24@gmail.com | | |
| Irv Grant | County Counsel | granti@co.monterey.ca.us | 831-796-6406 | |
| Jasper DeFranco | MCSO | DefrancoJ@co.monterey.ca.us | | |
| Jim Bass | MCSO | bassjh@co.monterey.ca.us | 831-755-3887 | |
| Joe Grammatico | Probation | grammaticoj@co.onterey.ca.us | 831-796-1253 | |
| Jose Ramirez | Probation | Ramirezj2@co.monterey.ca.us | 831-759-7276 | |
| Kevin Coolidge | CFMG | Kevin.coolidge@gmail.com | | |
| Kristy Michie | MCHD | MichieKJ@co.monterey.ca.us | 831-755-4503 | |
| Lola Bayer | CFMG | l.bayer_3@yahoo.com | 831-801-8422 | |

CFMG 002670

**CFMG**
California Forensic Medical Group
I N C O R P O R A T E D

## CONFIDENTIALITY AGREEMENT PG 2

Date _____

Effective peer review and quality assurance cannot be achieved unless the confidentiality of all discussions, deliberations, records and other information generated in connection with these activities is maintained. Such confidentiality is necessary to ensure the candid participation of members in these activities, which are critically important for the evaluation and improvement of the quality of care rendered.

Please respect and maintain the confidentiality of all discussion, deliberations, records and information related to these activities and do not disclose voluntarily any such information to anyone, except to persons authorized to receive it in the conduct of Quality Assurance affairs or as directed by this committee. Any questions regarding whether information is confidential may be directed to the Chairman of the Quality Assurance Committee.

The Quality Assurance and Peer Review Committee is entitled to take such action as deemed appropriate to ensure that the confidentiality of all such information is preserved. Any breach of this agreement or threatened breach of this agreement may subject the individual to legal action to prevent such disclosure, as well as corrective action.

| Print Name | Department | E-mail Address | Phone # | Signature |
|---|---|---|---|---|
| Maureen Hollcraft | CFMG | | 831-755-3886 | |
| Monica Sweeny | MCJH | | 831-755-3925 | *[signature]* |
| Richard Gray | Probation | grayr@co.monterey.ca.us | | |
| Robert Jackson | MCBH | jacksonrl@co.monterey.ca.us | 831-755-6351 | |
| Sarafina Tomaselli | | TomaselliS@co.monterey.ca.us | | |
| Scott Miller | MCSO | millersk@co.monterey.ca.us | 831-755-3750 | |
| Tamera Deleon | CFMG | | 831-796-1254 | |
| Taylor Fithian | CFMG | taylor@cfmg.com | 831-649-8994 | |
| Tim Gregory | Probation | gregoryt@co.monterey.ca.us | 831-796-1253 | |
| Troy Banuelos | Probation | banuelost@co.monterey.ca.us | | *[signature] T Banuelos* |
| Zonelle Cantu | MCHD | cantuzc@co.monterey.ca.us | 831-755-4582 | |
| Tipton, Tricia | J.H./U.C. | | | |
| Jaimey Lee | CFMG - MFT | | | |
| Simone Mevs | CFMG | msmevs@hotmail.com | 919-434-3360 | *[signature] SMevs* |
| | | | | |
| | | | | |

CFMG 002671



# CONFIDENTIALITY AGREEMENT PG 3

Date _____

Effective peer review and quality assurance cannot be achieved unless the confidentiality of all discussions, deliberations, records and other information generated in connection with these activities is maintained. Such confidentiality is necessary to ensure the candid participation of members in these activities, which are critically important for the evaluation and improvement of the quality of care rendered.

Please respect and maintain the confidentiality of all discussion, deliberations, records and information related to these activities and do not disclose voluntarily any such information to anyone, except to persons authorized to receive it in the conduct of Quality Assurance affairs or as directed by this committee. Any questions regarding whether information is confidential may be directed to the Chairman of the Quality Assurance Committee.

The Quality Assurance and Peer Review Committee is entitled to take such action as deemed appropriate to ensure that the confidentiality of all such information is preserved. Any breach of this agreement or threatened breach of this agreement may subject the individual to legal action to prevent such disclosure, as well as corrective action.

| Print Name | Department | E-mail Address | Phone # | Signature |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CFMG 002672

