MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
VAN SWEARINGEN – 259809
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:    mbien@rbgg.com
          egalvan@rbgg.com
          vswearingen@rbgg.com
          kstone-manista@rbgg.com

ALAN SCHLOSSER – 049957
MICAELA DAVIS – 282195
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (415) 621-2493
Facsimile:    (415) 255-8437
Email:    aschlosser@aclunc.org
          mdavis@aclunc.org

JAMES EGAR – 065702
Public Defender
DONALD E. LANDIS, JR. – 149006
Assistant Public Defender
OFFICE OF THE PUBLIC DEFENDER
COUNTY OF MONTEREY
111 West Alisal Street
Salinas, California  93901-2644
Telephone:    (831) 755-5806
Facsimile:    (831) 755-5873
Email:    EgarJS@co.monterey.ca.us
          LandisDE@co.monterey.ca.us

ERIC BALABAN (*admitted pro hac vice*)
CARL TAKEI – 256229
NATIONAL PRISON PROJECT of the
AMERICAN CIVIL LIBERTIES UNION
915 15th Street N.W., 7th Floor
Washington, D.C.  20005-2302
Telephone:    (202) 393-4930
Facsimile:    (202) 393-4931
Email:    ebalaban@aclu.org
          ctakei@aclu.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. CV 13 2354 PSG<br><br>**DECLARATION OF ERNEST GALVAN**<br><br>NO HEARING |

I, Ernest Galvan, declare:

1.      I am an attorney admitted to practice law in California, a member of the bar of this Court, and a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify.  I make this declaration in support of Plaintiffs' Brief Regarding Enforcement of Settlement Agreement's Implementation Plan Requirements.

### Class Member Medical and Custodial Records, Filed Under Seal

2.      Attached as **Exhibit A** are true and correct copies of medical and custodial records of **Prisoner A**[1] produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner A in the Declaration of Pablo Stewart ("Stewart Declaration"), filed herewith, at Paragraphs 8, 9, and 35.

3.      Attached as **Exhibit B** are true and correct copies of custodial records of **Prisoner B** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner B in the Stewart Declaration at Paragraphs 9 and 22.

4.      Attached as **Exhibit C** are true and correct copies of custodial records of **Prisoner C** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner C in the Stewart Declaration at Paragraph 9.

5.      Attached as **Exhibit D** are true and correct copies of medical and custodial records of **Prisoner D** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner D in the Stewart Declaration at Paragraph 29.

---

[1] Attached for the Court's convenience as **Exhibit VV** is a chart identifying by name and booking number each prisoner identified herein as "Prisoner [Letter]," whose records are being filed under seal herewith.

6. Attached as **Exhibit E** are true and correct copies of custodial records of **Prisoner E** produced by Defendants during the course of discovery. These records are relevant to the discussion of Prisoner E in the Stewart Declaration at Paragraph 22.

7. Attached as **Exhibit F** are true and correct copies of custodial records of **Prisoner F** produced by Defendants during the course of discovery. These records are relevant to the discussion of Prisoner F in the Stewart Declaration at Paragraph 22.

8. Attached as **Exhibit G** are true and correct copies of custodial records of **Prisoner G** produced by Defendants during the course of discovery. These records are relevant to the discussion of Prisoner G in the Stewart Declaration at Paragraph 22.

9. Attached as **Exhibit H** are true and correct copies of medical records of **Prisoner H** produced by Defendants during the course of discovery. These records are relevant to the discussion of Prisoner H in the Stewart Declaration at Paragraph 44.

10. Attached as **Exhibit I** are true and correct copies of custodial records of **Prisoner I** produced by Defendants during the course of discovery. These records are relevant to the discussion of Prisoner I in the Stewart Declaration at Paragraph 22.

11. Attached as **Exhibit J** are true and correct copies of custodial records of **Prisoner J** produced by Defendants during the course of discovery. These records are relevant to the discussion of Prisoner J in the Stewart Declaration at Paragraph 22.

12. Attached as **Exhibit K** are true and correct copies of custodial records of **Prisoner K** produced by Defendants during the course of discovery. These records are relevant to the discussion of Prisoner K in the Stewart Declaration at Paragraph 22.

13. Attached as **Exhibit L** are true and correct copies of custodial records of **Prisoner L** produced by Defendants during the course of discovery. These records are relevant to the discussion of Prisoner L in the Stewart Declaration at Paragraph 22.

14. Attached as **Exhibit M** are true and correct copies of medical records of **Prisoner M** produced by Defendants during the course of discovery. These records are relevant to the discussion of Prisoner M in the Stewart Declaration at Paragraph 69, 70, and 72.

15.     Attached as **Exhibit N** are true and correct copies of custodial records of **Prisoner N** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner N in the Stewart Declaration at Paragraph 22.

16.     Attached as **Exhibit O** are true and correct copies of custodial records of **Prisoner O** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner O in the Stewart Declaration at Paragraph 22.

17.     Attached as **Exhibit P** are true and correct copies of custodial records of **Prisoner P** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner P in the Stewart Declaration at Paragraph 22.

18.     Attached as **Exhibit Q** are true and correct copies of medical records of **Prisoner Q** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner Q in the Stewart Declaration at Paragraph 30.

19.     Attached as **Exhibit R** are true and correct copies of medical and custodial records of **Prisoner R** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner R in the Stewart Declaration at Paragraph 9 and 30.

20.     Attached as **Exhibit S** are true and correct copies of medical records of **Prisoner S** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner S in the Stewart Declaration at Paragraph 39, 42, 71, and 94.

21.     Attached as **Exhibit T** are true and correct copies of medical records of **Prisoner T** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner T in the Stewart Declaration at Paragraph 41.

22.     Attached as **Exhibit U** are true and correct copies of medical records of **Prisoner U** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner U in the Stewart Declaration at Paragraph 43, 89, and 90.

23.     Attached as **Exhibit V** are true and correct copies of custodial records of **Prisoner V** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner V in the Stewart Declaration at Paragraph 46.

24.     Attached as **Exhibit W** is a true and correct copy of a booking document related to **Prisoner W** produced by Defendants during the course of discovery, showing the prisoner was booked into the Jail on December 13, 2014.  This record is relevant to the discussion of Prisoner W in the Stewart Declaration at Paragraph 46.  On March 5, 2015, Prisoner W died from his self-inflicted injuries at 16:00 hours.  *See* Declaration of Jennifer Davenport in Support of Plaintiffs' Motion for Leave to File Supplemental Evidence in Support of Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 444-1, ¶ 12.

25.     Attached as **Exhibit X** are true and correct copies of the coroner's report for **Prisoner X**.  These records are relevant to the discussion of Prisoner X in the Stewart Declaration at Paragraph 46.

26.     Attached as **Exhibit Y** are true and correct copies of medical records of **Prisoner Y** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner Y in the Declaration of Donald Sauter, DDS ("Sauter Declaration"), filed herewith, at Paragraph 24.

27.     Attached as **Exhibit Z** are true and correct copies of medical records of **Prisoner Z** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner Z in the Sauter Declaration at Paragraph 25 and 29.

28.     Attached as **Exhibit AA** are true and correct copies of medical records of **Prisoner AA** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner AA in the Sauter Declaration at Paragraph 26.

29.     Attached as **Exhibit BB** are true and correct copies of medical records of **Prisoner BB** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner BB in the Sauter Declaration at Paragraph 31.

30.     Attached as **Exhibit CC** are true and correct copies of medical records of **Prisoner CC** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner CC in the Sauter Declaration at Paragraph 37.

31.     Attached as **Exhibit DD** are true and correct copies of medical records of **Prisoner DD** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner DD in the Sauter Declaration at Paragraph 38.

32.     Attached as **Exhibit EE** are true and correct copies of medical records of **Prisoner EE** produced by Defendants during the course of discovery.  These records are relevant to the discussion of Prisoner EE in the Sauter Declaration at Paragraph 40.

33.     Attached as **Exhibit FF** is a true and correct copy of a declaration signed by **Prisoner FF** on March 15, 2016.  These records are relevant to the discussion of Prisoner FF in the Declaration of Wendy Still ("Still Decl."), filed herewith, at Paragraphs 42-46.

## Documents Identified By Defendants As Security-Sensitive Information and Filed Under Seal

34.     Attached hereto as **Exhibit GG** are true and correct copies of emails produced as electronically stored information by Defendants.  The custodian for these emails, as produced by Defendants, was James Bass, a commander at the Jail who appeared for deposition as Defendants' person most knowledgeable about Jail operations.  These documents did not have Bates numbers as produced by Defendants.  During the course of discovery, Plaintiffs affixed the Bates numbers that appear on these documents and provided Defendants with a CD containing Bates numbered copies.  These records are relevant to the discussion of safety and security issues in the Still Declaration at Paragraphs 23, 26, and 36.

35.     Attached hereto as **Exhibit HH** are true and correct copies of emails produced as electronically stored information by Defendants.  The custodian for these emails, as produced by Defendants, was James Miller, then the Sheriff of Monterey County.   These documents did not have Bates numbers as produced by Defendants.  During the course of discovery, Plaintiffs affixed the Bates numbers that appear on these

1   documents and provided Defendants with a CD containing Bates numbered copies.  These

2   records are relevant to the discussion of safety and security issues in the Still Declaration

3   at Paragraphs 23, 24, 26, 29, 30, and 34.

4        36.     Attached hereto as **Exhibit II** are true and correct copies of emails produced

5   as electronically stored information by Defendants.  The custodian for these emails, as

6   produced by Defendants, was Michael Moore, the Chief Deputy for the Custody

7   Operations Bureau of the Monterey County Sheriff's Office.   These documents did not

8   have Bates numbers as produced by Defendants.  During the course of discovery, Plaintiffs

9   affixed the Bates numbers that appear on these documents and provided Defendants with a

10  CD containing Bates numbered copies.  These records are relevant to the discussion of

11  safety and security issues in the Still Declaration at Paragraph 23.

12  **Documents Containing Identifiable Class Member Medical Information, Filed Under**

13  **Seal**

14       37.     Attached hereto as **Exhibit JJ** are true and correct copies of minutes of a

15  California Forensic Medical Group ("CFMG") Quality Assurance Meeting held on April

16  21, 2011, as produced by Defendants during the course of discovery.  These records are

17  relevant to the discussion of unmet dental needs in the Sauter Declaration at Paragraph 17.

18       38.     Attached hereto as **Exhibit KK** are true and correct copies of minutes of a

19  CFMG Quality Assurance Meeting held on August 30, 2012, produced by Defendants

20  during the course of discovery.  These records are relevant to the discussion of unmet

21  dental needs in the Sauter Declaration at Paragraph 18.

22       39.     Attached hereto as **Exhibit LL** are true and correct copies of minutes of a

23  CFMG Quality Assurance Meeting held on September 18, 2014, produced by Defendants

24  during the course of discovery.  These records are relevant to the discussion of unmet

25  dental needs in the Sauter Declaration at Paragraph 18, and the requirement that all

26  patients transferred from the Jail to the hospital go through emergency room screening in

27  the Stewart Declaration at Paragraph 34.

28

40.     Attached hereto as **Exhibit MM** are true and correct copies of minutes of a CFMG Quality Assurance Meeting held on May 20, 2014, produced by Defendants during the course of discovery.  These records are relevant to the discussion of unduly long transfer times for patients to inpatient facilities in the Stewart Declaration at Paragraph 38.

41.     Attached hereto as **Exhibit NN** are true and correct copies of an excerpt of minutes of a CFMG Quality Assurance Meeting held on September 18, 2014, produced by Defendants during the course of discovery.

42.     Attached hereto as **Exhibit OO** are true and correct copies of minutes of a CFMG Quality Assurance Meeting held on December 23, 2014, produced by Defendants during the course of discovery.  These records are relevant to the discussion of the County's hospital's refusals to receive patients from the Jail for inpatient care, as described in the Stewart Decl. at Paragraph 36.

43.     Attached hereto as **Exhibit PP** is a true and correct copy of a dental care calendar for the months of February 2015 through June 2015, as maintained by Dr. Coolidge, the Jail's dentist, and produced by Defendants during the course of discovery. These records are relevant to the discussion of unmet dental needs in the Sauter Declaration at Paragraph 25.

44.     Attached hereto as **Exhibit QQ** are true and correct copies of safety cell audit records from January to March 2013, produced by Defendants during the course of discovery.  These records are relevant to the discussion of Jail staff's failure to adequately provide water to prisoners in safety cells, as described in the Stewart Decl. at Paragraph 11.

45.     Attached hereto as **Exhibit RR** is a true and correct copy of a photograph of a bulletin board in the mental health care office in the clinic taken during Dr. Stewart's tour of the Jail on March 31, 2015.  The photograph contains private patient information. Included on the bulletin board in the photograph, and as described in the Stewart Decl. at Paragraphs 37 and 39, are five monthly lists for the month of March 2015: prisoners awaiting transfer to the Mental Health Unit ("MHU") at Natividad Medical Center

1   ("NMC"); prisoners currently at the MHU; prisoners awaiting transfer to the state hospitals

2   for restoration of competency; prisoners returned from the state hospitals to the Jail; and

3   prisoners who had attempted suicide.

4                    **Exhibits Referred to in Expert Declarations, Filed Publicly**

5          46.    Attached hereto as **Exhibit SS** are  true and correct copies of summary

6   statistics produced by CFMG during the course of discovery.  As described in the Stewart

7   Decl. at Paragraph 39, these statistics confirm that there were five prisoners pending

8   transfer to the state hospital in January 2015 and two prisoners pending transfer to the state

9   hospital February 2015.

10         47.    Attached hereto as **Exhibit TT** is a true and correct copy of a page from the

11  Sheriff's Office Custody Operations Manual, Receiving and Intake Procedures and Duties,

12  produced by CFMG during the course of discovery.  As described in the Stewart Decl. at

13  Paragraph 65, this document shows that prisoners housed in isolation are classified as high

14  security.

15         48.    Attached hereto as **Exhibit UU** is a true and correct copy of a page from the

16  CFMG Monterey County Adult Detention Facility Policy & Procedure Manual, the subject

17  matter of which is "Inmates In Isolation," produced by CFMG during the course of

18  discovery.  As described in the Stewart Decl. at Paragraph, CFMG's operative policy

19  required that medical staff conduct health and welfare checks at least three times per week

20  on all prisoners in isolation.

21                              **Other Exhibits**

22         49.    Attached hereto as **Exhibit WW** is a true and correct copy of CFMG's

23  Revised Implementation Plan.  CFMG's counsel Peter Bertling sent this document to me

24  on April 1, 2016.

25         50.    A true and correct copy of relevant excerpts from the deposition of Dr. Kevin

26  Coolidge, the Jail's dentist, is attached to the Expert Declaration of Dr. Donald T. Sauter,

27  filed herewith, and cited therein as **Exhibit C**.  Dr. Coolidge was deposed by Sarah Poppy

28  Alexander, Plaintiff's counsel, on April 8, 2015.

51.     A true and correct copy of the dental care section from CFMG's Standardized Procedures for Registered Nurses, produced by CFMG during the course of discovery, is attached to the Expert Declaration of Dr. Donald T. Sauter, filed herewith, and cited therein as **Exhibit D**.

52.     True and correct copies of photographs taken during the April 6, 2015 Jail inspection of Plaintiff's expert Wendy Still are attached to the Expert Declaration of Wendy Still, filed herewith, and cited therein as Exhibits **C, E, F, and G**.

53.     True and correct copies of documents photocopied by Jail staff at the request of Plaintiff's expert Wendy Still during the course of her April 6, 2015 inspection are attached to the Expert Declaration of Wendy Still, filed herewith, and cited therein as Exhibits **D and H**.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 1st day of April, 2016.

*/s/ Ernest Galvan*
Ernest Galvan

# Exhibit A – RR
# Filed Under Seal

# Exhibit SS

NUMBER OF MENTAL HEALTH CONTACTS

|  | Jan-15 | Feb-15 |  |
|---|---|---|---|
| MHC | Total-296 | Total-214 | **Grand Total-510** |
| Psych MD | Total-291 | Total-272 | **Grand Total-563** |

SAFETY CELL PLACEMENTS/CLEARANCES

|  | Jan-15 | Feb-15 | Mar-15 |  |
|---|---|---|---|---|
| SW | Total-33 | Total-28 | Total-19 | **Grand Total-80** |
| SINGLE | Total-12 | Total-6 | Total-13 | **Grand Total-31** |
| DTS | Total-0 | Total-2 | Total-0 | **Grand Total-2** |
| DTO | Total-2 | Total-3 | Total-1 | **Grand Total-6** |
| COMBAT | Total-8 | Total-5 | Total-6 | **Grand Total-19** |
| DTP | Total-1 | Total-1 | Total-0 | **Grand Total-2** |

SMI PATIENTS STATE HOSPITAL SYSTEM

|  | Jan-15 | Feb-15 | Mar-15 |  |
|---|---|---|---|---|
| **Returned from State Hospital** Total- | 0 | 4 | 1 | **Grand Total-5** |
| **Pending Transfer to State Hospital System** Total- | 5 | 2 | 6 | **Grand Total-13** |
| **Transferred from MCJ to State Hospital System** Total- | 4 | 1 | 1 | **Grand Total-6** |

CFMG079946

# Exhibit TT

1104.14     *Receiving Accountability*

    A.   Receiving deputies are responsible for all inmates in the intake area to include booking, safety, sobering and isolation cells.

    B.   Accountability for inmates in the area shall be maintained.  A headcount and roster check shall be conducted at the beginning of each shift and at midnight.

