1  MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
2  VAN SWEARINGEN – 259809
KRISTA STONE-MANISTA – 269083
3  ROSEN BIEN
GALVAN & GRUNFELD LLP
4  50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
5  Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104
6  Email:   mbien@rbgg.com
egalvan@rbgg.com
7  vswearingen@rbgg.com
kstone-manista@rbgg.com
8
JAMES EGAR – 065702
9  Public Defender
DONALD E. LANDIS, JR. – 149006
10  Assistant Public Defender
OFFICE OF THE PUBLIC DEFENDER
11  COUNTY OF MONTEREY
111 West Alisal Street
12  Salinas, California  93901-2644
Telephone:   (831) 755-5806
13  Facsimile:   (831) 755-5873
Email:   EgarJS@co.monterey.ca.us
14  LandisDE@co.monterey.ca.us

ALAN SCHLOSSER – 049957
MICAELA DAVIS – 282195
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:   (415) 621-2493
Facsimile:   (415) 255-8437
Email:   aschlosser@aclunc.org
mdavis@aclunc.org

ERIC BALABAN (*admitted pro hac vice*)
CARL TAKEI – 256229
NATIONAL PRISON PROJECT of the
AMERICAN CIVIL LIBERTIES UNION
915 15th Street N.W., 7th Floor
Washington, D.C.  20005-2302
Telephone:   (202) 393-4930
Facsimile:   (202) 393-4931
Email:   ebalaban@aclu.org
ctakei@aclu.org

15  Attorneys for Plaintiffs

16  UNITED STATES DISTRICT COURT

17  NORTHERN DISTRICT OF CALIFORNIA

18  JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,

19  Plaintiffs,

20  v.

21  COUNTY OF MONTEREY; MONTEREY
22  COUNTY SHERIFF'S OFFICE;
CALIFORNIA FORENSIC MEDICAL
23  GROUP, INCORPORATED, a California corporation; and DOES 1 to 20, inclusive,

24  Defendants.

Case No. CV 13 2354 PSG

**DECLARATION OF PABLO STEWART, M.D.**

Judge:  Hon. Paul S. Grewal

NO HEARING SET

[2966047-5]

I, Pablo Stewart, M.D., declare:

1. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify. I have been retained by Plaintiffs' counsel to provide expert opinion concerning the adequacy of policies, procedures, and practices for mental health care provided to prisoners at the Monterey County Jail ("MCJ" or "the Jail").

2. On April 29, 2014, I submitted a Declaration in Support of Plaintiffs' Motion for Class Certification, Dkt. No. 51 ("Stewart Class Cert. Decl."). My education, training, and experience are detailed in this declaration. In short, I have approximately 30 years of experience in correctional mental health care, including serving as the court's expert in class action cases challenging the provision of mental health care to prisoners. On October 21, 2014, I submitted a Reply Declaration in Support of Plaintiffs' Motion for Class Certification and Motion for Preliminary Injunction. Dkt. No. 356 ("Stewart Class Cert. Reply Decl."). Many of the opinions in this declaration have already been expressed in my previous declarations.

3. Since I submitted those declarations, I have conducted further review of the mental health care system at the Jail, including the review of numerous documents pertaining to Defendants' policies and procedures, as well as medical records for a number of current and former prisoners in the Jail. A list of the additional documents I have reviewed is attached as **Exhibit A**. On March 30, 2015, I conducted an inspection of the Jail, during which I observed operations in nearly all areas of the Jail and interviewed prisoners. On March 31, 2015, I conducted additional interviews with prisoners in the attorney visiting rooms at the Jail.

4. I have reviewed County Defendants' and CFMG's Implementation Plans as filed with the Court on February 19, 2016. *See* Dkt. No. 14, Ex. 1 ("County Plan") and Dkt. No. 518, Ex. A ("CFMG Plan"). I have been asked to provide my opinion regarding the policies, procedures, and practices of the County of Monterey, the Monterey County

Sheriff's Office, California Forensic Medical Group, and their agents as they relate to the provision of mental health care to prisoners in Monterey County Jail (the "Jail").

## I.    SAFETY CELLS

5.    In previous declarations that I submitted in this matter, I have expressed my concerns regarding the extraordinarily punitive nature of Defendants' safety cells, as well how prisoners decompensate when placed in safety cells. *See* Stewart Class Cert. Decl. ¶¶ 76-88; Stewart Class Cert. Reply Decl. ¶¶ 41-47.

### A.    Safety Cells Fall Below Basic Standards of Decency

6.    I inspected the safety cells during my tour of the Jail.  Prior to my tour, I had reviewed the Neutral Expert Report of Dr. Hayward, who reported that his review of records indicated recurrent complaints that safety cells were not sufficiently cleaned and frequently smelled of feces. *See* Declaration of Eric Balaban in Support of Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 109-2, Ex. L (hereinafter, "Hayward Report") at 14.  I had also reviewed declarations submitted by named Plaintiffs, many of whom had been placed in safety cells and had commented on their filthiness.  If anything, the conditions in the safety cells were even worse and more punitive than I anticipated.

7.    The conditions in the safety cells are appalling and place prisoners at risk of serious harm.  The safety cells have no features other than a window and a tray slot in the door and a grate in the floor through which prisoners must urinate and defecate.  The safety cells have no beds, sinks, toilets, chairs, tables, or windows for natural light. Prisoners must sit, sleep, and eat on the same floor on which the toilet grate is located. Prisoners are unable to wash their hands or other body parts in the event they become soiled.

8.    The safety cells that I observed were disgusting and in abysmal condition. Attached as **Exhibit B** are photos showing the conditions in the safety cells that I toured. The floors of many of the cells were covered in the occupants' food or other garbage.  One cell had a hamburger bun stuck in the toilet grate drain.  Another cell smelled so bad I had to exit it immediately.  The smell in the cells was created, at least in part, by the fact that

custody staff control the flushing mechanism for the floor toilet, meaning that waste products are often left in the cells for significant periods of time.  The doors of two of the safety cells I observed were falling apart, exposing what appeared to be rubber or insulation that prisoners could easily remove and use as a choking hazard, as Dr. Hayward described in his report in May 2014.  *See* Hayward Report at 19.  In fact, at least one prisoner attempted to harm himself by eating the rubber off the safety cell walls and swallowing it.  *See* Declaration of Ernest Galvan (hereinafter, "Galvan Decl."), filed herewith, ¶ 2 & Ex. A [Prisoner A, CFMG_PLSBATES_00032053].

9.      In my Class Certification Declaration, I stated that "[p]risoners placed in the safety cells are denied nearly all privileges and human contact….  [P]risoners are not provided with showers, any out of cell time, exercise, or property while in the safety cells, regardless of how long they are retained in those cells…."  Stewart Class Cert. Decl. ¶ 77. I have reviewed Safety Cell Logs documenting the times prisoners were placed in safety cells between January 1, 2015 and March 19, 2015.  During this period, there were multiple safety cells placements that lasted one week or longer.  *See* Galvan Decl. ¶¶ 2, 3, 4, 19 & Exs. A, B, C, R [Prisoner A (1/21/2015-2/19/2015 and 2/21/2015-3/3/2015): COUNTY 17843-50, 17857-59, 17864, 17866, 17871-72, 17884-85; 17937-53, 17956-59, 17974-75, 17979-84, 17986, 17994-97; 18006, 18014, 18019-21, 18028-30, 18037-42, 18047-51, 18058-59, 18062-63, 18068-70, 18080-82, 18086-88, 18113-15, 18119, 18123-26, 18134-36, 18140, 18142-43, 18156-59, 18167-68, 18171-74, 18177-78, 18181-86, 18189-97; Prisoner B (1/17/2015 - 1/24/ 2015): COUNTY 17803, 17809, 17812-13, 17819-34, 17861-62; Prisoner C (2/17/2015 - 2/25/2015): COUNTY 18094-105, 18129-32, 18144-51, 18153, 18169-70, 18176; Prisoner R (1/29/2015 - 2/5/2015): COUNTY 17909-20; 17962-73, 17985]  One prisoner spent 29 consecutive days in the safety cell during one placement; the same prisoner was confined in a safety cell for 10 consecutive days in another.  *See id.* ¶ 2 & Ex. A [Prisoner A: 1/21/2015 - 2/19/ 2015 and 2/21/2015 - 3/3/2015].  None of these prisoners were permitted to go outside for exercise at any point during their time in safety cells.  According to the logs, these four prisoners were offered a

total of five showers during the approximately 66 collective days in which they were detained in safety cells.  Needless to say, spending such prolonged periods of time in a featureless, windowless cell without regular access to running water, a shower, or exercise can have a very harmful effect on a prisoner's mental health.

10.     Because prisoners in safety cells have no access to a sink or commissary, they are completely dependent on staff to provide them with sufficient food and water.  It appears that Jail staff often fail to provide adequate food and water to some prisoners placed in safety cells.  Internal audits conducted by the Sheriff's Office in January and March 2013 showed that Jail staff did *not* offer water to the prisoner even one time for nearly half of the placements (for twelve of twenty-seven safety cell placements).  These included safety cell placements that lasted eighteen, seventeen, nine, eight, and seven hours.  *See id.* ¶ 44 & Ex. QQ [COUNTY 023771, 024026].

11.     In my Class Certification Declaration, I wrote:

> As if the conditions discussed above were not sufficiently punitive, Defendants frequently strip prisoners and place them naked in the safety cells.  Jail policy requires that prisoners placed in the safety cells "shall be allowed to retain sufficient clothing or be provided with a safety smock to provide for their personal privacy unless specific identified risks to the inmate's safety or to the security of the facility are documented." *Id.* at § 1104.05(I) (section improperly numbered in exhibit as 1114.05)….

Stewart Class Cert. Decl. ¶ 78.  Though Jail policy states prisoners may be able to retain their own clothing, all of the prisoners I observed in the safety cells had their clothes taken away from them and were provided with a suicide resistant blanket and/or a suicide resistant smock.  A few of the prisoners I spoke with complained about how cold the cells were and how the blanket and smock were inadequate to keep them warm.  There can be good reasons to deny prisoners in mental health crisis clothing that they may be able to use to harm themselves.  However, Defendants must ensure that the prisoners have adequate provisions to keep them warm.  And Defendants should, as their policy states, determine on an individualized basis whether a prisoner can be permitted to possess their clothes.

12.     During my inspection of the Jail, I observed prisoners in safety cells sitting or lying on the floor of the cell, many of whom complained to me about how

1  uncomfortable they were.  Prisoners whom I interviewed commented on how the

2  conditions in the safety cells negatively affected their mental health.  One prisoner who

3  was provided with only a safety smock and became very cold in a safety cell stated that the

4  conditions "made me want to die."  Another stated:  "That's how they treat people who are

5  suicidal.  Treat them worse."  Another simply said "safety cell is hell."

6     13.    As I explained in my Class Certification Reply Declaration:

7  California prisons, unlike Monterey County Jail, have largely ended what I
   consider to be the horrific default practice of placing prisoners at heightened
8  risk of suicide or self-harm into cells that do not have a bed (i.e., cells in
   which a person must sit, lie, and sleep on the floor).  I understand that the
9  State has installed suicide-resistant beds in mental health crisis units for use
   by prisoners unless such beds are clinically contraindicated.  The Coleman
10 Special Master recommended (and the Coleman court ordered) such a step in
   order to address the practice of requiring suicidal prisoners to sleep on the
11 floor, which created a needlessly harsh environment that does not serve
   therapeutic purposes, and was found to hinder identification of suicidal
12 prisoners insofar as it contributed to prisoners' decisions not to report
   thoughts of self-harm to staff.  *Coleman v. Brown,* (E.D. Cal., Case No. 90-
13 cv-520), Docket No. 4044, July 21, 2011.  I agree with these findings.  It is
   my opinion that the practice of denying suicidal prisoners in safety cells any
14 place other than the floor to sit, lie, or sleep for extended periods of time is
   inhumane and dangerous.  This is a particularly disturbing practice at
15 Monterey County Jail given its apparently excessive use of safety cells and
   the system's exceedingly high suicide rate.

16

17 Stewart Class Cert. Reply Decl. ¶ 47.  It is my recommendation that if Defendants insist on

18 continuing to use safety cells as part of their suicide prevention program, which I object to

19 for the reasons stated in this Declaration, Defendants should install suicide resistant

20 features including beds, sinks, and toilets in all safety cells in the Jail.

21    **B.    Safety Cells Must Not Be Used for Observation of Potentially Suicidal
             Prisoners**
22

23    14.    As I have discussed at length elsewhere, Monterey County Jail's safety cells

24 are overly restrictive and extraordinarily punitive; placing a suicidal prisoner in a safety

25 cell actually exacerbates that prisoner's suicidality and inhibits him or her from coming

26 forward with suicidal feelings.  *See* Paragraphs 6-13, *supra*; Stewart Class Cert. Decl.

27 ¶¶ 76-88; Stewart Class Cert. Reply Decl. ¶¶ 41-47.  I previously explained:  "These

28 effects are very real, not hypothetical.  For example, according to his declaration, when

Plaintiff Mefford was experiencing suicidal thoughts in January 2014, he explicitly represented to mental health care staff that he was unsure whether he should report his true level of suicidality because he was afraid he would be placed in a safety cell.  Once he was placed in the safety cell, his suicidality increased markedly and he engaged in repeated acts of self-harm."  *See* Stewart Class Cert. Decl. ¶ 80.  Placing a suicidal prisoner in a safety cell unduly exposes that prisoner to harm and increases the risk that the prisoner will follow through on his or her suicidal feelings.

15.    I understand that Defendants have claimed that they have "rehabbed" the Jail's safety cells, including by replacing the padding in the safety cells, and my opinion remains unchanged.  A somewhat cleaner safety cell does not ameliorate the harsh and austere conditions that are contraindicated for suicidal prisoners.  Prisoners placed in the safety cells are denied privileges, sensorial input, and human contact; they are subjected to conditions in which they must sit, sleep, and eat on the same floor on which the toilet grate is located.  It is never appropriate to place a suicidal prisoner in a safety cell.  Additionally, as discussed further below, suicidal prisoners require a level of observation greater than that afforded in safety cells.

**C.    Safety Cell Placements Require Immediate Medical and Mental Health Assessments**

16.    Safety cell placements should be treated as a medical or mental health emergency. Oftentimes, behavior that prompts safety cell placement may be symptomatic of serious life-threatening medical problems (e.g., delirium tremens, blood sugar disregulation in diabetics, thyroid abnormalities).  Alternatively, such behavior may be indicative of the need for psychiatric care beyond the capabilities of the Jail.  Given the likelihood and severity for risk to the health and welfare of the prisoner placed in the safety cell, it is imperative that the prisoner receive a medical assessment by a Qualified Medical Professional and a suicide risk assessment by a Qualified Mental Health Professional prior to or immediately after (within 15 minutes) of safety cell placement.  If there is any lag

time between placement and assessment, the prisoner should be on constant one-on-one observation.

17.     Immediate assessments by qualified personnel are necessary to determine the appropriate course of care for the prisoner.  If, for example, the assessment establishes that the prisoner is acutely suicidal, the prisoner should be taken out of the safety cell and put on constant one-on-one monitoring or transferred to an inpatient unit.  Similarly, if the assessment establishes that the person is suffering a medical emergency, the prisoner should be immediately transferred to the hospital.  If, on the other hand, the prisoner receives clearance by the Qualified Medical Professional and Qualified Mental Health Professional conducting the assessments, the prisoner may be safely confined in the safety cell, subject to the time limitations discussed below.

18.     Defendant CFMG's Suicide Prevention plan includes the following provision regarding safety cells:  "Inmates on Suicide Precautions in safety cells whose condition deteriorates, or for whom the nurse is unable to complete a hands-on assessment including vital signs after six hours of placement shall be transferred to Natividad Medical Center for further assessment."  CFMG Plan at 67.  As I have stated earlier, safety cells are inappropriate placements for suicidal prisoners.  Additionally, if medical staff is unable to complete a hands-on assessment including vital signs, the prisoner should be immediately transferred to Natividad Medical Center to rule out the presence of a life-threatening medical condition.

**D.     Defendants' Lack Adequate Time Limits on Their Use of Safety Cells**

19.     Safety cells, especially those at the Jail, are a placement of last resort.  Only prisoners who are so out of control that they require confinement in a padded, featureless cell should ever be placed in a safety cell.  Because of the extraordinarily harsh conditions, the benefit of safety cell placement runs its course quickly.  For mentally ill patients, the punitive nature of the safety cells exacerbates symptoms of mental illness.  Given the overwhelmingly harsh nature of the Jail's safety cells, the goal is always to minimize exposure; prisoners should be transferred to less restrictive, and, if necessary, suicide-safe

[2966047-5]

1   housing as soon as clinically possible.  Under no circumstances should a prisoner be

2   confined in a safety cell for more than 24 hours.  Anyone who is a danger to self, others,

3   property and is unable to be safely housed in non-safety cell housing within 24 hours must

4   be transferred to an inpatient, licensed mental health care facility.

5          20.     Defendants' Implementation Plans provide that custody staff will begin

6   processing the inmate for transfer to a hospital after "24 consecutive hours" in a safety cell.

7   *See* County Plan at 7; CFMG Plan at 68.  The 24-hour standard is based on consecutive

8   hours, and is thus easy to evade by removing and replacing the inmate in a safety cell over

9   the course of a short period, even in a single day.  To avoid potential repeated placements

10  over a short period that could have the same detrimental effect as a placement for over 24

11  hours, Defendants' Implementation Plans should limit safety cell placement to a term of a

12  maximum total hours over a set period of time; for example, no more than 24 hours total

13  over a period of seven days.  My concerns about repeated placements are not based on

14  mere speculation.

15         21.     As part of my review of the mental health care system, I instructed a

16  paralegal at Rosen Bien Galvan & Grunfeld LLP to examine all of the Safety Cell Logs

17  from January 1, 2015 to March 19, 2015, and collect the following information: the

18  prisoner's name, booking number, and the date and time of safety cell placement and

19  removal.  I have spot checked the paralegal's work and am confident that the data collected

20  is accurate.  In total, 135 Safety Cell Logs were reviewed for 90 prisoners (a number of

21  prisoners were placed in safety cells multiple times during the period of Logs reviewed).

22  Combined, these prisoners spent approximately 4,070 hours in safety cells, for an average

23  of 30.15 hours per safety cell placement.  There were 36 safety cell placements during this

24  time period that were longer than 24 hours, 16 placements longer than 48 hours, and 8

25  placements longer than 96 hours.  These long safety cell placements are indicative of a

26  systemic failure to provide access to inpatient care.

27         22.     From my review of medical records, I observed many instances where a

28  prisoner was placed in a safety cell, released, and then placed back in the safety cell within

seven days.  *See* Galvan Decl. ¶¶ 3, 6-8, 10-13, 15-16 & Exs. B, E, F, G, I, J, K, L, N, O, P [*E.g.*, Prisoner B (1/17-24/2015, then 1/25-26/2015, then 2/2/2015): COUNTY 17803, 17809, 17812-13, 17819-34, 17861-62, 17868-69, 17883, 17960; Prisoner E (3/6-10/2015, then 3/11-16/15): COUNTY 18209-18, 18252, 18260-70; Prisoner F (1/4-5/2015, then 1/7-9/2015): COUNTY 17726-28, 17748-17752; Prisoner G (1/26/2015, then 1/27-28/2015): COUNTY 17870, 17887-88; Prisoner I (1/20-21/15, then 1/28-30/15): COUNTY 17841-42, 17892-93, 17894, 17896; Prisoner J (1/24-25/15, then 1/27-28/15): COUNTY 17879-82, 17889-90; Prisoner K (1/28/15, then 2/3-4/15): COUNTY 17935, 17976-78; Prisoner L (1/26/15, then 1/26-27/15): COUNTY 17876, 17873-75; Prisoner N (1/12-13/15, then 1/17-19/15): COUNTY 17787-89, 17804, 17808, 17810, 17811, 17835; Prisoner O (2/7-9/15, 2/14/15): COUNTY 18004, 18022-27, 18064; Prisoner P (3/7/15, then 3/7-9/15): COUNTY 18208, 18245-50].  These repeated safety cell placements are indicative of Defendants' inability to stabilize seriously mentally ill prisoners at the Jail.  Prisoners who require the drastic step of safety cell placement on multiple occasions within a short period of time almost always require an inpatient level of care.  Given Defendants' historical overuse of safety cells for the Jails' mentally ill population, Defendants would benefit by having a policy that any prisoner placed in a safety cell more than once in a seven-day period should be evaluated by a psychiatrist specifically to determine whether that prisoner has a need beyond the treatment capabilities of the Jail and should therefore be transferred to an inpatient facility.  If a prisoner requires repeated safety cell placement over a short amount of time, that is a strong indication that the person requires inpatient care.  If inpatient care is not indicated, then the psychiatrist should develop a treatment plan to address the patient's mental illness.

23.     Additionally, given my observation of Defendants' willingness to over-use safety cells as well as their failures to provide standards for timely transferring a person out of a safety cell to an inpatient unit, I am concerned that Jail staff only begin to initiate the transfer after 24 hours under Defendants' Implementation Plans.  A more concrete standard, such that no prisoner may be held in a safety cell for more than 24 hours over a

1  period of seven days would ensure that the prisoner spends no more than that amount of
2  time in the harsh conditions of a safety cell.  Transfers should be effected prior to the
3  expiration of the deadline, not initiated after a deadline and completed some unforeseen
4  time thereafter.

5  **II.      ACCESS TO HOSPITALIZATION AND INPATIENT CARE**

6            24.      I previously opined that "Defendants lack adequate policies and practices for
7  transferring prisoners who require higher level inpatient or crisis care to facilities that can
8  meet prisoners' serious mental health needs."  Stewart Class Cert. Decl. ¶¶ 6, 60-61;
9  Stewart Class Cert. Reply Decl. ¶¶ 48-52.  My opinion has not changed.

10           25.      An essential element of a correctional mental health care program is the
11  ability to provide inpatient mental health care services to prisoners who require higher
12  levels of care.  As I explained in my Class Certification Declaration, "Prisoners must have
13  access to inpatient units with appropriately trained mental health care staff.  Prisoners must
14  also have access to units licensed to provide care to prisoners in acute psychiatric crisis."
15  Stewart Class Cert. Decl. ¶ 60.  Access to inpatient care must be available 24 hours a day,
16  because, as explained by Defendants' expert Dr. Jason Roof, "[e]mergencies don't
17  necessarily happen at convenient times.  It can happen any and all times, and we have to
18  have a mechanism in place to make sure that we help people who are in need."  Stewart
19  Class Cert. Reply Decl. ¶ 50 (citing Roof Depo. at 28:23-29:6.)

20           26.      Pursuant to the standard of care, prisoners must be transferred to an inpatient
21  facility if they are a danger to self, others, or gravely disabled and cannot be stabilized in
22  the Jail.  It may also be necessary to hospitalize someone for further diagnostic
23  evaluation/clarification or for complex medication management.  Defendants' policies and
24  practices regarding transferring prisoners for inpatient care are not adequate.  Defendants'
25  Implementation Plan for providing access to hospitalization and inpatient care is limited to
26  following provision:  "Inmates requiring psychiatric care beyond the on-site capability will
27  be transferred to an appropriate off-site facility as deemed necessary by responsible jail
28  psychiatric staff.  The shift supervisor or his/her designee will be contacted to process the

documents required for transfer." CFMG Plan at 33. This provision fails to address criteria and time frames for referrals and transfers, or procedures to care for inmates returning from inpatient care. To guide decision-making, Defendants' Implementation Plans should set forth the specific "on-site capability[ies]" at the Jail. To prevent harm to the patient requiring a higher level of care, Defendants' Implementation Plans should also set timeframes for how quickly the transfer must occur, how quickly the shift supervisor should be contacted, and what additional supervision and treatment the prisoner should receive if for any reason the transfer of the prisoner cannot be effectuated immediately. As discussed below, Defendants' current policies place inmates at harm.

**A.    Defendants place or retain prisoners in safety cells instead of transferring prisoners for inpatient care**

27.     Some jails have licensed inpatient psychiatric units capable of caring for seriously mentally ill prisoners within the confines of the jail. For example, Santa Clara's jail has such facilities. In contrast, Defendants lack any inpatient care unit, and must transfer those patients who require psychiatric care beyond the on-site capabilities of the Monterey County Jail. From my review of medical records and safety cell logs, it is my opinion that Defendants frequently fail to transfer prisoners requiring psychiatric care beyond the Jail's capability for inpatient mental health care when necessary. Instead, and as previously acknowledged by myself and neutral expert Dr. Hayward, Defendants' over-use safety cells to house prisoners who should be transferred to inpatient facilities. *See* Hayward Report at 5 (finding that "safety cells are used excessively" for prisoners in need of acute psychiatric services); *see also* Stewart Class Cert. Decl. ¶¶ 61, 84, 88.

28.     Safety cells, especially those at the Jail, are a temporary placement of last resort, and are never appropriate long-term placements for patients with severe mental illness. Because of their extraordinarily harsh conditions, safety cell placement exacerbates symptoms of the mentally ill prisoner. Placement in a safety cell is not mental health treatment. Placement in a safety cell will tend to exacerbate symptoms of depression, and, in my opinion, increases the risk of suicidality. A prisoner who is such a

danger to self, others, and/or property that he or she is unable to be safely incarcerated in non-safety cell housing must be promptly transferred to an inpatient, licensed mental health care facility.

29. Defendants' Implementation Plans lack protocols and timeframes under which prisoners needing psychiatric inpatient care or hospitalization are transferred to receive appropriate care. Instead, Defendants place vulnerable prisoners in safety cells. Medical records demonstrate how Defendants' lack of transfer policies and protocols harm prisoners. As perhaps the most troubling example, Prisoner D was immediately placed in a safety cell upon arrival at the Jail on December 4, 2015, where she was identified as "under the influence of drugs and combative." *See* Galvan Decl. ¶ 5, Ex. D [COUNTY_PLSBATES_005339]. At the time of placement, a nurse noted that Prisoner D "Came in screaming and yelling don't kill me. … Eyes wide, white, foam at sides of mouth." *See id.* [CFMG_PLSBATES_00075671]. The safety cell log for Prisoner D documents the provision of only one cup of liquid and one meal to Prisoner D over the course of more than one day in the safety cell. *See id.* [COUNTY_PLSBATES_005324-28]. The CFMG logs show her condition deteriorating the entire time, with nurses unable to take complete vital signs even once. *See id.* Prisoner D was found "lying on side, lying in her feces" after 27 hours in the safety cell. *See id.* [CFMG_PLSBATES_00075673]. During the additional 50 minutes after Dr. Fithian ordered her to the ER and before her transfer, the nurse observed that she was no longer responsive and was in agonal breathing. *See id.* [CFMG_PLSBATES_00075678]. Prisoner D arrived at the hospital comatose, and remained in a coma until her death at the hospital on December 19, 2015.

