MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
VAN SWEARINGEN – 259809
ANDREW G. SPORE – 308756
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:    mbien@rbgg.com
    egalvan@rbgg.com
    vswearingen@rbgg.com
    aspore@rbgg.com

ERIC BALABAN (*admitted pro hac vice*)
CARL TAKEI – 256229
NATIONAL PRISON PROJECT of the
AMERICAN CIVIL LIBERTIES UNION
915 15th Street N.W., 7th Floor
Washington, D.C.  20005-2302
Telephone:    (202) 393-4930
Facsimile:    (202) 393-4931
Email:    ebalaban@aclu.org
    ctakei@aclu.org

ALAN SCHLOSSER – 049957
MICAELA DAVIS – 282195
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (415) 621-2493
Facsimile:    (415) 255-8437
Email:    aschlosser@aclunc.org
    mdavis@aclunc.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. CV 13 2354 BLF<br><br>**DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT REGARDING PSYCHIATRIC STAFFING AND TELEPSYCHIATRY**<br><br>Judge:  Hon. Beth Labson Freeman<br>Date:    September 20, 2017<br>Time:    9:00 a.m.<br>Crtrm.:  3, 5th Floor, San Jose |

[3140422.2]

Case No. CV 13 2354 BLF

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE
SETTLEMENT AGREEMENT REGARDING PSYCHIATRIC STAFFING AND TELEPSYCHIATRY

1     I, Van Swearingen, declare:

2         1.      I am an attorney duly admitted to practice before this Court.  I am an

3    associate in the law firm of Rosen Bien Galvan & Grunfeld LLP ("RBGG"), counsel of

4    record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called

5    as a witness, I could competently so testify.  I make this declaration in support of

6    Plaintiffs' Motion to Enforce Settlement Agreement Regarding Psychiatric Staffing and

7    Telepsychiatry.

8         2.      On May 27, 2016, the Court approved Defendants' Implementation Plans,

9    including the Clinical Staffing Implementation Plan requiring a 40-hour-per-week

10   psychiatrist as well as an on-call "24/7" psychiatrist to work at the Monterey County Jail

11   (the "Jail").  *See* Dkt. 549 at 2; *see also* Dkt. 532, Ex. A at ECF 116 and 139-140.  On

12   August 25, 2016, Peter Bertling, counsel for Defendant California Forensic Medical

13   Group, Inc. ("CFMG"), sent me an email stating that:  "The[] psychiatric services at MCJ

14   [Monterey County Jail] are currently being provided by a tele-psychiatrist. Currently, there

15   is no full time psychiatrist on site at MCJ."  A true and correct copy of Mr. Bertling's

16   August 25, 2016 email is attached hereto as **Exhibit A**.

17        3.      On November 10, 2016, I met and conferred by phone with Mr. Bertling

18   regarding Plaintiffs' concerns relating to the adequacy of psychiatric staffing at the Jail and

19   Defendants' use of telepsychiatry.  On the call, Mr. Bertling informed me that that there

20   was no full-time psychiatrist presently working at the Jail, and that CFMG had hired

21   Dr. Cristina Breiner as a full-time psychiatrist, to begin working at the Jail on January 3,

22   2017 but for only half of the year.  Mr. Bertling explained that she would cease working at

23   the Jail in early summer.  The following day, I sent an email to Mr. Bertling memorializing

24   my understanding of our discussions.  Mr. Bertling responded the same day, stating that

25   my memorialization of the call accurately reflected the substance of our conversation.  A

26   true and correct copy of the November 11, 2016 email chain containing my email to

27   Mr. Bertling and Mr. Bertling's response is attached hereto as **Exhibit B**.

28

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE
SETTLEMENT AGREEMENT REGARDING PSYCHIATRIC STAFFING AND TELEPSYCHIATRY

4.      On January 18 and 19, 2017, the Court-appointed neutral monitor on mental health, psychiatrist Kerry Hughes, M.D., toured the Monterey County Jail.  On May 12, 2017, Dr. Hughes submitted to the parties his final report evaluating this tour.  A true and correct copy of Dr. Hughes' May 12, 2017 final report is attached hereto as **Exhibit C**.  In the report, Dr. Hughes states on page 10:

> The monitor observed a telepsychiatry session during the monitoring visit. This means of provision of psychiatric services appeared to be an acceptable and effective means of psychiatric care; however, it should not be the primary mechanism for providing psychiatric care. All attempts should be made to ensure onsite coverage whenever possible. As this was the psychiatrist's last day of providing telepsychiatry services, ongoing review of telepsychiatry is indicated. Additionally, with anticipated changes in the use of the telepsychiatrists at the facility, this issue should be monitored in subsequent visits to ensure adequate psychiatric coverage at the facility in the future.

5.      Mr. Bertling provided me with proposed revisions to CFMG's Telepsychiatry Policy on August 25, 2016, March 23, 2017, and May 11, 2017.  These revisions did not include standards for when CFMG may deviate from a typical in-person psychiatric encounter and instead use telepsychiatry.

6.      I spoke to Mr. Bertling by phone on June 5, 2017.  On that call, we discussed CFMG's position on telepsychiatry and psychiatric staffing.  Mr. Bertling told me that Dr. Breiner is no longer working at the Jail, and it is unclear whether she will return to work at the Jail.  Mr. Bertling told me that he understood that CFMG psychiatrist Dr. Taylor Fithian and Dr. McKaye (first name unknown) would provide full-time psychiatric services at the Jail.  I asked Mr. Bertling to confirm their schedules with me, and he responded that he would.  I also asked Mr. Bertling to provide me with Dr. McKaye's licensure information, and he responded that he would.  Shortly following the call, I sent Mr. Bertling an email asking him to confirm and send me certain information, including the staffing pattern schedules (days and times) for Drs. Fithian and McKaye, as well as the staffing pattern schedule for telepsychiatry.  The next day, on June 6, 2017, Mr. Bertling provided me with CFMG's most recent revisions to Defendants' Telepsychiatry Policy and responded to my email requesting certain information by stating

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE
SETTLEMENT AGREEMENT REGARDING PSYCHIATRIC STAFFING AND TELEPSYCHIATRY

1    that he would provide me with that information "asap."  I emailed Mr. Bertling on June 9,

2    2017, requesting an update as to when Mr. Bertling would provide the information that I

3    requested.  To date, Mr. Bertling has neither responded to my email nor provided me with

4    the requested information.  A true and correct copy of the email string containing the

5    above-described emails is attached hereto as **Exhibit D**.  A true and correct copy of

6    CFMG's June 6, 2016 proposed revisions to its Telepsychiatry Policy ("Defendants'

7    Proposal"), as attached to Mr. Bertling's June 6, 2017 email is attached hereto as

8    **Exhibit E**.

9         7.    Plaintiffs deposed CFMG's expert psychiatric witness Jason Roof, M.D., on

10   October 3, 2014.  During that deposition, Dr. Roof testified regarding CFMG's plans to

11   add a full time on-site psychiatrist at the Jail.  Dr. Roof testified that this anticipated

12   addition of a full-time (40 hours/week) on-site psychiatrist would lead to "an overall

13   increase of accessibility.  The opinion of the full-time psychiatrist plus another psychiatrist

14   is always going to be a better thing.  Barring some professional issues with the psychiatrist

15   and what have you, but any time you're going to have additional coverage to assist in

16   medical care is usually going to be a very good thing for the patients."  TR 206:13-23.  A

17   true and correct copy of the transcript of that portion of the October 3, 2014 deposition of

18   Dr. Roof is attached hereto as **Exhibit F**.

19        8.    On June 20, 2017, I downloaded a copy of the American Psychological

20   Association's Guidelines for the Practice of Telepsychology from the website

21   https://www.apa.org/pubs/journals/features/amp-a0035001.pdf.  A true and correct copy ,

22   is attached hereto as **Exhibit G**.  On page 792 of the Guidelines, the term "in-person" is

23   defined in the section titled "Definition of Telepsychology":  "The term in-person, which

24   is used in combination with the provision of services, refers to interactions in which the

25   psychologist and the client/patient are in the same physical space and does not include

26   interactions that may occur through the use of technologies."  On page 795, the Guidelines

27   state that:  "before psychologists engage in providing telepsychology services, they are

28

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE
SETTLEMENT AGREEMENT REGARDING PSYCHIATRIC STAFFING AND TELEPSYCHIATRY

[3140422.2]

1   urged to conduct an initial assessment to determine the appropriateness of the

2   telepsychology service to be provided for the client/patient."

3        9.     The Court held a hearing on April 28, 2016 regarding Defendants' motions

4   for approval of their Implementation Plans.  The hearing included a discussion of CFMG's

5   proposed use of telepsychiatry at the Jail.  A true and correct copy of the transcript of the

6   portion of the April 28, 2016 hearing discussing telepsychiatry is attached hereto as

7   **Exhibit H**.

8        10.    Oxford University Press published The Oxford Textbook of Correctional

9   Psychiatry in 2015.  The Textbook is edited by Robert L. Trestman, Ph.D. and M.D.,

10  Kenneth L. Appelbaum, M.D., and Jeffrey L. Metzner, M.D.  The Textbook includes a

11  Chapter by Li-Wen Lee, M.D. (of the Department of Psychiatry at Columbia University

12  College of Physicians and Surgeons) titled "Interviewing in correctional settings."

13  Dr. Lee's chapter includes a section on correctional telepsychiatry on page 65, which

14  states: "While some mental health services can be delivered effectively by video,

15  telepsychiatry is not a substitute for on-site staff, particularly in responding to emergencies

16  or to deliver other modalities of assessment and treatment."  A true and correct copy of

17  this chapter from the Oxford Textbook of Correctional Psychiatry is attached hereto as

18  **Exhibit I**.

19       11.    RBGG is counsel of record for Plaintiffs in *Coleman v. Brown*, Case No. 2-

20  90-0520, in the Eastern District of California.  On February 6, 2017, Matthew A. Lopes,

21  Jr., Esq., Special Master in *Coleman v. Brown*, submitted the Special Master's Report on

22  the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan

23  as Dkt. No. 5564.  A true and correct copy of this report is attached hereto as **Exhibit J**.

24  Reporting on the mental health staffing of California's prisons, the Special Master in

25  *Coleman v. Brown* concluded that:

26        Telepsychiatry is not clinically desirable as a frontline approach to providing
          psychiatric services for inmates with the most intensive or emergent needs.
27        The higher the acuity of mental illness, the less telepsychiatry should be
          relied on as a permissible method of treatment….  For inmates at the MHCB
28        [Mental Health Crisis Bed] level of care, telepsychiatry is not an appropriate

5                                            Case No. CV 13 2354 BLF

[3140422.2]

> method of treatment to be used on a regular basis…. The ease of multidisciplinary interaction on-site is especially important in regards to emergency consultation, which is essential at the higher levels of care and much better accomplished with on-site psychiatrists.

Dkt. 5564 at ECF 16-17. In the Report, the Special Master also describes how on-site providers are better positioned to diagnose, treat, and coordinate care for patients behind bars:

> On-site psychiatrists are able to more positively impact the therapeutic milieu by regularly interacting with correctional, nursing and other mental health staff. This is just not possible with telepsychiatrists. In addition, on-site psychiatrists are better able to discern nonverbal behavior demonstrated by inmates which often has an important impact on diagnoses and treatment planning.

Dkt. 5564 at ECF 17.

12. On June 21, 2017, I downloaded a copy of a PDF document issued by the Department of Justice, Civil Rights Division, Disability Rights Section titled "Effective Communication," from the website https://www.ada.gov/effective-comm.pdf. At pages 2 through 4 of the document, the Department of Justice ("DOJ") describes how people who have vision, hearing, or speech disabilities use different ways to communicate, including: computer screen-reading programs, computer-assisted real-time transcription (CART), telecommunications devices and/or relay service (TRS), and/or video remote interpreting (VRI). A true and correct copy of the "DOJ" document titled "Effective Communication" is attached hereto as **Exhibit K**.

13. I conferred with Mr. Bertling about telepsychiatrist access to patient records during Dr. Pablo Stewart's tour of the Jail on August 29, 2016, as well as by phone subsequent to that tour. Mr. Bertling informed me that the telepsychiatrists affiliated with CFMG do not have access to the full patient medical history records kept at the Jail, and that complete patient files are not sent by CFMG staff to telepsychiatrists prior to patient evaluation. In order for a remote telepsychiatrist to obtain patient records, CFMG staff can electronically process and send individual pages of a patient's record from the Jail to the telepsychiatrist. Mr. Bertling told me that CFMG-affiliated telepsychiatrists may be able

[3140422.2]

1  to access the entire patient record once CFMG implements an Electronic Medical Record

2  system.  *See* Dkt. 532 at ECF 113 (describing CFMG's commitment to implement an

3  Electronic Medical Record system at the Monterey County Jail).

4         I declare under penalty of perjury under the laws of the United States of America

5  that the foregoing is true and correct, and that this declaration is executed at San Francisco,

6  California this 23rd day of June, 2017.

7

8                      /s/ *Van Swearingen*
                       Van Swearingen

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. CV 13 2354 BLF

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE
SETTLEMENT AGREEMENT REGARDING PSYCHIATRIC STAFFING AND TELEPSYCHIATRY

[3140422.2]

Exhibit A

**From:** Peter Bertling [mailto:pgb@bertling-clausen.com]
**Sent:** Thursday, August 25, 2016 8:42 AM
**To:** Ernest Galvan; Michael W. Bien; Van Swearingen; Andrew Spore
**Cc:** BlitchSK@co.monterey.ca.us; Philippi, Michael R. x5361 (PhilippiMR@co.monterey.ca.us); ben.rice@cmgcos.com
**Subject:** Tele-Psych Policy and Procedure

Dear Counsel:

They psychiatric services at MCJ are currently being provided by a tele-psychiatrist.  Currently, there is no full time psychiatrist on site at MCJ.  CFMG has been making a good faith effort to hire a full time on-site psychiatrist and those efforts are continuing.  Until a psychiatrist is hired CFMG proposes using the attached Tele-Psychiatry Policy and Procedure.  Do you have any objection to this Policy and Procedure pending CFMG's hiring of a full time psychiatrist?

Regards,

Peter Bertling
Bertling & Clausen, L.L.P.
15 West Carrillo, Suite 100
Santa Barbara, Calif. 93101
(805) 892-2100 ext. 100
(805) 963-6044: Fax

WARNING: This message and any attachments hereto may contain confidential and privileged communications or information and/or attorney-client communications or work-product protected by law. The information contained herein is transmitted for the sole use of the intended recipient(s). If you are not the intended recipient or designated agent of the recipient of such information, you are hereby notified that any use, dissemination, copying or retention of this e-mail of the information contained herein is strictly prohibited and may subject you to penalties under federal and/or state law. If you received this e-mail in error, please notify the sender immediately and permanently delete this e-mail.

Exhibit B

**From:**                    Peter Bertling <pgb@bertling-clausen.com>
**Sent:**                     Friday, November 11, 2016 1:18 PM
**To:**                        Van Swearingen
**Subject:**              RE: Hernandez: M&C re telepsych and intake form [IWOV-DMS.FID43916]

Hi Van:

Thank you for taking the time to speak with me yesterday.  This summary accurately reflects the substance of our conversation.

Have an enjoyable weekend.

Regards,

Peter Bertling
Bertling & Clausen, L.L.P.
15 West Carrillo, Suite 100
Santa Barbara, Calif. 93101
(805) 892-2100 ext. 100
(805) 963-6044: Fax

WARNING: This message and any attachments hereto may contain confidential and privileged communications or information and/or attorney-client communications or work-product protected by law. The information contained herein is transmitted for the sole use of the intended recipient(s). If you are not the intended recipient or designated agent of the recipient of such information, you are hereby notified that any use, dissemination, copying or retention of this e-mail of the information contained herein is strictly prohibited and may subject you to penalties under federal and/or state law. If you received this e-mail in error, please notify the sender immediately and permanently delete this e-mail.

**From:** Van Swearingen [mailto:VSwearingen@rbgg.com]
**Sent:** Friday, November 11, 2016 1:05 PM
**To:** Peter Bertling
**Subject:** Hernandez: M&C re telepsych and intake form [IWOV-DMS.FID43916]

Pete,

Thanks for meeting and conferring with me yesterday about CFMG's telepsychiatry policy as well as the comprehensive intake form.  Below is a high-level summary of our points of dispute and action items.  Please let me know if you think I missed anything.
Van

**Plaintiffs' Disputes w/ CFMG's Telepsych Policy**
- Telepscyh is overused and is unacceptable as the only form of psychiatry at the Jail.
- CFMG's Tele-Psychiatry Program lacks parameters under which a condition can or cannot be treated, as well as those situations that require referral to alternate modes of management.
  - Telepsychiatry is not appropriate for patients initiating mental health treatment.
  - Telepsychiatry is not appropriate for patients in a mental health crisis (such as those who are potentially suicidal, homicidal, or gravely disabled).

- ▪ As part of this concern, telepsych is only available during limited hours and in the library.
- ▪ CFMG does not appear to be referring patients with urgent or emergent conditions to local community providers as provided in CFMG's policy (at 6B); rather, CFMG appears to be providing telepsych in-house to such patients.
- The provider performing the telepsychiatry assessment or follow-up must have electronic access to the patient's complete medical record, and must adequately review the record to be sufficiently prepared prior to the telepsychiatry session.
- CFMG's use of telepsych must be free of technical difficulties such as where the providers' voice and image is fragmented and/or the session is prematurely disconnected.

**Telepsych Action Items**

- Dr. Cristina Breiner is going to begin working at MCJ on 1/3/17 as a full-time Psychiatrist (for half of the year, January-Summer).
- Pete is going to talk with CFMG's new patient advocate about whether any of the above disputed items can be addressed without Judge Cousins' involvement.  Pete will get back to me next week.  For those items still in dispute, we will brief them in the statement due 1/5/17.  Both parties are open to continued negotiations prior to the conference with Judge Cousins.

**Plaintiffs' Disputes w/ CFMG's Intake Form**

- The Comprehensive Form fails to capture much of the useful data about diabetes (including medication and meals) captured currently in CFMG's Intake Triage Assessment.
- The Comprehensive Form fails to capture important questions that help determine if acceptance should be precluded and the person sent directly to the hospital, captured currently in the MCJ Medical Intake Questionnaire.
- The Comprehensive Form fails to capture important questions currently in the Nursing Assessment of Psychiatric & Suicidal Inmate form, including:
  - ○ Questions about mood and affect;
  - ○ Questions about being present psychiatric care;
  - ○ Certain questions about suicidality, such as past suicidal ideation;
  - ○ Recommendations as to suicide watch; and
  - ○ Doctor referrals, including whether MD notified.

**Intake Form Action Items**

- Pete confirmed that CFMG is not replacing the questionnaire for developmental disabilities (Ex. C to the Implementation Plan), and are continuing to use that form as appropriate.
- Pete will review our suggested revisions with Kathy Wild, and will let me know if any are unacceptable.  We are hopeful that our negotiations will suffice, and that Judge Cousins' assistance will not be necessary.

Van Swearingen



ROSEN BIEN
GALVAN & GRUNFELD LLP

50 Fremont Street, 19th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
VSwearingen@rbgg.com

CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.
IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

Exhibit C

**Monterey County Jail**
**Mental Health Monitor's Report**
**January 18 - 19, 2017**

## Overview

The Monterey County Jail was visited for the first mental health monitoring tour on

January 18 and January 19, 2017.  The following report is based upon interviews with

institutional staff and detainees, medical records reviews, as well as review of documentation

and information provided by the institution and County.  This report will specifically address the

institution's status and progress toward compliance with the United States District Court

Northern District of California Settlement Agreement and the Implementation Plans between

Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County

Sheriff's Office; California Forensic Medical Group, INCORPORATED (CFMG) et al.

## Compliance with Settlement Agreement and Implementation Plan

1.  Intake Screening

    a.  Defendants will develop and implement an Intake Screening Implementation Plan
        that specifies standards and timelines to ensure that arriving prisoners are
        promptly screened for urgent medical, mental health and dental needs, with
        prompt follow-up and disability accommodations.

        i.  Upon arrival, an Initial Health Assessment will be performed by the intake
            nurse to determine whether the inmate should be excluded from the
            facility on medical or mental health grounds.  Upon acceptance into the
            jail, all inmates will be screened by the intake nurse for urgent medical,
            mental health and dental needs.  The intake nurse will have access to an

1

inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail.

ii.   A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.

iii.   The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive findings on the suicide assessment.

**Findings: Deferred**

Observations during the tour as well as review of provided documents and medical records indicated that an initial health assessment was routinely performed by an intake nurse at the time of arrival to the jail, and inmates were referred to mental health as clinically indicated. There appeared to be a process in place for acute as well as routine mental health referral and evaluation.  One area of recommendation was the need for greater confidentiality during the intake assessment performed by the nurse.  Observations of the intake assessment revealed that officers were present just outside the intake assessment room, allowing for possible non-confidentiality as the intake assessment was performed by the nurse in the intake booking area. The close proximity of the officers might prevent some inmates from providing necessary medical and mental health information.

A mental health assessment and suicide risk tools were routinely utilized at the time of intake for appropriate mental health assessment, triage and treatment.

The next monitoring tour will examine the availability of an inmate's medical records at the time of intake as well as acceptance and clearance of individuals at the time of jail intake assessment.

2. Mental Health Screening

   a. Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including appropriate screening… The Implementation Plan provides that all inmates will have an initial mental health screening performed by a qualified mental health professional on the mental health staff.

   b. Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including… medication practices

**Findings: Deferred**

These issues will be reviewed at the next monitoring visit.

   c. Defendants shall develop and implement a Health Care Implementation Plan to expand the provision of care for inmates with serious medical and/or mental health needs and to ensure they receive timely treatment appropriate to the acuity of their conditions.  The Implementation plan outlines the process by which inmates provide mental health sick call requests and healthcare staff respond to such requests.

    d.  Nursing staff shall conduct daily mental health rounds in segregation.

**Findings: Deferred**

These issues will be reviewed at the next monitoring visit.

3.  Safety Cells

    a.  The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall responsibility for safety and security of prisoners, prompt reviews by medical of all placements, and a process of resolving disagreements between medical and custody.

**Findings: Deferred**

Interviews with custody and mental health staff indicated that inmates were placed into the safety or sobering cells by custody, medical or mental health staff; and mental health was then informed regarding that placement or noted such placements during their daily rounds. There appeared to be a system in place for prompt evaluation of inmates who were placed into these cells. The facility also had developed a system to resolve disagreements that arose from such placements, and provided documents were reviewed that confirmed this observation. It was unclear at the time of the visit, whether timely suicide risk assessment, vital signs monitoring and medical checks occurred. This issue will be evaluated further at the next monitoring visit.

    b.  Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical

4

professional will see an inmate within one hour of placement in a sobering cell.

Inmates will be released from a sobering cell upon clearance by medical staff.

**Findings: Deferred**

There was an on-call system in place for mental health staff which provided for clinician availability regarding assessment of inmates who were placed into the safety cells after hours. Inmates were generally seen timely by a mental health clinician during work hours after such placements; however, a review of the logs indicated that there were occasions in which inmates were not always seen within one hour of placement. Removal from the safety cells occurred after mental health evaluation and clearance.

      c.   A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his findings through a report which will be sent to the Jail Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.

5

**Findings: Deferred**

There was a system in place for the logging of custody welfare checks and observations of inmates placed in the safety and sobering cells. Although there was documentation that welfare checks occurred twice every 30 minutes, there was documentation that there were some lapses. A review of the logs and accompanying documentation indicated that the facility did have a system in place for the auditing of these checks, as well as feedback to the supervisory staff regarding problem areas.

      d.   Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11:00 p.m. and 7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.

**Findings: Noncompliance**

Logs indicated that there was a lack of documentation regarding whether mattresses and sleeping bags were always offered to inmates placed into the safety and sobering cells. Although this was an area of concern, there was a system in place for tracking compliance in this area. It was unclear at the time of this visit if any corrective action was implemented to address this issue.

      e.   Inmates in sobering cells may have access to mattresses at the discretion of custody staff. Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.

**Findings: Noncompliance**

See above.

    f.  Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule.  Sobering cells shall be cleaned on a regular cleaning schedule.  Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.

**Findings: Substantial Compliance**

Observations during the monitoring tour indicated that the safety and sobering cells were clean and not in use at the time of the visit.  Interviews with some inmates indicated that there were some problems with consistent cleaning of the cells.  Supervisory staff reported that the cells were cleaned after each use.

    g.  For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.

**Findings: Deferred**

There was a process in place at the jail by which inmates who had been housed in a safety cell for 24 consecutive hours were evaluated and processed for transfer to inpatient treatment.  Although this system was in place, access to inpatient mental health treatment was poor and difficult to obtain for all inmates referred for inpatient care.  Inmates were frequently returned to the jail after assessment and prior to stabilization.  Access to inpatient mental health services remained problematic. This issue will be examined in greater detail during the next mental health monitoring tour.

4. Medication Continuity

   a. All inmates newly booked into the jail, who at the time of booking are prescribed
   medications in the community, shall be timely continued on those medications, or
   prescribed comparable appropriate medication, unless a medical provider makes
   an appropriate clinical determination that medications are not necessary for
   treatment.

**Findings: Deferred**

A review of medical records and observations during the visit indicated that the intake
nurses obtained information regarding prescribed mental health medications in the
community and began the process for verifying such treatment.  For those cases in which the
medication treatment was unverified or unclear, those individuals were scheduled to see a
mental health provider for assessment. Due to the noted delay in medication continuity noted
below, a finding of compliance is deferred until the next visit, when additional information
will be obtained.

   b. Inmates who, at the time of booking, report to Defendants that they are taking
   community-prescribed medications, but whose medications cannot be verified by
   Defendants, shall be timely assessed by a medical provider and timely prescribed
   medications necessary to treat their health needs.

**Findings: Deferred**

See above.  One healthcare record was reviewed (Inmate 4) that showed a delay in
prescribing necessary psychotropic medications, despite recent treatment at the facility.  This

case appeared to be an exception to otherwise timely provision of medications. This issue

will receive additional review at the next monitoring visit.

    c.  Provision of psychotropic medications upon discharge from the jail.  The

        Implementation Plan provides that a 30-day supply of medications be given to

        inmates upon discharge from the jail.

**Findings: Deferred**

This issue will be reviewed at the next mental health monitoring visit.

5.  Clinical Staffing

    a.  Defendants will maintain Qualified Medical Professional and Qualified Mental

        Health Professional staffing at the Jail to ensure adequate staffing to provide all

        necessary medical and mental health care.  The plan will identify all needed

        positions based on current and projected Jail population, and the number and

        qualifications of medical and mental health care staff to cover each position, with

        shift relief.

**Findings: Deferred**

At the time of the visit, the mental health staffing was as follows:

      0.8 FTE Psychiatrist (onsite) – 32 hours per week

      0.9 FTE Psychiatrist (telepsychiatry) – 36 hours per week

      1 FTE Psychiatric Registered Nurse/Psychologist – 40 hours per week

      1.4 FTE Licensed Clinical Social Worker – 56 hours per week

      1 FTE Licensed Marriage and Family Therapist – 40 hours per week

Although the plaintiffs noted that no staffing analysis was conducted as set forth in the Settlement Agreement; the current mental health staffing at the jail appeared to be adequate for the population and services required. Psychiatric on-call services were primarily provided by Dr. Fithian, and all of the clinicians provided on-call services on a rotating basis. The monitor observed a telepsychiatry session during the monitoring visit. This means of provision of psychiatric services appeared to be an acceptable and effective means of psychiatric care; however, it should not be the primary mechanism for providing psychiatric care. All attempts should be made to ensure onsite coverage whenever possible.

As this was the psychiatrist's last day of providing telepsychiatry services, ongoing review of telepsychiatry is indicated. Additionally, with anticipated changes in the use of the telepsychiatrists at the facility, this issue should be monitored in subsequent visits to ensure adequate psychiatric coverage at the facility in the future.

6. Mental Health Care

   a.  Training

      i.  All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.

**Findings: Substantial Compliance**

Documentation provided indicated that correctional staff had received training regarding the Implementation Plan; however, this training had not yet been incorporated into the new hire training.

    ii.  In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.

**Findings: Substantial Compliance**

This training was in place for new correctional officers.

    iii.  All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates, identifying warning signs specific to inmates, and how to recognize individuals who are in mental distress and/or suicidal.

**Findings: Substantial Compliance**

This training was in place.

    iv.  Yearly custody staff will conduct a situational training such as a mock

suicide attempt or a medical emergency.  CFMG staff will also participate

in the annual situational training.

**Findings: Noncompliance**

Although plans were in place for yearly emergency drills, including mock suicide drills;

verification of this training was not received.

    b.  Restraint Chairs

      i.  Use of a restraint chair will be documented in an observation log which

will be reviewed and signed by a supervisor.  Inmates shall not be placed

in a restraint chair for longer than six consecutive hours.

**Findings: Substantial Compliance**

There was no documented use of the restraint chairs during the monitoring period. The

Implementation Plan did include guidelines for the use of the restraint chair, duration of

placement, monitoring after placement and criteria for removal. This issue will continue to be

monitored on subsequent visits to evaluate use of the restraint chairs when and if it occurs.

      ii.  Deputies shall attempt to remove restraints at least once an hour to allow

inmates to exercise their arms and hands in a range of motion exercise (to

prevent circulatory problems). A shift supervisor and medical staff shall

oversee the exercise. If unsuccessful in allowing inmates to exercise their

arms and hands in a range of motion exercise, safety staff shall explain on

the observation log why extremities could not be exercised and a shift

supervisor shall be notified.

**Findings: Substantial Compliance**

There was no documented use of the restraint chairs during the monitoring period. This issue will continue to be monitored on subsequent visits to evaluate use of the restraint chairs when and if it occurs.

iii.   On a monthly basis, the compliance sergeant will audit one incident of use

of a restraint chair, if any existed in that month, to determine if proper

documentation has been maintained.

**Findings: Substantial Compliance**

There was no documented use of the restraint chairs during the monitoring period.  This issue will continue to be monitored on subsequent visits to evaluate use of the restraint chairs when and if it occurs.

iv.   Medical and mental health staff shall be consulted before any planned use

of force on an inmate.  Custody staff in concert with medical staff will

develop the most effective and appropriate means of imposing compliance

with rules and regulation, including attempts at de-escalation.  It is

understood that it is the goal of custody staff to use the least amount of

force necessary to ensure compliance with rules and regulations.  Planned

use of force will only be used after verbal attempts to obtain compliance.

Any use of force will be documented on a use of force form.

**Findings: Noncompliance**

Although there was no documented use of the restraint chairs during the monitoring period, interviews with staff indicated that there was not consistent and documented consultation between custody and mental health regarding planned uses of force.

    c.  Mental Health Grants

        i.  Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.

**Findings: Noncompliance**

No information was obtained during the visit to verify that such funding had been pursued.

    d.  Inmates Who Have Been Declared Incompetent to Stand Trial

        i.  The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period. As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment. The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for

14

orders to show cause to be directed the State of California) to expedite the transfer of inmates who have been determined to be incompetent to stand trial to an appropriate State facility.

**Findings: Noncompliance**

Inmates were not routinely placed into transition cells or administrative segregation and seen by medical staff daily upon a Court finding the inmate to be incompetent to stand trial. These inmates were generally housed in a general population cell. Despite this, the staff appeared to work hard to timely transfer those individuals to a forensic unit.

    e.  Treatment Plans

        i.  CFMG will develop individual treatment plans for the treatment of inmates who are suffering from mental illnesses.

**Findings: Deferred**

A review of medical records indicated the presence of individual treatment plans for mentally ill inmates. Prior to a finding of substantial compliance, additional treatment plans will be reviewed at the next monitoring visit.

    f.  Consideration of Mental Illness in Inmate Discipline

        i.  Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff are encouraged to contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness.

**Findings: Noncompliance**

A review of the Disciplinary Action Reports (DAR) indicated that there was no place on the form to note that mental health was contacted prior to November 2016; this was later corrected.  It did not appear that corrections officers were aware if inmates were receiving mental health services and therefore did not contact mental health when disciplinary infractions occurred.

    g.   Space Issues

        i.   Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including …adequate clinical and administrative treatment space….

**Findings: Deferred**

Although treatment space was available for clinicians to evaluate and treat patients in a confidential setting, specific housing for mentally ill individuals housed at the facility was not provided, and it was unclear at the time of the visit whether mental health staff had dedicated office space.  This issue will be reviewed in greater detail at the next mental health monitoring visit.

    h.   Administrative Segregation

        i.   The Mental Health Implementation Plan shall require classification to assess a totality of factors when assigning prisoners to administrative segregation units.  It is understood that the goal of Defendants is to limit

the use of administrative segregation for prisoners with serious mental illness.

**Findings: Deferred**

This monitoring tour noted that mentally ill prisoners were routinely housed in the administrative segregation units, and that the placement of such individuals on these units was not limited. Although measures were instituted to mitigate against the effects of administrative segregation placement, such as group therapy and daily checks, these units remained occupied with mentally ill individuals. This issue will be reviewed further at the next monitoring visit.

ii.   The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation…

iii.   The Mental Health Implementation Plan shall address suicide watch and suicide precautions procedures to ensure that prisoners in crisis are not placed in punitive and/or unsanitary conditions.

