Jaqueline Aranda Osorno (308084)
PUBLIC JUSTICE
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
jaosorno@publicjustice.net

*Counsel for Intervenors Monterey County Weekly, First Amendment Coalition, Patricia and Jennifer Ramirez, and Yvette, Xavier, and Janel Pajas*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED., a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. CV 13 2354 BLF<br><br>**NOTICE OF MOTION AND MOTION TO UNSEAL COURT RECORDS AND PROTECT ACCESS TO PUBLIC PROCEEDINGS**<br><br>Hearing Date: November 16, 2023<br>Hearing Time: 9:00 am<br><br>Judge:   Beth Labson Freeman |

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on November 16, 2023, at 9:00 a.m., or as soon thereafter as the matter may be heard, Monterey County Weekly, the First Amendment Coalition, Patricia Ramirez, Jennifer Ramirez, Yvette Pajas, Xavier Pajas, and Janel Pajas (collectively, "Proposed Intervenors") will and hereby do move the Court to unseal Plaintiffs' Motion to Enforce the Settlement Agreement and Wellpath Implementation Plan ("Motion to Enforce") and related court records (Docs. 787, 788, 793, 794, and all attachments).

This motion is based on (1) the accompanying Memorandum of Points and Authorities, (2) the Notice of Motion and Memorandum of Points and Authorities in Support of Proposed Intervenors' Motion to Intervene for the Limited Purpose of Unsealing Court Records and Protecting Access to Public Proceedings (Doc. 799) and exhibits filed in support of that Motion, and (3) the entire record in this action. By separate motion, Proposed Intervenors will also request that the Court hear their Motions at or before the upcoming August 24, 2023, hearing on Plaintiffs' Motion to Enforce. *See* Doc. 788.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The Monterey County community wants to know why four people have died while caged at the Monterey County Jail (the "Jail") this calendar year. *See* Doc. 799-1. They want to know why, in addition to these four deaths, David Sand, Juan Carlos Chavez, Sergio Gonzales, Thomas Pollacci, Barry Sumagang, Carlos Patino Regalado, Rafael Ramirez Lara, Manuel Anthony Vasquez, Larra Ann Gillis, and at least 10 others never went home since the *Hernandez* case was settled. *See id.*; Doc. 788 at 9. They want to know whether people incarcerated at the Jail—their family members, friends, and neighbors—suffer at the hands of the government. They want to know whether anyone is doing anything to change the conditions under which people are dying. The information they want very likely exists in sealed court records in this case, and public has a right to see for itself whether for almost eight years, the County and its correctional healthcare

contractor, Wellpath, have provided systemically inadequate care to the people whose wellbeing it is entrusted to safeguard, despite promising via a federal court class action settlement to remediate this failing. *See* Doc. 788 at 5.

Monterey County Weekly, the First Amendment Coalition, and the families of the late Rafael Ramirez Lara and Mark Pajas (collectively, "Proposed Intervenors") seek to assert the public's First Amendment and common law right of access to certain sealed court records, which include Plaintiffs' Motion to Enforce and evidence in support thereof (Docs. 787, 788, 793, 794, and all attachments) (hereafter "the requested records"). As discussed below, the public has a presumptive right of access to the requested records, which are of significant public interest. Because there are no compelling reasons for continued secrecy, the requested records should be unsealed.

## BACKGROUND

### I. The Public Has Largely Been in the Dark About What Is Happening Inside the Jail

The public has very little access to information about the harms to which the eight hundred people incarcerated at the Jail may be subjected. *See* Doc. 775-21 (calculating average daily population). News coverage about deaths in the Jail occurs with alarming frequency, suggesting the Jail is not able to adequately ensure the safety and wellbeing of the people it incarcerates. *See* Doc. 799-1. The problems at the Jail are long-standing. Almost eight years ago, and just a few months after this Court issued a preliminary injunction finding "significant evidence that Defendants' policies and practices constitute deliberate indifference to Plaintiffs' serious medical needs, particularly for the mentally ill," the County of Monterey agreed to an expansive settlement agreement intended to remedy systemic deficiencies in the Jail's operations and ensure that incarcerated people are not exposed to substantial risks of serious harm. *See* Doc. 108 at 946; Doc. 494. Yet despite its duration and scope of relief, the *Hernandez* litigation has generated very little public information about the County's progress in complying with the settlement.

