MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
VAN SWEARINGEN – 259809
CARA E. TRAPANI – 313411
CAROLINE E. JACKSON – 329980
BEN HATTEM – 335232
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email: mbien@rbgg.com
egalvan@rbgg.com
vswearingen@rbgg.com
ctrapani@rbgg.com
cjackson@rbgg.com
bhattem@rbgg.com

CORENE KENDRICK – 226642
KYLE VIRGIEN – 278747
NATIONAL PRISON PROJECT of the
AMERICAN CIVIL LIBERTIES UNION
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
Email: ckendrick@aclu.org
kvirgien@aclu.org

AVRAM D. FREY
(*admitted pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 255-8437
Email: afrey@aclunc.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. CV 13 2354 BLF<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENFORCE THE SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN**<br><br>Judge: Hon. Beth Labson Freeman<br>Date: August 24, 2023<br>Time: 9:00 a.m.<br>Crtrm.: 3 |

[4330024.1]                                                                                  Case No. CV 13 2354 BLF

PLS' MOT. TO ENFORCE

# TABLE OF CONTENTS

Page

NOTICE OF MOTION ...................................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................1

INTRODUCTION..........................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...................................................................3

    A.    By the Parties' Agreement and the Court's Orders, Wellpath Must Provide Minimally Adequate Medical, Mental Health, and Dental Care................................3

    B.    The Neutral Monitors Repeatedly and Consistently Find Serious Deficiencies in Wellpath's Treatment of People Incarcerated at the Jail..................4

    C.    Wellpath Ignores the Neutral Monitors' Recommendations.....................................4

    D.    The Deficiencies Repeatedly Found by the Neutral Monitors Continue to Cause Suffering and Death........................................................................................5

LEGAL STANDARD ....................................................................................................................6

ARGUMENT .................................................................................................................................7

I.    THE SETTLEMENT AGREEMENT EMPOWERS THE COURT TO ISSUE PLAINTIFFS' PROPOSED ORDER TO COMPEL WELLPATH'S COMPLIANCE ......................................................................................................................7

II.    THE MONITORS' REPORTS CONTAIN CLEAR AND CONVINCING EVIDENCE THAT WELLPATH IS VIOLATING SPECIFIC AND DEFINITE ORDERS OF THIS COURT..................................................................................................8

    A.    Sustained Noncompliance with Medical, Mental Health, and Dental Staffing .....................................................................................................................9

    B.    Sustained Noncompliance with Medical Requirements............................................9

        1.    Medical Requirements with which Wellpath Has Never Been Found in Substantial Compliance..................................................................9

        2.    Medical Requirements with which Wellpath Has Been Found Noncompliant in All Reports Issued Since 2019 .........................................10

        3.    Medical Requirements with which Wellpath Has Been Found Noncompliant in All Reports Issued Since 2021 .........................................11

    C.    Sustained Noncompliance with Mental Health Requirements................................11

        1.    Mental Health Requirements with which Wellpath Has Never Been Found in Substantial Compliance ..............................................................11

        2.    Mental Health Requirements with which Wellpath Has Been Found Noncompliant in All Reports Issued Since 2018 ........................................12

    D.    Sustained Noncompliance with Dental Requirements ............................................13

           1.    Dental Requirements with which Wellpath Has Never Been Found in Substantial Compliance...........................................................................13

           2.    Dental Requirements with which Wellpath Has Been Found Compliant in Only One Report ..................................................................14

III.    PLAINTIFFS' PROPOSED ORDER COMPLIES WITH THE PLRA ..............................15

CONCLUSION ...............................................................................................................................15

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Donovan v. Mazzola*,
    716 F.2d 1226 (9th Cir. 1983) .................................................................................................. 6

*Lemire v. Cal. Dep't of Corrs. & Rehab.*,
    726 F.3d 1062 (9th Cir. 2013) .................................................................................................. 9

*Melendres v. Penzone*,
    No. CV-07-2513, ECF No. 2681 (D. Ariz. Aug. 12, 2021) ...................................................... 6

*Parsons v. Ryan* (*Parsons I*),
    912 F.3d 486 (9th Cir. 2018) .................................................................................................. 15

*Parsons v. Ryan* (*Parsons I*),
    912 F.3d 486 (9th Cir. 2018) .................................................................................................... 6

*Parsons v. Ryan* (*Parsons II*),
    949 F.3d 443 (9th Cir. 2020) ................................................................................................ 6, 7

*Sekaquaptewa v. MacDonald*,
    544 F.2d 396 (9th Cir. 1976) .................................................................................................... 6

*Shell Offshore Inc. v. Greenpeace, Inc.*,
    815 F.3d 623 (9th Cir. 2016) .................................................................................................... 7

*Shuffler v. Heritage Bank*,
    720 F.2d 1141 (9th Cir. 1983) .................................................................................................. 7

