MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
VAN SWEARINGEN – 259809
CARA E. TRAPANI – 313411
CAROLINE E. JACKSON – 329980
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:    mbien@rbgg.com
    egalvan@rbgg.com
    vswearingen@rbgg.com
    ctrapani@rbgg.com
    cjackson@rbgg.com

CORENE KENDRICK – 226642
KYLE VIRGIEN – 278747
NATIONAL PRISON PROJECT of the
AMERICAN CIVIL LIBERTIES UNION
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (202) 393-4930
Facsimile:    (202) 393-4931
Email:    ckendrick@aclu.org
    kvirgien@aclu.org

AVRAM D. FREY
(*admitted pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (415) 621-2493
Facsimile:    (415) 255-8437
Email:    afrey@aclunc.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation; and DOES 1 to 20, inclusive,

Defendants.

Case No. CV 13 2354 BLF

**DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN**

Judge:   Hon. Beth Labson Freeman
Date:    August 24, 2023
Time:    9:00 a.m.
Crtrm.:  3

[4329777.1]

Case No. CV 13 2354 BLF

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

1       I, Cara E. Trapani, declare:

2       1.     I am an attorney duly admitted to practice before this Court. I am an

3 associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for

4 Plaintiffs. I have personal knowledge of the facts set forth herein, and if called as a

5 witness, I could competently so testify. I make this declaration in support of Plaintiffs'

6 Notice of Motion and Motion to Enforce the Settlement Agreement and Wellpath

7 Implementation Plan.

8       2.     After approving the parties' Settlement Agreement and the Implementation

9 Plans developed by the County of Monterey and Wellpath, Inc. ("Wellpath," formerly

10 California Forensic Medical Group or "CFMG"), the Court appointed neutral subject-area

11 monitors for five distinct areas—dental care, medical care, mental health care, Americans

12 with Disabilities Act ("ADA") compliance, and corrections and safety. The Order of

13 Reference requires the monitors to assess Defendants' substantial compliance with the

14 Settlement Agreement and the Implementation Plans. Dkt. 563 at 2-4.[1]

15       3.     In 2016, the Court appointed Dr. Bruce Barnett as the neutral monitor for

16 medical care, Dr. Viviane G. Winthrop for dental care, Dr. Kerry Hughes for mental health

17 care, Timothy Gilbert for ADA compliance, and Michael Hackett for corrections and

18 safety. *Id*. In July 2019, Mr. Gilbert and Mr. Hackett were replaced by Michael Brady for

19 ADA compliance, and Richard Bryce for corrections and safety. Dkt. 658 at 2. In

20 April 2022, Dr. Hughes was replaced by Dr. James Vess, who now monitors mental health

21 care. Dkt. 744 at 2. In June 2022, after Mr. Brady tragically passed away, the Court

22 appointed Eric McSwain to monitor ADA architectural compliance and Terri McDonald to

23 monitor ADA programmatic compliance. Dkt. 753 at 2.

24       4.     The Order Appointing Neutral Monitors and Order of Reference authorizes

25 each monitor to conduct two site visits each year to assess substantial compliance with the

---

[1] Citations to filed pleadings are to the ECF-generated page numbers.

Settlement Agreement and Implementation Plans.  Dkt. 563 at 3.  Each site visit may take up to two days.  *Id.*  The monitors can interview staff and incarcerated people, and request and review documents.  *Id*. at 3-4.  Defendants must provide the monitors with the documents they request within ten days prior to the monitor's site visit.  *Id.* at 3.  The medical, mental health, and dental monitors are authorized to access patients' electronic health records.  *Id*. at 3-4.

5.      At least twice a year, each monitor must prepare a draft report that determines whether Defendants are "substantially complying" with the Settlement Agreement and applicable Implementation Plan.  *Id.* at 4.  If the draft report contains findings of non-compliance, it must recommend actions Defendants should take to achieve substantial compliance.  *Id.*  The parties have thirty days to provide written comments, objections, or to cure issues, and seven days to reply.  *Id.*  The monitor must issue a final report within twenty days after the later of the monitor's receipt of any comments, objections, or replies, or any re-inspection.  *Id.*

6.      Pursuant to the Court's May 29, 2020 Order, each monitor may conduct one additional monitoring tour and issue one additional report per year, for a total of three two-day inspections and three reports per year, per monitor.  Dkt. 671 at 6.

7.      In addition to the above formal monitoring duties, the Court's June 3, 2022 Order authorizes the medical, mental health, and dental monitors to engage in enhanced mentoring, consisting of up to four *additional* visits per year (each up to one week long) to "mentor and shadow staff, review patient files, provide guidance, and train staff in the requirements of the Implementation Plans."  Dkt. 751 at 7-8.  The mentoring visits do not require written reports.  *Id.*

8.      Since 2017, each of the neutral monitors have issued periodic final reports pursuant to the above processes.  As of the date of this filing, Dr. Barnett has issued thirteen final monitoring reports and two reports regarding his enhanced mentoring activities.  Dr. Hughes and Dr. Vess have collectively issued nine final reports. Dr. Winthrop has issued eight final reports and a draft ninth report.  True and correct

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

1  copies of each of these reports are attached hereto, as detailed below.  The monitors'

2  findings regarding the medical, mental health, and dental care requirements at issue in

3  Plaintiffs' instant motion are also discussed in detail below.

4  **MEDICAL CARE MONITORING REPORTS**

5  9.      Attached hereto as **Exhibit 1** is a true and correct copy of Dr. Barnett's

6  finalized 1st Medical Report (toured March 9-10, 2017), dated June 13, 2017 and received

7  by my firm on May 31, 2017 via an email sent by Dr. Barnett.[2]

8  10.     Attached hereto as **Exhibit 2** is a true and correct copy of Dr. Barnett's

9  finalized 2nd Medical Report (toured September 7-8, 2017), dated December 20, 2017 and

10  received by my firm on December 21, 2017 via an email sent by Dr. Barnett.

11  11.     Attached hereto as **Exhibit 3** is a true and correct copy of Dr. Barnett's

12  finalized 3rd Medical Report (toured April 9-10, 2018), dated July 2, 2018 and received by

13  my firm on July 2, 2018 via an email sent by Dr. Barnett.

14  12.     Attached hereto as **Exhibit 4** is a true and correct copy of Dr. Barnett's

15  finalized 4th Medical Report (toured October 1-2, 2018), undated and received by my firm

16  on April 30, 2019 via an email sent by Dr. Barnett.

17  13.     Attached hereto as **Exhibit 5** is a true and correct copy of Dr. Barnett's

18  finalized 5th Medical Report (toured April 15-16, 2019), dated June 10, 2019 and received

19  by my firm on June 10, 2019 via an email sent by Dr. Barnett.

20

21  _____

22  [2] It is not clear why Dr. Barnett's first report include a date in the heading that post-dates

23  the day he provided it to the parties.  Furthermore, in conjunction with each of his finalized

24  monitoring reports, it is Dr. Barnett prepared Excel spreadsheet audit tools, as well as an

25  Excel spreadsheet containing individual patient case reviews.  Because these voluminous

26  files contain significant patient-level information protected by the Protective Order in this

27  case (Dkt. 401), I am not attaching those documents to this declaration.  All parties have

28  access to these files, and Plaintiffs can make this data available to the Court upon request.

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

14.     Attached hereto as **Exhibit 6** is a true and correct copy of Dr. Barnett's finalized 6th Medical Report (toured October 24-25, 2019), dated December 30, 2019 and received by my firm on December 30, 2019 via an email sent by Dr. Barnett.

15.     Attached hereto as **Exhibit 7** is a true and correct copy of Dr. Barnett's finalized 7th Medical Report (toured June 18, 2020), dated August 3, 2020 and received by my firm on August 3, 2020 via an email sent by Dr. Barnett.

16.     Attached hereto as **Exhibit 8** is a true and correct copy of Dr. Barnett's finalized 8th Medical Report (paper audit), dated September 4, 2020 and received by my firm on September 14, 2020 via an email sent by Dr. Barnett.

17.     Attached hereto as **Exhibit 9** is a true and correct copy of Dr. Barnett's finalized 9th Medical Report (toured December 14-15, 2020), dated February 11, 2021, and received by my firm on February 11, 2021 via an email sent by Dr. Barnett.

18.     Attached hereto as **Exhibit 10** is a true and correct copy of Dr. Barnett's finalized 10th Medical Report (toured April 29, 2021), dated June 25, 2021, and received by my firm on June 28, 2021 via an email sent by Dr. Barnett.

19.     Attached hereto as **Exhibit 11** is a true and correct copy of Dr. Barnett's finalized 11th Medical Report (toured September 30-October 1, 2021), dated November 30, 2021, and received by my firm on November 30, 2021 via an email sent by Dr. Barnett.

20.     Attached hereto as **Exhibit 12** is a true and correct copy of Dr. Barnett's finalized 12th Medical Report (reporting period of November 2021 through May 2022), dated July 20, 2022, and received by my firm on July 20, 2022 via an email sent by Dr. Barnett.

21.     Attached hereto as **Exhibit 13** is a true and correct copy of Dr. Barnett's finalized 13th Medical Report (toured October 13, 2022), dated December 26, 2022, and received by my firm on December 26, 2022 via an email sent by Dr. Barnett.

22.     Attached hereto as **Exhibit 14** is a true and correct copy of Dr. Barnett's finalized 1st Enhanced Monitoring and Mentoring Report (paper review) (hereafter "1st

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

Mentoring Report"), dated January 25, 2023, and received by my firm on January 27, 2023 via an email sent by Dr. Barnett.

23.    Attached hereto as **Exhibit 15** is a true and correct copy of Dr. Barnett's summary report from his second mentoring visit to the Jail from March 6-9, 2023 (hereafter "2nd Mentoring Report"), dated March 13, 2023, and received by my firm on March 13, 2023 via an email sent by Dr. Barnett.

24.    Attached hereto as **Exhibit 16** is a true and correct copy of the finalized Medical Care Corrective Action Plan ("CAP") that was created by Wellpath and approved by Dr. Barnett as a result of the Court's May 29, 2020 Order.  *See* Dkt. 671 at 5-6.

25.    Attached hereto as **Exhibit 17** is a true and correct copy of Wellpath's current staffing plan (hereafter "Wellpath Staffing Matrix") that I received via email from Wellpath's Implementation Specialist on April 14, 2022.

## SUSTAINED NONCOMPLIANCE WITH MEDICAL REQUIREMENTS

26.    **Health Care Staffing**.  The Settlement Agreement requires Wellpath to maintain "adequate staffing to provide all necessary medical and mental health care …" Dkt. 494 at 16.  Wellpath's Implementation Plan similarly requires Wellpath to maintain "sufficient staff to ensure compliance" with the other mandates of the Plan.  Dkt. 532 at 116.  Although there is a staffing plan included as Exhibit I to the Implementation Plan (*see id.* at 140), Wellpath has updated its staffing plan pursuant to the requirement that it must "evaluate on an on-going basis its staffing levels to ensure that all staffing positions are filled and sufficient staff is employed to ensure compliance with the CFMG Implementation Plan."  *Id.* at 116.  Under the current staffing plan, Wellpath must maintain, at minimum: 1.0 full-time equivalent ("FTE") Health and Safety Administrator ("HSA"); 1.0 FTE Director of Nursing ("DON"), 1.0 FTE Physician/Medical Director, 1.0 FTE Implementation Plan Specialist, 1.0 FTE medical records clerk/administrative assistant ("MRC/AA"), 1.0 FTE Clerk; 2.0 FTEs of family nurse practitioner/physician assistants ("FNP/PA"); 12.6 FTEs of registered nurses ("RN"); 10.5 FTEs of licensed vocational nurses ("LVN"); 7.8 FTEs of certified nursing assistant/medical assistants

1    ("CNA/MA"); and an on-call physician who must be available 24 hours a day, seven days

2    a week.  *See* Ex. 17 (Wellpath Staffing Matrix) at 1.

3         27.    In his most recent monitoring report, Dr. Barnett found:

4         "Staffing is not substantially compliant with the Implementation Plan.  MCJ
          has no Director of Nursing.  MCJ has no director for medical records.  The

5         Medical Director and an associate Nurse Practitioner are on site part time.
          An experienced PA is on-site Monday through Thursday.  Both [the] PA and

6         a recently hired NP whom I observed at work require more physician
          oversight and consultation than [is] being provided.

7

8    Ex. 13 (13th Medical Report) at 8-9.[3]  Dr. Barnett found that the staffing shortages

9    contributed to a substantial backlog and delays in access to care.  *See id.* at 9, n.10.  In one

10   recent case, Dr. Barnett noted that a patient's complaints about vaginitis were not attended

11   to for weeks, and that "[d]elayed care for vaginitis may contribute to psychic distress and

12   suicide ideation."  *Id.* at 10.  Dr. Barnett separately found that "[r]eview and response to

13   grievances are delayed or were not provided at all before [several patients'] release date."

14   *Id.* at 13.  In January 2023, Dr. Barnett concluded that "Wellpath needs to ensure sufficient

15   PCP staff to engage all cases that are referred by [an] RN."  Ex. 14 (1st Mentoring Report)

16   at 6.  He also found "inordinate delay in care for patient[s] requesting sick call."  *Id.* at 4.

17   In July 2022, Dr. Barnett reported based on staff interviews that:

18        MCJ leadership stated that staffing shortages has made it difficult to provide
          patient care (seen as the priority) and perform quality assurance in accord

19        with the Implementation Plan. … [T]he interviewed staff agreed that it has
          been difficult to meet the demands from the current MCJ jail census of more

20        than one thousand incarcerated persons with the current staffing and staff
          schedule.

21

22   Ex. 12 (12th Medical Report) at 16.  Counsel for Wellpath later informed Plaintiffs'

23   counsel that from June to September 2022, due to critical nursing staff shortages, Wellpath

24   stopped conducting the initial health assessments that the Implementation Plan mandates

25

26   _____

27   [3] Citations to the monitors' reports are to the page numbers generated by my firm that

28   correspond to each exhibit in the bottom right hand corner of the page.

[4329777.1]

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

1  for all incarcerated people 14 days after they are booked into the Jail.  *See infra*, ¶¶ 34-35

2  (discussing the 14-day requirement in more detail under the heading "Health Care

3  Maintenance").  In his most recent report, Dr. Barnett found that D.S., who died at the Jail

4  on November 12, 2022, should have, but did not, receive the required 14-day health

5  screen. Ex. 13 (13th Medical Report) at 16.  Dr. Barnett has found Wellpath noncompliant

6  with staffing requirements several times, especially recently.  *See* Ex. 1 (1st Medical

7  Report) at 14; Ex. 9 (9th Medical Report) at 8; Ex. 11 (11th Medical Report) at 8; Ex. 12

8  (12th Medical Report) at 17.

9         28.  **Intake Screening**.  The Settlement Agreement provides that Defendants will

10  "ensure that arriving prisoners are promptly screened for urgent medical … needs, with

11  prompt follow-up …."  Dkt. 494 at 13.  Wellpath's Implementation Plan requires that

12  "[a]ll arrestees … will be screened by a Registered Nurse (RN) at the time of intake ….

13  [i]n a manner to ensure the inmate's privacy."  Dkt. 532 at 11.  The intake screening must

14  include, among other things, taking of vital signs and inquiry into medical issues,

15  medications, and substance use.  *Id.* at 13-14, 29; Dkt. 494 at 15 (same); Dkt. 460 at 11-12.

16  "Inmates with medical … conditions identified during intake screening … shall be

17  assessed by the Booking RN who will begin initial treatment planning … and schedul[e]

18  referrals for follow up evaluation …."  Dkt. 532 at 27; *id.* at 12-14, 29, 41-42, 72

19  (describing various conditions the intake nurse must screen for).

20         29.  Dr. Barnett's most recent report concluded that Wellpath is not substantially

21  compliant with these intake screening requirements.  *See* Ex. 13 (13th Medical Report) at

22  5.  Dr. Barnett found significant lapses that exposed patients to substantial risk of harm,

23  including failure to notify a physician when patients show abnormal vital signs, failure to

24  screen incoming patients for sexually transmitted diseases, and failure to enroll patients

25  with substance abuse disorders in appropriate monitoring protocols.  *Id.*  For example,

26  Dr. Barnett found that Wellpath failed to complete the intake form for a patient with

27  developmental disabilities and a seizure disorder, and did not refer him for chronic care

28  follow-up.  *Id.* at 11 (Case 8).  He found that another patient with multiple physical

ailments including a swollen right foot, impaired mobility, disorientation, and abnormal vital signs was not referred for enhanced monitoring or chronic care visit. *Id.* at 13 (Case 18). Dr. Barnett also found that deficiencies in Wellpath's intake screening practices were one of several Implementation Plan violations implicated in the death of D.S. on November 12, 2022. *See id.* at 16. Dr. Barnett has found noncompliance with intake screening requirements in most of his prior reports. *See* Ex. 1 (1st Medical Report) at 5, 10, 14; Ex. 5 (5th Medical Report) at 6; Ex. 6 (6th Medical Report) at 9-10; Ex. 7 (7th Medical Report) at 4; Ex. 8 (8th Medical Report) at 1; Ex. 9 (9th Medical Report) at 6; Ex. 10 (10th Medical Report) at 6; Ex. 11 (11th Medical Report) at 5; Ex. 12 (12th Medical Report) at 4. Dr. Barnett also found Wellpath noncompliant with intake screening requirements in his January 2023 report. *See* Ex. 14 (1st Mentoring Report) at 1.

30.    **Sick Call**. The Settlement Agreement provides that "Defendants shall ensure timely access to necessary treatment by Qualified Medical Professionals for prisoners with medical issues." Dkt. 494 at 16; *see also* Dkt. 532 at 21 (section on Health Care Philosophy providing same information). Wellpath's Implementation Plan provides that "[h]ealth … complaints of inmates shall be collected, processed and documented on a daily basis," and patients must be scheduled for the next sick call if the slip was received prior to 2300 hours. *Id.* at 25-26. Sick call must be conducted Monday through Friday in a private clinical environment and sick call slips must be "filed in the inmate's medical record." *Id.* at 26. As part of the sick call process, an MD or RN must visit individuals housed in holding and isolation cells on Monday, Wednesday, and Friday. *Id.*

31.    Dr. Barnett's most recent report concluded that Wellpath is not substantially compliant with sick call requirements, finding "[i]nmates are not timely seen following their written request for sick call," and "[f]ace to face assessment is frequently delayed." *See* Ex. 13 (13th Medical Report) at 5. The report estimated that "access to PCP services falls short of demand by approximately 100 visits per month." *Id.* at 19. Wellpath did not contest this finding. In one case, Wellpath never responded to a patient who requested an appointment on February 21, 2023 to discuss termination of her 15-week pregnancy. *See*

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

1  Ex. 2 (2nd Mentoring Report) at 3.  Wellpath authorized the termination only after

2  Dr. Barnett happened to noticed the grievance in a document review and spoke with the

3  patient on March 6, 2023.  *Id.*  Dr. Barnett also found that Wellpath's failure to

4  appropriately respond to sick call requests played a role in the death of S.G. on

5  September 24, 2021.  *See* Ex. 11 (11th Medical Report) at 15-17.  According to

6  Dr. Barnett's report, S.G. submitted sick call requests prior to his death complaining that

7  he feared he had deep vein thrombosis (DVT), but the Physician Assistant at the Jail

8  determined not to refer him to the medical director, and declined to continue his

9  prescription for anticoagulation medication.  *Id.* at 15-16.  Dr. Barnett found that S.G. later

10 tested positive for COVID-19, and should have been, but was not, referred to an MD.  *Id.*

11 at 17.  The report states that approximately two weeks later, S.G. collapsed in his housing

12 unit with markedly distressed breathing, a pulse of 135, and no obtainable blood pressure.

