MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
VAN SWEARINGEN – 259809
CARA E. TRAPANI – 313411
CAROLINE E. JACKSON – 329980
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:     (415) 433-6830
Facsimile:      (415) 433-7104
Email:          mbien@rbgg.com
                egalvan@rbgg.com
                vswearingen@rbgg.com
                ctrapani@rbgg.com
                cjackson@rbgg.com

CORENE KENDRICK – 226642
KYLE VIRGIEN – 278747
NATIONAL PRISON PROJECT of the
AMERICAN CIVIL LIBERTIES UNION
39 Drumm Street
San Francisco, California  94111-4805
Telephone:     (202) 393-4930
Facsimile:      (202) 393-4931
Email:          ckendrick@aclu.org
                kvirgien@aclu.org

AVRAM D. FREY
(*admitted pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:     (415) 621-2493
Facsimile:      (415) 255-8437
Email:          afrey@aclunc.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. CV 13 2354 BLF<br><br>**EXHIBITS 1 TO 20 TO THE DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN**<br><br>Judge:   Hon. Beth Labson Freeman<br>Date:    August 24, 2023<br>Time:    9:00 a.m.<br>Crtrm.:  3 |

Case No. CV 13 2354 BLF

EXHIBITS 1 TO 20 TO THE DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION
TO ENFORCE THE SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN

# Exhibit 1

[4276968.1]

# MONTEREY COUNTY JAIL COMPLIANCE AND HEALTH CARE MONITORING AUDIT

March 9 - 10, 2017



# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................................4

SUMMARY TABLE..............................................................................................................................5

OBJECTIVES, SCOPE, METHODOLOGY.........................................................................................6

PHYSICIAN CASE REVIEW...............................................................................................................7

NURSING CASE REVIEW ...................................................................................................................9

ONSITE RNREVIEW OF CHARTS ...................................................................................................10

INMATE COMPLAINTS.....................................................................................................................12

INMATE DEATH(S)............................................................................................................................12

PERFORMANCE AND COMPLIANCE WITH IMPLEMENTATION PLAN ..................................14

      1. PRIMARY CARE PROVIDER STAFFING..............................................................................14

      2. CLINIC SPACE ..........................................................................................................................14

      3. INTAKE SCREEING .................................................................................................................14

      4. ACCESS TO CARE ...................................................................................................................14

      5. CHRONIC CARE.......................................................................................................................14

      6. HEALTH CARE MAINTENANCE............................................................................................15

      7. CONTINUITY OF CARE AFTER RELEASE ...........................................................................15

      8. OUTSIDE REFERRALS.............................................................................................................15

      9. DETOXIFICATION ...................................................................................................................15

      10. TB SCREENING AND TREATMENT.....................................................................................16

      11. MEDICATIONS/PHARMACY ...............................................................................................16

FACILITIES AND STAFF INSPECTION FINDINGS .......................................................................17

CONCLUSION ....................................................................................................................................18

PHYSICIAN RECOMMENDATIONS ........................................................................................................19

NURSING RECOMMENDATIONS ..........................................................................................................20



# DATE OF REPORT

**April 10, 2017**

# INTRODUCTION

Pursuant to a court-ordered survey (Hernandez v County of Monterey) Bruce Barnett, Medical Doctor (Dr. Barnett) and Angela Hill, Registered Nurse (RN Hill)[1] visited the Monterey County Jail (MCJ) on March 9 and 10, 2017 to review healthcare delivered to inmates.   At the time of this audit MCJ housed approximately 950 inmates.   Prior to visiting the facility, we reviewed inmates' medical records (clinical case reviews) derived from the population interred at the Jail from March 1, 2016 through January 30, 2017.[2]  On site, we examined aspects of medical care identified as important by the court in its orders for Hernandez v Monterey County, and addressed compliance with the California Forensic Medical Group (CFMG) implementation plan ("implementation plan").   We also reviewed additional medical records brought to our attention by the Plaintiffs.

On March 10, preliminary findings were presented to representatives for the parties present for the audit:

Taylor Fithian, Medical Doctor (MD) – President CFMG
Jodell Jencks, Registered Nurse (RN) – Director of Operations, CFMG
Peter Bertling, Juris Doctorate (JD) – Attorney for CFMG
Raymond Herr, MD – Chief Medical Officer CFMG
Michael Phillippi, JD - Deputy Attorney for Monterey County
Ernest Galvin, JD – representing Plaintiffs
██████████ RN – director of nursing, MCJ
Captain Bass
Commander Tongol

This report provides the findings associated with the onsite audit conducted on March 9-10, 2017, in addition to the findings in review of patient medical records from March 2016 through January 2017.  This audit includes a quantitative measure of compliance with the implementation plan, quality of care assessment, findings from interviews and facilities inspection.

# SUMMARY OF FINDINGS

**The auditors found that care provided to inmates at MCJ did not substantially comply with the implementation plan during the audit review period of March 2016 through January 2017.  Overall, less than half the care evaluated did not comply with the CFMG Implementation Plan.   Clinical care as evaluated in cases reviewed was deemed inadequate if the patient faced unnecessary risk of adverse outcomes due to unsafe practices.**

---

[1] Dr. Bruce Barnett is a board-certified physician. Angela Hill, RN is a registered nurse.  Both Dr. Barnett and RN Hill have extensive experience working in and evaluating the care delivered to patients in correctional and community medical settings. Dr. Barnett's CV is attached to the Order Appointing Neutral Monitors (CV 13 2354).
[2] Case reviews by Dr. Barnett and RN Hill are described below.

## Summary Table

| Quality Indicator | Compliant/Non Compliant | % Complaint | Comments |
|---|---|---|---|
| 1.  Intake Screening | Non compliant | 63.0% | Nursing did not adequately assess the inmate's current medical condition, reconciliation with previous admissions, identifying current medications and chronic medical conditions and providing them with the appropriate medical follow-up. Implementation plan not met. |
| 2.  Access to Care | Non compliant | 10.0% | Typed nursing protocols not deployed; implementation plan parameters not met |
| 3. Chronic Care | Non compliant | 63.0% | Not consistently recorded in a SOAP format; problem list not updated. |
| 4. Health Care Maintenance | Compliant | 76.0% | See text |
| 5. Continuity of Care | Non compliant | 10.0% | Discharge forms rarely dated or signed to indicate inmate education or opportunity for follow up after discharge |
| 6. Outside Care Referrals | Non compliant | 60.0% | Inadequate documentation. Few specialty reports in chart. |
| 7. Detox/Withdrawal | Compliant | 89.0% | See text |
| 8. TB and other infection control | Non compliant | 3.0% | Numerous inmates testing positive for latent TB not offered therapy and not tracked by Public Health |
| 9. Pharmaceutical Administration Procedures for Non Compliance;  Medications Supplied for Released Inmates or Inmates Going Offsite;  Central Dispensing | Non compliant | 0.0% | Inadequate follow up for patients refusing medications; poor compliance with implementation plan instructions regardin prescriptions for released inmates; LVNs dispensing fails to meet community standards. |
| 10. Administration On site | Compliant | 82.0% | Lack of posted signs regarding sick call process, lack of privacy brings down overall compliance that otherwise is excellent. |
| 11. RN Medication Administration On site | Compliant | 94.0% | Medication administration lapses described in nursing note and confidential work sheets provided to parties |
| 12. Physician/Provider Case Review | Non compliant | 67.0% | This measure considers chart reviews off site and charts brought to attention of auditor when on site. |
| 13. Nursing Case Review | Non compliant | 8.0% | lapses identified in confidential work sheets |
| Overal Audit Score and Rating: | Not Substantially Compliant | 48.1% | See text |

## OBJECTIVES, SCOPE, AND METHODOLOGY

The audit incorporates both *quantitative* and *qualitative* reviews for approximately 1,000 patient events.

### Quantitative Review

The *quantitative* review measures compliance with 11 components of medical care identified in the implementation plan:  Intake Screening, Access to Care, Chronic Care, Healthcare Maintenance, Continuity of Care, Outside Services, Detox/Withdrawal, Tuberculosis/Infection Control, Pharmaceutical Management (not RN), Administrative Services and RN Dispensing on Site.  The percentage score provided is the quotient of number of times compliance was found divided by the number of instances for compliance observed.  A score of 70% or better is consistent (though not determinative) with substantial compliance with the implementation plan.

### Qualitative Review

The *qualitative* portion of the audit consists of physician and RN case reviews. The case reviews evaluate adequacy of care for patients who are being treated for chronic diseases such as diabetes and hypertension, as well as patients receiving care for acute conditions.  The percentage score represents the number of patients who have been identified as having received overall adequate care divided by the total number of patient charts reviewed.  The implementation plan does not explicitly address the issue of adequate care aside from the specific parameters for performance in accord with the plan.  However, the underlying purpose of this review is promote safe medical care as manifest in the appropriateness of RN and physician encounters.

### Medical Facilities and Staffing

The auditors considered whether MCJ met with generally accepted and basic standards, such as cleanliness, orderliness, adequacy of space, privacy, infection control, and availability of essential medical equipment.   The auditors also reviewed staffing and supervision of staff.

### Interviews

Interviews with medical and nursing staff, and with inmates provided valuable insight into the adequacy of health care services at MCJ and directed the auditor's attention to areas of greatest concern.   The interviews did not affect the compliance scores or assessment of care in case studies.

### Overall Quality Indicator Percentage and Overall Audit Performance

The percentage calculation for overall quality of care provided at MCJ is based upon an average of the percentage compliance in the 11 components of medical care plus percentage of adequate care noted in the physician and RN case reviews.  This is by no means an exact measure of performance.  It is merely offered as a metric for comparison in future audits.  A score below 70% indicates a lack of substantial compliance with the implementation plan. However, this score is not by itself determinative of compliance.  The audit also takes into account adequacy of facilities, staffing, and inmate safety in

determining whether MCJ is substantially compliant with the terms of implementation plan.  Multiple avoidable poor patient outcomes are inconsistent with substantial compliance even if the percentage compliance on other measures is high.

## PHYSICIAN CASE REVIEW [3]

CASE #1 - Excessive medication provided for minor muscle aches.  This is common in the free world and does not seriously fall below applicable standards of care.  **Overall care is adequate.**

CASE #2 - 48 year old male with BP noted 180/115 on intake, sent to Hospital ER.  Inmate returns with BP 160/110.  MCJ Physician reorders BP medications, follow up BP checks.  **Overall care is adequate.**

CASE #3 - 36 year old male following intake, purported injury during arrest.  Inmate complained of back pain and rib pain.  Examination was unremarkable.  X-ray returned normal.  Limited ibuprofen appropriate. **Overall care is adequate.**

CASE #4 – Primary Care Provider (PCP) services were not provided as needed at time of intake.  Nursing provided ill-advised care without physician supervision until 20 weeks after intake.  The prednisone ordered by Physician Assistant (PA) for back pain was contraindicated.  The Flexeril ordered by the physician is not approved or favored treatment for drug addicts.  As a result of poor supervision by the MD, the care provided by non-physicians, and medications prescribed that pose more risk than benefit. **Overall care is inadequate**

Case #5 – 19 year old male with history of mild asthma is appropriately treated in his most recent admission.  However, an October 2016 admission for another inmate (different name, different intake number) is in this same chart.  Inclusion of a wrong patient's data and notes in the patient file is a serious lapse. The record keeping is inadequate, but the **Overall care is adequate.**

 Case #6 - 33 year old male at intake complains of groin pain and was sent to acute hospital where evaluation by MD recommends elective surgery at some later date.  On earlier intake (July 2016) the inmate admitted drinking 750 ml hard liquor daily (far more than threshold of 3 drinks for MD evaluation; more like 15 drinks daily).  His emotional disposition observed at intake should have resulted in reference to the withdrawal protocol which calls for MD consultation.  There is no MD note in the record for the July intake.  Although no harm came from the delay in initial MD evaluation, the lack of a medical examination in July is contrary to the implementation plan. **Care overall is adequate.**

Case #7 - 39 year old with chronic hemorrhoids, is followed closely by nursing and MD with appropriate outside attention by acute hospital and surgeon.  **Overall care is adequate.**

Case #8 -18 year old sent to hospital with acute thigh pain, diagnosed as having rhabdomyolisis without kidney complications.  Upon return no apparent effort made to rule out illicit drug use or physical assault

---

[3] These charts were reviewed by Dr. Barnett.  Names and ID # have been provided to MCJ Medical Directors.

as the cause of rhabdomyolysis.   The PCP's evaluation of causes of rhabdomyolysis was lax.  **Overall care is adequate.**

Case #9 -21 year old male inmate seen for pain after having multiple teeth extracted, also complains of URI symptoms to RN who makes diagnosis and treats without apparent MD oversight.   Independent RN diagnoses, although not ideal, is common procedure in jails.  **Overall care is adequate.**

Case #10 - 26 year old female inmate with history of IV heroin use, and chronic acne receives care from RN, Nurse Practitioner (NP) and MD for complications of intravenous drug use, acne, and URI.   Lapses in care include poor documentation of evaluation for ongoing IV heroin use, insufficient documentation of physician engagement in treatment for opiate withdrawal, and inadequate documentation to support asthma diagnosis listed in 6 month examination.  Also, NP and MD use of minocycline is not a best practice where topical therapy is preferred for acne vulgaris.  **Overall care is inadequate.**

Case #11 - Hispanic inmate at high risk of adult onset diabetes.  Failure to document diabetes screening, and insufficient patient education which falls below applicable standards of care.   **Overall care is inadequate.**

Case #12 - 24 Year old male with no complaints aside from mild acne and Upper Respiratory Infection (URI) symptoms which improved while incarcerated over 6 months.   He receives timely physical assessment by PCP.  **Overall care is adequate.**

Case # 13 - 55 year old Hispanic male with possible pre-diabetes based upon results from one blood test, which was not repeated.   Subsequently, when timely undergoing of six month physical examination his TST turned significantly positive.   No apparent treatment options offered to him for latent TB despite a 10-14% lifetime risk of active TB disease without treatment. Mildly elevated BP and self-limited minor infections, colds treated aggressively with excessive medications and poor physician oversight.  **Overall care is inadequate.**

Case #14 - 18 year old Hispanic male with multiple somatic complaints, most notably persistent unresolved headaches and pain behind the left eye.  No definitive diagnosis made by PCP, no referral for specialty consultation and no imaging studies ordered.   Nursing care provides illogical diagnoses and dangerous recommendations.  **Overall care is inadequate.**

Case #15 – On intake, 27 year old Hispanic female with high risk 29 week pregnancy is on methadone. PCP examination in jail was not completed until one week after intake.  Initial evaluation does not meet community standards because of delayed glucose tolerance testing.  Obstetrics evaluations are performed less frequent than ideal.  Patient very challenging due to anxiety and exaggerated complaints.  **Overall care is adequate.**

Case #16 - 37 year old male inmate with vague history of injury to neck and back with chronic pain, also has skin lesion in groin growing larger.  PCP (illegible) with oversight by Dr. ███ reviews prior medical records and finds no indication for continuing gabapentin or narcotic medications.   Mental health

consultation diagnoses include anxiety, depression, and polysubstance abuse with alcohol dependency. Surgery excises skin lesion, pathology benign (seborrheic keratosis). **Overall care is adequate.**

Case #17 - 49 year old Hispanic male admitted in apparently poor condition, with history of recent methamphetamine abuse, serious mental illness, history of TB, and hypertension.  No medical examination provided until 6 days after admission. No clear documentation to support why patient was not treated upon admission as possible withdrawal with observation under detoxification protocol. **Overall care is inadequate.**

Case #18 -26 year old Hispanic male with bipolar disorder, psychosis and substance abuse disorder.  Main problem is psychiatric.  Moderately elevated BP with complaints of chest pain and headaches evaluated at ED, with no significant findings, and returned to jail general housing.  Positive skin test not properly recorded as evidence of latent TB, and no documented offer to inmate for treatment.  Lack of proper attention to TB infection makes **overall care inadequate.**

Case #19 - 36 year old male with HIV disease, recently not treated.  Also has been treated in past for Syphilis.  He was placed in sobering cell for observation in June 2016 because of altered level of consciousness with no documented PCP examination after 2 months, although seen by NIDO (HIV clinic). Rash noted in December 2016 treated improperly by PA without apparent MD supervision or consultation by experts.  **Overall care is inadequate.**

Case # 20 - 19 year old with no complaints aside from acne and occasional muscle aches after working out.  PA tends to overprescribe for self-limited conditions.  **Overall care is adequate.**

## NURSING CASE REVIEW[4]

Case #1 - 47 year old male with chronic methamphetamine and alcohol substance misuse; inmate frequently complained of stomach ailments and common detox symptoms.  Requested evaluation by mental health.  RN saw the inmate but did not address the nature of the sick call slip, which was his desire to see mental health.  RN documented that the inmate should submit another sick call slip if the symptoms get worse.  On 01/09/17, PCP ordered the inmate to have BP checks related to elevated BP, but BPs were never obtained.  Nursing stated the inmate refused.  Refusal of BP measurement was not documented and nursing did not pass the information on to the PCP.  **Overall case is inadequate.**

Case #2 - 20 year old male detoxing from alcohol. Inmate has childhood asthma; in the past he was ordered an inhaler but states he has not utilized the inhaler for some time. Inmate has received treatment for his history of cystic acne.  Inmate requested to see mental health because he was feeling anxious and was having difficulty sleeping.  The inmate submitted numerous sick call slips that were not addressed or triaged by nursing.  Inmate went out to court yet there was no an assessment completed upon his

---

[4] Chart ID numbers are available upon request for confidential review in accord with HIPAA rules.

departure or return, nor prior to him being re-housed.  TB assessment form not completed in the time frame identified in policy.  **Overall Case inadequate**.

Case #3 - 48 year old male with chronic elevated BP and inguinal hernia.  Inmate was sent to Natividad Medical Center (NMC) for evaluation of hernia prior to being booked.  Inmate was ordered BP and vital signs (VS) checks.  Nursing obtained 2 days of VS, and did not report failure to capture a week of BP to the PCP.  Nursing did not complete the Intake Screening process within the time allotted.  **Overall case is inadequate.**

Case #4-50 year old male who denies any significant medical history.  Intake Screening process incomplete and missing multiple required documents. Nursing assessment incomplete on Initial Intake Nursing Triage form and pertinent information not recorded.  **Overall case is inadequate.**

Case #5 - 22 year old male with no significant medical history. Medical complaints consist of cold symptoms and request for Ibuprofen and dandruff shampoo.  Inmate submitted ten sick call slips which were not triaged and addressed by nursing.  There was no nursing assessment completed on the complaints.  **Overall case is inadequate.**

Case #6 - 21 year old male with no significant medical history.  Intake Screening process incomplete and missing several required components.  **Overall case is inadequate.**

Case #7 - 28 year old female who is approximately 27 weeks gestation, and admits to consuming methadone and being treated in a methadone clinic.  Inmate cleared by NMC prior to being rehoused. Mental Health evaluation not completed despite her history of drug abuse and inappropriate behavior. TB screening not completed according to time frame allotted.  Nursing did not triage or address two sick calls slips submitted by the inmate.  **Overall case is inadequate**

Case #8 - 34 year old male with a positive mental health history yet mental intake was not completed. Intake Screening documentation not completed in the time frame allotted.  **Overall case is inadequate.**

Case #9 - 22 year old male with no significant medical history.  **Overall case adequate**.

Case #10 - 24 year old male with no significant medical history.  Intake Screening documentation not completed in the time frame allotted.  **Overall case is inadequate.**


## ONSITE RN REVIEW OF CHARTS

Case #11 - TB assessment completed in the appropriate time frame.  **Overall case is adequate.**

Case #12 - TB assessment not completed in the appropriate time frame.  **Overall case is inadequate.**

Case #13 - TB assessment not completed in the appropriate time frame.  **Overall case is inadequate.**

Case #14 - TB assessment not completed in the appropriate time frame.  **Overall case is inadequate.**

Case #15 - TB assessment not completed in the appropriate time frame.  **Overall case is inadequate.**

Case #16 - TB assessment not completed in the appropriate time frame.  **Overall case is inadequate.**

Case #17 - TB assessment not completed in the appropriate time frame.  **Overall case is inadequate.**

Case #18 - Pharmaceutical administration:  Inmate did not receive their medication prior to going out to court as prescribed by the provider.  **Overall case is inadequate.**

Case #19 - Pharmaceutical administration:  Inmate did not receive medication prior to going out to court as prescribed by the provider.  **Overall case is inadequate.**

Case #20 - Pharmaceutical administration:  Inmate did not receive medication prior to going out to court as prescribed by the provider.  **Overall case is inadequate.**

Case #21 - Pharmaceutical administration:  Inmate did not receive a 30-day supply of essential medication(s) upon release from jail.  **Overall case is inadequate.**

Case #22 - Pharmaceutical administration:  Inmate did not receive a 30-day supply of essential medication(s) upon release from jail.  **Overall case is inadequate.**

Case #23 - Pharmaceutical administration:  Inmate did not receive a 30-day supply of essential medication(s) upon release from jail.  **Overall case is inadequate.**

Case #24 - Access to Care:  Sick call slips were not reviewed on the day it was received, following review of sick call slips a face-to-face assessment was not completed within the time frame.  **Overall case is inadequate.**

## INMATE COMPLAINTS

While on site the audit team learned of inmate complaints previously lodged with Plaintiffs' attorneys. The medical records for these cases were reviewed resulting in the following observations.  The medical care for one of the seven cases submitted was found inadequate.  The inmate complaints are as follows:

███████  Treatment for stroke was significantly and improperly delayed.  Chart review shows delay of at least one week from diagnosis of cerebrovascular accident (CVA) until inmate was provided with a definitive study and treatment.  The week delay falls below standard of care.  CFMG leadership will review in further detail. **Level of Care is inadequate.**

███████  Poor access to care. This is not validated in medical record. **Level of care is adequate**.

███████  Delayed hernia surgery; not validated by medical record. **Level of care is adequate**.

███████  Not receiving Hepatitis C treatment; not validated by medical record. **Level of care is adequate**.

███████  Liver cancer is not being treated; not validated by the medical record.  The record shows no liver cancer.  CFMG leadership will consider psychiatric services for inmate to address his fears.  **Level of care is adequate**.

███████  Inadequate sick call access; not validated in the medical record.  However the anxiety displayed by inmate in multiple visits does not appear to have been addressed. CFMG leadership will consider psychiatric services for inmate to address his anxiety. **Level of care is adequate**.

███████  Not provided neurosurgery as recommended by neurosurgeon; not validated by the medical records. Medical record shows that neurosurgeon recommended watchful waiting as a reasonable option. However, there is no documentation that PCP discussed the plan with neurosurgeon, and fully explained the rationale for not performing neurosurgery at this time.  CFMG leadership will review case and educate patient accordingly.  **Level of care is adequate**.

## INMATE DEATH(S)

One inmate death has been reported within the past 6 months.  The death occurred on January 23, 2017. MCJ and NMC medical records and the autopsy report establish that the cause of death was sepsis from an unknown source.  Because the autopsy report does not include any finding in the spinal cord, epidural abscess has not been excluded as the cause of sepsis and death.

Medical care provided to the inmate at MCJ in the days before his admission to NMC was remarkable for treatment of decedent's severe low back pain with high doses of prednisone before establishing a diagnosis.  The use of prednisone to treat acute low back pain is not a best practice.  Recent medical articles alert clinicians to the risk that steroids prescribed in this fashion are associated with increased

rates of fatal sepsis.[5]   It is also significant that the PA appears to have prescribed prednisone without physician oversight. Whether the PA prescription caused this particular patient to suffer sepsis is unknow. Nevertheless, care for this patient in MCJ appears to have been **inadequate** because no physician consultation was obtained by the PA who had made no apparent diagnosis to justify treatment, and because the treatment with steroids unnecessarily increased the patient's risk of adverse outcome.

This death case also reveals an apparent lapse in attention given to quality control because there was no immediate review by medical leadership to identify the cause of death, evaluate the care prior to death, and discern areas of concern worth addressing to improve future care.

In addition, the PA appears to have acted improperly by prescribing steroids outside the scope of written protocols that should be contained in the delegation of services agreement (DSA). [6]

---

[5] See, e.g. Waljee, et al. Short-term use of oral corticosteroids and related harms among adults in United States. BMJ 2017;357:j1415
[6] MCJ administration were unable during the audit visit to locate the DSA, which is a document required by California State law to direct the care provided by PAs in accord with physician-approved protocols.

## COMPLIANCE WITH IMPLEMENTATION PLAN

Medical care was reviewed during the site visit using direct observation and chart review.  The Auditors measured compliance based on the specific requirements cited in the CFMG implementation plan. Findings are listed below.[7]

**PRIMARY CARE PROVIDER (PCP) STAFFING**[8]  –   PCP staffing was assessed based on the California State Prison staffing plan that calls for one full time equivalent (FTE) PCP for every 300 to 800 inmates, depending upon the severity of illnesses and medical needs in the population of inmates receiving care. During this first visit, the auditors considered MCJ to be delivering an immediate level of care because some inmates required intense care (detoxification, high risk pregnancy) while other inmates had very few medical needs.  The auditors estimate the staffing need for MCJ is one FTE PCP for every 450 inmates. That is the number of PCPs working at MCJ during this first visit.[9]

On the dates of this first audit MCJ PCP staff consisted of two full time PA's, supervised by the medical director who is also the sole physician on site. This appears to be enough providers to meet the population needs.  But because neither of the PA's at MCJ were fully trained, in fact they did not adequately perform the tasks of patient care assigned to them.  The medical director did not ameliorate the short-comings of PA services as he saw very few inmates.  Because inmates did not appear to have sufficient access to qualified, trained medical personnel, **PCP Staffing is not compliant with the standards of care required for substantial compliance with the implementation plan.**

**CLINIC SPACE** – As described above, the exam rooms were crowded and cluttered with no functioning examination tables. There were no accessible "red bags" for bio-hazardous waste.  MCJ staff advised the rooms will be reconfigured to include placement of examination tables. At this time, **Clinic Space is not compliant with the standards of care required for substantial compliance with the implementation plan.**

**INTAKE SCREENING** – Intake screening was deficient mostly because the developmental disabilities form appeared to not be referenced, and because of poor follow up when inmates were believed to be developmentally disabled.  Another major deficit was the failure of medical providers to see inmates taking medications within seven days after the initial RN consultation.   **Overall the standards identified in the implementation plan were not met.**

**ACCESS TO CARE** - RN sees inmates for complaints with putative reference to protocols but without using forms to ensure compliance with protocols.  Nurses do not appear to communicate with PCP or referrals to MD in all cases deserving such attention, such as patients admitted to detoxification with delirium or

---

[7] Raw data was collected from patient charts.  The names/numbers for these patients and further details of finding are contained in confidential files available for review in accord with HIPAA rules upon request.
[8] Primary Care Providers (PCP) are those professionals with licenses to prescribe (MD, DO, NP, PA).  Although nurses evaluate and provide limited treatment, nurses are not considered PCP.
[9] In subsequent visits, the auditors will analyze the demands for care to make a more exacting measure of PCP staffing needs.

at risk of delirium. Inmates are not afforded visits to physician in accord with community standards. Nurses taking on the task of initial medical evaluation do so without using preprinted forms that demonstrate strict adherence to physician approved protocols.  In addition, sick call slips provided to inmates through which they requested services did not contain optimal space for recording important data regarding date, time and nature of the inmate complaint.  **Overall the access to care for MCJ inmates appears to not be substantially compliant with the implementation plan.**

**CHRONIC CARE** – In five charts reviewed there was approximately 63% overall compliance.  Some glaring lapses were disconcerting, including incomplete examinations, or lack of continuity of care for HIV patient. Problem lists are not uniformly maintained. MCJ staff advised the auditors that no logs were maintained to track patients with various chronic conditions.  **Chronic Care appears to not be substantially complaint with the implementation plan.**

**HEALTH CARE MAINTENANCE** – Inmates are due for full examinations six months after intake. The audit revealed these exams were completed timely and adequately performed.  Auditors observed a 75% rate of compliance with the measured aspects for Health Care Maintenance:  examination timely, complete, and using the appropriate form.  The lapses identified were due to lack of date and/or signature, failure to provide patient education on refusal of examinations, and no measurement of patient height.  **Overall, health care maintenance with timely and complete examinations over six months substantially complied with the implementation plan.**

**CONTINUITY OF CARE AFTER RELEASE -** Two major continuity of care matters were reviewed:

1) Release back to community - When released to the community none of the inmates discharged with forms that showed a signature or date on the document that purported to provide supply of medications and/or needed follow up in clinic.  Accordingly, there was 0% compliance with implementation plan parameters that call for form to be used showing a 30 day supply, community health referral and written patient education. **Continuity of care after release was not substantially compliant with the implementation plan.**

2)  Transfer to another facility – Four out of five transfers reviewed used of a pre-printed form to communicate status of the transferred inmate to the receiving facility.  However, these 4 cases involved inmates who were not ill.  In the one case of five reviewed a patient with significant illness was transferred to Atascadero with no apparent physician to physician communication documented as having been transmitted in writing or orally.  Because of this deficit in necessary physician to physician communications (or "hand-off"), **the continuity of care associated with transfer appears to be not substantially compliant with the implementation plan.**

**OUTSIDE REFERRALS** –Two cases out of 10 cases reviewed regarding referrals for outside care complied with the implementation plan that calls for use of referral form, timely visits, forms used for ambulance, and forms or records documenting outside services placed in the chart upon inmate return.  Half of patients returning from outside services had no written consultation note from the outside providers in

their charts.  Although specialty care seemed timely, and ambulance transfer forms were used, **overall the process for outside referral services appeared to be <u>not</u> substantially compliant with the implementation plan.**

**DETOXIFICATION -** Compliance with implementation plan parameters calls for SOAP note, treatment and monitoring in accord with COWS/CIWA[10] protocol, PCP exam within 72hr, and urgent care for severe symptoms.  Nurses seemed to properly assess the inmates needing sobering cells and use the appropriate guidelines to treat the specific kind of intoxication or withdrawal risk.   Auditors note that in some cases the PCPs did not participate in the care of patients who appeared to be delirious, and/or at risk due to history of heavy drinking.  Because the protocol-driven nursing care was well implemented, the program for detoxification seemed to be safely deployed despite lapses in PCP examinations.  Overall this audit deemed the provided for detoxification **substantially compliant with the implementation plan.**

**TB SCREENING AND TREATMENT** – We found no treatment offered to the two PPD positive patients identified in our chart review. **TB screening and treatment appears to be <u>not</u> compliant with the implementation plan.**

**MEDICATIONS/PHARMACY** – There are multiple components in the implementation plan for administration of medications.

    A.  <u>Dispensing of medications</u>.  California Correctional Health Care Services (CCHCS) Inmate Medical Services Policies and Procedures (IMSP&P, court approved in 2002), defines dispensing medications as "the interpretation of a physician's order for drug and the proper selection, measuring, package, labelling, or in any way filling a prescription for a patient. This includes counting stock medications, placing them in a container with the patient name and issuing the medication to the patient." At MCJ this task is performed by a Licensed Vocational Nurse (LVN).  The implementation plan approved for MCJ includes a provision for LVN dispensing.  However, in this audit visit, LVN dispensing did not appear to be performed in a fashion that meets the community standards.  Large supplies of dangerous drugs in bulk/stock bottles were left open adjacent to other open bottles in an area that did not seem secured, increasing the risk of errors in the dispensing process.

    B.  <u>Medication Administration.</u>  Administration of medications is the process of delivering drugs to inmates for whom the medication was prescribed. At MCJ this may be done by LVNs or RNs.  RN Hill observed that administration was performed properly in most cases.  But in some cases, inmates received medication without being subjected to appropriate observations (checking mouth for ingestion) to guard against drug diversion.

---

[10] COWS is abbreviation for clinical withdrawal opiate scale.  CIWA is abbreviation for clinical institute withdrawal assessment.

C. <u>Noncompliance with medication order or recommendations.</u>  The auditors noted multiple instances in which inmates appeared to refuse recommended treatment for latent TB.  It is possible that appropriate treatment was not offered, which would be a lapse.  However, because there was no refusal form in the record the auditors could not determine whether inmates in this case were properly counseled as to the risks in not accepting treatment for latent TB.

D. <u>Continuity of Prescription Medications.</u>  The implementation plan contains specific instructions about documentation to show that inmates received instructions and continued medications upon their release.  The documentation called for by the implementation plan was lacking in nearly every case reviewed.

**Pharmaceutical administration overall appears to be <u>not</u> compliant with the implementation plan.**

## FACILITIES AND STAFF INSPECTION FINDINGS

Auditors found room for improvement in the following areas:

1. Nurses tended to diagnose and treat outside their legal scope of practice, without adhering to physician-written protocols.  In a few encounters, the advice provided to the patient by nursing was ill advised.
2. Nursing does not write out encounters with patient on the printed sick call protocol.
3. PA care, although generally meeting applicable standards, at times was flawed for lack of consultation with a supervising physician.
4. Evidence of direct and indirect physician supervision and/or monitoring of PA or nursing care was lacking. There were no instances observed of co-signature on PA charts.[11]
5. Physician services were not provided as often as the protocols called for when inmates were undergoing detoxification, being treated for HIV infection, in last weeks of high risk pregnancy, or complaining of symptoms for which medical evaluation had been requested.
6. Medications were prescribed for self-limited conditions that are often not treated with medications in the free world or in accord with best practices.  Some of these medications are wasteful, but benign, such as topical antibiotic cream. Other unnecessary medications, such as Tylenol or Naprosyn, are frequently hoarded by inmates and can be very deleterious when used improperly.
7. Antibiotics and anti-fungal medications are prescribed in fashion (not first line, or wrong dosage) not considered to be a best practice as established by current medical literature.
8. Physician, PA, RN signatures are often illegible.  This makes quality control difficult.

---

[11] California state law mandates that unless the supervising physician examines patients seen by the PA on same day, the supervising physician shall co-sign no fewer than 5% of charts written by physician assistants. Title 16 California Code of Regulations, 1399.545

9. Positive TB skin tests establishing with near certainty that a patient had latent TB infection was not noted as problem in the problem list.  Affected inmates were either not offered treatment or were given no disclosed consent in regards to non-compliance with treatment recommendations in at least two cases.

10. Problem lists were not used. Obvious and important conditions such as positive TB skin test, HIV treatment, or diabetes were not documented.

11. Pharmacy procedures did not meet state and national standards that generally do not allow LVN to dispense.  LVN dispensing at MCJ appeared to be seriously flawed.  Pills were dispensed in unsanitary conditions with adjacent open bottles of different stock medicines.  Patients receiving drugs ordered to be directly observed (DOT) were, in some cases, allowed to walk away from pill line with no check to insure the dispensed medicine was swallowed.

12. Referral services were not documented well or in accord with national standards of care.  PCPs referred to outside facilities and/or specialists without any documented discussion or transfer of pertinent information.  Specialist consultation notes were not found in patients' charts.

13. Inmates released did not have proper paper work in the chart to show they received instructions in accord with the implementation plan.  The forms filled out in nearly all cases did not bear any signature of the inmate and were not dated.

14. Examination rooms were poorly equipped, cluttered and lacking exam tables.  Auditors did not observe biohazard waste receptacles in any of the exam rooms.

15. The quality assurance programs appeared weak.  For example, there had been no review of cause of death for an inmate who expired same day he was transported to NMC, even though this event occurred ten weeks prior to our site visit.

## CONCLUSION

Based upon pre-visit medical chart review, site visit and additional onsite chart reviews, the auditors found that the medical care provided to inmates at the MCJ was overall **not substantially** compliant with the implementation plan. However, in the areas of Health Care Maintenance and Detoxification MCJ seemed to be substantially compliant with the implementation plan.  Conversely, medical care at MCJ was **not substantially** compliant in regard to the other parameters reviewed. The percentages of compliance for each of the measured parameters are summarized in the table above.  The audit tool used by the auditors to record their findings, along with the chart numbers, will be provided to parties upon request subject to the confidentiality of protected health information (PHI).

Aside from the audit of implementation plan parameters, Dr. Barnett and RN Hill reviewed the medical care provided for individuals during incarceration.  In Eighteen (18) out of 27 charts reviewed by Dr.

Barnett demonstrated adequate care.  Two (2) out of 24 charts reviewed by RN Hill demonstrated adequate care.[12]

This first audit encountered deficiencies that are reportedly being addressed.  Also, it is important to note that notwithstanding the lapses in process identified above, the auditors noted no adverse outcomes aside from the death from sepsis at NMC.  In that case, although medical care at MCJ was not consistent with best practices, there is no indication that MCJ actions or inaction caused the inmate's death.

The clinical care at MCJ needs to improve in many areas to meet applicable standards for best practices and compliance with the implementation plan.   MCJ staff appears committed to improving patient care.

## PHYSICIAN RECOMMENDATIONS:

1. Medical leadership should intensify training programs for PA's and Nurses.
2. The delegated services agreement (DSA) for each PA working at MCJ should be on site for inspection at all times.
3. All NP's at MCJ should identify a physician collaborator with whom consultations can be readily obtained.
4. Daily PCP lines should not exceed 24 inmates per provider.
5. Inmates should be seen by PCP within 2 weeks of request for routine care, and not more than one day if care is considered urgent.  Emergency care should be provided on site and/or at NMC immediately when needed.
6. A physician on site 5 days each week and as needed on call should provide inmates with physician consultation upon reasonable request.  Complex medical conditions should not be managed by PA, NP or RN.
7. Monthly meetings to discuss quality assurance, utilization management, and continuing medical education should include nursing.
8. Increased attention should be given to medication management that includes reviewing process for proper prescribing and proper dispensing.
9. Exam tables should be available in all exam and treatment rooms.  Biohazard bags should be readily available to providers.
10. Medical and custody leadership should provide appropriate privacy for inmates seeking and receiving medical care.
11. The medical director and director of nurses should develop and use logs to track and treat:
    a. TB test positive
    b. Chronic care:  asthma, DM, hypertension.
    c. Aged population needs PCP attention

[12] As mentioned above, "adequate" is defined for purposes of this audit as care that does not expose inmates to unnecessary risk of harm.  Care that minimizes risks of harm is generally a best practice.  "Inadequate" care exposes inmates to an unnecessary risk of harm.  Such care is not considered best practice

12. Protocols for detox, sober cell admission should be followed with increased consultations by PCP for patients at risk of delirium or other complications of substance abuse.
13. The written consultations by outside providers should be sent on the same day back to MCJ. The medical chart should contain documentation of conversation between PCP and medical consultants when the written consultation needs clarification.

## NURSING RECOMMENDATIONS

1. Nursing staff should be trained on Protocols that conform to standards set by the implementation plan for Intake Screening, Health Care Transfer procedures, Continuity of Care outside the facility and Pharmaceutical Administration.
2. Nurses providing care to patients with acute problems should document their examination, assessment and plan using pre-printed forms that ensure compliance with approved protocols.
3. The MCJ nursing administration should replace the sick call slips currently used with a more complete document that includes the necessary elements. *An example sick call slip template was provided during the onsite audit.*
4. Health Care Management should provide additional training to nursing staff regarding requirements for nursing assessment of the patient's complaint.
5. Health Care Management should provide additional training to nursing staff regarding the documentation required in the medical record.
6. Nursing staff should ensure that tests and treatments are completed timely and as ordered by the PCP.
7. Nursing staff should ensure patient's prescribed medications are received timely and as ordered.
8. Nursing staff should ensure a refusal form is completed and the patient is referred to the PCP when a patient refuses medication and/or outside specialty appointments.
9. RN examination and treatment room should be equipped with essential supplies to promote timely and accurate assessments and charting.
10. Examination rooms should have functioning and accessible exam tables without clutter.
11. Examination and treatment rooms should have "Red Bags" for biohazardous waste.
12. Establish an infection control committee to deal with known and potential communicable disease and outbreaks in partnership with the Monterey Public Health Department.
13. All inmates who are released on medications should sign forms that document counseling regarding drugs dispensed, next outside appointments, and patient education.
14. Prescription medications should be dispensed by persons licensed to do so or by persons authorized and trained by licensed personnel in accordance with state law.
15. Inmates receiving medications by RN or LVN administration should be observed to ensure no diversion of drugs is occurring.

# Exhibit 2

[4276968.1]

# MONTEREY COUNTY JAIL COMPLIANCE AND HEALTH CARE MONITORING AUDIT

September 7 – 8, 2017    -    FINAL REPORT December 20, 2017



# TABLE OF CONTENTS

INTRODUCTION......................................................................................................................3

SUMMARY TABLE..................................................................................................................4

OBJECTIVES, SCOPE, METHODOLOGY..............................................................................4

PERFORMANCE AND COMPLIANCE WITH IMPLEMENTATION PLAN................................6

      1. INTAKE SCREENING.................................................................................................6

      2. ACCESS TO CARE....................................................................................................6

      3. CHRONIC CARE.......................................................................................................6

      4. HEALTH CARE MAINTENANCE...............................................................................6

      5. CONTINUITY OF CARE AFTER RELEASE..............................................................7

      6. OUTSIDE CARE REFERRALS..................................................................................7

      7. DETOXIFICATION/WITHDRAWL..............................................................................7

      8. TB/INFECTION CONTROL........................................................................................8

      9. MEDICATIONS/PHARMACY....................................................................................8

      10. PRIMARY CARE PROVIDER STAFFING...............................................................9

      11. CLINIC SPACE.......................................................................................................9

      12. RECORD KEEPING ..............................................................................................9

      13. INMATE DEATH(S).................................................................................................9

      14. INMATE COMPLAINTS.........................................................................................10

PHYSICIAN CASE REVIEW...................................................................................................11

NURSING CASE REVIEW......................................................................................................12

FACILITIES AND STAFF INSPECTION FINDINGS...............................................................13

PHYSICIAN RECOMMENDATIONS.......................................................................................14

NURSING  RECOMMENDATIONS.........................................................................................14

CASES REFERRED BY PLAINTT'S ATTORNEYS ...............................................................15

CONCLUSION........................................................................................................................20

## DATE OF REPORT

**November 13, 2017**

## INTRODUCTION

Pursuant to a court-ordered survey (Hernandez v County of Monterey) Bruce Barnett, Medical Doctor (Dr. Barnett) and Angela Hill, Registered Nurse (RN Hill)[1] visited the Monterey County Jail (MCJ) on September 7 - 8, 2017 to review healthcare delivered to inmate population. Prior to visiting the facility, the audit team conducted clinical case reviews of inmate medical records derived from the population interred at the Jail from January 1, 2017 through August 30, 2017.[2] On site, the audit team examined aspects of medical care identified as important by the court in its orders for Hernandez v Monterey County, and addressed compliance with the California Forensic Medical Group (CFMG) implementation plan ("implementation plan").

On September 19, preliminary findings were presented by electronic mail to representatives for the parties. This report provides the findings associated with the onsite audit conducted on September 7 – 8, 2017 in addition to the findings discovered in review of inmate medical records. This audit includes a quantitative measure of compliance with the implementation plan, quality of care assessment, findings from interviews and facility inspection.

Dr. Barnett met with the new medical director, ▮▮▮▮▮▮▮, MD (replacing Dr. ▮▮▮▮ ▮▮▮▮▮▮▮ PA (in his last week of work), and ▮▮▮▮▮▮▮ PA (continuing her PA role).

## SUMMARY OF FINDINGS

**The auditors found that care provided to inmates at MCJ did not substantially comply with the implementation plan during for the audit review period of January 2017 through August 2017. Although most of the evaluated care did comply with the CFMG Implementation Plan the audit found substantial and serious lapses with unsafe practices that exposed patients to unnecessary risks of adverse outcomes.**

---

[1] Dr. Bruce Barnett is a board-certified physician. Angela Hill, RN is a registered nurse. Both Dr. Barnett and RN Hill have extensive experience working in and evaluating the care delivered to patients in correctional and community medical settings. Dr. Barnett's CV is attached to the Order Appointing Neutral Monitors (CV 13 2354).
[2] Case reviews by Dr. Barnett and RN Hill are described below.

Monterey County Jail Compliance and Health Care Monitoring Audit
CONFIDENTIAL REPORT "FINAL" December 20, 2017
Page 4

## Summary Table

| Quality Indicator | Compliant/Non Compliant | % Complaint | Comments |
|---|---|---|---|
| 1.  Intake Screening | Compliant | 90.0% | See text |
| 2.  Access to Care | Non compliant | 44.0% | Percentage is combined measure from on site chart reviews and case reviews.  Nurses did not consistently record encounters in a SOAP format; sick call slips do not include important data |
| 3. Chronic Care | Non compliant | 60.0% | Not consistently recorded in a timely manner or in SOAP format |
| 4. Health Care Maintenance | Compliant | 80.0% | See text |
| 5. Continuity of Care | Compliant | 74.0% | See text |
| 6. Outside Care Referrals | Compliant | 100.0% | See text |
| 7. Detox/Withdrawal | Compliant | 89.0% | See text |
| 8. Tuberculosis/Infection Control | Non compliant | 0.0% | Serious and repeated lapses in TST screening and reporting |
| 9. Pharmaceutical Administration Procedures for Non Compliance;  Medications Supplied for Released Inmates or Inmates Going Offsite;  Central Dispensing | Compliant | 100.0% | See text |
| 10. Administration On site | Compliant | 100.0% | See text |
| 11. RN Medication Administration On site | Compliant | 100.0% | See text |
| 12. Physician/Provider Case Review | Non compliant | 67.0% | This measure considers chart reviews off site and charts brought to attention of auditor when on site |
| 13. Nursing Case Review | Non compliant | 50.0% | This measure considers chart reviews off site and charts brought to attention of auditor when on site |
| Overal Audit Score and Rating: | | 73.4% | |

## OBJECTIVES, SCOPE, AND METHODOLOGY

The audit incorporates both *quantitative* and *qualitative* reviews for approximately 1,000 patient events.

### Quantitative Review

The *quantitative* review measures compliance with 11 components of medical care identified in the implementation plan:  Intake Screening, Access to Care, Chronic Care, Health Care Maintenance, Continuity of Care, Outside Care Referrals, Detox/Withdrawal, Tuberculosis/Infection Control, Pharmaceutical Management (not RN), Administrative Services and RN Dispensing on Site.   The percentage score provided is the quotient of number of times compliance was found divided by the

number of instances for compliance observed.  A score of 70% or better is consistent (though not determinative) with substantial compliance with the implementation plan.

## Qualitative Review

The *qualitative* portion of the audit consists of physician and RN case reviews. The case reviews evaluate adequacy of care for patients who are being treated for chronic diseases such as diabetes and hypertension, as well as patients receiving care for acute conditions.  The percentage score represents the number of patients who have been identified as having received overall adequate care divided by the total number of patient charts reviewed.  The implementation plan does not explicitly address the issue of adequate care aside from the specific parameters for performance in accord with the plan.  However, the underlying purpose of this review is to promote safe medical care as manifest in the appropriateness of RN and physician encounters.

## Medical Facilities and Staffing

The auditors considered whether MCJ met with generally accepted and basic standards, such as cleanliness, orderliness, adequacy of space, privacy, infection control, and availability of essential medical equipment.  The auditors also reviewed staffing and supervision of staff.

## Interviews

Interviews with medical and nursing staff, and with inmates provided valuable insight into the adequacy of health care services at MCJ and directed the auditor's attention to areas of greatest concern.   The interviews did not affect the compliance scores or assessment of care in case studies.

## Overall Quality Indicator Percentage and Overall Audit Performance

The percentage calculation for overall quality of care provided at MCJ is based upon an average of the percentage compliance in the 11 components of medical care plus percentage of adequate care noted in the physician and RN case reviews.  This is by no means an exact measure of performance.  It is merely offered as a metric for comparison in future audits.  A score below 70% indicates a lack of substantial compliance with the implementation plan. However, this score is not by itself determinative of compliance.  The audit also considers adequacy of facilities, staffing, and inmate safety in determining whether MCJ is substantially compliant with the terms of implementation plan.  Multiple serious lapses in process and avoidable poor patient outcomes are inconsistent with substantial compliance even if the percentage compliance on other measures is high.[3]

---

[3] Plaintiff's counsel expressed concern that a quantitative analysis "papers over" serious and life-threatening lapses in care.  This audit report and conclusions should assuage such concerns.  Instances where medical care (or lack of care) put prisoners at risk for adverse health outcomes are noted in detail.   Because there were significant deficiencies observed in the health care process during this audit,  MCJ was not found to be compliant with the implementation plan, despite improved percentage compliance compared to the initial audit.

## COMPLIANCE WITH IMPLEMENTATION PLAN

Medical care was reviewed during the site visit using direct observation and chart review.  The Auditors measured compliance based on the specific requirements cited in the CFMG implementation plan. Findings are summarized below.[4]

**INTAKE SCREEING** – The overall compliance with the implementation plan parameters was approximately 90%.  Although changes in policy and procedures implemented since the last audit have markedly improved compliance, MCJ nursing staff inconsistently follows protocol for TB screening.  Nursing also failed at times to document important information on intake forms such as history of frequent falling. Patients did not consistently see the PCP within time frames established for new intakes.  However, **overall the standards identified in the implementation plan were met.**

**ACCESS TO CARE** – The overall compliance with the implementation plan parameters (including access to care noted in nurse's case reviews) was approximately 44%.  The Sick Call slips observed in use for this audit review period did not promote documentation of important elements in the examination; i.e.; date, time, classification of complaint and disposition.  The new forms made available for use beginning in September 2017 appear to address all the elements required for proper sick call assessment.  Accordingly, based upon the charts reviewed for this audit, the **standards identified in the implementation plan were not met.**

**Plaintiff's counsel has expressed concern that new forms may not address delayed processing of sick call requests, and insufficient referral by nurses for primary care.   However, in addition to new forms, a new medical director is in place beginning on August 2017.**

**CHRONIC CARE** – The overall compliance with implementation plan parameters was approximately 60%. However, new systems put in place shortly before the September on site visit consisted of the creation of logs which clinicians can use to track chronic conditions.  Effective use of this tracking log is likely to improve performance at the next audit. The problem lists reviewed during this audit appeared to be better maintained than evident on the last audit.  However, because there were substantial delays in chronic care follow up, at this time **Chronic Care is not substantially complaint with the implementation plan.**

**HEALTH CARE MAINTENANCE** – Inmates are due for full examinations six months after intake. The audit revealed these exams were completed timely and adequately performed.  Auditors observed an 80% rate of compliance with the measured aspects for Health Care Maintenance.  The examinations were complete, timely, and reflected use of the appropriate form.  **Overall, health care maintenance over the audit review period substantially complied with the implementation plan.**

---

[4] Raw data was collected from patient charts.  The names/numbers for these patients and further details of finding are contained in confidential files available for review in accord with HIPAA rules upon request.

This audit found that the exams due 6 months after intake were performed on time in only one third of the cases reviewed. However, this lapse is not by itself sufficient to find non-compliance overall. Patients with no pressing need for examination may reasonably undergo this routine check up a few weeks after 6 months. Because the 6 month exam was done properly in regard to all of the other parameters measured, health care maintenance for MCJ prisoners substantially complied with the implementation plan.

**CONTINUITY OF CARE AFTER RELEASE** - Two major continuity of care matters were reviewed:

1) Release back to community - Inmates were discharged with forms that showed a signature or date on the document that purported to provide supply of medications and/or needed follow up for medical problems. However, the forms used did not explicitly document referral for needed psychiatric care. **Overall, continuity of care after release was substantially compliant with the implementation plan.**

2) Transfer to another facility – There were no lapses identified in communicating status of transferred inmate to the receiving facility. **The continuity of care associated with transfer appears to be substantially compliant with the implementation plan.**

**OUTSIDE CARE REFERRALS** - Overall compliance with the implementation plan parameters was 100%. Lapses noted in the previous audit, including failure to document patient return from consultations appear corrected by the use of new triplicate Medical Referral Forms. **Overall the process for outside referral services appeared to be substantially compliant with the implementation plan.**

**Although this audit review noted improved documentation of outside care in the jail records, some consultant reports are still not being placed in the MCJ medical record. In some cases brought to my attention by Plaintiff's counsel, I could not discern how or if the specialist had instructed the MCJ medical team. MCJ is invited to respond to these concerns. I anticipate addressing these cases and the MCJ response in my next audit (Spring, 2018).**

**DETOX/WITHDRAWL** - Compliance with implementation plan parameters calls for SOAP note, treatment and monitoring in accord with COWS/CIWA[5] protocol, PCP exam within 72hr, and urgent care for severe symptoms. Nurses seemed to properly assess the inmates in need of sobering cells and used the appropriate guidelines to treat the specific kind of intoxication or withdrawal risk. PCPs appeared to participate in the care of patients with delirium or at risk due to history of heavy drinking. Overall this audit found the MCJ provisions for detoxification **substantially compliant with the implementation plan.**

**Nursing did not consult with the MCJ physician for CC ███████[6] who had been using heroin just prior to intake and was therefore at high risk for withdrawal and complications of IV drug abuse. However, the**

---

[5] COWS is abbreviation for clinical withdrawal opiate scale. CIWA is abbreviation for clinical institute withdrawal assessment.
[6] Patients will be referred to by initials and booking numbers.

medical record does not show that CC suffered symptoms of opiate withdrawal.  This audit did not find a pattern of inattention to patients at risk for withdrawal.  Compliance with drug and alcohol detoxification protocols will be reviewed at the next audit.[7]

**TB/INFECTION CONTOL** – This audit identified multiple lapses in screening and reporting of positive TST. The treatment for one young patient with likely active TB (Physician Review Case 8) was substantially delayed.  Evaluation was not documented for an elderly patient with X-ray evidence of old or recent TB (Physician Review Case 9).  **TB screening and treatment appears to be not compliant with the implementation plan.**

**MEDICATIONS/PHARMACY** – There are multiple components in the implementation plan for administration of medications.

    A.  Dispensing of medications.  The implementation plan approved for MCJ includes a provision for LVN to participate in dispensing of medications.  The process observed by the auditors for dispensing drugs appeared to meet community standards with bulk/stock bottles securely stored and managed with all due cautions.

    B.  Medication Administration.  Administration of medications seemed to be performed properly as observed during this audit.  However, because nurses pass great numbers of prescriptions it is very difficult for them to prevent drug diversion. See below - Nursing recommendation 8.

    C.  Documenting Noncompliance with medication order or recommendations.  Signed refusal forms were not found in all cases where inmates did not accept medications prescribed to them, or refused offered treatments, such as for latent TB.

    D.  Continuity of Prescription Medications.  Inmates received instructions and continued medications upon their release.

    E.  Timely Provision of Medications at MCJ that had been prescribed to prisoner before intake. This audit did not find prisoners denied necessary medications at intake.   The next audit will include a review of whether necessary drug treatments provided to prisoners before admission to MCJ are continued after intake.

**Overall the pharmaceutical administration appears to be compliant with the implementation plan. However, there is room for improvement in pharmaceutical administration.  The work**

---

[7] The COWS (opiate withdrawal) protocols requires physician consultation prior to drug therapy. It is prudent, but not explicitly required in COWS protocol, to have physicians made aware of patients arriving who report being addicted to opiates or other substances but have no withdrawal symptoms that need treatment.  Jail physician(s) should also be called to assess even asymptomatic addicts who have additional risk factors, such as heart disease or pregnancy.  CIWA (alcohol withdrawal) protocols call for physician notification of any patient who reports more than 3 drinks daily or for where medical conditions put patients at higher risk of harm from withdrawal.

**load on the medication line should be reduced or have more nursing allocated to the task. Refusal forms should be more consistently completed, with follow up by medical staff regarding reasons for refusal or need for the refused drug. MCJ staff should remain vigilant in providing necessary medications previously prescribed to new arrivals.**

**PRIMARY CARE PROVIDER (PCP) STAFFING**[8]  –   On the dates of this audit MCJ PCP staff consisted of two full time PA's, supervised by the medical director, who is also the sole physician on site. This appears to be enough providers to meet the population needs.  The PAs at MCJ are trained and well experienced. The medical director, new in her role for the past two weeks, appeared to share the patient load and was also available for frequent consultation.  This situation is a marked improvement from what was seen in the prior audit where the medical director saw very few inmates and was frequently not available for onsite consultation with the PA.  **PCP Staffing is substantially compliant with the implementation plan.**

**Plaintiff's counsel has expressed concern that my assessment of staffing as "substantially compliant" is contradicted by my finding of insufficient nursing and delays in care from PCP.  My assessments are not in conflict with one another.  I believe the number of persons assigned to the task of patient care are sufficient.  But, the deployment of that staff has much room for improvement.  Here, and in other parts of this report, there is an opportunity for the new medical director to correct dysfunctions in nurse and physician assistant performances that have deprived MCJ prisoners of optimal access to care.**

**CLINIC SPACE** – Compared to findings at the prior audit, exam rooms are much better equipped with functioning examination tables, accessible "red bags" for bio-hazardous waste and adequate space for proper examinations.  **Clinic Space is substantially compliant with the implementation plan.**

**RECORD KEEPING**

Illegible Provider signatures and missing consultant reports do not comport with applicable standards of care.   CFMG implementation plan requires all health staff to maintain "accurate and legible medical records."  MCJ compliance with that requirement was not measured in this audit aside from the comments I have made on a case by case basis.  The next audit will include a measure of compliance with the implementation plan requirement for legibility and accuracy.

**INMATE DEATH(S)**

One inmate death was reported during the audit review period of January to August 2017.  A 30-year-old Hispanic male was diagnosed in 2012 with a testicular tumor with high risk for future metastases and treated with repeated courses of chemotherapy.  His prognosis was considered guarded.  A subsequent biopsy of a new bone lesion in early 2017 showed changes in morphology consistent with melanoma.  On

[8] Primary Care Providers (PCP) – also referred to as "Providers" are licensed as allopathic or osteopathic physicians (MD, DO), family nurse practitioners (NP) and physician assistants (PA).  Although licensed nurses may evaluate and provide limited treatment, nurses who are not additionally credentialed as NP are not considered PCPs.

June 25, 2017, the patient complained of severe nausea, headache and vomiting at which time he was examined by nurses, yet not seen by the MD until two days later.  The MD sent the patient to the hospital on June 27, 2017 with a diagnosis of suspected brain tumors (metastases).  The CT examination showed widespread brain metastases.  The patient continued to deteriorate and died on June 29, 2017.   Although this death was not likely preventable, the care provided did not appear to meet the applicable standard of care.  MCJ did not provide immediate physician attention for a critical illness. **The two-day delay, from the onset of new and alarming symptoms to the time a physician examination was conducted, is below applicable standards of care and does not satisfy the implementation plan for access to care.**

Another death occurred on November 25, 2017 -  after the September 2017 audit.   A 59-year-old male admitted on October 18, 2017 died on November 25, 2017 from a yet unknown cause.  He had long suffered with severe schizophrenia, dementia, and significant complicating medical problems including diabetes, hypertension, and pan hypopituitarism. He had refused medications and medical examinations on multiple occasions.  It does not look like refusal forms were signed or documentation was put in the record the patient refused to sign forms.

In light of decedent's severe mental illness and medical conditions numerous non-preventable causes for his death may be hypothesized.  He could have poisoned himself or otherwise committed suicide.  He could have suffered a heart attack or stroke.  He could have been a victim of homicide. The results of a post mortem exam will be illuminating.

Regardless of the cause of death, events on and around 10/21/17 are troublesome.  On 10/21/17 nurses recorded markedly abnormal vital signs (VS) that should have been measured again along with a comprehensive exam. Indeed, the record shows a physician's verbal request for VS to be reevaluated.  But despite this request, there are no VS and no comprehensive exam documented after 10/21/17 or prior to the patient's demise.  Patients with abnormal vital signs not followed and/or treated are at substantial risk of adverse outcomes. MCJ staff should be vigilant in assuring that inmates with significantly abnormal vital signs (blood pressure, heart rate, temperature, respiratory rate, and blood oxygen levels) are promptly seen by a physician/PA/FNP.

Since this death occurred after the second audit cycle I will provide my full assessment in my next audit. It is important that MCJ produce its own assessment and report for both the death in June 2017 and November 2017, including corrective action deemed necessary. The response by MCJ to these deaths will be reviewed and evaluated in the next audit.

## INMATE COMPLAINTS

Dr. Barnett and RN Hill interviewed male and female inmates (in separate sessions).  The Interviewees were provided by custody as representative spokespersons and as patients representing themselves.  The inmates were asked to comment on their personal experiences and their understanding of experiences by fellow inmates regarding the parameters being measured for compliance with the implementation plan. The complaints voiced in these interviews were primarily centered on difficulty or delays in access

to a primary care physician, delays in specialist care and delays in receipt of prescription medications taken before admission to the jail. These complaints were brought to attention of MCJ medical leadership.

Complaint #1 – Patient alleged not being provided a diagnosis for the causation of headache despite multiple visits and normal CT scan.

Complaint #2 – Patient reported her concern that her strong family history of breast cancer was not addressed with appropriate screening examinations while she was in jail.

Complaint #3 – Patient claimed to not have been seen by a physician since admission to jail for review of diabetic condition.

There was no allegation that lapses described in these complaints caused any patient harm. Nonetheless, the nature of inmate complaints is consistent with observations made in the course of this audit, that access to care and reliability of medication administration can be improved.


## PHYSICIAN CASE REVIEW [9]

CASE #1 – delayed evaluation and diagnosis for patient with cancer complaining about sudden onset of severe headache, nausea and vomiting. **Overall care is inadequate.**

CASE #2 – **Care is adequate.**

CASE #3 - **Care is adequate.**

CASE #4 – **Care is adequate.**

Case #5 – **Care is adequate.**

 Case #6 - **Care is adequate.**

Case #7 - **Care is adequate.**

Case #8 – 17-year-old male admitted to MCJ on 6/25/17 with symptoms consistent with TB, also has positive skin test and abnormal chest X-ray but not isolated and treated for TB until 7/27/17. **Overall care is inadequate.**

Case #9 -62-year-old male diabetic, alcoholic not scheduled for physician examination until one week after admission despite high risk for significant medical issues needing more immediate attention.  X-ray

[9] Names and ID numbers for charts noted in this audit report as reviewed by Dr. Barnett and/or RN Hill have been provided to MCJ Medical/Nursing Directors and are available upon request for confidential review in accord with HIPAA rules.

consistent with active TB.  No follow up in the medical record regarding this X-ray finding.  **Overall care is inadequate.**

Case #10 – 18-year-old female with vague symptoms of dysuria treated for vaginitis and UTI at the same visit with no evidence of UTI in urine analysis and no direct examination to discern what type of vaginitis if any merits treatment.  **Overall care is inadequate.**

Case #11 - **Care is adequate.**

Case #12 - **Care is adequate.**

**Physician Case Review Results**
The facility primary care provider performance was overall _inadequate_.  Of the 12 detailed case reviews conducted, eight were found to be _adequate_, and four were _inadequate_.  In a random chart review serious lapses were found related to end of life care, TB monitoring and woman's health care.  Some of these lapses may have been due to delayed nursing referrals.  Overall, evaluated PCP care did not meet applicable standards of care as established in published CFMG implementation plan.


# NURSING CASE REVIEW

Case #1 – On 7/4/17 patient complained of chest pain and was seen by nursing.  Nursing utilized the protocol for Musculoskeletal Pain despite the complaint of "sharp chest pain" not being typical for muscle ache.  Nursing administered TST on 7/4/17 and read TST 20mm on 7/9/17 but patient was not referred to a Primary Care Provider or other nurse resources for follow up.  **Overall care is inadequate.**

Case #2 – **Care is adequate.**

Case #3 – Nursing failed to place required information on the sick call slip, Purified Protein Derivative (PPD) placed outside of time frames outlined in policy, Tuberculin Skin Test (TST) not read and thus required placement of second TST.  **Overall care is inadequate.**

Case #4 – Nursing did not perform general assessment or focused exam.  In five encounters no nurse assessment found.  On seven occasions sick call protocols were not followed. **Overall care is inadequate.**

Case #5 – **Care is adequate.**

Case #6 – **Care is adequate.**

Case #7 - Nursing failed to enter required information on sick call slip in two places.  Nursing failed to describe the medical treatment refused by patient on the refusal form. Nursing failed to administer TST or read TST in the appropriate timeframes. **Overall care is inadequate.**

Case #8 – **Care is adequate.**

Case #9 – **Care is adequate.**

Case #10 – Nurse charted review of systems incompletely for a complex patient and did not confer with the physician.   The patient was transferred to acute hospital 2 days later with severe symptoms from his germ cell cancer. **Overall care is inadequate.**

Case #11 – Intake:  **Care is adequate.**

Case #12 – Intake:  **Care is adequate.**

Case #13 - Intake:  **Care is adequate.**

**Nursing Case Review Results**
Nursing performance was _inadequate_.  Of the 13 detailed case reviews conducted, eight were found to be _adequate_, and five were _inadequate_.   Improper charting and delayed referral to physicians for serious medical symptoms put patients at serious risk of adverse patient outcomes.   Overall, the care provided by MCJ Nursing staff did not meet applicable standards of care as established in CFMG implementation plan.


## FACILITIES AND STAFF INSPECTION FINDINGS

Auditors found significant improvement since the prior visit in the following areas:

1.  Nurses appeared to better adhere to physician-written protocols.  [10]
2.  Nurses are being provided with printed sick call forms that adhere to protocols.
3.  PA are consulting with a supervising physician.
4.  Physician supervision and/or monitoring of PA or nursing is planned by the new medical director, along with co-signature on PA charts.[11]
5.  Physician, PA, RN signatures are legible.
6.  Problem lists are being used now.
7.  Pharmacy procedures appear to meet state and national standards.  Pills are stored in sanitary and orderly conditions.  Although it is unusual for LVNs to dispense medications, this process has been approved by the court.
8.  Inmates released usually receive instructions in accordance with the implementation plan.

---

[10] Nursing did not always obtain sufficient and timely medical input.  (Physician Case Review 1, 8, 9).
[11] California state law mandates that unless the supervising physician examines patients seen by the PA on the same day, the supervising physician shall co-sign no fewer than 5% of charts written by physician assistants. Title 16 California Code of Regulations, 1399.545

9.  Examination rooms are well equipped and have functioning examination tables. Biohazard waste receptacles are present in all examination rooms. Inmate privacy is being respected.
10. The new medical director promises to implement a comprehensive quality assurance program.


## PHYSICIAN RECOMMENDATIONS:

1.  Medical leadership should document its training programs for PA's and Nurses.
2.  Nurses should be strongly encouraged to consult promptly with physicians, especially regarding any inmate who has alarming complaints or findings.
3.  The delegated services agreement (DSA) for each PA working at MCJ should be kept on site for inspection at all times.
4.  Inmates should be seen by PCP within 2 weeks of request for routine care, and not more than one business day for patients at significant risk for illness if not monitored closely.
5.  The recently hired medical director should be on site 5 days each week and should provide on call services to inmates (i.e.) physician consultation upon reasonable request as needed.  Complex medical conditions should not be managed by PA, NP or RN.
6.  The medical director and director of nurses should use logs to track and treat:
    a.  TB test positive
    b.  Chronic care issues:  asthma, DM, hypertension.
    c.  Aged population needs PCP attention
7.  The written consultations by outside providers should be sent MCJ on the same day the patient returns to the facility. The medical chart should contain documentation of conversations between the PCP and medical consultants when the written consultation needs clarification.
8.  The new medical director should take responsibility for patients having appropriate access to care, monitoring the timeliness of encounters with nurses, appropriately prompt referral to physician (or supervised physician assistant) and treatment plans in accord with best practices.


## NURSING RECOMMENDATIONS:

1.  Nursing staff should be trained on Protocols that conform to standards required by the implementation plan for Intake Screening, Health Care Transfer procedures, Continuity of Care outside the facility and Pharmaceutical Administration.
2.  Nurses providing care to patients with acute problems should document their examination, assessment and plan using pre-printed forms that ensure compliance with approved protocols.
3.  The MCJ nursing administration should replace the sick call slips currently used with a more complete document that includes the necessary elements.
4.  Health Care Management should provide additional training to nursing staff regarding requirements for nursing assessment of the patient's complaint.
5.  Nursing staff should ensure patient's prescribed medications are received timely and as ordered.

6. Nursing staff should ensure a refusal form is completed and the patient is referred to the PCP when a patient refuses medication and/or outside specialty appointments.

7. Establish an infection control committee to deal with known and potential communicable disease and outbreaks in partnership with the Monterey Public Health Department.

8. Inmates receiving medications by RN or LVN administration should be observed to ensure no diversion of drugs is occurring. Additional nursing staff should be assigned to the pill line to assure effective, safe and reliable administration of medications to each inmate and to reduce the risk of drug diversion.

## CASES REFERRED BY PLAINIFF'S ATTORNEYS:

The audit process invites comments and input from all parties.  Plaintiff's counsel has identified incidents they submit for further review.  Essentially all of their inquiries involve occurrences that follow the dates of this audit.  I have reviewed the cases brought to my attention as elucidated below.

In summary, I found no harm done to patients in the cases mentioned below.  However, lapses noted by Plaintiff's counsel have been at issue in the prior and current audit:

a) Outside consultant reports were not placed in the medical records

b) Drug administration was not accurately reported.

c) Mental health consultation was not provided for an overtly and seriously anxious patient

d)  Physician assistants made diagnoses without documentation of appropriate physician supervision.

Plaintiff's counsel comments do not alter my conclusions regarding this audit's reviews of care provided up to August 30, 2017. However, I expect to include Plaintiff's concerns in the next audit, along with the response by MCJ to the issues raised in the care of these patients.

**LC,   Booking ▮▮▮▮ (October 18, 2017)**

> LC is 48 year old with hypertension, asthma (both well controlled), history of substance abuse, history of kidney stones, and visual loss.  LC complained on October 26, 2017 that she had not received latanoprost (Xalatan) prescribed for her glaucoma.  Medical records as of November 22, 2017 (as provided by Plaintiff's attorney) contain testing by ophthalmology done October 25, and report by nursing of ophthalmology instructions to continue latanoprost purportedly ordered on October 18.  The medical record contains no note written by ophthalmologist, or documentation of latanoprost administered to LC following her admission to jail on October 18.

> Ophthalmology consultation on March 15, 2016 documents multiple eye diseases, and described LC as legally blind due to permanent deficits in her vision.  The Ophthalmologist also writes in the consultation note that LC describes visual loss inconsistent with the

objective exam, and was "resistant" to suggestions by which her vision could be improved with low-vision aids.

Auditor analysis/response:  Plaintiff's complaints at issue post-date the September audit visit.   Medical records seem deficient in not showing administration of ordered eye drops, and not including the report of ophthalmology evaluation and conclusions.  However, there is no evidence of any harm to LC even if her eye drops had not been administered as ordered.  LC suffers from multiple eye diseases that leave her with permanent visual loss.  It is also worth noting that LC has refused to comply with recommendations by ophthalmology in her prior visit (3/16/16) and is documented to have refused her lanatoprost eye drops on 9/15/17 and 9/28/17.

Non-compliance and lack of harm does not excuse inadequate record keeping, including failure to document medication administration and missing consultant report(s). The next audit (Spring, 2018) will survey records in regard to these concerns:  a) that all ordered medications are being timely provided to prisoners, and b) that reports from outside consultations are timely placed in the jail medical record.

**KR, Booking ▆▆▆▆ (November 7, 2016)**

KR is a 35-year-old diagnosed with remitting multiple sclerosis (MS).  On intake KR reported drinking a pint of vodka daily.   CIWA protocols direct nurses to consult the PCP ("Provider") if a patient reports more than 3 drinks daily.  This was not done.

The medical record documents a lapse in provision of Glatopa (recommended to reduce the frequency and severity of MS attacks) for approximately six days from October 25 through 31, 2017.  Plaintiff's counsel suggests that KR experienced several MS related health emergencies in summer and autumn of 2017 that might have been avoided by consistent doses of Glatopa.

Auditor analysis/response: The intake procedure for KR was flawed as a Provider should have been consulted for a patient at high risk of complications from alcohol withdrawal.  However, the medical record does not document that KR suffered alcohol withdrawal or other adverse consequences.

The described lapse in Glatopa administration occurred after the September audit.  A review of the medical record from December 2016 through November 2017 does not reveal any harm arising from the documented lapse in Glatopa (10/25/17 to 11/1/17).  Hospital visits that occurred in summer and autumns of 2017 were diagnosed as unrelated to MS.[12]  KR may benefit from mental health evaluation for psychiatric conditions that complicate medical management.

---

[12] KR was prescribed Glatopa starting 3/15/17.  Her subsequent hospital visits in summer and autumn of 2017 were considered caused by migraine, not MS.  Further, the hospital medical records show that KR was taking

**SR, Booking [REDACTED] (August 8, 2017)**

SR is a 44-year-old with no apparent chronic medical conditions, diagnosed as having an inguinal hernia on August 16, 2017 for which he was prescribed ibuprofen to treat associated pain. Plaintiff's attorney reports that SR experienced delays in receiving refills on his ibuprofen, and an unexplained "hold" for a hernia belt ordered 9/13/17.

Auditor analysis/response : The concerns mentioned by Plaintiff's attorney in  this matter relate to circumstances following the September 2017 audit visit.  SR appears to have been first diagnosed on August 16, 2017 as having an inguinal hernia (left) based upon the report by physician assistant who describes a fullness in left groin and some pain "reducing" the hernia.  The diagnosis of hernia is dubious in this case.  There is no other mention of hernia in the record.  A full exam and diagnosis by a physician is warranted.

It is below the standard of care to treat a painful hernia with ibuprofen.  Hernias are not painful unless they become incarcerated, or far worse – strangulated.  Incarcerating hernias should be scheduled for surgery at the earliest reasonable opportunity.  Strangulated hernias require emergency surgery as substantial delay leads to necrotic bowel and death.  In neither of these circumstance is the pain treated with ibuprofen alone.  Likewise, hernia belts are not indicated for treatment in the modern era unless the condition is severe enough to merit prompt surgery.

This patient does not appear to have suffered any harm by not receiving ibuprofen as he requested or a hernia belt.  Indeed, neither ibuprofen nor a hernia belt are appropriate for the patient's likely condition which is a non-symptomatic hernia, or no hernia at all.   However, an explicit diagnosis and treatment plan from a physician regarding the possible hernia seems to be lacking.

**PM, Booking [REDACTED] (July 25, 2017)**

PM is a 44-year-old with paraplegia following a gunshot wound injury to his spinal cord in early 2017.  Plaintiff's attorney expresses concern about following aspects of care provided at MCJ: a) a second mattress was not provided until 2 months after it was ordered, b) No heel protectors had been provided as of October 20 despite the order entered on July 31. 2017, c) previously prescribed medications (sertraline for depression, baclofen for muscle spasms and gabapentin for chronic neuropathic pain) were not provided when his supply ran out on or around September 23.

---

Glatopa during the time of her hospital visits on 5/14/17, 6/25/17, 7/11/17, 8/13/17, 9/12/17, 10/3/17. Accordingly, it does not appear that continuous treatment with Glatopa prevents KR's symptoms.

Auditor analysis/response :  The concerns mentioned by Plantiff's attorney in  this matter relate to circumstances following the September 2017 audit visit.

Sertraline (brand name Zoloft), baclofen, and gabapentin were described as ▇▇▇▇▇▇ medications upon intake.  The Intake exam also documents PM's report that he has "sores on bottom" and states that because he is in a wheel chair his bottom is not seen. This intake exam is incomplete for lack of direct visualization of the reported skin ulcer.  The intake exam also documented that PM was able to transfer from bed to chair.

PM was evaluated by the new medical director on and around August 15, 2017.  Dr. ▇▇▇ noted that PM had not been receiving his prescribed sertraline and baclofen.  It appears no gabapentin was prescribed by Dr. ▇▇▇  On August 25, 2017, following consultation with colleagues, Dr.▇▇▇ discontinued sertraline and started duloxetine and meloxicam for chronic pain.  Progress note dated 10/10/17 reported that physical therapy at NMC is pending.   A second mattress was provided to him on 10/18/17.  It seems he was not provided with heel protectors as of 10/16/17.

Plaintiff's attorney has requested my opinion as to whether PM can receive necessary drugs and physical therapy at MCJ.  I believe he can receive necessary care and has been receiving appropriate care for his condition at MCJ in the short term.  As of 10/16/17 PMs was described as comfortable, sleeping well, transferring self as needed, and performing self-catheterization.  However, for the longer-term PM should be seen by specialist(s) in rehabilitation.  It appears that such referral was being scheduled at the end of October. If PM cannot receive any specialty consultations and treatment while at MCJ then I would say he is not receiving adequate therapy at that location.

In reply to Plaintiff's specific concerns:  a) it is not necessary for PM ▇▇▇▇ to take sertraline, baclofen or gabapentin as there are significant side effects to these drugs and alternative medications may work as well.  PM received numerous medication that appear to be making him comfortable. b) The utility of double mattress is dubious, as PM can transfer himself on and off his bed and thus is not at great risk of skin ulcers from non-mobility.  Moreover, many patients can move about better on a single firm mattress rather than two.  c) PM may need heel protectors as his ability to move his lower extremities is markedly compromised.  However, as a practical matter, he does not appear to be developing any pressure sores on his heels without the protectors.    I did not see an evaluation by his physician or by specialist as to whether heel protectors should be provided to him at this time. The standard of care calls for a more comprehensive evaluation by a physician regarding need for heel protectors and other aspects of PM's paraplegia than is in the record prior to October 20, 2017.

**JH, Booking** ███████ **(June 7, 2017)**

JH is a 34-year-old prisoner diagnosed with a thyroglossal cyst soon after booking.  The cyst was
not infected.   He received antibiotics for a dental infection in August, 2017.   He continued to
receive treatments from dental and ENT specialist for lymph node inflammation associated with
dental abscess.  The thyroglossal cyst was removed without complications on November 29,
2017.  Plaintiff's attorney notes this procedure was delayed from the original date of November
16 because JH drank milk instead of keeping his stomach empty before surgery.

Auditor analysis/response :  The concerns mentioned by Plaintiff's attorney in  this matter relate to
circumstances following the September 2017 audit visit.  The surgery performed on his thyroglossal cyst
was timely.  It was important to treat the dental abscess first.   Patients frequently misunderstand or
forget the instructions to not eat before surgery, necessitating a rescheduling. Of course, preparations
for surgery should minimize the risk of unnecessary delays.  But the occasional rescheduling is to be
expected in jails just as it is in the free world.

**JB, Booking** ███████ **(July 4, 2017)**

JB is a 33-year-old prisoner admitted to MCJ following a motor vehicle collision with broken foot and
clavicle.  Plaintiff attorney express concern that "emergency surgery" done on JB's clavicle on 9/17/17
was compromised (antibiotics needed to treat subsequent wound infection) due to MCJ not providing JB
with an adequate cleansing shower prior to the surgery

Auditor analysis/response :  The concerns mentioned by Plantiff's attorney in  this matter relate to
circumstances following the September 2017 audit visit. JB received frequent expert care from
orthopedic surgeon who did not believe any surgery would be needed to repair the clavicle until
September 15 when the fracture was seen to not be healing.  The surgery scheduled for two days later
was not considered an emergency.  The preoperative shower/wash was an adjunct to the far more
important surgical preparation done in the operating room.  A post-operative wound infection such as
noted here is not unusual and may occur despite best efforts at cleanliness before, during and after
surgery.  JB did not sustain any harm from the wound infection.  His orthopedic surgeon has described
the post-operative course as routine and satisfactory.

**RG, Booking** ███████ **(July 17, 2017)**

RG is 43 years old, admitted to MCJ with metastatic renal cell cancer.  Progress notes
describe a return from NMC for chemotherapy on 9/26/17.  CT exam on 10/13/17
confirmed widespread disease (stage IV).  Plaintiff's attorney expressed concern that RG's
chart does not document the administration of any chemotherapy.

Auditor analysis/response :  Plaintiff's concerns in  this matter relate to circumstances following the September 2017 audit visit.  RG was known to have end-stage, fatal disease in 2016 prior to his arrival at MCJ.  Oncology consultation in 2016 suggested palliative care, as no cure would be possible.

The medical record describes engagement by oncology while RG was housed at MCJ. It appears that RG sustained no harm for any delay or lack of chemotherapy while at MCJ.  However, the medical records do not include a report from the oncologist during RGs stay at MCJ.  Also, the MCJ medical record does not document any discussion by PCP with RG regarding his prognosis.

## CONCLUSION

Based upon pre-visit medical chart review, site visit and additional onsite chart reviews, the auditors found that medical care provided to inmates at MCJ for the period under review (January through August 2017) was overall **not substantially** compliant with the implementation plan.  Despite improvement in many parameters as evident in the Overall Audit Score of 73.4%, some extreme lapses were noted indicating that MCJ care was not substantially compliant with the implementation plan.

Plaintiff's counsel has provided substantial input that I refer to in this audit, mostly in the form of comments regarding events occurring after September 2017.  I do not agree with all of Plaintiff's comments.  But I note that events brought to my attention since September support recommendations herein as to how care at MCJ can be improved.

# Exhibit 3

# MONTEREY COUNTY JAIL COMPLIANCE
# AND HEALTH CARE MONITORING AUDIT

April 9 – 10,  2018



# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................................. 2

BRIEF SUMMARY OF FINDINGS................................................................................................... 2

OBJECTIVES, SCOPE, AND METHODOLOGY ........................................................................... 4

## DATE OF REPORT

**July 2, 2018**

## INTRODUCTION

Pursuant to a court-ordered survey (Hernandez v County of Monterey) Bruce Barnett, MD visited the Monterey County Jail (MCJ) on April 9 – 10, 2018 to review healthcare delivered to inmate population. Prior to visiting the facility, Dr. Barnett reviewed 40  inmate medical records derived from the population interred at the Jail from September 1, 2017 through February 28, 2018 .[1]  On site, Dr. Barnett examined aspects of medical care identified as important by the court in its orders for Hernandez v Monterey Count that addresses compliance with the California Forensic Medical Group (CFMG) implementation plan ("implementation plan").

On April 10, 2018 Dr. Barnett's preliminary findings were presented at an exit interview at MCJ.   These findings were reiterated to representatives for the parties in a memo dated April 19, 2018.   A draft report was issued at end of April 2018 that provided a compilation of findings from the site visit, review of inmate medical records, a quantitative measure of compliance with the implementation plan, overall assessment of care, and summary of findings.   This final report for the April 2018 visit considers the party responses and rebuttal to findings described in the April draft report.

## BRIEF SUMMARY OF FINDINGS

**Care provided to inmates at MCJ reviewed at this audit did not substantially comply with the implementation plan.  Serious lapses in a number of areas exposed patients to unnecessary risks of adverse outcomes.**

**The percentage compliance scores listed below, however, shows improvement in a number of areas compared to prior audits.**

---

[1] The care of twenty patients is reviewed in detail and presented below in "Physician Case Review. "

**<u>Summary Table</u>**

| Quality Indicator | Compliant/Non Compliant | % Complaint | Comments |
|---|---|---|---|
| 1.  Intake Screening | Compliant | 79.0% | Height and weight  values were entered as given to nurse by the inmate. |
| 2.  Access to Care | Non compliant | 73.0% | Lack of nurse sick call line is non compliant with the implementation plan. |
| 3. Chronic Care | Compliant | 93.0% | |
| 4. Health Care Maintenance | Compliant | 51.0% | Lapses noted in 2017 but few in 2018. |
| 5. Continuity of Care | Compliant | 90.0% | |
| 6. Outside Care Referrals | Non Compliant | 60.6% | No ambulance forms in charts, specialists' consults not in chart, speciality services not timely provided. |
| 7. Detox/Withdrawal | Compliant | 81.8% | Appropriate detoxification in most cases.  See case review for details. |
| 8. Tuberculosis/Infection Control | Non compliant | 38.0% | Delays identified in treatment of postitive TB tests. |
| 9. Pharmaceutical Administration Procedures for Non Compliance;  Medications Supplied for Released Inmates or Inmates Going Offsite; Central Dispensing | Compliant | 100.0% | No log available for extensive review. No lapses found on site. |
| 10. Administration and staff on  site | Non- Compliant | 90.0% | Insufficient nurse staffing exposes inmates to serious risk of adverse outcomes. |
| 11. RN Medication Administration On site | Compliant | 95.0% | Inmates not consistently inspected to ensure ingestion of administered medications. |
| 12. Physician/Provider Case Review | Compliant | 82.0% | This measure considers chart reviews off site. |
| 13. Nursing Case Review | Non compliant | NA | The nurse sick call line was suspended at time of this audit |
| Overal Audit Score and Rating: | | 77.8% | |

# OBJECTIVES, SCOPE, AND METHODOLOGY

This audit assesses compliance with the implementation plan.  Where lapses are identified this auditor has made recommendations for corrective actions to promote compliance with plan parameters.

3-4

**Quantitative Review**

Eleven components of medical care are identified in the implementation plan:  Intake Screening, Access to Care, Chronic Care, Health Care Maintenance, Continuity of Care, Outside Care Referrals, Detox/Withdrawal, Tuberculosis/Infection Control, Pharmaceutical Management (not RN), Administrative Services and RN Dispensing on Site.  A measure of clinical care provided as a percentage of appropriate encounters is also included in the quantitative review.

The score derived from these assessments is provided solely to assist in comparing performances from prior audits to the current audit.  A high score suggests substantial compliance with the implementation plan for that aspect of care.  However, a serious lapse in the care of a single inmate may indicate non-compliance with the plan even though care was overall appropriate for other inmates.

**Qualitative Review**

Case reviews considers the adequacy of care in accord with generally accepted principles of medicine and applicable standards, aside from the specific parameters for performance specifically described by the implementation plan.

**Medical Facilities and Staffing**

The audit reviewed the facility to assess cleanliness, orderliness, adequacy of space, privacy, infection control, and availability of essential medical equipment.   The audit also reviewed staffing and supervision of staff.

**Interviews**

Interviews with medical and nursing staff, and with inmates provided valuable insight into the adequacy of health care services at MCJ and directed the auditor's attention to areas of greatest concern.   The interviews did not affect the compliance scores or assessment of care in case studies.

**Overall Quality Indicator Percentage and Overall Audit Performance**

The percentage calculation for overall quality of care provided at MCJ is based upon an average of the percentage compliance in the 11 components of medical care plus percentage of adequate care noted in the case reviews.  It is merely offered as a metric for comparison in future audits.  Serious lapses in process and avoidable poor patient outcomes are inconsistent with substantial compliance even if the percentage compliance on other measures is high.

## FINDINGS AND RECOMMENDATIONS TO IMPROVE COMPLIANCE

Findings and recommendations are summarized below.  Patient names and further details are available for confidential review upon request.

**INTAKE SCREEING** – Nursing examinations at intake were carefully executed and documented except that height and weight were not measured, but instead entered into the chart based upon the inmate's own report.  The absence of accurate height and weight at intake does not comport with community standards.  MCJ agreed to the corrective action described below.  Otherwise the intake process **is substantially compliant with implementation plan.**

Recommended corrective action:  1) intake nurse should observe the officers who are booking the inmate nearby to see the actual height in foot and inches as measured against the wall chart (custody will paint inch markers to fill in the existing foot markings).   2)  nurse should use scale to obtain accurate weight.

**ACCESS TO CARE** – There were no nurse lines scheduled for inmate care, but instead all patients requesting medical services were referred to the first available Physician Assistant appointments, usually days later without apparent regard to the request.  The small sick call slips provided to inmates as well as the computer-stored and printed sick call slips did not convey any information about nurse evaluation of the request.   Lack of documented nurse evaluation within 24 hours of inmate complaint or request for services is **not substantially compliant with implementation plan.**

Recommended corrective action: the use of small, quarter page sick call slips should be discontinued as they provide insufficient space for nursing notes.  Slips should be replaced with 8.5 x 11 letter sized request forms and computer-generated typed forms that include documentation of timely nursing evaluation of the inmate request.  The nursing sick call line should be reinstated as soon as feasible to provide inmates with timely assessment and triage of their requests for services.

**CHRONIC CARE** – Patients with chronic medical problems were examined appropriately and timely.  Diagnoses documented in chronic care visits were not consistently entered into problem lists.  Overall, the evaluation and treatment of chronic care problems **is substantially compliant with the implementation plan.**

Recommended corrective action:  electronic medical records soon to be in place should automatically populate a problem list with all diagnoses.


**HEALTH CARE MAINTENANCE** – Inmates with a significant medical condition or stable chronic diseases should undergo full exam by physician or physician assistant within a week after intake.  All inmates should undergo complete history and physical while incarcerated at 6 month intervals, unless the exam is refused by the inmate.  The complete physical exam required pursuant to implementation plan is sometimes redundant to regularly scheduled chronic care visits.   Overall, the periodic examinations for long-term resident inmates **is substantially compliant with the implementation plan.**

Recommended corrective action:  Chronic care forms may be reconfigured to also meet requirement for the full exam required every 6 months.

**CONTINUITY OF CARE AFTER RELEASE - T**he appropriate forms were deployed correctly to provide instructions to inmates with need for medical follow up.   Continuity of care for inmates leaving jail for the free world or transferred to prisons **is substantially complaint with the implementation plan**.

**OUTSIDE CARE REFERRALS** – Although inmates were generally referred to and treated as needed by outside health care providers, the case reviews describe below two patients were not able to access needed specialists (Oral surgeon and neurosurgeon).   Reports from outside health care providers were not consistently placed into the medical records. No ambulance transfer forms were found in the charts. Frequently MCJ staff placed follow up calls to outside medical providers to obtain reports to be entered into the MCJ medical record.  The process for outside medical care **was not substantially compliant with the implementation plan**.   Reducing the work involved in chasing down specialist reports would make medical care at MCJ more efficient.

Recommended corrective action:  Revised forms and administrative follow up should lead to more efficient specialty care and timely reports from outside medical care providers.

**DETOX/WITHDRAWL -** In nearly all cases inmates were properly placed in sobering cell and/or assessed for withdrawal according to protocols.  A few circumstances were noted (see case reviews)  where an inmate at risk of imminent harm from withdrawal or medical complications of intoxication was not referred for timely medical evaluation.  Overall, detoxification procedures and monitoring for withdrawal **is compliant with implementation plan.**

Recommended corrective action:  Medical director and administrative follow up, as provided in monthly MCJ QA meeting, should reinforce the importance of timely referral by nursing of patients at greatest risk to physician or physician assistants. As described further below, quality assurance meetings held monthly can improve compliance with all aspects of the implementation plan.

**TB/INFECTION CONTOL** – Multiple positive TB skin tests were not timely referred for primary care evaluation.  In a few cases there was no clinical action documented (i.e. no counseling, no treatment and no public health notification) even when the patient involved was at relatively high risk for TB illness on account of age or co-morbid conditions.  See case reviews. The implementation plan calls for nursing to review TB skin tests for further action and to maintain an effective log of positive TB test results.  The observed delay in  counseling and treatment of positive TB tests **is not substantially compliant with the implementation**

Recommended corrective action:   current logs of positive skin tests are compiled monthly and mostly serve to confirm the delays in counseling and treatment.  The logs should be prepared weekly to ensure that inmates with positive skin tests are promptly counseled and treated in accord with the implementation plan.

**MEDICATIONS/PHARMACY** – There are multiple components in the implementation plan for administration of medications.

A.  Dispensing of medications.  MCJ dispensing drugs appeared to meet community standards with bulk/stock bottles securely stored and managed with all due cautions.

B.  Medication Administration.  Administration of medications seemed to be performed properly as observed during this audit (confirmation of inmate ID, direct observation of medication ingestion, documenting ingestion).  However, some inmates were observed to leave the line without adequate inspection to ensure ingestion of the administered medication.

C.  Documenting Noncompliance with medication order or recommendations.  There is no log maintained for patients refusing medications for three or more consecutive doses.

D.  Continuity of Prescription Medications.  Inmates received instructions and continued medications upon their release.

E.  Timely Provision of Medications at MCJ that had been prescribed to prisoner before intake.  This audit did not find prisoners denied necessary medications at intake.

F.  Administration every 12 hours for "twice daily" drugs.  Med lines are scheduled at appropriate times.

Overall the pharmaceutical administration **is compliant with the implementation plan.** However, there is room for improvement in pharmaceutical administration.  The work load on the medication line should be reduced or have more nursing or custody assistance allocated to the task.

Recommended corrective actions:  a) The custody officer, always accompanying the nurse, can illuminate oral cavities with a flashlight to facilitate the nurse's confirmation that the administered medication has been ingested.  The custody officer acting in this fashion will alert inmates to the seriousness of the nurse's inspection while ensuring inmate and staff safety.   b)  A log should be maintained of all patients who are refusing their medications to facilitate review by the medical director.

**PRIMARY CARE PROVIDER (PCP) STAFFING**[2]  –  On the dates of this audit MCJ PCP staff consisted of two full time PA's (PA ▮▮▮▮▮ PA ▮▮▮▮▮ supervised by the medical director, who is also the sole physician on site. PA ▮▮▮▮ has worked at MCJ for some years.  PA ▮▮▮▮ was hired recently.  This is the first corrections experience for PA ▮▮▮▮ The medical director shares the patient load and frequently consults with PA and nursing staff.  Primary care provider staffing, with physician assistants operating pursuant to delegated services agreement on file in MCJ **is compliant with the implementation plan**. However, the physician assistants need ongoing monitoring and education to provide optimal services to the challenging inmate population.

[2] Primary Care Providers (PCP) – also referred to as "Providers" are licensed as allopathic or osteopathic physicians (MD, DO), family nurse practitioners (NP) and physician assistants (PA).  Although licensed nurses may evaluate and provide limited treatment, nurses who are not additionally credentialed as NP are not considered PCPs.

Recommended correction action:  Formal, monthly quality improvement meetings should be instituted as described below.

**STAFFING (non-provider)** The lack of sufficient nurses to provide a nurse sick call line is **not compliant with the implementation plan.**  Serious errors in medication administration (see case review)  and delays in nursing referral to primary care further suggest that nurse staffing is insufficient to meet requirements of the implementation plan.  New administrative staff (present for this on-site visit) promise to ensure management and clinical support that substantially complies with the implementation plan.

Recommended corrective action:  Sufficient number of RN should be hired or otherwise installed at MCJ as soon as feasible to allow inmates access to a RN sick call line and reduce the risk of errors from overworked staff. The interim solution of directing all inmates' request for care to the physician assistants has overloaded these providers and puts inmates at risk of adverse health outcomes.

**CLINIC SPACE** -  Clinic Space **is substantially compliant with the implementation plan.**

**RECORD KEEPING -** Illegible Provider signatures and missing consultant reports do not comport with applicable standards of care.   CFMG implementation plan requires all health staff to maintain "accurate and legible medical records."  MCJ compliance with that requirement should improve dramatically with the introduction of electronic medical records at this time.  The next audit will report on the efficacy of the new electronic medical record system.

**QUALITY ASSURANCE:**  MCJ does not have scheduled monthly quality assurance meeting chaired by the MCJ medical director to discuss complicated cases or adverse outcomes.  Quarterly meetings have not addressed many issues at MCJ that merit further discussion towards quality improvement.  The current process for quality assurance is not substantially compliant with the implementation plan requirement for effective systems that monitor outcome and implement corrective actions for continual quality improvement.

Recommended corrective action:  Nursing leadership, administrative mangers and the medical director should develop a program for quality improvement meetings monthly to monitor and discuss adverse outcomes and the reduction of health risks.

## INMATE DEATH(S)

**Inmate AP.**  This  59-year-old male admitted on October 18, 2017 died on November 25, 2017 from a yet unknown cause.  He had long suffered with severe schizophrenia, dementia, and significant complicating medical problems including diabetes, hypertension, and pan hypopituitarism. He had refused medications and medical examinations on multiple occasions.  It does not look like refusal forms were signed or documentation was put in the record the patient refused to sign forms.

As mentioned in the last audit report, decedent's severe mental illness and medical conditions suggest numerous non-preventable causes for his death.  The post mortem exam was requested, along with the death review by MCJ.  Neither has been provided.  The auditor's analysis of this death therefore remains incomplete.

*The paucity of details in the medical record regarding care provided to decedent's care around the time of death and the apparent lack of death review process in this case substantiates the concern that MCJ medical records and quality assurance processes have much room for improvement.*  At the exit interview, the medical director and administrative staff expressed their commitment to ameliorating this situation with an electronic medical record system, and regularly monthly quality assurance meetings to review deaths and other clinical concerns.

**Inmate AC:**   This 32 year old inmate death on January 8, 2018 was caused by hanging, and did not appear related to any non-psychiatric issues.  Accordingly, I anticipate that an analysis of this death will be provided by the mental health expert.  As is the case in the demise of inmate AP,  a death review should be timely completed for AC as well.

**INMATE COMPLAINTS**

Three male and three female inmate interviewees were provided by custody as representative spokespersons and as patients representing themselves.  The inmates were asked to comment on their personal experiences and their understanding of experiences by fellow inmates regarding the parameters being measured for compliance with the implementation plan. The inmates voiced no concern about access to a primary care physician, specialist care or access to prescription medications. Two inmates did mention they were unable to access desired dental care.

These complaints were brought to attention of MCJ medical leadership.

## PHYSICIAN CASE REVIEW [3]

CASE #1 – delayed referral to MD after intake for medications, medical care and mental health evaluations. **Care is inadequate.**

CASE #2 – **Care is adequate.**   Wrong medication administered on single occasion with no ill effects noted after monitoring.

CASE #3 - **Care is adequate.**

CASE #4 – Sick call slips not processed.  TB testing delayed.  **Care is inadequate.**

---

[3] Names and ID numbers for charts noted in this audit report as reviewed by Dr. Barnett have been provided to MCJ Medical/Nursing Directors.

Case #5 – **Care is adequate.**

Case #6 - **Care is adequate.**

Case #7 - **Care is adequate.**

Case #8 - **Care is adequate.**

Case #9 - **Care is inadequate.**

Case #10 –**Care is adequate.**

Case #11 – Delayed referral by RN to providers for positive TB skin test, incomplete transfer information. **Care is inadequate.**

Case #12 - **Care is adequate.**

Case #13 - Serious medication error (repeatedly wrong drugs administered)  leads to life-threatening hypoglycemic seizure.  Record does not detail emergency care at MCJ.  Also medical chart does not document required education for positive TB skin test.  **Care is inadequate.**

Case #14 - Patient not provided with oral surgery for multiple dental abscesses.  **Care is inadequate.**

Case #15 - **Care is adequate.**  Neurosurgery consultation requested but not obtained.

Case #16   - Positive PPD not attended to in accord with implementation plan.  **Care is inadequate.**

Case #17 - **Care is adequate**

Case #18 - **Care is adequate.**  However, patient was released by custody without medical follow-up despite CIWA score of 12 suggesting risk of impending delirium tremens.  Quality assurance meeting and custody education might prevent future similar events.

Case #19 - **Care is adequate**

Case #20 - **Care is adequate**

**Physician Case Review Analysis**

Multiple serious lapses were identified:  1) delayed referral at intake to PCP for patients at risk  2) delayed counseling/treatment for latent TB, 3) serious medication errors  4) inadequate access to specialty services (dental and neurosurgery).  These deficiencies appeared due to insufficient nurse staffing and/or inadequate administrative services.  PCP services were overall appropriate and met applicable standard of care.

**Nursing Case Review Results**
No review of care by nurses was performed in this audit as there was no nurse sick call line.

## RECOMMENDATIONS SUMMARY

1. Nursing sick call lines should be reinstated.
2. Nurses should review inmate requests for services prior to triage for PA care at next available appointment.
3. Sick call requests should be promptly evaluated by nurses.
4. Each PA needs to consult with and receive education from the medical director.
5. Intake height and weight should be measured and recorded accurately.
6. Electronic medical records should be installed as soon as feasible
7. Administration should improve inmate access to care for needed specialty services.
8. TB testing logs should be updated weekly to ensure prompt follow up for positive tests
9. Quality assurance meetings for MCJ patient care should be held monthly to provide enhanced education, corrective actions, and promote better use of the multiple patient logs already in place. Minutes should be recorded as peer review privileged documents.
10. Custody officers attending pill line should work with nursing to promote consistently effective inspection that ensures inmates ingest and do not divert prescribed medications.
11. A death reviews should be performed and endorsed by medical leadership within 30 days of any inmate's death.

## CONCLUSION

Based upon pre-visit medical chart review, site visit and additional onsite chart reviews, this audit finds that medical care provided to inmates at MCJ for the period under review (September 2017 through February 2018) was **not substantially** compliant with the implementation plan.   MCJ performances in four of the thirteen parameters listed were not in substantial compliance with the plan.  Moreover, there were serious lapses in the treatment of latent TB, inadequate nursing care and poor access to some specialty services.

On the other hand, the performance at MCJ has steadily improved since the first audit was done in 2017.   Medical leadership at MCJ has agreed in most parts with the recommendations issued in this audit to help make all medical services substantially compliant with the implementation plan.

## ADDENDUM

**ANALYSIS OF COMPLIANCE – comparing March/September 2017 audits to April 2018.**

The table below summarizes whether the April 2018 audit found current compliance (Yes or No) in regard to recommendations proposed with the prior audit.

RECOMMENDATION                                                                          compliant:  Y/N

(Comments – citing pages in April 2018 audit unless noted otherwise. )

| RECOMMENDATION | compliant: Y/N (Comments) |
|---|---|
| 1. Medical leadership should intensify training programs for PA's and Nurses. | Y (improved with Dr. ██ but not yet sufficient, see p. 9) |
| 2. The delegated services agreement (DSA) for each PA working at MCJ should be on site for inspection at all times. | Y (documented on site p. 9) |
| 3. All NP's at MCJ should identify a physician collaborator with whom consultations can be readily obtained. | Y – (Dr. ██ supervising, but no NP employed April 2018) |
| 4. Daily PCP lines should not exceed 24 inmates per provider. | N – (inadequate nurse staffing overloads PCP – P. 9) |
| 5. Inmates should be seen by PCP within 2 weeks of request for routine care, and not more than one day if care is considered urgent.  Emergency care should be provided on site and/or at NMC immediately when needed. | N – (Access to care non compliant as no nurse sick line. P. 9) |
| 6. A physician on site 5 days each week and as needed on call should provide inmates with physician consultation upon reasonable request.  Complex medical conditions should not be managed by PA, NP or RN. | Y – (Dr. ██ hire and full time presence noted in Sept 2017 audit and April 2018 p. 9) |
| 7. Monthly meetings to discuss quality assurance, utilization management, and continuing medical education should include nursing. | N – (See April draft audit p. 9, 10) |
| 8. Increased attention should be given to medication management that includes reviewing process for proper prescribing and proper dispensing. | Y – ( See audit draft p. 8. However, insufficient nurse staffing increases risk of medication errors. P. 9, 11, 12). |
| 9. Exam tables should be available in all exam and treatment rooms.  Biohazard bags should be readily available to providers. | Y – (compliance documented in September 2017 audit; p. 14) |
| 10. Medical and custody leadership should provide appropriate privacy for inmates seeking and receiving medical care. | Y (compliance documented in September 2017 audit; p. 14) |
| 11. The medical director and director of nurses should develop and use logs to track and treat:<br>    a.  TB test positive<br>    b.  Chronic care:  asthma, DM, hypertension. | N (TB logs, and other longs, although compiled monthly, do not promote timely PCP action; no log identifies |

| | |
|---|---|
| c. Aged population needs PCP attention | aged population. P. 7, p. 12) |
| 12. Protocols for detox, sober cell admission should be followed with increased consultations by PCP for patients at risk of delirium or other complications of substance abuse. | Y (room for improvement noted to reduce risk of withdrawal syndromes and ensure prompt treatment of seriously ill. P. 7, p. 12) |
| 13. The written consultations by outside providers should be sent on the same day back to MCJ. The medical chart should contain documentation of conversation between PCP and medical consultants when the written consultation needs clarification. | N (Specialists' reports have not been filed timely in medical charts. P. 7) |
| 14. Nursing staff should be trained on Protocols that conform to standards set by the implementation plan for Intake Screening, Health Care Transfer procedures, Continuity of Care outside the facility and Pharmaceutical Administration. Nurses providing care to patients with acute problems should document their examination, assessment and plan using pre-printed forms that ensure compliance with approved protocols. | N (in April 2018 there was no nurse sick call, and nurse triage was essentially reduced to PCP scheduling without assessment. P. 12) |
| 15. Nursing staff should ensure patient's prescribed medications are received timely and as ordered. Nursing staff should ensure a refusal form is completed and the patient is referred to the PCP when a patient refuses medication and/or outside specialty appointments. Inmates receiving medications by RN or LVN administration should be observed to ensure no diversion of drugs is occurring. | N (Nursing staff does not effectively monitor patient medication compliance at all times required. P. 8, 12) |
| 16. Establish an infection control committee to deal with known and potential communicable disease and outbreaks in partnership with the Monterey Public Health Department. | N (Insufficient quality assurance meetings and inadequate attention to positive TB tests identified in April audit. P. 7, 12) |
| 17. Prescription medications should be dispensed by persons licensed to do so or by persons authorized and trained by licensed personnel in accordance with state law. | Y (Dispensing is done in accord with state law, as provided for by the court approved implementation plan that permits LVN participation. See September 2017 audit report, p. 8). |
| 18. All inmates who are released on medications should sign forms that document counseling regarding drugs dispensed, next outside appointments, and patient education. | Y (April audit report p. 8). |

| | |
|---|---|
| | |

As detailed above, ten (10) out of eighteen (18) lapses noted in my March 2017 audit appear to have been substantially if not fully corrected upon inspection in September 2017 and April 2018.  It is also significant that for nearly half of the recommendations adequate corrective action has not been observed.  I emphasize this circumstance in my April 2018 summary of recommendations (page 12):

### MCJ TOUR BY ROBERT L. COHEN,  MD

In conjunction with the April 2018 audit, Robert L. Cohen, MD submitted his findings from a tour of MCJ on April 12-13, 2018 on behalf of the Plaintiffs.  Dr. Cohen described as non-compliant some aspects of care that this report describes as substantially compliant. Dr. Cohen and Dr. Barnett appear to agree that overall medical care to inmates at MCH is not substantially compliant with the implementation plan.

# Exhibit 4

# MONTEREY COUNTY JAIL COMPLIANCE AND HEALTH CARE MONITORING AUDIT

October 1 - 2,  2018



# TABLE OF CONTENTS

BRIEF SUMMARY OF FINDINGS ................................................................................................... 2

OBJECTIVES, SCOPE, AND METHODOLOGY ............................................................................. 4

# INTRODUCTION

Pursuant to a court-ordered survey (Hernandez v County of Monterey),  Bruce Barnett, MD (auditor) visited the Monterey County Jail (MCJ) on October 1 – 2, 2018  to review healthcare delivered to inmate population.  Prior to visiting the facility, Dr. Barnett reviewed 40  inmate medical records derived from the population interred at the Jail from September 1, 2017 through February 28, 2018 .[1]  On site, Dr. Barnett examined aspects of medical care identified as important by the court in its orders for Hernandez v Monterey Count that addresses compliance with the California Forensic Medical Group (CFMG) implementation plan ("implementation plan").

On October 2, 2018 Dr. Barnett's preliminary findings were presented at an exit interview at MCJ. [2] These findings were reiterated to representatives for the parties in a memo sent by e mail on October 7, 2018.   This draft report provided a compilation of findings from the site visit, review of inmate medical records, a quantitative measure of compliance with the implementation plan, overall assessment of care, and summary of findings.   This "final report" follows consideration of party responses and rebuttal to findings described in October.

# BRIEF SUMMARY OF FINDINGS

**The newly installed electronic medical record system significantly complicated the current audit. Medical records reviewed before the audit did not contain information available on site and were at times incomplete.  On site medical record review was only possible working with the program manager to open electronic files and assist in data searches. Multiple inquiries regarding specific inmates and areas of care were not answered, as summarized at the end of this report.**

**Compared to prior audits, chart review yielded an overall numeric compliance percentage of 85% compared to previously calculated compliances of 78% (April 2018), 73% (September 2017) and 51% (March 2017). However, <u>this final audit report finds healthcare for inmates at MCJ to be not substantially compliant with the implementation plan.</u>**

**Although this audit found evidence that health care services improved at MCJ,  there were serious lapses identified in patient care that expose MCJ inmates to risks of adverse outcomes. Because of difficulties in accessing data with the new electronic record, the auditor could not confirm that MCJ**

---

[1] The care of thirty patients is reviewed in detail and presented below in "Physician Case Review. "
[2] Present at this interview:  Captain Bass, Program Manager ▊▊▊  Medical Director Dr. ▊▊  Nurse Director ▊▊
CFMG Director Dr. Taylor.

has addressed and remediated the apparent insufficient medical leadership oversight associated with
the observed lapses.

## Summary Table[3]

| Quality Indicator | Compliant/Non Compliant | % Compliant | Comments |
|---|---|---|---|
| 1.  Intake Screening | Compliant | 92.0% | see text below |
| 2.  Access to Care | Compliant | 88.0% | see text below |
| 3. Chronic Care | Compliant | 100.0% | the 100% figure does not include physician case reviews or CFMG audit |
| 4. Health Care Maintenance | Compliant | 86.0% | see text below |
| 5. Continuity of Care | Non Compliant | 73.0% | lapses in medical record |
| 6. Outside Care Referrals | Non Compliant | 75.0% | Brief specialists reports nearly always accompany returned patients. Significant delay in specialty care for two patients suggests MCJ is non compliant. |
| 7. Detox/Withdrawal | Compliant | 82.0% | Appropriate detoxification in most cases.  See case review for details. |
| 8. Tuberculosis/Infection Control | Non compliant | 63.0% | Delays still identified in planning treatment for postitive TB tests. |
| 9. Pharmaceutical Administration Procedures for Non Compliance;  Medications Supplied for Released Inmates or Inmates Going Offsite; Central Dispensing | Compliant | 100.0% | No log available for extensive review. No lapses found on site. |
| 10. Administration and staff on  site | Compliant | 100.0% | Facility to provide updated confirmation of staffing |
| 11. RN Medication Administration On site | Compliant | 100.0% | |
| 12. Physician/Provider Case Review | Non Compliant | 60.0% | This measure considers chart reviews off site. Response to findings pending. |
| 13. Nursing Case Review | NA see comment | NA | Nurse Case Review included with Physician Case Review; Full audit impaired by new electronic medical records. |
| Overall Audit Score and Rating: | | 84.9% | |

---

[3] Percentages in this table provide a gross accounting of the findings in the auditors review of charts accessed on
site.  It does not include data from the physician chart case reviews (described separately as quality indicator 12)
or from the CFMG conducted audits.  Please see audit text and auditor's worksheets for more details.

## OBJECTIVES, SCOPE, AND METHODOLOGY

This audit assesses compliance with the implementation plan.  Where lapses are identified recommendations are provided for corrective actions to promote compliance with plan parameters.

**Quantitative Review**

Eleven components of medical care are identified in the implementation plan:  Intake Screening, Access to Care, Chronic Care, Health Care Maintenance, Continuity of Care, Outside Care Referrals, Detox/Withdrawal, Tuberculosis/Infection Control, Pharmaceutical Management (not RN), Administrative Services and RN Dispensing on Site.  A measure of clinical care provided as a percentage of appropriate encounters is also included in the quantitative review.  Physician/Provider case review is also considered an important indicator of quality care.  The percentage of adequate care in case reviews is listed as number 12 on the summary chart. The overall score includes the percentage of adequate care found in case review.  **A serious lapse in the care of a one or more inmates may indicate non-compliance with the plan even though care was overall appropriate for other inmates.**

The score derived from these assessments is provided solely to assist in comparing performances from prior audits to the current audit.  A high score suggests, but does not establish, substantial compliance with the implementation plan.

**Qualitative Review**

Case reviews considers the adequacy of care in accord with generally accepted principles of medicine and applicable standards, aside from the specific parameters for performance specifically described by the implementation plan.  It is reasonable to consider these case review to be of greater importance, or greater weight, in evaluating whether MCJ is substantially compliant with the implementation plan to improve health care for its inmates.

**Medical Facilities and Staffing**

The audit reviewed the facility to assess cleanliness, orderliness, adequacy of space, privacy, infection control, and availability of essential medical equipment.  The audit also reviewed staffing and supervision of staff.

4-4

**Interviews**

Interviews with medical and nursing staff, and with inmates provided valuable insight into the adequacy of health care services at MCJ and directed the auditor's attention to areas of greatest concern.   The interviews did not affect the compliance scores or assessment of care in case studies.


## FINDINGS

The newly installed electronic medical record system complicated the current audit.  Queries have remained open due to challenges in using the new system, as summarized at end of this report.

**INTAKE SCREENING** – Nursing examinations at intake were carefully executed and documented using a new electronic medical record system.  The height and weight are measured and entered into the chart along with a calculated body mass index (BMI).  This greatly assists the clinicians in assessing risks for multiple medical conditions and may aid in calculating drug doses.  Patient confidentiality was respected.  Although custody officers were within sight of the inmates during intake for safety and security, nurse queries and patient replies appeared to be private[4].  Except as noted in a few of the case reviews[5] the new system facilitates hospital transfers of acutely ill patients, proper deployment of withdrawal protocols and referral to PCP for chronic care problems.   Accordingly, the intake process **is substantially compliant with implementation plan.**

**ACCESS TO CARE** –Nurse sick call has been restored.  Nurses have been trained to follow the "Registered Nurse Protocols" introduced July 2018. In the auditor's direct observation of nursing sick call lines, the effective use of these protocols was confirmed. The medical record reviews indicate that requests for medical services are triaged promptly (within 24 hours) for timely visits to nurses or PCP.  Emergency needs appear to be addressed immediately.   Inmates interviewed by the auditor confirmed that they did not experience inordinate delay in obtaining requested medical care.

Each physician assistant each now sees approximately 20 inmates daily instead of the larger number previously required to make up for no nurse lines.  The new medical record system allows for easy review and documentation of PA supervision by the medical director.  [6]  The audit parameter of providing inmates with prompt and appropriate access to care **is substantially compliant with implementation plan.**

---

[4] HIPAA requirements for the incarcerated allow that peace officers are sworn to privacy and thus may be among the persons authorized to receive and protect privileged health information.
[5] See discussion below regarding identification of addiction as a chronic problem that should reliably produce referral for PCP exam within 5 – 7 days of intake.
[6] Significant lapses were detected in the qualitative chart review, due in large part to apparently lax supervision of PA activities.  The process wherein a minimum of 5% of PA cases are "signed off" by the supervising MD was not evident in the charts reviewed for this audit. This issue is discussed further in the Physician/Nurse case reviews.

**CHRONIC CARE** – Patients with chronic medical problems were examined appropriately and timely in the cases reviewed on site except for addiction disorders that MCJ has not regarded as "chronic." In approximately a third of the encounters reviewed off-site, the auditor did not deem chronic care appropriate.   Overall, the evaluation and treatment of chronic care problems appeared to be **substantially compliant with the implementation plan.** [7]

**HEALTH CARE MAINTENANCE** – Inmates with a significant medical condition or stable chronic diseases should undergo full exam by physician or physician assistant within a week after intake.[8]  All inmates should undergo complete history and physical while incarcerated at 6 month intervals, unless the exam is refused by the inmate.  The complete physical exam required pursuant to implementation plan is sometimes redundant to regularly scheduled chronic care visits.   As best reviewed at this time through electronic record reports,[9] the periodic examinations for long-term resident inmates appear to be **substantially compliant with the implementation plan.** [10]

**CONTINUITY OF CARE AFTER RELEASE** - Inmates are purportedly provided with appropriate instructions for medical follow up upon release, including continuation of necessary medications. However, at least one nurse was identified who did not properly document these instructions. Based on the documents reviewed at this audit continuity of care for inmates leaving jail for the free world or transferred to prisons **was not substantially complaint with the implementation plan**.

**OUTSIDE CARE REFERRALS** –Inmates were generally referred to and treated as needed by outside health care providers.   Brief reports from outside health care providers consistently accompanied inmates returning from consultation.  The medical records also documented frequent communications between MCJ medical director and treating specialists. Nonetheless, failure to obtain prompt specialty care for two inmates at high risk for adverse outcome (see case reviews #20, #21) suggest that the process for outside medical care **was not substantially compliant with the implementation plan**.

**DETOX/WITHDRAWL** - Inmates were properly placed in sobering cell and/or assessed for withdrawal according to protocols.  As occurred in the past, a few circumstances were noted (see case reviews) where an inmate at risk of medical complications related to chronic intoxication was not referred for timely medical evaluation.  This occurs, it seems, because nurses do not regard addiction as a chronic disease that merits automatic referral to PCP for exam within 5-7 days.  Overall, detoxification procedures and monitoring for withdrawal **is compliant with implementation plan.**

---

[7] This assessment does not consider the CFMG audit report described by Plaintiff as showing only 47% compliance.
[8] Acutely ill patients need immediate physician attention.
[9] The copies of records provided to the auditor refer to "chronic care forms" without supplying copies of the actual exams.  The appropriate forms should be included in the electronic record for the next audit.
[10] Health care maintenance delayed by some days or weeks did not put health patients at risk and were accordingly not considered to be inconsistent with a finding of substantial compliance.

**TB/INFECTION CONTOL** – Multiple positive TB skin tests were not timely referred for primary care evaluation.  In a few cases there was no clinical action documented (i.e. no counseling, no treatment and no public health notification) after many weeks.  See audit work sheets, case reviews. A list of positive TB test results are updated at most monthly, and not regularly followed by any medical leadership. [11] The observed delay in counseling and treatment of positive TB tests **is not substantially compliant with the implementation**

**MEDICATIONS/PHARMACY** – There are multiple components in the implementation plan for administration of medications.

A.  Dispensing of medications.  MCJ dispensing drugs appeared to meet community standards with bulk/stock bottles securely stored and managed with all due cautions.   Under new pharmacy contract, regularly dispensed medications are pre-packaged.

B.  Medication Administration.  Administration of medications seemed to be performed properly as observed during this audit (confirmation of inmate ID, direct observation of medication ingestion, documenting ingestion).

C.  Documenting Noncompliance with medication order or recommendations.   MCJ is asked to produce a log listing patients who refuse medications for three or more consecutive doses.

D.  Continuity of Prescription Medications.  Inmates received instructions and continued medications upon their release.

E.  Timely Provision of Medications at MCJ that had been prescribed to prisoner before intake. This audit did not find prisoners denied necessary medications at intake.

F.  Administration every 12 hours for "twice daily" drugs.   Med lines are scheduled at appropriate times.

Overall the pharmaceutical administration **is compliant with the implementation plan.** However, there is room for improvement in pharmaceutical administration.  The work load on the medication line should be reduced or have more nursing or custody assistance allocated to the task.

**PRIMARY CARE PROVIDER (PCP) STAFFING**[12]  –  On the dates of this audit MCJ PCP staff consisted of two full time PA's (PA ████  PA ████ supervised by the medical director, who is also the sole physician on site. PA ████ has worked at MCJ for some years.  PA ████ was hired recently.  Primary care provider staffing, with physician assistants operating pursuant to delegated services agreement on

---

[11] TB logs and other logs (such as chronic disease) are not consulted by medical leadership on a regular basis to monitor patient care.

[12] Primary Care Providers (PCP) – also referred to as "Providers" are licensed as allopathic or osteopathic physicians (MD, DO), family nurse practitioners (NP) and physician assistants (PA).  Although licensed nurses may evaluate and provide limited treatment, nurses who are not additionally credentialed as NP are not considered PCPs.

file in MCJ **is compliant with the implementation plan**. However, as suggested in case reviews, the physician assistants need more supervision from the medical director in treating complex patients.

**STAFFING (non-provider)**  Access to a  nurse sick call line appears to be  **compliant with the implementation plan.**

**CLINIC SPACE** - Clinic Space **is substantially compliant with the implementation plan.**

**RECORD KEEPING -**  CFMG implementation plan requires all health staff to maintain "accurate and legible medical records."  MCJ compliance with that requirement should improve with the introduction of electronic health records (EHR) at this time.   This audit noted some "growing pains" associated with the transition to a new system.   Data previously available in the written chart was hard to locate in the electronic records.  The EHR did not contain updated problem lists. Health care providers complained that the electronic records were not intuitive and thus required more time to engage than a paper chart. The next audit will report on the efficacy of the new electronic medical record system after nearly one year's deployment.

**QUALITY ASSURANCE:**  Quarterly meetings have not addressed many issues at MCJ that merit further discussion towards quality improvement. MCJ discontinued its scheduled monthly quality assurance (QA) meeting that were chaired by the MCJ medical director to discuss complicated cases or adverse outcomes, as recommended in the last audit.  An effective quality assurance program, as demonstrated by prompt and meaningful reviews of all deaths or other untoward events, is required for MCJ to be in substantial compliance with the implementation plan.

**INMATE DEATH(S)**

No inmate deaths were reported for the period under review at this audit:  April – September 2018. This auditor has not been provided with the death reviews that were supposed to be generated following the demise of inmates in 2017 and early 2018.  An Inmate death occurring in November 2018 is not reviewed in this audit report. The next audit will assess the clinical care, and the post-mortem report by MCJ.

**INMATE INTERVIEWS**

Three male and three female inmate interviewees were provided by custody as representative spokespersons and representing themselves.  The inmates were asked to comment on their personal experiences and their understanding of experiences by fellow inmates regarding the parameters being measured for compliance with the implementation plan. The inmates voiced no concern about access to care in general but did state that it seemed difficult to see a physician when requested rather than a nurse.   The inmates also reported an occasional minor lapse in receiving medications previously prescribed.  Two inmates did mention they were unable to access desired dental care.

Inmates' complaints were brought to attention of MCJ medical leadership.

## PHYSICIAN/NURSE CARE CASE REVIEW [13]

CASE #1 –**Care is inadequate.**

CASE #2 – **Care is inadequate.**   PA makes mistaken diagnosis, unnecessary antibiotic.  Reconsider use of dextromethorphan in jail (not on California or Federal prison formularies)

CASE #3 - **Care is adequate.**

CASE #4 – **Care is adequate.**

Case #5 – **Care is adequate.**

 Case #6 - **Care is inadequate.** Positive PPD not followed up with PCP visit.  No wet smears to validate vaginitis diagnosis. Illogical diagnosis and treatment for "bed bugs." Insufficient documentation of medical supervision of PA care.

Case #7 - **Care is inadequate.**  Complaint of "tarry stools" in patient with fatty liver not promptly referred for GI evaluation. No hemoccult documented while awaiting GI exam.

Case #8 – **Care is adequate.**

Case #9 - **Care is inadequate.**  Patient education/counseling for positive PPD delayed. OTC med prescribed for headache with no exam.

Case #10 –**Care is adequate.**

Case #11 –**Care is adequate.**

Case #12 - **Care is adequate.**

Case #13 - **Care is adequate.** Two NSAID prescribed at same time. Error corrected after one week.

---

[13] Names and ID numbers for charts noted in this audit report as reviewed by Dr. Barnett are included in the work sheets that accompany this draft.  Most of the lapses noted have already been brought to attention of parties.  No responses to that notice has been yet sent to auditor.

Case #14 – **Care is adequate.**  Prescription of antibiotic for viral sinusitis common in community but does not comport with best practices.  Insufficient PA monitoring by Medical Director. Also reconsider prescribing dextromethorphan in jail population at risk for substance abuse**.**

Case #15 - **Care is adequate.**

Case #16   **Care is adequate.**

Case #17 - **Care is adequate.**

Case #18 - **Care is adequate.**

Case #19 - **Care is inadequate.**   Insufficient medical director monitoring of care delivered by PA to inmate with complex and possibly life threatening HIV infection with evidence of deteriorated immune response (oral thrush, MAI pneumonitis)

Case #20 - **Care is inadequate.**  Delayed orthopedic consultation. Delayed physical therapy.

Case #21 – **Care is inadequate.**  Delayed gynecological evaluation of patient with possible ovarian cancer.

Case #22 – **Care is inadequate**. Delayed evaluation and treatment by MD for CHF.

Case #23 **Care is inadequate.**  Intake fails to identify patient with morbid obesity, DM, sleep apnea and alcoholism as having chronic diseases needing prompt PCP evaluation and continuity of past medications.

Case #24 – **Care Is adequate.**

Case #25 – **Care is inadequate**. Poor follow up in MCJ for elderly patient (age 60) with poorly compensated COPD.

Case #26 – **Care is adequate**

Case #27 – **Care is adequate**

Case #28 – **Care is adequate**

Case #29 – **Care is adequate**

Case #30 – **Care is inadequate**. PA treatment of possible tonsillar abscess without MD consultation exceeds scope of practice, insufficient follow-up, failure to document application of Ottawa rules in evaluating ankle injury.

**Physician Case Review Analysis – updated after discussion with Dr. ███ November 2, 2018**

Possible lapses in clinical care were discussed with MCJ staff attention.

| ID, date | possible lapse | Medical Director Response |
|---|---|---|
| ███<br>5/14<br>5/22<br><br>8/21 | ███ exam does not explicitly consider strep throat<br>███ Lump in R neck, mass below mandible, no diagnosis ("lymphadenopathy").  Treatment: Rocephin IM, Augmentin 875 bid x 10 days<br>███:Injured ankle, not subjected to Ottawa rules | Medical Director agrees that PA should rule out strep and also bring to her attention cases severe enough to require IM antibiotic treatment.<br><br>The Ottawa rule test will be taught to staff as a valuable tool for discerning more serious injury from mild injury. |
| ███ | ███ Augmentin 875 tid for bulging TM, no pain. Told to avoid dairy products. | Medical Director agrees this case represents an opportunity for teaching about diagnosis and treatment of otitis media? |
| ███<br>5/16<br><br><br>6/1/18 | ███ diagnosis -contact dermatitis, bed bug. Tension headaches.  Rx Benadryl, Tylenol, hibiclens.<br><br>███ Abdominal pain, normal exam.  No diagnosis except constipation.  Rx: MOM, Colace, Fiber Lax (all subtherapeutic dosages) and Reglan. | Medical Director agrees this case represents an opportunity for teaching about diagnosis and treatment of skin conditions.  There is no role for Hibiclens in treating rash.<br>Medical Director agrees that PA should consult with MD when unable to make diagnosis. |
| ███<br><br>7/10/18 | Reported tarry stool not seen by GI until 8/22.  Endoscopy done 9/13/18 finding severe gastritis is more than 2 months after the reported blood in stool.  No CBC followed. | Transition from written chart to EMR makes it difficult to track the multiple CBC that were done, and showed stable hematocrit.  However, no stool occult blood testing is documented, and that is a lapse in the care of someone who claims tarry stools.  Medical director agrees that presence of blood in stool does merit immediate GI specialty attention. |
| ███<br>7/16/18 | This patient was booked with history of methadone dependence.  No PCP visits are noted.  Are heroin users with or without other medical problems, such as alcoholism followed by PCP  within a week of booking? | The initial case number cited is incorrect. This case will be further reviewed. Addiction and alcoholism is considered a chronic disease and is scheduled for follow up within 3 months.  Protocols will be reviewed to have such patients consistently examined by PCP within a week of booking. |
| ███<br>8/21/18 | ███ unable to see patient due to time constraint.  Prescribes Excedrin with no plans for return visit | PA are instructed that any treatment, event OTC, requires some documented encounter with either PCP or RN. |

4-11

| | | |
|---|---|---|
| ▉▉▉<br>7/2/18 | ▉▉ "suspicious facial lesion" . No diagnosis or treatment noted in medical record. | EMR transition made reading of this record difficult. Dr. ▉▉ did diagnose the lesion considered suspicious by the nurse as benign tinea. This is no lapse. |
| ▉▉▉<br>7/24/18 | Bactrim DS, CTM for "tender bilateral frontal sinus," headache. | Medical Director agrees that Bactrim is not appropriate treatment for uncomplicated acute sinusitis. Instruction will be provided. |
| ▉▉▉<br>6/8/18 | Benzodiazepine withdrawal followed by COWS protocol 6/8/18. I do not see any MD/PCP visit afterwards. | Number first provided is in error. Correct booking number is ▉▉▉▉ In this case, patient was seen by psychiatry within 24 hours of booking. Patients with history of benzodiazepine abuse are seen by either psychiatrist or PCP within 24 hours. Medical director agrees that protocol should be clarified to allow that either psychiatrist or medical PCP within 3 days suffices. Accordingly, I did not find any lapses in care for this patient. |
| ▉▉▉<br>4-8/ 2018 | Abnormal US shows complex ovarian or para ovarian mass in April 2018. No GYN evaluation note in medical record until July, and no ultrasound done as late as end of August. | Transition to EMR has complicated the follow up for this patient. The follow up for abnormal US was delayed. The medical director agrees in the need for improved systemic approach to promptly obtain important hospital records and ensure timely follow up. This patient did have MRI study in October 2018 that showed the mass is a dermoid cyst. This needs further follow up. Dr. ▉▉ will be calling the OB GYN consultant to discuss the appropriate for this patient. |

There were other cases in addition to those discussed above where the audit found possible lapses in care. The issues associated with these cases have been discussed at the prior audits.

 - 28 year old does not receive PCP consultation until 6 weeks after a positive TB skin test. The matter of delay in addressing patients with positive TB skin tests has previously been discussed. Dr. ▉▉ will be working with program manager on this issue.

▉▉▉ – 58 yo with HIV and multiple medical problems, followed by PA but not seen by MD until after patient deteriorates and requires recurrent hospital admission. The matter of MD supervision of PA has been brought up in previous audits. Dr. ▉▉ has reinstituted regular quality management meetings that had lapsed in the past months. Dr. ▉▉ agrees that PA need to bring challenging cases to her attention for co-management.

███████ – 60 year old alcoholic with COPD seen by PA with no MD supervision until after deterioration leads to hospitalization. This is another example of a patient who should be co-managed by MD along with PA.

███████ – 21 year old recovering from severe fracture with persistent substantial pain requiring narcotics.  Referral to orthopedic specialist delayed.  This is an example of specialty needs not being met, and apparent lack of advocacy by PCP for patient welfare.

## RECOMMENDATIONS SUMMARY

1. Each PA needs to regularly consult with and receive education from the medical director.
2. Administration should monitor inmate access to needed specialty services.
3. TB  logs should be updated weekly to ensure prompt follow up for positive PPD tests.
4. Quality assurance meetings chaired by MCJ medical director should be held monthly to provide enhanced education, corrective actions, and promote better use of the multiple patient logs already in place. Minutes should be recorded as peer review privileged documents.
5. Consider patients with alcoholism and substance abuse generally as suffering from chronic disease that merit referral to PCP within 5-7 days after intake, whether or not placed on withdrawal protocols.
6. Consider removing dextromethorphan from the formulary to reduce risk of inmate drug abuse.

## REQUESTS FOR FURTHER INFORMATION

The following information and documentary confirmation was requested but not provided at the time of this final audit report:

1. Confirmation of medical or mental health provider assessment of patients who in September refused prescribed medications for three or more consecutive doses.
2. Roster of RN assigned to sick call during September, and total number of patients seen during September in nurse sick call.
3. List of clinical support positions (CMA, MA, medical records clerks) filled and not filled as of October 1, 2018.
4. Copy of inventory log showing daily narcotic count during September 2018.

## CONCLUSION

**This review of medical care provided to inmates at MCJ during April 2018 through September 2018 disclosed significant deficiencies as described above and therefore also finds that MCJ was for this audit period NOT substantially complaint with the implementation plan.**  Most notably, there were lapses in PA supervision by the medical director, failure to deploy TB logs and other logs for tracking patients at risk, and occasional delays in urgently needed specialist care.  Services provided in 4 out of 12 parameters measured for this audit were not substantially compliant with the implementation plan.

In preparation for the future audit(s), MCJ leadership should anticipate further inquiries into the following aspects of care:

1. Logs documenting follow up of patients refusing medication.
2. Timely documentation of PCP follow-up on positive TB skin tests
3. Clear documentation of supervision by the medical director of PA services
4. Documentation that the director of nursing oversees nurse sick call performance
5. Reinstitution of regular quality assurance meetings (preferably each week and no less than once per month) chaired by the medical director at MCJ to assess clinical care and discuss challenging patients
6. Establishment of logs of patients at risk and use of these logs to improve patient care.  Such logs may include, but need not be limited to:  chronic care, positive TB test, HIV, inmates over 60 years old, polypharmacy (more than 6 medications), inmates referred out for services.
7. Safeguards to ensure that during the next six months and beyond, no patient faces inordinate and unexplained delays in receiving urgently needed specialty consultations.
8. Inspection of medication administration process, including narcotic counts
9. Review of health care staffing, including clinical support.
10. Assessment of EHR use and effectiveness.

# Exhibit 5

# MONTEREY COUNTY JAIL COMPLIANCE AND HEALTH CARE MONITORING AUDIT

April 15, 16 2019



# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................................3

SUMMARY TABLE.............................................................................................................................4

OBJECTIVES, SCOPE, METHODOLOGY.........................................................................................5

FINDINGS ..........................................................................................................................................6

     1. INTAKE SCREENING...................................................... .........................6

     2. ACCESS TO CARE...............................................................................6

     3. CHRONIC CARE..................................................................................6

     4. HEALTH CARE MAINTENANCE...........................................................6

     5. CONTINUITY OF CARE AFTER RELEASE...........................................7

     6. OUTSIDE CARE REFERRALS..............................................................7

     7. DETOXIFICATION/WITHDRAWL........................................................7

     8. TB/INFECTION CONTROL..................................................................7

     9. MEDICATIONS/PHARMACY..............................................................8

     10. PRIMARY CARE AND OTHER STAFFING..........................................9

     11. CLINIC SPACE, MEDICAL RECORDS .............................................9

     12. QUALITY ASSURANCE....................................................................9

 INMATE DEATH(S)............................................................................................................................10

INMATE INTERVIEWS......................................................................................................................11

PHYSICIAN/NURSE CASE REVIEW................................................................................................12

RESPONSE TO COMMENTS BY PLAINTIFFS AND DEFENDANTS.............................................13

CONCLUSION ......................................................................... ......................................................14

RECOMMENDATIONS......................................................................................................................15

REQUESTS FOR FURTHER INFORMATION..................................................................................16

# INTRODUCTION

Pursuant to a court-ordered survey (Hernandez v County of Monterey), Bruce Barnett, MD (auditor) visited the Monterey County Jail (MCJ) on April 15 – 16, 2019  to review healthcare delivered to inmate population.  This audit report refers to:  a)  a review of approximately 100 medical record entries and/or documented encounters  between MCJ health care providers and inmates interred at the Jail from September 1, 2018 through March 30, 2019, [1]   b)  A detailed analysis of care provided to 26 patients described in "Physician Case Review, c)  on site facility review and interviews  d) review of deaths occurring at MCJ or immediately following MCJ incarceration, e) concerns brought to attention of Dr. Barnett by the parties and f) CMGC Registered Nurse Protocols (July 2018) and CFMG Policy and Procedure Manual, collectively referred to herein as "guidelines."

Preliminary findings were presented on April 16, 2019  in an exit interview at MCJ. [2]   These findings were reiterated to representatives for the parties in a memo sent by e mail on April 18, 2019.  The parties' response to the "draft report"  and raw data is noted herein.

# BRIEF SUMMARY OF FINDINGS

Some aspects of care at MCJ have improved since 2018, such as continuity of care and outside referrals. But overall the measured healthcare performance deteriorated with an overall implementation plan compliance score of 64% compared to the prior score of 85%.  Some of this variance may be due to better data access with the new electronic medical record (EMR) system that may reveal deficiencies not evident in previous audits.  On the other hand, some aspects of the EMR system could conceal appropriate care.   For example, documents showing inmate requests for medical services cannot be accessed in the EMR; some of the forms used in the EMR do not report crucial information, such as the amount of medications dispensed upon release or the assessment of clinical condition when undergoing annual history and physical examination.

Putting aside comparative percentages, this audit found numerous incidences of care for specific MCJ inmates that did not comport with the implementation plan or guidelines.  Thus, it appears that healthcare provided to inmates at MCJ is not currently substantially compliant with the implementation plan.

---

[1] Data from patient encounters are compiled according to the parameters that measure compliance with the "implementation plan" at issue.

[2] In attendance at the exit interview:  Bruce Barnett, MD, JD – Monitor/auditor; Taylor Fithian, MD – Well Path Board Member; ███████████ RN – Program Manager; ███████████ MD – Wellpath Medical Director; ███████████ MD – MCJ Medical Director; ███████████, RN – Technical Support; James Bass - Chief of Detentions, MCJ

## Summary Table[3]

| Quality Indicator | Compliant/Not Compliant | % Compliant | Comments |
|---|---|---|---|
| 1.  Intake Screening | Not Compliant | 83.0% | see text below and case reviews |
| 2.  Access to Care | Not Compliant | 65.0% | see text below and case reviews |
| 3. Chronic Care | Not Compliant | 67.0% | see text below |
| 4. Health Care Maintenance | Not Compliant | 66.0% | see text below |
| 5. Continuity of Care | Unknown Compliance | 94.0% | see text below |
| 6. Outside Care Referrals | Compliant | 88.0% | see text below |
| 7. Detox/Withdrawal | Not Compliant | 45.0% | See test below and case review for details. |
| 8. Tuberculosis/Infection Control | Not compliant | 10.0% | Few patients with positive PPD tests have documented counseling |
| 9. Pharmaceutical Administration Procedures for Non Compliance;  Medications Supplied for Released Inmates or Inmates Going Offsite; Central Dispensing | Not Compliant | 10.0% | Few patients have documented PCP counseling regarding their refusals of multiple medication doses. |
| 10. Administration and staff on  site | Compliant | 100.0% | Facility to provide updated confirmation of staffing |
| 11. RN Medication Administration On site | Compliant | 98.0% | |
| 12. Physician/Provider Case Review | Non Compliant | 46.0% | This measure considers chart reviews off site. Response to findings pending. |
| 13. Nursing Case Review | NA see comment | NA | Nurse Case Review included with Physician Case Review and access to care; |
| Overal Audit Score and Rating: | | 64.3% | |

---

[3] Percentages in this table provide a gross accounting of the findings in the auditor's review of charts.   It does not include data or from the CFMG conducted audits.  Please see audit text and auditor's worksheets for more details.

# OBJECTIVES, SCOPE, AND METHODOLOGY

This audit assesses compliance with the implementation plan.  Where lapses are identified recommendations are provided for corrective actions to promote compliance with plan parameters.

## Quantitative Review

Eleven components of medical care are identified in the implementation plan:  Intake Screening, Access to Care, Chronic Care, Health Care Maintenance, Continuity of Care, Outside Care Referrals, Detox/Withdrawal, Tuberculosis/Infection Control, Pharmaceutical Management (not RN), Administrative Services and RN Dispensing on Site.  A measure of clinical care provided as a percentage of appropriate encounters is also included in the quantitative review.  Physician/Provider case review is also considered an important indicator of quality care.  The percentage of patients provided with adequate care among the cases reviewed is listed as number 12 on the summary chart. The overall score includes the percentage of adequate care found in case review.

The score derived from these assessments is provided solely to assist in comparing performances from prior audits to the current audit.  A high score suggests, but does not establish, substantial compliance with the implementation plan.   A low score suggests but does not on its own suffice to show lack of compliance.  Conclusions reached from the quantitative review are reconciled with case reviews to determine whether MCJ care complies with the applicable guidelines and the implementation plan.

## Qualitative Review

Case reviews considers the adequacy of care in accord with generally accepted principles of medicine and applicable standards, aside from the specific parameters for performance specifically described by the implementation plan. These case reviews are very important in the analysis of care provided to the inmates.

### Medical Facilities and Staffing

The audit reviewed the facility to assess cleanliness, orderliness, adequacy of space, privacy, infection control, and availability of essential medical equipment.   The audit also reviewed staffing and supervision of staff.

### Interviews

Interviews with medical and nursing staff, and with inmates provided valuable insight into the adequacy of health care services at MCJ and directed the auditor's attention to areas of greatest concern.   The interviews were notable for reports consistent with the auditors findings.  However, the interviews did not affect the compliance scores or assessment of care in case studies.

## FINDINGS

**INTAKE SCREENING**  - Based upon the finding for 10 random inmates, this audit initially  found the intake screening process overall substantially compliant with the implementation plan.  However, substantial faults were identified for intake procedures in the assignment of incorrect withdrawal protocols for patients who were overtly ill or had complicated medical histories.   Some patients were assigned to the wrong withdrawal protocols and housing that impaired evaluation and delayed referrals to PCP.  Cases 4 and 17 provide examples of such lapses.   Accordingly,  this audit found that intake screening at MCJ was not compliant with the implementation plan.

**ACCESS TO CARE** – Inmate access to care seems to have deteriorated since the last audit.   The EMR data showed that many MCJ inmates waited longer for nursing and/or PCP care than considered appropriate by the implementation plan.  Nurse and PA care did not receive enough oversight as many complex patients seem to have been managed without physician input.   This observation from review of the chart was consistent with complaints by male inmates interviewed at this audit who stated that their requests for medical services did not generate immediate attention by nursing and that inmates rarely saw a physician.  This auditor found that access to care at MCJ was not compliant the implementation plan. [4]

**CHRONIC CARE** – Patients with chronic medical problems were generally examined appropriately and timely in the cases reviewed.  However, the EMR in many cases did not document that any assessment had been made at the chronic care appointment.  Also, the problem list for some chronic care patients was not updated.  Considering these lapses, the evaluation and treatment of chronic care problems appeared to be not compliant with the implementation plan.

**HEALTH CARE MAINTENANCE** – Inmates with a significant medical condition or stable chronic diseases should undergo full exam by physician or physician assistant within a week after intake. [5]  All inmates should undergo complete history and physical while incarcerated at 6-month or one year intervals. Refusals of care by an inmate do not excuse the physician from writing an informative note to describe the patient as either stable or in need of further medical attention notwithstanding the inmate's uncooperative stances. [6]  In a number of cases the periodic exam did not include assessment, which is a crucial component in the document. [7] Accordingly, the periodic examinations for long-term resident inmates appear to be not compliant with the implementation plan.

---

[4] MCJ has undergone multiple changes in medical leadership during the past year.  Future audits will report on the effect of supervision from the newly installed medical director.
[5] Acutely ill patients need immediate physician attention.
[6] Correctional care providers have a duty to observe and report the condition of cooperative and uncooperative inmates.
[7] The format of subjective, objective assessment and plan (SOAP) has long been considered the foundation of adequate patient evaluation. However, the EMR seems to not include a field for assessment.

**CONTINUITY OF CARE AFTER RELEASE –** The EMR documents instructions given to released inmates for medical follow up, including continuation of necessary medications.  The discharging nurse needs to explicitly describe the supply as the EMR form does not specify the amount dispensed to the inmate. This audit noted incomplete data regarding continuity of care for cases 5, 8, 16 ans 22.  The vast majority of inmates leaving MCJ for the free world or transferred to other facilities seemed to be processed in compliance with the implementation plan.  However because EMR inefficiency impairs access to discharge information this audit finds that <u>compliance with the implementation plan regarding continuity of care is unknown.</u>

**OUTSIDE CARE REFERRALS –** Necessary specialty care seemed to be readily available to all inmates without inordinate delay.  Brief reports from outside health care providers consistently accompanied inmates returning from consultation.  The medical records also documented frequent communications between MCJ medical director and treating specialists.   Nearly all recommendations from a specialist received prompt attention and follow up. <u>The process for outside medical care was substantially compliant with the implementation plan.</u>

**DETOX/WITHDRAWL –** This audit detected many lapses in the application of the MCJ implementation plan, and deviations from applicable guidelines.  As described further below, some inmates were not monitored in accord with their level of risk, and not referred for timely medical evaluation.  Commonly, the intake nurse failed to notify PCPs as called for by the implementation plan about patients with a risk of withdrawal from multiple drugs.  Vital signs were often not obtained in accord with the applicable guidelines and the implementation plan.  I recommend below that all staff at MCJ receive further training to improve assessment and treatment of patients at risk from medical complications of withdrawal.  Overall, the detoxification procedures and monitoring for withdrawal <u>was not compliant with implementation plan.</u>

**TB/INFECTION CONTOL –**  Routine PCP evaluation of positive PPD skin tests is not evident in the EMR. Even in cases of positive PPD with confirming positive Quantiferon results, the EMR often fails to show PCP discussion with the patient.  There is also no documentation of communications with the department of public health, as is required by the implementation plan for patients who are at high risk of latent TB and fail to complete their course of treatment before leaving the jail. A list of positive TB test results are updated monthly, but appears to not be regularly followed by medical leadership. Medical leadership should make better use of the TB logs.  The observed delay in counseling and treatment of positive TB tests <u>is not substantially compliant with the implementation plan.</u>

**MEDICATIONS/PHARMACY** – There are multiple components regarding the implementation plan for administration of medications.

A.  Dispensing of medications.  MCJ dispensing and storage of drugs, including controlled substances, appeared to meet community standards.

B.  Medication Administration.  Administration of medications seemed to be performed properly as observed during this audit (confirmation of inmate ID, direct observation of medication ingestion, documenting ingestion).

C.  Documenting Noncompliance with medication order or recommendations.  The EMR generates a list of patients who refuse medications.  However, there was clear documentation in only a few of these patients that a PCP reviewed refusals, and consider means of improving patient cooperation.

D.  Continuity of Prescription Medications.  Inmates seemed to receive instructions and continued medications upon their release. However, in some of the cases reviewed the EMR did not document the amount of medications dispensed or follow  up to renew prescriptions.

E.  Timely Provision of Medications at MCJ that had been prescribed to prisoner before intake. Prisoners seemed to be provided with necessary medications at intake. However, a few inmates did not undergo prompt evaluation to assess the need for medications that might cause serious withdrawal syndrome upon abrupt discontinuation.[8]

F.  Administration every 12 hours for "twice daily" drugs.  Med lines are scheduled at appropriate times.

In the cases described below (see Response to Comments) inmates at substantial risk of withdrawal syndromes received no evaluation by PCP to determine the need for tapering previously administered narcotics.  Follow up for multiple refusals, and description of medications dispensed on release (quality indicator 9) were irregularly documented.   Accordingly, despite adequate performance in some areas of pharmacy control, and although this audit did not detect any adverse outcomes from lapses in medication administration, pharmaceutical administration and documentation at MCJ was not compliant with the implementation plan.

---

[8] Many medications that inmates report receiving in the free world need not and indeed should not be continued in jail.  Current best practices do not favor continuing treatment with narcotics absent compelling need for these drugs.  But the discontinuation of narcotics, like all other medical decisions, should be carefully considered. Inmates should be afforded prompt physician evaluation as to the need for medications to mitigate against serious withdrawal syndromes.

**PRIMARY CARE PROVIDER (PCP) STAFFING**[9]  –   On the dates of this audit MCJ PCP staff was in flux.  PA ███ alone remains as the other providers have departed from MCJ.  Because MCJ has hired a new PA and medical director, the primary care provider staffing <u>is substantially compliant with the implementation plan</u>. [10]

**STAFFING (RN, and other non-providers) -** There appear to be enough nurses to see patients in need of medical attention.  Problems in performance of nursing, and delays in referral to PCP should be addressed by medical leadership, as the staffing (aside from PCP addressed above) seems to be <u>substantially compliant with the implementation plan.</u>

**CLINIC SPACE** - Clinic Space <u>is substantially compliant with the implementation plan.</u>

**RECORD KEEPING -**  CFMG implementation plan requires all health staff to maintain "accurate and legible medical records."  MCJ compliance with that requirement has improved with the introduction of electronic health records (EHR).  The audit identified some problems with the EMR, including failure to include sick call in the data base, and incomplete information upon release regarding medication doses supplied.   During this implementation, while the EMR is a work in progress,  <u>this audit finds that the medical records cannot be assessed as either compliant or not compliant with the implementation plan.</u>

**QUALITY ASSURANCE:**  To date, MCJ medical leadership has not issued formal death reviews or written response to this auditor's analysis of inmate deaths. In April, this audit did not observe any formal process at MCJ for medical leadership to instruct staff about the more challenging cases. Adequate healthcare requires rigorous peer review and quality control to reduce errors and to correct discovered defects.   MCJ must have an effective quality assurance program, as demonstrated by prompt and meaningful reviews of all deaths and other untoward events, to be in substantial compliance with the implementation plan. [11]

---

[9] Primary Care Providers (PCP) – also referred to as "Providers" are licensed as allopathic or osteopathic physicians (MD, DO), family nurse practitioners (NP) and physician assistants (PA).  Although licensed nurses may evaluate and provide limited treatment, nurses who are not additionally credentialed as NP are not considered PCPs. Previous audits have considered the California Prison average MD/inmate ratios of 1/300-600 to indicate that two PA and supervising MD at MCJ is sufficient in number to provide MCJ inmates with timely access to care.

[10] California law requires that all PA services be monitored by the supervising physician as evidenced by countersignature on the charts of patients deemed to be at highest risk, and not less than 5% of the PA patient encounters (CCR 1399.545).  The new medical leadership is aware subsequent visits will audit compliance with this legal requirement.

[11] Dr. ███ was holding quality assurance meetings every two weeks. But since her departure these meetings have not been continued. Dr. ███ meetings did not address deaths or propose corrective actions.   The new administration has not described how future quality assurance programs at MCJ will be implemented.

## INMATE DEATHS

All inmate deaths at MCJ from January 2017 to the present were reviewed by Dr. Barnett and discussed with MCJ medical leadership attending the April 2019 audit.  Dr. Barnett opines as follows:

█████████          █████          **01/22/17  -  Mr. █████ death was probably not preventable.**   Post mortem exam shows sepsis and multiorgan failure.  Mr. █████ was vulnerable to sepsis on account of his multiple, severe chronic diseases including cirrhosis A few days before his death, a PA at MCJ treated Mr. █████ professed back pain with high doses of prednisone. There was no documented physician oversight in this case.  Because "corticosteroids may exacerbate infections and increase risk of disseminated infections" (FDA warning), high dose prednisone posed a theoretical risk of turning an underlying infection into a fatal sepsis.  **The unsupervised PA care provided to Mr. █████ was not appropriate.**

█████████          █████          **06/29/17  -  Mr. █████ death was probably not preventable.**  The autopsy report describes the cause of death as brain swelling with herniation. There is some dispute as to the amount of medical attention provided to Mr. █████ at MCJ.  After further review of the medical record on site, it appears that Mr. █████ became unresponsive in the end-stages of brain herniation and did not suffer appreciable pain in his last moments at MCJ.  **Medical care for Mr. █████ at MCJ appears to have been appropriate.**

█████████          █████          **11/25/17 -  Mr. █████ death was probably not preventable.**  The autopsy report concludes that the cause of death was pulmonary emboli from right femoral vein thrombosis.   Mr. █████ was an extremely challenging patient on account of his severe mental illness.  He was also at very high risk for adverse medical events due to his history of diabetes, hypertension, endocrine dysfunction (panhypopituitary) and heart disease. The medical record does not show appropriate monitoring of Mr. █████ at MCJ, with efforts to obtain vital signs and do physical examination despite his refusals.   Because vital signs and frequent PCP evaluations were not documented **the medical care provided at MCJ was inadequate.**

█████████          █████          **01/07/18  -**  There was no apparent medical issue with this death by suicide.  **The medical care provided at MCJ was adequate.** [12]

█████████          █████          **11/30/18 -  Ms. █████ death was probably preventable.**  Mr. █████ died from a ruptured middle cerebral aneurysm.  Had Ms. █████ small aneurysm been detected by the appropriate radiological study, prompt neurosurgical intervention would have likely prevented the fatal rupture.  The sudden and severe headaches (at one point she is described as tearing at her hair) of which Ms. █████ complained are typical for aneurysmal bleed. Unfortunately, the acute hospital staff who performed the CT scan and returned Ms. █████ to jail following headache and seizure apparently failed to consider aneurysm, as did the neurologist who was contacted by phone when Mr. █████ suffered further headaches and seizures.  The CT without contrast was an insufficient test at the ER. The appropriate test was CT with contrast, MRI angiogram and/or lumbar puncture.  **The care provided to her by MCJ medical staff was appropriate insofar as the patient was**

---

[12] This medical audit offers no opinion as to the adequacy of psychiatric care in this case.

**transported to the ER.   However, care from the neurology consultant and the hospital
appear to not meet applicable community standards in their evaluations and
recommendations.[13]**

**01/10/19** - . Autopsy findings are not yet reported
and so it is unclear whether Mr. ▮▮▮▮ demise was preventable. However, according to
nursing reports, it seems that Mr. ▮▮▮ choked on an excess of peanut butter that he was
unable to properly ingest due to a previously diagnosed swallowing disorder. In hind sight it was
not a good idea to allow Mr. ▮▮▮ access to foods that might pose a choking hazard. On the
other hand, the elderly and infirm can experience fatal choking episodes from any sustenance,
including water. Moreover, Mr. ▮▮▮ was a very challenging patient to treat on account of his
combined medical and mental illness.  It would have been difficult to assess whether Mr. ▮▮▮▮
confusion, hallucinations, lethargy and altered vital signs were symptoms of delirium calling for
immediate hospitalization or more of the same behavior that he had manifest in the past.
Whether Mr. ▮▮▮ condition merited hospitalization is doubtful as he was alert and responsive
shortly before he seemed to be choking.   A formal death review in this case will provide an
opportunity for learning about choking hazards in the elderly and infirm, and delirium.  **Pending
the autopsy results, medical care appears to have been adequate**

**3/16/19  - No postmortem/autopsy results available and
therefore cause of death uncertain.**  Nurse books Ms. ▮▮▮ as CIWA 0 on 3/14/19 with
history of alcohol, heroin and amphetamine abuse.  Vital signs were not taken as per protocol.
No contact with a physician as required by protocols for multiple substance abuse/detox was
documented when Ms. ▮▮▮ pulse rose to 120 and agitation noted with refusal to allow vital
signs on day after intake at 4 pm on 3/15/19.  There is no documented PCP attention to Ms.
▮▮▮ up to time she is discovered dead on 3/16/19 at 0915. Accordingly, **MCJ care appears
to have been inadequate.**

### INMATE INTERVIEWS

Three male and three female inmate interviewees were provided by custody as representative
spokespersons and representing themselves.  The inmates were asked to comment on their personal
experiences and their understanding of experiences by fellow inmates regarding the parameters being
measured for compliance with the implementation plan. The men reported significant delays in access
to medical care after requests in writing or by computer tablet.  Otherwise the men were satisfied with
medical care.  The women were satisfied with their medical care but reported being concerned by the
recent deaths of two female inmates, while in custody. The inmates' comments were brought to
attention of MCJ medical leadership.

---

[13] This case is a good example of how death reviews can improve health care.  MCJ medical staff can learn from
this case that ER staff and specialists do not provide faultless care.  The jail population is at relatively high risk for
intracranial catastrophes.  Severe "sentinel" headaches such as suffered by Ms. ▮▮▮ is cause for great concern
and return to the hospital notwithstanding neurology advice to the contrary.

## PHYSICIAN/NURSE CARE CASE REVIEW [14]

CASE #1 –**Care is inadequate.**  Assigned COWS level at intake incorrect.  Physician involvement delated. Weights not recorded as appropriate for his condition.  Cardiology care was appropriately rendered by Dr. ██ with input from consulting cardiologist.

CASE #2 – **Care is adequate.**

CASE #3 - **Care is adequate.**

CASE #4 – **Care is inadequate.**  Patient not treated with detoxification protocols despite admitting to the abuse of alcohol, opiates and methamphetamine. Drastic weight changes not explained. Chronic pain and acute complaints not referred to PCP. 6 month physical not performed.

Case #5 – **Care is inadequate.** Patient enrolled in methamphetamine withdrawal program but physician not contacted per protocol when patient refuses vital signs. treated with detoxification protocols despite description of being under the influence of meth.   Possible testicular lump not examined. Dramatic weight gain (70 lbs in 6 months) not evaluated.

 Case #6 - **Care is adequate.**

Case #7 - **Care is adequate.**

Case #8 - **Care is adequate.**

Case #9 - **Care is adequate.**

Case #10 –**Care is inadequate.** Nurse does not refer patient to PCP after report of 9/10 pain.

Case #11 –**Care is inadequate.**  Treatment of mild viral warts on hand with caustic solution and minor surgery (paring) unnecessary and contrary to principles that disfavor elective care in jail that is better provided after release.

Case #12 - **Care is inadequate.**  Nurse at intake fails to take adequate history of systemic illness. Patient admitted next day to hospital for disseminated cocci and requires  treatment for MRSA sepsis.

Case #13 - **Care is adequate.**

Case #14 – **Care is adequate.**[15]

---

[14] Names and ID numbers for charts noted in this audit report as reviewed by Dr. Barnett are included in the work sheets that accompany this draft.  Most of the lapses noted have already been brought to attention of parties.  The analysis is subject to reconsideration following responses ("rebuttal") to this audit.
[15] Annual physical overdue, but care overall adequate.

Case #15 - **Care is adequate.** [16]

Case #16   **Care is adequate.**[17]

Case #17 - **Care is inadequate.**  Treatment protocols for methamphetamine withdrawal not followed.  Physician care delayed.

Case #18 - **Care is inadequate.**  Patient incorrectly identified as level 0 CIWA.  Physician not timely contacted when vital signs deteriorate and when patient refuses vital signs.  See death review above.

Case #19 - **Care is adequate**

Case #20 – **Care is inadequate.**  Morbidly obese female inmate with poorly controlled asthma needs attention from MD and is instead treated by R and PA throughout jail stay.  No referral for chronic care as required by implementation plan.

Case #21 – **Care is inadequate.**  Medical care for complex patient provided mostly by RN.  Patient has multiple medical and psychiatric conditions that merit physician exam, evaluation and treatment. .

Case #22 – **Care is inadequate**. 33 year old obese diabetic female inmate with classic symptoms of gall stones. Treatment delayed putting patient at risk of fatal complications for cholecystitis even after diagnosis made and surgery recommended.

Case #23 **Care is adequate.** [18]

Case #24 – **Care Is adequate.**

Case #25 – **Care is inadequate**. Gabapentin discontinued abruptly without concern for seizures.  Collaboration with mental health not obtained as needed.

Case #26 – **Care is inadequate.** Complex medical and psychiatric conditions merit multidisciplinary case planning.  Attention from MD delayed.

## RESPONSE TO COMMENTS FROM PLAINTIFFS AND DEFENDANTS

Following the draft audit report, and in response to defendants' request for further details, Plaintiff reported that four inmates had complained about not receiving medications that had been prescribed before intake.

---

[16] MRI recommended by specialists not provided timely, but care overall adequate.
[17] Chronic care appointments not scheduled in accord with implementation plan, colonoscopy delayed. Overall care is adequate.
[18] Referral not made for chronic care.  But overall care adequate.

██████████████████ ) – Intake on 11/1/18 documents the patient's report patient of taking the following prescriptions:  codeine, gabapentin, lorazepam, Xanax, Ritalin, levothyroxine,  magnesium sulfate, tizanidine, Rizatriptan.  ████ was at risk of serious withdrawal symptoms, including seizures or death from the abrupt discontinuation of lorazepam, Xanax and gabapentin.  Abrupt withdrawal from the other drugs she claimed to be taking could be uncomfortable but rarely fatal.  ████ probably did not need most of the medications she claimed to be taking.  Nevertheless, it would have been appropriate for the PCP to evaluate upon intake whether to taper ████ off of codeine, gabapentin, lorazepam, Xanax and tizanidine and Ritalin.  PCP exam and monitoring would be appropriate very soon after intake and until ████ stable condition was assured.

██████████████████ – Medications verified on intake 9/6/18 were:  Zyprexa, Ativan, topiramate, Norco, Ritalin, Fluoxetine, Imitrex and ibuprofen.  The first PCP exam seems to have been on 9/17/18.   It does not look like any medications aside from ibuprofen and mental health drugs were provided after intake until topiramate was started on 10/29/18.   Although many of her prior prescriptions may not have been necessary or even well-advised, the abrupt discontinuation of topiramate and Ativan could have caused life-threatening seizures.  Discontinuation of Ritalin, Norco (if ████ had been taking these drugs in large amounts) would have been uncomfortable but not likely fatal.    It would have been appropriate for ████ to have prompt PCP evaluation and determination of need to taper her prior medications.

██████████████████ – issues related to pharmacy not taking insurance to supply medications after release are not so much medical as administrative issues.

██████████████████ – ████ was at risk of serious withdrawal symptoms from abrupt cessation of meds he reported taking prior to 5/3/19 booking:  Wellbutrin, Propranolol, Losartan, Effexor, Gabapentin, Ativan, Trazodone, and Tizanidine.  As in the cases described above, ████ chronic medical condition (hypertension) combined with the acute need for assessment of medications required that he be seen soon after intake by a PCP who should have determined whether he needed to be tapered off some or all of his medications.

## CONCLUSION

**This audit of medical care provided to inmates at MCJ from September 2018 through March 2019 observed significant deficiencies as described above and therefore finds that MCJ is not substantially complaint with the implementation plan.**  Most notably, physician supervision of PA and RN care is often delayed or not provided at all, in violation of applicable guidelines and state law.   Nurses often do not properly assess intoxicated and withdrawing inmates for appropriate monitoring and treatment. Inmates are not always seen promptly for acute conditions.  Some inmates are not followed up timely for their chronic diseases. PCPs do not seem to provide advice or treatment for inmates at high risk of latent TB.

Although the EMR is a vast improvement over prior the non-electronic records, there remain areas of concern:  a) sick call slips are not included in the EMR;  b) follow up for refused medications is not documented;  c) chronic care and 6/month/annual physicals do not promote assessment or automatically populate problem list; d) The medical records provide no evidence of communication with the public health department as called for in the implementation plan; e) continuity of care after release inconsistently documented.

MCJ performance appears to not substantially comply with the implementation plan.  Quality assurance programs, including formal death review, should be established by the current medical leadership to address the issues raised in this audit and improve future medical care.

## RECOMMENDATIONS

1. PA Delegation services agreement should be signed anew with current physician supervisors in accord with the provisions of CCR 1399.540 and California B&P 3502.  Each PA needs to regularly consult with and receive education from the medical director, as recommended in the October 2018 audit report.
2. The MCJ medical director, along with the director of nursing, should oversee the quality of intake and nurse sick call.
3. Sick call slips generated by inmates should be viewable in the medical record.
4. Death Reviews should be performed by MCJ medical staff leadership, with results discussed in QA meetings, as recommended in the October audit report.
5. Twice monthly QA meetings should be resumed, with continuing medical education supervised by the medical director.  Immediately important topics include:  assessing withdrawal, importance of body weight, measuring and reporting abnormal vital signs, Title 15 and the concept of necessary medical care, reviewing the process of SOAP notes, appropriate application of the registered nurse protocols and when to contact a primary care provider.
6. Important notices and instructions regarding healthcare behind framed safety-glass in each of the housing To comply with California law CCR 1355.4  post the following sign on the medical clinic wall:  "NOTICE TO CONSUMERS Medical doctors are licensed and regulated by  the Medical Board of California (800) 633-2322  www.mbc.ca.gov."
7. TB  logs should be reviewed weekly to ensure prompt follow up for positive PPD tests.  If PCPs are overwhelmed, this task can be accomplished with RN practicing pursuant to protocols.
8. EMR efficacy and efficiency should be improved to address issues raised above.
9. Protocols should facilitate documentation and actions by which intake nurses cab alerting PCPs to  prescribed  (either verified or unverified) medications which indicate significant chronic disease(s), and that may also expose the patient to a risk of serious withdrawal symptoms best evaluated by a licensed provider (PA, NP, MD, DO).
10. Medical staff should receive additional training about the pharmacology and physiology of withdrawal to promote better recognition of inmates at risk of serious withdrawal syndromes.

## REQUESTS FOR FURTHER INFORMATION

The following data will be reviewed on the next audit:

1. log of inmates sent to court, and reports of medications dispensed with them.
2. daily narcotic count log
3. isolation/observation cell log showing rounds by RN or PCP.
4. clinical support positions (CMA, MA, medical records clerks) not filled

# Exhibit 6

# MONTEREY COUNTY JAIL COMPLIANCE AND HEALTH CARE MONITORING AUDIT

Visit October 24, 25 2019

Audit Report December 30, 2019

CONFIDENTIAL



# TABLE OF CONTENTS

INTRODUCTION AND BRIEF SUMMARY OF FINDINGS.................................................................3

RECOMMENDATIONS FOR COMPLIANCE ...........................................................................4

SUMMMARY TABLE; OBJECTIVES, SCOPE, METHODOLOGY ...........................................7

FINDINGS ...........................................................................................................................9

      INTAKE SCREENING.....................................................................................................9

      ACCESS TO CARE .......................................................................................................10

      CHRONIC CARE ..........................................................................................................10

    HEALTH CARE MAINTENANCE.....................................................................................10

    CONTINUITY OF CARE AFTER RELEASE........................................................................11

    OUTSIDE CARE REFERRALS........................................................................................11

    DETOXIFICATION/WITHDRAWAL..................................................................................12

    TB/INFECTION CONTROL...........................................................................................12

    MEDICATIONS/PHARMACY........................................................................................13

    PRIMARY CARE .........................................................................................................13

    STAFFING (NOT PRIMARY CARE) ...............................................................................14

    CLINIC SPACE, MEDICAL RECORDS .............................................................................14

    CORRECTIVE ACTION PLANS ......................................................................................14

    QUALITY ASSURANCE................................................................................................15

 INMATE DEATH(S).............................................................................................................16

INMATE INTERVIEWS.........................................................................................................16

PHYSICIAN/NURSE CASE REVIEW...................................................................... ....17

CONCLUSIONS ..................................................................................................................18

RECCOMMENDATIONS........................................................................... ............................19

REQUESTS FOR FURTHER INFORMATON ............................................................................20

LIST OF ATTACHMENTS ....................................................................................................21

## INTRODUCTION

Pursuant to court-orders (Hernandez v County of Monterey), Bruce Barnett, MD (expert monitor for medical care) visited the Monterey County Jail (MCJ) on October 24 and 25, 2019, accompanied by Nurse Chia Chen Lee, to review healthcare delivered to inmate population.  This audit report refers to encounters by MCJ health care providers with inmates interred at the Jail from April 1, 2019 through September 30, 2019 with particular attention to the following: a) compliance with standards of care cited in the court-approved implementation plan  b) analysis of care provided to 24 patients described in "Physician Case Review, c)  on site facility review and interviews, d) review of deaths occurring at MCJ or immediately following MCJ incarceration and  e) concerns brought to attention of Dr. Barnett by the parties.  As in prior audits, Dr. Barnett and Ms. Lee refer to the following documents in determining adequacy of medical services at the Monterey County Jail:  CFMG Implementation Plan (approved August 18, 2015); CMGC Nurse Protocols (July 2018); and CFMG Policy and Procedure Manual (April 2015).[1]

Preliminary findings were presented at MCJ on October 25, 2019 in an exit interview at MCJ. [2]   These findings were reiterated to representatives for the parties in a memo sent by e mail on October 29, 2019. A draft audit report was sent to the parties on November 15, 2019.  Plaintiff's response, dated December 13, 2019, has been considered and integrated into this "final" report. The audit tools and raw data referenced in this report have been provided as confidential documents to the parties.

## BRIEF SUMMARY OF FINDINGS

There have been improvements in some areas of care at MCJ since 2017. However, for seven out of eleven quality indicators (as listed below) MCJ care was not compliant with the implementation plan.

---

[1] California Forensic Medical Group (CFMG), an original defendant in Hernandez v. Monterey County, has evolved through corporate mergers and acquisitions to become Correctional Medical Group Companies (CMGC) and most recently Wellpath.

[2] In attendance at the exit interview:  Bruce Barnett, MD, JD – expert medical monitor; Chia Chen Lee, RN, FNP  - nurse expert; ▮▮▮▮▮▮▮ RN – Program Manager; ▮▮▮▮▮ MD  - Medical Director, ▮▮▮▮▮▮▮▮, RN – Director of Nursing; ▮▮▮▮▮▮, RN – Operations Manager, Gerorge McNight LVN – Operations Manager;  John Thornburg, Captain Monterey Sheriff's Department;  Chief James Bass – Monterey Sheriff's Department

QUALITY INDICATOR COMPLIANCE FOR OCTOBER 2019:

1. Intake Screening for Health Care – not compliant

2. Access to Health Care – not compliant

3. Chronic Care – substantially compliant

4. Health Care Maintenance – not compliant

5. Continuity of Care after release – substantially compliant

6. Outside Medical Care Referrals by MCJ – not compliant

7. Treatment of Intoxicated Inmates and Detoxification – not compliant

8. Detections and Treatment of TB and other infections – not compliant

9.  Safe Storing of Pharmaceuticals – not compliant (see comments below)

10.  Dispensing Pharmaceuticals following intake, while in Jail, when out to court, and upon Release – substantially compliant

11. Adequate Staff – substantially compliant

The case review for 24 inmates considered MCJ compliance with the guiding principles that call for timely and appropriate treatment of inmates' serious medical needs that comports with current/applicable standards of care for best practices.  Dr. Barnett and Nurse Lee found care provided was appropriate in 15 out of 24 inmates' cases reviewed. This is an improved ratio compared to prior audits.

**Recommendations for corrective actions to effect substantial compliance:**

INTAKE SCREENING

1. Medical staff should receive additional "in service" education to ensure 100% compliance with basis standards of care, such as a) consistently accurate measurement of vital signs including height and weight, b) timely referral of all patients at risk (unstable, chronically ill) to medical providers, and c)  prompt assignment of withdrawing patients to observation cells for further evaluation.

2. Specialized "task force" to engage the care of pregnant inmates.

ACCESS TO HEALTH CARE:

1.  Sick call request slips should be linked to the electronic medical record system in a fashion that facilitates review by medical care auditors.

2. Inmate height and weight should be consistently recorded on intake and periodically throughout their medical care encounters.

3. Notices listed below should be securely posted for ready review by inmates in their housing areas and/or clinics.

> NOTICE OF CLASS ACTION LAWSUIT
> SICK CALL REQUEST INSTRUCTIONS
> PREA NOTICE
> REPRODUCTIVE CARE RIGHTS FOR WOMAN
> MEDICAL BOARD CONTACT INFORMATION
> PHYSICIAN ASSISTANT BOARD CONTACT INFORMATION

4.  RN line visits (RN sick calls) should generate appropriate referrals to PCP.  The examining RN should refer to PCP inmates who complained of injury following custody use of force or altercations.

5.  Complex medical conditions (such as high-risk pregnancies, persistent infections) should be followed closely by the medical director.

6. PCP should document a chart review regarding the inmate medical condition following a second missed appointment or second rescheduled appointment.

HEALTHCARE MAINTENANCE

1. The full examination by PCP that is due within first 6 months of incarceration should not be unreasonably delayed.

2.  Inmates with documented Hepatitis C infections should be counseled about options for immediate versus delayed treatments.

TREATMENT OF INTOXICATED PATIENTS AND DETOXIFICATION

1.  Inmates described on the intake form as "under the influence" should not be sent to general population without clarifying on the record that the inmate is safe for such placement.

2.  RNs should be trained and monitored to ensure that withdrawal protocols are followed rigorously.

PHARMACEUTICAL SAFE STORAGE

1. Medications must be stored in closed bottles/tubes/etc.

2.  Multi-use vials or tubes must be labeled to indicate the date upon which they were first opened

## QUALITY ASSURANCE
## (also addressing outside referrals, infection control)

1. Restore regular (at least monthly) QA meetings led by Medical Director and Director of Nursing review problematic cases (including deaths and hospitalizations), review clinical care guidelines, and effect corrective actions to improve health care. Minutes of quarterly and monthly QA meetings should be shared with the expert medical monitor.

2. Evaluate care provided by qualified health professionals at MCJ (RN, PA, FNP, MD, DO) with formal review of no less than 5 charts per provider each month.  See attached proposed peer review form.

3.  Provide MCJ qualified health professionals with training to access reliable on-line resources of authoritative medical information including Uptodate, Emedicine/Medscape and Epocrates.

4. PA Delegation services agreement should be signed anew with current physician supervisors in accord with the provisions of CCR 1399.540 and California B&P 3502. Each PA needs to regularly consult with and receive education from the medical director, as recommended in the previous audit reports.

## Summary Table

| Quality Indicator | Substantiall Compliant/Not Compliant | % Compliant | Comments |
|---|---|---|---|
| 1.  Intake Screening | Not Compliant | 85.0% | see text below |
| 2.  Access to Care | Not Compliant | 64.0% | see text below |
| 3. Chronic Care | Compliant | 83.0% | see text below |
| 4. Health Care Maintenance | Not Compliant | 67.0% | see text below |
| 5. Continuity of Care | Compliant | 84.0% | see text below |
| 6. Outside Care Referrals | Not Compliant | 70.0% | see text below |
| 7. Detox/Withdrawal | Not Compliant | 57.0% | See text below and case review for details. |
| 8. Tuberculosis/Infection Control | Not Compliant | 85.0% | see text below |
| 9. Pharmaceutical Storage and Dispensing; refusals | Not Compliant | na | Unable to score compliance with insufficient data regarding medications for inmates out to court. However, critcal lapse corrected during audit included open containers, and  failure to label multi-use containers. |
| 10. Administration and staff on  site | Compliant | 100.0% | Facility to provide updated confirmation of PCP staff and delegated services agreements |
| 11. RN Medication Administration On site | Compliant | 100.0% | no lapses observed |
| 12. Physician/Provider Case Review | Not Compliant | 63.0% | see case reviews |
|  |  |  |  |
| Overal Audit Score and Rating: |  | 78.0% |  |

## OBJECTIVES, SCOPE, AND METHODOLOGY

This audit assesses compliance with the implementation plan.  Where lapses are identified recommendations are provided for corrective actions to promote compliance with plan parameters.

### Methodology

The compliance rates are listed in the Summary Table that shows the percentage of charts reviewed in which specific described performance parameters have been met.

Also listed in the summary table is percentage of the "case reviews" wherein individual patient care was found adequate  (meeting applicable standards of care). [3]

The overall score represents an average of the compliance data for 11 quality indicators and case reviews as described below (quantitative review and qualitative review).  The score derived from these assessments is provided solely to assist in comparing performances from prior audits to the current audit.  This audit does not apply a "benchmark" to establish compliance.  A relatively high score (80%) suggests, but does not establish, substantial compliance with the implementation plan.   A relatively lower score (below 70%) suggests but does not on its own suffice to show lack of compliance.  Conclusions reached from the quantitative review are reconciled with case reviews and other qualitative measures to determine whether MCJ care complies with the applicable guidelines and the implementation plan.

The quantitative analysis ("methodology") applied in this audit and past audits has produced "rounding errors" and generalizations which may fail to highlight significant lapses further described in the report's narrative sections. Notwithstanding inefficiencies and rounding errors, the methodology used to date shows that MCJ performance has not been substantially compliant with the implementation plan.

Medical care audits in 2020 will deploy revised Excel spreadsheet formulas along with clarified methodology to more accurately report MCJ compliance with the implementation plan.   [4]

**Quantitative Review**

Eleven components of medical care are identified in the implementation plan:  Intake Screening, Access to Care, Chronic Care, Health Care Maintenance, Continuity of Care, Outside Care Referrals, Detox/Withdrawal, Tuberculosis/Infection Control, Pharmaceutical Management (including storage of medications and dispensing while not on site), Administrative Services (staffing)  and Dispensing Medications on Site.  Physician/Provider case review includes an assessment of care provided by nurses as well as by PCP (MD, DO, FNP, PA).

---

[3] The specific charts reviewed, and indicia of compliance are described in an excel spread sheet have been provided as a confidential document to the parties.

[4] Plaintiff has noted that the audit tool spreadsheet listed fewer than 20 patient records in assessing certain areas of care.  Revised audit tools and methodology will combine findings from case reviews and quality indicators to provide reports based upon findings from a minimum of 20 patient charts.

## Qualitative Review

Case reviews consider the adequacy of care in accord with generally accepted principles of medicine and applicable standards, aside from the specific parameters for performance specifically described by the implementation plan. These case reviews are very important in determining that the care provided to the inmates comports with the proviso put forth by the implementation plan calling for "appropriate" care "in accordance with community standards."  Other qualitative measures include the adequacy of staffing, staff supervision, and medical facilities.

## Medical Facilities and Staffing

The audit reviewed facility cleanliness, adequacy of space, privacy, infection control, availability of essential medical equipment, staffing, supervision of staff and quality control.

## Quality Assurance

Quality assurance meetings and minutes are important because this process promotes corrective measures to effect "durable and sustained compliance.  Applicable community standards for continual quality improvement (CQI)  procedures also cite the need for corrective action and documentation of completed corrective action. See Settlement Agreement, page 2-3. See, also Implementation Plan page 8.

## Interviews

Interviews with medical and nursing staff, and with inmates provided valuable insight into the adequacy of health care services at MCJ and directed the auditor's attention to areas of greatest concern.  The interviews did not affect the compliance scores or assessment of care in case studies.

## FINDINGS

**INTAKE SCREENING**   - Intake screening was not substantially compliant.  Although the intake process was generally performed in accord with the implementation plan and applicable guidelines, there were significant lapses that exposed inmates to substantial risk of harm.  See cases 7, 9, 11, 17 (delayed reinstatement of anti-hypertensive medications, failure to record vital signs, lack of detail to elucidate the extent of

substance abuse, incorrect withdrawal protocols and/or housing that delayed appropriate referrals for PCP evaluation). [5]

**ACCESS TO CARE** – Inmate access to care is not substantially compliant.  The auditors observed systemic lapses that put inmates at substantial risk of adverse outcomes, as noted in the attached audit tool and case review spreadsheets.  See "access to care" (Exhibit A) and Cases 9, 14,15,18, 20 in "case reviews" (Exhibit B).  Lapses included the following:

a) Sick call slips were not linked to the medical record[6]

b) Face to face assessments were delayed

c) SOAP format to document a comprehensive evaluation was not consistently used

d) Nurses failed to consistently enter a plan of action

e) Nurses failed to perform complete assessments and/or seemed to provide care that exceeded their legal scope of practice.  Of concern was the finding that nurses routinely evaluated without consultation or referrals to PCP inmates who complained of injury following altercations and/or custody use of force.

f) Notices were not consistently posted in housing units and/or clinics required by state law, or in accord with the Settlement Agreement.[7]

**CHRONIC CARE** – Provision of chronic care was substantially compliant.  Treatments for chronic conditions appeared consistent with applicable guidelines and standards of care.  The problem lists did not consistently list chronic medical conditions.  However, this lapse occurred infrequently and did not appear to be a systemic failure.

---

[5] Non-systemic deviations do not prevent a finding of substantial compliance where MCJ demonstrates appropriate policies and resources to enact corrective actions.  However, as described below, medical leadership has not demonstrated adequately enhanced staff education and monitoring to effect needed changes.

[6] MCJ leadership has agreed this matter merits attention.  It appears the copies of hand-written sick call slips are visible in the EMR, but electronic requests have not yet been linked to the EMR.

[7] Custody posted the notices listed above (page 5) following recommendations during this audit.  It has been difficult to keep the notices on the wall.  Custody is considering means of reducing loss or removal of such notices.

**HEALTH CARE MAINTENANCE** – Health care maintenance was <u>not substantially compliant</u> with the implementation plan in several manners.  Inmates with a significant medical condition or stable chronic diseases were not consistently provided with a full exam by physician or physician assistant within a week after intake.  See case 7.  Inmates at risk for HIV and HCV (see ███████████████ ) were not timely screened for these diseases in accord with current, CDC and USPTF guidelines for testing adopted by NCCHC.  This is a systemic breach.  Some annual examinations failed to accurately report the patient's current diagnoses, current medications and/or significant laboratory abnormalities. ███████████████ ).  Also, History and physical exams due at 6-month or one-year intervals were not timely performed. ██████████████████████ ██████ ). When such exams are delayed because of patient refusals, it is prudent for the physician to either note patient appears stable or attempt to promptly reschedule the required examination.

**CONTINUITY OF CARE AFTER RELEASE –** Nearly all released inmates were processed regarding their medical conditions <u>in substantial compliance</u> with the implementation plan.  However, the auditors noted the following incomplete entries into the medical record :   1)  EMR forms do not specify the amount of medications dispensed to the inmate (see, e.g. ██████████  2)  Information transmitted to prisons seemed incomplete or not documented (see ███████████   3) a patient with serious/life-threatening condition (newly diagnoses syphilis) was released with no documented specific follow up appointment (contrary to the requirement by Implementation Plan, page 28) (see ██████████   MCJ medical leadership reported that the appropriate care was provided in these cases but was not necessarily reported clearly in the record.  Corrective action, including modifications to the EMR, will be reviewed at the next audit.

**OUTSIDE CARE REFERRALS** – The process for providing outside medical care to MCJ inmates <u>was not compliant</u> with the implementation plan.  Recommendations from outside providers are generally available in the EMR with rare exception (See ██████████ This is an improvement compared to prior audits where outside reports were often not found in the EMR.  That the EMR does not yet consistently document outside services, especially ambulance services, is not an immediate threat to inmate safety so long as referrals to the hospital or specialist are nonetheless occurring as needed.  On the other hand, delayed care for a pregnant patient, as seen in case 2, falls far below applicable standards of care.  MCJ should aim for 100% compliance with community standards in providing health care to pregnant inmates.  See, also medical records for case 5 and Case 12 finding inadequate communications between MCJ and outside medical providers.

**DETOX/WITHDRAWL –** MCJ was <u>not substantially compliant</u> with the implementation plan regarding treatment of intoxicated and/or withdrawing inmates. Withdrawal protocols were not followed consistently.   This audit noted systemic lapses wherein the intake nurse sent to GP housing inmates described as "under the influence" or overtly intoxicated. ███████████████████████████████).  MCJ leadership explained that such patients were always medically stable for GP housing when examined later,  notwithstanding their initial intoxication,  but agreed that the medical records failed to explicitly comment on the safety for GP placement.

Non-systemic lapses were noted as well:  1) inmates were not referred for PCP evaluation in accord with applicable protocols. ███████████████. 2) documentation regarding substance abuse was incomplete – incomplete description of abused substances, problem list incomplete, lack of intake or discharge forms in EMR. (████████████████████████████).   The corrective action for these matters will likely include educating and monitoring staff to ensure better documentation of inmates' condition and nature of substance abuse to promote appropriate placement and referrals.

**TB/INFECTION CONTROL –** MCJ testing and evaluation of positive PPD skin tests was performed, for most part, appropriately.  But for reasons below, TB infection control was <u>not substantially compliant</u> with the implementation plan.

MCJ deserves credit insofar as patients showing possible latent TB (greater than 10 mm skin reaction) had timely medical interviews that related options for treatment and/or observation.  This is a marked improvement from the last audit in which multiple positive TB skin test results were not addressed or addressed belatedly.  Thus, the problem noted at the last audit, that positive skin test results were not promptly addressed, appears to have been resolved.

However, case #16 (████████ was of great concern because neither TB skin testing nor appropriate examination was performed until 3 months after intake, despite the inmate's complaints of cough.  This circumstance exposed the patient, all inmates and staff to considerable risk of harm.  Moreover, there were other cases noted wherein TB skin testing seemed to be delayed.  (█████████████).

TB screening goes beyond the skin test to include X ray and physical examination.  This audit did not find any cases in which the TB screening was considered "positive." [8]   The

---

[8] TB screening findings are considered positive when X ray exam, or clinical findings indicate the presence of active TB infection that requires isolation and/or immediate

next audit with expand its surveillance to further consider how MCJ deals with patients with positive TB screening.

**MEDICATIONS/PHARMACY STORAGE** – The audit detected open bottles, and multiple dose containers not labeled with date of first use.  These serious lapses, although addressed immediately after the audit findings on site, merit a finding that medication storage and dispensing procedures <u>were not substantially compliant</u> with the implementation plan. In addition, the EMR did not contain information regarding whether inmates were dispensed their needed medication when out to court.  The auditors have not yet been provided with a log of inmates who have refused their medications on three consecutive occasions and thus cannot comment on whether the implementation plan, including provider notification) is being followed for the treatment of non-compliant patients.

The auditors were concerned as well about MCJ controlled substance count.   Currently MCJ staff validates the accuracy of past counts for multiple substances with a single signature.  It would seem preferable that the same person who signs the count log verify by physical count each of the controlled substances (pills, vials, etc.) not less often than once every 3 months.  Medical leadership was alerted that California Code of Regulations, title 16, section 1715.65 (enacted April 2018) requires a physical count, not estimate, of all federal schedule II-controlled substances at least every 3 months.  Whether current MCJ protocols comply with the CCR is a matter for party attorneys to discuss.

**ADMINISTRATION OF MEDICATIONS** – The administration of medications appears to be <u>compliant with the implementation</u> plan. Medication lines were timed to allow for doses every 12 hours.  The audit noted on site that patients were carefully identified and that nurses were able to consistently observe ingestion of the medications.  As reported above, inmates received instructions and continued medications upon their release. With few exceptions, inmates were prescribed at intake a continuation of essential medications prescribed to them before incarceration.

**PRIMARY CARE PROVIDER (PCP) STAFFING**[9]   –   For the dates at issue in this audit, MCJ primary care staffing consisting of two PA and  the medical director has

medical treatment.  A skin test that is "positive" does not amount to positive screening absent further evaluation to indicate active infection.

[9] Primary Care Providers (PCP) – also referred to as "Providers" are licensed as allopathic or osteopathic physicians (MD, DO), family nurse practitioners (NP) and physician assistants (PA).  Although licensed nurses may evaluate

been <u>substantially compliant with the implementation plan</u>. [10]  The auditors were informed that as of October 25, 2019 PA ███ and Dr. ███ were the sole primary care providers at MCJ.  MCJ has not reported new PCP staffing going forward.   CFMG staffing plan (presumedly applied by the current Wellpath management) calls for one full time medical director and two full time physician extenders (PA or NP).

**STAFFING (RN, and other non-providers) –**  Staffing <u>was substantially compliant with the implementation plan</u> based upon representations by MCL leadership.  However, the audit team did not confirm in person that all positions were filled in accord with the Staffing Plan (CFMG Staffing Plan).  At the next audit, adequate staffing will be confirmed by direct observation on-site.

**CLINIC SPACE -** Clinic Space and equipment remain <u>substantially compliant with the implementation plan.</u>  However, the auditors noted that scales in each of the exam rooms were not calibrated to ensure accuracy.  Also, during interviews of staff the auditors learned that blood pressure cuffs were used that had not been purchased or approved by MCJ leadership.  The newly installed director of nurses will be looking into these matters. A finding of compliance at the next audit requires verified accuracy of medical equipment.

**RECORD KEEPING -**  CFMG implementation plan requires all health staff to maintain "accurate and legible medical records."  MCJ <u>was not</u> <u>substantially compliant</u> with the implementation plan in this regard.  Problems with the EMR previously identified were not corrected, including failure to integrate all sick call requests into the EMR, and incomplete information in the EMR about the amount of medication supplied to released inmates. This information is collected by MCJ but not yet linked to the records available to the auditors.   MCJ leadership stated their intent to address this problem.

**CORRECTIVE ACTION PLANS -** The CFMG Implementation Plan calls for the MCJ Quality Management Committee to devise corrective action plans responsive to deficiencies identified by these audits.   Visits by the medical care monitor at 6 month intervals in 2017, 2018 and 2019 have served as "re-audits" to assess the effect of corrective actions performed by MCJ.  As many of the deficiencies noted in the past few

---

and provide limited treatment, nurses who are not additionally credentialed as NP are not considered PCPs. Previous audits have considered the California Prison average MD/inmate ratios of 1/300-600 to indicate that a full time PA and supervising MD at MCJ is sufficient in number to provide MCJ inmates with timely access to care.
[10] California law requires that all PA services be monitored by the supervising physician as evidenced by countersignature on the charts of patients deemed to be at highest risk, and not less than 5% of the PA patient encounters (CCR 1399.545).  The new medical leadership is aware subsequent visits will audit compliance with this legal requirement.

years have not been corrected, The audit team recommends shortening the re-audit interval to 4 months during 2020 in the expectation that more intensive evaluations will promote effective corrective action plans and thereby facilitate MCJ compliance with the implementation plan.

**QUALITY ASSURANCE -** Even aside from the matter of corrective actions, the overall MCJ quality assurance processes are not substantially compliant with the Implementation Plan or terms of the Settlement Agreement.

MCJ deserves credit for complying with the California law requiring that the medical director (responsible physician) oversees and co-signs the charts for no less than 5% of all care provided by the physician assistant he is supervising. Business & Professions 3502.   The Implementation Plan (page 23) calls for the medical director (responsible physician) to countersign no less than 10% of all charts in which document treatment provided by a physician assistant, nurse practitioner or registered nurse. These requirements appear to have been met as Dr. ▇▇▇ examinations and/or chart reviews were documented in approximately 50% of the charts accessed at this audit.

Minutes for 2019 have not been provided to this auditor.  However, the 2018 minutes reviewed (2/2/18, 4/18, 8/2/18, 12/20/18) do not demonstrate adequate quality assurance at MCJ. The minutes reviewed appear deficient in the following manners:

a) the minutes do not document attendance by any of the active PCPs

b) the review of inmate deaths did not include an assessment of opportunities for corrective action

c) reviews of hospitalized patient did not consider lapses in care contributing to the hospitalization or corrective actions to prevent hospitalizations

d) there were no detailed educational programs for continual quality improvement (CQI).

MCJ leadership has reported that the previous medical director, Dr. ▇▇▇ organized monthly meetings at MCJ, as recommended in previous medical audits, to review patient-care problems and provide staff with pertinent medical education.  MCJ leadership has stated that these monthly meetings were not continued after Dr. ▇▇▇ departure.

Moreover, MCJ has not provided documentation of peer review that comports with the CFMG Policy and Procedure (page 15) that calls for the medical director and director of nurses regularly evaluate a minimum of 5 charts monthly to assess subordinate PCP and RN performances.  Dr. ▇▇▇ has agreed that regular chart review is essential for

optimal quality control. An example of how medical director oversight can improve care, see case 6 (fetal demise observed by nurse with no PCP exam), cases 11 and 14 (nurse diagnosis and prescriptions without examination),  case 12 (mistaken reliance of plain films to rule out osteomyelitis); case 12, 20 (unsupervised treatment with unusual antibiotic combination of clindamycin plus Bactrim),  to reduce errors and to correct discovered defects.

PA ████ has not been instructed in the use of standard references which are considered crucial for optimal medical care, such as Uptodate, E-medicine, Epocrates or other online medical references. She is dependent upon Dr. ████ to validate her medical care decisions.  But her decisions for difficult cases are not always reviewed by Dr. ████ (Case 12).

MCJ must have an effective quality assurance program with robust peer review, as demonstrated by documented medical director chart reviews, to be in substantial compliance with the implementation plan.

## INMATE DEATHS

████ (MV) – MV, age 48, died June 2, 2019 as the result of hanging.  His medical history was significant for schizophrenia and drug abuse. There were no indications of medical (i.e. non-psychiatric) issues causing his demise.

## INMATE INTERVIEWS

Women – Three female inmates interviewed (████████████████) did not report problems with access to care, difficulties obtaining outside medical care when needed, or delays in receipt of prescription drugs. Their complaints that non-steroidal anti-inflammatory drugs (Motrin, Advil, Naprosyn) used regularly for menstrual cramps or headaches without a prescription in the free world was not available in the jail canteen.  They also complained that shampoo was not provided, requiring indigent inmates to use regular soap to wash hair.  The medical conditions of TW ████ was brought Dr. ████ attention for further review.

Men – Three male inmates interviewed (████████████████) reported difficult obtaining prescriptions in timely fashion.  These complaints were not validated in the review of the medical record. The medical condition for ES ████ was brought to Dr. ████ attention for further review.

## PHYSICIAN/NURSE CARE CASE REVIEW [11]

Case 1 ██████ – Adequate care

Case 2 ██████ – Inadequate care. 38 yo pregnant inmate at very high risk for fatal birth defects and complications during gestation does not receive timely prenatal laboratory evaluations.

Case 3 – ██████ – Adequate care

Case 4 - ██████ - Adequate care

Case 5 - ██████ – Adequate care.  Medical record is incomplete as to the communication between specialists and MCJ in the treatment of a recurrent shoulder dislocation. But the initial referral and follow up were appropriate.

Case 6 - ██████ – Adequate care.  However, possible early fetal demise noted by nurse not promptly referred for definitive evaluation and treatment.

Case 7 - ██████ – Adequate care.  However, anti hypertensive medications not ordered promptly upon intake.

Case 8 – ██████ – Adequate care.  Records incomplete.

Case 9 – ██████ – Inadequate care. Overtly withdrawing patient sent to general population, not followed in accord with CIWA protocols.

Case 10 – ██████ – Adequate care

Case 11 – ██████ – Inadequate care. Nurse practice at multiple encounters exceeds scope of practice.  Physician exam for patient with chronic care condition not performed timely in accord with protocols.

Case 12 – ██████ – Inadequate care.  Complex medical illness not followed by supervising physician.

Case 13 – ██████ – Adequate care.  However, although this patient's new diagnosis of syphilis needs heightened attention after release,  no appointment was made for him upon his release.

---

[11] Names and ID numbers are included in the work sheets that accompany this draft. Most of the lapses noted have already been brought to attention of parties.  The analysis is subject to reconsideration following responses ("rebuttal") to this audit.

Case 14 – ▮▮▮▮▮ – Inadequate care.  Nurse exceeds scope of practice in not obtaining PCP consultations for patient who may have rhabdomyolysis. Also treats common cold with excessive and unnecessary medications.

Case 15 – ▮▮▮▮▮ – Adequate care.  Inmate has multiple intakes.  Nursing sick call does not consistently document vital signs, or physical examinations.

Case 16 – ▮▮▮▮▮ – Inadequate care. Inmate complaining of cough at intake has exam rescheduled 7 times and no TB skin testing done until months later.

Case 17 – ▮▮▮▮▮ – Inadequate care. Inmates alcoholic intake incompletely assessed, with no CIWA monitoring.  Inmates request for HIV and HCV screening unreasonably denied.

Case 18 – ▮▮▮▮▮ – Inadequate care. Nursing care and treatment provided for patient's hand abscess exceeds scope of practice.

Case 19 – ▮▮▮▮▮ – Adequate care.

Case 20 – ▮▮▮▮▮ – Inadequate care. Amount of alcohol ingested not documented in accord with protocol. Nurse exceeds scope of care by evaluating chest pain with no PCP consultation. Toe infection resistant to antibiotic therapy not seen by PCP.

Case 21 – ▮▮▮▮▮ - Adequate care

Case 22 – ▮▮▮▮▮ – Adequate care

Case 23 – ▮▮▮▮▮ – Adequate care

Case 24 – ▮▮▮▮▮ – Adequate care

## CONCLUSIONS

This audit of medical care provided to inmates at MCJ from April 1, 2019 through September 30, 2019 found significant deficiencies as described above.  Thus, despite continued improvement in care, MCJ is not substantially complaint with the implementation plan.

1) Physician supervision of PA and RN care is not always provided when appropriate.

2) Nurses often do not consistently assess intoxicated and withdrawing inmates in accord with applicable protocols for appropriate monitoring and treatment.

3) Nurses do not consistently obtain necessary vital signs or perform appropriate evaluations in accord with approved nursing protocols.  Nurses seemed to provide care on occasion that exceeds their legal scope of practice.

3) Sick call requests are not consistently included in the EMR

4) Major medical problems are not consistently documented in the problem list

5) Quality assurance programs, including formal chart review by the medical director of all nurse and physician assistant performance is not performed in accord with community standards as articulated in the implementation plan, medical group policies and Settlement agreement.

6) Notices regarding access to care have not been consistently and reliably posted in housing and clinic areas in accord with state law and the Settlement Agreement.

## RECOMMENDATIONS –

**(See also recommendations to effect substantial compliance, page 5)**

1. PA Delegation services agreement should be signed anew with current physician supervisors in accord with the provisions of CCR 1399.540 and California B&P 3502.  Each PA needs to regularly consult with and receive education from the medical director, as recommended in the previous audit reports.
2. The MCJ medical director, along with the director of nursing, should oversee the quality of intake and nurse sick call. The medical director and director of nursing should formally review the performance of all clinical practitioners (RN, FNP, PA, MD and DO)  by analysis of no less than 5 medical records for each provider each month.  Complex medical conditions should be followed closely by the medical director. Inmates with significant injuries following altercations and/or use of force should be examined by a PCP.
3. Untoward medical events at MCJ, such as hospital admissions or deaths, should be reviewed with medical staff in monthly (or more often) QA meetings, as recommended in prior audit reports.
4. Continuing medical education should be provided to medical staff, including training as to appropriate use of reliable on-line resources such as Uptodate, Emedicine/Medscape and Epocrates.
5. Sick call slips generated by inmates should be viewable in the medical record.
6. The initial full examination and periodic physical exams should not be unduly delayed.  PCP should repeat efforts to examine inmates or document lack of need when patients refuse examination. All patients should be timely tested for

TB AND treated in accord with the accepted protocols.  Inmates at high risk should be screened for HIV and/or HCV infection.  Patients found to have HIV, HCV or latent TB should be counseled about options for immediate versus delayed treatments.

7.  Important notices and instructions regarding healthcare (see list on page 5) should be posted behind framed safety-glass in each of the housing.   To comply with California law CCR 1355.4  the following signs should be posted in the medical clinic:  "NOTICE TO CONSUMERS Medical doctors are licensed and regulated by  the Medical Board of California (800) 633-2322 www.mbc.ca.gov."

8.  Withdrawal protocols should be rigorously followed.  Inmates described as "under the influence" should not be sent to the General Population without clearly documenting in the medical record that the inmate is safe for such placement.

9.  Medications must be stored in closed bottles/tubes/etc.   Multi use medication containers must be labeled to show the date upon which the medication was first opened.

10. EMR should be reviewed to address inefficient or inaccurate entries, including sick call slips, ambulance services, specialty care, health care maintenance, medications and follow up care after release.

11.  The interval between site visits in 2020 should be shortened to 3 or 4 months, with audits scheduled for March, June, September and December in order to facilitate a more intensive quality assurance process and corrective action implementation.


## INFORMATION REQUESTED TO MONITOR CORRECTIVE ACTION,

## (PRIOR TO NEXT AUDIT)

1. Corrective action plan(s) to link sick call slips to the EMR.
2. Inmates attending nurse sick call in 2020.
3. Inmates attending PCP sic call in 2020.
4. Inmates seen for chronic care 2020.
5. Inmates released 2020.
6. Inmates in 2020 who had been incarcerated for more than one year.
7. Inmates sent out to medical specialists in 2020
8. Inmates sent out to the hospital in 2020.
9. Inmates housed in observation cells in 2020.
10 Inmates who refuse medication doses 3 times or more in 2020.
11. Inmates during 2020 sent from Jail to court July.
12. TB skin test results for 2020.
13. Log of inmates in 2020 who are screened "positive" for TB.

14. Copies of current PA Delegation of Services Agreement for Ms. ███████ and any other PA currently working at MCJ.

15. Updated list of PCP medical staff at MCJ (MD, DO, PA, NP) besides Ms. ███████ and Dr. ██████

16. Updated list of MCJ staff naming individuals (initials suffice)  that fill each of the time-slots shown in the Monterey County Jail Staffing Plan.

17. Copies of minutes for 2019 and 2020 quality assurance meetings.

18. Monthly performance evaluation of nursing and PCP staff performance.  Forms sent to auditors may identify staff by initials.

19. Written policy regarding screening and treatment for inmates at risk of infection or known to be infected with HIV or HCV.

20. Log of appointments rescheduled more than twice in 2020

21. Narcotic inventory records January-February 2020.

**Attachments:**

MCJ HC Audit Tool revised Nov 15 2019

MCJ Combined Case Review revised Nov 15 2019

Proposed Peer Review Tool

# Exhibit 7

# MONTEREY COUNTY JAIL COMPLIANCE AND HEALTH CARE MONITORING AUDIT

Visit June 18, 2020

Final Report – August 3, 2020



Bruce P. Barnett, MD, JD – expert medical monitor

HERNANDEZ V. COUNTY OF MONTEREY

# TABLE OF CONTENTS

INTRODUCTION .............................................. ......................................................................3

BRIEF SUMMARY OF FINDINGS ............................................................................................3

SUMMMARY TABLE  ..................................................... ...................................................6

OBJECTIVES, SCOPE, METHODOLOGY ...............................................................................6

FINDINGS ....................................................................................................... . 8

      INTAKE.....................................................................................................................8

      ACCESS TO CARE..................................................................................................10

      CHRONIC CARE, HEALTH CARE MAINTENANCE....................................................11

      CONTINUITY OF CARE, OUTSIDE CARE REFERRALS, ............................................12

      DETOXIFICATION/WITHDRAWAL............................................................................13

      TB/INFECTION CONTROL........................................................................................13

      MEDICATIONS/PHARMACY....................................................................................13

      STAFFING.............................................. .................................................................13

      CLINIC SPACE AND FACILITIES ..….......................................................................13

      QUALITY ASSURANCE............................................................................................14

  INMATE DEATH(S)..............................................................................................................15

INTERVIEWS......................................................................................................................19

PHYSICIAN/NURSE CASE REVIEW....................................................................... .…21

ANALYSIS OF FINDINGS ....................................................................................................23

RECCOMMENDATIONS............................................................. .........................................24

CONCLUSION......................................................................................................................25

LIST OF ATTACHMENTS ....................................................................................................26

# INTRODUCTION

This audit report describes my findings in regards to the following:   a) compliance with standards of care described for each of the quality indicators cited in the court-approved implementation plan (hereinafter implementation plan or  "plan")  b) analysis of care provided to patients described in "Physician Case Review" and c) review of inmate deaths occurring at MCJ or immediately following MCJ incarceration.

The medical records evaluated herein date from October 2019 through early April 2020. Due to delays and visiting constraints imposed by the Covid-19 pandemic, the site visit was performed on June 17, 2020.

In determining adequacy of medical services at the Monterey County Jail I refers to authoritative documents that include but are not necessarily limited to the following: CFMG Implementation Plan (case5:13cv-02354-PSG document 532 Filed 04/01/16) [1]; CMGC Nurse Protocols (July 2018); CFMG Policy and Procedure Manual (April 2015) and the Wellpath Policy and Procedure Manual – Monterey County California, [2] California Code of Regulations[3] and NCCHC Standards for Health Services in Jails [4]

The audit tools and raw data referenced in this report are also provided as confidential documents to the parties.

## BRIEF SUMMARY OF FINDINGS

Medical care at MCJ has improved since 2017.  For the current audit, the facilities are in substantial compliance and lapses in pharmacy management noted before have been corrected.  The electronic medical records system has been refined to meet the implementation plan requirements.  However I did note in other areas of concern significant departures from the implementation plan.     Deviations in six of the quality indicators described below seem to reflect systems at MCJ that inadequately address

---

[1] CFMG's Implementation Plan citations reference the upper right ECF page number for the document described as Exhibit A, which shows page number XX of 140.

[2] California Forensic Medical Group (CFMG), an original defendant in Hernandez v. Monterey County, has evolved through corporate mergers and acquisitions to become Correctional Medical Group Companies (CMGC) and most recently Wellpath.

[3] Title 15, Division 1, Chapter 1, Subchapter 4.  Of particular interest is section 1046 regarding review of deaths in custody. .

[4] The Wellpath Policy and Procedure Manual makes frequent reference to NCCHC Standards for Health Services 2018.

key medical issues.  Deviations from the plan for other quality indicators seem to reflect a failure to enact the corrective actions I recommended in multiple prior audits.

<u>QUALITY INDICATORS NOT IN COMPLIANCE DUE TO APPARENT SYSTEMIC DEVIATIONS FROM THE IMPLEMENTATION PLAN.</u>

**Intake Screening for Health Care – not compliant**

a. The intake nurses did not consistently report an actual weight and height measurement

b. Abnormal vital signs documented at intake were not repeated and/or not acted upon in accord with implementation plan and applicable standards of care

c.  Intake nurses failed to contact PCP for consultation in cases where the inmate is acutely ill, has an unstable chronic illness or presents with new or complex medical problems to which Nurse Protocols do not apply.

d. Intake nurses sent to the general population inmates who have been described as under the influence, impaired or at imminent risk of severe withdrawal symptoms.

**Access to Health Care – not compliant**

a. Inmates were not timely seen following their written requests for sick call

b.  Nurses provided care that exceeds the legal scope of practice by failing to follow the Nurse Protocols and by not referring to PCP patients with conditions for which no Nursing Protocol applies.

**Outside Medical Care Referrals by MCJ – not compliant**

a. Medical director and/or MCJ leadership did not appear to advocate for patients when needed outside medical attention is delayed.

b. Medical director and/or MCJ leadership did not appear to communicate directly with outside specialists, especially when the specialty report is vague or missing.

**Treatment of Intoxicated Inmates and Detoxification – not compliant**

a.  Inmates described as intoxicated, under the influence and/or otherwise overtly impaired (lethargic, ataxic, uncooperative) were sent to GP without observation in sobering cell.

b.  Inmates with abnormal vital signs and/or overtly impaired (lethargic, ataxic, uncooperative, injured) were not seen promptly by PCP or mental health to reduce risk of deterioration.

c. Inmates withdrawing from opiates in addition to other substances were not monitored by COWS Protocol.

d.  Inmates with symptoms of withdrawal, even if subtle (uncooperative, ataxia) were not consistently sent to hospital as called for in the implementation plan for further evaluation and treatment.

e. Intake nurses did not consistently document contact with PCP for orders when booked inmates are potentially withdrawing from multiple substances.

**Detections and Treatment of TB and other infections – not compliant**

a. TB skin testing was not consistently performed in accord with implementation timelines.

b. Advice was not offered to inmates in accord with the implementation plan regarding positive PPD tests indicating likelihood of latent TB.

**Quality Assurance – non compliant**

a.  Quality assurance policies and protocols at MCJ failed to review the performance of staff, and thus allow continued lapses similar to those noted in prior audits, including but not limited to the following:   inattention to abnormal vital signs, failure to make any assessment as to cause of an inmate's medical complaint, treatment by nurses outside their scope of practice and without support from nursing protocols, treatment of complex medical conditions by health care staff who do not document consultation with a physician.

b. Minutes from the Quality Assurance Meetings (Quality Management Committee) did not address findings from medical audits or produce corrective actions plans, as required under the implementation plan.

c. Death Reviews were incomplete and did not consistently provide directions to MCJ staff for corrective active to reduce risk of death.

QUALITY INDICATORS NOT IN COMPLIANCE DUE TO LACK OF CORRECTIVE ACTIONS:

**Chronic Care**

a. The problem list was not consistently updated to show significant medical conditions.

**Health Care Maintenance**

a. Annual exams were not consistently performed within required time frame, even when patient has serious illness (such as polycythemia vera) that requires close follow up.

b. Exam forms were not properly filled out – missing diagnoses, physical exam incomplete.

**Continuity of Care**

a. Patients with serious illnesses that were not under control did not consistently receive referrals for continued care upon release.

b.  The discharge form did not indicate how many days' supply of a drug was provided to the released inmate.

## Summary Table

| TABLE 1 | Quality Indicator | Compliant/Not Compliant | % Compliant | Comments |
|---|---|---|---|---|
| 1.  Intake Screening | | Not Compliant | 36.0% | see text below |
| 2.  Access to Care | | Not Compliant | 52.0% | see text below |
| 3. Chronic Care | | Not Compliant | 70.0% | see text and worksheets |
| 4. Health Care Maintenance | | Not Compliant | 67.0% | see text and worksheets |
| 5. Continuity of Care | | Not Compliant | 60.0% | see text and worksheets |
| 6. Outside Care Referrals | | Not Compliant | 50.0% | see text and worksheets |
| 7. Detox/Withdrawal | | Not Compliant | 28.0% | see text and worksheets |
| 8. Tuberculosis/Infection Control | | Not Compliant | 27.0% | see text and worksheets |
| 9. Pharmaceutical Storage and Dispensing; refusals | | Compliant | 100.0% | based on virtual tour |
| 10. Administration and staff on  site | | Compliant | 100.0% | based on virtual tour |
| 11. RN Medication Administration On site | | Compliant | 100.0% | based on virtual tour |
| 12. Physician/Provider Case Review | | Not Compliant | 30.0% | see text and worksheets |
| | | | | |
| Overal Audit Score and Rating: | | | 60.0% | |

## OBJECTIVES, SCOPE, AND METHODOLOGY

This audit assesses compliance with the implementation plan.  As in prior audits, recommendations are provided for corrective actions to promote compliance with plan parameters.

## Methodology

The Summary Table shows the percentage of clinical encounters reviewed that demonstrated compliance with the described performance parameter.  For this audit, the "compliance rate" is derived from the findings compiled in the "Physician Case Review Tool" as well as the Monitoring Audit Tool." [5]  These spreadsheets are attached.

---

[5] Prior audits presented these data sets separately.

The overall score represents an average of the compliance data for the 11 quality indicators (quantitative reviews) and the case reviews (qualitative reviews) found to demonstrate adequate medical care.  A different methodology has been applied that used in past audits. The score thus may be used for comparison of performance in future audits using the same methodology.

This audit does not propose a "benchmark" percentage that indicates compliance with the plan.   I consider whether apparent departures from the plan were due to systemic lapses (i.e. inadequate protocols) or non-systemic lapses (i.e. failures to follow operational protocols). I view systemic lapses as significant deviations from the plan.  I also find that non-systemic lapses, even in relatively small numbers, amount to non-compliance if there are insufficient measures applied by MCJ to ensure correction of these lapses.

**Quantitative Review**

Eleven components of medical care are identified in the implementation plan:  Intake Screening, Access to Care, Chronic Care, Health Care Maintenance, Continuity of Care, Outside Care Referrals, Detox/Withdrawal, Tuberculosis/Infection Control, Pharmaceutical Management (including storage of medications and dispensing while not on site), Administrative Services (staffing)  and Dispensing Medications on Site. Physician/Provider case review includes an assessment of care provided by nurses as well as by PCP (MD, DO, FNP, PA).

**Qualitative Review**

Case reviews consider the adequacy of care in accord with generally accepted principles of medicine and applicable standards, aside from the specific parameters for performance specifically described by the implementation plan. These case reviews are very important in determining that the care provided to the inmates comports with the proviso put forth by the implementation plan calling for "appropriate" care "in accordance with community standards."  Other qualitative measures include the adequacy of staffing, staff supervision, medical facilities and quality assurance. [6]

**Interviews**

Interviews with medical and nursing staff, and with inmates provide valuable insight into the adequacy of health care services at MCJ and direct the monitor's attention to areas of concern.  The interviews do not affect the compliance scores or assessment of care in case studies.

---

[6] See Settlement Agreement, page 2-3; Implementation Plan page 8

## FINDINGS

**INTAKE SCREENING**  - Intake screening <u>is not substantially compliant</u>.  Significant deviations from implementation plan are noted herein, some of which exposed inmates to substantial risk of harm. Departures from the plan [7] include inattention to vital signs, failure to record actual (as opposed to reported) weight and height, not obtaining blood sugar readings from diabetics, delayed referral to PCP [8]   or specialists for treatment of acute injuries or unstable chronic conditions.  The accompanying worksheets provides details of problematic care and identifies inmates by the following ID numbers:

██████ – pulse 125, sent to GP, medications taken on outside not provided at MCJ until 10 days after booking.

██████ – BP 170/100 not repeated, weight and height not measured

██████ – weight and height not measured

██████ – hypertension noted with no referral for chronic care documented

██████ – diabetic not tested for blood sugar on intake, no referral to PCP for urinary tract infection.

██████ – overt hand injury typical for boxer's fracture not referred for PCP evaluation or X rays.

██████ – 63 year old inmate with diabetes, congestive heart failure and abnormal vital signs does not receive necessary medications at intake and for days thereafter.  PCP should evaluate promptly after booking, but does not see patient until 3 days after booking.

██████ –  low temperature reading on intake of 94.6, and complaint of feeling cold not reevaluated for possible hypothermia.  Abnormal vital sign not repeated.

██████ – 71 year old paranoid schizophrenic with pacemaker, out of compliance with usual medications while out of jail, needs prompt evaluation upon booking as his

---

[7] CFMG implementation plan ("plan") at pages 17, 18,  21,23,24,27, 29, 53-55
[8] Primary Care Providers (PCPs) – are healthcare providers licensed as allopathic or osteopathic physicians (MD, DO), family nurse practitioners (NP) and physician assistants (PA).  RNs delivering health care in accord with the plan and nursing protocols are also considered "providers" of medical services in this audit. But RNs are not considered to be PCPs.

condition is not stable but is not seen by PCP for 5 days.  Even then the care is provided by NP with no documented MD collaboration.



███████ – 48 yo alcoholic with severe heart disease not taking medications, at risk for withdrawal needs immediate medical attention for unstable clinical condition.  Does not see a physician for 40 days after intake.

███████ – 61 year old alcoholic, cocaine user and smoker does not have any PCP exam after intake and released after 8 days with no PCP visit despite suffering from a chronic disease of alcoholism and at risk for serious complications from that condition.

███████ – 61 year old alcoholic with abnormal physical finding on intake of swollen face and hand, not seen by PCP until five days after booking, at which time X ray is ordered that is not done for three more days – revealing a complex fractured finger.

███████ – no blood sugar measured for diabetic at intake, PCP not contacted to consult on patients uncertain medications.  Medications for diabetes and blood pressure not prescribed until 4 days after intake.

███████ – no action taken at intake for abnormal vital signs – pulse 111, BP elevated - requiring further investigation

███████ – hypertensive patient not provided with chronic care follow up for 15 days after intake.

███████ – no blood sugar measured in diabetic patient at intake

The process for intake screening appears to be dysfunctional, and thus is a <u>systemic deviation</u>.

**ACCESS TO CARE** – Inmate access to care is <u>not substantially compliant</u>. Significant deviations from implementation plan were noted that include delayed attention to requests for sick call, inconsistent use of SOAP format, lack of assessments and nursing care that exceeds legal scope of practice or practice permitted by nurse protocols. PCP and RN care was noted to be deficient in multiple circumstances where serious conditions did not receive timely attention.  Physician supervision was not apparent in the management of complex medical problems.  In some cases delayed care at MCJ  was followed by an emergency admission to the hospital for severe illness. Departures from CFMG implementation plan ("plan") at pages 17, 18, 21,23,24,27, 29, 53-55  are observed in the patient care as detailed in the accompanying worksheets and identified by the following ID numbers:

██████ – hives could be manifestation of severe allergic reaction not triaged same day as an emergency when care was requested; he was not seen at the next sick call. Complaint of pain under left side not addressed for 5 days.  Nurse exam documents weakness and pain in right arm does not consider risk for stroke in accord with nurse protocols.

██████ – sick call request on 2/5/20 not triaged until 2/17/20. Complaint about vaginal discharge treated without examination or consultation. [9]

██████ – low weight in patient with known HIV disease not investigated as cachexia related to infection or cancer. Care provided to complex patient by nurse and physician extenders without concurrent physician supervision.

██████ – incomplete exam for rectal warts.

██████ – patient hospitalized after many days of deteriorating heart failure at MCJ.

██████ – chest pain in patient at risk for heart attack is treated by nurse as heartburn without medical consultation.  Bloody diarrhea treated by nurse without PCP consultation.

██████ – nurse performs incomplete exam for patient complaint of cold symptoms and finger pain. Diagnosis and treatment for finger fracture delayed by nursing and by PCP.

██████ – elderly diabetic with renal insufficiency deteriorates in MCJ without benefit of needed specialist (nephrology, endocrinology) consultations, leading to hospitalization.

██████ – 70 year old presenting with influenza like illness on 3/23 is not considered at risk by nurses for Covid-19.  Nurse exam is incomplete and inaccurate.

██████ – nurse assessment of diabetic patient at risk for heart attack does not include consultation with PCP. Nurse assessment for hemorrhoids without exam does not comport with protocols or applicable standards of care.

---

[9] Clinicians cannot make an accurate assessment of what kind of discharge a patient might have without direct inspection of the discharge.   It is also worth noting that the nursing protocols call for referral to medical provider for a diagnosis of trichomonas vaginalis, or for "pelvic complaints" or for unresolved/repeat infections.

 – nurse exam of shoulder injury without adhering to protocol leads to inadequate treatment of torn rotator cuff.

– recurrent diarrhea episodes possibly related to metformin toxicity or other undiagnosed condition treated on multiple occasions by nursing and not referred to PCP.  Benign lesion on scrotum incorrectly described by nurses as "testicular abscess."

– cursory nurse exam of leg injury does not comport with nursing protocols or applicable standards of care.

There appears to be <u>systemic problems</u> wherein nurse training is inadequate to ensure safe medical practices.  Also, medical care overall is in some cases inadequate for MCJ patients with severe and complex medical conditions needing specialist consultations.

**CHRONIC CARE** – Provision of chronic care is <u>not substantially compliant.</u>  Systems in place provide applicable forms to assist PCP documentation.  But there appears to be no mechanism to correct the recurrent deviations noted (incomplete problem list, unaddressed significant chronic care issues).

See examples of deficiencies described in the Case Review Tool and  Monitoring Audit Tool, attached.

**HEALTH CARE MAINTENANCE** – Health care maintenance is <u>not substantially compliant.</u>  Some annual examinations ae incomplete, lacking full physicals and inaccurately reporting current diagnoses.  History and physical exams due at 6-month or one-year intervals are occasionally not timely performed. There appears to be no corrective action plans to remediate these lapses. See examples of deficiencies described in the Case Review Tool and  Monitoring Audit Tool, attached.

**CONTINUITY OF CARE AFTER RELEASE –** Although released inmates were usually released with instructions and medications for their medical conditions, the monitor identified a few serious lapses for which there appeared to be no corrective action.  The amount of medication dispensed is not identified by the release document.  This problem was described in the last audit.  Several patients with serious and unstable conditions were not provide with post release appointments as called for by the plan.

- 3/12/20 discharge of paranoid schizophrenic with alcoholism and other medical issues, without documented follow up for medical care

- 3/21/20 discharge with retinal detachment and need for surgery to maintain vision has no discharge documents recorded in EMR

███████ - acute finger injury sustained while in jail is not referred for needed outside care upon release.

These uncorrected lapses show MCJ to be  not substantialy compliant with the implementation plan.  .

**OUTSIDE CARE REFERRALS** – The process for providing outside medical care to MCJ inmates is not compliant with the implementation plan.  Although access to specialty consultations seems improved compared to prior audits, the written reports from outside providers are still not consistently available in the EMR.   The monitor also noted significant delays in providing necessary outside treatment.

 – no report returned with patient regarding wired jaw.

███████ – orthopedic follow-up not provided as needed.  Malunion of fracture found at delayed orthopedic appointment.

 – delayed orthopedic care for acute dislocation

███████ – delayed appointment for glaucoma

There appears to be a systemic deviation from the plan where MCJ does not have a protocol by which the medical director and/or PCP are encouraged to communicate directly with the specialists to whom they send their patients.

**DETOX/WITHDRAWL –** MCJ is not substantially compliant due to systemic deviation from the plan.  Withdrawal protocols were not followed consistently.  The intake nurse sends to GP housing inmates described as "under the influence" or overtly intoxicated. Nurses have apparently not been trained regarding the significance of abnormal vital signs, the significance of delirium, or the need to obtain prompt medical consultations for acute medical problems. The death in January 2020 of an inmate placed in the sobering cells (see deaths below) is an example of why patients with overt signs of intoxication and withdrawal need heightened scrutiny.

**TB/INFECTION CONTROL** –MCJ TB infection control systemically deviates from the plan and is not substantially compliant because patients with signs of latent TB (unequivocally positive PPD) are not counseled regarding treatment options. This audit, performed remotely, did not assess compliance with the plan regarding the Airborne Infection Isolation Rooms (AIIR) required for infected patients.  I anticipate the Fall/Winter audit will include an on-site MCJ visit to review AIIR components as listed in Exhibit H of the Implementation Plan.

**MEDICATIONS/PHARMACY STORAGE** – During my site review performed by remote computer connection I observed medications safely stored, with up to date narcotic logs.  <u>MCJ is substantially compliant</u> with this aspect of the implementation plan.

**ADMINISTRATION OF MEDICATIONS** –  During my site review performed by remote computer connection I observed medications administered with the appropriate safeguards that ensure identification of patient, ingestion of administered medications and documentation of refused medications. <u>MCJ is substantially compliant</u> with this aspect of the implementation plan.[10]

**STAFFING - PRIMARY CARE PROVIDER (PCP), RN and others** –   Staffing logs, staff interviews and inspection of care on site indicates that MCJ has sufficient staff to deliver effective medical care. . The inmates interviewed did not describe any instances of significant delays in obtaining attention from nursing or PCP when sick call requests are made.  <u>Staffing appears to be substantially compliant with the implementation plan.</u>[11]

**CLINIC SPACE AND FACILITIES** - Clinic Space and equipment was reviewed in the course of a virtual facility tour using remote video and audio links.  Clinic spaces remain clean with appropriate infectious waste containers.  Opthalmoscope, otoscope and sphygmomanometer are present.  Signs regarding patient rights, as required by California law and by the implementation plan, are posted clearly.  Scales are present in each room with documented calibration to ensure accuracy.  The intake area was found to allow confidential conversations with the patient, with access to custody officers to ensure staff safety.  Observation cells were clean and free of overt suicide risks (hooks, ledges).  Custody logs document safety checks every 15 minutes for inmates housed in observation cells.   <u>MCJ is substantially compliant</u> with this aspect of the implementation plan.

---

[10]  My assessment of storage and nurse administration of drugs does not address the choice of drugs.  Apparent lapses in dispensing and/or prescribing medications by PCP/nurses are described in my reports on Intake, Access to Care, Chronic Care, and Continuity of Care.

[11]  The audit of medical records, as elucidated elsewhere in this report, did reveal multiple instances of delayed response to sick call requests. These delays appear related to poor performance by individual staff members and not due to inadequate staff numbers or systemic flaws.  The MCJ DON reported during this audit that MCJ has hired new nurses who are being trained and monitored to improve compliance with the implementation plan.

## QUALITY ASSURANCE -

The Implementation Plan (page 23) calls for the medical director (responsible physician) to countersign no less than 10% of all charts where treatment is provided by a physician assistant, nurse practitioner or registered nurse. These requirement appears to have been met as Dr. ███████ documented his engagement in the care of approximately 80% of the patients listed in the Physician Case Reviews.  However, as described in this report, Dr. ██████ oversight did not appear to ensure appropriate care in all circumstances.

Wellpath Monterey County California Policies & Procedures, effective 6/2/2019, call for the establishment of a CQI committee involving the MCJ medical director as well as physician extenders (physician assistants, nurse practitioners), nursing, mental health, dentistry, health records, pharmacy and laboratory.  The CQI committee must meet at least quarterly but can meet more often – as this monitor has recommended. The CQI meetings are supposed to review all deaths in custody, suicide attempts, illness outbreaks and adverse or unexpected outcomes.  The minutes provided to the monitor have not addressed lapses in medical care brought to MCJ attention in past audits or document clinical improvement plans to prevent avoidable hospitalizations or deaths.[12]

In addition, the CQI process should include health record reviews to ensure that staff provides appropriate care.  MCJ did not perform peer review that comports with the CFMG or Wellpath Policy and Procedure manuals that calls for regular, formal evaluation of RN and PCP performance.

The timely and complete analysis of inmate deaths, with consideration of possible corrective action plans, is an important component of quality assurance.  As described below, the death reviews submitted for this audit did not comply with standards for jails as set forth in the implementation plan and Wellpath protocols.

MCJ must have an effective quality assurance program with robust peer review, as demonstrated by adequate review of deaths, regular CQI meetings and documented medical director chart reviews to be in substantial compliance with the implementation plan. MCJ quality assurance processes are not substantially compliant with the Implementation Plan or terms of the Settlement Agreement.

//

---

[12] The matter of death reviews is addressed in further detail  below alongside the analysis of inmate deaths.

## INMATE DEATHS

Three inmate deaths have been reported since the October 2019 audit:

**Patient** ███████ **AR** was at the time of his death (March 3, 2020) 54 years old. He had a long history of poorly controlled diabetes, hypertension, severe coronary atherosclerosis requiring stent, chronic congestive heart failure, stroke and lung dysfunction (emphysema, recent pneumonitis, fluid retention). He admitted to having not seen his physician for the 6 months prior to his intake. His condition was chronically unstable. He was at the highest risk for sudden death.

AR was booked at or around 7 PM on March 1. His severe chronic illness and poor pre-booking medical care should have prompted physician examination for the next morning. Instead of seeing a physician, AR was seen by a PA, and not until around 5 pm, nearly 24 hours later.

ARs weight was recorded as 207 pounds at noon on March 2, an increase of 11 pounds since intake less than 24 hours previously. The dramatic weight gain should have raised concerns of fluid retention from severe heart failure. (Weight variations of his order cannot be attributed to differences in scales as MCJ scales should have been calibrated to the same measure as recommended in past audits). At 5 pm on March 2, PA ████ reported that breath sounds were absent in AR's right lower lung. This finding was consistent with congestive heart failure severe enough to cause fluid to accumulate in the lung and impair breathing. Considered in combination with the substantial weight gain, AR should have been sent to the hospital at this time for Chest X ray, stat laboratory tests, and in-hospital treatment for congestive heart failure.

At 5:30 PM on March 2, barely 30 minutes after seeing PA ████ AR complained of chest pain. His ECG at MCJ was read by Dr. ████ as not showing any changes from prior ECG. Dr. ████ did not personally examine AR. Dr. ████ ordered housing in the observation unit. Applicable standards of care call for AR to have been sent to the hospital immediately to rule out a heart attack. A normal or unchanged ECG does not negate the probability of an acute cardiac event, especially in diabetic patients with a history of heart disease. The need for AR to be hospitalized was even greater on account of his severe heart failure manifest in his rapid weight gain, loss of lung sounds in right chest).

AR died in the early morning hours of 3/3/20 while under observation at MCJ, likely as a result of an acute coronary event. The time of his death is given as 4:24 AM, a few minutes after the paramedics arrived and could not revive him. Nursing notes state it was difficult to open AR's jaw to perform CPR, suggesting his death occurred a few hours before CPR was attempted.

Pending autopsy results, this review leads the monitor to the following conclusions:

REPORT August 3, 2020

1. AR died from an acute myocardial infarction suffered in the early morning hours of March 3, 2020 sometime before he was noted by staff to be unresponsive

2. The medical care at MCJ was not compliant with the plan as the services were not provided in accordance with community standards:  a) AR's medical examination at MCJ was inordinately delayed; he did not see a physician between his intake and death.   b) despite evidence of severe acute and chronic congestive heart failure (right lung aeration not audible, significant weight gain) PA ██████ did not seek immediate physician consultation.  c)AR  was not sent to the hospital for his complaint of severe chest pain at 5:30 pm on March 2, despite his extremely high risk for death from acute coronary events.

The lapses noted in the care provided to AR are similar to those observed elsewhere in this audit:

1. Nurses seem unaware of the significance of the vital signs and weights they measure.

2.  Inmates at high risk of illness or death from uncontrolled chronic diseases (such as diabetes, heart failure) when booked are not being seen by a physician as soon as possible.  If no physician is available on site in MCJ, then it is appropriate to send these patients to the hospital for immediate physician assessment.

3.  Diabetics and patients with a history of heart disease complaining of severe chest pain should be sent to the hospital as an emergency to rule out myocardial infarction unless a physician exam on site at MCJ can justify the observation of that patient in the jail.

In addition, I found the death review inadequate for lack of compliance with applicable standards.  The death review did not provide details of the care hours before death.  The death review failed to discuss the opportunities for corrective action plans.

**Patient** ████████ **-  GB**  died a few hours from an acute drug and alcohol overdose a few hours after being booked at MCJ on January 15, 2020  Autopsy blood tests revealed GB's alcohol content in his blood at death sufficient to induce coma.  He also had a significant amount of morphine in his blood. The autopsy report describes an unknown substance within Mr. ██████ rectum, wrapped in plastic that has been identified subsequently as heroin.  Mr. ██████ morphine level was high enough to suppress respiration and would have slowed his gastrointestinal motility to bring a fatal dose of alcohol into the small intestine a few hours after his arrest.  The combination of alcohol and morphine stopped Mr. ██████ breathing and killed him.

MCJ health care staff documented GB responses to questions that included a denial of having hidden any substances in his body (rectum or elsewhere). The intake nurse also

documented a minor head abrasion.[13]  However, GB was able to speak clearly and ambulate without assistance.  Because GB appeared to be under the influence of alcohol, he was not sent directly to the general population but instead observed while sobering. GB did not appear to be withdrawing at intake or displaying signs of life-threatening intoxication or injury.

MCJ staff did not know that GB was at risk for sudden death from the heroin contained in his rectum. Immediate medical consultation would probably have not provided any warning.  It does not seem that GB met the criteria for outside hospital care before admission to the observation cell.

The disconcerting issues in this relate to protocols for custody observation and the death review process.  GB did acknowledge at intake that he used/abused all manners of drugs including opiates.  Custody and medical staff should have been prepared to treat any deterioration with Narcan as self- induced coma and respiratory arrests are common mishap among addicts. My understanding is that inmates under observation can always be seen by camera and are also under direct line of sight. Yet, Custody observation did not detect GB apnea and respiratory arrest until he was found dead. How GB was collapsed for as long as 15 minutes without treatment is a matter for investigation by custody.

Contrary to the Wellpath policies and procedures, the death review submitted to me did not consider the results of the autopsy.  Wellpath policies also call for consideration of matters that may require further review, such as the cause of death or lapses in monitoring in the observation cell. Thus the death review that followed GB demise did not comply with the implementation plan.

I have shared with MCJ and Wellpath leadership my concern that current protocols do not provide sufficient guidance for nursing, custody, and physicians (and physician extenders) to ensure optimal attention is provided to arrestees most at risk.  Nurses may need assistance to accurately assess arrestee behavior for neurological or psychiatric conditions that require further evaluation.[14] But Wellpath protocols at MCJ do

---

[13] In retrospect, one could say that the head abrasion was evidence of an injury for which outside care was needed before admission to MCJ.  However, the abrasion was reasonably considered insignificant.  The postmortem exam found no significant head or brain injury.
[14] See, e.g. Critical care:  the eight vital signs of patient monitoring.  British Journal of Nursing, 2012, Vol. 21. No 10 page 625.  "Cognitive deficits are often subtle in their presentation…Many nurses do not have a good understanding of the underlying mechanism that produce altered level of consciousness… changes in a patient personality could be [due to] medication side effects."

not require immediate physician input to assist the intake nurse in assessing arrestees assigned to sobering cells. [15]

It is my impression that Wellpath leadership is considering corrective actions, including modifications to the protocols that direct the assessment of intoxicated inmates.  I am recommending the following:  1) Any inmate with evidence of head injury, notwithstanding the nurse assessment, must undergo physician evaluation (telephonic, video, in person) before acceptance into the jail.  2) Any inmate who is deemed sufficiently intoxicated to be placed in a sobering cell must undergo evaluation by the physician on call before acceptance into the jail 3)  Arrestees in sobering cells should be directly observed for not less than 2 hours before release to general population housing. 4)  During those 2 hours, vital signs should be obtained not less than every 15 minutes. Abnormal vital signs or alterations in consciousness should be brought to attention of the physician on call immediately or in the alternative, should lead to immediate hospital transfer. 5) Patients who appear to have fallen asleep need to be watched especially closely to make sure their breathing is not compromised or stopped. [16]

███████ **- RL** died December 22, 2019, from complications of acute hyponatremia (very low serum sodium) according to the autopsy report.  RL was a schizophrenic with delusions seemingly not controlled, and thus predisposed to self-injurious behaviors including polydipsia.  The finding of exceptionally low serum sodium levels, and gastric contents in his lungs makes probable that RL died following an aspiration of his vomit with or without a seizure.  That RL was diabetic likely aggravated the effect of his excessive water intake as diabetics often have relatively low serum sodium even with normal water intake.

The last clinicians to see RL before his death were mental health providers.  On December 2, 2019, psychiatrist Dr. ███████ wrote that RL reported hearing voices, seemed psychotic, and refused psychiatric consultation.  Dr. ███████ documented no other clinical observations.  There were no laboratory tests performed or follow up appointments with psychiatry documented for RL at that time. The record does not report any further medical or mental health encounters with RL prior to his collapse and death on December 22.   In retrospect, it appears that throughout December RL's

---

[15] Requirements that arrestees in sobering cells be under "close observation" and that medical staff "be promptly contacted" do not explicitly demand timely action that can prevent deaths from drug toxicity. The Wellpath protocol allowing that a patient may remain in a sobering cell for up to 4 hours before qualified health care professional evaluation is too long.   GB expired barely an hour after his intake.

[16] See, e.g. alcohol poisoning, diagnosis and treatment.   Mayo Clinic.org.   Treatment includes "careful monitoring."  A dangerous myth is that affected individuals will get better by "sleeping it off."

mental state was deteriorating.  His hyponatremia probably evolved in association with his psychosis.

I see no lapses in medical care that corrected would have likely prevented RL's death.  RL had refused to allow testing of his blood sugars when his diagnosis of diabetes was suspected in September 2019. It would have been better had providers made more strenuous efforts to test RL's blood sugars and monitor his electrolytes despite his objections.  However, the blood sugars measured at the time of death were not so high (approximately 250 and 490) as to have caused by themselves the extremely low sodium and vomiting that caused his death.

Although care provided to RL appears to have met applicable standards, I am concerned the death review was incomplete, much as I observed with GB.  Because there are insufficient facts of the case within the death review  and no cause of death identified, I believe this review does not comply with the implementation plan or the intent of Wellpath protocols and state law that death review generate information that will lead to corrective action plans.

**Death Reviews –**

I was provided with copies of six death reviews with the understanding that no portions of these documents shall be reproduced in any fashion.  Accordingly, I do not reiterate the content of these documents in detail, but instead report my findings in general terms.

I noted a lack of important details about the facts and circumstance of the death in the 6 death review documents submitted for my examination.  In a few cases portions of the form that should be filled in were blank. In two cases pertinent autopsy results were not mentioned.  The matter of opportunities for improve care were not addressed in adequate detail to assure me that appropriate corrective action would be taken to reduce the risk of future similar deaths.   Accordingly, I find that the MCJ death review process as evident in the 6 reports provided to me, does not meet prevailing standards for quality assurance and therefore <u>does not comply with the implementation plan</u>


**INMATE INTERVIEWS** -

I interviewed three male and two female inmates with the assistance of DON

██████████

RJ – ████████  -  46 year old male diabetic residing in MCJ for past year.  He expressed no complaints about access to care.  His last eye exam was more than one year ago. DON ██████████ will follow up regarding timely eye exam.

MV – ▮▮▮▮▮ - 41 year old male diabetic residing in MCJ for three years.  He expressed  no complaints regarding access to care.   Routine health maintenance appears to be appropriate.  However, his blood sugars seemed to not be under ideal control.  MV admitted to not following his diabetic diet, eating from the canteen.   DON ▮▮▮▮▮ will follow up regarding necessary dietary consultation.

AS – ▮▮▮▮▮ -  51 year old male diabetic to be released soon.  He expressed no complaints regarding access to care.

CK – ▮▮▮▮▮ - 45 year old female with bipolar disorder and history of Raynauds syndrome has resided at MCJ for 8 months. CK said she had good access to medical care but complained that she continued to suffer with Raynaud symptoms.   CK did not seem to understand her diagnosis or prognosis.  DON Richardson will refer CK to a PCP for consultation and education.

AJ – ▮▮▮▮▮ - 45 year old female with ankle pain post fusion residing in MCJ for 9 months.  AJ expressed no complains about access to care at MCJ.

None of the inmates interviewed reported alarming incidents or systemic lapses in medical care. This is not necessarily inconsistent with the audit findings of inadequate access revealed in review of EMR from October 2019 through March 2020.   A sample of only 5 inmates is not representative of the much larger MCJ inmate population.  Also, the satisfactory access and care described by the inmates interviewed may reflect improvements in MCJ since April 2020 which is the last month for which charts were reviewed.

## STAFF INTERVIEWS -

During my facilities tour and exit interview I talked with MCJ medical leadership.

Director of Nurses ▮▮▮▮▮▮▮▮ – stated that all employees are undergoing intensive training. Since May, 2020 a program has been initiated for monthly quality assurance meeting, continuing education programs, and formal performance evaluations.

Health Services Administrator ▮▮▮▮▮▮▮, - stated that the process for follow up on TB skin tests is under review with consideration of new patient education forms to improve compliance with implementation plan.

Chief James Bass – stated that he would look into the areas of concern for custody regarding a recent inmate death from what looks like an accidental heroin overdose.

Medical Director ████████ – stated that he would be working with Wellpath leadership to improve documentation of counseling for patients with latent tuberculosis.

## PHYSICIAN/NURSE CARE CASE REVIEW

Case 1 – Inadequate care.  Very low BMI in patient with HIV disease not investigated for causes of wasting.  Antibiotic treatment for 10 days absent evidence of infection is unwarranted.  Evidence of supervision by medical director, an expert in infectious disease, is lacking.

Case 2 – Adequate care.

Case 3 – Adequate care

Case 4 – Inadequate care.  Insufficient attention provided to rectal warts, alcoholism and obesity.  Patient not assigned to chronic care at intake despite known HIV disease.

Case 5 – Adequate care

Case  6 – Adequate care

Case 7 – Inadequate care.  Medical staff and medical director provide insufficient attention to overt signs of heart failure leading up to hospital admission.

Case 8 – Inadequate care.  Chronic care and health care maintenance not provided in accord with implementation plan.

Case 9 – Inadequate care.  Cardiology recommendations for treatment of low cardiac output not followed.  Abnormal vital signs and 02 saturations not appreciated.

Case 10 – Inadequate care. Patient not clinically stable at intake, and uncertain as to medications taken before booking.  Initial PCP exam is five days after booking. Complex medical condition with abnormal neurological exam reported by NP with no physician consultation.

Case 11 – Inadequate care.  Complex medical condition, with chest pain, COPD, HTN, bloody diarrhea managed without input from medical director. Patient is discharged from jail with no follow up.

Case 12 – Inadequate care.  Diabetic with renal insufficiency and hypertension complains of edema.  Amlodipine prescription not considered as cause of edema. Lisinopril or other ACE not provided in accord with the standard of care for such patients.

Case 13 – Inadequate care.  48 year old alcoholic, hepatitis C, with prior heart attack and poly substance abuse not seen after booking for 8 days.  No MD supervision evident until 40 days after admission.  Discharge document incorrectly describes patient as needing no follow up despite being on multiple medications, including lithium, requiring refill and careful monitoring.

Case 14 – Inadequate care.  Seriously ill elderly patient not seen by PCP during 8 day stay at MCJ.

Case 15 – Inadequate care. Intoxicated patient with signs of physical trauma to face and hands at intake not referred for immediate medical evaluation to rule out broken bones.  Patient has broken finger, treated belatedly with poor results (angulation, disabling stiffness).

Case 16 – Adequate care.

Case 17 – Inadequate care. 70 year old with symptoms of influenza like illness seen during height of current pandemic by nurse without apparent concern for COVID 19.

Case 18 – Inadequte care.  Nurse exam of 61 year old for non traumatic musculoskeletal pain does not comport with nursing protocols, and fails to consult with PCP despite abnormal vital signs and risks of serious disease.

Case 19 – Inadequate care.  Necessary prescriptions not provided to inmate for 4 days after booking. Aspirin continued while on clopidogrel despite medical record ordering cessation of aspirin. NP considers DVT as cause for leg swelling but waits on the ultrasound test for 2 days, and does not confer with physician collaborator.   No ultrasound report found in medical record.

Case 20 – Inadequate care.  Positive PPD and risk of latent TB not addressed by MCJ. Nurse assessment of 61 year old diabetes with hypertension as having atypical chest pain with high pulse rate (114) is contrary to nursing protocols that require PCP consultation.

Case 21 – Adequate care.

Case 22 – Adequate care.

Case 23 - Inadequate care.  Diabetic alcoholic with skin abscess receives inadequate attention from MCJ medical staff, requiring admission to hospital for treatment when he deteriorates.   Treatment of elevated BP does not include ACE inhibitor, contrary to community standards.

Case 24 – Inadequate care. 55 yo unsure of meds for HTN.  Obese, pre diabetic.  Borderline abnormal lipid profile.  Heavy smoker.  Baseline chronic care visit not provided within 7 days.  At 14 days, review of lab performed.  Patient prescribed BP meds, metformin (1000mg bid) and Tricor to treat insignificant triglyceride level of 220.  Mobic prescribed for complaint of hand pain, with normal exam and no functional limitations.  History of latent TB treated in 1994 not included on problem list.

Case 25 – Adequate care.

Case 26 – Inadequate care.  Nurse sick calls repeatedly fail to make an assessment, do not follow protocols and do not use SOAP format.

Case 27 – Inadequate care.  49 year old with diabetes, hypertension has shoulder injury probably causing rotator cuff tear.  Not treated with immobilization and ice in accord with the CFMG nursing protocols.

Case 28 – Inadequate care.   Intake does not test for random blood sugar. Patient has HbA1c over 11. Incomplete and inaccurate discharge instructions do not account for patients conditions:  morbidly obese, hypertensive and at high risk for diabetic complications including renal failure, blindness, blood clots, heart attack and death.

Case 29 – Inadequate care. Nurse treatments for symptoms of dehydration, and possible hypovolemia with electrolyte disturbances not supported by nursing protocols exceeds the scope of RN practice.  The chronic care form is inaccurately and incompletely filled out with no assessment made to explain the recurrent loose  BM.  Problem list not updated.

Case 30 – Adequate care.

## ANALYSIS OF FINDINGS

This audit of medical care provided to inmates at MCJ from October 2019 through April 2020 found significant deficiencies in the many of the same areas of concern as noted in the prior audits.

1) Physician supervision of PA and RN care was not always provided when appropriate.

2) Nurses did not consistently obtain necessary vital signs, properly interpret abnormal vital signs, and accurately assess intoxicated and withdrawing inmates in accord with applicable protocols for appropriate monitoring and treatment.

3) Sick call requests were not consistently managed by nurses as required under the implementation plan.

4) Nurses failed to perform sick calls in accord with approved nursing protocols and/or provide care on occasion that exceeds their legal scope of practice.

5) Major medical problems were not consistently documented in the problem list

6) Some patients with severe illness needing medical attention upon release were discharged without adequate instructions for appropriate follow up care.

7) Necessary specialty care was not consistently and timely provided.  Specialty reports, including radiological studies, were not always placed in the EMR.

8) The EMR did not document disclosure to patients with risk of latent TB of their condition and treatment options.

9).  Necessary medications on occasion were not provided to inmates for days after their admission to MCJ.

10) Quality assurance programs, including quality management committee minutes, formal performance evaluations and death reviews were not documented in accord with community standards as articulated in the implementation plan, medical group policies and Settlement agreement.

## RECOMMENDATIONS –

1. Prior MCJ medical audits contain multiple recommendations that should be reviewed and acted upon where needed to effect compliance with the plan. This audit reiterates many of the same recommendations.   It is worth noting that the following recommendations have been followed:
      a) Sick call requests have been integrated into the EMR
      b) notices of patient rights were posted in inmate residence and clinics.
      c) multi dose vials have been properly labeled
2. The MCJ medical director, along with the director of nursing, should oversee the quality of intake and nurse sick call. The medical director and director of nursing should formally review the performance of all clinical practitioners (RN, FNP, PA, MD and DO)  by analysis of no less than 5 medical records each month. Particular attention should be given to abnormal vital signs, recording accurately weight and height, obtaining blood sugar readings from diabetics, and ensuring timely referral to PCP or specialists for treatment of  acute injuries or unstable chronic conditions.   Complex medical conditions should be

followed closely by the medical director. Medical staff should be hired in sufficient numbers to provide timely and appropriate care for all MCJ patients.

3. Untoward medical events at MCJ, such as hospital admissions or deaths, should be reviewed with medical staff in monthly QA meetings, as recommended in prior audit reports.

4. Continuing medical education should be provided to medical staff, including training as to appropriate use of reliable on-line resources such as Uptodate, Emedicine/Medscape and Epocrates.

5. Initial full examination and periodic physical exams should not be unduly delayed.  PCP should repeat efforts to examine inmates or document lack of need when patients refuse examination.

6. All patients should be timely tested for TB and treated in accord with the accepted protocols.  Inmates at high risk should be screened for HIV and/or HCV infection.  Patients found to have HIV, HCV or latent TB should be counseled about options for immediate versus delayed treatments.

7. Withdrawal protocols should be rigorously followed.  Inmates described as "under the influence" should not be sent to the General Population without clearly documenting in the medical record that the inmate is safe for such placement. Nurses should appreciate the significance of abnormal vital signs and obtain prompt medical consultations for acute medical problems.  Patients with signs of delirium should be transported urgently to the hospital unless an on site PCP exam provides justification for observation and treatment at MCJ.

8. EMR should be reviewed to address inefficient or inaccurate entries, including sick call slips, ambulance services, specialty care, health care maintenance, medications and follow up care after release.

9. Death reviews should be performed as part of the quality improvement process in accord with California Code of Regulations, NCCHC Standards, Wellpath policies and the Implementation plan and thereby generate appropriate corrective action plans to prevent future deaths.

## CONCLUSION

In some areas, described above, medical care is improved at MCJ.  However, it is disconcerting to note that over the past three years my audits have not yet found MCJ overall to be in compliance regarding medical aspects of the implementation plan.  For the audit period of October 2019 through June 2020 I found the medical care at MCJ did not substantially comply with the Implementation Plan. Beginning in May 2020, MCJ has instituted changes in the quality assurance process and the health management team to address deficient performances in certain areas of care. A "paper audit" in August 2020 and an additional audit with site visit in late 2020 will be undertaken to monitor improvements at MCJ.

## Attachments:

MCJ HC Audit Tool revised June 19, 2020

MCJ Case Review revised April 27, 2020

# Exhibit 8

# MONTEREY COUNTY JAIL COMPLIANCE AND HEALTH CARE MONITORING AUDIT

"Paper Audit"  September 4, 2020

*CONFIDENTIAL*

Bruce P. Barnett, MD, JD – expert medical monitor

## INTRODUCTION

This is a review of medical care provided to inmates at the Monterey County Jail (MCJ) from July through August based upon a limited examination of the electronic medical records (EMR) to identify areas of concern.  I refer to the following documents in determining adequacy of medical services at the Monterey County Jail:  CFMG Implementation Plan (5:13cv-02354-PSG document 532 Filed 04/01/16); CMGC Nurse Protocols (July 2018); CFMG Policy and Procedure Manual (April 2015) and the Wellpath Policy and Procedure Manual – Monterey County California (April 2020).

The audit tool I used to compile cited data is attached.

## BRIEF SUMMARY OF FINDINGS

**Intake Screening for Health Care – not compliant**

a. The intake nurses do not consistently complete intake forms with accurate information including measured weight and height.  Portions of the forms are often left blank.

b. Abnormal vital signs documented at intake are not repeated and/or not acted upon in accord with implementation plan and applicable standards of care

c.  Intake nurses do not consistently contact PCP for consultation in cases where the inmate is acutely ill, has an unstable chronic illness or presents with new or complex medical problems.

**Access to Health Care – not compliant**

a.  Nurses continue to provide care that exceeds the legal scope of practice by failing to follow the Nurse Protocols.

b. Nurses do not consistently refer to PCP patients with conditions for which no Nursing Protocol applies.

**Outside Medical Care Referrals by MCJ – not compliant**

a. PCPs at MCJ do not seek outside medical care (not even by email or telephonic consultations)  to assist in the care of patients with unusual conditions or conditions seemingly resistant to therapy.

b.  Examples of specialty care delayed are:

i.  cases 3 – chronic tympanic membrane perforation with pain and dischargd

ii.  case 5 – recurrent lower extremity cellulitis

ii.  case 21 – possible colon cancer

**Treatment of Intoxicated Inmates and Detoxification – not compliant**

a. Inmates withdrawing from opiates in addition to other substances are not consistently monitored by COWS Protocol.

b.  Inmates reporting substance abuse at the time of being booked are not consistently seen by MCJ PCP before discharge from the jail.

**Detections and Treatment of TB and other infections – not compliant [1]**

a. TB skin testing not consistently performed timely.

b. Production of documents to show compliance with TB protocols does not indicate actions taken for positive skin tests.

c.  Patient with flu-like illness not quarantined in accord with protocol to prevent possible spread of Covid-19.

d.  Patient with possible chronic Hepatitis C infection not provided with education regarding treatment options.

**Chronic Care – not compliant**

a. The problem list is not consistently updated to show significant medical conditions.

b.  Chronic care forms do not consistently address all of patients' medical problems

**Health Care Maintenance** – insufficient data for comment in this review with time frame of 2 months.[2]

**Continuity of Care - not compliant**

a.  The discharge form does not indicate how many days' supply of a drug was provided to the released inmate.

---

[1] MCJ has not provided a list of patients with positive TB skin tests by which I can review compliance with requirements for patient education and treatment.  However, I noted significant lapses related to infection management as described in cases 8, 12.  17.

[2] See case 21, below, wherein chronic care and 6 month physical exam is deficient for failure to diagnose cause of anemia in patient at risk of colon cancer.

## CASE REVIEW

This report describes findings regarding care provided to 30 patients at MCJ.  I randomly selected cases from the list of inmates deemed at relatively high risk for COVID 19 complications, and inmates placed in sobering cells.  A few of the charts that I  reviewed came to my attention through party inquiries.

Case 1 – Inadequate care. Symptoms consistent with serious medical conditions (possible pulmonary embolisms, atypical angina) were not brought to PCP attention. No medical or psychiatric diagnosis provided to explain recurrent abdominal complaints.

Case 2 – Inadequate care. The history documented was incomplete and did not explain the need to prescribe for ongoing prescription of the anti-coagulant Xarelto.  The problem list was incomplete, not including chronic treatment with blood thinner

Case 3 – Inadequate care.  34 year old male with chronic right TM perforation following surgery complained of fever, acute pain, canal tenderness and discharge had no ordered ENT consultation (not even by e mail).  A drug contraindicated for this patient according to FDA literature (neomycin) was prescribed without explanation.

Case 4 – Inadequate care.  The patient's history and peak flow measurements,  being consistent with a diagnosis of mild to moderate persistent asthma, merits prescription of an inhaled corticosteroid (ICS).

Case 5 – Inadequate care.  21 yo with borderline thyroid deficiency, has recurrent cellulitis in leg not followed closely, and treated with antibiotic not effective against streptococcal infections. Complaints of asthma and groin pain appear specious, but were not reviewed by medical director.

Case 6 – Inadequate care. 20 yo obese male with hypertension complains of acute, reported severe episodes of abdominal and chest pain 9 times in one month with no review by the medical director.

Case 7 – Adequate care.

Case 8 – Inadequate care.  47 old patient with COVID symptoms (body ache, sore throat) was not timely isolated, unnecessarily exposing staff and inmates to virus.

Case 9 – Adequate care.

Case 10 – Inadequate care. 45-year-old who refuses intake examination on admission and appearing under influence was held in sobering cell.  The EMR did not describe condition in sobering cell, or vital signs. There were no exams performed subsequently.

Case 11 – Inadequate care.  No comprehensive medical evaluation was documented for this patient within 14 days of intake. A single RN visit for constipation did not include assessment.

Case 12 – Inadequate care. TB testing and comprehensive medical evaluation was not documented within 14 days of intake.

Case 13 – Adequate care.

Case 14 – Adequate care.

Case 15 – Adequate care.

Case 16 – Adequate care.

Case 17 – Inadequate care. Intake lapses included:  failure to repeat abnormal vital signs (pulse 124), failure to report elevate pulse per protocol, failure to document history of substance abuse, failure to enroll in COWS when patient admits to taking opiate without prescription before booking, failure to schedule patient for PCP visit within 7 days for acute problem.  PCP lapses included:  failure to document exam prior to or in context of prescribing medications, failure to consider and edit list of problems in summary that appear to mistaken include kidney disease and HCV, and failure to treat and/or educate regarding treatment of HCV if patient does have chronic HCV.

Case 18 – Inadequate care.  Patient with serious chronic disease (lupus) was seen by nurse for musculo-skeletal complaint, without following applicable protocols.  Nursing evaluation of patient with lupus without physician consultation was beyond proper scope of practice and puts patient at risk for adverse outcomes.

Case 19 – Adequate care.

Case 20 – Inadequate care. Gabapentin should have been immediately dispensed to patient upon intake to reduce risk of withdrawal seizure but was not supplied until nearly 24 hours after intake.   No PCP visit was scheduled for chronic care of epilepsy, increasing risk of recurrent seizures.

Case 21 – Inadequate care. Anemia presumed due to iron deficiency in 49 year old male should raise concern regarding colon cancer, especially if stool OB is unobtainable for occult blood analysis.  This patient is candidate for colonoscopy.  Also doxycylcine for recurrent cellulitis was not best choice of antibiotic absent evidence of major staph infection as doxycycline does not treat streptococcus.  Persistent conditions

deserve consultation with specialists, in this case dermatology and hematology.  This can be done telephonically.  But there was no indication of any consultations requested.

Case 22 – Inadequate care. The intake nurse did not document a repeat of significantly abnormal vital sign on intake (BP 184/120), and made no referral to PCP per protocols and as instructed in the intake form.  Persistent tachycardia was not diagnosed or treated.

Case 23 - Adequate care.

Case 24 – Inadequate care.  No  neurological examination or diagnosis provided for 34 yo male on blood thinner (Eliquis) who complains of recurrent and persistent headaches.

Case 25 – Adequate care.

Case 26 – Adequate care.

Case 27 – Inadequate care. 21 year-old female reporting alcohol and opiate abuse, pulse 140,  was not placed on COWS protocol.

Case 28 – Inadequate care.  Intake form was not completed. Height and weight left blank.  Amount of alcohol patient ingests regularly is left blank.  Need for referral blank.

Case 29 – Adequate care.

Case 30 – Adequate care.

## PRODUCTION OF DOCUMENTS

The document titled *Receiving Screening and Medication Verification* submitted by MCJ to the experts as part of the July 2020 document production provided conclusions with which I disagree.  The MCJ CQI audit found patients needing referrals at intake were provided referrals.   In the following cases, my findings differ

1. ███████████  - REFERRAL NOT PROVIDED.  Pulse of 105, remains same on repeat.  medical provider not contacted per protocol. (Chart should state not symptomatic, if that is the rationale for not contacting PCP).   Problem list is incomplete, does not include methamphenatime abuse.
6. ███████████  (see case 25, above) - REFERRAL NOT PROVIDED.  Pulse of 109 is not repeated.  Persistent abnormal vital signs merit referral.
7. ███████████  - REFERRAL NOT PROVIDED. Pulse of 115 is not repeated, no referral to PCP, no chronic care follow up for asthma

8. ███████████ - REFERRAL NOT PROVIDED.  History of Asthma and use of inhaler described in 8/8/19 intake health history, but inmate reported as never having asthma in Receiving Screening.  Asthma not on problem list, no asthma medication prescribed, no chronic care referral made.
9. ███████████ (see case 22, above) - REFERRAL NOT PROVIDED.  BP 184/120 not repeated.  This is an alarming blood pressure that calls for immediate medical oversight.  No referral made.

## ANALYSIS

The attached audit tool that I used to compile data provides a percentage compliance for each of the quality of care indicators.  These figures highlight the areas that may be of greater concern relative to others.   The instances of care that I identify as non-compliant with the implementation plan may focus efforts by MCJ and Wellpath to correct deficiencies.

Departures from the applicable standards of care seem to fall into the following main categories:

1.  Nurses do not consistently follow written protocols for intake and sick call.  For example, a patient with COVID-19 symptoms was not isolated until positive test results were reported approximately 24 hours later.  I cite two examples above where COWS protocol seems to have not been instituted for patients with known risk of opiate withdrawal.

2.  Nurses exceed legal scope of practice when not contacting PCP or not referring complicated/persistent patient complaints for PCP follow up.  Examples include treatment of headache in patient on anti-coagulants, treatment of patient with joint swelling and Lupus, dispensing ibuprofen for left sided chest pain with no diagnosis.

3. Nurses and PCPs are not consistently filling in forms designed for their use.  Examples are described above include failure to fill in forms for intake, for observation in sobering cell, for sick calls, problem list, chronic care and for discharge.

4.  Nurses sometimes fail to note and/or act upon significantly abnormal vital signs. The most extreme examples include BP 180/124, and pulse 140 in another case, not repeated or referred to PCP.

5. PCPs do not routinely access specialty consultations for complicated patients that are readily available by electronic communications through Wellpath. Examples include chronic ear pain and drainage, chronic iron deficiency anemia, recurrent cellulitis.

6.  PCP diagnoses and treatments are not consistently evidence-based and thus depart from applicable standards for best care. Examples include: treatment with Xarelto with no apparent need for anti-coagulation; treatment of persistent asthma with rescue inhalers alone and not in combination with ICS, prescription of gabapentin needed to avoid withdrawal was not expedited, prescription of antibiotics not appropriate for the diagnosed condition (doxycycline is not a first line drug for cellulitis, neomycin is contraindicated with perforated TM).

7. Inmates are not consistently seen for comprehensive examinations within 14 days of intake.  See case 11, 12.

8.  Patients with significant acute illnesses and/or serious chronic diseases are not consistently seen by PCP within 7 days after admission.  See case 17, 20.

9.  The CQI process described by Wellpath Monterey County California Policies & Procedures relies upon "[h]ealth record reviews… to ensure that appropriate care is ordered and implemented…"   I am concerned that health record reviews done by MCJ staff inaccurately assess the quality of care at MCJ.

## RECOMMENDATIONS

The following corrective actions may help bring medical care at MCJ closer to substantial compliance with the implementation plan.

1) Instruction and monitoring of MCJ staff to ensure that forms are filled out appropriately.  MCJ/Wellpath should modify the EMR to prevent users from closing files that have incomplete entries.

2) In-service instruction and exams to ensure that nurses know significance of vital signs and provide appropriate attention to abnormal findings.  EMR could alert RN or PCP about abnormal vital signs and be programmed to not close unless further action is documented.

3) Daily oversight by director of nurses and medical director to review inmates sent to sobering cells to ensure that patients at risk of withdrawal are placed in appropriate withdrawal protocols. The EMR could require electronic notification of PCP for every inmate placed in a sobering cell.

4) Facilitate referral to Medical Director or other Wellpath resources regarding problematic case seen by medical staff (RN or PCP) with prompts from the EMR to use e mail or other electronic means for obtaining consultations.

8-7

5)  EMR notification of patients not seen within 14 days of intake, or within 7 days if chronic care condition identified.

6) Enhanced oversight of MCJ medical care with Wellpath review of EMR.

7) Careful review of this audit and future audits to confirm/refute observations and to integrate findings into the quality assurance program.  The Implementation plan requires that "all monitoring and audit findings will be reported to the Quality Management Committee at its quarterly meetings."  I would like to see the meeting minutes that document MCJ/Wellpath's responses to this audit.

## CONCLUSION

MCJ care described in this report is not substantially compliant with the obligations established by the Implementation Plan.  It seems to me that changes in the EMR as I suggest above could quickly and significantly improve compliance.

There appears to have not been sufficient time to see the effect of corrective action plans developed within the past few months.  I will be looking at clinical care again before the end of 2020 with the expectation of seeing improvement due to the Corrective Action Plans that I have endorsed, as well as the recommendations set forth above.

I invite MCJ and Wellpath to respond to my recommendations and to inform me as to when changes can be made to the EMR, or why the suggested changes cannot or should not be made.

## Attachments:

MCJ Case Review July-August 2020

# Exhibit 9

# MONTEREY COUNTY JAIL COMPLIANCE AND HEALTH CARE MONITORING AUDIT

February 11, 2021

CONFIDENTIAL



Bruce P. Barnett, MD, JD – expert medical monitor

# TABLE OF CONTENTS

INTRODUCTION .......................................... ...........................................................3

BRIEF SUMMARY OF FINDINGS ..........................................................................3

SUMMMARY TABLE  ........................................... ............................................4

OBJECTIVES, SCOPE, METHODOLOGY ..............................................................4

FINDINGS ...........................................................................................................6

      INTAKE....................................................................................................6

        ACCESS TO CARE.....................................................................................6

        CHRONIC CARE,........................................................................................6

        HEALTH CARE MAINTENANCE. ...................,.............................................6

        CONTINUITY OF CARE UPON RELEASE,  OUTSIDE CARE, DETOXIFICATION/WITHDRAWAL..........7

        TB/INFECTION CONTROL..........................................................................7

        MEDICATIONS/PHARMACY, NURSE MED ADMINISTRATION.............................-8

        STAFFING.................. ...............................................................................8

       CLINIC SPACE ..........................................................................................8

        QUALITY ASSURANCE..............................................................................8

PHYSICIAN/NURSE CASE REVIEW ........................................................................9

ADDITIONAL CASES ...........................................................................................13

DEATHS...............................................................................................................14

QUALITY MANAGEMENT ...................................................................................17

INMATE INTERVIEWS..........................................................................................20

STAFF INTERVIEWS.............................................................................................21

DISCUSSION, CONCLUSIONS ..............................................................................22

RECCOMMENDATIONS.......................................................................................23

LIST OF ATTACHMENTS .....................................................................................25

# INTRODUCTION

Based upon my review of healthcare services provided to inmates housed at Monterey County Jail (MCJ) from September through December 2020 MCJ does not appear to be providing medical care in compliance with the Implementation Plan (CFMG Implementation Plan (5:13cv-02354-PSG document 532 Filed 04/01/16). In assessing the adequacy of healthcare, I also refer to CMGC Nurse Protocols (July 2018); CFMG Policy and Procedure Manual (April 2015) and the Wellpath Policy and Procedure Manual – Monterey County California (April 2020).

This report describes my findings in regards to the following:   a) compliance with standards of care described for each of the quality indicators[1] cited in the court-approved implementation plan (hereinafter implementation plan or "plan")  b) analysis of care provided to patients described in "Physician Case Review," c) review of inmate deaths occurring at MCJ or immediately following MCJ incarceration, d) further notable departures from implementation plan  e) matters brought to my attention by attorneys for Plaintiffs,  f) quality management including supervisors' audits of MCJ healthcare providers, g) interview of MCJ inmates on site, h) interviews of MCJ healthcare staff and i) facility inspection.

The audit tools and raw data referenced in this report are provided as confidential documents to the parties and attached to this report.

## BRIEF SUMMARY OF FINDINGS

The corrective action plan (CAP) developed following the last audit in Spring, 2020 to address areas of non-compliance was not finalize and not enacted. Only a few of the proposed corrective actions were verified to have been performed.  See Ex. C, attached.  This audit found MCJ overall performance unimproved notwithstanding any of the corrective actions that may have been performed.

This audit finds MCJ is not substantially compliant in 11 out of 12 quality indicators for which percentage compliances are calculated and summarized in the table below. Many lapses are related to inefficiencies in the electronic medical record system (EMR) and user error that did not appear to cause any inmate harm.  I have highlighted episodes of inadequate medical attention that I believe did cause inmates significant harm. Facilities are adequate.  Staff training and quality management did not comply with the plan.

---

[1] MCJ compliance with the plan according to quality indicators is summarized in Table 1, below.

## Summary Table

| TABLE 1      Quality Indicator | Compliant/Not Compliant | % Compliant | Comments |
|---|---|---|---|
| 1.  Intake Screening | Not Compliant | 48.3% | see text and worksheets |
| 2.  Access to Care | Not Compliant | 47.4% | see text and worksheets |
| 3. Chronic Care | Not Compliant | 45.5% | see text and worksheets |
| 4. Health Care Maintenance | Not Compliant | 40.0% | see text and worksheets |
| 5. Continuity of Care | Not Compliant | 52.4% | see text and worksheets |
| 6. Outside Care Referrals | Not Compliant | 41.2% | see text and worksheets |
| 7. Detox/Withdrawal | Not Compliant | 25.0% | see text and worksheets |
| 8. Tuberculosis/Infection Control | Not Compliant | 26.3% | see text and worksheets |
| 9. Pharmaceutical Storage and Dispensing; refusals | Not Compliant | 38.9% | includes discharge meds.  See text, worksheets |
| 10. Administration and staff on  site | Not Compliant | na | percentage not applicable |
| 11. RN Medication Administration On site | Compliant | 100.0% | see text and worksheets |
| 12. Physician/Provider Case Review | Not Compliant | 20.0% | 6 out of 30 cases were managed adequately |
|  |  |  |  |
| Overal Audit Score | | 44.1% | |

## OBJECTIVES, SCOPE, AND METHODOLOGY

This audit assesses compliance with the implementation plan.  As in prior audits, recommendations are provided for corrective actions to promote compliance with plan parameters.

## Methodology

The Summary Table shows the percentage of clinical encounters reviewed that demonstrated compliance with the described performance parameter.  For this audit, the "compliance rate" is derived from the findings compiled in the "Physician Case Review Tool" as well as the "Monitoring Audit Tool." [2] These spreadsheets are attached.

---

[2] Prior to April 2020 the audits presented these data sets separately. See discussion below regarding significance of case review data vs encounter data.

The overall "score" represents an average of the compliance data for the 11 quality indicators (quantitative reviews) and the percentage of cases (qualitative reviews) found to demonstrate adequate medical care.  This score thus may be used for comparison of performance in future audits using the same methodology.

This audit does not presume that there is a a "benchmark" percentage that indicates compliance with the plan.   Departures from the plan may be due to systemic lapses (i.e. inadequate protocols, poor training, inefficient records) or failure to correct non-systemic lapses (i.e. failures to follow operational protocols, performance errors).

**Quantitative Review**

Eleven components of medical care are identified in the implementation plan:  Intake Screening, Access to Care, Chronic Care, Health Care Maintenance, Continuity of Care, Outside Care Referrals, Detox/Withdrawal, Tuberculosis/Infection Control, Pharmaceutical Management (including storage of medications and dispensing while not on site), Administrative Services (staffing)  and Dispensing Medications on Site. Physician/Provider case review includes an assessment of care provided by nurses (RN and LVN) as well as by PCP (MD, DO, FNP, PA). [3]

**Qualitative Review**

Case reviews consider the adequacy of care in accord with generally accepted principles of medicine and applicable standards, aside from the specific parameters for performance specifically described by the implementation plan. These case reviews are especially important in determining that the care provided to the inmates comports with the proviso put forth by the implementation plan calling for care "in accordance with community standards."  Other qualitative measures include the adequacy of staffing, staff supervision, medical facilities and quality management. [4]

**Interviews**

Interviews with staff and inmates may highlight problems not detected in the review of medical records and/or confirm audit observations.

---

[3] Primary Care Providers (PCPs) – are healthcare providers licensed as allopathic or osteopathic physicians (MD, DO), family nurse practitioners (NP) and physician assistants (PA).  RNs delivering health care in accord with the plan and nursing protocols are also considered "providers" of medical services in this audit. But RNs are not considered to be PCPs.

[4] See Settlement Agreement, page 2-3; Implementation Plan page 8

## FINDINGS[5]

**INTAKE SCREENING**   - Intake screening is <u>not substantially compliant</u>.  Departures from the plan include inattention to vital signs, not obtaining blood sugar readings from diabetics, conflicting data entry, inaccurate information, and delayed referral to PCP or specialists for treatment of acute injuries or unstable chronic conditions.  See cases 1, 2, 5, 10, 14,19,22, 24.

**ACCESS TO CARE** – Inmate access to care is <u>not substantially compliant</u>. Significant deviations from implementation plan were noted that include delayed attention to requests for sick call, inconsistent use of SOAP format, lack of assessments and nursing care that exceeds legal scope of practice or practice permitted by nurse protocols. Nurse training appeared inadequate to ensure safe medical practices.  PCP and RN care was noted to be deficient in multiple circumstances where serious conditions did not receive timely attention.  Physician supervision was not apparent in the management of complex medical problems.  In some cases delayed care at MCJ was followed by an emergency admission to the hospital for severe illness.  See cases 5, 6, 8,9, 10, 11,13, 14,15,16, 18, 19, 20, 21, 22, 23, 24,

**CHRONIC CARE** – Provision of chronic care is <u>not substantially compliant.</u>  The EMR forms for chronic care are not properly deployed, and do not ideally assist PCP documentation.   Data entry in these forms seemed to be mistaken or incomplete on multiple occasions.  Problem lists are not updated.  Significant acute and chronic medical concerns are often not described or adequately addressed in these forms or elsewhere, defeating the purpose of these regularly scheduled visits. See Cases 2, 12, 14,   Incomplete attention at chronic care visits to chronic care problems delays needed referral for specialty care.  See Cases 5 (psychiatry),8 ( ob-gyn), 25 (GI) , 26 (general surgery), and 28 (nephrology), .

**HEALTH CARE MAINTENANCE** – Health care maintenance is <u>not substantially compliant.</u>  Some annual examinations are incomplete, lacking full physicals and inaccurately reporting current diagnoses. Important matters, including injuries, abnormal findings or unresolved patient complaints are not always addressed.  Few annual exams provide necessary attention to women's healthcare needs, including pelvic examinations and PAP smears.  The forms for annual exam are used in most cases every 6 months, although healthy inmates do not need such frequent examination.  See cases 10, 13, 20, #▮▮▮▮▮▮

---

[5] Deficiencies are discussed below and noted with case No. and/or patient ID numbers in the accompanying worksheets that provide details of problematic care.

**CONTINUITY OF CARE AFTER RELEASE –** Continuity of care required after release is not substantially compliant with the implementation plan.  As noted in the past, patients with serious and unstable conditions are sometimes released without appropriate follow up appointments as called for by the plan.  The amount of medication dispensed is not consistently identified by the release document. In one case (see patient ████████ transfer to another facility did not include mention of a serious medical condition (hypothyroidism) requiring further care.  Instructions to patients upon release are not consistently documented.  See cases 1, 2, 6, 10, 18, 26.

**OUTSIDE CARE REFERRALS** – The process for providing outside medical care to MCJ inmates is not substantially compliant with the implementation plan.  Access to specialty consultations has not improved compared to prior audits and in some cases was dangerously lacking. Particularly alarming examples include apparent failures to consult, communicate and/or follow specialists' recommendations. See case No. 4 (hematology, nephrology), No. 10 (radiology and emergency room physician), No. 23 and 24 (orthopedic surgery delayed), Case 25 (GI bleeding not addressed), #████████ (delayed care of tendon injury) ████████ (delayed care for open fracture).  On the positive side, written reports when outside providers did see inmates were more often available in the EMR than noted in prior audits.

**DETOX/WITHDRAWL –** MCJ is not substantially compliant in its treatment of patients who are intoxicated or withdrawing.  Withdrawal protocols were not followed consistently.  The intake nurse notes show inmates sent to GP housing who were described as "under the influence," overtly intoxicated or in early stages of delirium.  Nurses continue to note abnormal vital signs with documenting any repeat for verification.  Nurses are not consistently consulting with PCP for alarming vital signs.  See cases 10, 14, 29, ████████████████

**TB/INFECTION CONTROL** –MCJ TB/ infection control deviates is not substantially compliant.  Inmates who may have latent TB infections as manifest by unequivocally positive skin test are not consistently investigated further with blood testing (Quantiferon Gold) , and often not counseled regarding treatment options. This problem had been noted in past audits.  That appropriate screening and patient counseling is given to some (see case No. 6) indicates that MCJ staff is aware of proper procedures.  Another persistent lapse in deploying TB protocols is delays in chest X rays beyond 72 hours after positive skin tests.  See Patient No. ████████ (3 weeks), ████████ (30 days) and ████████ (16 days).

The implementation plan does not explicitly address Covid –19. However, MCJ staff failed to adhere to the applicable community standards and the MCJ protocols for

controlling this disease as at least one patient with Covid symptoms (case No. 20) was not isolated pending further coronavirus testing.

**PHARMACEUTICAL ADMINISTRATION -** MCJ procedures medications, including storage and provision is not substantially compliant with the implementation plan. Mechanisms for storage of medications and counting of narcotics are much improved since my first audit. However, patients do not consistently receive needed medications during their stay in MCJ.  MCJ does not document provision of needed medications upon release. I also noted that medications are sometimes prescribed without appropriate medical consultation or examination.  See case No 7 and ████████

**NURSE ADMINISTRATION OF MEDICATIONS** – The administration of medications at MCJ by nurses on medication rounds is substantially compliant with best practices and with the implementation plan.

**STAFFING - PRIMARY CARE PROVIDER (PCP), RN and others** –   Based upon the findings of inadequate medical care for most parameters reviewed, staffing during the past three months appears to have been not substantially compliant.   Staffing logs, staff interviews and inspection of care suggest there is insufficient hours and/or attention by healthcare staff to ensure adequate access of care for inmates who need medical attention.

**CLINIC SPACE -** Clinic Space and equipment is substantially compliant with implementation plan, aside from the findings that PREA announcements were not posted as required.

**QUALITY ASSURANCE and STAFF SUPERVISION** [6]**-** MCJ quality assurance processes are not substantially compliant with the Implementation Plan or terms of the Settlement Agreement.

The Implementation Plan (page 23) calls for the medical director (responsible physician) to countersign no less than 10% of all charts in which document treatment provided by a physician assistant, nurse practitioner or registered nurse. Although Dr. ████ documented his engagement in the care of approximately 66% of the patients listed in the Physician Case Reviews, his oversight did not appear to ensure appropriate care in many circumstances.

Wellpath Monterey County California Policies & Procedures, effective 6/2/2019, call for the establishment of a CQI committee involving the MCJ medical director as well as

---

[6] Quality Management is discussed in greater detail below.

9-8

physician extenders (physician assistants, nurse practitioners), nursing, mental health, dentistry, health records, pharmacy and laboratory.  The CQI committee must meet at least quarterly but can meet more often – as I have recommended. The minutes I have seen do not address untoward clinical events (also known as morbidity and mortality) at MCJ including avoidable hospitalizations.

Another crucial CQI process is review of health record reviews to ensure that appropriate care is ordered and implemented.  The current Director of Nursing has implemented a program of nurse performance audits, with mentoring by more experienced nurses for new hires.  However, the Medical Director does not appear to be similarly monitoring and training his subordinates. MCJ must have an effective quality assurance program with robust peer review, as demonstrated by regular CQI meetings and documented effective medical director chart reviews to be in substantial compliance with the implementation plan.

## PHYSICIAN/NURSE CARE CASE REVIEW [7]

Case 1 – Inadequate care.  EMR forms inaccurately and incompletely filled out. There is no release form for a patient with known need for medication and continued care.

Case 2 – Inadequate care. Complex and chronically ill patient with diabetes, alcoholism admitted with slurred speech. Documented care provided by RN and NP with no apparent MD oversight.  Patient is released with no documented instructions for continued care regarding rectal bleeding and abnormal blood tests.

Case 3 – Adequate care

Case 4 – Inadequate care.  Patient deteriorated while in custody despite visits to medical providers who failed to take note of or consult specialist regarding deteriorating kidney and heart function, leading to emergency need for hospitalization

Case 5 – Inadequate care.  Young patient with overtly self-destructive behavior manifest in refusal to treat his diabetes, is not referred to mental health.  Patient's purported penicillin allergy is not confirmed with on-site infectious disease expert (Dr. ███ who would likely recognize the symptoms as side effect and not allergy.  Prescribed antibiotics by NP without MD collaboration is suboptimal and ineffective.

---

[7]  Cases I considered remarkable for apparent indifference to inmate's medical conditions and leading to adverse outcomes are presented **in bold type.**

Case 6 – Adequate care. [8]

Case 7 – Inadequate care.  Multiple requests by inmate for medical attention not processed in accord with implementation plan. MD oversight ineffective. Care is delayed.  Medical staff and medical director provide insufficient attention to overt signs of heart failure leading up to hospital admission.

Case 8 – Inadequate care.  Persistent serious complaints of vaginal bleeding and discomfort not attended to by on-site exam or referral.

Case 9 – Adequate care.

**Case 10 – Inadequate care. Nursing and PCP staff document concern that patient may have dislocation or other serious orthopedic problem but do not obtain orthopedic consultation while at MCJ from 10/1/20 to release on 12/8/20. Discharge documents do not descried need for follow up.  Delayed specialty care substantially increases risk of permanent disability.**

Case 11 – Inadequate care. Glaucoma follow up not timely provided. RN sick call provides confusing assessment and treatment not supported by protocols. MD chronic care note is incomplete.

Case 12 – Inadequate care. Chronic care form filled out incorrectly and inaccurately. Problem list not updated.  Glaucoma care delayed.

Case 13 – Inadequate care. Nurse sick call fails to treat severe pain (dental) in accord with protocols. Annual/6 month "full physical" is incomplete and does not reference ongoing problem with ankle injury.

**Case 14 – Inadequate care.  Blood sugar not tested in diabetic at intake.  Blood sugar noted to be alarmingly elevated day after intake.  Rash typical for methamphetamine abuse not treated. Recurrent Bartholin Gland Cyst Abscess not treated, and patient decides to treat it herself. Urgently needed GYN referral not made.  No pelvic examination performed.  Recurrent vaginitis aggravated by poorly controlled diabetes.**

**Case 15 – Inadequate care. RN sees diabetic patient on 10/26 for dental pain from broken tooth since 10/14, without reporting extent of pain with pain scale, and not**

---

[8] Case 6 in the draft report described incidents in 2019.  The case 6 included here is different, and  relates to events in the audit period of September – December 2020.

assuring dental care. Dental care (extraction) not provided until **December 8, 2020 – nearly 3 months later at which time patient describes pain as 9/10.**

Case 16 – Adequate care.

Case 17 – Adequate care.

Case 18 – Inadequate care. Maximum dose of prescription NSAID prescribed by NP without diagnosis, and without MD collaboration.  30 days supply provided to patient upon release without referral to PCP

Case 19 – Inadequate care.  Intake blood pressure of 193/112 dangerously high, in range of hypertensive emergency that could lead to heart attack, stroke or kidney damage.  Protocols require immediate consultation with PCP, or possibly ER visit to control BP and effect clearance for jail.  Abnormal pulse rate of 123 is not repeated to rule out error or transient elevation.

Case 20 – Inadequate care.  21-year-old inmate with documented psychosis, has multiple visits to medicine for imagined conditions, not co-managed with mental health input. evident somatic symptom disorder not referred to mental health for co-management. **Covid symptoms and other complaints including chest pain not promptly addressed in accord with protocols.**

**Case 21 – Inadequate care.  Inmate tested positive for Covid-19, not documented in problem list or adequate discussion of care in EMR.   Leg pain not adequately evaluated for thrombophlebitis due to Covid, later found to be the case. Genital lesion not tested or treated for sexually transmitted disease, and likely herpes that appears on face one week later.  NP and PA care for  patient with multiple viral infections and complications of Covid-19 not adequately supervised by Medical Director who filled out chronic care form incompletely and inaccurately, without description of inmates active problems.**

**Case 22 – Inadequate care.  57-year-old with long history of serious GI disease, abdominal pain and bleeding is not referred to gastroenterologist for evaluations and treatments in accord with consultant's requests.  Discharge instruction incorrectly reports patient is medically stable, and makes no arrangements for necessary follow up to mitigate risk of fatal GI bleed following release.**

**Case 23 - Inadequate care. 34 yo with angulated finger fracture requires urgent surgery for repair and restoration of function.  Surgery, as requested by orthopedic consultation, is delayed despite knowledge by MCJ team of the need**

for immediate attention.  Recovery of full function in hand is seriously compromised by delayed medical attention.

**Case 24 – Inadequate care.** 35 yo receives care from RN that does not comport with nurse protocols regarding musculoskeletal injury to shoulder and hand. Classic history and symptoms for hand surgery not recognized by nurse examiner, and no referral made to PCP as called for by protocols. X rays done belatedly show fracture that MCJ is told by Wellpath orthopedics should receive prompt hand surgeon attention.  Despite this recommendation, inmate does not see hand surgeon for 2 months.  The surgical  required to restore at that date could have likely been avoided by timely conservative care by hand surgeon.

**Case 25 – Inadequate care.** 49 yo inmate suffers physical and psychic discomfort in delayed attention to rectal bleeding.  Risk for colon cancer is high.  Delay may transform disease from curable to incurable.  As of December 30, inmate remains housed at MCJ and has not had needed rectal exam, referral to GI specialist or colonoscopy as determined necessary by MCJ PCP on 9/22/20.

**Case 26 – Inadequate care.**  Evaluation and treatment for deep diabetic foot ulcer in 44 yo inmate on dialysis does not meet applicable standards for best practices. Patient is provided with documented instructions regarding possible osteomyelitis and significant risk of losing his limb if not properly treated.

Case 27 – Adequate care.

**Case 28 – Inadequate care.**   34-year-old inmate informs MCJ staff he is candidate for renal dialysis due to end stage kidney disease.  Laboratory testing not done promptly to discern complications of renal failure.  No treatment provided when lab results show life threatening renal failure that require immediate dialysis.  The inmate's worsening fluid retention was not attended to despite inmate complaints in his documented requests for medical care until his condition necessitated emergency hospitalization over 2 weeks after intake. Emergency care would have been avoided by elective consultation and treatment at booking or soon after being booked.

**Case 29 – Inadequate care.** 42 yo alcoholic inmate was not sent to the hospital when MCJ nurse first documents deterioration in mental status indicating the onset of delirium tremens.  12 hours later, patient is brought to nurse sick call for increased agitation and confusion, requiring emergency transfer to the hospital for severe withdrawal symptoms. Medical staff should know that prompt treatment for delirium tremens is necessary to reduce risk of death.

Case 30 – Inadequate care.  Inmate released from MCJ after stroke without documentation of continued medication or follow up.

## ADDITIONAL CASE REVIEW [9]

███████ – Although right hand wound was referred to PCP, the intake form describes skin as "normal."

**███████ – Methamphetamine abuse was documented, with no referral for detoxification.**

**███████ – Inmate with 8/10 pain was not referred for PCP evaluation.**

**███████ – A diabetic inmate was instructed by nurse to treat his skin rash on his own without examination by a health care professional.**

**███████ ███████ and ███████ – Treatment with lipid-lowering drug was prescribed contrary to ACC/AHA guidelines.**

███████ – Hypertension was mistakenly entered on problem list

███████ – The patient's problem list not updated to show patient is pre-diabetic and not diabetic.

███████ – The annual physical form for this patient did not include appropriate physical exam, and fails to reference past or current complaints.

**███████ – Inmate's transfer documents to psychiatric hospital were dangerously incomplete without mentioning hypothyroid condition**.

**███████ – Follow up to orthopedics for open fracture was not provided for 2 weeks.**

**███████ – Urgent care for tendon laceration needing prompt repair was denied to patient during the entire stay at MCJ from 10/20/20 until release on December 25, 2020.  Discharge instructions did not mention need for surgery to repair lacerated tendon.**

---

[9] This is partial list of departures noted in chart review. Except as noted, further details can be found in the attached document "MCJ HC Monitoring Audit Tool Dec 14 2020. The cases in **bold type** demonstrate apparent indifference to inmate's medical conditions, with a risk of causing   adverse outcomes.

███████ **– Inmate under the influence or withdrawing from alcohol and methamphetamine was not referred to on call provider, or cleared by ER for admission to the jail.**

███████ **– Clear history at booking of very heavy alcohol abuse but not placed in CIWA protocol.  Failure to monitor and treat for withdrawal at MCJ caused life threatening delirium and need for emergency hospital treatment.**

████ ████ ████ ████ ████ ████ ████ **– Positive TB skin tests with delayed X ray and/or failure to confirm with interferon test and failure to inform patient of options for treatment of latent TB.**

███████ **– Grievance by JC states she is denied testing for HIV and other sexually transmitted disease (STD). Patient has a history of IV drug use.  Applicable standards of care call for patients at high risk, such as JC, to be tested upon admission.**

## INMATE DEATHS

Three inmate deaths have been reported IN 2020.  I reiterate my analysis for the deaths of patients ███████ and ███████  In addition, per request by Plaintiffs, I report my findings on the death of patient ███████

**Patient** ███████ **(AR)** at the time of his death (March 3, 2020) was 54 year old with a long history of poorly controlled diabetes, hypertension, severe coronary atherosclerosis requiring stent, chronic congestive heart failure, stroke and lung dysfunction (emphysema, recent pneumonitis, fluid retention).  He admitted to having not seen his physician for the 6 months prior to his intake.  His condition was chronically unstable.  He was at the highest risk for sudden death.

AR was booked at or around 7 PM on March 1.  His severe chronic illness and poor pre-booking medical care should have prompted physician examination for the next morning.  Instead of seeing a physician, AR was seen by a PA, and not until around 5 pm, nearly 24 hours later.

ARs weight was recorded as 207 pounds at noon on March 2, an increase of 11 pounds since intake less than 24 hours previously.  The dramatic weight gain should have raised concerns of fluid retention from severe heart failure.  (Weight variations of his order cannot be attributed to differences in scales as MCJ scales should have been calibrated to the same measure as recommended in past audits).   At 5 pm on March 2, PA ███████ reported that breath sounds were absent in AR's right lower lung.  This finding was consistent with congestive heart failure severe enough to cause fluid to accumulate in the lung and impair breathing.  Considered in combination with the

substantial weight gain, AR should have been sent to the hospital at this time for Chest X ray, stat laboratory tests, and in-hospital treatment for congestive heart failure.

At 5:30 PM on March 2, barely 30 minutes after seeing PA ███████ AR complained of chest pain.  His ECG at MCJ was read by Dr. ████ as not showing any changes from prior ECG.  Dr. ████ did not personally examine AR.  Dr. ████ ordered housing in the observation unit.   Applicable standards of care call for AR to have been sent to the hospital immediately to rule out a heart attack.  A normal or unchanged ECG does not negate the probability of an acute cardiac event, especially in diabetic patients with a history of heart disease.  The need for AR to be hospitalized was even greater on account of his severe heart failure manifest in his rapid weight gain, loss of lung sounds in right chest).

AR died in the early morning hours of 3/3/20 while under observation at MCJ, likely as a result of an acute coronary event.   The time of his death is given as 4:24 AM, a few minutes after the paramedics arrived and could not revive him.   Nursing notes state it was difficult to open AR's jaw to perform CPR, suggesting his death occurred a few hours before CPR was attempted.

Pending autopsy results, this review leads the monitor to the following conclusions:

1. AR died from an acute myocardial infarction suffered in the early morning hours of March 3, 2020 sometime before he was noted by staff to be unresponsive

2. The medical care at MCJ was not compliant with the plan as the services were not provided in accordance with community standards:  a) AR's medical examination at MCJ was inordinately delayed; he did not see a physician between his intake and death.   b) despite evidence of severe acute and chronic congestive heart failure (right lung aeration not audible, significant weight gain) PA ██████ did not seek immediate physician consultation.  c)AR was not sent to the hospital for his complaint of severe chest pain at 5:30 pm on March 2, despite his extremely high risk for death from acute coronary events.

The lapses noted in the care provided to AR are like those observed elsewhere in this audit:

1. Nurses seem unaware of the significance of the vital signs and weights they measure.

2. Inmates at high risk of illness or death from uncontrolled chronic diseases (such as diabetes, heart failure) when booked are not being seen by a physician as soon as possible.  If no physician is available on site in MCJ, then it is appropriate to send these patients to the hospital for immediate physician assessment.

3.  Diabetics and patients with a history of heart disease complaining of severe chest pain should be sent to the hospital as an emergency to rule out myocardial infarction unless a physician exam on site at MCJ can justify the observation of that patient in the jail.


**Patient** ▮▮▮▮▮ **(GB)** died a few hours from an acute drug and alcohol overdose a few hours after being booked at MCJ on January 15, 2020  Autopsy blood tests revealed GB's alcohol content in his blood at death sufficient to induce coma.  He also had a significant amount of morphine in his blood. The autopsy report describes an unknown substance within Mr. ▮▮▮▮ rectum, wrapped in plastic that was likely an illicit opiate, such as heroin.   Whether ingested or absorbed from his rectum, Mr. ▮▮▮▮ morphine level was high enough to suppress respiration and would have slowed his gastrointestinal motility to bring a fatal dose of alcohol into the small intestine a few hours after his arrest.  The combination of alcohol and morphine stopped Mr. ▮▮▮▮ breathing and killed him.

MCJ appears to have failed to comply with the CFMG implementation plan that calls for care in accord with community standards.

1. MCJ health care staff should have appreciated that GB displayed signs of a serious illness - delirium (from intoxication, from withdrawal or both) - as manifest by his confusion and agitation. Immediate medical consultation should have been obtained from the physician on call, or from the NMC emergency room to  address GB's delirium and withdrawal symptoms.

2. GB should have been sent out to the NMC emergency room prior to booking as the CFMG implementation plan calls for MCJ to obtain "outside" medical clearance for arrests with:   "any signs of serious injury or illness," "displaying signs of acute alcohol or drug withdrawal," or "signs of head injuries."

3.  While at MCJ, GB should have been under continual observation in consideration of his known abuse of multiple substances and unpredictable behavior.  Staff should have been prepared to treat any deterioration with Narcan.  Self- induced coma and respiratory arrests are common mishap among addicts.  Narcan deployed by lay persons and professionals combats the deadly effects of opiates.

The lapses noted in the care provided to GB are similar to those observed elsewhere in this audit:

1. Nurses seem unaware that intoxicated and withdrawing patients are at high risk of sudden death.

2.  Inmates at high risk of death from acute illness when booked are not being seen by a physician as soon as possible.  If no physician is available on site in MCJ, then it is appropriate to send these patients to the hospital for immediate physician assessment.

3.  Delirious patients should be sent to the hospital for immediate evaluation and treatment unless a physician exam on site at MCJ can justify the observation of that patient in the jail.

**Patient** ▮▮▮▮▮▮ **(JM).**  JM had a history of multiple suicide gestures and housing at MCJ on suicide watch prior to his demise from a successful suicide attempt on 7/21/20. The medical record documents that at 10:24 PM on 7/20/20 Mr. ▮▮▮▮▮▮ complained of having vomited and fainted, but the sick call nurse did not document vital signs or physical examination. The RN documented contacting Dr. ▮▮▮ receiving orders for medication, but did not provide any details regarding the consultation (as required by Wellpath Policies and Procedures of On-call contact).  There was no follow up visit in the morning by medical. This medical care did not comport with the implementation plan guidelines.

The EMR describes mental health assessment of Mr. ▮▮▮▮▮ on 7/21/20.  The times noted (2:35 PM)  are inconsistent with Mr. ▮▮▮▮▮ time of death (1:39 pm).  In my discussion of this case with the neutral monitor for mental health, we agree that there was insufficient communication between clinicians on the mental health and medical teams regarding Mr. ▮▮▮▮▮ complaints.  A medical visit on the morning of 7/21/20 might have been helpful in alleviating Mr. ▮▮▮▮▮ psychic distress.

Suicide occurs despite strenuous preventative measures, especially in young males who have made multiple attempts.  However, the implementation plan is designed to reduce the risk of suicide and other untoward outcomes by providing inmates with adequate access to medical and mental health care.  The recent corrective action plan proposes enhanced training and monitoring of all medical professionals at MCJ to improve compliance with applicable standards of care, protocols, and guidelines. This audit will reiterate my recommendations that medical and mental health professionals work together in treating MCJ inmates.

## QUALITY MANAGEMENT

The Continuous Quality Improvement program at MCJ should "ensure that required peer reviews are completed in accordance with accrediting agencies' requirements."[10] MCJ is not substantially compliant with the implementation plan and community

---

[10] Wellpath Monterey County California Policies & Procedures, HCD-110 A-06, page one, last revised 4/20/2020.  See also, Implementation Plan Page 9, 20, 77 and 98, Exhibit A, filed 4/1/16.

standards for Quality Management because its physician, PA and NP providers are not subject to adequate peer reviews.[11]

**Peer Review by Medical Director, Dr. Patel:**

Dr. ▇▇ documented his peer review for the two current PCPs (PA ▇▇▇▇▇ NP ▇▇▇▇ in a "Peer Review Tool" list that cites 12-16 encounters per month (identified by medical record number and date of patient encounter) for each of the PCPs reviewed.  Dr. ▇▇ did not report any details about his assessment of care other than whether he recommended any modifications to the PCP treatment plan.  I summarize below the cases in which my analysis differs from Dr. ▇▇▇▇ for the November encounters listed.

Issues in care provided by PA ▇▇▇▇

▇▇▇▇ 11/2/20 – X ray was not ordered to rule out osteomyelitis in a possible open fracture.

▇▇▇▇ 11/2/20 – the diagnosis of ganglion cyst should have been considered.

▇▇▇▇ 11/9/20 – extensor tendon laceration was not attended to.

▇▇▇▇ 11/18/20   patient with abdominal and back pain and history of pancreatitis did not get laboratory tests and ultrasound to assess pancreatic function and rule out pseudocyst or penetrating peptic ulcers.

Issues in care by NP ▇▇▇▇

▇▇▇▇ 11/6/20 – diagnosis of external otitis was made without satisfactory examination or typical symptoms.

▇▇▇▇ 11/20/20 - suspected otitis externa and/or otitis media in diabetic patient was prescribed drug unlikely to treat the pathogens of greatest concern.

▇▇▇▇ 11/24/20 – patient reporting unprotected sex and STD symptoms should be tested for syphilis and HIV without necessarily waiting or positive test results for gonorrhea and chlamydia.

---

[11] CQI committee minutes and peer reviews forming the basis for my opinion are not attached pending instructions from the parties regarding their disposition as privileged documents.

Dr. ▮▮▮▮ peer review process is not compliant with the implementation plan for a few reasons.  First, he reviewed insufficient charts.  PA ▮▮▮▮ and NP ▮▮▮▮ each see no fewer than 12 patients every day in a four-day work week.  A sampling of 12-16 patients each month is less than the required 10%.[12]  Second, the detail provided in Dr. ▮▮▮▮ review log does not describe any corrective actions.  For November Dr. ▮▮▮▮ recommended no modifications in treatments. Third, that Dr. ▮▮▮▮ recommends virtually no modification in the treatments provided by his subordinates suggests that his reviews are cursory.[13] As I report in this audit, have identified numerous examples of care passing muster with Dr. ▮▮▮▮ that I believe fall below applicable standards for best practice.  Fourth, Dr. ▮▮▮▮ does not affix his signature in any form (electronic or otherwise) in a minimum of 10% of all procedures provided by the healthcare professionals practicing under his supervision.[14]

Dr. ▮▮▮▮ participated in the care of many patients by performing an annual physical exams or chronic care.  But it does not seem that his engagement has provided effective monitoring and mentoring.  Significant lapses in care provided to patients who have been seen by Dr. Patel and his subordinates are described above and detailed in the attached documents "MCJ Physician Case Review Tool December 10 2020" and "MCJ HC Monitoring Audit Tool Dec 14 2020."


### Peer Review by Director of Nurses, RN ▮▮▮▮▮▮ -

DON ▮▮▮▮ documented her peer review of ten (10) nurses I identify herein by initials:  M.R., D.M., R.F., M.P., G.G., J.D. B.A., A.S., C.R., J.A..  DON ▮▮▮▮

---

[12] "[A] minimum of ten percent (10%) of all protocol/standardized procedures/initiated care/treatment provided by a physician assistant, nurse practitioner and registered nurse charts shall be reviewed and countersigned by the responsible physician." Implementation Plan, Exhibit A, filed 4/1/26, page 24.

[13] Amid approximately 120 encounters by PA ▮▮▮▮ and NP ▮▮▮▮ listed in the "Peer Review Tool" for months of July through November Dr. ▮▮▮▮ identified only 3 in which he recommended treatment plan be modified ("eye exam," "no prescription," and an unknown modification).

[14] Under California Law, and in accord with the delegated services agreement on file at MCH, Dr ▮▮▮▮ is "responsible" for PA ▮▮▮▮▮▮ medical practice.  Pursuant to the Implementation plan and Wellpath policy NP ▮▮▮▮ is subject to collaboration and review by Dr. ▮▮▮▮ just like PA ▮▮▮▮▮▮  The triage services by nurses at MCJ arguably do not fall into the category of care/treatment and thus need no countersignature by Dr. ▮▮▮▮ Wellpath protocols describes the detailed peer review of health professionals, including nurses, that must be performed at least annually in accord with NCCHC standards.

reviewed for each nurses 10 -15 encounters per month (October and November)[15] in multiple areas of care (e/g/ health appraisal, receiving screening, intake, sick call) accompanied by a detail critique of performance.  DON ███████ analyses found lapses similar or identical to those I have identified previously, such as the absence of needed mental health referrals, inexcusably blank forms, inattentiveness to abnormal vital signs, failure to measure height and weight accurately, failure to follow registered nursing protocols, departures from detoxification protocols, delayed higher-level provider referrals, and inaccuracy of history and physical findings.  DON ███████ documented in educational notes to each nurse the rationale for correcting these departures from best practices.

DON ███████ audit of nurse performances is compliant with the implementation plan and Wellpath policies that call for annual reviews.   DON ███████ peer reviews include a summary of findings and corrective action. Her iteration of multiple lapses displays her awareness of performances by nurses under her supervision and shows her interest in effective mentoring.  There is no requirement within the implementation plan or Wellpath policies for 10% of nurses notes be co-signed by the DON.

CQI Committees

CQI meetings at MCJ are substantially improved compared to what I saw in past audits but are not yet in substantial compliance with the Implementation Plan and Wellpath Monterey County California Policies & Procedures.  I was impressed that Wellpath supervising physicians brought my concerns to the attention of MCJ staff, including standards or care for the use of ibuprofen, asthma medications, and lipid lower drugs.

The meeting minutes for October 21, 2020 addressed deficiencies noted in past audits and plans for corrective actions. However, there were no discussions about ongoing peer review.  There was no documented discussion about inmates needing emergency hospital care or other circumstances suggesting departures from best practices that need to be addressed.[16]  The minutes for November 16, 2020 are extremely abbreviated and provided virtually no information about peer review or challenges in patient care during the preceding month. I have not seen any minutes for December 2020.

---

[15] DON ███████ started work at MCJ in October 2020.

[16] The certifying of health care professionals peer review at committee is a cornerstone of quality management. The analysis of unexpected illness or death (also known as "morbidity and mortality") is a critical component in quality management,

## INMATE INTERVIEWS

The Male interviews were remarkable for reported satisfaction with access to care. I was informed, and brought to MCJ staff attention, that follow up care for glaucoma in one case did not seem in accord with ophthalmologist recommendations (██████████

Female interviews were remarkable for complaints by both interviewees that their women's health issues were not addressed in MCJ.

## STAFF INTERVIEWS -

I spoke at some length with the following staff when I visited MCJ on December 14 and 15, 2020 by remote video.

██████████████, RN, Health Services Administrator, MCJ

██████████p, RN, Operational Specialist, Wellpath

██████████, RN, Director of Nursing. MCJ

██████, MD, Medical Director, MCJ

████████████, RN, Staff Nurse, MCJ

██████████, RN, Staff Nurse, MCJ

██████████ Physician Assistant, MCJ

██████████, Nurse Practitioner, MCJ

Each of the interviewed professionals at MCJ told me that the existing medical record system was less helpful than they would like, and in some ways complicated their work. Challenges cited included the following:

- Patient encounter records could not be reopened to edit or correct.
- The record for a patient can be closed regardless of fields being left unanswered.
- Referral to supervisors is not prompted or facilitated by the system.

Dr. █████ did not express any concerns about the efficacy of the EMR or standards of care at MCJ.  Nurse █████████ and ██████████████████ (the DON before Nurse █████████ shared their belief that nursing care could be improved with future monitoring and mentoring. Some of the staff interviewed volunteered that communications, aside from the medical record, were not easy between nurses, the PCPs and the medical director.

PA ████ and NP ██ agreed that EMR inefficiencies impaired their work.  For example, it was difficult to correct errant entries. They would like the EMR to facilitate referral to the medical director and medical specialists.  PA ████ and NP ██ were not familiar with the current practices and protocols deployed by Wellpath, but instead relied upon their understanding of general principles in medical practice to meet applicable standards of care.  ████ and ██ agreed that coordinating patient care between nursing, mental health and dentists could be improved.

## DISCUSSION

The parties may wonder how it is that I find MCJ no more compliant with the implementation plan than my audits reported in the past.  I believe the main reasons for this are twofold.  First, that the Covid – 19 pandemic has distracted the MCJ staff from processes and procedures necessary for compliance with the plan. I understand from my interviews that pandemic concerns interfered greatly with implantation of the CAP.  Second, because my recommendations for enhanced training and monitoring have only recently been enacted it will take some months to yield evidence of their effects on improving care.

I selected the cases for review from among those patients likely to be the most challenging for medical staff:  a) inmates hospitalized, b) inmates seen by specialists, 3) inmates registering grievances.   The question arises as to whether a random sampling of inmates would show much better compliance with the implementation plan.  In my assessment of patient chosen at random from encounters for each of the quality indicators, as detailed in Exhibit A (audit monitoring tool), the compliance with the implementation plan was no better than for more challenging patients.  This can be appreciated in comparing the "Case Review Findings" to Medical Chart Review Findings" that I post the Summary Table tab of the Physician Case Review attached herein as Exhibit B.

The stress of dealing with Covid-19 and training new staff make the difficult task of healthcare for the incarcerated that much harder.   Notwithstanding the challenges up to this date, current MCJ and Wellpath leadership agree with the need to enact prior planned corrective actions and to consider additional corrective actions as proposed in this audit.

## CONCLUSIONS

This audit of medical care provided to inmates at MCJ from September 1 through December found significant deficiencies in many of the same areas of concern I noted in prior audits.

1) Physician supervision of PA and RN care is not always provided when appropriate.

2) Nurses do not consistently obtain necessary vital signs, properly interpret abnormal vital signs, and accurately assess intoxicated and withdrawing inmates in accord with applicable protocols for appropriate monitoring and treatment.

3) Sick call requests are not timely managed by nurses as required under the implementation plan.

4) Nurses fail to perform sick calls in accord with approved nursing protocols and/or provide care on occasion that exceeds their legal scope of practice.

5) Chronic care visits and health care maintenance do not consistently address all significant chronic and and/or acute problems that merit attention.   Major medical problems are not consistently documented in the problem list.

6) Some patients with severe illness needing medical attention upon release are discharged without adequate instructions for appropriate follow up care.

7) Necessary specialty care is not consistently and timely provided.

8) The EMR does not consistently document the disclosure to patients with risk of latent TB about their condition and treatment options.

9) Quality assurance programs, including formal chart review by the medical director of are not performed in accord with community standards as articulated in the implementation plan, medical group policies and Settlement agreement.

10) MCJ medical/nursing staff are not familiar with the standards of care that apply to their professional duties. Inmates with significant mental illness were not timely referred to mental health. Patients identified by medical providers with serious dental conditions were treated with sub-optimal doses of pain medication while awaiting dental care.

## RECOMMENDATIONS –

1. The MCJ medical director and director of nursing should oversee the quality of care provided by nurses and PCP.  Performances of the medical and nursing directors in this matter should be audited pursuant to Wellpath policies.  See Clinical Performance Enhancement (regarding peer reviews and template showing credentials required for review of site Medical Director). Until such time as other monitor measures are deemed appropriate, the medical director (or Wellpath designee) should document review and co-signature on no less than 10% of all NP and PA encounters at MCJ.

2. Untoward medical events at MCJ, such as hospital admissions or deaths, should be promptly reviewed with pertinent staff and in committee with documented corrective action, as recommended in prior audit reports. Continuing medical education, referencing authoritative sources such as Uptodate, should be provided to medical staff pertinent to these events.

3. Inmate grievances should be reviewed by Medical Director and Director of Nurses promptly after received to determine necessary action and/or reply.

4. Weekly executive meetings with Health Services Administrator, Medical Director and Mental Health leadership should discuss collaborative care for high-risk patients suffering co-morbid medical and mental health problems.

5. Training of nursing and medical staff in treatment of inmate pain complaints, should focus on most common causes of pain complaints including dental disease and drug habituation.

6. Inmates at high risk should be screened for HIV, HCV and STD.  Screening for TB in patients with history of BCG vaccination should include interferon-gamma release assay, such as Quantiferon TB Gold+.[17]  Patients found to have HIV, HCV or latent TB should be counseled about options for immediate versus delayed treatments.

7. Withdrawal protocols should be rigorously followed.  Inmates described as "under the influence" should not be sent to the General Population without clearly documenting in the medical record that the inmate is safe for such placement.  Patients with signs of delirium should be transported urgently to the hospital unless an on-site PCP exam provides justification for observation and treatment at MCJ.

8. The EMR used at MCJ should undergo major modifications as soon as possible to address the following correctable deficiencies and such other concerns as medical leadership may identify:

    i.  non entry of critical data, such as vital signs
    ii. failure to update problem list with diagnoses entered in the EMR
    iii. alarm for seriously abnormal vital signs
    iv. reminders for health maintenance overdue (PAP, Colonoscopy)
    v. prompts to MCJ HSA for specialist care ordered but not provided.
    vi.  mechanism to refer patients from nursing line or PCP for immediate MD review
    vii.  Improved forms for discharge that identify conditions needing further attention and assist inmate in attaining necessary medical care.
    viii. Improve and consolidate chronic care with annual physical forms to ensure that all significant chronic and acute problems receive needed attention during these visits.

9. Wellpath medical leadership should be prepared to assist MCJ in managing inmates following emergency room care, hospitalization or other conditions

---

[17] See, e.g., Lewinsohn, DM et al. Official American Thoracic Society/Infectious Disease Society of America/CDC clinical practice guidelines: diagnosis of tuberculosis in adults and children.  Clin Infec Dis. 2017:64)2):111-115.

requiring unusual resources and expertise.  Wellpath should increase its engagement in the care of patients who need specialty consultation.

10. All MCJ medical staff should have a copy of the Registered Nursing Protocols/Procedures and be expected to have read this document "cover to cover."

## Attachments:

Ex. A:  MCJ HC Audit Monitoring Tool Dec 14  2020, revised Feb 7 2021

Ex. B:  MCJ HC Physician Case Review December 10 2020, revised Feb 7 2021

Ex C:   MCJ Corrective Action Plan, August 2020 and verifications

CONFIDENTIAL

# Exhibit 10

# MONTEREY COUNTY JAIL COMPLIANCE AND HEALTH CARE MONITORING AUDIT

June 25, 2021

CONFIDENTIAL



Bruce P. Barnett, MD, JD – expert medical monitor

# TABLE OF CONTENTS

INTRODUCTION ...................................................................  ..................................................................3

BRIEF SUMMARY OF FINDINGS .........................................................................................................3

SUMMMARY TABLE   ...............................................  ...........................................................................4

OBJECTIVES, SCOPE, METHODOLOGY ...............................................................................................4

FINDINGS        ...............................................................................................................................6

      INTAKE...........................................................................................................................6

        ACCESS TO CARE.......................................................................................................6

        CHRONIC CARE,.........................................................................................................6

        HEALTH CARE MAINTENANCE. ............................................,...................................6

        CONTINUITY OF CARE UPON RELEASE,  OUTSIDE CARE, DETOXIFICATION/WITHDRAWAL...........7

        TB/INFECTION CONTROL...........................................................................................7

        MEDICATIONS/PHARMACY, NURSE MED ADMINISTRATION.......................................-8

        STAFFING....................................................................................................................8

        CLINIC SPACE ..........................................  .................................................................8

        QUALITY ASSURANCE.................................................................................................8

PHYSICIAN/NURSE CASE REVIEW ......................................................................................................9

ADDITIONAL CASES,  ......................................................................................................................12

DEATHS............................................................................................................................................12

PATIENT INTERVIEWS........................................................................................................................13

STAFF INTERVIEWS............................................................................................................................14

PLAINTIFFS' ATTORNEYS' INQUIRIES................................................................................................14

DISCUSSION .....................................................................................................................................15

CONCLUSIONS...................................................................................................................................17

RECCOMMENDATIONS.........................................................  .............................................................18

LIST OF ATTACHMENTS .....................................................................................................................19

## INTRODUCTION

Based upon my review of healthcare services provided to patients[1] housed at Monterey County Jail (MCJ) from January through April 2021, MCJ does not appear to be providing medical care in compliance with the Implementation Plan (CFMG Implementation Plan (5:13cv-02354-PSG document 532 Filed 04/01/16)). In assessing the adequacy of healthcare, I also refer to CMGC Nurse Protocols (July 2018); CFMG Policy and Procedure Manual (April 2015) and the Wellpath Policy and Procedure Manual – Monterey County California (April 2020).

This report describes my findings in regards to the following:   a) compliance with standards of care described for each of the quality indicators cited in the court-approved implementation plan (hereinafter implementation plan or "plan")  b) analysis of health services assessed in my reviews of patients during the time of their incarceration,  c) review of deaths occurring at MCJ or immediately following MCJ incarceration, d) further notable departures from implementation plan  e) matters brought to my attention by attorneys for Plaintiffs,  f) quality management including supervisors' audits of MCJ healthcare providers, g) interview of MCJ patients on site, h) interviews of MCJ healthcare staff and i) facility inspection.

The audit tools and raw data referenced in this report are provided as confidential documents to the parties and attached to this report. See Ex. A, Physician Case Review (case review)  and Ex. B Monitoring Audit Tool.

## BRIEF SUMMARY OF FINDINGS

The corrective action plan (CAP) developed following the last audit has been refined and finalized at the end of April 2021.  See Exhibit C.  I will review MCJ compliance with this CAP in subsequent audits.

This audit found that MCJ was not substantially compliant with the implementation plan for 10 out of 12 measures summarized in the table below.[2]  I believe departures from the implementation plan occurred for two main reasons.  First, there were many errant and/or incomplete data entered into the electronic medical record system (EMR).  Second, medical care frequently did not follow established policies.  Follow up for positive TB skin tests, for example, did not comport with applicable protocols or

---

[1] Pursuant to a February 2021 position statement from the National Conference of Correctional Healthcare recommending the use of "humanizing language," this audit report refers to incarcerated persons receiving medical attention as "patients" in place of the term "inmate" used in past audits.

[2] Pharmaceutical administration as shown in this table is divided into two components:  1) Prescribing appropriate medications upon intake and release and 2) Observation of nurse dispensing during on-site audit.  The on site dispensing was performed in compliance with the implementation plan.

community standards.  These, and other significant departures from the implementation plan are enumerated in the report below.

## Summary of Quantitative Measures of Implementation Plan Compliance[3]

| TABLE 1            Quality Indicator | Compliant/Not Compliant | % Compliant | Comments |
|---|---|---|---|
| 1.  Intake Screening | Not Compliant | 31.0% | see text and worksheets |
| 2.  Access to Care | Not Compliant | 61.2% | see text and worksheets |
| 3. Chronic Care | Not Compliant | 44.8% | see text and worksheets |
| 4. Health Care Maintenance | Not Compliant | 47.1% | see text and worksheets |
| 5. Continuity of Care | Not Compliant | 38.9% | see text and worksheets |
| 6. Outside Care Referrals | Not Compliant | 45.9% | see text and worksheets |
| 7. Detox/Withdrawal | Not Compliant | 52.4% | see text and worksheets |
| 8. Tuberculosis/Infection Control | Not Compliant | 33.3% | see text and worksheets |
| 9. Pharmaceutical Management; refusals | Not Compliant | 47.1% | includes discharge meds.  See text, worksheets |
| 10. Administration and staff on  site | Compliant | 100.0% | data from on site interviews |
| 11. RN Medication Administration On site | Compliant | 100.0% | see text and worksheets |
| 12. Physician/Provider Case Review | Not Compliant | 29.0% | 10 out of 34 cases were managed adequately |
|  |  |  |  |
| Overal Audit Score |  | 52.6% |  |

## OBJECTIVES, SCOPE, AND METHODOLOGY

This audit assesses compliance with the implementation plan.  As in prior audits, recommendations are provided for corrective actions to promote compliance with plan parameters.

## Methodology

The Summary Table shows the percentage of clinical encounters reviewed that demonstrated compliance with the described performance parameter.  For this audit, the "compliance rate" is derived from the findings compiled in the "Physician Case Review Tool" as well as the "Monitoring Audit Tool." These spreadsheets are attached.

---

[3] The category of Administration and staff on site is inclusive of Clinic Facilities and Quality Assurance.

The overall "score" represents an average of the degree of compliance for quality indicators in which a percentage calculation was performed.  This score is an imprecise measure.  I offer the score for comparison with other MCJ audits I have done using the same methodology.

This audit does not presume that there is a "benchmark" percentage that indicates compliance with the plan.   A single serious lapse in care otherwise adequate, especially if such lapse arises from systemic problems (e.g. inadequate medical records, insufficient staff, faulty protocols) may signal non-compliance with the plan.

## Quantitative Review

Eleven components of medical care are identified in the implementation plan along with the performances required for compliance:    Intake Screening, Access to Care, Chronic Care, Health Care Maintenance, Continuity of Care, Outside Care Referrals, Detox/Withdrawal, Tuberculosis/Infection Control, Pharmaceutical Management (including storage of medications, and appropriate prescribing), Administrative Services (staffing) and Dispensing Medications on Site.  Physician/Provider case review includes an assessment of care provided by nurses (RN) as well as by PCP (MD, DO, FNP, PA).

## Qualitative Review

This audit also considers whether MCJ complies with the proviso in the implementation plan that requires medical services be provided "in accordance with community standards." [4]   Case reviews consider the adequacy of care in accord with generally accepted principles of medicine and applicable standards, aside from elucidated performance parameters.  Other qualitative measures described as compliant or not without citing percentages staff supervision, medical facilities, and quality management.

## Interviews

Interviews with staff and patients may highlight problems not detected in the review of medical records and/or confirm audit observations.

---

[4] See Settlement Agreement, page 2-3; Implementation Plan page 8

## FINDINGS[5]

**INTAKE SCREENING**   - Intake screening is <u>not substantially compliant</u> with the implementation plan.   I observed in this audit similar departures from the plan as I noted in prior audits:  inattention to abnormal vital signs, conflicting data entry, inaccurate information especially regarding risk of intoxication/withdrawal, and delayed referral to PCP or specialists for treatment of acute injuries or unstable chronic conditions.  See cases 1, 5, 6, 13, 16, 20; ID: ▬▬▬▬ ▬▬▬▬ ▬▬▬▬

**ACCESS TO CARE** – Patient access to care is <u>not substantially compliant</u> with the implementation plan. Significant deviations were noted that include inconsistent use of SOAP format, nursing care deviating from MCJ protocols, and delayed referral for necessary PCP or specialty care.  Physician supervision was not apparent in the management of complex medical problems.  Women's health issues were not treated in accord with community standards.  See cases 1, 2, 3, 5, 8, 9, 10, 11,13, 15, 17, 20, 21, 22, 27, 32, 33. ID ▬▬▬▬ ▬▬▬▬ ▬▬▬▬

**CHRONIC CARE** – Provision of chronic care is <u>not substantially compliant</u> with the implementation plan.  Patients with chronic illness noted on intake were not consistently and/or timely referred for chronic care.  The EMR forms for chronic care are not properly deployed, and do not ideally assist PCP documentation.  Data entry in these forms seemed to be mistaken or incomplete on multiple occasions.  Problem lists are not updated.  Significant acute and chronic medical concerns are often not described or adequately addressed in these forms or elsewhere, defeating the purpose of these regularly scheduled visits. I did not see any improvement in Chronic Care since the last audit noted these same lapses.  See Cases 1, 11, 16, 20, 21, 26, 33, 34, 35.   ID: ▬▬▬▬ ▬▬▬▬ ▬▬▬▬ ▬▬▬▬ ▬▬▬▬ ▬▬▬▬

**HEALTH CARE MAINTENANCE** – Health care maintenance is <u>not substantially compliant</u> with the implementation plan.  Some annual examinations are incomplete, lacking full physicals and inaccurately reporting current diagnoses. Important matters, including injuries, abnormal findings or unresolved patient complaints are not always addressed.  Few annual exams provide necessary attention to women's healthcare needs, including pelvic examinations and PAP smears. Patients at high risk for chronic hepatitis infections and/or HIV disease are not screened in accord with applicable standards.  Patients residing at MCJ for long periods not offered timely colon cancer screening.   The forms for annual exam are used in most cases every 6 months,

---

[5] Deficiencies are discussed below and noted with case No. and/or patient ID numbers in the accompanying worksheets that provide details of problematic care.

although healthy patients do not need such frequent examination.  See cases 2, 7, 16, 22.  ID; ███████ ███████

**CONTINUITY OF CARE AFTER RELEASE –** Continuity of care required after release is <u>not substantially compliant</u> with the implementation plan.  As noted in the past, patients with serious and unstable conditions are sometimes released without appropriate follow up appointments as called for by the plan. The EMR does not consistently include a record of discharge instructions and/or medication dispensed upon discharge.  See cases 16, 23, 31, ID: ████████ █████████ █████████ ████████ ████████

**OUTSIDE CARE REFERRALS –** The process for providing outside medical care to MCJ patients is <u>not substantially compliant</u> with the implementation plan.  Access to specialty consultations has not improved demonstrably compared to prior audits.  Fewer written reports than noted in the last audit seemed to be provided timely to MCJ when patients returned to the jail from outside care. No forms are in the EMR documenting instructions for ambulance transports. See case 17, 19, 21, 22, 25, 26, 29.  ID:

████████████████████████████████████████████████████████

**DETOX/WITHDRAWL –** MCJ is <u>not substantially compliant</u> in its treatment of patients who are intoxicated or withdrawing.  Withdrawal protocols were not followed consistently.  The intake nurse form shows booked persons sent to general population (GP)  housing who were described as "under the influence" or determined by custody to be unsafe in GP.  Nurses continue to document abnormal vital signs without repeat or referral as required by protocols.  PCP evaluations are delayed or incomplete.    See cases 5, 8, 16, 20, 28. ID: ███████████████████████████

**TB/INFECTION CONTROL –**MCJ TB/ infection control is <u>not substantially compliant</u> with the implementation plan. Patients likely have latent TB infections as manifest by unequivocally positive skin test following normal prior tests were not investigated further with blood testing (Quantiferon Gold), and not counseled regarding treatment options.  This problem had been noted in past audits.  Screening protocols for latent TB well known to MCJ staff are not being followed. See case 4.  ID: ██████████████ █████████████████████████

The implementation plan directs MCJ to perform appropriate screening and isolation of persons with possible communicable diseases, and thus addresses the jail's Covid-19 pandemic management.  MCJ appears to have substantially adhered to applicable community standards to detect, prevent and treat Covid-19 infections.  Newly booked

persons and any possible infections have been quarantined until confirmed negative for Covid 19.  Vaccinations are being offered to all staff and incarcerated persons.[6]

**PHARMACEUTICAL MANAGEMENT -**.  I found pharmaceutical administration to be overall not substantially compliant with the implementation plan.  Mechanisms for storage of medications and counting of narcotics are much improved since my first audit and meet applicable standards, including provision of the implementation plan.  However, I observed medications delayed or prescribed without appropriate supervision. Instances in which did not have RN, PA, and NP provided care involving medications without the benefit of sufficient MD oversight.  See cases 8,13, 20, 27, 29, and 33.  I also noted that the EMR did not consistently document provision of needed medications to patients upon their release.  See cases ███████████

**NURSE ADMINISTRATION OF MEDICATIONS** – The administration of medications at MCJ by nurses on medication rounds is substantially compliant with best practices and with the implementation plan.

**STAFFING – Administrative, PCP, RN, medical records, and support**  –  Based upon the monthly document disclosures, including attendance logs, staffing during the past three months appears to have been substantially compliant with the implementation plan.  However, staff interviews and inspection of care suggest to me that MCJ staff was so preoccupied with Covid 19 concerns as to impair record keeping and health care notwithstanding staffing that would be adequate at other times.  Improvements in the staff supervision, recommended below, and CAP provisions address the challenge of staff efficiency and effectiveness.

**CLINIC FACILITIES** - Clinic Space and equipment is substantially compliant with implementation plan.  All announcements were posted as required in residential and/or clinic spaces.

**QUALITY ASSURANCE -** MCJ quality assurance processes for January through April 2021 seemed substantially compliant with the Implementation Plan and terms of the Settlement Agreement.  My assessment finds that that QI process is improved compared to the prior audits, as discussed below.

The Implementation Plan (page 23) calls for the medical director (responsible physician) to countersign no less than 10% of all charts in which document treatment provided by a

---

[6] MCJ administration reports that vaccinations have been provided to all persons eligible and requesting vaccination. As of June, 2021 the rate of vaccination for staff is  approximately 60%, and for incarcerated persons 50%.  This compares favorably to the current data showing 46% of California population to be fully vaccinated.

physician assistant, nurse practitioner or registered nurse. Dr. ███ documented his review of approximately 10% of patient encounters by the physician extenders (PA, NP) during the time period for January through March, 2021.[7] The DON has also instituted chart reviews and audits in accord with Wellpath policies that comport with the continual quality improvement (CQI) provisions of the implementation plan.

Wellpath Monterey County California Policies & Procedures, effective 6/2/2019, call for the establishment of a CQI committee involving the MCJ medical director as well as physician extenders (physician assistants, nurse practitioners), nursing, mental health, dentistry, health records, pharmacy and laboratory.  CQI minutes for the first quarter of 2021 (March 4, 2021) document attention to my request for review of grievances. March 2021, and minutes for end of 2020 addressed untoward clinical events (also known as morbidity and mortality) as well as my findings at the last audit.

## PHYSICIAN/NURSE CARE CASE REVIEW

Case 1,  Inadequate care.  56 yo with possible radiation proctitis. No medical attention provided to GI complaints**.**

Case 2  Inadequate care. 50 yo diabetic with incomplete problem list that does not mention opiate abuse.  Significant hand injury not documented in EMR.

Case 3 Inadequate care.  52 yo with chronic headaches not referred to physician for medical evaluation.

Case  4.  Inadequate care. 20 yo at risk of latent TB not properly screened.

Case  5   Inadequate care. 50 yo released with no follow up for high risk of colon cancer.

Case 6  Inadequate care. 35 yo with alarmingly abnormal vital signs, not submitted to PCP for review.

Case 7. Adequate care.

---

[7] Dr. ███ review of PA and NP work is more detailed than he reported in the last audit. I agree with Dr. ███ assessment of his subordinates' care in about 80% of the cases I reviewed.  I disagreed with Dr ███ in the following cases where he considered care appropriate:  ███ – the CBC result does not support the prescription of iron; ███ antibiotic prescribed unnecessarily; ███ – patient at risk for diabetes has no documented blood glucose, fractured finger not splinted.   I will discuss these cases and the manner of his case selection with Dr. ███ I do not believe  that Dr. ███ written assessments need to concur 100% with my analysis for the QI process to be substantially compliant with the implementation plan.

Case 8.  Inadequate care.  35 year old with psychosis.  Pulse over 120 not brought to PCP attention. No documented coordination with mental health.

Case 9:   Inadequate care.  21 year old with possible corneal erosion at risk of loss of sight not seen timely by ophthalmology.

Case 10.  Adequate care.

Case 11. Adequate care.

Case 12. Adequate care.

Case 13. Inadequate care. Treatment for draining abscess not in accord with published standards of care.

Case 14. Adequate care.

Case 15. Inadequate care**.**  35 yo methamphetamine addict not seen by PCP for 5 weeks after booking despite complaints of headache and alarmingly high BP.

Case 16.  Inadequate care.  28 yo booked with polysubstance abuse.  PCP not contacted by intake nurse in accord with protocols, and signs of serious withdrawal.  No follow up for chronic hepatitis C infection (HCV).

Case 17  41 year old with 3rd nerve palsy, resolved. Not provided with ophthalmology evaluations and intensified patient education for diabetes

Case 18. Adequate care.

Case 19 Adequate care.

Case 20  Inadequate care.  30 year old treated with 95 mg of methadone daily at risk for sleep apnea and sudden death not seen by MD for more than 3 weeks after booking.

Case 21. Inadequate care**.** 61 year old with lymphoma, alcoholism, polysubstance ab use and depression complaining of hip pain.  Hip pain not diagnosed.

Case 22. Inadequate care. 27 yo post partum with multiple complaints.  No pelvic exam documented and no communication with obstetrician more than three weeks after delivery.

Case 23. Inadequate care.  58 yo schizophrenic swallowed sharp metallic object, not passed by time of release.  Discharge instructions mistakenly state he is stable and provide for no follow up regarding foreign body in his GI tract.

Case 24. Adequate care.

Case 25. Inadequate care. 33 year old sustained wrist fracture not properly immobilized, remains at high risk for non union despite plain film appearances of healing. Published best practices call for MRI/CT and/or orthopedic consultation.

Case 26 Inadequate care. 47 yo belatedly seen by opthalmology for complaint (MCJ staff mistakenly writes eye "normal" but he is blind in that eye).Needs opthalmology follow to discern risk of sympathetic opthalmia that could leave him blind in his other eye.

Case 27. Adequate care.

Case 28. Inadequate care. 55 yo alcoholic at high risk for delirium[8] is not seen by PCP within 24 hours of booking despite a request for this exam made by intake nurse who was acting in accord with applicable protocols.

Case 29 22 pregnant patient does not timely see obstetrician for high risk pregnancy, poly substance abuse on subutex.

Case 30. Adequate care.

Case 31. Inadequate care. 29 year old seen in MCJ and outside clinics for antepartum care, found to have HCV. No documentation in EMR to show that patient was informed about this before release. No discharge documents.

Case 32. Inadequate care. 40 year old with multiple somatic complaints was prescribed by mid-level providers excessive and unnecessary antibiotics without adequate oversight by supervising medical director.

Case 33. Inadequate care. 32 year old describes classic symptoms for gonorrhea urethritis (GC) was not tested for this disease, or given presumptive treatment. Resolution of symptoms does not mean patient is cured as GC may be symptomless

Case 34 22 year old overweight concerned about his health. Abnormal lab suggests possibility of non-alcoholic liver disease related to his obesity. This has not been noted by PCP or discussed with patient.

---

[8] Delirium (also described in the case of alcoholics as DTs – delirium tremens - is a potentially fatal complication from drug overdose and/or drug withdrawal.

## ADDITIONAL CASE REVIEW [9]

██████  Pulse 135, polysubstance abuse at high risk for DT, sent to GP with no medical referral.

██████ – request for sick call on 1/25/21 after purported assault, seen by RN 1/27/21. No PCP exam or consultation despite pain reported as severe - 7/10.

██████ – eye complaint.  No Snellen (visual acuity) checked.

██████ – diabetic not tested with blood glucose, no meds. Positive TB skin test released with possible latent TB but no referral for care.

██████ –seen for annual physical with no action taken regarding latent TB (skin test positive after negative test year before).

██████ – seizures, not placed in chronic care.  No discussion or action regarding hepatitis C.

██████ – released with no referral for IV opiate abuse.

██████ – delayed orthopedic consultation and surgery.

██████ – in sobering cell for 10 hours with no nurse assessment or deployed protocol documented.

██████ – patient with signs of delirium apparently due to illicit ingestion of pruno (jail-brewed alcohol) not sent to hospital for more than 12 hours after onset of symptoms.

## PATIENT DEATHS

One patient death was reported in 2021.

**Patient** ██████ **(CR)**  was at the time of his death (March 19, 2021) 22 years old with a psychiatric history of schizophrenia and multiple suicide attempts.  His medical history was significant for poorly healing gunshot wound to left leg complicated with an open fracture.  The PCP examining CR on 2/18/21 reported his bizarre behavior to mental health, also noting that CR had no orders for psychiatric medications previously prescribed.

---

[9] This is partial list of departures noted in chart review. Further details can be found in the attached document "MCJ HC Monitoring Audit April 11 2021."

CR was seen by mental health daily thereafter until admitted to Natividad Medical Center (NMC)  ER for crisis evaluation on 2/25/21.  Mental health notes document his diagnosis of schizophrenia.  The mental health team at MCJ continue to see CR daily upon his return from NMC up to his suicide attempt on 3/13/21.  CR died in NMC a few days later from complications of that suicide attempt.

The death review performed by MCJ found no aspects of medical care that could have been changed to prevent the death.  I agree. The patient refused to cooperate with the PCP looking after his leg injury. Plans were being made for follow up with his orthopedic surgeon. But there was no medical emergency on that account.

I was not provided with a "psychological autopsy."  I defer to the mental health monitor evaluation of the adequacy of the psychological autopsy and appropriateness of care provided by the mental health team.

It is worth noting that the PCP on 2/18/21 explicitly discussed her concerns about her patient's mental status with the mental health team.  This is the kind of collaboration I have recommended in past audits.

## PATIENT INTERVIEWS

The interviewees speaking to me at this audit reported several perceived problems, which I brought to attention of MCJ staff.  Actions taken in response to their concerns are in italics.

███████ (MS) – pain in his right shoulder consistent with torn rotator cuff, received no care. *Follow up examination and X ray was obtained suggesting minor injury.*

███████ (EF) – injury sounds like a mallet finger (fracture) not seen by PCP, not splinted. *Follow up X ray obtained is negative, but finger is kept in splint to rule out occult fracture.*

███████ (JM) -  denied continuation of Diflucan prescribed by his infectious disease physician prior to booking, following disseminated coccidiomycosis.   *Cocciomycosis immune titer has been measured to assure patient that no need to continue Diflucan at this time.*

███████ (KP) – vaginal bleeding after termination, not examined for possible retained products of conception or uterine infection.  Has chronic hepatitis C infection, but not advised about treatment options.  A*dvice has been provided to the patient regarding treatment options for HCV.*

## STAFF INTERVIEWS -

I spoke with the following staff.

, RN, Health Services Administrator, MCJ

, RN, Operational Specialist, Wellpath

, RN, Director of Nursing. MCJ

, MD, Medical Director, MCJ

, Physician Assistant, MCJ

, Nurse Practitioner, MCJ

They stated changes are being made in the schedule to improve patient access.  They also agreed with my assessment that modifications of the EMR will help MCJ provide medical care the is substantially compliant with the implementation plan. There was general agreement with my suggestion that additional support from Wellpath physician executives would also help MCJ comply with the implementation plan.

## PLAINTIFFS' ATTORNEY INQUIRIES

The following patients were brought to my attention in May by attorneys for plaintiffs. Actions taken in response to the concerns raised are reported here in italics.

(JC) - This patient complained of abdominal pain following treatment in the acute hospital for mesenteric ischemia and thrombosis.  He was discovered in the hospital possibly have protein S deficiency that puts him at risk for excessive blood clots.  Upon return from the hospital this patient had not been seen by a physician. *This patient has been examined by Dr.          The problem list has been updated to with mention of possible coagulation problem.*

(AB) – This patient complained of excruciating migraine headaches during his sick call with nursing but was not referred for primary care evaluation.  The annual physical exam by Dr.         done a few weeks later made no mention of patient's headaches.  NP        documented complaints that seemed delusional.  This suggested a deterioration in the patient's mental status as he has a diagnosis of schizophrenia but had no recent mental health evaluation or treatment.  *Patient is now followed by the Mental health team.*

(DE) – This patient had complained of pain in his hand following an altercation.  A provisional diagnosis was entered into the EMR of "boxer's fracture" when he was booked in early May, but he underwent no X ray and had no appointment

with orthopedics.  *His hand has been X rayed, and he has seen an orthopedic surgeon was delayed by some weeks after his injury.*

▮▮▮▮ (MP) – this patient has been complaining of chronic rash with severe recurrences that have been unrelieved by treatments offered at MCJ.  *Dr.* ▮▮▮ *has been talking to medical colleagues informally about this case.   The patient has not yet received a formal specialty consultation.*

MCJ care for patients JC and AB was initially not compliant with the implementation plan.  Following my discussions with Wellpath managers JC and AB did receive appropriate healthcare.  The care provided to patients DE and MP did not comply with the implementation plan insofar as specialty care was delayed.  Accordingly, MCJ care has not been substantially compliant with the plan in the four cases brought to my attention by Plaintiffs' attorneys in May.

## DISCUSSION

By the percentage measures alone, MCJ seems to be doing less well over time rather than improving.  Corrective actions can bring MCJ performance into the range of substantial compliance.

The CAP has been finalized this past month.  <u>The following corrective actions appear to be underway:</u>

1.  Clinical competency evaluations of PA, NP and RN performance

2.  Affirmation that a 30 day supply of medication is provided upon release

3.  Notices regarding class action lawsuit, PREA, women's reproductive rights, and medical board oversight have been posted in all housing locations.

4. Weekly grievance reports are reviewed by DON and sent to me.

5. Appropriate testing to determine cause of vaginitis and improved access for women's health matters.

6.  I am meeting with the medical director at MCJ and Wellpath medical supervisors every two weeks to discuss grievances and other cases of concern.

<u>CAP provisions not yet enacted or documented include the following:</u>

1. Training to repeat and report abnormal vital signs

2. Ensure immediate referral to PCP for patients with unstable chronic disease, acute injury or uncertain conditions including persons involved in altercations, and patients who are either intoxicated or appear to be withdrawing whether noted on intake or at later time.

3. Ensure timely referral to PCP for stable chronic disease and/or complex medical problems.

4. Improve use of all computer forms, including nurse protocols, chronic care and annual physicals.  Encourage staff to add type important information rather than be limited by any of the pre-printed fields.

5.  Improve the EMR to reduce frequency of mistaken or omitted data.

6.  Train all MCJ staff on policies for patient education and treatment of TB, HIV, HCV, Hepatitis B, skin infections and cancer screening (colonoscopy, mammogram, etc.)

7. Train nursing staff on promoting community follow up for patients released from MCJ, to include treatment for HCV, cancer, latent TB and substance abuse.

8.  Education of patients who have positive skin tests suggesting latent TB, regarding options for treatment and risks of not being treated.

9.   Advocate for timely referral and care by specialists, using a telehealth network if necessary. [10]

10.  Monthly QA meetings to review cases of interest and continuing education.  All medical staff should attend or be informed of discussions by transcript or minutes.

---

[10] Telepsychiatry services are being provided at MCJ.  I defer telepsychiatry evaluation to the mental health expert, except regarding the role of medical staff in treating patients with mental illness.  As described above, in discussion of the 2021 death (CR-███████  PCP evaluation includes consideration and communications about mental health status of patients to the mental health staff.  I am informed that the matter of Abnormal Involuntary Movement Scale (AIMS) screening by PCP is being discussed at MCJ.

## CONCLUSIONS

Although improvements are noted with enactment of some corrective actions, medical care provided to patients at MCJ from January 1 through April 2021, and for May cases described above, demonstrated deficiencies similar to those noted in prior audits.

1) Physician supervision of PA and RN care is not always provided when appropriate.

2) Nurses do not consistently verify or report abnormal vital signs, and accurately assess intoxicated and withdrawing patients in accord with applicable protocols for monitoring and treatment.

3) Sick call requests are not consistently managed by nurses as required under the implementation plan.

4) Nurses fail to perform sick calls in accord with approved nursing protocols and/or delay necessary referrals to PCPs.

5) Chronic care visits and health care maintenance encounters (annual physical) do not consistently address all significant chronic and and/or acute problems that merit attention.   Major medical problems are not consistently documented in the problem list.

6) Some patients with severe illness needing medical attention upon release are discharged without adequate instructions for appropriate follow up care.

7) Necessary specialty care is not consistently and timely provided.  Reports from specialists or medical visits outside of the jail are often delayed or not found in the medical record.

8) Patients at risk of latent TB and other infections (such as chronic hepatitis C)  are not informed about their condition and treatment options.

9) Collaboration with mental health does not occur consistently for patients suspected by PCP as having deteriorated mental status.

## RECOMMENDATIONS –

1. Untoward medical events at MCJ, such as hospital admissions or deaths, should be promptly reviewed with pertinent staff and in committee with documented corrective actions, as recommended in prior audit reports.

2. The medical director should be informed on a regular basis of all patients housed in MCJ who are at relatively higher risk than most patients for adverse health outcomes.  The medical director should review the medical record of these patients and enter in the addendum section documentation appropriate for the circumstances.  Patients at relatively higher risk include, but are not necessarily limited to the following:

   a. Patients over age 65

   b. Patients prescribed 10 or more medications

   c. Pregnant patients

   d. Patients with diagnosed cancer

   e. Patients with abnormal radiological studies such as severe osteoarthritis, fractures, heart failure, pneumonitis, osteomyelitis, spinal cord impingement, and possible cancer.

   f. All formal grievances filed at MCJ

   g. Patients returned from emergency room or returned from hospital

   h. Patients returned from visits to specialists

   i. Patients with positive TB skin tests

   j. Patients referred to the medical director by RN, PA or NP (such as patients with uncommon conditions that ordinarily require the attention of medical specialists.)

3. All RNs should read the nursing protocol applicable for the patient under care and follow the directives therein. Continuing medical education, referencing authoritative sources such as Uptodate, should be provided to all medical staff to supplement nursing protocols.

4. Abnormal vital signs must be repeated, recorded, reported, and referred for appropriate follow up.

5. Training of nursing and medical staff regarding treatment for the more common causes of pain complaints such as dental disease, chronic back pain and drug habituation.

6. Patients should be screened for HIV, HCV, and STD.[11]  Screening for TB in patients with history of BCG vaccination should include interferon-gamma

---

[11] See, e.g., Weinbaum C, et al. Prevention and control of infections with hepatitis viruses in correctional settings. Centers for Disease Control and Prevention. MMWR Recomm Rep. 2003;52(RR-1):1; See also, Spaulding, Anne, Screening for HCV infections in jails. JAMA 2012; 307:1259 (recommending opt-out testing).

release assay, such as QuantiFERON TB Gold+.[12]  Patients found to have HIV, HCV or latent TB should be counseled about treatment options.

7. Withdrawal protocols should be rigorously followed.  Patients described as "under the influence" should not be sent to the GP without documenting in the medical record that the patient is safe for such placement.  Patients with signs of delirium should be transported urgently to the hospital unless an on-site PCP exam provides justification for observation and treatment at MCJ.

8. The EMR used at MCJ should undergo modifications to address the following matters and such other concerns as medical leadership may identify:
    i.  entry of critical data, such as vital signs
    ii. updating problem list with diagnoses entered in the EMR; ensuring chronic care for patients with chronic diseases (including drug addiction and cancer).
    iii. alarm for seriously abnormal vital signs
    iv. reminders for health maintenance overdue (PAP, Colonoscopy)
    v. prompts for specialist care ordered but not provided.
    vi.  mechanism to refer patients for immediate MD review
    vii.  Improved forms for discharge that identify conditions needing further attention and assist patient in attaining necessary medical care upon release from jail. .
    viii. Improve and consolidate chronic care with annual physical forms to ensure that all significant chronic and acute problems receive needed attention during these visits.

9. Assignment of personnel, possibly a chief of medical records, to obtain and post in the EMR reports from specialists, outside medical care and other documents requested by PCP including the results of radiological studies. [13]

10. Continue the process of prompt review of grievances filed by patients regarding their medical conditions or medical care.


## Attachments:

Ex. A:  MCJ HC Audit Monitoring Tool

Ex. B:  MCJ HC Physician Case Review

Ex C:   MCJ Corrective Action Plan,

---

[12] See, e.g., Lewinsohn, DM et al. Official American Thoracic Society/Infectious Disease Society of America/CDC clinical practice guidelines: diagnosis of tuberculosis in adults and children.  Clin Infec Dis. 2017:64)2):111-115.
[13] I understand the medical record department has no assigned "chief."

# Exhibit 11

# MONTEREY COUNTY JAIL

# HEALTH CARE AUDIT

November 30, 2021

CONFIDENTIAL



Bruce P. Barnett, MD, JD – expert medical monitor

## TABLE OF CONTENTS

BRIEF SUMMARY OF FINDINGS..................................................................................................... 2

OBJECTIVES, SCOPE, AND METHODOLOGY ............................................................................. 4

# INTRODUCTION

Based upon my review of healthcare services provided to patients[1] housed at Monterey County Jail (MCJ) from April through mid-October,2021 MCJ does not appear to be providing medical care in compliance with the Implementation Plan (CFMG Implementation Plan (5:13cv-02354-PSG document 532 Filed 04/01/16)). In assessing the adequacy of healthcare, I also refer to CFMG Policy and Procedure Manual (April 2015), CMGC Nurse Protocols (July 2018)  and the Wellpath Policy and Procedure Manual – Monterey County California (April 2020).[2]

This report describes my findings in regards to the following:   a) compliance with standards of care described for each of the quality indicators cited in the court-approved implementation plan (hereinafter implementation plan or "plan")  b) analysis of care provided to patients described in "Physician Case Review," c) review of deaths occurring at MCJ or immediately following MCJ incarceration, d) further notable departures from implementation plan  e) matters brought to my attention by attorneys for Plaintiffs,  f) quality management including supervisors' audits of MCJ healthcare providers, g) interview of MCJ patients on site, h) interviews of MCJ healthcare staff and i) facility inspection.

The audit tools and raw data referenced in this report are provided as confidential documents to the parties and attached to this report. See Ex. A, Case Review and Ex. B Monitoring Audit Tool.

## BRIEF SUMMARY OF FINDINGS

The corrective action plan (CAP) developed following the last audit has been refined and finalized at the end of April 2021.  In most parts, MCJ has not enacted the CAP at the time of this audit. See summary of current CAP status attached. Ex. C.

---

[1] Pursuant to a February 2021 position statement from the National Conference of Correctional Healthcare recommending the use of "humanizing language," this audit report refers to incarcerated persons receiving medical attention as "patients" in place of the term "inmate" used in past audits.

[2] California Forensic Medical Group (CFMG), an original defendant in Hernandez v. Monterey County, has evolved through corporate mergers and acquisitions to become Correctional Medical Group Companies (CMGC) and most recently Wellpath.

This audit found that MCJ was not substantially compliant with the implementation plan for 11 out of 12 measures summarized in the table below.[3]  These findings do not differ substantially from what I reported in June 2021.  Three recurrent findings may explain why MCJ has not made much progress to improve its measured health services.

1) Physicians seem to not provide adequate oversight of care provided by nurse (RN), physician assistant (PA), and nurse practitioner (NP).  For the past few months there has been no full-time director of nurses. Also, in October a new medical director (MD) was appointed to MCJ.

2) Incomplete and/or errant data continues to be entered into the electronic medical record system (EMR).

3)  Medical care frequently does not comport with applicable MCJ protocols or community standards.

## Summary of Implementation Plan Compliance[4]

| TABLE 1                      Quality Indicator | Compliant/Not Compliant | % Compliant | Comments |
|---|---|---|---|
| 1.  Intake Screening | Not Compliant | 43.8% | see text and worksheets |
| 2.  Access to Care | Not Compliant | 64.9% | see text and worksheets |
| 3. Chronic Care | Not Compliant | 43.8% | see text and worksheets |
| 4. Health Care Maintenance | Not Compliant | 41.2% | see text and worksheets |
| 5. Continuity of Care | Not Compliant | 33.3% | see text and worksheets |
| 6. Outside Care Referrals | Not Compliant | 37.9% | see text and worksheets |
| 7. Detox/Withdrawal | Not Compliant | 35.3% | see text and worksheets |
| 8. Tuberculosis/Infection Control | Not Compliant | 35.1% | see text and worksheets |
| 9. Pharmaceutical Storage and Dispensing; refusals | Not Compliant | 50.0% | includes discharge meds.  See text, worksheets |
| 10. Administration and staff on  site | Not Compliant | na | percentage not applicable |
| 11. RN Medication Administration On site | Compliant | 100.0% | see text and worksheets |
| 12. Physician/Provider Case Review | Not Compliant | 19.0% | 3 out of 20 cases reviewed were managed adequately |
| | | | |
| Overal Audit Score | | 45.8% | |

---

[3] Pharmaceutical administration as shown in this table is divided into two components:  1) Prescribing appropriate medications upon intake and release and 2) Observation of nurse dispensing during on-site audit.  The on site dispensing was performed in compliance with the implementation plan.

[4] The category of Administration and staff on site is inclusive of Clinic Facilities and Quality Assurance.

## OBJECTIVES, SCOPE, AND METHODOLOGY

This audit assesses compliance with the implementation plan.  As in prior audits, recommendations are provided for corrective actions to promote compliance with plan parameters.

### Methodology

The Summary Table shows the percentage of clinical encounters reviewed that demonstrated compliance with the described performance parameter.  For this audit, the "compliance rate" is derived from the findings compiled in the "Physician Case Review Tool" as well as the "Monitoring Audit Tool." These spreadsheets are attached.

The overall "score" represents an average of the degree of compliance for 11 quality indicators in which a percentage calculation was performed.  This score is an imprecise measure.  I offer the score for comparison with other MCJ audits using the same methodology.

This audit does not presume that there is a "benchmark" percentage that indicates compliance with the plan.   A single serious lapse in care otherwise adequate may suffice to indicate non-compliance with the plan. Conversely, multiple minor departures do not necessarily negate the assessment that patient care is overall adequate.

### Quantitative Review

Eleven components of medical care are identified in the implementation plan:  Intake Screening, Access to Care, Chronic Care, Health Care Maintenance, Continuity of Care, Outside Care Referrals, Detox/Withdrawal, Tuberculosis/Infection Control, Pharmaceutical Management (including storage of medications, and appropriate prescribing), Administrative Services (staffing) and Dispensing Medications on Site. Physician/Provider case review includes an assessment of care provided by nurses (RN) as well as by PCP (MD, DO, FNP, PA).  Except for staffing, which is not subject to a percentage measure, this audit reports a percentage compliance for each of the other aspects of medical care.

### Qualitative Review

This audit also considers whether MCJ complies with the proviso in the implementation plan that requires medical services be provided "in accordance with community standards." [5]   Case reviews consider the adequacy of care in accord with generally accepted principles of medicine and applicable standards, aside from elucidated

---

[5] See Settlement Agreement, page 2-3; Implementation Plan page 8

performance parameters.  Other qualitative measures described as compliant or not without citing percentages are adequacy of staffing, staff supervision, medical facilities, and quality management.

**Interviews**

Interviews with staff and patients may highlight problems not detected in the review of medical records and/or confirm audit observations.

## FINDINGS[6]

**INTAKE SCREENING**   - Intake screening is <u>not substantially compliant</u> with the implementation plan.   I observed in this audit similar departures from the plan as I noted in prior audits:  Inattention to abnormal vital signs, conflicting data entry, inaccurate information especially regarding risk of intoxication/withdrawal, and delayed referral to appropriate primary care providers (PCP) [7] or specialists[8] for treatment of acute injuries, unstable and serious chronic conditions.  See cases 2, 3, 6, 8, 9, 10; 15, 19; and ID ███████████████████████.

**ACCESS TO CARE** – Patient access to necessary medical care is <u>not substantially compliant</u> with the implementation plan. Significant deviations were noted that include untimely face to face visits following patient requests for service, nursing care deviating from MCJ protocols, and delayed referral for necessary PCP or specialty care. Physician supervision was not apparent in the management of complex medical problems.  Women's health issues (most notably pregnancy) were not treated in accord with community standards.  See cases 1, 5, 7, 8,11,13, 14, 17, 18; and ID: ██████████ ████████████████████████

**CHRONIC CARE** – Provision of chronic care is <u>not substantially compliant </u>with the implementation plan.  Patients with chronic illness noted on intake were not consistently and/or timely referred for chronic care.  Data entry in these forms seemed to be mistaken or incomplete on multiple occasions.  Problem lists are not updated.

---

[6] Deficiencies are discussed below and noted with case No. and/or patient booking ID numbers in the accompanying worksheets that provide details of problematic care.
[7] The term primary care provider (PCP) refers to physicians (MD or DO) and physician extenders (physician assistant, nurse practitioners) practicing in consultation with physicians who provide and/or supervise patient care.
[8] Specialists are physicians or other licensed healthcare practitioners with training that qualifies them to provide care for conditions not ordinarily managed by PCP.

Significant acute and chronic medical concerns are often not described or adequately addressed, defeating the purpose of these regularly scheduled visits.  See Cases 1, 7, 4, 6, 10, 16, 17, 18, and ID: ████████████████████████ .

**HEALTH CARE MAINTENANCE** – The health care maintenance process (routine checkups) is not substantially compliant with the implementation plan.  Some annual examinations are incomplete and do not accurately report current diagnoses. Important matters, including injuries, abnormal findings or unresolved patient complaints are not always addressed.  Patients at high risk for chronic hepatitis infections, and/or human immunodeficiency virus (HIV) are not screened in accord with applicable standards. See cases 7, 8. 11, 12, 14, and   ID; ████████████████████ .

**CONTINUITY OF CARE AFTER RELEASE –** Continuity of care after release of patients with significant illness is not substantially compliant with the implementation plan.  The EMR does not consistently include a record of discharge instructions and/or medication dispensed upon discharge from the jail or transfer to prison.  See cases 9, 11, 12, 15, and ID ██████████████████████ .

**OUTSIDE CARE REFERRALS** – The process for providing outside medical care to MCJ patients is not substantially compliant with the implementation plan.  Access to necessary specialty consultations seemed delayed or not provided at all[9]  for patients with high-risk pregnancy, fractures, and complex medical conditions including thyrotoxicosis, heart failure, deep vein thrombosis and poorly controlled diabetes. Full reports from specialists were frequently not in the EMR.  No forms are in the EMR documenting instructions for ambulance transports.[10]  See cases 9, 10, 11,13, 18, 19, and ID ████████████████████████████████
████████

**DETOX/WITHDRAWL –** MCJ is not substantially compliant in its treatment of patients who are intoxicated or withdrawing.  Withdrawal protocols were not followed consistently.  Nurses continue to document abnormal vital signs without repeat or referral as required by protocols. Persons described as "unstable" or otherwise unfit to be housed in the general population (GP) were not examined by a PCP in accord with

---

[9] Case Nos. 10 and 11 (failure to consult about uncontrolled diabetes); Case No. 18 (failure to consult about fluid retention causedby heart failure); Case No. 19 (failure to refer high risk pregnancy to prenatal care provider); Case No. 2106052 (no referral for urological complaint); Case No. 1912700 (no ENT consultation, not even by phone, after request for ENT referral by PCP).

[10] I understand the medical record department has no assigned "chief" but is instead supervised by the general administrative staff.  See recommendations below.

Wellpath protocols and applicable community standards of care.  See case 5 and ID ████████████████████████████████████████████████

## TB/INFECTION CONTROL –

**TB**:   MCJ controls for tuberculosis (TB) and other infections (TB/ infection) are <u>not substantially compliant</u> with the implementation plan. Patients likely have latent TB infection (LTBI) as manifest by positive skin test (PPD) [11]  were not investigated further with blood testing (QuantiFERON-TB Gold test or QFT-G)[12] as recommended by CDC and in accord with applicable community standards. Patients suspected to have LTBI were generally not counseled regarding treatment options. This problem had been noted in past audits.  Protocols for active and latent TB were not being followed. See case 4, 5, 9,[13], 12, and ID ████████████████████████████ ████████████████ .

**Coronavirus (COVID)** – COVID tests are not promptly performed for symptomatic patients. Patients presenting symptoms consistent with COVID are not isolated pending COVID test results.  Some MCJ patients with COVID symptoms were treated as having common colds and returned to GP without the assurance of negative COVID testing. See case 7, 11,13, 17 and ID ████████ [14]

**Other Contagious Diseases** – HIV and Hepatitis testing not offered to patients at high risk for these diseases.  See case 20.

**PHARMACEUTICAL ADMINISTRATION -**.  I found pharmaceutical administration to be overall <u>not substantially compliant</u> with the implementation plan.  Mechanisms for storage of medications and counting of narcotics do not meet requirements in the Implementation Plan or applicable community standards.  Narcotics were not locked within the medication room.  The EMR revealed examples of medications delayed or

---

[11] A PPD (purified protein derivative) skin test (also known as tuberculin skin test, TST, is a small injection under the top layer of skin (intradermal) that forms a temporarily inflamed bump in patients who are infected with TB, but may not be acutely ill.

[12] QFT-G is a blood test approved in 2005 by the FDA to diagnose LTBI that may be used in place of PPD or to validate diagnosis of LTBI based upon a positive PPD.

[13] ID ████████ is especially troublesome as the EMR shows patient was released without public health notice/follow up despite concern that he had active TB.

[14] A spike in COVID infections and COVID related hospitalizations reported late September could have been due to lax isolation practices as well as relatively lower vaccination rates than more recently achieved.  In the past weeks vaccination rates for inmates has increased by coordinating vaccine clinics with Public Health.  MCJ requires that all staff not exempted for medical reasons be vaccinated against COVID.  The total number of infected inmates as of October 27 is 8 with no hospitalizations.

prescribed improperly without appropriately documented examinations, and/or physician supervision. See cases 6 7, 10, 16,13, 17.  I also noted that the EMR did not consistently document provision of needed medications to patients upon their release. See ID ████████████████ .

**NURSE ADMINISTRATION OF MEDICATIONS** – The administration of medications at MCJ by nurses on medication rounds <u>is substantially compliant</u> with best practices and with the implementation plan.

**STAFFING – Administrative, PCP, RN, medical records, and support**  –   Staffing during the past three months appears to have been <u>not substantially compliant</u> with the implementation plan.  MCJ has no Director of Nursing.  The Medical Director was on-site four days a week (Mon-Thurs).  He did not appear to be engaged with clinical matters Friday-Sunday leaving non-physician staff unsupervised during that time.  Lapses in care detected during this audit indicate that the Medical Director was not providing sufficient oversight even during the days he was working on site.  There was not sufficient staff to ensure collection of reports from outside care and entry into the EMR of appropriate patient instructions upon release.  It appears that MCJ has no on-site pharmacist to regularly oversee and/or consult on the storage and administration of medications.

**CLINIC FACILITIES** - Clinic Space and equipment and housing was not inspected during this audit due to an active COVID outbreak.  However, this parameter has been <u>substantially compliant</u> with the implementation plan for the past three audits. I expect to make an on site inspection during my next visit.

**QUALITY ASSURANCE -** MCJ quality assurance processes for April 2021 through October were <u>not substantially compliant</u> with the Implementation Plan and terms of the Settlement Agreement.

The implementation plan (page 23) calls designated physician/s to countersign no less than 10% of all charts in which document treatment provided by a physician assistant, nurse practitioner or registered nurse.[15]    This process does not relieve MCJ physicians from the duty to oversee medical care for the most challenging cases, and not merely sign 10% of charts at random.  This audit finds that during months from April through

---

[15] The California Physician Assistant Practice Act, effective January 1, 2020, requires that PA services are rendered pursuant to a "practice agreement" that establishes methods for continued evaluation of PA competency. Cal  B & P code 3502.3.  Nurse practitioners must designate a physician collaborator.  RN services, including services by a NP,  are subject to oversight by a supervising physician who must approve the protocols that direct care delivered to patients by the RN and NP.  California Code of Regulations 1485. Nursing Practice Act 2725, 2834-2837.

October 2021 the care by RN, NP and PA for the most challenging patients was not reviewed or supervised by a physician in accord with applicable law and community standards.  This audit found PA, NP and RN care at MCJ without documented physician supervision for patients with thyrotoxicosis , decompensated heart failure ▮▮▮▮, deep vein thrombophlebitis ▮▮▮▮, complex diabetic regimen ▮▮▮▮, possible complex regional pain syndrome ▮▮▮▮ and hi-risk pregnancy ▮▮▮▮.

Wellpath Monterey County California Policies & Procedures, effective 6/2/2019, call for the establishment of a continuos quality improvement (CQI)  committee involving the MCJ medical director as well as physician extenders (physician assistants, nurse practitioners), nursing, mental health, dentistry, health records, pharmacy and laboratory.  I have not seen CQI minutes for the third quarter of 2021.  Prior minutes did mention audit findings that included concerns about management of patients with positive TB tests.  That MCJ management of LTBI still does not meet CDC guidelines and other applicable protocols is another reason I find the CQI process to not be compliant with the Implementation Plan.

## SUMMARY OF CASE REVIEWS

Case 1,  Inadequate care. 25 yo obese male schizophrenic, injured in altercation 5/21/21.   The EMR did not report consideration of antibiotics or follow up to address risk of infection from human bite.

Case 2  Inadequate care.  54 yo homeless female with polysubstance abuse at risk for withdrawal was housed in GP with no subsequent PCP exam, and released without documented discharge instructions.

Case 3 Adequate care.  22 yo male with no serious medical problems identified on intake.  The pulse rate documented on intake of 110 was not repeated or reported in accord with Wellpath protocols.[16]

Case  4.  Inadequate care.  49 year old male incarcerated at MCJ since April 2020 with positive PPD was not evaluated for latent TB since 2020 admission, and not evaluated fully after repeat positive April 2021. He was transferred to NKSP without QuantiFERON test to determine his TB status. Transfer sheet fails to note patient had a positive TB skin test.

---

[16] In cases 3, 15 and 16 health care services were deemed adequate where departures from protocol or standards of care did not appear to pose a substantial threat to the patient's welfare.

Case 5   Inadequate care.60 yo immigrant from Vietnam at high risk for latent TB is not screened properly.  Pulse of 110 recorded, not repeated and not referred.

Case 6  Inadequate care. 61 yo obese male with a history of hypertension, hyperlipidemia, BPH, and positive PPD.  No medical provider review was requested at intake.  The PCP visit 6 days after intake was incomplete regarding anticoagulation, and pain medications.  The abrupt discontinuation of gabapentin put patient at risk of withdrawal seizures. The chest X ray at MCJ was abnormal.   There was no release document in the EMR to educate the patient about his abnormal X ray and recommendations by radiologist for additional X rays.

Case 7. Inadequate care. This 39 yo male was booked into MCJ in January 2021 after hospital clearance at which time the ER prescribed Eliquus, an anticoagulant.   A determination is made by PA with no MD consultations that no further anticoagulation needed based ultrasound done on 1/7/21 that purportedly showed no evidence of lower extremity DVT.  Following isolation for COVID infection, patient became suddenly unresponsive and died.   Autopsy is pending. See Patient Deaths below.

Case 8.  Inadequate care.  38 year old obese male (BMI 37) with recurrent skin infection, not tested with finger stick or lab for diabetes.

Case 9:   Inadequate care. 58 yo patient with intoxication noted on intake that was severe enough to impair communication generated no referral to PCP. Pulse at booking 124 not repeated or reported to PCP.

He had a positive TB skin test.  Following an abnormal chest x ray he was treated at MCJ for community acquired pneumonitis, but the radiologist interpretation of X ray was that TB cannot be ruled out.  No QuantiFERON testing was done. No sputum was tested.  The EMR shows no patient education regarding his risk for TB and no contact with public health.  Inmates and staff potentially exposed to active TB.  No continuity of care upon release with public health.  Failure to screen patient for diabetes who is over 45 years old, obese, and with Hispanic heritage does not comport with CDC guidelines

Case 10.  Inadequate care. 47 yo male with diabetes reported he was treated before booking with Trulicity, Jardiance, glipizide, metformin and insulin.  These medications were not ordered at MCJ or refilled until 9/1/21, 4 days after booking. During stay at MCJ no consultation obtained from endocrinology to review this unusual combination of diabetes medications.  Insulin prescription of 1 unit BID on sliding scale was nonsensical and confusing.

Case 11. Inadequate care. 69 yo male booked 6/5/2020 and in 10/13/2021 with history of Diabetes requiring insulin, HTN, CKD, and Hypothyroidism.  He was diagnosed with COVID in July 2020.  When he complained of COVID-like symptoms in April 2021 he

was not tested to rule out recurrent COVID.  He was transferred to ASH but no transfer documentation was found in the EMR.[17]

Case 12. Inadequate care. 36 yo booked June 2020 with history of stimulant abuse, depression on psych med (Zoloft).   PPD placed upon intake was read as positive (12mm) two days later. X ray negative.  The positive PPD was determined to be insignificant.  Repeat annual PPD on 5/20/21 was read as  15x15mm. Based upon history of BCG[18] vaccination, it was again determined that reaction the postivie PPD was not  significant.  This is contrary to CDC guidelines that promote QuantiFERON testing when for patients with history of BCG vaccination.  Also, 6 month physical exam has incomplete and inaccurate history.  Problem list was not updated.  Transfer form to state prison did not highlight possible need for treatment of latent TB.

Case 13. Inadequate care. 31 yo male booked with cracked ribs.  Abnormal VS not repeated and not referred.  Patient restrained for symptoms of severe withdrawal and/or delirium (DTS)  but not seen promptly by PCP. Medication prescribed without exam or referral to have an exam. COVID testing not done for COVID symptoms.   EMR does not have note from specialist or any documented communications with the specialist more than a month after the specialty visit occurred to evaluate need for hernia repair.

Case 14. Inadequate care. 42 year old booked on 4/11/21 claimed allergy to peanut butter but no history of adverse reactions to peanut butter sandwiches he is eating while incarcerated. No determination was made that he has peanut allergy, but the medical record lists as allergies "PEANUT BUTTER".  Inaccurate and confusing allergy statements placed in the medical record.  The mistaken listing of allergy in a patient known to not have the allergy is significant lapse in record keeping.  See Stern, Lutzkanin and Lutzkanin, Strategies to identify and prevent penicillin allergy mislabeling and appropriately de-label patients. The Journal of Family Practice, Sept 2021, Vol 70, No 7, 326-333.

Nurse described RUQ tenderness but did not refer to PCP for diagnosis. Nurse failed to identify Level One dental need.  There is no documented dentist visit/exam/treatment. Pain was not adequately controlled.  Abnormal vital signs were not repeated, not referred.

Case 15. Adequate care. 50 yo male with heart disease caused by methamphetamine abuse.  Height and weight at intake was not measured with no reason provided for that

---

[17] Overall care was inadequate for inattention to possible COVID, and absent transfer documentation even though some of his care was appropriate.  Unlike many other patients with a positive PPD this patient did under QuantiFERON testing and treatment for confirmed LTBI.

[18] BCG is abbreviation for bacilli Calmette-Guerin, a vaccine used widely outside of the United States to provide children with protection against tuberculosis.  It has been long appreciated, and noted in warnings from CDC, that vaccination wit BCG may cause a false positive reaction to TB skin testing (PPD).

lapse. Patient was released without documented follow up care plan and prescribed medications. However, patient received substantial attention for his conditions and was clinically stable while housed at MCJ.

Case 16.  Adequate care. 21 yo booked most recently 11/13/2109 (housed at MCJ nearly 2 years).  Has active problems were listed as constipation, COVID, Obesity and arm pain.  Overall care complied with Implementation plan.  Deficiency noted was liberal prescription of NSAIDs without examination to establish need for that drug.

Case 17  Inadequate care. 40 yo booked January 2021 and again in 5/7/21 with history of obesity, diabetes and schizophrenia.  Abnormal vital signs were not addressed in accord with protocols.  Skin infection diagnosed by nurse 9/13/21. Antibiotics were prescribed by NP without NP exam or timely follow up.  Chronic care visit did not address recent complaints or injuries. COVID testing for significant symptoms in this patient at risk of complicationis from COVID infection is delayed.

Case 18. Inadequate care. 30 yo with dilated cardiomyopathy secondary to drug abuse. Booked 8/9/21. First post booking PCP exam PA was on 8/17/21; treatment with medications prescribed from outside was delayed for a week after intake. No documented visit to MD until chronic care visit on 9/9/21.  PA care was not supervised. Patient's substantial weight gain showed the medications prescribed did not control his fluid retention caused by heart failure. Patient did not receive necessary consultation from cardiology to address this fluid retention. Ivermectin prescribed to treat scabies outbreak without physician note.

Case 19 Inadequate care. 29 yo, booked 4/22/21 and again 8/7/21.  Incarceration while pregnant complicated by history of recent drug use, and anemia.   Intake 4/22/21 and 8/7/21 was incomplete and inaccurate.  Following the August 2021 intake OB care was delayed so that her first OB was in second trimester instead of first trimester.

Case 20 Inadequate care. 53 yo female with history of depression, stimulant abuse, low back pain and cataract. She reported recent vaginal sex but refused pregnancy test. States she abuses methamphetamine "as much as I can." While at MCJ she was treated for oral moniliasis (thrush).   Failure to test this patient for HIV and Hep C is significant breach in standards of care as was/is at high risk for these diseases.

Case 21 – 58 yo male with schizoaffective behavior poorly controlled recurrently inserts and ingests metallic objects into his body. He receives overall appropriate medical attention.  I defer to the mental health expert evaluation of psychiatric care.

## ADDITIONAL CASE REVIEWS [19]

████████        Intake on 8/5/21 failed to note that this patient had suffered from elevated thyroid hormone levels due to Grave's disease.  MCJ made no timely inquiry as to medication she should be taking.  Post intake evaluation by NP ████ on 8/10 (without evident MD collaboration) was inadequate; crucial testing for TSH, T4 was delayed purported due to patient's bizarre behavior that was probably related to thyrotoxicosis. Patient deteriorated over many weeks without treatment for Grave's disease and her dangerously hyperthyroid state, leading to a thyroid storm that could have been fatal.[20]

████████ – 39 yo alcoholic was sent to sobering cell 7/1/21 with no intake screening until 7/9/21. 7/1/21 assessment by RN was that patient was "unstable" and intoxicated, and uncooperative.  On 7/1/21 in sobering cell at 1815 patient was described as restless, sweating, disoriented. These signs of delirium required immediate medical attention from PCP or evaluation in the hospital.

████████ – 55 yo with diagnosed schizoaffective disorder volunteered his history of opiate and methamphetamine abuse during the past year.  When booked on 8/8/21 (Sunday) intake nurse described patient as dirty/disheveled and not permitting vital signs to be taken.  Patient was sent to GP without enrolling in COWS or synthetics protocol.  Mental health evaluation was not approximately 24 hours later, rather than immediately to assure safety in GP.  When patient complained of visual disturbance the exam was incomplete with no  Snellen (visual acuity) checked.

████████ – 47 yo obese male submitted request for sick call on 4/23/21 complaining that he feared he has deep vein thrombosis.  The face-to-face exam was not performed until 4/26/21.  Timely evaluation for acute thrombosis should be within 24 hours of complaint if not sooner.  He was not tested for diabetes as should be done in accord with CDC guidelines. He received no referral for care upon release regarding his positive TB skin test that suggested LTBI.

████████ – 42 yo obese male with hypertension seen by PA on 9/9/21 for complaints of bad taste and smell, chills, headache, difficulty breathing. Assessed by as having early URI and treated according to protocol for minor viral illness.  No COVID testing done for 2 days despite COVID symptoms. Rapid COVID test performed by custody staff on 9/11/21 was positive.  Patient's return to GP on 9/9/21 could have spread COVID.

---

[19] This is partial list of departures noted in chart review that especially merit further investigation. Further details for these cases and others can be found in the attached document "MCJ HC Monitoring Audit Tool September 21 2021"

[20] Mortality rates for thyroid storm, also known at thyrotoxic crisis, approach 20%.  See Carroll and Matfin, Endocrine and metabolic emergencies: thyroid storm.  Ther Adv Endocrinol Metab 2020 Jun: 1(3): 139-145.

Chronic care form reported that patient had rales, irregular respiration, and pale mucosa with no explanation for findings.[21]  That patient has pre-diabetes, as identified in lab work (random blood glucose over 100),  was not included in problem list, chronic care form or progress notes.

█████ – 27 yo inmate whose pregnancy was detected on 7/15/21 (she had refused pregnancy testing at booking on 5/11/21) did not have her first OB visit for prenatal care until 8/24/21 at which time she was well into 2nd trimester (19 weeks). Sufficient efforts not made to have patient seen in first trimester.

█████ – 26 yo male with trauma to left foot was examined in NMC ER before booking.  No fracture was seen.  Patient complaints of severe continued pain and hypersensitivity thereafter were suspicious for complex regional pain syndrome (CRPS)[22].  He returned from orthopedic visit on 8/19/21 with no note addressing the foot complaint. A report from the orthopedic consultant that recommended PT was placed in EMR on 8/25/21. There was no documented discussion with orthopedic specialist or patient regarding possible CRPS.

█████ – 44 yo obese male with hypertension was seen in nurse sick call on 10/24/21 for headache and fever (clinic temperature was 99.9)[23].  He was assessed as having dental pain.  No COVID testing done at that time. Rapid COVID test done on 10/26/21 was negative. This patient was especially at risk from COVID complications because of obesity and hypertension.  He should have been isolated pending results from immediate COVID testing.

█████ – 20 yo male booked on 5/9/21, with strongly positive PPD (25mm) read on 5/12/21.  Chest X ray on 5/17/21 suggested active TB.  Patient sent to NMC for treatment. Delayed Chest X ray (more than 72 hrs.) after positive TB test exposed inmates and staff to TB.

## PATIENT DEATHS

Four patient deaths have been reported to date in 2021.

---

[21] Rales (crackling lung sounds), irregular respirations and pale mucosa are signs of severe illness that requires immediate attention.  The entry of these findings in the chart were probably errant.

[22] CRPS is a term describing excess and prolonged pain following an injury to arm or leg.  The condition typically follows injuries with or without fractures.  CRPS, especially if untreated, can be crippling.  See National Institute of Health Complex Regional Pain Syndrome Fact Sheet.

[23] A patient's complaint of feeling feverish must be taken seriously.  Temperatures fluctuate over time and the office reading might be lower than experienced at some prior time.  A temperature of 99.9 is indubitably abnormally high and should be regarded as a fever.

**Patient** ███████ **(CR)**  - see April audit report. I found no lapses in medical care.  I defered analysis of this death to the mental health expert.

**Patient** ███████ **(BS)** – Suicide. June 6, 2021.   I found upon review of the        EMR that the medical care was appropriate and not related to his death.

**Patient** ███████ **(TP)** -  Suicide. August 5, 2021.    I found a deficiency in the July 15, 2021 chronic care note.  This note does not document that the PSA level measured on July 2 was rising substantially, and consistent with prostate cancer.  The note suggests but does not clearly state that the patient did not care to know the results of his PSA test.  The patient appears to have not been informed that he needs further tests to determine whether he has prostate cancer. [24]

Notwithstanding this departure from best practices, the care provided by medical staff did not appear to be related to or cause this patients demise by suicide.

**Patient** ███████ **(SG)**  -

(SG) age 39, died at 7:30 am (according to NMC) on 9/24/21 following an apparent sudden respiratory and circulatory collapse.

Approximately 4 months prior to being booked at MCJ on 1/22/21 SG had been treated for deep vein thrombophlebitis (DVT).  SG claims to have been taking his anticoagulation medication, although not clearly in accord with medical directions.   The NMC ER physician seeing SG for clearance for his January admission to MCJ wrote a prescription to continue anticoagulation with the drug Eliquus that SG had been taking to prevent blood clotting. A determination was made by MCJ PA that no anticoagulating drug was needed because an ultrasound done in January 2021 showed no blood clots.  SG was being monitored in MCJ for recovery from COVID and had normal vital signs documented at 4 am on 9/24/21.  Three hours later his pulse was 135 on EKG, with markedly distressed breathing and no obtainable blood pressure.  Notes from MCJ are hard to interpret as the times for care provided are later than the time of death.  The note for 0743 and 0838 are the same:  patient is cold and clammy, pulse 146, respiration 24, no blood pressure.

---

[24]  Patients tacitly request to know the results of tests they undergo willingly. Failure to disclose such test results violates applicable standards of care and state law.   "The health care professional at whose request a test is performed shall provide or arrange for the provision of the results of a clinical laboratory test to the patient who is the subject of the test if so requested by the patient, in oral or written form." CA Health & Safety Code 123148.

SG sudden demise is suspect for massive pulmonary embolism (PE) arising from DVT because of his past history of thrombosis and lack of anticoagulation.  SG risk for thrombotic events was increased when he became ill with COVID as discussed below. Autopsy results are pending.

Without regard to the autopsy results, the care for this patient was not in accord with the implementation plan and applicable standards of care.   The treating PA should have been managing SG with oversight from her superviso.  Determination of treatment for DVT is beyond the usual scope of practice for CA licensed PA, and not established in any MCJ protocols.  There is no indication that the decision to not provide Eliquus was made in collaboration with any physician.  The history of prior DVT is extremely important as an ongoing concern. But it was not listed in this patient's summary of Current Problems.

It does not appear that the MCJ medical director was aware that SG had been treated for deep vein thrombosis with Eliquis and that a NMC ER physician had recommended the drug be continued.  In retrospect it is disconcerting that SG never received the prescription for Eliquis at MCJ written for him at NMC, even after complaining to a MCJ NP that he had leg pain and swelling reminiscent of DVT, and after seeing the MCJ medical director for a 6 month exam.

I find additional departures from best practices in the following chart entries:

6/18/21 - NP saw SG when he complains of left leg swelling after hitting left shin on bunk. Exam was described as significant for 1.5 cm larger circumference in left leg compared to right. NP deployed the predictive model of "Well's Score" and determined that DVT was unlikely.  NP diagnosed patient as having leg pain from bump on metal bunk, and thus needed no further testing to rule out DVT. Ibuprofen was prescribed.  However, NP misapplied the Well's criteria, as it did not preclude the possibility of DVT, but rather called for further testing such as D-Dimer to confirm absence of DVT.  Moreover, another prediction test, the Geneva Score that NP ███ did not deploy would have showed SG had an intermediate risk of DVT.

7/6/21 – The medical director's encounter with the patient on this date is disconcerting for several reasons:
1) The note did not describe any history of past DVT, or discuss patients recent complaint of leg pain and fear of recurrent DVT, or that Eliquis had been prescribed by physicians outside of MCJ and not continued after booking.
2) The 6 month exam did not consider the patient in context of DVT as a chronic illness or address SG expressed fears of recurrent DVT.
3) The physical exam was incomplete as the form stated for musculoskeletal review "NA - not applicable."   That is an error as the musculoskeletal exam in a patient complaining of DVT is applicable and extremely important.

4) Careful physician management for this patient was crucial as studies have shown around 15% of patients hospitalized with COVID have DVT/Pulmonary embolism and SG was already at high risk for on account of having had DVT recently.
5)  Whether or not treatment with Eliquis as recommended by the NMC ER would have prevented SG demise, appropriate care for SG at MCJ should have included management and prescribing of Eliquis by a physician experienced in managing DVT.

9/10/21 - SG is seen by RN for cold sweat, cough, body ache, headache.  Respiratory condition form includes onset for 2 days, with dry cough, fatigue, sore throat, congestion, chills.  Temperature of 99.3 is an elevated temperature. Pulse rate of 112 is above the threshold for concern and requires repeat and/or further evaluation.  Exam stating "in no apparent distress" belies apparent distress with symptoms, interference with ADL and abnormal vital signs. assessment is "cold like symptoms."  RN described findings that sound much more like COVID than a cold.  Especially in a patient overweight with history of DVT, the possibility of COVID and need to treat must be considered and referred to MD. COVID testing not offered until 9/11.

9/22/21 – SG was sent to regular housing without exam and notwithstanding history of DVT.

I have not seen the death review performed by MCJ and Wellpath staff. In accord with Wellpath protocols and California state law this death review should be completed on or around October 22, 2021.

## PATIENT INTERVIEWS

The patients speaking to me at this audit visit (3 females and 3 males) reported no specific problems with access to primary care or specialists.  The care provided to these interviewees at MCJ seemed adequate in my follow up review of their medical records.

## STAFF INTERVIEWS -

I spoke with the following staff.

Medical Director, MCJ

Physician Assistant, MCJ

The medical director reported he was working with a new peer review tool to better assess PA and NP performance.  This tool had not yet been deployed.  The medical director stated he would be applying the latest CDC recommendations to screen for latent TB in patients with history of prior BCG vaccination.

MCJ PA stated that she and her colleague NP spent much time dealing with patients who had complaints of oral pain and delayed dental care.  PA also stated that turnover in nursing staff impaired efficient triage of patients with medical needs.

## PLAINTIFFS' ATTORNEY INQUIRIES

Plaintiff attorneys sent me on September 24, by electronic mail only, a "pre-tour letter" describing concerns they would like me to discuss in the course of this audit. I attach that letter and my response as Exhibit D.

## DISCUSSION

MCJ has not improved its compliance with the Implementation Plan since the last audit. Lax supervision of physician extenders, insufficient safety measures in storing narcotics, departures from CDC guidelines for treatment of latent TB, inattention to abnormal vital signs and delayed COVID testing for symptomatic patients stand out as notable lapses. The corrective action plan (CAP) designed to address these problems has not been fully implemented.    I attach a summary of the progress made with the CAP provisions as reported by Wellpath staff.  I have not verified these assertions that show approximately 50% CAP implementation. Thus, there is much work to be done in this regard even by Wellpath's self-assessment.

## CONCLUSIONS

There have been no substantial improvements in performance at MCJ since April 2021. Demonstrated deficiencies appear in the same areas as noted in prior audits.

1) Physician supervision of PA, NP and RN care is not always provided as needed.

2) Nurses do not verify or report abnormal vital signs.

3) Intake nurses do not consistently accurately assess intoxicated and withdrawing patients in accord with applicable protocols for appropriate monitoring and treatment.

4) Nurses fail to perform sick calls in accord with approved nursing protocols and/or delay necessary referrals to PCPs.

5) Chronic care visits and health care maintenance encounters (annual physical) do not consistently address all significant chronic and and/or acute problems that merit attention.   Major medical problems are not consistently documented in the problem list.

6) The EMR does not adequately document instructions and medications provided to patients who need medical attention upon release.

7) Necessary specialty care is not consistently and timely provided.  Reports from specialists or medical visits outside of the jail are often delayed or not found at all in the medical record.

8) Patients at risk of latent TB and other infections (such as chronic hepatitis C, HIV) are not consistently offered appropriate screening tests and informed about their condition and treatment options.

## RECOMMENDATIONS –

1.  Untoward medical events at MCJ, such as hospital admissions or deaths, should be promptly reviewed with pertinent staff and in committee with documented corrective actions.  CQI staff meetings at MCJ should be convened each month.
2.  The medical director should be informed on a regular basis of all patients housed in MCJ who are at relatively higher risk than most patients for adverse health outcomes.  The medical director or assignee should review the medical record of these patients and enter in the addendum section documentation appropriate for the circumstances.  Patients at relatively higher risk include, but are not necessarily limited to the following:
    a. Patients placed in sobering cells
    b. Patients prescribed 10 or more medications
    c. Pregnant patients
    d. Patients with diagnosed cancer
    e. Patients with abnormal radiological studies such as severe osteoarthritis, fractures, heart failure, pneumonitis, osteomyelitis, spinal cord impingement, and possible cancer.
    f. All formal grievances filed at MCJ
    g. Patients returned from emergency room or returned from hospital
    h. Patients returned from visits to specialists
    i.  Patients with positive TB skin tests
    j. Patients over age of 65

3. RN and PCP should read the nursing protocol applicable for the patient under care and follow the directives therein. Continuing medical education, referencing authoritative sources such as Uptodate, should be provided to all medical staff to supplement nursing protocols.  Practice agreements should be reviewed and revised to comport with California law (amended in 2020) and signed by current physician supervisor(s).

4. MCJ staff should receive updated instruction in the proper use of EMR to record significant findings.  Abnormal vital signs must be repeated, recorded, reported, and referred for appropriate follow up.

5. Training of nursing and medical staff in treatment of patient pain complaints, should focus on most common causes of pain complaints such as dental disease, chronic back pain and drug habituation.

6. Patients at risk should be screened for HIV, HCV, and STD.[25]  Screening for TB in patients with history of BCG vaccination should include interferon-gamma release assay, such as QuantiFERON TB Gold+.[26]  Patients found to have HIV, HCV or latent TB should be counseled about treatment options.

7. Withdrawal protocols should be rigorously followed.  Patients with signs of delirium should be transported urgently to the hospital unless an on-site PCP exam provides justification for observation and treatment at MCJ.

8. The medical record department should obtain and post in the EMR reports from specialists, outside medical care, and other documents at the times of service and as requested by PCP including the results of radiological studies.

9. MCJ medical leadership should oversee the prompt review and action taken for patient grievances.

10. The medical CAP should be modified in accord with these recommendations. The CAP should be updated to account for goals achieved and actions still pending.

11. Medication administration, including storage of narcotics and non-narcotic drugs, should be supervised by a pharmacist.


## Attachments:

Ex. A:  MCJ HC Audit Monitoring Tool

---

[25] The CDC currently recommends "opt-out" HIV testing in correctional settings. Testing for chronic hepatitis C is reasonable under same rationale.

[26] See, e.g., Lewinsohn, DM et al. Official American Thoracic Society/Infectious Disease Society of America/CDC clinical practice guidelines: diagnosis of tuberculosis in adults and children.  Clin Infec Dis. 2017:64)2):111-115.

Ex. B:  MCJ HC Physician Case Review

Ex C:   MCJ Corrective Action Plan – Summary of Implementation as of October 2021, as reported by Wellpath staff.

Ex. D1 and D2:  Plaintiff to Barnett pre-tour letter 9/24/21 requesting my response to concerns, and my response (Ex D2)

# Exhibit 12

# MONTEREY COUNTY JAIL
# HEALTH CARE AUDIT

July 20, 2022 (Final Report)



Bruce P. Barnett, MD, JD – expert medical monitor

## TABLE OF CONTENTS

INTRODUCTION ........................................................... ................................................................................3

SUMMARY OF FINDINGS ........................................................................................................................3

SUMMARY TABLE ........................................................... ...................................................................7

METHODOLOGY............................................................................................................................................7

SUMMARY OF CASE REVIEWS............ .................................................................................................9

ADDITIONAL CASES. ................................................................................................................................12

DEATHS...........................................................................................................................................................13

PATIENT INTERVIEWS.............................................................................................................................16

STAFF INTERVIEWS....................................................................................................................................16

PLAINTIFFS' ATTORNEY INQUIRIES....................................................................................................17

RECOMENDATIONS....................................................................................................................................18

CONCLUSIONS..............................................................................................................................................20

LIST OF ATTACHMENTS .........................................................................................................................21

# INTRODUCTION

Based upon my review of healthcare services provided to patients[1] housed at Monterey County Jail (MCJ) from November through May 2022, MCJ does not appear to be providing medical care in compliance with the Implementation Plan.[2] In assessing the adequacy of healthcare at MCJ I look primarily to the standards/requirements elucidated within the Implementation Plan.  I also refer to CFMG Policy and Procedure Manual (April 2015), CMGC Nurse Protocols (July 2018) and the Wellpath Policy and Procedure Manual – Monterey County California (April 2020).[3]  Wellpath Policies make frequent reference to guidelines from the  National Commission on Correctional Health Care (NCCHC)

This report describes my findings in regards to the following:   a) compliance with standards of care described for each of the quality indicators cited in the court-approved Implementation Plan  b) analysis of care provided to patients described in "Physician Case Review," c) review of deaths occurring at MCJ or immediately following MCJ incarceration, d) further notable departures from Implementation Plan  e) matters brought to my attention by attorneys for Plaintiffs,  f) quality management including supervisors' audits of MCJ healthcare providers, g) interview of MCJ patients on site, h) interviews of MCJ healthcare staff and i) facility inspection.

The audit tools and raw data referenced in this report are provided as confidential documents to the parties and attached to this report. See Ex. A, Case Review and Ex. B Monitoring Audit Tool.

## SUMMARY OF FINDINGS [4]

The corrective action plan (CAP) finalized at the end of April 2021 appears to not have been fully deployed at MCJ during much of the time subject to this audit.  Thus, many lapses noted in prior reviews were observed during this audit as well. Indeed, the overall performance "score" (see methodology below)  is not substantially improved since the last audit. See Summary of Implementation Plan Compliance and Methodology, below.

---

[1] Pursuant to a February 2021 position statement from the National Conference of Correctional Healthcare recommending the use of "humanizing language," this audit report refers to incarcerated persons receiving medical attention as "patients" in place of the term "inmate" used in past audits.

[2] CFMG Implementation Plan (5:13cv-02354-PSG document 532 Filed 04/01/16)

[3] California Forensic Medical Group (CFMG), an original defendant in Hernandez v. Monterey County, has evolved through corporate mergers and acquisitions to become Correctional Medical Group Companies (CMGC) and most recently Wellpath.

[4] Booking numbers are provided to illustrate findings, described further in Ex. A and B.

**Intake** was <u>not substantially compliant</u> with the Implementation Plan.

Intake nurses did not consistently refer patients to PCP for significant clinical conditions (new or chronic), did not regularly obtain blood sugar reading from diabetics, failed to consistently elucidate the extent of substance abuse, often did not verify and/or act upon abnormal vital signs (i.e. repeat and/or follow up as indicated by the Implementation Plan), and/or consistently failed to contact PCP for consultation when needed, such as when dealing with problems not covered by Nurse Protocols. ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

**Access** <u>was not substantially compliant</u> with the Implementation Plan.

Sick call requests were not consistently managed by nurses as required under the Implementation Plan. Inmates are not timely seen following their written request for sick call.  Face to face assessments were delayed.  Nurses provided care that seemed to exceed their legal scope of practice by failing to follow the nurse protocol or by not appropriately referring to PCPs patients needing treatment for conditions that nurse protocols do not cover. ████████████████████

███████████████████████████████████████████████████████████

████████████████████████

**Chronic Care** <u>was not substantially compliant</u> with the Implementation Plan.

Patients eligible for chronic care were not consistently seen timely by PCP following intake.  Major medical problems were sometimes not documented in the problem list. Chronic care forms were incomplete. ███████████████████████████

███████████████████████████████████████████████████

**Healthcare Maintenance** <u>was not substantially compliant</u> with the Implementation Plan.

Annual examinations were at times incomplete and lacked full physicals.  Some annual exams inaccurately reported diagnoses, medications, and/or significant laboratory abnormalities.   National guidelines for human immune virus (HIV), chronic hepatitis C infection (HCV)  and sexually transmitted diseases (STD) screening were not followed. Patients with latent TB, HIV and/or Hepatitis C infections were not counseled about options for immediate versus delayed treatments.  Womens' health care did not meet applicable community standards. ████████████████████████████████

███████████

**Continuity of Care** was not substantially compliant with the Implementation Plan.

Forms that referred to "attached" documents for information about medication dispensed or ordered on release were not included in the EMR.  In some cases, there was no documented follow up instructions for patients released with serious and unstable conditions.  Transfer documents were sometimes inaccurate.  ███████
████████████████████████████████████████████████████
███████

**Intoxication Care and Detoxification** was not substantially compliant with the Implementation Plan.

Intake nurses did not consistently contact the on-call PCP for orders for patients at risk of withdrawing from multiple substances. Patients with relatively subtle symptoms of withdrawal (uncooperative, ataxia) or described as overtly impaired were sent put in sobering cells or sent to GP without consultation by PCP to ensure that such placement is safe. ████████████████████████████████████████

**Tuberculosis and other Infections** was not substantially compliant with the Implementation Plan.

Patients with unequivocally positive PPD (many of whom had received a  BCG vaccine) were not promptly evaluated with QuantiFERON testing to confirm diagnosis of latent TB.[5]  Most patients with latent TB were not counseled to discuss their condition and treatment options.  Patients with Covid symptoms were not consistently tested for Covid infection.  Patients were not screened for HIV, HCV and STD in accord with state law and national standards of care. ████████████████████████████████████
████████

**Pharmaceutical Administration** [6] was not substantially compliant with the Implementation Plan.

Multiple-dose vials/tubes did not all bear dates of first use and expiration.  The EMR revealed examples of medications prescribed without appropriately documented indications,  examinations, and/or physician supervision. The EMR did not consistently

---

[5] QuantiFeron is described by the CDC as a "TB blood test" that may be used in place of PPD (purified protein derivative)  tuberculin skin testing (TST).  TB blood tests can verify the presence or absence of tuberculosis infection detected by PPD.  CDC guidelines state that TB blood tests are the preferred method to testing for persons who have received BCG TB vaccine.
[6] Pharmaceutical Administration considerations include choice of medications and filling PCP authorized prescriptions while incarcerated and upon release.   Nurse dispensing on med lines is a separate category – "RN Administration On-Site".

document provision of needed medications to patients upon their release.  █████
████████████████████████████████████████████████████████

**Outside Referrals** were <u>not substantially compliant</u> with the Implementation Plan.

Necessary specialty care was not consistently provided in timely fashion.  Written
reports from outside providers were not consistently available in the EMR.  PCP review
and follow up on visits to outside care was not consistently documented.  ████████
████████████

**Nurse Administration of Medications** – The administration of medications at MCJ by
nurses on medication rounds <u>was observed to be substantially compliant</u> with best
practices and with the Implementation Plan.

**Staffing – Administrative, PCP, RN, medical records, and support**  –  Staffing
during the past three months appears to have been <u>not substantially compliant</u> with the
Implementation Plan.  MCJ has no Director of Nursing.  The Medical Director and Nurse
Practitioner are on site three days a week (Fri, Sat., Sunday).  The only on-site PCP for
Monday through Thursday is a Physician Assistant.  Telephone contact and oversight of
the physician assistant is improved compared to prior performance.  But the overall
access to medical care for MCJ patients is not sufficient to meet the apparent needs.

**Clinic Facilities** - Clinic Space and equipment is <u>not substantially compliant</u> with the
Implementation Plan.  Exam rooms do not have scales that provide accurate patient
weights.[7]

**Quality Assurance –** was <u>not substantially compliant</u> with the Implementation Plan.
Quality assurance programs, including formal chart review by the medical director did
not comport with the Implementation Plan.  See page 23, requiring physician to
countersign no less than 10% of all charts wherein treatment is provided by a physician
assistant, nurse practitioner or registered nurse.[8]   During the 6 months reviewed for
the instant audit, MCJ medical leadership did perform formal chart review to assess

---

[7] I understand that plans to calibrate scale have been sidelined by the pandemic and staff shortages.  The
importance of accurate weights is highlighted by the vigilance of the acting Medical Director at MCJ who brings to
the exam room he is using a calibrated scale.

[8] See, also California Physician Assistant Practice Act, effective January 1, 2020, requiring that PA services are
rendered pursuant to a "practice agreement" that establishes methods for continued evaluation of PA
competency.  Cal  B & P code 3502.3.  Nurse practitioners must designate a physician collaborator.  RN services,
including services by a NP,  are subject to oversight by a supervising physician who must approve the protocols
that direct care delivered to patients by the RN and NP.  California Code of Regulations 1485. Nursing Practice Act
2725, 2834-2837.

PCP and RN performances.  Grievances were not reviewed regularly by medical leadership to ensure adequate corrective action for lapses regarding individual patient care.

Wellpath Monterey County California Policies & Procedures, effective 6/2/2019, call for the establishment of a continuous quality improvement (CQI) committee involving the MCJ medical director as well as physician extenders (physician assistants, nurse practitioners), nursing, mental health, dentistry, health records, pharmacy, and laboratory.  I have not seen CQI minutes for the first quarter of 2022.

## Summary of Implementation Plan Compliance [9]

| TABLE 1          Quality Indicator | Compliant/Not Compliant | % Compliant | Comments |
|---|---|---|---|
| 1.  Intake Screening | Not Compliant | 51.2% | see text and worksheets |
| 2.  Access to Care | Not Compliant | 64.8% | see text and worksheets |
| 3. Chronic Care | Not Compliant | 65.9% | see text and worksheets |
| 4. Health Care Maintenance | Not Compliant | 46.2% | see text and worksheets |
| 5. Continuity of Care | Not Compliant | 7.4% | see text and worksheets |
| 6. Outside Care Referrals | Not Compliant | 33.3% | see text and worksheets |
| 7. Detox/Withdrawal | Not Compliant | 50.0% | see text and worksheets |
| 8. Tuberculosis/Infection Control | Not Compliant | 61.9% | see text and worksheets |
| 9. Pharmaceutical Storage and Dispensing; refusals | Not Compliant | 50.0% | includes discharge meds.  See text, worksheets |
| 10. Administration and staff on  site | Not Compliant | na | percentage not applicable |
| 11. RN Medication Administration On site | Compliant | 100.0% | see text and worksheets |
| 12. Physician/Provider Case Review | Not Compliant | 33.3% | 9 out of 27 cases reviewed were managed adequately |
| Overal Audit Score | | 51.3% | |

## OBJECTIVES, SCOPE, AND METHODOLOGY

## Methodology

The Summary Table shows the percentage of clinical encounters reviewed that demonstrated compliance with the described performance parameter.  For this audit,

[9] My assessment of administration and staff on site considered staffing,  quality assurance and facilities.  The performances regarding these matters are not reported in this table with a percentage compliance.

the "compliance rate" is derived from the findings compiled in the "Physician Case Review Tool" as well as the "Monitoring Audit Tool." These spreadsheets are attached.

The overall "score" represents an average of the degree of compliance for 11 quality indicators in which a percentage calculation was performed.  Evaluation of administration and staff include considerations of facilities and quality assurance programs.  I do not measure compliance of these performances in percentage terms.

The calculated scores are imperfect measures, offered for comparison to previous MCJ audits that use the same methodology.  I observe that the overall score for this audit has improved marginally from 45% to 51%.

This audit does not presume that there is a "benchmark" percentage that indicates compliance with the plan.   A single serious lapse in care otherwise adequate may suffice to indicate non-compliance with the plan. Conversely, finding multiple minor departures would not necessarily negate the assessment that patient care is overall adequate.

## Quantitative Review

Eleven components of medical care are identified in the Implementation Plan:  Intake Screening, Access to Care, Chronic Care, Health Care Maintenance, Continuity of Care, Outside Care Referrals, Detox/Withdrawal, Tuberculosis/Infection Control, Pharmaceutical Management (including storage of medications, and appropriate prescribing), Administrative Services (staffing) and Dispensing Medications on Site. Physician/Provider case review includes an assessment of care provided by nurses (RN) as well as by PCP (MD, DO, FNP, PA).  For each of the medical care components, the Implementation Plan ascribes multiple quality indicators.

## Qualitative Review

This audit considers whether MCJ complies with the proviso in the Implementation Plan that requires medical services be provided "in accordance with community standards." [10] Case reviews consider the adequacy of care in accord with generally accepted principles of medicine and applicable standards, aside from elucidated performance parameters.

I rely upon my training, experience, and authoritative references to evaluate compliance with community standards. Publications I refer to in determining current best medical practices (applicable community standards of care) include but are not limited to UpToDate, Centers for Disease Control (CDC), United States Preventive Task Force (USPTF), Cochrane Reviews/Cochrane Library, American Family Physician and New England Journal of Medicine.

---

[10] See Settlement Agreement, page 2-3; Implementation Plan page 8.

Adequacy of staffing, staff supervision, medical facilities, and quality management are described as compliant or not without citing percentages.

## SUMMARY OF CASE REVIEWS

Medical services reviewed in this audit that do not comport with community standards and thereby place patients at substantial risk of harm are considered "inadequate."  Of 27 patients listed in "case reviews" 18 appeared to have received inadequate care.

Case 1,  Inadequate care. 48 yo male booked 112/25/21 with opioid use disorder reportedly receiving suboxone.   Admitted to GP with COWS protocol and routine medical evaluation ordered for +5 days.  Mental health referral done.  MH eval is documented 11/25.  Patient at high risk for HIV, HCV is not tested even after request made by patient for HIV test.  Dental pain reported as 8/10 at Nurse Sick Call requires that nurse contacting PCP for adequate pain relief, but no documented encounter or orders from PCP.    Patient care does not comport with Implementation Plan for access to care and does not meet standards for best practices as CDC recommends universal HCV, HIV, STD testing subject to opt-out requests.

Case 2  Inadequate care.  51 yo female 54 booked in MCJ complaining of breast discharge, visual disturbance and feeling pregnant two months after October 21, 2021 intake.  Prolactin levels found elevated.  MRI recommended by supervising physician on January 13, 2022.  MRI done 5/17/22 reveals microadenoma in pituitary.   As of May 22, 2022 there is no indication in EMR that patient has been seen by PCP to explain test results, and/or referred to endocrinology in light of persistent headaches that suggest the adenoma merits medical or surgical intervention.

Case 3 Inadequate care.  58 yo obese male with multiple medical problems, including foot ulcer, skin abscess, morbid obesity, DM2 controlled with metformin, renal insufficiency, and atrial flutter.  Specialty care not timely provided.  Recommendations from specialists for anticoagulation not timely followed, placing patient at substantial risk for stroke. Patient reported that he needed CPAP for diagnosed sleep apnea, included on the problem list.  MCJ clinic notes indicate that patient would not receive CPAP therapy unless the equipment is  brought to jail by family.  The care, with delays or exclusions of necessary treatment,  does not comport with the Implementation Plan.

Case  4.  Inadequate care.  59 year old male with chronic substance abuse and borderline malnutrition (BMI 19.7) documented on 1/11/22 intake.  BMI documented on 2/8/22 at 17.5, clearly abnormal but described by PA as "near normal." PCP evaluation of weight loss and multiple GI symptoms is incomplete without consideration of lactose intolerance, gluten intolerance or other GI conditions.

Case  5    Inadequate care.  60 yo immigrant from Vietnam treated with INH for latent TB.  Cold symptoms not tested for COVID.  Sick call requests in 2021 not timely reviewed.

Case 6  Adequate care.

Case 7. Adequate care.

Case 8.  Inadequate care.  40 yo with brain injury.    Intake reported slurred speech, blurry vision, headache as residual effect of brain injury.  Cleared in ER before booking.  Patient should be followed for chronic condition. First PCP exam (for URI). was more than 30 days after intake.  Initial Chronic Care visit 3 months after intake.

Case 9:  Inadequate care.  1) No referral to PCP when patient claims she is pregnant at intake. No HCG test obtained. 2)  Chronic Care (history of SLE) and HCM visit delayed and incomplete.  3)  Transfer forms upon release to another facility inaccurately report that patient received "no medical treatment" (she did receive treatment from mental health, and for vaginitis) and that RPR had not been tested (it was tested and found negative).

Case 10.  Adequate care.

Case 11. Inadequate care. 30 yo male with dilated cardiomyopathy, probably related to IV drugs, alcohol, synthetic/stimulants abuse.  PCP evaluations delayed and incomplete.  Placed on synthetics withdrawal protocol, but not CIWA.  CDC guidelines for HCV, HIV and STD testing not followed.

Case 12. Adequate care.

Case 13. Inadequate care.  25 yo schizophrenic patient appears intoxicated and uncooperative during intake in October 2021 and January 2022.  No PCP evaluations provided at those times to rule out delirium.

Case 14. Inadequate care. 23 yo male with asthma, MRI evidence of labral tear is incompletely and inaccurately assessed at intake March 2022.   Attention to hip pain delayed. Pain management initially not well documented, and possibly inadequate.

Case 15. Adequate care.

Case 16. Inadequate care. 36 yo with history of substance abuse. Problem list is incomplete at intake.  Chronic care visits not timely.   Patient's claim of needing chronic antibiotics 9 months after MVA is not investigated timely.  More than 40 days after requesting antibiotics, information obtained from prior physicians that long term antibiotics are indicated to suppress infection in knee prosthesis.  No testing done for HIV, HCV or STD despite risks.

Case 17  Inadequate care. 62 yo booked 3/13/22 with history of IV Heroin, methamphetamine abuse and alcoholism. Patient reports history of COPD requiring meds. Skin lesions not addressed to consider diagnoses of scabies or formication.[11]  No screening for HIV, HCV, STD documented. No attention documented at booking regarding opiate or synthetics withdrawal. Patient is sent to ER for withdrawal 5 days after intake without PCP follow up. Formal Chronic Care visit not timely. Abnormal vital signs not verified or followed up.  8/10 pain was not discussed with or referred to PCP. Release to prison was not accompanied by documented instructions in EMR for continued healthcare.  Transfer form incomplete.

Case 18. Adequate care.

Case 19 Adequate care.

Case 20 Inadequate care. 52 yo female reports being raped shortly before arrest. Abnormal vital signs not repeated. Is not provided/offered GYN examination and/or treatment for vaginal discomfort. Possible finger fracture after injury in door not seen by PCP and no X ray obtained.

Case 21. Inadequate care.  58 yo alcoholic, diabetic male not placed into CIWA when booked.  Following his complaint of pain in both feet. PA makes a diagnosis of gout flare with no face-to-face exam, and no confirming lab tests (no uric acid).  The treatment with NSAIDs is appropriate. But prescription of allopurinol in most acute attacks is disfavored as the administration of that drug should be delayed until blood tests establish the uric acid level.

Case 22. Inadequate care.  68 year old male with deteriorating cognitive function has not been provided with any accommodations for this disability.  PCP did not order a workup to determine presence of reversable causes of dementia.

Case 23.  Inadequate care. 37 yo female with history of latent TB.  No follow up in jail to determine eradication of TB infection.  Dental care for severe carries delayed.

Case 24. Adequate care.

Case 25, Adequate care.

Case 26.  Inadequate care. 36 yo male.  Tattoo reported on patient is not described but is likely a "jail house" tattoo that puts patient at high risk for HCV.  No HCV, HIV or STD testing offered or performed.

---

[11] Formication – a sense of bugs under the skin – may cause a methamphetamine addict to obsessively pick at his/her skin and produce ulcers that can get infected.

Case 27.  Inadequate care.  36 yo female testing positive on booking for amphetamines, opiates.  Reports unprotected sex.  Patient is clearly at high risk for GC, Syphilis, HIV and HCV diseases but is not tested.  Initial HCG testing was negative, but patient reported missing period a month later with suspicions that she could be pregnant. Patient is tested by urine for vaginitis and treated for positive trichomonas and BV.  No pelvic exam is documented, Evaluation of this patient's complaints is incomplete.  The menstrual irregularity could be due to pregnancy, missed abortion or gynecological disease.

## ADDITIONAL CASES  [12]

▓▓▓▓▓ - : 23 yo male.  Intake on 3/14/22 documents that patient had been prescribed duloxetine while in prison just before transfer to jail.  This drug appears to not be continued after booking.  Abrupt cessation can cause severe withdrawal symptoms. His labral tear and asthma are not included on problem list.

▓▓▓▓▓ – 46 yo female patient with abnormal vital signs, alcoholism is not seen by PCP despite concern for DTs that required hospital clearance. Screening for HIV, HCV, STD not documented.  While incarcerated complains of rash, and vaginal bleed. No PCP examination documented to address these or any other complaints.

▓▓▓▓▓ – 45 yo male with history of alcohol and methamphetamine abuse is placed in safety cell on 1/4/22 due to bizarre and uncooperative behavior.  He is seen by psychiatrist on 1/6/22.  He is not seen by a PCP following intake to rule out delirium.

▓▓▓▓▓ - 29 yo homeless, IV drug user.  Has bizarre, intoxicated appearance at intake. Elevated pulse persists for days.   Clearance by ER does not excuse PCP from obligations to perform face to face exam to rule out complications of IV drug use including infections (which he does develop during incarceration).  No documented screening for HIV, HCV, STD.  Blood glucose not checked as required by intake form.

▓▓▓▓▓ – Schizophrenic 66 yo homeless male does not cooperate with medical or mental health providers. After multiple admissions to MCJ he has recently been considered a candidate for involuntary medications.  He appears to have been released without documented prescriptions to continue his chronic care medications or follow up instructions.

---

[12] These cases are notable but do not represent an exhaustive list of all departures I detected.  The attached document "MCJHC Monitoring Audit Tool" describes in detail the incidence of compliance and noncompliance with Implementation parameters.  Approximately 100 patient encounters were reviewed and listed in the Audit Tool, Exhibit A. I detected departures from the Implementation Plan requirements in approximately 35% of the patient encounters reviewed. Multiple departures from Plan requirements (also referred to as quality indicators) in some encounters resulted in an overall compliance "score" of just over 50%.



██████ – 30 yo female in second trimester of pregnancy is released 12/29/21 without instructions for perinatal care.  MCJ  appears to make no effort to contact patient after release to ensure adequate follow up care, including medications.

██████ – 38 yo alcoholic male placed in sobering cell for being under the influence not entered into CIWA protocols at intake, but instead 48 hours later.

██████ – 35 yo female described on intake as fit for general population, following clearance at hospital.  Seen by mental health who describes bizarre, uncooperative behavior requiring safety cell.  Intake note inconsistent with the mental health note. No documented examination by PCP to rule out delirium.  No CIWA, COWS or synthetics protocol.  No documented discharge instructions or follow up to show improved condition.

██████ 62 yo male with positive QuantiFERON test, placed on 12 weeks of anti TB therapy.  Appears to have been released in midst of therapy.  No documented continuity of medications or continuity of care in community.

██████ – 36 yo male with HIV appears to be denied prescription for HIV meds to continue after release on account of insurance disputes.   No documented engagement by social worker or other staff to refer patient for continuing care.

██████ – 35 yo male admitted on 1/9/22, with positive PPD test reported on 1/17/22. He is released on 1/19/22.  The EMR does not document that patient was informed about the meaning of his positive PPD, and/or options to confirm latent TB and/or treat TB. [13]

## PATIENT DEATHS [14]

**Patient** ██████ **(JCC) -** Patient died at MCJ on April 20, 2022 from what appeared to be suicide.  Patient was known to staff as having attempted suicide on April 19 by strangulation with his shoelace. He was in the sobering cell for suicide watch on April 20 when noted to be unresponsive.  During CPR the airway was noted to be obstructed. Hard white objects (later found to be compressed balls of toilet paper) were extracted

---

[13]   Patients tacitly request to know the results of tests they undergo willingly. Failure to disclose such test results violates applicable standards of care and state law.    "The health care professional at whose request a test is performed shall provide or arrange for the provision of the results of a clinical laboratory test to the patient who is the subject of the test if so requested by the patient, in oral or written form." CA Health & Safety Code 123148.

[14] Only one death is reported during November 2021 through May 2022.  The death of patient ██████ occurred September 24, 2021 is discussed as an update to my prior report.

from nose and oral pharynx with some difficulty but without fully relieving the obstruction prior to the arrival of EMT.

Based upon my review of the EMR for this patient I have the following concerns:

1) Given this patient's persistent severe depression (not communicative) should he have been placed under constant watch to prevent another suicide attempt?  [15]

2)  Should medical providers (nurses and on call PCP) been more assertive in communicating to mental health team this patient's apparent psychic distress.  Absent satisfactory response from mental health staff, should on-site medical personnel contacted supervising medical staff or sent patient to hospital.[16]

3)   Did the extent of this patient's psychiatric/medical condition render him unfit to stay in the jail?  Should he have been sent to the hospital for acute psychiatric care? [17]

4)  CPR does not appear to have been administered in accord with American Heart Association instructions revised in 2010:  1) assess consciousness and call for help while collecting personal protective equipment  2) with patient on hard, flat surface administer 30 chest compressions 3) administer breath and observe chest rise with air flow. Readjust head and neck if 1st breath not effective.  Look for airway obstruction if second breath not effective.  4) continue with 30 chest compressions and 2 breaths thereafter.  5) use AED.

As best I can determine from the medical record, CPR was provided in accord with outdated protocols in which breaths were provided first.  Also, there seemed to be a delay in assessing the patency of the airway.  That is not to say this patient's outcome would have been better regardless of how CPR was administered.  I believe the main issue is whether closer observation or admission to hospital would have prevented the suicide.

I have not seen the autopsy report, which is often not available for many weeks after the death.  I have not seen the death review, required to be produced within 30 days of the event.  (Title 15, Section 1046).  Pending the autopsy and death review report I defer to mental health a determination as to whether MCJ care in this case met the requirements within the Implementation Plan.

---

[15] Toilet paper, food, and other objects have been reported as means by which a depressed/disturbed patients can obstruct their airway.

[16] Medical records do not show that nurses contacted chiefs of medical or mental health services.  The PCP on call contacted while patient was overtly depressed did not document any communication with mental health team, assessment for suicide risk and/or consideration of transfer to the acute hospital.

[17] Plaintiffs' attorney response to my draft raised concerns about compliance with the quality indicators for mental health services elucidated in the Implementation Plan requirements for care.  My comments do not include an assessment of compliance with the requirements or standards of care for mental health services.

**Patient** ████ **(SG)** -   update

(SG) age 39, died at 7:30 am at NMC on 9/24/21 following an apparent sudden respiratory and circulatory collapse.

Approximately 4 months prior to being booked at MCJ on 1/22/21 SG had been treated for deep vein thrombophlebitis (DVT).  SG claims to have been taking his anticoagulation medication, although not clearly in accord with medical directions.   The NMC ER physician seeing SG for clearance for his January admission to MCJ wrote a prescription to continue anticoagulation with the drug Eliquus that SG had been taking to prevent blood clotting. A determination was made by MCJ PA that no anticoagulating drug was needed because an ultrasound done in January 2021 showed no blood clots. SG was being monitored in MCJ for recovery from COVID and had normal vital signs documented at 4 am on 9/24/21.  Three hours later his pulse was 135 on EKG, with markedly distressed breathing and no obtainable blood pressure.

Autopsy dated 10/29/21 reported coronary thrombosis, coronary atherosclerosis and COVID – 19 positive.  Death was attributed to "Coronary Thrombosis."  The coroner did not comment of possibility that COVID increased the patient's coagulopathy previous treated with anticoagulants. The report did not find a massive ptulmonary embolism (PE) arising from DVT that I had suspected because of his past history of thrombosis and lack of anticoagulation.

The autopsy results do not alter my opinion that care provided to this patient failed to comply with the Implementation Plan and was also contrary to applicable standards of care.   The treating PA and NP should have been managing SG with oversight the physician supervisor/collaborator.  The EMR does not show the decision to not provide Eliquus was made in collaboration with any physician. Had Eliquus been continued as recommended by the NMC physician, and in accord with best practices, the risk of fatal blood clots such as occurred in the coronary arteries would have been reduced.

Please see the MCJ Medical Care Audit, November 30, 2021 for my additional comments issued at that time.

I have not seen the death review performed by MCJ and Wellpath staff that should have been completed by end of October 22, 2021.

## PATIENT INTERVIEWS

The patients speaking to me at this audit visit (2 females and 2 males) reported protracted waits for both primary care and specialty services.

Male Patients:  FK did not receive timely specialty care. See case 3.  Patient DA appeared confused and demented during his interview. Medical record review shows that this dementia had been observed but he was receiving no clinical attention and no accommodations.  See case 22.

Female Patients:   SB described one week delay in obtaining care following request for services.  She reported lesions on leg were not attended to for 10 days.  Chart review revealed old history of positive TB test not investigated, and delayed care for severe carries.  See case 23.   Patient MA reported delays of 1 to 2 weeks for medical attention following request for services.  Review of the medical record did not substantiate her complaint.  See Case 24.

## STAFF INTERVIEWS -

I spoke with the following staff:

Acting Medical Director, Wellpath, MCJ

Regional Medical Director for Wellpath at MCJ

Physician Assistant, MCJ

MCJ, Wellpath Implementation Specialist for MCJ

All interviewed staff were eager to implement recommended corrective actions.  They felt that reviewing nursing and provider performances would improve services.  MCJ leadership stated that staffing shortages has made it difficult to provide patient care (seen as the priority) and perform quality assurance in accord with the Implementation Plan.

MCJ has an onsite physician, along with a nurse practitioner, Friday through Sunday.  The Physician Assistant is on site from Monday through Thursday reported having excellent access to physician expertise by phone and e mail. However, the interviewed staff agreed that it has been difficult to meet the demands from the current MCJ jail census of more than one thousand incarcerated persons with the current staffing and staff schedule.

## PLAINTIFFS' ATTORNEY INQUIRIES

Plaintiff attorneys raised concerns regarding following matters, which I report upon herein:

| Plaintiffs' expressed concerns | Expert Medical Monitor Response |
|---|---|
| Staffing is inadequate. | Staffing does not currently meet the Implementation Plan.  My recommendations to address this circumstance are below. |
| Patients do not have sufficient access to care, as measured by number of patients seen daily | By my rough estimate, MCJ PCPs and nurse sick call amount to fewer than 200 encounters each week.  In my experience, incarcerated patients request an average of one visit each month, creating a demand for approximately 250 encounters.  My recommendations to address this are below. |
| Observation cells and associated logs do not protect patients. | The sobering cells – also referred to as observation cells are not under 24-hour direct observation.  Even if a camera viewed all cells patients frequently hide under their blanket. The monitoring log documents frequent checks in accord with the protocols. My recommendations to improve observation are below. |
| Infirmary unit care is not adequately supervised. | Patients residing in the outpatient housing unit adjacent to the main clinic are not formally "rounded upon" with documented clinic notes. My recommendations for regular visits to these patients are below. |
| Patients missing pill call or medications are not seen by healthcare staff. | Patients who do not appear for their pills are subject to custody safety checks.  I did not see any instance of meds refused without clinical staff awareness.  Patient missing 3 or more doses are supposed to be seen face to face.  My recommendations to better enforce that protocol are below. |

## RECOMMENDATIONS:

| Deficiency | Expert's Recommendation |
|---|---|
| **Intake** Nurses do not consistently obtain blood sugar reading from diabetics when needed (such as on intake), document extent of substance abuse, verify and/or act upon abnormal vital signs up and/or consistently contact PCP for consultation when needed for acute problems or unstable chronic conditions. | All nurses, and especially those performing intake, should be trained to properly use COR EMR forms with attention to pertinent findings, vital signs, and protocols. Newly hired nurses and those not previously passing inspection should undergo audits of no less than 10 cases every week until performance consistently meets applicable standards. |
| **Patients do not consistently have timely access to necessary care.** Patient requests for services are often not scanned into the EMR. I cannot determine whether patient care is unduly delayed after a request for service. Sick call nurses do not always follow the protocols such as reporting to PCP pain levels exceeding 6/10. | MCJ leadership should keep a log counting the weekly requests for services to compare with the number of face-to-face encounters (Sick calls). There should be sufficient clinical encounters each week to meet the demand. In service training should familiarize nurses with protocols. |
| **Chronic care and health care maintenance** did not consistently comply with Implementation Plan. Problem lists were not up to date. Patients with long standing drug abuse diagnoses are not treated as having a chronic disease, and thus do not always receive needed attention from PCP after booking. | Patients abusing substances should be scheduled as "chronic care" patients. PCP should verify completeness and accuracy of the Problem list at every visit. Current recommendations by CDC and United States Preventative Services Task Force (USPSTF) should be incorporated (as practicable) into the chronic care and health maintenance protocols. |
| Documentation of care for released patients **(continuity of care) does not meet Implementation Plan requirements or applicable community standards.** | Discharge planning should be a distinct component of care provided to patients at MCJ. A team should be devoted to ensuring that patients receive a supply of necessary medications upon release along with clear instructions for follow up care. Discharge services should be accurately documented in the EMR. |
| **Care for patients unstable at booking, intoxicated or at risk for withdrawal was not** | Protocols for evaluation and treatment of acutely intoxicated should be updated to include assessment by nurse or PCP for |

| | |
|---|---|
| **consistently provided in accord with the Implementation Plan.** Patients sent to sobering cells are not automatically seen by qualified health personnel to assess possible delirium or other alarming conditions that might be best treated in the hospital. | delirium.  Admission to sobering cell should require entry into the EMR of a Sick Call note by nurse or PCP.Constant monitoring ( also known as a "sitter") should be provided to patients who have the highest risk for suicide or self harm.   Patient with persistently abnormal vital signs or in  unstable condition should be seen by a PCP or sent to the hospital |
| **Patients are not consistently assessed for TB and other infections in accord with best practices and community standards.**  QuantiFERON testing is not timely provided for patients with history of BCG or positive skin tests. | Protocols for treatment of TB, HIV, HCV and STD should be updated to reflect current CDC recommendations in line with NCCHC guideline and common practice at other California jails and prisons. CDC recommends testing all booked patients for HIV, HCV and STD. Patients with history of BCG vaccination and past positive skin tests should have QuantiFERON tests as primary means of TB screening. |
| **Pharmaceutical Administration** (includes timely administration of appropriate medications) was <u>not substantially compliant</u> with the Implementation Plan.  Multi dose vials were not consistently labelled with date opened and expiration date. Antibiotics and other drugs were prescribed contrary to best practices. | MCJ should identify a pharmacy director (license pharmacist)  who work on site in person or virtually (e.g. Zoom) and review MCJ compliance with state laws regarding medication storage and dispensing.  The pharmacy director should be available for consultation and be part of the medical team that meets regularly for continuing medical education.  PA, NP and RN prescribing should be overseen by a supervising/collaborating physician. |
| **Necessary specialty care was not consistently provided in timely fashion**.  Written reports from outside providers were not consistently available in the EMR. PCP review and follow up on visits to outside care was not consistently documented | Wellpath leadership should assist MCJ staff to obtain timely expert care by telephone or video link if local resources are insufficient. The medical record department should track all referrals (using the outside referral log) to ensure that reports from specialists are promptly filed in the EMR. The return from outside services should automatically generate MD or RN sick call. |
| **Staffing during the past six months appears to have been <u>not substantially compliant</u> with the Implementation Plan.** | MCJ should have a medical director and director of nurses on site 5 days a week. Support for the medical director should include two full time ancillary providers (PA or NP). |

| | |
|---|---|
| **Exam rooms do not have scales that provide accurate patient weights.** | Scales should be regularly calibrated for accuracy.  Patient weights should be noted with each visit. |
| **Quality assurance programs, including formal chart review by the medical director of all nurse and physician assistant performance were not performed in accord with community standards as articulated in the Implementation Plan, medical group policies and Settlement agreement**. | There should be brief daily "huddles" to bring any difficult matters to attention of the medical and nursing directors.  There should be weekly staff meetings to review challenging cases and provide continuing medical education.  Monthly QA meetings should review adverse events, hospitalizations, and recommendations from the monitors.  The Quarterly meetings should discuss progress on corrective actions and monitor the  peer review process.  The medical director or assignee should audit and countersign  5- 10% of all charts in which document treatment is provided by a physician assistant, nurse practitioner or registered nurse.  Grievances should be timely reviewed by medical leadership to ensure adequate corrective action for lapses affecting particular patients. |
| **The patients housed in the infirmary are not followed by PCP with written progress notes.** | Assignment to an infirmary bed should automatically generate a RN or PCP sick call. that requires  visit by the PCP.  A progress note by RN or PCP should be entered into EMR each day the patient remains in the infirmary.  The patient should be seen by PCP at least once each week. |
| **Patients not taking their prescribed medications do not consistently receive attention from PCP to address noncompliance.** | A PCP sick call should be generated automatically for any patient who does not take prescribed medications three days in a row.  The PCP can respond to that sick call with a chart review or face to face encounter. |
| | |

## CONCLUSION

Staff shortages have complicated MCJ efforts to comply with the Implementation Plan.  MCJ leaders need to revise outdated/inefficient  processes to apply available resources to meet the challenges in patient care.  All MCJ staff should carefully use applicable forms, follow endorsed protocols, and collaborate more often with colleagues.  A robust quality assurance program, including rigorous peer review, can bring performance at MCJ into compliance with the Implementation Plan.

**Attachments:**

Ex. A:  MCJ HC Audit Monitoring Tool

Ex. B:  MCJ HC Case Review

# Exhibit 13

# MONTEREY COUNTY JAIL
# HEALTH CARE AUDIT

December 26, 2022 – Final Report



Bruce P. Barnett, MD, JD – expert medical monitor

# TABLE OF CONTENTS

SUMMARY OF FINDINGS ................................................................................. 2

METHODOLOGY .............................................................................................. 3

BRIEF DESCRIPTION OF FINDINGS.................................................................. 5

# INTRODUCTION

Based upon my review of medical records and site visit on October 13, 2022 I find that medical care provided at Monterey County Jail (MCJ) is not substantially compliant with the Implementation Plan.[1]

This report describes my findings in regards to the following:   a) compliance with standards of care described for each of the quality indicators cited in the court-approved Implementation Plan  b) analysis of care provided to patients described in "Physician Case Review," c) review of deaths of patients in custody at MCJ d) notable departures from Implementation Plan  e) matters brought to my attention by attorneys for Plaintiffs, f) adequacy of quality assurance (QA) including supervisors' audits of MCJ healthcare providers (Peer Review), death reviews, continuous quality improvement (CQI) committee meetings g) interview of MCJ patients on site, h) interviews of MCJ healthcare staff and i) facility inspection, with particular attention in this audit to the medication room and pharmacy management.

The audit tools and raw data referenced in this report are provided as confidential documents.  See Ex. A, Case Review and Ex. B Monitoring Audit Tool.

# SUMMARY OF FINDINGS [2]

---

[1] CFMG Implementation Plan (5:13cv-02354-PSG document 532 Filed 04/01/16).  See, also CFMG Policy and Procedure Manual (April 2015), CMG Nurse Protocols (July 2018) and the Wellpath Policy and Procedure Manual – Monterey County California (April 2020). Wellpath Policies make frequent reference to guidelines from the  National Commission on Correctional Health Care (NCCHC).

[2] Booking numbers are provided to illustrate findings, described further in Ex. A and B.

MCJ compliance seems to have deteriorated since the last audit.  See Table 1, Summary of Implementation Plan Compliance.  Persistent departures from the Implementation Plan discussed in  this report include:

A. Lack of follow up for patients identified by skin tests as possibly having latent tuberculosis infection.
B. Long delays in attending to patient requests for medical services (sick call requests)
C. Failure to screen for HIV, HCV, STD upon intake or soon thereafter, even for patients at high risk for these conditions.
D. Poor or absent oversight of pharmacy services as manifested by my discovery in the medication room of expired medications, improperly labelled multiple dose vials, and delinquent controlled substance logs.
E. Insufficient monitoring/supervision of RN, PA and NP.

## Summary of Implementation Plan Compliance

| TABLE 1              Quality Indicator | Compliant/Not Compliant | % Compliant | Comments |
|---|---|---|---|
| 1.  Intake Screening | Not Compliant | 30.0% | see text and worksheets |
| 2.  Access to Care | Not Compliant | 42.0% | see text and worksheets |
| 3. Chronic Care | Not Compliant | 47.0% | see text and worksheets |
| 4. Health Care Maintenance | Not Compliant | 29.0% | see text and worksheets |
| 5. Continuity of Care | Not Compliant | 46.0% | see text and worksheets |
| 6. Outside Care Referrals | Not Compliant | 33.0% | see text and worksheets |
| 7. Detox/Withdrawal | Not Compliant | 57.0% | see text and worksheets |
| 8. Tuberculosis/Infection Control | Not Compliant | 15.0% | see text and worksheets |
| 9. Pharmaceutical Storage and Dispensing; refusals | Not Compliant | 60.0% | includes discharge meds.  See text, worksheets |
| 10. Administration and Staff On  Site, Clinic Facilities, Quality Assurance | Not Compliant | na | percentage not applicable, see text |
| 11. RN Medication Administration On Site | Compliant | 100.0% | see text and worksheets |
| 12. Physician/Provider Case Review | Not Compliant | 10.0% | 2 out of 20 cases reviewed were managed adequately |
| Overal Audit Score | | 42.6% | |
| | | | |

## METHODOLOGY

The Summary Table shows the percentage of clinical encounters reviewed that demonstrated compliance with the described performance parameter.  For this audit,

the "compliance rate" is derived from the findings compiled in the "Physician Case Review Tool" as well as the "Monitoring Audit Tool." These spreadsheets are attached.

The overall "score" represents an average of the degree of compliance for 10 quality indicators and case reviews. Adequacy of staff, administration functions, facilities and quality assurance programs are assessed without numeric values.

This audit does not presume that there is a "benchmark" percentage that indicates compliance with the plan.   A single serious lapse in care otherwise adequate may suffice to indicate non-compliance with the plan. Conversely, finding multiple minor departures would not necessarily negate the assessment that patient care is overall adequate.

An illustrative example is case 20, patient ███████ (see additional explanation below). From May through October 2022 medical services provided to this patient were appropriate for multiple encounters.  But the discovery in late August that his triglyceride level exceeded 1,000 was not addressed properly.  If not treated adequately, this condition puts the patient at high risk for harm from pancreatitis which can be fatal. Therefore, notwithstanding appropriate care manifest in many clinical encounters, the inadequate attention to patient ███████ on August 30, 2022 does not meet the standards put forth in the Implementation Plan.

The calculated scores are imperfect measures, cited for comparison to previous MCJ audits that use the same methodology.  I observe that the overall score for this audit has substantially deteriorated compared to the prior measure, from 51% to 43%.

## Quantitative Review

Eleven components of medical care are identified in the Implementation Plan:  Intake Screening, Access to Care, Chronic Care, Health Care Maintenance, Continuity of Care, Outside Care Referrals, Detox/Withdrawal, Tuberculosis/Infection Control, Pharmaceutical Management (including storage of medications, and appropriate prescribing), Administrative Services (staffing) and Dispensing Medications on Site. Physician/Provider case review includes an assessment of care provided by nurses (RN, LVN) as well as by primary care providers ( PCP).[3]   For each of the medical care components, the Implementation Plan ascribes multiple quality indicators.

## Qualitative Review

This audit considers whether MCJ complies with the provisos in the Implementation Plan that requires medical services be provided "in accordance with community

---

[3] Primary care providers at MCJ include allopathic physicians (MD),  osteopathic physicians (DO), physician assistants (PA) and nurse practitioners (NP).

standards." [4]   Case reviews consider the adequacy of care in accord with generally accepted principles of medicine and applicable standards, aside from elucidated performance parameters.

I rely upon my training, experience, and authoritative references to evaluate compliance with community standards. Publications I refer to in determining current best medical practices (applicable community standards of care) include but are not limited to UpToDate, Centers for Disease Control (CDC), United States Preventive Task Force (USPTF), Cochrane Reviews/Cochrane Library, American Family Physician and New England Journal of Medicine.

Findings of compliance for staffing, staff supervision, medical facilities, and quality management are described without citing percentages.

## BRIEF DESCRIPTION OF FINDINGS

**Intake** is not substantially compliant with the Implementation Plan.

Intake nurses do not repeat abnormal vital signs and fail to notify PCP of persistently abnormal signs despite the directions to do so printed on the intake form.  Patients with significant clinical conditions, including trauma and substance abuse, are not consistently referred for appropriate follow up medical examinations.  Nurses do not consistently obtain urine analysis or blood sugar readings for diabetics or patients with substance abuse disorders.  On multiple occasions intake nurses failed to enroll patients with substance abuse disorders in the appropriate monitoring protocols. Well established standards for screening newly incarcerated patients for HIV, HCV and STD are not followed at MCJ.  I found a few patients for whom there was no documented intake assessment in the EMR.

**Access** is  not substantially compliant with the Implementation Plan.

Sick call requests were not consistently managed by nurses as required under the Implementation Plan. Inmates are not timely seen following their written request for sick call.  Face to face assessment is frequently delayed. Assessments are incomplete or not in accord with applicable protocols. Women's health care issues related to vaginal discharge, abnormal bleeding and risks for cancer are not managed in accord with applicable standards for care. Patients needing PCP appointments are not always timely referred or seen at all as needed by a PCP.  The care for complex patients is

---

[4] See Settlement Agreement, page 2-3; Implementation Plan page 8.

sometimes provided without appropriate/adequate physician collaboration. 

**Chronic Care**  is <u>not substantially compliant</u> with the Implementation Plan.

Many patients diagnosed with substance abuse disorders are not seen by a PCP in accord with protocols for treating chronic diseases. Chronic care visits are frequently delayed and/or incomplete. Major medical problems are not consistently documented in the problem list.  Chronic care forms are not consistently deployed and/or properly filled out.  Patients at known high risk for HCV, HIV and STD are not screened in accord with community standards. [5]

**Healthcare Maintenance**  is  <u>not substantially compliant</u> with the Implementation Plan.

Annual examinations were at times incomplete and lacked full physicals.  Full ophthalmological examinations for patients with diabetes and/or hypertension, usually not performed by PCP, were frequently not referred for specialists (optometry, ophthalmology) exam.   Some annual exams inaccurately reported diagnoses, medications, and/or significant laboratory abnormalities.   National guidelines for human immune virus (HIV), chronic hepatitis C infection (HCV)  and sexually transmitted diseases (STD) screening were not followed. Women's health care did not meet applicable community standards.

**Continuity of Care** is  <u>not substantially compliant</u> with the Implementation Plan.

Documents elucidating medications and follow up care that should accompany patients transferred to other facilities are often not in the MCJ electronic medical record (EMR).[6]  In some cases, there was no documented follow up instructions for patients released with serious and unstable conditions.  Transfer documents were sometimes inaccurate.

---

[5] Centers for Disease Control and Prevention (CDC) recommend opt-out testing for all persons who are incarcerated in jails and prisons. See, e.g., HIV Testing Implementation Guidance for Correctional Settings, CDC (2006); CDC Recommendations for Hepatitis C Screening Among Adults in the United States (2020);  Sexually Transmitted Infections Treatment Guidelines, 2021, Persons in Correctional Facilities, CDC (2022).
[6] I was unable to find in the EMR documents referenced as being "attached"

**Intoxication Care and Detoxification** is <u>not substantially compliant</u> with the Implementation Plan.

Intake nurses do not consistently contact the on-call PCP for orders for patients at risk of withdrawing from multiple substances.  Patients with history of synthetics abuse are often not entered into appropriate monitoring protocols.  Patients with relatively subtle symptoms of withdrawal (uncooperative, ataxia) or described as overtly impaired are sometimes housed in sobering cells or sent to the general population (GP) without consultation by PCP to ensure that such placement is safe. ███████████████████████
███████████████████████████████████████

**Tuberculosis and other Infections** is <u>not substantially compliant</u> with the Implementation Plan.

Patients with unequivocally positive PPD (many of whom had received a  BCG vaccine) are not appropriately evaluated with QuantiFERON, or equivalent, testing to confirm diagnosis of latent TB.  Patients with latent TB[7], and Hepatitis C infections (HCV) are not counseled about options for immediate versus delayed treatments.  STD diagnoses including HCV were delayed and/or not promptly communicated to patients.  Patients with Covid symptoms were not consistently tested for Covid infection.  Patients were not screened for HIV, HCV, and STD in accord with state law and national standards of care. █████████████████████████████████████████████
██████████████████████████████████████████████████
███████████

**Pharmaceutical Administration** [8] is <u>not substantially compliant</u> with the Implementation Plan.

In my visit to the medication room at MCJ I found multiple-dose vials/tubes that did not bear dates of first use and expiration.  I found a bottle of expired medication, with no label identifying source or intended patient. The count for controlled substances is not reconciled daily.  I have not seen documented review of narcotic/controlled substances and/or operations of pharmacy by chief  or managing pharmacist. These lapses overtly depart from performances required in the Implementation Plan (Chapter IX

---

[7] A positive skin test absent with negative Chest X ray is presumptive evidence for latent TB. QuantiFERON blood tests should be performed to verify significance of the skin test.

[8] My assessment of pharmaceutical administration at MCJ refers to compliance with provisions in the Implementation Plan and the Wellpath Policy and Procedure Manual, Monterey County California.   My review of the activity of nurse dispensing medications is a separate category referred to as "RN Administration On-Site".

Pharmaceutical Administration).  See, also Wellpath Policy and Procedure Manual, HCD-110_D-01, Pharmaceutical Operations – Monterey County, effective 6/2/19. [9]

MCJ did not allow patient ████████ to complete a course of antibiotics started before incarceration or resume Depo-Provera while incarcerated.  On multiple occasions the EMR did not document provision of needed medications to patients upon their release. ████████████████████████████████████████

**Outside Referrals** were <u>not substantially compliant</u> with the Implementation Plan.

Necessary specialty care is not consistently provided in a timely fashion.  Written reports from outside providers are not consistently available in the EMR.  PCP review and follow up on visits to outside care are not consistently documented.  Documentation for instruction to ambulances is not found in the EMR. █████████████████ ████████████████████████████████████

**Nurse Administration of Medications** – The administration of medications at MCJ by nurses on medication rounds is apparently <u>substantially compliant</u> with the Implementation Plan. The Implementation Plan directs the medication nurse to take "every reasonable precaution to assure the inmate actually ingests the medication…" by "having the inmate speak after taking the medication and/or drinks water."  I did not observe inmates speaking following ingestion of medications. However, asking each inmate to speak after taking medications is probably not practical and in any case does not exclude possibility of cheeking or otherwise diverting medication, such as by sleight of hand.  I observed that the medication nurse reasonably confirmed ingestion in substantial compliance with the Plan.

**Staffing – Administrative, PCP, RN, medical records, and support**  –  Staffing is <u>not substantially compliant</u> with the Implementation Plan.  MCJ has no Director of Nursing. MCJ has no director for medical records.  The Medical Director and an associate Nurse Practitioner are on site part time. An experienced PA is on-site Monday

---

[9] Required performance for adequate pharmacy administration includes, inter alia:  a) that a licensed pharmacist is responsible for dispensing of prescriptions, shall serve on the MCJ pharmacy and therapeutics committee, verify appropriate storage/security/record keeping regarding medications at MCJ, and ensure accurate reconciliation of accounts for all controlled substances;  b)  documentation of the quarterly on-site inspections by consulting pharmacist at least quarterly to be kept on file;  c)  daily temperature logs on each refrigerator; d) disposal of all outdated, discontinued or recalled medications e) once multi dose vials are opened, they must be dated and initial, and used or discarded per manufacturer recommendation but not to exceed 30 days, e) Controlled medications  are under the control of the Medical Director and accounted for the Health Services Administrator or designee; f) Controlled substances must be counted at the end of every shift by the nurse going off duty and the nurse coming on duty, with discrepancies in the count reported to the on duty supervisor to be resolved before next shift.

through Thursday.  Both PA and a recently hired NP whom I observed at work require more physician oversight and consultation than being provided.   At the time this final report is composed, I understand medical staffing is in flux.  In any case, based upon my review of medical records, it appears that access to physician services (including care provided by physician extenders) is not sufficient to meet the apparent needs.[10]

**Clinic Facilities[11]** - Clinic Space and equipment is <u>not substantially compliant</u> with the Implementation Plan. Exam rooms do not all have scales that provide accurate patient weights. Ophthalmoscopes installed in all exam rooms are not being used by the NP and PA. The white noise machine outside the room used for intake was not turned on. Patients housed in the reception area for isolation of Covid were not provided with mattresses.  The Medication Room storage and controlled substance logs did not comport with requirements elucidated in the Implementation Plan and Wellpath policies.

**Quality Assurance –** is <u>not substantially compliant</u> with the Implementation Plan. Quality assurance programs, including formal chart review by the medical director do not comport with the Implementation Plan. MCJ medical leadership do not perform formal chart review to assess PCP and RN performances.  Grievances are not reviewed regularly by medical leadership to ensure adequate corrective action for lapses regarding individual patient care.  As of the date of this report, I have not received copies of grievances for which I requested be sent to me for the months of November and December.

Wellpath Monterey County California Policies & Procedures, effective 6/2/2019, call for the establishment of a continuous quality improvement (CQI) committee involving the MCJ medical director as well as physician extenders (physician assistants, nurse practitioners), nursing, mental health, dentistry, health records, pharmacy, and laboratory.   I have not seen CQI minutes for 2022. I have not seen the quarterly pharmacy and therapeutics minutes.  I have also not been provided with the death review for patients who died while in custody during 2022.  The death reviews and CQI minutes I have seen do not address the concerns set for in my audit reports.

## SUMMARY OF CASE REVIEWS

---

[10] MCJ's average census of 900 inmates appears to generate approximately 900 requests for service per month. Currently full time and part time providers together see approximately 800 patients each month, thus explaining the apparent backlog and delay in access to care.

[11] I inspected a sampling of housing units, most of the rooms used for patient examination, intake and reception area, infirmary, and medication room.

I reviewed the care for 20 patients [12] who were incarcerated at MCJ after May 2022, as described in "case reviews."  The names and patient ID are provided in the case review spreadsheets attached as Exhibit A.    Eighteen out of these 20 patients received care that I deemed was inadequate, as described below. [13]

Case 1,  Inadequate care. 34-year-old obese female booked 6/15/22.  I found no intake form in the EMR. Complaints about vaginitis did not seem to be attended to for weeks. There was no apparent action taken on lab reports showing a vaginal infection. Delayed care for vaginitis may contribute to psychic distress and suicide ideation.  The reported prior-diagnosed cervical neoplasia (pre-cancer) requires further evaluation including pelvic examination and specialty care. Patient is at risk for death from cervical cancer.

Case 2  Inadequate care. 36 yo male, with left arm injury and history of hardware repair. Hypertension.  History of stimulant abuse.  Multiple intakes do not accurately report his left arm deformity or extent of pain.  Patient is not being timely referred for Medical and Mental Health assessment to address his history of substance abuse and volatile behavior in jail.  Repeated complaints about pain in left arm and requests for service are not attended to in timely fashion or in accord with the Implementation Plan.  Visit to PCP is delayed. Unclear whether patient has OUD, or pseudo addiction to opiates caused by severe, chronic pain.  RN assessment of vomiting is inadequate.  Patient subsequently treated for life-threatening OD from Fentanyl.  Thereafter patient has not had MD assessment of chronic pain, and no treatment for OUD. Patient is at risk for death from opiate use disorder.

Case 3 Inadequate care.  58 yo male complaining of dental pain upon intake.  Pain relief was  delayed.  Nurse sick call for polyuria did not address possibility of diabetes. Insufficient attention was provided to patient's continued complaints of polyuria and groin pain after prescription of Flomax.  Since the patient's symptoms could arise from prostate cancer, he needs PSA test and/or urology consultation.  Delayed lab testing for possible cancer puts patient at risk for premature death.

Case  4.  Inadequate care. 39 yo male alcoholic, abusing stimulants. Patient is at high risk for adverse effects of alcohol and stimulant abuse. But no exam by PCP was performed on this patient since intake to MCJ on 2/22/22 and through later intakes.

Case  5    Inadequate care.  49 yo with hypertension, OUD, methamphetamine abuse. Multiple requests to have rash and leg swelling treated are not timely addressed. Patient released without apparent prescriptions and/or plans for medical follow up. EMR

[12] My review of these 20 cases has provided me with sufficient data to propose corrective actions to remedy apparent systemic issues contributing to departures from the Implementation Plan.
[13] Medical care that does not comport with community standards and places a patient at substantial risk of harm is considered "inadequate."

contains incomplete and inaccurate medical records (BP reported at 468/98). Nurse issues diagnosis and treatment for "rigid abdomen" as constipation without adequate oversight of PCP. The cause for patient's leg swelling was not diagnosed.

Case 6  Inadequate care.  30 yo male had received meds for HIV but stopped 4 months prior to intake. Urgent need for specialty clinic was identified by RN 4 days after intake. No specialty clinic visit provided 6 weeks after intake. Belatedly, patient was seen by Medical Director for treatment of monilia infection, HIV and Syphilis.  Patient was discharged on appropriate meds with follow up instructions.  Overall, are did not comport with community standards and was not compliant with the Implementation Plan.

Case 7. Inadequate care. 45 yo, hypertensive male, with daily opiate use described at intake May 2022.  Examined at MCJ for rash, URI symptoms, nasal discharge, sinus tenderness, toothache and decay requiring extraction. Treatment by RN did not comport with protocols.  Multiple courses of antibiotics without confirmed bacterial infection put patient at risk for complications from polypharmacy.  Care does not comport with community standards.

Case 8.  Inadequate care.  40 yo male with seizure disorder following traumatic brain injury (TBI) who is developmentally disabled.  His diagnoses include polysubstance abuse, obesity, pre diabetes and hypothyroidism.  Intake was incomplete with no referral noted for chronic care.  The pulse rate of 115 at intake was not repeated or referred for further attention; HCV, HIV and STD not screened in accord with CDC guidelines.  No documented discharge planning for continuity of care in community. Care was not coordinated care with MH and custody.

Case 9:   Inadequate care. 35-year-old with HCV, Type 2 diabetes, alcoholic, stimulant abuse. PTSD and Bipolar. Admits to OUD on day 3 after intake.  Intake form includes report of having diabetes, past treatment for Hepatitis C, and "Yes" to question have you ever had HIV/AIDS."  The intake note is inaccurate and confusing as to patients' HIV and HCV status.  The patient should be referred for PCP chronic care.  But the chronic care visit is delayed by nearly a month. Treatments provided by RN do not comport with CMG protocols. Patient not tested for Covid when presenting with symptoms on 7/13/22 and 7/15/22 consistent with Covid.  Patient's history of substance use disorder, reduced platelet count, elevated LFT are consistent with patient's report of prior HCV infection.  Patient did not receive evaluation of need for treatment of HCV to reduce risk of hepatic fibrosis and death from hepatoma.

Case 10.  Inadequate care. 52 yo with chronic neuropathic pain following amputation. Has toothaches.  Also pains in feet related to old surgery. Positive skin test reported from intake screening. PCP evaluation delayed.  No QuantiFERON confirmation or counseling or treatment provided for latent tuberculosis infection. Release without continuity of care puts patient and community at risk for complications of TB infection.

Case 11. Inadequate care. 56 yo Spanish speaking male seen by MH upon intake March 2021 pursuant to protocols for patients accused of sex crime.  Limited MH evaluation described patient as tearful.   Medical history was unremarkable.  May 27, 2022 patient complained of 2-3 weeks of  right side motor and sensory deficits.  In hospital CT and MRI exam, followed by brain biopsy confirmed diagnosis of advanced glioblastoma multiforme with bleak prognosis.  Patient died in  hospice care September 2, 2022.  Annual physical examination was not timely performed within one year of intake. Triage of request for service on 5/27/22 did not send patient for immediate face to face exam, which was needed because of alarming symptoms.  Delayed annual physical, delayed face to face exam was not in compliance with Implementation Plan.

Case 12. Inadequate care. 33 yo with long history of recurrent incarceration, PTSD, mood disorder and substance.  Admitting vital signs not documented.  Problem list incomplete.  STD screening incomplete.  The patient requested continuation of her birth control with Depo-Provera and completion of antibiotics started before incarceration. Nursing protocols were not followed.  Failure to provide continuity of care with regards to birth control and antibiotics do not comply with Implementation Plan provisos.

Case 13. Inadequate care.   39 yo repeat described as under influence of drugs with history of methamphetamine abuse and hypertension.  Patient's status is not reported to PCP or sent to hospital. While monitored for synthetic withdrawal, protocols not followed to alert PCP of patient's abnormal vital signs.  Cellulitis not detected until late in disease leading to hospitalization. These departures from Implementation Plan increased risk of patient suffering from serious complications of drug abuse.

Case 14. Inadequate care. 38 yo with reducible inguinal hernia, requesting surgical repair while incarcerated. No other medical problems. Problem list is not updated to show hernia. Nursing evaluation and recommendation regarding inguinal hernia  are not directed per protocol and thus exceed scope of care.  Patient should be followed by PCP.  Medical director should make determination of need for surgery while incarcerated. Care does not comport with Implementation Plan.

Case 15. Inadequate care. 39 yo on long term anticoagulant for prosthetic heart valve. Also polysubstance abuse. Admitted to MCH 12/12/21, and again 9/19/33. Intake on 9/22/22 and subsequent chronic care visits did not adequately review history and medical needs  The request by cardiology consultation for echocardiogram issued in December of 2021 was not performed during the next year while incarcerated. Echocardiogram and cardiology follow up had not occurred by date of release October 25, 2022.   Delayed evaluation by specialist does not comply with Implementation Plan.

Case 16. Inadequate care. 49-year-old patient, schizophrenia, polysubstance abuse and uncooperative on admission 4/22/22.  Treatment by RN for respiratory distress (with documented abnormal respiratory rate of 24) was inadequate as patient was returned to housing even though his breathing did not improve. Patient was sent next day to hospital to obtain X ray, and treatments for COPD and possible pneumonitis.

Departures from Implementation Plan include failure to enroll in Chronic Care, lack of screening for HIV, HCV, STD, and inadequate treatment of abnormal vital signs.

Case 17  Adequate care.

Case 18. Inadequate care.  36 yo alcoholic, abusing methamphetamines.  On September 17, 2022, intake form documents multiple physical ailments including swollen right foot, impaired mobility, disorientation, and abnormal vital signs (pulse 116). The abnormal urine test and physical exam suggesting complications of amphetamine abuse were not attended to.  Patient was not referred for synthetics monitoring, or chronic care visit and was not screened by tests for blood sugar, HCV, HIV or STD. Medical care at MCJ for this patient does not comply with the Implementation Plan.

Case 19 Adequate care.

Case 20. Inadequate care. 42 yo with methamphetamine abuse, HTN and chronic low back pain is booked into MCJ on 3/17/22.  He is not monitored for synthetics abuse. No lab is drawn.  He is not referred for PCP evaluation or MH evaluation.  On August 30, 2022, patient lab is  reviewed by PA who documents finding  triglycerides (TG) level is 1309. This high TG level put patient at serious risk for pancreatitis.  The prescription for rosuvastatin did not mitigate the danger as drugs take time to reduce hepatic synthesis. The necessary treatment of strict dietary fat reduction was not ordered  Lab needs to be repeated fasting. Patient care was inadequate in this case because the patient was exposed to serious and avoidable risk of harm.

## ADDITIONAL CASES  [14]

████████████████ – Review and response to grievances are delayed or were not provided at all before their release date.

████ – potentially serious hand injury not timely examined.

████ – 29-year-old male with complaint of rash on hand and feet.  Evaluation substantially delayed, prior urinary discomfort, merits lab tests to rule out syphilis, HIV, HCV and other STD. Patient housed at MCJ as of October 30, 2022.

████ – 42-year-old male with dysuria not evaluated for possible infection.  Skin test findings with negative CxR consistent with latent tuberculosis infection.  No confirmation by QuaniFERON, no consultation and no treatment provided. Patient housed at MCJ as of October 30, 2022..

---

[14] These cases do not represent an exhaustive list of all departures I detected.  The attached "MCJ HC Monitoring Audit Tool for Oct 2022" and "MCJ Physician Case Review for October 2022" reports my findings of compliance and noncompliance with the Implementation Plan parameters.  Approximately 300 patient encounters were reviewed and listed in these Audit Tools.   I detected departures from the Implementation Plan requirements in approximately 60% of the patient encounters reviewed.

█████ – 43-year-old male with chronic hepatitis C infection told by NP at MCJ that he is not a candidate for treatment because of non-compliance with prior medical advice.  There is no documented determination from Wellpath committee to which this patient was supposed to have been referred for evaluation of treatment options.  Patient housed at MCJ as of October 30, 2022.

█████ – 32-year-old male with ulcerative colitis released from jail after two months of incarceration without any documented continuity of care with medications and referrals to treat his colitis.

█████ – Instructions from hospital upon return to jail either not read or not followed. █████ 43-year-old returned from hospital with instructions for 5 days of Augmentin, prescribed at MCJ for 10 days. █████ – 46 yo male returned from hospital with instructions for 7 days of Augmentin, prescribed at MCJ for 10 days.

█████ – patients apparently sent to GP while acutely intoxicated or unstable from withdrawal. █████ 52-year-old male with OUD and meth abuse described as too angry and aggressive in booking to undergo intake screening.  Form shows him being sent to GP without PCP exam, hospital clearance or referral. █████ – 46-year-old documented disheveled, depressed with toxic drugs detected in urine analysis sent to GP with no medical clearance and no medical referral.

█████ – 32-year-old male with very strong positive skin test result on July 20, 2022 that indicates tuberculosis infection.  No Chest X ray results are in the EMR, and there is no documented X ray order. There is no confirmation of tuberculosis infection with blood  test (such as QuantiFERON Gold). There is no documented consultation/treatment with physician, nurse, public health, or documented refusal of consultation/ treatment.  Patient is housed at MCJ as of October 30, 2022. [15]

## PATIENT DEATHS [16]

HCM █████ was a 56 yo Spanish speaking male seen by Mental Health during intake in March 2021 pursuant to protocols for patients accused of sex crime.  A limited evaluation and report described patient as tearful.   The medical history at intake was unremarkable.

On April 14, 2022 HCM complained of severe hip pain for which he received a prescription of ibuprofen from the on call physician collaborating with the examining nurse.  At that time HCM had been residing at MCJ for more than a year but had not yet undergone an annual physical examination. Despite his complaint of severe hip pain, no annual exam was scheduled.

___

[15] This is one example of MCJ patients  (some of whom remain in MCJ)  who have suspected tuberculosis but are not being advised of their diagnosis, and not offered treatment.
[16] Only one death is reported for this audit period, from May 2022 through October 2022.

On May 27, 2022, HCM submitted a request for health services.  Patient stated he was having difficulty walking, loss of sensation in legs, and forgetfulness.  The nurse triage on May 28 scheduled HCM for the next nurse sick call.  On May 30, the nursing evaluation found mild weakness and referred the patient to the next PCP sick call.  PCP exam the next day, May 31, found profound neurological defects suggesting brain tumor or stroke.  HCM was sent urgently to the hospital ER for evaluation of neurological deficit.  CT scan and MRI demonstrated very large brain tumor.  Brian biopsy confirmed the diagnosis of advanced glioblastoma multiforme. HCM died in  hospice care September 2, 2022.

HCM should have undergone an annual physical before the 1-year anniversary of his admission to MCJ.  The triage of HCM's request for service on 5/27/22 should have brought HCM for an immediate face to face exam, rather than the PCP evaluation done 4 days later.

Even if an earlier diagnosis of his brain tumor had been made during a timely annual physical exam, HCM's demise would not have been averted. However, delayed annual physical and delayed face to face exams were departures from performance called for by the Implementation Plan.

**JCC** (███████ died at MCJ on April 20, 2022, from what appeared to be suicide.  I noted some departures from best medical practices:   a) The PCP on call notified about patient's overt depression did not document communication with mental health team to assess suicide risk and/or need for acute hospitalization considering recent suicide attempt. b) CPR was not administered in accord with American Heart Association instructions revised in 2010.  It appears first responders provided breaths upon finding patient unresponsive.  The latest protocols call for 30 chest compressions before attempting ventilation.  The patency of JCC airway did not appear to be assessed promptly, but instead was found to be obstructed only after ventilation was attempted.  The death review produced by Wellpath does not discuss departures from best practice I brought to their attention in the April 2022 audit report.

The autopsy results issued November 2, 2022 concluded that JCC death was the result of suicide.  Unexplained, however, was the finding of methamphetamine in the decedents drug screen.  The amount detected (.04 mg/L) was not enough to cause death.  But chronic methamphetamine abuse is well know to cause bizarre behavior.  Withdrawal from methamphetamine often causes severe depression and suicidal gestures.  The finding that JCC was probably using methamphetamine while incarcerated validates my concern that medical provides did not timely refer him to

mental health, and that JCC was not provided with sufficient access to mental health services.

**DJS (**▮▮▮▮▮▮**)** DJS, age 29, died on 11/12/22 from causes uncertain.  Progress notes from prior incarceration at MCJ documented his substance abuse and psychosis, possibly substance induced.  At the time of his death there were conflicting reports describing varying amounts of blood and water on the floor besides his nude body with wounds on both legs.  The reported muscle rigidity suggests the death was discovered some hours after his death.  Preliminary autopsy results, related by the DJS father, purportedly describe decedent's heart as enlarged and lungs were "heavy" (with water, presumably, from congestion when his heart failed).  This finding would  be consistent with a history of methamphetamine abuse that would have injured decedent's heart and predispose him to fatal arrhythmias.

The full autopsy result with toxicology is pending.  I will comment further upon this case at the next audit report. [17]

I have observed in the medical record the following departures from care required by the Implementation Plan:

1) At the time he was booked on April 30, 2022, the intake nurse documented abnormally elevated pulse of 111 which requires notification of the PCP on call.  The  PCP was not contacted to discuss significant abnormal vital sings at intake. Had a PCP been called, the next appropriate step should have been examination looking for evidence of heart disease which, if detected early, might have been treated to reduce risk of death.  Patient purportedly denied using illicit substances at this intake, but his record documents abuse of heroin and methamphetamines prior to his incarceration.

2) DJS history of homelessness, and substance abuse (methamphetamines, heroin)  meet the definition for chronic disease. He should have been scheduled for Chronic Care visit within  the week after his intake.  DJS was not referred for any medical or mental health services when booked into MCJ on 4/30/22.

3) DJS did not undergo an Initial Health History and Physical Exam. Within 2 weeks of his admission to MCJ Mr. Sands should have been assessed with history and exam to determine his need for further medical care. At this time, it would have been appropriate to screen for HIV, Hepatitis, TB test, and sexually transmitted disease. This was not done.

---

[17] Autopsy reports in cases like this are often not available for months after death.

4)  Nursing assessed DJS on 10/20/22 following an altercation involving a stabbing as having "no abdominal, flank swelling to indicate internal bleeding and injury."  The presumption that the absence of flank swelling meant DJS incurred no serious internal injury was mistaken.  The abdominal cavity can hold liters of blood without external signs. The more sensitive measure of internal bleeding, postural vital signs, was not performed.  In any case,  the care in this case did not comport with operative nurse protocols (CFMG Standardized Nursing Procedures) that required referral to PCP for any puncture "deep penetrating wound."[18]  The PCP was not contacted, nor was DJS referred for PCP exam in the weeks following, up to the time of his death.  PCP examination of any injured incarcerated persons should be routine, especially if the injury follows altercation with another inmate or purportedly use of force by custody.

5)  The medical record does not document psychiatric evaluation of DJS and/or treatment of his diagnosed schizophrenia from his intake in April 2022, or in prior intakes, and even until his death.  Medical services deployed in coordination with Mental Health would have reduced the risk of his demise.


SG (████████ died September 24, 2021. The formal Wellpath death review (entitled "Wellpath Mortality & Morbidity Report and Review") was reportedly conducted on November 3, 2021, approximately one week later than required by State regulations (See, Minimum Standards for Local Detention Facilities, CCR Title 15, Section 1046). The document was provided to me September 15, 2022, approximately 10 months afterwards.  This death review does not appear to have addressed my concerns that determinations by physician assistant and nurse practitioner to withhold anti-coagulation treatment recommended by the emergency room physician was ill advised absent consultation with supervising/collaborating medical director.

TP (████████ died August 5, 2021.  The formal Wellpath death review was reportedly conducted on November 3, 2021, approximately 60 days later than required by State regulations.  The document was provided to me September 15, 2022, approximately 10 months later.  The death review does not appear to have addressed my concern that the medical record did not sufficient document appropriate follow up for blood tests consistent with prostate cancer.

I have not seen formal reviews for deaths occurring in 2022 despite the State law requires be conducted and documented within 30 days of death.   The purpose of these reviews is to prompt corrective actions that improve care, even if the death was unpreventable.  As mentioned above, formal death review and/or quarterly QA meeting

---

[18] MCJ Standardized Nursing Procedures do not define "deep penetrating wound" but it seems reasonable if not common sense that a bleeding puncture wound on the flank or chest is "deep."

have not addressed the concerns about quality of care I raise in my review of deaths at MCJ.

## PATIENT INTERVIEWS

The patients speaking to me at this audit visit (3 females and 4 males) reported protracted waits for both primary care and specialty services.

Female Patients:  CD ▮▮▮▮▮ stated it has been weeks since her arrival at MCJ and has yet to have her diet adjusted to account for her peanut allergy.  SF ▮▮▮▮▮ stated she was denied access to antibiotics brought by her family to finish a course started before being booked into MCJ, and is overdue for her Depo-Provera injection. See case 12.  ES ▮▮▮▮▮ stated a rash under her arms that was resistant to all treatments since June 2022 was not referred for specialty consultation, until recently.

Male Patients:  NG ▮▮▮▮▮ had no specific complaints.  I noted this patient had not been screened for Hepatitis despite the large array of tattoos on his body increasing the risk of hepatitis C.  JD ▮▮▮▮▮ stated he often waits 3 or 4 weeks to be seen by health care staff after his requests for services.  He was concerned about his shoulder pain unrelieved for 6 months. MA ▮▮▮▮▮ SB reported waiting 2 to 4 weeks for medical care to treat his migraines.  HL ▮▮▮▮▮ had no complaints but reported that he waited a week for a response to his requests for medical attention.

## STAFF INTERVIEWS -

I spoke with the following staff:

Acting Medical Director, Wellpath, MCJ

Regional Medical Director for Wellpath at MCJ

Physician Assistant, MCJ

MCJ, Wellpath Implementation Specialist for MCJ

Wellpath Chief Pharmacist [19]

Interviewed staff did not dispute my findings and did not take exception to my provisional recommendations for corrective actions.  Staff responsible for following

---

[19] Wellpath Chief Pharmacist stated that she is familiar with Wellpath's process for contracting pharmacy services at MCJ;  the Wellpath Chief Pharmacist does not oversee pharmacy operations at MCJ. I have asked to speak with the pharmacist(s)  responsible for filling MCJ medication orders,  supervises/inspects the MCJ  medication room and participates in quarterly pharmacy/therapeutic committee meetings.

medication room protocols personnel will be educated about the required processes for management of medications and controlled substance logs.

## PLAINTIFFS' ATTORNEY INQUIRIES[20]

Plaintiff attorneys raised concerns regarding following matters:

| Plaintiffs' expressed concerns | Expert Medical Monitor Response |
| --- | --- |
| Nurse Administration of Medications has been compliant with Implementation Plan | I do not anticipate reviewing compliance of nurse administration in future audits. |
| Pharmaceutical Administration Lapses | I have elucidated the departures from the Implementation Plan that I identified in this audit.  I am seeking an interview with the licensed pharmacist obliged by contract  to fill MCJ medications and the consultant pharmacist (possibly same person) who is supposed to file quarterly inspection reports. |
| Sick call slips are not documented.  Responses to requests for service and necessary visits are delayed. | I estimate access to PCP services falls short of demand by approximately 100 visits per month. I recommend that grievances filed for delayed response be considered requests for sick call visit. |
| Wellpath has not hired sufficient management to oversee care provided at MCJ. | I have recommended hiring full-time medical director, director of nursing and medical records supervisor.  I have also recommended that in the meantime MCJ augment medical services with telemedicine and off-site monitoring. |
| Nurses need additional training and updated protocols.  MCJ does not screen patients for HIV, HCV, STD. | I have recommended updating protocols to promote appropriate testing for patient with obvious risk factors for diseases. |
| In-Custody Death Reviews have not been performed and/or timely shared. | I have not seen the death review for the most recently in-custody death (HCM ███████    My audit cites the requirement under California state law for deaths occurring in custody to be formally reviewed within a month of demise |
| Adequacy of care for patients complaining to Plaintiffs' attorneys | EMR for patients JP ██████ AO ██████ AA ██████ PJ ██████ WW ██████ were reviewed.  Observations and recommendations were issued in my written summary of the exit interview, October 12, 2022. |

---

[20] See, also, Exhibit C attached,  Plaintiffs' Response to Draft Audit Report

| Observation cells and infirmary care unit are not adequately supervised. | I recommend daily rounds on patients housed in reception area and the infirmary for any reason. Patients housed without concern of suicide should be provided with mattresses and other amenities as they would receive in the general population.  . |

## RECOMMENDATIONS:

Departures I observed at the April 2022 audit reappear in this audit.  Few, if any of my recommendations issued at that time have been implemented. Accordingly, this list of deficiencies and recommendations will look familiar.

| Deficiency | Expert's Recommendation |
|---|---|
| **Intake** Nurses do not consistently obtain blood sugar reading from diabetics when needed (such as on intake), document extent of substance abuse, verify and/or act upon abnormal vital signs up and/or consistently contact PCP for consultation when needed for acute problems or unstable chronic conditions. | All nurses, and especially those performing intake, should be trained to properly use COR EMR forms with attention to pertinent findings, vital signs, and protocols. Abnormal vital signs should be repeated, and reported to PCP on call if the findings remain seriously abnormal. Medical staff  should undergo audits of no less than 10 cases every week until performance consistently meets applicable standards. |
| **Patients do not consistently have timely access to necessary care**. Patient requests for services are often not scanned into the EMR Sick call nurses do not always follow the protocols such as reporting to PCP pain levels exceeding 6/10. PA and NP (physician extenders) do not consistently confer with supervising and collaboration physician for advice on challenging patients. | MCJ leadership should keep a log counting the weekly requests for services to compare with the number of face-to-face encounters (Sick calls).  There should be sufficient clinical encounters each week to meet the demand.  In service training should familiarize nurses with protocols.   Grievances complaining about insufficient access to care should be timely reviewed by medical leadership to assure that patients' reasonable concerns have been addressed. <br><br>There should be brief daily "huddles" to bring any difficult matters to attention of the medical and nursing directors.  There should be weekly staff meetings to review challenging cases and provide continuing medical education. |
| **Chronic care and health care maintenance** did not consistently | Patients abusing substances should be scheduled as "chronic care" patients.  PCP |

| | |
|---|---|
| comply with Implementation Plan. Problem lists were not up to date. Patients with long standing drug abuse diagnoses are not treated as having a chronic disease, and thus do not always receive needed attention from PCP after booking. | should verify completeness and accuracy of the Problem list at every visit. Current recommendations by CDC and United States Preventative Services Task Force (USPSTF) should be incorporated (as practicable) into the chronic care and health maintenance protocols. PA and NP should be instructed in proper use of the ophthalmoscope.  A referral to ophthalmology should be made for patients whose diagnoses (diabetes, hypertension) call for fundoscopic exam not performed by PCP. |
| Documentation of care for released patients **(continuity of care) does not meet Implementation Plan requirements or applicable community standards.** | Discharge planning should be a distinct component of care provided to patients at MCJ to ensure documentation confirming that patients receive a supply of necessary medications upon release along with clear instructions for follow up care. I recommend hiring a nurse to be in charge of discharge planning. |
| **Care for patients unstable at booking,  intoxicated or at risk for withdrawal was not consistently provided in accord with the Implementation Plan. Patients are housed in the reception area for administrative needs were treated on occasion as if they were suicidal**   Patients sent to sobering cells are not automatically seen by qualified health personnel to assess possible delirium or other alarming conditions that might be best treated in the hospital. | Protocols for evaluation and treatment of acutely intoxicated should be updated to include assessment by nurse or PCP for delirium.  Admission to sobering cell should require entry into the EMR of a Sick Call note by nurse or PCP. Constant monitoring ( also known as a "sitter") should be provided to patients who have the highest risk for suicide or self-harm.    Patient with persistently abnormal vital signs or in  unstable condition should be seen by a PCP or sent to the hospital. Patients housed in reception area for matters other than suicide need to be seen regularly as their isolation puts them at risk of harm for lack of observation or communication. These patients should have mattresses and access to other amenities normal provided to inmates in the usual housing. I recommend that rounds be made (and documented in the EMR) for patients housed in reception area and infirmary cells. |
| **Patients are not consistently assessed for TB and other infections in accord with best practices and community** | Protocols for treatment of TB, HIV, HCV and STD should be updated to reflect current CDC recommendations in line with NCCHC guideline and common practice at other California jails |

| | |
|---|---|
| **standards.**  QuantiFERON testing is not timely provided for patients with history of BCG or positive skin tests. | and prisons. CDC recommends testing all booked patients for HIV, HCV, and STD. Patients with history of BCG vaccination and past positive skin tests should have QuantiFERON tests as primary means of TB screening. |
| **Pharmaceutical Administration** was not substantially compliant with the Implementation Plan.  Multi dose vials were not consistently labelled with date opened and expiration date. Antibiotics and other drugs were prescribed contrary to best practices. Controlled substance logs to document reconciliation of counts were not maintained in accord with applicable protocols and policies.  I have not been provided with copies of quarterly pharmacy inspection or with minutes for the quarterly pharmacy and therapeutic meeting | MCJ should identify the pharmacist who is responsible for filling MCJ meds and reviews MCJ compliance with state laws regarding medication storage and dispensing.  The pharmacy director should be meet regularly(at least quarterly) with the medical team.  PA, NP and RN prescribing and management of the medications at MCJ should be overseen by a supervising/collaborating physician.  I have requested a meeting with the pharmacist who fills the prescriptions issued at MCJ and inspects the medication room every 3 months.  I have recommended that nursing be trained to comply with requirements for reconciling controlled substance counts on each shift. |
| **Necessary outside specialty care was not consistently provided in timely fashion**.  Written reports from outside providers were not consistently available in the EMR. PCP review and follow up on visits to outside care was not consistently documented | Wellpath leadership should assist MCJ staff to obtain timely expert care by telephone or video link if local resources are insufficient. The medical record department should track all referrals (using the outside referral log) to ensure that reports from specialists are promptly filed in the EMR. The return from outside services should automatically generate MD or RN sick call. I have recommended hiring a full-time medical director to oversee the care of patients going outside for consultation services.  I have recommended hiring a full-time medical record supervisor to assist in obtaining documentation from outside care. |
| **Exam rooms do not have scales that provide accurate patient weights.  Ophthalmoscopes are not used by PA or NP.** | Scales should be regularly calibrated for accuracy.  Patient weights should be noted with each visit. Physician extenders should be trained in the appropriate use of ophthalmoscopes. |
| **Quality assurance programs, including formal chart review by the medical director of all nurse** | The Quarterly meetings should discuss progress on corrective actions and monitor the peer review process.  Quarterly meeting should |

| | |
|---|---|
| **and physician assistant performance were not performed in accord with community standards as articulated in the Implementation Plan, medical group policies and Settlement agreement**.<br><br>Peer review is not documented. The QA minutes do not demonstrate corrective actions in response to medical monitor observations. I have not seen any pharmacy and therapeutic committee minutes.  Death reviews are not performed timely. Opportunities for improved care are not consistently described in death reviews. | include the pharmacist, by telephone is acceptable, to comply with the requirement for quarterly pharmacy and therapeutic committee meeting.    I need to see copies of these meetings.<br><br>The medical director or assignee should audit and countersign  5- 10% of all charts in which document treatment is provided by a physician assistant, nurse practitioner or registered nurse. Monthly QA meetings should review adverse events, hospitalizations, and recommendations from the monitors.<br><br>I have lectured staff on the importance of vital signs.  I am willing to provide additional continuing medical education to MCJ staff. |
| **Staffing is insufficient to provide services in accord with the Implementation Plan.** | MCJ should appoint a full time Medical Director, Director of Nurses, and Medical Records Manager. |

## CONCLUSION

MCJ is substantially compliant with the Implementation Plan regarding medication nurse administration of prescriptions. MCJ is not substantially compliant in the other Implementation Plan parameters.  The ongoing vacancies for full time medical director, director of nursing and medical records supervisor may account for the apparent deterioration in performance since the April audit

Following my site visit I recommended that MCJ staff prioritize the implementation of the following recommendations:[21]

1. Standardize management of patients with latent TB infection suggested by positive skin test (PPD) results.

---

[21] See also report from Exit Interview, October 13, 2022, attached to Exhibit C.

2. Highlight requirements in the Implementation Plan that calls for appropriate screening at or soon after intake for HIV, HCV, and STD.
3. Bring management of medication room into compliance with the Implementation Plan, Wellpath Policies and state law.  I asked MCJ to arrange for me to interview the pharmacist filling MCJ prescriptions.
4. Document patient requests for sick call visits.  Maintain a log to record time from requested service until a needed face to face visit is provided.  Allow grievances that request medical services to be treated as effective requests for sick call visit.
5. Implement peer review to monitor proper use of forms, compliance with protocols and appropriate collaboration with supervising medical staff at Intake and afterwards.  Particular attention should be given to patient's grievances as these complaints may signal deficiencies in care that need prompt remediation.
6. Hire full time Medical Director, Director of Nurses, and Medical Records Manager.

As of this time, at the end of 2022, it seems that my recommendations listed above have not been honored. I have recently reiterated my requests for access to patient grievances, peer reviews and timely formal review for deaths occurring in 2022. MCJ has not arranged for me to interview the pharmacist in charge of filling MCJ prescriptions. I have not seen CQI minutes that address the observations iterated above.   Having noted the insufficiency of staff, I presume CQI minutes have not been produced for lack of timely meetings and insufficient minutes,  rather than merely a failure to produce minutes taken.

MCJ may want to clarify and/or emphasize parts of its policies and procedure, now many years old, to acknowledge evolving standards of care.  I have recommended it do so.  For example, the use of blood tests to confirm latent TB has only recently become commonplace and promoted by state and federal guidelines as a standard of care.  However, the Implementation Plan in its current form reasonably, and comprehensively defines MCJ  responsibilities.  MCJ practice is not in substantial compliance with the Implementation Plan.

### Attachments:

Ex. A:  MCJ HC Case Review

Ex. B:  MCJ HC Audit Monitoring Tool

Ex  C:  Plaintiffs' November 29 Response to October 31, 2022 Draft Report

# Exhibit 14

# MONTEREY COUNTY JAIL
# HEALTH CARE COMPLIANCE AUDIT
## Enhanced Monitoring and Mentoring
## Hernandez v County of Monterey

January 25, 2023

*CONFIDENTIAL*

Bruce P. Barnett, MD, JD – expert medical monitor

## INTRODUCTION

This is a review is pursuant to the court order dated June 3, 2022 that invites me to "mentor and shadow staff, review patient files, provide guidance and train staff..." Court-authorized enhanced monitoring visits (up to one week each occasion, up to 4 times a year) are to be performed in addition to the earlier-established audit process that required two site visits for 2 days on each occasion and an optional additional audit to be done onsite or remotely. See the attached schedule for 2023 I have proposed to comply with the court order for the basic audits plus enhanced monitoring. (Ex A).

Reviewing Patient Files:

This instant report describes findings and recommendations from my inspection of medical records for 29 patients who filed formal grievances and one suicide.  See the attached spreadsheet entitled "MCJ Grievance Review November and December 2022" (Ex. B) for details of my findings.  I present a "compliance rate" as the percentage of encounters for each specified parameter of care in which I found requirements of the Implementation Plan were met.

Mentoring, Guidance and Training:

This report assesses the performance of the nurses and PCPs providing care in the cases reviewed, followed by recommendations for medical education to promote professional performances in compliance with the Implementation Plan

## BRIEF SUMMARY OF FINDINGS January 2023

**Intake Screening for Health Care – Not compliant.  Compliance rate 39.%**

Intake nurses do not consistently enroll patients in appropriate protocols for treatment of substance abuse, and/or refer to PCP for chronic illness. Medications prescribed prior to booking are not consistently and timely issued to patients after Intake.  Substance abuse history

14-1

is often incomplete or inaccurate.  Patients with substance abuse disorder do not have their blood sugar tested even despite intake form requirements to do so.  Problem lists are not updated.

**Access to Health Care – Not compliant. Compliance rate 55%**

Patient requests for services are not reviewed timely.  In many cases patients are rescheduled for weeks or even months for needed medical service. Nursing  and PCP notes are often incomplete, Nursing assessments at times do not follow the Nurse Protocols. Nurses do not consistently refer to PCP patients with conditions for which no Nursing Protocol applies.  The acting medical director does not appear to be monitoring a sufficient number of Nurse and PA encounters to provide teaching that would promote better compliance with the Implementation Plan.

**Outside Medical Care Referrals by MCJ – Not compliant. Compliance rate 69%.**

Reports from the Emergency Room did not consistently accompany patients upon their return, and occasionally were not referenced by MCJ staff even days later.  The ER report of illicit drug use in case 9, for example, was not noted by MCJ staff or acted upon.

**Treatment of Intoxicated Inmates and Detoxification – Not Compliant.  Compliance rate 67%.**

Incarcerated persons at risk for withdrawal or showing evidence of withdrawal from opiates and other substances are not consistently monitored by appropriate protocols.

**Detections and Treatment of TB and other infections – Not compliant. Compliance rate 50%**

Persons at risk of chronic hepatitis C (HCV), human immunodeficiency virus (HIV) and other sexually transmitted diseases (STD) are not screened after Intake or provided timely blood testes during incarceration even after such tests are requested by the patient.  See case 28.

I observed delays in testing where patients had symptoms consistent with Covid.  On account of this delay patients with Covid infections will not be isolated timely, with a resultant increase  in spread of infection. Patients testing positive for Covid infection are not consistently evaluated by PCP regarding need for treatment with anti-viral agents such as Paxlovid.

**Chronic Care – Not compliant.  Compliance rate 62%**

Patient problem lists are not consistently updated to show significant medical conditions.  Patients with documented substance abuse are not entered into chronic care program.  Chronic care visits required after Intake do not occur timely.

**Health Care Maintenance** – **Not compliant.  Compliance rate 25%.**

Patients housed in MCJ for more than 6 months are not consistently examined by PCP.

**Continuity of Care - Not compliant.  Compliance rate 38%**

Appropriate discharge forms are not consistently filled out or stored in the EMR.  Discharge information is sometimes incomplete and/or inaccurate. See case 28 - patient with newly diagnosed syphilis needing treatment transferred from MCJ to prison with no record of syphilis and no instructions regarding need for treatment.

**Pharmacy Administration/Management – Not compliant Compliance rate 43%**

Patients are not consistently receiving medications that were prescribed before Intake and needed after admission to MCJ.  See case 23.

Medication room and medication management inspections are not being performed quarterly despite state law reiterated by the requirements set forth in the Implementation Plan and Wellpath protocols.  See, Business & Professions Code Chapter 9, Division 2, Article 13.5 (Correctional Clinics), sections 4187 – 4187.5. I have requested the name of the pharmacist in charge of the pharmacy services at MCJ, along with a copy of the latest inspection of the MCJ medication room.  My next MCJ audit will include an extended on-site examination of pharmacy services to assess compliance of policies and procedures with the Implementation Plan and State law.

**Quality Assurance – Not compliant.**

Death reviews do not address my concerns as elucidated in the written audit reports. Peer review is not being performed and/or documented to assess adequacy of care delivered by RN and PCP care.

## CASE REVIEW and RECOMMENDATIONS FOR TRAINING/GUIDANCE

This report describes findings regarding care provided to 29 patients at MCJ selected from the list of grievances filed in November and December and one patient who committed suicide.

| Case | Assessment of Care | Guidance/Training Recommendations |
|---|---|---|
| 1 | Somatic symptoms comorbid to mental health diagnosis.  Access to care delayed. Covid symptoms not fully evaluated. | **RN** – should consistently record vital signs and test for COVID as needed. |
| 2 | No visit to PCP scheduled for patient with chronic disease. Chest pain complaint not addressed. Transfer documents inaccurate. | **RN** – forms filled out for transfer should be accurate, and in accord with EMR information. |
| 3 | Patient requesting STD does not receive test. | **Dr.** should establish standing order for any patient requesting STD test, not already performed during the current incarceration to be so ordered under his name. |

| | | |
|---|---|---|
| 4 | Complaint of visual loss not addressed. Purportedly referred to NP/PA but no such exam took place. | ███████ RN should be instructed about how to ensure that intended referrals for serious complaints, such as loss of vision, are enacted. |
| 5 | Nurse evaluation that is incomplete and without PCP consultation regarding abdominal pain exceeds scope of practice and does not comport with RNP (registered nurse protocol). | ███████ RN should be counseled and instructed in proper use of RNP generally, and the dangers in not referring to PCP cases of severe and/or undiagnosed abdominal pain. |
| 6 | Nurse notes incomplete with inadequate history and lack of exam. Medications provided without indications. Inordinate delay in care for patient requesting sick call | ███████ RN should be counseled regarding the necessity for complete notes that document history and physical exam, especially before dispensing drugs, even OTC meds. |
| 7 | The patient did not see PCP for CC (chronic care) visit chronic alcoholism (alcohol use disorder). Patient subsequently fell in shower. | Dr. ████████ should work with Intake to automatically enroll patients with AUD in CC program. Fall could be related to complications from alcohol abuse |
| 8 | Painful cyst on arm not seen promptly. Treatment is according to RNP | **Welpath** should be working on improving access to care following patient request for service. |
| 9 | Chronic care visit not timely. Reports of valium in urine test done while patient incarcerated is not followed up. Patient released without documented continuity of care for seizure disorder. | **PA** ████████ should review this case wherein she saw patient after hospital release with lab report of valium in urine. Does **Wellpath** have a policy regarding detection of illicit substances in patient while incarcerated.? |
| 10 | Complaint about hernia made on 11/15/22 but no visit offered to patient until 11/29/22. | **Wellpath** should be working on improving access to care following patient request for service. |
| 11 | Patient with AUD and methamphetamine abuse overdosed while incarcerated. | **Wellpath and Custody** should be tracking number of overdoses while in custody and work with the medical and MH teams to determine how many of these cases arise from prescribed drugs. |
| 12 | Patient with documented methamphetamine abuse, and AUD has signs of acute toxicity and/or withdrawal with pulse rate of 124 at Intake. PCP on call contacted for meds and MH referral for same day. Patient commits suicide within 24 hours. | **MCJ and Wellpath** should consider protocol to have all patients with abnormal vital signs or other indicia of drug toxicity on intake seen by PCP or mental health MD for clearance before releasing to GP. |
| 13 | Methamphetamine abusing patient issues a complaint of itching called "formication." Patient not provided with CC referral. Treatment of drug withdrawal and formication inadequate as anti psychotics may be needed. | **PA** ████████ **RN,** ████████ **RN and** ██ **RN – possibly entire staff,** should be instructed about formication as consequence of methamphetamine abuse, and other mental health conditions. RN need to refer to PCP all conditions not resolving with nurse sick call. |
| 14 | Exam after fall is incomplete, and delayed. Treatment prescribed by MD without exam to determine diagnosis | ███████ RN should be reminded that the examination form needs to be filled out entirely to provide PCP basis for treatment. |
| 15 | Cleared by NMC for MCJ housing with 24 wk pregnancy, OUD and methamphetamine abuse. Blood sugar not tested. | ███████ RN and all staff need reminder and education about testing blood sugar at intake for patients at risk of hypoglycemia – all patients with substance use disorders. |

| 16 | Functionally blind patient followed by opthamology and treated in accord with protocols. | MCJ staff does provide appropriate care in many cases. |
|----|---|---|
| 17 | Patient with AUD and methamphentamine abuse is at risk for HIV, HCV, STD but not screened after intake, even after requested by patient.  STD testing is  belatedly done.  PCP visit 90 days after intake is later than should be for patient with Chronic Disease.  No history of physical exam documented (sections left blank) to establish cause of neck pain complaints. | **Dr.** ▮▮▮▮ needs to monitor Intake process to have patients with chronic diseases including substance abuse referred for timely exam.  Forms need to be filled out entirely to establish basis for treatmetns. Dr. ▮▮▮▮ needs to have sufficient time applied to task of chart review to complete all charts. |
| 18 | HCV testing delayed, severe back pain not addressed timely or followed up.  Problem list incomplete. | ▮▮▮ **RN** needs reminder to refer patients with chronic diseases (in this cased syphilis, IV drug use) for CC and obtain HCV, HIV testing.**Wellpath** – needs to deploy corrective actions to provide patients with timely access to care. |
| 19 | Patient not referred for CC despite risk from homelessness and polysubstance abuse, Prednisone prescribed for administration at night, and without face to face exam is not best practice. | ▮▮▮ **RN,** ▮▮▮ **RN** need education to refer patients like this for CC, and follow form requirement to obtain blood sugar. ▮▮▮ **PA** needs education re proper prescribing of prednisone – daily dose should be in AM.  All prescriptions generally requires examination. |
| 20 | STD testing not performed even after requests. Albuterol prescribed without adequate history and exam to establish need for medication. Covid symptoms not tested timely for Covid | ▮▮▮ **PA** needs education regarding necessity for exam and history before or in course of prescribing medications, including albuterol. ▮▮▮ **PA and other staff** need education to ensure patients at risk for STD are being properly tested and followed. |
| 21 | 49 yo female with dysfunctional uterine bleeding (DUB)  does not have access to prompt care, and becomes severely anemic before receiving attention in hospital.  Patient's tachycardia, suggesting dangerous blood loss, is ignored.  Hospital recommendation for GYN consultation ASAP is not followed.  GYN care is delayed. | ▮▮▮ **PA** needs education regarding proper treatment for DUB and reasons for immediate GYN evaluation including use of IM/IV treatments, adjusting meds and surgery. **Wellpath** needs to work with MCJ to improve access to specialty care.  **All Staff** need to be trained to take appropriate action for significantly abnormal vital signs. |
| 22 | Asthma medication not timely provided. Singulair prescribed by PA ▮▮▮ without exam and history to validate prescription.  X ray ordered by RN without evident PCP approval. Medications dispensed to patient by RN without apparent need. | ▮▮▮ **RN needs** reminder to enroll patients in CC programs who have history of asthma and request asthma med. ▮▮▮ **PA** needs reminder that patients to whom she prescribed medications usually need to be examined by her. ▮▮▮ **RN** needs to be trained that medications should only be dispensed to treat conditions that merit medications. |
| 23 | 25 yo female, chronic asthmatic is not prescribed asthma meds on Intake that she had been taking before incarceration.  Treatment provided at MCJ is insufficient as patient is documented to be wheezing on | ▮▮▮ **FNP,** ▮▮▮ **PA and staff need** training regarding the importance of treating asthma patients to degree that they are manifestly free of wheezes. |

| | exam with no follow up to ensure resolution of symptoms and asthma control | |
|---|---|---|
| 24 | 57 yo with chronic pain, substance abuse is not provided physical therapy as ordered. Dental care for painful tooth not provided. | **Wellpath** should develop protocol for managing non cancer chronic pain, that includes adequate access to physical therapy and multidisciplinary approach. Timely treatment of dental pain is crucial. |
| 25 | 25 yo female not tested for HIV, HCV, STD despite risks from polysubstance abuse and no cultures taken from recurrent skin abscess taken to determine best treatment for possible MSRA. | ▓▓▓ **PA, and staff** should be reminded of HIV, HCV, STD testing required for patients at risk, and need to culture recurrent skin wounds for possible MSRA. |
| 26 | 58 yo male with methamphetamine abuse is not seen by PCP for CC or full physical as of 12/30/22, more than 6 months after his intake. Tooth abscess is not being treated | **Wellpath and staff need** apply consistently the protocols for Dental pain relief and procure timely dental services. |
| 27 | 48 year old male with chronic headaches following assault. Dental pain not treated with adequate pain relief. | **Wellpath and staff need** apply consistently the protocols for Dental pain relief and procure timely dental services. |
| 28 | Syphilis infection detected after patient request for testing was belatedly granted. Positive test results not noted by MCJ staff. No documented report to public health. Patient transferred to WSP without evident knowledge of his medical condition and without this information sent to receiving health care providers. (I have alerted parties by e mail). | **Wellpath** needs to ensure discharge and/or transfer information is complete, uptodate and effectively communicated for patients with serious medical condition. Systems need to be deployed that ensure serious abnormal test results receive appropriate attention. A start for this program is in reviewing carefully all submitted grievances. |
| 29 | 41 yo female with headache complaints not seen by PCP within 6 months of intake | Wellpath needs to deploy system to ensure patients undergo full exam by PCP within 6 months of their admission to MCJ. |
| 30 | 56 yo female complaining of sudden headached onset in temporal lobe. RN writes that PCP will be contacted. No contact described. In this case, possible temporal arteritis needs to be considered as delayed treatment can cause blindness. | **Wellpath** needs to ensure sufficient PCP staff to engage all cases that are referred by RN. |

## RECOMMENDATIONS and CONCLUSIONS

Dr. Dheeraj Taranth, VP Medical Director, has responded to the above concerns with a Corrective Action Plan, January 19, 2023, in which he states plans for remedial education to all staff. See Ex. C. I have identified individuals to whom additional training might be directed. I plan on visiting MCJ for one week in March 2023 to assess the effectiveness of the corrective action plan. I can assist MCJ leadership in their training program on site or remotely.

## Attachments:

Ex. A – Proposed 2023 Schedule for MCJ Audit, with Enhanced Monitoring

Ex B – MCJ Grievances - Selected Cases in November and December 2022

Ex. C – Preliminary Corrective Action Plan, January 19, 2023

# Exhibit 15

**Cara Trapani**

| | |
|---|---|
| **From:** | Bpbmdjd <bpbmdjd@aol.com> |
| **Sent:** | Monday, March 13, 2023 10:56 AM |
| **To:** | Cara Trapani; Ben Hattem; blitchsk@co.monterey.ca.us; peter@bertlinglawgroup.com; mosesjj@co.monterey.ca.us |
| **Cc:** | ███████████████████████████████ |
| **Subject:** | Barnett mentoring visit at MCJ March 6 - 9 2023 |
| **Attachments:** | Report of March 2023 mentoring visit by Barnett March 13.docx |

[EXTERNAL MESSAGE NOTICE]

To all,

 I visited MCJ March 6 - 9, 2023 to teach and mentor staff regarding means by which MCJ may perform medical services in substantial compliance with the Implementation Plan.  I attach a summary of my activities and understandings reached during that visit.

Recently elected Sheriff for Monterey County, Tina Nieto, and her team attended the debriefing meeting on Thursday at 2 pm, Sheriff Nieto and Undersheriff Boyd clearly expressed their interest in participating in the process to promote compliance with the Implementation Plan.  I believe the Sheriff wants to be "kept in the loop" regarding these matters.  I am copying Captain Moses, as he is  (and has long been) the liaison at  the jail for health affairs.

I will be considering dates for future visits.  At this time, April seems too soon for an audit.  MCJ may need all of April to deploy corrective action plans developed following this most recent visit.

As always, feedback and comments are welcome.

Best regards,

Bruce Barnett, MD, JD
████████████ - personal cell

1

15-1

Summary of mentoring visit by Bruce Barnett, MD – Medical Expert Monitor March 6 – 9

## Monday – March 6, 2023

Orientation Meeting with

- ████████████ RN; regional and acting MCJ DON
- ████████████████ Interim Health Services Administrator

Not present:   Ann Marie Natali, Interim Implementation Specialist; Dheeraj Taranth, DO, Regional Medical Director are informed by e mail and will attend debrief by video.

Visit objectives proposed:

1. Improve process for reviewing grievances.  Wellpath policies call for effective review of grievances within 3 days of submission.  Physician oversight of grievances strongly recommended.
2. Adequate treatment of pain.  Wellpath policies call for PCP referral when pain levels exceed 6.  Treatment of moderate to severe pain with acetaminophen/ibuprofen may require TID or QID rather than BID administration.
3. STD testing should include HCV screening for all persons not released within 7 to 14 days after booking. Persons requesting STD testing should be tested promptly.
4. Persons describing current substance abuse (alcohol, stimulants, opiates) should at intake be referred for timely evaluation by PCP and/or enrolled in chronic care program.
5. Protocol is revised for evaluation of positive TB skin testing, and patient education/consent form for treatment of latent TB is being finalized.

REVIEW OF INTAKE – interview with Intake nurse on site

Instruction provided in accordance with the Implementation Plan and current Wellpath Protocols:


1. All persons with documented/reported substance abuse disorders should be referred for PCP/Medical evaluation
2. STD screening can be initiated by Intake Nurse for persons at overt risk of STD.  Testing should include HCV,
3. Abnormal vital signs should be repeated.  Persistent, alarmingly abnormal VS should be reported to PCP on call.
4. All parts of the form should be filled in where required.
5. Evident significant clinical  conditions should be added to the problem list.
6. Instructions in the forms used at Intake need to be followed.  Example:  finger stick blood sugar should be obtained from every person reporting substances abuse (tobacco cannabis excepted).

Summary of mentoring visit by Bruce Barnett, MD – Medical Expert Monitor March 6 – 9  p2

Review of the Holding Cells :

1. Daily rounds are to be continued.  This process had been discontinued during Covid pandemic.
2. Nurses should consider medical referral for persons housed in Holding Cells in the Intake area beyond 24 hours.

Outpatient housing (Infirmary) visited.  I have suggested PCP visits/notes at least weekly to document the  status of patients in the infirmary.

Two patients were interviewed.

████████████████ – 34 yo female is now 18 weeks pregnant.  She requested appointment to discuss termination of 15 week pregnancy in a grievance dated 2/21/23.  Since then she has not seen OB, has not been counseled or undergone any prenatal evaluation/testing. OB appointment was scheduled for March 10.  Following this interview, consultation regarding termination was authorized by Wellpath.

████████████████ – Mr. █████ is a 60 year old male, diabetic, with history of schizophrenia.  He reported not receiving medications.  He was recently sent to ER to treat an allergic reaction.  When interviewed he was feeling better.  He said he is receiving all prescribed medications.  He had refused his blood sugar tests after return from hospital. Blood sugar was tested, and found elevated.  Referral to PCP was made to follow blood sugar.

**TUESDAY March 7, 2023**

**Meet with RN █████ HSA █████** We reviewed the findings and plans discussed yesterday.

**I interviewed PA █████████.**  He is seeing patients by telehealth.  I reviewed with Mr ████ the requirements set forth in the Implementation Plan that include requirements for access to care.  Mr. █████ documented care generally complies with the Implementation Plan.  I encouraged him to order in person exams when needed as there are some assessments that cannot be completed through telehealth alone.  We also discussed pain management.

**I visited the MCJ Medication Room with RN █████ HSA █████ and Correct Rx Pharmacist, █████████, Pharm D.**  Ms. █████ explained that the medication room is not a pharmacy. It is essentially a storage facility.  The titular on site manager of this storage facility is Dr. ████████.  The day-to-day oversight of this medication room has been delegated to HAS Ms. █████ described the following pharmacy services provided by Correct Rx for Wellpath and Monterey County: 1) filling prescription ordered for individual patients 2) filling orders for stock medications that will be later dispensed to individual patients  3) performance of  drug utilization review (DUR) by California licensed pharmacist for any prescribed drug supplied by Correct Rx whether dispensed from stock or individually ordered.  4) every 90 days inspect

Summary of mentoring visit by Bruce Barnett, MD – Medical Expert Monitor March 6 – 9  p3

medication room and report on compliance with requirements for storage – with particular attention to a) controlled substance inventory b) disposal of expired medications,  c) safe storage.

I found many drugs stored in the medication room had labels naming a prescribing provider that no longer works at MCJ. This matter will be further investigated by HSA ███████

**Interview with Captain Joseph Moses**.  We discussed following items:

1) Plaintiffs' attorneys have reported concerns that deputy staffing, as well as health care staffing, has been insufficient to ensure timely care on site or when trips are needed off site. Captain Moses stated that current deputy staffing is sufficient to support all medical needs.  He is not aware of any instances in which medical services were curtailed due to insufficient custody staff.
2) I have been concerned that patients in holding cells may have unappreciated medical problems. Captain Moses welcomed observation of patients in holding cells with regular nursing rounds.
3) I noted that death reviews were not being timely performed/released.  CCR Title 15, Section 1046 requires the jail to produce a death review within 30 days of the incarcerated person's demise, without regard to when the coroner presents a formal report.  Captain Moses agreed that death reviews by Monterey Jail leadership within 30 days after death will help address custody issues as well as medical issues that need prompt attention.  I asked Captain Moses to work with county counsel to assist in obtaining timely death reviews.

**WEDNESDAY, March 8, 2023**

**The newly hired Medical Director ████████, MD met with me, DON ████ and HSA ████** Dr. ███ is a board-certified internal medicine and infectious disease specialist.  We reviewed the format of the Implementation Plan.  I explained that Access to care is a crucial component in compliance with the terms of the Plan.  Dr. ███ and I reviewed the matters I have recommended for immediate attention:

1. Diagnosis and treatment of Latent TB should include QuantiFeron blood test to verify positive skin test results.
2. Persons booked with acute conditions and unstable chronic disease*, **including substance abuse***, should be referred to PCP for timely evaluation and/or chronic disease visits.   Chronic diseases include any condition that lasts more than 6 months and adversely impacts the individual function and prognosis.
3. Screening for infections should be performed in accord with Wellpath Monterey County California Policies & Procedures, State and Federal guidelines. MCJ leadership agrees that appropriate tests for Syphilis, chlamydia, gonorrhea, HIV and Hepatitis C should be done no later than the initial health assessment within 2 weeks of booking.

Summary of mentoring visit by Bruce Barnett, MD – Medical Expert Monitor March 6 – 9  p4

4. Ibuprofen and acetaminophen should be offered to patients in safe and appropriate doses.
5. Grievances should be reviewed promptly.  An example was discussed wherein  patient's request for urgently needed attention to her pregnancy was not acted upon at MCJ even after she had filed a grievance.  She is now receiving care.

I provided Dr. ███ with copy of the Implementation Plan, MCJ policies and procedures and CFMG Standardized Nursing Protocols.  Dr. ███ and I reviewed proposed Wellpath nursing procedures and provided DON ███ with suggestions to reconcile these protocols with the current CFMG protocols and authoritative medical guidelines, such as presented in Uptodate.

**THURSDAY, March 9, 2023**

The DON, HAS and I reviewed this morning the February grievances.  At the exit/debrief session this afternoon I presented a summary of my findings and plans for corrective action.

Attending debriefing/exit summary:

Bruce Barnett MD – Medical Expert Monitor
███████████, RN – Interim Director of Nursing
███████ MD – Medical Director, MCJ
██████████, DO – Regional Medical Director
███████████ – Regional Operations, , Acting MCJ Implementation Specialist
Chief Keith Boyd – Undersheriff
Garret Sanders – Chief Deputy
Commander Rebecca Smith – Corrections Operations Bureau
Sheriff Tina Nieto – Monterey County Sheriff and Coroner

I reported that my visit is designed to prioritize attention to aspects of care I believe are most amenable to improvement.  MCJ medical leadership concurs that corrective actions should address the following:
1) Prompt grievance review.
2) Documenting counseling of patient with suspected Latent TB  (following positive skin testing, ideally verified with QuantiFERON blood test).
3) Adequate treatment of pain.
4) STD testing of incarcerated persons.  See explanation below.
5) Referring all persons identified at Intake as substance abusers to PCP for timely medical evaluation and/or enrollment in chronic care program.

Summary of mentoring visit by Bruce Barnett, MD – Medical Expert Monitor March 6 – 9  p5

Sheriff Tina Nieto  attended the debriefing in person.  She inquired about the audit process and plans for bringing MCJ performance to substantial compliance with the Implementation Plan.

I related to Sheriff Neito that:

1)  The medical monitoring reports I have submitted twice each year since 2018 describe percentage compliance of MCJ services with the performance parameters identified in the Implementation Plan using an audit tool that has not changed year to year so as to allow comparison and measures of improvement.

2)  MCJ should be screening incarcerated persons for  infectious diseases (including TB, HIV, STD, and Hepatitis C) in accord with community standards of care, as reiterated in Wellpath Monterey County California Policies and Procedures, to comply with the Implementation Plan

3)  MCJ does not have to perform perfectly to be considered in substantial compliance with the Implementation Plan.   In my experience, performance that meets the Plans guidelines for 80% of reviewed circumstances has been deemed substantially compliant.  However, I will be disinclined to find MCJ in substantial compliance of the Implementation Plan regarding medical services if I observe processes or departures from the Implementation Plan that expose incarcerated persons to  risk injury or death.

The Sheriff's Office representatives described their commitment to assisting health care staff to ensure persons incarcerated in Monterey County receive medical care that is substantially compliant with the Implementation Plan.  Undersheriff Keith Boyd said that the department will be considering in its budget equipment to improve efficiency and safety, including systems for storing and administering medications.

**Explanation for communicable disease screening at intake:**

Wellpath Monterey County California Policies & Procedures, HCD-110_B-02 Infectious Disease Prevention and Control-Monterey CA requires a written Exposure Control Plan approved by the Responsible Physician / Medical Director to address the management of, at a minimum, tuberculosis, HIV, MRSA, sexually transmitted diseases, outbreaks of common respiratory and gastrointestinal disturbances and Hepatitis A, B, and C.  Wellpath policies for Monterey requires that "[t]he [infection control] plan is reviewed and updated at least annually ***and is consistent with the current requirements and published guidelines of the Centers for Disease Control (CDC),*** (emphasis added), the National Institute of Occupational Safety and Health (NIOSH), and the Occupational Safety and Health Administration (OSHA  ).

CDC guidelines (September 2021) state that all persons housed in juvenile and adult correctional facilities should be screened at entry for Syphilis, Hepatitis B and C, and HIV

Summary of mentoring visit by Bruce Barnett, MD – Medical Expert Monitor March 6 – 9  p6

infection.  Females under age 36 and Men under age 30 should be screened for chlamydia and gonorrhea. Women under age 36 should be screened for trichomonas.  Women and transgender men should be screened for cervical cancer in accord with standards applied to persons not incarcerated..

Timing for communicable disease screening will be determined by medical providers according to patients' circumstances.  Persons at manifestly high risk for infection, such as IV drug users, may merit testing at intake.  Others may be tested when undergoing health assessment to be performed not later than 14 days after booking, as required by Wellpath Monterey County California Policies & Procedures HCD-110_E-04 Initial Health Assessment.

# Exhibit 16

[4276968.1]

# CORRECTIVE ACTION PLAN

**Site:** CA – Monterey County Jail
**Audit Type:** Medical

| Item Code | Finding | Corrective Actions | Responsible Person | Target Date | Verification Method | X |
|---|---|---|---|---|---|---|
| INTAKE | Intake nurse do not consistently:<br>1) record an actual weight and height measurement,<br>2) obtain blood sugar reading from diabetics, or<br>3) elucidate the extent of substance abuse.<br><br>Abnormal vital signs documented at intake are not repeated or followed up with an implementation plan.<br><br>Intake nurses do not contact PCP for consultation in cases where the inmate is: acutely ill, has an unstable chronic illness or presents with new medical problems not covered by Nurse Protocols.<br><br>Intake nurse send to the general population inmates who have described as "under the influence," "impaired," or "at imminent risk of severe withdrawal symptoms."<br><br>Necessary medications on occasion were not provided to inmates for days after their admission to MCJ. | 1. Review with all relevant medical staff: Receiving screening form and **Wellpath Policy HCD-110_E-02 Receiving Screening, and Wellpath Policy HCD-110_E-09B Timely Initiation of Medication upon Arrival.**<br><br>2. In-service all relevant medical staff on proper vital sign measurement, TO INCLUDE ACTUAL height and weight, obtaining blood sugar reading for all diabetics, evaluation and documentation. Intake nurse will be instructed to check all abnormal vital signs by repeating the reading and referring to PCP on call unresolved abnormal results<br><br>3. Intake nurse will utilize a receiving tool, which aids in ensuring that receiving steps are complete to include: vital signs, referrals, medications, chart reviews and documentation<br><br>4. Train all relevant medical staff on CIWA/COWS assessment, monitoring and referrals and **Wellpath Policy HCD-110_A-11 On-Call Provider Contact and HCD-110_F-04 Medically Supervised Withdrawal and Treatment.**<br><br>5. Train all relevant staff on timely referral to PCP or ER, as medically indicated. Medically unstable patients will be referred immediately to PCP for consult and monitored by medical staff until resolved. Acute cases will be seen by onsite promptly by PCP or transferred to ER as medically indicated.<br><br>6. Create report in EMR to monitor medications not continued within 24 hours of booking. – Daily review of all medications not continued within 24 hours of booking should be done by on-call provider. HSA will review weekly. | HSA or Designee<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Home Office (Report)<br>HSA or Designee (audit) | | 1. HSA will provide copies of all training material and signed training attestations from all relevant staff members.<br><br>2. HSA will provide proof of training and clinical competency assessments for each relevant staff member.<br><br>3. Will Produce tool to Neutral Monitor.<br><br>4. HSA will provide copies of all training material and signed training attestations from all relevant staff members.<br><br>5. HSA will provide copies of all training material and signed training attestations from all relevant staff members.<br><br>6. A.) Proof Provided of System update. B.) Pending creation of EMR report Produce Audits of medication not continued within 24 hours of booking to expert monitor monthly. | ☐<br>☐<br>☐<br>☐<br>☐<br>☐<br>☐ |

16-1

# CORRECTIVE ACTION PLAN

**Site:**    **CA – Monterey County Jail**
**Audit Type:**    **Medical**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 7. | The MCJ medical director, along with the director of nursing, will oversee the quality of intake. The medical director and/or director of nursing will perform no less than 10 peer reviews of intakes per month. | DON/ Medical Director | | 7. | Audits to be produced to expert monitor monthly. |
| | | **8.** | **Home Office to complete a CQI study related to the Intake Process. This study will be completed monthly.** | Home Office | | 8. | Monthly CQI study to be provided to expert monitor. |
| ACCESS | Sick call requests were not consistently managed by nurses as required under the implementation plan. Inmates are not timely seen following their written request for sick call.  Face to face assessments were delayed.<br><br>Nurses provide care that exceeds the legal scope of practice by failing to follow the nurse protocol or by not referring to PCP for conditions that nurse protocols do not cover.  Nurses routinely evaluated without consultation or referrals to PCP inmates who complained of injury following altercations and/or custody use of force.<br><br>Nurses failed to consistently enter a plan of action, inconsistent use of SOAP format, lack of assessments, and failures to consistently record accurate height and weight.<br><br>Complex medical conditions (such as high-risk pregnancies, persistent infections) are not being followed closely by the medical director.<br><br>PCP fail to document a chart review regarding the inmate medical condition following a second missed appointment or second rescheduled appointment.<br><br>Physician supervision of PA and RN care is not always provided when appropriate. | 1.<br><br><br><br>2.<br><br><br><br>3.<br><br><br><br>4.<br><br><br><br>5.<br><br><br><br>6.<br><br><br>7.<br><br><br>8. | Review **Wellpath Policy HCD-110_E-07 Nonemergency Health Care Requests and Services** with all relevant staff.<br><br>Perform monthly audits to ensure that sick calls are triaged daily and responded to with a face-to-face encounter within 24 hours of receipt.<br><br>In service all relevant staff on utilization of Nursing Protocols, appropriate documentation and referrals and **Wellpath Policy E-08 Nursing Assessment Protocols and Procedures**<br><br>After completion of protocol training nurses will be required to pass a clinical competency evaluation prior to being able to utilize protocols.<br><br>Inmates with significant injuries following altercations and/or use of force should be examined by a PCP. All Relevant Staff will be trained to this point.<br><br>Complex medical conditions require referral in EMR to the medical director.  Easy Referral method to be put in place in EMR.<br><br>Perform monthly audits to ensure appropriate referrals to PCP and medical director.<br><br>Complex medical conditions will be followed closely by the medical director. | HSA or Designee<br><br><br><br><br><br>Wellpath HO Training Team<br><br><br>DON<br><br><br><br>HSA<br><br><br><br>Home Office<br><br><br>HSA<br><br><br>Medical Director | 08-27-20 | 1.<br><br><br><br>2.<br><br><br>3.<br><br><br><br>4.<br><br><br><br>5.<br><br><br><br>6.<br><br><br><br>7.<br><br><br>8. | HSA will provide copies of all training material and signed training attestations from all relevant staff members.<br><br>Audits to be produced to expert monitor monthly.<br><br>Will Produce training material and roster for completion for all applicable staff.<br><br>Clinical Competency evaluations for all staff will be kept on site and available for review if requested.<br><br>HSA will provide copies of training material and signed training attestations from all relevant staff members.<br><br>Proof of implemented change produced.<br><br><br>Audits Produced to expert monitor Monthly.<br><br>A.) Medical Director to maintain binder including daily huddle notes to discuss | ☐<br><br><br><br>☐<br><br><br>☐<br><br><br><br>☐<br><br><br><br>☐<br><br><br><br>☐<br><br><br>☐ |

# CORRECTIVE ACTION PLAN

**Site:**        CA – Monterey County Jail
**Audit Type:**    Medical

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | high risk patients with nurses (Available upon request). B.) Current High-Risk List to be maintained at the nursing station, Patients added to list by MD, indicating to nurses that PCP should be called for all issues (Available upon request) | |
| | | 9. | EMR will be updated to automatically generate an alert for all second and subsequent missed and/or rescheduled appointments. | Home Office | | 9. Proof of implemented change produced. | |
| | | 10. | PA Delegation services agreement must be signed anew with current physician supervisors in accord with the provisions of CCR 1399.540 and California B&P 3502.  Each PA must regularly consult with and receive education from the medical director. | HSA / Medical Director | | 10. Agreements to be produced and maintained on site. | |
| | | 11. | The MCJ medical director, along with the director of nursing, should oversee the quality of nurse sick call.  The medical director and director of nursing will formally review the performance of all clinical practitioners (RN, FNP, PA, MD and DO) by analysis of no less than 5 medical records for each provider each month. ***Need 10% for PA, NP*** | Medical Director/ DON | | 11. Audits to be produced monthly to expert monitor. Binder of monthly Audits will be kept on site. | |
| | | 12. | **Home office to complete a CQI study related to Access to Care. This study will be completed monthly.** | Home Office | | 12. Monthly CQI study to be provided to expert monitor. | |
| CCARE | Major medical problems were not consistently documented in the problem list. Incomplete problem lists, SOAP notes, and treatment plans result in unaddressed significant chronic care issues. Failure to order labs and review results. Failure to ensure that patients with chronic health conditions (such as diabetes, respiratory disorders, cardiac | 1. | In-service all relevant staff that at every chronic care appointment, the medical provider shall (1) assess the patient's current medications, complaints, and compliance with treatment plan; (2) examine vital signs and weight; (3) assess the patient's diagnosis, degree of control, compliance with treatment plan and clinical status as compared to prior visits; (4) conduct lab and diagnostic tests as necessary, develop strategies to improve outcomes if the condition has worsened, and educate the patient; and (5) document | HSA or Designee | 08-27-20 | 1. A.) HSA will provide minutes and attendance roster with name, title, and signature of all attendees in training. B.) Perform and produce monthly audits to ensure complete problem lists, SOAP notes, and treatment plans. | ☐ ☐ |

# CORRECTIVE ACTION PLAN

**Site:**       **CA – Monterey County Jail**
**Audit Type:**   **Medical**

| | | | | | | |
|---|---|---|---|---|---|---|
| | disorders, hypertension, seizure disorders, and communicable diseases) are seen by an FNP, PA, or MD at least every 90 days, and more frequently if appropriate.<br><br>Chronic care assessments fail to include supervision by or consultation with MD. | | decision to refer to MD or specialist, and/or conduct discharge planning as necessary. | | | ☐ |
| | | 2. | EMR will be updated to automatically generate an alert for PCP appointment within 7 days of intake, pursuant to implementation plan, for patients diagnosed or with suspected chronic health condition. | Home Office | | 2. Proof of implemented changes produced. | ☐ |
| | | 3. | Chronic care assessments will require EMR review and approval of treatment plans by an MD. EMR system to be updated to facilitate this. Including automatically adding all midlevel Chronic care forms to sign off que for MD, and sign off box added to bottom of forms. Monthly reports of MD ran to assure compliance of MD with sign offs. | Home Office/ Medical Director | | 3. A.) Produce proof of implemented changes.<br>B.) Pending implementation of EMR Changes reports to be produced monthly to expert monitor. | ☐ |
| | | 4. | Chronic Care List will be produced monthly to expert Monitor. | HSA or Designee | | 4. List to be produced Monthly | |
| | | 5. | **Home office to complete a CQI study related to Access to Care. This study will be completed monthly.** | Home Office | | 5. Monthly CQI study to be provided to expert monitor. | |
| HMAINT | Annual examinations are incomplete, lacking full physicals and inaccurately report current diagnoses, current medications, and/or significant laboratory abnormalities.<br><br>History and physical exams due at 6-month or one-year intervals are not timely performed.<br><br>Inmates with a significant medical condition or stable chronic diseases were not consistently provided with a full exam by physician or physician assistant within a week after intake.<br><br>Inmates with documented HIV and/or Hepatitis C infections should be counseled about options for immediate versus delayed treatments. | 1. | HSA will review the periodic health assessment requirements with all relevant employees, to include: initial and annual physical assessments, chronic care appointments per established schedule and patient's condition. | HSA or Designee | 08-27-20 | 1. HSA will provide minutes and attendance roster for training of all relevant staff members. | ☐ |
| | | 2. | Train all relevant medical staff on **Wellpath Policy HCD-110_B-08A Hepatitis C Virus (HCV) and B-09A Medical Management of Exposures: HIV, HBV, HCV, Human Bites and Sexual Assaults**. | HSA or Designee | | 2. HSA will provide copies of all training material and signed training attestations from all relevant staff members. | ☐ ☐ |
| | | 3. | Visual reminder (flyer) will be posted in all provider exam rooms, to indicate timeframes for history and physical exams. | | | 3. All provider exam rooms have a flyer posted on the wall, indicating the timeframe for scheduling a history and physical appointments. Will produce copy of flyer and verify placement during visits. | ☐ |

[3724049.1]

7

16-4

# CORRECTIVE ACTION PLAN

**Site:** CA – Monterey County Jail
**Audit Type:** Medical

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 4. EMR will be updated to automatically generate an alert for 6-month and 12-month exams. | Home Office | | 4. Produce Proof of implemented changes. | | |
| | | 5. HSA will implement a PCP Self Audit tool to ensure that PCP visits are completed with problem lists updates. | HSA | | 5. HSA will maintain a binder with all PCP Self Audit Tools | | |
| | | **6. Home Office to complete a CQI study related to the health maintenance process. This study will be completed monthly.** | Home Office | | 6. Monthly CQI study to be provided to expert monitor. | | |
| CONTI | The amount of medication dispensed is not identified by the release document. | 1. Add to EMR a trigger for amount of medication dispensed upon release. | Home Office | | 1. Produce proof of implemented changes. | ☐ |
| | Patients with serious and unstable conditions were not provided with post release appointments and without adequate instructions for appropriate follow up care. | 2. EMR will generate a report listing Release date and amount of medication dispensed to patient to be reviewed by HSA weekly. | Home Office (report) HSA (review) | | 2. Produce Monthly. | ☐ |
| | Information transmitted to prisons is incomplete or not documented. | 3. HSA or designee to audit releases for documentation completion utilizing an audit tool, to include: amount of medication dispensed to patient and documentation of follow up referrals made. | HSA or Designee | | 3. Audits produced monthly to expert monitor. | ☐ |
| | | 4. Information transmitted to prisons for patients transferred to prison audited monthly for completeness. | HSA or Designee | | 4. Audits produced Monthly. | ☐ |
| | | 5. In service all relevant nursing staff on follow up referrals upon release from facility, and review **Wellpath Policy HCD-110_E-10 Discharge Planning and Release Medications.** | | | 5. HSA will provide copies of all training material and signed training attestations from all relevant staff members. | ☐ |
| | | **6. Home Office to complete a CQI study related to the Continuity of Care process. This study will be completed monthly.** | Home Office | | 6. Monthly CQI study to be provided to expert monitor. | ☐ |
| INTOX / DETOX | Inmates described as intoxicated, under the influence and/or otherwise overtly impaired (lethargic, ataxic, and uncooperative) are being sent to GP without observation | 1. Train all relevant medical staff on CIWA/COWS assessment, monitoring and referrals and **Wellpath Policy HCD-110_A-11 On-Call Provider Contact and** | HSA or Designee | 08-27-20 | 1. HSA will provide copies of all training material and signed training attestations from all relevant staff members. | ☐ |

# CORRECTIVE ACTION PLAN

**Site:**        **CA – Monterey County Jail**
**Audit Type:**   **Medical**

| | | | | | | |
|---|---|---|---|---|---|---|
| | in sobering cell and/or documentation that inmate is safe for such placement.<br><br>Intake nurses do not consistently document contact with PCP for orders when booked inmates are potentially withdrawing from multiple substances.<br><br>Nurses often do not consistently assess intoxicated and withdrawing inmates in accord with applicable protocols for appropriate monitoring and treatment.<br><br>Nurses have apparently not been trained regarding the significance of abnormal vital signs, the significance of delirium, or the need to obtain prompt medical consultations for acute medical problems<br><br>Inmates with abnormal vital signs and/or overtly impaired (lethargic, ataxic, uncooperative, injured) were not seen promptly by PCP or mental health to reduce risk of deterioration.<br><br>RNs are not trained and monitored to ensure that withdrawal protocols are followed rigorously.<br><br>Inmates withdrawing from opiates in addition to other substances were not monitored by COWS Protocol.<br><br>Inmates with symptoms of withdrawal, even if subtle (uncooperative, ataxia) were not consistently sent to hospital as called for in the implementation plan for further evaluation and treatment.<br><br>Documentation regarding substance abuse was incomplete – incomplete description of abused substances, problem list incomplete, lack of intake or discharge forms in EMR. | **HCD-110_F-04 Medically Supervised Withdrawal and Treatment.**<br><br>2.  Train all relevant staff on timely referral to PCP or ER, as medically indicated (per pre-established perimeters), all acute or medically unstable patients for further evaluation and treatment. Training will include instruction not to send inmates described as intoxicated, under the influence and/or other overtly impaired (lethargic, ataxic, and uncooperative) to GP without observation in sobering cell and/or documentation that inmate is safe for such placement<br><br>3.  Establish clear criteria for when NMC clearance is required prior to admission to Jail (i.e., all persons withdrawing and severely/acutely intoxicated persons). Establish protocols for when administering withdrawal protocols on-site is permissible.<br><br>4.  Monthly audits to ensure 1) NMC clearance or appropriate withdraw protocols; 2) timely referrals to PCP and ER; 3) appropriate protocols followed based on intake screening, vital signs, and RN evaluation.<br><br>5.  Add to EMR a trigger for any intake suspected of withdrawal or intoxication to ensure 1) complete and accurate alcohol and drug history, and 2) confirmation that prior admissions have been reviewed for alcohol and drug history<br><br>6.  **Home Office to complete a CQI study related to the CIWA/COWS process. This study will be completed monthly.** | Home Office<br><br><br><br><br><br><br><br><br><br><br>Home Office | | 2.  HSA will provide minutes and attendance roster for all attendees in training.<br><br><br><br>3.  Will post in intake and produce to expert monitor.<br><br>4.  Will produce Audits monthly to expert monitor.<br><br>5.  Produce proof of implemented changes.<br><br><br><br>6.  Monthly CQI study to be provided to expert monitor. | ☐<br><br><br>☐<br><br>☐ |
| TBINF | TB skin testing is not consistently performed in accord with implementation timelines.<br><br>Patients with signs of latent TB (unequivocally positive PPD) are not counseled regarding their condition and treatment options. | 1.  Review with all relevant health care staff **Wellpath policy HCD-110_B-02 Infectious Disease Prevention and Control**.<br><br>2.  EMR to include: date/time/location of PPD test, as well as date/time of reading of PPD results. | HSA<br><br><br><br>Home Office | 08-27-20 | 1.  HSA will provide copies of all training material and signed training attestations from all relevant staff members.<br><br>2.  Proof of implemented changes produced. | ☐<br><br><br>☐ |

16-6

# CORRECTIVE ACTION PLAN

**Site:**       CA – Monterey County Jail
**Audit Type:**   Medical

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 3. Monthly audit to ensure timely PPD tests and reading thereof, as well as referrals for positive patients. | HSA or Designee | | 3. Audits produced Monthly to expert Monitor. | ☐ |
| | | 4. Add to EMR a trigger for any inmate who has not received a PPD test within 7 days of admission. | | | 4. Produce Proof of implemented changes. | |
| | | 5. Add to EMR a trigger requiring all patients with a positive PPD result to be referred to the PCP for further evaluation and counseling regarding treatment options (Wellpath form) | Home Office | | 5. Produce Proof of implemented changes. | |
| | | **6. Home Office to complete a CQI study related to the TB/PPD process. This study will be completed monthly.** | Home Office | | 6. Monthly CQI study to be provided to expert monitor. | |
| OUTSIDE REFERRALS | Significant delays in providing necessary outside treatment.  Necessary specialty care was not consistently provided.<br><br>Written reports from outside providers are still not consistently available in the EMR | 1. Review with all relevant health care staff **Wellpath Policy HCD-110_D-08 Hospitals and Specialty Care.**<br><br>2. All referrals to outside providers will include a scheduled date by which the outside care must be completed or a follow up appointment with referring provider will be scheduled to decide further action. | HSA | 08-27-20 | 1. HSA will provide copies of all training material and signed training attestations from all relevant staff members.<br><br>2. Monthly audit produced of all outside referrals that are not completed by their scheduled date and/or rescheduled. | ☐<br><br>☐ |
| | | 3. Add to EMR a trigger for outside referral that has not been completed by the scheduled date. | Home Office | | 3. Provide proof of implemented changes. | ☐ |
| | | 4. PCP should document a chart review regarding the inmate medical condition following a second missed appointment or second rescheduled appointment. Add to EMR a trigger notifying the Medical Director any time an outside referral is rescheduled for a second time. | Home Office/ Medical Director | | 4. A.) Provide Proof of implemented changes.<br><br>B.) Pending EMR implementation. A report of all outside appointments rescheduled for a second time will be produced to the expert monthly. | |
| | | 5. Develop a telehealth network to ameliorate problem of not having access to sufficient number of specialists to timely accommodate patient needs | | | 5. A.) Proof of established program B.) Monthly report of all Telehealth referrals after establishment. | |

16-7

# CORRECTIVE ACTION PLAN

**Site:**      CA – Monterey County Jail
**Audit Type:**    Medical

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 6. **Home Office to complete a CQI study related to the outside referral process. This study will be completed monthly.** | | | 6.   Monthly CQI study to be provided to expert monitor | |
| QACQI | Quality assurance programs, including formal chart review by the medical director of all nurse and physician assistant performance is not performed in accord with community standards as articulated in the implementation plan, medical group policies and Settlement agreement. | 1.   Medical Director to lead a monthly QA meeting, to discuss deaths, hospitalizations, review of clinical guidelines, review of corrective actions and other relevant subjects.  Medical Director will review, revise, and sign-off on QA minutes. | HSA/ Medical Director | 08-27-20 | 1.   HSA will maintain a binder with QA monthly agendas, meeting minutes and an attendance roster of all attendees. | ☐ |
| | Quality assurance meeting minutes are deficient in the following manners:<br>a) the minutes do not document attendance by any of the active PCPs<br>b) the review of inmate deaths did not include an assessment of opportunities for corrective action including, but not limited to findings by expert monitor(s)<br>c) reviews of hospitalized patient did not consider lapses in care contributing to the hospitalization or corrective actions to prevent hospitalizations<br>d) there were no detailed educational programs for continual quality improvement (CQI). | 2.   The person appointed to take minutes of QA meetings will receive specific training from Wellpath's Home Office on how to take attendance and keep minutes, including on how to ensure that lapses in care, corrective actions, and CQI will be identified in QA minutes. | Home Office | | 2.   HSA will provide minutes and attendance roster of all attendees in in-service training | ☐<br><br>☐ |
| | MCJ has not provided documentation of peer review that comports with the CFMG Policy and Procedure that calls for the medical director and director of nurses regularly evaluate a minimum of 5 charts monthly to assess subordinate PCP and RN performances. | 3.   Medical Director to complete a peer review on >5 charts per provider monthly. Medical Director to discuss peer review results weekly, with each mid-level provider. Signatures from both parties will be collected on review sheet along with date of review. | Medical Director/ HSA | | 3.   HSA will maintain a binder with monthly MD peer review audit logs for each PCP. Available for expert monitor review upon request. | ☐ |
| | | 4.   Maintain at least a quarterly CQI meeting held by HSA or designee, to include: medical, nursing, dental, mental health, pharmacy, security. | HSA | | 4.   HSA will produce Quarterly CQI agendas, meeting minutes, and attendance rosters. Records will be maintained onsite in HSA office. | ☐ |
| | The minutes provided to the monitor have not addressed lapses in medical care brought to MCJ attention in past audits or document clinical improvement plans to prevent avoidable hospitalizations or deaths. | 5.   Review with all relevant health care staff **Wellpath Policy HCD-110_A-09 Procedure in the Event of a Patient Death** | Home Office | | 5.   HSA will provide copies of all training material and signed training attestations from all relevant staff members. | ☐ |
| | Death reviews did not comply with standards for jails as set forth in the implementation plan and Wellpath protocols. | 6.   Death reviews should be performed as part of the quality improvement process in accord with California Code of Regulations, NCCHC Standards, Wellpath policies and the Implementation plan and thereby generate appropriate corrective action plans to prevent future deaths.  Death reviews will result in completed forms with no blank entries in the forms. Death reviews will include autopsy results, opportunities to improve care, and corrective actions to be taken to reduce the risk of similar deaths. | HSA | | 6.   Produced to expert monitor for each patient death that occurs. | |

# CORRECTIVE ACTION PLAN

**Site:**        CA – Monterey County Jail
**Audit Type:**    Medical

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Medical Director will review, revise, and sign-off on Death Reviews.<br><br>**7. Home Office to complete a CQI study related to the MD-PA peer review process. This study will be completed monthly.** | Home Office | | 7. Monthly CQI study to be provided to expert monitor. | |
| **MISC 2020** | Maintaining knowledge of current best treatment options.<br><br>EMR should be reviewed to address inefficient or inaccurate entries, including sick call slips, ambulance services, specialty care, health care maintenance, medications and follow up care after release.<br><br>To comply with California law CCR 1355.4 the following signs should be posted in the medical clinic: "NOTICE TO CONSUMERS Medical doctors are licensed and regulated by the Medical Board of California (800) 633-2322 www.mbc.ca.gov." | 1. In service all relevant staff on available online resources: Uptodate, eMedicine/Medscape and ePocrates.<br><br>2. CFMG will develop a Statement of Work for the EMR vendor to identify, review, and remedy inefficient and/or inaccurate entries in EMR.<br><br>3. CFMG shall post the required notice in all medical clinic facilities in which patients are seen. | HSA<br><br>Home Office | | 1. HSA will provide minutes and attendance roster for in-service, training.<br><br>2. Statement of Work and verification of completion to be provided to neutral monitor.<br><br>3. Neutral monitor to verify posted notices in medical clinic areas. | ☐<br><br>☐<br><br>☐ |
| **MISC Added 2021** | *Re: maintaining knowledge of best treatment and applying current standards of care in treatment of inmates.*<br><br>*EMR form does not promote optimal care*<br><br>*Medical staff members do not explain confusing entries in EMR and/or correct mistaken entries.*<br><br>*Inmates' formal Grievances that should alert MCJ staff to potentially serious medical problems are not reviewed for weeks after submission.*<br><br>*Pain management for inmates does not comply with implementation plan requirements that treatments be consistent with applicable standards of care. Most notably, patients with substantial pain receive prescriptions for sub-therapeutic doses of over the counter drugs.*<br><br>*Inmates do not consistently receive consultation from the medical director and specialty services that appear to be needed for complicated conditions.* | *1. All MCJ medical will be given a copy of the Registered Nursing Protocols/Procedures and be expected to have read this document "cover to cover." RN may not administer care not approved within Wellpath-approved protocols.*<br><br>*2. Address evident inadequacies/inefficiencies including but not limited to the following: a) forms can be closed with blanks, or overtly incorrect entries such as a person's weight of 1 pound, or temperature of 99 degrees. b) forms cannot be reopened to correct errors c) forms have no easy place to record repeated or corrected vital signs.*<br><br>*3. Medical staff will receive in-service instruction about how to enter data in the medical record* | *HSA*<br><br><br><br>*Home Office*<br><br><br><br>*HSA* | | *1. HSA will provide minutes and attendance roster with name, title, and original signature demonstrating receipt by all MCJ staff of Wellpath Nursing Protocols, and their understanding that RN must promptly refer to PCP all patients for whom no approved protocol can be applied.*<br><br>*2. HSA will submit to medical monitor an update on plans and progress made in revising EMR to fix apparent problems or shortcomings.*<br><br>*3. HSA will provide minutes and attendance rosters to demonstrate instruction to all staff regarding entry* | |

16-9

# CORRECTIVE ACTION PLAN

**Site:**         CA – Monterey County Jail
**Audit Type:**   Medical

| | | | | | |
|---|---|---|---|---|---|
| | | *in addition to or for clarification of entries in the EMR.* | | | *of data in the medical record in addition to fields and options offered by EMR.* |
| | *Women's health issues were not addressed in MCJ. Few annual exams provide necessary attention to women's healthcare needs, including pelvic examinations and PAP smears.* | 4.   *Grievances will be reviewed by medical leadership (Health service administrator, director of nurses, medical director) within 1 business day after submitted by inmate.* | *DON* | | 4.   *A summary of past week's grievances will be sent to the medical monitor along with the action taken by staff for those grievances.* |
| | | 5.   *Medical staff will be instructed in proper prescribing of over-the-counter pain medications.* | *HSA or Designee* | | 5.   *HSA will provide minutes and attendance roster with name, title, and original signature demonstrating that all MCJ medical staff has been provided with pain management training.* |
| | | 6.   *Wellpath will provide all medical staff the means for easy referrals of patients to medical director and/or Wellpath HQ who seem to need further medical attention.* | *Home office/HSA* | | 6.   *HSA shall maintain a log of requests made for additional services and the respective actions taken for each request.* |
| | | 7.   *Steps will be taken to provide necessary attention to Women's Healthcare needs.*<br><br>a.   *Will Purchase Microscope to complete wet mount slides as best practice for assessment of Vaginal complaints.*<br>b.   *Will have providers in-serviced on use of Microscope and other appropriate diagnostic tests.*<br>c.   *Site Medical Director will work with Senior Regional Medical Director to establish Clinical Monographs governing women's health issues that will serve to guide Women's health care on site.* | *HSA or Designee* | | 7.   *Monthly audits to ensure that Pap smears, laboratory testing and breast exams are provided as clinically indicated, and that all acute, intercurrent and chronic gynecological complaints are monitored by the Medical Director and referred as necessary will be performed and produced monthly.*<br><br>*7.a. Proof of Purchase will be provided to expert Monitor.*<br><br>*7b. Will provide proof of training*<br><br>*7c. Monographs will be provided upon completion.* |

END OF CAP REPORT

16-10

# Exhibit 17

| Monterey County | | | | | | | | | | Staffing |
| Position | Sun | Mon | Tues | Wed | Thurs. | Fri | Sat | Total Hours | FTE | Facility |
|---|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | | |
| HSA | | 8 | 8 | 8 | 8 | 8 | | 40 | 1 | Jail |
| DON | | 8 | 8 | 8 | 8 | 8 | | 40 | 1 | Jail |
| Medical Director/Physician | | 8 | 8 | 8 | 8 | 8 | | 40 | 1 | Jail |
| Implementation Specialist | | 8 | 8 | 8 | 8 | 8 | | 40 | 1 | Jail Goodwill |
| Dental Assistant | | 8 | 8 | 8 | 8 | 8 | | 32 | 0.8 | Jail |
| MRC/AA | | 8 | 8 | 8 | 8 | 8 | | 40 | 1 | Jail |
| Clerk | | 8 | 8 | 8 | 8 | 8 | | 40 | 1 | Jail |
| FNP/PA | | 10 | 10 | 10 | 10 | | | 40 | 1 | Jail |
| FNP/PA | | | 10 | 10 | 10 | 10 | | 40 | 1 | Jail |
| RN | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| RN | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| RN | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| LVN | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| LVN | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| LVN | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| CNA/MA | | 12 | 12 | 12 | 12 | 12 | | 60 | 1.5 | Jail |
| CNA/MA | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| CNA/MA | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| Psychiatrist | | 8 | 8 | 8 | 8 | 8 | | 40 | 1 | Jail |
| LCSW/MFT/Psy RN | | 12 | 12 | 12 | | | | 36 | 0.9 | Jail |
| LCSW/MFT/Psy RN | 12 | 12 | 12 | 12 | | | | 48 | 1.2 | Jail |
| LCSW/MFT/Psy RN | | | | | 12 | 12 | 12 | 36 | 0.9 | Jail |
| Program Director/Psychologist | | 8 | 8 | 8 | 8 | 8 | | 40 | 1 | JBCT |
| AA (JBCT) | | 8 | 8 | 8 | 8 | 8 | | 40 | 1 | JBCT |
| MHC (JBCT) | | 8 | 8 | 8 | 8 | 8 | | 40 | 1 | JBCT |
| Competency Trainer (JBCT) | | 8 | 8 | 8 | 8 | 8 | | 40 | 1 | JBCT |
| Psychiatrist (JBCT) | | | | | | 8 | | 8 | 0.2 | JBCT |
| Totals | | | | | | | | 1412 | 35.3 | |
| Totals | | | | | | | | #REF! | #REF! | |
| **Night Shift** | | | | | | | | | | |
| RN | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| RN | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| RN | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| LVN | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| LVN | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| CNA/MA | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 84 | 2.1 | Jail |
| Totals | | | | | | | | 504 | 12.6 | |
| **Physicians and other Providers** | | | | | | | | | | |
| PA/NP/MFT/Physician on-call | 24 hours per 7 days per week | | | | | | | | | |
| Forensic Psychiatrist | 8 hours per week TBD | | | | | | | 8 | 0.2 | JBCT |
| | 24 hours per 7 days a week on-call | | | | | | | | | |
| Psychiatris on-call | 24 hours per day 7 days per week | | | | | | | | | jail/YC |
| Dentist | 24 hours per week TBD | | | | | | | 24 | 0.6 | Jail |
| Dental Hygienist | 4 hours per week TBD | | | | | | | 4 | 0.1 | Jail |
| Total Providers | | | | | | | | 36 | 0.9 | |
| | | | | | | Total All Staff | | #REF! | #REF! | |

| | |
|---|---|
| RN | 12.6 |
| LVN | 10.5 |
| CNA/MA | 7.8 |
| LCSW/MFT/Psy RN | 3 |

17-1

# Exhibit 18

**Monterey County Jail**
**Mental Health Monitor's Report**
**January 18 - 19, 2017**

<u>Overview</u>

The Monterey County Jail was visited for the first mental health monitoring tour on

January 18 and January 19, 2017.  The following report is based upon interviews with

institutional staff and detainees, medical records reviews, as well as review of documentation

and information provided by the institution and County.  This report will specifically address the

institution's status and progress toward compliance with the United States District Court

Northern District of California Settlement Agreement and the Implementation Plans between

Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County

Sheriff's Office; California Forensic Medical Group, INCORPORATED (CFMG) et al.

<u>Compliance with Settlement Agreement and Implementation Plan</u>

1.  Intake Screening

   a.  Defendants will develop and implement an Intake Screening Implementation Plan

       that specifies standards and timelines to ensure that arriving prisoners are

       promptly screened for urgent medical, mental health and dental needs, with

       prompt follow-up and disability accommodations.

       i.  Upon arrival, an Initial Health Assessment will be performed by the intake

           nurse to determine whether the inmate should be excluded from the

           facility on medical or mental health grounds.  Upon acceptance into the

           jail, all inmates will be screened by the intake nurse for urgent medical,

           mental health and dental needs.  The intake nurse will have access to an

1

18-1

inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail.

ii. A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.

iii. The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive findings on the suicide assessment.

**Findings: Deferred**

Observations during the tour as well as review of provided documents and medical records indicated that an initial health assessment was routinely performed by an intake nurse at the time of arrival to the jail, and inmates were referred to mental health as clinically indicated. There appeared to be a process in place for acute as well as routine mental health referral and evaluation. One area of recommendation was the need for greater confidentiality during the intake assessment performed by the nurse. Observations of the intake assessment revealed that officers were present just outside the intake assessment room, allowing for possible non-confidentiality as the intake assessment was performed by the nurse in the intake booking area. The close proximity of the officers might prevent some inmates from providing necessary medical and mental health information.

A mental health assessment and suicide risk tools were routinely utilized at the time of intake for appropriate mental health assessment, triage and treatment.

The next monitoring tour will examine the availability of an inmate's medical records at the time of intake as well as acceptance and clearance of individuals at the time of jail intake assessment.

2.  Mental Health Screening

    a.  Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including appropriate screening... The Implementation Plan provides that all inmates will have an initial mental health screening performed by a qualified mental health professional on the mental health staff.

    b.  Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including... medication practices

**Findings: Deferred**

These issues will be reviewed at the next monitoring visit.

    c.  Defendants shall develop and implement a Health Care Implementation Plan to expand the provision of care for inmates with serious medical and/or mental health needs and to ensure they receive timely treatment appropriate to the acuity of their conditions. The Implementation plan outlines the process by which inmates provide mental health sick call requests and healthcare staff respond to such requests.

    d. Nursing staff shall conduct daily mental health rounds in segregation.

**Findings: Deferred**

    These issues will be reviewed at the next monitoring visit.

3. Safety Cells

    a. The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall responsibility for safety and security of prisoners, prompt reviews by medical of all placements, and a process of resolving disagreements between medical and custody.

**Findings: Deferred**

    Interviews with custody and mental health staff indicated that inmates were placed into the safety or sobering cells by custody, medical or mental health staff; and mental health was then informed regarding that placement or noted such placements during their daily rounds. There appeared to be a system in place for prompt evaluation of inmates who were placed into these cells. The facility also had developed a system to resolve disagreements that arose from such placements, and provided documents were reviewed that confirmed this observation. It was unclear at the time of the visit, whether timely suicide risk assessment, vital signs monitoring and medical checks occurred. This issue will be evaluated further at the next monitoring visit.

    b. Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical

4

professional will see an inmate within one hour of placement in a sobering cell.

Inmates will be released from a sobering cell upon clearance by medical staff.

**Findings: Deferred**

There was an on-call system in place for mental health staff which provided for clinician availability regarding assessment of inmates who were placed into the safety cells after hours. Inmates were generally seen timely by a mental health clinician during work hours after such placements; however, a review of the logs indicated that there were occasions in which inmates were not always seen within one hour of placement. Removal from the safety cells occurred after mental health evaluation and clearance.

    c.  A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log.  A sergeant shall verify whether deputies are completing their checks, at least one time per shift.   The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift.  Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week.  Once a month, the Compliance Sergeant will track his findings through a report which will be sent to the Jail Operations Commander.  Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.

5

**Findings: Deferred**

There was a system in place for the logging of custody welfare checks and observations of inmates placed in the safety and sobering cells.  Although there was documentation that welfare checks occurred twice every 30 minutes, there was documentation that there were some lapses. A review of the logs and accompanying documentation indicated that the facility did have a system in place for the auditing of these checks, as well as feedback to the supervisory staff regarding problem areas.

      d.   Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11:00 p.m. and 7:00 a.m.  The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.

**Findings: Noncompliance**

Logs indicated that there was a lack of documentation regarding whether mattresses and sleeping bags were always offered to inmates placed into the safety and sobering cells.  Although this was an area of concern, there was a system in place for tracking compliance in this area.  It was unclear at the time of this visit if any corrective action was implemented to address this issue.

      e.   Inmates in sobering cells may have access to mattresses at the discretion of custody staff.  Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.

**Findings: Noncompliance**

6

18-6

See above.

  f. Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.

**Findings: Substantial Compliance**

Observations during the monitoring tour indicated that the safety and sobering cells were clean and not in use at the time of the visit. Interviews with some inmates indicated that there were some problems with consistent cleaning of the cells. Supervisory staff reported that the cells were cleaned after each use.

  g. For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.

**Findings: Deferred**

There was a process in place at the jail by which inmates who had been housed in a safety cell for 24 consecutive hours were evaluated and processed for transfer to inpatient treatment. Although this system was in place, access to inpatient mental health treatment was poor and difficult to obtain for all inmates referred for inpatient care. Inmates were frequently returned to the jail after assessment and prior to stabilization. Access to inpatient mental health services remained problematic. This issue will be examined in greater detail during the next mental health monitoring tour.

7

4.  Medication Continuity

    a.  All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.

**Findings: Deferred**

A review of medical records and observations during the visit indicated that the intake nurses obtained information regarding prescribed mental health medications in the community and began the process for verifying such treatment.  For those cases in which the medication treatment was unverified or unclear, those individuals were scheduled to see a mental health provider for assessment. Due to the noted delay in medication continuity noted below, a finding of compliance is deferred until the next visit, when additional information will be obtained.

    b.  Inmates who, at the time of booking, report to Defendants that they are taking community-prescribed medications, but whose medications cannot be verified by Defendants, shall be timely assessed by a medical provider and timely prescribed medications necessary to treat their health needs.

**Findings: Deferred**

See above.  One healthcare record was reviewed (Inmate 4) that showed a delay in prescribing necessary psychotropic medications, despite recent treatment at the facility.  This

8

case appeared to be an exception to otherwise timely provision of medications. This issue will receive additional review at the next monitoring visit.

    c.   Provision of psychotropic medications upon discharge from the jail.  The Implementation Plan provides that a 30-day supply of medications be given to inmates upon discharge from the jail.

**Findings: Deferred**

This issue will be reviewed at the next mental health monitoring visit.

5.  Clinical Staffing

    a.   Defendants will maintain Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to ensure adequate staffing to provide all necessary medical and mental health care.  The plan will identify all needed positions based on current and projected Jail population, and the number and qualifications of medical and mental health care staff to cover each position, with shift relief.

**Findings: Deferred**

At the time of the visit, the mental health staffing was as follows:

    0.8 FTE Psychiatrist (onsite) – 32 hours per week

    0.9 FTE Psychiatrist (telepsychiatry) – 36 hours per week

    1 FTE Psychiatric Registered Nurse/Psychologist – 40 hours per week

    1.4 FTE Licensed Clinical Social Worker – 56 hours per week

    1 FTE Licensed Marriage and Family Therapist – 40 hours per week

Although the plaintiffs noted that no staffing analysis was conducted as set forth in the Settlement Agreement; the current mental health staffing at the jail appeared to be adequate for the population and services required.  Psychiatric on-call services were primarily provided by Dr. ███ and all of the clinicians provided on-call services on a rotating basis. The monitor observed a telepsychiatry session during the monitoring visit.  This means of provision of psychiatric services appeared to be an acceptable and effective means of psychiatric care; however, it should not be the primary mechanism for providing psychiatric care.  All attempts should be made to ensure onsite coverage whenever possible.

As this was the psychiatrist's last day of providing telepsychiatry services, ongoing review of telepsychiatry is indicated. Additionally, with anticipated changes in the use of the telepsychiatrists at the facility, this issue should be monitored in subsequent visits to ensure adequate psychiatric coverage at the facility in the future.

6.  Mental Health Care

    a.   Training

        i.  All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.

**Findings: Substantial Compliance**

10

Documentation provided indicated that correctional staff had received training regarding the Implementation Plan; however, this training had not yet been incorporated into the new hire training.

ii.   In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.

**Findings: Substantial Compliance**

This training was in place for new correctional officers.

iii.   All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates, identifying warning signs specific to inmates, and how to recognize individuals who are in mental distress and/or suicidal.

**Findings: Substantial Compliance**

This training was in place.

11

18-11

    iv.  Yearly custody staff will conduct a situational training such as a mock suicide attempt or a medical emergency.  CFMG staff will also participate in the annual situational training.

**Findings: Noncompliance**

Although plans were in place for yearly emergency drills, including mock suicide drills; verification of this training was not received.

   b.  Restraint Chairs

    i.  Use of a restraint chair will be documented in an observation log which will be reviewed and signed by a supervisor.  Inmates shall not be placed in a restraint chair for longer than six consecutive hours.

**Findings: Substantial Compliance**

There was no documented use of the restraint chairs during the monitoring period. The Implementation Plan did include guidelines for the use of the restraint chair, duration of placement, monitoring after placement and criteria for removal. This issue will continue to be monitored on subsequent visits to evaluate use of the restraint chairs when and if it occurs.

    ii.  Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A shift supervisor and medical staff shall oversee the exercise. If unsuccessful in allowing inmates to exercise their arms and hands in a range of motion exercise, safety staff shall explain on

the observation log why extremities could not be exercised and a shift
supervisor shall be notified.

**Findings: Substantial Compliance**

There was no documented use of the restraint chairs during the monitoring period. This issue will continue to be monitored on subsequent visits to evaluate use of the restraint chairs when and if it occurs.

iii. On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.

**Findings: Substantial Compliance**

There was no documented use of the restraint chairs during the monitoring period.  This issue will continue to be monitored on subsequent visits to evaluate use of the restraint chairs when and if it occurs.

iv. Medical and mental health staff shall be consulted before any planned use of force on an inmate.  Custody staff in concert with medical staff will develop the most effective and appropriate means of imposing compliance with rules and regulation, including attempts at de-escalation.  It is understood that it is the goal of custody staff to use the least amount of force necessary to ensure compliance with rules and regulations.  Planned use of force will only be used after verbal attempts to obtain compliance.  Any use of force will be documented on a use of force form.

**Findings: Noncompliance**

13

Although there was no documented use of the restraint chairs during the monitoring period, interviews with staff indicated that there was not consistent and documented consultation between custody and mental health regarding planned uses of force.

    c.  Mental Health Grants

        i.  Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.

**Findings: Noncompliance**

No information was obtained during the visit to verify that such funding had been pursued.

    d.  Inmates Who Have Been Declared Incompetent to Stand Trial

        i.  The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period. As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment. The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for

14

orders to show cause to be directed the State of California) to expedite the

transfer of inmates who have been determined to be incompetent to stand

trial to an appropriate State facility.

**Findings: Noncompliance**

Inmates were not routinely placed into transition cells or administrative segregation and

seen by medical staff daily upon a Court finding the inmate to be incompetent to stand trial.

These inmates were generally housed in a general population cell. Despite this, the staff

appeared to work hard to timely transfer those individuals to a forensic unit.

    e.   Treatment Plans

        i.   CFMG will develop individual treatment plans for the treatment of

            inmates who are suffering from mental illnesses.

**Findings: Deferred**

A review of medical records indicated the presence of individual treatment plans for

mentally ill inmates. Prior to a finding of substantial compliance, additional treatment plans

will be reviewed at the next monitoring visit.

    f.   Consideration of Mental Illness in Inmate Discipline

        i.   Mental illness will be considered in administering any disciplinary

            measures against an inmate.  Custody staff are encouraged to contact the

            appropriate qualified mental health care staff when evaluating the level of

            discipline for an inmate with mental illness.

**Findings: Noncompliance**

15

A review of the Disciplinary Action Reports (DAR) indicated that there was no place on the form to note that mental health was contacted prior to November 2016; this was later corrected.  It did not appear that corrections officers were aware if inmates were receiving mental health services and therefore did not contact mental health when disciplinary infractions occurred.

      g.  Space Issues

          i.  Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including …adequate clinical and administrative treatment space….

**Findings: Deferred**

Although treatment space was available for clinicians to evaluate and treat patients in a confidential setting, specific housing for mentally ill individuals housed at the facility was not provided, and it was unclear at the time of the visit whether mental health staff had dedicated office space.  This issue will be reviewed in greater detail at the next mental health monitoring visit.

      h.  Administrative Segregation

          i.  The Mental Health Implementation Plan shall require classification to assess a totality of factors when assigning prisoners to administrative segregation units.  It is understood that the goal of Defendants is to limit

16

the use of administrative segregation for prisoners with serious mental illness.

**Findings: Deferred**

This monitoring tour noted that mentally ill prisoners were routinely housed in the administrative segregation units, and that the placement of such individuals on these units was not limited. Although measures were instituted to mitigate against the effects of administrative segregation placement, such as group therapy and daily checks, these units remained occupied with mentally ill individuals.  This issue will be reviewed further at the next monitoring visit.

      ii.   The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation…

      iii.  The Mental Health Implementation Plan shall address suicide watch and suicide precautions procedures to ensure that prisoners in crisis are not placed in punitive and/or unsanitary conditions.

**Findings: Deferred**

These issues will be reviewed further at the next monitoring visit.

7.  Suicide Prevention

    a.  Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.

**Findings: Substantial Compliance**

All of the cells in administrative segregation units (A, B, R and S) were modified to remove potential tie-off opportunities. In addition, fencing was installed on the upper level and stairway to prevent jumping and self-harm.

    b.  Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior, Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal.

        i.  Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.

        ii.  All welfare checks shall be documented on a welfare check log. The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance. Monthly spot checks for compliance will be conducted by the Compliance Sergeant at least weekly with monthly audits.

**Findings: Deferred**

There was documentation that the custody welfare checks were conducted appropriately, with some few exceptions. Audits were performed by custody supervisory staff based upon administrative segregation welfare door entry. Welfare checks were documented on a log, and there was also documentation of audits that were conducted by custody supervisory staff. The only exception was in the male administrative segregation units A and B where there were problems with the door that prevented adequate auditing. Supervisory staff reported that the facility was in the process of replacing the doors later this year. A findings of compliance will be deferred until full auditing is completed.

    c. Increase in Time Outside of Cell and/or Increasing Programs

        i. Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:

            1. 3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)

            2. 14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time

            3. 2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail)

        ii. Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking

and receiving area will be guaranteed the following weekly times out of their cell:

1. 3 hours of week for exercise

2. 14 hours a week in the common area

3. 2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail

iii.  inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services,

**Findings: Substantial Compliance**

Review of logs and audits indicated that inmates housed in the administrative segregation units as well as in the isolation and single holding cells outside of the booking and receiving areas were afforded the required out of cell time as outlined by the Settlement Agreement and Implementation Plans with some few exceptions.  Additionally, inmates in administrative segregation were afforded access to group therapy weekly which was provided by the mental health staff as well as other groups and activities such as NA/AA, religious activities, parenting groups and other self-help activities.

20

**Summary and Recommendations**

I want to thank all of the parties and the Monterey County Jail staff for helping to facilitate this monitoring visit.  The staff was extremely cooperative and responsive to my requests, providing necessary access to jail activities, staff, inmates and requested documents.

The following are recommendations to address the Settlement Agreement/Implementation Plan issues of concern.

1. The County should continue to work to improve access to timely inpatient psychiatric care for all jail inmates in need of such services.

2. There was the need for greater confidentiality during the intake assessment performed by the nurse.  Observations of the intake assessment revealed that officers were present just outside the intake assessment room, allowing for possible non-confidential intake assessments.  The close proximity of the officers might prevent some inmates from providing necessary medical and mental health information.

3. The facility should ensure that inmates are offered a mattress or safety sleeping bag when indicated while housed in the safety and sobering cells with appropriate documentation.  Corrective action should also be documented when staff fail to address this concern.

4. The facility should conduct a yearly situational training such as a mock suicide attempt or a medical emergency, with the involvement of CFMG.  The facility should provide verification of such training for all staff.

5. Medical and mental health staff shall be consulted before any planned use of force on an inmate.

21

18-21

6. Mental illness should be considered in administering any disciplinary measures against an inmate, and greater consultation is needed between custody and mental health staff to ensure that mental illness is taken into consideration.  Although the DAR forms were modified to include documentation of this contact, it did not appear that the necessary consultation occurred routinely.

7. The County should provide documentation to verify that the Office of the Sheriff in cooperation with The Monterey County Public Defender has pursued state funding for mental health and programming space at the jail.

8. In lieu of placement of inmates who were declared incompetent to stand trial into transition cells in administrative segregation, mental health staff should ensure that these inmates are immediately identified and placed onto a priority list for daily follow-up and monitoring.  The County should continue to work to expedite the transfer of these inmates to an appropriate State inpatient facility.

9. The County should work to decrease the use of administrative segregation as housing for mentally ill individuals.  In lieu of alternative placement, mitigating factors such as clinical contacts, rounding and out of cell activities should continue as outlined in the Settlement Agreement and Implementation Plans.

Please contact me should you have any questions regarding this report.


Respectfully submitted,




x _Kerry C. Hughes, MD_
Kerry C. Hughes, M.D.
Mental Health Monitor


Kerry C. Hughes, M.D.
1579 Monroe Dr., Suite F, Box 612
Atlanta, GA  30324
Phone ███████████
Fax:  404-364-9708
Email:  dockc99@aol.com


23

# Exhibit 19

CASE SUMMARIES FOR MONTEREY COUNTY JAIL

**Inmate 1**

This inmate was housed in the C dormitory.  He was provided with a diagnosis of Schizoaffective Disorder, bipolar type.  He was prescribed Trileptal 600 mg per day, Seroquel 500 mg per day, Effexor 37.5 mg per day, Klonopin 1 mg per day and Prazosin 1 mg per day.

The inmate was booked into the jail on 12/20/16. The healthcare record indicated a history of mental health treatment at the jail as well as in the community. The medical intake screening noted his history of mental health treatment and his prescribed psychotropic medications. The psychiatrist on-call was contacted, and he was scheduled for evaluation by the telepsychiatrist with daily welfare checks for seven days. The screening and orders also noted the inmate's history of a suicide attempt.

The inmate was seen by the telepsychiatrist on the following day.  The above medications were continued at that time. He was seen by the psychologist on 12/22/16 when it was noted that the inmate made a serious, near lethal suicide attempt during his last incarceration that occurred during 2016. The psychologist noted that he was refusing to eat due to paranoia.  He was scheduled to be seen on the following morning.

The healthcare record indicated that the inmate was seen daily and then consistently for follow-up and evaluation, and he was noted to be stable.  On 1/7/17 he reportedly was found hoarding medications multiple times, and his medications were ordered crushed and floated.

Subsequent notes indicated that the inmate was essentially stable, was eating and taking his medications.  He was seen on 1/17/17 and 1/18/17 for follow-up with subsequent follow-up scheduled for five to seven days.

<u>Findings:</u>

This inmate had a significant history of suicide attempts and remained at risk.  It appeared that there was appropriate screening at the time of intake, timely ordering of psychotropic medications and appropriate and timely mental health staff evaluation and follow-up.  This inmate appeared to be receiving appropriate mental health care.

**Inmate 2**

This inmate was booked into the jail on 11/17/16. He had only recently been released from the jail when he was monitored on suicide precautions. The medical intake questionnaire indicated a history of treatment for depression. The note indicated that he had been cleared by Natividad Medical Center. At the time of intake, he reported suicidal ideation with plan (hanging by a belt). He was placed on Level 2 suicide watch at that time with follow-up order on the following day.

The inmate was seen by the psychologist when he was reportedly "demanding, hostile, manipulative".  The psychologist noted that he was housed in ISO during prior incarceration due to suicide threats and his reluctance to house with others. At that time, Level 2 watch was discontinued, and approval was provided to house the inmate.  It appeared that later that day, he was seen by the LMFT when he refused to answer questions for the suicide risk evaluation and spat at the clinician.  He was then placed back on Level 2 suicide watch. Subsequent notes indicated that he presented with agitation, and he was then placed in a safety cell.  He continued to present with uncooperative behavior, and refused to participate in suicide risk evaluation. He was removed from the safety cell on 11/19/17.  He refused to see the telepsychiatrist on the following day. He was released from custody on 11/21/16.

<u>Findings:</u>

There was documentation of appropriate intake screening and placement on suicide watch.  He was appropriately placed into the safety cell when he presented with self-injurious behavior. Attempts were made to complete the suicide risk evaluation when appropriate; however, he refused.  There was appropriate documentation of safety cell placement.

**Inmate 3**

This inmate was booked into the jail on 10/3/16. The intake assessment noted the inmate's history of mental health treatment, including treatment with Effexor, Artane and Zyprexa. He was provided with a diagnosis of Substance-Induced Mood Disorder.  He had only recently been discharged from the jail several weeks prior.  He was seen on that day by the psychologist and the psychiatrist when he presented with agitation and reportedly appeared to be under the influence on drugs.  He was placed into the safety cell, and his medications were ordered.  It was unclear from the documentation when he was removed from the safety cell, but he was subsequently moved to segregation. Subsequent progress notes indicated some issues with possible medication side effects, but no recurrent agitation or psychosis.  He was discharged from the jail from on 11/29/16.

The inmate was re-incarcerated on 12/4/16.  The intake information noted the inmate's history of psychiatric treatment and recent methamphetamine use.  He did not report recent treatment with psychotropic medications at the time of intake screening. Follow-up was ordered with psychiatric nurse, and he was housed in booking.  Attempts were made to see the inmate on the two following days; however, he was not cooperative with interview. The inmate continued to

refuse housing.  He was seen by the psychiatrist on 12/11/16 when he remained with irritability; his medications were reordered at that time.

Progress notes indicated gradual improvement in symptoms and medication adherence.  He was last seen by the telepsychiatrist on 1/13/17.  At that time, Tegretol was added.

The inmate was interviewed during the visit.  He was slightly hyperverbal, but exhibited no evidence of auditory hallucinations, delusional thinking or agitation. He reported that he attended the newly initiated group therapy in segregation which he is eager to continue.

Findings:

There was documentation of appropriate intake screening, timely medication provision and mental health follow-up.  There was documentation of daily medical checks in segregation.  The appropriate laboratory testing was ordered for treatment with Tegretol.


**Inmate 4**

This inmate was booked into the jail on 12/29/16.  The intake screening noted a history of mental health treatment for "seizures". He had recently been released from the jail during the prior month.

He was seen for an initial mental health assessment and appraisal on 1/6/17 when it was noted that he had depression and anxiety.  He was subsequently followed consistently by the LFMT.  He was seen the telepsychiatrist on 1/16/17 when he was provided with a diagnosis of Anxiety Disorder, NOS.  He was prescribed Zoloft and Remeron.

This inmate was interviewed during the visit.  He reported that he was stable, but noted a delay in receiving his psychotropic medications upon arrival.

Findings:

This inmate was appropriately screened at the time of intake and was followed consistently by mental health.  He was not ordered the above medications until 1/15/17 which was approximately two weeks after his arrival, despite having received these medications during his prior incarceration.

**Inmate 5**

This 19-year-old inmate was booked into the jail on 9/13/16.  The intake questionnaire noted the inmate's history of treatment with treatment for Attention Deficit Hyperactivity Disorder (ADHD), anxiety and auditory hallucinations. He denied hallucinations, depression and suicidal ideation at the time of screening.  He was transferred to the jail from Juvenile Hall.  The on-call psychiatrist was contacted and ordered follow up with the telepsychiatrist on the following day and requested that medications not be started until he was seen.  He was seen by the psychiatrist on 9/15/16 when he was noted to be treated with Latuda, Trazodone, Lexapro and Adderall.  He was prescribed Zyprexa 5 mg per day in response to his report of "hearing things". At his next psychiatric appointment on 9/29/16, Zyprexa was increased and Lexapro was added due to continued report of auditory hallucinations.  The inmate was released from custody on 10/20/16.

He was re-booked into the jail on 12/7/16. The intake assessment forms again noted the inmate's history of mental health treatment.  Zyprexa and Lexapro were re-ordered with mental health follow-up on the following day.  He refused to be seen by the telepsychiatrist on 12/8/16.

The inmate was seen by the LCSW and subsequently by the psychologist when he presented with subdued mood and odd/inappropriate affect.  He was seen by the telepsychiatrist on that same date; at that time, he reported continued auditory hallucinations and poor sleep.  His medications were reordered with the addition of Remeron.  He was provided with a diagnosis of Polysubstance Dependence and rule-out Substance Induced Psychotic Disorder.

At his next psychiatric appointment, he continued to request increases in his medications and/or change to Seroquel.  The psychiatrist noted that he appeared to medication-seeking.  His medications were continued at that time.

This inmate was interviewed during the visit.  He reported that he was doing well, but continued to request medication adjustment.  He appeared to be stable, but he presented with a somewhat flat and inappropriate affect.

Findings:

This inmate appeared to be receiving appropriate mental health treatment.  He was followed consistently by mental health staff with appropriate medication management.


**Inmate 6**

This inmate was booked into the jail on 1/13/17.  The medical intake questionnaire noted his history of mental health treatment for paranoid schizophrenia. His medications were listed as Abilify, Gabapentin, Vistaril and Xanax. His medications were verified and ordered by the psychiatrist on the following morning.  The inmate was seen by the telepsychiatrist on 1/16/17; however, the documentation of that contact was not yet available in the healthcare record.

This inmate was interviewed during the visit.  He reported a history of auditory and visual hallucinations, and requested that his medications be adjusted.

Findings:

This inmate appeared to be receiving appropriate mental health care.  He was appropriately screened at the time of intake with timely psychiatric evaluation and medication evaluation and provision.  Although the inmate reported drowsiness and requested a medication adjustment, he appeared to be stable at the time of review and had been seen by the telepsychiatrist during the week of the visit.


**Inmate 7**

This inmate was booked into the jail on 10/26/16.  She was provided with diagnoses of Mood disorder, NOS, Psychosis, NOS and Substance Induced Mood Disorder as well as Polysubstance Dependence. The inmate was transferred from the Solano County Jail, and the transfer form noted her history of mental health treatment, as well as a list of her prescribed psychotropic medications. These included Gabapentin, Geodon and Zoloft. She was re-incarcerated on 12/4/16.

She was seen by the telepsychiatrist on 10/29/16; her medications were continued; a baseline EKG was ordered with laboratory testing.  She was released from jail on 11/16/16.

Findings:

This inmate appeared to receive appropriate mental health care.  She was appropriately screened, and her medications were ordered timely. She also was seen timely for psychiatric evaluation.

**Inmate 8**

This inmate was booked into the jail on 11/26/16.  The medical intake questionnaire noted the inmate's history of mental health treatment.  She had been prescribed Zoloft, Neurontin and Clonazepam.  She also presented with crying.  She reportedly stated that she was suicidal and began hitting her head on the cell door; she was subsequently placed into the safety cell.  She was prescribed Zoloft and Klonopin.  She was seen by the LCSW; the Withdrawal Protocol Assessment was requested to be completed by medical staff with re-evaluation by the LCSW on the following day.  She was removed from the safety cell on 11/27/16, and she was seen daily thereafter.  She was transferred to S pod where there was documentation of daily medical checks. She was released from the jail on 12/1/16.

Findings:

There was documentation of appropriate screening at the time of intake as well as appropriate medication management.  The inmate was appropriately placed into the safety cell after presenting with self-injurious behavior.  There was good documentation that she was seen timely by mental health in the safety cell as well as assessment for suicide risk.  There was also documentation of daily medical checks in segregation.

# Exhibit 20

**Monterey County Jail
Mental Health Monitor's Report
November 14 - 15, 2017**

<u>Overview</u>

The Monterey County Jail was visited for the second mental health monitoring tour on November 14 and 15, 2017. The following report is based upon interviews with institutional staff and detainees, healthcare records reviews, as well as review of documentation and information provided by the institution and County. This report will specifically address the institution's status and progress toward compliance with the United States District Court Northern District of California Settlement Agreement and the Implementation Plans between Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County Sheriff's Office; California Forensic Medical Group, INCORPORATED (CFMG) et al.

<u>**Compliance with Settlement Agreement and Implementation Plan**</u>

1. Intake Screening
   a. Defendants will develop and implement an Intake Screening Implementation Plan that specifies standards and timelines to ensure that arriving prisoners are promptly screened for urgent medical, mental health and dental needs, with prompt follow-up and disability accommodations.
      i. Upon arrival, an Initial Health Assessment will be performed by the intake nurse to determine whether the inmate should be excluded from the facility on medical or mental health grounds. Upon acceptance into the jail, all inmates will be screened by the intake nurse for urgent medical, mental health and dental needs. The intake nurse will have access to an

1

inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail.

ii.  A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.

iii. The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive findings on the suicide assessment.

**Findings: Noncompliance**

A review of healthcare records indicated that for those cases reviewed, all jail intakes were seen by a screening nurse for intake screening.

Information was provided regarding patients who were not accepted at the time of intake into the jail from January 4, 2017 to November 10, 2017.  A total of 71 patients were rejected at the time of intake and sent to the hospital for clearance prior to acceptance at the jail. These patients primarily presented with suicidal ideation, but others presented with uncooperative behavior, confusion and evidence of psychosis.  Most, if not all, of these patients were returned to the jail within 24 hours with clearance. A review of healthcare records noted transfers to NMC at the time of intake for clearance prior to jail acceptance.

Records reviews also indicated that healthcare records and information regarding past medication treatment was generally requested; however, past medical records of jail treatment were not always available at the time of intake. Verification of past medication treatment at the jail was also improved using the Sapphire eMAR.

2

20-2

Mental health assessment and suicide risk tools were routinely utilized for appropriate mental health assessment, triage and treatment; however, the use of the suicide risk assessment did not result in appropriate safety and treatment planning.

There also appeared to be a process in place for acute as well as routine mental health referral and evaluation.  Review of intake referrals indicated that they were appropriately referred and evaluated timely with some exceptions (see Inmates 1 and 8).

An issue that was reported at the last visit was also observed during this monitoring visit. Officers remained present outside the intake assessment room during the intake assessment performed by the nurse.  As the officer could easily hear the entire intake process, this resulted in non-confidentiality during the process.  The close proximity of the officers might prevent some inmates from providing necessary medical and mental health information; this is especially important during the intake process when important and potentially sensitive information should be conveyed to the screening nurse.

The lack of confidentiality and referral lapses resulted in the finding of noncompliance.

2. Mental Health Screening

    a. Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including appropriate screening…  The Implementation Plan provides that all inmates will have an initial mental health screening performed by a qualified mental health professional on the mental health staff.

3

b.  Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including… medication practices

**Findings: Noncompliance**

Healthcare records indicated that the Initial Mental Health Assessment and Appraisal was routinely completed by an RN and not by a Qualified Mental Health Professional on the mental health staff. There were also delays in the timely completion of these assessments. Many of the assessments indicated no mental health referral warranted, as the patients were already followed by mental health at the time of this assessment.

c.  Defendants shall develop and implement a Health Care Implementation Plan to expand the provision of care for inmates with serious medical and/or mental health needs and to ensure they receive timely treatment appropriate to the acuity of their conditions.  The Implementation plan outlines the process by which inmates provide mental health sick call requests and healthcare staff respond to such requests.

d.  Nursing staff shall conduct daily mental health rounds in segregation.

**Findings: Noncompliance**

A new system was instituted during May 2017 in which inmates could access mental health sick call requests by submitting them on portable tablets. The tablets appeared to be a positive development; however, some issues were noted during the visit.  There was a limited supply of tablets in segregation units, with two in each of the women's segregation

4

units, and one of the men's segregation units had only one working tablet.  Inmate interviews

did not reveal significant issues with tablets were being hoarded by some inmates or evidence

that some inmates were intimidated and not able to obtain access; however, particularly in

segregation, there were complaints regarding access to the limited number of tablets.

Although it was reported that the paper system for requests remained in place,

staff and inmates did not appear aware that this was true. The alternative use of paper sick

call slips could help to mitigate concerns regarding those who are unable to use a tablet due

to access issues, intimidation by others or those having a lack of understanding in the use of

the tablets.  Plans were discussed to ensure that inmates and staff were made aware that they

could continue to submit paper requests.

The facility did not track the timeliness of response to requests.  Although this did

not appear to be a significant source of inmate complaint, the facility should track this issue.

There were lapses in the documentation of daily nursing rounds in segregation.

3.  Safety Cells

    a.  The Health Care and Mental Health Implementation Plans shall provide for

        necessary coordination between medical staff and custody regarding placement of

        prisoners in a safety cell, addressing the prisoner's medical and mental health

        needs, custody's overall responsibility for safety and security of prisoners, prompt

        reviews by medical of all placements, and a process of resolving disagreements

        between medical and custody.

**Findings: Noncompliance**

The facility primarily utilized the booking cells rather than the safety cells for suicide monitoring since the last visit; sobering cells were infrequently utilized. A new process was reportedly implemented for custody to place a radio call to medical when an inmate was placed into one of the cells. Records reviews indicated that there were some delays in medical notification of placements into the cells. The facility did not report disagreements between medical and custody staff regarding such placements in their custody audits of this issue.

    b.  Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical professional will see an inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.

**Findings: Noncompliance**

Placements for suicide monitoring generally occurred in the booking cells. Mental health staff made daily rounds of the booking, safety and sobering cells. There were occasions in which medical staff was not timely alerted regarding booking cell placements, resulting in some delays in timely medical assessments. Removal from the safety cells occurred after mental health evaluation and clearance, which usually included the completion of a suicide risk assessment.

There was consistent documentation of post-suicide watch follow-up, which was a very important component of suicide prevention.

    c.  A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare

check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his findings through a report which will be sent to the Jail Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.

**Findings: Noncompliance**

During June 2017, the jail began routine auditing of custody welfare checks and observations of inmates placed in the safety, sobering cells as well as the booking cells. A review of welfare check logs indicated that there were lapses in the documentation of timely welfare checks by custody. There was documentation of supervisory checks of the logs as well as monthly reports from the Compliance Sergeant to the Jail Operations Commander. No information was available regarding corrective action regarding lapses in documentation.

   d. Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11:00 p.m. and 7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.

**Findings: Noncompliance**

7

20-7

Logs and facility audits indicated that there were lapses in the documentation regarding whether mattresses and sleeping bags were offered to inmates placed into the safety, booking and sobering cells. There remained a system in place for auditing and tracking compliance in this area. It was unclear at the time of this visit if any corrective action was implemented to address this issue.

> e. Inmates in sobering cells may have access to mattresses at the discretion of custody staff. Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.

**Findings: Noncompliance**

As above.

> f. Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.

**Findings: Substantial Compliance**

Observations during the monitoring tour indicated that the safety, booking and sobering cells were clean. At this visit, none of the inmates reported issues with the cleaning of these cells. Supervisory staff reported that the cells were cleaned after each use; although they reported that there was no set schedule for cleaning.

> g. For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an

8

20-8

appropriate in-patient mental health facility or the Natividad Medical Center
emergency room for assessment.

**Findings: Noncompliance**

A review of safety cell logs indicated that inmates routinely remained in the safety cells
for greater than 24 consecutive hours.  Although it appeared that staff consistently attempted to
obtain inpatient mental health treatment, that access remained poor and difficult to obtain for all
inmates referred for inpatient care. A review of healthcare records indicated that inmates were
frequently returned to the jail after assessment and prior to stabilization.  Access to inpatient
mental health services remained problematic, and as a result, jail staff may not have referred
those in need of care due to lack of success in achieving hospitalization. A review of transfers to
NMC indicated that inmates in need of inpatient psychiatric treatment were not always
transferred to that facility for inpatient mental health treatment.

As the facility began utilizing the booking cells rather than the safety and sobering cells
primarily for suicide monitoring, the facility should replace the ventilation grates to ones with
smaller bores.  The current grates in the booking cells could easily be utilized as a ligature point,
and smaller bore ventilation grates would be beneficial in suicide prevention.

4. Medication Continuity

   a. All inmates newly booked into the jail, who at the time of booking are prescribed
      medications in the community, shall be timely continued on those medications, or
      prescribed comparable appropriate medication, unless a medical provider makes
      an appropriate clinical determination that medications are not necessary for
      treatment.

9

**Findings: Noncompliance**

A review of medical records and observations during the visit indicated that the intake nurses obtained information regarding prescribed mental health medications in the community and began the process for verifying such treatment. For those cases in which the medication treatment was unverified or unclear, those individuals were scheduled to see a mental health provider for assessment. Two of the 25 healthcare records reviewed included examples of poor medication continuity upon arrival to the jail. The majority of healthcare records reviewed did include medication continuity upon arrival at the jail or documentation that medication treatment was verified and subsequently ordered. The appropriate laboratory testing for treatment with psychotropic medications was conducted.

b. Inmates who, at the time of booking, report to Defendants that they are taking community-prescribed medications, but whose medications cannot be verified by Defendants, shall be timely assessed by a medical provider and timely prescribed medications necessary to treat their health needs.

**Findings: Substantial Compliance**

Inmates were generally appropriately referred to mental health at the time of intake; however, delays were noted with the completion of the Initial Mental Health Assessment and Appraisal. This did not generally appear to result in delays in medication ordering based upon the healthcare records reviewed.

20-10

c. Provision of psychotropic medications upon discharge from the jail.  The
   Implementation Plan provides that a 30-day supply of medications be given to
   inmates upon discharge from the jail.

**Findings: Substantial Compliance**

A review of healthcare records indicated that discharge medications were consistently provided.  There was documentation that a 30-day supply of discharge medications was called into the local CVS pharmacy; this form was usually signed by the jail staff and the patient.

5. Clinical Staffing

   a. Defendants will maintain Qualified Medical Professional and Qualified Mental
      Health Professional staffing at the Jail to ensure adequate staffing to provide all
      necessary medical and mental health care.  The plan will identify all needed
      positions based on current and projected Jail population, and the number and
      qualifications of medical and mental health care staff to cover each position, with
      shift relief.

**Findings: Noncompliance**

At the time of the visit, the mental health staffing was as follows:

1.0 FTE Psychiatrist

- 40 hours per week onsite

1.0 FTE Psychiatric Registered Nurse/Psychologist

- 40 hours per week onsite

1.2 FTE Licensed Clinical Social Worker

- 40 hours per week onsite and 8 hours on weekends by per diem staff.

11

20-11

1.0 FTE Licensed Marriage and Family Therapist

- 40 hours per week onsite

No staffing analysis was conducted as set forth in the Settlement Agreement. Although the current mental health staffing at the jail appeared to be adequate for the population and services required, it should be noted that healthcare documentation indicated that the psychologist played a screening role at times in assessing whether inmates required psychiatric evaluation. Although this role was necessary in eliminating unnecessary appointments with the psychiatrist; at times, it appeared that this role prevented inmates from seeing the psychiatrist when indicated. This also brought into question whether the level of psychiatric staffing was adequate.

Psychiatric on-call services were primarily provided by Dr. ███████ Telepsychiatry was discontinued during September 2017, and the clinical supervisory staff indicated that there were no plans in place to resume the use of telepsychiatry. A review of healthcare records noted that there were various instances of poor provision of telepsychiatry services with poor clinical documentation, confusion regarding medication orders and lack of informed consent noted (please refer to Inmates 3, 21, 22 and 23).

6. Mental Health Care

   a. Training

      i. All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.

12

**Findings: Substantial Compliance**

Documentation, including lesson plans and attendance rosters, were provided that indicated that correctional staff had received training regarding the Implementation Plan.

    ii.  In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.

**Findings: Substantial Compliance**

The lesson plans provided included information regarding the recognition of individuals with mental illness and suicidality.  This training was in place for new correctional officers.

    iii.  All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates, identifying warning signs specific to inmates, and how to recognize individuals who are in mental distress and/or suicidal.

**Findings: Substantial Compliance**

This training was in place.

13

20-13

       iv.  Yearly custody staff will conduct a situational training such as a mock
suicide attempt or a medical emergency.  CFMG staff will also participate
in the annual situational training.

**Findings: Noncompliance**

No verification of this training was not received.

    b.  Restraint Chairs

       i.  Use of a restraint chair will be documented in an observation log which
will be reviewed and signed by a supervisor.  Inmates shall not be placed
in a restraint chair for longer than six consecutive hours.

**Findings: Noncompliance**

The jail began utilizing the WRAP restraint device since the last monitoring visit.  The healthcare record review of Inmate 17 indicated that the inmate remained in restraints for greater than six hours, and that supervisory staff subsequently met to discuss interventions to prevent prolonged restraint use in the future.  Of concern was an internal audit that included review of this incident during September 2017, that determined that "proper policies and procedures were executed during his placement in the wrap, to include direct supervision and health & welfare checks".

A review of model policy for the safe use of the WRAP by the manufacturer included a recommendation for constant supervision during restraint use; the County's policy only requires that custody staff monitor inmates in restraints twice every 30 minutes.  I agree with the manufacturer's recommendation for constant monitoring of inmates in restraint.

14

The plaintiff's attorney also provided information regarding a corrective action plan regarding the use of restraints and the need for nursing assessments. The plan indicated that the usage of restraints would be re-assessed during August 2017. When questioned regarding this reassessment, the facility staff indicated that this did not occur.

Review of orders for restraint indicated that the orders did not include release criteria directing the staff regarding the behaviors and observations necessary for the removal of restraints.

      ii.  Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A shift supervisor and medical staff shall oversee the exercise. If unsuccessful in allowing inmates to exercise their arms and hands in a range of motion exercise, safety staff shall explain on the observation log why extremities could not be exercised and a shift supervisor shall be notified.

**Findings: Noncompliance**

Review of healthcare records and provided documentation did not find evidence of attempts to remove restraints to allow range of motion exercises or reasons that this did not occur.

      iii.  On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.

**Findings: Noncompliance**

20-15

Although monthly audits were provided regarding the use of the restraint chair and WRAP use, the conclusions reached did not coincide other provided information. Additionally, some audits appeared to be based upon staff reports and memos rather than an actual review of documents and other objective information.

   iv. Medical and mental health staff shall be consulted before any planned use of force on an inmate. Custody staff in concert with medical staff will develop the most effective and appropriate means of imposing compliance with rules and regulation, including attempts at de-escalation. It is understood that it is the goal of custody staff to use the least amount of force necessary to ensure compliance with rules and regulations. Planned use of force will only be used after verbal attempts to obtain compliance. Any use of force will be documented on a use of force form.

**Findings: Substantial Compliance**

Documentation in the healthcare records and staff interviews indicated that mental health was contacted prior to planned uses of force.

   c. Mental Health Grants
      i. Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.

**Findings: Noncompliance**

No information was obtained during the visit to verify that such funding was pursued.

16

20-16

    d.  Inmates Who Have Been Declared Incompetent to Stand Trial

        i.  The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period.  As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff.  Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment.   The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for orders to show cause to be directed the State of California) to expedite the transfer of inmates who have been determined to be incompetent to stand trial to an appropriate State facility.

**Findings: Noncompliance**

This issue remained unchanged. Inmates were not routinely placed into transition cells in administrative segregation and seen by medical staff daily upon a Court finding the inmate to be incompetent to stand trial. There was documentation that the staff made attempts to contact the Public Defender's Office to begin the process of evaluation and eventual transfer for incompetence to stand trial. The staff continued to work hard to timely transfer those individuals to a forensic unit.

17

    e.   Treatment Plans

          i.  CFMG will develop individual treatment plans for the treatment of

             inmates who are suffering from mental illnesses.

**Findings: Noncompliance**

A review of healthcare records indicated that approximately one-third of those records did not include individualized treatment planning as was clinically indicated and required. Additionally, inmates with significant and repeated incidents of self-harm should have been provided with behavioral plans to help to address those dangerous behaviors.

None of the healthcare records reviewed included appropriate safety planning in the suicide risk assessments when clinically indicated.  Adequate safety planning is essential in identifying interventions to prevent further self-harm.

Additionally, none of the healthcare records reviewed included behavioral plans. Behavioral plans were indicated, especially in those cases in which inmates presented with repeated self-injurious incidents, for example Inmate 17.

Some mental health staff documented the use of "safety contracts" in an attempt to prevent self-injurious behavior. These measures have been proven to be ineffective, and they can result in a false sense of comfort.  They should not be utilized and are not a substitute for adequate mental health evaluation, suicide risk assessment and appropriate treatment planning.

The healthcare records reviews also identified a very concerning pattern (noted in 36 percent of records reviewed) in which inmates were described by some mental health staff in disparaging terms, such as "malingering", "med-seeking" and "manipulative". This practice

is counter-therapeutic and should be discontinued, as it can negatively affect the treatment provided to inmates. Additionally, inmates with severe psychiatric illness can also often present with behaviors consistent with some personality disorders; such labeling can lead to misdiagnosis and poor care. When these behaviors are noted, adequate treatment planning and interdisciplinary team meetings should occur to appropriately discuss diagnostic clarification and necessary treatment interventions rather than stigmatization of inmates which may lead to denial of needed services.

The facility performed an audit titled "Individualized Treatment Plans (Mental) & Chronic Care". The audit examined various treatment areas including scheduling for an initial mental health visit at intake (50 percent), contacting the psychiatrist for current verified medications (50 percent), informed consent (67 percent), mention of housing, medication and follow-up plan at the initial mental health visit (100 percent), discharge plan initiated at first encounter (not applicable), patient seen according to treatment plan (100 percent) and problem list updated with diagnosis (0 percent). None of these audit measures examined clinically appropriate, individualized treatment planning.

Several healthcare records indicated the need for diagnostic clarification, as there were multiple and/or conflicting diagnoses present. Consistent, formal interdisciplinary treatment team meetings as well as treatment planning would assist in clarification of this issue.

An area of needed training was in the identification and appropriate referral of inmates experiencing medication side effects. An incident was noted in which the inmate was experiencing severe extrapyramidal side effects from treatment with antipsychotic medications; however, the staff failed to recognize this condition and to appropriately refer to psychiatry.

19

f.  Consideration of Mental Illness in Inmate Discipline

 i.  Mental illness will be considered in administering any disciplinary measures against an inmate.  Custody staff are encouraged to contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness.

**Findings: Noncompliance**

This issue remained unchanged. It did not appear that corrections officers were aware if inmates were receiving mental health services; and therefore, did not consult with mental health staff regarding the level of discipline administered.

g.  Space Issues

 i.  Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including …adequate clinical and administrative treatment space….

**Findings: Noncompliance**

The segregation units continued to function as de facto mental health units; dormitories also housed some chronically mentally ill inmates.  Adequate treatment space was available for clinicians to evaluate and treat patients in a confidential setting; however, confidentiality for clinical encounters was problematic.  Observations during the monitoring visit, healthcare records reviews as well as staff and inmate interviews revealed that clinical encounters routinely occurred

20

with the door open and an officer present outside the door.   This resulted in no sound confidentiality and may result in inmates not providing critical information to staff when needed.

Dedicated office space was provided to the psychiatrist, and the remainder of the mental health staff shared an office in the infirmary area. This office was not utilized for clinical encounters.

      h.   Administrative Segregation

          i.   The Mental Health Implementation Plan shall require classification to assess a totality of factors when assigning prisoners to administrative segregation units.  It is understood that the goal of Defendants is to limit the use of administrative segregation for prisoners with serious mental illness.

**Findings: Noncompliance**

Mentally ill prisoners were routinely housed in the segregation units, and the placement of such individuals on these units was not limited. Although measures continued to be instituted to mitigate against the effects of segregation placement, such as group therapy, daily nursing checks and at least weekly mental health rounds, these units remained occupied almost exclusively by mentally ill individuals.

          ii.   The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation…

iii. The Mental Health Implementation Plan shall address suicide watch and suicide precautions procedures to ensure that prisoners in crisis are not placed in punitive and/or unsanitary conditions.

**Findings: Noncompliance**

Healthcare records reviews noted some examples of lapses in the required placement screening for all prisoners for mental illness and suicidality with segregation housing. The documentation in the healthcare record made it difficult to determine whether this screening occurred timely in all required placements.

Of concern, however, were the statements by mental health staff describing inmates' suicidal statements as "manipulative". This determination did not appear based upon any clinical assessment other than individual opinion. The literature regarding suicide prevention in corrections has repeatedly warned against making such judgmental determinations regarding manipulative behaviors in suicide prevention. Many completed suicides have occurred in individuals who were previously determined to exhibit manipulative behaviors.

Particularly concerning was a statement made by mental health staff indicating that continuation of suicide watch should occur as a "negative behavioral reinforcement" noted in the healthcare record of Inmate 20 during October 2017. A similar statement was present in a September 13, 2017 suicide risk assessment which stated, "maintain current s/w as a negative reinforcer". Punitive suicide prevention measures should never be utilized as a deterrent for suicide threats. Aside from the counter-therapeutic nature of the use of such unpleasant measures, such as loss of clothing and placement into the safety cell to prevent suicide threats; the use of suicide prevention measures in a punitive manner may actually

22

20-22

discourage a truly suicidal individual from conveying to staff their suicidal intent. Such practice is strongly discouraged.

7. Suicide Prevention

a. Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.

**Findings: Substantial Compliance**

All cells in the administrative segregation units (A, B, R and S) were modified to remove potential tie-off opportunities. In addition, fencing was installed on the upper level and stairway to prevent jumping and self-harm. As was previously stated, ventilation grates in the booking cells should be replaced by suicide resistant, smaller bore grates as these cells were primary locations for suicide monitoring; this issue was discussed with facility supervisory staff.

b. Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior, Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal.

i. Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals

23

during the midnight shift.  Welfare checks shall include a visual
observation of each inmate in the unit with verbal interaction if necessary.

ii.  All welfare checks shall be documented on a welfare check log.  The logs
will be reviewed and initialed by the on-duty sergeants at least one time
per shift to insure compliance.  Monthly spot checks for compliance will
be conducted by the Compliance Sergeant at least weekly with monthly
audits.

**Findings: Noncompliance**

The jail began a system during June 2017 for the auditing of custody welfare checks
and observations of inmates.  A review of welfare check logs indicated that there were lapses
in the documentation of timely welfare checks by custody.  There was documentation of
supervisory checks of the logs as well as monthly reports from the Compliance Sergeant to
the Jail Operations Commander.  No information was available regarding corrective action
regarding lapses in documentation.

c.  Increase in Time Outside of Cell and/or Increasing Programs

i.  Unless exigent circumstances or safety and security concerns exist, each
inmate in administrative segregation pods A, B, R, and S will be
guaranteed the following weekly times out of their cell:

1.  3 hours a week for exercise and socialization (exercise time will
include exercise with one or more other inmates)

2.  14 hours a week of "socialization time" where at least one other
inmate is in the common area at the same time

24

        3. 2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail)

    ii. Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking and receiving area will be guaranteed the following weekly times out of their cell:

        1. 3 hours of week for exercise

        2. 14 hours a week in the common area

        3. 2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail

    iii. inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services,

**Findings: Substantial Compliance**

Review of logs and documentation indicated that inmates housed in the administrative segregation units as well as in the isolation and single holding cells outside of the booking and receiving areas continued to be afforded the required out of cell time as outlined by the Settlement Agreement and Implementation Plans. Additionally, inmates in administrative segregation were afforded access to group therapy weekly which was provided by the mental health staff as well as other groups and activities, including access to groups provided by an outside contractor (Geo Group).

25

The monitor observed group therapy sessions conducted in the men's B dorm, and women's R pod. Both groups were well attended and were facilitated by the LCSW. The content of the groups was clinically beneficial, and group participants unanimously reported satisfaction and benefit from their participation.

**Summary and Recommendations**

I want to thank all the parties and the Monterey County Jail staff for helping to facilitate this monitoring visit. The staff was extremely cooperative and responsive to my requests, providing necessary access to jail activities, staff, inmates and requested documents.

The following are recommendations to address the issues of concern.

1. The facility should continue to work to improve access to timely inpatient psychiatric care for all jail inmates in need of such services.

2. There was the need for greater confidentiality during the intake assessment performed by the nurse as well as during clinical encounters. The close proximity of the officers during assessments and clinical interviews may result in some inmates not providing necessary medical and mental health information.

3. The facility should ensure that inmates are offered a mattress or safety sleeping bag when indicated while housed in the safety, booking and sobering cells with appropriate documentation. Corrective action should also be documented when staff fail to address this concern.

4. The facility should conduct a yearly situational training such as a mock suicide attempt or a medical emergency, with the involvement of CFMG. The facility should provide verification of such training for all staff.

5. Mental illness should be considered in administering any disciplinary measures against an inmate, and greater consultation is needed between custody and mental health staff to ensure that mental illness is taken into consideration.

6. The facility should provide documentation to verify that the Office of the Sheriff in cooperation with The Monterey County Public Defender has pursued state funding for mental health and programming space at the jail.

7. In lieu of placement of inmates who were declared incompetent to stand trial into transition cells in administrative segregation, mental health staff should ensure that these inmates are immediately identified and placed onto a priority list for daily follow-up and monitoring. The County should continue to work to expedite the transfer of these inmates to an appropriate State inpatient facility.

8. The facility should work to decrease the use of administrative segregation as housing for mentally ill individuals. In lieu of alternative placement, mitigating factors such as clinical contacts, rounding, groups and other out of cell activities should continue as outlined in the Settlement Agreement and Implementation Plans.

9. The facility should ensure an adequate supply of functioning tablets and educate staff and inmates regarding the alternative paper sick call request process. Paper sick call slips should be provided to nurses to give to patients upon request.

10. The facility should track sick call request timelines.

11. The facility should ensure documentation of daily nursing rounds in segregation.

12. The facility should ensure timely notification to medical of placements in the safety, sobering and booking cells with timely medical assessments.

13. The facility should ensure that the documentation of timely custody welfare checks occurs, with documentation of corrective action as necessary.

14. The facility should ensure that patients remaining in the safety, booking and sobering cells for 24 consecutive hours are promptly processed for transfer to an inpatient mental health facility or NMC for assessment.

15. The facility should consider replacing the ventilation grates in the booking cells to more suicide resistant grates.

16. The facility should ensure timely medication continuity upon intake at the jail for all inmates.

17. The facility should ensure timely completion of the Initial Mental Health Assessment and Appraisals.

18. The facility should conduct a staffing analysis as set forth in Settlement Agreement.

19. The facility should address issues noted with the provision of telepsychiatry prior to future consideration regarding its usage.

20. The facility should limit the duration of restraint use to less than six consecutive hours. Restraint orders should include release criteria.

21. The facility should consider changing policy to maintain constant watch for inmates in restraints.

22. The facility should complete the reassessment of the corrective action plan regarding nursing assessments with the use of restraints.

28

20-28

23. The facility should provide documentation of range of motion exercises for inmates in restraints, and that audits of restraint use include objective documentation and rather than solely subjective staff reports.

24. The facility should provide training to mental health staff regarding appropriate individualized treatment and behavioral planning and should document individualized treatment planning in the healthcare records. Suicide risk assessments should include appropriate safety planning.

25. The use of contracts for safety should be discontinued.

26. The use of derogatory or negative labels for inmates, such as malingering, should be discontinued. Training may be necessary to assist in this effort and to aid in improved diagnostic clarification and treatment planning. Additional training in the recognition and appropriate referral for medication side effects is also recommended.

27. The facility should ensure that required placement screenings for all prisoners for mental illness and suicidality occur with segregation housing. Facility audits of this issue would be beneficial.

28. The facility should ensure that placement or continuation of suicide watch should never occur for punitive reasons.  Additional training may be required for facility staff.

20-29

Please contact me should you have any questions regarding this report.

Respectfully submitted,

X ~~Kerry C. Hughes, MD~~
Kerry C. Hughes, M.D.
Mental Health Monitor

Kerry C. Hughes, M.D.
1579 Monroe Dr., Suite F, Box 612
Atlanta, GA  30324
Phone:  ████████
Fax:  404-364-9708
Email:  dockc99@aol.com

30

20-30