MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
VAN SWEARINGEN – 259809
CARA E. TRAPANI – 313411
CAROLINE E. JACKSON – 329980
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:        mbien@rbgg.com
              egalvan@rbgg.com
              vswearingen@rbgg.com
              ctrapani@rbgg.com
              cjackson@rbgg.com

CORENE KENDRICK – 226642
KYLE VIRGIEN – 278747
NATIONAL PRISON PROJECT of the
AMERICAN CIVIL LIBERTIES UNION
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (202) 393-4930
Facsimile:    (202) 393-4931
Email:        ckendrick@aclu.org
              kvirgien@aclu.org

AVRAM D. FREY
(*admitted pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (415) 621-2493
Facsimile:    (415) 255-8437
Email:        afrey@aclunc.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. CV 13 2354 BLF<br><br>**EXHIBITS 21 TO 39 TO THE DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN**<br><br>Judge:  Hon. Beth Labson Freeman<br>Date:   August 24, 2023<br>Time:   9:00 a.m.<br>Crtrm.: 3 |

# Exhibit 21

[4276968.1]

## Monterey County Jail (MCJ) Healthcare Records Reviews

  **Patient 1**

This patient was observed during the monitoring visit. She was housed in the women's segregation unit.

A review of the healthcare record indicated that the patient had received mental health treatment at the MCJ during 2012 and 2014, including suicide monitoring, treatment with antipsychotic medications and placement in the safety cell.

A Medical Intake Triage/Receiving Screening was completed on September 15, 2017. The mental health history section indicated negative responses to questions, but the screener noted the presence of "possibly psych issues", including paranoia and probable delusional thinking. She was placed into general population and was scheduled for the next mental health clinic.

An initial mental health assessment and appraisal was performed on October 12, 2017. At that time, she noted her history of mental health treatment and hospitalizations. She also acknowledged current hallucinations. She appeared to be minimally cooperative, and was repeatedly described as a questionable historian. She acknowledged a history of treatment with psychotropic medications, but denied current medications. Despite presenting with restlessness, constant moving and probable delusional thinking of paranoid content, she was referred for routine mental health referral by the screening RN.

A progress note by the psychologist indicated that the patient was seen for "SMI f/u" (serious mental illness follow up?). The patient indicated that she would not take psychotropic medications as they were against her religion. She was described as presenting with bizarre affect. The note indicated that she was scheduled for "DOC @ NMC11/3/17". She was seen two days later by the LCSW, and she was followed consistently by the LCSW. Those contacts by the LCSW described the patient as labile, with periods of agitation and hostility, paranoid and refusing treatment with psychotropic medications.

The patient was closely followed by the Marriage and Family Therapist (MFT), psychologist and LCSW. She remained resistant to evaluation by the psychiatrist and presented with what was described as possibly hypomanic symptoms. A note by LCSW ▆▆▆ on December 5, 2017 indicated that the patient had been transferred to NMC-MHU for 1370 order (incompetent to stand trial).

Although it was unclear when placement in segregation occurred, Segregated Population Observation Logs were located in the record from November 11, 2017 to December 3, 2017. They noted daily nursing rounds on that unit, and that the patient was at the hospital from November 30, 2017 to at least December 3, 2017.

The record also included multiple signed treatment refusal forms.

1

## Monterey County Jail (MCJ) Healthcare Records Reviews

 **Patient 1**

This patient was observed during the monitoring visit.  She was housed in the women's segregation unit.

A review of the healthcare record indicated that the patient had received mental health treatment at the MCJ during 2012 and 2014, including suicide monitoring, treatment with antipsychotic medications and placement in the safety cell.

A Medical Intake Triage/Receiving Screening was completed on September 15, 2017.  The mental health history section indicated negative responses to questions, but the screener noted the presence of "possibly psych issues", including paranoia and probable delusional thinking.  She was placed into general population and was scheduled for the next mental health clinic.

An initial mental health assessment and appraisal was performed on October 12, 2017. At that time, she noted her history of mental health treatment and hospitalizations. She also acknowledged current hallucinations. She appeared to be minimally cooperative, and was repeatedly described as a questionable historian. She acknowledged a history of treatment with psychotropic medications, but denied current medications. Despite presenting with restlessness, constant moving and probable delusional thinking of paranoid content, she was referred for routine mental health referral by the screening RN.

A progress note by the psychologist indicated that the patient was seen for "SMI f/u" (serious mental illness follow up?).  The patient indicated that she would not take psychotropic medications as they were against her religion.  She was described as presenting with bizarre affect.  The note indicated that she was scheduled for "DOC @ NMC11/3/17".  She was seen two days later by the LCSW, and she was followed consistently by the LCSW.  Those contacts by the LCSW described the patient as labile, with periods of agitation and hostility, paranoid and refusing treatment with psychotropic medications.

The patient was closely followed by the Marriage and Family Therapist (MFT), psychologist and LCSW.  She remained resistant to evaluation by the psychiatrist and presented with what was described as possibly hypomanic symptoms.  A note by LCSW ▅▅▅ on December 5, 2017 indicated that the patient had been transferred to NMC-MHU for 1370 order (incompetent to stand trial).

Although it was unclear when placement in segregation occurred, Segregated Population Observation Logs were located in the record from November 11, 2017 to December 3, 2017.  They noted daily nursing rounds on that unit, and that the patient was at the hospital from November 30, 2017 to at least December 3, 2017.

The record also included multiple signed treatment refusal forms.

1

At the time of the monitoring visit, the patient was observed with paranoid thinking and disorganization.

**Findings**

The following issues of concern were noted regarding the care provided to this patient. Based upon the provided information, it appeared that the patient was not seen timely for the initial mental health assessment and appraisal; it occurred almost one month after the patient's Medical Intake Triage/Receiving Screening was completed.  At the time of initial mental health assessment and appraisal, her presentation should have resulted in a priority or urgent mental health referral rather than a routine referral. The algorithm for determining whether a mental health referral was routine versus priority/urgent indicated that a priority/urgent referral should occur if questions 1-5 were positive with active symptoms.  She did present with active symptoms and was repeatedly described as unreliable; therefore, she should have been referred more urgently, especially in light of her known mental health history.

It was unclear what the duration of the patient's placement in segregation was, but it appeared that she was seen weekly by mental health and that daily nursing rounds occurred based upon the information available.

A progress note by the MFT on November 13, 2017 indicated that the patient agreed to a safety contract.  These forms of "contracts" are not clinically reliable and can present a false sense of comfort; they should never be utilized as a substitute for appropriate clinical assessment, suicide risk assessment and appropriate treatment planning.

Additionally, no treatment plan was located for this patient. There was also no evidence of placement screening completion prior to or shortly after segregation placement.

▬▬▬▬▬▬      <b>Patient 2</b>

This patient's healthcare record was reviewed as he was a recent intake into the jail.  He received his Medical Intake Triage/Receiving Screening on November 15, 2017. The intake screening was unremarkable, noted no current medications; the patient was placed into general population with no mental health referral indicated.

**Findings**

No mental health issues were noted regarding this case.

▬▬▬▬▬▬   ▬▬▬      <b>Patient 3</b>

This patient was provided with diagnoses of Bipolar Disorder, NOS as well as Schizophrenia by history; however, there were various diagnoses present in the healthcare record.  She was prescribed Zoloft, Lithium and Zyprexa. It appeared that his patient was booked into the jail on January 20, 2017.  She had a long and significant history of multiple self-injurious behaviors.

2

At the time of the monitoring visit, the patient was observed with paranoid thinking and disorganization.

**Findings**

The following issues of concern were noted regarding the care provided to this patient. Based upon the provided information, it appeared that the patient was not seen timely for the initial mental health assessment and appraisal; it occurred almost one month after the patient's Medical Intake Triage/Receiving Screening was completed.  At the time of initial mental health assessment and appraisal, her presentation should have resulted in a priority or urgent mental health referral rather than a routine referral. The algorithm for determining whether a mental health referral was routine versus priority/urgent indicated that a priority/urgent referral should occur if questions 1-5 were positive with active symptoms.  She did present with active symptoms and was repeatedly described as unreliable; therefore, she should have been referred more urgently, especially in light of her known mental health history.

It was unclear what the duration of the patient's placement in segregation was, but it appeared that she was seen weekly by mental health and that daily nursing rounds occurred based upon the information available.

A progress note by the MFT on November 13, 2017 indicated that the patient agreed to a safety contract.  These forms of "contracts" are not clinically reliable and can present a false sense of comfort; they should never be utilized as a substitute for appropriate clinical assessment, suicide risk assessment and appropriate treatment planning.

Additionally, no treatment plan was located for this patient. There was also no evidence of placement screening completion prior to or shortly after segregation placement.


### Patient 2

This patient's healthcare record was reviewed as he was a recent intake into the jail.  He received his Medical Intake Triage/Receiving Screening on November 15, 2017. The intake screening was unremarkable, noted no current medications; the patient was placed into general population with no mental health referral indicated.

**Findings**

No mental health issues were noted regarding this case.


### Patient 3

This patient was provided with diagnoses of Bipolar Disorder, NOS as well as Schizophrenia by history; however, there were various diagnoses present in the healthcare record.  She was prescribed Zoloft, Lithium and Zyprexa. It appeared that his patient was booked into the jail on January 20, 2017.  She had a long and significant history of multiple self-injurious behaviors.

The initial mental health assessment and appraisal was completed on February 16, 2017. The form noted that the patient had a missing eye, a history of cutting as well as a history of mental health treatment. She was prescribed psychotropic medications at that time. The RN indicated that the patient was already followed by mental health and a routine mental health referral was noted with general population housing recommended.

The patient had multiple self-injurious behavior incidents at the jail. On June 2, 2017, she was seen after swallowing a comb and indicating suicidal intent. It appeared that she was sent to the NMC emergency department after this incident. Again on June 27, 2017, she reportedly swallowed combs and three pencils. At that time, she reported hearing voices telling her to kill herself. She was subsequently transferred to NMC for treatment. She returned to the jail on June 30, 2017, and later that day was seen again in the infirmary after swallowing her comb and reporting auditory hallucinations with suicidal intent. She was returned to the jail on the same day after the comb was removed by the emergency department physician at NMC. On the following day, she refused to be seen by the telepsychiatrist and was scheduled for follow-up with the psychiatrist in two weeks and with the psychologist in two days.

She was again seen after reporting that she swallowed two pencils on August 8, 2017; the note indicated that the case would be discussed with mental health and "no transfer yet". She was seen by the MFT who indicated that she would remain on level 2 suicide watch. Handwritten and dictated psychiatry notes were present for that date indicating that the patient was seen after reportedly swallowing a comb and pencil one-hour prior. A Medical Treatment Order for Inmate Housing Form was completed on that date that noted that level 2 suicide watch would begin, and noted that the patient would only receive a safety smock and blanket. The medical provider listed was the psychologist. A subsequent form noted the removal of level 2 suicide watch on the following day. There was also an order for an Ativan injection to be given at 0900, and then every twelve hours as needed for three days.

It was unclear when the patient was placed into a booking cell for observation; however, a progress note on August (date?), 2017 notes that she was already in a booking cell on level 2 suicide watch when she bit herself on the left bicep in a suicide attempt. The note indicated that the patient reported that she had been given a shot by Dr. █████

On August 31, 2017, the patient again swallowed three pencils with report of suicidal ideation and auditory hallucinations. She was subsequently sent to NMC where she received medical treatment.

On October 10, 2017, she was seen in the infirmary after swallowing a three-inch pencil. At that time, she expressed suicidal ideation. She was transferred to the NMC emergency room and returned on the following day and placed on level 2 suicide watch. Suicide watch was discontinued on October 12, 2017. A subsequent note by the RN on October 26, 2017 noted that the patient returned from NMC after ingesting cleaning products. She was also placed on level 2 suicide watch on November 7, 2017 after reporting auditory hallucinations and suicidal ideation.

On November 12, 2017, the RN responded to the housing unit after the patient reported swallowed four ounces of cleaning solution. She was medically evaluated and the note indicated

3

The initial mental health assessment and appraisal was completed on February 16, 2017. The form noted that the patient had a missing eye, a history of cutting as well as a history of mental health treatment. She was prescribed psychotropic medications at that time. The RN indicated that the patient was already followed by mental health and a routine mental health referral was noted with general population housing recommended.

The patient had multiple self-injurious behavior incidents at the jail. On June 2, 2017, she was seen after swallowing a comb and indicating suicidal intent. It appeared that she was sent to the NMC emergency department after this incident. Again on June 27, 2017, she reportedly swallowed combs and three pencils. At that time, she reported hearing voices telling her to kill herself. She was subsequently transferred to NMC for treatment. She returned to the jail on June 30, 2017, and later that day was seen again in the infirmary after swallowing her comb and reporting auditory hallucinations with suicidal intent. She was returned to the jail on the same day after the comb was removed by the emergency department physician at NMC. On the following day, she refused to be seen by the telepsychiatrist and was scheduled for follow-up with the psychiatrist in two weeks and with the psychologist in two days.

She was again seen after reporting that she swallowed two pencils on August 8, 2017; the note indicated that the case would be discussed with mental health and "no transfer yet". It was unclear if the patient was seen by mental health at that time as no documentation was located or if she was seen at NMC.

It was unclear when the patient was placed into a booking cell for observation; however, a progress note on August (date?), 2017 notes that she was already in a booking cell on level 2 suicide watch when she bit herself on the left bicep in a suicide attempt. The note indicated that the patient reported that she had been given a shot by Dr. ███████.

On August 31, 2017, the patient again swallowed three pencils with report of suicidal ideation and auditory hallucinations. She was subsequently sent to NMC where she received medical treatment.

On October 10, 2017, she was seen in the infirmary after swallowing a three-inch pencil. At that time, she expressed suicidal ideation. She was transferred to the NMC emergency room and returned on the following day and placed on level 2 suicide watch. Suicide watch was discontinued on October 12, 2017. A subsequent note by the RN on October 26, 2017 noted that the patient returned from NMC after ingesting cleaning products. She was also placed on level 2 suicide watch on November 7, 2017 after reporting auditory hallucinations and suicidal ideation.

On November 12, 2017, the RN responded to the housing unit after the patient reported swallowed four ounces of cleaning solution. She was medically evaluated and the note indicated that she was subsequently placed into the safety cell. On November 28, 2017, she again was seen after she reportedly swallowed four to six ounces of lemon disinfectant neutral cleaner. She was sent to the NMC emergency room after poison control was contacted. She returned from the NMC emergency room on the same date; she was placed on Level 2 suicide watch upon her return to the jail. On November 29, 2017, a suicide risk assessment checklist was completed, and

that she was subsequently placed into the safety cell. On November 28, 2017, she again was seen after she reportedly swallowed four to six ounces of lemon disinfectant neutral cleaner. She was sent to the NMC emergency room after poison control was contacted. She returned from the NMC emergency room on the same date; she was placed on Level 2 suicide watch upon her return to the jail. On November 29, 2017, a suicide risk assessment checklist was completed, and suicide watch was discontinued. She was seen for follow-up by the LCSW on the following day and by the MFT on December 1, 2017.

A suicide risk evaluation was completed on November 28, 2017. This form included a section for assessment/plan/education; however, there was not a specific individualized safety plan for this patient to address her recurrent self-injurious behavior.

**Findings**

This was a very difficult to treat patient who required mental health services greater than that which could be provided at the MCJ. She was followed consistently by mental health staff, and she was appropriately sent to NMC after self-harm incidents.

Of concern was the lack of access to the NMC MHU after this patient presented with multiple incidents of suicidal behavior and obvious inability of the jail to protect the patient from self-harm. Although it appeared that the jail appropriately sent patients to NMC for evaluation and treatment, this patient was not hospitalized for psychiatric reasons for needed stabilization. It did not appear that NMC was available to jail inmates for mental health stabilization.

There was documentation that the mental health staff contacted the patient's attorney regarding possible referral to Patton State Hospital; however, a progress note on October 26, 2017 indicated that she had already been sentenced and that this hospitalization was not possible from the jail.

Although there was documentation of the completion of suicide risk assessments after some, if not all of the suicide watch placements; there was not adequate determination of suicide risk or adequate treatment and safety planning to prevent recurrent incidents.

There was also documentation of post suicide watch follow-up documented in the healthcare record.

It also appeared that more aggressive treatment of the patient's psychotic symptoms may have been indicated as she reported auditory hallucinations at several of the incidents of self harm with little change in her antipsychotic medication.

There was also a lack of adequate treatment planning for this very difficult to treatment patient. This was especially important to address the appropriate housing for this patient as well as behavioral interventions to prevent continued self-harm behaviors.

Several progress notes by the MFT indicated that the patient agreed to a safety contract. These forms of "contracts" are not clinically reliable and can present a false sense of comfort; they should never be utilized as a substitute for appropriate clinical assessment, suicide risk assessment and appropriate treatment planning.

suicide watch was discontinued. She was seen for follow-up by the LCSW on the following day and by the MFT on December 1, 2017.

A suicide risk evaluation was completed on November 28, 2017. This form included a section for assessment/plan/education; however, there was not a specific individualized safety plan for this patient to address her recurrent self-injurious behavior.

**Findings**

This was a very difficult to treat patient who required mental health services greater than that which could be provided at the MCJ. She was followed consistently by mental health staff, and she was appropriately sent to NMC after self-harm incidents.

Of concern was the lack of access to the NMC MHU after this patient presented with multiple incidents of suicidal behavior and obvious inability of the jail to protect the patient from self-harm. Although it appeared that the jail appropriately sent patients to NMC for evaluation and treatment, this patient was not hospitalized for psychiatric reasons for needed stabilization. It did not appear that NMC was available to jail inmates for mental health stabilization.

There was documentation that the mental health staff contacted the patient's attorney regarding possible referral to Patton State Hospital; however, a progress note on October 26, 2017 indicated that she had already been sentenced and that this hospitalization was not possible from the jail.

Although there was documentation of the completion of suicide risk assessments after some, if not all of the suicide watch placements; there was not adequate determination of suicide risk or adequate treatment and safety planning to prevent recurrent incidents.

There was also documentation of post suicide watch follow-up documented in the healthcare record.

It also appeared that more aggressive treatment of the patient's psychotic symptoms may have been indicated as she reported auditory hallucinations at several of the incidents of self harm with little change in her antipsychotic medication.

There was also a lack of adequate treatment planning for this very difficult to treatment patient. This was especially important to address the appropriate housing for this patient as well as behavioral interventions to prevent continued self-harm behaviors.

Several progress notes by the MFT indicated that the patient agreed to a safety contract. These forms of "contracts" are not clinically reliable and can present a false sense of comfort; they should never be utilized as a substitute for appropriate clinical assessment, suicide risk assessment and appropriate treatment planning.

The appropriate laboratory testing for treatment with psychotropic medications was conducted.

4

The appropriate laboratory testing for treatment with psychotropic medications was conducted.

The plaintiff's attorney had questioned whether this patient was ordered emergency medications without onsite psychiatric contact no longer than 24 hours prior to the psychiatric emergency on August 8, 2017. Based upon the documentation in the healthcare record, the patient was seen by the psychiatrist on that date in person; although the heading for the dictated psychiatric note was titled "Tele-Psychiatric Consult".



### Patient 4

This patient's healthcare record was reviewed as he was a recent intake into the jail. He arrived at the jail on November 14, 2017. He received his Medical Intake Triage/Receiving Screening on the day of arrival. The screening noted no medical or mental health issues; he was however, placed on a methadone detox protocol. According to the movement log, he was placed into general population.

**Findings**

No mental health issues were noted regarding this case.

### Patient 5

This patient was booked into the jail on September 7, 2017 when the Medical Intake Triage/Receiving Screening was completed. The screening was negative for mental health concerns, with the exception of ongoing counseling and affirmative responses to recent rejection and worrying about a major problem. He was scheduled to be seen at the next mental health clinic.

He was seen by the LCSW on September 9, 2017 when he reported depression related to restrictions in seeing his daughter. He reported that he was seen on an outpatient basis by a counselor for the past three years. He was seen for follow-up on September 24, 2017. He appeared to be stable at that time and follow-up was noted as needed. This patient received his Initial Mental Health Assessment and Appraisal on September 18, 2017. Although he denied a history of mental health treatment or suicidality, he acknowledged recent rejection or loss and worries regarding a major problem resulting in a routine referral to mental health and general population housing.

It appeared that the patient was booked into the jail again on November 15, 2017 when the Medical Intake Triage/Receiving Screening was completed. This screening was negative for mental health concerns and he was placed into general population without mental health referral.

**Findings**

This patient was appropriately referred to mental health where he was evaluated and seen for follow-up. There was documentation that outside healthcare records were requested.

████████        ████████        **Patient 4**

This patient's healthcare record was reviewed as he was a recent intake into the jail. He arrived at the jail on November 14, 2017. He received his Medical Intake Triage/Receiving Screening on the day of arrival. The screening noted no medical or mental health issues; he was however, placed on a methadone detox protocol. According to the movement log, he was placed into general population.

**Findings**

No mental health issues were noted regarding this case.

████████        ████████        **Patient 5**

This patient was booked into the jail on September 7, 2017 when the Medical Intake Triage/Receiving Screening was completed. The screening was negative for mental health concerns, with the exception of ongoing counseling and affirmative responses to recent rejection and worrying about a major problem. He was scheduled to be seen at the next mental health clinic.

He was seen by the LCSW on September 9, 2017 when he reported depression related to restrictions in seeing his daughter. He reported that he was seen on an outpatient basis by a counselor for the past three years. He was seen for follow-up on September 24, 2017. He appeared to be stable at that time and follow-up was noted as needed. This patient received his Initial Mental Health Assessment and Appraisal on September 18, 2017. Although he denied a history of mental health treatment or suicidality, he acknowledged recent rejection or loss and worries regarding a major problem resulting in a routine referral to mental health and general population housing.

It appeared that the patient was booked into the jail again on November 15, 2017 when the Medical Intake Triage/Receiving Screening was completed. This screening was negative for mental health concerns and he was placed into general population without mental health referral.

**Findings**

This patient was appropriately referred to mental health where he was evaluated and seen for follow-up. There was documentation that outside healthcare records were requested.



████████        ████████        **Patient 6**

This patient was housed in the women's segregation unit (S Pod) at the time of the monitoring visit.

The Medical Intake Triage/Receiving Screening was completed on July 8, 2017. The screening noted the patient's history of treatment for panic attacks and abuse as well as contacts with the social worker at her last incarceration. Current medications were listed as Xanax and Trazodone.

<table>
<tr><td>████████</td><td>████</td><td>**Patient 6**</td></tr>
</table>

This patient was housed in the women's segregation unit (S Pod) at the time of the monitoring visit.

The Medical Intake Triage/Receiving Screening was completed on July 8, 2017. The screening noted the patient's history of treatment for panic attacks and abuse as well as contacts with the social worker at her last incarceration. Current medications were listed as Xanax and Trazodone. The form also noted her use of heroin and alcohol. She was started on the withdrawal protocol, scheduled for the next mental health clinic and placed into general population.

An RN note on the following day indicated that Dr. ████ had been contacted regarding the patient's history and stated medications. He indicated that the patient was on alcohol withdrawal monitoring, and he wanted the patient to be seen by the psychiatrist prior to ordering psychotropic medications. It appeared that she subsequently had severe nausea and was placed on monitoring for opiate withdrawal rather than alcohol withdrawal. On the following day, she was seen by the telepsychiatrist; it was noted that she was on the opioid detox protocol and she was started on Trazodone. She was discharged on July 13, 2017, and there was documentation that a 30-day prescription was sent to a local CVS on the following day for the patient.

It appeared that the patient returned to the jail on September 4, 2017. An RN note indicated that an order for Trazodone was verified with a pharmacist on September 4, 2017; there was no documentation that this medication was ordered upon arrival.

It appeared that the patient was involved in an altercation with another inmate on September 6, 2017 with resulting multiple injuries to her face and neck. Segregation Population Observation Logs were noted from September 11 to September 19, 2017.

The patient was seen by the psychologist on September 12, 2017 when she reported sleep difficulties; she also indicated a desire for counseling. She was seen by the psychiatrist on September 19, 2017 with report of anxiety and panic attacks. At that time, Celexa was ordered and the patient was provided with diagnoses of Opioid Abuse and Dependence, Anxiety Disorder, NOS and possible Substance Induced Mood Disorder.

An Initial Mental Health Assessment and Appraisal was completed on October 12, 2017 which noted the patient's history of psychiatric treatment, abuse, self-harm by cutting and substance abuse. The disposition noted that she was already being seen by the LCSW.

She was seen by the LCSW on September 27 and on October 12, 2017; she appeared to be generally stable at the time of those visits. A progress note on October 13, 2017 (unable to determine the discipline of the writer) noted that the patient had complained that she had not received her Celexa, but it was noted that the patient had refused or not shown for multiple medication passes with only 65% medication compliance. She was encouraged to show for medication administration passes.

The form also noted her use of heroin and alcohol. She was started on the withdrawal protocol, scheduled for the next mental health clinic and placed into general population.

An RN note on the following day indicated that Dr. ███ had been contacted regarding the patient's history and stated medications. He indicated that the patient was on alcohol withdrawal monitoring, and he wanted the patient to be seen by the psychiatrist prior to ordering psychotropic medications. It appeared that she subsequently had severe nausea and was placed on monitoring for opiate withdrawal rather than alcohol withdrawal. On the following day, she was seen by the telepsychiatrist; it was noted that she was on the opioid detox protocol and she was started on Trazodone. She was discharged on July 13, 2017, and there was documentation that a 30-day prescription was sent to a local CVS on the following day for the patient.

It appeared that the patient returned to the jail on September 4, 2017. An RN note indicated that an order for Trazodone was verified with a pharmacist on September 4, 2017; there was no documentation that this medication was ordered upon arrival.

It appeared that the patient was involved in an altercation with another inmate on September 6, 2017 with resulting multiple injuries to her face and neck. Segregation Population Observation Logs were noted from September 11 to September 19, 2017.

The patient was seen by the psychologist on September 12, 2017 when she reported sleep difficulties; she also indicated a desire for counseling. She was seen by the psychiatrist on September 19, 2017 with report of anxiety and panic attacks. At that time, Celexa was ordered and the patient was provided with diagnoses of Opioid Abuse and Dependence, Anxiety Disorder, NOS and possible Substance Induced Mood Disorder.

An Initial Mental Health Assessment and Appraisal was completed on October 12, 2017 which noted the patient's history of psychiatric treatment, abuse, self-harm by cutting and substance abuse. The disposition noted that she was already being seen by the LCSW.

She was seen by the LCSW on September 27 and on October 12, 2017; she appeared to be generally stable at the time of those visits. A progress note on October 13, 2017 (unable to determine the discipline of the writer) noted that the patient had complained that she had not received her Celexa, but it was noted that the patient had refused or not shown for multiple medication passes with only 65% medication compliance. She was encouraged to show for medication administration passes.

On October 19, 2017, the patient signed a refusal with the LCSW; indicating that she only wanted her psychotropic medications and to see the psychiatrist only. She was seen by the psychologist on November 1, 2017 when the patient indicated that was prescribed Celexa and Trazodone; however, she was only receiving Celexa. The psychologist indicated that this issue would be referred back to the psychiatrist; and Trazodone was ordered by the psychiatrist on the following day. The patient was scheduled for follow-up with the LCSW on November 14, 2017; however, she refused the appointment and was rescheduled for five to seven days.

6

On October 19, 2017, the patient signed a refusal with the LCSW; indicating that she only wanted her psychotropic medications and to see the psychiatrist only. She was seen by the psychologist on November 1, 2017 when the patient indicated that was prescribed Celexa and Trazodone; however, she was only receiving Celexa. The psychologist indicated that this issue would be referred back to the psychiatrist; and Trazodone was ordered by the psychiatrist on the following day. The patient was scheduled for follow-up with the LCSW on November 14, 2017; however, she refused the appointment and was rescheduled for five to seven days.

Sick call requests were submitted to mental health on the following dates: September 9, 2017 (was seen on September 12, 2017), September 12, 2017 (seen by psychiatrist on September 19, 2017) and October 26, 2017 (seen by psychiatrist on November 1, 2017).

**Findings**

There was documentation of the provision of discharge medications upon release from the jail. It appeared that the completion of the initial mental health evaluation was delayed. There was also documentation that attempts were made to locate that prior medical record at the time of arrival to the jail as well as confirmation of medications and prescriptions.

It appeared to be clinically appropriate for the psychiatrist to delay the ordering of psychotropic medications for this inmate on a withdrawal protocol until she was evaluated by the psychiatrist during the patient's July incarceration. However, her treatment with Trazodone was verified during her subsequent incarceration in September, and this medication was not ordered at the time of intake.

There was documentation that welfare checks occurred in segregation from September 11 to September 19, 2017; however, it was unclear what the duration of her segregation stay was. There was documentation of at least weekly mental health contacts.

Response to sick call requests was timely. No documentation was located for placement screening with segregation placement.

 **Patient 7**

This patient's healthcare record was reviewed as he was a recent intake into the jail. This patient arrived at the jail on November 15, 2017, and his Medical Intake Triage/Receiving Screening indicated no history of mental health difficulties or medications. He did express worry about his family. He was housed in general population with no referrals. Information during past incarcerations did not reveal mental health concerns.

**Findings**

No mental health concerns noted.

**Patient 8**

Sick call requests were submitted to mental health on the following dates: September 9, 2017 (was seen on September 12, 2017), September 12, 2017 (seen by psychiatrist on September 19, 2017) and October 26, 2017 (seen by psychiatrist on November 1, 2017).

**Findings**

There was documentation of the provision of discharge medications upon release from the jail. It appeared that the completion of the initial mental health evaluation was delayed. There was also documentation that attempts were made to locate that prior medical record at the time of arrival to the jail as well as confirmation of medications and prescriptions.

It appeared to be clinically appropriate for the psychiatrist to delay the ordering of psychotropic medications for this inmate on a withdrawal protocol until she was evaluated by the psychiatrist during the patient's July incarceration. However, her treatment with Trazodone was verified during her subsequent incarceration in September, and this medication was not ordered at the time of intake.

There was documentation that welfare checks occurred in segregation from September 11 to September 19, 2017; however, it was unclear what the duration of her segregation stay was. There was documentation of at least weekly mental health contacts.

Response to sick call requests was timely. No documentation was located for placement screening with segregation placement.

 **Patient 7**

This patient's healthcare record was reviewed as he was a recent intake into the jail. This patient arrived at the jail on November 15, 2017, and his Medical Intake Triage/Receiving Screening indicated no history of mental health difficulties or medications. He did express worry about his family. He was housed in general population with no referrals. Information during past incarcerations did not reveal mental health concerns.

**Findings**

No mental health concerns noted.

 **Patient 8**

This patient was housed in the women's segregation unit (S Pod) at the time of the monitoring visit. She had several incarcerations of short duration, but frequent occurrence at the MCJ.

This patient was seen as a new jail intake on February 5, 2017. At that time, the nurse documented that she was unable to stand or ambulate on her own without falling, almost falling several times during the intake process and falling asleep during intake questions. She had a strong odor of alcohol, slurred speech and mild drooling. She was sent to the NMC emergency

This patient was housed in the women's segregation unit (S Pod) at the time of the monitoring visit. She had several incarcerations of short duration, but frequent occurrence at the MCJ.

This patient was seen as a new jail intake on February 5, 2017. At that time, the nurse documented that she was unable to stand or ambulate on her own without falling, almost falling several times during the intake process and falling asleep during intake questions. She had a strong odor of alcohol, slurred speech and mild drooling. She was sent to the NMC emergency room prior to acceptance at the jail. It also appeared that she had a brief incarceration during March 2017.

She was re-admitted to the jail on May 17, 2017. The Jail Re-Admission Health Appraisal was completed on May 26, 2017, and treatment with Zoloft was noted on the form. An Initial Mental Health Assessment and Appraisal was also completed on that date; it noted no current mental health treatment and no current medications. She was referred for routine mental health evaluation and was housed in general population.

It appeared that she was again re-admitted to the jail on June 21, 2017. The Medical Intake Triage/Receiving Screening was completed on that date and noted treatment with Zoloft; however, the form noted that her old record did not include orders for that medication. A Jail Re-Admission Health Appraisal was completed on July 8, 2017. The form noted treatment with Zoloft as well as a history of mental health treatment. An Initial Mental Health Assessment and Appraisal was also completed on that date; this form confirmed information that the patient had a history of mental health treatment and hospitalization, but that she was not prescribed psychotropic medications at that time. The RN indicated that no mental health referral was warranted, and she was housed in general population. She was seen by the telepsychiatrist on June 23, 2017 when Zoloft was ordered for possible depressive symptoms.

A Segregated Population Observation Log was located documenting nursing rounds from June 22 to September 8, 2017, September 11 to October 31, 2017, and November 2 to November 18, 2017.

The patient was seen by the psychiatrist on June 23, 2017, when she was prescribed Zoloft. When next seen by the psychiatrist on September 20, 2017, it was noted that she had been noncompliant with Zoloft. Her medication was adjusted to assist in medication adherence.

Progress notes indicated that the patient was seen by the LCSW weekly while in segregation. The patient was seen by the LCSW on November 6, 2017 when she presented as unkempt and disheveled; she was also described as "highly delusional". She was referred to the psychiatrist, and she was seen on the following day. The psychiatrist provided a diagnosis of Psychotic Disorder, NOS and added Zyprexa to Zoloft which was already ordered.

**Findings**

This patient was appropriately sent to NMC for medical evaluation and clearance prior to acceptance at the jail during February 2017. A routine mental health referral should have been submitted after her June 2017 re-admission to the jail.

room prior to acceptance at the jail. It also appeared that she had a brief incarceration during March 2017.

She was re-admitted to the jail on May 17, 2017. The Jail Re-Admission Health Appraisal was completed on May 26, 2017, and treatment with Zoloft was noted on the form.  An Initial Mental Health Assessment and Appraisal was also completed on that date; it noted no current mental health treatment and no current medications.  She was referred for routine mental health evaluation and was housed in general population.

It appeared that she was again re-admitted to the jail on June 21, 2017.  The Medical Intake Triage/Receiving Screening was completed on that date and noted treatment with Zoloft; however, the form noted that her old record did not include orders for that medication.  A Jail Re-Admission Health Appraisal was completed on July 8, 2017.  The form noted treatment with Zoloft as well as a history of mental health treatment. An Initial Mental Health Assessment and Appraisal was also completed on that date; this form confirmed information that the patient had a history of mental health treatment and hospitalization, but that she was not prescribed psychotropic medications at that time. The RN indicated that no mental health referral was warranted, and she was housed in general population.  She was seen by the telepsychiatrist on June 23, 2017 when Zoloft was ordered for possible depressive symptoms.

A Segregated Population Observation Log was located documenting nursing rounds from June 22 to September 8, 2017, September 11 to October 31, 2017, and November 2 to November 18, 2017.

The patient was seen by the psychiatrist on June 23, 2017, when she was prescribed Zoloft. When next seen by the psychiatrist on September 20, 2017, it was noted that she had been noncompliant with Zoloft.  Her medication was adjusted to assist in medication adherence.

Progress notes indicated that the patient was seen by the LCSW weekly while in segregation. The patient was seen by the LCSW on November 6, 2017 when she presented as unkempt and disheveled; she was also described as "highly delusional".  She was referred to the psychiatrist, and she was seen on the following day.  The psychiatrist provided a diagnosis of Psychotic Disorder, NOS and added Zyprexa to Zoloft which was already ordered.

**Findings**

This patient was appropriately sent to NMC for medical evaluation and clearance prior to acceptance at the jail during February 2017. A routine mental health referral should have been submitted after her June 2017 re-admission to the jail.

There were some lapses in the documentation of daily segregation nursing rounds as noted above. There was documentation of weekly mental health contacts and consistent psychiatric evaluation.

Medications were appropriately ordered after psychiatric evaluation in light of consistencies on the patient's history of treatment.

There were some lapses in the documentation of daily segregation nursing rounds as noted above. There was documentation of weekly mental health contacts and consistent psychiatric evaluation.

Medications were appropriately ordered after psychiatric evaluation in light of consistencies on the patient's history of treatment.

As it was difficult to determine the date of actual segregation placement, it was difficult to determine whether timely placement screening occurred.

**Patient 9**

This patient was housed in the A Pod male segregation unit at the time of the monitoring visit. The healthcare record documented a history of multiple incarcerations and mental health treatment.

The Medical Intake Triage/Receiving Screening was performed on September 5, 2017 and again on September 11, 2017. Both screenings were significant for a history of mental health hospitalization for "bipolar" as well as substance abuse treatment. He also acknowledged placement on suicide watch during prior incarcerations, but no current suicidality. The screening on September 5 indicated affirmative regarding whether the patient appeared to be under the influence, with an additional comment that his symptoms appeared to be related to a mental health condition. At that time, he presented with paranoia directed at the arresting officer and he reported occasional auditory hallucinations. The RN indicated that the patient would begin the withdrawal protocol, would be scheduled for the next mental health clinic and for a routine psychiatric evaluation.

It appeared that the patient was released from custody on September 6 and re-incarcerated on September 11, 2017. The September 11, 2017 screening did not note the symptoms of psychosis, and the patient was placed in general population and scheduled for the next mental health clinic.

A review of past jail documentation indicated that the patient was previously treated with various psychotropic medications, including Seroquel, Trilafon, Lithium and Thorazine.

The patient was seen by the psychiatrist on September 6, 2017 in response to referral from intake. He was described as dirty, thin and homeless with poor eye contact, tangential speech and flat affect. He was also guarded in his responses regarding the presence of hallucinations. The psychiatrist indicated that the patient had not taken psychotropic medications for "a long time". He was provided with a diagnosis of Psychotic Disorder, NOS, and the patient became upset when psychotropic medications were mentioned to him, refusing to take them. He was scheduled for weekly welfare checks.

The patient was seen at least weekly by the LCSW, MFT or the psychologist. He presented generally with cooperative behavior; although he sometimes refused mental health contact when he was seen at cell front. On September 27, 2017, he attended group therapy, and the MFT indicated that he appeared to be responding to auditory hallucinations.

9

As it was difficult to determine the date of actual segregation placement, it was difficult to determine whether timely placement screening occurred.

   **Patient 9**

This patient was housed in the A Pod male segregation unit at the time of the monitoring visit. The healthcare record documented a history of multiple incarcerations and mental health treatment.

The Medical Intake Triage/Receiving Screening was performed on September 5, 2017 and again on September 11, 2017. Both screenings were significant for a history of mental health hospitalization for "bipolar" as well as substance abuse treatment. He also acknowledged placement on suicide watch during prior incarcerations, but no current suicidality. The screening on September 5 indicated affirmative regarding whether the patient appeared to be under the influence, with an additional comment that his symptoms appeared to be related to a mental health condition. At that time, he presented with paranoia directed at the arresting officer and he reported occasional auditory hallucinations. The RN indicated that the patient would begin the withdrawal protocol, would be scheduled for the next mental health clinic and for a routine psychiatric evaluation.

It appeared that the patient was released from custody on September 6 and re-incarcerated on September 11, 2017. The September 11, 2017 screening did not note the symptoms of psychosis, and the patient was placed in general population and scheduled for the next mental health clinic.

A review of past jail documentation indicated that the patient was previously treated with various psychotropic medications, including Seroquel, Trilafon, Lithium and Thorazine.

The patient was seen by the psychiatrist on September 6, 2017 in response to referral from intake. He was described as dirty, thin and homeless with poor eye contact, tangential speech and flat affect. He was also guarded in his responses regarding the presence of hallucinations. The psychiatrist indicated that the patient had not taken psychotropic medications for "a long time". He was provided with a diagnosis of Psychotic Disorder, NOS, and the patient became upset when psychotropic medications were mentioned to him, refusing to take them. He was scheduled for weekly welfare checks.

The patient was seen at least weekly by the LCSW, MFT or the psychologist. He presented generally with cooperative behavior; although he sometimes refused mental health contact when he was seen at cell front. On September 27, 2017, he attended group therapy, and the MFT indicated that he appeared to be responding to auditory hallucinations.

An Initial Mental Health Assessment and Appraisal was completed on November 8, 2017. The assessment noted no mental health concerns and indicated that no mental health referral was warranted with a general population housing recommendation.

The patient was seen by the LCSW on November 9, 2017 at cell front; at that time, he presented with labile mood, bizarre affect, and incoherent speech. He was seen two days later by the MFT

An Initial Mental Health Assessment and Appraisal was completed on November 8, 2017. The assessment noted no mental health concerns and indicated that no mental health referral was warranted with a general population housing recommendation.

The patient was seen by the LCSW on November 9, 2017 at cell front; at that time, he presented with labile mood, bizarre affect, and incoherent speech.  He was seen two days later by the MFT who noted that he refused sick call; he was again seen on November 16, 2017 at cell front.  She described his room as neat, and he denied current difficulties. He indicated that he did not want mental health contacts.

**Findings**

It was unfortunate that this patient refused treatment with psychotropic medications, despite his probable psychosis and potential benefit from this treatment.  Despite this, he did occasionally participate in mental health contacts and group therapy.

It was unclear why the Initial Mental Health Assessment and Appraisal was significantly delayed; additionally, it did not appear that the healthcare record was available, and if so, reviewed by the RN performing the assessment for this patient with a long and detailed history of mental health treatment.

There was documentation that the patient was seen weekly by mental health in segregation. The reviewer was unable to locate documentation regarding daily rounds in segregation. This patient remained in segregation due to his inability to function in a less restrictive setting secondary to his mental illness.  This was another example of the use of the segregation unit at MCJ as a de facto mental health unit. Although it did not appear that he met the criteria for involuntary hospitalization, he would benefit from inpatient treatment for stabilization.

 **Patient 10**

This patient's healthcare record was reviewed as he was a recent intake into the jail. This patient received his Medical Intake Triage/Receiving Screening on November 14, 2017.  His screening was negative for mental health concerns, except concern regarding his medical condition; he had a history of diabetes, hypertension and hip problems.  There was no disposition or referral designation noted on the intake screening form. It appeared that he was released from the jail on November 22, 2017. An Adult Facility Discharge Instructions Discharge Follow-up and Medications at Time of Release was completed on November 22, 2017, which noted that the patient was medically stable with no further medical complaints or concerns which was signed by the patient.

**Findings**

No mental health concerns noted.

**Patient 11**

10

who noted that he refused sick call; he was again seen on November 16, 2017 at cell front. She described his room as neat, and he denied current difficulties. He indicated that he did not want mental health contacts.

**Findings**

It was unfortunate that this patient refused treatment with psychotropic medications, despite his probable psychosis and potential benefit from this treatment. Despite this, he did occasionally participate in mental health contacts and group therapy.

It was unclear why the Initial Mental Health Assessment and Appraisal was significantly delayed; additionally, it did not appear that the healthcare record was available, and if so, reviewed by the RN performing the assessment for this patient with a long and detailed history of mental health treatment.

There was documentation that the patient was seen weekly by mental health in segregation. The reviewer was unable to locate documentation regarding daily rounds in segregation. This patient remained in segregation due to his inability to function in a less restrictive setting secondary to his mental illness. This was another example of the use of the segregation unit at MCJ as a de facto mental health unit. Although it did not appear that he met the criteria for involuntary hospitalization, he would benefit from inpatient treatment for stabilization.

  **Patient 10**

This patient's healthcare record was reviewed as he was a recent intake into the jail. This patient received his Medical Intake Triage/Receiving Screening on November 14, 2017. His screening was negative for mental health concerns, except concern regarding his medical condition; he had a history of diabetes, hypertension and hip problems. There was no disposition or referral designation noted on the intake screening form. It appeared that he was released from the jail on November 22, 2017. An Adult Facility Discharge Instructions Discharge Follow-up and Medications at Time of Release was completed on November 22, 2017, which noted that the patient was medically stable with no further medical complaints or concerns which was signed by the patient.

**Findings**

No mental health concerns noted.

  **Patient 11**

This patient's healthcare record was reviewed as he was sent to NMC and returned to the MCJ.

The patient was brought to the jail on May 27, 2017. The Medical Intake Questionnaire noted the patient's unwillingness to answer questions for the deputies, and his denial of any difficulties or history of treatment. The RN indicated that on May 26, 2017, the patient was seen at intake

This patient's healthcare record was reviewed as he was sent to NMC and returned to the MCJ.

The patient was brought to the jail on May 27, 2017. The Medical Intake Questionnaire noted the patient's unwillingness to answer questions for the deputies, and his denial of any difficulties or history of treatment. The RN indicated that on May 26, 2017, the patient was seen at intake but was unwilling to answer questions for deputies. He was responsive to the nurse, indicating that he was God and that he would not speak with custody. The nurse scheduled the patient to be seen by mental health on the following day. On the following day, another nurse indicated that the patient did agree to respond to intake questions. The nurse noted that he appeared unkempt, soft-spoken and homeless. Psychiatric follow-up was scheduled.

On June 1, 2017, the patient was scheduled for court; at that time, he was unwilling to answer questions or to open his eyes. Upon his return from court on that day, the RN saw the inmate at the request of a deputy. The patient was described as calm, but not responsive to commands. He did allow vital signs to be obtained. The nurse indicated that the patient would see the psychiatrist on the following day and that Dr. █████ would be contacted for further orders.

A note by the CNA on the following day indicated that MCBH and NMC were called and faxed to release the patient's healthcare records.

The patient was seen by the psychiatrist on June 2, 2017; he appeared to be psychotic, with delusional thinking, suspiciousness and unkempt appearance, refusing to respond to questions. The psychiatrist indicated that they would attempt to obtain his healthcare record, and Haldol and Cogentin were ordered; although the psychiatrist indicated that he was skeptical that the patient would take the medications.

On June 5, 2017, an RN indicated that a report was received that the patient was "unresponsive". Attempts were made to talk with the patient but he was described as uncooperative. Vital signs were obtained. He was observed with his eyes closed; he did remove an ammonia stick from his nostril. The RN noted that the patient was scheduled to see the medical physician on the following day and to see the psychiatrist in two days.

The patient was seen by the telepsychiatrist on June 7, 2017. He was unresponsive, mute and immobile and his eyes were closed. He indicated that the patient was gravely disabled and met criteria for involuntary hospitalization under WIC 5150. He provided a diagnosis of possible schizophrenia. The psychiatrist noted that due to his grave disability, the MCJ was unable to provide adequate care for the patient.

On June 7, 2017 at 1000, the RN noted that the patient had been transferred to NMC under the 5150 California Welfare and Institutions Code "per Dr. █████ at that time his vital signs were stable and he remained mute with his eyes closed. He returned from the NMC emergency room at 1755; his symptoms were unchanged upon return from the hospital. The nurse indicated that the patient would be scheduled to see Dr. █████ on the following day.

A Monterey County Health Department Behavioral Health Bureau 311 – Finalized Progress Note Report dated June 7, 2017 was reviewed. It indicated that the patient was brought to the emergency department at NMC after the psychiatrist reported that he was not eating, drinking or

11

but was unwilling to answer questions for deputies.  He was responsive to the nurse, indicating that he was God and that he would not speak with custody.  The nurse scheduled the patient to be seen by mental health on the following day. On the following day, another nurse indicated that the patient did agree to respond to intake questions.  The nurse noted that he appeared unkempt, soft-spoken and homeless.  Psychiatric follow-up was scheduled.

On June 1, 2017, the patient was scheduled for court; at that time, he was unwilling to answer questions or to open his eyes.  Upon his return from court on that day, the RN saw the inmate at the request of a deputy.  The patient was described as calm, but not responsive to commands.  He did allow vital signs to be obtained.  The nurse indicated that the patient would see the psychiatrist on the following day and that Dr. ▆▆▆▆ would be contacted for further orders.

A note by the CNA on the following day indicated that MCBH and NMC were called and faxed to release the patient's healthcare records.

The patient was seen by the psychiatrist on June 2, 2017; he appeared to be psychotic, with delusional thinking, suspiciousness and unkempt appearance, refusing to respond to questions. The psychiatrist indicated that they would attempt to obtain his healthcare record, and Haldol and Cogentin were ordered; although the psychiatrist indicated that he was skeptical that the patient would take the medications.

On June 5, 2017, an RN indicated that a report was received that the patient was "unresponsive". Attempts were made to talk with the patient but he was described as uncooperative.  Vital signs were obtained.  He was observed with his eyes closed; he did remove an ammonia stick from his nostril. The RN noted that the patient was scheduled to see the medical physician on the following day and to see the psychiatrist in two days.

The patient was seen by the telepsychiatrist on June 7, 2017.  He was unresponsive, mute and immobile and his eyes were closed. He indicated that the patient was gravely disabled and met criteria for involuntary hospitalization under WIC 5150. He provided a diagnosis of possible schizophrenia.  The psychiatrist noted that due to his grave disability, the MCJ was unable to provide adequate care for the patient.

On June 7, 2017 at 1000, the RN noted that the patient had been transferred to NMC under the 5150 California Welfare and Institutions Code "per Dr. ▆▆▆▆"; at that time his vital signs were stable and he remained mute with his eyes closed. He returned from the NMC emergency room at 1755; his symptoms were unchanged upon return from the hospital. The nurse indicated that the patient would be scheduled to see Dr. ▆▆▆▆ on the following day.

 A Monterey County Health Department Behavioral Health Bureau 311 – Finalized Progress Note Report dated June 7, 2017 was reviewed.  It indicated that the patient was brought to the emergency department at NMC after the psychiatrist reported that he was not eating, drinking or showering, was mute and unresponsive.  They indicated that the reports regarding whether he was eating or not were contradictory.  He was given a Zyprexa intramuscular injection, and approximately one hour later, he ate chips and drank some water.  The note indicated that based

showering, was mute and unresponsive. They indicated that the reports regarding whether he was eating or not were contradictory.  He was given a Zyprexa intramuscular injection, and approximately one hour later, he ate chips and drank some water.  The note indicated that based upon the patient's willingness to eat and drink, he did not meet the criteria for inpatient psychiatric treatment for grave disability.

The psychologist indicated that the public defender's office was contacted to request a 1368 evaluation for the patient; a message was left with an attorney regarding this request.

The patient was again seen by the telepsychiatrist on June 8, 2017.  He indicated that despite his evaluation at NMC and receipt of Zyprexa injection, he remained gravely disabled. He also indicated that he would be seen consistently and returned to NMC if his condition deteriorated.

A progress note on June 11, 2017 was written by what appeared to be a social worker who attempted to see the patient at cell front after he refused out of cell contact. He was uncooperative to interview, lying on the floor under his blanket and was unresponsive to questioning.  Follow-up was scheduled for the next day. On June 15, he came out of cell for interview, he remained delusional and refused to take psychotropic medications. He was also seen by the psychologist on that date.

The patient was seen by the social worker or MFT at least weekly, and at times more frequently. He usually refused out of cell contacts, and interactions occurred at cell front.  He also frequently refused to respond to interview attempts during June through August 2017.  His cell and hygiene were frequently described as unkempt and filthy with insects; other inmates assisted in occasional cleaning of his cell.

The psychologist noted on August 3, 2017 that she had received a call from someone at MCBH who indicated that she would be obtaining a court order for the patient to be cell extracted for transport to NMCBHU for restoration of competency. On August 22, 2017, the patient was seen by the LCSW who described his cell as less filthy after other inmates helped to clean.  He did speak with the LCSW, and follow-up was scheduled for three to five days.

Segregation observation logs noted nursing rounds from May 29 to August 25, 2017. There were multiple signed and un-signed treatment refusal forms located in the healthcare record.

### Findings

This severely mentally ill patient required mental health services that were in excess of what could be provided at the MCJ.  He required inpatient psychiatric treatment for stabilization, with probable involuntary medication and monitoring.  When the patient presented with catatonic behavior and questionable eating, drinking and showering; the mental health staff at the jail attempted to send him to NMC for stabilization.  Despite this attempt, NMC merely provided the patient with a one-time antipsychotic injection, and returned him to the jail on the same day, indicating that he was improved and that he did not meet the requirements for involuntary commitment for grave disability.  This patient was gravely disabled and required more intensive care than was provided at the NMC.

12

upon the patient's willingness to eat and drink, he did not meet the criteria for inpatient psychiatric treatment for grave disability.

The psychologist indicated that the public defender's office was contacted to request a 1368 evaluation for the patient; a message was left with an attorney regarding this request.

The patient was again seen by the telepsychiatrist on June 8, 2017. He indicated that despite his evaluation at NMC and receipt of Zyprexa injection, he remained gravely disabled. He also indicated that he would be seen consistently and returned to NMC if his condition deteriorated.

A progress note on June 11, 2017 was written by what appeared to be a social worker who attempted to see the patient at cell front after he refused out of cell contact. He was uncooperative to interview, lying on the floor under his blanket and was unresponsive to questioning. Follow-up was scheduled for the next day. On June 15, he came out of cell for interview, he remained delusional and refused to take psychotropic medications. He was also seen by the psychologist on that date.

The patient was seen by the social worker or MFT at least weekly, and at times more frequently. He usually refused out of cell contacts, and interactions occurred at cell front. He also frequently refused to respond to interview attempts during June through August 2017. His cell and hygiene were frequently described as unkempt and filthy with insects; other inmates assisted in occasional cleaning of his cell.

The psychologist noted on August 3, 2017 that she had received a call from someone at MCBH who indicated that she would be obtaining a court order for the patient to be cell extracted for transport to NMCBHU for restoration of competency. On August 22, 2017, the patient was seen by the LCSW who described his cell as less filthy after other inmates helped to clean. He did speak with the LCSW, and follow-up was scheduled for three to five days.

Segregation observation logs noted nursing rounds from May 29 to August 25, 2017. There were multiple signed and un-signed treatment refusal forms located in the healthcare record.

**Findings**

This severely mentally ill patient required mental health services that were in excess of what could be provided at the MCJ. He required inpatient psychiatric treatment for stabilization, with probable involuntary medication and monitoring. When the patient presented with catatonic behavior and questionable eating, drinking and showering; the mental health staff at the jail attempted to send him to NMC for stabilization. Despite this attempt, NMC merely provided the patient with a one-time antipsychotic injection, and returned him to the jail on the same day, indicating that he was improved and that he did not meet the requirements for involuntary commitment for grave disability. This patient was gravely disabled and required more intensive care than was provided at the NMC.

After his return to the jail, mental health staff consistently monitored the patient, encouraging treatment participation. Custody staff also assisted in attempting to maintain hygiene for this

After his return to the jail, mental health staff consistently monitored the patient, encouraging treatment participation. Custody staff also assisted in attempting to maintain hygiene for this individual. Although documentation was not located in the healthcare record, it is hopeful that the patient was transferred to an inpatient psychiatric facility for stabilization.

The patient was appropriately referred to mental health at the time of intake. There was documentation of at least weekly mental health contacts for this patient housed in segregation. There was also documentation of daily nursing rounds. Medications were ordered at the time of intake; however, the patient refused. He was also followed consistently by psychiatry.

There was also documentation that other efforts were made to obtain inpatient treatment for this very ill patient.

This patient remained in segregation due to his inability to function in a less restrictive setting in the jail secondary to his mental illness. This was another example of the use of the segregation unit at MCJ as a de facto mental health unit.

     **Patient 12**

This patient was housed in the A dorm. His healthcare record was reviewed as he was interviewed during the monitoring visit.

The patient received the Medical Intake Triage/Receiving Screening on July 4, 2017. The screening noted a recent motor vehicle accident resulting in a fractured right leg, sternum, clavicle and resulting chronic pain. The screening indicated a history of depression and Attention Deficit Hyperactivity Disorder (ADHD) as well as a history of substance abuse treatment. He denied treatment with psychotropic medications. He was scheduled to be seen by the LCSW at the next mental health clinic.

A review of the patient's voluminous healthcare record indicated that the vast majority of the care provided to this patient was by medical staff related to orthopedic surgery, chronic pain and follow-up care.

He was seen by the LCSW on July 7, 2017 for what was described as a brief contact in the OPH. At that time, the patient requested to speak with the psychiatrist to obtain medications for ADHD. He reported drinking alcohol to manage those symptoms. Follow-up was ordered for five to seven days. He was seen by the same clinician two days later when he reported that he was doing the same as when he was last seen.

An Initial Mental Health Assessment and Appraisal was completed on July 11, 2017, which noted current/previous diagnoses of bipolar disorder and ADHD, and daily alcohol and marijuana use. The disposition section of the form indicated general population housing and routine mental health referral.

The patient was seen by the telepsychiatrist on July 16, 2017. At that time, he reported symptoms of depression and anxiety with mood swings for which he reportedly took Valium. The

13

individual. Although documentation was not located in the healthcare record, it is hopeful that the patient was transferred to an inpatient psychiatric facility for stabilization.

The patient was appropriately referred to mental health at the time of intake. There was documentation of at least weekly mental health contacts for this patient housed in segregation. There was also documentation of daily nursing rounds. Medications were ordered at the time of intake; however, the patient refused. He was also followed consistently by psychiatry.

There was also documentation that other efforts were made to obtain inpatient treatment for this very ill patient.

This patient remained in segregation due to his inability to function in a less restrictive setting in the jail secondary to his mental illness. This was another example of the use of the segregation unit at MCJ as a de facto mental health unit.


████████████          ██████          **Patient 12**

This patient was housed in the A dorm. His healthcare record was reviewed as he was interviewed during the monitoring visit.

The patient received the Medical Intake Triage/Receiving Screening on July 4, 2017. The screening noted a recent motor vehicle accident resulting in a fractured right leg, sternum, clavicle and resulting chronic pain. The screening indicated a history of depression and Attention Deficit Hyperactivity Disorder (ADHD) as well as a history of substance abuse treatment. He denied treatment with psychotropic medications. He was scheduled to be seen by the LCSW at the next mental health clinic.

A review of the patient's voluminous healthcare record indicated that the vast majority of the care provided to this patient was by medical staff related to orthopedic surgery, chronic pain and follow-up care.

He was seen by the LCSW on July 7, 2017 for what was described as a brief contact in the OPH. At that time, the patient requested to speak with the psychiatrist to obtain medications for ADHD. He reported drinking alcohol to manage those symptoms. Follow-up was ordered for five to seven days. He was seen by the same clinician two days later when he reported that he was doing the same as when he was last seen.

An Initial Mental Health Assessment and Appraisal was completed on July 11, 2017, which noted current/previous diagnoses of bipolar disorder and ADHD, and daily alcohol and marijuana use. The disposition section of the form indicated general population housing and routine mental health referral.

The patient was seen by the telepsychiatrist on July 16, 2017. At that time, he reported symptoms of depression and anxiety with mood swings for which he reportedly took Valium. The psychiatrist noted that he appeared to be fabricating symptoms and was more interested in obtaining Valium. He noted a past history of treatment with Valium and Adderall. He was

psychiatrist noted that he appeared to be fabricating symptoms and was more interested in obtaining Valium. He noted a past history of treatment with Valium and Adderall. He was provided with a diagnosis of Depressive Disorder, NOS, Cannabis and Alcohol Use Disorder and possible Substance Induced Mood Disorder. He was prescribed Zoloft and Remeron.

He was next seen by the telepsychiatrist on July 31, 2017, when his Zoloft was increased to address his continued symptoms.

On August 26, 2017, the patient was seen by the telepsychiatrist. He reported continued depression and anxiety. The psychiatrist again noted his request for benzodiazepine treatment. Zoloft was further increased and Buspar was added to address the mood and anxiety complaints.

The patient was seen by the psychologist on September 5, 2017 when he requested Klonopin. The psychologist noted that Zoloft had only recently been increased and that the patient was "highly benzo seeking – wants Klonopin". She also noted that he had only recently been seen by the psychiatrist (10 days prior), and that it was too soon for medications to be increased; she also noted that he would be seen by the psychiatrist in one month.

On September 20, 2017, the patient was seen by the MFT who indicated that dialectic behavioral therapy (DBT) was provided to the patient to address his anxiety symptoms. The note indicated that the patient was medication seeking and malingering. Follow up was scheduled for seven to ten days.

On September 25, 2017, there was a progress note by the psychologist indicating that the patient was requesting to take Buspar. She noted his frequent mental health requests and noted that he appeared to be medication seeking. The note stated that he was already prescribed Zoloft and Buspar, making the request for Buspar confusing. The note also indicated that the patient was addicted to benzodiazepine medications, and that he was seeking these medications at intake and had been placed on a medication taper. He was scheduled to see the psychiatrist in 90 days; however, the psychologist indicated that in light of his frequent requests, this appointment would be changed to approximately 45 days. The patient reportedly did not appear in distress or with self harm concerns.

The patient was seen by the psychologist on October 11, 2017 after he submitted a request on the tablet indicating that he had suicidal thoughts. At the time of interview, he denied suicidality; he indicated that he no longer wanted Zoloft, but he wanted a sedative. The psychologist indicated that the patient was feigning psychotic symptoms (after he made vague statements that the suicidal thoughts had not been his) or malingering and that he continued to seek benzodiazepine medications. The psychologist noted his scheduled psychiatric appointment for November 25, 2017 which would not be moved earlier.

The patient was, however, seen by the psychiatrist on October 16, 2017 after the plaintiff's attorney contacted the County Counsel to have the patient seen by the psychiatrist earlier. He was provided with diagnoses of Depressive Disorder, NOS, Anxiety Disorder, NOS, Polysubstance Dependence and rule out Substance Induced Mood Disorder. The patient reported panic attacks on Zoloft, and he subsequently refused to take the mediation. He reported

provided with a diagnosis of Depressive Disorder, NOS, Cannabis and Alcohol Use Disorder and possible Substance Induced Mood Disorder. He was prescribed Zoloft and Remeron.

He was next seen by the telepsychiatrist on July 31, 2017, when his Zoloft was increased to address his continued symptoms.

On August 26, 2017, the patient was seen by the telepsychiatrist. He reported continued depression and anxiety. The psychiatrist again noted his request for benzodiazepine treatment. Zoloft was further increased and Buspar was added to address the mood and anxiety complaints.

The patient was seen by the psychologist on September 5, 2017 when he requested Klonopin. The psychologist noted that Zoloft had only recently been increased and that the patient was "highly benzo seeking – wants Klonopin". She also noted that he had only recently been seen by the psychiatrist (10 days prior), and that it was too soon for medications to be increased; she also noted that he would be seen by the psychiatrist in one month.

On September 20, 2017, the patient was seen by the MFT who indicated that dialectic behavioral therapy (DBT) was provided to the patient to address his anxiety symptoms. The note indicated that the patient was medication seeking and malingering. Follow up was scheduled for seven to ten days.

On September 25, 2017, there was a progress note by the psychologist indicating that the patient was requesting to take Buspar. She noted his frequent mental health requests and noted that he appeared to be medication seeking. The note stated that he was already prescribed Zoloft and Buspar, making the request for Buspar confusing. The note also indicated that the patient was addicted to benzodiazepine medications, and that he was seeking these medications at intake and had been placed on a medication taper. He was scheduled to see the psychiatrist in 90 days; however, the psychologist indicated that in light of his frequent requests, this appointment would be changed to approximately 45 days. The patient reportedly did not appear in distress or with self harm concerns.

The patient was seen by the psychologist on October 11, 2017 after he submitted a request on the tablet indicating that he had suicidal thoughts. At the time of interview, he denied suicidality; he indicated that he no longer wanted Zoloft, but he wanted a sedative. The psychologist indicated that the patient was feigning psychotic symptoms (after he made vague statements that the suicidal thoughts had not been his) or malingering and that he continued to seek benzodiazepine medications. The psychologist noted his scheduled psychiatric appointment for November 25, 2017 which would not be moved earlier.

The patient was, however, seen by the psychiatrist on October 16, 2017 after the plaintiff's attorney contacted the County Counsel to have the patient seen by the psychiatrist earlier. He was provided with diagnoses of Depressive Disorder, NOS, Anxiety Disorder, NOS, Polysubstance Dependence and rule out Substance Induced Mood Disorder. The patient reported panic attacks on Zoloft, and he subsequently refused to take the mediation. He reported occasional suicidal ideation and thoughts of hurting people, but denied intent or plan; he denied

occasional suicidal ideation and thoughts of hurting people, but denied intent or plan; he denied current suicidal or homicidal ideation. Buspar was increased, and Zoloft was discontinued. Effexor was also prescribed.

On October 24, 2017, the patient was seen by the LCSW who noted his complaint of medication side effects, "not eating or sleeping, sleeps four hours per day". He was referred to see the psychiatrist.

He was seen by the psychiatrist on the following day when he reported increased anxiety and feeling jittery since treatment with Effexor. Effexor was discontinued, and Paxil and Depakote were ordered with laboratory studies.

When next seen by the LCSW on November 2, 2017, the patient reported that he was feeling better.

He was seen by the psychiatrist on four days later, when he requested an increase in his Paxil; Trazodone was also added. When seen by the LCSW six days later, the patient reported improvement on his current medications.

The patient was interviewed during the monitoring visit. He reported that his primary concerns were anxiety, chronic pain and symptoms of ADHD. He reported chronic pain as a result of a motor vehicle accident which resulted in reconstructive surgery. A primary concern for him was the treatment of his chronic pain. Prior to incarceration, he reported that he was "self-medicating" with alcohol; he had a history of treatment with Paxil and Depakote, but he had not taken those medications prior to his incarceration. He expressed frustration that there were a "series of ladies that you have to go through to get to see the psychiatrist". He was satisfied with his contacts with the psychiatrist who he had seen on three occasions. He also expressed concern that more services should be made available, such as psychotherapy.

**Findings**

This patient was interviewed and his healthcare record reviewed at the request of the plaintiff's attorneys who were concerned that the psychologist was performing an inappropriate gate-keeping role in preventing the patient from seeing the psychiatrist timely.

The patient was seen consistently by the psychiatrist for evaluation and medication management. Although the plaintiff's letter indicated that the patient was prevented from seeing the psychiatrist by the psychologist during October 2017; he had actually been evaluated by the psychiatrist on three occasions prior, and his request for benzodiazepine medications was inconsistent with an emergency mental health condition which would warrant moving his psychiatric appointment sooner. Further, the patient had just been seen by the psychiatrist ten days prior when he requested to be seen sooner for Klonopin; this interval did not allow enough time for the recent increase and change in medications to take effect.

Although this patient was seen by the LCSW prior to evaluation by the psychiatrist soon after intake, this was not clinically inappropriate in light of his history, symptom presentation and lack of recent treatment with psychotropic medications.

Of note; however, was the determination by the psychologist (and listing on the Problem List) and others that the patient was malingering/feigning symptoms based upon limited clinical contact and available information. Caution is advised regarding the provision of such diagnoses which frequently negatively label a patient and prevent needed treatment when indicated. Such cases, when malingering is suspected, should be referred to the psychiatrist for diagnostic clarification and evaluation as occurred in this situation.

It did appear that this patient had a history of substance abuse treatment, and his medication requests may have been a result of the need for additional treatment. Appropriate treatment planning, which did not occur for this patient, should have identified this behavior and provided treatment goals to address. There was documentation that the MFT was working with the patient to learn dialectic behavioral therapy (DBT) to address his anxiety symptoms; appropriate treatment planning would include these interventions to document the treatment provided.

The Initial Mental Health Assessment and Appraisal was completed timely.

The appropriate laboratory testing for treatment with Depakote was conducted.



**Patient 13**

This patient was housed in the women's segregation unit at the time of the monitoring visit.

The Medical Intake Triage/Receiving Screening was completed on November 9, 2017. The form noted that the patient denied any physical or mental health issues or current medications. The RN noted that the patient began crying at the end of the assessment, indicating that she wanted to complete the interview and to go to sleep. A referral to see the LCSW was offered; however, the patient refused to see a mental health clinician. She denied suicidality. No information was completed regarding disposition or mental health referral.

The patient was evaluated by the psychologist on November 14, 2017, at the patient's request to resume her psychotropic medications. The psychologist noted that the patient denied mental health treatment at the time of intake; however, she currently reported treatment with Zoloft and Abilify. She was provided with a diagnosis of Substance Induced Mood Disorder, and she indicated that the medications would be verified. The patient's medications were verified on that same date and she was scheduled to see the psychiatrist.

She was seen by the psychiatrist on November 16, 2017 who noted her history of depression, anxiety and methamphetamine abuse. She had reportedly been doing well on Abilify and Zoloft prior to incarceration. She agreed to resumption of her medications which were ordered at that time.

There was no subsequent documentation of mental health contact.

**Findings**

This patient was appropriately seen in response to self-referral when she requested her psychotropic medications, which she denied taking at the time of intake.

16

This patient was housed in segregation, and there was no information regarding nursing or mental health checks located in the healthcare record for this incarceration. It appeared that the patient may have been released from the jail shortly after her psychiatric evaluation.

 **Patient 14**

This patient's healthcare record was reviewed as he was a recent intake into the jail. He received his Medical Intake Triage/Receiving Screening on November 11, 2017. He denied mental health or substance related concerns, and no mental health referral was indicated. There was no documentation of mental health contact.

**Findings**

No mental health concerns noted.

 **Patient 15**

This patient was housed in A Pod segregation at the time of the monitoring visit. It appeared that he had several incarcerations during 2017.

The patient had a history of mental health treatment at the jail. During an incarceration on February 11, 2017, the patient was found standing in the hallway where he reported hearing voices and becoming increasingly anxious. He was seen by the social worker on the following day when he continued to present with psychotic symptoms.

The patient was re-booked into the jail on July 19, 2017 and September 19, 2017. Due to his multiple arrests and release from the jail, this review will primarily focus on the most recent incarcerations.

He was treated with Zyprexa and Depakote during much of his incarcerations.

Forms were present in the healthcare record dated July 10, 2017 and August 24, 2017 indicating that the patient was discharging from the facility which noted the need for follow-up with his mental health provider and indicating provision of a 30-day prescription of his current medications at the local CVS pharmacy.

He was seen by the psychiatrist on September 21, 2017 when his history of methamphetamine abuse was noted and his report of mood swings and auditory hallucinations. He reported good response to Depakote and Zyprexa, but he discontinued medications upon release from the jail. He was provided with diagnoses of Methamphetamine Abuse and possible Substance Induced Psychotic and Mood Disorder. Depakote and Zyprexa were resumed and laboratory studies were ordered.

The patient was seen for follow up on October 11, 2017; at that time, he reported medication adherence, but continued anxiety. Depakote was increased.

17

Segregated Population Observation Logs were reviewed for the dates September 21 to October 14 (missing September 24), October 16 to November 19 (missing October 15) and July 22 to August 23, 2017.

**Findings**

The Problem List included as an active problem during a prior incarceration on February 13, 2017 "r/o malingering/feigning psychotic symptoms for instrumental reasons" by the psychologist. There was a later diagnosis (undated) of Psychotic Disorder, unspecified and "r/o substance-induced" listed. Caution is advised regarding the provision of diagnoses of malingering and feigning of symptoms which frequently negatively labels a patient and prevents needed treatment when indicated. Such cases, when malingering is suspected, should be referred to the psychiatrist for diagnostic clarification and evaluation. Further, the conclusion that this patient was feigning the psychotic symptoms that he presented is questionable.

Regarding medication continuity upon arrival to the jail, documentation indicated that the patient was generally nonadherent with medications after release; medications were generally re-ordered after mental health evaluation which appeared to be clinically appropriate. Additionally, the patient had a significant methamphetamine abuse history; that drug might cause or worsen psychotic symptoms, making re-evaluation prior to medication treatment clinically indicated.

It did not appear that the old healthcare record was always available when the patient returned to the jail, as there was an order requesting the old records.

There was documentation of the provision of a 30-day prescription for medications upon release from the jail.

The appropriate laboratory testing was conducted for treatment with Depakote.

There was documentation of weekly mental health contacts in segregation. There were occasional lapses of one day in the documentation of daily nursing rounds.



**Patient 16**

This patient's healthcare record was reviewed as he was a recent intake into the jail. He received his Medical Intake Triage/Receiving Screening on November 16, 2017. He denied mental health or significant substance related concerns, and no mental health referral was indicated. There was an order for the patient to be seen by the LCSW due to worry about his children; however, it appeared that he may have been released from jail prior to mental health contact. There was no documentation of mental health contact.

**Findings**

No mental health concerns noted.

█████████     ████████                    **Patient 17**

This patient was interviewed and his healthcare record reviewed at the request of the plaintiff's attorney to evaluate the mental health care provided at the MCJ.

The Problem List included diagnoses of Polysubstance Dependence and Borderline Personality Disorder as well as Antisocial Personality Disorder with cluster B traits. Another problem list included a diagnosis of Schizoaffective Disorder. The psychiatrist provided diagnoses of Bipolar Disorder, NOS, Methamphetamine Abuse and Cluster B Personality Traits.

As this patient's healthcare record was voluminous and the clinical encounters were numerous, a summary of pertinent events will be included in this clinical review.

The patient had many episodes of agitation with head banging and suicidal ideation that frequently resulted in placement on level 2 suicide watch.

The patient was placed into restraints for head banging on September 21, 2017 at 2040. At 2140, he was given injections of Haldol, Ativan and Cogentin as per the psychiatrist order.

A nursing note September 23, 2017 indicated that the patient returned from NMC and was placed into WRAP at 1751; at the time, he was described as uncooperative with suicidal ideation.

On September 29, 2017 at 2238, he was housed in the booking cell when he was observed lying on the floor refusing to respond to verbal commands. He became increasingly agitated and was subsequently placed into the restraint chair with a helmet after hitting his head on the floor. He was completely removed from restraints on September 30 at 0240. On September 30, 2017 at 2240, he was placed into the restraint chair on suicide watch after he became combative and began hitting the back of his head. A soft helmet was placed on the patient to discourage had banging. He was removed from the restraint chair on the same day at 2351 when his behavior was calm.

On October 25, 2017, at 2253 medical staff responded to the A Pod after custody staff reported a patient hanging. The patient was awake and breathing with normal vital signs. He was transported to NMC by ambulance for evaluation and treatment. He returned from the NMC emergency department on October 26, 2017 at 0110. He stated that he would begin to hit his head if not placed into the restraint chair.

On October 26, 2017, an RN noted that the patient was placed into safety cell one and placed on level 2 suicide watch with a smock and mattress. He indicated suicidal ideation at that time. Later that day, he was observed with a contusion on his forehead. On the following day, the RN noted that the patient had been in and out of the safety cell one and booking cell 11. He was also refusing food, water and medications and he continued to express suicidal ideation. He was removed from the restraint chair at 2200, began hitting his head again and was returned to the restraint chair. He was sent to NMC @ 0210 for mental health evaluation and was returned at 0600. A subsequent note indicated that mental health would be contacted to review the incident and the need for the safety chair and transport to the hospital and to develop a plan.

19

Neuro and Vital Sign Flow Sheets were present for October 26 to October 27, 2017. During that time, he reportedly was hitting his head on the cell door requesting placement in the restraint chair. A contusion was noted on his forehead. There was a notation on October 27, 2017 by an RN indicating that they were attempting to contact the psychiatrist to clarify orders regarding the patient's restraint situation. No response was obtained as per the RN. There was an order for continuation in the restraint chair by the psychologist on that date.

A nursing note on two days later indicated that they had spoken with the on call mental health clinician who authorized continuation in the restraint chair.

The most recent progress notes indicated some improvement for this patient. On November 1, 2017 he was seen by the psychologist who indicated that he was medication adherent and denied suicidal ideation. On the following day, he was seen by the LCSW who indicated that he was stable. On November 9, 2017, he was seen by the psychologist for post suicide watch follow-up. She noted poor insight regarding his behavior, but no suicidality. She indicated that consultation with the psychiatrist would occur due to the patient's impulsivity and high risk behavior.

The patient was interviewed during the monitoring visit. He reported some depression regarding his legal case. He reported that he was currently housed in the B dorm and was seen by the psychologist weekly and sometimes more frequently. He reported that he was treated with Wellbutrin, Buspar and Zyprexa and his medications were recently increased. He denied any lapses in the receipt of his psychotropic medications. The patient reported a history of cutting in the community and while incarcerated. When questioned regarding a scar on his forehead, he discussed hitting his head in the seclusion room and while in the restraint chair. He indicated that he was taken to NMC after placement in the restraint chair for six hours, and he remained in the restraint chair for greater than six hours upon his return to the jail. He stated that NMC "refused to help me because of my charges. The refused to help me". He reported that he was followed consistently by the psychiatrist, but he felt that he needed more than one hour of treatment weekly.

**Findings**

The following were comments and concerns noted regarding the care provided to this patient.

In light of the recurrent episodes of significant self-injurious behaviors and failed attempts to obtain treatment at outside facilities, it was apparent that NMC was not a treatment option for this patient and that the jail was unable to adequately address the mental health needs for this individual. Inpatient mental health treatment was indicated.

It did appear that the staff worked hard to obtain inpatient treatment for the patient, and his attorney was contacted to provide information regarding his risk for continued self harm and the need for PC 1368 hearing as soon as possible. They were able to schedule a hearing on November 31, 2017.

There was a need for diagnostic clarification, with several differing diagnoses present in the healthcare record. This is particularly important if a primary diagnosis of Borderline Personality Disorder is present, as necessary treatment would be very different from the alternative

diagnoses of Schizoaffective Disorder or Bipolar Disorder that were also present in the healthcare record.

Although attempts were made to address the patient's behavior, there was a lack of adequate treatment planning for this patient with recurrent episodes of self-injurious behaviors. On September 25, 2017, the psychologist included a progress note titled "MH Treatment Plan for (Patient 17)". All of the interventions outlined only addressed the behaviors after the patient became suicidal and agitated and after placement in the restraint chair. There was no discussion of antecedent behaviors that led to his suicidal threats and self harm. Additionally, on October 30, 2017 the psychiatrist, psychologist, Program Manager, and Captain met to discuss treatment options when the patient required placement in the restraint chair for greater than six hours. Plans from this meeting included an attempt to change the patient's medication and a statement that the patient would not remain in the restraint chair for greater than six hours, if so the on call mental health clinician would be called.

Although this discussion and the interventions outlined in the treatment plan were important and necessary, there was also the need for a specific behavioral plan to address the target behaviors, prior to the need for placement on suicide watch. Adequate treatment planning is essential to address the behaviors described. An appropriate behavioral plan was clearly indicated.

This patient remained in restraints for prolonged periods of time. A review of the healthcare record indicated that he was repeatedly agitated with head banging. In light of the lack of alternatives for the jail to manage this very difficult to treat patient, the limited use of restraints with adequate monitoring and medications to decrease his agitation and further self-harm appeared to be clinically indicated; however, the orders for restraints did not include release criteria informing the staff when the patient could be safely released. He was also sent to NMC, as was previously stated on several occasions, but quickly returned to the jail. It was later decided not to return him to NMC except for medical emergencies, as this reportedly was reinforcing his self-injurious behaviors, and treatment was not provided while at the hospital. Based upon the review of the healthcare record and the symptomatology that the patient presented, it did not appear that medications were prescribed as a chemical restraint or in a punitive manner. It should be noted that clinical documentation at times conveyed the staff frustration with the behaviors exhibited by the patient and the lack of treatment options; for this reason, it was critical that ongoing interdisciplinary meetings and appropriate treatment planning occur to address counter-transference issues often present in the treatment of patients with possible personality disorders.

Review of logs indicated that was documentation of nursing checks and range of motion while in restraints. He was timely evaluated with safety cell placements.

A suicide risk evaluation was completed upon release from suicide monitoring. There was documentation of post suicide watch follow-up after removal from suicide watch.

A note on October 19, 2017 by the MFT indicated that the patient was "med seeking and malingering". Caution is advised regarding the provision of such terms which frequently negatively label a patient and prevent needed treatment when indicated. Such cases, when

malingering is suspected, should be referred to the psychiatrist for diagnostic clarification and evaluation.

A review of the Safety Cell Logs noted some missed safety checks.

There was documentation that attempts were made to locate the patient's jail and NMC healthcare records at the time of intake.

████████        ████████                    **Patient 18**

This patient was housed in segregation at the time of the monitoring visit. She received her Medical Intake Triage/Receiving Screening on August 15, 2017. She denied current medications or history of mental health treatment; she did acknowledge daily IV heroin use. She was placed on the withdrawal protocol and was housed in general population.

The Initial Mental Health Assessment and Appraisal was completed on August 24, 2017. The assessment was unremarkable for mental health concerns; the patient's heroin use was noted. No mental health referral was generated from this assessment.

On August 18, 2017, the patient was taken to NMC emergency department after she reported that she accidently swallowed a three-inch pencil while trying to re-pierce her tongue. An x-ray did not reveal a foreign body, and the patient reportedly did not appear in any distress. Prior to going for a CT scan, she stated that she wanted to leave the hospital. She was returned to the jail against medical advice. On August 26, 2017, the patient was again taken to NMC emergency department after reportedly swallowing a three-inch pencil. At the hospital, she again stated that it was an accident; however, it was noted that this was the second time that week that she allegedly swallowed a pencil. The x-ray did not reveal evidence of a foreign body, and the patient was cleared for return to the jail. There were subsequent orders by medical staff at the jail as well as nursing documentation that the patient would be limited to no small objects.

On September 11, 2017, the patient submitted a sick call request to see mental health due to her report of hearing voices; at that time she was housed in Women's Holding. An order on September 12, 2017 noted that the patient would be re-scheduled on the following day with the LCSW for "hearing voices". There were subsequent orders for LCSW follow-up on a weekly basis. It should be noted that there were also multiple treatment refusal forms signed by the patient regarding those contacts as well as other medical treatments.

The LCSW noted that the patient was out to court on September 12, 2017, and she refused to see the LCSW on two days later, stating that she would only speak with the psychiatrist. She was seen by the LCSW on September 15, 2017. At that time, she denied current auditory hallucinations. Her primary complaint was "sleep deprivation". She also reported depression regarding her charges. The LCSW worked with the patient regarding relaxation techniques with follow-up scheduled for one week. On October 2, 2017, the patient refused out of cell contact, indicating that she preferred to continue reading her book. She was seen by the MFT on one

week later when the patient indicated that she did not want to take psychotropic medications or to see the psychiatrist.

Logs were present for nursing rounds in segregation for August 17 to August 21, 2017, August 23 to September 19, 2017 (missing September 4, 8, 9 and 10), September 5 and September 6, and September 21 to October 9, 2017(missing 4 days).

### Findings

This patient was appropriately transferred to NMC for treatment after reportedly swallowing foreign objects. There was documentation that weekly mental health contacts were attempted for this patient in segregation; however, she frequently refused contact. There did appear to be a one week lapse in mental health contacts. There were lapses in the documentation of daily nursing rounds in segregation.

There was no documentation of treatment planning for patient. It also appeared that a suicide risk assessment should have been completed after the report of foreign body ingestion to determine whether the incidents were related to suicidal intent.

There was timely response to the patient's sick call request. It was difficult to determine whether there was timely placement screening in segregation as it was unclear when actual placement occurred.

### ███████          ███████          Patient 19

This patient was interviewed and her healthcare record reviewed at the request of the plaintiff's attorney to evaluate the mental health care received at the jail. She was housed in the U Pod, an open dormitory, at the time of the visit.

It appeared that the patient was originally booked into the jail during September 2016. At that time, she denied a history of mental health treatment or medications.

She was seen by the LCSW on June 21, 2017 in an out of cell setting to discuss depression related to her expected lengthy sentence. She reported a history of severe and chronic methamphetamine abuse. She was provided with a diagnosis of Depressive Disorder, NOS, and follow-up was scheduled for four subsequent brief therapy sessions.

On July 5, 2017, the patient reportedly went to the LCSW's office and signed a refusal form, stating that she did not want to speak with anyone except the psychiatrist. The LCSW indicated that she need to obtain information to make an appropriate referral to the psychiatrist. The patient then reported that she had been in the MCJ for the past ten months and had been taking someone else's anti-anxiety medications, but that person was released from the jail and she was now anxious. She was described as medication-seeking, and plans were outlined for continued follow-up with the LCSW for coping skills and supportive therapy.

A brief progress note that was dated July 11, 2017 by the psychologist stated the following: "chart reviewed. Meds not indicated."

23

21-37

A note by the MFT on the following day noted that the patient was eating well, but she had anxiety and poor sleep. She was described as "med seeking and malingering". She was encouraged to continue to utilize her coping skills, and follow-up was scheduled for five to seven days.

She was seen by the LCSW out of cell for follow-up regarding the patient's anxiety on July 19, 2017. She refused to respond to mental status questions. It was noted that the patient would not speak with the clinician as the deputy was just outside the door. The LCSW told her that the officer was there for safety and security concerns. The patient was then described as increasingly verbally aggressive, and the interview was ended. The LCSW stated that the patient continued to seek medications.

The patient refused an interview with the LCSW on August 8, 2017.

She was seen by the MFT on November 23, 2017. At that time, she reported a history of treatment with Dr. ▆▆▆▆ She stated that she refused to see mental health staff as they "roll their eyes and ignore me". The MFT discussed non-medicinal means to address the patient's anxiety, and a contract for safety was obtained.

On November 29, 2017, she was seen by the psychologist when she was requesting psychotropic medications. She was described as "rude, hostile and entitled". There was no evidence of psychosis noted; however, the psychologist indicated that a mood disorder might be present as well as substance abuse related dependence. The psychologist indicated that the patient appeared to be exaggerating her symptoms for "instrumental reasons". She reportedly had not taken psychotropic medications for over two years. She was provided with a diagnosis of Adjustment Disorder and possible Mood Disorder, NOS, as well as Polysubstance Dependence. She indicated that the patient should continue coping skills and sleep hygiene with the LCSW prior to scheduling with the psychiatrist.

A note on December 5, 2017 by the MFT noted that the patient had been seen by mental health and that she had been "short-tempered". The MFT indicated that the patient agreed to a safety contract, and that she would be referred to see the psychiatrist for further evaluation.

Several refusal forms were present in the healthcare record indicating the patient's refusal to participate in treatment.

This patient was interviewed during the monitoring tour. She reported a long history of mental health treatment, and past mental health treatment at the MCJ. She reported that she was displeased with the demeanor of the LCSW when she was seen for evaluation. She was requesting Wellbutrin, Topamax and Desyrel at that time. She was uncertain whether a release of information was obtained to get information from her pharmacy about her past treatment. She stated that she had not yet been seen by the psychiatrist. She also reported that poor confidentiality occurred during her mental health contact, and she stated that the encounter did not occur in a private office.

**Findings**

It appeared that this patient presented with behaviors that resulted in counter-transference issues with the mental health staff making a therapeutic relationship very difficult. It should also be noted that there were entries by medical staff noting similar interactions with the patient. This was also evident in the various statements by mental health staff that the patient was malingering to obtain medications. Whether this assumption was true or false, this patient should have been referred to the psychiatrist sooner for evaluation of her symptom complaints. The staff should be cautioned regarding the labeling of patients with malingering, as this frequently results in negative counter-transference issues and possible treatment denial.

Of additional concern was the use of safety contracts which have been proven to be ineffective and provide a false sense of safety. The use of these contacts should never substitute for an adequate suicide risk assessment when indicated.

There was also an absence of adequate treatment planning for this patient. It did appear that the non-medication interventions provided by the LCSW were clinically appropriate; however, she should have been referred sooner to the psychiatrist for evaluation of her mood and anxiety complaints.

My interview with this patient, review of this healthcare record, as well as observations during the monitoring visit, indicated that individual mental health sessions were routinely not confidential as the officer was generally outside the open door during interviews. This practice breached confidentiality and might result in a patient not providing necessary information to clinicians. This issue of concern was discussed in detail with the supervisory staff during the monitoring visit.

                                    **Patient 20**

This patient had a history of treatment at DSH; he was returned to the jail during June 2016.

An attempt was made to complete the Medical Intake Triage/Receiving Screening on August 23, 2017; however, the RN indicated that the patient presented with intermittent yelling of obscenities and anger at the arresting officer. He was placed into the detox cell and was noted with moderate odor of alcohol on his breath.

A note on the following day at 0558 indicated that the patient had been placed into B112 without medical knowledge. Notes later that day by nursing indicated that the patient remained with the same behavior, presenting the completion of the intake process.

He was seen by the telepsychiatrist on August 26, 2017. A note dated August 27, 2017 by an undetermined staff member indicated that the patient had refused to come for the telepsychiatry session and signed a refusal. An order for psychotropic medications (Risperdal, Zoloft and Remeron) was dated August 27, 2017.

On August 29, 2017, the psychologist indicated that she was called to assist with a cell extraction of the patient. He presented as psychotic and disorganized, smearing and eating feces. He refused his evening medications and the note indicated that emergency medications were given

due to grave disability. On that date at 0900, orders were provided for Haldol, Ativan and Cogentin intramuscular injections. On that same date at 0949, an undetermined staff member indicated that Haldol, Cogentin and Ativan were ordered intramuscular by Dr. █████ "given R & L gluteus m with deputys on sides as stand by, pt calm non-combative". The psychologist indicated that the patient would be sent to NMC for evaluation and treatment.

On August 30, 2017, the nurse indicated that the patient had returned from NMC and had been placed into booking 5 at 2030. He initially allowed the nurse to perform vital signs, then he lunged at the nurse and spat on the RN. The LCSW was made aware of the incident.

He was seen by the psychiatrist on August 31, 2017 when he was treated with Haldol, Ativan and Cogentin.

On September 3, 2017, the patient tied something around his neck and then pounded on the door for attention. He then laughed stating suicidal ideation, when he subsequently denied. He was then placed on level 2 suicide watch.

patient was seen by the psychiatrist on September 8, 2017; he noted that Dr. █████ had ordered Haldol, Cogentin and Ativan on September 4. He appeared psychotic at that time, and Haldol was increased. Later that day, it was noted that he had been refusing medications; a doses of Zyprexa and Benadryl were ordered.

On September 9, 2017, he was seen by the nurse after he reportedly punched the wall due to not receiving extra food. He was sent to the NMC emergency room and was returned on the following day with his hand in a cast and orthopedic follow-up scheduled. The patient subsequently removed the cast from his hand on the following day.

On September 11, 2017, he was placed on level 2 suicide watch after telling custody staff that he would attempt to kill himself. He then became angry when he was told that the nurse would bring his medications after the completion of the medication pass; he had previously refused his evening medications. He then hit the glass of the door, near the nurse's face. The staff was able to calm the patient.

The patient was brought to medical on September 18, 2017 after he hit the cell wall with his hand, which had previously been fractured while he was housed in booking. On the following day, it appeared that he was again brought to medical for evaluation after punching the wall again with his injured hand. At that time, he reported suicidal and homicidal ideation. He was placed on level 2 suicide watch at that time.

He was seen by the psychiatrist on September 22, 2017. He was provided with a diagnosis of Psychotic Disorder, NOS and rule out Bipolar Disorder. Haldol and Ativan were continued, and Depakote was added for mood stabilization.

The RN noted on October 1, 2017 that during movement of the patient from the booking cell on level 2 suicide watch to the safety cell on level 1 suicide watch, the patient stated that he wished to kill himself, and proceeded to put his head underwater in the toilet. He was then removed from the cell into the safety cell. He responded that he was hearing voices. He subsequently, and

without warning, spat on the nurse while vital signs were being obtained. He remained in the safety cell and was placed on level 2 suicide watch.

A suicide risk assessment was completed on October 2, 2017, and suicide watch was continued. Of note and concern was a statement by the psychologist under the assessment section that stated "maintain L2 S/W as a negative behavioral reinforcement". Additionally, the patient was described in a note by the psychologist on the same day as "a behavior mngt problem. He is very attention seeking".

He was seen by the LCSW on October 3, 2017 when he was seen naked on top of his security blanket, shaking and drooling; he was unresponsive to questioning. The LCSW indicated that this information was conveyed to the late night staff.

On October 4, 2017, medical staff was asked to see the patient by custody as they were concerned that he was "not looking too good". He was lying on his stomach and stated that he was unable to move. His blood pressure was elevated at that time. He was described as not having appropriate control of his musculoskeletal movement. Orders were obtained from the psychiatrist to transport the patient to NMC for evaluation. Upon his return from NMC on the same day, he was noted with shuffling gait and drooling; the psychiatrist was contacted and his mediations were held briefly and Ativan was provided. It was noted that the patient's symptoms earlier that day may have been due to extrapyramidal side effects from his psychotropic medications. It was noted that the patient had a history of hoarding of medications and required close monitoring during medication administration.

A suicide risk assessment was completed on October 5, 2017, and suicide watch was discontinued. The patient was seen by the psychiatrist on October 6, 2017. He was cooperative with the interview. He denied hearing voices or depression, but was noted with poor insight. He agreed to treatment with Depakote, Zyprexa, Cogentin and Ativan. Laboratory studies were ordered. On the following day, the LCSW attempted to see the patient at cell front after he refused out of cell contact. He refused answer questions, staring at the interviewer.

The MFT saw the patient on October 9, 2017 for post suicide watch follow-up. He was described as stable at that time. He was seen by the LCSW on the following day when he denied current difficulties. On four days later, he again presented as pleasant and cooperative without complaints. A post suicide watch follow-up was also conducted on October 21, 2017 when the patient presented as stable and without complaints.

Progress notes on October 22, October 25, October 26, October 31, November 2, November 9, November 16, November 23, and November 30, 2017 all indicated that the patient was improved and stable, adherent with prescribed medications and at times, agreeable to out of cell contacts. A note by the MFT on November 16, 2017 indicated that the patient agreed to a safety contract. At that time, he had moved from segregation to a dorm without difficulties.

On November 1, 2017, he was seen by the psychiatrist when he reported anxiety and increased appetite with Zyprexa. He was without auditory hallucinations. He was provided with a

diagnosis of Bipolar Disorder with psychotic features; Zyprexa was discontinued, and Risperdal was started.

The Segregated Population Observation Log noted nursing checks on the following dates: August 24 to September 8, September 11 to September 29, 2017 (missed September 24).

The patient was interviewed during the monitoring visit. He was housed in segregation. He reported that he was taking Depakote and that laboratory studies were obtained. He indicated that he was awaiting transfer to Atascadero State Hospital.

**Findings**

This patient initially presented with mental health symptoms that made continued treatment at the jail unsafe and dangerous, as exhibited by his self-injurious and assaultive behaviors. The patient was appropriately transferred to NMC; however, his mental health concerns was not treated were not addressed there. At that time, the patient would have benefited from inpatient mental health treatment. NMC was not available to MCJ inmates in need of mental health stabilization and inpatient treatment.

It appeared that suicide risk assessments were completed when indicated. Very concerning was a statement made by the psychologist indicating that continuation of suicide watch should occur as a "negative behavioral reinforcement" on October 2. A similar statement was present in a September 13, 2017 suicide risk assessment which stated "maintain current s/w as a negative reinforcer". Much has been written in the literature about suicide prevention measures utilized as a deterrent for suicide threats. Aside from the counter-therapeutic nature of the use of unpleasant measures, such as loss of clothing and placement into the safety cell to prevent suicide threats; the use of suicide prevention measures in a punitive manner may actually discourage a truly suicidal individual from conveying to staff their suicidal intent. Such practice is strongly discouraged.

The suicide risk assessments did not include an adequate safety plan to address the patient's continued self-injurious behaviors.

The MFT mentioned obtaining contracts for safety on several occasions with the patient. These contracts have been shown to be ineffective, and they can result in a false sense of comfort. They should not be utilized and are not a substitute for adequate mental health evaluation and assessment.

Also noted was a progress note by the psychologist on the same date (October 2, 2017) which described the patient as attention seeking and a management problem. Such comments and assumptions are very concerning, and in this case incorrect, as the patient required transport to NMC and his medications were held as it was thought that he was exhibiting significant medication side effects resulting in some of his behaviors.

There was a lapse in the ordering of medications for this patient who was known to the jail until approximately four days after his arrival.

It did not appear that emergency medications provided on August 29, 2017 were in compliance with the CFMG Implementation Plan requiring that involuntary psychotropic medications for a psychiatric emergency be given to a direct written or verbal one-time order from the responsible facility psychiatrist following an on-site evaluation, and that a telephone order would not be acceptable unless the inmate was personally evaluated by the prescribing physician no longer than 24 hours prior to the psychiatric emergency. That did not appear to have occurred in this situation.

On October 3, the LCSW saw the patient when he presented with the symptoms described above. The psychiatrist should have been contacted at that time, as the symptoms mentioned appeared to be significant medication side effects requiring evaluation and intervention. Additional training for jail clinical staff regarding potential psychotropic medication side effects may be beneficial.

Appropriate treatment planning was absent and needed, especially in light of the possibility of medication hoarding to ensure that all staff were knowledgeable about the treatment goals for this patient.

There was documentation of medical review within one hour of placement into the safety cell on September 30, 2017; however, there was a lack of communication with medical of security placement into a booking cell on August 24, 2017.

There was documentation of consistent mental health contacts for this patient. This patient appeared to improve after receiving the appropriate medications and was able to function adequately in a dormitory setting.

Lapses were noted in the documentation of daily nursing segregation rounds.

There was documentation of post suicide watch follow-up.

 **Patient 21**

A focused review of this patient's healthcare record was performed at the request of the plaintiff's attorneys to evaluate the provision of telepsychiatry at the MCJ.

This patient received the Medical Intake Questionnaire on September 18, 2016. At that time, he reported recent treatment with Risperdal, Paxil and Methadone.

On that date, there was a telephone order by Dr. ▮▮▮ for olanzapine and Risperdal for seven days.

The LVN noted on September 21, 2016 that the patient refused sick call with the telepsychiatrist, Dr. ▮▮ and that the appointment would be rescheduled. A treatment refusal form was signed regarding telepsychiatry dated September 21, 2016.

An order on September 26, 2016 indicated that he was scheduled for psychiatric sick call "med request 9/28".

A note dated September 29, 2016 by an undetermined person, stated that the patient was "seen by Dr. ▇ (telepsych) as an intial eval, see MD order sheet". A telephone order by Dr. ▇ on September 29, 2016, discontinued olanzapine and Risperdal ordered for seven days and ordered the same medications at the same dosages for 60 days. A consent for medications was signed by the patient on that date. A Monterey Tele-Medicine Psychiatric Referral was completed; this form was undated, but indicated that the patient was last seen by Dr. ▇ on September 29, 2016. When the above medications were renewed for 30 days. The form indicated that the patient refused telepsychiatry.

A Monterey Tele-Medicine Psychiatric Referral indicated that the patient refused to see Dr. ▇ the telepsychiatrist on November 13, 2016; however, the form was confusing as it also had the date 9/29/16 circled twice on the form and an accompanying entry stating "9/29/16 needs notes".

On November 23, 2016, an undetermined person indicated that the patient refused telepsychiatry and that Dr. ▇ renewed medications for 30 days and "needs his notes from 9/29/16". Medications were reordered for thirty days via a telephone order by Dr. ▇ Another Monterey Tele-Medicine Psychiatric Referral form, which again was undated, noted that the patient was not seen on November 23, 2016 by Dr. ▇ that he was last seen by Dr. ▇ on September 29, 2016, but "no notes found". It also indicated that on September 18, 2016 telephone orders were obtained to begin treatment with olanzapine and Risperdal for seven days.

A note by the MFT stated that the patient did not like his medications as they made him feel strange. He indicated that he wanted to see the telepsychiatrist to discuss possible medication changes.

There was an order by Dr. ▇ on December 6, 2016, rescheduling a telepsychiatry appointment for the following day.

A note by another undetermined person indicated that the patient again refused to be seen by telepsychiatry on December 7, 2016. A refusal form was signed on that date.

A refusal form was also signed on December 8, 2016 for telepsychiatry. The Physician Progress Note by Dr. ▇ on that date indicated that the patient refused to be seen by telepsychiatry, but noted that informed consent about medication regimen including accepting all risks of side effects was provided.

The psychologist stated on December 9, 2016 that the patient had an appointment to see Dr. ▇ on December (unable to determine the date) to renew medications, and that he did not need to be seen by telepsychiatry prior to that date.

A Monterey Tele-Medicine Psychiatric Referral was present in the record that indicated that the patient was last seen by Dr. ▇ and Dr. ▇ on December 15, 2016. Another such form noting Dr. ▇ contact on that date was also present in the record.

A Physician Initial Evaluation/Tele-Psychiatric Consult form dated December 15, 2016 was present in the record. This form did not include the name of the psychiatrist. It noted that the

21-44

"Chart was not available for review". It also stated that the patient had been refusing all mediations. Of concern was an entry stating that the patient was last seen by the psychiatrist on November 23, 2016, when he actually refused to be seen. Consent for medications was obtained at that time.

There were three medication orders for psychotropic medications dated December 15, 2016; one telephone order at 1100 renewed Zyprexa 15 mg every afternoon and Risperdal 3 mg every afternoon by Dr. ███ and another order at 1530 by Dr. ███ discontinued Risperdal 3 mg and Zyprexa 15 mg and ordered Zyprexa at 5 mg at midnight. On a separate order sheet, also dated December 15, 2016 was another order by Dr. ███ which also discontinued Risperdal and previous olanzapine dose, and ordered olanzapine 5 mg at midnight. This order was dated 3 pm and did not appear to have been noted by the nurse. It was essentially the same as the telephone order previously mentioned.

Two entries dated December 15, 2016 by undetermined persons noted that that patient "was not seen by tele psych (Dr. ███ med ren for 30d"; the other note stated that the patient requested to be seen by telepsychiatrist Dr. ███ A subsequent note on December 20, noted that the patien did not need to be seen by telepsychiatry as he was seen twice on December 15, 2016 by Drs. ███ and ███

On February 27, 2017, a telephone order by Dr. ███ was noted for Zyprexa, Paxil and Remeron with laboratory studies ordered.

An order on March 7, 2017, discontinued Zyprexa and noted follow-up with Dr. ███ as previously scheduled.

An order on March 12, 2017, appeared to be a note to the psychiatrist that the patient refused laboratory studies.

On March 18, 2017, there was an entry on the doctors orders form stating "chart review w/Dr. ███ at telepsychiatry", and to discontinue Remeron. This was a telephone order by Dr. ███

There were multiple medication and treatment refusal forms located in the healthcare record, as well as documentation that the patient frequently refused to take, or did not show for prescribed psychotropic medications.

The problem list included "r/o malingering" entry dated June 22, 2016. There was also an entry dated November 23, 2016 on the same form indicating that the patient had refused telepsychiatry.

A note by the psychologist dated July 6, 2016, indicated that the patient wanted additional sleep medications. He was prescribed Paxil and Risperdal. The patient was described as "highly mediation-seeking and manipulative". "He was told that he will need to wait until the end of the month to see the psychiatrist again."

A progress note by the psychologist dated November 6, 2017, indicated that the patient was awakened for his interview, but refused, "preferred to sleep". The note indicated that the patient had a diagnosis of schizophrenia by history, but never demonstrated any psychotic processes.

The note also referenced a psychiatric note of March 7, 2017 in which the psychiatrist thought that the patient might be malingering. The plan was for follow-up as needed, "monthly mental health follow-up not necessary". On the following day, the patient refused to see the onsite psychiatrist.

**Findings**

There were several troubling aspects regarding the care provided to this patient. The patient was described as highly manipulative and malingering; these pejorative terms have no clinical benefit, and only serve to label the patient and to prevent necessary care. If there was concern regarding behaviors exhibited by the patient, this should have been addressed with adequate treatment planning and interdisciplinary treatment team meetings and discussions.

Additionally, the provision of psychiatric care, at this time by telepsychiatry was poor and disorganized. There was poor documentation of care, with missing progress notes and confusing regarding scheduling of appointments and medication order duplication. There were also errors in documentation, noting that the patient had been seen when he had not and noting that informed consent was obtained when the patient had refused the psychiatric appointment.

                      **Patient 22**

A focused review of this patient's healthcare record was performed at the request of the plaintiff's attorneys to evaluate the provision of telepsychiatry at the MCJ.

The Problem List included the following diagnoses: Substance Induced Mood Disorder, Antisocial Personality Disorder and Depressive Disorder, NOS. Another Problem List included the term "med seeking", and yet another Problem List only listed "Med Seeking, Manipulative".

It appeared that the patient was booked into the jail on December 5, 2016. His screening was significant for mental health treatment and treatment with psychotropic medications.

The patient was seen by the telepsychiatrist on December 11, 2016. He was described as medication seeking as he was requesting Wellbutrin. He was also described as resistant to treatment recommendations and left the room. His previous medications were restarted at that time.

The patient was seen by the telepsychiatrist on January 13, 2017. This note was very similar to the prior note in which he described the patient as medication seeking as he was requesting Wellbutrin. The note also stated that the patient was resistant to treatment recommendations and left the room. The note then indicated that the patient was in isolation and agreed to try a mood stabilizer.

A note by the telepsychiatrist on January 28, 2017 stated that the patient was not seen, only the laboratory studies were reviewed. The note was misleading, as it also stated that the patient was interviewed on that day. The note then conveyed observations and statements from other mental

health staff regarding the patient; additionally, a mental status examination was noted, despite the patient not having been seen.

On February 9, 2017, the psychologist indicated that the patient's primary problem was polysubstance abuse. At that time, he refused Effexor and requested Wellbutrin. She noted that he was last seen by the psychiatrist on December 11, 2016; he was scheduled for psychiatric follow-up on January 28, 2017, but he was not seen and he apparently refused. She noted that his next appointment was early March and that appointment would be retained as the patient "did not appear in any distress at all. He appears to be mediation-seeking, specifically goal-directed towards Wellbutrin".

A note by the psychologist February 28, 2017, described the patient as "gamey & manipulative".

He was seen by the telepsychiatrist on March 11, and April 1, 2017.

There was documentation that a prescription for the patient's medications were called into the local CVS pharmacy upon discharge on April 8, 2017.

**Findings**

There appeared to be a pattern of the labeling of individuals as "med seeking", manipulative and malingering by some mental health staff. This practice is counter-therapeutic and should be discontinued as it can negatively affect the treatment provided to patients. Additionally, patients with genuine psychiatric illness can present with such behaviors, leading to misdiagnosis and poor care. When these behaviors are noted, adequate treatment planning and interdisciplinary team meetings should occur to appropriately discuss diagnostic clarification and necessary treatment interventions rather than labeling of patients which may lead to denial of needed services.

Diagnostic clarification was also indicated for this patient. Although the psychiatrist noted diagnoses of Schizoaffective Disorder, bipolar type, Polysubstance Dependence and rule out Substance Induced Mood Disorder and Antisocial Personality Disorder, these diagnoses were not specifically listed on his problem list as was previously noted.

Of concern was the documentation regarding the provision of telepsychiatry. All three notes by one of the telepsychiatrists were repetitive and confusing, including statements by other mental health staff and including difficult to reconcile information. Although the telepsychiatrist indicated that the patient had not been seen on January 28, 2017, the progress note provided information that implied that the patient had been interviewed and that a mental status examination had been conducted. Additionally, determinations were made regarding medication management, including mediation changes. This documentation was clinically very poor, confusing and erroneous.

Although Tegretol was ordered on January 13, 2017, at the session in which the patient as not seen, no informed consent for treatment with this medication on that date was located in the healthcare record.

There was documentation of the provision of a prescription for medications upon discharge.

████████    ████████        Patient 23

A focused review of this patient's healthcare record was performed at the request of the plaintiff's attorneys to evaluate the provision of telepsychiatry at the MCJ.

The patient had a history of prior mental health treatment at the MCJ. The most consistent diagnoses present in the healthcare record were Bipolar Disorder and Methamphetamine Dependence.

The patient received the Medical Intake Triage/Receiving Screening on August 5, 2017. Although she denied mental health and medication treatment, the screener indicated that she was in the jail often and stated, "will consult". She exhibited bizarre behavior, placing the pin in her mouth.  She was placed on a withdrawal protocol with mental health referral.

Orders were present on August 6, 2017 at 0950 for Zyprexa 15 mg now and then 10 mg every morning and 20 mg at night for seven days by verbal order by Dr. ████

There was an order by the psychologist on August 7, 2017 to schedule the patient to see the psychiatrist on August 8 "to get I/P back on meds ASAP". Another order on the same day, fifteen minutes later requested verification that the patient was "getting correct meds MCBH." A request was faxed for that information.

The patient was placed into the safety cell on August 8, 2017 after hitting her head and reporting suicidal ideation.  A Physician Progress Note on August 8, 2017, indicated that the patient was seen by telepsychiatry when she presented with hypomanic symptoms.  The psychiatrist ordered continuation of Zyprexa and ordered Lithium with laboratory studies in one week.

On August 9, 2017, the psychologist indicated that the patient was demanding Benadryl for sleep and Risperdal Consta.  She indicated that the patient continued to report suicidal ideation "although this statement appears to be more manipulative than sincere".  The psychologist stated that she would ask the psychiatrist to write an order for a "sleeper".  A subsequent, brief note by the psychologist on that date stated that the patient was given Ativan 2 mg injection "voluntarily". An order on the following day was present for Ativan 2 mg intramuscular now, "then 2 mg twice per day for seven days, then discontinue". A nursing entry indicated that this medication was administered. A consent for medications was present and dated August 8, 2017; this consent was specific for neuroleptics and Lithium.  No informed consent was located for treatment with Ativan.

On August 10, 2017, level 2 suicide watch was discontinued after evaluation by the psychologist.

**Findings**

Prior healthcare records were requested and obtained.

Suicide risk assessments were completed as indicated; however, there was a lack of safety planning as well as overall clinically appropriate treatment planning.

There was timely medical assessment with safety cell placement, but nursing checks showed lapses in daily contact documentation.

Based upon the documentation available, it was unclear whether the ordering and administration of Ativan injection was performed on an emergency basis. It did not appear that the patient was agitated or combative prior to administration of this medication, suggesting that the medication was not provided for an emergency; however, no informed consent was obtained which usually would occur for treatment with voluntary medications.

Of concern, however, were the statements by the psychologist describing the patient's suicidal statements as "manipulative". This determination did not appear based upon any clinical assessment other than personal opinion. The literature regarding suicide prevention in corrections has repeatedly warned against making such judgmental determinations regarding manipulative behaviors in suicide prevention. Many completed suicides have occurred in individuals who were previously determined to exhibit manipulative behaviors.

████████          ████████          **Patient 24**

This patient was housed in segregation at the time of the monitoring visit.

An Intake Triage Assessment was completed on April 7, 2017. The assessment noted the patient's treatment with Abilify, Cogentin and Seroquel prior to incarceration. A nursing entry on April 8, 2017 indicated that the patient had brought in his personal medications which were Abilify, Benztropine and Seroquel. A note later that day indicated that the RN had contacted Dr. ████ of the medications and that the nurse was awaiting recommendations. Telephone orders were present from Dr. ████ for the above medications on that date, and the patient was scheduled to see the telepsychiatrist on April 10, 2017.

The patient was seen by telepsychiatry on April 10, 2017 when the psychiatrist noted that he was prescribed Seroquel for sleep. He stated that the patient "appears resistant to tx-recommendation and keeps insisting to have Seroquel". Abilify, Cogentin and Seroquel were continued at that time.

An initial Mental Health Assessment and Appraisal was completed on April 18, 2017. The assessment noted a diagnosis of schizophrenia and current prescribed medications, including Abilify and Seroquel. He did not report suicidal or depressive symptoms. He was housed in general population.

The patient was seen by telepsychiatry on May 8, 2017. During this encounter, there was discussion regarding Seroquel continuation. The patient was described as "resistant to tx-recommendation and keeps insisting to have Seroquel for sleep". The psychiatrist noted a desire to treat with Remeron rather than Seroquel, as this medication was not indicated for sleep. He stated that the patient eventually agreed to discontinuation of Seroquel, and non-medication interventions were discussed. Seroquel was discontinued at that time, and Remeron was ordered.

The patient was seen for follow-up by the MFT or LCSW on the following dates: May 18, May 31, June 12, 2017; he reported occasional voices, but he was otherwise stable.

A telepsychiatry note on June 7, 2017 indicated that the patient was stable.

He was seen by the MFT on June 20, 2017 when he reported that he was taking medications. He was described as "malingering and med seeking" without further explanation.

A note by the telepsychiatrist on August 30, 2017, indicated that the patient was adherent with medications and had no complaints. His medications were continued at that time with laboratory studies pending.

**Findings**

There was good medication continuity upon arrival to the jail.

The mental health assessment occurred timely.

Prior treatment records were present in the healthcare record.

It was concerning that the telepsychiatrist repeatedly indicated that the patient was treatment resistant during sessions as the patient was resistant to discontinuation of Seroquel, a medication that he had been prescribed prior to incarceration. Additionally, references in the healthcare record by mental health staff describing the patient as "malingering and med seeking" were counter-therapeutic and not clinically supported.

 **Patient 25**

This patient's healthcare record was reviewed as she was seen during the monitoring visit. She was housed in the women's iso unit at the time of the visit. The Problem List noted a diagnosis of Psychotic Disorder, NOS.

The Medical Intake Triage/Receiving Screening was dated October 24, 2017. At that time, she denied mental health concerns, but stated that she was royalty. She was referred to the LCSW.

A note by the psychologist on October 26, 2017 indicated that the patient was in the intake area as she was refusing housing and to go to court. She was described as delusional with grandiosity. She was guarded and denied mental health treatment or symptoms. She was provided with a diagnosis of Psychotic Disorder, NOS, and as the patient did not have prior jail records, MCBH was contacted for information about possible treatment there, and she was scheduled to see the psychiatrist.

She was seen by the onsite psychiatrist on the following day when her presentation was unchanged. She refused to take psychotropic medications.

On October 30, 2017, the patient was seen on several occasions by the psychologist while she was housed in the booking cell; at one of those encounters it was noted that she was asked to speak with the patient prior to a cell extraction as she refused to go to court. She was observed

sitting on the toilet for long periods of time, and she remained with delusional thinking. The cell extraction was reportedly delayed until the following day.

On the following day, the patient was described as hypervigilant, paranoid and delusion with confusion and disorganization by the psychologist.

A psychologist note on November 1, 2017 indicated that the patient was housed in women's holding. Two local facilities were contacted to obtain information about the patient; however, she was unknown to those facilities. The psychologist indicated that the public defender's office would be contacted to request a 5150 commitment be initiated. Another note later that day indicated that the public defender's office had been contacted to learn who the patient's lawyer was and to request a 1368 evaluation; a later entry indicated that the lawyer would request a 1368 evaluation.

The patient was seen by the psychologist on November 2 and November 9, 2017. She remained generally uncooperative and psychotic. On November 12, when seen by the MFT, she remained with delusional thinking.

The patient was seen by mental health staff on November 22, November 28, and December 5, 2017; she remained delusional with disorganization and treatment non-adherence.

The psychiatrist attempted to see the patient on December 6, 2017 when she began screaming and yelling at the psychiatrist with delusional content.

Segregation logs for nursing contacts were present for November 2, November 5, November 9 to November 25 (missing November 15, 2017).

This patient was seen during the monitoring visit during segregation rounds with the psychologist. She was found sitting on the toilet; she exhibited hostile behavior and delusional thinking, telling us to leave her cell.

**Findings**

The patient was seen at least weekly, but generally more frequently while housed in segregation. She was floridly psychotic, and she refused treatment with psychotropic medications, sitting on the toilet for prolonged periods of time.

This patient required inpatient psychiatric hospitalization for stabilization. Although NMC transfer and hospitalization was not pursued, discussions with the staff during the visit indicated that they believed that such efforts would be fruitless in light of past inability to obtain mental health hospitalization there.

The mental health staff appropriately made attempts to have the patient hospitalized by commitment due to her severe psychosis and treatment non-adherence. There was an order in the record dated November 9, 2017 by the psychologist that a WIC 5150 should be implemented should she be released by the court to the community.

Attempts were made to obtain information about past mental health treatment.

There were lapses in the documentation of daily nursing rounds in segregation.

21-52

# Exhibit 22

**Monterey County Jail Mental Health Monitor's**
**Report**

**July 10, 2018 – July 11, 2018**

Overview

The Monterey County Jail was visited for the third mental health monitoring tour on July 10 and 11, 2018. The following report is based upon interviews with institutional staff and detainees, healthcare records reviews, as well as review of documentation and information provided by the institution and County. This report will specifically address the institution's status and progress toward compliance with the United States District Court Northern District of California Settlement Agreement and the Implementation Plans between Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County Sheriff's Office; California Forensic Medical Group, INCORPORATED (CFMG) et al.

Compliance with Settlement Agreement and Implementation Plan

1. Intake Screening

    a. Defendants will develop and implement an Intake Screening Implementation Plan that specifies standards and timelines to ensure that arriving prisoners are promptly screened for urgent medical, mental health and dental needs, with prompt follow-up and disability accommodations.

        i. Upon arrival, an Initial Health Assessment will be performed by the intake nurse to determine whether the inmate should be excluded from the facility on medical or mental health grounds. Upon acceptance into the jail, all inmates will be screened by the intake nurse for urgent medical, mental health and dental needs. The intake nurse will have

22-1

access to an inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail.

ii.   A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.

iii.   The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive findings on the suicide assessment.

**Findings: Noncompliance**

A review of healthcare records indicated that for those cases reviewed, all jail intakes continued to be seen by a screening nurse for intake screening.

Information was provided regarding patients who were not accepted at the time of intake into the jail from November 10, 2017 to June 10, 2018. A total of 51 patients were rejected at the time of intake and sent to Natividad Medical Center (NMC) for clearance prior to acceptance at the jail. Suicidal ideation was the primary reason for hospital referral; however, other reasons included psychosis, combative and uncooperative behavior.  Most, if not all, of these patients continued to be returned to the jail within 24 hours with clearance. Healthcare records also documented consistent transfers to NMC at the time of intake for clearance prior to jail acceptance.

Records reviews also indicated that healthcare records and information regarding past medication treatment was routinely requested.

Mental health assessment and suicide risk tools continued to be routinely utilized for appropriate mental health assessment, triage and treatment; however, appropriate safety and treatment planning remained problematic.

Inmates seen at intake were also referred for routine and emergency mental health evaluation and treatment timely.

A continuing issue that has persisted was the lack of confidentiality for nursing intake assessments.   Officers remained present outside the intake assessment room during the intake assessment performed by the nurse. As the officer could easily hear the entire intake process, this resulted in non-confidentiality during the process. The close proximity of the officers could prevent some inmates from providing necessary medical and mental health information; this is especially important during the intake process when important and potentially sensitive information should be conveyed to the screening nurse. This lack of confidentiality due to the presence of custody officers was not only limited to the intake process but was observed in most mental health treatment interactions for which sound confidentiality was critical.

The lack of confidentiality resulted in the finding of noncompliance.

2. Mental Health Screening

    a.  Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including appropriate screening... The Implementation Plan provides that all inmates will have an initial mental health screening performed by a qualified mental health professional on the mental health staff.

    b.  Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified

Mental Health Professionals for prisoners with mental illness, including...

medication practices

**Findings: Noncompliance**

This issue remained unchanged. Healthcare records indicated that the Initial Mental Health Assessment and Appraisal was routinely completed by an RN and not by a Qualified Mental Health Professional on the mental health staff. There continued to be delays in the timely completion of these assessments.

Review of healthcare records and inmate interviews indicated timely ordering of psychotropic medications at the time of intake; however, documentation of the rationale for medication substitutions was inadequate.

    c.   Defendants shall develop and implement a Health Care Implementation Plan to expand the provision of care for inmates with serious medical and/or mental health needs and to ensure they receive timely treatment appropriate to the acuity of their conditions. The Implementation plan outlines the process by which inmates provide mental health sick call requests and healthcare staff respond to such requests.

    d.   Nursing staff shall conduct daily mental health rounds in segregation.

**Findings: Noncompliance**

Inmates accessed mental health sick call requests by submitting them on portable tablets. The issues reported at the last visit regarding access to the tablets appeared to have been resolved at this visit; there were no complaints voiced by inmates interviewed regarding issues with the use of the tablets.

The facility did not track the timeliness of response to requests. This would be an optimal area for quality assurance review to examine the timeliness and appropriateness of response to inmate requests.  This issue was not the source of inmate complaints during the visit.

There were continued lapses in the documentation of daily nursing rounds in segregation.

3. Safety Cells

a. The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall responsibility for safety and security of prisoners, prompt reviews by medical of all placements, and a process of resolving disagreements between medical and custody.

**Findings: Substantial Compliance**

The facility primarily utilized the booking cells rather than the safety cells for suicide monitoring since the last visit; sobering cells were infrequently utilized. Safety cell usage was limited to those inmates presenting with suicidal and self-injurious behaviors.

Records reviews did not note delays in medical notification of placements into the cells. The facility did not report disagreements between medical and custody staff regarding such placements in their custody audits of this issue.

b. Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical

22-5

professional will see an inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.

**Findings: Substantial Compliance**

Placements for suicide monitoring generally occurred in the booking cells; placement into the safety cell was limited to those exhibiting self-injurious behavior. Mental health staff made daily rounds of the booking, safety and sobering cells. Documentation indicated that medical staff was timely alerted regarding booking cell placements for timely medical assessments. Removal from the safety cells occurred after mental health evaluation and clearance, which usually included the completion of a suicide risk assessment. There continued to be consistent documentation of post-suicide watch follow-up, which was a very important component of suicide prevention.

c. A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his findings through a report which will be sent to the Jail Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.

**Findings: Noncompliance**

Information regarding welfare checks was requested, but not received prior to completion of the draft report.  This issue will be examined at the upcoming monitoring visit.

d.  Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 1 1 p.m. and 7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.

**Findings: Noncompliance**

Information regarding this issue was requested, but not received prior to completion of the draft report.  This issue will be examined at the upcoming monitoring visit.

Inmates in sobering cells may have access to mattresses at the discretion of custody staff. Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.

**Findings: Noncompliance**

Information regarding this issue was requested, but not received prior to completion of the draft report.  This issue will be examined at the upcoming monitoring visit.

f.  Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be

cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.

**Findings: Substantial Compliance**

Observations during the monitoring tour indicated that the safety, booking and sobering cells were clean. At this visit, none of the inmates reported issues with the cleaning of these cells. Supervisory staff reported that the cells were cleaned after each use; although they reported that there was no set schedule for cleaning.

g. For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.

**Findings: Substantial Compliance**

A review of safety cell logs indicated that inmates did not remain in the safety cells for greater than 24 consecutive hours. After placement into the safety cells, inmates were either sent to NMC; or suicide monitoring was downgraded, and the inmate moved to a booking cell after mental health assessment.

Although inmates were sent to NMC for stabilization, review of logs and healthcare records indicated that they were frequently returned prior to stabilization.  It appeared that the mental health staff continued to refer for inpatient treatment despite this obstacle.

4. Medication Continuity

a. All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.

**Findings: Noncompliance**

A review of medical records and observations during the visit indicated that the intake nurses obtained information regarding prescribed mental health medications in the community and began the process for verifying such treatment. For those cases in which the medication treatment was unverified or unclear, those individuals continued to be scheduled to see a mental health provider for assessment. Healthcare records reviewed did include documentation of medication continuity upon arrival at the jail or documentation that medication treatment was verified and subsequently ordered.

Of concern was one reviewed case which illustrated concerns regarding the ordering of medications at the time of arrival to the jail.  It appeared that the inmate was timely seen soon after intake; however, there was poor documentation regarding the reasons for not continuing community prescribed medications.  Additionally, there was evidence of the gate-keeping process that was described in the last monitoring report.

b. Inmates who, at the time of booking, report to Defendants that they are taking community-prescribed medications, but whose medications cannot be verified by Defendants, shall be timely assessed by a medical provider and timely prescribed medications necessary to treat their health needs.

22-9

**Findings: Noncompliance**

Inmates were generally appropriately referred to mental health at the time of intake; however, delays were noted with the completion of the Initial Mental Health Assessment and Appraisal. Healthcare records reviewed did include documentation of medication continuity upon arrival at the jail or documentation that medication treatment was verified and subsequently ordered; however, there was poor documentation regarding the reasons for not continuing community prescribed medications.

c. Provision of psychotropic medications upon discharge from the jail. The Implementation Plan provides that a 30-day supply of medications be given to inmates upon discharge from the jail.

**Findings: Substantial Compliance**

A review of healthcare records indicated that discharge medications were provided, with few exceptions. There was documentation that a 30-day supply of discharge medications was called into the local CVS pharmacy; this form was usually signed by the jail staff and the patient.

5. Clinical Staffing

a. Defendants will maintain Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to ensure adequate staffing to provide all necessary medical and mental health care. The plan will identify all needed positions based on current and projected Jail population, and the number and

qualifications of medical and mental health care staff to cover each position, with shift relief.

**Findings: Noncompliance**

At the time of the visit, the mental health staffing was as follows:

1.0 FTE Psychiatrist

- 40 hours per week onsite

1.0 FTE Licensed Marriage and Family Therapist/Psychologist

- 40 hours per week onsite

2.0 FTE Licensed Clinical Social Worker

- 40 hours per week onsite

Although the current mental health staffing at the jail appeared to be adequate for the population and services required; workload issues appeared to be problematic primarily related to the availability of escort officers. The timeliness of completion of scheduled appointments, such as Initial Mental Health Assessments was problematic.  Custody constraints, including escort to the hospital, reportedly resulted in postponement and rescheduling of some appointments and groups.   It appeared that custody and not mental health staffing was the limiting factor in mental health care provision.

No staffing analysis was conducted as set forth in the Settlement Agreement. A staffing analysis would assist in evaluating custody and mental health staffing. Psychiatric on-call services were primarily provided by Dr. █████ Telepsychiatry was reportedly not utilized during the monitoring period.  The mental health and psychiatry call schedules were provided and reviewed.

22-11

6. Mental Health Care

    a. Training

        i. All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.

**Findings: Substantial Compliance**

Documentation, including lesson plans and attendance rosters, were provided that indicated that correctional staff had received training regarding the Implementation Plan.

        ii. In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.

**Findings: Substantial Compliance**

The lesson plans provided included information regarding the recognition of individuals with mental illness and suicidality. This training was in place for new correctional officers.

        iii. All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates, identifying

warning signs specific to inmates, and how to recognize individuals who

are in mental distress and/or suicidal.

**Findings: Substantial Compliance**

This training was documented.

iv. Yearly custody staff will conduct a situational training such as a mock

suicide attempt or a medical emergency. CFMG staff will also participate

in the annual situational training.

**Findings: Noncompliance**

Although this training occurred, review of documentation indicated that medical staff

were not included in the mock training scenarios.

b. Restraint Chairs

i. Use of a restraint chair will be documented in an observation log which

will be reviewed and signed by a supervisor. Inmates shall not be placed

in a restraint chair for longer than six consecutive hours.

**Findings: Noncompliance**

Information regarding this issue was requested, but not received prior to completion of the

draft report.  This issue will be examined at the upcoming monitoring visit.

ii. Deputies shall attempt to remove restraints at least once an hour to allow

inmates to exercise their arms and hands in a range of motion exercise (to

prevent circulatory problems). A shift supervisor and medical staff shall

oversee the exercise. If unsuccessful in allowing inmates to exercise their

arms and hands in a range of motion exercise, safety staff shall explain on

the observation log why extremities could not be exercised and a shift supervisor shall be notified.

**Findings: Noncompliance**

Information regarding this issue was requested, but not received prior to completion of the draft report.  This issue will be examined at the upcoming monitoring visit.

iii. On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.

**Findings: Noncompliance**

Information regarding this issue was requested, but not received prior to completion of the draft report.  This issue will be examined at the upcoming monitoring visit.

iv. Medical and mental health staff shall be consulted before any planned use of force on an inmate. Custody staff in concert with medical staff will develop the most effective and appropriate means of imposing compliance with rules and regulation, including attempts at de-escalation. It is understood that it is the goal of custody staff to use the least amount of force necessary to ensure compliance with rules and regulations. Planned use of force will only be used after verbal attempts to obtain compliance. Any use of force will be documented on a use of force form.

**Findings: Noncompliance**

Although documentation in the healthcare records and staff interviews indicated that mental health was contacted prior to planned uses of force; incident reports were not provided to confirm compliance.  This issue will be reviewed at the next monitoring visit.

      c. Mental Health Grants

            i. Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.

**Findings: Substantial Compliance**

Information was provided during the visit that state funding was obtained, and plans were underway to build a Jail Based Competency Treatment program (JBCT).  These inmates currently await trial at the jail, where they remain non-adherent with treatment and pose a risk to themselves and others. This type of unit can assist in stabilizing and treating inmates who present with psychosis and inability to participate in court proceedings.  This was a welcomed development.

      d. Inmates Who Have Been Declared Incompetent to Stand Trial

            i. The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period. As such, within 24 hours of a Court determining

that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment. The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for orders to show cause to be directed the State of California) to expedite the transfer of inmates who have been determined to be incompetent to stand trial to an appropriate State facility.

**Findings: Noncompliance**

At the time of the visit, this issue remained unchanged; however, please see the above comments regarding plans for a JBCT. Inmates were not routinely placed into transition cells in administrative segregation and seen by medical staff daily upon a Court finding the inmate to be incompetent to stand trial. Mental health staff continued to contact the inmate's attorneys to begin the process of evaluation and eventual transfer to an inpatient unit for incompetence to stand trial. The staff continued to work hard to timely transfer those individuals to a forensic unit for stabilization.

    e.  Treatment Plans

          i.  CFMG will develop individual treatment plans for the treatment of inmates who are suffering from mental illnesses.

**Findings: Noncompliance**

This was an issue of continued deficiency.  Healthcare records did not include appropriate individualized treatment planning.  Additionally, inmates with significant and

repeated incidents of self-harm were not provided with behavioral plans to help to address those dangerous behaviors.

None of the healthcare records reviewed included appropriate safety planning in the suicide risk assessments when clinically indicated. Adequate safety planning remains essential in identifying interventions to prevent further self-harm.

Some mental health staff continued the use of "safety contracts" in an attempt to prevent self-injurious behavior. These measures have been proven to be ineffective, and they can result in a false sense of comfort. They should not be utilized and are not a substitute for adequate mental health evaluation, suicide risk assessment and appropriate treatment planning. Interviews with supervisory staff indicated that training had occurred regarding the inappropriate use of safety contracts, and personnel changes occurred since the last visit; it is hopeful that these changes will help to address this issue.

Some healthcare records continued to illustrate the need for diagnostic clarification, as there were multiple and/or conflicting diagnoses present. I would still recommend that consistent, formal interdisciplinary treatment team meetings as well as treatment planning occur to better facilitate communication and treatment consistency.

f. Consideration of Mental Illness in Inmate Discipline

i. Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff are encouraged to contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness.

22-17

**Findings: Noncompliance**

This issue remained unchanged. Although the custody supervisory staff reported that weekly meetings were occurring between classification and mental health staff, there was a lack of documentation of those meetings.  Additionally, there was inconsistent documentation on the Disciplinary Action Reports if the inmate was receiving mental health services and if medical was consulted.

      g. Space Issues

            i. Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including . . .adequate clinical and administrative treatment space....

**Findings: Noncompliance**

This issue remained unchanged. Adequate treatment space was available for clinicians to evaluate and treat patients in a confidential setting; however, confidentiality for clinical encounters was problematic as custody staff remained either in the room or outside the door within hearing distance. Observations during the monitoring visit, healthcare records reviews as well as staff and inmate interviews revealed that clinical encounters routinely occurred with the door open and an officer present outside the door. This resulted in no sound confidentiality and may result in inmates not providing critical information to staff when needed.

Dedicated office space was provided to the psychiatrist, and the remainder of the mental health staff shared an office in the infirmary area. This office was not utilized for clinical encounters.

h.  Administrative Segregation

i.  The Mental Health Implementation Plan shall require classification to assess a totality of factors when assigning prisoners to administrative segregation units. It is understood that the goal of Defendants is to limit the use of administrative segregation for prisoners with serious mental illness.

**Findings: Noncompliance**

This issue remained unchanged. The segregation units continued to function as de facto mental health units; the dormitories also housed some chronically mentally ill inmates. Mentally ill prisoners were routinely housed in the segregation units, and the placement of such individuals on these units continued to not be limited. Although measures continued to be instituted to mitigate against the effects of segregation placement, such as group therapy, daily nursing checks and at least weekly mental health rounds, these units remained occupied almost exclusively by mentally ill individuals. It is hopeful that the opening of the JBCT unit will assist in more appropriately housing these severely mentally ill individuals.

ii.  The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation...

iii.  The Mental Health Implementation Plan shall address suicide watch and suicide precautions procedures to ensure that prisoners in crisis are not placed in punitive and/or unsanitary conditions.

**Findings: Noncompliance**

There was a lack of documentation of the required placement screening for all prisoners for mental illness and suicidality with segregation housing.

22-19

Healthcare records reviews indicated that suicide monitoring generally occurred in the booking cells.  The safety cells were utilized when an inmate presented with self-injurious behaviors.  Documentation indicated that safety cell stays were for less than 24 hours.

7. Suicide Prevention

    a. Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.

**Findings: Substantial Compliance**

All cells in the administrative segregation units (A, B, R and S) had previously been modified to remove potential tie-off opportunities and, fencing was in place on the upper level and stairway to prevent jumping and self-harm. Additionally, modifications were made to the windows in the administrative segregation cells to prevent ligature points.

    b. Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior, Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal.

        i. Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.

22-20

ii. All welfare checks shall be documented on a welfare check log. The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance. Monthly spot checks for compliance will be conducted by the Compliance Sergeant at least weekly with monthly audits.

**Findings: Noncompliance**

Information regarding this issue was requested, but not received prior to completion of the draft report.  This issue will be examined at the upcoming monitoring visit.

c. Increase in Time Outside of Cell and/or Increasing Programs

i. Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:

1. 3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)

2. 14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time

3. 2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail) ii. Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking and receiving area will be guaranteed the following weekly times out of their cell:

1. 3 hours of week for exercise

22-21

2. 14 hours a week in the common area

3. 2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail iii. inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services,

**Findings: Noncompliance**

Review of logs, staff and inmate interviews and documentation indicated that inmates housed in the administrative segregation units as well as in the isolation and single holding cells outside of the booking and receiving areas were not afforded the required out of cell time as outlined by the Settlement Agreement and Implementation Plans. Improvements in the provision of group therapy were noted during the month preceding the visit.

The monitor observed administrative segregation group therapy sessions conducted in the men's and women's units, as well as individual sessions in the isolation and single holding cells outside booking and receiving. The groups were facilitated by a LCSW. The content of the groups remained clinically beneficial, and group participants unanimously reported satisfaction and benefit from their participation.

**Quality Management**

The CFMG Implementation Plan outlines the following:

Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action

plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit findings will be reported to the Quality Management Committee at its quarterly meetings.

All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met.

All completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure.

**Findings: Noncompliance**

Review of provided Quality Assurance/Peer Review Committee Minutes failed to document appropriate identification of issues of deficiency with corrective action plans and follow-up.  Additionally, no information was provided regarding critical review of the completed suicide that occurred during the monitoring period. This lack of documentation also included critical assessment of the provision of emergency medications. A well-functioning Quality Assurance program is vital in identifying areas of deficiency, developing corrective action to address those deficiencies and monitoring to ensure that the corrective action is addressed. Documentation of appropriate mortality and morbidity review is also essential in suicide prevention.

## Summary and Recommendations

The completion of this report was delayed by issues with the production of requested documents and information.  Further, this monitor provided a document request for monthly monitoring on two occasions which was not produced, even after onsite discussions with facility staff regarding the timelines for document production and clarification regarding the documents needed. Despite these obstacles, the onsite staff was extremely helpful and appeared to be working to address identified areas of deficiency.  It is hopeful that going forward these obstacles can be corrected.

The following are recommendations to address the issues of concern identified in this report.

1.          The facility should better document Quality Assurance meetings and efforts to ensure that areas of deficiency are identified, corrective action is developed, and monitoring occurs to ensure that the identified issue are corrected.

2.          The facility should develop and/or better document a mortality review process that critically examines inmate deaths as well as serious self-harm incidents to identify areas of deficiency, corrective action and opportunities for improvement.

3.          The facility should continue to work to improve access to timely inpatient psychiatric care for all jail inmates in need of such services.

4.          The facility should work to address the lack of confidentiality in the intake process and for clinical contacts.

22-24

5.       Healthcare records indicated that the Initial Mental Health Assessment and Appraisal was routinely completed by an RN and not by a Qualified Mental Health Professional on the mental health staff. The facility should work to address delays in the timely completion of these assessments.

6.       The facility did not track the timeliness of response to inmate requests. This would be an optimal area for quality assurance review to examine the timeliness and appropriateness of response to inmate requests.

7.       The facility should address lapses in the documentation of daily nursing rounds in segregation.

8.       Information regarding welfare checks was requested, but not received prior to completion of the draft report.  The facility should ensure that custody welfare checks are timely completed, provided to the monitor for review and examined by the Quality Assurance process to ensure compliance.

9.       The facility should ensure that inmates are offered a mattress or safety sleeping bag when indicated while housed in the safety, booking and sobering cells with appropriate documentation. Corrective action should also be documented when staff fail to address this concern.

10.      The facility should ensure that medication continuity occurs at the time of jail intake, and that changes to community-prescribed medications are documented with a rationale for such changes.

11.      The facility should conduct a staffing analysis to assess current custody staffing levels and their effect on the provision of mental health services.

12.      The facility should include medical staff in mock situational training scenarios.

13.      The facility should ensure that observation logs regarding the use of medical restraints (WRAP) are timely completed, provided to the monitor for review and examined by the Quality Assurance process to ensure compliance. This documentation should include range of motion, as well as monthly audits by the compliance sergeant.

14.      In lieu of placement of inmates who were declared incompetent to stand trial into transition cells in administrative segregation, mental health staff should ensure that these inmates are immediately identified and placed onto a priority list for daily follow-up and monitoring. The County should continue to work to expedite the transfer of these inmates to an appropriate inpatient facility.

15.      The facility should provide ongoing training and supervision to mental health staff regarding appropriate individualized treatment and behavioral planning. Individualized treatment planning should be documented in the healthcare records. Suicide risk assessments should include appropriate safety planning.

16.      The facility should document any custody/classification and mental health meetings regarding the consideration of mental illness in inmate discipline. Additionally, training should be provided regarding appropriate documentation on the Disciplinary Action Reports if the inmate was receiving mental health services and if medical was consulted.

17.        The facility should examine current treatment space to identify if physical plant issues negatively affect the provision of confidential clinical encounters.

18.        The facility should decrease the use of administrative segregation as de facto housing for mentally ill individuals. In lieu of alternative placement, mitigating factors such as clinical contacts, rounding, groups and other out of cell activities should occur as outlined in the Settlement Agreement and Implementation Plans.

19.        The facility should ensure that the required placement screening for all prisoners for mental illness and suicidality with segregation housing are documented.

20.        The facility should consider replacing the ventilation grates in the booking cells to more suicide resistant grates.

21.        The use of contracts for safety should be discontinued.

22.        The facility should ensure that the requested monthly document production is provided to the monitor.

Please contact me should you have any questions regarding this report.


Respectfully submitted,



X ~~Kerry C. Hughes, MD~~

Kerry C. Hughes, M.D.
Mental Health Monitor


Kerry C. Hughes, M.D.
1579 Monroe Dr., Suite F, Box 612
Atlanta, GA 30324
Phone: ███████
Fax: 404-364-9708
Email: dockc99@aol.com

# Exhibit 23

**Monterey County Jail (MCJ) Healthcare Records Reviews**

**July 2018**

**Inmate 1**

This inmate was booked into the jail on January 28, 2018. The Medical Intake Triage/Receiving Screening was completed on that date; the form noted that the patient had been cleared in the NMC ER prior to transfer to the jail due to a motor vehicle accident. The form did not note a history of mental health treatment; a prior intake form from 2011 also did not note a history of mental health treatment.

An order by an RN documented a psychiatric referral due to bizarre behavior; a telephone order was obtained for a urine toxicology screen by Dr. ███ A urine dipstick analysis was positive for benzodiazepines and THC.

A Suicide Risk Assessment Checklist was dated January 30, 2018. The assessment was remarkable for current suicidal ideation and plan, alcohol, methamphetamine and cannabis use, history of Schizophrenia, recent assault in the dormitory, and depressive symptoms.  He was provided with diagnoses of Borderline Personality Disorder, Schizophrenia and Alcohol Abuse. A Psychiatric Crisis Evaluation Request was completed by the psychologist/RN and the physician assistant on January 31, 2018.  The form noted that the patient was agitated with head banging, resulting in restraint placement (WRAP) and emergency medications, which included Haldol, Cogentin and Ativan intramuscular injections on January 30, 2018. A one-time order for those medications was noted in the healthcare record dated January 30, 2018 at 1725 by the psychologist/RN with a telephone order by Dr. ███ (?). It was noted that the inmate had severe swelling of his forehead. An Inmate Injury Report was dated January 30, 2018 which indicated that the inmate was in booking cell #6 when he told the staff that he wanted to commit suicide.  He was seen by medical staff and moved to the Safety Cell 1 where he began "violently banging his head against the cell door".  Mental health staff was contacted and evaluated the inmate who continued to hit his head resulting in redness and swelling to his forehead.  He was subsequently placed into the WRAP by custody staff at 1730, and a helmet was placed on his head. The RN noted that neurological checks and vital signs were obtained.

A Medical Referral Form dated January 30, 2018 which noted that the inmate "cut lip, fell hit face".  The form noted that the inmate was "jail checked on January 28 at NMC for MVA". The form noted that the inmate acknowledged methamphetamine use and that he still felt intoxicated. The referral indicated that he would be referred to the emergency room. The hospital response noted a complex laceration repair, treatment with antibiotics and suture removal in several days. A medical treatment order for inmate housing indicated discontinuation of level 1 suicide watch with a start date of January 30 to January 31, 2018 written by the psychologist/RN. A Suicide Risk Assessment Checklist indicated that level 1 suicide watch was discontinued on January 31, and level 2 suicide watch was initiated on the same date. It was completed by the psychologist/RN, and the assessment was remarkable for depressed mood, serious DUI charges and recent trauma.

Another Medical Referral form was dated January 31, 2018 which indicated transfer to the NMC emergency department due to forehead swelling after head banging. A CT of the head and neck were recommended; however, the inmate refused against medical advice.

An order by the psychologist/RN dated January 31, 2018 indicated that level 1 suicide watch was discontinued, and upon return from the hospital, the inmate would be placed on level 2 suicide watch. An order for the inmate to see the psychiatrist was also present.

**Findings**

Based upon available documentation, this inmate was placed into the safety cell for less than 24 hours where he was placed into restraints due to self-injurious behavior. He was appropriately sent to the hospital prior to admission due to possible medical injuries, and he was returned to the emergency room after incidents of self-harm.

An order by the psychologist/RN indicated that the patient would be downgraded from level 1 to level 2 suicide watch upon return from the hospital. This lowering of suicide monitoring, particularly for an inmate with recent self-harm was inappropriate prior to clinical assessment.

There was documentation that medical staff supervised the placement into Wrap with vital signs and medical checks completed noted on the custody form. Although there was nursing documentation that neurological checks and vital signs were completed; actual documentation of such checks was not provided. It did appear that nursing monitoring and suicide risk checklists were completed timely.

There was no documentation of treatment or safety planning for this inmate.

Additionally, an Initial Health Assessment was not performed at intake into the jail. It was unclear if the inmate was released from the jail shortly after intake.

**Inmate 2**

On November 11, 2017, the RN documented that the patient had been brought into intake uncooperative and angry. She presented with disorganization and pressured speech. She denied suicidal ideation. An order for a urine toxicology screen and for the patient to be seen by the LCSW due to bizarre behavior on intake by the RN. On that same date, the marriage and family therapist (MFT) noted that the inmate denied current mental health treatment, but indicated a history of treatment with no medications. She was described as homeless without suicidal or homicidal ideation. The MFT noted that the patient agreed to a safety contract. The inmate presented with disorganized behavior and tearfulness.

An Initial Mental Health Assessment and Appraisal was completed; however, there were confusing discrepancies present on the form. The form contained the dates March 14, 2017 and November 16, 2017. Additionally, there were negative responses to all mental health related questions; no

mental health referral was made, and the inmate was transferred to general population. This was concerning as the inmate had a known history of significant mental health treatment.

The LCSW noted on November 14, 2017 that the inmate refused to meet with her, and she rescheduled the welfare check for four days later. She was then scheduled to be seen by mental health for sick call on three days later for a welfare check by the MFT. On November 14, 2017 there was an order for the LCSW to see the inmate on November 18, 2017 for a welfare check. Information in the healthcare record from prior incarcerations indicated a history of treatment for psychosis. An order by the nurse on December 19, 2017 indicated that the patient denied psychiatric symptoms, but she had a history of Bipolar Disorder, 5150 commitment and suicidal ideation. The psychologist/RN attempted to see the inmate on December 20, 2017; however, the note indicated that the inmate did not want to get up for the interview. Segregated Population Observation Logs were present for the following dates: November 12-15, and December 21, 2017.

It appeared that the inmate was released from jail and returned on January 10, 2018. The RN documented on January 10, 2018 that the inmate had a history of mental health treatment, was very angry and easily agitated; upon leaving the intake room, she reported suicidal ideation which she had previously denied.  An order by the nurse on January 10, 2018 indicated that the patient denied psychiatric symptoms, but she had a history of Bipolar Disorder, 5150 commitment and suicidal ideation. The nurse indicated that the inmate would need to be cleared at NMC for mental health evaluation.  Documentation indicated that the inmate was seen at NMC emergency department from the jail for a "jail check".  At that time, the documentation indicated that she admitted using methamphetamine earlier that day; she also reported suicidal ideations as well as female demons that were bothering her.  She initially presented with agitation and possible homicidal ideation by family report; she was treated with Zyprexa 10 mg and Ativan 2 mg. The documentation noted a diagnosis of Schizoaffective Disorder. It also indicated that she did not meet medical necessity for a 5150 commitment or inpatient psychiatric services, and she was discharged to return to the jail. She was seen by the nurse upon her return from NMC later that day; the nurse indicated that the inmate denied current suicidal ideation upon return.

On March 5, 2018, the RN wrote an order stating "LCSW" as well as for a urine pregnancy test. She was seen by the psychiatrist on that date who noted that she entered custody on the prior date when she presented with psychosis.  She also reportedly had been banging her head.  She was irritable and "appeared tortured by internal stimuli".  She refused oral antipsychotic medications. A one-time order was provided for intramuscular Zyprexa 10 mg and Benadryl 50 mg due to "psychosis and self-injurious behavior". A progress note by the nurse indicated that the inmate was placed on level 2 suicide watch by the LCSW and was provided with Zyprexa and Benadryl on an emergency basis by Dr. ████ A Problem List noted that on March 6, 2018, the inmate was placed on level 2 suicide watch with the administration of emergency medications. A verbal order by Dr. ████ later that day indicated that the inmate should be monitored every two hours until seen by the LCSW. A Suicide Risk Evaluation was completed on March 6, 2018 by the LCSW due to the inmate's self injurious behavior (head banging).  She was provided with differential diagnoses of Schizophrenia, paranoid type versus Psychotic Disorder, NOS.

A Medical Treatment Order for Inmate Housing was completed by LCSW ███████ as well as a progress note on March 7, 2018. She indicated that she had consulted with the psychiatrist who started oral medications. It also indicated that level 2 suicide watch was started on March 6, 2018 and was discontinued on March 7, 2018.  An order for Zyprexa 20 mg per day and Benadryl 50 mg per day was provided on March 7, 2018.  A Suicide Risk Evaluation was completed on that date which noted improvement in suicidal ideation and auditory hallucinations.

There was documentation of daily mental health contact while the inmate was on suicide watch. Subsequent documentation indicated improvement in psychotic symptoms with medication treatment.

There were multiple treatment refusals present in the healthcare record; some of these refusals were difficult to read due to poor copying/scanning. Urine toxicology and pregnancy tests were negative. On April 10, 2018, the inmate signed a refusal of Benadryl and Zyprexa.

There was documentation that discharge medications were called into CVS pharmacy on April 13, 2018.

**Findings**

There was inappropriate use of a safety contract to prevent self harm. Additionally, an Initial Health Assessment was not performed for each intake into the jail. It also did not appear that the nurse had access to, or did not review prior jail healthcare records. There was a lack of documentation that medications were timely provided to this inmate upon jail intake.

There was also a lack of documentation that discharge medications were provided after the jail release between December 2017 and January 2018.

There was documentation of placement in the safety cell on level 2 suicide watch for less than 24 hours with appropriate nursing assessment documentation and timely medical notification.

There was no documentation of appropriate treatment planning or safety planning for this suicidal inmate.

There were lapses in the documentation of daily nursing checks in segregation.

**Inmate 3**

This inmate had multiple MCJ incarcerations.  His most recent incarceration during this review period occurred on April 7, 2018 when the Medical Intake Triage/Receiving Screening was completed; the form did not include the time that it was completed.  The form noted his last incarceration at the jail during November 2017, his history of treatment with lorazepam, Ambien and Wellbutrin, his daily use of methamphetamine and heroin and a suicide attempt by overdose of heroin approximately four months prior.  The form had the question whether he was suicidal now marked as no with a line drawn through the response.  It appeared that he was cleared for general population without a mental health referral.

An Opioid Withdrawal Protocol was completed on April 7, 2018 which indicated no symptoms of withdrawal.

Progress notes by the RN on the same date noted that the CVS pharmacy was contacted, and Ambien and lorazepam had not been filled within the past year. The nurse also noted that the inmate had a history of suicide attempts four months prior resulting in a 5150 commitment. He was also hospitalized six days' prior for liver failure.  He was sent to NMC for clearance.

On the same date, a note from the jail indicated that the inmate was sent to NMC for crisis evaluation due to suicidal statements by the RN.  A form from the NMC ER noted that the inmate had been evaluated from 1718 to 1915 for suicidal thoughts and was determined not to be a danger to himself and was returned to the jail.

Another Medical Intake Triage/Receiving Screening was completed on April 8, 2018 at 2018.  This form noted treatment with Ativan and Xanax, the previously mentioned daily drug and alcohol use, and mental health hospitalization due to 5150 commitment four months' prior including treatment with Risperdal. The form indicated no mental health referral and transfer to general population. A Confidential Transfer of Medical Information form indicating transfer of information from the MCJ to San Benito was dated April 11, 2018 which noted that the inmate was not treated with medications.

A review of this inmate's healthcare record indicated that he had been treated with Trazodone for Depressive Disorder, NOS at the MCJ during November 2017; Trazodone was discontinued at the next psychiatric appointment during December 2017 due to medication side effects, and Benadryl was prescribed for insomnia.

### Findings

Although this patient was appropriately transferred to NMC for mental health clearance after apparently making suicidal statements, the documentation of these statements was poor. Additionally, neither of the intake screenings noted routine mental health referral which was indicated for this inmate. There was documentation that attempts were made to verify community medications.

### Inmate 4

Healthcare documentation indicated that this inmate had a diagnosis of Schizophrenia and multiple medical concerns including COPD, congestive heart failure and diabetes. He had multiple MCJ incarcerations. The healthcare record included numerous Refusal of Clinical Services forms indicating that the inmate had refused medications or treatment.

The inmate received the Medical Intake Triage/Receiving Screening on September 25, 2017.  He acknowledged hospitalization at Atascadero State Hospital for trial competency and a history of substance abuse treatment.  He denied treatment with psychotropic medications. He was seen by the psychiatrist on September 26, 2017 when the inmate acknowledged non-adherence with psychotropic medications for the past three months.  At that time, he did not present with evidence

of psychosis or suicidality. Vistaril 100 mg per day was ordered by the psychiatrist on September 26, 2017. Medication consent was obtained.

On October 6, 2017, the inmate refused his appointment with the LCSW; follow-up was ordered for October 12, 2017. He was seen at the follow-up appointment when he was reportedly doing well.  Follow-up with the LCSW was ordered for October 19, 2017 for mental status examination update. The inmate refused this appointment as well as the next appointment on October 26, 2017.

On November 2, 2017, he was seen in follow-up with the LCSW when he appeared stable.  He was scheduled for follow-up on November 9, 2017.

On November 9, 2017 he presented with good grooming, tangential thinking and stable mood.  On November 14, 2017, he initially refused his interview, but he reportedly was eating and showering regularly. Subsequent appointments on November 16 and 21 documented minimal cooperation with interview, pressured speech and other evidence of decompensation, including disorganized behavior and poor sanitation in his room. The MFT indicated that the patient agreed to a safety contract.

A meeting occurred on November 30, 2017 to discuss discharge planning for the inmate on December 5, 2017; this meeting included the psychiatrist, program manager, medical physician and CFMG regional staff as well as custody management staff. An order by the psychologist on November 30, 2018, indicated that the inmate would be committed by 5150 at the time of release from custody.

There was documentation that discharge medications were called into the pharmacy after his December 2017 release from jail.

It appeared that the inmate was released from jail and returned on December 14, 2017 when a Medical Intake Triage/Receiving Screening was completed.  At this intake, the inmate was uncertain regarding medication treatment or pharmacy information. He was scheduled for the next mental health clinic.  On December 18, 2017, the psychologist/RN indicated that the inmate would be scheduled to see the psychiatrist to discuss medications.

The inmate had to be physically extracted from his cell by custody staff on December 29, 2017 to be brought to the hospital for 5150 commitment.

It appeared that the inmate was released from jail, but soon returned.  On January 2, 2018, he refused to see the psychiatrist or to take psychotropic medications. On January 10, 2018, a Medical Referral Form was completed from MCJ to NMC indicating that the inmate was on a 5150 commitment. The hospital indicated that a CT of the head was normal, that the inmate stated that he would take his medications and that he was cleared for return to the jail.

There were progress notes and orders on January 29, 2018 and February 8, 2018 by the psychologist/RN to send the inmate to the hospital for possible admission to the inpatient psychiatric unit due to grave disability. On January 29, 2018, a Medical Referral Form was completed from MCJ to NMC indicating that the inmate was acutely psychotic and demonstrated grave disability due to mental illness. The inmate was returned to the jail with recommendation to

continue medications prescribed at Atascadero State Hospital (which he had consistently been refusing). The psychologist/RN documented contact with the inmate's public defender regarding possible transfer to the state hospital for stabilization. He refused to meet with the psychiatrist on January 31, 2018. He was housed in the booking area upon his return from NMC.

On February 8, 2018, a Medical Referral Form was completed from MCJ to NMC indicating that the inmate was gravely disabled, not eating and refusing to get out of bed or to take medications. At the hospital, the inmate was given olanzapine 10 mg, and the jail was informed that he had borderline elevation of glucose but no evidence of diabetic ketoacidosis, and no significant electrolyte abnormalities. He was discharged back to the jail. Again on February 12, 2018, a Medical Referral Form was completed from MCJ to NMC indicating that the inmate was gravely disabled with multiple medical concerns and refusal of all medications, vital signs and food. The recommendation to the jail was that the inmate had eaten well there (NMC), was given Risperdal 2 mg, that his vital signs were normal and that he "ate and drank a lot here". He was cleared for return to the jail.

On March 9, 2018, Risperdal 4 mg per day was ordered by the psychiatrist. This medication was discontinued one week later by the psychiatrist.

A 5150 commitment was signed by Dr. ███████ on March 29, 2018; the form noted that the inmate had been exhibiting aggressiveness toward staff, and he continued to refuse psychotropic medications. He also exhibited grave disability and inability to care for himself.

The inmate was again returned to the jail where he remained non-adherent with treatment. Due to concerns that he was at risk for stroke and heart attack due to his untreated medical condition, the social worker again contacted the inmate's attorney to attempt to hasten his transfer to the state hospital.

A social worker note on April 24, 2018 noted that the inmate was so covered in urine and feces that his clothes had to be cut off his body. His toilet was so full from not flushing that it overflowed flooding his cell with feces and urine. The medical physician and all parties again agreed to transfer to NMC due to grave disability.

Documentation of Segregated Population Observation Logs was provided from November 16, 2017 to December 1, 2017, December 16, 2017 to December 31, 2017, January 4, 2018, January 6, 2018, January 8 to January 19, 2018, January 20 to February 12, 2018, February 16 to March 18 to April 5, and April 22, 2018 to August 2, 2018. There were lapses in the documentation of daily contacts in segregation.

**Findings**

This gravely disabled mentally ill inmate required inpatient treatment. The jail appropriately referred him to NMC on multiple occasions due to grave disability and treatment refusal, only to have him returned promptly with only temporary treatment provided, if any.

Despite the inmate's lack of treatment adherence, he was followed closely and consistently by mental health staff.

Risperdal was ordered on March 29, 2018; however, the inmate consistently refused psychotropic medications or any mental health interventions. This medication was subsequently discontinued.

There were lapses in the documentation of daily checks in segregation.

There was good discharge planning in preparation for the inmate's December 2017 release from jail.

The use of a safety contract was clinically inappropriate.


**Inmate 5**

Documentation indicated that the inmate was sent to NMC for clearance after reporting suicidal ideation at the time of intake.  The Medical Intake Triage/Receiving Screening was completed upon his return to the jail on May 9, 2018. The inmate reported a history of suicide attempts, the last occurred during 2017 involving jumping from a bridge and a subsequent 5150 commitment. He denied taking current medications. He acknowledged use of cocaine and alcohol on a daily basis; he did report some alcohol withdrawal symptoms at the time of screening. He also reported a history of psychiatric hospitalization at NMC and symptoms of depression and anxiety. He was referred for the next mental health clinic, and he was placed on level 2 suicide watch. He was also started on a withdrawal protocol for alcohol.

The inmate was seen by the social worker on the same date when a Suicide Risk Assessment & Evaluation was completed. The assessment noted that the inmate was suicidal at the time of arrest, and he was seen at NMC for clearance prior to jail acceptance. He was provided with a diagnosis of Adjustment Disorder with depression, Alcohol Use Disorder, severe and Cocaine Use Disorder, severe. He was initially placed on level 2 suicide watch, and this watch was discontinued later that day. He was provided with cognitive behavioral therapy (CBT) information to address his depression, and he was referred to the psychiatrist due to past antidepressant treatment and scheduled for follow-up within three days.

The inmate was seen in follow-up the social workers on May 10, 11, 12, and 18, 2018, due to his depressive symptoms and follow-up after suicide watch.

The inmate was seen by the psychiatrist on May 21, 2018.  At that time, he reported depressed mood with recurrent passive suicidal ideation.  He had been nonadherent with medication treatment for the preceding six months. He was provided with a diagnosis of Major Depressive Disorder. Trazodone and Lexapro was ordered by the psychiatrist at that time.

He was seen by the social worker on May 24, 2018 when he reported some continued suicidal ideation.

He was seen by a mental health therapist on May 25, 2018; he reported some continued passive suicidal ideation and depression, but denied current suicidal intent or plan.  He was described as stable at that time.

The 14 Day Health Inventory was completed on June 1, 2018. This inventory noted a history of depression, anxiety and 5150 commitment as well as a history of suicide attempts.

The inmate was seen by the social worker on June 27, 2018, when he requested an increase in his medications due to poor sleep and having taken a higher dosage when not incarcerated. He was seen in follow-up by the psychiatrist on June 29, 2018 when he reported continued depressive symptoms. Lexapro and Trazodone were increased at that time.

He was seen by the social worker on July 10, 2018 when he reported that he was doing "okay". He continued to report passive suicidal ideation without plan or intent.  His overall presentation was described as improved from prior contacts. On July 24, the inmate reported continued passive suicidal ideation and difficulty sleeping to the social worker. He indicated that his medications appeared to be beneficial.

**Findings**

This inmate was appropriately transferred to NMC for clearance after presenting at the jail with suicidal ideation; he was subsequently quickly returned to the jail.  He was appropriately monitored on suicide watch, and appropriate follow-up occurred after suicide watch discontinuation.  As this inmate had not taken psychotropic medications prior to incarceration, his medications were not immediately started upon arrival.  He was seen timely by the psychiatrist when antidepressant medications were initiated; these medications were adjusted as was clinically indicated.

**Inmate 6**

It appeared that the inmate was booked into the jail on March 30, 2018.  At the time of intake, he presented with agitation and verbal aggression toward staff.  He acknowledged use of methamphetamines prior to arrest; a urine toxicology screen was later positive for amphetamines. He reported having a seizure, and he was transferred to NMC for evaluation; he was returned to the jail after medical assessment. He was placed into the safety cell on that date at 1432. There was documentation that mental health was notified at 1444. There was documentation of medical assessment upon placement into the safety cell.

On April 1, 2018 at 0920, the inmate told the RN that he would kill himself by hanging himself with torn clothing.  The nurse placed the inmate on level 2 suicide watch and informed mental health.  Documentation was present indicating medical assessment at the time of safety cell placement. Level 2 suicide watch was discontinued by the social worker on April 2, 2018.

MH Suicide Risk Assessment & Evaluations were completed on April 1 and 2, 2018, while he was housed in the safety cell. The assessments were positive for significant issues, including recent suicidal ideation, intent and plan as well as evidence of delusional thinking, and agitation.

The inmate was readmitted to the jail on or about June 28, 2018.  He was referred at intake to NMC by the social worker after presenting with delusional thinking and hitting his head against the wall; he also reportedly attempted to strangle himself with a sheet. Documentation from NMC indicated that they believed his symptoms consistent with a diagnosis of malingering.  He was given Benadryl 50 mg orally and returned to the jail with a statement that his suicidality was situational in nature and that he would not benefit from inpatient mental health treatment.

### Findings

It was unclear from the information provided when this inmate arrived at the jail and when he was released due to a lack of information, such as the medical intake or documentation of contacts after his initial placements on suicide watch. Assuming that he was only briefly housed at the jail, it appeared that he was appropriately placed on suicide watch. There was documentation that medical was notified timely, and he was evaluated and followed appropriately by mental health staff.  Although this inmate was appropriately referred to NMC for evaluation, he was rapidly returned to the jail without an adequate period of assessment of the issues for which he was referred. It did appear that he remained in the safety cell for less than 24 hours.

### Inmate 7

This inmate had an extensive history of treatment for Schizophrenia, amphetamine use and mental health treatment at the MCJ and at NMC.  He was incarcerated from approximately September 2017 to December 2017; during that time, he presented with active psychosis with depression and suicidal ideation. He was briefly released from jail, but he returned on January 1, 2018.

At the time of booking, he was sent to NMC emergency department after reporting suicidal ideation; he was subsequently returned to the jail on the same day. While at NMC, he was provided with Zyprexa and Ativan. He was seen by the social worker upon return from the hospital, when he was reportedly not suicidal.  Dr. ███ was contacted, and Risperdal and Ativan were order; the patient was also scheduled to see Dr. ███ on the following day.

The inmate was housed in a booking cell when he was seen by Dr. ███ on January 2, 2018; he was described as unkempt and disheveled, was unable to participate in the evaluation and he subsequently returned to sleep.  His appointment was rescheduled for three days. He was seen by the psychologist/RN on two days later, when it was noted that he continued to refuse medications and psychiatric treatment; he also refused housing, resulting in his placement in the booking area. The notes also indicated that the inmate would be committed by 5150 upon his release from jail due to grave disability.

A suicide risk evaluation was completed on January 6, 2018 by the social worker.  The evaluation noted the inmate's numerous 5150 commitments; the most recent after his incarceration during December 2017.  Documentation indicated that the inmate was housed in A Pod when he told the deputy that his door opened after he tried to hang himself, so he ran out to use the restroom.  He was placed on level 1 suicide watch by the deputy; this watch was changed to level 2 approximately 30 minutes later by the social worker when it appeared that he was moved from the safety to a

booking cell. There was documentation of medical assessment at the time of safety cell placement, and the inmate was described as combative. His behavior improved over time, and he was removed from suicide watch on January 8, 2018. There was documentation of daily mental health contact while on suicide watch.

He was seen by the psychiatrist on January 8, 2018; at that time, his compliance with Risperdal treatment was described as 71 percent. He appeared improved from previous contacts and suicide watch was discontinued, and Risperdal was continued at 8 mg per day.

The inmate was seen for follow-up after discontinuation of suicide watch.  Some notes described the inmate as stable, but other notes indicated that he remained very psychotic and unstable. Subsequent documentation noted that the inmate was followed consistently and that he would discharge to a local housing facility.

The Medical Intake Triage/Receiving Screening was completed on January 18, 2018.  It was unclear why this was completed so late after intake; the inmate at least two intakes completed within several months as he was in and out of jail frequently.

There was documentation of contacts on the Segregated Population Observation Log from January 11 to January 22, January 24, January 25 to February 2, February 4 to February 15, 2018. It appeared that he was released from jail soon afterward.

### Findings

This inmate was appropriately referred to the hospital after presenting with suicidal ideation.  He was also placed into the safety cell on level 1 suicide watch after presenting with suicidal behavior. There was documentation of medical assessment within one hour of safety cell placement.  He was seen daily by mental health and medical staff.  There were lapses in daily welfare checks on the segregation logs.

Medications were ordered timely at the time of intake. A suicide risk evaluation was completed as was clinically indicated, and follow-up with mental health occurred after suicide watch discontinuation.

It was unclear why the Medical Intake Triage/Receiving Screening was completed so late after intake.


### Inmate 8

This inmate was seen at jail intake on February 14, 2018 when he presented with suicidal ideation and a history of 5150 commitments.  He was subsequently sent to NMC for clearance; he was returned to the jail later that day.  He was placed into the safety cell on level 2 suicide watch after reporting that he felt "a little suicidal" upon his return.  He was seen by the psychologist/RN on the following day when the inmate denied a history of recent mental health treatment; however, he reported treatment with mood stabilizing and antidepressant medications.  The clinician

indicated that the inmate was at low risk for self- harm. Suicide watch was discontinued at that time by the psychologist/RN, and the inmate was referred to see the psychiatrist.

The intake nurse attempted unsuccessfully to verify the inmate's medications on the day of arrival. Prozac and Divalproex were verified on the following day, February 15, 2018.

He was seen by the psychiatrist on February 16, 2018.  The inmate reported a diagnosis of Bipolar Disorder, NOS, and he last received treatment during December 2017.  The inmate reported that his previous medications were ineffective in stabilizing his moods. He was prescribed lithium 600 mg per day, and informed consent was obtained.

A second Medical Intake Triage/Receiving Screening was completed on March 24, 2018; it appeared that the inmate was released from jail and returned soon after. There was a telephone order from Dr. ████ for evaluation by the social worker in three days and to verify medications with psychiatric follow-up in two days. There was no subsequent documentation in the healthcare record, and it was possible that the inmate was again released from jail shortly after intake.

### Findings

This inmate was appropriately referred to the hospital after presenting with suicidal ideation.  He was also placed into the safety cell on level 2 suicide watch after presenting with suicidal behavior. There was documentation of medical assessment within one hour of safety cell placement.  He was seen daily by mental health and medical staff.

Attempts to verify the inmate's medications were made, and the inmate was timely seen by the psychiatrist when his medications were changed to address his symptoms.

A suicide risk assessment checklist was appropriately completed prior to discontinuation of suicide watch.

The appropriate laboratory testing for treatment with lithium was conducted.

Follow-up was ordered for monitoring after discontinuation of suicide watch.


### Inmate 9

The Medical Intake Triage/Receiving Screening was completed on December 25, 2017.  The form indicated that the inmate refused to see the psychiatrist, but she acknowledged a history of mental health treatment. She was scheduled for mental health follow-up. The inmate was provided with several diagnoses, including Schizophrenia, paranoid type, Other Psychotic Disorder, and Bipolar Disorder current episode mixed, severe with psychotic features.

On December 25, 2017 at 2345, the nurse documented contact with Dr. ████ after medication confirmation (she had been prescribed lorazepam as needed and Abilify 20 mg per day). On December 26, 2017 at 0413, an order for Ability was obtained. A psychiatric note on that date at 1230, indicated that the inmate refused to see the psychiatrist.

On January 7, 2018, she refused interview with the social worker who noted that the inmate was receiving increased disciplinary reports. She was scheduled for follow-up on January 16, 2018. She was seen by the psychologist/RN on January 16, 2018 when she was described as "very rude & hostile.   Did not want to talk to me but was forced to interact with me." She was described as psychotic and delusional.  The clinician indicated referral to the psychiatrist and possible referral for competency to stand trial evaluation.

The psychiatrist attempted to see the inmate on January 17, 2018, but she was uncooperative to interview.  On January 21, 2018, the social worker also attempted to see the inmate who refused to answer questions, stared at the interviewed and appeared to be responding to internal stimuli. She also refused social worker out of cell and cell-front interviews one week later.

Documentation indicated that the inmate was placed into the safety cell on February 25, 2018 at 0250 by custody after she was pounding the cell window and was described as combative.  A medical nursing entry at 0315 noted the inmate's refusal of vital signs. She was removed from the safety cell by custody on the same date at 0636.

The inmate also refused to respond to mental health contacts on February 4 and 19, 2018.  The social worker described her as highly delusional, psychotic, uncooperative, "rageful" and was observed masturbating underneath her blanket.

She was seen by the psychologist/RN on February 28, 2018 after custody reported that the inmate was banging her head, pulling out her pubic hair and presenting with paranoid and delusional thinking. The clinician also indicated that the inmate's attorney would be contacted to request a competent to stand trial evaluation. The patient was seen by the psychiatrist soon after she was seen by the psychologist/RN.  He indicated that the inmate had not slept for four days by staff report, was observed talking to herself and presented with incoherent speech. An order for one time dosages of Zyprexa and Benadryl intramuscular injections was provided by the psychiatrist on that date.

She refused appointments with the social worker on March 16, 2018, March 28, 2018 and April 4, 2018.  On April 16, 2018, the social worker indicated that the inmate would be hospitalized for danger to others as she had exhibited recent assaultive behavior. She was cell extracted due to refusal to leave the cell and threatening behavior, and she was transferred to NMC for evaluation.

Information from NMC indicated that she was admitted due to posing imminent risk of harm to others and grave disability due to exacerbation of manic symptoms with psychosis and medication noncompliance.  It appeared that she remained at NMC from April 16 to April 20, 2018.  She was provided with a diagnosis of Bipolar Disorder, current episode manic severe with psychotic features.

The inmate was seen in follow-up after return from NMC on April 21, April 22 and April 23 at cell-front as she refused to participate in interviews.

There was documentation of segregation rounds contacts from December 26, 2017 to January 11, 2018, February 14 to February 28, 2018, March 1 to March 6, March 8 to March 10, March 13 and March 16, April 3, April 5, April 6 to April 8, April 12 to April 16, April 21 to May 17, 2018.

23-13

On April 25, 2018, the inmate was seen for segregation rounds by the social worker.  Nursing notes on April 29, 2018 to May 1, 2018 indicated that the inmate remained unkempt.  She was seen again by the social worker on May 2; the inmate remained under her blanket and several pieces of hair were observed on the floor.

On May 7, 2018, she was seen by the social worker for a welfare check; however, she refused to acknowledge the clinician's presence. She reportedly interacted with her peers, and her cell was tidy and orderly. On May 10, 2018, she was seen by the social worker when she again refused interview, responding with profanity.

There were multiple refusals of medical services forms present in the healthcare record.

**Findings**

Medications were verified by the intake nurse and prescribed timely upon jail intake.

There were lapses in daily welfare checks on the segregation logs.

Emergency medications were appropriately ordered and administered for this gravely ill inmate.

This inmate was appropriately referred for inpatient mental health treatment by the jail.  Unlike most referred cases, she was hospitalized for approximately four to five days and discharged back to the jail.  Upon her return, she resumed her treatment non-adherence and uncooperative behavior.

The staff appropriately sought inpatient treatment, both at NMC and by request to her attorney for a competency evaluation.

The inmate was seen timely by medical after safety cell placement for assessment.  The duration of safety cell placement did not exceed 24 hours.


**Inmate 10**

This inmate's healthcare record was reviewed as he committed suicide during the review period. The custody logs for this inmate were requested, but they were not provided for review.

The Problem List for this inmate included the following diagnoses: Methamphetamine Dependence, Schizophrenia versus Schizoaffective by history, rule out Antisocial Personality Disorder.  He also had diabetes, hypertension, obesity and an eye injury.

The Monterey County Jail Medical Intake was completed; however, the date of completion and the person completing the intake were illegible.  The intake noted diagnoses of Schizoaffective Disorder and sleep apnea.

On 2/24/17 the Intake Triage assessment was completed. The assessment noted the inmate's diagnoses and outside treatment at Natividad Mental Health.  He was referred to mental health for further assessment and treatment.

On that same date, the nurse called Dr. ███ and Dr. ███ for medication orders.  He was ordered Haldol 5 mg per day, Topamax 300 mg per day, Cogentin 2 mg day and Naltrexone 50 mg per day. The order also indicated that the inmate used a C-PAP machine.

On 3/1/17, the Doctors Orders form noted an order to obtain the patients' jail medical chart. On that same date, outpatient records from Monterey County Department of Health Behavioral Health Division noted treatment with the following medications: Haldol 5 mg every night, Cogentin 2 mg every night, Invega Sustenna 234 mg every four weeks, and Topamax 300 mg per day.  It should be noted that Invega Sustenna was not ordered and continued despite the inmate's treatment with this medication as recently as two weeks' prior (2/9/17) on an outpatient basis.

The inmate was seen by a psychiatrist (unable to decipher name) on 3/2/17.  The psychiatrist noted that the inmate had been arrested on 2/24/17, and he had a history of methamphetamine abuse.  The diagnoses of Schizophrenia versus Schizoaffective Disorder, depressive type provided by the outpatient psychiatrist were also noted. The psychiatrist also noted that the inmate reported auditory hallucinations that were decreased and that he was able to ignore them. The inmate denied medication side effects. His history of psychiatric inpatient treatment (most recent 2015) which was associated with auditory hallucinations and methamphetamine use. At that time, Haldol was discontinued, Risperdal 3 mg was ordered, and Topamax and Cogentin were continued.  Informed consent was obtained, and routine laboratory studies were ordered with follow-up scheduled for 30 days.

The Initial Mental Health Assessment and Appraisal was dated 3/4/17, which noted the inmate's history of two psychiatric hospitalizations; the most recent in 2015 in Santa Clara County due to auditory hallucinations.  It also noted current treatment at Natividad Behavioral Health on Risperdal and Cogentin.  The inmate was reportedly experiencing auditory hallucinations, was not suicidal, he endorsed recent loss, worry about his case, feelings of helplessness and worthlessness and he showed signs of depression.  A priority mental health referral was appropriately submitted, and he was housed in general population.

The Health Inventory & Communicable Disease Screening was also completed on the same date. This screening also documented the inmate's mental health treatment history and noted that the inmate was already being seen by mental health.

The inmate was seen by LCSW ███ on 3/5/17; he reportedly was doing "ok", was anxious about his court case and he denied auditory hallucinations.  Follow-up was scheduled in three to five days.  He was next seen by Dr. ███ on 3/11/17 for follow-up when he was reportedly stable and medication compliant.  The clinician indicated that follow-up would occur "as needed".

On 3/31/17, he was seen by the psychiatrist when he was reportedly doing well, but he reported mild non-intrusive auditory hallucinations.  He was provided with previously stated diagnoses, and the following medications were continued: Risperdal 3 mg day, Topamax 300 mg day and Cogentin 2 mg day.  Follow-up was scheduled for 90 days.

He was seen by LCSW ▮▮▮▮ on 4/21/17 for an out of cell welfare check. He reported that he was stressed out and hearing voices as well as problems sleeping with sleep apnea. He was referred to Dr. ▮▮▮▮ for medication follow-up. On five days later, he was seen by the psychiatrist. He was described as stable, and his main complaint was regarding a CPAP machine.

An appointment on 5/20/17 was not completed "after discussion with Dr. ▮▮▮▮ He was next seen by the psychiatrist on 6/21/17 when he was reportedly "doing ok" on his current medications. He reported occasional non-intrusive auditory hallucinations. He was described as stable, and follow-up was scheduled for four weeks with continuation of current medications.

On 7/19/17, the inmate was seen by LCSW ▮▮▮▮ when he reported that his medications were not working; he requested resumption of intramuscular Invega Sustenna. He was referred to Dr. ▮▮▮▮ for a second opinion. He was seen by Dr. ▮▮▮▮ on 7/24/17 when he reported hearing increasingly more disruptive voices keeping him awake at night; he also reported increased anxiety and requested Invega. The psychologist/RN ordered verification of medications by contacting MCBH. On the following day, Dr. ▮▮▮▮ noted that she spoke with the program manager at MCBH who confirmed that the patient was enrolled there for treatment, and "his psychiatric problems are related to his use of drugs". Dr. ▮▮▮▮ referred the inmate to the psychiatrist to determine if he should be back on Invega Sustenna.

A Tele-Psychiatric Consult dated 7/28/17 by Dr. ▮▮▮▮ noted the inmate's history of treatment, diagnoses and medical treatment. His current medications were also noted, and he reported that the inmate stated that Risperdal was not working, and he was experiencing "lots of voices telling him to hurt himself but without plan or concern by him". The inmate did report and present with depression. Risperdal was discontinued, and Zyprexa 15 mg per day was started; Topamax was continued.

A Tele-Psychiatric Consult dated 8/1/17 by Dr. ▮▮▮▮ indicated that the inmate had been in custody since 3/24/17, and that he saw the inmate on 7/28/17 when he was not doing well and reported auditory hallucinations. He reported that the inmate remained with depression, but he adamantly denied any suicidal ideation or intent. He stated that he went to see patient, but he refused to come down, so "I made a house call". The inmate was described as stable without complaints. Zyprexa, Topamax, and Cogentin were continued, and Zoloft was added with follow-up in 30 days.

A Tele-Psychiatric Consult dated 8/2/17 by Dr. ▮▮▮▮ indicated that the inmate was seen at the request of his attorney regarding his eye. The inmate was referred to the medical doctor.

A Tele-Psychiatric Consult dated 8/7/17 by Dr. ▮▮▮▮ noted the inmate's date of arrest on 2/24/17 and that he had been seen by him on numerous occasions. He noted that he was last seen on 8/2/17, and the inmate refused to see the doctor on the following day for his eye lesion. The note indicated that the inmate's treatment refusals were discussed with the medical doctor and program manager. He was described as unchanged from a psychiatric standpoint with no medication complaints; however, he was also described as guarded, suspicious and flat with minimal interaction. He was assessed as stable from a psychiatric standpoint; and his current medications were continued for 90 days.

23-16

On 8/9/17 the inmate was seen by the licensed marriage and family therapist (LMFT) when he reported issues with poor sleep. He was described as guarded and very suspicious.

On 8/17/17 a Release of information was obtained for outpatient psychologist records.

He was seen by the LMFT on 8/30/17, when the inmate reported poor sleep (5 hours per day) and anxiety.  Follow-up was scheduled for five to seven days.

The inmate was seen by the psychiatrist on 9/7/17 when he was reportedly compliant with medications without side effects, but he remained anxious and depressed due to his court case. He presented with a sad affect, and no suicidal or homicidal ideation.  Zyprexa, Topamax and Cogentin were continued, and Zoloft was increased. One week later, the LMFT reported that the inmate's medications were helping.  He was seen in follow-up by the LMFT on September 28, October 5, and October 15 with little change in his presentation described.

On 10/31/17 he was seen by the psychiatrist; he was reportedly medication compliant with no medication side effects, improved mood, but continued insomnia and auditory hallucinations. Zyprexa was increased, Cogentin was discontinued, and Benadryl added. Zoloft and Topamax were continued.

He was seen by LCSW ███ on 11/3/17 when he reported that his mood was stable, and his medication change was helpful with improved sleep and appetite.  Follow-up was scheduled for seven to ten days.

On 11/13/17, the MFT indicated that the inmate was stable, and that he agreed to a safety contract.

On 11/21/17, the MFT "renews safety contract".  He was again described as stable with follow-up in four weeks.

The inmate was seen on 12/19/17 by Dr. ███ when he was described as polite, and he denied suicidal ideation.  She indicated that follow-up would be ordered as needed.

There was no subsequent documentation of mental health contact located in the healthcare record.

On 1/4/18, the RN documented that the inmate had an altercation with another inmate, when he was hit in right low occipital region.  He was assessed in the infirmary, where he refused a cold pack and pain medications.

On 1/6/18 @ 2303, the On-Site Emergency Response Record indicated that the inmate was found in J pod hanging; he was cut down by custody and brought to the floor.  He was cold to touch, unresponsive, cyanotic, foaming from his mouth and incontinent. No vital signs were noted with no pupil response.

At 2305, CPR was started and continued until AMR gave the order to stop at 2339.  AED pads were applied, but no shockable rhythm was discerned.  The ambulance was called at 2303 and arrived at 2317.  The patient expired at 2339.

An RN note dated 1/7/18 @ 0009, stated that the RN and LVN responded to the call of a patient hanging in J pod. Upon arrival, custody staff was cutting the patient down.  He was cold to touch, unresponsive, cyanotic, foaming from his mouth and was incontinent. CPR was started at 2305, with no pulse or blood pressure. At 2307 the AED was applied, with no shockable rhythm. At 2317, AMR arrived, and CPR was continued. At 2339, the order to stop CPR was given.

**Findings**

There appeared to a delay in the ordering of previously prescribed community medications, and the inmate's medications were changed from his prior outpatient medications. Invega was not ordered and continued for this patient, despite treatment just prior to arrest as an outpatient.  There was not clear documentation why this medication was not continued, especially after the inmate requested this medication due to ongoing symptoms.

Despite this inmate's request for resumption of his prior long acting psychotropic medication, he was not resumed on this medication, and it appeared that there were also significant delays in even verifying treatment with this medication.  This was an example of an apparent gate-keeping role by the psychologist/RN which delayed necessary medication treatment.

It was unclear if the Tele-Psychiatric Consult forms documented telepsychiatry contacts or in-person psychiatric contacts.

The use of safety contracts is dangerous and has not been proven to be preventive in completed suicides.  These contracts are no substitute for appropriate assessment of suicide risk and safety planning.

There was no documentation of appropriate treatment planning or adequate safety planning for this inmate.

The lack of provision of custody welfare checks prevented review of these documents for timely required monitoring of this inmate.

# Exhibit 24

**Monterey County Jail Mental Health Monitor's
Report**

**November 28, 2018 – November 29, 2018**

<u>Overview</u>

The Monterey County Jail was visited for the fourth mental health monitoring tour on November 28 and 29, 2018. The following report is based upon interviews with institutional staff and detainees, healthcare records reviews, as well as review of documentation and information provided by the institution and County. This report will specifically address the institution's status and progress toward compliance with the United States District Court Northern District of California Settlement Agreement and the Implementation Plans between Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County Sheriff's Office; California Forensic Medical Group, INCORPORATED (CFMG) et al.

<u>Compliance with Settlement Agreement and Implementation Plan</u>

*1. Intake Screening*

   *a. Defendants will develop and implement an Intake Screening Implementation Plan that specifies standards and timelines to ensure that arriving prisoners are promptly screened for urgent medical, mental health and dental needs, with prompt follow-up and disability accommodations.*

   *i.  Upon arrival, an Initial Health Assessment will be performed by the intake nurse to determine whether the inmate should be excluded from the facility on medical or mental health grounds. Upon acceptance into the jail, all inmates will be screened by the intake nurse for urgent medical, mental health and dental needs. The intake nurse will have*

1

> *access to an inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail.*
>
> ii.   *A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.*
>
> iii.  *The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive findings on the suicide assessment.*

**Findings: Noncompliance**

This issue was unchanged from the prior monitoring report.

A review of healthcare records indicated that for those cases reviewed, all jail intakes continued to be seen by a screening nurse for intake screening.

Information was provided regarding patients who were transferred to Natividad Medical Center from July 4, 2018 to November 26, 2018. A total of 37 patients were rejected at the time of intake and sent to Natividad Medical Center (NMC).  The majority of these patients were sent to the hospital at the time of intake to the jail for clearance prior to acceptance at the jail; however, some of the patients were also sent during the course of their incarceration at the jail due to mental health concerns. Suicidal ideation remained the primary reason for hospital referral; however, patients were also transferred due to psychosis, agitation, grave disability and crisis evaluation.  Only seven or 19% of these patients remained at the hospital for greater than 24 hours. Healthcare records also documented consistent transfers to NMC at the time of intake for clearance prior to jail acceptance.

Records reviews also indicated that healthcare records and information regarding past medication treatment were routinely requested.

2

Mental health assessment and suicide risk tools continued to be routinely utilized for appropriate mental health assessment, triage and treatment; however, appropriate safety and treatment planning remained inadequate.

Healthcare records also documented that patients seen at intake were referred for routine and emergency mental health evaluation and treatment timely.

A continuing issue that remained unchanged was the lack of confidentiality for nursing intake assessments.   Officers remained present outside the intake assessment room during the intake assessment performed by the nurse. The close proximity of the officers to the intake process resulted in a non-confidential assessment and could prevent some inmates from providing necessary medical and mental health information; this is especially important during the intake process when important and potentially sensitive information should be conveyed to the screening nurse. This lack of confidentiality due to the presence of custody officers was not only limited to the intake process but was observed in some mental health treatment interactions for which sound confidentiality was critical.

The lack of confidentiality resulted in the finding of noncompliance.

*2. Mental Health Screening*

    a.  *Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including appropriate screening... The Implementation Plan provides that all inmates will have an initial mental health screening performed by a qualified mental health professional on the mental health staff.*

3

b. *Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including...medication practices*

**Findings: Noncompliance**

A review of healthcare records found that several did not include completed Initial Mental Health Assessment and Appraisals. These assessments had previously been routinely completed by an RN and not by a Qualified Mental Health Professional on the mental health staff; however, in the cases reviewed, the assessments were completed by mental health clinicians.

Review of healthcare records and inmate interviews indicated timely ordering of psychotropic medications at the time of intake; however, some exceptions were noted in the records reviews without adequate documentation for medication ordering delays.

c. *Defendants shall develop and implement a Health Care Implementation Plan to expand the provision of care for inmates with serious medical and/or mental health needs and to ensure they receive timely treatment appropriate to the acuity of their conditions. The Implementation plan outlines the process by which inmates provide mental health sick call requests and healthcare staff respond to such requests.*

d. *Nursing staff shall conduct daily mental health rounds in segregation.*

4

**Findings: Noncompliance**

Inmates continued to access mental health sick call requests by submitting them on portable tablets. Inmate access to tablets was adequate with no inmate report of difficulties with the exception of men's segregation A Pod. The tablets for that unit were broken. Staff and inmates both expressed frustration that this was a recurring issue for that unit. The facility might investigate the purchase of more durable tablets for the segregation units which unfortunately housed severely mentally ill individuals. A check of the nursing carts revealed blank sick call requests that could be provided to inmates without access to the tablets.

The facility did not track the timeliness of response to requests. This would be an optimal area for quality assurance review to examine the timeliness and appropriateness of response to inmate requests. This issue was not the source of inmate complaints during the visit.

There were continued lapses in the documentation of daily nursing rounds in segregation.

*3. Safety Cells*

    *a. The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall responsibility for safety and security of prisoners, prompt reviews by medical of all placements, and a process of resolving disagreements between medical and custody.*

**Findings: Noncompliance**

The facility utilized the booking cells rather than the safety cells for suicide monitoring; however, safety cells were utilized for those inmates with self-injurious behavior.  Review of logs and healthcare records indicated that placement into the safety cells was limited to less than 24 hours; however, one possible exception was noted in the healthcare records reviews. Sobering cells were not utilized for suicide monitoring.

Records reviews did note one example of delay in medical review of a patient placed into the cells.  Facility supervisory audits also included examples of late medical assessment of placements into the cells. The facility staff denied disagreements between medical and custody staff regarding such placements, and custody audits and healthcare records reviews did not identify this as a problem area.

*Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical professional will see an inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.*

**Findings: Noncompliance**

Placements for suicide monitoring generally occurred in the booking cells; placement into the safety cell was limited to those exhibiting self-injurious behavior. Mental health staff made daily rounds of the booking, safety and sobering cells. Documentation noted some lapses in the timely medical assessment of inmates placed into these cells. There continued to be

6

consistent documentation of post-suicide watch follow-up, a very important component of suicide prevention.

> c.  *A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his findings through a report which will be sent to the Jail Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.*

**Findings: Noncompliance**

Review of a sample of logs indicated welfare checks that occurred at intervals greater than twice every 30 minutes.  Additionally, custody supervisory audits also confirmed lapses in required checks.  No information was provided regarding additional training or disciplinary action regarding those consistently not adhering to the requirements.

> d.  *Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between*

7

*the hours of 11 p.m. and 7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.*

**Findings: Noncompliance**

Review of the logs indicated instances in which a mattress or safety sleeping bag was not offered.  This finding was also confirmed in custody supervisory audits.

*Inmates in sobering cells may have access to mattresses at the discretion of custody staff. Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.*

**Findings: Noncompliance**

See above.

 *f. Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.*

**Findings: Substantial Compliance**

This issue was unchanged. Observations during the monitoring visit indicated that the safety, booking and sobering cells were clean. At this visit, none of the inmates reported issues with the cleaning of these cells. Supervisory staff reported that the cells were cleaned after each use; although they reported that there was no set schedule for cleaning.

*g. For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.*

**Findings: Substantial Compliance**

A review of safety cell logs indicated that inmates did not remain in the safety cells for greater than 24 consecutive hours. The possible exception noted in the healthcare records review was transferred to NMC for stabilization and treatment. After placement into the safety cells, inmates were either sent to NMC; or suicide monitoring was downgraded, and the inmate was moved to a booking cell after mental health assessment.

Although inmates were sent to NMC for stabilization, review of logs and healthcare records indicated that they continued to be returned prior to stabilization.

*4. Medication Continuity*

*a. All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.*

**Findings: Noncompliance**

A review of medical records and observations during the visit indicated that the intake nurses obtained information regarding prescribed mental health medications in the community and began the process for verifying such treatment. The psychiatrist was then

9

contacted for a medication order.  For those cases in which the medication treatment was unverified or unclear, those individuals were scheduled to see a mental health provider for assessment. Some examples were noted in the healthcare review when medications were not promptly ordered when indicated at the time of intake. This may be due to psychiatric staffing workload issues.

> b. *Inmates who, at the time of booking, report to Defendants that they are taking community-prescribed medications, but whose medications cannot be verified by Defendants, shall be timely assessed by a medical provider and timely prescribed medications necessary to treat their health needs.*

**Findings: Noncompliance**

Inmates were generally appropriately referred to mental health at the time of intake; however, examples of delay in ordering community-prescribed medications and even medications that had recently been ordered at the jail.  It did appear that inmates were timely seen by mental health clinicians after intake referral.  This may be due to psychiatric staffing workload issues.

> c. *Provision of psychotropic medications upon discharge from the jail. The Implementation Plan provides that a 30-day supply of medications be given to inmates upon discharge from the jail.*

**Findings: Substantial Compliance**

A review of healthcare records indicated that discharge medications were provided. There was documentation that a 30-day supply of discharge medications was called into the local CVS pharmacy; this form was usually signed by the jail staff and the patient.

*5. Clinical Staffing*

> *a. Defendants will maintain Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to ensure adequate staffing to provide all necessary medical and mental health care. The plan will identify all needed positions based on current and projected Jail population, and the number and qualifications of medical and mental health care staff to cover each position, with shift relief.*

**Findings: Noncompliance**

At the time of the visit, the mental health staffing was as follows:

1.0 FTE Psychiatrist

- 40 hours per week onsite

1.0 FTE Licensed Marriage and Family Therapist/Psychologist

- 40 hours per week onsite

2.0 FTE Licensed Clinical Social Worker

- 40 hours per week onsite

The facility utilized one of the social workers to provide group therapy, including weekend groups.  The other two clinicians performed initial assessments, follow-up care and crisis assessment and intervention.  The issues with custody availability had reportedly

11

improved with changes in the custody work schedule.  Clinicians did appear to be overwhelmed with referrals for substance abuse related issues; they indicated that approximately one-third of their referrals were for these issues.  These assessments and contacts occupied valuable time for the clinicians and diverted them from other perhaps more important tasks.  The hiring of a substance abuse counselor who could respond to such referrals and provide needed treatment would allow the mental health clinicians to better focus on other duties.

It did appear that the workload for the psychiatrist may have had an impact on the provision of psychiatric services at the facility.  Due to the large caseload of patients, reportedly ranging from 13 to 22 sick calls per day, many cases had to be rescheduled for more acute ones.  Follow-up contacts were not seen timely.  Additionally, healthcare records reviews indicated instances in which there were lapses in timely psychiatric follow-up and medication assessment.

No staffing analysis was conducted as set forth in the Settlement Agreement. A staffing analysis would assist in evaluating the adequacy of custody and mental health staffing.

Psychiatric on-call services continued to primarily be provided by Dr. █████ Telepsychiatry was utilized on two occasions during the monitoring period.  Clinical notes were provided for ten patients seen by Dr. █████ on July 25, 2018; and eight patients were scheduled to be seen by Dr. █████ on October 5, 2018, but four were out to court or refused the interview. The notes indicated that informed consent for treatment with psychotropic medications was obtained.

The mental health and psychiatry call schedules were provided and reviewed.

*6. Mental Health Care*

    *a. Training*

        *i. All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.*

**Findings: Substantial Compliance**

Documentation was provided that indicated that correctional staff had received training regarding the Implementation Plan.

        *ii. In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.*

**Findings: Substantial Compliance**

The lesson plans provided included information regarding the recognition of individuals with mental illness and suicidality. This training was in place for new correctional officers.

        *iii. All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates,*

13

*identifying warning signs specific to inmates, and how to recognize*

*individuals who are in mental distress and/or suicidal.*

**Findings: Substantial Compliance**

This training was documented.

*iv. Yearly custody staff will conduct a situational training such as a mock*

*suicide attempt or a medical emergency. CFMG staff will also participate*

*in the annual situational training.*

**Findings: Substantial Compliance**

Since the last visit, this training was amended to include a mock suicide

attempt/medical emergency, and medical staff was involved.

*b. Restraint Chairs*

*i. Use of a restraint chair will be documented in an observation log which will be*

*reviewed and signed by a supervisor. Inmates shall not be placed in a restraint chair for*

*longer than six consecutive hours.*

**Findings: Noncompliance**

The restraint chair was not utilized during the monitoring period; however, the WRAP

Restraint Device was utilized.  Documentation was provided for two incidents of use that occurred

on September 6 and September 22, 2018.  Each incident lasted for approximately one hour. The

WRAP Restraint Device Report Forms were signed by the sergeants.

It should be noted that a review of incident reports revealed an additional incident of WRAP use which was not provided with the documents requested regarding WRAP use.  This inmate was placed into the WRAP after a cell extraction to transfer to NMC for possible 5150 commitment on August 28, 2018. Documentation was not provided that this incident was logged with supervisory review.

> *ii. Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A shift supervisor and medical staff shall oversee the exercise. If unsuccessful in allowing inmates to exercise their arms and hands in a range of motion exercise, safety staff shall explain on the observation log why extremities could not be exercised and a shift supervisor shall be notified.*

**Findings: Substantial Compliance**

The documentation for the inmates placed in the WRAP indicated placement for approximately one hour.

> *iii. On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.*

**Findings: Substantial Compliance**

Documentation was provided that indicated that the compliance sergeant audited the use of the WRAP.

   *iv. Medical and mental health staff shall be consulted before any planned use*

    *of force on an inmate. Custody staff in concert with medical staff will*

    *develop the most effective and appropriate means of imposing compliance*

    *with rules and regulation, including attempts at de-escalation. It is*

    *understood that it is the goal of custody staff to use the least amount of*

    *force necessary to ensure compliance with rules and regulations. Planned*

    *use of force will only be used after verbal attempts to obtain compliance.*

    *Any use of force will be documented on a use of force form.*

**Findings: Noncompliance**

Incident reports were reviewed for August, September and October 2018. Although there were examples in which mental health and/or medical staff was contacted before planned uses of force; examples were also noted in which there were uses of force without such contact.

   *c. Mental Health Grants*

    *i. Monterey County Office of the Sheriff will in good faith continue to pursue*

    *state funding for mental health and programming space at the jail. The*

    *Monterey County Public Defender will cooperate in those efforts.*

**Findings: Substantial Compliance**

Information was provided during the visit that a tentative agreement with the state was forthcoming, and plans were underway to build a Jail Based Competency Treatment program (JBCT).  These inmates currently await trial at the jail, where they remain non-adherent with treatment and pose a risk to themselves and others. This type of unit can assist

in stabilizing and treating inmates who present with psychosis and inability to participate in court proceedings.  This was a welcomed development.

    d.  *Inmates Who Have Been Declared Incompetent to Stand Trial*

        i.  *The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period. As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment. The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for orders to show cause to be directed the State of California) to expedite the transfer of inmates who have been determined to be incompetent to stand trial to an appropriate State facility.*

**Findings: Noncompliance**

This issue remained unchanged; however, please see the above comments regarding plans for a JBCT. Inmates were not routinely placed into transition cells in administrative segregation and seen by medical staff daily upon a Court finding the inmate to be incompetent to stand trial. Mental health staff continued to contact the inmate's attorneys to begin the process of evaluation and eventual transfer to an inpatient unit for incompetence to

17

stand trial, and examples were noted during the visit as well as in healthcare records reviews. The staff continued to work hard to timely transfer those individuals to a forensic unit for stabilization.

e. *Treatment Plans*

i. *CFMG will develop individual treatment plans for the treatment of inmates who are suffering from mental illnesses.*

**Findings: Noncompliance**

This issue was unchanged and was an area of continued deficiency. Healthcare records did not include appropriate individualized treatment planning. Additionally, inmates with significant and repeated incidents of self-harm were not provided with behavioral plans to help to address those dangerous behaviors.

None of the healthcare records reviewed included appropriate safety planning in the suicide risk assessments when clinically indicated. Adequate safety planning remains essential in identifying interventions to prevent further self-harm.

Consistent, formal interdisciplinary treatment team meetings are recommended with discussion of treatment planning and diagnostic considerations to better facilitate provider communication and treatment consistency.

f. *Consideration of Mental Illness in Inmate Discipline*

i. *Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff are encouraged to contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness.*

18

**Findings: Noncompliance**

This issue remained unchanged. There continued to be inconsistent documentation on the Disciplinary Action Reports regarding whether the inmate was receiving mental health services and if medical was consulted.

> g. *Space Issues*
>
> > i. *Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including . . .adequate clinical and administrative treatment space....*

**Findings: Noncompliance**

This was an area of needed improvement. Staff indicated that there was a lack of adequate treatment space for patient interviews, primarily in the main jail and especially in A and B Pods. No offices were available for confidential patient interviews and limited availability of officers in these areas made confidential clinical contacts problematic. Additionally, confidentiality for clinical encounters was problematic as custody staff remained either in the room or outside the door within hearing distance. Observations during the monitoring visit, healthcare records reviews as well as staff and inmate interviews revealed that clinical encounters routinely occurred with the door open and an officer present outside the door. This resulted in no sound confidentiality and may result in inmates not providing critical information to staff when needed. The staff had begun to explore ways to address these issues. Attorneys booths allowed for safe and confidential interview space, and some staff utilized this option when available.

19

Dedicated office space was provided to the psychiatrist, and the remainder of the mental health staff shared an office in the infirmary area. This office was not utilized for clinical encounters.

    h.  *Administrative Segregation*

    i.  *The Mental Health Implementation Plan shall require classification to assess a totality of factors when assigning prisoners to administrative segregation units. It is understood that the goal of Defendants is to limit the use of administrative segregation for prisoners with serious mental illness.*

**Findings: Noncompliance**

This issue was unchanged. The segregation units continued to function as de facto mental health units; the dormitories also housed some chronically mentally ill inmates. Mentally ill prisoners were routinely housed in the segregation units, and the placement of such individuals on these units continued to not be limited. The monitor toured the men's and women's segregation units. The A Pod particularly housed severely mentally ill individuals, many who were treatment non-adherent refusing medications and treatment interventions. Some of these individuals were unable to participate in group and individual therapy out of cell due to their decompensated state. Mental health staff reported that in-cell materials, such as puzzles, work packets and materials for journaling, were provided to these individuals.

Although measures continued to be instituted to mitigate against the effects of segregation placement, such as group therapy, daily nursing checks and at least weekly mental health rounds, these units remained occupied almost exclusively by mentally ill

20

individuals. Some of these individuals required inpatient treatment for stabilization. It is hopeful that the opening of the JBCT unit will assist in more appropriately housing these severely mentally ill individuals.

   ii.  *The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation...*

   iii. *The Mental Health Implementation Plan shall address suicide watch and suicide precautions procedures to ensure that prisoners in crisis are not placed in punitive and/or unsanitary conditions.*

**Findings: Noncompliance**

There was a lack of documentation of the required placement screening for all prisoners for mental illness and suicidality with segregation housing.

Suicide monitoring generally occurred in the booking cells.  The safety cells were utilized when an inmate presented with self-injurious behaviors.  Documentation indicated that safety cell stays were for less than 24 hours.

*7. Suicide Prevention*

   *a. Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.*

**Findings: Substantial Compliance**

This issue was unchanged. All cells in the administrative segregation units (A, B, R and S) had previously been modified to remove potential tie-off opportunities and, fencing

21

was in place on the upper level and stairway to prevent jumping and self-harm. Additionally, modifications were made to the windows in the administrative segregation cells to prevent ligature points.

 

> b. *Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior, Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal.*
>
>> i. *Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.*
>>
>> ii. *All welfare checks shall be documented on a welfare check log. The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance. Monthly spot checks for compliance will be conducted by the Compliance Sergeant at least weekly with monthly audits.*

**Findings: Noncompliance**

Documentation was provided that the compliance sergeant conducted monthly audits of all segregation units, men's and women's holding comparing the written logs with the video surveillance systems time; he noted that all entries were very close in proximity (within one to three minutes).

22

Samples of welfare check logs were reviewed for all segregated housing units, including men's and women's holding and the administrative segregation units.  There were lapses in the required custody welfare checks resulting in a finding of noncompliance.

*c. Increase in Time Outside of Cell and/or Increasing Programs*

    *i. Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:*

        1. *3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)*

        2. *14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time*

        3. *2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail) ii. Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking and receiving area will be guaranteed the following weekly times out of their cell:*

            1. *3 hours of week for exercise*

            2. *14 hours a week in the common area*

            3. *2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail iii. inmates in administrative*

23

*segregation will have access to the normal group programs provided*

*at the County jail such as NA/AA, religious services,*

**Findings: Noncompliance**

Information was requested regarding all out of cell activities for the segregated units; Program Reports were only provided for July, September and October 2018. Review of those months documented the provision of two hours of groups. Information was also provided that documented monthly audits by the compliance sergeant.  Although it appeared that there was significant improvement in the out of cell activities for segregation inmates, a finding of noncompliance is made due to the lack of documentation provided.

Since the last monitoring visit, a new LCSW was hired whose primary focus was the provision of groups for the segregation units, including weekend groups. The monitor observed administrative segregation group therapy sessions conducted in the men's and women's units. The groups were facilitated by a LCSW. Unlike previous groups observed, custody officers were no longer present in the groups. This allowed for better assignment of officers for more necessary tasks and increased confidentiality.  The content of the groups remained clinically beneficial, and group participants unanimously reported satisfaction and benefit from their participation. They reported that they were offered two hours of group therapy per week.

Of note were several inmates, primarily housed in the men's segregation A Pod, who were severely ill and either refused to attend groups or were so psychotic and disruptive that they were unable to attend and fully participate in group therapy.  The group facilitator reported that these inmates were provided with in-cell activities, such as materials for journaling, puzzles and other items.  Although it appeared that all attempts were made to

24

involve all segregation inmates in groups, some of these inmates required inpatient treatment and stabilization before they could benefit from group therapy.

**Quality Management**

*The CFMG Implementation Plan outlines the following:*

*Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit findings will be reported to the Quality Management Committee at its quarterly meetings.*

*All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met.*

*All completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure.*

**Findings: Noncompliance**

Minutes were provided for Quality Assurance/Peer Review Committee Meetings that occurred in April, August and December 2018.  Although there was improvement over time in

25

the information included; the minutes failed to document appropriate identification of issues of deficiency with corrective action plans and follow-up.  Additionally, no information was provided regarding death reviews as well as a psychological autopsy for the completed suicide that occurred last year. This lack of documentation also included critical assessment of the provision of emergency medications. The frequency of documented quality assurance meetings was also of concern; more frequent meetings are recommended.

A well-functioning Quality Assurance program is vital in identifying areas of deficiency, developing corrective action to address those deficiencies and monitoring to ensure that the corrective action is addressed. Documentation of appropriate mortality and morbidity review is also essential in suicide prevention.

**Summary and Recommendations**

The following are recommendations to address the issues of concern identified in this report.

1.      The facility should better document Quality Assurance meetings and efforts to ensure that areas of deficiency are identified, corrective action is developed, and monitoring occurs to ensure that the identified issue is corrected. More frequent meetings would also be beneficial.

2.      The facility should develop and/or better document a mortality review process that critically examines inmate deaths as well as serious self-harm incidents to identify areas of deficiency, corrective action and opportunities for improvement.

26

3.      The facility should continue to work to improve access to timely inpatient psychiatric care for all jail inmates in need of such services.

4.      The facility should continue to work to address the lack of confidentiality in the intake process and for clinical contacts.

5.      Healthcare records indicated that the Initial Mental Health Assessment and Appraisal was by conducted by a Qualified Mental Health Professional on the mental health staff; however, some records did not include the completion of this assessment.

6.      The facility did not track the timeliness of response to inmate requests. This would be an optimal area for quality assurance review to examine the timeliness and appropriateness of response to inmate requests.

7.      The facility should address lapses in the documentation of daily nursing rounds in segregation.

8.      The facility should ensure that custody welfare checks are timely completed and examined by the Quality Assurance process to ensure compliance.

9.      The facility should work to ensure timely medical review and assessment of inmates placed into safety cells.

10.     The facility should ensure that inmates are offered a mattress or safety sleeping bag when indicated while housed in the safety, booking and sobering cells with appropriate documentation. Corrective action should also be documented when staff fail to address this concern.

27

11.                The facility should ensure that medication continuity occurs at the time of jail intake. Clinical rationale should be provided for cases of delays in medication continuity

12.                The facility should conduct a staffing analysis to assess current custody staffing levels and their effect on the provision of mental health services. Additional psychiatric staffing and the addition of a substance abuse counselor should also be considered.

13.                In lieu of placement of inmates who were declared incompetent to stand trial into transition cells in administrative segregation, mental health staff should ensure that these inmates are immediately identified and placed onto a priority list for daily follow-up and monitoring. The County should continue to work to expedite the transfer of these inmates to an appropriate inpatient facility.

14.                The facility should provide ongoing training and supervision to mental health staff regarding appropriate individualized treatment and behavioral planning.  Individualized treatment planning should be documented in the healthcare records. Suicide risk assessments should include appropriate safety planning.

15.                The facility should document any custody/classification and mental health meetings regarding the consideration of mental illness in inmate discipline. Additionally, training should be provided regarding appropriate documentation on the Disciplinary Action Reports if the inmate was receiving mental health services and if medical was consulted.

28

16. The facility should investigate the purchase of more durable tablets for the segregation units which unfortunately housed severely ill individuals.

17. The facility should continue to work to improve and to provide appropriate documentation of the provision of out of cell activities in segregation.

18. The facility should examine current treatment space to identify if physical plant issues negatively affect the provision of confidential clinical encounters.

19. The facility should decrease the use of administrative segregation as de facto housing for mentally ill individuals. In lieu of alternative placement, mitigating factors such as clinical contacts, rounding, groups and other out of cell activities should occur as outlined in the Settlement Agreement and Implementation Plans.

20. The facility should ensure that the required placement screening for all prisoners for mental illness and suicidality with segregation housing are documented.

21. The facility should ensure that mental health/medical staff is contacted and that attempts at de-escalation occur prior to planned use of force.

29

Please contact me should you have any questions regarding this report.

Respectfully submitted,

X ~~Kerry C. Hughes, MD~~
Kerry C. Hughes, M.D.
MentalHealth onit

Kerry C. Hughes, M.D.
1579 Monroe Dr., Suite F, Box 612
Atlanta, GA 30324
Phone: ███████
Fax: 404-364-9708
Email: dockc99@aol.com

# Exhibit 25

**CASE SUMMARIES FOR MONTEREY COUNTY JAIL**

**Inmate 1**

The patient was housed in the MHO during the monitoring period. The Medical Intake

Triage/Receiving Screening was completed on June 9, 2018 by an RN.  The screening indicated

that the patient had been cleared for jail admittance after presenting with agitation and receiving

a knee injury during arrest.  It also noted treatment with Metformin and Abilify which was

verified at the local pharmacy. He was described as upset with poor attention span and inability

to focus on medication dosages.  He presented with pressured speech, cursing and verbally

threatening violence to the staff.  He was believed to be under the influence, but denied a history

of drug abuse or withdrawal. He also denied suicidal ideation or history of suicide attempts. The

screening also noted that he believed that he was "el chapo". He reported mental health treatment

prior to arrest and a history of 5150 commitment. Abilify was ordered for seven days, and the

patient was scheduled to see mental health on the following day and the psychiatrist.

He was seen by the mental health clinician on the following morning due to the RN referral for

bizarre behavior.  He was seen at cell front due to his refusal to leave his cell, stating that he was

unable to walk.  He presented with delusional thinking, disorganized behavior and unkempt

appearance. He was referred to medical for evaluation.

The patient was scheduled for and seen by the psychiatrist on June 11, 2018. There was

documentation that the patient was seen by the psychologist or social worker weekly; he

presented with intermittent agitation.

On July 9, 2018, the patient was involved in a mindfulness/CBT group by the social worker; he

verbalized numerous delusional statements, but was described as friendly and positive. There

1

was also documentation that he was involved in DBT Skills Group weekly; however, there was documentation that his behavior negatively affected his group participation.

The Initial Health Assessment was completed by an RN on July 25, 2018. The form noted negative responses to drug but significant alcohol use, with dirty, disheveled appearance, rapid speech, a history of psychiatric hospitalization at NMC and outpatient mental health treatment. At that time, he presented with pressured speech paranoid delusions and disorganized thinking. It noted past diagnosis of schizophrenia, and also noted that he was already followed by mental health with no acute symptoms at the time of assessment.

On August 20, 2018, the patient was involved in a cell extraction after refusing to return his dinner tray and presenting with agitation.  He was pepper-sprayed and subsequently taken to the infirmary for medical treatment.  There was documentation of vital signs prior to placement in the safety cell. He was placed in the safety cell at 2110; he was removed on August 21, 2018 at 1429.

There was documentation of sobering/safety/restraints observations from August 21 2018 at 1:42 am to August 21, 2018 at 5:49 am.

The Suicide Risk Assessment & Evaluation form was completed on August 21, 2018. The assessment was positive for a history of substance abuse problems, and treatment for schizophrenia.  There was no documentation of increased suicide risk, with the exception of the presence of serious charges. The assessment was completed by the psychologist/LMFT who noted that the patient had returned from NMC where he received intramuscular medications; he was described as stable upon return.

Subsequent progress notes indicated that the patient was generally uncooperative to interview with psychotic symptoms and sporadic medication adherence. A note by the social worker on September 5, 2018 indicated that the patient remained in MHO due to violence, aggressiveness towards other inmates and poor medication adherence.

The patient was sent to NMC for emergency care due to acute psychosis on September 6, 2018; he returned on that date at 2259.  He was evaluated upon his return from the NMC ER on September 6, 2018 by a nurse, as he had presented with psychotic behavior.  He was returned to MHO #1. He was described as calm and cooperative; he received an injection of Olanzapine at the emergency room. The psychologist/LMFT was contacted upon the patient's return to the jail. He was seen on the following day by the psychiatrist when he remained with uncooperative, psychotic behavior and medication non-adherence.

There was documentation that the patient's public defender was contacted regarding information about his legal case. On September 11, 2018, there was an order for WRAP restraint device placement at 3:22 pm. On September 15, 2018, he presented with agitation, threats to staff and medication refusal; he initially refused to remove paper covering his window, and mental health staff was asked to intervene to prevent a cell extraction. Subsequent progress notes indicated medication non-adherence with psychiatric and medical medications

Abilify was ordered at 15 mg per day on the day of arrival to the jail; this medication was reordered by the psychiatrist on June 11, 2018.  A review of the medication administration record (MAR) indicated that he was initially adherent with prescribed medications; however, he became non-adherent with prescribed medications from late August 2018 through October 2018.

On September 23, 2018, the patient was sent to NMC due to grave disability and danger to self, as he presented with medication non-adherence, psychotic and disorganized behavior and incoherence. He had flooded his cell on several occasions. On September 24, 2018, the patient returned from NMC for crisis evaluation where he was treated with Zyprexa and Cogentin. An order was obtained from Dr. ███ for recommended medications, and a psychiatric appointment was scheduled for that day.

On two days later, the patient was seen in MHO where he remained very aggressive and argumentative.  He refused prescribed medications. He was not offered groups due to his psychotic behavior for safety reasons.

It also appeared that the patient was returned to NMC on October 10, 2018 where he received Zyprexa and Ativan.  He was evaluated by the psychologist upon his return.

Subsequent progress notes indicated that the patient remained uncooperative and very psychotic. On October 26, 2018, the patient's public defender was contacted regarding a possible order for involuntary medications due to the patient's decompensated state. On two days later, he bit the deputy's hand during an attempt to remove the patient for cell cleaning. His water and food intake were monitored by custody and medical staff, as there were empty food bags on the floor. Progress notes indicated that he was seen daily by mental health staff during this period of severe psychosis.

He was seen by the psychiatrist on November 27, 2018 when he was described as cooperative, and he agreed to restart Zyprexa.  A note by the social worker on November 29, 2018 indicated that the patient was discussed with the medical physician and psychiatrist, and she was provided

with contact information from the patient's attorney to request a copy of the court order to allow involuntary medications.

There was documentation of segregated population observation log entries for the following dates: June 10 to June 30, 2018, July 2, July 4, July 6 to July 7, July 9 to July 11, July 14 to July 21, July 23 to August 8, August 10 to August 12 to August 19, August 22 to August 24, August 26 to August 28, August 30 to September 5, September 7 to September 12, September 14 to September 15, September 17 to September 19, September 22 to September 30, October 2 to October 18, October 20, and October 22 to October 31, 2018.

**Findings**

This patient was appropriately sent to NMC at the time of jail intake as well as subsequently on several occasions when he presented with severe psychosis, dangerousness and treatment non-adherence.  Despite these measures, the patient was not retained at NMC, and he was returned to the jail usually within 24 hours.  Additionally, the jail staff made numerous attempts to obtain a court order for involuntary medications for this severely ill patient.

This patient was monitored closely by the mental health staff in the MHO which was appropriate in light of his symptoms.  There was documentation of daily mental health contacts; however, there was a lack of documentation of daily nursing rounds.

Medications were ordered timely upon jail arrival, and the patient was timely referred to mental health. Safety cell placement did not exceed 24 hours, and there was medical assessment prior to placement with the completion of a suicide risk assessment. Psychiatric contacts were timely.

There was documentation that mental health staff was contacted on one occasion to prevent a planned use of force.

5

There was however a lack of documented adequate treatment planning for this patient.

**Inmate 2**

This patient received the Medical Intake Triage/Receiving Screening on September 5, 2018. The screening indicated that the patient was not taking medications, he denied a history of drug or recent alcohol use. He did report a history of hospitalization at NMC during 1989. He denied suicidality, but presented with paranoia and delusional thinking of a grandiose and persecutory nature. He was scheduled for mental health follow-up. He was seen by the social worker on the same day for the Initial Mental Health Assessment and Appraisal. He denied a history of suicide attempts. He presented with blunted affect, lability and delusional thinking.  An urgent mental health referral was submitted, and he was placed into mental health housing.

The patient was seen by the psychiatrist on the following day when he presented with rambling, incoherent speech and disorganized thinking, poor insight and probable auditory hallucinations. He was provided with a diagnosis of Schizophrenia. Zyprexa 20 mg daily was ordered by the psychiatrist on September 6, 2018.

He was seen by the psychologist on September 11, 2018 when it was noted that he was followed at a local mental health facility.

The 14 Day Health Appraisal was completed on September 15, 2018 by the nurse.

A note on September 22, 2018 by the social worker indicated that the patient was unstable and as a result, was not offered group on that date. Documentation indicated that the patient was seen weekly by mental health staff. He presented as "highly paranoid" with poor memory and an inability "to advocate for self". On September 30, 2018, it was noted that nursing staff reported

that the patient had consistently refused Zyprexa. His clinical presentation appeared unchanged with subsequent clinical contacts. He was seen at least weekly by mental health staff.

The patient was seen by the social worker on November 15, 2018 who indicated that the patient was decompensating with poor interaction and aggressiveness.  His cellmate described disorganized and aggressive behavior. He reportedly was almost tazed by custody staff. He was transferred to NMC on that date and returned at 7:58 pm. There was documentation that he was seen daily after his return from NMC by mental health staff; he was seen on November 16, 2018 by the psychiatrist. He continued to present with psychosis and medication non-adherence. He was seen by the psychiatrist on November 26, 2018 when it was documented that new medication orders from the NMC ER doctor for continuation of Zyprexa was implemented.

A note by the social worker on November 28, 2018 indicated that the patient was not showering and that he had defecated on himself. He was seen by the psychiatrist on that date. Orders were received from Dr. ████ for Haldol decanoate intramuscular injections every two weeks on November 28, 2018. He was seen by Dr. ████ on the following day.

A review of the MAR indicated that the patient had poor medication adherence, refusing most of doses of Zyprexa.

There was documentation of segregated population observation log entries for the following dates: September 18 to October 2, 2018, October 4 to October 20, and October 22 to October 31, 2018.

**Findings**

This severely ill patient was appropriately screened and evaluated timely by medical and mental health staff upon arrival to the jail.  Psychotropic medications were ordered timely, and

7

psychiatric assessment and treatment were timely.  He was appropriately transferred to NMC for treatment after he presented with medication non-adherence, psychosis and dangerousness; however, he was subsequently returned on the same day after he was provided with onsite psychotropic medications.  This patient required inpatient mental health stabilization, and his needs exceeded that which could be provided at the jail. Despite this, he was followed consistently and appropriately by mental health staff with appropriate monitoring. There were lapses in the documentation of daily nursing segregation rounds. There was a lack of documented adequate treatment planning for this patient.

**Inmate 3**

This patient received the Medical Intake Triage/Receiving Screening on November 18, 2018 by the RN.  She denied current medication treatment, but she reported daily heroin use. She also reported a voluntary mental health hospitalization during 2015, but no outpatient treatment or positive response to suicide related questions. Her mental status examination was unremarkable. She was placed on an opiate withdrawal protocol, and she was informed how to access mental health services if needed.

She was seen by the social worker on November 19, and November 20, 2018.  On November 24, 2018 at 4:14 pm, the patient returned to the jail after a four-day hospitalization. She was placed into the safety cell at 1602 on Level 2 suicide watch, and mental health was contacted. A Suicide Risk Assessment & Evaluation was completed by a mental health clinician (LMFT) on the following day. The evaluation noted that the patient had attempted to commit suicide at court, on the way to court and in the emergency department bathroom by hanging herself.  She also swallowed a screw while in transport to court. She acknowledged a history of self-injurious behavior, including swallowing staples and screws as well as suicidal behavior in the past. She

8

remained with suicidal ideation and poor impulse control. She was assessed with moderate suicide risk. Level 2 suicide watch was continued.

The patient was seen while on suicide watch on November 24 and November 25, 2018; documentation on November 25 noted that the patient was moved from a booking cell to the safety cell after reporting suicidal intent to jump off the ledge and hit her head. Vital signs were obtained at that time.

Documentation indicated that Level 2 suicide watch was discontinued on November 26, 2018 at 0500, and she was removed from the safety cell and possibly placed into the WHO. Level 2 suicide watch was re-instituted on November 28, 2018 at 1256.

Orders were provided for stat Ativan, Haldol and Cogentin with subsequent ongoing orders for these medications on November 28, 2018 at 1515. Documentation indicated that the patient presented with severe lability, ranging from yelling to loud crying and agitation. It appeared that she was briefly placed into the safety cell, at her request, due to safety related fears regarding her legal case in which she was a witness. The patient reportedly agreed to accept the above stat medications.

The patient was removed from Level 2 suicide watch on November 28, 2018 at 2045 by the psychologist. The psychologist noted that the patient remained with unchanged presentation from the most recent suicide risk assessment completed within seven days; she remained at moderate to high risk, but was not currently suicidal. He outlined a plan of monitoring twice daily.

A review of the MAR indicated that the patient was generally adherent with prescribed psychotropic medications.

9

The patient was provided with the following diagnoses: Opioid use, unspecified, Other stimulant use, unspecified, Unspecified psychosis not due to a substance or known physiological condition and Borderline Personality Disorder.

**Findings**

This patient presented with severe lability with mood instability and suicidal ideation and plan. She was appropriately screened at the time of intake with daily mental health follow-up after intake.  Although Zoloft and Risperdal were not initially prescribed until two days after arrival, this was reasonable in light of the patient's initial denial of mental health treatment and symptoms.

After several suicide and self-harm attempts while out to court, she was appropriately hospitalized at NMC for four days; subsequently she was returned to the jail where she had continued suicidal behavior.

The patient was appropriately placed into the safety cell; however, it appeared that she remained there for greater than 24 hours from November 24 to November 26, 2018. Although suicide watch was ultimately discontinued, this patient remained at elevated suicide risk.

There was appropriate and timely mental health contact for this inmate. Nursing rounds were documented daily.

It did not appear that the stat medications that were administered were done so on an involuntary basis.  Based upon the reported symptoms, it appeared appropriate that this patient received stat medications.

There was a lack of documented adequate treatment planning for this patient.

10

25-10

**Inmate 4**

This patient received the Medical Intake Triage/Receiving Screening on June 7, 2018 by the RN. He denied treatment with psychotropic medications, drug or alcohol abuse. He was described with very little eye contact, odd speech, blunted affect and depressed mood. He reported amnesia for the previous two years. The TB Assessment Form which was completed on the same date by another nurse, included contradictory information with the patient answering affirmatively regarding drug and alcohol use.  He was described as homeless.

The patient was scheduled for mental health contact on June 9 and June 12, 2018; but it appeared that these appointments were rescheduled. He was seen by the psychologist on June 14 when he presented with poor eye contact, response to auditory hallucinations, paranoia and refusal to leave his cell.  The 14 Day Health Appraisal was scheduled for June 17; however, this appointment was also rescheduled. He was seen by the psychologist on June 19, 2018; he was evaluated by the psychiatrist on the following day, when he appeared psychotic and paranoid, refusing eye contact or response to questioning.  He also refused to leave his cell. He refused to see the psychiatrist on June 21, 2018.  An appointment with the psychologist scheduled for June 27 was rescheduled due to "time constraints, deputy, escort".  The 14 Day Health Appraisal was again rescheduled on July 13, 2018 and July 26, 2018. The patient was released from the jail on August 18, 2018.

It appeared that the patient may have been released from jail and re-arrested, as there was another Medical Intake Triage/Receiving Screening completed on September 4, 2018. The screening was unremarkable with negative responses regarding substance abuse, mental health treatment or suicidality. His mental status examination was unremarkable. He was, however, described with odd behavior, making comments that the deputies were not wearing the American

11

flag on their uniforms, and cursing at the officer accusing them of being terrorists. He was referred to mental health for assessment.

The Initial Mental Health Assessment and Appraisal was completed on the same date.  The patient reported a history of mental health treatment, but denied receiving outpatient treatment. He presented with agitation, threatening to kill the officer, and he presented with paranoid delusional thinking.  A priority mental health referral was generated and he was housed in mental health/special population housing.

He was seen by the social worker on September 5, 2018 in response to the intake referral for bizarre behavior. He was also seen by the psychiatrist on that date. The 14 Day Health Appraisal was completed on September 14, 2018.

There was documentation of weekly administration contacts by mental health. There was documentation of segregated population observation log entries for the following dates: June 10, 2018 to June 20, June 22 to June 30, July 2, July 4 to July 7, July 9 to July 11, July 13 to August 8, August 10, and August 12 to August 17. During the next incarceration, there was documentation of segregated population observation log entries for the following dates: September 5, 2018, September 7 to September 15, September 17 to October 20, and October 22 to November 1, 2018.

No orders for psychotropic medications or MARs were located in the healthcare record.

**Findings**

This severely mentally ill patient was generally uncooperative to any mental health contact. Documentation indicated that he was psychotic, paranoid and he refused to leave his segregation cell.  He appeared to require inpatient treatment for stabilization.  There was not documentation

that the patient was referred to NMC for inpatient evaluation; however, it appeared that this was not pursued as the patient did not present with agitation or overtly dangerous behavior.

Although implied by his refusal to participate in mental health services, better documentation was required to explain why this patient was not prescribed psychotropic medications.

Additionally, there were several instances in which appointments were rescheduled.  This rescheduling appeared to be the result of workload issues of mental health as well as custody escort staff.  This brings into question the adequacy of mental health and custody staffing.

There was a delay in the completion of the 14 Day Health Appraisal. There was a lack of documented adequate treatment planning for this patient.

**Inmate 5**

This patient received the Medical Intake Triage/Receiving Screening on August 20, 2018 by the RN. At that time, she denied treatment with psychotropic medications. She did report a history of daily methamphetamine and alcohol use, as well as alcohol withdrawal symptoms. She denied a history of mental health treatment or hospitalization. She did report a history of a suicide attempt by drug overdose six months prior, but she denied current suicidality. She was referred to see mental health on that date, and she was placed on an alcohol withdrawal protocol.

She was seen by the LCSW on the following day, when she noted the patient's history of abuse and past suicidal ideation/attempts. The social worker attempted to see the patient on August 28, 2018, but she was reportedly out to court.  She was seen on the following day for follow up and completion of the Initial Mental Health Assessment and Appraisal. During the assessment, the social worker reported that the patient was depressed regarding possible prison sentencing. The assessment was remarkable for report of auditory hallucinations, current symptoms of

13

depression, anxiety and a family history of suicide. The patient's reports of past suicide attempts conflicted with other reports. A routine mental health referral was submitted, and the patient was housed in general population. She was scheduled for assessment upon her return from her next court date. The patient was seen after her return from court on September 1, 2018 when she reported "hearing voices and cannot sleep". She was seen three days later for follow-up by the psychologist when she was described as stable. This progress note indicated that the patient was housed in administrative segregation at that time.

On September 7, 2018, the patient reported continued depression and auditory hallucinations to the social worker; the patient was then scheduled to see the psychiatrist.

The patient was seen by the psychiatrist on September 11, 2018 who noted her significant history of trauma with flashbacks, depression, sleep disturbances and anxiety.  She was prescribed Celexa, and a diagnosis of Major Depressive Disorder was provided. Trazodone was increased on October 4, 2018 due to continued sleep difficulty. She continued to report depressive symptoms and to make requests for medication changes when she was seen by the psychologist on October 15, 2018. She was seen by the social worker on October 24, 2018 when she reported continued depression.  She was seen by the psychiatrist on the following day when Risperdal was prescribed on October 25, 2018 to address the auditory hallucinations.

Subsequent progress notes indicated that the patient was seen consistently by mental health clinicians.  She continued to report auditory hallucinations. Review of the MAR indicated that the patient was generally medication adherent.

Progress notes documented the patient's involvement in group therapy sessions, including psychoeducational, coping skills and cognitive behavioral therapy (CBT) groups.

14

There was documentation of segregated population observation monitoring on August 23, 2018 to August 25, 2018, August 27 to August 28, August 30, September 2 to September 5, September 7 to September 11, September 13 to September 18, September 20, September 22, September 24 to October 2, October 4 to October 9, October 11 to October 12, October 14 to October 16, October 18 to October 23, and October 25 to October 30, 2018.

**Findings**

This patient was appropriately screened and evaluated timely by medical and mental health staff upon arrival to the jail.  Psychotropic medications were ordered timely, after an appropriate period of observation and assessment.  Psychiatric assessment and treatment were timely.  She was followed consistently and appropriately by mental health staff with appropriate monitoring. There was documentation of provision of segregation unit group therapy. There were lapses in the documentation of daily nursing segregation rounds. There was however a lack of documented adequate treatment planning for this patient.

**Inmate 6**

This patient received the Medical Intake Triage/Receiving Screening on August 17, 2018 by the RN. The screening was unremarkable and negative for mental health concerns. Information was obtained regarding the patient's outside medication treatment, including treatment with Lithium Geodon and Benadryl.  These medications were ordered by the psychiatrist. It appeared that the patient was released from the jail on October 24, 2018.

The patient was placed into the sobering cell upon arrival to the jail. She was seen by the psychiatrist on August 21, 2018 when she presented with delusional thinking and auditory hallucinations. She was seen by the social worker on two days later when she reported hearing

15

voices, was observed urinating in the corner of the cell and actively displaying signs of drug/alcohol detoxification. Follow-up by the social worker was completed on the following day. The patient was seen by the social worker again on August 28, 2018, when she was described as acting strangely. A note on August 30, 2018 indicated a "psychiatric chart check/review" by the psychiatrist; medications were unchanged, but a lithium level was obtained. On September 3, 2018 and the following day, the mental health clinician noted that the patient appeared to be improving. She was seen by the psychiatrist on September 5, 2018, when the laboratory studies were ordered, but not completed as no laboratory studies were performed on weekends and on Monday (holiday). Subsequent studies were not completed due to patient refusal or lack of supplies. She was released from jail on September 8, 2018.

It appeared that the patient was rearrested and placed into the sobering cell on September 28, 2018.  A mental health intake assessment was attempted on September 30, 2018; however, the patient was reportedly combative. On October 5, 2018, she was seen by the psychologist who noted that she was delusional with response to auditory hallucinations. She was seen by the psychiatrist on October 9, 2018. A note by the psychologist on October 15, 2018 indicated that the patient was being considered for PC 1370, and that she was awaiting evaluation for placement at the mental health unit at Natividad Hospital.

It appeared that the Medical Intake Triage/Receiving Screening was completed on November 2, 2018; and it appeared that the patient was again released from and returned to the jail.  The patient was uncooperative and hostile. It appeared that the screening was not completed due to the patient's uncooperative state. A second Medical Intake Triage/Receiving Screening on November 4, 2018. The screening noted a diagnosis of "bipolar personality disorder", treatment with Geodon, Lithium, Risperdal, and Zyprexa. She was described as a poor historian. A

16

telephone order for psychotropic medications was obtained on November 4, 2018. She was seen

by the psychiatrist on November 5, 2018 when she presented with psychotic features.  She was

placed into the safety cell on November 5, 2018 after destroying a tablet. Laboratory studies for

treatment with Lithium were ordered. It appeared that she may have been released from the jail

on November 7, 2018.

A subsequent Medical Intake Triage/Receiving Screening dated November 18, 2018 was also

present in the healthcare record after it appeared that the patient returned to custody on

November 14, 2018.  This screening noted treatment with Lithium, Benadryl, Risperdal,

Trazodone and Buspar with diagnoses of "Bipolar I, anxiety and personality disorder". She also

reported recent intravenous heroin use and alcohol abuse. She reportedly had tangential speech

with flight of ideas on mental status examination. It appeared that medications were ordered on

November 16, 2018.

Segregated Population Observation Logs were reviewed from August 20, 2018 to September 5,

2018.  There were lapses in the documentation of daily rounds.  Sobering/Safety/Restraints

documentation was reviewed from September 29, 2018, and November 2, 2018 to November 5,

2018.  Nursing contact was documented at 0213 prior to the patient's placement into the sobering

cell at 0215 on August 17, 2018.

**Findings**

There was documentation that medications were ordered for the patient upon arrival to the jail in

August 2018.  There were lapses in the documentation of daily nursing segregation rounds.

There was documentation of medical check prior to placement into the sobering cell. There was

also documentation of the provision of discharge medication prescription upon release from the

17

jail. Upon her return to the jail during late September and in November, medications were not immediately ordered, and the cause for this delay was unknown.

The appropriate laboratory studies for treatment with Lithium were conducted.  Medications were adjusted appropriately with elevated Lithium levels. This patient was followed consistently by mental health clinicians while housed in segregation; however, the documentation for not transferring to the hospital for stabilization was insufficient. There was a lack of documented adequate treatment planning for this patient.

**Inmate 7**

This patient's healthcare record was reviewed as he was seen in the men's holding cell during the monitoring visit when he presented with uncooperative, psychotic behavior.

This patient received the Medical Intake Triage/Receiving Screening on November 26, 2018 by the RN. The screening was notable for a history of mental health hospitalizations and outpatient mental health treatment. He had injury to his right hand and a left thigh dog bite at the time of intake. He was described with disheveled appearance, experiencing auditory and visual hallucinations.  He was seen by the social worker and psychiatrist on that date, and he was placed on suicide watch at that time. The social worker noted that the patient had been extremely violent towards his parents prior to arrest when they attempted to get him to take his psychotropic medications. He was described as psychotic and delusional.  Suicide watch was continued at Level 2. The psychiatrist also indicated that the patient was psychotic with response to auditory hallucinations. He refused psychotropic medications as a result of his impaired insight and judgement. He was sent to NMC-ER for evaluation and management.

This patient was referred from the jail to Natividad Emergency Department on November 26, 2018 for crisis evaluation after presenting with delusion thinking, refusal of antipsychotic medications and disorganization.  Their hospital records indicated that he presented in custody for crisis evaluation.  He had reportedly been violent recently and had a splinted right upper extremity for which he refused evaluation. He was described as bizarre with minimal cooperation and paranoia. He was provided with a dose of Geodon, was cleared by the crisis team, and he was provided with a recommendation for treatment with Geodon at NMC.

On November 27, 2018, Level 2 suicide watch was discontinued, and the social worker noted that the patient would be seen twice daily due to his age, lack of prior incarcerations, his diagnosis and the seriousness of his crimes. There appeared to be significant confusion regarding the orders for suicide watch and the property allowed. A note on November 28, 2018 directed the patient to be moved to men's holding on Level 1 suicide watch with a suicide smock, no bedding or sharps. It appeared that he had been monitored on Level 2 suicide watch which was subsequently discontinued; however, he reportedly had no clothing or mattress. The social worker contacted Dr. ████ regarding this confusion; the note stated that the patient would remain in safety garments for the duration of his stay so that he would not "hang himself".

Geodon was increased from 80 mg per day to 160 mg per day, and follow-up was ordered with the psychiatrist on the following day. The patient was seen by the psychiatrist on November 29, 2018.

A note by the psychologist on December 1, 2018 noted that the patient was minimally cooperative to interview, remained psychotic with incoherent speech.  Although he denied suicidality, the psychologist noted that he was "not of sound mind and body to self regulate at this time"; therefore, he remained in the men's housing unit with a safety blanket and smock.

Subsequent mental health contacts indicated that the patient was generally uncooperative to interview. Attempts at interview generally occurred twice daily.

Segregated Population Observation Logs were reviewed from November 29, 2018 to December 8, 2018.

**Findings**

The record indicated that the patient did not have a previous healthcare record at the jail, and a release of information was requested to obtain his history of mental health treatment.

This patient was appropriately transferred to the hospital for clearance and crisis evaluation.

Review of segregation logs indicated daily nursing rounds. Medications were ordered timely upon return from the hospital. There was documentation of timely psychiatric evaluation as well as post-suicide watch monitoring at least daily.

Although this patient denied suicidal ideation or intent, he essentially remained on suicide watch due to concerns regarding his plans for self-harm, psychosis and his uncooperative behavior. Although clinicians had concern regarding providing full issue of clothing and other items, the patient should have been provided with a safety mattress if it was determined that he remained at risk for self-harm. This patient was monitored in men's holding rather than in the booking cells which were generally utilized for suicide monitoring.  The facility should work to transfer this patient for inpatient care if they believe that he remains at risk for suicide as long-term monitoring at the jail is inappropriate with the clinical presentation described.

This patient was seen during the monitoring visit.  He had a safety blanket and smock, but no clothing or mattress.  The expert was informed that the patient was not on Level 2 suicide watch,

20

and he was housed in men's holding. The neutral monitor recommended that a treatment team meeting be convened (including the psychiatrist) for this patient to discuss current treatment and plans for continued monitoring. There was a lack of documented adequate treatment planning for this patient.

**Inmate 8**

This patient was housed in the S Pod at the time of the monitoring visit.  She received the Medical Intake Triage/Receiving Screening on July 31, 2018 by the RN. The screening was negative for mental health concerns; however, the patient was described as confrontational and angry, did not seem to grasp her situation, and she was making demands. She was scheduled for a routine mental health evaluation and she was housed in general population. She was seen by the psychologist on August 2, 2018 in response to a referral from intake.  The psychologist noted that the patient was sent to Natividad Medical Center. She was seen again by the psychologist and social worker on the following two days, when she presented with anger and yelling in possible response to auditory hallucinations.  She was then scheduled to see the psychiatrist. On August 6, 2018, she was described as uncooperative and disoriented, not currently taking medications. On four days later, the psychologist reported that she was seen in women's holding where she refused an out of cell contact and that she was aggressive towards others in the jail. A note by the psychologist on August 22 indicted that she remained in jail as she was detained in court due to her behavior there.  She had been placed into segregation by custody and mental health due to her "dysregulated mood and cannot interact with others without fighting". A note on September 11, 2018 indicated that the patient had not been offered group as she had been violent with medication non-adherence.

21

The patient was followed at least weekly by mental health staff. Progress notes indicated that she remained psychotic and delusional. She later was cooperative with out of cell confidential clinical contacts, and she made several requests to be seen by specific mental health clinicians. She did, however, continue to refuse some clinical contacts. A note by the social worker indicated that on October 24, 2018, the patient was "too acutely ill to be receptive to therapeutic interventions and refusing medications". Progress notes described mood instability, agitation, delusional thinking and grandiosity.

It appeared that the patient was placed into segregation on or about August 1, 2018.  Segregated Population Observation Logs documented nursing rounds from August 1, 2018 to December 8, 2018.  There were lapses in the documentation of daily nursing rounds.

**Findings**

There were lapses in the documentation of daily nursing rounds in segregation.  This patient was seen timely by mental health staff and was offered confidential interviews.  There was a lack of documentation that this patient was seen and evaluated by a psychiatrist.  There were notes indicating psychiatric referral, and there was an entry that the patient was seen by Dr. ███ on August 5, 2018; however, there were no accompanying progress notes documenting psychiatric assessment.  Additionally, the patient was not prescribed psychotropic medications. There was also a lack of documented adequate treatment planning for this patient.

**Inmate 9**

This patient was housed in A Pod at the time of the monitoring visit.  He received the Medical Intake Triage/Receiving Screening on November 10, 2018 by the RN. He denied treatment with

22

psychotropic medications or any mental health treatment at the time of intake. He was not referred to mental health and was placed into general population from intake.

The patient was rearrested on December 3, 2018. The Medical Intake Triage/Receiving Screening was completed on that date. At this screening, he acknowledged a history of daily alcohol use and withdrawal symptoms. He continued to deny a history of mental health treatment. At the time of this intake, he was described as acting bizarre and was observed talking to himself. He was placed on an alcohol withdrawal protocol. He was referred to mental health for follow-up on the following day. The screener later found paperwork that indicated that the patient had been tazered at the time of arrest; this information was not provided by the patient or by the arresting officer. The patient was sent to NMC for treatment of a tazer wound to his left abdomen.

The patient was seen by the psychologist on December 4, 2018. He denied mental health concerns or the need for mental health services. The psychologist indicated that the patient was stable at that time and that he should seek mental health services if needed.

Segregated Population Observation Logs documented nursing rounds from November 12, 2018 to November 29, 2018. There were no lapses in the documentation of daily nursing rounds.

**Findings**

This patient's healthcare record was reviewed as he was housed in the men's segregation A Pod, and he presented during the visit with disorganized behavior (walking around his cell in his underwear). He was appropriately screened at the time of intake. Additionally, he was appropriately placed on an alcohol withdrawal protocol. He was evaluated by mental health and determined not to require ongoing mental health treatment.

23

There was documentation of daily nursing rounds in segregation.  He should receive ongoing monitoring and referral to mental health as indicated.

**Inmate 10**

This patient received the Medical Intake Triage/Receiving Screening on October 16, 2018 by the RN. His screening was remarkable for methamphetamine use approximately one week prior and the recent murder of his wife.  He was described with a disheveled appearance and depressed mood. He was scheduled for the next mental health clinic as he reported hearing things and his wife's recent murder.

The patient was seen by the psychologist on the day of arrival in response from the intake referral.  The psychologist noted that the patient had just learned that his wife was murdered.

It appeared that the patient was placed on Level 2 suicide watch on October 17, 2018 in the booking cell after he reported suicidal ideation. Suicide watch was changed to Level 1 in the safety cell on the following day after the patient was observed hitting his head; this watch was subsequently changed back to Level 2 on October 19, 2018.

The patient had been prescribed Zyprexa during a recent jail incarceration.  He was seen by the psychiatrist on October 19, 2018 when he reported suicidal ideation and auditory hallucinations. He was provided with diagnoses of Psychotic Disorder NOS, Mood disorder NOS and possible Substance Induced Mood and Psychotic Disorder.  Zyprexa was ordered at that time.

On October 21, 2018, suicide watch was discontinued as the patient was deemed no longer suicidal.

Segregated Population Observation Logs documented nursing rounds from October 17, 2018 to October 25, 2018.  There were no lapses in the documentation of daily nursing rounds.

It appeared that the inmate was released from jail on October 26, 2018.  There was documentation of the provision of discharge medications (Zyprexa) upon release from the jail.

### Findings

This patient was appropriately referred to mental health from intake.  There was documentation of medical evaluation within one hour of safety cell placement. There were no lapses in the documentation of daily nursing rounds.

Although the patient had been recently prescribed Zyprexa at the jail, this medication was not ordered until approximately three days after jail arrival.

The patient remained on Level 1 suicide watch in the safety cell for less than 24 hours. He was seen daily by mental health staff while monitored on suicide watch. The patient was also seen for daily follow-up after suicide watch discontinuation. There was however a lack of documented adequate treatment planning for this patient.

### Inmate 11

This patient received the Medical Intake Triage/Receiving Screening on September 4, 2018. Although the screening was negative for mental health concerns, he was scheduled for the next mental health clinic. The patient was seen by the social worker on the day of arrival when a Suicide Risk Assessment and Evaluation was completed. The assessment noted several issues of concern including recent suicidal ideation with intent.  He also had depressed mood with evidence of delusions, bizarre thoughts/behavior, impulsivity and recent methamphetamine use.

25

He was placed on Level 2 suicide watch; however, he began hitting his head on the glass, and suicide watch was elevated to Level 1.

The patient was transported to NMC for medical evaluation and clearance on September 5, 2018 due to reported chest pain. He was cleared for return to the jail.

The Sobering/Safety/Restraints documentation was reviewed from September 4, 2018 to September 5, 2018. Level 1 Suicide watch was discontinued on September 5, 2018; however, Level 2 suicide watch was initiated later that day. There was documentation of consistent nursing rounds. Suicide watch was subsequently discontinued, and the patient was moved to dormitory housing.  Subsequent progress notes indicated that the patient was stable without recurrent self-injurious behavior.

**Findings**

This patient was appropriately referred to mental health from intake.  There was documentation of medical evaluation within one hour of safety cell placement. There were no lapses in the documentation of daily nursing rounds.

The patient remained on Level 1 suicide watch in the safety cell for less than 24 hours. He was seen daily by mental health staff while monitored on suicide watch. The patient was also seen for daily follow-up after suicide watch discontinuation. The patient was placed in the safety cell at 0135, but he was not seen timely by medical staff until 0631.

This patient was not seen by the psychiatrist, nor was he prescribed psychotropic medications. As his symptoms appeared to be situational in origin with resolution after suicide monitoring, the lack of psychiatric contact appeared appropriate. There was however a lack of documented adequate treatment planning for this patient.

26

**Inmate 12**

This patient was sent to NMC for clearance after initially presenting at the jail with hypertension. This patient received the Medical Intake Triage/Receiving Screening on August 9, 2018. His screening was notable for no history of mental health treatment, but treatment by his primary care physician with anxiolytic medications. Although he responded negatively to questions regarding substance use, he was placed on a benzodiazepine withdrawal protocol; and he was referred for a routine mental health evaluation. He was housed in the outpatient housing unit for medical reasons.

The patient was seen by a mental health clinician on August 11, 2018 in response to the intake referral. He reported that he had recently been sexually assaulted prior to arrest, and he used high doses of prescription opiates and benzodiazepines.

It appeared that on August 12, 2018 at 11:41 pm, the inmate was briefly placed on Level 1 suicide watch after wrapping a sheet around his neck. He was placed in the safety cell on Level 1 suicide watch.  A Suicide Risk Assessment & Evaluation was completed by the social worker on August 13, 2018.  This assessment noted depression with impulsivity and poor impulse control, recent treatment with and withdrawal symptoms from Xanax (the reason for placement on the withdrawal protocol), and current serious charges.  He was provided with a diagnosis of Opioid Dependence Sedative, Hypnotic, or Anxiolytic Use Disorder. Suicide watch was discontinued on August 13, 2018. Subsequent progress notes by mental health staff indicated that the patient was stable.

**Findings**

27

This patient was appropriately referred to mental health from intake.  There were no lapses in the documentation of daily nursing rounds.

There was documentation that the patient was seen by medical staff within one hour of safety cell placement. The patient remained on Level 1 suicide watch in the safety cell for less than 24 hours. He was seen daily by mental health staff while monitored on suicide watch. The patient was also seen for daily follow-up after suicide watch discontinuation. There was however a lack of documented adequate treatment planning for this patient.

**Inmate 13**

This patient received the Medical Intake Triage/Receiving Screening on June 24, 2018. His screening was negative for reported mental health treatment or medications.  He was seen by the social worker on July 4, 2018 when he was referred to see the psychiatrist.  The patient was seen by the psychiatrist on July 9, 2018 when he reported treatment with Zyprexa; he also presented with auditory hallucinations and dysphoria.  He acknowledged that he had been medication non-adherent prior to his arrest. He was prescribed Zyprexa at that time, and he was provided with a diagnosis of Psychotic Disorder, NOS The patient remained on Level 1 suicide watch in the safety cell for less than 24 hours.

The patient was placed on Level 1 suicide watch on July 27, 2018 at 2036 after presenting with agitation and a suicide attempt by tying a sheet tightly around his neck.  This watch was decreased to Level 2 on the following day.   He was seen by the psychiatrist on July 30, 2018 when he presented with psychosis and command auditory hallucinations to harm himself. Zyprexa was increased at that time.

The patient remained on Level 2 suicide watch, and on July 30 he reported continued auditory hallucinations and suicidal ideation. He was sent to the NMC emergency department on July 31, 2018 as he was refusing food and water with passive suicidal intent.  The patient returned to the jail on the same day; Level 2 suicide watch was resumed upon his return. It appeared that suicide watch (Level 2) was discontinued on August 2, 2018; however, it also appeared that it was resumed from August 7 to August 11, 2018. He was seen by the psychiatrist on August 2 and 8, 2018 when his medication adherence was questioned; however, the patient refused changes in his medications. Follow-up with the psychiatrist on August 13 noted continued auditory hallucinations; Remeron was increased at that time.

The Sobering/Safety/Restraints documentation was reviewed from August 1, 2018 to August 2, 2018, and from August 7, 2018 to August 11, 2018. Segregated Population Observation Logs documented nursing rounds from November 22, 2018 to November 28, 2018.  There were no lapses in the documentation of daily nursing rounds.

Review of the MAR indicated that the patient had sporadic medication adherence with prescribed Zyprexa, Benadryl and Remeron. On October 5, 2018, he was seen by the psychiatrist for medication renewal.  On October 26, 2018, the psychiatrist noted that the patient remained with auditory hallucinations. He was seen for follow-up by the psychiatrist on November 9, 2018.

The patient was seen by the psychologist on November 26, 2018 as custody staff reported that he was on a hunger strike. He was also evaluated by medical staff. On the following day, he was also seen by the social worker who described the patient as delusional and highly paranoid. He was again seen by the social worker on November 28 who referred the patient to the psychiatrist.

29

On that date, the psychiatrist noted that the patient had resumed eating but remained acutely depressed. The patient transferred to the state hospital on November 29, 2018.

**Findings**

There was documentation that the patient was seen by medical staff within one hour of safety cell placement. The patient remained in the safety cell for less than 24 hours. He was seen daily by mental health staff while monitored on suicide watch. The patient was also seen for daily follow-up after suicide watch discontinuation with subsequent follow-up that was clinically appropriate.

Although the patient was followed consistently by the psychiatrist with appropriate medication management, there was a two-month lapse in psychiatric contacts between August and October 2018; during this period, the patient remained with suicidal ideation and psychotic symptoms.

This very ill patient was appropriately evaluated and monitored due to his chronic suicidal ideation and severe depressive and psychotic symptoms. There was however a lack of documented adequate treatment planning for this patient.

 He was appropriately transferred to NMC for evaluation; although he was not appropriately treated there for the time necessary for stabilization.  It was fortunate that he was transferred to the state hospital for necessary inpatient treatment.

**Inmate 14**

This patient received the Medical Intake Triage/Receiving Screening on July 16, 2018. His screening was significant for recent daily intravenous heroin use, history of 5150 commitment, treatment for anxiety and PTSD and a history of a suicide attempt by cutting his wrist in 2017.

30

He was placed on a withdrawal protocol; it did not appear that he was referred to see mental health.

On July 18, 2018, the patient was transferred and admitted to NMC after attempting to jump from the tier in his housing unit.  He was treated medically there, and he was subsequently admitted to the mental health unit. Risperdal was recommended at NMC, and this medication was continued at the jail. He was placed on Level 1 suicide watch in the safety cell upon his return from NMC on July 20, 2018 at 1345.  Suicide watch was decreased to Level 2 on July 21, 2018 and subsequently discontinued later that day; however, he was placed on Level 1 again that same date later in the day after wrapping a piece of clothing around his neck and expressing suicidal ideation.  A Suicide Risk Assessment & Evaluation was completed by the social worker on July 21, 2018, which noted suicidal ideation without plan, fear of going to prison, and feelings of hopelessness. He was again downgraded to Level 2 watch on the following day. The patient reported distress from hearing voices, with crying and hitting his head.  An order was received from Dr. ▮▮▮ to give stat Haldol, Ativan and Cogentin on July 22, 2018.  He was again placed into the safety cell. He was seen by the psychiatrist on the following day. On July 26, 2018, the patient reported auditory hallucinations to harm himself; a review of the MAR indicated that the patient had refused his morning dosages of medications (Zyprexa, Benadryl and Tylenol).  An order was provided by Dr. ▮▮▮ to administer these medications in response to the patient's symptoms. The MAR reflected that these medications were held by the doctor until 2000; however, there was not documentation that they were administered.  The patient took his morning dosages of these medications.

A second Suicide Risk Assessment & Evaluation was completed by the social worker on July 24, 2018. The assessment noted several issues of concern, including self-injurious behavior on that

31

date by hitting his head, prior suicide attempts including "gestures" in recent days and a history of mental health treatment. Level 2 suicide watch was discontinued on that date, and the patient was moved to A dorm. It appeared that the patient had recurrent suicidal ideation subsequently resulting in placement on Level 2 suicide watch on several occasions.

Review of MARs indicated that the patient was generally medication adherent, but with some sporadic non-adherence. The Sobering/Safety/Restraints documentation was reviewed from July 20, 2018 to July 24, 2018 August 5, 2018 August 6, 2018 and August 22, 2018.

**Findings**

There was documentation that the patient was seen by medical staff within one hour of safety cell placement. The patient remained in the safety cell for less than 24 hours. He was seen daily by mental health staff while monitored on suicide watch. The patient was also seen for daily follow-up after suicide watch discontinuation with subsequent follow-up that was clinically appropriate. There was however a lack of documented adequate treatment planning for this patient.

This chronically suicidal patient was appropriately transferred to NMC after a serious suicide attempt where he was hospitalized for only two days.

Orders were provided by the psychiatrist for stat dosages of medications in response to the patient's report of distress from auditory hallucinations and self-injurious behavior. This order appeared appropriate in light of the symptoms presented, and the patient was seen by the psychiatrist in follow-up on the following day.

**Inmate 15**

32

This patient received the Medical Intake Triage/Receiving Screening on June 15, 2018. He reported a history of mental health treatment, and he was referred to mental health from intake.

Segregated Population Observation Logs documented nursing rounds from August 1, 2018 to December 3, 2018.  There were lapses in the documentation of daily nursing rounds.

Progress notes indicated that the patient remained in segregation during the review period.  The patient frequently declined to participate in group therapy, and on some occasions, it was determined that his psychotic symptoms prevented his group therapy participation.

The patient initially refused treatment with psychotropic medications; however, on August 20, 2018 he reported past treatment with antipsychotic medication and requested assistance with auditory hallucinations. He was seen by the psychiatrist on the following day when Zyprexa was prescribed.  He was provided with a diagnosis of Psychotic Disorder, NOS and Amphetamine Abuse. He was next seen by the psychiatrist on October 2, 2018 when he reported that the Zyprexa was beneficial.  He was next seen by the psychiatrist on November 2, 2018 when he remained psychotic, but with decreased but continued auditory hallucinations.  The patient refused to allow an increase in his Zyprexa.

Review of MARs indicated that the patient was generally medication adherent, but with some sporadic non-adherence.

**Findings**

Of concern were multiple notations from the psychologist that the patient was seen at cell-front "due to unit safety and security matters." There was also mention that the patient could not be transported off the unit due to safety and security purposes. The reasons for not conducting confidential out of cell contacts should have been better documented.

33

The patient was seen for an initial psychiatric assessment on August 21, and he was followed consistently by the psychiatrist.

There was documentation of weekly mental health contacts in segregation. There were lapses in the documentation of daily nursing rounds in segregation. There was also a lack of documented adequate treatment planning for this patient.

**Inmate 16**

This patient received the Medical Intake Triage/Receiving Screening on June 30, 2018. He reported diagnoses of PTSD and anxiety; his screening was otherwise unremarkable. He was instructed how to access healthcare and was transferred to general population.  Also on that date, a PREA Screening Tool was completed which was also negative for significant findings.

A note by the psychologist on September 3, 2018 indicated that the patient was seen at cell-front after having just arrived on unit after placement by custody.  He was on socialize alone status. He was described as stable at that time.

Segregated Population Observation Logs documented nursing rounds from August 1, 2018 to December 3, 2018.  There were lapses in the documentation of daily nursing rounds. Documentation in the logs indicated that the patient frequently presented with uncooperative behavior, agitation and anger preventing involvement in segregation groups.

**Findings**

Documentation in the healthcare record was insufficient regarding mental health assessment, the lack of assessment by a psychiatrist and treatment interventions to gain treatment adherence for this patient.

This patient was observed during the monitoring visit.  He was housed in A Pod, men's segregation unit.  He was uncooperative to interview with loud yelling, agitation and he had smeared a substance on his cell window.   This patient required inpatient treatment for stabilization rather than housing in a segregation unit.

There was documentation of weekly mental health contacts in segregation. There were lapses in the documentation of daily nursing rounds in segregation. There was also a lack of documented adequate treatment planning for this patient.

# Exhibit 26

**Monterey County Jail Mental Health Monitor's
Report
June 19, 2019 – June 20, 2019**

Overview

    The Monterey County Jail was visited for the fifth mental health monitoring tour on June 19 and 20, 2019. The following report is based upon interviews with institutional staff and detainees, healthcare records reviews, as well as review of documentation and information provided by the institution and County. This report will specifically address the institution's status and progress toward compliance with the United States District Court Northern District of California Settlement Agreement and the Implementation Plans between Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County Sheriff's Office; California Forensic Medical Group, INCORPORATED (CFMG) et al.

    This monitoring report will include review of compliance for the period of January 2019 to May 2019.

Compliance with Settlement Agreement and Implementation Plan

   *Intake Screening*

- o *Defendants will develop and implement an Intake Screening Implementation Plan that specifies standards and timelines to ensure that arriving prisoners are promptly screened for urgent medical, mental health and dental needs, with prompt follow-up and disability accommodations.*
  - ▪ *Upon arrival, an Initial Health Assessment will be performed by the intake nurse to determine whether the inmate should be excluded from the facility on medical or mental health grounds. Upon acceptance into*

1

*the jail, all inmates will be screened by the intake nurse for urgent medical, mental health and dental needs. The intake nurse will have access to an inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail.*

- *A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.*

- *The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive findings on the suicide assessment.*

**Findings: Noncompliance**

This issue was unchanged from the prior monitoring report.

A review of healthcare records indicated that for those cases reviewed, all jail intakes continued to be seen by a screening nurse for intake screening.

Information was provided regarding patients who were transferred to Natividad Medical Center for crisis evaluation and treatment for March to May 2019; all months of the review period were requested; however, information for January and February 2019 crisis transfers was not provided. A total of 32 patients were sent to Natividad Medical Center (NMC) for crisis stabilization and treatment for the period reviewed.

The majority of these patients were sent to the hospital at the time of intake to the jail for clearance prior to acceptance at the jail; however, some of the patients were also sent during the course of their incarceration at the jail due to mental health concerns. Of those, only seven were admitted to NMC. Suicidal ideation remained the primary reason for hospital referral;

2

however, patients were also transferred due to psychosis, agitation, grave disability and crisis evaluation.  Healthcare records also documented consistent transfers to NMC.

Records reviews also indicated that healthcare records and information regarding past medication treatment continued to be routinely requested.

The facility utilized the Initial Mental Health Assessment and Appraisal for mental health assessment of new arrivals.  The staff acknowledged that, due to staffing limitations, they were unable to complete these assessments for all new arrivals.  The assessments were routinely completed for patients with known mental health history.

The facility utilized the Suicide Watch Initial Assessment for Mental Health to assess suicide risk.  This was a comprehensive assessment tool which was beneficial in determining the level of suicide risk; however, improvement was needed in the documentation of appropriate safety and treatment planning.

Healthcare records also documented that patients seen at intake were referred for routine and emergency mental health evaluation and treatment timely.

The lack of confidentiality for nursing intake assessments during the intake process has been an ongoing issue of concern.   Due to concerns regarding safety, officers remained present outside the intake assessment room during the intake assessment performed by the nurse. The close proximity of the officers to the intake process resulted in a non-confidential assessment and could prevent some inmates from providing necessary medical and mental health information; this is especially important during the intake process when important and potentially sensitive information should be conveyed to the screening nurse.

Since the last visit, the facility made several changes to address this issue.  The intake room was rearranged, resulting in the nurse positioned closer to the door and the inmate sitting

3

farther away from the door.  This change resulted in somewhat improved confidentiality as the inmate was further away from the custody staff; additionally, this repositioning was much safer for the nursing staff who could more easily exit the room if necessary.

The facility also installed white noise machines over the intake room door.  The monitor observed an intake as well as a simulated intake to evaluate the effectiveness of the white noise machine.  Although the machine had some effect in dampening the voices in the room, the machine was not loud enough to significantly diminish the sound of the conversations in the room.  The custody leadership indicated that they would investigate increasing the sound of the white noise machine to address this concern.  It should be noted that white noise machines were also located in other interview areas utilized for individual clinical sessions.  The machines did appear to be effective in the rehabilitation interview room area and in the interview room behind intake.

In addition to the above described changes, the issue of confidentiality has been added to the officer training. Review of the daily sergeant's meeting minutes documented discussion of this issue with custody staff.

Although the facility has worked hard to address this issue, confidentiality due to the presence of custody officers in the intake area remained problematic.  It is hopeful that adjustment of the white noise machine in the intake area will help to address this concern.

*Mental Health Screening*

- *Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness,*

4

26-4

> *including appropriate screening... The Implementation Plan provides that all inmates will have an initial mental health screening performed by a qualified mental health professional on the mental health staff.*

- *Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including...medication practices*

- *The medical or psychiatric provider will complete a baseline history and physical or psychiatric examination; order a therapeutic regimen, as appropriate; and, schedule the patient to be seen for chronic care clinic at least every ninety days for the length of the jail stay. Patients on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every **60 to 90** days.*

**Findings: Noncompliance**

A review of healthcare records and staff reports indicated that Qualified Mental Health Professionals completed the Initial Mental Health Assessment and Appraisals on inmates with a known history of mental health treatment. This also included those inmates referred for mental health services. They acknowledged that current staffing levels precluded them from completing the assessments on all inmates arriving at the jail. The requested staffing analysis should include this issue of concern in determining the appropriate staffing levels at the facility.

5

Review of healthcare records and inmate interviews continued to note some delays in the ordering of medications when indicated upon jail intake.  The facility attempted to address this issue in training by stressing the need for nurses to review the past healthcare record for medication renewal.  Additionally, those inmates in need of medication verification and ordering were included in the nursing shift change report.  An alert was also added to the electronic healthcare record for those inmates whose medications had not been verified, ordered or discussed with a provider; this would allow for nursing staff to identify those individuals and for supervisory review.

Healthcare records reviews indicated that there were delays in the initial psychiatric assessment and follow-up. This appeared to be due to psychiatric staffing workload issues, highlighting the need for a comprehensive staffing analysis to help to determine appropriate staffing levels.

- *Defendants shall develop and implement a Health Care Implementation Plan to expand the provision of care for inmates with serious medical and/or mental health needs and to ensure they receive timely treatment appropriate to the acuity of their conditions. The Implementation plan outlines the process by which inmates provide mental health sick call requests and healthcare staff respond to such requests.*
- *Nursing staff shall conduct daily mental health rounds in segregation.*

6

**Findings: Noncompliance**

Inmates continued to access mental health sick call requests by submitting them on portable tablets. Inmate access to tablets appeared to be adequate.  At the last visit, there were problems with access to tablets in the segregation units.  Extra tablets were purchased for those units allowing for better access.

The facility did not track the timeliness of response to requests. This continues to be an optimal area for quality assurance review to examine the timeliness and appropriateness of response to inmate requests.  This issue was, however, not the source of inmate complaints during the visit.

There were continued lapses in the documentation of daily nursing rounds in segregation. Since the last visit, the nursing supervisory staff was tasked with better monitoring of this issue, including the use of a nursing shift change checklist that documents the completion of segregation nursing rounds.

*Safety Cells*

- o *The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall responsibility for safety and security of prisoners, prompt reviews by medical of all placements, and a process of resolving disagreements between medical and custody.*

**Findings: Noncompliance**

The facility continued to utilize the booking cells rather than the safety cells for suicide monitoring; however, safety cells were utilized for those inmates with self-injurious behavior and in instances when single cells utilized for suicide monitoring were not available in the intake

area.  Review of logs and healthcare records indicated that placement into the safety cells was not limited to less than 24 hours; unlike during past reviews, there were several instances in which individuals remained in the safety cell greater than 24 hours.  This was particularly noted during April 2019, when there were greater than five instances of placements longer than 24 hours. Not all of these individuals were transferred to NMC.  Sobering cells were not utilized for suicide monitoring.

Healthcare records reviews, as well as audits by the Compliance Sergeant, documented lapses in the prompt review of medical of all safety cell placements.

Facility staff continued to deny disagreements between medical and custody staff regarding such placements; this issue was not noted in the healthcare records or incident report reviews. Since the last visit, nursing staff received training regarding the appropriate management of inmates on suicide watch, including a nursing checklist emphasizing the need for timely medical assessment upon placement.

- *Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical professional will see an inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.*

**Findings: Noncompliance**

Placements for suicide monitoring occurred in the booking and safety cells; placement into the safety cell was generally limited to those exhibiting self-injurious behavior or when a

single booking cell was unavailable. Mental health staff made daily rounds of the booking, safety and sobering cells; daily clinical contacts were verified in healthcare records reviews. Documentation noted some lapses in the timely medical assessment of inmates placed into these cells. Auditing of this issue was also conducted by the Compliance Sergeant.

Since the last visit, nursing staff received training regarding the appropriate management of inmates on suicide watch, including a nursing checklist emphasizing the need for timely medical assessment upon placement. There continued to be consistent documentation of post-suicide watch follow-up, a necessary component of suicide prevention.

- *A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his findings through a report which will be sent to the Jail Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.*

**Findings: Noncompliance**

Since the last monitoring visit, a timer was placed in intake as a reminder to perform timely welfare checks.  This timer was noted during this visit. Additionally, this issue was discussed during the daily briefings and shift change meetings.

Review of the provided documents noted some lapses in the documentation of safety checks twice every 30 minutes in the safety and sobering cells; it should be noted that the copies provided were at times difficult to read making verification also difficult. Documentation of spot checks for compliance by the Compliance Sergeant was provided, and it confirmed the above observation.

- *Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11 p.m. and 7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.*

**Findings: Noncompliance**

Provided documentation and audits by the Compliance Sergeant noted lapses in the provision of mattresses to inmates in the safety cell. The facility attempted to address this issue since the last visit by including the provision of a mattress or safety sleeping bag in the nursing checklist which also included other safety cell requirements.  Additionally, nursing staff training included this issue.  Discussions were underway regarding coordination between medical and custody regarding the inclusion of a specialized checkbox on the Safety Cell Logs that noted the provision of the necessary items; this would be helpful in documenting and auditing this issue.

10

- *Inmates in sobering cells may have access to mattresses at the discretion of custody staff.*
- *Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.*

**Findings: Noncompliance**

See above.

- *Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.*

**Findings: Substantial Compliance**

Observations during the monitoring visit indicated that the safety, booking and sobering cells were clean. Since the last monitoring visit, the facility acquired a pressure washing machine to allow for deep cleaning of the cells when indicated. Supervisory staff reported that the cells were cleaned after each use; although they reported that there was no set schedule for cleaning.

- *For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.*

11

**Findings: Noncompliance**

Some individuals remained in the safety cells for greater than 24 hours and were not always transferred to NMC for stabilization and treatment.

Although the facility continued to transfer patients to NMC for stabilization, review of logs and healthcare records indicated that they continued to be returned prior to stabilization.

*Medication Continuity*

o *All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.*

**Findings: Noncompliance**

Delays in the timely ordering of newly arriving inmates to the jail continued. A review of healthcare records and observations during the visit indicated that the intake nurses obtained information regarding prescribed mental health medications in the community and began the process for verifying such treatment. The staff noted that they had identified breakdown in the communication of information regarding the need for medication verification, ordering and consultation with providers.  Since the last visit, the facility attempted to address this issue with training, increased supervisory scrutiny, inclusion of needed verification in the nursing shift change report, and the attachment of an automatic alert in the electronic healthcare record.

It appeared that timely psychiatric assessment resulted in some delays in the timely ordering of medications.  This appeared to be related to psychiatric workload issues.

- *Inmates who, at the time of booking, report to Defendants that they are taking community-prescribed medications, but whose medications cannot be verified by Defendants, shall be timely assessed by a medical provider and timely prescribed medications necessary to treat their health needs.*

**Findings: Noncompliance**

Patients continued to be appropriately referred to mental health at the time of intake; however, examples of delay in ordering community-prescribed medications and even medications that had recently been ordered at the jail continued.  It did appear that patients were seen timely by mental health clinicians after intake referral; however, delays were noted in timely psychiatric evaluation.  This may be due to psychiatric staffing workload issues.

- *Provision of psychotropic medications upon discharge from the jail. The Implementation Plan provides that a 30-day supply of medications be given to inmates upon discharge from the jail.*

**Findings: Substantial Compliance**

A review of healthcare records and provided documentation indicated that discharge medications were provided. There was documentation that a 30-day supply of discharge medications was called into the local CVS pharmacy; this form was usually signed by the jail staff and the patient.

13

*Clinical Staffing*

     o  *Defendants will maintain Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to ensure adequate staffing to provide all necessary medical and mental health care. The plan will identify all needed positions based on current and projected Jail population, and the number and qualifications of medical and mental health care staff to cover each position, with shift relief.*

**Findings: Noncompliance**

At the time of the visit, the mental health staffing was as follows:

    1.0 FTE Psychiatrist

- 40 hours per week onsite

    1.0 FTE Licensed Marriage and Family Therapist/Psychologist

- 40 hours per week onsite

    2.0 FTE Licensed Marriage and Family Therapist

- 40 hours per week onsite

    1.0 FTE Licensed Clinical Social Worker

- 40 hours per week onsite

Since the last visit, an additional LMFT was hired.  One of the LMFTs provided group therapy and conducted mental health segregation rounds.  The remaining clinicians performed initial assessments, follow-up care and crisis assessment and intervention. Although custody availability for escort remained challenging, a schedule was in place which allowed for necessary custody escort.

14

As was discussed in the last report, clinicians received numerous referrals for substance abuse related issues.  The supervisory staff indicated that they would examine this issue and would consider the hiring of a substance abuse counselor.

The workload for the psychiatrist was an issue of concern. Although the psychiatrist's hours were augmented with coverage by Dr. ███ it did not appear that the workload and other duties that were reported at the last visit had decreased. This resulted in triage and rescheduling by the psychiatrist, resulting in delay in psychiatric assessment and evaluation. Follow-up contacts were not always seen timely.  Additionally, healthcare records reviews indicated instances in which there were lapses in timely psychiatric follow-up and medication assessment.

The inability of mental health clinicians to perform the required Initial Mental Health Assessment and Appraisals for all inmates as required by the Implementation Plan as well as psychiatric workload issues again illustrated the need for an adequate staffing analysis. During the visit, the monitor was provided with a preliminary staffing analysis for review. The staffing analysis did not include analysis of psychiatric workload and staffing.  Further the analysis did not capture all tasks for the mental health clinicians, particularly those tasks not captured by the electronic healthcare record.  A workflow analysis which includes all work tasks, duties and responsibilities is necessary to determine the current mental health staffing needs.  Feedback was provided regarding the suggested modifications of the staffing analysis.

Psychiatric on-call services continued to primarily be provided by Dr. ███ An onsite psychiatrist, Dr. ███ covered in Dr. ███ absence. One incident of telepsychiatry was noted during the monitoring period; this encounter was noted for Patient 2 on April 8, 2019. The note documented that informed consent was obtained for treatment

15

with Remeron; however, there was not documentation located indicating consent for

telepsychiatry.  There was not documentation that the patient was seen in-person by a

physician or mid-level provider within 24 hours of the telepsychiatry assessment, nor was

there documentation that a psychiatric nurse was present during the telepsychiatry

assessment.

The mental health and psychiatry call schedules were provided and reviewed.

*Mental Health Care*

- o *Training*
    - ▪ *All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.*

**Findings: Substantial Compliance**

Documentation was provided that indicated that correctional staff had received training

regarding the Implementation Plan.

    - ▪ *In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.*

16

**Findings: Substantial Compliance**

The lesson plans provided included information regarding the recognition of individuals with mental illness and suicidality. This training was in place for new correctional officers.

> ▪ *All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates, identifying warning signs specific to inmates, and how to recognize individuals who are in mental distress and/or suicidal.*

**Findings: Substantial Compliance**

This training was documented.

> ▪ *Yearly custody staff will conduct a situational training such as a mock suicide attempt or a medical emergency. CFMG staff will also participate in the annual situational training.*

**Findings: Substantial Compliance**

Since the last visit, this training was amended to include a mock suicide attempt/medical emergency, and medical staff was involved.  Additional training was provided to all staff with inmate contact regarding suicide prevention, and the mental health staff received training regarding safety planning.

17

*Restraint Chairs*

> ▪ *Use of a restraint chair will be documented in an observation log which will be reviewed and signed by a supervisor. Inmates shall not be placed in a restraint chair for longer than six consecutive hours.*

**Findings: Deferred**

The restraint chair was not utilized during the monitoring period; however, the WRAP Restraint Device was utilized. Three incidents of WRAP use during the review period were reported by the Compliance Sergeant. One incident occurred on January 27, 2019, in which the patient was placed in the WRAP in a safety cell for three hours after attempting to strangle himself with clothing, fighting custody and resisting efforts to stop his behavior. Restroom usage after two hours was not notated as offered. The patient was subsequently sent to NMC, but was returned within several hours. He was cleared from suicide watch on the following day. The second incident occurred on February 27, 2019. The patient was placed into the WRAP in a safety cell due to combativeness and suicidal threats; he remained in the WRAP for 26 minutes and was cleared from suicide watch later that day. The third incident occurred on March 16, 2019, when the patient refused to exit his cell and cooperate with custody direction. He was placed into the WRAP in a safety cell for 48 minutes, and he was subsequently removed.

There was appropriate documentation and auditing of restraint usage by the Compliance Sergeant.

The monitor had concern that the information and documents reviewed may not have included the total number of WRAP incidents during the monitoring period. As the use of

18

restraints was an important area of concern, a determination of compliance will be deferred until the next visit.

> ■ *ii. Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A shift supervisor and medical staff shall oversee the exercise. If unsuccessful in allowing inmates to exercise their arms and hands in a range of motion exercise, safety staff shall explain on the observation log why extremities could not be exercised and a shift supervisor shall be notified.*

**Findings: Noncompliance**

Review of an incident of WRAP use during January 2019 lasted for greater than one hour, and custody documentation did not include documentation of release of limbs for range of motion exercises.

> ■ *On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.*

**Findings: Substantial Compliance**

Documentation was provided that indicated that the compliance sergeant audited the use of the WRAP.

> ■ *Medical and mental health staff shall be consulted before any planned use of force on an inmate. Custody staff in concert with medical staff will develop the most effective and appropriate means of imposing*

> *compliance with rules and regulation, including attempts at de-*
> *escalation. It is understood that it is the goal of custody staff to use the*
> *least amount of force necessary to ensure compliance with rules and*
> *regulations. Planned use of force will only be used after verbal*
> *attempts to obtain compliance.*

- *Any use of force will be documented on a use of force form.*

**Findings: Noncompliance**

Incident reports were reviewed for the monitoring period. There was documentation that medical and/or mental health staff were contacted during emergency use of force on at least three occasions; however, at least two incidents were noted in which mental health was not contacted prior to planned use of force.  Since the last monitoring visit, this issue was included in custody officer training.

> *Mental Health Grants*

- *Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.*

**Findings: Substantial Compliance**

Plans continued to build a 10-bed regional Jail Based Competency Treatment program (JBCT) in the C-pod.  These inmates currently await trial at the jail, where they remain non-adherent with treatment and pose a risk to themselves and others. This type of

20

unit can assist in stabilizing and treating inmates who present with psychosis and inability to participate in court proceedings.

Completion of the new jail construction was planned for early October 2019 with occupancy planned for early 2020. When questioned regarding mental health treatment space, the supervisory staff reported that eight treatment rooms would be made available for medical and mental health staff which would be located adjacent to the housing unit allowing for decreased escort requirements. There were no plans for moving the segregation housing units.

*Inmates Who Have Been Declared Incompetent to Stand Trial*

- *The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period. As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment. The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for orders to show cause to be directed the State of California) to expedite the transfer of inmates who have been*

21

*determined to be incompetent to stand trial to an appropriate State*

*facility.*

**Findings: Substantial Compliance**

Not all inmates who were declared incompetent were routinely placed into transition cells in administrative segregation and seen by medical staff daily upon a Court finding the inmate to be incompetent to stand trial. There was increased coordination between custody and mental health staff regarding timely notification when an inmate was found incompetent to stand trial. Mental health staff then determined appropriate housing. Placement into administrative segregation cells was determined by the inmate's ability to function in general population.  More stable individuals were usually housed in general population, whereas less stable individuals unable to function in general population were housed in administrative segregation where they were seen daily. Additionally, inmates who were declared incompetent were discussed during the newly created Multidisciplinary Treatment Meeting (MDTM). Mental health staff continued to contact the inmate's attorneys to begin the process of evaluation and eventual transfer to an inpatient unit for incompetence to stand trial, and examples were noted during the visit as well as in healthcare records reviews. The staff continued to work hard to timely transfer those individuals to a forensic unit for stabilization.

Please also refer to the previous comments regarding plans for the JBCT.

The process that the facility developed for the identification, referral and monitoring of inmates who were considered or declared incompetent appeared to be adequate and sufficient to allow for a determination of substantial compliance.

*Treatment Plans*

22

> ▪ *CFMG will develop individual treatment plans for the treatment of*
>
>   *inmates who are suffering from mental illnesses.*

**Findings: Noncompliance**

Since the last monitoring visit, the facility implemented prior recommendations that resulted in significant improvements in treatment planning. A weekly Multidisciplinary Treatment Meeting (MDTM) was instituted which included mental health clinicians, psychiatry, nursing, classification, the ombudsman and custody supervisory staff. County mental health staff attended the meetings monthly. The expert attended the meeting and reviewed the minutes of prior meetings.  Inmates with mental health and medical concerns were discussed, including PC 1370 patients, inmates on suicide watch, referrals from classification, hospitalized patients, medication nonadherence and other important issues of concern. There was good interdisciplinary discussion from all disciplines with appropriate treatment planning.  Documentation of treatment planning was generated at the meeting. This was an excellent forum for the communication of needed clinical information.

Healthcare records continued to lack appropriate individualized treatment planning. Additionally, inmates with significant and repeated incidents of self-harm were not provided with behavioral plans to help to address those dangerous behaviors.

Although significant improvement was noted during this visit, these developments were recent and not in place during the entire monitoring period.  For this reason, a finding of noncompliance was made.

> ▪ *Consideration of Mental Illness in Inmate Discipline*
>   - *Mental illness will be considered in administering any disciplinary*
>
>     *measures against an inmate. Custody staff are encouraged to contact*

23

> *the appropriate qualified mental health care staff when evaluating the*
> *level of discipline for an inmate with mental illness.*

**Findings: Noncompliance**

A new procedure was underway for mental health to work with custody to receive notification of all disciplinary actions, so mental health inmates could be identified and to provide clinical feedback regarding possible consequences of disciplinary actions.

There continued to be inconsistent documentation on the Disciplinary Action Reports regarding whether the inmate was receiving mental health services, and if medical was consulted.

> *Space Issues*
>
> o *Defendants shall develop and implement a Mental Health Care*
> *Implementation Plan to more thoroughly ensure timely access to*
> *necessary treatment by Qualified Mental Health Professionals for*
> *prisoners with mental illness, including . . .adequate clinical and*
> *administrative treatment space....*

**Findings: Noncompliance**

Adequate treatment space for patient interviews, primarily in the main jail and especially in A and B Pods remained problematic.  Since the last visit, the facility attempted to address the issues regarding confidential patient interviews. White noise machines were installed in the areas primarily utilized by mental health staff for patient interviews. Portable white noise machines are planned for purchase to use in the main jail. As was previously mentioned, the white noise machine in the intake area resulted in limited improvement in

24

confidentiality. Conversely, the addition of the white noise machines in the area behind intake and in the rehabilitation dormitory areas functioned well in improving sound confidentiality. The women's infirmary area was also utilized for interviews; however, no white noise machine was placed in this area.  Due to the configuration of the room, if the officer remained away from the door outside the room, sound confidentiality was maintained.  Of concern was an observed medical encounter in which the officer was present inside the room.  Discussions were conducted with custody supervisory staff regarding the appropriate placement of officers outside the room (unless contraindicated). Additionally, the issue of confidentiality for clinical encounters will reportedly be addressed during training.

Dedicated office space was provided to the psychiatrist, and the remainder of the mental health staff shared an office in the infirmary area. This office was not utilized for clinical encounters.

*Administrative Segregation*

- *The Mental Health Implementation Plan shall require classification to assess a totality of factors when assigning prisoners to administrative segregation units. It is understood that the goal of Defendants is to limit the use of administrative segregation for prisoners with serious mental illness.*

**Findings: Noncompliance**

This issue was unchanged. The segregation units continued to function as de facto mental health units; the dormitories also housed some chronically mentally ill inmates. Mentally ill prisoners were routinely housed in the segregation units, and the placement of such individuals on these units continued to not be limited. There appeared to be better communication to mental health regarding segregation placement.

25

The monitor toured the men's and women's segregation units.  The units continued to house severely mentally ill individuals, many who were treatment non-adherent refusing medications and treatment interventions.  Some of these individuals were unable to participate in group and individual therapy out of cell due to their decompensated state. Mental health staff and inmates reported that in-cell materials, such as puzzles, work packets and materials for journaling, were provided to these individuals. Onsite observations confirmed this finding.

Discussions were conducted regarding the need for improved documentation of the provision of in-cell activities.  The mental health and custody staff indicated that this would be an area of focus.

Although measures continued to be instituted to mitigate against the effects of segregation placement, such as group therapy, daily nursing checks and at least weekly mental health rounds, these units remained occupied almost exclusively by mentally ill individuals. Some of these individuals required inpatient treatment for stabilization. It is hopeful that the opening of the JBCT unit will assist in more appropriately housing some of these severely mentally ill individuals.

- *The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation...*

- *The Mental Health Implementation Plan shall address suicide watch and suicide precautions procedures to ensure that prisoners in crisis are not placed in punitive and/or unsanitary conditions.*

**Findings: Noncompliance**

There was a lack of documentation of the required placement screening for all prisoners for mental illness and suicidality with segregation housing. As previously mentioned, mental health and classification staff worked to improve notification of segregation placements.

- *Inmates with a serious mental illness who are housed in Administrative Segregation will be scheduled for a weekly appointment with a qualified mental health provider. Nursing staff shall conduct mental health rounds in Administrative Segregation daily, separate and apart from medication distribution.*

**Findings: Noncompliance**

Staff and inmate interviews as well as onsite observations and healthcare records reviews documented that segregation inmates were seen weekly by a qualified mental health provider. Nursing rounds, however, were not always documented daily in administrative segregation.

*Suicide Prevention*

- *Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.*

**Findings: Noncompliance**

All cells in the administrative segregation units (A, B, R and S) had previously been modified to remove potential tie-off opportunities and, fencing was in place on the upper level and stairway to prevent jumping and self-harm. Additionally, modifications were made to the windows in the administrative segregation cells to prevent ligature points.

Of note was the recent suicide of Patient 11, who committed suicide by asphyxiation in an administrative segregation unit, A-pod.  This was accomplished by the inmate tying a ligature between holes in the bunk and the legs of the bunk, lying beneath the bed with resulting asphyxiation.  This unusual means of hanging was the first such incident reported at the facility.

The monitor toured the cell where the suicide occurred with the jail captain.  In addition, the monitor had a teleconference with the jail captain prior to the visit regarding the completed suicide. The captain informed the monitor that further modifications would be made to all the segregation beds to eliminate the opening in the bunk and to create a skirt around the bottom of the beds, eliminating ligature or an inmate lying beneath the bed.

- *Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior, Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal.*

- *Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.*

- *All welfare checks shall be documented on a welfare check log. The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance. Monthly spot checks for compliance will be conducted by the Compliance Sergeant at least weekly with monthly audits.*

**Findings: Noncompliance**

Samples of welfare check logs were reviewed for all segregated housing units, including men's and women's holding and the administrative segregation units.  Lapses were noted in the required custody welfare checks resulting in a finding of noncompliance.

It should be noted that the copies provided were at times difficult to read making verification also difficult. Documentation of spot checks for compliance by the Compliance Sergeant was provided, and it confirmed the above observation. A review of the daily briefing for custody staff indicated that this issue was addressed in that forum.

- *Increase in Time Outside of Cell and/or Increasing Programs*

- *Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:*
  - *3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)*
  - *14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time*
  - *2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail) ii. Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking and receiving area will be guaranteed the following weekly times out of their cell:*
    - *3 hours of week for exercise*
    - *14 hours a week in the common area*
      - *inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services,*

**Findings: Noncompliance**

Review of compliance audits indicated that out of cell time was negatively affected on occasion for various reasons.  It did appear that patients housed in segregation were offered two hours of groups per week; however, a significant number patients were unable to attend due to their level of mental health instability.

30

The monitor observed administrative segregation group therapy sessions conducted in the men's and women's units. The groups were facilitated by a LFMT. Custody officers were not present in the groups. The content of the groups remained clinically beneficial, and group participants unanimously reported satisfaction and benefit from their participation. Staff and inmates reported that they were offered two hours of group therapy weekly.

The monitor observed the LFMT conducting rounds in the women's segregation unit prior to group therapy. It was observed that all inmates were encouraged to attend group therapy.  The LFMT indicated that in-cell activities and materials, such as journaling, puzzles and artwork were provided for those not attending groups.  Some of those individuals were severely ill and either refused to attend groups or were so psychotic and disruptive that they were unable to attend and fully participate in group therapy.

There appeared to be a mechanism in place to evaluate individuals for the appropriateness of group participation.  Many of the individuals were in need of inpatient treatment for stabilization and were treatment non-adherent.

The monitor discussed the need for improved documentation of non-group, in-cell activities, particularly for those individuals unwilling or unable to attend groups. The supervisory staff indicated plans to address this issue.

*Quality Management*

31

- *Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit findings will be reported to the Quality Management Committee at its quarterly meetings.*

- *All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met.*

- *All completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure.*

**Findings: Noncompliance**

Minutes of an April 2019 quality assurance meeting were provided.  As was previously reported, the minutes failed to document appropriate identification of issues of deficiency with corrective action plans and follow-up.  Additionally, no information was provided to the monitor regarding qualitative review of the completed suicide that occurred during the review period.

The monitor met with Wellpath local and regional supervisory staff to discuss the documentation of quality assurance activities and audits as well as documentation of mortality and morbidity and the lack of provision of that documentation to the monitor for adequate

assessment of the quality assurance program at the Monterey County Jail. The monitor was informed that Wellpath had a robust quality assurance program which included mortality review. A copy of the mortality and morbidity process was provided.  The supervisory staff indicated that they would work with their company and legal representation to provide the necessary documentation to demonstrate compliance.

## Summary and Recommendations

The following are recommendations to address the issues of concern identified in this report.

1.  The facility should better document Quality Assurance meetings and efforts to ensure that areas of deficiency are identified, corrective action is developed, and monitoring occurs to ensure that the identified issue is corrected. More frequent meetings would also be beneficial.

2.  The facility should develop and/or better document a mortality review process that critically examines inmate deaths as well as serious self-harm incidents to identify areas of deficiency, corrective action and opportunities for improvement.

3.  The facility should continue to work to improve access to timely inpatient psychiatric care for all jail inmates in need of such services.

4.  The facility should continue to work to address the lack of confidentiality in the intake process and for clinical contacts.  The facility should continue to examine current treatment space to identify if physical plant issues negatively affect the provision of confidential clinical encounters.

33

The facility should work to adjust or replace malfunctioning white noise machines in those areas noted during the visit to address poor patient confidentiality. Clinical contacts should not occur in private settings that do not afford sound confidentiality.

5.     The facility should work to ensure sufficient mental health staffing to allow for the completion of the Initial Mental Health Assessment and Appraisal by conducted by a Qualified Mental Health Professional for all arriving inmates.

6.     The facility did not track the timeliness of response to inmate requests. This would be an optimal area for quality assurance review to examine the timeliness and appropriateness of response to inmate requests.

7.     The facility should address lapses in the documentation of daily nursing rounds in segregation.

8.     The facility should ensure that custody welfare checks are timely completed and examined by the Quality Assurance process to ensure compliance.

9.     The facility should work to ensure timely medical review and assessment of inmates placed into safety cells.

10.    The facility should ensure that inmates are offered a mattress or safety sleeping bag when indicated while housed in the safety, booking and sobering cells with appropriate documentation. Corrective action should also be documented when staff fail to address this concern.

34

11.              The facility should ensure that medication continuity occurs at the time of jail intake. Clinical rationale should be provided for cases of delays in medication continuity

12.              The facility should conduct a comprehensive staffing analysis to assess current custody staffing levels and their effect on the provision of mental health services. Additional psychiatric staffing and the addition of a substance abuse counselor should also be considered.

13.              In lieu of placement of inmates who were declared incompetent to stand trial into transition cells in administrative segregation, the County should continue to work to expedite the transfer of inmates who were declared incompetent to stand trial to an appropriate inpatient facility.

14.              The facility should provide ongoing training and supervision to mental health staff regarding appropriate individualized treatment and behavioral planning.  Individualized treatment planning should be documented in the healthcare records. Suicide risk assessments should include appropriate safety planning.

15.              The facility should document any custody/classification and mental health meetings regarding the consideration of mental illness in inmate discipline. Additionally, training should be provided regarding appropriate documentation on the Disciplinary Action Reports if the inmate was receiving mental health services and if medical was consulted.

16.        The facility should continue to work to improve and to provide appropriate documentation of the provision of out of cell activities in segregation.

17.        The facility should continue to examine current treatment space to identify if physical plant issues negatively affect the provision of confidential clinical encounters.

18.        The facility should decrease the use of administrative segregation as de facto housing for mentally ill individuals. In lieu of alternative placement, mitigating factors such as clinical contacts, rounding, groups and other out of cell activities should occur as outlined in the Settlement Agreement and Implementation Plans.

19.        The facility should ensure that the required placement screening for all prisoners for mental illness and suicidality with segregation housing are documented.

20.        The facility should ensure that placements in safety cells do not exceed 24 hours, and timely transfer those individuals to NMC that require prolonged safety cell placement.

21.        The facility should work to better document that range of motion exercises are conducted for inmates in restraint greater than one hour.

22.        The facility should ensure that mental health/medical staff is contacted and that attempts at de-escalation occur prior to planned use of force.

23.        The County and contractors should work to develop corrective action plans to address the ongoing deficiencies listed in this report.  These

corrective action plans (CAPs) should include the specific deficiency identified, plan for correction, date of anticipated completion, persons responsible for correction and any identified impediments to completion of the corrective action.

Please contact me should you have any questions regarding this report.

Respectfully submitted,

X ~Kerry C. Hughes, MD~

Kerry C. Hughes, M.D.
MentalHealth Unit

Kerry C. Hughes, M.D.
1579 Monroe Dr., Suite F, Box 612
Atlanta, GA 30324
Phone: ■■■■■■
Fax: 404-364-9708
Email: dockc99@aol.com

37

# Exhibit 27

# MONTEREY COUNTY JAIL (MCJ)
# HEALTHCARE RECORDS REVIEW
# BY KERRY HUGHES, M.D.

## Patient 1

This patient was booked into the jail on January 10, 2019; he had a history of recent incarceration at the MCJ during July and August, 2018.  The Medical Intake Triage/Receiving Screening was completed on that date. The screening nurse noted that the patient reported that he was suicidal; he also exhibited elevated blood pressure and somnolence.  The patient arrived at the facility with a spit mask and restraints from the Monterey Police Department. He was sent to Natividad Medical Center (NMC) for clearance and returned to the jail on Level 2 suicide watch. The screening was negative for mental health hospitalizations or medication treatment; he did report recent daily marijuana and alcohol use, but he denied current alcohol withdrawal symptoms. The healthcare record also noted past placement in the safety cell at MCJ. The screening was otherwise unremarkable, and it was consistent with his most recent screening conducted during July 2018.

Documentation indicated that he was initially placed into the sobering cell on the day of arrival due to his history of alcohol abuse.  He was then removed from the sobering cell and placed into the safety cell on Level 2 suicide watch due to danger to others and himself. His behavior was described as uncooperative; and he reportedly spit at staff, hit his head on the glass and placed his head in the toilet after indicating that he wanted to kill himself. His behavior improved, and suicide watch was discontinued on 1/11/19.

It appeared that he was returned to the safety cell later that day (January 10, 2019 at 2320) due to danger to self, and he remained on Level 2 suicide watch until January 11, 2019 at 0826 when it was discontinued by the social worker. The patient was subsequently housed in segregated housing.

The patient was seen for follow-up by mental health staff on 1/12/19, 1/13/19, 1/14/19, 1/20/19, 1/27/19, 1/28/19 and 2/4/19. At his 1/28/19 visit, he requested to see the psychiatrist for an assessment.  He reportedly requested Buspar, but later indicated that he did not want medications. The clinician consulted with the psychiatrist who declined to add the patient to his schedule due to release in several days, with subsequent inability to monitor medications.  The patient was instructed regarding access to mental health services after release from jail.

## Findings

This patient was appropriately referred to NMC for clearance; however, he was quickly returned to the jail.  He was appropriately placed on suicide watch due to self-injurious behavior and threats. There was documentation of medical evaluation within one hour of safety cell placement. There was also documentation of daily nursing rounds in segregation. The patient was seen daily by mental health staff for follow-up after discontinuation of suicide watch.

1

27-1

Of note was the decision by the psychiatrist to not see the patient due to upcoming release from jail.  The patient should have been scheduled for evaluation, and medications could have been continued and monitored at his local mental health facility. This decision to not see the patient may be related to workload issues for the psychiatrist and the need for increased psychiatric staffing.

**Patient 2**

This patient had multiple brief incarcerations at the MCJ.  His history included suicide monitoring at the jail, as well as treatment with Remeron and Zyprexa. He received the Medical Intake Triage/Receiving Screening on January 19, 2019; he had previously been incarcerated at MCJ six months prior. He denied recent treatment with psychotropic medications, mental health treatment or alcohol/drug withdrawal symptoms.  He acknowledged daily use of methamphetamine, and the nurse indicated that he appeared intoxicated. His screening was otherwise unremarkable, and he was recommended for placement in general population.

It appeared that the patient was subsequently released from jail; however, he was re-incarcerated on April 4, 2019. He did not appear intoxicated at the time of the Medical Intake Triage/Receiving Screening completed on that date, and the screening was consistent with the prior screening. He was again referred for housing in general population.

The patient was placed into the safety cell on Level 2 suicide watch on April 4, 2019 at 1617 due to danger to self.  There was not documentation that he was evaluated within one hour of placement; a note by the nurse indicated that no initial assessment was completed upon placement on Level 2 suicide watch.  A Suicide Watch Initial Assessment for Mental Health was completed which was essentially unremarkable. Suicide watch was discontinued after mental health evaluation on April 5 at 1807.

The patient was seen by the psychologist on at least four occasions on April 5 for crisis management. He was returned to suicide watch at Level 1 on the same date at 1750 due to hitting his head on the cell wall after reporting auditory hallucinations.  Documentation indicated that medical assessment occurred at 1953, approximately two hours after placement; however, it was unclear what the actual time of assessment was due to multiple different entries.  The level of suicide watch was decreased on April 6 at 0900; however, it was again increased to Level 1 at 1720. He was seen by the psychologist after he attempted to hit his head on the cell wall and refused psychiatric assessment on April 6, 2019.  He was referred to NMC emergency department (ED) as he had remained on Level 1 suicide watch for greater than 24 hours. Documentation indicated that the patient returned to MCJ within several hours, and suicide watch (Level 1) was resumed as he continued to threaten self harm. Information from NMC ED indicated that the patient did not meet criteria for 5150 hold, that his depression and suicidality was "situational" and that he was cleared for return to the jail.

2

A referral was made to the psychiatrist on April 8 as the patient remained on and off Level 1 and 2 suicide watch and continued to threaten to hit his head on the wall. He was seen by telepsychiatry (Dr. ████████ on that date. Remeron was ordered at that time.

The patient was released on or about April 11; the nursing discharge instructions and follow-up indicated that he was not suicidal at the time of release.  He was again arrested and received the Medical Intake Triage/Receiving Screening on May 28, 2019. The findings of this screening included additional information; he acknowledged a history of mental health hospitalization one to two years' prior, a past diagnosis of "anxiety and depression", a history of substance abuse treatment and prior suicide watch while incarcerated with a past suicide attempt two years prior by overdose. He also reported suicidal ideation at the time of screening. He was also described as depressed and disheveled with pressured speech. He was emergently referred to mental health at that time. It appeared that he was placed into the safety cell on that date due to danger to self at 0305 on Level 2 suicide watch. There was not documentation of medical assessment within one hour of placement.

The patient was seen by the psychiatrist on May 29, 2019.  He was minimally cooperative to interview, and he remained with suicidal ideation. He was provided with a diagnosis of Major Depressive Disorder, recurrent and Methamphetamine, Opioid and Cannabis Use Disorder. Suicide watch was continued.

A Suicide Watch Initial Assessment for Mental Health was completed on May 30, 2019 by the psychologist.  Based upon the assessment, suicide watch was discontinued at that time.

The Initial Mental Health Assessment and Appraisal was completed on June 3, 2019 by a mental health clinician. The assessment documented a history of hospitalization at NMC, treatment for depression in prison, no outpatient psychiatric treatment or medications, recent methamphetamine use and previous treatment with Remeron at the MCJ. The patient denied current suicidal ideation, but he acknowledged a history of suicide attempts. He was referred for further mental health treatment.

**Findings**

There was not documentation that the patient was evaluated within one hour of placement in the safety cell on April 4, 2019, April 5, 2019 and May 28, 2019. Based upon the information in the healthcare record, it appeared that this patient remained in the safety cell for greater than 24 hours prior to transfer to NMC.

There was a delay in psychiatric assessment and the ordering of medications for this patient with a known history of treatment with psychotropic medications at MCJ.  He arrived on April 4, and Remeron was not ordered until April 8.  There was not documentation that medications were ordered at all during the other incarcerations during the review period. This was concerning as the patient was provided with a diagnosis of depression, and on occasions he reported auditory hallucinations with head banging requiring psychiatric assessment and possible treatment.

3

There was documentation of completion of the Initial Mental Health Assessment and Appraisal. There was documentation of daily mental health assessment while the patient was on suicide watch. Suicide risk was appropriately assessed.

This patient was seen by telepsychiatry on April 8, 2019 by Dr. ████    The progress note indicated that the patient was calm and not engaging in self-injurious behavior at the time of the assessment.  The note also documented that informed consent was obtained for treatment with Remeron; however, there was not documentation located indicating consent for telepsychiatry. There was not documentation that the patient was seen by a physician or mid-level provider within 24 hours of the telepsychiatry assessment, nor was there documentation that a psychiatric nurse was present during the telepsychiatry assessment.

Although there was documentation regarding discharge medications upon release from the jail, the documentation regarding discharge instructions and medications in the healthcare record was incomplete, making it unclear whether a prescription for Remeron was provided after his release from jail in April 2019.


**Patient 3**

This patient received the Medical Intake Triage/Receiving Screening on November 30, 2018. At that time, she denied treatment with psychotropic medications, mental health hospitalizations or outpatient treatment. She was cleared for transfer to general population.

There was documentation that the facility was contacted by the patient's mother who provided information regarding the patient's diagnosis of schizophrenia and her doctor's name and number.

It appeared that the patient was placed into segregated housing (women's holding) on or about December 3, 2018.  There were lapses in the documentation of daily nursing contacts in segregation which were not accounted for by transfer to NMC ED (no documentation on 12/5, 12/9, 12/10, 12/22, 12/24, 12/30, 1/1, 1/6, 1/10, 1/24, 2/2, ….). Most of the nursing documentation indicated that the patient was withdrawn with minimal interaction with staff.

On December 13, 2018, the psychologist noted that the patient was actively psychotic, exhibiting withdrawn behavior and refusal to interact with mental health staff.  On that date, she was agitated, requiring handcuffing and she was subsequently injured when she reportedly attempted to assault a deputy. She refused to see the psychiatrist or to take psychotropic medications.  The mental health staff was also able to contact the patient's mother who reported that she had a diagnosis of schizophrenia; she also provided additional information regarding her past psychiatric treatment. The patient was transferred to NMC ED and was returned to the jail approximately nine hours later. She was described as actively psychotic with hallucinations, agitation and paranoia upon her return to the jail, necessitating placement on Level 2 suicide watch.

4

A note by the psychologist on the following day indicated that the patient had been sent to the ER on two occasions, but she remained psychotic and combative.  She was provided with a dose of Ativan.

The patient had some improvement of symptoms, and suicide watch was discontinued on December 15, 2019. Subsequent documentation noted almost daily contacts by the mental health staff.

An entry on February 6, 2019 indicated that the patient was discussed during the mental health treatment team meeting, and that she was on a PC 1370 order awaiting placement at the state hospital.

On March 1, 2019, the patient was seen by the psychologist in response to a referral that she was exhibiting increased psychosis. He observed areas of hair loss due to the patient pulling her hair out. She had reportedly been flushing her bedding down the toilet causing sewer problems. She was described as actively psychotic with auditory hallucinations and an inability to care for herself.  She continued to refuse medications or to see the psychiatrist. She was again sent to the NMC ED for treatment.

The patient returned from the hospital later that day; she received Haldol and Ativan intramuscular injections; however, she refused laboratory studies there. She appeared more calm and cooperative upon her return to jail.

It appeared that the patient was initially seen by the psychiatrist on March 4, 2019 after her return from NMC. She refused treatment with psychotropic medications at that time.

Regarding treatment with psychotropic medications, the patient received several stat doses of medications due to agitation and psychosis. She was seen by Dr. ███ on April 1, 2019 when she was provided with a diagnosis of Psychotic Disorder, NOS and possible schizophrenia.  He indicated that she posed a danger to herself and was gravely disabled. A nursing entry that date indicated that the patient had been placed into the safety cell, and vital signs were obtained per forced medication policy. Orders were present for Haldol injection given stat with Cogentin and Ativan on that date, as well as orders for oral Haldol, Ativan and Cogentin. It appeared that she was removed from the safety cell on the following day and returned to segregated housing.

She was seen again by Dr. ███ on April 3, 2019, when it was noted that she had been non-adherent with medications requiring involuntary medications.  She remained with psychotic symptoms.  Orders for oral Cogentin, Ativan and Haldol were provided on April 3, 2019; in addition, stat orders for the same medications were provided intramuscularly. She was seen again on the following day by Dr. ███ and again on April 5. Additional stat injections of the same medications were ordered on April 8, 2019; the healthcare record noted that a court order for involuntary medications was in place. The patient was also ordered and provided Haldol decanoate injection monthly on April 8, 2019. The patient generally refused most prescribed medications, and the only received medications appeared to be those ordered emergently (stat).

5

The patient was seen by Dr. ███████ on April 10, April 12, and April 15, 2019. She was seen by Dr. ███████ on April 16. 2019 and May 2, 2019. It was noted that the patient remained medication non-adherent.

There was documentation that the patient was offered group therapy.  She initially refused; however, later documentation indicated that she did intermittently participate in groups.

It appeared that the patient was released from jail on May 8, 2019 to the state hospital.

**Findings**

There was documentation that the patient was evaluated within one hour of placement in the safety cell.

There were lapses in the documentation of daily nursing contacts in segregation.

This patient was seen more frequently than weekly by mental health staff while she was housed in segregated housing.  There was documentation that this patient was routinely discussed in the treatment team meetings and that frequent monitoring was recommended; at least twice weekly.

The staff appropriately referred this patient on several occasions to NMC ED for stabilization due to psychosis and self-injurious behavior; however, she was returned prior to stabilization.

The patient received involuntary medications on several occasions.  Nursing staff documented appropriate monitoring of the patient during these incidents. There was appropriate documentation for the rationale of providing emergency medications which were allowed by court order.

There was a significant delay in the initial psychiatric assessment for this patient with a known history of severe mental illness and treatment with psychotropic medications. After this delay, the patient was seen consistently by the psychiatrist with appropriate medication management.


**Patient 4**

This patient received the Medical Intake Triage/Receiving Screening on February 10, 2019.  He had a history of multiple incarcerations at the MCJ; he had recently been incarcerated during December 2018. During the December screening, he reported taking current medications that included Seroquel, which he was prescribed Seroquel during that incarceration.  During the February 2019 incarceration, the screening form noted current medications, but did not include any psychotropic medications; he denied a history of psychiatric hospitalizations or current suicidality. He was referred for general population housing. The Initial Health History was completed by the nurse on February 26, 2019; this assessment indicated no mental health concerns.

It appeared that the patient was released from jail on March 29, 2019, and his discharge medications did not include psychotropic medications.

The patient was re-incarcerated on April 27, 2019.  The Medical Intake Triage/Receiving Screening was completed on that date; this screening was similar to the previous one in which the patient denied mental health treatment or medications. He did report a suicide attempt by overdose that occurred during 2005; however, he denied current suicidality.  The screening did note signs of depression. The Initial Health History was completed by the nurse on May 7, 2019; this assessment indicated no mental health concerns.

The patient was seen by the social worker on May 9, 2019 due to complaints of depression. The healthcare entry indicated that the appointment was rescheduled due to workload constraints. He was subsequently seen on May 11, 2019 when the Initial Mental Health Assessment and Appraisal was completed by the social worker.  The assessment noted that the patient had a history of six psychiatric hospitalizations, the last occurring ten years prior.  He had been provided with a diagnosis of Bipolar Disorder, and he reported current treatment with Seroquel. He denied current suicidality, but he had some depressive symptoms.  A priority mental health follow-up was ordered, with general population housing recommendation.

The patient was seen by Dr. ███████ on May 14, 2019.  Lithium was ordered at that time. He was seen in follow-up by Dr. ██████ on May 28, 2019.  A review of the medication administration record (MAR) revealed sporadic adherence with Lithium, and multiple no-shows were documented. Lithium levels were ordered after medication initiation.

The patient was released from the facility on June 15, 2019.

**Findings**

This patient was not seen by the psychiatrist during his incarceration from February 10, 2019 to March 29, 2019.  This was of concern, as he was prescribed antipsychotic medication one month prior during the previous incarceration. During his subsequent incarceration, this patient with a known history of treatment with psychotropic medications was not seen by the psychiatrist until seventeen days after his arrival to the jail when Lithium was ordered.  These delays and lapses in psychiatric assessment and contact bring into question the sufficiency of psychiatric staffing at the MCJ.

It should also be noted that there were several entries in the healthcare record in which the mental health clinician indicated that contacts were rescheduled due to "workload constraints". These delays in treatment illustrate the need for an adequate staffing analysis to determine the necessary staffing levels for mental health clinicians and psychiatrists to ensure timely mental health assessment and treatment.

The appropriate laboratory testing for treatment with Lithium was obtained.

There was documentation of completion of the Initial Mental Health Assessment and Appraisal.

**Patient 5**

7

This patient received the Medical Intake Triage/Receiving Screening on June 5, 2019. This screening was negative for mental health concerns.  The Initial Health History was completed on June 6, 2019; this assessment also was negative for mental health concerns.  There was not documentation that this patient requested mental health services or that he was seen by mental health staff.

**Findings**

No mental health concerns were noted upon review of this patient's healthcare record.


**Patient 6**

This patient received the Medical Intake Triage/Receiving Screening on March 28, 2019; he reported that he had been incarcerated at the MCJ five years prior.  He reported that he was currently prescribed aripiprazole, that he had last used methamphetamine two days prior, he had been provided with a diagnosis of schizophrenia, and he had a psychiatric hospitalization two years prior. He also reported a suicide attempt by overdose two years prior. He was scheduled to see mental health at the next clinic appointment. The local pharmacy was contacted to verify medications, and the only medications ordered were Benadryl as needed for itching and Propranolol.

The patient was placed into the safety cell on Level 2 suicide watch due to his suicidal ideation on March 28, 2019 at 0835.  There was not documentation that he was evaluated by medical staff within one hour of placement into the safety cell. He was removed from Level 2 suicide watch on March 29, 2019 at 2045.

It appeared that he was again placed into the safety cell on Level 2 suicide watch on the following day, March 30, 2019 at 1048.  The first nursing entry regarding this placement was at 1232. Hydroxyzine and Zyprexa were ordered on that date; a stat dosage of Ativan was also ordered by the medical physician.

A Suicide Watch Initial Assessment for Mental Health was completed on April 1, 2019. The assessment noted that the patient was depressed with psychosis; he was assessed with moderate suicide risk.

Abilify and Prazosin were ordered on April 1, 2019 by Dr. ████ Zyprexa and hydroxyzine were also discontinued. His suicide monitoring increased to Level 1 on April 1, 2019 at 2310, and on April 2, 2019, the patient was seen overnight (0148) by a mental health clinician after he attempted to hang himself; he was subsequently placed on Level 1 suicide watch in the safety cell. Stat doses of Haldol, Ativan and Cogentin were ordered.  The psychiatrist noted that Abilify and Prazosin had not arrived at the facility (ordered on the day prior).

It appeared that the patient was released from the jail on April 2, 2019.  The marriage and family therapist documented that custody had informed her that the patient was in jail on a "no file" and could be released. As the patient had actively attempted suicide less than 24 hours prior and had received sedating medications, they initially planned to have Dr. ████ evaluate the patient in

8

the morning; however, ultimately a hold was placed by the county sheriff's office. The patient was transported to NMC for evaluation, and NMC was informed of his transfer there by custody. The discharge instructions and follow-up noted that the patient reported current suicidal ideation, stating that he thought about suicide daily.

The patient was re-incarcerated on May 21, 2019. He received the Medical Intake Triage/Receiving Screening on that date which noted treatment with Prozac, as well as 5150 commitment on the day prior. He reported a suicide attempt by hanging himself with clothing on April 19, 2019, but he denied current suicidal ideation. He was scheduled for mental health assessment at the next clinic.

The patient was seen by the social worker on the following day when an Initial Mental Health Assessment and Appraisal was completed. The patient reported prior psychiatric hospitalizations at CHOMP, the most occurring three days' prior for psychosis. He reported treatment with Invega Sustenna as well as a history of suicide attempts. He denied current suicidality. The social worker scheduled priority mental health follow-up and placed the patient in mental health housing/special population housing.

The Initial Health History was completed on May 23, 2019, and the information obtained was consistent with prior assessments.

The patient was seen by Dr. ████████ on May 23, 2019. He noted that the patient had received an Invega Sustenna injection on the week prior. The patient was provided with diagnoses of PTSD and possible Substance Induced Psychotic Disorder. Abilify was ordered.

The patient was placed into the safety cell on Level 2 suicide watch on May 25, 2019 at 1727 due to suicidal ideation. There was a lack of documentation that he was assessed by medical within one hour of placement.

A Suicide Watch Initial Assessment for Mental Health was completed on May 28, 2019. The assessment noted the patient's history of suicide attempts, poor follow-up with outpatient mental health treatment, and that the patient was currently stable with good social supports. He was assessed with moderate suicide risk. He was removed from suicide watch on May 28, 2019 at 1218.

Review of the MAR indicated that the patient was generally medication adherent.

There was documentation of completion of the Initial Mental Health Assessment and Appraisal.

**Findings**

There was not documentation that the patient was consistently evaluated by medical staff within one hour of placement into the safety cell.

Although there were delays in ordering medications at the time of the initial incarceration, it appeared that this patient was not prescribed psychotropic medications on an outpatient basis. Initial medications were ordered by the medical physician. The nurse did contact Dr. ████████ and follow-up was ordered. There was a two-day delay in ordering medications during his second

9

incarceration, despite his history of treatment at the facility. These delays in medication continuity and psychiatric assessment bring into question the sufficiency of psychiatric staffing at the facility.

Documentation also indicated that there were problems with the facility obtaining prescribed Abilify as the medication were not in stock. This also resulted in delays in the patient receiving needed medications.

This patient was appropriately evaluated at the time of release from the jail and referred to NMC due to continued suicidal ideation.


**Patient 7**

This patient received the Medical Intake Triage/Receiving Screening on November 26, 2018. The screening was positive for a history of mental health treatment for schizophrenia; he also reported auditory hallucinations. It appeared that the patient was initially placed on Level 1 suicide watch from booking due to the nature of his charges.

The patient was provided with the following mental health diagnoses: Schizoaffective Disorder, bipolar type and Autistic Disorder.

He was seen by the social worker on the day of arrival; he presented with very poor insight, paranoid delusional thinking, disorganization and auditory hallucinations. He expressed his disinterest in treatment with psychotropic medications. He also made threats to harm mental health staff, and he had a recent history of very violent behavior towards others. After consultation with the psychiatrist, it was determined that the patient required a higher level of care than could be provided at MCJ.

His suicide monitoring was decreased Level 2 suicide watch on November 26, 2018 at 0438. There was documentation that he was seen by medical staff within one hour of placement.

The patient was seen by the psychiatrist on the day of arrival, when it was noted that he had been arrested for a high profile charge and he did not want to take antipsychotic medications. He had very poor insight and judgement, delusional thinking and guardedness. The psychiatrist indicated that the patient should be transferred to NMC for evaluation and management.

On the following day, he was again seen by the psychiatrist when he did subsequently agree to take medications, and Trazodone and Geodon were ordered by the psychiatrist on November 27, 2019. The patient remained with severe psychotic symptoms.

Suicide watch was discontinued on November 27, 2019, and the patient was moved to men's holding subsequently. Geodon was increased, and Trazodone was continued with follow-up scheduled with the psychiatrist on the following day.

After suicide watch was discontinued, the patient remained in a safety smock and no mattress on the orders of Dr. ▇▇▇▇ this issue was also brought to Wellpath leadership. At that time, the patient denied suicidal ideation or intent.

10

On February 14, 2019, a PC 1370 order for involuntary medications and transfer to the state hospital was granted.

Progress notes indicated that the patient presented with significant agitation and psychosis.

He was seen by the psychiatrist for evaluation and follow-up on December 5, December 11, December 25, 2018, January 2, January 4, January 23, March 7, March 28, April 1, April 2, April 3, April 5, April 12, and April 15, 2019.

Segregated Population Observation Logs were reviewed.  There were lapses in the documentation of daily nursing rounds in segregation; some of the dates for which there was not documentation included 1/10/19, 1/15/19, 1/21/19, 1/24/19, 2/1/19, 2/3/19, 2/5/19, 2/10/19, …

Attempts were made to involve the patient in group therapy; however, he was unable to effectively participate due to his psychotic symptoms.

A planned cell extraction was planned for February 21, 2019, after the patient covered his window and camera with continued psychotic behavior and thinking.  Dr. ███ was consulted, and mental health was onsite for the planned extraction. The patient complied with custody orders to leave his cell for cleaning without an extraction, and he was returned upon completion. A similar situation occurred on March 26, 2019, and no extraction occurred.

There were several orders for emergency/stat medications for this patient. On March 28, 2019 an attempt was made for the patient to see the psychiatrist, but he refused presenting with agitation and psychotic behavior.  At 1032, the patient was given a stat dose of Haldol intramuscular with Ativan and Benadryl.  At 1313, an order for Seroquel dose to be provided, then Seroquel 300 mg at night was provided. At 1617, a telephone order was provided allowing for the patient to have a mattress, but to remain in a safety smock.

On April 1, 2019, the patient was placed into the safety cell due to danger to self; the patient was ordered Haldol Decanoate injection every four weeks, and Seroquel was discontinued at that time. The reviewer was unable to determine the exact time that placement occurred. He was released from the safety cell on April 1, 2019 at 1319 and was returned to men's holding where he remained with periodic agitation.

On April 2, 2019 at 1316, stat doses of Haldol, Ativan and Cogentin were ordered due to severe agitation, combativeness and psychosis; stat medications were again ordered on April 17 and May 1.

A review of the MAR indicated that the patient was adherent with prescribed medications; however, some progress notes indicated that he had refused medications on occasion.

The patient remained intermittently cooperative with staff.  His room and hygiene were unkempt, with feces and trash on the floor and windows. He reportedly attempted to throw feces at custody and clinical staff.

He was seen by the psychiatrist on April 24, 2019 when his symptoms remained unchanged.

The patient was transferred to Atascadero State Hospital (ASH) on May 7, 2019.

11

## Findings

This patient was followed daily by mental health staff; he was initially seen twice daily due to the severity of his symptoms.  Contacts were later decreased to biweekly.  He was seen timely by the psychiatrist upon arrival to the jail with consistent follow-up at least monthly; in fact, he was seen daily during periods of increased agitation and disorganization. There did; however, appear to be a lapse in psychiatric contact during February 2019.

The patient was appropriately placed on suicide watch with clinically appropriate follow-up after discontinuation. It appeared that he was also seen by medical within one hour of safety cell placement.

There was documentation that this patient was consistently discussed in the mental health treatment planning meetings with discussion of appropriate treatment planning.

There was also documentation of involvement of mental health/medical with planned cell extraction.

A treatment plan was outlined in the April 3, 2019 psychiatric progress note.  It indicated that the patient would remain in men's holding in a suicide smock, not because he threatened to kill himself, but because he was a high profile patient and they did not want to provide him with opportunity to use any clothing or bedding to hang himself. Although the treatment plan was otherwise clinically appropriate and individualized for this patient, it was of concern that the patient remained without clothing and bedding for several months due to the possibility of suicidality. Although the concern that this patient may have been at high risk for self-harm was understandable, the provision of a safety mattress was indicated along with an adequate assessment of suicide risk to determine his actual level of suicide risk.  Denial of such basic items as a mattress may lead patients to not convey true suicidal ideation and intent due to the perceived punitive nature of such measures. It did appear that the patient was later allowed a mattress.

This patient required inpatient psychiatric treatment for stabilization.  An order for involuntary medications was pursued by the psychiatrist and obtained allowing for medication treatment.  He was ultimately transferred to ASH for needed stabilization.


## Patient 8

This patient's healthcare record was requested for review.  The record indicated that she was incarcerated from November 7, 2018 to November 16, 2018.

### Findings

The patient was not incarcerated during the review period.


## Patient 9

This patient had a history of multiple incarcerations at the MCJ. He had previously been incarcerated at MCJ during August 2018. He received the Medical Intake Triage/Receiving Screening on February 13, 2018. He denied current medications, but he reported that he was at NMC on the day prior due to a 5150 commitment (he reported belief that he was being followed). He reported daily use of heroin as well as a history of withdrawal symptoms. He was placed on a withdrawal protocol.

The patient was seen by the psychiatrist on February 19, 2019; Remeron and Depakote were prescribed. The patient was released from jail on February 22, 2019, and he returned to jail approximately one month later. The Medical Intake Triage/Receiving Screening was completed on April 4, 2019. At that time, he denied current medications, reported continued heroin and methamphetamine use and past suicidal ideation, but no attempts. He was again placed on a withdrawal protocol and cleared for general population housing. He was seen by the psychiatrist on April 9, 2019 when Depakote and Remeron were ordered. He was released from jail on April 12, 2019. He was provided with a prescription for Depakote and Remeron.

The patient was re-arrested and returned to jail; the Medical Intake Triage/Receiving Screening was completed on April 17, 2019 which noted the above medications and substance use. Depakote and Remeron were ordered on that date when the patient was seen by the psychiatrist.

The patient was placed on Level 2 suicide watch on April 17, 2019 at 1306. There was documentation that he was evaluated by medical within one hour of placement. A Suicide Watch Initial Assessment for Mental Health was completed on April 17, 2019. The patient was described as intoxicated and agitated. His suicide risk was assessed at low. Subsequent assessments were completed on the following day (two), and he was assessed with low risk on both occasions. Suicide watch was discontinued on April 18, 2019. Subsequent assessments were also completed on May 5 (moderate risk), and May 21 (low risk).

The patient was placed into segregated housing on April 19, 2019. He was again placed on Level 2 suicide watch on April 22 at 1950; there was not documentation that he was seen by medical within one hour of placement. It appeared that suicide watch was discontinued on the following day, and he was removed from the safety cell.

There was a lapse in documentation between April 28, 2019 when the patient was housed in segregated housing and May 4, 2019 when he was placed into the safety cell on Level 2 suicide watch due to danger to self; it appeared that he may have briefly been moved from segregation during this time. There was documentation of medical assessment within one hour of placement. He was removed from the safety cell on the following day and returned to segregated housing. He was again placed into the safety cell on May 21, 2019 at 0110 due to suicidality. There was documentation of medical assessment within one hour of placement. He was returned to segregated housing on the following day after suicide risk assessment.

Review of the MAR indicated sporadic medication adherence, with intermittent medication refusals documented.

There were several diagnoses present in the healthcare record, including Borderline Personality Disorder, Unspecified Mood Disorder, Depression, Anxiety and possible Substance Induced Mood Disorder.

**Findings**

There was appropriate assessment of suicide risk for this patient. He was placed on suicide watch as indicated; however, there was a lapse in the documentation of medical assessment within one hour of placement for one placement. Daily nursing contacts in segregation were documented. There was documentation of the provision of discharge medications upon release from the jail.

This patient was seen by the psychiatrist six days after his incarceration during February 2019 when medications were ordered; there was a three-day delay in medication continuity upon arrival to the jail for the April 2019 incarceration. These delays in the ordering of medications and psychiatric assessment bring into question whether psychiatric staffing was sufficient at the MCJ.

The appropriate laboratory testing for treatment with Depakote was conducted.

The patient was seen at least monthly while housed in segregation by mental health staff.

There several diagnoses present in the healthcare record for this patient. Discussion in treatment team meeting regarding diagnostic clarification may be helpful to ensure consistent treatment goals.


**Patient 10**

This patient received the Medical Intake Triage/Receiving Screening on January 8, 2019. Although she denied a history of mental health treatment, the screening nurse noted her combativeness and made a mental health referral.

It appeared that the patient was housed in segregated housing after intake. A review of the Segregated Population Observation Logs indicated that there were lapses in the documentation of daily nursing contacts in segregation.

On February 2, 2019, the patient was sent to NMC as she was not eating, drinking fluids or attending her activities of daily living (ADLs). She also appeared to be experiencing auditory hallucinations. She returned from NMC where she was admitted for inpatient psychiatric treatment on February 12, 2019. Risperdal 4 mg per day was recommended for treatment, and an order was obtained by the MCJ psychiatrist.

A note from the psychologist on February 15, 2019 indicated that the patient had not eaten or drank fluids since her return on February 12. She remained gravely disabled with no interaction with staff and loud yelling. She was returned to NMC for treatment.

On March 1, 2019, the psychologist noted that the patient had not eaten for several days and that she was defecating and urinating on her bed and refusing prescribed medications. After consultation with the psychiatrist, she was again referred to NMC. She returned to MCJ later that same day with recommendations for medications that the patient refused.

The patient was seen for psychiatric evaluation on March 4, 2019 after her return from NMC. On March 6, 2019, the patient was placed into the safety cell on Level 2 suicide watch, and she was given a stat dose of oral Risperdal. There was documentation of medical assessment within one hour of safety cell placement.

Again on March 7, 2019, the patient presented with significant disorganization, response to auditory hallucinations, and poor ADLs; she was again sent to NMC ED.  The patient returned from the hospital after two days of hospitalization. She was provided a primary diagnosis of malingering at NMC. Medication orders for Risperdal were obtained from the MCJ psychiatrist.

She was seen for follow-up by the psychiatrist on March 15, 2019. On March 18, 2019, the mental health clinician contacted the patient's attorney regarding pursuit of a PC 1370 order. On April 3, 2019, she was again placed in the safety cell at 2050 by custody staff. She reportedly became combative when asked to exit her room so that it could be cleaned, resulting in mild injury to the patient. There was not documentation that she was evaluated by medical staff within one hour of placement. She was released from the safety cell on the following day and returned to segregated housing.

Review of the MAR indicated that the patient routinely refused to take prescribed psychotropic medications. The patient was seen by the psychiatrist on April 12, 2019 for follow-up and medication evaluation.

On April 17, 2019, the patient was found incompetent to stand trial, and she was ordered transferred to NMC when a bed was available.  The order also indicated that the patient could be involuntarily medicated.

The patient was seen at least weekly by a mental health clinician.  She was unkempt with limited to no response to questions and periods of staring, response to auditory hallucinations and pacing. Her room was unkempt and smelled at times of urine. She was seen again by the psychiatrist on April 22, 2019.

On May 5, 2019, the patient presented with catatonia, including muteness, probable auditory hallucinations and urinary incontinence. She was initially placed in the safety cell.  There was documentation that medical contact occurred within one hour of placement.  She was again referred to NMC for treatment. She was returned on the following day with similar symptoms and an assessment of malingering. She was returned to segregated housing. She was evaluated by the psychiatrist on May 29, 2019.

## Findings

This patient was appropriately transferred to NMC on multiple occasions when she presented with grave disability, not eating, incontinence and at times, catatonia.  Although she was

hospitalized briefly on one occasion, she generally was returned with clinical symptoms that were unchanged.

The staff appropriately pursued and obtained a court order to allow involuntary treatment of this patient.

There was documentation of weekly mental health contacts in segregation. There was also documentation that attempts were made to engage the patient to attend group therapy; she did accept in-cell materials from the mental health staff.

There were lapses in the documentation of daily nursing contacts in segregation. Medical assessment within one hour of safety cell placement was also not always documented.

There was a delay in psychiatric assessment of this patient; she was seen for initial evaluation approximately one month after arrival to MCJ. Subsequently, she was seen at least monthly by the psychiatrist.

The provision of emergency medications for this patient appeared to be clinically indicated and appropriate.


## Patient 11

This patient's healthcare record was reviewed as he committed suicide by hanging at MCJ; he died on June 2, 2019.  The healthcare record indicated that the patient had a history of recurrent incarcerations at MCJ, as well as transfers to Natividad Medical Center for polysubstance abuse, schizophrenia and medication non-adherence.

The most recent incarceration began on April 10, 2019. He was placed on an alcohol and drug withdrawal protocol at the time of jail intake, as he was reportedly uncooperative and under the influence of alcohol. He was referred to and seen by mental health from intake on April 11, 2019 with a history of methamphetamine abuse, auditory hallucinations and paranoia on no medications.  He was minimally cooperative to interview.

It appeared that he was placed into a segregation cell on April 12, 2019, and on April 16, 2019 he was placed into a sobering cell at 1045.  At that time, he was described as uncooperative and combative. There was a lapse in contact on April 18, and on April 19, 2019, it appeared that he was transferred to a segregation cell.

There was documentation of daily rounds in segregation from April 19, 2019 to May 5, 2019; May 7 to May 29, 2019. Documentation on April 24, 2019 by the social worker indicated that the patient had refused to attend groups.  Subsequent documentation by the mental health staff indicated that the patient frequently yelled obscenities when his cell was approached, or he was nonverbal.  On May 19, 2019, he reportedly threw his lunch at custody staff. A note on May 27, 2019 noted that the patient slept on his mattress under his bed. On May 29, 2019, the social worker noted that the patient was sitting on his bed and "briefly chatted" with the clinician, but he refused to attend groups.

16

The patient was treated with Olanzapine; however, this was discontinued during January 2019.

The 14-day Health Appraisal was completed on April 20, 2019.

The patient was seen by the social worker on April 18, April 25, May 1, May 2, May 9, May 16, and May 23, 2019.  He was seen by the psychologist on May 1 in response to a referral from the LMFT who reported that the patient was more disorganized and hyperverbal.  He was described as disheveled and agitated but was determined to not be a danger to himself or others and not gravely disabled as he was eating.

The patient was last seen by mental health staff on May 27, 2019, when he was seen by the LMFT in response to a referral from custody who reported that the patient was lying on his bed and not interacting with others. He reported to the clinician that he was not doing well, and that he was experiencing auditory hallucinations. He was referred to the psychiatrist with mental health follow-up in one week.

**Findings**

Although the patient was followed consistently by mental health staff, he remained with psychosis and treatment non-adherence and was housed in the segregation unit.

It was unclear why this patient was not seen timely after arrival by the psychiatrist for medication review and ordering. It is also of concern that this patient was housed in segregation; this reviewer has commented repeatedly regarding the housing on severely mentally ill individuals in segregation who refuse treatment, groups and medications and need inpatient treatment.

There was documentation that the patient was seen within one hour of placement into the sobering cell by medical staff and was followed consistently after placement.

The reviewer will complete the assessment of this patient's care upon receipt of the custody files.

# Exhibit 28

**Monterey County Jail Mental Health Monitor's**
**Report**
**December 11, 2019 – December 12, 2019**

Overview

   The Monterey County Jail was visited for the sixth mental health monitoring tour on December 11 - 12, 2019. The following report is based upon interviews with institutional staff and detainees, healthcare records reviews, as well as review of documentation and information provided by the institution and County. This report will specifically address the institution's status and progress toward compliance with the United States District Court Northern District of California Settlement Agreement and the Implementation Plans between Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County Sheriff's Office; California Forensic Medical Group, INCORPORATED (CFMG) et al.

   This monitoring report will include review of compliance for the period of July 2019 to November 2019.

Compliance with Settlement Agreement and Implementation Plan

   *Intake Screening*

   o *Defendants will develop and implement an Intake Screening Implementation Plan that specifies standards and timelines to ensure that arriving prisoners are promptly screened for urgent medical, mental health and dental needs, with prompt follow-up and disability accommodations.*

   ▪ *Upon arrival, an Initial Health Assessment will be performed by the intake nurse to determine whether the inmate should be excluded from the facility on medical or mental health grounds. Upon acceptance into*

28-1

*the jail, all inmates will be screened by the intake nurse for urgent medical, mental health and dental needs. The intake nurse will have access to an inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail.*

- *A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.*

- *The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive findings on the suicide assessment.*

**Findings: Noncompliance**

This issue remained unchanged from the prior monitoring report.

A review of healthcare records indicated that for those cases reviewed, jail intakes continued to be seen by a screening nurse for intake screening.

Information was provided regarding patients who were transferred to Natividad Medical Center for mental health crisis evaluation and treatment, as well as those sent to the MHU for court ordered evaluation.  From the information provided, it was difficult to determine those inmates sent to NMC specifically for crisis evaluation.  Six inmates were transferred during July 2019, five inmates were transferred during August 2019, five were transferred during September 2019, and one inmate was transferred during November 2019. A partial list of transfers was provided for June 2019 which included four inmates transferred, and information was not located regarding transfers that occurred during October 2019.

Healthcare records continued to document consistent transfers to NMC for suicidal ideation and/or attempts, psychosis and agitation.

2

Records reviews also indicated that healthcare records and information regarding past medication treatment continued to be routinely requested.

The facility utilized the Initial Mental Health Assessment and Appraisal for mental health assessment of new arrivals.  The assessments were routinely completed for patients with known mental health history or those that presented with suicidality.

The facility utilized the Suicide Watch Initial Assessment for Mental Health to assess suicide risk.  It appeared that mental health clinicians consistently utilized this assessment tool for the evaluation of suicide risk, with some exceptions noted.  This was a significant improvement in suicide prevention.  This was a comprehensive assessment tool which was beneficial in determining the level of suicide risk; however, improvement was needed in the documentation of appropriate safety and treatment planning.

Healthcare records also documented that patients seen at intake were referred for routine and emergency mental health evaluation and treatment timely.

The lack of confidentiality for nursing intake assessments during the intake process remained problematic.   Due to concerns regarding safety, officers remained present outside the intake assessment room during the intake assessment performed by the nurse. The close proximity of the officers to the intake process resulted in a non-confidential assessment and could prevent some inmates from providing necessary medical and mental health information; this is especially important during the intake process when important and potentially sensitive information should be conveyed to the screening nurse.

Prior to the last visit, the facility made several changes to address this issue.  The intake room was rearranged, resulting in the nurse positioned closer to the door and the inmate sitting farther away from the door.  This change resulted in somewhat improved confidentiality as the

3

inmate was further away from the custody staff; additionally, this repositioning was much safer for the nursing staff who could more easily exit the room if necessary.

Although a white noise machine was installed over the intake room door to assist in noise dampening; the machine appeared to be malfunctioning, and it did not effectively lessen the sounds from the screening interview.  After the monitor reported these findings to the jail supervisory staff, technicians attempted to adjust the machine to provide better sound dampening; however, this attempt was unsuccessful. As this was also an issue of concern in other observed areas of inmate interview, the supervisory staff indicated that they would explore other options for noise dampening, such as smaller, portable white noise cancellation machines which might be more effective.

In addition to the above described changes, the issue of confidentiality has been added to the officer training. Review of the daily sergeant's meeting minutes documented discussion of this issue with custody staff.

Although the facility continued to attempt to address this issue, confidentiality due to the presence of custody officers in the intake area remained problematic.

There was improvement noted regarding the completion of mental health assessments for new arrivals to the jail; however, documentation of adequate safety and treatment planning remained deficient.

Review of healthcare records noted lack of documentation of intake nursing review of past healthcare records for inmates with known or recent history of mental health treatment at MCJ.  Inmate 10 had prior incarcerations at MCJ with documentation of past mental health

treatment; however, subsequent intake screenings failed to document this information or whether this information was considered in the intake assessment process.

For the above reasons, a finding of noncompliance is provided.

*Mental Health Screening*

- *Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including appropriate screening... The Implementation Plan provides that all inmates will have an initial mental health screening performed by a qualified mental health professional on the mental health staff.*

- *Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including...medication practices*

- *The medical or psychiatric provider will complete a baseline history and physical or psychiatric examination; order a therapeutic regimen, as appropriate; and, schedule the patient to be seen for chronic care clinic at least every ninety days for the length of the jail stay. Patients on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every **60 to 90** days.*

**Findings: Noncompliance**

A review of healthcare records and staff reports indicated that Qualified Mental Health Professionals completed the Initial Mental Health Assessment and Appraisals on inmates with a known history of mental health treatment and those with suicidality.  This also included those inmates referred for mental health services.

Review of healthcare records and inmate interviews continued to note occasional delays in the scheduling of initial psychiatric assessment, and at times medication initiation at the time of jail intake; however, this was improved from past visits.  The facility attempted to address this issue with improved and continued nursing supervisory monitoring and feedback.

Healthcare records reviews indicated that there were fewer, but continued delays in the initial psychiatric assessment and follow-up. This appeared to be due to psychiatric staffing workload issues, highlighting the need for a comprehensive staffing analysis to help to determine appropriate staffing levels.

- *Defendants shall develop and implement a Health Care Implementation Plan to expand the provision of care for inmates with serious medical and/or mental health needs and to ensure they receive timely treatment appropriate to the acuity of their conditions. The Implementation plan outlines the process by which inmates provide mental health sick call requests and healthcare staff respond to such requests.*
- *Nursing staff shall conduct daily mental health rounds in segregation.*

6

**Findings: Noncompliance**

Inmates continued to access mental health sick call requests by submitting them on portable tablets; in addition, a paper system for submission of mental health sick call requests remained in place. Inmate access to tablets continued to be adequate; tablets were also provided for male inmates housed in male holding cells.

The facility did not track the timeliness of response to requests. Inmate interviews did not indicate that this was an area of concern. This continued to be an optimal area for quality assurance review to examine the timeliness and appropriateness of response to inmate requests.

There were continued lapses in the documentation of daily nursing rounds in segregation.

*Safety Cells*

o *The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall responsibility for safety and security of prisoners, prompt reviews by medical of all placements, and a process of resolving disagreements between medical and custody.*

**Findings: Noncompliance**

The facility continued to primarily utilize the booking cells rather than the safety cells for suicide monitoring; however, safety cells were utilized for those inmates with self-injurious behavior and in instances when single cells utilized for suicide monitoring were not available in the intake area.  The facility noted that the previous form utilized to document placement in safety cells was confusing, and that it did not differentiate between those placed into safety cells

7

on Level 1 suicide watch; and those housed in booking cells on Level 2 suicide watch.  This form was amended to a "Health Watch Log" and separate "Safety Cell Log" and "Sobering Cell Log" forms.

Healthcare records reviews, as well as audits by the Compliance Sergeant, documented lapses in the prompt review by medical of all safety cell placements.

Facility staff denied disagreements between medical and custody staff regarding such placements; however, records reviews documented several conflicts between custody and mental health/medical staff regarding placement of inmates into safety cells and the provision of allowable items to inmates in safety cells on suicide monitoring.  Examples were noted in which inmates were provided with a blanket and smock by custody staff, despite orders prohibiting these items due to suicide risk. Additionally, of significant concern was documentation by mental health clinicians that a request for constant watch was overridden by custody staff who indicated that this was not required as the inmate was thought to be malingering.  Such determinations by custody regarding medical and mental health clinical determinations should be immediately addressed.

*Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical professional will see an inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.*

8

28-8

**Findings: Noncompliance**

Placements for suicide monitoring occurred in the booking and safety cells; placement into the safety cell was generally limited to those exhibiting self-injurious behavior or when a single booking cell was unavailable. Mental health staff made daily rounds of the booking, safety and sobering cells, and those daily clinical contacts were verified in healthcare records reviews. Documentation noted lapses in the timely medical assessment of inmates placed into these cells. This issue was audited by the Compliance Sergeant, and audits were provided and reviewed.

- *A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his findings through a report which will be sent to the Jail Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.*

**Findings: Noncompliance**

A timer remained in place in intake as a reminder for officers to perform timely welfare checks.  Additionally, this issue was discussed during the daily briefings and shift change meetings; documentation was provided that confirmed those discussions.

Review of the provided documents noted continued lapses in the documentation of safety checks twice every 30 minutes in the safety and sobering cells. Documentation of spot checks for compliance by the Compliance Sergeant was provided, and it confirmed the above observation. There were also lapses in supervisory approval for placement in safety cells.

The supervisory staff reported that late and absent documentation of timely checks was sent to the commander for review and corrective action.

- *Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11 p.m. and 7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.*

**Findings: Noncompliance**

The documentation of provision of mattresses remained problematic.  The form on which custody staff documented the provision of mattresses was organized in a way that the officers frequently did not document this provision.  The facility planned to amend the form to include a check box that indicated that provision of mattresses; this was discussed during the last monitoring report, but was not yet implemented the time of the visit.  Additionally, they

10

implemented a new procedure to provide mattresses to all inmates in safety and sobering cells on the night shift.

- *Inmates in sobering cells may have access to mattresses at the discretion of custody staff.*
- *Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.*

**Findings: Noncompliance**

See above.

- *Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.*

**Findings: Substantial Compliance**

This issue was unchanged since the last visit.  Observations during the monitoring visit indicated that the safety, booking and sobering cells were clean. Supervisory staff reported that the cells were cleaned after each use; although they reported that there was no set schedule for cleaning.

- *For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.*

**Findings: Noncompliance**

Although the facility reported that inmates did not remain in the safety cells for more than 24 hours, and they were timely transferred to NMC; the form utilized did not differentiate between inmates housed in the safety cells for Level 1 suicide watch and those housed in regular booking cells on Level 2 suicide watch. This resulted in confusion and inability for the monitor to determine whether inmates remained in a safety cell for 24 consecutive hours. Discussions with the staff resulted in changes to the form to allow for adequate determination of safety cell placements. As this change only occurred just prior to the monitoring visit, a finding of noncompliance was made.

*Medication Continuity*

- *All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.*

**Findings: Deferred**

Healthcare records reviews and patient interviews noted fewer examples of delays in the ordering of psychotropic medications at the time of jail intake. The healthcare records

12

reviewed indicated that medications were generally ordered when verified, or the inmate was scheduled to see the psychiatrist when medications were unable to be verified, or the inmate had not been medication adherent prior to jail intake.  As this is an important issue of concern, and concerns remain regarding the appropriate level of psychiatric staffing at the jail, findings regarding this issue will be deferred and re-evaluated at subsequent visits.

- *Inmates who, at the time of booking, report to Defendants that they are taking community-prescribed medications, but whose medications cannot be verified by Defendants, shall be timely assessed by a medical provider and timely prescribed medications necessary to treat their health needs.*

**Findings: Deferred**

Please see above.

- *Provision of psychotropic medications upon discharge from the jail. The Implementation Plan provides that a 30-day supply of medications be given to inmates upon discharge from the jail.*

**Findings: Substantial Compliance**

A review of healthcare records and provided documentation indicated that discharge medications were provided. There was documentation that a 30-day supply of discharge medications was called into the local pharmacy; this form was usually signed by the jail staff and the patient.

13

*Clinical Staffing*

    o   *Defendants will maintain Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to ensure adequate staffing to provide all necessary medical and mental health care. The plan will identify all needed positions based on current and projected Jail population, and the number and qualifications of medical and mental health care staff to cover each position, with shift relief.*

**Findings: Noncompliance**

At the time of the visit, the mental health staffing allocation was unchanged from the previous monitoring report and was as follows:

1.0 FTE Psychiatrist

- 40 hours per week onsite

4.0 FTE Licensed Clinical Social Worker (LCSW) or Licensed Marriage and Family Therapist (LMFT)

- 40 hours per week onsite

Since the last visit, significant staffing changes had occurred.  The LMFT/psychologist and the LCSW no longer worked at the facility, accepting jobs elsewhere.  Additionally, the remaining LMFT, who provided group therapy, planned to accept a job elsewhere.  Registry staff was utilized to fill the staffing vacancies.  Interviews for the vacant positions were underway at the time of the visit.  The supervisory staff reported that with the use of registry staff, they were down 1 FTE at the time of the visit; however, candidates had been identified to fill the vacant positions.

14

Healthcare documentation not infrequently indicated that mental health clinician appointments were rescheduled due to workload constraints. Additionally, it should be noted that there were frequent staffing changes in the mental health department noted at each of the past monitoring visits. Due to the staff turnover, the monitor again expressed concern regarding the workload issues for the clinicians at the visit to supervisory staff.  Despite repeated requests for an appropriate staffing analysis, no such assessment had occurred.  In light of the high staff turnover, an adequate staffing analysis was indicated to determine the necessary mental health staffing at the facility.

During the last monitoring visit, the workload for the psychiatrist was an issue of concern. Although the psychiatrist continued to have excessive numbers of patients scheduled; he reported that he was able to triage and ensure that patients were not delayed beyond the initial week of scheduling and to meet the timelines for initial and follow-up assessments.

Review of healthcare records indicated improvement in the timely ordering of psychotropic medications and initial psychiatric contacts.

Psychiatric hours were augmented with coverage by Dr. █████.

A workflow analysis which includes all work tasks, duties and responsibilities is necessary to determine the current mental health staffing needs.  Feedback was provided again regarding the need for an adequate staffing analysis.

Psychiatric on-call services continued to primarily be provided by Dr. █████.  An onsite psychiatrist, Dr. █████ and Dr. █████ covered in Dr. █████ absence. The facility denied the use of telepsychiatry; they noted that onsite psychiatric contacts by Dr. █████ were occasionally documented on a form titled "Telepsychiatry Consultation", resulting in

15

confusion regarding whether the contact occurred onsite or by telepsychiatry.  It did not appear that telepsychiatry was utilized during the monitoring period.

*Mental Health Care*

- o *Training*
  - ▪ *All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.*

**Findings: Substantial Compliance**

Documentation was provided that indicated that correctional staff had received training regarding the Implementation Plan.

  - ▪ *In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.*

**Findings: Substantial Compliance**

The lesson plans provided included information regarding the recognition of individuals with mental illness and suicidality. This training was in place for new correctional officers.

  - ▪ *All deputies, sergeants, and commanders will receive 24 hours of*

16

*Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates, identifying warning signs specific to inmates, and how to recognize individuals who are in mental distress and/or suicidal.*

**Findings: Substantial Compliance**

This training was documented.

- *Yearly custody staff will conduct a situational training such as a mock suicide attempt or a medical emergency. CFMG staff will also participate in the annual situational training.*

**Findings: Substantial Compliance**

Documentation was provided regarding yearly custody training for medical emergencies and suicide prevention.

*Restraint Chairs*

- *Use of a restraint chair will be documented in an observation log which will be reviewed and signed by a supervisor. Inmates shall not be placed in a restraint chair for longer than six consecutive hours.*

17

**Findings: Substantial Compliance**

The restraint chair was not utilized during the monitoring period; however, the WRAP Restraint Device was utilized.  Three incidents of WRAP use during the review period were reported by the Compliance Sergeant and were reviewed in incident reports; however, this did not include information for October 2019 during which there was reportedly no use of the WRAP. The longest duration of WRAP use was two hours and nine minutes.  The other two incidents lasted for less than two hours.  There was documentation that supported the use of the WRAP for all incidents reviewed.

There was appropriate documentation and auditing of restraint usage by the Compliance Sergeant.

> ▪ *ii. Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A shift supervisor and medical staff shall oversee the exercise. If unsuccessful in allowing inmates to exercise their arms and hands in a range of motion exercise, safety staff shall explain on the observation log why extremities could not be exercised and a shift supervisor shall be notified.*

**Findings: Noncompliance**

Provided documentation of the WRAP incidents did not include documentation of range of motion exercises performed.   Audits by the Compliance Sergeant did indicate that documentation regarding WRAP, including range of motion was appropriate.

> - *On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.*

**Findings: Noncompliance**

Documentation was provided that indicated that the compliance sergeant audited the use of the WRAP; however, that documentation did not include assessment regarding the provision of food and water, toileting opportunities or range of motion exercises performed.

> - *Medical and mental health staff shall be consulted before any planned use of force on an inmate. Custody staff in concert with medical staff will develop the most effective and appropriate means of imposing compliance with rules and regulation, including attempts at de-escalation. It is understood that it is the goal of custody staff to use the least amount of force necessary to ensure compliance with rules and regulations. Planned use of force will only be used after verbal attempts to obtain compliance.*
> - *Any use of force will be documented on a use of force form.*

**Findings: Noncompliance**

Incident reports were reviewed for the monitoring period. Two planned uses of force were noted; in one incident that occurred during September 2019, there was documentation that medical was contacted and was involved prior to the use of force. In the second incident that occurred during November 2019, there was no documentation that medical was

19

contacted prior to the planned use of force.  The inmate was seen by medical after the incident.

> *Mental Health Grants*
>
>> ▪ *Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.*

**Findings: Deferred**

Plans continued to build a 10-bed regional Jail Based Competency Treatment program (JBCT) in the C-pod.  These inmates currently await trial at the jail, where they remain non-adherent with treatment and pose a risk to themselves and others. This type of unit can assist in stabilizing and treating inmates who present with psychosis and inability to participate in court proceedings.

The scheduled opening of the unit will be February 2020; staff training is scheduled to occur during January 2020. Findings regarding this issue will be deferred pending documentation of the completion of training and the opening of the unit.

> *Inmates Who Have Been Declared Incompetent to Stand Trial*
>
>> ▪ *The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable*

*during this time period. As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment. The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for orders to show cause to be directed the State of California) to expedite the transfer of inmates who have been determined to be incompetent to stand trial to an appropriate State facility.*

**Findings: Substantial Compliance**

This issue was unchanged. Not all inmates who were declared incompetent were routinely placed into transition cells in administrative segregation and seen by medical staff daily upon a Court finding the inmate to be incompetent to stand trial. There was continued coordination between custody and mental health staff regarding timely notification when an inmate was found incompetent to stand trial. Mental health staff then determined appropriate housing. Placement into administrative segregation cells was determined by the inmate's ability to function in general population.  More stable individuals were usually housed in general population, whereas less stable individuals unable to function in general population were housed in administrative segregation where they were seen daily. Additionally, inmates who were declared incompetent were discussed during the Multidisciplinary Treatment Meeting (MDTM). Mental health staff continued to contact the inmate's attorneys to begin the process of evaluation and eventual transfer to an inpatient unit for incompetence to stand

21

trial, and examples were noted during the visit as well as in healthcare records reviews. The staff continued to work hard to timely transfer those individuals to a forensic unit for stabilization; transfer to these units reportedly occurred timelier since the last monitoring report.

Please also refer to the previous comments regarding plans for the JBCT.

The process that the facility developed for the identification, referral and monitoring of inmates who were considered or declared incompetent appeared to be adequate and sufficient to allow for a determination of substantial compliance.

*Treatment Plans*

- *CFMG will develop individual treatment plans for the treatment of inmates who are suffering from mental illnesses.*

**Findings: Noncompliance**

The weekly Multidisciplinary Treatment Meeting (MDTM) which included mental health clinicians, psychiatry, nursing, classification, the ombudsman and custody supervisory staff continued. County mental health staff attended the meetings monthly. The expert was unable to attend this meeting during the visit as the meeting occurred prior to the monitoring visit.

MDTM documentation was reviewed.  This meeting continued to be a good forum to discuss inmates with mental health and medical concerns, including PC 1370 patients, inmates on suicide watch, referrals from classification, hospitalized patients, medication nonadherence and other important issues of concern.

Healthcare and MDTM records continued to lack appropriate documentation of individualized treatment and safety planning.

22

Due to scheduling conflicts and staff turnover, not all mental health staff attended the MDTM.  Recommendations were made for the minutes of the meetings to be provided to all mental health staff to allow for improved communication of treatment planning; further, the minutes should include sufficient detail to convey this important information, and every effort should be made to allow necessary staff to attend the MDTM.

- *Consideration of Mental Illness in Inmate Discipline*
  - *Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff are encouraged to contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness.*

**Findings: Noncompliance**

There continued to be inconsistent documentation on the Disciplinary Action Reports (DARs) regarding whether the inmate was receiving mental health services, and if medical was consulted.  The custody supervisory staff reported that specific training was provided to the sergeants during October 2019; however, review of the DARs revealed continued omissions in documentation.

  *Space Issues*

  - *Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including . . .adequate clinical and administrative treatment space....*

23

**Findings: Noncompliance**

Treatment space for clinical interviews occurred in several locations based upon inmate housing.  Inmates housed in the main jail and pods were seen in rooms located in the rotunda.  Rooms in this area were also utilized for group therapy.  Inmates housed in men's holding were generally interviewed at cell-front.  Those housed in the women's holding and pods were interviewed in the women's infirmary.  Those housed in the men's dorms were seen in an interview room in the hallway near receiving.  In the rehabilitation area, the infirmary was utilized for individual contacts.

Issues regarding confidential patient interviews remained. Despite the installation of white noise machines in the intake screening room and in the hallway near receiving, officers remained just outside the open door, making sound confidentiality impaired.  The white noise machines did not appear to be functioning adequately, despite technicians attempting to adjust the unit in the intake screening area.  The supervisory staff again discussed purchasing portable white noise machines which might help to address or decrease the confidentiality concerns in the intake screening room and the hallway near receiving.  As was discussed in the last monitoring report, the women's infirmary and the rehabilitation dormitory areas provided better sound confidentiality due to the room configuration, sound acoustics or better functioning white noise machines.  The rooms in the rotunda also afforded good sound confidentiality as the officer was located outside the room at a distance as there were large windows allowing full observation of the encounter.  The monitor recommended that in addition to purchasing portable white noise machines, additional custody training was indicated to reinforce the need for officers to place themselves so they could visualize the room, but to remain far enough to provide sound confidentiality.

24

Of concern was documentation in the healthcare record of a clinical interview in which the officer was present during the mental health clinical interview. Although the inmate had presented with assaultive behavior, an appropriate space should have been provided to allow for a safe and confidential interview by mental health staff. The presence of custody staff prevented the adequate mental health assessment of that inmate.

Dedicated office space was provided to the psychiatrist, and the remainder of the mental health staff shared an office in the infirmary area. These offices were not utilized for clinical encounters.

*Administrative Segregation*

- *The Mental Health Implementation Plan shall require classification to assess a totality of factors when assigning prisoners to administrative segregation units. It is understood that the goal of Defendants is to limit the use of administrative segregation for prisoners with serious mental illness.*

**Findings: Noncompliance**

This issue was unchanged. The segregation units continued to function as de facto mental health units; the dormitories also housed some chronically mentally ill inmates. Mentally ill prisoners were routinely housed in the segregation units, and the placement of such individuals on these units continued to not be limited. There appeared to be better communication to mental health regarding segregation placement; however, improved documentation was needed to document communication. Placements were also discussed in the MDTM.

The segregation units continued to house severely mentally ill individuals, many who were treatment non-adherent refusing medications and treatment interventions.  Some of these individuals were unable to participate in group and individual therapy out of cell due to their decompensated state. Mental health staff and inmates reported that in-cell materials, such as puzzles, work packets and materials for journaling, were provided to these individuals. Onsite observations confirmed this finding.

Although measures continued to be instituted to mitigate against the effects of segregation placement, such as group therapy, daily nursing checks and at least weekly mental health rounds, these units remained occupied almost exclusively by mentally ill individuals. Some of these individuals required inpatient treatment for stabilization. It is hopeful that the opening of the JBCT unit will assist in more appropriately housing some of these severely mentally ill individuals.

- *The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation...*
- *The Mental Health Implementation Plan shall address suicide watch and suicide precautions procedures to ensure that prisoners in crisis are not placed in punitive and/or unsanitary conditions.*

**Findings: Noncompliance**

There remained lack of documentation of the required placement screening for all prisoners for mental illness and suicidality with segregation housing. This issue was

26

discussed with the classification sergeant with recommendations to change the inmate movement form to indicate notification to medical of segregation placements.

- *Inmates with a serious mental illness who are housed in Administrative Segregation will be scheduled for a weekly appointment with a qualified mental health provider. Nursing staff shall conduct mental health rounds in Administrative Segregation daily, separate and apart from medication distribution.*

**Findings: Noncompliance**

Staff and inmate interviews as well as onsite observations and healthcare records reviews documented that segregation inmates were seen weekly by a qualified mental health provider. Nursing rounds, however, were not always documented daily in segregation units.

*Suicide Prevention*

- *Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.*

**Findings: Noncompliance**

All cells in the administrative segregation units (A, B, R and S) were previously modified to remove potential tie-off opportunities and, fencing was in place on the upper level and stairway to prevent jumping and self-harm. Additionally, modifications were made to the windows in the administrative segregation cells to prevent ligature points.

27

At the last monitoring visit, the custody supervisory staff indicated that as a result of the completed suicide that occurred in administrative segregation unit, A-pod, modifications would be made to the bunks that would close the openings in the bed frame and to create a skirt around the bottom of the bed to prevent inmates from lying beneath the bed.  Cells in men's holding were modified; however, they realized that some inmates were urinating in this area, and the modifications prevented adequate cleaning of the area.  The modifications were then placed on hold pending further discussions with the monitor.

The segregation units were toured, and it was noted that one of the modified cells smelled of urine as had been reported.  Discussions with the custody supervisory staff resulted in a decision to amend the planned modifications to the segregated unit beds to closing the tie-off holes located in the beds and not to install the bed skirts.

- *Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior, Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal.*
  - *Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.*

28

- *All welfare checks shall be documented on a welfare check log. The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance. Monthly spot checks for compliance will be conducted by the Compliance Sergeant at least weekly with monthly audits.*

**Findings: Deferred**

Plans were underway to install the Guardian system in the new jail which would provide an electronic means of conducting welfare checks.

Based upon the information provided, the monitor was unable to determine the overall adequacy of required custody welfare checks.  Reviewed documentation did include observations regarding inadequate custody welfare checks for Inmate 10 prior to his death on December 22, 2019.

As this is an important area of monitoring, I will defer findings in this area until my next report.

- *Increase in Time Outside of Cell and/or Increasing Programs*
  - *Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:*
    - *3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)*

29

- *14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time*

- *2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail) ii. Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking and receiving area will be guaranteed the following weekly times out of their cell:*

  - *3 hours a week for exercise*
  - *14 hours a week in the common area*
    - *inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services,*

**This area will be addressed separately for the County and Wellpath**

**Findings for Wellpath: Noncompliance**

**Findings for the County: Substantial Compliance**

Review of compliance audits, patient and staff interviews indicated that inmates housed in segregation were offered the required group therapy hours per week; however, a significant number of inmates were unable to attend due to their level of mental health instability.  They also reported that they were offered the required out of cell time for dayroom and yard. Despite this, mental health and custody staff worked hard to provide

30

ongoing group therapy for inmates in segregated units, and inmates appeared to benefit from this necessary treatment intervention.

There was a lack of documentation regarding clinical interventions to address inmates who are unable or who routinely refused group and individual therapies. These interventions should be addressed in treatment planning, which was lacking.

The monitor observed group therapy sessions conducted in the men's holding unit. The groups were facilitated by a LFMT. Custody officers were not present in the groups. There were three inmates housed in the unit.  A group was conducted at cell-front for two of the participants housed in adjacent cells, and a separate individual session was conducted for the other inmate who was located in the dayroom for his time for recreation. The content of the groups remained clinically beneficial, and group participants unanimously reported satisfaction and benefit from their participation. Staff and inmates reported that they were offered two hours of group therapy weekly.

When questioned regarding why groups and individual sessions were conducted at cell-front rather than out of cell, custody and mental health staff indicated that patients were placed in the men's holding unit due to safety and security concerns by classification. Groups were provided for inmates housed within close proximity; others were seen in separate groups or individually.

31

There continued to be a mechanism in place to evaluate individuals for the appropriateness of group participation.  Many of the individuals not attending groups needed inpatient treatment for stabilization and were treatment non-adherent.

Staff and inmates continued to report that non-group, in-cell activities, particularly for those individuals unwilling or unable to attend groups, were provided. These reports were verified by healthcare records reviews that documented the provision of reading and other written materials to group and non-group participants housed in segregation units.

*Quality Management*

- *Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit findings will be reported to the Quality Management Committee at its quarterly meetings.*
- *All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met.*

- *All completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure.*

**Findings: Noncompliance**

No information was provided regarding ongoing audits, quality assurance meetings and minutes or mortality morbidity reviews.

Due to the lack of documentation of quality assurance, a finding of noncompliance was provided.

*Corrective Action Plans*

- *Defendants' implementation of a policy requires that there are corrective action measures to address lapses in application of the policy.*
- *Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame.*

**Findings: Noncompliance**

In response to the recommendation from the last monitoring report, the monitor discussed with the staff the need for development of corrective action plans (CAPs) to address identified areas of deficiency.  The staff reported that they had not been informed of the need for development of these plans prior to the monitoring visit.  The monitor instructed the staff to include in the plans the following: 1) Stated deficiency, 2) current status in addressing

deficiency, 3) responsible person(s) for completion, 4) date of planned completion, and 5) obstacles in resolution of identified deficiency.

We also discussed the need for a single CAP that included both custody and mental health areas of deficiency.  Additionally, we discussed the need for an update to be provided prior to the next monitoring visit; we agreed on an update that would be provided to the monitor on or about March 15, 2020. No CAP update had been provided to the monitor to date.

## Summary and Recommendations

The following are recommendations to address the issues of concern identified in this report. Many of these recommendations are unchanged from those suggested in prior reports.

Considering the ongoing COVID-19 crisis, it may be necessary to discuss the parameters of the next monitoring visit as the proposed visit date approaches.  I will be in touch with the parties to discuss this issue as well as changes in requested documents soon.

1. The facility should better document Quality Assurance meetings and efforts to ensure that areas of deficiency are identified, corrective action is developed, and monitoring occurs to ensure that the identified issue is corrected. More frequent meetings would also be beneficial.

2. The facility should develop and/or better document a mortality review process that critically examines inmate deaths as well as serious self-harm incidents to identify areas of deficiency, corrective action and opportunities for improvement.

3.          The facility should continue to work to improve access to timely inpatient psychiatric care for all jail inmates in need of such services.

4.          The facility should continue to work to address the lack of confidentiality in the intake process and for clinical contacts.  The facility should continue to examine current treatment space to identify if physical plant issues negatively affect the provision of confidential clinical encounters. The facility should work to adjust or replace malfunctioning white noise machines in those areas noted during the visit to address poor patient confidentiality. Clinical contacts should not occur in settings that do not afford sound confidentiality. Additionally, custody staff should ensure that they position themselves to allow for sound confidentiality for clinical encounters.

5.          The facility should train and supervise intake nurses regarding the appropriate review of past healthcare records and to document the presence of past mental health treatment to ensure that appropriate triage and treatment are provided.

6.          The facility did not track the timeliness of response to inmate requests. This would be an optimal area for quality assurance review to examine the timeliness and appropriateness of response to inmate requests.

7.          The facility should address lapses in the documentation of daily nursing rounds in segregation.

8.          The facility should ensure that custody welfare checks are timely completed and examined by the Quality Assurance process to ensure compliance.

9.         The facility should work to ensure timely medical review and assessment of inmates placed into safety cells.

10.        The facility should ensure that inmates are offered a mattress or safety sleeping bag when indicated while housed in the safety, booking and sobering cells with appropriate documentation. Corrective action should also be documented when staff fail to address this concern.

11.        The facility should continue to ensure that medication continuity occurs at the time of jail intake. Clinical rationale should be provided for cases of delays in medication continuity

12.        The facility should conduct a comprehensive staffing analysis to assess current custody staffing levels and their effect on the provision of mental health services. Additional psychiatric staffing and the addition of a substance abuse counselor should also be considered.

13.        In lieu of placement of inmates who were declared incompetent to stand trial into transition cells in administrative segregation, the County should continue to work to expedite the transfer of inmates who were declared incompetent to stand trial to an appropriate inpatient facility.

14.        The facility should provide ongoing training and supervision to mental health staff regarding appropriate individualized treatment and behavioral planning.  Individualized treatment planning should be documented in the healthcare records. Suicide risk assessments should include appropriate safety planning with documentation in the healthcare record.

36

15.         The facility should document any custody/classification and mental health meetings regarding the consideration of mental illness in inmate discipline. Additionally, training should continue regarding appropriate documentation on the Disciplinary Action Reports if the inmate was receiving mental health services and if medical was consulted.

16.         The facility should continue to work to improve and to provide appropriate documentation of the provision of out of cell activities in segregation.

17.         The facility should continue to examine current treatment space to identify if physical plant issues negatively affect the provision of confidential clinical encounters.

18.         The facility should decrease the use of administrative segregation as de facto housing for mentally ill individuals. In lieu of alternative placement, mitigating factors such as clinical contacts, rounding, groups and other out of cell activities should occur as outlined in the Settlement Agreement and Implementation Plans.

19.         The facility should ensure that the required placement screening for all prisoners for mental illness and suicidality with segregation housing are documented.

20.         The facility should ensure that custody welfare checks consist of direct visual observations that are sufficient to assess the inmate's well-being and behavior.

37

21.       The facility should ensure that placements in safety cells do not exceed 24 hours, and timely transfer those individuals to NMC that require prolonged safety cell placement.

22.       The facility should work to better document that range of motion exercises are conducted for inmates in restraint greater than one hour. Audits performed by the Compliance Sergeant should include whether range of motion exercises were conducted as well as the provision of food and water and toileting.

23.       The facility should ensure that mental health/medical staff is contacted and that attempts at de-escalation occur prior to planned use of force with appropriate documentation.

24.       The facility should ensure that medical orders regarding suicide monitoring are honored, and that there is a mechanism for discussion and resolution of conflicts and concerns regarding the provision of items to inmates on suicide monitoring and observation required.

25.       The County and contractors should work to develop corrective action plans to address the ongoing deficiencies listed in this report. These corrective action plans (CAPs) should include the specific deficiency identified, plan for correction, date of anticipated completion, persons responsible for correction and any identified impediments to completion of the corrective action.

Please contact me should you have any questions regarding this report.

Respectfully submitted,

X _Kerry C. Hughes, MD_
Kerry C. Hughes, M.D.
MentalHealth Monitor

Kerry C. Hughes, M.D.
1579 Monroe Dr., Suite F, Box 612
Atlanta, GA 30324
Phone: ███████████
Fax: 404-364-9708
Email: dockc99@aol.com

39

# Exhibit 29

[4276968.1]

## MONTEREY COUNTY JAIL (MCJ) HEALTHCARE RECORDS REVIEWS

**Inmate 1**

This inmate returned to the MCJ during August 2019 from the state prison system; however, there was conflicting information present in the healthcare record regarding this issue. He was seen by the psychologist on August 15, 2019 when he reportedly had been noncompliant with medications which had been discontinued.  He reported that he wanted to resume medications, and orders for Vistaril, Remeron and Buspar were provided on August 17, 2019; however, the medication administration record (MAR) indicated that Buspar was out of stock and had been ordered. He was seen by the psychologist upon his return to the jail when he reported suicidal ideation. The inmate's significant history of suicidal ideation and attempts were noted, and a Suicide Watch Initial Assessment for Mental Health was completed at that time. He was placed on Level 2 suicide watch due to suicidal ideation. Additional documentation indicated that he was later placed into the safety cell on Level 1 suicide precautions.  He was transferred to NMC ER on August 19, 2019 for crisis evaluation where he reportedly received a stat dose of Seroquel at Natividad Medical Center Emergency Room NMC ER. He returned to the jail on the following day.

The inmate was seen daily while on suicide monitoring.  On August 21, 2019, it appeared that he was transferred again to NMC.

It appeared that the inmate may have been returned to NMC, and he returned to the jail on August 27, 2019, when he was placed on Level 2 suicide watch as he was assessed to no longer be imminently suicidal. Medication orders for escitalopram, olanzapine and trazodone were provided upon return to the jail. Suicide watch was discontinued on August 28, 2019 after resolution of suicidal ideation; He was subsequently returned to Level 1 suicide watch after using a string from a safety smock in suicidal behavior and was again sent to NMC. A note on August 31, 2019 indicated that the inmate had made a noose and that he was placed on constant watch.

On September 1, 2019, there was an order to discontinue the safety smock as the inmate continued using smocks for self-harm.  One-to-one suicide observation with a sitter was continued. It appeared that he was again sent to NMC ER for crisis evaluation on September 2, 2019.

On September 4, 2019, the psychiatrist provided an order for escitalopram 20 mg per day, olanzapine 15 mg at bedtime and Trazodone 150 mg per day upon the inmate's return from NMC.  He was scheduled for psychiatric follow-up in six days.

Suicide watch was discontinued on September 5, 2019; however, later that day, he was returned to Level 2 and subsequently to Level 1 with constant watch. Documentation indicated that constant watch was discontinued by custody staff who indicated that the inmate was malingering. After assessment by mental health, he was downgraded to Level 2.  After consultation with the Regional Mental Health Director, on the following day, he was changed to Level 1 with no items provided in which he could harm himself. At that time, the clinician noted that in the past two

weeks, he had attempted to strangle himself with safety smocks on several occasions and had attempted to jump from the pony wall in suicide attempts.

A note on September 8, 2019 indicated that the inmate had again been sent to NMC ER as he had remained on Level 1 suicide watch for 72 hours.  He was again returned on the same day and returned to Level 1 suicide watch.

The inmate was released from the jail on September 10, 2019.

**Findings**

There was documentation of the appropriate assessment of suicide risk for this inmate, including the Columbia Suicide Severity Rating Scale and documentation in the Suicide Watch Daily Assessment/Discharge for MH.  He was seen daily while on suicide monitoring. The removal of smocks and the provision of finger foods was appropriate considering the inmate's continued self-harm attempts. There was documentation that mental health clinicians obtained supervisory and regional consultation for recommendations to keep this inmate from self-harm.

There was, however, conflicting information documented regarding the continuation of suicide monitoring. On September 5, 2019, when seen by the psychologist, the clinician documented "continue current suicide watch and follow up daily" and in the same note indicated that the inmate was "Appropriate for General Population" regarding recommended placement.

Of concern was an entry on the following day (September 6, 2019) which noted that the inmate was recommended for constant watch; however, the psychologist noted that "per Sgt. Kennedy it was determined by custody that they will not longer provide 1-1 services to inmates and they discontinued the constant watch shortly after it was started.  Sgt. Kennedy (said) that inmate was 'manipulating' housing". If true, the determination by custody of the level of suicide watch was alarming, particularly when constant watch was recommended by mental health staff due to the inmate's suicidal behavior and this appeared to have been overridden by custody staff. At that evaluation, his suicide watch was decreased to Level 2 and he was housed by classification in MHO.  The psychologist noted concern regarding this decision, stating that housing the inmate alone could be detrimental for his mental health.

There were other issues regarding the monitoring of this inmate on suicide watch and coordination with custody staff.  Due to his recurrent suicidal behavior in which he utilized a suicide smock, psychiatric orders were provided denying him access to a smock; however, on September 1, 2019, the inmate was provided a smock by custody staff.

There was discussion of safety planning for this inmate; however, documentation of actual safety planning was lacking.

There was documentation of coordination of treatment between NMC and MCJ regarding discharge instructions after release from NMC inpatient treatment.

There was also documentation of daily mental health contact when the inmate was on suicide watch.

The treatment team appropriately sought supervision and treatment recommendations from their regional supervisors for guidance in the treatment of this very ill, chronically suicidal inmate.

There was also documentation of daily nursing rounds while this inmate was housed in the safety and booking cells.

There was documentation of discussion of this inmate during the Multidisciplinary Treatment Meetings (MDTM); however, treatment planning was not well documented.

**Inmate 2**

This inmate received the Medical Intake Triage/Receiving Screening on September 18, 2019 on the date of jail intake. The screening was remarkable for recent inpatient treatment at NMC mental health unit during September 2019, where she had been treated for two months; she had been released the day prior.  She received a monthly Invega injection, Risperdal and Benadryl. The screening indicated that the medications had been verified, and the inmate had a conservator. She had a history of self-harm behaviors. Orders for Risperdal and Benadryl were obtained from the psychiatrist.

On the following day, the inmate attempted to hang herself by tying a bedsheet to the stairway and wrapping it around her neck in the S-Pod housing unit.  She was transferred to the NMC ER, and upon her return to the jail, she was placed on Level 1 suicide watch. She was seen by the LCSW and the Suicide Watch Initial Assessment for MH was completed. Her suicide risk was estimated at intermediate, and suicide watch was downgraded to Level 2 in a booking cell with a safety smock and blanket. An assessment on the following day assessed the inmate with high suicide risk.

The inmate was seen by the psychiatrist on September 20, 2019, when suicide watch and the above medications were continued.

Progress notes also indicated that the inmate appeared to be causing herself to vomit repeatedly. The regional mental health director and NMC were contacted to address this issue. NMC staff were very familiar with this inmate as she had been recently treated there, and they indicated that no beds were available.

Subsequent daily assessments assessed the inmate's risk at intermediate, and on September 23, 2019, suicide watch was discontinued.  A note by the psychologist on that date indicated that the inmate would be discharged from the jail to a board and care facility.  She was seen by the psychiatrist, who determined that the inmate did not meet the criteria for involuntary commitment. She was discharged, and progress notes indicated that she was provided with her safety plan upon discharge.

**Findings**

There was medication continuity upon arrival at the jail, as well as documentation of medication verification.

Suicide risk was appropriately assessed by a suicide risk assessment tool. There was also documentation of daily mental health assessment while the inmate was on suicide watch.

Daily nursing rounds were documented while the inmate was isolated on suicide precautions.

Due to the inmate's recent suicide attempt by hanging, mental health clinicians determined that the provision of a safety blanket was not recommended.  There was documentation that despite the order that the inmate not be provided a blanket, a blanket was provided on September 20, 2019.  After this was brought to the attention of custody staff, the blanket was removed.  There appeared to be communication issues and possible determinations made by custody staff regarding inmates on suicide watch that conflicted with mental health orders.

Although progress notes indicated that safety planning occurred, there was no written documentation located to evaluate the adequacy of safety planning.

## Inmate 3

This inmate was booked into the jail on February 1, 2019.  He received the Medical Intake Triage/Receiving Screening on the day of arrival. At that time, he denied a history of mental health treatment or illnesses, and his screening was unremarkable for mental health concerns.

The inmate was closely followed by medical regarding hypertension and chest pain. He had a significant history of medication nonadherence with hypertension medications.

On July 11, 2019, the inmate made a request to be seen by mental health. Progress notes indicated that his request was precipitated by situational stressors and requests for in-cell written and art materials. Documentation in the healthcare record indicated that the inmate was placed into segregated housing on or about July 8, 2019, and again on September 19, 2019. Mental health clinicians documented the inmate's participation in group therapy as well as the provision of written materials and artwork provided for in-cell use.

## Findings

There were lapses in the documentation of daily nursing rounds in segregation.  There was documentation of at least weekly mental health contacts in segregated housing.

There was also documentation of the provision of reading materials by mental health staff in segregation.

Documentation of weekly segregation group attendance was present.

## Inmate 4

This inmate was booked into the jail on September 28, 2019.  The Medical Intake Triage/Receiving Screening was completed on that date. The screening was unremarkable for mental health concerns, and the inmate was cleared for housing in general population.

The Initial Mental Health Assessment and Appraisal was completed by the LCSW on October 9, 2019; this assessment indicated that the inmate had a history of treatment for PTSD due to a rape in prison, no recent medications but past treatment with Remeron and current depressive symptom including insomnia and depressed mood. Special population mental health housing was recommended.

She was seen by the psychiatrist for initial assessment on October 10, 2019 when she was prescribed Zoloft and Benadryl due to complaints of flashbacks, nightmares, depressed and anxious mood and insomnia.  The inmate was seen for follow-up by the LCSW on October 18, 2019, when she reported continued insomnia and conflicts with another inmate.

Mental health clinicians had scheduled appointments for clinical interviews on October 25, 2019 and October 28, 2019; however, both appointments were rescheduled due to "workload constraints".

Documentation indicated that the inmate attended some groups and was an active participant when she attended.

She was discharged from the jail on December 30, 2019.

**Findings**

There was a lapse in the documentation of daily nursing rounds in segregation on December 15, 2019.  There was documentation of at least weekly mental health contacts in segregated housing. There was also documentation that the inmate was offered group therapy, but she frequently declined. The inmate was also offered group and other written materials for in-cell use.

Appointments were rescheduled by mental health clinicians due to workload constraints.  This points to concerns regarding whether there is adequate mental health staffing and the need for an adequate staffing analysis to determine needed mental health staffing levels.

There was documentation that discharge medications were called into the local pharmacy.

This inmate was timely seen for psychiatric assessment with appropriate medication management.  Medications were not ordered at the time of intake, as the inmate had not recently been taking psychotropic medications.

**Inmate 5**

This inmate had a history of multiple MCJ incarcerations.  His most recent incarceration occurred on July 1, 2019 when he received the Medical Intake Triage/Receiving Screening. He

denied recent treatment with psychotropic medications, mental health hospitalizations or current symptoms. He was cleared for general population housing.

The inmate was re-incarcerated at MCJ on September 23, 2019. During this screening, he reported that he had been treated at the NMC MHU on a WIC 5150 commitment approximately two to three weeks prior. He also reported some depressive symptoms. The inmate reported that he had been sexually assaulted during a prior MCJ incarceration during 2018; consequently, a PREA Screening Tool was completed on the day of arrival as the inmate indicated fearfulness of current incarceration due to the past rape. He was also referred to mental health.

An Initial Mental Health Assessment and Appraisal was completed on the following day. This assessment noted the use of methamphetamine and cannabis as well as depressive symptoms. The mental health clinician noted that there was no documentation or evidence that the inmate had been previously raped, and that he had been observed with probable auditory hallucinations.

The inmate was scheduled to see the psychiatrist on the following day; however, he was out to court at that time.

The inmate was seen by the psychiatrist on September 27, 2019 when he was prescribed Zoloft and Benadryl. The psychiatrist indicated that the inmate appeared to be exhibiting delusional thinking.

He was seen by a mental health clinician on October 21, 2019, due to medication nonadherence.

He was seen by the psychiatrist on December 12, 2019 when Celexa and Benadryl were ordered.

The inmate reportedly swallowed cleaning solution on December 17, 2019, and he was transferred to the NMC ER. Hospital records did not indicate evidence of ingestion, and the inmate was returned to the MCJ. He was seen by a mental health clinician on December 18, 2019 when the inmate reported that he saw someone that looked like the person that raped him.  He denied suicidal ideation.  The clinician reported that the safety plan was reviewed, and follow-up was ordered in one week. At the next appointment, the inmate appeared to be doing well.

**Findings**

This inmate was appropriately referred for psychiatric assessment due to his presentation at the time of intake. Scheduling was timely; however, the inmate was not seen until September 29 as he was out to court.  Psychiatric assessment and treatment were clinically appropriate.

There was documentation of follow-up after medication nonadherence.

There was documentation that discharge medications were phoned to the local pharmacy upon discharge.

This inmate reportedly swallowed cleaning solution, resulting in transfer to NMC ER for medical treatment.  Upon his return, he was appropriately seen by mental health; however, no suicide risk assessment was completed.  The healthcare record indicated that a safety plan was developed; however, no safety plan was located in the healthcare record for review.

**Inmate 6**

This inmate was booked into the jail on December 10, 2019.  The Medical Intake Triage/Receiving Screening was completed on that date. The screening was remarkable for daily methamphetamine use, history of NMC MHU hospitalization, diagnosis of Schizophrenia, and a history of suicide attempt by hanging five years ago.  He denied recent treatment with psychotropic medications. He was cleared for general population housing.

An Initial Mental Health Assessment and Appraisal was completed on the following day. It noted the above findings; additionally, the inmate was noted with auditory hallucinations, delusional thinking with tangentiality and odd belief systems.  He was described as malodorous with pressured speech. He was referred for routine mental health follow-up.

The inmate was seen by the psychiatrist on December 16, 2019 when Buspar and Risperdal were prescribed. He was described as calm, but with delusional thinking and unkempt appearance at the time of interview. The inmate reported that he had been medication nonadherent since his release from prison three months prior. Review of MARs indicated that the inmate was generally medication adherent.

**Findings**

This inmate was appropriately screened and referred to mental health from intake.  He was evaluated timely by mental health staff and referred to see the psychiatrist when his history of mental health treatment and current psychosis were noted.  The inmate was timely seen by the psychiatrist; he had not taken psychotropic medications for at least three months, and he was seen within one week of arrival and was prescribed appropriate medications to address his symptomatology.

**Inmate 7**

This inmate had a history of multiple MCJ incarcerations.  She was booked into the jail on October 26, 2019.  The Medical Intake Triage/Receiving Screening was completed on that date. The screening was unremarkable for mental health concerns, except for treatment with Prozac. Orders for Prozac and Benadryl were obtained at the time of intake. She was evaluated by a mental health clinician on the day of arrival.

She was housed in segregated housing after intake.  Segregated Population Observation Logs indicated that nursing rounds were completed daily, and the inmate was seen by mental health clinicians timely.  She was released from the jail on October 30, 2019.

It appeared that the inmate was re-incarcerated on December 6, 2019 when the Medical Intake Triage/Receiving Screening was completed on that date. The screening was remarkable for treatment with medications for anxiety and depression; however, the form did not include the specific medications. She was released, and again returned to the jail three days later when another Medical Intake Triage/Receiving Screening was completed on that date. The screening noted treatment with Prozac for depression and anxiety. At that time, she was described with pressured speech and flight of ideas. Prozac was ordered at the time of intake for the inmate.

The inmate was scheduled for evaluation by a mental health clinician on December 10, 2019; however, this appointment was rescheduled due to "workload". She was seen on the following day, when she presented with elevated mood.  The clinician noted that the inmate was already scheduled for psychiatric assessment.

The inmate was seen by the psychiatrist on December 12, 2019, when she was provided with a diagnosis of Depressive Disorder, NOS and Alcohol Abuse.  Prozac was continued at that time.

There was documentation of daily nursing rounds in segregation. She was also seen at least weekly by mental health staff.  Progress notes documented her involvement in group therapy.

A Medical Intake Triage/Receiving Screening was completed on December 27, 2019; however, it was unclear if the inmate had been released and returned to jail. The screening was remarkable for recent treatment with Prozac. The screening also indicated that the inmate had been treated at the hospital prior to arrival at the jail, and she had received a Zyprexa injection there with resulting drowsiness.

**Findings**

This inmate received appropriate mental health screening upon arrival at the jail. Medications were verified and ordered timely.

There was documentation of daily nursing segregation rounds.  She was also seen at least weekly by mental health clinicians.

The inmate was offered and participated in group therapy in segregation.

An appointment was rescheduled by mental health clinicians due to workload constraints.  This points to concerns regarding whether there is adequate mental health staffing and the need for an adequate staffing analysis to determine needed staffing levels.

**Inmate 8**

This inmate had multiple incarcerations at the MCJ.  He was booked into the jail on June 17, 2019.  The Medical Intake Triage/Receiving Screening was completed on that date; the screening was unremarkable for mental health concerns. Documentation indicated that the inmate was briefly placed on contraband watch by custody staff soon after his arrival.

It appeared that he returned to the jail on July 11, 2019; this screening noted a history of suicide attempt by hanging in 2017, but no current suicidality. He also reported a history of alcohol withdrawal. His behavior was described as uncooperative, and he was placed into a safety cell with restraints "per custody request" due to danger to others. He reportedly assaulted the arresting officer in the intake room.

The inmate was referred to mental health from intake, and the intake process was postponed until the following day due to the inmate's uncooperative behavior.

It appeared that the inmate remained in restraints for approximately two hours when he was reportedly cooperative.  There was documentation of nursing monitoring while the inmate was in restraints.

He was seen by the LCSW on July 13, 2019 in response to the intake referral. He reported a past suicide attempt, but he was guarded and unwilling to disclose requested information. It appeared that custody staff was present during the assessment, and it was postponed to the following day to ensure confidentiality for the assessment. Documentation of the following day indicated that custody remained present during the interview, and the inmate was reluctant to provide information with them present.

The inmate was released from the jail on July 27, 2019.

**Findings**

This inmate was appropriately monitored by medical staff while in restraints in the safety cell. He was soon removed from the safety cell when his behavior was calm.

Of concern was documentation in the healthcare record of a clinical interview in which the officer was present during the mental health clinical interview.  Although the inmate had presented with assaultive behavior, an appropriate space should have been provided to allow for a safe and confidential interview by mental health staff.  The presence of custody staff prevented the adequate mental health assessment of that inmate.

**Inmate 9**

The inmate arrived at the MCJ on November 2, 2019, and the Medical Intake Triage/Receiving Screening was completed on that date.  The screening was unremarkable for mental health concerns.

During intake, the inmate was reportedly calm, and subsequently began hitting his head until he bled.  He was placed into the WRAP with constant watch.  He was seen by the LCSW on the day of arrival when the Suicide Watch Initial Assessment for MH was completed. He was uncooperative to interview, and the social worker indicated that he was intoxicated or detoxing from alcohol or drugs.  He was provided with a safety smock, blanket and finger foods.

9

He was seen by a mental health clinician on the following day when he was calm, sober and cooperative, denying suicidality. He stated that he hit his head out of frustration and to get the attention from deputies. The Columbia Suicide Severity Rating Scale was completed as well as the Suicide Watch Daily Assessment/Discharge from MH, and suicide watch was discontinued.

It appeared that the inmate remained in the safety cell in the WRAP for approximately 2.5 hours (from November 2 at 2101 to 2330), and he removed from Level 2 suicide watch on the following morning (November 3 at 0801).

He was seen for mental health follow-up on November 3, November 4, November 5 and November 6, 2019.

The inmate was released from the jail on November 8, 2019.

**Findings**

There was appropriate assessment of suicide risk for this inmate with the completion of an appropriate suicide risk assessment tool. Inclusion of the Columbia Suicide Severity Rating Scale and safety planning in the healthcare record was indicated as these documents were not located in the healthcare record.

A Spanish translator was appropriately provided during mental health interviews with this inmate.

The appropriate suicide monitoring follow-up was conducted for this inmate after discontinuation of suicide watch.

**Inmate 10**

This inmate was originally booked into the jail on May 4, 2018; the Medical Intake Triage/Receiving Screening was completed on that date. The screening was unremarkable for mental health concerns.

Review of the healthcare record indicated that the inmate received treatment for hypertension and coccidiomycosis during his incarceration.

The inmate was involved in a man-down incident on June 18, 2018 in which he presented with bizarre behavior, later noted to be methamphetamine intoxication while incarcerated. He reportedly rammed his head and punched his hand into the cell door window breaking it. He was sent to NMC where he had recurrent behavior resulting in the use of restraints and treatment with Haldol, Ativan and Benadryl. He received a psychiatric evaluation and radiographic studies. Medical staff at the jail recommended and submitted a request for neurosurgical consultation due to the finding of a nodule in the upper third ventricle due to concern of sudden obstruction.

It appeared that the inmate was hospitalized at NMC from June 20, 2018 to June 23, 2018 due to altered mental status and self-harming behaviors. NMC was unable to determine the cause for

10

the inmate's psychosis and altered mental status, and Haldol was recommended upon discharge. Upon his return to the jail, he was briefly treated with a tapering dosage of Haldol which was discontinued after four days.  Forced medications were not administered or ordered.

He was seen by the LCSW on July 20, 2018 upon his return from an outside appointment, after he reported a suicide plan to transport officers.  He had previously hit his head against the glass in the infirmary so hard that the glass shattered. A Suicide Watch Initial Assessment for MH was completed at that time. The LCSW noted a history of treatment for depression, a desire to die with current suicidal ideation and statements to custody that he would kill himself during transport to the hospital for a medical appointment. He exhibited auditory hallucinations, impulsivity and a positive drug screen for methamphetamine. He was provided with a diagnosis of Unspecified Psychotic Disorder and Other Stimulant Use Disorder, and he was placed on Level 2 suicide watch. Suicide watch was discontinued on July 21, 2018, and he was seen for follow-up by mental health clinicians after discontinuation.

A note by the LCSW on July 30, 2018 indicated that she consulted with the medical director regarding whether the inmate's brain cysts could be resulting in his auditory hallucinations.  She was told that his clinical presentation and the cysts were unrelated.  The inmate was then referred to the psychiatrist.

A New Inmate Evaluation Tele-Psychiatric Consult form was completed by Dr. ███ indicating that the inmate received a psychiatric assessment on August 2, 2018.  Dr. ███ noted that the inmate had no history of psychiatric hospitalization or suicide attempts.  The inmate denied current symptoms and complaints, and he was assessed as stable. Haldol 5 mg per day was continued. It appeared that the inmate was soon released from the jail.

The inmate was re-incarcerated on March 23, 2019, when the Medical Intake Triage/Receiving Screening was completed on that date.  He denied a history of mental health treatment or current symptoms, but he was described as appearing to be under the influence, with a history of alcohol withdrawal and daily alcohol use. It appeared that he was transferred to the hospital where it was noted that he had mild alcohol withdrawal.  He received treatment for this condition at the hospital; monitoring and treatment continued at MCJ. He was released from the jail on April 2, 2019.

The inmate as re-incarcerated on September 1, 2019, when the Medical Intake Triage/Receiving Screening was completed. This screening was similar to prior healthcare intake screenings with a denial of past mental health treatment, medications or symptoms.  He did report daily alcohol use.

Subsequent progress notes indicated that the inmate was seen by mental health clinicians at his family's request as they reported that he exhibited bizarre behavior. He was seen by the psychologist on September 5, 2019, when he refused to leave his cell or cooperate with the interview.  Follow-up was scheduled for seven days. On September 12, 2019, he refused to leave his cell for his appointment with the psychologist, and he was described as paranoid, not wanting to interact; however, the psychologist reported that he interacted with others and was doing well by custody report.

The inmate refused to leave his cell for mental health appointments on October 12, 2019, and October 28, 2019. At the October 28, 2019 appointment, he did cooperate with a cell-front interview.  The clinician noted that custody had expressed concern that the inmate was not eating or accepting medical attention.  He reported that he was eating and taking his medications.  He was observed drinking water, and he denied any current difficulties.

An entry on October 24, 2019, noted that the inmate was at NMC and would be returning after he had been transferred there after an altercation that occurred on the day prior. Progress notes indicated that he attacked his cellmate, thinking that he had been sexually assaulted. He was seen by mental health on October 28, 2019 after custody expressed concerns that the inmate was not eating or accepting medical attention. Daily weights were ordered when vital signs were obtained.

He was seen by the same mental health clinician on December 1, 2019 "outside of his housing unit… to encourage to come out of his cell". He reported auditory hallucinations and appeared confused in response to questions. He was referred to the psychiatrist.

The inmate was scheduled to be seen by the psychiatrist on December 2, 2019 due to his reported auditory hallucinations; however, he refused to meet with the psychiatrist.

On December 22, 2019, a deputy found the inmate face down and unresponsive, the floor was wet and there was an odor of emesis.  American Medical Response (AMR) was called, and resuscitation efforts were initiated.  He was sent to the hospital by AMR where he was later pronounced deceased.

The Amended Coroner's report was reviewed.  The cause of death was determined as hyponatremia due to acute water intoxication due to psychogenic polydipsia.  A diagnosis of Schizophrenia was also provided.  Review of the healthcare record did not note a diagnosis of Schizophrenia; clinical assessments indicated uncertainty regarding the basis of the inmate's psychosis and suggestion that it might be related to his substance abuse. The toxicology report was negative for elicit substances.

Review of incident reports indicated that another inmate reported that the inmate was heard repeatedly flushing his toilet, which was unusual.  He later saw the inmate when he appeared with pacing, and his face and eyes were red. He was also overheard vomiting on the morning of his death by another inmate. He also reportedly had not left his cell during the past week.

**Findings**

This case was reviewed due to the death of the inmate at the MCJ.  He was housed in J-Pod which housed special needs individuals; this was not a mental health or specific segregation unit in which mental health rounds were conducted routinely. Despite this, review of the mental health services provided indicated that the mental health staff consistently followed the inmate after he presented with evidence of psychosis with paranoia.  He was transferred to NMC on several occasions after he exhibited agitated behavior and after he was involved in an altercation,

probably resulting from his paranoid delusional thinking.  He was not provided with a diagnosis of schizophrenia at MCJ as there was insufficient information to merit this diagnosis; however, there appeared to be diagnostic uncertainty regarding this inmate, and clinicians even contacted the medical director to see if abnormalities noted on radiological studies might explain his psychotic symptoms.

The inmate repeatedly refused to engage with mental health staff, despite their attempts to evaluate him out of cell in response to custody reports of not eating and treatment refusal.  The inmate also refused psychiatric evaluation just prior to his death. Optimally, this inmate should have been discussed in detail at the MDTM (if this did not occur) to clarify diagnostic uncertainty and his treatment refusal with documentation of such discussions and treatment planning. Treatment planning was lacking for this inmate.

None of the documentation reviewed indicated that the staff was aware of the inmate's polydipsia, and it would be difficult for the mental health staff to be aware of this behavior unless observed and informed by custody staff. Treatment refusal is a difficult obstacle to mental health care in a correctional setting, and as the inmate did not exhibit symptoms of a severity to merit involuntary commitment, treatment options were limited at MCJ. For this reason, treatment planning was indicated to develop a plan to engage the inmate in treatment if possible.

There was documentation that attempts were made to verify medications at intake. The inmate had not been treated with psychotropic medications in the community; however, he was treated during his 2018 MCJ incarceration with Haldol when this treatment was recommended after he returned from NMC on one occasion. Of concern was the lack of documentation that past healthcare records from prior MCH incarcerations were reviewed and considered in the intake referral process which resulted in inadequate intake screening for this inmate.

Appointments were rescheduled by mental health clinicians due to workload constraints.  This points to concerns regarding whether there is adequate mental health staffing and the need for an adequate staffing analysis to determine needed staffing levels.

An issue of concern regarding this inmate's death included the lack of response to reports that there was water coming from his cell prior to his death.  Custody welfare checks were inadequate for this inmate as incident reports indicated that there was a lack of response regarding this and other unusual events that occurred prior to the inmate's death.

## Inmate 11

This inmate was originally booked into the jail on October 27, 2019; the Medical Intake Triage/Receiving Screening was completed on that date.  The screening was unremarkable for mental health concerns; however, he reported daily alcohol use, and he was placed on an alcohol withdrawal observation and protocol.

It appeared that the inmate was released from jail on or about December 23, 2019; however, he was re-incarcerated on January 15, 2020, when he received the Receiving Screening.  The screening was remarkable for description that the inmate was agitated and appeared to be under

the influence of alcohol or drugs, and he reported seeing and hearing things that others did not or believe that someone could control his mind.  He also acknowledged unspecified drug use with changing responses to the date and time of last usage. He was placed into Sobering Cell #2 due to his agitation. He was placed on an alcohol and benzodiazepine withdrawal protocol.

On the day of arrival at approximately 1748, medical staff responded to a call from the Receiving Deputy for an emergency after the inmate was found supine with no apparent respirations and pulse; CPR was initiated. AMR arrived at 1751 and continued CPR. The inmate was subsequently pronounced deceased on January 15, 2020.

The Coroner's Report was not available for review at the time of this report.

**Findings**

This inmate had no reported history of mental health treatment, and there was no documentation of mental health referral, assessment or contact present in the healthcare record.

**Inmate 12**

It was difficult to determine when this inmate was booked into the jail as the screening information was not present in the provided healthcare record.

The inmate was placed into the safety cell on July 18, 2019 due to danger to others at 1726. Documentation of medical assessment was at 2126. It appeared that the inmate was removed from the safety cell on the following day.

There was documentation of placement into segregated housing on July 20, 2019.  There were lapses in the documentation of daily nursing rounds.

He was seen by the LCSW on July 24, 2019, when she noted that he was seen at the request of the MDTM as he had been moved to MHO.  He reported a history of a serious suicide attempt by hanging while incarcerated as a juvenile. He reported that he had taken Seroquel in the past; he reported that he was doing well without medication treatment.

The inmate was seen at least weekly by mental health clinicians while housed in segregation.  He was offered group and reading materials; however, he routinely participated in very few group therapy sessions. He was somewhat withdrawn, and he had minimal contact with staff; however, he did occasionally accept reading materials. He did leave his cell for dayroom and showers.

He was followed monthly by mental health clinicians.  He was scheduled to be seen by the psychiatrist on August 26, 2019, due to his history of treatment with Seroquel; however, he refused the appointment.

Subsequent progress notes indicated that the inmate was followed at least monthly by mental health clinicians, and he was reportedly stable.

14

**Findings**

This inmate was seen weekly by mental health staff while housed in segregation.  He was offered group therapy, but he only attended approximately two to three groups, refusing most group therapy sessions.

There were lapses in the daily documentation of nursing segregation rounds.

Provided documentation indicated that he was not seen by medical within one hour of placement into the safety cell.

There was documentation that the inmate was followed consistently by mental health staff.  He was seen for follow-up with increased frequency during the time of a significant court date, which could be a time for increased stress and suicidal ideation.

There was documentation that the inmate was discussed during MDTM; however, adequate treatment planning was not documented.

Mental health staff did document the provision of reading and other written materials for this inmate housed in segregation.

**Inmate 13**

This inmate's healthcare record was reviewed as he committed suicide by hanging at MCJ; he died on June 2, 2019.  The healthcare record indicated that the inmate had a history of recurrent incarcerations at MCJ, as well as transfers to Natividad Medical Center for polysubstance abuse, schizophrenia and medication non-adherence.

The most recent incarceration began on April 10, 2019. He was placed on an alcohol and drug withdrawal protocol at the time of jail intake, as he was reportedly uncooperative and under the influence of alcohol. He was referred to and seen by mental health from intake on April 11, 2019 with a history of methamphetamine abuse, auditory hallucinations and paranoia on no medications.  He was minimally cooperative to interview.

It appeared that he was placed into a segregation cell on April 12, 2019, and on April 16, 2019 he was placed into a sobering cell at 1045.  At that time, he was described as uncooperative and combative. There was a lapse in contact on April 18, and on April 19, 2019, it appeared that he was transferred to a segregation cell.

There was documentation of daily rounds in segregation from April 19, 2019 to May 5, 2019; May 7 to May 29, 2019. Documentation on April 24, 2019 by the social worker indicated that the inmate had refused to attend groups.  Subsequent documentation by the mental health staff indicated that the inmate frequently yelled obscenities when his cell was approached, or he was nonverbal.  On May 19, 2019, he reportedly threw his lunch at custody staff. A note on May 27, 2019 noted that the inmate slept on his mattress under his bed. On May 29, 2019, the social

15

worker noted that the inmate was sitting on his bed and "briefly chatted" with the clinician, but he refused to attend groups.

The inmate had a history of treatment with olanzapine; however, this was discontinued during January 2019.

The 14-day Health Appraisal was completed on April 20, 2019.

The inmate was seen by the social worker on April 18, April 25, May 1, May 2, May 9, May 16, and May 23, 2019. He was seen by the psychologist on May 1 in response to a referral from the LMFT who reported that the inmate was more disorganized and hyperverbal. He was described as disheveled and agitated but was determined to not be a danger to himself or others and not gravely disabled as he was eating.

The inmate was last seen by mental health staff on May 27, 2019, when he was seen by the LMFT in response to a referral from custody who reported that the inmate was lying on his bed and not interacting with others. He reported to the clinician that he was not doing well, and that he was experiencing auditory hallucinations. He was referred to the psychiatrist with mental health follow-up in one week.

The inmate's custody file was reviewed. It indicated that on May 30, 2019 at approximately 1454, a deputy approached the inmate's cell in A-Pod number 203 where he was housed in a single person cell. After receiving no response from the inmate, the deputy entered the cell to find him lying face down under the bed with his face suspended off the ground and a string around his neck fastened to holes in the bunk of the cell. Medical assistance was summoned, and CPR was initiated. He was transported to NMC where he was pronounced deceased on June 2, 2019 at 1520.

The Coroner's Report noted the cause of death as asphyxia due to hanging. The toxicology report noted no illicit substances, including alcohol or acetone.

**Findings**

Although the inmate was followed consistently by mental health staff, he remained with psychosis and treatment non-adherence and was housed in the segregation unit. It was unclear why this inmate was not seen timely after arrival by the psychiatrist for medication review and ordering. It is also of concern that this inmate was housed in segregation; this reviewer has commented repeatedly regarding the housing on severely mentally ill individuals in segregation who refuse treatment, groups and medications and need inpatient treatment.

There was documentation that the inmate was seen within one hour of placement into the sobering cell by medical staff and was followed consistently after placement.

Review of the custody files was unremarkable; however, information was not provided to determine whether the custody checks in A-Pod occurred timely.

16

This inmate presented with uncooperative and withdrawn behavior, refusing out of cell contacts and reportedly was seen lying under his bunk on the floor.  There was a lack of documentation regarding treatment planning to address this issue and to engage the inmate in treatment to allow for adequate assessment and treatment.



29-17

# Exhibit 30

**Monterey County Jail Mental Health Monitor's Report**
**July 16, 2020 – August 14, 2020**

**Overview**

The Monterey County Jail was toured virtually for the seventh mental health monitoring tour.  This monitoring tour occurred virtually utilizing Zoom due to the COVID-19 pandemic with resulting closure of the jail to outside persons to decrease the risk of transmission of the virus.

The tour was conducted over several days; a pre-site visit meeting occurred on July 16, 2020, with additional meetings, interviews and observations conducted on July 28, 2020, July 29, 2020, July 30, 2020, August 7, 2020 and August 14, 2020.

The following report is based upon interviews with institutional staff and inmates, meetings, healthcare records reviews, as well as review of documentation and information provided by the institution and County. This report will specifically address the institution's status and progress toward compliance with the United States District Court Northern District of California Settlement Agreement and the Implementation Plans between Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County Sheriff's Office; California Forensic Medical Group, INCORPORATED (CFMG) et al.

This monitoring report will include review of compliance for the period of December 2019 to July 2020.

**Compliance with Settlement Agreement and Implementation Plan**

**1.     Intake Screening**

- *Upon arrival, an Initial Health Assessment will be performed by the intake nurse to determine whether the inmate should be excluded from the facility on medical or mental health grounds. Upon acceptance into the jail, all inmates will be screened by the intake*

30-1

*nurse for urgent medical, mental health and dental needs. The intake nurse will have access to an inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail.*

- *If a patient's chronic condition is stable at booking, the Booking RN shall schedule a follow up with a medical provider within 5-7 days. If the patient is unstable or has unverified medications, the Booking RN must refer the patient to the on duty or on-call medical provider. [CFMG Plan at 29]*

- *The Booking RN shall identify and assess at booking individuals with a history of chronic medical or psychiatric condition. The Booking RN must document and verify and continue all current medications, whether verified or unverified, formulary or non-formulary. [CFMG Plan at 29, 72]*

- *Booking RN must observe/query for signs/history of mental illness and use of psychiatric medications. The RN shall verify any medications and request outside treatment records as necessary. Any inmate who exhibits signs/history of mental illness shall be referred to mental health services for evaluation, and a physician's opinion must be secured within 24 hours or the next scheduled sick call. [CFMG Plan at 16, 19, 41]*

- *A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.*

- *The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive Findings: on the suicide assessment.*

- *The Booking RN shall begin initial treatment planning at the time of booking and schedule referrals for follow up evaluation as necessary. [CFMG Plan at 27]*

2

**Findings: Deferred**

A review of healthcare records indicated that inmates were seen at the time of intake by an intake nurse, and those inmates in need of mental health treatment were referred to mental health clinicians.  Those inmates in need of more urgent mental health referral were promptly referred and seen by mental health clinicians.  Prior medical records of treatment at the MCJ were included in the healthcare record and were available for review; however, healthcare records were not always obtained when indicated for outside, prior mental health treatment.

There was documentation that intake nurses attempted to verify medications at the time of intake.

Review of jail clearance logs and healthcare records indicated that inmates were routinely referred to Natividad Medical Center (NMC) for jail clearance when presenting with suicidal ideation or behavior at the time of jail intake. Inmates were also sent to NMC due to possible alcohol and drug intoxication, and a number of inmates were sent to the hospital due to "jail check by arresting officer" making it unclear what the reason for hospital clearance resulted from.  For those inmates where documentation was provided regarding the date of referral and return to the jail, it appeared that inmates were routinely returned, usually within 24 hours to the MCJ.

The facility utilized the Initial Mental Health Assessment and Appraisal for mental health assessment of new arrivals.  The assessments were routinely completed for patients with known mental health history or those that presented with suicidality.

The facility utilized the Suicide Watch Initial Assessment for Mental Health to assess suicide risk. Mental health clinicians continued to consistently utilize this assessment tool for the evaluation of suicide risk.  As was noted during the last monitoring report, this was a comprehensive assessment tool which was beneficial in determining the level of suicide risk;

3

however, improvement was needed in the documentation of appropriate safety and treatment planning.

Healthcare records also documented that patients seen at intake were referred for routine and emergency mental health evaluation and treatment timely.

The issue of confidentiality for nursing intake assessments during the intake process remained of concern.  The jail took steps to address this issue since the last monitoring visit. White noise machines, used to dampen sound for improved confidentiality, were replaced in the intake room and outside receiving; previous machines were ineffective in providing adequate sound dampening and confidentiality.  These machines were observed in use during this visit, and staff were interviewed regarding the effectiveness of the white noise machines.  The staff reported that they noticed improvement with the newer machines, and they expressed that inmates did not report concerns.  Although the monitor noted that the machines appeared more functional than prior machines, it was difficult to evaluate the effectiveness of sound dampening and confidentiality by remote monitoring.

For these reasons, I will defer findings pending onsite review.


**2.     Mental Health Screening**

- *All inmates must undergo an initial mental health screening by a qualified mental health professional within 14 days of admission.  The screening must consist of a structured interview inquiring into (1) history of psychiatric hospitalizations, substance use hospitalization, detoxification and outpatient treatment, suicidal behavior, violent behavior, victimization, special education placement, cerebral trauma or seizures, and sex offenses; (2) current psychotropic medications, suicidal ideations, drug or alcohol use and orientation to person, place and time; (3) emotional response to incarceration; and (4) screening for*

4

*developmental disability and learning disabilities.  Any positive scores will be referred for*

*follow up.  [CFMG Plan at 36, 41-42]*

- *The medical or psychiatric provider will complete a baseline history and physical or psychiatric examination; order a therapeutic regimen, as appropriate; and, schedule the patient to be seen for chronic care clinic at least every ninety days for the length of the jail stay. Patients on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every **60 to 90** days.*

**Findings: Noncompliance**

Review of healthcare records and staff reports indicated that Qualified Mental Health Professionals completed the Initial Mental Health Assessment and Appraisals for inmates with a known history of mental health treatment, those with suicidality and those inmates referred for mental health services.

Healthcare records reviews indicated that there were continued delays in the initial psychiatric assessment and follow-up. Healthcare entries noted psychiatric appointments that were rescheduled due to workload issues.  Additionally, some inmates were not seen timely for psychiatric follow-up, even for some inmates with severe psychotic symptoms. Inmates were not seen every thirty days who had been prescribed psychotropic medications until stable, with subsequent decrease in follow-up intervals. These delays appeared to be due to psychiatric staffing workload issues. The psychiatrist frequently had to reschedule inmates due to large caseloads, and mental health staff noted increased mental health referrals due to anxiety, insomnia and stress related to COVID-19.

**3.     Sick Call**

- *Inmates' health and mental health complaints must be collected, processed, and documented daily and triaged as appropriate by medical and mental health providers. [CFMG Plan at 25]*

- *The on-duty medical provider shall see urgent sick call requests Monday through Friday.  On weekends and holidays, the on duty nurse shall communicate urgent complaints/requests to the on-call provider, who will treat or refer the patient as necessary.  [CFMG Plan at 25]*

**Findings: Noncompliance**

Inmate requests for mental health services were made by submission on the tablets.  At the time of the visit, there were significant issues with the availability of tablets for inmate use.  Inmates who were interviewed reported poor access to tablets on some units, and staff reported that damage to tablets by some inmates remained problematic in the segregation units.  Jail supervisory staff reported that additional tablets had been ordered; however, it appeared that there were problems with the distributor making access to tablets difficult.

Despite these difficulties, mental health staff continued to triage requests for services.  Emergency and urgent referrals were seen on that date; however, more routine requests were sometimes delayed and rescheduled due to workload constraints.

- *Health care staff must note (1) the date and time the sick call request slip is reviewed; (2) the signature of medical staff; and (3) the disposition.  The sick call slip must be filed in the inmates' medical record.  The sick call roster must be kept on file in the medical record room.  Providers must record sick call visits in the inmate's medical record.  [CFMG Plan at 25-26]*

6

**Findings: Noncompliance**

The process for documentation of sick call requests changed with the implementation of the electronic healthcare record.  There was documentation that inmate requests were scanned into the healthcare record; but scanned documents were not provided to the monitor for review.

- *Sick call must be conducted 5 days/week in a private clinical environment.  Health services staff must triage sick call slips dialed and schedule patients for the next sick call if the slip was received prior to 2300 hours. [CFMG Plan at 26]*
- *An MD or an RN shall visit inmates housed in holding and isolation cells on Monday, Wednesday and Friday.  [CFMG Plan at 26]*

**Findings: Noncompliance**

Mental health sick call occurred daily at least five days per week by mental health clinicians.  Follow-up appointments were sometimes rescheduled due to workload constraints.  There was documentation of nursing rounds in segregated units, that included MHO, WHO, men's and women's segregation units; these rounds occurred at least three times per week, but not always daily.  The psychiatrist did not visit inmates housed in holding and isolation cells on Monday, Wednesday and Friday, and no psychiatric nurse was employed at MCJ at the time of the visit.

4.      **Chronic Care**

- *Any patient whose chronic condition cannot be managed at MCJ shall be transferred offsite for appropriate treatment and care.  [CFMG Plan at 30]*
- *At every 90-day chronic care appointment, the medical/psychiatric provider shall (1) assess the patient's current medications, complaints, and compliance with treatment plan; (2) examine vital signs and weight; (3) assess the patient's diagnosis, degree of control,*

7

*compliance with treatment plan and clinical status as compared to prior visits; and (4)*

*conduct lab and diagnostic tests as necessary, develop strategies to improve outcomes if the*

*condition has worsened, educate the patient, and refer to MD or specialist, and/or conduct*

*discharge planning as necessary.  All of the above must be documented in the patient's health*

*record.  [CFMG Plan at 32-33]*

**Findings: Noncompliance**

Although inmates were routinely referred to NMC for crisis evaluation and stabilization, some inmates with severe and chronic mental illness that could not be managed at MCJ remained at the jail without referral.  The acceptance and adequate treatment of such inmates at NMC remained problematic, and as has been previously noted, referrals for needed inpatient mental health care did not occur due to the lack of access to inpatient treatment at NMC.

Psychiatrists documented the appropriate treatment interventions, medications, adherence and laboratory monitoring as indicated. Scanned psychiatric notes were not provided to the monitor for review.

## 5.     Acute Care

- *Inmates who require acute mental health services beyond what is available at the Jail must be transferred to an appropriate facility.  [CFMG Plan at 36, 42]*
- *Crisis intervention and management of acute psychiatric episodes shall be handled initially by on-duty medical/mental health staff with referral to psychologist and/or psychiatrist on a 24 hour per day basis.  [CFMG Plan at 43]*

**Findings: Noncompliance**

Although inmates were routinely referred to NMC for crisis evaluation and stabilization, some inmates with severe and chronic mental illness that could not be managed at MCJ remained

8

at the jail without referral.  The acceptance and adequate treatment of such inmates at NMC remained problematic, and as has been previously noted, referrals for needed inpatient mental health care did not occur due to the lack of access to inpatient treatment at NMC. This appeared to be particularly problematic for chronically mentally ill who exhibited chronic psychosis and treatment nonadherence.

Crisis intervention and management of acute psychiatric episodes were initially treated by medical/mental health staff and referred to the psychiatrist as indicated.

### 6.    Outpatient Services

- *The Jail shall make outpatient mental health services, provided by a qualified mental health provider, available to all inmates.  [CFMG Plan at 41]*
- *Inmates requiring mental health services beyond the on-site capability of the Jail shall be referred to appropriate off-side providers.  [CFMG Plan at 41, 43, 46]*

**Findings: Noncompliance**

Outpatient mental health services were provided by qualified mental health providers at MCJ, and clinicians provided services to all inmates regardless of their housing or mental health designation.

Please note prior comments regarding referral for inpatient mental health treatment.

### 7.    Safety and Sobering Cells

- *The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall*

9

*responsibility for safety and security of prisoners, prompt reviews by medical of all*

*placements, and a process of resolving disagreements between medical and custody.*

**Findings: Noncompliance**

The facility continued to primarily utilize the booking cells rather than the safety cells for suicide monitoring; however, safety cells were utilized for those inmates with self-injurious behavior and in instances when single cells utilized for suicide monitoring were not available in the intake area.  The facility noted that the previous form utilized to document placement in safety cells was confusing, and that it did not differentiate between those placed into safety cells on Level 1 suicide watch; and those housed in booking cells on Level 2 suicide watch.  This form was amended to a "Health Watch Log" and separate "Safety Cell Log" and "Sobering Cell Log" forms. This change appeared to address the confusion regarding placements in the safety and sobering cells for suicide monitoring.

Audits were performed by the Compliance Sergeant of safety and sobering cell requirements.  Although the audits indicated greater than 90% compliance, specific omissions regarding required documentation were consistently noted.

Healthcare records reviews, as well as audits by the Compliance Sergeant, documented lapses in the prompt review by medical of all safety cell placements.

 Facility staff and audits by the Compliance Sergeant indicated no disagreements between medical and custody staff regarding such placements.

10

30-10

- *Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical professional will see an inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.*

**Findings: Noncompliance**

See previous comments.

- *A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his Findings: through a report which will be sent to the Jail Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.*

**Findings: Noncompliance**

Audits were conducted by the Compliance Sergeant as required, and the audits indicated lapses in supervisory documentation as well as lapses in required welfare checks.

- *Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11 p.m. and*

11

*7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.*

**Findings: Noncompliance**

Audits by the Compliance Sergeant indicated instances that mattresses were not provided when indicated.

- *Inmates in sobering cells may have access to mattresses at the discretion of custody staff.*
- *Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.*

**Findings: Substantial Compliance**

Audits by the Compliance Sergeant indicated that the provision of mattresses was at the discretion of custody staff for inmates housed in the sobering cells.

- *Patients withdrawing from benzodiazepines must be evaluated by a medical provider within 3 days, and a psychiatrist or psychiatric NP within 7 days.  [CFMG Plan at 68]*

**Findings: Deferred**

This issue will be reviewed during upcoming monitoring visits.

- *Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.*

12

**Findings: Deferred**

The monitor was unable to evaluate this issue for this report; this issue will be reviewed during onsite monitoring.

- *For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.*

- *All inmates in safety cells whose condition deteriorates or for whom the nurse is unable to complete a hands-on assessment (including vital signs) after 6 hours of placement, shall be transferred to NMC.  [CFMG Plan at 16, 75]*

**Findings: Noncompliance**

Audits indicated that at least two inmates remained in the safety cell for greater than 24 consecutive hours prior to transfer to an inpatient setting.

8. **Medication Continuity**

- *All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.*

- *By the end of the nursing shift, the booking RN will consult with the on-call psychiatrist regarding any verified or unverified psychotropic medications. The on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate. The on-call psychiatrist will then set the time to see the*

13

*inmate within 5-7 days. The date of the appointment will be reflected on the written record of*

*the order.  [CFMG Plan at 19]*

**Findings: Substantial compliance**

This was an area of improvement.  Few instances were noted in which medications were

not ordered timely at jail intake.  There was documentation that nursing staff attempted to verify

psychotropic medications, and the psychiatrist was contacted timely.

- *No psychotropic medications shall be unilaterally discontinued without consultation with the*

  *facility physician or psychiatrist.  Psychotropic medication shall not be ordered for longer*

  *than 90 days, new psychiatric medications will not exceed 30 days, until condition is*

  *documented stable by the ordering physician. The prescribing provider will renew*

  *medications only after a clinical evaluation of the individual is performed.  [CFMG Plan at*

  *19]*

**Findings: Noncompliance**

There were not examples of psychotropic medications discontinuation without

consultation with the psychiatrist noted.  New psychotropic medications were ordered for greater

than 30 days, and inmates were seen at intervals greater than 30 days after new medications were

prescribed and prior to psychiatric stabilization.  This appeared related to psychiatric workload

issues. Psychotropic medications were at times renewed after chart review to prevent medication

discontinuity; however, inmates were subsequently scheduled for psychiatric assessment.

**9.    Discharge**

14

- *Provision of psychotropic medications upon discharge from the jail. The Implementation Plan provides that a 30-day supply of medications be given to inmates upon discharge from the jail.*

- *Inmates who are released prior to resolution of a continuing medical/mental health condition shall be referred to public health and/or community clinics as appropriate, and shall be provided written instructions for continuity of essential care.  [CFMG Plan at 38, 44]*

**Findings: Substantial Compliance**

There was documentation that discharge medications were consistently called into a local pharmacy upon jail discharge. When discharge dates were known, mental health clinicians worked with inmates regarding discharge planning and coordination; however, this was difficult as inmates were released directly from court and at times release dates were not known.

**10.    Involuntary Medication**

- *Psychotropic medications may not be used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment.  [CFMG Plan at 90, 96]*

- *Absent an emergency, inmates will not be administered involuntary psychotropic medications at the Monterey County Jail.  Psychotropic medication will not be administered for disciplinary purposes. [CFMG Plan at 19]*

- *Absent an emergency or court order for treatment with psychotropic medications, an inmate shall give his or her informed consent or refusal.  [CFMG Plan at 20]*

- *The Jail may only be administer involuntary psychotropic medications in a psychiatric emergency (i.e., when administration is necessary to preserve life or prevent serious bodily harm, and it is impracticable to obtain consent), or when an inmate is found to lack capacity*

15

*to consent at an Incapacity Hearing.  The responsible physician, Program Manager, and Director of Nursing, with the Facility Manager, are to identify appropriate community resources and develop procedures to obtain an Incapacity Hearing, and transfer inmates requiring involuntary psychotropic med administration to an appropriate community facility. If the inmate must remain at the jail for clinical or custodial reasons, the health services staff shall coordinate with County Mental Health Psychiatric Emergency Services to evaluate competency pursuant to Riese v. St. Mary's Hospital (Riese Hearing).  [CFMG Plan at 96, 98]*

- *In a psychiatric emergency, psychotropic medications can only be involuntarily administered pursuant to a direct written or verbal one-time order from the responsible facility psychiatrist or physician after an on-site evaluation (never as needed, never standing order).  A telephone order is sufficient only if the inmate has been personally evaluated by the prescribing physician **no longer than 24** hours prior to the emergency.  If none of above options are available, physical restraint should be used and the inmate transferred to the hospital emergency department for physician evaluation.  [CFMG Plan at 96]*

- *Verbal orders for involuntarily psychotropic medications must be documented in the inmate's medical record and signed by prescribing physician within 72 hours.  The Medical Program Manager and Custody Facility Manager shall be notified in writing, or by telephone if not available, within 24 hours of the involuntary administration of psychotropic medications. [CFMG Plan at 96-97]*

- *Inmates receiving involuntary psychotropic medications must be admitted to an infirmary or safety cell, with intermittent supervision by custody staff at least every 30 minutes.  Nursing staff must monitor (assessing response to medications, mental status, general physical*

16

*appearance, behavior, and hydration) every 15 minutes during first hour, then every 30 minutes thereafter until otherwise ordered by the prescribing physician, documenting all findings in the inmate's medical record.  The inmate must be evaluated by the responsible prescribing physician at least every 72 hours.  [CFMG Plan at 97]*

- *Inmates exhibiting any clinical deterioration at any time during involuntary therapy shall be transferred immediately to a clinically appropriate treatment facility.  [CFMG Plan at 97]*

**Findings: Noncompliance**

Review of healthcare records and provided documentation indicated that the provision of emergency orders by the psychiatrists did not follow the Implementation Plan.  Standing orders for emergency medications are not allowed, and the inmate must be seen by the prescribing physician no longer than 24 hours prior to the psychiatric emergency.  If the physician is not available, physical restraint should be used and the inmate transferred to the hospital emergency room. Verbal orders must be signed within 72 hours.

The order provided by the psychiatrist on May 8, 2020 for Inmate 9 appeared to be a standing order (for 2 days) and allowed for intramuscular involuntary administration without following the guidelines outlined in the Implementation Plan.  Further, documentation that the orders were signed within 72 hours was not present.

Regarding Inmate 1, telephone order for involuntary medication provided near the time of intake did not document evaluation by the prescribing psychiatrist within 24 hours of the emergency. Only after the inmate presented with a possible seizure was the inmate subsequently transferred to NMC.  Documentation of the presence of a qualified medical clinician to assist the telepsychiatrist at the session was absent.  This inmate received emergency psychotropic

17

medications on at least two occasions; however, there was a lack of documentation of timely

psychiatric follow-up; and the inmate was not seen within 72 hours (either in person or by

telepsychiatry).  It was also unclear whether the second emergency provision of medications was

accepted voluntarily, or whether it was administered to the inmate involuntarily which is against

policy.

Additionally, there was a lack of documentation that timely informed consent was

obtained in most cases reviewed.  Interviews with staff indicated that informed consent was

obtained by nursing staff prior to or after psychiatric telepsychiatry contacts; however, the

documentation provided in the healthcare record did not confirm this practice.  It is possible that

consent was obtained and scanned; however, it was not made available to the monitor for review.

There was a lack of documentation that a qualified, trained medical clinician was in

attendance to assist the telepsychiatrist and that the inmate was seen by a physician or mid-level

provider within 24 hours of initial psychiatric assessment.

**11.    Medication Refusals**

- *The on-call psychiatrist must be contacted whenever an inmate refuses his or her medications*
  *on three consecutive occasions. [CFMG Plan at 20]*

**Findings: Noncompliance**

There was a lack of documentation that the psychiatrist was always contacted regarding

medication refusal; however, the psychiatrist reported that the healthcare record was reviewed for

medication adherence during clinical encounters.

18

**12.    Clinical Staffing**

- *Defendants will maintain Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to ensure adequate staffing to provide all necessary medical and mental health care. The plan will identify all needed positions based on current and projected Jail population, and the number and qualifications of medical and mental health care staff to cover each position, with shift relief.*

- *Mental health services provided on-site shall include crisis evaluation, socialization programs, group therapy, medication management, psychiatric evaluations and individual therapy.  [CFMG Plan at 42]*

- *At all times, there shall be sufficient staff to ensure compliance with the Implementation Plan. The CFMG Staffing Plan is attached to the Implementation Plan as Exhibit I.  CFMG must ensure that all positions are filled.  Relief factors for each position shall be calculated into the staffing analysis to ensure staffing levels consistently meet requirements. CFMG must continuously evaluate staffing levels to ensure sufficiency for compliance.  [CFMG Plan at 116. ]*

- *Mental health staff shall be available on-site 7 days per week and on-call for assessment on an inmate's level of suicide risk upon referral by health services and/or custody staff. [CFMG Plan at 72]*

**Findings: Noncompliance**

On June 17, 2020, the mental health staffing was as follows according to the Wellpath staffing analysis:

1.0 FTE Psychiatrist

19

0.9 FTE LCSW

0.9 FTE LMFT

0.9 FTE open position – currently filled with OT and per diem or JBCT person

Since the last visit, staffing changes continued.  At the time of the visit, the mental health staffing for clinicians included three staff mental health clinicians and two clinicians who worked as contractors/per diem.

The LCSW who provided group therapy no longer worked at the facility, and group therapy was not provided for segregation inmates due to the COVID-19 pandemic precautions and these changes in staffing.  Mental health clinicians saw inmates for contacts at cell-front or remotely by using the tablets.

A mental health staff schedule was provided that included daily, evening and weekend coverage including on-call.

During the monitoring period, the provision of mental health services included crisis evaluation, medication management, psychiatric evaluations and individual therapy.  In-cell materials were provided to segregation inmates in lieu of group therapy.

Of significant concern was the lack of confidentiality that occurred for contacts with the psychiatrist and mental health clinicians.  As the contacts occurred in non-private settings (frequently at cell-front and in the dayroom); this greatly compromised the clinical encounter and minimized the provision of needed therapy.  Additionally, as some inmates did not have headphones (staff reported that approximately one-third of inmates did not have headphones), contacts with psychiatrists and clinicians could easily by overheard by other inmates and staff. Although the need for social distancing and minimization of virus transmission was understandable, additional measures were indicated to allow confidentiality in the clinical encounters.

Healthcare documentation not infrequently continued to indicate that mental health clinician appointments were rescheduled due to workload constraints. Staff interviews indicated that due to increased referrals and due to cell-front contacts, contacts with inmates were decreased in duration and clinical content.

Psychiatric services were primarily provided by Dr. ███████ Psychiatric hours were augmented with coverage by Dr. ██████ and Dr. R. █████ in Dr. █████████ absence.

Psychiatric on-call services continued to primarily be provided by Dr. ██████ with some on-call coverage by Dr. █████

During the monitoring period, due to the COVID-19 pandemic, psychiatric contacts primarily occurred by telepsychiatry using FaceTime.

During past monitoring reports, the workload for the psychiatrist was an issue of concern. Review of the monthly psychiatric sick call list indicated that an average of 255 inmates were scheduled to see the psychiatrist monthly.  This resulted in approximately 13 inmates who were scheduled daily for psychiatric assessment.  Additional psychiatric responsibilities also included crisis and emergency evaluations, medication renewals and consultation with medical and mental health clinicians as well as meetings and other obligations.  Staff interviews and healthcare records indicated that inmates were routinely rescheduled due to psychiatric workload issues. Although the psychiatrist continued to have excessive numbers of patients scheduled; he reported that he continued to triage and ensure that patients were not delayed for initial assessments.  Follow-up for inmates in need of monthly psychiatric contacts did not occur timely due to workload constraints.

Review of healthcare records indicated improvement in the timely ordering of psychotropic medications and initial psychiatric contacts.

In response to a request for a staffing analysis to determine the appropriate staffing levels at MCJ, Wellpath provided a staffing analysis dated June 17, 2020.  This analysis reviewed the daily work of mental health clinicians and psychiatry (such as sick call visits, medication orders chart reviews rounds), weekly duties (including group therapy and MDTM), and incremental work (including suicide watch monitoring, restraint, use of force). It also included a time study assessing time for chart review and clinic visit, assuming that each clinician would see 20 inmates per day and the psychiatrist seeing 17 inmates per day. It noted that the staff struggled with discharge planning and group facilitation and that a 0.9 FTE position had been added since 2019 that was unbudgeted and unfilled but covered by per diem staff and JBCT staff after hours. The analysis recommended increasing the total clinician FTE to 4.7 to include a 1.0 FTE Discharge Planner/Group Facilitator, and to continue to monitor staffing as the new building occupancy occurred with anticipated increased time to movement as a result.

This staffing analysis did not provide sufficient detail to determine the adequacy of the analysis.  The recommendation would add approximately 1 FTE mental health clinician; Although this addition will be helpful in addressing the omissions noted, it would essentially add 0.7 FTE mental health clinician position to the staffing levels previously reported in past reports, 1 FTE psychiatrist and 4.0 FTE mental health clinician.  Additionally, it does not address the sufficiency of the psychiatric staffing levels which would be unchanged.

**13.    Mental Health Care Training**

- *All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.*

**Findings: Substantial Compliance**

Training rosters were provided indicating training for correctional staff regarding the Implementation Plan.

- *In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.*

**Findings: Substantial Compliance**

Training documentation was provided.

- *All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates, identifying warning signs specific to inmates, and how to recognize individuals who are in mental distress and/or suicidal.*

**Findings: Substantial Compliance**

Training documentation was provided.

- *Yearly custody staff will conduct a situational training such as a mock suicide attempt or a medical emergency. CFMG staff will also participate in the annual situational training.*

**Findings: Deferred**

- *All medication nurses must be trained to recognize common side effects associated with use of psychotropic medications, and upon observing such side effects must document observation in the medical record and schedule the patient to see a medical provider at the next available sick call.  [CFMG Plan at 90]*

**Findings: Substantial Compliance**

Training rosters were provided.


**14.     Restraint Chairs**

- *Physical restraint devices can only be used on inmates who display bizarre behavior that results in the destruction of property or reveals an intent to cause physical harm to others, and cannot be used when there are less restrictive alternatives.  [CFMG Plan at 47]*
- *Use of a restraint chair will be documented in an observation log which will be reviewed and signed by a supervisor. Inmates shall not be placed in a restraint chair for longer than six consecutive hours.*

**Findings: Substantial Compliance**

Documentation was initially provided of monthly WRAP use for December 2019, January, March, May and July 2020. Based upon the documentation available, there were three incidents of WRAP usage; however, review of incident reports indicated an additional WRAP incident that occurred on January 9, 2020.  In this case, the duration of WRAP was not documented; however, it appeared that the inmate was placed into the WRAP, transferred to a safety cell, and the WRAP was subsequently removed. Of the cases for which documentation was provided, none exceeded six consecutive hours, and the use of WRAP appeared to be appropriate

24

based upon the behaviors and observations described.  Of note was an incident that occurred on March 21, 2020 in which the inmate was placed into WRAP at 2037, was removed at approximately 2200, and was placed in WRAP again and returned to the safety cell after presenting with uncooperative behavior.  This audit by the Compliance Sergeant indicated that at approximately 2215, the inmate was removed from WRAP and placed into the restraint chair as he attempted to leave the cell multiple times.  The duration of placement in the restraint chair was not reported.

Upon request of the monitor, the remaining missing documentation of WRAP usage was provided and reviewed. The documentation and auditing of WRAP restraint usage, as well as the duration of placement was appropriate.


- *Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A shift supervisor and medical staff shall oversee the exercise. If unsuccessful in allowing inmates to exercise their arms and hands in a range of motion exercise, safety staff shall explain on the observation log why extremities could not be exercised and a shift supervisor shall be notified.*

**Findings: Noncompliance**

There continued to be a lack of documentation of range of motion activities for inmates placed in WRAP.  Minutes from the Implementation Committee noted that there was difficulty documenting range of motion using the current forms, and that the Committee was working to address this issue.

25

- *On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.*

**Findings: Noncompliance**

Although documentation was provided, several months were missing from the document production.  For the months provided, the Compliance sergeant audited at least one incident of WRAP use.

## 15.     Use of Force

- *Medical and mental health staff shall be consulted before any planned use of force on an inmate. Custody staff in concert with medical staff will develop the most effective and appropriate means of imposing compliance with rules and regulation, including attempts at de-escalation. It is understood that it is the goal of custody staff to use the least amount of force necessary to ensure compliance with rules and regulations. Planned use of force will only be used after verbal attempts to obtain compliance.*
- *Any use of force will be documented on a use of force form.*

**Findings: Deferred**

During an incident on December 4, 2019, a planned use of force occurred, and mental health was consulted prior to the incident when they attempted to de-escalate the situation. The inmate later complied with custody staff orders. This inmate had several incidents that involved use of force, and for planned uses of force, there was documentation that medical and/or mental health staff was present or was consulted and that attempts at de-escalation occurred.

In another use of force incident that occurred on June 28, 2020 at 0550, an inmate housed in a sobering cell presented with probable psychosis, agitation, and threatening behavior.  He

26

then began tying his pants to the sprinkler inside his cell.  The officer believed that the inmate was attempting to make a noose for self-harm, and after consulting with the Sergeant, an extraction team was formed, and the inmate was placed into a safety cell on Level 2 suicide watch.  Although there was no documentation that mental health or medical was consulted, this appeared to be an emergency intervention due to imminent self-harm.

On July 16, 2020, an inmate housed in a sobering cell presented with threatening gestures and behavior, incoherence, slurred speech and combativeness.  Planned use of force was recommended due to the need for forced medications.  Medical and mental health staff were present at the scene, and medications were administered. On the following day, mental health staff advised custody that the inmate required involuntary commitment as he would be released from jail.  He was subsequently transferred to NMC on a WIC 5150 hold.

Review of additional incident reports indicated that mental health and/or medical staff were consistently contacted when inmates presented with concerning behaviors, use of force was not implemented, and the inmates were subsequently brought to medical for evaluation. Use of force was documented in incident reports.

This review of incident reports was contrasted with findings presented by plaintiffs' counsel in which several incidents of planned use of force were not accompanied by prior consultation with medical and mental health staff.  As a result of these examples provided, this finding will be deferred, and this issue will be reviewed at the next monitoring visit.


**16.    Mental Health Grants**

- *Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.*

**Findings: Substantial Compliance**

Since the last monitoring report, the 10-bed regional Jail Based Competency Treatment program (JBCT) opened in the C-Pod.  The unit was toured remotely during this visit, and staff were interviewed regarding the functioning and programming provided on the unit. This unit will assist in addressing those inmates awaiting trial at the jail who have frequently been treatment resistant and unable to be transferred for inpatient stabilization.

**17.     Inmates Who Have Been Declared Incompetent to Stand Trial**

- *The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period. As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment. The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for orders to show cause to be directed the State of California) to expedite the transfer of inmates who have been determined to be incompetent to stand trial to an appropriate State facility.*

**Findings: Substantial Compliance**

This issue remained unchanged. Not all inmates who were declared incompetent were routinely placed into transition cells in administrative segregation and seen by medical staff daily upon a Court finding the inmate to be incompetent to stand trial. There was continued coordination between custody and mental health staff regarding timely notification when an

28

inmate was found incompetent to stand trial. Mental health staff then determined appropriate housing. Placement into administrative segregation cells was determined by the inmate's ability to function in general population.  Additionally, inmates who were declared incompetent were discussed during the Multidisciplinary Treatment Meeting (MDTM). Mental health staff continued to contact the inmate's attorneys to begin the process of evaluation and eventual transfer to an inpatient unit for incompetence to stand trial.

Please also refer to the previous comments regarding plans for the JBCT.

The process that the facility developed for the identification, referral and monitoring of inmates who were considered or declared incompetent appeared to be adequate and sufficient to allow for a continued determination of substantial compliance.

## 18.    Treatment Plans

- *Qualified health services staff must develop a written individualized treatment plan for inmates requiring close medical and/or mental health supervision.  A treatment plan must specify a particular course of treatment and shall be included in the plan portion of the S.O.A.P. progress note.  The treatment plan shall reflect current problems or conditions being followed.  The treatment plan shall include monitoring of the efficacy of treatment and discharge planning. [CFMG Plan at 27, 75]*

- *Treatment plans shall include specific medical and/or psychiatric problems, nursing interventions, housing, dietary, medication, observation and monitoring, and follow-up referral and/or evaluation as appropriate.  [CFMG Plan at 27]*

- *Mental health providers must work with the Program Manager to designee to develop a treatment plan and meet the outpatient needs of inmates with mental illness, including*

*opportunity for social interaction and participation in community activities.  If an inmate is unable to participate, the reason must be documented.   [CFMG Plan at 43, 75]*

- *CFMG will inform classification through medical treatment orders as to any classification issues an inmate has due to a mental illness. [County Plan at 11]*

**Findings: Noncompliance**

The weekly MDTM continued.  Minutes of these meetings indicated that there was consistent attendance by mental health clinicians, medical, classification, and custody supervisory staff. The expert attended this meeting remotely during the visit.

MDTM documentation was reviewed.  This meeting continued to be a good forum to discuss inmates with mental health and medical concerns, including inmates returning from state hospital, PC 1370 patients, inmates on suicide watch, referrals from classification, hospitalized patients, medication nonadherence and other important issues of concern.

Due to scheduling conflicts and staff turnover, not all mental health staff attended the MDTM.  It appeared that the psychiatrist infrequently attended this meeting, and not all mental health clinicians attended the meeting due to scheduling. Recommendations were made for the minutes of the meetings to be provided to all mental health staff to allow for improved communication of treatment planning; further, the minutes should include sufficient detail to convey this important information, and every effort should be made to allow necessary staff to attend the MDTM.

Despite the importance of this meeting and the valuable information conveyed in a multidisciplinary forum, healthcare and MDTM records continued to lack appropriate documentation of individualized treatment and safety planning.  Greater efforts are necessary to provide adequate documentation of individualized treatment planning for each inmate receiving mental health services.

30

19.    **Consideration of Mental Illness in Inmate Discipline**

- *Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff are encouraged to contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness.*

**Findings: Deferred**

Disciplinary Action Reports (DARs) were requested, but not provided to assess this issue. This issue will be deferred until the next monitoring visit.

20.    **Space Issues**

- *Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including . . .adequate clinical and administrative treatment space....*

**Findings: Deferred**

Adequate assessment of this issue could not be performed remotely.

Dedicated office space was provided to the psychiatrist, and the remainder of the mental health staff shared an office in the infirmary area. These offices were not utilized for clinical encounters.

During this monitoring period, clinical encounters occurred primarily at cell-front and remotely by phone or FaceTime. Issues of confidentiality were noted.  Since the last monitoring visit, new white noise machines were purchased and utilized outside the receiving area which was

31

utilized for mental health interviews. Mental health staff did not report issues noted at the last visit in which custody staff were inappropriately present during the mental health interviews, and it appeared that this issue was addressed in training.

**21.    Administrative Segregation**

- *The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation...*

- *The Mental Health Implementation Plan shall require classification to assess a totality of factors when assigning prisoners to administrative segregation units. It is understood that the goal of Defendants is to limit the use of administrative segregation for prisoners with serious mental illness.*

**Findings: Deferred**

Mentally ill prisoners were routinely housed in the segregation units, and the placement of such individuals on these units continued to not be limited. MCJ attempted to address this issue by better documenting placements in segregation and the reason for placement. The Implementation Committee was formed, and minutes from the Implementation Committee noted plans for improved documentation regarding placements in segregation. Logs of placements in segregation were provided which noted that the inmate was screening prior to placement and whether mental health referral was indicated.  Segregation placements were also discussed in the MDTM.

Specifically, the jail implemented an Inmate Movement Form that identified the reasons for segregation placement, mental health consultation and whether the inmate was cleared for

placement.  These improvements were a positive step in addressing and documenting this very difficult to resolve issue of concern.

Despite these efforts, the segregation units continued to house severely mentally ill individuals, many who were treatment non-adherent refusing medications and treatment interventions.  Some of these individuals were unable or unwilling to participate in group and individual therapy out of cell due to their decompensated state. Mental health staff and inmates reported that in-cell materials, such as puzzles, work packets and materials for journaling, were provided to these individuals. This was especially important due to the lack of out of cell time due to COVID-19.  Healthcare records documented the offering of in-cell materials.

As this is an important and ongoing issue of concern and the changes made were newly implemented, my findings of compliance will be delayed pending on-site review and monitoring for sustainability.

- *Inmates with a serious mental illness who are housed in Administrative Segregation will be scheduled for a weekly appointment with a qualified mental health provider.*
- *Nursing staff shall conduct mental health rounds in Administrative Segregation daily, separate and apart from medication distribution.*

Findings: **Noncompliance**

Staff and inmate interviews as well as healthcare records reviews documented that segregation inmates were seen weekly by a qualified mental health provider.  Nursing rounds, however, were not always documented daily in segregation units.

33

- *Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior, Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal.*

- *Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.*

- *All welfare checks shall be documented on a welfare check log. The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance. Monthly spot checks for compliance will be conducted by the Compliance Sergeant at least weekly with monthly audits.*

**Findings: Substantive Compliance**

The Compliance Sergeant audited welfare checks monthly by comparing hand-written door entry on the housing rosters with the video surveillance system and/or computer door entry logs.  His audits of all the segregation housing units indicated compliance with entries in close proximity of with one to three minutes.

Review of logs indicated timely documentation of custody welfare checks.

**22.    Suicide Prevention**

- *Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.*

**Findings: Significant Compliance**

All cells in the administrative segregation units (A, B, R and S) were previously modified to remove potential tie-off opportunities and, fencing was in place on the upper level and stairway to prevent jumping and self-harm. Additionally, modifications were made to the windows in the administrative segregation cells to prevent ligature points.

Additional modifications were considered in administrative segregation unit A-pod in response to a completed suicide there. Modifications would have been made to the bunks that would close the openings in the bed frame and to create a skirt around the bottom of the bed to prevent inmates from lying beneath the bed.  Cells in men's holding were modified; however, they realized that some inmates were urinating in this area, and the modifications prevented adequate cleaning of the area.  The modifications were then placed on hold. Discussions with the custody supervisory staff at the last visit resulted in a decision to amend the planned modifications to the segregated unit beds to closing the tie-off holes located in the beds and not to install the bed skirts.

Since the last monitoring report, a completed suicide occurred in G-Pod; although not a segregation unit, G-Pod was utilized as a COVID-19 housing unit.  During the virtual tour, one of the cells on this unit was viewed; the actual cell where the inmate committed suicide was occupied. Due to the restrictions and limitations placed on movement and social distancing, this unit has had to function as a lockdown unit, resulting in inmates remaining in-cell for longer periods of time than would occur in a regular general population unit and very similar to a segregation unit. No such modifications occurred in G-Pod as it was not designated as a

segregation unit; at the time of the visit, a yearly review of this unit had not occurred by the Operations Manager for the same reason.

The County should consider additional cell modifications for units that will function similarly to segregation units for prolonged periods of time.  If the duration of such programmatic changes is brief, modifications would not be recommended.

- *A qualified mental health professional must perform a suicide risk assessment using the Suicide Risk Assessment Tool (attached as Exhibit G to Implementation Plan) in all the following circumstances: (1) if the RN identifies suicidality during the Initial Health Screen; (2) within 4 hours of placement in a safety cell and before release from a safety cell; (3) after placement in Administrative Segregation.  [CFMG Plan at 43, 72, 75]*
- *Whenever an inmate is placed in a safety cell due to suicide risk, CFMG shall immediately, and no later than within 4 hours, determine what level of suicide precautions are necessary and decide whether the inmate needs to be transferred to an inpatient mental health facility. If CFMG determines that more than 24 hours of suicide watch/precautions is necessary, CFMG shall work with custody to place the inmate in an inpatient mental health facility, the Outpatient Housing Unit, a receiving cell locating in the booking unit, or dorm A.  Whenever possible, the inmate will be transitioned from a safety cell to an open dormitory setting until the inmate has stabilized.  [CFMG Plan at 73, 75]*
- *Custody must transfer patients to NMC or another appropriate inpatient mental health facility if the patient has been housed in a safety cell for 24 consecutive hours or for more*

36

*than 36 cumulative hours in any 3-day period. If exigent circumstances prevent such transfer, a memo must be written to the Custody Operations Manager.  [CFMG Plan at 73, 75]*

- *Once CFMG determines that an inmate is no longer suicidal, CFMG shall work with custody staff to place the inmate in the most appropriate setting.  Mental health clinicians must follow-up with the patient until a step-down plan is no longer necessary.  [CFMG Plan at 73]*

**Findings: Noncompliance**

The mental health staff utilized the Mental Health Initial Assessment and Suicide Watch Initial Assessment for MH and Suicide Watch Daily Assessment/Discharge for MH forms for initial assessment and removal of suicide precautions.  They also utilized the Columbia Suicide Severity Rating Scale (CSSRS) for the assessment of suicide risk.

There was documentation that inmates were timely placed on suicide precautions upon safety cell placement.  There was also documentation of the determination of suicide risk by a suicide risk instrument. There was at least one lapse in timely removal of an inmate from the safety cell and transported to NMC. Inmates were seen for post-suicide follow-up consistently.

Of concern was the actual assessment of suicide risk and the rationale provided for discontinuation of suicide monitoring.  Frequently, the rationale for discontinuation was the inmate's denial of suicidality.  Inmates frequently were discontinued from suicide monitoring only to be quickly returned to suicide watch, at times on the same day.  As the information in the healthcare record provides minimal details regarding the actual assessment of risk and the clinician response to assessment items, it is difficult to adequately evaluate the adequacy of suicide risk assessment and it brings into question whether adequate suicide risk assessments occur.

An important component of suicide prevention is adequate safety planning.  Although improvements have been made over the years, with the addition of safety planning; the actual

documentation of safety planning efforts require improvement.  The healthcare records consistently document that safety planning occurred or was discussed with the inmate; however, the actual safety plans were not included.  This omission did not allow for assessment and evaluation of the adequacy of safety planning.  Inadequate and unrealistic safety planning could result in the need for repeated suicidal watch incidents and a false sense of protection for the inmate.

Improved documentation and additional training regarding suicide risk assessment and safety planning is indicated.

- *Custody must conduct welfare checks of patients on suicide watch/precaution twice every 30 minutes.  Health services staff must conduct welfare checks every 6 hours.  Mental health staff must conduct welfare checks once per shift.  The checks must be documented in the appropriate log (sobering/suicide watch/safety cell/restraints log).  The inmate may not have access to materials that could be used to inflict harm on his/her self or others, and may be dressed in an approved safety garment if necessary.  [CFMG Plan at 74, 76]*

**Findings: Noncompliance**

Lapses were noted in the timely documentation of custody welfare checks for suicide monitoring.  Mental health contacts were documented daily, and usually not once per shift.  Inmates were not allowed materials for which they could harm themselves, and safety garments were provided when clinically indicated.

- *The CFMG Program Manager and the Facility Manager shall have joint responsibility to report completed suicides in accordance with CFMG Inmate Deaths Policy and Procedure. [CFMG Plan at 76]*

- *The CFMG Program Manager or nursing staff on duty shall report all potential and/or attempted and completed suicides to the Facility Manager or Shift Supervisor.  CFMG management will be notified of any completed suicides within one working day.  Family members must be notified in accordance with the CFMG Notification of Next of Kin Policy and Procedure.  CFMG Plan at 76-77.*

**Findings: Noncompliance**

Additional information is needed prior to determination regarding compliance of this issue.  Of note was an incident that occurred on July 3, 2020 in H-Pod when an officer during health and welfare checks discovered an inmate hanging from a sheet tied to the metal grate above the toilet.  The inmate was cut down and assessed by medical staff.  Prior to transport by AMR to NMC, the inmate was conversant and standing unassisted.

Review of MDTM and provided quality assurance documentation did not indicate that discussion and analysis occurred regarding this serious suicide attempt. As with completed suicides, critical analysis and review should occur for serious suicide attempts which require medical intervention. The lack of documentation regarding adequate quality assurance and peer review regarding this recent death resulted in a finding of noncompliance.

**23.     Increase in Time Outside of Cell and/or Increasing Programs**

- *Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:*

  - *3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)*

  - *14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time*

  - *2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail) ii. Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking and receiving area will be guaranteed the following weekly times out of their cell:*

  - *3 hours a week for exercise*

  - *14 hours a week in the common area*

  - *inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services,*

**Findings: Deferred**

Due to the COVID-19 pandemic, out of cell programming was discontinued at the time of the visit.  Additionally, the mental health clinician providing group therapy no longer worked at MCJ, and staffing at the time of the visit did not allow for the provision of groups. As a result of social distancing, out of cell offering of dayroom and yard was also limited. To address this difficulty, mental health staff provided in-cell therapeutic materials for segregation inmates; this provision was well documented in healthcare records and by inmate interviews.

40

Additionally, through the Programs Manager, booklets and packets were provided to inmates focusing on dialectical behavioral therapy interventions, anger management, social skill, reentry planning, and parenting. These packets were returned, and feedback was provided. As milestone credits were available for these activities, provision of these packets was focused on sentenced inmates; however, the Programs Manager indicated that the packets were available to segregated inmates.

Documentation by the Compliance Sergeant indicated consistent monthly auditing of out of cell activities provided for inmates housed in the segregation units.

A finding is deferred for this issue pending improvement in the COVID-19 crisis at MCJ. Should the lockdown status continue long-term, additional emphasis on the provision of therapeutic activities, yard and out of cell time is needed.

**24.    Telepsychiatry**

- *The telepsychiatrist must obtain informed consent and explain all medications before prescribing.  [CFMG Plan at 45]*

- *The policies contain numerous provisions regulating the use of telepsychiatry at the jail, including requiring that a psychiatric nurse be present during telepsychiatry encounters where the patient is in a safety cell as well as requiring a local assessment by a physician or mid-level provider within 24 hours of an initial assessment that is conducted by telepsychiatry. [Dkts. 622 and 632].*

**Findings: Noncompliance**

Due to the COVID-19 crisis, since March 2020, psychiatric contacts occurred by telepsychiatry, specifically by FaceTime.

41

There was a lack of documentation that timely informed consent was obtained in most cases reviewed.  Interviews with staff indicated that informed consent was obtained by nursing staff prior to or after psychiatric telepsychiatry contacts; however, the documentation provided in the healthcare record did not confirm this practice.  It is possible that consent was obtained and scanned; however, it was not made available to the monitor for review.

There was a lack of documentation that a qualified, trained medical clinician was in attendance to assist the telepsychiatrist and that the inmate was seen by a physician or mid-level provider within 24 hours of initial psychiatric assessment.

Staff reported that a nurse was present during telepsychiatry contacts for inmates in the safety cell; however, the nurse was not a psychiatric nurse.

There were also issues of concern regarding the provision of involuntary/emergency medications by telepsychiatry that were previously reported.

At least one case review indicated the need for alternative psychiatric assessment other than telepsychiatry for some inmates.  This inmate presented with significant psychosis and treatment resistance; the healthcare documentation indicated that she refused to see the telepsychiatrist due to long waits that resulted from the logistics of organizing and implementing the telepsychiatry contact.


**25.   Medical Records**

- *Each inmate's medical record shall contain (as applicable):*

  - *The completed Receiving Screening form*
  - *Health Inventory/Communicable Disease Screening forms*
  - *Problem list*
  - *All findings, diagnosis, treatments, dispositions*
  - *Prescribed medications and their administration*
  - *Laboratory, x-ray and diagnostic studies*

- *Consent and Refusal forms*
- *Release of Information forms*
- *Place and date of health encounters (time, when pertinent)*
- *Health service reports (i.e., dental, psychiatric, and other consultations)*
- *Hospital Discharge Summaries*
- *Jail Medical Record Summaries (transfer forms)*
- *Individual treatment plan [CFMG Plan at 114]*

**Findings: Noncompliance**

Although healthcare records included most of the required items, individual treatment plans were not included.  It also appeared that some information that was scanned into the healthcare record was not provided to the monitor for review, such as medication consent forms and some scanned psychiatric notes.

**26.    Quality Management**

- *Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit Findings: will be reported to the Quality Management Committee at its quarterly meetings.*

- *All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met.*

- *All completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure.*

- *The Quality Management Committee shall evaluate appropriateness of every case of involuntary psychotropic medication administration, including treatment, process, and whether psychiatric emergency criteria were met.  [CFMG Plan at 98]*

**Findings: Noncompliance**

Although a finding of noncompliance is provided, this was an area of improvement. Quality assurance audits and meeting minutes were provided by Wellpath that indicated quality assurance review of various topics, including suicide prevention, alcohol/benzodiazepine withdrawal, continuity of care, initial health assessment, death reviews and mental health sick call.

Although these improvements were noted, no documentation was provided that all cases involving the need for involuntary psychiatric medication administration were reviewed by the Quality Management Committee.  Additionally, no information was provided that completed suicides were reviewed as indicated.

In addition to the need for review of completed suicides, serious incidents of self-harm should be reviewed by the Quality Management Committee. Of note was an incident that occurred on July 3, 2020 in H-Pod when an officer during health and welfare checks discovered an inmate hanging from a sheet tied to the metal grate above the toilet.  The inmate was cut down and assessed by medical staff.  Prior to transport by AMR to NMC, the inmate was conversant and standing unassisted.

Review of MDTM and provided quality assurance documentation did not indicate that discussion and analysis of this incident occurred regarding this serious suicide attempt. As with

44

completed suicides, critical analysis and review should occur for serious suicide attempts which require medical intervention.

The monitor has not yet received documentation regarding mortality and morbidity reviews, other than nonspecific mention of the topic in the minutes of the quarterly CQI meeting.

**27.    Corrective Action Plans**

- *Defendants' implementation of a policy requires that there are corrective action measures to address lapses in application of the policy.*
- *Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame.*

**Findings: Deferred**

The County and Wellpath have worked with the monitor to develop a combined corrective action plan to address identified deficiencies, including re-audits.  The monitor inadvertently omitted Plaintiff's recommendations for inclusion in the corrective action plan.

The combined corrective action plan that incorporates the Defendant's and Plaintiff's comments and recommendations will be provided with this report.

**Summary and Recommendations**

This report covered a very difficult and unprecedented period which posed enormous challenges for the staff and inmates at MCJ.  The monitor would like to commend the staff at the facility who worked hard to provide services in this, at times, dangerous environment.

Despite these adversities, improvements were made, and the staff worked to address identified areas of concern.  All parties have worked to develop and implement a corrective

action plan. An Implementation Committee was formed to specifically address issues of deficiency noted in the monitoring reports.  In an attempt to mitigate the effects of COVID-19 lockdown with resulting decreases in out of cell activities and increased isolation, in-cell materials and tablets were provided. Clinical contacts, by necessity, were altered to include remote and cell-front contacts to decrease the possibility of virus transmission. Quality assurance measures and auditing were better documented. Mental health clinicians and psychiatry, though understaffed, remained committed and persevered despite the lack of access to inpatient care for their patients. The MDTM remained a good forum for interdisciplinary treatment team discussion.

These changes and modifications allowed continued provision of mental health services; however, the quality and quantity of services provided suffered. Confidentiality of clinical encounters was problematic.  The increased use of telepsychiatry illustrated the need for improved adherence with Implementation Plan guidelines. Additionally, treatment planning and safety planning required improvement. Lastly, the provided staffing analysis indicated the need for increased staffing of mental health clinicians; consideration should be made for additional staffing to include increased psychiatric staffing.

The following are recommendations to address the issues of concern identified in this report.

1. The facility should ensure that healthcare records are requested and reviewed when indicated for inmates arriving to the jail with prior mental health treatment.

2. The facility should work to improve the documentation of suicide prevention efforts, specifically the assessment of suicide risk and the rationale for discontinuation of suicide

precautions.  Additional supervision and training is indicated..  This training should also include the documentation of appropriate safety planning.

3. The facility should continue to work to ensure confidentiality for nursing intake assessments during the booking/intake process.

4. The facility should work to ensure that there is adequate staffing of mental health clinicians and psychiatry to address problems related to clinician appointment rescheduling, response to routine inmate requests and delays in psychiatric assessment and follow-up.

5. The County should continue to work to address the availability of tablets for inmate use.

6. The facility should ensure that the complete healthcare records are made available to the monitor for review, including scanned documents which were previously provided.

7. The facility should ensure that there is prompt review by medical of all safety cell placements.

8. The County should work to address lapses in supervisory documentation as well as lapses in required welfare checks.

9. The County should work to ensure the provision of mattresses for inmates on suicide watch/precautions and those housed in safety cells when indicated.

10. The facility should ensure that the Implementation Plan guidelines regarding telepsychiatry and involuntary medications are followed including:

    a. Informed consent obtained and documented

    b. No standing orders for emergency/involuntary medications

    c. Documentation that the telephone/verbal orders were signed by the psychiatrist within 72 hours

47

30-47

    d.   Telephone order for involuntary medication provided near the time of intake document evaluation by the prescribing psychiatrist within 24 hours of the emergency

    e.   Documentation of timely psychiatric follow-up within 72 hours (either in person or by telepsychiatry)

    f.   Documentation of the presence of a qualified medical clinician to assist the telepsychiatrist at the session.

11. The facility should ensure that there is documentation that the psychiatrist was contacted with medication refusal.

12. The facility should work to ensure that clinical encounters with the psychiatrist and mental health clinicians are confidential. If contacts occur remotely, consideration should be given to providing sufficient headphones for inmates to use to facilitate these contacts.

13. The facility should continue to work to improve documentation of WRAP and restraint use, including duration and range of motion activities for those inmates in restraint greater than one hour.

14. The facility should continue to work to improve the documentation of individualized treatment planning, including documentation in the healthcare record.

15. The facility should work to improve the documentation of daily nursing rounds in segregation.

16. The County should consider modifications of cells for suicide prevention in units other than designated segregation units where prolonged lockdown will occur.

17. The County should ensure that inmates remaining in safety cell greater than 24 consecutive hours or for more than 36 cumulative hours in any 3-day period are transported to NMC.

18. The County should work to improve the documentation of timely custody welfare checks for inmates on suicide watch/precautions.

19. The facility should continue working to increase the provision of in-cell activities and out of cell time with continued documentation of those efforts.

20. The facility should develop and/or better document a mortality review process that critically examines inmate deaths as well as serious self-harm incidents to identify areas of deficiency, corrective action and opportunities for improvement.  Those reviews should be provided to the monitor.

21. The facility should continue to work to obtain access to timely inpatient psychiatric care for all jail inmates in need of such services, and to ensure that referrals for psychiatric inpatient care are made.

22. The parties should consider amending the current corrective action plan which will be provided with this report.  The amended plan should be inclusive of recommendations included in this report. The monitor will work with the parties to expeditiously complete work on completion of the corrective action plan.

Please contact me should you have any questions regarding this report.


Respectfully submitted,


*Kerry C. Hughes, M.D.*


Kerry C. Hughes, M.D.
1579 Monroe Dr., Suite F, Box 612
Atlanta, GA 30324
Phone: █████████
Fax: 404-364-9708
Email: dockc99@aol.com

# Exhibit 31

**July 2020 MCJ Monitoring Visit**
**Healthcare Records Reviews**
**Kerry Hughes, M.D.**

**Inmate 1**

This inmate received his Receiving Screening upon entry to the MCJ on March 21, 2020. During this screening, he denied a history of suicide, current medications or mental health symptoms requiring accommodation. He did acknowledge use of methamphetamines on the day of jail arrival, with usage one to five days weekly. He also reported current or past mental health diagnosis, but he denied a history of mental health hospitalization or current symptoms. The screening was also notable for self-inflicted cutting on his leg. His medical history was significant for a seizure disorder.  He was recommended for general population housing and mental health referral.

While housed in the booking cell, the inmate reportedly became increasingly confused and exhibited hallucinations.  As he refused oral medications, he was given Ativan intramuscular injection; while the injection was administered, he began having a seizure and was transported to Natividad ER.

Upon his return from NMC, the inmate presented with combativeness, and he was placed in the WRAP in Safety Cell 1 on March 21, 2020 at 2030.  There was documentation of medical assessment at 2148. His behavior was described as disorganized and combative. During the period of placement in the safety cell, the inmate was also monitored for opioid withdrawal, utilizing the COWS Score Sheet Opiate/Opioid Withdrawal document.

The Mental Health Initial Assessment and Suicide Watch Initial Assessment for MH was completed on March 22, 2020.  The assessment indicated that the inmate made suicidal statements and attempted to bite himself according to custody notes. The inmate denied current outpatient mental health treatment or current medications; however, he admitted to daily heroin use as well as methamphetamine use. He reported current suicidal ideation without plan due to inability to see his infant daughter. He also reported that he had recently broken up with his girlfriend with feelings of guilt, worthlessness, depression and paranoia.  He was scheduled for routine mental health follow-up.

The inmate was sent to NMC for treatment of his seizure disorder and returned on March 23, 2020; documentation there indicated that he also had cellulitis, opiate withdrawal and suicidal ideation.  A referral was made to the psychiatrist on that date at 1718, regarding the recommendation for mental health follow-up and medications. On the following morning at 0243, telephone orders were received from the psychiatrist for trazodone, clonidine and gabapentin. Later that day at 1041, additional orders were provided to be administered "NOW" for "Cogentin 1 mg IM, Ativan 2 mg IM, and Haldol 5 mg IM with welfare check every 30 minutes for two hours after medication administration."

Subsequent progress notes indicated that the inmate was observed on suicide watch with episodes of questionable seizures and attempted self-injurious behaviors. Suicide watch was

subsequently decreased to Level 2 and discontinued on March 23, 2020. The inmate was seen by mental health staff for follow-up.

A second psychiatric telephone order was provided on March 25, 2020 at 0901 for Cogentin 1mg two times per day, Ativan 2 mg two times per day and Haldol 5 mg two times per day, all for three days. Later that day, an additional telephone order was provided at 1517 for Haldol 5 mg, Ativan 2 mg and Cogentin 1 mg "now".

On March 26, 2020, orders were obtained to continue Cogentin, Haldol, trazodone, Neurontin and Ativan.  Psychiatric follow-up in one week was ordered on the following day, when the inmate was seen by the telepsychiatrist.  On March 30, 2020, a telephonic order was obtained to continue the same medications with psychiatric follow-up scheduled for April. 3, 2020.

A review of medication administration records (MARs) indicated that the inmate was generally medication adherent; however, there were multiple incidents of medication refusal documented.

The inmate was placed into segregated housing on April 7, 2020.  Documentation indicated that he refused group attendance. A note on April 10 indicated that he was out to court, and a mental health clinician entry on April 11, 2020, indicated that the inmate had been released.

It appeared the inmate may have released from jail; however, he returned to the facility during July 2020, when a second Receiving Screening was completed on July 9, 2020. During this screening, he reported a recent suicide attempt that occurred on June 29, 2020 by jumping from a height. He was hospitalized on that date on a WIC 5250 order due to danger to self at NMC Mental Health Unit. He remained with suicidal ideation and plan; however, his response regarding current suicidality varied during the various initial assessment that were completed on that date.  Orders for Haldol and Cogentin were obtained on the day of arrival to the jail for 30 days. As occurred during prior incarcerations, the inmate was placed on and monitored for opioid withdrawal protocol.

It appeared that the inmate was discharged from the facility on July 15, 2020; it also appeared that he had been scheduled for initial psychiatric assessment on that date. There was documentation that Haldol and Cogentin were called into the local CVS pharmacy upon discharge. He also denied suicidal ideation at the time of discharge.

Findings

There was the appropriate assessment of suicide risk when clinically indicated. Additionally, the mental health clinician documented that safety planning was conducted; however, no actual safety plan was located in the healthcare record.

Documentation indicated that the inmate was frequently uncooperative, and he refused some psychiatric appointments.

There was a lack of documentation of a telepsychiatry contact with Dr. ▮▮▮▮ that reportedly occurred on March 24, 2020.

There was documentation of daily mental health assessment while the inmate was on suicide monitoring.  Additionally, there was documentation of daily nursing segregation rounds. There was also documentation of appropriate follow-up after discontinuation of suicide watch.

There was documentation that this inmate was appropriately discussed in the Multidisciplinary Treatment Meeting (MDTM) with treatment planning.

The inmate was offered group and written materials while in segregated housing on two occasions, which he declined.

Regarding the use of telepsychiatry and the provision of emergency medications; available documentation did not indicate that policy was followed.  There was not documentation of timely informed consent when indicated.  Telephone order for involuntary medication provided near the time of intake did not document evaluation by the prescribing psychiatrist within 24 hours of the emergency. Only after he presented with a possible seizure was the inmate subsequently transferred to NMC.  Documentation of the presence of a qualified medical clinician to assist the telepsychiatrist at the session was absent.  This inmate received emergency psychotropic medications on at least two occasions; however, there was a lack of documentation of timely psychiatric follow-up; and the inmate was not seen within 72 hours (either in person or by telepsychiatry).  It was also unclear whether the second emergency provision of medications was accepted voluntarily, or whether it was administered to the inmate involuntarily which is against policy.

There was documentation of the provision of discharge medications upon jail release.

There was documentation of daily nursing segregation rounds.

The inmate was placed in the WRAP on March 21, 2020.  There was documentation of medical assessment within one hour of placement.  Mental health was contacted approximately two hours after placement.  The inmate was seen via telepsychiatry by Dr. ███ on March 26, 2020; this appeared to be the initial psychiatric contact after arrival to the jail; and it was concerning that the inmate was not seen for initial psychiatric assessment until five days after arrival in light of his symptomatology.  He was subsequently seen on the following day by telepsychiatry.

Although the duration of WRAP placement was less than two hours, there was a lack of documentation of vital signs obtained or range of motion provided.

Audits by the Compliance Sergeant indicated that the inmate remained in the safety cell for approximately 37 hours prior to transfer to NMC.

**Inmate 2**

This inmate's healthcare record and accompanying documents were reviewed as he committed suicide at the MCJ on July 21, 2020.

The inmate received his Receiving Screening on January 15, 2020. He responded negatively to history of suicidal behavior; however, it was noted that he took an overdose of pills one month prior. His screening was also positive for heroin use. He denied a history of mental health treatment or current suicidal ideation; however, he reported suicidal ideation during the prior month with plan and intent. Records from prison incarceration were not requested, as they were "not needed at this time".

The Initial Health History that was performed on the same date noted a history of treatment with Vistaril for anxiety on January 14, 2020. The question regarding history of mental health disorder was also marked affirmatively, as well as provision of diagnoses of schizophrenia, major depressive disorder or bipolar disorder, and attempted suicide. He also reported a history of psychiatric inpatient and outpatient treatment. Dr. ██████ the psychiatrist was contacted by telephone and an order was provided for Vistaril 50 mg at night for 30 days on the day of arrival to the jail. The nurse scheduled an appointment with the MFT/LCSW for the following day, January 16, 2020, noting that the inmate had transferred from Salinas Valley State Prison (SVSP) ending a ten-year sentence, with a suicide attempt by overdose of pills one month prior; he was reportedly not currently suicidal. He was also scheduled for psychiatric assessment on January 17, 2020, as it was noted that he left SVSP prior to receipt of prescription for psychotropic medications there.

The inmate was seen by mental health on January 16, 2020 when he noted that while in prison, he became depressed when he learned that he received more time, and he overdosed on medications and was placed in the mental health program at the 3CMS level of care one month prior. He was then scheduled for follow-up with the psychiatrist and with mental health clinicians weekly.

He was seen by the psychiatrist on January 17, 2020; at that time, Prozac and Vistaril were ordered. He was seen by the mental health clinician on two days later.

He was seen by the psychiatrist on January 21, 2020 when it was noted that he came into jail with a one-month supply of Vistaril.

The inmate was next seen by the psychiatrist on February 10, March 3 and April 6, 2020. At his April appointment, he reported increased anxiety since moving to H Pod with panic attacks; Prozac was increased, and Melatonin was continued.

He was seen by the psychiatrist on May 4, 2020 by telepsychiatry, when he reported increased depression, anergy and amotivation with increased sleep. Effexor was prescribed at that time.

The inmate was placed in a safety cell at Level 2 suicide watch on May 9, 2020 at 0143 due to danger to self. On May 9, 2020 at 1321, a Suicide Watch Daily Assessment/Discharge for MH was completed by a mental health clinician. It indicated that the inmate was placed on suicide watch on that date at 0143 and was discharged at that time. He was assessed with low suicide/self-harm risk. The provided rationale for discontinuing watch was not completed, but under additional information, the clinician indicated that the "patient denies s/i". He was

discontinued from suicide watch at that time; the entry also noted discontinuation of "L2" at 1059 on May 9, 2020. The Columbia Suicide Severity Rating Scale (CSSRS) was completed as was appropriate.

The inmate was seen for three consecutive days by a mental health clinician after suicide watch was discontinued with timely subsequent follow-up.

On May 21, 2020 at 1802, the inmate was removed from suicide watch by the mental health clinician; he was reportedly placed on watch on that date at 0645 due to suicidal ideation and threat.  The entry indicated that safety planning occurred, current medications included Effexor and Vistaril, and that his risk level was low. The note also documented the inmate's history of suicide attempts three months and one year prior. The identified rationale for discontinuing watch was the inmate's denial of suicidal ideation and his engagement in safety planning. The CSSRS was completed as required.

The inmate was seen by the mental health clinician for three consecutive days after suicide watch discontinuation.

He was seen by the mental health clinician on May 27, 2020 for crisis intervention when he reported increased anxiety and poor sleep.  The clinician indicated that the safety plan was reviewed with the inmate at that time.

The inmate was seen by a mental health clinician on June 11, 2020 after reporting auditory hallucinations telling him to harm himself.  He denied suicidal intent at the time of the evaluation.  The clinician documented discussion regarding release planning with the inmate. He was seen by the psychiatrist on the following day by telepsychiatry when he reported command auditory hallucinations and feeling very depressed. Effexor was increased and Vistaril was decreased, and olanzapine was continued by the psychiatrist on June 12, 2020. On June 19, the psychiatrist discontinued olanzapine as the inmate reported that it caused nausea and caused him "not to feel good".  It did not appear that the inmate was seen in person at that time.  Another psychiatric entry dated June 22 also noted the same; however, it was unclear if the inmate was actually seen by the psychiatrist.  He was seen by the psychiatrist on June 24, 2020 when he reported no change in depression, suicidal ideation or auditory hallucinations. Abilify was ordered at that time.

Review of MARs indicated general medication adherence; however, there were some sporadic refusals of psychotropic medications, especially olanzapine.

The inmate was seen by a mental health clinician on June 21, 2020; at that time, he was on Level 2 suicide watch.  He reported that he received a DAR for "popping" his door, and he made suicidal statements as a result. He denied suicidal ideation, and the clinician indicated that she reviewed the safety plan with the inmate and provided him with a copy.

The inmate was tested for COVID-19, and his results were positive on July 18, 2020.

On July 20, 2020, the nurse noted that he refused vital signs and assessment.  On that date, at 2110, he was placed on Level 2 suicide watch due to danger to self.  A nursing note stated that the inmate reported that he "wasn't really suicidal", but he expressed it as he did not feel that his health concerns were being addressed. Documentation indicated that he was experiencing gastrointestinal symptoms and tremors.

On July 20, 2020, he was seen by the psychiatrist when he requested an increase in Effexor as he continued with depression and anxiety; Celexa was ordered, Abilify was continued and Effexor was discontinued by the psychiatrist at that time.

The inmate was seen for assessment regarding suicide monitoring by the mental health clinician on July 21, 2020 at 1419 due to passive suicidal ideation; he had been placed on monitoring on the day prior at 2110 due to suicidal ideation and threat by nursing staff. The clinician noted that according to the lockdown form and DAR, the inmate was upset with medical staff and coughed in a nurse's face, making statements that he would go on suicide watch. It was noted at that time that he was prescribed Abilify and Celexa.  He was assessed with intermediate suicide/self-harm risk. The clinician also noted prior suicide attempts and a suicide note that was found; she also indicated that the inmate had a recent COVID-19 diagnosis. Suicide watch was discontinued on that date at 0904.

An entry in the healthcare record indicated that on July 21, 2020 at 1132, the inmate was "discussed in MDTM. Pt coughed on staff last night and threatened suicide watch. He has since been removed from L2 and will be taken to G pod housing."

On that date at 1329, staff responded to a suicide attempt by the inmate in which he was found hanging.  Custody staff cut the sheet from which the inmate was hanging, and he was described as cyanotic with no carotid pulse.  CPR was started at 1330, and he was noted with ligature marks around his neck and fixed dilated pupils. CPR continued and the AED was applied, but no shock was advised. AMR assumed CPR upon arrival and the inmate was pronounced dead on the scene.

Appointments on February 6, 2020, February 28, and February 29, 2020 were rescheduled due to "work load", "conflicting program needs" or unspecified reasons.

Review of custody logs indicated that custody checks on July 20 and 21, 2020 appeared timely when the inmate was housed in cell 6. The Movement Log indicated that on July 20, 2020; the inmate was housed in MJ4GP 204 until his death.

The Coroner's Report noted the manner of death as Suicide and the sub manner of death as Hanging. It noted that the death occurred after he was cleared from suicide watch and moved to G pod room 204; this was the designated lockdown housing unit for inmates who were positive for COVID-19. The inmate attached a torn sheet to the grill above the sink/toilet unit in the cell. Toxicology studies were positive for acetaminophen, but no illicit substances.

<u>Findings</u>

It is of concern that this inmate with a history of mental health treatment, recent diagnosis of COVID-19, recent psychotic symptoms including command auditory hallucinations to harm himself and treatment by the psychiatrist for such psychosis as well as multiple incidents of suicide watch was not housed and observed in a setting that allowed for appropriate monitoring. He subsequently hung himself. This brings into question the adequacy of the suicide risk assessments performed as well as the placement of a potentially suicidal inmate with the above risk factors in a quasi-segregation unit; housing in segregation is a known risk factor for suicide in correctional settings.

The completion of suicide risk assessments was referenced in the healthcare record; however, the documentation provided did not allow for adequate review and determination of the adequacy of the risk assessments.  Detailed review of these assessments would allow for determination whether suicide risk evaluation was conducted appropriately.  This is of significance in this case in which suicide watch was discontinued, the inmate was moved to a unit in which he was essentially segregated, and the inmate subsequently committed suicide.

Based upon review of the documents provided, it appeared that this death was not foreseeable; however, it was possibly preventable if adequate assessment of suicide risk and appropriate safety planning was performed. The lack of documentation of actual safety planning did not allow for evaluation of this treatment intervention.

Of additional concern was a progress note by a mental health clinician entered into the healthcare record after the death of the inmate.  If not addressed in policies and procedures, the entry of information after the death of an inmate should not occur and should be addressed.

The provided diagnosis in the healthcare record appeared to be incorrect.  Although this inmate was receiving antipsychotic, antidepressant and antianxiety medications, he was only provided with a diagnosis of Adjustment Disorder with depressed mood.

There was a lack of documentation that prior healthcare records were requested or reviewed. This inmate had recently been released from the California prison system prior to transfer to MCJ, and information regarding his treatment in that setting was critical in informing his treatment at MCJ.

Medications were ordered by the psychiatrist timely at the time of jail arrival; however, the use of telepsychiatry was not in compliance with policy.  There was a lack of documentation of informed consent, as well as documentation that a qualified, trained medical clinician was in attendance to assist the telepsychiatrist.

There was documentation of post suicide watch follow-up after suicide watch.

There was also documentation that the inmate was followed consistently by mental health staff on a weekly basis.

Appointments with the mental health clinicians were rescheduled on several occasions; as has been stated previously, this brings into question the adequacy of mental health staffing.

There was a lack of documentation of appropriate treatment planning for this inmate. Although there were several references to safety planning with this inmate; actual documentation of safety planning and detailed treatment planning (other than notations that he was discussed in MDTM) to address the inmate's presenting symptoms was lacking and concerning.

This inmate received multiple DARs; although the forms noted that the inmate was receiving mental health treatment and that medical was consulted, it was unclear if mental health concerns were considered or that the number of DARs received was considered for this inmate with increasing report of symptoms, treatment with antipsychotic medications, and several suicide watch placements. In light of these concerns, referral to a higher level of care should have been considered.

The Settlement Agreement directs the Operations Commander to conduct yearly examination of suicide-resistant features and maintenance. It is unclear if these reviews occurred in areas other than designated segregation units. Although modifications were made to the actual segregation units, G-Pod functioned as a segregation unit due to the medical restrictions on movement and contact. The County should consider if such modifications are needed going forward if these additional segregated units continue to be necessary.

No information or documents were provided to the monitor regarding mortality review of this completed suicide. Adequate morbidity and mortality review of this case is necessary for critical self-review and compliance with the Settlement Agreement and Implementation Plan.

Lastly, this case illustrates the need for better communication between medical and mental health staff. Meetings such as the MDTM might serve as a vehicle for such improved communication and interdisciplinary treatment planning; however, a mechanism for conveying this important information to the appropriate staff is necessary.

**Inmate 3**

This inmate received the Medical Intake Triage/Receiving Screenings on October 14, 2019 and October 25, 2019. It appeared that he was initially placed into the safety cell at the time of intake on October 14, 2019 at 0920 due to uncooperative and combative behavior and danger to others. He had a prior MCJ incarceration during July 2011. The screening noted the inmate's report of current medications that included Haldol, Keppra, Tegretol, Cogentin and Ativan. The screening also noted a history of inpatient and outpatient mental health treatment as well as history of traumatic brain injury with seizures. He was described as agitated and "rambles off-topic". He may have been transferred to NMC soon after his initial screening, returning to MCJ when his screening was completed on October 25, 2019.

The inmate was initially seen by a mental health clinician on October 16, 2019 when it was noted that they were still unable to complete intake after 48 hours in custody due to the inmate's response to auditory hallucinations, combativeness and incoherence. He was scheduled to see the psychiatrist on the following day to determine if he required a higher level of care. The

inmate was seen by the psychiatrist on October 17, 2019 due to psychotic symptoms and agitation.  He was provided with a diagnosis of Psychotic Disorder, NOS, and it was noted that he was unable to provide consent at that time. The psychiatrist also indicated that he would be sent to NMC for evaluation and management. A subsequent note later that day indicated that the inmate was at NMC.  Orders for Haldol, Ativan, and Cogentin were ordered stat on October 19, 2019 at 1445.

Review of MARs indicated intermittent medication adherence with seizure and psychotropic medications, with marked improvement in adherence noted after April 2020.

An appointment was scheduled for mental health follow-up after return from NMC on October 20, 2019 when the inmate remained with psychosis and his cell was described as filthy.  A note on October 21, 2019 indicated that Dr. ▮▮▮▮ wanted the inmate to be seen again for bizarre behavior and that he had been in booking for five days; he was scheduled for and seen for psychiatric follow-up on that date. The psychiatrist indicated that his medication adherence was only 50% and attributed the inmate's confusion and disorientation to his medical diagnoses of traumatic brain injury and seizure disorder.  The inmate's medical physician was consulted, and the inmate was tapered off psychotropic medications with monitoring in the Outpatient Housing Unit (OPH).

The patient was seen by the psychiatrist on October 29, 2019 to evaluate return to the housing unit from the OPH.  A note on October 29, 2019 indicated that he had been cleared by the psychiatrist, classification and the medical physician to be moved from the OPH to A dorm. He was seen for crisis intervention on October 31, 2019 at custody request after he was "rolled out of his housing unit".

The inmate was seen in weekly rounds by mental health on November 19, 2019, and this contact was documented on the Segregated Population Observation Log.  He reportedly presented with yelling, delusional thinking and "appears psychotic".  The note indicated that he was scheduled to be seen by mental health.  He was offered but declined group on the following week. Subsequent notes indicated that he did participate in groups intermittently.

On November 28, 2019, he was observed hitting his head on the glass window, and he was taken to the infirmary where the psychiatrist offered Atarax; however, the inmate declined.

Suicide Watch Daily Assessment/Discharge for MH was completed by a mental health clinician on December 21, 2019, which noted that the inmate had been placed on suicide watch on December 20, 2019 at 1932 due to suicidal ideation and threat. The clinician indicated that the inmate participated in safety planning and that he was safe to return to housing. At that time, suicide watch was discontinued. The CSSRS was completed prior to suicide watch discontinuation.

The inmate was seen by Dr. ▮▮▮▮ on December 20, 2019. It appeared that the inmate was returned to suicide watch on the following day at 1850; the note indicated that the inmate was unresponsive until AMR arrived when it was determined that he did not require hospitalization. The Suicide Watch Initial Assessment for MH was completed on that date; the inmate was

described as withdrawn and largely unresponsive to questioning. His suicide risk was described as intermediate with behavior of concern noted as impulsivity due to traumatic brain injury. The clinician indicated that the inmate would be placed in segregation/isolation due to his impulsivity and the holidays, and that they would work to improve his medication adherence (he was treated with Zyprexa). A note by another clinician later that day at 1715 indicated that suicide watch was discontinued as the inmate participated in "discussion and noted a reason for living". The entry indicated that safety planning was reviewed with the inmate, and the CSSRS was completed. Suicide watch was discontinued at that time.

There was a psychiatric entry dated January 21, 2020 noting that the chart had been reviewed and adherence with Zyprexa was at 50%. Zyprexa was discontinued at that time; however, it was unclear if the inmate was seen by the psychiatrist.

The inmate was seen by a mental health clinician on February 12, 2020 when the CSSRS was completed. The examination noted that the inmate had thoughts of suicide, but no plan or intent within the past three months. He initially presented with possible hallucinations, lability and thought blocking. He was scheduled to see the psychiatrist.

He was seen by the psychiatrist on February 13, 2020 when he was noted with poor medication adherence with seizure medications and refusal to take psychotropic medications. His presentation was unchanged.

The inmate was again seen for Suicide Watch Daily Assessment/Discharge for MH on February 14, 2020 at 1203 as he had been placed on suicide watch the day prior at 2308. The clinician noted that safety planning had occurred, and life goal was identified. He was noted to be medication adherent at that time, without suicidal ideation. His suicide risk was assessed as low. The CSSRS was completed.

The inmate was again placed on suicide watch on February 17, 2020 at 1742 after he presented with head banging; he was seen by a mental health clinician at 2235 on that date. An order for Cogentin, Haldol and Ativan intramuscular stat injections was provided at 1829 prior to this evaluation. The Suicide Watch Initial Assessment for MH was completed, and the inmate was assessed with intermediate risk. Suicide watch was continued with daily follow-up by mental health. A referral was also sent to the psychiatrist. He was seen on the following day when suicide watch was decreased to Level 2. An assessment of suicide risk later that day noted high suicide risk. He had continued head banging, and suicide monitoring continued. He was seen by another mental health clinician on the following day when suicide watch was discontinued. The note indicated that safety planning had occurred.

He was seen by the psychiatrist on February 18, 2020 when he presented with severe psychosis; Zyprexa was ordered at 10 mg per day. On February 22, 2020 at 1721, the inmate was seen by mental health after custody referral as the inmate was observed in his cell on his knees with his head on the floor and his fingers in his ears, crying and moaning. He was subsequently placed on suicide watch. He was described with hallucinations, delusional thinking, disorganized thinking and poor insight with agitated behavior. He refused to answer questions during the interview, and he was reportedly medication nonadherent with continued head banging. On February 23,

2020, suicide watch was downgraded to Level 2 after the inmate stopped head banging and appeared calm.

Subsequent progress notes indicated that the inmate had some improvement in prior symptoms. He was followed consistently by mental health staff.  He was seen by the psychiatrist on May 19, 2020 by telepsychiatry when Zyprexa was renewed. He appeared stable at that time.

Findings

Although documentation noted the use of safety planning when indicated; there was no documentation of actual safety plans for review and determination of the adequacy of safety planning. This is of particular concern for this inmate with recurrent incidents of suicide watch despite reported safety planning.

This inmate was assessed for suicide risk prior to suicide watch discontinuation and monitored daily by mental health clinicians while on suicide watch; however, documentation of the assessment included in the healthcare record was insufficient to evaluate the adequacy of assessment.

The rationale for discontinuation of suicide monitoring was insufficient in several circumstances for this inmate.  Although there was documentation that suicide risk was assessed and that safety planning was conducted, appropriate documentation of these suicide prevention measures was lacking. Denial of suicidality or the brief appearance of calm behavior are not indicators for discontinuation.  Suicide monitoring should be specifically linked with the assessment of suicide risk by the CSSRS, adequate safety planning and ongoing treatment planning.  This was of particular concern when the inmate was assessed with high suicide risk and subsequently discontinued from suicide watch on the following day.  This brings into question the adequacy of suicide risk assessment.

There was documentation of daily mental health contacts while the inmate was housed in the safety cell with appropriate post-suicide watch follow-up.

The placement of a suicidal inmate in segregation was concerning, particularly in light of his history of impulsivity and suicidality. Although it was unclear whether this placement was the result of a disciplinary infraction; it appeared that his placement was due to mental illness/medical issues that affected his behavior.  If this inmate was placed in the administrative segregation unit, this was an example of the use of the segregation unit as a de facto mental health unit.

It did not appear that the inmate remained in the safety cell for greater than 24 hours, and the record indicated that he was housed in a booking cell during the extended suicide monitoring during February 2020. There was documentation of the provision of meals and fluids.

Although the inmate did not remain in the safety cell for greater than 24 hours, he appeared to need a higher level of care than could be provided at the MCJ.  Referral for inpatient treatment was indicated as he exhibited decompensation; however, this was not pursued.

There was documentation of weekly mental health rounds in segregation.  Documentation of daily nursing rounds included some missed days (1/6/20, 1/24/20, 2/27/20).

There was also lapse in the documentation of monthly psychiatric contacts; at least monthly contact was indicated for this inmate with probable psychosis, recurrent lability and suicidality and treatment nonadherence.

Regarding the provision of telepsychiatry, provided documentation made it difficult to determine if a qualified, trained medical clinician was in attendance to assist the telepsychiatrist. Informed consent, although mentioned consistently, was not located in the healthcare record.

There was appropriate documentation of consultation and discussion between medical and psychiatric staff regarding this inmate with coexisting medical and mental health concerns.

## Inmate 4

This inmate had a history of mental health treatment at the MCJ during 2019.  It was unclear when this inmate returned to MCJ; it appeared that he arrived on June 17, 2020 when intake screening was not completed due to the inmate's agitation, uncooperative behavior and fecal smearing.  This inmate received the Receiving Screening on June 20, 2020 and June 22, 2020. The screening noted treatment with Zyprexa and Depakote.  He was described as appearing to be "under the influence/intoxicated/withdrawing from substance"; and he had rapid, pressured speech, making inappropriate sexual remarks to female deputies. An urgent mental health referral was submitted at the time of the initial screening. The screening also noted that the inmate was sent to the NMC emergency department for jail check clearance prior to transfer to the jail; this may have resulted in the two screenings. He was seen by a mental health clinician on that date.

There was documentation that staff attempted to verify medications taken prior to arrest; however, one pharmacy had no record of the inmate, and another reported medications that were inconsistent with those that he had previously taken at MCJ. An appointment was scheduled for initial psychiatric evaluation on June 23, 2020; however, this appointment was rescheduled by the psychiatrist and the inmate was seen by a mental health clinician. The mental health clinician noted that the inmate had been seen several times on June 23, 2020 when he presented with disorganization and psychosis.  A decision was made that the inmate should not be released from jail, but he would be committed upon release. He was seen by a mental health clinician on June 24 and June 25, 2020 when his clinical presentation was as previously described.

The inmate was seen by Dr. ███████ for initial assessment on June 25, 2020; he noted that the inmate had been in custody since June 22, 2020.  He was hyperverbal and disorganized, and he refused psychotropic medications.  Although the psychiatrist indicated that the inmate refused medications, the healthcare record noted that Abilify was ordered on that date.

On June 30, 2020 at 1344, the inmate was seen by a mental health clinician when the Suicide Watch Daily Assessment/Discharge for MH was completed.  It noted that the inmate had been

placed on suicide watch on that date at 0050 due to suicidal ideation/threat.  The documentation indicated that safety planning occurred during the session, and suicide watch was discontinued; the rationale provided was that the inmate "denied S/I". The clinician noted that the CSSRS was completed.

Psychiatric appointments scheduled on July 7 and July 8, 2020 were rescheduled. He was seen by the psychiatrist on July 13, 2020, when the inmate indicated that he would like to take Clozaril.

The Initial Health History was performed on July 8, 2020. It noted the inmate's history of psychiatric treatment and hospitalization.  He was described as delusional with inappropriate affect and lability. He was seen by a mental health clinician on July 10, 2020 when he remained with psychosis, agitation and disorganization.

On July 12, 2020 at 1929, the Suicide Watch Daily Assessment/Discharge for MH was completed by a mental health clinician.  It noted that the inmate had been placed on suicide watch in safety cell #5 on July 11, 2020 at 2035 after wrapping a sheet around his neck.  He was described as loud, anxious, irritable, labile, delusional and agitated. Suicide watch was discontinued with the rationale provided for discontinuation as the "Pt identified reasons for living and engaged in safety planning." The clinician noted that the CSSRS was completed. Although suicide watch was reportedly discontinued on July 12, the inmate remained on suicide watch from July 13 to July 14, 2020.  On July 14, 2020, the clinician indicated that suicide watch would continue due to continued suicidal ideation. The subsequent documentation indicated that the inmate was placed on suicide watch on July 15, 2020 at 0432 due to "ideation/threat"; suicide watch was discontinued on July 16, 2020 at 1125.  The rationale for discontinuation was that "symptoms of SI have reduced". The CSSRS was reportedly completed.

The inmate was seen by the psychiatrist on July 13, 200 when the patient indicated that he would take Clozaril.  He was seen by telepsychiatry/FaceTime.  He did agree to taking Haldol and Benadryl in the interim, and Abilify was discontinued. The appropriate laboratory studies were ordered for treatment with Clozaril. He remained housed in MHO.

Nursing notes documented that the inmate had ongoing fecal smearing in his cell with agitated behavior.  He was offered group therapy during his housing in MHO, which he frequently declined.

The inmate was again placed on suicide watch on July 19, 2020 at 1450 after tying his sheet around his neck. His suicide risk was assessed as high, and suicide watch was continued. On July 19, 2020 Dr. ▊▊▊▊ ordered Haldol 5 mg, Ativan 2 mg, Cogentin 1 mg all ordered stat which the inmate took voluntarily.  The medication was administered orally, and documentation indicated that administration was voluntary. Suicide watch was decreased to Level 2 on July 20, 2020. On that date, the inmate reportedly attempted to swallow plastic. The rationale for decreasing monitoring was that the inmate denied wanting to actively harm himself.  On July 21, 2020 suicide watch was discontinued, and the rationale provided was that the inmate denied "S/I and is future oriented toward going to court and getting out of jail".

Progress notes indicated that the inmate agreed to treatment with Clozaril; however, this treatment was delayed due to his unstable behavior for which blood draws were deemed unsafe.

An entry on July 26, 2020 indicated that the inmate had tested positive for COVID-19 and informed on the previous day.  He was seen by a mental health clinician on that date.

He was seen by the psychiatrist on July 27, 2020.

On July 29, 2020, the inmate reportedly attempted suicide by hanging from his bed sheet.  He was evaluated medically, cleared and returned to Level 1 suicide watch. Upon evaluation by mental health on that date; suicide monitoring was decreased to Level 2; no rationale was provided for this downgrade after this serious suicide attempt. Suicide watch was discontinued on July 30, with the clinician indicating "Pt no longer meets criteria for placement at L2 as acute risk for SIB is considered low at this time".  Despite this, the psychiatrist (Dr. ████████ ordered that the inmate remain "in safety protocol including safety smock for obs".

Stat telephone orders for psychotropic medications were provided on several occasions.  On July 1, 2020 Dr. ████████ ordered Ativan 2 mg and Haldol 10 mg orally. On July 12, 2020, Dr. ████████ ordered Haldol 5 mg, Ativan 2 mg and Cogentin 1 mg orally stat.  On July 13, 2020, Dr. ████████ ordered Haldol 10 mg, Benadryl 50 mg orally stat. On July 16, 2020, Dr. ████████ ordered Haldol 10 mg and Benadryl 50 mg stat orally.  All appeared to have been administered voluntarily.



The mental health clinician documented consultation with the crisis team at NMC regarding possible admission due to danger to self and others; however, she was advised that no admissions would occur due to lockdown at the Mental Health Unit, and that the inmate would not be admitted due to his COVID-19 positive status.

On July 25, 2020, the mental health clinician, medical staff and classification informed the inmate that he tested positive for COVID-19. He was seen for follow-up by mental health on the following day and supportive therapy was provided. The inmate was seen by Dr. ████████ on July 27, 2020 (FaceTime) and August 2, 2020, when Clozaril was started and the necessary laboratory studies were obtained. Subsequent progress notes indicated that he remained with psychotic symptoms, but he had some improvement in his symptoms.

Findings

The mental health staff appropriately attempted referral for inpatient care for this very ill inmate; however, he was not accepted for admission despite his symptomatology due to his COVID-19 status and the lockdown of the inpatient unit at MHU. In light of the severity of this inmate's symptoms, referral for inpatient treatment might have been considered earlier in his incarceration.

There was documentation that the inmate's medications were verified the time of intake.

It was unclear from the healthcare record if the inmate arrived on June 17 or June 22, and if he was away from the jail for evaluation at NMC during this time.  If he was placed in custody on June 22 as the psychiatrist noted; it appeared that he was seen for initial psychiatric assessment in three days.  If his arrival was June 17, the lapse in psychiatric initial assessment was concerning.

This inmate was appropriately discussed in the MDTM on multiple occasions with discussion of treatment related issues including possible commitment upon jail release, housing placements, the provision of in-cell materials, and group offering; however, documentation of actual treatment planning in the healthcare record was lacking.

Although documentation indicated the use of safety planning when indicated; there was no documentation of actual safety plans for review and determination of the adequacy and appropriateness of safety planning.

This inmate was assessed for suicide risk prior to suicide watch discontinuation and monitored daily by mental health clinicians while on suicide watch; however, documentation of the assessment included in the healthcare record was insufficient to evaluate the adequacy of assessment.

Additionally, the rationale for discontinuation of suicide monitoring was insufficient in several circumstances for this inmate.  Documentation of actual assessment of suicide risk was not consistently provided for this inmate.  There was documentation that safety planning was conducted; however, appropriate documentation of these suicide prevention measures was lacking. Denial of suicidality was at times cited as the rationale for discontinuation of suicide precautions.  Suicide monitoring should be specifically linked with the assessment of suicide risk by the CSSRS, adequate safety planning and ongoing treatment planning.  These issues were of particular concern for this inmate with multiple incidents of suicide monitoring that frequently occurred within a short period of time of suicide monitoring discontinuation.

This inmate was seen by mental health frequently and consistently as was clinically indicated.  There was documentation of appropriate follow-up after suicide watch discontinuation.

There was documentation that the inmate was provided with in cell materials and group therapy while housed in segregation.

There was also documentation of weekly mental health segregation rounds in segregation.

Nursing rounds were not documented daily in segregation.

There was documentation that the inmate was assessed by medical within one hour of placement in the safety cell.

Rescheduling of psychiatric appointments for this severely ill, agitated inmate brings into question the adequacy of psychiatric staffing.

This inmate was appropriately considered for involuntary commitment upon release from MCJ.


**Inmate 5**

This inmate received the Receiving Screening on May 27, 2020. The screening was remarkable for a history of mental health treatment and hospitalization as well as a diagnosis of Schizophrenia. She was unable to provide information regarding recent medication treatment. She was seen for Mental Health Initial Assessment by the mental health clinician on the following day when it was noted that she had a diagnosis of Schizoaffective Disorder and treatment with Zyprexa and Lorazepam. She was described as disheveled, incoherent or acting strangely, paranoid, and angry with pressured speech. A referral was made for the patient to see the psychiatrist.

She was seen by the psychiatrist on May 29, 2020 for initial assessment, when she presented with delusional thinking, hyperverbal speech, disorganization and bizarre, uncooperative behavior.  She refused psychotropic medications at that time.

On June 10, 2020, the inmate was placed in the WHO after flooding her room on more than one occasion. She was seen by the mental health clinician weekly for segregation rounds. The inmate was discussed in MDTM on June 16, 2020 when it was noted that she was refusing medications and group materials.  At that meeting, it was determined that she required enhanced mental health monitoring to include weekly mental health contacts.

The inmate was scheduled to be seen by the psychiatrist on June 18 and June 24, 2020; it appeared that she refused to meet with the psychiatrist.

The inmate was seen by the psychiatrist by telepsychiatry on July 2, 2020.  She remained psychotic and argumentative; however, she agreed to take Depakote, hydroxyzine and trazodone which were ordered by Dr. ███████ at that time.

She was seen for crisis intervention on July 13, 2020 by a mental health clinician after flooding her cell.

On July 15, 2020 when seen in mental health rounds, she declined group materials and out of cell contact, presenting with extreme agitation and verbal aggression. On that date, Dr. ███████ ordered by telephone Zyprexa 10 mg and Benadryl 50 mg orally stat, with an order to administer forced intramuscular medications if oral medications were refused; review of the MAR indicated that she did accept the medication orally. She was seen by a mental health clinician later that day when the CSSRS and a Suicide Watch Initial Assessment for MH were completed. It was noted that she was placed on suicide watch on July 16, 2020 at 1804; the reason cited for suicide watch placement was that she was frustrated by her current housing situation. She was described with pressured speech, irritability, and impulsivity.  Her suicide risk was assessed as low.  She was referred to the psychiatrist for assessment. She was seen on the following day when the Suicide Watch Daily Assessment/Discharge for MH was completed by another mental health clinician. This assessment noted that the inmate had presented with suicide ideation/threat resulting in

initial placement on suicide watch.  The clinician noted that she also had delusional thinking in addition to the same symptoms described on the previous day. Her suicide risk was assessed as low. It was noted that she had engaged in self-harm since the last assessment and that she had passive suicidal ideation.  Suicide watch was discontinued, and the rationale provided was that she denied "S/I". The CSSRS was completed.

It appeared that the inmate was again placed on suicide watch on the following day after removal at 0912 due to suicidal ideation. The Inmate Movement Form indicated that she was placed into the safety cell on July 17, 2020 after presenting with severe agitation, flooding and suicidal statements. The clinician indicated that she was placed in the safety cell rather than a booking cell as no booking cell was available. Documentation indicated that she had become frustrated with staff and requested that she remain on suicide watch as she remained suicidal. She remained with disorganization, agitation and irritability. Her insight and judgement were described as poor. Suicide risk was assessed as low. The clinician included in the assessment the following: "eliminate self-harm/self-harm statements.

The inmate was scheduled to be seen by the psychiatrist on July 16 as she requested treatment with Lithium.  That appointment was rescheduled due to "work load".  She was seen the following day by telepsychiatry, on July 17, 2020 when Lithium was prescribed by Dr. █████ in addition to continuation of Zyprexa.

It appeared that she was returned to the WHO on July 18, 2020, and suicide watch was discontinued on July 19, 2020 when the inmate was assessed with low suicide risk and denial of suicidality.  The rationale provided for discontinuation was that the inmate was able to "identify that she is frustrated and anxious, but not suicidal."

On July 19, 2020, Dr. █████ ordered by telephone Ativan 2 mg orally twice per day to address the inmate's persistent anxiety related symptoms.

She was seen for psychiatric follow-up on July 27, 2020.

On July 29, 2020, she was seen by the mental health clinician for crisis intervention.

A psychiatric note on July 30, 2020 indicated that the inmate had been found incompetent to stand trial, and the inmate requested medications that would assist her in regaining competency.

There were lapses in the documentation of daily nursing rounds in segregation.

Review of the MAR indicated that the inmate was generally medication adherent with occasional refusals, despite her initial medication refusal at the time of intake.

<u>Findings</u>

There was documentation that the inmate's medications were verified upon jail intake; however, it appeared that she initially refused to take psychotropic medications.

31-17

This inmate was assessed for suicide risk prior to suicide watch discontinuation and monitored daily by mental health clinicians while on suicide watch; however, documentation of the assessment included in the healthcare record was insufficient to evaluate the adequacy of assessment. Documentation indicated that the CSSRS was consistently utilized.

The rationale for discontinuation of suicide monitoring was insufficient. Denial of suicidality was at times cited as the rationale for discontinuation. Suicide monitoring should be specifically linked with the assessment of suicide risk by the CSSRS, adequate safety planning and ongoing treatment planning. A more appropriate rationale for discontinuation was also provided in which the clinician noted that the inmate was being assisted in recognizing and requesting help for symptoms of anxiety and anger rather than requesting help by stating suicidality.

There was documentation that safety planning was conducted; however, appropriate documentation of these suicide prevention measures was lacking.

Of concern was an entry by a mental health clinician that appeared to identify as a goal for treatment the elimination of self-harm statements. Clearly a goal for treatment should be the elimination of self-harm incidents; however, the focus here appeared to be elimination of the inmate's suicidal statements. This goal could have an unintended consequence of the inmate not informing staff that she was suicidal and completing suicide. Additional suicide prevention training may be necessary to address the issues of suicide monitoring and assessment.

The inmate was appropriately seen for post-suicide monitoring follow-up by mental health staff.

There was better documentation of treatment planning efforts regarding suicide monitoring; however, improvement is needed regarding the documentation of ongoing treatment planning efforts. There was also documentation that the inmate was consistently discussed in MDTM. Appropriate treatment interventions were discussed; however, as stated previously, improvement in the documentation of treatment planning in the healthcare record was indicated.

The appropriate laboratory studies for treatment with psychotropic medications was conducted.

There was documentation that the inmate was offered group therapy and in-cell materials. She was followed weekly by mental health staff.

Although the psychiatric care provided to this inmate appeared to be appropriate, documentation in the healthcare record indicated that this inmate refused to be seen by the psychiatrist during the early days of her incarceration. Due to the COVID-19 crisis, it appeared that these sessions were conducted by FaceTime, and it is possible that her refusal was related to the severity of her psychotic symptoms and the use of FaceTime rather than in person evaluation. Entries in the healthcare record noted that she complained of long waits to see the psychiatrist which could occur due to the logistics of organizing telepsychiatry contacts. Consideration should be made regarding alternative means of psychiatric assessment for such individuals with severe psychotic symptoms who might not be appropriate for remote clinical contacts.

Regarding the provision of telepsychiatry, there was not documentation that the inmate was seen by a physician or mid-level provider within 24 hours of initial psychiatric assessment.

Informed consent for treatment with medications via telepsychiatry was not located in the healthcare record.

**Inmate 6**

This inmate was housed in A Pod.  It appeared that he had multiple brief incarcerations at MCJ. He received his Receiving Screening on March 26, 2020.  The screening was unremarkable for mental health concerns; however, he reported that he was homeless with daily and heavy alcohol use. It appeared that he may have been released from jail and returned to MCJ on April 18, 2020 when he received another Receiving Screening which was also unremarkable for mental health concerns. Mental health clinicians attempted to interview him in receiving on two occasions, but he refused to meet with mental health staff.

He received another Receiving Screening on May 8, 2020; however, this screening noted diagnoses of anxiety and schizophrenia.  He denied recent mental health treatment or symptoms. The Initial Health History completed on May 9, 2020 also noted amphetamine and heroin use. He also reported a history of mental health treatment.

On May 10, 2020, he was seen by a mental health clinician as the inmate was exhibiting bizarre and strange behavior during intake.  The inmate refused to cooperate with the interview, and the clinician indicated that a follow-up interview would be attempted at a later date.  On two days later, he again refused to cooperate with mental health interview, stating "I don't need anything."

The inmate was seen for Mental Health Initial Assessment on May 20, 2020, when he reported a diagnosis of schizophrenia, no recent medications, but current auditory hallucinations and substance use. His mental status examination was remarkable for the presence of auditory hallucinations and hypervigilance, looking around the room during the interview, disorganized thinking and thought blocking.  He was scheduled for psychiatric assessment and routine mental health follow-up.

It appeared that the inmate was placed in segregation on or about June 9, 2020. Based upon the documentation in the healthcare record, it was difficult to determine the reason for segregation placement.

He was seen for initial psychiatric assessment on May 21, 2020 by Dr. ████████  He presented with disorganization and probable auditory hallucinations. At that time, he was provided with a diagnosis of Schizophrenia and prescribed Zyprexa.

He was seen by a mental health clinician for crisis intervention on June 7, 2020 when he flooded his cell and presented with agitation.  The clinician provided supportive therapy and worked with the patient to decrease his agitation.

The inmate was seen by Dr. ████████ by telepsychiatry on June 11, 2020 when the inmate requested an increase in Zyprexa. He was described as pleasant and cooperative; Zyprexa was increased to address the inmate's report of continued auditory hallucinations.

He was seen at cell-front due to COVID-19 lockdown on July 13, 2020 by the mental health clinician, when he reported passive suicidal ideation, but no plan or intent. He was scheduled to see the psychiatrist due to report of increased anxiety.  He was seen by the psychiatrist on July 15, 2020 via telepsychiatry when Dr. ████████ noted medication adherence and the inmate's report of anxiety and insomnia.  Buspar was added, and Zoloft was increased at that time. At his follow-up appointment on July 27, 2020, Buspar was increased at the inmate's request by the psychiatrist.

Review of the MAR indicated that the inmate was medication adherent.

Findings

There was a lack of documentation that informed consent was obtained for treatment with psychotropic medications by telepsychiatry. A "General Patient Chart Inmate Refusal" was scanned dated June 15, 2020; however, the reviewer was unable to determine if this was a specific consent for treatment with psychotropic medications prescribed by telepsychiatry.

There was documentation of weekly mental health rounds in segregation.

There was documentation of daily segregation nursing rounds.

There was documentation that the inmate was offered group therapy, which he routinely declined.

**Inmate 7**

This inmate was housed in the MHO.  He received the Medical Intake Triage/Receiving Screening on November 19, 2019. The screening was remarkable for treatment with Seroquel and Naloxone. He also reported a suicide attempt by overdose one month prior with treatment at NMC, as well as a diagnosis of Schizophrenia with command hallucinations.

The inmate was seen on the following day by mental health in response to the intake referral when the Mental Health Initial Assessment was completed on November 20, 2019.  The clinician noted that the inmate was facing a murder charge, and she documented his history of mental health treatment, including multiple suicide attempts, current paranoid delusional thinking regarding something implanted in his head and current command auditory hallucinations.  He denied current suicidality. The clinician also noted that the inmate had already been scheduled for psychiatric assessment and scheduled for follow-up in one day.  The inmate was placed on an opiate withdrawal protocol, and Seroquel was ordered on the day of arrival.

It appeared that the inmate was housed in MHO soon after jail arrival.  There were lapses in the documentation of daily nursing rounds. Weekly mental health rounds were documented.

The inmate was seen for mental health follow-up on November 21, 2019 when he reported continued auditory hallucinations and delusional thinking.  He was scheduled and seen for follow-up on November 24, 2019 when his symptoms remained unchanged. The clinician noted that he would be seen by the psychiatrist on the following day.

There was documentation dated November 25, 2019 that a General Patient Chart Doctor/Nurse Note by "Psych Dr. ███ was scanned. There was documentation that the appointment was completed on that date; however, the actual progress note, and details regarding this contact was not located in the healthcare record.  It also appeared that the General Patient Chart Consent for Psychiatric Medication was scanned on November 29, 2019.

He was seen by a mental health clinician on November 27, 2019 when he reported medication adherence and denied current difficulties, except constipation for which he had been referred to medical. When seen two days later, he presented with anxiety and agitation, reporting auditory hallucinations and delusions that something was implanted in his head. He was next seen by the mental health clinician on November 30, 2019 when he was seen at cell-front and denied current difficulties.

An entry by the psychiatrist dated January 23, 2020 indicated that the chart was reviewed and Seroquel was continued.  It did not appear that the inmate was seen in person at that time. It appeared that the inmate was scheduled at least monthly by mental health clinicians for follow-up. He refused his appointment during February 2020, but at the next appointment on March 13, 2020, he reported that he was doing well.

An entry by the psychiatrist on April 17, 2020 indicated that a "FEQ" was required for Seroquel, but noted that the inmate had his own supply and that the FEQ was not needed.  It did not appear that the inmate was seen by the psychiatrist on that date. He refused his next psychiatric appointment on April 22, 2020.

He was seen by a mental health clinician on April 17, 2020 at cell-front, as he refused out of cell contact. The content of that contact was unremarkable.

On April 18, 2020, a nursing entry indicated that the inmate had not received Seroquel for two days and to provide stat dose ordered by Dr. ███

The inmate was next seen for crisis evaluation on April 23, 2020 in response to a custody referral after the inmate reportedly began hitting his door, talking to himself in the third person and shouting threatening statements of stabbing someone with pacing. He refused to engage with the clinician. The plan only indicated that the inmate would be scheduled for follow-up appointments.

On May 1, 2020, the inmate was seen for crisis evaluation after mental health was contacted by custody reporting that the inmate broke the tablet on the cell door shattering the table and the cell window, resulting in glass in the cell and superficial cuts on several fingers.  He was described as actively psychotic and uncooperative, not allowing custody to remove the glass or broken tablet.

The psychiatrist was consulted about emergency medications.  The inmate eventually agreed to allow examination and treatment of his fingers and cooperated with removal of the glass and broken tablet.  He took oral PRN medications and laid on his bed.  The psychiatrist noted that the case was discussed with the RN and LCSW/MFT, and an order for Zyprexa and Benadryl was provided stat.

He was seen on the following day by a mental health clinician when he was seen at cell-front; he acknowledged the clinician and denied suicidality.

On May 17, 2020, the mental health clinician indicated that the inmate was seen at cell-front when he indicated that he did not wish to meet with mental health staff, and he signed a refusal at that time. When seen on May 31, 2020, he denied complaints or concerns.

He was seen for crisis intervention in response to custody referral on June 20, 2020, when the inmate presented with auditory hallucinations and somatic/paranoid delusional thinking regarding custody staff.  He did agree to see the psychiatrist.

An entry by the psychiatrist on June 22, 2020 documented the above presentation and indicated that the inmate refused to meet with him. No plan was documented. He was seen by the mental health clinician on June 29, 2020 for crisis intervention after he was yelling in his cell.  He was more engaging, inquiring about his court case.  The clinician noted that he was already scheduled for follow-up appointment.

The inmate was seen by the mental health clinician on June 23, 2020 when he remained with delusional thinking regarding microchips in his head and "creators crawling on his body".  He refused to meet the clinician in a private setting. He indicated that he felt unsafe, but he denied suicidality. The plan outlined was for "Patient scheduled for follow up MSE."

A note by the psychiatrist on July 22, 2020 indicated that the inmate had refused to meet with him on 2/25/20, 4/22/20, 6/22/20 and on that date.  He noted that the inmate was last seen by a psychiatrist on November 25, 2019.  Seroquel was discontinued "for refusing psych eval".

The inmate was seen by a mental health clinician on July 25, 2020 at the behest of nursing, as the inmate requested Seroquel which had been discontinued.  He agreed to cooperate with his psychiatric appointment and indicated that he was unaware that his medication would be discontinued if he did not meet with the psychiatrist.

He was seen by the psychiatrist on July 27, 2020 when he requested resumption of Seroquel, and the medication was restarted.  This contact occurred by telepsychiatry and was facilitated by the mental health clinician due to the severity of the inmate's psychotic symptoms.

Review of the MAR indicated that, with the exception of the early days of incarceration, the inmate was adherent with taking Seroquel.

Findings

The care provided to this inmate was concerning.  Documentation in the healthcare record indicated that this inmate was seen six days after his arrival to the jail by a psychiatrist, but the actual progress note documenting this contact was not located in the information provided to evaluate this contact.  In light of the severity of this inmate's psychosis and the seriousness of his charges, he should have been seen sooner if he was actually seen on November 25, 2019.  Despite this delay in initial psychiatric assessment, he was closely followed by mental health clinicians during this period and subsequently.

It appeared that scanned information from the healthcare record was not provided to the monitor for review.

Of concern was the lack of documentation of timely psychiatric initial assessment and follow-up for this severely ill inmate.  Although he presented with significant auditory hallucinations and delusional thinking with periods of agitation, the documentation of actual psychiatric contacts was sparse.  Although there was some documentation that the inmate refused most psychiatric contacts, it was unclear if the frequency and timeliness of contacts was solely related to refusals.  If refusals were the reason for this deficiency, then referral for inpatient care should have been documented. Discontinuation of Seroquel due to refusing appointments without having a plan to address the inmate's ongoing psychosis (which probably contributed to his treatment nonadherence) was clinically inappropriate.

Regardless of the inmate's refusals, it did not appear that he was scheduled timely for psychiatric follow-up.  In light of his psychiatric instability, he should have been scheduled for at least monthly, if not sooner, psychiatric assessment until stabilized; and this did not occur.

Additionally, this inmate appeared to require referral for inpatient care; however, there was not documentation that this necessary intervention was considered or pursued.

Despite the delay in initial psychiatric assessment, medications were ordered and administered on the day of jail arrival.

Treatment planning was poor, and progress notes frequently noted as the plan to remind the inmate how to contact mental health services or noted the next scheduled follow-up.  There were no interventions documented to increase the inmate's treatment participation or to address his ongoing psychosis.

There were lapses in the documentation of daily nursing rounds. Weekly mental health rounds were documented.

**Inmate 8**

This inmate received the Medical Intake Triage/Receiving Screening on November 2, 2019.  He denied treatment with psychotropic medications, history of mental health treatment or substance related difficulties. The Initial Health History completed on the following day noted daily alcohol usage and a history of withdrawal symptoms.

Documentation indicated that on November 2, 2019 at 2101 the inmate was housed in a booking cell when he began hitting his head against the window causing redness and an abrasion to his forehead and bleeding.  He was then moved to the safety cell and placed into the WRAP by custody at approximately 2128. Custody staff reported that the inmate had been calm, but non-verbal until he began hitting his head. The Suicide Watch Initial Assessment for MH was completed.  It noted that the inmate refused to answer questions and that he was intoxicated or detoxing from alcohol or drugs. He was removed from the WRAP on November 2, 2019 at approximately 2325 according to custody documentation; however, a provided mental health log indicated that he was released on November 3, 2019 at 0801, which would have resulted in his placement in the WRAP for greater than the limit of six consecutive hours.

He was seen on the following morning by a mental health clinician when he presented with appropriate and cooperative behavior. He denied suicidality, and he acknowledged that he had been intoxicated.  He denied a history of mental health treatment.  The CSSRS was completed, and his suicide risk was determined as low.  Suicide watch was discontinued at that time, and the rationale for discontinuation was that the inmate was now sober and denied that he was ever suicidal.  He reported that he hit his head out of frustration and to get the deputies attention.

The inmate was seen by a mental health clinician on November 4, 2019 for follow-up when he was reportedly doing well. He was seen on the following two consecutive days when he was reportedly doing well.

It appeared that the inmate may have been released from jail, and he returned during January 2020 when the Receiving Screening was completed on January 6, 2020. This screening noted weekend alcohol use and daily cannabis use, but the screening was otherwise unremarkable for mental health concerns.

Findings

This inmate was appropriately screened upon his arrival to MCJ, and it was noted that he did not have a history of mental health treatment or indications for referral.  Due to his head banging and the possibility of self-injury, he was initially placed into the safety cell and WRAP. Mental health clinicians appropriately evaluated the inmate regarding suicide risk, and he was seen appropriately for follow-up after suicide watch discontinuation.

Various documentation provided conflicting information regarding the duration of WRAP placement. Based upon custody and medical information and the audits by the Compliance Sergeant, the duration of placement in WRAP was less than six consecutive hours as was the placement in the safety cell.  Mental health documentation differed from that report. Based upon the information provided, it appeared that the duration of placement was appropriate.

There was documentation of timely medical assessment upon safety cell and WRAP placement. Range of motion activities while in WRAP was not documented.


**Inmate 9**

This inmate received the Medical Intake Triage/Receiving Screening on November 29, 2019. The screening noted that the inmate was uncooperative with the completion of obtaining vital signs. She stated that others could hear her thoughts and that she was hearing voices. She reported treatment with Zyprexa as well as methamphetamine use. The screening also noted a history of psychiatric hospitalization commitment.

The inmate was placed on suicide watch on December 2, 2019 at 1507 when the Suicide Watch Initial Assessment for MH was completed. Documentation indicated that she made several statements such as "I can't do this" after her return from court, and she was described as psychotic and delusional. She was referred to see the psychiatrist. On the following day, she was seen by a mental health clinician, and the inmate was assessed with low suicide risk. It should be noted that the CSSRS was not completed at that time; and it was unclear how suicide risk was assessed. Suicide watch was continued, and the clinician noted that the inmate remained with confusion.

She was seen on December 4, 2019 by a mental health clinician who noted that the inmate had been started on Zyprexa. She remained with passive suicidal ideation, but no plan or intent. The CSSRS was completed, and her suicide risk was determined as low. Suicide watch was discontinued, and the rationale for discontinuation was that the "pt is no longer endorsing suicidal ideation, she is able to identify her children as her protective factor and also her aunt. She appears emotionally regulated."

The inmate was again placed on suicide watch shortly after discontinuation earlier that day on December 4, 2019 at 1753. She had requested to be seen by mental health staff, reporting ongoing anxiety, suicidal ideation and urges to hit her head. The clinician noted that she was unable to participate in safety planning due to her lability and psychosis. Her suicide risk was assessed as intermediate. On the following day, suicide watch was again discontinued, and the rationale for discontinuation was the inmate's denial of suicidal ideation.

She was seen by the psychiatrist on December 5, 2019 when it was noted that the inmate had not taking psychotropic medications since her release from MCJ on November 1, 2019. Zyprexa and Benadryl were continued at that time.

The inmate was again placed on suicide watch on December 21, 2019 at 1315 due to suicidal ideation without plan. Suicide watch was discontinued on the following day, after the mental health clinician noted that the inmate was involved in safety planning and identified reasons for living. Her suicide risk was assessed as low. She was seen for follow-up after suicide monitoring was discontinued.

She was seen by the psychiatrist on December 19, 2019 when she reported medication side effects; Zyprexa was discontinued, Zoloft was prescribed, and Benadryl was continued. On January 6, 2020, the inmate complained of medication side effects from Zoloft. The psychiatrist discontinued Zoloft and began treatment with Remeron.

It appeared that the inmate was discharged on January 28, 2020, and that discharge medications were called into the local pharmacy.

The inmate was re-incarcerated and received the Receiving Screening on April 30, 2020. The screening noted that she had been "jail checked 4/29/20 for SI". The screening was remarkable for almost daily alcohol use and use of methamphetamine. She also reported a history of mental health hospitalization, thoughts of killing herself, passive suicidal ideation and delusional thinking.

She was placed on suicide watch on April 29, 2020 at 2210 due to suicidal ideation and threat. She remained on suicide watch for the next several days, and clinicians noted her lack of participation in safety planning. Suicide watch was discontinued on May 2, 2020; the clinician noted that safety planning was conducted, and interventions were outlined. Her suicide risk was assessed as low.

The inmate was returned to suicide watch on two days later when she made suicidal statements; she was described as psychotic with delusional thinking and auditory hallucinations. At that time, Dr. ███████ provided a telephone order for Zyprexa and Benadryl orally to be given intramuscular if she refused oral medications.

She remained on suicide watch until the following day (May 5); she was seen by one mental health clinician at 1503 when suicide watch was continued, and subsequently a note by another clinician at 1512 indicated that suicide watch was discontinued as the inmate denied suicidal ideation. Later that day (May 5, 2020) at 1950, she was returned to suicide watch after nursing staff reported that her mother called and stated that the inmate would kill herself. Suicide watch was discontinued on May 6, 2020 with the rationale for discontinuation that the inmate denied suicidal ideation.

An entry by Dr. ███████ on May 7, 2020 indicated that the inmate was unstable and having auditory and visual hallucinations and she refused to meet with him. On May 8, 2020, Dr. ███████ provided a telephone order as follows: Haldol 5 mg x 2 days BID PO/IM Ativan 2mg x 2 days BID PO/IM Cogentin 1mg x 2 days BID PO/IM.

On May 19, 2020, Dr. ███████ was contacted by a mental health clinician who reported that the inmate was having a "psychotic episode".  He spoke with the inmate by phone; she was delusional and crying.  She was reportedly adherent with Zyprexa, Remeron and Benadryl.  At that time, Zyprexa was discontinued, and Risperdal was ordered.  An entry dated May 21, 2020 indicated that the inmate requested to see the psychiatrist; however, he stated that he was unable to see the inmate and noted that she was placed on Level 2 suicide watch.  On May 24, 2020, Dr. ███████ provided an email order for "Haldol 5mg, Ativan 2 mg, Cogentin 1 mg stat doses & then BID x 3 days, with follow-up ordered with the psychiatrist." She was seen by Dr. ███████ on May 26, 2020 by telepsychiatry when he noted the order by Dr. ███████ on May 24. She was reportedly calm without evidence of psychosis and medication adherent, and medications were continued. Cogentin was discontinued on May 28, 2020 due to medication side effects. Her medications were further adjusted on June 1, 2020 due to continued side effects.

The inmate was again placed on suicide watch on the following dates: May 9, 2020 to May 11, 2020 due to scratching herself and auditory hallucinations; May 20, 2020 to May 21, 2020; May 22, 2020 to May 24, 2020; May 24 to May 25, 2020; May 29 to May 31, 2020; and June 1, 2020. Documentation indicated that during this period, the inmate remained with significant psychosis, including disorganization, confusion, delusional thinking and auditory hallucinations. Referrals to psychiatry were noted.

Findings

There was documentation that discharge medications were provided upon jail release.

Medications were ordered two days after the inmate arrived to the jail during November 2019; they were ordered timely upon return to the jail during April 2020.  As this inmate was known to the jail with recent incarceration, it is unclear why it took two days to order medications upon arrival for this psychotic inmate.

The provision of emergency (stat) orders by the psychiatrists was concerning. The Implementation Plan outlines the parameters for the provision of emergency medications. Standing orders for emergency medications are not allowed, and the inmate must be seen by the prescribing physician no longer than 24 hours prior to the psychiatric emergency.  If the physician is not available, physical restraint should be used and the inmate transferred to the hospital emergency room. Verbal orders must be signed within 72 hours.

The order provided by the psychiatrist on May 8, 2020 appeared to be a standing order (for 2 days) and allowed for intramuscular involuntary administration without following the guidelines outlined in the Implementation Plan.  Further, documentation that the orders were signed within 72 hours was not present.

This inmate was assessed for suicide risk prior to suicide watch discontinuation and monitored daily by mental health clinicians while on suicide watch; however, documentation of the assessment included in the healthcare record was insufficient to evaluate the adequacy of assessment. Documentation indicated that the CSSRS was consistently utilized.

The rationale for discontinuation of suicide monitoring was at times insufficient. Denial of suicidality was frequently cited as the rationale for discontinuation.  Suicide monitoring should be specifically linked with the assessment of suicide risk by the CSSRS, adequate safety planning and ongoing treatment planning.

There was documentation that safety planning was attempted. Actual documentation of safety planning was not present in the healthcare record for review.

There was documentation of appropriate follow-up after discontinuation of suicide monitoring.

Of concern was the frequency of suicide watch for this inmate.  Suicide watch was initiated and discontinued on multiple occasions, only to be reinstated sometimes on the same day.  This brings into question the adequacy of suicide risk assessment, safety planning and whether

adequate treatment planning occurred to ensure that the inmate was receiving optimal psychopharmacological treatment at MCJ, or if she should have been referred for a higher level of care for stabilization.

It appeared that scanned information in the healthcare record was not provided to the monitor for review.  A mental health clinician note dated December 27, 2019 indicated that the inmate was seen by Dr. ████ and that the note was scanned; however, documentation of this contact was not available for review.

There was documentation that the inmate was provided with in-cell reading and writing materials.

Regarding the provision of telepsychiatry, informed consent was not located in the healthcare record. There was documentation of at least monthly psychiatric contacts.

## Inmate 10

This inmate was housed in B Pod segregation unit.  He transferred from Atascadero State Hospital (ASH).  He received the Receiving Screening on May 15, 2020. The screening was notable for a diagnosis of Schizophrenia, history of psychiatric hospitalization and treatment with psychotropic medications.

Dr. ████ was contacted on the day of arrival to the jail; and Zyprexa, Cogentin, hydroxyzine and Haldol decanoate were ordered on that date.

He was seen by a mental health clinician on May 16, 2020 when it was noted that he had transferred from ASH.  He refused out of cell contact, lying in bed with his covers on. He was otherwise described as cooperative and pleasant without overt evidence of suicidality or psychosis.  He was provided with a diagnosis of Unspecified Psychosis not due to a substance or known physiological condition.

There was documentation that this inmate was discussed in MDTM. The entry noted that the inmate was placed in segregation at his request.

When seen on May 27, 2020 by a mental health clinician, he refused to meet out of cell and was seen at cell-front where he refused to get out of bed and to speak with the clinician. Subsequent attempts at interview were similar, with the inmate refusing to talk with mental health clinicians, generally stating that he was fine.  They described his cell as unkempt.

It appeared that the inmate was placed into segregated housing on May 29, 2020. The inmate was described as isolative with poor hygiene, malodorous with trash in his cell.  He consistently refused interactions with nursing and mental health staff. Mental health staff documented that the inmate was offered out of cell contacts, group therapy and written materials which he routinely refused.

The inmate refused to see the psychiatrist on June 12, 2020.

There was documentation that mental health staff provided weekly rounds for this inmate. There were lapses in the documentation of daily nursing rounds.

The most recent mental health contact occurred on July 22, 2020 when the inmate was seen at cell-front due to COVID-19 lockdown. The clinician surprisingly noted that the inmate was out of bed and standing at the sink, brushing his teeth. He greeted the clinician and stated that he was doing well. His cell was described as relatively tidy.

Despite the inmate's isolation and refusal to participate in clinical contacts, groups and offered written materials, review of the MAR indicated that he was generally adherent with prescribed psychotropic medications.

Findings

The care provided to this inmate appeared to be adequate.

Medications were ordered at the time of jail intake after his discharge from ASH.

He was seen weekly by mental health staff in segregation, and attempts were made to involve the inmate in group therapy and to provide written materials; however, he consistently refused.

There were lapses in the documentation of daily nursing rounds.

There was documentation that treatment planning was discussed in the MDTM; however, documentation of actual treatment planning required improvement.

# Exhibit 32

[4276968.1]

**Final Monterey County Jail Mental Health Monitor's Report**
**May 18, 2021 – May 19, 2021**

**Overview**

The Monterey County Jail (MCJ) was toured virtually for the eighth mental health monitoring tour.  This monitoring tour occurred virtually utilizing Zoom due to the COVID-19 pandemic.

The tour was conducted over several days; a pre-site visit meeting occurred on May 17, 2021; the virtual tour occurred on May 18, 2021 and May 19, 2021, with an additional interview which occurred on June 8, 2021.

The following report is based upon interviews with institutional staff and inmates, meetings, healthcare records reviews, as well as review of documentation and information provided by the institution and County. This report will specifically address the institution's status and progress toward compliance with the United States District Court Northern District of California Settlement Agreement and the Implementation Plans between Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County Sheriff's Office; California Forensic Medical Group, INCORPORATED (CFMG) et al.

This monitoring report will include review of compliance for the period of August 2020 to April 2021.

Appendix A includes healthcare and other document reviews of selected cases.

Three completed suicides occurred at the MCJ during 2021; although not all suicides occurred during the review period, those deaths are included in this report for review.

1

**Compliance with Settlement Agreement and Implementation Plan**

**1.      Intake Screening**

- *Upon arrival, an Initial Health Assessment will be performed by the intake nurse to determine whether the inmate should be excluded from the facility on medical or mental health grounds. Upon acceptance into the jail, all inmates will be screened by the intake nurse for urgent medical, mental health and dental needs. The intake nurse will have access to an inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail.*

- *If a patient's chronic condition is stable at booking, the Booking RN shall schedule a follow up with a medical provider within 5-7 days.  If the patient is unstable or has unverified medications, the Booking RN must refer the patient to the on duty or on-call medical provider.  [CFMG Plan at 29]*

- *The Booking RN shall identify and assess at booking individuals with a history of chronic medical or psychiatric condition.  The Booking RN must document and verify and continue all current medications, whether verified or unverified, formulary or non-formulary.  [CFMG Plan at 29, 72]*

- *Booking RN must observe/query for signs/history of mental illness and use of psychiatric medications.  The RN shall verify any medications and request outside treatment records as necessary. Any inmate who exhibits signs/history of mental illness shall be referred to mental health services for evaluation, and a physician's opinion must be secured within 24 hours or the next scheduled sick call.  [CFMG Plan at 16, 19, 41]*

- *A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.*

2

- *The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive Findings: on the suicide assessment.*

- *The Booking RN shall begin initial treatment planning at the time of booking and schedule referrals for follow up evaluation as necessary.  [CFMG Plan at 27]*

**Findings: Substantial Compliance**

A review of healthcare records indicated that inmates were seen at the time of intake by an intake nurse when an initial health screening was performed, and those inmates in need of mental health evaluation and/or treatment were referred to mental health clinicians.  Those inmates in need of more urgent mental health referral were promptly referred and seen by mental health clinicians.  Prior records of treatment at the MCJ were included in the healthcare record and were available for review, and there was documentation that prior healthcare records were requested when indicated for prior mental health treatment. It was noted that there were some incidents in which there were omissions and lack of documentation on the intake screening form regarding appropriate disposition and referral at the time of intake; however, other healthcare records documentation indicated that the appropriate referrals to mental health and disposition from intake occurred.

There was continued documentation that intake nurses attempted to verify medications at the time of intake, and release of information was documented in the healthcare record to obtain outside healthcare records. Documentation was also provided for nursing staff regarding verification of past healthcare records.

Review of jail clearance logs and healthcare records indicated that inmates were routinely referred to Natividad Medical Center (NMC) for jail clearance when presenting with

suicidal ideation or behavior, grave disability, possible intoxication or other mental health and medical issues of concern at the time of jail intake.

The facility continued to utilize the Initial Mental Health Assessment and Appraisal for mental health assessment of new arrivals.  The assessments were routinely completed for patients with known mental health history or those that presented with suicidality.

The facility utilized the Suicide Watch Initial Assessment for Mental Health to assess suicide risk. Mental health clinicians continued to consistently utilize this assessment tool for the evaluation of suicide risk.  As has been previously reported, this was a comprehensive assessment tool which was beneficial in determining the level of suicide risk; however, it appeared that the discontinuation of suicide monitoring was frequently determined by the patient's denial of suicidality rather than the tool.  This issue was discussed with Wellpath supervisory staff, and ongoing discussions should continue.  Improvement was also needed in the documentation of appropriate safety and treatment planning.

Healthcare records continued to document timely referral of patients for routine and emergency mental health evaluation and treatment seen at intake.

The issue of confidentiality for nursing intake assessments during the intake process has been an issue of concern.  Further modifications occurred since the last visit to address this issue. New smaller white noise machines were installed in outside the intake screening room. Staff reported that these machines worked better to dampen the sounds inside the room making it difficult for staff outside the room to overhear sensitive information.  Additionally, the configuration of the intake room was changed to allow for safe exit of staff in the event of an emergency.  The locking mechanism was removed from the door, and the door was left open. These changes allowed for greater safety for the staff and appeared to have increased confidentiality for the intake process.

4

**2.      Mental Health Screening**

- *All inmates must undergo an initial mental health screening by a qualified mental health professional within 14 days of admission.  The screening must consist of a structured interview inquiring into (1) history of psychiatric hospitalizations, substance use hospitalization, detoxification and outpatient treatment, suicidal behavior, violent behavior, victimization, special education placement, cerebral trauma or seizures, and sex offenses; (2) current psychotropic medications, suicidal ideations, drug or alcohol use and orientation to person, place and time; (3) emotional response to incarceration; and (4) screening for developmental disability and learning disabilities.  Any positive scores will be referred for follow up.  [CFMG Plan at 36, 41-42]*

- *The medical or psychiatric provider will complete a baseline history and physical or psychiatric examination; order a therapeutic regimen, as appropriate; and, schedule the patient to be seen for chronic care clinic at least every ninety days for the length of the jail stay. Patients on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every **60 to 90** days.*

**Findings: Noncompliance**

Review of healthcare records and staff reports indicated that Qualified Mental Health Professionals completed the Initial Mental Health Assessment and Appraisals for inmates with a known history of mental health treatment, those with suicidality and those inmates referred for mental health services. The screening forms included the necessary components.

Healthcare records and review of psychiatric sick call documentation indicated that patients on psychiatric medications were not always seen by the psychiatrist every thirty days until determined stable and then at least every 60 to 90 days. Psychiatric follow-up was routinely scheduled for 90 days, unless the patient requested to be seen sooner.  Documentation indicated that it was not infrequent that patients were seen at intervals greater than 90 days by the psychiatrist.

**3.      Sick Call**

- *Inmates' health and mental health complaints must be collected, processed, and documented daily and triaged as appropriate by medical and mental health providers. [CFMG Plan at 25]*

- *The on-duty medical provider shall see urgent sick call requests Monday through Friday.  On weekends and holidays, the on duty nurse shall communicate urgent complaints/requests to the on-call provider, who will treat or refer the patient as necessary.  [CFMG Plan at 25]*

**Findings: Substantial Compliancec**

Inmate requests for mental health services continued to be submitted by the tablets. Patients and staff interviewed at this visit did not report the same concerns with availability of tablets. They did report that tablets were frequently broken by peers; however, there were generally sufficient supplies for use.

The facility took steps to address the ongoing provision of tablets.  The Compliance Sergeant developed a procedure for the replacement of tablets, which reportedly were more frequently broken in A and B units.  This involved the development of instruction guidelines for usage.  Additionally, a "no tech" list was instituted for those with a history of breaking the tablets.  Prior to the visit, a 70 tablet shipment was received; and the Compliance Sergeant

6

reported that tablets were reordered every several weeks to maintain a 1:5 tablet to inmate ratio. Backlogs in tablet delivery were ongoing due to COVID. There were also ADA tablets as well as provisions for deaf inmates.

The facility continued to utilize the paper forms when needed.

There remained a system in place for the collection, processing, documentation and triage of inmate sick call requests.  It appeared that emergency and urgent referrals were seen on the date of referral, with more routine requests at times rescheduled due to workloads issues. A review of sick call requests indicated that although routine requests were at times rescheduled; mental health staff responded to patient sick call requests promptly informing them that they had been scheduled or other important information.

- *Health care staff must note (1) the date and time the sick call request slip is reviewed; (2) the signature of medical staff; and (3) the disposition.  The sick call slip must be filed in the inmates' medical record.  The sick call roster must be kept on file in the medical record room.  Providers must record sick call visits in the inmate's medical record.  [CFMG Plan at 25-26]*

**Findings: Substantial Compliance**

The process for documentation of sick call requests included the scanning of those documents in the electronic healthcare record.  There was documentation that inmate requests were scanned into the healthcare record, and scanned documents were noted in the healthcare record for review.

7

- *Sick call must be conducted 5 days/week in a private clinical environment.  Health services staff must triage sick call slips dialed and schedule patients for the next sick call if the slip was received prior to 2300 hours. [CFMG Plan at 26]*

- *An MD or an RN shall visit inmates housed in holding and isolation cells on Monday, Wednesday and Friday.  [CFMG Plan at 26]*

**Findings: Noncompliance**

Mental health sick call occurred daily at least five days per week by mental health clinicians. Follow-up appointments were sometimes rescheduled due to workload constraints.  There was documentation of nursing rounds in segregated units, that included MHO, WHO, men's and women's segregation units; however, there were lapses in the documentation of daily rounds. The psychiatrist did not visit inmates housed in holding and isolation cells on Monday, Wednesday and Friday, and no psychiatric nurse was employed at MCJ at the time of the visit.

## 4.    Chronic Care

- *Any patient whose chronic condition cannot be managed at MCJ shall be transferred offsite for appropriate treatment and care.  [CFMG Plan at 30]*

- *At every 90-day chronic care appointment, the medical/psychiatric provider shall (1) assess the patient's current medications, complaints, and compliance with treatment plan; (2) examine vital signs and weight; (3) assess the patient's diagnosis, degree of control, compliance with treatment plan and clinical status as compared to prior visits; and (4) conduct lab and diagnostic tests as necessary, develop strategies to improve outcomes if the condition has worsened, educate the patient, and refer to MD or specialist, and/or conduct*

*discharge planning as necessary.  All of the above must be documented in the patient's health*

*record.  [CFMG Plan at 32-33]*

**Findings: Noncompliance**

Although inmates were routinely referred to NMC for crisis evaluation and stabilization, some inmates with severe and chronic mental illness that could not be managed at MCJ remained at the jail.  The acceptance and adequate treatment of such inmates at NMC remained problematic; and as has been previously noted, referrals for needed inpatient mental health care did not always occur due to the lack of access to inpatient treatment at NMC.

Review of the NMC Mental Health Unit (MHU) admissions protocols indicated that patients "will not be admitted who are pending or who are convicted and serving time on a felony that fits the following criteria or definition of 'Violent Felony Offenses' as specified in Penal Code (PC)Section 667.5." This prohibition regarding admission of these patients to NMC MHU appeared to negatively impact necessary access to inpatient mental health treatment. If this ban remains in place, alternative mental health inpatient care should be identified and provided.

At every 90-day chronic care appointment, the psychiatrists did not

(1) assess the patient's current medications, complaints, and compliance with treatment plan.

- The documentation of treatment planning was essentially nonexistent in the healthcare record.

(2) examine vital signs and weight

- No documentation or comparisons of patient weights by the psychiatrist were noted in the healthcare records review.

9

(3) assess the patient's diagnosis, degree of control, compliance with treatment plan and clinical status as compared to prior visits.

- This documentation was lacking.

(4) conduct lab and diagnostic tests as necessary, develop strategies to improve outcomes if the condition has worsened, educate the patient, and refer to MD or specialist, and/or conduct discharge planning as necessary.

- These were also areas of omission noted in the psychiatric documentation. There was no documentation of Abnormal Involuntary Movements Scale (AIMS) testing, monitoring of weight and metabolic factors for patients prescribed psychotropic medications. Additionally, there was a lack of documentation of appropriate therapeutic interventions for patients that were decompensating or not participating in treatment.

## 5.   Acute Care

- *Inmates who require acute mental health services beyond what is available at the Jail must be transferred to an appropriate facility.  [CFMG Plan at 36, 42]*
- *Crisis intervention and management of acute psychiatric episodes shall be handled initially by on-duty medical/mental health staff with referral to psychologist and/or psychiatrist on a 24 hour per day basis.  [CFMG Plan at 43]*

**Findings: Noncompliance**

This issue remained essentially unchanged. Although inmates were routinely referred to NMC for crisis evaluation and stabilization, some inmates with severe and chronic mental illness that could not be managed at MCJ remained at the jail.  The acceptance and adequate treatment

of such inmates at NMC remained problematic, and as has been previously noted, referrals for needed inpatient mental health care may not have occurred due to the lack of access to inpatient treatment at NMC. This appeared to be particularly problematic for chronically mentally ill who exhibited chronic psychosis, recurrent self-injurious behaviors and treatment nonadherence.

Crisis intervention and management of acute psychiatric episodes were initially treated by medical or mental health staff and referred to mental health clinicians as indicated. It appeared that not all patients that required psychiatric assessment or follow-up were referred for psychiatric assessment.

**6.    Outpatient Services**

- *The Jail shall make outpatient mental health services, provided by a qualified mental health provider, available to all inmates.  [CFMG Plan at 41]*
- *Inmates requiring mental health services beyond the on-site capability of the Jail shall be referred to appropriate off-side providers.  [CFMG Plan at 41, 43, 46]*

**Findings: Noncompliance**

Outpatient mental health services were provided by qualified mental health providers at MCJ, and clinicians provided services to all inmates regardless of their housing or mental health designation.

Please note prior comments regarding referral for inpatient mental health treatment.

**7.    Safety and Sobering Cells**

- *The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall*

11

*responsibility for safety and security of prisoners, prompt reviews by medical of all*

*placements, and a process of resolving disagreements between medical and custody.*

**Findings: Substantial Compliance**

The facility continued to primarily utilize the booking cells rather than the safety cells for suicide monitoring; however, safety cells were utilized for those inmates with self-injurious behavior and in instances when single cells utilized for suicide monitoring were unavailable in the intake area.  Changes in the documentation of safety and sobering cell placement appeared to address the confusion regarding placements in the safety and sobering cells for suicide monitoring.

Audits were performed by the Compliance Sergeant of safety and sobering cell requirements.  Audits indicated greater than 90% compliance. There appeared to be a good system in place for the monitoring and auditing of safety cell placement with a process for providing notice and discipline when indicated. There were no noted disagreements between medical and custody staff regarding placements.

Healthcare records reviews did not note lapses in the prompt review by medical of all safety cell placements.

- *Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical professional will see an inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.*

12

**Findings: Deferred**

A determination of compliance  is deferred as there was insufficient documentation available to make a finding at this time.

- *A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his Findings: through a report which will be sent to the Jail Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.*

**Findings: Substantial Compliance**

Audits continued to be conducted by the Compliance Sergeant as required. The Administrative Door Entry Audit compared hand-written door entry times on the housing rosters with the video surveillance system and/or the computer stored door entry logs to assess the timeliness of custody welfare checks. Those audits indicated that welfare checks occurred timely. The facility reported that they would be implementing the Guardian System which will electronically document these checks.

- *Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11 p.m. and*

*7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.*

**Findings: Deferred**

A determination regarding compliance is deferred as there was insufficient documentation available to make a finding at this time.

- *Inmates in sobering cells may have access to mattresses at the discretion of custody staff.*
- *Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.*

**Findings: Substantial Compliance**

Audits by the Compliance Sergeant indicated that the provision of mattresses was at the discretion of custody staff for inmates housed in the sobering cells.

- *Patients withdrawing from benzodiazepines must be evaluated by a medical provider within 3 days, and a psychiatrist or psychiatric NP within 7 days.  [CFMG Plan at 68]*

**Findings: Deferred**

This issue will be reviewed during upcoming monitoring visits.

- *Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.*

**Findings: Deferred**

      The monitor was unable to evaluate this issue for this report; this issue will be reviewed during onsite monitoring.

- *For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.*
- *All inmates in safety cells whose condition deteriorates or for whom the nurse is unable to complete a hands-on assessment (including vital signs) after 6 hours of placement, shall be transferred to NMC.  [CFMG Plan at 16, 75]*

**Findings: Noncompliance**

      Audits and review of logs indicated that at least three inmates remained in the safety cell for greater than 24 consecutive hours prior to transfer to an inpatient setting or another housing location. As this has remained an area of repeated noncompliance, it appears to be indicative of systemic issues, and sustained compliance has not yet been achieved.

**8.      Medication Continuity**

- *All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.*
- *By the end of the nursing shift, the booking RN will consult with the on-call psychiatrist regarding any verified or unverified psychotropic medications. The on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically*

15

*equivalent formulary alternate. The on-call psychiatrist will then set the time to see the*

*inmate within 5-7 days. The date of the appointment will be reflected on the written record of*

*the order.  [CFMG Plan at 19]*

**Findings: Substantial compliance**

Medications were usually ordered timely at jail intake; only one example was noted in

which a patient with a history of recent treatment at the jail was not timely ordered psychotropic

medications upon intake.  There was documentation that nursing staff attempted to verify

psychotropic medications, and the psychiatrist was contacted timely.

- *No psychotropic medications shall be unilaterally discontinued without consultation with the*
  *facility physician or psychiatrist.  Psychotropic medication shall not be ordered for longer*
  *than 90 days, new psychiatric medications will not exceed 30 days, until condition is*
  *documented stable by the ordering physician. The prescribing provider will renew*
  *medications only after a clinical evaluation of the individual is performed.  [CFMG Plan at*
  *19]*

**Findings: Noncompliance**

There were not examples of psychotropic medications discontinuation without

consultation with the psychiatrist noted.  New psychotropic medications continued to be ordered

for greater than 30 days, and inmates were seen at intervals greater than 30 days after new

medications were prescribed and prior to documentation of psychiatric stabilization.

Psychotropic medications were at times renewed after chart review to prevent medication

discontinuity; however, inmates were subsequently scheduled for psychiatric assessment. Review

of psychiatric sick call logs indicated that patients were scheduled for psychiatric follow-up

almost routinely for 90 days, and some patients were seen for "renew meds" at intervals greater than 90 days.

### 9.        Discharge

- *Provision of psychotropic medications upon discharge from the jail. The Implementation Plan provides that a 30-day supply of medications be given to inmates upon discharge from the jail.*

- *Inmates who are released prior to resolution of a continuing medical/mental health condition shall be referred to public health and/or community clinics as appropriate, and shall be provided written instructions for continuity of essential care.  [CFMG Plan at 38, 44]*

**Findings: Substantial Compliance**

There was documentation that discharge medications were consistently called into a local pharmacy upon jail discharge. When discharge dates were known, mental health clinicians continued with patients and their attorneys regarding discharge planning and coordination; however, this was difficult as inmates were sometimes released directly from court and at times release dates were unknown.

### 10.      Involuntary Medication

- *Psychotropic medications may not be used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment.  [CFMG Plan at 90, 96]*

- *Absent an emergency, inmates will not be administered involuntary psychotropic medications at the Monterey County Jail.  Psychotropic medication will not be administered for disciplinary purposes. [CFMG Plan at 19]*

- *Absent an emergency or court order for treatment with psychotropic medications, an inmate shall give his or her informed consent or refusal.  [CFMG Plan at 20]*

- *The Jail may only administer involuntary psychotropic medications in a psychiatric emergency (i.e., when administration is necessary to preserve life or prevent serious bodily harm, and it is impracticable to obtain consent), or when an inmate is found to lack capacity to consent at an Incapacity Hearing.  The responsible physician, Program Manager, and Director of Nursing, with the Facility Manager, are to identify appropriate community resources and develop procedures to obtain an Incapacity Hearing, and transfer inmates requiring involuntary psychotropic med administration to an appropriate community facility.  If the inmate must remain at the jail for clinical or custodial reasons, the health services staff shall coordinate with County Mental Health Psychiatric Emergency Services to evaluate competency pursuant to Riese v. St. Mary's Hospital (Riese Hearing).  [CFMG Plan at 96, 98]*

- *In a psychiatric emergency, psychotropic medications can only be involuntarily administered pursuant to a direct written or verbal one-time order from the responsible facility psychiatrist or physician after an on-site evaluation (never as needed, never standing order).  A telephone order is sufficient only if the inmate has been personally evaluated by the prescribing physician **no longer than 24** hours prior to the emergency.  If none of above options are available, physical restraint should be used and the inmate transferred to the hospital emergency department for physician evaluation.  [CFMG Plan at 96]*

- *Verbal orders for involuntarily psychotropic medications must be documented in the inmate's medical record and signed by prescribing physician within 72 hours.  The Medical Program Manager and Custody Facility Manager shall be notified in writing, or by telephone if not*

18

*available, within 24 hours of the involuntary administration of psychotropic medications. [CFMG Plan at 96-97]*

- *Inmates receiving involuntary psychotropic medications must be admitted to an infirmary or safety cell, with intermittent supervision by custody staff at least every 30 minutes. Nursing staff must monitor (assessing response to medications, mental status, general physical appearance, behavior, and hydration) every 15 minutes during first hour, then every 30 minutes thereafter until otherwise ordered by the prescribing physician, documenting all findings in the inmate's medical record. The inmate must be evaluated by the responsible prescribing physician at least every 72 hours. [CFMG Plan at 97]*

- *Inmates exhibiting any clinical deterioration at any time during involuntary therapy shall be transferred immediately to a clinically appropriate treatment facility. [CFMG Plan at 97]*

**Findings: Noncompliance**

Review of healthcare records and provided documentation indicated that the provision of emergency orders and telepsychiatry by the psychiatrists was not consistent with requirements. Although the incidents that were reviewed in which emergency medications were provided appeared to be appropriate due to a psychiatric emergency, several requirements were not implemented. There was no evidence that involuntary or emergency medications were administered in the form of punishment, for physical restraint or disciplinary reasons.

There was a lack of documentation that patients that received emergency medications were seen timely in-person by the psychiatrist.

There was a lack of documentation that a qualified, trained medical clinician was in attendance to assist the telepsychiatrist and that the inmate was seen by a physician or mid-level provider within 24 hours of initial psychiatric assessment.

19

Additionally, the documentation of informed consent was concerning. As psychiatric contacts during the review period occurred by telepsychiatry with the assistance of a mental health clerical staff person, informed consent was obtained by the person onsite to assist the psychiatrist. Informed consent forms were frequently not completed in entirety, with some forms not indicating the medications for which consent was obtained and other important information. This lack of documentation brought into question whether actual informed consent was obtained.

**11.    Medication Refusals**

- *The on-call psychiatrist must be contacted whenever an inmate refuses his or her medications on three consecutive occasions. [CFMG Plan at 20]*

**Findings: Substantial Compliance**

There was documentation in the healthcare record that the psychiatrist was contacted by nursing staff regarding medication refusals, and the psychiatrist also reported that the healthcare record was reviewed for medication adherence during clinical encounters.

**12.    Clinical Staffing**

- *Defendants will maintain Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to ensure adequate staffing to provide all necessary medical and mental health care. The plan will identify all needed positions based on current and projected Jail population, and the number and qualifications of medical and mental health care staff to cover each position, with shift relief.*

- *Mental health services provided on-site shall include crisis evaluation, socialization programs, group therapy, medication management, psychiatric evaluations and individual therapy.  [CFMG Plan at 42]*

- *At all times, there shall be sufficient staff to ensure compliance with the Implementation Plan. The CFMG Staffing Plan is attached to the Implementation Plan as Exhibit I.  CFMG must ensure that all positions are filled.  Relief factors for each position shall be calculated into the staffing analysis to ensure staffing levels consistently meet requirements. CFMG must continuously evaluate staffing levels to ensure sufficiency for compliance.  [CFMG Plan at 116. ]*

- *Mental health staff shall be available on-site 7 days per week and on-call for assessment on an inmate's level of suicide risk upon referral by health services and/or custody staff. [CFMG Plan at 72]*

**Findings: Noncompliance**

Since the last monitoring visit, Wellpath provided a staffing analysis which documented the following mental health staffing levels:

- .9 FTE LCSW/LMFT

- .9 FTE LCSW/LMFT

- .9 FTE LCSW/LMFT

- 1.0 FTE Discharge Planner / Group Facilitator (8 hour / 5 day)

- 1.0 FTE Psychiatrist

At the time of this visit, MCJ was negatively impacted by severe mental health staffing shortages that resulted in the routine use of per diem staff to help to supplement.  There were two full-time mental health clinicians working at the facility at the time of the visit, and

additional staff was added from other Wellpath facilities as well as the per diem staff to assist. These shortages resulted in negative impacts on staff morale, workloads and continuity of care.  It also resulted in the routine rescheduling of less urgent appointments.

The monitor was informed that Wellpath would increase the staffing allocation at MCJ to 4 FTE mental health clinicians.  They will continue to have 1.0 FTE psychiatrist allocation, as well the additional office technician position.

Group therapy was not provided for segregation inmates, initially due to the COVID-19 pandemic precautions, and more recently due to the lack of adequate mental health staff to provide this service. Patients were provided with in-cell group therapy and other written materials. The supervisory staff indicated that group therapy would resume after the addition of the two new clinicians. Mental health clinicians saw their patients in confidential settings, except those housed in segregation who were seen at cell-front. All psychiatric contacts occurred remotely, utilizing FaceTime. Supervisory staff indicated that plans were in place to resume in-person psychiatric contacts.

A mental health staff schedule was provided that included daily, evening and weekend coverage including on-call.

During the monitoring period, the provision of mental health services included crisis evaluation, medication management, psychiatric evaluations and individual therapy.  In-cell materials were provided to segregation inmates in lieu of group therapy.

Of continued concern was the lack of confidentiality that occurred for remote contacts with the psychiatrist.  As the contacts frequently occurred in non-private settings (patient seen at cell-front or in the dayroom); this greatly compromised the clinical encounter and minimized the provision of needed therapy.  Additionally, although some staff indicated that patients were provided headphones; this practice did not appear to be consistent, and

contacts with psychiatrists and clinicians could easily by overheard by other inmates and staff. Although the need for social distancing and minimization of virus transmission was understandable; additional measures were indicated to allow confidentiality in the clinical encounters, including accessibility of headphones and conduct of clinical contacts in a confidential setting.

Healthcare documentation not infrequently continued to indicate that mental health clinician appointments were rescheduled due to workload constraints. These workload issues also resulted in decreased duration of clinical contacts.

Psychiatric services were primarily provided by Dr. ▉▉▉▉ Psychiatric hours were augmented with coverage by Dr. ▉▉▉▉ and Dr. ▉▉▉▉ in Dr. ▉▉▉▉ absence.

Psychiatric on-call services continued to primarily be provided by Dr. ▉▉▉▉ with some on-call coverage by Dr. ▉▉▉

During past monitoring reports, the workload for the psychiatrist was noted as an issue of concern. Based upon provided information, it remains unclear whether the issues related to psychiatric provision of services are related to workload issues or other factors.  It should be noted that there appeared to be reluctance in referring patients in need of psychiatric consultation for evaluation or follow-up to see the psychiatrist; it was unclear the reason for this reluctance which could be due to workload or personnel issues. Additionally, delays were noted in the timely scheduling of patients for psychiatric follow-up.

Review of healthcare records indicated improvement in the timely ordering of psychotropic medications and initial psychiatric contacts.

**13.    Mental Health Care Training**

23

32-23

- *All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.*

**Findings: Substantial Compliance**

Training rosters were provided indicating training for correctional staff regarding the Implementation Plan.

- *In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.*

**Findings: Substantial Compliance**

Training documentation was provided.

- *All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates, identifying warning signs specific to inmates, and how to recognize individuals who are in mental distress and/or suicidal.*

**Findings: Substantial Compliance**

Training documentation was provided.

- *Yearly custody staff will conduct a situational training such as a mock suicide attempt or a medical emergency. CFMG staff will also participate in the annual situational training.*

**Findings: Substantial Compliance**

     Training documentation was provided.


- *All medication nurses must be trained to recognize common side effects associated with use of psychotropic medications, and upon observing such side effects must document observation in the medical record and schedule the patient to see a medical provider at the next available sick call.  [CFMG Plan at 90]*

**Findings: Substantial Compliance**

     Training rosters were provided.


**14.      Restraint Chairs**

- *Physical restraint devices can only be used on inmates who display bizarre behavior that results in the destruction of property or reveals an intent to cause physical harm to others, and cannot be used when there are less restrictive alternatives.  [CFMG Plan at 47]*

- *Use of a restraint chair will be documented in an observation log which will be reviewed and signed by a supervisor. Inmates shall not be placed in a restraint chair for longer than six consecutive hours.*

**Findings: Substantial Compliance**

     There were four documented uses of WRAP or the restraint chair during the review period: three uses of WRAP and one incident of placement in the restraint chair.  Documentation indicated that the incidents of restraint were to prevent ongoing self-harm or danger to others and were appropriate. The use of restraint was documented in an observation log, and audits were conducted monthly by the Compliance Sergeant.  Audits indicated that placements were reviewed and signed by a supervisor.  No placement lasted for longer than six consecutive hours.

It should also be noted that incident reports documented the use of WRAP on at least two other occasions; however, it appeared that the WRAP was only used temporarily to transfer uncooperative inmates to the safety cell when it was subsequently removed.

- *Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A shift supervisor and medical staff shall oversee the exercise. If unsuccessful in allowing inmates to exercise their arms and hands in a range of motion exercise, safety staff shall explain on the observation log why extremities could not be exercised and a shift supervisor shall be notified.*

**Findings: Noncompliance**

Audits by the Compliance Sergeant indicated that two of the incidents of restraint chair or WRAP did not include the appropriate documentation of range of motion and or checking for placement of handcuffs.  After the initial incident in December 2020, the Sergeant appropriately provided additional training and guidelines for restraint use and placement.  The second incident occurred during April 2021; after that incident, the officer was provided with individual training and measures were implemented to provide ongoing training and reminders to staff, as it was noted that the incidents of restraint were few and staff required ongoing reminders and supervision regarding this issue.

Although a finding of noncompliance was made, the interventions undertaken by the Compliance Sergeant should assist the staff in addressing the omissions found and move to sustained compliance.

- *On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.*

**Findings: Substantial Compliance**

See above.  All incidents of restraint use were audited by the Compliance Sergeant.


**15.    Use of Force**

- *Medical and mental health staff shall be consulted before any planned use of force on an inmate. Custody staff in concert with medical staff will develop the most effective and appropriate means of imposing compliance with rules and regulation, including attempts at de-escalation. It is understood that it is the goal of custody staff to use the least amount of force necessary to ensure compliance with rules and regulations. Planned use of force will only be used after verbal attempts to obtain compliance.*

- *Any use of force will be documented on a use of force form.*

**Findings: Noncompliance**

Review of incident reports indicated that there was documentation that medical and mental health staff was consulted prior to most planned use of force incidents.  Additionally, there was documentation that custody staff routinely attempted to deescalate the situation and contacted their supervisors for assistance. One incident that occurred on October 1, 2020, appeared to be a planned use of force; however, the incident report only noted that medical staff was called and not mental health staff. An incident that occurred on December 27, 2020, lacked documentation that mental health staff was contacted; a patient was housed in a booking cell with agitation and refusal to get off the partition in his cell where he could harm himself.  A planned

27

use of force was implemented, and he was placed into a safety cell.  There was not documentation that mental health staff was contacted prior to this planned use of force.

Documentation in incident reports also noted that custody officers frequently declined to charge patients with known mental health concerns when their behaviors appeared related to their mental illness. This was a welcomed practice.

**16.    Mental Health Grants**

- *Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.*

**Findings: Substantial Compliance**

The 10-bed regional Jail Based Competency Treatment program (JBCT) was located in the C-Pod.  This unit will assist in addressing those inmates awaiting trial at the jail who have frequently been treatment resistant and unable to be transferred for inpatient stabilization.

Facility leadership reported that they were pursuing grants, including substance use, jail diversion, continuity of care and discharge planning related grants through the Substance Abuse and Mental Health Services Administration (SAMHSA) and Step Up Together.org.

**17.    Inmates Who Have Been Declared Incompetent to Stand Trial**

- *The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period. As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative*

28

*segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment. The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for orders to show cause to be directed the State of California) to expedite the transfer of inmates who have been determined to be incompetent to stand trial to an appropriate State facility.*

**Findings: Substantial Compliance**

This issue remained unchanged. Not all inmates who were declared incompetent were routinely placed into transition cells in administrative segregation and seen by medical staff daily upon a Court finding the inmate to be incompetent to stand trial. There was continued coordination between custody and mental health staff regarding timely notification when an inmate was found incompetent to stand trial. Mental health staff then determined appropriate housing. Placement into administrative segregation cells was determined by the inmate's ability to function in general population.  Additionally, inmates who were declared incompetent were discussed during the Multidisciplinary Treatment Meeting (MDTM). Mental health staff continued to contact the inmate's attorneys to begin the process of evaluation and eventual transfer to an inpatient unit for incompetence to stand trial.

Please also refer to the previous comments regarding plans for the JBCT.

The process that the facility developed for the identification, referral and monitoring of inmates who were considered or declared incompetent appeared to be adequate and sufficient to allow for a continued determination of substantial compliance.


18.    **Treatment Plans**

- *Qualified health services staff must develop a written individualized treatment plan for inmates requiring close medical and/or mental health supervision.  A treatment plan must*

*specify a particular course of treatment and shall be included in the plan portion of the*

*S.O.A.P. progress note.  The treatment plan shall reflect current problems or conditions*

*being followed.  The treatment plan shall include monitoring of the efficacy of treatment and*

*discharge planning. [CFMG Plan at 27, 75]*

- *Treatment plans shall include specific medical and/or psychiatric problems, nursing*

  *interventions, housing, dietary, medication, observation and monitoring, and follow-up*

  *referral and/or evaluation as appropriate.  [CFMG Plan at 27]*

- *Mental health providers must work with the Program Manager to designee to develop a*

  *treatment plan and meet the outpatient needs of inmates with mental illness, including*

  *opportunity for social interaction and participation in community activities.  If an inmate is*

  *unable to participate, the reason must be documented.   [CFMG Plan at 43, 75]*

- *CFMG will inform classification through medical treatment orders as to any classification*

  *issues an inmate has due to a mental illness. [County Plan at 11]*

**Findings: Noncompliance**

The documentation of treatment planning remained inadequate.  Patients with severe

mental illness, recurrent suicidal behavior and referral to NMC for stabilization were

reviewed, and the lack of adequate treatment planning continued. This was particularly

troubling for cases in which the patient required a higher level of care than could be

provided at MCJ; however, interventions to address problematic symptomatology such as

treatment nonadherence and self-injurious behaviors were not provided.

The weekly MDTM continued.  Minutes of these meetings indicated that there was

consistent attendance by mental health clinicians, medical, classification, and custody

supervisory staff. The expert attended this meeting remotely during the visit.  MDTM

documentation was reviewed.  This meeting continued to be a good forum to discuss inmates

with mental health and medical concerns, including inmates returning from state hospital, PC 1370 patients, inmates on suicide watch, referrals from classification, hospitalized patients, medication nonadherence and other important issues of concern.

There was documentation in the healthcare record that patients were discussed in MDTM. This information was available to staff who could not attend the MDTM.

Despite the importance of this meeting and the valuable information conveyed in a multidisciplinary forum, healthcare and MDTM records continued to lack appropriate documentation of individualized treatment and safety planning. A treatment plan form was noted in one of the healthcare records; however, documentation of actual treatment planning was inadequate. Greater efforts are necessary to provide adequate documentation of individualized treatment planning for each inmate receiving mental health services.

**19.    Consideration of Mental Illness in Inmate Discipline**

- *Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff are encouraged to contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness.*

**Findings: Noncompliance**

A sample of Disciplinary Action Reports (DARs) were reviewed. Some forms were completed in their entirety; however, many forms were not completed by checking boxes at the bottom of the form that noted whether the inmate received mental health services or if custody staff consulted with medical. Additionally, some forms included a box indicating whether mental illness impacted the discipline given; other forms did not include this option.

All incident reports during the monitoring period were reviewed. It should be noted that multiple examples were noted in which officers determined not to charge inmates for whom there

31

was a known mental health concern and for whom it appeared that their behavior was related to their mental illness.

Despite this welcomed and important observation, a finding of noncompliance is provided as appropriate documentation of this issue on the DARs has remained problematic.

## 20.     Space Issues

- *Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including . . .adequate clinical and administrative treatment space....*

**Findings: Substantial Compliance**

Dedicated office space was provided to the psychiatrist, and the remainder of the mental health staff shared an office in the infirmary area. These offices were not utilized for clinical encounters.

During this monitoring period, psychiatric clinical encounters occurred primarily at cell-front and remotely by phone or FaceTime; mental health clinicians saw patients in various settings throughout the jail that afforded confidentiality. Issues of confidentiality were noted regarding the provision of remote psychiatric clinical encounters.  Staff reported that the use of the new white noise machines for mental health interviews. They did not report issues with appropriate space for clinical encounters at the time of the monitoring visit.

## 21.     Administrative Segregation

32

- *The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation...*

- *The Mental Health Implementation Plan shall require classification to assess a totality of factors when assigning prisoners to administrative segregation units. It is understood that the goal of Defendants is to limit the use of administrative segregation for prisoners with serious mental illness.*

**Findings: Deferred**

The segregation units continued to primarily house mentally ill patients; however, better tracking was implemented regarding the placement of these individuals in segregation as well as the reasons for placement.  Segregation placements continued to be discussed in the MDTM.

As was previously stated, group therapy was not provided for segregation inmates, initially due to the COVID-19 pandemic precautions, and more recently due to the lack of adequate mental health staff to provide this service. Patients were provided with in-cell group therapy and other written materials. The supervisory staff indicated that group therapy would resume after the addition of the two new clinicians. Mental health clinicians saw their patients in confidential settings, except those housed in segregation who were seen at cell-front.

The facility also began tracking those patients who were treatment non-adherent. Some of these individuals were unable or unwilling to participate in group and individual therapy out of cell due to their decompensated state. Staff and inmates reported that in-cell materials, such as puzzles, work packets and materials for journaling, continued to be provided to these individuals. Healthcare records documented the offering of in-cell materials.

Despite the efforts to provide additional out of cell time and programming, these units remained segregation units primarily housing mentally ill individuals.  Efforts should continue to maximize out of cell time and programming.

As this is an important and ongoing issue of concern, a finding of compliance will be delayed pending on-site review and monitoring for sustainability.

- *Inmates with a serious mental illness who are housed in Administrative Segregation will be scheduled for a weekly appointment with a qualified mental health provider.*
- *Nursing staff shall conduct mental health rounds in Administrative Segregation daily, separate and apart from medication distribution.*

Findings: **Noncompliance**

Staff and inmate interviews as well as healthcare records reviews continued to document that segregation inmates were seen weekly by a qualified mental health provider; there appeared to be a brief lapse in contacts during January 2021.  Nursing rounds, however, were not always documented daily in segregation units, although improvement was noted.

- *Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior, Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal.*
- *Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.*

34

- *All welfare checks shall be documented on a welfare check log. The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance. Monthly spot checks for compliance will be conducted by the Compliance Sergeant at least weekly with monthly audits.*

**Findings: Substantial Compliance**

The Compliance Sergeant continued to audit welfare checks monthly.  Noted issues of concern resulted in notice and discipline when indicated.

Review of logs indicated timely documentation of custody welfare checks.

**22.    Suicide Prevention**

- *Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.*

**Findings: Deferred**

All cells in the administrative segregation units (A, B, R and S) were previously modified to remove potential tie-off opportunities and, fencing was in place on the upper level and stairway to prevent jumping and self-harm. Additionally, modifications were made to the windows in the administrative segregation cells to prevent ligature points.

The facility reported plans to modify cells in the following areas for improved suicide prevention; D, G, H, I and J pods. These units housed maximum security inmates or were COVID units. These modifications would include changing the vent grates and addressing other potential tie-off points.  These plans were welcomed and responsive to recommendations in the last monitoring report.

35

As these plans were not completed at the time of the visit, a finding of compliance will be deferred pending on-site review of the planned modifications.

- *A qualified mental health professional must perform a suicide risk assessment using the Suicide Risk Assessment Tool (attached as Exhibit G to Implementation Plan) in all the following circumstances: (1) if the RN identifies suicidality during the Initial Health Screen; (2) within 4 hours of placement in a safety cell and before release from a safety cell; (3) after placement in Administrative Segregation.  [CFMG Plan at 43, 72, 75]*

- *Whenever an inmate is placed in a safety cell due to suicide risk, CFMG shall immediately, and no later than within 4 hours, determine what level of suicide precautions are necessary and decide whether the inmate needs to be transferred to an inpatient mental health facility. If CFMG determines that more than 24 hours of suicide watch/precautions is necessary, CFMG shall work with custody to place the inmate in an inpatient mental health facility, the Outpatient Housing Unit, a receiving cell locating in the booking unit, or dorm A.  Whenever possible, the inmate will be transitioned from a safety cell to an open dormitory setting until the inmate has stabilized.  [CFMG Plan at 73, 75]*

- *Custody must transfer patients to NMC or another appropriate inpatient mental health facility if the patient has been housed in a safety cell for 24 consecutive hours or for more than 36 cumulative hours in any 3-day period. If exigent circumstances prevent such transfer, a memo must be written to the Custody Operations Manager.  [CFMG Plan at 73, 75]*

- *Once CFMG determines that an inmate is no longer suicidal, CFMG shall work with custody staff to place the inmate in the most appropriate setting.  Mental health clinicians must follow-up with the patient until a step-down plan is no longer necessary.  [CFMG Plan at 73]*

**Findings: Noncompliance**

The mental health staff utilized the Mental Health Initial Assessment and Suicide Watch Initial Assessment for MH and Suicide Watch Daily Assessment/Discharge for MH forms for initial assessment and removal of suicide precautions.  They also utilized the Columbia Suicide Severity Rating Scale (CSSRS) for the assessment of suicide risk.

There was documentation that inmates were timely placed on suicide precautions upon safety cell placement.  There was also documentation of the determination of suicide risk by a suicide risk instrument, as previously noted. There was at least one lapse in timely removal of an inmate from the safety cell. Patients were seen for post-suicide follow-up consistently.

Healthcare records reviews frequently documented the rationale for discontinuation of suicide monitoring as the denial of suicidality and engagement in safety planning. The issue of adequate assessment of suicide risk was discussed with Wellpath headquarters staff, and further discussions are required. They also reported that Wellpath headquarters consultation was also being provided to MCJ mental health clinicians, which was a positive support for the staff at the facility.

Healthcare records also frequently referenced the discussion of a safety plan with the patient prior to discontinuation of suicide monitoring; however, the actual safety plans were not located in the healthcare record for review and assessment of the adequacy of safety planning.

Improved documentation and additional training regarding suicide risk assessment and safety planning is indicated.

Please refer to recommendation #17 on page 46 of this report for specific areas of consideration regarding suicide risk assessment and prevention.

- *Custody must conduct welfare checks of patients on suicide watch/precaution twice every 30 minutes.  Health services staff must conduct welfare checks every 6 hours.  Mental health staff must conduct welfare checks once per shift.  The checks must be documented in the appropriate log (sobering/suicide watch/safety cell/restraints log).  The inmate may not have access to materials that could be used to inflict harm on his/her self or others, and may be dressed in an approved safety garment if necessary.  [CFMG Plan at 74, 76]*

**Findings: Noncompliance**

Timely custody welfare checks for suicide monitoring were documented.  Mental health contacts were documented daily, and usually not once per shift.  Patients were not allowed materials for which they could harm themselves, and safety garments were provided when clinically indicated.

- *The CFMG Program Manager and the Facility Manager shall have joint responsibility to report completed suicides in accordance with CFMG Inmate Deaths Policy and Procedure. [CFMG Plan at 76]*
- *The CFMG Program Manager or nursing staff on duty shall report all potential and/or attempted and completed suicides to the Facility Manager or Shift Supervisor.  CFMG management will be notified of any completed suicides within one working day.  Family members must be notified in accordance with the CFMG Notification of Next of Kin Policy and Procedure.  CFMG Plan at 76-77.*

**Findings: Deferred**

Additional information is needed prior to determination regarding compliance of this issue.

**23.      Increase in Time Outside of Cell and/or Increasing Programs**

- *Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:*

  - *3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)*

  - *14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time*

  - *2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail) ii. Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking and receiving area will be guaranteed the following weekly times out of their cell:*

  - *3 hours a week for exercise*

  - *14 hours a week in the common area*

  - *inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services,*

**Findings: Noncompliance**

  The provision of out of cell activities was negatively affected due to the COVID-19 pandemic.  Furthermore, mental health staffing issues resulted in the temporary discontinuation of group therapy for segregated patients.  Patients were provided with in-cell group therapy materials from mental health clinicians weekly.  Wellpath supervisory staff reported that plans were underway to resume groups after the hiring of two additional mental health clinicians.

39

Additionally, segregated patients were offered in-cell materials by the Programs department. Dedicated custody program staff rounded weekly in the segregation units and worked with patients using journaling and assisted in socialization skills and hygiene issues.  Patients interviewed reported benefit from these materials and interventions. Healthcare record also documented the provision of these materials from mental health clinicians.

The monitor reviewed some of the materials provided by the Program department and by mental health clinicians, and these materials appeared appropriate and therapeutic.

Audits were conducted by the Compliance Sergeant regarding the provision of out of cell time for segregated patients.  The audits indicated mixed results; some patients were offered greater than the required out of cell time, while some were not offered the required time out of cell. Documentation by the Compliance Sergeant indicated consistent monthly auditing of out of cell activities provided for inmates housed in the segregation units.

Information regarding patients who refused out of cell activities was forwarded to Wellpath to identify those patients requiring further clinical interventions.

## 24.   Telepsychiatry

- *The telepsychiatrist must obtain informed consent and explain all medications before prescribing.  [CFMG Plan at 45]*

- *The policies contain numerous provisions regulating the use of telepsychiatry at the jail, including requiring that a psychiatric nurse be present during telepsychiatry encounters where the patient is in a safety cell as well as requiring a local assessment by a physician or mid-level provider within 24 hours of an initial assessment that is conducted by telepsychiatry. [Dkts. 622 and 632].*

**Findings: Noncompliance**

Psychiatric contacts occurred by telepsychiatry, specifically by FaceTime during the monitoring period. The telepsychiatrist was assisted by a telepsychiatry assistant who was a mental health clerk.  Approximately 15 patients were scheduled daily to see the psychiatrist, and the assistant would have the patient sign the informed consent form. The informed consent forms were reviewed in the healthcare record.  The forms were frequently not completed in entirety, at times not including the medication for which informed consent was obtained. Such frequent omissions brought into question if actual informed consent was obtained.

There was a lack of documentation that a qualified, trained medical clinician was in attendance to assist the telepsychiatrist and that the inmate was seen by a physician or mid-level provider within 24 hours of initial psychiatric assessment. There was no documentation of the completion of AIMS examinations for patients prescribed antipsychotic medications.

Staff reported that a nurse was present during telepsychiatry contacts for inmates in the safety cell; however, the nurse was not a psychiatric nurse.

There were also issues of concern regarding the provision of involuntary/emergency medications by telepsychiatry that were previously reported.

### 25.    Medical Records

- *Each inmate's medical record shall contain (as applicable):*

  - *The completed Receiving Screening form*
  - *Health Inventory/Communicable Disease Screening forms*
  - *Problem list*
  - *All findings, diagnosis, treatments, dispositions*
  - *Prescribed medications and their administration*
  - *Laboratory, x-ray and diagnostic studies*
  - *Consent and Refusal forms*
  - *Release of Information forms*

41

- *Place and date of health encounters (time, when pertinent)*
- *Health service reports (i.e., dental, psychiatric, and other consultations)*
- *Hospital Discharge Summaries*
- *Jail Medical Record Summaries (transfer forms)*
- *Individual treatment plan [CFMG Plan at 114]*

**Findings: Noncompliance**

Healthcare records included the required items, except for the individual treatment plan.

When noted in the healthcare record, the treatment plan form did not include the necessary

documentation.

**26.    Quality Management**

- *Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit Findings: will be reported to the Quality Management Committee at its quarterly meetings.*

- *All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met.*

- *All completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure.*

- *The Quality Management Committee shall evaluate appropriateness of every case of involuntary psychotropic medication administration, including treatment, process, and whether psychiatric emergency criteria were met.  [CFMG Plan at 98]*

**Findings: Noncompliance**

This was an area of ongoing improvement.  Quality assurance audits and meeting minutes were provided by Wellpath and reviewed; the documents indicated quality assurance review of various topics. Most of these topics were not specific for mental health concerns.

The monitor was provided with some, but not all mortality reviews for completed suicides that occurred at MCJ.

No documentation was provided that all cases involving the need for involuntary psychiatric medication administration were reviewed by the Quality Management Committee.

Documentation that all completed suicides were subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure was lacking.

**27.    Corrective Action Plans (CAP)**

- *Defendants' implementation of a policy requires that there are corrective action measures to address lapses in application of the policy.*
- *Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame.*

**Findings: Noncompliance**

The County and Wellpath have worked with the monitor to develop a combined CAP to address identified deficiencies, including re-audits.  Despite these efforts, the CAP has to date not been fully implemented. Various areas included in the CAP remained noncompliant; including intake screening, sick call, chronic care, safety and sobering cells, discharge, restraint chairs,

treatment plans, and consideration of mental illness in intake discipline. The next monitoring report should include review of the implementation of the corrective action plan.

**Summary and Recommendations**

Since the last monitoring visit, MCJ continued to attempt to provide mental health services with the ongoing challenges presented by the COVID-19 pandemic.  Mental health staffing limitations further worsened the provision of mental health services at the facility. Additionally, three completed suicides occurred.  These challenges resulted in negative impacts on staff morale, increased workloads and difficulty in providing needed treatment.  The monitor again would like to commend the staff at the facility who worked hard to provide services under these circumstances.

To help to address these difficulties, Wellpath supervisory staff reported that plans were underway to increase the number of mental health clinicians to four.  Group therapy for segregation patients, which had been discontinued due to limited staffing, also reportedly will resume with the hiring of new staff.  Supervisory staff also reported plans to modify cells in the maximum custody and COVID units to address possible tie-off points for suicide prevention.

It is also hopeful that the development and implementation of the corrective action plan will assist the facility in prioritization and focus on areas of needed improvement.

Lastly, discussion with the medical monitor, review of healthcare records and discussions with MCJ staff indicate the need for greater collaboration and coordination between medical and mental health departments.  Many of the patients treated by mental health are also treated by medical, and a more formal process was indicated for the discussion between the two

44

departments when consultation is needed.  The MDTM does include discussion of both medical and mental health patients; however, greater collaboration and coordination is necessary.

The following are recommendations to address the issues of concern identified in this report.

1. Wellpath should ensure that patients prescribed psychotropic medications are seen timely by the psychiatrist for follow-up appointments.

2. Wellpath should ensure that a psychiatric RN or psychiatrist visits with patients housed in holding and isolation cells on Monday, Wednesday and Friday.

3. The County and Wellpath should continue to work to obtain inpatient care for mentally ill patients in need of such services.

4. Wellpath should ensure that at every 90-day chronic care appointment the psychiatrist

   - assesses the patient's current medications, complaints, and compliance with treatment plan.

   - examines vital signs and weight

   - assesses the patient's diagnosis, degree of control, compliance with treatment plan and clinical status as compared to prior visits.

   - conducts lab and diagnostic tests as necessary, develop strategies to improve outcomes if the condition has worsened, educate the patient, and refer to MD or specialist, and/or conduct discharge planning as necessary.

Additionally, AIMS examinations should be conducted as recommended for patients prescribed antipsychotic medications. There should also be better documentation of treatment interventions for those patients who are treatment resistant or decompensating.

5. Wellpath should ensure that patients requiring psychiatric assessment and follow-up are referred for psychiatric assessment and treatment.

6. The County should ensure that patients do not remain in the sobering cells for greater than 24 consecutive hours prior to transfer to an inpatient setting or other housing location.

7. Wellpath should ensure that psychiatrists order new psychotropic medications for 30 days and that they are scheduled for psychiatric follow-up prior to medication expiration.

8. Wellpath should ensure that the provision of emergency orders and telepsychiatry are consistent with policy and agreed upon guidelines.

9. Wellpath should ensure that actual informed consent is obtained and appropriately documented in the healthcare record for those patients prescribed psychotropic medications.

10. Wellpath should ensure that sufficient mental health staffing is in place for the provision of mental health services.

11. The County and Wellpath should resume group therapy in the segregation units as soon as possible.

12. The County and Wellpath should address issues of confidentiality during remote telepsychiatry sessions.

13. The County should continue to work to better document range of motion and placement of handcuffs for patients in WRAP or the restraint chair.

14. Wellpath should ensure that individualized treatment planning is developed and documented in the healthcare record.

15. The County should consider changing the DARs to ensure that all forms contain options for custody staff to note whether the patient received mental health services, whether medical was consulted and whether mental illness impacted the discipline given. The placement of these questions at the bottom of the form may result in these items not always being completed and changing the format of the forms should be considered.

16. Wellpath should ensure that nursing segregation rounds occur and are documented daily.

17. Wellpath should continue to review the process for suicide risk assessment and the discontinuation of suicide watch. Consideration should be given for implementation of the following:

   - Implementation of a five-day follow-up procedure for those discharged from suicide watch.

   - Implementation of a high-risk list for those at increased risk for suicide.

   - Consideration of a step-down housing location after suicide monitoring.

   - Additional training regarding suicide risk assessment and documentation.

   - Better documentation of safety planning

18. Wellpath should ensure that mental health staff conduct welfare checks once per shift for patients on suicide watch/precaution.

19. The County and Wellpath should ensure that segregation inmates are provided with the necessary out of cell time and programming.

20. Wellpath should ensure that quality assurance measures are documented and provided to the monitor. Quality assurance measures should include review of cases involving the

need for involuntary psychiatric medication administration by the Quality Management Committee.

21. Wellpath should ensure that all completed suicides are subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure and provided to the monitor.

22. The facility should continue to work to obtain access to timely inpatient psychiatric care for all jail inmates in need of such services, and to ensure that referrals for psychiatric inpatient care are made.

23. Wellpath and the County should work to implement the Mental Health CAP, including provision of verification methods and updated status reports.

Please contact me should you have any questions regarding this report.

Respectfully submitted,

X *Kerry C. Hughes, M.D.*

Kerry  C. Hughes, M.D.

Mental Health Monitor

Kerry C. Hughes, M.D.
1579 Monroe Dr., Suite F, Box 612
Atlanta, GA 30324
Phone: ██████████

Fax: 404-364-9708
Email: dockc99@aol.com

# Exhibit 33

**Monterey County Jail (MCJ) Mental Health Monitoring Visit**
**Healthcare Records Reviews**
**Kerry Hughes, M.D.**
**May 2021**

**Patient 1**

This patient received his Receiving Screening upon entry to the MCJ on October 29, 2020. The screening indicated that Spanish was his primary language; however, no interpreter was utilized. He was described as dirty and disheveled with paint and dirt on his hands and face. He reported daily alcohol use with no withdrawal symptoms. He denied mental health symptoms or past treatment. He was placed on The Clinical Institute Withdrawal Assessment for Alcohol (CIWA) monitoring with a recommendation for general population housing. He was prescribed Librium for possible alcohol withdrawal. He was evaluated by the physician assistant (PA) for CIWA follow-up at the end of his medication protocol by chart review; the note indicated that he was not seen in sick call to minimize contacts during the pandemic and as he was checked three times daily with multiple medication passes.  He was reportedly stable with follow-up as needed.

He was seen by the licensed marriage and family therapist (LMFT) on January 31, 2021, in response to a request due to complaint of anxiety and insomnia.  At that evaluation, he denied a history of mental health treatment; however, he reported daily alcohol use for five years.  He denied suicidality.  He was provided with a diagnosis of Alcohol Abuse and provided education regarding anxiety and sleep hygiene; he was also instructed to request to see mental health if no improvement in several weeks. An interpreter was not utilized.

The patient was re-incarcerated at MCJ and received the Receiving Screening upon entry to the jail on March 28, 2021; the screening noted his previous history of incarceration at the MCJ. The screening indicated that Spanish was the primary language, and an interpreter was utilized. The screening was remarkable for denial of past attempted suicide, substance use, or mental health treatment.  He was cleared for housing in general population with no referral indicated.

The Initial Health History was completed on the following day; this examination was negative for physical or mental health concerns.

The patient submitted an inmate request on April 13, 2021, and he was seen by the licensed clinical social worker (LCSW) on April 17, 2021, due to complaints of depression and anxiety. He reported that he was unsure how long he would remain in jail, and he felt as if "someone is after me, please help". The LCSW indicated that he was assisted in anxiety management. Follow-up was ordered in 30 days. The LCSW noted that the session was conducted in Spanish by the provider.

It also appeared that the patient submitted an additional sick call request on April 24, 2021, with the same complaints that he was seen for on April 17, 2021; this request was closed as it was noted that he had been seen for the complaint.

Findings

Although the overall care provided to this patient appeared to be adequate; issues of concern were noted.

There was inconsistent usage of a Spanish language interpreter.  Several staff noted that Spanish was the patient's primary language, and interpreters were utilized for some, but not all clinical encounters. The healthcare record included a flag that an interpreter was needed for this patient.

Additionally, this patient was seen at his request by a mental health clinician with report of depression, insomnia and anxiety.  He was provided with assistance in "anxiety management" and scheduled for follow-up in 30 days.  This was concerning; as although the patient was provided with a diagnosis of Alcohol Abuse, the symptoms that he reported were also consistent with a mood disorder for which psychiatric assessment and possible treatment with psychotropic medications may have been indicated.  He should have been referred for psychiatric assessment, and there was no documentation that this occurred.  It appeared that he may have been released from the jail prior to his follow-up mental health appointment.


**Patient 2**

This patient's healthcare record was reviewed as he died by suicide while incarcerated at the MCJ on August 5, 2021.

This patient received his Receiving Screening upon entry to the MCJ on June 18, 2021. The screening indicated that he had been transferred from Valley State Prison (VSP) and that he had been in custody since March 24, 2016. The screening also noted his history of treatment at the state hospital prior to arrival within the past three days, due to possible overdose; additionally, it also noted that he had a diagnosis of "AKI" (acute kidney injury?) with persistent hypotension. Although noting the recent possible overdose, the subsequent question whether he attempted suicide in the past was marked "no". If this had been marked correctly as yes, he would have been urgently referred to mental health, and an alert would automatically be generated for suicide history. Despite this history, the screener indicated no current or past mental health diagnosis; a positive response would have automatically generated an alert for Mental Health Patient. No mental health medications were noted.  Current or past outpatient treatment for mental health or psychiatric issues, past psychiatric hospitalizations, thoughts of self-harm and other suicide screening questions were all also marked "no". He was cleared for general population housing.  Despite these screening documentation errors, he was referred for an urgent mental health referral on the following day.

It appeared that the patient was placed into the safety cell after intake "as a single" on June 18, 2021 at 1858. He was seen by a mental health clinician on the day of arrival at 2028 for evaluation. He was subsequently moved to booking cell 7. The patient was seen on June 19 and June 20, 2021, for mental health follow-up.

The patient was seen by a mental health clinician on June 21, 2021, for initial mental health assessment.  The clinician noted that he had been denied parole after serving 12 years, was "possible SVP" (sexually violent predator?), recent transfer from VSP with a suspected suicide attempt per medical staff from different facility, but the patient denied that this was a suicide attempt.  He was primarily concerned with receiving his property from CDCR, and he reportedly denied suicidal ideation. He had continued feelings of being overwhelmed with concern about his transfer to jail and possible return to prison. The clinician indicated that daily mental status examinations would occur as the patient was high risk and depressed.

The patient was seen for daily follow-up on June 22, June 23, and June 24, 2021.  At these encounters, he variably was cooperative and engaging with concerns regarding his property and institutional concerns; however, at other times he did not engage with the clinician.  There was no documentation of an assessment of suicide risk since his jail arrival.

The patient was seen for the Mental Health Initial Assessment on June 26, 2021, eight days after his jail arrival. The clinician noted that the patient was disappointed that he was denied parole, with worry, anxiety and stress regarding his court case. The assessment indicated that there was no history of outpatient psychiatric treatment, medications or psychiatric hospitalizations. He did express concerns regarding his ability to cope while incarcerated. Information regarding substance use and treatment was not completed for the assessment. Suicide risk factors of a high-profile crime with new legal issues, segregation status, anxiety/agitation or fearfulness of safety and negative visit/phone call/recent bad new were all noted in the assessment. He was provided with a diagnosis of Adjustment Disorder with mixed anxiety and depression, and follow-up was ordered for five days.  He was not referred to see the psychiatrist at his request. Although the patient requested a single cell due to his crime, the clinician indicated that this was not indicated due to his risk factors.

He was seen on June 29, 2021 by a mental health clinician when it was noted that he denied suicidality. He reportedly had anxiety regarding his housing with cell mates due to his offense. Follow-up was ordered for one week. The follow-up appointment on July 6, 2021 was uneventful, with the exception of a notation that the patient denied suicidality, but endorsed homicidality.  There was no documentation that this issue was addressed by the clinician.  The clinician indicated that follow-up would occur in one week or in two weeks if stable; however, it was unclear how this level of stability would be determined. This statement appeared to be a recommendation for subsequent mental health follow-up.

The patient was seen on July 13, 2021, by a mental health clinician when he reported continued stress regarding his court proceedings. He was next seen on July 27, 2021, for a scheduled follow-up appointment.  At that time, he refused a confidential appointment, and he was seen at cell-front. He reported that he was "mentally in a good state".  Follow-up was scheduled for 30 days.

The patient was seen by medical staff for a chronic care visit on July 15, 2021; this assessment was unremarkable. He was prescribed carbamazepine for a seizure disorder.

On August 5, 2021, at approximately 0013, the patient was found in his cell hanging from blankets.  He was cut down and placed on the floor.  He was unresponsive to verbal and physical stimuli.  CPR was initiated, and he was transferred by ambulance to NMC ER. He was pronounced dead at NMC on August 5, 2021. The healthcare records from NMC were provided and reviewed.

Findings

The mental health care provided to this individual appeared to be inadequate. As a result of the issues of concern noted, this death appeared to be preventable.

The Mental Health Initial Assessment was not appropriately completed.

Of concern was the lack of appropriate assessment for suicide risk.  This patient had significant and alarming risk factors for suicide which were previously noted; however, the reviewer determined that his suicide risk did not merit suicide monitoring, more frequent follow-up or psychiatric assessment.

A collaborative safety plan was reported by several mental health clinicians for this patient; however, no documentation of such safety plan was located in the healthcare record to determine the adequacy of such plan.

No treatment plan was located for this patient. Due to concerns regarding suicide, adequate treatment and safety planning were critical.

Problems were noted with the initial screening upon arrival at the jail. The Receiving Screening was completed erroneously, not appropriately documenting information regarding a recent psychiatric hospitalization for possible overdose.  The correct documentation regarding screening questions would have led to an emergent mental health referral; however, the patient was seen by a mental health clinician emergently the evening of intake. Despite this, an urgent referral was submitted to mental health for evaluation on the following day.

Mental health clinicians did appropriately see the patient after initial screening, and he was seen daily due to concerns that he posed high risk for suicide.

The patient was seen for initial mental health assessment, which included a suicide risk assessment, eight days after arrival.  Considering the patient's history of recent state hospital treatment for possible overdose and high suicide risk factors, a more timely assessment of suicide risk was indicated. Although the patient declined psychiatric assessment, he should have been referred to see the psychiatrist despite his declination. The clinician appropriately recommended that he not be single celled due to his suicide risk factors.

It did appear that recent treatment information from CDCR was obtained and/or reviewed for this patient.

There was documentation that mental health clinical contacts occurred in a confidential setting.

There was documentation that this patient was appropriately discussed in the MDTM on June 22 and June 29, 2021, with recommendations for continued daily monitoring.

No mortality and morbidity report was provided for this patient.


**Patient 3**

This patient's healthcare record was reviewed as he died by suicide while incarcerated at the MCJ on March 19, 2021.

He was provided with a diagnosis of Schizoaffective Disorder, bipolar type.  At the time of his death, he was prescribed hydroxyzine, lithium, sertraline, Zyprexa and mirtazapine. He had a significant history of mental health treatment, as well as a history of recurrent suicidal ideation and attempts.

This patient had a history of incarcerations at MCJ, including observation on suicide watch during September 2020.  He was last incarcerated at MCJ on February 16, 2021. At the time of intake, he was reportedly agitated and yelling; at 1400, he was placed on Level 2 suicide watch due to danger to self.  He was described as combative at that time.

On February 18, 2021, he refused the receiving screening process. A note by the nurse practitioner indicated that the patient had a gun shot wound to his left leg with a fracture of the left fibula that occurred the month prior.

Documentation indicated that the patient remained on Level 2 suicide watch intermittently from February 16, 2021 to February 25, 2021. Suicide Watch Initial Assessments for Mental Health were completed on February 16, February 20, February 24, March 12 and March 13, 2021. Most assessments noted intermediate suicide risk and the need for ongoing suicide monitoring, followed subsequently with decrease to low risk and discontinuation of suicide watch. Although the patient remained symptomatic with impulsivity, mood instability and little change in risk factors, suicide watch was frequently discontinued.

The patient was placed into the safety cell and ultimately transferred to NMC ER after jumping from a concrete platform in his cell, attempting to hang himself and threatening to drown himself on February 25, 2021. It appeared that the patient was hospitalized at NMC MHU until March 8, 2021, when he returned to the MCJ.  There was documentation that the patient attempted to hang himself while at the hospital when informed that he would return to the jail; he was retained at the hospital for further treatment. He was seen by a mental health clinician on March 9; he reported that he remained with suicidal ideation and showed the clinician a sheet tied to his light which was removed by custody staff.

The patient was again placed on Level 2 suicide watch on March 11, 2021 at 2303 after he reported suicidal ideation.

He was again transferred to NMC ER for crisis evaluation at approximately 0128 on March 13, 2021, as he had been housed in a safety cell and refused to move to a booking cell. He reportedly refused treatment at the hospital, and he returned to the jail with recommendation to continue suicide watch precaution on the same day at 0447. He was seen by a mental health clinician upon his return to the jail when he remained with suicidal ideation.  The clinician indicated that collaborative safety planning was conducted at that time. Suicide watch was discontinued at that time with referral to psychiatry.

The patient was found hanging in his cell later that day, and he was sent by ambulance to NMC ER at 1430.  On March 19, 2021, MCJ was informed that the patient had died on that date.

The incident reports for this patient were reviewed.  On February 16, 2021, an incident report was completed after the patient turned himself in to the MCJ; he was accompanied by his mother. At that time, he was intoxicated and was arrested in the lobby of the jail where he had also brought alcohol. He had reportedly been recently released from inpatient psychiatric treatment; and reportedly, his mother was unable to handle his substance use and mental health instability.  The second incident report was dated March 13, 2021, when he was found hanging in his cell after a suicide attempt; he had tied a ligature to the vent in his cell in G Pod. He was cut down by custody staff, and medical staff promptly initiated CPR. He was taken to NMC by ambulance when he was pronounced dead on March 19, 2021.

Regarding psychiatric contacts, there was documentation that the patient was scheduled for psychiatric appointment on February 17, 2021, the healthcare record indicated that the patient was seen by FaceTime and that the appointment was completed. He was provided with a diagnosis of Adjustment Disorder and restarted on Zoloft and hydroxyzine. He was scheduled for follow-up on February 22, 2021, when he presented with psychotic delusional thinking; however, the psychiatrist indicated that the patient refused to meet with him.

The Suicide Prevention Report for this patient authored by the MCJ Commander was provided and reviewed. The report indicated that all policies and procedures from a custody standpoint were followed, and all welfare checks were conducted.  The report indicated that going forward, staff would be directed to house anyone released from suicide watch but requiring quarantine to be placed in the M and N blocks in the new jail addition which included more suicide resistant features in the cells.

The Wellpath Mortality & Morbidity Report and Review was provided for review. The date of the review meeting was May 12, 2021, and in attendance were the Health Services Administrator, Commanders, Programs Director and Captain. The documentation provided indicated that there were concerns regarding the clinical provision of care, specifically that the patient was cleared from level 2 suicide watch and rehoused to a single cell so quickly after returning from crisis evaluation at NMC where he refused care. It noted that applicable policies and procedures were followed; however, indicated that there was a "gap in policy for this kind of a situation, needs to create procedure to protect patients in this particular situation." They were unable to make judgements regarding the clinician's interpretation of the information obtained which may have been a contributing factor; they also noted that improvement could be made in

the process of immediate housing in single cell after clearance from level 2 in high-risk situations and noted that it was unknown if this was communicated to staff.

Findings

The mental health care provided to this individual appeared to be inadequate. As a result of the issues of concern noted, this death appeared to be preventable.

This case illustrated the ongoing and significant issue of the lack of adequate access to inpatient treatment for those inmates who require mental health services that are unavailable at the MCJ. The patient was followed consistently by mental health clinicians at the jail, and he was transferred to NMC on several occasions due to ongoing suicidal ideation.  He was appropriately hospitalized at the NMC MHU for approximately 12 to 13 days; however, he remained with suicidality upon return to the jail, and he required re-evaluation at the NMC ER several days later.  Although appropriately admitted for inpatient psychiatric treatment, it appeared that he required additional inpatient treatment for stabilization.

Although suicide assessments documented similar protective and risk factors for suicide, and risk assessments noted suicide risk that varied from low to intermediate; suicide watch was discontinued, only to resume shortly thereafter due to suicidal ideation or behavior.  Rationale for discontinuation included that the patient engaged in safety planning, cited reasons for living and denial of suicidal ideation. He was last discontinued from suicide watch on March 13, 2021. It was unclear what factors led to a determination that the patient's suicide risk had changed from previous assessments.  As has been noted in other cases, the assessment of suicide risk and resulting placement, continuation or discontinuation of suicide monitoring should be reviewed and modified accordingly.  A step-down plan with more frequent monitoring, appropriate suicide risk assessment and observation after discontinuation of suicide watch was also indicated.

Documentation indicated that safety planning occurred for this patient; however, no documentation of safety planning was located to assess the adequacy of such planning.

Despite the frequent placements on suicide monitoring, after discontinuation, he was followed consistently and daily by mental health clinicians every shift while the patient was housed in the safety cell.

There was documentation that this patient was appropriately discussed in the MDTM; details regarding that discussion were not provided. Documentation of appropriate treatment planning was also lacking; treatment planning was particularly critical for this patient with recurrent suicidality.

The lack of psychiatric contacts and follow-up was concerning for this patient with a known history of psychotic symptoms, inpatient treatment and suicidality.  Documentation indicated that he was only seen once during his last incarceration when he was provided with a diagnosis of Adjustment Disorder.

**Patient 4**

This patient's healthcare record was reviewed as he died by suicide while incarcerated at the MCJ on June 6, 2021.

This patient received his Receiving Screening upon entry to the MCJ on May 30, 2021. The screening was remarkable in that the patient appeared acutely intoxicated at the time of screening; the screening was negative for mental health concerns or suicidality. He was cleared for housing in general population, and no mental health referral was indicated.

On June 2, 2021, the patient was seen by a mental health clinician for an initial evaluation; the clinician noted that the patient was in jail on a murder charge which was in the news. He was initially cooperative to interview; however, when she asked about his veteran status, he discontinued the interview. The clinician reported that prior to his discontinuation of the interview, he denied a history of mental health treatment, suicide attempts, suicidal ideation or drug and alcohol use. He was an Army veteran, and this was his first incarceration. He was not provided with a mental health diagnosis and was instructed on submitting a sick call slip to mental health as needed. He was also provided with paper and other activities by the clinician.

On June 7, 2021, staff arrived on M Block cell #114 where the patient had hung himself. He was cut down by custody, removed from the cell. CPR had been initiated by custody staff in the cell. No pulse or breathing was noted, and he was pale with blue lips. He was transported to NMC ER at 2240 where he was pronounced deceased.

The Wellpath Mortality & Morbidity Report and Review was provided for review. The date of the review meeting was July 14, 2021, and in attendance were the Health Services Administrator, Commanders, Programs Manager and Captain. The documentation provided indicated that there were no concerns regarding the clinical provision of care, that applicable policies and procedures were followed, and that the care was safe, timely, effective, efficient and equitable. It also noted that the emergency response was appropriate.

Findings

This patient was appropriately seen for initial evaluation by mental health due to the high-profile nature of his charges. He did not cooperate with the completion of the evaluation; however, there was not evidence of the need for ongoing mental health treatment, and he was instructed regarding access to mental health services. This suicide did not appear foreseeable or preventable.

**Patient 5**

This patient received his Receiving Screening upon entry to the MCJ on April 29, 2021. The screening noted that the patient had transferred from High Desert State Prison. Information from CDCR did not indicate a history of mental health treatment or medications. He denied past suicide attempts at the time of screening, mental health medications or treatment or substance

abuse issues.  His screening was negative for mental health concerns, and he was cleared for general population housing with a routine medical referral in five or more days due to blood pressure concerns.  It appeared that the patient was housed in "lockdown/iso men's holding".

This patient was not prescribed psychotropic medications during his MCJ incarceration.

An initial chronic care visit on June 3, 2021, for evaluation of hypertension was completed.

Nursing segregation rounds were reviewed; there was documentation of daily rounding with the exception of June 19, 2021.

Mental health unit rounds were reviewed; there was documentation of weekly mental health rounds in segregation.

Findings

There was documentation that prior CDCR and Natividad Medical Center healthcare records were obtained.

There was documentation of weekly mental health rounding in segregation/Men's Holding with the provision of in-cell activities as indicated. Although rounding documentation indicated that the patient had access to the dayroom, there was not documentation of other out of cell activities, such as group therapy. Otherwise, there was no indication that this patient required additional mental health services, treatment or psychiatric referral.

There appeared to be a one-day lapse in the documentation of daily nursing segregation rounds.


**Patient 6**

It appeared that this patient was sent to NMC ER for jail clearance on February 6, 2020, due to complaints of left sided numbness.  Upon return to MCJ, the nurse stated that the NMC doctor reported that the patient was malingering and had a history of such behavior at NMC.  He was also noted to be under the influence of substances.

The Receiving Screening was attempted on February 6, 2020; however, the patient refused to cooperate with verbally abusive language and combativeness.  He was described as delusional and paranoid, and the nurse indicated that he appeared to be under the influence of substances; however, he refused to provide a urine sample. Additional documentation indicated that he was placed into a sobering cell on the day of MCJ arrival, and he presented with combative behavior. A referral to mental health was submitted.

The Receiving Screening was completed on the following day which noted a prior incarceration at MCJ approximately one year prior. At that time, he was described as disheveled and dirty; the screening was notable for daily use of cannabis, concern regarding loss of job and relationship,

and concerns regarding ability to cope with stress. The Receiving Screening indicated that the patient was cleared for general population housing.

Documentation indicated that the patient was cleared from the sobering cell on February 7, 2020 at 1306.

It did appear that he was referred to mental health at the time of intake, and he was seen on the on February 9, 2020 by the mental health clinician due to report of paranoia, delusional thinking and rapid, pressured speech. At that time, he remained in receiving awaiting housing in MHO. He refused interview with the mental health clinician; and the clinician noted that he would be housed in MHO with attempted re-assessment in two days. He refused the follow-up appointment on February 12, 2020, as well as several group therapy sessions in MHO. He also refused a subsequent appointment on March 15, 2020. Documentation indicated that group therapy was consistently offered, but the patient refused to attend groups or to accept written materials. He did attend group on June 17, 2020; beginning on August 14, 2020, there was documentation that the patient generally attended groups and accepted written materials with some few exceptions.

The patient was seen by a mental health clinician on December 21 and 19, 2020 when he was provided with group therapy information; documentation indicated that this appeared to be conducted in a group therapy format.

A note by the mental health clinician indicated that the patient was discussed in the MDTM.

This patient was not prescribed psychotropic medications, and there was no documentation of psychiatric contact during this incarceration.

Findings

Although outside the monitoring period, it was noted that the initial Receiving Screening performed on February 7, 2020 did not to accurately document significant recent observations and mental health symptomatology. No referral to mental health or segregated housing placement was documented on the Receiving Screening.  Despite this omission, the patient was appropriately referred to mental health for assessment and housed in MHO due to his presentation.

There was documentation of the provision of group therapy in MHO; however, it appeared that this occurred at cell-front.  He was also appropriately provided with in-cell group therapy materials, puzzles and art materials.

There was documentation that jail staff requested past medical records from prior treatment settings.

Lapses were noted in the documentation of daily segregation rounds.  There was also a lapse in the documentation of weekly mental health rounds in segregation between December 1, 2020 and January 18, 2021.

**Patient 7**

This patient's healthcare record was reviewed to evaluate the mental health care provided in segregation during the review period.  Based upon review of the record, it was unclear when this patient first arrived at MCJ; however, it appeared that he was incarcerated at MCJ since 2018.

Documentation indicated that the patient was housed in MHO due to recurrent violent behavior in other housing units.

The patient was placed on suicide watch level 2 on October 12, 2020 at his request as he stated that he had a "bad feeling". A Suicide Watch Initial Assessment for MH was completed at that time by the mental health clinician who reported that the safety plan was reviewed and provided to the patient. He was assessed with low risk, and he was removed from watch on the day of assessment.

On October 18, 2020, the patient had a suicide attempt by hanging; the mental health clinician reported that the video of the incident indicated that he tied a sheet around his neck and his chair and leaned forward.  After several minutes, he removed the sheet and informed custody that he was suicidal.  He was subsequently placed into a safety cell on suicide precautions after medical evaluation at NMC. A Suicide Watch Daily Assessment/Discharge for MH was completed on October 19 and 20, 2020.  The patient was assessed with intermediate suicide risk.  He refused to cooperate with the initial interview; on October 20, he was cooperative with the interview, and suicide watch was discontinued.

He continued to be followed consistently by mental health clinicians with weekly rounds and discussion in MDTM. He refused to meet with the mental health clinicians in a confidential setting, and he was seen at cell-front.

In addition to documentation of several assaults to custody staff at MCJ, the mental health clinician reported that the patient was tasered while at court on January 22, 2021; he was subsequently referred to mental health. There were also several entries indicating that the patient refused to return to his cell, to return items such as tablets or to otherwise follow custody instructions with planned use of force.  Mental health clinicians intervened in those cases in an attempt to diffuse the situation.

On March 31, 2021, the mental health clinician indicated that the patient continued to refuse to meet with mental health clinicians, and as he would be seen weekly while in segregation, he would be removed from the MH-special needs designation.  He had been previously provided with a diagnosis of Adjustment Disorder, unspecified.

On April 20, 2021, the patient was sentenced to 22 years in prison.  He was placed on level 2 suicide watch on four days later when he contemplated hanging himself, but instead alerted custody staff. He had tied a bedsheet to a stool prior to contacting custody.  A Suicide Watch Initial Assessment for MH was completed with a determination of intermediate suicide risk. The

mental health clinician in consultation with custody discussed his significant suicide risk related to his criminal case, sentence, first time in prison and history of unpredictable behavior; and they determined that the patient would only be issued a safety smock and safety blanket upon return to MHO with discussion at the next MDTM when his provided issue would be re-evaluated. Suicide watch was discontinued on April 25, 2021. A subsequent progress note indicated that his jail issue would remain restricted.

A review of incident reports noted that multiple reports documented incidents that involved this patient. Those reports documented frequent incidents primarily involving the patient assaulting staff, attempting self-harm and refusing to return to his MHO cell after dayroom.

Findings

There was documentation that the patient was offered group therapy in MHO as well as written in-cell materials consistently.

There was documentation that the patient was discussed in MDTM consistently; references often mentioned incidents of violence towards others. Although the MDTM was a positive and important forum for discussion of treatment issues, there was a lack of documentation of actual treatment planning for this patient; mention that the patient was discussed during MDTM did not adequately address the need for and documentation of treatment planning and interventions for this patient.

Suicide risk assessments were completed when indicated. Although a safety plan was mentioned in assessments; an actual safety plan was not located in the healthcare record for review.

There was appropriate follow-up after discontinuation of suicide watch. The criteria for discontinuation of suicide watch; however, remained unclear other than the patient's denial of suicidality.

There were at least two incidents in which custody staff appropriately contacted mental health prior to planned use of force, including planned cell extractions and refusal to return items or to return to his cell. There was documentation that mental health clinicians attempted to work with the patient to diffuse the situations.

There was documentation of weekly mental health rounds in segregation. Lapses were noted in the documentation of daily nursing segregation rounds.

Of note was the presence of a Mental Health Treatment Plan for Non-Acute Patients dated November 9, 2020. The plan indicated that it was an initial treatment plan; however, the form was incomplete absent minimal information such as diagnosis, sex and that the patient was not prescribed medication. The plan noted that the patient attempted suicide via asphyxiation, that he had been on suicide watch twice in the past month. The goal was that the patient would have no suicide attempts and would meet with mental health staff and learn and engage in coping skills practice. Documentation of treatment planning was inadequate.

**Patient 8**

This patient was housed in WHO during her incarceration at MCJ; her healthcare record was reviewed to assess the mental health care provided.  She was provided with a diagnosis of Psychotic Disorder, NOS, PTSD and possible "Substance Induced Psychosis". Documentation in the healthcare record led to confusion regarding when this patient initially arrived at MCJ. It appeared that the patient arrived at the jail on or about January 29, 2021; at that time, she was reportedly under the influence of substances, stating that she had been raped by the police.  She was uncooperative, and the initial screening was not completed at the time of intake.

Other documentation indicated that the patient arrived at the jail on February 4, 2021. A nursing note on February 4, 2021, also noted that the patient was very tangential and unable to focus on medical questions at intake.  She agreed to a urine drug screening at that time, and the intake screening was rescheduled. The urine drug screen was positive for methamphetamine, and she was placed on a Synthetic Drug Detox Protocol; she reportedly refused most of the medication dosages.

An attempt was made on February 6, 2021, to complete the initial mental health assessment; however, the patient presented with agitation, delusional thinking and uncooperative behavior; the assessment was rescheduled. She seen by a mental health clinician on February 11, 2021, for the Mental Health Initial Assessment. The assessment noted a history of mental health treatment; she denied current mental health treatment or medications. She reported a history of childhood trauma, and she denied suicide attempts.  She refused to answer questions regarding substance abuse. She was described as anxious, agitated or fearful of safety with evidence of psychosis and depression. The clinician noted that she was housed in segregation at the time of evaluation. The patient was assessed with low suicide risk, and she was referred for psychiatric evaluation with mental health clinician follow up in one month.

The patient was seen by the psychiatrist on the following day, February 12, 2021, for initial psychiatric assessment.  At that time, the psychiatrist noted that she was referred due to bizarre behavior and delusional thinking, insisting on release from jail. The psychiatric assessment did not note the presence of psychotic symptoms; and she was provided with a diagnosis of PTSD and Amphetamine Abuse by history.  She was prescribed Zoloft and Atarax.

This patient refused the Receiving Screening attempted on February 13. 2021.

She was seen for psychiatric follow-up on March 2, 2021, when she reported flashbacks and anxiety, requesting Zyprexa.  At that time Zoloft was discontinued, and Zyprexa 10 mg was prescribed.

She was seen by a mental health clinician for crisis intervention after a custody referral; she was the aggressor in an unprovoked fight with a peer.  She was seen in a confidential setting when she reported that the peer had "a man's voice coming out of her throat like she was possessed". She presented with poor insight and judgement, disorganized and delusional thinking. She was transferred to WHO at that time with follow-up scheduled for two days. She was seen on the

following day at her request when she stated that an IUD had been placed without her consent in the past. She refused a confidential interview, and she was seen at cell-front. She refused an initial psychiatric appointment on March 17. 2021 and again one week later; the psychiatric note of March 24, 2021, noted that she was interviewed by "MCBH for mental health court" when she presented as "highly paranoid, delusional; and endorses AH/VH from TV, outlets, etc.".

Progress notes after March 2021 noted that the patient reported symptoms of a urinary tract infection, and she was seen by medical on several occasions regarding these complaints. Although a urine culture was positive for a staph infection; she was treated but refused to cooperate with some appointments and continued with urinary and medication related complaints. An entry by the physician assistant on June 2, 2021, noted that she presented with delusional thinking stating that an IUD had been placed in her without her consent (this concern was previously evaluated during March 2021).

A chart note on March 16, 2021 indicated that the patient had been discussed in MDTM, and she was now housed in WHO after choking a peer. The note also indicated that she would be referred to the psychiatrist. On April 2, 2021, she was seen via FaceTime by the psychiatrist for initial psychiatric assessment. At that time Zyprexa was increased to 20 mg per day; Atarax was increased, and Prozac was continued.

She was seen by a mental health clinician on April 10, 2021, for follow-up; at that appointment she presented with improved thinking and behavior, and they discussed her recent interview with a community program. She refused a confidential interview on May 12, 2021; however, the clinician noted that she was adherent with prescribed psychotropic medications. She refused a follow-up appointment on June 10 with the psychiatrist, and she was last seen by the mental health clinician on June 17, 2021, when it was noted that she had been refusing dayroom; she also refused on out of cell confidential interview, and she was seen at cell-front. She was reportedly medication adherent and in no acute distress at the time of interview.

Findings

There was documentation of attempts for confidential mental health interviews for this severely ill patient.

Psychotropic medications were appropriately not ordered for this patient upon jail arrival, as she denied recent mental health treatment. Medications were ordered after initial psychiatric assessment. The patient was seen within one week of arrival for initial psychiatric assessment. Although antipsychotic medication was not ordered for this patient initially; Zyprexa was added at the patient's request, and this medication was appropriately increased due to ongoing psychosis.

There was not documentation that this patient was provided with group therapy and in-cell materials consistently. It should be noted that several refusal forms were noted, indicating that the patient refused to participate in mental health rounds and interviews.

There was documentation of weekly mental health rounds in segregation.

Lapses were noted in the documentation of daily nursing rounds in segregation.

There was documentation that consent for treatment with telepsychiatry, and confidentiality disclosure were obtained.

Although there was documentation that at least two informed consents for psychotropic medications were obtained and signed by the patient; both forms were blank, and it was unclear if actual informed consent was provided and obtained.

There was documentation that release of information was obtained for past mental health and substance abuse treatment.

**Patient 9**

This patient was housed in WHO during her incarceration at MCJ; her healthcare record was reviewed to assess the mental health care provided. The patient was provided with a diagnosis of Bipolar Disorder with psychotic features. The Receiving Screening was completed on September 30, 2020; the screening was remarkable for treatment with Depakote, but the screening form was notably incomplete regarding responses to mental health related questions. She was cleared for general population, and no referrals were documented on this form from intake. A second Receiving Screening was completed one week later on October 7, 2020; this form did document the patient's history of substance use as well as her history of mental health treatment for bipolar disorder. This second form also cleared the patient for general population and did not document the need for mental health referral. It did appear that the patient was sent to NMC for jail clearance.

She was placed on a COWS Score Sheet Opiate/Opioid Withdrawal protocol on October 1, 2020; this protocol was discontinued on October 5, 2020.

The patient was seen by a mental health clinician on October 1, 2020, when she presented as tearful and sobbing "because of attempted murder charges". She was seen at cell-front "per COVID precautions", and she refused to talk with the clinician. She was scheduled for follow-up, and she was seen on October 5 when the Mental Health Structured Progress Note was completed. The form noted that she had been referred from nursing/medical. She presented with expressive, loud and pressured speech, anxious and irritable mood, tearfulness and lability. The patient requested her medications, and she was referred to see the psychiatrist. She was also seen later that day for crisis intervention when she was referred after presenting with agitation and confusion regarding her arrest and incarceration in jail. The clinician indicated that she would assist the patient in contacting her attorney with follow-up on the following day.

She was seen by the psychiatrist by FaceTime on October 6, 2020, for initial assessment; the psychiatrist noted the use of heroin and medication nonadherence since her last incarceration earlier that year. She was prescribed Depakote, Topamax, Benadryl and Haldol.

A psychiatric note on October 20, 2020, noted that the patient was very dehydrated and attempts to obtain laboratory studies were unsuccessful; the studies were rescheduled after the patient was hydrated. Subsequent entries noted multiple refusals for blood draws.

A mental health clinician note on November 2, 2020, noted that the patient inquired why she had to socialize alone, but also noted a recent DAR.

A November 30, 2020 mental health note indicated that the patient had been moved to an open pod which she liked better.  At that time, she appeared improved.

On February 17, 2021, the patient requested discontinuation of her medications stating that she had continued side effects; at that time, Trileptal, Geodon and Atarax were discontinued. There was no documentation of scheduled psychiatric follow-up; however, she was seen by the psychiatrist on February 27, 2021 for follow-up.

On March 3, 2021, a mental health referral was submitted from medical, as the patient submitted multiple bizarre requests. On April 10, 2021, she was seen for crisis intervention after she reported suicidal intent. She also requested housing in WHO due to loud noises and lights in her housing unit. During the interview, she denied suicidality; there was no documentation that a suicide risk assessment was completed at that time.

She was seen on the following day, and on April 12 when she was placed on suicide watch after she threatened suicide if returned to her housing unit; she placed a sign on her door indicating that she would rather die than to remain in her cell. She was briefly placed into a safety cell after refusing housing in a booking cell. The Suicide Watch Initial Assessment for MH was completed on that date; however, she refused to cooperate with this interview. She was assessed with intermediate suicide risk with goals of "eliminate self-harm/self-harm statements" and to "improve medication compliance".

A note on the following day indicated that the patient was no longer suicidal, but she did not wish to return to her housing unit and requested placement in WHO. Suicide watch was discontinued, and the Suicide Watch Daily Assessment/Discharge for MH was completed.

The patient was followed consistently while housed in WHO.  She was at times offered confidential contacts which she sometimes accepted. Documentation indicated that she refused to meet with the psychiatrist, and she stated that she would resume psychotropic medications upon release from jail.

A psychiatric progress note on May 14, 2021 indicated that the patient requested medications, but she was delusional and presented multiple bizarre sick call requests.  She reportedly refused to meet with the psychiatrist.

On May 19, 2021, the psychiatrist indicated that the patient was interested in resuming treatment with psychotropic medications.  At that time, she was psychotic, argumentative and hyperverbal. The psychiatrist indicated that the patient was unable to provide informed consent for psychotropic medications; however, no plan of treatment was documented. A psychiatric note

dated May 26, 2021 indicated that the patient was seen by the psychiatrist via FaceTime when she was prescribed Trileptal.

Findings

The Receiving Screening of September 30, 2020 was not completed in entirety, and the patient was inappropriately cleared for general population without mental health referral.

It was unclear why this patient with known history of treatment at MCJ was not timely prescribed medications upon arrival at the MCJ.  Medications were not ordered until she was seen by the psychiatrist, six days after jail arrival.

On December 4, 2020, she was seen by the psychiatrist when Haldol and Topamax were discontinued, and Trileptal and Geodon were started due to complaint of medication side effects.

The appropriate laboratory studies for treatment with Depakote were conducted.

Documentation indicated that some mental health contacts occurred at cell-front due to COVID precautions.

Release of information was obtained regarding past mental health treatment.

There was documentation that consent for treatment with telepsychiatry, and confidentiality disclosure were obtained.

Although there was documentation that informed consent for psychotropic medications was obtained and signed by the patient; one of the forms was blank and the other was minimally competed.  It was unclear if actual informed consent was provided and obtained.

There was documentation of weekly mental health rounds in segregation. She was seen at least monthly for individual mental health sessions.

There was also documentation that the patient was offered and provided with group therapy and in-cell materials.

There were lapses in the documentation of daily nursing segregation rounds.

This patient was seen almost monthly for psychiatric follow-up. Contacts occurred by Face-Time.

During February 2021, the patient's medications were discontinued at her request.  There was no documentation that patient education was provided for this patient with a long history of significant psychiatric symptomatology regarding the need for medication adherence by the psychiatrist. There was also no documentation of scheduled psychiatric follow-up, which was clearly indicated. She later presented in crisis with suicidality.

There was documentation of appropriate follow-up after placement on suicide monitoring.

The patient presented with report of suicidality on April 10, 2021 necessitating a crisis mental health evaluation.  There was a lack of documentation that a suicide risk assessment was completed at that time.

The Suicide Watch Initial Assessment for MH form included as a goal the following "eliminate self-harm/self-harm statements".  Although the elimination of self-harm is a goal in suicide prevention, the elimination of self-harm statements should not be a goal.  If patients do not inform staff of suicidal thoughts, the result could be a completed suicide.  WellPath should review this assessment tool and amend it accordingly.

Although documentation indicated that a safety plan was appropriately reviewed and provided to the patient, no safety plan was located in the healthcare record for review regarding the adequacy of safety planning.

Of concern was the psychiatric documentation that the patient was not treated as she could not provide informed consent.  This was troubling as the patient was described as psychotic and had previously refused medication treatment.  No treatment plan to address this issue was documented.  If this patient was so impaired that she was unable to provide consent, alternative means for addressing competency or for psychiatric stabilization were clearly indicated. No such planning was documented, and fortunately, the patient was prescribed medications one week later.

There was documentation that the patient was discussed in MDTM consistently.  Although the MDTM was a positive and important forum for discussion of treatment issues, there was a lack of documentation of actual treatment planning for this patient; mention that the patient was discussed during MDTM did not adequately address the need for and documentation of treatment planning and interventions for this patient.


**Patient 10**

A focused healthcare review was performed to review the mental health care provided to this patient at MCJ. This patient had multiple recent incarcerations at MCJ.  He was seen by a mental health clinician on September 11, 2020 ,when he returned to jail off medications, intoxicated and making suicidal statements. He received the Receiving Screening on September 12, 2020, which noted that he had been sent to NMC for a jail check.  The screening was notable for use of methamphetamines and a history of mental health treatment; he had reportedly been hitting his head against the wall according to the transporting/arresting officer. He was placed on suicide watch and referred to mental health. He was seen for follow-up and evaluation on the following day by a mental health clinician when he was assessed with low risk; suicide watch was discontinued with referral to see the psychiatrist.

The patient was again placed on suicide monitoring several days later, and he was assessed by a mental health clinician on September 14 and 15, 2020.  The clinician determined that the patient

should remain on suicide monitoring, and he presented with hostility, irritability and suicidal ideation. Suicide watch was discontinued on the following day when the patient presented with cooperative behavior, future oriented interactions and a determination of low suicide risk.

The patient was placed on suicide watch on several other occasions during this incarceration. He was placed on suicide watch and released on September 17, 2020, October 12, 2020, October 24, 2020 and November 2, 2020.

It appeared that he was released from jail and returned within two weeks when the Receiving Screening was performed on November 23, 2020. At the time, he was described as appearing to be under the influence of alcohol and/or drugs. The screening also noted that he refused to take psychotropic medications. Mental health housing was recommended with a mental health referral.

He was again released and re-incarcerated on November 29, 2020; the screening noted that he would be housed in general population and referred to mental health.

The most recent incarceration and intake screening occurred on December 20, 2020. The screening noted his history of suicide attempts.  The screening indicated general population housing and did not note any referral to mental health.

Progress notes indicated that the patient was followed consistently by mental health clinicians; he frequently was uncooperative to attempts at interview or provided minimal responses to questions.  He was seen by the psychiatrist on April 1, 2021 when he was noted to have lost a significant amount of weight; he was also described as responsive to internal stimuli, and he refused to meet with the psychiatrist presenting with withdrawn behavior. The patient was seen by a mental health clinician on April 22, 2021, when he presented with agitated mood and sarcastic responses to questions.  The clinician noted that he had refused to see the psychiatrist and was not prescribed psychotropic medications and indicated that he would continue to be followed as a special needs patient.

There was documentation of several incidents in which the patient was forcibly cell extracted due to agitation, threatening and dangerous behavior.  On May 12, 2021, he grabbed an officer, spit and cursed at staff resulting in a cell extraction, placement in a safety cell and administration of medications. Another similar incident occurred on May 17, 2021; on both occasions, he was appropriately provided with involuntary medications due to dangerous behavior.

It appeared that he was moved to MHO during May 2021.  Documentation indicated continued treatment nonadherence.

There was documentation that the patient was frequently discussed in MDTM due to his disruptive behavior and treatment nonadherence. The most recent note indicated that he was awaiting placement at the Department of State Hospitals (DSH).

<u>Findings</u>

Of concern was the ability of MCJ to provide necessary mental health care to this severely ill patient. Refusal of a patient to be seen by the psychiatrist or mental health staff does not absolve them from attempting to provide needed care; and absent cooperation from the patient, improved documentation of interventions to obtain the needed level of care should have been documented. Earlier intervention with this patient may have prevented the need for cell extractions and the use of force. Wellpath should review their policies and procedures and work with local staff regarding the documentation and implementation of appropriate interventions for chronically ill individuals who refuse treatment and medications.

This patient was an example of an individual in need of transfer to inpatient psychiatric care for which this level of care was not provided or available. Fortunately, he was ultimately transferred to DSH for needed inpatient care.

Despite this patient's significant mental health symptomatology, treatment planning was not well documented and was inadequate. Psychiatric and mental health progress notes clearly documented the severity of the patient's symptoms and his withdrawn, uncooperative behavior; however, no plans for addressing these severe symptoms were documented. The patient was frequently discussed in the MDTM; however, documentation of actual treatment planning was limited.

Documentation on the Receiving Screening required improvement. Although it appeared that the appropriate mental health referrals and housing placements occurred, the forms sometimes did not include this information.

The rationale for discontinuation of suicide watch was documented as due to the patient's denial of suicidality, engagement in safety planning and identification of a reason for living. Discontinuation of suicide monitoring should not be determined by the patient's denial of suicidal intent.

Although clinicians noted that safety planning was implemented; no actual documentation of a safety plan was located in the healthcare record for review.

The Suicide Watch Daily Assessment form of September 15, 2020 was not completed in entirety. Documentation indicated that the patient may have been uncooperative, and the clinician may have been unable to obtain some information due to this; however, the form should explain this lack of documentation.

There was documentation of appropriate follow-up after suicide watch placement.

Lapses were noted in the documentation of daily nursing segregation rounds.

There was documentation of weekly mental health segregation rounds.

There was documentation that the patient was offered group materials consistently.

**Patient 11**

A focused healthcare review was performed to review the mental health care provided to this patient at MCJ. He received the Receiving Screening on March 27, 2021; the screening was notable for daily alcohol use and history of withdrawal symptoms. He was placed on an alcohol withdrawal protocol at that time.  No mental health referral was indicated based upon the intake screening.

The patient was placed on suicide watch on March 30, 2021, after wrapping a safety blanket around his neck, smearing feces and threatening self-harm. He was placed into the safety cell for less than 24 hours.  He was assessed with intermediate risk, and suicide watch was continued. He was seen by FaceTime for psychiatric initial assessment on April 1, 2021. He was provided with a diagnosis of possible Alcohol Use Disorder and Adjustment Disorder; and the psychiatrist recommended discontinuation of suicide watch.

He was also seen by a mental health clinician who performed a suicide risk assessment; the patient was assessed with low risk.  The rationale provided for discontinuation of suicide watch was that the patient engaged in safety planning and denied suicidal ideation.

On April 8, 2021 when seen by a mental health clinician, the patient requested to be seen by the psychiatrist due to depressive symptoms.  He was seen by the psychiatrist by FaceTime on the following day when Prozac and hydroxyzine were ordered.

Subsequent progress notes indicated that he was followed consistently by mental health clinicians who reported that he appeared stable without evidence of depressive symptoms or suicidality.  He was seen for psychiatric follow-up on July 8, 2021 when he requested treatment with Depakote; the note indicated that Zoloft was discontinued (the patient was prescribed Prozac) and Depakote was started.

The most recent progress notes indicated that the patient was stable on his prescribed medications.

<u>Findings</u>

This patient was seen timely by the psychiatrist upon arrival at the jail.  Psychotropic medications were, however, not initially indicated.

Consent for treatment by telepsychiatry and confidentiality disclosure statements were obtained. Consent for treatment with psychotropic medications was signed by the patient and psychiatrist on April 9, 2021; however, the form was not complete noting the medications for which consent was obtained, bringing into question whether actual informed consent was obtained. A later consent dated July 8, 2021, was completed appropriately.

There was documentation that past healthcare records were requested.

The rationale for discontinuation of suicide watch was documented as due to the patient's denial of suicidality and engagement in safety planning. Discontinuation of suicide monitoring should not be determined by the patient's denial of suicidal intent.

There was documentation of appropriate follow-up after suicide watch placement.

Although clinicians noted that safety planning was implemented; no actual documentation of a safety plan was located in the healthcare record for review.

Regarding the frequency of psychiatric contacts, the patient was seen timely by the psychiatrist for initial assessment.  He was seen for follow-up on April 8, 2021.  Subsequent mental health clinician notes indicated that the patient was stable; however, he requested psychiatric follow-up due to mood instability.  He was seen on July 8, 2021 by the psychiatrist; this date coincides with a request by the medical monitor, Dr. Barnett that he be seen for psychiatric follow-up.  It did not appear that there were significant lapses in follow-up by mental health clinicians; he was seen on April 10, April 17, May 29 and July 14, 2021. Documentation by mental health clinicians indicated that the patient was essentially stable.  He should; however, have been seen sooner for psychiatric follow-up after initiation of treatment with Prozac on April 9, 2021.

The appropriate laboratory testing for treatment with Depakote was performed.

# Exhibit 34

[4276968.1]

**Monterey County Jail Mental Health Monitor's Final Report**
**July 21 – 22, 2022**

**Overview**

  A site visit was conducted at the Monterey County Jail (MCJ) for the ninth mental health monitoring tour. The site visit was conducted in person on July 21 and 22, 2022. This was the first tour of the Monterey County Jail for this monitor, having recently assumed the responsibilities of the prior Mental Health Monitor, Dr. Kerry Hughes. In attendance for this initial tour with a new monitor were Cara Trapani, plaintiffs' attorney, Susan Blitch and Ellen Lyons, attorneys for the County, and various representatives from Wellpath, including Dr. ███████ Josephine Shear, Nicole Taylor, Ben Rice, and Peter Bertling. ███████████ of Wellpath also participated in the initial meeting of the tour via Zoom.

  In addition to their participation in the site visit, subsequent emails and videoconferences were conducted with ████████████, RN and Acting Health Services Administrator, and Compliance Sergeant Oliva Guerrero. Their ongoing assistance in the review process has been of great value in producing the current report. Also interviewed via Zoom and telephone was ██████████ Mental Health Supervisor, whose input has been very helpful.

  The following report is structured much like the prior reports by Dr. Hughes. The intent is to maintain consistency and continuity of the process established in prior tours and reports, the last of which occurred on May 18 – 19, 2021, conducted virtually using Zoom. As with prior reports, the following report is based upon interviews with institutional staff and inmates as well as discussions with the attorneys for the defendants and plaintiffs and other Wellpath representatives, in addition to healthcare record reviews, documentation provided by Wellpath, MCJ and the County, and direct observations of various parts of the jail facility. This report specifically addresses the jail's status and progress toward compliance with the United States District Court Northern District of California Settlement Agreement and the Implementation Plans between Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County Sheriff's Office; California Forensic Medical Group, Inc (CFMG) et al.

  As it has been over a year since the last mental health monitoring tour and resulting report, this monitoring report is focused primarily but not exclusively on the period starting in April, 2022.

**Compliance with Settlement Agreement and Implementation Plan Requirements**
**1. Intake Screening**
• *Upon arrival, an Initial Health Assessment will be performed by the intake nurse to determine whether the inmate should be excluded from the facility on medical or mental health grounds. Upon acceptance into the jail, all inmates will be screened by the intake nurse for urgent medical, mental health and dental needs. The intake nurse will have access to an inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail. [County Implementation Plan; Dkt. 528-1 at ECF 7]*
• *If a patient's chronic condition is stable at booking, the Booking RN shall schedule a follow up with a medical provider within 5-7 days. If the patient is unstable or has unverified medications, the Booking RN must refer the patient to the on duty or on-call medical provider. [CFMG Plan at 29]*
• *The Booking RN shall identify and assess at booking individuals with a history of chronic medical or psychiatric condition. The Booking RN must document and verify and continue all*

*current medications, whether verified or unverified, formulary or non-formulary. [CFMG Plan at 29, 72]*
*• Booking RN must observe/query for signs/history of mental illness and use of psychiatric medications. The RN shall verify any medications and request outside treatment records as necessary. Any inmate who exhibits signs/history of mental illness shall be referred to mental health services for evaluation, and a physician's opinion must be secured within 24 hours or the next scheduled sick call. [CFMG Plan at 16, 19, 41]*
*• A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.*
*• The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive findings on the suicide assessment. [Settlement Agreement at 6]*
*• The Booking RN shall begin initial treatment planning at the time of booking and schedule referrals for follow up evaluation as necessary. [CFMG Plan at 27]*

**Findings: Substantial Compliance**

When last reviewed by the prior Monitor for Mental Health in his report of May 2021, he found substantial compliance with all of these requirements.  The current review finds continuing substantial compliance. Healthcare records reflected that inmates were routinely seen at the time of intake by a nurse who conducted an initial health screening using a structured tool that includes mental health and suicide risk items. Inmates in need of mental health evaluation and/or treatment were consistently referred to mental health clinicians, who saw patients within required timeframes. Inmates in need of urgent or emergent mental health care were appropriately referred and promptly seen by a mental health clinician.  Review of jail clearance logs and healthcare records continued to indicate that inmates were routinely referred to Natividad Medical Center (NMC) for jail clearance when presenting with medical or mental health concerns that might exclude the inmate from acceptance into the jail.

As noted previously by the prior Mental Health Monitor, there were instances of omission and lack of clear documentation on the intake form regarding referrals at the time of intake, but other healthcare records indicated that the appropriate referrals to mental health were made and the appropriate disposition occurred. Discussions with the nurse who trains and supervises the intake nurses indicated that she is aware of these documentation issues, monitors the quality of the documentation, and provides additional training or direction as needed.

Prior treatment records generated at MCJ were available in the electronic healthcare record during intake and there were indications in the healthcare documentation that these records informed the intake process. This was notable in cases where a patient was intoxicated, acutely mentally ill, or otherwise uncooperative at intake and failed to provide relevant information about prior treatment or medications; the intake nurse used prior records to initiate the appropriate referrals and seek medication orders. There was documentation that a release of information and prior treatment records were requested when appropriate.

The Intake Screening Form includes questions designed to detect current risk of suicide; this screening is routinely completed with all incoming inmates.  Referral to mental health clinicians are made when there are positive findings on this form.  Mental health clinicians continue to use the Suicide Watch Initial Assessment for Mental Health to assess suicide risk.  A detailed review of the completed suicide that occurred within the timeframe of the current report

2

raised concerns about the assessment and management of suicide risk, but these are covered below in the section on Suicide Prevention.

The issue of confidentiality for nursing intake assessments was also addressed in the prior Monitor's last report. He noted that new white noise machines had been installed outside the room used for intake screenings.  The locking mechanism had been removed from the door, which was left open during intakes, and the configuration of the room changed to allow for safer egress of staff in the event of emergency.  Custody staff observe from outside the intake room for safety. This arrangement was observed during the current site visit of July 2022, and adequately provides for confidentiality during intakes.

A brief initial treatment plan was noted at the time of intake, consisting primarily of follow-up referrals or requests for information as needed and, in cases of more urgent need, obtaining proper cell placement and orders for the inmate.

The preceding compliance items were cited and reviewed in the last Mental Health Monitor's Report submitted by Dr. Kerry Hughes for the site visit conducted May 18 – 19, 2021. The following additional compliance item was also found to be relevant for the current review:

• *The Booking RN will obtain a signed release for records and attempt to verify current prescriptions.  By the end of the nursing shift, the RN will consult with the on-call psychiatrist regarding any verified or unverified medications.  The on-call psychiatrist  will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate.  During this consultation, the on-call psychiatrist will set the time to see the inmate within 5 – 7 days. The date of the appointment will be reflected on the written record of the order.*" [CFMG Implementation Plan; Dkt. 532 at ECF 19].

### Findings:  Noncompliance

The on-call psychiatrist is often reached by email. While the email may typically go out by the end of the nursing shift, the response is not always by the end of the shift and sometimes not within 24 hours.  The intent of this implementation plan requirement for intake screening appears to be that an actual consultation with the on-call psychiatrist will take place and an order received, not just that the intake nurse attempts to contact the provider.  The current on-call psychiatry coverage arrangement appears to be a barrier for compliance with the intent of the implementation plan requirement.

There were also cases observed in the current review where the intake nurse would refer to current medications with the notation "see list" but such a list could not be located anywhere in the healthcare record.  This made it impossible to verify that specific medications were in fact continued, modified, or not renewed by the psychiatrist.

### 2. Mental Health Screening
• *All inmates must undergo an initial mental health screening by a qualified mental health professional within 14 days of admission. The screening must consist of a structured interview inquiring into (1) history of psychiatric hospitalizations, substance use hospitalization, detoxification and outpatient treatment, suicidal behavior, violent behavior, victimization, special education placement, cerebral trauma or seizures, and sex offenses; (2) current psychotropic medications, suicidal ideations, drug or alcohol use and orientation to person, place and time; (3) emotional response to incarceration; and (4) screening for developmental*

*disability and learning disabilities. Any positive scores will be referred for follow up. [CFMG Plan at 36, 41-42]*

**Findings: Deferred**

As noted by the prior Mental Health Monitor in his last report, review of healthcare records and staff reports indicated that Qualified Mental Health Professionals completed the Initial Mental Health Assessment and Appraisal for inmates with a known history of mental health treatment, those with suicidality and those inmates referred for mental health services. However, this compliance item requires a Mental Health Screening to be conducted with all inmates within 14 days of admission. It was explained by Wellpath staff that the Intake Screening Form has been expanded to include more comprehensive coverage of mental health concerns; as this screening is conducted by the intake nurse with all inmates at the time of booking, it is considered by Wellpath to meet the requirements of a Mental Health Screening as specified by the Implementation Plan. At issue here is the definition of Qualified Mental Health Professional for the purposes of the initial Mental Health Screening, and specifically whether nursing staff qualify.

As described by the National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails (2018, at pages 96 – 97), it is essential that a mental health screening is performed to ensure that urgent mental health needs are met. This screening is to be performed as soon as possible, and no later than 14 calendar days after admission. The NCCHC standard states that the mental health screening may be conducted by a qualified mental health professional or qualified health care professionals who have received documented training. Qualified mental health professional is defined to include psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients. From this perspective, nurses who are not formally qualified psychiatric nurses but who have received documented training in the screening of mental health concerns would qualify for conducting the Mental Health Screening, and thereby satisfy this requirement. Additional documentation is needed to demonstrate that the necessary training is provided to nurses conducting the Intake Screenings before a determination of substantial compliance can be made.

*• The medical or psychiatric provider will complete a baseline history and physical or psychiatric examination; order a therapeutic regimen, as appropriate; and schedule the patient to be seen for chronic care clinic at least every ninety days for the length of the jail stay. Patients on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every 60 to 90 days*

**Findings: Noncompliance**

The prior Mental Health Monitor found noncompliance with this requirement in his last report, noting that patients on psychiatric medications were not always seen by the psychiatrist every 30 days until stable and then at least every 60 – 90 days. He also noted that psychiatric follow-up was routinely scheduled for 90 days, and that it was not infrequent that patients were seen at intervals greater than 90 days. In the current review, cases were again observed where patients on psychotropic medications were scheduled to be seen at 90 day intervals prior to being assessed as stable and sometimes while demonstrating active symptoms of psychosis.

4

**3. Sick Call**

• *Inmates' health and mental health complaints must be collected, processed, and documented daily and triaged as appropriate by medical and mental health providers. [CFMG Plan at 25]*
• *The on-duty medical provider shall see urgent sick call requests Monday through Friday. On weekends and holidays, the on duty nurse shall communicate urgent complaints/requests to the on-call provider, who will treat or refer the patient as necessary. [CFMG Plan at 25]*

**Findings: Substantial Compliance**

The prior Mental Health Monitor found substantial compliance with these requirements in his last report. Sick call requests continue to be done primarily through electronic tablet devices made available to inmates. The Compliance Sergeant determined through experience that a 1:5 ratio of tablets to inmates was necessary for daily use in General Population Housing, while certain areas such as the holding cells required a 1:1 ratio due to the restricted housing situation. The Compliance Sergeant conducts a monthly survey of functioning tablets to ensure that these ratios are maintained, ordering replacement tablets as needed to maintain availability at the necessary ratios.

A review of sick call requests indicated that the requests were promptly noted, triaged, and responded to by mental health clinicians. It is notable that a mental health clinician reviews and triages all mental health sick call requests submitted by patients, rather than having an initial review by nonclinical staff as occurs in some jail settings. Although the clinical contact in response to routine requests were frequently rescheduled due to workload issues, patients were typically seen within adequate timeframes based on the nature of the sick call request; patients were typically seen within one to three days of the originally scheduled contact, although in some cases this delay was longer. Specifically, a sample of 12 sick call requests were reviewed. All were reviewed and triaged by a clinician by the next calendar day. Responses were noted in a log maintained by mental health staff, and were verified by reviewing the healthcare records. As noted, mental health contacts were frequently rescheduled due to workload issues, but no urgent requests were observed to be delayed.

There is weekday and weekend coverage by the mental health clinicians, who respond promptly to urgent or emergent referrals as needed. Weekend, holiday and evening/over-night on-call coverage by psychiatry is less certain, as the on-call psychiatrist is sometimes reached by email, and the response time may vary.

It is important to note that a finding of substantial compliance on these requirements does not suggest that the current mental health staffing level is adequate. Routine mental health contacts are too frequently rescheduled due to workload issues. Group programming is still not provided as required in administrative segregation due to staffing inadequacies. It appears that mental health clinicians are prioritizing the review and triaging of mental health requests, and insuring that urgent requests are responded to promptly. Performance in this area will continue to be monitored in light of the challenges posed by mental health staffing.

• *Health care staff must note (1) the date and time the sick call request slip is reviewed; (2) the signature of medical staff; and (3) the disposition. The sick call slip must be filed in the inmates' medical record. The sick call roster must be kept on file in the medical record room. Providers must record sick call visits in the inmate's medical record. [CFMG Plan at 25-26]*

**Findings: Substantial Compliance**

5

The prior Mental Health Monitor found Substantial Compliance with this requirement in his last report. Sick call requests are now primarily submitted by tablets available in all housing locations. Requests are scanned into the electronic healthcare record, with corresponding tasks created and sick call entries documenting the review of and response to the requests appearing in the healthcare record.

• *Sick call must be conducted 5 days/week in a private clinical environment. Health services staff must triage sick call slips daily and schedule patients for the next sick call if the slip was received prior to 2300 hours. [CFMG Plan at 26]*

**Findings: Substantial Compliance**

Mental health clinicians review and triage sick call requests daily. Mental health sick calls are conducted daily, and patients are scheduled to be seen based on the level of urgency determined by triage. Patients are typically seen as scheduled, although it was noted that routine requests were often rescheduled due to workload issues.

• *An MD or an RN shall visit inmates housed in holding and isolation cells on Monday, Wednesday and Friday. [CFMG Plan at 26]*

**Findings: Noncompliance**

The prior Mental Health Monitor found noncompliance with this requirement in his last report, noting that there were lapses in the documentation of daily nursing rounds. Dr. Hughes also noted that the psychiatrist did not visit inmates housed in holding and isolation cells on Monday, Wednesday and Friday. Review of healthcare records for patients in segregated units for the current report again showed lapses in the documentation of daily nursing rounds. Although nurses documented rounds on multiple days each week, these contacts did not always occur on Mondays, Wednesdays and Fridays, as specified by this requirement.

It does not appear that this Implementation Plan requirement applies to the psychiatrist as written. It states that an MD (not specifically a psychiatrist) or RN shall visit inmates, and does not require both to do so. The only deficits in the current review that prevents a finding of substantial compliance are the observed lapses in documentation of daily nursing rounds in segregated housing, and the observation that some of these missed days occurred on a Monday, Wednesday or Friday. It appears that the intent of the requirement is to ensure adequate medical and mental health monitoring of inmates in segregated housing, and this intent could be met through consistent daily nursing rounds. It is noted that the required nursing rounds would only be compliant if completed by an MD or RN, rather than an LVN.

### 4. Chronic Care
• *Any patient whose chronic condition cannot be managed at MCJ shall be transferred offsite for appropriate treatment and care. [CFMG Plan at 30]*

**Findings: Noncompliance**

As noted by the prior Mental Health Monitor in his final report of May 2021, "Although inmates were routinely referred to NMC for crisis evaluation and stabilization, some inmates with severe and chronic mental illness that could not be managed at MCJ remained at the jail." Dr. Hughes further noted, "The acceptance and adequate treatment of such inmates at NMC remained problematic; and as has been previously noted, referrals for needed inpatient mental health care did not always occur due to the lack of access to inpatient treatment at NMC."  The current review indicated that these problems continue.  Several cases were reviewed that reflected severe and chronic mental illness that cannot be adequately treated in the current jail environment, and required an inpatient level of care which the jail cannot provide.

The NMC Mental Health Unit (MHU) admissions policy was reviewed, and indicated that the NMC MHU is not considered a secure facility, lacking a secure perimeter, and therefore cannot admit patients requiring that level of security.  It further states that patients will not be admitted who are pending or who are convicted of violent felony offenses. The sections of the policy addressing admissions from the MCJ references the following: PC 1370.1, which applies to individuals who are incompetent to stand trial; PC 4011.6, which applies to incarcerated persons with a mental disorder and requires a court order for transfer to a facility for 72 hour treatment and evaluation pursuant to PC 5150; and transfers from the jail for crisis 5150 evaluations. Not all patients requiring inpatient level of care will have been found to be incompetent to stand trial, a process which requires evaluation by an outside expert. PC 4011.6 requires a court order, and is therefore unresponsive to urgent needs for inpatient care. Regarding PC 5150, it was explained that in practice, this process does not apply to persons already currently incarcerated, so that admission to NMC MHU under this section of the policy can only apply at the point of release from jail custody.

Several cases reviewed for the current report were effectively precluded from admission to the NMC MHU, yet patients such as these will continue to require an inpatient level of care which is not otherwise available to MCJ inmates. As noted by Dr. Hughes, "This prohibition regarding admission of these patients to NMC MHU appeared to negatively impact necessary access to inpatient mental health treatment.  If this ban remains in place, alternative mental health inpatient care should be identified and provided."

• *At every 90-day chronic care appointment, the medical/psychiatric provider shall (1) assess the patient's current medications, complaints, and compliance with treatment plan; (2) examine vital signs and weight; (3) assess the patient's diagnosis, degree of control, compliance with treatment plan and clinical status as compared to prior visits; and (4) conduct lab and diagnostic tests as necessary, develop strategies to improve outcomes if the condition has worsened, educate the patient, and refer to MD or specialist, and/or conduct discharge planning as necessary. All of the above must be documented in the patient's health record. [CFMG Plan at 32-33]*

**Findings: Noncompliance**

The prior Mental Health Monitor found noncompliance with this set of requirements in his last report.  He noted that documentation of treatment planning was essentially nonexistent in the healthcare record; there was no documentation or comparison of patient weights by the

psychiatrist; documentation was lacking regarding the patient's diagnosis, degree of control, compliance with the treatment plan and clinical status compared to prior visits; there was no documentation of Abnormal Involuntary Movements Scale (AIMS) testing or monitoring of metabolic factors for patients prescribed psychotropic medications; and a lack of documentation of appropriate therapeutic interventions for patients who were decompensating or not participating in treatment.

In the current review, the psychiatrist typically noted a diagnosis and compliance (or lack thereof) with prescribed medications, but there were no notes regarding the patients degree of control, clinical status as compared to prior visits, or compliance with a treatment plan beyond medication compliance. There continues to be no documentation of AIMS testing.  There was no documented treatment planning by the psychiatrist beyond prescribed medications.  In cases of patients refusing to take psychotropic medications despite overt mental health symptoms, there was little in the way of psychiatric follow-up or further intervention. There was no documentation of collaborative, interdisciplinary treatment planning or intervention strategies. The field for patient education in the psychiatrist's notes was typically blank.

**5. Acute Care**
*• Inmates who require acute mental health services beyond what is available at the Jail must be transferred to an appropriate facility. [CFMG Plan at 36, 42] CFMG PLAN AT 26*
*• Crisis intervention and management of acute psychiatric episodes shall be handled initially by on-duty medical/mental health staff with referral to psychologist and/or psychiatrist on a 24 hour per day basis. [CFMG Plan at 43]*

**Findings: Noncompliance**
The prior Mental Health Monitor found noncompliance with these requirements in his last report. He noted that although inmates were referred to NMC for crisis evaluation and stabilization, some inmates with severe mental illness that could not be managed at MCJ remained at the jail. He further noted that referrals for needed inpatient mental health care may not have occurred due to the lack of access to inpatient treatment at NMC, and this appeared to be particularly problematic for chronically mentally ill inmates who exhibited continuing psychosis, recurrent self-injurious behaviors and treatment nonadherence.  Concerns similar to those reported by the prior Mental Health Monitor were found in the current review.  Cases were identified of patients who were in acute and severe mental health crises, with danger to self, danger to others, and possible grave disability, who were not transferred to NMC for evaluation and stabilization or to an appropriate facility.  Examples of such cases are included in the Healthcare Record Reviews document produced in association with the current report. These include Patient 2, Patient 3, Patient 4, and Patient 6, as identified in the case reviews. These cases demonstrated a level of serious mental illness that required an inpatient level of care that is beyond the MCJ's current capacity to provide.  This included episodes demonstrating a need for acute mental health services.  In some instances, these cases also demonstrated a need for crisis intervention, sometimes involving forced cell extractions when attempts at de-escalation were not effective and use of involuntary medications, where the patient was not sent to NMC or transferred to an appropriate facility.

8

34-8

Crisis intervention and management of acute psychiatric episodes were initially treated by medical staff and referred to mental health clinicians as indicated. However, the prior Mental Health Monitor has previously reported that it appeared not all patients who required psychiatric assessment or follow-up were referred for psychiatric assessment. Similar concerns were noted with cases in the current review. It is also noted that mental health staff are not on-site on a 24 hour basis, and on call psychiatry services are provided by a psychiatrist who is sometimes contacted by email. He is not always available to respond quickly.

## 6. Outpatient Services
• *The Jail shall make outpatient mental health services, provided by a qualified mental health provider, available to all inmates. [CFMG Plan at 41]*
• *Inmates requiring mental health services beyond the on-site capability of the Jail shall be referred to appropriate off-site providers. [CFMG Plan at 41, 43, 46]*

### Findings: Noncompliance
The prior Mental Health Monitor provided a finding of Noncompliance in his final report. It appears that this finding was based on the lack of adequate access to inpatient mental health services. The current report addresses those concerns under the compliance requirements for chronic and acute care. The compliance requirements under this section focus on outpatient services. As the prior Mental Health Monitor noted, outpatient services were provided by qualified mental health providers at MCJ, and clinicians provided services to all inmates regardless of their housing or mental health designation. The primary issue arising from the current review is whether staffing levels allow for adequate delivery of outpatient services to meet inmate needs, e.g., group treatment activities. A related issue is whether off-site providers coming into the jail can sufficiently augment the delivery of outpatient services. Based on the totality of the information reviewed for the current report, it is concluded that current mental health staffing levels do not allow for sufficient outpatient services to support a determination of substantial compliance.

## 7. Safety and Sobering Cells
• *The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall responsibility for safety and security of prisoners, prompt reviews by medical of all placements, and a process of resolving disagreements between medical and custody. [Settlement Agreement Dkt. 494 at ECF 14]*

### Findings: Substantial Compliance
The prior Mental Health Monitor found substantial compliance with this requirement in his last report. As Dr. Hughes noted, there appeared to be a good system in place for audits by the Compliance Sergeant of safety cell use. Current review of these monthly audits consistently showed compliance levels over 95% across a range of rating criteria. This system also includes a process for notification, supervision and training as needed for instances of non-compliance.

9

Information is now posted in the Receiving Area providing specific guidance on the use of safety and observation cells. As previously reported, the facility continued to primarily utilize booking cells rather than safety cells for suicide monitoring, although safety cells are still used for patients with active self-injurious behavior (i.e., those on Level 1 Suicide Watch). Safety cells are also still frequently used for suicide monitoring of patients on Level 2 Suicide Watch when other single cells are unavailable in the intake area. This practice should be minimized to the degree possible, in light of the severely restricted environment of the safety cells.

The Compliance Sergeant has explained that the Receiving Area consists of the following cell configuration:

- 4 large booking cells (Booking Cells 1 – 4) with a capacity of 10+ occupants
- 7 single booking cells (Booking Cells 5 – 11) with a single occupant
- 4 observation cells (Observation 1 – 4);
    Observation Cells 1 and 2 are large with multiple occupants if used as booking cell overflow; Observation Cells 3 and 4 are primarily used only if all booking cells and Observation cells 1 and 2 are occupied
- 4 Safety cells (Safety Cells 1 – 3 are in Receiving; Women's Safety cell is in Women's section and is only used if all other Safety cells are occupied

The compliance Sergeant also explained that the Receiving area will house somewhere between 20 – 100 inmates at any given time, but that this area only has seven single-inmate booking cells. These single cells are typically used by inmates who are either recently arrested or pending release who are not compatible with the general population. It is not uncommon for all seven single cells to be already occupied by this classification of inmate, so that as inmates report they are suicidal, there is no available option to placing Level 2 Suicide Watch inmates in a safety cell. Review of information provided by the Compliance Sergeant for the period of July – September 2022 showed between 45 and 80 safety cell placements per month. None of these were cases of Level 1 Suicide Watch which would have required placement in a safety cell. Effective alternatives are needed to placement of patients in safety cells when not clinically required. This requirement will be a focus of the next site visit.

There continued to be no reported cases of disagreement between medical and custody staff regarding placements, although there is a written procedure in place should such disagreements arise. Reviews of recent healthcare records showed prompt review by medical staff of safety cell placements.

*• Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical professional will see an inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.*

**FINDINGS: DEFERRED**

The prior Mental Health Monitor deferred on this item in his last report, stating that there was insufficient documentation available to make a finding. The current review results in deferring on this item for a different reason: this requirement refers specifically to medical staff

rather than mental health staff, and does not appear to be within the domain of mental health monitoring.

It should be noted that this requirement addresses the placement of inmates in a safety or sobering cells from housing or upon intake; it does not appear to address the movement of inmates from safety cells to sobering cells, as often occurs when inmates on Level 2 Suicide Watch have been placed in a safety cell due to lack of alternative single-cell housing.  This issue of safety cell placements which were not required by suicide risk or active self-injury is described in other parts of the current report, and is considered unresolved at this time. It is reported by the Compliance Sergeant that current best practice at MCJ is to immediately move inmates from safety cells as booking cells become available.  This practice should continue, with a priority given to finding alternatives to placement of an inmates not on Level 1 Suicide Watch into a safety cell.  A balance of considerations between inmates safety and efficient use of medical and mental health staff is needed, so that any situations where a medical staff contact or clearance is clinically unnecessary should not delay the transfer of an inmate from a safety cell. An effective means of reducing or eliminating use of safety cells for unrequired placements (e.g. Level 2 Suicide Watch) would address most of these concerns.

Plaintiffs' attorneys maintain that this requirement falls within the scope of mental health monitoring if the patient is in the safety or sobering cell for a mental health issue. In cases where the mental health issue is suicide risk, the requirements in the area of Suicide Prevention appear to cover these, and are clearly within the scope of mental health monitoring. Sobering cell placement and release, as written in this requirement, appears aimed at medical concerns. Consultation and coordination with the Medical Monitor will be pursued in order to ensure that adequate monitoring of this requirement continues, either by one or both of us.

• *A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his findings through a report which will be sent to the Jail Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.*

**Findings: Deferred**

The prior Mental Health Monitor found substantial compliance with this requirement in his last report. He focused primarily on the audits conducted by the Compliance Sergeant, which are now based on the Guardian System of welfare check logging.  This system currently demonstrates routine compliance with the requirement that custody staff make safety check rounds at the specified intervals, and the Compliance Sergeant has a robust system of auditing

11

and feedback to address any detected compliance issues based on the timing of the checks. The auditing system also includes the routine reports specified in this requirement.

However, the current review raised concerns regarding the requirement that safety checks consist of direct visual observation that is sufficient to assess the inmates well-being and behavior.  These concerns arise directly from review of the patient suicide which occurred within the timeframe covered by the current report. Specifically, as detailed in a separate written review of this case, it appears from the available documentation that the patient had been deceased for some time when he was discovered to be unresponsive by deputies conducting welfare checks in the safety and booking cells, even though welfare checks had been routinely recorded within the prescribed intervals.  Inconsistencies in the welfare check entries were also noted, including during the critical period around the patient's death. While there was documentation that the patient showed no signs of distress during these checks, there does not appear to have been sufficient evaluation that the patient was in fact alive, despite documentation in the welfare check log that the patient was observed breathing.  This concern extends beyond the period immediately preceding the discovery that the inmate was not breathing.  Information cited in the review of this case indicated that the inmate had been deceased for some time prior to initiation of emergency medical care, including a comment that rigor mortis had set in. This suggests that some number of welfare checks had been inadequate to assess the inmate's well-being.  It is not clear to what degree the problems identified in the single case of the welfare checks prior to the inmate suicide, although tragic in their outcome, represent a systemic failure to meet requirements. A finding regarding compliance is therefore deferred at this time.

Corrective actions have recently been proposed internally that may address these concerns, according to information provided by the Compliance Sergeant.  These include the implementation of "hard checks" which would require staff to verbally interact with all special status inmates to verify signs of life and well-being, including all suicide watch inmates, all sober protocol inmates, and all inmates placed in a safety cell. Lack of verbal interaction would require custody staff to enter the cell and physically confirm the inmate's well-being.  Such proposals should be given careful consideration and implemented as needed to meet the intent of this Implementation Plan requirement. A finding of substantial compliance will be based on the implementation of policies, procedures, practices and resources that are capable of sustained compliance, a system for tracking compliance, and a means for taking corrective actions in response to instances of noncompliance. This will be evaluated in future site visits.

It is also possible that staffing levels may have been a factor in this incident; further information about staffing levels and their impact on compliance with these implementation plan requirements is needed, in addition to actions taken to ensure the adequacy of welfare checks.

• *Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11 p.m. and 7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.*

**Findings: Substantial Compliance**

The prior Mental Health Monitor deferred findings on this requirement in his last report, noting that insufficient documentation was available to reach a determination.  Additional information was provided by the Compliance Sergeant for the current report. The Compliance Sergeant explained that attempts to implement the provision of safety mattresses failed because all available vendor options proved to be susceptible to destruction by inmates on suicide watch when subjected to practical testing during use.  They were determined to be unsafe for suicidal inmates, and therefore were contraindicated by security and safety needs.  The solution currently implemented uses a safety blanket made is the same thick tear-proof material as the safety smock and can be fastened together by Velcro to function in a similar way as a sleeping bag.  Review of safety cell logs and audits showed that inmates were consistently provided safety smocks and safety blankets as required while in safety cells. The adequacy of current procedures will continue to be a focus of monitoring.  This will include an assessment of the degree of similarity between the safety blankets that are provided and a safety mattress or sleeping bag during the next site visit, along with observation and documentation demonstrating that the safety blankets are provided as required. A related issue to be explored further is the frequent use of safety cells for inmates who are not on Level 1 Suicide Watch, and who therefore do not require placement in safety cells.

• *Inmates in sobering cells may have access to mattresses at the discretion of custody staff.*
• *Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.*

**Findings: Deferred**

The prior Mental Health Monitor found substantial compliance with these requirements in his last report, noting that audits by the Compliance Sergeant indicated that the provision of mattresses was at the discretion of custody staff housed in the sobering cells.  This remains the case, as described in the preceding finding for inmates in safety cells. In practice, mattress are not issued to inmates in either safety or sobering cells due to practical concerns over safety.

Telephone consultation was obtained with the Medical Monitor regarding his observations during a site visit on October 11-13, 2022.  He noted in his exit interview that there was no reason to deny mattresses to some patients he observed without mattresses in the reception area.  He specifically referenced one patient who was withdrawing from heroin and had tested positive for COVID-19; According to the Medical Monitor, this patient had been in a booking cell for over a week with no mattress.  The Medical Monitor stated that when he pointed this out to custody staff, the patient was promptly provided a mattress.  These observations cause sufficient concern to defer a finding of substantial compliance at this stage.

• *Patients withdrawing from benzodiazepines must be evaluated by a medical provider within 3 days, and a psychiatrist or psychiatric NP within 7 days. [CFMG Plan at 68]*

**Findings: Noncompliance**

A limited number of cases were reviewed which were identified as both withdrawing from benzodiazepines and incarcerated long enough to evaluate this requirement; the majority of cases were released before seven days in custody.  Twelve cases were identified for review; six cases were released prior to seven days in custody; four cases were seen by the psychiatrist;  two cases were found in which there was no documentation that the patient was seen by a psychiatrist (there was no psychiatric NP on staff during this period) within the specified timeframe.  On the basis that two of the six qualifying cases failed to meet this requirement, a finding of noncompliance is warranted. A larger sample showing that patients are seen consistently within seven days and additional information regarding available documentation is required to reach a determination of substantial compliance with this item.

• *Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance.**

**Findings: Substantial Compliance**

Sobering cells have a regular cleaning schedule.  Staff report that cleaning crews routinely clean these cells, and visual inspection during the recent site visit of July 2022 showed sobering cells to be adequately clean.  Safety cells are reported to be cleaned whenever there is a change of inmates housed in the cells in addition to a regular cleaning schedule, although a log of cleanings between inmates is not maintained.  Visual inspection of safety cells during the recent site visit showed these cells to be adequately clean.

• *For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.*

**Findings: Substantial Compliance**

The Compliance Sergeant  has implemented a thorough system to track and respond as needed to patients placed in safety cells. This system involves a status board that reflects when a patient enters a safety cell and the time at which they will reach the 24 hour mark.  This status board is audited every day by the Compliance Sergeant, with daily prompts to floor deputies to ensure these patients are moved as required.

The Compliance Sergeant explained an important distinction in the use of the safety cells which bears on the evaluation of compliance with this Implementation Plan requirement as well as others.  In practice, safety cells are far more frequently used to house inmates on Level 2 Suicide Watch (defined as those with suicidal ideation but no active self-harm) due to a lack of alternative observation housing, or inmates requiring a single cell in the booking area who are not on any level of suicide watch.  Use of safety cells to house inmates on Level 1 Suicide Watch

14

is relatively rare; the Compliance Sergeant estimates that on average there are approximately 70 safety cell placements per month, but only one to two cases per year of Level 1 Suicide Watch placements in the safety cells. It is the Level 1 inmates who require a safety cell (i.e. cannot be housed elsewhere), and therefore must be transferred out to inpatient care or the NMC emergency room after 24 hours.  Level 2 inmates can be moved to other appropriate observation cells as available without requiring transfer to another facility. The current monitoring system implemented by the Compliance Sergeant has resulted in fewer inmates on Level 2 Suicide Watch reaching the 24 hour mark in a safety cell; during August 2022 no cases were reported to go over 24 hours.  No inmates on Level 1 Suicide Watch have reached or exceeded the 24 hour mark in recent months. The internal monitoring and auditing system in place appears adequate to ensure compliance with this requirement.

This finding, however, does not address the issue of why so many inmates on Level 2 Suicide Watch are placed in safety cells. It has been explained that there is frequently a lack of alternative single observation cells for the placement of such patients, but this explanation does not explore the various factors which contribute to creating this chronic shortage, nor does it lead to actions which may reduce the reliance on safety cells for inmates whose condition does not require such a severely restrictive environment. This underlying issue will be a focus of further discussions with MCJ staff and monitoring as needed.

• *Inmates in safety cells whose condition deteriorates, or for whom the nurse is unable to complete a hands-on assessment including vital signs after 6 hours of placement shall be transferred to Natividad Medical Center for further assessment. [CFMG Plan at 16, 75]*

**Findings: Deferred**

Clarification is needed regarding how this requirement is interpreted and operationalized. If it is intended to mean that a hands-on assessment including vital signs is required within six hours of placement in a safety cell, no cases were reviewed in which a patient was not adequately assessed within six hours of placement.  If it is intended to require vital signs to be taken every six hours for the duration of placement in a safety cell, review of the most recent completed suicide indicated that vital signs were not obtained every six hours during the period the patient was housed in a safety cell, and the patient was not transferred to NMC.

The more reasonable interpretation appears to be the former; patients requiring a safety cell, who are assumed to be in a state of crisis and are placed in extremely restricted housing, should receive a baseline assessment to ensure their wellbeing as early as possible following placement.  However, to repeatedly insist on a hands-on assessment, including vital signs, which may involve waking a patient who is sleeping or otherwise refusing vital signs in the absence of overt signs of distress, and may result in a forced cell extraction in order to transfer the patient to NMC, does not seem warranted in the absence of visible deterioration in the patient's condition. Discussions regarding this requirement with the Acting Health Services Administrator made clear that the facility's interpretation of this requirement is that a hands-on nursing assessment including vital signs must be completed within six hours of placement, and that patients may subsequently refuse vital signs.  Review of additional cases is needed to reach a conclusion of substantial compliance.

15

Preliminary discussion with the Medical Monitor provided a degree of clarification and agreement on this issue, although it remains to be more specifically operationalized and documented in policy and procedures.  There appears to be agreement that an initial assessment including vital signs must occur within six hours of placement in a safety cell, or the patient must be transferred for further assessment. For subsequent assessments, the patient must be monitored every six hours, but this may not require obtaining vital signs if the patient refuses. However, the Medical Monitor also expressed thoughts about the qualifications of the medical staff conducting such monitoring.  I defer to his expertise in specifying the details of this compliance requirement.

It is also noted that one of the versions of this requirement appearing in the CFMG Implementation Plan (Dkt. 532 at ECF 75) includes the language, "Inmates on Suicide Precautions in safety cells whose condition deteriorates, or for whom the nurse is unable to complete a hands-on assessment including vital signs after six hours of placement shall be transferred to Natividad Medical Center for further assessment."  This requirement specifically references inmates on suicide precautions, and was not addressed separately in the Suicide Prevention section of the prior Mental Health Monitor's last report. Due to the similarity of the requirement as addressed in this section, the current report also does not address this version of the requirement again under the Suicide Prevention section.

## 8. Medication Continuity
• *All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that Wellpath provides evidence that this requirement has been incorporated into the Wellpath Policies and Procedures.  [Dkt. 751 at ECF 20]**

**Findings: Substantial Compliance**
Wellpath Monterey County Policies and Procedures HCD-110 E09B, Timely Initiation of Medication Upon Arrival, and HCD-110 E-09A, Medication Verification, were reviewed.  These policies meet the requirements for compliance on this issue.

• *By the end of the nursing shift, the booking RN will consult with the on-call psychiatrist regarding any verified or unverified psychotropic medications. The on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate. The on-call psychiatrist will then set the time to see the inmate within 5-7 days. The date of the appointment will be reflected on the written record of the order. [CFMG Plan at 19]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that Wellpath provides evidence that this requirement has been incorporated into the Wellpath Policies and Procedures.  [Dkt. 751 at ECF 21]**

16

**Findings: Substantial Compliance**

Wellpath Monterey County Policies and Procedures HCD-110 E09B, Timely Initiation of Medication Upon Arrival, and HCD-110 E-09A, Medication Verification, were reviewed.  These policies meet the requirements for compliance on this issue.

• *No psychotropic medications shall be unilaterally discontinued without consultation with the facility physician or psychiatrist. Psychotropic medication shall not be ordered for longer than 90 days, new psychiatric medications will not exceed 30 days, until condition is documented stable by the ordering physician. The prescribing provider will renew medications only after a clinical evaluation of the individual is performed. [CFMG Plan at 19]*

**Findings: Noncompliance**

As noted by the prior Mental Health Monitor in his last report, there were no examples of psychotropic medications discontinued without consultation with the psychiatrist in the current review.  As also noted by the prior Mental Health Monitor, new psychotropic medications continued to be ordered for greater than 30 days, and inmates were seen at intervals greater than 30 days after new medications were prescribed and prior to documentation of psychiatric stabilization.  The prior Mental Health Monitor noted in his last report that review of psychiatric sick call logs indicated that patients were scheduled for psychiatric follow-up almost routinely for 90 days.  Such cases were again observed in the current review, including patients who were scheduled for 90 day follow-up at the time of the initial post-intake psychiatric evaluation despite active symptoms of serious mental illness, and therefore prior to documentation that their condition was stable.

## 9. Discharge

• *Provision of psychotropic medications upon discharge from the jail. The Implementation Plan provides that a 30-day supply of medications be given to inmates upon discharge from the jail.* **This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that Wellpath provides evidence that this requirement has been incorporated into the Wellpath Policies and Procedures.  [Dkt. 751 at ECF 21]**

**Findings: Substantial Compliance**

Wellpath Monterey County Policy and Procedures document HCD-110 E-10, Discharge Planning and Release Medications was reviewed.  At section 6.6.2 this policy calls for a 30 day supply of all chronic care medications to be called into a pharmacy for the patient to pick up post-release. This is consistent with the CFMG Implementation Plan (Dkt 532 at 37], and with NCCHC Standards for Healthcare Services in Jails (2018, p. 106) which calls for health staff to arrange for a reasonable supply of current medications for planned discharges.

*• Inmates who are released prior to resolution of a continuing medical/mental health condition shall be referred to public health and/or community clinics as appropriate, and shall be provided written instructions for continuity of essential care. [CFMG Plan at 38, 44]*
**This item has been released from monitoring. [Dkt. 751 at ECF 12]**

**10. Involuntary Medication**
*• Psychotropic medications may not be used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment. [CFMG Plan at 90, 96]*

**Findings: Substantial Compliance**

The current review found no instances where psychotropic medications were used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment. All involuntary administrations of medications reviewed were in response to a recognizable and justifiable need, with appropriate doctor's orders or as allowed by the conditions of conservatorship.

*• Absent an emergency, inmates will not be administered involuntary psychotropic medications at the Monterey County Jail. Psychotropic medication will not be administered for disciplinary purposes. [CFMG Plan at 19]*

**Findings: Substantial Compliance**

The current review found that instances of involuntary medication were in response to situations justifiably considered an emergency, and were not administered for disciplinary purposes.

*• Absent an emergency or court order for treatment with psychotropic medications, an inmate shall give his or her informed consent or refusal. [CFMG Plan at 20]*

**Findings: Deferred**

Cases were reviewed for the current report which demonstrated that inmates regularly refused psychotropic medication when their condition was not sufficiently severe to consider involuntary medication. However, the prior Mental Health Monitor expressed concerns in his last report regarding the adequacy of documentation for informed consent. A finding of substantial compliance is deferred until additional documentation of informed consent is reviewed.

*• The Jail may only administer involuntary psychotropic medications in a psychiatric emergency (i.e., when administration is necessary to preserve life or prevent serious bodily harm, and it is impracticable to obtain consent), or when an inmate is found to lack capacity to consent at an Incapacity Hearing. The responsible physician, Program Manager, and Director of Nursing, with the Facility Manager, are to identify appropriate community resources and develop procedures to obtain an Incapacity Hearing, and transfer inmates requiring involuntary psychotropic med administration to an appropriate community facility. If the inmate must remain at the jail for clinical or custodial reasons, the health services staff shall coordinate with County*

18

34-18

*Mental Health Psychiatric Emergency Services to evaluate competency pursuant to Riese v. St. Mary's Hospital (Riese Hearing). [CFMG Plan at 96, 98]*

**Findings: Noncompliance**

A case was reviewed for the current reporting period in which repeated involuntary medication administrations were required. Forced medications were authorized in this case as a condition of the patient's conservatorship. It does not appear, in this situation, that a Riese Hearing was required. However, this Implementation Plan requirement also states that inmates requiring involuntary psychotropic medications are to be transferred to an appropriate community facility. In the case in question, an inpatient level of care was called for but not pursued; this deficiency is addressed in the findings under the Chronic and Acute Care sections of the current report. It is not clear from the wording of this requirement whether transfer to an appropriate community facility is for the purpose of conducting a Riese Hearing, or for the purpose of ongoing treatment.

Discussions with the Acting HSA and Mental Health Supervisor indicated there is not a process in place whereby the responsible physician, Program Manager, Director of Nursing, and Facility Manager will obtain Incapacity Hearings and transfer inmates requiring involuntary medication administration to an appropriate community facility.

• *In a psychiatric emergency, psychotropic medications can only be involuntarily administered pursuant to a direct written or verbal one-time order from the responsible facility psychiatrist or physician after an on-site evaluation (never as needed, never standing order). A telephone order is sufficient only if the inmate has been personally evaluated by the prescribing physician no longer than 24 hours prior to the emergency. If none of above options are available, physical restraint should be used and the inmate transferred to the hospital emergency department for physician evaluation. [CFMG Plan at 96]*

**Findings: Noncompliance**

A case of involuntary medication administration was identified in which a standing order was provided, albeit in a case where forced medications were authorized by the conditions of the patient's conservatorship. Repeated instances of forced mediation administration were recorded in this case, without documentation of an on-site evaluation of the patient. Another instance was identified in which telephone orders were given for stat administration of involuntary medication by the on-call psychiatrist but the patient had not been personally evaluated by the prescribing physician within 24 hours prior to the emergency, although a Facetime evaluation was attempted.

• *Verbal orders for involuntarily psychotropic medications must be documented in the inmate's medical record and signed by prescribing physician within 72 hours. The Medical Program Manager and Custody Facility Manager shall be notified in writing, or by telephone if not available, within 24 hours of the involuntary administration of psychotropic medications. [CFMG Plan at 96-97]*

**Findings: Noncompliance**

19

Based on information provided by the HSA, the respective Managers are not routinely notified of involuntary administrations of psychotropic medications, nor is a log kept of involuntary medication administrations which would allow verification of such notifications.

• *Inmates receiving involuntary psychotropic medications must be admitted to an infirmary or safety cell, with intermittent supervision by custody staff at least every 30 minutes. Nursing staff must monitor (assessing response to medications, mental status, general physical appearance, behavior, and hydration) every 15 minutes during first hour, then every 30 minutes thereafter until otherwise ordered by the prescribing physician, documenting all findings in the inmate's medical record. The inmate must be evaluated by the responsible prescribing physician at least every 72 hours. [CFMG Plan at 97]*

**Findings: Noncompliance**

Instances were identified in the current review in which a patient received involuntary psychotropic medications but was not admitted to an infirmary or safety cell.

• *Inmates exhibiting any clinical deterioration at any time during involuntary therapy shall be transferred immediately to a clinically appropriate treatment facility. [CFMG Plan at 97]*

**Findings: Noncompliance**

Cases were identified in the current review in which the patient's clinical condition periodically deteriorated despite the administration of involuntary medications but the patient was not transferred to a clinically appropriate treatment facility, i.e., an inpatient level of care.

## 11. Medication Refusals

• *The on-call psychiatrist must be contacted whenever an inmate refuses his or her medications on three consecutive occasions. [CFMG Plan at 20]*

**Findings: Noncompliance**

The prior Mental Health Monitor found substantial compliance with this requirement in his last report, noting that there was documentation in the healthcare record that the psychiatrist was contacted by nursing staff regarding medication refusals. For the current report, the Medication Administration Records for patients identified as having high rates of medication refusals were reviewed to identify instances of three or more consecutive refusals of psychotropic medications.  Documentation was not found in the healthcare records indicating that a psychiatrist was contacted regarding these refusals, nor were the patients consistently seen by a psychiatrist around the time of three or more consecutive refusals.  Some patients were seen by psychiatry in proximity to a series of psychotropic medication refusals, but this often appeared to be a result of sick call requests submitted by the patient.

## 12. Clinical Staffing

• *Defendants will maintain Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to ensure adequate staffing to provide all necessary medical and*

*mental health care. The plan will identify all needed positions based on current and projected Jail population, and the number and qualifications of medical and mental health care staff to cover each position, with shift relief.*

*• Mental health services provided on-site shall include crisis evaluation, socialization programs, group therapy, medication management, psychiatric evaluations and individual therapy. [CFMG Plan at 42]*

*• At all times, there shall be sufficient staff to ensure compliance with the Implementation Plan. The CFMG Staffing Plan is attached to the Implementation Plan as Exhibit I. CFMG must ensure that all positions are filled. Relief factors for each position shall be calculated into the staffing analysis to ensure staffing levels consistently meet requirements. CFMG must continuously evaluate staffing levels to ensure sufficiency for compliance. [CFMG Plan at 116. ]*

*• Mental health staff shall be available on-site 7 days per week and on-call for assessment on an inmate's level of suicide risk upon referral by health services and/or custody staff. [CFMG Plan at 72]*

**Findings: Noncompliance**

The prior Mental Health Monitor found noncompliance with these requirements in his last report, noting that MCJ was negatively impacted by severe mental health staffing shortages that resulted in use of per diem staff to supplement the provision of services. The staffing situation does not appear to have changed significantly since the time of Dr. Hughes' last review. During discussions held with various staff during the July 2022 site visit, Dr. ██████████ indicated that increased mental health staffing was needed to meet the needs of the MCJ inmate population.  The current review indicated that treatment activities are still not sufficiently provided due to staffing limitations, and review of healthcare records continue to show appointments by mental health clinicians and psychiatry frequently rescheduled due to workload issues. An interview with the psychiatrist during the MCJ site visit on July 21, 2022 indicated that one of the challenges of his position was keeping up with the number of referrals and the resulting volume of patients to be seen.  He indicated that his workload is dependent on the number of mental health clinicians who are making referrals.  It may therefore reasonably be anticipated that increasing the number of mental health clinicians on staff, as is clearly needed, will further increase the number of referrals being made to psychiatry, as more patients are identified and closely monitored.

Interviews with various staff indicated that almost all psychiatry contacts take place at cell-front; it is not clear whether this is due primarily to the time constraints associated with escorting patients out of their cells to a confidential setting or to other factors. As previously noted by Dr. Hughes, review of current healthcare records also continue to indicate that patients with acute or unresponsive chronic conditions were not always referred for psychiatric evaluation or treatment consultation; it is not clear at this point whether this is due primarily to workload issues or other factors.

Wellpath leadership has recently conducted a staffing analysis for mental health staffing, which has served as the basis of discussions among the parties.  This analysis results in a proposal for additional mental health staffing, as follows:

Current staffing allocation:
- 2 LCSWs working 3 x 12-hour shifts: 1.8 FTE
- 1 LCSW working 4 x 10-hour shifts: 1.0 FTE
- 1 part-time LCSW: 0.2 FTE
- (1 psychiatrist working 4 x 10-hour shifts: 1.0 FTE)
- TOTAL: 3.0 FTE, plus 1.0 FTE psychiatrist

The following new staffing levels are proposed:
- 1 MH director working 4 x 10-hour shifts: 1.0 FTE
- 3 LCSWs working 3 x 12-hour shifts: 2.7 FTE
- 1 LCSW working 5 x 8-hour shifts: 1.0 FTE
- 2 psych techs working 5 x 8-hour shifts: 2.0 FTE
- 1 discharge planner working 5 x 8-hour shifts: 1.0 FTE
- (1 psychiatrist working 4 x 10-hour shifts: 1.0 FTE)
- TOTAL: 7.9 FTE, plus 1.0 FTE psychiatrist*

*It is noted that the initial analysis did not address the need for additional psychiatry staffing, which was done as a separate process. Information provided by Plaintiffs' attorneys indicate this analysis concluded that 1.0 Full Time Equivalent psychiatry position would be sufficient to meet the needs of the MCJ, based on the estimated time required for the average number of initial and routine appointments, in addition to other duties such as chart reviews, orders, meetings and correspondence.  This raises concerns in light of the comments made by the psychiatrist during the recent site visit regarding the challenges of keeping up with his current workload, whereby he reported that he needed to reschedule most of his appointments. Related issues which may be associated with workload and adequacy of psychiatry staffing include the frequency of cell-front psychiatry contacts instead of using a confidential setting (even though such settings are available), cases not referred to psychiatry when this may have been needed, and the frequent rescheduling of psychiatry contacts due to workload constraints. Clinical documentation by the psychiatrist in the healthcare records was consistently noted to be minimal. If it is accurate that additional psychiatric staffing is not required, these issues will need to be addressed through other means.  As noted in other parts of the current report, there are also concerns about the adequacy of the on-call psychiatry coverage.  It is not clear how this has been factored into the calculations used to determine the proposed psychiatry staffing allocation.

It is clear that additional staffing is required to provide adequate mental health services to the MCJ inmate population. The staffing model recently developed by Wellpath appears to address these needs, although questions about the adequacy of psychiatry coverage are noted. Adequate staffing will be essential to achieving and maintaining compliance with the requirements of the Settlement Agreement and Implementation Plans.

### 13. Mental Health Care Training
*• All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.*

**Findings: Substantial Compliance**

The prior Mental Health Monitor found substantial compliance with this requirement in his last report. Training rosters were again provided by the Compliance Sergeant for the current review, along with relevant training materials, supporting a finding of continued substantial compliance.

• *In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.*
• *All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates, identifying warning signs specific to inmates, and how to recognize individuals who are in mental distress and/or suicidal.*
**Defendants have been released from monitoring on these items. [Dkt. 751 at ECF 10]**

• *Once a year, custody staff will conduct a situational training such as a mock suicide attempt or a medical emergency. CFMG staff will also participate in the annual situational training. At the conclusion of the situational training, command staff will meet with CFMG to determine if any changes in policies or operations are warranted as a result of the exercise. [Dkt. 528-1 at 17 of 90]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance. [Dkt. 751 at ECF 19]**

**Findings: Deferred**

Documentation was provided of a situational training involving a mock suicide attempt by hanging, conducted on 3/31/2022. The sign-in roster included the names of a Sergeant and six deputies. It did not, however, reflect the participation of any CFMG staff, as required by this compliance item. It did not reflect interaction between command staff and CFMG to determine if any changes in policies or operations were warranted as a result of the exercise. Further information is required regarding how these trainings are conducted and documented.

• *All medication nurses must be trained to recognize common side effects associated with use of psychotropic medications, and upon observing such side effects must document observation in the medical record and schedule the patient to see a medical provider at the next available sick call. [CFMG Plan at 90]*
**This item has been released from monitoring. [Dkt. 751 at ECF 12]**

**14. Restraint Chairs**
• *Physical restraint devices can only be used on inmates who display bizarre behavior that results in the destruction of property or reveals an intent to cause physical harm to others, and cannot be used when there are less restrictive alternatives. [CFMG Plan at 47]*

**This item has been released from monitoring. [Dkt. 751 at ECF 12]**

• *Use of a restraint chair will be documented in an observation log which will be reviewed and signed by a supervisor. Inmates shall not be placed in a restraint chair for longer than six consecutive hours.*

**This item has been released from monitoring. [Dkt. 751 at ECF 11]**

• *Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A shift supervisor and medical staff shall oversee the exercise. If unsuccessful in allowing inmates to exercise their arms and hands in a range of motion exercise, safety staff shall explain on the observation log why extremities could not be exercised and a shift supervisor shall be notified.*

**Findings: Substantial Compliance**

The prior Mental Health Monitor found noncompliance with this requirement in his last report, based on two incidents occurring in December 2020 and April 2021 that did not include appropriate documentation of range of motion and checking for placement of handcuffs. As reported by the Compliance Sergeant in his recent monthly audits, there continue to be few incidents of restraint usage, and of these, fewer still that extend to an hour or more in duration. Audits conducted by the Compliance Sergeant indicated that there was one use of the WRAP restraint device in November 2021 that lasted two hours and complied with requirements, including range of motion exercise. Other uses of the WRAP device were less than one hour and complied sufficiently with relevant requirements. As anticipated by the prior Mental Health Monitor in his last report, the interventions undertaken by the Compliance Sergeant has assisted the staff in addressing prior omissions that had previously resulted in findings of noncompliance.

• *On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.*

**Findings: Substantial Compliance**

The prior Mental Health Monitor found substantial compliance with this requirement in his last report, noting that all incidents of restraint use were audited by the Compliance Sergeant. This was again found in the current review.

**15. Use of Force**
• *Medical and mental health staff shall be consulted before any planned use of force on an inmate. Custody staff in concert with medical staff will develop the most effective and appropriate means of imposing compliance with rules and regulation, including attempts at de-escalation. It is understood that it is the goal of custody staff to use the least amount of force necessary to ensure compliance with rules and regulations. Planned use of force will only be used after verbal attempts to obtain compliance.*
• *Any use of force will be documented on a use of force form.*

**Findings: Substantial Compliance**

The prior Mental Health Monitor found noncompliance with these requirements in his last report. Dr. Hughes noted that while documentation indicated that medical and mental health staff were consulted prior to most planned uses of force, he cited two incidents during October and December of 2020 that lacked such documentation. Review of use of incident reports written between January and June 2022 for the current mental health monitoring report showed that all incidents included documentation that mental health staff were consulted prior to planned uses of force. Reasonable attempts at de-escalation were documented in most cases of unplanned uses of force when appropriate. In those incidents where attempts at de-escalation were not documented, it appeared plausible that there was not sufficient opportunity to attempt to de-escalate in light of the immediate circumstances and the potential threat to safety, security, or effective jail operations. Verbal attempts to obtain compliance were consistently noted where the situation allowed.

The prior Mental Health Monitor also stated in his last report that documentation in incident reports showed that custody officers frequently declined to charge patients with known mental health concerns, noting that this was a welcomed practice. During the current review, incident reports indicated that charges are routinely recommended, including for patients with known mental health problems. This is particularly concerning in cases of patients with severe and chronic mental health problems who require psychiatric inpatient level of care and cannot be adequately treated in the jail environment. It is recommended that a mental health patient's clinical condition and current status be taken into consideration when decisions are made about filing charges for infractions while incarcerated.

## 16. Mental Health Grants

• *Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.*

**This item has been released from monitoring. [Dkt. 751 at ECF 10]**

## 17. Inmates Who Have Been Declared Incompetent to Stand Trial

• *The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period. As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment. The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for orders to show cause to be directed the State of California) to expedite the transfer of inmates who have been determined to be incompetent to stand trial to an appropriate State facility. [Dkt. 582-1 at ECF 13]*

**Findings: Deferred**

The prior Mental Health Monitor found substantial compliance for this requirement in his last report, noting that the issue had remained unchanged. He reported that not all inmates who were declared incompetent were routinely placed into transition cells in administrative segregation and seen daily by medical staff upon a Court finding of incompetent to stand trial, but there was continued coordination between custody and mental health staff to notify inmates of the Court's finding.  Mental health staff then determined appropriate housing.  Placement into administrative segregation cells was determined by the inmate's ability to function in general population.  Inmates declared incompetent were also discussed in the Multidisciplinary Treatment Meeting.  The prior Mental Health Monitor concluded that, "The process developed for the identification, referral and monitoring of inmates who were considered or declared incompetent appeared to be adequate and sufficient to allow for a continued determination of substantial compliance."

Discussion of this process with the Mental Health Supervisor for the current report indicated that the Court does not always provide timely notification when inmates are declared incompetent to stand trial. In misdemeanor cases, charges are now typically dismissed or the judge releases the defendant. County Behavioral Health will typically check in regarding the inmate and arrange support services for transition back into the community. Felony cases often result in longer stays.  Once notified, mental health will see patients and place them on a 30 day follow-up schedule if appropriate.  Patients may be seen more frequently as needed.  It was noted by County Counsel that there are no longer "transition cells" and that there is considerable discussion between classification and mental health staff regarding inmate placement, and that inmates found incompetent to stand trial are typically discussed in the Multidisciplinary Team meetings.

Based on information obtained so far for the current report, it does not appear that compliance has been reached with all aspects of this requirement as written, particularly the element referring to placement in administrative segregation housing within 24 hours of a Court determination of incompetence to stand trial, unless contraindicated by medical staff. This did not prevent the prior Mental Health Monitor from finding substantial compliance. The concern that prevents a current finding of continued substantial compliance is the reported delayed and sporadic nature of notification of the jail by the Court when an inmate is found incompetent, and subsequent lack of timely notification of mental health staff.  The primary intent of this requirement appears to be the close monitoring of inmates during a period of potentially heightened vulnerability following a finding of incompetence to stand trial.  Additional information about current procedures is needed to make a determination regarding compliance with this requirement.

It is also noted that a small Jail Based Competency Treatment program is located within MCJ, and that a program of early access to enhanced mental health treatment (EASS) is under development for this population, which is encouraging. Information provided by Wellpath staff indicates that the EASS program started at MCJ on July 25, 2022.  It was reported that 22 males and five females have been enrolled in the program, with 17 males and 2 females subsequently unenrolled. The disposition of those unrolled include five transferred to DSH, 10 transferred to the Jail Based Competency Program, three transferred to jail, and one transferred to hospice. The program is reported to be currently staffed to matrix, although it is not clear what this means in

terms of allocated and filled positions. It is recognized that the EASS program is not specifically a part of the implementation plan requirements and associated monitoring process.  It is of relevance to the degree that it may help to alleviate the challenges noted in providing adequate acute and chronic care to inmates with serious mental illness who do not otherwise have access to the level of care they need.  Additional information about this program and the extent to which it may help alleviate the problems noted with the lack of adequate inpatient treatment options for the MCJ inmate population will be an ongoing focus of discussion.

## 18. Treatment Plans

• *Qualified health services staff must develop a written individualized treatment plan for inmates requiring close medical and/or mental health supervision. A treatment plan must specify a particular course of treatment and shall be included in the plan portion of the S.O.A.P. progress note. The treatment plan shall reflect current problems or conditions being followed. The treatment plan shall include monitoring of the efficacy of treatment and discharge planning. [CFMG Plan at 27, 75]*
• *Treatment plans shall include specific medical and/or psychiatric problems, nursing interventions, housing, dietary, medication, observation and monitoring, and follow-up referral and/or evaluation as appropriate. [CFMG Plan at 27]*
• *Mental health providers must work with the Program Manager or designee to develop a treatment plan and meet the outpatient needs of inmates with mental illness, including opportunity for social interaction and participation in community activities. If an inmate is unable to participate, the reason must be documented. [CFMG Plan at 43, 75]*
• *CFMG will inform classification through medical treatment orders as to any classification issues an inmate has due to a mental illness. [County Plan at 11]*

## Findings: Noncompliance

The prior Mental Health Monitor reported noncompliance with the requirements for treatment plans in his last review, noting that the documentation of treatment planning remained inadequate. The issues Dr. Hughes identified were again observed in the current review, including in cases involving severe mental illness, recurrent suicidal behavior and referral to NMC for stabilization.  As previously noted, these concerns were particularly troubling for cases in which the patient required a higher level of care than could be provided at MCJ, in which adequate interventions to address problem areas such as treatment nonadherence and self-injurious behaviors were not documented.

The Implementation Plan requirements for treatment plans specify the elements of an individualized treatment plan that must be included in the clinical documentation. Review of recent treatment plans indicated that these elements are seldom adequately addressed. Integration of the interventions provided by various professional disciplines (e.g., mental health clinicians, psychiatrist, nursing, custody, etc.) remains lacking. Specifically, the role of psychiatry appears limited to the prescription of psychotropic medications, without further involvement in an interdisciplinary treatment process; coordinated efforts to address problems such as medication compliance or reduction of self-injurious behavior were not evident in the documentation.

Although the weekly MDTM continues, which is understood to provide a forum to discuss cases of serious mental illness, the information discussed does not appear to reliably inform the treatment planning documentation found in the healthcare record. Dr. Hughes noted that despite the importance of this meeting and the valuable information conveyed in a multidisciplinary forum, healthcare and MDTM records continued to lack appropriate documentation of individualized treatment and safety planning. These limitations continue, such that treatment plans do not effectively guide treatment across time and across providers.

It is recognized that effective interdisciplinary treatment planning presents particular challenges in the jail environment, including unpredictable lengths of stay; a wide range of clinical presentations, including comorbid diagnoses such as substance use and personality disorders; and conditions of confinement that can make it difficult to create and maintain a therapeutic milieu. Despite these challenges, however, improvements in treatment planning documentation are needed. The Mental Health Monitor anticipates working with mental health leadership and clinical staff to implement necessary improvements that are both effective and realistic for MCJ.

### 19. Consideration of Mental Illness in Inmate Discipline
• *Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff shall contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness. (*Dkt. 532 at ECF 47*)*

### Findings: Noncompliance
The prior Mental Health Monitor found noncompliance with this requirement in his last report, noting that while some Disciplinary Action Reports (DARs) were completed in their entirety, many forms were not completed by checking boxes at the bottom of the form that noted whether inmates received mental health services or if custody staff consulted with medical staff. A review of recent DARs for the current report found this same deficiency. In addition, for those inmates whose DAR form was checked for receiving mental health services, the DAR contained no information related to consulting with mental health staff. Review of the electronic healthcare records for a sample of these patients also showed no documentation of such consultations by mental health staff regarding the evaluation of discipline for inmates with mental illness.

The prior Mental Health Monitor also noted that a review of incident reports during his last monitoring period contained multiple examples in which officers determined not to charge inmates for whom there was a known mental health concern and for whom it appeared that their behavior was related to their mental illness. Reviews of recent incident reports indicated that officers appear to routinely recommend charges, regardless of the potential impact of mental illness on the inmate's behavior, which, as noted earlier, was typically not explicitly assessed by mental health staff.

### 20. Space Issues
• *Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health*

*Professionals for prisoners with mental illness, including . . .adequate clinical and administrative treatment space....* [Dkt. 494 at ECF 17]

**Findings: Substantial Compliance**

The prior Mental Health Monitor found substantial compliance with this requirement in his last report. The recent site visit and subsequent discussions with staff indicate continued substantial compliance.  Adequate office space is available for mental health clinicians and the psychiatrist, and clinical treatment space is available for seeing patients in a confidential setting. Dr. Hughes noted in his final report that psychiatric clinical encounters occurred primarily at cell-front and remotely by phone or FaceTime.  He reported issues of confidentiality regarding the provision of remote psychiatric encounters. Similar concerns were noted during the current review regarding the consistent use of cell-front psychiatry contacts, whereby the confidentiality of these encounters was compromised.  This, however, does not appear to be a space issue.

**21. Administrative Segregation**
• *The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation, and require procedures to mitigate the impact of administrative segregation on persons with mental illness, including but not limited to structured therapeutic activity outside the segregation cell and where feasible assignment of cell mates.*  [Dkt. 494 at ECF 9-10]
• *Inmates being moved from general population to an administrative segregation cell will be screened for suicide risk within 24 hours of placement.* [Dkt. 528-1 at ECF 12]

**Findings: Noncompliance**

The prior Mental Health Monitor deferred a finding on compliance with this requirement in his last report. The current review found noncompliance with both elements of the requirement: the need for screening all inmates placed in administrative segregation and the need to provide structured therapeutic activity outside the segregation cell.  Discussion with the Mental Health Supervisor indicated that mental health staff do not routinely screen inmates placed in administrative segregation housing.  There is no process by which mental health staff are notified of all administrative segregation placements, and there is insufficient mental health staffing to conduct the resulting volume of screenings should such notifications be made. Groups are still not being held on a regular basis to meet out of cell programming requirements due to mental health staffing limitations, although in-cell materials are provided.

It was reported by the prior Mental Health Monitor that the facility had begun tracking those patients who were treatment non-adherent.  This apparently involved tracking by custody staff of inmates who consistently refused their out of cell socialization and programming time. Discussions with the Mental Health Supervisor for the current report indicated that there used to be paper logs on all administrative segregation units where deputies would note which inmates came out of cell during the times offered and those who did not.  Mental Health staff could track these logs to determine which inmates required mental health contact to evaluate their condition. Since the transition to use of the Guardian system for tracking out of cell time, the responsibility for running and filtering the necessary reports falls completely to the mental health supervisor.

This has proven to be much more time consuming, but remains a valuable process for monitoring the condition of inmates in administrative segregation housing and intervening early if mental health issues are detected. In the absence of more efficient alternative means of conducting the necessary monitoring of out of cell time usage by administrative segregation inmates, sufficient mental health staffing should be available to support this process.

• *Inmates shall not be placed in administrative segregation solely because of having a mental illness. Classification is to assess a totality of factors when assigning inmates to administrative segregation units. The goal of the County is to limit the use of administrative segregation for inmates with mental illness.* [Dkt. 528-1 at ECF 12]

**Findings: Substantial Compliance**

The prior Mental Health Monitor does not appear to have addressed in his reports the portion of this requirement regarding the placement of inmates in administrative segregation solely because of a mental illness. He deferred his findings on the other portions of this requirement in his last report. Dr. Hughes noted that the segregation units continued to primarily house mentally ill patients, but that better tracking had been implemented regarding the placement of these individuals in segregation and the reasons for placement.

Compliance with the requirement that inmates shall not be placed in administrative segregation solely because of having a mental illness depends in large measure to how this statement is interpreted. It is relevant to note that this requirement in County Implementation Plan is under the section on Classification. This contributes to the interpretation used in evaluating compliance for the current report, whereby the classification process will not result in placing an inmate in administrative segregation only ("solely") because of the presence of mental illness. During the current review, there were no indications that inmates were placed in administrative segregation solely because of having a mental illness. An alternative interpretation, put forth by the Plaintiffs' attorneys, is that inmates whose mental illness contributed to behaviors that resulted in administrative segregation, in the absence of adequate available treatment options such as inpatient level of care, have therefore been placed in administrative segregation solely because of having a mental illness. There were cases in the current review where a severe and chronic mental illness contributed to the behaviors leading to placement in administrative segregation, and these cases sometimes exceeded the capacity of MCJ to adequately treat the mental illness. This problem has been addressed in the sections of the current report covering chronic and acute care, where there are current findings of noncompliance. Cases where the presence of mental illness contributed to behaviors that resulted in administrative segregation are not considered to prevent a finding of substantial compliance with this requirement. This does not relieve MCJ and Wellpath from responsibility for making available adequate care for patients with severe acute and chronic mental illness, and finding more effective alternatives to administrative segregation for such patients.

A deputy assigned to the Classification Unit was interviewed during the site visit on July 21, 2022. She explained the process by which classification assesses a variety of factors when assigning inmates to administrative segregation housing. This process includes regular and ongoing consultation with mental health staff, consideration of the inmate's preferences, needs,

and behaviors.  The process as described appears to support placement of inmates in the least restrictive housing option that addresses both clinical and security concerns. There is an established process for resolving any disagreements between custody and mental health staff regarding housing placement, which are described as rare.

The Classification Unit is currently staffed with four deputies, a sergeant, a commander, and an intelligence officer. A challenge described by the deputy interviewed during the site visit involved delays in getting patients on proper medications, which can delay moving inmates out of administrative segregation. This appears to be a function of limitations in psychiatry coverage at intake and while on-call.  Housing placement for inmates with mental health needs are also discussed in the weekly multidisciplinary team meeting (MDTM), which is run by the Ombudsman and attended by both custody and mental health representatives.

• *Inmates with a serious mental illness who are housed in Administrative Segregation will be scheduled for a weekly appointment with a qualified mental health provider.* [CFMG Implementation Plan at 42]

**Findings: Substantial Compliance**

The prior Mental Health monitor noted in his last report that segregation inmates were seen weekly by a qualified mental health provider.  The current review of healthcare records indicated that mental health provider appointments were consistently scheduled weekly for inmates with serious mental illness while housed in Administrative Segregation, although it was noted that the contacts were sometimes rescheduled due to workload issues.  Despite the rescheduling of contacts with the mental health clinician, patients in Administrative Segregation were typically seen within two to three days of the originally scheduled appointment, and were thereby still seen each week on a consistent basis.

• *Nursing staff shall conduct mental health rounds in Administrative Segregation daily, separate and apart from medication distribution.* [CFMG Implementation Plan at 42]

**Findings: Noncompliance**

The prior Mental Health Monitor found noncompliance with this requirement in his last report, noting that nursing rounds were not always documented daily in segregation units. Review of healthcare records for the current report found a similar pattern whereby nursing rounds were not documented daily across administrative segregation housing.

• *Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior. Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal. [Dkt. 528-1 at ECF 15]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance.  [Dkt. 751 at ECF 19]**

**Findings: Deferred**

The prior Mental Health Monitor had previously found Substantial Compliance on this requirement, and the current review indicated that audits of the documented completion of welfare checks continued to show high levels of compliance. However, information emerged from review of a recent inmate suicide while housed in a booking cell, which raised substantial concerns about the adequacy of the welfare checks that were recorded as performed. These concerns are detailed under the section covering Safety and Sobering Cells above, and in the case review reported separately. It is noted that the Compliance Sergeant has developed a thorough and effective process for monitoring the recording of welfare checks, with routine reports and feedback to deputies, including disciplinary action as needed. These aspects of compliance are not currently at issue. The area of concern which prevents a finding of Substantial Compliance at this time is the requirement that welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior. There were apparent failures in this aspect of the requirement leading up to the completed suicide, although it is recognized that this inmate was not housed in administrative segregation. An effective and sustainable process is needed to ensure that welfare checks consist of observations sufficient to assess the inmate's well-being, including in administrative segregation. This aspect of compliance has not been adequately evaluated, and therefore a finding regarding compliance is deferred at this time.

• *Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.*

**Findings: Deferred**

The prior Mental Health Monitor found substantial compliance with this requirement, noting that the Compliance Sergeant continued to audit welfare checks monthly, and that issues of concern resulted in notice and discipline when indicated. The same level of performance was found in the current review. However, as indicated in the findings for the preceding requirement, concerns arise from the review of the most recent completed suicide at MCJ, whereby the adequacy of the welfare checks to ensure that signs of life are present were problematic. These concerns are addressed in more detail in the section of the current report covering Safety and Sobering Cells above. These concerns bear on the portion of this requirement regarding verbal interaction if necessary. It is recognized that the suicide did not occur in administrative segregation. It is not clear to what extent the issues noted in the welfare checks for that inmate generalize to administrative segregation. An effective and sustainable process is needed that ensures verbal interaction if necessary to assess an inmate's well-being in all areas covered by the implementation plans, including administrative segregation. A finding regarding compliance for this requirement is deferred at this time and will be a focus of future reports.

• *All welfare checks shall be documented on a welfare check log. The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. On a*

*monthly basis, the Compliance Sergeant will randomly select five log entries and use the door entry logs to verify that the deputy entered the administrative segregation pod, to conduct a welfare check. The Compliance Sergeant will track all of his findings through reports which will be sent to the Jail Ops Commander. Monthly audits of the Compliance Sergeant's reports will be conducted by the Jail Operations Commander. The Jail Operations Commander will generate a monthly report to document their audit findings. [Dkt. 528-1 at ECF 16]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neural monitor's next tour report finds substantial compliance. [Dkt 751 at ECF 20]**

### Findings: Deferred

The prior Mental Health Monitor found substantial compliance with this requirement during his last report, noting that the Compliance Sergeant continued to audit welfare checks monthly, and that areas of concern that were identified resulted in notifications and discipline when indicated. Review of logs by Dr. Hughes indicated timely documentation of custody welfare checks.

The current review produced the same findings in this regard. The Compliance Sergeant continues to conduct thorough and timely audits of welfare checks as required, with regular monthly reports to the Jail Operations Commander. The Corrections Operations Commander provides a thorough monthly compliance report to the Chief of the Corrections Operations Bureau. Review of welfare check logs and example reports by both the Sergeant and the Commander, in addition to discussions with the Compliance Sergeant about the procedures used in this process, demonstrated ongoing compliance with this aspect of the requirement.

This requirement is interpreted as pertaining primarily to the process of recording that welfare checks took place, and the associated internal monitoring process by the on-duty sergeants and Compliance Sergeant to ensure that welfare checks took place. These aspects of the welfare check process remain in substantial compliance, i.e., the welfare checks are consistently documented in a log, and the required reviews and reports are completed. However, concerns were raised regarding the accuracy of the welfare check log entries for the period leading up to the discovery of the completed suicide reviewed for the current report, even though this inmate was not housed in administrative segregation at the time. This leads to deferring a finding of substantial compliance until further information is obtained regarding the accuracy and consistency of the information entered into the welfare check logs, including in administrative segregation, and whether these aspects of the welfare check process are adequately reflected in the internal review and reporting process.

### 22. Suicide Prevention

• *Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.*
**The County has been released from monitoring for the reduction of tie-off points within administrative segregation cells in units A, B, R, and S. (Dkt. 751 at ECF 11)**

33

**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance for reduction of tie-off points in Pods D, G, H, I and J. [Dkt. 751 at ECF 19]**

**Findings: Substantial Compliance**

During the current site visit, cells in units D, G, H, I, and J pods were visually inspected. These cells had been modified according to the agreed upon reductions in tie-off points, i.e., the gap between the bed and the wall had been closed, the holes in the bed frame had been sealed, the space between the wall and the combination sink and toilet unit had been calked, the space between the ceiling and the light fixture had been calked, and the air vent grate holes were of small diameter. It was noted that some of the combination sinks in the inspected pods had a spout protruding from the top surface that could provide a tie-off point. It was also noted that metal plates affixed to the walls of some cells had gaps through which a ligature might be passed. Reductions of these potential tie-off points were not among the previously agreed upon modifications requirements, and are not considered to preclude a finding of substantial compliance.

**A footnote in Dkt. 751 at ECF 19 states that the Mental Health Monitor will evaluate the new jail for reduction of tie-off points. If substantial compliance is found for reduction of tie-off points in the new jail, Plaintiffs have agreed to release Defendants from further neutral monitoring for these cells.**

**Findings: Deferred**

Cells in the newly constructed areas of the jail were not inspected for the presence of tie-off points. County Counsel reported that the construction codes with which these areas must meet the requirements for reduction of tie-off points agreed to for the older administrative segregation cells. This was not visually verified during the July 2022 site visit.

There is disagreement between Plaintiffs' attorneys and County Counsel regarding whether the cells in the jail new addition fall within the scope of the implementation plan and are subject to monitoring. County Counsel maintains that the jail new addition is not part of the implementation plan and not subject to monitoring for the reduction of tie-off points. Plaintiffs' attorneys maintain that the language of the footnote in Dkt. 751 at ECF 19 represents such a requirement, as it states, "On his next inspection tour, Dr. Vess, the neutral monitor for mental health, will evaluate the new Jail for reduction of tie-off points. If Dr. Vess finds Defendants in substantial compliance in his next audit for the reduction of tie-off points in new Jail cells, Plaintiffs will release Defendants from neutral monitoring of tie-off points in those cells. Defendants contend that a reduction of tie-off points in D, G, H, I, and J pods are required by the implementation plans or settlement agreement."

As there appears to be a legal disagreement regarding the scope of the requirements subject to monitoring in the new jail areas, further monitoring and the rendering of a finding regarding compliance is deferred pending resolution of this disagreement.

*• A qualified mental health professional must perform a suicide risk assessment using the Suicide Risk Assessment Tool (attached as Exhibit G to Implementation Plan) in all the following circumstances: (1) if the RN identifies suicidality during the Initial Health Screen; (2) within 4 hours of placement in a safety cell and before release from a safety cell; (3) after placement in Administrative Segregation. [CFMG Plan at 43, 72, 75]*

**Findings: Noncompliance**

Determination of compliance with this requirement is complicated by the difference between patients who require a safety cell due to being placed on Level 1 Suicide Watch, vs. those on Level 2 Suicide Watch who are placed in a safety cell due to lack of availability of alternative single-cell placement. Those on Level 1 Suicide Watch appear to clearly meet the intent of this requirement. For those on Level 2 Suicide Watch who are placed in a Safety Cell, the applicability of this requirement is less clear. An example of this distinction is the completed suicide which was reviewed for the current report; he was placed in a safety cell but was on Level 2 Suicide Watch. A risk assessment using the Suicide Risk Assessment Tool was not completed within four hours of placement in a Safety Cell because the working assumption of staff was that he did not require this for Level 2 Suicide Watch. He was also not re-assessed for suicide risk prior to movement out of the safety cell for the same reason.

Review of Safety Cell audits provided by the Compliance Sergeant indicated that placement in a safety cell on Level 1 Suicide Watch is a relatively rare occurrence. The Compliance Sergeant conducted a review at the Mental Health Monitor's request from July 2021 to present and identified one case in November 2021 of an inmate on Level 1 Suicide Watch placed in a safety cell. Careful review of the healthcare record indicated that although the inmate was jail checked at NMC for intoxication and placed in a WRAP device with direct observation for approximately one hour, she was placed on Level 2 Suicide Watch upon release from restraints. The documentation associated with this case is inconsistent, and it is not clear that the patient was ever actually placed on Level 1 suicide watch by mental health staff. Another case involving an apparent suicide attempt by hanging in April 2022 was reviewed and showed that the patient was promptly seen by a mental health clinician, designated as a Level 1 Suicide Watch, and sent out to NMC for evaluation. The patient was promptly evaluated by a mental health clinician upon his same-day return and downgraded to a Level 2 Suicide Watch based on his assessed level of risk using the Suicide Watch Initial Assessment for Mental Health. It does not appear that he was ever placed in a safety cell during this episode.

Discussion of this requirement with the Mental Health Supervisor indicated that the structured suicide risk assessment tool currently used at MCJ is a version of the Columbia risk scale embedded in a form labeled Suicide Watch Initial Assessment for Mental Health. This is done within four hours of placement in a safety cell on Level 1 Suicide Watch. It is not done within four hours with those placed on Level 2 suicide watch, including those on Level 2 Suicide Watch who are placed in a safety cell for lack of alternative single cell availability. For these patients it is completed during the regular daily work shift; for patients placed on Level 2 Suicide Watch outside of daily mental health work shift hours (including those placed in a safety cell), the suicide risk assessment is completed the following day during the regular mental health work shift.

35

The Plaintiffs' attorneys maintain that the Implementation Plan makes no distinction or qualification regarding inmates on Level 1 vs. Level 2 Suicide Watch, and therefore all patients placed in a safety cell are required to have a suicide risk assessment, including use of a suicide risk assessment tool, performed by a qualified mental health provider within four hours after placement in a safety cell and before release from a safety cell (Dkt. 532 at ECF 43).  In light of all the information currently available, it is not clear that this is the optimal interpretation or application of this requirement. It seems likely that this will result in a substantial number of potentially unnecessary risk assessments for patients who have already been determined not to require Level 1 Suicide Watch and therefore did not require placement in a safety cell to begin with.  This does not, however, address the frequent use of safety cells for inmates on Level 2 Suicide Watch, who are not considered to require a safety cell in the absence of imminent risk of self-harm. This practice should be discontinued to the greatest degree possible.  Further exploration of this issue and identification of alternatives to placement in a safety cell for inmates on Level 2 is required; this will be the focus of further discussions and monitoring.

Structured suicide risk assessments are not routinely completed with inmates placed in administrative segregation housing. The Mental Health Supervisor indicated that there is no reliable and consistent way by which mental health staff are informed of all administrative segregation placements, nor are there enough mental health clinicians on staff to respond adequately to this requirement.

• *Whenever an inmate is placed in a safety cell due to suicide risk, CFMG shall immediately, and no later than within 4 hours, determine what level of suicide precautions are necessary and decide whether the inmate needs to be transferred to an inpatient mental health facility. If CFMG determines that more than 24 hours of suicide watch/precautions is necessary, CFMG shall work with custody to place the inmate in an inpatient mental health facility, the Outpatient Housing Unit, a receiving cell located in the booking unit, or dorm A. Whenever possible, the inmate will be transitioned from a safety cell to an open dormitory setting until the inmate has stabilized. [CFMG Plan at 73, 75]*
• *Custody must transfer patients to NMC or another appropriate inpatient mental health facility if the patient has been housed in a safety cell for 24 consecutive hours or for more than 36 cumulative hours in any 3-day period. If exigent circumstances prevent such transfer, a memo must be written to the Custody Operations Manager. [CFMG Plan at 73, 75]*
• *Once CFMG determines that an inmate is no longer suicidal, CFMG shall work with custody staff to place the inmate in the most appropriate setting. Mental health clinicians must follow-up with the patient until a step-down plan is no longer necessary. [CFMG Plan at 73]*

**Findings: Deferred**
The prior Mental Health Monitor found noncompliance with these requirements in his last report. His primary concern appears to have been the inadequacy of safety plans and cases where the documented reason for release from suicide monitoring was the patient's denial of suicidality and engagement in safety planning, rather than an adequate assessment of risk.  Dr. Hughes noted that healthcare records frequently referenced the discussion of the safety plan with the patient prior to discontinuation of suicide monitoring, but that the actual safety plans were not located in the healthcare record for review and evaluation for adequacy.

36

The current evaluation of compliance with these requirements is again somewhat complicated by the distinction between Level 1 and Level 2 Suicide Watch. Discussion with the Mental Health Supervisor about the procedures associated with these requirements indicated that inmates placed on Level 1 Suicide Watch will invariably be placed in a safety cell (if they are not immediately sent to NMC for further evaluation) and will be assessed for suicide risk by a mental health clinician using the Suicide Watch Initial Assessment for Mental Health within four hours. There is a system for closely tracking the time any inmate has been in a safety cell, implemented by the Compliance Sergeant and monitored daily to ensure compliance with the 24 hour limit.

It is noted in other sections of the current report that Level 1 Suicide Watch is a rare occurrence; almost all cases of inmates placed in a safety cell for risk of suicide are Level 2, for whom alternative housing placement is temporarily unavailable. Custody has the latitude to move such inmates out of the safety cell without further consultation or evaluation by a mental health clinician. Custody cannot, however, remove an inmate from suicide watch. This must be done by a mental health clinician, who will reassess the inmate's suicide risk using the structured risk assessment tool prior to removal from suicide watch.

As noted by the prior Mental Health Monitor, the documented safety plans were still not consistently located in the healthcare record for review. Some of the Collaborative Safety Plans which were located in the healthcare records for review were cursory and lacking in detail. Sick call notes for patients placed on Suicide Watch were reviewed, and usually contained a completed Suicide Watch Daily Follow-up and Discharge for Mental Health form; it appears that some of the information from a Collaborative Safety Plan may be included in the sick call note at the time a patient is released from suicide watch. This documentation does not always provide adequate information regarding the assessed level of current risk, the clinical decision to release the patient from suicide watch, or the collaborative safety planning to support that decision, although some notes were adequate in light of the patient's clinical presentation.

There is a step-down procedure for inmates removed from suicide watch. As explained by the Mental Health Supervisor, all inmates placed on Level 1 Suicide Watch will be stepped down to Level 2 Suicide Watch for at least one day. All patients on Level 2 Suicide Watch will be seen daily, defined as at least once per work shift; mental health clinicians currently work 12 hour shifts, but are not onsite during evening and overnight hours. Inmates will not be released from Level 2 Suicide Watch until an adequate collaborative safety plan can be developed with the inmate. Mental health staff will consult with custody to determine the least restrictive housing option. The inmate coming off Level 2 Suicide Watch will be followed by mental health, with a minimum of three contacts: once the next day, again within five days of that contact, and again within seven days of that contact. The inmate may be seen more frequently if indicated by the clinical presentation. A draft written step-down procedure for Level 1 Suicide watch was reviewed for the current report. It did not specifically refer to the extended series of follow-up contacts by mental health staff described by the Mental Health Supervisor.

A more thorough understanding of the policies and procedures in place to ensure compliance with these requirements is needed before reaching a finding about compliance. This includes a finalized written policy or procedure reflecting the current mental health follow-up of patients once they are stepped down from suicide watch. Greater consistency in the documentation that the assessed level of risk was considered in clinical decision-making about release from suicide watch, and consistent posting of the associated collaborative safety plans in the healthcare record, are also needed.

*• Custody must conduct welfare checks of patients on suicide watch/precaution twice every 30 minutes. Health services staff must conduct welfare checks every 6 hours. Mental health staff must conduct welfare checks once per duty shift. The checks must be documented in the appropriate log (sobering/suicide watch/safety cell/restraints log). The inmate may not have access to materials that could be used to inflict harm on his/her self or others, and may be dressed in an approved safety garment if necessary. [CFMG Plan at 74, 76]*

**Findings: Substantial Compliance**

The prior Mental Health Monitor found noncompliance with this requirement in his last report. Dr. Hughes indicated that timely custody welfare checks for suicide monitoring were noted, that patients were not allowed materials with which they could harm themselves, and safety garments were provided when clinically indicated. All of these observations appear to be in compliance with relevant aspects of the requirement. All of these observations are consistent with the findings of the current review.

Dr. Hughes also noted that mental health contacts were documented daily, and usually not once per shift; this appears to be the basis for his finding of noncompliance. The current review of healthcare records found that mental health clinicians continue to consistently see patients on suicide watch once per day, including patients on Level 2 Suicide Watch. This is interpreted as satisfying the requirement of mental health welfare checks once per duty shift, as mental health staff are typically scheduled to work one 12 hour shift per day.

It should be noted that this requirement is seen as addressing the frequency of welfare checks, not their quality. Concerns were raised by review of the most recent completed suicide about the quality of custody welfare checks, whereby there was insufficient attention to signs of life (as contrasted with signs of distress). This issue is addressed in other parts of the current report.

*• The CFMG Program Manager and the Facility Manager shall have joint responsibility to report completed suicides in accordance with CFMG Inmate Deaths Policy and Procedure. [CFMG Plan at 76]*
*• The CFMG Program Manager or nursing staff on duty shall report all potential and/or attempted and completed suicides to the Facility Manager or Shift Supervisor. CFMG management will be notified of any completed suicides within one working day. Family members must be notified in accordance with the CFMG Notification of Next of Kin Policy and Procedure. CFMG Plan at 76-77.*

**Findings: Deferred**

Additional information is needed in order to make a determination regarding compliance with these requirements. Beyond information and documentation about the logistics of reporting and notification, an understanding of the process by which attempted suicides are identified and reported is needed. For example, are all cases of self-injurious behavior classified as suicide attempts and considered reportable under this requirement? If not, (as this may be over-inclusive for the purposes of this reporting requirement), how is a determination of attempted suicide

made?  Are all instances of both self-injurious behavior and attempted suicide tracked in some consistent way?  Such information is relevant not only for these Suicide Prevention requirements, but also have relevance for Quality Management and Corrective Action Plans.

### 23. Increase in Time Outside of Cell and/or Increasing Programs

• *Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:*

- *3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)*
- *14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time*
- *2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail)*

• *Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking and receiving area will be guaranteed the following weekly times out of their cell:*

- *3 hours a week for exercise*
- *14 hours a week in the common area*
- *2 hours a week of programming will be offered to each inmate*

• *If approved by classification, inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services [County Plan, Dkt. 528-1 at ECF 19]*

### Findings: Noncompliance

The prior Mental Health Monitor found noncompliance with these requirements in his last report. Dr. Hughes noted that provision of out of cell activities was negatively affected due to the COVID-19 pandemic and mental health staffing issues, which resulted in the temporary discontinuation of group therapy for segregated patients.  He also noted that patients were provided with in-cell group therapy materials, and that dedicated custody program staff worked with segregated patients using journaling and assisted with socialization skills and hygiene issues.

The Compliance Sergeant continues to oversee the thorough and detailed system of routine audits he has implemented, which includes notification of custody staff and further training when deficiencies in out of cell time are identified.  Review of these audits indicated that inmates in segregated housing are generally offered the required amounts of exercise time (yard time) and time in the common area (socialization time). Yard time was sometimes cancelled due to staffing shortages, resulting in less than the required three hours being offered. This was more commonly noted in the January through March 2022 audits, although it was also noted in the May and June 2022 audits. Socialization time was sometimes noted as refused; it was also noted that Wellpath staff audit socialization time refusal entries to monitor changes in inmates' behavior.  One case was audited by the Compliance Sergeant in which an inmate had refused seven of seven days of socialization time offered, noting that Wellpath staff were notified of this

via email.  This proactive monitoring and communication between custody and mental health staff is commendable. Based on review of audit documentation, it appears that MCJ is performing well with the requirements for exercise and socialization time in the administrative segregation pods, with the possible exception of periods where yard time was cancelled due to staffing shortages.  However, substantial compliance with the implementation plan requirements also calls for offering two hours a week of programming time.

Routine group programming is still not being offered by mental health staff due to staffing inadequacies.  Custody programming staff continue to provide various classes and activities to inmates across the jail, including those in administrative segregation.  Programming time is not tracked by the Compliance Sergeant in his auditing procedures.

*• Working with the Monterey County Probation Office and the Monterey County Superior Court, the Office of the Sheriff has and will continue to support evidence based programs such as the Work Alternatives Program; Involuntary Home Detention; Pretrial Release through Probation; Own Recognizance; educational early release kickouts such as Choices/Liberty Pride; and Penal Code sections 4018.6 and 4024.1 kickouts. [County Plan at 15; Dkt. 528-1 at ECF 19]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance.  [Dkt. 751 at ECF 20].**

**Findings: Substantial Compliance**

An interview was conducted with Charles DaSilva, Program Director, during the course of the site visit on July 21, 2022, during which he provided a description of a range of programs offered to inmates.  Mr. DaSilva also provided additional written information following the tour. A standardized Basic Needs Questionnaire is used to identify stressors or barriers to successful transition following incarceration.  A transition counselor works to connect inmate participants with local jobs, community resources and Sober Living Environments.

Earlier programs such as Choices/Liberty Pride, although specifically mentioned in the Implementation Plan, were determined not to be sufficiently evidence based, and other programming opportunities were sought that would better serve the needs of the inmate population.  Mr. DaSilva described a range of courses currently offered through the local Hartnell College to provide both credit and non-credit educational courses. One encouraging development is the provision of milestones credits, whereby inmates can achieve an earlier release date through completion of program courses and educational classes.  Groups typically consist of eight inmates, with 12 in the larger classes.  For inmates who cannot interact with others in a group setting (e.g., those in Ad Seg), arrangements are made for individual activities they can complete in their cells. Serious mental illness was reported to not exclude inmates from participation.  Assessment for learning disabilities and reading level can be conducted to match inmates to appropriate activities.

There are also ties to local community employers and sober living environments to facilitate successful community reintegration following release from jail.  Offerings include instruction – based vocational courses, from which inmates are then connected to the Monterey County Department of Education to get the practical experience portion of the training. Partners

include iCEV, which provides career and technical education and certification, and the Monterey County Board of Education, which offers alternative education and High School Equivalency testing. The MCJ staff work with The Bridge Restoration Ministry in Monterey County, which offers a stable and sober living environment following release from jail.  It also offers various psychosocial and vocational training components.  MCJ staff have partnered with RJP, Inc. to provide Victim Impact Program courses in the jail, described as multi-session, group-based courses supported by an established curriculum, which include class activities designed to enhance communication skills, active listening and strategies for handling conflict.

A new set of programs under development in partnership with RJP, Inc. are the Circles of Hope; Reintegration Circles; and Community-Building and Solution Finding Circles, intended to support family members of incarcerated persons and assist with community reintegration of inmates. Similar programs have been described in the professional literature and appear to provide valuable support services.

Chief Bass described work alternative programs that are available. The offender has to be assigned by the court, in lieu of jail time.  Cases must involve misdemeanor charges, and excludes gang members, violent and sex offenders. Regarding PC 4024.1, Chief Bass explained that the opening of the new jail facility and the resulting increased housing capacity precludes him from seeking releases based on this penal code provision, which is based on over-housing.

Information was provided regarding the programs offered and inmate attendance.  It was noted by MCJ staff that staffing has had some impact on programs offered, both with County staff and the GEO Group, a contract provider for programs.  The journal programs are offered to all inmates in-cell, and consist of the same materials offered in the in-person classes. It was also reported that short sentence times restrict some inmates from fully completing programs and receiving certificates or credits; this is an inevitable challenge in programming for jail populations, with a high turnover rate and sometimes unpredictable sentence duration. It is noted that the language of this requirement does not specify a numerical threshold or capacity for such programs or early release options. It is not expected that the capacity of such programs will be equal to all inmates housed at MCJ, but that such programs will continue to be supported. Based on the information provided, the support shown for these programs is considered substantially compliant with this requirement.

## 24. Telepsychiatry

• *The telepsychiatrist must obtain informed consent and explain all medications before prescribing. [CFMG Plan at 45]*
• *The policies contain numerous provisions regulating the use of telepsychiatry at the jail, including requiring that a psychiatric nurse be present during telepsychiatry encounters where the patient is in a safety cell as well as requiring a local assessment by a physician or mid-level provider within 24 hours of an initial assessment that is conducted by telepsychiatry. [Dkts. 622 and 632].*

## Findings: Deferred

The prior Mental Health Monitor found noncompliance with these requirements.  It appears that at the time of his last review, most or all psychiatry contacts occurred via

41

telepsychiatry (using FaceTime).  Dr. Hughes noted problems with completion of the informed consent forms, a lack of documentation that a qualified clinician assisted, or that a physician or mid-level provider saw patients within 24 hours of an initial psychiatric assessment. He also noted concerns regarding provision of involuntary medications involving telepsychiatry.

Telepsychiatry contacts are reported to be much less frequent since a return to primarily in-person contacts following easing of COVID-19 restrictions. Insufficient cases were identified in the current review with which to evaluate these requirements. Additional information and examples of telepsychiatry contacts are needed to reach a determination about compliance.

### 25. Medical Records
• *Each inmate's medical record shall contain (as applicable):*
- *The completed Receiving Screening form*
- *Health Inventory/Communicable Disease Screening forms*
- *Problem list*
- *All findings, diagnosis, treatments, dispositions*
- *Prescribed medications and their administration*
- *Laboratory, x-ray and diagnostic studies*
- *Consent and Refusal forms*
- *Release of Information forms*
- *Place and date of health encounters (time, when pertinent)*
- *Health service reports (i.e., dental, psychiatric, and other consultations)*
- *Hospital Discharge Summaries*
- *Jail Medical Record Summaries (transfer forms)*
- *Individual treatment plan [CFMG Plan at 114]*

**Findings: Noncompliance**

The prior Mental Health Monitor found noncompliance with this set of requirements in his last report.  Dr. Hughes noted that the healthcare records included the required items except for the individual treatment plans, which, when they were noted in the healthcare record, did not include the necessary documentation.  Review of healthcare records for the current report resulted in similar findings. Deficits in treatment planning documentation are addressed above in the Section 18 on Treatment Plans.

### 26. Quality Management
• *Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit Findings will be reported to the Quality Management Committee at its quarterly meetings. [Dkt. 532 at ECF 9]*
• *All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met. [CFMG Plan at 98]*

• *All completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure.  [Dkt. 532 at ECF 77]*

**Findings: Noncompliance**

The prior Mental Health Monitor found noncompliance with these requirements, although he commented that this was an area of ongoing improvement. Dr. Hughes noted that no documentation was provided that all cases involving the need for involuntary medications were reviewed by the Quality Management Committee.  Such documentation was again not provided for the current review.  Discussions with the Acting Health Services Administrator indicated that cases involving involuntary medications are not routinely reviewed in QM meetings, that there was no current committee structure to do this, and that instances of involuntary medication administration are not routinely tracked in any way.

The one completed suicide that occurred during the review period for the current report was reviewed in a document dated 4/20/22 titled Suicide Safety Gap Analysis and a document dated 5/18/22 titled Psychological Autopsy.  Additional documents related to this suicide made available for review included Wellpath Mortality and Morbidity Report and Review, Parts I, II, and III.  Considered collectively, these documents did not contain sufficient information to reflect a detailed or in-depth analysis of the factors contributing to this suicide or corrective actions to be taken.  This aspect of Quality Management will be a focus of future reports.

Post-implementation monitoring that includes focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan does not appear to be comprehensive and fully developed at this stage. A process is needed whereby the various clinical functions addressed in the Implementation Plan are consistently monitored in relation to specific requirements, and routinely reported to and evaluated by the Quality Management Committee for the degree of compliance that is achieved and maintained over time. Areas where performance is falling short of expected thresholds should be followed by Corrective Action Plans (CAPs), which are updated and modified as needed in light of the ongoing monitoring data in order to achieve the desired level of results. This sequence of actions should be sufficiently documented so that the process can be clearly tracked, including the data reviewed; the corrective actions taken; the success or lack of success of the CAPs is measured; modifications to the CAPs are made as needed; and subsequent performance is measured to ensure continuing compliance.  Substantial compliance with the Quality Management requirements is therefore closely tied to compliance with the following section on Corrective Action Plans.

**27. Corrective Action Plans (CAP)**
• *Defendants' implementation of a policy requires that there are corrective action measures to address lapses in application of the policy. [Dkt. 494 at ECF 11]*
• *Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. [Dkt. 671 at ECF 5; Dkt. 532 at ECF 9]*

**Findings: Noncompliance**

The prior Mental Health Monitor found noncompliance with these requirements in his last report. Dr. Hughes noted that the County and Wellpath had worked with the monitor to develop a combined CAP to address identified deficiencies, but that despite these efforts, the CAP had not been fully implemented.

A spreadsheet document listing 38 different corrective actions was reviewed for the current report. The problems observed with this document, and the process it reflects, go beyond whether the specific items listed in the CAPs have been accomplished, although a number of them have not. The more fundamental problem is that the CAPs are not meaningfully connected to an effective Quality Management process, as noted in the preceding section of this report. Some of the items listed in the CAPs spreadsheet represent one-time actions, such as installing white noise machines near the room used for intake screenings to improve confidentiality, or making modifications to eliminate hanging points in segregation cells.  However, many of the actions listed to address various deficiencies provide no process or data regarding whether the observed deficiencies were effectively remedied.  Several items list various trainings that were to be developed and delivered.  While training can be tracked, this does not address whether the training was effective in producing the necessary changes to correct the identified deficiency.

The underlying problem is that the CAP documentation and the process it represents is largely static, and is not sensitive or responsive to the impact of corrective action on the identified deficiencies.  To complete the one-time actions specified in the CAP (e.g. the delivery of a training class) is not sufficient, in the absence of information on the effectiveness of these actions. CAPs should be consistently monitored by the Quality Management Committee, including ongoing auditing or data collection designed to measure and monitor outcomes.

**Summary and Recommendations**

This report attempts to address all relevant compliance requirements drawn from the Settlement Agreement and the Implementation Plans. Several compliance items were deferred, pending identification and review of additional cases or sources of information, or a more thorough understanding of the policies and procedures in place to address the requirements.  It was considered more appropriate to defer on these requirements than to offer a determination about compliance based on the information and understanding attained at this stage.

In summary, the current report is organized into 27 content areas, containing a total of 97 separate compliance items. This follows the structure and content of the prior Mental Health Monitor, with the intent of providing continuity in the monitoring process. Of the 97 total compliance items, seven have been released from further monitoring by agreement of the parties. Of the remaining 90 items, the current draft report finds 31 to be in substantial compliance, 39 to be noncompliant, and 20 are deferred. Some of the requirements which were deferred may be found in substantial compliance once more information is obtained.

The noncompliant requirements are more numerous in a few notable areas, including chronic care, acute care, outpatient services, involuntary medication, clinical staffing, treatment plans, quality management and corrective action plans. Requirements in other areas are more

substantially compliant, such as the intake screening, sick call, restraint chairs, and use of force requirements. Compliance in other areas are mixed, or a determination has been deferred.

The following recommendations are offered to facilitate continued progress toward addressing the compliance issues identified in the current report:

1.  Staffing.  Of particular importance is the issue of staffing levels. At the time of his last report in May 2021, the prior Mental Health Monitor highlighted staffing limitations as a significant barrier to providing adequate mental health services at MCJ, and noted at that time there were plans to increase the number of clinicians working at the facility. This need for increased staffing continues.  It is understood that Wellpath is in the process of finalizing a proposal for additional staffing based on their recent analysis of need, and that Wellpath's contract with the County is soon up for renegotiation and renewal.  This represents an important opportunity to ensure adequate staffing to meet the remaining requirements of the Settlement Agreement and Implementation Plans. Particular attention should be paid to the availability of adequate psychiatry staffing, including effective on-call coverage to ensure timely response, which presented the only area of noncompliance with intake screening requirements.

2.  Access to inpatient care.  Another area of particular concern is the limited access to inpatient level of care for inmates incarcerated in MCJ.  It is clear that most patients requiring this level of care, which is not available at MCJ, are prevented from accessing this care by the policies and procedures currently in place with Natividad Medical Center.  Unless viable alternatives are found, compliance with the requirements for chronic and acute care cannot be achieved, and compliance with all requirements for involuntary medications will be more difficult. Discussions with staff indicate that it is anticipated that a program to provide early access to enhanced care for inmates found incompetent to stand trial will address much of this need.  It remains to be seen to what extent the need for inpatient care across the inmate population is met through this program. Efforts should continue to explicitly pursue increased access to inpatient care for all inmates who require it.

3.  Treatment planning.  Improvement in the documentation of treatment planning is needed. Mental health staff should consistently provide focused and realistic treatment interventions based on individualized assessment of patients which is clearly documented in the clinical notes. Treatment plans should be easily referenced by all clinicians who may interact with the patient and should guide the treatment provided. Psychiatry notes should include all required elements, as discussed in the Chronic Care section of this report. A more explicit interdisciplinary treatment planning and treatment delivery process is needed, to incorporate both psychiatry input and the work of the mental health clinicians, and should be adequately documented in the healthcare records.

4.  Suicide Prevention.  More consistent documentation is needed of risk assessment findings and their application to clinical decision making about releasing patients from suicide watch, with clear documentation of individual safety plans and step-down procedures.

5.  Custody welfare checks.  A thorough and effective system is in place to ensure the timely completion of custody welfare checks.  At issue here is the quality of the checks, sufficient to

ensure adequate detection of signs of life.  Training and monitoring to ensure that this aspect of the checks occurs routinely is needed.

6.   <u>Psychotropic medications</u>.  As noted in the prior Mental Health Monitor's report, Wellpath should ensure that psychiatrists order new medications for 30 days and adequately assess and document the patient's stability before moving to a 90 day renewal period.

7.   <u>Nursing rounds</u>.  Daily nursing rounds should be consistently conducted and documented in Administrative Segregation housing areas.

8.   <u>Inmate discipline</u>. Custody staff should consistently indicate in their documentation that mental health staff are consulted prior to imposing discipline on inmates with mental illness. Mental health staff should consistently document that they have been consulted and the nature of the input or guidance they provided.

9.   <u>Out of cell programming</u>.  Delivery of group treatment programming should resume as soon as staffing levels allow.

10. <u>Involuntary medications</u>.  A process is needed by which instances of involuntary medication are routinely logged and reported to the QM Committee, Medical Program Manager, Director of Nursing, and Custody Facility Manager, who should review involuntary medication administrations to ensure compliance with requirements and arrange for Incapacity Hearings or placement in appropriate community facilities as needed. Instances of involuntary medications by telephone orders should be reviewed for compliance with relevant requirements, including admission of the patient to the infirmary or a safety cell and associated monitoring.

11. <u>Administrative Segregation Screening</u>. This requirement is referenced in the Settlement Agreement [Dkt. 494 at ECF 17 – 18], but a corresponding requirement was not located in the CFMG Implementation Plan. To meet the requirement as specified in the Settlement Agreement, a process is needed whereby mental health staff are routinely notified of all Administrative Segregation housing placements, and sufficient mental health staffing will be needed to respond to the volume of screenings this will entail.

12. <u>QM and CAPs</u>.  Quality Management and the Corrective Action Plans should be integrated. As discussed above in the respective sections of the current report, a process is needed whereby information is gathered about the effect of corrective action plans on achieving desired levels of performance/compliance; the information is routinely reviewed by the QM Committee or a similar body; adjustments are made to the CAPs as needed; and follow-up data are collected and reviewed to ensure that improvements are sustained.

Respectfully submitted,

James Vess, Ph.D.                                              November 4, 2022
Mental Health Monitor

46

# Exhibit 35

**Monterey County Jail (MCJ) Mental Health Monitoring Visit**
**Healthcare Record Reviews**
**James Vess, Ph.D.**
**July 2022**

**Patient 1 – Suicide Review**.

This patient's healthcare record was reviewed after he died by suicide while incarcerated at the MCJ on April 20, 2022.  In order to evaluate this suicide in light of the requirements of the implementation plans and relevant policies and procedures, a careful review of the timeline of events was conducted.

Background.  According to CorEMR documentation, the patient had prior incarcerations at MCJ, including March 2017, May 2018, July 2018, September 2018, November 2018, December 2018, March 2019, and August 2019.  The patient consistently denied any psychiatric conditions or history of suicide attempts throughout all current and prior intake documentation available in the healthcare record. There was no indication in the records that the patient was ever prescribed psychotropic medications, was ever a psychiatric inpatient, or received outpatient mental health services.

Prior intake notes from July 2, 2018 indicate a withdrawal protocol was initiated, although the specific substance or type of protocol was not specified. An entry from the September 28, 2018 reports the patient relapsed on methamphetamine after two years of abstinence; subsequent bookings also indicate use of methamphetamine.  A left arm injury with pain and weakness from bite by a police K9 were noted during September and November 2018 intakes; left hand grasp weakness and throbbing pain were noted during the December 5, 2018 booking.  No mental health issues were noted.

Intake and placement on Suicide Watch. The Intake Screening of 4/18/2022 notes the patient's speech as clear/coherent, behavior was appropriate, and mood was unremarkable.  It indicates that the patient did not appear acutely intoxicated. No medical or mental health referrals were indicated (at p. 133 in the CorEMR file).  According to the record, a detox protocol was not indicated at the time of intake.

An Inmate Movement Form dated 4/19/22 at 0030 by a deputy indicates patient moved from Sobering cell #2 to Safety cell #3.  The deputy stated that at about 0001 hours he noted the patient's unusual behavior, observing the patient with a shoestring in his hands and red marks around his neck.  The patient admitted trying to hang himself with the shoestring.

An Incident Report dated May 11, 2022 by a Deputy (at p. 36 of May 2022 Incident Report file) provides more detail and a slightly different timeline, stating that on April 18 at 2350 hours he noticed the patient in Sobering Cell #2 with what looked like a shoelace in his hand.  When he went to retrieve the item, he noticed red marks around the patient's neck, and that his demeanor was "skewed."  The patient acknowledged wanting to hurt himself.  The patient was cuffed, and the intake nurse took vitals and provided supplemental oxygen.  The patient made clear that he planned to hurt himself if given the opportunity.  The deputy's Incident Report states that the

1

medical staff on hand made an attempt to contact the on-call "psych staff as in accordance with their policy and procedures." No documentation was located regarding a response to this attempt to contact mental health staff. The patient was placed on Level 2 Suicide Watch in Safety Cell 3, where he remained for the duration of the deputy's shift.

A separate Incident Report entry dated May 12, 2022 by a deputy (at p. 40 of May 2022 Incident Reports file) stated that at approximately 2350 hours on April 18, he went to assist another deputy and noticed "a bright red mark around [the patient's] neck. I recognized the marks as someone who tried to commit suicide." The deputy observed the intake nurse give oxygen "for a few minutes" to raise the patient's oxygen level. Both this deputy and a separate Incident Report entry by another deputy noted that the patient was sweaty at the time they made initial contact.

A late entry in the healthcare record dated 4/19/22 at 7:32 PM by the Intake Nurse stated "Patient was found on the floor in strangulating himself and in respiratory distress. No Loc. Ligature marks noted. Medical staff did a full respiratory assessment and concluded that there was no immediate threat to airway status or breathing. Patient was placed on nonrebreather @ 15 LPM to maintain an oxygenation above 96% and normal breathing rate. Patient was initially found with 88% SPO2 at 30 respirations a minute. Patient was assessed to determine a potential motive for his suicide attempt. He states 'I'm just going through a rough time.' The patient failed to elaborate any further. Patient was placed in a safety cell for suicide monitoring and the mental health and on call provider were notified." No notes specific to contact with the mental health provider were found in the available healthcare records.

<u>Nursing Checks</u>. Healthcare record entries by the RN dated 4/19/22 at 12:37 AM indicate that the patient was placed in "sobering/safety/restraints" at 0009 on 4/19/22 for danger to self and was placed in safety garments. The current status for the appointment states completed. The notes indicate that the medical provider was notified. For psychiatric history, the entry states, "Suicide attempt/gesture in past, SI now?" The notes state that the patient appeared well, had clear speech and a steady gate, but was non-cooperative. Vital signs are noted as stable. A subsequent entry by an RN reports a contact time of 4:00 AM on 4/19/22 has entries identical to the 12:37 AM notes, with the additional notation that the patient had a safety blanket and smock, with a toilet in the cell. The patient was noted as resting on the floor in no distress.

Notes entered by a nurse at 1:38 PM on 4/19/22 state that a nursing check was conducted at 0930, noting that suicide watch level 2 in Safety cell #3 was started at 12:09 AM on 4/19/22 with assessment every six hours until cleared by mental health, with the next check due on 4/19/22 at 3:15 PM (at p. 149 of Cor EMR file). The next nursing entry reports a contact time of 5:36 PM. This entry appears to indicate that the nursing check was 2 hours and 21 minutes later than the required schedule of contacts.

Entries at pages 252 of the Cor EMR file by an RN show a Last Modified Date and Time as 4/19/22 at 1:37 PM and current status as "refused". A subsequent entry at page 253 show a Last Modified Date and Time as 5:36 PM on 4/19/22 also note current status as "refused." These are taken to mean that vital signs were not obtained during these appointments.

2

The Suicide Watch nursing entry, entered by the RN at 12:03 AM on 4/20/22, reports a contact time of 10:00 PM on 4/19. It records a date and time of placement on Suicide Watch as 6:10 PM on 4/19, which is assumed to be in error, and may refer to the time at which the patient was moved to Booking Cell #7 (see below). This note indicates that the patient had a safety blanket and smock, with a working drinking fountain and toilet in the cell. Vital signs were refused by the patient.

The next Suicide Watch nursing entry notes a contact time of 3:20 AM on 4/20/22. It again notes a date and time of suicide watch placement as 6:10 PM on 4/19. This note again reports that the patient refused vital signs.

Entries specific to vital signs begin at p. 265 of the CorEMR file. These entries show:
4/20 at 9:06 AM: "not obtained CPR in progress, no respirations, no pulse"
4/19 at 5:37 PM: patient refused – "gave thumbs up"
4/19 at 4:00 AM: patient refused
4/19 at 12:09 AM: records vitals
4/18 at 9:44 AM: records vitals

Taken together, the various sources of documentation indicate that the only vital signs taken while the patient was on Level 2 Suicide Watch occurred when he was first placed on suicide watch, and were not taken again before his death, a period of approximately 33 hours.

Mental Health Assessment. A Suicide Watch Initial Assessment for Mental Health is noted on April 19, 2022 at 2:09 PM. It records that the watch started April 19 at 0009 hours, and called for staggered 15 minute checks. The reason for this watch is noted as "Attempt", which apparently refers to his attempted strangulation with the shoestring while in the Sobering Cell shortly after booking. The chart entry notes that the patient refused to answer regarding current suicidal ideation, current homicidal ideation, and refused to engage in a collaborative safety process, with an inability to engage in safety planning. His appearance was described as appropriate, his speech pressured, mood depressed and anxious, tearful affect, guarded thought form and appropriate thought content. He was assessed to be fully oriented, with intact memory, fair insight and judgment, and to display withdrawn behavior. (at CorEMR file p. 137)

Risk factors were noted to include "active major depression/mania/hallucinations/delusions." This appears to be somewhat at odds with the observation regarding appropriate thought content, although this entry may reflect default language in the healthcare record software; further details were not provided. It was noted that the patient was depressed and not willing to discuss anything at the time of the assessment, so that it was difficult to assess risk.

Treatment goals at the time of the Suicide Watch Initial Assessment for Mental Health included that the patient will not engage in self-harming/self-injurious behaviors; will tell staff if he experiences suicidal ideation or a plan; will work with MHP to develop a collaborative safety plan including identifying maladaptive coping mechanisms and preplacing with healthy coping plans; and will discuss protective factors and reasons for living. The intervention listed was that the MHP would meet with the patient daily and develop a collaborative safety plan while on suicide watch. The plan was to continue suicide watch and follow up daily.

3

A mental health sick call note dated 4/19/22 at 2:12 PM by a mental health clinician indicates patient was on suicide watch level 2 in safety cell #3 starting at 0009, noting that at intake patient tried to hang himself with a piece of clothing in sobering cell 1 (other documentation indicates he was in sobering cell 2).  When the clinician met with patient, he was lying on the floor under a safety blanket, appearing tense and on the verge of tears.  He initially declined to speak about the events of last night, clenching his jaw and saying he was fine now.  He subsequently acknowledged depression but would provide no further information.  Stated he wanted to take a shower and get dressed.  When asked about how he felt about people intervening when he was putting the shoe string around his neck, he made motions for the writer to be quiet and not say anything else.

Video footage of the patient's attempt to strangle himself in the sobering cell was not reviewed prior to contacting the on-call mental health clinician, and therefore important information about the seriousness of that self-injurious behavior was not conveyed when she was contacted by phone and the patient was placed on Level 2 Suicide Watch.  Had this information been available, an immediate in-person evaluation should have been conducted, and the patient placed on Level 1 Suicide Watch, with all of the attendant precautions associated with that designation. Discussions with staff indicate that immediate review of available video surveillance at the time of the initial determination of the suicide watch level was not a formal requirement or expectation at the time of this patient's suicide.  It is understood that such review of available video is now expected, although a written policy or procedural protocol has not been reviewed by the Mental Health Monitor.

Patient movement and safety checks by custody staff.  An Inmate Log Report showing the cell location specific to the patient indicates that he was in Safety Cell 3 with an initial safety check entry at 12:13 AM on April 19, 2022.  The patient remained in Safety Cell 3 until the safety check entry at 6:16 PM on April 19, when he is shown as being in Booking Cell #7, where he remained until he was eventually discovered and pronounced deceased.  Intervals recorded between safety checks were less than 15 minutes except for one entry that was just under 17 minutes.  It is noted that safety check entries for the early morning hours of April 20 report the patient as lying down, appearing to sleep, and breathing. It is also noted that an entry in the log made at 8:01 AM reports that the patient appears asleep, on his stomach.  The entry at 8:02 AM records that the patient appears asleep, lying down and breathing.  Four additional entries from 8:34 AM to 8:48 AM report, "Well-Being Check Inmate and Cell OK (Booking07)."  This would have been the time period during and after the patient was discovered not to be breathing and subsequently pronounced dead at approximately 8:12 AM on April 20, 2022.  There is no indication in the log that a different inmate was moved into Booking Cell # 7 at this time, suggesting that these entries were made in error.  No documentation was located that addressed why the patient was moved from a safety cell to a booking cell, or who approved this move.

Discovery of deceased patient. An Incident Report dated 4/20/22 by a deputy states that while conducting 15 minute health and welfare checks on inmates who were on Level 2 Suicide Watch, he and another deputy noticed the patient to be unresponsive in Cell 7.  The deputy turned the patient from laying on his stomach over onto his back.  His face was blue and the deputy detected no pulse. One deputy went to notify the receiving nurse.  Another deputy radio

4

broadcasted notice of an unconscious male in Cell 7 and a third deputy radio broadcasted to start Fire and AMR response.  Upon returning to Cell 7, a third deputy was conducting CPR.  At approximately 0808 hours Fire arrived at the receiving sallyport.  At 0812 Fire personal pronounced the time of death.

A supplemental note in the Incident Report by a deputy indicates that he conducted the safety check for Cell 7 where the patient was discovered. The note indicates that the patient was laying on his stomach and appeared asleep and did not appear in distress.  When the patient did not respond to the deputy's kicks upon the door and strikes upon the cell window, the deputy entered the cell and shook the patient by his waist over the safety blanket.  With no response from the patient, the deputy check for a pulse.  He noted that the patient's check was not discolored and "looked normal."  Another deputy was sent to alert medical staff and the deputy used his radio to advise medical staff.  At this point, a third deputy arrived at booking cell #7, shook the patient, lifted his head, and it was noticed that his lips were "blue and white."  At this point both deputies placed the patient on his back and one deputy began CPR.  Another deputy noticed a white foreign object in both nostrils, and that the patient's right hand was "half closed and stiffed. He noticed that the patient had ligature marks around his neck.  Shortly thereafter the patient was moved out of the cell and medical staff took over. Although the timing of these events are difficult to determine with precision from the available documentation, it appears that the two deputies who initially discovered the patient did not immediately begin CPR.

It appears from the available documentation that nursing staff took over CPR from the deputy at approximately 0800 in front of Booking Cell 7.  A note recorded by a nurse with a timestamp of 4/20/22 at 0916 indicates that attempts to use an ambu bag were unsuccessful, with the patient's cheeks puffing out when the bag was pumped.  Visual inspection revealed a white object in the right nostril which was removed.  Another object was observed in the oral cavity.  Staff were unable to remove this object using a plastic spoon but dislodged it using safety scissors; it proved to be a compacted ball of tissue paper. Another object was detected further down.  This was another ball of tissue paper and was also removed.  No further objects were detected, but it was noted that further attempts to use the ambu bag remained unsuccessful.  (At CorEMR file p. 282)

A supplemental note in the Incident Report (at p. 89 in the April 2022 Incident Reports file) provides a detailed timeline of events beginning at 0812 hours.  It indicates that AMR and Fire arrived at 0812 hours, when Fire took over CPR from the Wellpath nurses.  This note indicates that at 0815 hours, Fire informed AMR and Wellpath to discontinue resuscitation measures.

Another note in the Incident Report file by a deputy (at p. 93 in the April 2022 Incident Reports file) states that "At approximately 0812 hours paramedics advised us that [patient] was deceased because rigor mortis had set in."  This suggests that the patient had been deceased for some time before he was discovered, and raises concerns about the adequacy of the 15 minute welfare checks that had been conducted leading up to his discovery.

Subsequent Internal Reviews.  The Psychological Autopsy report by the Regional Mental Health Director, dated 5/18/2022, states that the patient used the string from a hooded sweatshirt in his attempt to strangle himself in the Sobering Cell, causing himself to pass out.  This report states that it is typical protocol for custody to remove strings prior to providing a sweatshirt, but that

5

this was not done in this instance.  The report also notes that the patient had observable ligature marks but that the covering medical provider instructed the on-site team not to send the patient to an outside hospital for evaluation.  The report states that 15 minute checks were conducted up until the patient was discovered unresponsive on April 20, but that the checks emphasized "no signs of distress" rather than signs of life, such as breathing. It was noted that the camera above the observation cell where the patient was located had been "blocked, covered, or essentially out of service since April 6th."

Additional internal reviews of this suicide indicated that custody were retraining staff on the difference between "no signs of distress" and "signs of life" in their 15 minute checks. Reference was also made to staffing shortages which may have impacted the effectiveness of monitoring and care. The suicide watch protocols as currently designed were also called into question, particularly the distinction between Level 1 and Level 2 and the requirement to place a patient on Level 1 Suicide Watch in a safety cell and to transfer the patient to an outside emergency department after 24 hours. Concern was expressed that this may result in reluctance to place a patient on Level 1 Suicide Watch in order to avoid such transfers, and the potential perception that patients on Level 2 Suicide Watch were less at risk of self-harm or suicide.

Review of the documentation associated with this suicide raises several issues of concern:

_Were mental health staff contacted as required?_ The CFMG Implementation Plan requires that, "all inmates identified as displaying suicidal ideation, gestures and/or attempts shall be immediately referred to the on-site/on-call mental health staff by nursing staff." (Dkt. 523 at ECF 75).  The Implementation Plan also requires that, "Mental Health staff shall be available on-site 7 days per week and on-call for assessment of an inmate's level of suicide risk upon referral by health services and/or custody staff." (Dkt. 523 at ECF 72).  The Implementation Plan also requires that, "In the case of an inmate who is placed in a safety cell because of suicide risk, CFMG (1) shall promptly evaluate the inmate to determine the level of suicide precautions necessary in the immediate term (promptly defined as immediately to no later than 4 hours) and (2) shall make a medical decision regarding whether the inmate needs to be transferred to an inpatient mental health facility in lieu of suicide watch/suicide precautions at the jail." (Dkt. 523 at ECF 73).

A deputy's Incident Report of May 11, 2022 states that the medical staff on hand made an attempt to contact the on-call "psych staff as in accordance with their policy and procedures." No documentation was located regarding a response to this attempt to contact mental health staff. A late entry in the healthcare record dated 4/19/22 at 7:32 PM by the Intake Nurse notes that the mental health and on call provider were notified."  No notes specific to contact with or a response from the mental health provider were found in the available healthcare records. Discussion of this case with the on-call mental health clinician indicated that she was contacted during the night following the initial discovery of the patient's attempts to strangle himself in the sobering cell.  However, important information about the seriousness of the patient's attempts at strangulation, which would have been available if video of the instrument promptly reviewed and relayed to the clinician, was not available when she made a determination to place the patient on Level 2 Suicide Watch.  Proper risk management under current protocols, which apparently call for review of available videos, would have resulted in a Level 1 Suicide Watch.

6

The available documentation indicates that the response to the patient's initial self-injurious behavior and suicidal intent did not comply with requirements of the implementation plan, i.e., contact with a Qualified Mental Health Provider was not adequately documented, nor was the patient promptly evaluated in light of essential information that should have been available in the video footage to determine the proper level of suicide precautions necessary.

*Was the initial mental health contact within the required timeframe after placement in a safety cell?*  The patient was placed in a Safety Cell at approximately 12:09 AM on April 19, 2022. The initial mental health by a qualified mental health provider is recorded at 2:09 PM on April 19, 2022, 14 hours later.  A review of the file containing CMJ electronic healthcare records for the patient was conducted and found to contain a completed Suicide Watch Initial for Mental Health with a time stamp of 2:09 PM on 4/19/22, which specified staggered 15 minute safety checks.  As noted above, discussion of the case with the on-call mental health clinician indicated that she was contacted at the time the strangulation incident that led to the patient's placement in a safety cell, although documentation of this contact and response is limited in the available records.  Based on the information conveyed to her at the time, which did not include available video evidence of the seriousness of the strangulation attempts in the sobering cell, she determined that Level 2 Suicide Watch was appropriate.

One issue here is the timeframe requirement for an evaluation by a qualified mental health provider (QMHP). The Implementation Plan states a QMHP must perform a suicide risk assessment using the Suicide Risk Assessment Tool within four hours of placement in a safety cell and before release from a safety cell [Dkt. 532 at ECF 43].  It also states that, "In the case of an inmate who is placed in a safety cell because of suicide risk, CFMG (1) shall promptly evaluate the inmate to determine the level of suicide precautions necessary in the immediate term (promptly defined as immediately to no later than 4 hours), and (2) shall make a medical decision regarding whether the inmate needs to be transferred to an in-patient mental health facility in lieu of suicide watch/suicide precautions at the jail." [Dkt. 532 at ECF 73].  Another Implementation Plan requirement states that, "Inmates placed on suicide watch or suicide precautions shall be monitored by custody staff twice in 30 minutes; by health services staff every six hours; and mental health staff at a minimum of once per duty shift." [Dkt. 532 at ECF 74].  Another Implementation Plan requirement states that, "CFMG and custody will review the appropriateness of an inmate's placement in a safety cell because of suicide risk at least once every 12 hours." [Dkt. 532 at ECF 75].

A structured suicide risk assessment was conducted with the patient, labeled in the healthcare record as Suicide Watch Initial Assessment for Mental Health rather than the Suicide Risk Assessment Tool.  It was conducted approximately 14 hours after the patient was placed in a safety cell, while the patient remained housed in the safety cell.  The patient remained in the safety cell until approximately 6:15 PM.  Based on the placement of the patient in a safety cell because of suicide risk, there was a failure to conduct the suicide risk assessment within four hours.  However, complicating this situation is the placement of a patient on Level 2 Suicide Watch in a safety cell.  Level 2 Suicide Watch does not require placement in a safety cell, although this is sometimes done when other observation cells are unavailable to house the

7

inmate. It appears that the procedures followed in this case were driven by the requirements of the Level 2 Suicide Watch rather than the placement in a safety cell.

Discussion of the case with the on-call mental health clinician indicated that she consulted with custody by phone around the time of the initial placement in a safety cell (although documentation of this consultation was lacking), but this would not meet the requirement that CFMG and custody review the appropriateness of an inmate's placement in a safety cell because of suicide risk at least every 12 hours, if the term CFMG as specified in the Implementation Plan is interpreted to mean a QMHP, rather than nursing or other healthcare staff. The requirement for mental health staff to monitor the patient at a minimum of once per duty shift was met, based on the understanding of duty shift to mean the shift beginning the morning of 4/19/22.

_Was the mental health response adequate in light of the clinical presentation?_  Based on the information provided by the on-call clinician and the available documentation, the initial determination of a Level 2 Suicide Watch was reasonable.  The assessment and safety planning conducted by the mental health clinician at the time of her initial contact appear appropriate, given the patient's presentation and lack of cooperation or meaningful engagement in safety planning. In such circumstances, the safety of the patient is dependent upon external measures, ensuring that the environment is free of the means and opportunity to engage in self-harm and that sufficient observation is maintained to ensure that any attempts at self-harm are interrupted through prompt intervention.  In this case, the clinician's plan was to continue the current suicide watch and follow-up daily.  However, important information about the seriousness of the patient's strangulation attempts while in the sobering cell, as could have been observed on the surveillance video, was not made available; had it been, this was clearly a case that should have triggered a Level 1 Suicide Watch, with the additional monitoring that would entail.

_Should he have been transported to NMC when nursing could not get vital signs for more than 6 hours?_ Available documentation indicates that vital signs were taken initially but not taken again for a period of approximately 33 hours following the patient's placement in a safety cell on suicide watch.  It could be argued that the patient did not spend this entire period in a safety cell, as he was moved to a booking cell after 18 hours, but this still exceeds a six hour timeframe. At issue here is the interpretation of the requirement as currently written in the Implementation Plan, which states: "_Inmates on Suicide Precautions in safety cells whose condition deteriorates or for whom the nurse is unable to complete a hands-on assessment including vital signs after six hours of placement shall be transferred to Natividad Medical Center for further assessment._" (Dkt. 532 at ECF 75).

Discussions with Wellpath staff indicate that this requirement is interpreted as meaning patients who cannot be assessed by a nurse, including vital signs, within the first six hours of placement, must be transferred to NMC, not that vital signs must be obtained every six hours during the placement.  In the current case, vital signs were apparently obtained at the time of the patient's initial placement in a safety cell, and he would not have required transfer to NMC on the basis of subsequently refusing vital signs. If the intent of this Implementation Plan requirement is for vital signs to be obtained within six hours of placement, and every six hours for the duration of the placement in a safety cell, the language of the plan should be clarified to reflect this.

8

_Were nursing checks conducted within the required timeframes?_  The CFMG Implementation Plan requires that inmates placed on suicide watch or suicide precautions shall be monitored by health services staff every six hours. (Dkt. 532 at ECF 74).  Notes entered by a nurse at 1:38 PM on 4/19/22 state that a nursing check was conducted at 0930, noting that suicide watch level 2 in Safety cell #3 was started at 12:09 AM on 4/19/22 with assessment every six hours until cleared by mental health, with the next check due on 4/19/22 at 3:15 PM (at p. 149 of Cor EMR file). The next nursing entry reports a contact time of 5:36 PM. This entry indicates that the nursing check was 2 hours and 21 minutes later than the required schedule of contacts.

_Was the patient provided with a mattress or sleeping bag as required_?  The County Implementation Plan requires that, unless contradicted by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11:00 p.m. and 7:00 a.m.  (Dkt. 528-1 at ECF 9).  Various documentation indicates that the patient was placed in Safety Cell 3 at 12:09 AM on April 19, 2022.  The patient remained in Safety Cell 3 until the safety check entry at 6:16 PM on April 19, when he is shown as being in Booking Cell #7.  He was therefore in a safety cell for greater than 14 hours. However, he had not been in the safety cell for 14 hours during the period requiring provision of a mattress or sleeping bag.  This is interpreted as meaning that provision of a mattress or sleeping bag was not required in this instance, as specified in the Implementation Plan.

Discussions with the Compliance Sergeant indicated that in practice, mattresses or sleeping bags are not provided to inmates in safety cells.  Mattresses or sleeping bags of sufficiently safe construction have not been identified, such that provision of these have been determined to be contraindicated by safety and security needs. It was explained that the thick safety blankets provided will Velcro together to function as a sleeping bag.

_Should he have been transported to NMC after being in a safety cell as required?_  The CFMG Implementation Plan requires that any inmate who has been placed in a safety cell for Suicide Precautions for 24 consecutive hours shall be transferred to either an appropriate inpatient mental health facility or the Natividad Medical Center emergency room for assessment. In this instance, the patient was in a safety cell on suicide watch from 12:09 AM until approximately 6:16 PM on 4/19/22, a period of approximately 18 hours.  He therefore did not reach the 24 hour threshold which should have triggered a transfer to an outside facility.  The move out of the safety cell and into a booking cell does, however, raises another question:

_Was the patient appropriately moved out of a safety cell into a booking cell_?  The CFMG Implementation Plan requires that a qualified mental health provider will perform a suicide risk assessment, including use of the CFMG Suicide Risk Assessment Tool, whenever an inmate is released from the safety cell.  (Dkt. 532 at ECF 75).  The County Implementation Plan requires that CFMG will make the decision to release an inmate from a safety cell when the inmate was originally placed in a safety cell because of risk of suicide. (Dkt. 528-1 at ECF 10 – 11).  No documentation was found indicating that this occurred prior to the patient being moved from Safety Cell #3 to Booking Cell #7 at approximately 6:16 PM on 4/19/22.  The available documentation does not show that a suicide risk assessment was conducted, nor was a qualified mental health provider consulted prior to the move out of the safety cell.  This move therefore did not technically comply with Implementation Plan requirements as written.  However, it has

9

also been explained by various staff that patients on a Level 2 Suicide Watch do not require placement in a safety cell; such placement is typically done when no other cells are available. This patient was on a Level 2 Suicide Watch, although as noted, had information from the surveillance video of his initial attempts at strangulation while in the booking cell been available sooner, he should have been on Level 1 Suicide Watch.  At Level 2, a patient can be moved from a safety cell without prior clearance from a mental health clinician.  This is appropriate and desirable, as time in the severely restricted environment of a safety cell should be minimized to the greatest extent possible.

_Were 15 minute custody checks conducted properly?_  The County Implementation Plan requires that welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior. (Dkt. 528-1 at ECF 15).  In this instance, the patient's suicide watch status required staggered 15 minute checks.  Review of the Inmate Log Report specific to the patient shows that custody checks were regularly logged at intervals of approximately 15 minutes or less, including the period when the patient was in Safety Cell #3 and after his move to Booking Cell #7.

Entries for Booking Cell #7 continue until 8:48 AM on 4/20/22.  Entries at 5:05  and 5:10 AM note that the patient accepted a meal, although entries at 5:07 and 5:20 AM by a different deputy note that the patient appeared asleep, lying down and breathing.  All entries between 5:20 AM and 7:48 AM continue to note that the patient appeared asleep, lying down and breathing.  An entry at 8:01 notes that the patient appeared asleep, on his stomach, with no mention of breathing, although a separate entry at 8:02 by a different deputy notes that the patient appeared asleep, lying down and was breathing.  This would have corresponded with the approximate time that the patient was discovered not to be breathing, CPR was being administered, and shortly before he was declared deceased.  Further entries for Booking Cell #7 at 8:34, 8:40, 8:41 and 8:48 AM on 4/20/22 all note, "Well-Being Check Inmate and Cell OK (Booking07)."  It is not clear what these entries mean.

The most concerning issue with the custody welfare checks is that although the entries made by deputies using the Guardian technology appear to comply with requirements, the adequacy of the checks to determine the patient's well-being was lacking.  Of particular concern is the Incident Report file by a deputy (at p. 93 in the April 2022 Incident Reports file) which states "At approximately 0812 hours paramedics advised us that [patient] was deceased because rigor mortis had set in."  This indicates that the patient had been deceased for some time.  The distinction between observing the patient for signs of distress, in contrast to observing for signs of life, have been noted in the internal reviews that were conducted.

_Should the first responding deputies have started CPR sooner?_  As in the preceding review, although the timing of these events are difficult to determine with precision from the available documentation, it appears that the two deputies who initially discovered the patient did not immediately begin CPR.

**Patient 2**

This patient was booked into the MCJ on April 15, 2022 from an inpatient mental health program in CDCR. The Intake Screening was positive for a prior suicide attempt approximately one year ago by laceration to his neck. However, the Intake Screening also indicated no medical, mental health or other conditions that required special accommodations. There was a "no" response to the question regarding whether he was taking or supposed to be taking psychotropic medications, although it was also noted that there were multiple medications that came with the patient and that the provider would be called. Use of IV opiates was noted. Medication Assisted Treatment for opiate dependence using Suboxone was noted, apparently at the CDCR facility in Stockton, which was marked as verified.

Subsequent portions of the Intake Screening are positive for a current or past mental health diagnosis, noted as schizophrenia and depression. The intake screening states, "multiple meds on list will call provider"; but the medications were not named nor were dosages provided. Active psychotropic medications are noted, and the form directs the reader to "see list." The plan at intake on 4/15/22 included a note that the on-call psychiatrist was emailed with a list of the patient's mental health medications, but the specific list referred to was not located within the electronic medical record. This made it difficult to determine the medications and dosages with which the patient arrived at the jail. An email order from the on-call psychiatrist dated 4/16/22 at 9:27 AM prescribing Haldol, Zyprexa, Cogentin, Wellbutrin, and Gabapentin in the following dosages:

From 4/16/22 order by psychiatrist's email:
1). Haldol 15mg qhs x 30 days
2). Haldol 5 mg bid PRN agitation 30 days
3). Zyprexa 20 mg q hs x 30 days
4). Cogentin 1 mg bid x 30 days
5). Wellbutrin SR 150mg bid x 30 days
6). Gabapentin 1200 mg bid x 30 days and get a FEQ

From the available documentation, it was not possible to determine how these prescriptions aligned with the medications and dosages provided prior to the patient's transfer to jail. The patient was seen by the in-house psychiatrist 4/19/22 who continued meds as prescribed; Haldol was increased to BID on 4/26/22. The issue here is not only were meds begun within required timeframe but whether information regarding prior dosage levels was conveyed and considered.

The Intake Screening Form indicates past hospital care for mental health or psychiatric problems, apparently referring to the CDCR facility in Stockton. The Intake Screening Form is positive for the symptom of hearing or seeing things others don't or the believe that someone can control your mind, and concerns about the ability to cope emotionally or manage stress. Questions from the Columbia Suicide Severity Rating Scale were negative for risk.

The patient was seen by a mental health clinician 0n 4/16/22, who noted that the patient reported he was paroled from CHCF in Stockton as a Mentally Disordered Offender and was transferring to Atascadero State Hospital. The clinician's note states that the patient denied current or recent

11

psychiatric symptoms.  He was seen by the psychiatrist on 4/19/22, when he complained of depression, auditory hallucinations, and verbalized delusional ideas, stating he could read people's minds. The patient reported that his mood was not good, with congruent affect.  He stated that he did not feel well because he was not receiving his medications since his incarceration. Examination of the Medication Administration Record showed that psychotropic medication had begun on 4/16/22, but it could not be determined how the dosage levels compared to the patient's prior medication regime.  Consultation with Dr. Nicole Johnson, a Washington D.C based psychiatrist who is the Mental Health Subject Matter Expert in other Court actions involving jail systems, suggested that the initial levels of oral Haldol prescribed at MCJ may have been low in comparison to the patient's self-reported level of the injectable form of Haldol Decanoate he had previously been receiving. Dr. Johnson advised that in cases such as this, information confirming prior medications and dosages should be persistently pursued and consistently documented so that medication continuity can be maintained, and deterioration in functioning can be avoided.

The patient was seen again by the psychiatrist on 4/26/22, after he requested to speak with the psychiatrist regarding his medications.  The chart entry states, "He claims he was on Haldol Dec and Wellbutrin 450 mg per day while at Stockton hospital.  Denies SI.  Reports AH, hearing voices of people saying they are going to kill him.  Compliant with medications.  Chart reviewed. No record of med list from Stockton hospital found." The chart entry for this encounter goes on to describe a mental status examination that found the patient to be fully oriented, calm, pleasant and cooperative, with clear and coherent speech, "fine" mood and appropriate affect; thought process was organized and reality oriented; did not appear to be responding to internal stimuli; fair insight and judgment.  The patient's Haldol was increased to 15 mg twice per day.

A chart entry dated 5/2/22 notes that a request for records from CHCF Stockton was filled out by a mental health clinician and submitted to be faxed. A request for records addressed to the California Healthcare Facility in Stockton dated 5/2/22 was located in the chart. Another request for records addressed to CHCF in Stockton dated 5/17/22 was also located. No response from CDCR was found in the available records.

He was seen again by a mental health clinician on 5/8/22, when he again expressed that he was supposed to be taking 450 mg of Wellbutrin and "a shot of Haldol" that he was receiving in prison but not receiving in MCJ.  He also described incidents of self-harm, although it is not specified when these occurred.  In creating a safety plan, the patient identified that his trigger was not taking his medication.

On May 16, 2022, this patient was involved in an incident in V-block, described at the time of the incident as a two-tier, single-double occupant lockdown housing unit with 36 cells designated for sensitive needs yard inmates.  Such inmates usually consist of gang dropouts, problematic inmates, and/or inmates with mental health conditions.  The incident report files indicate that inmates on the unit were refusing to return to their cells and lock down.  Deputies responding to the unit were also advised that one of the inmates was swinging a broomstick and striking one of the security cameras.  This inmate was the patient of the current review.

12

When the patient was encountered by deputies on the top tier, he was reported to charge toward the deputies with closed fists. A total of five less lethal "super sock" rounds were deployed, striking the patient, but he continued to advance on the deputies. Tasers were deployed, resulting in the patient complying with deputy commands and being restrained.

The patient was attended to by medical staff, when he spontaneously stated that he was frustrated about not receiving his psychotropic medications and that when not receiving those medications he, "likes to fight cops." The patient also reported that he believed the deputies were coming to kill him. A Sick Call entry dated 5/16/22 by an RN following the use of force incident stated, "The patient was angry regarding his medication. He wanted the medications he was on at CCS Stockton state prison and no paperwork has (sic) Pt requests Haldol decanoate and some med time changes. Pt still hearing voices and feels extra angry. Pt. stated 'I can read people's minds and it's always negative and because of that I build weapons to defend myself and that creates violence.'"

The patient was seen by a mental health clinician on 5/17/22 following the use of force incident on 5/16/22. The patient reported that he continued to hallucinate that he was "reading the cops' minds and that it triggered him yesterday." He again expressed that he needed his correct medication of Haldol pills and Haldol Dec injection as well as 450 mg of Wellbutrin. "He explained that it is the medication that has helped him with his symptoms."

The patient was subsequently seen by the psychiatrist on 5/18/22, with a referral note saying that the patient reported he was hallucinating that he could read custody staff's minds and that he attempted to assault custody staff. The patient was requesting Haldol Decanoate and 450 mg of Wellbutrin. In speaking with the psychiatrist, the patient admitted acting aggressively towards deputies "because I thought the cops were going to kill me." "He requested Haldol DEC" and "Claims it has been several months since he got his last dose of the medication." Haldol DEC 100 mg monthly injections were ordered.

Contacts by mental health clinicians continued on a regular basis, with notes entered on 5/31, 6/9, 6/22, 7/2, 7/3, 7/4, 7/6, 7/15, and 8/4/22. On 6/9 and 6/22/22 the patient continued to request medications that matched was he was receiving at CHCF Stockton, specified as 250 mg Haldol Dec and 450 mg Wellbutrin. On 6/22/22 the patient was seen by a psychiatrist who increased his Haldol Decanoate from 100 mg every four weeks to 100 mg every two weeks, and Wellbutrin increased to a total of 450 mg per day.

A Psychiatric Progress Note by the on-call psychiatrist dated 7/3/22 states that the prescribed medications included Haldol Decanoate 100 mg every two weeks, with an injection received 7/1/22, in addition to Gabapentin 600 mg (two) twice a day, Zyprexa 20 mg in the PM, and Wellbutrin 150 mg both AM and PM. The patient reported to the psychiatrist that the medications were helping and denied wanting to kill anyone. This is in contrast to what the patient reported to a mental health clinician on 7/2/22, to whom he stated his medications were not working, that he reads minds, that his cellmate wanted to kill him, and that he wanted to hurt others.

This patient was interviewed during the site visit of July 22, 2022, when he was housed in Administrative Segregation. He was polite and cooperative during the interview, but it appeared he may have been responding to internal stimuli. When asked, he described that he was currently hearing the thoughts of others, particularly those of the deputies, who wished to do him harm. He also described experiencing either voices or his own thoughts (he could not clearly distinguish) urging him to harm others. These symptoms were similar to those described in his healthcare record.

Findings:
One concern in this case is the documentation of current medications, including type and dosage, as determined by the Intake Nurse and relayed to the on-call psychiatrist. Reference is made to a list of medications that apparently arrived with the patient, but this list was not located, nor was specific information about prior dosage levels. Subsequent requests for information from CDCR appear to have received no response. This leads to concern about whether the patient was initially adequately medicated, as he consistently reported to staff that the dosage he was receiving in jail was not equivalent to what he previously received and was not adequate to manage his symptoms. As reported by the patient, these symptoms included paranoid delusions and possible auditory hallucinations that appear to have contributed to his behavior that resulted in the use of force incident of 5/16/22.

Another concern in this case is an apparent need for inpatient care. It is not clear from the available record what level of care the patient received while at CDCR, but it is reported that he was paroled as a Mentally Disordered Offender and was to be transferred to Atascadero State Hospital, which is by definition an inpatient level of care. His reported symptoms and associated behavior suggest that he required this level of care, but there is no indication that he was referred to Natividad Medical Center's Mental Health Unit. Review of the admission criteria for this facility indicates that the patient would not be eligible for admission due to his history of violence. The only viable option for MCJ appears to be long-term housing in Administrative Segregation with the more limited mental health care that can be provided in the jail environment, which is neither designed nor staffed to care for severely and chronically ill patients. The lack of inpatient care options for patients such as this is problematic.

**Patient 3**

This patient was booked into the MCJ on 10/14/21 and released 6/9/22. He had prior jail bookings in 2018 (x 4), 2019 (x 8), 2020 (x 2), and 2021 (x 2); the last prior release appears to have occurred nine days before his most recent booking. His presentation at intake was described as dirty/disheveled but otherwise unremarkable, with the exception that the screening item asking, "Can you explain why you are in this building?" was marked 'no' without further explanation. The intake screening form indicates no current or past mental health diagnosis or current mental health medications. The intake screening form indicated that the patient did not need a referral, and from the documentation it does not appear that a mental health referral was made at the time of intake. However, the sick call entry for the intake conducted 10/14/21 also notes the medications were not renewed by the on-call psychiatrist, indicating that the on-call psychiatrist was notified regarding prior medications.

14

A sick call entry by a mental health clinician dated 10/16/21 indicates that the patient was seen two days after intake. The note states that the patient reported a psychiatric history, but only takes medications while in MCJ. The note also states that medications were not renewed per by the on-call psychiatrist, but no additional documentation pertaining to this was found. Past alerts for mental health special needs patient and withdrawal history were noted. He was reported as not presenting acute psychiatric distress, danger to self, danger to others, or grave disability. The patient refused mental health services at this time.

Review of prior MCJ documentation indicates that the patient has had mental health contacts while in MCJ dating back to 10/9/18, when the patient reported that he was genetically predisposed to schizophrenia, as his father had schizophrenia, and that he was starting to hear voices. A note by the psychiatrist dated 10/10/18 states that the patient reported decreased auditory hallucinations when he took Seroquel in the past. The psychiatrist started the patient on Zyprexa. There are prior entries in the healthcare record reflecting subsequent mental health contacts in MCJ during 2019, 2020, and 2021, in addition to the contacts during his most recent jail term extending into 2022 (65 mental health sick call entries in total). There was substantial mental health history documented in the MCJ records, which should have been available to the intake nurse at the time of the most recent intake screening. In light of the mental health contact on 10/16/21, it appears that a referral to mental health may have been made at intake, although this is not clearly reflected in the available documentation.

A mental health sick call note dated 10/25/21 notes that the patient was observed yelling and smashing a tablet. He yelled that he had to break the tablet to prevent being observed through the camera. A referral to psychiatry was made and a mental health follow-up was already scheduled. The note includes a diagnoses of unspecified psychosis not due to substances or known physiological condition and methamphetamine use. Upon follow-up by the psychiatrist on 10/27/21, the sick call note states that the patient had been aggressive, impulsive and paranoid, with a history of psychosis, and rule-out diagnoses of bipolar disorder and PSD (possibly Poly Substance Dependence?). The patient is reported to be noncompliant with medications. It is notable that the patient's mental status examination is reported as unremarkable. He refused medications.

Contacts by a mental health clinician on 11/13 and 12/21/21 were refused by the patient. He was observed to be in no acute distress or to present imminent danger to self or others, with no signs of grave disability. The note for 12/21/21 states that the patient was to be removed from Special Needs designation. On 1/9/22 a sick call note by mental health clinicians reports that they were called to the patient's pod for crisis intervention, as he had thrown urine at deputies and was displaying an inmate manufactured knife in his cell. He became verbally aggressive and threatened a clinician and deputies. De-escalation attempts failed and the patient was forcibly extracted from the cell. He subsequently refused medical or mental health interventions.

During the period from 10/26/21 through 1/10/22, it is noted that a number of appointments with the psychiatrist and mental health clinicians were rescheduled due to workload.

15

A sick call note by the psychiatrist dated 1/11/22 reports that the patient had been found incompetent to stand trial. The patient was not on medication and refused to meet with the psychiatrist. There was no assessment or plan noted in the chart entry.

A sick call notes was entered by a mental health clinician on 2/14/22. The patient was refusing to come out of the MHO dayroom and return to his cell, and the clinician had been called for crisis intervention. Attempts to de-escalate were unsuccessful and the patient was forcibly extracted from the dayroom. A sick call note entered by the psychiatrist on this date described the patient as agitated, threatening, and uncooperative with the interview. An offer of psychotropic medication was met with spitting on the glass of the cell door and cursing of the psychiatrist. Speech was described as rambling, thought process disorganized, and insight and judgment impaired. A stat order was given for Zyprexa and hydroxyzine. This appears to have been an involuntary medication administration. If so, there was no documentation that the patient was placed in an infirmary or safety cell with monitoring by custody and nursing staff as required by the Implementation Plan.

A sick call note by a mental health clinician dated 3/12/22 reported that Seeking Safety Group was not offered because the patient "could not be safe nor appropriate." While the group was in process, the patient would yell sexual profanities and suggestive remarks directed towards the clinician, and spit repeatedly on the ground in his cell while the clinician attempted to conduct the group with other participants. Because of these disruptive behaviors, the clinician had to end the group early. This entry also notes that the patient was incompetent to stand trial and awaiting transfer to DSH.

A sick call note by the psychiatrist dated 3/14/22 reports that the patient presented as a danger to others, sexually vulgar, and verbally aggressive, banging on his cell door and cursing. There was not further assessment or plan noted. A sick call note by a mental health clinician describe meeting the patient at cell front following reports by custody that his behavior had worsened, marked by constantly yelling, combative and spitting on deputies multiple times. The patient requested his sentencing computation sheet and denied any additional need for mental health services.

On 4/21/22 a mental health sick call note by a mental health clinician states that the clinician received a call from a nurse reporting that the patient was agitated, had hit his head on the cell door and was bleeding. The patient required medical clearance prior to mental health contact. A medical sick call note dated 4/21/22 noted that the patient hit his head against the cell door and had two hematomas with some bleeding. The patient was spitting and fighting when medical staff attempted to assess. The Nurse Practitioner directed that the patient be sent out for both a medical and psychiatric evaluation. The Use of Force report for this incident indicates that both medical and mental health were consulted prior to extracting the patient from his cell so that he could receive medical evaluation and treatment. During the cell extraction to take the patient to NMC, the patient was dry stunned with a Taser twice and the Wrap was used to restrain him. Chart notes indicate that the patient was sent to NMC for medical and psychiatric evaluation on 4/21/22 at 2208. An entry on 4/22/22 at 0641 states that the patient was on neuro checks and had been resting comfortably in his cell without yelling or spitting since returning from NMC. On

4/22/22 the mental health clinician attempted to follow up with the patient but he refused to interact with her and yelled for her to go away.

On 5/2/22 a sick call note by a mental health clinician states that she was called to the patient's cell for crisis intervention.  Custody staff reported that he had banged his head but "they couldn't get a good look at possible injury and he wouldn't engage with them."  Upon attempting to engage with the patient, he screamed for the mental health clinician to go away and became threatening.  The clinician then observed the patient via the camera in the sergeant's office, when the patient was observed to walking around his cell and then calmly sitting on his bed and eating.  A medical sick call note dated 5/2/22 states that the nurse was notified by the Sergeant that the patient had sustained a laceration to his right forehead.  The note stated, "Pt. seen lying down in bed and was able to ambulate towards the door.  Unable to assess pt. due to refusal of assessment and repeatedly stating, 'Kick rocks.' Cell window has limited visibility due to the glass window was broken and pt. covering the window." The plan included in this entry called for the patient to be placed on neuro checks.

On 5/20/22 a sick call note by a mental health clinician states that she was called by the sergeant and informed that the patient had covered his window with smeared feces and had not come out for dayroom time for over two weeks.  When encouraged by the clinician to cuff up and come out of his cell to shower, watch TV and walk around, the patient became hostile and cursed at her.  Observation via camera showed the patient appearing to respond to internal stimuli.  "His cell appeared to be littered with a significant amount of garbage from his meals and feces smeared on walls, floor and window."  The clinician called the on-call psychiatrist who attempted to conduct a Facetime interview with the patient, who remained hostile.  The on-call psychiatrist gave an order for stat medications consisting of Haldol, Ativan and Cogentin; the patient was extracted from his cell for it to be cleaned and for the medication to be administered.  The patient's cell "was observed to have the entirety of the door, the floor in cell and a section of the wall covered in feces." The plan called for "Follow up: 2 day MSE [mental status exam] monitor pt's ADL's, feces smearing?"

A nursing sick call note dated 5/20/22 states that in response to the stat medication order given by the on-call psychiatrist, the patient was extracted by multiple deputies, put in a spit mask, and placed in a Safety cell, where the medications were injected while the patient was subdued by deputies. The patient was then transferred to MH2 to be monitored as ordered.  MH2 may refer to Men's Holding Cell 2; it is not clear if this is a safety cell or infirmary housing as required by the Implementation Plan.

The final mental health sick call note dated 5/22/22 states that the patient's room appeared to be tidy with no feces.  When the clinician approached, the patient "put his hand over the window and yelled, 'kick rocks, Bitch!'" and did not engage further.  The plan in this note stated that due to housing placement, the patient would be seen for weekly ad seg checks.

A Confidential Transfer of Medical Information form dated 6/1/22 appears to indicate that the patient was transferred to Atascadero State Hospital, assumed to be as a PC 1370 commitment for incompetence to stand trial.

Findings

Several concerns emerged from the review of this case. The primary concern is the lack of transfer to an inpatient level of care in the face of his clearly deteriorating mental health condition. He was self-injurious. He required repeated uses of force to extract him from his cell and from the dayroom, exposing both the patient and custody staff to the risk of injury. He eventually smeared feces extensively in his cell, which had accumulated a significant amount of garbage, and had reportedly not left his cell for over two weeks. He rejected attempts at mental health intervention, and had to be forcibly medicated. He presented a danger to himself, a danger to others, and was potentially gravely disabled. He was eventually transferred to Atascadero State Hospital, a secure forensic inpatient facility. Based on the available information, his condition required treatment that could not reasonably be provided in the jail, and should have been referred to an inpatient level of care prior to his transfer to ASH.

A related concern is the lack of clear and explicit treatment planning to address his serious and deteriorating mental health condition. The mental health approach to treating this patient appeared to be a series of crisis responses and involuntary medications. A better coordinated, more proactive approach to the assessment and treatment of this patient was required. Ultimately, a higher level of care was needed.

Another related concern is the use of involuntary medications and whether the requirements of the Implementation Plan were met. It is not clear from the available documentation that the patient was transferred to an infirmary or safety cell following each involuntary medication administration and monitored as required. No documentation was available indicating that the patient was seen by the on-call psychiatrist no longer than 24 hours prior to ordering involuntary medications, although a Facetime interview was attempted. Documentation does not indicate that the patient was seen by the responsible prescribing physician at least every 72 hours as required. No documentation was available indicating that the Medical Program Manager and Custody Facility Manager were notified in writing or by telephone within 24 hours of the involuntary medication administrations, nor that the responsible physician, Program Manager, Director of Nursing, and Facility Manager identified appropriate community facility and procedures for obtaining an Incapacity Hearing, as required.

## Patient 4

This patient was initially booked into the MCJ on 12/21/20. An Intake Screening was done on 12/26/20. Sick Call entries indicate that the patient was too combative to complete the intake upon his initial booking. The intake screening indicated that the patient had a diagnosis of schizophrenia and self-reported taking Haldol and Zyprexa. It indicated that the patient had received outpatient psychiatric services and had been hospitalized for psychiatric problems. A letter of conservatorship dated 4/17/20 indicated that the Monterey County Health Department was reappointed as the patient's conservator. The patient was medically/psychiatrically cleared by NMC on 12/21/20, after he was evaluated for psychosis and depression. An urgent referral to mental health was made on 12/21/20. Attempts were made by a mental health clinician on 12/21/20 and by the psychiatrist on 12/23/20 to see the patient, but he refused. He was subsequently seen by a mental health clinician on 12/26/20 and by the psychiatrist on 12/29 and 12/31/20, but the sick call entry of 12/29/20 states that the patient refused to meet. There was no

18

assessment information or treatment plan included in the initial psychiatry notes. While these intake procedures and associated documentation fall outside the time parameters of the current review, the lack of treatment planning for a seriously mentally ill patient remains noteworthy.  A psychiatry sick call entry dated 1/11/21 suggests that the patient cooperated to a greater extent, as the note contains more historical information.  A diagnosis of schizophrenia is provided, and medications of Zoloft and Cogentin were added to the Zyprexa already prescribed.

The patient's condition appears to have vacillated in intensity over the course of his current incarceration, but has consistently included overt grandiose and paranoid delusions.  On 2/16/21 these symptoms were associated with self-injurious behavior, as the patient cut his leg because he had too much blood and needed to "drain the gout."  Mental health sick call notes state that he did not appear to be in acute psychiatric distress, nor did he meet criteria for danger to self, danger to others, or grave disability.  A mental health sick call note dated 3/13/21 indicated that the patient was placed in a safety cell as a danger to others after hitting a glass window. He expressed delusional beliefs. He was assessed as not in acute psychiatric distress, not a danger to self or others, and not gravely disabled.

A psychiatry note dated 4/3/21 indicates that the patient was court ordered to take medications and should receive Haldol as an intramuscular injection by force if necessary.

Documentation from the Department of State Hospitals shows admission to Atascadero State Hospital on 5/27/21 as a PC 1370 (incompetent to stand trial) with a discharge summary dated 1/12/22. This document shows that the patient had been arrested in Salinas 12/20/20 when he violently resisted arrest following a disturbance at the group home where he resided.  On 1/12/21 he was evaluated and opined incompetent and displayed grossly psychotic symptoms, including thought disorganization, behavioral disorganization, delusions, ideas of reference, and auditory hallucinations. He was given a diagnosis of Schizophrenia.  It was noted that his prescribed antipsychotic medications at the jail did not appear to be effective at the current dose in stabilizing his symptoms. He was noted to have assaulted his admitting psychiatrist when told that he would have to take psychotropic medications. He also attacked staff who came to the aid of the psychiatrist.  He was forcibly medicated while in restraints.

He was transferred to the hospital's most secure unit.  There he appeared to stabilize on Clozapine in the low-stimulation and highly controlled environment. When transferred to a regular unit (a higher-stimulation environment), his paranoia again increased and he became more overtly delusional. It appears that psychotropic treatment of the patient presented a challenge in finding a balance between reducing his symptoms and maintaining an effective Clozapine dose that he could tolerate without serious medical side effects.  It was noted that without a forced medication order, the patient would not accept treatment. The treatment gains that were observed while the patient was at Atascadero State Hospital were attributed more to the low-stimulation environment on a locked unit with a high ratio of staff to patients, than to the level of psychotropic medication he was able to tolerate. The patient was deemed unlikely to be restorable to competency for trial in spite of treatment with psychotropic medications.

Another intake screening was documented on 2/10/22 (in contrast to the ASH release date noted as 1/12/22; it seems likely the patient did not actually leave ASH on 1/12/22, the date of the

discharge summary).  It provides a diagnosis of schizoaffective disorder, and refers to Atascadero release papers for information regarding mental health medications. It does not specify prior hospitalizations. An email order from the on-call psychiatrist dated 2/11/22 prescribes 175 mg of Clozapine as a crush and float. This is consistent with the medication prescribed at the time of the discharge summary from ASH.

Following his return to MCJ, the patient was seen for assessment and treatment planning.  A Mental Health Treatment Plan for Non-Acute patients was completed on 2/12/22.  It provided a diagnosis of schizophrenia, and contained specific problems, goals, and modes of intervention. It is not clear from subsequent documentation that the treatment plan guided the actual delivery and course of treatment.

The patient was seen by a mental health clinician on 3/24/22 and appeared to be responding to internal stimuli and grossly delusional; he was "internally preoccupied and difficult to redirect." The psychiatrist was contacted and the psychiatrist gave stat verbal orders on 3/24/22 for an injection of Haldol and Ativan.  Custody staff entered cell and the injection was given by a nurse. The patient was moved to B pod.

An incident report dated 4/13/22 describes an incident in which the patient refused to take his medications while in the common area.  The nurse encouraged him to take it, in response to which the patient stood up in "a semi-aggressive manner."  A deputy instructed the patient to sit back down, to which the patient complied. The patient then took the medication, threw them on the floor, and again stood up "in a confrontational manner."  A supplemental incident report by another deputy described observing the patient as standing in an aggressive posture with balled up fists toward the deputy directly engaged, who told the patient to "lock down." The deputy grabbed the patient's arm, in response to which the patient pulled away and attempted to strike the deputy in the face. The deputy avoided the blow and tackled the patient to the floor, where the patient continued to resist.  With the assistance of other deputies, the patient was cuffed.  The patient attempted to kick deputies, so that he was again placed on the floor and his legs restrained.  Medical staff administered Zyprexa via injection.  The patient was escorted back to his cell and his restraints were removed. He was not placed in an infirmary or safety cell as required.

While the involuntary administration of medication appears to have been authorized by prior standing orders under the patient's conservatorship, at issue is whether further attempts at de-escalation could have been attempted prior to laying hands on the patient in the use of force. Based on the available documented information, it cannot be determined whether the patient presented an immediate physical threat to staff sufficient to warrant the immediate use of force. The patient's history of reactive and impulsive violence is, however, noteworthy, and custody staff must have the latitude to manage potentially dangerous situations based on their assessment of immediate risk.  It is also noted that this incident was recommended for referral to the District Attorney on charges of battery on a peace officer and resisting, delaying or obstructing a peace officer.  Based on the totality of the information available, it appears likely that the patient's mental illness played a role in his behavior.

On 4/17/22 the patient was seen by a mental health clinician on 4/17/22; notes of this encounter cite statements made by the patient that appear grossly delusional. Subsequent progress notes by mental health clinicians indicate the patient was seen by mental health staff almost daily between 4/17/22 and 5/5/22, sometimes more than once per day. He remained delusional and frequently agitated during this period. The patient was on suicide watch between 4/18 and 4/21/22, with daily mental health follow-up through 4/24/22.

A nursing chart entry dated 4/17/22 stated that the patient was not given forced medications due to the conservatorship ending on 4/16/22.  A subsequent nursing chart entry on 4/21/22 indicates that the patient is again conserved.

On 4/21/22 a nursing chart note indicates the patient was force medicated with an Olanzapine injection, after fighting with deputies during a use of force.

On 4/26/22 a nursing chart note indicates the patient was force medicated with an Olanzapine injection. A mental health clinician was present to de-escalate the patient and convince him to take his oral medication, which apparently failed.

On 4/28/22 a mental health clinician was notified by a Sergeant. that patient was refusing PO medications and refusing to cuff up for injection.  The clinician attempted to de-escalate patient, but was not successful.  The patient was restrained by custody and medications administered. The clinician consulted with the Mental Health Supervisor and psychiatrist about the patient's increasing hostility.

On 4/29/22 a mental health clinician was again notified by custody that the patient had declined his oral medication and that another cell extraction for forced medication was anticipated. Patient was observed to have become increasingly agitated and aggressive toward staff.  The mental health clinician was not able to speak to the patient to attempt de-escalation due to safety concerns, as the patient was in his cell with the door open and holding a weapon (a knotted sheet with a cup in the bottom).  The patient was extracted and forced medications were administered.

On 5/1/22 patient insisted he was being released that day; a mental health clinician explained he was waiting for placement through his conservator and needed to stabilize on medications. Patient insisted he was no longer with mental health, no longer conserved, and would be released that day.  Later that day a mental health clinician was called back to unit for crisis intervention after patient has cut his arm because no one came to pick him up. The patient was placed on Level 2 Suicide Watch.  He was subsequently seen by a mental health clinician daily through 5/5/21 for suicide watch follow-up.

On 5/2/22 a mental health clinician spoke with conservator and facilitated a FaceTime call with Deputy Public Guardian who explained that they were unable to secure a placement for him due to recent violence; encouraged him to take medications and not be aggressive with staff.  He made overtly delusional statements while denying mental illness.

On 5/4/22 the patient noted for spitting out PO medications; he becomes aggressive and assaultive toward staff when IM backup medications are given.  A signed consent form was

21

received from the Conservator's office for Haldol DEC, a longer acting injectable form of antipsychotic medication.

On 5/5/22 a nursing sick call note in response to a medical concern indicates that the nurse was unable to get vital signs, stating, "patient gets very combative needing shield and 6 deputies to hold." A nursing chart note on this date indicates again received forced medication injection of Haldol and Ativan.

On 5/6/22 a chart note indicates that Court documents were received for the patient to be released from custody and ordered to NMC for further treatment as he was under LPS conservatorship.

Findings

This patient required transfer to an inpatient level of care. He was treated at Atascadero State Hospital between 5/27/21 and 2/10/22 as a PC 1370. He was a challenging patient to treat even in that environment; he was eventually discharged from ASH as unlikely to regain competency, whereupon he was returned to MCJ. He was under conservatorship of the Monterey County Health Department, acting through the Monterey County Public Guardian, due to grave disability. Although his day to day presentation varied to some degree over the course of his incarceration, he remained actively and severely mentally ill, requiring repeated uses of force to administer his prescribed medications. His behavior appears to be directly driven by his mental illness, and the repeated uses of force placed both the patient and jail staff at risk for injury. When the Court ordered his release from jail, it directed that he be transferred to NMC for further treatment under his LPS conservatorship. Given the patient's severe mental illness, his consistent rejection of mental health treatment, and the limited mental health resources of the jail environment, MCJ cannot be expected to effectively treat and care for patients such as this.

Also at issue is the repeated use of involuntary medication with this patient on at least seven occasions over a period of approximately six weeks. As noted, the patient was court ordered under the conditions of his conservatorship to take medications, by force if necessary. In response to this, the psychiatrist wrote a standing order for involuntary medications should the patient refuse. The patient was not transferred to "an appropriate community facility" as required by the Implementation Plan. It does not appear that patient was admitted to an infirmary or safety cell following each involuntary medication administration, as required by the Implementation Plan. The patient was not evaluated by the responsible prescribing physician at least every 72 hours, as required by the Implementation Plan. The patient was not transferred immediately to a clinically appropriate treatment facility when exhibiting any clinical deterioration at any time during involuntary therapy, as required by the Implementation Plan.

A related concern is the relative lack of explicit treatment planning for this patient. The approach to care consisted primarily of medications (frequently forced near the end of his incarceration) and monitoring. Given the limitations of treatment in the jail environment for a patient with such extensive and acute needs, more effective treatment planning would be difficult in this situation. However, a more detailed treatment plan that attempts to assess and address the patient's resistant and sometimes violent behavior, in addition to his active symptoms of mental illness, was needed.

**Patient 5**

This patient was arrested and booked into MCJ on 1/20/22, with a prior release date from MCJ of 1/7/22, and a prior intake dated 1/3/22, when he was started on a withdrawal protocol for methamphetamine. His intake screening of 1/20 noted a history of depression, with mental health treatment while incarcerated. It notes psychiatric hospitalization in Nevada in 2016. It notes prior arrests for sex offences. His mental status exam at intake on 1/20/22 was unremarkable, with a note that he "takes some time to answer some questions." Infrequent use of alcohol and methamphetamine were noted. The question on the intake form about whether he was currently taking, supposed to take, or had ever been prescribed medication for mental health problems was checked as "inactive." No further information regarding psychotropic medications was provided. Medications for medical problems were verified.

Entry on 1/4/22 (prior intake/incarceration) by a mental health clinician states that the patient reported taking Prozac, Trazadone and Geodon, last use two weeks earlier, and reported two pharmacies where he obtained his medications. A nurse checked both pharmacies to confirm and neither had records for this patient. On 1/5/22 the psychiatrist restarted Geodon, Prozac and hydroxyzine.

The patient was seen by a mental health clinician on 1/21/22 by referral from the intake nurse. During this encounter the patient reported past suicide attempts, a history of depression, endorsed current depression, and recent but not current suicidal ideation. He also reported daily methamphetamine use. A referral to psychiatry was made and on 1/24/22 the psychiatrist again restarted Geodon, Prozac and hydroxyzine.

A mental health initial assessment was conducted on 1/29/22, which indicated disorganized thinking, auditory hallucinations, and depression. A history of auditory hallucinations and paranoia secondary to methamphetamine use were noted. Diagnoses of stimulant use disorder, substance induced psychosis, and unspecified depressive disorder were provided. A follow up mental health contact of 2/1/22 offered a diagnosis of Bipolar II disorder. He was seen at regular intervals by mental health clinicians and the psychiatrist.

His mental status and level of functioning appeared stable until an encounter with the psychiatrist on 5/9/22, as reported in the May Incident Reports file (at p. 25). In this incident, the patient insisted on seeing the psychiatrist immediately as the psychiatrist and a deputy attempted to enter the housing unit. The psychiatrist informed the patient that he had another patient to see and then he would attend to him. The patient appeared agitated and angrily shouted at the psychiatrist. The deputy intervened verbally to prevent the patient from further harassing the psychiatrist. The patient responded that he "better walk away before I swing on you." The deputy took this as a threat and closely followed the patient to the staircase. Following another statement about "swinging on" the deputy, the deputy grasped the patient to physically escort him up the stairs to his cell. Once at the cell, there was a physical altercation and restraint of the patient, leading to minor injuries for both the deputy and the patient. The deputy recommended charges to be forwarded to the District Attorney's Office for prosecution.

A subsequent encounter with the psychiatrist on 5/11/22 focused on the patient's medications. The patient was initially calm and pleasant, but quickly became irritated about the medication administration schedule. The patient then walked away without further incident.  His mental status on this occasion was unremarkable, aside from becoming easily irritated.  The patient was seen regularly by mental health clinicians through 6/29/22.  His mental status and level of functioning remained stable throughout this period.

Findings

The mental health care provided to this patient during his most recent incarceration appears adequate.  In the incident of 5/9/22, it is possible that further attempts at de-escalation may have been effective to avoid use of force, but it is not possible to determine from the documentation whether this was a viable option under the immediate circumstances.  From review of the mental health documentation throughout the period before and after the incident, the patient's mental illness did not appear severe enough to play a significant role in his behavior on that occasion.

**Patient 6**

This patient was booked into MCJ on 4/9/22.  Prior intakes are noted from 4/21/21 and 12/7/21. An entry from 1/4/22 reports that the patient was uncooperative and unwilling to answer receiving questions.  The 4/9/22 intake form indicated bizarre behavior such that the assessment could not be completed. His behavior was described as "currently manic."  The patient was placed in a sobering cell for observation and a withdrawal protocol (CIWA) for alcohol and/or Benzodiazepine with medications was initiated.

A subsequent attempt to complete the intake was conducted on 4/14/22.  A diagnosis of bipolar disorder is noted.  Prior use of psychotropic medications is noted and marked as inactive, noting this was one year ago and the medications were unknown.  Although the patient was uncooperative with the intake procedure, the nurse looked up the patient's earlier medications at MCJ and attempted to get a psychiatrist's order. There was no documentation that an order was received.  His mental status was unremarkable and he was referred to mental health for routine follow-up.

Overt psychotic symptoms including auditory hallucinations, delusions, disorganized thought and rambling speech were noted during prior incarcerations.  Medications were ordered for Olanzapine to be crushed on 4/30/21 after the patient found to be hoarding medications.

A mental health progress note dated 4/18/22 indicated that the patient reported a diagnosis of bipolar disorder with symptoms of hyperactivity and racing thoughts that last for a couple of hours. It should be noted that this is not the typical pattern observed with bipolar disorder, in which manic or hypomanic episodes are significantly longer in duration. The patient also reported "that he often gets 5150'd for a couple of weeks during his manic episodes" and that he doesn't really remember what happens during these episodes.  During this encounter, the patient was described as being fully oriented, with blunted affect and slowed speech, but otherwise unremarkable in presentation.

24

An Incident Report dated 5/1/22 describes a severe beating that the patient suffered at the hands of another inmate, involving choking the patient into unconsciousness, throwing him down the stairs and kicking him repeatedly in the head.  This assault was observed by custody staff from video footage of the incident. The incident went unnoticed by custody at the time – the assaulting inmate informed them the following day to check the video footage of the assault that took place the morning of 4/30/22. The assaulting inmate explained to the deputy filing the incident report that the patient was in bad standing with the entire unit due to his behavior, which appears to have been driven largely by his mental illness.

The patient was then taken to the NMC ER on 5/1/22, where he refused treatment and was returned to the jail.  An off-site provider recommended Zyprexa, to see a psychiatrist as soon as possible, and to be placed in a safety cell until he agreed to take medications. He arrived back from the ER in a spit mask and yelling. Receiving staff were unable to assess the patient. He returned with psychotropic medications prescribed, which were continued by email order from the on-call psychiatrist. A sick call note of 5/2/22 reports that the patient refused neuro checks despite encouragement from nursing staff and education that the checks were for the purpose of ensuring that his brain was not bleeding.  No vital signs could be obtained. Level 2 Suicide Watch was initiated on 5/2/22 at 10:15 AM and was placed in a safety cell.  It appears that he agreed to vital signs monitoring at 4:00 PM, but refused subsequent attempts by nurses to obtain vital signs. He was released from this episode of suicide watch on 5/9/22.

Records indicate that the patient was again admitted to NMC because of acute psychosis. An Emergency Department Provider Report dated 5/9/22 indicates frequent prior visits for both bipolar disorder and methamphetamine use, arriving on this date with acute psychosis. Prior ER visits are noted from January and on May 1 for jail clearance "when he was running in and out of traffic."  It is noted that, "Patient basically talks gibberish, very forced and rapid." The psychiatric impression at this time was one of bipolar disorder, current episode manic, severe with psychotic features." The disposition was admission to NMC MHU.

On 5/11/22  the patient returned from off-site medical care for mental health (psychosis) after three days in the hospital.  Nursing assessment states, "Patient remains internally preoccupied, unable to answer SI questions, very tangential with short attention span."  He was continued on suicide watch level 2 until cleared by a mental health clinician.  A mental health sick call note indicates the patient was placed on Level 2 Suicide Watch in a booking cell at 12:00 on 5/11/22. Vital signs were obtained at 7:31 PM on 5/11/22.  Because the patient was not on Level 1 Suicide Watch and was not placed in a safety cell, the six hour time limit for obtaining vital signs does not appear to apply in this instance.

A post-suicide watch release follow-up by a mental health clinician on 5/16/22 reported that the patient refused to speak with the clinician and appeared to have smeared food on his cell window. He is described as disheveled, loud, irritable, and tangential, showing obsessive compulsive thought process and belligerent, agitated and impulsive behavior.  He denied suicidal ideation and refused to engage with safety planning.  A subsequent mental health follow-up on 5/17/21 describes a similar clinical presentation, but indicates that the patient was more responsive and reported that he had taken his medication.

25

The next mental health documentation entry was from 6/24/22, which records an order from the on-call psychiatrist continuing Zyprexa and a psychiatry follow-up in 90 days.  On 6/25/22 a mental health clinician saw the patient for a 30 day mental status exam.  He reported doing well and taking his medications.  He denied psychiatric symptoms or having any mental health concerns. He was described as calm, appropriately groomed, and fully oriented.

A sick call entry by a mental health clinician dated 7/17/22 reports that the patient was banging incessantly on his cell door, yelling and spraying water on his door window.  He yelled that he was suicidal, along with other apparently delusional statements. He was placed on Level 2 Suicide Watch.  A Suicide Watch Initial Assessment for Mental Health was completed, which included a brief treatment plan. A brief collaborative safety plan was documented on 7/18/22, when the patient was released from suicide watch.

The patient was seen by a mental health clinician for two daily follow-ups after his release from suicide watch.  On 7/21/22 he was again yelling that he was suicidal and banging on his door. He was unable to meaningfully engage in safety planning, and again required Level 2 suicide watch. It required several deputies to extract the patient from his cell, during which he threw an unknown substance on them.  He appeared to be responding to internal stimuli and removed his pants while in the hallway. A Suicide Watch Initial Assessment for Mental Health was again completed.

The patient remained on Suicide Watch Level 2 until 7/24/22.  He was seen daily by a mental health clinician during this time. On 7/24/22 there is another safety plan entered into the healthcare record. This Collaborative Safety Plan and the associated sick call notes were sparse, and not considered to provide adequate assessment of or precautions against suicide risk.  On 7/25/22 there is a post suicide watch release follow up.  The patient was assessed as in good spirits and joking with the clinician, but he was described as bizarre in appearance, loud but appropriate speech, appropriate and euphoric mood, with circumstantial and tangential thinking and delusional (possibly grandiose) thought content.

He was seen by the psychiatrist on 7/25/22, whose note indicates the patient had become increasingly impulsive and manic, with rambling speech and tangential thinking.  His medications were increased. Subsequent mental health contacts through 8/3/22 (the most recent health record entry at the time of this review) show a variable course, alternating between being in good spirits and joking and yelling, banging on his door, hyperverbal and yelling obscenities. A chart note dated 7/26/22 reports that the patient was displaying aggressive and violent behavior while medications were being passed in his housing pod.  Floor deputies informed that the patient collected feces and set them aside for the apparent purpose of throwing at staff when his cell door or tray slot were opened.

The mental health chart entry dated 7/29/22 noted that the patient was seen cell-side due to safety concerns.  The patient was yelling and banging on his cell door.  He was hyperverbal and yelling obscenities at everyone in the pod.  He dismissed the clinician with cursing, and was difficult to assess due to his lability.  It was noted that he did not express suicidal ideation or appear to be an immediate danger to self or others.  A sick call entry by a mental health clinician on 8/3/22 describe the patient as calm and out of his cell during socialization time.  He stated that he did

not wish to work with the clinician any longer after she placed him on suicide watch, but apparently stated this in an appropriate manner.  Follow up was planned in 30 days, but as the patient was currently in administrative segregation, he would be seen weekly by mental health.

Findings:
This was a case of severe mental illness in which the patient was briefly admitted for inpatient treatment at NMC, which was appropriate. However, the available documentation indicates that his chronic mental health condition required more than a one-time, three day length of stay at an inpatient level of care.  It is understood that patients cannot be placed on a 5150 hold or subsequent longer involuntary commitments while in custody at the jail, yet the jail is not adequately equipped to care for either the acute or chronic manifestations of this patient's severe mental illness.  Behavior such as his, apparently driven in large part by his mental illness, will also make him and patients like him vulnerable to exploitation or violence from other inmates, and will therefore require administrative segregation or other forms of restricted housing with close monitoring to protect them from the general population.  The isolative environment of administrative segregation housing is not conducive to the effective treatment of mental illness, and will often exacerbate symptoms. Greater access to inpatient mental healthcare is needed.

The patient consistently refused to have vital signs taken while he was on Level 2 Suicide Watch and housed in a booking or observation cell.  However, there is no documentation that he was ever placed on Level 1 Suicide Watch or placed in a safety cell. The Implementation Plan requirement for hands-on nursing assessments to include vital signs is understood to apply only to patients housed in safety cells as mandated by Level 1 Suicide Watch.

The documentation of suicide risk assessment, collaborative safety planning, and clinical decision-making about release from suicide watch require improvement.

## Patient 7
This patient was most recently booked into MCJ on 3/1/22.  The intake screening was unremarkable regarding current mental health symptoms.  It notes a prior suicide attempt many years earlier as an adolescent. The patient reported a history of PTSD, bipolar disorder, and anxiety. The patient reported taking medications, reporting Prozac, Trazadone and Risperdal, but stated she had not taken her medications for two months.  The intake nurse spoke with the on-call psychiatrist and medications were restarted.  The patient was on a CIWA protocol for alcohol with medications at the time of her intake (apparently transferred from Santa Rita Jail in Alameda). She reported consuming a pint of vodka a day, and daily cannabis use.  She was referred for a routine mental health follow-up.

The patient was seen by a mental health clinician on 3/2/22.  The sick call note indicates the patient was fully oriented and coherent, with appropriate appearance, speech, and thought content, depressed mood and blunted affect. No other mental health signs or symptoms were noted.  A follow-up appointment was made for 30 days. A referral to psychiatry was made.

The patient was seen by psychiatry on 3/7/22. The patient presented with no complaints and her presentation was unremarkable. Medications were continued. A diagnosis of PTSD was provided.

The patient was seen again by a mental health clinician on 3/25/22 for routine follow-up. She shared information about her traumatic history, and reported flashbacks and nightmares. She reported an interest in being on medications that worked for her in the past.  These medications were not specified.  Her clinical presentation at this time was unremarkable.  She was referred to psychiatry, scheduled for follow-up on two weeks, and encouraged to contact mental health staff as needed.

The patient was seen again by the psychiatrist on 3/28/22, when she reported experiencing nightmares and had been hearing voices "all my life."  The note indicates she requested a higher dose of Risperdal and Prozac.  These medications were increased.  Her clinical presentation as described was unremarkable. Diagnoses of PTSD and Psychotic Disorder NOS were provided.

The patient was seen again by a mental health clinician on 4/1/22.  She disclosed more of her trauma and mental health history.  She again complained of flashbacks of past traumatic events and associated difficulties with sleep. The patient denied other mental health symptoms.  A Mental Health Initial Special Needs Assessment was completed.  It indicated that the patient appeared "down in mood and sullen, but perks up when she talks about her adult son and grandchildren." She was in an open dorm setting and maintaining her activities of daily living. She presented as fully oriented and unremarkable regarding mental health signs or symptoms. A treatment plan for non-acute patients was created that provides lists of problems, goals, and interventions.

Subsequent contact with a mental health clinician occurred on 5/2/22 for a 30 day follow-up. The patient expressed that her hallucinations were under control but that she continued to experience night terrors and involuntary movements. The interventions listed in the aforementioned treatment plan were briefly alluded to.  The patient's presentation was again otherwise unremarkable.

The patient was seen by the psychiatrist on 5/3/22, when she again reported night terrors, insomnia, and involuntary movements, i.e. "Reports experiencing occasional 'hands jerking.'" She reported that her auditory hallucinations had decreased.  Her presentation as described was otherwise unremarkable. No formal assessment for involuntary movements was recorded. Risperdal was discontinued, Prazosin was increased, and Zyprexa was prescribed.

A follow-up psychiatry sick call on 6/6/22 includes an apparent referral request to evaluate the patient's current involuntary movement symptoms and address ongoing PTSD/night terrors.  The psychiatrist's note states that the involuntary movements and night terrors had stopped since antipsychotic medication was changed from Risperdal to Zyprexa and the Prazosin dose was increased. The patient's clinical presentation was otherwise unremarkable.

The only subsequent mental health contacts were dated 6/6 and 6/7/22, regarding mild anxiety about her upcoming release and requesting assistance for shelter resources in Salinas.  This request was addressed. The overall mental health care provided to this patient during her incarceration appears appropriate.

**Patient 8**

Available documentation shows a series of brief jail stays, with a booking on 2/1/22 and release on 2/3/22; a booking on 4/3/22 and release on 4/7/22; a booking on 4/20/22 and release on 4/22/22; and a recent booking on 8/17/22.

An intake form dated 2/1/22 indicates that this patient was unremarkable in his clinical presentation but was placed on a withdrawal monitoring protocol and Medication Assisted Treatment for opiate dependence. Current psychotropic medications are indicated, and a note states that these are included on the list above.  Such a list was not identified in the healthcare record.  There was no documentation that these medications were relayed to the psychiatrist for continuation. Current or past inpatient or outpatient treatment is denied.

The patient was rearrested on 4/3/22 and required jail clearance prior to intake because of suicidal statements. He was cleared by NMC medically and for mental health with no recommendations. Upon intake the patient presented as dirty, disheveled and angry but otherwise unremarkable for mental health symptoms. He acknowledged IV methamphetamine use but denied drug withdrawal history. The paperwork from NMC indicated a history of bipolar disorder, but the patient denied any prior use of psychotropic medications. The patient was placed in Level 2 Suicide Watch and placed in a booking cell for observation.  A nursing assessment was completed including vital signs.

The patient was seen by a mental health clinician on 4/3/22 for crisis intervention when he returned from NMC following his jail clearance. The clinician completed a Suicide Watch Initial Assessment for Mental Health, in which she continued his Level 2 Suicide Watch and planned for daily mental health follow-up contacts. The patient was seen daily by mental health between 4/3 – 4/6/2022.

A mental health progress note by a clinician dated 4/5/22 shows that the patient was seen for suicide watch follow-up. Suicide watch had been discontinued on 4/4/22, after a Suicide Watch Daily Follow-up and Discharge form was completed by a clinician. This note indicates patient reported he was never suicidal and only wanted clothes.  He reported diagnoses of anxiety, bipolar and "impulsive disorder."  He stated that he was at the CCCMS level of care while in CDCR, which is the lowest level of mental health care and is intended to treat patients whose mental illness does not significantly impair their daily functioning in the prison environment. The patient denied past suicide attempts or current suicidal ideation. The psychiatrist began medications on 4/6/22. A chart note entered 4/7/22 indicates that nursing staff spoke with a pharmacy to verify Abilify and Remeron.

The patient was again booked into MCJ on 4/20/22 and again required clearance at NMC for suicide risk.  The patient had started to punch himself in the face during the intake screening. Once placed in a safety cell, he began banging his head on the door and suffered a cut to his head. He was assessed by nursing upon placement in the safety cell, including vital signs. Crisis intervention was provided and a Suicide Watch Initial Assessment for Mental Health was completed by a mental health clinician, with a brief treatment plan.  The patient was placed on Level 2 Suicide Watch.

An incident report dated 4/22/22 indicates that the patient was set to be released from custody due to the District Attorney's office rejecting his case. At the time, the patient was on a level 2 suicide watch, and therefore required evaluation for a possible 5150 hold. The patient was evaluated by a deputy and found not to meet the 5150 criteria. A chart note dated 4/22/22 states that the patient will be released, does not meet 5150 criteria, and that the mental health team was notified by the deputy.

A mental health note dated 4/22/22 for Suicide Watch Level 2 indicated that a deputy contacted the clinician to notify that the DA had rejected the patient's case and that he was to be released from custody. The clinician competed a Suicide Watch Daily Follow-up and Discharge for Mental Health form on this date, in which she recommended 15 minute staggered safety checks and continued daily follow-up. She noted that at intake on 4/20/22 he had been punching himself in the face and expressing suicidal ideation. Her evaluation cited a number of current suicidal indicators and risk factors, and characterized an estimated current suicide risk level as intermediate. The clinician recommended that the patient be released on a 5150 hold for suicidal ideation and danger to self and be brought to NMC for psychiatric evaluation and further treatment as necessary.

Based on the information provided in the incident report, it raises questions about who is making the determination regarding 5150 evaluations. Discussions about this issue with the Acting Health Services Administrator and Mental Health Supervisor indicated that as sworn law enforcement officers, Sheriff's Deputies are authorized to make determinations about whether to pursue a 5150 hold. Once an inmate is ordered release by the Court, it is unlawful to detain them further. In light of this, however, there appears to have been a difference of opinion between the clinician and the deputy regarding pursuit of a 5150 hold which should have been more effectively addressed.

Healthcare records indicate that the patient was again booked into MCJ on 8/17/22, and was quickly placed on Suicide Watch Level 2 after a nurse evaluation of suicide was completed, followed by assessment by a mental health clinician.

The mental health care provided to this patient appears adequate. He experienced a series of bookings and brief periods of incarceration, and it seems likely that his clinical presentation and behavior were significantly influenced by his drug use and dysfunctional interpersonal relationships in the community. The proper steps in his care were taken up to the point of his most recent release, when a deputy made the determination not to pursue 5150 after the mental health clinician had recommended it prior to his release on 4/22/22. More effective communication and coordination between custody and mental health staff was needed.

# Exhibit 36

## CORRECTIVE ACTION PLAN

**Site:**          CA – Monterey County Jail
**Audit Type:**    Mental Health (CFMG and County)

| Item Code | Finding | Corrective Actions | Responsible Person | Target Date | Verification Method | ✓ | Status |
|---|---|---|---|---|---|---|---|
| Intake | 1.   Difficult to determine those inmates sent to NMC for crisis evaluation from intake. | Develop and implement a log at intake to identify those sent to NMC for crisis evaluation. | HSA or Designee | 8-27-20 | NMC crisis evaluation log will be accessible in the DON office for review. | ☐ | |
| | Lack of confidentiality for nursing intake assessments during intake. | A.  Installation of new white noise machines in intake and receiving mental health room. Need to add in the receiving x-ray room (Portable), Rehab (Portable) and 2 in the infirmary (Bass & Banuelos) .

B. Coordinate training with the County to ensure that custody staff receive instruction on why non-confidential assessments can prevent some inmates from providing necessary medical and mental health information and how this is especially important during the intake process when important and potentially sensitive information should be conveyed to the screening nurse. | Bass & Banuelos | | A. Demonstrate effectiveness of white noise machines during monitoring checks.

B. Produce training materials and roster. | ☐

☐ | White Noise machines installed.  Locks on doors removed so can close for confidentiality.


Training completed. |
| | Lack of documentation of intake nursing review of past healthcare records for inmates with known or recent history of mental health treatment at MCJ. | A. Train and supervise intake nurses regarding the appropriate review of past healthcare records and to document the presence of past mental health treatment in COR EMR to ensure that appropriate triage and treatment are provided, as well as on policies regarding safety and treatment planning in connection with mental health assessments for new arrivals, and the proper documentation thereof.

B. Add to EMR a check box acknowledging review of past in-custody medical records and a free text box to manually enter information gleaned during this process to the Receiving Screening Exception Form.  Train staff on the importance of reviewing medical records. | | | A. Produce training materials and roster.



B. Demonstrate EMR capability as requested.  Produce training materials and roster | ☐ | |
| | Delays in scheduling of initial psychiatric assessment and follow-up. | A. Audit the timeliness of psychiatric assessments monthly ▮▮▮▮ or designee)

B Add to EMR a trigger that automatically schedules psychiatric assessment and follow-ups for all new inmates requiring mental health care. | | | A. Make audit and subsequent audits readily available for review

B. Demonstrate EMR capability as requested. | | |

# CORRECTIVE ACTION PLAN

**Site:**        **CA – Monterey County Jail**
**Audit Type:**    **Mental Health (CFMG and County)**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sick Call | 2. | The facility did not track the timeliness of response to sick call requests. | Track and audit timeliness of response to sick call requests monthly.  Intel mate has time stamp, audit response time weekly x 4 weeks, then bi-monthly x 4 weeks. | HSA or Designee | 8-27-20 | Produce audits monthly. | ☐ | |
| Medication continuity | 3. | [Intake] Delays in the timely ordering of medications for newly arriving inmates.  The facility should continue to ensure that medication continuity occurs at the time of jail intake. Clinical rationale should be provided for cases of delays in medication continuity.<br><br>[Discharge] The amount of medication dispensed is not identified by the release document. | Training of nurses on Implementation Plan requirements regarding medication continuity for new inmates.  Additionally, nursing staff will be trained to utilize the existing comment section to document number of pills upon release in the discharge planning section for each release medication and amount ordered until EMR trigger completed.<br><br>Perform monthly audits to ensure timely ordering of medications for newly arriving inmates.<br><br>HSA or designee to audit 10 random releases monthly for documentation completion utilizing an audit tool, to include: amount of medication dispensed to patient and documentation of follow up referrals made.<br><br>Work with Cor-EMR team to add to EMR a trigger for amount of medication dispensed upon release. | HAS or Designee | 8-27-20 | Provide training materials and nurse attendance roster.<br><br>Produce audits monthly.<br><br>Demonstrate EMR capability as requested.<br><br>Nurses will write in the comment section of the existing form.<br><br><br><br>Demonstrate EMR capability as requested. | ☐<br><br>☐<br><br>☐<br><br>☐ | |
| Clinical staffing | 4. | Delays in conducting initial psychiatric assessment and follow-up appear to be due to psychiatric staffing workload issues, highlighting the need for a comprehensive staffing analysis to help to determine appropriate staffing levels.<br><br>Mental health appointments were rescheduled due to workload constraints, and workload for the psychiatrist was an issue of concern.<br><br>A workflow analysis which includes all work tasks, duties and responsibilities is necessary to determine the current mental health staffing needs.<br><br>Additional psychiatric staffing and the addition of a substance abuse counselor should also be considered. | Conduct Staffing Analysis / Workflow Analysis.<br><br>Adjust staffing (including hiring) if/as necessary. | HSA or Designee | 8-27-20 | Make staffing analysis findings available for review. | ☐ | |

36-2

# CORRECTIVE ACTION PLAN

**Site:**         **CA – Monterey County Jail**
**Audit Type:**   **Mental Health (CFMG and County)**

| Safety Cells & Sobering cells | 5. | Lapses in the timely medical review of all safety cell placements.

Lapses in the timely medical assessment of inmates placed into safety and sobering cells.

Inmates need to be sent to NMC after 24 hours in Safety Cell.

The documentation of provision of mattresses remained problematic.  The form on which custody staff documented the provision of mattresses was organized in a way that the officers frequently did not document this provision.  The facility planned to amend the form to include a check box that indicated that provision of mattresses; this was discussed during the last monitoring report, but was not yet implemented the time of the visit.  Additionally, they implemented a new procedure to provide mattresses to all inmates in safety and sobering cells on the night shift, if appropriate. | A.  Train all relevant medical staff on Suicide watch and Safety cell placement, on timely medical reviews of all such placements, and timely  assessments during the duration of such placements.

B.  Audits will be performed monthly, both medical and custody, to ensure timeliness of assessments

A Training to custody and medical in regards of time frame in Safety Cell.
- Deputy briefing training, it is believed this is caused by Mental Health team asking for placement and deputies not following regular safety cell placement protocol because of that - Sergeants will be trained to conduct the briefing training during the week of May 25, 2020. Will include deputy initials to acknowledge training.

Train sergeants to review and remind deputy staff
- Briefing training - Sergeants will be trained to conduct the briefing training during the week of May 25, 2020. Will include deputy initials to acknowledge training.
- Check on a new form with a check box
- Audit the last two months compliance based on the 12-hour shift change

B.  Audits will be performed monthly, both medical and custody, to ensure transfers to NMC after 24 hours. | HSA | 8-27-20 | Produce training materials and roster.

Produce audits monthly.

Demonstrate EMR capability as requested.

Rosters available for training as well as training material

Rosters available for training as well as training material

Rosters and training material available. | ☐ ☐ ☐ | Training completed.

Training completed.

New forms completed.

Audits performed. Training completed. |
|---|---|---|---|---|---|---|---|---|
| | | Facility staff denied disagreements between medical and custody staff regarding such placements; however, records reviews documented several conflicts between custody and | 1.  Provide review training with sergeants and talk to Christina about Well Path mental health staff training also | | | Training Rosters * Bass, Smith

Wellpath staff present at custody briefings | | Custody training completed. |

## CORRECTIVE ACTION PLAN

**Site:**        **CA – Monterey County Jail**
**Audit Type:**   **Mental Health (CFMG and County)**

| | | | | | |
|---|---|---|---|---|---|
| | mental health/medical staff regarding placement of inmates into safety cells and the provision of allowable items to inmates in safety cells on suicide monitoring.  Examples were noted in which inmates were provided with a blanket and smock by custody staff, despite orders prohibiting these items due to suicide risk. Additionally, of significant concern was documentation by mental health clinicians that a request for constant watch was overridden by custody staff who indicated that this was not required as the inmate was thought to be malingering.  Such determinations by custody regarding medical and mental health clinical determinations should be immediately addressed.

A timer remained in place in intake as a reminder for officers to perform timely welfare checks.  Additionally, this issue was discussed during the daily briefings and shift change meetings; documentation was provided that confirmed those discussions. Review of the provided documents noted continued lapses in the documentation of safety checks twice every 30 minutes in the safety and sobering cells. Documentation of spot checks for compliance by the Compliance Sergeant was provided, and it confirmed the above observation. There were also lapses in supervisory | Following his discussion with Dr. Kottraba, implement Dr. Hughes' recommendations regarding suicide risk evaluations, safety planning, and post-suicide monitoring follow-up.

<br>

1.  Sergeant training and reminder
2.  Briefing training for deputies re: 15-minute checks - Sergeants will be trained to conduct the briefing training during the week of May 25, 2020. Will include deputy initials to acknowledge training.
Audit for previous two months to confirm severity of problem, reassess after audit  * | | TBD

1.  Training Rosters
2.  Training Rosters Review Audit * Bass, Smith, Guerrero | | TBD

Completed. |

# CORRECTIVE ACTION PLAN

**Site:**　　　　**CA – Monterey County Jail**
**Audit Type:**　　**Mental Health (CFMG and County)**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | approval for placement in safety cells. | | | | | | |
| Treatment Plans | 6.　MDT Meetings: Minutes needed for all those that cannot attend.<br><br>Healthcare and MDTM records continued to lack appropriate documentation of individualized treatment and safety planning.<br><br>The facility should provide ongoing training and supervision to mental health staff regarding appropriate individualized treatment and behavioral planning. Individualized treatment planning should be documented in the healthcare records. Suicide risk assessments should include appropriate safety planning with documentation in the healthcare record. | Ensure minutes are emailed to psych team and custody staff not attending MDT meeting.<br><br>Training to mental health staff regarding treatment planning and safety planning, including Implementation Plan requirements.<br><br>Monthly audits of at least 10 treatment plans and safety plans for appropriateness and completeness. | HSA | 8-27-20 | Produce MDT minutes, SharePoint drive where minutes are uploaded weekly available for all psych and sergeants to view.<br><br>Produce training materials and roster.<br><br>Produce monthly audits | ☐<br><br>☐<br><br>☐ | Minutes are going to custody staff. |
| Ad Seg | 7.　The facility should continue to work to improve access to timely inpatient psychiatric care for all jail inmates in need of such services.<br><br>Some of these individuals were unable to participate in group and individual therapy out of cell due to their decompensated state.<br><br>A significant percentage of seriously mentally ill are housed in administrative segregation.  In lieu of alternative placement, mitigating factors such as clinical contacts, rounding, groups and other out of cell activities should occur as outlined in the Settlement Agreement and Implementation Plans. | Quarterly meetings with Wellpath, NMC and County Behavioral Health will take place to continue to improve communication. The tracking spreadsheet identified as Exhibit 1 to this CAP will be electronically completed (not handwritted) for all patients referred to or otherwise sent to NMC's Mental Health Unit.<br><br>Contract with CFMG for the provision no less than an additional 10 hours/week for mental health staff to provide therapeutic treatment, clinical contacts, rounding, and group therapy exclusively to severely mentally ill inmates in Ad-Seg and isolation units.<br>　•　Wellpath will add two additional mental health staff.<br>Work with Charles and Well Path to develop some sort of program for these individuals and document it<br><br>Train Well Path Mental Health team on our requirements under the Settlement Agreement, include regular efforts to integrate difficult individuals into group sessions | HSA | 8-27-20 | Minutes will be taken and forwarded for this meeting.  The tracking spreadsheet will be produced monthly.<br><br>Provide documentation about new program, refusal form, and incentives for participation to monitor for review and comment.<br><br>Produce monthly audits.<br><br>Review training records | ☐<br><br>☐<br><br><br>☐ | Protocol involving manual call and referral form developed.<br><br>GEO/Custody /Program Staff will begin documenting special measures taken with these individuals |

# CORRECTIVE ACTION PLAN

**Site:** CA – Monterey County Jail
**Audit Type:** Mental Health (CFMG and County)

| | | | |
|---|---|---|---|
| A significant number of inmates were unable to attend group therapy due to their level of mental health instability.  Many of the individuals not attending groups needed inpatient treatment for stabilization and were treatment non-adherent. | Develop new form to indicate those inmates in Ad-Seg and Isolation cells who refuse to participate in programming.  For each refusal, identify actions taken to inform inmate of program and encourage participation. | Provide training materials and audits ⬛ Mental Health) | |
| There was a lack of documentation regarding clinical interventions to address inmates who are unable or who routinely refused group and individual therapies. These interventions should be addressed in treatment planning, which was lacking. | Incentivize inmates to participate in group programs by offering "extras" (such as increased time with tablet, extra time out of cell for socialization/exercise, cookies, etc.). | Provide documentation of incentives as earned, re-evaluate rosters for increased attendance ⬛ Mental Health)_ | Non-participation is noted. GEO/Custody /Program Staff will begin documenting special measures taken with these individuals |
| The facility should continue to work to improve and to provide appropriate documentation of the provision of out of cell activities in segregation. | Monthly audits of treatment plans for individuals in Ad-Seg and Isolation cells.<br><br>Monthly audits of nursing and mental health Ad-Seg and Isolation checks.<br><br>Better articulation of reasons for placement in Ad Seg<br><br>Classification Unit training<br><br>Talk with and train medical staff as well | | |
| There remained lack of documentation of the required placement screening for all prisoners for mental illness and suicidality with segregation housing. This issue was discussed with the classification sergeant with recommendations to change the inmate movement form to indicate notification to medical of segregation placements. | 1.  Classification Unit training<br>2.  Update Movement Form<br><br>3. Monthly audits of nursing and mental health ad seg checks<br><br>Audit monthly nursing rounds | 1.  Completed 5-13-20<br>2.  Completed 5-13-20<br>* Bass, Hedberg<br><br>Produce monthly audits (⬛<br><br>Continue monthly audits ⬛ RN)<br><br>Produce monthly audits ⬛ | Ongoing discussions with Dr. Hughes are taking place. |
| Nursing rounds were not always documented daily in segregation units. | Maintenance is welding plates on beds | | Completed. |
| Hanging Points - The segregation units were toured, and it was noted that one of the modified cells smelled of urine as had been reported. Discussions with the custody | | Completed 5-15-20 * Bass | |

# CORRECTIVE ACTION PLAN

**Site:**         CA – Monterey County Jail
**Audit Type:**   Mental Health (CFMG and County)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | supervisory staff resulted in a decision to amend the planned modifications to the segregated unit beds to closing the tie-off holes located in the beds and not to install the bed skirts. | | | | | | Welded metal plates on all ad seg beds.<br><br><br><br>Completed. |
| Training | 8. Yearly, custody staff will conduct a situational training such as a mock suicide attempt or medical emergency. CFMG staff will participate.<br><br>Provide ongoing training and supervision to the mental health staff regarding appropriate individualized treatment and behavioral planning. | Provide briefing training PowerPoints and roster after each training.<br><br>Conduct a situational training include Wellpath staff<br><br>Participate in Regional Mental Health calls monthly hosted by RDMH. | HSA | 8-27-20 | Produce training materials and roster.<br><br>Provide after-action review of situation training.<br><br>Provide agenda and attendance documentation (Bass and ▮▮▮▮) | ☐<br>☐ | Yearly situational trainings have been occurring since 2018. Custody has been compliant and have done yearly exercises – will continue to do that. |
| Restraints | 9. Documentation does not include range of motion exercises performed.<br><br>Documentation does not include assessment regarding provision of food, water, and toileting opportunities. | Audit each restraint log and medical record within 10 days after each use for documentation of whether range of motion exercises were conducted as well as the provision of food and water and toileting.<br><br>Train compliance sergeant about auditing and identifying problematic areas that can be remedied prior to monitor visits<br><br>Add check box to custody restraint log to ensure range of motion exercises performed.<br>1. Briefing training – Sergeants will be trained to conduct the briefing training during the week of May 25, 2020. Will include deputy initials to acknowledge training.<br>2. Audit the use for last four months and see how often inmate stays in WRAP longer than 1 hour | HSA | 8-27-20 | Produce audit and copy of restraint log.<br><br>1. Training Rosters<br>2. Review Audit Completed, 6-1-20 | ☐ | Completed.<br><br><br><br>Completed. |

36-7

# CORRECTIVE ACTION PLAN

**Site:**         **CA – Monterey County Jail**
**Audit Type:**   **Mental Health (CFMG and County)**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Planned use of force | 10. | No documentation that medical was advised prior to use of force.<br><br>The facility should ensure that mental health/medical staff is contacted and that attempts at de-escalation occur prior to planned use of force with appropriate documentation. | 1. Use of force form updated to include a check box for medical contacted and a space for time contacted.<br>2. Sergeant training – debrief and reminder training occurred after the incident in question. Medical was on-scene and advised but it wasn't documented.<br>3. Audit the use for last five uses of force<br><br>Documentation of medical assessment to be included in EMR. | HSA | 8-27-20 | Produce form as requested<br>1. Training Rosters<br>2. Review Audit<br>*Bass, Smith | ☐ | Completed. |
| Disciplinary Action Reports | 11. | Inmate receiving mental health treatment. Training should continue regarding appropriate documentation on the Disciplinary Action Reports if the inmate was receiving mental health services and if medical was consulted. | Training relevant personnel<br><br>1. Audit DAR monthly<br>2. Conduct training at SGT meetings regarding the consideration of mental illness in inmate discipline and documentation thereof.<br>Sergeant training<br>Audit last month to check compliance | HSA | 8-27-20 | Produce training materials and roster.<br><br>Review Audit * Bass, Smith | ☐ | Completed. |
| Quality Management | 12. | No information was provided regarding ongoing audits, quality assurance minutes, mortality and morbidity reviews.<br><br>The facility should better document Quality Assurance meetings and efforts to ensure that areas of deficiency are identified, corrective action is developed, and monitoring occurs to ensure that the identified issue is corrected. QA meetings should be held more frequently.<br><br>The facility should develop and/or better document a mortality review process that critically examines inmate deaths as well as serious self-harm incidents to identify areas of deficiency, corrective action and opportunities for improvement.<br><br>Quality assurance should review the timeliness and appropriateness of response to inmate requests. | The person appointed to take minutes of QA meetings will receive specific training from Wellpath's Home Office on how to take attendance and keep minutes, including on how to ensure that lapses in care, corrective actions, and CQI will be identified in QA minutes.<br><br>Maintain at least a quarterly CQI mental health meeting held by HSA or designee.<br><br>Death reviews shall be performed as part of the quality improvement process in accord with California Code of Regulations, NCCHC Standards, Wellpath policies and the Implementation plan and thereby generate appropriate corrective action plans to prevent future deaths. Death reviews will result in completed forms with no blank entries in the forms. Death reviews will include autopsy results, opportunities to improve care, and corrective actions to be taken to reduce the risk of similar deaths.<br><br>Review with all relevant health care staff **Wellpath Policy HCD-110_A-09 Procedure in the Event of a Patient Death.**<br><br>Monthly audits of sick call triage and evaluations times. | HSA | 8-27-20 | Produce training materials and roster<br><br>HSA will maintain a binder with QA monthly agendas, meeting minutes and an attendance roster with name, title, and original signature of all attendees.<br>Produce audits, quality assurance minutes, MDT meeting and mortality and morbidity reviews. ▮ | ☐<br><br>☐<br><br>☐ | |

# CORRECTIVE ACTION PLAN

**Site:** CA – Monterey County Jail
**Audit Type:** Mental Health (CFMG and County)

| | | | | | | |
|---|---|---|---|---|---|---|
| Treatment Space for Clinical Interviews | 13. Space should be provided to allow for a safe and confidential interview by mental health staff.<br><br>The facility should continue to examine current treatment space to identify if physical plant issues negatively affect the provision of confidential clinical encounters. | Installation of new white noise machines in identified treatment locations.<br><br>Laptop provided for mental health staff to be able to utilize rooms with no computer.<br><br>Briefing training re: confidentiality and awareness of spaces - Sergeants will be trained to conduct the briefing training during the week of May 25, 2020. Will include deputy initials to acknowledge training.<br><br>Review with Christina & Well Path re: their providers. | HSA | 8-27-20 | Demonstrate effectiveness of white noise machines during monitor checks.<br><br>Laptop provided 6/1/20 ▮▮▮▮<br><br>Training Rosters<br>  Completed 5-12-20 | ☐ | White noise machines added – Door locks removed to allow for closure where appropriate. |

# Exhibit 37

**Monterey MH Staffing Matrix Recommendation – August 2022**

|  | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
| **MH Coordinator** | 10 | 10 | 10 | 10 |  |  |  |
| **MHP – 12 hrs** | 12 | 12 | 12 |  | 24 | 24 | 24 |
| **MHP – 8 hrs** |  | 8 | 8 | 8 | 8 |  |  |
| **Psych Tech - Tele** |  | 8 | 8 |  | 8 | 8 |  |
| **Psych Tech\*** | 8 |  | 8 | 8 | 8 | 8 | 8 |
| **Discharge Planner** |  | 8 | 8 | 8 | 8 | 8 |  |

**Notes:**

- The Psychiatric Technician\* that is not running tele-health will be conducting restricted housing rounds for 2 days per week and facilitating programming (i.e. groups and 1:1 psych ed) 4 days per week.

- The Psych Tech – Tele will facilitate tele-health appointments.  This is done to help attract MHPs with an agreement that they will be able to work from home 1 day per week with the psych tech facilitating the camera.  This is a recruitment strategy given that one of the MHP positions has been difficult to recruit for.

- **New Needs:**
  - MHP – 0.9 FTE  Thursday – Saturday
  - MHP – 1.0 FTE  M – F
  - Psych Tech –  2.0 FTE Total needed
  - Discharge Planner – 1.0 FTE

37-1

# Exhibit 38

# Monterey County Jail

## and

# California Forensic Medical Group

## Dental Neutral Court Monitor Report

Dental Tour - Initial Evaluation - February 2 - 3, 2017

Jesse Hernandez et al

v.

County of Monterey; Monterey County Sheriff's Office; California Forensic Medical Group, Incorporated

Case No. 5:13-cv-02354-PSG

# Table of Contents

Table of Contents                                                                      2

Introduction                                                                           7

    Jesse Hernandez et al v. County of Monterey et al                 7

    In Attendance for Initial Dental Tour                              7

    AB109                                                              7

About the Institution                                                                  8

Report Format & Site Overview                                                          8

Standard of Care                                                                       8

Dental Staff                                                                           8

Dental Priority System                                                                 9

Executive Summary                                                                      9

Access to Care - Non-Compliance                                                       13

    Intake & Orientation to Dental Access to Care                     13

    Intake & Orientation to Dental Access to Care - Recommendations:   14

    Interpreter Services                                              15

    Interpreter Services - Recommendations:                           15

    MCJ Form used on Day of Booking                                   15

    MCJ Form used on Day of Booking - Recommendations:                16

    CFMG Intake Form used on Day of Booking                           16

    CFMG Intake Form used on Day of Booking - Recommendations:        16

    Access to Oral Hygiene Supplies                                   16

    Access to Oral Hygiene Supplies - Recommendations:                17

    Health Inventory and Communicable Disease Screening (HI&CDS)      17

    (IH&CDS) - Recommendations:                                       18

    Qualified Health Care Profession / Nurse Training                 18

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

Qualified Health Care Professional / Nurse Training - Recommendations:18

Dentist On Call System                                                    18

Dentist On Call System - Recommendations:                                 19

Sick Call - Urgent & Emergent Dental Care                                 19

Sick Call - Urgent & Emergent Dental Care - Recommendations:              19

Chronic Care - including I/Ps with Diabetes, HIV, Seizures and Pregnancy20

Chronic Care - Recommendations:                                          20

Comprehensive Dental Care                                                 21

Comprehensive Care - Recommendations:                                     22

Periodontal Program (PSR, Periodontal Charting and Periodontal Re-Eval)22

Periodontal Program - Recommendations                                     22

Custody Movement & Appointments                                          23

Custody Movement & Appointments - Recommendations                        23

Refusals                                                                  23

Refusal - Recommendations:                                               23

Quality of Care - Non-Compliance                                         23

Dental Clinic Facility Audit - See Appendix 3                             23

Dental Clinic Facility Audit - Recommendations:                          24

Dental Materials                                                         24

Dental Materials - Recommendations:                                      24

Tool Count                                                               24

Tool Count - Recommendations:                                            24

Sharps Count                                                             24

Sharps Count - Recommendations:                                          25

Housekeeping Logs                                                        25

Housekeeping Logs - Recommendations:                                     25

Prescriptions & Stock Medications                                        25

Prescriptions & Stock Medications - Recommendation:                    25

Recapping of needles                                                   26

Recapping of needles - Recommendations:                               26

Forms (i.e. Consent Forms, Comprehensive Exam, Periodontal Chart, etc)26

Forms - Recommendations:                                              26

Chart Audit                                                          26

Chart Audit - Recommendations:                                       27

X-rays Present and of Diagnostic Quality                             27

X-rays Present and of Diagnostic Quality - Recommendations:          27

Highspeed Handpiece Use and Water                                    27

Highspeed Handpiece Use and Water - Recommendations:                27

Grievances                                                          27

Grievances - Recommendations:                                        27

Legibility                                                          28

Legibility - Recommendations:                                        28

Patient Interview                                                    28

Timeliness of Care - Non-Compliance                                 28

Compliance                                                          28

Compliance - Recommendations:                                        28

Follow up after Referral to Outside Specialists                     29

Follow up after Referral to Outside Specialists - Recommendations    29

Physical Resources - Non-Compliance                                 29

Equipment and Instruments                                           29

Equipment and Instruments - Recommendations:                        30

New Dental Clinic                                                   30

New Dental Clinic - Recommendations:                                 30

Restroom                                                            30

Restroom - Recommendations:                                                       30

Office Space Adjacent to Dental Clinic                                             31

Office Space Adjacent to Dental Clinic - Recommendations:                          31

Charts & EHRS (including Dental HR and Digital X-rays)                             31

Charts & EHRS - Recommendations:                                                  32

Quality of Care & Peer Review                                                      32

Quality of Care & Peer Review - Recommendations:                                  32

Human Resources - Partial Compliance                                              32

Dental Clinic Staffing                                                            32

Dental Clinic Staffing - Recommendations:                                         33

Hygienist for the Periodontal Disease Program                                      33

Hygienist & The Periodontal Disease Program - Recommendations:                    33

Licensure and Required Certificates                                               34

Licensure and Required Certificates - Recommendations:                            34

Dental Program Management - Non-Compliance                                        34

Dental Policies and Procedures                                                     34

Dental Policies and Procedures - Recommendations:                                 34

Illness and Injury Prevention Plan (IIPP)                                          35

Illness and Injury Prevention Plan - Recommendations:                             35

Quality Management Meeting Minutes                                                35

Quality Management Meeting Minutes - Recommendations:                             35

Management Structure and Organizational Chart                                     35

Management Structure and Organizational Chart - Recommendations:                  35

Regulatory Compliance                                                             36

Regulatory Compliance - Recommendations:                                          36

Required Postings in a Dental Office                                               36

Required Postings in a Dental Office - Recommendations:                           36

Conclusions                                        36

Appendix 1                                         38

Appendix 2                                         41

Appendix 3                                         43

Appendix 4                                         49

Appendix 5                                         51

Appendix 6                                         54

Appendix 7                                         60

Appendix 8                                         62

38-6

# Introduction

**Jesse Hernandez et al v. County of Monterey et al**

The Settlement Agreement was approved by the Court on August 2015 and the Implementation Plan was filed on 04/01/16. Dental services are provided to Monterey County Jail (MCJ) inmate-patient's through the California Forensic Medical Group (CFMG). Although statistics for Juvenile Hall Medical Services are provided in MCJ/CFMG's Quarterly Assurance Peer Review Committee Meeting minutes, the youth are not part of the Settlement Agreement and are not evaluated in this report. At the time of our initial dental evaluation, CFMG was in contract negotiations with MCJ with the expectation that CFMG would renew their contract for the provision of medical services to continue to include dental services by April 2017.[1] This is the Dental Neutral Court Monitor's initial evaluation of the current dental program at MCJ since the Settlement Agreement's Implementation Plan.

**In Attendance for Initial Dental Tour**

In attendance was Susan Blitch, Senior Deputy County Counsel for Monterey County; Peter Bertling, Counsel for California Forensic Medical Group; ▇▇▇▇▇▇▇▇, Program Manager for CFMG; Captain Jim Bass, Custody Captain for Monterey County Jail; ▇▇▇▇▇▇▇▇, Medical Records Supervisor and Administrative Assistant; Dr. ▇▇▇▇▇▇▇▇, Dentist for CFMG; ▇▇▇▇▇▇▇▇, Dental Assistant for CFMG and Van Swearingen of RBGG representing the Plaintiff's counsel. ▇▇▇▇▇▇▇▇ RN joined us at the beginning of our dental tour to review the intake and sick call process. Myself, Dr. Viviane G. Winthrop, Dental Neutral Court Monitor was assisted by Dr. Andre G. Metcalf.

**AB109**

When AB109 or Realignment was signed in 2011, eligible inmate/patients (I/Ps) serving longer sentences at the California Department of Corrections and Rehabilitation, were transferred to the local county jails to finish out the terms of their incarceration. As of the date of the dental tour, there were approximately 100 inmate/patients who had already served more than one year at MCJ.

Per the Settlement Agreement's Implementation Plan, I/P's who are incarcerated for 12 months or greater are eligible for a comprehensive dental examination and subsequent eligible dental treatment, based on their earliest possible release date (EPRD).

---

[1] Discussion with ▇▇▇▇▇ Program Manager regarding continuity of care

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

## About the Institution

Monterey County Jail (MCJ) is a Type II and III facility, built in 1972. It houses both men and women and has a maximum capacity of 825. Inmates are housed in 31 separate housing units which ranges from single cell to open dormitory settings. On February 2nd, 2017, there were 972 inmates in custody. The average length of stay is 30 to 33 days and there were 101 inmate/patients currently incarcerated for greater than one year.

## Report Format & Site Overview

This report establishes the baseline of the current dental program at MCJ/CFMG. Anything typed in italics is taken verbatim from the Implementation Plan. The assessments of quality of care were made primarily through our site visit evaluation, by the limited observation of clinical care provided by Dr. ▮▮▮▮▮ and ▮▮▮▮▮ and through the chart review. One inmate-patient was interviewed and no I/Ps were clinically examined during this initial dental tour.

## Standard of Care

Establishing clinical relevance in relation to the standard of care[2] is based on chart reviews, direct observations of I/Ps receiving dental care, as well as the evaluation of the clinical dental facility and it's implemented systems. With the mandates from AB109, the standard of care is also based on the level of care received at the California Department of Corrections and Rehabilitation (CDCR), California Correctional Health Care Services's (CCHCS) Dental Program, and referenced from the September 2014 Inmate Dental Services Program (IDSP) Policies and Procedures.

## Dental Staff

When we arrived for our dental tour, we were advised that Dr. ▮▮▮▮▮ may or may not be continuing to provide dental care at MCJ. He said he may transfer to Santa Cruz County Jail to be closer to home. Dr. ▮▮▮▮▮ stated during our interview that he has been providing dental care services at MCJ for approximately 9 years. It was also disclosed that another dentist was hired, possibly to take over for Dr. ▮▮▮▮▮ but no other information was available.

During the writing of this report, I was informed by ▮▮▮▮▮, Program Manager, that Dr. ▮▮▮▮▮ took over dental care on 02/16/2017. She also stated that Dr. ▮▮▮▮▮ has

_____

[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3088386/

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

transferred to Santa Cruz County Jail and will be filling in for Dr. ██████ when Dr. ██████ is on vacation. ██████████ will remain as the Dental Assistant.

Per the Implementation Plan (IP), the dentist is to be contracted to work for 0.3 which is 16 hours per week. He informed us that he works 12 hours every Thursdays and has rarely ever missed a day in the 9 years of service. Dr. ████████ worked the remaining hours every other Fridays.

The new hours of operation for Dr. ████████ are Wednesdays and Thursdays, 8 hours per day, for a total of 16 hours per week. This meets the criteria established by the IP for the dentist's mandated staffing plan.

## Dental Priority System

For clarity please see the table below for correlation between the Implementation Plan's Dental Priority System (Dental Priority Codes, Section B.5) and the Dental Priority Code (DPC) from CDCR. Note that these DPCs are used in all aspects for denoting timelines of care and in determining compliance.

(1) Emergency Care (Immediate Treatment)……**To Be Seen Immediately**
(2) Treatment within 1 calendar day / 24 hrs…..DPC **1A**
(3) Treatment within 30 calendar days………….DPC **1B**
(4) Treatment within 60 calendar days………….DPC **1C**
(5) Treatment within 120 calendar days…………DPC **2**

## Executive Summary

Staff and counsel were receptive to implementing the many requested changes as discussed during our exit interview and which you will see outlined in the report below. In December 2016, ████████████ was promoted to Program Manager, and although she has not received much, if any, training in regards to the Dental program, appears motivated to make the dental program successful. Due to the substantial amount of issues discovered during the initial dental tour, ████████ assumes a large responsibility, not only with the transition of dental care from Dr. ████████ to Dr. ████████ but also in rebuilding a dental program to meet the expectations of the Implementation Plan. The comprehensive dental care program and the periodontal disease program have yet to be initiated and there are currently no formal systems in place to track compliance metrics at any level.

On a positive note, the dental assistant for CFMG, ████████████, has shown initiative as she has started to label the instruments and organize them in the carts in a manner consistent

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

with making the dental clinical environment more efficient. I am looking forward to this level of organization, especially as Dr. ██████ assumes the responsibilities of providing dental care to MCJ's inmate/patients.

The deficiencies were significant. Below is a small sampling of some of the dental clinic's issues.

• There are currently no logs or system tracking sick calls, including dental sick calls and their referrals to the onsite dental clinic, including from either intake or the 14 day screening to see if the inmate/patients have actually been seen following the referral. In 2015 there were 17635 sick calls and 1239 Dental Visits On Site. This means that Dental saw 7% of the total sick calls.
• There is an incomplete, rudimentary compliance tracking system for upcoming triaged diagnosed dental treatment (DPC 1B, 1C, 2) which luckily Dr. ██████ had the foresight to create on his desk calendar. Although it tracks only the diagnosed treatment needed from episodic care, it was a starting point. It is unknown if all patients were seen and if they were seen within timelines. There is no auxiliary staff to assist the dentist in entering, maintaining or monitoring this aspect of the compliance tracking system, nor does he have help in scheduling the upcoming treatment from the triage appointment. This means that the dentist is currently responsible for both patient care and administration, within the 16 hours of allocated time per week.
• There are no tracking logs for comprehensive dental treatment plans as comprehensive dental care has yet to be initiated. There are no logs of I/Ps referred to the offsite specialists and if the I/Ps are seen the following dental clinic day. There are no logs or tracking of refusals and the reasons for the refusals. It is imperative that an electronic Dental Compliance tracking log/spreadsheet be created! It should include I/P's Earliest Possible Release Date (EPRD) to determine which I/P's are eligible for comprehensive care depending on their anticipated length of incarceration.
• Minimal to no x-rays were taken at the diagnosis/triage visits. Many charts had no x-rays although a diagnosis was listed in the assessment portion the SOAP notes. Dr. ██████ was observed treating patients without an x-ray being taken to substantiate the diagnosis. The fixer and developer waste containers, which is the discarded material used to develop x-rays, were full. Dr. ██████ stated," I can't remember when the container of fixer and developer were last removed. Nobody's picked that up for years". Since diagnosis was often determined without x-rays, we discussed with both Dr. ██████ and ██████ that effective immediately, x-rays would be taken to substantiate the diagnosis. They complied.
• Taking quality radiographs necessary to provide an accurate diagnosis at the time of triage can be time consuming due to hand dipping the x-rays into the fixer and developer. During the chart review, many of the x-rays were fading and/or not well developed, if there were any x-rays at all. Essentially, some of the x-rays were not diagnostic. To hand dip an x-ray

can take up to 10-15 minutes. This is a considerable about of time when there is only one dental assistant and one dental chair. I recommend digital x-rays be instituted by CFMG as there is less radiation to the I/P and the image is captured instantly. With digital x-rays, one no longer has to wait 10-15 minutes before knowing if an x-ray needs to be retaken.

- There are no general consent forms for dental examination including the taking of x-rays and basic treatment. There are no comprehensive dental examination forms and no periodontal charting forms.
- There are no local Dental Policies and Procedures available to staff including any infection control policies and procedures. Dr. ███████ stated he was not given any training by CFMG regarding the Implementation Plan and therefore reported he has not read it.
- The delivery system in the dental clinic which includes the compressor, vacuum and the air/water for the handpieces was not functioning properly. No water came out of the high speed handpieces and we observed Dr. ███████ cutting "dry" on the inmate-patient's teeth. This increases the chance for irreversible damage to the tooth structure and pulp (nerve).
- There are no safety recapping systems in place and Dr. ███████ was observed recapping needles with both hands. There are no sharps injury logs. Dr. ███████ has yet to receive a review of the Illness and Injury Prevention Plan (IIPP) which should include the Bloodborne Pathogen and Hazard Communication training.
- There is no Peer Review system in place.
- The odontogram on the "Health Inventory & Communicable Disease Screening" is rarely filled in by the nurses when screening the I/P at the 14 day exam. Dr. ███████ did provide a PowerPoint presentation that was given to the nurses approximately 2 years ago, although there are no signed records of the training. In addition to the odontogram not being filled in, general conditions such as infections, abscess, trauma, mucosal lesions, broken teeth and so forth are rarely listed on the dental section of the form. The dental section of the form is often left blank or has a 0 through it.
- The charts are considerable mazes with several loose pages due to excessive wear. Ms. ███████ has done a remarkable job of keeping the charts in order considering the bulk of the charts. I recommend an dental x-ray folder so that the x-rays can be easily accessible, rather than removing layers of paperwork to place the x-ray in the chart.
- The dental clinical area is missing core medical equipment such as an emergency kit and an oxygen tank.
- Prescriptions from the floor stock are not tracked. The pharmaceutical flood stock from the pharmacy is not tracked.
- Many of the progress notes, other chart entries and compliance trackers are illegible.
- There is a bathroom with no sink to wash hands for proper hygiene. The only sink is within the dental clinic, outside of the restroom.

- The AED is in the Control Tower. From the Dental Clinic, in the case of an emergency, this takes a considerable amount of time to gain access to the AED as one must go through security doors and security checkpoints and back.
- PPE gowns were crumpled onto the dentist and dental assistant's chairs creating gross cross contamination. The dental chair was ripped and nothing was placed over the large gash in the chair to prevent cross contamination.
- There is no posted evacuation plan or other required dental board postings.
- The sharps container was unlocked and over 3/4 full.
- The general waste container was lined with a biohazard red bag, there was no dedicated biohazard waste container and there was food inside the dental clinic.
- The spore test was not performed weekly per CDC guidelines from January to May 2016.

Please see the recommendations in the report below, for each aspect of the dental program at MCJ. Until an adequate x-ray developer or a digital radiographic system is instituted, I recommend that an imaging company be contracted immediately to take the adequate number of diagnostic radiographs necessary to complete the comprehensive dental examination (i.e. full mouth series (FMX), panoramic radiograph).[3]

For further discussion, at a later time, please note that incoming inmate/patients at the California Department of Corrections and Rehabilitation, are seen at the reception center, where they receive a panoramic radiograph and a dental screening exam to identify any urgent or emergent dental issues and/or disease. Dental treatment found during the screening is then scheduled according to the DPC.

In order to properly complete each inmate/patient's odontogram and to identify dental conditions and diseases during the 14 day Health Inventory and Communicable Disease Screening, I recommend that Dr. ████ and CFMG immediately train all intake nurses and other health care professional staff involved in this process.

It is imperative that a formal tracking system is put into place by CFMG to identify and monitor every aspect of the dental care at MCJ as mandated in the Implementation Plan. MCJ and CFMG must be able to self monitor their operations so that they can be assured that each inmate/patient is not lost in the system and receives his or her mandated access to care, timeliness of care and quality of care. Although the Dentist and the Program Manager will have oversight of the compliance tracking system and the scheduling of dental care, it is not cost effective for the dentist to input and maintain this system. I suggest a dedicated ancillary staff to input, maintain and monitor the compliance tracking system as well as to schedule diagnosed dental care from the triage, comprehensive and periodontal dental examination.

---

[3] ADA Guidelines for Recommendations for Prescribing Dental Radiographs, Revised 2012

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

I also suggest that the dentist staffing ratio increase to 0.8 which is 32 hours per week. Performing dental triage and treatment at the time of the dental sick calls, as well as instituting the comprehensive dental examination and subsequent dental care with periodontal care, will take additional time than the allocated 16 hours per week.

To be assured that the tracking system is in place and is being well monitored, I recommend monthly statistics be sent by the 15th of every month.

- This is to include a summary of the successes accomplished by the dental program each month. It is also to list the areas of continuing concerns or any barriers to dental care as well as to include the potential solution for these identified issues.
- Additionally, there should be a dashboard to the tracking system to include the number of patients seen by dental each month, the number of sick calls (including the number of physician on call sick calls), and the number of these sick calls which relate to dental. Include the number of onsite and offsite dental appointments which relate to the above mentioned sick calls. For offsite visits (i.e. extractions with the Oral Surgeon), include if the followup was scheduled onsite and seen by the dentist on the next dental day. I strongly suggest that whenever possible, the dental triage and the treatment, should occur at the time of the dental visit related to the dental sick call.
- Include the number of extractions, fillings, triages and comprehensive dental exams performed each month (include the number of inmate/patients who have 12 months or more remaining on their sentence).
  - ❖ Until the explanation on accessing a comprehensive dental examination is standard in the Inmate Information Manual, I recommend that each inmate/patient is offered a comprehensive dental examination when they meet the criteria.
- Include in the dashboard the number of inmate/patients with a DPC 1A, 1B, 1C and 2 who are scheduled for dental treatment and if the timelines have been met.
- Additionally, please include a log of all refusals and the reason for the refusal.

Lastly, I recommend that CFMG's dental program at MCJ follow OSHA, Center for Disease Control, California Code of Regulations, American Dental Association, California Dental Board, local, state and federal guidelines and recommendations for providing dental care in a safe and sanitary manner.

## Access to Care - Non-Compliance

### Intake & Orientation to Dental Access to Care

We met with ███████ RN and Captain Bass at the intake processing area. RN ████ was professional and knowledgeable about the current intake progress. Per our discussion in the Intake area, a booklet entitled "Inmate Information Manual" for Monterey County

Correctional Facility is given to each inmate-patient at arrival to MCJ. This booklet is issued inside the "fish kit" which also contains personal and oral hygiene products. Captain Bass provided us with a sample fish kit which contained the Inmate Information Manual in both English and Spanish.

Per the RN, no query is asked of the inmate/patient on their ability to read, see the printed material or understand it's content. The content is not reviewed with the inmate/patient although, per the RN, the sick call process is verbally reviewed with each I/P at the time of booking.

The Inmate Information Manual states that to receive dental care, a sick call slip must be submitted and the medical provider will screen the inmate-patient for the facility dentist to determine if dental examination/dental treatment is needed. <u>There were no logs of patients referred to Dental.</u> If immediate needs were determined to exist at initial intake, the RN had access to Dr. ████████ schedule where she was able to directly schedule the patient into the dentist's next available opening. I/P's were generally categorized has having a Level I category and scheduled at the next dental clinic day.

The Inmate Information Manual, issued to all inmates at booking, does not inform inmates of their eligibility for a comprehensive dental examination. Per the Implementation Plan (IP), *Inmates incarcerated for 12 months or greater are eligible to receive a comprehensive dental exam.*

The IP states that *MCJ will maintain a periodontal disease program for the diagnosis and treatment of periodontal disease. Periodontal screening shall be available to all patients, regardless of the length of stay. Treatment will be based on periodontal disease classification, Dental Priority code, and special medical needs (i.e. pregnancy, diabetes, HIV/AIDS).* This service is currently not being discussed with the I/P's at intake. The periodontal disease program is currently not in effect nor is it offered by the dental clinician or the dental program at this time. Additionally, please refer to Appendix 1 for copy of sick call slip where staff appeared unaware of IP's periodontal disease program.

**Intake & Orientation to Dental Access to Care - Recommendations:**

1. Review and update the Inmate Information Manual to reflect that *Inmates incarcerated for 12 months or greater are eligible to receive a comprehensive dental exam.* Additionally, the Inmate Information Manual can be updated stating dental services are available every Wednesdays and Thursdays. The periodontal disease program will be explained in the

Inmate Information Manual. [4]<u>NOTE: "The County agrees to update the inmate handbook to reflect this information.</u>

2.  The periodontal disease program should be instituted as soon as all other basic dental services and systems are in place and working effectively to ensure the safety, access, timelines and quality of care to the inmate/patient . The Inmate Information Manual can be updated to reflect this mandated service. Once the periodontal disease program is in effect, qualified health care professionals can be trained on the IP to understand the parameters of this eligible service.

3.  Per the Implementation Plan, Exhibit A, page 13 *all inmates at time of booking are screened using the Guide to Developmental Disabilities*. Using effective communication to ascertain that the inmate-patient's comprehend the Inmate Information Manual at the time of booking is very important to the success of the I/P's ability to receive dental care as listed in the IP. This system will ensure that the I/P has the ability to understand how to access the sick call process and his/her ability to request all court mandated dental services.

**Interpreter Services**

Sign language interpreter services are available when needed. Captain Bass presented us with a copy of the contracted service. Per staff, there are currently no deaf I/Ps.

A certified language translator service is also available by telephone. This information was posted by the telephone in the dental clinic.

**Interpreter Services - Recommendations:**

No specific recommendations.

**MCJ Form used on Day of Booking**

The Monterey County Jail Medical Intake Questionnaire is filled out by the RN on the day of booking. Question #11 asks if the inmate/patient  has dentures. SUBSTANTIAL COMPLIANCE was achieved in this area with a score of 92%on Screen #1, for consistently filling out question #11 of the MCJ Medical Intake Questionnaire.

During the chart audit, it was noticed that the I/P who had dentures was not evaluated for having either full or partial dentures. See recommendation below as well as the Appendix II for the chart review with Screen #1 identifying question #11 for each inmate-patient.

---

[4] Monterey County comment and response #1 from email dated April 19, 2017.

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

**MCJ Form used on Day of Booking - Recommendations:**

1. When it is identified that the inmate/patient on Question #11 of the MCJ Medical Intake Questionnaire has dentures, please evaluate if they are either full or partial dentures. This will assist the dental clinician when reviewing the chart. Per the IP B.2.a.(5) *Removal of irritation conditions which may lead to malignancies* are eligible to I/P incarcerated for less than one year, (i.e. epulis fissuratum, angular chelitis relates to dentures). They are also eligible per IP B.2.a.(6) *Replacement of lost teeth and restoration of function, if dental function is markedly limited,* for those with less than one year remaining on their sentence.

**CFMG Intake Form used on Day of Booking**

This form has several uses. One of which is to identify chronic care conditions and dental problems requiring referral to the dental clinic. There is a box available to be checked at the end of the form stating "DDS Category". At Intake, the RN evaluates the inmate/patient using The Intake Triage Assessment form. Should the DDS Category box be checked due to trauma, infection, abscessed, etc, then referral to dental is performed.

The RN or qualified medical professional who identifies the I/P dental issue has access to Dr. ███████ schedule from a scheduling computer program. The referral is issued a Level 1 or Level 2 to determine the level of severity of the referral to Dental. Level 1 concerns are scheduled for the next dental clinic day.

There are no logs of patients referred to dental via this route. 13 charts in this area were audited. Although the score of 92% was achieved on the Screen #2, a PARTIAL COMPLIANCE is given due to the lack of a log to chart which patients are referred to dental. Without a log, it is not possible to verify if the referred inmate/patient was indeed seen and if his or her dental problem was resolved. Please see Appendix II for Screen #2.

**CFMG Intake Form used on Day of Booking - Recommendations:**

1. Until the electronic medical health record is instituted at MCJ, I recommend an Excel spreadsheet, to be used to actively log each patient referred to dental at Intake. There should be parameters to identify if and when the I/P was seen by dental within timeframe and if the issue was resolved.

**Access to Oral Hygiene Supplies**

The Manual states that "prior to initial housing, you will receive a toothbrush, one tube of toothpaste, soap and a comb". We were issued a "fish kit" to examine the contents of the

personal hygiene items.  The toothpaste was a fluoride toothpaste called "Nature Mint" although it was not ADA Acceptable. [5]

Floss loops were not provided in the "fish kit" although per the Implementation Plan, floss loops are to be made available through the commissary. The commissary list was emailed to me and floss loops are available for the inmate/patient  to purchase. None of the commissary products were reviewed during this initial dental tour.

**Access to Oral Hygiene Supplies - Recommendations:**

1.  Order an ADA Acceptable fluoride toothpaste for the "fish kit". [6]NOTE: "The County agrees to do this".
2.  Confirm that the toothpaste available in the commissary is ADA Acceptable. [7]NOTE: "The County agrees".

**Health Inventory and Communicable Disease Screening (HI&CDS)**

The HI&CDS is to be completed within 14 days of booking. When I/P's have already been in the system and return to jail with a new booking number, then the Jail Assessment form is filled out instead. Nonetheless, the HI&CDS identifies several conditions, including chronic diseases and dental problems. Per the IP section A, *at the time of the health inventory and communicable disease screening, the general condition of the patient's dentition, missing or broken teeth, evidence of gingival disease, mucosal lesions, trauma, infection, facial swelling, exudate production, difficulty swallowing, chewing and/or other functional impairment will be noted; urgent/emergent dental needs identified. All screening findings will be documented on the health inventory form including the odontogram.*

As with intake, the RN at the 14 day screening identifies any I/P's urgent dental issues as a Level 1 or Level 2. With direct access to Dr. ███████ schedule, schedules the I/Ps for dental's next available clinic day.

Most of the audited charts did not have the odontogram filled in. The general condition of the I/Ps were rarely if ever documented. Question #8 was rarely checked even when a dental problem was stated. "Refer to DDS"is rarely checked as well, even when a problem existed. See Appendix I for a sample.

---

[5]  http://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-products

[6]  Monterey County comment and response #2 from email dated April 19, 2017.

[7]  Monterey County comment and response #3 from email dated April 19, 2017.

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

**(IH&CDS) - Recommendations:**

1. Training of the qualified health care professionals by the dentist, in both identifying the general dental condition and of filling out the odontogram, is crucial to the inmate/patient receiving his or her mandated dental care.
2. A log must be created to track referrals to dental from the HI&CDS form, as well as from intake, to verify that inmate/patients are seen and that treatment, if indicated, is completed.

**Qualified Health Care Profession / Nurse Training**

Dr. ▮▮▮▮▮ submitted his PowerPoint presentation for review. Per Dr. ▮▮▮▮▮ and the Program Manager, it was given to all the nurses approximately 2 years ago for training in how to fill out the Health Inventory and Communicable Disease Screening (HI&CDS) form. This also included how to fill in the dental odontogram. There were no training records nor signatures of staff receiving this training.

The odontogram on most audited charts were not filled out and rarely were there any general oral conditions, as listed in the previous section, detailed in the dental section of the HI&CDS form.

**Qualified Health Care Professional / Nurse Training - Recommendations:**

1. All qualified health care professionals for all shifts must be be trained by the dentist to effectively and correctly enter the inmate/patient's oral health condition on the HI&CDS form, including the odontogram.
2. Due to the amount of dental information required to be included on the form, additional one on one training with the dentist and the qualified health care professional may be required to correctly identify and list the oral conditions onto the form as indicated in the IP Section A. and A.2.

**Dentist On Call System**

The physician on call handles dental/medical emergencies after hours. *In the case of a dental/medical emergency, in which a licensed dentist is not present, the patient will be seen, treated and managed immediately by medical provider staff.* If the dental issue is life threatening, then the inmate-patient will be transported to an urgent care facility or hospital. Per the Program Manager, no inmate/patient was sent out on an emergency basis in 2016 and none from 1/1/2017 to 2/2/17.

Additionally if the dental issues are urgent, then the inmate/patients are treated first with the medical provider/licensed health care provider, then scheduled if indicated, with the dentist at the next scheduled dental clinic.

In the Workload Statistics for 2015, there were 1509 Physician Sick Calls. There are no logs showing any of the after hours calls relating to dental (including date, time and nature of the dental after hours emergency). Nor if it includes what the inmate/patient was treated for with the medical provider and if he/she was scheduled with dental at the next scheduled dental clinic. Additionally there is no current way to know if the inmate/patient was actually seen following the emergency call.

**Dentist On Call System - Recommendations:**

1. Institute a log of inmate/patients seen or managed by the physician on call so that the referral back to the dentist can be verified and the loop can be closed.
2. This log can be tied into the compliance tracking log for dental sick call, after hours emergencies, as well as for inmate/patients referred from intake and from the Heath Inventory & Communicable Disease Screening.

**Sick Call - Urgent & Emergent Dental Care**

The inmate/patients are using the sick call process to indicate a dental concern. From reviewing the charts, it appears that the sick call slips are processed by the next business day. The qualified health care professionals appear to schedule the inmate/patients  with Dr. ████████ at his next clinical day using a computer scheduling program.

The RN or qualified medical professional identifies the I/P's sick call request as a Level 1 or Level 2 and as with intake and HI&CDS schedules the I/P directly into the dentist's schedule for the next available scheduled dental clinic day.

In the Workload Statistics for 2015, there were 17635 sick calls. There are no statistics identifying which sick calls were for dental related issues. There are no dental sick call logs or tracking system identifying when the I/P filled out a sick call slip, when the sick call slip was received and processed by CFMG, nor what the nature of the dental issue was and when the I/P was seen by the medical provider and/or the onsite Dental clinician. There is currently no way to monitor if the inmate/patient was scheduled with dental for the next dental day if it was a Level 1 concern, nor for a Level 2 concern, or if the I/P was seen and the appointment completed.

**Sick Call - Urgent & Emergent Dental Care - Recommendations:**

1. It is imperative to immediately implement a dental sick call tracking log to include the issues listed above.
2. The Dental Sick Call log as well as a Dental Compliance log (to be discussed further in the Comprehensive Dental Care and Compliance section of the Timeliness of Care) will be tracked using the Dental Priority Code. The Dental Compliance log is to include referrals to outside specialists as well as when they were seen in the dental clinic following their specialty referral.
3. It is important to also track the number and the reasons for refusals.
4. The Sick Call log as well as the Dental Compliance log will be part of the Proof of Practice.

**Chronic Care - including I/Ps with Diabetes, HIV, Seizures and Pregnancy**

*Chronic illness is any health problem/condition lasting at least six months which has the potential to, or actually does, impact an individual's functioning and long term prognosis…..Such encounters shall be scheduled at least every ninety days.* Additionally, *inmates with chronic medical conditions will be referred to and seen by a medical provider within five to seven days of arrival.*

On the medical side, I/P's with chronic diseases, see Exhibit A, page 27 of IP states *inmates with chronic care conditions will be managed pursuant to chronic care protocols and standardized procedures that are consistent with national practice guidelines.* Consistent with these guidelines, a dental examination is recommended when evaluating a patient who is diabetic[8] or pregnant[9].

Although there are several more chronic care conditions as mentioned in the IP, the focus for dental at this time will be the management of I/Ps with diabetes, HIV, seizures and those who are pregnant. In addition, there will be monitoring of I/Ps who are taking psychotropic medications, to ensure they understand and are able to request and access dental services.

There are currently no formal referrals to Dental for inmate/patients with diabetes, HIV, seizures and for those who are pregnant. As all I/P's are eligible for the periodontal disease program for the diagnosis and treatment of periodontal disease, those with chronic care conditions and who are pregnant should be monitored more closely and referred to dental for an examination so that *treatment will be based on periodontal disease classification, Dental Priority code, and special medical needs (i.e. pregnancy, diabetes, HIV/AIDS).*

**Chronic Care - Recommendations:**

---

[8] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3228943/

[9] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3217279/

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

1.  Having a well defined referral system and a tracking log will be essential to addressing the oral health care needs of I/Ps with diabetes, HIV/AIDs, seizures or who are pregnant.

**Comprehensive Dental Care**

Approximately 10% of the current inmate/patient population at MCJ have been incarcerated for longer than one year. No comprehensive dental examinations have been performed on these I/Ps. Subsequent the timelines recommended by the Implementation Plan have not been met.

To perform a comprehensive dental examination, objective findings are gathered to substantiate a diagnosis[10]. The diagnosis is included in the Assessment portion of the SOAP progress note. The objective findings, among other measures, include taking dental radiographs[11].

For episodic care, an x-ray, in addition to other objective findings, should be taken at the time of the triage appointment to determine the diagnosis.

For a comprehensive oral evaluation, generally a full mouth series of x-rays (FMX) is taken. There are usually 18 films, 4 posterior bitewings and 12 periapical films which visualize the root apex of the teeth. A panoramic x-ray is often taken with the FMX to identify other areas not visualized by only the teeth.[12] The x-rays assist the dentist in identifying various conditions including but not limited to caries (cavities), bone level to assist in the diagnosis of periodontal disease, infections, cysts, tumors, wisdom teeth, etc. X-rays substantiate and verifies diagnosis for treatment.

For comprehensive dental care to occur there must also be a tracking log to assess compliance of the timelines in which the diagnosed care is rendered. The DPC is used to monitor these timelines and the staff can review the tracking log to schedule the prescribed dental treatment within the mandated time.

There are no forms for the charting of the comprehensive dental examination findings or it's prescribed dental treatment plan. There are no general consent forms or periodontal charting forms. The existing Dental Materials Fact Sheet is not the approved one from the California

---

[10] http://www.ada.org/en/science-research/dental-practice-parameters/evaluation-patient-requiring-a-comprehensive-oral-evaluation

[11] http://www.ada.org/en/~/media/ADA/Member%20Center/FIles/Dental_Radiographic_Examinations_2012

[12] https://www.radiologyinfo.org/en/info.cfm?pg=panoramic-xray

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

Dental Board. It is difficult to perform clinical dental care without a vehicle in which to list the clinical findings and it's subsequent dental treatment plan.

**Comprehensive Care - Recommendations:**

1. Until the electronic health and dental record is instituted, creating a spreadsheet to track dental compliance, referrals, dental sick call, etc will assist in evaluating the success of the dental program. This spreadsheet must include the EPRD date so as to monitor who is incarcerated at MCJ for more than one year.
2. Decide which system you will implement in terms of taking radiographs. Purchase either an automatic x-ray developer or digital x-rays. My preference are digital x-rays with a size 2 sensor, as this provides an immediate result with low radiation to the inmate/patients.
3. The other option to consider is to contract with an outside imaging company and have an FMX and Panoramic radiograph taken for each comprehensive dental exam patient. This still does not address the individual x-rays needed during episodic care.
4. X-rays are one of the objective findings (i.e. percussion, palpation, pain, cold/hot lingering sensitivity, radiographs) necessary at the triage and comprehensive dental examination appointments for an accurate diagnosis of the inmate/patient's dental condition. Without radiographs, a large portion of the objective findings are missing and undocumented. The radiographic information is essential to the proper diagnosis and is a vital part of proper risk management.
5. Acquire the forms necessary to implement the comprehensive dental examination. At a minimum the general consent, comp exam, periodontal charting, the Dental Board's actual recommended Dental Material Fact Sheet, specific consent forms for treatment such as for periodontal treatment, extractions, and so forth.

**Periodontal Program (PSR, Periodontal Charting and Periodontal Re-Eval)**

The periodontal disease program has not been implemented yet. A hygienist has not been hired.

**Periodontal Program - Recommendations**

1. Due to the substantial number of items which need to be addressed, I suggest creating a strategic plan by looking at the next 5 to 10 years in addition to addressing the immediate needs of the dental clinic. This will determine if buying a digital x-ray system vs an automatic x-ray developer will be in the best interest of CFMG. The periodontal disease program will function more smoothly when a quick, low radiation system such as digital x-rays are implemented.

**Custody Movement & Appointments**

The percentage of inmate/patients scheduled and those who actually arrived and were seen for their dental appointment was not evaluated during the initial dental tour. This will be evaluated at a future visit.

**Custody Movement & Appointments - Recommendations**

No specific recommendations at this time.

**Refusals**

In the past 3 months there are approximately 4 to 5 refusals per dental day. It is unclear the reasons for the refusals without specifically auditing each chart.

There are refusals where no face to face discussions occurred with the I/P due to the I/P refusing directly to custody. Dr. ████████ stated that he does not go to the housing unit to discuss the risks, benefits and alternatives with the I/P, especially in the case of refusing or delaying an extraction, filling or exam.

The risks, benefits and alternatives should be discussed by the dentist with the inmate/patient at the time of the refusal so that the inmate/patient can be fully informed of the consequences of refusing or delaying treatment.[13]

**Refusal - Recommendations:**

1. Include the reason for the refusal in the Dental Compliance log.
2. It is encouraged that the risks, benefits and alternatives be discussed by the dentist with the inmate/patient at the time of the refusal, so that the inmate/patient can be fully informed of the consequences of refusing or delaying dental treatment. This is a gray area and future discussion will occur regarding this subject once logs are in place.
3. Cell extractions are not warranted to bring an I/P to his/her dental appointment.

# Quality of Care - Non-Compliance

**Dental Clinic Facility Audit - See Appendix 3**

---

[13] http://www.sacbee.com/news/local/health-and-medicine/article129870124.html

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

The Implementation Plan states that *All dental services will be provided in a safe and sanitary environment*. See Appendix 3.

**Dental Clinic Facility Audit - Recommendations:**

1.  It is paramount that the substantial number of noncompliant items be remediated.

**Dental Materials**

Dr. ▮▮▮▮▮ stated that they do not use amalgam for any restorations although they have contact and non contact amalgam containers. He stated they use Geristore as their main restorative material, which the manufacture recommends being refrigerated (no refrigerator present for dental materials only). Manufacture lists 17 uses for Geristore, however large posterior restorations including cuspal coverage, is not one of it's uses.[14]

**Dental Materials - Recommendations:**

1.  Amalgam is still an ADA recommended material for permanent posterior restorations and it is the main material of choice for CDCR. If the new dentist, Dr. ▮▮▮▮▮ favors amalgam as another option for a restorative material, then purchase of an amalgamator with a safety cover in place is recommended.
2.  Also a local policy should be in place identifying the use of dental materials at MCJ.

**Tool Count**

The tool count was well organized and labelled. Only the dental assistant was counting tools. The dentist's signature was not on the tool count. There was food in the cart where the sterilized dental instruments are stored.

**Tool Count - Recommendations:**

1.  Both the Dentist and the Dental Assistant should perform count for accountability.
2.  Include the Acrylic Bur and the handpieces in your tool count.
3.  No food or beverages should be in the dental clinic. Use the adjacent office space for this purpose.

**Sharps Count**

---

[14] https://www.denmat.com/Restorative/Composites/Geristore/Paste

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

Only the needles are currently being counted in the Sharps Count. The form and process are fine.

**Sharps Count - Recommendations:**

1. Scalpels/Blades and sutures are to be added to the Sharps Count immediately.
2. Between 12/15/16 and 1/26/17, there were 217 inmate/patients seen. There were 43 needles used during this time period. This is equivalent to 20% of the patients who were seen for a dental problem actually receiving onsite dental treatment. This appears to be a very low number for the dental procedures performed in relation to the number of sick calls.

**Housekeeping Logs**

Daily tasks such as purge water lines, check water in unit bottle, change ultrasonic solution, clean dental chair and carts, clean light handles and switches, empty trash bins, check emergency kit, should be signed off daily.

Weekly tasks include run spore test, run vacuum cleanser, restock supplies, clean countertops, fill out supply lists, clean ultrasonic, clean autoclave, check blood pressure cuff, change traps, check AED, check eyewash station.

Monthly tasks are check the fire extinguisher and waterline shock treatment if indicated on the mobile cart. Add other tasks as necessary.

**Housekeeping Logs - Recommendations:**

1. Create a housekeeping log for proof of practice.

**Prescriptions & Stock Medications**

There was no floor stock medication log to show which medication, amount, and strength was received from pharmacy and subsequently which I/P received the medication. "In regards to medication, all medication that were passed from Dr. ████████ come from stock bottles, so there are no prescriptions". [15]

**Prescriptions & Stock Medications - Recommendation:**

---

[15] From email conversation with ████████████, Program Manager.

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

1. Create a log of medications received from the pharmacy and which medications were prescribed and dispensed to the inmate/patients. This log should include the I/P name, type of medication, strength, dosage, duration and total.
2. Instructions should be given on how to take the medication and effective communication should be used to make sure the I/P knows how to take the prescription.
3. Follow all dispensing local, state and federal guidelines.

**Recapping of needles**

Dr. ███ was observed recapping a used needle using two hands.[16]

**Recapping of needles - Recommendations:**

1. California Code of Regulations, Title 16. Professional and Vocational Regulations Division 10. Dental Board of California Chapter 1. General Provisions Applicable to All Licensees Article 1. General Provisions (b), (9) Needle and Sharps Safety: Needles shall be recapped only by using the scoop technique or a protective device. Needles shall not be bent or broken for the purpose of disposal. Disposable needles, syringe, scalpel blades, or other sharp items and instruments shall be placed into the sharps container for disposal as close as possible to the point of use according to all applicable local, state, and federal regulations.
2. Immediately recap needles according to the regulation listed above.

**Forms (i.e. Consent Forms, Comprehensive Exam, Periodontal Chart, etc)**

As stated previously, there is no general consent for examination, x-rays, diagnosis and basic treatment. The DMFS is not the California Dental Board mandated form. There are no comprehensive exam nor periodontal charting forms.

**Forms - Recommendations:**

Please refer to the Comprehensive Examination section and acquire the necessary forms.

**Chart Audit**

The I/P's names and defining personal information have been recategorized with a letter and number.

---

[16] https://www.ncbi.nlm.nih.gov/pubmed/1525385

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

**Chart Audit - Recommendations:**

1. Electronic health and dental records are recommended. This must include logs for dental compliance.
2. Until such time, recommendation is made to request a separate envelop to contain the dental radiographs for ease of access.

**X-rays Present and of Diagnostic Quality**

Objective findings, including radiograph are used to determine the dental diagnosis. A diagnosis is incomplete without the proper objective findings.

**X-rays Present and of Diagnostic Quality - Recommendations:**

Please refer to the Comprehensive Care section recommendations above and take radiographs at the triage  and comprehensive dental examination appointments.

**Highspeed Handpiece Use and Water**

No water was flowing through the handpiece tubing in the current dental delivery system, therefore no water came out of the handpieces to cool the teeth during caries removal or prepping the tooth in preparation for a filling.

We observed Dr. ███████ removing enamel and dentin without irrigation (cutting dry) and the DA rinsing afterwards without providing water cooling during the procedure. Cutting dry can create heat and increase temperature to the pulp which can result in the pulp dying. As posterior root canals are not a current benefit, should the pulp become necrotic and die, then the tooth must be extracted.

**Highspeed Handpiece Use and Water - Recommendations:**

1. Purchase a new dental delivery system.

**Grievances**

The grievance policy and process was in place although there was no running log of grievances and when they were resolved. Per the Program Manager, there were 6 dental grievances in 2016. These appeared to have been addressed.

**Grievances - Recommendations:**

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

No specific recommendations at this time other than creating an easy to access log of the grievances and their resolution.

**Legibility**

Greater than 50% of the chart entries were difficult to decipher. This made chart auditing long and arduous. Should another dentist want to read the previous note, the length of time it takes to decipher the chart entry takes time away from patient care.

**Legibility - Recommendations:**

1.   Type or clearly print SOAP and tracking logs legibly.

**Patient Interview**

A kidney dialysis inmate-patient was interviewed. When reviewing the chart, is was not immediately evident what type of vascular access I/P has for dialysis. Pt stated he has a fistula for his vascular access which, as a side note, does not need to be premedicated (using antibiotic prophylaxis) prior to dental treatment. Other types of vascular access (i.e. AV graft) need to be premedicated prior to dental treatment. I/P said he was aware of accessing medical care but was not referred to dental. I/P also stated "no one really knows about dental care here".

# Timeliness of Care - **Non-Compliance**

**Compliance**

There is no CFMG HQ or local formal log to track all the components of compliance. Dr. ███████ luckily had experience working with CDCR and made his own tracking system for tracking sick call diagnosed dental treatment on his calendar so that patient's can be scheduled according to the Dental Priority System listed above.

As mentioned previously, comprehensive dental examination and dental care have not been implemented at MCJ/CFMG. Of the inmate/patient's reviewed, none who are incarcerated for greater than one year, received a comprehensive dental exam, an oral cancer screening, a full mouth series of radiographs or a periodontal screening with either a PSR or full mouth probings and therefore, no treatment was rendered.

**Compliance - Recommendations:**

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

1. Per our exit interview, it is paramount that a system be implemented to track all aspects of compliance. This should include at a minimum, the date of booking, the EPRD and list of patients arriving and leaving MCJ, to determine if and when the patients are eligible for a comprehensive exam.

**Follow up after Referral to Outside Specialists**

There is no formal HQ or local compliance log to make sure that when the patients are referred out for either oral surgery or to the hospital for emergent issues, that they are also seen the next dental business day for post-discharge dental care. *The contracted dentist will be notified and provide necessary post-discharge dental care at the next scheduled dental clinic.*

**Follow up after Referral to Outside Specialists - Recommendations**

1. The compliance log should also track referrals to outside specialists. It should include when the inmate/patient  was referred to the outside specialist, which specialist he/she is referred to and for what procedure. It should also include when the patient was seen by the outside specialist and when the inmate/patient is due for follow up care with the dentist. An entry to close this loop should be made when the patient was seen by the onsite dentist.
2. This will also be important when comprehensive care is instituted at MCJ/CFMG as inmate/patient  may be referred to an outside specialist not only for oral surgery and endodontics, but also for non specialty care such as for denture fabrication.

# Physical Resources - Non-Compliance

**Equipment and Instruments**

No panoramic x-ray is on site. Patients are sent to the oral surgeon, Dr. ███████ for panoramic x-rays mostly for more complicated oral surgery /extraction cases and not for general evaluation or screening upon arrival.

The current dental delivery system is antiquated, not fully functional (no water goes through the handpieces) and is not up to the standards of infection control that the new units are able to provide.

Currently hand dipping of the radiographic film is used for developing and fixing x-rays. There is no automatic x-ray developer or digital x-ray system on site. Few x-rays have been

taken over the years as evidenced by the containers under the sink which have not been disposed of by the regulated waste company.

**Equipment and Instruments - Recommendations:**

1. At the exit interview it was identified that taking x-rays prior to dental treatment is imperative for proper diagnosis of the oral condition in question. The dentist stated his understanding of the standard of care.
2. A regulated waste removal company is to be contracted to remove the fixer and developer from the dental clinic.
3. Recommend purchasing a new dental delivery system for the safety of inmate/patient and staff.
4. Recommend purchasing an automatic x-ray developer which would provide better quality radiographs with long term preservation of the film.
5. Or converting to digital x-rays for less radiation to the inmate/patient  and immediate viewing for diagnosis.

**New Dental Clinic**

Per Captain Bass, there are plans for a new dental clinic. Plans were requested but none were forthcoming. When asked, no one knew if there would be one or two dental chairs or if the clinic within MCJ would remain open or closed.

**New Dental Clinic - Recommendations:**

The future clinical dental needs of the inmate/patient  at MCJ should to be carefully planned and the new dentist, Dr. ███████ should be consulted on it's design, flow, equipment and supplies.

**Restroom**

The restroom within the MCJ dental clinic has large bottles right above the toilet. This is a potential hazard and needs to be remediated immediately. There is no hand washing facility within the restroom and this poses a health hazard.

**Restroom - Recommendations:**

1. For proper sanitation, install a sink or hand wash station within the restroom.
2. Post a sign stating to wash hands before exiting the restroom.
3. Remove the storage above the toilet to prevent a potential hazard.

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

**Office Space Adjacent to Dental Clinic**

There is a large office space with a refrigerator right next to the dental clinic. It was used as a break room for nursing and dental staff but per Dr. ██████ no one really uses this area for a break room and it remains mostly empty.

The sterilization cart is in the break room as there is no room within the dental clinic for proper infection control practices.

**Office Space Adjacent to Dental Clinic - Recommendations:**

1. Move Dr. ██████ office desk from within the dental clinic and use the break room for his office space.
2. Create an office area for ██████ the Dental Assistant as she needs a work area to order supplies and maintain logs.
3. Computers should be installed at both desks to access the compliance logs and ideally the digital x-rays and future electronic medical records for each inmate/patient.
4. A decision will need to be made if auxiliary staff is to be hired for additional hours to start scheduling patients from the compliance tracking logs. Scheduling should not be the responsibility of the dentist as the dentist's skills can be more efficiently utilized performing dental diagnosis and treatment.

**Charts & EHRS (including Dental HR and Digital X-rays)**

Electronic health record, electronic dental records and digital x-rays are not currently implemented at Monterey County Jail and used by the staff of California Forensic Medical Group.

The charts although well maintained by the ██████, Medical Records Supervisor, are intricate, elaborate and cumbersome mazes. Some of the charts are over 200 pages. Even though the dental section is the area of interest, we treat patients as a whole. We as dentists need to be fully informed of the inmate/patient's medical condition to properly and safely treat patients. For example a patient with end stage liver disease needs to have his platelets evaluated prior to extractions as there is an increased risk of post surgical bleeding. The information in the charts is split into various locations and require a lot of initial learning to gather all the pertinent information, especially if an inmate/patient has a complex health history.

To enter or view an x-ray (or a chart note) from the dental section of the chart, it is often necessary to remove and replace over 50-100 pages of chart content.

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

**Charts & EHRS - Recommendations:**

1. The existing system is inefficient and the expectation is that the EMR will improve efficiency, compliance, legibility and access to the inmate/patient's true health information.
2. Having an efficient EMR will free up the dentist to initiate the mandates of the Implementation Plan. The dentist's time can be spent more effectively diagnosing, treatment planning and treating inmate/patients. The goal for those inmate/patient with greater than one year of incarceration should be comprehensive care rather than episodic care. Spending ancillary time such as mopping the floor or scheduling for example should be delegated to support staff.

**Quality of Care & Peer Review**

There is no Peer Review system in place. There are no HQ or local dental policies and procedures available to assist staff in establishing a Peer Review system.

**Quality of Care & Peer Review - Recommendations:**

1. For quality of care, a confidential peer review system needs to be implemented. This would have avoided many of the pitfalls seen during this review such as not taking radiographs prior to dental treatment.

# Human Resources - Partial Compliance

**Dental Clinic Staffing**

There is one dentist and one dental assistant hired for 16 hours per week to provide dental care services to over 950 inmate/patient  at MCJ. With over 10% of the inmate/patient population having greater than one year remaining on their length of incarceration, it is important that staff be available to institute the comprehensive dental care program as well as the periodontal disease program as part of the Implementation Plan. All that has been provided so far is episodic rather than comprehensive dental care.

With Dr. ██████ leaving, the burden of responsibility is now on the new dentist, Dr. ██████ ██████ and the Program Manager. As you can see from this report, there are several systemic issues which need to be addressed immediately. Many of the facility and space issues can be rectified easily, but creating systems that work long term requires additional staff or additional hours for the existing staff. Especially considering the task involved which

---

is to provide access to care, quality of care and timeliness of care in a safe and sanitary environment.

**Dental Clinic Staffing - Recommendations:**

1. Conservatively, I recommend amending the Implementation Plan to reflect 0.8 position rather than 0.3 for Dentist and Dental Assistant. Per the state's adult correctional system, there is one permanent full time dentist for 600 inmate/patients and 1 dental assistant for 515 inmate/patients. The 0.8 position would reflect the Implementation Plan's mandate for a periodontal disease program and comprehensive dental examination and subsequent treatment for those inmate/patient's with greater than one year of incarceration.
2. A dental scheduler, preferably another Dental Assistant who can not only track, monitor and schedule but can also assist so that sterilization, infection control, cleanliness and the taking of x-rays can be performed.
3. In my opinion the Program Manager, although relatively new to the dental program, appears to be motivated in creating a dental program worthy of the Implementation Plan. She will however require support from CFMG's headquarters to implement the necessary changes.

**Hygienist for the Periodontal Disease Program**

A hygienist has not been hired as there is no periodontal disease program in place at MCJ. The infrastructure including the periodontal charting, exam and consent forms were not available. Nor is there a a comprehensive dental care program in place for those inmate/patient  having more than one year of incarceration remaining on their sentence.

**Hygienist & The Periodontal Disease Program - Recommendations:**

1. To create a periodontal disease program, all inmate/patient  must be seen by the dentist for the dentist to diagnose the periodontal condition including but not limited to the severity, stage, type and the frequency of periodontal treatment needed. It is vitally important for the dentist to review the inmate/patient's health history, especially for those I/P's who have chronic diseases, to make sure they are healthy enough for this invasive procedure. Generally, a full mouth probing and x-rays (full mouth series or 4 bitewings and a panoramic X-ray of diagnostic quality) are necessary to evaluate the dentition to arrive at a proper diagnosis. Then the hygienist can be scheduled to provide the diagnosed periodontal treatment (i.e. deep scaling an root planing, prophy, per re-evaluation).

2. Additionally, ensure that the periodontal disease process is in remission, a periodontal re-evaluation is needed 4-8 weeks after the periodontal treatment to assess the condition of the periodontium.

**Licensure and Required Certificates**

The credentials for Dr. ██████ (Dental License, BLS/CPR, DEA) were current although there was no record of Hepatitis B vaccination or declination on file.

The credentials for ██████, Dental Assistant were current for Dental Radiographic license. ██████ Hepatitis B form was submitted and is on file. As ██████ is not a Registered Dental Assistant, per the Dental Board of California she will need to furnish the requirements set forth by the Dental Board to take courses for Infection Control and the Dental Practice Act.

Dr. ██████ credentials are incomplete. His Dental License and BLS/CPR have been provided but his DEA license is not on file. No record of his Hepatitis B vaccination or declination form was provided. Per an email from ██████ she states "no current training documentation as he just started".

**Licensure and Required Certificates - Recommendations:**

1. ██████ must provide proof of courses required by the Dental Board of California for Dental Assistant.
2. Dr. ██████ must provide actual copy of DEA license. Also Hepatitis B vaccination or declination form.
3. As ██████ will be subbing in during periods of vacation relief, please provide his Hepatitis B vaccination or declination form.

## Dental Program Management - Non-Compliance

**Dental Policies and Procedures**

No HQ or local MCJ dental policies and procedures were available during the initial dental tour.

**Dental Policies and Procedures - Recommendations:**

1.  Have dental policies and procedures available for all aspects of dental care at MCJ provided by CFMG's contracted care.

**Illness and Injury Prevention Plan (IIPP)**

There was an OSHA report dated May 5th, 2016 where CFMG was fined for not having an Illness and Injury Prevention Plan in place at MCJ. A copy of the Illness and Injury Prevention Plan was not in the dental clinic.

**Illness and Injury Prevention Plan - Recommendations:**

1.  Ensure that the IIPP is in place for the safety of the staff. More information is available at the following link including etools to assist in creating the document: http://dir.ca.gov/dosh/etools/09-031/what.htm

**Quality Management Meeting Minutes**

There were quarterly meeting minutes for the past two years. There was no peer review for dental. Very little information in regards to the dental program and the various statistics were present.

**Quality Management Meeting Minutes - Recommendations:**

Once the dental compliance tracking logs have been created, include the statistics within the dental section of the Quality Management Meeting.

**Management Structure and Organizational Chart**

It appears that the Dental Assistant reports to the Director of Nursing and not to the Dentist in regards to the clinical supervision.

**Management Structure and Organizational Chart - Recommendations:**

1.  I suggest that the reporting structure be amended to reflect that the Dental Assistant reports to the Dentist in the clinical aspect and to the Director of Nursing for the administrative aspect.
2.  Recommend yearly performance reviews for the dental staff.

**Regulatory Compliance**

The fixer and developer containers are full and the fixer has leaked outside of the container.

 

**Regulatory Compliance - Recommendations:**

1.  The existing waste management company which I believe is Stericycle, can be contracted to pick up the fixer and developer from the dental clinic.

**Required Postings in a Dental Office**

There were minimal required postings in the dental clinic. The emergency number was not well defined although the certified language translator phone number was able to be well visualized.

**Required Postings in a Dental Office - Recommendations:**

1.  Please see the appendix for the required postings in a dental office.
2.  Many of these employment postings can be placed in the new dental office area adjacent to the dental clinic.

# Conclusions

Although there is much work to be done, with MCJ and CFMG's HQ and local support, it is possible for MCJ and the staff at CFMG to achieve the Implementation Plan's mandates. This will require a team effort from administration as well as from the dental staff. Providing the necessary resources, including providing adequate staffing as well as retaining qualified staff, will be important for the dental program and it's staff to be successful in meeting the mandates of the Implementation Plan.

As only episodic care is currently being done and comprehensive and periodontal care has yet to be established, it is time to think about increasing dental provider staffing and ancillary staff to a level sufficient for the number of patients to be seen, for the compliance tracking system to be implemented immediately and for the staff to be trained on the proper completion of the dental section and odontogram of the Heath Inventory and Communicable Disease Screening.

Quality of care is essential to the success of this program. Therefore it is imperative to establish systems of care and compliance tracking immediately while continuing to expand on the collaboration that already exists between medical, mental health and dental.

# Appendix 1

Protective Order

S|C 8/22/16 RM   **CFMG**   SICK SLIP

RECEIVED
AUG 19 2016

BOOKING NO.
NUMERO DE ARCHIVO

LOCATION
LOCALIDAD   U-Wing   Y:   DATE FECHA   8-18-16

NAME
NOMBRE   DOB FECHA DE NACIMIENTO   8-9-86

COMPLAINT
PROBLEMA   I would like a Dental Cleaning /
Dental Exam please. Thank You
09/08/16. Mue. ▮▮▮▮▮▮

You Are Not Eligible For Dental
Cleaning or Eye Exam Until
After you serve Full 12 Months

Allergies/Reaction: PCN

*Protective Order — Patient*

Sex: M  Race: Hisp  Ht: 6'1"  Wt: 210  Temp: 97.6  P 81  R 14  BP 107/68  PAIN (0/10) 7/10

**(x) Yes**

| PROBLEM | SELF | FAM HX | PROBLEM | SELF | FAM HX |
|---|---|---|---|---|---|
| 1. Vision | | | 24. Diabetes | | |
| 2. Hearing | | | 25. Kidney | | |
| 3. Dizziness | | | 26. Bladder/bowel | | |
| 4. Blackouts | | | 27. Lice/scabies | | |
| 5. Seizures | | | 28. STD | | |
| 6. Headaches | | | 29. Skin | | |
| 7. Thyroid | | | 30. Muscle/joint | | |
| 8. Dental | | | 31. Wound/burn | | |
| 9. Asthma | | | 32. Fractures | | |
| 10. Hayfever | | | 33. Ambulation | | |
| 11. Pneumonia | | | 34. Special need | | |
| 12. COPD | | | 35. Other | | |
| 13. Heart | | | (Female only) | | |
| 14. Hypertension | | | Menses: Freq. _____ Duration _____ | | |
| 15. Anemia | | | | | |
| 16. Sickle Cell | | | Date LMP _____ | | |
| 17. Stomach pain | | | | | |
| 18. Heartburn | | | Pregnant? _____ # weeks _____ EDC _____ | | |
| 19. Ulcer | | | | | |
| 20. Vomiting | | | G _____ P _____ A _____ | | |
| 21. Cancer | | | Recent AB? Date _____ Where _____ | | |
| 22. Gallbladder | | | Last PAP test _____ Result _____ | | |
| 23. Liver | | | Birth control _____ | | |
| □ DENIES ALL | | | 36. GYN Problem? | | |

Dental screening comments: ① *bottom molars*
*need pulling out*

STD SUPPLEMENTAL

| | Yes | No |
|---|---|---|
| 1. Diagnosed with STD in past 6 months? | [ ] | [✓] |
| 2. Any sexual contacts in the past 3 months diagnosed with STD? | [ ] | [✓] |
| 3. Recently had any of the following: | | |
| Pain / burning with urination? | [ ] | [✓] |
| Discharge from penis / vagina? | [ ] | [✓] |
| Genital sores, blisters, ulcers? | [ ] | [✓] |
| Unexplained rash on large area of body? | [ ] | [✓] |
| Lower abdominal pain? | [ ] | [✓] |
| 4. Unprotected sex with more than 2 people 3 months? | [✓] | [ ] |
| 5. In past 6 months, worked as or had sex with a prostitute? | [ ] | [✓] |
| 6. If NO to all the above, do you still think you might have STD? | [ ] | [✓] |

VDRL/CT/GC (circle)
Ordered _____ date Done _____ date

MENTAL HEALTH

| | Yes | No |
|---|---|---|
| History of suicide attempt? | [ ]* | [✓] |
| Suicidal thought now? | [ ]* | [✓] |
| History of mental health treatment | [ ] | [✓] |
| History Psych hospitalization? | [ ] | [✓] |

Diagnosis _____
*Complete suicide assessment form.

| PROB # | COMMENTS |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

Interviewed By: _____ Date: _____
X ████████

Inmate Signature: _____ Date: _____
████████



R                                                L
32 31 30 29 28 27 26 25 24 23 22 21 20 19 18 17

Refer to: RN [ ] NP/PA [ ] MD [✓] Psych [ ] DDS [ ]
Reviewed By: ████████

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

# Appendix 2

Protective Order

Table 1

| INTAKE | Chart Pull #1 | Chart Pull #2 | Chart Pull #3 | Chart Pull #4 | Chart Pull #5 | Chart Pull #6 | Chart Pull #7 | Chart Pull #8 | Chart Pull #9 | Chart Pull #10 | Chart Pull #11 | Chart Pull #12 | Chart Pull #13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ID # | A1 | A2 | A3 | A4 | A5 | A6 | A7 | A8 | A9 | A10 | A11 | A12 | A13 |
| Date of Incarceration | 02/21/16 | 11/28/16 | 02/18/16 | 02/23/16 | 09/08/16 | 12/21/16 | 12/22/16 | 01/24/17 | 01/23/17 | 01/25/17 | 01/24/17 | 01/26/17 | 01/26/17 |
| MCJ Medical Intake Form Completed at time of booking? | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Question #11 answered? SCREEN #1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No | Yes |
| CFMG Intake Triage Form Completed at time of booking? SCREEN #2 | Yes | No | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Chronic Care Issue? | No | No | No | Asthma | Psych | Not reviewed | Not reviewed | Not reviewed | Not reviewed | Not reviewed | Not reviewed | Not reviewed | Not reviewed |
| Was DDS Category checked? | No | No | No | No | No | No | No | No | No | No | No | No | No |
| Were entries legible? | Yes | Yes | Yes | Yes | Yes | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| If yes, was referral to Dental completed? | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Type of Referral - Onsite Medical (OSM), Physician On Call (POC), Onsite Dentist (ODS) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Urgent (U) or Emergent (E) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Where was I/P treated? Onsite or Offsite? | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| When was I/P seen Offsite or Onsite? | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| If I/P seen Offsite, was there a follow up with Onsite Dentist at next scheduled Dental day? | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Comments? | | | | Although DDS referral not checked, I/P was seen 3/3/16 for Juvenile, half requested orthodontic appointment. | | Dentures, full or partial dentures? | | | | | | | |

SCREEN #1 - 12/13 = 92% = Substantial Compliance

SCREEN #2 - 12/13 = 92% = Substantial Compliance, although there is no log for inmate/patients referred to Dental at Intake.

1

# Appendix 3

### Dental Clinic Facility Audit Tool - Final

| | Subject | Description | SC | PC | NC | N/A | Comments |
|---|---|---|---|---|---|---|---|
| 1 | Housekeeping | Counters appear uncluttered and clean | | | X | | Cluttered. Counter is Stained. Clean and Dirty area not marked on counter to differentiate between contaminated and non-contaminated area. |
| 2 | Housekeeping | Floors appear uncluttered and clean | | | X | | No cleaning service. Dr. ▮▮▮▮ states he's had to clean the floors. Floors dirty and dusty behind tool cabinets. |
| 3 | Housekeeping | Sinks appear uncluttered and clean | | X | | | Sink old/stained with hardened debris at drain. Note DA attempted cleaning it best as possible. |
| 4 | Housekeeping | Food - Staff aware no food storage, no eating, drinking, applying cosmetics or handling contact lenses in occupational exposure areas | | | X | | Fridge in sterilization room next to main clinic. Food (tea, creamer) found in clinic in clean instrument draw. |
| 5 | Housekeeping | General appearance appears clean and clutter free | | | X | | Crowded. Limited access to instrument draws. Dr. ▮▮▮▮ desk in clinical area with dirty crumpled clinical gown on fabric chair. DA's crumpled clinical gown on fabric chair. Dirty door to restroom with dark finger print marks on it. |
| 6 | Biohazard Waste/Haz Mat Procedures | Separate waste container for non-infectious/general waste in place | | | X | | General waste container lined with Red Biohazard Bag. Yogurt lid in Red Bag. |
| 7 | Biohazard Waste/Haz Mat Procedures | Biohazard Waste containers have lids | | | X | | General waste container was used for Biohazard Waste, no lid. Yogurt lid in Red Biohazard Waste container. |
| 8 | Biohazard Waste/Haz Mat Procedures | Biohazard Waste containers labeled on the top and sides of the container so as to be visible from any lateral direction | | | X | | General waste container was used for Biohazard waste. Not labeled. After inspection occurred, staff brought in Biohazard Waste with lid, lined with red bag but not labeled on all sides. |
| 9 | Biohazard Waste/Haz Mat Procedures | Biohazard Waste containers lined with Red Bag | | | X | | General waste container was used for Biohazard Waste. Not labeled. After inspection occurred, staff brought in Biohazard Waste with lid, lined with red bag but was not labeled on all sides |
| 10 | Biohazard Waste/Haz Mat Procedures | Biohazard Waste Red Bag removed regularly based on clinic need | | | X | | Staff were unclear as to protocol. Red bag used as general waste was thrown in trash. No policy in place to address removing Biohazard Waste. |
| 11 | Biohazard Waste/Haz Mat Procedures | Chemical Spill Kit in place | | X | | | Located outside of dental clinic area. Was brought into clinic after inspection. |
| 12 | Biohazard Waste/Haz Mat Procedures | Mercury Spill Kit in place | | | X | | Although per Dr. ▮▮▮▮ no amalgam used in clinic but there was a contact and non contact amalgam container in the clinic but no mercury spill kit in place. |
| 13 | Biohazard Waste/Haz Mat Procedures | Eyewash Station in good working order connected to tepid water | | X | | | Temporary eyewash in place. Place appropriately sized eyewash solution in temporary eyewash holder. |
| 14 | Biohazard Waste/Haz Mat Procedures | Sharps container (Approved type) | X | | | | |
| 15 | Biohazard Waste/Haz Mat Procedures | Sharps container (Located as close as feasible to area where disposable item used) | X | | | | |
| 16 | Biohazard Waste/Haz Mat Procedures | Sharps container (Secured) | | | X | | Not locked. |
| 17 | Biohazard Waste/Haz Mat Procedures | Sharps container (No more than 3/4 full before container removed) | | | X | | Over 3/4 full. No protocol in place identifying how staff is to remove sharps container to main biohazard container for disposal. |
| 18 | Biohazard Waste/Haz Mat Procedures | Pharmaceutical Waste container in place and labeled for incineration only | | | X | | No pharmaceutical waste container present although there is one in the Pharmacy |
| 19 | Biohazard Waste/Haz Mat Procedures | Pharmaceutical Waste container labeled with start date of accumulation - expires 1 year from initial date of use | | | X | | No pharmaceutical waste container present although there is one in the Pharmacy |
| 20 | Biohazard Waste/Haz Mat Procedures | Flammable Hazardous Materials (Inventoried and stored in fireproof locked cabinet) | | | X | | No fireproof cabinet. No inventoried list of flammable hazardous materials. When SDS binder is in place with all chemicals listed then will re-evaluate at next tour if fireproof cabinet is necessary. |

1

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

Dr. Viviane G. Winthrop          Dental Neutral Court Monitor          44

38-44

### Dental Clinic Facility Audit Tool - Final

| | Subject | Description | SC | PC | NC | N/A | Comments |
|---|---|---|---|---|---|---|---|
| 21 | Biohazard Waste/Haz Mat Procedures | Amalgam Separator filter (date of installation posted) | | | | N/A | Amalgam Separator mandates are exempt for mobile delivery carts. |
| 22 | Biohazard Waste/Haz Mat Procedures | Amalgam Separator filter (Checked routinely and documented in housekeeping log) | | | | N/A | Amalgam Separator mandates are exempt for mobile delivery carts. |
| 23 | Biohazard Waste/Haz Mat Procedures | Contact Amalgam commercial container in place | X | | | | |
| 24 | Biohazard Waste/Haz Mat Procedures | Non-contact Amalgam commercial container in place | X | | | | |
| 25 | Sterilization And Equipment | Amalgamator (Safety cover in place) | | X | | | Dr. ▮▮▮▮ stated that they don't use amalgam for any restorations although they have a contact and non contact amalgam containers. See comments for recommendation for purchasing amalgamator. |
| 26 | Sterilization And Equipment | Handpieces cleaned and lubricated prior to sterilization | | X | | | Cleaned but not lubricated prior to sterilization |
| 27 | Sterilization And Equipment | Ultrasonic Unit (Used to clean contaminated instruments prior to sterilization) | X | | | | Note, no there are no policies and procedures in place to address infection control and sterilization protocol in dental clinic. |
| 28 | Sterilization And Equipment | Sterilization Clean and Dirty Areas (Demarcations clearly marked) | | | X | | No Clean and Dirty Areas demarcated between contaminated and non contaminated area. |
| 29 | Sterilization And Equipment | Sterilized dental instruments (Bags/ Pouches intact) | | X | | | Crusted material in acrylic bur in sterilized pouch. |
| 30 | Sterilization And Equipment | Sterilized dental instruments (Bags/ Pouches labeled with sterilizer ID#, sterilization date and operator's initials) | | X | | | Not all dental instruments labeled with sterilizer ID, date or operator initials although organization of instruments is promising |
| 31 | Sterilization And Equipment | Unsterilized instruments prepackaged if overnight storage required | X | | | | Did not observe any unsterilized instruments. Per staff as they work weekly rather than daily |
| 32 | Sterilization And Equipment | Dental Lab Lathe (In separate lab / not with sterilizer) | | | X | | No dental lab lathe used in this clinic |
| 33 | Sterilization And Equipment | Dental Lab Lathe / Model Trimmer (Securely mounted and eye protection available for use) | | | X | | No dental lab lathe used in this clinic |
| 34 | Sterilization And Equipment | Dental Lab Burs / Rag Wheels (Changed after each patient, sterilized after use, stored in Bags / Pouches) | | | X | | Crusted acrylic bur in sterilized bag. |
| 35 | Sterilization And Equipment | Pumice Pans (Pumice and disposable plaster liner changed after each patient | | | X | | Pumice pans not used in this clinic. |
| 36 | Sterilization And Equipment | Water Lines (Flushed at least 2 minutes at beginning and end of each shift) | | | X | | No water flowing through handpiece tubing therefore unable to flush water lines. |
| 37 | Sterilization And Equipment | Water Lines (Flushed a minimum of 20 to 30 seconds between patients | | | X | | No water flowing through handpiece tubing therefore unable to flush water lines between patients. |
| 38 | Sterilization And Equipment | Vacuum System (Manufacturer's recommendations followed for cleaning, disinfection and maintenance) | | | X | | Dirty and no biohazard sticker on container. |
| 39 | Emergency Procedures | Emergency #'s prominently posted in clinic | | X | | | No written protocol for emergencies in dental clinic. |
| 40 | Emergency Procedures | Evacuation Plan prominently posted in clinic | | | X | | Not posted |

2

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

Dr. Viviane G. Winthrop                Dental Neutral Court Monitor                45

38-45

## Dental Clinic Facility Audit Tool - Final

| | Subject | Description | SC | PC | NC | N/A | Comments |
|---|---|---|---|---|---|---|---|
| 41 | Emergency Procedures | Fire Extinguishers (All staff aware of location) | | X | | | Fire extinguisher is present and in good working order as evidenced by the current yearly inspection performed in December 2016. A housekeeping log however is not present in the dental office to indicate that the fire extinguisher has been examined on a monthly basis. |
| 42 | Emergency Procedures | Emergency Medical Response protocol in place | | | X | | No written protocol |
| 43 | Emergency Procedures | Emergency Kit (Zip tied) | | | X | | No emergency kit in dental clinic. |
| 44 | Emergency Procedures | Emergency Kit drugs current | | | X | | No emergency kit present therefore no drugs available to see if current. |
| 45 | Emergency Procedures | Oxygen tanks, masks, tubes and keys present | | | X | | No oxygen tanks, masks, tubes or keys present. |
| 46 | Emergency Procedures | Oxygen tank charged | | | X | | No oxygen tank present. |
| 47 | Emergency Procedures | Amba-Bag (Bag-valve-mask present and in working order) | | | X | | No bag-valve-mask present. |
| 48 | Emergency Procedures | One-way pocket mask present and in working order | X | | | | Dr.█████ had a new, one way pocket mask. |
| 49 | Emergency Procedures | Blood pressure cuff and Stethoscope present and in working order | | X | | | Wrist cuff but no stethoscope or variety of different size cuffs present. |
| 50 | Emergency Procedures | Plastic evacuators (2) - Large diameter suction tips | | | X | | Not in emergency kit. |
| 51 | Emergency Procedures | 2 Sterile, 2 cc disposable syringes with 18 or 21 gauge needles | | | X | | Not in emergency kit. |
| 52 | Emergency Procedures | AED Accessible | | X | | | AED in control tower. Takes several minutes to reach control tower and then to return with AED to Dental clinic. |
| 53 | Emergency Procedures | AED in working order and pads are current and not expired | | X | | | Difficult to see in control tower, low light. No logs of unit being tested and evaluated for expired pads. |
| 54 | Safety | Dental Board Regulations on Infection Control posted | | | X | | Regulations were not posted. |
| 55 | Safety | Sterile Water used for invasive oral surgical procedures | | | X | | Sterile water in monoject syringes present in unlabelled metal container, with no top present located on the contaminated (dirty) area. |
| 56 | Safety | Hand Hygiene (Observed staff) | | X | | | Dr.█████ used alcohol gel before placing gloves. DA did not wash hands before or after procedures |
| 57 | Safety | PPE - Worn and correctly disposed of; observed staff | | X | | | Observed DA not wearing eyewear or side shields consistently for dental procedures. PPE gown used on previous patients, crumpled onto chair. |
| 58 | Safety | Barriers used to cover environmental surfaces replaced between patients | | X | | | Some barriers were present, nothing over handpieces. Armrests cleaned between patients but not chair itself. |
| 59 | Safety | Saliva Ejector (Staff aware that patients must not close lips around tip to evacuate oral fluids) | | X | | | No saliva ejectors used in dental clinic at this time. This may be due to no water working through the water lines. |
| 60 | Safety | Radiation Safety Program in place / Dental radiographic unit inspection date | | | X | | Dentist or DA not wearing X-ray badges. No policy in place to radiation safety program. |
| 61 | Safety | Caution X-ray Sign (Placed where all permanent radiographic equipment installed) | X | | | | |
| 62 | Safety | Lead Shields (Thyroid collar, hanging, free from tears or holes inspected regularly) | | X | | | Present but dirty |
| 63 | Safety | Is an area dosimeter posted no more than 6 ft from source of beam? | | | X | | Dosimeter badge posted near x-ray arm but dosimeter badge expired (8/15/16 to 11/14/16). |
| 64 | Safety | Dental staff wearing dosimeters at chest level or higher (i.e. new x-ray equipment; x-ray unit moved and reinstalled) | | | X | | Dr.█████ or DA did not have, nor were wearing dosimeter badges. |

3

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

## Dental Clinic Facility Audit Tool - Final

| | Subject | Description | SC | PC | NC | N/A | Comments |
|---|---|---|---|---|---|---|---|
| 65 | Safety | Dosimeter Badge (For pregnant staff working within the vicinity of radiographic equipment) | | | | X | No pregnant dental staff at this time. |
| 66 | Safety | Material Dates (Check expiration dates) | | X | | | Of materials reviewed, gloves expired, although possible expiration date is date of manufacturing. Staff to review. Note, some of the supplies had dates close to expiring. Recommend staff |
| 67 | Safety | Dental Impressions Materials / Waxes (Stored in secure location) | | | | X | Denture fabrication done at outside lab |
| 68 | Clinic Administration and Logs | Written infection prevention policies and procedures specific for the dental setting available, current & based on evidence-based guidelines? | | | X | | No CFMG HQ or local MCJ policies and procedures. |
| 69 | Clinic Administration and Logs | Annual Training (Infection Control, Radiation Safety, Oxygen Use, Hazmat and SDS) | | | X | | 2015 Radiation Safety training occurred but nothing current. |
| 70 | Clinic Administration and Logs | Did employees receive job or specific training on infection prevention policies and procedures and the OSHA blood borne pathogens standard? | | | X | | Per Program Manager, Dr. ▮▮▮▮ did not receive any training. There were no training records in ▮▮▮▮ file. ▮▮▮▮ also must take the courses outlined in the Dental Board of California's requirements. |
| 71 | Clinic Administration and Logs | Facility has an exposure control plan that is tailored to specific requirements of the facility? | | | X | | No Illness & Injury Prevention Plan in place at this time. |
| 72 | Clinic Administration and Logs | Personal Protective Equipment (PPE) and other supplies necessary for adherence to Standard Precautions are readily available? | | X | | | Gloves appear expired although it may be date of manufacturing. Staff to review. |
| 73 | Clinic Administration and Logs | Spore Test Log Weekly Testing | | | X | | Spore test log not present. Sheets from spore test service in a disorganized file folder and not all present. (Staff had to go to computer to pull up results). Several weeks missing from results - 1/21/16, 1/28/16, 2/11/16, 2/26/16, 3/3/16, 3/24/16, 3/31/16, 4/28/16, 5/5/16. Patients were seen during the weeks listed above. |
| 74 | Clinic Administration and Logs | Housekeeping Log Up-to-Date | | | X | | Only sterilization cleaning log present, no other housekeeping logs available at time of dental tour. |
| 75 | Clinic Administration and Logs | Eyewash Log Up-to-Date | | | X | | Only sterilization cleaning log present, no other logs available at time of tour |
| 76 | Clinic Administration and Logs | Tool Control Log (Complete enteries) | | X | | | Handpieces were not included in count. Only DA doing count. |
| 77 | Clinic Administration and Logs | Sharps Logs | | X | | | 27 guage, 30 gauge and extra short needles were well logged. Scalpels/Blades and Sutures were not included in count. |
| 78 | Clinic Administration and Logs | Sharps injury log and other employee exposure events is maintained according to state and federal requirements? | | | X | | No sharps injury log available. |
| 79 | Clinic Administration and Logs | Post injury protocol in place? | | | X | | No local Illness and Injury Prevention Plan available at the time of the Dental Tour. |
| 80 | Clinic Administration and Logs | Pharmaceutical Log | | | X | | Several stock medication bottles of analgesics and antibiotics present but no logs to indicate which patient received what antibiotic or analgesic. Nor was there a log indicating which floor stock of medications were obtained from the pharmacy. |
| 81 | Clinic Administration and Logs | SDS Binder (Accessible and current for materials used in clinic) | | | X | | File folder labeled MSDS. Loose sheets with no system to easily find SDS information in case of an emergency. Incomplete list of all chemicals in dental office. |
| 82 | Clinic Administration and Logs | Dentist On Call posted | | X | | | Sick call process in place with physician on call available for after hours. No logs available to see follow through of calls received pertaining to dental and shown to be scheduled with dental. |

4

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

### Dental Clinic Facility Audit Tool - Final

| | Subject | Description | SC | PC | NC | N/A | Comments |
|---|---|---|---|---|---|---|---|
| 83 | Clinic Administration and Logs | Dental Forms (Only most current, approved forms in clinic) | | | X | | No general consent form to include exam or x-rays or restorative, no health form with patient and dentist signature, no comprehensive dental exam form, extraction form has limited consent information. No forms explaining post extraction information. No periodontal screening or periodontal charting form. |
| 84 | Clinic Administration and Logs | Radiographic Certificate, Rules and Regulations posted | X | | | | Registered with the CDPH March 16, 2015. |
| 85 | Clinic Administration and Logs | Staff aware of equipment repair protocol | X | | | | Patterson services the dental equipment |

**Legend:**
SC = Substantial Compliance
PC = Partial Compliance
NC = Non-Compliance
N/A = Not Applicable

**Sources:**
Centers for Disease Control and Prevention (CDC), Guidelines for Infection Control in Dental Health-Care Settings - 2003 [MMWR December 19, 2003 / 52 (RR17);1-61],

Occupational Safety and Health Administration (OSHA), Blood Borne Pathogens Standard, Code of Federal Regulations (CFR), Title 29, Occupational Safety and Health Standards, Part 1910.1030

OSHA, Title 8 Section 3203(a)(4) Injury and Illness Prevention Program;
Title 8 Section 5193 Bloodborne Pathogens

CDCR, CCHCS, September 2014 Inmate Dental Services Program (IDSP), Policies and Procedures (P & P),

California Code of Regulations, Title 8, Division 1, Chapter 4, Subchapter 4, Article 3, Section 1512 Emergency Medical Services

Department Operations Manual, Chapter 9, Article 3, Section 91030.27

Inmate Medical Services Policies and Procedures, Volume 9, Chapter 11

https://www.dir.ca.gov/title8/5193.html

California Health & Safety Code, Division 10, Chapter 4, Article 1, Section 11150

California Code of Regulations, Title 16, Division 10, Chapter 1, Article 1, Section 1005

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

Dr. Viviane G. Winthrop                    Dental Neutral Court Monitor                    48

# Appendix 4

Protective order



# Appendix 5





# Appendix 6



CFMG
California Forensic Medical Group
Dental Department

*Protective Order*
*Dr.'s compliance tracking*

Day: **THURS**   Date: **JAN. 19, 2017**

| LOCATION | DOB | NAME | BOOKING | TOOTH # | TREATMENT | |
|----------|-----|------|---------|---------|-----------|--|
| CD | | | | 15,16,20 | T, Mor Chroth w: Ext ⑩ | 3/19 |
| CO | | | | — | Refused PO | |
| CD | | | | — | Refuse | |
| CD | | | | — | Refused | |
| CD. | | | | 4 | Ext, Mor Chroth DW w: DW Reig TS | — |
| EO | | | | 30 | DW, Mor Chroth DW w: Lulc ews | — |
| FS | | | | 27 | DW, Mor Chroth DW w: DPR | — |
| FS | | | | 18,19 | DW, Mor Chroth w: RM | |
| FS | | | | — | T, Mor Chroth not to referred | |
| H | | | | 13 | T, Mor Chroth w: DPR | — |
| H | | | | 9 | T, Ext Mor Chroth DW w: Pre Reig TS | |
| H | | | | 32 | T, Mor Chroth w: DPR | |
| K | | | | 12,15,16 | T, Mor Chroth w: Ext ⑩ | 3/19 |
| G | | | | — | Refused | |
| U | | | | 30 | T, Mor OH w: click | |
| U | | | | — | Refused | |
| R | | | | 9 | T, Mor Chroth w: PRR | |
| R | | | | 17 | Ext, Mor Chroth DW w: DW RA TS | |
| R | | | | 1 | T, Mor Chroth w: Ext #1 ② | 4/19 |
| R | | | | 18 | Ext, Mor Chroth, DW Reig w: click | |
| CW | | | | 30 | T, Mor Chroth w: Ext ⑥ | 3/19 |
| CW | | | | 30 | T, Mor, OH w: R refuses | |
| DW | | | | 12,15 | Ext Mor Chroth DW Reig w: DW TS | |
| AD | | | | 3 | Ext Mor Chroth w: RM TS | |

TODAY'S TO

Comprehensive Examination - Protective Order

| Pull List Category | Comp Exam | Comp Exam | Comp Exam | Comp Exam | Comp Exam | Comp Exam | Comp Exam | Comp Exam |
|---|---|---|---|---|---|---|---|---|
| Assigned ID # | E1 | E2 | E3 | E4 | E5 | E6 | E7 | E8 |
| Date of Incarceration | 9/26/14 | 5/28/14 | 10/29/15 | 11-23-13 | 9-25-15 | 7-5-16 | 1/18/17 | 10-6-15 |
| When I/P eligible for comp exam? | 9/26/15 | 5/28/16 | 10/29/16 | 11-23-14 | 9-25-16 | N/A | N/A | 10-6-16 |
| When was I/P seen for Comprehensive Exam? | No | No | No | No | No | N/A | N/A | No |
| Comments? | No recent health inventory, last on 2013. Pt seen for trophy 12/18/15. Prophy, per measurements 2-3, no diagnosis. Only dental appointment seen. Hypertension listed as problem. ***No xrays. ***No blood pressure taken. ***No annual exam on file | 12/1/15 6 months physical exam. None after that. ***10/6/16 pt says wants to be seen by dental to discuss extra needs. No further appointments given. For Heath screening, no comments in dental section to show that dental screening was done and this was in 06/05/15 | never seen in dental, no sick calls. Dental part of Health screening not completed 11/8/15 | Screening done 12/5/13. HTN and Diabetes. Pt was seen for sick call on 5/19/16. seen 5/19/16 for a triage, 4 BWX taken, PC 4 mm probe readings with 1-2 mm recession | Jail readmission 9/27/15 says "DDS/2005/ pulled tooth". Seen in dental on 1/26/17 for tooth #14, no X-ray taken, diagnosis failure unrestorable, next visit extraction 1C. | 9-30-15 health inventory filled says 20 yrs ago Broken molars, odontogram not filled in. Physical assessment exam done 09-14-16 states dental neglect. | sick call 10-30-15. Seen dental 11-6-15 unclear #8 but is #9 says temp indicated. Placed Fuji II??? No x-ray | 10/6/16 Triage #19. Tx for triage concern 10-07-16 for cleaning/ scaling. Consent signed on surgical consent form. No dx. One PA 10-06-16. Pt seen 10/29/15 for eval #14 no xray. Seen 1-14-16. Leaking heart valve stated on 10-19-15 on health inventory. Stating cardiac surgery for hole/ leak. See 4-13-2010 and echo was 2-25-10 heart septal defect on physician's note.***NEED PREMEDICATION not evaluated prior to caries control #14, no X-ray. Sick call on 10-01-16. then Triage 10-06-16 and cleaning 10-07-16. |

1

Chronic Care - Protective Order

| Pull List Category | Chronic Care | Chronic Care | Chronic Care | Chronic Care | Chronic Care | Chronic Care | Chronic Care |
|---|---|---|---|---|---|---|---|
| Assigned ID # | H1 | H2 | H3 | H4 | H5 | H6 | H7 |
| Date of Incarceration | 01/27/17 | 01/12/17 | 01/19/17 | 12/22/16 | 12/06/16 | 05/18/15 | 11/09/15 |
| Chronic Care referred to Dental? | Dialysis, fistula vascular access | Not seen by dental | Yes | | SC | No | SC |
| Periodontal evaluation & tx completed? | No | no updated health screening. Seen 11-19-16 says 18yo, chipped tooth during sz, odontogram not filed in. | Dental level 1. Referred to dental from intake Triage Assessment - on coumadin | health inventory done 5/7/16, odontogram not filled in, says "broken front tooth, saw dentist 2 ? ago". Jail re-admission health appraisal 7/28/16. Dental Screening findings "can't remember". | No, triage for perio | No | No |
| When was I/P seen for Comprehensive Exam? | No | No | Not seen by dental. Pt NIC - not in custody. | No | No. Triage. Says on 12-3-15 no treatment indicated on #14 but no X-ray taken. PA #1 doesn't show apex. Possible issue with #3 however difficult to see X-ray due to quality. | No. Has been there longer than one year | No |
| Comments? | Hasn't had his 14 day health screening yet. | Xarelto 20mg QD | Coumadin 7.5mg. Reports jaw pain. See copies of chart. No follow up with dental. Was seen offsite. Needs premed prior to dental care and needs to have INR check. Also PREMED for previous hx of endocarditis. | Warfarin 2mg QD on 1/27/17 with testing on 2/6/17. NOT SEEN BY DENTAL. | Seen 12-3-15 for periodontal issue. No X-ray #14 but there is a PA #1,2,3. Appears to be decay mesial #2, not addressed, no bwx, no written documentation of #2. | On Xarelto. Pt just released to prison 1/17/17 | Warfarin. Need chart Pt referred to Dr. ▉ on 2/1/17. Sent at Dr. ▉ office 2/2/17. Then scheduled 2/6/17, Should be seen by Dr. ▉ on 2/7/17. Verify. |

1

Pregnancy - Protective Order

| Pull List Category | Pregnancy | Pregnancy | Pregnancy | Pregnancy | Pregnancy | Pregnancy | Pregnancy |
|---|---|---|---|---|---|---|---|
| Assigned ID # | G1 | G2 | G3 | G4 | G5 | G6 | G7 |
| Date of most current Incarceration | 01/19/16 | 11/26/16 | 11/16/16 | 12/22/16 | 12/08/16 | 09/28/16 | 01/23/17 |
| Is patient pregnant? | No but was pregnant previously 3/11/15 at 30 weeks pregnancy, caries control #13 performed, teeth control #13 circled but not NO XRAYS, not until 2 years ago where X-rays taken very seriously). | No | Yes | Yes | Yes | Yes | Yes |
| What trimester? | Refused dental on 11/17/16 with progress note stating refused, pt signed form at housing unit but no with dentist. When dental | N/A | "a couple months pregnant" | 3rd trimester | 27w | 6-9 weeks pregnant on 9-28-16 | 2-3 months |
| Was pt referred to dental? | No | N/A | No but was seen 12-09-16 for sick call and seen in dental clinic 12/15/16 for sick call from tooth pain. | yes on 10-11-16 | No | No | No |
| Was it performed in 2nd trimester? | No | N/A | Pt refused 01-05-17 with no face to face discussion. | No | No | No | No |
| Was a periodontal exam performed that includes periodontal charting and classification? | No | N/A | No | No | No | No | No |

1

*Pregnancy - Page 2 - Protective Order*

| Pull List Category | Pregnancy G1 | Pregnancy G2 | Pregnancy G3 | Pregnancy G4 | Pregnancy G5 | Pregnancy G6 | Pregnancy G7 |
|---|---|---|---|---|---|---|---|
| Assigned ID # | | | | | | | |
| Was SRP given in 2nd trimester for those diagnosed with periodontitis? | No | N/A | No | | | No | No |
| Comments? | Booking number when pregnant 15001/63 on 5/29/15. No annual exam done yet but is scheduled for 1 year PE on 2/9/17 (TrackNet) | Delivered baby 11-12-16. Jail readmission done on 11-26-16 unreadable comment in dental | No xray to show broken teeth #4 & 15. Dx is unrestorable. 10 weeks and 5 days 12-9-2016 | Due March 23, 2017/not 6.5 months pregnant on 12-22-16. On 10-11-16 health screening RN writes "Last saw dentist 10 years ago, has tooth pain, consultation". 10-20-16 was seen where she requested exam and no exam given as the discussion was about acute vs comprehensive. Dr. C says "No tx indicated". No X-rays taken for either time. Pt also seen 1/12/17 for triage #17. Dx is #17 but no X-ray to substantiate assessment/dx. | On health screening 12/18/16 RN states "last screening 2 years ago pt denies current problems". | Health screening done 10-5-16 difficult to read but believe it says "denies" props at this time". Filled out sick call 1-1-16 "My tooth has been hurting really bad put in a few sick slips, was told I would get Ibuprofen or Tylenol haven't received it". Then was seen in dental on 1-7-16. NO XRAY WAS TAKEN. Filling #2 OB done with UltraF, added occlusion. Reversible pulpitis was diagnosis. Used Septocaine 1 carpule. 01-21-16 pt seen no X-ray still for redo indicated and filled with Fuji II. Difficult Filled out sick call on 01-24-17 "My filling fell out and I'm having a toothache". ***NO XRAY. Seen on 2-2-17 for triage. Dx was #2 vitality wnl. Rest. indicated. | Health screening done 9-14-16 says "6 mo ago". Not seen or referred to dental so far for current pregnancy. Sick on 10-19-15 & 10-21-15 was seen in dental on 10-26-15 for triage #2. Was seen on 12/4/15 for extraction #2, a PA was taken #2 but PA is not diagnostic due to developer not rinsed completely, see photo, center of X-ray whitened out. Diagnosis of Extraction #2 necrotic unrestorable - obj findings is pt no pain to cold, no pain to percussion swelling, no lymphadenopathy, pain to percussion and biting. Mesial decay and fracture. |

2

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

# Appendix 7



## ORGANIZATIONAL STRUCTURE

## MONTEREY COUNTY JAIL MEDICAL SERVICES

Protective order

Cindy Watson

Jodel Jenks

Monterey County Adult Detention Facility Policy & Procedure Manual          3

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

Dr. Viviane G. Winthrop          Dental Neutral Court Monitor          61

# Appendix 8

Regulatory Compliance



**California Dental Association**
1201 K Street, Sacramento, CA 95814
800.232.7645   cda.org

# Appendix 4
## List of Required Postings in a Dental Office

Listed below are posters that are required to be conspicuously displayed at dental offices. CDA offers, as a membership benefit, reproductions of most of these posters. Posters also can be printed, or ordered, from federal or state agency websites.

Individual cities and counties across California have passed local ordinances relating to minimum wage and paid sick leave laws — with eligibility rules and posting requirements varying from city to city. Check with local city government as to whether any local ordinances and posting requirements apply to employees in your practice. *January 2017*

*Available from the National Labor Relations Board,* nlrb.gov/who-we-are/regional-offices

- Employee Rights Under the National Labor Relations Act — published September 2011
  nlrb.gov/poster
  **Important Note:** The DC Circuit Court of Appeals have enjoined the NLRB's rule requiring the posting of employee rights under the National Labor Relations Act. However, employers are free to voluntarily post the notice, if they wish.

*Available from the U.S. Department of Labor,* dol.gov/oshp/sbrefa/poster/matrix.htm

- Employee Polygraph Protection Act – revised August 2016
  dol.gov/whd/regs/compliance/posters/eppa.htm
- Federal Fair Labor Standards Act (Minimum Wage) – revised August 2016
  dol.gov/whd/regs/compliance/posters/flsa.htm
- Employee Rights Under the Family Medical leave Act (50+ employees) – revised April 2016
  dol.gov/whd/regs/compliance/posters/fmlaen.pdf
- Equal Employment Opportunity Is the Law – revised November 2009
  dol.gov/ofccp/regs/compliance/posters/pdf/eeopost.pdf
- Your Rights Under USERRA (Uniformed Services Employment and Reemployment Rights Act) – published October 2008
  dol.gov/vets/programs/userra/USERRA_Private.pdf

*Available from the California Department of Fair Employment and Housing,* 916.227.0556, dfeh.ca.gov/resources/posters-and-brochures-and-fact-sheets

- California Law Prohibits Workplace Discrimination and Harassment (DFEH-162) – revised December 2014
  dfeh.ca.gov/res/docs/Publications/DFEH-162-2015.pdf
- "Your Rights and Obligations as a Pregnant Employee" notice (DFEH-100-20) replaces "Notice A"
  dfeh.ca.gov/res/docs/Publications/Brochures/2016/DFEH-100-20%20(04-16).pdf – new April 2016
- "Employers with 50 or more employees replace "Notice B" with: "Family Care and Medical Leave (CFRA Leave) and Pregnancy Disability Leave" notice (DFEH-100-21).
  dfeh.ca.gov/files/2016/09/DFEH-100-21rv201507.pdf – new July 2015

Copyright © 2007–2017 California Dental Association

PRCD013-0117

---

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

Dr. Viviane G. Winthrop                    Dental Neutral Court Monitor                    63

- The Facts About Sexual Harassment (DFEH-185) – revised November 2014 – This is a brochure, not a poster. Employers are required to provide each employee with this brochure or an equivalent document.
  dfeh.ca.gov/files/2016/09/DFEH-185.pdf

*Available from a local office of the California Employment Development Department or online at*
edd.ca.gov/Forms

- Notice to Employees of Unemployment Insurance, State Disability Insurance, and Paid Family Leave Insurance (DE 1857A) – revised November 2013
  edd.ca.gov/pdf_pub_ctr/de1857a.pdf
- Notice to Employees of Unemployment Insurance Benefits (DE 1857D) – revised October 2015
  edd.ca.gov/pdf_pub_ctr/de1857d.pdf

The following pamphlets must be provided to employees under situations stated in the above poster:

- State Disability Insurance Provisions (DE 2515) – revised October 2016
  edd.ca.gov/pdf_pub_ctr/de2515.pdf
- Paid Family Leave (DE 2511) – revised September 2016
  edd.ca.gov/pdf_pub_ctr/de2511.pdf
- Provide Notice to Employee Labor Code section 2810.5 notice – revised September 2014
  dir.ca.gov/dlse/LC_2810.5_Notice.pdf

*Available from the Industrial Welfare Commission, 916.274.1016,* dir.ca.gov/iwc/wageorderindustries.htm

- Industrial Welfare Commission's Orders Regulating Wages, Hours and Working Conditions in Professional, Technical, Clerical, Mechanical and Similar Occupations (IWC Order 4-2001) – revised July 2014
  dir.ca.gov/IWC/IWCArticle4.pdf
- Minimum Wage Order 2017
  dir.ca.gov/iwc/MW-2017.pdf

*Available from the California Division of Labor Standards Enforcement,* dir.ca.gov/dlse

- Health Workplaces/Healthy Families Act of 2014: Paid Sick Leave – published November 2014
  dir.ca.gov/DLSE/Publications/Paid_Sick_Days_Poster_Template_(11_2014).pdf

*Available from the California Department of Industrial Relations, 916.574.2528,* dir.ca.gov/DOSH/puborder.asp:

- Pay Day Notice
  The day, time and place of the regular pay date must be posted. As a convenience, the state provides a small form for this purpose. However, any employer may post this information in any understandable form.
- Emergency Information
  dir.ca.gov/dosh/dosh_publications/S500pstr.pdf
- Whistleblower Protection — revised January 2016
  dir.ca.gov/dlse/WhistleblowersNotice.pdf
  Print on 8.5 x 14 paper only

---

**MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017**

cdo.org/practicesupport

- Safety and Health Protection on the Job – revised January 2016
  dir.ca.gov/dosh/dosh_publications/shpstreng012000.pdf
  Print on 11 X 17 paper only
- Access to Medical and Exposure Records – revised January 2015
  dir.ca.gov/dosh/dosh_publications/Access_En.pdf
- Smoking Prohibited in the Workplace
  Labor Code section 6404.5 and Title 8 section 5148 of the California Code of Regulations prohibits smoking in an enclosed space at the workplace. Employers must notify workplace visitors of the prohibition by posting clear and prominent signs stating, "No smoking," at the building entrances. Signs stating, "Smoking is prohibited except in designated areas," also may be posted at building entrances if smoking is permitted in designated areas.
- Employers may purchase already made signs or create their own signs. The Department of Industrial Relations does not provide No Smoking signs. The law is enforced by local enforcement agencies.

*Available from Elections Division of the California Secretary of State, 916.657.2166:*

- Notice To Employees: Time Off to Vote
  elections.cdn.sos.ca.gov/pdfs/lew-english.pdf

*Available from the employer's workers' compensation insurance carrier or the Division of Workers' Compensation:*

- Notice to Employees – Injuries Caused by Work – revised January 2016
  This notice states the name of the employer's current compensation insurance carrier or the fact that the employer is self-insured. An employer may post the notice provided by the employer's insurance carrier or complete and poste this notice available from the state. Both English and Spanish language versions of the notice must be posted if there are Spanish-speaking employees.
  dir.ca.gov/dwc/NoticePoster.pdf
- Medical Provider Network (MPN) Notice – published June 2010
  Employers who use a medical provider network for workers' compensation claims must post a separate MPN Notice near the Notice to Employees. Obtain the notice from the employer's workers' compensation carrier or complete and post the notice provided by the state. A Spanish language version of the notice must be provided to Spanish speaking employees.
  dir.ca.gov/dwc/FORMS/MPN_MaterialModification_oct2010.pdf
- Your Rights to Workers Compensation Benefits – published June 2010
  Employers must provide this updated pamphlet to each new employee starting work on or after Oct. 8, 2010. Obtain pamphlet from employer's workers' compensation carrier.

*Available from the California Department of Health Services Radiologic Health Branch, 916.327.5106*

- Notice to Employees: Standards for Protection Against Radiation – revised February 2015
  cdph.ca.gov/pubsforms/forms/CtrldForms/rhb2364.pdf

---

**MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017**

Dr. Viviane G. Winthrop                     Dental Neutral Court Monitor                     65

*Available from CDA Practice Support, 800.232.7645*

- Dental Board of California Table of Allowed Duties
  cda.org/LinkClick.aspx?fileticket=TJRORpHqMnw=&portalid=0
- Dental Board of California Infection Control Regulations – revised August 2011
  cda.org/LinkClick.aspx?fileticket=Nbiijr-kXfrk%3d&portalid=0
- Proposition 65 Notices – for businesses with 10 or more employees
  cda.org/LinkClick.aspx?fileticket=5FNkNZSgbM8%3d&portalid=0
- Radiation Safety in Dental Practice – This fulfills the requirement for dental offices to "post" a copy of the state
  radiation regulations known as Title 17. Be sure to post the location where employees can find the document.
  cda.org/Portals/0/pdfs/practice_support/Radiation_Safey_Dental_Practice_Guide.pdf
- Radiation Safety Instructions – Must be available to employees.
  cda.org/LinkClick.aspx?fileticket=qNRAQ8_fWuY%3d&portalid=0

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

Dr. Viviane G. Winthrop                    Dental Neutral Court Monitor                    66

38-66

PAGE LEFT INTENTIONALLY BLANK

MCJ / CFMG - Initial Dental Tour Final Report #1 - April 30, 2017

# Exhibit 39

# Monterey County Jail

and

# California Forensic Medical Group

## Dental Neutral Court Monitor - Final Report #2

Dental Tour - #2 - May 4-5, 2017

Jesse Hernandez et al

v.

County of Monterey; Monterey County Sheriff's Office; California Forensic Medical Group, Incorporated

Case No. 5:13-cv-02354-PSG

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

# Table of Contents

Table of Contents                                                                          2

Introduction                                                                               7

    Purpose of the May 4-5, 2017 Dental Tour #2                         7

    Initial Dental Tour - February 2-3, 2017                            7

    Objectives for the 2nd Dental Tour                                  7

    In Attendance for the Second Dental Tour                            7

    Staffing Updates Since February 2-3, 2017 Dental Tour #1            8

    Staffing Updates Since May 4-5, 2017 Dental Tour #2                 8

Maximum Capacity & Number of Bookings                                                      8

AB109 & Eligibility of Dental Care                                                         8

Existing Staffing                                                                          9

Dental Clinic & Anticipated New Dental Facility                                            9

Site Overview                                                                             10

Standard of Care                                                                          10

Dental Priority System                                                                    10

Executive Summary                                                                         11

Access to Care - Non-Compliance                                                           20

    Intake Process                                                     20

    Intake - Access to Oral Hygiene Supplies                           21

    Intake - Access to Oral Hygiene Supplies - Recommendations:        21

    MCJ Intake Form Used on Day of Booking                             22

    MCJ Intake Form Used on Day of Booking - Recommendations:          22

    CFMG Intake Form Used on Day of Booking                            22

    CFMG Intake Form Used on Day of Booking - Recommendations:         22

    Health Inventory & Communicable Disease Screening (HICDS)          23

    (IHCDS) - Recommendations:                                         24

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

Dentist On Call System / Physician On Call                                                  24

Dentist On Call System / Physician On Call - Recommendations:                                25

Sick Call - Urgent & Emergent Dental Care                                                    25

Sick Call - Urgent & Emergent Dental Care - Recommendations:                                 26

Comprehensive & Periodontal Dental Care                                                      26

Comprehensive & Periodontal Care - Recommendations:                                         27

Custody Movement & Appointments                                                             27

Custody Movement & Appointments - Recommendations:                                          27

Refusals                                                                                     27

Refusal - Recommendations:                                                                   28

Case Review #1                                                                               28

Timeliness of Care - Non-Compliance                                                         28

Compliance                                                                                   28

Compliance - Recommendations:                                                                29

Reschedules                                                                                   29

Reschedules - Recommendations:                                                               29

Follow up after Referral to Outside Specialists                                             29

Follow up after Referral to Outside Specialists - Recommendations:                          30

Case Review #2                                                                               30

Quality of Care - Non-Compliance                                                            32

Restorative and Palliative Care                                                             32

Restorative and Palliative Care - Recommendations:                                          33

Extractions - Oral Surgery                                                                   33

Extractions - Oral Surgery - Recommendations:                                                34

Chronic Care Conditions                                                                      34

Chronic Care - Pregnancy                                                                     34

Chronic Care - HIV, Seizures, Diabetes, and I/Ps taking Anticoagulants                      35

Chronic Care - Psych Meds                                                          35

Chronic Care Conditions - Recommendations:                                         36

Legibility                                                                         36

Legibility - Recommendations:                                                      36

Regulatory Compliance & Infection Control                                          36

Dental Clinic Facility Audit                                                       36

Dental Clinic Facility Audit - Recommendations:                                    36

Dental Materials                                                                   36

Dental Materials - Recommendations:                                                36

Tool Count                                                                         37

Tool Count - Recommendations:                                                      37

Sharps Count                                                                       37

Sharps Count - Recommendations:                                                    37

Housekeeping Logs                                                                  37

Housekeeping Logs - Recommendations:                                               38

Prescriptions & Stock Medications                                                  38

Prescriptions & Stock Medications - Recommendation:                                38

Recapping of needles                                                              38

Recapping of needles - Recommendations:                                           38

Forms (i.e. Consent Forms, Comprehensive Exam, Periodontal Chart, etc)39

Forms - Recommendations:                                                           39

Highspeed Handpiece - Dental Delivery System                                       39

Highspeed Handpiece - Dental Delivery System - Recommendations:                    39

Physical Resources                                                                 39

Equipment and Instruments                                                          39

Equipment and Instruments - Recommendations:                                       40

New Dental Clinic                                                                   40

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

New Dental Clinic - Recommendations:   40

Restroom Within Dental Clinic   40

Restroom Within Dental Clinic - Recommendations:   41

Office Space Adjacent to Dental Clinic   41

Office Space Adjacent to Dental Clinic - Recommendations:   41

Charts & EHRS (including Dental HR and Digital X-rays)   41

Charts & EHRS - Recommendations:   41

Human Resources   42

   Dental Clinic Staffing   42

   Dental Clinic Staffing - Recommendations:   42

   Hygienist for the Periodontal Disease Program   42

   Hygienist & The Periodontal Disease Program - Recommendations:   42

   Licensure and Required Certificates   42

   Licensure and Required Certificates - Recommendations:   43

Dental Program Management   43

   Dental Policies and Procedures   43

   Dental Policies and Procedures - Recommendations:   43

   Grievances   43

   Grievances - Recommendations:   43

   Peer Review   44

   Peer Review - Recommendations:   44

   Illness and Injury Prevention Plan (IIPP)   44

   Illness and Injury Prevention Plan - Recommendations:   44

   Quality Management Meeting Minutes   44

   Quality Management Meeting Minutes - Recommendations:   44

   Management Structure and Organizational Chart   44

   Management Structure and Organizational Chart - Recommendations:   45

Required Postings in a Dental Office                                      45

Required Postings in a Dental Office - Recommendations:                   45

Conclusions                                                              45

Appendix 1 thru 10                                                       47

39-6

# Introduction

**Purpose of the May 4-5, 2017 Dental Tour #2**

There are two main purposes to this second dental audit. The first is to confirm that baseline metrics to monitoring dental compliance are established and are being recorded and maintained accurately and consistently.

The second purpose is to evaluate the quality of dental care provided by the California Forensic Medical Group (CFMG), as it relates to the Implementation Plan, for the inmate-patients of the Monterey County Jail (MCJ). This audit focuses on the dental care provided since the transition to new dental leadership which occurred on February 16, 2017.

**Initial Dental Tour - February 2-3, 2017**

Please refer to the Final Report #1 for the baseline evaluation of the dental program.

As seen in the Executive Summary and throughout the initial report, the list of issues were substantial.

**Objectives for the 2nd Dental Tour**

My objective for the Dental Tour #2 is for MCJ's Dental Department to actively self monitor and assess itself, both qualitatively and quantitatively, by using compliance data and outcome measures to find solutions for continuous improvements in **access, timeliness**, **quality** and **continuity** of dental care.

**In Attendance for the Second Dental Tour**

Per the Settlement Agreement filed 05/14/15, Plaintiff and Defendant's council no longer attend the Dental Tours unless warranted by special circumstances. Therefore in attendance on May 4-5, 2017 were ▮▮▮▮▮▮▮▮, Program Manager for CFMG; ▮▮▮▮▮▮▮▮, Medical Records Supervisor and Administrative Assistant for CFMG; Dr. ▮▮▮▮▮▮▮▮, Dentist for CFMG; ▮▮▮▮▮▮▮▮, Dental Assistant for CFMG; ▮▮▮▮▮▮▮▮, Certified Nursing Assistant/Clerk for CFMG; Officer DeFranco for Monterey County Jail; Captain Jim Bass, Custody Captain for Monterey County Jail; Jodel Jencks, Regional Vice President for Central to Southern California for CFMG; myself, Dr. Viviane G. Winthrop, Dental Neutral Court Monitor, assisted by Dr. Andre G. Metcalf.

**Staffing Updates Since February 2-3, 2017 Dental Tour #1**

Dr. ████ continues to work for CFMG but has relocated to the Santa Cruz County Jail, which is closer to his home. Dr. ████ has agreed to fill in at MCJ for the new dentist, Dr. ████, when he is needed for vacation relief. Therefore Dr. ████ will maintain his credentials on file with MCJ/CFMG.

Dr. ████ came on board on February 16, 2017, and received approximately 1 day of training from Dr. ████ before assuming the responsibilities of the clinical dental care at MCJ. Dr. ████ is currently contracted to provide dental care on Wednesdays and Thursdays, 8 hours per day, although he has had to reschedule some of his dental days for other weekdays to accommodate his schedule.

**Staffing Updates Since May 4-5, 2017 Dental Tour #2**

████, Dental Assistant, also found a full time position closer to her home. Her last day with CFMG was 06/08/17. ████ has also agreed to provide vacation relief at MCJ, if and when her schedule allows.

A new Dental Assistant, ████, started on 06/07/17.

████ has been redirected to assist both ████ and Dr. ████ in maintaining and updating the dental compliance tracking logs.

# Maximum Capacity & Number of Bookings

Monterey County Jail (MCJ) has a maximum capacity of 825. It houses both men and women and is a Type II and III facility built in 1972. On May 4th, 2017, there were 899 inmates in custody. The average length of stay remains approximately 30 to 33 days and there are currently 82 inmate-patients who have been incarcerated for greater than one year.

There were 10,916 total inmate-patients booked and incarcerated at Monterey County Jail in 2016. There are 5051 inmate-patients booked as of June 30th, 2017.

# AB109 & Eligibility of Dental Care

When AB109 or Realignment was signed in 2011, eligible inmate-patients (I/Ps) serving longer sentences at the California Department of Corrections and Rehabilitation, were transferred to the local county jails to finish out the terms of their incarceration.

On the date of the audit, the 82 inmate-patients incarcerated for over 12 months are eligible for comprehensive dental care. Per the Settlement Agreement's Implementation Plan, I/P's who are incarcerated for 12 months or greater are eligible for comprehensive dental care including periodontal care and eligible for diagnosed dental treatment, based on their earliest possible release date (EPRD).

This dental treatment, if indicated, can include 4 quadrants, full mouth, periodontal scaling and root planing (deep cleaning) which is often performed in 4 separate appointments if the I/P requires to be anesthetized. Additional dental treatment can include the removal of symptomatic or diseased teeth including wisdom teeth; biopsy, if a lesion is found during an oral cancer screening and/or a radiographic evaluation; posterior fillings; anterior root canals; anterior composite fillings for carious or broken down teeth; and/or full or partial dentures to replace missing teeth and improve mastication. A dental treatment plan, once diagnosed at the comprehensive dental examination, is to be completed within one year. Each line of diagnosed treatment requires a DPC code to identify the timeline in which the particular dental treatment must be completed. Depending on the severity of the case, multiple one hour appointments may be required to complete a treatment plan.

This is in comparison to episodic care which focuses on urgent and emergent dental care of a single tooth or specific area of the mouth for those incarcerated with less than one year remaining on their sentence.

## Existing Staffing

There is one dentist and one dental assistant working 2, eight hour days per week. Dental does not have a permanent dedicated scheduler nor an administrative assistant. There is no Dental Hygienist hired yet as per the Implementation Plan.

There is one Program Manager who is in charge, at a minimum, of running Medical, Mental Health and Dental, and who is also in charge of setting up the working parameters of the Implementation Plan for all of these programs.

## Dental Clinic & Anticipated New Dental Facility

Currently there is one dental clinic with one dental chair at MCJ. The dental clinic is located within the jail facility, opposite to the library. Adjacent to the dental clinic is a break room which has now been converted into an office space for the dental staff.

There is another dental clinic being planned outside of the perimeter but within the grounds of MCJ. Limited information is available regarding this project although the construction

contract has been approved. No architectural drawings or plans, nor information about potential equipment for the new dental facility, has been submitted for review to myself or to Dr. ███████ This information was requested in the Final Report for Dental Tour #1. No information about any anticipated changes in program structure has been provided either.

I request that the County provide Dr. ███████ and myself, prior to my 3rd Dental Tour, with any and all information regarding the number of planned dental operatories, including the planned design and equipment to be purchased.[1]

## Site Overview

The assessments for the quality of dental care were made primarily through chart reviews and by the site visit evaluation. There was a limited observation of the clinical care provided by Dr. ████████████ and ████████████ on May 4th.

No inmate-patients were interviewed and no I/Ps were clinically examined during this second dental tour.

The audit focused on the provision of episodic dental care as comprehensive dental care, periodontal care and all of its clinical measures and outcomes had yet to be implemented by MCJ/CFMG, i.e., initiated and completed dental treatment plans.

## Standard of Care

Although this section is in the Initial Dental Tour's Final Report, I am restating it to emphasize its importance. With the mandates from AB109, the standard of care is based, not only by the community at large, but on the level of dental care received at the CDCR, California Correctional Health Care Services's (CCHCS) Dental Program, and referenced from the September 2014 Inmate Dental Services Program (IDSP) Policies and Procedures.

The link to the IDSP Policies and Procedures is provided below:
http://www.cdcr.ca.gov/DHCS/docs/September2014IDSP_PandP_Final.pdf

## Dental Priority System

For clarity please see the table below for the correlation between the Implementation Plan's Dental Priority System (Dental Priority Codes, Section B.5) and the Dental Priority Code

---

[1] See Appendix, Letter from RBGG, August 9th, 2017

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

(DPC) from CDCR. Note that these DPCs are used in all aspects for denoting timelines of care and in determining compliance.

**For Episodic & Comprehensive Dental Care:**
(1) Emergency Care (Immediate Treatment)……**To Be Seen Immediately**
(2) Treatment within 1 calendar day / 24 hrs….DPC **1A - Emergent**
(3) Treatment within 30 calendar days…………DPC **1B - Urgent**
(4) Treatment within 60 calendar days…………DPC **1C - Unusual hard/soft tissue pathology**
(5) Treatment within 120 calendar days..………DPC **2 - Interceptive Care**
(6) Special needs care or referrals………………DPC **5 - Outside Specialist or Referral**

# Executive Summary

Dr. ▮▮▮▮ ▮▮▮ and ▮▮▮▮ the Program Manager were interviewed on the first day of the dental audit to assess for improvements from the initial baseline report. As mentioned previously, please refer closely to the Final Report #1 issued for the February 2-3, 2017 Dental Tour when reading this report.

There were improvements in the clinical space and flow of the dental clinic at MCJ. The dentist's large desk, which was previously near the entrance to the dental clinic, was moved to the office adjacent the dental clinic. Dr. ▮▮▮▮ now has a fully functioning space to write his charts and run the dental clinic, without jeopardizing infection control. The autoclave was placed against the wall, where the old desk used to be in the dental clinic. Although there is still some clutter, a clean area for sterilization is in place. I recommend that a safety mirror be placed in such a fashion that the dental assistant can visualize any movement behind her.

I was advised that another desk will be brought into the office space for the dental assistant to use as this position necessitates a dedicated work space. The Dental Assistant has several roles which includes but is not limited to the ordering of dental supplies, maintaining housekeeping and several other clinical logs and monitoring for proper infection control. Although there were some missing logs which were initiated and implemented on the day of the audit, there appeared to be an increase in the efficient recording and proper maintenance of the dental clinical logs.

The clinical space was painted for sanitary purposes. There are still areas of grim which need to be addressed. The large calendar in the dental clinic was not removed prior to painting which has left a large unpainted area behind it. There also remains unusable and outdated equipment in the dental clinic. These were pointed out and should be removed and discarded appropriately, i.e., old compressor.

Dr. ███████ brings valuable surgical skills to MCJ and due to his experience has already decreased the number of referrals to the outside oral surgeon. Dr. ███████ does many of the more complicated extractions himself.

Periapical x-rays are routinely being taken at the time of the triage appointment to substantiate the diagnosis. I recommend that bitewing x-rays be added to the objective findings to further assist with diagnosis.

Additionally, since the audit was conducted, I was informed that an automatic x-ray developer was purchased and is now in operation. This should make the x-ray films of better archival quality. Stericycle, the waste management company, has removed the old fixer and developer and new fixer and developer is being used consistently.

I commend the staff for acquiring and using the automatic x-ray developer. I still recommend however, that digital x-rays be implemented as they are beneficial in saving time (taking and developing one to two x-rays can still take approximately 10-12 minutes even with the automatic x-ray developer). As there is only one dental chair, and one dental assistant, saving approximately 10 minutes per patient can add up to one hour and 20 minutes in additional treatment time per dentist day. When the comprehensive dental care program is initiated, taking the full mouth series of 18 radiographs and any necessary retakes, will be more efficient with digital x-rays. Digital x-rays will also expose the patient to less radiation, increase available chair time and can be linked to an electronic health and dental record in the future.

There was a new fully functioning dental delivery system and vacuum in place. The handpieces appeared to be in working order and the staff used distilled water in the dental lines, brought in by the ███████ The surgical handpieces however had yet to be ordered and are important when performing surgical extractions to prevent air embolisms to the patients when cutting bone, especially during 3rd molar extractions.[2]

There were unfortunately several setbacks since the initial dental tour. There were no restorative procedures of any kind being performed since Dr. ███████ left. None. Per Dr. ███████ and staff, this situation was "remedied immediately and there are restorative procedures now being completed when clinically indicated".

Currently however, as evidenced by the dental compliance tracking logs, there are only a few temporary, palliative restorative procedures being performed to address the daily requests to fix broken or decayed teeth. IRM, which is a non permanent, temporary, sedative intermediate filling material is being utilized for temporary posterior restorations. Geristore

---

[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3798223/

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

which is an approved restorative material for Buccal Class V restorations was utilized for interproximal, posterior Class II restorations, i.e., DO #12. This is still considered a temporary, palliative solution as Geristore is not recommended for posterior, interproximal restorations.[3]

There are no permanent anterior or posterior restorative materials on site, i.e., composite (for anterior or posterior teeth) or amalgam (for posterior teeth), to address the permanent restorative needs of the inmate-patients at MCJ. Therefore, no adequate permanent restorations have been completed for posterior interproximal carious lesions or broken down anterior teeth since February 16, 2017. There does not appear to be any follow through to track the patients who received a temporary filling, and who still need to receive a permanent restoration. This situation must be rectified immediately. Additionally, the appropriate permanent restorative materials must be ordered and used to provide constitutionally adequate dental care.[4]

The red emergency button in the dental clinic was not working on the day of the audit. The red button was pressed indicating an emergency and no one responded. Staff and inmate-patient's safety is paramount! Safety equipment, safety measures and Custody staff must have properly functioning equipment, which should be tested regularly, to assure staff feel and are safe in a correctional environment. The Office of the County Counsel responded to this issue and stated "the red button was disconnected as there is no longer any time in which dental staff work with inmates without a deputy present".[5] Had we not tested the red emergency button, the staff would never have known that the emergency system was disconnected. There is no policy or memo in place stating that the red emergency button was disconnected. In the event of an emergency, albeit rare, the non working emergency button gives the illusion of safety. I recommend that all non working equipment be either promptly fixed or removed.

Areas which can be quickly improved on, are the dental charts, which were routinely not signed, with no printed name and credentials of the dentist. There were spaces between entries. The SOAP format needs to be updated such that S is for subjective; O for objective findings, including review of the I/P's medical history, allergies, x-ray review, objective findings such as pain, palpation, percussion, cold, hot, swelling, sinus tract, exudate, etc.; A is for assessment/diagnosis; and P for plan and what was performed at the dental appointment. Lastly the Dental Priority Code (DPC) and the description of the next visit was

---

[3] https://www.denmat.com/Restorative/Ionomers/Geristore/Syringe/

[4] See Appendix, Letter from RBGG, August 9th, 2017

[5] See Appendix, Letter from Monterey County addressing custody related recommendations, August 9th, 2017

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

rarely listed. I recommend that the SOAP progress note be more fully reflective of the inmate-patient's dental encounter.

The SOAP progress note is the legal document verifying the inmate-patient's dental encounter and in some cases, the progress note was missing from the chart. It is also recommended that whatever education is given to the patient, i.e. verbal and written post operative instructions given following extraction(s), be listed in the progress note following the Plan, therefore using a SOAPE format for the progress note.

There was a new general consent form for x-rays which was started recently although it only addresses radiographs. It is not a general consent form informing the inmate-patient of the dental examination, radiographs, palliative or restorative care. On the radiographic consent, there is only place for the patient to sign. I recommend updating the form to be truly a general consent form, with a signature block for both the patient and the dentist.

The comprehensive dental care program and the periodontal disease program were not initiated. Currently, 82 I/Ps, who have already completed over 12 months of incarceration, have yet to receive a comprehensive dental examination and subsequent treatment. There are no forms available to document a comprehensive dental and periodontal examination, nor is there a form to list the treatment plan and appropriate DPC for each treatment within the dental treatment plan timeframe.

As mentioned in the first final report, the Inmate Information Manual is given to each inmate-patient to inform them they can request dental care, but no identification of the inmate-patient's ability to read or comprehend written language was assessed. No verbal instructions were given to patients letting them know that dental is available upon request for episodic and/or comprehensive dental care. The dental program's infrastructure is missing and must be created and implemented.

No training has been provided to educate the health care professionals, who perform the 14-Day Health Inventory and Communicable Disease Screening (HICDS), on how to correctly complete each inmate-patient's dental section and odontogram. If inadequate screenings are performed or noted incorrectly, then there is non-compliance with the Implementation Plan's directive in XI. CFMG Dental Services Implementation Plan, Section A. Due to the lack of verifiable training, there is a chance that a serious dental condition can be missed, resulting in serious consequences to the inmate-patient, i.e. cancerous mouth lesion.

"Often oral cancer is only discovered when the cancer has metastasized to another location, most likely the lymph nodes of the neck. Prognosis at this stage of discovery is significantly worse than when it is caught in a localized intra oral area. Besides the metastasis, at these

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

later stages, the primary tumor has had time to invade deep into local structures. Oral cancer is particularly dangerous because in its early stages it may not be noticed by the patient, as it can frequently prosper without producing pain or symptoms they might readily recognize, and because it has a high risk of producing second, primary tumors.….There are several types of oral cancers, but around 90% are squamous cell carcinomas."[6]

At the time of the audit, there were no logs confirming the referrals to Dental from either Intake, the 14-Day HICDS (also called the 14-Day Physical) and/or from Sick Calls. Without concise logs, it is difficult to identify when the I/P is seen by the RN, when he/she is scheduled according to a Dental Level I or II timeframe and when the I/P is scheduled with the dentist. This information should correlate with the documentation in the Dental Compliance Tracking Log (DCTL). These tracking logs from Intake, 14-Day and Sick Calls allows the dental program to see if the dentist is seeing the scheduled patients as scheduled and within timeframes. There was a time when the dentist had access to TrackNet and patients were rescheduled without them being tracked.

These Intake, 14-Day and Sick Call Tracking Logs were created by ▉▉▉▉▉ after the audit took place. Monitoring however, has determined that there is inconsistency in maintaining these tracking logs, especially those from Sick Call. I request more consistent tracking of the referrals to dental. These logs should be sent with the weekly Dental Compliance Tracking Logs.

TrackNet is MCJ's scheduling tool but it is not a complete dental compliance monitoring or tracking system. Even the basic compliance log that Dr. ▉▉▉▉▉ had created was not being utilized correctly by the new administration and patients were being scheduled outside of the mandated timelines.

There is no dashboard and no dental compliance tracking logs which encompass the complete dental system to identify if all patients are seen as scheduled and seen within mandated timeframes. There is currently no electronic medical or dental record although I am informed that when the contract between the County and CFMG is signed then, MCJ will be the first to receive an electronic health record. There is also no referral system to identify chronic care patients and refer them to dental for evaluation and treatment, i.e. pregnant patients, HIV, diabetes or those with seizures.

▉▉▉▉▉ myself, ▉▉▉▉▉ and Officer DeFranco spent a considerable amount of time during the audit to identify the parameters necessary for creating a compliance tracking system. Additionally, Officer DeFranco stated that an automatic tic file can be created to identify an inmate-patient with 12 months of incarceration and at their one year mark, can be

---

[6] http://oralcancerfoundation.org/facts/

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

automatically scheduled for a comprehensive dental examination. When this occurs, the inmate-patient can accept or refuse the dental examination. Following the discussion, an initial spreadsheet was created and deployed. ███████ was advised that monthly compliance auditing will begin. On August 9th, the Monterey Office of the County Counsel identified that, "Sergeant DeFranco has completed this task". It was requested on May 4th that the DCTL be sent on June 15th.

The dashboard should at a minimum track the number of patients referred to dental from Intake, 14-Day HICDS and Sick Calls. It should be able to identify how many patients were scheduled, how many were actually seen by dental each month for triages and treatments, including the number of extractions, fillings, outside referrals, comprehensive exams and periodontal care performed each month. Tracking of the offsite visits (i.e. extractions with the Oral Surgeon), is to include when the inmate-patient is seen for followup and if the dentist saw the patient on the next dental day. The dashboard should include how many patients were seen within the various Dental Priority Codes (DPC) and the percentages of compliance. I strongly suggest that whenever possible for episodic care that the dental triage and the treatment should occur at the time of the triage visit. Additionally, the dashboard should include the number of monthly reschedules and refusals, and the reasons for the refusals.

The first set of monthly data was sent to me timely on June 15th. It retroactively spanned 02/23/17 thru 06/08/17. The Dental Compliance Tracking Log (DCTL) had many good items on it, although it was incompletely filled out, leaving out vital information. Many of the log's entries were unclear and difficult to track. March 8, 9, 22, 23, 29, 30 were missing from the log. The Dental Priority Codes were mislabeled and often left blank on the form. This caused problems on several fronts trying to audit mandated timelines fas identified in the Implementation Plan. There were also no logs verifying the referrals to dental from Intake, the 14-Day Health Inventory or from Sick Call.

After speaking with ███████ and discussing the form, Dr. Metcalf and I spent considerable time updating the format of the DCTL so that it can reflect more of the required parameters. This particular log is a work in progress and I recommend CFMG update its format when appropriate. Currently it is only tracking episodic care. It does not track outside referrals nor comprehensive and periodontal care. ███████ has stated that the electronic health and dental record will be able to monitor all these timelines.

███████ implemented the updated Dental Compliance Tracking Log on 07-03-2017. ███████ and I reviewed that day's data and discussed where improvements in scheduling and timeframes could be accomplished. There were still several areas with incomplete documentation. Reviewed with her that without the information, the form is essentially useless. ███████ quickly understood the changes and recommendations and stated she will

*MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017*

review with Dr. ███████ that all aspects of the form are to be filled out completely for the data to be valid. It was also noted that several patients were rescheduled but none of the rescheduled information was tracked. She stated that she will ensure that all scheduled patients are to be seen as scheduled and if not, then the rescheduled visit will be tracked.

███████ is a dedicated employee but has multiple hats to wear. Without additional administrative support for her position, she is having to choose daily between running the program for medical, mental health, dental and/or ADA versus working on the Implementation Plan. I request that she is allocated more time to support implementing the dental program's infrastructure. I believe that retention of employees is as important as recruitment and providing them adequate resources is paramount for their success.

The next set of monthly data was due to arrive on July 15th. ███████ stated that the logs for Intake, 14-Day Health Inventory and Sick Call process would be included. These logs should match the Dental Compliance Tracking Log's referrals. This is to prevent any patients from being "lost in the system". I recommended that all scheduled patients from the "Scheduled Events for MCJ" found in TrackNet be entered into the Dental Compliance Tracking Log, as well as any add ons, so that all patients can be accounted for and tracked for continuity of dental care. Included in the Appendix are various emails discussing these issues.

In both the February 23rd thru June 15th and July 3rd data, I saw an inordinate amount of reschedules occurring. For example, there were 18 patients scheduled on April 5th and only 6 patients seen. I was unable to verify that all 11 unaccounted for patients were actually seen on another dental day and treated. On July 3rd, there were 34 patients scheduled in an 8 hour day. 16 were rescheduled and 18 were seen. On July 27th, there were 58 patients scheduled and 39 rescheduled. The same patterns continued for August and September. A conference call was conducted with Plaintiff, Defendant and Program Manager identifying these patterns. Additional dental staff was requested for MCJ's dental department. It was acknowledged that there was a serious staffing issue but no additional temporary, registry or permanent staff was hired to address the serious staffing crisis.

This trend of over-scheduling and then re-scheduling continues to be evident.[7] Referrals from Intake, 14-Day Health Inventory and Sick Calls, are being rescheduled numerous times. There are countless patients rescheduled 5 or more times for various conditions such as broken teeth, bleeding gums and teeth pain. This is non-compliance and this practice of rescheduling must cease and the scheduled patients are to be seen as scheduled. The staffing crisis must be addressed before a sentinel event occurs.

---

[7] Appendix

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

This issue also implies that there are too many patients with dental pain and disease and not enough dental days to currently provide the necessary and quality dental services mandated by the Implementation Plan and the 8th amendment. "Dental care of prisoners is governed by the same constitutional standard of deliberate indifference as is medical care." "Dental care is one of the most important medical needs of inmates." "Dental care that consists of pulling teeth that can be saved is constitutionally inadequate. Delays in dental care can also violate the Eighth Amendment, particularly if the prisoner is suffering pain in the interim".[8]

The Dr. ███████ is currently allocated only 16 hours per week for the responsibility of both patient care and administration. This is not enough time to reasonably accommodate more than 10-14 inmate-patients per day. At the time of the audit there was no administrative assistance to assist with scheduling and the Dental Compliance Tracking Log. Since July, ███████████ has been temporarily redirected to assist dental with these administrative duties.

It is important for the staff of MCJ/CFMG to identify best practice models for efficiency and quality of dental care in a correctional setting. Until all of the forms can be adequately completed, including the progress notes, and the dental care scheduled and consistently provided, I recommend that **no more than 14 patients are to be scheduled per 8 day.** All patients are to be accounted for in the Dental Compliance Tracking Log (DCTL). If both triage and treatments can be completed at the triage appointment, then this minimizes the length of time the inmate-patient experiences pain, discomfort or is on additional medication. When evaluating the compliance data, I have seen that Dr. ███████ generally performs triage and treatment on the DPC 1A patients and others when given the time. I encourage him to be given the resources to continue this practice.

For both triage and treatment to occur for both quality episodic and comprehensive dental care, and for inmate-patients to receive their 8 amendment rights in a clean and safe environment, it is imperative that the number of dental days for the Dentist increase immediately to a minimum of 0.8. I also recommend that the Dentist be given a 0.2 administrative day to work on the dental portion of the Implementation Plan, including but not limited to training the health care professionals to understand and fill out the dental section and odontogram at the 14-Day Health Inventory appointment.

The Dental Assistant's position should also increased to a full time, 1.0 position. The Dental Assistant's position is crucial to an efficient and effective dental team. The Dental Assistant not only must keep up with the clinical demands of assisting the doctor but must maintain proper infection control between each patient and procedure, and clean and maintain the autoclave, order and organize supplies and maintain all clinical logs. Scheduling the patients is also an important job which the Dental Assistant can perform or have an administrative

---

[8] https://www.aclu.org/files/images/asset_upload_file690_25743.pdf

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

position perform this task. Without CFMG's support, Dr. ██████ is forced to add scheduling as another one of his duties which takes away from patient care.

To be assured that the Dental Compliance Tracking Log is in place and is being well monitored and maintained by CFMG, I recommend weekly monitoring. This may include weekly conversations with ██████ Peter Bertling, Defendant's Counsel, and Dr. ██████ regarding the compliance logs and dashboard. Until further notice weekly monitoring is to be sent every Thursday. Monthly monitoring of compliance can resume when weekly monitoring is shown to be accurate and the patients are seen within timelines.[9]

Dental practices in the community at large, as well as Safety Net Dental Clinics such as those found in Community Health Centers, generally recommend the following for efficiency: 2 dental chairs, 1 full time 40 hours a week Dentist, and 2 full time 40 hours per week Dental Assistants.[10]

CDCR/CCHCS recommends 1 full time dentist for 600 inmate-patients.[11] Note that both CDCR and MCJ dental programs are patient initiated/patient requested programs. The difference is that CDCR has long term inmate-patients and the 1:600 ratio is rather stable. MCJ on the other hand has nearly 11,000 inmate-patients booked per year, who could request dental care and often present with years of dental neglect. Once the tracking started being monitored, after July 2017, one saw often 40 to 50 inmate-patients scheduled per day at MCJ and only 10-14 are actually seen. Of those seen, not all were treated as many were just triaged. Often 30 or more inmate-patients are rescheduled per day, and these same patients are then rescheduled multiple times, even before being triaged to assess their dental concerns and condition. Due to the numbers of rescheduled appointments, many of those inmate-patients never receive care as they are discharged with an unaddressed dental issue.

It is the responsibility of Dr. ██████ and ██████ the Program Manager, to self monitor and self correct any issues which become evident from the dental compliance tracking logs. I am concerned that due to the excess number of patients needing dental care, the sheer number of reschedules and the lack of additional dental days given for both the dentist and the dental assistant, that the Dental Clinic program at Monterey County Jail is being set up to fail.

---

[9] See Appendix, Letter from RBGG, August 9th, 2017

[10] https://www.dentalclinicmanual.com/chapt6/3_6.html. *Recommendation*: At least two dental assistants should be available per dentist….If there are fewer than 2.0 assistants available per dentist, the clinic is likely to experience difficulty in maintaining smooth patient flow.

[11] http://www.cdcr.ca.gov/DHCS/docs/September2014IDSP_PandP_Final.pdf

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

Therefore, I recommend that effective immediately, all scheduled dental patients are to be seen on the day they are scheduled. A registry, interim dentist and dental assistant should be hired to accommodate the needs of the inmate-patients at MCJ until such time that permanent staff can be hired. A steady state must be achieved so that patients are seen as scheduled. I recommend that no more than 14 patients be scheduled in an 8 hour day until all aspects of the Settlement Agreement's Implementation Plan are in consistent, sound and accurate working order for both episodic and comprehensive dental and periodontal care.

## Access to Care - Non-Compliance

### Intake Process

There are currently two parts to the Intake process. The Monterey County Jail Medical Intake Questionnaire is filled out by the RN on the day of booking. Question #11 asks if the inmate-patient has dentures.

The CFMG's Intake Triage Assessment form identifies urgent and chronic care conditions present at the time of booking. There is a box available to be checked at the end of the form stating "DDS Category" for referring inmate-patients to dental.

The new CFMG Intake form which is 4 pages, was introduced to MCJ on June 16, 2017 and deployed June 19, 2017. This new form is more comprehensive regarding dental concerns of pain, cavities, dentures and other screening criteria for referral to Dental from Intake. There were no logs created nor implemented of patients referred from any part of Intake to Dental (MCJ and CFMG). From the initial compliance data received spanning 02/23/17 to 06/15/17, the data showed that only two patients were referred to Dental from Intake, although there were several sick call slips put in by patients requesting dental care for broken, decayed, painful or abscessed teeth.

TrackNet is used to schedule the inmate-patients and the two referrals mentioned above were scheduled as a Dental Level I. Please see the memo below from the Program Manager, educating staff on the indication for a Dental Level I or Dental Level II referral condition. A Dental Level I referral is an emergent condition, where the patient is scheduled for the next dental day to address issues of pain, swelling, exudative lesion, recent trauma to the oral cavity. If a Dental Level I escalates to a dental emergency before he or she can be seen by the next dental day, then the inmate-patient is to be sent to a higher level of care to address the dental emergency. A Dental Level II is the status of an inmate-patient who has an urgent dental condition which can be scheduled within 14 calendar days, i.e. broken tooth, deep cavity.

*July 5, 2017*

*DENTAL SICK CALL REMINDERS*

*Staff,*

*When scheduling inmates for Dental Sick call please make sure the following are done.*

1. *Make sure you specify Level1, or Level 2.. Level 1 it is an emergency and they need to be seen the very next dental sick call. Level 2 means they need to be seen within 14 calendar days.*

2. *When scheduling in track net please specify in comment line where the sick call initiated from: example sick call request, provider, nursing, 14 day health inventory.*

   *Another example: Inmate places sick call slip stating cracked tooth*

   *Track net entry should look like this*
   *"Sick call slip :Level 2 cracked tooth"*

*EVERYDAY Reminders:*

 *Please make sure you are printing and signing your name on all documentation so it can be read legible.*

*Nurses Please make sure you are utilizing the preprinted SP forms with all encounters using Standardized Procedure*

*Please make sure you are updating the Problem List*

*Thank You all for your hard work and flexibility with all these changes, if you have any questions please ask.*

█████

## Intake - Access to Oral Hygiene Supplies

The Inmate Manual states "prior to initial housing, you will receive a toothbrush, one tube of toothpaste, soap and a comb". Floss loops are found in the commissary although none of the commissary products were reviewed during this tour.

The County agreed and is now providing an ADA Acceptable fluoride toothpaste for the "fish kit".[12]

## Intake - Access to Oral Hygiene Supplies - Recommendations:

1. None at this time The toothpaste issued is Freshmint, Premium Anticavity Toothpaste which is ADA Accepted. *A Safety Data Sheet was submitted with the toothpaste sample.*[13]

---

[12] Monterey County comment and response from email dated April 19, 2017.

[13] See Appendix, letter from Monterey County addressing custody related recommendations, August 9th, 2017

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

**MCJ Intake Form Used on Day of Booking**

**Screen 1** - MCJ Medical Intake Form Completed at time of booking and Question #11 answered?

Table 1.1 - Feb 2-3, 2017
- Screen 1 - 92% - PARTIAL COMPLIANCE

Table 1.2 - May 4-5, 2017
- Screen 1 - 80% - PARTIAL COMPLIANCE

**MCJ Intake Form Used on Day of Booking - Recommendations:**

1. Create, implement and maintain a log indicating which patients are referred, and when they are referred, to Dental from Intake. This log can then be compared and used to confirm in the Dental Compliance Tracking Log that the patients were seen as scheduled and that they were scheduled and seen within timeframes.
2. Once the logs are in place, and the scores are maintained above 90%, then substantial compliance will be achieved. There was a decrease in the score from the first to second audit mostly due to the mismatched and misfiled chart.

**CFMG Intake Form Used on Day of Booking**

**Screen 1** - Was CFMG Intake Triage Form completed at time of booking?
**Screen 2** - Were entries legible and all signatures present?

Table 2.1 - Feb 2-3, 2017
- Screen 1 - 92% - PARTIAL COMPLIANCE
- Screen 2 - 100% - SUBSTANTIAL COMPLIANCE

Table 2.2 - May 4-5, 2017
- Screen 1 - 90% - PARTIAL COMPLIANCE
- Screen 2 - 10% - NON COMPLIANCE

**CFMG Intake Form Used on Day of Booking - Recommendations:**

1. No co-signatures present on the form which could imply that no physician oversight was present during this recent round. Recommend health care professional review and co-sign Intake Triage Assessment form.

2. The log is to include the patient's name, booking number, date of birth, date of referral, reason for referral, Dental Level I or Dental Level II and when the patient is scheduled with Dental. This log will then be compared and used to confirm in the Dental Compliance Tracking Log that the patients were seen as scheduled and that they were scheduled and seen within timeframes.
3. A partial compliance is given for Screen 1 for both dates due to the lack of a log to chart which patients are referred to dental. Without a log, it is not possible to verify if the referred inmate-patient was indeed seen as scheduled and if his or her dental problem was resolved. Once the scores are maintained over 90%, then substantial compliance will be achieved.

**Health Inventory & Communicable Disease Screening (HICDS)**

The HICDS is to be completed within 14 days of booking. When I/P's have already been in the system and return to jail with a new booking number, then the Jail Assessment form is filled out instead. As with Intake, the RN at the 14 day Health Inventory identifies any I/P's emergent or urgent dental conditions as a Dental Level 1 or Dental Level 2.

With direct access to Dr. ███████ schedule, through TrackNet, the health care professional schedules the I/Ps within the timelines indicated for a Dental Level I or 2. Per the Implementation Plan (IP) section A, *at the time of the health inventory and communicable disease screening, the general condition of the patient's dentition, missing or broken teeth, evidence of gingival disease, mucosal lesions, trauma, infection, facial swelling, exudate production, difficulty swallowing, chewing and/or other functional impairment will be noted; urgent/emergent dental needs identified. All screening findings will be documented on the health inventory form including the odontogram.*

The audited charts did not have the odontogram filled in for either dental tour. The general condition of the I/Ps mouth was not documented in the dental section per the Implementation Plan's mandates. "Refer to DDS" was not checked, even when a problem existed and even when the inmate-patient was scheduled in Dental during the 14-Day Health Inventory.

**Screen 1** - Was HICDS form completed within 14 days?
**Screen 2** - Per Implementation Plan A & A.2., was the general condition of the patient's dentition, missing or broken teeth, evidence of gingival disease, mucosal lesions, evidence of infection, recent trauma, infection, facial difficulty swallowing, chewing and /or other functional impairment noted in the "Dental screening comments"?
**Screen 3** - Was the odontogram completed?
**Screen 4** - Are the entries legible and do entries have a legible signature, printed name & title and credential of the person making the entry?

**Screen 5** - Was "Refer to: DDS" checked and referral to Dental completed and scheduled?
**Screen 6** - Was I/P seen in Dental within timeframe? If I/P seen Offsite, was there a followup with Onsite Dentist at next scheduled Dental day?

Table 3.1 - Feb 2-3, 2017
- Screen 1 - 89% - PARTIAL COMPLIANCE
- Screen 2 - 0%   - NON COMPLIANCE
- Screen 3 - 0%   - NON COMPLIANCE
- Screen 4 - 67% - NON COMPLIANCE
- Screen 5 - 0%   - NON COMPLIANCE
- Screen 6 - 75% - NON COMPLIANCE

Table 3.2 - May 4-5, 2017
- Screen 1 - 89% - PARTIAL COMPLIANCE
- Screen 2 - 0%   - NON COMPLIANCE
- Screen 3 - 0%   - NON COMPLIANCE
- Screen 4 - 33% - NON COMPLIANCE
- Screen 5 - 50% - NON COMPLIANCE
- Screen 6 - NA - No parameters met for this set of criteria

**(IHCDS) - Recommendations:**

1. Training of the qualified health care professionals by the dentist, in both identifying the general dental condition and of filling out the odontogram, is crucial to the inmate-patients receiving their mandated dental care.
2. A log must be created, implemented and maintained to track referrals to dental from the HICDS form, same recommendation as for Intake, to verify that inmate-patients are seen and that treatment, when indicated, is completed.

**Dentist On Call System / Physician On Call**

The physician on call handles dental/medical emergencies after hours. *In the case of a dental/medical emergency, in which a licensed dentist is not present, the patient will be seen, treated and managed immediately by medical provider staff.* If the dental issue is life threatening, then the inmate-patient will be transported to an urgent care facility or hospital. Per the Program Manager, no inmate-patient was sent out on an emergency basis in 2016 and from 1/1/17 thru 7/10/17.

Additionally if the dental issues are emergent, then the inmate-patients are treated first with the medical provider/licensed health care provider, then scheduled if indicated, with the dentist at the next scheduled dental clinic.

There are no logs showing any of the after hours calls relating to dental (including date, time and nature of the dental after hours emergency). Nor what the inmate-patient was treated for, and if he/she was scheduled appropriately depending on his or her Dental Level. As there is no log, there is no current way to know if the inmate-patient was actually seen in dental following the emergency call.

### Dentist On Call System / Physician On Call - Recommendations:

1. Institute a log of inmate-patients seen or managed by the physician on call so that the referral back to the dentist can be verified and the loop can be closed.
2. This log can be tied into the compliance tracking log for dental sick calls/after hours emergencies.

### Sick Call - Urgent & Emergent Dental Care

Inmate-patients use the sick call process to request dental services. From reviewing the charts, it appears that the sick call slips are generally processed by the next business day. The qualified health care professionals appear to schedule the inmate-patients with Dr. ███████ at his next clinical day using TrackNet. However it also appears that Dr. ███████ may be rescheduling the patients so that they are not seen within the Dental Level 1 or Dental Level 2 timeframes.

There are no statistics identifying which sick calls were for dental related issues as there are no logs indicating the referral to Dental from the Sick Call process.

**Screen 1** - Was I/P triaged by medical within timeframe?
**Screen 2 -** Was patient seen for dental triage within timeframe?
**Screen 3 -** Is diagnosis (Dx) present and correct based on objective findings?
**Screen 4 -** Was a Dental Priority Code of 1A, 1B, 1C, 2 prescribed at triage?
**Screen 5 -** If I/P seen Offsite, was there a followup with Onsite Dentist at next dental day after Offsite treatment (Tx)?
**Screen 6** - Was I/P's complaint of dental pain/concern addressed?
**Screen 7 -** Was I/P's complaint of cavities and fractured fillings or broken teeth addressed and stabilized?
**Screen 8 -** Medical history (Hx) completed, updated and signed by pt and dentist?
**Screen 9** - Allergies reviewed?

*MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017*

**Screen 10** - Medication received timely by the I/P following the procedure?
**Screen 11** - Was SOAP legible? Do entries have legible printed name, signature and credential of person making the entry?

Table 4.2 - May 4-5, 2017
- Screen 1 - 67% - NON COMPLIANCE
- Screen 2 - 20% - NON COMPLIANCE
- Screen 3 - 50% - NON COMPLIANCE
- Screen 4 - 33% - NON COMPLIANCE
- Screen 5 - NA - No parameters met for this set of criteria
- Screen 6 - 100% - SUBSTANTIAL COMPLIANCE
- Screen 7 - NA - No parameters met for this set of criteria
- Screen 8 - 0%   - NON COMPLIANCE
- Screen 9 - 0%   - NON COMPLIANCE
- Screen 10 - 50% - NON COMPLIANCE
- Screen 11 - 0%   - NON COMPLIANCE

**Sick Call - Urgent & Emergent Dental Care - Recommendations:**

1.  It is imperative to create, implement and maintain a dental sick call tracking log. See similar request for referral logs to Dental from Intake and 14-Day Health Inventory.
2.  All logs must be filled out completely as they are part of the Proof of Practice.

**Comprehensive & Periodontal Dental Care**

Approximately 10% of the current inmate-patient population at MCJ has been incarcerated for longer than one year. Of the 889 inmate-patients incarcerated on May 4th, 2017, 82 of them had already spent more than 12 months in incarceration. No comprehensive dental examinations were performed on these I/Ps. No system is currently in place to provide comprehensive dental care and periodontal care. Periodontal care cannot be completed without a diagnosis which come from a periodontal examination which is completed at the time of the comprehensive dental examination. Subsequently the timelines recommended by the Implementation Plan have not been met.

**Screen 1** - Was I/P seen for Comprehensive Exam?
**Screen 2** - Did I/P meet mandated timeframe?

Table 5.1 - Feb 2-3, 2017
- Screen 1 - 0% - NON COMPLIANCE
- Screen 2 - 0% - NON COMPLIANCE

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

Table 5.2 - May 4-5, 2017
- Screen 1 - 0% - NON COMPLIANCE
- Screen 2 - 0% - NON COMPLIANCE

**Comprehensive & Periodontal Care - Recommendations:**

1. Work with Officer DeFranco to establish an automatic system of referral to Dental when the I/P reaches 12 months of incarceration.
   - *Per the Office of the County Counsel, "Sergeant DeFranco has completed this task".*
2. Decide which system you will implement in terms of taking radiographs, continue to use the automatic x-ray developer or purchase digital x-rays with a size 2 sensor, as this provides an immediate result with low radiation to the inmate-patients.
3. The other option to consider is to contract with an outside imaging company and have an FMX and Panoramic radiograph taken for each comprehensive dental examination patient.
4. Acquire the forms necessary to implement the comprehensive dental examination and the periodontal program.
5. Due to the substantial number of items which need to be addressed, I suggest creating a strategic plan by looking at the next 5 to 10 years in addition to addressing the immediate needs of the dental clinic. This will determine if buying a digital x-ray system vs keeping the automatic x-ray developer will be in the best interest of CFMG. The periodontal disease program will function more smoothly when a quick, low radiation system such as digital x-rays is implemented and an electronic dental record is utilized for charting and treatment planning.

**Custody Movement & Appointments**

The percentage of inmate-patients scheduled and those who actually arrived and were seen for their dental appointment was not evaluated during the second dental tour. This will be evaluated at a future visit.

**Custody Movement & Appointments - Recommendations:**

No specific recommendations at this time.

**Refusals**

Please refer to the Final Report #1. Tracking of refusals and reschedules will occur at the next dental tour.

**Refusal - Recommendations:**

1. Include the reason for the refusal in the Dental Compliance Tracking Log.
2. It is encouraged that the risks, benefits and alternatives be discussed by the dentist with the inmate-patient at the time of the refusal, so that the inmate-patient can be fully informed of the consequences of refusing or delaying dental treatment. This is a gray area and future discussion will occur regarding this subject once logs are in place.
3. Cell extractions are not warranted to bring an I/P to his/her dental appointment however establishing a culture where it is expected that the inmate-patient refuses in person to the dentist can be established.

## Case Review #1

There was a pregnant inmate-patient who had reported pain of 9/10 and was scheduled for the next dental day however she refused to the Deputy and not to the dentist. A face to face discussion with the dentist is an important step in educating the patient. These discussions may reverse the refusal and can help prevent complications, not only for pregnant patients, but for any whose oral condition may become complicated by chronic conditions. In this instance there was also no dental progress note and the appointment was not listed in the DCTL.

This situation is also significant as the Deputy who obtained the refusal is not clinically licensed to explain the risks, benefits and alternatives to the patient nor licensed to explain why refusing dental treatment for a dental infection can at times lead to a life threatening condition.

## Timeliness of Care - Non-Compliance

**Compliance**

As stated in the Executive Summary, there was no comprehensive compliance tracking system in place at the time of the May 4-5, 2017 audit. The logs were created thereafter. I recommend that the logs be sent to me weekly for continued evaluation. A discussion with staff may occur as a result of the weekly compliance logs in which additional recommendations may be given depending on the situation presented by the logs.

See the sample Dental Compliance Tracking Log in the Appendix. Additional updates to the form will occur as the form is used and issues arise. Originally I had requested that weekly monitoring cease by August but due to the ongoing issues, I recommend weekly monitoring

*MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017*

to continue until the end of December 2017 where it will be re-evaluated if weekly monitoring needs to continue.

**Screen 1** - X-ray of diagnostic quality taken at time of triage?
**Screen 2** - <u>Was dental treatment (Tx) performed within timeframe of DPC?</u>
**Screen 3** - Was a general consent reviewed and signed at time of triage?
**Screen 4** - Are records legible?
**Screen 5** - Is the progress note signed with printed name/or name stamp of the provider's credentials?

Table 6.2 - May 4-5, 2017
- Screen 1 - 84% - PARTIAL COMPLIANCE
- Screen 2 - 57% - NON COMPLIANCE
- Screen 3 - 0%   - NON COMPLIANCE
- Screen 4 - 90% - PARTIAL COMPLIANCE
- Screen 5 - 0%   - NON COMPLIANCE

## Compliance - Recommendations:

1. Per the exit interview with ▮▮▮▮▮ on May 5th, it is paramount that a system be implemented to track all aspects of compliance, including both episodic and comprehensive dental care visits.
2. Weekly monitoring until all aspects of the episodic tracking system is accurate and presents with usable information for tracking inmate-patient's dental care at MCJ.
3. Note patient #33, which is identified as patient #32 on the Dental Compliance Tracking Log on September 20th was scheduled for a Dental Level I for Intake loose tooth on lower right. This patient was not seen for a triage and was rescheduled to 9/27. He is not the only one. A system of triaging the inmate-patients during this staffing crisis must be developed and implemented so that at a minimum, Dental Level I patients are not rescheduled.

## Reschedules

See Executive Summary.

## Reschedules - Recommendations:

See Executive Summary. & Conclusion.

## Follow up after Referral to Outside Specialists

*MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017*

There is no formal HQ or local log yet implemented to make sure that when the patients are referred out for either oral surgery, biopsies, to the hospital for emergency dental issues, or for root canals and denture procedures, that the patients are also seen the next dental business day for post-discharge dental care. *The contracted dentist will be notified and provide necessary post-discharge dental care at the next scheduled dental clinic.*
This aspect of monitoring will need to be added to the Dental Compliance Tracking Log using DPC 5.

**Follow up after Referral to Outside Specialists - Recommendations:**

1. The compliance log should also track referrals to outside specialists and conversely. It should include when the inmate-patient was referred to the outside specialist, which specialist he/she is referred to and for what procedure. It should also include when the patient was seen by the outside specialist and when the inmate-patient is due for follow up care with the dentist. An entry to close this loop should be made when the patient was seen by the onsite dentist.
2. This will also be important when comprehensive care is instituted at MCJ/CFMG as inmate-patients may be referred to an outside specialist not only for oral surgery and endodontics, but also for non specialty care such as for denture fabrication.

# Case Review #2

One of the purposes of this audit is to review charts to assess patient care. When there are too many patients, not enough time to effectively see, triage, treat patients and self monitor the dental program, it is easy, as this case exemplifies, for the progress notes to not completely illustrate the clinical picture.

This inmate-patient was seen in the dental clinic for a triage. The treatment was also performed and an extraction #1 occurred on May 3rd. The patient had put in a sick call slip previously and was originally scheduled with dental on March 8th, but was never seen in the dental clinic for the first request. Per discussion with Program Manager, TrackNet may have inadvertently lost the patient as the inmate-patient wasn't seen in dental as scheduled.

There was a second sick call request and the inmate-patient was then screened again by medical on April 26. It was stated on April 26th that the patient was not seen on March 8th, and the inmate-patient was scheduled for the next dental day which was now on May 3rd.

On reviewing the periapical radiograph, there appears to be a large distal decay midway to the pulp on #2 and an occlusal decay not involving the pulp on #1, including periodontal bone loss. The periapical x-ray was taken to evaluate the teeth including the apex although

no bitewing was taken to assist in clearly identifying occlusal and interproximal decay or to identify if the decay is below the crest of the alveolar bone on #2. Please see the attached periapical x-ray on the following page.



When reviewing the progress notes, it stated that tooth #1 was extracted due to pain on palpation (which can indicate an infection), was periodontally involved and had pericoronitis. No periodontal probings or caries were recorded in the progress notes for the May 3rd appointment. No objective findings and therefore no clear diagnosis were performed for tooth #2, although it was stated that #2 can be "cleaned and restored" with access from the extraction #1. No evaluation of pain to percussion, palpation, to cold or hot, nor was there any periodontal probings identified for tooth #2. There was no diagnosis for #2. The progress note was not signed. The patient was not scheduled for #2 treatment after the extraction of #1 and the dental notes state that the next visit is "prn". This means that the inmate-patient would again have to fill out a sick call slip if the tooth #2 continued to be painful. No DPC code was given for tooth #2. Worse, if decay goes unattended due to not being scheduled, then the patient could lose the tooth.

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

In the past 7 months, per the evaluation of the compliance logs, no permanent restorative procedures have been performed in this dental clinic. It appears that no posterior restorative material has been ordered from the dental supply company, neither amalgam nor a posterior composite, nor a bonding agent for the posterior composite. Since the end of May 2017, some class V restorations were performed using Geristore. Geristore is not indicated as a permanent restorative material for posterior interproximal lesions. Some interim restorations with IRM were performed. No tracking of the temporary restorations were done to replace the temporaries with permanent restorations.

## Quality of Care - Non-Compliance

### Restorative and Palliative Care

5 charts of restorative cases were requested during the May 4-5, 2017 dental tour. Per Dentist and Dental Assistant, no charts were submitted because no restorative or palliative procedures were done from 02/16/17 to 5/4/17.

**Screen 1** - Was pt seen within timeframes?
**Screen 2 -** Signed informed consent?
**Screen 3 -** Was there a diagnostic x-ray taken at the time of triage?
**Screen 4** - Diagnosis present and correct?
**Screen 5** - Was DMFS given and signed?
**Screen 6 -** Was health history reviewed and blood pressure taken?
**Screen 7 -** Was material used listed in SOAP?
**Screen 8** - Was SOAP progress note legible?
**Screen 9** - Do entries have legible signature, title and credential of person making the entry or name stamp with authentication by the person making the entry?

Table 7.1 - Feb 2-3, 2017
- Screen 1 - 100% - SUBSTANTIAL COMPLIANCE
- Screen 2 - 0%   - NON COMPLIANCE
- Screen 3 - 0%   - NON COMPLIANCE
- Screen 4 - 0%   - NON COMPLIANCE
- Screen 5 - 50% - NON COMPLIANCE
- Screen 6 - 100% - SUBSTANTIAL COMPLIANCE
- Screen 7 - 100% - SUBSTANTIAL COMPLIANCE
- Screen 8 - 100% - SUBSTANTIAL COMPLIANCE
- Screen 9 - 0%   - NON COMPLIANCE

Table 7.2 - May 4-5, 2017

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

- Screen 1 - 0%   - NON COMPLIANCE
- Screen 2 - 0%   - NON COMPLIANCE
- Screen 3 - 0%   - NON COMPLIANCE
- Screen 4 - 0%   - NON COMPLIANCE
- Screen 5 - 0%   - NON COMPLIANCE
- Screen 6 - 0%   - NON COMPLIANCE
- Screen 7 - 0%   - NON COMPLIANCE
- Screen 8 - 0%   - NON COMPLIANCE
- Screen 9 - 0%   - NON COMPLIANCE

**Restorative and Palliative Care - Recommendations:**

1. Discussed lack of restorative procedures with both Dr. █████ and ███████ to stabilize carious teeth. See Executive Summary.

**Extractions - Oral Surgery**

Dr. ███████ brings extensive oral surgery experience to the Dental Program at Monterey County Jail.

**Screen 1** - Was Dental Priority Code (DPC) prescribed?
**Screen 2 -** Was pt seen within SC timeframe?
**Screen 3 -** Was Blood Pressure (BP) taken before procedure?
**Screen 4 -** Was there a diagnostic x-ray taken at the triage appointment?
**Screen 5 -** Signed extraction informed consent?
**Screen 6 -** Was analgesic prescribed after extraction?
**Screen 7 -** Did I/P receive medication timely?
**Screen 8 -** Was SOAP legible?
**Screen 9 -** Was signature legible, printed or name stamp and credentials included?

Table 8.2 - May 4-5, 2017
- Screen 1 - 27% - NON COMPLIANCE
- Screen 2 - 33% - NON COMPLIANCE
- Screen 3 - 57% - NON COMPLIANCE
- Screen 4 - 100% - SUBSTANTIAL COMPLIANCE
- Screen 5 - 57% - NON COMPLIANCE
- Screen 6 - —%   - To be discussed with clinician
- Screen 7 - 100% - SUBSTANTIAL COMPLIANCE
- Screen 8 - 57% - NON COMPLIANCE
- Screen 9 - 100% - SUBSTANTIAL COMPLIANCE

*MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017*

- Screen 10 - 0%   - NON COMPLIANCE

**Extractions - Oral Surgery - Recommendations:**

1. Schedule time with Dr. ███████ to review SOAP format in more detail and to review comment section and compliance.

**Chronic Care Conditions**

*Chronic illness is any health problem/condition lasting at least six months which has the potential to, or actually does, impact an individual's functioning and long term prognosis…..Such encounters shall be scheduled at least every ninety days.* Additionally, *inmates with chronic medical conditions will be referred to and seen by a medical provider within five to seven days of arrival.*

On the medical side, I/P's with chronic diseases, see Exhibit A, page 27 of Implementation Plan, states *inmates with chronic care conditions will be managed pursuant to chronic care protocols and standardized procedures that are consistent with national practice guidelines.* Consistent with these guidelines, a dental examination is recommended when evaluating a patient who is diabetic[14] or pregnant[15].

Although there are several more chronic care conditions as mentioned in the Implementation Plan, the focus for dental at this time will be the management of I/Ps with diabetes, HIV, seizures and those who are pregnant. <u>In addition, there will be monitoring of I/Ps who are taking psychotropic medications, to ensure they understand and are able to request and access dental services.</u>

There are currently no formal referrals to Dental for inmate-patients with diabetes, HIV, seizures and for those who are pregnant. **As all I/P's are eligible for the periodontal disease program for the diagnosis and treatment of periodontal disease**, those with chronic care conditions and who are pregnant should be monitored more closely and referred to dental for an examination so that t*reatment will be based on periodontal disease classification, Dental Priority code, and special medical needs (i.e. pregnancy, diabetes, HIV/AIDS).*

**Chronic Care - Pregnancy**

**Screen 1** - Was pt referred to dental?

---

[14] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3228943/

[15] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3217279/

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

**Screen 2 -** Was a dental examination and periodontal exam performed that includes periodontal charting and diagnosis?
**Screen 3 -** Was oral hygiene instruction given?
**Screen 4 -** Was cleaning or SRP given, SRP for those diagnosed with periodontitis?

Table 9.1 - Feb 2-3, 2017
- Screen 1 - 0%   - NON COMPLIANCE
- Screen 2 - 0%   - NON COMPLIANCE
- Screen 3 - 0%   - NON COMPLIANCE
- Screen 4 - 0%   - NON COMPLIANCE

Table 9.2 - May 4-5, 2017
- Screen 1 - 0%   - NON COMPLIANCE
- Screen 2 - 0%   - NON COMPLIANCE
- Screen 3 - 0%   - NON COMPLIANCE
- Screen 4 - 0%   - NON COMPLIANCE

**Chronic Care - HIV, Seizures, Diabetes, and I/Ps taking Anticoagulants**

**Screen 1 -** When was I/P referred to Dental due to chronic care condition?
**Screen 2 -** Periodontal evaluation & treatment (Tx) completed?

Table 10.1 - Feb 2-3, 2017
- Screen 1 - 0%   - NON COMPLIANCE
- Screen 2 - 0%   - NON COMPLIANCE

Table 10.2 - May 4-5, 2017
- Screen 1 - 0%   - NON COMPLIANCE
- Screen 2 - 0%   - NON COMPLIANCE

**Chronic Care - Psych Meds**

**Screen 1 -** Was I/P referred to Dental due to chronic care condition?
**Screen 2 -** Periodontal evaluation & treatment (Tx) completed?

Table 10.1 - Feb 2-3, 2017
- Screen 1 - 0%   - NON COMPLIANCE
- Screen 2 - 0%   - NON COMPLIANCE

Table 10.2 - May 4-5, 2017

- Screen 1 - 0%   - NON COMPLIANCE
- Screen 2 - 0%   - NON COMPLIANCE

**Chronic Care Conditions - Recommendations:**

1.  Having a well defined referral system, and a tracking log to identify these patient who suffer from chronic care conditions, will be essential to addressing the oral health care needs of I/Ps with diabetes, HIV/AIDs, seizures, who are pregnant and/or on psychotropic medications.

**Legibility**

Greater than 50% of the chart entries took extra time to decipher. This made chart auditing long and arduous. Should another dentist want to read the previous note, the length of time it takes to decipher the chart entry takes time away from patient care.

**Legibility - Recommendations:**

1.  Type or clearly print SOAPE.
2.  Type of clearly print tracking logs.

# Regulatory Compliance & Infection Control

**Dental Clinic Facility Audit**

The Implementation Plan states that *All dental services will be provided in a safe and sanitary environment.* Several improvements have been noted. See the table in the Appendix.

**Dental Clinic Facility Audit - Recommendations:**

1.  Remedy all remaining noncompliant items.

**Dental Materials**

As mentioned previously, no permanent restorative procedures were performed from 02/16/17 thru 09/22/2017.

**Dental Materials - Recommendations:**

1. Dr. ████ stated that he favors composite restorations on posterior teeth although I recommended that amalgam be seriously considered as another option for a permanent long term restorative material. There is an amalgamator present with a safety cover in place.
2. The Dental Material Fact Sheet (DMFS) has since been updated although the signature page for patients to sign for the receipt of the DMFS, has not. I recommend that you update the signature page to reflect current information from the Dental Board of California.
3. A local policy should be in place identifying the use of dental materials at MCJ.
4. Safety Data Sheets (SDS) should be updated to reflect only current dental materials.

**Tool Count**

Both the Dentist and the Dental Assistant should perform tool count for accountability - **the tool count was updated to reflect both signatures although both signatures were not present on the tool count.**

**Tool Count - Recommendations:**

1. Include the Acrylic Bur and the handpieces in your tool count
2. Finish the labeling and organization of the tool count and carts.
3. Have a lost tool policy and procedure on file.
4. Tool count is an important task in a correctional facility. An accurate count is mandatory for the safety and security of both staff and inmate-patients.

**Sharps Count**

1. Scalpels/Blades and sutures are to be added to the Sharps Count immediately. This request was completed.

**Sharps Count - Recommendations:**

1. Accurately maintain complete sharps log and count.

**Housekeeping Logs**

Daily tasks such as purge water lines, check water in unit bottle, change ultrasonic solution, clean dental chair and carts, clean light handles and switches, empty trash bins, check emergency kit, should be signed off daily.

Weekly tasks include run spore test, run vacuum cleanser, restock supplies, clean countertops, fill out supply lists, clean ultrasonic, clean autoclave, check blood pressure cuff, change traps, check AED, check eyewash station.

Monthly tasks are check the fire extinguisher and waterline shock treatment if indicated on the mobile cart. Add other tasks as necessary.

**Housekeeping Logs - Recommendations:**

1.  Improve on the housekeeping log for proof of practice - not fully completed yet.

**Prescriptions & Stock Medications**

Medications were added to the Stock Medications log which was created by ▮▮▮▮ on the day of the audit. Antibiotics include Doxycycline 100 mg, Penicillin VK 500 mg and Clindamycin 150 mg. Analgesics include Tylenol Extra Strength 500 mg, Ibuprofen 600 mg, Ibuprofen 800 mg and Naproxen 500 mg.

**Prescriptions & Stock Medications - Recommendation:**

1.  I recommend Amoxicillin 500 mg be added to the stock medications in case it is needed for prophylactic antibiotic premedication. See antibiotic chart in footnote #22.[16] [17] [18]
2.  I recommend that only Dr. ▮▮▮▮ dispense the medications and write the log entry himself.
3.  Instructions should be given on how to take the medication and effective communication should be used to make sure the I/P knows how to take the prescription.
4.  Follow all dispensing local, state and federal guidelines.

**Recapping of needles**

Dr. ▮▮▮▮ performed single needle recapping procedures.

**Recapping of needles - Recommendations:**

---

[16] http://www.ada.org/en/member-center/oral-health-topics/antibiotic-prophylaxis,

[17] http://www.heart.org/HEARTORG/Conditions/CongenitalHeartDefects/TheImpactofCongenitalHeartDefects/Infective-Endocarditis_UCM_307108_Article.jsp#.WdGTwkyZNZ0

[18] https://www.aae.org/uploadedfiles/clinical_resources/guidelines_and_position_statements/aae_antibiotic-prophylaxis-2017update.pdf

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

1. Recommend an approved, safety recapping method as shown to ███████ in the Henry Schein dental catalog for additional safety.

**Forms (i.e. Consent Forms, Comprehensive Exam, Periodontal Chart, etc)**

As stated previously, there are no general consent for examination, x-rays, diagnosis and basic restorative treatment. There are no comprehensive exam nor periodontal charting forms. The extraction consent form can be expanded upon to give the inmate-patient additional information about the risks, benefits and alternatives of having the procedure.

A sample of the CDCR forms were faxed to ███████ for her and Dr. ███████ to review. It is important to note that no CDCR form is to be duplicated. The CDCR forms can be used as guidelines only for CFMG to make their own.

**Forms - Recommendations:**

1. Please refer to the Comprehensive Examination section and acquire the necessary forms.

**Highspeed Handpiece - Dental Delivery System**

Purchase a new dental delivery system - **Completed.**

**Highspeed Handpiece - Dental Delivery System - Recommendations:**

1. Maintain and clean the dental delivery system as recommended by the manufacturer.

# Physical Resources

**Equipment and Instruments**

No panoramic x-ray is on site. Patients are sent to the oral surgeon, Dr. ███████ for panoramic x-rays mostly for more complicated oral surgery / extraction cases and not for general evaluation or screening upon arrival. No referrals to Dr. ███████ oral surgeon, from 02/16/17 to 06/08/17 have been sent since Dr. ███████ was hired.

Taking x-rays prior to dental treatment is imperative for proper diagnosis of the oral condition in question - *radiographs are now being taken at the triage appointment to substantiate the assessment and diagnosis!*

Recommend purchasing an automatic x-ray developer which would provide better quality radiographs with long term preservation of the film - *completed, a new automatic x-ray developer is in operation.*

Recommend purchasing a new dental delivery system for the safety of inmate-patient and staff - *a new dental delivery system was purchased and is in operation.*

A regulated waste removal company is to be contracted to remove the fixer and developer from the dental clinic - *completed, Stericycle has removed the old fixer and developer and new fixer and developer being used for the automatic x-ray developer.*

**Equipment and Instruments - Recommendations:**

1. I still recommend converting to digital x-rays for less radiation to the inmate-patient, for immediate viewing of the area being evaluated, minimizes loss of chair time for retakes and increases patient treatment time as taking and developing the x-ray is instantaneous.
2. Recommendation to maintain the standard of care as established in CDCR, a Panoramic x-ray unit should be either purchased or rented to visualize the wisdom teeth and any other area where pathology cannot be evaluated with only the Full Mouth Series of x-rays.

**New Dental Clinic**

Per Captain Bass, there are no architectural plans available yet for the new dental clinic.

**New Dental Clinic - Recommendations:**

1. Dr. ███████ and myself, should be consulted on every aspect of the new dental clinic's design, flow, equipment and supplies.
2. Please provide this information prior to the next Dental Tour scheduled for December 6-7, 2017.

**Restroom Within Dental Clinic**

For proper sanitation, installation of a sink or hand wash station within the restroom - *a hand sanitizer was install within the restroom.*

Post a sign stating to wash hands before exiting the restroom - *a sign was posted indicating that hands are to be washed before exiting the restroom. The sink however is outside of the restroom.*

Remove the storage above the toilet to prevent a potential hazard - *the overhead storage was removed and the potential hazard has been eliminated.*

**Restroom Within Dental Clinic - Recommendations:**

1. Add restroom cleanliness to the daily housekeeping log and duties.
2. Clean and maintain restrooms in a correctional facility per state and federal guidelines.
3. Recommend the placement of an actual hand washing station/sink within the restroom for proper sanitation.

**Office Space Adjacent to Dental Clinic**

Move the dentist's office desk from within the dental clinic and use the break room for his office space - *this has been completed.*

Create an office area for ███████ the Dental Assistant as she needs a work area to order supplies and maintain logs - at the time of the audit, ███████ did not have a work area in the office space adjacent to the Dental Clinic. ███████ has assured me that the new Dental Assistant now has a desk and a proper working area. - **in progress.**

**Office Space Adjacent to Dental Clinic - Recommendations:**

1. Computers should be installed at both desks to access the compliance logs and future electronic health and dental record, and ideally the digital x-rays.
2. Scheduling is currently the responsibility of the dentist which I recommend this task be given to someone else, as the dentist's skills can be more efficiently utilized performing diagnosis and treatment. Auxiliary staff should be utilized for scheduling.

**Charts & EHRS (including Dental HR and Digital X-rays)**

Electronic medical record (EMR), electronic dental records (EDR) and digital x-rays are not currently implemented at Monterey County Jail and nor used by the staff of California Forensic Medical Group.

To enter or view an x-ray (or a chart note) from the dental section of the chart, it is often necessary to remove and replace over 50-100 pages of chart content.

**Charts & EHRS - Recommendations:**

1. The existing system is inefficient and the expectation is that the EMR and EDR will improve efficiency, compliance, legibility and access to the inmate-patient's true health information.
2. Having an efficient EMR will free up the dentist to initiate the mandates of the Implementation Plan. The dentist's time can be spent more effectively diagnosing, treatment planning and treating inmate-patients.  The goal for those inmate-patient  with greater than one year of incarceration should be comprehensive care rather than episodic care. Spending ancillary time such as scheduling for example should be delegated to support staff.

## Human Resources

**Dental Clinic Staffing**

See the Executive Summary.

**Dental Clinic Staffing - Recommendations:**

1. See the Executive Summary.
2. It is paramount that CFMG provide the resources for Dr. ▓▓▓▓▓ and the Dental Program to be successful. I recommend that immediate action be taken to increase the dental days to 0.8 with a 0.2 for an administrative day to initiate the recommendations set forth in the Implementation Plan.
3. An interim registry Dentist and Dental Assistant should be hired to handle the backlog of patients until a steady state can be achieved where the patients scheduled are seen on the date they are scheduled.

**Hygienist for the Periodontal Disease Program**

Same as listed in Final Report #1. There is currently no Registered Dental Hygienist hired per the Implementation Plan mandates.

**Hygienist & The Periodontal Disease Program - Recommendations:**

1. Same as listed in Final Report #1.

**Licensure and Required Certificates**

- Dr. ████████ credentials are complete except for his Hepatitis B vaccination or declination form.
- ██████ x-ray license and hepatitis form has been received. I have yet to receive her CPR card and evidence of the Dental Board of California's mandatory courses for Dental Assistants.

**Licensure and Required Certificates - Recommendations:**

1. ██████ must provide proof of courses required by the Dental Board of California for Dental Assistant and her CPR card.
2. Hepatitis B vaccination or declination form for Dr. ██████
3. As Dr. ██████ will be subbing in during periods of vacation relief, please maintain his credentials on file.

# Dental Program Management

**Dental Policies and Procedures**

Some headquarter and local MCJ policies and procedures were made available during the 2nd dental tour although I did not review them for content.

**Dental Policies and Procedures - Recommendations:**

1. Have dental policies and procedures available for all aspects of dental care at MCJ as provided by CFMG's contracted care, at the next dental tour. I have included the link to CDCR's CCHCS Policies and Procedures for your perusal.

**Grievances**

The grievance policy and process is in place although there are no running logs of grievances and when they were resolved.

**Grievances - Recommendations:**

1. Create an easy to access log of the grievances, including the resolution and completion date.
2. Per the Office of the County Counsel, "the County will look at creating a grievance log". [19]

---

[19] See Appendix, letter from Monterey County addressing custody related recommendations, August 9th, 2017

MCJ / CFMG - Dental Tour #2 Final Report - September 29, 2017

**Peer Review**

There is no Peer Review system in place. There are no HQ or local dental policies and procedures available to assist staff in establishing a Peer Review system.

**Peer Review - Recommendations:**

1. For quality of care, a confidential peer review system needs to be implemented. This would have avoided many of the pitfalls seen during this review such as signing the progress notes.

**Illness and Injury Prevention Plan (IIPP)**

A copy of the Illness and Injury Prevention Plan was in the dental clinic although I did not open it nor review its content.

**Illness and Injury Prevention Plan - Recommendations:**

1. Ensure that the IIPP is in place for the safety of the staff. More information is available at the following link including etools to assist in completing the document:
2. http://dir.ca.gov/dosh/etools/09-031/what.htm

**Quality Management Meeting Minutes**

March and June's Quality Management Meeting minutes were not finalized for review. There has previously been little information regarding to the dental program and only yearly statistics.

**Quality Management Meeting Minutes - Recommendations:**

1. Please provide the Quality Management Meeting minutes upon completion.
2. I recommend that Dr. ███████ attend all Quality Management Meetings.
3. Include the monthly dental statistics within the dental section of the quarterly Quality Management Meeting.

**Management Structure and Organizational Chart**

See Final Report #1. The Program Manager, Dentist and Dental Assistant are all relatively new. No yearly performance reviews are available yet.

**Management Structure and Organizational Chart - Recommendations:**

1. I suggest that the reporting structure be amended to reflect that the Dental Assistant reports to the Dentist in the clinical aspect and to the Director of Nursing in the administrative aspect.
2. Recommend yearly performance reviews for the dental staff.

**Required Postings in a Dental Office**

Many improvements were noted in this category although not quite complete yet.

**Required Postings in a Dental Office - Recommendations:**

1. Please see the appendix in the first final report for the required postings in a dental office.
2. Many of the employment postings can be placed in the new dental office area adjacent to the dental clinic.

# Conclusions

The best programs, I have found, are those who strive for consistent improvement by taking the time to evaluate their statistics while following their vision. The balance is finding ways to increase efficiency while maintaining excellence. In this case, the Settlement Agreement's Implementation Plan is the guide to quality dental care. Adequate staffing is the key to the success of the dental program at Monterey County Jail.

The time is now to increase dental provider staffing and ancillary dental staff to a level sufficient for all scheduled patients to be seen without being rescheduled, for the dental compliance tracking system to be implemented and utilized correctly; for continuity of care to occur; for the comprehensive dental and periodontal care program to be developed and implemented; and for the health professional staff to be trained by the dentist on the proper completion of the dental section and the odontogram, during the 14-Day Heath Inventory and Communicable Disease Screening.

This culture of continued and ongoing reschedules cannot continue. The resources must be made available so that the inmate-patients can have confidence that their dental pain and concerns will be addressed in a timely manner. It appears that undo pressure may be placed on nursing staff to accommodate dental's lack of resources in the form of more sick calls and increases in the management of patient's dental pain, while patients wait for an opening in dental's schedule. This will be studied at the next dental tour.

The 3rd Dental Tour is scheduled for December 6-7, 2017. It will combine the initial evaluation standards, from the first report, and the clinical and compliance parameters found in this report, to assess the overall health of the dental program as MCJ and CFMG strive for a signed contract.

Weekly monitoring of the Dental Compliance Tracking Log is to continue until further notice. This will be re-evaluated quarterly. Weekly monitoring includes sending the Intake, 14-Health Inventory/Physicals and Sick Call tracking logs. Consistent, legible, accurate logs are requested to assist with accumulating viable data.

Access, quality, timeliness and continuity of care is best evaluated by understanding the compliance measures necessary for a steady and stable dental program. The staff of CFMG and Monterey County Jail are well placed to perform this mission as they strive to build the foundation of their dental program. Dental staff must be given the resources of time by expanding the number of dental days to properly triage, treat, educate, schedule and monitor the quality and timely dental care afforded to the inmate-patients of the Monterey County Jail.

# Appendix 1 thru 10

Pages 47 - 130

# Appendix 1

Tables

Table 1.1 - INTAKE for MCJ - MCJ/CFMG Audit - Feb 2-3, 2017 - Protective Order

| ID # | A1.1 | A1.2 | A1.3 | A1.4 | A1.5 | A1.6 | A1.7 | A1.8 | A1.9 | A1.10 | A1.11 | A1.12 | A1.13 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incarceration | 02/21/16 | 11/28/16 | 02/18/16 | 02/29/16 | 09/08/16 | 12/21/16 | 12/21/16 | 01/24/17 | 01/23/17 | 01/25/17 | 01/24/17 | 01/26/17 | 01/28/17 | |
| MCJ Medical Intake Form completed at time of booking and Question #11 answered? SCREEN #1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 12/13 = 92% Partial Compliance |
| Is there an Indication for "DDS Referral" to be checked? | N | N | N | N | N | N | N | N | N | N | N | N | N | |
| Comments? | | | | | | Full or partial dentures? | | | | | | | | |

1

Table 1.2 - INTAKE for MCJ - MCJ/CFMG Audit - May 4-5, 2017 - Protective Order

| ID # | A2.1 | A2.2 | A2.3 | A2.4 | A2.5 | A2.6 | A2.7 | A2.8 | A2.9 | A2.10 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incarceration | 04/11/17 | 04/14/17 | 04/10/17 | 04/03/17 | 04/05/17 | 04/11/17 | 04/13/17 | 04/13/17 | 03/15/17 | 03/01/17 | |
| MCJ Medical Intake Form Completed at time of booking and Question #11 answered? SCREEN #1? | 0 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 8/10 = 80% Partial Compliance |
| Comments? | Note: I/P used sister's name - Chart name, DOB, health history and chart entries incorrectly matched. Advised medical records, chart later corrected. | | | | | | | | | | |

1

39-50

Table 2.1 - INTAKE for CFMG - MCJ/CFMG Audit - Feb 2-3, 2017 - Protective Order

| ID # | B1.1 | B1.2 | B1.3 | B1.4 | B1.5 | B1.6 | B1.7 | B1.8 | B1.9 | B1.10 | B1.11 | B1.12 | B1.13 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incarceration | 02/21/16 | 11/28/16 | 02/18/16 | 02/29/16 | 09/08/16 | 12/21/16 | 12/21/16 | 01/24/17 | 01/23/17 | 01/25/17 | 01/24/17 | 01/26/17 | 01/28/17 | |
| CFMG Intake Triage Form Completed at time of booking? SCREEN 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 12/13 = 92% = Partial Compliance, although there is no log for inmate/ patients referred to Dental at Intake. |
| Were entries legible and all signatures present? SCREEN 2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 13/13 = 100% Substantial Compliance |
| Chronic Care Issue? | No | No | No | Asthma | Psych | Not reviewed | Not reviewed | Not reviewed | Not reviewed | Not reviewed | Not reviewed | Not reviewed | Not reviewed | |
| Were Urgent / Emergent dental needs identified? | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| Was "DDS Category" checked for referral to Dental? | No | No | No | No | No | No | No | No | No | No | No | No | No | |
| If yes, was referral to Dental completed and scheduled? SCREEN 3 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NOT APPLICABLE - No set of criteria present for this screen |
| Type of Referral - Onsite Medical (OSM), Physician On Call (POC), Onsite Dentist (OSD) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| Where was I/P treated? Onsite or Offsite? | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| When was I/P seen Offsite or Onsite? | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| Was I/P seen in Dental within timeframe? If I/P seen Offsite, was there a follow up with Onsite Dentist at next scheduled Dental day? SCREEN 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NOT APPLICABLE - No set of criteria present for this screen |
| Comments? | | | | Although DDS referral not checked, I/P was seen 3/10/16 for Juvenile hall requested orthodontic appointment. | | | | | | | | | | |

1

Table 2.2 - INTAKE CFMG - MCJ/CFMG Audit - May 4-5, 2017 - Protective Order

| ID # | B2.1 | B2.2 | B2.3 | B2.4 | B2.5 | B2.6 | B2.7 | B2.8 | B2.9 | B2.10 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incarceration | 04/11/17 | 04/14/17 | 04/10/17 | 04/03/17 | 04/05/17 | 04/11/17 | 04/13/17 | 04/13/17 | 03/15/17 | 03/01/17 | |
| CFMG Intake Triage Form completed at time of booking? SCREEN 1 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 9/10 = 90% **Partial Compliance** |
| Were entries legible and all signatures present? SCREEN 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 - | 0 | 0 | 1/10 = 10% **Non Compliance** |
| Chronic Care Issue? | N | N | N | N | N | N | N | N | N | N | |
| Were Urgent / Emergent dental needs identified? | N | N | N | N | N | N | N | N | N | N | |
| Was "DDS Category" checked for referral to Dental? | N | N | N | N | N | N | N | N | N | N | |
| If yes, was referral to Dental completed and scheduled? SCREEN 3 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NOT APPLICABLE - No set of criteria present for this screen |
| Type of Referral - Onsite Medical (OSM), Physician On Call (POC), Onsite Dentist (OSD) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| Where was I/P treated? Onsite or Offsite? | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| Was I/P seen in Dental within timeframe? If I/P seen Offsite, was there a follow up with Onsite Dentist at next scheduled Dental day? SCREEN 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | NOT APPLICABLE - No set of criteria present for this screen |

| ID # | B2.1 | B2.2 | B2.3 | B2.4 | B2.5 | B2.6 | B2.7 | B2.8 | B2.9 | B2.10 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Comments? | I/P used her sister's name - Chart name, DOB, health history and chart entries incorrectly matched. Advised medical records, chart later corrected. | Note: I/P placed on sick call for swollen right hand and added Dental Pain on 4/17/17 and on 5/2/17 at the 14 Day HICDS, "top left back needs to be pulled". Dr. ▇▇▇ did triage on 4-26-17. PA #13 &14 taken including half of tooth #12. Of the portion #12 taken in radiograph, #12 is grossly decayed to pulp. Note that x-ray is already decaying and nearly not diagnostic. No additional PA of #12 taken to evaluate remainder of decayed tooth #12. Additionally, there were spaces above the chart entry and the chart entry was not signed with the printed | No co-signature. | No co-signature. | No co-signature. | No co-signature. | No co-signature. | No co-signature. | No co-signature. | No co-signature. | |

53

2

Table 3.1 - 14 Day Health Inventory & Communicable Disease Screen (HI&CDS) - MCJ/CFMG Audit - Feb 2-3, 2017 - Protective Order

| ID # | C1.1 | C1.2 | C1.3 | C1.4 | C1.5 | C1.6 | C1.7 | C1.8 | C1.9 | C1.10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incarceration | 09/08/16 | 01/11/17 | 8/1/16 re-admission | 10/07/16 | 10/11/16 | 06/29/15 | 06/15/16 | 10/06/16 | 01/13/16 | |
| When was HI&CDS Form Completed? | 09/21/16 | 01/21/17 | 08/08/16 | 10/14/16 | 10/17/16 | 07/28/15 | 06/26/16 | 10/13/16 | 01/15/16 | |
| Was the HI&CDS completed within 14 days? SCREEN 1 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 8/9 = 89% Partial Compliance |
| Did I/P self identify #8 "Dental" as a problem? | N | N | N | N | N | N | N | N | N | |
| Per Implementation Plan A & A.2., was the general condition of the patient's dentition, missing or broken teeth, evidence of gingival disease, mucosal lesions, evidence of infection, recent trauma, infection, facial difficulty swallowing, chewing and /or other functional impairment noted in the "Dental screening comments". SCREEN 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0/9 = 0% Non Compliance |
| Was the odontogram completed? SCREEN 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0/9 = 0% Non Compliance |
| Are the entries legible and do entries have a legible signature, printed name & title and credential of the person making the entry? SCREEN 4 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 6/9 = 67% Non Compliance |
| Were Urgent (U) / Emergent (E) dental needs identified? | N | N | N | Y | Y | N | N | Y | N | |
| Was "Refer to: DDS" checked and referral to Dental completed and scheduled? SCREEN 5 | N/A | N/A | 0 | 0 | 0 | N/A | N/A | 0 | N/A | 0/4 = 0% Non Compliance |
| Type of Referral - Onsite Medical (OSM), Physician On Call (POC), Onsite Dentist (OSD) | N/A | N/A | None | OSD | OSD | N/A | N/A | OSD | N/A | |
| Was I/P seen in Dental within timeframe? If I/P seen Offsite, was there a follow up with Onsite Dentist at next scheduled Dental day? SCREEN 6 | N/A | N/A | 0 | 1 | 1 | N/A | N/A | 1 | N/A | 3/4 = 75% Non Compliance |

1

| ID # | | C1.1 | C1.2 | C1.3 | C1.4 | C1.5 | C1.6 | C1.7 | C1.8 | C1.9 | C1.10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Comments? | | Under older booking #, dental screening not completed but under this new one, HI&CDS completed | | The initial Health Inventory form on 6/6/12 was not filled in. Jail Re-admission form used. On 10/18/16 Sick Call, RN identifies that there is "obvious signs of decay" on upper and lower left molars. This should have been identified at 14 Day Health Inventory and placed on Odontogram with a Dental Level 2 referral to Dental for evaluation of decay. | At time of Health Inventory, clinician wrote "R top wisdom tooth issue" but did not describe the issue nor if there was any obvious decay, swelling, etc. Unknown if mouth inspection performed or just if I/P interviewed. Referral to dental made as pt seen on 10/20/16 but "Refer to DDS" not checked on form. Pt had triage on 10/20/16. Pt had sick call request for #20 on 11/29/16 although unknown if the tooth was broken off or decayed at time of 14 Day exam as no mouth evaluation noted. | No reviewed by signature. Referred to DDS not checked although referral to dental took place, form said "has tooth pain, consultation" and was seen by dentist on 10-20-16. | Not reviewed by medical provider. Case review: ***** #10 fractured 4/8/16 and as of 2/27/17, pt has not had RCT. | No reviewed by signature | Says "Broken molar R lower side". Pt was scheduled with dental on 10/20/17 to address tooth #30 (lower right side) but refer to DDS not checked on form. | Pt saw dentist for triage and it was recommended that multiple teeth be extraction #2,14,16, 17. Decay visibly evident #2 and #14 which could have been indicated on odontogram and referred to dental rather than through sick call process on 3/18/16. | |

Table 3.2 - 14 Day Health Inventory & Communicable Disease Screen (HI&CDS) - May 4-5, 2017 - Protective Order

| ID # | C2.1 | C2.2 | C2.3 | C2.4 | C2.5 | C2.6 | C2.7 | C2.8 | C2.9 | C2.10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incarceration | 04/11/17 | 04/14/17 | 04/10/17 | 04/03/17 | 04/05/17 | 04/11/17 | 04/13/17 | 04/13/17 | 03/15/17 | 03/01/17 | |
| When was HI&CDS Form Completed? | 04/24/17 | 05/02/17 | 04/22/17 | N/A (Pt Refused) | 04/16/17 | 04/21/17 | 04/26/17 | 04/25/17 | 03/24/17 | 03/09/17 | |
| Was the HI&CDS completed within 14 days? SCREEN 1 | 1 | 0 | 1 | N/A (Pt Refused) | 1 | 1 | 1 | 1 | 1 | 1 | 8/9 = 89% Partial Compliance |
| Did I/P self identify #8 "Dental" as a problem? | N | N | N | N/A (Pt Refused) | N | N | N | N | N | N | |
| Per Implementation Plan A & A.2., was the general condition of the patient's dentition, missing or broken teeth, evidence of gingival disease, mucosal lesions, evidence of infection, recent trauma, infection, facial difficulty swallowing, chewing and /or other functional impairment noted in the "Dental screening comments". SCREEN 2 | 0 | 0 | 0 | N/A (Pt Refused) | 0 | 0 | 0 | 0 | 0 | 0 | 0/9 = 0% Non Compliance |
| Was the odontogram completed? SCREEN 3 | 0 | 0 | 0 | N/A (Pt Refused) | 0 | 0 | 0 | 0 | 0 | 0 | 0/9 = 0% Non Compliance |
| Are the entries legible and do entries have a legible signature, printed name & title and credential of the person making the entry? SCREEN 4 | 1 | 0 | 0 | N/A (Pt Refused) | 0 | 0 | 0 | 1 | 0 | 1 | 3/9 = 33% Non Compliance |
| Were Urgent (U) / Emergent (E) dental needs identified? | N, but should have indicated #32 as needing referral to dental due to gross decay. Pt not referred. Pt filled out sick call slip 5 days after 14 Day HICDS. | N. Although I/P already scheduled in Dental due to sick call on 04/17/17 | N | N/A (Pt Refused) | N | N | N | N | N | N | |
| Was "Refer to: DDS" checked and referral to Dental completed and scheduled? SCREEN 5 | 0 | 0 | N/A | N/A (Pt Refused) | N/A | N/A | N/A | N/A | N/A | N/A | 0/1 = 50% Non Compliance |

1

| ID # | C2.1 | C2.2 | C2.3 | C2.4 | C2.5 | C2.6 | C2.7 | C2.8 | C2.9 | C2.10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of Referral - Onsite Medical (OSM), Physician On Call (POC), Onsite Dentist (OSD) | N/A | OSM. Pt then scheduled with Dental | N/A | N/A (Pt Refused) | N/A | N/A | N/A | N/A | N/A | N/A | |
| Was I/P seen in Dental within timeframe? If I/P seen Offsite, was there a follow up with Onsite Dentist at next scheduled Dental day? SCREEN 6 | N/A | N/A | N/A | N/A (Pt Refused) | N/A | N/A | N/A | N/A | N/A | N/A | NOT APPLICABLE |
| Comments? | On 4/29/17 sick call slip for "very bad tooth". Received 4/29/17 and triaged #32 by PAc (whose handwriting is exceptional!). Given Dental Level 2 and scheduled for 5/10/17 with dentist. Dental odontogram not filled in but says in dental section "one tooth missing top right". Note: if #32 very decayed, should have been marked on HICDS form and odontogram and was not. | Pt already scheduled due to sick call on 04/17/17. "Top left back needs to be pulled". Good start but additional information needs to be added about pt's condition and rest of mouth | No reviewed by signature | Refusal signed. Staff to follow up with patient | No interviewed by, and no reviewed by signature | No reviewed by signature. . Says no complaints but this doesn't identify if anything was reviewed or indicate patient's mouth condition | No reviewed by signature. No dental complaints but doesn't identify if anything was reviewed in patient's mouth | "last screening 2016, pt denies current problems". This also does not identify if anything reviewed in patient's mouth | No reviewed by signature. No dental complaints but does not identify if anything reviewed in patient's mouth | "Dental several months ago. No complaints at this time". This also does not identify if anything reviewed in patient's mouth | |

2

Table 4.2 Sick Call - MCJ/CFMG Audit - May 4-5, 2017 - Protective Order

| Assigned ID # | D2.1 | D2.2 | D2.3 | D2.4 | D2.5 | D2.6 | D2.7 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|
| Date of Incarceration | 04/20/17 | 04/19/17 | 01/17/17 | 04/12/17 | 09/20/16 | 12/06/16 | 11/15/16 | |
| When was Sick Call initiated? | 04/26/17 | 04/23/17 | 03/15/17 | N/A | N/A | 03/17/17 | 04/10/17 | |
| When was Sick Call accepted? | 04/26/17 | 04/26/17 | 03/15/17 | N/A | N/A | 03/17/17 | 04/10/17 | |
| When was patient triaged by medical? | 04/26/17 | 04/26/17 | 03/22/17 | N/A | N/A | 03/20/17 | ? | |
| Was I/P triaged by medical within timeframe?  SCREEN 1 | 1 | 1 | 0 | N/A | N/A | Notes not located | Notes not located | 2/3 = 67% Non Compliance |
| Scheduled as Dental Level 1 (Next dental day) or Level 2 (within 14 days) | Dental Level I | Dental Level I | Dental Level I STAT | N/A | N/A | Dental Level I | Dental Level II | |
| When was I/P Scheduled in Dental? | 5/4/2017. Dental Level I but pt not scheduled on next dental day which was 4/27/17 | 5/4/2017. Dental Level I but pt not scheduled on next dental day which was 4/27/17 | 3/30/17. Next dental day was 3/23/17 | N/A | N/A | 3/29/17. Next dental day was 3/23/17. | 04/13/17 | |
| When was I/P seen in Dental Clinic? | 05/04/17 | 05/04/17 | 03/30/17 | N/A | N/A | 03/29/17 | 04/13/17 | |
| Was patient seen for dental triage within timeframes? SCREEN 2 | 0 | 0 | 0 | N/A | N/A | 0 | 1 | 1/5 = 20 % Non Compliance |
| Is the Dx present and correct based on objective findings? SCREEN 3 | 0 | 1 | 0 | N/A | N/A | Pt refused | 1 | 2/4 = 50% Non Compliance |
| Was a Dental Priority Code of 1A, 1B, 1C, 2 prescribed at triage? SCREEN 4 | 0 | 1 | 0 - no progress note for 4/27/17 | N/A | N/A | N/A | Pt to have crown done on outside once pt is release in 2 months | 1/3 = 33% Non Compliance |
| Was triage and treatment completed at the triage appointment? | Yes | No | No handpiece on 3/30/17 | N/A | N/A | N/A | N/A | |
| Was Inmate/patient treated Onsite or Offsite for this problem? | Onsite treatment | Onsite triage | Onsite | N/A | N/A | N/A | N/A | |
| If I/P seen Offsite, was there a follow up with Onsite Dentist at next dental day after Offsite Tx? SCREEN 5 | N/A | N/A although it was recommended to patient to go to WDS to complete care when released | N/A | N/A | N/A | N/A | N/A | N/A = no parameters meet the criteria |

39-58

| Assigned ID # | D2.1 | D2.2 | D2.3 | D2.4 | D2.5 | D2.6 | D2.7 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|
| Triage? Extraction? Restorative? Periodontal? Prosthodontics? Endodontic? Palliative? | Extraction | Triage | Extraction | N/A | N/A | N/A | N/A | |
| Was I/P's complaint of dental pain/concern addressed? SCREEN 6 | 1 | 1 | 1 | N/A | N/A | N/A | N/A | 3/3 = 100% Substantial Compliance |
| Was I/P's complaint of cavities, fractured fillings or broken teeth addressed and stabilized? SCREEN 7 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A = no parameters meet the criteria |
| Med Hx completed, updated and signed by pt and dentist? SCREEN 8 | 0 | 0 | 0 - no progress note for 4/27/17 exraction | N/A | N/A | N/A | 0 | 0/4 = 0 % Non Compliance |
| Allergies reviewed? SCREEN 9 | 0 | 0 | 0 - no progress note for 4/27/17 exraction | N/A | N/A | N/A | 0 | 0/4 = 0 % Non Compliance |
| Was medication indicated and prescribed at the time of the triage appointment? | No but prescribed day before by medical | Yes | 0 - no progress note for 4/27/17 exraction | N/A | N/A | N/A | No | |
| If so, was medication received timely by the I/P following the procedure? SCREEN 10 | 0 | 1 | 0 - no progress note for 4/27/17 exraction | N/A | N/A | N/A | N/A | 1/2 = 50% Non Compliance |
| Was SOAP legible? Do entries have legible printed name, signature and credential of person making the entry? SCREEN 11 | 0 | 0 | 0 - no progress note for 4/27/17 exraction | N/A | N/A | 0 | 0 | 0/5 = 0% Non Compliance |

| Assigned ID # | D2.1 | D2.2 | D2.3 | D2.4 | D2.5 | D2.6 | D2.7 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|
| Comments | 14-Day Health Inventory on 5/1/17 states "all molars rotted and wisdom teeth coming in". The refer to DDS was not checked. **NO PROGRESS NOTES** for 5/4/17 appointment although x-ray consent form, x-ray of #31 and extraction consent form for #31 is present and signed. No other appointments noted for other rotted molars. Prescriptions given by medical on 5/3/17. SC slip on 5/4/17 says pain level 10+ and "still bleeding lots, need to see dentist ASAP". Pt not in custody on 5/5/17. | Medical intake not completed and blood draw unable to have venous access, so no full review of medical and therefore, dental progress notes state HQR (Health Questionnaire Reviewed) but none filled out. Pt also leaving custody within a few days/ weeks of dental appt. Note that irreversible pulpitis is a diagnosis rather than an objective finding. The objective findings for irreversible pulpitis is at a minimum lingering hot temperature sensitivity. Recommend to list all objective findings to substantiate diagnosis. Dental Progress note not signed. | Pt first requested to be seen regarding wisdom tooth on 1/17/17. Pt seen for triage on 2/2/17 and DPC given as 1C. Pt appointed on 3/30/17 but handpiece and delivery system hadn't arrived yet. Pt then seen for extraction, extraction consent form and compliance tracking log indicate pt seen on 4/27/17 and had extraction. Post op check on 5/4/17 indicate pt healing well. **NO PROGRESS NOTES** for 4/27/17. | Pt diabetic. Not seen by dental nor referred to dental for diabetic condition. | Pt never seen in dental. Hx of dementia. | Dental refusal signed but not dated. Progress note signed but no printed name or credentials. | Recommend stating significant medical findings and allergy status in progress notes. | |

3

39-60

Table 5.1 - Comprehensive Care - MCJ/CFMG Audit - Feb 2-3, 2017 - Protective Order

| Assigned ID # | E1.1 | E1.2 | E1.3 | E1.4 | E1.5 | E1.6 | E1.7 | E1.8 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|---|
| Date of Incarceration | 9/26/14 | 5/28/15 | 10/29/15 | 11-23-13 | 9-25-15 | 7-5-16 | 1/18/17 | 10-6-15 | |
| When I/P eligible for comp exam? | 9/26/15 | 5/28/16 | 10/29/16 | 11-23-14 | 9-25-16 | N/A | N/A | 10-6-16 | |
| When was I/P seen for Comprehensive Exam? SCREEN 1 | 0 | 0 | 0 | 0 | 0 | N/A | N/A | 0 | 0/6 = 0% Non Compliance |
| Did I/P meet mandated timeframe? SCREEN 2 | 0 | 0 | 0 | 0 | 0 | N/A | N/A | 0 | 0/6 = 0% Non Compliance |
| Comments? | No recent health inventory, last on 2013. Pt seen for trophy 12/18/15. Prophy, per measurements 2-3, no diagnosis. Only dental appointment seen. Hypertension listed as problem. ***No xrays. ***No blood pressure taken. ***No annual exam on file | 12/1/15 6 months physical exam. None after that. ***10/6/16 pt says wants to be seen by dental to discuss extra needs. No further appointments given. For Heath screening, no comments in dental section to show that dental screening was done and this was in 06/05/15 | never seen in dental, no sick calls. Dental part of Health screening not completed 11/8/15 | Screening done 12/5/13. HTN and Diabetes. Pt was seen for sick call on 5/19/16. seen 5/19/16 for a triage, 4 BWX taken, PC 4 mm probe readings with 1-2 mm recession | Jail readmission 9/27/15 says "DDS/ 2005/pulled tooth". Seen in dental on 1/26/17 for tooth #14, no X-ray taken, diagnosis failure unrestorable, next visit extraction 1C. | 9-30-15 health inventory filled says 20 yrs ago Broken molars, odontogram not filled in. Physical assessment exam done 09-14-16 states dental neglect. | sick call 10-30-15. Seen dental 11-6-15 unclear #8 but is #9 says temp indicated. Placed Fuji II??? No x-ray | 10/6/16 Triage #19. Tx for triage concern 10-07-16 for cleaning/scaling. Consent signed on surgical consent form. No dx. One PA 10-06-16. Pt seen 10/29/15 for eval #14 no xray Seen 1-14-16. Leaking heart valve stated on 10-19-15 on health inventory. Stating cardiac surgery for hole/ leak. See 4-13-2010 and echo was 2-25-10 heart septal defect on physician's note.***NEED PREMEDICATION not evaluated prior to caries control #14, no X-ray. Sick call on 10-01-16. then Triage 10-06-16 and cleaning 10-07-16. | |

1

Table 5.2 - Comprehensive Care - MCJ/CFMG Audit - May 4-5, 2017 - Protective Order

| Assigned ID # | E2.1 | E2.2 | E2.3 | E2.4 | E2.5 | E2.6 | E2.7 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|
| Date of Incarceration | 11/20/2012 | 5/3/14 | 8/28/2015 | 1/22/14 | 7/23/15 | 12/17/14 | 1/13/14 | |
| When is I/P eligible for comp exam? | 5/19/14??? | 5/3/15 | 8/28/16 | 1/22/15 | 7/23/16 | 12/17/15 | 1/13/15 | |
| Was I/P seen for Comprehensive Exam? SCREEN 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0/7 = 0% Non Compliance |
| Did I/P meet mandated timeframe? SCREEN 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0/7 = 0% Non Compliance |
| Comments? | N, seen by dental 1/10/13 for triage for extraction #31 nv. No x-ray. 1/5/2017 but kept same booking number (5/19/13) | N, last seen in dental 1-19-17 for extraction #17. | N, never seen in dental. | N, never seen in dental. | SC on 3/28/17, triaged 3/30/17, seen by medical 3/30/17 for a dental level 1, seen by dental on 4/13/17. PA but No BWX, so can't see interproximal, appears to have periodical lucency at apex #3 with recurring decay under existing MO amalgam. No evaluation of #4. No objective findings on #3 other than decay MB cusp, says restorable with Crown/RCT. No mention if patient to pay for service, if not then crown/rct not covered benefit??? No pain profile to indicate if pain with tooth, no medication prescribed. Periapical lucency not discussed although RCT recommended. No signature. NV MOB temp but it would be a pulpotomy or pulpectomy. 1C DPC given. Pt currently schedule for 06/14/17 and therefore is scheduled out of compliance. | Pt has diabetes. with A1c of 6.7. N, never seen in dental. | N, never seen in dental. | |

Table 6.2 - Dental Compliance — MCJ/CFMG Audit - May 4-5, 2017 - Protective Order

| ID # | F2.1 | F2.2 | F2.3 | F2.4 | F2.5 | F2.6 | F2.7 | F2.8 | F2.9 | F2.10 | F2.11 | F2.12 | F2.13 | F2.14 | F2.15 | F2.16 | F2.17 | F2.18 | F2.19 | F2.20 | F2.21 | F2.22 | F2.23 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incarceration | 02/07/17 | 02/04/17 | 03/28/17 | 10/19/16 | 02/11/17 | 11/02/16 | 12/08/16 | 01/14/17 | 01/15/17 | 10/13/16 | 01/03/17 | 09/27/16 | 07/20/16 | 02/14/17 | 11/12/16 | 03/04/17 | 3/26/17 ??? | 02/14/17 | 06/09/15 | 02/06/17 | 02/22/17 | 02/11/17 | 12/31/16 | |
| Source of Referral | Sick Call | - | Sick Call | Sick Call | Sick Call | Sick Call | Sick Call | Sick Call | Sick Call | Sick Call | Sick Call | Sick Call | Sick Call | Sick Call | Sick Call | Provider Request | Sick Call | Sick Call | Sick Call | Sick Call | Intake | Sick Call | Sick Call | |
| Date of Initial Request | - | - | 02/27/17 | | 02/21/17 | 02/27/17 | 02/23/17 | 01/23/17 | 01/23/17 | 01/25/17 | 03/01/17 | 01/16/17 | 02/20/17 | 02/23/17 | 02/27/17 | 03/01/17 | 03/01/17 | 02/24/17 | 01/23/17 | 03/16/17 | 02/23/17 | 03/24/17 | 01/05/17 | |
| Date Seen in Dental | 03/01/17 | 03/01/17 | 03/01/17 | 03/01/17 | 03/01/17 | 03/01/17 | 03/01/17 | 03/01/17 | 03/01/17 | 03/01/17 | 03/01/17 | 03/01/17 | 03/02/17 | 03/02/17 | 03/02/17 | 03/02/17 | 03/01/17 | 03/02/17 | 03/02/17 | 03/02/17 | 03/02/17 | 03/02/17 | 03/02/17 | |
| Xray of diagnostic quality taken at time of triage? SCREEN 1 | 1 | 1 | 0 | 1 | 1 | 1 | N/A | 0 | 1 | 1 | 1 | 1 | 1 | N/A | 1 | 1 | N/A | 0 | 1 | N/A | 1 | 1 | 1 | 18/19 = 84% Partial Compliance |
| DPC | 1A | - | 1A | – | – | 1A | N/A | 1C | - | 1B | – | 1C | 1B | Refused | 1A | – | Refused | - | None given | Refused | 1B | 0 | 1C | |
| Date Pt seen for dental tx after triage | 3/6/17 | - | 3/2/17 | 03/01/17 | 3/1/17 - Refused tx | 3/1/17 | N/A | 5/3/17 | 3/1/17 | 5/9/17 | 2/22/17 | 2/23/17 | 4/5/17 | N/A | 3/2/17 | - | - | - | N/A | - | 4/6/17 | N/A pt to released | 3/2/17 | |
| Was tx performed within timeframe of DPC. SCREEN 2 | 0 | - | 0 | 1 | 1 | 1 | N/A | 0 | 1 | 0 | 1 | 1 | 0 | N/A | 1 | - | - | N/A | N/A | - | 0 | N/A | 1 | 9/14 = 57% Non Compliance |
| Was a general consent reviewed and signed at time of triage? SCREEN 3 | 0 | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | N/A | 0 | - | - | 0 | 0 | - | 0 | 0 | 0 | 0/18 = 0% Non Compliance |
| Are records legible? SCREEN 4 | 1 | - | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | - | - | 1 | 1 | - | 1 | 0 | 1 | 17/19 = 90% Partial Compliance |
| Is progress note signed w/ credentials, and printed name or name stamp? SCREEN 5 | 0 | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | - | 0 | 0 | - | 0 | 0 | 0 | 0/19 = 0% Non Compliance |
| Comments | Extraction consent present. Pt seen also 4/27/17, progress note says 4/26/17, triage states 1A for next visit but not seen for ext yet. Also not listed in compliance tracker | PA #2, 3, 4, 5 (decay on #2) not noted? Chart not sent but progress note says nv extractions and no DPC given and not seen in logs for a return appt for ext. Disqualifie d this chart for audit | No X-ray in chart although notes say x-ray #13 taken. Says nv 1A but not seen until next day and says refused. No dental notes in chart, only noted in compliance tracker | Pt refused tx on 3/1/17. | No DPC given. No refusal on file for refusal on 3/1/17. Missing credential s and printed name. | Extraction consent present but no general consent form | Pt requested wax for brackets | Only X-ray for #20 but not for #9 Signed chart note but no indication that suture placed. Signed but no printed name or credential | Extraction consent given. Says tap made for ext, no indication that suture placed. Signed consent | Extraction performed outside of 18 status. Extraction consent form signed but no general consent | Was scheduled on 2/6/17 but never seen. Treatment #18 done on 2/22/17. No DPC given but clinician new to program. Several different teeth identified as having pain during additional SC on 3/15/17. Xray taken only of one area, large cone cut noted. Extraction consent given but not general consent. | Extraction consent present but no general consent. | Extraction consent but no general consent. | | Consent for extraction but no general consent form. | Disqualifie d, no chart | See 3/1/17 | No x-ray in chart although notes say PA #15. Compliance log says some 3/2/17 but progress note says 3/1/17 | Pt referred to Western Dental for tx on several occasions , pt still not seen. Notes signed but no credential s or name printed/ name stamp. | Soft tissue lesion from tooth infection, pt referred to Western Dental | No dental progress not in chart | Extraction consent says tooth #2 in one area and #20 in another. Pt not reappoint ed for other previously triaged teeth (#15 & #16) for extraction s |

Table 7.1 - Restorative - MCJ/CFMG Audit - Feb 2-3, 2017 - Protective Order

| Assigned ID # | G1.1 | G1.2 | G1.3 | G1.4 | G1.5 | G1.6 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|
| Date of Incarceration | 7/8/16 | 7/19/16 | 3/28/16 | 1/26/17 | 8/27/16 | 8/5/13 | |
| SC or was a Comprehensive Exam completed before extraction? | SC | SC | SC | SC | SC | SC | |
| What Dental Priority System was prescribed, 1, 2, 3, 4, 5 at Triage for this restorative dental treatment? | N/A | 2 | 1C | N/A | N/A | 2 | |
| Was pt seen within timeframes? SCREEN 1 | N/A | 1 | 1 | N/A | N/A | N/A | 2/2 = 100 % Substantial Compliance |
| Signed informed consent? SCREEN 2 | N/A | 0 | 0 | N/A | N/A | N/A | 0/2 = 0% Non Compliance |
| Was there a diagnostic X-ray taken at the time of triage? SCREEN 3 | N/A | 0 | 0 | N/A | N/A | N/A | 0/2 = 0% Non Compliance |
| Diagnosis present and correct? SCREEN 4 | N/A | 0 | 0 | N/A | N/A | N/A | 0/2 = 0% Non Compliance |
| Was DMFS given and signed? SCREEN 5 | N/A | 0 | 1 | N/A | N/A | N/A | 1/2 = 50% Non Compliance |
| Was health history reviewed and blood pressure taken? SCREEN 6 | N/A | 1 | 1 | N/A | N/A | N/A | 2/2 = 100% Substantial Compliance |
| Was material used listed in SOAP? SCREEN 7 | N/A | 1 | 1 | N/A | N/A | N/A | 2/2 = 100% Substantial Compliance |
| Was SOAP progress note legible? SCREEN 8 | N/A | 1 | 1 | N/A | N/A | N/A | 2/2 = 100% Substantial Compliance |
| Do entries have legible signature, title and credential of person making the entry or name stamp with authentication by the person making the entry? SCREEN 9 | N/A | 0 | 0 | N/A | N/A | N/A | 2/2 = 0% Substantial Compliance |

| Assigned ID # | G1.1 | G1.2 | G1.3 | G1.4 | G1.5 | G1.6 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|
| Comments | Not restorative, pt seen for extraction | SC on 9/22/16 consent form was extraction consent with extraction risks, benefits and alternatives and not restorative. Chart signed but same not printed/ name stamp | Consent form was extraction consent with extraction risks, benefits and alternatives and not restorative | Not restorative, seen for extraction | Orthodontic removal | Not in custody when pt scheduled for fillings. Says PA taken, x-rays not available for evaluation | |

2

Table 7.2 - Restorative - MCJ/CFMG Audit - May 4-5, 2017 - Protective Order

| Assigned ID # | G2.1 | G2.2 | G2.3 | G2.4 | G2.5 | SCREEN RESULTS |
|---|---|---|---|---|---|---|
| Date of Incarceration | - | - | - | - | - | |
| SC or was a Comprehensive Exam completed before extraction? | SC as comp program not started yet | SC as comp program not started yet | SC as comp program not started yet | SC as comp program not started yet | SC as comp program not started yet | |
| What Dental Priority System was prescribed, 1, 2, 3, 4, 5 at Triage for this restorative dental treatment? | No restorative patients seen | No restorative patients seen | No restorative patients seen | No restorative patients seen | No restorative patients seen | |
| Was pt seen within timeframes? SCREEN 1 | 0 | 0 | 0 | 0 | 0 | 0/5 = 0% Non-compliance |
| Signed informed consent? SCREEN 2 | 0 | 0 | 0 | 0 | 0 | 0/5 = 0% Non-compliance |
| Was there a diagnostic X-ray taken at the time of diagnosis? SCREEN 3 | 0 | 0 | 0 | 0 | 0 | 0/5 = 0% Non-compliance |
| Diagnosis present and correct? SCREEN 4 | 0 | 0 | 0 | 0 | 0 | 0/5 = 0% Non-compliance |
| Was DMFS given and signed? SCREEN 5 | 0 | 0 | 0 | 0 | 0 | 0/5 = 0% Non-compliance |
| Was health history reviewed and blood pressure taken? SCREEN 6 | 0 | 0 | 0 | 0 | 0 | 0/5 = 0% Non-compliance |
| Was material used listed in SOAP? SCREEN 7 | 0 | 0 | 0 | 0 | 0 | 0/5 = 0% Non-compliance |
| Was SOAP progress note legible? SCREEN 8 | 0 | 0 | 0 | 0 | 0 | 0/5 = 0% Non-compliance |
| Do entries have legible signature, title and credential of person making the entry or name stamp with authentication by the person making the entry? SCREEN 9 | 0 | 0 | 0 | 0 | 0 | 0/5 = 0% Non-compliance |
| Comments | 5 charts of restorative cases requested. Per dentist and dental assistant, no charts submitted because no restorative procedures done from 02/16/17 to 5/4/17. | | | | | |

39-66

Table 8.2 - Extraction - MCJ/CFMG Audit - May 4-5, 2017 - Protective Order

| Assigned ID # | H2.1 | H2.2 | H2.3 | H2.4 | H2.5 | H2.6 | H2.7 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|
| Date of Incarceration | 8/3/16 | 3/6/17 | 2/1/17 | 1/14/17 | 12/18/16 | 1/12/17 | 9/27/16 | |
| SC or was a Comprehensive Exam completed before extraction? | SC | SC | SC | SC | SC | SC | SC | |
| Was Dental Priority Code (DPC) prescribed, SCREEN 1 | 0. No DPC given and should have been given a DPC for #2. | 1. Yes for 3/30/17 but no for 4/13/17 | 0. No DPC in progress note but given a 1B in tracking tool | 0. Yes on his private notes but not on progress note | 0 | 0 | 1 | 2/7 = 29% Non Compliance |
| Was pt seen within SC timeframes? SCREEN 2 | 0. No for first SC on 3/2/17 and yes for SC on 4/20/17 | 0, pt not seen on next dental day although seen the next day after that. | 0 | Unable to determine | 1 | 0 | 1 | 2/6 = 33% Non Compliance |
| Was BP taken before procedure? SCREEN 3 | 0. BP not taken before procedure | 1 | 1. N on progress note but Y on consent form | 0 | 1. Y on consent form but not progress note. | 0 | 1. Y on consent form but not on progress notes | 4/7 = 57% Non Compliance |
| Does pt require premedication? | N | N | N | N | N | N | N | |
| Is pt on anticoagulant therapy? | N | N | N | N | N | N | N | |
| Was there a diagnostic x-ray taken at the triage appointment? SCREEN 4 | 1 | 1 | 1. Y but #10 not completely present | 1. PA - #12 decayed | 1. Yes but film already starting to break down, not fixed completely | 1. PA taken 2/22/17 of #14 and #15 distal decay to near pulp although no BWX taken to view occlusal view. | 1 | 7/7 = 100% Substantial Compliance |
| Signed extraction informed consent? SCREEN 5 | 1 | 1. Y but need better form and form not dated or time listed. Appears #32 is in radiograph, unable to visualize, would have needed another PA | 0. #10 not consented. | 1. Y for #12 | 0. #32 but not #31 and #31 and #32 extracted on 4/13/17 | 0. No consent seen in chart | 1 | 4/7 = 57% Non Compliance |
| Dx present and correct? SCREEN 6 | PC | PC, under A no teeth number listed | PC "hopeless teeth" | PC | PC | PC see comments | Y | To be discussed with Dentist |
| Was analgesic prescribed after extraction? SCREEN 7 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7/7 = 100% Substantial Compliance |
| Did I/P receive medication timely? SCREEN 8 | 0 | 1. Possibly as antibiotics checked but ibuprofen | 1 | 1 | 0. N. Med pass not until 1611 | 1 | 0. N (procedure at 2:14 pm, order at 2:38 pm and order noted at 7:50 pm and if meds given then, then too late and patient may be in pain. | 4/7 = 57% Non Compliance |
| Are post procedure instructions verbal and written given to patient after extraction and is it documented? | Not listed in notes that Post op instructions given | Y | Y (POI) | Ext #12 done on 4/6/17 | Y | N | N | |
| Was a post op appt given if surgical or multiple teeth extracted? | No and #2 was not scheduled | Y | No | Y on 4/13/17 | N/A | Y | Y | |
| Was inmate/patient seen offsite for this problem? | N | N/A | N | N | N | N | N | |
| Was there a follow up with Onsite Dentist? | N/A | N/A | N/A | N/A | N/A | N/A | N | |
| Was SOAP legible? SCREEN 9 | 1 | 1 | N/A | 1 | 1. Y but not right format. | N/A | 1 | 5/5 = 100% Substantial Compliance |
| Was signature legible, printed or name stamp and credentials included? SCREEN 10 | 0 | 0. Initials but not printed and signed | 0 | 0 | 0 | 0 | 0 | 0/7 = 0% Non Compliance |

39-67

| Assigned ID # | H2.1 | H2.2 | H2.3 | H2.4 | H2.5 | H2.6 | H2.7 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|
| Comments | 1st SC date 4/20/17, triaged 4/22/17, 4/26/17 (For this sc scheduled at Dental Level II), seen by PA and said pt not seen for SC, Pt has yet to be evaluated by dental from prior No odontogram filled in in dental notes. 3/3/17 request for appt. Appt was scheduled for 3/8/17 but was never seen. Not in dentist's schedule so order was placed but not entered for dental level II, seen in 5/3/17, Triage, PA taken, #1 extraction done and deep decay #2 referenced but not scheduled. 5/3/17 NOTE: #2 would also be causing pain by Ext #1....#2 from PA has large distal decay. No BWX taken. #2 not scheduled, said PRN but can't ignore large distal decay. Dental progress note not signed. Spaces at top of progress note. 2nd SC 3/2/17, triaged (one of his molars is hurting) 3/3/17, given PA on 3/3/17, given analgesics, "schedule pt w/ dental for evaluation". ***pt was scheduled on 3/8/17 but not seen in dental. | No review of med hx. No teeth number in assessment "Hopeless teeth". Used only 1 carpule of lidocaine but doesn't list concentration of epinephrine. SC 4/8/17, triaged 4/9/17, seen 4/11/17 "My tooth is abscessing, very painful"...Dental level II.... Requests evaluation #7 but no X-ray taken #7 on 4/13/17 when seen by dental and no refusal signed for #7. Listed nv as PRN even though #7 hopeless. SC 3/23/17 triaged 3/24/17, Seen 3/27/17 for a dental level I, given augmentin 875 mg Bid x 7 days. "Emergency my tooth is abscessing and it hurts, having fever as well". Pt seen 3/30/17 instead of 3/29/17. Xray taken but Premolar and molar PA should be taken to include #32 for reference, notes not signed, no BP in progress but listed on consent form, space on top. No signature on progress notes | Doesn't list that there's a periodical lucency at apex #5. SC 4/26/17, triaged 4/26/17, Seen by medical for a Dental Level I, seen in dental on 5/3/17 (not seen next dental day) | Note that on H#CDS on 1/26/17 noted R Upper and dental was checked on it question #8 but DDS not checked or patient referred to dental. Note no epi concentration given. SC on 3/26/17, triaged 3/28/17, seen by medical 3/29/17 for dental level I, points to #13 >#12, swelling, analgesics given 3/29/17 and antibiotics given 3/30/17. Previous sick calls on 2/27/17 and 3/5/17 and seen by medical on 3/9/17 and lists dental problems but doesn't appear to be scheduled with dental until next sick call 3/29/17 then seen by dental on 3/30/17 | More info needed on progress note. Allergies, health hx, BP, signature. SC 3/2/17, triaged 3/8/17, seen by medical 3/9/17 Dental Level I. | dental section odontogram not filled , #14 not addressed, not scheduled and patient not advised of decay #14. Hopeless is diagnosis. No objective findings listed such as percussion, cold, palpation, swelling, hot and X-ray evaluation. No DPC listed on progress notes. Post op 3/15/17 "no problem". SC 2/16/17, triaged says already scheduled for 2/22/17, seen by dental 2/22/17 and went main down 2/24/17 and 2/27/17 seen by medical for multiple sc due to pain meds needed after dental tx, seen for dental triage 2/22/17 and extraction 3/8/17 | When done with one page, do not continuing into border area, use new progress note. Didn't list 4% for Septocaine. SC 2/21/17, triaged on 2/22/17 and seen by medical on 2/21/17 and 2/24/17. Medical does not state dental level I or II but discusses tooth pain. Seen by dental on 2/23/17 for extraction #12 & #13. | |

Table 9.1 - Pregnancy - MCJ/CFMG Audit - Feb 2-3, 2017 — Protective Order

| Assigned ID # | I1.1 | I1.2 | I1.3 | I1.4 | I1.5 | I1.6 | I1.7 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|
| Date of most current Incarceration | 01/19/16 | 11/26/16 | 11/16/16 | 12/22/16 | 12/08/16 | 09/28/16 | 01/23/17 | |
| Is patient pregnant | Yes | No | Yes | Yes | Yes | Yes | Yes | |
| What trimester? | 30w on 3/11/15 | N/A | "a couple months pregnant" | 3rd trimester | 27w | 6-9 weeks pregnant on 9-28-16 | 2-3 months | |
| Was pt referred to dental? SCREEN 1 | 0 | N/A | 0 | 1 | 0 | 0 | 0 | 1/6 = 17% Non-Compliance |
| Was a dental examination and periodontal exam performed that includes periodontal charting and diagnosis? SCREEN 2 | 0 | N/A | 0 | 0 | 0 | 0 | 0 | 0/6 = 0% Non-Compliance |
| Was oral hygiene instruction given? SCREEN 3 | 0 | N/A | 0 | 0 | 0 | 0 | 0 | 0/6 = 0% Non-Compliance |
| Was cleaning or SRP given, for those diagnosed with periodontitis? SCREEN 4 | 0 | N/A | 0 | 0 | 0 | 0 | 0 | 0/6 = 0% Non-Compliance |
| Comments? | No annual exam done yet but is scheduled for 1 year PE on 2/9/17 (TrackNet). 3/11/15 at 30 weeks pregnancy, caries control #13 performed, teeth circled but NO XRAYS taken. Refused dental on 11/17/16 with progress note stating refused, pt signed form at housing unit but no with dentist. | Delivered baby 11-12-16. Jail readmission done on 11-26-16 unreadable comment in dental | No xray to show broken teeth #4 & 15. Dx is unrestorable. 10 weeks and 5 days 12-9-2016. 0. No but was seen 12-09-16 for sick call and seen in dental clinic 12/15/16 for sick call from tooth pain. Pt refused 01-05-17 with no face to face discussion. | Due March 23, 2017 was 6.5 months pregnant on 12-22-16. On 10-11-16 health screening RN writes "Last saw dentist 10 years ago, has tooth pain, consultation". 10-20-16 was seen where she requested exam and no exam given as the discussion was about acute vs comprehensive. Dr. C says "No tx indicated". No X-rays taken for either time. Pt also seen 1/12/17 for triage #17. Dx is #17 but no X-ray to substantiate assessment/dx. | On health screening 12/18/16 RN states "last screening 2 years ago pt denies current problems". | Health screening done 10-5-16 difficult to read but believe it says "denies ? props at this time". Filled out sick call 1-1-16 "My tooth has been hurting really bad put in a few sick slips, was told I would get Ibuprofen or Tylenol haven't received it". Then was seen in dental on 1-7-16. NO XRAY WAS TAKEN. Filling #2 OB done with UltraF, added occlusion. Reversible pulpits was diagnosis. Used Septocaine 1 carpule. 01-21-16 pt seen no X-ray still for redo indicated and filled with Fuji II. Difficult Filled out sick call on 01-24-17 "My filling fell out and I'm having a toothache". ***NO XRAY. Seen on 2-2-17 for triage. Dx was #2 vitality wnl. Rest. indicated. | Health screening done 8-14-16 says "6 mo ago". Not seen or referred to dental so far for current pregnancy. Sick on 10-19-15 &10-21-15 was seen in dental on 10-29-15 for triage #2. Was seen on 12/4/15 for extraction #2, a PA was taken #2 but PA is not diagnostic due to developer not rinsed completely, see photo, center of X-ray whitened out. Diagnosis of Extraction #2 necrotic unrestorable - obj findings is pt no pain to cold, no swelling, no lymphadenopathy, pain to percussion and biting. Mesial decay and fracture. | |

Table 9.2 - Pregnancy - MCJ/CFMG Audit - May 4-5, 2017 - Protective Order

| Assigned ID # | I2.1 | I2.2 | I2.3 | I2.4 | I2.5 | SCREEN RESULTS |
|---|---|---|---|---|---|---|
| Date of Incarceration | 04/17/17 | 02/02/17 | 03/10/17 | 11/16/16 | 01/23/17 | |
| Is patient pregnant | Yes | Yes | Yes | Yes | Yes | |
| What trimester? | 14w/due 10/14/17 | 2nd trimester on 3/13/17 | 10 weeks on 4/9/17 | ~4 mos at 01/04/17. Due 7/2/17 | Approximately 2-3 months pregnant on 01/23/17 | |
| Was pt referred to dental? SCREEN 1 | 0 | 0 | 0 | 0 | 0 | 0/5 = 0% Non-Compliance |
| Was a dental examination and periodontal exam performed that includes periodontal charting and diagnosis? SCREEN 2 | 0 | 0 | 0 | 0 | 0 | 0/5 = 0% Non-Compliance |
| Was oral hygiene instruction given? SCREEN 3 | 0 | 0 | 0 | 0 | 0 | 0/5 = 0% Non-Compliance |
| Was cleaning or SRP given, for those diagnosed with periodontitis? SCREEN 4 | 0 | 0 | 0 | 0 | 0 | 0/5 = 0% Non-Compliance |

1

| Assigned ID # | I2.1 | I2.2 | I2.3 | I2.4 | I2.5 | SCREEN RESULTS |
|---|---|---|---|---|---|---|
| Comments? | Pt to spend 2 months at MCJ. 14-Day Health Inventory on 04/29/17 states "no dental problems at this time" although unclear if clinician looked in her mouth as the odontogram is not filled in. Pt given an order for 6 milks per day. Pt has regular bouts of nausea and emesis. | Co-signature not present on Intake form. 14-Day Health Inventory done on 02-13-17. States "last screening over 2 years, #1 circled on odontogram and says "cracked back molar". Refer to DDS not checked. Not referred to dental, no dental notes, not seen in dental. | 14 Day Health Inventory on 3/17/17. No dental concerns identified, odontogram not completed. Had tooth pain of 9/10 on 5/2/17. Refused sick call and not dental to Deputy on 5/3/17 but no refusal form nor discussion of risks, benefits and alternatives with pregnant inmate/ patient. No indication on Dental Compliance Tracking Log of patient's appointment and pt did not refuse to dentist nor was there any dentist notes showing the refusal. No notes in dental section. No ability to follow up as there is no tracking of inmate's appointment or concerns. | 14-Day Health Inventory on 11/24/17. Reviewed by signature missing. Dental section has a slashed 0 and Odontogram not filled in. SC 0n 12/09/16, seen in dental for triage on 12/15/16, determined extractions necessary, no x-rays taken. Pt refused extractions on 1/5/17, refusal signed. | Patient never seen. No dental progress notes. Gestational diabetes. Odontogram not filled in. | |

Table 10.1 - Chronic Care Conditions - MCJ/CFMG Audit - Feb 2-3, 2017 - Protective Order

| Assigned ID # | J1.1 | J1.2 | J1.3 | J1.4 | J1.5 | J1.6 | J1.1 | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|---|
| Date of Incarceration | 01/27/17 | 01/12/17 | 01/19/17 | 12/22/16 | 12/06/16 | 05/18/15 | 11/09/15 | |
| Was I/P seen in Dental for Chronic Care condition? | No | No | Intake | No | SC | No | SC | |
| Was I/P referred to Dental due to chronic care condition? SCREEN 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0/7 = 0% Non Compliance |
| Periodontal evaluation & tx completed? SCREEN 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0/7 = 0% Non Compliance |
| Comments? | Dialysis, fistula vascular access. Hasn't had his 14 day health screening yet as of Feb 2, 2017 | no updated health screening. Seen 11-19-16 says 18yo, chipped tooth during seizure, odontogram not filled in. On Xarelto 20mg QD | Dental level 1. Referred to dental from Intake Triage Assessment - on Coumadin 7.5mg. Reports jaw pain. See copies of chart. No follow up with dental. Was seen offsite. Needs premed prior to dental care and needs to have INR check. Also PREMED for previous hx of endocarditis. Not seen by dental. Pt not in custody. | health inventory done 5/7/16. odontogram not filled in, says "broken front tooth, saw dentist 2 ? ago". Jail re-admission health appraisal 7/28/16. Dental Screening findings "can't remember". Warfarin 2mg QD on 1/27/17 with testing on 2/5/17. NOT SEEN BY DENTAL. | Seen triage 12-3-15 for periodontal issue. No X-ray #14 but there is a PA #1,2,3. Doesn't show apex. Appears to be decay mesial #2, not addressed, no bwx, no written documentation of #2. | On Xarelto. Has been there longer than one year. Pt just released to prison 1/17/17 | Warfarin. Need chart.Pt referred to Dr.⬛ on 2/1/17. Seen at Dr. ⬛ office 2/2/17. Then scheduled 2/6/17. Should be seen by Dr.⬛ on 2/7/17. Verify. | |

1

39-72

Table 10.2 - Chronic Care Conditions - MCJ/CFMG Audit - May 4-5, 2017 - Protective Order

| Assigned ID # | J2.1 | J2.2 | J2.3 | J2.4 | J2.5 | J2.6 | SCREEN RESULT |
|---|---|---|---|---|---|---|---|
| Date of Incarceration | 11/15/16 | 06/04/16 | 02/01/17 | 03/30/17 | 03/22/17 | 06/27/16 | |
| Was I/P seen in Dental for Chronic Care condition? | N | N | N | N | N | N | |
| When was I/P referred to Dental due to chronic care condition? SCREEN 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0/7 = 0% Non Compliance |
| Periodontal evaluation & tx completed? SCREEN 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0/7 = 0% Non Compliance |
| List Chronic Care Condition - HIV, Diabetes, Seizures, Pregnancy, Infectious Disease such as HIV (For Pregnancy see Table #9) | Pt w/ HIV. HQR but not stated in progress note that patient has HIV, HTN, RA, Asthma. Doesn't state that labs are reviewed. Labs taken on 1/31/17 with CD4 of 753, platelets 264, neutrophils not listed, WBC 4.8, viral loads not listed | Pt w/ HIV. Not seen by dental since 11/10/16 | HIV noted in physician's notes. No Odontogram or dental section filled out. Referred to NIDO clinic. CD4 1356. HIV reactive on 3/8/17. Nothing listed on problem list. Note: HIV not included in HICDS for health questionnaire. | Pt on anticoagulants for A Fib, Chest pain, HTN, Bipolar. From physician notes, takes warfarin, INR at 1.9 to be rechecked in 4 weeks from 4/11/17 | Pt on anticoagulant. Started on warfarin on 4/20/17 for protein S deficiency w/ hypercoagulolity and INR taken on 5/1/17 with INR at 1.9. | Pt on anticoagulant. CVA w/ carotid stenosis w/ stent placement on 10/10/16. Hep C, LUTS/BPH and hx of cephaligia. Pt on Plavix. | |

| Assigned ID # | J2.1 | J2.2 | J2.3 | J2.4 | J2.5 | J2.6 | SCREEN RESULT |
|---|---|---|---|---|---|---|---|
| Comments? | SC on 4/17/17, no notes to say was triaged, Seen by medical on 4/18/17 for dental referral but dental level not written. Pt seen by dental on 4/19/17, #30 to be extracted, #30 was listed on odontogram of dental chart. 1B... CHECK, scheduled on 5/15/17 for extraction #30 if by 5/19/17 scheduled by dental. No comp exam | HIV, HTN, last seen SC on 10/5/16, triaged 10/6/16 and was already seen 9/29/16 (1C) then seen dental 11/10/16 for extraction PA taken #19 on 11/10/16, consent form present. BP present but HIV condition not discussed. Labs not discussed. We reviewed labs taken on 9/26/16 stated CD4 count at 126cells/uL, WBC at 4.0 thousand/uL, neutrophils at 1592 cells/uL, platelets at 220. No premedication given for low CD4 count. DPC 1B on 11/10/16, refused post op on 11/17/16 | Never seen in dental | No dental notes, never seen in dental. Chart has different spelling of I/P name. ▇▇▇▇ vs ▇▇▇▇ Never seen in dental | Last seen in dental 12/3/15 with Dr. ▇▇▇ #14 no X-ray. Xray for #1-4 with missed mesial decay on #2 and treated. INR was addressed in progress notes but not taken close to date of treatment, taken 11/18/15 w/ INR at 2.94 | SC 3/13/17 "Bad toothache - lower left behind K9 incizor, need extraction", Triaged 3/13/17, seen by medical on 3/15/17 with dental level I. Seen by dental on 3/16/17. Dental odontogram not filled in, space, signature present but not printed. No x-ray taken at triage nor listed on progress note, 1B. No mention of patient on Plavix. Pt should have been scheduled prior to 4/16/17, was on his calendar for 4/20/17 but never seen and no other chart entry other than - not followed up. | |
| | NIDO Clinic to treat HIV patients | NIDO clinic - no report from nido clinic and CD4 at 126 on 9/26/16. To be seen June 9th. | No dental visits, no dental sick calls. No referrals to dental. No problems listed and pt has HIV | | | | |

Table 11.1 - Psych Meds - MCJ/CFMG Audit - Feb 2-3, 2017 - Protective Order

| ID # | K1.1 | K1.2 | K1.3 | K1.4 | K1.5 | | SCREEN RESULTS |
|---|---|---|---|---|---|---|---|
| Date of Incarceration | Not available | Not available | Not available | Not available | Not available | 03/16/16 | |
| Was any dental condition identified at the 14-Day Health Inventory? | Not reviewed | Not reviewed | Not reviewed | Not reviewed | Not reviewed | N | |
| Was I/P seen in Dental for sick call? | N/A | N/A | N/A | N/A | N/A | N | |
| Was I/P referred to Dental due to chronic care condition? SCREEN 1 | N/A | N/A | N/A | N/A | N/A | 0 | **0/1 = 0% Non Compliance** |
| Periodontal evaluation & tx completed? SCREEN 2 | N/A | N/A | N/A | N/A | N/A | 0 | **0/1 = 0% Non Compliance** |
| Comments | | | | | | Incarcerated more than 12 months, pt eligible also for comprehensive dental care. Not seen in dental, no dental records | |

1

39-75

Table 11.2 - Psych Meds - MCJ/CFMG Audit - May 4-5, 2017 - Protective Order - DRAFT

| ID # | K2.1 | K2.2 | K2.3 | K2.4 | K2.5 | SCREEN RESULTS |
|---|---|---|---|---|---|---|
| **Date of Incarceration** | 12/19/16 | 03/09/17 | 10/08/16 | 11/06/16 | 12/07/16 | |
| **Was any dental condition identified at the 14-Day Health Inventory?** | N | Form not in chart | Y | N | N | |
| **Was I/P seen in Dental for sick call?** | N | N | N | N | N | |
| **Was I/P referred to Dental due to chronic care condition? SCREEN 1** | 0 | 0 | 0 | 0 | 0 | **0/5 = 0% Non Compliance** |
| **Periodontal evaluation & tx completed? SCREEN 2** | 0 | 0 | 0 | 0 | 0 | **0/5 = 0% Non Compliance** |
| **Comments** | Not seen in dental. No dental records | Not seen in dental. No dental records | Discomfort when eating cold foods. Not seen in dental. No dental records | Not seen in dental. No dental records | Not seen in dental. No dental records | |

1

# Appendix 2

Dental Clinic Facility Audit Tool

# Dental Clinic Facility Audit Tool - Final

| | Subject | Description | SC | PC | NC | N/A | Comments |
|---|---|---|---|---|---|---|---|
| 1 | Housekeeping | Counters appear uncluttered and clean | | X | | | Cluttered. Counter is Stained. Marked improvement since last visit. |
| 2 | Housekeeping | Floors appear uncluttered and clean | | X | | | Floors still dirty and dusty behind tool cabinets but less dusty than last visit. Several outdated and unusable items on floor in clinic. |
| 3 | Housekeeping | Sinks appear uncluttered and clean | | X | | | Sink old/stained with debris at drain and staining around caulking. |
| 4 | Housekeeping | Food - Staff aware no food storage, no eating, drinking, applying cosmetics or handling contact lenses in occupational exposure areas | X | | | | Office now moved from within dental clinic to adjacent office. Sterilization area now back in dental clinic. Food in office area and none found in dental clinic. No |
| 5 | Housekeeping | General appearance appears clean and clutter free | | X | | | Still some crowding of outdated equipment. Walls appeared painted but still has debris on it. Paint not applied under calendar. |
| 6 | Biohazard Waste/Haz Mat Procedures | Separate waste container for non-infectious/general waste in place | X | | | | |
| 7 | Biohazard Waste/Haz Mat Procedures | Biohazard Waste containers have lids | X | | | | |
| 8 | Biohazard Waste/Haz Mat Procedures | Biohazard Waste containers labeled on the top and sides of the container so as to be visible from any lateral direction | | X | | | Not labeled on all sides. |
| 9 | Biohazard Waste/Haz Mat Procedures | Biohazard Waste containers lined with Red Bag | X | | | | |
| 10 | Biohazard Waste/Haz Mat Procedures | Biohazard Waste Red Bag removed regularly based on clinic need | | X | | | No policy in place to address removing Biohazard Waste. |
| 11 | Biohazard Waste/Haz Mat Procedures | Chemical Spill Kit in place | X | | | | Located outside of dental clinic area. Was brought into clinic after inspection. |
| 12 | Biohazard Waste/Haz Mat Procedures | Mercury Spill Kit in place | | | X | | No mercury spill kit in place. |
| 13 | Biohazard Waste/Haz Mat Procedures | Eyewash Station in good working order connected to tepid water | | X | | | Temporary eyewash in place. Place appropriately sized eyewash solution in temporary eyewash holder. |
| 14 | Biohazard Waste/Haz Mat Procedures | Sharps container (Approved type) | X | | | | |
| 15 | Biohazard Waste/Haz Mat Procedures | Sharps container (Located as close as feasible to area where disposable item used) | X | | | | |
| 16 | Biohazard Waste/Haz Mat Procedures | Sharps container (Secured) | X | | | | |
| 17 | Biohazard Waste/Haz Mat Procedures | Sharps container (No more than 3/4 full before container removed) | X | | | | |
| 18 | Biohazard Waste/Haz Mat Procedures | Pharmaceutical Waste container in place and labeled for incineration only | | X | | | No pharmaceutical waste container present although there is one in the Pharmacy |
| 19 | Biohazard Waste/Haz Mat Procedures | Pharmaceutical Waste container labeled with start date of accumulation - expires 1 year from initial date of use | | X | | | No pharmaceutical waste container present although there is one in the Pharmacy |
| 20 | Biohazard Waste/Haz Mat Procedures | Flammable Hazardous Materials (Inventoried and stored in fireproof locked cabinet) | | | X | | No fireproof cabinet. No inventoried list of flammable hazardous materials. When SDS binder is in place with all chemicals listed then will re-evaluate at next tour if fireproof cabinet is necessary. |
| 21 | Biohazard Waste/Haz Mat Procedures | Amalgam Separator filter (date of installation posted) | | | | X | Amalgam Separator mandates are exempt for mobile delivery carts. |

78

39-78

# Dental Clinic Facility Audit Tool - Final

| | Subject | Description | SC | PC | NC | N/A | Comments |
|---|---|---|---|---|---|---|---|
| 22 | Biohazard Waste/Haz Mat Procedures | Amalgam Separator filter (Checked routinely and documented in housekeeping log) | | | | X | Amalgam Separator mandates are exempt for mobile delivery carts. |
| 23 | Biohazard Waste/Haz Mat Procedures | Contact Amalgam commercial container in place | X | | | | |
| 24 | Biohazard Waste/Haz Mat Procedures | Non-contact Amalgam commercial container in place | X | | | | |
| 25 | Sterilization And Equipment | Amalgamator (Safety cover in place) | | X | | | Dr. _____ stated that they don't use amalgam for any restorations at this time although they have a contact and non contact amaigam containers. Restorative dental materials and SDS to be determined and subsequently listed in policies. |
| 26 | Sterilization And Equipment | Handpieces cleaned and lubricated prior to sterilization | | X | | | Cleaned but not lubricated prior to sterilization |
| 27 | Sterilization And Equipment | Ultrasonic Unit (Used to clean contaminated instruments prior to sterilization) | | X | | | Note, no there are no policies and procedures in place to address infection control and sterilization protocol in dental clinic. |
| 28 | Sterilization And Equipment | Sterilization Clean and Dirty Areas (Demarcations clearly marked) | | X | | | No Clean and Dirty Areas demarcated between contaminated and non contaminated area in sterilization area. |
| 29 | Sterilization And Equipment | Sterilized dental instruments (Bags/ Pouches intact) | | X | | | Some of the sterilization bags still outdated. |
| 30 | Sterilization And Equipment | Sterilized dental instruments (Bags/ Pouches labeled with sterilizer ID#, sterilization date and operator's initials) | | X | | | Not all dental instruments labeled with sterilizer ID, date or operator initials although organization of instruments still promising |
| 31 | Sterilization And Equipment | Unsterilized instruments prepackaged if overnight storage required | X | | | | Per staff, instruments are sterilized prior to leaving for the day. |
| 32 | Sterilization And Equipment | Dental Lab Lathe (In separate lab / not with sterilizer) | | | | X | No dental lab lathe used in this clinic |
| 33 | Sterilization And Equipment | Dental Lab Lathe / Model Trimmer (Securely mounted and eye protection available for use) | | | | X | No dental lab lathe used in this clinic |
| 34 | Sterilization And Equipment | Dental Lab Burs / Rag Wheels (Changed after each patient, sterilized after use, stored in Bags / Pouches) | | | | X | Crusted acrylic bur in sterilized bag. |
| 35 | Sterilization And Equipment | Pumice Pans (Pumice and disposable plaster liner changed after each patient | | | | X | Pumice pans not used in this clinic. |
| 36 | Sterilization And Equipment | Water Lines (Flushed at least 2 minutes at beginning and end of each shift) | | X | | | New unit in place. Practice consistency with flushing of lines. |
| 37 | Sterilization And Equipment | Water Lines (Flushed a minimum of 20 to 30 seconds between patients | | X | | | New unit in place. Practice consistency with flushing of lines in between patients. |
| 38 | Sterilization And Equipment | Vacuum System (Manufacturer's recommendations followed for cleaning, disinfection and maintenance) | | X | | | No biohazard sticker on container. |
| 39 | Emergency Procedures | Emergency #'s prominently posted in clinic | | X | | | Emergency numbers and other information more clearly posted. No written protocol for emergencies in dental clinic. |
| 40 | Emergency Procedures | Evacuation Plan prominently posted in clinic | | | X | | Not posted |

79

## Dental Clinic Facility Audit Tool - Final

| # | Subject | Description | SC | PC | NC | N/A | Comments |
|---|---------|-------------|----|----|----|----|----------|
| 41 | Emergency Procedures | Fire Extinguishers (All staff aware of location) | X | | | | Fire extinguisher is present and in good working order as evidenced by the current yearly inspection performed in December 2016. A housekeeping log however is not present in the dental office to indicate that the fire extinguisher has been examined on a monthly basis. |
| 42 | Emergency Procedures | Emergency Medical Response protocol in place | | | X | | No written protocol |
| 43 | Emergency Procedures | Emergency Kit (Zip tied) | | X | | | Emergency kit in dental clinic started but not complete |
| 44 | Emergency Procedures | Emergency Kit drugs current | | X | | | No emergency kit present therefore no drugs available to see if current. |
| 45 | Emergency Procedures | Oxygen tanks, masks, tubes and keys present | | X | | | No oxygen tanks, masks, tubes or keys present. |
| 46 | Emergency Procedures | Oxygen tank charged | | X | | | No oxygen tank present. |
| 47 | Emergency Procedures | Amba-Bag (Bag-valve-mask present and in working order) | | | X | | No bag-valve-mask present. |
| 48 | Emergency Procedures | One-way pocket mask present and in working order | X | | | | |
| 49 | Emergency Procedures | Blood pressure cuff and Stethoscope present and in working order | | X | | | Wrist cuff but no stethoscope or variety of different size cuffs present. |
| 50 | Emergency Procedures | Plastic evacuators (2) - Large diameter suction tips | | | X | | Not in emergency kit. |
| 51 | Emergency Procedures | 2 Sterile, 2 cc disposable syringes with 18 or 21 gauge needles | | | X | | Not in emergency kit. |
| 52 | Emergency Procedures | AED Accessible | X | | | | AED in control tower. Takes several minutes to reach control tower and then to return with AED to Dental clinic. |
| 53 | Emergency Procedures | AED in working order and pads are current and not expired | X | | | | Difficult to see in control tower, low light. No logs of unit being tested and evaluated for expired pads. |
| 54 | Safety | Dental Board Regulations on Infection Control posted | | | X | | Regulations were not posted. |
| 55 | Safety | Sterile Water used for invasive oral surgical procedures | | | X | | |
| 56 | Safety | Hand Hygiene (Observed staff) | | X | | | Inconsistent use of hand hygiene. |
| 57 | Safety | PPE - Worn and correctly disposed of; observed staff | | X | | | Inconsistent use of PPE gown. |
| 58 | Safety | Barriers used to cover environmental surfaces replaced between patients | | X | | | Chair cover now used. Not all barriers used to cover handpieces. |
| 59 | Safety | Saliva Ejector (Staff aware that patients must not close lips around tip to evacuate oral fluids) | | X | | | No saliva ejectors used or available. |
| 60 | Safety | Radiation Safety Program in place / Dental radiographic unit inspection date | | | X | | Dentist or DA not wearing X-ray badges. No policy in place to radiation safety program. |
| 61 | Safety | Caution X-ray Sign (Placed where all permanent radiographic equipment installed) | X | | | | |
| 62 | Safety | Lead Shields (Thyroid collar, hanging, free from tears or holes inspected regularly) | X | | | | |
| 63 | Safety | Is an area dosimeter posted no more than 6 ft from source of beam? | | | X | | Dosimeter badge posted near x-ray arm but dosimeter badge expired. |
| 64 | Safety | Dental staff wearing dosimeters at chest level or higher (i.e. new x-ray equipment; x-ray unit moved and reinstalled) | | | X | | Dr. █████ and DA did not have, nor were wearing dosimeter badges. |
| 65 | Safety | Dosimeter Badge (For pregnant staff working within the vicinity of radiographic equipment) | | | | X | No pregnant dental staff at this time. |

3

# Dental Clinic Facility Audit Tool - Final

| | Subject | Description | SC | PC | NC | N/A | Comments |
|---|---|---|---|---|---|---|---|
| 66 | Safety | Material Dates (Check expiration dates) | X | | | | |
| 67 | Safety | Dental Impressions Materials / Waxes (Stored in secure location) | | | | X | Denture fabrication done at outside lab |
| 68 | Clinic Administration and Logs | Written infection prevention policies and procedures specific for the dental setting available, current & based on evidence-based guidelines? | | | X | | No CFMG HQ or local MCJ policies and procedures. |
| 69 | Clinic Administration and Logs | Annual Training (Infection Control, Radiation Safety, Oxygen Use, Hazmat and SDS) | | | X | | No evidence of annual training. |
| 70 | Clinic Administration and Logs | Did employees receive job or specific training on infection prevention policies and procedures and the OSHA blood borne pathogens standard? | | | X | | Per Program Manager, Dr. ▮▮ did not receive any training. There were no training records in ▮▮ or ▮▮ file. ▮▮ also must take the courses outlined in the Dental Board of California's requirements. |
| 71 | Clinic Administration and Logs | Facility has an exposure control plan that is tailored to specific requirements of the facility? | | X | | | Some of the Illness & Injury Prevention Plan in place at this time. |
| 72 | Clinic Administration and Logs | Personal Protective Equipment (PPE) and other supplies necessary for adherence to Standard Precautions are readily available? | X | | | | |
| 73 | Clinic Administration and Logs | Spore Test Log Weekly Testing | | | X | | Spore test log not present. Sheets from spore test service in a disorganized file folder and not all present. (Staff had to go to computer to pull up results). Several weeks missing from results - 1/21/16, 1/28/16, 2/11/16, 2/26/16, 3/3/16, 3/24/16, 3/31/16, 4/28/16, 5/5/16. Patients were seen during the weeks listed above. |
| 74 | Clinic Administration and Logs | Housekeeping Log Up-to-Date | | X | | | Only sterilization cleaning log present, no other housekeeping logs available at time of dental tour. |
| 75 | Clinic Administration and Logs | Eyewash Log Up-to-Date | | | X | | Only sterilization cleaning log present, no other logs available at time of tour |
| 76 | Clinic Administration and Logs | Tool Control Log (Complete enteries) | | X | | | Handpieces were not included in count. Only DA doing count. |
| 77 | Clinic Administration and Logs | Sharps Logs | | X | | | 27 guage, 30 gauge and extra short needles were well logged. Scalpels/Blades and Sutures were not included in count. |
| 78 | Clinic Administration and Logs | Sharps injury log and other employee exposure events is maintained according to state and federal requirements? | | | X | | No sharps injury log available. |
| 79 | Clinic Administration and Logs | Post injury protocol in place? | | | X | | No local Illness and Injury Prevention Plan available at the time of the Dental Tour. |
| 80 | Clinic Administration and Logs | Pharmaceutical Log | | | X | | Several stock medication bottles of analgesics and antibiotics present but no logs to indicate which patient received what antibiotic or analgesic. Nor was there a log indicating which floor stock of medications were obtained from the pharmacy. |
| 81 | Clinic Administration and Logs | SDS Binder (Accessible and current for materials used in clinic) | | | X | | File folder labeled MSDS. Loose sheets with no system to easily find SDS information in case of an emergency. Incomplete list of all chemicals in dental office. |
| 82 | Clinic Administration and Logs | Dentist On Call posted | | X | | | Sick call process in place with physician on call available for after hours. No logs available to see follow through of calls received pertaining to dental and shown to be scheduled with dental. |
| 83 | Clinic Administration and Logs | Dental Forms (Only most current, approved forms in clinic) | | | X | | No general consent form to include exam or x-rays or restorative, no health form with patient and dentist signature, no comprehensive dental exam form, extraction form has limited consent information. No forms explaining post extraction information. No periodontal screening or periodontal charting form. |

4

## Dental Clinic Facility Audit Tool - Final

| | Subject | Description | SC | PC | NC | N/A | Comments |
|---|---|---|---|---|---|---|---|
| 84 | Clinic Administration and Logs | Radiographic Certificate, Rules and Regulations posted | X | | | | Registered with the CDPH March 16, 2015. |
| 85 | Clinic Administration and Logs | Staff aware of equipment repair protocol | X | | | | Patterson services the dental equipment |

**Legend:**
SC = Substantial Compliance
PC = Partial Compliance
NC = Non-Compliance
N/A = Not Applicable

**Sources:**
Centers for Disease Control and Prevention (CDC), Guidelines for Infection Control in Dental Health-Care Settings - 2003 [MMWR December 19, 2003 / 52 (RR17);1-61],

Occupational Safety and Health Administration (OSHA), Blood Borne Pathogens Standard, Code of Federal Regulations (CFR), Title 29, Occupational Safety and Health Standards, Part 1910.1030

OSHA, Title 8 Section 3203(a)(4) Injury and Illness Prevention Program; Title 8 Section 5193 Bloodborne Pathogens

CDCR, CCHCS, September 2014 Inmate Dental Services Program (IDSP), Policies and Procedures (P & P),

California Code of Regulations, Title 8, Division 1, Chapter 4, Subchapter 4, Article 3, Section 1512 Emergency Medical Services

Department Operations Manual, Chapter 9, Article 3, Section 91030.27

Inmate Medical Services Policies and Procedures, Volume 9, Chapter 11

https://www.dir.ca.gov/title8/5193.html

California Health & Safety Code, Division 10, Chapter 4, Article 1, Section 11150

California Code of Regulations, Title 16, Division 10, Chapter 1, Article 1, Section 1005

5

82

# Appendix 3

Counsel Comments



ROSEN BIEN
GALVAN & GRUNFELD LLP

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Van Swearingen
Email: vswearingen@rbgg.com

August 9, 2017

Viviane G. Winthrop, D.D.S.
P.O. Box 4696
El Dorado Hills, CA 95762
███████████████

Re:   Dental Compliance Monitoring Report #2
      *Hernandez v. County of Monterey*, No. 05:13-2354 BLF
      Our File No. 1187-08

Dear Dr. Winthrop:

Thank you for providing the Draft Report dated July 10, 2017, covering the May 4-5, 2017 tour of Monterey County Jail.  This letter provides Plaintiffs' comments on the Draft Report.

The Draft Report includes analysis of the Dental Compliance Tracking Log through July 3, 2017.  Since the issuance of the Draft Report, you have conducted additional analysis of the Dental Compliance Tracking Log through early August (albeit partial analysis in some instances, given incomplete documents).  We recommend that the final report include the most recent analysis.  At a minimum, the recent analysis is necessary to understand whether the rescheduling problems are improving or getting worse.

The Draft Report states that absolutely no restorative or palliative care was provided during the review period, and that MCJ had not even ordered the supplies necessary to provide such care.  Draft Report at 11, 27, 30-31.  This violation is all of the more serious in light of the findings that no comprehensive care at all has been provided to the 10% of MCJ inmates who have served a year or more, and that MCJ was lacking even the basic forms and tracking system for such comprehensive care at the time of the tour.  Draft Report at 9, 12, 23-24.

[3160802.1]

84

Viviane G. Winthrop, D.D.S.
August 9, 2017
Page 2

The Draft Report states, however, that the lack of restorative and palliative care "was remedied immediately and there are restorative procedures now being completed when clinically indicated." Draft Report at 11. The complete lack of restorative care through April 2017 is a very serious violation—if it has now been remedied in some way it is worthwhile to provide some detail as to what the more recent data shows. The vague assurance by Dr. ███████ and █████ sounds more like another promise of compliance rather than actual compliance. Draft Report at 28. In furtherance of tracking and measuring compliance, the Dental Compliance Tracking Log should clearly track the provision of restorative and palliative care.

The Draft Report at 16 recommends weekly monitoring and maintenance of the Dental Compliance Tracking Log, followed by monthly monitoring of compliance once "weekly monitoring is shown to be accurate and the patients are seen within timelines." The Draft Report at page 43 states that weekly monitoring of the Dental Compliance Tracking Log is to occur "for the remainder of July and hopefully no longer than through mid August. Thereafter, assuming minimal errors will continue, then monthly monitoring can resume from mid August until December 2017." In light of the very serious violations regarding comprehensive care, and restorative/palliative care, with no progress shown at all in implementation as late as May 2017, as well as the problems with urgent appointments not being kept, continued weekly monitoring of the logs is merited for the rest of the year.

The Draft Report states that custody staff could provide no architectural drawings for the new jail dental facility at the time of the tour. Draft Report at 38. The Draft Report vividly illustrates the ways in which the poor physical plant of the current jail impedes the provision of minimally safe dental care. Draft Report at 11, 15. It is therefore essential and urgent that the County provide you with access to full plans for the new jail's dental workspace. Publicly available information from the Monterey County Board of Supervisors shows that the County awarded the construction contract in early June 2017, and approved an aggressive completion schedule with work set to have begun last month, in July 2017, and occupancy in October 2019. (The full Board of Supervisors package, including the schedule as Attachment A, is available for download at this link: http://bit.ly/2vnucue.) With the aggressive schedule, it appears highly likely that some plans are available for the new dental facility, even if they were not immediately available at the jail in May. The County should provide whatever it has to you immediately, and commit to keeping you in the loop regarding the design and equipping of this new facility.

//

[3160802.1]

Viviane G. Winthrop, D.D.S.
August 9, 2017
Page 3

Thank you for your work.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Van Swearingen*

By:   Van Swearingen

VS:vs

[3160802.1]

86

From: Peter Bertling pgb@bertling-clausen.com
Subject: Re: May 4-5, 2017 MCJ/CFMG Draft Dental Report
Date: Sep 10, 2017, 10:27:44 AM
To: Viviane Winthrop
Cc: Van Swearingen VSwearingen@rbgg.com, Blitch, Susan K. x5161
BlitchSK@co.monterey.ca.us, Ernest Galvan EGalvan@rbgg.com
Michael W. Bien MBien@rbgg.com, Ben Rice
ben.rice@cmgcos.com, Andrew Spore ASpore@rbgg.com

Hi Dr. Winthrop:

The primary issue I have with your report is the bases for your staffing recommendations. As we have previously discussed, I believe it is inappropriate and inapplicable to use the CDCR staffing guidelines to base the dental staffing recommendations you expect at the Monterey County Jail. In addition, your staffing recommendations seem to be based on a skewed statistical analysis regarding the number of inmates you assume will participate in the comprehensive dental program that is currently available for inmates who are incarcerated for more than one year. Is it your assumption that all of the inmates who are incarcerated for more than one year will take advantage of this program? If so, that doesn't seem to be consistent with what is actually happening at the Monterey County Jail.

Finally, I understand you have concern about patients being rescheduled. However, it is important for CFMG to know if your audits have identified any patients who needed an emergent or urgent evaluation because of pain or potential infection who were not seen in a timely fashion and pursuant to the time parameters set forth in the Implementation plan. If so, please provide the patient information so that chart can be reviewed and a root cause analysis can be performed to find out why the patient was not seen in a timely fashion.

Thank you for you continued assistance with helping CFMG to achieve compliance with the Implementation Plan. Your efforts are sincerely appreciated.

Regards,

Pete

On Sep 10, 2017, at 9:45 AM, Viviane Winthrop

87

# MONTEREY COUNTY



**OFFICE OF THE COUNTY COUNSEL**
168 WEST ALISAL STREET, 3RD FLOOR, SALINAS, CALIFORNIA 93901-2439
(831) 755-5045      FAX: (831) 755-5283

**CHARLES J. McKEE**
**COUNTY COUNSEL**

Susan K. Blitch
Sr. Deputy County Counsel
E-mail: blitchsk@co.monterey.ca.us

August 9, 2017

*Via Email and U.S. Mail*

Viviane G. Winthrop, D.D.S.
P.O. Box 4696
El Dorado Hills, CA 95762

     Re:    *Jesse Hernandez v. County of Monterey, et al.*
           USDC Case No. 13-cv-02354 BLF

Dear Dr. Winthrop:

    Thank you for your time and effort in touring the Monterey County jail and preparing the Dental Neutral Monitor Report related to your tour of May 4-5, 2017.  Pursuant to the settlement agreement, we provide the following comments and response.  We are only responding to items that are related to custody operations, as CFMG will respond more fully to issues related to their provision of dental services.

    We do, initially have a question concerning your recommendations as to staffing.  You appear to pull the suggested dentist to inmate ratio from the CDCR ("CDCR/CCHCS recommends 1 full time dentist for 600 inmate/patients").  Yet, the CDCR population is one where the average stay is more than a year, while the average stay for a Monterey County inmate is, pursuant to your report, 30-33 days.  The average inmate is not incarcerated long enough to require a dental check-up.  There are currently 109 inmates at the Monterey County jail who are sentenced for one year or more.  Assuming roughly one hour for each per year on regular care; this would only amount to 2 hours a week needed to treat those who remain at the jail for longer than a year.  Accordingly, the County would be interested in statistics showing the average dentist to inmate/patient ratio for County jails as the population still is significantly different from that of State prisons.

    As to the other custody related recommendations:

1.  The red emergency button in the dental clinic was not working on the day of the audit.

    The red button was disconnected as there is no longer any time in which dental staff work with inmates without a deputy present.

Viviane G. Winthrop, D.D.S.
August 9, 2017
Page 2


2.  Confirm that the toothpaste available in the commissary is ADA Acceptable.

    The County has done this.

3.  Work with Officer DeFranco to establish an automatic system of referral to Dental when
    the I/P reaches 12 months of incarceration.

    Sergeant DeFranco has completed this task.

4.  Creating an easy to access log of the grievances, their resolution and the completion date.

    The County will look at creating a grievance log.


                              Sincerely,

                              CHARLES J. McKEE, County Counsel



                              By:    SUSAN K. BLITCH
                                     Sr. Deputy County Counsel


SKB/kz

cc (via email only):   Van Swearingen, Esq.
                       Ernest Galvan, Esq.
                       Peter Bertling, Esq.
                       Michael R. Philippi, Esq.

*89*

# Appendix 4

Various Correspondence

From: **Viviane Winthrop** █████████████
Subject: Re: Encrypt Dentl logs
Date: July 31, 2017 at 1:40 AM
To: Peter Bertling pgb@bertling-clausen.com, Van Swearingen VSwearingen@rbgg.com
Cc: █████████████████████████████

Good morning Pete and Van,

Please see the enclosed logs for July 19th, 20th, 26th & 27th and the PDF for the July 2017 Trend.

I recommend that the dental staff enter the patients in the Dental Compliance Tracking Log in the same order as they are listed in the Pending Scheduled Events for MJ. This will make it easier to address the patient's issues without become dental log detectives.

As evidenced by the data, the greatest problem is that over 60% of the patients are not being seen as scheduled. Only 27% of the patients scheduled are currently being seen. Of the 373 patients scheduled in July, 227 patients were rescheduled with many of them rescheduled multiple times. The data indicates that there is not enough dental staff to triage and treat the patient's dental care needs at Monterey County Jail.

I believe that ████████████ and ████████████ are working very hard to see the patients but there is only one dental chair, one Dental Assistant and one Dentist. Having the doctor reschedule patients he has not even seen, and see too many patients in an hour, can not only be an infection control problem but increase his liability.

One patient's dental pain and/or concern not being addressed, triaged and treated is one too many. **This situation is emergent.** My recommendation is that CFMG find a solution to the staffing problem and address it immediately. In my draft report, I recommended that no more than 14 patients be scheduled per an 8 hour day. I stand by this recommendation until the complete system of dental care mandated by the Implementation Plan can be instituted correctly, consistently and efficiently.

Best regards,

Viviane G. Winthrop, DDS
P.O. Box 4696
El Dorado Hills, CA 95762
██████████████████████





Dental
Compli...017.pdf

Dental
Compli...017.pdf

Dental
Compli...017.pdf

Dental
Compli...017.pdf

Hello,

Attached are the dental 14 day PE, and intake logs, along with the logs done by Dr████ The sick call logs were placed in an area by one of our aids after she left and I can not locate them. I will get them to you tomorrow when I can get them from her.
I spoke with Dr████ and he said that he can only do the two days a week that he is currently already scheduled to do but can do them at 12 hours instead of 8 hours. He also stated that there might be a possibility that he could do one Monday out of the month but did not state what Monday that would be.

Thank you,

████████████

On Jul 22, 2017, at ██ PM, Viviane Winthr██████████████

H████

Thank you for your email and I hope you feel better soon.

████ sent the logs yesterday although the sick call log is missing ████ can you forward the sick call referral to dental log please?

Thank you,

Dr. Winthrop

From: ████████ ████ ██████
Sent: Friday, July 21, 2017 6:22:06 PM
To: Viviane Winthrop
Cc: neb@bertline-clausen.com
Subject: Re: Encrypt Denti logs

Hello I apologize I am out on medical leave for a few days. I will have ████ send those to you I will return Tuesday 7/25, again I apologize I forgot to ask her to send those ████ please email thank you I will speak with you Tuesday in regards to them. Any questions prior ████ can most definitely help you

Sent from my iPhone

████████████ at 8:29 PM, Viviane Winthr██████████████

I hope you had a good week. Please send the new logs for the week.

Thank you,

Dr. Winthrop

On Jul 18, 2017, at 2:32 AM, Viviane Wi████████████████

I████

I reviewed the logs that ████ sent on Friday, July 14th. Thank you████

I'm only enclosing July 13th and 14th's Dental Compliance Tracking Logs as reference with the Pending Scheduled Events so you can see how the data interrelates. I've removed the patient identification.

The following are some observations and recommendations:
1. Please rename the "Dental Log" to Dental Compliance Tracking Log - to match with my report.
2. Make the logs coming from Intake, Sick Call and 14-Day Physicals/Health Inventory all the same format. Also identify where the logs come from so that I can easily identify the source of referrals to dental. Include if they were referred as a Dental Level I or 2. This will assist me to see if the patients are scheduled and also if they are seen in dental within timeframe.
3. Looking at the Pending Scheduled Events for MI, look on Thursday July 13th, see 9th patient from the top. On July 14th, see 2nd patient from the top. This is the perfect description for a referral. Please train remainder of staff to follow this format. Source of referral (Ex. Sick Call or Sick Slip): Dental Level (Ex. Dental Level 1, or D1 or D2): Description of dental problem (Ex. Broken molar, pain): Please include Location (Ex. UR 1st molar).
4. If the referral source is 1 (Intake), 2 (Sick Call), 3 (14-Day physical) then they should only be referred as either a Dental Level 1 or 2. On the Dental Compliance Tracking Log (DCTL) often I see a Sick Call (2) with a N/A. This should not occur. This is possibly indicative of an appointment that has been previously rescheduled.
5. If the patient is at court, you will have to find a way to note when you have reappointed the patient on the log and in TrackNet.
6. It appears that the 1C patients are appointed for their treatment past the 60 day mark. This is an automatic failure which can easily be avoided by scheduling the patient within their designated DPC timeframe. Please re-appoint the patients to meet the timeframe requirements.
7. List the reason for any refusal.
8. For DPC, please add a number 5 on the second line, prior to the PO check. The 5 will represent a referral to an outside source. A DPC 5 in the adult institutions represents an outside referral to a specialist. Remember that if a patient is referred to an outside specialist, that they must be seen at the next dental day for a follow up.
9. Patient is "at work today", was this a refusal or will patient be rescheduled? Please address in DCTL.
10. Have all the boxes filled in. If not applicable, put N/A or NA. It is important to follow up on the Date Tx Provided to make sure all patients receive their diagnosed dental care. Make it as easy as possible to see who still has not received their mandated dental care so that no patients are lost in the system.
11. On July 14th, 22 patients were scheduled. 8 were rescheduled including a patient who was scheduled due to "teeth pain". This is a concern on several levels. If the patient continues to have pain and puts in several sick call slips, this is an added workload for the nursing staff and other health care professionals. It also means the patient may be in pain and that their 8th amendment rights to having access to care is not met.
12. On July 12th there were 49 patients scheduled and 29 rescheduled. Many were reschedules from previous reschedules. You must account for all patients. No more reschedules. See Draft Report for May 4-5, 2017 Audit.

Please share with Dr ████████ and ████ and let them know that all your efforts are appreciated. I know that there is still a lot more to go but you're on the right track. To account for all patients, it is important to add enough dental days per week to take care of all of the scheduled patient's dental health care needs. If you have any questions and/or need a phone conference, please let me know.

92



Therefore for this week's dental days, I expect to see continued improvements while addressing the above mentioned items. You can do this!

Best regards,

Viviane G. Winthrop, DDS
P.O. Box 4696
El Dorado Hills, CA 95762

‹Dental Compliance Tracking Logs - July 14, 2017.pdf›
‹Dental Compliance Tracking Logs - July 13, 2017.pdf›

**From:** ███████████
**Sent:** Friday, July 14, 2017 4:23:06 PM
**To:** geb@bertling-clausen.com; Viviane Winthrop
**Cc:** ███████████
**Subject:** Encrypt Denti logs

Dear Dr. Winthrop,

    Per our conversation. Since we have now taken over scheduling in TrackNet (That just started last week) you will start to see more consistency between written logs and printed schedules.
Attached are the logs from sick call, intake, and 14 day physical, also attached are the written notes/logs from dental from June 2017 to present.

Thank you,

On Jul 14, 2017 at 4:05 PM ███████████

You've received an encrypted message from ███████████
To view your message
Save and open the attachment (message.html), and follow the instructions.
Sign in using the following email address: ███████████

This email message and its attachments are for the sole use of the intended recipient or recipients and may contain confidential information. If you have received this email in error, please notify the sender and delete this message.

‹Mail Attachment.png› Message encryption by Microsoft Office 365

‹message.html›

93

From: **Peter Bertling** pgb@bertling-clausen.com
Subject: Re: Sick Call Logs for Dental Referrals
Date: August 14, 2017 at 7:43 AM
To: Viviane Winthrop
Cc: x5161 Blitch, Susan K. BlitchSK@co.monterey.ca.us,           Van Swearingen
VSwearingen@rbgg.com,           Ben Rice benjamintrice@hotmail.com

Hi Dr. Winthrop:

As always, I appreciate your response.  I want to assure you there in no reluctance on the part of CFMG to provide additional dental staffing and, even before you expressed concerns about this issue, we have been trying to contract with the County for additional dental staffing.  CFMG is providing the dentist hours set forth in the Implementation Plan as approved by the Court.  We will continue to work with the County to obtain approval for additional dental staffing, but, in the meantime, we will comply with the mandates of the Implementation Plan and try to address any concerns you may raise.

When you say there "should be appointments for comprehensive care" have you identified any patients who have submitted a request for comprehensive care that have not been seen and a treatment plan initiated?  If so, please identify any such patients.

I will be back from vacation on August 22 and believe it would be beneficial to convene a conference call that includes County counsel in order to address your concerns with all necessary parties involved.

Regards,

Sent from my iPad

On Aug 14, 2017, at 7:20 AM, Viviane Winthrop           wrote:

Good morning Pete,

Thank you for your email. Please refer to the chart below for a sample of the records reviewed showing the inordinate number of reschedules experienced by the patients at MCJ prior to having their dental pain/concerns triaged, as well as dental treatment falling outside of the mandated timeframes.

When reviewing the Pending Scheduled Events on TrackNet, there are indeed appointments scheduled for episodic care from Intake, 14 Day Health Inventory/Physical Exam and Sick Calls. There are also provider requested appointments and there should be appointments for comprehensive care. Therefore, it is unwise to assume that all other patients scheduled on TrackNet, not listed on the Intake and 14 Day logs, are those who submit sick call slips.

It is important to have a verifiable Dental Sick Call Log showing who was referred to dental from the sick call process, when they are scheduled and what their Dental Level classification is at the time of the referral. The goal is to have the patients seen as scheduled so as to address their dental pain/concerns as mandated by the Implementation Plan.

It appears that the majority of Dental Level 1 emergent patients are seen as scheduled however Dental Level 2 urgent patients are rescheduled numerous times before having their dental pain, bleeding gums, broken teeth, etc triaged and subsequently treated in the Dental Clinic. This practice is outside of the standard of care.

Please see some examples of non-compliance, where patients whose dental treatment falls outside of the timeframe once their dental concerns have been triaged and a Dental Priority Code (DPC) has been issued.

Once you have reviewed the enclosed chart, please help me to understand why there is a reluctance to provide adequate staffing to address this staffing crisis at MCJ. I will be happy to review the Dental Compliance Tracking Logs in more detail with you, Plaintiff's Counsel

94

and Senior Counsel for MC, if it is needed for greater clarity. As you can infer from both our previous phone conversation and this email, I am highly concerned about the lack of staff to address the inmate/patient's episodic, comprehensive and periodontal dental health care needs as well as their 8th amendment rights to dental care.

Additionally, I was told that an electronic compliance tracking system was due to be implemented at MCJ. Can you let me know the status of this system? Manual logs, although better than no logs at all, are still cumbersome and it is a tedious enterprise to make sure that all patients are seen and accounted for, especially when considering the high number of reschedules. Therefore I recommend an electronic version of the Dental Compliance Tracking Log be implemented.

Please let me know when you will schedule a phone conference with Dr. ███████.

Thank you,

Viviane G. Winthrop, DDS
P.O. Box 4696
El Dorado Hills, CA 95762
███████████
█████████████████

On Aug 10, 2017, at 5:31 AM, Peter Bertling <pgb@bertling-clausen.com> wrote:

Hi Dr. Winthrop:

Please help me understand why you cannot verify that patients who submitted a sick call request were actually referred to dental. It is my understanding these patients would be included on the track net documentation you receive. We are already providing you dental logs for patients referred to dental from intake, 14 day assessments and mid level/MD providers. You can assume that all other patients who appear on the track net log are those patients who submitted sick call slips.

I am currently on vacation, but when I return, I would like to schedule a phone conference with Dr. ███████ to discuss how he determines patient priority and related issues.

Are you able to provide me with a list of patients whose records you have actually reviewed who you do not believe were seen in a timely fashion based on their dental priority as set forth in the Implementation Plan? It is important for me to have this information in order to provide you with an informed response to your draft report.

Thank you for your continued assistance with this matter.

Regards,

Pete

Sent from my iPad

On Aug 9, 2017, at 7:35 AM, Viviane Winthrop ███████████████████ wrote:

Hi ████████

See ██████ email below. Please provide the Dental Sick Call Logs referring patients to the dental clinic. Without these Dental Sick Call Logs, we are unable to verify that the patients were referred to dental, when they were scheduled and subsequently if they were seen as scheduled. Not having the Dental Sick Call Logs is an automatic noncompliance.

Thank you ████ for adding the matching Pending Scheduled patients to the Dental Compliance Log.

95

There were 31 patients plus an add on, for 32 patients, for August 2nd. Only 30 patients were noted on the Dental Compliance Log. Missing page #4. It appears that sixteen (16) patients were rescheduled.

There were 47 patients for August 3rd and pages #2 & #4 of the Dental Compliance Logs are missing and page 2 of the Pending Scheduled Events is missing for August 3rd as well. I am unable to provide a better analysis due to the missing data.

███████ at a minimum:
1. When sending this week's compliance data, please include last weeks complete data as well.
2. Train the nurses, when scheduling a patient on TrackNet, to include the location from where they are referred from, the Dental Level, the problem and the location of the patient's pain/issue/concern.
3. Include the entire Sick Call Logs for July and August since I do not have the Dental Sick Call Logs.
4. Submit the Dental Sick Call Logs for this week onward.
5. Please include Dr. ███████ on the future compliance emails so that he can be included in the discussion.
6. How are the rescheduled patients chosen to be rescheduled? How many of the rescheduled patients have resubmitted a new sick call slip to address their pain or concern?
7. Let me know when you and Pete anticipate increasing the Dentist/Dental Assistant schedule to address the dental care needs at Monterey County Jail.

Thank you,

Viviane G. Winthrop, DDS
P.O. Box 4696
El Dorado Hills, CA 95762

███████████
███████████████.

**From:** ███████████████████
**Sent:** Thursday, August 3, 2017 4:06:48 PM
**To:** Viviane Winthrop; pgb@bertling-clausen.com; ████████████████
**Subject:** encrypt

Hello,

Here are this weeks dental logs (8/2, 8/3). Attached are the Dental Sick call list and log, 14 day PE log, and intake log. The sick slip/sick call log has not been getting done by the R.N's and I have talked to them about the importance of it getting done.

Thank you,



<Scheduled Dental Appointment.pdf>

97



From: **Viviane Winthrop** ▇▇▇▇▇▇▇▇▇
Subject: CONFIDENTIAL: Fwd: Dental Logs
Date: August 25, 2017 at 11:07 AM
To: ▇▇▇▇▇▇▇▇▇
Cc: Peter Bertling pgb@bertling-clausen.com, Swearingen Van VSwearingen@rogg.com, Blitch, Susan K. x5161 BlitchSK@co.monterey.ca.us

Hi ▇▇▇ and ▇▇▇▇

Thank you for the logs. Where are the Sick Call logs for this week? Also it appears that the Intake and 14 Day logs are just started and not a continuation of the last weeks. Can you send me the series of Sick Call, Intake and 14 Day logs since July 1st to current? I will use this for my final report.

Also, how are you tracking the previously rescheduled patients to make sure they are seen even though they've be rescheduled multiple times?

Additionally, please see the email I sent on 08/16/17. I haven't heard back and there are a few questions I need answered.

Thank you!

Dr. Winthrop

Begin forwarded message:

From: ▇▇▇▇▇▇▇▇▇
Date: August 25, 2017 at 10:37:53 AM PDT
To: Viviane Winthrop ▇▇▇▇▇▇▇▇▇ "pgb@bertling-clausen.com"
<pgb@bertling-clausen.com>
Subject: Dental Logs

Hello,

Attached are the dental logs, and sick call. Sorry that I did not get them to you yesterday night it was a very busy day.

Thank you,

dental824.PDF

98

39-98

# Appendix 5

Examples of Scheduled Dental Appointments With Patients Not Seen Within Timeframe

Scheduled Dental Appointments

| Pt Initials | Triage Date | DPC | Tx to be Rendered | Seen | Comment |
|---|---|---|---|---|---|
| AA | Mar 1, 2017 | 1B (to be seen within 30 days) | Extraction #4 | Scheduled April 5, 2017 but not seen. Also scheduled on May 4 and not seen. | Pt on roster for May 3rd so patient was at MCJ during time period but was not seen per Implementation Plan's mandate - Non-compliance |
| KF | Mar 2, 2017 | 1B (to be seen within 30 days) | Extraction #28 | Not seen for extraction #28 within DPC timeframe | Pt scheduled for another problem on 4/5/17 and given a DPC of 1A for teeth #1, 2, 3, 4. Scheduled for a toothache on July 13, triaged for 1B extraction #13 on 08/10/17, not present unscheduled, paroled? |
| TC | May 24, 2017 | 1B (to be seen within 30 days) | Extraction #17 | Not seen within DPC timelines. | Scheduled July 27 and not in compliance log. Appears to have been rescheduled to 8/3/17, then 8/9/17, then rescheduled to 8/17 |
| WD | June 15, 2017 | 1C (to be seen with 60 days) | Extraction #2 | Not seen within timeframe | Scheduled on compliance log for 08/16/17 which already places patient out of compliance |
| KW | Complained of abscess/pain on 7/18/17 scheduled 7/20/17. Was never triaged only rescheduled to 7/26/17, 7/27/17, 8/2/17. Not in compliance log 8/2/17 - NIC? | | | | |

1

100

| Pt Initials | Triage Date | DPC | Tx to be Rendered | Seen | Comment |
|---|---|---|---|---|---|
| LD | Date of sick call 7/12/17, scheduled 7/14/17 and rescheduled to 7/20/17, rescheduled to 8/2/17, rescheduled to 8/9/17, rescheduled to 8/16/17 | | | | |
| MZ | Date of sick call is 7/3/17, scheduled for 7/12/17, rescheduled to 7/19/17, rescheduled to 7/27/17, rescheduled to 8/3/17, rescheduled to 8/9/17 and triaged on 8/9/17 for extraction #30 | | | | |
| FU | Sick call for molar pain 7/15/17, rescheduled to 8/10/17, rescheduled to 8/17/17 | | | | |
| AR | Sick call for bleeding gums, scheduled 7/14/17, rescheduled to 7/26/17 then categorized as a Dental Level 1, rescheduled to 8/9/17 and rescheduled to 8/17 | | | | |
| PC | Date of sick call request 7/6/17, scheduled 7/12/17, then rescheduled to 7/14/17, then rescheduled to 7/19/17 where he was triaged for a cleaning | | | | |

| Pt Initials | Triage Date | DPC | Tx to be Rendered | Seen | Comment |
|---|---|---|---|---|---|
| AL | Date of request 7/4/17, scheduled 7/6/17, rescheduled to 7/12/17, rescheduled to 7/20/17, rescheduled to 8/10/17, rescheduled to 8/16/17 | | | | |
| CF | Sick Call 7/12/17 for teeth pain, scheduled 7/14/17, rescheduled to 7/27/17, rescheduled to 8/3/17, rescheduled to 8/9/17, rescheduled to 8/16/17 | | | | |

3

102

# Appendix 6

July 2017 Trend
Patients Scheduled & Patient Seen

| | July 3 | July 6 | July 12 | July 13 | July 14 | July 19 | July 20 | July 26 | July 27 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|
| # of patients scheduled | 34 | 44 | 49 | 22 | 22 (+5) = 27 | 40* | 58 | 37 (+4) | 58 | 373 |
| # of patients not in custody (NIC) | 0 | 5 | 3 | 1 | 1 | 0 | 0 | 6 | 0 | 16 |
| # of refusals | 2 | 0 | 3 | 6 | 5 | 5 | 1 | 0 | 7 | 29 |
| # of patients rescheduled | 16 | 39 | 29 | 2 | 10 | 25 | 45 | 22 | 39 | 227 |
| # of patients seen | 16 | 0 | 14 | 13 | 11 | 10 | 12 | 13 | 12 | 101 |

* 41 actually scheduled but one patient scheduled twice

# Appendix 7

Dental Compliance Tracking Logs
July 27th, 2017

58 pts

# Pending Scheduled Events for MJ

| Booking # | | Event Comment | Cell | |
|---|---|---|---|---|
| | EN MT | 07/27/2017 07:00 LEVEL 2 NEED DENTURES   RSSC FROM 7/14 | INTAKE | 1 |
| | MT | 07/27/2017 07:00 INTAKE: LEVEL 2, UPPER WISDOM TOOTH | INTAKE | 2 |
| | MT | 07/27/2017 07:00 BLEEDING GUMS WHEN    BRUSHING TEETH | 3QP 02M | 3 |
| | MT | 07/27/2017 07:00 INTAKE: LEVEL 2 CHIPPED MOLAR W/OCCASIONAL PAIN | 3RP 107 | 4 |
| | MT | 07/27/2017 07:00 LEVEL 2 | 3RP 107D | 5 |
| | MT | 07/27/2017 07:00 LEVEL 2         DENTURE EVAL | 3SP 103 | 6 |
| | MT | 07/27/2017 07:00 TOOTH ACHE, REQ EXTRACTION | 3SP 104 | 7 |
| | MT | 07/27/2017 07:00 DENTAL LEVEL 2 | 3SP 206D | 8 |
| | MT | 07/27/2017 07:00 SICK SLIP/L2/TOOTH ACHE | 3SP 207 | 9 |
| | MT | 07/27/2017 06:59 SICK SLIP: L2 TOOTH PAIN | 3SP 207D | 10 |
| | MT | 07/27/2017 07:00 DENTAL LEVEL 2 | 3SP 209 | 11 |
| | MT | 07/27/2017 07:00 BROKEN TEETH        RSSC FROM 7/8/17 | 3TP 06 | 12 |
| | MT | 07/27/2017 06:58 WISDOM TEETH EVAL | 3TP 07 | 13 |
| | MT | 07/27/2017 07:00 FRONT UPPER TOOTHACHE | 3TP 22 | 14 |
| | MT | 07/27/2017 07:00 TEMP FILL #29 RSSC FROM 7/6/17 | 3TP 32 | 15 |
| | MT | 07/27/2017 07:00 SICK CALL SLIP: LEVEL 2: LOWER MOLAR PAIN. | 3UP 30 | 16 |
| | MT | 07/27/2017 07:00 LEVEL 2          X 1 | 4AP 109 | 17 |
| | MT | 07/27/2017 07:00 LEVEL 2 | 4AP 201 | 18 |
| | MT | 07/27/2017 07:00 DENTAL LEVEL 2 | 4BP 109 | 19 |
| | MT | 07/27/2017 07:00 REQ TEETH CLEANING     SICK SLIP, LEVEL 2 | 4DP 104 | 20 |
| | MT | 07/27/2017 07:00 DENTAL LEVEL 2     RE SCHEDULED FROM 7/12/17 | 4EP 03 | 21 |
| | MT | 07/27/2017 07:00 LEV 2        RSSC FROM 7/12/17 | 4EP 17 | 22 |
| | MT | 07/27/2017 07:00 DENTAL        RSSC FROM 7/14 | 4FP 14 | 23 |
| | MT | 07/27/2017 07:00 TOOTHACHE | 4FP 27 | 24 |
| | MT | 07/27/2017 07:00 LEVEL 2        RSSC FROM 7/12/17 | 4INF02 | 25 |
| | MT | 07/27/2017 07:00 FILLING FELL OUT      RSSC FROM 7/15 | 4IP 206 | 26 |
| | MT | 07/27/2017 01:10 X 31 | T 4JP 110 | 27 |
| | MT | 07/27/2017 07:00 C/O GUMS BLEEDING WHILE BRUSHING TEETH  RSSC FROM 7/14 | 4JP 206D | 28 |
| | MT | 07/27/2017 07:00 LEVEL 2        RSSC FROM 7/18 | 4K4 10 | 29 |
| | MT | 07/27/2017 07:00 DENTAL PAIN LEVEL 2 | 5BT303 | 30 |
| | MT | 07/27/2017 07:00 DENTAL PAIN #30 | 5BT319 | 31 |
| | MT | 07/27/2017 07:00 SICK SLIP, LEVEL 2    "EXTREME PAIN ON LEFT WISDOM" REQ IBU RI | 5CW 11M | 32 |
| | MT | 07/27/2017 07:00 SICK CALL SLIP, LEVEL 2 C/O PAIN R/T HOLE IN TOOTH RSSC FROM 7/ | 5CW 17B | 33 |
| | MT | 07/27/2017 07:00 DENTAL | 5DW 04T | 34 |
| | MT | 07/27/2017 07:00 PE DENTAL LEVEL 2    LEVEL 2 INTAKE RESCHEDULED FROM 7/13 T | 5DW 08T | 35 |
| | MT | 07/27/2017 07:00 SICK SLIP: LEVEL 2; C/O TOOTH PAIN | 5DW 09T | 36 |
| | MT | 07/27/2017 04:07 DENTAL ISSUES | 5DW 14B | 37 |
| | MT | 07/27/2017 07:00 ISSUES W/ DENTURES | 5DW 16M | 38 |
| | MT | 07/27/2017 07:00 WISDOM TEETH | 5FS 18T | 39 |
| | MT | 07/27/2017 07:00 FIXED RETAINER LOOSE | 5FS 21M | 40 |
| | MT | 07/27/2017 07:00 LEVEL 2        RSSC FROM 7/12/17 | 7AD 07 | 41 |
| | MT | 07/27/2017 07:00 L1         DEEP CLEANING | 7BD 19 | 42 |
| | MT | 07/27/2017 07:00 INTAKE: LEVEL 2 "NEEDS CROWN" | 7BD 21 | 43 |
| | MT | 07/27/2017 07:00 PT REQUEST DENTAL | 7BD 47 | 44 |
| | MT | 07/27/2017 07:00 BLEEDING GUMS REQUEST TEETH CLEANING, STD CHECK RSSC FRO | 7BD 69 | 45 |
| | MT | 07/27/2017 07:00 PAIN IN BACK TEETH | 8CD 01 | 46 |

# Pending Scheduled Events for MJ



| Booking # | | Event Comment | | | Cell | |
|---|---|---|---|---|---|---|
| EN | MT | 07/27/2017 07:00 | LEVEL 1 | | 8CD 06 | 47 |
| | MT | 07/27/2017 07:00 | TEETH PAIN | RSSC FROM 7/14/17 | 8CD 14 | 48 |
| | MT | 07/27/2017 07:00 | ROTTEN BACK MOLARS | RSSC FROM 7/19 | 8CD 17 | 49 |
| | MT | 07/27/2017 07:00 | WISDOM TOOTH | | 8CD 24 | 50 |
| | MT | 07/27/2017 07:00 | LEVEL 2 | | 8CD 40 | 51 |
| | MT | 07/27/2017 07:00 | SICK SLIP, LEVEL 2 | REQ TOOTH EXTRACTION | 8CD 41 | 52 |
| | MT | 07/27/2017 07:00 | WANTS ASPIRIN FOR TOOTHACRSSC FROM 7/18 | | 8DD 02 | 53 |
| | MT | 07/27/2017 17:13 | X 18 | | S 8DD 10 | 54 |
| | MI | 07/27/2017 07:00 | LEVEL 2 | | 8DD 12 | 55 |
| | MT | 07/27/2017 07:00 | SICK SLIP, LEVEL 2 | TOOTH ACHE, REQ MED REFILL | 8DD 62 | 56 |
| | MT | 07/27/2017 07:00 | CLEANING/ANNUAL EVAL   CLEANING | | 8DD 67 | 57 |
| | MT | 07/27/2017 07:00 | LEVEL 2 | RSSC FROM 7/14/17 RSSC FROM 7/19 | 8DD 72 | 58 |

5B scheduled

16 not entered in compliance by RLS?

39 produce { 23 rescheduled
9 refused
12 seen

## DENTAL COMPLIANCE LOG   July 27th 2017 — Pg 1

1= Intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5=Comp Exam, D1=Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days.  DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 7/9/17 | ①2 3 4 5 D1 ⑩2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re sched 8/2/17 |
| | 7/6/17 | 1 ② 3 4 5 D1 ⑩2 N/A R NIC OTC | 7/27/17 | N/A | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | REFUSED |
| | 7/8/17 | 1 ② 3 4 5 D1 ⑩2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Resched 8/3/17 |
| | 7/19/17 | 1 ② 3 4 5 D1 ⑩2 N/A R NIC OTC | 7/27/17 | 7/27/17 | TR / TX | 15 | NV. P V N | ⓨ N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | 7/27/17 | RDA, HaZ, IPA X-15 NV, PVN |
| | 7/23/17 | 1 ②③ 4 5 D1 ⑩2 N/A ⓡ NIC OTC | 7/27/17 | M A | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | REFUSED |
| | 7/11/17 | 1 ② 3 4 5 D1 ⑩2 N/A ⓡ NIC OTC | 7/27/17 | N/A | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | REFUSED |
| | 7/8/17 | 1 2 3 4 5 ⑩1 D2 N/A R NIC OTC | 7/27/17 | 7/27 | TR / TX | 14 | N. X-14 | Y N | 1A ⑪B 1C 2 5, PO Check Per Pt Req | 8/24/17 | | RDA, H2O, RDA NV. X-14 |
| | 7/25/17 | 1 ② 3 4 5 D1 ⑩2 N/A ⓡ NIC OTC | 7/27/17 | N/A | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 PO Check Per Pt Req | N/A | N/A | REFUSED |
| | 7/6 | 1 ② 3 4 5 D1 ⑩2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Seen 7/24 |
| | 7/6/17 | 1 2 3 ④ 5 D1 D2 ⑩/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched 8/2/17 |

# DENTAL COMPLIANCE LOG  July 27th 2017

Pg2

1= Intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5=Comp Exam, D1=Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days.  DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 7/7/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched 8/2/17 |
| | 7/14/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | N/A | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched 8/2/17 |
| | 7/14/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched 8/3/17 |
| | 7/14/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched 8/3/17 |
| | 7/12/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched 8/3/17 |
| | 7/12/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched 8/2/17 |
| | 7/14/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched 8/3/17 |
| | 7/7/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 PO Check Per Pt Req | n/a | n/a | Re Sched 8/3/17 |
| | 7/12/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched 8/2/17 |
| | 7/6/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | 7/27/17 | TR / TX | 31 | NV PRN | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | 7/27/17 | RBA,PTC, H2F. K~31 |

## DENTAL COMPLIANCE LOG

PG3
July 27th 2017

1= Intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5=Comp Exam, D1=Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days.  DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 7/14/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re sched 26 8/9/17 |
| | 7/18/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re sched 29 8/9/17 |
| | 7/18/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re sched 32 8/9/17 |
| | 7/24/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched 33 8/10/17 |
| | 7/18/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re saved 37 8/10/17 |
| | 7/15/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re sched 38 26 8/2/17 |
| | 7/12/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched 39 8/9/17 |
| | 7/12/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | N/A | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 PO Check Per Pt Req | N/A | N/A | REFUSED 41 |
| | 7/24/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | 7/27/17 | TR / TX | 31 | NV mob Temp YES N | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | 8/24/17 | | AV. in BIS Recid Temp~Ary 46 |
| | 7/24/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | 7/27/17 | TR / TX | 15 | pv N | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | 7/27/17 | RBA off, 42C. 47 X-15 er ~ p~N |

110

39-110

## DENTAL COMPLIANCE LOG

Pg4
July 27th 2017

1= intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5=Comp Exam, D1=Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days.  DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 7/19/17 | 1 ②3 4 5 ⓓ1 D2 N/A Ⓡ NIC OTC | 7/27/17 | MA | TR TX | MA | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | Refusal 1/4 |
| | 7/14/17 | 1 ②3 4 5 D1 ⓓ2 N/A Ⓡ NIC OTC | 7/27/17 | n/a | TR TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Refusal 56 |
| | 7/16/17 | 1 ②3 4 5 D1 ⓓ2 N/A R NIC OTC | 7/27/17 | 7/27/17 | TR TX | 16 | AV RPS | Ⓨ N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | IPA, No NGN Psurf foto 51 TBR 2 wks No ADD Tx NEEDED |
| | 7/14/17 | 1 2 ③ 4 5 D1 ⓓ2 N/A R NIC OTC | 7/27/17 | 7/27/17 | TR TX | 14 | AV Ref (5) Local Dentist | Ⓨ N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re only Pt to seek Tx By Local Dentist per Pt. (14) 52 |
| | 7/16/17 | 1 2 3 ④ 5 D1 D2 Ⓝ/Ⓐ R NIC OTC | 7/27/17 | 7/27/17 | TR TX | 17/18B | NV PLN | Ⓨ N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | 7/27/17 | X-17/18B 54 NV PVN |
| | 7/26 | ① 2 3 4 5 D1 ⓓ2 N/A R NIC OTC | 7/27/17 | n/a | TR TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched 2 8/10/17 |
| | 7/26/17 | 1 2 3 ④ 5 D1 D2 Ⓝ/Ⓐ R NIC OTC | 7/27/17 | n/a | TR TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched 31 8/3/17 |
| | 7/19/17 | 1 ②3 4 5 ⓓ1 D2 N/A R NIC OTC | 7/26/17 | 7/27/17 | TR TX | 15 | NV PVN | Y Ⓝ | 1Ⓐ 1B 1C 2 PO Check Per Pt Req | n/a | 7/27/14 | X-15 44 NV PVN |
| | 7/14/17 | 1 2 3 4 5 ⓓ1 D2 N/A R NIC OTC | 7/27/17 | 7/27/17 | TR TX | n/a | NO TX NEEDED | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | NO TX NEEDED 55 |
| | 7/13 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 7/27/17 | 7/27/17 | TR TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | NO TX NEEDED 43 |
| HUA | | | 7/27 | | | | | | | | | NO TX NEEDED pt will seek care (Kolosso) 2 |

p55

# DENTAL COMPLIANCE LOG

1= Intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5=Comp Exam, D1=Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days.  DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 7/23/17 | 1 2 ③ 4 5 D1 D② N/A R NIC OTC | 7/27/17 | n/a | TR TX | | n/a n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | Re Sched E/3/17 |
| | | 1 2 3 4 5 D1 D2 N/A R NIC OTC | | | TR TX | | | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | | | |
| | | 1 2 3 4 5 D1 D2 N/A R NIC OTC | | | TR TX | | | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | | | |
| | | 1 2 3 4 5 D1 D2 N/A R NIC OTC | | | TR TX | | | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | | | |
| | | 1 2 3 4 5 D1 D2 N/A R NIC OTC | | | TR TX | | | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | | | |
| | | 1 2 3 4 5 D1 D2 N/A R NIC OTC | | | TR TX | | | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | | | |
| | | 1 2 3 4 5 D1 D2 N/A R NIC OTC | | | TR TX | | | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | | | |
| | | 1 2 3 4 5 D1 D2 N/A R NIC OTC | | | TR TX | | | Y  N | 1A 1B 1C 2 PO Check Per Pt Req | | | |
| | | 1 2 3 4 5 D1 D2 N/A R NIC OTC | | | TR TX | | | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | | | |
| | | 1 2 3 4 5 D1 D2 N/A R NIC OTC | | | TR TX | | | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | | | |

19

# Appendix 8

Dental Compliance Tracking Logs
August 31st, 2017

**Pending Scheduled Events for MJ**

Wednesday, August 30, 2017 12:19      Page 1 of 1

notby ① DNRS

| | | | Event Comment | Cell | |
|---|---|---|---|---|---|
| 8/29 | ADMIN EVEN | MT | 08/31/2017 07:00  LEVEL 2 CRACKED MOLARS | INTAKE | 1 |
| 8/3 | | MT | 08/31/2017 07:00  SICK SLIP, LEVEL 2    C/O BLEEDING GUMS RRSC FROM 8/3, 8/10, 8/1 | 1MHOO4 | 2 |
| 8/29 | DNRS | MT | 08/31/2017 07:00  SICK CALL - LEVEL 2 - CAVITIES | 3QP 11M | 3 |
| 8/29 | | MT | 08/31/2017 07:00  DENTAL LEVEL 2 | 3QP 13T | 4 |
| 8/11 | | MT | 08/31/2017 07:00  DENTAL 2 | 3RP 106D | 5 |
| 8/29 | DNRS | MT | 08/31/2017 07:00  CLEANING        MOLARS PAINFUL 8/10 | 3RP 107D | 6 |
| 8/17 | | MT | 08/31/2017 07:00  SICK CALL DENTAL 2 | 3SP 207D | 7 |
| TAL 8/24 | R | MT | 08/31/2017 07:00  INTAKE - LEVEL 2 - CAVITIES   RSSC DUE TO COURT 8/24 | 3TP 08 | 8 |
| | C | MT | 08/31/2017 07:00  WISDOM TEETH COMING IN | 3TP 29 | 9 |
| 8/27 | | MT | 08/31/2017 07:00  DENTAL PAIN | 3TP 43 | 10 |
| 8/29 | | MT | 08/31/2017 07:00  AM TREATMENTS: L2 TOOTH ACHE | 3TP 48 | 11 |
| 8/29 | | MT | 08/31/2017 07:00  SICK CALL DENTAL L2 | 3UP 02 | 12 |
| 8/29 | | MT | 08/31/2017 07:00  SICK CALL DENTAL 2 | 3UP 18 | 13 |
| 8/28 | | MT | 08/31/2017 07:00  LEVEL 2 - PE - L LOWER MISSING TEETH | 3WHO21 | 14 |
| 8/29 | DNRS | MT | 08/31/2017 07:00  REQUEST DENTURES | 4AP 103 | 15 |
| 7/27 | DNRS | MT | 08/31/2017 07:00  LEVEL 2        RSSC FROM 7/27/17, 8/3, 8/10, 8/16, 8/23 | 4AP 201 | 16 |
| 7/14 | | MT | 08/31/2017 07:00  C/O DENTAL ISSUE     RSSC FROM 7/14, 8/10, 8/16, 8/23 | 4CP 203 | 17 |
| 8/29 | | MT | 08/31/2017 07:00  LEVEL 2 | 4DP 103D | 18 |
| 8/23 | DNSR | MT | 08/31/2017 07:00  SICK SLIP, LEVEL 2    STATING PAIN AND REQ ABX AND IBU  RSSC 8/2 | 4FP 05 | 19 |
| 8/29 | DNSR | MT | 08/31/2017 07:00  PE LVL 2 | 4FP 27 | 20 |
| 8/10 | | MT | 08/31/2017 07:00  REQ MOUTH GUARD      RSSC FROM 8/16, 8/24 | 4IP 210 | 21 |
| 7/14 | DNRS | MT | 08/31/2017 07:00  C/O GUMS BLEEDING WHILE BRUSHING TEETH   RSSC FROM 7/14 RSS | 4JP 206D | 22 |
| 8/27 | | MT | 08/31/2017 07:00  CAVITIES | 4K1718 | 23 |
| 8/29 | | MT | 08/31/2017 07:00  SICK CALL - LEVEL 2 BRACES/WISDOM TEETH | 4K4 18 | 24 |
| 8/29 | | MT | 08/31/2017 07:00  TOOTH ACHE REFILL IBU | 4K4 27 | 25 |
| 8/17 | | MT | 08/31/2017 07:00  LEVEL-2,ANNUAL CK UP     RSSC 8/17, 8/24 | 4K5 13 | 26 |
| | ④ | MT | 08/31/2017 07:00  X-19 | 4K5 29 | 27 |
| 8/24 | | MT | 08/31/2017 07:00  PE DENTAL 2 MOLARS    RSSC 8/24 | 5BT311 | 28 |
| 8/29 | | MT | 08/31/2017 07:00  TEMP CROWN CAUSING PAIN | 5CW 04B | 29 |
| 8/30 ① ✳ | | MT | 08/31/2017 07:00  LEVEL 1        FACE SWELLING SECONDARY TEETH → Hospital | 5CW 12M | 30 |
| 8/3 | | MT | 08/31/2017 07:00  SC WISDOM TEETH PAIN    RSSC 8/3, 8/10, 8/16, 8/23 | 5DW 04B | 31 |
| 8/17 | ①NDRM | MT | 08/31/2017 07:00  X-16  DNRS | 5DW 07M | 32 |
| 8/25 | ④ | MT | 08/31/2017 07:00  X-30 | 5DW 11M | 33 |
| NZO  8/17 | | MT | 08/31/2017 07:00  DISCUSS DENTAL EXTRACTION RSSC 8/17, 8/24 | 5DW 15T | 34 |
| 8/17 | | MT | 08/31/2017 07:00  LEVEL 2        RSSC 8/17, 8/24 | 5EW 03T | 35 |
| 8/23 | | MT | 08/31/2017 07:00  PER 6 MO PE  LEVEL 2   RSSC 8/23 | 5FS 27B | 36 |
| 8/25 | ④ | MT | 08/31/2017 07:00  X-7,8,9,10 | 5FS 32B | 37 |
| 8/28 | | MT | 08/31/2017 07:00  DENTAL PAIN; REQ IMPLANT | 7AD 15 | 38 |
| 8/23 | | MT | 08/31/2017 07:00  EVAL NEED FOR DENTURES  RRSC 8/23 | 7BD 43 | 39 |
| 8/24 | | MT | 08/31/2017 07:00  DENTAL L-2 | 8CD 07 | 40 |
| 8/24 | | MT | 08/31/2017 07:00  INTAKE DENTAL LEVEL 2  REQ.MOUTH GUARD | 8CD 22 | 41 |
| 8/10 | | MT | 08/31/2017 07:00  REQ TEETH CLEANING     8/10, 8/23 | 8CD 31 | 42 |
| 8/10 | | MT | 08/31/2017 07:00  R LOWER BACK WISDOM PAIN RSSC 8/10, 8/23 | 8CD 46 | 43 |
| HER  7/14 | | MT | 08/31/2017 07:00  TEETH PAIN      RSSC FROM 7/14/17, 7/27, 8/3, 8/10, 8/16, 8/23 | 8CD 61 | 44 |
| 8/29 | | MT | 08/31/2017 07:00  MOLARS COMING IN, PAIN | 8DD 06 | 45 |
| ⑦  8/25  RS | | MT | 08/31/2017 07:00  X-20 | 8DD 19 | 46 |

per  PM SNAVR.

Pg 2

## DENTAL COMPLIANCE LOG August 31ST 2017

1= Intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5=Comp Exam, D1=Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days.  DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched. | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 8/29/17 | 1 (2) 3 4 5 D1 (D2) N/A R NIC OTC | 8/31/17 | n/a n/c | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17  1 |
| 7 | 8/3/17 | 1 (2) 3 4 5 D1 (D2) N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17  2 |
| 3 | 8/29/17 | 1 (2) 3 4 5 D1 (D2) N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | • DNRS SEEN ↑TIMES |
| | 8/29/17 | 1 (2) 3 4 5 D1 (D2) N/A R NIC OTC | 8/31/17 | 8 31 17 | (TR) / TX | 15 | X-15 | Y (N) | 1A (1B) 1C 2 5, PO Check Per Pt Req | 8.28 .17 | | (FA) |
| 5 | 8/11/17 | 1 (2) 3 4 5 D1 (D2) N/A (R) NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | • DNRS ↑REFUSAL |
| | 8/29/17 | 1 (2) 3 4 5 D1 (D2) N/A (R) NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | • DNRS ↑REFUSAL S |
| | 8/27/17 | 1 (2) 3 4 5 D1 (D2) N/A R NIC OTC | 8/31/17 | 9/7/17 n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17  1 |
| | 8/24/17 | (1) 2 3 4 5 D1 (D2) N/A (R) NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 PO Check Per Pt Req | n/a | n/a | REFUSED • DNRS |
| | 8/29/17 | 1 (2) 3 4 5 D1 (D2) N/A R NIC OTC | 8/31/17 | 8/31/17 | (TR) / TX | 3z | NV X-32 | (Y) N | 1A (1B) 1C 2 5, PO Check Per Pt Req | 9. 27 17 | | ANTIBIOTIC COV. |
| | 8/27/17 | 1 (2) 3 4 5 D1 (D2) N/A R NIC OTC | 8/31/17 | 8/31/17 | TR / TX | 3 | NV. X-3 | (Y) N | 1A 1B 1C 2 5, PO Check Per Pt Req | 9/14 /17 | | HERE 1wk TBZ 1wk SENTENCE-? FIRST AVAILABLE |

39-115

## DENTAL COMPLIANCE LOG August 31st 2017

F-2

1= Intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5- Comp Exam, D1 –Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days.  DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched. | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 8/29/17 | 1 2③ 4 5 D1 ⓓ2 N/A R NIC OTC | 8/31/17 | 8/31/17 | TR / TX | 20 | NV. X-20 | Y  N | 1A ①B 1C 2 5, PO Check Per Pt Req | 9/28/17 | | Recd one etc (F A) |
| 2 | 8/29/17 | 1 2③ 4 5 D1 ⓓ2 N/A R NIC OTC | 8/31/17 | 8/31/17 | ⓉR / TX | 32 | NV P×N | Y ⓃN | 1A 1B 1C 2 5, PO Check Per Pt Req | N/a | N/a | TBR 5 DAYS REFER TO O3. |
| 3 | 8/27/17 | 1 2③ 4 5 D1 ⓓ2 N/A R NIC OTC | 8/31/17 | 8/31/17 | TR / Ⓣx | 1? | P×N | Ⓨ N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | 8/31/17 | X-14 completed |
| 4 | 8/28/17 | 1 2 ③ 4 5 D1 ⓓ2 N/A R NIC OTC | 8/31/17 | n/a 8/31/14 | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | a/7/17 |
| 5 | 8/29/17 | 1 ② 3 4 5 D1 ⓓ2 N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | DENTURES DNRS |
| 0 | 7/27/17 | 1 2③ 4 5 D1 ⓓ2 N/A Ⓡ NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | DNRS ↑ REFUSED |
| 7 | 7/14/17 | 1 2③ 4 5 D1 ⓓ2 N/A R NIC OTC | 8/31/17 | n/a 8/31/17 | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | a/7/17 |
| 6 | 8/29/17 | 1 2③ 4 5 D1 ⓓ2 N/A R NIC OTC | 8/31/17 | n/a 8/31/17 | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 PO Check Per Pt Req | n/a | n/a | a/7/17. |
| 1 | 8/23/17 | 1 2③ 4 5 D1 ⓓ2 N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | DNRS ↑ appli |
| 0 | 8/29/17 | 1 2③ 4 5 D1 ⓓ2 N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | DNRS ↑ JIMES |

Pg #3

# DENTAL COMPLIANCE LOG August 31st 2017

1= Intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5- Comp Exam, D1=Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days.  DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | 9/10/17 | 1 ②3 4 5 D1 ⑩2 N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | DENTURS DNRS |
| 22 | 7/14/17 | 1 ②3 4 5 D1 ⑩2 N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | ↑TIMES DNRS |
| 23 | 8/27/17 | 1 ②3 4 5 D1 ⑩2 N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17 |
| 24 | 8/29/17 | 1 ②3 4 5 D1 ③ N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17 |
| 25 | 8/29/17 | 1 ②3 4 5 D1 ⑩2 N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17 |
| 26 | 8/17/17 | 1 ②3 4 5 D1 ⑩2 N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17 4 |
| 27 | 8/17/17 | 1 2 3 ④⑤ D1 D2 (N/A) R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17 1 |
| 28 | 8/24/17 | 1 2 ③4 5 D1 ⑩2 N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 PO Check Per Pt Req | n/a | n/a | 9/7/17 1 |
| 29 | 8/29/17 | 1 ②3 4 5 D1 ⑩2 N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17 1 |
| 30 | 8/30/17 | 1 ②3 4 5 ⑩1 D2 N/A R NIC OTC | 8/31/17 | 8/31/17 | (TR) TX | UR | Nv lwk POL | Y (N) | (1A) 1B 1C 2 5, PO Check Per Pt Req | 9-6-17 | | EVALATZ UR SWELING AFTTZ MD Referal |

39-117

P-4

# DENTAL COMPLIANCE LOG August 31st 2017

1= Intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5=Comp Exam, D1=Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days. DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3) | 8/3/17 | 1 2③ 4 5  D1 D2 N/A  R NIC OTC | 8/31/17 | 8/31/17 | TR  TX | 13 | FILL #13 | Y N | 1A 1B 1C 2  5, PO Check Per Pt Req | 11/1/17 | | |
| 52 | 8/17/17 | 1 2 3④5  D1 D2 N/A  R NIC OTC | 8/31/17 | n/a | TR  TX | n/a | n/a | Y N | 1A 1B 1C 2  5, PO Check Per Pt Req | n/a | n/a | REFUSED  DN RS |
| 53 | 8/25/17 | 1 2 3④5  D1 D2 N/A  R NIC OTC | 8/31/17 | 8 31 17 | TR  TX | 30 | p~N | Y N | 1A 1B 1C 2  5, PO Check Per Pt Req | n/a | 8 31 17 | X = SO  completed |
| 54 | 8/17/17 | 1 2③ 4 5  D1 D2 N/A  R NIC OTC | 8/31/17 | n/a | TR  TX | n/a | n/a | Y N | 1A 1B 1C 2  5, PO Check Per Pt Req | n/a | n/a | 9/7/17 3 |
| 5 | 8/17/17 | 1 2③ 4 5  D1 D2 N/A  R NIC OTC | 8/31/17 | n/a 9/7 | TR  TX | n/a | n/a | Y N | 1A 1B 1C 2  5, PO Check Per Pt Req | n/a | n/a | 9/7/17 3 |
| 6 | 8/23/17 | 1 2 3④5  D1 D2 N/A  R NIC OTC | 8/31/17 | n/a 9/7 | TR  TX | n/a | n/a | Y N | 1A 1B 1C 2  5, PO Check Per Pt Req | n/a | n/a | 9/7/17 2 |
| 7 | 8/25/17 | 1 2 3④5  D1 D2 N/A  R NIC OTC | 8/31/17 | 8/31/17 | TR  TX | 7 11  8 9  10 | p~N | Y N | 1A 1B 1C 2  5, PO Check Per Pt Req | n/a | 8 31 17 | 7-8-9-10,11  EXTRACTION  completed |
| 8 | 8/28/17 | 1 2③ 4 5  D1 D2 N/A  R NIC OTC | 8/31/17 | n/a | TR  TX | n/a | n/a | Y N | 1A 1B 1C 2  PO Check Per Pt Req | n/a | n/a | NIC |
| 9 | 8/23/17 | 1 2③ 4 5  D1 D2 N/A  R NIC OTC | 8/31/17 | n/a | TR  TX | n/a | n/a | Y N | 1A 1B 1C 2  5, PO Check Per Pt Req | n/a | n/a | 9/7/17 2 |
| 0 | 8/29/17 | 1 2③ 4 5  D1 D2 N/A  R NIC OTC | 8/31/17 | n/a nic | TR  TX | n/a | n/a | Y N | 1A 1B 1C 2  5, PO Check Per Pt Req | n/a | n/a | 9/7/17 . 1 |

# DENTAL COMPLIANCE LOG August 31st 2017

P 5

1= Intake, 2=Pt Sick Call, 3– 14 Day Health Inventory, 4– Provider Request, 5= Comp Exam, D1=Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days  DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | 8/24/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 8/31/17 | n/a 9/17 | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17 1 |
| 12 | 8/19/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 8/31/17 | n/a 9/17 | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17 3 |
| 13 | 8/19/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 8/31/17 | n/a 9/17 | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17 3 |
| 14 | 7/14/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 8/31/17 | n/a 9/17 | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17 7 |
| 15 | 8/24/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 8/31/17 | n/a 9/17 | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/7/17 1 |
| 16 | 8/25/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 8/31/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | 9.5.17 | 9/7 | OUT ON MEDICAL VISIT TO OUTSIDE MD. RESCHEDULE |
| 7 | | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 8.31.17 | 9/31/17 | TR / TX | n/a | DVN | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | pt wants a soft pm KNACK (soft diet) |
| 8 | | 1 2 3 4 5 D1 D2 N/A R NIC OTC | n/a | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 PO Check Per Pt Req | n/a | n/a | REFUSED NDRS |
| | | 1 2 3 4 5 D1 D2 N/A R NIC OTC | n/a | n/a DNC | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | RESCHEDULE |
| | | 1 2 3 4 5 D1 D2 N/A R NIC OTC | | | TR / TX | | | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | | | |

39-119

# Appendix 9

Dental Compliance Tracking Logs
September 14th, 2017

*3 — 1 'Am — ( NO DEPUTY TRAINING )*

Wednesday, September 13, 2:12:16

## Pending Scheduled Events for MJ

Page 1 of 1

| Booking # | | Event Comment | | Cell | |
|---|---|---|---|---|---|
| | *1/12* | ADMIN EVEN | MT 09/14/2017 05:55  INTAKE: LEVEL 1 PAINFUL  CAVITIES | INTAKE | 1 |
| | *9/12* | | MT 09/14/2017 07:00  DENTAL LEVEL 2 | INTAKE | 2 |
| | *9/7* | | MT 09/14/2017 07:00  LEVEL 2 SICK SLIP       REQ CLEANINGRSSC 9/7 | INTAKE | 3 |
| | *8/3* | | MT 09/14/2017 07:00  SICK SLIP  LEVEL 2       C/O BLEEDING GUMS RRSC FROM 8/3, 8/10, 8/1 | 1MHO04 | 4 |
| | *9/12* | | MT 09/14/2017 07:00  TOOTH PAIN              9/10 | 3QP 11M | 5 |
| | *9/10* | | MT 09/14/2017 07:00  LEVEL 2              REQUEST TO SEE DENTIST FOR TOOTH PAIN | 3RP 108 | 6 |
| | *1/12* | | MT 09/14/2017 07:00  C/O MOLAR PAIN           9/2 | 3RP 107D | 7 |
| | | | MT 09/14/2017 07:00  CRACKED MOLAR            WANTS TOOTH PULLED | 3SP 207 | 8 |
| | *9/7* | | MT 09/14/2017 07:00  SICK CALL DENTAL L2      9/7 | 3TP 11 | 9 |
| | *9/7* | | MT 09/14/2017 07:00  TOP LEFT TOOTH, WANTS DENTURES | 3TP 18 | 10 |
| | *8/81* | | MT 09/14/2017 07:00  RCT | 3UP 11 | 11 |
| | *9/7* | | MT 09/14/2017 07:00  TOOTH DECAY            RSSC COURT 9/7 | 3UP 23 | 12 |
| | *9/13* | | MT 09/14/2017 07:00  SICK CALL DENTAL 2 TOOTH PULLED | 3UP 30 | 13 |
| | *9/7* | | MT 09/14/2017 07:00  LEVEL 2- 2 BROKEN MOLARS | 3UP 47 | 14 |
| | *9/7* | | MT 09/14/2017 07:00  LEVEL 2 SICK SLIP       TOOTH ACHE9/7 | 3WHO20 | 15 |
| | *9/10* | | MT 09/14/2017 07:00  BROKEN TEETH WANTS PULLED9/10 | 4BP 203 | 16 |
| | *9/3* | | MT 09/14/2017 07:00  MOLAR PAIN              9/3 | 4CP 206 | 17 |
| | *1/12* | | MT 09/14/2017 07:00  DENTAL F/U | 4DP 103 | 18 |
| | *8/31* | | MT 09/14/2017 07:00  LEVEL 2                 RSSC 8/31, 9/7 | 4DP 110D | 19 |
| | *9/13* | | MT 09/14/2017 07:00  SICK CALL DENTAL L2 UPPERTOOTH, PT STATES HOLE IN TOOTH, PAIN | 4FP 27 | 20 |
| | *9/01* | | MT 09/14/2017 07:00  REQUESTING MOUTH GUARD | 4IP 210 | 21 |
| | *8/31* | | MT 09/14/2017 07:00  DENTAL L-2            RSSC 8/31, 9/7 | 4JP 209 | 22 |
| | *8/31* | | MT 09/14/2017 07:00  CAVITIES              RSSC 8/31, 9/7 | 4K1718 | 23 |
| | *8/17* | | MT 09/14/2017 07:00  6 FILL | 4K4 10 | 24 |
| | *8/31* | | MT 09/14/2017 07:00  SICK CALL - LEVEL 2 BRACES/WISDOM TEETHRSSC 8/31, 9/7 | 4K4 18 | 25 |
| | *8/24* | | MT 09/14/2017 07:00  SC LEVEL 2           RSSC 8/24, 8/30, 9/6 | 5BT112 | 26 |
| | *8/81* | | MT 09/14/2017 07:00  PE DENTAL 2 MOLARS      RSSC 8/24, 8/31, 9/7 | 5BT311 | 27 |
| | *8/81* | | MT 09/14/2017 07:00  TEMP CROWN CAUSING PAIN  RSSC 8/31, 9/7 | 5CW 04B | 28 |
| | *9/12* | | MT 09/14/2017 07:00  PE DENTAL L2 | 5CW 09M | 29 |
| | *9/11* | | MT 09/14/2017 07:00  LEVEL 2 SICK SLIP        WISDOM TOOTH PAIN | 5CW 23B | 30 |
| | *9/16* | | MT 09/14/2017 07:00  MOLAR PAIN              9/8 | 5DW 20M | 31 |
| | *9/2* | | MT 09/14/2017 07:00  L2- TOP RIGHT TOOTH PAIN | 5DW 25M | 32 |
| | *9/12* | | MT 09/14/2017 07:00  SICK CALL DENTAL L2 | 5EW 04M | 33 |
| | *9/11* | | MT 09/14/2017 07:00  TEETH CLEANING/EVAL     RSSC 9/6 | 5EW 05T | 34 |
| | *8/17* | | MT 09/14/2017 07:00  XXX | 5FS 25T | 35 |
| | *8/12* | | MT 09/14/2017 07:00  X-19 | 5FS 31M | 36 |
| | *9/16* | | MT 09/14/2017 07:00  BROKEN TOOTH | 5FS 32B | 37 |
| | *9/12* | | MT 09/14/2017 07:00  LEVEL 2- HOLE IN TOOTH  9/7 | 7AD 18 | 38 |
| | *9/7* | | MT 09/14/2017 07:00  TOOTH PAIN | 7BD 01 | 39 |
| | *9/12* | | MT 09/14/2017 07:00  PE DENTAL L2 | 7BD 18 | 40 |
| | *9/12   9/11* | | MT 09/14/2017 07:00  MOLAR PAIN              9/8 | 7BD 39 | 41 |
| | | | MT 09/14/2017 07:00  LEVEL 2 C/O DENTAL PAIN AT INTAKE | 7BD 53 | 42 |
| | *9/16   9/11* | | MT 09/14/2017 07:00  LEVEL 2 | 7BD 71 | 43 |
| | | | MT 09/14/2017 07:00  LEVEL 2              CLAIMED TOOTH PAIN UPON INTAKE | 8CD 19 | 44 |
| | *8/17* | | MT 09/14/2017 07:00  REQ CLEANING         RSSC 8/17, 8/30, 9/6 | 8DD 11 | 45 |
| | *9/12* | | MT 09/14/2017 07:00  X-20 | 8DD 19 | 46 |

*121*

39-121

# DENTAL COMPLIANCE LOG September 14th 2017

Pg1

1= Intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5=Comp Exam, D1=Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days.  DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9/12/17 | ①2 3 4 5 D1 D2 N/A R NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | NIC |
| | 9/12/17 | 1②3 4 5 D1 D2 N/A R NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 ) |
| | 9/7/17 | 1②3 4 5 D1 D2 N/A R NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 ) |
| | 8/3/17 | 1②3 4 5 D1 D2 N/A R NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 S |
| | 9/12/17 | 1②3 4 5 D1 D2 N/A R NIC OTC | 9/14/17 | 9.14 | TR / TX | 8 | x-8 | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | 9. 8 | | |
| | 9/10/17 | 1②3 4 5 D1 D2 N/A R NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | NIC |
| | 9/2/17 | 1②3 4 5 D1 D2 N/A R NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 ) |
| | 9/10/17 | 1②3 4 5 D1 D2 N/A R NIC OTC | 9/14/17 | 9.14 | TR / TX | 15 | x-15 | Y  N | 1A 1B 1C 2 PO Check Per Pt Req | 10. 12 | | |
| | 9/7/17 | 1②3 4 5 D1 D2 N/A R NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 ) |
| | 9/10/17 | 1②3 4 5 D1 D2 N/A R NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17. ) |

# DENTAL COMPLIANCE LOG September 14th 2017

pg2

1= Intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5= Comp Exam, D1=Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days.  DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | 8/31/17 | 1 ②3 4 5 D1 ②D2 N/A ®NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | REFUSED DNRS |
| 12 | 9/7/17 | 1 ②3 4 5 D1 ②D2 N/A ®NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | REFUSED DNRS |
| 13 | 9/13/17 | 1 ②3 4 5 D1 ②D2 N/A R NIC OTC | 9/14/17 | 9.14 | ⓉR / TX | 4 | X-4 | Y Ⓝ | 1A ①B 1C 2 5, PO Check Per Pt Req | 10.12 | | |
| 14 | 9/1/17 | 1 ②3 4 5 D1 ②D2 N/A R NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 |
| 15 | 9/7/17 | 1 2 3 4 5 D1 ②D2 N/A R NIC OTC | 9/14/17 | 9.14 | ⓉR / TX | Fm | PrN | Y Ⓝ | 1A 1B 1C 2 5, PO Check Per Pt Req | - | - | Recommended Night GuARD |
| 16 | 9/10/17 | 1 ②3 4 5 D1 ②D2 N/A R NIC OTC | 9/14/17 | 9.14 | TR / ⓉX | 29 31 | PrN | Ⓨ N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | 9-14 | X-29,30,31 completeD |
| 17 | 9/13/17 | 1 ②3 4 5 D1 ②D2 N/A R NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 |
| 18 | 9/12/17 | 1 ②3 4 5 D1 ②D2 N/A R NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 PO Check Per Pt Req | n/a | n/a | 9/21/17 |
| 19 | 9/31/17 | 1 ②3 4 5 D1 ②D2 N/A R NIC OTC | 9/14/17 | n/a | TR / TX | n/a | n/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 3 |
| 20 | 9/13/17 | 1 ②3 4 5 D1 ②D2 N/A R NIC OTC | 9/14/17 | 9.14 17 | TR / TX | 12 | PrN | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | 9.14 | PO CHECK 24 hour post surgery — ikeLLy wzr |

123

## DENTAL COMPLIANCE LOG September 14th 2017    [73]

1= Intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5 Comp Exam, D1 =Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C  60 Days, 2= 120 Days   DCP 5= Outside Referral

| | Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Schd. | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | | 9/10/17 | 1 2 3 4 5 D1 (D2) N/A R NIC OTC | 9/(14)/17 | n/a | TR TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 |
| 22 | | 8/31/17 | 1 2 3 4 5 D1 (D2) N/A R NIC OTC | 9/14/17 | n/a | TR TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 ² |
| 23 | | 8/31/17 | 1 2 3 4 5 D1 (D2) N/A R NIC OTC | 9/14/17 | n/a | TR TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 ² |
| 24 | | 8/17/17 | 1 2 3 4 5 D1 D2 (N/A) R NIC OTC | 9/14/17 | n/a | TR TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 ! |
| 25 | | 8/31/17 | 1 2 3 4 5 D1 (D2) N/A R NIC OTC | 9/14/17 | n/a | TR TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 ³ |
| 26 | | 8/24/17 | 1 2 3 4 5 D1 (D2) N/A R NIC OTC | 9/14/17 | n/a | TR TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 ! |
| 27 | | 8/24/17 | 1 2 3 4 5 D1 (D2) N/A R NIC OTC | 9/14/17 | n/a | TR TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 ² |
| 28 | | 8/31/17 | 1 2 3 4 5 D1 (D3) N/A R NIC OTC | 9/14/17 | n/a | TR TX | n/a | n/a | Y  N | 1A 1B 1C 2 PO Check Per Pt Req | n/a | n/a | 9/21/17 ³ |
| 29 | | 9/10/17 | 1 2 (3) 4 5 D1 (D2) N/A R NIC OTC | 9/14/17 | n/a | TR TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 ! |
| 30 | | 9/11/17 | 1 2 (3) 4 5 D1 (D2) N/A R NIC OTC | 9/14/17 | n/a | TR TX | n/a | n/a | Y  N | 1A 1B 1C 2 5, PO Check Per Pt Req | n/a | n/a | 9/21/17 ! |

24

# Appendix 10

Dental Compliance Tracking Logs
September 20th, 2017

## Pending Scheduled Events for MJ

Tuesday, September 19, 2017 12:58                                                      Page 1 of 1

| Booking # | | | Event Comment | Cell | |
|---|---|---|---|---|---|
| | ADMIN EVEN | MT | 09/20/2017 03:41  INTAKE: LEVEL 2 BROKEN MOLAR | INTAKE | 1 |
| | | MT | 09/20/2017 07:00  SLIP SLIP L2 BROKEN TEETH | 3QP 08M | 2 |
| | A | MT | 09/20/2017 07:00  REQ TOOTH EXTRACTION | 3QP 17M | 3 |
| | | MT | 09/20/2017 07:00  SICK CALL DENTAL L2' | 3TP 15 | 4 |
| | | MT | 09/20/2017 07:00  LEVEL 1 SICK SLIP     STATES ABSCESS AND PAIN | 3TP 26 | 5 |
| | (REFREO) | MT | 09/20/2017 07:00  LEVEL 1 MOLAR ABCESS | 3TP 26 | 6 |
| | | MT | 09/20/2017 07:00  LEVEL 1 - INTAKE MULTIPLEISSUES | 3TP 37 | 7 |
| | (REFUND) | MT | 09/20/2017 07:00  X-3 | 3TP 43 | 8 |
| | | MT | 09/20/2017 02:32  INTAKE: LEVEL 2 CHIPPED TOOTH RSSC 9/7, 13 | 4AP 110 | 9 |
| | | MT | 09/20/2017 07:00  DENTAL LEVEL 2 | 4BP 110 | 10 |
| | | MT | 09/20/2017 07:00  LEVEL 2 SICK SLIP RE: BRACES CAUSING PAIN RSSC 8/24, 8/30, 9/6, 9/ | 4CP 210 | 11 |
| | EL | MT | 09/20/2017 07:00  #30              COURTRSSC 9/7, 9/13 | 4EP 03 | 12 |
| | | MT | 09/20/2017 07:00  LEVEL 1, SICK SLIP     DENTAL PAINRSSC 9/7, 9/13 | 4EP 37 | 13 |
| | | MT | 09/20/2017 07:00  LEVEL 2 - SICK SLIP - DENTAL PAIN | 4FP 05 | 14 |
| | | MT | 09/20/2017 15:51  INTAKE: LEVEL 1 BROKEN TEETH W/PAINRSSC 9/13 | 4FP 23 | 15 |
| | | MT | 09/20/2017 07:00  DENTAL LEVEL 1        RSSC 9/6/17, 9/13 | 4GP 103 | 16 |
| | N | MT | 09/20/2017 07:00  FILLING FELL OUT PER SICKSLIP | 4HP 107D | 17 |
| | | MT | 09/20/2017 07:00  TOOTH ACHE        RSSC 8/30, 9/6, 9/13 | 4HP 109D | 18 |
| | | MT | 09/20/2017 07:00  TOOTH ACHE LEVEL2       RSSC 8/30, 9/6, 9/13 | 4INF03 | 19 |
| | | MT | 09/20/2017 07:00  PE DENTAL 2 MOLAR      RSSC 8/24, 8/30, 9/6, 9/13 | 4IP 206D | 20 |
| | (REFXED) | MT | 09/20/2017 07:00  LEVEL 2 - INTAKE CAVITIES | 4JP 210 | 21 |
| | | MT | 09/20/2017 08:18  INTAKE: LEVEL 2 CRACKED TOOTH, NO PAINRSSC 9/13 | 4K1706 | 22 |
| | | MT | 09/20/2017 07:00  LEVEL 1 TOOTH PAIN     RSSC 9/13 | 4K5 03 | 23 |
| | | MT | 09/20/2017 07:00  FILL | 4K5 11 | 24 |
| | MY | MT | 09/20/2017 07:00  PRIORITY I ABCESS      SEVERE DECAYRSSC 9/13 | 4K5 22 | 25 |
| | | MT | 09/20/2017 07:00  TOOTH PAIN        RSSC 9/13 | 5BT118 | 26 |
| | | MT | 09/20/2017 07:00  X | 5BT319 | 27 |
| | | MT | 09/20/2017 07:00  FILLING CAME OUT      RSSC 9/13 | 5CW 16T | 28 |
| | | MT | 09/20/2017 07:00  LVL 2 RE: PAIN | 5CW 18B | 29 |
| | | MT | 09/20/2017 07:00  TEETH PAIN LEVEL 1     PER PA ORDER | 5CW 20M | 30 |
| | O | MT | 09/20/2017 06:32  INTAKE: LEVEL 2 MISSING TEETH | 5DW 02T | 31 |
| | | MT | 09/20/2017 07:00  X-31 DENT L2        RSSC 9/13 | 5DW 03T | 32 |
| | | MT | 09/20/2017 07:00  LEVEL 1 - INTAKE LOOSE TOOTH R LOWER | 5DW 10M | 33 |
| | | MT | 09/20/2017 07:00  X-14,15,16 | 5DW 15M | 34 |
| | | MT | 09/20/2017 07:00  LEVEL 2 - SICK CALL -  LOOSE TOOTHRSSC 9/13 | 5EW 06B | 35 |
| | R | MT | 09/20/2017 23:37  INTAKE: LEVEL 1 BROKEN TEETH | 5FS 18B | 36 |
| | | MT | 09/20/2017 07:00  RESCHEDULE PER ORDER    RSSC 9/13 | 5FS 29T | 37 |
| | | MT | 09/20/2017 07:00  CAVITRON CLEANING      RSSC 9/6, 9/13 | 5FS 30M | 38 |
| | | MT | 09/20/2017 23:49  INTAKE: LEVEL 1 BROKEN MOLAR W/PAIN RSSC 9/13 | 5FW 06B | 39 |
| | D | MT | 09/20/2017 07:00  LEVEL 1 VISABLE BONE IN GUMS-DECAY PAIN SWELLING PER PE | 5FW 06T | 40 |
| | | MT | 09/20/2017 14:07  LV 2 CRACKED MOLARS     RSSC 9/13 | 7AD 04 | 41 |
| | | MT | 09/20/2017 07:00  NEEDS UPPER DENTURES | 7AD 23 | 42 |
| | | MT | 09/20/2017 07:00  LEVEL 2- INTAKE MULTIPLE ISSUES | 7AD 41 | 43 |
| | (NEED CHART) | MT | 09/20/2017 07:00  X-16          RSSC 9/13 | 7AD 45 | 44 |
| | | MT | 09/20/2017 07:00  TOOTH CUTTING TONGUE   SICK SLIP | 7BD 73 | 45 |
| | | MT | 09/20/2017 07:00  GUMS BLEED | 8CD 18 | 46 |

# DENTAL COMPLIANCE LOG September 20ᵗʰ 2017

1= Intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5=Comp Exam, D1=Dental Level 1, D2=Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days.  DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/18 | ①2 3 4 5 D1 ⑫ N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9-27 |
| 2 | 9/16 | 1②3 4 5 D1 ⑫ N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9-27 |
| 3 | 9/16 | 1②3 4 5 D1 ⑫ N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9/27 |
| 4 | 9/10 | 1②3 4 5 D1 ⑫ N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9-27 |
| 5 | 9/18 | 1②3 4 5 ① D2 N/A R NIC OTC | 9/20 | 9./20 | TR / TX | 20 | PVN | Y Ⓝ | 1A 1B 1C 2 5, PO Check Per Pt Req | — | — | pt refused (x) pt on antibiotics and pain med TBL ~ 25 day |
| 6 | 9/14 | 1②3 4 5 D1 D2 N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | | | R/s 9-27 |
| 7 | 9/18 | 1 2 3 4⑤ D1 D2 Ⓝ/A Ⓡ NIC OTC | 9/20 | 9/20 | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | REFUSED DNRS |
| 8 | 9/7 | 1②3 4 5 D1 ⑫ N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 PO Check Per Pt Req | N/A | N/A | R/s 9/27 |
| 9 | 9/17 | 1②3 4 5 D1 ⑫ N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9/27 |
| 10 | 9/24 | 1②3 4 5 D1 ⑫ N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9/27 |

P92

# DENTAL COMPLIANCE LOG September 20th 2017

1= Intake, 2=Pt Sick Call, 3– 14 Day Health Inventory, 4= Provider Request, 5 =Comp Exam, D1–Dental Level 1, D2– Dental level 2
TR= Triage, TX= Treatment, 1A= Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days.  DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/7 | 1 2 3 ④⑤ D1 D2 N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Ⓨ N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/a | N/A | R/s 9-27 3 |
| 2 | 9/7 | ④②3 4 5 D1 D2 N/A R NIC OTC | 9/20 | 9/20 | TR / TX | 19 | PVN | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | — | — | TX NEEDED – RCT will walk For prison For TX. PV refused (x) |
| 3 | 9/17 | 1②3 4 5 D1 ⓓ2 N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9/27 |
| 4 | 9/13 | ①2 3 4 5 ⓓ1 D2 N/A R NIC OTC | 9/20 | 9/20 | TR / TX | 2,3 | PVN | Ⓨ N | 1A 1B 1C 2 5, PO Check Per Pt Req | — | 9/20 | x- 2-3 completed |
| 5 | 9/6 | 1②3 4 5 ⓓ1 D2 N/A R NIC OTC | 9/20 | 9/20 | TR / TX | 3 | PVN | Y Ⓝ | 1A 1B 1C 2 5, PO Check Per Pt Req | — | 9/20 | x-3 completed |
| 6 | 9/6 | 1②3 4 5 D1 ⓓ2 N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9/27 |
| 7 | 8/30 | 1②3 4 5 D1 ⓓ2 N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9/27 4 |
| 8 | 8/30 | 1②3 4 5 D1 ⓓ2 N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 PO Check Per Pt Req | N/A | N/A | R/s 9/27 4 |
| 9 | 8/24 | 1 2③4 5 D1 ⓓ2 N/A R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/a | N/a | R/s 9/27 6 |
| | 9/17 | ①2 3 4 5 D1 ⓓ2 N/A ⓡ NIC OTC | 9/20 | | TR / TX | N/A | N/a | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | REFUSED DMRS |

93

## DENTAL COMPLIANCE LOG September 20th 2017

1= Intake, 2=Pt Sick Call, 3= 14 Day Health Inventory, 4= Provider Request, 5= Comp Exam, D1= Dental Level 1, D2= Dental level 2
TR= Triage, TX= Treatment, 1A: Within 24 hrs, 1B= 30 Days, 1C= 60 Days, 2= 120 Days. DCP5= Outside Referral

| | Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV TX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | 9/13 | 1 2 3 4 5 / D1 D2 N/A / R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 / 5, PO Check / Per Pt Req | N/A | N/A | R/s 9/27 2 |
| 2 | | 9/13 | 1 2 3 4 5 / D1 D2 N/A / R NIC OTC | 9/20 | 9/20 | TR / TX | 15/16 | PVN | Y N | 1A 1B 1C 2 / 5, PO Check / Per Pt Req | — | — | TBNL Tuk. pt will want for EXTRACTION. |
| 3 | | 8/25 | 1 2 3 4 5 / D1 D2 N/A / R NIC OTC | 9/20 | 9/20 | TR / TX | 21 | PVN | Y N | 1A 1B 1C 2 / 5, PO Check / Per Pt Req | | 9 20 | FILL #21 (C Completed (F |
| 4 | | 9/13 | 1 2 3 4 5 / D1 D2 N/A / R NIC OTC | 9/20 | | TR / TX | | | Y N | 1A 1B 1C 2 / 5, PO Check / Per Pt Req | | | RESCHEDULE TOMORROW 2 9/21 |
| 5 | | 9/13 | 1 2 3 4 5 / D1 D2 N/A / R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 / 5, PO Check / Per Pt Req | N/A | N/A | R/s 9/27 2 |
| 6 | | 8/25 | 1 2 3 4 5 / D1 D2 N/A / R NIC OTC | 9/20 | 9/20 | TR / TX | 30 | PVN | Y N | 1A 1B 1C 2 / 5, PO Check / Per Pt Req | | 9.20 | x-30 completed |
| 7 | | 9/13 | 1 2 3 4 5 / D1 D2 N/A / R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 / 5, PO Check / Per Pt Req | N/A | N/A | R/s 9/27 2 |
| 8 | | 9/13 | 1 2 3 4 5 / D1 D2 N/A / R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 / PO Check / Per Pt Req | N/A | N/A | R/s 9/27 |
| 9 | | 9/18 | 1 2 3 4 5 / D1 D2 N/A / R NIC OTC | 9/20 | 9.20 | TR / TX | 1 | PVN | Y N | 1A 1B 1C 2 / 5, PO Check / Per Pt Req | | 9.20 | x-1 completed |
| 0 | | 9/18 | 1 2 3 4 5 / D1 D2 N/A / R NIC OTC | 9/20 | | TR / TX | N/A | N/A | Y N | 1A 1B 1C 2 / 5, PO Check / Per Pt Req | N/A | N/A | NIC 9/20 |

# DENTAL COMPLIANCE LOG September 20th, 2017

PG4

1= Intake, 2–Pt Sick Call, 3– 14 Day Health Inventory, 4= Provider Request, 5. Comp Exam, D1–Dental Level 1, D2– Dental level 2
TR= Triage, TX= Treatment, IA= Within 24 hrs, LB= 30 Days, LC= 60 Days, 2= 120 Days. DCP 5= Outside Referral

| Pt Name Booking # | Date of Request | Source & level | Date Sched | Date seen | TR TX | Tooth # | NV IX Recommend Action | RX Given | Current DPC | Date tx Sched | Date Tx Provided | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31 | 9/13 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 9/20 | 9 20 | TR TX | 14 | prn | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | | 9 20 | x – 14 completed |
| 32 | 9/14 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 9/20 | | TR TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9/27 1 |
| 33 | 8/28 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 9/20 | 9 20 | TR TX | 16 15 14 | prn | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | | 9 20 17 | x – 14,15,16s completed |
| 34 | 9/13 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 9/20 | | TR TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9/27 2 |
| 35 | 9/12 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 9/20 | | TR TX | | | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | | | RESCHEDULE Tomorrow 9/21 |
| 36 | 9/13 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 9/20 | | TR TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9/27 2 |
| 37 | 9/6 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 9/20 | | TR TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9/27 3 |
| 38 | 9/13 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 9/20 | | TR TX | N/A | N/A | Y N | 1A 1B 1C 2 PO Check Per Pt Req | N/A | N/A | R/s 9/27 2 |
| 39 | 9/17 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 9/20 | | TR TX | | | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | | | RESCHEDULE Tomorrow 9/21 |
| 40 | 9/13 | 1 2 3 4 5 D1 D2 N/A R NIC OTC | 9/20 | | TR TX | N/A | N/A | Y N | 1A 1B 1C 2 5, PO Check Per Pt Req | N/A | N/A | R/s 9/27 2 |