MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
VAN SWEARINGEN – 259809
CARA E. TRAPANI – 313411
CAROLINE E. JACKSON – 329980
BEN HATTEM – 335232
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104
Email:        mbien@rbgg.com
              egalvan@rbgg.com
              vswearingen@rbgg.com
              ctrapani@rbgg.com
              cjackson@rbgg.com
              bhattem@rbgg.com

CORENE KENDRICK – 226642
KYLE VIRGIEN – 278747
NATIONAL PRISON PROJECT of the
AMERICAN CIVIL LIBERTIES UNION
39 Drumm Street
San Francisco, California  94111-4805
Telephone:   (202) 393-4930
Facsimile:   (202) 393-4931
Email:        ckendrick@aclu.org
              kvirgien@aclu.org

AVRAM D. FREY
(*admitted pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:   (415) 621-2493
Facsimile:   (415) 255-8437
Email:        afrey@aclunc.org

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED., a California corporation; and DOES 1 to 20, inclusive,

Defendants.

Case No. 5:13-cv-02354-BLF

**REPLY DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN [ECF NO. 788]**

Judge:  Beth Labson Freeman
Date:   August 24, 2023
Time:   9:00 a.m.
Crtrm.: 3

[4308238.1]

1      I, Cara E. Trapani, declare:

2      1.    I am an attorney duly admitted to practice before this Court.  I am an

3 associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for

4 Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a

5 witness, I could competently so testify.  I make this Reply Declaration In Support of

6 Plaintiffs' Motion to Enforce the Settlement Agreement and Wellpath Implementation Plan

7 (Dkt. 788).

8      2.    The neutral monitor for dental care, Viviane G. Winthrop, DDS, visited the

9 Jail from April 10 to 14, 2023, for a mentoring visit under the Court's June 3, 2022 Order

10 (Dkt. 751).  On April 17, 2023, the dental monitor spoke to my colleague Caroline Jackson

11 to provide Plaintiffs notice of her mentoring visit with Defendant Wellpath, Inc

12 ("Wellpath," formerly California Forensic Medical Group, Inc. or "CFMG").  Ms. Jackson

13 informed me that the dental monitor reported that she devoted nearly her entire mentoring

14 visit to setting up the dental clinic appropriately because it was in a state of disarray,

15 especially with respect to infection control.

16      3.    Attached hereto as **Exhibit 1** is a true and correct copy of the Joint Staffing

17 Update that counsel for Wellpath and counsel for Plaintiffs provided to Magistrate Judge

18 Cousins on March 31, 2023.  In the joint update, Peter Bertling, counsel for Wellpath,

19 wrote that Paulette Torres (Health Services Administrator) and Linda Corfman (Director of

20 Nursing), hold their positions on an interim basis. Ex. 1 at 3.[1]  The update also shows that

21 Wellpath currently has 9.3 of 12.6 full time equivalent ("FTE") registered nurse ("RN")

22 positions filled, for a vacancy rate of 26%, and 6.7 of 10.5 FTE licensed vocational nurse

23 ("LVN") positions filled, for a vacancy rate of 36%.  *Id.*  On June 8, 2023, I attended, via

24 Zoom, the exit call for the June 7-8, 2023 on-site medical monitoring audit conducted by

---

[1] Plaintiffs have conditionally redacted portions of this declaration and Exhibit 1 hereto in accord with their pending administrative motion under Civ. L.R. 795-(f) (Dkt 776).

1

1  medical monitor Bruce Barnett, M.D.  During the exit call, the medical monitor and

2  Wellpath staff stated that as of that date, there was only one nurse practitioner working at

3  the Jail (down from two as of March 31, 2023).

4        4.        Attached hereto as **Exhibit 2** is a true and correct copy of Part III of

5  Wellpath's Mortality & Morbidity Report and Review regarding M.M., who died by

6  suicide at the Jail on January 4, 2023 ("M.M. M&M Report Part III"), that my colleague

7  Caroline Jackson received via email from Mr. Bertling on May 11, 2023, and then

8  forwarded to me.

