1

2

3

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| JESSE HERNANDEZ, et al., | Case No.  13-cv-02354-BLF |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT AND WELLPATH IMPLEMENTATION PLAN** |
| v. | |
| COUNTY OF MONTEREY, et al., | |
| Defendants. | [Re:  ECF 825] |

This class action was filed in 2013 by several inmates ("Plaintiffs") seeking relief from constitutionally deficient conditions at the Monterey County Jail ("Jail").  The Jail is operated by Defendant County of Monterey ("County"), which contracts with Defendant Wellpath, LLC ("Wellpath")[1] to provide medical, mental health, and dental services at the Jail.  The parties entered into a Settlement Agreement that was approved by the Court in 2015 and Defendants developed Implementation Plans that were approved by the Court in 2016.  Plaintiffs assert that since then, Wellpath has failed to provide minimally adequate medical, mental health, and dental care required under the Settlement Agreement and the Wellpath Implementation Plan.  Plaintiffs have filed an enforcement motion, asking the Court to find that Wellpath is out of compliance with forty-four requirements of the Settlement Agreement and Wellpath Implementation Plan, and to impose civil contempt fines if Wellpath fails to come into compliance within six months.

Plaintiffs' motion is GRANTED as to forty-three of the forty-four requirements at issue.

---

[1] Wellpath formerly was known California Forensic Medical Group, Inc.

## I.    BACKGROUND

*Settlement of the Action*

Plaintiffs filed this class action in May 2013 on behalf of themselves and all other similarly situated Jail inmates.  *See* Compl., ECF 1.  After more than two years of litigation regarding Jail conditions, the parties entered into a Settlement Agreement that was approved by the Court in a written order dated August 18, 2015 ("Final Approval Order").  *See* Final Approval Order, ECF 494.  The Settlement Agreement requires Defendants to make changes with respect to numerous aspects of the Jail's operations, including – as relevant here – in the areas of medical, mental health, and dental care.  *See id.* Ex. A (Settlement Agreement).  The terms of the Settlement Agreement are incorporated into the Court's Final Approval Order, which provides that the Settlement Agreement "has the full force and effect of an order of this Court."  Final Approval Order at 3.  Defendants were required to develop Implementation Plans describing how they would meet their obligations under the Settlement Agreement, and those Implementation Plans are "enforceable by the Court as part of the Settlement Agreement."  *Id*.  The Settlement Agreement gives the Court jurisdiction to enforce the terms of the Settlement Agreement and Implementation Plans for a period of five years, which period may be extended.  *See* Settlement Agreement ¶ 46.

*Mechanism for Enforcement*

In the event Plaintiffs believe that Defendants are out of compliance with the Settlement Agreement and/or Implementation Plans, they must give Defendants written notice of their belief and the facts supporting their belief.  *See* Settlement Agreement ¶ 48.  Defendants must investigate and respond to the notice within 30 days.  *See id.*  The parties must attempt informal resolution, first through negotiation and then through mediation.  *See id.*  If the parties cannot resolve the issues, either party "may move the Court for any relief permitted by law or equity."  *Id*.

If the Court finds that Defendants are not in substantial compliance with the Settlement Agreement and/or Implementation Plans, the Court shall require Defendants to submit a plan to remedy the deficiencies for Court approval.  *See* Final Approval Order at 3.  If the Court thereafter determines that Defendants' plan did not remedy the deficiencies, the Court may enforce compliance "through all remedies provided by law[.]"  *Id*.

United States District Court
Northern District of California

*Development of Implementation Plans and Appointment of Neutral Monitors*

The County developed an Implementation Plan addressing intake screening, cell monitoring, staffing, and similar issues, while Wellpath developed an Implementation Plan focused on medical, mental health, and dental care.  *See* County Implementation Plan, ECF 514; Wellpath Implementation Plan, ECF 532.  The Court approved both plans in May 2016 with some modifications.  *See* Order, ECF 549.  In August 2016, the Court appointed neutral monitors to monitor Defendants' compliance with the Settlement Agreement and Implementation Plans in five distinct areas:  medical care, mental health care, dental care, Americans with Disabilities Act compliance, and corrections/safety.  *See* Order, ECF 563.  The Court authorized each monitor to conduct two site visits per year.  *See id.* at 3.  Twice a year, each monitor must prepare a written report regarding Defendants' compliance.  *See id.* at 4.

*Plaintiffs' February 2020 Notice to Defendants Re Lack of Substantial Compliance*

In February 2020, Plaintiffs gave Defendants written notice of Plaintiffs' belief that Defendants were not in substantial compliance with the Settlement Agreement and Implementation Plans.  *See* 2020 Joint Status Report and Order, ECF 671.  The parties met and conferred several times and participated in a two-day "summit" that included all parties and all five monitors.  *See id.* at 2.  The parties thereafter entered into a stipulation requiring Defendants to develop corrective action plans addressing all areas in which the neutral monitors had found lack of substantial compliance.  *See id.*  The stipulation included a one-year extension (through August 2022) of the five-year period for Jail monitoring and the Court's retention of jurisdiction.  *See id.* at 2-3.  The Court approved the parties' stipulation and incorporated its terms in an order dated May 29, 2020.  *See id.* at 4-5.

*Plaintiffs' January 2022 Notice to Defendants Re Lack of Substantial Compliance*

In January 2022, Plaintiffs gave Defendants a second written notice of Plaintiffs' belief that Defendants were not in substantial compliance with the Settlement Agreement and Implementation Plans.  *See* 2022 Joint Status Report and Order, ECF 751.  The parties thereafter met and conferred several times, and ultimately entered into another stipulation.  *See id.*  The parties agreed that Defendants would be released from neutral monitoring of certain requirements,

United States District Court
Northern District of California

and that the neutral monitors could provide enhanced monitoring and mentoring with respect to other requirements. *See id.* at 3. The stipulation included a two-year extension (through August 2024) of monitoring with respect to safety, security, and ADA-architectural issues, and a three-year extension (through August 2025) of monitoring with respect to medical, mental health, dental, and ADA-programmatic issues. *See id.* at 2-3. The Court's jurisdiction to enforce the Settlement Agreement and Implementation Plans was extended for corresponding periods of time. *See id.* The Court approved the stipulation and incorporated its terms in an order dated June 3, 2022. *See id.* at 6-7.

> *Plaintiffs' December 2022 Notice to Defendants Re Lack of Substantial Compliance*

In December 2022, Plaintiffs gave Defendants a third written notice of Plaintiffs' belief that Defendants were not in substantial compliance with the Settlement Agreement and Implementation Plans. *See* Swearingen Decl. ¶ 5 & Ex. 1 (Dec. 16, 2022 Letter), ECF 825-8. Counsel for Plaintiffs, the County, and Wellpath met and conferred but were not able to resolve the issues raised by Plaintiffs. *See id.* ¶ 6. The parties then attempted to mediate with the aid of Magistrate Judge Nathanael Cousins. *See id.* Judge Cousins conducted two mediation sessions with the parties, on February 17, 2023 and April 7, 2023. *See* Minute Entries, ECF 765, 771. Plaintiffs and the County resolved their issues, but Plaintiffs and Wellpath were not able to reach resolution. *See* Minute Entry, ECF 771.

