# Exhibit A

**Monterey County Jail Mental Health Monitor's Final Report**
**For May 8 – 11, 2023 Site Visit**
**James Vess, Ph.D.**

**Overview**

A site visit was conducted at the Monterey County Jail (MCJ) for the tenth mental health monitoring tour.  The site visit was conducted in person from May 8 – 11, 2023, which also included monitoring and shadowing/mentoring activities.  This was the second tour of the Monterey County Jail for this monitor, having assumed the responsibilities of the prior Mental Health Monitor, Dr. Kerry Hughes in 2022.  In attendance for portions of this tour were Drs.  ██████████ ████████ and ████████ of Wellpath.  Dr. ████ ████ also participated in a meeting during the tour via Zoom.

In addition to their participation in the site visit, subsequent emails and telephone calls were conducted with ████████████ and Dr. ████ of Wellpath, and Compliance Sergeant Oliva Guerrero.  Also participating in the tour and subsequent correspondence was ████ ████ Mental Health Supervisor, whose input has been helpful.

As with prior reports, the following report is based upon interviews with institutional staff and inmates as well as discussions with the attorneys for the defendants and plaintiffs and other Wellpath representatives, in addition to healthcare record reviews, documentation provided by Wellpath, MCJ and the County, and direct observations of various parts of the jail facility. This report specifically addresses the jail's status and progress toward compliance with the United States District Court Northern District of California Settlement Agreement and the Implementation Plans between Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County Sheriff's Office; California Forensic Medical Group, Inc (CFMG) et al.

**Compliance with Settlement Agreement and Implementation Plan Requirements**
**1. Intake Screening**
• *Upon arrival, an Initial Health Assessment will be performed by the intake nurse to determine whether the inmate should be excluded from the facility on medical or mental health grounds. Upon acceptance into the jail, all inmates will be screened by the intake nurse for urgent medical, mental health and dental needs. The intake nurse will have access to an inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail. [County Implementation Plan; Dkt. 528-1 at ECF 7]*
• *A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.*
• *The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive findings on the suicide assessment. [Settlement Agreement at 6]*
• *The Booking RN shall begin initial treatment planning at the time of booking and schedule referrals for follow up evaluation as necessary. [CFMG Plan at 27]*

**Findings: Substantial Compliance**

These requirements have been found in substantial compliance for the past two monitoring reports, including the prior Monitor's final report of May, 2021 and my initial report of July 2022. There was no change to these findings in the current review.  Review of jail

clearance logs and healthcare records continued to indicate that inmates were routinely referred to Natividad Medical Center (NMC) for jail clearance when presenting with medical or mental health concerns that might exclude the inmate from acceptance into the jail.

The intake procedure includes access to inmates' prior electronic healthcare records generated at Monterey County Jail. The intake screening was routinely conducted at booking, except in one case (Patient #7 in the accompanying case review document), where the nursing intake appears to have been repeatedly delayed and eventually not completed.  However, this patient was uncooperative and resistant, requiring a spit mask at the time of booking, and was seen by the psychiatrist and mental health clinicians soon after intake.  This case is considered an non-systemic deviation rather than an indication of systemic failure, and did not significantly affect this particular patient's mental health care.  All other healthcare records reviewed for this report were in compliance with this requirement.

Review of healthcare records indicated that patients with chronic conditions who were stable at intake were consistently referred to mental health providers within required timeframes. Inmates in need of urgent or emergent mental health care were appropriately referred and promptly seen by a mental health clinician.  The Intake Screening Form includes questions designed to detect current risk of suicide; this screening is routinely completed with all incoming inmates.  Referral to mental health clinicians were made when there are positive findings on this form.  As noted previously, there were instances of omission and lack of clear documentation on the intake form regarding referrals at the time of intake, but other healthcare records indicated that the appropriate referrals to mental health were made.  Brief initial treatment plans were again noted at the time of intake, consisting primarily of follow-up referrals or requests for information as needed and, in cases of more urgent need, obtaining proper cell placement and orders for the inmate.

Although it is not specifically mentioned in the Implementation Plan requirements for Intake Screenings, the prior mental health monitor had noted the issue of confidentiality in the nursing assessment during the intake process as an area of concern.  Based on modifications made while he was the monitor, including the implementation of white noise machines outside the nursing room, he found substantial compliance in his final monitoring report of May 2021.  I noted in during my site visit for the current monitoring report that the noise machines were not, at the time I initially observed the intake screening process, turned up loud enough to be effective, and would be more effective if the angle of the speaker were changed to project noise out into the area beyond the nursing room. These issues were successfully addressed before the end of my site visit, and did not cause sufficient concern to alter my finding of substantial compliance with these requirements.

The Plaintiffs' attorneys also raised a question regarding the finding of substantial compliance for the requirement that the intake nurse will have access to an inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail, in light of my observations below that intake nurses did not always appear to review earlier healthcare records to verify medications.  This observation does not negate the fact that nurses consistently have access to prior healthcare records during intake.  When other requirements specify actions the nurses must take based on review of the records, these requirements are specifically evaluated separately, such as the following.

• *If a patient's chronic condition is stable at booking, the Booking RN shall schedule a follow up with a medical provider within 5-7 days. If the patient is unstable or has unverified medications,*

*the Booking RN must refer the patient to the on duty or on-call medical provider. [CFMG Plan at 29]*
*• The Booking RN shall identify and assess at booking individuals with a history of chronic medical or psychiatric condition. The Booking RN must document and verify and continue all current medications, whether verified or unverified, formulary or non-formulary. [CFMG Plan at 29, 72]*
*• Booking RN must observe/query for signs/history of mental illness and use of psychiatric medications. The RN shall verify any medications and request outside treatment records as necessary. Any inmate who exhibits signs/history of mental illness shall be referred to mental health services for evaluation, and a physician's opinion must be secured within 24 hours or the next scheduled sick call. [CFMG Plan at 16, 19, 41]*
*• The Booking RN will obtain a signed release for records and attempt to verify current prescriptions. By the end of the nursing shift, the RN will consult with the on-call psychiatrist regarding any verified or unverified medications. The on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate. During this consultation, the on-call psychiatrist will set the time to see the inmate within 5 – 7 days. The date of the appointment will be reflected on the written record of the order.*" [CFMG Implementation Plan; Dkt. 532 at ECF 19].

**Findings: Noncompliance**

These items had been found in substantial compliance for the past two monitoring reports, including by the prior Monitor in his last report of May 2021, and my prior report of July 2022. The current review, however, showed sufficient problems in the area of verifying and continuing medications at the time of the intake screening to warrant a finding of noncompliance. Multiple instances were found where review of available documentation indicated that medications were not verified and continued (including patients 4, 5, 6, 7, 9, and 10 in the separate case reviews document). Discussions with the mental health clinicians during the recent site visit also indicated that verification and continuation of medications at intake were not happening as required, which they described as a significant problem. It was noted that it takes the intake nurses extra time to review the old charts, which doesn't always happen, and the verification process is not always followed. The clinicians then spend time trying to clarify medications with recently booked patients, and providing additional support to patients for whom this causes distress.

Discussions with the acting Wellpath Implementation Specialist at the time of the site visit indicated that additional nursing resources have recently been devoted to specifically support the medication verification and continuation process at intake. A recently implemented contract with the company Precise to provide on-call telepsychiatry coverage is also intended to help address the concerns that have been identified. Wellpath has written policies regarding the use of telepsychiatry. Greater familiarity among staff is needed regarding procedures for the use of the Precise telepsychiatry services vs. the psychiatrist who has long been providing on-call psychiatry, as there is still some confusion regarding when and how to use this relatively new service (as reflected with patient #5 in the separate case reviews document). It is hoped that with these additional resources and sustained focus on these requirements, substantial compliance can be achieved by the next monitoring report.

3

**2. Mental Health Screening**

• *All inmates must undergo an initial mental health screening by a qualified mental health professional within 14 days of admission. The screening must consist of a structured interview inquiring into (1) history of psychiatric hospitalizations, substance use hospitalization, detoxification and outpatient treatment, suicidal behavior, violent behavior, victimization, special education placement, cerebral trauma or seizures, and sex offenses; (2) current psychotropic medications, suicidal ideations, drug or alcohol use and orientation to person, place and time; (3) emotional response to incarceration; and (4) screening for developmental disability and learning disabilities. Any positive scores will be referred for follow up. [CFMG Plan at 36, 41-42]*

**Findings: Noncompliance**

This requirement was deferred in my last report. It has been explained by Wellpath staff that the Intake Screening Form includes coverage of mental health concerns, and as this screening is conducted by the intake nurse with all inmates at the time of booking, it is considered by Wellpath to meet the requirements of a Mental Health Screening as specified by the Implementation Plan. At issue here has been the definition of Qualified Mental Health Professional (QMHP) for the purposes of the initial Mental Health Screening, and specifically whether nursing staff qualify. In my prior report, I sought to clarify who is qualified to conduct Mental Health Screenings by citing the National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails (2018, at pages 96 – 97), which state that it is essential that a mental health screening is performed to ensure that urgent mental health needs are met. This screening is to be performed as soon as possible, and no later than 14 calendar days after admission. The NCCHC standard further states that the mental health screening may be conducted by a qualified mental health professional *or qualified health care professionals who have received documented training*. From this perspective, nurses who are not formally qualified psychiatric nurses but who have received documented training in the screening of mental health concerns would qualify for conducting the Mental Health Screening, and thereby satisfy this requirement.

However, since the time of my last report, it has been noted that language in the Settlement Agreement defines Qualified Mental Health Professional as "an individual with training in psychology, social work, psychiatric nursing, or marriage and family therapy, who is currently licensed by the State of California to deliver those mental health services he or she has undertaken to provide." [Dkt. 494 at 12] As written, this requirement specifies that a qualified mental health professional must conduct the initial mental health screening. Therefore, nursing staff who are not licensed psychiatric nurses would not be qualified to conduct this screening. It is on this basis that the current finding is noncompliance.

Having reached this finding, I do not think it is unreasonable for nurses, with adequate training and supervision, to conduct an initial mental health screening at the time of intake and thereby fulfill this requirement. A finding was deferred at the time of my last report because I had not received documentation of the training provided to nurses in this role. Training would need to adequately cover all of the areas specified in the requirement, and must be consistently documented. The primary purpose of this requirement is to screen inmates and identify those who require follow-up by mental health staff. To cover all of these areas adequately in the context of the intake screening may expand the time required to complete sufficiently thorough intake screenings, which has implications for staffing resources and workflow, especially during

periods of high booking volume. Ideally, part of the Quality Management process would also routinely monitor the adequacy and effectiveness of the intake screening for detection and referral of inmate's with problems in the areas specified for the initial mental health screening.

The issue that prevents a finding of substantial compliance at this time, however, is the language of the requirement as it relates to the language in the Settlement Agreement regarding the definition of a qualified mental health professional.  I have encouraged the parties to consider how this language might be revisited whereby it could create the opportunity for the current process of intake screenings to be found substantially compliant with the requirements of the Implementation Plan. The Plaintiffs' Attorneys have indicated that they are not receptive to amending this Settlement Agreement requirement at this time. Rather than amending the Settlement Agreement definition of a Qualified Mental Health Professional, what I was envisioning was amending the Implementation Plan requirement that a QMHP is required to conduct the 14 day mental health screening. The alternative is that Wellpath staff who meet the qualifications of a Qualified Mental Health Professional will be required to conduct the mental Health screening with all inmates within 14 days of admission.  It is possible that a Licensed Psychiatric Technician could conduct such screenings, and would fall within the definition of a QMHP.  Hiring staff into the allocated Psychiatric Technician positions, however, has proven to be difficult, and these positions remain unfilled.

*• The medical or psychiatric provider will complete a baseline history and physical or psychiatric examination; order a therapeutic regimen, as appropriate; and schedule the patient to be seen for chronic care clinic at least every ninety days for the length of the jail stay. Patients on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every 60 to 90 days.*

**Findings: Noncompliance**

The prior two monitoring reports have found noncompliance with this requirement, noting that patients on psychiatric medications were not always seen by the psychiatrist every 30 days until stable and then at least every 60 – 90 days.  In the current review, cases were again observed where patients on psychotropic medications were scheduled to be seen at 90 day intervals prior to being assessed as stable and sometimes while demonstrating active symptoms of psychosis. However, it was also noted that more recent cases were sometimes scheduled for 30 day medication follow-ups when the patient was not stable at the time of the initial medication order.  Documentation of the psychiatric examination was also improved in some of the recent cases reviewed for this report.  Sustained improvement in these areas would result in substantial compliance with these requirements.

