# Exhibit B

# MONTEREY COUNTY JAIL

# HEALTH CARE AUDIT

September 4, 2023 – Final Report



Bruce P. Barnett, MD, JD – expert medical monitor

# TABLE OF CONTENTS

INTRODUCTION ......................................................... ...............................................................................3

SUMMARY OF FINDINGS ...........................................................................................................................3

SUMMARY TABLE ...................................... ...............................................................................4

METHODOLOGY..........................................................................................................................................4

FINDINGS.......................................................................................................................................................7

SUMMARY OF CASE REVIEWS............. ...............................................................................20

DEATHS ........................................................................... ...........................................27

NOTABLE CASES.......................................................................................................................................35

PATIENT INTERVIEWS...............................................................................................................................37

STAFF INTERVIEWS...................................................................................................................................38

PLAINTIFFS' ATTORNEY INQUIRIES......................................................................................................39

RECOMENDATIONS....................................................................................................................................40

CONCLUSION..............................................................................................................................................42

LIST OF ATTACHMENTS ...........................................................................................................................44

## INTRODUCTION

Based upon my review of medical records and site visit on June 7-8, 2023 (15th site visit),   I find that medical care provided at Monterey County Jail (MCJ) from January through June 2023 was not substantially compliant with the Implementation Plan (IP).[1]

This report includes the following:  a) assessment of MCJ performance regarding quality indicators cited in the court-approved Implementation Plan  b) analysis of care provided to 23 patients described in "Physician Case Review," c) review of deaths of patients in custody or in immediate proximity to custody at MCJ since the last audit in Fall of 2022 d) notable departures from Implementation Plan as detailed in Ex A and Ex B,  e) matters brought to my attention by attorneys for Plaintiffs,  f) adequacy of quality assurance (QA) including supervisors' audits of MCJ healthcare providers (Peer Review) and death reviews g) interview of MCJ patients on site, h) interviews of MCJ/Wellpath staff and i) facility inspection.

The audit tools and raw data referenced in this report are provided as confidential documents.  See Ex. A, Case Review and Ex. B Monitoring Audit Tool.

## SUMMARY OF FINDINGS[2]

MCJ compliance has not substantially improved since the last audit.  See Table 1, Summary of Implementation Plan Compliance.  Persistent departures from the Implementation Plan include:
   A. Patients at risk were not screened for sexually transmitted diseases,  including HIV, HCV, Hepatitis B and Syphilis.
   B. Patients with positive skin tests suggesting latent tuberculosis infection were not consistently tested further with QuantiFERON blood tests and/or counseled accordingly.
   C. Patients did not consistently and timely receive needed medical care.

---

[1] The CFMG Implementation Plan (IP)  - 5:13cv-02354-PSG document 532, Filed 04/01/16 - sets for criteria for compliance with expected performance.  This report also refers to "standardized procedures" the IP cites as pertinent, including but not limited to CFMG Policy and Procedure Manual (April 2015), CMG Nurse Protocols (July 2018) and the Wellpath Policy and Procedure Manual – Monterey County California (April 2020).  Wellpath Policies make frequent reference to guidelines from the  National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails (2018), and to California Code of Regulations, Title 15, Minimum Standards for Local Detention Facilities 2019.

[2] In accord with the February 2021 position statement from the National Conference of Correctional Healthcare recommending the use of "humanizing language," this report refers to incarcerated persons receiving medical attention as "patients."

D. Patients appearing intoxicated or withdrawing were not attended to in accord with the Implementation Plan.

E. The medical director did not sufficiently oversee services provided to the most complex patients by RN, PA and NP.

F. Patients suffering from substance abuse were not provided adequate care for their chronic disease.

G. Patients released from jail needs did not consistently receive necessary medications and/or follow up instructions.

H. Staffing did not meet IP requirements.

I. QA/QM does not substantially comply with the IP.

## Summary of Implementation Plan Compliance

| TABLE 1          Quality Indicator | Compliant/Not Compliant | % Compliant | Comments |
|---|---|---|---|
| 1.  Intake Screening | Not Compliant | 16.7% | see text and worksheets |
| 2.  Access to Care | Not Compliant | 41.2% | see text and worksheets |
| 3. Chronic Care | Not Compliant | 36.0% | see text and worksheets |
| 4. Health Care Maintenance | Not Compliant | 42.9% | see text and worksheets |
| 5. Continuity of Care | Not Compliant | 43.8% | see text and worksheets |
| 6. Outside Care Referrals | Not Compliant | 51.4% | see text and worksheets |
| 7. Detox/Withdrawal | Not Compliant | 28.6% | see text and worksheets |
| 8. Tuberculosis/Infection Control | Not Compliant | 0.0% | see text and worksheets |
| 9. Pharmaceutical Storage, refusals and dispensing upon release | Substantially Compliant | 87.5% | distinguished from dispensing |
| 10.Operational Aspects:  Administration and Medical Staff, Facilities, Quality Assurance | Not Compliant | na | facilities are adequate, but other operational aspects are not compliant |
| 11. RN Medication Dispensing On Site | Substantially Compliant | 100.0% | see text and worksheets |
| 12. Physician/Provider Case Review | Not Compliant | 0.0% | I found none of the 23 cases described in Ex A to be managed adequately |
| Overal Audit Score | | 40.7% | |

## METHODOLOGY

Table I shows the percentage of clinical encounters reviewed that demonstrated compliance with the described performance parameter.  Compliance rates are derived from the findings compiled in the "Physician Case Review Tool" as well as the "Monitoring Audit Tool." These spreadsheets are attached as Exhibits A and B respectively.

Starting with my first audit, I have summarized the requirements for medical care described in the IP with reference to the following quality indicators:

1. Intake – including continuation of medications taken just prior to incarceration.
2. Access to Health Care
3. Chronic Care
4. Health Care Maintenance
5. Continuity of Care upon Release
6. Outside Medical Referrals
7. Detoxification and Withdrawal
8. TB and other infections
9. Pharmaceutical Administration (describing drug management, aside from the process of dispensing to the patients on medications rounds)
10. Administration Services – including health records, quality assurance, facility maintenance and staffing
11. Dispensing of Medications by RN to patients[3]

This report cites examples of departures from the IP according to the requirements for each of the quality indicators, elucidated by subheadings. [4]   Ex. A and Ex. B provide dates, identities of care givers and extensive details about the medical care at MCJ that are not necessarily reiterated in the body of the audit report.

The overall "score" represents an average of the degree of compliance for 11 quality indicators regarding the medical services listed in Table 1, and the extent to which community standards of care were met in case reviews. Adequacy of staff, administration functions, facilities and quality assurance programs are assessed without numeric values. I leave assessments of Mental Health, Dental, and Disability compliance to the other appointed monitors. This Methodology allows me to compare MCJ performance from one year to the next.

The calculated scores are imperfect measures, cited for comparison to previous MCJ audits that use the same methodology.  I observe that the overall score for this audit has not improved compared to the prior audits.

//
//
//

---

[3] I separated medication dispensing from other aspects of medications management at the outset of my audits because medication rounds were initially reviewed by a nurse co-auditor.  Lately, I am attending med pass rounds myself.   I continue to describe compliance for med pass as a separate category (quality indicator 11)  to keep the methodology consistent with prior years.

[4] The subheadings are new to this report.  Defendant's attorneys have asked that I specify the exact IP provisions not met that lead me to find noncompliance.

## Quantitative Review

Table 1 lists eleven components of medical care identified in the Implementation Plan:
Intake Screening, Access to Care, Chronic Care, Health Care Maintenance, Continuity
of Care, Outside Care Referrals, Detox/Withdrawal, Tuberculosis/Infection Control,
Pharmaceutical Management (storage of medications, refusals, and dispensing
essential medications upon release), Administrative Services (including staffing,
facilities, and quality assurance),  and Dispensing Medications on Site. I assess
compliance for staffing, staff supervision, medical facilities, and quality management
without citing percentages. Within each of these medical care components, the
Implementation Plan cites multiple quality indicators. [5]

Satisfactory performance in all or nearly all components for each quality indicator is
deemed substantial compliance with the IP.  In general,[6] I consider compliance with the
IP in 80% or more of encounters reviewed to be tantamount to "substantial compliance,"
and lesser performance to be "not compliant."[7]

## Qualitative Review

Physician/Provider case review includes an assessment of care provided by nurses
(RN, LVN) as well as by primary care providers ( PCP).[8] For each encounter listed
described I specify the quality indicator for which I find there is compliance or non-
compliance. I incorporate this data into the quantitative review.

The review of individual patients over the course of their care (herein "case reviews")
further addresses whether MCJ complies with the provisos in the Implementation Plan
that requires medical services be provided "in accordance with community standards." [9]
Case reviews consider the adequacy of care in accord with generally accepted
principles of medicine and applicable standards, aside from elucidated performance
parameters. Publications I refer to in determining current best medical practices
(applicable community standards of care) include but are not limited to UpToDate,
Centers for Disease Control (CDC), United States Preventive Task Force (USPTF),
Cochrane Reviews/Cochrane Library, American Family Physician and New England
Journal of Medicine.

---

[5] See Ex. B, Monitory Audit Tool.
[6] However, as stated above, a single serious lapse in care that places a patient at substantial risk of harm may
suffice to indicate non-compliance with the plan.
[7] Defendants have asked me to report partially compliant performance.   Absent objections from the parties, my
future audits will describe performance that meets 50 – 80% of parameters as partially compliant, and below that
as non-compliant.
[8] Primary care providers at MCJ include allopathic physicians (MD),  osteopathic physicians (DO), physician
assistants (PA) and nurse practitioners (NP).
[9] See Settlement Agreement, page 2-3; Implementation Plan page 8.

## FINDINGS

**Intake** was <u>not substantially compliant</u> with the Implementation Plan.

Intake nurses did not consistently follow Wellpath policies to deploy monitoring protocols and/or obtain PCP consultation for patients at risk for life-threatening withdrawal. Abnormal vital signs were often not repeated.  Fingerstick blood glucose was rarely obtained despite instructions on the form to do so. A few patients did not receive Intake screening after their return from hospital clearance.  Well-established standards for screening newly incarcerated patients for HIV, HCV and STD were not followed. See, e.g., Ex. A  Cases 1, 8, 9  11, 12 13, 14, 16 , 18,  20, 21,  22 and 23.

1.1 - <u>Did the inmate receive an initial health screening upon arrival at the facility by the registered nurse? (on same day unless otherwise noted). IP I.</u>  **No.**  Patients ███████ (2/9/23), ███████ (1/25/23)were not screened for intake after return from hospital.

1.2 - <u>If during the initial intake screening the registered nurse determined that the inmate required medical evaluation and clearance prior to incarceration, was the inmate transported for medical clearance? IP I  A.</u>  **No.** Patient ███████ (2/9/23) clearance was not documented in EMR.

1.3 - <u>Did booking include accurate vital signs, FBS as indicated,  and EMR inquiry regarding past and current health problems? IP I C, and intake Form.</u> **No.** ███████ (2/17/23), ███████ (3/21/23)  abnormal vital signs were not repeated. ███████ (2/9/23), ███████ (4/25/22), ███████ (5/26/23) Blood sugar was not tested.

1.4 - <u>If during the initial intake screening process the inmate was identified with an acute or  chronic medical condition deteriorated, did the booking nurse refer the inmate to the primary care provider for immediate care? IP I C 1,2,3; See also Wellpath Policy and Procedure (hereinafter WPP) E-02 .</u>  **No.** ███████ (2/9/23) the patient identified as intoxicated and hallucinating, possibly delirious should have been referred for immediate PCP exam. ███████ (4/1/23) patient with an alarming BP elevation did not have face to face PCP exam for 24 hours. ███████ (1/25/23) Intake form was not filled out, and no Intake documented.