CFMG 002673

## MONTHLY WORKLOAD STATISTICS 2014
### MONTEREY ADULT FACILITIES

| CATEGORY | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. MEDICATION ADMINISTERED | 6211 | 4854 | 5889 | 5227 | 5817 | 5598 | 6637 | 6077 | | | | | 46310 |
| 2. OTC MEDICATION ADMINISTERED | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | 0 |
| 3. SICK CALL | 1686 | 1205 | 1279 | 1302 | 1279 | 1154 | 1330 | 1007 | | | | | 10242 |
| 4. PHYSICIAN SICK CALL | 333 | 241 | 302 | 203 | 361 | 400 | 335 | 304 | | | | | 2479 |
| 5. DENTAL VISITS/ON-SITE | 119 | 102 | 102 | 95 | 119 | 83 | 83 | 68 | | | | | 771 |
| 6. DENTAL VISITS/ ORAL SURGERY OFF-SITE | 10 | 5 | 5 | 5 | 3 | 7 | 2 | 6 | | | | | 43 |
| 7. EMERGENCY ROOM VISITS | 25 | 17 | 17 | 15 | 18 | 12 | 28 | 14 | | | | | 146 |
| 8. HOSPITAL DAYS | 11 | 3 | 3 | 3 | 2 | 11 | 16 | 3 | | | | | 52 |
| 9. HEALTH INVENTORY | 219 | 192 | 258 | 227 | 266 | 165 | 207 | 344 | | | | | 1878 |
| 10. MENTAL HEALTH WORKER | 347 | 361 | 345 | 277 | 438 | 433 | 418 | 438 | | | | | 3057 |
| 11. PSYCHIATRIC CONTACTS | 307 | 264 | 276 | 270 | 308 | 276 | 385 | 170 | | | | | 2256 |
| 12. TB SCREENINGS | 209 | 148 | 187 | 216 | 248 | 163 | 180 | 241 | | | | | 1592 |
| 13. ON-SITE X-RAYS | 79 | 49 | 61 | 54 | 65 | 133 | 50 | 64 | | | | | 555 |
| 14. OFF-SITE X-RAYS | 5 | 0 | 3 | 4 | 0 | 0 | 0 | 2 | | | | | 14 |
| 15. INFIRMARY DAYS | 65 | 45 | 79 | 64 | 95 | 91 | 83 | 77 | | | | | 599 |
| 16. 6 MONTH PHYSICALS | 0 | 25 | 45 | 0 | 15 | 0 | 22 | 17 | | | | | 124 |
| 17. SPECIALTY SERVICES | | | | | | | | | | | | | 0 |
| A. OBIGYN OFF-SITE | 7 | 12 | 12 | 12 | 7 | 6 | 10 | 15 | | | | | 81 |
| B. ORTHOPEDIC | 15 | 14 | 7 | 12 | 11 | 12 | 4 | 9 | | | | | 84 |
| C. CARDIOLOGY | 0 | 1 | 1 | 1 | 2 | 1 | 2 | 6 | | | | | 14 |
| D. OUTPATIENT SURGERY | 3 | 2 | 2 | 1 | 3 | 6 | 1 | 3 | | | | | 21 |
| E. SCANS (CT/MRI/ULTRA/MAMM) | 6 | 7 | 5 | 0 | 4 | 5 | 9 | 8 | | | | | 44 |
| F. ENT | 3 | 3 | 2 | 4 | 6 | 5 | 6 | 12 | | | | | 41 |
| G. OPTHAMOLOGY | 1 | 3 | 0 | 6 | 4 | 3 | 1 | 4 | | | | | 22 |
| H. OTHER | 21 | 19 | 14 | 17 | 17 | 6 | 18 | 12 | | | | | 124 |
| 18. CONFIRMED COMMUNICABLE DISEASES | | | | | | | | | | | | | 0 |
| A. TB | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | 0 |
| B. HIV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | 0 |
| C. HEPATITIS A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | 0 |
| D. HEPATITIS B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | 0 |
| E. MENINGITIS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | 0 |
| F. STD | 1 | 0 | 0 | 0 | 1 | 3 | 0 | 0 | | | | | 5 |
| G. ECTOPARASITES | 4 | 3 | 6 | 11 | 7 | 5 | 6 | 7 | | | | | 49 |
| H. OTHER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | 0 |
| 19. INCIDENTS | | | | | | | | | | | | | 0 |
| A. INMATE DEATHS | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | 2 |
| B. INMATE GRIEVANCES | 54 | 11 | 16 | 36 | 29 | 32 | 30 | 28 | | | | | 236 |
| C. SUICIDE ATTEMPTS | 0 | 0 | 2 | 1 | 1 | 2 | 0 | 0 | | | | | 6 |
| AVERAGE INMATE POPULATION | 974 | 924 | 960 | 928 | 1002 | 986 | 1017 | 1008 | | | | | 974.88 |

CFMG 002674

| MONTHLY WORKLOAD STATISTICS 2014 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MONTEREY JUVENILE HALL | | | | | | | | | | | | | |
| CATEGORY | JAN | FEB. | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD TOTALS |
| 1. MEDICATION ADMINISTERED | | | | | | | | | | | | | |
| 2. OTC MEDICATION ADMINISTERED | | | | | | | | | | | | | |
| 3. SICK CALL | | | | | | | | | | | | | |
| 4. PHYSICIAN SICK CALL | | | | | | | | | | | | | |
| 5. DENTAL VISITS/ON-SITE | | | | | | | | | | | | | |
| 6. DENTAL VISITS/ ORAL SURGERY OFF-SITE | | | | | | | | | | | | | |
| 7. EMERGENCY ROOM VISITS | | | | | | | | | | | | | |
| 8. HOSPITAL DAYS | | | | | | | | | | | | | |
| 9. HEALTH INVENTORY | | | | | | | | | | | | | |
| 10. MENTAL HEALTH WORKER | | | | | | | | | | | | | |
| 11. PSYCHIATRIC CONTACTS | | | | | | | | | | | | | |
| 12. TB SCREENINGS | | | | | | | | | | | | | |
| 13. ON-SITE X-RAYS | | | | | | | | | | | | | |
| 14. OFF-SITE X-RAYS | | | | | | | | | | | | | |
| 15. INFIRMARY DAYS | | | | | | | | | | | | | |
| 16. 6 MONTH PHYSICALS | | | | | | | | | | | | | |
| 17. SPECIALTY SERVICES | | | | | | | | | | | | | |
| A. OB\GYN OFF-SITE | | | | | | | | | | | | | |
| B. ORTHOPEDIC | | | | | | | | | | | | | |
| C. CARDIOLOGY | | | | | | | | | | | | | |
| D. OUTPATIENT SURGERY | | | | | | | | | | | | | |
| E. SCANS (CT/MRI/ULTRA/MAMM) | | | | | | | | | | | | | |
| F. ENT | | | | | | | | | | | | | |
| G. OPTHAMOLOGY | | | | | | | | | | | | | |
| H. OTHER | | | | | | | | | | | | | |
| 18. CONFIRMED COMMUNICABLE DISEA | | | | | | | | | | | | | |
| A. TB | | | | | | | | | | | | | |
| B. HIV | | | | | | | | | | | | | |
| C. HEPATITIS A | | | | | | | | | | | | | |
| D. HEPATITIS B | | | | | | | | | | | | | |
| E. MENINGITIS | | | | | | | | | | | | | |
| F. STD | | | | | | | | | | | | | |
| G. ECTOPARASITES | | | | | | | | | | | | | |
| H. OTHER | | | | | | | | | | | | | |
| 19. INCIDENTS | | | | | | | | | | | | | |
| A. INMATE DEATHS | | | | | | | | | | | | | |
| B. INMATE GRIEVANCES | | | | | | | | | | | | | |
| C. SUICIDE ATTEMPTS | | | | | | | | | | | | | |
| AVERAGE INMATE POPULATION | | | | | | | | | | | | | |