    C.   The computer and printouts shall be corrected to reflect current cell assignments. Deputies shall sign the corrected rosters and write the date/time completed.  Both the initial and corrected roster shall be placed in the 24-hour file. At midnight, new logs will be posted.

1104.15     *Isolation Cells*. Inmates housed in isolation are classified as high security and require special precautions for officer safety.

    A.   Receiving Deputies shall prepare and post the *MCSO Custody Operations Isolation Cell Log* at midnight Receiving Deputies shall conduct hourly safety checks of inmates in isolation, notate the time the check was made and legibly initial the log.  Missed checks shall be explained on the log.  The Receiving Sergeant shall initial the explanation.

    B.   Receiving Sergeants shall make a minimum of two periodic checks of isolation cells during their shift.  The Sergeant shall place a notation of the time and legibly initial the log when the check was made.

    C.   Inmates in isolation shall be allowed one hour of dayroom exercise daily.

    D.   Inmates housed in isolation are high risk inmates.  Deputies shall handcuff inmates from behind whenever they are moved from their cell.  Isolation inmates shall be moved by a minimum of two deputies.

    E.   Receiving Deputies on day shift are responsible for laundry exchange for inmates housed in isolation cells.  Roll exchange shall be on Monday and Friday, jumpsuit exchange on Tuesday and sheet exchange on Thursday.

1104.16     *Court Accountability*. The morning court goes out through Receiving and Court Holding. Returning court and afternoon court go out through Court Holding. Court returning after 1700 hours returns through the Receiving area. Regardless of the time of day, female inmates housed in the Women's Section will depart and return through the Control #3 sallyport. The outgoing court will be processed as follows:

    A.   Deputies shall obtain a court transportation list from CJIS.

    B.   As the housing Deputies escort the inmates from the housing units to Receiving or court holding, a deputy shall account for the inmates by name and ensure all inmates are present for transportation.

    C.   All inmates being transported to court shall be dressed out in a jail inmate uniform according to their classification. No inmate shall go to court in civilian clothes except those who have a court order or jury trial.

    D.   All inmates going to court shall be wearing their armband.

    E.   Dressing inmates out for jury trial or by order of the court.  Review the court calendar for any inmates scheduled for jury trial, and follow the procedures below.

        1.   Pull the inmates' trial clothes from the clothing room and have the inmates dress in their civilian trial clothes.   Private shoes, belts, and ties shall be given to the

COUNTY 000509

# Exhibit UU

SUBJECT:     INMATES IN ISOLATION

POLICY:

Inmates placed out of the general population in isolated cells for any reason will be evaluated by the health services staff three times weekly to determine their physical and mental status.

AUTHORITY REFERENCE:        IMQ Standard #320 (I)

PURPOSE:

Prevention of depression and suicidal behavior and/or digression of physical well-being due to the effects of isolation.

PROCEDURE:

1.    The nurse conducting medication rounds on Mondays, Wednesdays, and Fridays, shall visually observe and speak with all inmates in Isolation and Holding cells.  In addition, the provider conducting sick call shall also visualize and speak with all inmates in Isolation and Holding and document appropriately.

2.    Evaluation will include notation of any bruises, injuries, general attitude, intake of fluids and meals, and comments on the inmate's general outlook and level of orientation.

3.    Documentation shall be entered in each inmate's medical record after each observation.

4.    Inmates who exhibit signs of medical and/or mental deterioration shall be promptly referred to the appropriate medical/mental health provider for further evaluation and follow up.

CFMG_PLSBATES_00063793

# Exhibit VV
# Filed Under Seal

# Exhibit WW

Jesse Hernandez v. County of Monterey
United States District Court Northern
District of California
Case No. CV 5:13 2354 PSG

CFMG'S AMENDED
IMPLEMENTATION PLAN

The CFMG Implementation Plan addresses all of the issues identified in the Settlement Agreement approved by the Honorable Paul Grewal on August 18, 2015.

All CFMG health services staff will participate in classroom orientation and training regarding compliance with all aspects of the CFMG Implementation Plan. Orientation and training will be conducted by a qualified health services instructor. Counseling, training or appropriate discipline may ensue from failure to comply with the Implementation Plan.

The CFMG Implementation Plan is designed to be used in concert with the County of Monterey's Implementation Plan. If there are any inconsistencies between the plans, they shall be resolved through a meet and confer process which shall include a representative from CFMG, the Monterey County Office of the Sheriff and the Monterey County Office of the Public Defender.

Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit findings will be reported to the Quality Management Committee at its quarterly meetings.

# TABLE OF CONTENTS

Page(s)

I.   INTAKE HEALTH SCREENING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

II.  CONTINUATION OF MEDICATIONS BEGUN PRIOR TO INCARCERATION. . . . .  9

III.  INMATE ACCESS TO HEALTH CARE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

IV.  INMATE ACCESS TO MENTAL HEALTH SERVICES. . . . . . . . . . . . . . . . . . . .  33

V.  TREATMENT OF ALCOHOL WITHDRAWAL. . . . . . . . . . . . . . . . . . . . . . . . .  40

VI.  TREATMENT OF DRUG WITHDRAWAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

VII.  SUICIDE PREVENTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

VIII. TUBERCULOSIS IDENTIFICATION, CONTROL AND TREATMENT PROGRAM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

IX.  PHARMACEUTICAL ADMINISTRATION. . . . . . . . . . . . . . . . . . . . . . . . . . . .  83

X.  INVOLUNTARY ADMINISTRATION OF PSYCHOTROPIC MEDICATIONS. . . . . .  91

XI.  CFMG DENTAL SERVICES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  94

XII.  HEALTH RECORDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  108

XIII. CFMG STAFFING PLAN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  111

EXHIBIT INDEX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  112

## I.   INTAKE HEALTH SCREENING

All arrestees detained in the Monterey County Jail (MCJ) will be screened by a Registered Nurse (RN) at the time of intake using the MCJ Medical Intake Questionnaire, a copy of which is attached hereto as Exhibit A.  The screening will be conducted in a manner to ensure the inmate's privacy.  Translators and interpreters will be used whenever necessary to ensure effective communication.

A.   The following three levels of medical conditions will be identified initially upon arrival of the arrestee.

    1.   Those obvious and acute conditions which would preclude acceptance into custody prior to "outside" medical evaluation and clearance.

        a.   Arrestees who are unconscious or who cannot walk under their own power.

        b.   Arrestees who are having or have recently had convulsions.

        c.   Arrestees with any significant external bleeding.

        d.   Arrestees with any obvious fractures.

        e.   Arrestees with signs of head injuries.

        f.   Arrestees with any signs of serious injury or illness.

        g.   Arrestees displaying signs of acute alcohol or drug withdrawal.

        h.   Pregnant women in labor or with other serious problems.

        i.   Arrestees who display symptoms of possible internal bleeding or with abdominal bleeding.

        j.   Arrestees with complaints of severe pain or trauma.

        k.   ***Arrestees who by reason of mental health disorder are a danger to others or themselves, or gravely disabled except for arrestees who have been released from a County-designated LPS involuntary detention facility with the previous 12 hours.***

2.    Those conditions which are identified during the completion of the MCJ Medical Intake Questionnaire by the Booking RN may or may not be deemed to require "outside" medical evaluation and treatment.

a.   If the Booking RN determines that the arrestee requires medical evaluation and clearance prior to incarceration, the arrestee will be transported to Natividad Medical Center for medical clearance prior to booking.

b.   All acutely positive findings identified on the MCJ Medical Intake Questionnaire will be assessed by the Booking RN using the CFMG

3.    Those conditions which are identified during the completion of the Intake Triage Assessment will be evaluated by the Booking RN and treated in accordance with CFMG Standardized Procedures or referred to the medical provider as indicated.

B.   The arresting officer shall report any signs of trauma or acute illness to the reception officer prior to transfer of custody.  The information obtained by the arresting officer will be communicated to the Booking RN. If the arrestee is taken to an emergency treatment center for medical evaluation and clearance prior to booking, documented evidence of such evaluation, treatment and clearance must be returned to the jail so as to become part of that inmate's medical record. The Booking RN in booking will review the treatment records to determine the course of treatment and/or contact the medical provider as indicated.

CFMG's Amended Implementation Plan

C.   Receiving Health Screening by Booking RN during the Intake Screening Process.

The MCJ Medical Intake Questionnaire will be completed on all inmates at the time of intake into the facility by the Booking RN. The receiving screening shall include vital signs and, inquiry into:

1.   Current illness and health problems, including medical, mental health, dental and communicable diseases (including sexually transmitted diseases and tuberculosis and other aerosol transmissible diseases).

2.   Medications and special health requirements.

3.   Substance use, including type, methods, amount, frequency, date or time of last use, and history of withdrawal problems.

4.   History or appearance of suspected mental illness, including suicidal ideation or behavior.

5.   Appearance or history of developmental disability.

6.   Appearance or history of recent sexual abuse or abusiveness.

7.   For females, a history of gynecological problems, possibility of current pregnancy, recent delivery and present use of birth control.

Observation of:

1.   Behavior, to include state of consciousness, mental status, appearance, conduct, tremors and sweating;

2.   Body deformities and ease of movement;

5

3.      Condition of skin, including bruises, trauma markings, lesions, jaundice, rashes and infestations, needle marks or other indication of drug abuse; and,

4.      Slowness in speech or lack of comprehension of questions suggestive of developmental disabilities.

Disposition:

1.      Positive receiving screening findings will be referred to the provider for further evaluation as deemed necessary by the Booking RN.

2.      ***Inmates with chronic medical conditions will be referred to <u>and seen by a medical provider within five to seven days of arrival</u>.***

3.      Immediate referral to the local emergency room for clearance, if warranted.

4.      Persons with possible communicable disease will be isolated from others pending evaluation by health services staff.

5.      Refer to classification for housing.

D.   Developmental Disabilities Screening by the Booking RN during the Intake Screening Process.

All inmates at time of booking are screened using the Guide to Developmental Disabilities, a copy of which is attached as Exhibit C.  If an inmate is believed to have a developmental disability, the San Andreas Regional Center will be contacted within 24 hours.

6

1.   The Booking RN performing the intake screening will determine if new detainees have known or suspected developmental disabilities.

2.   The Booking RN shall complete an initial assessment to determine the level of disability and need for special housing and/or care, and contact the psychiatric provider on-call.

3.   The Booking RN shall consult with shift supervisor regarding appropriate housing such as protective custody.

4.   The CFMG Program Manager or designee will notify the San Andreas Regional Center within 24 hours of the presence of inmates believed to have developmental disabilities.

5.   If the San Andreas Regional Center cannot be reached by phone at (831) 759-7500, a letter will be sent notifying them of the developmentally disabled inmate.

6.   The San Andreas Regional Center is mandated by law to assure provision of services to individuals in whom developmental disability criteria are met.

     Criteria include:

     I.Q. of 70 or lower with epilepsy, autism, or significant neurological impairment which occurred before age 18 and resulted in a significant handicap.

     The medical staff is encouraged to develop an ongoing relationship with the San Andreas Regional Center.

E.   Mental Health Screening by Booking RN during the Intake Screening Process.

7

1.    All new inmates shall be observed and queried for signs/presence and history of mental illness, including suicidal behavior/ideations, and use of medication for psychiatric treatment as part of the intake health screening completed by the Booking RN. Verification of medications and request of treatment records will be initiated for inmates indicating current or recent treatment including medications, hospitalization, emergency department visits and/or outpatient services. Any inmate exhibiting or testifying to presence or history of mental illness is referred to mental health services staff for further evaluation.   A physician's opinion is secured within 24 hours or the next scheduled sick call.

2.    The Booking RN will complete a Nursing Psychiatric and Suicidal Assessment Form on all inmates with a positive mental health history.  A copy of the Nursing Psychiatric and Suicidal Assessment form is attached as Exhibit D.

3.   The on-site mental health team is comprised of the psychiatrist, psychologist, Marriage and Family Therapist and Psychiatric Registered Nurse. A licensed psychiatrist and psychologist are available on-site and on-call to health services staff at the jail for consultation, referral and treatment.

4.   Inmates in safety cells whose condition deteriorates, or for whom the nurse is unable to complete a hands-on assessment including vital signs after six hours of placement shall be transferred to Natividad Medical Center for further assessment.

II.   <u>CONTINUATION OF MEDICATIONS BEGUN PRIOR TO INCARCERATION.</u>

Continuation and bridging of all medications begun prior to incarceration is essential to the health and well-being of inmates.  It is the policy of CFMG to ensure that inmates will not miss any medications whether verified or unverified, ***formulary or non-formulary.***

A.   The following information shall be obtained from the inmate or his/her attending physician:

    1.   Drug name, dosage and frequency ordered.  Time the previous dose was ingested (prior to incarceration).

    2.   Name of physician who prescribed the medication and the last time the inmate was seen by the physician.

    3.   The frequency with which the medication was taken.

B.   Confirmation of the information should be attempted by calling the pharmacy to confirm legitimacy of the prescription and/or:

    1.   Seeing the prescription or bottle of medication and verifying that the contents have not been tampered with and are as labeled.

    2.   Communication with the prescribing physician or his office.

C.   Ordering Verified Medications for Continuation and Bridging.

    1.   If the RN verifies the medication with the prescribing physician or pharmacy, the RN will provide the medication after contacting the on-call provider for an order. During this consultation the on-call provider, based on clinical judgment, will schedule a date for a provider to see the patient

CFMG's Amended Implementation Plan

face-to-face within 7 days.  The date of the appointment will be reflected in the written record of the order.

D.    Ordering Unverified Medications or Medications that Have the Potential for Abuse.

1.    If possible, find out what chronic conditions the inmate is being treated for or has been treated for in the past.

2.    If inmate was on medications, inquire whether s/he remembers names or dosages.

3.    Obtain random blood sugar on inmate if s/he states history of diabetes.

4.    If female inmate states she is on opiates, request urine sample for pregnancy test. If inmate is pregnant, contact on-call provider for orders or send to ED for evaluation and possible emergency three-day methadone or buprenorphine prescription. FOR THE SAFETY OF THE FETUS, pregnant inmates should not be allowed to withdrawal for opioids and may need to be sent to the ED or methadone clinic or buprenorphine provider daily to avoid withdrawal.

5.    By the end of the nursing shift, the RN will contact the on-call provider for orders to address critical unverified medications or medications with abuse potential and obtain orders to either continue, discontinue, or substitute with a clinically equivalent formulary alternative.  During this consultation the on-call provider will set the time for a provider to see the patient within 5-7 days. The date of the appointment will be reflected in the written record of the order.

6.      Submit all medication orders to emergency backup pharmacy to ensure inmate-patient will not miss any doses within 12 hours of booking.

E.    Ordering Psychotropic Medications

1.      The Booking RN will assess all arrestees who state they are taking psychotropic medications upon arrival at the facility.

2.      The Booking RN will obtain a signed release for records and attempt to verify current prescriptions. By the end of the nursing shift, the RN will consult with the on-call psychiatrist regarding any verified or unverified medications. The on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate. During this consultation, the on-call psychiatrist will set the time to see the inmate within 5-7 days.    The date of the appointment will be reflected on the written record of the order.

3.      No psychotropic medications shall be unilaterally discontinued without consultation with the facility physician or psychiatrist.

4.      Psychotropic medication shall not be ordered for longer than 90 days, new psychiatric medications will not exceed 30 days, until condition is documented stable by the ordering physician. The prescribing provider will renew medications only after a clinical evaluation of the individual is performed.

5.      Absent an emergency, inmates will not be administered involuntary psychotropic medications at the Monterey County Jail.

6.      Psychotropic medication will not be administered for disciplinary purposes.

11

7.      Absent an emergency or a court order for treatment, an inmate shall give his or her informed consent and refusal.

8.      The on-call psychiatrist will be contacted whenever an inmate refuses his or her medications on three consecutive occasions.

III.   INMATE ACCESS TO HEALTH CARE

A.   Health Care Philosophy

Inmates shall have access to emergent and medically necessary non-emergent health care services as deemed appropriate by qualified health services professionals to maintain health and safety of the inmate during his/her period of incarceration. Elective procedures shall not be performed unless, in the opinion of qualified medical/dental professionals, the postponement of such procedures would adversely affect the immediate health and safety of the inmate or future course of treatment and/or prognosis of the individual. Medically necessary services which are not provided on-site shall be made available by referral to County or private medical/health services providers. Health services shall be provided by licensed health care professionals in accordance with community standards and professional ethical codes for confidential and appropriate practices.

1.   CFMG personnel provide health care services for inmates and act as their advocates in health care matters. Health services shall be rendered with consideration for the patient's dignity and feelings and in a manner which encourages the patient's subsequent utilization of appropriate health services.

   a.   Medical procedures and interviews shall be performed in a private clinical setting in accordance with facility security procedures.

   b.   Chaperons shall be present when indicated.

   c.   Verbal consent shall be obtained and implicit for all direct patient contact. Written informed consent shall be obtained for all invasive

and other procedures in accordance with established CFMG procedure and community standards of practice.

d.  Inmates have a right to refuse treatment.  Inmates refusing treatment will be counseled regarding any untoward effects of such refusal.   Refusals shall be documented in the medical record progress note and refusal of medical treatment form completed, signed by the inmate and filed in the medical record. If the inmate refuses to sign the form, such refusal shall be noted on the form and witnessed by two staff members.

e.  Refusal of essential medications and treatment (i.e., the absence of which would jeopardize the health and safety of the inmate) shall be reported to the responsible medical provider after three sequential refusals.