30. Other examples demonstrate that Defendants fail to transfer patients needing care beyond the Jail's capacity to inpatient care, and instead place such individuals in safety cells. Prisoner Q was involuntarily medicated and placed in a restraint chair in a safety cell on March 13, 2015. *See id.* ¶ 18 & Ex. Q [CFMG_PLSBATES_00055651, 00055680]. Prisoner Q, who had attacked staff and had eaten his own flesh, clearly required care at an inpatient level. *See id.* [CFMG_PLSBATES_00055680]. Yet,

1   Defendants maintained Prisoner Q in a safety cell from March 12 until March 16.  *See id.*

2   [CFMG_PLSBATES_00055646-52].  I have reviewed Prisoner Q's medical record very

3   closely, and, as I far as I can discern, staff never even considered sending Prisoner Q to an

4   inpatient facility.  As another example, Prisoner R, was placed in a safety cell from

5   January 29 to February 6, 2015.  *See id.* ¶ 19 & Ex. R [COUNTY 01909-20, 17962-73,

6   17985].  From my review of records, it does not appear that Defendants considered

7   sending Prisoner R to an inpatient facility, even though his detention in the safety cell

8   lasted almost eight days and he was clearly in acute psychiatric distress for most of that

9   time. *See id.* ¶ [CFMG_PLSBATES_00055485-99].

10       31.    To prevent future incidents such as these, and consistent with the Settlement

11   Agreement's promise of adequate and timely treatment, the Jail should implement

12   protocols that include mandatory timeframes for the initiation and completion of transfers

13   of mentally ill prisoners requiring care beyond the Jail's capabilities to hospitals or other

14   inpatient facilities.

15       **B.**    **Once Defendants make the decision to transfer a prisoner to an**
               **inpatient facility, there are frequently delays between when Defendants**

16               **decide to transfer a prisoner to an inpatient facility and when a prisoner**
               **is actually transferred to the inpatient facility**

17

18       32.    In most circumstances, sending a prisoner to an inpatient facility for

19   psychiatric care is the equivalent of sending a prisoner to the emergency room for

20   treatment for an emergent medical problem such as a stroke, a broken bone, or a heart

21   attack.  Any delay in transferring the prisoner to a facility capable of providing a higher

22   level of care risks unnecessary suffering, worsening of condition, and, if not properly

23   supervised, death.  Accordingly, there is no such thing as a tolerable delay in transferring a

24   prisoner for inpatient psychiatric care.

25       33.    Defendants are in an advantageous position with respect to access to

26   inpatient care.  There is a 22-bed mental health unit ("MHU") at Natividad Medical Center

27   ("NMC").  Using a feature available on Google Maps, I measured the "as the crow flies"

28   distance between the Jail and the Natividad Medical Center; they are less than 1000 feet

apart.  While in Salinas, I also drove from the Jail to NMC; the drive takes less than three minutes.  Moreover, it is my understanding that NMC and its MHU are operated by the County, the same entity that operates the Sheriff's Office and is a defendant in this case.  In my experience, county jails rarely have such easy access to inpatient care.

34.     Despite the Jail's extremely close proximity to inpatient care, it appears that the MHU has put in place barriers obstructing access to inpatient care for prisoners in the Jail.  According to Quality Assurance Committee Meeting minutes, beginning in mid-2014, NMC instituted a new policy requiring that "jail inmate referred patients to their psychiatric inpatient service have 24-hour security and first go through the emergency department for screening."  *See id.* ¶ 40 & Ex. LL [CFMG 079582].  As described in the minutes, the policy "has caused significant effect to the jail, in particular custody staff and usually the medical deputy is the person who has recently been asked to provide security for Natividad's hospitalized patients."  *See id.*  From the minutes it appears that this policy applies to all Jail prisoners and that no individualized assessment of the need for such security occurs.  *See id.*  I do not see the need for such policy where the person making the psychiatric referral has already made the determination that the patient needs psychiatric care at the inpatient level.  The requirement that a patient go through the emergency department for screening, even where the patient has been directly referred by his treating psychiatrist, is an undue barrier that impedes the transfer and care of the patient.

35.     Moreover, I am aware of at least two prisoners that the MHU has simply refused to accept as patients.  As the most egregious example, Prisoner A was detained in the Jail from November 24, 2014 to March 4, 2015.  He spent most of his time at the Jail in safety cells, including 46 of 59 days between January 4 and March 3, 2015.  *See id.* ¶ 2 & Ex. A [COUNTY 17722-25, 17739, 17763-69, 17792-800, 17843-50, 17857-59, 17864, 17866, 17871-72, 17884-85; 17937-53, 17956-59, 17974-75, 17979-84, 17986, 17994-97; 18006, 18014, 18019-21, 18028-30, 18037-42, 18047-51, 18058-59, 18062-63, 18068-70, 18080-82, 18086-88, 18113-15, 18119, 18123-26, 18134-36, 18140, 18142-43, 18156-59, 18167-68, 18171-74, 18177-78, 18181-86, 18189-97].  Prisoner A repeatedly harmed

himself by opening and infecting a large wound on his abdomen related to treatment for Munchausen syndrome.   By December 31, 2015, Defendants determined that Prisoner A required care at the inpatient level.  *See id.*  [CFMG_PLSBATES_00031538].  Dr. Fithian requested that the MHU accept Prisoner A as a patient, but was informed that "they would not take him because of a variety of issues including security and his history of behavior and acting out."  *See id.* [CFMG_PLSBATES_00031537].  Dr. Fithian then sought to place him in other inpatient facilities, with no success.  As explained in a series of letters drafted by Dr. Fithian to the Superior Court, Defendants attempted to, but could not, find an inpatient facility to accept Prisoner A.  Dr. Fithian admitted in one letter, "[Prisoner A] is clearly beyond the scope of care that we can provide at the Monterey County Jail;" and he wrote in another, "we are unable to manage him at the Monterey County Jail."  *See id.* [CMFG_PLSBATES_00031755, 00031758].  Prisoner A was not transferred to an inpatient facility until March 4, 2015, more than three months after staff decided he should be transferred.  *See id.* [CFMG_PLSBATES_00032050].  It appears that Prisoner A was only provided access to inpatient care after he was found incompetent in his criminal proceedings.  *See id.* [CFMG_PLSBATES_00032072].

36.     According to Quality Assurance Committee meetings from December 23, 2014, the MHU refused to accept another prisoner because "the staff at the mental health unit does not want him back because of his assaultive behavior and alleged attack on a nurse."  *See id.* ¶ 43 & Ex. OO [CFMG 079590].  Psychiatric hospitalization cannot be denied to a patient because of the risk of violence.  The risk of "danger to others," is a medical basis for admission to a psychiatric hospital and appropriate security for staff and patients must be provided by the County.

37.     In addition, during my inspection, I observed a bulletin board in the mental health care office in the clinic.  *See id.*  ¶ 46 & Ex. RR (a true and correct copy of a photograph of the bulletin board that I observed).  Posted on the board were five monthly lists for the month of March 2015: prisoners awaiting transfer to the MHU at NMC; prisoners currently at the MHU; prisoners awaiting transfer to the state hospitals for

restoration of competency; prisoners returned from the state hospitals to the Jail; and
prisoners who had attempted suicide.  The list of prisoners waiting for transfer to the MHU
is particularly troubling.  There should never be a waitlist for prisoners to be transferred to
an inpatient facility; such a waitlist is the equivalent of a waitlist for the emergency room.
And there most certainly should not be a waiting list given the relationship and proximity
between the Jail and the MHU.

      **C.**      **When prisoners are awaiting transfer to a state hospital, Defendants
have no protocols for providing them with appropriate care**

      38.      Once a court finds a prisoner incompetent to stand trial, the prisoner is
required to be transferred to a state hospital to receive treatment and, if possible, have their
competency restored.  Defendants have an obligation to provide adequate treatment to
prisoners awaiting such transfers.  Defendants' Implementation Plans fail to provide any
protocols for ensuring the timely and adequate care, including access to inpatient facilities,
for these especially vulnerable prisoners.  Rather, Defendants' attitude appears to be that
once a court has ordered a patient transferred to a state hospital, that patient is no longer
the Defendants' responsibility.  This is inconsistent with the standard of care, especially
given the long waiting times experienced by patients at the Jail.  As Dr. Fithian has
indicated in numerous Quality Assurance Committee Meeting minutes, prisoners typically
must wait in a county jail for 90 days or longer for a bed in one of the state hospitals to
become available.  *See id.* ¶ 41 & Ex. MM [CFMG_PLSBATES_00027359].

      39.      During my tour of the Jail, I observed a list of prisoners awaiting transfer to a
state hospital posted on a bulletin board in the mental health care office in the clinic.  As
indicated in the photograph, there were six prisoners awaiting transfer to the state hospital.
*See id.* ¶ 46 & Ex. RR.  The list indicated that three of the prisoners had been found
incompetent in the last week of January 2015 or the first two weeks of February 2015;
accordingly, on the date of my inspection, they had been waiting to transfer to the state
hospital for between one and a half and two months.  *See id.*  Prisoner S, who is also on
this list, was found incompetent and had been awaiting transfer to a state hospital for

DECLARATION OF PABLO STEWART, M.D.

[2966047-5]

1    approximately four months at the time of my tour.  *See id.* ¶ 20 & Ex. S

2    [CFMG_PLSBATES_00064160].  Statistics produced by CFMG confirm that there were

3    also two prisoners pending transfer to the state hospital in February 2015 and five pending

4    transfer in January 2015.  *See id.* ¶ 47 & Ex. SS [CFMG 079946].

5         40.    A prisoner who is found incompetent does not necessarily need mental

6    health care at an inpatient level; a prisoner may not be aware of his or her legal situation or

7    not be able to assist with his or her defense, but may be stable enough to be treated in a

8    Jail.  That said, there is a significant overlap between individuals who are found

9    incompetent to stand trial and individuals who require inpatient care.  And even if an

10   incompetent prisoner does not require inpatient care, the finding of incompetence is a

11   strong indicator that the person may have serious mental health needs.

12        41.    My review of records for prisoners awaiting transfer to the state hospital

13   system reveals that they are not provided with additional mental health monitoring or

14   treatment and are thus at risk.  And in some cases that I reviewed, prisoners awaiting

15   transfer to the state hospital received extremely little or no treatment in the Jail.  As one

16   example, Prisoner T was found incompetent by Dr. Fithian on January 27, 2014.  At that

17   time, Dr. Fithian described Prisoner T as "grossly psychotic and totally noncompliant….

18   He refused to come out of his cell.  He refused to [sic] blanket off from his head."  *See id.*

19   ¶ 21 & Ex. T [CFMG_PLSBATES_00063314].  Despite these findings, Prisoner T was not

20   provided with any mental health care—medication or therapy—until mid-March 2014,

21   when he was seen by an RN after submitting a sick call slip.  *See id.*

22   [CFMG_PLSBATES_00063313].  He was only seen one other time by mental health care

23   staff prior to being transferred to Atascadero State Hospital on April 10, 2014.  *See id.*

24   [CFMG_PLSBATES_00063205].

25        42.    As another example, Prisoner S was found incompetent on or around

26   December 17, 2014.  *See id.* ¶ 20 & Ex. S [CFMG_PLSBATES_00064160].  Prisoner S,

27   who suffers from very serious psychosis, was housed in an isolation cell a substantial

28   portion of his time at the Jail.  At the time of my inspection he was still incarcerated at the

1   Jail and had not yet been transferred to a state hospital.  I observed nothing in his medical

2   file reflecting any change in the course of treatment designed to address his serious mental

3   illness.  In fact, if anything, his record shows relatively fewer contacts with mental health

4   care staff after he was found incompetent.

5          43.     Prisoner U, was found incompetent on or around August 11, 2014, but was

6   not transferred to Atascadero State Hospital until December 11, 2014.  In August 11, 2014

7   letter to the court, written by Dr. Fithian, recommending a finding of incompetency,

8   Dr. Fithian concluded that Prisoner U was so impaired that he could not even consent to

9   psychiatric medications.  *See id.* ¶ 22 & Ex. U [CFMG_PLSBATES_00043008-10].

10  Dr. Fithian followed up with Prisoner U on August 15 and 18, 2014, though he did not

11  order any medication or therapy.  *See id.* [CFMG_PLSBATES_00043068-69].  But

12  following those two encounters, Prisoner U had absolutely no contact with any mental

13  health care staff until October 20, 2014, more than two months later, when custody staff

14  requested that he be seen because he was eating his own feces and smearing it on the wall.

15  *See id.* [CFMG_PLSBATES_00043067-68].  If Prisoner U required psychiatric

16  medications, but was too impaired to consent, he should have been transferred to an

17  inpatient facility immediately; that Prisoner U was awaiting admission to Atascadero State

18  Hospital provides no excuse for delay.  Medications aside, Prisoner U should also have

19  received increased therapy, follow-up, and monitoring at the Jail until he was transferred to

20  Atascadero State Hospital.  Instead, he was ignored until he became even more psychotic.

21         44.     As another example, Prisoner H was booked into the Jail on July 8, 2014 and

22  transferred to Atascadero State Hospital for restoration of competency on December 4,

23  2014.  *See id.* ¶ 9 & Ex. H [CFMG_PLSBATES_00041339, 00041699].  As far as I was

24  able to discern, there was not even any indication in Prisoner H's medical file between July

25  9 and December 4, 2014, that he had been found incompetent to proceed with his case.

26  And there is absolutely no indication that he received any treatment to address his serious

27  mental health needs.  In fact, Prisoner H was only seen by mental health care staff three

28

times during that period, and was not seen by a psychiatrist until the day before he was transferred to Atascadero State Hospital. *See id.* [CFMG_PLSBATES_00041700-05].

45.     Defendants' failure to provide adequate and timely mental health care services denies prisoners found incompetent to proceed with their criminal cases and place prisoners at risk of serious harm.

### III.     SUICIDE PREVENTION

46.     Prisoners at the Jail remain exposed to an extremely high risk of suicide. Three prisoners committed suicide at Monterey County Jail in 2015. *See id.* ¶¶ 23-25 & Exs. V, W, X [Prisoner V: COUNTY 032874-77; Prisoner W: CFMG_PLSBATES_ 00046986; Prisoner X: CORONER_PLSBATES_000001-10]. Relying on the method of calculating suicide risk provided by the U.S. Department of Justice's Bureau of Justice Statistics ("BJS"), see Stewart Class Cert. Decl. ¶ 72 and Stewart Class Cert. Reply Decl. ¶¶ 60-61, the Court concluded that, based o`n an average daily population of 1,000 inmates, the suicide rate at the jail over the four-year period 2010 to 2013 was "75 per 100,000, which is 74% above the national average of 43 suicides per 100,000." *See* Order Granting Motion for Preliminary Injunction (Dkt. No. 460 at 23). Using the same BJS method of calculation, the suicide rate at the Jail for 2015, based on an average daily population of 1,000 inmates, was 300 per 100,000. **The 2015 suicide rate at the Jail is thus approximately seven times the national average** of 43 suicides per 100,000.

47.     I previously observed that all of the suicides that occurred in the Jail between January 2010 and April 2014 took place in administrative segregation cells. *See* Stewart Class Cert. Decl. ¶ 69. Given the deprivations I observed in the Jail's administrative segregation and isolation cells, as discussed in Sections V and VI, *infra*, I find it particularly noteworthy that the three incidents of suicide at the Jail in 2015 also occurred in administrative segregation and isolation cells.

48.     Defendant County's Implementation Plan states that the "proposed policies related to suicide prevention" are attached as Exhibit G to their plan, see County Plan at 13; however, that exhibit does not contain suicide prevention policies.

**A.**    **Defendants Lack Suicide Prevention Measures That Are Connected to Graduated Levels of Suicide Risk**

49.    All correctional facilities should have policies to be able to place prisoners who present with any degree of suicidality at the appropriate level of suicide precaution. Suicide precautions are prevention measures designed to keep a prisoner from harming himself, and are based on the degree of presenting suicide risk.  Suicide precautions are necessarily linked to the assessed level of suicide risk.  For the prisoner determined to be at the highest level of suicide risk, constant observation is indicated.  The indicated level of observation (*e.g.*, every 15 minutes, every 30 minutes, every hour, every shift) decreases with the assessed level of suicide risk.

50.    Constant and intermittent observation of prisoners are extraordinarily effective means of deterring suicide because:  (1) prisoners are less likely to attempt suicide when they know someone is watching them, and (2) the observers can quickly notify staff if a prisoner begins to engage in self-injurious behavior.  To be sure, not all suicidal patients need constant observation.  The proper use of a suicide risk assessment tool, such as a graded or scored assessment of suicidality, can inform a clinician about the best possible placement to ensure patient safety while minimizing the amount of necessary observation time.

51.    Defendants have a suicide risk assessment tool.  *See* CFMG Plan at 66. Defendants also have, at least on paper, provided for different levels of observation for the potentially suicidal prisoner:  "suicide watch" and "suicide precautions."  *See id.* at 67. But, as explained below, they have not provided any policies or protocols such that the results from the risk assessment tool guide the decision to place a prisoner in either suicide precautions or suicide watch.

52.    The CFMG and County Implementation Plans also fail to define standards and adequately distinguish "suicide watch" and "suicide precautions" protocols. Defendants' Plans mention two levels of observation:  (1) "Suicide Precautions" - custody rounds twice every 30 minutes, medical rounds every six hours, and mental health rounds

DECLARATION OF PABLO STEWART, M.D.

[2966047-5]

once per duty shift; and (2) "Suicide Watch" – housing in a safety cell or open observation (occupied cell or dormitory); "options may include" one on one observation in the Outpatient Housing Unit. *See* County Plan at 6; CFMG Plan at 67-68. Without any protocols identifying or distinguishing when a patient is placed on "suicide watch" versus "suicide precautions," it is unclear how such decisions are made and on what basis. Consistent with Defendants' use of a suicide risk assessment tool, the Implementation Plans should be clarified so that certain suicide risk scores or gradation levels require protocols for the appropriate level of observation, which include one-on-one observation. The purpose of having suicide risk level scores or gradations is to drive decision-making about levels of suicide prevention measures.

53.     Defendants have agreed to use the Suicide Prevention Assessment Form attached as Appendix A to Dr. Hayward's neutral expert report (Dkt. No. 109-2). This form includes scores for each "yes" or "no" answer, and states that "Suicide risk level is determined by clinical evaluation of the inmate. A higher number of points suggests a higher risk level." Risk levels identified at the bottom of the form include: "No Precautions," "Minimal Risk," "Moderate Risk," High Risk," and "Acute Risk." The Form appears to be incomplete as it lacks instructions and scoring information. I find it problematic that Defendants' Implementation Plans provide no connection of the risk level identified by the form and the level of observation ("suicide precautions" or "suicide watch") associated with a particular risk level. Given the extreme risk associated with the underestimation of a prisoner's suicidality, the use of a scored tool in guiding placement decisions is consistent with the standard of care.

54.     Psychiatric literature demonstrates that suicide risk assessment instruments are helpful in properly identifying a potentially suicidal person. A person's risk of suicidality is not a binary "risk/no risk" determination; rather, there are gradations of risk. Put another way, risk assessment instruments help a clinician determine the patient's level of severity, or where that person is along the spectrum of suicidality. This gradation, or score, helps inform the clinician as to the proper placement and level of observation for the

1  suicidal prisoner.  Certain observational procedures are appropriate based on the severity

2  of suicidality as a result of these measurements of suicide risk.  As an example, a person

3  who scores in the "acute" range of suicidality would require constant observation as

4  opposed to someone who scores on the "minimal" or "low" end, who could likely be safely

5  observed at a lower level of suicide precautions.

6       55.    Having a scored instrument not only guides the clinician's assessment as to

7  the level of observation, it provides a helpful safeguard against improper placement.

8  Evidence-based suicidology has demonstrated that even the most highly skilled clinician

9  can miss a potentially suicidal patient using her clinical judgment alone.  Given the high-

10  stake nature of suicidality, measures have been proven helpful to augment a clinician's

11  judgment.  The clinician can always "step up" the level of care, deciding that the patient

12  needs a higher level of observation.  But proper protocols preclude a clinician from

13  "stepping down" – that is, placing a high risk individual on a lower level of observation.

14     **B.    The Jail Lacks Adequate Facilities for Suicidal Placements and
             Defendants Over-Rely on Safety Cells**

15

16       56.    As discussed above in Paragraphs 21-22 and 27-31, Defendants have

17  historically over-utilized safety cells rather than provide patients with adequate mental

18  health services.  The same is true for its overuse of safety cells for suicide prevention.

19  Indeed, in my review of medical records, I have not seen any instances in which

20  Defendants elected to house a suicidal prisoner in a location other than a safety cell.

21       57.    Defendants' Implementation Plans provides two housing options for a

22  prisoner placed on "suicide watch":  either (1) a safety cell, or (2) "open observation

23  (occupied cell or dormitory)."  *See* CFMG Plan at 67.  Defendants do not provide

24  standards or protocols to guide the determination between the two options.  For the reasons

25  explained above, safety cells are always inappropriate housing options for suicidal

26  prisoners.  Defendants' second option, an occupied cell or dormitory, is appropriate for

27  certain prisoners who are not a threat to others.

28

58.     Defendants' over-reliance on safety cells as placement options for suicidal prisoners is indicative of the lack of suicide-safe housing options within the Jail.  Having toured the Jail, I am familiar with its physical space and recognize that Defendants lack viable space designed for suicidal observation.  An appropriate space would be a non-punitive space in which the suicidal prisoner could experience constant interaction and/or observation.  Given the present inadequacy of the physical space at the Jail, the most appropriate housing option for a suicidal prisoner, other than occupied cell or dormitory placement (where appropriate), is the Outpatient Housing Unit or transfer to the hospital, depending on the level of risk.

59.     Defendants' Implementation Plans provide additional housing options for the suicidal prisoner transitioning out of safety cell placement:  (1) an in-patient mental health facility, (2) an open dormitory setting (general population), (3) the Outpatient Housing Unit for one-on-one observation, (4) a transition cell in administrative segregation, or (5) administrative segregation.  *See* CFMG Plan at 68; County Plan at 6.  The transfer of a suicidal inmate to (1) an appropriate in-patient mental health facility is appropriate in many instances; so too is the transfer to (2) an open dormitory setting or to (3) the Outpatient Housing Unit for one-on-one observation.  Indeed, contact with other people often helps to ameliorate the risk of suicidality.  However, administrative segregation conditions do just the opposite.  Placement in (4) transition cell in administrative segregation or (5) administrative segregation is harmful and always improper for suicidal prisoners.  Administrative segregation cells are not designed for suicide observation; instead, they isolate the suicidal prisoner in dangerous conditions where he or she has substantial restrictions and little or no access to others.  The "transition cells" in administrative segregation refer to the first set of cells to have suicide hazards removed in the County's Plan.  *See* County Plan at 10-11.  The County's Plan designates these cells to hold inmates during the first seven days in segregation.  *See id.*  The risk of suicide is at its highest during the first days a prisoner is coming off of suicide precautions.  The purpose of such transition cells is to reduce the suicide risk for all inmates arriving in segregation.

1  They are not appropriate to house inmates who have already been identified as suicidal.

2  As I previously testified, approximately half of all suicides committed in correctional

3  facilities take place in administrative segregation units, and all three suicides between 2010

4  and 2013 in the Jail occurred in administrative segregation.  *See* Stewart Class Cert.

5  Decl.¶ 69; Reply Stewart Decl.¶ 62.

6       60.    Absent from Defendants' Implementation Plan is any guidance as to which

7  housing placement is appropriate for which level of suicide risk.  The Implementation

8  Plans hint at sorting suicidal prisoners into alternative housing arrangements "[d]epending

9  on the assessment of the level of suicide risk" (CFMG Plan at 68); however, as discussed

10  above in Paragraphs 49 to 55, Defendants' Plans fail to include any provision for suicide

11  risk scoring or grading that would necessarily result in placing a suicidal inmate in one

12  housing option over another.  Accordingly, Defendants have not developed appropriate

13  policies and procedures for providing housing options according to suicide risk.

14  **IV.  RESTRAINT CHAIRS AND OTHER MEANS OF PHYSICAL RESTRAINT**

15       61.    I previously opined that "Defendants' use of restraint chairs also places

16  prisoners at risk of serious harm."  Stewart Class Cert. Decl. ¶¶ 89-90.  Exhibit C to the

17  County's Implementation Plan, Policy 512, Use of Restraints (pages 205-208), sets

18  specific time standards after restraints are applied, including: approval by the Chief Deputy

19  or Shift Commander every two hours; medical assessment within four hours, and thereafter

20  every six hours; mental health assessment as soon as possible and no later than eight hours

21  after placement.  CFMG's restraints policy (at pages 283-285 of the Monterey County

22  Adult Detention Facility Policy & Procedure Manual) similarly provides for medical

23  assessment within four hours of placement and that mental health assessment shall take

24  place within eight hours of placement.  It is still my opinion that Defendants' physical

25  restraint policies are dangerous and fail to protect prisoners from harm.

26       62.    Restraint chairs should only be used when a prisoner is so out of control that

27  the only means for preventing harm to self or others is to place them in a restraint chair.

28  That said, prisoners placed in restraint chairs are at significant risk of physical harm from

being restrained.  It is not uncommon for a patient to incur musculoskeletal injury secondary to his or her placement in restraint chairs.  This is often due, but not exclusively due, to his or her activity of "fighting" or resisting the restraints.  It could also be a result of the misapplication or overtightening of the restraints.

63.     Accordingly, the placement of a prisoner in a restraint chair should be considered a psychiatric emergency, with evaluation by a Qualified Mental Health Professional at the time of placement, or as soon as possible and no later than one hour after placement, and hourly thereafter.  The fact that Jail staff has deemed restraint placement necessary indicates the severity of an individual's psychiatric condition.  In my experience, the overwhelming majority of persons placed in restraint chairs in correctional institutions are seriously mentally ill.  The fact that the person's mental state has deteriorated to the point of requiring physical restraint to maintain his or her own safety necessitates an immediate mental health evaluation.  Prisoners who have been in a restraint chair for more than six hours should be transferred to a hospital to ensure adequate care and stabilization.  This is not because the person cannot be safely restrained; rather, it is because such a lengthy period in restraints is indicative of the person's acute need for inpatient-level psychiatric care.

64.     Defendants' Plans should also address where restraint chairs are used within the Jail.  Prisoners who have been placed in a restraint chair must be constantly observed to ensure that they do not further hurt themselves while restrained, such as by tipping over a restraint chair or straining their limbs.  Restraint chairs should not be used in safety cells because placing a person in a safety cell and further restraining that person by placing him or her in a restraint chair aggravates the perceived and actual harshness of both the safety cell and restraints.  Additionally, such combined uses add to monitoring challenges, requiring constant observation through the small safety cell window.