**Findings: Deferred**

These issues will be reviewed further at the next monitoring visit.

7.  Suicide Prevention

    a.  Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.

**Findings: Substantial Compliance**

All of the cells in administrative segregation units (A, B, R and S) were modified to remove potential tie-off opportunities. In addition, fencing was installed on the upper level and stairway to prevent jumping and self-harm.

    b.  Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior, Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal.

        i.  Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.

       ii.  All welfare checks shall be documented on a welfare check log. The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance. Monthly spot checks for compliance will be conducted by the Compliance Sergeant at least weekly with monthly audits.

**Findings: Deferred**

There was documentation that the custody welfare checks were conducted appropriately, with some few exceptions. Audits were performed by custody supervisory staff based upon administrative segregation welfare door entry. Welfare checks were documented on a log, and there was also documentation of audits that were conducted by custody supervisory staff. The only exception was in the male administrative segregation units A and B where there were problems with the door that prevented adequate auditing. Supervisory staff reported that the facility was in the process of replacing the doors later this year. A findings of compliance will be deferred until full auditing is completed.

    c.   Increase in Time Outside of Cell and/or Increasing Programs

          i.   Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:

               1.   3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)

               2.   14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time

               3.   2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail)

          ii.   Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking

and receiving area will be guaranteed the following weekly times out of their cell:

1. 3 hours of week for exercise

2. 14 hours a week in the common area

3. 2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail

iii. inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services,

**Findings: Substantial Compliance**

Review of logs and audits indicated that inmates housed in the administrative segregation units as well as in the isolation and single holding cells outside of the booking and receiving areas were afforded the required out of cell time as outlined by the Settlement Agreement and Implementation Plans with some few exceptions. Additionally, inmates in administrative segregation were afforded access to group therapy weekly which was provided by the mental health staff as well as other groups and activities such as NA/AA, religious activities, parenting groups and other self-help activities.

**<u>Summary and Recommendations</u>**

I want to thank all of the parties and the Monterey County Jail staff for helping to facilitate this monitoring visit.  The staff was extremely cooperative and responsive to my requests, providing necessary access to jail activities, staff, inmates and requested documents.

The following are recommendations to address the Settlement Agreement/Implementation Plan issues of concern.

1. The County should continue to work to improve access to timely inpatient psychiatric care for all jail inmates in need of such services.

2. There was the need for greater confidentiality during the intake assessment performed by the nurse.  Observations of the intake assessment revealed that officers were present just outside the intake assessment room, allowing for possible non-confidential intake assessments.  The close proximity of the officers might prevent some inmates from providing necessary medical and mental health information.

3. The facility should ensure that inmates are offered a mattress or safety sleeping bag when indicated while housed in the safety and sobering cells with appropriate documentation. Corrective action should also be documented when staff fail to address this concern.

4. The facility should conduct a yearly situational training such as a mock suicide attempt or a medical emergency, with the involvement of CFMG.  The facility should provide verification of such training for all staff.

5. Medical and mental health staff shall be consulted before any planned use of force on an inmate.

6.  Mental illness should be considered in administering any disciplinary measures against an inmate, and greater consultation is needed between custody and mental health staff to ensure that mental illness is taken into consideration.  Although the DAR forms were modified to include documentation of this contact, it did not appear that the necessary consultation occurred routinely.

7.  The County should provide documentation to verify that the Office of the Sheriff in cooperation with The Monterey County Public Defender has pursued state funding for mental health and programming space at the jail.

8.  In lieu of placement of inmates who were declared incompetent to stand trial into transition cells in administrative segregation, mental health staff should ensure that these inmates are immediately identified and placed onto a priority list for daily follow-up and monitoring.  The County should continue to work to expedite the transfer of these inmates to an appropriate State inpatient facility.

9.  The County should work to decrease the use of administrative segregation as housing for mentally ill individuals.  In lieu of alternative placement, mitigating factors such as clinical contacts, rounding and out of cell activities should continue as outlined in the Settlement Agreement and Implementation Plans.

Please contact me should you have any questions regarding this report.

Respectfully submitted,

X _Kerry C. Hughes, MD_

Kerry C. Hughes, M.D.
Mental Health Monitor

Kerry C. Hughes, M.D.
1579 Monroe Dr., Suite F, Box 612
Atlanta, GA  30324
Phone:  404-277-4912
Fax:  404-364-9708
Email:  dockc99@aol.com

Exhibit D

**From:** Van Swearingen
**Sent:** Friday, June 09, 2017 4:35 PM
**To:** 'Peter Bertling'
**Subject:** RE: TelePsych Policy and Procedure [IWOV-DMS.FID43916]

Hi Pete,

Can you give me an update as to when I should expect the outstanding items below (see my 6/5 email)?  Also, please let me know if you will send a clean copy of CFMG's most recent proposed revisions.  Thanks, and have a nice weekend.
Van

---

**From:** Van Swearingen
**Sent:** Tuesday, June 06, 2017 1:07 PM
**To:** 'Peter Bertling'
**Subject:** RE: TelePsych Policy and Procedure [IWOV-DMS.FID43916]

Hi Pete,

Thanks for sending your proposed revisions.  Can you please send me a clean copy (without redlines) that has a title reflecting only one date and that it is CFMG's – not RBGG's – proposal?  Thanks very much.
Van

---

**From:** Peter Bertling [mailto:pgb@bertling-clausen.com]
**Sent:** Tuesday, June 06, 2017 9:43 AM
**To:** Van Swearingen
**Subject:** RE: TelePsych Policy and Procedure [IWOV-DMS.FID43916]

Hi Van:

Attached is CFMG's revised Tele-psych Policy and Procedure.  I will provide you with the additional information you requested asap.

Regards,

Peter Bertling
Bertling & Clausen, L.L.P.
15 West Carrillo, Suite 100
Santa Barbara, Calif. 93101
(805) 892-2100 ext. 100
(805) 963-6044: Fax

WARNING: This message and any attachments hereto may contain confidential and privileged communications or information and/or attorney-client communications or work-product protected by law. The information contained herein is transmitted for the sole use of the intended recipient(s). If you are not the intended recipient or designated agent of the recipient of such information, you are hereby notified that any use, dissemination, copying or retention of this e-mail of the information contained herein is strictly prohibited and may subject you to penalties under federal and/or state law. If you received this e-mail in error, please notify the sender immediately and permanently delete this e-mail.

**From:** Van Swearingen [mailto:VSwearingen@rbgg.com]
**Sent:** Monday, June 05, 2017 5:17 PM
**To:** Peter Bertling
**Subject:** RE: TelePsych Policy and Procedure [IWOV-DMS.FID43916]

Pete,

Thanks for talking with me earlier this afternoon.  I understand that you will further revise CFMG's proposed telepsychiatry policy and send to me by noon tomorrow.

I also understand that you will confirm and send me:

- The identity and licensure status of Dr. McKaye
- Staffing pattern schedule for Drs. Fithian and McKaye (days/times)
- Staffing pattern schedule for telepsychiatry (days/times)
- Guidelines for initial and emergency assessments (Dr. Yellowlees' Point 4)
- Dr. Yellowlees anecdotal evidence of that telepsych is better for certain types of inmate-patients than in-person services (Dr. Yellowlees' Point 5)

Thanks again.  Have a good evening.
Van

Exhibit E

Tele-Psychiatry Program

      i.     All inmates in the Monterey County Jail will have access to the tele-psychiatry program.

      a.   Standards for Use of Tele-Psychiatry

The use of tele-psychiatry, which is provided by an off-site provider, is authorized if it is determined that:

    (1)    More than 40 hours of on-site psychiatric services are necessary;

    (2)    Psychiatric services are required during a time the on-site psychiatrist is not regularly scheduled to work, such as nights, weekends, or holidays;

    (1)(3)  Psychiatric services are required during a time the on-site psychiatrist is regularly scheduled to work but is unavailable because of illness, temporary disability, vacation, personal emergencies, or other documented extenuating circumstances; or

    (2)(4)  The inability to recruit an on-site psychiatrist who is willing to work at the Monterey County Jail.  Circumstances regarding the inability to recruit an on-site psychiatrist include, but are not limited to:

      (a)   The inability to recruit a psychiatrist who is willing to work in a correctional healthcare setting because of safety concerns;

      (b)   The inability to recruit a psychiatrist who is willing to work in a correctional health care setting for reasonable and customary compensation;

      (c)   The inability to recruit a psychiatrist because there are no licensed psychiatrists within a reasonable geographic location to the Monterey County Jail.

The decision regarding whether an inmate is an appropriate candidate for tele-psychiatry will be determined by the tele-psychiatrist or on-site psychiatrist who is scheduled to see the inmate.

Tele-psychiatry may be used to provide psychiatric services which include, but are not limited to: initial psychiatric consultations; diagnostic and treatment evaluations; formulation of individual treatment plans; medication management; emergency psychiatric assessments including, but not limited to, inmates who are suicidal or at risk for suicide; crisis interventions and patient education.

Tele-psychiatric services are not indicated for inmates who are actively engaged in behavior that is a danger to themselves or others. The telepsychiatrist will not authorize, either verbally or in writing, the administration of involuntary medications.

      b.   Informed Consent

An inmate's informed consent shall be obtained during the initial tele-psychiatry session and should include but, not be limited to , discussions regarding the confidentiality of information; the potential for technical failure during the tele-psychiatry session and conditions under which the use of tele-psychiatry may be terminated and a referral made to in-person care. The provider shall document the provision of consent in the medical record.

     ii.    Referrals to the tele-psychiatrist can be made by the following:

        (1)   M.D.
        (2)   Registered Nurse
        (3)   Program Manager
        (4)   Qualified Mental Health Provider (LCSW, MFT, Psych RN)

     iii.    Tele-Psych Clinic Procedure

All telepsychiatry sessions will use videoconferencing applications that have been vetted and designed to achieve the most reliable internet connect and avoid any technology breakdowns or disruptions during the session. Any technical problems that prevent adequate patient assessment should be

documented in the patient record.

(1)     Inmates being referred to the clinic will be placed on the sick call list.

(2)     The mental health worker will set up the clinic for the scheduled day. The tele-psych referral form will be completed and sent to the psychiatrist for each individual patient being seen.

(3)     The telepsychiatrist shall have access to relevant clinical data of the patient as if they were being seen in person. Relevant clinical data may be provided to the telepsychiatrist by (1) facsimile transmission, (2) secured encrypted HIPPA complaint internet based formats including email, or (3) direct discussions with any of the patient's medical or mental health care providers.  Relevant clinical data on each patient will be provided to the telepsychiatrist at least 1 hour before the start of the telepsychiatry session. All pertinent information, i.e., pertinent history, lab results, progress notes from mental health provider, medication compliance, etc., will be included. This information may be provided either by:  1) providing the patient's entire medical and mental health file to the telepsychiatrist; or 2) providing pertinent records documenting the patient's active psychiatric and medical conditions (including treatments and responses), past medical and psychiatric treatments (including treatments and responses), pertinent lab results and progress notes, and an abbreviated social history to the telepsychiatrist. Additional clinical data may be sent to the telepsychiatrist during or after the telepsychiatry session as necessary.

(4)     Once the clinic begins the mental health worker will facilitate the process:

(a) Provide privacy for the patient by closing the room door, whenever possible, so clinical discussions cannot be overhear by others outside of the room where  the

service is provided. There may be times when the door cannot be closed for security/safety reasons. If this occurs, the mental health worker will make sure there are no inmates and/or non-essential staff seated outside the room or within hearing distance of the room. The medical assistant will work with the facility staff to do everything possible to ensure privacy for the patients. If at any time the patient requests to speak to the doctor privately, the medical assistant will advise the appropriate detention staff and leave room.

(b)     Assist the psychiatrist with information needed from the medical record and will write the doctor's orders in the chart. The psychiatrist's orders will then be faxed to the doctor at the corporate office for signature, and will be returned to the county to be put into the patient record.

(c)     Assist the inmate by explaining the process and providing support during the procedure.

(d)     Medication

(i)     Informed consent for medication

1)     The psychiatrist will verbally provide the inmate with the rationale for the use of the specific medication, the benefits, and potential side effects; the potential risks of refusing to take the medication; and document this information and the patient's level of understanding in the medical record.

2)     The medical assistant will complete the consent form, obtain the patient's signature and fax the consent form to the psychiatrist for signature. The completed, signed form will be faxed back to the county and filed in

the inmate's medical record.

     (ii)    Medication monitoring

        1)    All patients on medications will be seen by an onsite psychiatrist or telepsychiatrist and re-evaluated every 30 days until condition stable; then every 60 to 90 days at the clinical discretion of the psychiatrist. More frequent evaluates will be scheduled as indicated by the patient's condition.

  (e)    Onsite monitoring / follow up of patient status

     (i)    The onsite mental health provider will routinely monitor patient status and report significant changes to the psychiatrist between scheduled tele-psychiatry clinics.

     (ii)    Urgent or emergent patient conditions will be referred to local community providers through consultation with the onsite medical director.

  (f)    Documentation

     (i)    The telepsychiatrist will document all patient progress notes and transmit them electronically to the facility for inclusion in the patient's medical record within 24 hours of the clinic visit. The documentation should include, to the extent it is applicable, client identification information, relevant history, treatment plan and confirmation that the patient has been provided an informed consent.

[3133878-1]

Exhibit F



Transcript of the Testimony of:

# Jason Roof, MD

Hernandez v. County of Monterey

October 3, 2014

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312   |   F:  877.561.5538
www.thorsnes.com

Jason Roof, MD                                          October 3, 2014

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


JESSE HERNANDEZ, ET AL., ON        )
BEHALF OF THEMSELVES AND ALL       )
OTHERS SIMILARLY SITUATED,         )
                                   )
          Plaintiffs,              )
                                   )
          vs.                      ) NO: CV 13 2354 PSG
                                   )
COUNTY OF MONTEREY; MONTEREY       )
COUNTY SHERIFF'S OFFICE;           )
CALIFORNIA FORENSIC MEDICAL GROUP  )
INCORPORATED, A CALIFORNIA         )
CORPORATION; AND DOES 1 TO 20,     )
INCLUSIVE,                         )
                                   )
          Defendants.              )
_____)



DEPOSITION OF JASON ROOF, MD

SACRAMENTO, CALIFORNIA

OCTOBER 3, 2014






REPORTED BY:   NICHOLE THUT, RPR, CSR
               Certified Shorthand Reporter
               License No. 13655

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS: AARON J. FISCHER, ESQ.
                         ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4                       315 MONTGOMERY STREET, 10TH FLOOR
                         SAN FRANCISCO, CA 94104
 5                       (415)433-6830
                         (415)433-7104
 6                       Afischer@rbgg.com

 7

 8
     FOR THE DEFENDANT CALIFORNIA FORENSIC MEDICAL GROUP:
 9                       PETER BERTLING, ESQ.
                         BERTLING & CLAUSEN, LLP
10                       15 WEST CARRILLO STREET
                         SUITE 100
11                       SANTA BARBARA, CA 93101
                         Pgb@bertling-clausen.com
12

13

14   FOR THE DEFENDANT COUNTY OF MONTEREY (TELEPHONICALLY):
                         SUSAN BLITCHE, ESQ.
15                       ANDREW PRICE, ESQ.
                         COUNTY OF MONTEREY
16                       168 WEST ALISAL STREET, 3RD FLOOR
                         SALINAS, CA 93901
17                       (831)755-5045
                         (831)755-5283
18

19

20

21

22

23

24

25
```

Jason Roof, MD                                           October 3, 2014

```
 1                    I N D E X
 2   Examination by Mr. Fischer .........................4
 3   Examination by Mr. Bertling ......................237
 4   Examination by Mr. Fischer .......................239
 5   Examination by Mr. Bertling ......................243
 6            EXHIBITS MARKED FOR IDENTIFICATION
 7   No.              Description                    Page
 8   Exhibit 61       Notice of Deposition ..................7
 9   Exhibit 62       Jason Roof, MD Curriculum Vitae ........9
10   Exhibit 63       Dr. Roof's billing hours sheet .........9
11   Exhibit 64       Dr. Roof's trial testimony history ....11
12   Exhibit 65       E-mail correspondence .................15
13   Exhibit 66       E-mail correspondence .................17
14   Exhibit 67       Declaration of Jason Roof, MD .........36
15   Exhibit 68       Monterey County Sheriff's Office ......77
16                    intake health screenings
17   Exhibit 69       Appendix C Suicide Prevention ........110
18   Exhibit 70       Monterey County suicide prevention ...125
19                    policy
20   Exhibit 71       Position Statement on Segregation ....132
21                    of Prisoners with Mental Illness
22   Exhibit 72       Standards for Adult Correctional .....142
23                    Institutions
24   Exhibit 73       Monterey County safety cell ..........185
25                    placement and retention policy
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    A.       On what date?

 2    Q.       About.

 3    A.       I don't -- I don't have a recollection of that.

 4    I'm not sure.  I am aware of the result that there were

 5    some addition of coverage, but I can't recall what day I

 6    reviewed it.

 7    Q.       Do you know who Daniel Hustedt is?

 8    A.       A consultant of some regard.  More than that,

 9    I'm not sure.

10    Q.       Okay.

11             (Reporter clarification.)

12    Q.       BY MR. FISCHER:  And do you have any idea the

13    basis for the information that you -- that Mr. Hustedt

14    provided in his declaration?

15    A.       I'm not at this time, no.

16    Q.       Okay.  Now, you say you're aware that CFMG had

17    added 20 hours of psychiatric LCSW coverage to its

18    program?

19    A.       Yes.

20    Q.       Based on your expertise and your review, do you

21    think that addition of staff is necessary in order to

22    provide adequate mental health care at the facility?

23    A.       I don't think it's necessary.  But it is great.

24    It's great that additional hours were added.  I think it

25    will be a better result.  I don't think that it was
```

Jason Roof, MD                                    October 3, 2014