With exception of some evidence suggesting the County was not following psychiatric staffing requirements, and some evidence of conditions during the COVID-19 pandemic, the public, including Proposed Intervenors, has largely been left to speculate whether the settlement

agreement has resulted in meaningful progress. *See* Doc. 599, 718. But relevant and important information about conditions at the Jail does exist. Under the terms of the settlement agreement, five neutral monitors were appointed by the Court to oversee Defendants' compliance with the various settlement implementation plans. Doc. 494 at 13-23. The monitors were ordered to create written reports with their findings and recommendations, but until earlier this year, these reports were not publicly docketed. *See id.* at 23.

Earlier this year, Plaintiffs moved to enforce the settlement agreement, alleging that the County's medical contractor, Wellpath (formerly the California Forensic Medical Group), has provided systemically inadequate care to incarcerated people since the case was settled. Plaintiffs' Motion, though heavily redacted, reveals enough information to suggest that the evidence submitted in support of that Motion, including the monitor reports, contains information of significant public interest.

**II.     Information Relating to Conditions in the Monterey County Jail Is of Significant Public Interest**

Because the Monterey County community experiences among the highest incarceration rates in California, information relating to conditions of confinement is of particular significance to the public. *See* Emily Widra & Felicia Gomez, *Where People in Prison Come From: The Geography of Mass Incarceration in California*, Prison Pol'icy Initiative (Aug. 2022), https://tinyurl.com/35beecrk  (noting that the City of Salinas has the sixth- highest imprisonment rate in the state); *Number of People in Prison in 2020 from Each California County* (Aug. 2022), https://www.prisonpolicy.org/origin/ca/2020/county.html (noting Monterey County has an incarceration rate of 354 per 100,000 people). The County expends a significant amount of its resources on jailing its population; in the past three years, the County has allocated over $60 million dollars yearly to its jail operations budget and will spend slightly over a third of its budget on law enforcement functions. County of Monterey, Recommended Budget: Fiscal Year Ending June 30th, 2024, at 389, *available at* https://tinyurl.com/bdcwkf9s; *Id.* at 43 chart 2 (showing roughly 35% of the budget is allocated to the Sheriff, Probation, District Attorney, and Public Defender offices). In addition to these expenditures, taxpayers have also borne the cost of multiple

1 six-figure settlements or jury verdicts against the County in cases involving conditions at the Jail. *See* Rey Mashayekhi, *Monterey County Sheriff Tina Nieto Reflects on Her Storm-Soaked Early Days in Charge*, Monterey Cty. Weekly (Mar. 9, 2023) https://tinyurl.com/3reetuve.

The substantial costs of incarceration—and of Defendants' failure to provide adequate care at the Jail—are more than financial. Intervenors Patricia and Jennifer Ramirez (together the "Lara family") and Yvette, Xavier, and Janel Pajas (together, the "Pajas family") are two of the many families whose lives have been and continue to be irreparably harmed by the Jail's failures to protect the safety and wellbeing of the people it incarcerates. In 2015, Mark Vasquez Pajas, Sr. died at the Jail less than 24 hours after he was brought there. Joe Szydlowski, *Jury Awards $1.6M to Family of Monterey County Jail Inmate Who Died*, Californian (Feb. 7, 2019), https://tinyurl.com/mr28d7m4. Mr. Pajas reported his daily heroin use and immediate need for detox medication, but his medical needs were ignored. *Id*. Not placed in a sobering cell or treated for drug and alcohol withdrawal, he died an excruciating and entirely preventable death. *Id*. Motivated by a desire to stop something similar from happening to other incarcerated people, the Pajas family sued the County and the California Forensic Medical Group (now Wellpath). *See* Doc. 799-6 at ¶ 3. After years of painful litigation, the Pajas family ultimately prevailed in a jury trial on February 7, 2019, and were awarded $1.6 million. Szydlowski, *supra*. They remain committed to ensuring the Jail makes necessary changes so no one else will ever die like their father did. Doc. 799-6 at ¶ 6; Doc. 799-7 at ¶ 5; Doc. 799-8 at ¶ 5.