*Stone v. City & County of San Francisco*,
    968 F.2d 850 (9th Cir. 1992) .................................................................................................... 6

*UMW v. Bagwell*,
    512 U.S. 821 (1994) .................................................................................................................. 7

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159, 172 (1977) ......................................................................................................... 7

**STATUTES**

18 U.S.C. § 3626 ........................................................................................................................ 3, 15

# NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 24, 2023, at 9:00 a.m., or as soon thereafter as the matter may be heard, Plaintiffs will and hereby do move the Court for an order enforcing the Settlement Agreement and Wellpath Implementation Plan in this case regarding medical care, mental health care, and dental care. Plaintiffs request that the Court enter an order finding that Defendant Wellpath, Inc. ("Wellpath," formerly California Forensic Medical Group, Inc. or "CFMG") is noncompliant with the Settlement Agreement and Wellpath Implementation Plan, and requiring: (1) Defendant Wellpath to come into compliance with the Settlement Agreement and Implementation Plans; (2) Defendant Wellpath to show cause after six months why contempt fines should not be issued for any requirements with which it remains noncompliant; and (3) continued monitoring and contempt sanctions until Wellpath comes into compliance.

Plaintiffs' motion is based on the accompanying Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Enforce, the Declarations of Cara E. Trapani, Van Swearingen, and Erick Stewart in support thereof, Plaintiffs' [Proposed] Order Granting Plaintiffs' Motion to Enforce, any oral argument, and the entire record in this action.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

For more than seven and a half years, Wellpath has defied its Court-ordered obligations and provided systemically inadequate care to people incarcerated at the Monterey County Jail (hereafter "MCJ" or "Jail"). The result of Wellpath's persistent noncompliance with this Court's orders and its own remedial plan is a death rate at the Jail more than twice the national average and a suicide rate more than three times the average for California jails. Year after year, the Court-appointed neutral monitors responsible for evaluating medical, mental health, and dental care find Wellpath noncompliant with the vast majority of the requirements of the Settlement Agreement and Implementation Plan ("IP"). Year after year, the neutral monitors make recommendations about how Wellpath can come into compliance. Nevertheless, Wellpath refuses to implement the neutral monitors' recommendations and continues to deliver substandard care.

Medical monitor Dr. Bruce Barnett observed after a recent visit that the problems from his previous tour "reappear[ed] in this audit. Few, if any of my recommendations issued at that time have been implemented." Decl. of Cara E. Trapani ("Trapani Decl."), filed herewith, Ex. 13 at 20. Dr. James Vess, the mental health monitor, found "numerous" areas of noncompliance in "chronic care, acute care, outpatient services, involuntary medication, clinical staffing, treatment plans, quality management and corrective action plans" in his latest report, the vast majority of which were the same findings made by the prior mental health monitor, Dr. Kerry Hughes. *Id.*, Ex. 34 at 44; *see also id.*, Ex. 32 at 44-48. Dental monitor Dr. Viviane Winthrop found in 2021 that "[a]fter a total of six dental tours to MCJ, spanning a length of over four years, little progress has been made towards implementing the mandates of the [IP]." *Id.*, Ex. 43 at 12. Wellpath's compliance has barely changed since then. *Compare id.* at 11 *with id.*, Ex. 47 at 8.

In May 2020, this Court entered a stipulated order requiring Wellpath to develop "corrective action plans to remedy all the areas for which the neutral monitors have found Defendants to be not in substantial compliance." Dkt. 671 at 5.[1] When compliance had not improved two years later, the Court issued another stipulated order on June 3, 2022, requiring Wellpath to confer with Plaintiffs about its staffing deficiencies and empowering the neutral monitors to provide training and supervision to Wellpath's overworked and under-supported line staff through "enhanced monitoring." *See* Dkt. 751 at 7. Since the June 2022 Order, the care Wellpath provides has only worsened. Three people have died at the Jail since the Court's June 2022 Order. For nearly all of October 2022 to January 2023, Wellpath provided no dental care at the Jail because it lacked adequate dental staff. From June to September 2022, due to critical nursing staff shortages, Wellpath stopped conducting 14-day initial medical, mental health, and dental assessments for all incarcerated people. Staffing shortages are so dire that most of Wellpath's current healthcare leadership are interim staff.

The deficiencies in the medical, mental health, and dental care provided by Wellpath cause daily pain and suffering, including serious medical and dental complications, untreated chronic

---

[1] All citations to documents filed on the Court's docket refer to ECF page numbers.

illnesses, suicide attempts, and deaths.  This Court must intervene and order Wellpath to finally meet its remedial obligations.  The Settlement Agreement allows this Court to use "all … remedies permitted by law or equity" to compel compliance with the terms of the Settlement Agreement and IPs.  *See id.* at 25.  Wellpath's ongoing refusal to comply with this Court's orders, coupled with the continued harms to incarcerated people, shows that only the threat of monetary sanctions will force private equity-owned Wellpath to take its obligations seriously.