13 Ex. 12 (12th Medical Report) at 15.  Dr. Barnett reported that S.G. died in the hospital later

14 that day, and that the autopsy report attributed his death to "Coronary Thrombosis."  *Id.*

15 Dr. Barnett concluded "that care provided to this patient failed to comply with the

16 Implementation Plan and was also contrary to applicable standards of care."  *Id.*  In the

17 case of J.M., who died by suicide at the Jail on July 21, 2020, Dr. Barnett found that his

18 "medical care did not comport with the implementation plan guidelines" because the sick

19 call nurse failed to document his vital signs after he vomited and fainted and failed to

20 ensure follow-up care by a physician.  Ex. 9 (9th Medical Report) at 17.  Dr. Barnett has

21 found Wellpath noncompliant with sick call requirements in the vast majority of his

22 reports.  *See* Ex. 2 (2nd Medical Report) at 6; Ex. 3 (3rd Medical Report) at 6; Ex. 5 (5th

23 Medical Report) at 6; Ex. 6 (6th Medical Report) at 10; Ex. 7 (7th Medical Report) at 4;

24 Ex. 8 (8th Medical Report) at 6 (finding "[n]urses do not consistently follow written

25 protocols for intake and sick call," though not issuing an explicit finding of

26 noncompliance); Ex. 9 (9th Medical Report) at 6; Ex. 10 (10th Medical Report) at 6;

27 Ex. 11 (11th Medical Report) at 5; Ex. 12 (12th Medical Report) at 4.  Dr. Barnett also

28 found Wellpath noncompliant with sick call requirements in his January 2023 report.  *See*

1  Ex. 14 (1st Mentoring Report) at 2 ("Patient requests for services are not reviewed timely.

2  In many cases patients are rescheduled for weeks or even months for needed medical

3  service.").

4        32.   **Chronic Care**.  Wellpath's Implementation Plan requires that "[i]nmates

5  with chronic medical conditions will be referred to and seen by a medical provider within

6  five to seven days of arrival."  Dkt. 532 at 14.  "Inmates with chronic care conditions will

7  be managed pursuant to chronic care protocols and standardized procedures that are

8  consistent with national practice guidelines."  *Id.* at 28.  Patients with chronic health

9  conditions, such as diabetes, respiratory disorders, cardiac disorders, hypertension, seizure

10  disorders, communicable diseases, and psychiatric disorders, must be seen by an FNP, PA,

11  or MD at least every 90 days, and more frequently if needed.  *Id.* at 28, 31.  At every 90-

12  day appointment, the provider must (1) assess the patient's medications, complaints, and

13  compliance with the treatment plan; (2) examine vital signs and weight; (3) assess

14  diagnosis, degree of control, compliance with the treatment plan and clinical status as

15  compared to prior visits; and (4) conduct lab and diagnostic tests as necessary, develop

16  strategies to improve outcomes if the condition has worsened, educate the patient, and

17  refer to an MD or specialist, and/or conduct discharge planning as necessary.  *Id.* at 32-33.

18        33.    In his most recent report, Dr. Barnett found Wellpath noncompliant with

19  these requirements for chronic care treatment, concluding that "[c]hronic care visits are

20  frequently delayed and/or incomplete," and "[m]ajor medical problems are not consistently

21  documented."  Ex. 13 (13th Medical Report) at 6.  The report further states that "[p]atients

22  at known high risk for HCV, HIV and STD are not screened in accord with community

23  standards," and that "[p]atients abusing substances should be scheduled as 'chronic care'

24  patients."  *Id.* at 6, 20.  Dr. Barnett found that D.S., who died at the Jail on November 12,

25  2022, "should have been scheduled for [a] Chronic Care visit within the week after his

26  intake.  [He] was not referred for any medical or mental health services when booked into

27  MCJ on 4/30/22."  *Id.* at 16.  In the case of A.R., who died at the Jail on March 3, 2020,

28  Dr. Barnett found similar lapses in chronic care:

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

[A.R.] was 54 year[s] old with a long history of poorly controlled diabetes, hypertension, severe coronary atherosclerosis requiring stent, chronic congestive heart failure, [and] stroke and lung dysfunction . . . . His condition was chronically unstable.  He was at the highest risk for sudden death.

. . .

His severe chronic illness and poor pre-booking medical care should have prompted physical examination for the next morning.  Instead of seeing a physician, AR was seen by a PA, and not until around 5 pm, nearly 24 hours later.

. . .

The medical care at MCJ was not compliant with the plan as the services were not provided in accordance with community standards:  a) AR's medical examination at MCJ was inordinately delayed; he did not see a physician between his intake and death. b) despite evidence of severe acute and chronic congestive heart failure (right lung aeration not audible, significant weight gain) [the Physician Assistant] did not seek immediate physician consultation.  c) AR was not sent to the hospital for his complaint of severe chest pain at 5:30 pm on March 2, despite his extremely high risk for death from acute coronary events.

Ex. 9 (9th Medical Report) at 14-15.  Dr. Barnett has found noncompliance with requirements for chronic care in all but a few of his prior reports.  *See* Ex. 1 (1st Medical Report) at 15; Ex. 2 (2nd Medical Report) at 6; Ex. 5 (5th Medical Report) at 6; Ex. 7 (7th Medical Report) at 11; Ex. 8 (8th Medical Report) at 2; Ex. 9 (9th Medical Report) at 6; Ex. 10 (10th Medical Report) at 6; Ex. 11 (11th Medical Report) at 5; Ex. 12 (12th Medical Report) at 4.  Dr. Barnett also found Wellpath noncompliant with chronic care requirements in his January 2023 report.  *See* Ex. 14 (1st Mentoring Report at 2).

34.    **Health Care Maintenance**.  Wellpath's Implementation Plan requires that all patients receive both a 14-day health inventory and communicable disease screening, and a six-month complete physical examination.  *See* Dkt. 532 at 30, 37.  The 14-day health screening must be completed using the Health Inventory & Communicable Disease Screening Form, attached to the Implementation Plan as Exhibit E, and staff must record the patient's "[t]emperature, pulse, respirations, blood pressure, height and weight," assess for possible sexually transmitted diseases, and note all positive findings on a "problem list" for follow-up.  *See id.* at 35, 129-30 (Health Inventory & Communicable Disease

1   Screening form).  The six-month physical examination must include "[r]eview of the

2   health inventory and communicable disease screening; [v]ital signs, height and weight;

3   [a] full body system review and assessment …; [a] documented assessment of the

4   individual's health status; [and a] plan for follow up, treatment and referral as indicated."

5   *Id.* at 37.

6         35.    In his most recent report, Dr. Barnett found Wellpath noncompliant with

7   these health care maintenance requirements, finding that "[a]nnual examinations were at

8   times incomplete and lacked full physicals," patients "were frequently not referred for

9   specialists," and some examinations "inaccurately reported diagnoses, medications, and/or

10  significant laboratory abnormalities."  Ex. 13 (13th Medical Report) at 6.  The report also

11  determined that "[w]omen's health care did not meet applicable community standards."

12  *Id.*  Dr. Barnett found that D.S., who died at the Jail on November 12, 2022, "did not

13  undergo an Initial Health History and Physical Exam.  Within 2 weeks of his admission to

14  MCJ D.S. should have been assessed with history and exam to determine his need for

15  further medical care. … This was not done."  *Id.* at 16.  Regarding S.G., who died at the

16  Jail on September 24, 2021, Dr. Barnett found: "The physical exam was incomplete as the

17  form stated for musculoskeletal review 'NA – not applicable.'  That is an error as the

18  musculoskeletal exam in a patient complaining of DVT is applicable and extremely

19  important."  Ex. 11 (11th Medical Report) at 16.  Dr. Barnett has not found Wellpath

20  substantially compliant with health care maintenance requirements since finalizing his

21  fourth report in April 2019.  *See* Ex. 5 (5th Medical Report) at 6; Ex. 6 (6th Medical

22  Report) at 11; Ex. 7 (7th Medical Report) at 11; Ex. 8 (8th Medical Report) at 2 (deferred

23  due to "insufficient data"); Ex. 9 (9th Medical Report) at 6; Ex. 10 (10th Medical Report)

24  at 6; Ex. 11 (11th Medical Report at 6; Ex. 12 (12th Medical Report) at 4.  Dr. Barnett also

25  found Wellpath noncompliant with these requirements in his January 2023 report.  *See*

26  Ex. 14 (1st Mentoring Report) at 2 ("Patients housed in MCJ for more than 6 months are

27  not consistently examined by PCP.").

28        36.    **Continuity of Care**.  Wellpath's Implementation Plan requires that

"[p]atients will receive continuity of care from admission to discharge while in this facility, including referral to community care when indicated." Dkt. 532 at 38. "Inmates released to the community will be provided with written instructions for the continuity of essential care, including, but not limited to, name and contact information of community providers for follow up appointments, prescriptions and/or adequate supply of medication for psychiatric patients." *Id.* at 38-39.

37.     In his most recent report, Dr. Barnett found Wellpath noncompliant with these continuity of care requirements, finding "[i]n some cases, there was no documented follow up instructions for patients released with serious and unstable conditions." Ex. 13 (13th Medical Report) at 6.  Dr. Barnett also found Wellpath noncompliant with these requirements in his January 2023 mentoring report.  *See* Ex. 14 (1st Mentoring Report) at 3.  In one case, Dr. Barnett found that a patient requesting syphilis testing belatedly after submitting the request, and then was never told that the test came back positive.  *Id.* at 6. He reported that the patient was transferred to a State prison without knowledge of his medical condition and without the receiving health care providers being made aware.  *Id*. Dr. Barnett has found noncompliance with continuity of care requirements in many of his prior reports.  *See* Ex. 1 (1st Medical Report) at 15; Ex. 4 (4th Medical Report) at 6; Ex. 5 (5th Medical Report) at 7 (deferred due to "incomplete data"); Ex. 6 (6th Medical Report) at 7 (deferred due to "incomplete data"); Ex. 7 (7th Medical Report) at 6; Ex. 8 (8th Medical Report) at 2; Ex. 9 (9th Medical Report) at 7; Ex. 10 (10th Medical Report) at 7; Ex. 11 (11th Medical Report) at 6; Ex. 12 (12th Medical Report) at 5.

38.     **<u>Outside Care Referrals</u>**.  Wellpath's Implementation Plan provides that "[i]nmates will have access to outside health care providers."  Dkt. 532 at 39.  The Settlement Agreement provides that all "records, results, and orders received from [such] off-site consultations and treatment" be maintained in the patient's medical record. Dkt. 494 at 17.

39.     Dr. Barnett's most recent monitoring report found Wellpath noncompliant with these outside care referral requirements.  *See* 13th Medical Report at 8.  He concluded

that "[n]ecessary specialty care is not consistently provided," and "PCP review and follow up on visits to outside care are not consistently documented." *Id.*  In January 2023, he also found Wellpath noncompliant, in part because "[r]eports from the Emergency Room did not consistently accompany patients upon their return, and occasionally were not referenced by MCJ staff even days later." *See* Ex. 14 (1st Mentoring Report) at 2. Dr. Barnett has linked Wellpath's failure to maintain outside provider records to patient deaths.  For example, in concluding that S.G. received care that "was not in accord with the implementation plan and applicable standards of care" prior to his death on September 24, 2021, Dr. Barnett found that S.G. "never received the prescription for Eliquis at MCJ written for him at NMC, even after complaining to a MCJ NP that he had leg pain and swelling reminiscent of DVT, and after seeing the MCJ medical director for a 6 month exam." *See* Ex. 11 (11th Medical Report) at 15-16.  Dr. Barnett has found noncompliance with requirements for outside care referrals in many of his prior reports. *See* Ex. 1 (1st Medical Report) at 15-16; Ex. 3 (3rd Medical Report) at 7; Ex. 4 (4th Medical Report) at 6; Ex. 7 (7th Medical Report) at 4; Ex. 8 (8th Medical Report) at 1-2; Ex. 9 (9th Medical Report) at 7; Ex. 10 (10th Medical Report) at 7; Ex. 11 (11th Medical Report) at 6; Ex. 12 (12th Medical Report) at 6.

40.   **Treatment of Intoxicated Patients**.  The Settlement Agreement requires that "[m]edical providers shall be timely involved in assessing and treating inmates potentially undergoing withdrawal, and non-provider medical staff shall timely refer to providers those inmate undergoing withdrawals when clinically indicated."  Dkt. 494 at 14-15.  Wellpath's Implementation Plan enumerates numerous specific requirements for the identification and treatment of patients in a state of alcohol or drug intoxication, or withdrawal.  *See* Dkt. 532 at 18, 48-71.

41.   Dr. Barnett concluded in his most recent report that Defendants are not substantially compliant with these detoxification and withdrawal protocols, finding that "[i]ntake nurses do not consistently contact the on-call PCP for orders for patients at risk of withdrawing from multiple substances," and "[p]atients with history of synthetics abuse

are often not entered into appropriate monitoring protocols."  *See* Ex. 13 (13th Medical Report) at 7.  Dr. Barnett has consistently found "systemic lapses wherein the intake nurse sen[d] to [general population] housing inmates described as 'under the influence' or overtly intoxicated."  Ex. 6 (6th Medical Report) at 12.  The medical records provided by Wellpath for M.M., who died by suicide at the Jail on January 4, 2023, show similar concerns; the records show that he died after being left in a general population cell without monitoring despite that staff noted him to be "suffering from meth induced psychosis." *See* Ex. 51 (M.M. Custody Records) at 12.  In the case of G.B., who died at the Jail January 15, 2020, Dr. Barnett determined that he received care that "failed to comply with the CFMG implementation plan" because staff failed to identify signs of delirium caused by intoxication or withdrawal.  Ex. 9 (9th Medical Report) at 16.  He concluded that G.B. "should have been under continual observation in consideration of his known abuse of multiple substances and unpredictable behavior.  Staff should have been prepared to treat any deterioration with Narcan."  *Id.*  In the case of J.M., who died at the Jail on March 16, 2019, Dr. Barnett found that "MCJ care appears to have been inadequate," because "[n]o physician was notified as required by protocols for multiple substance abuse/detox or when J.M.'s pulse rose to 120 or when her agitation was noted with refusal to allow vital signs." Ex. 5 (5th Medical Report) at 11.  Dr. Barnett has found Wellpath noncompliant with requirements for detoxification and withdrawal protocols in every monitoring report he has issued since June 2019.  *See id.* at 7-8, 12-15 (case reviews showing noncompliance); Ex. 6 (6th Medical Report) at 7; Ex. 7 (7th Medical Report) at 4-5; Ex. 8 (8th Medical Report) at 2; Ex. 9 (9th Medical Report) at 7; Ex. 10 (10th Medical Report) at 7; Ex. 11 (11th Medical Report) at 6-7; Ex. 12 (12th Medical Report) at 5.

     42.  **<u>Treatment of Tuberculosis</u>**.  The Settlement Agreement states that Defendants "shall provide for appropriate infectious disease screening and follow-up, including but not limited to screening for tuberculosis and methicillin resistant staphylococcus aureus (MRSA)."  Dkt. 494 at 13-14; *see also* Dkt. 460 at 20, 42 (finding in 2015 preliminary injunction order finding Defendants knew their tuberculosis screening

policies and practices were inadequate, yet did nothing to improve them, creating an "unacceptably high" risk of infection for the Plaintiff class).  The Settlement Agreement further provides that "Defendants' tuberculosis identification, control and treatment program shall comply with [U.S. Centers for Disease Control and Prevention ("CDC") guidelines]," and that "Defendants shall have a reliable system to track whether all newly booked inmates have received tuberculosis screening and appropriate follow-up testing and treatment."  Dkt. 494 at 14.  Wellpath's Implementation Plan contains strict protocols for the identification, control, and treatment of tuberculosis.  *See generally* Dkt. 532 at 78-87.

43.    Dr. Barnett has concluded in each of his reports that Defendants are not substantially compliant with these tuberculosis screening and treatment protocols.  *See* Ex. 1 (1st Medical Report) at 5, 16; Ex. 2 (2nd Medical Report) at 6, 8; Ex. 3 (3rd Medical Report) at 7; Ex. 4 (4th Medical Report) at 3, 7, 12, 14; Ex. 5 (5th Medical Report) at 7; Ex. 6 (6th Medical Report) at 12-13; Ex.7 (7th Medical Report) at 12; Ex. 8 (8th Medical Report at 2; Ex. 9 (9th Medical Report) at 7; Ex. 10 (10th Medical Report at 7; Ex. 11 (11th Medical Report) at 7; Ex. 12 (12th Medical Report) at 5; Ex. 13 (13th Medical Report) at 7; Ex. 14 (1st Mentoring Report) at 2.  Dr. Barnett repeatedly found that Wellpath routinely failed to treat patients with positive tuberculosis tests or even to counsel them about treatment options.  *See* Ex. 3 (3rd Medical Report) at 7; Ex. 5 (5th Medical Report) at 7; Ex. 7 (7th Medical Report) at 12; Ex. 8 (8th Medical Report) at 2; Ex. 9 (9th Medical Report) at 7; Ex. 10 (10th Medical Report) at 7; Ex. 11 (11th Medical Report) at 7; Ex. 12 (12th Medical Report) at 5; Ex. 13 (13th Medical Report) at 7.  In his most recent monitoring report, Dr. Barnett repeated his finding from prior reports that "[p]atients with unequivocally positive PPD (many of whom had received a BCG vaccine) are not appropriately evaluated with QuantiFERON, or equivalent, testing to confirm diagnosis of latent TB.  Patients with latent TB … are not counseled about options for immediate versus delayed treatments."  *Id*.  In March 2023, Dr. Barnett found that Wellpath should take corrective action to address, among other things, "[d]ocumenting counseling of patient[s] with suspected Latent TB (following positive skin testing, ideally

1   verified with QuantiFERON blood test)."  Ex. 15 (2nd Mentoring Report) at 5.