9        5.        On May 23, 2023, I received an email from Susan K. Blitch, counsel for the

10 County, that Jail staff discovered M.P.M. unresponsive in booking cell nine on the evening

11 of May 22, 2023, and that emergency responders later declared him dead.  Attached hereto

12 as **Exhibit 3** is a true and correct copy of Wellpath's electronic medical records file for

13 M.P.M. ("M.P.M. CorEMR File"), that my colleague Van Swearingen received via email

14 from Mr. Bertling on June 2, 2023, and then forwarded to me.  The neutral monitors for

15 medical and mental health care are still evaluating this patient's death, and the medical

16 monitor provided his preliminary findings to the parties on June 2, 2023 that identified

17 multiple violations of the Implementation Plan.  M.P.M.'s medical records show that he

18 displayed mobility issues indicative of possible intoxication and signs of mental illness at

19 intake, but the intake nurse recommended that he be housed in general population.  Ex. 3 at

20 3, 16, 21.  The medical records show that staff later observed him responding to internal

21 stimuli.  *Id.* at 18.  The records do not show a referral to the hospital or to a physician or

22 psychiatrist.  M.P.M. was discovered dead later that night.  *Id.*  Plaintiffs' counsel have

23 requested the incident report and death review, but the County and Wellpath have not

24 provided these documents as of the date of this filing.

25       6.        As of the time of this filing, three people have died at the Jail in 2023, and

26 four people have died at the Jail since November 2022.  Plaintiffs' Enforcement Motion

27 calculated the Jail's annual death rate since the Settlement Agreement as 350 deaths per

28 100,000 people as of April 26, 2023.  *See* Decl. of Van Swearingen In Supp. of Pls.'

Enforcement Mot., Dkt. 788-2 at ¶ 4.  As of May 31, 2023, my colleague Ben Hattem calculated an updated annual death rate of 361 deaths per 100,000 people at the Jail, using the same methodology described in Plaintiffs' Motion.  *See id.* at ¶¶ 2-4.  This is more than twice the national average of 167 deaths per 100,000 incarcerated people.  *See* Bureau of Just. Stats., U.S. Dep't of Just., Mortality in Local Jails, 2000–2019, at 1 (2021), https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf.

7.      On May 22, 2023, the medical monitor provided his assessment to counsel in this case that two of the patient deaths that occurred at the Jail in 2023 involved Jail staff responding inappropriately to signs of drug overdose.

8.      On January 25, 2023, I received an email from the medical monitor enclosing his 1st Enhanced Monitoring and Mentoring Report and a workbook titled MCJ Grievance Review November and December 2022 that included assessments of patients' medical care.  The workbook provided the medical monitor's finding that a female patient (identified as "MCJ21") was admitted to the hospital for blood loss in December 2022 after Wellpath did not provide timely treatment for heavy vaginal bleeding.  The medical monitor wrote that Wellpath provided "deficient care" and that the patient "could go into shock and die from blood loss."  On March 24, 2023, I received a second email from the medical monitor enclosing a document that contained findings about this patient.  He wrote that after this patient was seen by a doctor in January 2023, she waited six weeks for a follow-up visit and was hospitalized again for blood loss on March 21, 2023.  On April 6, 2023, I received a third email from the medical monitor that included further findings regarding this patient.  He wrote that in April 2023, the patient again went to emergency room about two weeks after receiving a hysterectomy because the incision site from her surgery opened, started bleeding, and became infected after she received no medical care from Wellpath for four days.