> *Present Enforcement Motion*

Plaintiffs filed the present enforcement motion against Wellpath on May 11, 2023, asserting that Wellpath is not in substantial compliance with forty-four requirements of the Settlement Agreement and Wellpath Implementation Plan. *See* Mot., ECF 825.[2] They seek to enforce Wellpath's substantial compliance under threat of civil contempt fines. Wellpath filed opposition to the enforcement motion and the Court held a lengthy motion hearing. Neither party requested an evidentiary hearing.

---

[2] Plaintiffs' motion filed on May 11, 2023 included numerous redactions due to Defendants' claim that the neutral monitor reports should be sealed. *See* Redacted Mot., ECF 788. Plaintiff later re-filed their motion without redactions after the Court declined to seal the neutral monitor reports. *See* Mot., ECF 825. The Court cites to the unredacted version of the motion in this order.

## II.    LEGAL STANDARD

Civil contempt sanctions may be imposed "when the district court finds by clear and convincing evidence that a party violated a specific and definite order of the court." *Parsons v. Ryan*, 949 F.3d 443, 454 (9th Cir. 2020) (internal quotation marks and citation omitted). The moving party has the burden of showing such violation by clear and convincing evidence. *See Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992). "The burden then shifts to the contemnors to demonstrate why they were unable to comply." *Id*. (citation omitted). "They must show they took every reasonable step to comply." *Id*. (citation omitted).

"A court may wield its civil contempt powers for two separate and independent purposes: (1) to coerce the defendant into compliance with the court's order; and (2) to compensate the complainant for losses sustained." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) (internal quotation marks and citation omitted). "Coercive sanctions may only be imposed after a reasoned consideration of the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Id*. (internal quotation marks and citation omitted). The contemnor must have the ability to comply with the court's order and thus "purge" the contempt. *Id.* at 629-30. "[T]he ability to purge is perhaps the most definitive characteristic of coercive civil contempt." *Id.* at 629. For that reason, "coercive civil sanctions . . . generally take the form of conditional fines." *Id*.

## III.   DISCUSSION

Plaintiffs ask the Court to use its civil contempt power to coerce Wellpath to comply with the Settlement Agreement and Wellpath Implementation Plan. Plaintiffs present overwhelming evidence that Wellpath is not in substantial compliance with forty-three of the forty-four specific requirements of the Settlement Agreement and Wellpath Implementation Plan raised in Plaintiff's motion. As to the forty-fourth requirement, listed below as "14. Hospital Transfers," the Court finds that Plaintiffs have presented clear and convincing evidence of a historical lack of substantial compliance, but not of a current lack of substantial compliance as required to issue coercive civil contempt sanctions.

United States District Court
Northern District of California

1   Plaintiff's evidence includes the most recent neutral monitor reports from Dr. Bruce

2   Barnett, the neutral monitor for medical care; from Dr. James Vess, the neutral monitor for mental

3   health care; and from Dr. Viviane Winthrop, the neutral monitor for dental care.  *See generally*

4   Trapani Decl. & Exhibits, ECF 825-1.  Plaintiffs also submit dozens of neutral monitor reports

5   dating back to the commencement of monitoring in 2017, as well as mentoring reports prepared by

6   the neutral monitors after they were given permission for enhanced access to and interaction with

7   Jail staff in the 2022 Joint Status Report and Order issued on June 3, 2023.  *See id.*

8   Wellpath offers no substantive challenge to Plaintiffs' evidence of lack of substantial

9   compliance with the Settlement Agreement and Wellpath Implementation Plan, and as a result

10  Plaintiffs' evidence stands uncontroverted.  Wellpath nonetheless urges the Court to disregard

11  Plaintiffs' evidence, arguing that the neutral monitor reports and mentoring reports submitted by

12  Plaintiffs are so outdated as to be "antiquated."  Wellpath's Opp. at 1, ECF 790.  Touting its recent

13  hiring of "a new team of well qualified supervisory staff," and recent increase in its staffing,

14  Wellpath suggests that it is well on the way to sustained, substantial compliance with the

15  Settlement Agreement and Wellpath Implementation Plan.  On that basis, Wellpath requests that

16  the Court deny Plaintiffs' enforcement motion in its entirety as premature.

17  The Court finds Wellpath's request to be not only frivolous, but also offensive.  The

18  neutral monitors consistently have found Wellpath to be not in substantial compliance with

19  multiple requirements of the Settlement Agreement and Implementation Plans since monitoring

20  began in 2017.  *See* Trapani Decl. Exs. 1-13 (neutral monitor reports re medical care), Exs. 18, 20,

21  22, 24, 26, 28, 30, 32, 34 (neutral monitor reports re mental health care); Exs. 38-45 (neutral

22  monitor reports re dental care).  Plaintiffs have repeatedly tried to address these issues through the

23  mechanism for enforcement outlined in the Settlement Agreement:  Plaintiffs gave Defendants

24  notice that they were not in substantial compliance with the Settlement Agreement and

25  Implementation Plans on three separate occasions in February 2020, January 2022, and December

26  2022; Plaintiffs met and conferred with Defendants on each occasion; Plaintiffs thought they had

27  resolved the issues on the first two occasions after entering into stipulations that were approved by

28  the Court; and little has changed.  Dr. Barnett, the neutral monitor for medical care, found that

6

1  Wellpath's overall compliance *decreased* from 48.1% in March 2017 to 42.6% in October 2022.

2  *See* Trapani Decl. Ex. 1 at 5 (Barnett March 2017 report).  Following the parties' Settlement

3  Agreement, the Jail's annual death rate is more than twice the national average, and its annual

4  suicide rate is more than three times the average for jails in California.  *See* Swearingen Decl. ¶ 4.

5  On this record, the Court finds Plaintiffs' motion for enforcement to be timely and well-

6  taken.  Below, the Court addresses Plaintiffs' compliance with the procedural requirements of the

7  Settlement Agreement before bringing the present motion, and then addresses Plaintiffs' showing

8  on the requirements for a finding of civil contempt against Wellpath.