**3. Sick Call**
*• Inmates' health and mental health complaints must be collected, processed, and documented daily and triaged as appropriate by medical and mental health providers. [CFMG Plan at 25]*
*• The on-duty medical provider shall see urgent sick call requests Monday through Friday. On weekends and holidays, the on duty nurse shall communicate urgent complaints/requests to the on-call provider, who will treat or refer the patient as necessary. [CFMG Plan at 25]*

**Findings: Substantial Compliance**

The prior two monitoring reports have found substantial compliance with these requirements. Sick call requests continue to be done primarily through electronic tablet devices made available to inmates. Review of the sick call request process and direct observation during the recent site visit continued to indicate that the requests were promptly noted and triaged daily by mental health clinicians. There is weekday and weekend coverage by the mental health clinicians, who consistently respond promptly to urgent or emergent referrals, although it was again noted that routine requests are often delayed or rescheduled due to workload limitations and staffing deficiencies. A contract for on-call psychiatry services has been implemented, and reports by nursing staff indicate that responses have been timely and effective. Some confusion was observed during the recent site visit with a newer nurse in the intake area and the mental health clinicians regarding when to use the on-call psychiatrist who has assisted at MCJ for many years and how to use the new service. This issue was addressed during follow-up meetings in relation to the observed incident, but will need to be systematically conveyed to all staff involved in such situations.

*• Health care staff must note (1) the date and time the sick call request slip is reviewed; (2) the signature of medical staff; and (3) the disposition. The sick call slip must be filed in the inmates' medical record. The sick call roster must be kept on file in the medical record room. Providers must record sick call visits in the inmate's medical record. [CFMG Plan at 25-26]*

**Findings: Substantial Compliance**

The last two monitoring reports have found substantial compliance with this requirement. The current review again found substantial compliance. Sick call requests are still primarily submitted by tablets available in all housing locations. Requests are scanned into the electronic healthcare record. Corresponding tasks were created and sick call entries documenting the response to the requests were consistently found in the healthcare record.

*• Sick call must be conducted 5 days/week in a private clinical environment. Health services staff must triage sick call slips daily and schedule patients for the next sick call if the slip was received prior to 2300 hours. [CFMG Plan at 26]*

**Findings: Noncompliance**

This requirement was found to be in substantial compliance in the last monitoring report of July 2022. That report noted that mental health clinicians review and triage sick call requests daily. Mental health sick calls were conducted daily, and patients were scheduled to be seen based on the level of urgency determined by triage. Patients were typically seen as scheduled, although it was noted that routine requests were often rescheduled due to workload issues. The current review indicated that sick calls are still reviewed, triaged, and scheduled as required. The current finding of noncompliance is based on the frequency and duration of rescheduled sick call appointments due to workload constraints, resulting from inadequate staffing levels to meet demand. It is important to recognize that these rescheduled appointments are not held as scheduled, i.e., the patient was not seen on the date they were supposed to be seen, and thus the sick call was not conducted. While some patients who were rescheduled were seen within one to four days of the originally scheduled appointment, others were not, and one extreme case (Patient #9 in the separate case reviews document) was rescheduled 45 consecutive times due to

6

workload, going 77 days between contacts by a mental health clinician. It is noted that the mental health clinicians typically see patients based on effective triage decisions, but staffing levels during the period of this review were not sufficient in relation to the needs of the inmate population to maintain substantial compliance with this requirement. It is recognized that this requirement is not about staffing levels per se, but the current finding of noncompliance is based on the number of sick call appointments that were not conducted in a sufficiently timely manner.

• *An MD or an RN shall visit inmates housed in holding and isolation cells on Monday, Wednesday and Friday. [CFMG Plan at 26]*

**Findings: Noncompliance**
        The last two monitoring reports found noncompliance with this requirement, noting that there were lapses in the documentation of daily nursing rounds.  It has been noted that a psychiatrist or medical physician did not visit inmates housed in holding and isolation cells on Monday, Wednesday and Friday.  Very few instances of visits by an MD (psychiatry or medical) were noted in the current review. The review of healthcare records for patients in holding and administrative segregation units for the current report also again showed lapses in the documentation of daily nursing rounds.  Fewer documented nursing rounds were noted in the current review than in the last reporting period, with the result that neither an MD nor an RN visited the inmates housed in holding and isolation cells as required.

**4. Chronic Care**
• *Any patient whose chronic condition cannot be managed at MCJ shall be transferred offsite for appropriate treatment and care. [CFMG Plan at 30]*

**Findings: Noncompliance**
        As noted by the prior Mental Health Monitor in his final report of May 2021, "Although inmates were routinely referred to NMC for crisis evaluation and stabilization, some inmates with severe and chronic mental illness that could not be managed at MCJ remained at the jail." Dr. Hughes further noted, "The acceptance and adequate treatment of such inmates at NMC remained problematic; and as has been previously noted, referrals for needed inpatient mental health care did not always occur due to the lack of access to inpatient treatment at NMC."  My prior report of July 2022 found that these issues remained unchanged.  The current review also found that these problems continue.  Several cases were reviewed that again reflected severe and chronic mental illness which cannot be adequately treated in the current jail environment, and required an inpatient level of care which the jail cannot provide.
        One potentially promising development with chronically, severely mentally ill inmates is the Early Access and Stabilization Program (EASS).  Review of documentation for several patients who were enrolled in this program showed that, during the period of their treatment by EASS staff, their mental health needs were more frequently and adequately addressed than when they were not being followed by the program.  The degree to which such services may adequately address the needs of severely mentally ill inmates while incarcerated in MCJ remains to be seen.  The case of one patient (Patient #9 in the separate case reviews document) clearly

7

illustrated the advantages and limitations of the EASS program for treating such patients. Once placed in the program, the treatment provided to this patient while at MCJ was notably better. He was transferred to Atascadero State Hospital as a PC 1370, but was eventually returned to MCJ as unrestorable to competence. His subsequent treatment at MCJ, when he was no longer eligible for the EASS program, was inadequate, and is likely to remain inadequate for a patient with needs that can only be met in a secure forensic inpatient psychiatric treatment facility.

The Plaintiffs' Attorneys have requested additional information regarding the EASS program, which includes information I have not specifically requested for the current report. Additional information will be sought for the next monitoring report, insofar as this program may directly bear on mental health care for inmates with chronic conditions under the requirements of the Implementation Plan. Wellpath has pointed out that these programs are intended to provide adequate mental health services at the jail. Wellpath has also noted that it has interdisciplinary meetings in which patients are discussed who may need a higher level of care. Recent discussions with staff have indicated that this process is still in the process of being fully and effectively implemented. Notwithstanding these promising developments, the extent to which all patients whose chronic severe mental illness can be adequately managed at the jail has not yet been established, and will remain a focus of monitoring.

*• At every 90-day chronic care appointment, the medical/psychiatric provider shall (1) assess the patient's current medications, complaints, and compliance with treatment plan; (2) examine vital signs and weight; (3) assess the patient's diagnosis, degree of control, compliance with treatment plan and clinical status as compared to prior visits; and (4) conduct lab and diagnostic tests as necessary, develop strategies to improve outcomes if the condition has worsened, educate the patient, and refer to MD or specialist, and/or conduct discharge planning as necessary. All of the above must be documented in the patient's health record. [CFMG Plan at 32-33]*

### Findings: Noncompliance

The prior two Mental Health Monitoring reports have found noncompliance with this set of requirements. The prior Monitor noted in his report of May 2021 that documentation of treatment planning was essentially nonexistent in the healthcare record; there was no documentation or comparison of patient weights by the psychiatrist; documentation was lacking regarding the patient's diagnosis, degree of control, compliance with the treatment plan and clinical status compared to prior visits; there was no documentation of Abnormal Involuntary Movements Scale (AIMS) testing or monitoring of metabolic factors for patients prescribed psychotropic medications; and a lack of documentation of appropriate therapeutic interventions for patients who were decompensating or not participating in treatment.

In my prior review of July 2022, the psychiatrist typically noted a diagnosis and compliance (or lack thereof) with prescribed medications, but there were no notes regarding the patients' degree of control, clinical status as compared to prior visits, or compliance with a treatment plan beyond medication compliance. There was no documentation of AIMS testing. There was no documented treatment planning by the psychiatrist beyond prescribed medications. In cases of patients refusing to take psychotropic medications despite overt mental health

symptoms, there was little in the way of psychiatric follow-up or further intervention. There was no documentation of collaborative, interdisciplinary treatment planning or intervention strategies. Similar observations were found in some of the cases drawn from the early portion of the current review (i.e., prior to May 2023). Some recent psychiatry notes were more complete, although strategies to improve outcomes did not go beyond encouraging the patient to be medication compliant, and the education field of the SOAPE notes were still typically blank. It was observed that the standardized forms for psychiatry progress notes and AIMS testing have been entered into the healthcare record in some of the more recent cases reviewed.

### 5. Acute Care
*• Inmates who require acute mental health services beyond what is available at the Jail must be transferred to an appropriate facility. [CFMG Plan at 36, 42] CFMG PLAN AT 26*
*• Crisis intervention and management of acute psychiatric episodes shall be handled initially by on-duty medical/mental health staff with referral to psychologist and/or psychiatrist on a 24 hour per day basis. [CFMG Plan at 43]*

**Findings: Noncompliance**

      The compliance status of these requirements remain essentially unchanged. The prior two monitoring reports, including the final report of the prior Mental Health Monitor of May 2021 and my most recent report of July 2022, have noted that although inmates were referred to NMC for crisis evaluation and stabilization, some inmates with acute severe mental illness which could not be managed at MCJ remained at the jail. Similar concerns were noted in the current review.

      The case of Patient #4 in the separate case reviews document illustrate some of the significant problems in the coordination of care between MCJ and NMC in instances of acute mental health crisis, including persistent self-injurious behaviors. This patient was sent out to NMC on an emergency basis 10 times over the course of nine days, once accompanied by the Jail Captain in an effort to obtain adequate interventions for the patient. The patient was consistently sent back, with recommendations that called for placement in a safety cell and treatment by the jail psychiatrist. Such recommendations are not particularly helpful. Clinical staff at the jail recognize the lack of utility to sending patients to the NMC-ER, knowing they will not be accepted for admission. This particular patient's care was complicated by what appeared to be severe Borderline Personality Disorder, for which ongoing inpatient treatment is typically not recommended, but the lack of adequate crisis intervention services beyond what is available at the jail is problematic. Better communication, coordination, and cooperation between mental health services at MJC and NMC are needed. Toward this end, County Counsel has noted that quarterly meetings are being held between NMC, Wellpath, the Sheriff's Office, and the County of Monterey's Behavioral Health Division to facilitate the necessary communication, cooperation, and whole person care. Such meetings are commendable, and will be necessary for progress in providing adequate care for inmates with the challenging combination of acute, severe mental illness and violent behavior. Tangible solutions with viable placement alternatives will also be needed.

      Cases were again identified in which patients who were in acute and severe mental health crises, with danger to self, danger to others, and possible grave disability, were not transferred to

NMC for evaluation and stabilization or to an appropriate facility. In at least one case, a patient did not appear to be referred to mental health providers as required.  Patient #9 in the separate case reviews document illustrates this issue. This chronically mentally ill inmate had periods of acute psychosis and acting out behaviors, including episodes of danger to others and violent resistance to custody staff requiring forced extraction from the men's holding area dayroom. Available documentation did not indicate that the patient was brought to the attention of mental health staff at the time of this incident or anytime soon thereafter. This case also illustrates a problem noted by both the prior Mental Health Monitor and in my last report of July 2022, whereby not all patients who required psychiatric assessment or follow-up were referred for psychiatric assessment.

It is important to note that Wellpath does not control admission to other facilities such as NMC or state hospitals.  This bears on the interpretation of the phrase "transferred to an appropriate facility" as stated in the Implementation Plan requirement. If the term transferred is taken to mean admitted to another facility, this is not something Wellpath can achieve independently.  Inmates can be referred, and can be transported to an outside facility such as NMC, but admission decisions are made by those facilities.  Whether this is taken to mean that Wellpath has thereby discharged its duty in relation to the Implementation Plan has not been explicitly addressed.  The overarching goal of this requirement appears to be that inmates requiring acute mental health services actually receive such services.  For this to be achieved, the participation and cooperation of entities beyond Wellpath and the jail will be required.

It is also noted that the second element of the acute care requirements in the Implementation Plan calls for crisis intervention and management of acute episodes to be handled initially by on-duty staff with referral to a psychologist and/or psychiatrist on a 24 hour per day basis.  Review of relevant cases indicates that such situations are typically handled by on-duty medical and mental health staff, or with the involvement of on-call mental health staff if occurring outside of scheduled mental health coverage hours. Referral can be made to a psychiatrist as needed (regular mental health staffing does not currently include psychologists), and on-call psychiatry coverage is available.  Further evaluation of compliance with this requirement will be undertaken in the next monitoring report.

### 6. Outpatient Services
• *The Jail shall make outpatient mental health services, provided by a qualified mental health provider, available to all inmates. [CFMG Plan at 41]*
• *Inmates requiring mental health services beyond the on-site capability of the Jail shall be referred to appropriate off-site providers. [CFMG Plan at 41, 43, 46]*

### Findings: Noncompliance
The prior monitoring report of July 2022 found noncompliance with these requirements, based on insufficient staffing levels to allow for the adequate deliver of outpatient services to meet inmate needs, e.g., group treatment activities.  Delivery of outpatient services has not yet substantially changed, although recent developments in the hiring of additional mental health staff may be encouraging (this is addressed in Section 12 below regarding Clinical Staffing).