1.5  <u>Was the inmate with a chronic medical condition seen by a primary care provider within seven days of arrival at the facility? IP I C 1,2,3; See also Wellpath Policy and Procedure (hereinafter WPP) E-02 .</u> **No.** ███████ (2/17/23), ███████ (2/9/23) hypertension was not referred to PCP. ███████ (2/22/23) Chronic

methamphetamine abuse was not referred for CC. ████ (1/25/23) Chronic Care visit was delayed.

1.6  Did  booking screen the inmate utilizing the Quick Reference Guide to Developmental Disabilities form?–  IP I D.  **Deferred to ADA expert.  Will review in next audit.**

1.7  If during the intake screening process an inmate was believed to have a developmental disability, did the facility contact San Andreas Regional Center within 24 hours? IP I D.  –  **Deferred to ADA expert.  Will review in next audit.**

1.8 If during the intake screening process an inmate exhibited or testified to presence or history of mental illness, was the inmate referred to a mental health services staff for further evaluation? IP I E 1. **No.** ████ (5/26/23) Patient reported severe anxiety, but no MH visit was scheduled.[10]

1.9   Did the booking registered nurse complete a Nursing Assessment of Psychiatric & Suicidal Inmate form on an inmate with a positive mental health history? IP I E 2. **No.** ████ (2/17/23), ████ (5/26/23)  patients at risk for suicide were not evaluated with assessment form;

1.10   If an inmate had an existing medication order upon arrival at the facility, was the medication administered without undo interruption? IP II. **No.** ████ (4/1/23) Clonidine was not continued, even after being ordered by hospital. ████ (2/20/23) HIV medications taken before booking were interrupted by incarcerateion. ████ (5/26/23) Medications purportedly taken before incarceration for asthma and heart failure were not continued.

1.11   Was the inmate (with verified and/or unverified medication order) seen by a medical provider within seven days of the registered nurse's consultation with the facility's primary care provider? IP II **No.** ████ No PCP visit provided for this patient who had been taking medications until hospitalization a week after booking.

1.12   For inmates prescribed psychotropic medications: Did the booking registered nurse obtain from the inmate a signed release for medical records to verify the inmate's current prescriptions?   **Deferred to Mental Health expert.  Will review in next audit.**

1.13  For inmates prescribed psychotropic medications:Was an inmate seen by a psychiatrist within seven days of arrival at the facility? **Deferred to Mental Health expert.  Will review in next audit.**

1.14   For inmates prescribed psychotropic medications: If an inmate refused prescribed psychotropic medication on three consecutive occasions, did the

---

[10] I have relied on the Mental Health expert monitor to evaluate adequacy of mental health intake.  Future medical audits will examine more closely the compliance at Intake with requirements for mental health screening.

registered nurse refer the inmate to the psychiatrist? Deferred to Mental Health
expert. **Will review in next audit.**

1.15    At the time of booking, was the inmate verbally and in writing informed by a
registered nurse of the sick call procedures? **Yes.**

**Access** was not compliant with the Implementation Plan.[11]

Face to face assessments needed pursuant to IP and applicable standards of care were
frequently delayed. Assessments were  incomplete or not in accord with applicable
protocols. Some assessments and treatments were provided without physical
examination. Covid testing was not consistently performed on patients with Covid-like
symptoms.  Patients needing PCP appointments were not timely referred.  The care for
complex patients was sometimes provided by physician extenders without physician
collaboration. Documentation was lacking for refusals of care in some instances.  See
Ex. A Cases 1, 3, 6, 7, 9, 10, 11, 12, 13, 14, 15, 19; Ex. B ███████████████████
███████████████████

2.1 - Did the licensed health care staff review the sick call slip on the day it was
received? IP III D 1. **No.** ██████ (4/1/23) – apparent delay; ██████ (4/19/23) eye
complaint not addressed for 5 days; ██████ (4/1/23); ██████ (4/1/23) - Medical staff
did not respond to complaint of stomach and body pain from 4/1/23 through 4/12/23;
██████ (2/4/23) sick call exam delayed; ██████ (4/19/23) – complaint about eyes
not attended to for 4 days.

2.2 - Following the review of the sick call slip, did the registered nurse or PCP complete
a face-to-face assessment of the inmate within the required time frame? IP D2
("emergency requests are seen immediately … and.or transported to NMC") **No.**
██████ (4/9/23) – inordinate time from complaint of severe pain to appropriate care;
██████ -(5/29/23) chest pain should have been triaged as emergency, but was instead
sent to hospital 7 hours after compliant.

2.3 –  Did the registered nurse or PCP document the face-to-face encounter in
Subjective, Objective, Assessment, and Plan (SOAP) format? IP III A (care "shall be
provided…in accordance with community standards); See, also WPP HCD 110-E-08

---

[11] Administrative services provided by custody that protect access to care have been in substantial compliance
with the IP.  See subheadings 2.7 – 2.10 for Access to Care reported in Exhibit B under Administration Onsite:  sick
call rosters, bilingual rule books and signage regarding health care rights, and privacy afforded for clinic visits.

(requires SOAPE documentation of "subjective, objective, assessment, plan and education.) **No.** ████████ (3/13/23) - no vital signs; ████████ (4/1/23) – no exam, no SOAP note for face-to-face exam required to treat stomach and body pains.

2.4 <u>Did the registered nurse or PCP document a thorough treatment plan including appropriate referral to PCP that is within the practioner's scope of practice and supported by the sick call Nursing Protocols?</u> IP III F.  **No.** ████████ (3/13/23). No PCP assessment for treatment of delirium, withdrawal; ████████ (4/5/23) patients significantly abnormal vital signs (BP 161/92, pulse 110) were not repeated or attended to.  The patient required ER treatment next day for pneumonitis; ████████ (3/29/23)  Covid symptoms not addressed with screening and instructions; ████████ (4/1/23; 6/4/23, 6/9/23) repeated visits for stomach pain, scratchy throat did not generate appropriate treatment plan that should include COVID and STD screening; ████████ (3/24/23) Inappropriate prescription for Metformin, provided contrary to standard of care; ████████ (2/27/23) No treatment plan enacted to treat chronic diarrhea; ████████ (2/16/23) No treatment plan for anemia in pregnancy.

2.5  <u>If the registered nurse determined a referral to the primary care provider was necessary, was the inmate seen within the specified time frame?</u> IP III A, B1, D 1,2; F1 G 12  (Health services shall be provided in accordance with community standards, pursuant to physician approved protocols consistent with scope of practices. Urgent conditions will be referred to on-site or on-call provider resources.)  **No.** ████████ (4/24/23) patient with visual complaint, history of stroke and hypertension, not scheduled for timely eye exam; ████████ (6/9/23) possible eye infection treated without exam or follow up.

2.6 - <u>Does the registered nurse or provider conduct rounds in holding, isolation cells every Monday, Wednesday, and Friday, and make documented rounds in the infirmary as needed ?</u>  See IP III E4 (Inmates housed in holding and isolation are visited by MD or RN every Monday, Wednesday and Friday);  MPP HCD 110 F-02 (frequency of physician and nursing rounds for patients who need infirmary-level care is specified based upon clinical acuity and the categories of care provided.) **No.** I did not see documentation in the EMR that described nurse or PCP rounds on all patients in holding cells, isolation cells, and the infirmary as required by the IP.

 **Chronic Care**  was <u>not substantially compliant</u> with the Implementation Plan.

Patients diagnosed with substance abuse disorders were not seen by a PCP in accordance with protocols for treating chronic diseases. Chronic care visits were frequently delayed and/or incomplete. Major medical problems were not consistently

documented in the problem list.  The care for complex patients was sometimes provided by nurses and physician extenders without physician collaboration.  Patients at known high risk for HCV, HIV and STD were not screened in accord with community standards. [12] See Ex. A Cases 1,3,6,7,8,9,11,12,13,18, 20,22,23. Ex. B ████████ ████████ ████████ ████████ ████████

3.1 <u>Was the inmate's chronic care follow-up visit completed as indicated and/or following 14 day health inventory if needed or as ordered? IP III C, G  (chronic medical conditions observed at intake will see medical provider within 5-7 days of arrival or next medical provider line); III G 2, 5  (requires 14 day health inventory & communicable disease screening).</u>[13]  **No.** ████████ – Hypertension was not followed up with chronic care visit; ████████ patient with chronic alcoholism was not provided with chronic care. ████████ (4/1/23) chronic care visit for hypertension delayed; ████████ a patient with chronic methamphetamine abuse was not seen for chronic disease; ████████ – patients with chronic disease had delayed chronic care visits. ████████ – this 21 year old with borderline low weight suggesting malnutrition was admitted 3/11/22.  His first complete physical was performed 8/11/23.

3.2 <u>For patients on psychiatric medications: Was an inmate seen by the psychiatrist every thirty days until determined stable and then at least every 60 to 90 days?</u> **Deferred to Mental Health monitor.**

3.3 <u>Was the inmate's chronic care clinic interaction appropriately documented in the Subjective, Objective, Assessment, and Plan (SOAP) format on the progress note or on approved, standardized, condition specific Chronic Care Clinic form? IP III G 3,4</u>. **No.** ████████ No neurological exam was done despite the recent history of stroke. ████████ ████████ – long-term substance abuse was not addressed as chronic disease. ████████ – HIV with significant viral load was not evaluated for continuation of anti-viral therapy.

3.4 <u>Are the patient's chronic medical/mental conditions and other pertinent problems recorded on the Patient Problem List? IP III G 4b (Chronic medical/mental conditions and other pertinent problems will be recorded on the Patient Problem List).</u>  **No.** ████████ – Hypertension and obesity were not on problem list. ████████ – alcoholism was not on problem list. ████████ – stroke was not on problem list. ████████ – hypertension was not on problem list.

---

[12] MCJ/Wellpath medical leadership has agreed to comply with CDC recommendations by offering screening ("opt out") to incarcerated persons housed beyond 14 day.

[13] I allow that a comprehensive examination performed by RN or PCP within 14 days of intake satisfies this requirement of the IP, even if the examination is not documented on the 14 day health inventory form.

**Healthcare Maintenance** was  not substantially compliant with the Implementation Plan. [14]

Initial examinations required within 6 months of booking, and annual examinations were at times delayed and incomplete.   National guidelines for human immune virus (HIV), chronic hepatitis C infection (HCV)  and sexually transmitted diseases (STD) screening were not followed. Ex. A Cases  3, 4, 10; Ex. B ████████

4.1 Did the inmate receive a complete physical examination within six months of the date of incarceration? IP III I. **No.** ████████ – This patient was admitted to MCJ 9/17/22 but did not receive physical before his release on 3/31/23. ████████ - this patient was admitted to MCJ on 10/14/22 and released 5/5/23 with no complete physical examination performed during incarceration. ████████ – this 54 year old patient incarcerated at MCJ since 8/26/22 had no complete physical documented.

4.2 -  Did the physical examination include all the required components as listed in CFMG'S's Implementation Plan, Exhibit A? IP III I 3. **No.** ████████ ████████ – No physical done within 6 months of admission. ████████ PSA not tested or discussed, no STD screening.

4.3 - Were the findings of the physical examination recorded on an approved CFMG'S physical examination form? IP III I 4  **No.** ████████ – physical not done. ████████ – physical belatedly done but form not  used.