CFMG 002675

## MONTHLY WORKLOAD STATISTICS 2014
### MONTEREY JUVENILE TREATMENT CENTER

| CATEGORY | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. MEDICATION ADMINISTERED | | | | | | | | | | | | | |
| 2. OTC MEDICATION ADMINISTERED | | | | | | | | | | | | | |
| 3. SICK CALL | | | | | | | | | | | | | |
| 4. PHYSICIAN SICK CALL | | | | | | | | | | | | | |
| 5. DENTAL VISITS/ON-SITE | | | | | | | | | | | | | |
| 6. DENTAL VISITS/ ORAL SURGERY OFF-SITE | | | | | | | | | | | | | |
| 7. EMERGENCY ROOM VISITS | | | | | | | | | | | | | |
| 8. HOSPITAL DAYS | | | | | | | | | | | | | |
| 9. HEALTH INVENTORY | | | | | | | | | | | | | |
| 10. MENTAL HEALTH WORKER | | | | | | | | | | | | | |
| 11. PSYCHIATRIC CONTACTS | | | | | | | | | | | | | |
| 12. TB SCREENINGS | | | | | | | | | | | | | |
| 13. ON-SITE X-RAYS | | | | | | | | | | | | | |
| 14. OFF-SITE X-RAYS | | | | | | | | | | | | | |
| 15. INFIRMARY DAYS | | | | | | | | | | | | | |
| 16. 6 MONTH PHYSICALS | | | | | | | | | | | | | |
| 17. SPECIALTY SERVICES | | | | | | | | | | | | | |
| A. OBIGYN OFF-SITE | | | | | | | | | | | | | |
| B. ORTHOPEDIC | | | | | | | | | | | | | |
| C. CARDIOLOGY | | | | | | | | | | | | | |
| D. OUTPATIENT SURGERY | | | | | | | | | | | | | |
| E. SCANS (CT/MRI/ULTRA/MAMM) | | | | | | | | | | | | | |
| F. ENT | | | | | | | | | | | | | |
| G. OPTHAMOLOGY | | | | | | | | | | | | | |
| H. OTHER | | | | | | | | | | | | | |
| 18. CONFIRMED COMMUNICABLE DISEASES | | | | | | | | | | | | | |
| A. TB | | | | | | | | | | | | | |
| B. HIV | | | | | | | | | | | | | |
| C. HEPATITIS A | | | | | | | | | | | | | |
| D. HEPATITIS B | | | | | | | | | | | | | |
| E. MENINGITIS | | | | | | | | | | | | | |
| F. STD | | | | | | | | | | | | | |
| G. ECTOPARASITES | | | | | | | | | | | | | |
| H. OTHER | | | | | | | | | | | | | |
| 19. INCIDENTS | | | | | | | | | | | | | |
| A. INMATE DEATHS | | | | | | | | | | | | | |
| B. INMATE GRIEVANCES | | | | | | | | | | | | | |
| C. SUICIDE ATTEMPTS | | | | | | | | | | | | | |
| AVERAGE INMATE POPULATION | | | | | | | | | | | | | |

CFMG 002676



Grievance Trending
May - September 2014

Availiability & Access
5%

Appropriatness
11%

Acceptability to Patient
25%

Effectiveness
22%

Timeliness
11%

Efficiency
6%

Safety
0%

Coordination of Care
20%

- Availiability & Access
- Appropriatness
- Effectiveness
- Efficiency
- Safety
- Coordination of Care
- Timeliness
- Acceptability to Patient



Off-site Utilization
May 2014 - August 2014

Surgical Services
32%

Miscellaneous Services
21%

Women's Health Services
9%

Primary Care
8%

Emergency Services
17%

Diagnostic Services
8%

Off-site Dental Services
5%

CFMG 002677

# Exhibit D

## Joan McMaster

| | |
|---|---|
| **From:** | Elaine Hustedt <Elaine@cfmg.com> |
| **Sent:** | Thursday, February 19, 2015 12:50 AM |
| **To:** | Jemma Saunders; Peter Bertling |
| **Subject:** | FW: Task Force recommendations |

---

**From:** Taylor Fithian
**Sent:** Saturday, April 05, 2014 9:14 AM
**To:** wmreuss@sbcglobal.net
**Cc:** Elaine Hustedt; Ronni Brown-Kimbrew; Kevin Coolidge; James Roemmich; Jodel@cfmg.com; Dan Hustedt; Kip Hallman; Donald Myll
**Subject:** Re: Task Force recommendations

Drs. Reuss, Brown, and Coolidge we will be positive in our approach and commitment to enact the recommendations of your task force. The next step is further review by Elaine and me, then by our entire executive team. I'm hopeful by the end of April we will have some answers and a course action. We obviously need to bring us all together again. Best as always, Taylor