2.  Inmates shall have access to their private physician and/or dentist at their own expense.

3.  The patient/provider confidentiality practices of the community shall prevail in all inmate-patient/jail provider encounters except where state statute supersedes.

a.  Patient information necessary for the protection of the health and safety of facility staff and inmates shall be communicated to the facility manager or his/her designee by the responsible physician or other designated health services staff.

b.  Access to medical and psychiatric records shall be under the control of the Health Authority. Confidentiality of health records shall be maintained at all times.

4.   Inmates requiring medical or ***mental health*** services beyond the scope of services provided by CFMG shall be transferred to a community provider in accordance with CFMG Policy and Procedures.

5.   Inmates retain all the recognized rights of an ordinary citizen relative to informed consent and self-determination of health care.   This shall include the ability to appoint a Durable Power of Attorney for Health Care, and to create a Natural Death Act Declaration addressing end-of-life care.

    a.   Health services and custody staff will work cooperatively to provide access to the means necessary for the creation and recognition of properly executed advance directives. County counsel shall be consulted in the creation of advanced directives.

    b.   A documented end-of-life care plan will be developed when warranted by the inmate-patient's condition. The plan will include, but not be limited to, the inmate-patient's input and consent, properly executed DNR, advanced directives and durable power-of-attorney, pain management, and provision for psychological/spiritual support.

B.   Protocols and Standardized Procedures.

RNs function under standardized procedures developed in accordance with California Board of Registered Nursing requirements. All treatment is pursuant to protocol, standard procedures and/or direct MD orders by personnel licensed to carry out such functions in the State of California. Physician Assistants and Nurse Practitioners shall function under agreements specific to their scope of

15

practice with the supervision of the responsible physician in accordance with the Medical Board of California regulatory guidelines.

1.  Standardized procedures and PA protocols are developed by PA/nursing staff, CFMG Administration, Program Manager, Director of Nursing, and the responsible physician. All orders are subject to the approval of the responsible physician.

2.  When utilized, a minimum of ten percent (10%) of all protocol/standardized procedures initiated care/treatment provided by a physician assistant, nurse practitioner and registered nurse charts shall be reviewed and countersigned by the responsible physician.

3.  All RN protocols/standardized procedures and PA and NP practice agreements are reviewed by the Program Manager, responsible physician and administrative staff at least annually and revised as necessary.

C.  Access to Treatment.

Information regarding access to health care services shall be communicated verbally and in writing to inmates upon their arrival at the facility. Upon confirmation of pregnancy, females shall be informed of their rights to services while in custody and use of restraints prohibition. Provision shall be made to communicate this information to non-English speaking inmates.

1.  Verbal explanations of the sick call procedure shall be communicated to all detainees at the time of booking by the Booking RN. Verification of the nurse's verbal explanation is documented on health screening form. Direct referral to health services staff shall be made in any case of an immediate health need upon booking or as soon as possible after the individual enters the facility.

2. Signs posted in English and Spanish describing sick call availability and procedure shall be posted in booking and in the common areas of the living units.

3. Information regarding access to medical and mental health services is provided in English and Spanish versions of the Inmate Rules booklets given to all inmates.

D. Daily Management of Health *or Mental Health* Care Requests.

Health *and mental health* complaints of inmates shall be collected, processed and documented on a daily basis. Health services staff shall triage and treat health complaints as appropriate. ***Medical complaints will be triaged to the medical provider as appropriate.  Mental health care complaints will be triaged to a qualified medical health care provider as appropriate.***

1. Medical and/or mental health sick call slips are triaged daily. Urgent sick call requests are seen by the on duty medical provider, Monday through Friday. On weekends and holidays, urgent complaints/requests are communicated to the on-call medical provider by the nurse on duty.  The on-call provider will treat or refer the patient as deemed medically appropriate.

2. Emergency requests are seen immediately by on-duty, on-call staff and/or transported to Natividad Medical Center.

3. All ***medical or mental health care*** sick call request slips are reviewed by licensed health services staff on a daily basis. Sick call slips will have the following notations:

17

CFMG's Amended Implementation Plan

      a.   date and time reviewed

      b.   signature of medical staff

      c.   disposition

4.     Sick call slips are filed in the inmate's medical record and the sick call roster shall be kept on file in the medical record room.

5.     Health care providers shall record sick call visits in the inmate's personal medical record.

E.   Sick Call

1.     Sick call is conducted five days per week in a designated clinical environment ensuring privacy for all inmates.

2.     Inmates wishing to be seen on sick call will fill out a slip, listing name, location, date of birth, and complaint.

3.     Slips are collected and triaged daily by health services staff.  Sick call slips received prior to 2300 hours will be scheduled for the next sick call.  If an inmate's custody status precludes attendance at clinic, such as going to court or visits, the inmate must reschedule his/her self for the next scheduled sick call.  Exceptions will be assessed by physician or other medical providers.

4.     Inmates housed in holding and isolation are visited by an MD or RN every Monday, Wednesday and Friday.

5.     Inmates requesting sick call services may be charged a $3.00 co-pay as defined in Penal Code Section 4011.2.  Inmates shall not be refused services because of inability to pay.

F.   Individualized Treatment Plans

A written individualized treatment plan shall be developed by qualified health services staff for inmates requiring close medical and/or mental health supervision, including chronic and convalescent care, and includes directions to health services and other staff regarding their roles in the care and supervision of these inmates.

1.   Inmates with medical and/or psychiatric conditions identified during intake screening or returning to the jail from off-site hospitalization shall be assessed by the Booking RN who will begin initial treatment planning by initiating the continuation of essential care and treatment at the time of intake; consultation with the on-call provider as necessary; and, scheduling referrals for follow up evaluation by the responsible physician mid-level provider or RN who will be responsible for further developing and documenting an individualized plan of treatment.

2.   Treatment plans shall include specific medical and/or psychiatric problem, nursing interventions, housing, dietary, medication, observation and monitoring, and follow-up referral and/or evaluation as appropriate.

3.   The Facility Manager or his designee shall be informed of aspects of the treatment plan which include custody staff, e.g., housing, observation, transportation, etc.

4.   A treatment plan is a series of written statements which specify the particular course of treatment.  A thorough plan will be included in the plan portion of S.O.A.P. progress note and problem lists will reflect current problems or conditions being followed.  Monitoring the efficacy of treatment while in custody, and discharge planning are essential components of the treatment plan.

G.   Chronic Care

CFMG will provide a system for managing patients with chronic health conditions through screening, identifying and monitoring these patients while incarcerated in the Monterey County Jail.

Chronic illness is any health problem/condition lasting at least six months which has the potential to, or actually does, impact an individual's functioning and long term prognosis. Such conditions may include, but are not limited to, cardiovascular disease, diabetes mellitus, gynecological disorders or diseases, chronic infectious diseases, chronic pulmonary diseases, seizure disorders and psychiatric disorders.

Chronic Care Clinic: Routinely scheduled encounters between an FNP, PA or MD and a patient with an identified chronic medical or mental condition for the purpose of treatment planning, monitoring the patient's condition and therapeutic regimen while in custody. Such encounters shall be scheduled at least every ninety days, but may occur more frequently at the discretion of the medical provider. Routinely scheduled Chronic Care Clinic monitoring shall apply to the following conditions: diabetes; cardiac disorders, hypertension, seizure disorders, communicable diseases, respiratory disorders, and psychiatric disorders.  Other conditions may be included as appropriate at the discretion of the medical provider.

***Inmates with chronic care conditions will be managed pursuant to chronic care protocols and standardized procedures that are consistent with national practice guidelines. National Practice Guidelines constitute recommendations regarding patient care and are not intended to preclude clinical judgment. Any national practice guidelines must be applied in the context of clinical care and with adjustments for individual preferences, comorbidities, and other patient factors.***

20

1.     Screening/Identification

    a.   Intake Health Screening

        (1)   Individuals giving a history of a chronic medical or psychiatric condition and/or are taking essential medication for the management of a chronic medical or mental condition will be identified at the time of jail intake screening by the Booking RN.

        (2)   The RN will:

            (a)  Complete an assessment, document and verify all current medications.

        (3)   Continue verified, current medication prescriptions that are on CFMG formulary in accordance with CFMG Medication Continuation Policy and Procedure.

            (a)   The nurse will contact the on-call medical provider by the end of the nursing shift to obtain an order for all medications, whether verified or unverified, formulary or non-formulary.

            (b)  Schedule the patient to be seen on medical provider line, within five to seven days if the inmate's condition is stable. Refer individuals for whom medications cannot be verified or whose condition is unstable to the medical provider on duty or contact the on-call medical provider for orders.

21

(c) ***Attempt to obtain an authorization from the inmate for a release of his/her medical records from outside providers and <u>use the authorization to try and obtain the outside medical records</u>.***

(4) The medical provider will complete a baseline physical examination and history, order a therapeutic regimen and schedule the patient to be seen at least every ninety days for chronic care management.

(5) ***Any patient whose chronic condition cannot be managed at MCJ will be transferred offsite for appropriate treatment and care.***

2. The medical/mental health condition and other pertinent problems will be entered on the Patient Problem List in the health record.

   a. 14-Day Health Inventory & Communicable Disease Screening

      (1) Chronic problems identified during the 14-day health inventory and communicable disease screening that have not previously been identified will ***be*** referred to the next medical or psychiatric provider line for evaluation and follow up.

      (2) The medical or psychiatric provider will complete a baseline history and physical or psychiatric examination; order a therapeutic regimen, as appropriate; and, schedule the patient to be seen for chronic care clinic at least every ninety

CFMG's Amended Implementation Plan

days for the length of the jail stay. Patients on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every **60 to 90** days.

(3)   The medical / mental condition will be entered on the Patient Problem List in the health record and in the IMS computer system.

b.   Sick Call.

(1)   Chronic medical/mental health conditions identified during the routine sick call process shall be evaluated; baseline history and physical examination completed; a therapeutic regimen ordered as appropriate and, scheduled to be seen at least every ninety days for the length of jail stay.  Patient's on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every **sixty**/ninety days.  ***More frequent evaluations by a psychiatrist will be scheduled if necessitated by the patient's condition***.

3.   Monitoring.

a.   Patients with identified chronic medical/mental health conditions shall be scheduled for Chronic Care Clinic and seen by the physician or the psychiatrist at least every ninety days if condition is stable or more frequently if condition is unstable while in custody.

b.   The medical/psychiatric provider conducting the chronic care clinic will assess at minimum:

(1)  History:

   (a)  Current medications
   (b)  Complaints/problems
   (c)  Compliance with therapeutic regimen

(2)  Examination:

   (a)  Vital signs and weight recorded each visit (medical conditions; patients on psychotropic medications with metabolic side effects).

   (b)  Systems examination in accordance with the nature of the chronic condition.

(3)  Assessment:

   (a)  Diagnosis, degree of control, compliance with treatment plan and clinical status in comparison to prior visit.

(4)  Plan:

   (a)  Periodic laboratory and diagnostic tests as indicated by medical and professional practice standards.

   (b)  Strategies to improve outcomes if the degree of control is fair or poor or the clinical status has worsened.

   (c)  The plan also includes:

CFMG's Amended Implementation Plan

i)      Medications.

ii)     Vital signs and other condition specific key indicator monitoring (e.g., blood glucose monitoring indiabetes; peak flow monitoring in chronic pulmonary conditions, serum drug levels, etc.), as clinically indicated.

iii)    Health care education (e.g., nutrition, exercise and lifestyle changes; medication management).

iv)     Referral to MD or specialist, as clinically indicated.

v)      Interval to next visit.

vi)     Discharge planning in preparation for release or transfer from the facility.

4.    Documentation:

a.    Chronic care clinic interactions will be documented in the health record in a SOAP format progress note or on approved, standardized, condition specific Chronic Care Clinic forms.

b.    Chronic medical/mental conditions and other pertinent problems will be recorded on the Patient Problem List.

5.    Health Inventory & Communicable Disease Screening.

A complete gender specific health history inventory and communicable disease screening shall be completed on all inmates within 14 days of arrival at the facility by a Registered Nurse who has completed appropriate training that is approved or provided by the responsible

physician.  A copy of the Health Inventory & Communicable Disease Screening Form is attached as Exhibit E. Communicable disease screening shall include at a minimum, screening for diseases in accordance with the findings of the health inventory and prevalence data for the local community.   The extent of communicable disease screening shall be determined by the responsible physician in collaboration with local public health officials.  Individuals returning to custody within 3 months of the prior incarceration shall have vital signs and communicable disease screening repeated; the remaining history will not be repeated unless the individual indicates a change in historical information since the prior documented history.

6.     Inmates will complete a gender specific self-health history form which has been approved by the health authority. The health history form will include, at a minimum:

- prior illnesses
- operations
- injuries
- medications
- allergies
- systems review
- relevant family history, e.g., heart disease, cancer, substance abuse, etc.
- substance abuse
- risk factors for sexually transmitted disease
- history of sexual abuse and/or abusiveness

7.     The completed history form and the intake health screening will be reviewed with the inmate by a qualified health professional, i.e., licensed vocational nurse, registered nurse, mid-level provider, or physician. The

CFMG's Amended Implementation Plan

date and outcome of the review and signature of the reviewer shall be documented on the approved form.

8.   Temperature, pulse, respirations, blood pressure, height and weight will be recorded on the approved form.

9.   The STD Supplemental form will be completed. Positive responses will be referred to the medical provider.

10.   Positive findings shall be recorded onto a problem list. A follow-up plan of action shall be developed and documented in the health record by a qualified health professional (i.e., physician, mid-level provider or registered nurse in accordance with approved standardized procedures).

11.   All positive health inventory findings and plans of action shall be reviewed by the responsible physician.

12.   Positive findings and conditions requiring further evaluation and/or treatment shall be referred to the appropriate provider, i.e., medical, mental health and dental, next scheduled sick call.  Urgent conditions will be referred immediately to on-site or on-call provider resources.

13.   Individuals returning to custody within 3 months of prior incarceration: vital signs and communicable disease screening will be repeated at each jail admission; inmate will be queried regarding any changes in health status since last documented health inventory. All assessment data will be documented, dated, timed, and signed by the health services staff completing the assessment.

14.   Inmates refusing the Health Inventory & Communicable Disease Screening will be counseled by medical staff as to the confidentiality and medical importance. If an inmate still refuses, a refusal form will be

27

signed by the inmate and medical staff. Document in the inmate's medical chart that he/she was counseled and contact a provider for orders.

H.   Mental Health Screening and Evaluation.

1.   Within 14 days of admission to the Monterey County Jail all inmates will have an initial mental health screening performed by a qualified mental health professional on the mental health staff.

2.   The initial mental health screening will consist of a structured interview including inquiries into the following:

   a.   A history of psychiatric hospitalizations and outpatient treatments, substance use hospitalization, detoxification and outpatient treatment, suicidal behavior, violent behavior; victimization, special education placement; cerebral trauma or seizures and sex offenses.

   b.   The current status of psychotropic medications, suicidal ideations, drug or alcohol use and orientation to person, place and time.

   c.   Emotional response to incarceration.

   d.   A screening of intellectual function (i.e., mental retardation, developmental disability and learning disabilities).

3.   Inmates who score positive for mental health problems will be referred to a qualified mental health provider for further evaluation.

4.   Inmates who require acute mental health services beyond those available on site are transferred to an appropriate facility.

I.    Health Care Maintenance.

A complete physical examination for the purpose of health maintenance will be completed by health services staff within six months of the date of incarceration. The components of the physical examination shall be determined by the responsible physician and will include a review of body systems; breast exam for all females; a rectal exam and PSA for males 50 years of age or older.

1.    A computer generated list of inmates requiring a physical examination (those who have been in custody 170 days) will be utilized to schedule physical exams Monday through Friday (holidays excluded).

2.    The exam will be completed by the responsible physician, physician assistant or nurse practitioner.

3.    The physical examination shall include:

a.    Review of the health inventory and communicable disease screening;

b.    Vital signs, height and weight;

c.    A full body system review and assessment consistent with community standards and guidelines.

d.    A documented assessment of the individual's health status based on the physical findings;

e.    A plan for follow up, treatment and referral as indicated; and,

f.    Review and countersignature by the responsible physician.

4.    All examination findings will be recorded on an approved CFMG physical examination form and filed in the inmate's medical record.

J.    Continuity of Care

Patients will receive continuity of care from admission to discharge while in this facility, including referral to community care when indicated.

1.    If possible, health providers will obtain information regarding previous care when undertaking the care of a new patient.

2.    When the care of the patient is transferred, appropriate health information is shared with the new providers in accord with consent requirements.

3.    A Transfer of Medical Information form will be completed and accompany inmates being transferred to another detention/corrections system who have been receiving medical and/or mental health treatment while detained within the Monterey County Jail system.

4.    A prescription for a 30-day supply of medications taken while in jail may be given to inmates upon discharge by order of the responsible physician.

5.    Referral to public health and/or community clinics for follow-up care and treatment will be made as appropriate to need and availability for inmates who are released prior to resolution of a continuing medical/mental health condition.

30

6.    Inmates released to the community will be provided with written instructions for the continuity of essential *care,* including, but not limited *to,* name and contact information of community providers for follow up appointments, prescriptions and/or adequate supply of medication for psychiatric patients.

K.    Outside Appointments.

Inmates will have access to outside health care providers in one of two ways:

1.    The medical staff (M.D. N.P. or P.A.) determines that a medical consultation is indicated for which the cost for service will be the responsibility of CFMG.