## V.   APPROPRIATE USE OF SECLUSION – TIME LIMITS ON USE OF ISOLATION CELLS

65.   Defendants have approximately six isolation cells in the Jail, all located near the booking area.  According to Sheriff's Office policy, "[i]nmates housed in isolation are classified as high security …."  *See* Galvan Decl. ¶ 47 & Ex. TT [COUNTY 000509].

66.   The isolation cells that I observed are the most austere custody setting I have ever observed in my many years of inspecting correctional systems.  This includes the Security Housing Units at Pelican Bay State Prison in Crescent City, California, and the federal lockup at the United States Penitentiary, Administrative Maximum Facility in Florence, Colorado, which are the most secure locations facilities in the California Department of Corrections and Rehabilitation and the Federal Bureau of Prisons, respectively.

67.   At the time of my tour, prisoners in isolation were confined to their cells 23 hours a day.  Prisoners received only one hour per day outside of their cell by themselves in a small isolation dayroom.  Prisoners also received occasional access to outside exercise in the E Dorm yard.

68.   The isolation cells I observed were harmful to prisoners' mental health largely because they deprived prisoners of all connection to the outside world.  The cells only have one window, which looks onto a corridor near the booking area.  However, at the time of my tour, I observed metal shutters connected to the outside of each window that are controlled by custody staff which, when closed, completely block the window. When these shutters are closed, it effectively turns the cells into sensory deprivation boxes. During the tour, five of the six isolation cells were occupied; the shutters on all five of these cells were closed.  This form of sensory deprivation is even more severe and dangerous than the sensory deprivation in administrative segregation.  Photographs of isolation cell 1 show the sparse setting of the cells, the lack of natural light, and the dangerous attachment points in ventilation grates in the ceiling.  *See* Declaration of Wendy Still, filed herewith, ¶ 11, Ex. C.

69.     It is my opinion that the conditions in these cells, particularly the sensory deprivation, contribute to the creation of and/or worsen prisoners' mental illness.  Put simply, the cells I observed are breeding grounds for mental illness.  I spoke with one prisoner, Prisoner M, who had been housed in an isolation cell since the beginning of September 2014, approximately eight months.  According to his medical file, when Prisoner M entered the Jail, he did not suffer from and had never been diagnosed with mental illness.  *See* Galvan Decl. ¶ 14 & Ex. M [CFMG_PLSBATES_00044175, 44177-78 ].  In addition, his medical file, which includes treatment from prior jail terms dating back to 2010, has no indication of mental illness.  But over the course of his time in the isolation cell, he developed serious mental illness.  When I interviewed him on March 30, 2015, he reported that he had begun to hear voices whispering in his head and that the walls of the cell were bouncing.  Regarding the conditions in isolation, he stated "it's like a kennel, a cage, the echoing it stays in your head."

70.     The development and progression of Prisoner M's mental illness during his time in isolation is apparent in his medical file.  On October 3, 2014 after a month in isolation, he reported during a welfare check that he did not "think he can take ISO anymore."  *See id.* [CFMG_PLSBATES_00044402].  In December 2014, during another welfare check, he stated that "I feel like the walls are closing in," and reported that he suffered from anxiety.  *See id.* [CFMG_PLSBATES_00044392].  In January 2015, he complained that "I don't know how long I need to be here," and that the relaxation techniques he had been provided by the MFT were no longer working.  In February 2015, he stated "I don't know how much I can handle of this ISO….  They are treating me like a dog.  I might … have to bite them."  *See id.* [CFMG_PLSBATES_00044390].  And on March 4, 2015, during an appointment with a psychiatrist, he also complained about being in isolation for 8-9 months.  *See id.* [CFMG_PLSBATES_00044465].  Having spoken with Prisoner M and reviewed his medical file, it is my opinion that the conditions in isolation caused him, at least in part, to develop a serious mental health problem.

71.     As another example, Prisoner S was booked into the Jail on August 29, 2014. He reported no symptoms of mental illness at intake.  *See id.* ¶ 20 & Ex. S [CFMG_PLSBATES_00064043, 00064046-47].  For reasons unclear from his medical file, he was placed in an isolation cell on or around October 10, 2014.  *See id.* [CFMG_PLSBATES_00064132].  He remained in isolation since then, at least until the time of my tour, with exception of a few instances during which he was placed in a safety cell.  *See id.* [CFMG_PLSBATES_00064114-32].  Over the course of his time in isolation, he began demonstrating serious symptoms of mental illness, including paranoia [CFMG_PLSBATES_00064186 (10/18/14)], auditory hallucinations [CFMG_PLSBATES_00064163 (12/10/14)], and self-harmful behavior [CFMG_PLSBATES_00064151 (3/13/15, banging head)].  *See id.*  In November 2014, Dr. Fithian diagnosed him with paranoid schizophrenia.  *See id.* [CFMG_PLSBATES_00064181].  In the course of his incarceration, Prisoner S made a number of comments that indicate that the conditions in isolation were impacting his mental health; for example, when asked why he was refusing medication in November 2014, he stated he just wanted to stay in his "cave."  *See id.* [CFMG_PLSBATES_00064180].  When I interviewed him, he reported to me that he has heard voices at other times in his life, but the voices are considerably worse in isolation. Referring to the isolation cells, he stated "you go crazy in there."  He also expressed serious suicidality.  Having reviewed Mr. Prisoner S's medical file and interviewed him, it is my opinion that the conditions in isolation at the Jail caused his underlying mental illness, which Defendants did not initially identify, to significantly worsen.  As demonstrated by his worsening mental status, the conditions in isolation caused him serious suffering.

72.     The monitoring of prisoners in isolation was also deficient.  During my tour, CFMG's operative policy required that medical staff conduct health and welfare checks at least three times per week on all prisoners in isolation.  *See id.* ¶ 48 & Ex. UU [CFMG_PLSBATES_00063793].  Such checks are inadequate given the harsh conditions.

Moreover, my review of prisoner records showed that at times Defendants failed to even conduct welfare checks in accordance with their inadequate policy.  For example, during Prisoner M's eight months in isolation, lengthy periods – including 10-day, 7-day (two times), 6-day, and 5-day stretches – passed without welfare checks being conducted.  *See id.* ¶ 14 & Ex. M [*See* 9/22-29/2014, 10/15-20/2014, 11/15-22/2014, 11/25-12/1/2014, 2/4-14/2015, CFMG_PLSBATES_00044380-44405].

73.     It is my opinion that the conditions I observed in the isolation cells at the Jail are so dangerous that Defendants should never us them to house any prisoners with mental illness.  The risk of harm to such prisoners from the sensory deprivation and lack of mental health care and programming is simply too high.  If prisoners develop symptoms of mental illness while housed in isolation cells, they should be immediately removed to other locations within the Jail.  Moreover, Defendants should never deprive prisoners of sensory inputs by shuttering the windows in the isolation cells.  Finally, Defendants should ensure prisoners in isolation receive rounds from mental health care staff at least daily and custody welfare checks at least two times per hour.

## VI.     ADMINISTRATIVE SEGREGATION

### A.     The Physical Conditions of Administrative Segregation Are Dangerous

74.     From my tour of the Jail, I discovered that the physical conditions of the cells in administrative segregation are more isolating and dangerous than I anticipated.  The exterior windows in all of the men's administrative segregation cells that I inspected were covered with thick metal plates that completely block all natural light.  Attached as **Exhibit C** are photographs taken in B Pod cell 206 during my tour, showing the steel plate covering the window.  I was in this cell in the middle of the day and it blocked all natural light from entering the cell.  The windows in the women's section were similarly covered by metal plates, although some of them had small holes drilled in them to allow for a tiny modicum of natural light.  This form of sensory deprivation is extraordinarily unsafe.  It has the effect of decreasing sensory input to individuals who are already at risk of losing

1   contact with reality.  This places them at increased risk of developing psychotic, mood,

2   and anxiety symptoms or of having an existing condition worsen.

3       75.     The cells in administrative segregation, like many of the other areas of the

4   Jail, are in a state of disrepair.  Most of the more than 20 administrative segregation cells

5   into which I looked had significant amounts of graffiti on the walls.  Attached as

6   **Exhibit D** are photographs taken during my tour showing the graffiti on the walls of

7   administrative segregation cells.  The first two photographs were taken in A Pod cell 201;

8   the last four photos were taken in B Pod cell 206.  In one cell, of which I did not take any

9   pictures, a prisoner had etched into the walls the names of multiple former players on the

10  San Francisco 49ers who have not played for the team in more than 15 years, indicating

11  the walls of the cell had not been painted for that long.

12      **B.    Administrative Segregation Conditions of Isolation Harm Prisoners with
             Serious Mental Illness**

13

14      76.     I have previously explained how and why Defendants' placement of

15  prisoners with serious mental illness in administrative segregation units places those

16  individuals' health in serious jeopardy.  *See* Stewart Class Cert. Decl. ¶¶ 62-71; *see also*

17  Stewart Class Cert. Reply Decl. ¶¶ 37-40.  As I explained in my Class Certification

18  Declaration, the harsh conditions in administrative segregation cause significant harm to

19  all prisoners and especially prisoners with mental illness:

20      Prisoners with mental illness are likely to deteriorate and decompensate in
        segregation units under isolated conditions.  This deterioration and

21      decompensation often takes the form of acting out and other actions that may
        violate the rules of the correctional facility.  In these cases, the prisoners'

22      "bad" conduct is the direct product of their mental illness.  Their illness
        exacerbates the psychological and behavioral reactions they have to the pain

23      and stress of isolated confinement.

24      Scientific literature establishes the risk of harm posed to seriously mentally
        ill persons who are placed in solitary confinement or segregation.  The

25      recognition of this risk has led professional mental health organizations to
        prohibit the placement of the seriously mentally ill in such units or, if it is

26      absolutely necessary (and only as a last resort) to confine them there, but
        under strict limits and with significant amounts of out-of-cell time and

27      enhanced access to care.  For example, the American Psychiatric Association
        ("APA") has issued a Position Statement on Segregation of Prisoners with

28      Mental Illness stating:

Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space and adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for the individuals. [1]

The APA's position on this issue reflects the accepted fact that mentally ill prisoners are especially vulnerable to isolation- and stress-related regression, deterioration, and decompensating that worsen their psychiatric conditions and intensify their mental health-related symptoms and maladies (including depression, psychosis, and self-harm). I share this view.

Correctional professionals likewise have recognized the risk of placing mentally ill prisoners in isolated confinement. Mental health staff in a well-functioning prison or jail system is required by policy and practice to screen prisoners in advance of their possible placement in isolation to identify those who are mentally ill and to exclude them from such confinement if indicated. Moreover, they are charged with regularly monitoring isolated prisoners to identify any who may be manifesting the signs and symptoms of emerging mental illness and to remove them from these harmful environments if indicated.

The concerns about placing prisoners with serious mental illness in isolated conditions generally emanate from the conundrum faced by correctional staff when a prisoner with serious mental illness violates the rules of a facility. Standard correctional practice is to place prisoners who break facility rules in the isolated conditions of administrative segregation as a punishment. A consensus has been reached in mental health care and correctional communities, however, that when a prisoner who breaks the rules suffers from serious mental illness, the facility must take into account the prisoner's mental illness when devising an appropriate response to his or her rule breaking. This break from ordinary practice is necessitated by the risks that a prisoner with mental illness faces in administrative segregation.

Defendants' use of administrative segregation as a place to house prisoners with mental illness who have not violated any Jail rules is an extremely dangerous practice. Instead of trying to avoid placing prisoners with serious mental illness in administrative segregation unless absolutely necessary, Defendants place such prisoners in administrative segregation *because of* their serious mental illness. Thus, as a matter of policy and practice, Defendants intentionally expose prisoners with serious mental illness to the dangerous conditions of administrative segregation. This practice is far

---

[1] Am. Psych. Assoc., Position Statements: Segregation of Prisoners with Mental Illness (2012), *available at* http://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2012-Prisoners-Segregation.pdf.

DECLARATION OF PABLO STEWART, M.D.

[2966047-5]

1    outside the accepted norms in the correctional or mental health care
2    communities, and places prisoners at risk of grave harm.

3    Stewart Class Certification Decl. ¶¶ 62-67.

4        77.    That conditions in administrative segregation cause harm to prisoners with

5    mental illness is not a controversial proposition.  In fact, Defendants readily agree with this

6    concept.  In their Board of State and Community Corrections SB 863 Application for

7    Construction Financing Proposal Form, County Defendants wrote "[a]n isolation

8    environment is detrimental housing for inmate-patients with mental illness."  *See*

9    Declaration of Ernest Galvan in Support of Plaintiffs' Response to Defendants' Motion for

10   Approval of Implementation Plans, Ex. 11, Dkt. No. 516-2 ("SB 863 Application"),

11   Section 5: Narrative at 4.

12   **C.    Defendants Lack Adequate Housing for Prisoners with Serious Mental
            Illness, Such as a Specialized Mental Health Unit**
13

14       78.    Over the course of my two-day tour at the Jail, I observed a tremendous

15   number of prisoners suffering from serious psychotic, mood, and anxiety disorders.  The

16   majority of these prisoners were housed in administrative segregation and/or isolation

17   cells.  As stated above in Paragraph 2, I have worked in correctional medicine for

18   approximately 30 years.  Compared to the approximately 100 other correctional facilities I

19   have toured, Monterey County Jail ranked among the highest in terms of prevalence and

20   severity of serious mental illness.  I was truly overwhelmed by the sheer number of

21   inmates who presented with substantial treatment needs for their serious mental illness.

22       79.    County Defendants acknowledge the need for a Special Mental Health Unit

23   ("SMHU") for chronically mentally ill prisoners that would provide focused evaluation

24   and treatment of mentally ill inmates, direct supervision, group rooms and individual

25   counseling areas, and a therapeutic living and treatment environment.  *See id.*, Section 5:

26   Narrative at 2.  In their SB 863 Application, Defendants state that the goal of an SMHU is

27   to "allow for mentally ill inmate patients to receive direct observation, medication delivery

28   and individual, group, socialization, recreation and discharge planning interventions. These

are the key components of a successful mental health program. This supportive environment would assist fragile mentally ill inmate-patients to cope and even thrive in a stressful jail setting and begin to prepare them for consistent mental health interventions upon re-entry into the community." *See id.*, Section 5: Narrative at 7.  Specialized housing for seriously mentally ill prisoners with a high level of acuity, such as the SMHU proposed by Defendants in their SB 863 Application, is not included in Defendants' Implementation Plans.

80.     The Jail currently lacks housing and treatment space for seriously mentally ill prisoners who, because of their illness (or behavioral manifestations of their mental illness), experience adjustment difficulties in a general population setting yet are not so impaired as to require hospitalization or 24-hour inpatient care.  This population of prisoners has a high acuity of mental illness that requires a higher degree of psychiatric services as compared to other prisoners at the Jail, including those with mental illness that can be safely housed in the general population setting.  In addition to certain chronically mentally ill long-term prisoners, this population may include prisoners found not competent to stand trial as well as patients transitioning to and/or from inpatient care.  Prisoners found incompetent to stand trial may have serious mental health needs that are incompatible with general population placement but may not necessarily need mental health care at an inpatient level.  Patients who are determined to require psychiatric care beyond the on-site capabilities of the Monterey County Jail are likely to require specialized housing and treatment pending their transfer.  Similarly, patients recently discharged from inpatient care require a high degree of monitoring to ensure that they are able to function adequately within the available housing units at the Jail.  I estimate that the Jail would have between 10 and 20 prisoners with serious mental illness at this high level of acuity at any given time.

81.     Due to the great potential for harm, seriously mentally ill prisoners, who because of their illness, experience adjustment difficulties in a general population setting yet are not so impaired as to require 24-hour inpatient care, should never be placed in the

1   Jail's regular administrative segregation units.  I recognize that there are times where it is

2   necessary to remove acutely mentally ill prisoners from general population in order to

3   provide for the safety of that individual or others.  In such situations, the acutely mentally

4   ill prisoner is appropriately housed in a structured therapeutic environment that is less

5   restrictive than the administrative segregation settings at the Jail and that provides for the

6   safety of the prisoner, other prisoners, and jail staff alike.

7          82.     The standard of care for addressing the heightened needs of seriously

8   mentally ill prisoners with a high level of acuity who cannot be safely housed in general

9   population due to behavioral manifestations of their mental illness is to provide a

10  specialized housing unit for those prisoners.  Such a housing unit should, at minimum:

11  provide clean cells and enforce standards for cell cleanliness; be free of barriers that

12  obstruct natural light flow into the facilities; provide increased structured programming,

13  including group therapy; provide increased unstructured out-of-cell time; provide

14  increased medical and mental health supervision; and include a policy of regular

15  reconsideration of whether such prisoners can be moved to housing at the Jail that affords

16  a lower level of custody.

17         83.     The American College of Correctional Physicians endorses the exclusion of

18  seriously mental ill prisoners from prolonged segregation; when placed therein, the society

19  recommends adequate out-of-cell time for structured therapeutic activities and outdoor

20  exercise.  Structured out-of-cell activities are important because often, medication alone

21  cannot adequately treat serious psychotic, mood, and anxiety disorders.  The literature is

22  very clear that psychosocial treatment is just as important as medication.  The standard of

23  care requires that seriously mental ill prisoners be provided a minimum of 10 structured

24  out-of-cell hours, including group and individual therapy, and 10 unstructured out-of-cell

25  hours, including day room time and outside exercise, per week.  Treatment should be

26  responsive to the level of care clinically required, and should occur in appropriate

27  programming space.  I know from my work in the *Coleman* case that the California

28  Department of Corrections and Rehabilitation must provide a minimum of ten hours of

group therapy per week to prisoners with the most serious mental illness who are housed in segregation.  Specialized mental health units that provide clean, less restrictive environments with heightened access to mental health services are appropriate for the fraction of long-term seriously mental ill prisoners with a high level of acuity at the Jail.

**D.     Defendants' Plans Fail to Ensure that Seriously Mentally Ill Prisoners Will Not Be Placed in Administrative Segregation**

84.     Consistent with the above section, it is my opinion that the Implementation Plans should provide that no seriously mentally ill prisoner be placed in administrative segregation at the Jail.  The County's Implementation Plan currently provides:  "Inmates shall not be placed in administrative segregation solely because of having a mental illness.  Classification is to assess a totality of factors when assigning inmates to administrative segregation units."  *See* County Plan at 8.  I agree with the first sentence.  However, I have concerns with the second sentence of the Plan given that the placement of a mentally ill inmate in administrative segregation solely because of manifestations of his or her mental illness is equivalent to placing that inmate in administrative segregation solely because of having a mental illness.  Regardless of his or her behavior, placing a seriously mental ill patient in administrative segregation is injurious to that prisoner.  In order to protect seriously mentally ill prisoners from harm, the Implementation Plan should acknowledge this issue, and should clarify how classification decisions take into consideration factors that include behavioral manifestations of mental illness.

**VII.   MEDICATION ADMINISTRATION – FAILURE TO MONITOR SIDE EFFECTS AND MAKE CONTEMPORANEOUS MARS ENTRIES**

85.     In a correctional facility, one of the primary means for monitoring medication efficacy, compliance, and side effects is the medication administration process. Staff who administer medications should, as part of the process, contemporaneously record whether and why prisoners are refusing to take medications or experiencing side effects. And staff must refer prisoners who are non-compliant or experiencing side effects to the

1    psychiatrist for immediate attention.  Failure to maintain comprehensive and accurate

2    medication administration records places all prisoners at risk.

3         **A.**     **Defendants Fail to Monitor Side Effects**

4         86.     Medications used in the treatment of mental illness are known to produce

5    side effects.  Psychiatric academic literature is clear that the primary reason for non-

6    compliance with psychotropic medication is the presence of side effects.  Nursing staff

7    who administer medication on a daily basis are in the best position to observe and inquire

8    about the presence of medication side effects.  Therefore, daily monitoring is imperative.

9         87.     Defendants' Implementation Plans governing medication administration at

10   the Jail are deficient because they do not require that staff inquire about, observer, and/or

11   document side-effects.  *See* CFMG Plan at 81-82.  Nor do the Implementation Plans

12   require staff to document the reason for a prisoner's non-compliance.  *See id.*  During my

13   tour of the Jail, I observed medication administration in A and B Pods, two of the

14   administrative segregation units in which Defendants house prisoners with mental illness,

15   and observed a number of problems with the process.  The medications were distributed

16   incredibly rapidly, with the medication administration Licensed Vocational Nurse

17   ("LVN") spending no more than 10 seconds interacting with each prisoner.  This did not

18   allow sufficient time for the medication distribution LVN to adequately inquire about

19   medication efficacy and/or side-effects.  Moreover, the LVN did not consistently ask

20   prisoners about whether they were experiencing any side effects or other problems with

21   their medication; for example, I observed the LVN distribute medications to a prisoner in

22   B Pod, cell 206, who I know suffered from serious mental illness and was prescribed

23   psychiatric medications, without asking about efficacy or side-effects.  When the LVN did

24   ask prisoners about these issues, it was done in a cursory and rapid manner, usually

25   nothing more than inquiring "How are you doing today?"  All of these interactions took

26   place at cell front, a non-confidential setting, with custody staff and prisoners in other cells

27   within earshot.

28

88.     It is incumbent upon the person who administers medication to inquire into and document negative side effects to assure a patient receives medication that will not harm him or her.  For example, certain anti-psychotic drugs, especially Haldol, Risperdal, Prolixin, and Thorazine, carry a risk that prisoners will develop extrapyramidal symptoms ("EPS"), which are medication-induced movement disorders.  Symptoms can include muscle spasms, restlessness, and Parkinsonism (including rigidity, bradykinesia, and tremors).  EPS may develop as soon as the first dose of a medication is delivered.  If untreated, EPS can develop into a potentially irreversible condition called tardive dyskinesia.  Daily monitoring of the clinical efficacy and side effects is a primary function of the person administering medication to avoid negative outcomes such as these.

89.     Defendants' failure to adequately monitor side effects is exemplified in the shocking treatment of Prisoner U.  On October 21, 2014, Dr. Fithian prescribed Prisoner U Haldol Decanoate monthly injections, oral Haldol twice daily, and Cogentin twice daily.[2] *See* Galvan Decl. ¶ 22 & Ex. U [CFMG_PLSBATES_00042974].  On November 18, 2014, Dr. Fithian renewed all three of Prisoner U's medications by verbal order without anyone, psychiatrist or otherwise, conducting a face-to-face evaluation of Prisoner U.  *See id.*  On November 21, Prisoner U came out to an interview with an MFT in the dayroom in his underwear because he stated he was so stiff he could not put on clothes.  *See id.* [CFMG_PLSBATES_00043059].  Prisoner U was unable to move his arms freely and was developing sores on his feet and buttocks.  *See id.*  On November 22, 2014, Prisoner U was barely able to move.  *See id.* [CFMG_PLSBATES_00043059].  On November 23, 2014, an RN reported that he was unkempt and that his cell had "clothes, garbage, and food everywhere."  *See id.* [CFMG_PLSBATES_00043056].  Despite his worsening condition,

---

[2] Defendants, in what appears to be a consistent practice, automatically prescribe Cogentin, a drug that counteracts EPS, whenever they prescribe a medication that carries EPS as a possible side effect.  This practice falls below the standard of care.  Because Cogentin carries its own side-effect profile, Cogentin should only be prescribed if a person actually develops EPS and dose adjustment of the drug causing EPS does not eliminate EPS.

1    Prisoner U was not again seen by a psychiatrist until December 2, 2014, and only then

2    after he had been transferred to the OHU because of his EPS-related inability to

3    accomplish activities of daily life, such as cleaning himself and his cell.  He had also

4    developed serious breaks in his skin and sores.  *See id.* [CFMG_PLSBATES_00043055].

5    Notwithstanding his very serious EPS, Prisoner U continued to receive oral Haldol until

6    December 10, 2014, one day before he was transferred from the Jail to Atascadero State

7    Hospital.  *See id.* [CFMG_PLSBATES_00042977].  Once Prisoner U arrived at

8    Atascadero State Hospital, doctors immediately took him off of Haldol and placed him on

9    another anti-psychotic.  His EPS quickly dissipated.  *See id.*

10   [CFMG_PLSBATES_00042983-96].

11       90.    Defendants' monitoring and treatment of Prisoner U's EPS fell far below the

12   standard of care.  Because Prisoner U was on both oral and long-acting injectable Haldol,

13   he was at increased risk of developing EPS.  Yet, the manner in which he was monitored

14   was completely inadequate.  Evaluation of side effects should have been, but was not part

15   of the regular administration of medication to Prisoner U.  Instead, by the time Dr. Fithian

16   first observed Prisoner U's EPS-related symptoms on November 20, 2014, the symptoms

17   were well-developed and impacting his life.  Defendants' failure to adequately monitor for

18   side effects, as well as their failures to subsequently address Prisoner U's EPS, caused him

19   to suffer greatly and put him at risk of developing tardive dyskinesia.

20       **B.    Defendants Fail to Keep Contemporaneous Medication Administration**
         **Records**

21

22       91.    Psychiatric literature establishes that the lack of a clinical response to a

23   psychotropic medication is primarily due to poor compliance.  Documenting compliance

24   and/or non-compliance is therefore particularly important for the proper monitoring of the

25   efficacy of medication.  In order to properly monitor medication compliance, medication

26   administration records ("MARs") should be accurately and contemporaneously filled out

27   whenever a prisoner receives, refuses, or otherwise misses medication.

28

92.     Defendants' Implementation Plans fail to require contemporaneous recording of compliance with prescribed medications, see CFMG Plan at 82, and Defendants' process for documenting medication administration is deeply flawed.  In his neutral expert reports, Dr. Puisis described the problematic ways in which Defendants make entries in a patient's MAR: "[m]edication administration records are not used to record administration of medication at the time medication is administered.  Instead, … [r]ecording medication administration is performed at a later time by virtue of evaluating the envelopes [in which the medications were packaged for prisoners] after return to the medication room which may be a few hours after starting medication administration.  The nurse records an empty envelope as a successful medication administration.  Envelopes which still contain medication are recorded as not given.  The reason for not administering medication is recollected from memory.  This is not good nursing practice.  Medication administration should be documented at the time it is performed."  *See* Declaration of Gay Crosthwait Grunfeld in Support of Plaintiffs' Motion for Class Certification, Dkt. No. 49-3, Ex. J at 24-25.  I agree with Dr. Puisis.

93.     During my tour of the Jail, I observed that when prisoners refused medications, the LVN did not contemporaneously record this refusal or any reasons provided by the prisoner.  I observed prisoners in A Pod, cells 201, 203, and 209 refuse one or more medications; as far as I could see, the LVN did not write anything contemporaneously with these refusals.