```
 1   necessary that it be done, but any time there's
 2   additional coverage is always a very good sign.
 3   Q.      And with respect to the second part of the
 4   sentence, are you aware that TMG is currently in the
 5   process of recruiting a full-time psychiatrist position.
 6   Do you have any opinion as to the addition of a
 7   full-time psychiatrist is necessary in order to provide
 8   adequate patient care at Monterey County Jail?
 9   A.      Again, I don't think it was necessary, but I
10   think it's going to be very beneficial.  More coverage
11   is typically going to mean better outcome for the
12   patients.
13   Q.      What do you mean by that?  What do you think a
14   full-time psychiatrist will provide that's not being
15   provided now, if anything?
16   A.      I think it's going to be an overall increase of
17   accessibility.  The opinion of the full-time
18   psychiatrist plus another psychiatrist is always going
19   to be a better thing.  Barring some professional issues
20   with the psychiatrist and what have you, but any time
21   you're going to have additional coverage to assist in
22   medical care is usually going to be a very good thing
23   for the patients.
24   Q.      Did you do any review to determine whether the
25   addition of a full-time psychiatrist might be excessive
```

1    given the need at the jail?

2    A.        No.  I did not do a study.

3    Q.        Okay.  Same thing for the additional 20 hours of

4    the psychiatric RN social worker, did you do any review

5    to determine whether that would be an excessive amount

6    of coverage?

7    A.        No, I did not.

8    Q.        Is there -- so your opinion is whittled down to

9    more is better?

10   A.        Yes.

11   Q.        Okay.  I want to turn to paragraph 40 of your

12   declaration.  It's at the bottom of page 21.  The title

13   "CFMG is not responsible for jail facilities."  Were you

14   not asked to opine as to the adequacy of jail facilities

15   as part of your evaluation?

16   A.        I was not.

17   Q.        Okay.  As a treating psychiatrist, do you think

18   that when you're -- if you're in a situation -- I'm

19   speaking hypothetically now.  If you were in a situation

20   where you're unable to treat patients in a setting that

21   you deem appropriate, do you feel like -- do you feel

22   responsibility to take steps in order to provide care in

23   an appropriate setting?

24   A.        I'm not sure I understand.

25            MR. BERTLING:  The question is vague and

Exhibit G

# Guidelines for the Practice of Telepsychology

Joint Task Force for the Development of Telepsychology Guidelines for Psychologists

These guidelines are designed to address the developing area of psychological service provision commonly known as telepsychology. *Telepsychology* is defined, for the purpose of these guidelines, as the provision of psychological services using telecommunication technologies, as expounded in the Definition of Telepsychology section of these guidelines. The expanding role of technology in the provision of psychological services and the continuous development of new technologies that may be useful in the practice of psychology present unique opportunities, considerations, and challenges to practice. With the advancement of technology and the increased number of psychologists using technology in their practices, these guidelines have been prepared to educate and guide them.

These guidelines are informed by relevant American Psychological Association (APA) standards and guidelines, including the "Ethical Principles of Psychologists and Code of Conduct" ("APA Ethics Code"; APA, 2002a, 2010) and the "Record Keeping Guidelines" (APA, 2007). In addition, the assumptions and principles that guide APA's "Guidelines on Multicultural Training, Research, Practice, and Organizational Change for Psychologists" (APA, 2003) are infused throughout the *Rationale* and *Application* subsections describing each of the guidelines. Therefore, these guidelines are informed by professional theories, evidence-based practices, and definitions in an effort to offer the best guidance in the practice of telepsychology.

The use of the term *guidelines* within this document refers to statements that suggest or recommend specific professional behaviors, endeavors, or conduct for psychologists. Guidelines differ from standards in that standards are mandatory and may be accompanied by an enforcement mechanism. Thus, guidelines are aspirational in intent. They are intended to facilitate the continued systematic development of the profession and to help ensure a high level of professional practice by psychologists. "Guidelines are created to educate and to inform the practice of psychologists. They are also intended to stimulate debate and research. Guidelines are not to be promulgated as a means of establishing the identity of a particular group or specialty area of psychology; likewise, they are not to be created with the purpose of excluding any psychologist from practicing in a particular area" (APA, 2002b, p. 1048). "Guidelines are not intended to be mandatory or exhaustive and may not be applicable to every professional or clinical situation. They are not definitive and they are not intended to take precedence over the judgment of psychologists" (APA, 2002b, p. 1050). These guidelines are meant to assist psychologists as they apply current standards of professional practice when utilizing telecommunication technologies as a means of delivering their professional services. They are not intended to change any scope of practice or define the practice of any group of psychologists.

The practice of telepsychology involves consideration of legal requirements, ethical standards, telecommunication technologies, intra- and interagency policies, and other external constraints, as well as the demands of the particular professional context. In some situations, one set of considerations may suggest a different course of action than another, and it is the responsibility of the psychologist to balance them appropriately. These guidelines aim to assist psychologists in making such decisions. In addition, it will be important for psychologists to be cognizant of and compliant with laws and regulations that govern independent practice within jurisdictions and across jurisdictional and international borders. This is particularly true when providing telepsychology services. Where a psychologist is providing services from one jurisdiction to a client/patient located in another jurisdiction, the law and regulations may differ between the two jurisdictions. Also, it is the responsibility of the psychologists who practice telepsychology to maintain and enhance their level of understanding of the concepts related to the delivery of services via telecommunication technologies. Nothing in these guidelines is intended to contravene any limitations set on psychologists' activities based on ethical standards, federal or jurisdictional statutes or regulations, or for those psychologists who work in agencies and public settings. As in all other circumstances, psychologists must be aware of the stan-

The "Guidelines for the Practice of Telepsychology" were developed by the Joint Task Force for the Development of Telepsychology Guidelines for Psychologists established by the following three entities: the American Psychological Association (APA), the Association of State and Provincial Psychology Boards (ASPPB), and the APA Insurance Trust (APAIT). The "Guidelines for the Practice of Telepsychology" were approved as APA policy by the APA Council of Representatives on July 31, 2013. The co-chairs of the joint task force were Linda Campbell and Fred Millán. Additional members of the task force included the following psychologists: Margo Adams Larsen, Sara Smucker Barnwell, Bruce E. Crow, Terry S. Gock, Eric A. Harris, Jana N. Martin, Thomas W. Miller, and Joseph S. Rallo. APA staff (Ronald S. Palomares, Deborah Baker, Joan Freund, and Jessica Davis) and ASPPB staff (Stephen DeMers, Alex M. Siegel, and Janet Pippin Orwig) provided direct support to the joint task force.

These guidelines are scheduled to expire as APA policy 10 years from July 31, 2013 (the date of their adoption by the APA Council of Representatives). After this date, users are encouraged to contact the APA Practice Directorate to determine whether this document remains in effect.

Correspondence concerning these guidelines should be addressed to the Practice Directorate, American Psychological Association, 750 First Street, NE, Washington, DC 20002-4242.

© 2013 American Psychological Association   0003-066X/13/$12.00
Vol. 68, No. 9, 791–800   DOI: 10.1037/a0035001

dards of practice for the jurisdiction or setting in which they function and are expected to comply with those standards. Recommendations related to the guidelines are consistent with broad ethical principles (APA Ethics Code, APA, 2002a, 2010), and it continues to be the responsibility of the psychologist to apply all current legal and ethical standards of practice when providing telepsychology services.

It should be noted that APA policy generally requires substantial review of the relevant empirical literature as a basis for establishing the need for guidelines and for providing justification for the guidelines' statements themselves (APA, 2002b, p. 1050). The literature supporting the work of the Joint Task Force on the Development of Telepsychology Guidelines for Psychologists (i.e., the Telepsychology Task Force) and the guidelines statements themselves reflect seminal, relevant, and recent publications. The supporting references in the literature review emphasize studies from approximately the past 15 years plus classic studies that provide empirical support and relevant examples for the guidelines. The literature review, however, is not intended to be exhaustive or to serve as a comprehensive systematic review of the literature that is customary when developing professional practice guidelines for psychologists.

## Definition of Telepsychology

*Telepsychology* is defined, for the purpose of these guidelines, as the provision of psychological services using telecommunication technologies. Telecommunications is the preparation, transmission, communication, or related processing of information by electrical, electromagnetic, electromechanical, electro-optical, or electronic means (Committee on National Security Systems, 2010). Telecommunication technologies include but are not limited to telephone, mobile devices, interactive videoconferencing, e-mail, chat, text, and Internet (e.g., self-help websites, blogs, and social media). The information that is transmitted may be in writing or include images, sounds, or other data. These communications may be synchronous, with multiple parties communicating in real time (e.g., interactive videoconferencing, telephone), or asynchronous (e.g., e-mail, online bulletin boards, storing and forwarding of information). Technologies may augment traditional in-person services (e.g., psychoeducational materials posted online after an in-person therapy session) or be used as stand-alone services (e.g., therapy or leadership development provided over videoconferencing. Different technologies may be used in various combinations and for different purposes during the provision of telepsychology services. For example, videoconferencing and telephone may also be utilized for direct service, while e-mail and text are used for nondirect services (e.g., scheduling). Regardless of the purpose, psychologists strive to be aware of the potential benefits and limitations in their choices of technologies for particular clients in particular situations.

## Operational Definitions

The Telepsychology Task Force has agreed upon the following operational definitions for terms used in this document. In addition, these and other terms used throughout the document have a basis in definitions developed by the following U.S. agencies: the Committee on National Security Systems (2010), the U.S. Department of Health and Human Services, Health Resources and Services Administration (2010), and the U. S. Department of Commerce, National Institute of Standards and Technology (2008, 2011). Last, the terminology and definitions that describe technologies and their uses are constantly evolving, and therefore psychologists are encouraged to consult glossaries and publications prepared by agencies such as the Committee on National Security Systems and the National Institute of Standards and Technology, which represent definitive sources responsible for developing terminology and definitions related to technology and its uses.

The term *client/patient* refers to the recipient of psychological services, whether psychological services are delivered in the context of health care, corporate, supervision, and/or consulting services. The term *in-person,* which is used in combination with the provision of services, refers to interactions in which the psychologist and the client/patient are in the same physical space and does not include interactions that may occur through the use of technologies. The term *remote,* which is also used in combination with the provision of services utilizing telecommunication technologies, refers to the provision of a service that is received at a different site from where the psychologist is physically located. The term *remote* includes no consideration related to distance and may refer to a site in a location that is in the office next door to the psychologist or thousands of miles from the psychologist. The terms *jurisdictions* and *jurisdictional* are used when referring to the governing bodies at states, territories, and provincial governments.

Finally, there are terms within these guidelines related to confidentiality and security. *Confidentiality* means the principle that data or information is not made available or disclosed to unauthorized persons or processes. The terms *security* and *security measures* are terms that encompass all of the administrative, physical, and technical safeguards in an information system. The term *information system* is an interconnected set of information resources within a system and includes hardware, software, information, data, applications, communications, and people.

## Need for the Guidelines

The expanding role of telecommunication technologies in the provision of services and the continuous development of new technologies that may be useful in the practice of psychology support the need for the development of guidelines for practice in this area. Technology offers the opportunity to increase client/patient access to psychological services. Service recipients limited by geographic location, medical condition, psychiatric diagnosis, financial constraint, or other barriers may gain access to high-quality psychological services through the use of technology.

Technology also facilitates the delivery of psychological services by new methods (e.g., online psychoeducation, therapy delivered over interactive videoconferencing) and augments traditional in-person psychological services. The increased use of technology for the delivery of some types of services by psychologists who are health service providers is suggested by recent survey data collected by the APA Center for Workforce Studies (2008) and by the increasing discussion of telepsychology in the professional literature (Baker & Bufka, 2011). Together with the increasing use and payment for the provision of telehealth services by Medicare and private industry, the development of national guidelines for the practice of telepsychology is timely and needed. Furthermore, state and international psychological associations have developed or are beginning to develop guidelines for the provision of psychological services (Canadian Psychological Association, 2006; New Zealand Psychologists Board, 2011; Ohio Psychological Association, 2010).

## Development of the Guidelines

These guidelines were developed by the Joint Task Force for the Development of Telepsychology Guidelines for Psychologists (Telepsychology Task Force) established by the following three entities: the American Psychological Association (APA), the Association of State and Provincial Psychology Boards (ASPPB), and the APA Insurance Trust (APAIT). These entities provided input, expertise, and guidance to the Telepsychology Task Force on many aspects of the profession, including those related to its ethical, regulatory, and legal principles and practices. The Telepsychology Task Force members represented a diverse range of interests and expertise that are characteristic of the profession of psychology, including knowledge of the issues relevant to the use of technology, ethical considerations, licensure and mobility, and scope of practice, to name only a few.

The Telepsychology Task Force recognized that telecommunications technologies provide both opportunities and challenges for psychologists. Telepsychology not only enhances a psychologist's ability to provide services to clients/patients but also greatly expands access to psychological services that, without telecommunication technologies, would not be available. Throughout the development of these guidelines, the Telepsychology Task Force devoted numerous hours to reflecting on and discussing the need for guidance for psychologists in this area of practice; the myriad, complex issues related to the practice of telepsychology; and the experiences that they and other practitioners address each day in the use of technology. There was a concerted focus on identifying the unique aspects that telecommunication technologies bring to the provision of psychological services, as distinct from those present during in-person provision of services. Two important components were identified:

(1) the psychologist's knowledge of and competence in the use of the telecommunication technologies being utilized; and

(2) the need to ensure that the client/patient has a full understanding of the increased risks for loss of security and confidentiality when using telecommunication technologies.

Therefore, two of the most salient issues that the Telepsychology Task Force members focused on when creating this document were the psychologist's own knowledge of and competence in the provision of telepsychology and the need to ensure that the client/patient has a full understanding of the potentially increased risks for loss of security and confidentiality when using technologies.

An additional key issue discussed by the task force members was interjurisdictional practice. The guidelines encourage psychologists to be familiar with and comply with all relevant laws and regulations when providing psychological services across jurisdictional and international borders. The guidelines do not promote a specific mechanism to guide the development and regulation of interjurisdictional practice. However, the Telepsychology Task Force noted that while the profession of psychology does not currently have a mechanism to regulate the delivery of psychological services across jurisdictional and international borders, it is anticipated that the profession will develop a mechanism to allow interjurisdictional practice given the rapidity with which technology is evolving and the increasing use of telepsychology by psychologists working in U.S. federal environments such as the U.S. Department of Defense and the Department of Veterans Affairs.

## Competence of the Psychologist

**Guideline 1. Psychologists who provide telepsychology services strive to take reasonable steps to ensure their competence with both the technologies used and the potential impact of the technologies on clients/patients, supervisees, or other professionals.**

**Rationale.**   Psychologists have a primary ethical obligation to provide professional services only within the boundaries of their competence based on their education, training, supervised experience, consultation, study, or professional experience. As with all new and emerging areas in which generally recognized standards for preparatory training do not yet exist, psychologists utilizing telepsychology aspire to apply the same standards in developing their competence in this area. Psychologists who use telepsychology in their practices assume the responsibility for assessing and continuously evaluating their competencies, training, consultation, experience, and risk management practices required for competent practice.

**Application.**   Psychologists assume responsibility to continually assess both their professional and technical competence when providing telepsychology services. Psychologists who utilize or intend to utilize telecommunication technologies when delivering services to clients/patients strive to obtain relevant professional training to develop their requisite knowledge and skills. Acquiring

competence may require pursuing additional educational experiences and training, including but not limited to a review of the relevant literature, attendance at existing training programs (e.g., professional and technical), and continuing education specific to the delivery of services utilizing telecommunication technologies. Psychologists are encouraged to seek appropriate skilled consultation from colleagues and other resources.

Psychologists are encouraged to examine the available evidence to determine whether specific telecommunication technologies are suitable for a client/patient, based on the current literature available, current outcomes research, best practice guidance, and client/patient preference. Research may not be available in the use of some specific technologies, and clients/patients should be made aware of those telecommunication technologies that have no evidence of effectiveness. However, this, in and of itself, may not be grounds to deny providing the service to the client/patient. Lack of current available evidence in a new area of practice does not necessarily indicate that a service is ineffective. Additionally, psychologists are encouraged to document their consideration and choices regarding the use of telecommunication technologies used in service delivery.

Psychologists understand the need to consider their competence in utilizing telepsychology as well as their client's/patient's ability to engage in and fully understand the risks and benefits of the proposed intervention utilizing specific technologies. Psychologists make reasonable efforts to understand the manner in which cultural, linguistic, socioeconomic, and other individual characteristics (e.g., medical status, psychiatric stability, physical/cognitive disability, personal preferences), in addition to organizational cultures, may impact effective use of telecommunication technologies in service delivery.

Psychologists who are trained to handle emergency situations in providing traditional in-person clinical services are generally familiar with the resources available in their local community to assist clients/patients with crisis intervention. At the onset of the delivery of telepsychology services, psychologists make reasonable efforts to identify and learn how to access relevant and appropriate emergency resources in the client's/patient's local area, such as emergency response contacts (e.g., emergency telephone numbers, hospital admissions, local referral resources, clinical champion at a partner clinic where services are delivered, a support person in the client's/patient's life when available). Psychologists prepare a plan to address any lack of appropriate resources, particularly those necessary in an emergency, and other relevant factors that may impact the efficacy and safety of said service. Psychologists make reasonable efforts to discuss with and provide all clients/patients with clear written instructions as to what to do in an emergency (e.g., where there is a suicide risk). As part of emergency planning, psychologists are encouraged to acquire knowledge of the laws and rules of the jurisdiction in which the client/patient resides and of the differences of those laws from those in the psychologist's jurisdiction, as well as to document all their emergency planning efforts.

In addition, as applicable, psychologists are mindful of the array of potential discharge plans for clients/patients for whom telepsychology services are no longer necessary and/or desirable. If a client/patient recurrently experiences crises/emergencies, which suggests that in-person services may be appropriate, psychologists take reasonable steps to refer a client/patient to a local mental health resource or begin providing in-person services.

Psychologists using telepsychology to provide supervision or consultation remotely to individuals or organizations are encouraged to consult others who are knowledgeable about the unique issues telecommunication technologies pose for supervision or consultation. Psychologists providing telepsychology services strive to be familiar with professional literature regarding the delivery of services via telecommunication technologies, as well as to be competent with the use of the technological modality itself. In providing supervision or consultation via telepsychology, psychologists make reasonable efforts to be proficient in the professional services being offered, the telecommunication modality via which the services are being offered by the supervisee/consultee, and the technology medium being used to provide the supervision or consultation. In addition, since the development of basic professional competencies for supervisees is often conducted in person, psychologists who use telepsychology for supervision are encouraged to consider and ensure that a sufficient amount of in-person supervision time is included so that the supervisees can attain the required competencies or supervised experiences.

## Standards of Care in the Delivery of Telepsychology Services

***Guideline 2. Psychologists make every effort to ensure that ethical and professional standards of care and practice are met at the outset and throughout the duration of the telepsychology services they provide.***

***Rationale.*** Psychologists delivering telepsychology services apply the same ethical and professional standards of care and professional practice that are required when providing in-person psychological services. The use of telecommunication technologies in the delivery of psychological services is a relatively new and rapidly evolving area, and therefore psychologists are encouraged to take particular care to evaluate and assess the appropriateness of utilizing these technologies prior to engaging in, and throughout the duration of, telepsychology practice to determine if the modality of service is appropriate, efficacious, and safe.

Telepsychology encompasses a breadth of different psychological services using a variety of technologies (e.g., interactive videoconferencing, telephone, text, e-mail, Web services, and mobile applications). The burgeoning research in telepsychology suggests that certain types of interactive telepsychological interventions are equal in effectiveness to their in-person counterparts (specific therapies delivered over videoteleconferencing and telephone).

Therefore, before psychologists engage in providing tele-psychology services, they are urged to conduct an initial assessment to determine the appropriateness of the telepsychology service to be provided for the client/patient. Such an assessment may include the examination of the potential risks and benefits of providing telepsychology services for the client's/patient's particular needs, the multicultural and ethical issues that may arise, and a review of the most appropriate medium (video teleconference, text, e-mail, etc.) or best options available for the service delivery. It may also include considering whether comparable in-person services are available and why services delivered via telepsychology are equivalent or preferable to such services. In addition, it is incumbent on the psychologist to engage in a continual assessment of the appropriateness of providing telepsychology services throughout the duration of the service delivery.

**Application.** When providing telepsychology services, considering client/patient preferences for such services is important. However, it may not be solely determinative in the assessment of their appropriateness. Psychologists are encouraged to carefully examine the unique benefits of delivering telepsychology services (e.g., access to care, access to consulting services, client convenience, accommodating client special needs, etc.) relative to the unique risks (e.g., information security, emergency management, etc.) when determining whether or not to offer telepsychology services. Moreover, psychologists are aware of such other factors as geographic location, organizational culture, technological competence (both that of the psychologist and that of the client/patient), and, as appropriate, medical conditions, mental status and stability, psychiatric diagnosis, current or historic use of substances, treatment history, and therapeutic needs that may be relevant to assessing the appropriateness of the telepsychology services being offered. Furthermore, psychologists are encouraged to communicate any risks and benefits of the telepsychology services to be offered to the client/patient and to document such communication. In addition, psychologists may consider some initial in-person contact with the client/patient to facilitate an active discussion on these issues and/or to conduct the initial assessment.

As in the provision of traditional services, psychologists endeavor to follow the best practice of service delivery described in the empirical literature and professional standards (including multicultural considerations) that are relevant to the telepsychological service modality being offered. In addition, they consider the client's/patient's familiarity with and competency for using the specific technologies involved in providing the particular telepsychology service. Moreover, psychologists are encouraged to reflect on multicultural considerations and how best to manage any emergency that may arise during the provision of telepsychology services.

Psychologists are encouraged to assess carefully the remote environment in which services will be provided to determine what impact, if any, there might be on the efficacy, privacy, and/or safety of the proposed intervention offered via telepsychology. Such an assessment of the remote environment may include a discussion of the client's/patient's situation within the home or within an organizational context, the availability of emergency or technical personnel or supports, the risk of distractions, the potential for privacy breaches, or any other impediments that may impact the effective delivery of telepsychology services. Along this line, psychologists are encouraged to discuss fully with the clients/patients their role in ensuring that sessions are not interrupted and that the setting is comfortable and conducive to making progress in order to maximize the impact of the service provided, since the psychologist will not be able to control those factors remotely.

Psychologists are urged to monitor and assess regularly the progress of their client/patient when offering telepsychology services in order to determine if the provision of telepsychology services is still appropriate and beneficial to the client/patient. If there is a significant change in the client/patient or in the therapeutic interaction that causes concern, psychologists make reasonable efforts to take appropriate steps to adjust and reassess the appropriateness of the services delivered via telepsychology. Where it is believed that continuing to provide remote services is no longer beneficial or presents a risk to a client's/patient's emotional or physical well-being, psychologists are encouraged to thoroughly discuss these concerns with the client/patient, appropriately terminate their remote services with adequate notice, and refer or offer any needed alternative services to the client/patient.

## Informed Consent

**Guideline 3. Psychologists strive to obtain and document informed consent that specifically addresses the unique concerns related to the telepsychology services they provide. When doing so, psychologists are cognizant of the applicable laws and regulations, as well as organizational requirements, that govern informed consent in this area.**

**Rationale.** The process of explaining and obtaining informed consent, by whatever means, sets the stage for the relationship between the psychologist and the client/patient. Psychologists make reasonable efforts to offer a complete and clear description of the telepsychology services they provide, and they seek to obtain and document informed consent when providing professional services (APA Ethics Code, Standard 3.10). In addition, they attempt to develop and share the policies and procedures that will explain to their clients/patients how they will interact with them using the specific telecommunication technologies involved. It may be more difficult to obtain and document informed consent in situations where psychologists provide telepsychology services to their clients/patients who are not in the same physical location or with whom they do not have in-person interactions. Moreover, there may be differences with respect to informed consent between the laws and regulations in the jurisdictions where a

psychologist who is providing telepsychology services is located and those in the jurisdiction in which this psychologist's client/patient resides. Furthermore, psychologists may need to be aware of the manner in which cultural, linguistic, and socioeconomic characteristics and organizational considerations may impact a client's/patient's understanding of, and the special considerations required for, obtaining informed consent (such as when securing informed consent remotely from a parent/guardian when providing telepsychology services to a minor).

Telepsychology services may require different considerations for and safeguards against potential risks to confidentiality, information security, and comparability of traditional in-person services. Psychologists are thus encouraged to consider appropriate policies and procedures to address the potential threats to the security of client/patient data and information when using specific telecommunication technologies and to appropriately inform their clients/patients about them. For example, psychologists who provide telepsychology services should consider addressing with their clients/patients what client/patient data and information will be stored, how the data and information will be stored, how it will be accessed, how secure the information communicated using a given technology is, and any technology-related vulnerability to their confidentiality and security that is incurred by creating and storing electronic client/patient data and information.

**Application.**   Prior to providing telepsychology services, psychologists are aware of the importance of obtaining and documenting written informed consent from their clients/patients that specifically addresses the unique concerns relevant to those services that will be offered. When developing such informed consent, psychologists make reasonable efforts to use language that is reasonably understandable by their clients/patients, in addition to evaluating the need to address cultural, linguistic, and organizational considerations and other issues that may have an impact on a client's/patient's understanding of the informed consent agreement. When considering for inclusion in informed consent those unique concerns that may be involved in providing telepsychology services, psychologists may include the manner in which they and their clients/patients will use the particular telecommunication technologies, the boundaries they will establish and observe, and the procedures for responding to electronic communications from clients/patients. Moreover, psychologists are cognizant of pertinent laws and regulations with respect to informed consent in both the jurisdiction where they offer their services and the jurisdiction where their clients/patients reside (see Guideline 8 on Interjurisdictional Practice for more detail).

Besides those unique concerns described above, psychologists are encouraged to discuss with their clients/patients those issues surrounding confidentiality and the security conditions when particular modes of telecommunication technologies are utilized. Along this line, psychologists are cognizant of some of the inherent risks a given telecommunication technology may pose in both the equipment (hardware, software, other equipment components)

and the processes used for providing telepsychology services, and they strive to provide their clients/patients with adequate information to give informed consent for proceeding with receiving the professional services offered via telepsychology. Some of these risks may include those associated with technological problems and those service limitations that may arise because the continuity, availability, and appropriateness of specific telepsychology services (e.g., testing, assessment, and therapy) may be hindered as a result of those services being offered remotely. In addition, psychologists may consider developing agreements with their clients/patients to assume some role in protecting the data and information they receive from them (e.g., by not forwarding e-mails from the psychologist to others).

Another unique aspect of providing telepsychology services is that of billing documentation. As part of informed consent, psychologists are mindful of the need to discuss with their clients/patients prior to the onset of service provision what the billing documentation will include. Billing documentation may reflect the type of telecommunication technology used, the type of telepsychology services provided, and the fee structure for each relevant telepsychology service (e.g., video chat, texting fees, telephone services, chat room group fees, emergency scheduling, etc.). It may also include discussion about the charges incurred for any service interruptions or failures encountered, responsibility for overage charges on data plans, fee reductions for technology failures, and any other costs associated with the telepsychology services that will be provided.

# Confidentiality of Data and Information

***Guideline 4. Psychologists who provide telepsychology services make reasonable efforts to protect and maintain the confidentiality of the data and information relating to their clients/patients and inform them of the potentially increased risks of loss of confidentiality inherent in the use of the telecommunication technologies, if any.***

**Rationale.**   The use of telecommunications technologies and the rapid advances in technology present unique challenges for psychologists in protecting the confidentiality of clients/patients. Psychologists who provide telepsychology learn about the potential risks to confidentiality before utilizing such technologies. When necessary, psychologists obtain the appropriate consultation with technology experts to augment their knowledge of telecommunication technologies in order to apply security measures in their practices that will protect and maintain the confidentiality of data and information related to their clients/patients.

Some of the potential risks to confidentiality include considerations related to uses of search engines and participation in social networking sites. Other challenges in this area may include protecting confidential data and information from inappropriate and/or inadvertent breaches to es-

tablished security methods the psychologist has in place, as well as boundary issues that may arise as a result of a psychologist's use of search engines and participation on social networking sites. In addition, any Internet participation by psychologists has the potential of being discovered by their clients/patients and others and thereby potentially compromising a professional relationship.

**Application.** Psychologists both understand and inform their clients/patients of the limits to confidentiality and the risks of possible access to or disclosure of confidential data and information that may occur during service delivery, including the risks of others gaining access to electronic communications (e.g., telephone, e-mail) between the psychologist and client/patient. Also, psychologists are cognizant of the ethical and practical implications of proactively researching online personal information about their clients/patients. They carefully consider the advisability of discussing such research activities with their clients/patients and how information gained from such searches would be utilized and recorded, as documenting this information may introduce risks to the boundaries of appropriate conduct for a psychologist. In addition, psychologists are encouraged to weigh the risks and benefits of dual relationships that may develop with their clients/patients, due to the use of telecommunication technologies, before engaging in such relationships (APA Practice Organization, 2012).

Psychologists who use social networking sites for both professional and personal purposes are encouraged to review and educate themselves about the potential risks to privacy and confidentiality and to consider utilizing all available privacy settings to reduce these risks. They are also mindful of the possibility that any electronic communication can have a high risk of public discovery. They therefore mitigate such risks by following the appropriate laws, regulations, and the APA Ethics Code (APA, 2002a, 2010) to avoid disclosing confidential data or information related to clients/patients.