The family of Rafael Ramirez Lara has suffered and continues to suffer similarly. On December 22, 2019—over four years after the *Hernandez* settlement agreement was approved—Mr. Lara died at the Jail of acute water intoxication after his untreated schizophrenia caused him to compulsively drink water until his sodium level fatally dropped. Casey Bastian, *$775,000 Paid for Mentally Ill California Jail Detainee Who Compulsively Drank Water Until He Died*, Prison Legal News (Jun. 15, 2023). Mr. Lara had a documented history of mental illness, including Jail staff repeatedly noting that he was mentally decompensating over the months leading up to his death. *Id*. But instead of providing Mr. Lara with meaningful care, Jail staff left him alone to suffer, ignoring sign after sign that he was in danger. *Id*. The Lara family filed suit against the Jail

and Wellpath and the case ultimately settled for $2.5 million in October 2022. Royal Calkins, *Another Monterey County Jail Death Claim Settled*, Voices of Monterey Bay (Oct. 19, 2022), https://tinyurl.com/3u4z28zc. Like the Pajas family, the Lara family pursued legal action to hold the County and Wellpath accountable for the harm it inflicted. Doc. 799-5 at ¶ 4. They continue to have a strong interest in advocating for the wellbeing of their community, including my making sure the Jail makes required changes. Doc. 799-4 at ¶¶ 7, 8; Doc. 799-5 at ¶ 10.

Although specific details about the Jail's shortcomings and the extent of the harm people incarcerated at the Jail may experience are largely hidden from the public, the fact that the Jail has not been able to get out from under the *Hernandez* settlement is not a secret. The settlement has now spanned the administrations of three elected sheriffs over a period of almost eight years, and the settlement has been a major election issue in the past three sheriff's campaigns. In 2018, when Sheriff's Deputy and City of Salinas Councilman Scott Davis ran to unseat then-incumbent Sheriff Steve Bernal, debate over staffing at Monterey County Jail—especially parole deputies, whose numbers had been increased in 2015 to comply with the *Hernandez* settlement—proved a central tension between the candidates. *See* Mary Duan & Sara Rubin, *The Race Between Scott Davis and Steve Bernal Reflects a Deeper Divide in Monterey County's Largest Law Enforcement Agency*, Monterey Cty. Weekly (May 31, 2018) https://tinyurl.com/2shmamcv. More recently, in 2022, Joe Moses, then-Captain of the Monterey County Sheriff's Office, and Tina Nieto, who is now the Sheriff, both noted that improving Jail conditions in accordance with the *Hernandez* settlement would be a top priority. *Candidate Q&A: Joe Moses for Sheriff,* Monterey Cty. Weekly (Sept. 27, 2022), https://tinyurl.com/m37hmujw Compliance with the *Hernandez* settlement remains a stated priority. Mashayekhi, *supra*.

## ARGUMENT

### I. PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AND THE EVIDENCE SUBMITTED IN SUPPORT OF THAT MOTION MUST BE UNSEALED

#### A. The Public Has First Amendment and Common Law Rights of Access to Court Records in the *Hernandez* Proceedings

Open access to court proceedings and judicial records is a fundamental element of the American legal system. *See generally Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572–73 (1980); *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597–98 (1978); *San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1102 (9th Cir. 1999). Rooted in both common law and the First Amendment, "[t]he presumption of access is 'based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice.'" *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)); *see also Associated Press v. U.S. Dist. Ct.*, 705 F.2d 1143, 1145 (9th Cir. 1983) (holding that the public and press have a First Amendment right of access to pretrial documents in criminal proceedings, which "are often important to a full understanding of the way in which the judicial process and the government as a whole are functioning" (internal quotations omitted)).

In the Ninth Circuit, the analysis begins with a "strong presumption in favor of access to court records," which can only be overridden if the party seeking to seal can establish there are "sufficiently compelling reasons for doing so." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003) (citing *San Jose Mercury News*, 187 F.3d at 1102). For any documents that are "more than tangentially related to the merits" of a case, regardless of whether they are technically dispositive of the action, the party seeking to seal documents "must demonstrate compelling reasons to keep the documents under seal." *Ctr. for Auto Safety*, 809 F.3d at 1101, 1103.