Plaintiffs hereby seek an order:  (1) confirming the monitors' findings of noncompliance with the 44 provisions of the Settlement Agreement and Wellpath IP identified in Section II, *infra*; (2) ordering Wellpath to come into full and permanent compliance with each of those provisions; (3) instructing the neutral monitors to evaluate Wellpath's compliance with these provisions after six months; (4) ordering Wellpath to show cause why fines of $25,000 per provision should not be imposed for each provision with which Wellpath remains noncompliant at that time; (5) requiring continued neutral monitor evaluations of Wellpath's compliance twice per year in the course of their regular monitoring duties; and (6) imposing ongoing fines of $25,000 per noncompliant provision after each monitoring period until Wellpath fully and durably corrects its noncompliance with the Court's order.  *See* [Proposed] Order Granting Pls.' Mot. to Enforce at 4-5.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. By the Parties' Agreement and the Court's Orders, Wellpath Must Provide Minimally Adequate Medical, Mental Health, and Dental Care

Plaintiffs brought suit in 2013, challenging inadequate medical, mental health, and dental care, safety and security issues at the Jail, and problems with disability access.  *See* Dkt. 431 at 1-2, 6-8.  In April 2015, the Court entered a preliminary injunction in favor of Plaintiffs, finding "significant evidence that Defendants' policies and practices constitute deliberate indifference to Plaintiffs' serious medical needs."  Dkt. 406 at 21.  In August 2015, the Court approved the parties' Settlement Agreement and ordered Defendants to comply with its terms.  Dkt. 494 at 4.  The Court retained jurisdiction and power to enforce the agreement and found that it satisfied the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a)(1)(A). Dkt. 494 at 4.  The Court also ordered the parties to develop implementation plans that would be "enforceable by the Court

as part of the Settlement Agreement" and would contain detailed mandates "to ensure that the class is not exposed to substantial risks of serious harm." *Id.* at 4, 13. The Court approved these IPs with some modifications in May 2016, *see* Dkts. 528-1 & 532, and appointed the neutral monitors in August 2016, *see* Dkt. 549.

### B. The Neutral Monitors Repeatedly and Consistently Find Serious Deficiencies in Wellpath's Treatment of People Incarcerated at the Jail

The neutral monitors have found egregious and largely unchanged levels of noncompliance by Wellpath since monitoring began in 2017. Dr. Barnett's first audit in March 2017 determined Wellpath's overall compliance score was 48.1%. Trapani Decl., Ex. 1 at 5. In October 2022, he found Wellpath's overall compliance had deteriorated to 42.6%. *Id.*, Ex. 13 at 3. Dr. Hughes's initial reports found Wellpath noncompliant with requirements related to mental health staffing, treatment planning, nursing rounds in administrative segregation, and consideration of mental illness in discipline, among other provisions. *E.g.*, *id.*, Ex. 20 at 4-5, 11-12, 18-20. Dr. Vess made the same noncompliance findings in his latest report. *Id.*, Ex. 34 at 45-46. In her first report from 2017, Dr. Winthrop found two areas of compliance out of the dozens of areas she monitors. *Id.*, Ex. 38 at 15. In both her latest final report and her current draft report, Dr. Winthrop did not find substantial compliance with *any* area she evaluated. *See generally id.*, Ex. 45; *id.*, Ex. 47. In her most recent audit, she found that Wellpath's "dental program remains in non-compliance … due to a staffing crisis" and because "corporate oversight is lacking in providing resources and communication to the Chief Dental Officer." *Id.*, Ex. 47 at 33.

### C. Wellpath Ignores the Neutral Monitors' Recommendations

The neutral monitors have made repeated recommendations to Wellpath about how to fix many of the deficiencies that have plagued its medical, mental health, and dental care systems. Wellpath has ignored them. For example, Dr. Barnett instructed Wellpath in his third monitoring report that individuals with positive skin tests for tuberculosis must be "promptly counseled and treated in accord with the implementation plan." Trapani Decl., Ex. 3 at 7. In his fifth, seventh, eighth, ninth, tenth, eleventh, twelfth, and most recent thirteenth reports, Dr. Barnett found that counseling and treatment still were not occurring. *See id.* ¶ 43. Almost all of the recommenda-

tions made in Dr. Vess's most recent monitoring report, including improving staffing and treatment planning, were identical to recommendations made by Dr. Hughes in his last monitoring report nearly a year earlier. *Compare id.*, Ex. 34 at 44-46 *with id.*, Ex. 32 at 45-48. For dental care, Wellpath has even ignored recommendations from Dr. Winthrop as simple as the requirement to look in patients' mouths when assessing whether they need dental care. *See id.*, Ex. 43 at 12 (noting that Dr. Winthrop "was assured" during a tour in 2021 that "moving forward, the nurses are to look into every patient's mouth"); *id.*, Ex. 45 at 10 (finding problem unchanged a year later). This cycle of indifference, unkept promises, and patient harm will continue unless and until this Court orders Wellpath to come into compliance with its obligations and imposes consequences if Wellpath does not.