2   44.   **Pharmaceutical Practices**.  Wellpath's Implementation Plan provides that

3   "[u]nder the direction of the Medical Director and in accordance with Pharmacy and

4   Business Code, the Medical Program Manager or their designee acting as an agent of the

5   Medical Director will procure, store, and manage pharmaceuticals for use in the Monterey

6   County Jail."  Dkt 532 at 94.  "Containers which are cracked, soiled or without secure

7   closures shall not be used" and "[d]rug labels shall be legible."  *Id.* at 95.  This includes

8   non-prescription medications, which must be provided "in unit dose, sealed, labeled

9   packaging."  *Id.* at 91.  "Inmates on essential medications will receive medication while in

10  court."  *Id.* at 92.  "Controlled substances will be kept under maximum security storage

11  and counted at each shift change" by "the nursing going off duty" together with "the nurse

12  coming on duty."  *Id.* at 93.  "The medication nurse is responsible for and will verify"

13  whether each patients takes their prescribed medication, including by recording it "on the

14  inmate's medication administration record (MAR)."  *Id.* at 89.  "If a prescribed substance

15  is refused or withheld, a notation will be made on the [MAR] and the prescribing medical

16  provider shall be notified after three consecutive refusals."  *Id.* at 89, 90.

17  45.   Dr. Barnett's most recent monitoring report concluded that Wellpath is not

18  substantially compliant these requirements for pharmaceutical practices, finding that there

19  was "poor or absent oversight of pharmacy services as manifested by my discovery in the

20  medication room of expired medications, improperly labelled multiple dose vials, and

21  delinquent controlled substance logs."  *See* Ex. 13 (13th Medical Report) at 3; 22.

22  Dr. Barnett found that "[t]hese lapses overtly depart from performances required in the

23  Implementation Plan."  *Id.* at 7.  In January 2023, Dr. Barnett again found Wellpath

24  noncompliant, noting that the Jail's "[m]edication room and medication management

25  inspections are not being performed quarterly despite state law reiterated by the

26  requirements set forth in the Implementation Plan and Wellpath protocols."  Ex. 14 (1st

27  Mentoring Report) at 3.  He identified similar deficiencies in March 2023.  *See* Ex. 15 (2nd

28  Mentoring Report) at 4 ("I found many drugs stored in the medication room had labels

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

naming a prescribing provider that no longer works at MCJ.").  Dr. Barnett has found Wellpath noncompliant with pharmaceutical practice requirements in most of his reports. *See* Ex. 1 (1st Medical Report) at 5, 11, 16-17; Ex. 5 (5th Medical Report) at 8; Ex. 6 (6th Medical Report) at 7-8; Ex. 9 (9th Medical Report) at 8; Ex. 10 (10th Medical Report) at 8; Ex. 11 (11th Medical Report) at 7-8; Ex. 12 (12th Medical Report) at 5-6.

46.    **Quality Assurance**.  Wellpath's Implementation Plan requires Wellpath to engage in post-implementation monitoring, including "focused process[es] and outcome audits to measure compliance with the elements of the [Wellpath] Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame.  All monitoring and audit findings will be reported to the Quality Management Committee at its quarterly meetings."  Dkt. 532 at 9; *see also* Dkt. 494 at 11-12 ("[There must be] corrective action measures to address lapses in application of the policy.").  Wellpath's Implementation Plan also requires the responsible physician to provide appropriate supervision of the PA, NP, and RNs. Dkt. 532 at 24.  The Plan further provides that "all completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with [Wellpath] Inmate Deaths Policy and Procedure."  *Id.* at 77.  Under the May 29, 2020 Stipulated Order, Wellpath must provide Plaintiffs' counsel access to death reviews of post-Settlement in-custody deaths within thirty days from the date the review is completed.  Dkt. 671 at 6.

47.    In July 2018, Dr. Barnett found Wellpath not substantially compliant with quality assurance requirements, finding that "MCJ does not have scheduled monthly quality assurance meeting[s] chaired by the MCJ medical director to discuss complicated cases or adverse outcomes," and "[q]uarterly meetings have not addressed many issues at MCJ that merit further discussion towards quality improvement."  Ex. 3 (3rd Medical Report) at 9.  In December 2018, Dr. Barnett emphasized that "[a]n effective quality assurance program, as demonstrated by prompt and meaningful reviews of all deaths or other untoward events, is required for MCJ to be in substantial compliance with the

implementation plan." Ex. 4 (4th Medical Report) at 8.  Nearly five years later, Dr. Barnett found that Wellpath is still not conducting appropriate death reviews or holding monthly or quarterly quality assurance meetings. *See, e.g.*, Ex. 13 (13th Medical Report) at 9 ("I have not seen CQI minutes for 2022. … I have also not been provided with the death review for patients who died while in custody during 2022."). Dr. Barnett has noted that many of Wellpath's death reviews fail to discuss departures from the Implementation Plan that are identified in Dr. Barnett's reports. *See id.* at 15, 17-18, 23. Dr. Barnett has never found Wellpath's quality assurance practices substantially compliant. *See* Ex. 1 (1st Medical Report) at 18; Ex. 2 (2nd Medical Report) at 14; Ex. 3 (3rd Medical Report) at 9; Ex. 4 (4th Medical Report) at 8; Ex. 5 (5th Medical Report) at 9; Ex. 6 (6th Medical Report) at 9; Ex. 7 (7th Medical Report) at 14; Ex. 8 (8th Medical Report) at 7-8; Ex. 9 (9th Medical Report) at 8-9; Ex. 10 (10th Medical Report) at 8-9; Ex. 11 (11th Medical Report) at 8-9; Ex. 12 (12th Medical Report) at 6-7, 20; Ex. 13 (13th Medical Report) at 9, 22-23; Ex. 14 (1st Mentoring Report) at 3.  Dr. Barnett has concluded that Wellpath's failure to durably implement quality assurance practices contributes to in-custody deaths.  For example, in his first report, Dr. Barnett reviewed a patient's death in 2017 and found that "[t]his death case … reveals an apparent lapse in attention to quality control because there was no immediate review by medical leadership to identify the cause of death, evaluate the care prior to death, and discern areas worth addressing to improve future care." Ex. 1 (1st Medical Report) at 12-13.  In his third report, Dr. Barnett reviewed another patient death and concluded that "[t]he paucity of details in the medical record regarding care provided to decedent[] … around the time of death and the apparent lack of death review process in this case substantiates the concern that MCJ medical records and quality assurance processes have much room for improvement." Ex. 3 (3rd Medical Report) at 10.  In his fifth report, Dr. Barnett reviewed the care provided to a patient who died in 2018 and determined the death was "probably preventable," noting that "[t]his case is a good example of how death reviews can improve health care.  MCJ medical staff can learn from this case that ER staff and specialists do not provide faultless care." Ex. 5 (5th

1  Medical Report) at 10-11 & n.13.  In his most recent monitoring report, Dr. Barnett

2  concluded that "formal death review[s] and/or quarterly QA meeting[s] have not addressed

3  the concerns about quality of care I raise in my review of deaths at MCJ."  Ex. 13 (13th

4  Medical Report) at 17-18.

5  **MENTAL HEALTH CARE MONITORING REPORTS**

6  48.     Attached hereto as **Exhibit 18** is a true and correct copy of Dr. Hughes's

7  finalized 1st Mental Health Report (toured January 18-19, 2017), undated and received by

8  my firm on May 12, 2017 via an email sent by Dr. Hughes.

9  49.     Alongside each finalized mental health monitoring report, the mental health

10  monitors also provided a document with detailed records reviews for a subset of patients

11  with mental illness and issued findings regarding the adequacy of their care.  As identified

12  below, these case review documented are attached hereto as separate exhibits for each

13  finalized mental health monitoring report.[4]

14  50.     Attached hereto as **Exhibit 19** is a true and correct copy of Dr. Hughes's

15  finalized 1st Records Review, received by my firm on February 27, 2017 via an email sent

16  by Dr. Hughes.

17  51.     Attached hereto as **Exhibit 20** is a true and correct copy of Dr. Hughes's

18  finalized 2nd Mental Health Report (toured November 14-15, 2017), undated and received

19  by my firm on May 3, 2018 via an email sent by Dr. Hughes.

20  52.     Attached hereto as **Exhibit 21** is a true and correct copy of Dr. Hughes's

21

22  _____

23  [4] In conjunction with each of the case reviews, Dr. Hughes and Dr. Vess prepared a key

24  identifying the incarcerated people discussed in the anonymized case reviews appended to

25  the end of each of his reports.  Because this patient-level information is protected by the

26  Protective Order in this case (Dkt. 401), I am not attaching the patient keys to this

27  declaration.  All parties already have access to these keys, and Plaintiffs can make them

28  available to the Court upon request.

finalized 2nd Records Review, received by my firm on May 3, 2018 via an email sent by Dr. Hughes.  The 2nd Records Review document as originally produced to Plaintiffs' counsel contained numerous pages that appeared to be included in error.  This included duplicate pages, blank pages, and pages that appeared to be scrap paper (i.e., an illegibly printed email, a receipt for an amazon purchase, and a blank nomination form for a professional award).  Plaintiffs' counsel has removed from the report all blank pages and the pages that appeared to be scrap paper.  We have not removed the duplicate pages, due to the risk of removing important substantive components of the report.

53.     Attached hereto as **Exhibit 22** is a true and correct copy of Dr. Hughes's finalized 3rd Mental Health Report (toured July 10-11, 2018), undated and received by my firm on December 5, 2018 via an email sent by Dr. Hughes.

54.     Attached hereto as **Exhibit 23** is a true and correct copy of Dr. Hughes's finalized 3rd Records Review, received by my firm on December 5, 2018 via an email sent by Dr. Hughes.

55.     Attached hereto as **Exhibit 24** is a true and correct copy of Dr. Hughes's finalized 4th Mental Health Report (toured November 28-29, 2018), undated and received by my firm on May 6, 2019 via an email sent by Dr. Hughes.

56.     Attached hereto as **Exhibit 25** is a true and correct copy of Dr. Hughes's finalized 4th Records Review, received by my firm on May 6, 2019 via an email sent by Dr. Hughes.

57.     Attached hereto as **Exhibit 26** is a true and correct copy of Dr. Hughes's finalized 5th Mental Health Report (toured June 19-20, 2019), undated and received by my firm on November 5, 2019 via an email sent by Dr. Hughes.

58.     Attached hereto as **Exhibit 27** is a true and correct copy of Dr. Hughes's finalized 5th Records Review, received by my firm on November 5, 2019 via an email sent by Dr. Hughes.

59.     Attached hereto as **Exhibit 28** is a true and correct copy of Dr. Hughes's finalized 6th Mental Health Report (toured December 11-12, 2019), undated and received

by my firm on May 18, 2020 via an email sent by Dr. Hughes.

60.     Attached hereto as **Exhibit 29** is a true and correct copy of Dr. Hughes's finalized 6th Records Review, received by my firm on May 18, 2020 via an email sent by Dr. Hughes.

61.     Attached hereto as **Exhibit 30** is a true and correct copy of Dr. Hughes's finalized 7th Mental Health Report (toured July 16 and 28-30 2020, and August 7 and 14, 2020), undated and received by my firm on March 9, 2021 via an email sent by Dr. Hughes.

62.     Attached hereto as **Exhibit 31** is a true and correct copy of Dr. Hughes's finalized 7th Records Review, received by my firm on January 19, 2021 via an email sent by Dr. Hughes.

63.     Attached hereto as **Exhibit 32** is a true and correct copy of Dr. Hughes's finalized 8th Mental Health Report (toured May 18-19, 2021), undated and received by my firm on January 4, 2022 via an email sent by Dr. Hughes.

64.     Attached hereto as **Exhibit 33** is a true and correct copy of Dr. Hughes's finalized 8th Records Review, received by my firm on January 4, 2022 via an email sent by Dr. Hughes.

65.     Attached hereto as **Exhibit 34** is a true and correct copy of Dr. Vess's finalized 9th Mental Health Report (toured July 21-22, 2022), undated and received by my firm on November 4, 2022 via an email sent by Dr. Hughes.

66.     Attached hereto as **Exhibit 35** is a true and correct copy of Dr. Vess's finalized 9th Records Review, received by my firm on September 16, 2022 via an email sent by Dr. Vess.

67.     Attached hereto as **Exhibit 36** is a true and correct copy of the finalized Mental Health CAP that was created by Wellpath and approved by Dr. Hughes as a result of the Court's May 29, 2020 Order.  *See* Dkt. 671 at 5-6.

**SUSTAINED NONCOMPLIANCE WITH MENTAL HEALTH REQUIREMENTS**

68.     <u>**Mental Health Staffing**</u>.  The Settlement Agreement requires Wellpath to

maintain adequate mental health staff sufficient to ensure compliance with the
Implementation Plan, and must evaluate its staffing levels on an ongoing basis.  *See* Dkt.
494 at 16; Dkt. 532 at 116.  Wellpath's current staffing plan requires Wellpath to maintain,
at minimum: 1.0 FTE psychiatrist and an on-call psychiatrist available 24 hours a day, 7
days per week.  *See* Ex. 17 (Wellpath Staffing Matrix) at 1.  Wellpath updated the non-
psychiatry portions of its mental health staffing plan in the Fall of 2022.  Attached hereto
as **Exhibit 37** is a true and correct copy of the staffing matrix updates that I received from
Ben Rice, former counsel for Wellpath, via email on September 3, 2022.  In addition to the
1.0 psychiatry staffing and on-call requirements noted above, Wellpath must now also
maintain, at minimum, a full-time Mental Health Coordinator; 3.0 FTEs of licensed
clinical social worker/marriage and family therapist/psychiatric nurses ("LCSW/MFT/Psy
RN"); 2.0 FTE of psych techs; and 1.0 FTE of discharge planners.  *See* Ex. 37 at 1; *see
also* Ex. 17 at 1 (providing additional detail regarding the provider types that fulfill each
position noted in the updated matrix).

69.     The mental health monitors have found Wellpath noncompliant with these
staffing requirements in every report except the first mental health report issued in 2017,
where Dr. Hughes deferred making any compliance findings.  *See* Ex. 18 (1st Mental
Health Report) at 9-10 (deferred); Ex. 20 (2nd Mental Health Report) at 11-12, 28; Ex. 22
(3rd Mental Health Report) at 10-11; Ex. 24 (4th Mental Health Report) at 11-12, 28;
Ex. 26 (5th Mental Health Report) at 14-15; Ex. 28 (6th Mental Health Report) at 14-16;
Ex. 30 (7th Mental Health Report) at 19-22; Ex. 32 (8th Mental Health Report) at 21-23;
Ex. 34 (9th Mental Health Report) at 21-22.  In his fifth monitoring report, Dr. Hughes
noted that "psychiatric staffing workload issues" caused delays in patients' initial
psychiatric assessment and follow-up, "highlighting the need for a comprehensive staffing
analysis."  Ex. 26 (5th Mental Health Report) at 6.  In his sixth report, Dr. Hughes found
that mental health appointments were often "rescheduled due to workload constraints," and
noted "the high staff turnover."  Ex. 28 (6th Mental Health Report) at 15.  Dr. Hughes's
seventh report again found delays "due to psychiatric staffing workload issues," and noted

that "[t]he psychiatrist frequently had to reschedule inmates due to large caseloads." Ex. 30 (7th Mental Health Report) at 5.  In his eighth report, Dr. Hughes again found that "MCJ was negatively impacted by severe mental health staffing shortages."  Ex. 32 (8th Mental Health Report) at 21.  In the most recent mental health monitoring report, Dr. Vess concluded that "[t]he staffing situation does not appear to have changed significantly since the time of Dr. Hughes' last review."  Ex. 34 (9th Mental Health Report) at 21.  He found that "almost all psychiatry contacts take place at cell-front" and that "the psychiatrist [commented] during the recent site visit regarding the challenges of keeping up with his current workload, whereby he reported that he needed to reschedule most of his appointments."  *Id.* at 21-22.  Dr. Vess concluded that "[i]t is clear that additional staffing is required to provide adequate mental health services to the MCJ inmate population."  *Id.* at 22.  The mental health monitors have linked staffing shortages to patient deaths.  For example, in the case of R.L., who had a history of mental illness and died in custody on December 22, 2019, Dr. Hughes concluded that "[a]ppointments were rescheduled by mental health clinicians due to workload constraints.  This points to concerns regarding whether there is adequate mental health staffing and the need for an adequate staffing analysis to determine needed mental health staffing levels."  Ex. 29 (6th Records Review) at 5 (Patient 10).  In the case of J.M., who died by suicide on July 21, 2020, Dr. Hughes noted that "[a]ppointments with the mental health clinicians were rescheduled on several occasions; as has been stated previously, this brings into question the adequacy of mental health staffing."  Ex. 31 (7th Records Review) at 7 (Patient 2).  In the case of C.R., who died by suicide on April 20, 2021, Dr. Hughes found that despite C.R. having a significant mental health history, several recent psychiatric hospital admissions, and a known ongoing risk for suicidal ideation and self-injurious behavior, there was a "lack of psychiatric contacts and follow-up."  Ex. 33 (8th Records Review) at 7 (Patient 3).  In that same report, Dr. Hughes found "severe mental health staffing shortages," which impacted staff's ability to see patients timely.  *See* Ex. 32 (8th Mental Health Report) at 21-22.

70.  **Initial Mental Health Screening**.  Wellpath's Implementation Plan requires

that "[w]ithin 14 days of admission … all inmates will have an initial mental health screening performed by a qualified mental health professional."  Dkt. 532 at 41; *id.* at 36 (same).  The 14-day mental health screening must "consist of a structured interview" and include inquiries into the patient's "history of psychiatric hospitalizations and outpatient treatments," "[t]he current status of psychotropic medications, suicidal ideations, drug or alcohol use and orientation to person place, and time," and "[e]motional response to incarceration."  *Id.* at 36.  The medical or psychiatric provider who conducts the 14-day mental health screening must "complete a baseline … psychiatric examination," order a "therapeutic regimen, as appropriate," and, if the patient is on psychiatric medications, schedule the patient to be seen by the psychiatrist "every thirty days until determined stable and then at least every 60 to 90 days."  *Id.* at 30-31.

71.     The mental health monitors have never found Wellpath substantially compliant with these mental health screening requirements since monitoring began in 2017.  *See* Ex. 18 (1st Mental Health Report) at 3 (deferred); Ex. 20 (2nd Mental Health Report) at 3-4; Ex. 22 (3rd Mental Health Report) at 3-4; Ex. 24 (4th Mental Health Report) at 3-4; Ex. 26 (5th Mental Health Report) at 4-6, 13; Ex. 28 (6th Mental Health Report) at 5-6; Ex. 30 (7th Mental Health Report) at 4-5; Ex. 32 (8th Mental Health Report) at 5-6; Ex. 34 (9th Mental Health Report) at 3-4 (deferred).  In his most recent report, Dr. Vess found that Wellpath has added mental health questions to the intake screening form in lieu of conducting the initial 14-day mental health screenings, and he found that "[a]dditional documentation is needed to demonstrate that the necessary training is provided to nurses conducting the Intake Screenings."  *Id.* at 4 (emphasis in original).