9.      In February 2023, the medical monitor found that a woman at the Jail who was 15 weeks pregnant asked for immediate medical help getting family planning services to terminate her pregnancy, but that Wellpath did not respond to her request.  *See* Trapani

1   Decl., Dkt. 788-1, Ex. 15 (2nd Mentoring Report) at 3, 5.  The medical monitor happened

2   to notice the grievance that this patient had filed when he was conducting record reviews,

3   and he interviewed the patient on March 6, 2023, where he learned she was 18 weeks

4   pregnant.  *Id*.  I understand from subsequent communications with the medical monitor

5   and Wellpath, that following his interview with the patient, the medical monitor urged

6   Wellpath to take appropriate action as part of his mentoring work.  On May 13, 2023, after

7   reading the medical monitor's report regarding his March 6-9 mentoring visit, I contacted

8   Wellpath and asked whether the patient had met with a medical provider regarding

9   termination of her pregnancy.  On April 3, 2023, I received an email from a Wellpath

10   employee informing me that the patient was seen at an outside facility on March 24 and

11   25, 2023.  I understand that treatment occurred just short of the date for fetal

12   viability (around 23 weeks) that would bar termination in California absent extraordinary

13   maternal health considerations.

14         10.    Attached hereto as **Exhibit 4** is a true and correct copy of relevant excerpts

15   of the medical monitor's draft 14th monitoring report Physician Case Review Tool

16   Worksheet, received by my firm on May 31, 2023 via an email sent by Dr. Barnett.  The

17   worksheet provides the medical monitor's preliminary findings that he will focus on at his

18   June 7 and 8, 2023 on-site audit.  The excerpts consist of the medical monitor's draft

19   reviews of two patients' medical records (identified as "MCJ7" and "MCJ13") and a

20   summary of his preliminary findings of Wellpath's noncompliance with the

21   Implementation Plan.  The medical monitor informed the parties that these findings are

22   incomplete and that he intends to augment the assessments in his final draft report.

23         11.    On May 11, 2023, I attended, via Zoom, the exit call for the May 8-11, 2023

24   on-site mental health monitoring audit by mental health monitor, James Vess, Ph.D.

25   During the exit call, the mental health monitor shared some of his preliminary findings and

26   identified ongoing concerns with many Implementation Plan requirements, including, but

27   not limited to, staffing, the initial mental health screening, treatment planning, and

28   involuntary medication.  The mental health monitor also stated that earlier that same day, a

patient suffering a psychiatric crisis was made to wait for emergency medication because Wellpath had no on-site psychiatrist and could not reach one by phone.  The mental health monitor later informed me that the patient's name is ██.  He further explained that when the staff at the Jail finally reached an on-call psychiatrist, the nurse mis-heard the dosage of the prescribed medication.  The mental health monitor stated that the Director of Nursing, who happened to be present, expressed concern that the dose seemed too low and called the psychiatrist back.  The psychiatrist then corrected the dosage.  According to the mental health monitor, there was approximately one hour of delay before the patient received the emergency medication.

12.     On May 22, 2023, Yesenia Murillo, a paralegal in my office, spoke with class member ██. who was booked into the Jail on May 16, 2023, and reported that he was bedridden in the infirmary and was forced to lay in his own excrement and rely on another patient to help him attend to his activities of daily living.  Later that day, I emailed Mr. Bertling to alert him to these concerns.  On May 30, 2023, an employee for Wellpath responded to my email stating that the patient was discharged from custody on May 23, 2023 and referred to a skilled nursing facility.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Walnut Creek, California this 9th day of June, 2023.

*/s/ Cara E. Trapani*
Cara E. Trapani

# Exhibit 1



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Caroline E. Jackson
Email:  cjackson@rbgg.com

March 31, 2023

VIA ELECTRONIC MAIL ONLY
Hon. Judge Nathanael Cousins
Magistrate Judge
United States District Court
for the Northern District of California
Nat_Cousins@cand.uscourts.gov

> Re:   *Hernandez v. County of Monterey*, N.D. Cal. No. 5:13-cv-02354-BLF
>        Our File No. 1187-08

Dear Judge Cousins:

We write to provide a Joint Staffing Update from Plaintiffs' counsel and from Wellpath.  In addition, Plaintiffs' counsel writes to express concern about the County's refusal to provide staffing updates.  Wellpath does not join in that portion of the letter.