9  **A.**      **Settlement Agreement's Procedural Requirements for Enforcement**

10  Paragraph 48 of the Settlement Agreement sets forth certain procedural requirements for its

11  enforcement.  *See* Settlement Agreement ¶ 48.  If Plaintiffs believe that Defendants are not in

12  substantial compliance with the Settlement Agreement and/or Implementation Plans, they must

13  give Defendants written notice of their belief and the facts supporting their belief.  *See id.*

14  Defendants must investigate and respond to the notice within 30 days.  *See id.*  The parties must

15  attempt informal resolution, first through negotiation and then through mediation.  *See id.*  If the

16  parties cannot resolve the issues, either party "may move the Court for any relief permitted by law

17  or equity."  *Id.*

18  If the Court finds that Defendants are not in substantial compliance with the Settlement

19  Agreement and/or Implementation Plans, the Court shall require Defendants to submit a plan to

20  remedy the deficiencies for Court approval.  *See* Final Approval Order at 3.  If the Court thereafter

21  determines that Defendants' plan did not remedy the deficiencies, the Court may enforce

22  compliance "through all remedies provided by law[.]"  *Id.*

23  As discussed above, Plaintiffs went through this entire process twice before giving

24  Wellpath the third notice of lack of substantial compliance that led to this motion.  In 2020, the

25  process resulted in the Court ordering Wellpath to develop corrective action plans addressing all

26  areas in which the neutral monitors had found lack of substantial compliance.  *See* 2020 Joint

27  Status Report and Order.  Those corrective action plans were finalized in September 2021.  *See*

28  Trapani Decl. ¶ 24 & Ex. 16 (Medical Care corrected action plan); ¶ 67 & Ex. 36 (Mental Health

United States District Court
Northern District of California

Care corrective action plan).  In 2022, Plaintiffs initiated and completed the procedural enforcement process contemplated by Settlement Agreement yet again.  That round resulted in the Court approving the parties' stipulated plan for enhanced monitoring and mentoring of Jail Staff in an effort to remedy the deficiencies in Defendants' compliance with the Settlement Agreement and Implementation Plans.  *See* 2022 Joint Status Report and Order.  As discussed in detail below, the neutral monitors have determined that these plans did not remedy the deficiencies in Wellpath's performance under the Settlement Agreement and Wellpath Implementation Plan.  Consequently, the Court now may enforce Wellpath's compliance "through all remedies provided by law[.]"  Final Approval Order at 3.

**B.      Requirements for Finding of Civil Contempt**

Civil contempt is one of the remedies provided by law for enforcement of a settlement agreement in the custody context.  *See Parsons*, 949 F.3d at 454.  As the moving parties, Plaintiffs have the burden to show by clear and convincing evidence that Wellpath violated a specific and definite order of the court.  *See Stone*, 968 F.2d at 856 n.9.  If Plaintiffs meet this burden, the burden shifts to Wellpath to demonstrate why they were unable to comply, and that they took every reasonable step to comply.  *See id.*

**1.      Plaintiffs' Burden to Show Lack of Substantial Compliance**

Plaintiffs have submitted clear and convincing evidence, discussed below, that Wellpath is not in substantial compliance with forty-three of the forty-four specific requirements of the Settlement Agreement and Wellpath Implementation Plan raised in Plaintiff's motion.  As to the forty-fourth requirement, listed below as "14. Hospital Transfers," the Court finds that Plaintiffs have presented clear and convincing evidence of a historical lack of substantial compliance, but not of a current lack of substantial compliance.  The most recent monitoring report indicates that more information is needed before a compliance determination may be made.  That evidence is insufficient to meet the clear and convincing standard to show that Wellpath currently is not in substantial compliance with requirement 14.

As discussed above, the parties' Settlement Agreement was expressly incorporated into the Court's Final Approval Order such that it has the "full force and effect of an order of this Court."

Final Approval Order at 3.  The Implementation Plans are "enforceable by the Court as part of the Settlement Agreement."  *Id.*  Accordingly, Wellpath's failures to comply with forty-three requirements of the Settlement Agreement and the Wellpath Implementation Plan constitute violations of the Court's orders.

Plaintiffs' evidence of noncompliance is organized by and appended to the declaration of Cara E. Trapani, counsel for Plaintiffs.  *See generally* Trapani Decl., ECF 825-1.  Below, the Court lists each of the forty-four requirements raised by Plaintiffs in its enforcement motion and identifies where in the Settlement Agreement and/or Wellpath Implementation Plan the requirement can be found.[3]  Next, the Court provides the paragraph of the Trapani declaration summarizing the attached documents demonstrating by clear and convincing evidence that Wellpath is not in substantial compliance with requirements 1-13 and 15-44, and identifies what in the Court's view is the most probative of those documents.  With respect to requirement 14, the Court notes that the most recent report declines to find a lack of substantial compliance at this time.  The Court adopts this approach because, although the Court has considered and relied on all of the documents attached to the Trapani declaration and cited therein, the documents are too numerous to summarize here.

Clinical Staffing

1. *Medical, Mental Health, and Dental Staffing (Noncompliance Established)*

The Settlement Agreement requires Wellpath to maintain "adequate staffing to provide all necessary medical and mental health care[.]"  Settlement Agreement at 16.  Wellpath's Implementation Plan requires Wellpath to maintain "sufficient staff to ensure compliance" with the other mandates of the Plan.  Wellpath Implementation Plan at 116.  Many of Dr. Barnett's reports, including his most recent monitoring report, found that Wellpath's staffing is not substantially compliant with the Wellpath Implementation Plan.  Trapani Decl. ¶ 27 & Ex. 13

---

[3] The Settlement Agreement is appended to the Court's Final Approval Order, docketed at ECF 494.  When citing to the Settlement Agreement, the Court refers to the page numbers in the ECF header of docket entry 494.  The Wellpath Implementation Plan is appended to Wellpath's motion for approval of the plan, docketed at ECF 532.  When citing to the Wellpath Implementation Plan, the Court refers to the page numbers in the ECF header of docket entry 532.

United States District Court
Northern District of California

(13th Medical Report) at 8-9.

<u>Medical Requirements</u>

2. *Medical Intake Screening (Noncompliance Established)*

The Settlement Agreement provides that Defendants will "ensure that arriving prisoners are promptly screened for urgent medical . . . needs, with prompt follow-up. . . ." Settlement Agreement at 13.  Wellpath's Implementation Plan requires that "[a]ll arrestees . . . will be screened by a Registered Nurse (RN) at the time of intake . . . [i]n a manner to ensure the inmate's privacy." Wellpath Implementation Plan at 11.  The intake screening must meet other specified requirements as well.  *Id.*  Almost all of Dr. Barnett's reports, including his most recent monitoring report, found that Wellpath is not substantially compliant with these intake screening requirements.  Trapani Decl. ¶ 29 & Ex. 13 (13th Medical Report) at 5.

3. *Sick Call (Noncompliance Established)*

The Settlement Agreement provides that "Defendants shall ensure timely access to necessary treatment by Qualified Medical Professionals for prisoners with medical issues." Settlement Agreement at 16.  Wellpath's Implementation Plan provides that "[h]ealth . . . complaints of inmates shall be collected, processed and documented on a daily basis," and patients must be scheduled for the next sick call if the slip was received prior to 2300 hours.  Wellpath Implementation Plan at 25-26.  Dr. Barnett's most recent report concludes that Wellpath is not substantially compliant with these and other sick call requirements.  Trapani Decl. ¶ 31 & Ex. 13 (13th Medical Report) at 5.  Among other things, that report finds that access to primary care services falls short of demand by 100 visits per month.  *Id.*

4. *Chronic Care (Noncompliance Established)*

Wellpath's Implementation Plan requires that "[i]nmates with chronic medical conditions will be referred to and seen by a medical provider within five to seven days of arrival." Wellpath Implementation Plan at 14.  The plan contains other specific requirements for care of inmates with chronic conditions, providing that inmates with certain conditions must be seen by a medical provider every 90 days.  *Id.* at 28-31.  In his most recent report, Dr. Barnett found that Wellpath is not substantially compliant with these requirements, and found specifically that chronic care visits

United States District Court
Northern District of California

are frequently delayed and major medical problems are not consistently documented.  Trapani Decl. ¶ 33 & Ex. 13 (13th Medical Report) at 6.