To properly evaluate compliance with these requirements, it is necessary to consider what constitutes outpatient services. The Implementation Plan states, "Outpatient mental health services to include screening, evaluation, diagnosis, treatment and referral services shall be available to all inmates in the Monterey County Jail." [Dkt. 532 at p. 41] Unlike the services needed for some of the more severely mentally ill inmates, which are considered under the requirements for chronic and acute care, outpatient services could be effectively delivered by mental health staff within the existing jail environment, assuming sufficient staff are available to consistently deliver these services. Adequate staffing is currently seen as the primary obstacle to achieving substantial compliance with the requirements for outpatient services, as it results in insufficient clinical resources to meet the outpatient needs of the inmate population.

### 7. Safety and Sobering Cells
• *The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall responsibility for safety and security of prisoners, prompt reviews by medical of all placements, and a process of resolving disagreements between medical and custody. [Settlement Agreement Dkt. 494 at ECF 14]*

### Findings: Substantial Compliance
This requirement was found in substantial compliance in the last two monitoring reports. As previously noted, there is a good system in place for audits by the Compliance Sergeant of safety cell use. Review of recent monthly audits consistently showed compliance levels over 95% across a range of rating criteria. This system also includes a process for notification, supervision and training as needed for instances of non-compliance. Information is posted in the Receiving Area which provides specific guidance on the use of safety and observation cells, and the Compliance Sergeant is noted to regularly follow-up with custody staff regarding placements in the safety and sobering cells. Two of the four cells designed as safety cells, with padded walls and no bed or toilet, have been redesignated as observation cells, intended for use when inmates are on contraband watch. The same tacking and notification system applies to these redesignated cells, as these cells are still sometimes used for inmates on suicide watch when other single cells are not available.

Also as previously reported, the facility continued to primarily utilize booking cells rather than safety cells for suicide monitoring, although safety cells are still used for patients with active self-injurious behavior (i.e., those on Level 1 Suicide Watch, to be referred to as continuous watch according to recently revised policies and procedures). Safety cells are still being used for suicide monitoring of patients on Level 2 Suicide Watch (referred to as intermittent watch in recently revised policies) when other single cells are unavailable in the intake area. Wellpath and custody leadership have been encouraged to explore ways to minimize or eliminate this practice. Using cells in the receiving area to house multiple inmates on Level 2/Intermittent Suicide Watch together apparently has been successfully implemented in other jail facilities. This should be pursued at MCJ, although it has been noted by custody staff that various classification issues can make it difficult to match compatible inmates to be housed

11

together.  The terms continuous and intermittent watch are more clearly descriptive of the type of suicide watch to be enacted.  It is not clear how effectively this change in terminology has been locally implemented at Monterey County Jail; clinical and custody staff should be fully oriented to this change in terminology so as to avoid confusion when communicating about the level of suicide watch to be used.

There continued to be no reported cases of disagreement between medical and custody staff regarding placements, although there is a written procedure in place should such disagreements arise. Review of recent healthcare records showed prompt review by medical staff of safety cell placements.  Review of healthcare records indicated adequate coordination between medical staff, mental health, and custody regarding placement of inmates into safety cells and addressing their mental health needs.

An incident was observed during the recent site visit in which an inmate on Level 2/intermittent Suicide Watch in an observation cell became agitated and self-injurious (banging her head on the cell door and wall), and required transfer to a safety cell.  Although Mental health clinicians were on hand throughout the incident, attempting to de-escalate the patient while  facilitating and expediting the placement and care required, there were several points at which the process should have been more efficient (see Patient 5 in the separate case reviews document for a more detailed account). At no time was the patient left unattended or in jeopardy. This incident was later thoroughly discussed with custody, medical and mental health leadership, and reasonable corrective actions identified.  One aspect of the immediate response to this incident was a brief discussion between custody and clinical staff regarding whether to use the WRAP restraint devise or regular handcuffs to help insure the inmate's safety from self-injury. While communication and collaboration between mental health clinicians and custody staff is desirable and appropriate, such decisions involving inmates with serious mental illness should ultimately be primarily clinical in nature. This particular incident is not considered to represent a systemic deviation that would prevent a finding of substantial compliance.

*• Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical professional will see an inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.*

**FINDINGS: Noncompliance**

Review of healthcare records indicated that placement of inmates into safety cells were consistently done with communication between custody and mental health staff.  However, results from the Medical Monitor's recent review indicated that while nursing staff have typically assessed inmates at the time they are placed in a sobering cell as part of the intake screening, documentation reflecting adequate medical assessment for such placement was usually not completed.  On this basis, the current finding is noncompliance. The perspective of the Medical Monitor should be the basis for establishing the acceptable standard for the actions of medical staff in relation to this requirement.

Another part of the issue here is the definition of a "qualified medical professional."  My understanding of the Medical Monitor's position on this question is that a registered nurse would

qualify to complete the medical assessments specified in this requirement for placement into and release from a sobering cell, unless the assessment detected indications of a medical condition that required further assessment by or consultation with the on-call PCP.

*• A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his findings through a report which will be sent to the Jail Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.*

**Findings: Deferred**

The prior Mental Health Monitor found substantial compliance with this requirement in his last report of May 2021. He focused primarily on the audits conducted by the Compliance Sergeant, which are now based on the Guardian System of welfare check logging. This system has continued to demonstrate compliance with the requirement that custody staff make safety check rounds at the specified intervals, and the Compliance Sergeant has a robust system of auditing and feedback to address any detected compliance issues based on the timing of the checks. The auditing system also includes the routine reports specified in this requirement.

My subsequent review of July 2022 identified concerns regarding the requirement that safety checks consist of direct visual observation that is sufficient to assess the inmates well-being and behavior. These concerns arise directly from review of a patient suicide in which the patient had been deceased for some time before he was discovered to be unresponsive by deputies conducting welfare checks in the safety and booking cells. While there was documentation that the patient showed no signs of distress during these checks, there does not appear to have been an evaluation that the patient was in fact alive, suggesting that some of the welfare checks had been inadequate to assess the inmate's well-being. It was not clear to what degree the problems identified in this single case of suicide represented a systemic failure to meet requirements. A finding regarding compliance was therefore deferred in my prior report. It was noted that a finding of substantial compliance would be based on policies, procedures, practices and resources that are capable of sustained compliance, a system for tracking compliance, and a means for taking corrective actions in response to instances of noncompliance.

The core concern in evaluating this and other requirements related to welfare checks is finding a reasonable balance between adequately assessing an inmate's wellbeing and insisting on procedures that would unduly interfere with the inmate's sleep or create unnecessary agitation within the inmate population. Consultation has been sought with a number of subject matter experts, former custody and jail administrative staff from other jurisdictions, and monitors involved in similar cases at other jails. Several points emerged from these discussions. One is

13

that this is an issue that many, perhaps most, jail systems struggle with.  A clear consensus on a specific procedure which would explicitly address the balance of ensuring wellbeing vs. overly intrusive and disruptive interactions with inmates was not identified during discussions with various experts.  A consensus did emerge, however, regarding the need to somehow ensure that an inmate was alive, and not merely showing no signs of distress. Finally, there was agreement that any procedure for adequately assessing inmate wellbeing will depend to some degree on the judgment and situational awareness of the deputies conducting the checks. It is recognized that reliance upon individual judgment and adaptation to specific circumstances introduces potential variation into a procedure that must also be standardized.

 To assess compliance with requirements related to welfare checks, it is necessary to define the procedural expectations and devise a method to evaluate performance against this standard.  What follows is an attempt to do so.  On one end of a continuum, it is possible to define an inadequate welfare check as one that involves insufficient time and attention in the observation of an inmate.  Moving quickly past each cell or dorm area without carefully observing the inmates is not compliant with requirements. Awareness of specific inmates' condition or circumstances is necessary, in that inmates on suicide watch, especially those with acute mental illness, current intoxication or active withdrawal from drugs or alcohol, or recent signs of self-injury, require careful observation and may warrant more active measures to ensure their wellbeing.  Observing chest raise and fall with breathing or change of position would suffice, although this can be difficult to detect in some cases. If the inmate's position remains unchanged for several checks, further actions may be needed, up to and including tapping on the cell window to get a response, or entering the cell to observe breathing and skin tone.  This will need to be at the discretion of the deputies, taking into consideration the totality of the situation.

 A method is needed to evaluate compliance with these expectations. It is proposed that security videos showing welfare checks will be reviewed for the housing areas specified in the various requirements.  This approach has been used in other jails undergoing monitoring.  Videos have been requested from MCJ staff, who have agreed to provide them.  Once these videos have been reviewed, findings will be reached on the various requirements involving the adequacy of welfare checks to assess inmate wellbeing.

*• Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11 p.m. and 7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.*

**Findings: Substantial Compliance**

 Substantial compliance was found for this requirement in the last monitoring report. Review of safety cell logs and audits at that time showed that inmates were consistently provided safety smocks and safety blankets as required while in safety cells. The current review resulted in similar findings. The safety blankets that are used as a sleeping bag, which can be closed by Velcro and have a sewn-in pillow, were observed during the recent site visit, and found to be adequate for the intended purpose. A sufficient number of such safety blankets were available in the current inventory.

*• Inmates in sobering cells may have access to mattresses at the discretion of custody staff.*
*• Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.*

**Findings: Substantial Compliance**

The prior Mental Health Monitor found substantial compliance with these requirements in his last report of May 2021.  My last monitoring report of July 2022 deferred a finding, based largely on concerns raised by the Medical Monitor during a site visit in October 2022, in which some patients appeared not to have received mattresses as required. These concerns were not observed during the recent mental health monitoring tour.  Policies and procedures continue in the same manner as were found substantially compliant in prior mental health monitoring reports.

*• Patients withdrawing from benzodiazepines must be evaluated by a medical provider within 3 days, and a psychiatrist or psychiatric NP within 7 days. [CFMG Plan at 68]*

**Findings: Noncompliance**

A list of inmates placed on withdrawal protocols for benzodiazepines between January and June 2023 was provided, from which a sample of healthcare records was reviewed.  The majority of cases were seen by registered nurse within the three day timeframe, but not by a physician or nurse practitioner.  If the term medical provider is not considered to include RNs, this portion of the requirement was noncompliant.  The majority of cases reviewed were not seen by a psychiatrist or psychiatric NP within seven days as required.  The few cases where an inmate listed as withdrawing from benzodiazepines was seen by a psychiatrist within seven days appeared to have resulted from overt symptoms of psychosis who were referred to psychiatry by a mental health clinician in follow-up to their initial mental health evaluation, rather than referral to psychiatry as a result of being placed on the withdrawal protocol per se.  If the intent is for all inmates identified as withdrawing from benzodiazepines are routinely referred to psychiatry or a psychiatric NP for evaluation within seven days, Wellpath should examine current procedures to see if this expectation is clear to the nursing staff who are typically responsible for initiating the withdrawal protocol.

*• Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance.  This requirement was found in substantial compliance in the most recent prior monitoring report of July 2022, and is no longer subject to monitoring.**

15

*• For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.*

**Findings: Substantial Compliance**

As noted in previous monitoring reports, the Compliance Sergeant has implemented a thorough system to track and respond as needed to patients placed in safety cells. This system involves a status board that reflects when a patient enters a safety cell and the time at which they will reach the 24 hour mark.  This status board is audited every day by the Compliance Sergeant, with daily prompts to floor deputies to ensure these patients are moved as required.

The Compliance Sergeant has previously explained that safety cells are most frequently used to house inmates on Level 2/intermittent Suicide Watch (defined as those with suicidal ideation but no active self-harm) due to a lack of alternative observation housing, or inmates requiring a single cell in the booking area who are not on any level of suicide watch. Inmates on Level 1/continuous Suicide Watch must be transferred out to inpatient care or the NMC emergency room after 24 hours, while Level 2 inmates can be moved to other appropriate observation cells as available without requiring transfer to another facility.

Safety Cell audits conducted by the Compliance Sergeant for January through April 2023 were reviewed.  In January, two of 33 safety cell placements exceeded 24 hours.  One was an oversight by the receiving area Sergeant, resulting in a safety cell placement of 29.25 hours. This instance was addressed by the Compliance Sergeant with relevant custody staff. The other case involved a patient on Level 2 Suicide Watch who refused custody's attempt to move her from the safety cell, beginning six hours before the 24 hour limit was reached.  Substantial ongoing communication occurred among custody staff, including the Compliance Sergeant and the Sergeants on duty in the receiving area, about how to best respond to the situation.  Nursing continued to monitor the inmate.  A mental health clinician was consulted and concurred with a decision not to forcibly extract the inmate from the safety cell. A mental health clinician met with the patient but was unable to convince her to voluntarily leave the safety cell. A cell extraction was eventually conducted. The total time in a safety cell was 36.75 hours.  Review of this case concluded that custody, medical, and mental health staff made the best available decisions in attempting to avoid a forced extraction of the inmate who did not otherwise require an emergency transfer to NMC.  Daily follow-up by a mental health clinician continued to indicate that the patient's behavior had stabilized and she did not require transfer to an outside facility.

Review of the February 2023 safety cell audits indicated none of the 10 safety cell placements exceeded 24 hours. Review of audits for March 2023 showed 2 of 46 safety cell placements exceeded 24 hours; one for 25.75 hours and one for approximately 26.25 hours. Both cases resulted from the on-duty receiving area Sergeant misunderstanding the time of the 24 hour deadline. The Compliance Sergeant continued to follow-up with the custody staff involved. Review of the April 2023 safety cell audits showed none of the 12 safety cell placements exceeded 24 hours.