**Continuity of Care** was  not compliant with the Implementation Plan.

Documents elucidating medications and follow up care that should accompany patients upon release were at times incomplete or not found at all in the MCJ electronic medical record (EMR). Ex. A Cases 7, 13, 14, 21, 22,  23, Ex. B – ████████

5.1 For inmates transferring to another detention/corrections system:
Was a Transfer of Medical Information form accurately completed for an inmate transferring to another detention/corrections system? IP III G J2; G 3b (4) c vi (Chronic care includes discharge planning in preparation for release and transfer of information);
**No.** ████████ Patient sent to Prison with incomplete form that failed to communicate his crucial diagnoses of hypothyroid crisis, malnutrition, hepatitis,

5.2 Was there a documented 30-day supply of medications provided to the patient upon discharge? IP IX F (nursing and medical staff  will notify custody of the need to ensure up  to 30 days supply of essential medication or a prescription upon release.  **No.** ████████ – Patient refused medications that he should have received.   The adequacy of

---

[14] My assessment of this parameter was restricted to a review of persons incarcerated in MCJ for at least 6 months.  There were not many patients in this category provided to me for review.

patient's informed consent was not documented. Because this patient appeared to not be competent to make medical decision upon release, the patient's mother could have been called.   His mother complained to the jail that this patient needed emergency, lifesaving care at the hospital when he was released from jail.

5.3 <u>For an inmate who was released prior to resolution of a continuing medical/mental health condition, was the referral to public health and/or community clinic completed by the facility as appropriate? IP III G J2; G 3b (4) c vi (Chronic care includes discharge planning in preparation for release and transfer of information);</u>  **No.** ███████ – health staff did not document that patient was competent to make medical decision upon release and was fully informed.  The patient's mother could have been called.  His mother reported that the patient was brought to hospital in extremely poor condition immediately upon release.


5.4 <u>For an inmate who was released to community, was the inmate provided with written instructions for the continuity of essential care</u>?  IP III G J2; G 3b (4) c vi (Chronic care includes discharge planning in preparation for release and transfer of information)**; No.** ████████ – There was no documented counseling upon release to address positive Syphilis test, lesions on vagina, skin rash and need for medications. ████████ – this patient was released without continued medications for OUD and instructions for follow up care.

**Outside Referrals** were <u>not substantially compliant</u> with the Implementation Plan.

Necessary specialty care was not consistently provided in a timely fashion. Referrals for specialty services requested by co-managing physicians were delayed or not provided. Written reports from outside providers were not consistently available in the EMR.  PCP review and follow-up on visits to outside care were not consistently documented. Documentation for instruction to ambulances was not found in the EMR. Ex. A cases 4,5,6,7,11. Ex B ████████████████████

6.1 - <u>For inmates referred to outside provider for higher level of care:</u>
<u>Did health care staff complete the CFMG's Medical Referral Form? IP III L.</u> **Yes,**


6.2 -  <u>If an inmate was referred to an outside provider for a higher level of care, was the inmate seen within the time frame specified by the ordering physician? IP III A (Medically necessary services which are not provided on site shall be made available by referral… in accordance with community standards).  NCCHC Standards for Health Services in Jails 2018 J-D-08 (standard of care services include appropriate and timely access to necessary hospital and specialist care).</u> **No.** ████████ - Chest X ray ordered 4/4/23 not done until 4/7/23. ████████ – CT scan and follow up requested by specialist in November 2022 not performed until March 1, 2023. ████████ – referral to orthopedic recommended by ER doctor on 1/6/23 was not provided timely.

6.3 - <u>For inmates transported to outside provider via ambulance, did the health care staff complete two medical referral forms, one for the hospital and one for the ambulance company?  IP III L2.</u> **No.**I found no ambulance referral forms in the EMR. [15]

6.4 - <u>Did the Medical Referral Form with recommendations for follow-up accompany the inmate upon his/her return from outside provider with appropriate follow up on these recommendations? IP III A, NCCHC Standards for Health Services in Jails 2018 J-E-09 (standard of care services include visit to jail health staff upon return from hospital or specialty visit to review recommendations)</u> **No.** ████████ – X ray 4/7/23 showing pneumonitis not acted upon by MCJ staff until 4/14/23. ████████ – orthopedic consultation note delayed from 1/27/23 visit until 2/7/23. ████████ – No copy of hospital note from 6/9/23 in the EMR.

**Detoxification and Withdrawal Care** was <u>not substantially compliant</u> with the Implementation Plan.

Intake nurses did not consistently contact the on-call PCP for orders for patients at risk of serious complications caused by intoxication and withdrawal from multiple substances. Monitoring protocols were not consistently followed as required in the IP. Improper delays in obtaining vital signs are noted. Patients with a history of synthetics abuse were not entered into appropriate monitoring protocols.  Patients apparently withdrawing  (uncooperative, ataxia, abnormal vital signs) or described as overtly impaired were housed in sobering cells or sent to the general population (GP) without medical consultation to ensure that such placement was safe.  MAT for OUD was not accompanied by counseling or collaboration with MH.  Ex.A Case 6, 8, 12, 18, Ex B ████████████████████████

7.1 - <u>For inmates who were intoxicated at the time of booking into MCJ:</u>
<u>Was the inmate placed in the protective environment of the sobering cell for close observation by custody and health care staff? IP V.A. ("[patients] placed in the protective environment of the sobering cell will be under close observation by custody and health care services staff.").</u> **No.** ████████ – this patient was placed in a sobering cell, but not seen by PCP. ████████ – this patient was sent to the general population while under the influence and/or withdrawing without PCP evaluation. ████████ (4/4/23) this patient was not placed in observation when admitted under the influence. ████████ (3/7/23) – this patient was described as under the influence, but not placed in a sobering cell.
//
//
//

---

[15] I am informed that ambulance forms are kept by custody.  I have not seen copies of these forms.

7.2 - For inmates who were intoxicated at the time of booking into MCJ:
Did the medical staff document an assessment/evaluation of the inmate in the SOAP format? IP I C3 (Assessment shall include vital signs and inquiry into substance abuse including type/methods/amount/etc)  IP V.D. (note must provide following data    or Subjective, Objective, Assessment and Plan). **No.** ▮▮▮▮▮ –this patient was placed in sobering cell, not seen by PCP and not evaluated by SOAP process. ▮▮▮▮▮ – this patient was sent to the general population while under the influence and withdrawing without PCP evaluation, and was not evaluated by SOAP criteria. ▮▮▮▮▮ (4/4/23) this patient was not observed in sobering cell when admitted under the influence, not evaluated by SOAP criteria.

7.3 - Was the appropriate alcohol withdrawal treatment protocol followed by medical staff based on the identified risk factors? IP V. **No.** ▮▮▮▮▮ – this patient was identified as being at risk of alcohol withdrawal, but not entered into CIWA. ▮▮▮▮▮ – patient reported drinking alcohol heavily daily, but not enrolled in CIWA. ▮▮▮▮▮ -  PCP consultation was required for this patient because of multiple risk factors, but not obtained. ▮▮▮▮▮ (3/7/23) vital signs were not recorded for CIWA form.

7.4 - Did the facility initiate an appropriate drug withdrawal treatment protocol based on the identified symptoms?  IP VI. **No.** ▮▮▮▮▮ – PCP was not contacted to treat mixed substance use disorder; patient had meth abuse disorder but was not enrolled in protocol for monitoring withdrawal from synthetics/stimulants. ▮▮▮▮▮ – patient with mixed substance use disorder was  not monitored by CIWA. ▮▮▮▮▮ – patient possibly undergoing meth withdrawal was not monitored. ▮▮▮▮▮ – MAT patient was prescribed medications to mitigate withdrawal from multiple substance but had no PCP exam. ▮▮▮▮▮ – patient with severely deteriorated condition during methamphetamine withdrawal was not referred to PCP.

7.5 - For inmates withdrawing from Opiates: In addition to taking vital signs and completing an assessment for dehydration, did the medical staff utilize the Clinical Opiate Withdrawal Scale to assess the inmate with history of opiate use and/or withdrawal? IP VI C. **No.** ▮▮▮▮▮ – vital signs not were consistently recorded as required by COWS protocol.

7.6 - For inmates withdrawing from Opiates: Did the health care staff implement an appropriate opioid withdrawal monitoring and treatment/plan for an inmate withdrawing from opiates? IP VI C 1. **Yes.**

7.7 - For inmates withdrawing from Benzodiazepines/Barbiturates: Prior to starting the withdrawal protocol, did the health care staff conduct an initial assessment of the inmate that included current symptoms, physical findings, and full vital signs? IP VI C 2. **Yes.**

7.8 - <u>For inmates withdrawing from Benzodiazepines/Barbiturates: Was the inmate seen by a medical provider within three days the Benzodiazepine and Barbiturate Withdrawal treatment was initiated? IP VI C 2. Page 58.</u> **No.** ▓▓▓▓▓ – patient identified as abusing benzodiazepines, was not immediately referred to PCP and was not seen without 3 days by PCP provider.

7.9 - <u>For inmates withdrawing from Benzodiazepines/Barbiturates:Was the inmate seen by a psychiatrist or psychiatric nurse practitioner for evaluation within seven days the Barbiturate Withdrawal treatment was initiated</u>? **Yes.**

7.10 - <u>If the inmate was using both alcohol and benzodiazepines, was the alcohol withdrawal protocol followed and was the inmate seen by a provider within three days? IP VI C 2. Page 58.</u> **No.** ▓▓▓▓ – upon booking 5/22/23 the patient was monitored for withdrawal from alcohol and benzodiazepines.   There is no record of a medical examination.

7.11 - <u>If the inmate was using both opioids and benzodiazepines, was the opiate withdrawal protocol utilized and the on-call provider contacted? IP VI C 2. Page 58.</u>  **No.** ▓▓▓▓▓  This patient, described as withdrawing from methadone and from benzodiazepines, was placed on COWS and CIWA but there was no indication in chart of contact with PCP.

7.12 <u>- If the inmate exhibited signs of severe drug withdrawal, was the patient immediately transported to the emergency room with notification of the on call medical provider as needed? IP I A, IP VI. See also MPP HCD 110-E-02 6.4 (Purpose of receiving screening is to identify patients requiring emergency treatment and wil will require immediate care upon entry to the jail).</u>  **I did not see such cases to review.**

**Tuberculosis and other Infections** was <u>not substantially compliant</u> with the Implementation Plan.

Patients with an unequivocally positive PPD (many of whom had received a  BCG vaccine)  were not appropriately evaluated with QuantiFERON testing to confirm diagnosis of latent TB.  Patients were not counseled regarding options for treatment of latent TB. Patients with Covid symptoms were not consistently tested for Covid infection.  Patients were not screened for HIV, HCV, and STD in accord with state law and national standards of care. Ex. A: Case 1,2, 12, 13, 14, 20; Ex. B: ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓

8.1 <u>Did the inmate receive appropriate STD  screening not later than 14 days after booking, and tuberculosis screening within seven days of inmate's admission to the facility? ( IP  1; III G 5 (Health inventory and communicable disease screening shall be completed within 14 days of arrival); VIII H,  I (screen for active TB upon arrival, test for latent TB within 7 days of arrival).</u> **No.** See Exhibit B describing following patients: ██ transferred to MCJ 2/17/23 with history of Neg STD tests.  Refused PPD test, not offered QuantiFeron. ███ - no STD testing done or offered. ███ - no TB, or STD screening done. ███ -  TB skin test not administered (BCG history) CXR done, but no QuantiFeron.  No STD screening done/offered. ███ - TB skin test done.  No STD testing done or offered. ███  TB skin test done IS NEG.  No STD testing done or offered. ██  TB skin test done IS NEG.  No STD testing done or offered. ███  TB skin test done jAN 2023. nEG. .  No STD testing done or offered with multiple 2023 admissions. ███ - no TB skin test reading in EMR, and no STD testing. ██ refuses PPD, no Interferon and no STD testing ordered. ███ - testing for STD not done.  No test ordered for HCV, Hep B. ███ resides since Jan 2023 in MCJ with no STD screening, no TB screening. ███ - STD testing not done

8.2 - <u>For an inmate screening positive for active TB: Was the inmate seen by PCP and moved to an Airborne Infection Isolation room for isolation and further evaluation?</u>  **NA.** I did not see any such cases identified.