Sent from my iPhone

On Apr 5, 2014, at 7:36 AM, "wmreuss@sbcglobal.net" <wmreuss@sbcglobal.net> wrote:

> Thank you Dr. Fithian for your encouragement. We must face the challenges before us as a united team. My prayer for you, Elaine, and Don will be vision, wisdom, endurance, and peace as you lead and guide through these changing times. Bill
>
> Sent from Windows Mail
>
> **From:** Taylor@cfmg.com
> **Sent:** Friday, April 4, 2014 7:48 PM
> **To:** wmreuss@sbcglobal.net
> **Cc:** Elaine@cfmg.com, Ronni Brown-Kimbrew, Kevin Coolidge, James Roemmich, Jodel@cfmg.com, Dan Hustedt
>
> Dr. Reuss, thank you! Never a doubt of where you stand. Thanks for being a colleague. Taylor
>
> Sent from my iPhone
>
> On Apr 4, 2014, at 6:48 PM, "wmreuss@sbcglobal.net" <wmreuss@sbcglobal.net> wrote:
>
>> Thank you Taylor for your prompt reply. Ronni, Kevin, and I have been working on this assignment for five plus months so for us it has been upper most in our conscious for awhile. I understand it is necessary for you, Elaine, and Dan to fully comprehend our recommendations and consider all consequences before initiating action. You are a busy trio with much to do. We believe three local pilot

CFMG 078399

trials would reduce risk, create information and documentation to guide and support future decisions regarding state wide implementation.

I am all for what is in the best interests of inmate dental health, CFMG contract obligations, reduction of risk liability, and provider/staff moral.

Sincerely, Bill

Sent from Windows Mail

**From:** Taylor@cfmg.com
**Sent:** Friday, April 4, 2014 10:53 AM
**To:** wmreuss@sbcglobal.net
**Cc:** Elaine@cfmg.com, Ronni Brown-Kimbrew, Kevin Coolidge, James Roemmich, Jodel@cfmg.com, Dan Hustedt

Dr. Reuss I just got the the proposal yesterday, no one else has had a chance to even look at it. We can not make contract amendments or changes overnight. We will review the recommendations of the Task Force and try to implement then. Thanks for your work at many levels. I'm sure that Dan will respond as Elaine. Taylor

Sent from my iPhone

On Apr 4, 2014, at 9:06 AM, "wmreuss@sbcglobal.net" <wmreuss@sbcglobal.net> wrote:

> Taylor and Elaine
>
> I would like to offer my emphasis to Kevin's presentation of the Task Force recommendations to both of you.
>
> Ronni, Kevin, and I are in full agreement that it is urgent to initiate tangible progress in updating our policies and procedures for the delivery of dental care in all CFMG facilities. Inmates with sentences greater than six months need dental care beyond the scope of our current policy/procedures. Each week I see urgent needs that beg attention but go untreated because of current policy. This fact heightens our professional/corporate risk exposure. Our recommendation is to immediately initiate three pilot programs to develop/test/document updated dental policy/procedures. At Shasta that would include dental screening by RDA.
>
> I am feeling the pressure of professional liability risks due to escalating numbers of dental visits each week. In all my professional dental career (42 years), I have never worked harder.  Melinda my RDA feels the same. We need more hours to

CFMG 078400

provide timely care to urgent dental needs. I have offered a proposal (Dental Screening by RDA) that would significantly reduce costs and improve efficiency. This also equates to reduced stress, reduced liability risk, and boosted moral. This escalation in requests for dental care is an established continuing pattern. I believe my colleagues would reflect like feelings.

It is my strong recommendation to initiate immediately three pilot programs. More could be said but our recommendations await your response.

Respectfully,


William M. Reuss III, D.D.S.



Sent from Windows Mail

# Exhibit E



**MINUTES**
**QUALITY ASSURANCE / PEER REVIEW COMMITTEE MEETING**
**MONTEREY COUNTY JAIL & JUVENILE HALL MEDICAL SERVICES**

May 29, 2014

**Members Present**

- Angie Gladstone, RN, Monterey County Public Health
- Terry Whiting, PA, CFMG
- Zonell Cantu, RN, Monterey County Health Department
- Lola Bayer, RN, Director of Nurses, CFMG
- Kevin Coolidge, DDS, Dental Services, CFMG
- Monica Sweeny, Monterey County Juvenile Hall
- Jaimey Lee, CFMG
- Taylor Fithian, MD, CFMG
- Robert Jackson, Monterey County Behavioral Health-Natividad Medical Center
- Tamara DeLeon, LVN, CFMG
- Dave Harness, RN, Program Manager, CFMG
- Troy Banuelos, Monterey County Probation Department
- Elaine Hustedt, CFMG
- Irv Grant, County Counsel
- Eliud Garcia, MD, Onsite Medical Director
- Jim Bass, Commander, Monterey County Sheriff's Office
- Joe Grammatico, Monterey County Probation Department
- Jose Ramirez, Monterey County Probation Department
- Charlotte Gage, RN, CFMG Mental Health Services

Introductions were made and the confidential nature of the meeting was expressed to all in attendance.

The minutes of the previous meeting were reviewed. Elaine Hustedt noted that there was a misspelling on page two, number four for Dr. Puissus.

**Deaths**

External peer review was done by Dr. Paul Genstler reviewing in-custody deaths of the past year. Four cases were reviewed. In general all four reviews noted that medical care was appropriate; however, recommendations to include vital signs with each visit and a check of oxygen saturation for patients with pulmonary symptoms was made and agreed.