2.    When an inmate requests to see a private health care provider which is not determined necessary by the in-house medical staff. In this case, the inmate will assume responsibility for all costs incurred. All requests to see off-site providers must be approved by the physician and by custodial staff for security reasons.

a.    The Program Manager or his/her designee will:

   (1)  Establish contact with outside provider to schedule appointments
   (2)  Arrange transportation services
   (3)  Complete medical referral forms only for inmates that they determine need outside medical consultation

b.    The Inmate:

   (1)  If inmate assumes responsibility for cost, must contact outside provider to arrange payment for services.  Once arrangements are made, the medical records coordinator will schedule

31

appointments and transportation services. CFMG medical referral forms are not completed for this type of appointment.

L.   CFMG Medical Referral Form.

The CFMG Referral Form is utilized at all times when the medical staff refers an inmate off-site for medical information to the outside provider as well as authorize payment.  A copy of the CFMG Referral Form is attached as Exhibit F.

1.   The M.D. N.P. or P.A. may refer an inmate to an outside provider for medical care which cannot be provided on-site.  When this occurs, the medical staff will complete the medical referral form, and give it to the medical record clerk, who will then arrange the appointment.

2.   In an emergency, when an ambulance is called, medical staff will complete two medical referral forms, one for the hospital and one for the ambulance company.

3.   Medical staff should not complete the medical referral form for:

   a.   Inmates who are refused at time of booking (CFMG is not financially responsible for these inmates).
   b.   Inmates going off-site to see their private physicians at their expense.

4.   All sections of the referral form should be completed except the section, "Recommendations to the Referring Agency."   The Medical Insurance Section should be completed and all pertinent information noted.

5.   A copy is retained in the inmate's medical chart.  Two copies are given to transportation to pass on to the outside provider.  One of those copies is then returned with recommendations for follow-up.

32

IV.   INMATE ACCESS TO MENTAL HEALTH SERVICES

Outpatient mental health services to include screening, evaluation, diagnosis, treatment and referral services shall be available to all inmates in the Monterey County Jail. All mental health outpatient services will be provided by qualified mental health providers.  Inmates requiring services beyond the on-site capability at the Monterey County Jail shall be referred to appropriate off-site providers.

A.   All new inmates shall be observed and queried for signs/presence and history of mental illness, including suicidal behavior/ideations, and use of medication for psychiatric treatment as part of the intake health screening completed by the Booking Registered Nurse. Verification of medications and request of treatment records will be initiated for inmates indicating current or recent treatment including medications, hospitalization, emergency department visits and/or outpatient services. Any inmate exhibiting or testifying to presence or history of mental illness is referred to mental health services staff for further evaluation.

B.   Mental Health Screening and Evaluation.

1.   Within 14 days of admission to the Monterey County Jail all inmates will have an initial mental health screening performed by a qualified mental health professional on  the mental health staff.

2.   The initial mental health screening will consist of a structured interview including inquiries into the following:

a.   A history of psychiatric hospitalizations and outpatient treatments, substance use hospitalization, detoxification and outpatient treatment, suicidal behavior, violent behavior; victimization, special education placement; cerebral trauma or seizures and sex offenses.

CFMG's Amended Implementation Plan

      b.    The current status of psychotropic medications, suicidal ideations, drug or alcohol use and orientation to person, place and time.

      c.    Emotional response to incarceration.

      d.    A screening of intellectual function (i.e., mental retardation, developmental disability and learning disabilities).

3.    Inmates who score positive for mental health problems will be referred to a qualified mental health provider for further evaluation.

4.    Inmates who require acute mental health services beyond those available on site are transferred to an appropriate facility.

C.    The on-site mental health team is comprised of the psychiatrist, psychologist, Marriage and Family Therapist, Licensed Clinical Social Worker and Psychiatric Registered Nurse. A licensed psychiatrist and psychologist are available on-site and on-call to health services staff at the jail for consultation, referral and treatment.

D.    Mental Health services provided on-site will include crisis evaluation, socialization programs, group therapy, medication management, psychiatric evaluations and individual therapy.

E.    Inmates requiring special in-jail housing and/or observation for psychiatric reasons will be housed in single cells and/or the Outpatient Housing Unit pursuant to consultation with the Facility Manager or Watch Commander and the responsible on-duty medical/mental health staff.

F.  Individual treatment plans shall be developed by the responsible mental health provider and the Program Manager or designee to meet the outpatient treatment needs of the inmate during his/her period of incarceration including the opportunity for social interaction and participation in community activities. If the inmate is unable to participate, the reason will be documented by the responsible mental health professional.

G.  Crisis intervention and management of acute psychiatric episodes shall be handled initially by on-duty medical and/or mental health team staff with referral to the psychologist and/or psychiatrist on a 24 hour per day basis.

H.  A suicide risk assessment, including use of the Suicide Risk Assessment Tool, a copy of which is attached as Exhibit G, will be performed by a qualified mental health provider when the booking R.N. identifies suicidality during the Initial Health Screening; *within four hours* after placement in a safety cell; *before release from a safety cell*;   o r after placement in Administrative Segregation.  *Any qualified mental health provider who performs a suicide risk assessment will be trained in the use and interpretation of the Suicide Risk Assessment Tool.*

I.  Inmates with a serious mental illness who are housed in Administrative Segregation will be scheduled for a weekly appointment with a qualified mental health provider. Nursing staff shall conduct mental health rounds in Administrative Segregation *daily*, separate and apart from medication distribution.

J.  Inmates requiring psychiatric care beyond the on-site capability will be transferred to an appropriate off-site facility as deemed necessary by responsible jail psychiatric staff.  The shift supervisor or his/her designee will be contacted to process the documents required for transfer.

K.  A prescription for a 30-day supply of medications taken while in jail may be

given to inmates upon discharge by order of the responsible physician.

L.   Referral to public health and/or community clinics for follow-up care and treatment will be made as appropriate to need and availability to inmates who are released prior to resolution of a continuing mental health condition.

M.   Inmates released to the community will be provided with written instructions for the continuity of essential care, including, but not limited to, name and contact information for community providers for follow-up appointments, prescriptions, and/or adequate supply of medication for psychiatric patients.

N.   Tele-Psychiatry Program

   1.   All inmates within the Monterey County Jail have access to the tele-psychiatry program.

   2.   Referrals to the tele-psych program can be made by the following:

      a.   MD
      b.   Registered Nurse
      c.   Program Manager
      d.   Mental Health Provider (LCSW, MFT, Psych RN)

   3.   Tele-Psych Clinic Procedure

      a.   Inmates being referred to the clinic will be placed on the sick call list.

      b.   The mental health worker will set up the clinic for the scheduled day. The tele-psych referral form will be completed and sent to the psychiatrist for each individual patient being seen.

      c.   All the information on each patient will be faxed to the psychiatrist at least 1 hour before the start of the clinic. All pertinent

37

information, i.e., pertinent history, lab results, progress notes from mental health provider, medication compliance, etc., will be included.

d.   Once the clinic begins the mental health worker will facilitate the process:

(1)   Provide privacy for the patient by closing the room door, whenever possible. There may be times when the door cannot be closed for security/safety reasons. If this occurs, the mental health worker will make sure there are no inmates and/or non-essential staff seated outside the room or within hearing distance of the room. The medical assistant will work with the facility staff to do everything possible to ensure privacy for the patients. If at any time the patient requests to speak to the doctor privately, the medical assistant will advise the appropriate detention staff and leave room.

(2)   Assist the psychiatrist  with information needed from the medical record and will write the doctor's orders in the chart. The psychiatrist's orders will then be faxed to the doctor at the corporate office for signature, and will be returned to the county to be put into the patient record.

(3)   Assist the inmate by explaining the process and providing support during the procedure.

(4)   Medication

(a)   Informed consent for medication

i)   The psychiatrist will verbally provide the inmate with the rationale for the use of the specific medication,

38

the benefits, and potential side effects; the potential risks of refusing to take the medication; and document this information and the patient's level of understanding in the medical record.

ii)   The medical assistant will complete the consent form, obtain the patient's signature and fax the consent form to the psychiatrist for signature. The completed, signed form will be faxed back to the county and filed in the inmate's medical record.

(b)   Medication monitoring

i)   ***Patients*** on ***psychiatric*** medications will be ***seen by a psychiatrist every thirty days until determined stable and*** then every 60 to 90 days.  More frequent ***evaluations by a psychiatrist*** will be scheduled as ***necessitated*** by the patient's condition.

(5)   Onsite monitoring / follow up of patient status

(a)   The onsite mental health provider will routinely monitor patient status and report significant changes to the psychiatrist between scheduled tele-psychiatry clinics.

(b)   Urgent or emergent patient conditions will be referred to local community providers through consultation with the onsite medical director.

(6)  Documentation

(a) The tele-psychiatrist will document all patient progress notes and transmit them electronically to the facility for inclusion in the patient's medical record within 24 hours of the clinic visit.

O.  ***Medical and mental health staff shall be consulted before any planned use of force on an inmate.***

P.  ***Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff shall contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness.***

Q.  ***Physical restraint devices shall only be utilized on inmates who display bizarre behavior which results in the destruction of property or reveals an intent to cause physical harm to others. Physical restraints should only be used when it appears less restrictive alternatives would be ineffective in controlling the disordered behavior.***

***Any inmate placed in a restraint chair will be seen and evaluated by a medical provider no later than one hour from the time of placement.  The medical evaluation may be performed by trained nursing staff, physician assistant, nurse practitioner or physician.  If the medical provider believes the inmate is experiencing a mental health crises  the medical provider  will promptly contact a qualified mental health provider who will see and evaluate the inmate within one hour of being contacted by the medical provider.***

V.      TREATMENT OF ALCOHOL WITHDRAWAL

A.   Policy

Individuals booked into the Monterey County Jail who are intoxicated, a threat to their own safety or the safety of others are placed in the protective environment of the sobering cell will be under close observation by custody and health services staff.   Detoxification from alcohol, when performed in this facility, will be done under medical supervision in accordance with direct orders from the responsible medical provider using approved protocols/standardized procedures.

B.   Circumstances under which the RN may perform the function:

   1.      Setting - CFMG Monterey County Correctional Facilities.

   2.      Supervision - ***Direct supervision required prior to starting any prescription medication***.

   3.      Patient conditions - Registered nurses may routinely assess and care for patients' in a state of alcohol intoxication and/or withdrawal following procedures approved by the responsible physician.

   4.      ***Access to the on-site or on-call medical provider for consultation. Medical Provider consultation is required prior to initiation of prescription medication.***

CFMG's Amended Implementation Plan

C.    Protocol

    1.    Definition:

        a.    Intoxication - behavior and physical abnormalities that are manifested when the  amount of substance exceeds the person's tolerance.

        b.    Withdrawal - signs and symptoms that appear when a substance known to cause physiological dependency is stopped.

        c.    CIWA(Ar) (Clinical Institute Withdrawal Assessment, revised) is a common measure used in to assess and treat Alcohol Withdrawal Syndrome.

        d.    Alcohol abuse - use of alcoholic beverages to excess, either on individual occasions ("binge drinking") or as a regular practice.

        e.    Alcohol dependence also known as alcoholism is a  chronic, progressive, and potentially fatal disease. The characteristics include:

            (1)    Drinking excessive amounts frequently.

            (2)    Inability to curb drinking despite medical, psychological, legal or social complications.

            (3)    Increased tolerance to alcohol.

            (4)    Occurrence of withdrawal symptoms when the person stops drinking.

f.   Tolerance - a state in which increased amount of psychoactive substance is needed to produce a desired effect.

g.   Alcohol Withdrawal Syndrome (AWS) -a defined clinical syndrome of autonomic hyper-excitability that develops on cessation of prolonged alcohol consumption because neuroreceptors previously inhibited and up-regulated by alcohol are no longer inhibited resulting in the clinical manifestations of AWS.

(1)   Eighty-five percent of people have only very minor symptoms or none at all.

(2)   Fifteen percent develop major symptoms.

(3)   One percent of those will develop significant morbidity and/or death.

(a)   Alcohol withdrawal follows a bimodal pattern of clinical evolution with minor symptoms generally occurring in the first 48 hours and major symptoms occurring thereafter.

(b)   Minor symptoms:

i)    Anxiety and agitation
ii)   Tremors
iii)  Nausea and vomiting
iv)   Headache
v)    Insomnia
vi)   Tachycardia
vii)  Elevated blood pressure
viii) Flushed face
ix)   Diaphoresis

43

        (c)   Major Symptoms

              i)     Seizures
              ii)    Delirium
              iii)   Arrhythmias

        (d)   Treatment Goals

              i)     Reduce the generalized hyper-excitability and make patients more comfortable
              ii)    Prevent the development of major symptoms
              iii)   Reduce the overall morbidity and mortality

        (e)   Treatment

              i)     Benzodiazepines
              ii)    Beta blockers
              iii)   Clonidine (Catapres)
              iv)   Adjunct medication such as Gabapentin, Tegretol, atypical antipsychotics
              v)    Nutrition, fluids, multi-vitamins, thiamine
              vi)   Treat underlying medical problems

D.   Data Base

    1.   Subjective:

        a.   Obtain consumption history: amount, kind, frequency, and date/time of last consumption.

        b.   Obtain withdrawal history: seizures*, delirium tremens*, arrhythmias*, other complications.

---

*High risk factors.

    c.   Obtain past medical history:

        (1)   Particularly heart disease* and/or pulmonary disease*

        (2)   Recent trauma, particularly head trauma*

        (3)   Determine if other drugs or prescriptions taken, date/time last taken.

        (4)   Females: determine if pregnant.

        (5)   Allergy history

2.   Objective:

    a.   Initial assessment includes vital signs and somatic symptoms: Pulse, blood pressure, respiration, diaphoresis, tremor, nausea and vomiting; and, headache. Look for signs of head trauma, i.e., abrasions, lacerations, bruising, raccoon eyes, blood from ears and/or nose;

        (1)   Initial assessment also includes behavioral symptoms: Agitation, contact, hallucinations, and anxiety

        (2)   Patient appears under the influence of alcohol such as smells of alcohol, has withdrawal symptoms*, or has a measurable blood alcohol content in the presence  of active signs/symptoms of withdrawal*

        (3)   Tachycardia greater than 120*

        (4)   Alcohol Withdrawal Scale (AWS) score of eight or greater on initial evaluation*

        (5)   Access previous jail medical records for history of in custody AWS protocol treatment*.

E.   Assessment

1.   Altered nutrition: less than body requirements related to poor dietary habits.

2.   Altered thought processes related to potential delirium tremors.

3.   Anxiety related to withdrawal.

4.   High risk for fluid volume deficit related to (specify: excessive diaphoresis, agitation, decreased fluid intake)

5.   High risk for violence related to substance withdrawal.

6.   Sensory/Perceptual Alterations; visual,  auditory,  kinesthetic, tactile, olfactory related to neurochemical imbalance in brain.

F.   Plan

1.   Level 0 - Alcohol Withdrawal Scale (CIWA-Ar ) 8 or less & NO Identified Risk Factors.

a.   A CIWA-Ar monitoring every 4 hours x 72 hours; if scores less than 8 for 72 hours, discontinue monitoring.

b.   House per custody classification

(1) Encourage fluids

2.   Level I - Alcohol Withdrawal Scale (CIWA revised) 8 or less with one or more identified risk factors (i.e., measurable blood alcohol level in the presence of active signs/symptoms of withdrawal; tachycardia above 120; history of withdrawal seizures, DT's, arrhythmias, or other complications; past medical history of heart disease, pulmonary disease

and/or head trauma).

a.  Valium (Diazepam) 10 mg PO with initial CIWA-Ar assessment; then, every 6 hours x 72 hours, then, if stable every 8 hours; then discontinue if stable.

b.  CIWA-Ar monitoring every 6 hours x 72 hours; then, if stable every 8 hours x 24 hours; then, if stable, discontinue the monitoring and Diazepam.

c.  Push fluids, 1 quart (32 ounces) every 6 hours.

d.  Clonidine (Catapres 0.1 mg PO tid x 5days (hold if systolic less than 95).

e.  Multivitamins one daily PO x 5 days.

f.  Thiamine (Vitamin B1) 100 mg PO every day x 5 days.

g.  Folic acid 1 mg PO every day x 5 days

h.  Ondansetron Hydrochloride (Zofran) ODT 4 mg PO bid PRN nausea/vomiting x 5 days.

i.  Acetaminophen 500 mg. PO every 6 hours PRN for headache x 5 days.

j.  Notify medical provider if CIWA-Ar score worsens or shows no improvement in **one hour** of protocol medication administration.

k.   Notify medical provider if inmate refuses medications and/or CIWA-Ar monitoring.

l.   Consult with medical provider daily until score < 5.

m.  If released prior to completion of the protocol, give written discharge instructions.

3.   Level II - Alcohol Withdrawal Scale (CIWA-Ar) score 9-14 ***with or without risk factors as noted above***.

a.   Diazepam (Valium) 10 mg PO with initial assessment; then, every 2 hours until CIWA-Ar score less than 10; then, Diazepam 10 mg. PO every 6 hours to complete x five full  days of protocol.

b.   ***CIWA-Ar*** score assessment every 2 hours until score less than 10; then, if stable, every  6 hours to complete full five days of protocol.

c.   Notify medical provider if CIWA-Ar score is 15 or greater; worsens; or shows no improvement in one hour following initiation of medications for consideration of hospital transfer.

d.   PRN medication response assessment: CIWA-Ar 30-60 minutes after medication administration.

e.   A Clonidine (Catapres 0.1 mg PO tid x 5days (hold if systolic less than 95).

f.   Gabapentin 400mg PO qid x 5 days (for a full 5 days).

g.   Continue all other medications as for Level 1.

48

h.    House in OPHU, Medical Observation Status. If no OPHU beds available, contact medical provider for consideration of transfer to Natividad Medical Center.

i.    Next medical provider sick call.

j.    If CIWA-Ar score is less than 8 x 24 hours may move to custody housing; and continue Level I protocol to complete 5 full days.

k.    Must be assessed prior to release for possible transport to hospital if not stable, or in need of additional medical intervention.