94.     Defendants' failure to contemporaneously record the administration or refusal of medication at the time the nurse interacts with the patient may lead to problems pertaining to the accuracy of MARs entries.  My own review of medical records indicates that the documentation of medication refusals is inadequate and prone to creating confusion.  It is my understanding, from reviewing medical files, that the receipt or refusal of medication is summarily documented on the front of the MAR with a single letter or the nurses initial.  Refusals are also documented on the back of a MAR, with the date and short description of refusal noted in handwriting.  But in files I reviewed, the information

on the back of the MAR regarding non-compliance was not consistent with the information

on the front of the MAR.  For example, according the back of the December 2014 MAR

for Prisoner S, he refused his medication on December 11, 2014.  *See* Galvan Decl. ¶ 20 &

Ex. S [CFMG_PLSBATES_00064071].  However, the front of MAR indicates that

Prisoner S received and took his medication on that date.  *See id.* [CFMG_PLSBATES_

00064071].  The same thing occurred on October 24, 2014.  *See id.* [CFMG_PLSBATES_

00064073].  In contrast, on October 25, 2014, the front of the MAR appears to indicate that

he refused his medications.  *See id.* [CFMG_PLSBATES_ 00064072].  But there is no

corresponding notation on the back of the MAR.  *See id.* [CFMG_PLSBATES_

00064073].  And in all of these cases, there is no documentation of the reason for the

refusal.  *See id.* [CFMG_PLSBATES_00064070-73].

## VIII.   TELE-PSYCHIATRY

95.     Telepsychiatry is an emerging field of practice and has gained acceptance for

non-emergency assessments and follow-up care.  Best practices require that the mental

health provider performing the telepsychiatry assessment or follow-up have electronic

access to the patient's complete medical record.  In the absence of electronic access to

medical records, the referring entity to the off-site psychiatrist is obligated to provide off-

site psychiatrist with complete medical records of the off-site patient to be treated.

Medical records should not be limited to the mental health portion of chart.

96.     Defendants' Tele-Psychiatry Program provides that "[a]ll inmates within the

Monterey County Jail have access to the tele-psychiatry program" and that "[i]nmates

being referred to the clinic will be placed on the sick call list."  CFMG Plan at 34.

Defendants' Tele-Psychiatry Program lacks parameters under which a condition can or

cannot be treated, as well as those situations that require referral to alternate modes of

management.  Importantly, telepsychiatry is not indicated for patients initiating mental

health treatment or in a mental health crisis (such as those who are potentially suicidal,

homicidal, or gravely disabled).

97.     Telepsychiatry referrals should be made only after an initial in-person evaluation by a psychiatrist to determine its appropriateness.  The American Psychiatric Association ("APA") and the American Telemedicine Association ("ATA") have issued practice guidelines pertaining to the use of tele-psychiatry.  The ATA's December 2014 Practice Guidelines for Live, On Demand Primary and Urgent Care (hereinafter "ATA Guidelines"), attached hereto as **Exhibit E**, requires that "providers **shall** exercise their professional judgment when deciding whether or not to use telemedicine, taking into account the patient condition, mitigating circumstances, available resources, and their own comfort level and expertise in using telemedicine."  *See* ATA Guidelines, Ex. A, at 8 (emphasis in the original).  Initial in-person evaluation by a psychiatrist is indicated because certain conditions are not suitable for telemedicine, including "some patients with cognitive disorders, intoxication, language barriers, emergency situations that warrant escalation to an ER visit or 911," as well as "those for which an in-person visit is required to evaluate the patient due to the severity of presenting symptoms, the necessity of haptic information, the need for protocol-driven procedures, or the need for aggressive interventions."  *See id.*  Similarly, in an Official Action by the APA Counsel on Psychiatry and Law, the APA advised that "[p]roviders need to perform an individual assessment to see if telepsychiatry is appropriate for the case in question."  *See* January 2014 Resource Document on Telepsychiatry and Related Technologies in Clinical Psychiatry (hereinafter "APA Resource Document"), attached hereto as **Exhibit F**, at 12.  The APA Official Action further counsels that "not all patients will be well suited for … telepsychiatry" and that "[t]he mental health practitioner will need to rely upon professional judgment to determine the applicability of e-therapy for a particular patient."  *See id.*

98.     Defendants' Implementation Plans fail to ensure that inmates experiencing mental health crises are seen in-person and not via telepsychiatry.  The use of telepsychiatry is not appropriate for a patient in mental health crisis.  My opinion is consistent with ATA and APA official policy stances.  For example, the ATA Guidelines state that "An emergent condition is an illness or injury that poses an immediate threat to a

1  person's life or long-term health. Such conditions are outside the scope of a primary and/or

2  urgent care telemedicine practice." ATA Guidelines, Ex. A, at 13. Likewise, the APA

3  Board of Trustees has stated that behavioral health emergencies such as suicidal,

4  homicidal, and acutely psychotic patients should not be managed via telepsychiatry. *See*

5  Telepsychiatry, Adaptation from APA Resource Document on Telepsychiatry, attached as

6  **Exhibit G**, at 2.

7          I declare under penalty of perjury under the laws of the United States and the State

8  of California that the foregoing is true and correct, and that this declaration is executed at

9  San Francisco, California this 31st day of March, 2016.

10

11                                          */s/ Pablo Stewart*
                                            Pablo Stewart

12

13

14          Pursuant to Northern District General Order 45(X)(B), I hereby attest that I have on

15  file approvals for any signatures indicated by a "conformed" signature (/s/) within this

16  e-filed document.

17  DATED:  April 1, 2016              ROSEN BIEN GALVAN & GRUNFELD LLP

18                                     By:  */s/ Ernest Galvan*

19                                          Ernest Galvan

20                                     Attorneys for Plaintiffs

21

22

23

24

25

26

27

28

# Exhibit A

| |
|---|
| February 19, 2016 County Defendants' Motion to Approve Implementation Plan as Part of Settlement Agreement (Dkt. No. 514, Ex. 1) |
| February 19, 2016 California Forensic Medical Group Inc.'s ("CFMG") Motion to Approve Implementation Plan as Part of Settlement Agreement (Dkt. No. 518, Ex. A) |
| Safety Cell Logs for numerous prisoners produced by County Defendants, including all prisoners identified in this declaration (County 015936 – 018288) |
| Safety Cell Audit Logs for January-March 2013 (COUNTY 023771, 024026) |
| Medical records of prisoners at Monterey County Jail, including but not limited to: <br> Prisoner A (CFMG_PLSBATES_00030536-32150) <br> Prisoner D (CFMG_PLSBATES_00075671-78) <br> Prisoner H (CFMG_PLSBATES_00041332-754) <br> Prisoner M (CFMG_PLSBATES_00044174-5258) <br> Prisoner Q (CFMG_PLSBATES_00055365-98) <br> Prisoner R (CFMG_PLSBATES_00055485-99) <br> Prisoner S (CFMG_PLSBATES_00064042-192) <br> Prisoner T (CFMG_PLSBATES_00063010-343) <br> Prisoner U (CFMG_PLSBATES_00042956-3073) <br> Prisoner W (CFMG_PLSBATES_00046986-7115) |
| Custody records of prisoners at Monterey County Jail, including but not limited to: <br> Prisoner D (COUNTY_PLSBATES_005324-47) <br> Prisoner V (COUNTY 032874-77) |
| CFMG Quality Assurance Meeting Minutes, including from meetings held on: <br> May 29, 2014 (CFMG_PLSBATES_00027358-62) <br> September 18, 2014 (CFMG 079582-86) <br> September 30, 2014 (CFMG 002663-67) <br> December 23, 2014 (CFMG 079588-92) |
| Statistics produced by CFMG confirming number of prisoners pending transfer to the state hospital in January and February 2015 (CFMG 079946) |
| Coroner Report of Prisoner X (CORONER_PLSBATES_000001-10) |
| Declaration of Jennifer Davenport (Dkt. No. 444-1) |
| Sheriff's Office Custody Operations Manual, Receiving and Intake Procedures and Duties (COUNTY 000497-510) |
| CFMG Monterey County Adult Detention Facility Policy & Procedure Manual (CFMG_PLSBATES_00063535-867) |
| Declaration of Ernest Galvan in Support of Plaintiffs' Response to Defendants' Motion for Approval of Implementation Plans, Ex. 11, Dkt. No. 516-2 ("SB 863 Application") |
| American Telemedicine Association's December 2014 Practice Guidelines for Live, On Demand Primary and Urgent Care |
| APA Counsel on Psychiatry and Law, January 2014 Resource Document on Telepsychiatry and Related Technologies in Clinical Psychiatry |
| Telepsychiatry, Adaptation from APA Resource Document on Telepyschiatry |

[2980741-1]

# Exhibit B











# Exhibit C









# Exhibit D











# Exhibit E

# Practice Guidelines for Live, On Demand Primary and Urgent Care

December 2014



American Telemedicine Association
*Connected to Care*

## ACKNOWLEDGEMENTS

The American Telemedicine Association (ATA) wishes to express sincere appreciation to the ATA Primary and Urgent Care Guidelines Work Group and the ATA Practice Guidelines Committee for the development of these practice guidelines.[1]  Their hard work, diligence and perseverance are highly appreciated.

Primary and Urgent Care Practice Guidelines Work Group

Leadership

Co-Chair:  **Frances Gough, MD (Co-Chair),** Medical Director, Molina Healthcare of Washington

Co-Chair: **Sunil Budhrani, MD, MPH, MBA (Co-Chair),** CEO, CareClix

Work Group Members (Alphabetical Order)

**Ellen Cohn, PhD,** Associate Dean for Instructional Development, School of Health and Rehabilitation Sciences, NIDRR Rehabilitation Engineering Research Center on Telerehabilitation, University of Pittsburgh

**Alan Dappen, MD,** Director, DocTalker Family Medicine

**Cindy Leenknecht, MS, ACNS-BC,** Clinical Informatics Specialist, SCL Health System

**Bill Lewis, MD,** SVP Medical Operations, Concentra

**Deborah Ann Mulligan MD FAAP FACEP,** Chief Medical Officer, MDLIVE, Director, Institute for Child Health Policy, Nova Southeastern University, American Academy of Pediatrics, Executive Committee Chair Council Media and Communications

**Deborah Randall, JD,** Consultant and Counsel, Deborah Randall Consulting

**Karen Rheuban, MD,** Professor of Pediatrics, Senior Associate Dean for CME and External Affairs Director, University of Virginia Center for Telehealth, University of Virginia Health System

**Lisa Roberts, PhD,** Senior Vice President, Government, AMC Health

**Terrance J. Shanahan, JD,** Partner, The O'Neil Group, LLC

**Kathy Webster, MD,** Director, Loyola University Medical Center, Pediatric Critical Care

---

[1] Work on this document was performed under the sponsorship of the U.S. Department of Commerce, National Institute of Standards and Technology (NIST).  However, all opinions, statements of fact, and viewpoints presented in this document are entirely our own, and they do not necessarily represent the position or views of NIST.

ATA Practice Guidelines Committee

Chair:  **Elizabeth A. Krupinski**, PhD, Professor & Vice Chair of Research, Department of Medical Imaging, University of Arizona

Committee Members

**Nina Antoniotti**, RN, MBA, PhD, Director of Telehealth, Marshfield Clinic TeleHealth Network

**David Brennan**, MSBE, Director, Telehealth Initiatives, MedStar Health

**Anne Burdick**, MD, MPH, Associate Dean for Telemedicine and Clinical Outreach, Professor of Dermatology, Director, Leprosy Program, University of Miami Miller School of Medicine

**Jerry Cavallerano**, PhD, OD, Staff Optometrist, Assistant to the Director, Joslin Diabetes Center, Beetham Eye Institute

**Helen K. Li**, MD, Adjunct Associate Professor, University of Texas Health Science Center

**Lou Theurer**, Grant Administrator, Burn Telemedicine Program, University of Utah Health Sciences Center

**Jill M. Winters**, PhD, RN, President and Dean, Columbia College of Nursing

Contributing Editor

**Rashid Bashshur,** PhD, Senior Advisor for eHealth, University of Michigan Health System

ATA Staff

**Jordana Bernard**, MBA, Senior Director Program Services

**Jonathan D. Linkous**, CEO



American Telemedicine Association

# Practice Guidelines for Live, On Demand Primary and Urgent Care

**Table of Contents**

Preamble................................................................................................5

Scope....................................................................................................6

Introduction.........................................................................…...........................6

Guidelines

    Practice Guidelines..................................…...................................8

    Technical Guidelines.................................…..................................15

    Administrative Guidelines..............................…...........................17

Appendix: References....................................................…...............20

**PREAMBLE**

The American Telemedicine Association (ATA) is a membership-based organization composed of a diverse set of members including healthcare providers, academicians, program administrators, industry, and policymakers.  ATA collaborates actively with related health professional organizations, as well as the public and private sectors in promoting the safe and effective use of telemedicine to promote the health and wellbeing of people.

ATA has embarked on a mission to establish practice guidelines in many areas of telemedicine practice to promote patient safety, uniformity and quality of services provided via telemedicine.  The guidelines were developed by panels of experts in this field and are designed to assist providers of care in adhering to ethical standards and sound business practices.  They are intended to serve as guides for patients and their caregivers in assuring their rights and protecting their health.

The development of these guidelines entailed a rigorous process of peer review and analysis to ensure their appropriateness, relevancy, consistency, and comprehensiveness.  They were enacted after full review and approval by the Board of Directors.  In view of changing circumstances and developments, these guidelines are reviewed periodically and updated as indicated.

Compliance with these guidelines alone will not guarantee accurate diagnoses or successful outcomes. The practitioner should rely on their best professional experience and expertise when faced with unexpected circumstances or new developments in technology. When this occurs, the practitioner is strongly advised to document their rationale in the patient record.

The framers of these guidelines do not purport to establish legal standards for telemedicine services but focus on the quality, safety and effectiveness of telemedicine encounters.

## SCOPE

These guidelines cover the provision of patient-initiated primary and urgent care services by licensed healthcare providers using real-time, interactive technologies, including mobile devices. Healthcare providers include individual practitioners, group and specialty practices, hospitals and healthcare systems, triage or call centers, and other licensed providers of telemedicine services. They do not address communications between healthcare professionals and patients via short message service, email, social network sites, or online "coaching", or the use of telemedicine for primary care when facilitated by a provider connecting to another provider.

The guidelines address three aspects of service delivery: clinical, technical and administrative.  Under each set, the guidelines are classified into three levels of adherence: "**Shall**" indicates required action whenever feasible and/or practical. **"Shall not"** indicates a proscription or action that is strongly advised against. "**Should**" indicates a recommended action without excluding others.  "**May**" indicates pertinent actions that may be considered to optimize the telemedicine encounter. These indications are found in bold throughout the document.

ATA urges health professionals using telemedicine in their practices to familiarize themselves with these guidelines, and other position statements or standards from their professional organizations and societies and incorporate them into telemedicine practice. They pertain to the United States (US) when both patient and provider are within the US. Others may use them at their discretion.


## INTRODUCTION

Telemedicine enables providers to extend their reach, and improve their efficiency and effectiveness while still maintaining high quality care and attention to patient safety. These guidelines pertain to telemedicine in primary and urgent care encounters initiated by patients. As with the practice of medicine in general, users must adhere to strict ethical and professional standards to assure quality of care and patient safety. ATA has developed a series of guidelines including Core Guidelines for Telemedicine Operations (8).  However, this guideline focuses on the use of telemedicine services to connect providers and patients in the delivery of primary and urgent care.

The development of these guidelines followed a rigorous process of evidence review and expert assessment of more than 600 studies regarding the practice of telemedicine in primary and urgent care.  Several studies within and outside the US have demonstrated the safety, efficacy, and quality of telemedicine in primary and urgent medical care for uncomplicated conditions. (3, 12, 14, 15, 27) These studies report outcomes often on par with in-person encounters, high patient satisfaction and reduced costs of care depending on the attributes of the intervention and the metrics studied. (1, 4, 10, 12-15, 17, 18, 40-49)

Practitioners must be mindful of all relevant statutes and regulations when choosing to provide care to patients via telemedicine, and in particular when considering prescribing medications.

**Telemedicine in the Practice of Primary and Urgent Care**

For purposes of this document, primary and urgent care is defined as the delivery of basic non-specialty care outside a hospital emergency department when a patient is deemed in need of immediate medical attention. This type of care is typically unscheduled and episodic, and is not always provided by the patient's regular primary care provider.  Primary care typically implies a longer-term relationship between patient and provider, wherein the provider is usually familiar with the patient's health history.

Both acute and chronic conditions may present with symptoms that range from mild to severe.  Examples of acute medical conditions that may  be managed effectively by video-based telemedicine and as appropriate other interactive technologies supported by peripheral devices and ancillary tests necessary to establish a diagnosis, include uncomplicated cases of allergy/asthma, chronic bronchitis, conjunctivitis, genitourinary conditions,  low back pain, otitis media, rashes, and upper respiratory infections. (10, 12, 13, 15, 27, 34) Chronic medical conditions addressed by telemedicine within primary care practices may include mental illness and behavioral health, chronic obstructive pulmonary disease, congestive heart failure, diabetes, and hypertension. (4, 11, 17-21, 23, 26, 28) The virtual medium is also an appropriate tool for consultations regarding prevention and wellness services such as immunizations, smoking cessation, diet and physical activity.

Prescribing is generally accepted (given local and federal regulations) within the context of real-time videoconferencing sessions when information can be provided that approximates the in-person exam. Prescribing is also generally accepted based on telephone-only consultations with a patient where there is a prior relationship by the provider or with providers offering weekend coverage with access to the patient's medical record.  However for prescribing based on a telephone session with a patient with no prior relationship and no medical record there are differences of opinion and few independent, validated studies.  One recent study, conducted in a health system outside of the United States (Denmark) concluded that prescriptions made during telephone consultations conducted under that system were feasible and that practitioners who had access to the patient's medical record were conservative in the encounters, being less likely to offer prescriptions when cases are severe or involve children (30), with no differences in prescription rates between contacts due to new episodes and exacerbation of chronic disease. Antibiotics, analgesics and medications for the respiratory system are the most commonly prescribed drugs. (30) Other published data, however, have demonstrated higher rates of prescribing for patients with complaints of urinary tract symptoms evaluated and treated via non video-based visits without laboratory testing. (26)  For isolated patients with no other means to access a provider, an audio-based consult may be the only alternative.  The prudent practitioner should be aware of and follow all relevant statutes and regulations regarding the modality of technology used when choosing to provide care to patients via telemedicine, and in particular when considering prescribing medications.

Despite some overlap between acute and chronic diseases, there are several common attributes of primary/urgent care in traditional, in person practice and video-based telemedicine, including timely service, a trust relationship and opportunity for follow-up. These are identified in the primary care medical home model. (20, 22, 24) The Agency for Healthcare Research and Quality (AHRQ) defines the medical home not simply as a location but as an organization that delivers the core functions of primary healthcare. (2)

**PRACTICE GUIDELINES**

Many conditions lend themselves to a virtual visit as defined in this document.  Currently there is a growing body of evidence regarding the effectiveness of video and audio-based interventions for a variety of acute and chronic conditions seen in primary care, such as diabetes, asthma, heart failure and hypertension. (4, 10-13, 15, 17-21, 23, 24-29, 31, 33) Typically these include conditions for which there is a reasonable level of certainty in establishing a diagnosis and generating a treatment plan, especially when visual information coupled with access to a medical record with diagnostic studies and imaging is available. (15, 26, 29)

In general, conditions that are not suitable for telemedicine are those for which an in-person visit is required to evaluate the patient due to the severity of presenting symptoms, the necessity of haptic information, the need for protocol-driven procedures, or the need for aggressive interventions. Other circumstances that are not suitable for telemedicine include some patients with cognitive disorders, intoxication, language barriers, emergency situations that warrant escalation to an ER visit or 911 or when patients do not have the requisite technology to complete a virtual visit.

These practice guidelines identify primary and urgent care services that current information indicates can be provided safely and effectively using telemedicine. They are not intended to substitute for the independent medical judgment, training, and skill of the practitioner. Therefore, providers **shall** exercise their professional judgment when deciding whether or not to use telemedicine, taking into account the patient condition, mitigating circumstances, available resources, and their own comfort level and expertise in using telemedicine. Providers **shall** be aware of all relevant state and federal regulations related to the use of telemedicine to include those that govern prescribing as it relates to the establishment of a doctor-patient relationship. In addition, practitioners **shall** be aware of relevant practice guidelines developed by the specialty societies as they relate to both in-person and telehealth practice.

## I. Preliminary Considerations

### A. Regulatory and Licensure Requirements

Providers **shall** follow federal, state and local regulatory and licensure requirements related to their scope of practice, and **shall** abide by state board and specialty training requirements.  Providers **shall** ensure that the patient is physically located in a jurisdiction in which the provider is duly licensed and credentialed. Providers **shall** practice within the scope of their licensure and **shall** observe all applicable state and federal legal and regulatory requirements.

### B. Informing and Educating the Patient

Prior to the initiation of a telemedicine encounter, the provider or designee **shall** inform and educate the patient (either in writing or verbally) about the nature of telemedicine service compared to in–person care. This **shall** include discussion of the nature of a telemedicine encounter, timing of service, record keeping, scheduling, privacy and security, potential risks, mandatory reporting, the credentials of the distant site provider and billing arrangements. The information **shall** be provided in simple language that can be easily understood by the patient. This is particularly important when discussing technical issues like encryption or the potential for technical failure.

More specifically, this information **shall** include the limits to confidentiality in electronic communication; an explicit emergency plan, particularly for patients in settings without access to clinical staff; a process by which patient information will be documented and stored; the potential for technical failure; procedures for coordination of care with other professionals; a protocol for contact between visits; prescribing policies including local and federal regulations and limitations; and the conditions under which telemedicine services may be terminated and a referral made to in-person care.

Finally, the provider or designee **should** set appropriate expectations regarding the telemedicine encounter, including for example, prescribing policies, scope of service, communication, and follow-up. To reduce the risk of overprescribing, the provider **shall** follow evidence-based guidelines and all federal, state and local regulations.

### C. Physical Environment

The provider **shall** determine the minimal acceptable levels of privacy, lack of distraction and background noise, and other environmental conditions that may affect the quality of the encounter, in particular when video-based services are offered.  The provider's and the patient's room/environment **should** ensure privacy to prevent unauthorized access. Seating and lighting **should** be designed for both comfort and professional interaction. Both provider and patient **should** be visible and heard.  Patients receiving care in non-traditional settings **should** be informed of the importance of reducing background light from windows or light emanating from behind them. Both provider and patient cameras **should** be placed on a secure, stable platform to avoid wobbling and shaking during the videoconferencing session. To the extent possible, the patient and provider cameras **should** be placed at the same elevation as the eyes with the face clearly visible to the other person.

### D. Referrals and Emergency Resources

The provider **shall** have an emergency or contingency plan that is communicated to the patient in advance of the telemedicine encounter.

The provider **should** be familiar with, or have access to available medical resources in proximity to the patient in order to make referrals or request transfers when indicated.

### E. Cultural Competence

Telemedicine providers and their staff **shall** deliver services in a culturally competent manner that takes into account the patient's age, disability status, ethnicity, language, gender, gender identity and sexual orientation, geographical location, language,  religion, and socio-economic status.

Provider and patient or patient-representative **should** be able to converse in a language comfortable and familiar to both parties allowing the provider to obtain a clear history and the patient/representative to understand the recommendations provided. If necessary, a translator (or signer for deaf/hearing impaired patients) **should** be used.

### II. Telemedicine Management of the Patient

Telemedicine providers **shall** determine the appropriateness of telemedicine on a case-by-case basis, whether or not a telemedicine visit is indicated, and what portion of the examination must be performed and documented in conformance with appropriate standards in evaluating the patient. Wherever possible, diagnostic interventions **should** be

supported by high quality evidence.  Where evidence is lacking, providers **shall** use their professional judgment, experience and expertise in making such decisions. Conditions for use of telemedicine are likely to change to reflect new evidence from future research and the evolution of the enabling technology.

Telemedicine providers **shall** be cognizant of establishment of a provider-patient relationship in the context of a telemedicine encounter, whether using synchronous or asynchronous modes of communication/interaction makes a difference, and they **shall** proceed accordingly with an evidence-based standard of care. If not previously established, a provider-patient relationship **may** be established where the provider is guiding the process of care. The provider **shall** use their professional judgment and conform to all state and federal regulations in determining whether a provider-patient relationship has been established and whether it is sufficient to proceed with an encounter and make diagnostic and treatment decisions including prescribing.  In the event the patient does not have a primary care provider, the provider **should** recommend options to assure continuity of care for the patient. Provider practices **should** establish standard operating procedures and workflows for telemedicine visits consistent with prevailing norms.

Telemedicine management of the patient **may** involve establishment of a diagnosis and treatment plan, or it **may** result in a referral to a medical facility for further evaluation and/or treatment.

Clinical protocols **should** be developed for live, on demand services.  Such protocols are beyond the scope of these guidelines and practitioners are advised to review specialty society guidelines and the evidence published in the peer-reviewed literature.  However, protocols **should** include the following components:

1. Named condition and corresponding ICD code;
2. Scope of condition amenable to treatment by telemedicine based on medical evidence, or at a minimum, precedent for successful management based on peer-reviewed guidelines or expert opinion;
3. The mode of intervention required to diagnose and treat the condition (i.e., under what circumstance and regulatory framework is telephonic care adequate, is videoconferencing required, are peripheral devices needed or other diagnostic tests,  or is an in-person visit needed);
4. Documentation required to appropriately assess the patient's condition including history and any video-based examination including required components needed to visualize, demonstrate or test;
5. Parameters under which the condition can be treated;
6. Parameters under which the condition may not be treated and require referral to alternate modes of management; and
7. Parameters under which prescribing can and cannot be done.

## A. Patient Evaluation

Patient examination should be commensurate with the level of assessment required to manage a patient, taking into consideration the technical quality and extent of information that **may** be elicited remotely. This evaluation **should** be supported by clinical history, access to the patient's medical record where possible, diagnostic data (e.g. obtained via self-report or access to store and forward databases) and laboratory test results and peripheral devices for patient physical examination when appropriate.

Audio-based evaluation **may** be used for consultation, if and only if the evaluation, diagnosis and treatment of conditions can be made reliably on the basis of complete medical history, full understanding of presenting symptoms reported by the patient or caregiver and be consistent with established clinical protocols, state and federal laws and regulations related to audio-based evaluations, in particular when such evaluation results in prescribing.

The telemedicine provider **should** obtain all the data necessary for a diagnosis and treatment plan. Necessary items include:

1. Identifying information
2. Source of the history
3. Chief complaint(s)
4. History of present illness (including location, description, size, quality, severity, duration, timing and context modifying factors)
5. Associated signs and symptoms
6. Past medical history
7. Family history
8. Personal and social history
9. Medication review
10. Allergies including medication, nature and severity of reaction
11. Detailed review of symptoms
12. Provider-directed patient self-examination to include the use of peripheral devices as appropriate.