## Security and Transmission of Data and Information

**Guideline 5. Psychologists who provide telepsychology services take reasonable steps to ensure that security measures are in place to protect data and information related to their clients/patients from unintended access or disclosure.**

**Rationale.** The use of telecommunication technologies in the provision of psychological services presents unique potential threats to the security and transmission of client/patient data and information. These potential threats to the integrity of data and information may include computer viruses, hackers, theft of technology devices, damage to hard drives or portable drives, failure of security systems, flawed software, ease of accessibility to unsecured electronic files, and malfunctioning or outdated technology. Other threats may include policies and practices of technology companies and vendors, such as tailored mar-

keting derived from e-mail communications. Psychologists are encouraged to be mindful of these potential threats and to take reasonable steps to ensure that security measures are in place for protecting and controlling access to client/patient data within an information system. In addition, they are cognizant of relevant jurisdictional and federal laws and regulations that govern electronic storage and transmission of client/patient data and information, and they develop appropriate policies and procedures to comply with such directives. When developing policies and procedures to ensure the security of client/patient data and information, psychologists may include considering the unique concerns and impacts posed by both intended and unintended use of public and private technology devices, active and inactive therapeutic relationships, and the different safeguards required for different physical environments, different staffs (e.g., professional vs. administrative staff), and different telecommunication technologies.

**Application.** Psychologists are encouraged to conduct an analysis of the risks to their practice settings, telecommunication technologies, and administrative staff in order to ensure that client/patient data and information are accessible only to appropriate and authorized individuals. Psychologists strive to obtain appropriate training or consultation from relevant experts when additional knowledge is needed to conduct an analysis of the risks.

Psychologists strive to ensure that policies and procedures are in place to secure and control access to client/patient information and data within information systems. Along this line, they may encrypt confidential client/patient data for storage or transmission and utilize such other secure methods as safe hardware and software and robust passwords to protect electronically stored or transmitted data and information. If there is a breach of unencrypted electronically communicated or maintained data, psychologists are urged to notify their clients/patients and other appropriate individuals/organizations as soon as possible. In addition, they are encouraged to make their best efforts to ensure that electronic data and information remain accessible despite problems with hardware, software, and/or storage devices by keeping a secure back-up version of such data.

When documenting the security measures to protect client/patient data and information from unintended access or disclosure, psychologists are encouraged to clearly address what types of telecommunication technologies are used (e.g., e-mail, telephone, video teleconferencing, text), how they are used, and whether the telepsychology services used are the primary method of contact or augment in-person contact. When keeping records of e-mail, online messaging, and other work using telecommunication technologies, psychologists are cognizant that preserving the actual communication may be preferable to summarization in some cases depending on the type of technology used.

## Disposal of Data and Information and Technologies

**Guideline 6. Psychologists who provide telepsychology services make reasonable efforts to dispose of data and information and the technologies used in a manner that facilitates protection from unauthorized access and accounts for safe and appropriate disposal.**

**Rationale.** Consistent with the APA "Record Keeping Guidelines" (APA, 2007), psychologists are encouraged to create policies and procedures for the secure destruction of data and information and the technologies used to create, store, and transmit the data and information. The use of telecommunication technologies in the provision of psychological services poses new challenges for psychologists when they consider the disposal methods to utilize in order to maximally preserve client confidentiality and privacy. Psychologists are therefore urged to consider conducting an analysis of the risks to the information systems within their practices in an effort to ensure full and complete disposal of electronic data and information, plus the technologies that created, stored, and transmitted the data and information.

**Application.** Psychologists are encouraged to develop policies and procedures for the destruction of data and information related to clients/patients. They also strive to securely dispose of software and hardware used in the provision of telepsychology services in a manner that ensures that the confidentiality and security of any patient/client information is not compromised. When doing so, psychologists carefully clean all the data and images in the storage media before reuse or disposal, consistent with federal, state, provincial, territorial, and other organizational regulations and guidelines. Psychologists are aware of and understand the unique storage implications related to telecommunication technologies inherent in available systems.

Psychologists are encouraged to document the methods and procedures used when disposing of the data and information and the technologies used to create, store, or transmit the data and information, as well as any other technology utilized in the disposal of data and hardware. They also strive to be aware of malware, cookies, and so forth and to dispose of them routinely on an ongoing basis when telecommunication technologies are used.

## Testing and Assessment

**Guideline 7. Psychologists are encouraged to consider the unique issues that may arise with test instruments and assessment approaches designed for in-person implementation when providing telepsychology services.**

**Rationale.** Psychological testing and other assessment procedures are an area of professional practice in which psychologists have been trained, and they are uniquely qualified to conduct such tests. While some symptom screening instruments are already frequently being administered online, most psychological test instruments and other assessment procedures currently in use were designed and developed originally for in-person administration. Psychologists are thus encouraged to be knowledgeable about, and account for, the unique impacts of such tests, their suitability for diverse populations, and the limitations on test administration and on test and other data interpretations when these psychological tests and other assessment procedures are considered for and conducted via telepsychology. Psychologists also strive to maintain the integrity of the application of the testing and assessment process and procedures when using telecommunication technologies. In addition, they are cognizant of the accommodations for diverse populations that may be required for test administration via telepsychology. These guidelines are consistent with the standards articulated in the most recent edition of *Standards for Educational and Psychological Testing* (American Educational Research Association, American Psychological Association, and the Council on Measurement in Education, 1999).

**Application.** When a psychological test or other assessment procedure is conducted via telepsychology, psychologists are encouraged to ensure that the integrity of the psychometric properties of the test or assessment procedure (e.g., reliability and validity) and the conditions of administration indicated in the test manual are preserved when adapted for use with such technologies. They are encouraged to consider whether modifications to the testing environment or conditions are necessary to accomplish this preservation. For example, a test taker's access to a cell phone, the Internet, or other persons during an assessment could interfere with the reliability or validity of the instrument or its administration. Further, if the individual being assessed receives coaching or has access to such information as potential test responses or the scoring and interpretation of specific assessment instruments because they are available on the Internet, the test results may be compromised. Psychologists are also encouraged to consider other possible forms of distraction which could affect performance during an assessment and which may not be obvious or visible (e.g., sight, sound, and smell) when utilizing telecommunication technologies.

Psychologists are encouraged to be cognizant of the specific issues that may arise with diverse populations when providing telepsychology and to make appropriate arrangements to address those concerns (e.g., language or cultural issues, cognitive, physical, or sensory skills or impairments, or age may impact assessment). In addition, psychologists may consider the use of a trained assistant (e.g., a proctor) to be on the premises at the remote location in an effort to help verify the identity of the client/patient, provide needed on-site support to administer certain tests or subtests, and protect the security of the psychological testing and/or assessment process.

When administering psychological tests and other assessment procedures when providing telepsychology services, psychologists are encouraged to consider the quality

of those technologies that are being used and the hardware requirements that are needed in order to conduct the specific psychological test or assessment. They also strive to account for and be prepared to explain the potential difference between the results obtained when a particular psychological test is conducted via telepsychology and when it is administered in person. In addition, when documenting findings from evaluation and assessment procedures, psychologists are encouraged to specify that a particular test or assessment procedure has been administered via telepsychology and to describe any accommodations or modifications that have been made.

Psychologists strive to use test norms derived from telecommunication technologies administration if such are available. Psychologists are encouraged to recognize the potential limitations of all assessment processes conducted via telepsychology and to be ready to address the limitations and potential impact of those procedures.

## Interjurisdictional Practice

**Guideline 8. Psychologists are encouraged to be familiar with and comply with all relevant laws and regulations when providing telepsychology services to clients/patients across jurisdictional and international borders.**

**Rationale.**  With the rapid advances in telecommunication technologies, the intentional or unintentional provision of psychological services across jurisdictional and international borders is becoming more of a reality for psychologists. Such service provision may range from the psychologists or clients/patients being temporarily out of state (including split residence across states) to psychologists offering their services across jurisdictional borders as a practice modality to take advantage of new telecommunication technologies. Psychological service delivery systems within such institutions as the U.S. Department of Defense and the Department of Veterans Affairs have already established internal policies and procedures for providing services within their systems that cross jurisdictional and international borders. However, the laws and regulations that govern service delivery by psychologists outside of those systems vary by state, province, territory, and country (APA Practice Organization, 2010). Psychologists should make reasonable efforts to be familiar with and, as appropriate, to address the laws and regulations that govern telepsychology service delivery within the jurisdictions in which they are situated and the jurisdictions where their clients/patients are located.

**Application.**  It is important for psychologists to be aware of the relevant laws and regulations that specifically address the delivery of professional services by psychologists via telecommunication technologies within and between jurisdictions. Psychologists are encouraged to understand what services the laws and regulations of a jurisdiction consider as telehealth or telepsychology. In addition, psychologists are encouraged to review the relevant jurisdictions' professional licensure requirements, the ser-

vices and telecommunication modalities covered, and the information required to be included in providing informed consent. It is important to note that each jurisdiction may or may not have specific laws that impose special requirements for providing psychological services via telecommunication technologies. The APA Practice Organization (2010) has found that there are variations in whether psychologists are specified as a single type of provider or covered as part of a more diverse group of providers. In addition, there is wide diversity in the types of services and the telecommunication technologies that are covered by these laws.

At the present time, there are a number of jurisdictions without specific laws that govern the provision of psychological services utilizing telecommunication technologies. When providing telepsychology services in these jurisdictions, psychologists are encouraged to be aware of any opinions or declaratory statements issued by the relevant regulatory bodies and/or other practitioner licensing boards that may help inform them of the legal and regulatory requirements involved when delivering telepsychology services within those jurisdictions.

Moreover, because of the rapid growth in the utilization of telecommunication technologies, psychologists strive to keep abreast of developments and changes in the licensure and other interjurisdictional practice requirements that may be pertinent to their delivery of telepsychology services across jurisdictional boundaries. Given the direction of various health professions, and current federal priorities to resolve problems created by requirements of multijurisdictional licensure (e.g., the Federal Communications Commission's 2010 National Broadband Plan, the Canadian government's 1995 Agreement on Internal Trade), the development of a telepsychology credential required by psychology boards for interjurisdictional practice is a probable outcome. For example, nursing has developed a credential that is accepted by many U.S. jurisdictions that allows nurses licensed in any participating jurisdiction to practice in person or remotely in all participating jurisdictions. In addition, an ASPPB task force has drafted a set of recommendations for such a credential.

## Conclusion

It is important to note that it is not the intent of these guidelines to prescribe specific actions, but rather, to offer the best guidance available at present when incorporating telecommunication technologies in the provision of psychological services. Because technology and its applicability to the profession of psychology constitute a dynamic area with many changes likely ahead, these guidelines also are not inclusive of all other considerations and are not intended to take precedence over the judgment of psychologists or applicable laws and regulations that guide the profession and practice of psychology. It is hoped that the framework presented will guide psychologists as the field evolves.

## REFERENCES

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education. (1999). *Standards for educational and psychological testing.* Washington, DC: American Educational Research Association.

American Psychological Association. (2002a). Ethical principles of psychologists and code of conduct. *American Psychologist, 57,* 1060–1073. doi:10.1037/0003-066X.57.12.1060

American Psychological Association. (2002b). Criteria for practice guideline development and evaluation. *American Psychologist, 57,* 1048–1051. doi:10.1037/0003-066X.57.12.1048

American Psychological Association. (2003). Guidelines on multicultural education, training, research, practice, and organizational change for psychologists. *American Psychologist, 58,* 377–402. doi:10.1037/0003-066X.58.5.377

American Psychological Association. (2007). Record keeping guidelines. *American Psychologist, 62,* 993–1004. doi:10.1037/0003-066X.62.9.993

American Psychological Association. (2010). *Ethical principles of psychologists and code of conduct including 2010 amendments.* Retrieved from http://www.apa.org/ethics/code/index.aspx

American Psychological Association Center for Workforce Studies. (2008). *2008 APA survey of psychology health service providers: Module D: Information on telepsychology, medication, and collaboration.* Retrieved from http://www.apa.org/workforce/publications/08-hsp/telepsychology/index.aspx

American Psychological Association Practice Organization. (2010). Telehealth: Legal basics for psychologists. *Good Practice, 41,* 2–7.

American Psychological Association Practice Organization. (2012, Spring/Summer). Social media: What's your policy? *Good Practice,* pp. 10–18.

Baker, D. C., & Bufka, L. F. (2011). Preparing for the telehealth world: Navigating legal, regulatory, reimbursement, and ethical issues in an electronic age. *Professional Psychology: Research and Practice, 42*(6), 405–411. doi:10.1037/a0025037

Canadian Psychological Association. (2006). *Ethical guidelines for psychologists providing psychological services via electronic media.* Retrieved from http://www.cpa.ca/aboutcpa/committees/ethics/psychserviceselectronically/.

Committee on National Security Systems. (2010). *National information assurance (IA) glossary.* Retrieved from https://www.cnss.gov/Assets/pdf/cnssi_4009.pdf

New Zealand Psychologists Board. (2011). *Draft guidelines: Psychology services delivered via the Internet and other electronic media.* Retrieved from http://psychologistsboard.org.nz/cms_show_download.php?id=141

Ohio Psychological Association. (2010). *Telepsychology guidelines.* Retrieved from http://www.ohpsych.org/psychologists/files/2011/06/OPATelepsychologyGuidelines41710.pdf

U.S. Department of Commerce, National Institute of Standards and Technology. (2008). *An introductory resource guide for implementing the Health Insurance Portability and Accountability Act (HIPAA) Security Rule.* Gaithersburg, MD: Author.

U.S. Department of Commerce, National Institute of Standards and Technology. (2011). *Glossary of key information security terms.* Gaithersburg, MD: Author.

U.S. Department of Health and Human Services, Health Resources and Services Administration. (2010). *Special report to the Senate Appropriations Committee: Telehealth licensure report.* Retrieved from http://www.hrsa.gov/healthit/telehealth/licenserpt10.pdf

Exhibit H

1          Pages 1 - 74

2              UNITED STATES DISTRICT COURT

3            NORTHERN DISTRICT OF CALIFORNIA

4    Before The Honorable Paul Singh Grewal, Magistrate Judge

5    JESSE HERNANDEZ, et al.,       Case No. 5:13-cv-02354-PSG

6         Plaintiffs,

7       v.

8    COUNTY OF MONTEREY, et al.,

9         Defendants.

10   _____/

11                          San Francisco, California
                             Thursday, April 28, 2016
12

13
          TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL
14      ELECTRONIC SOUND RECORDING - FTR 10:04 - 11:38

15

16   APPEARANCES:

17        For Plaintiffs:

18             **PETER GEORGE BERTLING, ESQ.**
               Bertling and Clausen, LLP
19             15 W. Carrillo Street, Suite 100
               Santa Barbara, CA 93101-8215
20
               **SUSAN K. BLITCH, ESQ.**
21             County Counsel
               Office of the County Counsel
22             County of Monterey
               168 West Alisal Street, 3rd Floor
23             Salinas, CA 93901-2680

24

25   **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

1    **APPEARANCES CONTINUED**

2

3            For Defendants:

4                        **ERNEST JAMES GALVAN, ESQ.**
                        **MICHAEL WILLIAM BIEN, ESQ.**
                        Rosen Bien Galvan & Grunfeld LLP
5                        50 Fremont Street, 19th Floor
                        San Francisco, CA 94105.

6

7                        **JAMES SAMUEL EGAR, ESQ.**
                        Monterey County Public Defender's Office
8                        111 W. Alisal
                        Salinas, CA 93901

9

10

11    *Transcribed by Kelly Polvi, Contract Transcriber, utilizing*
      *court reporting and transcription hardware and software.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    doctor you talk to.

2         I have no problem, if you look at the beginning of the

3    implementation plan, there's a yearly review of staffing, of

4    incident reports, of custody -- deaths, et cetera, et cetera,

5         I'm happy to have the executive team over at the jail

6    review mental health needs on a yearly basis or even a biannual

7    basis.  But really this is where I get suspicious, is that we

8    had been working to get specific implementation plans but we

9    have a roadmap of what needs to be done and this is very

10   amorphous.

11        **THE COURT:**  Okay.  Thank you.

12        On the issue of telepsychiatry, let me just ask.

13        Mr. Galvan, what is the plaintiffs' specific objection?

14   Just the potential that this may become the norm rather than

15   the exception?

16        **MR. GALVAN:**  Well, the specific document that CFMG

17   attached to their plan, which is their telepsychiatry policy,

18   basically it's the same policy that they've had all along.

19        And so one of our concerns about the way that the

20   defendants are approaching their implementation of this

21   settlement agreement is that there are no changes from the

22   practices before we filed the case.

23        And so if there's one thing that we -- we believe is

24   required by the settlement agreement is change.

25        And they recite that they are starting change, that they

1    had started change before they settled.

2         But more specifically, the problem is that that

3    particular policy allows for telepsychiatry in the very first

4    visit with a person with serious mental illness and in any kind

5    of emergency.

6         And what our experts have seen about that that's

7    troubling is that telepsychiatry needs to be prescribed based

8    on some qualified clinical knowledge about the patient.

9         So in other words, someone who actually has established a

10   bench-line exam of that patient, either psychiatric or medical,

11   then you could say, "Okay, this condition we're going to follow

12   with telepsychiatry."

13        THE COURT:  Are you saying that you can't establish or

14   measure that bench-line using telepsychiatry in the first

15   instance?  Is that what your expert is suggesting?

16        MR. GALVAN:  That's what -- I mean, that is what the

17   experts are suggesting.  That's what -- and he also attached

18   the American Psychiatric Association guidelines, which are also

19   saying that as well.

20        And then also for some patients it's not appropriate.  If

21   you have patients whose symptoms prevent them from

22   understanding even what is that person on the screen, then

23   you're not going to use -- should not be using telepsychiatry

24   for that.

25        And this is -- and also an example I think where we're --

1    it's just a clear breach of contract.  Because the settlement

2    agreement says a face-to-face clinical encounter -- or clinical

3    encounter shall typically be face to face.  And what we get

4    instead is we could make it on telephone all the time whenever

5    we want.

6       THE COURT:  Well, the agreement does say that the

7    encounter must be typically in person.  I see that.  But it

8    also says explicit that this term does not preclude the use;

9    right?

10      MR. GALVAN:  Correct.  And we are adhering to that

11   faithfully.  We're not asking them to preclude the use.  We're

12   asking them just to provide the clinicians with some basic

13   guidelines as to when it's appropriate and when it's not

14   appropriate.

15      THE COURT:  Okay.  I think I have it.

16      MR. GALVAN:  Thank you.

17      THE COURT:  Mr. Bertling.

18      MR. BERTLING:  Your Honor, we spent a considerable amount

19   of time making certain that language was in there, that

20   face-to-face included the use of telepsychiatry.  Because in

21   some circumstances, for example, an emergency circumstance,

22   that may be the quickest route to get one of our patients to

23   have an evaluation by a psychiatrist.

24      We use high-tech equipment so we're not using outdated

25   equipment, it's an effective method of conducting an interview

1    with a client, evaluating them, it's a situation where the

2    nurses there, as well, provide additional information of

3    necessary.

4         And on the rest of that note, just (indiscernible.)

5         **THE COURT:**  Okay.  Thank you.

6         All right.  That takes us, I believe, to a raft of issues

7    regarding dental care.  And I will say candidly, for as long as

8    we've all been working on this case, I have not focused as much

9    on the dental-care issues as some of these others that you've

10   raised.  So I have spent some time digging into some of the

11   details in your briefs on dental care disputes that I have not

12   with some of the others I was more familiar with.

13        That's a long way of me saying I think I understand your

14   respective positions on each of these issues, but I have just a

15   couple of questions.  And of course I'll invite you to

16   supplement your papers as you see fit.

17        One question I had regarding dental care was with respect

18   to the oral pathologies.  And in particular, what direction, if

19   any, is given for when oral pathologies are going to be

20   required, if at all.

21        So Mr. Bertling, if you could just perhaps elaborate on

22   what you've presented in your papers?

23        **MR. BERTLING:**  Certainly, Your Honor.

24        I think typically it starts out as a nurse or somebody

25   observing a lesion in the patient's oral cavity.  If that

## CERTIFICATE OF CONTRACT TRANSCRIBER

I, Kelly Polvi, CSR, RMR, FCRR, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further, that I am not financially nor otherwise interested in the outcome of the action.

Dated June 1, 2016.

_____
Kelly Polvi, CSR, RDR, FCRR
Contract Transcriber

*Kelly Polvi, CSR 6389*
*Registered Diplomate Reporter*
*Federal Certified Realtime Reporter*
*P.O. Box 1427*
*Alameda, CA 94501*
*(503) 779-7406; kpolvi@comcast.net*

Exhibit I

# OXFORD TEXTBOOKS IN PSYCHIATRY

## Oxford Textbook of

# Correctional Psychiatry



Edited by

**Robert L. Trestman PhD MD**
**Kenneth L. Appelbaum MD**
**Jeffrey L. Metzner MD**



OXFORD

# OXFORD
UNIVERSITY PRESS

Oxford University Press is a department of the University of
Oxford. It furthers the University's objective of excellence in research,
scholarship, and education by publishing worldwide.

Oxford   New York

Auckland   Cape Town   Dar es Salaam   Hong Kong   Karachi
Kuala Lumpur   Madrid   Melbourne   Mexico City   Nairobi
New Delhi   Shanghai   Taipei   Toronto

With offices in

Argentina   Austria   Brazil   Chile   Czech Republic   France   Greece
Guatemala   Hungary   Italy   Japan   Poland   Portugal   Singapore
South Korea   Switzerland   Thailand   Turkey   Ukraine   Vietnam

Oxford is a registered trademark of Oxford University Press
in the UK and certain other countries.

Published in the United States of America by
Oxford University Press
198 Madison Avenue, New York, NY 10016

© Oxford University Press 2015

All rights reserved. No part of this publication may be reproduced, stored in
a retrieval system, or transmitted, in any form or by any means, without the prior
permission in writing of Oxford University Press, or as expressly permitted by law,
by license, or under terms agreed with the appropriate reproduction rights organization.
Inquiries concerning reproduction outside the scope of the above should be sent to the
Rights Department, Oxford University Press, at the address above.

You must not circulate this work in any other form
and you must impose this same condition on any acquirer.

Library of Congress Cataloging-in-Publication Data
Oxford textbook of correctional psychiatry / edited by Robert L. Trestman,
Kenneth L. Appelbaum, Jeffrey L. Metzner.
    p. ; cm.
Textbook of correctional psychiatry
Includes bibliographical references.
ISBN 978–0–19–936057–4 (alk. paper)
I. Trestman, Robert L., editor.   II. Appelbaum, Kenneth L., editor.   III. Metzner, Jeffrey L.,
editor.   IV. Title: Textbook of correctional psychiatry.
[DNLM:   1.  Forensic Psychiatry—methods.   2.  Mental Health Services.   3.  Prisoners—
psychology.   4.  Prisons.  W 740]
RC451.4.P68
365'.6672—dc23
2014022223

The science of medicine is a rapidly changing field. As new research and clinical experience broaden our
knowledge, changes in treatment and drug therapy occur. The author and publisher of this work have checked
with sources believed to be reliable in their efforts to provide information that is accurate and complete, and
in accordance with the standards accepted at the time of publication. However, in light of the possibility of
human error or changes in the practice of medicine, neither the author, nor the publisher, nor any other party
who has been involved in the preparation or publication of this work warrants that the information contained
herein is in every respect accurate or complete. Readers are encouraged to confirm the information contained
herein with other reliable sources, and are strongly advised to check the product information sheet provided
by the pharmaceutical company for each drug they plan to administer.

9 8 7 6 5 4 3 2 1
Printed in the United States of America
on acid-free paper

46 Pharmacotherapy for substance use
disorders within correctional facilities   260
Sarah E. Wakeman and Josiah D. Rich

47 Transition to the community   266
Jaimie P. Meyer and Frederick L. Altice

SECTION XI
Aggression, self-injury, and misconduct

48 Aggression   275
Robert L. Trestman

49 Self-injurious behaviors   281
Kenneth L. Appelbaum

50 Behavior management plans   286
Henry Schmidt III and André M. Ivanoff

SECTION XII
Distinct populations

51 Gender-specific treatment   293
Catherine F. Lewis

52 Developmental disabilities   299
Barbara E. McDermott

53 Traumatic brain injury   305
Pamela M. Diamond

54 A roadmap for providing psychiatric
services to incarcerated veterans: a
challenging subspecialty   310
James F. DeGroot

55 Lesbian, gay, bisexual, and
transgendered inmates   315
Randi Kaufman, Kevin Kapila, and
Kenneth L. Appelbaum

56 Juveniles   321
Carl C. Bell

57 Aging prisoners and the provision of
correctional mental health   326
Kristin G. Cloyes and Kathryn A. Burns

58 Clinical and legal implications of gangs   331
Annette L. Hanson

59 Treatment of incarcerated sex offenders   336
Fabian M. Saleh, Albert J. Grudzinskas,
and H. Martin Malin

60 Cultural competence   341
Reena Kapoor and Ezra E. H. Griffith

SECTION XIII
Special topics

61 Forensic issues   349
Erik J. Roskes and Donna Vanderpool

62 Psychological testing   354
Ira K. Packer and Tasha R. Phillips

63 Standards and accreditation for jails,
prisons, and juvenile facilities   359
Joseph V. Penn

64 Hunger strikes   365
Emily A. Keram

65 Responding to prisoner sexual
assaults: successes, promising
practices, and challenges   370
Robert W. Dumond and Doris A. Dumond

66 Systems monitoring and quality
improvement   377
Jeffrey L. Metzner

67 Leadership, training, and educational
opportunities   382
Raymond F. Patterson

68 Role of clinical trainees   387
Charles L. Scott and Brian J. Holoyda

69 International perspectives and
practice differences   392
Lindsay D. G. Thomson

70 Correctional mental health research
and program evaluation   399
Nancy Wolff

71 The future of correctional psychiatry: evolving
and recommended standards   404
Kenneth L. Appelbaum, Robert L. Trestman,
and Jeffrey L. Metzner

Appendix: Resources   409
Stacey K. Rich and Robert L. Trestman

Index   411

Randi Kaufman, PsyD
Department of Psychiatry
Harvard Medical School

Emily A. Keram, MD
Department of Psychiatry
University of California, San Francisco

James L. Knoll, IV, MD
Department of Psychiatry
SUNY Upstate Medical University

Catherine M. Knox, MN, RN

Li-Wen Lee, MD
Department of Psychiatry
Columbia University College of Physicians and Surgeons

Catherine F. Lewis, MD
Department of Psychiatry
University of Connecticut Health Center

Ingrid Li, MD
Department of Psychiatry
Rutgers University—Robert Wood Johnson Medical School

Rebecca Lubelczyk, MD
Department of Family Medicine and Community Health
University of Massachusetts Medical School

H. Martin Malin, PhD
The Institute for Advanced Study of Human Sexuality

Michael P. Maloney, PhD
Department of Psychiatry and the Biobehavioral Sciences
The David Geffen School of Medicine
University of California

Barbara E. McDermott, PhD
Department of Psychiatry and Behavioral Sciences
University of California

Jeffrey L. Metzner, MD
Department of Psychiatry
University of Colorado School of Medicine

Jaimie P. Meyer, MD, MSc
Section of Infectious Diseases, AIDS Program
Yale School of Medicine

Kevin R. Murphy, PhD
Department of Psychiatry
University of Massachusetts Medical School

Michael A. Norko, MD, MAR
Department of Psychiatry
Yale School of Medicine

Maureen L. O'Keefe, MA
Colorado Department of Corrections

Jason D. Ourada, MD
Suffolk County House of Correction

Ira K. Packer, PhD
Department of Psychiatry
University of Massachusetts Medical School

Raymond F. Patterson, MD
Department of Psychiatry
Howard University

Joseph V. Penn, MD
Department of Psychiatry
Correctional Managed Care
University of Texas Medical Branch

Mary Perrien, PhD

Tasha R. Phillips, PsyD
Department of Psychiatry
University of Massachusetts Medical School

Debra A. Pinals, MD
Department of Psychiatry
University of Massachusetts Medical School

Rusty Reeves, MD
Department of Psychiatry
University Correctional Health Care
Rutgers University—Robert Wood
    Johnson Medical School

Josiah D. Rich, MD, MPH
Departments of Medicine and Epidemiology
The Warren Alpert Medical School
Brown University

Stacey K. Rich, AS
Correctional Managed Health Care
University of Connecticut Health Center

Erik J. Roskes, MD
Department of Psychiatry
University of Maryland School of Medicine

# CHAPTER 12

# Interviewing in correctional settings

Li-Wen Lee

## Introduction

Research has shown that mental illness is disproportionately represented among incarcerated individuals as compared to the community setting (Abram, Teplin, & McClelland, 2003; Fazel & Seewald, 2012; Steadman, Osher, Robbins, Case, & Samuels, 2009; Teplin, 1994). According to the Bureau of Justice Statistics, in 2005 more than half of all jail and prison inmates had a recent history of symptoms of a mental health problem (James & Glaze, 2006). This high rate of mental illness is both an opportunity for and a source of significant challenges to the provision of much-needed treatment. Significant numbers of inmates do not present as acutely ill during intake yet have current or lifetime psychiatric disorders and may require further assessment (Trestman, Ford, & Zhang, 2007). Without adequate assessment and treatment, inmates with mental illness may harm themselves, other inmates, or correctional staff; become victimized; or disrupt facility operations (Ogloff et al., 1994). An essential component in assessment and appropriate management is the psychiatric interview.

While there are helpful standards and guidelines for mental health services in correctional settings (Hills, Siegfried, & Ickowitz, 2004; Metzner, 1997a, 1997b; National Commission on Correctional Health Care, 2008), relatively little has been written about the specific impact of the correctional setting or the specific features of the correctional population that should be understood when conducting the mental health interview. Given the importance of the interview in providing mental health treatment, the essential elements and complexities involved in conducting an effective interview in the correctional setting are presented in this chapter. This chapter assumes that the interviewer understands fundamental clinical evaluation skills (American Psychiatric Association, 2006). Aspects of the psychiatric interview are reviewed with particular attention given to how the correctional population and setting can affect the interview process. References are provided where possible; in other instances, information has been drawn from clinical experience, as there is a limited body of literature in this area.

## Population factors

Presentations of mental disorders in corrections may be complicated by high rates of comorbidities, substance use, and personality disorders, in particular, that may make diagnostic clarity more difficult to achieve. An estimated 85 percent of jail and prison inmates are substance involved—they meet criteria for a history of substance use disorders or committed their offenses due to drug use or other drug-related activity (National Center on Addiction and Substance Abuse at Columbia University, 2010). Approximately 42 percent of state prison inmates and 49 percent of local jail inmates have both mental health and substance abuse problems (James & Glaze, 2006). The consequences of substance use include the more immediate effects of intoxication or withdrawal and the induction or exacerbation of symptoms of mental disorders. Inmates are at increased risk of presenting with acute consequences of substance use in jails than in prisons, as they are typically in the community before admission. Even so, interviewers should be aware that drugs and alcohol are available within prisons.

Personality disorders in prison settings have been estimated to be three times more common than in the community (Rotter, Way, Steinbacher, Sawyer, & Smith, 2002). Common disorders in the incarcerated population include antisocial and borderline personality disorders, although other diagnoses such as paranoid, schizotypal, and narcissistic personalities also pose challenges (Trestman, 2000). Interviewers should be alert to indications of a personality disorder and ensure that countertransference does not detract from the evaluation. Countertransference to severe personality disorders may lead to underdiagnosis of treatable mental illness. However, research shows that individuals with personality disorder are more likely to have worse mental health functioning and higher suicide risk (Black, Gunter, Loveless, Allen, & Sieleni, 2010).

## Environmental factors

In corrections, security requirements supersede all other activities. Security staff regulates all entry, exit, and internal movement; access to inmates is dictated by security rules and institution schedules. Even with these limitations, effort should be made to ensure that there are acceptable parameters within which to conduct the evaluation. Common examples of institution schedules that limit clinicians' access to inmates include designated "count" times and meal times. Planning around institution schedules may help ensure adequate time is available; however, some situations may require established lines of communication or policy to make urgent or emergent assessments possible. In some facilities, security rules may result in interviewees remaining in restraints during an interview, or an

officer may habitually remain present during the interview. In this situation, it may be appropriate to request that correctional officers wait outside the interview room but maintain safety through line-of-sight observation.

Location is another consideration. The physical space should allow for confidentiality and clear communication. It may seem logistically simpler if the evaluation is conducted cell-side. This, however, raises confidentiality issues if other inmates or officers nearby can hear the interview, and it may become difficult for the clinician and the inmate to hear one another. Interviews should occur in private, away from other prisoners and, when possible, away from correctional officers (Blaauw & van Marle, 2007).

In addition to considerations about where and when to conduct interviews, clinicians also need to be aware of their personal safety. Concerns include both the evaluee and other inmates (see Chapter 7). Assault is a possibility in many mental health settings, including community clinics and inpatient hospitals; however, clinicians understand that most mental health patients are not violent. Similarly, most patients in the correctional system are not aggressive toward clinicians, but it remains essential to be aware of the environment and to avoid exposure to vulnerable positions to the extent possible. While maintenance of confidentiality is essential, clinicians should consider whether the interview location leaves the clinician alone in a potentially dangerous situation. Clinicians should be aware of how to exit the interview area and how to obtain assistance should they need to end an interview or feel threatened.

## Culture of correctional facilities

Correctional facilities have their own cultures, and understanding these cultures is an important component of assessing the interviewee (Metzner, 1998). The location where the individual is placed within the correctional setting is important. There are significant differences between minimum- and maximum-security settings and differences between general population and disciplinary segregation. There can also be notable differences between housing blocks within the general population, and prisons vary in their individual cultures. There may be differences in the level of crowding, gang presence, and the ways in which institution rules are enforced. These differences can affect symptoms and presentations during evaluation. There is also prison jargon, or slang, that carries regional variations. An interviewer's ability to understand jargon is helpful in correctly interpreting what the interviewee is saying and potentially helpful in developing rapport with the interviewee.