In this case, Proposed Intervenors seek to unseal Plaintiffs' Motion to Enforce, which is heavily redacted, and the exhibits submitted in support of that Motion, which include over thirty neutral monitor reports containing detailed findings. *See* Doc. 775-1 at ¶ 8. Because motions to enforce a settlement are closely related to the merits, if not dispositive, the requested records cannot be sealed unless Defendants can prove compelling reasons for doing so. *See Allstar Mktg. Grp., LLC v. Your Store Online, LLC*, No. CV 09–02094 MMM (AGRx), 2010 WL 11523739, at *1 (C.D. Cal. July 14, 2010) ("While factually distinct from the original claims brought, motions

to enforce settlement agreements are viewed as dispositive of the action.") As described below, Defendants cannot meet this stringent standard.

### B. The Public Has a Significant Interest in Information Relating to Conditions Inside the Jail that Is Not Outweighed by Any Compelling Reasons for Secrecy

In determining whether there are compelling reasons to seal court records, court must "conscientiously balance[ ] the competing interests of the public and the party who seeks to keep certain judicial records secret." *Ctr. for Auto Safety*, 809 F.3d at 1097. Compelling interests for secrecy have been found where the release of information would "gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). Meanwhile, courts have found that the public has a significant interest in matters relating to jail and prison conditions. *See, e.g.*, *Braggs v. Dunn*, 382 F. Supp. 3d 1267, 1272 (M.D. Ala. 2019) ("[C]ertain Alabamians may care about correctional understaffing because they care about whether their tax dollars are misspent; others may care about the issue because they do not want their government to violate the Constitution. Either way one looks at it, Alabamians indisputably have a powerful interest in overseeing [the Alabama Department of Corrections'] performance."); *Freitag v. Bucks Cty.*, No. 19-cv-5750-JMG (E.D. Pa. June 28, 2023), ECF No. 139 (finding that a media intervenor demonstrated that unsealing a jail settlement "is in the public interest as this settlement concerns a public entity, and can fairly be said to impact public tax expenditures and the safety of incarcerated individuals").

Here, the public's interest in information relating to the status of the County's commitment is considerable. The Monterey County community, who bear responsibility for funding the county government (including Jail operations) and the burden of costly settlements, has for years continued to see evidence that people continue to die in horrific conditions. The public has a significant interest in examining how their tax dollars are spent, and in determining whether this case is producing positive outcomes, or any change at all. *See* Doc. 799-5 at ¶ 10; Doc. 799-6 at ¶ 4; Doc. 799-7 at ¶ 5; Doc. 799-8 at ¶ 4. The Monterey County community also has an interest in ensuring that its resources are being allocated and utilized in a way that promotes the community's wellbeing. *See* Doc. 799-4 at ¶¶ 5, 7; Doc. 799-7 at ¶ 5. The requested records could

inform, for example, considerations of the funding stream for carceral functions versus non-carceral social services, and decisions about whether the County should continue to make multi-million-dollar payments to the same private, for-profit health contractor that has a long record of providing deficient care. County of Monterey, Recommended Budget: Fiscal Year Ending June 30th, 2024, at 43 chart 2, *available at* https://tinyurl.com/bdcwkf9s. (noting the county will spend roughly 35% of its budget on law enforcement and carceral functions); Amendment No. 3 to Agreement A-13814 Between the County of Monterey and California Forensic Medical Group, Inc. 1 (Dec. 19, 2022), *available at* https://tinyurl.com/mrxmayx2.) The Monterey County community has an interest in evaluating the performance of its public officials and public entities, including the Sheriff's Department and the Board of Supervisors, who oversee the County budget and County litigation. Doc. 799-4 at ¶ 6 The fact that the status of the *Hernandez* settlement has been a major issue in recent Sheriff elections demonstrates that the public is fully engaged with this issue. Mashayekhi, *supra*.