### D. The Deficiencies Repeatedly Found by the Neutral Monitors Continue to Cause Suffering and Death

Twenty-three people have died at the Jail since the parties entered the Settlement Agreement[2]—including J.H., who died on April 7, 2023, and who is the second person to die in custody this year. Nine of these twenty-three deaths were suicides. *See* Decl. of Van Swearingen ("Swearingen Decl.") ¶¶ 3-4. This count of suicides omits D.S. and R.L., both of whom died of acute water intoxication after compulsive, excessive drinking of water, a symptom of their mental illness. The Jail's annual death rate since the Settlement Agreement is 350 deaths per 100,000 people, more twice the national average. *See id.* at ¶ 4. Excluding D.S. and R.L., the Jail's annual suicide rate since the Settlement Agreement is 137 suicides per 100,000 people, more than three times the average for jails in California. *See id.*

The Jail's death and suicide rates are rising. A majority of the post-Settlement suicides have occurred since 2021. The neutral monitors have found that almost all of the deaths they have fully reviewed (18 out of 19, or 95%) could have been prevented with adequate treatment and/or involved violations of Wellpath's obligations. Recent deaths at the Jail have involved areas of

---

[2] This count of deaths omits an individual who died in September 2022 while in the Jail's custody, but who was transferred to hospice care several months before his death.

noncompliance the monitors have long identified and instructed Wellpath to correct. *See* Trapani Decl. at ¶¶ 159-73. These include failures to conduct appropriate suicide risk assessments, which contributed to the deaths of M.M. in 2023 and T.P. in 2021; failures to provide adequate intake screenings, treatment planning, and acute and chronic care, which contributed to the death of D.S. in 2022;[3] failures to use suicide watch appropriately and to make psychiatry referrals when necessary, which contributed to the deaths of J.C. in 2022 and C.R. in 2021; and failures to ensure physician supervision of nurses and physician assistants, which contributed to the death of S.G. in 2021. *See id.*

Deaths are only the worst consequences of Wellpath's disregard for the Court's orders and the needs of people at the Jail. For every person who dies because of Wellpath's deficient treatment, many more endure serious harm. This death and suffering alone justifies an order from this Court to enforce the Settlement Agreement and Wellpath IP.

## LEGAL STANDARD

A party may be held in civil contempt when, after receiving notice, it fails to take all reasonable steps within its power to comply with a specific and definite judicial order. *See, e.g.*, *Parsons v. Ryan* (*Parsons II*), 949 F.3d 443, 454 (9th Cir. 2020); *Melendres v. Penzone*, No. CV-07-2513, ECF No. 2681 at 1-2 (D. Ariz. Aug. 12, 2021). The moving party bears the initial burden of establishing by clear and convincing evidence that the contemnors violated a specific and definite order of the Court. *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983). The burden then shifts to the contemnor to show that it "performed 'all reasonable steps within [its] power to insure compliance' with the court's orders." *Stone v. City & County of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992) (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir. 1976)); *see also id.* at 856 n.9.

In addition, the Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued." *United States v. N.Y. Tel. Co.*, 434 U.S.

---

[3] Because of the violations in D.S.'s case, Plaintiffs seek reinstatement of monitoring on the medication continuation provisions released from monitoring last year. *See* Dkt. 759 at 5-6.

159, 172 (1977). These include civil contempt sanctions, which "may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *UMW v. Bagwell*, 512 U.S. 821, 827 (1994). When contempt takes the form of a monetary fine for noncompliance, "it is civil only if the contemnor is afforded an opportunity to purge"—that is, to come into compliance with the court's order before the fine is issued. *See id.* at 829. To that end, the Ninth Circuit has recognized that civil contempt sanctions "generally take the form of conditional fines." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016).

Along with these requirements, "[c]oercive sanctions may only be imposed 'after a reasoned consideration' of 'the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'" *Parsons II*, 949 F.3d at 457 (quoting *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1148 (9th Cir. 1983)). This obligation is satisfied when the court "document[s] Defendants' failures to comply … and explain[s] that the sanctions were warranted to 'address Plaintiffs' injuries resulting from [Defendants'] noncompliance.'" *Id.* (third alteration in original).