72.     **Nursing Rounds in Administrative Segregation**.  Wellpath's Implementation Plan provides that "[n]ursing staff shall conduct mental health rounds in Administrative Segregation daily, separate and apart from medication distribution."  Dkt. 532 at 43.

73.     The mental health monitors have found Wellpath noncompliant with this requirement in every monitoring report they have issued, except in the first mental health

report where Dr. Hughes deferred his findings.  *See* Ex. 18 (1st Mental Health Report) at 4 (deferred); Ex. 20 (2nd Mental Health Report) at 4-5; Ex. 22 (3rd Mental Health Report) at 4-5, 25; Ex. 24 (4th Mental Health Report) at 4-5, 27; Ex. 26 (5th Mental Health Report) at 6-7, 27; Ex. 28 (6th Mental Health Report) at 6-7; Ex. 30 (7th Mental Health Report) at 33; Ex. 32 (8th Mental Health Report) at 34; Ex. 34 (9th Mental Health Report) at 31.  In his most recent report, Dr. Vess cited Dr. Hughes's prior findings of noncompliance, and found that "[r]eview of healthcare records for the current report found a similar pattern whereby nursing rounds were not documented daily across administrative segregation housing."  *Id*. at 31.

74.     **Hospital Transfers**.  Wellpath's Implementation Plan provides that "[a]ny inmate who has been placed in a safety cell for Suicide Precautions for 24 consecutive hours shall be transferred to either an appropriate inpatient mental health facility or the Natividad Medical Center emergency room for assessment."  Dkt. 532 at 75; *id.* at 43, 80. Patients must also transfer to an inpatient facility or NMC if they have been housed in a safety cell "for more than 36 cumulative hours in any 3-day period."  *Id.* at 73.  Individuals placed into a safety cell at intake due to a positive mental health screening must be transferred to NMC for further assessment if their "condition deteriorates," or if "the nurse is unable to complete a hands-on assessment including vital signs after six hours of placement."  *Id.* at 16.

75.     The mental health monitors have not found Wellpath substantially compliant with the requirements for hospital transfers since Dr. Hughes issued his fourth report in November 2018.  *See* Ex. 26 (5th Mental Health Report) at 11-12 (noncompliant); Ex. 28 (6th Mental Health Report) at 12 (noncompliant); Ex. 30 (7th Mental Health Report) at 13, 36-37 (noncompliant); Ex. 32 (8th Mental Health Report) at 15, 37 (noncompliant); Ex. 34 (9th Mental Health Report) at 36-37 (deferred).  Prior to that, Dr. Hughes found Wellpath noncompliant with these requirements in his second report, and deferred making a finding in his first report.  *See* Ex. 18 (1st Mental Health Report) at 7; Ex. 20 (2nd Mental Health Report) at 8-9.  In his most recent report, Dr. Vess deferred making findings because "[t]he

current evaluation of compliance with these requirements is again somewhat complicated

by the distinction between Level 1 and Level 2 Suicide Watch."  Ex. 34 (9th Mental Health

Report) at 37.  Dr. Vess concluded:

> A more thorough understanding of the policies and procedures in place to ensure compliance with these requirements is needed before reaching a finding about compliance.  This includes a finalized written policy or procedure reflecting the current mental health follow-up of patients once they are stepped down from suicide watch.  Greater consistency in the documentation that the assessed level of risk was considered in clinical decision-making about release from suicide watch, and consistent posting of the associated collaborative safety plans in the healthcare record, are also needed.

*Id.*

76.     **Treatment Planning**.  Wellpath's Implementation Plan states:

> Individual treatment plans shall be developed by the responsible mental health provider and the Program Manager or designee to meet the outpatient treatment needs of the inmate during his/her period of incarceration including the opportunity for social interaction and participation in community activities.  If the inmate is unable to participate, the reason will be documented by the responsible mental health professional.

Dkt. 532 at 43; *id.* at 27, 75 (additional treatment plan requirements).  Initial treatment

planning must begin at the time of intake by the booking nurse, and must "include [the]

specific medical and/or psychiatric problem, nursing interventions, housing, dietary,

medication, observation and monitoring, and follow-up referral and/or evaluation as

appropriate."  *Id.* at 27.  An individualized treatment plan must be documented in each

patient's medical record.  *Id.* at 114.  When a psychiatric provider sees patients with

chronic mental health conditions at the chronic care clinic, they must, among other things,

assess the patient's "compliance with [the] treatment plan and clinical status in comparison

to [the] prior visit."  *Id.* at 32.

77.     The mental health monitors have never found Wellpath substantially

compliant with the requirement to develop individual treatment plans for patients suffering

from mental illness.  *See* Ex. 18 (1st Mental Health Report) at 15 (deferred); Ex. 20 (2nd

Mental Health Report) at 18, 29; Ex. 22 (3rd Mental Health Report) at 16-17, 26; Ex. 24

(4th Mental Health Report) at 18, 28; Ex. 26 (5th Mental Health Report) at 23, 35; Ex. 28

(6th Mental Health Report) at 22, 35; Ex. 30 (7th Mental Health Report) at 29-30; Ex. 32 (8th Mental Health Report) at 29-31; Ex. 34 (9th Mental Health Report) at 27-28.  In his second report, finalized in November 2017, Dr. Hughes concluded "that approximately one-third of [reviewed healthcare] records did not include individualized treatment planning as was clinically indicated and required," and that "[n]one of the healthcare records reviewed included appropriate safety planning in the suicide risk assessments when clinically indicated."  Ex. 20 (2nd Mental Health Report) at 18.  Dr. Hughes recommended that Wellpath "should provide training to mental health staff regarding appropriate individualized treatment and behavioral planning and should document individualized treatment planning in the healthcare records."  *Id.* at 29.  Dr. Hughes made similar findings in the years that followed, and Dr. Vess found in his most recent report:

> Review of recent treatment plans indicated that [the required] elements are seldom adequately addressed.  Integration of the interventions provided by various professional disciplines (e.g., mental health clinicians, psychiatrist, nursing, custody, etc.) remains lacking.  Specifically, the role of psychiatry appears limited to the prescription of psychotropic medications, without further involvement in an interdisciplinary treatment process; coordinated efforts to address problems such as medication compliance or reduction of self-injurious behavior were not evident in the documentation. … [T]reatment plans do not effectively guide treatment across time and across providers.

Ex. 34 (9th Mental Health Report) at 27-28.  The mental health monitors have identified treatment planning violations in their reviews of several in-custody deaths.  In the case of R.L. who died at the Jail on December 22, 2019, Dr. Hughes concluded that although "treatment planning was indicated to develop a plan to engage the inmate in treatment," "[t]reatment planning was lacking."  Ex. 29 (6th Records Review) at 13 (Patient 10).  In assessing the death of M.V., who died by suicide on June 2, 2019, Dr. Hughes concluded that despite the patient's "uncooperative and withdrawn behavior, …. [t]here was a lack of documentation regarding treatment planning to address this issue and to engage the inmate in treatment to allow for adequate assessment and treatment."  *Id.* at 17 (Patient 13).  In the case of J.M., who died by suicide on July 21, 2020, Dr. Hughes noted that "actual documentation of safety planning and detailed treatment planning … to address the

1  inmate's presenting symptoms was lacking and concerning."  Ex. 31 (7th Records Review)

2  at 8 (Patient 2).  In the case of T.P., who died by suicide at the Jail on August 5, 2021,

3  Dr. Hughes found that "this death appeared to be preventable," and noted "[n]o treatment

4  plan was located for this patient.  Due to concerns regarding suicide, adequate treatment

5  and safety planning were critical."  Ex. 33 (8th Records Review) at 4 (Patient 2).

6       78.    **Chronic Care**.  Wellpath's Implementation Plan requires that "[i]nmates

7  with chronic medical conditions will be referred to and seen by a medical provider within

8  five to seven days of arrival."  Dkt. 532 at 14; *id.* at 29.  The Plan defines "[c]hronic

9  illness" as including "psychiatric disorders."  *Id.* at 28.  After intake, patients with chronic

10  conditions must be evaluated "at least every ninety days."  *Id.* at 28, 31.  The psychiatric

11  provider conducting the chronic care clinic must, at minimum, (1) assess the patient's

12  history, (2) conduct a physical examination, (3) assess the patient's diagnosis and

13  "compliance with [the] treatment plan," (4) create a treatment plan, including conducting

14  laboratory and diagnostic tests, implementing "[s]trategies to improve outcomes,"

15  monitoring vital signs, educating the patient, and discharge planning, and (5) document the

16  encounter in the patient's medical record.  *Id.* at 32-33.

17       79.    The mental health monitors have found Wellpath noncompliant with these

18  chronic requirements in every report issued since November 2019.  *See* Ex. 26 (5th Mental

19  Health Report) at 5-6; Ex. 28 (6th Mental Health Report) at 5-6; Ex. 30 (7th Mental Health

20  Report) at 7-8; Ex. 32 (8th Mental Health Report) at 8-10; Ex. 34 (9th Mental Health

21  Report) at 6-8.  In his most recent report, Dr. Vess found:

22       In the current review, the psychiatrist typically noted a diagnosis and
        compliance (or lack thereof) with prescribed medications, but there were no
23       notes regarding the patients degree of control, clinical status as compared to
        prior visits, or compliance with a treatment plan beyond medication
24       compliance. There continues to be no documentation of AIMS [Abnormal
        Involuntary Movements Scale] testing.  There was no documented treatment
25       planning by the psychiatrist beyond prescribed medications.  In cases of
        patients refusing to take psychotropic medications despite overt mental
26       health symptoms, there was little in the way of psychiatric follow-up or
        further intervention. There was no documentation of collaborative,
27       interdisciplinary treatment planning or intervention strategies.  The field for
        patient education in the psychiatrist's notes was typically blank.

28

1    *Id*. at 8.  The monitors have never found Wellpath compliant with these requirements.

2          80.    **Acute Care**.  The Settlement Agreement provides that Defendants shall

3    "ensure timely access to … hospitalization and inpatient care."  Dkt. 494 at 17.  Wellpath's

4    Implementation Plan requires that "[i]nmates who require acute mental health services

5    beyond those available on site are transferred to an appropriate facility."  Dkt. 532 at 36;

6    *id.* at 41, 42.

7          81.    The mental health monitors have found Wellpath noncompliant with the

8    requirement to provide adequate access to inpatient psychiatric care in almost every report

9    they have issued.  Dr. Hughes and Dr. Vess have found access to NMC's Mental Health

10   Unit ("MHU") inadequate in every report since March 2021, and in all but two reports

11   before then.  *See* Ex. 18 (1st Mental Health Report) at 7, 21 ("[A]ccess to inpatient mental

12   health treatment was poor and difficult to obtain for all inmates referred for inpatient

13   care."); Ex. 20 (2nd Mental Health Report) at 8-9, 26; Ex. 21 (2nd Records Review) at 7

14   (Patient 3) ("Of concern was the lack of access to the NM MHU after this patient presented

15   with multiple incidents of suicidal behavior and obvious inability of the jail to protect the

16   patient from self-harm."); Ex. 25 (4th Records Review) at 35 (Inmate 16) ("This patient

17   required inpatient treatment for stabilization rather than housing in a segregation unit.");

18   Ex. 27 (5th Records Review) at 17 (Patient 11) ("[T]his reviewer has commented

19   repeatedly regarding the housing o[f] severely mentally ill individuals in segregation who

20   refuse treatment, groups and medications and need inpatient treatment."); Ex. 30 (7th

21   Mental Health Report) at 8-9 ("Although inmates were routinely referred to NMC for

22   crisis evaluation and stabilization, some inmates with severe and chronic illness that could

23   not be managed at MCJ remained at the jail without referral.  The acceptance and adequate

24   treatment of such inmates at NMC remained problematic, and as has been previously

25   noted, referrals for needed inpatient mental health care did not occur due to the lack of

26   access to inpatient treatment at NMC.  This appeared to be particularly problematic for

27   chronically mentally ill who exhibited chronic psychosis and treatment nonadherence.");

28   Ex. 32 (8th Mental Health Report) at 10-11 ("This issue remained essentially

1  unchanged."); Ex. 34 (9th Mental Health Report) at 8 ("Concerns similar to those reported

2  by the prior Mental Health Monitor were found in the current review.").  The monitors

3  have never found Wellpath substantially compliant with these requirements.  In his most

4  recent report, Dr. Vess found:

5          Cases were identified of patients who were in acute and severe mental health
           crises, with danger to self, danger to others, and possible grave disability,
6          who were not transferred to NMC for evaluation and stabilization or to an
           appropriate facility. … It is also noted that mental health staff are not on-site
7          on a 24 hour basis, and on call psychiatry services are provided by a
           psychiatrist who is sometimes contacted by email.  He is not always available
8          to respond quickly.

9  *Id*. at 8-9.  Dr. Vess further stated that "[s]everal cases were reviewed that reflected severe

10 and chronic mental illness that cannot be adequately treated in the current jail environment,

11 and required an inpatient level of care which the jail cannot provide." *Id.* at 7; *see also*

12 Ex. 35 (9th Records Review) at 14 (Patient 2) ("Another concern in this case is an apparent

13 need for inpatient care. … The lack of inpatient care options for patients such as this is

14 problematic."); *id.* at 18 (Patient 3) ("He presented a danger to himself, a danger to others,

15 and was potentially gravely disabled. … [H]is condition required treatment that could not

16 reasonably be provided in the jail, and [he] should have been referred to an inpatient level

17 of care."); *id.* at 22 (Patient 4) ("This patient required transfer to an inpatient level of care.

18 … Given the patient's severe mental illness, his consistent rejection of mental health

19 treatment, and the limited mental health resources of the jail environment, MCJ cannot be

20 expected to effectively treat and care for patients such as this."); *id.* at 27 (Patient 6) ("This

21 was a case of severe mental illness in which the patient was briefly admitted for inpatient

22 treatment at NMC, which was appropriate.  However, the available documentation

23 indicates that his chronic mental health condition required more than a one-time, three day

24 length of stay at an inpatient level of care. … [T]he jail is not adequately equipped to care

25 for either the acute or chronic manifestations of this patient's severe mental illness.").

26 Similar to Dr. Hughes's prior findings, Dr. Vess found that the NMC MHU's admissions

27 policy—which "states that patients will not be admitted who are pending or who are

28 convicted of violent felony offenses"—precludes MCJ patients' access to the MHU, which

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

"appeared to negatively impact necessary access to inpatient mental health treatment.  If this ban remains in place, alternative mental health inpatient care should be identified and provided."  Ex. 34 (9th Mental Health Report) at 7 (quoting 8th Mental Health Report at 9).  Relatedly, in the case of C.R., who died by suicide on April 20, 2021, Dr. Hughes concluded:

> This case illustrated the ongoing and significant issue of the lack of adequate access to inpatient treatment for those inmates who require mental health services that are unavailable at the MCJ.  The patient was followed consistently by mental health clinicians at the jail, and he was transferred to NMC on several occasions due to ongoing suicidal ideation.  He was appropriately hospitalized at the NMC MHU for approximately 12 to 13 days; however, he remained with suicidality upon return to the jail, and he required re-evaluation at the NMC ER several days later.  Although appropriately admitted for inpatient psychiatric treatment, it appeared that he required additional inpatient treatment for stabilization.

Ex. 33 (8th Records Review) at 7 (Patient 3).  Dr. Hughes found that "[t]he mental health care provided to this individual appeared to be inadequate.  As a result of the issues of concern noted, this death appeared to be preventable."  *Id.*

82.  **<u>Outpatient Services</u>**.  Wellpath's Implementation Plan states that "[o]utpatient mental health services to include screening, evaluation, diagnosis, treatment and referral services shall be available to all inmates in the Monterey County Jail." Dkt. 532 at 41.  "Inmates requiring special in-jail housing and/or observation for psychiatric reasons will be housed in single cells and/or the Outpatient Housing Unit …" *Id.* at 42.  Wellpath's Implementation Plan further provides:

> Individual treatment plans shall be developed by the responsible mental health provider and the Program Manager or designee to meet the outpatient treatment needs of the inmate during his/her period of incarceration including the opportunity for social interaction and participation in community activities.  If the inmate is unable to participate, the reason will be documented by the responsible mental health professional

*Id.* at 43.

83.  The mental health monitors have found Wellpath noncompliant with the requirement to provide adequate access to outpatient mental health treatment at MCJ in every report issued since March 2021.  *See* Ex. 30 (7th Mental Health Report) at 9; Ex. 32

(8th Mental Health Report) at 11; Ex. 34 (9th Mental Health Report) at 9.  In his most recent monitoring report, Dr. Vess found "that current mental health staffing levels do not allow for sufficient outpatient services to support a determination of substantial compliance." *Id.* at 9.  Dr. Hughes found similar deficiencies in his earlier reports.  *See* Ex. 18 (1st Mental Health Report) at 17 (finding people with mental illness in need of outpatient services routinely housed in administrative segregation units); Ex. 20 (2nd Mental Health Report) at 21 (same); *id.* at 19 (finding evidence of stigmatization of patients with mental illness by clinical staff rather than provision of appropriate treatment planning and necessary care); Ex. 22 (3rd Mental Health Report) at 19 (same); *see also* Ex. 23 (3rd Records Review) at 2-3 (Inmate 2) ("[N]o mental health referral was made, and the inmate was transferred to general population.  This was concerning as the inmate had a known history of significant mental health treatment."); Ex. 24 (4th Mental Health Report) at 20 ("Mentally ill prisoners were routinely housed in the segregation units, and the placement of such individuals on these units continued to not be limited."); Ex. 26 (5th Mental Health Report) at 25 ("The segregation units continued to function as de facto mental health units …."); Ex. 28 (6th Mental Health Report) at 25 (same).

84.  **Psychiatric Follow-Up Visit Intervals**.  Wellpath's Implementation Plan requires that "patient[s] on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every sixty/ninety days.  More frequent evaluations by a psychiatrist will be scheduled if necessitated by the patient's condition." Dkt. 532 at 31.

85.  The mental health monitors have made express findings of noncompliance with these requirements in every report since November 2019 and have never found Wellpath in substantial compliance with these requirements.  *See* Ex. 26 (5th Mental Health Report) at 5-6; Ex. 28 (6th Mental Health Report) at 5-6; Ex. 30 (7th Mental Health Report) at 5; Ex. 32 (8th Mental Health Report) at 5-6; Ex. 34 (9th Mental Health Report) at 4.  In his most recent monitoring report, Dr. Vess found Wellpath noncompliant with the requirement that patients on psychiatric medications be seen by the psychiatrist every 30

days until stable and then at least every 60 – 90 days.  *See id*. at 4 ("[C]ases were again observed where patients on psychotropic medications were scheduled to be seen at 90 day intervals prior to being assessed as stable and sometimes while demonstrating active symptoms of psychosis.").  Wellpath's violations with these requirements have caused significant harm.  In the case of C.R., who died by suicide on April 20, 2021, Dr. Hughes concluded:

> The lack of psychiatric contacts and follow-up was concerning for this patient with a known history of psychotic symptoms, inpatient treatment and suicidality.  Documentation indicated that he was only seen once during his last incarceration when he was provided with a diagnosis of Adjustment Disorder.