**I.     The County's Decision Not To Provide Staffing Updates Masks A Likely Critical Shortage Of Deputies And Sergeants, The Deputies' Immediate Supervisors**

The County informed us that it will not participate in these updates and, for that reason, also refuses to provide this information to Plaintiffs' counsel.  The absence of information from the County allows it to mask an apparent trend showing that the total number of deputies has dropped each time the County has reported it.  **At last count, the County had just 95 active deputies–nine fewer than they had reported just two months before**; eight fewer than required under the Implementation Plan, when they had a lesser need for deputies; and a whopping 39 deputies fewer than their most recent staffing analysis indicates they may need.  We have also noted recent decreases in the number of active sergeants, whose job it is to supervise the day-to-day operations of the Jail, including compliance with Implementation Plan requirements.  Further, we have been waiting some 10 weeks for the County to produce documents in response to our requests–a delay we can only assume is related to a lack of staffing at the Jail.

[4262942.4]

1-1

Hon. Judge Nathanael Cousins
March 31, 2023
Page 2

The Parties' Settlement Agreement provides that "Plaintiffs are entitled to conduct reasonable monitoring of Defendants' compliance with this Agreement, including the right to … review relevant records … related to Defendants' compliance with the provisions of this Agreement."  Dkt. 494 ¶ 41.  Given historic deficiencies in County staffing, the parties stipulated and the Court ordered on June 3, 2022 that the parties will "meet and confer regarding Plaintiffs' staffing questions and the need for staffing analyses. The discussions with the County will focus on answering Plaintiffs' questions about the County's staffing data and the most recent staffing analysis, as well as possibly designing a new format for the staffing plan that is more clear and transparent than the current documentation that is normally provided."  Dkt. 751 at ECF 5.

In light of our concerns that the County is failing to comply with the Settlement Agreement and June 3, 2022 stipulated Order—and may be masking dangerously low staffing levels—we ask that the Court request the County to provide an update to the following staffing numbers last reported on January 31, 2023:

- Chief: **1 of 1** position filled.
- Captain: **1 of 1** position filled.
- Commanders: **3 of 3** positions filled.
- Sergeants: **12 of 16** positions filled (sergeant staffing includes no allowances for when a sergeant is on leave; the four vacant, full-time positions must be filled by overtime)
- Deputies: **95 of 107** (without including the relief factor, deputies in training, or deputies on long-term leave) or **107 of 134** (including the relief factor, deputies in training, and deputies on long-term leave)
- CCSs: **44 of 46** positions filled (includes 1 CCS on injury status; this position does not include extra numbers in case of injury or leave).

### A.    County's Statement

Plaintiffs have implied that the Court ordered us to report on staffing every 30 days.  We are not aware of this Court order nor that your Honor wants to be briefed every 30 days on staffing.  Beginning on April 10, 2023, Plaintiffs will be receiving the monthly staffing rosters per our agreement with them.  The latest monitor report found Monterey to be compliant in our staffing analysis and we are compliant with the implementation plans.

## II.    Wellpath Staffing

Wellpath's current staffing levels are as follows:

[4262942.4]