### 5.   *Health Care Maintenance (Noncompliance Established)*

Wellpath's Implementation Plan requires that all patients receive both a 14-day health inventory and communicable disease screening, and a six-month complete physical examination. Wellpath Implementation Plan at 30, 37.  Both the 14-day and six-month examinations must meet specific requirements.  *Id*. at 35, 37.  Dr. Barnett has found Wellpath to be not substantially compliant with these requirements in multiple reports, including his most recent report.  Trapani Decl. ¶ 35 & Ex. 13 (13th Medical Report) at 6.

### 6.   *Continuity of Care (Noncompliance Established)*

Wellpath's Implementation Plan requires that "[p]atients will receive continuity of care from admission to discharge while in this facility, including referral to community care when indicated."  Wellpath Implementation Plan 38.  "Inmates released to the community will be provided with written instructions for the continuity of essential care, including, but not limited to, name and contact information of community providers for follow up appointments, prescriptions and/or adequate supply of medication for psychiatric patients."  *Id*. at 38-39.  Dr. Barnett has found Wellpath to be noncompliant with these requirements in multiple reports, including his most recent monitoring report.  Trapani Decl. ¶ 37 & Ex. 13 (13th Medical Report) at 6.

### 7.   *Outside Care Referrals (Noncompliance Established)*

Wellpath's Implementation Plan provides that "[i]nmates will have access to outside health care providers."  Wellpath Implementation Plan at 39.  The Settlement Agreement provides that all "records, results, and orders received from [such] off-site consultations and treatment" be maintained in the patient's medical record.  Settlement Agreement at 17.  Dr. Barnett's most recent monitoring report found Wellpath to be not in substantial compliance with the outside care referral requirements.  Trapani Decl. ¶ 39 & Ex. 13 (13th Medical Report) at 8.

### 8.   *Treatment of Intoxicated Patients (Noncompliance Established)*

The Settlement Agreement requires that "[m]edical providers shall be timely involved in assessing and treating inmates potentially undergoing withdrawal, and non-provider medical staff

shall timely refer to providers those inmate undergoing withdrawals when clinically indicated."
Settlement Agreement at 14-15.  Wellpath's Implementation Plan enumerates numerous specific
requirements for the identification and treatment of patients in a state of alcohol or drug
intoxication, or withdrawal.  Wellpath Implementation Plan at 18, 48-71.  In his most recent
report, Dr. Barnett concluded that Wellpath is not in substantial compliance with these
requirements.  Trapani Decl. ¶ 41 & Ex. 13 (13th Medical Report) at 7.

   9.   *Treatment of Communicable Diseases (Noncompliance Established)*

   The Settlement Agreement states that Defendants "shall provide for appropriate infectious
disease screening and follow-up, including but not limited to screening for tuberculosis and
methicillin resistant staphylococcus aureus (MRSA)."  Settlement Agreement at 13-14.  The
Settlement Agreement contains further requirements relating to identification and treatment of
tuberculosis.  *Id.*  Wellpath's Implementation Plan contains strict protocols for the identification,
control, and treatment of tuberculosis.  Wellpath Implementation Plan at 78-87.  Dr. Barnett has
found in all of his reports, including his most recent report, that Wellpath is not in substantial
compliance with these screening and treatment protocols.  Trapani Decl. ¶ 43 & Ex. 13 (13th
Medical Report) at 7.

   10.   *Pharmaceutical Practices (Noncompliance Established)*

   Wellpath's Implementation Plan sets forth several requirements for the procurement,
storage, and distribution of pharmaceuticals for use in the Jail.  Wellpath Implementation Plan at
94.  Dr. Barnett's most recent monitoring report concluded that Wellpath is not in substantial
compliance with these requirements for pharmaceutical practices, finding that there was "poor or
absent oversight of pharmacy services as manifested by my discovery in the medication room of
expired medications, improperly labelled multiple dose vials, and delinquent controlled substance
logs."  Trapani Decl. ¶ 45 & Ex. 13 (13th Medical Report) at 3, 22.

   11.   *Medical Quality Assurance (Noncompliance Established)*

   Wellpath's Implementation Plan requires it to conduct audits to identify any deficiencies in
care.  Wellpath Implementation Plan at 9.  The plan also requires the responsible physician to
provide appropriate supervision of the PA, NP, and RNs.  *Id.* at 24.  All suicides are to be subject

United States District Court
Northern District of California

to medical and psychiatric review in accordance with specified procedures.  *Id.* at 77.  Dr. Barnett found Wellpath to be not in substantial compliance with these requirements in multiple reports, including his most recent report.  Trapani Decl. ¶ 47 & Ex. 13 (13th Medical Report) at 9, 15-18, 23.

### Mental Health Requirements

12.   *Initial Mental Health Screening (Noncompliance Established)*

Wellpath's Implementation Plan requires that "[w]ithin 14 days of admission . . . all inmates will have an initial mental health screening performed by a qualified mental health professional."  Wellpath Implementation Plan at 41.  The screening must meet several requirements regarding the structure of the interview, the patient's history, and status of medication.  *Id.* at 36.  None of the neutral monitoring reports has found Wellpath to be substantially compliant with these requirements, and Dr. Vess's most recent report found that Wellpath improperly added mental health questions to the intake screening form in lieu of conducting the required initial 14 day screening.  Trapani Decl. ¶ 71 & Ex. 34 (9th Mental Health Report) at 3-4.

13.   *Nursing Rounds in Administrative Segregation (Noncompliance Established)*

Wellpath's Implementation Plan provides that "[n]ursing staff shall conduct mental health rounds in Administrative Segregation daily, separate and apart from medication distribution."  Wellpath Implementation Plan at 43.  All but the first mental health monitoring report has found Wellpath to be out of compliance with this requirement, and in his most recent report Dr. Vess found that nursing rounds were not documented daily across administrative segregation housing.  Trapani Decl. ¶ 73 & Ex. 34 (9th Mental Health Report) at 31.

14.   *Hospital Transfers (Noncompliance Not Established)*

Wellpath's Implementation Plan provides that "[a]ny inmate who has been placed in a safety cell for Suicide Precautions for 24 consecutive hours shall be transferred to either an appropriate inpatient mental health facility or the Natividad Medical Center emergency room for assessment."  Wellpath Implementation Plan at 75.  Patients also must be transferred to an inpatient facility or Natividad Medical Center if they have been housed in a safety cell "for more

than 36 cumulative hours in any 3-day period." *Id*. at 73.  Inmates placed in a safety cell at intake due to a positive mental health screening must be transferred to Natividad Medical Center for further assessment if their "condition deteriorates," or if "the nurse is unable to complete a hands-on assessment including vital signs after six hours of placement."  *Id*. at 16.  Several mental health monitoring reports found Wellpath to be not substantially compliant with these requirements.  Trapani Decl. ¶ 75 & Ex. 32 (8th Mental Health Report) at 15, 37.  However, Dr. Vess deferred making findings on compliance in the most recent report.  *Id.* Ex. 34 (9th Mental Health Report) at 37.  Dr. Vess determined that "[a] more thorough understanding of the policies and procedures in place to ensure compliance with these requirements is needed before reaching a finding about compliance."  *Id*. at 37.