Although the individual instances of safety cell placements exceeding 24 hours during the four months for which data were reviewed are concerning, they are not considered to represent system deviations; compliance rates as a percentage of total monthly safety cell placements ranged from 94% to 100% for the months reviewed.  As noted above, one of the four cases exceeding 24 hours during this period was considered to represent an appropriate response by jail staff under the circumstances. The system that is in place is considered adequate to warrant a finding of substantial compliance.

*• Inmates in safety cells whose condition deteriorates, or for whom the nurse is unable to complete a hands-on assessment including vital signs after 6 hours of placement shall be transferred to Natividad Medical Center for further assessment. [CFMG Plan at 16, 75]*

**Findings: Substantial Compliance**

A finding on this requirement was deferred in my last monitoring report. A question was raised regarding the proper interpretation of the requirement: whether it is intended to mean that a hands-on assessment including vital signs is required within six hours of placement in a safety cell, or if it is intended to require vital signs to be taken every six hours for the duration of placement in a safety cell.  Following discussions with various Wellpath staff and the Medical Monitor, the proper interpretation is taken to mean that an initial hands-on assessment including vital signs is required within six hours of placement in a safety cell.  Patients are to be medically monitored for the duration of safety cell placement; I defer to the medical monitor regarding what such monitoring should consist of, and what qualifications are required for staff conducting this monitoring.

Using this definition of the requirement, nine instances of safety cell placement were reviewed.  All had complete vital signs entered into the healthcare record within required timeframes.

**8. Medication Continuity**

*• All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.*

**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that Wellpath provides evidence that this requirement has been incorporated into the Wellpath Policies and Procedures.  [Dkt. 751 at ECF 20].  The subsequent monitoring report of July 2022 found substantial compliance, in that Wellpath Monterey County Policies and Procedures HCD-110 E09B, Timely Initiation of Medication Upon Arrival, and HCD-110 E-09A, Medication Verification met this requirement.  This requirement has been released from further monitoring.**

*• By the end of the nursing shift, the booking RN will consult with the on-call psychiatrist regarding any verified or unverified psychotropic medications. The on-call psychiatrist will give*

17

*an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate. The on-call psychiatrist will then set the time to see the inmate within 5-7 days. The date of the appointment will be reflected on the written record of the order. [CFMG Plan at 19]*

**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that Wellpath provides evidence that this requirement has been incorporated into the Wellpath Policies and Procedures.  [Dkt. 751 at ECF 21]  The subsequent monitoring report of July 2022 found substantial compliance, in that Wellpath Monterey County Policies and Procedures HCD-110 E09B, Timely Initiation of Medication Upon Arrival, and HCD-110 E-09A, Medication Verification meet the requirements. This requirement has been released from further monitoring.**

*• No psychotropic medications shall be unilaterally discontinued without consultation with the facility physician or psychiatrist. Psychotropic medication shall not be ordered for longer than 90 days, new psychiatric medications will not exceed 30 days, until condition is documented stable by the ordering physician. The prescribing provider will renew medications only after a clinical evaluation of the individual is performed. [CFMG Plan at 19]*

**Findings: Noncompliance**

As noted in the last two monitoring reports, including the final report of the prior Mental Health Monitor in his report of May 2021 and my report of July 2022, new psychotropic medications continued to be ordered for greater than 30 days, and inmates were seen at intervals greater than 30 days after new medications were prescribed and prior to documentation of psychiatric stabilization.  Cases were again observed in the current review in which medication follow-up appointments were scheduled for 90 days despite active symptoms of serious mental illness, including psychosis. More recent cases (from May and June 2023) showed some improvement in these areas.  This improvement will need to be consistently sustained to reach substantial compliance with requirements.

**9. Discharge**

*• Provision of psychotropic medications upon discharge from the jail. The Implementation Plan provides that a 30-day supply of medications be given to inmates upon discharge from the jail.*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that Wellpath provides evidence that this requirement has been incorporated into the Wellpath Policies and Procedures.  [Dkt. 751 at ECF 21]  The subsequent monitoring report of July 2022 found substantial compliance, in that Wellpath Monterey County Policy and Procedures document HCD-110 E-10, Discharge Planning and Release Medications, meets this requirement. This requirement has been released from further monitoring.**

• *Inmates who are released prior to resolution of a continuing medical/mental health condition shall be referred to public health and/or community clinics as appropriate, and shall be provided written instructions for continuity of essential care. [CFMG Plan at 38, 44]*
**This item has been released from monitoring. [Dkt. 751 at ECF 12]**

**10. Involuntary Medication**
• *Psychotropic medications may not be used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment. [CFMG Plan at 90, 96]*

**Findings: Substantial Compliance**
      As noted by the prior Mental Health Monitor in his report of May 2021, and in my last monitoring report of July 2022, the current review again found no instances where psychotropic medications were used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment.

• *Absent an emergency, inmates will not be administered involuntary psychotropic medications at the Monterey County Jail. Psychotropic medication will not be administered for disciplinary purposes. [CFMG Plan at 19]*

**Findings: Substantial Compliance**
      Consistent with the findings of the most recent two monitoring reports, the current review found that instances of involuntary medication were in response to situations justifiably considered an emergency, and were not administered for disciplinary purposes.

• *Absent an emergency or court order for treatment with psychotropic medications, an inmate shall give his or her informed consent or refusal. [CFMG Plan at 20]*

**Findings: Substantial Compliance**
      Review of documentation in the electronic healthcare records consistently showed that inmates provided signed informed consent or refusal of mental health treatment. There were no instances observed where an inmate was administered psychotropic medication in the absence of a psychiatric emergency or court order without their consent.

• *The Jail may only administer involuntary psychotropic medications in a psychiatric emergency (i.e., when administration is necessary to preserve life or prevent serious bodily harm, and it is impracticable to obtain consent), or when an inmate is found to lack capacity to consent at an Incapacity Hearing. The responsible physician, Program Manager, and Director of Nursing, with the Facility Manager, are to identify appropriate community resources and develop procedures to obtain an Incapacity Hearing, and transfer inmates requiring involuntary psychotropic med administration to an appropriate community facility. If the inmate must remain at the jail for clinical or custodial reasons, the health services staff shall coordinate with County Mental Health Psychiatric Emergency Services to evaluate competency pursuant to Riese v. St. Mary's Hospital (Riese Hearing). [CFMG Plan at 96, 98]*

19

**Findings: Noncompliance**

No instances were found during the current review in which psychotropic medications were administered involuntarily in the absence of a psychiatric emergency when the inmate had refused to provide consent. However, as noted in the last monitoring report, this Implementation Plan requirement also states that inmates requiring involuntary psychotropic medications are to be transferred to an appropriate community facility, and specifies a procedure to follow regarding evaluation of competency. A case was reviewed (Patient #4 in the separate case reviews document) in which this procedure was not followed. Also as noted in the last monitoring report, there is no process in place whereby the responsible physician, Program Manager, Director of Nursing, and Facility Manager will obtain Incapacity Hearings and transfer inmates requiring involuntary medication administration to an appropriate community facility.

The intent of this requirement appears to focus primarily on constraining the use of psychotropic medications to legitimate psychiatric emergencies, and to create a process by which patients requiring involuntary medications are properly evaluated and cared for in an appropriate setting.  The inverse of these concerns is that sometimes patients who require involuntary medications because of the seriousness of their mental health condition, and who are unwilling or unable to provide consent, are not receiving involuntary medications when they appear to be called for (e.g., Patient #9 in the separate case reviews document). Cases such as this suggest there is sometimes a reluctance to pursue involuntary medications when the condition of the patient warrants consideration of this treatment approach.

• *In a psychiatric emergency, psychotropic medications can only be involuntarily administered pursuant to a direct written or verbal one-time order from the responsible facility psychiatrist or physician after an on-site evaluation (never as needed, never standing order). A telephone order is sufficient only if the inmate has been personally evaluated by the prescribing physician no longer than 24 hours prior to the emergency. If none of above options are available, physical restraint should be used and the inmate transferred to the hospital emergency department for physician evaluation. [CFMG Plan at 96]*

**Findings: Noncompliance**

Noncompliance with this requirement was found in the last monitoring report, in which an instance was identified where telephone orders were given for stat administration of involuntary medication by the on-call psychiatrist but the patient had not been personally evaluated by the prescribing physician within 24 hours prior to the emergency, although a Facetime evaluation was attempted.  In the current review, another case of involuntary medication administration was identified in which an order was given by the on-call psychiatrist, who attempted to evaluate the patient via a Facetime contact at the time the order was given (Patient #4 in the separate case reviews document). The requirement, however, specifies that an on-site evaluation is necessary, or that the prescribing physician must have been personally evaluated by the prescribing physician not longer than 24 hours prior to the emergency.  There was again no documentation found indicating that this was done in the current review.

Further consideration of the language for this Implementation Plan requirement raises questions about how it should be interpreted and applied to the procedures for the administration of psychotropic medications in a psychiatric emergency.  The first sentence calls for an on-site evaluation, taken to mean a face-to-face encounter occurring at the jail.  The second sentence allows for a telephone order only if the inmate has been "personally" evaluated by the prescribing physician no longer than 24 hours prior to the emergency.  This portion of the requirement does not appear to require an on-site evaluation, and may allow for telepsychiatry evaluation of the inmate.

Referring to the case cited as the basis for the current finding of noncompliance, I have no fundamental objection to patients being evaluated remotely if this includes adequate visual contact by the prescribing psychiatrist. I believe it is usually preferable to manage psychiatric emergencies at the jail with the appropriate use of involuntary medications than to transport the inmate to an outside facility, assuming that an adequate psychiatric assessment can be conducted. This, however, may not comply with the requirement as currently written. Expanded use of videoconferencing technology in the delivery of telepsychiatry services could offer improvements in some areas of service delivery, including more consistent availability of psychiatric contacts. This, however, may require clarifying the specific language of this requirement. More broadly, effective use of telepsychiatry will require clearly understood procedures for contacting psychiatric providers, clinically and logistically supporting telepsychiatry contacts, and ensuring adequate clinical documentation. The implementation of Wellpath's current telepsychiatry policies and procedures at the Monterey County Jail will be a focus of subsequent monitoring reports.

It should be noted that a broader evaluation of compliance with this requirement has been hampered by the lack of routine tracking of involuntary medication administrations. This limits the sample of instances that can be effectively identified through case reviews.

*• Verbal orders for involuntarily psychotropic medications must be documented in the inmate's medical record and signed by prescribing physician within 72 hours. The Medical Program Manager and Custody Facility Manager shall be notified in writing, or by telephone if not available, within 24 hours of the involuntary administration of psychotropic medications. [CFMG Plan at 96-97]*

**Findings: Noncompliance**

The last monitoring report found noncompliance with this requirement based on information provided by the HSA, indicating that the respective Managers are not routinely notified of involuntary administrations of psychotropic medications, nor was a log kept of involuntary medication administrations which would allow verification of such notifications. Wellpath reports that a log for involuntary medication administrations has recently been initiated.  If effectively implemented and integrated with ongoing Quality Assurance procedures, this should facility compliance with the various requirements for involuntary medications.

*• Inmates receiving involuntary psychotropic medications must be admitted to an infirmary or safety cell, with intermittent supervision by custody staff at least every 30 minutes. Nursing staff*

*must monitor (assessing response to medications, mental status, general physical appearance, behavior, and hydration) every 15 minutes during first hour, then every 30 minutes thereafter until otherwise ordered by the prescribing physician, documenting all findings in the inmate's medical record. The inmate must be evaluated by the responsible prescribing physician at least every 72 hours. [CFMG Plan at 97]*

**Findings: Noncompliance**

This requirement was found noncompliant in the last monitoring report, where instances were identified in which a patient received involuntary psychotropic medications but was not admitted to an infirmary or safety cell.  An instance was found in the current review in which the required nursing assessments following involuntary medication administration were not documented in the healthcare record (Patient #4 in the separate case reviews document).

*• Inmates exhibiting any clinical deterioration at any time during involuntary therapy shall be transferred immediately to a clinically appropriate treatment facility. [CFMG Plan at 97]*

**Findings: Deferred**

Noncompliance with this requirement was found in the last monitoring report, when cases were identified in which the patient's clinical condition periodically deteriorated despite the administration of involuntary medications but the patient was not transferred to a clinically appropriate treatment facility, i.e., an inpatient level of care.  A similar case was identified in the current review in which a patient continued to demonstrate high levels of impulsivity, emotional reactivity, and self-injurious behavior despite administration of involuntary medications (Patient #4 in the separate case reviews document), but this patient's likely diagnosis of severe borderline personality disorder suggests that an inpatient level of care may not have been the optimal treatment option.

A finding is deferred in the current report, as too few cases of involuntary medication administration were identified in the course of healthcare record reviews to reach a conclusion about this area of practice.  A routine process to log and internally review all instances of involuntary medication administration is needed; this would better support progress toward substantial compliance in this and other requirements involving involuntary medications.