8.3 - <u>For an inmate screening positive for active TB: Was the inmate seen by PCP and moved to an Airborne Infection Isolation room for isolation and further evaluation?</u> **NA**. I I did not see such cases.

8.4  - <u>Did the facility contact the local public health department within 24 hours of inmate's positive TB symptom screen?</u>  **NA.**   I did not see such cases.

8.5  <u>Are inmates screened annually for signs and symptoms of tuberculosis with TB skin tests as indicated? IP VII H (screen for TB symptoms annually with skin testing as indicated annually);  HCD 110 B-03 (after positive skin test, screen for symptoms annually).</u> **No**. ████████████████████████ – annual TB testing not documented.

**Pharmaceutical Administration** [16] was  <u>substantially compliant</u> with the Implementation Plan.

---

[16] My assessment of pharmaceutical administration at MCJ refers to compliance with provisions in the Implementation Plan and the Wellpath Policy and Procedure Manual, Monterey County California for storage and patient refusals.  Compliance with the requirement for medications and instructions given to patient upon release is addressed under Continuity of Care.   My review of how medications were dispensed to patients is a separate category referred to as "RN Administration On-Site".  Prior audit reports described improperly prescribed drugs as

Departures from the Implementation Plan regarding maintenance of controlled substance logs and medication storage have been rectified.  Narcotic logs were kept in accord with the IP and state regulations.  There were virtually no expired multi-dose containers.[17]  Medications were all ordered by a physician currently working at MCJ.

**Staffing – Administrative, PCP, RN, medical records, and support**  –   Staffing reviewed during this audit was not substantially compliant with the Implementation Plan. MCJ has only recently installed a full-time, permanent Director of Nursing. MCJ has no manager/director/supervisor for medical records.[18]  The Medical Director provides patient care for complicated cases, oversight of physician extenders and nurse practitioners, and administrative tasks. I have recommended that Wellpath assist the Medical Director to ameliorate excessive workloads, especially while corrective actions are being enacted.

Based upon the apparent delays from the time of patients' requests for care until patients are provided access to RN and PCP sick call, staffing has not been substantially compliant with the IP.

To further assess compliance with the IP, I have requested the following documents:  1) "Practice Agreement" for all PAs currently seeing patients at MCJ, as required by California Business and Professions Code 3502.3. 2) Notice posted in MCJ clinics where Nurse Practitioner(s) provide care, as required under California Business and Professions Code 2837.104(e) and 2837.103 (e).

**Nurse Dispensing Medications** – The dispensing of medications at MCJ by nurses on medication rounds was substantially compliant with the Implementation Plan. I am finding in each of my visits that the medication nurse takes "every reasonable precaution to assure the inmate actually ingests the medication."

**Clinic Facilities** - Clinic Space and equipment were  substantially compliant with the Implementation Plan. Departures from applicable standards noted in the prior site visit. The lack of scales, non-use of white noise machine, unavailable mattresses and medication storage room deficiencies have been remediated.

---

[17] I found a two multidose vials one day past their expiration date.

a departure from proper pharmacy administration.  This audit report will address the appropriateness of prescriptions ordered as a component of Access to Care.

[18] IP staffing plan caalls for "Medical Record Supervisor" on site five days each week.

**Quality Assurance[19] –** was <u>not substantially compliant</u> with the Implementation Plan. The IP references the "Quality Management and Peer Review Committee" and the "CFMG Deaths Policy and Procedure."  The IP states that "[c]orrective action plans will be developed and instituted for identified deficiencies  and audit findings will be reported to the Quality Management Committee at its quarterly meetings."  IP introduction (Exhibit A. page 8,  Document 532 page 9 of 140).  I have not been provided copies of the quarterly 2023 Quality Management (QM) minutes.  The minutes I have seen in prior years did not consistently address my findings.

Death reviews have not satisfied the requirements under the MPP for patients who died while in custody or following care provided by MCJ during 2023. See HCD 110 A-09 ("thorough review of all deaths in custody to verify best practices; to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures or practices are warranted; to identify issues that require further study; and to prevent future deaths"), citing Title 15, section 1046.  I provide a detailed analysis in my assessment of care for deceased patients below: MAM ███████ DOD 1/4/23;  JSH ███████ DOD 4/7/23; MPM ███████ DOD 5/22/23; JPG ███████ DOD 6/9/23;  and regarding the death that occurred immediately following care at MCJ -  AB ███████ DOD 7/4/23,

Standard practices and protocol updates are overdue. The Implementation Plan states that "[a]ll RN protocols/standardized procedures and PA and NP practice agreements are reviewed by the Program Manager, responsible physician, and administrative staff at least annually and revised as necessary."  IP III B.3.  MPP (HCD 110 A-05, 6.2) requires  that "[e]ach policy and procedure is reviewed and approved by the RHA/HAS and Responsible Physician/Medical Director at the time of publishing and annually thereafter."  Nursing policies, standardized procedures, and other protocols in effect currently date back many years with no recent update or documented approval.

The Implementation Plan states that "services shall be provided by licensed health care professionals in accordance  with community standards and professional ethical codes for confidential and appropriate practices."  IP III A.  Medical staff should be evaluated shortly after being hired and not less than annually to document performance in accordance with the community standards.  I have not seen initial and annual assessments of PCP and RN performances.

The Implementation Plan also states as part of its Health Care Philosophy that members of the medical staff "act as …advocates [for inmates] in health care matters.

---

[19] Also referred to as "Quality Management" or "Quality Improvement."

IP III A 1.  The prompt review of grievances filed by inmates is an essential means of assuring adequate attention to significant medical conditions.  See, e.g. MPP HCD 110-a-10 Grievance Process for Health Care Complaints, referencing Title 15, section 1073. On or about July 28, 2023.  In my review of June 2023 grievances I found the following patients were not being provided with services in compliance with the IP:



█████████ - needs chronic care visit, LAB, STD screen
█████████ - needs chronic care visit, LAB, STD screen
█████████  needs chronic care visit, LAB, STD screen
█████████ - needs chronic care visit, LAB, STD screen
███████ -  needs chronic care visit, LAB, STD screen
█████████ - needs follow-up from emergency care calling for urology visit, medical director to see regarding drug diversion.
███████ - TB testing overdue
█████████ - needs updated problem list, STD screening.
█████████ - needs documentation in EMR for gynecology care, ordered labs not in EMR.
█████████ - needs Chronic care visit, update problem list.
█████████ - needs follow up on gynecology request for ultrasound, lab, return visit


From January through June, 2023 it seems that audit grievances were not adequately addressed by medical leadership.  [20]

## SUMMARY OF CASE REVIEWS

I found the care was inadequate[21]  for each of the 23 patients listed in Exhibit A (case reviews).

Case 1,  **Inadequate care**. 58 year old male was booked 3/24/23, reporting diabetes requiring medications.  He was automatically scheduled for chronic care. Insulin was ordered pending determination of medications prescribed prior to admission. He was noted to have a history of BCG in Mexico making skin testing unreliable.  X ray performed was negative. Healthcare failed to comport with IP and best practices:  1) no STD testing was offered 2) Chest X ray obtained was insufficient to establish no latent tuberculosis or need for treatment. QuantiFERON test should have been performed.  3) Covid test was not done when patient complained of Covid-like symptoms.

---

[20]  I have not received copies of July or August grievances.

[21] I deem medical care that does not comports with community standards and places a patient at substantial risk of harm to be "inadequate."

Case 2  **Inadequate care**. 61 yo male booked on 12/28/22 was started on BP meds because of  elevated readings at intake.  The Chronic Care requirements were not followed.  The first chronic care visit was delayed.  The exam was incomplete as the patient had no eye exam.  The prescription of metformin for a lab test result  (HBA1c 6.0) does not conform with best practices and was undertaken absent consultation with supervising physician. (There is no evidence of benefit in non-obese person with borderline HbA1c). The patient was not offered testing for STD.

Case 3 **Inadequate care**.  63 yo male booked on 10/14/22 complained of back pain, loss of visual acuity and rash. He was prescribed Meloxicam.  He did not have a full physical exam within 6 months of intake, which is overdue now.   Markedly abnormal vital signs noted on visit 1/12/23 were not repeated.

Case  4.  **Inadequate care**.  54 yo male booked 8/26/22 with history of neck fracture, femur fracture, subarachnoid hemorrhage from auto vs bike July 2022 was followed by MH with diagnoses of polysubstance abuse, adjustment reaction and depression.  He was placed on chronic care and prescribed medications for hypertension. Recommendations by orthopedic and neurosurgical for follow up X rays and appointments were not followed.  Orthopedic care was delayed. Follow up by neurosurgery was delayed and incomplete.  A possible nonunion neck fracture was not addressed despite continual complaints of neck pain.  Health maintenance needs were not being addressed. (he was not scheduled for colonoscopy and not screened for HIV, Hep B/C, syphilis).  The PA telehealth evaluation of patient's complaint of 6 months' diarrhea did not meet community standards.

Case  5   **Inadequate care.**  39 yo female in custody since November 6, 2022 (at which time she refused Urine HCG)  was followed by MH for stimulant use disorder and psychotic disorder.  She had a history of sex work and requested HIV testing 12/23/22. The HIV result was reported negative on 1/4/23;  Her pregnancy test (HCG) on 1/12/23 showed her to  be pregnant, later determined to be at 21 week gestation.  OB care recommendations were not timely communicated to MCJ, leading to delays in providing medications and delayed follow up for abnormal lab tests.

Case 6 **Inadequate care.**  31 yo male who came to MCJ after an ER visit for his acute 4th metacarpal fracture, reported opiate and synthetics abuse.  He was placed on buprenorphine MAT same day as booked without referral for PCP exam.  Specialty Ortho services was unduly delayed putting patient at risk for nonunion of the fracture and angulation.  The patient's substance use disorder was not treated properly. Subutex was prescribed for only 4 days to reduce withdrawal symptoms and not for MAT.  PA, NP services were rendered without adequate MD oversight.  Screening for STD was not performed.

Case 7. **Inadequate care**. 58 yo with schizoaffective disorder was booked 11/5/22 with history of malingering, personality disorder, suicide ideations and hording medications. During stay at MCJ in April 2023 he was followed by mental health staff without documented MD oversight.   Severe weight loss with low BMI indicating borderline malnutrition, weakness, unsteady gait and hypothermia with low pulse rate led to multiple hospital visits for failure to thrive. No medical follow up and/or attention from medical director until 4/5/23 when profound hypothyroidism was discovered by lab test.

The grave risk of psychiatric complications (myxedema madness)  from chronic low thyroid state was not addressed.  This patient's abnormal lab tests and vital signs (hypothermia) were not addressed promptly and/or adequately  by MCJ staff. There were no documented communications between jail and hospital physicians. Endocrinology was not consulted.

While under observation in MCJ, nurses failed to report deterioration to the medical director and the patient became comatose before his transfer back to hospital, requiring 18 day's stay due to complications of inadequately treated hypothyroidism.  The patient was transferred to prison without apparent communication from medical staff at MCJ to medical staff at the prison.