CFMG 002653

**Hospitalized Patients**

The medical cases of (1)                 . with end stage liver disease and hepatic encephalopathy; (2) I                 with a drug-related cardiomyopathy and right sided heart failure; (3) Ha Tran Cobb with Staghorn Calculus and recurrent nephrostomy and lithotripsy treatments, and (4) Angel Perez with right foot tumor status post excision were reviewed.

**Juvenile Hall**

**Statistics**

Dave Harness reviewed workload statistics and off-site usage in the past quarter.  Reports were provided to members and are included in this packet.  Notable was an increase in administered medications at the Youth Center that will be followed.  Two grievances at juvenile hall were noted and those issues were addressed.

Jose Ramirez commented on a juvenile inmate who ·

**Mental Health Services**

Psychiatric RN Charlotte Gage introduced new therapist Jaimey Lee to the group. Jaimey outlined her experience in correctional mental health, and was welcomed.

Dr. Fithian expressed gratitude to the psych staff and Natividad psychiatric services in caring for a very challenging patient population.  Noted were the increase in safety cell use, and the 1368 transfers taking an average of 90 days.  Psychiatric services in the jail are getting to patients quickly, which is far better than psych patients at large receive in the community.

Robert Jackson from Natividad psych services noted that his department has seen an increase in violent patients, and reviewed the case of a jail referred patient who was medicated for agitation, slept sixteen hours, and upon awakening attacked another patient.  The case prompted a review by the state and Natividad Medical Center to place a policy that all Monterey County Jail inmate patients have 24-hour security, and that they go through the emergency department for a screening evaluation before admission to the

CFMG 002654

psychiatric department. Mr. Jackson said he hopes that policy can be individualized, as it is certainly not necessary for all patients. Both Mr. Jackson and Commander Bass commented on how that will slow the process for patients. It is estimated that 20 or 30 patients are referred from Monterey County to Natividad inpatient psych department yearly.

Commander Bass noted the increase in violent inmates with a recent assault on a deputy staff member. Elaine Hustedt asked about using telepsychiatry to limit patient transfers. Commander Bass commented that the current jail chief is not in favor but they will review and discuss with county counsel.

**Public Health**

Zonell Cantu and Angie Gladstone from Monterey County Public Health Department brought up several issues.

Pertussis in Monterey County is at epidemic levels with 57 new case reports since January, and over 1700 cases statewide. Most cases, approximately 89%, are in the under 18-year-old population. Tdap vaccine has not been as effective as expected. Usual effectiveness seems to be lasting only about three years. Current state recommendations are to provide Tdap vaccinations with each pregnancy.

Measles, 49 cases in California this year, over 200 nationally. It appears to be a travel-related communicable disease due to a large outbreak in the Philippines, however, there are two cases of non-immunized measles. This is under large-scale state investigation.

Tuberculosis The county has a new TB supervisor who is currently very busy. We will invite her to our next QA meeting.

Salmonella There is an active and ongoing issue under investigation with 500 total cases, 400 in California related to Foster Farms chickens. There have been no deaths due to Salmonella poisoning.

Corona Virus – MRS There are no current cases in Monterey County; however surveillance continues.

**Pharmacy**

Dave Harness mentioned that Diamond Corporation, our pharmaceutical supplier, will no longer be mailing Actifed to California. This is thought to be related to tighter regulations on pseudoephedrine, which is used as a precursor molecule in the manufacture of methamphetamine. Also Warfarin supply will be changed to a different manufacturer but should not affect supply.

CFMG 002655

**Sheriff's Department**

Commander Bass commented more on the deputy assault by Norteno inmates and noted that that has caused changes in jail policy. There will now be two deputies at each station and inmate movement within the jail will occur with inmates handcuffed or in belly chains. The sheriff will be asking for increased staff and funding for staff due to the heightened security needs. Commander Bass noted that there was a "change in the caliber of inmates" with more violent acts. He feels this is largely related to AB 109 incarcerants. Commander Bass also noted in-custody depositions are ongoing regarding the class action suit noted as Hernandez.

Dr. Fithian reiterated how telepsychiatry and telemedicine services would limit inmates being taken off-site and hopes that the chief will consider that aspect when reviewing telemed services. It was learned that the assaulted deputy has facial lacerations and a concussion but is doing okay and an expression to wish him well was made by medical staff.

**Probation/Juvenile Hall**

**Dental**

Dr. Kevin Coolidge noted how inmates with prolonged stays are requiring time-consuming services, mostly teeth cleaning and prophylaxis. Dr. Fithian noted that a dental committee including Dr. Coolidge has gathered and provided recommendations for inmate care for those in custody longer than twelve months. He said that CFMG staff are currently reviewing those recommendations and will have those out soon.

**Grievances**

Dave Harness noted that there has been a decrease over the past quarter in grievances filed. He notes that most grievances reflect unhappiness on the part of the inmate with not getting a particular treatment, especially a particular medication. Commander Bass stated that he is currently interviewing for two civilian positions. One is an omsbudsman to collect and track grievances. The other is a community reintegration facilitator for community programs. There is one candidate currently in the background checks for those positions.

CFMG 002656

**CQI**

Usual ongoing physician chart reviews and directive nursing, sobering cell reviews continue.  Dr. Hayward was here last week for a second look at psych services, with nothing new to report.

**Other**

Dr. Garcia brought up the case of ⟨                ⟩, a 19-year-old woman with a five-month pregnancy who has gestational diabetes and has been refusing all medical care both in jail and for outside appointments, lab and other fetal testing.  Dr. Garcia directed a question to Mr. Grant of County Counsel as to whether her case should be presented to an administrative law judge for forced medical care in that medical case law has statute for protection of the fetus.  Mr. Grant will be looking into the matter.

It was learned later that day that Ms. ⟨      ⟩ had left custody that afternoon.