4.    Level III - Alcohol Withdrawal Scale (CIWA-Ar ) score  *15 or greater with or without risk factors as noted above*.

a.    Diazepam (Valium) 20 mg PO, continue Diazepam dosing based on CIWA-Ar score every 1 hour; when CIWA-Ar score less than 15: give Diazepam 10 mg. PO every 6 hours to complete five full days of protocol.

b.    Continue all medications; as for Level II.

c.    CIWA- Ar assessment/ vital signs: every hour until score less than 15; then, if stable, 4 hrs x 72 hrs; then, if stable, every 6 hours to complete full five days of protocol.

d.    House in OPHU, Medical Observation Status. If no OPHU beds available, contact medical provider for consideration of transfer to Natividad Medical Center.

e.    Next medical provider sick call; and daily.

49

f.   Notify medical provider if CIWA-Ar score shows no improvement within one hour following initiation of medications for consideration of hospital transfer. ***Immediately contact on-call provider for any patient at any AWS level who complains of respiratory distress and/or chest pain. Immediately*** send patient to the emergency department for any ***patient failing to improve after one hour from valium dosing on any AWS level or for active seizing.***

g.   If  CIWA-Ar score less than 8 x 24 hours move to custody housing

h.   Must be assessed by medical prior to release for possible transport to hospital if remains at a protocol level II or III, or is not stable.

50

## VI.   TREATMENT OF DRUG WITHDRAWAL

A.   Policy:

This procedure is to facilitate and guide in the evaluation and treatment of drug withdrawal. Medical response will be initiated within one hour of the identification of drug withdrawal treatment need at any time during the inmate's incarceration. Drug withdrawal is characterized by physiologic changes that occur when the addicting drug is discontinued.

B.   Circumstances under which the RN may perform the Function:

1.   Setting - Monterey County Correctional Facilities

2.   Supervision - ***Direct supervision required for initiation of prescription medications.***

3.   Patient conditions - Registered nurses may routinely evaluate and care for patients' health complaints following procedures approved by the responsible physician.

4.   ***Access to the on-site or on-call medical provider for consultation. Medical Provider consultation is required prior to initiation of prescription medication.***

C.   Data Base

1.   Opiods (opiates, heroin, methadone, buprenorphine):

Withdrawal from opioids can generally be managed safely in a jail setting, however, there are certain criteria for when hospitalization is the preferred setting for managing withdrawal (see below).

CFMG's Amended Implementation Plan

a.   Subjective:

   (1)   Patient relates history of opioid use or addiction.

   (2)   Patient relates one or more of the following complaints:

      (a)   Craving and demanding of addicting drugs
      (b)   Lacrimation - tearing of the eyes
      (c)   Restless sleep, insomnia
      (d)   Gooseflesh - pilomotor erection
      (e)   Hot and cold flashes
      (f)   Generalized aches and pains
      (g)   Nausea and vomiting, abdominal cramping
      (h)   Diarrhea
      (i)   Methadone may be asymptomatic 48-72 hours after last dose

b.   Objective

   (1)   Yawning
   (2)   Diaphoresis
   (3)   Rhinorrhea-watery discharge from the nose
   (4)   Lacrimation - tearing of the eyes
   (5)   Fever
   (6)   Increased rate and depth of respirations
   (7)   Tachycardia
   (8)   Vomiting
   (9)   Agitation, anxiety
   (10)  Piloerection
   (11)  Dilated pupils

(12) Access previous jail medical records for history of in custody drug protocol treatment.

2.   Benzodiazepines: (Klonopin, Alprazolam (Xanax), Chlordiazepoxide (Librium), Diazepam (Valium), Lorazepam (Ativan) and BARBITURATES: (Phenobarbital, Secobarbital Sodium (Seconal), and Pentobarbital (Nembutal)). Withdrawal from these sedatives can generally be managed safely in a jail setting; however there are certain conditions when hospitalization is the preferred setting for managing withdrawal that determination will be made by the medical provider.

   a.   Subjective:

   (1)   Patient relates history of benzodiazepine (barbiturate) use

      (a)   Name of medication.

      (b)   Amount, route, frequency, duration of use and last use.

      (c)   Other substance and/or prescription drug use/abuse (name/type, frequency and dose/amount),

      (d)   In the past year has patient used opioids, cocaine, amphetamines, heroin, pain pills, or marijuana. If yes, last use. If used within last week determine amount and frequency of use. Is daily drinker of alcohol, determine amount and if there is a history of withdrawal.

   (2)   Withdrawal symptoms    per Benzodiazepine Withdrawal Symptom  Questionnaire (2) (refer to questionnaire below).

(3)   Additional symptoms:

    (a)   Itching or peculiar feeling in the skin (e.g., hot patches, tingling, wet legs)

    (b)   Buzzing in the ears (tinnitus)

    (c)   Blurred vision

    (d)   Flu-like symptoms ( runny nose, sore throat)

    (e)   Anxiety/irritability

    (f)   Dizziness

    (g)   Breathlessness

    (h)   Vomiting, retching

    (i)   Relates current history of possible psychotic behavior; suicidal or homicidal thoughts: report to on-call medical provider during consultation.

    (j)   Relates history of current medical conditions for which receiving treatment (e.g., cardiac, pulmonary, seizure disorders): include in consultation with on- call provider.

    (k)   Relates history of alcohol and/or sedative withdrawal; loss of consciousness, delirium, loss of bowel and/or bladder control, etc.); ever hospitalized and/or treated for alcohol or sedative withdrawal while hospitalized for another problem: include in consultation with on-call provider.

b.   Objective:

(1)   Physical Assessment

(2)   Vital signs: elevated heart rate, blood pressure, respiratory rate, and temperature

(3)   General: sweating, retching, increased motor activity.

54

(4) Neuro-motor: not fully oriented, unable to track/follow commands, tremor, myoclonic jerks

(5) Other: signs of chronic or acute illness

(6) Access previous jail medical records for history of in custody drug protocol treatment.

3.    Cocaine/Methamphetamine/Designer Drugs:(LSD, PCP, Ecstasy):

   a.    Subjective:

      (1) Patient relates history of cocaine, methamphetamine, or designer drug use.

      (2) Patient relates one or more of the following complaints:

         (a) Drug craving
         (b) Paranoia
         (c) Desire to sleep a lot and/or insomnia
         (d) Loss of energy
         (e) Depression
         (f) Apathy
         (g) Suicidal ideation
         (h) Nausea
         (i) Palpitations
         (j) Increased appetite
         (k) Feeling cold

   b.    Objective:

      (1) Anxiety, agitation or lethargy

(2)   Tremulousness

(3)   Tachycardia

(4)   Hypertension

(5)   Hyperventilation

(6)   Diaphoresis

(7)   Dilated pupils

(8)   Psychosis

(9)   Seizures may be caused by severe toxicity

(10)  Unresponsive/coma

(11)  Access previous jail medical records for history of in custody drug protocol treatment.

4.   Assessment:

   a.   Altered Nutrition: less than body requirements related to poor eating habits

   b.   High risk for injury related to hallucinations, drug effects

   c.   High risk for violence related to poor impulse control

   d.   Ineffective individual coping related to situational crisis, withdrawal

   e.   Sensory/perceptual alterations as evidenced by symptoms related to substance intoxication

   f.   Sleep pattern disturbance related to effects of drugs or medications

5.   Plan:

   a.   Opioid (Opiates, Heroin, Methadone, Buprenorphine) Withdrawal Treatment:

   ***While opioid withdrawal is generally considered safe, dehydration and electrolyte imbalance from prolonged vomiting can lead to serious health consequences including death. Additionally, the cardiovascular stress of opioid and other drug***

56

**withdrawal can lead to serious health complications including myocardial infarction and cardiac arrest especially in patients with underlying chronic medical conditions such as heart disease and diabetes.**

(1) If patient is pregnant or lactating consult with on-call medical provider and DO NOT USE THIS PROTOCOL as patient may need to continue or be started on methadone or buprenorphine.

(2) If patient is withdrawing from or has the potential to withdrawal from Opiates and Alcohol: include this information to medical provider when obtaining orders to initiate protocol; also, see section d. Multiple Substance Withdrawal in this protocol.

(3) The Clinical Opiate Withdrawal Scale (COWS) will be used to assess all inmates stating a history of opiate use and/or withdrawal, **as well as vital signs and assessment for dehydration.**

(4) Withdrawal from longer acting opioids like methadone or buprenorphine generally begin later and last longer duration than heroin withdrawal, especially when on larger doses, i.e., **methadone at greater than 50 mg/day; buprenorphine at greater than 16 mg/day. For patients that admit to or are known to be using methadone or buprenorphine, COWS assessment monitoring and vital signs will continue for a full 10 days, or until discontinued by the provider. Monitoring and treatment will follow the levels described below.**

(5) Consider drug-to-drug interactions and drug contraindications

57

when ordering medications. Consult with medical provider prior to initial of prescription medications.

(6)   Baseline labs at the discretion of the medical provider.

(7)   Mild Withdrawal/Level 1 - COWS score 5-12; HIGH-RISK inmates (those having co-morbidities such as CAD, DM, COPD and/or inmates >50 years of age) should be started at LEVEL 2:

(a)   Tylenol #3, 2 tabs  PO bid x 3 days
(b)   Gabapentin 400mg PO qid x 3 days

(c)  Ondansetron (Zofran) ODT 4mg PO tid x 3 days PRN

(d)  Clonidine (Catapres) 0.1 mg PO bid x 3 days (Hold Clonidine if BP below 80/60)

(e)  Multi vitamins one PO every day x 3 days

(f)  Loperamide (Imodium) 2 mg PO tid x 3 days PRN.

(g)  Push fluids

(h)  COWS assessment and vital signs bid x 3 days

(i)  Sick Call in 72 hours for re-evaluation

(j)  Notify medical provider if inmate refuses medications and/or COWS monitoring.


(8)  Moderate Withdrawal/Level 2 - COWS Score 13-24 or ALL high risk (see above) inmates with score <24

(a)  Tylenol #3 2 tabs PO bid x 3 days

(b)  Gabapentin 400mg PO tid x 3 days

(c)  Ondansetron (Zofran) ODT   4 mg PO tid x 3 days PRN

(d)  Clonidine (Catapres) 0.1 mg PO tid x 3 days (Hold Clonidine if BP below 80/60).

(e)  Multivitamins one PO every day x 3 days.

(f)  Loperamide (Imodium) 2 mg PO tid x 3 days PRN.

(g)  Push fluids.

(h)  COWS assessment and vital signs tid until score <13.

(i)  Medical Provider Sick Call in 24 hours for re-evaluation or contact on call provider.

(j)  Notify medical provider if inmate refuses medications and/or COWS monitoring.

(9)   Moderately Severe Withdrawal/Level 3 - COWS Score 25 - 36:

(a)   Tylenol #3  2 tabs PO tid x 3 days, then bid x 3 days.

(b)   Gabapentin 400 mg PO qid x 6 days.

(c)   Ondansetron (Zofran) ODT 4 mg PO tid x 3 days PRN.

(d)   Clonidine (Catapres) 0.1 mg PO tid x 6 days.   (Hold Clonidine if BP below 80/60).

(e)   Multivitamins one PO every day x 3 days.

(f)   Loperamide (Imodium) 2 mg PO tid x 3 days PRN.

(g)   Push fluids.

(h)   COWS assessment and vital signs q 6 hours x 2 days or until score <25, then tid until score <13.

(i)   Notify medical provider if inmate refuses medications and/or COWS monitoring.

(j)   Medical Provider Sick Call daily for re-evaluation or contact on-call daily until score <25.

(k)   <u>Scores greater than 30 that do not improve with medication after one hour consult with medical provider and order ambulance for transport to emergency department.</u>

INSERT 3 PAGE Opioid
Withdrawal Scales
PP 58-60

CFMG's Amended Implementation Plan

INSERT 3 PAGE Opioid 58-
60

CFMG's Amended Implementation Plan

INSERT 3 PAGE Opioid

CFMG's Amended Implementation Plan

*b.   Benzodiazepine and Barbiturate Withdrawal (BWS) Treatment:*

*(1)   Conduct initial assessment which includes current symptoms and physical findings including full vital signs.*

*(2)   Consult on-call medical provider with assessment findings for consideration of starting withdrawal protocol and baseline labs.   Provider may elect to monitor only or, for high risk patients, may elect to start a diazepam (Valium) withdrawal taper.*

*(3)   Benzodiazepine Taper:*

*(a)   Days 1, 2 and 3: Diazepam 10 mg tid PO (total of 30mg/day)*

*(b)   Days 4, 5 and 6: Diazepam 5 mg qid PO (total of 20 mg/day)*

*(c)   Days 7,8 and 9: Diazepam 5 mg tid PO (total of 15 mg/day)*

*(d)   Days 10, 11 and 12: Diazepam 5 mg, bid PO (total of 10 mg/day)*

*(e)   Days 13, 14 and 15: Diazepam 5 mg day PO.*

*(4)   Monitoring of vital signs during the withdrawal period begins with TID monitoring for the first three days and decreases to BID for an initial seven days.   If patient is high risk for withdrawal complications as noted above\* and diazepam (Valium) was ordered by the provider, continue the BID monitoring for nine days, then daily x 3.*

*(5)   Attempt to confirm benzodiazepine use through pharmacy verification/outside provider office verification and/or urine toxicology, if available at your site.*

*(6)   All inmates placed on benzodiazepine withdrawal monitoring or withdrawal medications should be housed*

64

CFMG's Amended Implementation Plan

*lower bunk and lower tier.*

**(7) Consideration should be made for special medical housing for withdrawal patients and especially for those abusing multiple substances.**

**(8) Generally, benzodiazepine withdrawal symptoms fluctuate. It is not recommended to increase the dose of Valium when symptoms worsen; instead, continue the current dosing schedule until symptoms improve.**

**(9) Schedule patient to see medical provider within three days and refer to psychiatrist or psychiatric NP for evaluation within seven days.**

**(10) If the patient is pregnant consult with on-call medical provider.  Abrupt withdrawal from benzodiazepines is potentially dangerous for both patient and fetus.  Patient should have urgent referral to OB provider.  Onsite provider will need to give guidance on whether to continue patient's current benzodiazepine or switch to diazepam for the process of tapering the patient off the benzodiazepine.  It is suggested to reduce daily dose no more than 10% from previous daily dose.  (Please also refer to the Pregnancy Standardized Procedure).**

**(11) If the patient is using alcohol and benzodiazepines, use the alcohol withdrawal protocol (AWS) and schedule with provider within 3 days to determine if Valium needs to be continued for an extended period beyond AWS treatment.**

**(12) If the patient is using opioids and benzodiazepines, use the opiate withdrawal protocol and contact on-call provider to add Valium especially for high-risk patients.**

**(13) Notify the medical provider immediately for possible ambulance transport to the nearest emergency room if patient**

*shows any of the following signs of severe withdrawal:*

- *Heart rate > 120 BMP*
- *Severe prolonged vomiting greater than 4 hours*
- *Grossly visible tremor*
- *Profuse perspiration*
- *Temperature > 101º F*
- *Currently worsening sedative withdrawal despite appropriate pharmacotherapy at the highest level of lower care.*

*(14) Patients considered high risk for complicated benzodiazepine withdrawal (especially when confirmed on chronic high doses of a benzodiazepine) and should be considered potential candidates for hospitalization are:*

- *History of seizure disorder including history of withdrawal seizures from any substance*
- *History of requiring hospitalization due to withdrawal from any substance*
- *Known diabetes, renal disease, and cardiovascular disease.*
- *If the patient is in any of these subgroups of benzodiazepine withdrawal, notify your provider for possible hospital admission.*

66

CFMG's Amended Implementation Plan

    c.    Cocaine, Methamphetamine & Designer Drug Treatment:

        (1)   Monitor vitals every 6 hr until stable;
        (2)   For BP above 160/100, HR above 100, and symptomatic call medical provider;
        (3)   Consider a urine dipstick to rule out rhabdomyolysis.
        (4)   Watch for depression, suicidal behavior; and
        (5)   Refer to next mental health staff sick call.

    d.    Multiple Substance Abuse Withdrawal:

        (1)   Alcohol and benzodiazepine: contact on-call provider for use AWS Protocol.

        (2)   Alcohol and opioid: Contact on-call provider for Use AWS Protocol and the addition of clonidine.

        (3)   Opioid and benzodiazepine: Contact on-call provider for use BWS and the addition of Clonidine.

        (4)   Other combinations of drugs of abuse: Contact on-call provider for orders.

VII.   SUICIDE PREVENTION

A.   Identification

1.   The receiving screening procedure completed at the time of intake into the facility by the Booking Registered Nurse    shall include questions and observations regarding mental status and presence and/or potential for suicidal behavior.

2.   Custody and health services staff shall be trained and alerted to the need to continuously monitor inmate behavior for suicide potential during incarceration.

B.   Training

1.   Regularly scheduled training for all custody and health services staff shall be provided to include identification and management of suicidal behavior in the jail setting including high-risk periods of incarceration, suicidal risk profiles and recognition of verbal and behavioral cues that indicate potential suicide. This training is an adjunct to training required by the Sheriff's Department and in no way is intended to meet all the training needs of the department.

C.   Assessment

1.   Initial assessment of inmates identified as exhibiting signs of or the potential risk for suicidality shall be performed by a qualified mental health provider and will include the use of  CFMG's Psychiatric Suicide Assessment Tool:

2.   Mental health staff shall be available on-site 7 days per week and on-call for assessment of an inmate's level of suicide risk upon referral by health services and/or custody staff.