Documentation **shall** be performed following each patient encounter and **shall** be maintained in a secure, HIPAA (Health Insurance Portability and Accountability Act) compliant form and location (e.g., paper/fax, server, cloud).

Following every visit, the provider **shall** communicate results of the encounter to the patient's primary care provider or other specialty providers using secure methods (e.g., email/fax, secure email, transmit to EMR), as well as to the patient, unless, the patient has requested a limitation on such communication. An appropriate disposition **shall** also be discussed with the patient including any required follow up and discussion of clinical signs that would signify a significant escalation. Laboratory tests, including diagnostics ordered in the usual course of evaluation **shall** be followed up in a timely manner with the patient and any additional providers as needed.

**B. Physical Examination**

The provider **shall** perform a virtual physical examination as indicated by the patient complaint and medical history and other relevant information reported by the patient conforming to the standards of medical practice, and provided by a credentialed and qualified practitioner. This examination **may** include a demonstration or an explicit physician-guided self-examination which, as appropriate, **may** include peripheral devices. Where additional diagnostic testing is required to confirm the diagnosis, the provider **shall** recommend to the patient that such testing be performed in accordance with standards of medical care.

**III. Quality**

The provider **shall** employ a coordinated quality improvement program or clinical oversight process.

## A. Quality Review

Quality review **should** be conducted on a periodic basis to identify specific risks and qualify failures. It **should** include assessment of:

- equipment or connectivity failures
- number of attempted and completed visits
- patient and provider satisfaction with the virtual visit
- patient or provider complaints related to the virtual visits (e.g., via surveys)
- measures of clinical quality such as whether the visit was appropriate for a virtual encounter
- recommendations consistent with appropriate standard of care

Unless there is an external requirement for recording a virtual visit, the provider **may** opt not to record the visit. If he/she chooses to record the encounter for quality or training purposes, it **shall** comport with appropriate consent and privacy/security measures (see Technical Considerations below).

## B. Provider Training and Mentoring

Provider orientation and training should entail a thorough review of history taking skills and physical examination skills as they pertain to the evaluation of a patient through telemedicine. Providers **shall** know current local and state laws as they pertain to telemedicine practice.  They **shall** obtain the necessary training and education for themselves and/or staff to ensure maintaining technical and clinical competence in accordance with their discipline. Providers **should** conduct several "dry run" visits with test "patients" to become familiar and comfortable with the technology of virtual visits, and be generally familiar with the nature of the technology the patient is using to direct and assist with minor technical questions and potential problems that may arise. The provider **should** also be familiar with and proficient with a satisfactory default mode for patient engagement should technology fail during a patient encounter. Those new to telemedicine are encouraged to identify a mentor to observe during telemedicine encounters. This can also be done post hoc by a video recording.  Proctored visits **should** include a variety of conditions, and modes of encounter (e.g., phone, web, mobile). Protocols regarding indications when care should be escalated, and provision for escalating patients when necessary to alternate modes of care should be established, documented and communicated as part of the provider orientation process. The effectiveness of these guidelines should be assessed routinely by the provider entity as part of their standard quality review process.

## IV. Ethical Considerations

Practicing at a distance requires the same attention and adherence to professional ethical principles-as would an in-person encounter. Telemedicine providers **should** incorporate ethical statements and policies into their standard operating procedures.

The following are the ethical guidelines for health professionals' engaged in telemedicine:

1. A practitioner **shall** uphold the code of ethics for their profession and be aware of the codes for other professional disciplines.
2. A practitioner **shall** abide by all federal, state, and jurisdictional laws and regulations, and institutional policies.
3. Telemedicine **shall not** be employed as a means of preferentially avoiding in-person encounters based on geographic location, socio-economic status, disease or disability,

gender, gender preferences or sexual orientation, behavioral factors, ethnicity, religion, etc. An exception to this rule **may** be the avoidance of in-person visits during epidemics or pandemics to avoid the spread of infectious disease.

4. Payment made by the patient **should not** be conditional on receiving a certain diagnoses or particular treatment, such as receipt of a prescription.

5. Providers **should** abide by a strict conflict of interest policy that deters the use of telepractice for the sole purpose of enhancing income.

6. Providers **shall**:
   a. Apprise patients of their rights when receiving telemedicine, including the right to suspend or refuse treatment.
   b. Apprise patients of their own responsibilities when participating in telemedicine.
   c. Inform patients of a formal complaint or grievance process to resolve ethical concerns or issues that might arise as a result of participating in telemedicine.
   d. Discuss the potential benefits, constraints and risks (e.g., privacy and security) of telemedicine.
   e. Inform patients and obtain their consent when students or trainees observe the encounter.

7. Providers **should** have a policy in place concerning the disclosure to patients of technology or equipment failures during service sessions, the contingency plans in case of technical failure, and document such events in the patient's health record.

## V. Emergencies

### A. Definition of Emergent Conditions

An emergent condition is an illness or injury that poses an immediate threat to a person's life or long-term health. Such conditions are outside the scope of a primary and/or urgent care telemedicine practice.

### B. Emergent Patient Evaluation and Referrals

The provider **shall** assess a presenting patient's condition to determine severity and acuity of the patient's condition, and when indicated, refer the patient to the appropriate level of care accessible to the patient.  The telemedicine provider **shall** be responsible for triaging the patient to the appropriate level of care (e.g., PCP, specialist, urgent care, ED). Providers **may** consider incorporating standard triage protocols in their telemedicine practices.

### C. Documentation of Emergent Encounters

The provider **shall** document the process for treating emergent situations which **may** include phoning the receiving facility in advance of the patient's arrival.

Providers **shall** document all referrals to EMS (Dialing 911) including the medical indication/basis for the recommendation, and nature of the problem.

Providers **should** document the location of the patient at the start of the encounter.

Providers **should** document any extenuating circumstances or adverse events, be they technical or clinical, which occurred during the encounter.

Documentation **should** adhere to all medical-legal standards of care, and if appropriate, insurance requirements for future review and audit.

## VI. Follow-Up

As noted previously, follow-up is a critical aspect of patient safety and continuity of care and **should** include the following:

### A. Knowledge of the Patient's Healthcare Network

The provider **should** have knowledge of the patient's healthcare network whenever possible, to be able to facilitate timely access to recommended specialty consultations or referrals.

### B. Provision of Clinical Reports to Referral Sources

The provider, to the extent possible while being remote, **shall** make available relevant clinical reports to the referral institution or specialist absent a request by the patient to the contrary.

### C. Transmission of Home Monitoring and Electronic Data

If feasible, the provider **should** facilitate transference of any home monitoring or electronic data and discuss with the patient how and if such data will be stored.

### D. Patient Requests for Records

The provider **shall** establish an explicit process for patients to request copies of their telemedicine encounters at their request and to facilitate specialty care, where indicated.

## VII. Special Populations

Virtual visits can be conducted with patients with unique needs such as those with communication disorders, mental or physical disabilities, sensory disorders, or special needs related to age, gender, culture, rare diseases or location of care.  Some **may** need a translator or facilitator that calls for non-medical personnel during the visit. These populations often require special considerations to ensure their engagement in the care process and follow-up and their needs are met appropriately.  For instance telemedicine providers in the United States **shall** be in compliance with the American Disabilities Act of 1990 (ADA) and other legal and ethical requirements, described elsewhere. A useful reference to identifying and responding to these populations can be found in the ATA Practice Guidelines for Videoconferencing-Based Telemental Health. (9)

### A. Pediatric

The literature contains examples of clinically effective pediatric telemedicine programs (42-46).  Such pediatric encounters require the presence and/or active participation of a caregiver or facilitator, including parent/guardian, nurse, and/or childcare worker.  In certain cases involving adolescents with behavioral or mental health issues a facilitator would not remain in the room for part of or for the entire duration of the visit. Nonetheless, the practitioner **shall** obtain consent from the parent or legal representative of the child as required by law in the respective jurisdiction.  If the parent/guardian is not present at the time of the visit, a process **shall** be established for prompt communication of the results of the visit with the parent/guardian.

## B. Geriatric

Here again, the literature contains examples of clinically effective geriatric telemedicine programs. (19, 38)  The evidence indicates frequent monitoring for chronic diseases tends to reduce the need for office visits, transportation, as well as reduce stress and increase access to care for homebound patients. (5, 33, 36, 39)   Providers also report benefits from the ability to observe the patient in their home environment. (39)

In designing a system for virtual geriatric visits, providers **should** consider the special needs of the elderly, including vision and hearing difficulties and limited physical dexterity or mobility.  These **should** be taken into account when designing and choosing equipment and systems.  In cases where a patient demonstrates substantial confusion or anxiety during a telemedicine encounter, the practitioner **should** exercise judgment concerning the continuation or termination of the visit.  The presence of facilitators family members/caregivers, and nurses would facilitate the process and ultimate decision making. However, providers **should** have the patient affirm consent to that person's participation in the visit. A practitioner should obtain the patient's consent regarding the presence/participation of facilitators. In cases of questionable mental competency, practitioners **should** ensure appropriate consent from a legal proxy or representative. In circumstances where the patient is in a care facility or senior living community, a trained technician **may** assist in collecting relevant clinical information, including medical records, lab or diagnostic testing, and access to caregivers and staff.

In managing patients with dementia, providers should ask for the patient's durable power of attorney for healthcare decisions, and use that as the legal guardian.

## C. Locus of  Care

The literature contains examples of clinical effectiveness of successful telemedicine programs in a variety of settings including patient homes, childcare centers, schools, chronic care facilities, the workplace, and prisons. (19, 20, 22, 25, 27, 31, 38) All legal and regulatory requirements and ethical considerations **shall** be used in these settings.


## TECHNICAL GUIDELINES

## I. Security and Privacy

Providers and healthcare organizations **shall** comply with privacy and confidentiality requirements stipulated by HIPAA and other applicable laws.  They should also familiarize themselves with security arrangements for their systems and their limitations.

This **shall** include appropriate disclosure to patients about sharing their personal healthcare information (PHI). Providers **shall** document medical records as thoroughly as if the patient participated in an in-person visit. Storage of medical records **shall** be accomplished using methods that are compliant with all laws pertaining to medical record storage.  Access to patient information **shall** follow standard HIPAA privacy provisions.  If an intermediary or third party entity is engaged for the collection, storage, transmission or processing of PHI, a Business Associate Agreement (BAA) should be executed as stipulated under HIPAA.

Patients **shall** consent prior to any recording of the encounter, and such recording be available for the patients upon request.  Release of such recordings data **shall** require written patient authorization or court order in a legal proceeding.

Access to the recordings **shall** only be granted to authorized users, and **should** be protected from accidental or unauthorized file sharing and/or transfer.

Data security **shall** be assured by prevailing encryption methods, including FIPS 140-2, known as the Federal Information Processing Standard. Providers **should** familiarize themselves with the technologies available regarding computer and mobile device security, and **should** share such information with their patients as appropriate.  Special attention **should** be placed on the privacy of information being communicated via mobile devices.

Mobile devices used for clinical purposes **shall** require authentication for access to them, as well as timeout thresholds and protections when lost or misplaced. Mobile devices **should** be kept in the possession of the provider when traveling or in an uncontrolled environment. Unauthorized persons **shall not** be allowed access to sensitive information stored on the device, or use the device to access sensitive applications or network resources. Providers **should** have the capability to remotely disable or wipe their mobile device in the event it is lost or stolen. Videoconference software **shall not** allow multiple concurrent sessions to be opened by a single user. Should a second session be attempted, the system **shall** either log off the first session or block the second session. Session logs stored in 3rd party locations (i.e., not on providers' or patients' access device) **shall** be secure and access to these logs **shall** only be granted to authorized users.

Protected health information and other confidential data **shall** only be backed up to or stored in secure data storage locations. Cloud services unable to achieve HIPAA compliance **shall not** be used for PHI or confidential data.

## II. Communication between Organizations

Providers of telemedicine **shall** meet the same standards for communication between patient and provider, and between provider and other organizations, as those for in-person encounters.

## III. Remote Monitoring Devices and Data

Numerous studies in the US and elsewhere have confirmed the reliability and effectiveness of remote monitoring. (6, 7, 16) This evidence reveals the benefits of remote monitoring in reducing hospitalization/re-hospitalization, greater patient compliance with medication management, timely diagnosis and initiation of treatment, and improved health outcomes.

The provider **should** be aware of data trends or current evidence in remote monitoring to the extent possible. Data gathered from remote monitoring **should** be incorporated into the visit record.

When using a personal computer (including laptops, iPads, and other mobile devices), both the provider and patient devices should, when feasible, use professional grade or high quality cameras and audio equipment. Devices **shall** have up-to-date antivirus software and if feasible a personal firewall installed (at least on the provider's device). Providers should ensure their personal computer or mobile device has the latest security patches and updates applied to the operating system and any 3rd party applications.

## A. Provider Organizations

Provider organizations **should** provide adequate resources for hardware, software, and network management, including installation, maintenance, troubleshooting and replacement, as well as effective security arrangements. Special attention **shall** be paid to verify the secure and reliable networks, including successful information exchange.

## B. Connectivity

Connectivity **shall** have adequate bandwidth, resolution and speed for clinical consultations. Bandwidth **shall** be set at a minimum bandwidth of 384 Kbps in both the downlink and uplink directions.  Resolution **shall** be set a minimum of 640X360, and speed at 30frames per second. Where practical, providers **may** recommend preferred video conferencing software and/or video and audio hardware to the patient. The provider and/or patient **may** use link test tools (e.g., bandwidth test) to pre-test the connection before starting their session.  Each party **should** use the most reliable connection method to access the Internet, including wired (e.g., Ethernet) connections when available. The videoconferencing software **should** be able to adapt to changing bandwidth environments without losing/dropping the connection.

In the event of a technology breakdown, causing a disruption of the session, the professional **shall** have a backup plan in place. The plan **shall** be communicated to the patient prior to commencement of the encounter, and it **should** be included in the general emergency management protocol.

The plan **should** include calling the patient via telephone and attempting to troubleshoot the issue together. It **may** also include referring the patient to another provider, or completing the encounter by voice only.

Professionals and patients **may** opt to use cameras that pan, tilt, and zoom for maximal flexibility in viewing.


## ADMINISTRATIVE GUIDELINES

### I. Verification of Service Eligibility

Prior to any telemedicine encounter, the  provider or staff **shall** determine the appropriateness of telemedicine for the specific encounter, and also gather information on medical history, presenting symptoms/problems, reimbursement method, and usual provider.

### II. Provider and Patient Identity Verification

The provider **shall** introduce him/herself and any attendant personnel (e.g., residents, fellows, students) to the patient and document those present.  The patient **should** **announce** those in attendance at his/her end (e.g., guardian, family).  This information **shall** become part of the encounter document.

The full name and credentials of the provider and the full name of the patient **shall** be verified by birthdate, address, and insurance status.

### III. Provider and Patient Location Documentation

The provider **shall** document the location of the patient and the communication tools. The locations of the provider and patient **may** require documentation for reimbursement and licensing purposes.

Most states require that licensure requirements are based on the location of the patient when service is rendered. Therefore, providers **shal**l be aware of the state where the patient is located at the time of service to assure they are licensed in that state.

Emergency management protocols are entirely dependent on where the patient receives services.

### IV. Contact Information Verification for Provider and Patient

Contact information **shall** be obtained from the patient including address of usual residence, address at time of consultation, telephone, mail, and email addresses. Similarly, provider contact information **shall** be exchanged with patient including telephone, practice address and email. It is not necessary for the health provider to reveal their specific location to the patient, especially if the provider is located at home at the time of service.

### V. Credentialing and Licensing

All providers **shall** abide by the same local and regional credentialing policies as required for a traditional in-person visit as mandated by state and federal law.

Providers **shall** abide by all qualifications of licensure, board eligibility, or certification as required for traditional in-person visits according to by state and federal laws. The scope of care provided **shall** be consistent with the provider's level of training (e.g., MD/DO, ARNP, PA, RN, etc.). Providers **should** be cognizant of oversight requirements and auditing standards that **may** be applied to telemedicine patient visits as if the patient visit occurred in person. Where telemedicine/ telehealth laws require or permit different credentialing, compliance **shall** be maintained with those provisions.

### VI. Organizational Policies and Procedures

Healthcare organizations **should** develop and implement organizational policies and procedures governing the use of telemedicine. Providers **shall** adhere to all applicable laws and regional and local practice as to Patient Informed Consents and Disclaimers. As part of organizational policies and procedures, healthcare entities **should** promulgate standards for patient and provider verification and authentication.

### VII. Coding and Documentation

Coding and medical record documentation **should** be accurate in reflecting the content of the medical visit rather than enhancing reimbursement.

Medical record and procedure coding **should** follow prevailing coding practices based on state and national guides such as the AMA Coding Requirements.

### A. Electronic Medical Record

Providers **shall** generate and maintain an electronic medical record (when feasible) for each patient for whom they provide remote care. All communications with the patient (verbal, audiovisual or written) **should** be documented in patient's unique medical record on par with documentation standards of in-person visits.

### B. Access to Analytics and Clinical Information at Point of Care

The provider should ensure that the patient's clinical record is available during or prior to a visit whenever possible, and that sufficient time is allotted to update the patient history; if possible with the patient's primary care provider or other relevant healthcare entity.

### C. Payment and Billing

Prior to providing patient services, the patient **shall** be made aware of the patient's cost of the service to be provided, if any. Arrangement for payment should be completed prior to the delivery of the service. Special consideration must be made for Medicare patients participating in telemedicine care. Providers **shall** follow Medicare rules (such as the Medicare Opt Out election) for billing patients outside of standard Medicare reimbursement.

## References

1. Adamson S, et al. Pilot study of providing online care in a primary care setting, Mayo Clinic Proc., 2010August; 85(8): 704–710.

2. Agency for Healthcare Research and Quality: Defining the PCHM. http://www.pcmh.ahrq.gov/page/defining-pcmh

3. Alsos, et al. Mobile health IT: The effect of user interface and form factor on doctor-patient relationship, Int J Med Inform, 2012 Jan;81(1):12-28.

4. Alverson, et al. One Size Doesn't Fit All: bringing telehealth service to special populations; Telemed JE Health, 2008 Nov: 14 (9):957-63.

5. Amaert A, Delesie L. Telenursing for the elderly. The case for video-telephony Journal of Telemedicine and Telecare, Vol 7, No 6, Jun 2005.

6. Anker SD. Telemedicine and remote management of patients with heart failure, Lancet, Volume 378, Issue 9792, Pages 731 - 739, 20 August 2011.

7. Antonicelli R. Impact of telemonitoring at home on the management of elderly patients with congestive heart failure. J Telemed Telecare. 2008;14(6):300-5.

8. American Telemedicine Association, Core standards for telemedicine operations, americantelemed.org, ATA Standards and Guidelines, Jun 2005.

9. American Telemedicine Association, Practice standards for video-based online mental health services, americantelemed.org, ATA Standards and Guidelines, May 2013.

10. Barry H. A randomized controlled trial of telephone management of suspected urinary tract infections in women, J Fam Pract. 2001 Jul;50(7):589-94.

11. Bennett, et al. Heart Messages: A tailored message intervention for improving heart failure outcomes, J Cardiovasc Nurs. 2000 Jul;14(4):94-105.

12. Bent, et al. Does this woman have an acute uncomplicated urinary tract infection?, JAMA. 2002 May 22-29;287(20):2701-10.

13. Blozik E. Effectiveness and safety of telemedical management in uncomplicated urinary tract infections, J Telemed Telecare. 2011;17(2):78-82.

14. Colgan, et al. Diagnosis and Treatment of Acute Uncomplicated Cystitis, Am Fam Physician. 2011 Oct 1;84(7):771-776.

15. Coureya P. HealthPartners' online clinic for simple conditions delivers savings of $88 per episode and high patient approval, Health Aff (Millwood). 2013 Feb;32(2):385-92.

16. Dang S. Evaluating the evidence base for the use of home telehealth remote monitoring in elderly with heart failure, Telemed J E Health. 2009 Oct;15(8):783-96.

17. Demaris G. Change of patient's perceptions of telehomecare, Telemedicine Journal and e-Health 2001; 7(3):241-248.

18. Dixon R. Virtual visits in a general medicine practice: a plot study, Telemed J E Health. 2008 Aug;14(6):525-30.

19. Gellis ZD. Outcomes of a telehealth intervention for homebound older adults with heart or chronic respiratory failure: a randomized controlled trial Gerontologist. 2012 Aug;52(4):541-52.

20. Goulis DG, et al. Effectiveness of home-centered care through telemedicine applications for overweight and obese patients: a randomized controlled trial, International Journal of Obesity (2004), 28, 1391-1398.

21. Graham, et al. A randomized trial of internet and telephone treatment of smoking cessation, JAMA Internal Medicine, 2011,171(1)46.

22. Hughes CL, et al. Technologies in the patient-centered medical home: examining the model from an enterprise perspective. Telemed J E Health. 2011 Jul-Aug;17(6):495-500. (add on to ref list))

23. Kashim A, et al. Web-based internet telemedicine management of patients with heart failure, Telemed J E Health. 2006 Aug;12(4):439-47.

24. Kraschnewski JL, et al. Role of health information technologies in the patient-centered medical home, Diab Sci Techology2013 Sep 1;7(5):1376-85.

25. Larsen D, et al. Prison telemedicine and telehealth utilization in the United States: state and federal perceptions of benefits and barriers, telemedicine Telemed J E Health. 2004;10 Suppl 2:S-81-9.

26. Mehrotra A, et al, Comparison of care at e-visits and physician offered visits for sinusitis and UTI, JAMA 2013:173(1) 72-74.

27. Mehrotra A. The Convenience Revolution for Treatment of Low-Acuity Conditions. *JAMA.* 2013;310(1):35-36.

28. Marziali E. E-health program for patients with chronic disease, Telemed J E Health. 2009 Mar;15(2):176-81.

29. McConnochie KM. Differences in diagnosis and treatment using telemedicine versus in-person evaluation of acute illness, Ambul Pediatr. 2006 Jul-Aug;6(4):187-95; discussion 196-7.

30. Moth G, Huibers L, Christensen MB, Vedsted P. Drug prescription by telephone consultation in Danish out-of-hours primary care: a population-based study of frequency and associations with clinical severity and diagnosis. BMC Family Practice. 2014;15:142.

31. Ohinmaa, et al. Telehealth in substance abuse an addiction: review of the literature on smoking, alcohol, drug abuse and gambling, Institute of Health Economics, Alberta, CA, 2010 – 106.

32. Pare' G. Clinical effects of home telemonitoring in the context of diabetes, asthma, heart failure and hypertension: a systematic review, J Med Internet Res. 2010 Jun 16;12(2).

33. Raimer BG, Stobo JD. Health care delivery in the Texas prison system: the role of academic medicine. JAMA 2004;292(4):485-9.

34. Shmidt S. Telemonitoring in patients with chronic heart failure: a chance to improve patient care?, Dtsch Arztebl Int. 2010 February; 107(8): 131–138.

35. Seto E. Perceptions and experiences for heart failure patients and clinicians on the user of mobile phone-based telemonitoring, J Med Internet Res. 2012 Feb 10;14(1).

36. Shauberger C. Acute cystitis in women: experience with a telephone-based algorithm, WMJ. 2007 Sep;106(6):326-9.

37. Spooner SA, et al. Telemedicine: pediatric applications, Pediatrics, Vol 113, No.6, Jun 1, 2004 pp e639-e643.

38. Shah. Potential of telemedicine to provide acute medical care for adults in senior living communities, Acad Emerg Med, 2013, Feb;10(2):162-8 -135.

39. Unwin BK. The home visit, Am Fam Physician. 1999 Oct 1;60(5):1481-8U.S.

40. Department of Justice, Office of Justice Programs, National Institute of Justice, McDonald D, et al. Telemedicine can reduce correctional health care costs: An Evaluation of a prison telemedicine network, Research Report, March 1999.

41. Vitacca M. Tele-assistance in chronic respiratory failure patients: a randomized clinical trial, Eur Respir J. 2009 Feb;33(2):411-8

42. Practice Guidelines for Video-Based Online Mental Health Services, American Telemedicine Association, May 2013, p. 15-18.

43. Herendeen NE, Deshpande P. Telemedicine and the Patient-Centered Medical Home; Pediatric Annals Feb 2014 - Volume 43 • Issue 2: e28-e32.

   Herendeen NE, Schaefer GB. Practical Applications of Telemedicine for Pediatricians; Pediatric Annals Sept 2009 38(10) 567-569.

44. McConnochie KM, Conners GP, Brayer AF, Goepp J, Herendeen NE, Wood NE, Thomas A, Ahn DS, Roghmann KJ. Effectiveness of Telemedicine in Replacing In-Person Evaluation for Acute Childhood Illness in Office Settings. Telemedicine and e-Health., Vol. 12, No. 3: June 2006.

45. McConnochie KM, Conners GP, Brayer AF, Goepp J, Herendeen NE, Wood NE, Thomas A, Ahn DS, Roghmann KJ. "Differences in diagnosis and treatment using telemedicine versus in-person evaluation of acute illness". Ambulatory.Pediatrics. 6 (2006): 187-95; discussion 196-7.

46. McConnochie KM, Wood NE, Kitzman HJ, Herendeen NE, Roy J, Roghmann KJ. Telemedicine reduces absence resulting from illness in urban child care: evaluation of an innovation. Pediatrics 115 (2005): 1273-1282.

47. McConnochie KM, Tan J, Wood NE, Herendeen NE, Dick A, Kitzman H, Roghmann K. Acute Illness Utilization Patterns Before and After Telemedicine in Childcare for Inner-City Children a Cohort Study: Telemedicine and e-Health 2007.

48. Federation of State Medical Boards. Model policy for the appropriate use of telemedicine technologies in the practice of medicine; April 2014. http://www.fsmb.org/Media/Default/PDF/FSMB/Advocacy/FSMB_Telemedicine_Policy.pdf

49. American Medical Association. Report of the Council on Medical Service: coverage of and payment for telemedicine. CMS Report 7-A-14. June 2014.

# Exhibit F

APA Official Actions

# Resource Document on Telepsychiatry and Related Technologies in Clinical Psychiatry

## APA Council on Psychiatry & Law

**Special Acknowledgment**

Patricia Recupero, M.D., J.D.
Carl Erik Fisher, M.D.

Approved by the Joint Reference Committee
January 2014

The findings, opinions, and conclusions of this report do not necessarily represent the views of the officers, trustees, or all members of the American Psychiatric Association. Views expressed are those of the authors." APA Operations Manual.