Ramifications of jail and prison culture extend to interactions with mental health staff and, therefore, affect the interview process. The "inmate code" discourages sharing information with staff, which may manifest as withholding information from clinicians (Rotter, McQuistion, Broner, & Steinbacher, 2005). The code places value on the appearance of strength, which may result in inmates deliberately intimidating others, including clinicians. Inmates who appear weak are more vulnerable to victimization, and identification as a mental health patient adds to the appearance of weakness, thereby motivating some inmates to avoid treatment. If mental health staff are identified with the institution's custodial administration, there may also be issues with trust. In other institutions, mental health staff may be seen as separate from security staff and, therefore, viewed as potential allies or advocates.

These perceptions may create barriers to the inmate's engagement in the evaluation and treatment process. Clinicians should be clear about the purpose of the interview, and it may help to be forthcoming about the limitations of the clinician's role. If inmates are reluctant or hostile when addressing their treatment needs, motivational interviewing (MI) may help overcome treatment resistance. MI is used to explore and resolve ambivalence toward change by using "change talk" that is empathic and supportive rather than confrontational (Hettema, Steele, & Miller, 2005). The evidence base for MI supports use in substance-abusing populations as well as those with comorbid substance abuse and schizophrenia (Barrowclough et al., 2001), and MI has been used in the forensic population (McMurran, 2009).

## Confidentiality

Maintaining confidentiality is often a concern of inmates being interviewed due to the stigma and vulnerabilities associated with identification as a mental health patient. The correctional setting has additional exceptions to consider beyond dangerousness to self or others, such as information on potential security breaches at the facility. Confidentiality is also difficult to guarantee absolutely, as even lining up for medications may mark an individual as a mental health client. Acknowledging these concerns and informing interviewees when confidentiality cannot be maintained is recommended (see Chapter 8).

## Communication skills

The interviewee's ability to communicate should be assessed, and the interviewer should evaluate barriers to communication and determine whether there are means of addressing those barriers (American Psychiatric Association, 2006). In-person interpreter services are often most effective; when not available, telephone interpreter services are an accepted alternative. Hearing impairment may require use of a signing interpreter and referral to medical services to assess the need for a hearing aid. In some instances, neurologic symptoms such as aphasia may be the source of the communication barrier. Psychiatric symptoms such as thought disorder may also result in difficulty communicating—assessment of symptoms is essential to appropriate diagnosis and treatment. These problems may be misinterpreted as behavioral issues with a volitional component, such as deliberately ignoring or defying instructions from officers or institutional rules. Thus, identification and understanding of communication barriers is important in this environment.

### Scenario: communication skills

A recently arrested jail inmate is referred for psychiatric evaluation of psychotic symptoms. The referral describes the inmate as impulsive, irritable, having prominent word salad, and having difficulty following instructions from officers. The only known history is of epilepsy.

On interview, the inmate is indignant about the mental health referral. He speaks loudly and rapidly, and while his rhythm of speech resembles that of someone speaking in sentences, much

of what he says cannot be followed. Some words sound made up. He eventually provides a history of a gunshot wound to the head six years ago, which preceded the onset of seizures. A scar is visible on the left side of his head. Prior medical records confirm brain injury with resulting Wernicke's aphasia. Due to his diagnosis, the inmate was unable to convey his history and was not psychotic.

## Interview structure

The structure of the interview is similar in correctional and community settings (American Psychiatric Association, 2006). The sequence may vary, but the content typically includes the following elements: presenting illness, past psychiatric history, psychosocial and developmental history, substance abuse history, relevant medical history, legal history, review of symptoms, and mental status examination. These elements are discussed in the following paragraphs.

- ◆ Presenting illness. In exploring the chief complaint or the reason for referral, prison-specific stressors should be considered. Interpersonal stressors within corrections may involve conflict with other inmates, gangs, or correctional officers. Environmental changes can include moving to a new facility or imposition of disciplinary sanctions. Community factors can also have a role. Difficulties experienced by family may negatively affect an inmate's emotional well-being, especially when associated with frustration or guilt about inability to help loved ones due to incarceration. Incarceration can also lead to erosion of personal relationships, and a break with a significant other can be particularly difficult, as can lack of access or visitation from supports in the community.

- ◆ Past psychiatric history. A review of prior mental health treatment can provide information about the trajectory of illness, treatment options, and sources of treatment records. The interviewee's perspective on personal history can also provide an understanding of the level of insight into illness, likelihood of treatment adherence, and approaches to developing rapport. As mentioned earlier, past psychiatric history should encompass treatment while incarcerated and in the community, with review of medication history, hospitalization, outpatient care, response to treatment, and deliberate self-injury or suicide attempts.

- ◆ Psychosocial and developmental history. Developmental history may provide helpful insights into the interviewee's current difficulties. In the correctional population, assessment for developmental delay may contribute to a clearer understanding of problems with impulse control, planning, and/or comprehension, all deficits that can hinder an inmate's ability to follow institutional rules. If the history suggests intellectual disability not previously diagnosed, further cognitive testing may be indicated. Psychosocial history should include inquiry into trauma and victimization, whether from childhood abuse or adulthood experiences. Trauma may have occurred during the current or a prior incarceration. Additionally, functioning in the community should be reviewed, including histories of relationships, education, employment, and military service. In addition to contributing to the overall clinical understanding of

the individual, these areas of investigation have a specific application in corrections. Difficulties in the community may point to areas that should be addressed during treatment. The relationship history may suggest supports available to the inmate during incarceration, and an overall understanding of community functioning will assist in reentry planning.

- ◆ Substance abuse history. It is appropriate in correctional mental health interviews to conduct in-depth inquiries into substance use history. In addition to the type and extent of substance use, discussion regarding the consequences of use should be included. The possibility of ongoing use may be relevant, as drugs of abuse, while more difficult to obtain, are accessible in jails and prisons (see Chapter 24). The consequences of substance use in corrections may include debts owed to other inmates or disciplinary sanctions and may result in stressors relevant to the mental health presentation. If there is suspicion of ongoing or recent substance use, drug testing should be considered (see Chapter 24).

- ◆ Medical history. Review of relevant medical history includes a focus on brain injury, seizure disorders, and other neurologic conditions and documentation of conditions with psychiatric sequelae (see Chapter 38). In corrections, the medical service provides health screening and management of medical problems. When relevant physical health issues exist, coordination of the evaluation and subsequent treatment with the medical service may be indicated.

- ◆ Legal history. All inmates should be asked about their chronological history of arrest and conviction, including the index offense, and about the nature of the offenses and contributing factors, including violent or sexual offenses. If unsentenced, the interviewee may be unwilling to disclose details of the index defense for fear of compromising the ongoing case. It is nevertheless appropriate to obtain information about the charges, issues, and concerns the interviewee has about the pending case (see Chapter 61). Understanding the role of mental illness in prior offenses may be helpful in foreseeing potential symptom manifestations in the correctional setting and in planning reentry needs when the inmate returns to the community. Another consideration is duration of sentence and type of conviction. Certain classes of offenses, such as sexual offenses, carry stigma within the correctional population, and such offenders may be more vulnerable to interpersonal stressors if their offenses become known. They may also be at higher risk for suicide. Inmates entering the system for the first time are also more vulnerable, and inmates with lengthy sentences may face problems with hopelessness. In addition to offense history, the interviewee's experience while incarcerated should be reviewed. As mentioned earlier, trauma experienced during incarceration may affect mental disorders or cause mental health symptoms.

- ◆ Review of symptoms. The review of symptoms is similar to that in other mental health settings, with inquiry into mood, anxiety, and psychotic symptoms as well as behavioral and functional areas, including sleep, appetite, activity levels, and interest. The review may uncover additional symptoms not reported by the interviewee during discussion of the present illness.

- ◆ Mental status examination. As with other sections of the interview, the components of the mental status examination (MSE)

are essentially the same as with the MSE conducted in the community, with attention to hygiene, affect, mood, thought process, hallucinations, delusions, suicidality, homicidality, insight, and judgment.

### Scenario: index offense

An inmate is seen for mental health screening at intake. The index offense involved illegal gun possession and making threats to "shoot up" a college campus. He presents as calm, well spoken, and logical, and he has had no difficulties adjusting to prison. He explains the circumstances of his arrest as "a misunderstanding" and adds nothing further about what happened. Despite acknowledging a prior history of psychiatric hospitalization, he denies having mental health problems.

This scenario may not pose immediate apparent treatment needs, but the inmate's minimization of a serious offense and his unclear psychiatric history suggest that further inquiry may yield more information. Direct in-depth questioning about his history and functioning in the community and efforts to obtain prior treatment records may guide evaluation.

### Additional information

As in community settings, collateral sources of information are important in interpreting interview findings. Prior treatment records, both during incarceration and in the community, should be obtained and reviewed. When possible, contacting personal supports such as family members may yield additional information. Because correctional officers typically have the most contact with inmates, they may be able to provide observations about an inmate's behavior or the context of an inmate's situation. Correctional officers may be the source of a referral for mental health evaluation. While correctional officers may be a valuable source of information, the interviewer must still exercise appropriate measures to maintain patient confidentiality.

### Scenario: collateral information

An inmate is referred by a housing officer who provides little detail, saying only, "Inmate says feeling suicidal." When seen for interview, the inmate says, "I didn't mean it."

On the surface, the statement may indicate that the interviewee did not have suicidal intent or planning. The statement may have been made at the height of emotional expression and represented a fleeting thought. Even so, stopping the assessment at the point of the inmate's reassurance that he or she never made suicidal statements or that this was simply a passing feeling is premature.

Referrals from nonmental health professionals may lack relevant detail. Therefore, obtaining information on the actual statements raising concern, the context within which such statements were made, and additional environmental or situational factors can help determine whether there is legitimate concern regarding suicidality. These kinds of situations highlight the importance of obtaining and reviewing correctional and community treatment history, as this will help place the evaluation within the individual's historical context.

## Telepsychiatry

The use of live two-way videoconferencing to provide correctional mental health services has steadily been increasing as a means of overcoming geographic limitations to clinician availability (Antonacci, Bloch, Saeed, Yildirim, & Talley, 2008), which is a frequent problem in correctional settings. Use of telepsychiatry has been found to be efficacious, without negative impact on clinician–patient communication, rapport, or satisfaction with treatment, at least with assessment and short-term treatment (O'Reilly et al., 2003).

The use of telepsychiatry in correctional mental health interviews simplifies safety concerns for the interviewer, but other issues remain. Scheduling and timing may be complicated by the addition of technological requirements. The same issues regarding noise and privacy during the interview also apply. An additional consideration is on-site mental health staffing. While some mental health services can be delivered effectively by video, telepsychiatry is not a substitute for on-site staff, particularly in responding to emergencies or to deliver other modalities of assessment and treatment.

## Countertransference and bias

Countertransference toward inmates takes many forms. There may be the impulse to view prisoners as criminals primarily deserving punishment or who are simply untreatable. Some offenses, such as sexual offenses, or notorious offenders may engender an emotional response. There may be negative reactions to ongoing and persistent noxious behaviors in the correctional setting. The inmate may be off-putting due to strong character traits associated with a personality disorder or may have a reputation for malingering. Whatever the cause, these reactions may lead the clinician to become judgmental and lose objectivity; potential problems include failing to adequately explore relevant areas or missing diagnoses altogether. Negative countertransference may become apparent in the clinician's demeanor; clinicians may become overtly patronizing, skeptical, or judgmental. Because inmates are sensitive to being judged, this damages rapport and reduces the clinician's ability to elicit necessary information.

Clinicians may become fearful of the inmate or vicariously traumatized. If this occurs, the clinician might attempt to avoid the inmate by reducing the amount of time spent in direct interview, by withdrawing, or by interacting with the inmate in an anxious manner. This, too, can affect objectivity and therapeutic rapport and reduce diagnostic accuracy and treatment efficacy.

Positive countertransference can lead to overidentification with the inmate and overinvolvement by befriending or attraction (Hayes, Gelso, & Hummel, 2011). Boundary erosion may cloud clinical judgment and negatively affect assessment and treatment. In more severe forms, there may be serious boundary violations that place the clinician or the interviewee, or both, in vulnerable positions (Faulkner & Regehr, 2011). These can lead to professional sanctions or negatively affect personal life.

Clinicians cannot always avoid emotional responses to an inmate, but awareness enables them to appropriately manage countertransference and maintain objectivity. During the interview, clinicians should maintain a nonjudgmental attitude. Countertransference may also be a useful tool if clinicians

recognize their own feelings as an opportunity to inform diagnosis and treatment (Colli, Tanzilli, Dimaggio, & Lingiardi, 2014).

## Summary

Interviewing in correctional mental health is a challenging and multifaceted task that is the foundation to assessing and treating the increased numbers of incarcerated individuals with mental illness. Understanding the correctional population, environment, and culture will help the interviewer to conduct evaluations that are more nuanced and relevant to this traditionally underserved population.

## References

Abram, K., Teplin, L., & McClelland, G. (2003). Comorbidity of severe psychiatric disorders and substance use disorders among women in jail. *American Journal of Psychiatry, 160*(5), 1007–1010.

American Psychiatric Association (2000). *Psychiatric services in jails and prisons: a task force report of the American Psychiatric Association.* Washington, DC: American Psychiatric Association.

American Psychiatric Association (2006). *Practice guideline for the psychiatric evaluation of adults.* Washington, DC: American Psychiatric Association.

Antonacci, D., Bloch, R., Saeed, S., Yildirim, Y., & Talley, J. (2008). Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing: Implications for forensic and correctional psychiatry. *Behavioral Sciences and the Law, 26,* 253–269.

Barrowclough, C., Haddock, G., Tarrier, N., et al. (2001). Randomized controlled trial of motivational interviewing, cognitive behavior therapy, and family intervention for patients with comorbid schizophrenia and substance use disorders. *American Journal of Psychiatry, 158,* 1706–1713.

Blaauw, E., & van Marle, H. (2007). Mental health in prisons.In L. Moller, H. Stover, R. Jurgens, & A. Gatherer (Eds.), *Health in prison: A WHO guide to the essentials in prison health* (pp. 133–145). Copenhagen, Denmark: World Health Organization.

Black, D., Gunter, T., Loveless, P., Allen, J., & Sieleni, B. (2010). Antisocial personality disorder in incarcerated offenders: Psychiatric comorbidity and quality of life. *Annals of Clinical Psychiatry, 22*(2), 113–120.

Colli, A., Tanzilli, A., Dimaggio, G.,& Lingiardi, V. (2014). Patient personality and therapist response: An empirical investigation. *American Journal of Psychiatry, 171,* 102–108.

Faulkner, C., & Regehr, C. (2011). Sexual boundary violations committed by female forensic workers. *Journal of the American Academy of Psychiatry and the Law, 39*(2), 154–163.

Fazel, S., & Seewald, K. (2012). Serious mental illness in 33,588 prisoners: Systemic review and meta-regression analysis. *British Journal of Psychiatry, 200,* 364–373.

Hayes, J., Gelso, C., & Hummel, A. (2011). Managing countertransference. *Psychotherapy, 48*(1), 88–97.

Hettema, J., Steele, J., & Miller, W. (2005). Motivational interviewing. *Annual Review of Clinical Psychology, 1,* 91–111.

Hills, H., Siegfried, C., & Ickowitz, A. (2004). *Effective prison mental health services: Guidelines to expand and improve treatment.* Washington, DC: US Department of Justice, National Institute of Corrections.

James, D. J., & Glaze, L. E. (2006). *Mental health problems of prison and jail inmates* (NCJ 213600). Washington, DC: Department of Justice. Office of Justice Programs—Bureau of Justice and Statistics.

McMurran, M. (2009). Motivational interviewing with offenders: A systematic review. *Legal and Criminological Psychology, 14,* 83–100.

Metzner, J. (1997a). An introduction to correctional psychiatry: Part I. *Journal of the American Academy of Psychiatry and the Law, 25*(3), 375–381.

Metzner, J. (1997b). An introduction to correctional psychiatry: Part II. *Journal of the American Academy of Psychiatry and the Law, 25*(4), 571–579.

Metzner, J. L. (1998). An introduction to correctional psychiatry, part III. *Journal of the American Academy of Psychiatry and the Law, 28*(1), 107–115.

National Center on Addiction and Substance Abuse at Columbia University (2010). *Behind Bars II: Substance Abuse and America's Prison Population.* Columbia University.

National Commission on Correctional Health Care (2008). *Standards for mental health services in correctional facilities.* Chicago, IL: National Commission on Correctional Health Care.

Ogloff, J. R., Roesch, R., & Hart, S. D. (1994). Mental health services in jails and prisons: Legal, clinical, and policy issues. *Law & Psychology Review, 18,* 109–124.

O'Reilly, R., Bishop, J., Maddox, K., et al. (2003). Is telepsychiatry equivalent to face-to-face psychiatry? Results from a randomized controlled equivalence trial. *Psychiatric Services, 58*(6), 1604–1609.

Rotter, M., Way, B., Steinbacher, M., Sawyer, D., & Smith, H. (2002). Personality disorders in prison: Aren't they all antisocial? *Psychiatric Quarterly, 73*(4), 337–349.

Rotter, M., McQuistion, H., Broner, N., & Steinbacher, M. (2005). Best practices: The impact of the "incarceration culture" on reentry for adults with mental illness: A training and group treatment model. *Psychiatric Services, 56*(3), 265–267.

Steadman, H. J., Osher, F. C., Robbins, P. C., Case, B., & Samuels, S. (2009). Prevalence of serious mental illness among jail inmates. *Psychiatric Services, 60*(6), 761–765.

Teplin, L. A. (1994). Psychiatric and substance abuse disorders among male urban jail detainees. *American Journal of Public Health, 84,* 290–293.

Trestman, R. (2000). Behind bars: Personality disorders. *Journal of the American Academy of Psychiatry and the Law, 28*(2), 232–235.

Trestman, R., Ford, J., & Zhang, W. W. (2007). Current and lifetime psychiatric illness among inmates not identified as acutely mentally ill at intake in Connecticut's jails. *Journal of the American Academy of Psychiatry and the Law, 35*(4), 490–500.

Exhibit J

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,
    **Plaintiffs**

    **v.**                                 **No. CIV S-90-0520 KJM KJN P**

EDMUND G. BROWN, JR., et al.,
    **Defendants**

## SPECIAL MASTER'S REPORT ON THE
## STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION
## OF DEFENDANTS' STAFFING PLAN

Matthew A. Lopes, Jr., Esq.

Special Master

PANNONE LOPES DEVEREAUX & WEST LLC

317 Iron Horse Way, Suite 301

Providence, RI 02908

(401) 824-5100

Fax: (401) 824-5123

February 6, 2017

## INTRODUCTION

As stated in the Special Master's Twenty-Sixth Round Monitoring Report, there is a long and tortured history behind CDCR's struggle to implement a viable staffing plan for the provision of adequate mental health treatment.  ECF No. 5439 at 12.  As previously reported, mental health staffing deficiencies within the California prisons were addressed in the *Coleman* Court's 1995 remedial order, when the Court ruled that the prisons were "significantly and chronically understaffed in the area of mental health care services."  *Coleman v. Wilson*, 912 F. Supp. 1282, 1307 (E.D. Cal. 1995).  In early 1996, the Special Master began an assessment of defendants' staffing ratios, filing his first report regarding their adequacy in November 1998. ECF No. 993.  The Special Master filed his first report addressing defendants' staffing vacancies in May 1999.  ECF No. 1032.  Since 1998, the Special Master has consistently reported on defendants' mental health staffing issues, to include 18 reports that directly or indirectly addressed staffing deficiencies[1], in addition to addressing staffing vacancies in all 26 of his monitoring reports.

---

[1] Special Master's Recommendations for Staffing Ratios, (filed 11/20/1998, ECF No.994); Supplementary Recommendations of the Special Master on Staffing Ratios and Administrative Segregation, (filed 5/19/1999, ECF No.1033); Special Master's Report on Staffing Vacancies, (filed 5/19/1999, ECF No.1032); Special Master's Recommendations on Defendants' Request for Extension of Time to Staff Administrative Segregation and Expedite Transfers, (filed 2/8/2000, ECF No.1131); Special Master's Recommendation on the Development of a Retention Plan for Psychiatrists, (filed 4/24/2000, ECF No.1149); Special Master's Report and Recommendations on Psychiatrist and Psychiatric Social Worker Vacancies, (filed 12/20/2000, ECF No.1227); Special Master's Report on Defendants' Compliance with Staffing Enhancements for Administrative Segregation, (filed 9/25/2000, ECF No. 1206); Special Master's First Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies, (filed 9/26/2001, ECF No.1304); Special Master's Report on the Defendants' Compliance with October 26, 2001 and December 20, 2001 Court Orders, (filed 2/22/2002, ECF No.1350); Special Master's Second Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies, (filed 2/26/2002, ECF No.1351); Special Master's Third Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies, (filed 7/10/2002, ECF No.1392); Special Master's Report on Defendants' Schedule of Differential Pay for Mental Health Clinicians in Specific California Department of Corrections Institutions, (filed 5/6/2005, ECF No.1661); Special Master's Report on the Impact of Defendants' Increases in Differential Pay for Mental Health Clinicians in California State Prison, Corcoran, (filed 2/15/2006, ECF No.1762); Special Master's Report on the Status and Sufficiency of the Defendants' Budget Requests for Staffing to Implement the Revised Program Guide, (filed 6/21/2006, ECF No.1851); Special Master's Supplemental Report on the Status and Sufficiency of the Departments' Budget Requests for Staffing to Implement the Revised Program Guide, (filed 7/28/2006, ECF No.1921); Special Master's Report on Plaintiffs' Response to the Sixteenth Report on Compliance Seeking Salary Enhancements for Department of Mental Health Clinicians, (filed

A June 13, 2002 *Coleman* Court order directed defendants to maintain the vacancy rate among psychiatrists and case managers[2] at a maximum of ten percent, including the use of contractors.  ECF No. 1383 at 4.  At around the same time, defendants commenced a field study to determine the necessary staffing levels required to implement recent Program Guide revisions.  However, defendants repeatedly failed to fund the full complement of the staffing allocations recommended by the field study.  As a result, the Court ordered defendants to prepare and present a proposal for no less than 530.65 permanent positions and 21.2 limited-term positions to a special session of the California Legislature in August 2006.  ECF No. 1929 at 3.  The legislature made appropriations for far less positions than proposed and requested that defendants conduct a workload study to determine the necessary level of staffing.

Defendants engaged outside consultants and the workload study was conducted over the course of six months in 2007.  The completed study, which recommended 404 positions, was presented to defendants in June 2007.  However, defendants did not submit a request to the legislature for those positions until April 2008.  The legislature declined to fund additional staffing allocations until all vacant positions had already been filled.

After his review of the workload study in July 2008, the Special Master determined that although the concept and model were appropriate, the data used to calculate the number of allocations was faulty.  Soon thereafter the workload study lost its momentum and was ultimately abandoned.

---

1/30/2007, ECF No.2121); Special Master's Response to Court's May 17, 2007 Request for Information, (filed 5/31/2007, ECF No.2253); Twenty-Sixth Round Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols, (filed 5/6/16, ECF 5439).

[2] "Case managers" refers collectively to psychologists and social workers, which are now referred to as "primary clinicians".

On June 18, 2009, the *Coleman* Court ordered defendants to develop another staffing plan. ECF No. 3613 at 2. As directed by the Court, the Special Master provided guidance and assistance in developing a workable plan. Defendants filed their staffing plan on September 30, 2009. ECF No. 3693. The Special Master endorsed the staffing plan on March 4, 2010. (See, Exhibit A attached hereto.)

In the April 5, 2013 order denying defendants' motion to terminate *Coleman* federal court oversight, the Court found that, "[c]hronic understaffing continues to hamper the delivery of constitutionally adequate medical care and is a central part of the ongoing constitutional violation in this action." ECF No. 4539 at 62. On March 18, 2014, in an order relating to activation of mental health units at California Health Care Facility, defendants were ordered to review whether the current salary schedule for prison psychiatrists was competitive within California and nationally. ECF No. 5116 at 12. In response to that order, defendants reported that their prison psychiatrist salaries were within the range of comparable salaries within California and nationally. ECF No. 5123 at 3. Defendants further reported that they had the authority to offer newly-hired psychiatrists salaries in excess of the minimum starting salary. *Id.*

On June 19, 2014, defendants were ordered to review the 2009 staffing plan, revising it as appropriate, in order to achieve compliance with the June 13, 2002 order. ECF No. 5171 at 4. The Special Master was to provide guidance and expertise where necessary and ensure that plaintiffs were provided notice and an opportunity for input as appropriate. *Id.* at 3. Defendants were ordered to report on the results of their review by September 12, 2014. *Id.*

After receiving an extension of time, defendants filed their "Report on Review of Mental Health Staffing" on February 2, 2015, in which they conceded that the vacancy rate among psychiatry positions, including the use of contract staff, was nearly 20 percent. ECF No. 5269 at

6.  As a remedy for staffing deficits for both psychiatrists and psychologists, defendants

proposed a four-pronged approach, which included:

1.  The creation of a psychiatric medical assistant classification to perform clerical tasks currently performed by psychiatry staff.

2.  The expansion of their psychologist internship program and reactivation of a fellowship program for psychiatrists.

3.  Offering differential pay for civil service psychiatrists and increasing contract rates for contract psychiatrists to work in hard to recruit locations.

4.  Continuing the recently expanded telepsychiatry program.

*Id*. at 6-10.

On May 18, 2015, defendants were ordered to proceed with the proposals in their report

and they were required to seek the approval of the Special Master and leave of Court before

making any changes in their existing mental health staffing ratios.  ECF No. 5307 at 6.  The

Special Master was ordered to report to the Court on the status of the implementation of

defendants' proposals within 180 days of the order.  *Id*.  On November 12, 2015, at his own

request, the Special Master was ordered to include his staffing report and recommendations in

his Twenty-Sixth Round Monitoring Report, in lieu of filing a separate report.  ECF No. 5377.

Defendants submitted their "CDCR Status Update to Report on Court-Ordered Staffing

Review," the first status update to their February 2, 2015 staffing plan proposals, on November

2, 2015.  Defendants submitted a second status update on February 1, 2016, at which time they

indicated that additional staffing positions for psychiatrists, psychologists and social workers had

been allocated, but gave no indication as to how many had been hired since their staffing plan

was proposed on February 2, 2015.

The Special Master filed his Twenty-Sixth Round Monitoring Report on May 6, 2016,

finding that defendants had "demonstrated no sense of the required urgency for a meaningful

implementation" of the February 2, 2015 revised staffing plan, resulting in little to no change in mental health staffing throughout the department.  ECF 5439 at 21.   As a result, he put forth a number of recommendations, the goal being to facilitate defendants' timely implementation of their staffing plan.  *Id*. at 131.

The Twenty-Sixth Round Monitoring Report included the following table comparing staffing vacancies in 1998 to staffing vacancies in 2015 – a 17-year time span.  *Id* at 27.  The table further illustrates defendants' ongoing staffing problems, demonstrating how static the vacancy rates for psychiatrists and psychologists have remained over time.

| Position | Vacancy Rate 1998* | Vacancy Rate 2015* |
|---|---|---|
| Psychiatrists | 35% | 32% |
| Psychologists | 14.8% | 15% |
| Social Workers | 26% | 10% |
| Recreational Therapists | 12.5% | 30% |
| Psych Techs | 15% | 21% |
| Clerical | 11.4% | 14% |

* Does not include contract staff.

On August 9, 2016, the Court issued an order adopting the Special Master's Twenty-Sixth Round Monitoring Report recommendations and including the following orders related specifically to staffing:

1.  Defendants shall provide the Special Master with monthly updates on their implementation of their staffing plan, which implementation shall be tracked and monitored by the Special Master.  Defendants and the Special Master shall meet and confer monthly to discuss and consider strategies and initiatives, including but not limited to potential clustering of higher-acuity mentally ill inmates at those institutions where it has been shown that mental health staff can be more readily attracted and retained, all to resolve the continuing problem of mental health staffing in CDCR prisons in a thorough

and lasting way.  The Special Master shall include plaintiffs in these meetings as appropriate.

2.  Within one hundred twenty days (120) from the date of this order the Special Master shall issue a stand-alone report on the status of mental health staffing and implementation of defendants' staffing plan.

ECF No. 5477 at 8-9.

In keeping with the recommendations contained in his Twenty-Sixth Round Monitoring Report, ECF No. 5439 at 131, and a desire to address outstanding issues from the Twenty-Sixth Monitoring Round in a more focused manner than the regular quarterly policy meetings, in June 2016, the Special Master initiated the meet and confer process, convening the first of a series of all-parties workgroup meetings.  In addition to the Special Master and his staff, workgroup meeting participants included, among others, plaintiffs' counsel, representatives of CDCR defendants and defendants' counsel.

In meetings held over a period of seven months, the workgroup discussed the status of implementation of the four proposals in defendants' February 2, 2015 plan.  The workgroup also discussed a multitude of other proposals, including, cash for on-call compensation for all clinicians, dual appointments, psychiatric nurse practitioners, utilization management, establishing a mental health academy for new mental health staff, salary increases for psychiatrists and clustering.

During the course of the meet and confer process, it was determined that certain staffing proposals were complex and thus required additional time to plan and bring into fruition.  This led to a delay in defendants' submission of their final staffing plan.  As a result, on November 23, 2016, the Special Master requested a 60-day extension of time to file his report on staffing. ECF No. 5523.  On December 9, 2016 the Court granted the Special Master's request, ordering that his report on staffing be filed on or before February 6, 2017.  ECF No. 5530.

Defendants submitted their updated staffing plan to the Special Master on January 10, 2017.  (See, Defendants' January 10, 2017 Updated Staffing Plan, attached hereto as Exhibit B.) On January 25, 2017, plaintiffs submitted their objections to the plan to the Special Master. (See, Plaintiffs' Objections to Defendants' January 10, 2017 Staffing Plan, attached hereto as Exhibit C.)

What follows is the Special Master's report on the status of mental health staffing and implementation of defendants' staffing plan.

### Defendants' January 10, 2017 Updated Staffing Plan

Defendants' January 10, 2017 updated staffing plan contained the four original proposals from their February 2, 2015 staffing plan, in addition to a number of new proposals that were introduced during the meet and confer process, resulting in a final staffing plan that included the following remedial measures:

- Use of medical assistants to assist psychiatrists
- Internship and Fellowship programs
- Increased pay rates for contract psychiatrists
- Telepsychiatry
- Cash for on-call compensation for all clinicians
- Dual appointments at additional institutions
- Psychiatric Nurse Practitioners
- Utilization Management
- Proposition 57
- Establishment of a Mental Health Academy
- Salary increases for psychiatrists
- Bed planning (clustering)

Generally, defendants' staffing plan is promising.  For the reasons set forth below, however, the Special Master recommends that the defendants' staffing plan be adopted by the Court in part and rejected in part.

I.     **Status of Implementation of February 2, 2015 Staffing Plan Proposals**

      A.  **Medical Assistants**

In an effort to positively impact psychiatrist recruitment and retention, the use of medical assistants was proposed as part of defendants' four-pronged approach to remedy staffing deficits in their February 2, 2015 staffing plan.  Medical assistants perform numerous administrative tasks in the support of psychiatrists, including scheduling appointments, sending out physician orders for labs or medication, reminding inmates of appointments, making referrals to therapists and other physicians and meeting with the inmate prior to the appointment and collecting relevant data, among others.

Defendants continued to make sufficient progress on their proposal related to the use of medical assistants.[3]  At the time of defendants' February 1, 2016, second status update, they employed 37 registry medical assistants at nine institutions.  In their January 10, 2017 updated staffing plan, defendants reported an increase in the number of employed registry medical assistants to approximately 70 working at 18 institutions.

Since the filing of the Twenty-Sixth Round Monitoring Report, defendants have received approval to hire full-time medical assistants.  Defendants reported that the California State Personnel Board approved the establishment of the civil service medical assistant classification in August 2016; the civil service exam was under development.  All CDCR institutions will be allowed to hire registry medical assistants while the list of eligible candidates is being developed.

Plaintiffs granted that the use of medical assistants was a positive approach that over time may lead to an increase in the retention of psychiatrists.[4]  However, plaintiffs expressed certain concerns about the proposal, including defendants' failure to provide the results of studies

---

[3] All references to defendants' January 10, 2017 Updated Staffing Plan, unless otherwise indicated, are the writer's summary of what is contained in Exhibit B.

[4] All references to plaintiffs' Objections to Defendants' January 10, 2017 Staffing Plan, unless otherwise indicated, are the writer's summary of what is contained in Exhibit C.

conducted regarding the position's efficacy.  Indeed, during the meet and confer process defendants committed to providing the workgroup with written results of psychiatrist surveys regarding their experiences with medical assistants.  As of the time of this writing, that information had not been produced.

The Special Master agrees that the use of medical assistants to work with psychiatrists has the potential to positively impact the recruitment and retention of psychiatrists.  However, the proposal has been in development for almost two years and must be implemented without further delay.

The Special Master recommends that defendants be directed to continue with the implementation of this proposal and report to the Special Master regarding statewide implementation of the use of civil service medical assistants on a quarterly basis.  The Special Master also recommends that defendants be directed to provide detailed, written results of the effect medical assistants have had at the institutions where they are used, including whether psychiatrist retention and productivity has improved.

During the recent meet and confer process, defendants admitted that, at times, medical assistants were being pulled away from their psychiatry assignments to work elsewhere.  The Special Master strongly urges defendants to develop a mechanism to ensure that this practice does not continue.  The issue will be monitored during the course of his regular monitoring visits.

### B.  Internship and Fellowship Programs

In an attempt to increase the candidate pool for full-time psychiatrists and psychologists, defendants proposed psychiatrist fellowship and psychology internship programs at several CDCR institutions as part of their February 2, 2015 staffing plan.  The fellowship program,

which had been re-activated in 2015, employed licensed post-graduate forensic residents to treat inmates.  The psychology internship program provided a source of trained clinicians to work for CDCR upon completion of their internship.