Competing against these weighty interests is Defendants' purported interest in maintaining secrecy. In their Response to Plaintiffs' Administrative Motion to Consider Whether to File Under Seal Neutral Monitor Reports, Defendants have broadly argued that "the Neutral Monitor reports and communications are confidential and protected from disclosure pursuant to a Protective Order." Doc. 782 at 2. This argument is without merit. The protective order in this case does not govern documents that were created by neutral third parties; put another way, neither Plaintiffs nor Defendants are a producing party. *See* Doc. 401 at 4. And even if the reports were, in fact, subject to the Protective Order, that fact alone is not legally dispositive where the Protective Order in this case was a blanket order—"by nature overinclusive"—without particularized showings of good cause as to individual documents. *Foltz*, 331 F.3d at 1133. Defendants cannot "reasonably rely" on a blanket order "to hold these records under seal forever." *Id.* at 1138. For records "more than tangentially related to the merits," such as the requested records in this case, the higher "compelling reason" standard must still be met in order to overcome the presumption in favor of access. *Ctr. for Auto Safety*, 809 F.3d at 1103.

Defendants' second ground for secrecy—that keeping the monitor reports secret helps ensure the free flow of information between the monitors and the Jail—is also unavailing. *See* Doc. 782 at 2. The County has and continues to have a court-ordered duty to comply with the settlement, which includes sharing information with the court-appointed monitors for the purpose of assessing substantial compliance with the settlement. Doc. 494 at 10-11; Doc. 563. Whether the information revealed shows noncompliance and exposes the County to additional liability is not compelling grounds for continued secrecy where the requested records will not "become a vehicle for improper purposes, such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana*, 447 F.3d at 1179. And as noted by Plaintiffs, many other jurisdictions make monitor reports publicly available, demonstrating that carceral institutions can comply with monitoring requirements despite the reports being publicly available. Doc. 786 at 4-5 (collecting examples). The Jail should ensure a free flow of information because it has an obligation to do so, but most importantly because, as the new Sheriff admits, complying with the *Hernandez* settlement is "the right thing to do." Mashayehki, *supra*.

After "conscientiously balanc[ing]" the public's significant interest in the records with Defendants' grounds for secrecy that fail the "compelling reasons" standard, the Court should order that the records be unsealed. *Kamakana*, 447 F.3d at 1179.

## III.   THE PUBLIC HAS A PRESUMED RIGHT OF ACCESS TO SETTLEMENT ENFORCEMENT HEARINGS

Plaintiffs also seek to intervene in this case to protect their right to access any upcoming enforcement proceedings, including the upcoming hearing on August 24, 2023. *See Courthouse News Serv. v. Planet*, 947 F.3d 581, 590 (9th Cir. 2020) (noting that "federal courts of appeals widely agree" that the First Amendment right of access to information applies to civil judicial proceedings); *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court*, 980 P.2d 337, 358 (Cal. 1999) ("[I]t is clear today that substantive courtroom proceedings in ordinary civil cases are 'presumptively open' . . . ."); *Newman v. Graddick*, 696 F.2d 796, 801–03 (11th Cir. 1983) (recognizing a constitutional right of access to settlement enforcement proceedings in a prison

conditions case); *see also Visit a Federal Court*, U.S. Courts, https://tinyurl.com/22fpsvvn ("Our Constitution and court tradition give citizens right of access to court proceedings. Citizens gain confidence in the courts by seeing judicial work in action, and learn first-hand how the judicial system works.").

Although Defendants have not explicitly requested that the upcoming hearing on Plaintiffs' Motion to Enforce be closed to the public, Proposed Intervenors assume that the Court would be inclined to grant such a request if the records remain sealed at that time. For this reason, Proposed Intervenors—at least one of whom plans to attend and produce news coverage of the upcoming hearing—ask that the Court rule on Proposed Intervenors' Motions before Plaintiffs' Motion to Enforce is heard, as requested by separate application, and ensure that the hearing on Plaintiffs' Motion to Enforce remains open to the public.

## CONCLUSION

The public has well-established rights to access the court records and hearing at issue here, which are of significant public interest. Defendants cannot prove there is any compelling reason to seal documents or a hearing that bears directly on whether the County is failing to meet its constitutional obligations to care for people incarcerated at the Jail. For these reasons, and the reasons described above, this Motion should be granted.

Dated: July 20, 2023                    Submitted,

/s/ Jaqueline Aranda Osorno
*Counsel for Proposed Intervenors*

Jaqueline Aranda Osorno (308084)
PUBLIC JUSTICE
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
jaosorno@publicjustice.net