**ARGUMENT**

**I.  THE SETTLEMENT AGREEMENT EMPOWERS THE COURT TO ISSUE PLAINTIFFS' PROPOSED ORDER TO COMPEL WELLPATH'S COMPLIANCE**

In its August 18, 2015 Order granting final approval of the parties' Settlement Agreement and incorporating the agreement with "the full force and effect of an order of this Court," the Court expressly retained "the power to enforce this Agreement through all remedies provided by law." Dkt. 494 at 4; *accord Parsons II*, 949 F.3d at 454. The Court further ordered that the terms of Wellpath's IP (Dkt. 532) are enforceable as "part of the Settlement Agreement." Dkt. 494 at 4. By the terms of the Settlement Agreement, its provisions and the provisions of the IPs are orders of this Court. The Court has authority to enforce these orders by all means necessary and appropriate to prevent their frustration. *See N.Y. Tel. Co.*, 434 U.S. at 172; *Parsons II*, 949 F.3d at 455.

The Settlement Agreement imposes only two procedural requirements before enforcement remedies like contempt sanctions may be imposed. Both are satisfied here. First, Plaintiffs must notify Defendants of the basis for their belief that Defendants are out of compliance, confer with

Defendants, and mediate the issue if Defendants do not provide a satisfactory response.  Dkt. 494 at 25-26.  Plaintiffs submitted notice to Wellpath on December 16, 2022 and mediated their concerns with Judge Cousins in accordance with the Settlement Agreement.  *See* Swearingen Decl. ¶¶ 5-6.

Second, the Settlement Agreement requires that if the Court finds noncompliance, it should first instruct Defendants "to submit a plan for approval by the Court to remedy the deficiencies identified by the Court" before imposing additional remedies.  Dkt. 494 at 25.  This procedure has been exhausted too.  After the neutral monitors found noncompliance with each of the requirements identified in this motion, the Court ordered Wellpath in May 2020 to create Corrective Action Plans ("CAPs") "to remedy all the areas for which the neutral monitors have found Defendants to be not in substantial compliance" and to submit these plans to the monitors for approval.  Dkt. 671 at 5-6.  The Court ordered Wellpath to draft the CAPs within 30 days and implement them within 90 days.  *Id.* at 6.  For more than a year, Wellpath failed to finalize the CAPs.  *See* Dkt. 751 at 3.  Instead, Wellpath contested their finality for months after the monitors approved the plans, preventing the CAPs from being finalized until September 2021.  Wellpath still has not complied with the CAPs.  *See* Trapani Decl. ¶¶ 47, 99, 147.  Plaintiffs' Proposed Order addresses areas of noncompliance that have already been included in the remedial process set forth in the Settlement Agreement, and for which Wellpath's CAPs "did not remedy the deficiencies."  *See* Dkt. 494 at 25.

Plaintiffs' Proposed Order appropriately affords Wellpath every chance required by law and by the Settlement Agreement to correct its longstanding noncompliance with its Court-ordered obligations before any fines would be levied for its violations of the Settlement Agreement and Wellpath IP.  With those procedures observed, the Ninth Circuit has upheld the authority of a district court to issue contempt sanctions to address noncompliance with the terms of a settlement with jurisdictional and enforcement provisions identical in all relevant ways to the provisions of the Settlement Agreement in this matter.  *See Parsons II*, 949 F.3d at 454-55.

## II. THE MONITORS' REPORTS CONTAIN CLEAR AND CONVINCING EVIDENCE THAT WELLPATH IS VIOLATING SPECIFIC AND DEFINITE ORDERS OF THIS COURT

Plaintiffs identify below each specific IP area of medical, mental health, and dental care with which Wellpath has been consistently found noncompliant by the neutral monitors and which

warrants immediate intervention by the Court to remedy.  Most of the IP requirements identified below have received few or no findings of substantial compliance throughout this litigation, and none have been found compliant in the last two years.  Court action is necessary because Wellpath has disregarded and defied these requirements, including the May 2020 Order requiring corrective action, and because of the resulting suffering and death of the Plaintiff class members.

### A. Sustained Noncompliance with Medical, Mental Health, and Dental Staffing

**Health care staffing** is an overarching area of Wellpath's consistent noncompliance with IP requirements ("sustained noncompliance").  As the Ninth Circuit has held, "[i]nadequate staffing can create an objective risk of substantial harm in a prison setting that is sufficient to satisfy the objective prong of the deliberate indifference test." *Lemire v. Cal. Dep't of Corrs. & Rehab.*, 726 F.3d 1062, 1076 (9th Cir. 2013).  Wellpath's IP requires it to maintain "sufficient staff to ensure compliance" with the other medical, mental health, and dental mandates of the IP.  Dkt. 532 at 116.  The neutral monitors have consistently found Wellpath noncompliant with the IP's staffing requirements in all three monitoring areas.  *See* Trapani Decl. ¶¶ 26-27, 68-69, 114-15.  The monitors have found that Wellpath's deficient clinical staffing has contributed to significant patient harm and death.  *See id.*