Ex. 33 (8th Records Review) at 7 (Patient 3).

86.  **Consideration of Mental Health in Discipline**.  Wellpath's Implementation Plan provides:

> Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff shall contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness.

Dkt. 532 at 47.

87.  The mental health monitors have never found Wellpath substantially compliant with these requirements since monitoring began in 2017.  *See* Ex. 18 (1st Mental Health Report) at 15-16; Ex. 20 (2nd Mental Health Report) at 20; Ex. 22 (3rd Mental Health Report) at 17-18; Ex. 24 (4th Mental Health Report) at 18-19; Ex. 26 (5th Mental Health Report) at 23-24; Ex. 28 (6th Mental Health Report) at 23; Ex. 30 (7th Mental Health Report) at 31 (deferred); Ex. 32 (8th Mental Health Report) at 31-32; Ex. 34 (9th Mental Health Report) at 28.  Dr. Vess's most recent report noted that the Disciplinary Action Reports ("DARs") he reviewed "contained no information related to consulting with mental health staff."  Ex. 34 (9th Mental Health Report) at 28.  He also found that "[r]eviews of recent incident reports indicated that officers appear to routinely recommend charges, regardless of the potential impact of mental illness on the inmate's behavior, which, as noted earlier, was typically not explicitly assessed by mental health staff."  *Id.*

88.   **Segregation Placement Screenings**.  The Settlement Agreement provides:

> The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation, and require procedures to mitigate the impact of administrative segregation on persons with mental illness, including but not limited to structured therapeutic activity outside the segregation cell and where feasible assignment of cell mates.

Dkt. 494 at 17-18.  Wellpath's Implementation Plan similarly provides:

> A suicide risk assessment, including use of the Suicide Risk Assessment Tool, a copy of which is attached as Exhibit G, will be performed by a qualified mental health provider … after placement in Administrative Segregation. Any qualified mental health provider who performs a suicide risk assessment will be trained in the use and interpretation of the Suicide Risk Assessment Tool.

Dkt. 532 at 43.

89.   The mental health monitors have never found Wellpath substantially compliant with these segregation placement screening requirements since monitoring began in 2017.  *See* Ex. 18 (1st Mental Health Report) at 17 (deferred); Ex. 20 (2nd Mental Health Report) at 21-23; Ex. 22 (3rd Mental Health Report) at 19-20; Ex. 24 (4th Mental Health Report) at 21; Ex. 26 (5th Mental Health Report) at 26-27; Ex. 28 (6th Mental Health Report) at 26-27; Ex. 30 (7th Mental Health Report) at 36-38; Ex. 32 (8th Mental Health Report) at 36-37; Ex. 34 (9th Mental Health Report) at 29, 35-36.  Similar to Dr. Hughes's prior findings, Dr. Vess's most recent report found that:

> Structured suicide risk assessments are not routinely completed with inmates placed in administrative segregation housing.  The Mental Health Supervisor indicated that there is no reliable and consistent way by which mental health staff are informed of all administrative segregation placements, nor are there enough mental health clinicians on staff to respond adequately to this requirement.

*Id*. at 36.

90.   **Mental Health Programming in Segregation**.  The Settlement Agreement mandates that "[t]he Mental Health Implementation Plan shall require … procedures to mitigate the impact of administrative segregation on persons with mental illness, including but not limited to structured therapeutic activity outside the segregation cell."  Dkt. 494, at

17-18.  Wellpath's Implementation Plan requires, in relevant part, that "Mental Health services provided on-site will include … socialization programs, group therapy, … psychiatric evaluations and individual therapy."  Dkt. 532 at 42.

91.   In his most recent report, Dr. Vess found Wellpath noncompliant with these requirements, finding that "[r]outine group programming is still not being offered by mental health staff due to staffing inadequacies."  Ex. 34 (9th Mental Health Report) at 40.  Dr. Hughes's eighth report noted similar concerns, finding that "mental health staffing issues resulted in the temporary discontinuation of group therapy for segregated patients."  Ex. 32 (8th Mental Health Report) at 39.  The mental health monitors have not found substantial compliance with these requirements since Dr. Hughes finalized his second report in May 2018.  *See* Ex. 30 (7th Mental Health Report) at 40 ("[T]he mental health clinician providing group therapy no longer worked at MCJ, and staffing at the time of the visit did not allow for the provision of groups."); Ex. 28 (6th Mental Health Report) at 29-31 (finding "a significant number of inmates were unable to attend [group therapy] due to their level of mental health instability," and that "[t]here was a lack of documentation regarding interventions to address inmates who are unable or who routinely refused group and individual therapies"); Ex. 26 (5th Mental Health Report) at 30-31; Ex. 24 (4th Mental Health Report) at 23-25; Ex. 22 (3rd Mental Health Report) at 21-22.

92.   **Involuntary Medication**.  Wellpath's Implementation Plan provides:

> Involuntary psychotropic medications will only be given when a psychiatric emergency exists or when an inmate, following an[] Incapacity Hearing, is found to lack the capacity to consent to medications. Medications shall not be used for punishment, for the convenience of staff, as a substitute for program, or in quantities that interfere with the treatment program.  The responsible physician, Program Manager and Director of Nursing in cooperation with the Facility Manager will be responsible for identifying appropriate community resources and developing procedures to obtain an Incapacity Hearing and to transfer inmates requiring involuntary psychotropic medication administration to an appropriate community facility.

Dkt. 532 at 96.  The Plan defines "psychiatric emergency" as a situation where involuntary treatment is "immediately necessary for the preservation of life or the prevention of serious

bodily harm to the inmate or others." *Id.* Involuntary psychotropic medications may only be given pursuant to a "one-time order from the responsible facility psychiatrist or physician following an on-site evaluation." *Id.* Patients who receive involuntary psychotropic medications must be admitted to the infirmary or a safety cell and must be monitored by custody staff at least every 30 minutes. *Id.* at 97. "Monitoring by nursing staff will be provided at a minimum of every 15 minutes for the first hour and every 30 minutes thereafter …." *Id.* Any patient "exhibiting any clinical deterioration … will be transferred immediately to a clinically appropriate treatment facility." *Id.*

93.     The mental health monitors have found Wellpath noncompliant with these requirements in every report issued since March 2021, and in several reports before then. Ex. 20 (2nd Mental Health Report) at 87; Ex. 22 (3rd Mental Health Report) at 23; Ex. 24 (4th Mental Health Report) at 26; Ex. 30 (7th Mental Health Report) at 15-18; Ex. 32 (8th Mental Health Report) at 17-20; Ex. 34 (9th Mental Health Report) at 18-20 (finding noncompliance with most of the Implementation Plan's involuntary medication requirements). Dr. Vess's most recent report identified a patient who repeatedly received forced medication administration without documentation of an on-site evaluation, and without transfer to an appropriate community facility as required. *Id*. at 19. Dr. Vess also found that mental health leadership "are not routinely notified of involuntary administrations of psychotropic medications, nor is a log kept of involuntary medication administrations which would allow verification of such notifications." *Id.* at 20.

94.     **<u>Suicide Risk Assessments</u>**. Under Wellpath's Implementation Plan, suicide risk assessments may only be performed by qualified mental health providers who are "trained in the use and interpretation of the Suicide Risk Assessment Tool." *See* Dkt. 532 at 43. Such assessments must occur at intake if suicidality is identified, prior to placement in segregation, within four hours after placement in a safety cell, and before release from a safety cell. *Id.*; *see also id.* at 72-73, 75.

95.     Since monitoring began in 2017, the mental health monitors have never found Wellpath substantially compliant with these suicide risk assessment requirements.

1  *See* Ex. 18 (1st Mental Health Report) at 2 (deferred); Ex. 20 (2nd Mental Health Report)

2  at 2-3; Ex. 22 (3rd Mental Health Report) at 2-3; Ex. 24 (4th Mental Health Report) at 2-3;

3  Ex. 26 (5th Mental Health Report) at 2-4; Ex. 28 (6th Mental Health Report) at 2-5; Ex. 30

4  (7th Mental Health Report) at 36-37; Ex. 32 (8th Mental Health Report) at 36-37; Ex. 34

5  (9th Mental Health Report) at 29, 35.  Dr. Vess found in his most recent monitoring report

6  that Wellpath violated these requirements in the case of J.C., who died by suicide at the

7  Jail on  April 20, 2022.  Dr. Vess found that "[a] risk assessment using the Suicide Risk

8  Assessment Tool was not completed within four hours of placement in a Safety Cell ….

9  He was also not re-assessed for suicide risk prior to movement out of the safety cell …."

10  *Id*. at 35.  He further found that the on-call provider would have placed J.C. on Level 1

11  suicide watch instead of Level 2 if more information about his suicide attempt and level of

12  suicide risk been provided:

13  > Video footage of the patient's attempt to strangle himself in the sobering cell
   > was not reviewed prior to contacting the on-call mental health clinician, and
14  > therefore important information about the seriousness of that self-injurious
   > behavior was not conveyed when she was contacted by phone and the patient
15  > was placed on Level 2 Suicide Watch.  Had this information been available,
   > an immediate in-person evaluation should have been conducted, and the
16  > patient placed on Level 1 Suicide Watch, with all of the attendant
   > precautions associated with that designation. Discussions with staff indicate
17  > that immediate review of available video surveillance at the time of the
   > initial determination of the suicide watch level was not a formal requirement
18  > or expectation at the time of this patient's suicide.  It is understood that such
   > review of available video is now expected, although a written policy or
19  > procedural protocol has not been reviewed by the Mental Health Monitor.

20  Ex. 35 (9th Records Review) at 4 (Patient 1).  Dr. Vess noted similar concerns in other

21  cases he reviewed.  *See, e.g.*, *id.* at 27 (Patient 6) ("The documentation of suicide risk

22  assessment, collaborative safety planning and clinical decision-making about release from

23  suicide watch require improvement.").  In the case of J.M., who died by suicide on July 21,

24  2020, Dr. Hughes concluded that "this death … was possibly preventable if adequate

25  assessment of suicide risk and appropriate safety planning were performed."  Ex. 31 (7th

26  Records Review) at 7 (Patient 2).  In the case of T.P., who died by suicide at the Jail on

27  August 5, 2021, Dr. Hughes found that "this death appeared to be preventable," in part due

28  to "the lack of appropriate assessment for suicide risk."  Ex. 33 (8th Records Review) at 4

(Patient 2) ("The patient was seen for initial mental health assessment, which included a suicide risk assessment, eight days after arrival.  Considering the patient's history of recent state hospital treatment for possible overdose and high suicide risk factors, a more timely assessment of suicide risk was indicated.")

96.  **Medical Records**.  Wellpath's Implementation Plan requires that each patient's medical record contain the following items, as applicable:

    1. The completed Receiving Screening form.
    2. Health Inventory/Communicable Disease Screening forms.
    3. Problem list.
    4. All findings, diagnosis, treatments, dispositions.
    5. Prescribed medications and their administration.
    6. Laboratory, x-ray and diagnostic studies.
    7. Consent and Refusal forms.
    8. Release of Information forms.
    9. Place and date of health encounters (time, when pertinent).
    10. Health service reports (i.e., dental, psychiatric, and other consultations).
    11. Hospital Discharge Summaries.
    12. Jail Medical Record Summaries (transfer forms).
    13. Individual treatment plan

Dkt. 532 at 114.

97.  The mental health monitors have found Wellpath noncompliant with these medical records requirements in almost every report.  *See* Ex. 20 (2nd Mental Health Report) at 18-19; Ex. 22 (3rd Mental Health Report) at 16-17, 26; Ex. 24 (4th Mental Health Report) at 4, 18; Ex. 26 (5th Mental Health Report) at 23; Ex. 28 (6th Mental Health Report) at 22; Ex. 30 (7th Mental Health Report) at 42-43; Ex. 32 (8th Mental Health Report) at 41-42; Ex. 34 (9th Mental Health Report) at 42.

98.  **Corrective Action Plans**.  The Settlement Agreement states that "[t]o 'implement' a policy means that … compliance with the policy is monitored and tracked, … the policy is consistently applied; and there are corrective action measures to address lapses in application of the policy."  Dkt. 494 at 11-12.  Wellpath's Implementation Plan provides that Wellpath will engage in post-implementation monitoring, including "focused process[es] and outcome audits to measure compliance with the elements of the [Wellpath]

1  Implementation Plan.  Corrective action plans will be developed and instituted for

2  identified deficiencies, including re-audits within a stipulated time frame."  Dkt. 532 at 9.

3  The May 29, 2020 Stipulated Order required Wellpath to "develop, under the direction and

4  guidance of the neutral monitors and with input from Plaintiffs' counsel, corrective action

5  plans to remedy all the areas for which the neutral monitors have found Defendants to be

6  not in substantial compliance."  Dkt. 671 at 5.

7        99.    In his most recent report, Dr. Vess found Wellpath noncompliant with the

8  above requirements for developing and implementing adequate corrective action plans

9  ("CAPs").  *See* Ex. 34 (9th Mental Health Report) at 43-44.  Dr. Vess found the "static"

10  nature of Wellpath's current CAP developed pursuant to the May 29, 2020 Order

11  problematic, and concluded that Wellpath's CAPs must be "sensitive or responsive to the

12  impact of corrective action on the identified deficiencies," and "should be consistently

13  monitored by the Quality Management Committee, including ongoing auditing or data

14  collection designed to measure and monitor outcomes."  *Id.* at 44.  Dr. Hughes deferred

15  findings in his seventh report because the CAP required under the May 29, 2020 Order was

16  incomplete, and he found Wellpath noncompliant in his eighth report.  *See* Ex. 30 (7th

17  Mental Health Report) at 45; Ex. 32 (8th Mental Health Report) at 43-44 (finding, as of

18  January 2022, that "the CAP has to date not been fully implemented" and "[v]arious areas

19  included in the CAP remained noncompliant").

20        100.   **Provider Visits to Holding and Isolation Cells**.  Wellpath's

21  Implementation Plan requires that ""[i]nmates housed in holding and isolation are visited

22  by an MD or an RN every Monday, Wednesday and Friday."  Dkt. 532 at 26.

23        101.   Dr. Vess found Wellpath noncompliant with this requirement in his most

24  recent report. Ex. 34 (9th Mental Health Report) at 6.  Dr. Vess concluded that "the

25  required nursing rounds would only be compliant if completed by an MD or RN, rather

26  than an LVN."  *Id*.  Dr. Hughes similarly found in his fifth report that a licensed marriage

27  and family therapist was conducting these segregation rounds, rather than an MD or RN as

28  required by the Implementation Plan.  *See* Ex. 26 (5th Mental Health Report) at 14.

Dr. Hughes also found Wellpath noncompliant in his seventh and eighth reports.  *See* Ex. 30 (7th Mental Health Report) at 7; Ex. 32 (8th Mental Health Report) at 8.

102.  **Quality Assurance**.  Wellpath must conduct quarterly Quality Management Committee meetings to assess their compliance with Wellpath's Implementation Plan, and to develop and institute corrective actions for identified deficiencies.  Dkt. 532 at 9.  "All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met."  *Id.* at 98.  Additionally, "[a]ll completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with [Wellpath's] Inmate Deaths Policy and Procedure."  *Id.* at 77.  Under the May 29, 2020 Stipulated Order, Wellpath must provide Plaintiffs' counsel access to death reviews of post-Settlement in-custody deaths within thirty days from the date the review is completed.  Dkt. 671 at 6.

103.  The mental health monitors have never found Wellpath substantially compliant with these quality management requirements.  *See* Ex. 18 (1st Mental Health Report) at 6, 21 (noting deficiencies in self-auditing and assessment, but not making explicit compliance findings); Ex. 20 (2nd Mental Health Report) at 7-8, 14, 24; Ex. 22 (3rd Mental Health Report) at 22-24; Ex. 24 (4th Mental Health Report) at 25-26; Ex. 26 (5th Mental Health Report) at 32; Ex. 28 (6th Mental Health Report) at 31; Ex. 30 (7th Mental Health Report) at 43-45; Ex. 32 (8th Mental Health Report) at 42-43; Ex. 34 (9th Mental Health Report) at 37.  In his most recent report, Dr. Vess observed:

> Post-implementation monitoring that includes focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan does not appear to be comprehensive and fully developed at this stage.  A process is needed whereby the various clinical functions addressed in the Implementation Plan are consistently monitored in relation to specific requirements, and routinely reported to and evaluated by the Quality Management Committee for the degree of compliance that is achieved and maintained over time.  Areas where performance is falling short of expected thresholds should be followed by Corrective Action Plans (CAPs), which are updated and modified as needed in light of the ongoing monitoring data in order to achieve the desired level of results.  This

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

1

> sequence of actions should be sufficiently documented so that the process can be clearly tracked, including the data reviewed; the corrective actions taken; the success or lack of success of the CAPs is measured; modifications to the CAPs are made as needed; and subsequent performance is measured to ensure continuing.

2

3

4  Ex. 34 (9th Mental Health Report) at 37.  Dr. Vess also found that there was no evidence

5  that the Quality Management or Peer Committees reviewed the completed suicide that

6  occurred during the review period, and "that cases involving involuntary medications are

7  not routinely reviewed in QM meetings, that there was no current committee structure to

8  do this, and that instances of involuntary medication administration are not routinely

9  tracked in any way."  *Id.*  Dr. Vess's findings mirror Dr. Hughes's prior reports, which

10  found a lack of quality assurance processes at the Jail.  In his second report, Dr. Hughes

11  found that Wellpath failed to take corrective action to address lapses in compliance, and in

12  the few instances where they *did* conduct self-audits, they were deficient.  *See, e.g.*, Ex. 20

13  (2nd Mental Health Report) at 19 ("None of the[] audit measures [Wellpath used in their

14  treatment plan audit] examined clinically appropriate, individualized treatment planning.");

15  *id.* at 7-8, 14, 24.  In his third report, Dr. Hughes concluded that Wellpath's "Quality

16  Assurance/Peer Review Committee Minutes failed to document appropriate identification

17  of issues of deficiency with corrective action plans and follow-up.  Additionally, no

18  information was provided regarding critical review of the completed suicide that occurred

19  during the monitoring period. … Documentation of appropriate mortality review is …

20  essential in suicide prevention."  Ex. 22 (3rd Mental Health Report) at 23.  Dr. Hughes's

21  third report recommended that the Jail "should develop and/or better document a mortality

22  review process that critically examines inmate deaths as well as serious self-harm incidents

23  to identify areas of deficiency, corrective action and opportunities for improvement."  *Id.*

24  at 24.  Dr. Hughes's fourth report similarly concluded that Wellpath's quality assurance

25  process did not adequately examine in-custody deaths and serious self-harm incidents, or

26  the timeliness of responses to inmates' mental health-related requests.  Ex. 24 (4th Mental

27  Health Report) at 5, 7, 26-27.  In his fifth report, Dr. Hughes reiterated that "[a]s was

28  previously reported, the [quality assurance meeting] minutes failed to document

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

appropriate identification of issues of deficiency with corrective action plans and follow up. " Ex. 26 (5th Mental Health Report) at 33.  Dr. Hughes also noted that Wellpath claimed to have "a robust quality assurance program" and staff assured him "they would work with their company and legal representation to provide the necessary documentation to demonstrate compliance." *Id.*  Dr. Hughes concluded in his subsequent sixth report that "[n]o information was provided regarding ongoing audits, quality assurance meetings and minutes or mortality morbidity reviews." Ex. 28 (6th Mental Health Report) at 32.  He also found that staff "had not been informed of the need for development of [Dr. Hughes's previously recommended corrective action] plans prior to the [sixth] monitoring visit." *Id*.