Hon. Judge Nathanael Cousins
March 31, 2023
Page 3

*Medical*:
- Medical Director: **1 of 1** position filled.  Dr. Meenu Vaid is the Medical Director.  She works 25 hours onsite and provides a minimum of 15 hours remote administrative services including attendance at weekly provider meetings, review of patient chart's, and P.R.N. consultative services.
- HSA: **1 of 1** position filled.  Paulette Torres is the HSA who works onsite full time on an interim basis.
- DON: **1 of 1** position filled.  Linda Corfman, R.N. is the Director of Nursing. She has been an R.N. for 40 years and has worked at CFMG/Wellpath for 20 years as either an R.N., DON or HSA.  She began working full time, on-site at MCJ on March 13, 2023 and holds the position on an interim basis.
- PA/FNP: **2 of 2** positions.  Phil Wilcox, PA provides 8 hours of tele-health services on Monday-Friday.  Joseph Lemire, N.P. provides 10 hours of onsite services on Thursday-Sunday. Shaminder Gill, PA. is a per diem provider.  She works 1 shift each week and 1 weekend shift each month.
- RNs: Wellpath's staffing matrix requires **12.6 FTE** RNs per week.  They currently have 10.2 FTE RNs.  One .9 RN FTE is currently on a leave of absence, yielding **9.3 FTE**.
- LVNs: Wellpath's staffing matrix requires **10.5 FTE** LVNs per week.  They currently have 7.8 FTE LVNs.  One .9 FTE LVN is currently on leave of absence, yielding **6.7 FTE**.
- MAs/CNAs: Wellpath's staffing matrix requires **7.8 MAs/CNAs** per week.  They currently have **7.4 FTE** MAs/CNAs.

*Mental health:*
- Psychiatrist: **1 of 1** position filled.
- Mental Health Clinicians:  Wellpath's staffing matrix requires **3.7 FTE** MH Clinicians per week. (This includes a new MH clinician position that was created on January 1, 2023.) Wellpath currently has **1.8 FTE** MH Clinicians.
- \*\* Mental Health Coordinator: **0 of 1** position filled.
- \*\* Discharge planner: **1 of 1** position filled.
- \*\* Psychiatric Technician: **0 of 2** positions filled.
\*\* Indicates newly created position that was first posted on January 1, 2023.

*Dental*:
- Dentist: **1 of 1** position filled.
- Dental Assistant: **1 of 1** position filled.

Hon. Judge Nathanael Cousins
March 31, 2023
Page 4

## A.      Plaintiffs' Statement

Plaintiffs' counsel is concerned about the lack of nursing staff and of mental health staff at Monterey County Jail.  In each of the RN and LVN positions, the Jail has approximately four fewer nurses[1] than necessary to fill all shifts.  While the Jail has some capacity to make up for the missing employees by having other nurses work extra shifts, this capacity is not limitless.  The nursing shortage is particularly concerning because, in addition to providing a number of the services central to the Wellpath Implementation Plan, such as the 14-day health appraisal and the provision of medications within the Jail, nurses are the gatekeepers for dental services, higher levels of medical care, and even some disability accommodations.  Accordingly, a lack of on-site nursing care carries serious implications for compliance with the Implementation Plan and risks harming patients with the highest needs.

The mental health department is even more severely short-staffed: the Jail has just **two of the five** mental health clinicians Wellpath previously determined are necessary to meet the Jail's needs (five clinicians includes the 3.7 FTE clinicians and the Mental Health Coordinator, who will also provide clinical services).  We appreciate that Wellpath has recognized the need to increase its mental health staffing; but we remain concerned that this critical staffing shortage leaves the Jail unable to meet basic requirements of the Wellpath Implementation Plan, such as developing a treatment plan for the many people with mental illnesses who are housed at the Jail.

Plaintiffs' counsel also remains unsatisfied with the staffing of supervisory positions, especially with respect to the Director of Nursing ("DON"), who has primary responsibility for supervising nurses, and the Health Services Administrator ("HSA"), who oversees the entire medical department.  Both positions, crucial to the smooth operations of healthcare services, are filled by interim employees.

In his reports, Dr. Barnett has repeatedly expressed alarm over the lack of training and oversight of nursing staff.  Without a permanent nursing supervisor, Wellpath has no hope of solving this problem.  Recently, Dr. Barnett issued an informal report documenting eleven patients who experienced lapses in medical care that appeared to cause patient harm.  In 2023 alone, these lapses in care included:

- Failing to test a patient at high risk for STIs until he reported symptoms, then allowing two weeks to elapse between when he reported symptoms and when he received treatment for his STI.