15.  *Treatment Planning (Noncompliance Established)*

Wellpath's Implementation Plan sets forth several requirements for treatment planning, including that initial treatment planning must begin at the time of intake by the booking nurse, and must "include [the] specific medical and/or psychiatric problem, nursing interventions, housing, dietary, medication, observation and monitoring, and follow-up referral and/or evaluation as appropriate."  Wellpath Implementation Plan at 27.  An individualized treatment plan must be documented in each patient's medical record.  *Id*. at 114.  The mental health monitors have never found Wellpath to be in compliance with these requirements, and in the most recent report Dr. Vess stated that "[r]eview of recent treatment plans indicated that [the required] elements are seldom adequately addressed."  Trapani Decl. ¶ 77 & Ex. 34 (9th Mental Health Report) at 27-28.

16.  *Chronic Care (Noncompliance Established)*

Wellpath's Implementation Plan regarding chronic care, addressed above, defines chronic illness to include psychiatric disorders.  Wellpath Implementation Plan at 28.  In his most recent report, Dr. Vess found that Wellpath is not in substantial compliance with the chronic care requirements with respect to psychiatric patients.  Trapani Decl. ¶ 79 & Ex. 34 (9th Mental Health Report) at 8.

17.  *Acute Care (Noncompliance Established)*

The Settlement Agreement provides that Defendants shall "ensure timely access to . . .

United States District Court
Northern District of California

hospitalization and inpatient care."  Settlement Agreement at 17.  Wellpath's Implementation Plan requires that "[i]nmates who require acute mental health services beyond those available on site are transferred to an appropriate facility."  Wellpath Implementation Plan at 36.  Dr. Hughes and Dr. Vess have found access to Natividad Medical Center's Mental Health Unit inadequate in every report since March 2021, and in the latest report Dr. Vess found expressly that "[c]ases were identified of patients who were in acute and severe mental health crises, with danger to self, danger to others, and possible grave disability, who were not transferred to NMC for evaluation and stabilization or to an appropriate facility."  Trapani Decl. ¶ 81 & Ex. 34 (9th Mental Health Report) at 8-9.

　　　　18.　*Outpatient Services (Noncompliance Established)*

　　　　Wellpath's Implementation Plan states that "[o]utpatient mental health services to include screening, evaluation, diagnosis, treatment and referral services shall be available to all inmates in the Monterey County Jail."  Wellpath Implementation Plan at 41.  The mental health monitors have found Wellpath noncompliant with the requirement to provide adequate access to outpatient mental health treatment in every report issued since March 2021, and most recently Dr. Vess found "that current mental health staffing levels do not allow for sufficient outpatient services to support a determination of substantial compliance."  Trapani Decl. ¶ 83 & Ex. 34 (9th Mental Health Report) at 9.

　　　　19.　*Psychiatric Follow-Up Visit Intervals (Noncompliance Established)*

　　　　Wellpath's Implementation Plan requires that "patient[s] on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every sixty/ninety days.  More frequent evaluations by a psychiatrist will be scheduled if necessitated by the patient's condition."  Wellpath Implementation Plan at 31.  The mental health monitors have made express findings of noncompliance with these requirements in every report since November 2019, and in he most recent report Dr. Vess found Wellpath noncompliant with the requirement that patients on psychiatric medications be seen by the psychiatrist every thirty days.  Trapani Decl. ¶ 85 & Ex. 34 (9th Mental Health Report) at 4.

20.     *Consideration of Mental Health in Discipline (Noncompliance Established)*

Wellpath's Implementation Plan provides:  "Mental illness will be considered in administering any disciplinary measures against an inmate.  Custody staff shall contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness."  Wellpath Implementation Plan at 47.  The mental health monitors have never found Wellpath substantially compliant with these requirements since monitoring began in 2017, and in the most recent report Dr. Vess found that Jail officers appeared to routinely recommend charges regardless of mental illness.  Trapani Decl. ¶ 87 & Ex. 34 (9th Mental Health Report) at 28.

21.     *Segregation Placement Screenings (Noncompliance Established)*

The Settlement Agreement provides:  "The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation, and require procedures to mitigate the impact of administrative segregation on persons with mental illness, including but not limited to structured therapeutic activity outside the segregation cell and where feasible assignment of cell mates."  Settlement Agreement at 17-18.  The Wellpath Implementation Plan provides:  "A suicide risk assessment, including use of the Suicide Risk Assessment Tool, a copy of which is attached as Exhibit G, will be performed by a qualified mental health provider . . . after placement in Administrative Segregation.  Any qualified mental health provider who performs a suicide risk assessment will be trained in the use and interpretation of the Suicide Risk Assessment Tool."  Wellpath Implementation Plan at 43.  The mental health monitors have never found Wellpath to be substantially compliant with these requirements, and most recently Dr. Vess found that "[s]tructured suicide risk assessments are not routinely completed with inmates placed in administrative segregation housing.  The Mental Health Supervisor indicated that there is no reliable and consistent way by which mental health staff are informed of all administrative segregation placements, nor are there enough mental health clinicians on staff to respond adequately to this requirement."  Trapani Decl. ¶ 89 & Ex. 34 (9th Mental Health Report) at 36.

22. *Mental Health Programming in Segregation (Noncompliance Established)*

The Settlement Agreement mandates that "[t]he Mental Health Implementation Plan shall require . . . procedures to mitigate the impact of administrative segregation on persons with mental illness, including but not limited to structured therapeutic activity outside the segregation cell." Settlement Agreement at 17-18. Wellpath's Implementation Plan requires, in relevant part, that "Mental Health services provided on-site will include . . . socialization programs, group therapy . . . psychiatric evaluations and individual therapy." Wellpath Implementation Plan at 42. In his most recent report, Dr. Vess found Wellpath noncompliant with these requirements, finding that "[r]outine group programming is still not being offered by mental health staff due to staffing inadequacies." Trapani Decl. ¶ 91 & Ex. 34 (9th Mental Health Report) at 40.

23. *Involuntary Medication (Noncompliance Established)*

Wellpath's Implementation Plan provides that involuntary psychotropic medications will be given only in the case of a psychiatric emergency, and the plan contains other restrictions on the use of such medications. Wellpath Implementation Plan at 96. The mental health monitors have found Wellpath noncompliant with these requirements in every report issued since March 2021, and in the most recent report Dr. Vess identified a patient who repeatedly received forced medication administration without documentation of an on-site evaluation, and without transfer to an appropriate community facility as required. Trapani Decl. ¶ 93 & Ex. 34 (9th Mental Health Report) at 18-20.

24. *Suicide Risk Assessments and Safety Planning (Noncompliance Established)*

Under Wellpath's Implementation Plan, suicide risk assessments may be performed only by qualified mental health providers who are "trained in the use and interpretation of the Suicide Risk Assessment Tool." Wellpath Implementation Plan at 43. Such assessments must occur at intake if suicidality is identified, prior to placement in segregation, within four hours after placement in a safety cell, and before release from a safety cell. *Id.* The mental health monitors have never found Wellpath substantially compliant with these suicide risk assessment requirements, and in the most recent report Dr. Vess found that these requirements were not met with respect to an inmate who then died by suicide. Trapani Decl. ¶ 95 & Ex. 34 (9th Mental

Health Report) at 35.