## 11. Medication Refusals

*• The on-call psychiatrist must be contacted whenever an inmate refuses his or her medications on three consecutive occasions. [CFMG Plan at 20]*

**Findings: Noncompliance**

The last monitoring report of July 2022 found noncompliance with this requirement, noting a lack of documentation demonstrating that a psychiatrist was contacted for patients whose Medication Administration Record showed three or more consecutive refusals, nor were the patients consistently seen by a psychiatrist around the time of such refusals.  For the current report, the Medication Administration Records for patients identified by the mental health clinicians as having high rates of medication refusals were again reviewed to identify instances

of three or more consecutive refusals of psychotropic medications. Eight patients were identified who met this criteria.  One had documentation in the healthcare record that indicated a psychiatrist was notified by nursing staff.  In one case, a mental health clinician made a referral to a psychiatrist and noted medication noncompliance.  In another case, the patient was discussed in the multidisciplinary treatment team meeting, and medication noncompliance was noted. In the remaining cases, no communication with the psychiatrist regarding medication noncompliance was found.

## 12. Clinical Staffing

*• Defendants will maintain Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to ensure adequate staffing to provide all necessary medical and mental health care. The plan will identify all needed positions based on current and projected Jail population, and the number and qualifications of medical and mental health care staff to cover each position, with shift relief.*
*• Mental health services provided on-site shall include crisis evaluation, socialization programs, group therapy, medication management, psychiatric evaluations and individual therapy. [CFMG Plan at 42]*
*• At all times, there shall be sufficient staff to ensure compliance with the Implementation Plan. The CFMG Staffing Plan is attached to the Implementation Plan as Exhibit I. CFMG must ensure that all positions are filled. Relief factors for each position shall be calculated into the staffing analysis to ensure staffing levels consistently meet requirements. CFMG must continuously evaluate staffing levels to ensure sufficiency for compliance. [CFMG Plan at 116. ]*

**Findings: Noncompliance**

Clinical staffing remains inadequate to fully meet the requirements of the Implementation Plan.  The current staffing allocation is as follows:

- 1 MH Director working 4 x 10-hour shifts: 1.0 FTE
- 3 Mental Health Clinicians working 3 x 12-hour shifts: 2.7 FTE
- 1 Mental Health Clinician working 5 x 8-hour shifts: 1.0 FTE
- 2 psych techs working 5 x 8-hour shifts: 2.0 FTE
- 1 discharge planner working 5 x 8-hour shifts: 1.0 FTE
- (1 psychiatrist working 4 x 10-hour shifts: 1.0 FTE)
  - TOTAL: 7.9 FTE, plus 1.0 FTE psychiatrist

Two additional mental health clinicians have recently been hired, so that there are now three Mental Health Clinicians in addition to the Mental Health Director.  The recent hiring of these additional clinicians should allow the Mental Health Director to transition into more supervisory and administrative functions, as her time has been primarily dedicated to direct clinical services.  The discharge planner position has been recently filled.  One full-time psychiatrist continues to work a 4 x 10 hour schedule Mondays through Thursdays, and an on-call psychiatrist provides additional psychiatry coverage.  A contract with Precise telepsychiatry services in now in place to provide evening and weekend on-call psychiatry coverage.  Currently unfilled positions include one full-time mental health clinician and two psychiatric technicians.

Difficulties in recruiting psychiatric technicians have led to consideration of hiring LVNs into these positions, and to provide them with training and supervision to allow them to fulfill the necessary duties.  If properly executed, this could provide a reasonable alternative to ongoing vacancies in these psychiatric technician positions.

Review of rescheduled appointments due to workload continue to demonstrate that mental health staffing levels to date cannot meet demand, despite continual triage and the consistent efforts of the mental health clinicians.  Filling the remaining allocated mental health positions will be essential for continued progress across a range of requirements, including sick call, mental health screenings, outpatient services, suicide prevention, treatment planning, inmate discipline, and administrative segregation screenings. It will also be essential that adequate clinical staffing is achieved to allow the Mental Health Director to assume the necessary administrative, supervisory and professional development duties of that role, rather than continuing to provide front-line mental health services. The additional mental health clinicians should help alleviate some of the shortcomings noted in the current report, although ongoing monitoring will be required to determine if the needs of the inmate population are adequately met in accordance to Implementation Plan requirements.

• *Mental health staff shall be available on-site 7 days per week and on-call for assessment on an inmate's level of suicide risk upon referral by health services and/or custody staff. [CFMG Plan at 72]*

**Findings: Substantial Compliance**

Review of staffing schedules showed that mental health staff were available on-site seven days per week for the months of May, June and July 2023.  Staff were also available on-call for assessment of suicide risk upon referral.

### 13. Mental Health Care Training
• *All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.*

**Findings: Substantial Compliance**

The last two monitoring reports have found substantial compliance with this requirement. Training rosters and related memos were again provided by the Compliance Sergeant for the current review, along with relevant training materials, supporting a finding of continued substantial compliance.

• *In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.*
• *All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates,*

*which will include identifying risk factors specific to inmates, identifying warning signs specific to inmates, and how to recognize individuals who are in mental distress and/or suicidal.*
**Defendants have been released from monitoring on these items. [Dkt. 751 at ECF 10]**

• *Once a year, custody staff will conduct a situational training such as a mock suicide attempt or a medical emergency. CFMG staff will also participate in the annual situational training. At the conclusion of the situational training, command staff will meet with CFMG to determine if any changes in policies or operations are warranted as a result of the exercise. [Dkt. 528-1 at 17 of 90]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance. [Dkt. 751 at ECF 19]**

**Findings: Substantial Compliance**

Documentation was provided of a situational training conducted by custody staff on 5/18/23 based on a mock suicide attempt by hanging.  This documentation reflected the involvement of Wellpath staff and custody command staff as required, and included a post-drill review which identified areas for performance improvement.

• *All medication nurses must be trained to recognize common side effects associated with use of psychotropic medications, and upon observing such side effects must document observation in the medical record and schedule the patient to see a medical provider at the next available sick call. [CFMG Plan at 90]*
**This item has been released from monitoring. [Dkt. 751 at ECF 12]**

**14. Restraint Chairs**
• *Physical restraint devices can only be used on inmates who display bizarre behavior that results in the destruction of property or reveals an intent to cause physical harm to others, and cannot be used when there are less restrictive alternatives. [CFMG Plan at 47]*
**This item has been released from monitoring. [Dkt. 751 at ECF 12]**

• *Use of a restraint chair will be documented in an observation log which will be reviewed and signed by a supervisor. Inmates shall not be placed in a restraint chair for longer than six consecutive hours.*
**This item has been released from monitoring. [Dkt. 751 at ECF 11]**

• *Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A shift supervisor and medical staff shall oversee the exercise. If unsuccessful in allowing inmates to exercise their arms and hands in a range of motion exercise, safety staff shall explain on the observation log why extremities could not be exercised and a shift supervisor shall be notified.*

**Findings: Substantial Compliance**

The last monitoring report of July 2022 found substantial compliance with this requirement.  There continued to be relatively few incidents of restraint use.  The Compliance Sergeant continues to oversee a robust system of monitoring and reporting on use of restraints, including the WRAP devise.  Review of audit reports and restraint logs dating from January through April 2023 showed ongoing substantial compliance.

*• On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.*

**Findings: Substantial Compliance**

The last two monitoring reports have found substantial compliance with this requirement. Audits by the Compliance Sergeant were again found to be substantially compliant in the current review.

## 15. Use of Force

*• Medical and mental health staff shall be consulted before any planned use of force on an inmate. Custody staff in concert with medical staff will develop the most effective and appropriate means of imposing compliance with rules and regulation, including attempts at de-escalation. It is understood that it is the goal of custody staff to use the least amount of force necessary to ensure compliance with rules and regulations. Planned use of force will only be used after verbal attempts to obtain compliance.*
*• Any use of force will be documented on a use of force form.*

**Findings: Substantial Compliance**

The most recent prior monitoring report of July 2022 found substantial compliance with this requirement.  The current review of use of force reports from January through April 2023 found continuing substantial compliance. Medical and mental health staff were consulted and responded appropriately, and custody attempted verbal de-escalation where circumstances allowed.

## 16. Mental Health Grants

*• Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.*
**This item has been released from monitoring. [Dkt. 751 at ECF 10]**

## 17. Inmates Who Have Been Declared Incompetent to Stand Trial

*• The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period. As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen*

26

*by medical staff on a daily basis, who are trained in suicide risk assessment. The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for orders to show cause to be directed the State of California) to expedite the transfer of inmates who have been determined to be incompetent to stand trial to an appropriate State facility. [Dkt. 582-1 at ECF 13]*

**Findings: Noncompliance**

  The prior Mental Health Monitor found substantial compliance for this requirement in his last report of May 2021. He concluded that, "The process developed for the identification, referral and monitoring of inmates who were considered or declared incompetent appeared to be adequate and sufficient to allow for a continued determination of substantial compliance."

  In my subsequent monitoring review of July 2022, I deferred a finding on this requirement.  Concerns were noted that the Court does not always appear to provide timely notification when inmates are declared incompetent to stand trial. It has since been reported by the Compliance Sergeant that the Court does in fact notify the jail on a daily basis regarding inmates found incompetent to stand trial. He also noted that many incompetent to stand trial inmates are already in Administrative Segregation. Once notified by custody, mental health will see patients and place them on a follow-up schedule as needed.  What appears to be missing is timely communication between custody and mental health staff, such as would allow for the required evaluation of the inmate's condition upon the change in their legal status.

  The primary intent of this requirement appears to be the close monitoring of inmates during a period of potentially heightened vulnerability following a finding of incompetence to stand trial.  This may be as simple as having a designated custody staff (e.g., the Compliance Sergeant) notify mental health staff (e.g., the mental health supervisor) on a daily basis regarding newly classified 1370s, as received from the courts.  Such inmates could be added to the daily sick call list, and evaluated as required. A housing determination should follow established procedures, including discussion between classification and mental health staff, and review of inmates found incompetent to stand trial in the Multidisciplinary Team meetings.  It is recognized that this process would have implications for staffing levels and workload.

  It has been previously noted by County Counsel that there are no longer "transition cells" and that in misdemeanor cases, charges are now typically dismissed or the judge releases the defendant. It is also noted that a small Jail Based Competency Treatment program is located within MCJ, and that a program of early access to enhanced mental health treatment (EASS) has been implemented. It is recognized that the EASS program is not specifically a part of the implementation plan requirements and associated monitoring process.  However, this program may facilitate the early detection and clinical response to inmates where competency is a factor. It should be coordinated with the other aspects of the process involved in meeting this requirement.

**18. Treatment Plans**

• *Qualified health services staff must develop a written individualized treatment plan for inmates requiring close medical and/or mental health supervision. A treatment plan must specify a particular course of treatment and shall be included in the plan portion of the S.O.A.P. progress*

*note. The treatment plan shall reflect current problems or conditions being followed. The treatment plan shall include monitoring of the efficacy of treatment and discharge planning. [CFMG Plan at 27, 75]*

*• Treatment plans shall include specific medical and/or psychiatric problems, nursing interventions, housing, dietary, medication, observation and monitoring, and follow-up referral and/or evaluation as appropriate. [CFMG Plan at 27]*

*• Mental health providers must work with the Program Manager or designee to develop a treatment plan and meet the outpatient needs of inmates with mental illness, including opportunity for social interaction and participation in community activities. If an inmate is unable to participate, the reason must be documented. [CFMG Plan at 43, 75]*

*• CFMG will inform classification through medical treatment orders as to any classification issues an inmate has due to a mental illness. [County Plan at 11]*

**Findings: Noncompliance**

The last two monitoring reports have found noncompliance with the requirements for treatment plans. Although a few instances of improved documentation were observed in the current review, the deficiencies noted in earlier reports remain evident.

The Implementation Plan requirements for treatment plans specify the elements of an individualized treatment plan that must be included in the clinical documentation. Review of most recent treatment plans indicated that these elements are still seldom adequately addressed. As noted before, integration of the interventions provided by various professional disciplines (e.g., mental health clinicians, psychiatrist, nursing, custody, etc.) remains lacking. Specifically, the role of psychiatry appears limited to the prescription of psychotropic medications, without further involvement in an interdisciplinary treatment process; coordinated efforts to address problems such as medication compliance or reduction of self-injurious behavior were not evident in the documentation. Treatment plans by mental health clinicians, documented primarily in SOAPE notes, typically do not address the required elements.

Two aspects of treatment planning must be in place to achieve substantial compliance with Implementation Plan requirements.  One is the process of treatment planning, the other is the resulting documentation of a treatment plan.  Best practice in the process of treatment planning involves active participation of an interdisciplinary team of service providers to produce an individualized treatment plan, based on an adequate assessment of the patient, that guides interventions and case management. This treatment plan must then be documented in a way that is sufficiently specific, readily accessible to relevant staff, and revised as needed based on the patient's current condition and behavior.