Case 8.  **Inadequate care.**  32 yo male with a history of alcoholism and stimulant abuse was  uncooperative at booking at 0351 3/7/23.  He was placed in a sobering cell without a documented medical evaluation.  Intake screening was done nearly 24 hours later at 0149 3/8/23.  While in sobering cell the monitoring protocols were not followed. Patients' severe dental disease not reported at intake and referral for needed dental care was delayed.  He was not enrolled in chronic care.  He was not  screened for STD. He had no Chronic care visits during his multi-month stay.

Case 9:  **Inadequate care.** 32 yo female booked 4/11/23 denied medical problems but admitted to abusing opiates and methamphetamine.  Her pulse was abnormally elevated to 113, and not retested.  UTOX confirmed synthetics abuse.  She was not placed in COWS and not placed on a synthetic withdrawal protocol. Her abnormal vital signs were not attended to.  FBS, and STD not screened, She was not referred for Chronic Care. The patient's diagnosis of syphilis was delayed until the belated RPR test was performed July 17, 2023.  Expert assessment and treatment even then was not provided even though the on-site medical director specializes in infectious disease. .

During her stay, she was mistakenly given a drug with sedating side effects.  She fell from her bunk some hours afterwards.  Her purported dental injury caused by the fall was not promptly evaluated.

Case 10.  **Inadequate care.** 21 yo male followed by MH for anxiety disorder was medicated with Prozac and buspirone. At intake on March 11, 2022 his BMI of 17.5

indicated malnutrition.  The initial health history due 14 days later was not done until 10/11/2022.  Although IP calls for full exam within 6 months, there was no full history and physical in the chart as of July 2023.  No STD screening tests were administered. Repeat weights not recorded since 4/21/23, and lab tests ordered not yet done as of July 2023.  The patient's extremely low weight deserved assessment and possibly treatment, especially since this patient was taking medications prescribed by psychiatry that can cause weight loss. There was no treatment plan and no collaboration between medical and MH providers.

Case 11. **Inadequate care.**  54 year old female was booked 2/22/23  with history of hypothyroidism, alcoholic cirrhosis, chronic hepatitis B.  Appropriate lab tests and screening for STD were delayed.  The medications she reported taking on the outside were not continued promptly after booking.  No chronic care visits were provided to her for hypothyroidism. The patient complained of fungal infection in hands and feet, blurry vision, and headaches. Her exam was incomplete and did not include visual acuity testing. Lamisil (a medication that carries a risk of inducing liver failure, and contraindicated in persons with liver disease)  was ordered for onychomycosis by the PA, without first consulting supervising medical director on site who is also an infectious disease specialist.

A delayed Snellen test showed patient's best eye vision was 20/200.  ("legally blind"). The response to this finding - to fill eyeglass prescription written in May 2018, without repeat eye examination - was inappropriate and non-responsive to patient's other complaints, including headache. Repeat testing to assess low platelets and hypothyroidism was not done.

Case 12. **Inadequate care.** 24-year-old female was admitted to MCJ 2/12/23 and again 4/27/23 with history of OUD and stimulant abuse.   She reported headaches, history of pituitary tumor and lactation.  The Intake form inaccurately stated that the patient did not have SUD while also reporting more than one-year history of daily meth use.  She was not enrolled in synthetics monitoring protocol.  She did not have chronic care evaluations.  Her chest pain was not assessed in context of her methamphetamine abuse. Since meth abuse creates risk of heart disease, she should have undergone medical evaluation including ECG.  Her claim of pituitary tumor was not investigated adequately. The local neurologist named by patient was not contacted for further information.   Because this patients' care was complicated by comorbid mental illness, there should have been a care plan involving the medical director along with MH collaboration.

Case 13. **Inadequate care.**  34 yo male testing positive for HIV, with polysubstance abuse was booked 3/30/23 after being cleared by NMC ER for being combative when arrested.   On admission to jail from ER he was overtly ill with markedly abnormal vital signs.  The elevated pulse of 123 was not repeated and not referred for PCP evaluation.

The report from the ER of renal failure and signs of infection was not followed up at MCJ.  Although the patient did not appear to be mentally competent,  MCJ did not contact a surrogate decision maker. His mother was purportedly a physician. Immediate medical evaluation and attention from the on-site medical director (who is also an infectious disease expert) was not provided. The patient was released on 4/4/23 with incomplete discharge instructions.  He was reportedly taken to the hospital by his mother immediately after release, where he was admitted for life threatening illness. The patient's problem list was incomplete.

Case 14. **Inadequate care**. 50 yo female was booked 2/2/23 with a history syphilis treated, and chronic hepatitis C infection untreated. She complained of a broken and decayed tooth, anxiety, and depression. Her care was deficient for lack of examination to assess perineal infection, status of syphilis, and rash under breasts.  She was released from care with insufficient instructions and no medications.  After being booked again on 6/1/23 she was not scheduled for PCP exam to treat her acute skin infection. Nurse sick call on 6/5/23 should have generated an immediate  PCP consultation. PCP exam and treatment of patient's skin infection was provided on 6/14/23 .

Case 15. **Inadequate care.** 31 year old female was admitted 5/18/23 with apparent withdrawal from alcohol., bipolar disorder and anxiety. Post booking, she was not provided with adequate PCP examination, assessment or treatment for vaginitis, hand infection and skin rash.   Her hand wound was treated with an antibiotic but not examined by a PCP. Her complaint on 6/9/23 of rash on chest, under arms and breast was not properly evaluated by the Nurse Practitioner who failed to make a reasonable diagnosis or provide effective treatment and did not collaborate with the medical director who is also an infectious disease expert. When medical director examined patient on 6/14/23 she did not document review of the chart and/or comment on the complaint of skin rash.

Case 16. **Inadequate care**. 47 yo with multiple prior admissions  was booked on 6/9/23 at approximately 1:54 PM and committed suicide about 3 hours later.  At intake it was noted that  he had a history of abusing methamphetamines.  His abnormal pulse rate, 117, was not repeated and not reported to the on call PCP.   Custody found him hanging and lifeless at 5:02 pm.  See death reviews below for my analysis of his care.

Case 17  **Inadequate care**. 35-year-old male complained of a rash that had been , resistant to treatment. He was diagnosed on 9/2022 by e-consultation as having interdigital candidiasis and tinea.  The recommendation at that time was for in-person consultation and biopsy if the condition did not improve.  Patient complained about the rash while incarcerated at MCJ from 2/7/23 through 6/14/23.   The dermatology consultation that was ordered on 5/19/23 and occurred on 6/27/23 was delayed.

Case 18. **Inadequate care.**  52 yo male had a with history of +PPD and INH treatment described at Intake on 2/2/23,  His hypertension was treated with amlodipine and atenolol.  He had multiple carries.  No referrals to medical, dental or MH were made. He was released the day after being booked.  When he was readmitted on 3/7/23 he appeared under the influence of alcohol and/or drugs.  He was not placed in sobering cell, and not placed on CIWA protocols.  He was seen by PCP on  3/10/23 at which time abnormal pulse of 112 was not repeated.  Despite history of unsafe sex, the patient was not screened for HIV or HCV or Hep B.

On 4/13/23 the patient complained of rash, chest pain and pain with urination.  A Nurse Practitioner diagnosed this patient as having bacterial folliculitis and prescribed the antibiotic doxycycline.  The NP did not consult the medical director who is also an infectious disease expert. The NP diagnosis was probably incorrect as fungal folliculitis is far more common in jails than bacterial folliculitis. Furthermore, at that time the NP did not assess the cause of the patient's purported chest pain or dysuria.  The doxycycline improperly prescribed for skin rash probably caused some gastritis that aggravated the chest pain.  The patient's subsequently prescribed hydrocortisone was also a poor therapy for his skin rash, as hydrocortisone (or any topical steroid) can worsen fungal skin infections.

When the patient complained of chest pain on 4/30/23 the nurse at sick call did not deploy the chest pain protocol properly.  Because this patient was at high risk of acute coronary syndrome the nurse should have immediately conferred with the PCP on call. There was inadequate engagement and oversight by the Medical Director to assure NP and RN services are appropriate.

Case 19 **Inadequate care**.  21 year old male witih seizure disorder on medication residing in MCJ since intake on 12/7/21 had a chronic care visit with his annual physical on 12/22/22.  He was non-compliant with medical orders for anti-convulsant.  Although the Implementation Plan requires PCP consultation following refusals of recommended care, this did not occur when patient refused blood draw to measure anticonvulsant blood levels on 5/15/23.  After patient's seizure on 6/1/23  there was no documented review by on site Medical Director of this significant adverse event.

Case 20. **Inadequate care**. 42-year-old male with diabetes, HTN, and a history of stimulant abuse was admitted to MCJ 2/21/23 after jail clearance for abnormal BP and pulse (153/113 and 128)   suggesting meth intoxication or withdrawal. The patient's vital signs were not repeated upon booking.  The patient stated he takes no meds despite history of HTN. Missing teeth and decay was noted consistent with patient's reported heavy meth use.  Blood sugar was not tested at intake although this is required on the intake form.  There was no referral noted on the intake for CC or PCP follow up.  Patient was not offered STD screening.  No urine testing was done to rule out renal dysfunction, rhabdomyolysis and/or proteinuria from methamphetamine abuse and diabetes.  This

patient's first face to face chronic care visit was 3 weeks after intake, and did not include STD screening.

Case 21.  **Inadequate care**. 21 yo female was booked on 2/7/23 but had no Intake exam performed because she was  "resisting physically, verbally abusive, and uncooperative."   VS were recorded as BP 140/78, pulse 115 with no repeat measures noted.  No contact or referral was documented to the PCP on call.  The patient was placed in an observation cell without any documented confirmation of medical condition by PCP or other healthcare provider.  She was seen by LMFT on 2/8/23, and diagnosed as Psychosis NOS.  Psychiatry visit is documented on 2/13/23.

This psychotic patient followed by mental health also requires medical evaluation to assess for possible organic (non-psychiatric) issues that cause or aggravate psychosis, such as infection, brain tumor, or endocrinopathy. There was no care plan, and no collaboration with the medical director to consider the  likelihood that patient lacks capacity and needs conservatorship for health matters.

Case 22  **Inadequate care.**  31 yo male with chronic polysubstance abuse was booked on 3/8/23 where he reported being prescribed Methadone and Pregabalin for OCD and PTSD diagnoses.  He had a history of benzodiazepine abuse.  UTOX confirmed abuse of THC, benzodiazepines, and methadone.  Despite the history of polysubstance abuse, and risks of benzodiazepine withdrawal, this patient was not provided with a face-to-face PCP visit until 3/20/23 when he reported having suicide ideation associated with purported methadone withdrawal. The patient's withdrawal was not adequately monitored considering the risks of seizures from benzodiazepine withdrawal and prolonged withdrawal state associated with methadone abuse.

Case 23 **Inadequate care.**   49 yo obese male, with OUD, DM, stimulant abuse, glaucoma and psychosis was booked on 2/14/23.  His first chronic care visit (face to face) was on 2/24/23.  This patient was not cooperative with therapy for diabetes. He was COVID positive on two occasion and appropriately treated with Paxlovid.  No STD screenings were documented. There was no evident documentation of meds continued upon release or referral for further chronic care after release.

//
//
//
//
//
//
//
//

## PATIENT DEATHS in 2023

**APB** ██████ [22] – 68-year-old male schizophrenic alcoholic, abusing benzodiazepine died on or about July 4, 2023 one day after he was reportedly released from custody, while being treated in the hospital following his collapse at MCJ on June 29, 2023.