Dr. Garcia reviewed and brought members up to date with the case of Angel Perez who has had a foot tumor for the past eight or more years and has had it recently resected at Santa Clara Valley Medical Center by an oncologic orthopedic surgeon.  Commander Bass noted he is the first patient enrolled in the jail for Medi-Cal services, however, those will not be effective for this recent outpatient surgery.  Mr. Jackson brought up the idea of "presumptive Medi-Cal" being an entity that may be helpful.  CFMG staff in attendance will look into this further.

There being no further business the meeting was adjourned.

Eliud Garcia, MD

Attachments:
Statistics

CFMG 002657



### CFMG
**California Forensic Medical Group**
I N C O R P O R A T E D



# AGENDA

## QUALITY ASSURANCE/PEER REVIEW COMMITTEE MEETING

## MONTEREY COUNTY JAIL AND JUVENILE HALL SERVICES

### May 29, 2014

### 12:00 noon

**A.    QUALITY ASSURANCE**

1.    Introduction    *sign up sheet / confidential nature of mtg*

2.    Review of Previous Minutes

3.    Review of Inmate/Minor Deaths    *5 of Peer Review } 4 cases    Dr Gustloso peer reviewed.*

4.    Hospitalized Patients
    a.    Adults    *& Colon, Perez,*
    b.    Juvenile Inmate/Minor ~~Deaths~~ *Hosp → Robt. Bogwell : 2 recent Hospital Clearances ← SVMC ← NMC*

5.    Statistical Report *DH: not ↑ in medications administered — JH - 2 greivances - addressed*

6.    Mental Health *Charlotte - introduced Jamie, introduced newly of developed in correctional MH & relationship c NMC*

7.    Public Health/Infectious Disease *Zunie Costa  Hope Gaethe*

8.    Pharmacy *next pg*

9.    Sheriff

10.   Probation */ JH*

11.   Dental Services

12.   Grievances

13.   CQI

14.   Other *Mr Grant    JH Angell Perez*

**B.    PEER REVIEW**

1.    Review of Medical Records

*[handwritten marginal notes:]*
*Dr. F. — consulted on escalated of const staff — Robt Jackson noted ↑ in violence — pt. outlined the care f pt — pt - Medicated - slept x16 hrs then awoke & attacked other pt. Case was difficult to settle.*
*Challengin/disputed = safety call f us - 1388 transfer ? - we are getting to SU f pt quickly - but then the community*
*Now pts referred from MCJ will be required to keep Security. All pts also now have to go through ED Dr F. said they will go on our referral feb ≈ 20-30 pts/d*

*Const. Bass ↑ in violent inmates c self assaults Elizabeth echoed Const Bass said Bob previously no but said currently no but said currently no f self assaults c severity*
*Co. caused overload*
*Elane H:    Refrrip OB care. Geostad DM - naproxen*

**CFMG**
California Forensic Medical Group
I N C O R P O R A T E D

# AGENDA

## QUALITY ASSURANCE/PEER REVIEW COMMITTEE MEETING

## MONTEREY COUNTY JAIL AND JUVENILE HALL SERVICES

### May 29, 2014

### 12:00 noon

**A.    QUALITY ASSURANCE**

1.    Introduction

2.    Review of Previous Minutes

3.    Review of Inmate/Minor Deaths

4.    Hospitalized Patients

    a.    Adults
    b.    Juvenile Inmate/Minor Deaths

5.    Statistical Report

6.    Mental Health

7.    Public Health/Infectious Disease

8.    Pharmacy

9.    Sheriff

10.    Probation

11.    Dental Services

12.    Grievances

13.    CQI

14.    Other

**B.    PEER REVIEW**

1.    Review of Medical Records

## CFMG
**California Forensic Medical Group**
INCORPORATED

## CONFIDENTIALITY AGREEMENT PG 1
### Date _____5/29/14_____

Effective peer review and quality assurance cannot be achieved unless the confidentiality of all discussions, deliberations, records and other information generated in connection with these activities is maintained. Such confidentiality is necessary to ensure the candid participation of members in these activities, which are critically important for the evaluation and improvement of the quality of care rendered.

Please respect and maintain the confidentiality of all discussion, deliberations, records and information related to these activities and do not disclose voluntarily any such information to anyone, except to persons authorized to receive it in the conduct of Quality Assurance affairs or as directed by this committee. Any questions regarding whether information is confidential may be directed to the Chairman of the Quality Assurance Committee.

The Quality Assurance and Peer Review Committee is entitled to take such action as deemed appropriate to ensure that the confidentiality of all such information is preserved. Any breach of this agreement or threatened breach of this agreement may subject the individual to legal action to prevent such disclosure, as well as corrective action.

| Print Name | Department | E-mail Address | Phone # | Signature |
|---|---|---|---|---|
| Angela Gladstone | Public Health | GladstoneA@co.monterey.ca.us | | |
| Charlotte Gage | CFMG | cargage@gmail.com | 831-755-3845 | |
| Dave Harness | CFMG | dharness@cfmg.com | 831-755-3885 | |
| Davithia Salisbury | MCHD | salisburydm@co.monterey.ca.us | 831-755-4718 | |
| Edward Laverone | MCSO | LaveroneER@co.monterey.ca.us | | |
| Elaine Finnberg | CFMG | finnberg@sbcglobal.net | 831-772-0158 | |
| Elaine Hustedt | CFMG | elaine@cfmg.com | 831-649-8994 | |
| Eluid Garcia | CFMG | eliud24@gmail.com | | |
| Fabian Barrera | MCSO | barreraf@co.monterey.ca.us | 831-755-3868 | |
| Irv Grant | County Counsel | granti@co.monterey.ca.us | 831-796-6406 | |
| Jim Bass | MCSO | bassjh@co.monterey.ca.us | 831-755-3887 | |
| Joe Grammatico | Probation | grammaticoj@co.onterey.ca.us | 831-796-1253 | |
| Jose Mendoza | MCSO | mendozajl@co.monterey.ca.us | 831-755-3878 | |
| Jose Ramirez | Probation | Ramirezj2@co.monterey.ca.us | 831-759-7276 | |
| Kevin Coolidge | CFMG | Kevin.coolidge@gmail.com | | |
| Kristy Michie | MCHD | MichieKJ@co.monterey.ca.us | 831-755-4503 | |
| Maureen Hollcraft | CFMG | | 831-755-3886 | |