CFMG's Amended Implementation Plan

D.   Housing and Monitoring

　　1.   Inmates identified as potentially suicidal shall be placed on suicide watch *or suicide precautions* by custody, health services or mental health staff:

　　　　a.   Safety cell;

*In the case of an inmate who is placed in a safety cell because of suicide risk, CFMG (1) shall promptly evaluate the inmate to determine the level of suicide precautions necessary in the immediate term (promptly defined as immediately to no later than 4 hours), and (2) shall make a medical decision regarding whether the inmate needs to be transferred to an in-patient mental health facility in lieu of suicide watch/suicide precautions at the jail. If CFMG determines, based on appropriate clinical judgment informed by a suicide risk assessment evaluation, that the inmate requires prolonged suicide precautions or suicide watch (prolonged defined as longer than 24 hours) CFMG shall work with custody to place the inmate in the most appropriate setting.  Options for placement include: an in-patient mental health facility; the Outpatient Housing Unit; a receiving cell located in the booking unit; or dorm A.*

*When CFMG determines that an inmate is no longer suicidal, and clears the inmate from suicide precautions or suicide watch, CFMG shall make a medical recommendation regarding transitioning the inmate from suicide precautions or suicide watch.  CFMG shall work with custody to place the inmate in the most appropriate setting.  Options for placement include: an in-patient mental health facility; the Outpatient Housing Unit; Transition Cells in Administrative Segregation; receiving cells in the booking unit; dorm A or general population.  CFMG Mental Health Clinicians will provide these inmates with supportive contact and will follow-up with them until such time the clinician determines the inmate's step-down plan is discontinued.*

*For any inmate who has been housed in a safety cell for 24 consecutive hours or for more than 36 cumulative hours in any 3-day period, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.  It is recognized that on occasion*70

*there may be exigent circumstances which prevent compliance with these requirements. If such circumstances occur, a memo detailing the circumstances shall be written and directed to the Custody Operations Commander.*

Should there be a disagreement regarding where an inmate should be placed following release from a safety cell; the on duty sergeant will be contacted in an attempt to reach an agreement.  If a dispute still exists as to the placement of an inmate, an on-call commander will be contacted.  The on-call commander will have final decision-making authority as to placement.  However, any time there is a disagreement between medical and custody staff as to placement of an inmate following release from a safety cell, a report outlining the reasons for disagreement will be generated by the on-call sergeant.  These reports will be reviewed on a monthly basis by the Operations Commander, who will meet with the medical director when necessary to identify any systemic disagreements or issues.  Custody staff will be briefed at staff briefings as to any changes which need to be made or issues that are identified as a result of the meeting between the Operations Commander and medical director.

    b.   Open observation (occupied cell or dormitory).

2.   Inmates placed on ***suicide watch or*** suicide precautions shall be monitored by custody staff twice in 30 minutes; by health services staff every six hours; and mental health staff at a minimum of once per duty shift. Precautions will be taken to ensure that the inmate has no materials on his/her person to inflict harm to his/her self or others.  If necessary, dress inmate in an  approved safety garment.

    a.   All monitoring/supervision shall be documented on a log to include date, time, patient status, intervention (when appropriate) and signature/initials of individual monitoring.

    b.   Nursing staff will document all monitoring findings on the CFMG Sobering/Suicide Watch/Safety Cell/Restraints Log.

71

E.   Referral

    1.   Referral of all inmates identified as displaying suicidal ideation, gestures and/or attempts shall be immediately referred to the on-site/on-call mental health staff by nursing staff.

    2.   Inmates on Suicide Precautions in safety cells whose condition deteriorates, or for whom the nurse is unable to complete a hands-on assessment including vital signs after six hours of placement shall be transferred to Natividad Medical Center for further assessment.

CFMG's Amended Implementation Plan

2 .  A qualified mental health provider is responsible for developing individual treatment plans for those inmates suffering from mental illness.  A qualified mental health provider will perform a suicide risk assessment, including use of the CFMG Suicide Risk Assessment Tool, whenever an inmate is released from the safety cell.

3.  In the case of an inmate who is placed in a safety cell because of suicide risk, a qualified mental health provider may recommend transfer of the inmate to an appropriate in-patient mental health facility. Depending on the assessment of the level of suicide risk, whenever possible, the inmate will be transitioned from the safety cell to an open dormitory setting until the inmate has stabilized.  Other transition options may include housing in a transition cell or one on one observation in the OPHU.  Mental health providers and custody will collaborate to ensure classification needs of an inmate are considered.

4.  CFMG will inform classification, through medical treatment orders, as to any classification issues an inmate has due to mental illness.  CFMG and custody will review the appropriateness of an inmate's placement in a safety cell because of suicide risk at least once every twelve hours.

5.  Any inmate who has been placed in a safety cell for Suicide Precautions for 24 consecutive hours shall be transferred to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.

F.  Intervention

1.  Intervention and treatment shall be carried out in accordance with direct order of the responsible medical or mental health provider and/or CFMG protocols/standardized procedures.

2.  Inmates placed on Suicide Precautions will be housed as indicated in Item D above and be provided with a suitably designed safety garment to provide for their personal privacy unless specific identifiable risks to the inmate's safety or to the security of the facility are documented.

73

G.    Communication

1.    Custody, nursing and mental health staff will maintain open lines of communication to insure that all parties are kept apprised of suicide potential; suicide precaution placement, retention, and release status; monitoring findings including general status reporting through time of event and end-of-shift reporting and on-call contacts to insure appropriate continuity of care and follow-up.

H.    Reporting

1.    Reporting of inmates identified or suspected of being at risk for suicidal behavior will occur through the referral process. Referrals may be made by custody to nursing or mental health staff at any time. Current status reporting will be carried out as described in Communications section, above, and CFMG Safety Cell Policy and Procedure.

2.    Reporting completed suicides shall be a joint responsibility of the CFMG Program Manager and Facility Manager in accordance with CFMG Inmate Deaths Policy and Procedure.

a.    The CFMG Program Manager or nursing staff on duty shall be responsible for reporting all potential and/or attempted and completed suicides to the Facility Manager or Shift Supervisor.

3.    CFMG management shall be notified of completed suicides within one working day.

CFMG's Amended Implementation Plan

I.   Notification

Family members  shall be notified in accordance  with  the CFMG
Notification of Next of Kin Policy and Procedure.


J.   Review:

All completed suicides shall be subject  to  a medical  and  psychiatric  review
and  review  by the  Quality  Management  and  Peer Review  Committees in
accordance with  CFMG Inmate  Deaths Policy and Procedure.

VIII.   TUBERCULOSIS IDENTIFICATION, CONTROL AND TREATMENT PROGRAM

A.  Tuberculosis screening of all inmates will be performed at the time of intake by a registered nurse using the Standardized Monterey County Jail Intake Health Screening Form.  During the initial intake screening the registered nurse will ask each inmate whether they have a history of TB disease, or if they have previously been treated for LTBI or TB Disease.  If possible, documentation of any such history should be obtained from an inmate's prior medical records.

B.  All incoming inmates will immediately be screened for symptoms of pulmonary TB by being asked if they have had a cough lasting greater than three weeks, bloody sputum, chest pain, fever, chills, night sweats, easy fatigability, loss of appetite and weight loss. Inmates will be interviewed systematically to determine whether thy have experienced symptoms in recent weeks.  Inmates will be observed for the presence of cough or evidence of significant weight loss.

C.  Any inmate with positive TB screening findings at the time of intake will be followed-up by a registered nurse in accordance with the CDC recommendations.  A TB screening will be considered positive when an inmate answers yes to any of the following questions: prolonged cough for greater than 3 weeks, bloody sputum, weight loss/poor appetite, fever/chills, night sweats, unexplained chest pain or unusual fatigue.

D.  Inmates who have symptoms suggestive of TB disease at the time of intake or a history of inadequate treatment for TB disease, will immediately be placed in an Airborne Infection Isolation Room until they have undergone a thorough medical evaluation by a medical provider which including a TST, chest radiograph, and, if indicated, sputum examinations. If deemed infectious, these inmates will remain in isolation until treatment has rendered them noninfectious.

E.  Inmates who are placed in an Airborne Infection Isolation Room because they are suspected to have Infectious TB can be discontinued when infectious TB is considered unlikely and either another diagnosis is made that explains the

clinical syndrome or the patient had three negative acid-fast bacilli sputum-smear results.  Patient for whom the suspicion of TB disease remains after the collection of three negative AFB sputum-smear results should not be released from airborne precautions until that are on standard multidrug anti-TB treatment and are clinically improving. However, these inmates should not be housed in an area in which other patients with immune-compromising conditions are housed.

F.   All inmates with confirmed TB disease should remain in an Airborne Infection Isolation Room until they have had three consecutive AFB sputum-smear results collected 8 hours apart, with at least one being an early morning specimen; having received standard multidrug anti-TB treatment; and have demonstrated clinical improvement.

G.   The Airborne Infection Isolation Rooms will be monitored, inspected and maintained in accordance with the CFMG ATD Procedure, a copy of which is attached as Exhibit H.

H.   Tuberculosis signs and symptoms screening and skin testing (when indicated) shall be initiated within 7 days of admission to the facility; as part of the kitchen workers' clearance examinations; as a component of the six-month physical exam; and annually thereafter, for the duration of incarceration.

I.   Procedure:

1.   Timing of TST Testing:

a.   An LVN will place the TST within seven days of incarceration.

b.   An LVN will read the TST between 48 and 72 hours of placement.

2.   Prior to applying the TST test the following information shall be obtained:

a.   Has inmate ever had a positive reaction to TST test?

(1)   If yes, when and name of clinic/jail/prison/provider?

77

      (2)   If yes, has the inmate had a chest x-ray in the past 6 months?

      (3)   If yes, name of clinic/jail/prison/provider and results of x-ray.

b.   Is the inmate an immigrant from Latin America, Southeast Asia, the Philippines, equatorial Africa, former Soviet Union, Eastern Europe or the Caribbean?

c.   Has the inmate ever received BCG vaccine?

      (1)   If yes, when was vaccine given?

d.   Is the inmate HIV positive or have AIDS?

3.   Inmates with positive TB symptom screen (answering yes to any of the following: prolonged cough > 3 weeks, hemoptysis/bloody sputum, weight loss/poor appetite, fever/chills, night sweats, unexplained chest pain, unusual fatigue) for active TB.

a.   Place surgical mask on patient.

b.   Move patient to an Airborne Infection Isolation (AII) room; if no AII room is available move to well ventilated room/cell and isolate from other inmates until patient can be transferred by ambulance to the Natividad Medical Center emergency department for isolation and further evaluation. Notify emergency room staff that patient needs evaluation and isolation for possible active TB.

c.   Contact provider on-call.

d.   Contact local department of public health (within 24 hrs).

e.   Schedule patient to be seen by provider within 24 hours; if unable to have a provider evaluate the patient within 24 hours, transfer to the emergency department for evaluation.

f.   Place TST/ppd on patient unless the inmate has a documented history of a positive TST result, a documented history of TB disease, or a reported history of a severe reaction to tuberculin.  Inmates with a history of severe necrotic reactions and without a documented positive result with a millimeter reading, may have a QFT-G test.

g.   If evaluation by provider and active TB is still felt to be possible, order CXR and obtain 3 (done at least 8 hours apart) sputum samples for TB testing.

h.   Patient must remain in AII room until cleared by a negative chest x-ray AND three negative sputums.

i.   Any staff entering the AII room must wear a N-95 fitted mask; inmate to wear a surgical mask when staff present in room and/or when out of the AII for any reason.

4.   Inmates who have been re-booked into the facility or are transferring from another county or state facility; have a documented TST within the last three months and are signs and symptoms free on the TB questionnaire do not require a new skin test.

5.   Verified previous positive skin test:

a.   Do not apply skin test.

b.   Complete CFMG TB History signs and symptoms review.

(1)   Signs and symptoms free and a previous negative chest film can be verified, no further follow up is required.

(2)   Signs and symptom free and no verified negative chest film: order chest x-ray.

(3)   Signs and/or symptoms present: place in respiratory isolation and schedule a chest x-ray.

6. Inmates reporting history of BCG vaccination; document BCG vaccination history, proceed with the skin test and reading using the usual norms.

7. Inmates reporting HIV/AIDS positive **and those who are at risk for HIV but *whose status is unknown***; apply skin test; schedule a chest x-ray and follow-up by medical provider post x-ray for evaluation for further testing and/or treatment.   If inmate is a re-admission with a verified negative chest film in the medical record and signs/symptom free, skin test only.

J.  Application:

1. Give 0.1 ml of 5TU of purified protein derivative (PPD) slowly intradermally, right forearm, if possible.  Enter information on the medical record; site of injection, solution and amount, manufacture & lot number, inmate's name, housing location, identification number (if applicable), date and time done and date and time read, signature of individual giving and reading the test, signature of individual applying the reading test.

2. Instruct inmate that test must be read in 48 - 72 hours.

K.  Reading:

1. Measure all TB Skin Tests 48 - 72 hours after placement.

2. Record all test results in mm, including negative results.

   a. Document induration (not erythema) on 14 day PE form.  Note date and time results were read and individual responsible for reading.

3. A reaction of 5mm or more of induration should be considered positive in the following individuals who are considered high risk for TB and a CXR should be ordered and completed within 72 hours:

   a. Persons with close recent (within one year) contact to a case of infectious tuberculosis.

b. Persons with HIV infection or with behavioral risk factors for HIV infection, but decline HIV testing.

c. Persons who use intravenous drugs (if HIV status is unknown).

d. Persons with fibrotic changes on the chest radiograph consistent with previous TB disease.

e. ***Organ transplant recipients and inmates with other immunocompromised conditions, i.e. inmates requiring greater than 15 mg. of prednisone for greater than one month.***

4. A reaction of 10mm or more induration should be considered positive in all other persons ***who are considered lower risk for TB and should have a CXR ordered and completed within 72 hours.***

5. All individuals who have a positive tuberculin skin test should receive counseling and risk assessment for HIV infection.

L. Follow-Up to Chest X-Ray:

1. Negative chest x-rays:

   a. Schedule with provider to discuss treatment options.

   b. See treatment and management options below (Latent TB Infection).

2. Positive or questionable x-ray results, consult with MD/PA/NP regarding ordering sputum specimens times three and further follow-up. Reported to Public Health TB Control and isolation until results of AFB sputum return.

   a. Inmate should not be cleared for kitchen duty.

   b. Call County TB Control Program to check master index for previous treatment or history within the county.

81

c.   Close contacts, i.e., cell mates, should be followed up in accordance with CFMG Aerosol Transmissible Disease Exposure Control Plan, and recommendations from the County Public Health Officer.

d.   If inmate is determined to be likely to have active TB disease, County TB Control shall be notified within 24 hours.

M.   Latent TB Infection (LTBI):   LTBI continues to be a major public health problem in the United States. Infected persons usually have a positive tuberculin skin test (TST) reaction or positive Immune-Globulin Release Assay (IGRA), a normal chest x-ray (any abnormal chest x-ray needs referral to your provider for sputum testing and additional imaging) and have no symptoms related to the infection and are not infectious:

1.   Candidates for Preventive Therapy: All persons with suspected LTBI and normal chest x-ray should be considered for therapy and the following list are those considered to be at highest risk for developing an active infection:

a.   Persons known to have HIV infection (TST result of 5mm or greater).

b.   Person at risk for HIV infection (including persons who inject drugs) but whose HIV status is unknown (5mm or greater).

c.   Close contact of a person with infectious TB (5 mm or greater).

d.   Persons who have chest radiograph findings suggestive of previous TB and who have received inadequate or no treatment (5 mm or greater).

e.   Persons who inject drugs and who are known to be HIV negative (10 mm or greater).

f.   Persons who have medical conditions known to increase the risk for TB disease such as Diabetes Mellitus and other immune suppressive diseases (10 mm or greater).

82

g.   Persons whose TST reaction or IGRA result converted from negative to positive within the past 2 years (10 mm or greater increase if younger than 35 years of age).

2.   Tracking of all TST results, chest x-ray results, and treatment must be done on all patients regardless of their expected length of stay.  Tracking will occur in each patient's chart as well as in the TB tracking log which is kept in the medical department.

3.   Treatment Recommendations and Medication Regimens: All persons with a positive TST or IGRA will get a chest x-ray and will be referred to the jail medical provider to discuss treatment options. An important point to remember is that starting therapy that cannot be completed is worse than not starting treatment due to the development of drug resistant strains of TB. The following categories of inmates will help guide whether therapy should be started and which therapy is preferred.

a.   Pregnant women: Generally preventive therapy should not be given to pregnant women who are found to be TST or IGRA positive on screening with the following exceptions noted below. Isoniazid (INH) therapy should be considered for pregnant women who were

(1)   likely to have been recently infected with TB; or

(2)   who have high-risk medical conditions, especially HIV infection

(3)   Pregnant minors with positive TST or IGRA will be referred to the responsible medical provider for evaluation and consultation with OB/GYN specialist for the decision of whether Isoniazid (INH) therapy is to be initiated.

b.   Persons who are confirmed to be incarcerated for greater than 6 months should receive 6 months of INH therapy or, if HIV infected, 9 months of INH therapy.

c.   Persons who are confirmed to be incarcerated for greater than 3 months, but less than 6 months should receive 11 doses or 12 weeks of INH with Rifapentine (INH-RPT) weekly. Per the CDC, this must be Directly Observed Therapy (DOT).

d.   If an inmate is unexpectedly released early, every effort should be made to arrange for completion of treatment on the outside, particularly if treatment was nearly complete.

e.   Persons for whom INH therapy is contraindicated (such as past drug reaction, etc.), should be considered for Rifampin therapy.