**Abstract**

The goal of this resource document is to address the major areas of the use of the internet in communication with patients and the public in the practice of psychiatry. The rate of change of technological capabilities and their implementation is so rapid that the workgroup believes that it would be inappropriate to promulgate fixed rules for constantly changing situations. Rather, we seek to provide some questions to be considered when implementing any new communication technology with patients or the public. This document seeks to address professional use of the internet and does not discuss issues related to psychiatrists' use of social media and social networking sites such as Facebook or Twitter. In order to assist the practitioner, references to resource materials will be given. However, the reference is not an endorsement by either the APA or the members of the work group of the material contained therein.

As with the addition of any relatively new technology, there are complicated legal and ethical issues to consider, and it is beyond the scope of this resource document to provide an exhaustive list of the relevant concerns. This document aims, instead, to provide a general introduction to the use of the internet in clinical psychiatry, to identify some of the key issues arising from the debate, and to provide some starting-point resources for physicians and other practitioners who may be interested in learning more about this developing area in health services. We expect that the prudent practitioner will use this document as a starting point only and that a more thorough investigation or research effort will be conducted before acting. The role of the internet in medicine is an unsettled area of the law. There are few specific appellate court rulings on these issues. Often, reasoning from analogy is applied. The legal implications suggested herein may not be applicable in any or all jurisdictions. This resource document is not intended to be construed as a clinical practice guideline, nor to define a standard of care.

## Introduction to the Available Technology

Technology changes rapidly in today's world. This resource document does not aim to address every relevant technological or internet-related concern in clinical psychiatry. Instead, the discussion seeks to address some of the more frequently asked questions, specifically regarding the use of e-mail, medical practice websites, and e-therapy.

### Telemedicine

Telemedicine typically refers to the use of telecommunications technology to assist in the practice of medicine. In psychiatry, the practice is often termed telepsychiatry. Telemedicine is a broad term that encompasses a variety of physical or psychological treatments at a distance, including, for example, remote computer-assisted surgery, teleconferencing, and videoconferencing. Videoconferencing by internet requires that both the provider and the patient have access to webcam technology and an internet connection. In videoconferencing, both the physician and the patient are able to see one another as they chat. They can chat using their voices (which requires that both parties have microphones and speakers) or through text-based instant messaging. From the psychotherapeutic perspective, because therapy via videoconferencing sends the patient and the practitioner a live video image of the other participant, it may be more similar to traditional psychotherapy than other (e.g., text-based) forms of e-therapy. However, the nature of electronic communication adds unique risks to this form of therapy that are not present in face-to-face communication, which are discussed below.

### Websites

Websites are collections of electronic pages on the internet. A medical practice website is an online resource that provides a convenient mechanism for a physician to communicate with patients and the public. Developing a web presence is an effective way for a physician to provide new and existing patients with administrative information about the practice as well as links to credible healthcare information on the web. Medical practice websites can be classified according to their scope and purpose into basic and interactive sites. A basic website might include the following: an introduction to the practice's care philosophy; physician's bio, CV, and photo; services and procedures summary; contact information; office hours; maps and directions; a list of insurance participation; hospital and professional affiliations; a privacy policy/disclaimer; medical news; and patient education resources. An interactive website may also include: secure patient and physician log in; secure messaging capabilities; secure bill paying; and a secure system for fee-based online consultations.

© Copyright, American Psychiatric Association, all rights reserved.

Providers may also use third-party websites, many of which provide interactive functions. For example, some online scheduling services allow patients to book appointments on-line. There are also "cloud-based" medical record websites (i.e., web-based services in which records are kept on-line), which may also have interactive functions that enable patients to rate their physicians or to access their medical records.

### E-mail

E-mail can be a versatile tool for psychiatrists. Some physicians use e-mail to communicate with patients (physician-patient e-mail), while others choose to use e-mail only for non-clinical matters, such as discussions with colleagues. Issues to consider vary depending upon the way that e-mail is used. Before a psychiatrist considers e-mail correspondence with patients, the psychiatrist should be familiar with the emerging laws concerning the internet and medicine, particularly with respect to HIPAA regulations and current standards of data protection (e.g., encryption, firewalls). Data protection methods will be addressed further in this resource document.

### E-therapy

E-therapy refers to the provision of mental health services online (through the internet). Related terms include cybertherapy, teletherapy, internet counseling, online counseling, and so forth. Among the most common technologies utilized in e-therapy services are live (real-time) videoconferencing, e-mail, instant messaging (IM), chat rooms, and discussion groups through e-mail- or web-based message boards. Despite earlier debate among mental health practitioners about the efficacy of e-therapy, trials comparing e-therapy to traditional psychotherapy have generally found that the efficacy of e-therapy is comparable to traditional, face-to-face therapy (for a partial listing, see bibliography at the end of this document).

One of the most complex issues involves the question of what constitutes the provision of e-therapy, as opposed to other types of physician-patient contact online. At what point does an e-mail from a physician become therapy? The easiest way to gain an understanding of the difference between physician-patient e-mail and e-therapy is to examine the limits of physician-patient e-mail. In physician-patient e-mail, the contents of messages between a physician and a patient are normally restricted to minor "matters of business," such as prescription refill requests, appointment confirmations, and similar issues. These e-mails are similar to the messages a patient may leave with a doctor's office staff when the doctor is not available.

In the case of e-therapy, however, the content of the communications is significantly more psychological. Some form of counseling, advising, or other therapy generally takes place. E-mails that delve into areas of the patient's personal life, emotional issues, or even advice may be considered a form of e-therapy. A physician must be careful to ensure that both the provider and the patient are in agreement regarding the nature of their relationship (e.g., is the physician-patient relationship in place, or is this an unsolicited inquiry from a prospective patient?). As a general rule, any individual providing e-therapy services should also be a qualified and licensed practitioner for face-to-face services. The potential anonymity of internet communications does not reduce professional or ethical obligations. On the contrary, the use of the internet creates for the physician an additional set of responsibilities associated with the risks and benefits of the technology and its novelty.

### Instant messaging and chat rooms

Instant messages, or "IMs," are very similar to e-mail. Whereas in e-mail a sender may wait hours or days for a reply, in IMs both parties are receiving and sending messages at the same time. In this sense, it is similar to a phone conversation, but parties are typing and sending text messages rather than speaking to one another. The provider and patient typically must set an appointment for this type of communication. Many instant messaging software packages enable features such as file sharing, webcams, and audio or "voice chat," in which the clinician and patient (provided each has a microphone and speakers) can talk as if on the telephone.

Live chat rooms are similar to instant messages, but in a chat room, more than two parties are able to chat. Live chat rooms could be used for forms of group therapy, and instant messaging may be used simultaneously to exchange private messages between participants. Unlike face-to-face group therapy, the combination of instant messaging and chat rooms allows members in the group to direct private comments to the therapist or to one another during the group discussion.

Numerous instant messaging applications are available for free downloading or access through websites. Because privacy policies and security features may vary from one application to the next, it is important to read thoroughly the "terms of use" to which one must agree prior to using a particular program. Some medical practice websites have instant messaging and chat room capabilities.

### Texting and mHealth

Recent years have witnessed a dramatic increase in publications about applications for texting and mobile phones (including smartphones) in healthcare. The con-

© Copyright, American Psychiatric Association, all rights reserved.

venience and improved technology of portable electronic devices has led to a significant shift toward mobile computing and away from the traditional desktop personal computer, at least among consumers. Many individuals now access the internet primarily through mobile phones or tablet computers, and this trend appears to be increasing. Potential applications for texting and mHealth (health applications via mobile phones) are numerous and constantly expanding, as developers roll out new health "apps" (applications) on nearly a daily basis. With new apps come new opportunities as well as new risks. Providers interested in using mHealth applications or texting with patients would be well advised to stay current on the emerging research and should take special care regarding the security and legal implications of these new technologies. It may be advisable to consult with one's liability insurance provider, information technology providers or staff, and/or a legal professional prior to initiating the use of such applications with patients, as the relevant risks and security considerations are continually evolving and changing.

## Technological Safeguards and Risk Management

Fortunately, there are many affordable technological measures that can increase the security of electronic communications. If the physician chooses NOT to use any of these security features, the decision not to use them should be discussed along with other risks in the informed consent process. To avoid liability, however, it is not advisable to practice e-therapy or telepsychiatry if one does not have the appropriate technology to ensure reasonable security, confidentiality, and privacy. The informed consent discussion should address not only security risks and safeguards, but also the clinical and practical drawbacks and alternatives, as discussed elsewhere in this document. Below are only some of the options available to decrease risks.

### Passwords
All computers and internet accounts should be protected with passwords for log-on. Some e-mail software enables the user to download e-mail automatically through stored passwords; disabling this feature can increase security. Some internet protection software includes additional password protection features. Interactive medical practice websites can be configured to require secure patient and provider log-ins and passwords in order to activate messaging features. For maximum security, passwords should be case-specific and contain a combination of letters, numerals, and special characters. Users should create different passwords for different applications, and passwords should be changed periodically. Patients and

physicians should not share with others any passwords used for accessing sensitive personal information.

### Screen savers
Most medical offices should set computer screens in a way that prevents passers-by from viewing the contents of the screen during the ordinary course of business. When unattended, computer screens should be obscured by a screen saver program. Ideally, the screen saver program should be supplemented by a security algorithm that automatically logs the user out and requires the next user to log in again. If the physician's computer is in a setting in which others may see the screen as they walk by, a screen saver with password protection may be used. Additionally, for providers who use portable electronic devices such as smartphones or tablets, privacy-enhancing screen protectors can help to lessen the likelihood of an inadvertent confidentiality breach.

### Anti-virus software
Anti-virus software is a must for anyone using the internet. Anti-virus software scans computer files for viruses and other malware (such as Trojan horses) and quarantines infected files. If an essential file is corrupted with a virus, anti-virus software and the virus protection service usually provide resources to help repair the infected file. Additionally, anti-virus software allows the removal of viruses from the computer so that the user may safely resume use of the internet without unwittingly transmitting the virus to other computers. Some anti-virus packages include software that assists in backing up the hard drive onto recovery disks in the event of a systemic shutdown from virus infection. Most anti-virus programs require annual subscription renewals to keep virus definitions up-to-date and effective against newly emerging threats.

### Anti-spyware software
Spyware is software often used by advertising companies to track an individual's online activities. Users are often unaware of the existence of these programs on their computers, and anti-spyware software is usually necessary to detect and remove them. Like anti-virus software, anti-spyware programs scan the computer for malicious software and assist in their removal. Some anti-virus software packages include anti-spyware applications.

### Firewalls
A firewall protects a computer from intrusion attempts, which may come from hackers or harmful software. Firewalls, which are sets of related programs, are located at the level of the gateway server network. Together, they form a security protection system that includes software, hardware, and often a router, which is situated between a private network and outside networks. The firewall screens user names, source addresses, destination addresses, and

© Copyright, American Psychiatric Association, all rights reserved.

all other information that is entering or leaving the private network. The firewall system allows, denies, or limits access to the private network, depending on the system rules. A customized firewall may firmly deny access to confidential information on a website while permitting open access to the homepage. In medicine, firewalls help to protect electronic patient records and other medical data from outside users or other unauthorized networks. Firewalls can be programmed to protect various components of a computer network so that no incoming request can gain access to segregated data. A simple firewall could be used to keep all electronic patient records on a separate computer or server.

### Encryption

Encryption programs may greatly enhance the security of electronic communications, particularly doctor-patient e-mail. Encryption provides secure transmission of confidential information as it passes over the internet from a patient's browser to the physician's server. It is a software coding procedure that converts plain text into a disguised file or message using a mathematical algorithm. In order to transform the document back into readable plain text, one must know the key to the code.

The internet standard for encrypting web-based information interchanges is based on two protocols, Secure Sockets Layer (SSL) and Transport Layer Security (TLS). SSL/TLS is a two-key system, involving an encrypt/decrypt key at the browser and an encrypt/decrypt key at the server. The keys for this symmetric encryption are generated uniquely for each connection by a pseudo-random number generator (PRNG) and are related to each other by a complex mathematical formula. The longer the string of digits used in the keys, the harder the encryption is to break. The only method for breaking an encryption is by trying every possible key. The keys only work between the browser and server for the duration of the connection, and the encryption dies when the session is terminated. Length of key structure combined with the short time of operation highlights the effectiveness of encryption as a data security measure.

The patient and physician can discuss whether or not to use encryption technology. The education of the average consumer about encryption technologies and the expenses associated with their use may be too high a barrier for the average consumer and too cumbersome for the physician. Encryption which has not been appropriately established may preclude the doctor from even knowing who is corresponding with the doctor. Furthermore, providers and patients should know that even the highest levels of commercially available encryption cannot guarantee security—the recent disclosure that the United States National Security Agency (NSA) has the capacity to "crack"

most any form of encryption serves as a reminder that motivated parties can achieve access to data even when it is protected by vigorous security measures. Where the use of encryption is impractical, security may be enhanced through other measures discussed elsewhere in this document.

### E-signatures

Some commentators have suggested that an e-mail may be sent by someone masquerading as the patient, e.g. by a spouse who has access to the patient's e-mail. Other times, a patient may deliberately mislead as to his or her own identity. The Electronic Signatures Act provides a way to have near-perfect authentication and identification. The doctor would then know the identity of the person sending the e-mail. Anonymity would not be possible. Although electronic signature technology has been accepted as legally binding for purposes of contract law, the process of registering an e-signature is cumbersome and may not be practical for individual patients for several reasons, including the expense involved. Nonetheless, as technology evolves, the use of e-signatures may become less costly and more user-friendly over time.

### Audit trails

Audit trails, similar to their accounting counterparts, are electronic or paper logs that are used to track computer activity. Audit trails can be used to monitor a number of medical office activities, including determining who has had or attempted to have access to patient records, recording of patient contacts, and payment for services. They are also used to investigate the occurrence of hacker activity or other cybercrimes involving medical practices. HIPAA requires that a record of some disclosures of personal health information be maintained and reported to the patient on request. A computer audit trail would help maintain this record of who has had access to the e-mail record.

### Authentication and patient registration

Security can be increased using a web-based messaging system that requires a secure log-on. This process requires the doctor to establish a website, e.g., through a practice-hosting service. The patient can access a messaging application after logging on and providing a password. Strictly speaking, this is not "e-mail," but it functions in a similar way. The use of this technology provides added security without the cumbersome aspects of encryption. The system may also collect identifying information (such as name, address, date of birth, and telephone number) before the patient is able to access the interactive aspects of the website. As a condition of registration, a patient may be required to acknowledge that he/she has read and

© Copyright, American Psychiatric Association, all rights reserved.

understood the physician's privacy policy and terms of service and is willing to abide by them. Patient registration decreases liability exposure by providing a mechanism to authenticate a patient's identity and to document the patient's consent. Each time that a patient wishes to access the interactive aspects of the website, the patient must sign in with his/her user name and password. This technology authenticates the identity of the correspondents and ensures that confidential information will not be lost or copied in transit over the internet.

### Networks and connection issues

Most employers who provide internet access to staff members do so via a firewall-protected network. However, always-on connections, such as network connections, are more vulnerable to security threats. Anytime a computer is connected to the internet, the computer has what is known as an IP (Internet Protocol) address. The IP address is essentially a digital location of the computer in cyberspace. If the IP address is unchanging, as is often the case on university networks, there is an increased vulnerability to hackers and other intrusion attempts. To combat these threats, in many networks the information technology or information services department may screen employees' e-mail and other electronic data. While having the protection of a dedicated IT department can help to reduce security risks, physicians should familiarize themselves with the IT policy and maintain HIPAA compliance with updated privacy notices if necessary.

### Comprehensive security packages and computer maintenance

Many website-hosting services include sophisticated security tools, and several companies offer comprehensive internet security software packages with subscriptions to ongoing updates for continued protection. These packages may include anti-virus software, anti-spyware software, a firewall, anti-spam software, and password protection. Some provide tools to remove "cookies" and other unwanted files from the computer. Viruses and other malware are continually evolving, and renewed subscriptions are necessary to keep the software up-to-date.

Ongoing computer maintenance also performs a protective function. The physician and patient should both conduct periodic scans of the computer to detect and remove unwanted "cookies" and corrupted files. Subscribing to internet security newsletters and bulletins can confer additional protection. These subscriptions will help to keep the practitioner advised with respect to newly emerging threats so that appropriate safeguards may be used. For example, security alerts may notify the user of viruses for which no virus removal tool yet exists. Tips and suggestions may include temporarily avoiding the use of vulnerable programs until virus definitions and removal tools have been updated. Staying abreast of internet security news will help both the practitioner and the patient to remain safe.

### Data breach prevention and management

The risk of data breaches is an unfortunate but inevitable consequence of the shift toward electronic and remote-storage data access. Data breaches constitute a significant and increasingly expensive source of liability in the health sector. Although a thorough discussion of data breaches and their prevention and management is beyond the scope of this resource document, providers should be aware of the risks and stay informed of new developments, including applicable laws and regulations as well as newer technological safeguards. Keeping antivirus software and security patches up-to-date helps to lessen the risk of a breach through remote access (i.e., hackers), as does restricting mobile access to confidential health information.

The risk of data breaches may be minimized by avoiding the clinical use of mobile storage technology, as theft of USB flash drives and tablet computers represents one common source of data breaches. Many data breaches have resulted from inappropriate staff access to patient electronic records; audit trails, discussed above, can help to mitigate this risk and to identify the source of a breach if one occurs. Providers should also be aware that data breach insurance is available to help cover the expenses associated with a breach, should one occur. Laws such as HIPAA and the HITECH Act have requirements for notifications in the event of a data breach; psychiatrists who use electronic technology to handle patient information should have a policy in place for dealing with potential breaches of confidential data.

## Legal Issues

While information technology offers numerous benefits to physicians and patients alike, it also opens the door to a wide variety of legal concerns. Legal issues may vary depending upon which technology is being used and how it is being used. This document does not aim to address all possible legal concerns related to the use of information technology in clinical psychiatry, but to provide some starting points for further reflection and research. There are several aspects of website management that may benefit from a professional legal consultation. Legal experts can advise physicians on specific details of licensing, jurisdiction, copyright infringement, HIPAA compliance, and disclaimer language.

### Laws and regulations

A familiarity with federal and state laws and other regulations is imperative to ensure compliance with regulations regarding websites and medicine. Some state laws, for example, require that a physician meet with a patient

© Copyright, American Psychiatric Association, all rights reserved.

face-to-face before the physician is authorized to prescribe medicine or treat the patient online. States are permitted to have more restrictive confidentiality rules than the HIPAA rules, and every state has some legal requirement of confidentiality of medical records, particularly with regard to psychiatric records. How these are applied to e-mail is often unclear. Additional commerce, advertising, and communications regulations apply to websites and other uses of information technology in healthcare. This document details some of the more common concerns.

## Licensing

A mental health care provider working from an office in State A, when treating a patient who lives in State B, might need to be licensed and authorized to work as a mental health professional in State B. He/she may also need to be familiar with the applicable laws in State B. Similarly, providing services to patients outside of the United States often necessitates familiarizing oneself with the laws of each patient's country and verifying that one is authorized to provide services via internet in that region. If a physician provides e-therapy services to someone without being licensed in the patient's home jurisdiction, the physician's malpractice insurance company may not be obligated to pay a judgment or even to reimburse associated legal fees if the patient initiates a lawsuit. States and countries have their own laws and regulations for medical and counseling services, and many of the local regulations place additional restrictions on services. In Oklahoma, for example, a physician was sanctioned by the state medical board for conducting appointments via Skype. Online interactions between a physician and a patient are subject to requirements of state licensure. Aside from incidental communications, contact online with a patient outside of the state in which the physician holds a license may subject the physician to increased risk. If either the physician or the patient is traveling, or if by happenstance the physician's office is in a different state than the patient's residence, e-mail contact (like phone calls) would usually be deemed incidental, and the issues of medical licensing may not arise. It bears noting that a local licensing board can be an important resource for information about jurisdictional issues; however, ultimately it is the provider's responsibility to ensure that one is in compliance with the applicable licensing rules.

## HIPAA

Originally enacted in 1996, with subsequent regulations issued for medical confidentiality, HIPAA is a federal law that applies to physicians who are involved in the electronic transmission of patient data. The prudent psychiatrist must remain aware of these regulations and how they may affect one's clinical practice. HIPAA requires physicians to develop a security policy for medical data and to notify patients about the privacy procedures in effect for the practice. If a physician's practice falls within the HIPAA definition, then one's practice website should contain a HIPAA-compliant privacy policy to inform patients how their medical information may be used and disclosed and how the patient can get access to this information. Furthermore, e-mail that contains protected health information would need to meet standards consistent with both the Privacy and Security Rules.

HIPAA also applies to e-therapy if a service provider is otherwise a covered entity subject to HIPAA. HIPAA regulations require that service providers who manage patient data observe rules of privacy and confidentiality and also inform their patients about the procedure, safeguards, and risks to privacy that may be involved. Physicians using electronic applications will need to use the appropriate technological safeguards to ensure confidentiality of patients' protected health information to avoid a violation of HIPAA regulations.

Many providers now use third-party applications (i.e., programs such as Skype, or Apple's FaceTime) for video-conferencing. Some of these services state that they are fully secure and private, but providers need to consider the full scope of HIPAA and other confidentiality practices when considering whether these third-party applications are in fact HIPAA compliant and appropriate for the practice of medicine. For example, while many third-party applications advertise confidentiality, they may not be able to notify you when there is a security breach or be able to generate an audit trail. Such entities, when they have access to PHI, may be defined as "business associates" under HIPAA, thereby triggering the need for specific agreements and HIPAA compliance by the third party.

HIPAA provisions and regulations apply to all electronic communications to some degree, depending upon how the doctor chooses to incorporate information and communications technology into the practice. For example, videoconferencing with a patient may raise certain privacy issues, but unless the interaction is saved on a server it may not trigger comments about storage and retrieval of the conference from the patient's medical record.

The HIPAA omnibus rule (published January 25, 2013, compliance deadline September 23, 2013) requires amendments to existing Notices of Privacy Practices and contains additional provisions regarding access to PHI and data breach notification and mitigation. The specifics of the HIPAA omnibus rule and other HIPAA regulations are beyond the scope of this document, and providers should note that these regulations and requirements may change over time. The best strategy to mitigate risk and ensure compliance is to be proactive about staying informed of

© Copyright, American Psychiatric Association, all rights reserved.

developments in HIPAA and its implementation. HIPAA noncompliance is potentially very costly, with penalties up to $1,500,000.

## Copyright and related issues

A number of practices that are common in the development of websites raise issues related to copyright infringement. Hyperlinking, the practice of linking one website to another, sometimes warrants requesting the permission of the linked website's owner. Many website owners will not permit a link that bypasses the website's home page, a practice known as deep linking. Another practice that raises potential legal issues is called framing. Framing involves pulling content from one website and putting it into a frame on another website without referencing the source. This practice is essentially plagiarism. Content for a website should not be taken from another website without properly recognizing the true source of the information.

Meta-tags are invisible words and software codes embedded in a website which, although invisible to visitors, are detected by web search engines for indexing purposes. Legal issues arise when a company puts the name of its competitors or other trademark names in its meta-tags in an attempt to attract customers. For example, an overzealous physician eager to get new patients may wish to embed the names of common psychotropic medicines as meta-tags on his/her practice website. Although this may seem like a good form of indirect advertisement, the unauthorized use of these names constitutes a trademark infringement. Using prescription medicines to advertise one's medical practice might raise additional ethical concerns. A number of other practices that are common in the design and development of websites can lead to claims related to intellectual property, communications, or commerce regulations. For a detailed explanation of these practices and their risks, consultation with an attorney is advised.

## Evidence in legal proceedings

Electronic communications between doctors and patients, like any other medical records, are subject to discovery and court orders. Unlike a progress note, which can be "sanitized," e-mail and IM transcripts contain the exact words of the participants. Psychiatrists and therapists typically structure their notes to protect patients and third parties from disclosure of inappropriate material such as fantasies. E-mail is more like a complete transcript and therefore is potentially more revealing. When e-mail is sought in discovery, the expense of searching for the e-mail is usually borne by the party obligated to produce the material. This process may be burdensome to an individual practitioner and very expensive to a group practice. The vulnerability of electronic communications to subpoena and search warrant may be especially troubling to patients

who are involved in legal proceedings such as family court (divorce, custody disputes, etc.) or criminal prosecution.

## Liability and malpractice exposure

The addition of any new technology to a clinical practice often affects the physician's liability risk. Care should be taken to avoid the initiation of a physician-patient relationship solely through online interaction, as this can increase liability exposure (Recupero, 2005). Prior to engaging in online communication, a physician should obtain informed consent from the patient regarding the appropriate use and limitations of online communication. A physician may be held responsible for the credibility of any information made available on his/her medical practice website. Information that is provided on a medical practice website should come either directly from the physician or from a recognized and credible source. If a practice website includes links to external sites, then patients will be able to connect to other websites directly from the physician's website. A physician may reduce liability for information on linked websites through the use of security alerts. A security alert pops up when a patient clicks on a link and notifies the patient that they are leaving the physician's secure website.

An interactive website may increase liability exposure by initiating a physician-patient relationship solely through online interaction. If one replies to an e-mail or other communication from someone who is not currently a patient, one should always include a disclaimer to avoid any liability from a perceived physician-patient relationship. Using the telephone, some physicians have been found liable for "advice" they have given members of the public who have contacted the physician even if there was no pre-existing doctor/patient relationship. E-mail and other forms of electronic communication can potentially give rise to similar liability.

Under no circumstances should the physician give advice of any kind to "strangers" who are not already patients of the practice. Even a "strong" disclaimer such as the following can be made moot by giving any advice: "I do not correspond on clinical matters by e-mail. This response in no way creates a doctor/patient relationship between the sender and the recipient." Even giving advice to established patients has risks. When a physician discusses a concern or symptom with a patient, the possibility of continued questioning for purposes of clarification is present. However, in an exchange of e-mail, the physician does not have the ease of communication that face to face or telephonic communication provides. Therefore, the physician should understand the exact nature of the patient's concern before making a recommendation or ordering a treatment. The physician might include in a routine signature a statement instructing the patient to take certain steps if they are in any way concerned with their condition. E-mail provides a documentation of the

© Copyright, American Psychiatric Association, all rights reserved.

advice given, which if not followed by the patient may protect the doctor.

In most cases, a therapist-patient relationship will be established by e-therapy. The distinction between providing information and providing advice is not always clear. Disclaimers for many e-therapy websites describe the service as informational or educational, even when the sites serve as portals to counseling services by licensed mental health clinicians. A common disclaimer warns visitors that the service being offered "is not intended to be a substitute for face-to-face professional advice." The depressed person who visits a website's homepage will read the promotional language but may not find the disclaimer in the "Terms & Conditions" link in small print at the bottom of the page. While the website may claim that practitioners offer information rather than advice, the client or consumer may rely upon this information as he would rely upon advice from a face-to-face treatment. Websites should be configured so as to avoid this kind of ambiguity and confusion. Where a clinician touts his credentials (e.g., Dr. G, M.D., Psychiatrist) but provides a service akin to "coaching" rather than psychiatric treatment, he/she may be estopped from further use of those credentials to advertise the practice.