Defendants' reported that both programs had been effective in recruiting new clinicians. However, considerably more progress was made with the psychology internship program.  At the time of defendants' February 1, 2016, second status update, there were two psychiatry fellows at San Quentin State Prison and 21 psychology interns at five institutions.  In their January 10, 2017 updated staffing plan, defendants reported there were two psychiatry fellows at San Quentin State Prison and 31 psychology interns at 11 institutions.  Defendants reported that in the fall of 2016, psychology interns were hired into permanent positions at four institutions, however, they did not report how many.

In their January 10, 2017 updated staffing plan, defendants also reported that they were working to expand the fellowship program as a psychiatry recruitment strategy and had contacted several schools in California and surrounding states that had fellowship programs. Although they indicated that some schools had expressed interest in developing a fellowship program with CDCR, defendants' report was vague; it did not identify the names or the number of schools that were contacted, indicate the status of any negotiations, or provide further specificity.

Plaintiffs expressed that both programs were positive, noting however, that the fellowship program was small, had much less of an impact than the internship program, and that there were not yet any firm plans for its expansion.  As reported above, the fellowship program had not expanded since the February 1, 2016, second status update and remained at two fellows.

The Special Master agrees that the internship and fellowship programs may continue to increase the candidate pool for full-time psychiatrists and psychologists, and recommends that defendants be directed to proceed with both programs, undertaking efforts to significantly increase the number of psychiatry fellows.  The Special Master also recommends that defendants be directed to maintain and report to the Special Master on a quarterly basis, the number of fellows and interns who are hired as civil service employees and track the length of their employment.

## C.  Increased Rates for Contract Psychiatrists

Increased rates for contract psychiatrists *and* differential pay for civil service psychiatrists in hard-to-recruit institutions was one of the original four proposals in defendants February 2, 2015 staffing plan.  However, as discussed in more detail below, despite consistently providing past status updates regarding their efforts around pursuing differential pay for civil service psychiatrists, defendants left out any specific mention of it in their January 10, 2017 updated staffing plan.  As a result, this section will primarily cover the surviving part of the proposal, increased rates for contract psychiatrists.

Although defendants reported to the Court in 2014 that their psychiatrist salaries were competitive within California and nationally, (ECF No. 5123 at 3) in their February 2, 2015 staffing plan they nonetheless proposed to increase contract rates for psychiatrists working in hard-to-recruit institutions.  In their January 10, 2017 updated staffing plan, defendants reported that during the past 1.5 years they had increased rates for contract psychiatrists at 15 such institutions.[5]  At the time of the writing of the Twenty-Sixth Round Monitoring Report,

---

[5] High Desert State Prison, Pelican Bay State Prison, Avenal State Prison, California State Prison, Corcoran, Pleasant Valley State Prison, the California Substance Abuse Treatment Facility, Kern Valley State Prison, Wasco State Prison, North Kern State Prison, Central California Women's Facility, Valley State Prison, Salinas Valley

defendants reported increased registry hours for psychiatrists at most institutions due to increased registry pay rates. ECF No. 5439 at 19. However, as plaintiffs pointed out in their objections to defendants' staffing plan, the most recent data available showed a significant fluctuation in overall psychiatry registry usage during the six-month time period between June 2016 and November 2016.[6] In view of this and other factors, plaintiffs asserted that a dramatic pay raise was needed to boost recruitment and retention for both registry and staff psychiatrists.

The Special Master recommends that defendants be required to provide detailed information about the timing and the amount of the increase in contractor rates. The Special Master further recommends that defendants be required to monitor the effect of salary rate increases on the usage of registry hours in order to determine whether further rate increases are necessary to assist in the recruitment and retention of psychiatry registry staff and report to the Special Master on a quarterly basis.

As stated above, defendants February 2, 2015 staffing plan also contained a proposal for differential pay for civil service psychiatrists working in hard-to-recruit locations. In their November 2, 2015 staffing plan update, defendants reported that the proposal was being reviewed "as part of a statewide, multi-departmental initiative" and requested to provide the Special Master with a further update on January 31, 2016. At the time of their February 1, 2016 second status update, defendants reported that they were working on providing pay differentials to psychiatrists hired at High Desert State Prison, Pelican Bay State Prison, Pleasant Valley State Prison, Avenal State Prison, California State Prison, Corcoran and the California Substance

---

State Prison, California Treatment Facility [*sic*], California Correctional Institute [*sic*] and California State Prison, Lancaster [*sic*]

[6] Source: CDCR Secure Website for Monthly Reports, covering the period of November 2016.

Abuse Treatment Facility.  Defendants further reported that, "if the pay differential proposal is approved, it will be part of the 2016/2017 California State budget for legislative approval."

By the time the meet and confer process began in June 2016, defendants' position had changed.  In a June 1, 2016 third status update submitted to the workgroup for discussion, defendants reported that the pay differential would be handled through the collective bargaining process and provided no further details.  As stated above, the January 10, 2017 updated staffing plan dropped any specific mention of pursuing pay differentials.  The proposal was not included in a discussion of the original four Court-approved proposals from the February 2, 2015 staffing plan as it had been in all previous staffing plan updates.  Instead, defendants included a section in the plan titled, "Salary Increases for Psychiatrists" and reported on the issue in the vaguest of terms, a complete reversal from their prior positions and commitments to the Court regarding the pursuit of pay differentials for psychiatrists.  This detour from their previous Court-approved approach rendered defendants' proposal incomplete, in addition to proving terribly confusing. The "Salary Increases for Psychiatrists" section is covered below under item II G.

### D.  Telepsychiatry

The inability to hire and retain on-site psychiatrists has plagued CDCR for the last 19 years and defendants have been unable to remedy this chronic problem.  Unless and until defendants can increase the rate of recruitment and retention of on-site psychiatrists and reduce the vacancy rate to ten percent or less, all options must be explored without sacrificing the ability to provide adequate psychiatric treatment to inmates participating in the MHSDS.

The use of telepsychiatry was first proposed nearly two decades ago as a method of providing mental health treatment to CDCR inmates and was already in use in 12 facilities by October 1999.  ECF No. 974 at 3.

The Statewide Telepsychiatry Program was one of the four original prongs in defendants' approach to reduce staffing vacancies, and employed 28 staff psychiatrists working out of three offices at the time of defendants' submission of their "Report on Review of Mental Health Staffing" on February 2, 2015.  By January 2017, the telepsychiatry staff had grown to 48 providing services to 18 institutions with an intended expansion to 100 working in three locations, Elk Grove, San Quentin and Rancho Cucamonga.  However, in order to accommodate this expanding program, additional office space is required which will not be fully completed until 2018.

Plaintiffs disagree with the apparent proposed use of telepsychiatry at all levels of care with no limitations or parameters.  Plaintiffs also object to anything but a temporary use of telepsychiatry in an MHCB setting, and a limited use of it for EOP level of care inmates.  They assert that it should be used as a supplemental measure in addition to on-site psychiatrists, as plaintiffs fear that psychiatrists are merely moving from institutions to call centers, further depleting the existing shortage of on-site psychiatrists.  Finally, plaintiffs believe that this remedy will take too long to implement at a time when relief is needed immediately.

 Defendants indicated that their preference was to use on-site psychiatrists whenever possible rather than telepsychiatrists – a view shared by the Special Master's experts.  Although the Special Master's experts have determined that telepsychiatry is a viable method for the delivery of mental health services, this does not come without admonitions and parameters.

Telepsychiatry should serve as a supplement for on-site psychiatry, not as a substitute and should only be utilized when institutions are unable to recruit psychiatrists to work on-site.  In no circumstances should this method of delivering mental health treatment relieve CDCR of their obligation to continue their efforts of recruiting full-time psychiatrists to work on-site at the

facilities.  The convenience of telepsychiatry should also not serve as a reason to allow on-site psychiatrists to migrate to the comfort of remote off-site offices.  It cannot be emphasized enough that telepsychiatry should not replace on-site psychiatry, a concern shared by plaintiffs' counsel.  An example of such a problem would be to allow the use of telepsychiatry at the California Institution for Women and the California Institution for Men by psychiatrists working out of the Rancho Cucamonga offices.  The proximity of those two facilities to the Rancho Cucamonga offices voids any reason for not providing on-site psychiatrists and would undermine the very purpose of the telepsychiatry program.  Similar arguments can be made regarding the use of telepsychiatry at Mule Creek State Prison and the California Health Care Facility given their proximity to Elk Grove, a point plaintiffs raised in their objections to defendants' January 10, 2017 updated staffing plan.

Telepsychiatry is not clinically desirable as a frontline approach to providing psychiatric services for inmates with the most intensive or emergent needs.  The higher the acuity of mental illness, the less telepsychiatry should be relied on as a permissible method of treatment.  For 3CMS level of care inmates, it is an appropriate option with the requirement that the telepsychiatrist work on-site at least twice per year at the designated institutions and more frequently if feasible.  Although the efficacy of telepsychiatry for EOP inmates is not clear or recommended as a permanent solution at this time, it would be recommended that a psychiatrist be on-site at least quarterly to treat EOP inmates, given the frequency of psychiatric contacts required by the Program Guide.  The Special Master's experts observed EOP inmates receiving treatment using telepsychiatry and it appeared to function properly, but additional data would need to be examined before further expansion for EOP inmates could be endorsed.   The use of

telepsychiatry for inmates at the EOP level of care will be monitored by the Special Master during his regular monitoring visits, or more frequently if necessary.

For inmates at the MHCB level of care, telepsychiatry is not an appropriate method of treatment to be used on a regular basis. Telepsychiatry for these higher acuity inmates should only be used as a last resort or in emergency situations when an on-site psychiatrist is not available. On-site psychiatrists are able to more positively impact the therapeutic milieu by regularly interacting with correctional, nursing and other mental health staff. This is just not possible with telepsychiatrists. In addition, on-site psychiatrists are better able to discern nonverbal behavior demonstrated by inmates which often has an important impact on diagnoses and treatment planning. The ease of multidisciplinary interaction on-site is especially important in regards to emergency consultation, which is essential at the higher levels of care and much better accomplished with on-site psychiatrists.

The Special Master recommends the continued expansion of the telepsychiatry program with the caveats expressed above. The Special Master further recommends that defendants be required to report their progress to the Special Master on a quarterly basis.

## II.   **Defendants' New Staffing Plan Proposals**

### A.   **Cash for On-Call Compensation for all Clinicians**

CDCR has modified the method of compensation for those clinicians who remain "on-call," including psychiatrists. Clinicians were previously compensated for on-call time with leave credit, or additional time off. Defendants now compensate on-call clinicians with cash payments which should serve as a more attractive incentive for psychiatrists to work additional on-call times with the expectation of improving retention. This change was made as a result of

staff feedback.  Plaintiffs had no objection to this proposal, but did not believe that it would have much of an impact.

Time will tell if plaintiffs are correct, but defendants are nevertheless encouraged to continue with this element of their plan, and report their progress to the Special Master on a quarterly basis.

### B.  Dual Appointments at Additional Institutions

CDCR had a policy in place at three institutions allowing staff psychiatrists to accept a second position at a different institution on a quarter time (.25) basis, on weekends or their regular day off.  As a measure to increase psychiatry fill rates, defendants expanded the use of these dual appointments statewide.  Plaintiffs expressed concerns that working additional days would cause full-time psychiatrists to be less efficient and possibly less effective as clinicians.

As dual appointments were limited to a quarter time (.25) basis, at this stage it is unclear whether there is cause for concern regarding a potential for decline in clinical efficiency and effectiveness.

The Special Master recommends that defendants be encouraged to continue forward with this proposal, reporting to the Special Master on a quarterly basis regarding its effectiveness in decreasing vacancy rates and its impact on staff retention.

### C.  Psychiatric Nurse Practitioners

Defendants proposed to recruit psychiatric or mental health nurse practitioners to provide psychotropic medication management to 3CMS inmates in place of psychiatrists.  A civil service nurse practitioner classification already existed.  In their January 10, 2017 updated staffing plan, defendants reported that they were currently developing a recruitment plan with the goal of

beginning nurse practitioner hiring in early 2017.  Nurse practitioners would be supervised by the institution's chief psychiatrist or senior psychiatrist supervisor.

Plaintiffs agreed that the use of psychiatric nurse practitioners was potentially very helpful.  However, plaintiffs expressed concern that discussions during the meet and confer process revealed that there were a limited number of trained and licensed psychiatric nurse practitioners in California.

The Special Master agrees that the use of psychiatric nurse practitioners could positively impact mental health treatment.  The Special Master recommends that defendants be directed to continue with their proposal to recruit and hire psychiatric nurse practitioners and report their progress to the Special Master on a quarterly basis.

### D.  <u>Utilization Management</u>

During the recent meet and confer process, defendants admitted that utilization management was not something they had done well.  CDCR's proposed implementation of utilization management to address staffing shortages is designed to reduce the mental health population and in turn reduce caseloads for clinicians so they can service those inmates who meet criteria for inclusion in the MHSDS.

In a workgroup meeting, the Special Master and plaintiffs raised the concept of reducing the 3CMS population through criteria currently existing in the Program Guide which could possibly result in reduced staffing ratios.  Defendants were reminded that objective standards were contained in the Program Guide allowing them to identify a subset of 3CMS inmates to be reviewed for possible discharge from the 3CMS program.  Specifically, the Program Guide states that inmates may be clinically discharged from the 3CMS program if they have been in

continuous remission and are functioning adequately in the mainline program without treatment, including medication, for six months.  MHSDS Program Guide, 2009 Revision, pg. 12-3-13.

Following those discussions, on November 15, 2016, defendants issued a statewide memo to the chiefs of mental health directing them to review inmates at the 3CMS level of care to determine if discharge from the 3CMS program was warranted.  This memo was reviewed by the Special Master, his team of experts and plaintiffs and there were no objections to its adoption and implementation.

Defendants have identified approximately 5,000 inmates statewide at the 3CMS level of care who meet objective criteria for possible discharge from the program.  Although a 3CMS inmate may meet objective criteria for review for possible discharge, a clinician may still determine that the inmate should be retained in the mental health program based on a clinical review and the need for ongoing therapy.  As previously stated, the desired outcome of this process is to remove inmates from the program who no longer meet the standards for inclusion in the 3CMS program, thereby reducing the 3CMS population with a concomitant reduction in caseloads for clinicians.  Defendants will be conducting these reviews quarterly.

It is unclear how much of an impact this measure will have on staffing resources. However, the Special Master recommends that defendants be encouraged to continue in their efforts and report any results to the Special Master and plaintiffs on a quarterly basis.

Defendants have recently proposed a similar approach in regards to the EOP population. However, the manner in which the preliminary concept is presented in defendants' January 10, 2017 updated staffing plan gives the impression that it has been endorsed by the workgroup.  In actuality, during the recent meet and confer process defendants provided the workgroup with a memo for review and comment.  During a discussion of the memo, a myriad of concerns were

raised by plaintiffs and the Special Master's experts, which are codified in plaintiffs' objections, discussed below.  Central to those concerns was that the memo would lead to a wholesale removal of inmates from the EOP program, as the underlying implication of the memo seemed to be that clinicians should seek to remove EOP inmates from their caseloads.

Unlike with the 3CMS level of care, there are no objective criteria codified in the Program Guide to trigger an automatic review of EOP inmates for potential discharge from the EOP program.  Since there is no objectively defined subset of the EOP population that can be identified as warranting a review for possible discharge from the EOP program, this leaves clinicians with no alternative but to review every EOP inmate.  The concern then, turns to how to deliver the message to clinicians in order to avoid any interpretation of the memo as a mandate to reduce the EOP population.  Defendants have previously stated that an informal review yielded no results of inmates being inappropriately placed at the EOP level of care.  It would be more productive for defendants to select an institution with a high EOP population to determine if this type of review produces any measurable results or select another methodology to review a sample of the EOP population.

In their objections to defendants' January 10, 2017 updated staffing plan, plaintiffs state that there is no evidence that defendants are currently providing unnecessary treatment to inmates at the EOP level of care.  Plaintiffs provide examples of various targeted methods to determine if EOP inmates are clinically appropriate to remain at the EOP level of care without the necessity of evaluating every EOP inmate system-wide.

The Special Master shares in plaintiffs' concerns and believes that different methodologies are available to evaluate the proper or improper retention of inmates at the EOP level of care.  Until such time as more information has been provided and the parties have had

the opportunity to thoroughly vet the memo, it is the recommendation of the Special Master that this provision of defendants' plan be rejected at this time and that the parties be ordered to meet and confer to fully explore all options to ensure that all EOP inmates are being treated at the appropriate level of care.

**E.  Proposition 57**

The Public Safety and Rehabilitation Act of 2016, or Proposition 57, was passed by the California voters on November 8, 2016 and created certain parole and earned credit changes for CDCR inmates.  In their January 10, 2017 updated staffing plan, defendants advanced Proposition 57 as a remedial measure which they anticipated would reduce the prison population overall, thereby reducing the MHSDS population and resulting in a parallel reduction in staff. While the regulations for the measure are not expected to be implemented until October 1, 2017, defendants have reported that they expect a reduction of the total inmate population by 1,959 in 2017-18.  They did not, however, offer any projection for a reduction in the MHSDS population.

Currently, in addition to the staffing crisis, CDCR is in the midst of a population crisis. The MHSDS population ballooned at the same time that the overall total prison population has dramatically decreased.  To illustrate, in June 2008, at the height of CDCR's population crisis, the total MHSDS population was 34,035.[7]  As of November 2016, the total MHSDS population was 36,645, an increase of almost eight percent.[8]  Simultaneously, in June 2008, the overall total inmate population was 159,488.[9]  As of November 2016, the population had decreased to 117,306, or 26 percent.[10]  As these figures demonstrate, the MHSDS census numbers continue to

---

[7] Source:  CDCR Secure Website for Monthly Reports, covering the period of June 2008.
[8] Source:  CDCR Secure Website for Monthly Reports, covering the period of November 2016.
[9] Source:  CDCR Website, Population Reports, Weekly Archives as of midnight June 18, 2008.  This number only includes inmates housed in the institutions and camps.
[10] Source:  CDCR Website, Population Reports, Weekly Archives as of midnight, November 2, 2016.  This number only includes inmates housed in the institutions and camps.

rise and unless the population drops precipitously this trend will have a distinct impact on staffing, exacerbating yet another crisis.

While defendants should be applauded for their efforts in this regard, it is much too soon to know what the effects of Proposition 57 will be, if any, on reducing the MHSDS population and leading to decreased staffing needs. Considering this, and that the implementation of Proposition 57 is so far in the future, any reliance on future projections at this stage, would be premature.

### F.  Mental Health Academy

In an effort to impact staff retention, defendants proposed to develop a Mental Health Academy orientation program for new mental health staff. Defendants reported that the program's objective was to provide "a uniform approach on policies, procedures and expectations when staff is first hired." Defendants indicated that they anticipated the program would have a positive impact on staff retention, but provided few additional details regarding the proposal. The program was reported to be in the early stages of development, with no date set for implementation. Plaintiffs offered no objections to this proposal.

Any program that could potentially result in mental health staff retention should be encouraged. At this level of crisis in staffing, all positive efforts advanced by defendants to aid in solving the chronic problem of staffing vacancies should be encouraged.

Granted, the proposal is in the very early stages of development, making it too soon to consider its potential outcome. Nonetheless, the Special Master recommends that defendants be directed to move forward, updating the Special Master as to their progress on this proposal on a quarterly basis.

### G.  Salary Increases for Psychiatrists

As reported above, although in 2014 defendants represented to the Court that CDCR psychiatrist salaries were competitive within California and nationally, they still subsequently proposed and then undertook efforts to increase both registry and civil service psychiatrist salaries at hard-to-recruit institutions.  In doing so, defendants effectively admitted through their actions that psychiatrist salaries were actually not competitive enough to impact the recruitment of psychiatrists to work at CDCR institutions.  Offering differential pay for civil service psychiatrists (and increasing contract rates for contract psychiatrists) to work in hard-to-recruit locations was one of the original four proposals from defendants' February 2, 2015 staffing plan.

Throughout the recent meet and confer process, defendants repeatedly asserted that the issue of salary increases was being addressed through the collective bargaining process and they could provide no further information on the subject.  Through this repeated assertion, defendants implied that the mere act of engaging in the collective bargaining process satisfied their Court-ordered directive to consider salary increases as a measure to recruit and retain psychiatry staff.  Indeed, the section on this issue in defendants' January 10, 2017 updated staffing plan read:

> This Court has also directed that CDCR consider increasing the salaries of the psychiatry staff to make the work in its institutions more attractive.  CDCR agrees that it should examine salaries and its fulfilling this directive by engaging in the collective bargaining process with the union representing the psychiatrists.  The negotiations between the union representing psychiatrists and the state of California are ongoing.  As bargaining processes are fluid and confidential,[11] CDCR cannot provide an estimated end date or disclose the substance of the negotiations, but is optimistic about a positive bargaining outcome with psychiatrists.  See, Exhibit B at 5.

---

[11] A footnote to defendants' plan read:  "Before contract negotiations begin between the state and a union, a formal understanding about the bargaining process is reached. This includes a provision to not speak publicly about proposals at the bargaining table, including those involving salary increases. A violation of this agreement could result in unfair practices charges brought before the Public Employees Relations Board. The Legislature has recognized the confidentiality of the bargaining process by exempting it from the Public Records Act. (See Cal. Gov. Code, § 6254(p).) CDCR also is mindful that if one party violates the terms of confidentiality, it will chill the bargaining process."  See, Exhibit B at 5.

Because the details of the ongoing collective bargaining negotiations are confidential, it is impossible for the Special Master to know if the outcome would have a positive effect on the staffing crisis.

This portion of defendants' staffing plan is unacceptable. It does not provide any additional details and does not fulfill the Court's stated directive that defendants present more than a "mere plan" and "demonstrate clear action in accordance with planned steps and a measurable timeline by which those steps will be completed." ECF No. 5477 at 6. Further, the collective bargaining process may not keep pace with salary increases that could occur in the region in years to come. It may be necessary to put a consistent benchmark in place that would lead to regular salary increases.

Alternatively, it may be time for defendants to offer a salary survey for the Court to adopt as they did in 2006. In 2006, CDCR provided the Special Master with a proposed schedule of pay for CDCR mental health clinicians. ECF No. 2081-11 at 11-14. In essence, the proposed schedule of pay was a salary survey, which was adopted by the Court on December 14, 2006. ECF No. 2083. It may be time for CDCR to develop another salary survey that the Court can consider for adoption.

Taking into account defendants' longstanding elevated psychiatry vacancy rates, as well as their past self-reported and subsequently Court-ordered efforts to increase psychiatry salaries, it is not reasonable that they would take their current position and decline to provide any information during the meet and confer process, or in their January 10, 2017 updated staffing plan regarding possible plans to increase salaries.

In their objections to defendants' January 10, 2017 updated staffing plan, plaintiffs indicated that defendants' failure to raise psychiatrist salaries in any significant way was responsible for their inability to recruit psychiatry staff. To illustrate the urgency required in addressing the issue, plaintiffs offered that in the two-year time period between November 2014 and November 2016, the EOP population grew 23 percent, while the number of psychiatrists

working for CDCR grew less than three percent.  This resulted in an increase in the number of

EOP inmates per psychiatrist from 29.6 to 42.2 during this time period.  Plaintiffs expressed

strong objections to defendants' position that they could not provide any information regarding

plans to increase salaries or studies about pay because the issue was part of the collective

bargaining process.

For the aforementioned reasons, defendants' preliminary report regarding salary increases

for psychiatrists is woefully incomplete.  The Special Master recommends that within 90 days,

defendants be directed to inform the Special Master "of the results of final collective bargaining

agreements with all categories of mental health and medical staff that impact the delivery of

mental health services, with a focus on any changes in existing terms of collective bargaining

agreements that may enhance or impede future recruitments in each category," as required by the

*Coleman* Court's June 13, 2002 order.  ECF No. 1383 at 4.  If the collective bargaining process

remains ongoing, defendants should be required to develop a benchmark that can be adopted by

the Court, or in the alternative, develop a salary survey for the Court to consider.

### H. **Bed Planning (Clustering)**

In its August 9, 2016 order, the Court directed defendants to meet and confer with the

Special Master regarding, among other things, clustering higher-acuity mentally ill inmates at

institutions that are more readily able to recruit and retain mental health staff as a part of a plan

to resolve the longstanding staffing issues facing CDCR.  ECF No. 5477 at 8-9.

In response to the Court's order, defendants submitted a plan that has expanded or will

expand the number of EOP beds at existing institutions with EOP programs except one, Pelican

Bay State Prison, which was closed to EOP inmates because it was at a hard to recruit location.

Defendants' interconnected rationale for its clustering plan as presented are: (1)

"overfilling an institution with the most acute patients can have a negative impact on the staff

and mental health delivery program" and (2) there is a serious risk of staff fatigue posed by "an

overload of difficult cases" at institutions due to "over clustering." Defendants described their

bed plan as a "careful compromise between absolute clustering and decentralized services."  See,

Exhibit B at 7.

Plaintiffs objected to the clustering plan characterizing it as "far too limited in scope and

the clustering is at the wrong locations."  See, Exhibit C at 7.  Plaintiffs pointed out that while

closing a small EOP program at Pelican Bay State Prison, defendants' bed expansion plan

effectively creates large clustering of EOP beds at several institutions that are already difficult to

staff, and the plan will only result in worsening the current staffing problems.

The Special Master agrees that the EOP bed expansion plan as currently designed does

not address the core of the Court's order regarding clustering, which is to consider placing

"higher-acuity mentally ill inmates at those institutions where it has been shown that mental

health staff can be more readily attracted and retained."  ECF No. 5477 at 8.  True clustering, for

example, would be closing a hard-to-recruit institution such as High Desert State Prison to

intake, and placing those MHSDS inmates in an institution that has the ability to recruit and

retain mental health staff.  At its core, all defendants' plan does is dramatically expand EOP beds

at a number of institutions that defendants themselves described as hard-to-recruit institutions in

their February 2, 2015 staffing plan, particularly in psychiatry, which was discussed earlier.  For

example, the vacancy rates in November 2016 for both on-site and telepsychiatry for Kern

Valley State Prison, California Substance Abuse Treatment Facility, California State Prison/Los

Angeles County, and California State Prison, Corcoran were 54 percent, 46 percent, 47 percent,

and 33 percent respectively.[12]  The EOP clustering plan offered by defendants is inadequate; it does not resolve the issue of recruiting and retaining staff in its current iteration.

The Special Master recommends that defendants be directed to develop a *true* clustering plan within 90 days that expressly demonstrates how defendants propose to recruit and retain mental health staff at each designated cluster institution in order to resolve the long-standing staffing problems in CDCR.  The plan should be developed under the guidance and assistance of the Special Master with input from the plaintiffs as appropriate.

## CONCLUSION AND RECOMMENDATIONS

As it applies to staffing, CDCR has historically undertaken a piecemeal approach.  As a result, their efforts are never sufficient or long-lasting.  The Court was clear in articulating what was expected of defendants in terms of their staffing plan.  While the Special Master believes that defendants have put forth a strong effort, as stated above, there are certain elements of defendants' updated staffing plan that are lacking in details or otherwise deficient, and thus cannot be adopted.  However, that does not preclude the adoption of the remaining elements of the plan.

In view of all the foregoing, the Special Master recommends:

- That the Court enter an order directing defendants to proceed with the implementation of their staffing plan proposals related to medical assistants, internship and fellowship programs, increased rates for contract psychiatrists, telepsychiatry, cash for on-call compensation, dual appointments, psychiatric nurse practitioners, utilization management relating to 3CMS inmates, Proposition 57, and the Mental Health Academy, which includes the above recommendations;

- That the Court reject defendants' staffing plan proposals on utilization management related to EOP inmates, salary increases for psychiatrists, and clustering, and that the Court enter an order that defendants be required to develop a supplemental plan to address those areas, which includes the above recommendations;

---

[12] Source:  CDCR Secure Website for Monthly Reports, covering the period of November 2016.

- That the Court enter an order directing the defendants and the Special Master to meet and confer every 90 days until the staffing plan is fully implemented, including plaintiffs as appropriate, to discuss the status of defendants' implementation of the adopted staffing plan proposals as outlined in the recommendations above.


                                        Respectfully Submitted

                                            /s/

                                        _____
                                        Matthew A. Lopes, Jr., Esq.
                                        Special Master

February 6, 2017

EXHIBIT A

PANNONE
LOPES
DEVEREAUX &
WEST llc

Case 5:13-cv-02354-BLF    Document 587-3    Filed 06/23/17    Page 115 of 163
Case 2:90-cv-00520-KJM-DB    Document 5564    Filed 02/06/17    Page 31 of 71

*counselors at law*                                                                                      www.pldwlaw.com

                                                                                    March 4, 2010

**_VIA ELECTRONIC MAIL_**

Debbie Vorous, Esq.                                      Michael Bien, Esq.
Deputy Attorney General                                 Rosen, Bien & Galvan, LLP
State of California                                      315 Montgomery Streets,
Department of Justice                                    Tenth Floor
1300 I Street                                           San Francisco, CA 94104
Sacramento, CA 94211

RE:  Defendant's Staffing Plan

Dear Ms. Vorous and Mr. Bien:

Adequate mental health staffing in the prisons of the California Department of Corrections and
Rehabilitation (CDCR) has been one of the core directives of the *Coleman* court since its entry of
the remedial *Coleman* order in 1995. To this day, it remains a critical element of CDCR's
responsibilities to its inmates who are mentally ill. The *Coleman* court's most recent directive on
staffing is embodied in its order dated June 17, 2009, in which the court required defendants:

> to take all steps necessary to resolve all outstanding staffing
> allocation issues. To that end, defendants shall complete a staffing
> plan by the end of August 2009. The plan shall be developed
> under the guidance of the Special Master following the model that
> was used to develop the activation schedules and the short-term
> and intermediate plan before the court.

   To facilitate the defendants' task, I selected and appointed a group from my staff to guide and
assist CDCR in the development of a workable staffing plan. This group was led by Jeffrey
Metzner, M.D., a nationally recognized expert in psychiatric care in the correctional setting, and
included *Coleman* Deputy Special Master Mohamedu F. Jones, Esq., mental health experts
Raymond Patterson, M.D. and Ted Ruggles, Ph.D., and monitors Patricia Williams, Esq. and
Haunani Henry. CDCR participation was headed by Sharon Aungst, Chief Deputy Secretary of
Correctional Health Care Services (DCHCS), and included representatives of the CDCR Legal
Department, Department of Adult Institutions (DAI), Budget Department, DCHCS, and the
*Plata* receiver's nursing staff, as well as the California Department of Finance (DOF) and the
California Department of the Attorney General.

Debbie Vorous, Esq.
Michael Bien, Esq.
March 4, 2010
Page 2

Ms. Aungst led the development and refinement of the staffing plan from the beginning to the end of the process. She gave the project a scope that was broader than required by the *Coleman* court order, resulting in a plan that is sufficiently comprehensive to address not only the mental health parameters of the court order, but also a number of needs that fall within some of the other inmates' rights cases, including those involving medical care, dental care, and accessibility to care pursuant to the Americans With Disabilities Act. I agree with and support Ms. Aungst's decision to take this more comprehensive approach to the staffing plan. I believe that it will help alleviate many staffing problems in years to come.

The *Coleman*-CDCR workgroup met in-person in Sacramento, beginning on July 1, 2009, and thereafter on July 16, August 4, 13, 25, and September 9, 2009, and by teleconference on August 19, 2009. CDCR produced its plan on September 30, 2009. From December 2009 to February 2010, I and my staff met with defendants, plaintiffs, and other key participants over the course of five more in-person meetings and teleconferences to further refine the plan. The process was arduous but productive. Its end result is a staffing plan that is grounded in a large investment of both clinical and administrative time and talent. I recommended it for adoption and implementation.

**The Process**

As stated above, the staffing plan workgroup had its kick-off meeting on July 1. Unlike in the Workload Study ("the Study," also sometimes referred to as the Staffing Analysis Model or SAM), CDCR decided to utilize a straight ratio model for its ease of application and explanation, and to build into the plan a "relief factor" for vacation and sick time. On August 4, 2009, CDCR group members had prepared and presented preliminary working documents, including a purpose-and-background document covering all areas and a breakdown of clinical and non-clinical tasks. CDCR group members reported that they were developing a table that would include all positions needed for each program area, their recommended staffing ratios, and all of the data sources on which they relied.