### B. Sustained Noncompliance with Medical Requirements

#### 1. Medical Requirements with which Wellpath Has Never Been Found in Substantial Compliance

Wellpath has not reached substantial compliance with the requirements for **tuberculosis treatment** and **quality assurance** in any medical care audit since monitoring began in 2017.  In 2015, the Court found that Wellpath's tuberculosis screening policies and practices resulted in an "unacceptably high" risk of infection for the Plaintiff class.  Dkt. 460 at 20.  The Settlement Agreement and IP contain requirements for identifying, controlling, and treating tuberculosis.  *See* Dkt. 494 at 13-14; Dkt. 532 at 78-87; Trapani Decl. ¶ 42.  Dr. Barnett has found year after year that patients with unequivocally positive skin tests are not appropriately evaluated to confirm diagnosis of latent tuberculosis.  *See, e.g., id.*, Ex. 13 at 7.  On numerous occasions, patients who were determined to be positive for latent tuberculosis have not been counseled about treatment options, leaving them at risk of developing active tuberculosis and spreading the disease to

incarcerated people, staff, and the public. *See id.*

Dr. Barnett has also never found Wellpath substantially compliant with the IP's quality assurance requirements, including requirements to conduct monthly and quarterly quality assurance meetings, self-monitor its compliance with the IP, develop corrective actions to remedy identified deficiencies, and conduct thorough and adequate death reviews following in-custody deaths. *See* Dkt. 532 at 9, 23-24, 77, 98; *see also* Trapani Decl. ¶¶ 46-47. In his third report, Dr. Barnett reviewed a patient death and concluded that "[t]he paucity of details in the medical record regarding care provided to decedent[] … and the apparent lack of death review process in this case substantiates the concern that MCJ medical records and quality assurance processes have much room for improvement." *Id.*, Ex. 3 at 10. In his latest monitoring report, Dr. Barnett concluded that "formal death review[s] and/or quarterly QA meeting[s] have not addressed the concerns about quality of care I raise in my review of deaths at MCJ." *Id.*, Ex. 13 at 17-18.

### 2. Medical Requirements with which Wellpath Has Been Found Noncompliant in All Reports Issued Since 2019

Dr. Barnett has not found Wellpath substantially compliant in the areas of **intake screening**, **sick call**, **chronic care**, **health care maintenance**, **continuity of care**, and **treatment of intoxicated patients** in any report he has issued since 2019. Intake screening serves to identify and ensure proper referrals regarding patients' medical conditions at booking. *See* Dkt. 532 at 11-14, 29, 41, 72. Sick call ensures that patients have timely access to providers. *See id.* at 21, 24-26. Chronic care provides life-saving monitoring and treatment for their conditions. *See id.* at 14, 28-36. Health care maintenance includes a 14-day initial health screening and a six-month examination. *See id.* at 34, 37-38. Continuity of care requires coordination between the Jail and outside providers and continuation of prescription medication for patients released to the community. *See id.* at 38-39. Intoxication treatment is a system for monitoring and treating patients such as M.M., who died in January 2023 after arriving at the Jail with a high risk of lethal detoxification complications. *See id.* at 18, 48-71.

Dr. Barnett has not only found widespread deficiencies in these areas of care, *see* Trapani Decl. ¶¶ 28-37, 40-41; he has tied these deficiencies to patient deaths. He found that A.R., a patient

with "a long history of poorly controlled diabetes, hypertension, severe coronary atherosclerosis requiring stent, chronic congestive heart failure, [and] stroke," was not referred to a doctor after an initial medical evaluation showed "evidence of severe acute and chronic congestive heart failure." *See id.* ¶ 33 & Ex. 9 at 14.  A.R. died in March 2020 within two days of arriving at the Jail.  *See id.*, Ex. 9 at 14-15.  J.M. and G.B., who died in custody in 2019 and 2020, respectively, also were not correctly monitored or assessed by a physician prior to their deaths despite actively withdrawing from substances or being overtly intoxicated; Dr. Barnett found their care was "inadequate" and "failed to comply with the CFMG implementation plan." *Id.* ¶ 41.

### 3. Medical Requirements with which Wellpath Has Been Found Noncompliant in All Reports Issued Since 2021

Dr. Barnett has not found Wellpath to be substantially compliant in the areas of **outside care referrals** and **pharmaceutical practices** in any of the six reports he has issued since February 2021.  Outside care referral requirements ensure that patients have access to outside health care providers when needed.  *See* Dkt. 532 at 39; Dkt. 494 at 17.  Pharmaceutical practices ensure appropriate oversight of pharmacy services at the Jail, including proper drug labelling and tracking of controlled substances.  Dkt. 532 at 90-95.  The widespread deficiencies that Dr. Barnett has found in these areas of care have resulted in harm to the Plaintiff class.  *See* Trapani Decl. ¶¶ 38-39, 44-45.  In his most recent monitoring report, Dr. Barnett found that there was "[p]oor or absent oversight of pharmacy services as manifested by my discovery in the medication room of expired medications, improperly labelled multiple dose vials, and delinquent controlled substance logs." *See id.*, Ex. 13 at 3.  He concluded that "[t]hese lapses overtly depart from performances required in the Implementation Plan." *Id.* at 7.