## DENTAL CARE MONITORING REPORTS

104.    Attached hereto as **Exhibit 38** is a true and correct copy of Dr. Winthrop's finalized 1st Dental Report (toured February 2-3, 2017), dated April 30, 2017 and received by my firm on May 1, 2017 via an email sent by Dr. Winthrop.

105.    Attached hereto as **Exhibit 39** is a true and correct copy of Dr. Winthrop's finalized 2nd Dental Report (toured May 4-5, 2017), dated September 29, 2017 and received by my firm on October 5, 2017 via an email sent by Dr. Winthrop.

106.    Attached hereto as **Exhibit 40** is a true and correct copy of Dr. Winthrop's finalized 3rd Dental Report (toured December 6-7, 2017, with a re-evaluation May 8-9, 2018), dated May 9, 2018 and received by my firm on June 11, 2018 via an email sent by Dr. Winthrop.

107.    Attached hereto as **Exhibit 41** is a true and correct copy of Dr. Winthrop's finalized 4th Dental Report (toured December 5-6, 2018, with a re-evaluation May 21-22, 2019), dated November 30, 2019 and received by my firm on December 2, 2019 via an email sent by Dr. Winthrop.

108.    Attached hereto as **Exhibit 42** is a true and correct copy of Dr. Winthrop's finalized 5th Dental Report (toured June 15-16, 2020), dated October 30, 2020 and received by my firm on November 8, 2020 via an email sent by Dr. Winthrop.

109.    Attached hereto as **Exhibit 43** is a true and correct copy of Dr. Winthrop's

1  finalized 6th Dental Report (toured May 4-5, 2021), dated August 15, 2021 and received

2  by my firm on August 16, 2021 via an email sent by Dr. Winthrop.

3      110.    Attached hereto as **Exhibit 44** is a true and correct copy of Dr. Winthrop's

4  finalized 7th Dental Report (toured January 11-12, 2022), dated June 17, 2022 and

5  received by my firm on June 17, 2022 via an email sent by Dr. Winthrop.

6      111.    Attached hereto as **Exhibit 45** is a true and correct copy of Dr. Winthrop's

7  finalized 8th Dental Report (toured May 24-25, 2022), dated November 21, 2022 and

8  received by my firm on that date via an email sent by Dr. Winthrop.  Dr. Winthrop

9  separately recorded her findings in specific areas of dental care in her 8th Dental Audit

10 Tool, attached hereto as **Exhibit 46** are true and correct copies of relevant excerpts of this

11 document.[5]

12     112.    Attached hereto as **Exhibit 47** is a true and correct copy of Dr. Winthrop's

13 draft 9th Dental Report (toured December 5-6, 2022), dated March 21, 2023 and received

14 by my firm on that date via an email sent by Dr. Winthrop.  Dr. Winthrop separately

15 recorded her findings in specific areas of dental care in her 9th Dental Audit Tool; attached

16 hereto as **Exhibit 48** are true and correct copies of relevant excerpts of this document.

17 Plaintiffs plan to update their Enforcement Motion and this declaration once Dr. Winthrop

18 finalizes her 9th Dental Report.

19     113.    Attached hereto as **Exhibit 49** is a true and correct copy of the finalized

20 Dental CAP that was created by Wellpath and approved by Dr. Winthrop as a result of the

21 Court's May 29, 2020 Order.  *See* Dkt. 671.

22     **SUSTAINED NONCOMPLIANCE WITH DENTAL REQUIREMENTS**

23     114.    **<u>Dental Staffing</u>**.  The Settlement Agreement requires Wellpath to maintain

24

25 _____

26 [5] Dr. Winthrop's audit tools, which were also provided to Wellpath, are voluminous and

27 therefore only relevant excerpts are attached hereto.  Plaintiffs can make the full audit tools

28 available to the Court upon request.

adequate mental health staff sufficient to ensure compliance with the Implementation Plan, and must evaluate its staffing levels on an ongoing basis. *See* Dkt. 494 at 16; Dkt. 532 at 116. Wellpath's current staffing plan requires Wellpath to maintain, at minimum, a 0.6 FTE dentist, a 0.8 FTE dental assistant, and a 0.1 FTE dental hygienist. *See* Ex. 17 (Wellpath Staffing Matrix) at 1.

115. Dr. Winthrop has not found Wellpath substantially compliant with staffing requirements in any of her reports. She found that Wellpath provided no dental care at the Jail from approximately October 2022 to January 2023 because it lacked adequate dental staff. *See* Ex. 47 (9th Dental Report) at 9-11; *id.* at 13 ("No rescue plan for dental staffing emergencies is in place, which caused the inmate/patients at MCJ to not have diagnoses and dental treatments performed onsite from October 5th – December 20th, 2022. And then again from December 29th, 2022 thru [sic] February 13, 2022."). In her draft ninth report, Dr. Winthrop found that "from January 1st, 2023, to March 13, 2023, … there were 1385 rescheduled dental appointments." *Id.* at 15. After Wellpath recently hired new dental staff, Dr. Winthrop characterized the "staffing crisis" as "still ongoing." *Id.* at 30; *id.* at 10-11 ("12/29/22 – 01/20/23: No dentist at all. No full-schedule dentist from Jan. 3 – Feb. 13, 2023, although the new dentist [] worked a few days here and there to diagnose patients prior to his 02/23/23 start date. I was not advised of this change, neither were Plaintiff[s'] Counsel until 01/20/23 even after repeated requests for information as I was trying to plan the training/mentoring visit for January 24, 2022. It was 'radio silence' until 1/20/23."). Dr. Winthrop also found that Wellpath has not conducted a thorough staffing or workflow analysis, and should do so immediately. *Id.* at 15, 17, 29. Furthermore, she found that "[t]he County ratified contract [with Wellpath, which went into effect January 1, 2023] eliminated 6 hours per week [of hours worked by the dentist]. At 45 minute[s] per procedure, this is 30 patients a month that was taken away from patient care." *Id.* at 15. The draft report concludes:

> The dental program remains in non-compliance. Although this time it appears that this is due to a staffing crisis in both the administrative and clinical aspect of the facility, corporate oversight is lacking in providing

resources and communication to the Chief Dental Officer.  The
Implementation Specialist, who for the great majority of this audit tour's
span for review, was also acting as the H.S.A., floor nurse and Director of
Nursing.  I am a fan of the Implementation Specialist, but burnout is a real
danger and being stretched too thin working 4 jobs for Wellpath, I believe
contributed to my receiving important data nearly 3 months late.

*Id.* at 33.  Dr. Winthrop's prior reports identify similar concerns and have never found

Wellpath fully compliant with dental staffing requirements.  *See* Ex. 38 (1st Dental Report)

at 32-34 (finding only partial compliance); Ex. 39 (2nd Dental Report) at 9, 17, 45; Ex. 40

(3rd Dental Report) at 12-13; Ex. 41 (4th Dental Report) at 41-42 (no explicit compliance

findings, but finding that "having only one dental operatory [chair] is prohibitive to having

a Dental Hygienist, which is a staffing position recommended in the Implementation

Plan"); Ex. 42 (5th Dental Report) at 110 (finding only partial compliance, and stating:

"[t]he 'lack of resources' is used on many occasions as the reason for rescheduling

patients. 'Lack of resources' appears to translate to lack of staff"); Ex. 43 (6th Dental

Report) at 22 ("I recommend full time dental care, five days a week, at MCJ with a

minimum of two Dental Assistants and a part time hygienist as recommended by the

[Implementation Plan]."); *id.* at 166; Ex. 44 (7th Dental Report) at 18, 39-40; Ex. 45 (8th

Dental Report) at 8, 19-20.  Dr. Winthrop has found that staffing shortages cause dental

staff to reschedule patients' appointments over and over.  *See*, *e.g.*, Ex. 44 (7th Dental

Report) at 78 ("Booked 12/15/2021. Urgent Referral from intake 12/21/21.  Rescheduled

by Dental due to quarantine 12/21/21.  Seen in dental 01/04/22.  Rescheduled for treatment

02/02/22, 02/15/22 and deleted appointment by staff on 03/01/22.  No future appointment

for this treatment plan, although can see overdue task for tooth #14 open and med/temp

fill. … Still in custody."); *id*. at 84 ("[Patient] was rescheduled by DDS for Lack of

resources, Limited coverage."); *id.* at 85 ("Sick call created on 10-10-21 by RN.  Pt was

rescheduled by RN on 10-10-21, 10-11-21, 10-12-21, 10-13-21.  Patient was never seen in

dental for any care.").

116.  **Intake Screening**.  The Settlement Agreement requires Defendants to

specify "standards and timelines to ensure that arriving prisoners are promptly screened for

urgent … dental needs, with prompt follow-up." Dkt. 494 at 13. The Settlement

Agreement further provides that "Defendants shall develop and implement a Dental Care

Implementation Plan to ensure timely access to necessary treatment for dental and oral

health conditions, including but not limited to Intake Screening." *Id.* at 18. Wellpath's

Implementation Plan requires that: "A qualified health care professional who has been

trained by the dentist shall obtain a dental history regarding any current or recent dental

problems, treatment including medications during the Receiving Health Screening at

intake with follow up to positive findings." Dkt. 532 at 99. Wellpath's Implementation

Plan further requires that: "If the medical staff/licensed health care professional determines

the dental issue to be urgent, the patient shall be referred to and evaluated by the dentist at

the next scheduled dental clinic." *Id.* at 100.

117.    Dr. Winthrop has not found substantial compliance with these requirements

in any report since her first report. In her second report, Dr. Winthrop found that Wellpath

was noncompliant but close to substantial compliance, with 80% compliance with intake

screening requirements. Ex. 39 (2nd Dental Report) at 50. In her fourth report,

Dr. Winthrop found Wellpath noncompliant, with only 35% compliance for requirements

that the "Dental Section of the Intake Form [be] completely filled out at the time of Intake

and [a] dental referral [is] completed when appropriate." Ex. 41 (4th Dental Report) at 15.

This resulted in harm to patients, for example "no referral to dental" for a patient

complaining of dental pain. *Id.* Dr. Winthrop's finding of noncompliance with these

requirements has been repeated in every subsequent report. *See* Ex. 42 (5th Dental Report)

at 53 ("Noted patient has 'multiple broken teeth.' … Decay box not checked. No referral

to dental made."); Ex. 43 (6th Dental Report) at 59-60; Ex. 44 (7th Dental Report) at 67-

68; Ex. 46 (8th Dental Audit Tool) at A.5-A.6; Ex. 48 (9th Dental Audit Tool) at A.5-A.7.

118.    **<u>Initial Health Inventory</u>**. Wellpath's Implementation Plan requires that "[a]

complete gender specific health history inventory and communicable disease screening

shall be completed on all inmates within 14 days of arrival at the facility by a Registered

Nurse who has completed appropriate training that is approved or provided by the

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

1   responsible physician." Dkt. 532 at 33-34.  The registered nurse at the 14-day exam

2   identifies patients' urgent and emergent dental conditions as a Dental Level 1, Dental

3   Level 2, or as a non-urgent/emergent dental condition.  *See, e.g.*, Ex. 41 (4th Dental

4   Report) at 17.  Wellpath's Implementation Plan provides further requirements concerning

5   the 14-day exam:

> A qualified health care professional who has been trained by the dentist shall
> … perform an initial health screening on each inmate at the time of the
> health inventory and communicable disease screening, the general condition
> of the patient's dentition, missing or broken teeth, evidence of gingival
> disease, mucosal lesions, trauma, infection, facial swelling, exudate
> production, difficulty swallowing, chewing and/or other functional
> impairment will be noted; urgent/emergent dental needs identified.  All
> screening findings will be documented on the health inventory form
> including the odontogram.  Follow up referral and/or consultation with onsite
> or on call medical provider and/or dental provider (if onsite) will determine
> treatment plan and schedule for initial provider evaluation.

12  Dkt. 532 at 99.

13      119.   Dr. Winthrop has never found Wellpath compliant with these requirements

14  in any of her reports.  *See* Ex. 38 (1st Dental Report) at 11, 17-18; Ex. 39 (2nd Dental

15  Report) at 14, 23-24; Ex. 40 (3rd Dental Report) at 11, 16-17; Ex. 41 (4th Dental Report)

16  at 18-19; Ex. 42 (5th Dental Report) at 54-56; Ex. 43 (6th Dental Report) at 61-63; Ex. 44

17  (7th Dental Report) at 68-69; Ex. 46 (8th Dental Audit Tool) at A.8; Ex. 48 (9th Dental

18  Audit Tool) at A.8.  For example, in her fifth report, Dr. Winthrop found numerous

19  instances of patients with severe dental issues who were not referred to the dentist at the

20  14-day exam.  *See* Ex. 42 (5th Dental Report) at 55 ("Patient had sick call appointment on

21  03/08/2020 with multiple decayed and broken teeth which would have been visible on a

22  dental screening but were not identified at the 14-day evaluation."); *id.* at 55-56 ("[P]atient

23  noted to have 'multiple broken teeth' at intake. No referral to dental made at 14-day

24  exam.").  In her eighth report, Dr. Winthrop found that Wellpath had stopped conducting

25  the required initial health inventory in May 2022 because of staffing shortages.  *See* Ex. 45

26  (8th Dental Report) at 41.  She also found that nurses conducting the initial health

27  inventory did "not consistently look in the patient's mouth." *Id.* at 10.  Dr. Winthrop's

28  previous reports identified similar problems.  For example, in her sixth report,

[4329777.1]

48

Case No. CV 13 2354 BLF

Dr. Winthrop reported that she had been told during her previous tour that nurses would receive "clear instruction . . . that moving forward, the nurses are to look into <u>every</u> patient's mouth," but that the "same lack of protocol continued unchanged" at the time of her sixth tour.  Ex. 43 (6th Dental Report) at 12 (emphasis in original).

120.  **Dental Training for Intake Staff**.  Wellpath's Implementation Plan states:

> All CFMG health services staff will participate in classroom orientation and training regarding compliance with all aspects of [Wellpath's] Implementation Plan. Orientation and training will be conducted by a qualified health services instructor.  Counseling, training or appropriate discipline may ensue from failure to comply with the Implementation Plan.

Dkt. 532 at 9.  The Plan further provides that the registered nurse who performs the intake screening and the 14-day dental evaluation during the initial health history must be trained by the dentist.  *Id.* at 99.

121.  Dr. Winthrop has not found substantial compliance with these requirements in any of her monitoring reports.  *See, e.g.*, Ex. 42 (5th Dental Report) at 108; Ex. 43 (6th Dental Report) at 161; Ex. 44 (7th Dental Report) at 189; Ex. 45 (8th Dental Report) at 17; Ex. 47 (9th Dental Report) at 13.  In her second report, Dr. Winthrop found that "[n]o training has been provided to educate the health care professionals, who perform the 14-Day Health Inventory and Communicable Disease Screening (HICDS), on how to correctly complete each inmate-patient's dental Section and odontogram."  Ex. 39 (2nd Dental Report) at 14.  In her eighth report, Dr. Winthrop again found that there was "no documentation from the dentist of any nurse training or any one-on-one nurse training" during the review period.  Ex. 45 (8th Dental Report) at 17.

122.  **Treatment for Urgent and Emergent Conditions**.  Wellpath's Implementation Plan requires that when a patient is found in the initial health screening to be experiencing a dental emergency, and "a licensed dentist is not present, the patient will be seen, treated and managed immediately by medical provider staff."  Dkt. 532 at 99.  If "the acute dental emergency is life threatening, the patient will be transported to an urgent care facility or hospital."  *Id.* at 99-100.  If the dental issue is found "to be urgent, the patient shall be referred to and evaluated by the dentist at the next scheduled dental clinic."

*Id.* at 100.  The Implementation Plan further requires Wellpath to give its highest treatment priority to "[r]elief of pain and treatment of acute infections and other urgent conditions." *Id.*  The Implementation Plan also requires "Emergency Care (Immediate Treatment)" for any "acute oral or maxilla-facial condition, which is likely to remain acute, worsen, or become life threatening without immediate intervention," as well as treatment within one calendar day for patients "with a dental condition of sudden onset or severe pain, which prevents them from carrying out essential activities of daily living."  *Id.* at 102.  It additionally requires treatment within 30 days for patients with "a sub-acute hard or soft tissue condition that is likely to become acute without early intervention," *id.* at 103, a requirement that refers to urgent treatment, *see* Ex. 40 (3rd Dental Report) at 18.

123.    Dr. Winthrop's third report suggested that Wellpath was compliant with requirements for treating urgent and emergent dental issues at the time of that audit, but Wellpath has been found noncompliant in every report since then.  *See* Ex. 40 (3rd Dental Report) at 21; Ex. 41 (4th Dental Report) at 21-22; Ex. 42 (5th Dental Report) at 54, 57, 59-60 (finding compliance with urgent/emergent treatment following intake screening but noncompliance following 14-day examination and sick call); Ex. 43 (6th Dental Report) at 14, 60-61, 63; *id.* at 64 (finding "patient rescheduled for filling 5 times"); Ex. 44 (7th Dental Report) at 76-80, 84-86; Ex. 46 (8th Dental Audit Tool) at A.6, A.9, A.12; Ex. 48 (9th Dental Audit Tool) at A.6, A.9, A.12.  Dr. Winthrop has explained that "[h]aving a continuing untreated abscess and postponement of an extraction or root canal/crown can become an urgent medical condition. … [O]ne of the many consequences of postponing an extraction can be death."  Ex. 43 (6th Dental Report at 199).  She has also found that Wellpath's failure to comply with urgent/emergent treatment requirements following 14-day examination is "an example of a systemic, continuous, observed pattern of neglect."  Ex. 43 (6th Dental Report) at 43.  Dr. Winthrop has found that patients with serious dental concerns often experience delays in care.  *See, e.g.*, Ex. 43 (6th Dental Report) at 185 ("Patient stopped psych staff complaining of tooth abscesses causing headaches and his left eyeball to hurt. … Dentist informed Clinician to put Patient up to be seen. Rescheduled

1  Appointment [due to] Lack [of] resources.").  She has found that when patients do receive

2  treatment, it is not always appropriate.  *See, e.g.*, Ex. 45 (8th Dental Report) at 45 ("It

3  appears that [the dentist] performed treatment on tooth #19 without an x-ray, objective

4  findings, or diagnosis.  This is below the standard of care and can be constituted as causing

5  harm to the patient."); Ex. 44 (7th Dental Report) at 32 ("There are occasions where some

6  discrepancies between which tooth the patient complained of and the one the dentist works

7  on, making it possible that the dentist is treating the wrong tooth on some patients and/or

8  not addressing patient's chief complaint.  These errors can be potentially harmful to

9  patients.").