---

[1] The Jail's nurses work 36-hour weeks, meaning that each nurse equals 0.9 FTE.

Hon. Judge Nathanael Cousins
March 31, 2023
Page 5

- Waiting more than two weeks even to respond to a patient who had requested to terminate her second-trimester pregnancy; the delay resulted in an elevated risk of complications and trauma.

- Waiting months to provide gynecological care for a patient with dysfunctional vaginal bleeding, resulting in hospitalization for severe blood loss, dizziness and weakness.

Just this week, Plaintiffs' counsel also identified a patient who did not receive medical attention for dramatic visible injuries to her eye and finger during her arrest for more than one week after she was booked into the Jail.

In the area of dental care, one patient did not receive the timely follow-up visit the Wellpath Implementation Plan requires after having all eight of her remaining teeth extracted at an off-site appointment (indeed, she did not receive any follow-up care until after Plaintiffs' counsel intervened). Further, the initial referral for off-site care, which was submitted by a member of the medical staff, was wildly inaccurate – it instructed the off-site surgeon to extract four molars when the patient had no molars remaining in her mouth.

Without adequate levels of staffing and permanent supervising employees, Defendants cannot hope to remedy these problems and come into compliance with the Implementation Plans. We note that Wellpath proposes using tele-health services to augment their staffing capability. We are open to this approach and look forward to working with Wellpath to identify ways that Wellpath may be able to use these services to improve compliance with the Implementation Plans and to enhance access to healthcare for all those housed at the Monterey County Jail.

**B.      Wellpath's Statement**

Wellpath has aggressively attempted to fill all open medical and mental health staffing positions with well-qualified providers. This has been a Herculean task given the National shortage of nursing and mental health providers that impacts all correctional and community based health care providers and systems.

During the upcoming conference on April 7, 2023, Wellpath would like to discuss their intention to hire medical and mental health tele-providers and tele-nursing services at MCJ. The Implementation Plan (IP) does not preclude the use of tele-health services. Since the Covid Pandemic tele-health services have gained widespread acceptance in correctional and community based health care systems across the Nation.

[4262942.4]

Hon. Judge Nathanael Cousins
March 31, 2023
Page 6

There is no legitimate reason that tele-health services cannot be effectively used at MCJ. Wellpath currently uses tele-health services in other counties very successfully.

Wellpath proposes consulting with Plaintiffs' counsel and the neutral monitors to identify, and agree upon, those circumstances where tele-health services can be used.  However, if after engaging in good faith efforts an agreement cannot be reached, Wellpath will proceed with any remedies under the Settlement Agreement to seek a modification of the IP in order to allow for the use of tele-health services at MCJ.

Ann Marie Natali, DBE, MA, MBA is the full time IP Specialist at MCJ.  Gina Olson, R.N. is Wellpath's Regional Director of Nursing who is working with Ms. Natali to achieve substantial compliance with the IP.

Debbie Massetti, N.P. and Joanna Manalo, P.A. alternate weekly to provide on call provider services between 7:00 p.m. and 7:00 a.m.

Amanda Briseno will become the full time Mental Health Coordinator for MCJ. This position was recently added to Wellpath's contract and approved by the County. Ms. Briseno is a well-qualified mental health provider who currently provides face to face services to mental health patients.

Wellpath is fully staffed with dental providers. In addition, Dr. Choi and his assistant have been providing 8 additional hours of dental services every other Saturday to reduce the current dental backlog.

*        *        *        *        *

We appreciate your attention to this important matter.  We intend to provide the Court with an additional update no later than April 28, 2023.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Caroline E. Jackson*

By:   Caroline E. Jackson

CEJ:CEJ

[4262942.4]

1-6

# Exhibit 2

# EXHIBIT FILED UNDER SEAL

# Exhibit 3

# EXHIBIT FILED UNDER SEAL

# Exhibit 4

# EXHIBIT FILED UNDER SEAL