25.     *Medical Records (Noncompliance Established)*

Wellpath's Implementation Plan requires that each patient's medical record contain a list of enumerated items, including a completed Receiving Screening form, a Health Inventory/Communicable Disease Screening forms, all findings diagnoses, treatments, and dispositions, an individual treatment plan, and other data. Wellpath Implementation Plan at 114. Multiple monitor reports, including Dr. Vess's latest report, have found Wellpath not in substantial compliance with this requirements. Trapani Decl. ¶ 97 & Ex. 34 (9th Mental Health Report) at 42.

26.     *Corrective Action Plans (Noncompliance Established)*

Wellpath's Implementation Plan requires that Wellpath to engage in post-implementation monitoring, and to develop corrective action plans for identified deficiencies. Wellpath Implementation Plan at 9. The 2020 Joint Status Report and Order required Wellpath to "develop, under the direction and guidance of the neutral monitors and with input from Plaintiffs' counsel, corrective action plans to remedy all the areas for which the neutral monitors have found Defendants to be not in substantial compliance." 2020 Joint Status Report and Order at 5. In his most recent report, Dr. Vess found Wellpath noncompliant with the above requirements for developing and implementing adequate corrective action plans. Trapani Decl. ¶ 99 & Ex. 34 (9th Mental Health Report) at 43-44.

27.     *Provider Visits to Holding and Isolation Cells (Noncompliance Established)*

Wellpath's Implementation Plan requires that "[i]nmates housed in holding and isolation are visited by an MD or an RN every Monday, Wednesday and Friday." Wellpath Implementation Plan at 26. Dr. Vess found Wellpath noncompliant with this requirement in his most recent report. Trapani Decl. ¶ 101 & Ex. 34 (9th Mental Health Report) at 6.

28.     *Mental Health Quality Assurance (Noncompliance Established)*

Wellpath must conduct quarterly Quality Management Committee meetings to assess their compliance with Wellpath's Implementation Plan, and to develop and institute corrective actions for identified deficiencies. Wellpath Implementation Plan at 9. "All cases involving the need for

United States District Court
Northern District of California

involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met." *Id*. at 98.  In his latest report, Dr. Vess found that Wellpath is not in substantial compliance with these and related requirements.  Trapani Decl. ¶ 103 & Ex. 34 (9th Mental Health Report) at 37.  Among other things, Dr. Vess found that there was no evidence that the Quality Management or Peer Committees reviewed the completed suicide that occurred during the review period, and "that cases involving involuntary medications are not routinely reviewed in QM meetings, that there was no current committee structure to do this, and that instances of involuntary medication administration are not routinely tracked in any way." *Id*.

Dental Requirements

29.     *Dental Intake Screening (Noncompliance Established)*

The Settlement Agreement requires Defendants to specify "standards and timelines to ensure that arriving prisoners are promptly screened for urgent . . . dental needs, with prompt follow-up." Settlement Agreement at 13.  Wellpath's Implementation Plan requires that:  "A qualified health care professional who has been trained by the dentist shall obtain a dental history regarding any current or recent dental problems, treatment including medications during the Receiving Health Screening at intake with follow up to positive findings."  Wellpath Implementation Plan at 99.  Wellpath's Implementation Plan further requires that:  "If the medical staff/licensed health care professional determines the dental issue to be urgent, the patient shall be referred to and evaluated by the dentist at the next scheduled dental clinic." *Id*. at 100.  In all monitoring reports, including her latest report,[4] Dr. Winthrop has found Wellpath to be not substantially compliant with these requirements.  Trapani Decl. ¶ 117 & Ex. 45 (8th Dental Report).

30.     *Initial Health Inventory (Noncompliance Established)*

Wellpath's Implementation Plan requires that "[a] complete gender specific health history

---

[4] The Court's reference to Dr. Winthrop's latest report is to the 8th Dental Report, which is Dr. Winthrop's latest finalized report.  Plaintiffs have submitted Dr. Winthrop's 9th Dental Report, which is in draft, but because that report has not yet been finalized, the Court does not rely on it. Trapani Decl. Ex. 47 (Draft 9th Dental Report).

United States District Court
Northern District of California

inventory and communicable disease screening shall be completed on all inmates within 14 days of arrival at the facility by a Registered Nurse who has completed appropriate training that is approved or provided by the responsible physician." Wellpath Implementation Plan at 33-34. Wellpath's Implementation Plan also provides specific requirements concerning the 14-day exam. *Id*. at 99. Dr. Winthrop has never found Wellpath in compliance with these requirements, and in her latest report she found that Wellpath had stopped conducting the required initial health inventory in May 2022 because of staffing shortages, and that nurses conducting the initial health inventory did not consistently look in the patient's mouth. Trapani Decl. ¶ 119 & Ex. 45 (8th Dental Report) at 10, 41.

31. *Dental Training for Intake Staff (Noncompliance Established)*

Wellpath's Implementation Plan requires all staff to participate in classroom orientation and training on all aspects of the plan. Wellpath Implementation Plan at 9. The plan also provides that the registered nurse who performs the intake screening and the 14-day dental evaluation during the initial health history must be trained by the dentist. *Id*. at 99. Dr. Winthrop has found that Wellpath is not in substantial compliance with these requirement in all her reports, including her most recent report. Trapani Decl. ¶ 121 & Ex. 45 (8th Dental Report) at 17.

32. *Treatment for Urgent and Emergent Conditions (Noncompliance Established)*

Wellpath's Implementation Plan contains several specific procedures that must be followed when an inmate has an urgent dental issue or a dental emergency. Wellpath Implementation Plan at 99-103. If the dental issue is found "to be urgent, the patient shall be referred to and evaluated by the dentist at the next scheduled dental clinic." *Id*. at 100. Treatment must be provided within one calendar day for patients "with a dental condition of sudden onset or severe pain, which prevents them from carrying out essential activities of daily living." *Id*. at 102. Dr. Winthrop has found Wellpath to be not in substantial compliance with these requirements in multiple reports, including her most recent final report. Trapani Decl. ¶ 123 & Ex. 45 (8th Dental Report) at 45.

33. *Dental Sick Call (Noncompliance Established)*

Wellpath's Implementation Plan requires that: "All dental complaints are assessed, provided treatment for obvious infection and pain relief at regularly scheduled medical sick call by

the MD, PA or RN to be seen within one day of the request.  The complaint is prioritized and referred to Dental Sick call as deemed necessary.  Interim treatment for pain and infection is provided until the patient is seen by the dentist."  Wellpath Implementation Plan at 102.  Dr. Winthrop has found Wellpath to be out of compliance with these requirements in all but her first report, including in her most recent report.  Trapani Decl. ¶ 125 & Ex. 45 (8th Dental Report) at 11.