Regarding the process of treatment planning, various staff continue to participate in a weekly Multidisciplinary Team Meeting.  However, it does not appear that this meeting systematically addresses all relevant cases (e.g., all cases on the Special Needs or Seriously Mentally ill list), nor does it appear to directly inform a written treatment plan for the cases that are reviewed.  Wellpath staff report that a new meeting structure is under development.  My understanding based on recent discussions is that there will be both a weekly mental health meeting on Tuesdays and a weekly multidisciplinary meeting on Thursdays.  The focus, membership, and outputs from these meetings are yet to be clearly defined.  It is hoped that the

28

systematic review of patients requiring individualized treatment plans, resulting in adequate treatment plan documentation, can be accommodated once this new meeting structure is fully implemented.

Regarding the documentation of treatment plans, most plans reviewed to date exist in the form of SOAPE notes.  This approach is not optimal.  SOAPE notes can work effectively to document individual clinical encounters, but are not typically effective as a centralized document to guide treatment across encounters and across providers. Their format does not lend itself to sufficient integration of assessment findings and specific interventions to address identified problems. This is better accomplished through a centralized, stand-alone treatment plan document that results from input by a multidisciplinary team.  Wellpath staff have provided copies of forms titled Mental Health Initial Special Needs Assessment, Mental Health Special Needs Progress Note, and Mental Health Treatment Plan for Non-Acute Patients.  Training for the interdisciplinary treatment team process was also reviewed during the recent site visit, and input was provided.  These forms, training, and process, once fully implemented, could provide a path to substantial compliance for the specified treatment plan requirements. This area will remain a focus of ongoing monitoring and consultation.

### 19. Consideration of Mental Illness in Inmate Discipline

• *Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff shall contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness. (*Dkt. 532 at ECF 47*)*

### Findings: Noncompliance

The last two monitoring reports have found noncompliance with this requirement.  The prior Mental Health Monitor noted that while some Disciplinary Action Reports (DARs) were completed in their entirety, many forms were not completed by checking boxes at the bottom of the form that noted whether inmates received mental health services or if custody staff consulted with medical staff.  Similar deficiencies were found in my last report of July 2023. Review of DARs for the current report found a higher rate of forms which checked boxes related to inmates receiving mental health services, although not all forms were so marked.  For those inmates whose DAR form was checked for receiving mental health services, the DARs once again contained no information related to consulting with mental health staff.  Review of electronic healthcare records also showed no documentation of such consultations by mental health staff regarding the evaluation of discipline for inmates with mental illness.

During the current review, some incident reports again indicated that charges are recommended for patients with known mental health problems.  It is recommended that a mental health patient's clinical condition should be consistently taken into consideration when decisions are made about filing charges for infractions while incarcerated.

### 20. Space Issues

• *Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health*

*Professionals for prisoners with mental illness, including . . .adequate clinical and administrative treatment space....* [Dkt. 494 at ECF 17]

**Findings: Substantial Compliance**

The prior two monitoring reports of May 2021 and July 2022 found substantial compliance with this requirement. The most recent site visit and subsequent discussions with staff indicate continued substantial compliance.  Adequate office space is available for mental health clinicians and the psychiatrist, and space is available for seeing patients in a confidential setting.

### 21. Administrative Segregation

• *The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation, and require procedures to mitigate the impact of administrative segregation on persons with mental illness, including but not limited to structured therapeutic activity outside the segregation cell and where feasible assignment of cell mates.*   [Dkt. 494 at ECF 9-10]
• *Inmates being moved from general population to an administrative segregation cell will be screened for suicide risk within 24 hours of placement.* [Dkt. 528-1 at ECF 12]

**Findings: Noncompliance**

The last monitoring report of July 2022 found noncompliance with both elements of the requirement: the need for screening all inmates placed in administrative segregation and the need to provide structured therapeutic activity outside the segregation cell.  These findings have not changed.  Discussion with the Mental Health Supervisor still indicated that mental health staff do not routinely screen inmates placed in administrative segregation housing.  There is no process by which mental health staff are notified of all administrative segregation placements, and there has been insufficient mental health staffing to conduct the resulting volume of screenings should such notifications be made.  However, this requirement, as written, does not specify that the screenings are to be conducted by a qualified mental health provider, unlike the requirement under Suicide Prevention (at page 34 of the current report) which states that a QMHP must perform a suicide risk assessment using the Risk Assessment Tool, "after placement in Administrative Segregation."  Procedures to meet both of these requirements should be pursued.  Groups are still not being held on a regular basis to meet out of cell programming requirements due to mental health staffing limitations, although in-cell materials continue to be provided.

• *Inmates shall not be placed in administrative segregation solely because of having a mental illness.  Classification is to assess a totality of factors when assigning inmates to administrative segregation units.  The goal of the County is to limit the use of administrative segregation for inmates with mental illness.* [Dkt. 528-1 at ECF 12]

**Findings: Substantial Compliance**

The last monitoring report of July 2022 found substantial compliance with this requirement.  This was based on the interpretation used in evaluating compliance, whereby the

30

classification process must not result in placing an inmate in administrative segregation only ("solely") because of the presence of mental illness.  During the current review, there continued to be no indications that inmates were placed in administrative segregation solely because of having a mental illness.  As in previous reviews, there were cases in the current review where a severe and chronic mental illness contributed to the behaviors leading to placement in administrative segregation, and these cases sometimes exceeded the capacity of MCJ to adequately treat the mental illness. This problem has again been addressed in the sections of the current report covering chronic and acute care, where there were continued findings of noncompliance.

The Plaintiffs' attorneys have raised the concern that because a disproportionate percentage of inmates in administrative segregation have mental illness and cannot be housed elsewhere, they are being placed in administrative segregation solely because they have a mental illness. I have not requested or reviewed specific statistics regarding the percentage of inmates with mental illness in administrative segregation housing, but I believe the observation that there are many such inmates is accurate. However, I do not believe inmates are being place in administrative segregation *solely* due to mental illness, i.e., that once an inmate is diagnosed with a mental illness, this and this alone is the reason they are so housed.  Some inmates with mental illness are not housed in administrative segregation.  Those mentally ill inmates who are housed in administrative segregation also present with behaviors or other classification factors which require segregated housing.

*• Inmates with a serious mental illness who are housed in Administrative Segregation will be scheduled for a weekly appointment with a qualified mental health provider.* [CFMG Implementation Plan at 42]

**Findings: Noncompliance**

The prior two monitoring reports have found substantial compliance with this requirement, although the last report of July 2022 noted that the contacts were sometimes rescheduled due to workload issues.  In the last report it was observed that despite the rescheduling of contacts with the mental health clinician, patients in Administrative Segregation were typically seen within two to three days of the originally scheduled appointment, and were thereby still seen each week on a consistent basis. This was not the case in the current review. Some mentally ill inmates in Administrative Segregation did not appear to be scheduled to see mental health clinician at all; others who were scheduled were repeatedly rescheduled without being seen for several weeks and in some cases for over a month. It is likely that these rescheduled appointments were due to inadequate staffing levels, which may improve as allocated mental health positions are filled. The lack of scheduled appointments for mentally ill inmates in administrative segregation appears to indicate other problems with procedures for identifying and scheduling such patients, which should be explored by Wellpath staff for corrective action.

Wellpath has noted that mental health staff routinely conduct weekly Administrative Segregation rounds.  Whether this practice is sufficient to meet the requirement for a scheduled weekly appointment with a QMHP will be considered in the next monitoring report.

*• Nursing staff shall conduct mental health rounds in Administrative Segregation daily, separate and apart from medication distribution.* [CFMG Implementation Plan at 42]

**Findings: Noncompliance**

The last two monitoring reports found noncompliance with this requirement, noting that nursing rounds were not always documented daily in segregation units. Review of healthcare records for the current report found a similar pattern whereby nursing rounds were not documented daily across administrative segregation housing areas.

*• Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior. Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal. [Dkt. 528-1 at ECF 15]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance.  [Dkt. 751 at ECF 19]**

*• Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.*

**Findings: Deferred**

Considerations regarding the evaluation of compliance with welfare check requirements are addressed at pages 13 - 14 of the current report.  The prior Mental Health Monitor had found Substantial Compliance on these requirements, and my last report of July 2022 indicated that audits of the documented completion of welfare checks continued to show high levels of compliance.  It was noted that the Compliance Sergeant has developed a thorough and effective process for monitoring the recording of welfare checks, with routine reports and feedback to deputies, including correctional action as needed. The current review found similar compliance with this aspect of the requirement.

A finding for these requirements were deferred in my last report.  The area of concern which prevented a finding of Substantial Compliance is the requirement that welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior.  Suggestions for achieving and evaluating compliance with this aspect of the requirement are offered earlier in the current report at page 14. It is proposed that security video showing welfare checks will be reviewed to reach a finding.  Such videos have been requested. A finding for these requirements is again deferred until review of these videos is completed.

*• All welfare checks shall be documented on a welfare check log.  The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance.  Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week.  On a*

*monthly basis, the Compliance Sergeant will randomly select five log entries and use the door entry logs to verify that the deputy entered the administrative segregation pod, to conduct a welfare check. The Compliance Sergeant will track all of his findings through reports which will be sent to the Jail Ops Commander. Monthly audits of the Compliance Sergeant's reports will be conducted by the Jail Operations Commander. The Jail Operations Commander will generate a monthly report to document their audit findings. [Dkt. 528-1 at ECF 16]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neural monitor's next tour report finds substantial compliance. [Dkt 751 at ECF 20]**

**Findings: Substantial Compliance**

The prior Mental Health Monitor found substantial compliance with this requirement during his last report of May 2021, noting that the Compliance Sergeant continued to audit welfare checks monthly, and that areas of concern that were identified resulted in notifications and corrective actions when indicated. Review of logs by Dr. Hughes indicated timely documentation of custody welfare checks. My last review of July 2022, and the current review, produced the same findings in this regard. The Compliance Sergeant continues to conduct thorough and timely audits of welfare checks as required, with regular monthly reports to the Jail Operations Commander. The Corrections Operations Commander provides a thorough monthly compliance report to the Chief of the Corrections Operations Bureau. Review of welfare check logs and example reports by both the Sergeant and the Commander, in addition to discussions with the Compliance Sergeant about the procedures used in this process, demonstrated ongoing compliance with this aspect of the requirement.

This requirement is interpreted as pertaining primarily to the process of recording when welfare checks took place, and the associated internal monitoring process by the on-duty sergeants and Compliance Sergeant to ensure that welfare checks took place. These aspects of the welfare check process have remained in substantial compliance, i.e., the welfare checks are consistently documented in a log, and the required reviews and reports are completed. Concerns were raised at the time of my last report regarding the accuracy of the welfare check log entries for the period leading up to the discovery of the completed suicide, even though this inmate was not housed in administrative segregation at that time. This led to deferring a finding of substantial compliance until further information was obtained regarding the accuracy and consistency of the information entered into the welfare check logs, including in administrative segregation, and whether these aspects of the welfare check process are adequately reflected in the internal review and reporting process. Having gathered and reviewed additional information, a finding of substantial compliance with this requirement is warranted. There is sufficient evidence that welfare checks are routinely documented, audited, and reported on as required. Issues related to the quality of the welfare checks, and specifically how far deputies must go to ensure the wellbeing of inmates, are addressed under other requirements (see pages 11 -12 of the current report).

**22. Suicide Prevention**

• *Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.*

**The County has been released from monitoring for the reduction of tie-off points within administrative segregation cells in units A, B, R, and S. (Dkt. 751 at ECF 11)**

**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance for reduction of tie-off points in Pods D, G, H, I and J.  [Dkt. 751 at ECF 19].  This requirement was found in substantial compliance in the last monitoring report of July 2022, and has been released from further monitoring.**

**A footnote in Dkt. 751 at ECF 19 states that the Mental Health Monitor will evaluate the new jail for reduction of tie-off points.  If substantial compliance is found for reduction of tie-off points in the new jail, Plaintiffs have agreed to release Defendants from further neutral monitoring for these cells.**

**Findings: Substantial Compliance.**

Cells in N Block of the newly constructed areas of the jail were inspected for the presence of tie-off points during the most recent site visit, and found to be in compliance with requirements consistent with those pertaining to administrative segregation cells. Specifically, there were no open holes in the metal bunk; there was no gap between the bunk and the wall; the air vent grate holes were of small diameter; light fixtures, air vents and sink units were adequately calked to reduce ligature tie-off points.  County Counsel has reported that all areas of the new jail must similarly meet construction codes that comply with requirements for reduction of tie-off points agreed to for the older administrative segregation cells.

• *A qualified mental health professional must perform a suicide risk assessment using the Suicide Risk Assessment Tool (attached as Exhibit G to Implementation Plan) in all the following circumstances: (1) if the RN identifies suicidality during the Initial Health Screen; (2) within 4 hours of placement in a safety cell and before release from a safety cell; (3) after placement in Administrative Segregation. [CFMG Plan at 43, 72, 75]*

**Findings: Noncompliance**

This requirement was previously found in noncompliance, based primarily on the determination that structured suicide risk assessments are not routinely completed with inmates placed in administrative segregation housing. The Mental Health Supervisor has indicated that there is no reliable and consistent way by which mental health staff are informed of all administrative segregation placements, nor are there enough mental health clinicians on staff to respond adequately to this requirement. This situation continues, and is the basis of the current finding of noncompliance.