I reviewed a printout of the electronic medical record. I have not been allowed access to the entire EMR.  The dates of bookings and releases, requests by the patient for services, medications prescribed, laboratory tests, hospital records and specialists reports were not included in the materials provided to me.  **I have not seen the autopsy report.  I have not seen the formal death review by Wellpath/MCJ.**

Based upon the limited materials available for my inspection, I find that the care provided to Mr. ██████ departed from the services required by the Implementation Plan.

There are vague references to APB being  uncooperative when booked February 22, 2023.  There is no record of him being fully examined then.  I presume he was subsequently released as the EMR states he was hospitalized 3/8/23 after MVA and had seizures while hospitalized.  His next incarceration date is not clear, possibly 3/12/23.

It looks like he was booked again at MCJ on 5/22/23 and monitored for withdrawal from alcohol and benzodiazepines.   On 5/29/23 PA ██████ reported that laboratory tests (from an uncertain date) showed mild elevated liver functions.  There is no record of a medical examination.   He was prescribed Depakote for seizure prophylaxis and psychiatric illness.

APB clinical activities are not well described thereafter.  He returned from an outside medical appointment, not specified, on 6/16/23.   A mental health intake form is filled out 6/17/23.  There is no medical intake form in the EMR.  "Tasks" portion of the EMR seems to indicate that Mr. ██████ was due for completion of his Intake that was not addressed in 5/22/23.

On 6/16/23 a nurse progress note documented that upon return from outside medical care, APB had an open wound that was draining, with edema of the LLE.  A prescription

---

[22] I have not seen the autopsy or medical records documenting the time of death for APB.  APB purportedly died a day after being released from custody while under hospital care for a condition that occurred while in custody.   I include this case with my reviews of in-custody deaths for the purposes of evaluating compliance with the IP.

was provided for Lasix, compression stockings and daily wound care.[23]  The EMR does not supply the name of clinician who prescribed Lasix or authorized treatment. There is no face-to-face examination with a PCP documented.

On 6/16/23 the sick call notes report bilateral lower extremity swelling, edema, and malodorous discharge from leg lesions.  APB told the attending nurse that this had been going on for 2 months, and that he was using his blanket to absorb discharge.   This note states that APB was sent to the ER for evaluation.  There are no ER evaluation records in the materials sent to me.

On 6/20/23 a Nurse Practitioner documented in her face-to-face exam finding an oozing wound in the left lower extremity. Her diagnosis was "probably left venous status [sic] ulcer."  I expect the NP meant "stasis ulcer."  There were no changes to the treatment described above.  No antibiotics were prescribed.  No referral to the medical director or any other physician was made.  In documents provided to me I saw no record of any nursing examinations, vital signs, laboratory tests, cultures, or other attention for this open wound until the documented visit with MCJ medical director on 6/29/23.

On 6/29/23 custody brought APB to the medical director.  APB was disheveled, with foul odor, cool to touch and obtunded.  He had apparently allowed a dressing change on 6/20/23, refused wound dressing on 6/22/23, and was scheduled for wound care on 6/25/23 and 6/27/23.  I did not see that any wound care was provided after 6/20/23, notwithstanding the scheduled appointments.

The MCJ medical director diagnosed APB as suffering from shock and life-threatening sepsis, The medical director ordered immediate fluid resuscitation and paramedic transport to the hospital.  APB clinical condition and mental status did not improve in the hospital.  MCJ medical records report that APB life support was removed on or about July 2, 2023.  His blood pressure reported at 1749 was 52/21 and O2 sat 60%.  He would not have likely survived more than a few hours longer without life support.

I have not seen the medical records that describe APB hospital course after the removal of his life support. Without seeing the hospital records, from what is reported in the jail records it seems likely that APB died on July 2 or July 3, 2023.   I have not seen the medical records that report time of death or cause of death.  The MJC medical record

---

[23] Prescribed Lasix and compression stockings are not appropriate treatments for what appears to have been an infection.

print out reports that APB was released from custody on 7/4/2023.  I am unable to state unequivocally that he died before or after he was released from custody.

I observe the following departures from the Implementation Plan:

1)  The medical record is incomplete.  The EMR needs to report assessments made by offsite physicians.
2) The Quality assurance process is flawed. Following the patient's demise, the EMR cannot be viewed.  The death review required by California within 30 days of a patient's demise cannot be properly performed if the entire record is not available for review.
3) There was no medical intake for this patient, and thus no opportunity for early medical intervention to treat the weeping leg wound that likely deteriorated to cause  his death.
4) The RN sick call did not sufficiently and properly assess the patient wound and did not document the consultation needed for appropriate medical treatment.
5) The care provided by the NP was not in accord with community standard and Wellpath policies that call for physician collaboration to evaluate and treat difficult cases.   A wound described as swollen (edema), red,  painful and weeping must be regarded as infected until proven otherwise.  Yet, the NP did not perform tests to determine extent of infection, such as culture, CBC, or repeat evaluations after treatment.  The NP diagnosis of "probable venous stasis ulcer" did not exclude possible cellulitis or osteomyelitis – both conditions potentially fatal if not treated with antibiotics. The NP should have conferred with her collaborating physician and medical director.
6) APB suffered with serious chronic diseases.  His chronic alcoholism put him at substantial risk for liver failure and infections.  Accordingly, he should have seen a PCP for full examination and assessment within 7 days of booking. This did not occur.

In my analysis of this matter, I find the following generic lapses that have been observed in the care provided to other patients at MCJ:

1) Insufficient access to care.
2) Insufficient consultation with PCP
3) Insufficient supervision of RNs, NPs and PAs
4) Incomplete medical records
5) Delayed or absence of attention altogether for chronic diseases, including substance use disorders.

I have not seen a review by Wellpath regarding this death. Monterey CA/Wellpath Policies state that "[d]eath occurring after release from custody and proximate to care (which may have a relationship to continuity of care) may have a mortality review performed on a case-by-case basis.  It is uncertain whether APB was in custody at the time of his death.  It is not disputed that his death occurred proximate to the care he was receiving at MCJ.

**MPM** ████████  -  DOD 5/22/23 -This patient was 64 years old when he died.

5/22/23 - 0332 -At intake  he reportedly had difficulty walking.  There was no referral to assess the reason for this abnormal condition.  He was sent to the general population housing.

5/22/23- 0335-  Custody reports that the patient was acting bizarrely and complained of a "bad leg."

5/22/23 - 0337 – The nurse progress note reported that the patient was complaining of a stomachache, for which he refused TUMS.  The documented exam was limited to "bowel sounds positive in all 4 quadrants." There was no contact with medical provider, and no referral to medical provider.

5/22/23 -1614 – The mental health assessment reported that Mr. ████████ was delusional, and hallucinating. No referral to a physician or PCP was made.

5/23/23 – 2300 The nurse called by custody described finding Mr. ████████ to not be breathing.  The presence or absence of a pulse at that time was not reported.  The time patient was noted to have collapsed was not stated.  When CPR was started at 2301 the patient's pulse was not detected.  No Narcan was administered. Paramedics determined the patient deceased "around 2323."

**The autopsy report, dated July 26, 2023 certified this death was caused by "toxic effects of methamphetamine."  Hypertension was a contributing condition but not the underlying cause of death.**

I find the following departures from the Implementation Plan:

1.  The patient appears to have not been assessed at Intake in accord with the Implementation Plan.  The finding of difficulty in ambulation is a key indicator of intoxication (opiate or mixed) or other acute illness (brain infection, stroke, brain tumor) that demands immediate evaluation by qualified medical personnel.  Opiates, amphetamines, and other substances ingested or hidden in orifices (such as in the rectum) could manifest similar symptoms before fatal effects arose from full absorption into the blood stream.   There was no inquiry or

referral to the on-call PCP.   This patient should have been cleared by NMC ER before admission to the jail.

2. The bizarre behavior documented by custody at 0335 along with claimed injury/pain in leg required prompt medical evaluation. Custody should have referred the patient for clinical examination to rule out delirium from toxic substances or other illnesses. The autopsy revealed that indeed this patient was under the influence of a toxic methamphetamine dose that led to his death.

3. The 0337 nurse's sick call note was inadequate and did not comply with the Implementation Plan. The finding of normal bowel sounds was not reassuring[24]. The patient's abdominal pain was consistent with alcohol withdrawal. In an elderly patient with a history of substance abuse, such pain could have also been caused by angina or a heart attack. The symptoms of stomach discomfort, vomiting and nausea caused by withdrawal may be followed by disorientation, hallucinations, seizures, and death. Mental health documented confusion and hallucinations about 12 hours later, and the patient was found dead not long after that.  The sick call nurse assessing this patient's abdominal pain should have obtained immediate PCP evaluation on site or in the hospital.

4. The alarming mental health note at 4:14 pm described confusion and visual hallucinations that required immediate medical evaluation and treatment.

5. The EMR notes on and around 2300 did not document an immediate assessment of breathing and pulse to determine the need for CPR or AED which must be provided immediately for best effect.

6. Narcan was not administered.

**JPG** ███████ - DOD 6/9/23.  This patient was 47 years old when he died.  He was booked on 6/9/23 at approximately 1:54 PM with no apparent history of medical or mental health issues.  He reported use of methamphetamine in the past but no current SUD.  He was described as disheveled. His vital signs recorded at 1:56 pm were abnormal with a pulse of 117.[25]  This pulse rate was not repeated and not reported to PCP.

**The autopsy report issued on or about July 20, 2023 certified the cause of death as suicide by hanging.  Significant medical findings included toxic levels of methamphetamine and evidence of alcohol ingestion before booking.**

The autopsy report described a video surveillance following his booking on 6/9/23 at 1129.  The recording starting at 1359 showed JPG in a holding cell, repeatedly wrapping a wall mounted payphone around his neck. The video shows JPG collapsing, unresponsive after wrapping the phone cord around his neck on or around 1407.  The

---

[24] Nursing and medical staff should be trained to appreciate that the finding of normal bowel sounds does not exclude significant disease.

[25]The exact same set of vital signs reiterated in the medical record at 4:44 pm does not look like a new reading .

surveillance footage shows custody discovering JPG unresponsive in the holding cell at 1509.

I find the following departures from the Implementation Plan:

1) Abnormal vital signs noted at Intake were not repeated.
2) JPG should have been enrolled in a program for methamphetamine withdrawal, where he could be monitored for extreme depression.
3) Because JPG was intoxicated (as evidenced by his appearance and abnormal vital signs) he should have been placed in an observation cell, where protocols would have required medical evaluation.
4) MCJ staff should have referred JPG for immediate psychiatric evaluation and hospitalization for his suicidal ideation and gestures that were being recorded on video.
5) JPG should have been on suicide watch.
6) MCJ staff should have intervened at 1407 to prevent JPG death.

**MAM** ███████ - DOD 1/4/23.  This patient was 26 years old when he died.  He had been abusing methamphetamines prior to his recent  MCJ booking on January 3, 2023.  Abnormal vital signs (pulse 124) were noted at intake around 11:52 AM.   In accord with the Implementation Plan, the on-call PCP was  contacted, medications ordered, and patient was placed on synthetics monitoring protocol.  Mental Health staff, when visiting the patient some hours before his death, documented bizarre behavior and questionable suicidal ideation but did not order a suicide watch.[26]

On 1/4/23 at 12:06 AM, the nurse recorded vital signs as blood pressure 124/70 and pulse 79.  At 7:28 PM custody responded to yelling from housing units and found the patient hanging for the top corner of his bunk, pulseless and not breathing.  CPR was begun immediately.  Narcan was administered at 7:37 PM. Paramedics took over CPR at approximately 7:41 PM.  The patient was pronounced dead at approximately 7:58 PM.