CFMG 002660



**CFMG**
California Forensic Medical Group
INCORPORATED

## CONFIDENTIALITY AGREEMENT PG 2

Date _____ 5/29/14

Effective peer review and quality assurance cannot be achieved unless the confidentiality of all discussions, deliberations, records and other information generated in connection with these activities is maintained.  Such confidentiality is necessary to ensure the candid participation of members in these activities, which are critically important for the evaluation and improvement of the quality of care rendered.

Please respect and maintain the confidentiality of all discussion, deliberations, records and information related to these activities and do not disclose voluntarily any such information to anyone, except to persons authorized to receive it in the conduct of Quality Assurance affairs or as directed by this committee.  Any questions regarding whether information is confidential may be directed to the Chairman of the Quality Assurance Committee.

The Quality Assurance and Peer Review Committee is entitled to take such action as deemed appropriate to ensure that the confidentiality of all such information is preserved.  Any breach of this agreement or threatened breach of this agreement may subject the individual to legal action to prevent such disclosure, as well as corrective action.

| Print Name | Department | E-mail Address | Phone # | Signature |
|---|---|---|---|---|
| Monica Sweeny | MCJH | | 831-755-3925 | m Sweeno RN |
| Richard Gray | Probation | grayr@co.monterey.ca.us | | |
| Robert Jackson | MCBH | jacksonrl@co.monterey.ca.us | 831-755-6351 | |
| Scott Miller | MCSO | millersk@co.monterey.ca.us | 831-755-3750 | |
| Tamera Deleon | CFMG | | 831-796-1254 | |
| Taylor Fithian | CFMG | taylor@cfmg.com | 831-649-8994 | |
| Terry Whiting | CFMG | Botoxgirl1@gmail.com | 951-796-3536 | |
| Tim Gregory | Probation | gregoryt@co.monterey.ca.us | 831-796-1253 | |
| Troy Banuelos | Probation | banuelost@co.monterey.ca.us | 755-3947 | |
| Zonelle Cantu | MCHD | cantuzc@co.monterey.ca.us | 831-755-4582 | |
| Lola Bayer | CFMG | l.bayer_3@yahoo.com | 831-801-8422 | |
| Angie Gladstone | mcHD | gladstonea@co.monterey.ca.us | 831-755-4683 | |
| Jaimey Lee | CFMG | | 661-903-0826 | |
| | | | | |
| | | | | |
| | | | | |



**CFMG**
California Forensic Medical Group
I N C O R P O R A T E D

## CONFIDENTIALITY AGREEMENT PG 3

Date _____ 5/29/14

Effective peer review and quality assurance cannot be achieved unless the confidentiality of all discussions, deliberations, records and other information generated in connection with these activities is maintained.  Such confidentiality is necessary to ensure the candid participation of members in these activities, which are critically important for the evaluation and improvement of the quality of care rendered.

Please respect and maintain the confidentiality of all discussion, deliberations, records and information related to these activities and do not disclose voluntarily any such information to anyone, except to persons authorized to receive it in the conduct of Quality Assurance affairs or as directed by this committee.  Any questions regarding whether information is confidential may be directed to the Chairman of the Quality Assurance Committee.

The Quality Assurance and Peer Review Committee is entitled to take such action as deemed appropriate to ensure that the confidentiality of all such information is preserved.  Any breach of this agreement or threatened breach of this agreement may subject the individual to legal action to prevent such disclosure, as well as corrective action.

| Print Name | Department | E-mail Address | Phone # | Signature |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CFMG 002662

# Exhibit C



Transcript of the Testimony of:

# **Kevin Coolidge**

Hernandez v. County of Monterey

April 8, 2015

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312  |  F: 877.561.5538
www.thorsnes.com