4.   For all persons who have no contraindications to begin therapy:

a.   Obtain a signed CFMG Consent for TB Therapy Form from patient, parents or guardian; counsel patient, parents or guardian regarding the side effects and toxicity problems associated with Isoniazid (INH) or other drug therapies noted above and the need to complete the full course of therapy. Verify a normal chest x-ray and instruct patient to report any symptoms to health services staff.

b.   Isoniazid (INH) 900 mg. PO bi-weekly; or, 300 mg PO daily, directly observed therapy (DOT) for 6 or 9 months, depending on immune status. Pyridoxine supplementation is not typically needed when using INH with exception of patients who are pregnant, have diabetes, HIV, renal failure, and alcoholism.

c.   For those patients needing Pyridoxine (Vitamin B6) supplementation (see #2 above) 100 mg PO bi-weekly; or, 50 mg daily, for 6 or 9 months, depending on length of INH therapy.

d.   Isoniazid (INH) 900mg (max dose and based on body weight) with Rifapentine 900mg (max dose and based on body weight) given once weekly with Directly Observed Therapy (DOT) for 3 months.

84

e.   Rifampin 600mg daily (max dose and based on body weight) for 4 months.

f.   Schedule for medical provider sick call every month for evaluation for signs and symptoms of medication toxicity (i.e., loss of appetite, weight changes, nausea, vomiting, fatigue, dark urine, jaundice and/or rash.

g.   Patients exhibiting any signs or symptoms of toxicity: refer to medical provider sick call as soon as possible.

h.   Individuals who are released from custody prior to completion of the full course of treatment: need referral to own medical provider, health plan, or county public health agency. This is critical to avoid risk of development of resistance to any of these drug regimens.

85

IX.   PHARMACEUTICAL ADMINISTRATION

*The procurement of pharmaceuticals is done under the supervision of a licensed pharmacist in accordance with all applicable federal and state laws. Prescription medications will be administered to inmates by licensed nursing staff in accordance with CFMG's Implementation Plan regarding pharmacy administration. A consulting pharmacist will be used for documented inspections and consultation on a regular basis, not less than quarterly.*

*Administering medication, as it relates to managing legally obtained drugs, means the act by which a single dose of medication is given to the patient. The single dose of medication may be taken either from stock (undispensed), or dispensed supply.*

*Dispensing, as it relates to managing legally obtained drugs, means the interpretation of the prescription order, the preparation, repackaging, and labeling of the drug based upon a prescription from a physician, dentist, or other prescriber authorized by law.*

*Delivering medication as it relates to managing legally obtained drugs, means the act of providing one or more doses of a prescribed and dispensed medication to a patient. Delivering of medication may be done by either licensed or non-licensed personnel, e.g., custody staff, acting on the order of a prescriber.*

A.  Administration of Medication

   To assure safe, accurate methods of administering medication, the following procedures will be strictly adhered to:

   1.  As a general policy, prescribed and over-the-counter medications will be administered twice daily at intervals approximately 12 hours apart. Inmates requiring more frequent medications will receive such as medically indicated.

   2.  All patients must be identified by the medication nurse by checking inmate's armband and/or I.D. badges.  Verify last names, first name and middle where applicable.  If the inmate is not wearing an armband/I.D. badge, the

86

medication will be held until the inmate is identified by correctional staff and armband/I.D. badge is obtained.

3. The medication nurse is responsible for and will verify:

   a. Appropriate medication, as ordered
   b. Proper dose
   c. Given to correct inmate
   d. Given at correct time
   e. Given by correct route (po, r, sq, etc.).
   f. Vital signs taken where indicated.

4. The medication nurse is responsible for taking every reasonable precaution to assure that the inmate actually ingests the medication by:

   a. Watching the inmate take the medication.

   b. Checking for "cheeking" or "palming" to assure that medication has been ingested.

   c. Having the inmate speak after taking the medication and/or drinks water.

5. The medication nurse will keep the medication envelopes well out of the reach of inmates at all times.

6. The medication nurse will never:

   a. Reach into a cell.

   b. Put face near a door opening.

7. When a prescribed substance is administered it will be recorded on the inmate's medication administration record (MAR).

8. If a prescribed substance is refused or withheld, a notation will be made on the medication administration record (MAR) and the prescribing medical provider shall be notified after three consecutive refusals.

87

B.    Prescription Medications

Medications, except those specifically listed on the policy regarding non-prescription drugs, will be given only on the order of the Physician. Long-term use of minor tranquilizers is discouraged. Psychotropic medications are prescribed only when clinically indicated and are not given for disciplinary reasons.

***All nurses administering medications will be trained to recognize the common side effects associated with the use of psychotropic medications. If a nurse observes that an inmate is experiencing any of these side effects they will document their observations in the medical record and schedule the patient to see a medical provider at the next available sick call.***

1.    Medication will be ordered in writing on the patient's chart by the Physician or FNP/PA, or written as a verbal order by the nurse. Verbal orders must be co-signed by a physician within 7 days.

2.    Medication orders will be transferred to the inmate's medication record and envelope. Orders will be signed off in red ink when completed with date, time and signature of the individual transcribing orders.

3.    New orders will be written clearly as new orders on the medication record. Absent a change in order medication records will never be altered. No correction fluid will be used on any permanent record.

4.    D/C dates will be marked clearly in red.

5.    Every health care provider who gives medication will sign the medication record.

6.    If a prescribed substance is refused or withheld, a notation will be made on the medication record, and the provider will be notified after three consecutive refusals.

7.    Medication may only be administered according to the direct order of the

Physician or P.A./F.N.P.

8. Each nurse will set up and give his/her own medication.

CFMG's Amended Implementation Plan

C.   Non-Prescription Medications

Inmates are encouraged to purchase non-prescription medications through the commissary for self-care. Indigent inmates and those requiring over the counter medications when commissary is not available may request such medications from health care staff through the sick call process. The responsible physician/health authority along with custody administration will determine what medications will be sold over-the-counter at the commissary.

1.   The responsible physician/health care authority along with custody administration has determined which medications and medical supplies will be sold over-the-counter through commissary.

2.   There is a limit on the amount of medications that can be purchased and held by inmates.

3.   Medications are provided to the inmate with their weekly commissary purchases in unit dose, sealed, labeled packaging. The commissary vendor confirms that each inmate may only obtain maximum allowed each week, when filling the commissary order.

4.   Inmates found to have more than the weekly allowed amount in their cell are subject to confiscation of the medication and disciplinary proceedings by custody staff.

5.   Indigent inmates and those who are not eligible for medications from the commissary purchases are provided medications as prescribed on regularly scheduled medication pass after being seen on sick call.

D.   Medication for Inmates Going to Court

Inmates on essential medications will receive medication while in court.

1.   The midnight nurse will review court lists nightly for inmates taking prescribed medications.

2.  Inmates who are on essential medication will have medication set up for transportation officers to take to court with inmate.

3.  Medication will be placed in envelope labeled with:
    a.  Patient's name
    b.  Date
    c.  Name of medication
    d.  Number of tablets or capsules
    e.  Time medication should be ingested
    f.  Location of court

4.  The court list will be marked indicating inmates who will be receiving medication.

5.  If no one on the court list is to receive medication, this will be indicated on the court list.

6.  The court list and medication envelopes will be left with the receiving deputy in the receiving area.

7.  The officer delivering the medication will:

    a.  Verify correct inmate by checking name of inmate on envelope against wrist band.

    b.  Deliver the medication at correct time.

    c.  Write on envelope, date; time taken ; if not, why not, and officer's signature.

    d.  Return envelopes to nurse's box in Control I.

8.  The nursing staff will pick up envelopes from box in Control I and record medication given or not given on medication sheets.

E.   Management of Controlled Substances

Controlled substances will be kept under maximum security storage and counted at each shift change.

1.   All controlled substances will be kept in a locked narcotics drawer/cabinet, inside a locked medication room, within the locked medical office.

2.   All controlled substances will be signed for when administered.

3.   The nurse going off duty will count every shift with the nurse coming on duty using the End of Shift Narcotics Inventory form.

4.   If count is incorrect, a report will be made using Report of Error in End of Shift Narcotics Count form.

5.   Records will be kept in a 3-ring notebook in the pharmacy.

6.   All controlled substances are purchased in narcotic counters.  The supplying pharmacy will note the following information on each narcotic counter:

   a.   Name of medication
   b.   Dosage
   c.   Expiration date
   d.   Lot number
   e.   Signature of physician
   f.   Date packaged

7.   The nursing staff will administer the medication as prescribed.

F.   Medications at Time of Release from Jail

Personal medications brought in with inmate at booking will be returned to him/her at the time of discharge.

A 30-day supply of essential medications taken while in jail may be given at the time of discharge only by order of jail physician who is responsible for personally dispensing such medication or providing a written prescription.

92

1. Nursing staff and the responsible medical provider will identify, through discharge planning, patients who will require either a written prescription or a limited supply of essential medications upon release from custody.

2. Nursing staff will notify custody in advance of the inmate's release of the need to be cleared through medical prior to transfer or release to ensure receipt of essential medication or a prescription.

G.   Procurement of Pharmaceuticals

Under the direction of the Medical Director and in accordance with Pharmacy and Business Code, the Medical Program Manager or their designee acting as an agent of the Medical Director will procure, store, and manage pharmaceuticals for use in the Monterey County Jail and Juvenile Detention Facilities.

1. All stock medication will be ordered electronically or telephonically from Diamond Pharmacy Services, Inc.

2. In cases of emergencies, the Medical Director will be contacted and a prescription will be called into a local pharmacy.

H.   Storage of Drugs

All prescription and non-prescription drugs stocked for the purpose of administration to inmates will be stored in a locked area, and/or refrigerators located in the treatment area accessible only to the medical staff.

1. Containers which are cracked, soiled or without secure closures shall not be used.  Drug labels shall be legible.

2. Internal use drugs in liquid, tablet, capsule or powder form shall be stored separately from drugs for external use.

3. Drugs shall be stored at appropriate temperatures.

4.    Drugs shall be accessible only to medical personnel.  Only licensed nursing personnel shall have access to controlled drugs.

5.    Drugs shall not be kept in stock after the expiration date on the label and no contaminated or deteriorated drugs shall be available for use.

CFMG's Amended Implementation Plan

X.   INVOLUNTARY ADMINISTRATION OF PSYCHOTROPIC MEDICATIONS

Involuntary psychotropic medications will only be given when a psychiatric emergency exists or when an inmate, following and Incapacity Hearing, is found to lack the capacity to consent to medications.  Medications shall not be used for punishment, for the convenience of staff, as a substitute for program, or in quantities that interfere with the treatment program.  The responsible physician, Program Manager and Director of Nursing in cooperation with the Facility Manager will be responsible for identifying appropriate community resources and developing procedures to obtain an Incapacity Hearing and to transfer inmates requiring involuntary psychotropic medication administration to an appropriate community facility.

PSYCHIATRIC EMERGENCY - a situation in which action to impose treatment over the inmate's objection is immediately necessary for the preservation of life or the prevention of serious bodily harm to the inmate or others, and it is impracticable to first gain consent.  It is not necessary for harm to take place or become unavoidable prior to treatment.

A.   Medication Order

Involuntary psychotropic medications for a psychiatric emergency shall be given pursuant to a direct written or verbal one-time order from the responsible facility psychiatrist or physician following an on-site evaluation.  A telephone order will not be acceptable unless the inmate in question has been personally evaluated by the prescribing physician *no longer than 24 hours* prior to the psychiatric emergency. If the physician is not available on-site or if the inmate has not been evaluated by the on-call physician prior to the emergency situation, physical restraint should be used and the inmate transferred to the hospital emergency department for physician evaluation.

1.   At no time prior to a Court Order, will an order for involuntary psychotropic medication be a PRN (as needed) or a standing order.

2.   Verbal orders shall be entered into the inmate's medical record and signed by the prescribing physician within 72 hours.

95

3. The Medical Program Manager and Custody Facility Manager will be notified in writing or by telephone if not available, within 24 hours of the administration of involuntary psychotropic medication.

B. Patient Supervision and Monitoring

Inmates receiving involuntary psychotropic medications will be admitted to the infirmary or a safety cell.

1. Intermittent supervision by the custody staff will be provided at a minimum of every 30 minutes.

2. Monitoring by nursing staff will be provided at a minimum of every 15 minutes for the first hour and every 30 minutes thereafter until otherwise ordered by prescribing physician to assess response to medication, mental status, general physical appearance, behavior, and hydration.

3. All monitoring findings will be documented in the inmate's medical record.

4. The inmate will be evaluated by the responsible prescribing physician at a minimum of every 72 hours.

C. Duration of Involuntary Therapy Prior to Riese Hearing

The determination of need for continued involuntary administration of medications shall be the responsibility of the responsible facility psychiatrist or physician commensurate with psychiatric evaluation findings and availability of timely treatment options necessary to protect the inmate from harm and consistent with CCR Title 15, Section 1217. Continued involuntary therapy thereafter is pursuant to a competency hearing and/or transfer to a clinically appropriate community treatment facility.

1. Inmates exhibiting any clinical deterioration at any time during involuntary therapy will be transferred immediately to a clinically appropriate treatment facility.

2. The facility will manage inmates meeting the psychiatric emergency criteria as follows:

   a. The inmate will be transferred to a clinically appropriate treatment facility outside of the jail, or

   b. If the inmate, for clinical or custodial reasons must remain at the jail, the health services staff shall coordinate with County Mental Health Psychiatric Emergency Services to evaluate for competency to refuse medications pursuant to *Riese v. St. Mary's Hospital* (Riese Hearing).

D. Review

   All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met.

XI.   CFMG DENTAL SERVICES IMPLEMENTATION PLAN

CFMG will provide a tiered dental services delivery program at the Monterey County Jail. ***All dental services will be provided in a safe and sanitary environment.***

A.   Screening for All Inmates:

***A qualified health care professional who has been trained by the dentist*** shall obtain a dental history regarding any current or recent dental problems, treatment including medications during the Receiving Health Screening at intake with follow up to positive findings; perform an initial health screening on each inmate at the time of the health inventory and communicable disease screening, the general condition of the patient's dentition, missing or broken teeth, evidence of gingival disease, mucosal lesions, trauma, infection, facial swelling, exudate production, difficulty swallowing, chewing  and/or other functional impairment will be noted; urgent/emergent dental needs identified. All screening findings will be documented on the health inventory form including the odontogram.  Follow up referral and/or consultation with onsite or on call medical provider and/or dental provider (if onsite) will determine treatment plan and schedule for initial provider evaluation.

Definition:  Emergency care requiring immediate treatment: Inmate-patients requiring treatment of an acute oral or maxillofacial condition, which is likely to remain acute, worsen, or become life threatening without immediate intervention.

1.   Results of the Initial Health Screening:

a.   In the case of a dental/medical emergency, in which a licensed dentist is not present, the patient will be seen, treated and managed immediately by medical provider staff. If in the opinion of the medical staff/licensed health care provider, the dental condition is likely to respond to immediate administration with antibiotic and/or analgesic medication this will be given. If in the opinion of the medical staff person/licensed health care professional in charge, the acute dental emergency is life threatening, the patient will be

98

transported to an urgent care facility or hospital to protect the life of the patient. The contracted dentist will be notified and provide necessary post-discharge dental care at the next scheduled dental clinic.

b.    If the medical staff/licensed health care professional determines the  dental issue to be urgent, the patient shall be referred to and evaluated by the dentist at the next scheduled dental clinic.

2.    At the time of the health inventory, examination includes notation of the general condition of the patient's dentition, missing or broken teeth, evidence of gingival disease, mucosal lesions, evidence of infection, recent trauma, difficulty swallowing, chewing or other functional impairment.

B.    Services for Inmates *Incarcerated for* less than One Year

1.    Dental Hygiene:

Professional dental hygiene services are currently not provided. Inmates are given toothbrushes and can receive instruction in proper brushing technique from the medical staff upon request.  Dental floss loops are available through the commissary for routine flossing.  Indigent inmates shall be provided with dental care supplies.

2.    Dental Treatment:

Dental floss loops are available through the commissary for routine flossing.  Indigent inmates shall be provided with dental care supplies.

a.    Treatment provided is based on the inmate's needs, length of stay and the priorities listed below:

(1) Relief of pain and treatment of acute infections and other urgent conditions. This would include hemorrhage, toothaches, broken, loose or knocked out teeth, abscesses, dry sockets after extractions and severe periodontal disease.

99

(2)   Extraction of unsalvageable teeth.

(3)   Treatment of bone and soft tissue diseases.

(4)   Repair of injured or carious teeth.

(5)   Removal of irritation conditions which may lead to malignancies.

(6)   Replacement of lost teeth and restoration of function, if dental function is markedly limited.  The attending dentist will determine necessity and priority.

b.   Although treatment is not limited to simple extractions, elective restorative work which can reasonably be deferred without serious detriment to the patient should be considered the inmate's responsibility. Such work may, with custody's approval, be done during the period of incarceration at the inmate's expense; otherwise, appropriate referral information should be supplied upon release.

MCJ will maintain a periodontal disease program for the diagnosis and treatment of periodontal disease. Periodontal screening shall be available to all patients, regardless of length of stay. Treatment will be based on periodontal disease classification, Dental Priority code, and special medical needs (i.e. pregnancy, diabetes, HIV/AIDS).