Some malpractice insurance carriers will provide coverage for telemedicine at no additional cost to the insured. However, such coverage often is not automatic; one may need to contact the carrier and specifically request the initiation of coverage for telepsychiatry or e-therapy.

**Disclaimers**

All medical practice websites should have a disclaimer. The disclaimer should include language similar to the following:

> "Users of this website accept full responsibility for use of information from this site and any sites linked to or from it. We do not make any representations to its completeness or appropriateness for a particular purpose. The content of this website is not intended to treat or diagnose any medical or psychological problem. Use of this website is not intended to be used as a substitute for medical or psychological care by a qualified professional. We are neither responsible nor liable for any claim, loss or damage resulting from use of information on this site. The mention of a specific product or service does not constitute a recommendation unless so stated. Check with your healthcare provider before changing your healthcare regimen."

A disclaimer should be located, along with the website's privacy policy, in a prominent and easily accessible place. The disclaimer should state that the content of the website, and any services contained therein, is not intended to, and does not, provide medical advice, diagnosis, or treatment. Ideally, the disclaimer (and privacy policy) should appear the first time users register at the site, requiring them to "agree" (vs. "disagree") to the terms of the service as a precondition to accessing any interactive portions of the website. In all cases, the disclaimer should be prominently displayed and easily accessible from the website home page. Physicians should have a prepared disclaimer to send to those who send e-mail seeking clinical assistance but do not have an established doctor/patient relationship with the physician. The disclaimer should clearly state that no relationship is being created by e-mail. If the doctor suggests that the inquirer make an appointment, the e-mail should remind the potential patient that no doctor-patient relationship will arise until an agreement is made during the appointment.

## Benefits of the Technology

In the sections that follow, which weigh the risks and benefits of various technological aids, this document primarily addresses the direct provision of care (i.e., e-therapy). The interested provider, however, will note that each of the several options available will have its own risk/benefit calculation, which will further be informed by individual patient considerations. Psychiatrists should carefully consider the use of a particular technology not only regarding its specific characteristics but also regarding its application to the specific context in question.

**Convenience**

The internet can offer a great deal of convenience to clinicians and patients alike. E-therapy may allow patients access to mental health services during all hours of the day and during every day of the week, which can be helpful to patients who work long hours. E-mail, in particular, can help to eliminate "phone tag" problems, as it can be sent and answered at any hour. Physicians can respond to e-mail from anywhere in the world, and patients can access their doctors from virtually anywhere. The physician and the patient need not be available simultaneously in order to communicate effectively by e-mail.

Through e-mail and an interactive practice website, patients can utilize online appointment requests and reminders, place prescription renewal requests, and contact office staff with other administrative or billing questions, even at night or on weekends. Many providers have begun to use text message-based appointment reminders and confirmations. Some patients appreciate the convenience this affords, but the provider should obtain the patient's permission before sending text messages, and should allow patients to opt-out of receiving such messages, as they may incur additional charges for the patient, depending upon his or her data service plan. Practice websites can also facilitate appointment setting,

© Copyright, American Psychiatric Association, all rights reserved.

confirmations, and cancellations by the patient. A physician can efficiently address many patient requests through electronic communication, reducing the burden of interruptions from non-urgent telephone calls and pages. Some electronic correspondence can be incorporated directly into a patient's electronic medical record or other clinical records, potentially reducing the clinician's paperwork burden.

### Documentation

In most forms of internet communication, a written record is easily (often automatically) created of all communications. Patients and clinicians can have a permanent record of the communication to refer to as needed. This record can be helpful in following through on detailed instructions or giving the patient guidance on when to seek additional medical attention. The automatic documentation can save time previously spent on manual, handwritten documentation and can increase the amount of information retained in the record. As noted later in this document, however, there are potential drawbacks to the automatic creation of detailed transcripts of communication between the psychiatrist and patient.

### Increased range of options for communication

Some individuals are better able to express themselves in writing than verbally. E-therapy can utilize both synchronous (simultaneous, e.g., video conferencing) asynchronous (time delayed, e.g., e-mail) forms of communication. A patient may compose an e-mail or message immediately as a problem occurs instead of waiting for the next scheduled appointment. In e-mail communications, there is no time limit on how long a patient may take to compose and organize a thought, and the physician will have more time to think over the issues before sending a response. Because e-mail is an asynchronous form of communication, both sides are afforded the opportunity to reflect upon messages for extended periods of time without the pressure of filling ⸺awkward silences⸺ in face-to-face interactions. On the other hand, the physician will be unable to interpret awkward silences and other important metacommunications that do not come through in e-mail.

### Increased access to care

Telemedicine enables providers to serve patients who otherwise would not receive care. For example, relief organizations are able to provide e-therapy services to patients in unsafe, war-torn areas, such as refugees in politically unstable regions. Other initiatives provide service to patients and expert consultation to local physicians who are too geographically remote to otherwise receive care. This increases the number of potential patients for a practitioner and also increases patients'

access to needed care. Similarly, electronic therapy can enable psychiatrists and patients who are engaged in a face-to-face treatment to remain in contact when one or both are out of the area due to work or vacation. Telepsychiatry and e-therapy are also accessible to those who for various reasons (disability, agoraphobia, paralysis, chronic disease, etc.) have difficulty leaving their homes. Instant messaging and videoconferencing allow for real-time interaction between a psychiatrist and patient from different time zones. Furthermore, technology may help to increase access for patients suffering from rare conditions or treatment-resistant illnesses, as electronic communication may bridge geographical gaps between these patients and experts and specialists.

A growing number of patients have indicated a preference for internet-based counseling and e-mail access to their physicians' offices. The use of the internet may alleviate some patients' fears about confidentiality and stigma. Some patients are wary of seeking face-to-face mental health services, because they fear that acquaintances may see them and recognize them on their way to and from services. Others may be uncomfortable discussing sensitive topics in person and may avoid seeking help in a face-to-face setting. The perceived anonymity in internet communications may enable some patients to be more forthcoming, thereby facilitating more therapeutic progress.

### Patient education and referrals

Numerous research studies have demonstrated a growing trend for healthcare consumers to conduct health-related research on the world-wide web. Many families use online health plan provider directories when selecting a physician. These directories often include links to physician practice websites. A practice website allows potential new patients to conveniently access detailed information about the doctor's practice (for example, office hours, special areas of expertise, insurance types accepted, etc.) without contacting the office. Medical practice websites can also be important tools for disseminating accurate health information to patients and prospective patients. Websites can be designed to contain a large volume of educational information that cannot be conveyed in a brief, 15-minute office visit. For example, the clinician may wish to include on the website a detailed description of different types of therapy available through the clinic, with links to high-quality medical information on the web if the patient desires to read more in-depth information about his or her condition. Patients often have many questions about their treatment, and an informative website may help them to find answers without unnecessary office visits or phone calls. Web- and mobile phone-based applications also provide opportunities for patient education, for example, by providing easily

© Copyright, American Psychiatric Association, all rights reserved.

TELEPSYCHIATRY IN CLINICAL PSYCHIATRY

accessible references, tools for tracking health-related behaviors (such as nutrition or sleep), or means for cognitive-behavioral assignments.

The internet can facilitate immediate referrals to further reading and adjunctive resources. The psychiatrist can send links to support groups, educational medical websites, or information about prescriptions to support informed consent. Physicians can combat online misinformation and participate in patient education by linking their own websites to various known websites that provide quality content. By supporting patients' use of the internet for self-help and education, psychiatrists can help their patients to become more effective advocates and partners in their own care.

## Risks and Drawbacks to the Technology

The risks associated with the use of the internet in clinical psychiatry vary by context and by the extent of the internet's role in the physician's practice. For example, interactive websites present a greater opportunity for risk (e.g., by compromising confidentiality) than basic, informative websites. E-therapy is among the more controversial uses of the internet, and physicians may be cautious about it for several reasons. For some, the technology is a barrier—learning how to use encryption software may seem tedious and overwhelming, for example. Others are wary of malpractice liability. Some may believe that e-therapy is not an appropriate means of practicing psychotherapy at all. A practitioner should be thoroughly aware of the actual risks and limitations of using information technology in clinical practice so that appropriate safeguards may be used and patients can be fully informed. The following list of risks and limitations is not intended to be comprehensive.

### Confidentiality and security

All forms of communication have a level of insecurity associated with them. Contents of postal mail, telephone messages, and facsimile transmissions all may be revealed in inappropriate ways. Just as physicians are required to use appropriate care in using these traditional forms of communication, due care is required when using electronic communication. However, the elements of due care must be appropriate to the medium of communication and proportional to its risks. While some patients may perceive increased confidentiality in online communication, the reality is that the use of the internet can increase the risk for a breach of confidentiality if practitioners (or patients) are not diligent in the application of security measures. Viruses, hackers, spyware, and other threats are continually evolving alongside the development of security measures. Although it is a criminal offense, a hacker may gain illegal access to remote servers and access patients' protected health information or the office's financial records. Viruses have the capacity to shut down websites and contaminate hard drives. Choosing an internet provider with a secure network and excellent anti-virus software can help guard against these security risks.

Most e-mail is not completely secure, in that it may be monitored, misdirected, or read inadvertently at the sender's or the receiver's computer. If the doctor forwards e-mail to a home account to answer at the end of the day, security issues again arise. The location of the e-mail on another computer system increases the risk of inappropriate disclosure. Although it is relatively more difficult to intercept an e-mail communication than it is to intercept a portable telephonic conversation, most would recommend the use of extra care in case the transmission is misdirected. When a doctor calls a patient's home and does not reach the intended person, no information may be disclosed. In contrast, an e-mail arrives at its destination with all the intended communications visible. It bears noting that similar concerns may arise regarding telephone contact between psychiatrists and their patients. If the psychiatrist calls the patient's home, the doctor's information may appear on the caller ID screen, potentially compromising the patient's confidentiality. In e-mail communication, an inadvertent misspelling or misidentification on the "To" line may send the message to an unintended recipient. Furthermore, providers must be cautious about the use of third-party email services, as some of these may technically "own" the contents of messages on their servers.

Patients should be cautioned never to use an employer's computer, network, or e-mail address for communication with the physician unless the patient wants the employer to be able to see the communication and any response. In many states, an employer can freely access all e-mail in its systems. Similarly, both patients and physicians should try to minimize the risk of intentional or inadvertent interception or viewing of sensitive patient information via shared family computers or accounts.

Virtually all ISPs (Internet Service Providers) and internet nodes screen e-mail for security purposes. Patients who describe delusions of a political nature may find that the government takes an interest in them. Computers and electronic communications belonging to patients involved in the legal system may be subject to search warrants or subpoenas. Although a live person may not be screening all e-mail, there are significant possibilities that the e-mail will not remain strictly between doctor and patient. Will the physician's office staff have access to the e-mail, or will the doctor be the only one to read it? In the usual telephone conversation the patient can censor information being transmitted depending on the

© Copyright, American Psychiatric Association, all rights reserved.

listener. However, with e-mail, the private information may be included for all readers.

The patient needs to know under what circumstances the information contained in electronic communications may be transmitted by the doctor to another agency. For example, the doctor may use the information or even a transcript to document for managed care approvals. A specific release of information should be executed by the patient prior to releasing communications to third parties.

### Misunderstandings and misdiagnosis

Misunderstandings and confusion can occur in electronic communications. The emotional tone of a text-based conversation is often ambiguous, leaving room for intended sarcasm to be interpreted literally or for a gesture of kindness to seem hostile. Furthermore, technical aspects of electronic communication can lead to misunderstandings or other failures in communication. For example, e-mails from a patient may wind up inadvertently blocked by the doctor's spam filters or vice versa. Patients' use of "net slang" or "text-speak," such as "lol" ("laughing out loud"), in communications with the psychiatrist may lead to misunderstandings or difficulties in communication. The provider and patient may wish to discuss and clarify how abbreviations and internet slang will be used in the communications.

The choice of screen names is but one example of many ways in which confusion may arise. Although screen names may provide some anonymity, patients may "sign" their e-mails with a complete name and other pertinent information such as telephone number and street address. This will facilitate rapid contact should it be required, but it may also compromise confidentiality if a message is intercepted or misdirected. The use of a screen name may provide added privacy and security or may increase the possibility of confusion of identities. When an e-mail from a known patient is received in the office, the patient's name may not necessarily be used as the screen name or e-mail address. Casual readers of the screen or the e-mail would not necessarily know the true name of the sender. Conversely, the doctor may not recognize the name and delete the message. The doctor may also confuse screen names between patients and disclose information inappropriately. Patients may have different screen names through different accounts, and this may increase the possibility of confusion.

### Emergency Management

Telemedicine requires particular cautions regarding emergency management. Most sources discourage the use of e-therapy for suicidal patients, for example. Psychiatrists who provide services remotely may not be familiar with local resources in the area of the patient. The internet is extremely limited when emergency intervention is required. In order to practice remotely, clinicians may

need to make the extra effort to learn local resources or consult with services in that area.

### Computer Literacy

Patients will require some degree of computer literacy in order to benefit from e-therapy services. They will need to use specific computer services and set up their overall information technology infrastructure reliably in order to maintain continuity of care. Providers also need to assess patients' technological savvy as part of the overall assessment of appropriateness for telemedicine, which creates an extra step in the assessment process. Furthermore, the providers themselves may need to develop proficiency in the practice of telemedicine. Providing care online is in many ways a unique skill. Providers might need practice looking at a camera (i.e., rather than the screen), choosing the optimal backdrop and angle, speaking clearly, and otherwise becoming comfortable practicing online.

## Ethical, Clinical, and Practical Issues

### Content of practice websites

A medical practice website provides a convenient avenue for delivering medical and health care information and resources. It is incumbent on the physician to monitor the credibility of all links available on his/her practice website. Appropriate links will lead the patient to reliable health care information from trusted sources. Appropriate links may include:

- Colleagues' medical practice websites
- Medication information websites from trustworthy sources, such as the National Institutes of Health and the National Library of Medicine (http://www.nlm.nih.gov/medlineplus/druginformation.html)
- Websites for patients' health insurance companies
- Medical news from trustworthy sources, such as the NLM (http://www.nlm.nih.gov/medlineplus/newsbydate.html)
- Professional medical organizations (e.g., APA: www.psych.org)
- Patient education resources on disorders and therapeutic strategies
- General health information resources from respected sources
- Patient advocacy and support organizations, e.g., the National Alliance on Mental Illness (NAMI: www.nami.org)

A physician should take care to avoid linking to medical information sources that serve to endorse products or companies rather than to educate. There are some links that may not be appropriate for a practice website, such as:

- Unrelated commercial websites
- Pop-up or banner advertisements

© Copyright, American Psychiatric Association, all rights reserved.

TELEPSYCHIATRY IN CLINICAL PSYCHIATRY

- Pharmaceutical companies or pharmaceutical companies' promotional websites about particular products
- Websites that promote specific treatments to the exclusion of others
- Other websites with evidence of bias

**Scope of issues for e-therapy or telepsychiatry**
Psychiatrists should weigh carefully the decision to publish e-mail addresses on their practice websites or business cards. The provider also has a responsibility to ensure that adequate security measures are taken to protect patients' privacy and confidentiality. Although some physicians will have different ground rules for e-mail, some topics may be considered entirely appropriate for e-mail or instant messaging communications between a physician and patient, such as:

- Setting, rescheduling, and confirming appointments
- Prescription refill requests
- General information, e.g., time to take medication, name and contact info for covering physician when primary psychiatrist is unavailable

Topics that may not be suitable for communication via e-mail, texting, or instant messaging include:

- Suicidal ideation or intent
- Homicidal ideation or intent
- Intent to do violence

Other topics which may not be appropriate for e-mails or IMs, particularly when risks outweigh potential benefits, include:

- Sensitive personal information, such as HIV status, illegal drug use, or criminal or embarrassing behavior
- Names or identities of third parties or information related to third parties
- Requests to become a patient

The physician should develop a message that can supportively indicate to the patient that the issue cannot be dealt with by e-mail or IM response, suggesting instead an office visit or telephone call. In addition, physicians may want to monitor the number of e-mails per patient per time period in order to address over-utilization as a therapeutic issue.

**Scope of issues for e-therapy or telepsychiatry**
Numerous issues have been addressed effectively in e-therapy, with published literature on a variety of conditions including mood disorders, anxiety disorders, substance use disorders, posttraumatic stress disorder, collaborative care for general medical conditions, and others (see bibliography for a partial listing of published

studies). Telepsychiatry has also been studied in a range of patient ages, from child and adolescent to geriatric populations. Effectiveness trials have also examined the use of telepsychiatry versus usual face-to-face practice in more naturalistic settings and have found no difference in clinical outcomes (e.g., O'Reilly et al 2007). That said, not all patients will be well suited for e-therapy or telepsychiatry. These modalities would be contraindicated for any patient for whom the risks would outweigh the benefits.

Providers need to perform an individual assessment to see if telepsychiatry is appropriate for the case in question. There may be evidence about telepsychiatry's effectiveness for a particular disorder, and this evidence should be reviewed when considering the appropriateness of the technology. However, the provider must still perform an individualized medical assessment and exercise one's usual clinical judgment regarding diagnosis, prognosis, and treatment. Additionally, such judgments should take into account factors specific to telepsychiatry, such as the client's local resources, technological proficiency, home or organizational environment, and so on. These and related factors should be assessed in an ongoing way during the course of telepsychiatry; for example, if the nature of the environment where someone is receiving care is leading to repeated interruptions, this would need to be addressed.

Some patient situations require particular caution. Of course, as part of the overall safety and appropriateness assessments, potentially suicidal, violent, or homicidal patients must be considered with particular care. Providers may wish to be cautious when treating clients with paranoia, psychosis, or other forms of disordered thinking, though it bears noting that one review (Sharp, Kobak, and Osman 2011) found no evidence for the inferiority of video-conferencing telemental health for patients with psychosis, and one other report concluded that even psychotic patients with delusions pertaining to television were able to respond appropriately to teleconferencing and did not incorporate their telemedicine experience into their delusional system (Dongier et al, 1986). In the more prosaic vein of using e-mail and other text-based communications, patients for whom extensive written records could be problematic (e.g., patients who are facing investigation or litigation, celebrities and public figures) may wish to be cautious about email and text-based communications, even if they are thought to be appropriate in a narrower clinical sense.

The mental health practitioner will need to rely upon professional judgment to determine the applicability of e-therapy for a particular patient. Some providers may have to turn away prospective patients if e-therapy is not advisable and the patient is unwilling to seek face-to-face services. Ethical standards, clinical judgment, and con-

© Copyright, American Psychiatric Association, all rights reserved.

cerns about professional liability can help to guide these decisions. Regarding documentation, in addition to usual practices regarding the informed consent and clinical assessment process, providers should consider documenting their reasons for choosing telemedicine and their thought process regarding the appropriateness of telemedicine for the particular patient.

**Telepsychiatry as "augmenting" versus "stand alone" treatment**

Telemedicine services can be used as an additional tool to enhance an existing face-to-face treatment, or it can stand alone as the sole modality of treatment for a patient. For some patients, it may be reasonable to use telepsychiatry sessions in addition to standard face-to-face visits—for example, to maintain continuity—but not to use telepsychiatry as the sole means of patient contact. Factors such as whether the patient is at their home versus an organizational (i.e., their workplace) or an institutional (i.e., a remote hospital, prison, or jail) setting will signifycantly affect this consideration. Whether to use telepsychiatry in an "augmenting" or "stand alone" fashion is an important choice that providers should carefully consider in their assessment of treatment appropriateness.

This consideration is particularly important when considering the initiation of treatment. Historically, the APA has issued cautions about the provision of treatment by telephone, letter, or audiotape, presumably applicable to internet-based treatment as well, but these opinions have been withdrawn in light of the progression of telemedicine practices.

There may be some cases in which the requirement of an initial face-to-face interview may prevent a patient from receiving therapy. If an individual contacts a mental health professional online and indicates that he/she is seeking services, the psychiatrist should be careful when wording a reply. Not all who seek e-therapy will be well suited to it. As always, the psychiatrist should assess the patient's suitability for e-therapy before allowing any treatment relationship to develop. In some cases (e.g., agoraphobia), e-therapy could be used in the beginning stages of therapy to work towards traditional face-to-face therapy as the patient's condition improves. In such cases, it may be advisable to establish contact with the patient's PCP or other referring clinician to obtain a history and face-to-face evaluation.

**Psychodynamic and boundary issues**

Although e-mail can afford an opportunity to compose one's thoughts carefully, the perceived anonymity and privacy of internet communication can also reduce inhibitions, prompting hastily written messages that may lack the thought and reflection that go into a letter or face-to-face interchange. Hence, there is a special need to check "knee jerk reactions." There is also a risk that messages may not be adequately proofed and may contain significant typographical errors that may mislead the recipient. Misunderstandings in face-to-face settings may be recognized and corrected more quickly. The "online disinhibition effect" (Suler, 2004) may also affect the doctor-patient relationship, particularly in the areas of boundaries and transference. Bhuvaneswar and Gutheil (2008) discuss psychotherapeutic and psychoanalytic aspects of e-mail and boundaries between psychiatrists and patients.

- Role of transference & countertransference in internet communications
- Professionalism, writing style, etc.
- Physician privacy; patients "Googling" the doctor's screen name or name
- Internet profiles, social networking sites (e.g., Facebook, MySpace)—don't let your patients "friend" you if you have a profile online; is it appropriate for your profile to be searchable through Google, or should you disable this feature?

Some of these issues may be mitigated by improving one's proficiency in providing telemedicine, e.g., by practicing or receiving training in the skills relevant to telemedicine such as using the technology comfortably. Courses and other forms of continuing education are available to providers who wish to improve in this domain.

**Communication Practices and Discussions with Patients**

As noted in the *Legal Issues* section, the psychiatrist has a responsibility to discuss their communication practices with patients, regardless of the scope of technology used. One role of these discussions will be to specifically address the use of technology in one's practice, outlining practices and expectations. The risks and benefits of electronic communication are sufficiently different from postal mail and telephone that the physician and the patient should have a discussion about the communication technology and its risks and benefits.

Regarding text-based communication, instant messaging, texting, the availability of e-mail on smartphones, and other technology may lead a patient to believe that the physician is immediately aware of any message. This belief may lead the patient to act on that assumption. The prudent physician would want to tell patients not to use e-mail or text messaging for any matter that cannot wait at least 72 hours to be addressed. The physician should routinely disclose information such as:

- How often does the physician check e-mail?
- How soon should the patient expect a response?
- That all requests may not be assented to automatically. The physician may want to tell patients that no assumptions should be made based on a lack of

© Copyright, American Psychiatric Association, all rights reserved.

TELEPSYCHIATRY IN CLINICAL PSYCHIATRY

response and that patients should follow-up by telephone if they do not receive a response.

The physician also cannot assume that the patient will read or receive an e-mail unless confirmation is received. In contrast with a telephonic contact, the physician has no information about whether a message was left at the patient's answering machine, with a live responsible person, or by direct contact with the patient. Psychiatrists and patients can request ―read receipts‖ on e-mails they send to alert them when the recipient has received the messages.

E-mail may be configured to send an automatic message back to the sender when the message has been read by the recipient. Although there is some risk of many ricochet messages being created when both sender and receiver have auto response working at the same time, some advisors recommend the use of this feature. E-mail can also be configured to indicate to the sender that the recipient will not see the e-mail for a specified period of time and that an alternative form of communication should be attempted for time-sensitive matters. Patients would then know not to expect responses to e-mail for a certain period. The coverage mechanism can also be communicated to the patient. However, patients who routinely use e-mail may have an expectation that the covering physician also uses e-mail. The coverage notice should provide a specific means to access the covering physician.

Both physicians and patients should have adequate mastery of basic computer and e-mail skills. Patients should understand that there are alternatives to internet technologies, each with its own risks and benefits. The patient should be aware that communication can be made via several different ways such as: telephone, office visit, mail, and/or facsimile and that each of these have their own unique risks and benefits. It is incumbent on the physician to educate the patient on the appropriate use of the internet in the physician's practice.

Other issues to consider when discussing the use of technology with patients relate to the risks inherent in the use of technology; e.g., information security, the potential for interruption, etc. Some of these risks and considerations are outlined in the Technological Safeguards section. Telemedicine services will require different considerations for (and safeguards against) potential risks, so providers will need to consider appropriate procedures and local conditions when considering how to communicate these risks and how to fully inform their clients.

Prior to beginning a course of e-therapy, the clinician should educate the patient regarding those risks and benefits and inform the patient of available safeguards and alternative options. Patients should also understand that

psychiatrists are not technology experts and cannot therefore fully educate them about all of the relevant security risks. Before beginning an online counseling practice, the provider may wish to develop informational risks-and-benefits handouts to discuss with potential clients. Physicians will undoubtedly discover new risks, benefits, and safeguards, so it may be helpful to keep a list of these factors so as not to omit important information in the informed consent process.

To minimize risk, the physician should anticipate problems and be sure to have a procedure in place in the event of problems or emergencies. This procedure should be developed prior to the provision of e-therapy, rather than improvised at the last minute when a crisis arises. The physician should also arrange with each patient a plan for what to do in the event of a computer system "crash" or a network failure. Because these technological inconveniences may interrupt services at inappropriate times, patients need to know how to contact the physician. One possibility would be to provide patients with the phone number for the doctor's office.

**Records and documentation**

A physician should adopt a policy concerning online patient communications and medical records documentation. Whenever possible and appropriate, a record of online communications pertinent to the ongoing care of the patient should be maintained as part of the patient's medical record. Just as the prudent physician makes a notation of emergency phone calls and requests for prescription refills, the physician will want to make a record of e-mail communications. Some physicians may elect to insert a hard copy of the e-mail into a paper chart or save the file directly to an EMR, while others may want to enter only a brief summary. An effective storage and retrieval process would be advisable for computer storage. Presumably, the clinical record retention rules for a given jurisdiction would govern as to the length of time the record must be preserved. Some EMR programs may have a feature allowing for effective archiving of e-mails with efficient search inquires for retrieval.