At the next meeting, on August 13, 2009, CDCR reported significant progress, including having obtained data from six other state correctional systems for comparison purposes. It was decided that all positions other than clinical supervisors will have a relief factor for five-day operations. Staffing ratios were reviewed and discussed for reception center intake (screening and evaluation), the Enhanced Outpatient Program (EOP) for general population, EOP administrative segregation, EOP reception center, EOP condemned, the correctional clinical case management system (3CMS) for general population, 3CMS reception, 3CMS administrative segregation, and 3CMS secured housing unit (SHU) and psychiatric services unit (PSU). The management structure being developed had a director of mental health services, a clinical director for institutions with 500-plus mental health caseload inmates, and a senior psychiatrist for institutions with a mental health crisis bed (MHCB) unit for three or more major mental health programs. The clinical director position would be open to psychiatrists, psychologists, and possibly to social workers at the smaller institutions. Current chief psychiatrists would

Debbie Vorous, Esq.
Michael Bien, Esq.
March 4, 2010
Page 3

remain in place, but psychiatry positions would preferably be utilized to meet clinical rather than administrative needs, as they should be.

At its teleconference on August 19, 2009, the group worked on staffing ratios, which did not include positions for central office staff. At an in-person meeting on August 25, 2009, Ms. Aungst presented an overview of the staffing ratios for each program area. She said that the remaining tasks of finishing the ratio spreadsheets and written justifications, sending them to the budget department (which would then include the relief factors), verifying the positions, costing-out the package, and submitting the plan to the Department of Finance for review would consume another month, meaning that CDCR needed a 30-day extension beyond the court's deadline of August 31, 2009. That meeting concluded with a commitment that the ratio spread sheets would be simultaneously submitted to the Budget department and the *Coleman* group, with all justifications, by August 28, 2009. The workgroup met again on September 9, 2009, and CDCR filed its staffing plan on September 30, 2009, having obtained its 30-day extension.

### The Plan

The defendants' staffing plan is comprised of four parts: (1) an overview of clinical and support staff spreadsheets; (2) justification for the clinical and support staff identified in the spreadsheets for each mental health program area; (3) discussion of custody and correctional counselor ratios for the short-term and intermediate-term projects identified in Defendants' May 26, 2009 bed plan; and (4) discussion of the funding aspects of the plan. The most significant and necessary changes over prior staffing plans and/or practices were the use of staff-to-caseload inmate ratios, the inclusion of relief factors for most clinical line staff, and the inclusion of custody staffing which is integral to the mechanics of delivering mental health care but was omitted from the earlier Workload Study. Based on need, CDCR central office will retain the right to allocate line and supervisory staff positions to specific correctional institutions. This allows for actual ratios at any given institution to vary, although total system staff ratios should be consistent with the staffing plan so that the CDCR mental health system as a whole will have an appropriate ratio for each position. When available, staffing data from other systems was used for comparison purposes. My experts considered the resulting ratios and allocations for the 3CMS, EOP, and non-mental health administrative segregation areas to be reasonable as long as they can be re-adjusted based on actual experience and as future analyses unfold.

On November 23, 2009, CDCR submitted a supplement to its plan, covering custody and correctional counselor staffing. Site-specific assessments will be conducted to determine staffing deficiencies that may exist and need to be addressed, given each institution's individual mission, physical plant characteristics, etc. The DAI would initially address workload responsibilities for the correctional officer and correctional counselor allocations per the *Coleman* Program Guide 2009 Revisions. DAI will utilize the Monthly Health Care Access Quality Report (AQR) to determine the current level of access to the mental health programs at the institutions where the mental health short-term and intermediate-term projects will be activated. It will also use the local quality management committee (QMC) process to assess custodial staffing for each program, beginning when each program is activated. Ongoing monitoring of the short-term and intermediate-term bed projects will be completed utilizing the QMC process, monthly review of

Debbie Vorous, Esq.
Michael Bien, Esq.
March 4, 2010
Page 4

the AQR, site visits by representatives from headquarters, and conference calls to discuss issues throughout the life of each project. It is anticipated that it will take at least six months from activation of each program to complete the QIT assessment and forward it, along with any recommendations, to the QMC. DAI will provide quarterly updates to me on custody and correctional counselor staffing utilized for each of these projects.

## Participation by Plaintiffs' Counsel

Plaintiffs' counsel vetted their questions and concerns about various aspects of the staffing plan with CDCR and Department of Finance officials who worked on the plan. From December 2009 to February 2010, they spent numerous hours in no less than five teleconferences and in-person meetings with me, my staff, and defendants to work out any differences with the plan. To facilitate plaintiffs' having the benefit of the most accurate and up-to-date details on those aspects of the plan that are within the *Plata* receiver's jurisdiction, I also arranged a teleconference on January 29, 2010 and an in-person meeting on February 10, 2010 among myself, plaintiffs' counsel, and the receiver and his staff. Plaintiffs' counsel have notified me that they will not object to the defendants' staffing plan.

## Why the Staffing Plan and Not the Workload Study

Ms. Aungst said at the initial workgroup meeting that the previously-completed Workload Study would not be utilized for this project due to its various shortcomings. I concur with Ms. Aungst that the Workload Study is unresponsive to current staffing considerations and cannot fulfill the staffing plan mandate that CDCR now faces. It was never refined and developed to a level at which it could now carry the day.

The flaws in the Study are not news. In July 2008, my experts and I reviewed the Study (*see* Letter dated 7/12/08, attached) and found that it was neither sufficiently comprehensive, nor based on reliable data or objective measures. My experts noted specific concerns with the Study insofar as certain time values assigned to various distinctly articulated clinical tasks (Letter, pages 6-9), the Study's omission of some required clinical tasks (Letter, pages 8-9), its failure to take into account so-called "indirect time" [i.e. sick leave, vacation, and time not attributed to direct clinical time with inmates but a necessary part of the workday (Letter, page 9)], and its failure to account for time required to be spent on carrying out other court-ordered mental health tasks (Letter, page 9-10). The Study also left out custody staffing altogether. The latter omission left a significant gap in the Study, as custody functions are an integral and necessary part of the mechanics of delivering mental health care within the prisons. In addition, some critical assumptions underlying the Study caused my experts to pose some direct questions that challenged these assumptions. (Letter, pages 10-11) Answers to these questions have never been provided.

Although the Excel-based spreadsheet framework of the Study initially appeared to have been a functional and appropriately adaptable tool, it still fell short as a solid staffing plan going forward. As I reported in July 2008, in view of the concerns voiced by my experts, the key assumptions and the clinical activities covered by the Study needed to be reviewed; activity grids



Debbie Vorous, Esq.
Michael Bien, Esq.
March 4, 2010
Page 5

including *all* tasks typically assigned to mental health staff should be developed; all work tasks identified as sub-tasks should be reviewed for consistency with the *Coleman* Program Guide; the time values used in the Study should be validated; and CDCR mental health staffing needs should be reviewed bi-annually, with the input of the *Coleman* experts. (Letter, page 12) To the best of my knowledge, none of these things were ever done.

My recommendation in July 2008 was not to adopt the Workload Study *carte blanche*, but to persist with refining a better, more responsive staffing model. As I said in my letter back then, because of the dynamic nature of mental health care within CDCR institutions, "it is important to keep in mind that, of necessity, a meaningful Workload Study must be a work in progress." (Letter, page 1) Although I reported at that time that the Excel-based spreadsheet staffing matrix in the Workload Study appeared to be functional, its flaws in a number of important respects led me to conclude that "the Workload Study simply did not go far enough and is incomplete," for the reasons I cited then and summarize above. (Letter, page 11) There has been no indication that this situation has changed or that the Workload Study has ever evolved into a useful tool. It was the consensus among myself and those who worked on the defendants' staffing plan that the Workload Study did not offer much of value and still fell short for the task at hand. Consequently, I endorsed, and continue to endorse, Ms. Aungst's decision to start afresh on this project.

### Recommendation

After extensive consultation with my experts, I have concluded that the staffing plan proposed by the defendants is the best-designed and most comprehensive effort to cover staffing that has been offered to date. It promises to address many lingering staffing problems in an efficient, common-sense, and sustainable way. Accordingly, I recommend the defendants' staffing plan for funding and implementation, subject of course to any necessary modifications as they may become apparent in the future.

If you have any questions, please feel free to contact me.

Sincerely,

Matthew A. Lopes, Jr.

Debbie Vorous, Esq.
Michael Bien, Esq.
March 4, 2010
Page 6

cc:     S. Aungst
        B. Rice, Esq.
        K. Tebrock, Esq.
        M. Stone, Esq.
        D. Specter, Esq.
        S. Fama, Esq.
        E. Galvan, Esq.
        J. Kahn, Esq.
        A. Whelan, Esq.
        Coleman Experts and Monitors

EXHIBIT B

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Patrick R. McKinney II
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



January 10, 2017


VIA EMAIL ONLY

Special Master Matthew Lopes Jr.
Pannone Lopes Devereaux & West LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908

Dear Special Master Lopes:

Enclosed please find CDCR's updated Staffing Plan developed in response to the court's August 9, 2016, order.


Sincerely,


Nick Weber
Attorney
Office of Legal Affairs


Enclosure

## CDCR Staffing Plan

## Introduction:

On August 9, 2016, the *Coleman* Court ordered the California Department of Corrections and Rehabilitation (CDCR) "to meet with the Special Master monthly 'to discuss and consider strategies and initiatives, including but not limited to potential clustering of higher-acuity mentally ill inmates at those institutions where it has been shown that mental health staff can be more readily attracted and retained, all to resolve the problem of mental health staffing in CDCR prisons in a thorough and lasting way.'" (8/9/16 Order, ECF No. 5477.)  With respect to staffing, the Court stated it "can no longer sanction the continued pursuit of remedial strategies that have not worked in the past." (8/9/16 Order at 6.)  It urged the parties to "devise a meaningful strategy that will, finally, mean mentally ill inmates are located in institutions that are adequately staffed with mental health staff competent to meet their treatment needs." (*Id.*) Consistent with the Court's order, CDCR met internally, with the Special Master team, and with the plaintiffs to discuss and develop a revised staffing plan.

The following plan is the product of those discussions, and builds on the prior court-approved staffing proposal submitted in February 2015.  The revised staffing plan incorporates all of the efforts outlined in the February 2015 plan including: establishing and fully utilizing the Medical Assistant classification (approved August 11, 2016) to aid psychiatrists, enhancing an internship program for psychologists and fellowship program for psychiatrists at several CDCR institutions to increase the pool of candidates for full time employment, increasing salary rates in hard to recruit locations to attract registry psychiatrists, and expanding the use of the statewide telepsychiatry program.  CDCR's current plan includes negotiated proposals to modify the "on-call" compensation package for clinicians, increase the use of dual appointments, hire psychiatric nurse practitioners to provide psychiatric services, improve utilization management, and develop a mental health academy for new employees.  CDCR continues to explore all viable options that will help the Department deliver the best mental healthcare possible to its patient population. The Department looks forward to ongoing discussions surrounding staffing.

## Current Staffing Level:

Since 2016, CDCR's fill rate for psychologists and social workers meets and, in most cases, exceeds 90%.  The rates for filled positions, including registry, are as follows:  92% for psychologists (approximately 5% filled by registry); 73% for psychiatrists, including telepsychiatrists (approximately 14% filled by registry); and 99% for social workers (approximately 6% filled by registry).

## Status of Court Approved Initiatives in CDCR's 2015 Plan:

1. Medical Assistants

CDCR currently employs approximately 70 registry medical assistants at 18 institutions to assist psychiatrists and telepsychiatrists.  In August 2016, the California State Personnel Board

approved the establishment of the medical assistant civil service classification, and the State is developing the civil service exam. While the list of eligible candidates is being developed, CDCR will allow all institutions to hire registry medical assistants.

Hiring medical assistants to work with psychiatrists will positively impact recruitment and retention of psychiatrists. Medical assistants provide myriad services, including clerical tasks, now handled by psychiatrists within CDCR. Medical assistants remind patients of appointments, send out physician orders for labs or medication, schedule new appointments, make referrals to therapists and other physicians, meet with the patient prior to the appointment, collect relevant data, and take blood pressures and measure weights. In addition, medical assistants help find treatment rooms to meet patients and schedule with correctional staff to bring a patient to the psychiatrist. CDCR hopes that the addition of this resource will improve a psychiatrist's work environment, free up clinical time that can be divided between spending more time with each patient and seeing more patients in a day, and create a clinic-like environment that is more familiar to medical staff in the community. Once this proposal is implemented, it may be necessary to review and, if appropriate, modify the ratios in the 2009 staffing plan.

### 2. Internship and Fellowship Programs

Among the initiatives that CDCR uses to help recruit and retain clinicians are the psychologist internship and psychiatrist fellowship programs. Both programs have been effective at recruiting new clinicians to work within the correctional setting.

CDCR expanded its internship program for the 2016/2017 school year and currently employs 31 interns at 11 institutions – four at the California Institution for Men, two at California State Prison, Sacramento, seven at R.J. Donovan, four at San Quentin State Prison, three at Valley State Prison, two at Central California Women's Facility, two at California Healthcare Facility, two at California Men's Colony, two at California State Prison, Solano, one at California Medical Facility, and two at California Institution for Women.

Interns in the program are given an opportunity to work in a variety of clinical and custodial settings in order to become familiar with the unique characteristics of working in a correctional setting. The program also allows interns to develop both general clinical skills and a distinct set of assessment and intervention skills tailored to a correctional environment. The program provides a steady source of well-trained, competent clinicians who, following completion of their internship, continue to work in locations that experience chronic difficulties hiring psychologists. For instance, in the fall of 2016, CDCR hired interns into permanent positions at California State Prison, Los Angeles, Wasco State Prison, California State Prison, Sacramento, and Valley State Prison. The program also enhances CDCR's reputation among potential clinicians in the community and provides professional enrichment for licensed clinicians who train and supervise the interns, which should improve CDCR's retention of psychologists.

In 2015, CDCR re-activated its fellowship program for psychiatry and currently has two fellows at San Quentin State Prison. CDCR's fellowship program employs licensed post-graduate forensic residents to treat inmates while also learning the concepts and practices of forensic psychiatry within a prison setting. CDCR is now working to expand the fellowship program as a recruitment strategy for psychiatry. To that end, CDCR has contacted a number of schools in

2

California and surrounding states, listed by the Accreditation Council on Graduate Medical Education, that have fellowship programs.  Some of these schools have expressed interest in developing a formal fellowship program with CDCR. CDCR is following with those schools that have shown interest.

### 3. Increased Rates for Contract Psychiatrists

Over the past year and a half, CDCR has amended its registry contract to increase the psychiatrist-contractor rate at the following institutions:  High Desert State Prison, Pelican Bay State Prison, Avenal State Prison, California State Prison, Corcoran, Pleasant Valley State Prison, the California Substance Abuse Treatment Facility, Kern Valley State Prison, Wasco State Prison,  North Kern State Prison, Central California Women's Facility, Valley State Prison, Salinas Valley State Prison, California Treatment Facility, California Correctional Institute, and California State Prison, Lancaster.

In addition to increasing the rates at hard to recruit locations, leadership in headquarters are now providing more direct oversight of the contractor recruitment and hiring.  CDCR will continue to monitor this recruitment effort.

### 4.  Telepsychiatry

Telepsychiatry is a proven method for delivering services to the mentally ill.  Consistent with prior agreements with the Coleman Special Master team and Coleman plaintiffs' counsel, telepsychiatrists receive the same training as staff psychiatrists, visit their assigned institution at least twice per year, participate in mental health team meetings, and participate in patients' treatment team meetings.  Telepsychiatry services are provided to inmates in a confidential, out of cell setting.  Telepsychiatrists currently serve 18 institutions, and CDCR intends to expand the use of telepsychiatry throughout the system.

The program has been helpful to respond to vacancies in hard to recruit areas.  Telepsychiatry has also proven to be a useful way to retain staff psychiatrists.  Taken altogether, these benefits support the expansion and further reliance on telepsychiatry.  To that end, CDCR intends to expand its telepsychiatry team to at least 100 telepsychiatrists.  Currently, CDCR has telepsychiatry offices in Elk Grove, San Quentin, and Rancho Cucamonga, California to provide services to the institutions. As of January 9, 2017, CDCR employ 48 telepsychiatry staff which includes 45 staff telepsychiatrists, two Senior Psychiatrist Supervisors, and a chief psychiatrist. Five additional telepsychiatrists have tentative start dates within the next six months and several others are in different stages of the hiring process.

In order to facilitate the expansion of the telepsychiatry team, CDCR plans to add telepsychiatry space in Rancho Cucamonga in Spring 2017 and at San Quentin State Prison in late 2018. Because of the number of telepsychiatry applicants, CDCR is working toward acquiring additional space in easy to recruit areas.  As with other prison systems across the country, CDCR's telepsychiatry program is a critical and successful component of its staffing plan.

## Additional Proposals to Augment Already Approved 2015 Initiatives:

    1.  On-Call Compensation for all Clinicians

In response to feedback from staff, and to retain clinicians, CDCR has modified its compensation package for clinicians who remain "on-call."  CDCR previously compensated on-call clinicians with leave credit.  CDCR has revised its policy and now compensates clinicians with cash, a modification CDCR believes will help retain psychiatry staff.

    2. Additional Appointments

To increase psychiatry position fill rates, CDCR has authorized staff psychiatrists to accept a second psychiatric staff position at a different institution on a quarter time basis.  This will allow psychiatrists to earn more and help fill vacant positions.  Though this program was in place at three institutions, a statewide advertisement was recently released.  CDCR will monitor whether this is effective in decreasing vacancy rates and/or has an impact on staff retention.

    3.  Psychiatric Nurse Practitioners

In recognition of the national shortage of psychiatrists, CDCR will begin to recruit Nurse Practitioners (Psychiatric or Mental Health) to provide psychotropic medication management in lieu of psychiatrists for the Clinical Correctional Case Management System (CCCMS) population.  Their work will be supervised by the institution's senior psychiatrist supervisor or chief psychiatrist. The civil service classification for Nurse Practitioners already exists.  CDCR is currently developing the recruitment and hiring plan and hopes to begin hiring applicants that specialize in psychiatry in early 2017.

    4.  Utilization Management

CDCR strives to ensure that only appropriate patients receive services in its Mental Health Services Delivery System.  To ensure that CDCR is placing the right patient in the right bed at the right time, CDCR has renewed efforts to comply with the Coleman Program Guide discharge criteria established in 2009.  On November 15, 2016, CDCR directed the Chiefs of Mental Health at each institution to review CCCMS patients who have been stable and free of psychiatric medication for at least six months to determine whether they have been in continuous remission and are functioning adequately in the mainline without treatment.  This type of review will occur quarterly on an ongoing basis.  The purpose is to ensure the limited staff resources are servicing the patients meeting criteria for inclusion in the Mental Health Services Delivery System.

CDCR is in the early stages of designing a similar review for the Enhanced Outpatient Program population in order to ensure that the right patients are placed and retained at the EOP level of care.  CDCR recognizes that this effort should be implemented with care and consideration for the safety and wellbeing of the patients. To that end, CDCR is committed to working with the Special Master and his team of experts to ensure that the review is implemented appropriately.

5.   Proposition 57

On November 8, 2016, the voters passed Proposition 57, the Public Safety and Rehabilitation Act of 2016.  Proposition 57 reforms the adult criminal justice system in California by creating a parole consideration process for non-violent offenders who have served the full term for their primary criminal offense in state prison, and authorizes CDCR to award credits earned for good behavior and approved rehabilitative or educational achievements. (*See* http://www.ebudget.ca.gov /for a more detailed discussion.)   Proposition 57 allows the state to implement durable solutions to maintain compliance with the court-ordered population cap, and gives the state regulatory authority to eliminate the need for court-ordered population reduction measures.

CDCR is drafting regulations now to implement the proposed parole and credit changes, which will be subject to a certification by the Secretary that they protect and enhance public safety. The Budget assumes that regulations will be implemented on October 1, 2017.  Proposition 57 is expected to reduce the average daily adult inmate population by 1,959 in 2017-18.  In addition to the staffing proposals included in this plan, CDCR anticipates that Proposition 57 will reduce the number of patients participating in the Mental Health Services Delivery System, and CDCR will achieve a parallel reduction in staff.

6.   Mental Health Academy

CDCR understands that its system is only as strong as the staff who implement its requirements. In an effort to further invest in the training and development of staff, CDCR will establish a Mental Health Academy onboarding program for new mental health staff which will provide a broader perspective of the entire system and a uniform approach on policies, procedures and expectations when staff is first hired.  CDCR anticipates this will have a positive impact on retention of staff.  Because CDCR is in the early stages of development of this program and is collaborating with its partners at CCHCS in its development, no specific date is set for implementation at this time.

## Other Issues:

1.   Salary Increases for Psychiatrists

This Court has also directed that CDCR consider increasing the salaries of the psychiatry staff to make the work in its institutions more attractive.  CDCR agrees that it should examine salaries and is fulfilling this directive by engaging in the collective bargaining process with the union representing the psychiatrists.  The negotiations between the union representing psychiatrists and

the state of California are ongoing.  As bargaining processes are fluid and confidential,[1] CDCR cannot provide an estimated end date or disclose the substance of the negotiations, but is optimistic about a positive bargaining outcome with psychiatrists.

2. Bed Planning

In its August 9, 2016 order, this Court directed CDCR to consider whether patients in it mental health system can be further clustered in areas where it can more easily recruit and retain staff. Attached as Exhibit A is CDCR's current bed plan for the mental health population, which proposes additional dedicated mental health beds throughout the system.  This proposal has been developed in consultation with the Special Master and his team of experts as well as plaintiffs' counsel during multiple working group sessions.  In an effort to implement the Court's vision, CDCR has worked to add EOP beds at institutions that have existing programs while it has shuttered beds at one hard to staff location.  The plan indicates bed expansions at California State Prison, Corcoran (214), California State Prison, Los Angeles County (150), Kern Valley State Prison (96), R.J. Donovan Correctional Facility (264), California Substance Abuse Treatment Facility (220), California Men's Colony (197), and San Quentin State Prison (233).   Between June 2016 and March 2017, CDCR will add a net 1,820 EOP beds, including 300 at California State Prison, Los Angeles County, activated between June and October 2016, 150 at CSP-COR activated in October 2016, and 62 and Central California Women's Facility activated in December 2016.   CDCR also closed all 90 EOP and Psychiatric Services Unit beds at Pelican Bay State Prison.

| Institution | Level | # of Beds | Date (Estimate) |
|---|---|---|---|
| **LAC** | IV | 300 | June - October 2016 |
| **COR** | IV | 150 | October 2016 |
| **RJD** | II | 264 | December 2016 |
| **SATF** | II | 220 | January - March 2017 |
| **KVSP** | IV | 96 | February 2017 |
| **COR** | IV | 214 | March 2017 |

---

[1] Before contract negotiations begin between the state and a union, a formal understanding about the bargaining process is reached.  This includes a provision to not speak publicly about proposals at the bargaining table, including those involving salary increases.  A violation of this agreement could result in unfair practices charges brought before the Public Employees Relations Board.  The Legislature has recognized the confidentiality of the bargaining process by exempting it from the Public Records Act.  (See Cal. Gov. Code, § 6254(p).)  CDCR also is mindful that if one party violates the terms of confidentiality, it will chill the bargaining process.

6

| | | | |
|---|---|---|---|
| **SQ** | II or III | 233 | March 2017 |
| **LAC** | III | 150 | TBD |
| **CCWF** | Female | 62 | TBD |
| **CMC** | III | 197 | TBD |

Further clustering would require CDCR to close some institutions to the mental health population and concentrate the same population in fewer locations. While CDCR has increased the size of existing EOP programs throughout the system, CDCR and the *Plata* Receiver are cognizant that overfilling an institution with the most acute patients can have a negative impact on the staff and mental health delivery program. CDCR must be careful not to cluster too great a population of hard to treat patients in any one place or risk alienating the very staff it seeks to attract and retain. Even in urban areas where it is easier to hire staff, creating an environment in which the program offers staff only the most difficult and acute types of patients presents a challenge to hiring and retaining staff. Staff fatigue from an overload of difficult cases is a serious risk posed by over clustering. CDCR must be careful to strike a reasonable balance between clustering existing mental health programs while also ensuring that the environment remains an attractive place for employees to work.

CDCR's bed plan represents a careful compromise between absolute clustering and decentralized services. It is ideal for patients to have both continuity of care and location. By creating institutions that offer as many levels of care and housing programs as possible, it increases the chance that the patient will thrive in his or her environment. Likewise, staff in that location will be able to treat a variety of patients with different acuities, reducing the likelihood of staff fatigue and increasing workplace satisfaction. CDCR's current bed plan balances both staff and patient satisfaction with the ability to continue to attract and retain competent clinical staff.

## Conclusion:

CDCR's mental health staff provides quality care to all participants within its Mental Health Services Delivery System. CDCR is committed to regularly reviewing and adjusting the court-ordered 2009 staffing plan and these current plans to meet the needs of the patient population. Through that process, Defendants will continue to explore alternatives to the way care is delivered to patients in CDCR's mental health delivery system. CDCR will continue to work with the Special Master and his team to assess the proposals laid out in this staffing plan. CDCR will also monitor the staffing plans and the system's need through the Continuous Quality Improvement Tool with the ultimate goal of ending court oversight as soon as reasonably practicable.

California Department of Corrections and Rehabilitation
Division of Health Care Services
Mental Health Program

## MALE BED PLAN
## CALIFORNIA HEALTH CARE FACILITIES - MENTAL HEALTH PROGRAM
### Projections through 2017 - Updated numbers 1/12/17

### Previous Bed Plan Numbers

| Level of Care: | Permanent Program Capacity | + | Temporary Capacity | + | Proposed Changes Capacity: | = | Net Capacity | Mental Health Bed Need Study - McManis Spring 2012 Population Projections - Need to 2013 | over/ (under) need |
|---|---|---|---|---|---|---|---|---|---|
| EOP | 3205 | | 150 | | 448 | | 3,803 | 3,655 | 148 |
| ASU | 519 | | 47 | | -16 | | 550 | 639 | -89 |
| PSU | 384 | | 0 | | 128 | | 512 | 474 | 38 |
| MHCB | 241 | | 114 | | 34 | | 389 | 343 | 46 |
| Acute | 130 | + | 68 | + | 34 | = | 232 | 232 | 0 |
| ICF Low Custody | 390 | | 0 | | -50 | | 340 | 276 | 64 |
| ICF High Custody | 192 | | 382 | | 50 | | 624 | 556 | 68 |
| Total: | 5,061 | | 761 | | 628 | | 6,450 | 6,175 | 275 |

### Bed Plan Numbers

| Level of Care: | Permanent Program Capacity | + | Temporary Capacity | + | Proposed Changes to Capacity: | = | Net Capacity | Mental Health Bed Need Study McManis Fall 2016 Population Projections - Need to 2017: | over/ (under) need | Mental Health Bed Need Study - McManis Fall 2016 Population Projections - Need to 2017 "NO Occupancy Standard" | over/ (under) need |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EOP | 5,830 | | -170 | | 1,037 | | 6,597 | 5,811 | 786 | 5,520 | 1,077 |
| ASU | 585 | | 0 | | 0 | | 585 | 786 | -201 | 747 | -162 |
| PSU | 300 | | 0 | | 0 | | 300 | 390 | -90 | 371 | -71 |
| MHCB | 427 | | -54 | | 0 | | 373 | 495 | -122 | 446 | -73 |
| PIP | 40 | | 0 | | 0 | | 40 | 43 | -3 | 39 | 1 |
| Acute | 412 | + | 0 | + | 0 | = | 412 | 365 | 47 | 328 | 84 |
| ICF Low Custody | 390 | | 0 | | 0 | | 390 | 360 | 30 | 324 | 66 |
| ICF High Custody | 700 | | 0 | | 72 | | 772 | 701 | 71 | 631 | 141 |
| Total: | 8,684 | | -324 | | 1,109 | | 9,469 | 8,951 | | 8,406 | |

### Table #A: Mental health bed capacity as of 1/12/17

| Institution | EOP | ASU | PSU | MHCB | Acute/PIP | ICF | ICF-H | Total |
|---|---|---|---|---|---|---|---|---|
| CHCF/DNCA | 375 | 50 | | 98 | 154 | | 360 | 1,037 |
| CIM | | | | 34 | | | | 34 |
| CMC | 452 | 100 | | 50 | | | | 602 |
| CMF | 447 | 58 | | 50 | 218 | 84 | 94 | 951 |
| COR | 300 | 100 | | 24 | | | | 424 |
| HDSP | | | | 10 | | | | 10 |
| KVSP | 96 | | | 12 | | | | 108 |
| LAC | 600 | 100 | | 12 | | | | 712 |
| MCSP | 774 | 50 | | 8 | | | | 832 |
| NKSP | | | | 10 | | | | 10 |
| PBSP | 66 | | | 10 | | | | 76 |
| PVSP | | | | 6 | | | | 6 |
| RJD | 894 | 63 | | 14 | | | | 971 |
| SAC | 514 | 64 | 300 | 44 | | | | 922 |
| SATF | 352 | | | 20 | | | | 372 |
| SOL | | | | 9 | | | | 9 |
| SQ | | | 40 | | | | | 40 |
| SVSP | 588 | | | 10 | | | 246 | 844 |
| VSP | 372 | | | | | | | 372 |
| WSP | | | | 6 | | | | 6 |
| Total: | 5,830 | 585 | 300 | 427 | 412 | 84 | 700 | 8,338 |

**Department of State Hospital Beds:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ASH | | | | | | 256 | | 256 |
| CSH | | | | | | 50 | | 50 |
| Total: | 0 | 0 | 0 | 0 | 0 | 306 | 0 | 306 |

| Grand Total: (DSH + CDCR) | 5,830 | 585 | 300 | 427 | 412 | 390 | 700 | 8,644 |

### Table #B: Temporary Capacity as of 1/12/17

| Institution | EOP | ASU | PSU | MHCB | Acute/PIP | ICF | ICF-H | Total |
|---|---|---|---|---|---|---|---|---|
| CHCF/DNCA | | | | | | | | 0 |
| CIM | | | | -34 | | | | -34 |
| CMC | | | | | | | | 0 |
| CMF | | | | | | | | 0 |
| COR | | | | | | | | 0 |
| HDSP | | | | | | | | 0 |
| KVSP | | | | | | | | 0 |
| LAC | | | | | | | | 0 |
| MCSP | -60 | | | | | | | -60 |
| NKSP | | | | | | | | 0 |
| PBSP | | | | | | | | 0 |
| PVSP | | | | | | | | 0 |
| RJD | -30 | | | | | | | -30 |
| SAC | | | | | | | | 0 |
| SATF | | | | -20 | | | | -20 |
| SOL | | | | | | | | 0 |
| SQ | | | | | | | | 0 |
| SVSP | | | | | | | | 0 |
| VSP | -180 | | | | | | | -180 |
| WSP | | | | | | | | 0 |
| Total: | -270 | 0 | 0 | -54 | 0 | 0 | 0 | -324 |

**Department of State Hospital Beds:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ASH | | | | | | | | 0 |
| CSH | | | | | | | | 0 |
| Total: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| Grand Total: (DSH + CDCR) | -270 | 0 | 0 | -54 | 0 | 0 | 0 | -324 |

### Table #C: PROPOSED Permanent Changes in Capacity

| Institution | EOP | ASU | PSU | MHCB | Acute/PIP | ICF | ICF-H | Total |
|---|---|---|---|---|---|---|---|---|
| CHCF/DNCA | | | | | | | | 0 |
| CIM | | | | | | | | 0 |
| CMC | 190 | | | | | | | 190 |
| CMF | | | | | | 72 | | 72 |
| COR | 214 | | | | | | | 214 |
| HDSP | | | | | | | | 0 |
| KVSP | 96 | | | | | | | 96 |
| LAC | 150 | | | | | | | 150 |
| MCSP | | | | | | | | 0 |
| NKSP | | | | | | | | 0 |
| PBSP | -66 | | | | | | | -66 |
| PVSP | | | | | | | | 0 |
| RJD | | | | | | | | 0 |
| SAC | | | | | | | | 0 |
| SATF | 220 | | | | | | | 220 |
| SOL | | | | | | | | 0 |
| SQ | 233 | | | | | | | 233 |
| SVSP | | | | | | | | 0 |
| VSP | | | | | | | | 0 |
| WSP | | | | | | | | 0 |
| Total: | 1,037 | 0 | 0 | 0 | 0 | 0 | 72 | 1,109 |

**Department of State Hospital Beds:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ASH | | | | | | | | 0 |
| CSH | | | | | | | | 0 |
| Total: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| Grand Total: (DSH + CDCR) | 1,037 | 0 | 0 | 0 | 0 | 0 | 72 | 1,109 |

### Table #D: PROPOSED Net number of mental health beds

| Institution | EOP | ASU | PSU | MHCB | Acute/PIP | ICF | ICF-H | Total |
|---|---|---|---|---|---|---|---|---|
| CHCF/DNCA | 375 | 50 | | 98 | 154 | 0 | 360 | 1,037 |
| CIM | | | | | | | | 0 |
| CMC | 642 | 100 | | 50 | 0 | | | 792 |
| CMF | 447 | 58 | | 50 | 218 | 84 | 166 | 1,023 |
| COR | 514 | 100 | | 24 | 0 | | | 638 |
| HDSP | 0 | | | 10 | 0 | | | 10 |
| KVSP | 192 | 0 | | 12 | 0 | | | 204 |
| LAC | 750 | 100 | | 12 | 0 | | | 862 |
| MCSP | 714 | 50 | | 8 | 0 | | | 772 |
| NKSP | 0 | 0 | | 10 | 0 | | | 10 |
| PBSP | 0 | | | 10 | 0 | | | 10 |
| PVSP | 0 | | | 6 | 0 | | | 6 |
| RJD | 864 | 63 | | 14 | 0 | | | 941 |
| SAC | 514 | 64 | 300 | 24 | 0 | | | 902 |
| SATF | 572 | | | 20 | 0 | | | 592 |
| SOL | 0 | 0 | | 9 | 0 | | | 9 |
| SQ | 233 | 0 | | 0 | 40 | 0 | | 273 |
| SVSP | 588 | 0 | | 10 | 0 | | 246 | 844 |
| VSP | 192 | 0 | | 0 | | | | 192 |
| WSP | 0 | | | 6 | 0 | | | 6 |
| Total: | 6,597 | 585 | 300 | 373 | 412 | 84 | 772 | 9,123 |

**Department of State Hospital Beds:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ASH | 0 | 0 | 0 | 0 | 0 | 256 | 0 | 256 |
| CSH | 0 | 0 | 0 | 0 | 0 | 50 | 0 | 50 |
| Total: | 0 | 0 | 0 | 0 | 0 | 306 | 0 | 306 |

| Grand Total: (DSH + CDCR) | 6,597 | 585 | 300 | 373 | 412 | 390 | 772 | 9,429 |

1) All proposals are preliminary as site assessments to identify treatment and program space have not been evaluated.
2) CDCR would like to open discussions with the Special Master and Plaintiffs regarding additional open dormitory settings for future program expansion.

California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Mental Health Program

| FEMALE BED PLAN |
| --- |
| CALIFORNIA HEALTH CARE FACILITIES - MENTAL HEALTH PROGRAM |

Projections through 2017 - Updated numbers 1/12/17

## Previous Bed Plan Numbers

| Level of Care: | Current Program Capacity: | + | New Capacity: | - | Returned Capacity: | = | Net Capacity: | Mental Health Bed Need Study - McManis Spring 2012 Population Projections - Need to 2012 | over/ (under) need |
|---|---|---|---|---|---|---|---|---|---|
| EOP | 129 | | 0 | | 0 | | 129 | 85 | 44 |
| ASU | 19 | | 1 | | 0 | | 20 | 13 | 7 |
| PSU | 20 | + | 0 | - | 0 | = | 20 | 22 | -2 |
| MHCB | 22 | | 0 | | 0 | | 22 | 8 | 14 |
| Acute/ICF | 30 | | 45 | | -30 | | 45 | 17 | 28 |
| Total: | 220 | | 46 | | -30 | | 236 | 145 | 91 |

## Bed Plan Numbers

| Level of Care: | Permanent Program Capacity: | + | Temporary Capacity: | + | Proposed Changes to Capacity: | = | Net Capacity: | Mental Health Bed Need Study - McManis Fall 2016 Population Projections - Need to 2017 | over/ (under) need | Mental Health Bed Need Study - McManis Fall 2016 Population Projections - Need to 2017 "NO Occupancy Standard": | over/ (under) need |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EOP | 129 | | 0 | | 62 | | 191 | 183 | 8 | 174 | 17 |
| ASU | 20 | | 0 | | 0 | | 20 | 10 | 10 | 9 | 11 |
| PSU | 20 | + | 0 | + | 0 | = | 20 | 12 | 8 | 12 | 8 |
| MHCB | 22 | | 0 | | 0 | | 22 | 30 | -8 | 27 | -5 |
| Acute/ICF | 45 | | 30 | | 0 | | 75 | 55 | 20 | 50 | 25 |
| Total: | 236 | | 30 | | 62 | | 328 | 290 | | 272 | |

---

**Table #A:  Mental health bed capacity as of 1/12/17**

| Institution | Level of Care | | | | | Total |
|---|---|---|---|---|---|---|
| | EOP | ASU | PSU | MHCB | Acute/ ICF | |
| CCWF | 54 | 10 | | 12 | | 76 |
| CIW | 75 | 10 | 20 | 10 | 45 | 160 |
| FWF | | | | | | 0 |
| Total: | 129 | 20 | 20 | 22 | 45 | 236 |

**\*\*Department of State Hospital Beds:**

| PSH | | | | | | |
|---|---|---|---|---|---|---|
| Total: | 0 | 0 | 0 | 0 | 0 | 0 |

| Grand Total: (DSH Hospital + CDCR) | 129 | 20 | 20 | 22 | 45 | 236 |
|---|---|---|---|---|---|---|

**Table #B:  Temporary Capacity as of 1/12/17**

| Institution | Level of Care | | | | | Total |
|---|---|---|---|---|---|---|
| | EOP | ASU | PSU | MHCB | Acute/ ICF | |
| CCWF | | | | | | 0 |
| CIW | | | | | | 0 |
| FWF | | | | | | 0 |
| Total: | 0 | 0 | 0 | 0 | 0 | 0 |

**Department of State Hospital Beds:**

| PSH | | | | | 30 | 30 |
|---|---|---|---|---|---|---|
| Total: | 0 | 0 | 0 | 0 | 30 | 30 |

| Grand Total: (DSH Hospital + CDCR) | 0 | 0 | 0 | 0 | 30 | 30 |
|---|---|---|---|---|---|---|

**Table #C: PROPOSED Permanent Changes in Capacity as of 1/12/17**

| Institution | Level of Care | | | | | Total |
|---|---|---|---|---|---|---|
| | EOP | ASU | PSU | MHCB | Acute/ ICF | |
| CCWF | 62 | | | | | 62 |
| CIW | | | | | | 0 |
| FWF | | | | | | 0 |
| Total: | 62 | 0 | 0 | 0 | 0 | 62 |

**Department of State Hospital Beds:**

| PSH | | | | | | |
|---|---|---|---|---|---|---|
| Total: | 0 | 0 | 0 | 0 | 0 | 0 |

| Grand Total: (DSH Hospital + CDCR) | 62 | 0 | 0 | 0 | 0 | 62 |
|---|---|---|---|---|---|---|

**Table #D:  PROPOSED Net number of mental health beds**

| Institution | EOP | ASU | PSU | MHCB | Acute/ ICF | Total |
|---|---|---|---|---|---|---|
| CCWF | 116 | 10 | | 12 | 0 | 138 |
| CIW | 75 | 10 | 20 | 10 | 45 | 160 |
| FWF | | | | | | 0 |
| Total: | 191 | 20 | 20 | 22 | 45 | 298 |

**Department of State Hospital Beds:**

| PSH | | | | | 30 | 30 |
|---|---|---|---|---|---|---|
| Total: | 0 | 0 | 0 | 0 | 0 | 30 |

| Grand Total: (DSH Hospital + CDCR) | 191 | 20 | 20 | 22 | 75 | 328 |
|---|---|---|---|---|---|---|

EXHIBIT C



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email:  tnolan@rbgg.com

January 25, 2017

VIA ELECTRONIC MAIL ONLY