### C. Sustained Noncompliance with Mental Health Requirements

#### 1. Mental Health Requirements with which Wellpath Has Never Been Found in Substantial Compliance

For all but two of the seventeen mental health requirements at issue in this motion, the mental health monitors have *never* found Wellpath substantially compliant:  **initial mental health screening** (Dkt. 532 at 36, 41-42), **nursing rounds in administrative segregation** (*id*. at 43),

**treatment planning** (*id.* at 27, 32, 43, 75), **chronic care** (*id.* at 14, 28-36), **acute care** (*id.* at 11, 36, 41-43), **outpatient services** (*id.* at 41-43), **psychiatric follow-up visit intervals** (*id.* at 31), **consideration of mental illness in discipline** (*id.* at 47), **segregation placement screenings** (*id.* at 43; Dkt. 494 at 17-18); involuntary medication (Dkt. 532 at 96-98), **suicide risk assessments** (*id.* at 43, 72-73, 75), **medical records** (*id.* at 114), **corrective action plans** (*id.* at 9; Dkt. 494 at 11-12; Dkt. 671 at 5-6), **provider visits to holding and isolation cells** (Dkt. 532 at 26), and **quality assurance** (*id.* at 9, 77, 98). *See* Trapani Decl. ¶¶ 70-73, 76-89, 92-103 & Exs. 18-35.

Wellpath's noncompliance with these requirements creates a substantial risk of harm and death for people with mental illness. Dr. Hughes found T.P.'s death in August 2021 "appeared to be preventable" and noted that "[n]o treatment plan was located for this patient. Due to concerns regarding suicide, adequate treatment and safety planning were critical." *Id.*, Ex. 33 at 4. He found that C.R.'s suicide in April 2021 "illustrated the ongoing and significant issue of the lack of adequate access to inpatient treatment for those inmates who require mental health services that are unavailable at the MCJ." *Id.* at 7. Dr. Hughes concluded that J.M.'s death in July 2020 "was possibly preventable if adequate assessment of suicide risk and appropriate safety planning were performed." *Id.*, Ex. 31 at 7. Regarding the suicide of J.C. in April 2022, Dr. Vess found that Wellpath's "response to the patient's initial self-injurious behavior and suicidal intent did not comply with requirements of the implementation plan, i.e., contact with a Qualified Mental Health Provider was not adequately documented, nor was the patient promptly evaluated in light of essential information that should have been available in the video footage to determine the proper level of suicide precautions necessary." *Id.*, Ex. 35 at 7. Wellpath's continued noncompliance with these requirements confirms the need for contempt fines.

    2.    **Mental Health Requirements with which Wellpath Has Been Found Noncompliant in All Reports Issued Since 2018**

The mental health monitors have not found Wellpath substantially compliant with the requirements for **hospital transfers** and **mental health programming in segregation** in any audit since 2018. These provisions include requirements to transfer to a hospital patients needing emergency care or assessment (*see* Dkt. 532 at 16, 43, 73, 75), and to provide people with mental

illness housed in segregation structured therapeutic activity outside of their cells (*id.* at 42; Dkt. 494 at 17-18). Wellpath's failure to comply with these requirements has resulted in dangerous conditions at the Jail. In his last report, Dr. Hughes found "systemic issues" with suicidal or psychotic patients remaining in safety cells—small, padded cells in the Jail's booking area without bunks or toilets, and metal grates in the floor for bodily functions—for more than 24 hours without being transferred to the hospital. *See* Trapani Decl., Ex. 32 at 15. The monitors have also found that out-of-cell mental health groups have not been routinely provided to patients in segregation since at least May 2020. *See id.*, Ex. 34 at 29; *id.*, Ex. 32 at 39; *id.*, Ex. 30 at 40.

### D.   Sustained Noncompliance with Dental Requirements

#### 1.   Dental Requirements with which Wellpath Has Never Been Found in Substantial Compliance

For the majority of the dental requirements in the Settlement Agreement and Wellpath IP, Dr. Winthrop has *never* found Wellpath substantially compliant. These include requirements to evaluate the condition of patients' teeth during the 14-day health assessment (**initial health evaluations**, *see* Dkt. 532 at 33, 99-100), control infection risks in the dental treatment area (**sanitary treatment space**, *see id.* at 99; *see also* Dkt. 494 at 18), refer patients to outside care when Wellpath staff are unable to provide the treatment they need (**specialty care referrals**, *see* Dkt. 532 at 103, 109-10, 112), and maintain accurate and usable records of patients' dental treatment (**medical records**, *see id.* at 113-14; Dkt. 494 at 17). The requirements with which Wellpath has never been compliant also include **dental training for intake staff** (Dkt. 532 at 99), **comprehensive care** (*id.* at 104), **restorative and palliative care** (*id.* at 107-08), **endodontics** (*id.* at 109-10), **periodontics** (*id.* at 104-05), **informed consent** (*id.* at 21-22), **dental treatment for people with chronic conditions** (*id.* at 28-36; Dkt. 671 at 6), and **dental quality assurance** (Dkt. 532 at 9; Dkt. 671 at 6). *See* Trapani Decl. ¶¶ 118-21, 126-31, 134-47 & Exs. 38-48.