10        124.    **Dental Sick Call**.  Wellpath's Implementation Plan requires that:

11        All dental complaints are assessed, provided treatment for obvious infection
          and pain relief at regularly scheduled medical sick call by the MD, PA or RN
12        to be seen within one day of the request.  The complaint is prioritized and
          referred to Dental Sick call as deemed necessary.  Interim treatment for pain
13        and infection is provided until the patient is seen by the dentist.

14  Dkt. 532 at 102.

15        125.    In her first report, Dr. Winthrop found that "sick call slips are processed by

16  the next business day" and that patients are appropriately scheduled with the dentist "at his

17  next clinical day."  Ex. 38 (1st Dental Report) at 19.  In every audit since then,

18  Dr. Winthrop has found Wellpath noncompliant with this requirement.  *See* Ex. 39 (2nd

19  Dental Report) at 25; Ex. 40 (3rd Dental Report) at 4, 32; Ex. 41 (4th Dental Report) at 21-

20  22; Ex. 42 (5th Dental Report) at 21-22, 26; Ex. 43 (6th Dental Report) at 64-65; Ex. 44

21  (7th Dental Report) at 19-21; Ex. 45 (8th Dental Report) at 11; Ex. 46 (8th Dental Audit

22  Tool) at A.11; Ex. 48 (9th Dental Audit Tool) at A.11.  In her seventh report, Dr. Winthrop

23  found that only 30% of patients were seen within Implementation Plan timeframes and that

24  more than half of all scheduled dental sick call appointments were postponed.  *See* Ex. 44

25  (7th Dental Report) at 19-20.  In her latest audit, she found that none of the sick call

26  requests she reviewed were seen by Wellpath staff within the timeframe required by the

27  Implementation Plan.  Ex. 48 (9th Dental Audit Tool) at A.11.2; *cf.* 9th Dental Report at

28  12 ("Of the 65 Dental labeled grievances, only 4.6% of the dental grievances were

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

addressed and seen within 24 hours.").  Dr. Winthrop concluded that "[d]ental treatment is not always provided in a timely manner to relieve the patient's pain when a patient is not assigned a DPC at the time of diagnosis.  At time patients are scheduled multiple times and medicated with antibiotics and analgesics rather than receiving treatment available for them to get out of pain." *Id.* at 21.  She recommended:  "Do not delay care by medicating the patient when there is a treatment available for them to get out of pain."

126.  **Chronic Care**.  Wellpath's Implementation Plan requires that "[i]nmates with chronic care conditions will be managed pursuant to chronic care protocols and standardized procedures that are consistent with national practice guidelines."  Dkt. 532 at 28.  Pursuant to the Court's May 2020 Order (Dkt. 671), Wellpath created a dental care CAP, which was approved by Dr. Winthrop, that required Wellpath to "[p]erform and chart a full comprehensive dental examination for patients referred from chronic care with the following issues: HIV, Seizures, Diabetes, Pregnancy, and Patients on over 4 psych medications."  Ex. 49 (Dental CAP) at 5.

127.  Dr. Winthrop has found Wellpath noncompliant with these requirements in every monitoring report in which she has made compliance findings on this issue.  *See* Ex. 38 (1st Dental Report) at 20; Ex. 39 (2nd Dental Report) at 34-36; Ex. 41 (4th Dental Report) at 24; Ex. 42 (5th Dental Report) at 64-67; Ex. 43 (6th Dental Report) at 68-73; Ex. 44 (7th Dental Report) at 23, 71-72, 88-91; Ex. 45 (8th Dental Report) at 10; Ex. 47 (9th Dental Report) at 19.  In her seventh report, she found, for example: "There were no patients with chronic care conditions such as HIV, Seizures, Diabetes, Pregnancy, and patients on 4 or more psych meds, referred to dental at the 7-day physician led chronic care appointment."  Ex. 44 (7th Dental Report) at 23 (emphasis in original).  Dr. Winthrop made similar findings several years later:  "Patients with chronic care issues were not referred to, scheduled for, or seen in dental for comprehensive dental examination."  Ex. 45 (8th Dental Report) at 10.

128.  **Comprehensive Care**.  The Settlement Agreement requires Wellpath "to ensure timely access to necessary treatment for dental and oral health conditions, including

… periodic dental care for long-term prisoners."  Dkt. 494 at 18.  Wellpath's Implementation Plan requires that:  "Inmates incarcerated for 12 months or greater are eligible to receive a comprehensive dental exam.  The purpose of the dental examinations shall be for the identification, diagnosis, and treatment of dental pathology which impacts the health and welfare of inmate patients."  Dkt. 532 at 104.  Wellpath's Implementation Plan further requires that "[e]xamination findings and proposed treatment plan will be documented on standardized comprehensive dental exam, periodontal exam and treatment planning forms which will be filed in the patient medical record."  *Id.*

129.    Dr. Winthrop has found noncompliance with these requirements in every monitoring report except her fourth report, in which she was unable to measure Wellpath's compliance on this issue.  *See* Ex. 38 (1st Dental Report) at 9-14, 21-22; Ex. 39 (2nd Dental Report) at 14, 16, 26-27; Ex. 40 (3rd Dental Report) at 11-13; Ex. 41 (4th Dental Report) at 24; Ex. 42 (5th Dental Report) at 30; Ex. 43 (6th Dental Report) at 73-74; Ex. 44 (7th Dental Report) at 28; Ex. 46 (8th Dental Audit Tool) at A.17; Ex. 48 (9th Dental Audit Tool) at A.17.  In her seventh report, for example, Dr. Winthrop found "zero instance[s] of seeing patients for their comprehensive dental examination or comprehensive recall examination within 30 days of their one year date of incarceration."  Ex. 44 (7th Dental Report) at 28; *see also id.* at 230 ("Patient filed a grievance on August 24, 2021, stating he had requested his comprehensive exam on July 17, but still had not been seen.  He reported that he had been at the jail for 'well over a year.'").

130.    **<u>Restorative and Palliative Care</u>**.  Wellpath's Implementation Plan requires that patients "with comprehensive examinations and treatment plans" must be "eligible to receive permanent restorations in accordance with their established treatment plan."  Dkt. 532 at 107.  The Plan further requires dental staff to verify that patients have received the Dental Material Fact Sheet "[p]rior to initiating any restorative procedure."  *Id.* at 108.

131.    Dr. Winthrop has found Wellpath noncompliant with these requirements in every report in which she has made compliance findings on this issue.  *See* Ex. 39 (2nd Dental Report) at 32-33; Ex. 41 (4th Dental Report) at 39; Ex. 42 (5th Dental Report) at

1 36; Ex. 43 (6th Dental Report) at 104; Ex. 44 (7th Dental Report) at 146-54; Ex. 46 (8th

2 Dental Audit Tool) at C.9; Ex. 48 (9th Dental Audit Tool) at C.9.

3      132.   **Extractions**. Wellpath's Implementation Plan requires dental staff to

4 "provide necessary oral surgery services to all inmate-patients onsite or through a local

5 community provider." Dkt. 532 at 101. The Plan also requires Wellpath to provide

6 "[e]xtraction of unsalvageable teeth" as a treatment priority. *See id.* at 100-01.

7      133.   Dr. Winthrop found Wellpath substantially compliant with these

8 requirements in her fourth report. *See* Ex. 41 (4th Dental Report) at 40. She had not found

9 compliance in any previous report in which she made compliance findings, and she has

10 found Wellpath noncompliant with these requirements in every subsequent report. *See*

11 Ex. 39 (2nd Dental Report) at 33; Ex. 40 (3rd Dental Report) at 7-9; Ex. 42 (5th Dental

12 Report) at 92-94; Ex. 43 (6th Dental Report) at 106; Ex. 44 (7th Dental Report) at 154-65;

13 Ex. 46 (8th Dental Audit Tool) at C.10; Ex. 48 (9th Dental Audit Tool) at C.10. In her

14 eighth audit, Dr. Winthrop "[o]bserved the dental team performing a surgical extraction

15 and the dentist cutting on bone without the use of a sterile irrigant, i.e., sterile saline or

16 sterile water." Ex. 45 (8th Dental Report) at 13. She noted that "[t]his is a potential route

17 of entry [for] infections." *Id.* In her sixth report, Dr. Winthrop found:

> As noted throughout this report, the dentist struggles to correctly diagnose patients, often giving a diagnosis that is inconsistent with the objective findings, and there are often discrepancies between which tooth the patient complained of and the one the dentist worked on, making it possible that the dentist is treating and *even extracting the wrong tooth on some patients*. These errors are alarming and potentially harmful to the patients.

22 Ex. 43 (6th Dental Report) at 25 (emphasis added). In her draft ninth report, Dr. Winthrop

23 found several cases of extractions occurring late, for example:

> [Patient 1:] Triage for #19 extraction occurred and was given a [Dental Priority Code] 3 (30 days) for the extraction to be performed. Not seen within timeframe. No appointment was made for this extraction from the triage. It was made from a sick call asking for the extraction. Essentially the appointment was not created, and the patient was lost in the system. Had the patient not submitted a sick call, patient would not have received care. And the dental treatment for extraction was shown "completed" on 06/08/22 when in fact the treatment was not done until 07/19/22, outside of timeframe.

1    Ex. 47 (9th Dental Report) at 12-13.

2        134.   **Specialty Care Referrals**.  Wellpath's Implementation Plan requires

3    Wellpath to "provide necessary oral surgery services to all inmate-patients onsite or

4    through a local community provider."  Dkt. 532 at 101.  "Complicated dental problems"

5    must be "referred to an oral surgeon as deemed necessary."  *Id.* at 103.  The Plan also

6    requires that "[r]eferral to and priority of offsite oral surgeon" must be conducted in

7    accordance with the timelines and treatment priorities required by the Implementation

8    Plan.  *Id.* at 102.  For root canal services, procedures that "cannot be accomplished by

9    [Wellpath's] dentist at MCJ will be referred to a contracted dentist in the outside facility"

10   and that "[a] local contract dentist will be available for referral when in the opinion of the

11   treating dentist the procedure could be handled more predictably by an endodontic

12   specialist."  *Id.* at 109-10.  Patients with failing dental implants "shall be referred to a

13   dental specialist experienced in the management and placement of dental implants" for

14   evaluation.  *Id.* at 112.

15       135.   Dr. Winthrop did not make findings on this issue in her first three monitoring

16   reports.  She has found Wellpath noncompliant with the Implementation Plan requirements

17   for extractions in every subsequent report.  *See* Ex. 41 (4th Dental Report) at 23; Ex. 42

18   (5th Dental Report) at 61-62; Ex. 43 (6th Dental Report) at 66-67; Ex. 44 (7th Dental

19   Report) at 87; Ex. 46 (8th Dental Audit Tool) at A.15; Ex. 48 (9th Dental Audit Tool) at

20   A.15.  For example, in her eighth report, Dr. Winthrop found that the dentist should have,

21   but did not, refer a patient to an orthodontist.  *See* Ex. 45 (Eighth Dental Report) at 45

22   ("[The dentist] states 'braces appear wnl [within normal limits]'.  Dentist is not an

23   orthodontist.  Referral should have been made to the orthodontist …. This is potential harm

24   to the patient to not have any follow up from the orthodontist for either continuation of

25   treatment or discontinuation of treatment with removal of braces per the Implementation

26   Plan.").  In her sixth report, Dr. Winthrop observed one case where a patient was

27   "[r]escheduled on 01/26/2021 and seen outside of timeframe on 07/07/21 where root canal

28   was still not done. … [Wellpath should] [r]efer patient out to specialist if can't do the root

[4329777.1]

55

Case No. CV 13 2354 BLF

1    canal in dental clinic."  Ex. 43 (6th Dental Report) at 94.

2        136.    **Endodontics**.  Wellpath's Implementation Plan requires that all patients at

3    the Jail must be "eligible to receive palliative endodontic therapy limited to upper and

4    lower anterior teeth."  Dkt. 532 at 109.  Individuals incarcerated for 12 months or longer

5    must also be "eligible to receive root canal therapy limited to upper and lower anterior

6    teeth."  *Id.*  Both palliative endodontic therapy and root canal treatments must be

7    "performed in accordance with established criteria and within the specific guidelines" of

8    the Implementation Plan.  *Id.*  The Implementation Plan imposes a series of requirements

9    for when and how these procedures must be performed.  *Id.* at 109-10.

10        137.    Dr. Winthrop has found Wellpath noncompliant with the requirements for

11    endodontics in every report in which she has addressed this issue.  *See* Ex. 39 (2nd Dental

12    Report) at 30-31, 53 (discussing incidents of noncompliant treatment); Ex. 42 (5th Dental

13    Report) at 94-95; Ex. 43 (6th Dental Report) at 107; Ex. 44 (7th Dental Report) at 122.

14        138.    **Periodontics**.  Wellpath's Implementation Plan requires that: "MCJ will

15    maintain a periodontal disease program for the diagnosis and treatment of periodontal

16    disease.  Periodontal screening shall be available to all patients, regardless of length of

17    stay.  Treatment will be based on periodontal disease classification, Dental Priority code,

18    and special medical needs (i.e. pregnancy, diabetes, HIV/AIDS)."  Dkt. 532 at 104.

19        139.    Dr. Winthrop has found noncompliance with these requirements in every

20    report except her fourth and sixth reports, in which she was unable to measure compliance.

21    *See* Ex. 38 (1st Dental Report) at 22; Ex. 39 (2nd Dental Report) at 14, 16, 26-27, 39, 42;

22    Ex. 40 (3rd Dental Report) at 12-13; Ex. 41 (4th Dental Report) at 24; Ex. 42 (5th Dental

23    Report) at 35-36; Ex. 43 (6th Dental Report) at 23; Ex. 44 (7th Dental Report) at 24;

24    Ex. 45 (8th Dental Report) at 10; Ex. 48 (9th Dental Audit Tool) at A.18.  In her seventh

25    report, Dr. Winthrop found that "[t]here is no periodontal disease program in effect at

26    MCJ." Ex. 44 (7th Dental Report) at 24.  In her eighth report, Dr. Winthrop found that

27    Wellpath still had "failed to implement the Periodontal Disease Program per the

28    [Implementation Plan] and [Corrective Action Plan]."  Ex. 45 (8th Dental Report) at 10.

140.   **Informed Consent**.  Wellpath's Implementation Plan contains numerous provisions concerning informed consent related to dental procedures.  *See* Dkt. 532 at 21 ("Written informed consent shall be obtained for all invasive and other procedures in accordance with established [Wellpath] procedure and community standards of practice"); 23 ("Inmates retain all the recognized rights of an ordinary citizen relative to informed consent and self-determination of health care"); 108 ("[Wellpath] dental staff shall verify that every patient has received a copy of the Dental Materials Fact Sheet.  Prior to initiating any restorative procedure the patient shall sign the Acknowledgment of Receipt of Dental Material Fact Sheet.  This signature acknowledges acceptance of possible risks, denial of alternate procedures, and consents to the proposed procedure and use of the materials as recorded in the dental record."); 110 ("A Consent for Root Canal Treatment Form must be completed by the dentist and signed by the patient and witness (dentist) prior to the provision of root canal treatment"); 112 (Wellpath "shall obtain informed consent from all inmates who request removal of orthodontic bands/brackets and discontinuation of their orthodontic treatment"); 114 ("The health record of an inmate contains the following items as applicable to his/her case: … Consent and Refusal forms").

141.   Dr. Winthrop has found noncompliance with these requirements in every report in which she has made specific compliance findings on this issue.  *See* Ex. 38 (1st Dental Report) at 26, 33; Ex. 39 (2nd Dental Report) at 39; Ex. 40 (3rd Dental Report) at 9, 11, 33; Ex. 44 (7th Dental Report) at 31-32; Ex. 45 (8th Dental Report) at 9; Ex. 47 (9th Dental Report) at 18.  In audits where Dr. Winthrop did not make findings on this issue separately from her findings about other quality of care concerns, Dr. Winthrop nonetheless found serious problems in this area.  *See, e.g.*, Ex. 43 (6th Dental Report) at 69-70 ("patient in dental for extraction [of tooth] #1 and #2 however consent form is for extraction #15 & #16 and progress note states extraction #15 & #16"); Ex. 42 (5th Dental Report) at 55 ("No surgical consent form on 2/13/2020 for extraction #18.").

142.   **Sanitary Treatment Space**.  The Settlement Agreement requires "a safe and sanitary on or off-site facility for necessary dental care."  Dkt. 494 at 18.  Wellpath's

1  Implementation Plan similarly requires that "[a]ll dental services will be provided in a safe
2  and sanitary environment."  Dkt. 532 at 99.

3       143.    Dr. Winthrop has found Wellpath noncompliant with these requirements in
4  every one of her reports.  *See* Ex. 38 (1st Dental Report) at 11, 29-30; Ex. 39 (2nd Dental
5  Report) at 80-81; Ex. 40 (3rd Dental Report) at 30-31; Ex. 41 (4th Dental Report) at 42;
6  Ex. 42 (5th Dental Report) at 38-42; Ex. 43 (6th Dental Report) at 153-59; Ex. 44 (7th
7  Dental Report) at 35-38; Ex. 45 (8th Dental Report) at 7, 13-16; Ex. 47 (9th Dental Report)
8  at 22.  Dr. Winthrop found in her draft ninth report that compliance with these requirements
9  had deteriorated from the time of her eighth audit.  Ex. 47 (9th Dental Report) at 22.  Upon
10 visiting the Jail in February 2023, she instructed Wellpath to immediately stop all dental care
11 in its new clinic because of "many deficiencies" related to infection control, including lack
12 of bacterial ("spore") testing "on the new Statim sterilizer since it had been put in to use,"
13 "lack of flow for the processing of dental instruments from the 'dirty' to the 'clean,' side,"
14 "red fluid backed up into the amalgam separator filter," "expired dental materials," and "no
15 tool and sharps control."  *Id.* at 14; *id.* at 24 ("Water lines have not been flushed since
16 September. . . . This can cause bacteria to accumulate in the lines and therefore could be
17 passed on to the patient. … The water and vacuum lines have not been cleaned and
18 disinfected per manufacturer's instructions since September 2022."); *id.* at 25 ("All sterile
19 water in the Dental Clinic had expired as of 08/2022.").