34.   *Chronic Care (Noncompliance Established)*

Wellpath's Implementation Plan requires that "[i]nmates with chronic care conditions will be managed pursuant to chronic care protocols and standardized procedures that are consistent with national practice guidelines."  Wellpath Implementation Plan at 28.  Wellpath created a dental care corrective action plan, which was approved by Dr. Winthrop, that requires Wellpath to "[p]erform and chart a full comprehensive dental examination for patients referred from chronic care with the following issues: HIV, Seizures, Diabetes, Pregnancy, and Patients on over 4 psych medications."  Trapani Decl. ¶ 126.  Dr. Winthrop found Wellpath to be not in substantial compliance with these requirements in multiple reports, and noted in her latest report that "Patients with chronic care issues were not referred to, scheduled for, or seen in dental for comprehensive dental examination."  Trapani Decl. ¶ 127 & Ex. 45 (8th Dental Report) at 10.

35.   *Comprehensive Care (Noncompliance Established)*

The Settlement Agreement requires Wellpath "to ensure timely access to necessary treatment for dental and oral health conditions, including . . . periodic dental care for long-term prisoners."  Settlement Agreement at 18.  Wellpath's Implementation Plan requires among other things that inmates incarcerated for 12 months or greater are eligible to receive a comprehensive dental exam.  Wellpath Implementation Plan at 104.  Dr. Winthrop has found noncompliance with these requirements in multiple monitoring reports, and in her seventh report found "zero instance[s] of seeing patients for their comprehensive dental examination or comprehensive recall examination within 30 days of their one year date of incarceration."  Trapani Decl. ¶ 129 & Ex. 44 (7th Dental Report) at 28.

United States District Court
Northern District of California

36.     *Restorative and Palliative Care (Noncompliance Established)*

Wellpath's Implementation Plan requires that patients "with comprehensive examinations and treatment plans" must be "eligible to receive permanent restorations in accordance with their established treatment plan." Wellpath Implementation Plan at 107. The plan further requires dental staff to verify that patients have received the Dental Material Fact Sheet "[p]rior to initiating any restorative procedure." *Id*. at 108. Dr. Winthrop has found Wellpath to be out of compliance with these requirements on in multiple reports. Trapani Decl. ¶ 131 & Ex. 46 (8th Dental Audit Tool) at C.9.

37.     *Extractions (Noncompliance Established)*

Wellpath's Implementation Plan requires dental staff to "provide necessary oral surgery services to all inmate-patients onsite or through a local community provider." Wellpath Implementation Plan at 101. The plan also requires Wellpath to provide "[e]xtraction of unsalvageable teeth" as a treatment priority. *Id*. at 100-01. Dr. Winthrop found that Wellpath is noncompliant with these requirements in multiple reports, observing in her latest report that the dental team performing a surgical extraction without the use of a sterile irrigant, and that such procedure risked infection. Trapani Decl. ¶ 133 & Ex. 45 (8th Dental Report) at 13.

38.     *Specialty Care Referrals (Noncompliance Established)*

Wellpath's Implementation Plan provides that complicated dental problems must be "referred to an oral surgeon as deemed necessary," and in accordance with the timelines and treatment priorities required by the plan. Wellpath Implementation Plan at 101-02. Dr. Winthrop has found Wellpath to be noncompliant with these requirements in multiple reports, including her latest report. Trapani Decl. ¶ 135 & Ex. 45 (8th Dental Report) at 45.

39.     *Endodontics (Noncompliance Established)*

Wellpath's Implementation Plan requires that all patients at the Jail must be "eligible to receive palliative endodontic therapy limited to upper and lower anterior teeth." Wellpath Implementation Plan at 109. Individuals incarcerated for 12 months or longer must also be "eligible to receive root canal therapy limited to upper and lower anterior teeth." *Id*. Both palliative endodontic therapy and root canal treatments must be "performed in accordance with

established criteria and within the specific guidelines" of the Implementation Plan. *Id.* The Implementation Plan imposes a series of requirements for when and how these procedures must be performed. *Id.* at 109-10. Dr. Winthrop has found Wellpath noncompliant with the requirements for endodontics in multiple reports. Trapani Decl. ¶ 137 & Ex. 44 (7th Dental Report) at 122.

40.   *Periodontics (Noncompliance Established)*

Wellpath's Implementation Plan requires the Jail to "maintain a periodontal disease program for the diagnosis and treatment of periodontal disease." Wellpath Implementation Plan at 104. "Periodontal screening shall be available to all patients, regardless of length of stay. Treatment will be based on periodontal disease classification, Dental Priority code, and special medical needs (i.e. pregnancy, diabetes, HIV/AIDS)." *Id.* Dr. Winthrop has found Wellpath to be not in substantial compliance with these requirements in multiple reports, including her latest report. Trapani Decl. ¶ 139 & Ex. 45 (8th Dental Report) at 10.

41.   *Informed Consent (Noncompliance Established)*

Wellpath's Implementation Plan contains numerous provisions concerning informed consent related to dental procedures. Wellpath Implementation Plan at 21, 23, 108, 110, 112, 114. Dr. Winthrop has found noncompliance with these requirements in every report in which she has made specific compliance findings on this issue, including her latest report. Trapani Decl. ¶ 141 & Ex. 45 (8th Dental Report) at 9.

42.   *Sanitary Treatment Space (Noncompliance Established)*

The Settlement Agreement requires "a safe and sanitary on or off-site facility for necessary dental care." Settlement Agreement at 18. Wellpath's Implementation Plan similarly requires that "[a]ll dental services will be provided in a safe and sanitary environment." Wellpath Implementation Plan at 99. Dr. Winthrop has found Wellpath noncompliant with these requirements in every one of her reports, including her latest report. Trapani Decl. ¶ 143 & Ex. 45 (8th Dental Report) at 7.

43.   *Electronic Medical Records (Noncompliance Established)*

The Settlement Agreement requires Defendants to ensure "that appropriate and complete medical records are maintained to ensure adequate treatment of prisoners' serious medical and

23

mental health needs. Medical records shall include all records, results, and orders received from off-site consultations and treatment conducted while the prisoner is in the Jail custody." Settlement Agreement at 17.  Wellpath's Implementation Plan contains additional requirements and also provides for a "Dental Priority System" that determines when patients will be seen for immediate treatment or treatment within 1, 30, 60, or 120 days, with scheduling for follow up appointments.  Wellpath Implementation Plan at 103, 113.  Dr. Winthrop has found noncompliance with these requirements in every monitoring report, including her latest final report.  Trapani Decl. ¶ 145 & Ex. 45 (8th Dental Report) at 16.

44.     *Dental Quality Assurance (Noncompliance Established)*

Wellpath's Implementation Plan requires "[a]ll monitoring and audit findings" to be "reported to the Quality Management Committee at its quarterly meetings."  Wellpath Implementation Plan at 9.  The Dental corrective action plan contains further requirements regarding transmission of daily, weekly and monthly data for discussion at the dental meetings. Trapani Decl. ¶ 146.  Dr. Winthrop has found Wellpath noncompliant with these requirements in every report in which she has made compliance findings, and in her latest report she made several recommendations for improving quality assurance.  Trapani Decl. ¶ 147 & Ex. 45 (8th Dental Report) at 45-46.

Conclusion

The Court finds that this evidence is sufficient to meet Plaintiffs' burden to show by clear and convincing evidence that Wellpath is not in substantial compliance with forty-three specific requirements of the Settlement Agreement and the Wellpath Implementation Plan, that is, requirements 1-13 and 15-44 above.  While Plaintiffs have presented evidence of historical noncompliance with requirement 14, the Court finds that Plaintiffs have not shown Wellpath's current noncompliance by clear and convincing evidence.

As discussed above, the Settlement Agreement and the Wellpath Implementation Plan have been incorporated into the Final Approval Order and carry the force of a court order.  The burden therefore shifts to Wellpath to show why it could not comply with the forty-three requirements as to which Plaintiffs have demonstrated substantial noncompliance.

United States District Court
Northern District of California

### 2.     Wellpath's Burden to Show Why it Could Not Comply

Perhaps recognizing that the task would be impossible, Wellpath makes no effort to show why it could not comply with the requirements at issue.  Wellpath instead argues that Plaintiffs' evidence of noncompliance is outdated and does not reflect the current state of Wellpath's compliance.  This argument is entirely unpersuasive.  The neutral monitor reports submitted by Plaintiffs date from 2017 through 2022 and provide the most recent information available.  The reports as a whole, and in particular the most recent reports from each neutral monitor, show a lack of substantial compliance with forty-three specific provisions of the Settlement Agreement and Wellpath Implementation Plan.  And, most revealing, Wellpath offers absolutely no evidence of substantial compliance being achieved after any of the monitors' reports were issued.  Attorney say-so is simply inadequate.  Consequently, the Court finds that Wellpath has failed to meet its burden.

### 3.     Coercive Civil Contempt Sanctions are Appropriate

In light of the foregoing, the Court finds that the legal requirements for imposition of civil contempt sanctions are satisfied.  The Court next must determine whether it should impose such sanctions here in an effort to coerce Wellpath's compliance.  "Coercive sanctions may only be imposed after a reasoned consideration of the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired."  *Shell*, 815 F.3d at 629 (internal quotation marks and citation omitted).

The character and magnitude of the threatened harm favor imposition of coercive sanctions.  Wellpath's continued failure to comply with its obligations under the Settlement Agreement and the Wellpath Implementation Plan creates a serious risk of harm to the health and well-being of the entire inmate population of the Jail.  Plaintiffs and the Court have been unsuccessful at obtaining Wellpath's compliance by less drastic measures, despite numerous efforts over a period of years.  Plaintiffs argue persuasively that "Wellpath's ongoing refusal to comply with this Court's orders, coupled with the continued harms to incarcerated people, shows that only the threat of monetary sanctions will force private equity-owned Wellpath to take its obligations seriously."  Mot. at 3, ECF 825.  The Court agrees that Wellpath has left it no viable

option but to impose coercive sanctions in the form of a conditional fine in the hope that a threat to its bottom line may galvanize Wellpath's compliance where other measures have failed.  Plaintiff suggests imposition of a fine of $25,000 for each requirement, those fines to be imposed only if Wellpath fails to come into compliance within a six month period.  The Court finds Plaintiffs' suggestion to be reasonable.

Accordingly, Plaintiffs' motion to enforce the Settlement Agreement and Wellpath Implementation Plan is GRANTED.  The Court finds Wellpath to be in civil contempt, and imposes a conditional fine of $25,000 for each of the forty-three requirements listed above as to which Wellpath is not in substantial compliance (requirements 1-13 and 15-44).  The Court will grant Wellpath six months to purge the contempt before any fines will attach.

## IV.   ORDER

(1)   Plaintiffs' motion to enforce the Settlement Agreement and Wellpath Implementation Plan is GRANTED.

(2)   The Court finds Wellpath to be in civil contempt of each of the forty-three requirements of the Settlement Agreement and Wellpath Implementation Plan identified above as requirements 1-13 and 15-44, which are incorporated into the Final Approval Order and carry the force of a court order.

(3)   Wellpath is hereby enjoined to come into immediate and sustained compliance with the requirements of the Settlement Agreement and Wellpath Implementation Plan identified above as requirements 1-13 and 15-44.

(4)   The Court imposes a conditional coercive civil contempt fine on Wellpath in the amount of $25,000 per each of the forty-three requirements of the Settlement Agreement and Wellpath Implementation Plan identified above as requirements 1-13 and 15-44.

(5)   Wellpath is granted six months, until March 25, 2024, to purge the contempt by coming into substantial compliance with each and every one of requirements 1-13 and 15-44.

(6)     The neutral monitors will provide reports regarding Wellpath's compliance with requirements 1-13 and 15-44 at the end of the six-month purge period.  If the neutral monitors find that Wellpath is not in substantial compliance with one or more of these requirements, Wellpath shall be required to show cause, in writing and within ten days after issuance of the reports of non-compliance, why Wellpath should not be required to pay civil contempt fines in the amount of $25,000 per requirement.  The Court will advise the parties if it requires a Show Cause Hearing.

(7)     The neutral monitors will continue to evaluate Wellpath's compliance as part of their regular monitoring duties.  The parties shall file the neutral monitor reports with the Court.  After each round of monitoring reports is filed, if the neutral monitors determine that Wellpath is not in substantial compliance with one or more requirements of the Settlement Agreement and/or the Wellpath Implementation Plan, Plaintiffs may request that the Court issue an order to show cause why Wellpath should not be required to pay an additional $25,000 fine for each such requirement.

(8)     Plaintiffs may request that the Court issue an order to show cause after each round of monitoring reports is filed until Wellpath achieves full compliance with this Order.  Wellpath will deposit with the Clerk of Court payment for any fines imposed within one week of the fine's issuance.

(9)     Pursuant to Paragraph 50 of the Settlement Agreement, and in light of the evidence of Wellpath's recent noncompliance with Implementation Plan requirements related to the verification and continuation of mental health medications, neutral monitoring shall be reinstated for the two provisions of the Implementation Plan related to mental health medication verification and continuation for which Wellpath was released from monitoring on November 22, 2022.  *See* Wellpath Implementation Plan at 19; November 2022 Joint Status Report and Order at 5-6, ECF 759.

27

(10) The Court previously found that the Settlement Agreement entered in this matter was narrowly drawn, extended no further than necessary to correct the violation of Plaintiffs' federal rights, and was the least intrusive means necessary to correct that violation.  Settlement Agreement at 4.  Based on the evidence presented, the Court finds that this Order is necessary, narrowly tailored, and the least intrusive means of ensuring compliance with the Settlement Agreement.  The Court finds that other remedies have not corrected Wellpath's noncompliance with the Settlement Agreement and Implementation Plans and that this Order is the only remedy likely to bring Wellpath into compliance.  The Court therefore finds that this Order is narrowly tailored, extends no further than necessary to correct the violation of Plaintiffs' federal rights, and is the least intrusive means necessary to correct the violation.  *See* 18 U.S.C. § 3626(a)(1)(A).

(11) A status hearing is HEREBY SET for March 28, 2024 at 11:00 a.m.

Dated:  September 26, 2023

_____
BETH LABSON FREEMAN
United States District Judge