34

Regarding other elements of this requirement, adequate suicide risk assessments are routinely conducted when the RN identifies suicidality during the Initial Health Screen.  Suicide risk assessments are routinely conducted when inmates on Level 1/continuous Suicide Watch are placed in a safety cell and prior to release from a safety cell.  For inmates on Level 2/intermittent Suicide Watch who are placed in safety cells due to a lack of other observation cell housing, it is interpreted that they do not need a suicide risk assessment prior to removal from a safety cell as specified in this requirement, as they did not require placement in the safety cell due to suicide risk, and their removal from a safety cell should be expedited to the greatest extent possible. For these patients, a structured suicide risk assessment is completed during the regular daily work shift; for patients placed on Level 2 Suicide Watch outside of daily mental health work shift hours (including those placed in a safety cell), the suicide risk assessment is completed the following day during the regular mental health work shift.  Alternatives to placing inmates on Level 2 Suicide Watch in safety cells is under consideration by Wellpath and custody staff.  This is strongly encouraged.

• *Whenever an inmate is placed in a safety cell due to suicide risk, CFMG shall immediately, and no later than within 4 hours, determine what level of suicide precautions are necessary and decide whether the inmate needs to be transferred to an inpatient mental health facility. If CFMG determines that more than 24 hours of suicide watch/precautions is necessary, CFMG shall work with custody to place the inmate in an inpatient mental health facility, the Outpatient Housing Unit, a receiving cell located in the booking unit, or dorm A. Whenever possible, the inmate will be transitioned from a safety cell to an open dormitory setting until the inmate has stabilized. [CFMG Plan at 73, 75]*
• *Custody must transfer patients to NMC or another appropriate inpatient mental health facility if the patient has been housed in a safety cell for 24 consecutive hours or for more than 36 cumulative hours in any 3-day period. If exigent circumstances prevent such transfer, a memo must be written to the Custody Operations Manager. [CFMG Plan at 73, 75]*
• *Once CFMG determines that an inmate is no longer suicidal, CFMG shall work with custody staff to place the inmate in the most appropriate setting. Mental health clinicians must follow-up with the patient until a step-down plan is no longer necessary. [CFMG Plan at 73]*

**Findings: Substantial Compliance**
Findings were deferred on these requirements in the last monitoring report of July 2022. It was noted that a more thorough understanding of the relevant policies and procedures was needed before reaching a finding about compliance.  This included a finalized written policy or procedure reflecting the current mental health follow-up of patients once they are stepped down from suicide watch.  Greater consistency in the documentation that the assessed level of risk was considered in clinical decision-making about release from suicide watch, and consistent posting of the associated collaborative safety plans in the healthcare record, were also needed.
The relevant policies and procedures were reviewed for the current report. These included Policy HCD-110 B-05: Suicide Prevention and Intervention Program – Monterey County; B-05 Appendix A: Suicide Care Pathway Placement Flowchart; Suicide Care Pathway Treatment Approaches; and Appendix B: Care Transition Flowchart. Training provided by Wellpath to mental health staff was reviewed, and it was confirmed that clinicians at Monterey

35

County Jail have received this training.  Healthcare records containing documentation of assessed suicide risk and safety planning were also reviewed.  Direct observation of suicide risk assessment and safety planning with patients in observation and safety cells was conducted during the recent monitoring site visit. From these various sources of data, the following points were noted.

In cases reviewed for the current report, Mental health clinicians have been consistently documenting suicide risk assessment and collaborative safety planning using the structured forms titled "Suicide Watch Initial Assessment for Mental Health" and "Suicide Watch Daily Follow-up and Discharge for Mental Health."  Decisions about placing inmates on and releasing them from suicide watch were adequately based on the information and clinical reasoning documented on these forms and reflected in progress notes. Direct observation of clinicians performing these duties showed adequate clinical practice, consistent with recommended practice standards. Consultation with other subject matter experts in the area of correctional suicide prevention confirmed that the procedures followed at Monterey County Jail align with current perspectives on best practice. More specifically, effective suicide prevention involves identifying personal triggers for suicidal ideation and associated behaviors, identifying the individual's abilities to cope with these triggers, and to attempt to build upon these abilities. Interventions are focused on what the individual can do to remain safe when faced with a situation that trigger suicidal thoughts, including both internal resources (e.g., ways to refocus or distract themselves, such as reading or exercising) and external resources (e.g., contacting family, speaking with a religious or spiritual advisor, socializing with others).  Mental health clinicians at the jail have been observed to consistently engage with suicidal inmates using this approach, and to document the resulting safety plan on cards that are left with the inmate.

It was noted that some of the narrative portions of the suicide risk assessment and safety planning forms, such as the risk formulation section, could be improved.  This will be an area of further consultation during subsequent site visits.  The current quality of these portions of the documentation (which, it should be noted, can be among the more sophisticated and nuanced aspects of suicide prevention), were sufficient to support a finding of substantial compliance. Patients were followed after release from suicide watch at intervals documented in the healthcare record, consistent with clinical judgement and assessed level of risk.

The bigger challenge at this point in time is the transfer of persistently suicidal inmates to NMC or another inpatient treatment facility.  In one of the cases reviewed for the current report (Patient #4 in the separate case reviews document), repeated attempts to transfer the patient to NMC occurred in accordance to policy requirements.  The patient was not admitted, possibly in large measure because the suicidal statements and self-injurious behaviors of this patient appeared to be driven by his severe personality pathology rather than an acute psychotic or mood disorder.  However, this case does appear to be representative of the difficulties in successfully transferring patients who cannot be effectively treated at MCJ to NMC.  Jail staff nevertheless attempted (repeatedly) to transfer the patient, including having the Captain accompany the patient on one occasion to advocate for the transfer, but were ultimately unsuccessful due to the admission policy and practices of NMC.  Under these circumstances, clinical and custody staff at MCJ followed appropriate procedures in order to effectively treat this inmate and ensure his safety.

Collaboration and consultation was noted between mental health staff and custody regarding the appropriate placement of inmates who are no longer suicidal. Step-down procedures were followed and adequately documented.

*• Custody must conduct welfare checks of patients on suicide watch/precaution twice every 30 minutes. Health services staff must conduct welfare checks every 6 hours. Mental health staff must conduct welfare checks once per duty shift. The checks must be documented in the appropriate log (sobering/suicide watch/safety cell/restraints log). The inmate may not have access to materials that could be used to inflict harm on his/her self or others, and may be dressed in an approved safety garment if necessary. [CFMG Plan at 74, 76]*

**Findings: Noncompliance**

      The last monitoring report found substantial compliance with this requirement. The current review noted that custody and mental health checks welfare checks were conducted as required. However, several cases were reviewed in which health services staff (i.e., nursing) did not consistently complete and document welfare checks every six hours as required.  Intervals between documented nursing checks were as long as 11 hours, suggesting that some of the routine checks were either missed entirely or not properly documented.

*• The CFMG Program Manager and the Facility Manager shall have joint responsibility to report completed suicides in accordance with CFMG Inmate Deaths Policy and Procedure. [CFMG Plan at 76]*

**Findings: Substantial Compliance**

      A finding for this requirement was deferred in the last monitoring report of July 2022, pending a better understanding of the processes involved and the availability of documented information to evaluate.  Documentation provided by Wellpath, including internal emails, demonstrated that recent suicides in January and June 2023 were reported as required.

*• The CFMG Program Manager or nursing staff on duty shall report all potential and/or attempted and completed suicides to the Facility Manager or Shift Supervisor. CFMG management will be notified of any completed suicides within one working day. Family members must be notified in accordance with the CFMG Notification of Next of Kin Policy and Procedure. CFMG Plan at 76-77.*

**Findings: Deferred**

      A finding for this requirement was deferred in the last monitoring report of July 2022, pending a better understanding of the processes involved and the availability of documented information to evaluate.  One question involved how attempted suicides are distinguished from other incidents of self-injurious behavior.  It has since been explained that incidents of self-injury are assessed by a clinician regarding, among other things, the inmate's intent.  If the inmate had any intention to end their life, it is classified as an attempted suicide. Another question involved the notification of next of kin in cases of completed suicides.  It has been explained that according to MCJ procedures, this is the responsibility of the Coroner.

      Documentation has been provided by Wellpath for critical clinical events that included two completed suicide and four suicide attempts.  Review of this documentation showed that the

internal reporting of completed suicides was compliant with the 24-hour reporting requirement. Further information is needed to evaluate compliance with requirements pertaining to potential and/or attempted suicides.

**23. Increase in Time Outside of Cell and/or Increasing Programs**
• *Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:*
- *3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)*
- *14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time*
- *2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail)*

• *Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking and receiving area will be guaranteed the following weekly times out of their cell:*
- *3 hours a week for exercise*
- *14 hours a week in the common area*
- *2 hours a week of programming will be offered to each inmate*

• *If approved by classification, inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services [County Plan, Dkt. 528-1 at ECF 19]*

**Findings: Noncompliance**

The last two monitoring reports have found noncompliance for these requirements. It has been noted that the Compliance Sergeant continues to oversee a thorough and detailed system of routine audits, which includes notification of custody staff and further training when deficiencies in out of cell time are identified. The current review of these audits continues to indicate that inmates in segregated housing are consistently offered the required amounts of exercise time (yard time) and time in the common area (socialization time). Programming time is not tracked by the Compliance Sergeant in his auditing procedures.

Routine group programming offered by mental health staff has not resumed due to staffing inadequacies. Custody programming staff continue to provide various classes and activities to inmates across the jail, including those in administrative segregation. Program attendance reports were provided for review, and it appeared that more than two hours per week of such programming were consistently being offered. It could not, however, be determined if these programming opportunities were offered to each inmate in the housing areas designated by these requirements. If two or more hours of programming are offered in designated housing areas as required, a finding of substantial compliance is possible prior to the restarting of groups by mental health staff.

• *Working with the Monterey County Probation Office and the Monterey County Superior Court, the Office of the Sheriff has and will continue to support evidence based programs such as the Work Alternatives Program; Involuntary Home Detention; Pretrial Release through Probation; Own Recognizance; educational early release kickouts such as Choices/Liberty Pride; and Penal Code sections 4018.6 and 4024.1 kickouts. [County Plan at 15; Dkt. 528-1 at ECF 19]*

**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance. [Dkt. 751 at ECF 20]. The subsequent monitor's report of July 2022 found substantial compliance. This requirement has been released from further monitoring.**

## 24. Telepsychiatry

• *The telepsychiatrist must obtain informed consent and explain all medications before prescribing. [CFMG Plan at 45]*

• *The policies contain numerous provisions regulating the use of telepsychiatry at the jail, including requiring that a psychiatric nurse be present during telepsychiatry encounters where the patient is in a safety cell as well as requiring a local assessment by a physician or mid-level provider within 24 hours of an initial assessment that is conducted by telepsychiatry. [Dkts. 622 and 632].*

### Findings: Noncompliance

The prior Mental Health Monitor found noncompliance with these requirements in his last report of May 2021. At the time of his last review, most or all psychiatry contacts occurred via telepsychiatry (using FaceTime). Dr. Hughes noted problems with completion of the informed consent forms, a lack of documentation that a qualified clinician assisted, or that a physician or mid-level provider saw patients within 24 hours of an initial psychiatric assessment. He also noted concerns regarding provision of involuntary medications involving telepsychiatry.

Telepsychiatry contacts are reported to be much less frequent since a return to primarily in-person contacts following easing of COVID-19 restrictions. A finding for these requirements were deferred in my last report of July 2022, as insufficient cases were identified with which to evaluate these requirements. For the current review, four cases were identified who had received telepsychiatry services via telephone or Facetime. Documentation of informed consent for telepsychiatry was not found in any of the healthcare records for these patients. Cases where the patient was in a safety cell or received an initial assessment conducted by telepsychiatry were not identified. It is not clear that telepsychiatry contacts are routinely logged and reviewed for compliance with these requirements. Such a monitoring procedure, as part of the Quality Management process, would better facilitate substantial compliance with telepsychiatry requirements.

## 25. Medical Records

• *Each inmate's medical record shall contain (as applicable):*
  ▪ *The completed Receiving Screening form*
  ▪ *Health Inventory/Communicable Disease Screening forms*

- *Problem list*
- *All findings, diagnosis, treatments, dispositions*
- *Prescribed medications and their administration*
- *Laboratory, x-ray and diagnostic studies*
- *Consent and Refusal forms*
- *Release of Information forms*
- *Place and date of health encounters (time, when pertinent)*
- *Health service reports (i.e., dental, psychiatric, and other consultations)*
- *Hospital Discharge Summaries*
- *Jail Medical Record Summaries (transfer forms)*
- *Individual treatment plan [CFMG Plan at 114]*

**Findings: Noncompliance**

 The last two monitoring reports have found noncompliance with this requirement. Both of these earlier reports noted that the healthcare records included the required items except for the individual treatment plans, which, when they were noted in the healthcare record, did not include the necessary documentation.  This issue remains largely unchanged. Deficits and recent developments in treatment planning documentation are addressed above in the Section 18 on Treatment Plans.

 For requirements such as this, which include elements that are in compliance but other elements that are not compliant, consideration will be given in the next monitoring report to the use of partial compliance as a possible finding.  Findings of partial compliance have been used in the monitoring of other jurisdictions, and may provide a more useful description of the progress toward substantial compliance.


## 26. Quality Management

*• Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit Findings will be reported to the Quality Management Committee at its quarterly meetings. [Dkt. 532 at ECF 9]*

*• All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met. [CFMG Plan at 98]*

*• All completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure.  [Dkt. 532 at ECF 77]*


**Findings: Noncompliance**

 The last two monitoring reports have found noncompliance with these requirements. It was noted that post-implementation monitoring, including focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan, was not adequately

developed.  Little has changed in terms of a currently implemented structure and process. There has been, however, some recent progress toward the design of a more adequate Quality Management and Continuous Quality Improvement process at MCJ.  Discussions onsite with Dr. ███████ and subsequent discussions with Drs. ███████ and ███████ supported by documents provided for review, describe a revised CQI structure involving the implementation of a Sitewide Continuous Quality Improvement Committee.  Required attendance is to include the HSA, DON, Compliance Specialist, Mental Health Coordinator, JBCT Program Director, Site Psychiatrist, Medical Director, Dental leader, Pharmacy leader, and Custody Captain for Healthcare. Optional attendees include various regional leadership positions, County Counsel, and other staff as needed. It is to meet a minimum of monthly, although more frequent meetings are recommended initially to establish an effective process.

The Sitewide CQI Committee is to receive and review reports from various subcommittees, including a Mental Health Subcommittee, to identify and address barriers to progress on the corrective action plans. These CAPs are to be directly linked to the various requirements of the Implementation Plans (see below).  Membership of the proposed Mental Health Subcommittee is to include the Mental Health Coordinator, JBTC Program Director, Site Psychiatrist, Custody Captain for Healthcare, DON or nursing designee, and the Site Compliance Coordinator.  The subcommittee is to meet monthly, with weekly meetings considered optimal, at least until sustained progress is demonstrated on the CAPs.

These developments appear promising, but will require consistent engagement by the key players, and sufficient prioritization among the competing demands of day-to-day and week-to-week operations, in order to make tangible progress toward substantial compliance with requirements.

Discussions with the prior Acting Health Services Administrator for the last monitoring report indicated that cases involving involuntary medications are not routinely reviewed and documented in QM meetings, that there was no current committee structure to do this, and that instances of involuntary medication administration are not routinely tracked in any way. Discussions with Wellpath staff during the preparation of the current report indicated that a log for involuntary medication administrations has recently been implemented.  This process will be a focus of the next monitoring report. Minutes from QM meetings during the period under review for the current monitoring report were requested but not received.  In recent discussions with Wellpath staff they reported that a revised QM process is still under development, and is to be tied more directly to Corrective Action Plans (CAPs) associated with the various requirements of the Implementation Plan. Plaintiffs' Attorneys have noted that their involvement in the prior set of CAPs as required by the Court's May 2020 Order, and stated their intent to coordinate with Wellpath on any revised CAPs.  My recommendation is that once Wellpath staff complete the current process of revising the CAPs, along with the QA/CQI process (e.g. the staff composition, tracking, reporting, and data review structure, schedule of meetings, etc.), the revised CAPs should then be shared with Plaintiffs' Attorneys for review and comment.  It is noted that effective CAPs should be dynamic and responsive to the findings of the QA process, and should not remain fixed and unchanging, so that any review will represent only a point in time for a system that continues to evolve and adjust in response to current performance issues.

There was one completed suicide that occurred during the prior review period for the monitoring report of July 2022. For that case, documents were reviewed titled Suicide Safety Gap Analysis and a Psychological Autopsy.  Additional documents related to this suicide made available for that review included Wellpath Mortality and Morbidity Report and Review, Parts I, II, and III.  Considered collectively, these documents did not contain sufficient information to reflect a detailed or in-depth analysis of the factors contributing to this suicide or corrective actions to be taken.  For the current review, there was again one case of confirmed death by suicide.  Documents made available for review of this case included one titled Psychological Autopsy and another titled simply "recommendations."  These may be different parts of the same form.  Both documents were undated and unsigned. The deficits noted in the earlier review of post-suicide documentation were again present in the current review.  The recommendations offered, although potentially useful, are too generic and not tied to specific aspects of the individual suicide under review. The psychological autopsy document was again cursory and lacking in sufficient analysis or narrative detail to be useful in guiding quality management or performance improvement. It is noted that more recently there have been additional inmates deaths while in custody, including a case of apparent suicide. These cases will be reviewed in depth in the next monitoring report.

## 27. Corrective Action Plans (CAP)
• *Defendants' implementation of a policy requires that there are corrective action measures to address lapses in application of the policy. [Dkt. 494 at ECF 11]*
• *Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. [Dkt. 671 at ECF 5; Dkt. 532 at ECF 9]*

### Findings: Noncompliance
The prior Mental Health Monitor found noncompliance with these requirements in his last report of May 2021.  Dr. Hughes noted that the County and Wellpath had worked with the monitor to develop a combined CAP to address identified deficiencies, but that despite these efforts, the CAP had not been fully implemented. My subsequent review of July 2022 found that little had changed.  The last monitoring report noted that, in addition to the observation that the CAPs had largely become stagnant and were essentially neglected, the more fundamental problem was that the CAPs are not meaningfully connected to an effective and responsive Quality Management process.  Many of the actions listed in the CAPs provide no process or data regarding whether the observed deficiencies were effectively remedied, i.e., they are not sensitive or responsive to the impact of corrective action.  This should be the function of the Quality Management or Continuous Quality Improvement Committee and the proposed Mental Health Subcommittee (see above).

During the recent site visit and in subsequent follow-up discussions, a draft document was reviewed which explicitly links the requirements of the Implementation Plans to the CAPs. These CAPs are intended to be the primary focus for the proposed QA/CQI committee structure. Such developments are promising.  However, the same caveats apply to both the QA/CQI and the closely related topic of the CAPs; consistent focus on the CAPs by those in positions to enact and sustain change will be essential for achieving substantial compliance with requirements.

Stated more specifically, if the necessary staff are pulled in too many directions, with too many competing responsibilities, or if there is no clearly assigned responsibility for achieving compliance, it is likely that insufficient progress will continue in this area, despite the promising potential of revised QM and CAPs processes.

## Summary and Recommendations

The last monitoring report found that seven of the 97 total compliance items had been released from further monitoring by agreement of the parties.  Of the remaining 90 items, the prior report found 31 to be in substantial compliance, 39 to be noncompliant, and 20 were deferred. In the current draft report, a total of 13 requirements have been released from further monitoring; 31 have been found in substantial compliance, 48 have been found noncompliant, and five have been deferred.

Some requirements include a number of different elements that must be met to arrive at a finding of substantial compliance.  In some instances, most but not all of the elements have been in compliance. Although I have tried to describe such distinctions in the body of my reports, these have been reported as noncompliant.  For the next monitoring report, consideration will be given to providing findings of partial compliance where appropriate.  This has been done in other cases involving the monitoring of mental health services in jails, and may provide a useful description of the progression toward substantial compliance.

A number of areas remain essentially unchanged, and a few have moved from substantial compliance to noncompliance. Requirements that have lapsed from prior findings of substantial compliance to noncompliance include several nursing functions, such as verification of medications and initiation of releases of information at intake, and completion and/or documentation of nursing rounds in Administrative Segregation or with inmates on suicide watch.  Another area moving from substantial compliance to noncompliance was the timely completion of sick call by mental health staff, including in Administrative Segregation Housing, where some patients did not appear to have been scheduled to see a mental health clinician. Whereas prior reports have noted that scheduled mental health appointments were often rescheduled, patients typically had been seen within a few days of the originally scheduled appoint, and usually seen with required timeframes.  In the current review, inmates were not only more frequently rescheduled, but were sometimes not seen for periods which exceeded requirements or reasonable standards of practice.

Some areas have shown promising developments and signs of progress, but have not yet demonstrated substantial compliance with specific requirements.  These include staffing, treatment planning, Corrective Actions Plans, and Quality Management. Continued progress in these areas, with a sustained focus on the specifics of  Implementation Plan requirements, could result in substantial compliance in subsequent monitoring reviews.  The following recommendations are offered to guide and facilitate progress.

1.  <u>Staffing</u>.  As noted in my last report, adequate staffing remains essential for achieving and sustaining substantial compliance with many of the remaining requirements. Recent progress has been made with the hiring of two additional mental health clinicians and a discharge planner to

fill full-time positions that were allocated as part of an expanded contract between Wellpath and the County. One full-time clinician position and two psychiatric technician or LVN positions remain open.  A contract has been implemented to provide additional on-call psychiatry services. As was observed during the recent site visit, additional clarity and training is needed to effectively utilize this service.  These additional staffing resources help set the stage for improved progress toward substantial compliance, if utilized effectively.  Substantial compliance with the Implementation Plan requirements for staff will depend not only on filling all allocated positions, but must also involve demonstrating that staffing levels enable compliance with the remaining requirements, including those involving nursing staff.

2.   Access to inpatient care.  This remains an area of concern. Adequate access to higher levels of care than can be provided at MCJ is needed. The EASS program for those who are incompetent to stand trial may provide the necessary services to some, but likely not all such inmates. Additional communication, coordination, and collaboration with NMC is recommended, although the current NMC admission criteria will continue to exclude some MCJ inmates who require inpatient care. Alternative treatment resources will ultimately be required.

3.   Nursing intake procedures.  Additional attention and possibly additional resources are needed to ensure that medications are consistently verified and continued as required at the time of intake, including timely consultation with on-call psychiatry as needed.  Releases of information should be consistently pursued as required.  Adequate documentation of these efforts is needed.

4.   Nursing rounds.  Daily nursing rounds should be consistently conducted and documented in Administrative Segregation housing areas and with inmates on suicide watch as required.

5.   Psychotropic medications.  As noted in prior monitoring reports, Wellpath should ensure that psychiatrists consistently order new medications for 30 days and adequately assess and document the patient's stability before moving to a 90 day renewal period.

6.   Telepsychiatry and on-call psychiatry services.  Informed consent, onsite assessments, and the presence of other staff should be ensured and consistently documented as required.  All staff should understand and comply with procedures for accessing on-call or remote psychiatric services, including when and how to utilize the long-established on-call psychiatrist and the recently contracted Precise telepsychiatry service.

7.   Treatment planning.  Improvement in the documentation of treatment planning is still needed.  As noted in previous monitoring reports, mental health staff should consistently provide focused and realistic treatment interventions based on individualized assessment of patients which is clearly documented in the clinical notes.  Treatment plans should be easily referenced by all clinicians who may interact with the patient and should guide the treatment provided. Psychiatry notes should include all required elements, as discussed in the Chronic Care section of this report. A more explicit interdisciplinary treatment planning and treatment delivery process is needed, to incorporate both psychiatry input and the work of the mental health clinicians, and should be adequately documented in the healthcare records. Recent developments in the forms to be used and the multidisciplinary team process have the potential to achieve substantial compliance with requirements if effectively and consistently implemented.

8.  <u>Suicide Prevention</u>.  The reporting, review, and documentation requirements under Suicide Prevention and Quality Management should be carefully reviewed and consistently followed. Please refer to the relevant sections of the current report for additional feedback.

9.  <u>Inmate discipline</u>.  As noted in the last monitoring report, custody staff should consistently indicate in their documentation that mental health staff are consulted prior to imposing discipline on inmates with mental illness.  Mental health staff should consistently document that they have been consulted and the nature of the input or guidance they provided.

9.  <u>Out of cell programming</u>.  Delivery of group treatment programming by mental health staff should resume as soon as staffing levels allow.  It is possible that programming offered by assigned custody staff may meet requirements, independent of programming services provided by clinicians.  A clear system of tracking and reporting hours of programming offered to inmates in the areas designated by the Implementation Plan requirements is needed to demonstrate substantial compliance through this source of service delivery.

10.  <u>Involuntary medications</u>.  As noted in the last monitoring report, a process is needed by which instances of involuntary medication are routinely logged and reported to the QM Committee, Medical Program Manager, Director of Nursing, and Custody Facility Manager, who should review involuntary medication administrations to ensure compliance with requirements and arrange for Incapacity Hearings or placement in appropriate community facilities when appropriate. Instances of involuntary medications by telephone orders should be reviewed for compliance with relevant requirements, including admission of the patient to the infirmary or a safety cell and associated monitoring.

11.  <u>Administrative Segregation Screening and Suicide Risk Assessment</u>.  To meet the requirements as specified in the Settlement Agreement, a process is needed whereby mental health staff are routinely notified of all Administrative Segregation housing placements, and sufficient staffing will be needed to respond to the volume of screenings and risk assessments this will entail.

12.  <u>QM and CAPs</u>.  Recent efforts by Wellpath staff in these areas are promising.  Quality Management and the Corrective Action Plans still need to be integrated and effectively implemented.  Restructuring the CAPs to correspond to Implementation Plan requirements, and incorporating the CAPs into a consistently focused QM/CQI process, would more effectively support progress to substantial compliance across all requirements of the Settlement Agreement and Implementation Plans.

Respectfully submitted,

James Vess, Ph.D.                                                  August 21, 2023
Mental Health Monitor