**The autopsy report issued March 15, 2023 declared the cause of death to be suicide by hanging.  Associated conditions noted were methamphetamine and amphetamine toxicity.**

Medical care appears to have been in substantial compliance with the IP requirement for treating patients with cocaine, methamphetamine & designer drugs. The on-call PCP was contacted for orders and the patient was observed by medical personnel.  Although

---

[26] The autopsy report comments that "[w]withdrawal from amphetamine following abuse can result in extreme fatigue and uncontrollable sleepiness, agitation and depression."  I defer to the Mental Health expert monitor assessment of care provided to this patient by MCJ Mental Health services.

MCJ staff was late in checking the patient's second set of vital signs, the vital signs were checked about 6 hours later were normal.

The death review I saw for this case was not complete insofar as it made no mention of the autopsy results.  Moreover, the death review was performed more than 60 days after the death.  Thus, MCJ was not in substantial compliance with Wellpath policies and procedures, citing state law 15 CCR 1046, that requires MCJ to "conduct [within 30 days] a thorough review of all deaths in custody to verify best practices."

**JSH** ███████ DOD 4/7/23 – This patient was 39 when he died.  Intake noted on February 16, 2023 that he was morbidly obese (weight over 300 lbs) and that he had a history of hypertension, heart disease, opioid abuse, methamphetamine abuse, and seizures.  The patient requested a CPAP machine on 3/23/23 stating that he was using one in prison before being transferred to MCJ.  The patient was told by PA examining him by telehealth on 3/28/23 that a copy of his old sleep studies was needed before a CPAP machine could be provided to him.  The PA also requested in his note that the patient be weighed by nurse and height measured to obtain an accurate BMI, and that his neck circumference be measured. At this time patient was being treated for bipolar disorder by MH with medications for depression including divalproex, sertraline, prazosin, and hydroxyzine.

On 4/7/23 at approximately 1:20 pm custody found the patient unresponsive, laying on his left side, "face turning blue as he began to throw up."  At 1:25 custody called for medical staff. At this time custody checked for pulse on neck and wrist and found none. CPR was started at approximately 1:26. The first nurse on the scene reported the patients eye had pinpoint pupils.   CPR was continued by paramedics and transported to the hospital around 1:50 PM.  The patient was pronounced dead at the hospital around 4:28 pm.

Investigators at MCJ identified an inmate who described this patient as having accessed illicit drugs diverted by others, including valium and fentanyl.

**The autopsy report issued June 1, 2023 reported death caused by cardiac arrhythmia and subsequent multiple organ failure after resuscitation. Toxicology studies showed JSH had ingested illicit drugs (fentanyl, alprazolam and bromazolam) and prescribed medications (valproic acid, sertraline and hydroxyzine) that had a combined effect that may have contributed to this death.**

Based upon my review of the medical record and MCJ incident reports, it seems that care for this patient was not in substantial compliance with the implementation plan.

1) The patient's extensive and complicated medical history made him eligible for immediate medical attention and chronic care visits.  This did not happen. Instead, he saw a PA by telehealth exam about a month after intake. At that time the PA should have conferred with his physician supervisor.

2) The PA assessment was incomplete.  He was unable to obtain the patient height and document neck size.  But these were not important details within the context of the patient's obvious risk for sleep apnea with a weight over 300 pounds, and history of hypertension.  The PA should have assumed the patient needed to be using the CPAP machine in same manner as he was in prison and not be waiting an indefinite time for old records and height, and neck measurements.

3) Just as MCJ is obliged to verify and continue essential medications prescribed before admission to the jail, it is also equally important for MCJ to continue essential durable equipment such as CPAP.  If there is a question about how to use the CPAP machine pending old records, the PA should have conferred with his supervisor or other Wellpath physicians.

4) The history of opiate abuse, ongoing prescriptions of sedating medications by psychiatry and seizure history substantially increased the patient's risk of death from sleep apnea.  The management of this case was beyond the scope of a PA absent specialty training for the treatment of sleep disorders.  A care plan should have been developed by the medical director in collaboration with the patient's psychiatrist.

5) That the first nurse on scene noted the patient had pinpoint pupils strongly suggests that the patient was unresponsive because of fentanyl.  Narcan should have been administered immediately.  That the patient was observed to be vomiting when found unresponsive means he was alive when discovered and might have been resuscitated with a dose of Narcan.

6) The failure to administer Narcan by either nasal or IM route is a departure from the standards of care required by the Implementation Plan and a breach of the community standards.[27]

7) Narcan IM or subcutaneously is more effective than nasal Narcan.  The custody officers are only able to administer nasal Narcan.

## OTHER DEATHS

In my last report I reviewed the death of **DJS (**████████  DJS, age 29, who died on 11/12/22 from causes uncertain.  **The autopsy report filed on January 31, 2023 reported the cause of death as acute water intoxication from psychogenic**

---

[27] As best I can discern from the medical records and interviews with staff, custody was unable to administer Narcan because the nasal passages were blocked by vomit.  The Nurse was preparing to administer Narcan by injection but did not do so as the paramedics arrived.  After many minutes of CPR Narcan would have been of virtually no use.

**polydipsia associated with schizophrenia.**  I augment my prior review considering these findings.

I find the following departures from care required by the Implementation Plan:

1) At the time he was booked on April 30, 2022, the intake nurse documented an abnormally elevated pulse of 111 which required notification of the PCP on call. The  PCP was not contacted to discuss significant abnormal vital signs at intake.
2) DJS history of homelessness, and substance abuse (methamphetamines, heroin)  meet the definition for chronic disease. He should have been scheduled for Chronic Care visit within  the week after his intake.  DJS was not referred for any medical or mental health services when booked into MCJ on 4/30/22.
3) DJS did not undergo an Initial Health History and Physical Exam. Within 2 weeks of his admission to MCJ Mr. ▇▇▇▇ should have been assessed with history and exam to determine his need for further medical care. At this time, it would have been appropriate to screen for HIV, Hepatitis, TB test, and sexually transmitted disease. This was not done.
4) Nursing assessed DJS on 10/20/22 following an altercation involving a stabbing as having "no abdominal, flank swelling to indicate internal bleeding and injury."  A follow up PCP exam was called for to ensure patient had not suffered any serious injury following the altercation.
5) The medical record does not document psychiatric evaluation of DJS and/or treatment of his diagnosed schizophrenia from his intake in April 2022, or in prior intakes, and even until his death.
6) This patient  succumbed to the effects of metabolic derangement caused by polydipsia.   Medical services deployed in coordination with Mental Health would have reduced the risk of his demise.

## NOTABLE CASES

I list here the cases that I feel call for additional attention and consideration when MCJ and Wellpath develop corrective actions plans.

**APB** ▇▇▇▇▇▇ **–** Death occurred from sepsis, following transfer from jail to hospital. While in jail, the patient's serious skin infection was inadequately treated and not brought to the attention of the medical director (who is an infectious disease expert). See further details above reported in PATIENT DEATHS.

▇▇▇▇▇▇▇ – 58 year old male who required hospitalization because of delayed treatment for hypothyroidism

████████ – 21-year-old with signs of chronic illness or malnutrition housed in MCJ since 3/11/22 was not screened for STD or TB, and not evaluated for medical and/or psychiatric causes of very low weight.

████████ – 54-year-old female was described on exam as having recent deteriorated visual acuity to 20/200, which is deemed "legally blind." She was not provided with urgent eye exam.  A physician assistant on telehealth visit prescribed a drug to treat cosmetic problem of fungal nails that put her at risk for liver failure.[28]

████████ – 21-year-old female housed intermittently at MCJ since 2/12/23 had a pituitary adenoma (brain tumor that can cause blindness if not treated) that was treated with medications outside of the jail, but not while incarcerated.

████████ – 34-year-old male  HIV positive with polysubstance abuse, schizoaffective disorder was returned to MCJ from hospital with instructions to evaluate for infection and renal failure.  The patient should have been seen by an infectious disease specialist to treat HIV and complicating conditions but is not referred by staff to the onsite medical director who has that expertise.  Upon release, this patient was so deteriorated as to need immediate hospitalization.

████████ – 21-year-old male had a seizure a few weeks after he refuses to allow measurement of his anti-seizure medication blood levels. In contravention of the Implementation Plan requirements regarding noncompliance counseling, there was no documented discussion by PCP or effort to obtain blood level tests.

████████ – 31-year-old male with chronic polysubstance abuse, including benzodiazepine was placed on CIWA and COWS protocols without documented PCP consultation.  The patient did not have a face to face chronic care examination by PCP within the time frame (3 days) required by IP.

**MPM** ████████ – 64-year-old male with substance abuse history died May 2023 after receiving no  attention or medical therapy for overt symptoms of delirium (elevated pulse, weakness, stomach upset, visual hallucinations).  Resuscitative efforts did  not include Narcan. See additional details above in Patient Deaths.

**JSH** ████████ - 39-year-old male, morbidly obese with history of hypertension, substance abuse and obstructive sleep apnea was admitted to MCJ on 2/16/23.  On

---

[28]  The IP forbids "elective" (i.e. non-essential) procedures such as treatment of cosmetic defects.  See III A. Health Care Philosophy. "Elective procedures shall not be performed unless… postponement of such procedures would adversely affect the immediate health and safety of the inmate." In this case, there was no documented risk in postponing treatment of fungal toe nail.  Moreover, the treatment put the patient at risk of grave harm.

3/28/23 a physician assistant seeing the patient by telehealth visit, and not in consultation with his physician supervisor, denied this patient access to CPAP machine at MCJ.  The patient had reported he used a CPAP machine at the prison before transferring to jail. On 4/7/23 this patient was found on the ground, vomiting and dusky. He received no Narcan.  Vomitus obstructed his airway.  Custody had nasal Narcan. Custody did not have injectable Narcan.  The nurse arriving about 5 minutes into CPR did not administer injectable Narcan. The patient died.

▮▮▮▮▮▮▮▮▮▮ – 54-year-old male on medications for hypertension and cardiomyopathy complained of chest pain and dizziness on 6/8/23 at 9 am.  He was not seen for face-to-face examination by PCP.  Patient was seen by RN in response to custody call at 4:50 PM.  The patient complained of difficulty breathing.  BP and pulse were elevated.  After telephonic consultation with PCP the patient was sent to the hospital ER.  The patient was returned to the jail with a diagnosis of non cardiac chest pain.

▮▮▮▮▮▮▮▮▮▮ – This patient is known to be HIV positive.  Blood tests at MCJ detect substantial virus in  his bloodstream.  The patient is housed currently in MCJ.  His last chronic care visit with the medical director was on 2/24/23, at which time further workup to determine the need for HIV treatment was ordered.  There has been no follow up for treatment of HIV, and he is not receiving anti-HIV medications.

## PATIENT INTERVIEWS

The patients speaking to me at this audit visit (4 females and 4 males) reported modest delays in obtaining access to primary care and specialty services.

Female Patients: ▮▮▮▮▮▮▮▮▮claimed she could not see a PCP, and that the telehealth services were not helpful. ▮▮▮▮▮▮▮▮▮ had no complaints about access to care. ▮▮▮▮▮▮▮▮reported waiting more than 3 weeks primary care services.,  She felt that specialty care to remove her IUD removal was delayed. ▮▮▮▮▮▮▮▮reported waiting 2 weeks to be seen for ear wax removal.

Male Patients: ▮▮▮▮▮▮▮▮reported that his access to medical care took a few weeks. ▮▮▮▮▮▮▮▮ claimed he had not been provided with an eye patch, or treatment for pain related to a serious facial injury. ▮▮▮▮▮▮▮▮claimed he had not been provided with a cream he needed for a skin rash. ▮▮▮▮▮▮▮stated access to medical care was taking a month.

I reviewed the medical records for these patients. The care provided appears to be substantially compliant with the Implementation Plan.

//

## STAFF INTERVIEWS -

I spoke with the following staff:

Dr. ████████, Medical Director; ████████ Health Service Administrator; ████████ MCJ, Wellpath Implementation Specialist ; ████████ RN, Nursing Consultant . (Director of Nurses ████████ was unavailable); ████████ MBA, Regional Director of Operations.

Interviewed staff did not dispute my preliminary findings and stated that recently hired staff and enhanced supervision will improve compliance with the Implementation Plan.

At the exit interview on June 8, 2023  I discussed my preliminary findings with attendees from the Sheriff's office and Wellpath.

Concerns discussed at the exit interview and afterwards included the following:

1. Access to care is often delayed.  Patients requesting nurse and/or PCP care should be triaged within 24 hours and seen within a few days or as indicated by the complaint.
2. MCJ patients are not being screened for latent TB and STD in accordance with community standards.  The newly hired medical director agreed to bring MCJ protocols in line with CDC guidelines.
3. Intoxicated patients, and patients demonstrating signs of withdrawal need appropriate immediate attention and chronic care.
4. Patients in sobering cells at times are not monitored as often as called for by the Implementation Plan.  Wellpath leadership will investigate this.
5. Patients housed in the infirmary need to be periodically assessed.
6. Narcan was not being deployed optimally.  In one case Narcan appeared to have not been used at all, where it might have been effective in resuscitation.  Custody is not authorized to administer Narcan by injection.  .
7. Primary Care staffing does not appear sufficient to satisfy the need for sick call and chronic care.
8. Quality assurance processes do not appear to meet the requirements in the Implementation Plan. I have requested quality management meeting minutes, peer review documents, death reviews and evidence of updated standardized procedures.
9. Continuity of care should be ensured for released patients. The Implementation Plan requires the provision of up to 30-day supply of essential medications or access to these medications by prescription, along with instructions for follow up

by healthcare providers outside of jail.  This service is not consistently performed or documented.  MCJ medical staff should document communications with the physicians at other correctional facilities who receive MCJ patients who have complicated clinical conditions.

## PLAINTIFFS' ATTORNEY INQUIRIES

Plaintiff attorneys raised concerns regarding following matters:

| Plaintiffs' expressed concerns | Expert Medical Monitor Response |
|---|---|
| 2023 In custody deaths. | A remarkable common feature is the abuse of methamphetamine by 3 out of 5 deaths in 2023, and other substance abuse in the other 2 deaths. I am recommending better adherence by MCJ to the IP provisions for monitoring patients with substance abuse, and treating such patients as needing chronic disease management. |
| Medical Care Staff | The nursing staff appears sufficient in number but needs more supervision.  The newly hired Director of Nurses, ▮▮▮▮▮▮▮ has just begun her job. Likewise, the newly hired Medical Director  is beginning to implement changes in protocols to better comply with the Implementation Plan and applicable community standards. |
| Custody staffing | Custody appears to be working on ensuring adequate custody escorts. |
| Individual Patient Concerns | MCJ leadership has not disputed my assertions that MCJ departs from the standards put forth in the Implementation Plan.  I am asking for corrective action plans. |
| What is the progress made on issues identified din March 2023 mentoring visit. | 1) Pharmaceutical administration is dramatically improved.  A new pharmacy contract has been established. 2) Nursing protocols are not updated.  I understand this project is underway. 3) Death reviews are not being completed timely.  See recommendations. 4) Patients in sobering cells require monitoring in manner prescribed by the IP. See recommendations. 5) Sick call encounters should be provided to patients housed in the infirmary every week |

|  | or more often and should be documented in the progress note. See recommendations |
|---|---|

## RECOMMENDATIONS:

| Deficiency | Expert's Recommendation |
|---|---|
| **Intake processes did not comply with the IP.**  Nurses did not consistently obtain blood sugar reading on intake, did not document extent of substance abuse, did not verify and/or act upon abnormal vital signs up and/or consistently contact PCP for consultation when needed for acute problems or unstable chronic conditions. | All nurses, and especially those performing intake, should be trained to properly use COR EMR forms with attention to pertinent findings, vital signs, and protocols. **Abnormal vital signs should be repeated, and reported to the PCP on call if the findings remain seriously abnormal**.  Forms should be used as required. Blood sugars should be obtained when indicated. |
| **Patients did not consistently have timely access to necessary care**.  Patient requests for services were not documented in the EMR. Requests made through grievance were not treated as requests for service. Sick call nurses did not always follow standardized procedures.  PA and NP (physician extenders) did not consistently confer with supervising and collaboration physician for advice on challenging patients. | MCJ leadership should keep a log counting the weekly requests for services to compare with the number of face-to-face encounters (Sick calls.   Grievances complaining about insufficient access to care should be timely reviewed by medical leadership to assure that patients' reasonable concerns have been addressed.   In service training should familiarize nurses with current best practices and standardized procedures. |
| **Patients with unusual infections, hard-to-treat substance abuse, and other complex matters were managed by mid-levels (PA, NP) and RNs without input from the medical director. MAT programs using buprenorphine have not been fully implemented.** | There should be brief daily "huddles" to bring any difficult matters to the attention of the medical and nursing directors.  There should be weekly staff meetings to review challenging cases and provide continuing medical education.  RN, PA, and NP should obtain input from the medical director – who is board certified in the treatment of substance abuse and infectious diseases. |
| **Chronic care and health care maintenance did not consistently comply with the Implementation** | **Patients abusing substances should be scheduled as "chronic care" patients**.  PCP should verify completeness and accuracy of the |

| | |
|---|---|
| **Plan.** Problem lists were not up to date. Patients with long standing drug abuse diagnoses are not treated as having a chronic disease, and thus did not always receive needed attention from PCP after booking.  The MH team and medical providers are not collaborating to develop a treatment plan for patients with comorbid medical and mental health diseases.  Direct ophthalmoscopy has not been performed on site, even when visual acuity is very poor and for diabetics. | Problem list at every visit. Current recommendations by CDC and United States Preventative Services Task Force (USPSTF) should be incorporated (as practicable) into the chronic care and health maintenance protocols. MH and medical teams should meet weekly to discuss the most challenging patients and develop multi-disciplinary treatment plans. Patients with diabetes or visual complaints should have a direct ophthalmoscopic exam and Snellen visual acuity check on site, and be scheduled to see optometry according to the findings. Patients with vision worse than 20/200 may be "legally blind" and candidates for ADA accommodations. |
| Documentation of care for released patients **(continuity of care) did not meet Implementation Plan requirements or applicable community standards.** | Discharge planning should be a distinct component of care provided to patients at MCJ to ensure documentation confirming that patients receive a supply of necessary medications upon release along with clear instructions for follow up care. I will be looking for improved compliance with the IP following the hiring of personnel who can assist in discharge planning. |
| **Care for patients unstable at booking,  intoxicated or at risk for withdrawal was not consistently provided in accord with the Implementation Plan.** Patients sent to sobering cells are not automatically seen by qualified health personnel to assess possible delirium or other alarming conditions that might be best treated in the hospital. | Protocols for evaluation and treatment of acutely intoxicated should be updated to include assessment by nurse or PCP for delirium.  Admission to sobering cell should require entry into the EMR of a Sick Call note by nurse or PCP. Patient with persistently abnormal vital signs or in  unstable condition should be seen by a PCP or sent to the hospital. I recommend that rounds be made (and documented in the EMR) for patients housed in reception area and infirmary cells. |
| **Patients are not consistently assessed for TB and other infections in accord with best practices and community standards.** QuantiFERON testing is not timely provided for patients with history of BCG or positive skin tests. | Protocols for treatment of TB, HIV, HCV and STD should be updated to reflect current CDC recommendations in line with NCCHC guidelines and common practice at other California jails and prisons. CDC recommends testing within 2 weeks of admission for HIV, Hepatitis C, Hepatitis B and STD.  Patients with history of BCG vaccination and past positive |

|  | skin tests should have QuantiFERON tests as primary means of TB screening. |
|---|---|
| **Necessary outside specialty care was not consistently provided in timely fashion**.  Written reports from outside providers were not consistently available in the EMR. PCP review and follow up on visits to outside care was not consistently documented | Wellpath leadership should assist MCJ staff to obtain timely expert care by telephone or video link if local resources are insufficient. The medical record department should track all referrals to ensure that reports from specialists are promptly filed in the EMR. The return from outside services should automatically generate MD or RN sick call.  The IP staffing plan calls for a full time "medical record supervisor" who could assist in obtaining documentation from outside care. |
| **Quality assurance programs were not performed in accord Wellpath policies and the Implementation Plan.**  .  The QA minutes did not demonstrate corrective actions in response to medical monitor observations. I have not seen any pharmacy and therapeutic committee minutes.  Death reviews were not performed timely. Opportunities for improved care were not consistently described in death reviews. Peer review has not been documented. | Quarterly Quality Management Meetings minutes should document discussion of  death reviews, recommendations made by the experts, and peer review.  Peer review should include evaluation of clinical performance within the first month of hire and no less than annually thereafter.   The medical director or assignee should audit and countersign  5- 10% of the patient encounters with physician assistants, nurse practitioners and registered nurses. .  Monthly QA meetings should review adverse events, hospitalizations, and progress made regarding recommendations from the monitors. The care provided to the most recently deceased patient should be reviewed pursuant to Wellpath/MCJ policies. |
| **Staffing was insufficient to provide services in accord with the Implementation Plan.** | I will report on improvements arising from the appointment of a full-time Medical Director, Director of Nurses, and discharge planner.  I recommend hiring a Medical Records Supervisor. . |

## CONCLUSION

I found medical services at MCJ were not substantially compliant with the Implementation Plan.  I describe above examples of serious departures from the

required standards put forth by the Implementation Plan.  I recommend that MCJ staff prioritize implementation of the following recommendations:

1. Standardize management of patients with latent TB infection suggested by positive skin test (PPD) results.
2. Offer patients screening for HIV, HCV, Hepatitis B and STD within 2 weeks of intake.
3. Facilitate sick call visits.  Maintain a log to record time from requested service until a needed face to face visit is provided.
4. Grievances should be reviewed daily by nursing supervisor(s) to identify requests for services that merit a sick call visit.  The Medical Director or Wellpath designee should review the grievances submitted each week to ensure and expedite necessary care.
5. Implement peer review to monitor proper use of forms, compliance with protocols, consistent attention to indicia of delirium,  and appropriate collaboration with supervising medical staff at Intake and afterwards. All substantially abnormal vital signs must be repeated to validate accuracy.  All persistently abnormal vital signs must be reported immediately to the on-call PCP.
6. Contact the on-call PCP for orders to treat acutely intoxicated or withdrawing patients.  Refer patients with history of chronic substance abuse for chronic care.
7. Engage the medical director in the care of MCJ patients at highest risk of harm and in greatest needs of specialized skills. [29]
8. Wellpath should assist the medical director in the care and monitoring of  patients with the following conditions:
   a. HIV positive
   b. Hepatitis B or C
   c. Syphilis
   d. Patients referred to specialists.
   e. Patients sent to hospital
   f. Patients seeking MAT for substance abuse
   g. Patients with unresolved grievances.
9. Include in monthly document production to  the medical monitor copies of Quality Management Meetings, Peer Reviews, Death Reviews, and actions taken on patient grievances.

---

[29] MCJ'S current medical director is board-certified in general internal medicine, infectious diseases, and addiction.

## Attachments:

Ex. A:  MCJ HC Case Review

Ex. B:  MCJ HC Audit Monitoring Tool