Kevin Coolidge                                                    April 8, 2015

```
 1            UNITED STATES DISTRICT COURT

 2          NORTHERN DISTRICT OF CALIFORNIA

 3                   --o0o--

 4   JESSE HERNANDEZ, ET AL., ON        )
     BEHALF OF THEMSELVES AND ALL       )
 5   OTHERS SIMILARLY SITUATED,         )
                                        )
 6                     Plaintiffs,      )
                                        )
 7          vs.                         ) NO. CV 13 2354 PSG
                                        )
 8   COUNTY OF MONTEREY; MONTEREY       )
     COUNTY SHERIFF'S OFFICE;           )
 9   CALIFORNIA FORENSIC MEDICAL        )
     GROUP, INCORPORATED, A CALIFORNIA  )
10   CORPORATION; AND DOES 1 TO 20,     )
     INCLUSIVE,                         )
11                                      )
                       Defendants.      )
12   _____)

13

14            DEPOSITION OF KEVIN COOLIDGE

15        (SEPARATELY BOUND CONFIDENTIAL PORTIONS

16         PAGES 116 - 120, 123 - 126, AND 145 - 147)

17

18   DATE:          April 8, 2015

19   TIME:          9:34 a.m.

20   LOCATION:      MORGAN, LEWIS & BOCKIUS, LLP
                    3000 EL CAMINO REAL, SUITE 700
21                  PALO ALTO, CALIFORNIA

22

     REPORTED BY:   MEGAN F. ALVAREZ, RPR
23                  Certified Shorthand Reporter
                    License No. 12470
24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1                    A P P E A R A N C E S

 2

 3      FOR THE PLAINTIFFS:

 4                SARAH P. ALEXANDER, ESQ.
                  ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 5                315 MONTGOMERY STREET, 10TH FLOOR
                  SAN FRANCISCO, CALIFORNIA 94104
 6                415.433.6830
                  415.433.7104 FAX
 7                SPALEXANDER@RBGG.COM

 8

 9      FOR THE DEFENDANT COUNTY OF MONTEREY:
        (VIA TELEPHONE)
10

11                SUSAN BLITCH, ESQ.
                  COUNTY OF MONTEREY
12                168 WEST ALISAL STREET, 3RD FLOOR
                  SALINAS, CALIFORNIA 93901-2680
13                831.755.5045
                  831.755.5283 FAX
14                BLITCHSK@CO.MONTEREY.CA.US

15
        FOR THE CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED:
16

17                PETER G. BERTLING, ESQ.
                  BERTLING & CLAUSEN LLP
18                15 WEST CARRILLO STREET
                  SUITE 100
19                SANTA BARBARA, CALIFORNIA 93101
                  805.892.2100
20                PGB@BERTLING-CLAUSEN.COM

21

22                          --o0o--

23

24

25
```

Kevin Coolidge                                         April 8, 2015

```
 1        Q.   And when did you start working at the
 2   Monterey County Jail?
 3        A.   The end of 2007.
 4        Q.   Okay.  So --
 5        A.   November 2007.
 6        Q.   Was that after you worked at Salinas Valley
 7   State Prison?
 8        A.   Correct.
 9        Q.   And have you always worked one day a week at
10   the Monterey County Jail?
11             MR. BERTLING:  Well, vague and ambiguous as
12   to -- well, go ahead.  Answer the question.
13             THE WITNESS:  Yes, there have been weeks I've
14   worked more.
15   BY MS. ALEXANDER:
16        Q.   But your schedule is to work one day a week at
17   the Monterey County Jail?
18        A.   Yes.
19        Q.   And have you always worked on a Thursday?
20             MR. BERTLING:  Again, vague and ambiguous.
21   Incomplete hypothetical.
22             But please answer the question if you can.
23             THE WITNESS:  The scheduled dental day has
24   been Thursday.  Except for the very -- the first couple
25   months that I was working there, it was Friday.
```

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

Kevin Coolidge                                        April 8, 2015

```
 1   BY MS. ALEXANDER:
 2       Q.   And do you have any plans to change your work
 3   schedule at the Monterey County Jail?
 4       A.   Not currently.
 5       Q.   Okay.  Do you work for any other CFMG
 6   facilities currently?
 7       A.   Yes.
 8       Q.   Where else do you work?
 9       A.   San Benito County Jail and Santa Cruz County
10   Jail.
11       Q.   And how many hours a week do you work at the
12   San Benito County Jail?
13       A.   Four hours every other week.
14       Q.   And do you work on the same -- do you work on
15   a particular day of the week at the San Benito?
16       A.   Friday.
17       Q.   Friday.
18            And how many hours a week do you work at the
19   Santa Cruz County Jail?
20       A.   Eight hours every other week.
21       Q.   And do you work a particular day of the week?
22       A.   Friday I alternate.
23       Q.   And when did you start working at the
24   San Benito County Jail?
25       A.   I have to think about that.
```

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

Kevin Coolidge                                        April 8, 2015

 1        Q.    Okay.  Are there any other administrative
 2   duties -- for example, supervision of other employees --
 3   that you're required to do?
 4        A.    I do my own recordkeeping.
 5        Q.    Okay.
 6        A.    I work closely with my dental assistant.  So
 7   as much as I supervise her, she -- she and I work
 8   together to manage the whole of the dental services.
 9        Q.    And what exactly does Ms. Adamo do as your
10   assistant?
11        A.    She does chairside assisting.  She takes
12   x-rays.  She manages inventory.  She sterilizes
13   instruments.  She helps in the processing of records and
14   orders and the system that's in place to get patient
15   records to me.
16        Q.    And is Ms. Adamo there every Thursday when you
17   work?
18        A.    Yes.
19        Q.    Have you ever worked at Monterey County Jail
20   without a dental assistant?
21        A.    No.
22        Q.    Is there anyone else besides Ms. Adamo that
23   works as a dental assistant for you?
24        A.    No.
25              MR. BERTLING:  At the Monterey County Jail?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Kevin Coolidge                                                    April 8, 2015

1        Q.   Would you estimate that you often are needed
2    to participate in this process?
3        A.   No.
4             MR. BERTLING:   Well...
5    BY MS. ALEXANDER:
6        Q.   How many hours a week do you work at the jail?
7        A.   12.
8        Q.   What time do you start in the morning on
9    Thursdays?
10       A.   7:00 a.m.
11       Q.   And what time do you leave?
12       A.   7:00 p.m.
13       Q.   Okay.  Do you take a lunch break?
14       A.   Yes.
15       Q.   How long of a lunch break?
16       A.   Half an hour.
17       Q.   Do you take any other breaks?
18       A.   Not really, no.
19       Q.   And do you have any other scheduled
20   obligations while you're at the Monterey County Jail
21   besides seeing patients?
22       A.   Only QA meetings.
23       Q.   Are you aware of any training of nurses and
24   mid-level providers at the jail on -- regarding how to
25   triage dental complaints?