3.   Oral Surgery

a.   MCJ dental clinic shall provide necessary oral surgery services to all inmate- patients onsite or through a local community provider.

b.   Routine extraction of non-pathologic and/or asymptomatic erupted, partial erupted, partial impacted or complete impacted third molars is an excluded service.

100

    c.    Removal of third molars to prevent crowding or future pathology is an excluded service.

    d.    Referral to and priority of offsite oral surgeon will be the responsibility of the facility dentist in accordance with the Dental Priority System.

4.    All dental complaints are assessed, provided treatment for obvious infection and pain relief at regularly scheduled medical sick call by the MD, PA or RN to be seen within one day of the request. The complaint is prioritized and referred to Dental Sick call as deemed necessary. Interim treatment for pain and infection is provided until the patient is seen by the dentist.

5.    ***Dental Priority System***

    a.    Dental treatment will be provided in accordance with the following Dental Priority System:

    (1)    Emergency Care (Immediate Treatment):

    Inmate-patients requiring treatment of an acute oral     or maxilla-facial condition, which is likely to remain acute, worsen, or become life threatening without immediate intervention.

    (2)    Treatment within 1 calendar day:

    Inmate-patients with a dental condition of sudden onset or in severe pain, which prevents them from carrying out essential activities of daily living.

101

(3)   Treatment within 30 calendar days:

Inmate-patients requiring treatment for a sub-acute hard or soft tissue condition that is likely to become acute without early intervention.

(4)   Treatment within 60 calendar days:

Inmate-patients requiring early treatment for any unusual hard or soft tissue pathology.

(5)   Treatment within 120 calendar days:

Advanced caries or advanced periodontal pathology requiring the use of intermediate therapeutic or palliative agents or restorative materials, mechanical debridement, or surgical intervention.   Moderate or advanced periodontitis requiring non-surgical periodontal treatment (scaling and/or root planing).

b.   The need and schedule for follow up dental clinic appointments will be determined by the responsible dentist.

c.   Complicated dental problems are referred to an oral surgeon as deemed necessary with priority determined by the responsible dentist in accordance with the Dental Priority System.

C.   Services for Inmates *Incarcerated for* Greater than One Year

Inmates *incarcerated* for 12 months or greater and whose dental conditions meet treatment eligibility requirements as determined by a licensed dentist in accordance with the established definitions and guidelines within this document shall be provided such medically necessary services during their period of incarceration.

1.      Comprehensive Dental Examinations

Inmates *incarcerated for* 12 months or ***greater*** are eligible to receive a comprehensive dental exam.  The purpose of the dental examinations shall be for the identification, diagnosis, and treatment of dental pathology which impacts the health and welfare of inmate patients.

a.   Inmates will be notified of eligibility for a comprehensive examination through the inmate information booklet issued to all inmates at intake into the facility.

b.   Examination findings and proposed treatment plan will be documented on standardized comprehensive dental exam, periodontal exam and treatment planning forms which will be filed in the patient medical record.

c.   Panoramic radiograph may be requested from an outside source when, in the discretion of the dentist, it will assist in diagnosis and treatment planning.

2.      Periodontal Disease Program

MCJ will maintain a periodontal disease program for the diagnosis and treatment of periodontal disease. Periodontal screening shall be available to all patients, regardless of length of stay. Treatment will be based on periodontal disease classification, Dental Priority code, and special medical needs (i.e. pregnancy, diabetes, HIV/AIDS).

a.   MCJ will have available, either through commissary purchase or through jail-issued personal hygiene kit, interproximal cleaners (e.g. floss loops) and a flexible handled tooth brush for inmate-patient self-dental care.

b.   A per diem Registered Dental Hygienist (RDH): will be scheduled, as needed, to provide dental hygiene education and periodontal

CFMG's Amended Implementation Plan

hygiene treatment consistent with dentists' treatment recommendations.

c. Treatment regimens will provide maintenance services only. No periodontal surgery, periodontal soft tissue grafting, or reconstructive procedures will be provided.

3. Removable Prosthodontic Dental Services

CFMG shall provide limited removable prosthodontic dental services to inmate-patients in the custody of MCJ. Inmates **incarcerated for** 12 months **or greater** a completed comprehensive examination, and a treatment plan may qualify for removable prosthodontic services.

a. A patient's need for a dental prosthesis shall be based on medical necessity defined as: Medically Necessary means health care services that are determined by the attending dentist/physician to be reasonable and necessary to protect life, prevent significant illness or disability, or alleviate severe pain, and are supported by health outcome data as being effective medical/dental care. (California Code of Regulations (CCR), Title 15, Division 3, Chapter 1, Subchapter 4, Article 8, Section 3350 (b) (1) "Provision of Medical Care and Definitions".)

b. A removable dental prosthesis shall be constructed only when:

(1) The dentist believes the patient can tolerate it and can be expected to use it on a regular basis to aid mastication and support the physiologic relationships of the maxilla and mandible.

(2) A patient is edentulous or has seven or fewer posterior teeth in occlusion.

104

(3)   All restorative, endodontic and oral surgery procedures have been completed and adequate healing has occurred to proceed with removable prosthodontic procedures.

(4)   The active phase of periodontal therapy has been completed and the patient is in periodontal maintenance.

(5)   Time requirements are calculated from the date impressions are taken and are as follows:

(a)   The patient has a Dental Priority 2 prosthetic need (e.g. complete denture) and a minimum of six (6) months verifiable, continuous incarceration remaining before release or parole.

(b)   The patient has a Dental Priority 2 prosthetic need (e.g. partial denture) and a minimum of twelve (12) months verifiable, continuous incarceration remaining before release or parole.

(c)   The patient, where applicable, has acceptable oral hygiene for long term stability of the removable prosthesis.

(6)   Partial dentures for anterior cosmetic purposes are excluded.

(7)   When a patient's treatment plan includes a removable dental prosthesis, the treating dentist shall inform him or her of the possibility that the prosthesis may not be completed prior to the patient's parole date. The patient shall provide the name and address of a private dentist who can be contacted by CFMG dental staff, to deliver the completed appliance, in case the patient is released before the completed appliance is delivered.

(8)  Patients are responsible for paying for the prescribed appliance by following the procedures, designated by the county and CFMG, to transfer funds from their account to CFMG, on or before dental impressions are taken for the appliance and the case is considered initiated. If a patient is indigent (wholly without funds at the time they were eligible for withdrawal of funds for canteen or other purchases) a prescribed dental prosthesis shall be provided at CFMG expense. Otherwise, patients shall purchase prescribed appliances through the department or an approved vendor as directed by the CFMG medical program manager.

(9)  A patient who is purchasing a removable dental appliance with their own funds may choose an approved local dentist to construct his/her appliance. A patient who is determined indigent will choose from a list of local contract dental providers.

c.  Approved, prescribed removable dental prosthesis/dentures will be provided by contract with a local dental services provider.

d.  Fitting, adjustment and maintenance of removable prosthesis will be provided onsite when feasible or through contract with a local dentist.

4.  Dental Restorative Services.

Inmate-patients with comprehensive examinations and treatment plans are eligible to receive permanent restorations in accordance with their established treatment plan.

a.  All restorative material utilized in CFMG dental clinics shall have the approval of the American Dental Association.

b.   Acceptable materials for restorations are amalgams, light cured composites, and light cured and self-cured glass ionomers. The material of choice shall be selected by the dentist based upon clinical considerations.

c.   CFMG dental staff shall verify that every patient has received a copy of the Dental Materials Fact Sheet. Prior to initiating any restorative procedure the patient shall sign the Acknowledgment of Receipt of Dental Material Fact Sheet. This signature acknowledges acceptance of possible risks, denial of alternate procedures, and consents to the proposed procedure and use of the materials as recorded in the dental record.

d.   Based upon the comprehensive examination, teeth lacking adequate structural integrity for a long-term prognosis or with advanced periodontal disease shall not be eligible for permanent or temporary restorations.

e.   Permanent and temporary restorations will not be provided for cosmetic purposes.

5.   Oral Surgery

MCJ dental clinic shall provide necessary oral surgery services to all inmate-patients onsite or through a local community provider.

Routine extraction of non-pathologic and/or asymptomatic erupted, partial erupted, partial impacted or complete impacted third molars are an excluded service.

Removal of third molars to prevent crowding or future pathology is an excluded service.

6.   Endodontics.

All patients in custody of county detention centers with CFMG dental contracts shall be eligible to receive palliative endodontic  therapy

107

limited to upper and lower anterior teeth.

CFMG's Amended Implementation Plan

Endodontic services shall be performed in accordance with established criteria and within the specific guidelines of this section.

Palliative endodontic therapy-the procedure in which pulpal debridement is performed to relieve acute pain shall be provided to all inmate-patients.

Inmate-patients **incarcerated for** 12 months or greater are eligible to receive root canal therapy limited to upper and lower anterior teeth performed in accordance with established criteria and within the specific guidelines of this section. Eligibility for root canal therapy will be in accordance with their dental treatment plan, PI score, and with the approval of the treating dentist. Any routine root canal procedure that cannot be accomplished by CFMG dentist at MCJ will be referred to a contracted dentist in the outside facility.

Definition: Routine Root Canal Therapy is the procedure in which the pulpal chamber and canals undergo cleaning, shaping and obturation.

a.  Endodontic procedures shall not be performed when extraction of the tooth is appropriate due to non-restorability, periodontal involvement or when the tooth can easily be replaced by an addition to an existing or proposed prosthesis in the same arch.

b.  Endodontics, or root canal therapy, shall only be performed for an inmate-patient on the upper and lower six anterior teeth when all of the following conditions are met.

    (1)  The retention of the tooth is necessary to maintain the integrity of the dentition.

    (2)  The tooth has adequate periodontal support and a good prognosis for long- term retention and restorability.

(3)   The patient is maintaining an acceptable level of oral hygiene, defined as a plaque index score of 20% or less, necessary to preserve the health of his or her oral cavity.

(4)   The tooth is restorable using available restorative materials approved by the American Dental Association and does not require extensive restorative treatment including pin or post retained core build up and /or a crown.

(5)   There is adequate posterior occlusion, either from natural dentition of a dental prosthesis to provide protection against traumatic occlusal forces.

(6)   A local contract dentist will be available for referral when in the opinion of the treating dentist the procedure could be handled more predictably by an endodontic specialist.

c.   A Consent for Root Canal Treatment Form must be completed by the dentist and signed by the patient and witness (dentist) prior to the provision of root canal treatment.

d.   Apicoectomies, retrograde fillings, posterior root canal therapies, hemi-sections, root amputations and re-treatment of root canal therapies are excluded procedures.

7.   Fixed Prosthesis (Crown and Bridge).

Fixed prosthetic services, (i.e., lab processed crowns and bridges), shall be considered an excluded service and shall not be routinely provided to patients by dentists employed by the CFMG.

Fixed prosthetics:

a.   Shall not be utilized to restore missing or defective teeth if an adequate restoration can be placed, (e.g., a stainless steel crown, polycarbonate crown, a bonded composite, or an amalgam with

110

cuspal coverage), or if a removable partial denture can be fabricated to replace the missing teeth.

b.  May be provided if all of the following criteria are met:

    (1)  The teeth involved in fixed prosthetic therapy have adequate periodontal support, with no mobility other than normally occurring physiologic movement.

    (2)  All Dental Priority 1 and 2 dental care has been completed prior to commencing fixed prosthetic treatment.

    (3)  The inmate-patient has demonstrated a PI score of 20% or less for two (2) consecutive months after the completion of all Dental Priority 2 dental care.

    (4)  The inmate-patient has a minimum of at least six (6) months of verifiable, continuous incarceration time remaining on his or her sentence.

c.  Patients undergoing fixed prosthetics that are in progress but not completed at the time of their incarceration, shall have their dental needs met with CFMG authorized restorative materials and procedures only, (e.g., removable prosthetics, stainless steel crowns, polycarbonate crowns).

8.  Implants

CFMG dentists shall not initiate the placement, completion, or repair of dental implants for patients.

a.  A patient with dental implants begun but not completed at the time of his or her incarceration shall not have their dental implants completed by a CFMG dentist. The patient, at his/her own expense, may request to be seen by a local licensed dentist, upon authorization by the county, to complete the implant treatment.

111

b.  Patients shall be referred to a dental specialist experienced in the management and placement of dental implants (e.g. oral surgeon, periodontist, endodontist) to have a failing dental implant evaluated for possible removal.

9.  Orthodontics

The MCJ dental clinic shall not initiate orthodontic procedures, (i.e., braces), or continue orthodontic treatment for inmate-patients incarcerated while in active orthodontic treatment.

a.  Inmate-patients may request to have orthodontic bands/brackets removed by the CFMG dental department.

(1)  CFMG shall not be held liable for changes to the inmate-patients' dentition once the orthodontic bands/brackets are removed and shall of orthodontic bands/brackets and discontinuation of their orthodontic treatment.

(2)  CFMG shall not be held liable for changes to the inmate's dentition once the orthodontic bands/brackets are removed and shall obtain informed consent from all inmates who request removal of orthodontic bands/brackets and discontinuation of their orthodontic treatment.

(3)  Every attempt shall be made to contact the treating orthodontist prior to removal of orthodontic bands or brackets.

(4)  Removal of orthodontic bands/brackets and/or arch wires shall be at the discretion of the treating dentist.

(5)  CFMG shall not be held liable for the replacement of orthodontic bands that are damaged or removed in the process of providing dental procedures on banded teeth.

XII.   HEALTH RECORDS

*CFMG is working toward implementing an Electronic Medical Record system (EMR) for use at the Monterey County Jail that will enhance the delivery of health care services.  The EMR is being designed to try and accomplish the following*:

1. *The EMR will contain the complete medical record of each inmate at the MCJ.*

2. *Health care staff will use the EMR to closely track all requests for health care including the date of submission, date of triage, date of evaluation, disposition and date of any necessary follow-up care.*

3. *Health care staff will use the EMR to closely track all medications administered to an inmate including the name of the medication and dose required.*

4. *The EMR will contain a catalog of all Standardized Nursing Procedures and the appropriate algorithm of care that must be followed and documented by the health care provider who is treating an inmate pursuant to the Standardized Nursing Procedure.*

5. *The EMR will identify any inmates who require Chronic Disease Management and health care staff will use it to closely track the condition/s that need to be monitored, the nature of the treatment required and the frequency of any required follow-up care.*

CFMG is committed to implementing an Electronic Medical Record system at the Monterey County Jail.  Until the EMR is implemented the following medical record procedures will apply.

CFMG's Amended Implementation Plan

A.    Contents of Medical Record

The health record of an inmate contains the following items as applicable to his/her case:

1.    The completed Receiving Screening form.
2.    Health Inventory/Communicable Disease Screening forms.
3.    Problem list.
4.    All findings, diagnosis, treatments, dispositions.
5.    Prescribed medications and their administration.
6.    Laboratory, x-ray and diagnostic studies.
7.    Consent and Refusal forms.
8.    Release of Information forms.
9.    Place and date of health encounters (time, when pertinent).
10.   Health service reports (i.e., dental, psychiatric, and other consultations).
11.   Hospital Discharge Summaries.
12.   Jail Medical Record Summaries (transfer forms).
13.   Individual treatment plan

B.    Maintenance

All health services staff is responsible for maintaining current, accurate and legible medical records.

C.    The physician-patient confidentiality privilege applies to the medical/psychiatric record.  Access to the inmate's medical record is controlled by the Medical Director, CFMG.

1.    Medical records shall be maintained in secure, locked storage cabinets within the medical unit.

2.    Access to medical records shall be limited to licensed health services personnel and medical records personnel.

114

CFMG's Amended Implementation Plan

3.      The health authority or his designee shall share information with the facility manager as necessary to deliver medical treatment and to preserve the health and safety of inmates and staff in accordance with state regulations.

4.      All requests for medical information will require written consent of the inmates or subpoena.

5.      Mental health, alcohol and drug abuse information is confidential under federal regulations and can be disclosed only by specific written consent of the inmate.

6.      Release of information forms shall be processed by the program administrator or his/her designee.

D.      Records Retention

Inactive medical records are to remain confidential and protected from destruction for a minimum of 7 years past the last health encounter.  Retention of medical records of inmates that were pregnant during an incarceration shall be stamped to identify them as OB records and will be kept at a minimum of 25 years.  CFMG will not be responsible for medical records destruction.  Medical records which have been inactive three years will be returned to the County.

1.      Inactive medical records are stored in a secure room designated for medical records.

2.      Inactive medical records over three years will be returned to the County for storage.

3.      Inactive OB records shall be stored separately from other inactive records in the storage area.

115

XIII.   CFMG STAFFING PLAN

There shall be, at all times, sufficient staff to ensure compliance with the CFMG Implementation Plan.   The CFMG Staffing Plan for the Monterey County Jail is attached hereto as Exhibit I.  CFMG will ensure that staffing levels are sufficient to consistently and adequately fill all positions identified in the CFMG Staffing Plan. Relief factors for each position will be calculated into the staffing analysis to ensure staffing levels consistently meet requirements.   CFMG will evaluate on an on-going basis its staffing levels to ensure that all staffing positions are filled and sufficient staff is employed to ensure compliance with the CFMG Implementation Plan.

CFMG's Amended Implementation Plan

[EXHIBIT INDEX]

Exhibit A    MCJ Medical Intake Questionnaire

Exhibit B    CFMG Intake Triage Assessment form

Exhibit C    Guide to Developmental Disabilities

Exhibit D    Nursing Psychiatric and Suicidal Assessment Form

Exhibit E    Health Inventory & Communicable Disease Screening Form

Exhibit F    CFMG Referral Form

Exhibit G    Suicide Risk Assessment Form

Exhibit H    CFMG ATD

Exhibit I    CFMG Staffing Plan