Medical records concerns may emerge in relation to online interactions between doctors and patients. Some e-mail programs and instant messaging software automatically save a written archive of all communications, even if users do not intend for them to do this. The archive may be stored on the user's device or computer; but off-site, "cloud"-based storage at a remote third-party server (or multiple servers) is increasingly common. Cloud-based file storage carries special risks and ethical considerations in the practice of psychiatry (Klein 2011). Electronic communications are often automatically saved in a computer's hard drive or backed up onto a network even after users

© Copyright, American Psychiatric Association, all rights reserved.

have deleted the files. Computer forensics experts are often able to retrieve the full contents of electronic data long after users believe they have successfully deleted the files. This problem raises issues similar to those associated with audiotaped or videotaped sessions, which create a verbatim record of the physician-patient exchange. This record would not be available in the patient's medical records following an office visit. This could be beneficial, as it allows the physician to study the interaction. However, it can also create problems with protected confidentiality if someone else gains (or desires to gain) access to the written record. To minimize risks, the psychiatrist should develop a policy and follow it carefully.

### Financial considerations

Like telephone conversations, electronic communications are often considered "incidental" by insurers and are not always reimbursed separately. Some insurers may preclude the charging of a separate fee for e-mail communication. However, fee-for-service electronic consultations and reimbursable "virtual office visits" appear to be gaining ground as viable options. In July, 2004, the American Medical Association assigned a new code (0074T) for reimbursement of online consults, and recently states have begun passing legislation for telemedicine reimbursement. Not all health insurance payers will reimburse e-therapy or other internet-based services, however, and those who do pay for such services sometimes reimburse them at a lower rate than for traditional, face-to-face treatment. If a patient wishes to use his/her health insurance to pay for internet-based services, the provider should obtain the insurance carrier's guidelines regarding claims for online services.

### Services and guidance for the virtual practice

Because the use of the internet in clinical psychiatry is a relatively new phenomenon involving rapidly changing technology and ongoing research, rules and regulations are continually evolving. It is best to follow a set of ethical guidelines established by professionals in the mental health field. Psychiatrists should consult the practice guidelines and ethical guidance promulgated by professional organizations such as the American Psychiatric Association (www.psych.org) and the American Medical Association (www.ama-assn.org) for opinions relating to the internet and electronic communications technology. Other professional mental health organizations, such as the American Psychological Association, the American Counseling Association, and the National Board for Certified Counselors, can be useful sources of additional information. The International Society for Mental Health Online (ISMHO: www.ismho.org), for example, has published ethical guidelines to assist professionals in the development of ethically sound e-therapy practices.

The American Telemedicine Association (www.americantelemed.org) is an excellent resource and has published numerous practice guidelines and documents to assist physicians who are interested in providing telepsychiatry (e.g., ATA 2009a, ATA 2009b, ATA 2013). The American Association for Technology in Psychiatry (AATP: tecpsych.com/techpsych) is another useful resource with an informative blog. Subspecialty and APA-allied organizations (such as the American Academy of Psychiatry and the Law, the American Academy of Child and Adolescent Psychiatry, etc.) may have their own guidelines and ethical opinions regarding the use of the internet and electronic media in professional practice; a partial list of these organizations and links to their websites can be found through the APA website (psychiatry.org/about-apa-psychiatry/allied-organizations). Finally, the Federation of State Medical Boards (www.fsmb.org) has produced a number of opinions and publications relating to the use of information and communication technologies in medicine.

Some physicians may choose to purchase web design software that will allow them to develop their practice website without a professional consultation. If a professional consultation is desired, there are several options available. Many hospitals and professional organizations offer web design, hosting, and maintenance services to their affiliated physicians. Professional web designers and third-party companies offer extensive web management services. A company with extensive experience in web development for the healthcare industry will understand the practical and legal implications of designing a medical website. As noted previously in this document, consultation with an attorney may be especially helpful to ensure regulatory compliance and to help minimize legal risks.

### Reputation management

With the popularity of online rating sites such as Healthgrades and Yelp, many doctors have grown concerned about the impact of negative online reviews of their practices. Before seeing a new provider, and even sometimes when deciding whether to continue seeing a current clinician, many patients go online and seek out ratings and reviews posted by other patients. Some healthcare providers, in an attempt to control their web presence, have asked patients to sign no-complaint" agreements promising not to give negative reviews on the web. Such agreements violate the basic ethical tenets of medicine and should be avoided. Similarly, attempting to remove negative comments and negative reviews through legal channels may raise ethical issues, as filing a claim may result in breached medical confidentiality (if the patient's name is revealed). Instead, providers are advised to learn more about ethical forms of reputation management. As a first step, one might perform a basic search on Google or Bing and look for outdated or incorrect information that can be corrected easily. These searches may also reveal errors or lapses in one's privacy settings on

© Copyright, American Psychiatric Association, all rights reserved.

TELEPSYCHIATRY IN CLINICAL PSYCHIATRY

various social networking sites such as Facebook or LinkedIn. If information appears in a Google or Bing search that one would prefer to keep private, it may be time to revisit the privacy settings at the site for which the problematic results appeared. An important aspect of reputation management for psychiatrists is ensuring professionalism in the use of social media (see bibliography for several resources on this subject).

**Staying informed**

Because the practices of telepsychiatry and telemental health (and the associated laws and regulations) are changing so rapidly, it is critical for psychiatrists who offer internet-based services of any kind to stay abreast of new developments in empirical research and laws and rules regulating their practices. Fortunately, modern technology offers many options for staying informed. Some providers may appreciate the convenience of subscribing to RSS feeds or e-mail listservs and electronic newsletters pertaining to their topics of interest. Malpractice carriers and law firms often produce helpful, informative, and concise newsletters and blogs that one can follow in order to learn about the critical developments affecting one's practice. A growing number of CME courses cover issues such as telemedicine reimbursement and interpreting the HIPAA rules. One may also set customized alerts in academic research databases (such as PubMed) so that one receives an e-mail anytime a new article is published on a topic of interest.

# Empirical Research

Several studies investigating the efficacy and effectiveness of e-therapy or telepsychiatry for the treatment of several disorders or conditions have recently been published, but this field developing rapidly, and the interested reader should perform a literature review to locate the latest findings. There remains a need for additional research into the use of e-therapy and telepsychiatry in the treatment of various conditions. A selected bibliography follows at the end of this document.

# Implications for the Future

Given the rapid increase in the popularity of the internet for obtaining information about mental health, a growing number of people will become aware of the availability of e-therapy and internet applications in mental health services. As knowledge of these services becomes widespread, the demand for them will likely grow. There are already numerous practitioners of e-therapy and tele-psychiatry, and this number will continue to increase. Younger generations may express a preference for internet-

enabled communications with their healthcare providers, and patients' preferences must be taken into account in order to provide patient-centered care. As the use of the internet in clinical psychiatry expands, new research studies will surface. The results of these research projects, in conjunction with evolving case law, regulations, and ethical guidelines, will formulate the standard practices and procedures in the growing field of electronic mental health services.

**BIBLIOGRAPHY**

Note: References in **BOLD** type are meta-analyses, reviews, or otherwise recommended as especially helpful.

Amarendran V, George A, Gersappe V, et al. The reliability of telepsychiatry for a neuropsychiatric assessment. Telemed e-Health 2011; 17(3):223-225.

**American Academy of Child and Adolescent Psychiatry. Practice parameter for telepsychiatry with children and adolescents. J Am Acad Child Adolesc Psychiatry 2008; 47(12):1468-1483.**

American Medical Association. AMA Code of Medical Ethics, Opinion 9.124: Professionalism in the use of social media. Opinion issued June 2011. Accessed 2 September 2013 from http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion9124.page.

American Psychiatric Association. Telepsychiatry via videoconferencing [Resource Document]. Washington, D.C.: American Psychiatric Association, July 1998.

American Telemedicine Association. Evidence-based practice for telemental health. ATA, July 2009. Accessed 29 August 2013 from http://www.americantelemed.org/practice/standards/ata-standards-guidelines/evidence-based-practice-for-telemental-health.

American Telemedicine Association. Practice guidelines for Videoconferencing-based telemental health. ATA, October 2009. Accessed 29 August 2013 from http://www.americantelemed.org/practice/standards/ata-standards-guidelines/videoconferencing-based-telemental-health.

**American Telemedicine Association. Practice guidelines for video-based online mental health services. ATA, May 2013. Accessed 29 August 2013 from http://www.americantelemed.org/practice/standards/ata-standards-guidelines/practice-guidelines-for-video-based-online-mental-health-services.**

Armfield NR, Gray LC, Smith AC. Clinical use of Skype: a review of the evidence base. J Telemed Telecare 2012; 18:125-127.

Bailey RA. The legal, financial, and ethical implications of online medical consultations. J Tech Law Policy 2011; 16:53-105.

Baker L, Wagner TH, Singer S, Bundorf MK. Use of the internet and e-mail for health care information: results from a national survey. JAMA 2003; 289:2400-2406.

Barak A, Grohol JM. Current and future trends in internet-supported mental health interventions. J Technol Hum Serv 2011; 29:155-196.

**Barak A, Hen L, Boniel-Nissim M, Shapira N. A comprehensive review and a meta-analysis of the effectiveness of internet-based psycho-therapeutic interventions. J Technol Hum Serv 2008; 26(2/4):109-160.**

**Bee PE, Bower P, Lovell K, et al. Psychotherapy mediated by remote communication technologies: a meta-analytic review. BMC Psychiatry 2008; 8:60.** Accessed 29 August 2013 from http://www.biomed central.com/1471-244X/8/60.

© Copyright, American Psychiatric Association, all rights reserved.

Bhuvaneswar CG, Gutheil TG. E-mail and psychiatry: some psycho-therapeutic and psychoanalytic perspectives. Am J Psychother 2008; 62(3):241-261.

Bosslet GT, Torke AM, Hickman SE, et al. The patient-doctor relationship and online social networks: results of a national survey. J Gen Intern Med 2011; 26(10):1168-1174.

Callens S, Cierkens K. Legal aspects of E-HEALTH. Stud Health Technol Inform 2008; 141:47-56.

Cash CD. Telepsychiatry and risk management. Innov Clin Neurosci 2011; 8(9):26-30.

Center for Connected Health Policy (National Telehealth Policy Resource Center). State telehealth laws and reimbursement policies: a comprehensive scan of the 50 states and the District of Columbia. Sacramento, CA: CCHP, March 2013.

Clemens NA. Privacy, consent, and the electronic mental health record: the person vs. the system. J Psychiatr Pract 2012; 18(1):46-50.

Clinton BK, Silverman BC, Brendel DH. Patient-targeted Googling: the ethics of searching online for patient information. Harv Rev Psychiatry 2010; 18(2):103-112.

Coiera E, Aarts J, Kulikowski C. The dangerous decade. J Am Med Inform Assoc 2012; 19:2-5.

Currie SL, McGrath PJ, Day V. Development and usability of an online CBT program for symptoms of moderate depression, anxiety and stress in post-secondary students. Comp Hum Behav 2010; 26:1419-1426.

Dongier M, Tempier R, Lalinec-Michaud M, Meunier D. Telepsychiatry: psychiatric consultation through two-way television. A controlled study. Can J Psychiatry 1986; 31(1):32-34.

**Farnan JM, Sulmasy LS, Worster BK. Online medical professionalism: patient and public relationships: policy statement from the American College of Physicians and the Federation of State Medical Boards. Ann Intern Med 2013; 158(8):620-627.**

Farrell HM, Mossman D. Practicing psychiatry via Skype: medicolegal considerations. Curr Psychiatry 2011; 10(12):30-39.

**Federation of State Medical Boards of the United States, Inc. Model guidelines for the appropriate use of the internet in medical practice. Dallas, TX: FSMB, 2002.** Accessed 29 August 2013 from http://www.fsmb.org/pdf/2002_grpol_Use_of_Internet.pdf.

**Federation of State Medical Boards of the United States, Inc. Model policy guidelines for the appropriate use of social media and social networking in medical practice. Euless, TX: FSMB, 2012.** Accessed 29 August 2013 from http://www.fsmb.org/pdf/pub-social-media-guidelines.pdf.

**Gabbard GO. Clinical challenges in the internet era. Am J Psychiatry 2012; 169(5):460-463.**

Gabbard GO, Kassaw K, Perez-Garcia G. Professional boundaries in the era of the internet. Acad Psychiatry 2011; 35:168-174.

**García-Lizana F, Muñoz-Mayorga I. What about telepsychiatry? A systematic review. Prim Care Companion J Clin Psychiatry 2010; 12(2):e1-e5.**

Goldstein MM. Health information technology and the idea of informed consent. J Law Med Ethics, Spring 2010: 27-35.

Goodman KW. Ethics, information technology, and public health: new challenges for the clinician-patient relationship. J Law Med Ethics, Spring 2010: 58-63.

**Hilty DM, Ferrer DC, Parish MB, et al. The effectiveness of telemental health: a 2013 review. Telemed e-Health 2013; 19(6):444-454.**

Hunkeler EM, Hargreaves WA, Fireman B, et al. A web-delivered care management and patient self-management program for recurrent depression: a randomized trial. Psychiatr Serv 2012; 63(11):1063-1071.

Hyler SE, Gangure DP. Legal and ethical challenges in telepsychiatry. J Psychiatr Pract 2004; 10(4):272-276.

**Hyler SE, Gangure DP, Batchelder ST. Can telepsychiatry replace in-person psychiatric assessments? A review and meta-analysis of comparison studies. CNS Spectr 2005; 10(5):403-413.**

Institute of Medicine. Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research. Washington, D.C.: National Academies Press, 2009.

Jain S. Googling ourselves: what physicians can learn from online rating sites. NEJM 2010; 362(1):6-7.

Karasz HN, Eiden A, Bogan S. Text messaging to communicate with public health audiences: how the HIPAA security rule affects practice. Am J Pub Health 2013; 103(4):617-622.

Kellermann AL, Jones SS. What it will take to achieve the as-yet-unfulfilled promises of health information technology. Health Aff 2013; 32(1):63-68.

Kenter R, Warmerdam L, Brouwer-Dudokdewit C, et al. Guided online treatment in routine mental health care: an observational study on uptake, drop-out and effects. BMC Psychiatry 2013; 13:43 [epub ahead of print]; doi: 10.1186/1471-244X-13-43.

Klein CA. Cloudy confidentiality: clinical and legal implications of cloud computing in health care. J Am Acad Psychiatry Law 2011; 39(4):571-578.

Lardiere MR. Unlocking and sharing behavioral health records: movement emerges to exchange sensitive records through HIEs. J AHIMA, April 2013. Accessed 29 August 2013 from http://library.ahima.org/xpedio/groups/public/documents/ahima/bok1_050144.hcsp?dDocName=bok1_050144.

**Lexcen FJ, Hawk GL, Herrick S, Blank MB. Use of video conferencing for psychiatric and forensic evaluations. Psychiatr Serv 2006; 57(5):713-715.**

Lo B, Parham L. The impact of Web 2.0 on the doctor-patient relationship. J Law Med Ethics, Spring 2010: 17-26.

Luxton DD, Sirotin AP, Mishkind MC. Safety of telemental healthcare delivered to clinically unsupervised settings: a systematic review. Telemed e-Health 2010; 16(6):705-711.

Menachemi N, Prickett CT, Brooks RG. The use of physician-patient email: a follow-up examination of adoption and best-practice adherence 2005-2008. J Med Internet Res 2011; 13(1):e23.

Mewton L, Wong N, Andrews G. The effectiveness of internet cognitive behavioral therapy for generalized anxiety disorder in clinical practice. Depression Anxiety 2012; 29:843-849.

Midkiff DM, Wyatt WJ. Ethical issues in the provision of online mental health services (etherapy). J Technol Hum Serv 2008; 26(2/4):310-332.

Modahl M, Tompsett L, Moorhead T. Doctors, Patients, & Social Media. QuantiaMD, September 2011.

Moreno FA, Chong J, Dumbauld J, et al. Use of standard webcam and internet equipment for telepsychiatry treatment of depression among underserved Hispanics. Psychiatr Serv 2012; 63(12):1213-1217.

**Mostaghimi A, Crotty BH. Professionalism in the digital age. Ann Intern Med 2011; 154(8):560-562.**

**O'Reilly R, Bishop J, Maddox K, et al. Is telepsychiatry equivalent to face-to-face psychiatry? results from a randomized controlled equivalence trial. Psychiatr Serv 2007; 58(6):836-843.**

Osunmuyiwa O, Ulusoy AH. Wireless security in mobile health. Telemed e-Health 2012; 18(10):810-814.

**Pho K, Gay S. Establishing, Managing, and Protecting Your Online Reputation: A Social Media Guide for Physicians and Medical Practices. Phoenix, MD: Greenbranch Publishing, LLC, 2013.**

**Recupero PR. Legal concerns for psychiatrists who maintain web sites. Psychiatr Serv 2006; 57(4):450-452.**

Recupero PR. E-mail and the psychiatrist-patient relationship. J Am Acad Psychiatry Law 2005;33(4):465-475.

Recupero PR, Rainey SE. Forensic aspects of e-therapy. J Psychiatr Pract 2005; 11(6):405-410.

Recupero PR, Rainey SE. Informed consent to e-therapy. Am J Psychother 2005; 59(4):319-331.

Reynolds Jr DJ, Stiles WB, Bailer AJ, Hughes MR. Impact of exchanges and client-therapist alliance in online-text psychotherapy. Cyber-Psychology Behav Soc Networking 2013; 16(5):370-377.

© Copyright, American Psychiatric Association, all rights reserved.

TELEPSYCHIATRY IN CLINICAL PSYCHIATRY

**Ruskin PE, Silver-Aylaian M, Kling MA, et al. Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in-person treatment. Am J Psychiatry 2004; 161(8):1471-1476.**

Sarasohn-Kahn J. The Online Couch: Mental Health Care on the Web. Oakland, CA: California HealthCare Foundation, June 2012.

Seçkin G. Cyber patients surfing the medical web: computer-mediated medical knowledge and perceived benefits. Comp Hum Behav 2010; 26:1694-1700.

Sharp IR, Kobak KA, Osman DA. The use of videoconferencing with patients with psychosis: a review of the literature. Ann Gen Psychiatry 2011; 10(1):14; doi: 10.1186/1744-859X-10-14.

Shore JH, Savin D, Orton H, et al. Diagnostic reliability of telepsychiatry in American Indian veterans. Am J Psychiatry 2007; 164:115-118.

**Shore JH. Telepsychiatry: videoconferencing in the delivery of psychiatric care. Am J Psychiatry 2013; 170(3):256-262.**

**Siemer CP, Fogel J, Van Voorhees BW. Telemental health and web-based applications in children and adolescents. Child Adolesc Psychiatr Clin N Am 2011; 20:135-153.**

Simon GE, Ludman EJ, Tutty S, et al. Telephone psychotherapy and telephone care management for primary care patients starting antidepressant treatment: a randomized controlled trial. JAMA 2004; 292(8):935-942.

Singh SP, Arya D, Peters T. Accuracy of telepsychiatric assessment of new routine outpatient referrals. BMC Psychiatry 2007; 7:55, doi: 10.1186/1471-244X-7-55.

Spielberg AR. Sociohistorical, legal, and ethical implications of e-mail for the patient-physician relationship, JAMA 1998; 280:1353-1359.

Spielberg AR. Online without a net: physician-patient communication by electronic mail, Am J Law Med 1999; 25(2-3):267-295.

Taitsman JK, Grimm CM, Agrawal S. Protecting patient privacy and data security. NEJM 2013; 368(11):977-979.

Terry M. Medical identity theft and telemedicine security. Telemed e-Health 2009; 15(10):928-932.

Thompson LA, Dawson K, Ferdig R, et al. The intersection of online social networking with medical professionalism. J Gen Intern Med 2008; 23(7):954-957.

Wagner B, Horn AB, Maercker A. Internet-based versus face-to-face cognitive-behavioral intervention for depression: a randomized controlled non-inferiority trial. J Affect Disord 2013; epub ahead of print; doi: 10.1016/j.jad.2013.06.032.

Williams AD, Andrews G. The effectiveness of internet cognitive behavioural therapy (iCBT) for depression in primary care: a quality assurance study. PLoS One 2013; 8(2):e57447.

Wisdom J, Bielavitz S, French R. Psychiatric information systems: an analysis of inpatient and outpatient unit capabilities. J Technol Hum Serv 2008; 26(1):1-17; doi: 10.1300/J017v26n01_01.

Yellowlees PM, Holloway KM, Parish MB. Therapy in virtual environments: clinical and ethical issues. Telemed e-Health 2012; 18(7):558-564.

**Yellowlees PM, Odor A, Parish MB, et al. A feasibility study of the use of asynchronous telepsychiatry for psychiatric consultations. Psychiatric Serv 2010; 61(8):838-840.**

Yuen EK, Herbert JD, Forman EM, et al. Treatment of social anxiety disorder using online virtual environments in Second Life. Behav Ther 2013; 44:51-61.

**Zack JS. How sturdy is that digital couch? Legal considerations for mental health professionals who deliver clinical services via the internet. J Technol Hum Serv 2008; 26(2/4):333-359.**

Zou JB, Dear BF, Titov N, et al. Brief internet-delivered cognitive behavioral therapy for anxiety in older adults: a feasibility trial. J Anxiety Disord 2012; 26:650-655.

*© Copyright, American Psychiatric Association, all rights reserved.*

# Exhibit G

# Telepsychiatry

Adapted from the APA Resource Document on Telepsychiatry, approved by the APA Board of Trustees July 1998

## I.    INTRODUCTION

Telemedicine is an enabling technology, originally developed to enhance access to health care for rural and underserved populations. With the development of more technology and increasing experience, it has become evident that the goal of telemedicine is much broader. Telemedicine- and by extension telepsychiatry- is becoming more widespread, less costly, and may demonstrate greater efficiency, continuity, and timeliness in the provision of medical care.  The widening scope of applications now includes hospice, support groups, substance abuse and behavioral health screenings, remote consultations that obviate language or cultural barriers, and telepsychiatric care of the deaf mentally ill via American Sign Language. Increased use of the internet for medical care implies that the computerized patient record, patient access to vast amounts of medical information, and provider access to patients anywhere in the world through the use of the internet will likely modify the practice of psychiatry and the doctor-patient relationship as we have known it.  At this time there is limited experience upon which to base clinical guidelines. Nevertheless, we must begin to address the issues. While we await more data, the following guidelines are proposed, mindful that these guidelines will be modified as the field of telepsychiatry develops.

## I.    DEFINITION

Telepsychiatry is the use of electronic communication and information technologies to provide or support clinical psychiatric care at a distance. This definition is paraphrased from the National Library of Medicine. It is the intent of this guideline to focus on the live, interactive two-way audio-video communication technology- videoconferencing. Videoconferencing has become synonymous with telepsychiatry involving patient assessment and clinical care at a distant location.

## II.    CLINICAL APPLICATIONS

### 1. Scope
Clinical applications encompass diagnostic, therapeutic, and forensic modalities across the age span. The technology appears applicable to a broad range of diagnoses, although suitability for a specific patient may depend on the individual needs of the patient at the time. Points of delivery include hospitals and their emergency rooms, clinics, offices, homes, nursing homes, schools, and prisons.

### 2. Clinical Interview
Telepsychiatry may be conducted between physicians in consultation, between health care team members, or between mental health providers and a patient. The consulting clinician's role must be clearly defined, and the patient needs to be clear as to whom is responsible for his/her care. The referring and consulting providers should clarify who

will be communicating results of the interview to the patient. If the provider is to be the treating clinician for the patient at a distance, it is helpful for them to have a working relationship with the local mental health providers; in this way the patient has available a full continuum of care which can be directed even at a distance. Availability of the treating clinician, at times other than those scheduled, should be addressed as in any practice setting.

### 3. Emergency Evaluations

In general, behavioral health emergencies such as suicidal, homicidal, and acutely psychotic patients should not be managed via telepsychiatry. If there is no other option available, telepsychiatry could be utilized while other options are pursued.  In that instance support staff or responsible family members should be available at the remote site. A provider who provides telepsychiatry to remote locations should be responsible for considering options if acute hospitalization of the patient is indicated. At a minimum, resources in the patient's immediate area should be identified and documented, and the patient informed of those options.

### 4. Other Uses of Telepsychiatry

Telepsychiatry has other applications including, but not limited to, forensic evaluations, disability determinations, and assessments of fitness for duty and return to work evaluations. It is also expected that telepsychiatry will become an important component in the use of distance learning, research, clinical supervision, and administration.

## III.   PRIVACY, CONFIDENTIALITY, AND INFORMED CONSENT

Patients have a right to privacy and confidentiality of communication, and many states recognize a higher confidentiality standard for psychiatric records. Evaluation or treatment must be performed in an environment where there is a reasonable expectation of absence from intrusion by individuals not involved in the patient's direct care. Hospital or clinic staff involved in the patient's care, family members, of telemedicine staff may at times be present in interviews. Patients should be informed about others present in the room at a distant site, if such persons are off camera. Equipment should utilize decoding/encoding technology and/or transmission over secure lines.

As with any procedure, the patient must be aware of the potential risks and consequences as well as the likely benefits of telemedicine consultation, and must be given the option of not participating. Patients should be informed that care would not be withheld if the telepsychiatric encounter were refused, although such care could depend on the availability of alternative resources.

## IV.   MEDICAL RECORDS

Medical records of telepsychiatric interventions are to be maintained as with psychiatric interviews in general. If the quality of the transmission was poor, or equipment failure prevents an adequate assessment, this should be documented in the patient record. Telepsychiatric care is subject to Quality Assurance monitoring as with other forms of

psychiatric care; procedures should be systematically monitored and evaluated as part of overall quality improvement of a facility.

## V.      LICENSURE, LIABILITY, AND TRAINING

Provider licensing requirements may vary from state to state. The provider must establish with the state board of that specialty area in that patient's state whether a license is required from that state in order to provide telepsychiatric services. Interstate use of telepsychiatry may require multi-state licensing unless a national telemedicine license is developed.

The provider should establish with his malpractice carrier whether coverage is provided for interstate use of telepsychiatry.

Training for clinical applications should include familiarity with the equipment, its operation and limitations, and means of safeguarding confidentiality, security, and safety. Providers have an obligation to stay current with the technology and its uses through continuing education.

## VI.      EQUIPMENT FOR VIDEOCONFERENCING

Selection of equipment should be based on ease of use, image and sound quality, cost, and suitability to expected applications. The major components may include monitors, cameras, CODEC (coder-decoder), desktop computer, microphones, speakers, videophones, and other technologies as they are developed. The equipment chosen should be adequate to obtain the results expected with a good evaluation or treatment done in a traditional setting. This should be a part of ongoing Quality Assurance monitoring.

## VII.      REIMBURSEMENT

Reimbursement for Telepsychiatry should follow customary charges for the delivery of the appropriate outpatient CPT code. Only those services currently covered in an office or outpatient setting will be allowed for payment.

> The covered CPT Codes are:
> Office and Outpatient visits (99201-99215)
> Psychiatric Diagnostic Interview (90801)
> Individual Psychotherapy Services (90804-90809)
> Pharmacologic Management (90862)
> Consultations (99241-99245)

An additional structure for reimbursement of collateral charges, e.g. technician time and line time, may be identified and considered as a component of Telepsychiatry.