```
┌─────────────────────────┐
│      SUBJECT TO          │
│  PROTECTIVE ORDERS       │
└─────────────────────────┘
```

Matthew A. Lopes, Jr.
*Coleman* Special Master
Pannone Lopes Devereaux & West LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908-5600
MLopes@pldwlaw.com

> Re:   *Coleman v. Brown*
>       Plaintiffs' Objections to Defendants' January 10, 2017 Staffing Plan.
>       Our File No. 0489-03

Dear Special Master Lopes:

After more than 18 months of meetings between the parties and the Special Master on staffing issues, and several hearings before the Court, Defendants have presented their Final Staffing Plan to the Plaintiffs and the Special Master.  *See* January 10, 2017 Updated Staffing Plan (hereinafter, "Final Staffing Plan.")

While we appreciate the efforts Defendants have made, their Final Staffing Plan presents an inadequate remedy to the severe current staffing problems -- particularly in the key category of psychiatry staff.  Indeed, Defendants' efforts fall far short of the Court's clear mandate in 2009 to "take all steps necessary" to address the "ongoing problem of mental health staffing shortages and come into compliance with" the existing Court-ordered staffing plan.  *See* June 18, 2009 Order, Docket 3613, at 2; June 16, 2014 Order, Docket 5171, at 4 (referencing June 13, 2002 Order, Docket 1383).  Likewise, Defendants' plan falls short of the Court's more recent mandate in its May 18, 2015 Order, which noted that "inadequate mental health staffing levels have plagued the remedial phase of this litigation since its inception" and which forcefully asserted that "after almost twenty years of effort this problem must be finally and fully remedied."  *See* May 18, 2015 Order, Docket 5307, at 5:18-20.  While Defendants have made some

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 2

progress and have set forth some productive ideas, we do not agree that their current plan will lead to a "final and full" remedy for this problem, without further salary increases for psychiatrists and additional steps.

Also, while the main focus of our objections is on the critical psychiatrist category where the shortfalls are most severe, Defendants' staffing still persistently falls short in the area of Recreational Therapists, and the overall progress Defendants have made in the areas of Psychologist and Social Worker staffing masks some persistent staffing shortfalls in those categories at individual institutions.  *See* Section D below.

Defendants' Final Staffing Plan is deficient for many reasons:

- Defendants have failed to make any attempt to address their severe, chronic psychiatry vacancy rates with appropriate, measured salary increases designed to attract and retain more candidates.

- Defendants rely excessively on tele-psychiatrists without appropriate limitations on their use.

- The psychiatrist shortage in the CDCR is getting worse, and the telepsychiatry program appears in part to be merely moving psychiatrists already working for the CDCR from institutions to remote tele-psychiatry call centers.

- The planned expansions of the telepsychiatry programs in Rancho Cucamonga and at San Quentin require construction, so that many of the positions cannot even be filled until 2018 at the earliest, making this approach too slow to bring relief that is needed now.

- The proposed "lift and shift" of inpatient programs from DSH to CDCR is certain to make the psychiatrist staffing problems worse, particularly at SVPP and CHCF, where the DSH staffing levels for psychiatrists and other mental health professionals are *much* higher than the corresponding rates in the parallel CDCR programs.

- Defendants' clustering plan is far too limited in scope and the clustering is at the wrong locations.  Defendants are shutting down only one small remote EOP program, and they are adding large "clusters" of EOP beds at a number of very difficult to staff institutions.

- The dramatic ongoing current expansion of EOP beds and other mental health beds will make the current staffing problems worse.

SUBJECT TO PROTECTIVE ORDERS
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 3

- Defendants' utilization management efforts are unlikely to yield significant results.  Defendants reported during the work group meetings last year that they already reviewed EOPs and found they overwhelmingly need EOP care.

- Defendants' other remedial measures are too small to affect the overall psychiatrist vacancy rate and any other potential vacancy problems in other clinical categories that – given the Department's past record in this area – must be viewed as likely to re-occur in the future.

We discuss each of these significant staffing-related problems in turn below:

A.      **Defendants Should Be Required to Dramatically Boost Pay for Psychiatrists and Possibly for Other Clinical Categories.**

The CDCR's staffing problems are well-established and have persisted throughout the life of this case.  The original order requiring Defendants to reduce clinical staffing vacancies to 10% or less in each category of clinical staff is now more than 14 years old. *See* June 13, 2002 Order, Docket 1383.  Defendants have *never* achieved that benchmark.

As explained in the 26th Monitoring Report, Defendants' vacancy levels for psychiatrists and psychologists in 2015 were essentially unchanged from when monitoring in this case began in 1998.  And, "without adequate staff, even the best of plans for mental health care are at risk of remaining merely an abstraction." *See* 26th Report, Docket 5439, at 16.[1]

Despite this lack of progress, Defendants have failed to increase psychiatrist pay in any significant way in recent years.  As a result, in the last two years, since November of 2014, the total number of psychiatrists (*including* tele-psychiatrists and registry psychiatrists) working in the CDCR has remained essentially unchanged, growing by only 7 from 251 to 258 between November of 2014 and November of 2016.  *See* **Exhibit A** hereto.  During that same period of time, the number of EOP patients in the CDCR grew by 23%, from 5938 to 7318.[2]  *Id.*  As a result, the number of EOP patients per

---

[1] All references for the 26th Round Report and DSH Report are to the docket pagination.

[2] To their credit, during this same period of time the CDCR Defendants were able to significantly increase the headcount of social workers (from 339 to 380), psychologists (from 622 to 675), and Recreational Therapists (from 166.5 to 211).

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 4

psychiatrist in the CDCR has increased during this period from 29.6 to 42.2.  *See* **Exhibit B** hereto.

Moreover, having failed to increase the psychiatrist staffing numbers at the same time that the mental health population has been steadily growing, the overall percentage vacancy rate for CDCR psychiatrists has now been steadily growing for two years.  The following chart includes use of registry psychiatrists but does not include telepsychiatrist use because of insufficient data for the period in question:



Note: the Psychiatric Staffing Rate is taken as the number of Staff Psychiatrists over the number of established Staff Psychiatrist positions, *including* Registry Psychiatrists.

Given the CDCR's inability to expand the total number of psychiatrists using other means, Defendants must now be required to dramatically increase pay for both Registry and Staff Psychiatrists.  Including Registry and Staff Psychiatrists, but not including tele-psychiatrists, the total number of CDCR psychiatrists has actually declined steadily since November of 2014, falling by 35 from 251 to 216 in the two-year period between November of 2014 and November of 2016.  *See* **Exhibit A** hereto.

Moreover, monthly statistical data for the last six months on registry use from the most recent November data package shows that usage rates have been falling slowly and steadily in the last six months for registry clinicians statewide, including individually for

SUBJECT TO PROTECTIVE ORDERS
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 5

both psychiatrists and psychologists.  *See* **Exhibit C** hereto.  Indeed, overall, the data shows a marked reduction in registry usage in just the last six months since June 2016, with the overall number of position equivalents used falling from 127.15 in June to 96.52 in October, and then rising to 114.75 in November.  *Id.*

A dramatic pay raise is needed to boost psychiatry recruitment and retention for both Staff and Registry psychiatrists – everything else has failed.

We also strongly object to the position of Defendants throughout the Court-ordered workgroup discussions on staffing issues in the last six months that they cannot share any information about possible plans to increase psychiatrist salaries, or studies about psychiatrist pay, because the issue is currently in the process of collective bargaining negotiations.   The Court's power to remedy the ongoing violations of its staffing orders with pay increases is not in any way inhibited by the collective bargaining process.  By withholding information about possible pay increases, Defendants have simply forced the Special Master and the Court to make a blunt estimate of the pay increase needed to attract more psychiatrists to California's prisons.

**B.      Defendants' Telepsychiatry Policy Does Not Include All Appropriate Safeguards and Will Not Be An Adequate or Timely Remedy for The Chronic Psychiatry Staffing Problem.**

Defendants rely excessively on telepsychiatrists in their Final Staffing Plan, without appropriate limitations on their use.  Defendants should be required to affirm their prior statements that they will *not* use telepsychiatrists in inpatient programs and will only allow their use in MHCB units in urgent off hours circumstances.  Defendants should also be required to limit the percentage of psychiatrists at any given institution who can be telepsychiatrists.

As we noted in our letter on this issue last summer, we agree with the *Coleman* Court's observation in its May 18, 2015 Order that the unrestricted use of telepsychiatry "is troubling, particularly because there may be class members not susceptible to this method of care."  *See* May 18, 2015 Order, Docket 5307, at 5:13-14.  Despite the Court's cautionary statement, Defendants' Telepsychiatry Policy from late 2015 broadly authorizes the use of this treatment method indicating that "IPs shall not be excluded from participation in [the] Telepsychiatry Program based solely on their level of care or their diagnosis."  *See* Defendants' November 1, 2015 Staffing Update, Ex 2 (2015 Telepsychiatry Policy), at 12-12-6.

SUBJECT TO PROTECTIVE ORDERS
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 6

     We disagree with Defendants' sweeping characterization of the appropriate use and scope of telepsychiatry. We object to this policy as not imposing basic, clearly established limitations on the use of telepsychiatry that have been set forth by the Special Master and/or in professional standards.

     First, Defendants' policy should incorporate the Special Master's finding in the 26th Progress Report that telepsychiatry "is primarily an option for treatment of inmates at the 3CMS level of care, and a less desirable option for higher levels of care." *See* 26th Report, Docket 5439, at 30 (emphasis removed). Defendants did not object to this finding. Although the CDCR policy does specify that "[o]nsite providers shall remain the preferred method of psychiatric care in inpatient settings," it expressly permits the use of telepsychiatry in MHCBs when no on site providers are available, and the policy clearly envisions the routine use of telepsychiatry with EOPs. *See* Defendants' 2015 Telepsychiatry Policy at 12-12-1. We object to anything other than temporary, emergency use of telepsychiatrists in MHCBs or ever in any other inpatient units. Limited use of telepsychiatry in EOP programs could be negotiated, with appropriate limitations.

     Second, each mental health program must have a stable, onsite contingent of live psychiatrists which is supplemented by telepsychiatry. New monthly staffing reports including telepsychiatry that the parties developed in the workgroup meetings (and that have been made available only since August) provide numbers of on-site staff psychiatrists as well as telepsychiatrists at individual institutions. For example, the November 2016 telepsychiatry data shows that SVSP has only 1.3 on site psychiatrists and 5.3 tele-psychiatrists. SVSP has a 10-bed MHCB unit, where the use of telepsychiatrists should be limited. *See* **Exhibit D hereto (**Monthly telepsychiatry data including staff psychiatrist staffing for same institutions, November 2016**).** Another example is HDSP, which also has a 10-bed MHCB and which has *no* psychiatrists on site and 4.0 telepsychiatrists. *Id.* How can the institution appropriately care for crisis patients with no on-site psychiatrists? What happens if all the telephone lines go down in a storm, such as the severe rains that eliminated 58 beds at SVPP in the past months?

     In addition, with the lack of progress in recent years in hiring psychiatrists, and the steady erosion in the number of staff psychiatrists working in the CDCR, we are concerned that the telepsychiatry program is merely moving psychiatrists already working for the CDCR from institutions to telepsychiatry call centers. Since November of 2014, the number of mission-critical, on-the-ground staff psychiatrists working in CDCR institutions has fallen by 27 from 200 to 173. *See* **Exhibit E hereto.** Thus, the 48 additional tele-psychiatrists hired to date have actually only resulted in an additional 20 clinicians. This is consistent with our observation when the parties visited the

SUBJECT TO PROTECTIVE ORDERS
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 7

telepsychiatry offices in Elk Grove last year that two of the three telepsychiatrists we observed had previously worked at CDCR institutions – MCSP and CHCF – located within an hour from Elk Grove.

Finally, the telepsychiatry remedy is too slow and relief is needed now.  The planned expansions of the telepsychiatry programs in Rancho Cucamonga and at San Quentin require construction, so that many of the positions cannot even be filled until 2018, making this approach too slow to bring relief that is needed now.

C.      **Defendants' Clustering Plan Is Inadequate and the Cluster Locations are Poorly Selected**

Defendants' clustering plan is far too limited in scope and the clustering is at the wrong locations.  Defendants are shutting down only one small remote EOP program (PBSP with 90 EOP and PSU beds combined), and they are adding significant "clusters" of EOP beds at a number of very difficult to staff institutions.  *See* Final Staffing Plan at 6.  Defendants are adding the following EOP beds at "cluster" institutions with extremely low psychiatrist staffing rates:

- Defendants are adding 300 EOP beds at LAC, which has 4.0 out of 16.0 allocated psychiatrist positions filled and on site, and which has a 47% vacancy rate *including* tele-psychiatrists and registry coverage.  *See* **Exhibit D hereto (**Defendants' November 2016 Allocated and Filled Tele-psychiatry Positions Chart, from December 2016 Monthly Statistics).[3]

- Defendants are adding 220 EOP beds at SATF, which has only 1.0 out of 16 allocated psychiatrist positions filled and on site, and which has a 46% vacancy rate *including* tele-psychiatrists and registry coverage.  *Id.*

- Defendants are adding 96 EOP beds at KVSP, which has ***zero*** on site allocated psychiatrist positions filled out of 9.0 positions, which is using a single tele-psychiatrist, and which, including registry usage, has a 54% vacancy rate – one of the very worst in the state.  *Id.*

- Defendants are adding 364 EOP beds (in two stages) at CSP-Corcoran, which has a slightly better total vacancy rate overall, including

---

[3]  This chart is the only monthly source of staffing levels including tele-psychiatrists in the totals for their institutions.

SUBJECT TO PROTECTIVE ORDERS
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 8

telepsychiatrists and registry, of 33%, but which only has 2.5 out of 14.5 allocated psychiatrist positions filled with staff psychiatrists on the ground. *Id.*

These examples establish that Defendants' approach to clustering has been too limited and has included clusters at institutions certain to be very difficult to staff.

Plaintiffs also object to Defendants' failure to relocate its mental health programs from the troubled HDSP to a location where it can hire clinical staff more easily.  HDSP does not have a single Staff Psychiatrist on site, despite a 10-bed MHCB, and has not for a very long time.  *See* **Exhibit D** hereto.

D.     **Defendants' Progress State-Wide in Hiring Psychologists and Social Workers Masks Persistent Problems at Individual Institutions, and Defendants Fall Short of the 10% Benchmark for Recreational Therapists Statewide**.

Defendants are correct that they have made significant progress towards the meeting Court-ordered 10% staffing vacancy threshold for psychologists and social workers state-wide.  *See* June 13, 2002 Order, Docket 1383.  However, that overall progress masks persistent shortages in these categories at a number of critical institutions for mental health care.  The charts below for the five institutions with the most persistent hiring trouble *outside* the staff psychiatrist category  highlights staffing levels below 80% for clinical psychologists, social workers, and recreational therapists in May of 2016 and again in November of 2016:

| Excluding Registry | COR | KVSP | MCSP | SATF | SVSP |
|---|---|---|---|---|---|
| **Clinical Psychologists** | | | | | |
| *May 2016* | 91% | 70% | 77% | 71% | 67% |
| *November 2016* | 97% | 74% | 73% | 86% | 63% |
| **Social Workers** | | | | | |
| *May 2016* | 95% | 100% | 100% | 93% | 88% |
| *November 2016* | 94% | 92% | 93% | 95% | 74% |
| **Rec Therapists** | | | | | |
| *May 2016* | 27% | 80% | 89% | 23% | 74% |
| *November 2016* | 34% | 60% | 88% | 31% | 74% |

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 9

| Including Registry | COR | KVSP | MCSP | SATF | SVSP |
|---|---|---|---|---|---|
| **Clinical Psychologists** | | | | | |
| *May 2016* | 96% | 72% | 77% | 73% | 77% |
| *November 2016* | 100% | 74% | 76% | 89% | 72% |
| **Social Workers** | | | | | |
| *May 2016* | 103% | 100% | 102% | 95% | 88% |
| *November 2016* | 101% | 92% | 97% | 98% | 74% |
| **Rec Therapists** | | | | | |
| *May 2016* | 38% | 80% | 89% | 23% | 74% |
| *November 2016* | 50% | 60% | 90% | 31% | 75% |

The chart shows persistent staffing problems in multiple categories at SVSP, persistent staffing problems for Recreational Therapists at Corcoran, KVSP, SATF and SVSP, and persistent staffing problems for clinical psychologists at KVSP, MCSP and SVSP.

CDCR needs to focus on the addressing the key staffing shortfalls in the psychiatrist category, but they should also be required to develop a headquarters process and additional resources that will assist individual institutions like those above that are struggling to obtain adequate staff in particular clinical categories.

    **E.**    **Defendants' Proposed Lift and Shift Transfer of the Inpatient Hospitals at CMF, SVSP and CHCF Will Make Overall Staffing Problems Worse**.

The proposed "lift and shift" transfer of inpatient programs from DSH to CDCR is certain to make the current psychiatrist staffing problems worse, particularly at SVPP and CHCF, where the DSH staffing levels for psychiatrists (and in other categories) are much higher than the corresponding rates for CDCR clinical staff.  This transfer proposal has been made several times in the past, and has never been implemented.  *See, e.g.,* 10/17/07 Order, Docket 2461.  One of the key reasons for the failure of this idea to progress may be that a significant number of clinicians who are willing to work for a State Hospital Program are not willing to work for the CDCR.  We have heard this anecdotally from DSH clinicians over the years, and current staffing data for the two departments bears out this concern.

Currently at the Salinas Valley State Prison, the staffing rates for the CDCR program and the DSH program show dramatic differences, based on the most recent staffing data in the monthly reports, which is for November of 2016:

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 10

| Position | SVSP (CDCR) Vacancy Rate | SVPP (DSH) Vacancy Rate |
|---|---|---|
| Staff Psychiatrist | 76.11% | 8.7% |
| Clinical Psychologist | 33.07% | 0% |
| Clinical Social Worker | 26.32% | 5.9% |
| Recreational Therapist | 25.11% | 0% |

Similarly dramatically better staffing in DSH programs is also illustrated in the vacancy rates for the two Departments at the new Stockton Hospital:

| Position | CHCF (CDCR) Vacancy Rate | CHCF (DSH) Vacancy Rate |
|---|---|---|
| Staff Psychiatrist | 66.67% | 21.56% |
| Clinical Psychologist | 31.6% | 1.76% |

Given these differences in staffing rates, we recommend against approval of the "lift and switch" proposal without a clear and well established record of improvement in CDCR staffing levels at these critical program sites and a plan for how to maintain adequate staffing. [4]

---

[4] Plaintiffs have limited their comments about the "lift and shift" proposal to only the most relevant issue to the current staffing plan. They do not waive other objections to the proposal but so doing. In particular, Plaintiffs await a promised "rollout" plan, which presumably will include a plan for hiring of sufficient numbers of hospital administrators to handle an additional approximately 1,000 high-acuity patients, as contemplated by the Court's 2007 order. *See* 10/17/07 Order at 2, Docket 2461.

SUBJECT TO PROTECTIVE ORDERS
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 11

> **F.    Defendants' Utilization Management Proposals Are Vague and Unlikely to Result in Significant Reductions in Demand for Mental Health Care.**

Defendants have been reviewing CCCMS patients who are not on medications to see if they need to stay on the caseload.  They are also "in the early stages" of designing a similar review process for EOPs.  Defendants' clinical leadership previously reported to plaintiffs and the Special Master in an all parties meeting last summer that they informally reviewed EOP class members to see if they were appropriately at that level of care and found that they were indeed appropriately EOPs.

We will be providing detailed comments and objections in a separate letter to the draft plan to review EOPs for removal from the program, many of which were already discussed in previous workgroup sessions.  However, for the purposes of this letter, Plaintiffs note that there is no evidence that CDCR is currently providing excessive or unnecessary mental health services to any class members.

> **G.    Defendants' Remaining Remedial Measures are Too Small and Timid to Impact the Overall Vacancy Problems Facing the Department.**

Defendants' other remedial measures are too small to impact the overall psychiatrist vacancy rate.

(a) *The Internship and Fellowship Program*:  While positive, the Psychiatry Fellowship program only has two psychiatry residents and there are no firm plans yet for expansions of this program to other schools or prisons.  In this regard, the Fellowship program is much smaller and has had much less of an impact than the internship program for psychologists, which currently employs 31 individuals at 11 institutions.  *See* Final Staffing Plan at 2.  Defendants should not be given much credit for a program that only involves two residents at a time.

(b) *Medical Assistants:*  The use of Medical Assistants is also positive and may over time lead to an increase in psychiatry staff retention.  *See* Final Staffing Plan at 1-2.  However, Defendants have not shown that these positions will reduce the need for psychiatrists.  Defendants have promised multiple times to provide details on studies they planned to conduct on the efficacy of the position, but have not.  Indeed, informal reports at workgroup meetings indicate that the rollout of the position has been spotty. Right now, based on plaintiffs' counsel's observations of telepsychiatry meetings with a medical assistant present, the medical assistants mostly seem to be working as assistants

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 12

for tele-psychiatrists.  In that role, they facilitate the tele-psychiatry process itself by helping with scheduling, documenting the meeting and providing a physical staff presence in the room with the patient during meetings with the telepsychiatrists, but their role does not appear likely to speed up clinical contacts or reduce paperwork for the psychiatrists.  For example, the psychiatrist still has to write his or her own progress notes and medication orders.

(c) *Increasing Contract Rates for Registry Workers:*  The increased rates for contract psychiatrists do not appear to have helped increase the use of registry contractors during the last two years.  Indeed, as explained above, in just the last six months the use of registry psychiatrists has fallen from 44.9 to 42.9 position equivalents per month.  *See* **Exhibit C hereto.**  Contract usage has also fallen for other clinical categories during the same period.  *Id.*   Moreover, Defendants have provided no detailed information about the timing or the amount of the increase in contractor rates.  The lack of an increase in registry usage in recent years suggests the rate increases have been too modest.

(d) *On Call Compensation and Double Positions:*   The change in compensation for on call hours from leave credit to cash is positive but unlikely to have much impact. The use of double positions is concerning. Full-time workers will inevitably be less efficient working additional days, and possibly less effective as clinicians.

(e) *Psychiatric Nurse Practitioners:*  This is a potentially very helpful measure, but the workgroup discussions on this issue made clear that there are not many individuals in this category currently trained and licensed in California.  There was discussion about working with Fresno State and other schools starting programs for Psychiatric Nurse Practitioners, but that will take time to develop and to have a meaningful impact on CDCR staffing.

<u>**Conclusion**</u>

Defendants are not treating ongoing staffing inadequacies with the required sense of urgency.  As we stated in our staffing letter to Defendants last July, this is a severe staffing crisis that is putting patients' lives at risk.  As found in the 26th Report, although "Defendants' latest court-ordered staffing plan was submitted over a year ago, they have demonstrated no sense of the required urgency for a meaningful implementation of the plan."  *See* 26th Report, Docket 5439, at 31.  At the same time that Defendants face the current staffing crisis, the system's mental health population of 38,356 prisoners as of October 17, 2016 is now significantly larger than it was in July 2008, at the peak of

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 13

CDCR's overcrowding crisis.[5]  The overall acuity level of class members has also increased dramatically in this timeframe.[6]  This means that Defendants are administering a severely overcrowded mental health treatment system with an acute shortage of psychiatrists and other key mental health staff members.  The time has come for more aggressive remedial action by Defendants on every level.

                                        Sincerely,

                                        ROSEN BIEN
                                        GALVAN & GRUNFELD LLP

                                        */s/ Thomas Nolan*

                                By:     Thomas Nolan
                                        Of Counsel

TN:cg
Encl.
cc:     Special Master Matthew A. Lopes, Jr.
        *Coleman* Special Master Team
        *Coleman* Co-counsel
        Katherine Tebrock
        Amy Eargle
        Danielle O'Bannon
        Sean Rashkis
        Patrick McKinney
        Tom Gilevich
        Nick Weber
        Elise Thorne
        Christine Ciccotti

---

[5] According to the Monthly Statistical Data package for July of 2008, the total mental health population at that time was 34,035.  *See* Health Care Placement Oversight Report R1-4, June 20, 2008.

[6] On July 21, 2008, the total EOP population was 2,859 in male EOP programs. On November 4, 2016, the mainline male EOP GP population was more than double the 2008 population at 5,946, even though the increase in overall MHSDS population from 34,035 to 36,645 was only about 10%.

Exhibit A

## CDCR Total Psychiatrist Staffing Numbers (including Registry), February 2014 – November 2016

Source: *Coleman* Monthly Reports, Enclosure 1b

| Month | Psychiatrists | Psychiatrists (including Telepsychiatrists) |
|---|---|---|
| Feb-14 | 229.74 | |
| May-14 | 219.71 | |
| Jul-14 | 216.08 | |
| Sep-14 | 238.18 | |
| Nov-14 | 251.15 | |
| Feb-15 | 255.11 | |
| May-15 | 253.66 | |
| Aug-15 | 232.39 | |
| Nov-15 | 217.89 | |
| Feb-16 | 228.5 | |
| May-16 | 210.15 | |
| Aug-16 | 218.14 | 255.54 |
| Nov-16 | 216.2 | 258.5 |

Exhibit B

## CDCR Psychiatrist Staffing Rate and Inmates per Psychiatrist, February 2014 – November 2016

Source: *Coleman* Monthly Reports, Enclosure 1b

| Month | Psychiatrist Staffing Rate (Excluding Registry) | Number of Staff Psychiatrists (All) | Number of Staff Psychiatrists (Line) | EOP Inmates per Line Psychiatrist | EOP Population |
|---|---|---|---|---|---|
| Feb-14 | 64.3% | 229.74 | 191 | 27.1 | 5167 |
| May-14 | 61.4% | 219.71 | 184 | 29.7 | 5464 |
| Jul-14 | 60.4% | 216.08 | 181.05 | 31.3 | 5671 |
| Sep-14 | 64.4% | 238.18 | 193 | 30.0 | 5797 |
| Nov-14 | 68.4% | 251.15 | 200.8 | 29.6 | 5937 |
| Feb-15 | 66.4% | 255.11 | 201 | 30.1 | 6050 |
| May-15 | 64.8% | 253.66 | 202 | 30.6 | 6184 |
| Aug-15 | 60.4% | 232.39 | 188.25 | 33.9 | 6375 |
| Nov-15 | 56.1% | 217.89 | 180.25 | 36.1 | 6501 |
| Feb-16 | 56.7% | 228.5 | 188 | 35.7 | 6705 |
| May-16 | 52.4% | 210.15 | 173.75 | 40.1 | 6971 |
| Aug-16 | 53.0% | 255.54 | 171.75 | 41.9 | 7195 |
| Nov-16 | 53.7% | 258.5 | 173.3 | 42.2 | 7318 |

# Exhibit C

Correctional Health Care Services

**Six Month Registry Usage Summary**

<u>June - 2016 through November - 2016</u>

**Mental Health**

| REGISTRY USAGE BY GROUP | | | | | | |
|---|---|---|---|---|---|---|
| **GENERAL CLASSIFICATION** | **Jun-16** | **Jul-16** | **Aug-16** | **Sep-16** | **Oct-16** | **Nov-16** |
| PSYCHIATRIST | 44.09 | 45.94 | 46.42 | 35.05 | 35.05 | 42.90 |
| PSYCHOLOGIST | 38.49 | 38.34 | 36.30 | 30.38 | 30.38 | 37.22 |
| SOCIAL WORKER | 25.28 | 21.98 | 23.05 | 14.72 | 14.72 | 19.37 |
| OTHER MH CLINICAL STAFF | 19.29 | 19.10 | 23.05 | 16.38 | 16.38 | 15.29 |
| ALL OTHER SUPPORT STAFF | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **127.15** | **125.36** | **128.82** | **96.52** | **96.52** | **114.78** |



Each position represents 173.33 monthly registry hours.

Source: Summary (from invoices) provided by the institutions

Report Date: 1/5/2017
Report Generated By:
Program Support

Exhibit D

## Division of Health Care Services
## Statewide Mental Health Program
## Allocated and Filled Telepsychiatry Positions - November 2016

| Sites | Allocated July 2016 | | | Filled | | | | |
|---|---|---|---|---|---|---|---|---|
| | Site | Telepsych | Total | Site[1] | Registry[2] | Telepsych[3] | Total | Percentage |
| CCC | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0% |
| CCI | 4.0 | 3.0 | 7.0 | 0.0 | 1.3 | 2.5 | 3.8 | 54% |
| CCWF | 9.0 | 2.0 | 11.0 | 7.0 | 0.0 | 0.5 | 7.5 | 68% |
| CHCF | 21.0 | 3.0 | 24.0 | 11.0 | 0.4 | 2.1 | 13.5 | 56% |
| CIW | 9.0 | 1.0 | 10.0 | 6.0 | 2.1 | 2.1 | 10.2 | 102% |
| COR | 10.5 | 4.0 | 14.5 | 2.5 | 4.8 | 2.5 | 9.8 | 67% |
| CTF | 6.0 | 1.0 | 7.0 | 3.3 | 0.0 | 1.0 | 4.3 | 61% |
| CVSP/ISP | 1.0 | 1.0 | 2.0 | 0.0 | 0.0 | 0.7 | 0.7 | 37% |
| HDSP | 2.0 | 4.0 | 6.0 | 0.0 | 0.0 | 4.0 | 4.0 | 67% |
| KVSP | 9.0 | 0.0 | 9.0 | 0.0 | 3.1 | 1.0 | 4.1 | 46% |
| LAC | 13.0 | 3.0 | 16.0 | 4.0 | 1.5 | 3.0 | 8.5 | 53% |
| MCSP | 15.0 | 3.0 | 18.0 | 8.0 | 5.9 | 3.0 | 16.9 | 94% |
| PBSP | 2.0 | 2.0 | 4.0 | 2.0 | 0.3 | 1.3 | 3.6 | 90% |
| RJD | 16.5 | 3.0 | 19.5 | 5.5 | 1.6 | 4.0 | 11.1 | 57% |
| SAC | 20.0 | 3.0 | 23.0 | 10.0 | 2.0 | 1.0 | 13.0 | 56% |
| SATF | 9.0 | 7.0 | 16.0 | 1.0 | 2.7 | 5.0 | 8.7 | 54% |
| SVSP | 9.0 | 5.0 | 14.0 | 1.3 | 0.1 | 5.1 | 6.4 | 46% |
| VSP | 7.0 | 3.0 | 10.0 | 1.0 | 0.3 | 3.0 | 4.3 | 43% |
| WSP | 11.0 | 0.0 | 11.0 | 3.0 | 1.2 | 0.5 | 4.7 | 42% |
| TOTAL | 174.0 | 49.0 | 223.0 | 65.5 | 27.1 | 42.3 | 134.9 | 60% |

**Footnote**

1  Source: November 25, 2016 Mental Health Hire Tracking Executive Summary from CCHCS Human Resources

2  Source: November 25, 2016 Mental Health Hire Tracking Executive Summary from CCHCS Human Resources, September 2016 Registry

3  Source:  November 2016 Telepsychiatry Provider list

# Exhibit E

# CDCR Total Psychiatrist Staffing Numbers
## (excluding Registry and Telepsychiatry),
## February 2014 – November 2016
Source: *Coleman* Monthly Reports, Enclosure 1b

| Month | Line Psychiatrists |
|-------|-------------------|
| Feb-14 | 191 |
| May-14 | 184 |
| Jul-14 | 181.05 |
| Sep-14 | 193 |
| Nov-14 | 200.8 |
| Feb-15 | 201 |
| May-15 | 202 |
| Aug-15 | 188.25 |
| Nov-15 | 180.25 |
| Feb-16 | 188 |
| May-16 | 173.75 |
| Aug-16 | 171.75 |
| Nov-16 | 173.3 |

Exhibit K

U.S. Department of Justice
Civil Rights Division
Disability Rights Section





# Effective Communication

## Overview

The Department of Justice published revised final regulations implementing the Americans with Disabilities Act (ADA) for title II (State and local government services) and title III (public accommodations and commercial facilities) on September 15, 2010, in the Federal Register. These requirements, or rules, clarify and refine issues that have arisen over the past 20 years and contain new, and updated, requirements, including the 2010 Standards for Accessible Design (2010 Standards).

People who have vision, hearing, or speech disabilities ("communication disabilities") use different ways to communicate. For example, people who are blind may give and receive information audibly rather than in writing and people who are deaf may give and receive information through writing or sign language rather than through speech.

The ADA requires that title II entities (State and local governments) and title III entities (businesses and nonprofit organizations that serve the public) communicate effectively with people who have communication disabilities. The goal is to ensure that communication with people with these disabilities is equally effective as communication with people without disabilities.

This publication is designed to help title II and title III entities ("covered entities") understand how the rules for effective communication, including rules that went into effect on March 15, 2011, apply to them.

- The purpose of the effective communication rules is to ensure that the person with a vision, hearing, or speech disability can communicate with, receive information from, and convey information to, the covered entity.

- Covered entities must provide auxiliary aids and services when needed to communicate effectively with people who have communication disabilities.

- The key to communicating effectively is to consider the nature, length, complexity, and context of the communication and the person's normal method(s) of communication.

Effective Communication

- The rules apply to communicating with the person who is receiving the covered entity's goods or services as well as with that person's parent, spouse, or companion in appropriate circumstances.

## Auxiliary Aids and Services

The ADA uses the term "auxiliary aids and services" ("aids and services") to refer to the ways to communicate with people who have communication disabilities.

- For people who are blind, have vision loss, or are deaf-blind, this includes providing a qualified reader; information in large print, Braille, or electronically for use with a computer screen-reading program; or an audio recording of printed information. A "qualified" reader means someone who is able to read effectively, accurately, and impartially, using any necessary specialized vocabulary.

- For people who are deaf, have hearing loss, or are deaf-blind, this includes providing a qualified notetaker; a qualified sign language interpreter, oral interpreter, cued-speech interpreter, or tactile interpreter; real-time captioning; written materials; or a printed script of a stock speech (such as given on a museum or historic house tour) . A "qualified" interpreter means someone who is able to interpret effectively, accurately, and impartially, both receptively (i.e., understanding what the person with the disability is saying) and expressively (i.e., having the skill needed to convey information back to that person) using any necessary specialized vocabulary.

- For people who have speech disabilities, this may include providing a qualified speech-to-speech transliterator (a person trained to recognize unclear speech and repeat it clearly), especially if the person will be speaking at length, such as giving testimony in court, or just taking more time to communicate with someone who uses a communication board. In some situations, keeping paper and pencil on hand so the person can write out words that staff cannot understand or simply allowing more time to communicate with someone who uses a communication board or device may provide effective communication. Staff should always listen attentively and not be afraid or embarrassed to ask the person to repeat a word or phrase they do not understand.

In addition, aids and services include a wide variety of technologies including 1) assistive listening systems and devices; 2) open captioning, closed captioning, real-time captioning, and closed caption decoders and devices; 3) telephone handset amplifiers, hearing-aid compatible telephones, text telephones (TTYs), videophones, captioned telephones, and other voice, text, and video-based telecommunications products; 4) videotext displays; 5) screen reader software, magnification software, and optical readers; 6) video description and secondary auditory programming (SAP) devices that pick up video-described audio feeds for television programs; 7) accessibility features in electronic documents and other electronic

and information technology that is accessible (either independently or through assistive technology such as screen readers).

Real-time captioning (also known as computer-assisted real-time transcription, or CART) is a service similar to court reporting in which a transcriber types what is being said at a meeting or event into a computer that projects the words onto a screen. This service, which can be provided on-site or remotely, is particularly useful for people who are deaf or have hearing loss but do not use sign language.

The free nationwide telecommunications relay service (TRS), reached by calling 7-1-1, uses communications assistants (also called CAs or relay operators) who serve as intermediaries between people who have hearing or speech disabilities who use a text telephone (TTY) or text messaging and people who use standard voice telephones. The communications assistant tells the telephone user what the other party is typing and types to tell the other party what the telephone user is saying. TRS also provides speech-to-speech transliteration for callers who have speech disabilities.

Video relay service (VRS) is a free, subscriber-based service for people who use sign language and have videophones, smart phones, or computers with video communication capabilities. For outgoing calls, the subscriber contacts the VRS interpreter, who places the call and serves as an intermediary between the subscriber and a person who uses a standard voice telephone. The interpreter tells the telephone user what the subscriber is signing and signs to the subscriber what the telephone user is saying.

Video remote interpreting (VRI) is a fee-based service that uses video conferencing technology to access an off-site interpreter to provide real-time sign language or oral interpreting services for conversations between hearing people and people who are deaf or have hearing loss. The new regulations give covered entities the choice of using VRI or on-site interpreters in situations where either would be effective. VRI can be especially useful in rural areas where on-site interpreters may be difficult to obtain. Additionally, there may be some cost advantages in using VRI in certain circumstances. However, VRI will not be effective in all circumstances. For example, it will not be effective if the person who needs the interpreter has difficulty seeing the screen (either because of vision loss or because he or she cannot be properly positioned to see the screen, because of an injury or other condition). In these circumstances, an on-site interpreter may be required.

If VRI is chosen, all of the following specific performance standards must be met:

- real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;

- a sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the face, arms, hands, and fingers of the person using sign language, regardless of his or her body position;

Effective Communication

- a clear, audible transmission of voices; and

- adequate staff training to ensure quick set-up and proper operation.

## Effective Communication Provisions

Covered entities must provide aids and services when needed to communicate effectively with people who have communication disabilities.

The key to deciding what aid or service is needed to communicate effectively is to consider the nature, length, complexity, and context of the communication as well as the person's normal method(s) of communication.

Some easy solutions work in relatively simple and straightforward situations. For example:

- In a lunchroom or restaurant, reading the menu to a person who is blind allows that person to decide what dish to order.

- In a retail setting, pointing to product information or writing notes back and forth to answer simple questions about a product may allow a person who is deaf to decide whether to purchase the product.

Other solutions may be needed where the information being communicated is more extensive or complex. For example:

- In a law firm, providing an accessible electronic copy of a legal document that is being drafted for a client who is blind allows the client to read the draft at home using a computer screen-reading program.

- In a doctor's office, an interpreter generally will be needed for taking the medical history of a patient who uses sign language or for discussing a serious diagnosis and its treatment options.

A person's method(s) of communication are also key. For example, sign language interpreters are effective only for people who use sign language. Other methods of communication, such as those described above, are needed for people who may have lost their hearing later in life and do not use sign language. Similarly, Braille is effective only for people who read Braille. Other methods are needed for people with vision disabilities who do not read Braille, such as providing accessible electronic text documents, forms, etc., that can be accessed by the person's screen reader program.

Covered entities are also required to accept telephone calls placed through TRS and VRS, and staff who answer the telephone must treat relay calls just like other calls.

Many deaf-blind individuals use support service providers (SSPs) to assist them in accessing the world around them. SSPs are not "aids and services" under the ADA. However, they provide mobility, orientation, and informal communication services for deaf-blind individuals and are a critically important link enabling them to independently access the community at large.

The communications assistant will explain how the system works if necessary.

Remember, the purpose of the effective communication rules is to ensure that the person with a communication disability can receive information from, and convey information to, the covered entity.

## Companions

In many situations, covered entities communicate with someone other than the person who is receiving their goods or services. For example, school staff usually talk to a parent about a child's progress; hospital staff often talk to a patient's spouse, other relative, or friend about the patient's condition or prognosis. The rules refer to such people as "companions" and require covered entities to provide effective communication for companions who have communication disabilities.

The term "companion" includes any family member, friend, or associate of a person seeking or receiving an entity's goods or services who is an appropriate person with whom the entity should communicate.

## Use of Accompanying Adults or Children as Interpreters

Historically, many covered entities have expected a person who uses sign language to bring a family member or friend to interpret for him or her. These people often lacked the impartiality and specialized vocabulary needed to interpret effectively and accurately. It was particularly problematic to use people's children as interpreters.

The ADA places responsibility for providing effective communication, including the use of interpreters, directly on covered entities. They cannot require a person to bring someone to interpret for him or her. A covered entity can rely on a companion to interpret in only two situations.

(1) In an emergency involving an imminent threat to the safety or welfare of an individual or the public, an adult or minor child accompanying a person who uses sign language may be relied upon to interpret or facilitate communication only when a qualified interpreter is not available.

(2) In situations not involving an imminent threat, an adult accompanying someone who uses sign language may be relied upon to interpret or facilitate communication when a) the individual requests this, b) the accompanying adult agrees, and c) reliance on the accompanying adult is appropriate under the circumstances. This exception does not apply to minor children.

Even under exception (2), covered entities may not rely on an accompanying adult to interpret when there is reason to doubt the person's impartiality or effectiveness. For example:

- It would be inappropriate to rely on a companion to interpret who feels conflicted about communicating bad news to the person or has a personal stake in the outcome of a situation.

- When responding to a call alleging spousal abuse, police should never rely on one spouse to interpret for the other spouse.

Effective Communication ─────────────────────────────

## Who Decides Which Aid or Service Is Needed?

When choosing an aid or service, title II entities are required to give primary consideration to the choice of aid or service requested by the person who has a communication disability. The state or local government must honor the person's choice, unless it can demonstrate that another equally effective means of communication is available, or that the use of the means chosen would result in a fundamental alteration or in an undue burden (see limitations below) . If the choice expressed by the person with a disability would result in an undue burden or a fundamental alteration, the public entity still has an obligation to provide an alternative aid or service that provides effective communication if one is available.

Covered entities may require reasonable advance notice from people requesting aids or services, based on the length of time needed to acquire the aid or service, but may not impose excessive advance notice requirements. "Walk-in" requests for aids and services must also be honored to the extent possible.

Title III entities are encouraged to consult with the person with a disability to discuss what aid or service is appropriate. The goal is to provide an aid or service that will be effective, given the nature of what is being communicated and the person's method of communicating.

## Limitations

Covered entities are required to provide aids and services unless doing so would result in an "undue burden," which is defined as significant difficulty or expense. If a particular aid or service would result in an undue burden, the entity must provide another effective aid or service, if possible, that would not result in an undue burden. Determining what constitutes an undue burden will vary from entity to entity and sometimes from one year to the next. The impact of changing economic conditions on the resources available to an entity may also be taken into consideration in making this determination.

State and local governments: in determining whether a particular aid or service would result in undue financial and administrative burdens, a title II entity should take into consideration the cost of the particular aid or service in light of all resources available to fund the program, service, or activity and the effect on other expenses or operations. The decision that a particular aid or service would result in an undue burden must be made by a high level of official, no lower than a Department head, and must include a written statement of the reasons for reaching that conclusion.

Businesses and nonprofits: in determining whether a particular aid or service would result in an undue burden, a title III entity should take into consideration the nature and cost of the aid or service relative to their size, overall financial resources, and overall expenses. In general, a business or nonprofit with greater resources is expected to do more to ensure effective communication than one with fewer resources. If the

entity has a parent company, the administrative and financial relationship, as well as the size, resources, and expenses of the parent company, would also be considered.

In addition, covered entities are not required to provide any particular aid or service in those rare circumstances where it would fundamentally alter the nature of the goods or services they provide to the public. In the performing arts, for example, slowing down the action on stage in order to describe the action for patrons who are blind or have vision loss may fundamentally alter the nature of a play or dance performance.

## Staff Training

A critical and often overlooked component of ensuring success is comprehensive and ongoing staff training. Covered entities may have established good policies, but if front line staff are not aware of them or do not know how to implement them, problems can arise. Covered entities should teach staff about the ADA's requirements for communicating effectively with people who have communication disabilities. Many local disability organizations, including Centers for Independent Living, conduct ADA trainings in their communities. The Department's ADA Information Line can provide local contact information for these organizations.

For more information
about the ADA,
please visit our website
or call our toll-free number.

ADA Website: www.ADA.gov

To receive e-mail notifications when new ADA information is available, visit the ADA Website and click on the link near the bottom of the right-hand column.

ADA Information Line

800-514-0301 (Voice) and
800-514-0383 (TTY)

Call M-W, F 9:30 a.m. – 5:30 p.m., Th 12:30 p.m. – 5:30 p.m., (Eastern Time) to speak with an ADA Specialist (calls are confidential) or call 24 hours a day to order publications by mail.

For people with disabilities,
this publication is available
in alternate formats.

Duplication of
this document is encouraged.

January 2014