This wide-ranging and consistent noncompliance places people in the Jail at substantial risk of harm and evidences Wellpath's disregard for its dental care obligations under the Settlement Agreement and Wellpath IP. In every report, Dr. Winthrop has found dangerous deficiencies in Wellpath's infection control practices, such as failure to test dental equipment for

bacteria, failure to clean vacuum and water lines, plumbing problems, and inadequate control of biohazards. *See, e.g.*, *id.*, Ex. 47 at 14, 23-24. Upon visiting the Jail in February 2023, she instructed Wellpath to immediately stop all dental care in its clinic because of egregious infection control problems. *Id.* at 14. In her latest final report, she found that Wellpath has "no active clinical dental record system for charting episodic dental care," making it unable to "prevent continuing errors from happening." *Id.* Considering Wellpath's dental care as a whole, Dr. Winthrop concluded in 2021 that Wellpath was "[t]urning a blind eye to the basic problems which continue to occur year after year, and which can easily be rectified with the application of resources, planning, implementing, training, and monitoring." *Id.*, Ex. 43 at 30. Wellpath's compliance has not meaningfully improved since then. *See id.*, Ex. 47 at 8.

### 2. Dental Requirements with which Wellpath Has Been Found Compliant in Only One Report

Dr. Winthrop has found Wellpath substantially compliant with requirements related to **intake screening**, **sick call**, **treatment for urgent and emergent conditions**, and **extractions** in only one report since monitoring began. These four requirements serve to ensure that patients receive an initial evaluation for dental problems at intake (intake screening, *see* Dkt. 532 at 99-100), that requests for dental care are triaged in an accurate and timely way (sick call, *see id.* at 102), that treatment for acute dental problems is not delayed (urgent and emergent conditions, *see id.* at 99-102), and that tooth extractions are provided when necessary and in a safe way (extractions, *see id.* at 100-01). Dr. Winthrop has not found compliance with extraction requirements in any report since 2019, has not found compliance with urgent and emergent care requirements in any report since 2018, and has not found compliance with intake screening or sick call requirements at any time since her first report in 2017.

Time and again, Dr. Winthrop has warned that Wellpath's failure to comply with these requirements results in delayed and dangerous care for people at the Jail. In her sixth report, Dr. Winthrop found Wellpath's failure to timely treat urgent and emergency dental problems to be "an example of a systemic, continuous, observed pattern of neglect." Trapani Decl., Ex. 43 at 14 (emphasis omitted). She found in her seventh report that only 30% of patients were seen for sick

call within IP timeframes and that more than half of all scheduled dental sick call appointments were postponed. *Id.*, Ex. 44 at 19-20. In her eighth audit, she witnessed "the dental team performing a surgical extraction and the dental cutting on bone without the use of a sterile irrigant," noting that "[t]his is a potential route of entry [for] infections." *Id.* ¶ 133.

### III. PLAINTIFFS' PROPOSED ORDER COMPLIES WITH THE PLRA

Under the PLRA, prospective relief addressing prison or jail conditions must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The Court found that the Settlement Agreement satisfied this requirement for enforcement purposes, *see* Dkt. 494 at 4, and the Ninth Circuit has held that orders necessary "to enforce compliance" with a stipulated remedy comply with the PLRA when the underlying stipulation meets the PLRA's requirements, *Parsons v. Ryan* (*Parsons I*), 912 F.3d 486, 501 (9th Cir. 2018). In light of Wellpath's persistent noncompliance and demonstrated unwillingness to make the changes it must make to achieve compliance, the contempt sanctions that Plaintiffs seek are necessary to enforce the Settlement Agreement and IPs. The sanctions are narrowly tailored to target requirements with which Wellpath has been consistently noncompliant for most or all of this litigation. Finally, because the Court's prior orders have failed to produce compliance with these requirements, and because Wellpath's noncompliance is causing urgent and ongoing harm to individuals in the Jail's custody, these sanctions are the least intrusive means necessary to correct Wellpath's continued violations of Plaintiffs' federal rights.

### CONCLUSION

Plaintiffs respectfully request that the Court enter the proposed order filed herewith.

DATED: May 11, 2023            Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Ben Hattem*
      Ben Hattem

Attorneys for Plaintiffs