20       144.    **Medical Records**.  The Settlement Agreement requires Defendants to ensure
21 "that appropriate and complete medical records are maintained to ensure adequate
22 treatment of prisoners' serious medical and mental health needs.  Medical records shall
23 include all records, results, and orders received from off-site consultations and treatment
24 conducted while the prisoner is in the Jail custody."  Dkt. 494 at 17.  Wellpath's
25 Implementation Plan requires that: "Health care staff will use the [electronic medical
26 record] to closely track all requests for health care including the date of submission, date of
27 triage, date of evaluation, disposition and date of any necessary follow-up care. … The
28 [electronic medical record] will identify any inmates who require Chronic Disease

Management and health care staff will use it to closely track the condition/s that need to be monitored, the nature of the treatment required and the frequency of any required follow-up care." Dkt. 532 at 113.  Wellpath's Implementation Plan also provides for a "Dental Priority System" that determines when patients will be seen for immediate treatment or treatment within 1, 30, 60, or 120 days, with scheduling for follow up appointments. *Id.* at 103.

145.   Dr. Winthrop's reports have explained that electronic compliance tracking is essential to ensure timely and adequate dental care, including by tracking sick call requests and patient referrals pursuant to the Dental Priority System and ensuring patients receive necessary follow up care. *See* Ex. 38 (1st Dental Report) at 12 ("It is imperative that a formal tracking system is put into place by [Wellpath] to identify and monitor every aspect of the dental care at MCJ as mandated in the Implementation Plan.  MCJ and [Wellpath] must be able to self-monitor their operations so that they can be assured that each inmate/patient is not lost in the system and receives his or her mandated access to care, timeliness of care and quality of care.").  Dr. Winthrop has found noncompliance with these requirements in every monitoring report. *See id.* at 31; Ex. 39 (2nd Dental Report) at 41; Ex. 40 (3rd Dental Report) at 15; Ex. 41 (4th Dental Report) at 5, 72; Ex. 42 (5th Dental Report) at 44; Ex. 43 (6th Dental Report) at 160; Ex. 44 (7th Dental Report) at 193; Ex. 45 (8th Dental Report) at 16; Ex. 47 (9th Dental Report) at 28.  In her fourth report, Dr. Winthrop described Wellpath's dental records system as "primordial."  Ex. 41 (4th Dental Report) at 5.  In her eighth report, Dr. Winthrop found again that Wellpath has "no active clinical dental record system for charting episodic dental care" and explained that Wellpath's inadequate record keeping makes it unable to "prevent continuing errors from happening."  Ex. 45 (8th Dental Report) at 16.  In her most recent draft ninth report, Dr. Winthrop found that "[i]naccurate data is skewing statistics.  [The dentist] was completing appointments without doing the dental work. . . . This skews the data and creates a false sense that compliance is achieved."  *See* Ex. 47 (9th Dental Report) at 12; *id.* at 27 ("Nurse marked dental appointment complete without the patient being seen by the Dentist.  This can cause harm to the patient if the patient does not receive dental

1    care.").

2        146.   **Dental Quality Assurance**.  Wellpath's Implementation Plan requires "[a]ll

3    monitoring and audit findings" to be "reported to the Quality Management Committee at

4    its quarterly meetings."  Dkt. 532 at 9.  The Dental CAP further requires that "Daily,

5    weekly and monthly data is to be included in the Dental Subcommittee meeting and taken

6    from the dental excel spreadsheet and CorEMR to be reviewed, discussed and provided to

7    the dental monthly subcommittee meeting minutes and given to the Quality Assurance

8    (QA) meeting."  Ex. 49 (Dental CAP) at 8.

9        147.   Dr. Winthrop has found Wellpath noncompliant with these requirements in

10   every report in which she has made compliance findings.  See Ex. 38 (1st Dental Report) at

11   35; Ex. 40 (3rd Dental Report) at 42; Ex. 41 (4th Dental Report) at 47; Ex. 42 (5th Dental

12   Report) at 117; Ex. 43 (6th Dental Report) at 163; Ex. 44 (7th Dental Report) at 38, 41-42;

13   Ex. 46 (8th Dental Audit Tool) at E.17; Ex. 48 (9th Dental Audit Tool) at E.17.  In her

14   most recent ninth draft report, Dr. Winthrop found 0% compliance with these

15   requirements.  9th Dental Audit Tool at E.17.  In her eighth report, she recommended:

16       Improve the content and meaningful dental information within QA meeting
         minutes.  Include the PowerPoint presentations to this monitor.  Include the
17       Dental Subcommittee meeting minutes into the QA meeting. Establish a
         dental Quality Improvement Team (QIT), with ongoing studies conducted to
18       improve the quality and quantity of dental care at MCJ. Develop key
         performance indicators.  Use the peer review, dental subcommittee, and
19       quality assurance functions to assess the conditions of the dental program.
         Perform internal audits to highlight court mandates, achieve the standard of
20       care and increase the health of the dental program.  Put systems into place
         for self-governance.

21

22   Ex. 45 (8th Dental Report) at 45-46.  In her ninth report, Dr. Winthrop repeated nearly

23   verbatim the same recommendations, and found that "dental staff has not been present nor

24   represented Dental at the [Quality Assurance] meeting" and "[t]here is minimal and lack of

25   meaningful information in the dental portion of the [Quality Assurance] minutes."  *See*

26   Ex. 47 (9th Dental Report) at 29.

27                  **DOCUMENTS RELATED TO RECENT DEATHS**

28       148.   Attached hereto as **Exhibit 50** is a true and correct copy of Wellpath's

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

electronic medical records file for M.M., who died by suicide on January 4, 2023 ("M.M. CorEMR File"), that I received via email from Peter Bertling, counsel for Wellpath, on January 23, 2023.

149.    Attached hereto as **Exhibit 51** is a true and correct copy of the County's custodial records for M.M. ("M.M. Custody Records"), which I received via email from Susan K. Blitch, counsel for the County, on January 9, 2023.

150.    Attached hereto as **Exhibit 52** is a true and correct copy of Wellpath's psychological autopsy report regarding M.M.'s suicide ("M.M. Psychological Autopsy"), that I received via email from Mr. Bertling on March 29, 2023.

151.    Attached hereto as **Exhibit 53** is a true and correct copy of an email that I received from Dr. Barnett on January 19, 2023 regarding M.M.'s death.

152.    Attached hereto as **Exhibit 54** is a true and correct copy of relevant excerpts NMC's electronic medical records file for D.S., who died at the Jail on November 12, 2022 ("D.S. NMC Records"), that was mailed to my firm by Anne K. Brereton, counsel for NMC, and received on December 7, 2022.

153.    Attached hereto as **Exhibit 55** is a true and correct copy of Wellpath's electronic medical records file for D.S. ("D.S. CorEMR File"), that I received via email from Stephanie Aguiniga, a colleague of Mr. Bertling, on December 5, 2022.

154.    Attached hereto as **Exhibit 56** is a true and correct copy of the Jail's October 2022 Special Conditions List, which I received via email from Ms. Blitch on November 10, 2022, as part of the County's monthly document production.

155.    Attached hereto as **Exhibit 57** is a true and correct copy of the Jail's incident reports regarding D.S.'s death, which I received via email from Angélica Brito, a colleague of Ms. Blitch, on December 12, 2022, as part of the County's monthly document production.

156.    Attached hereto as **Exhibit 58** are true and correct copies of photographs I received from Ellen Lyons, counsel for the County, on April 7, 2023, showing the inside of D.S.'s cell after his death.

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

157.    Attached hereto as **Exhibit 59** is a true and correct copy of the autopsy report regarding D.S.'s death ("D.S. Autopsy Report"), that I received via email from Ms. Lyons on March 6, 2023.

158.    Attached hereto as **Exhibit 60** is a true and correct copy of Wellpath's suicide safety gap analysis regarding J.C., who died by suicide at the Jail on April 20, 2022 ("J.C. Suicide Safety Gap Analysis"), that I received via email from Mr. Bertling on November 1, 2023.

**RECENT DEATHS INVOLVING AREAS OF SUSTAINED NONCOMPLIANCE**

159.    J.H. died at the Jail on the afternoon of April 7, 2023.  Erick Stewart, an incarcerated person who lived in J.H.'s cell block, stated that J.H. had trouble breathing at night and used a CPAP machine before he was transferred to the Jail from a facility in another state.  *See* Decl. of Erick Stewart in Supp. of Pls.' Mot. to Enforce Settlement Agreement and Wellpath Implementation Plan, filed concurrently here with ("Stewart Decl."), ¶¶ 4-5.  Mr. Stewart stated that J.H. requested a CPAP machine before he died, but Wellpath did not provide him one.  *Id.*  Mr. Stewart stated that on the night before J.H.'s death, J.H. woke up gasping for air, and told Mr. Stewart in the morning that he felt he had nearly died.  *Id.* ¶ 6.  Mr. Stewart stated that staff discovered J.H. nonresponsive in his cell a few hours later.  *Id.* ¶¶ 8-12.  Given the recency of J.H.'s death, the medical and mental health monitors are still actively reviewing this case, including the cause of death.

160.    M.M. committed suicide on January 4, 2023, at the age of 45.  M.M.'s medical and custody records reflect that at his intake on January 3, he reported methamphetamine use, and he later reported hallucinating, started kicking his cell door, told custody staff he thought he was being charged with a serious crime, said he wanted to hurt himself and others, and was found by a mental health clinician to be "███████████ ████████████" Ex. 50 at 12, 15, 30; Ex. 51 at 11-12.  The Implementation Plan states that psychosis, anger, drug dependency, being under the influence, and being charged with a serious crime are all signs of suicide risk.  *See* Dkt. 532 at 134-35.  M.M.'s

medical records reflect that he was not placed on suicide precautions after his statements about self-harm. Ex. 50 at 15, 31. The records also indicate that he was not referred to or seen by a psychiatrist. *Id.* at 31. The psychological autopsy report that Wellpath completed after M.M.'s death states that on the evening of January 4, another incarcerated person found that M.M. had hanged himself. *Id.*, Ex. 52 at 1.

161. Dr. Barnett found that M.M. showed "[s]ignificant signs of withdrawal," including "depression, suicidality, anxiety, tachycardia (abnormally high pulse) and prior history of methamphetamine abuse." *See* Ex. 53 at 1. Dr. Barnett observed that "[M.M.'s] apparent suicide leads me to question whether he was sufficiently monitored 'until stable,'" as required by the Implementation Plan for individuals withdrawing from methamphetamine use. *Id.*; *see* Dkt. 532 at 71. Dr. Hughes made similar findings in a prior report regarding T.P., who committed suicide at the Jail in August 2021; Dr. Hughes found that T.P. was never monitored for suicide risk despite having "significant and alarming risk factors for suicide." *See* Ex. 33 at 4.

162. D.S. was 29 years old when he died at the Jail on November 12, 2022. His hospital records show that he had a decade-long history of diagnosed schizoaffective disorder and multiple active psychiatric prescriptions. Ex. 54 at 76, 1415-16, 2291. The Implementation Plan requires Wellpath to ensure that individuals' psychiatric prescriptions are identified and continued. *See* Dkt. 532 at 17-19. D.S.'s medical records show that he received no psychiatric medication during his confinement. Ex. 55 at 109-12. D.S.'s medical records indicate that he regularly showed signs of serious mental illness, including auditory hallucinations and "███████████████████████████████████████████ ███████████████████████" *Id.* at 105, 153. Custody documents show that Wellpath never identified D.S. as a person with a serious mental illness and never created a treatment plan for him. *See* Ex. 56; Ex. 13 at 17. D.S.'s medical records reflect that he had three mental health contacts in the six months between his booking and his death, and he never saw a psychiatrist. Ex. 55 at 46-51.

163. Dr. Barnett found in his thirteenth monitoring report that D.S. was found stiff

1    and nonresponsive in his cell on the morning of November 12, 2022.  Ex. 13 at 16.  The

2    incident report states that D.S. was naked, had a puncture wound on his leg, and had

3    written incomprehensibly on his cell wall and door in blood.  Ex. 57 at 15-16.  Photos of

4    his cell show a ligature hanging from the ceiling.  Ex. 58.  According to the autopsy report,

5    D.S. died of acute water intoxication resulting from psychogenic polydipsia: compulsive,

6    excessive drinking of water that can lower a person's sodium level, causing "vomiting,

7    confusion, seizures, coma, and death."  Ex. 59 at 6.  The autopsy doctor observed that this

8    is a symptom of schizophrenia.  *Id.*

9    164.    Dr. Hughes found excessive water consumption contributed to the December

10   2019 death of class member R.L., who had schizophrenia too.  *See* Ex. 28 at 4-5.  Dr.

11   Hughes concluded that R.L. had "prior incarcerations at MCJ with documentation of past

12   mental health treatment," but "subsequent intake screenings failed to document this

13   information."  *Id.*  Dr. Barnett found that D.S. also received no psychiatric evaluation or

14   treatment at the Jail and that "[m]edical services deployed in coordination with Mental

15   Health would have reduced the risk of his demise."  Ex. 13 at 17.

16   165.    J.C. died by suicide at the Jail on April 20, 2022, at the age of 39.  J.C. was

17   on Level 2 suicide watch at the time of his death, and the Implementation Plan requires

18   that such patients receive staggered checks twice every 30 minutes to confirm signs of life.

19   Dkt. 532 at 74.  Dr. Vess's most recent report found that when J.C.'s body was found with

20   fist-sized balls of toilet paper impacting his airways, rigor mortis had started to set in.  Ex.

21   35 at 5.

22   166.    Dr. Vess's report also found that J.C. attempted suicide using a shoestring

23   soon after he arrived at the Jail on April 18, 2022*. Id.* at 3.  Wellpath did not contact the

24   on-call psychiatrist or any other licensed mental health provider.  *Contra* Dkt. 532 at 75.

25   Dr. Vess found that J.C. was placed on suicide watch but was never evaluated by a

26   psychiatrist before his death.  Ex. 35 at 6.  Dr. Vess found that J.C. should have been

27   placed on Level 1 suicide watch in light of his suicide attempt, which would have required

28   constant observation instead of the staggered checks on Level 2 watch.  *Id.* at 4, 6, 8.

1  Wellpath's review of J.C.'s death noted that mental health providers may not place patients

2  who need constant observation on Level 1 status because of pressure from custody staff

3  and the "████████" it takes to ensure that patients held in safety cells (where the Jail

4  houses Level 1 patients) for more than 24 hours are transferred to a hospital for increased

5  care.  Ex. 60 at 4.  In his most recent report, Dr. Vess found that Wellpath has placed at

6  most only one person on Level 1 status since July 2021.  Ex. 34 at 35.  Three people have

7  died by suicide at the Jail since then.

8          167.   S.G. was 39 years old when he died at the Jail on September 24, 2021.  Dr.

9  Barnett found that four months before coming to the Jail, S.G. was treated for deep vein

10  thrombophlebitis ("DVT")—a potentially fatal blood clot in his leg—and was prescribed

11  an anticoagulant.  Ex. 12 at 15.  Dr. Barnett also found that immediately after S.G. was

12  booked into the Jail, a Wellpath physician assistant ("PA") discontinued his medication

13  without consulting a physician, in contravention of the Implementation Plan.  *Id.*

14  According to Dr. Barnett's report, S.G. later alerted medical staff that he was having

15  symptoms of a recurrence of his DVT.  Ex. 11 at 16.  He was not referred to a doctor and

16  received an evaluation by a nurse practitioner that Dr. Barnett found to be inadequate.  *Id.*

17          168.   In September 2021, S.G. contracted Covid during an outbreak at the Jail.  *Cf.*

18  Dkt. 718 at 1-3 (discussing September 2021 outbreak).  Dr. Barnett found that he was

19  misdiagnosed as having "cold like symptoms" and received no further assessment, despite

20  having a fever and a heightened pulse rate.  Ex. 11 at 17.  Dr. Barnett found that on the

21  morning of September 24, S.G. suffered a massive heart attack and died within hours.

22  Ex. 12 at 15.  After reviewing his medical records, Dr. Barnett concluded that the "care

23  provided to [S.G.] failed to comply with the Implementation Plan and was also contrary to

24  applicable standards of care. … Had [the anticoagulant] been continued as recommended

25  by the NMC physician, and in accord with best practices, the risk of fatal blood clots …

26  would have been reduced."  *Id.*

27          169.   T.P. died by suicide in his cell on August 5, 2021, at the age of 62.  He

28  arrived at the Jail from Valley State Prison on June 18, 2021.  Ex. 33 at 2.  Dr. Hughes

found that T.P. had been treated at the state hospital for an overdose within a few days of his transfer, but the intake screener wrongly marked that T.P. had made no past suicide attempts. *Id.* Dr. Hughes found that "[i]f this had been marked correctly as yes, he would have been urgently referred to mental health." *Id.* T.P. showed further suicide risk factors during his initial mental health assessment, including "a high-profile crime with new legal issues, segregation status, anxiety/agitation or fearfulness of safety and negative visit/phone call/recent bad new[s]." *Id.* at 3. He reported on July 6 that he was homicidal; Dr. Hughes found "no documentation that this issue was addressed by the clinician." *Id.* Just after midnight on August 5, T.P. was found hanging in his cell. *Id.* at 4.

170. Dr. Hughes observed that T.P. did not receive an "appropriate assessment for suicide risk" at intake despite his "significant and alarming risk factors." *Id.* Dr. Hughes found that Wellpath never developed a treatment plan for T.P., noting that "adequate treatment and safety planning were critical" because of his suicide risk. *Id.* Dr. Hughes also found that T.P. "should have been referred to see the psychiatrist" after his initial mental health assessment because of his "history of recent state hospital treatment for possible overdose and high suicide risk factors." *Id.* Dr. Hughes concluded that T.P.'s death could have been prevented with adequate care. *Id.*

171. C.R. was 22 years old when he died by suicide in March 2021, less than two weeks after returning to the Jail from NMC's mental health unit, where he had been treated for a suicide attempt. *Id.* at 5. Dr. Hughes found that although he continued to report suicidality and had to be sent to NMC's emergency room for crisis evaluation six days before his death, he was never seen by a psychiatrist after returning to the Jail. *Id.* at 5-7. Dr. Hughes concluded that C.R.'s treatment was "inadequate" and his death preventable. *Id.* at 7.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Walnut Creek,

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

California this 11th day of May, 2023.

*/s/ Cara E. Trapani*
Cara E. Trapani

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN