MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
VAN SWEARINGEN – 259809
CAROLINE E. JACKSON – 329980
MAYA E. CAMPBELL – 345180
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:    mbien@rbgg.com
         egalvan@rbgg.com
         vswearingen@rbgg.com
         cjackson@rbgg.com
         mcampbell@rbgg.com

CORENE KENDRICK – 226642
KYLE VIRGIEN – 278747
ACLU NATIONAL PRISON PROJECT
425 California St., Ste. 700
San Francisco, CA 94104
Telephone:    (202) 393-4930
Facsimile:    (202) 393-4931
Email:    ckendrick@aclu.org
         kvirgien@aclu.org

AVRAM D. FREY
(*admitted pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (415) 621-2493
Facsimile:    (415) 255-8437
Email:    afrey@aclunc.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED., a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 5:13-cv-02354-BLF<br><br>REDACTED EXHIBIT B TO NOTICE OF FILING MEDICAL AND MENTAL HEALTH NEUTRAL MONITOR REPORTS<br><br>Judge:   Beth Labson Freeman |

## Monterey County Jail Mental Health Monitor's Final Report
## For November 6 – 8, 2023 Site Visit
## James Vess, Ph.D.

**Overview**

A site visit was conducted in person from November 6 – 8, 2023 at the Monterey County Jail (MCJ) for the eleventh mental health monitoring tour.  The site visit included both monitoring and mentoring activities.  In attendance for this tour were Drs. Nicole Taylor and Josephine Shaar of Wellpath. Also participating in this tour were ███████████, Mental Health Supervisor, and Compliance Commander ██████████.  Entrance and exit interviews were conducted, which were attended by various Wellpath and Custody staff, as well as County, Wellpath, and Plaintiff's attorneys.

This report is based upon interviews with institutional staff and inmates as well as discussions with the attorneys for the defendants and plaintiffs and other Wellpath representatives, in addition to healthcare record reviews, documentation provided by Wellpath, MCJ and the County, and direct observations of various parts of the jail facility.  The report specifically addresses the jail's status and progress toward compliance with the United States District Court Northern District of California Settlement Agreement and the Implementation Plans between Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County Sheriff's Office; California Forensic Medical Group, Inc (CFMG) et al.

Three aspects of the current report differ from previous mental health monitoring reports.  One is the use of Partial Compliance to provide a rating for the various requirements subject to monitoring.  This type of rating has been used in the monitoring of other jail systems, and I believe it provides useful information regarding compliance status beyond the dichotomy of Substantial Compliance vs. Noncompliance.  An attempt has been made to use compliance ratings in a manner consistent with other relevant work in this field.  Based on consultation with Monitors in other cases and review of various monitoring reports issued in other jurisdictions (cited below), the following definitions were identified:

Substantial Compliance, as set forth in the Settlement Agreement for this case, "shall mean adherence to the requirements of the Settlement Agreement and the Implementation Plans in all material respects, recognizing that 100% compliance is not required.  Non-systematic deviations from the requirements of the Settlement Agreement and the Implementation Plans shall not prevent a finding of substantial compliance, provided that the Defendants demonstrate that they have (a) implemented a system for tracking compliance, where appropriate and practical, and for taking corrective measures in response to instances of non-compliance, and (b) that Defendants have instituted policies, procedures, practices, and resources that are capable of durable and sustained compliance." [Dkt. 494 at ECF 10].

This definition of Substantial Compliance is slightly more detailed than that used in other Monitors' reports reviewed, which typically define substantial compliance to indicate compliance with all or most components of the components of a particular provision, with one adding that no significant work remains to accomplish the goal of that provision (Murray v. County of Santa Barbara, Case No. 2:17-cv-08805).

Partial Compliance, as defined in other reports reviewed, typically indicates that the responsible party has achieved compliance on some, but not all, of the material components of the relevant provision of the Agreement (e.g., U.S. v. County of Los Angeles, et al., CV No. 1505903 DDP).  Other Monitors have noted Partial Compliance to indicate compliance with

some of the components of the relevant provision of the Remedial Plan, and work remains to reach Substantial Compliance (e.g., Murry v. County of Santa Barbara). Other reports define partial compliance as meaning that the defendant has made notable progress in achieving compliance with the key components of the provision, but substantial work remains (U.S. vs City of Meridian, et al., C.A. No. 3:13-CV-978), or that the defendant has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance (Remick et al. vs. City of Philadelphia, U.S. District Court for the Eastern District of Pennsylvania, No.: 2:20-cv-01959-BMS).

Non-Compliance has typically been defined as indicating that the responsible party has not met most or all components of the relevant provision, sometimes adding that the defendant has made no notable progress in achieving compliance on any of the key components of the provision (e.g., U.S. vs. City of Meridian et al.), or that work remains to reach Partial Compliance (Murry v. County of Santa Barbara).

In reaching a determination of Partial Compliance in the current monitoring report, consideration was given to the various aspects of compliance identified by other Monitors, including indications of progress, observed compliance with some but not all of the components of a given requirement, the proportion of cases reviewed that demonstrated compliance with some or all of the components of a requirement, and the severity or risk involved in instances of failure to meet the various components of a requirement. By considering these various factors, I did not utilize a strict cut-off percentage for the number of compliant vs. not compliant cases to determine compliance ratings. For some requirements, such as Medical Records, where there are multiple required elements listed, partial compliance may reflect failure to reach substantial compliance with only a subset of those elements (e.g. individual treatment plans) while all or almost all cases reviewed contained the other required elements. For other requirements, such as those involving welfare checks, even a small number of failures to meet compliance standards can result in a rating of Partial Compliance due to the high risk for adverse outcomes.

A second new aspect of the current monitoring report is the inclusion of a comprehensive table showing the compliance status of all requirements under review. This is intended to provide a more convenient and effective way to visualize the compliance status of the many requirements, and to see how the compliance status has changed, or not, over time. This table shows the compliance status across all requirements for the last four monitoring reports, starting with the prior Mental Health Monitor's final report from May 2021.

The third aspect of the current report that differs from prior reports is the inclusion of findings specific to the Court's 9/26/23 Order Granting Plaintiffs' Motion to Enforce the Settlement Agreement (Dkt. No. 838). This Court Order organizes and numbers the mental health requirements in a somewhat different fashion than has been used in the monitoring reports. To facilitate a clear understanding of the compliance status for the requirements addressed in the Motion to Enforce, this information is organized to correspond to the numbering of the requirements in the Court Order, and appears as an appendix at the end of the this report.

The following table presents the compliance status of the various requirements. Letters identifying each requirement corresponds to letters listed in the body of the report under the major requirement sections, which are numbered. Ratings consist of SC for Substantial Compliance, NC for Noncompliance, and PC for Partial Compliance. Some ratings have at times been deferred, some released from monitoring, and in two instances were not rated. Two requirements previously released from monitoring have been reinstated for this report.

| 1. Intake Screening | May 2021 | July 2022 | May 2023 | Nov. 2023 |
|---|---|---|---|---|
| a. | SC | SC | SC | Released |
| b. | SC | SC | SC | Released |
| c. | SC | SC | SC | Released |
| d. | SC | SC | SC | Released |
| e. | SC | SC | NC | NC |
| f. | SC | SC | NC | NC |
| g. | SC | SC | NC | NC |
| h. | Not Rated | NC | NC | NC |
| 2. Mental Health Screen | | | | |
| a. | NC | Deferred | NC | NC |
| b. | NC | NC | NC | PC |
| 3. Sick Call | | | | |
| a. | SC | SC | SC | Released |
| b. | SC | SC | SC | Released |
| c. | SC | SC | SC | Released |
| d. | NC | SC | NC | NC |
| e. | NC | NC | NC | NC |
| 4. Chronic Care | | | | |
| a. | NC | NC | NC | NC |
| b. | NC | NC | NC | PC |
| 5. Acute Care | | | | |
| a. | NC | NC | NC | NC |
| b. | NC | NC | NC | SC |
| 6. Outpatient Services | | | | |
| a. | NC | NC | NC | PC |
| b. | NC | NC | NC | PC |
| 7. Safety & Sobering Cells | | | | |
| a. | SC | SC | SC | Released |
| b. | Deferred | Deferred | NC | Not Rated |
| c. | SC | Deferred | Deferred | PC |
| d. | Deferred | SC | SC | SC |
| e. | SC | Deferred | SC | SC |
| f. | SC | Deferred | SC | SC |
| g. | Deferred | NC | NC | NC |
| h. | Deferred | SC | Released | Released |
| i. | NC | SC | SC | SC |
| j. | NC | Deferred | SC | NC |
| 8. Medication Continuity | | | | |
| a. | SC | SC | Released | PC |
| b. | SC | SC | Released | PC |
| c. | NC | NC | NC | PC |
| 9. Discharge | | | | |
| a. | SC | SC | Released | Released |
| b. | SC | Released | Released | Released |

| 10. Involuntary Medication | | | | |
|---|---|---|---|---|
| a. | NC | SC | SC | SC |
| b. | NC | SC | SC | SC |
| c. | NC | Deferred | SC | SC |
| d. | NC | NC | NC | PC |
| e. | NC | NC | NC | Deferred |
| f. | NC | NC | NC | Deferred |
| g. | NC | NC | NC | Deferred |
| h. | NC | NC | Deferred | Deferred |
| 11. Medication Refusals | | | | |
| a. | SC | NC | NC | NC |
| 12. Clinical Staffing | | | | |
| a. | NC | NC | NC | NC |
| b. | NC | NC | NC | NC |
| c. | NC | NC | NC | NC |
| d. | NC | NC | SC | SC |
| 13. Mental Health Training | | | | |
| a. | SC | SC | SC | Released |
| b. | SC | Released | Released | Released |
| c. | SC | Released | Released | Released |
| d. | SC | Deferred | SC | Released |
| e. | SC | Released | Released | Released |
| 14. Restraint Chairs | | | | |
| a. | SC | Released | Released | Released |
| b. | SC | Released | Released | Released |
| c. | NC | SC | SC | SC |
| d. | SC | SC | SC | Released |
| 15. Use of Force | | | | |
| a. | NC | SC | SC | SC |
| b. | NC | SC | SC | SC |
| 16. Mental Health Grants | | | | |
| a. | SC | Released | Released | Released |
| 17. Inmates IST | | | | |
| a. | SC | Deferred | NC | NC |
| 18. Treatment Plans | | | | |
| a. | NC | NC | NC | PC |
| b. | NC | NC | NC | PC |
| c. | NC | NC | NC | PC |
| d. | NC | NC | NC | PC |
| 19. Inmate Discipline | | | | |
| a. | NC | NC | NC | NC |
| 20. Space Issues | | | | |
| a. | SC | SC | SC | Released |
| 21. Administrative Segregation | | | | |
| a. | Deferred | NC | NC | NC |

4

| | | | | |
|---|---|---|---|---|
| b. | Not Rated | NC | NC | NC |
| c. | Deferred | SC | SC | SC |
| d. | NC | SC | NC | SC |
| e. | NC | NC | NC | NC |
| f. | SC | Deferred | Deferred | PC |
| g. | SC | Deferred | Deferred | PC |
| h. | SC | Deferred | SC | SC |
| 22. Suicide Prevention | | | | |
| a. | Deferred | Deferred | SC | SC |
| b. | NC | NC | NC | PC |
| c. | NC | Deferred | SC | SC |
| d. | NC | Deferred | SC | SC |
| e. | NC | Deferred | SC | SC |
| f. | NC | SC | NC | SC |
| g. | Deferred | Deferred | SC | SC |
| h. | Deferred | Deferred | Deferred | SC |
| 23. Out of Cell/Program Time | | | | |
| a. | NC | NC | NC | PC |
| b. | NC | NC | NC | PC |
| c. | NC | NC | NC | PC |
| d. | Not Rated | SC | Released | Released |
| 24. Telepsychiatry | | | | |
| a. | NC | Deferred | NC | NC |
| b. | NC | Deferred | NC | NC |
| 25. Medical Records | | | | |
| a. | NC | NC | NC | PC |
| 26. Quality Management | | | | |
| a. | NC | NC | NC | PC |
| b. | NC | NC | NC | Deferred |
| c. | NC | NC | NC | PC |
| 27. Corrective Action Plans | | | | |
| a. | NC | NC | NC | NC |
| b. | NC | NC | NC | NC |

**Compliance with Settlement Agreement and Implementation Plan Requirements**
**1. Intake Screening**
• *(a)  Upon arrival, an Initial Health Assessment will be performed by the intake nurse to determine whether the inmate should be excluded from the facility on medical or mental health grounds. Upon acceptance into the jail, all inmates will be screened by the intake nurse for urgent medical, mental health and dental needs. The intake nurse will have access to an inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail. [County Implementation Plan; Dkt. 528-1 at ECF 7]*
• *(b)  A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.*

•*(c)  The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive findings on the suicide assessment. [Settlement Agreement at 6]*
•*(d) The Booking RN shall begin initial treatment planning at the time of booking and schedule referrals for follow up evaluation as necessary. [CFMG Plan at 27]*

**Findings: These requirements were released from further monitoring by Court Order dated October 27, 2023 (Dkt. 844 at ECF 4).**

•*(e) If a patient's chronic condition is stable at booking, the Booking RN shall schedule a follow up with a medical provider within 5-7 days. If the patient is unstable or has unverified medications, the Booking RN must refer the patient to the on duty or on-call medical provider. [CFMG Plan at 29]*
•*(f)  The Booking RN shall identify and assess at booking individuals with a history of chronic medical or psychiatric condition. The Booking RN must document and verify and continue all current medications, whether verified or unverified, formulary or non-formulary. [CFMG Plan at 29, 72]*
•*(g) Booking RN must observe/query for signs/history of mental illness and use of psychiatric medications. The RN shall verify any medications and request outside treatment records as necessary. Any inmate who exhibits signs/history of mental illness shall be referred to mental health services for evaluation, and a physician's opinion must be secured within 24 hours or the next scheduled sick call. [CFMG Plan at 16, 19, 41]*
•*(h)  The Booking RN will obtain a signed release for records and attempt to verify current prescriptions.  By the end of the nursing shift, the RN will consult with the on-call psychiatrist regarding any verified or unverified medications.  The on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate.  During this consultation, the on-call psychiatrist will set the time to see the inmate within 5 – 7 days. The date of the appointment will be reflected on the written record of the order*." [CFMG Implementation Plan; Dkt. 532 at ECF 19].

**Findings: Noncompliance**

These requirements were found noncompliant in the last monitoring report of May 2023, after having been found in substantial compliance for the two prior monitoring reports dating back to May 2021.  During the May 2023 review, sufficient problems in the area of verifying and continuing medications at the time of the intake screening were identified to warrant a finding of noncompliance. Multiple instances were found in that report where review of available documentation indicated that medications were not verified and continued.  Similar cases were found in the current review (see, e.g., case #5 in the separate case reviews).  Also similar to the May 2023 site visit and monitoring report, discussions with the mental health clinicians during the current site visit again indicated that verification and continuation of medications at intake were not consistently happening as required, which placed additional responsibilities on the clinicians when they are already struggling to keep up with seeing mentally ill inmates.

Instances were noted in cases reviewed for the current monitoring report (but not included in the written case reviews document) in which documentation could not be found that an inmate's psychiatric medications were verified and continued as required.  Additional cases were found where inmates whose medications were verified and continued at intake were not

6

seen by psychiatry within the 5 – 7 day timeframe as required. In most cases reviewed for the current report, the requirement that for any inmate who exhibits signs/history of mental illness, a physician's opinion must be secured within 24 hours or the next scheduled sick call was not met.

As noted in the comments to the preceding requirements, Wellpath has taken steps to improve the intake screening, including the medication verification and continuation process, through the temporary use of telehealth nursing. Timely follow-up psychiatry contacts are also required. Ongoing attention to these functions is needed to return to substantial compliance with requirements. It has been recommended that the quality assurance process and associated corrective action plans focus specifically on all Implementation Plan requirements for the intake screening process and undertake to ensure that these requirements are consistently met. Documentation for such an internal auditing process was recently shared by Wellpath staff, which appears to be well designed to achieve the intended purpose.  Their internal auditing results for cases undergoing intake during August, September, and October 2023 showed compliance figures ranging from 53% to 63% across these various requirements.  However, because of the risk for severe adverse outcomes associated with failure to properly identify unstable or actively symptomatic inmates at intake and the importance of continuing psychotropic medication, and in light of the degree to which problems in these areas appeared to impact the continuity of care following intake, a finding of noncompliance is maintained.

## 2. Mental Health Screening

•*(a)   All inmates must undergo an initial mental health screening by a qualified mental health professional within 14 days of admission. The screening must consist of a structured interview inquiring into (1) history of psychiatric hospitalizations, substance use hospitalization, detoxification and outpatient treatment, suicidal behavior, violent behavior, victimization, special education placement, cerebral trauma or seizures, and sex offenses; (2) current psychotropic medications, suicidal ideations, drug or alcohol use and orientation to person, place and time; (3) emotional response to incarceration; and (4) screening for developmental disability and learning disabilities. Any positive scores will be referred for follow up. [CFMG Plan at 36, 41-42]*

## Findings: Noncompliance

This requirement was found noncompliant in my last report from May 2023.  In the current monitoring review, nine cases involving inmates referred to mental health staff were examined in relation to this requirement. Four of these cases were compliant, with a Mental Health Initial Assessment completed by a QMHP within 14 days of admission (see cases #6; #7; #9; and #10 in the separate case reviews document).  In three cases, the Mental Health Initial Assessment was completed by a QMHP but not within 14 days of admission (cases #3; #4; and #11).  In two cases, a Mental Health Initial Assessment was not completed (cases #5 and #8). The key caveat here is that these were inmates who were referred to mental health, not a sample of all inmates admitted to MCJ, as specified in this requirement. It appears to remain infeasible to expand the completion of the Mental Health Initial Assessment or a similar initial mental health screening completed by a QMHP to all inmates admitted to MCJ, rather than those specifically referred to mental health staff during the intake process.

It has been previously explained by Wellpath staff that the Intake Screening Form includes coverage of mental health concerns, and as this screening is conducted by the intake nurse with all inmates at the time of booking, it has been considered by Wellpath to meet the

requirements of a Mental Health Screening as specified by the Implementation Plan.  At issue here has been the definition of Qualified Mental Health Professional (QMHP) for the purposes of the initial Mental Health Screening, and specifically whether nursing staff are qualified.  It was noted that language in the Settlement Agreement defines Qualified Mental Health Professional as "an individual with training in psychology, social work, psychiatric nursing, or marriage and family therapy, who is currently licensed by the State of California to deliver those mental health services he or she has undertaken to provide" [Dkt. 494 at 12].  As written, this requirement specifies that a qualified mental health professional must conduct the initial mental health screening. Therefore, nursing staff who are not licensed psychiatric nurses would not be qualified to conduct this screening.  There is no viable procedure in place to ensure that all inmates undergo a mental health screening by a QMHP as required.  It is on this basis that the finding in my last report was noncompliance.

Having reached this finding, I continue to believe that nurses or licensed psychiatric technicians, with adequate training and supervision, could conduct an initial mental health screening at the time of intake and thereby fulfill this requirement. A finding was deferred at the time of my July 2022 report because I had not received documentation of the training provided to nurses in this role. Training would need to adequately cover all of the areas specified in the requirement, and must be consistently documented. The primary purpose of this requirement is to screen inmates and identify those who require follow-up by mental health staff. To cover all of these areas adequately in the context of the intake screening would likely expand the time required to complete sufficiently thorough intake screenings, which has implications for staffing resources and workflow, especially during periods of high booking volume. Ideally, part of the Quality Management process would also routinely monitor the adequacy and effectiveness of the intake screening for detection and referral of inmate's with problems in the areas specified for the initial mental health screening.

The issue that continues to prevent a finding of substantial compliance is the language of the requirement and the language in the Settlement Agreement regarding the definition of a qualified mental health professional.  I have encouraged the parties to consider how this language might be revisited whereby it could create the opportunity for the current process of intake screenings to be found substantially compliant with the requirements of the Implementation Plan. The Plaintiffs' Attorneys have indicated that they are not receptive to amending this Settlement Agreement requirement at this time. Rather than amending the Settlement Agreement definition of a Qualified Mental Health Professional, what I was envisioning was amending the Implementation Plan requirement that a QMHP is required to conduct the 14 day mental health screening. The alternative is that Wellpath staff who meet the qualifications of a Qualified Mental Health Professional will be required to conduct the mental Health screening with all inmates within 14 days of admission.  It remains possible that a Licensed Psychiatric Technician could conduct such screenings, and would fall within the definition of a QMHP.  Hiring staff into the allocated Psychiatric Technician positions, however, continues to prove difficult, and these positions remain unfilled.

*•(b)   The medical or psychiatric provider will complete a baseline history and physical or psychiatric examination; order a therapeutic regimen, as appropriate; and schedule the patient to be seen for chronic care clinic at least every ninety days for the length of the jail stay. Patients on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every 60 to 90 days.*

**Findings: Partial Compliance**

The prior three monitoring reports have found noncompliance with this requirement, noting that patients on psychiatric medications were not always seen by the psychiatrist every 30 days until stable and then at least every 60 – 90 days.  In the current review, some cases were compliant with these requirements (cases # 6, # 8, and # 10) although problems with timely psychiatry follow-up (e.g., case # 7) or a lack of clarity in the psychiatric documentation (cases # 5 and # 9) were again observed.  Other cases which were reviewed but not included in the written case reviews document also showed instances where a psychiatry follow-up was not completed within the required 30 day period prior to achieving stability. Documentation using standard forms such as the Psychiatric Provider Progress Note, Psychiatric Initial Evaluation, and Assessment of Involuntary Movement Scale were more frequently found in the healthcare records during the current review, but still not in all cases. Information documented for some of the psychiatry contacts reviewed remained sparse.

A rating of Partial Compliance for this requirement is based on the progress noted in the psychiatric documentation and the improvement in the number of patients on psychiatric medications who were scheduled as required, which was observed in a majority of the overall healthcare records reviewed. Work remains to be done to ensure that patients are consistently seen as scheduled within the required timeframes, and in providing more complete documentation of psychiatric examinations, in order to achieve substantial compliance.

**3. Sick Call**

*•(a)   Inmates' health and mental health complaints must be collected, processed, and documented daily and triaged as appropriate by medical and mental health providers. [CFMG Plan at 25]*

*•(b)   The on-duty medical provider shall see urgent sick call requests Monday through Friday. On weekends and holidays, the on duty nurse shall communicate urgent complaints/requests to the on-call provider, who will treat or refer the patient as necessary. [CFMG Plan at 25]*

*•(c)   Health care staff must note (1) the date and time the sick call request slip is reviewed; (2) the signature of medical staff; and (3) the disposition. The sick call slip must be filed in the inmates' medical record. The sick call roster must be kept on file in the medical record room. Providers must record sick call visits in the inmate's medical record. [CFMG Plan at 25-26]*

**Findings: These requirements were released from further monitoring by Court Order dated October 27, 2023 (Dkt. 844 at ECF 4).**

*•(d)   Sick call must be conducted 5 days/week in a private clinical environment. Health services staff must triage sick call slips daily and schedule patients for the next sick call if the slip was received prior to 2300 hours. [CFMG Plan at 26]*

**Findings: Noncompliance**

This requirement was found to be in noncompliance in the last monitoring report from May 2023, after a finding of substantial compliance in the earlier monitoring report of July 2022. In July 2022 it was noted that mental health clinicians review and triage sick call requests daily. Mental health sick calls were conducted daily, and patients were scheduled to be seen based on the level of urgency determined by triage.  Patients were typically seen as scheduled, although it

was noted that routine requests were often rescheduled due to workload issues.  The current review again indicated that sick calls are still typically reviewed, triaged, and initially scheduled as required.

The May 2023 finding of noncompliance was based on the frequency and duration of rescheduled sick call appointments due to workload constraints. These rescheduled appointments are not held as originally scheduled, i.e., the patient was not seen on the date they were supposed to be seen, and thus the sick call was not conducted.  At that time it was noted that some patients who were rescheduled were seen within one to four days of the originally scheduled appointment, but others were not, with excessive periods between contacts by a mental health clinician.

Unfortunately this pattern has continued (see, e.g., cases #3, #5, #7, and #9 in the separate case reviews document).  As noted in previous monitoring reports, the mental health clinicians typically see patients based on effective triage decisions, but it appears that staffing levels have not been sufficient in relation to the needs of the inmate population to maintain substantial compliance with this requirement. It is recognized that this requirement is not about staffing levels per se, but the current finding of noncompliance is again based on the number of sick call appointments that were not conducted in a sufficiently timely manner.

Wellpath has raised a question involving the definition of sick call.  In their responses to the draft version of the current report, a distinction is made between mental health contacts conducted specifically in response to an inmate's request for services, in contrast to contacts that have been scheduled by mental health or in response to referrals by other staff.  I have not made this distinction in my review of healthcare records for the purposes of evaluating compliance with requirements, and have instead considered all scheduled appointments with mental health staff to be conducted as part of sick call.  This has included contacts scheduled in response to referrals made during the intake process and contacts made in response to subsequent referrals by nursing or custody staff due to concerns about an inmate's condition, as well as appointments made by clinicians in follow-up to services initially request by inmates or the contacts required by, for example, removal from suicide watch. The urgency and relative priority of all of these types of contacts must be considered by mental health staff when conducting triage and creating a daily schedule for clinicians, which I have viewed collectively as their sick call procedure.  I view the suggested restriction of this requirement to the completion of initial requests for services by the inmate, to the exclusion of other types of scheduled clinical contacts and other referral or scheduling sources, to be too narrow for evaluating compliance with this requirement.

Another issue raised by Wellpath concerns whether rescheduled appointments were subsequently seen within required timeframes, such that the rescheduling of appointments per se is not necessary problematic.  I agree that a brief delay resulting from rescheduling a clinical contact that still falls within a required timeframe is not necessarily problematic.  What concerns me, and contributes to the current finding of noncompliance, are the cases where appointments are repeatedly rescheduled, and sometimes fall well outside required or reasonable timeframes. Wellpath has requested, I believe reasonably, for a more detailed account of the sample and specific results of chart reviews resulting in the current finding of noncompliance.  Beyond the details provided in the case review document submitted in association with the current report, my impressions for compliance with this requirement were derived from the frequency with which I

observed rescheduled and delayed mental health contacts across the total number of cases reviewed during this monitoring period.  I am unable to provide a specific percentage across all cases reviewed, but it was sufficiently frequent to lead to a finding of noncompliance  I will provide more specific information in this regard in subsequent monitoring reports.

Wellpath is in the process of implementing an internal auditing process to monitor performance in relation to the various requirements of the Implementation Plan. It is recommended that a specific area of internal monitoring should be the frequency of rescheduled appointments and the length of time between the originally scheduled appointment and the date the inmate is actually seen by mental health staff.

•*(e)  An MD or an RN shall visit inmates housed in holding and isolation cells on Monday, Wednesday and Friday. [CFMG Plan at 26]*

**Findings: Noncompliance**

The last three monitoring reports found noncompliance with this requirement, noting that there were lapses in the documentation of daily nursing rounds.  It has been noted that a psychiatrist or medical physician did not visit inmates housed in holding and isolation cells on Monday, Wednesday and Friday.  Very few instances of visits by an MD (psychiatry or medical) were noted in the current review, although this requirement can also be met through RN visits. The review of healthcare records for patients in holding and administrative segregation units for the current report also again showed lapses in the documentation of daily nursing rounds.  More documented nursing rounds were noted in the later portion of the current review (i.e., October and November 2023) than in the last reporting period, but in most of the cases reviewed, neither an MD nor an RN consistently visited the inmates housed in holding and isolation cells on Mondays, Wednesdays, and Fridays as required.

## 4. Chronic Care
•*(a)  Any patient whose chronic condition cannot be managed at MCJ shall be transferred offsite for appropriate treatment and care. [CFMG Plan at 30]*

**Findings:  Noncompliance**

As the prior Mental Health Monitor stated in his final report of May 2021, "Although inmates were routinely referred to NMC for crisis evaluation and stabilization, some inmates with severe and chronic mental illness that could not be managed at MCJ remained at the jail." Dr. Hughes further noted, "The acceptance and adequate treatment of such inmates at NMC remained problematic; and as has been previously noted, referrals for needed inpatient mental health care did not always occur due to the lack of access to inpatient treatment at NMC."  My prior reports of July 2022 and May 2023 found that these issues remained unchanged.

The current review again finds that inmates whose chronic severe mental illness requiring a higher level of care have no viable alternatives to be transferred offsite for appropriate treatment and care.  Cases reviewed for the current report (see cases #6 and #11 in the separate case reviews document) reflected the type of severe and chronic mental illness which cannot be adequately treated in the current jail environment. As noted with similar cases reviewed for prior

monitoring reports, in case #6 the inmate's clinical condition was complicated by a likely diagnosis of borderline personality disorder.  It is especially difficult to manage the self-injurious behavior sometimes associated with this disorder in a jail or other custodial environment, but inpatient psychiatric care is also typically not advised for such individuals living in the community, except at times of imminent suicide risk.

In the cases I have reviewed to date, staff at MCJ frequently send inmates out to NMC for crisis evaluation and stabilization, or when the inmate has reached a triggering threshold for transfer such as 24 hours in a safety cell.  Such inmates are seldom admitted to the inpatient mental health unit, and are often sent back to the jail with recommendations that the inmate be seen by the jail psychiatrist, treated by the jail mental health staff, and/or placed in a safety cell.  Such measures have typically already been enacted by MCJ staff, and been found inadequate to manage the inmates' condition.  Because jail staff cannot control admissions to other facilities, they cannot effect a transfer of the patient as indicated in this requirement, despite the staff's sometimes repeated efforts to do so.

Wellpath has noted in their response to the draft version of this report that their transporting of inmates whose condition cannot be managed at the jail to NMC should serve to satisfy the intent of this requirement, regardless of whether the patient is admitted to that facility for necessary inpatient care.  I cannot agree. The Settlement Agreement, when addressing mental health care, states that "Defendants shall develop a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with Mental Illness, including . . . access to hospitalization and inpatient care," (Settlement Agreement, Dkt. No. 494 at 17).  It is recognized that this places Wellpath and the Jail in a difficult position, as NMC and other such facilities control access to their inpatient mental health beds. This reflects part of the broader challenge of insufficient inpatient mental health treatment beds across the state and across the country.  Nevertheless, the Settlement Agreement and Implementation Plan require that inmates requiring psychiatric care beyond the onsite capacity of the jail will be transferred to an appropriate offsite facility – I take this to mean transfer of the inmate to the care of an appropriate facility, not merely to transport the inmate to such a facility and then return the inmate to the jail while the need for a higher level of care remains unmet. The intent of this require appears to be that patients will ultimately receive the needed treatment services, including access to inpatient treatment when necessary.

This leaves us looking for viable solutions to meet the intent of this requirement. I have not seen specific data regarding the number of patients needing a higher level of mental health care than is available at the jail (although such data could and should be collected), but my sense from review of various available documentation sources is that the number is relatively small at any given point in time.  Solutions should focus on both minimizing the number of inmates whose conditions deteriorate to the point where they cannot be effectively treated in jail, and finding ways to expediently transfer a patient for psychiatric inpatient care when needed (i.e., gain admission for the inmate to an appropriate offsite facility).

It has been noted in prior monitoring reports that a potentially promising development with chronically, severely mentally ill inmates is the Early Access and Stabilization Program (EASS).  Once again in the current monitoring review, documentation for several patients who were enrolled in this program showed that during the period of their treatment by EASS staff,

their mental health needs were more frequently and more adequately addressed than when they were not being followed by the program.  Although this is a promising program for the treatment of inmates who have been found incompetent to stand trial while they await competency restoration services, it is becoming apparent that EASS is unlikely to be an adequate solution to the overall need for a higher level of care in all cases whose chronic mental health condition is too severe to treat in the jail.  This program will also not address the needs of inmates who have been sent to a DSH facility for treatment and returned to the jail as unrestorable to competence, as has been observed in cases reviewed for earlier monitoring reports.

The question arises as to what can realistically be done to meet the requirement for inmates whose chronic condition cannot be managed at MCJ if there are no viable alternatives for transferring these inmates offsite for treatment and care.  Some, perhaps many, of these inmates may be effectively treated in the EASS program if certain assumptions are met. This would include sufficiently early detection of an inmate's condition as one that cannot be effectively treated by the jail's standard mental health program and is likely to result in incompetency to stand trial. There would need to be a fast and efficient response in such cases to get the inmate enrolled in the EASS program and begin more intensive psychiatric treatment than can otherwise be provided by MCJ mental health staff, including the use of involuntary psychotropic medications as needed, thereby preventing the inmate from languishing with a severe mental illness that is not being adequately treated.  Another necessary element would be that the EASS program has sufficient capacity to ensure that all inmates requiring this level of intervention can be enrolled and maintained in the program.

An additional consideration, potentially independent of the EASS program, is the use of involuntary medication for inmates who are chronically, severely mentally ill to the extent that they present a danger to self, a danger to others, or are gravely disabled as a result of their mental illness.  Mechanisms exist to provide involuntary medications, such as the provisions of PC2603, when the inmate's condition requires such intervention and they are unable to give informed consent.  This approach would require early detection and decisive action to initiate the necessary steps involved. This would be best supported by an effective interdisciplinary patient review and treatment planning process where such cases are routinely discussed and all available treatment options vigorously pursued in a coordinated manner. Documented treatment plans should reflect these interdisciplinary clinical considerations and guide the various approaches to treatment being pursued. Consideration should also be given to more extensive use of behavioral treatment plans with inmates whose mental illness results in self-injurious or otherwise health-jeopardizing behaviors.

The forgoing possibilities are not comprehensive or exhaustive, and may not cover all relevant cases.  They are presented here in an effort to stimulate focused consideration of viable options for treating the most severely mentally ill inmates at MCJ, whose conditions are not effectively managed by existing mental health services, but for whom transfer offsite to an appropriate treatment facility (i.e., an inpatient level of psychiatric care) has not been an available option.

•*(b)  At every 90-day chronic care appointment, the medical/psychiatric provider shall (1) assess the patient's current medications, complaints, and compliance with treatment plan; (2) examine*

*vital signs and weight; (3) assess the patient's diagnosis, degree of control, compliance with treatment plan and clinical status as compared to prior visits; and (4) conduct lab and diagnostic tests as necessary, develop strategies to improve outcomes if the condition has worsened, educate the patient, and refer to MD or specialist, and/or conduct discharge planning as necessary. All of the above must be documented in the patient's health record. [CFMG Plan at 32-33]*

**Findings:  Partial Compliance**

The prior three Mental Health Monitoring reports have found noncompliance with this set of requirements.  The prior Monitor noted in his report of May 2021 that documentation of treatment planning was essentially nonexistent in the healthcare record; there was no documentation or comparison of patient weights by the psychiatrist; documentation was lacking regarding the patient's diagnosis, degree of control, compliance with the treatment plan and clinical status compared to prior visits; there was no documentation of Abnormal Involuntary Movements Scale (AIMS) testing or monitoring of metabolic factors for patients prescribed psychotropic medications; and a lack of documentation of appropriate therapeutic interventions for patients who were decompensating or not participating in treatment.

Some improvements in the clinical documentation were noted in the last monitoring report from May 2023.  It was observed that some of the most recent psychiatry notes from that review were more complete, although strategies to improve outcomes did not go beyond encouraging the patient to be medication compliant, and the education field of the SOAPE notes were still typically blank. It was observed that the standardized forms for psychiatry progress notes and AIMS testing had been entered into the healthcare record in some of the cases reviewed.

During the current monitoring review, standardized forms such as the Psychiatric Provider Progress Note and the Assessment of Involuntary Movement Scale were used more frequently, but were not found consistently in the healthcare records across all of the cases that were reviewed.  Cases continue to be identified with sparse documentation in the healthcare record (see e.g., case #5 in the separate case reviews document).  As another example, (from a case not included in the written case reviews document) a patient refused to meet with the psychiatrist for a 90 day follow-up.  This was noted in the chart entry, with a plan to continue Zoloft and Zyprexa, crush and float, but with no further documentation.  The next psychiatry follow up was scheduled for 90 days. Similar brief progress notes were also observed in other cases.  The current finding of partial compliance reflects some degree of improvement observed in the documentation of the required elements of the 90 day chronic care psychiatry appointments, although more consistent documentation of all required elements is needed to achieve substantial compliance.

**5. Acute Care**
•*(a)  Inmates who require acute mental health services beyond what is available at the Jail must be transferred to an appropriate facility. [CFMG Plan at 36, 42] CFMG PLAN AT 26*

**Findings:  Noncompliance**

14

The observations made in the preceding section of the current report pertaining to the requirements for chronic care are relevant here. As with prior monitoring reports, cases continue to be identified in which the inmate's need for acute mental health services exceed the capacity of the MCJ mental health staff, but the inmate cannot be transferred to an appropriate outside facility, e.g., case #11 in the separate case reviews document.  Documentation reviewed in this case suggests that the capacity to meet this requirement has not appreciably changed. It was noted in the review of this case that although the inmate was referred to NMC on several occasions during acute episodes, as required by policy, MCJ and Wellpath cannot control admission to outside treatment facilities, while at the same time they cannot provide the required level of care.  This situation currently precludes a finding of substantial or partial compliance. If some of the suggestions offered under the section regarding chronic care can be followed, it is possible that the number and intensity of acute psychiatric episodes may be reduced, but it is unlikely that such episodes will be completely eliminated. More effective communication and coordination of care between MCJ and outside facilities such as NMC are still needed.

*•(b)  Crisis intervention and management of acute psychiatric episodes shall be handled initially by on-duty medical/mental health staff with referral to psychologist and/or psychiatrist on a 24 hour per day basis. [CFMG Plan at 43]*

**Findings:  Substantial Compliance**

This element of the acute care requirements specifically addresses the initial onsite response to acute psychiatric episodes.  Review of relevant cases indicated that such situations are initially handled by on-duty medical and mental health staff, or with the involvement of on-call mental health staff if occurring outside of scheduled mental health coverage hours. Referral can be made to a psychiatrist as needed (regular mental health staffing does not currently include psychologists), and on-call psychiatry coverage is available.

### 6. Outpatient Services
*•(a)  The Jail shall make outpatient mental health services, provided by a qualified mental health provider, available to all inmates. [CFMG Plan at 41]*
*•(b) Inmates requiring mental health services beyond the on-site capability of the Jail shall be referred to appropriate off-site providers. [CFMG Plan at 41, 43, 46]*

**Findings: Partial Compliance**

The prior monitoring reports of July 2022 and May 2023 found noncompliance with these requirements, based on insufficient staffing levels to allow for the adequate deliver of outpatient services to meet inmate needs, e.g., group treatment activities.  Additional mental health staff have since been hired, but staff are still struggling to keep up with workloads, as noted in cases #3, #5, #7, and #9 in the case reviews. According to information provided by Wellpath, there are now 3.7 full-time equivalent clinician positions covered by four mental health professionals, in addition to the Mental Health Coordinator.  This includes mental health professionals who began work at the jail on 5/30/23 and 9/24/23.  Another mental health

clinician has returned from maternity leave, so that all allocations for mental health clinician positions are now filled.

The Implementation Plan states, "Outpatient mental health services to include screening, evaluation, diagnosis, treatment and referral services shall be available to all inmates in the Monterey County Jail" [Dkt. 532 at p. 41].  Unlike the services needed for some of the more severely mentally ill inmates, which are considered under the requirements for chronic and acute care, outpatient services could be effectively delivered by mental health staff within the existing jail environment, assuming sufficient staff are available to consistently deliver these services.  It is difficult to envision a situation in which an inmate would need to be sent to appropriate off-site providers for outpatient services as defined in the Implementation Plan, if there were sufficient mental health staff available onsite to address the need for these outpatient services.  Adequate staffing, including adequate custody staffing to provided the necessary escorts, is again seen as the primary obstacle to achieving substantial compliance with the requirements for outpatient services.  It should be noted that the outpatient services identified in the Implementation Plan do not include treatment groups.  Most inmates who require outpatient services, as defined, are seen by mental health staff, just not yet in a consistently timely manner.

I do not, at this stage, have a specific quantification of the frequency of rescheduled mental health contacts across all cases reviewed in the course of preparing this monitoring report, beyond observing that such rescheduled appointments occurred with sufficient frequency to prevent a finding of substantial compliance. This is a metric that could be useful for Wellpath to include in their internal auditing and performance improvement efforts.  A finding of partial compliance is currently based on observations indicating that outpatient mental health services are made available to all inmates as required by the implementation plan, but that staffing limitations appear to prevent the delivery of these services in a consistently timely manner. Substantial work remains to be done to reduce the number of rescheduled appointments to see inmates for sick call requests and routine follow-up contacts.

### 7. Safety and Sobering Cells

*•(a)  The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall responsibility for safety and security of prisoners, prompt reviews by medical of all placements, and a process of resolving disagreements between medical and custody. [Settlement Agreement Dkt. 494 at ECF 14]*

**Findings: This requirement was released from further monitoring by Court Order dated October 27, 2023 (Dkt. 844 at ECF 4 - 5).**

*•(b)  Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical professional will see an inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.*

**FINDINGS:  Unable to determine compliance**

As observed in prior monitoring reports, placement of inmates into safety cells are consistently done with communication between custody and mental health staff.  This requirement, however, specifically refers to the involvement of medical staff, and in cases of sobering cell placement, it specifies that a qualified medical professional will see the inmate within one hour. Cases reviewed for this requirement included inmates whose intake screening was conducted by telehealth nursing.  Sobering protocols were initiated and telephone orders were received from a Nurse Practitioner at the time of intake. Entries into the Sobering/Safety/Restraints flow sheets documented observations of the inmate, but not within one hour of placement in the sobering cell.

I have previously raised concerns about the appropriateness of reviewing this requirement from a mental health perspective, as it primarily involves the involvement of and decision-making by medical staff.  I believe these concerns are heightened by the need to evaluate the use of telehealth to reach medical determinations, and the need to evaluate the adequacy of medical clearance decisions for release from sobering cells.  The Plaintiffs' attorneys have suggested that, to the extent that I feel that I require a medical expert's assistance to evaluate this item, that I contact Dr. Barnett, who serves as the Medical Monitor.  I believe that a better solution is to have Dr. Barnett, as the Medical Monitor, evaluate and reach a determination about compliance with this requirement, which falls within a medical scope of practice.  Although some aspects of the requirement are straightforward, such as whether there is documentation in the medical record that an inmate was seen within an hour of placement in a safety or sobering cell, and upon clearance by medical staff for release from a sobering cell, findings involving the adequacy of these procedures falls within the purview of the Medical Monitor. I have recently discussed this matter with Dr. Barnett, and he is in agreement with this perspective.

•*(c)  A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his findings through a report which will be sent to the Jail Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.*

**Findings: Partial Compliance**

The prior Mental Health Monitor found substantial compliance with this requirement in his last report of May 2021. He focused primarily on the audits conducted by the Compliance Sergeant, which are based on the Guardian System of welfare check logging.  This system has continued to demonstrate compliance with the requirement that custody staff make safety check rounds at the specified intervals, and the Compliance Commander has a well-established system

of auditing and feedback to address any detected compliance issues based on the timing of the checks. The auditing system also includes the routine reports specified in this requirement.

My subsequent monitoring reviews of July 2022 and May 2023 deferred findings on this requirement, having identified concerns regarding the requirement that safety checks consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior.  As noted in my last report, "The core concern in evaluating this and other requirements related to welfare checks is finding a reasonable balance between adequately assessing an inmate's wellbeing and insisting on procedures that would unduly interfere with the inmate's sleep or create unnecessary agitation within the inmate population. Consultation has been sought with a number of subject matter experts, former custody and jail administrative staff from other jurisdictions, and monitors involved in similar cases at other jails.

Several points emerged from these discussions.  One is that this is an issue many, perhaps most, jail systems struggle with.  A clear consensus on a specific procedure which would explicitly address the balance of ensuring wellbeing vs. overly intrusive and disruptive interactions with inmates was not identified during discussions with various experts.  A consensus did emerge, however, regarding the need to somehow ensure that an inmate was alive, and not merely showing no signs of distress. Finally, there was agreement that any procedure for adequately assessing inmate wellbeing will depend to some degree on the judgment and situational awareness of the deputies conducting the checks. It is recognized that reliance upon individual judgment and adaptation to specific circumstances introduces potential variation into a procedure that must also be standardized.

Key elements to ensuring substantial compliance with the Implementation Plan requirements for welfare checks include training, monitoring, and corrective action. The mechanics of ensuring that welfare checks occur and are recorded as required has been well established over the course of several monitoring reports. The Compliance Commander in charge of this process continues to maintain an effective monitoring, reporting, and response process based on reviews of the Guardian System data.  The Compliance Commander and other custody leadership reported during the November site visit that additional training was under development to address issues concerning the quality of the welfare checks.  I have recently reviewed the training materials and corresponded with the Compliance Commander regarding plans for providing this training to custody staff.  The training materials consist of demonstration videos, videos drawn from incidents involving welfare checks, a PowerPoint presentation, and various reference documents regarding policies and procedures. This training and associated materials address the necessary quality of effective welfare checks, and should make a valuable contribution in the jail's efforts to ensure that welfare checks meet the requirements of the Implementation Plan.

Another recently added element to address the quality of the welfare checks is the routine review of surveillance video by the Compliance Commander in conjunction with welfare check documentation as part of the quality assurance monitoring process. The Commander now reviews samples of video that correspond with the times of welfare checks in order to observe whether checks appear to be completed in accordance to training and performance expectations. Instances of inadequately performed welfare checks are addressed by the Compliance Commander through the chain of command.  I reviewed such videos with the Compliance

Commander during the most recent site visit, as he described how he conducts his audits.  Such reviews are a useful addition to the quality assurance process at MCJ.

The current system that is being put into place at MCJ appears to be as robust as any I am aware of, either through direct observation of other jail facilities or as described by the other monitors and subject matter experts with whom I have consulted.  I believe MCJ has now taken the available, feasible steps to ensuring compliance with requirements. A finding of partial compliance is based on the fact that these steps have only recently been enacted, or in the case of the training, have been developed but not fully implemented. It is also notable that there was a completed suicide in a booking cell during the current reporting period that involved inadequate welfare checks (see Case #1 in the separate case reviews document).  While this incident did not occur in a safety or sobering cell, the issues with the quality of the welfare checks are sufficiently similar to be relevant here.  Plaintiffs' attorneys have asserted that this incident was so egregious that it warrants a finding of noncompliance.  However, while the outcome was tragic, and the events around this incident clearly indicate the need for improvements, it does not completely negate the progress that has been made. The current finding of partial compliance is consistent with the definition offered at the beginning of this report, whereby partial compliance typically indicates that the responsible party has achieved compliance on some, but not all, of the components of the relevant provision of the Agreement, and work remains to reach Substantial Compliance.  This particular incident was a factor that prevented a finding of substantial compliance, but does not preclude a finding of partial compliance at this time.

*•(d)  Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11 p.m. and 7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.*

**Findings: Substantial Compliance**

Substantial compliance was found for this requirement in the last two monitoring reports. Review of safety cell logs and audits have shown that inmates are consistently provided safety smocks and safety blankets as required while in safety cells. The current review resulted in similar findings.  The safety blankets that are used as a sleeping bag, which can be closed by Velcro and have a sewn-in pillow, were again observed during the recent site visit, and found to be adequate for the intended purpose. A sufficient number of such safety blankets were available in the current inventory.

*•(e)  Inmates in sobering cells may have access to mattresses at the discretion of custody staff.*
*•(f)  Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.*

**Findings: Substantial Compliance**

These requirements were found to be in substantial compliance in the last monitoring report.  No issues regarding these requirements were observed during the recent mental health

monitoring tour.  Policies and procedures continue in the same manner as have been found substantially compliant in prior mental health monitoring reports.

•*(g)  Patients withdrawing from benzodiazepines must be evaluated by a medical provider within 3 days, and a psychiatrist or psychiatric NP within 7 days. [CFMG Plan at 68]*

**Findings: Noncompliance**

An issue which has hampered the evaluation of compliance with this requirement has been the identification of an appropriate sample of inmates withdrawing from benzodiazepines, separate from those placed on a similar protocol for alcohol withdrawal.  Wellpath reports that they have now determined a method to accurately identify inmates who are placed specifically on a benzodiazepine withdrawal protocol.  An internal review by Wellpath staff determined that patients withdrawing from benzodiazepines were not evaluated by a medical provider within 3 days, nor a psychiatrist of psychiatric NP within 7 days, as required.  It was reported that chart reviews were conducted in some cases, but this was not considered to meet the required level of evaluation.  A list of relevant cases has not been received for my review. The current finding of noncompliance is based on information reported to me by Wellpath staff.

•*(h)  Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance.  This requirement was found in substantial compliance in the most recent prior monitoring report of July 2022, and is no longer subject to monitoring.**

•*(i)  For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.*

**Findings: Substantial Compliance**

The Compliance Commander continues to maintain a thorough system to track and respond as needed to patients placed in safety cells. This system involves a status board that reflects when a patient enters a safety cell and the time at which they will reach the 24 hour mark.  This status board is audited daily by the Compliance Commander, with daily prompts to floor deputies to ensure these patients are moved as required.

The Compliance Commander has previously explained that safety cells are most frequently used to house inmates on Level 2/Intermittent Suicide Watch (defined as those with suicidal ideation but no active self-harm) due to a lack of alternative observation housing, or inmates requiring a single cell in the booking area who are not on any level of suicide watch. Inmates on Level 1/Continuous Suicide Watch must be transferred out to inpatient care or the

NMC emergency room after 24 hours, while Level 2 inmates can be moved to other appropriate observation cells as available without requiring transfer to another facility.  It is also noted that two safety cells have been designated as observations cells; former Safety Cells 4 and 5 are now Observation Cells 3 and 4, respectively, although the design of these cells has not been altered (e.g., there is no toilet, running water, bench or bedding in these cells).  The Implementation Plan requirements that apply to safety cells are therefore also applicable to these redesignated observation cells.

Safety Cell audits conducted by the Compliance Commander for June through September 2023 were reviewed.  The audit for June indicated that none of the 23 safety cell placements, 18 sobering cell placements, or 30 observation cell placements for intermittent suicide watch exceeded 24 hours. The audit for July indicated that there were 30 safety cell placements, 13 sobering protocol placements, and 30 observation cell placements for intermittent suicide watch. Two of these 73 placements exceeded 24 hours in the relevant observation cells (cells 3 and 4). One instance resulted from the receiving area Sergeant being unclear regarding the 24 hour rule pertaining to Observation Cells 3 and 4 and not being aware that the 24 hour limit had been exceeded. This was detected by the Compliance Commander, who intervened and ensured the inmate was moved to a booking cell. Total time in Observation Cell 3 was 29 hours 49 minutes. The second case exceeding 24 hours in July involved an inmate who refused to leave Observation Cell 4 while on intermittent suicide watch, and who appeared to be acutely mentally ill.  Mental health staff intervened, and the inmate was eventually removed from the observation cell and transported to NMC for crisis evaluation.  The Compliance Commander tracked the situation and was in communication with the receiving area Sergeant.  Total time in Observation Cell 4 was 34 hours 31 minutes.  Actions taken in this case appear appropriate under the circumstances.  It is noted by the Compliance Commander that training is provided to all sergeants regarding the 24 hour limit for specific cells, and that these placement rules were clearly reiterated in an email sent to all sergeants on 7/29/23.

The audit report for August 2023 indicated that there were 18 safety cell placements, 19 sobering protocol placements, and 37 observation cell placements for intermittent suicide watch. None of these placements exceeded 24 hours.  The audit report for September 2023 indicated that there were 18 safety cell placements, 20 sobering protocol placements, and 33 observation cell placements for intermittent suicide watch.  One of these 71 placements exceeded 24 hours. An inmate was placed in Observation Cell 3 on intermittent suicide watch.  The receiving area sergeant believed that moving the inmate from Observation Cell 3 to Observation Cell 4 reset the 24 hour clock, and the Compliance Commander, who was tracking the situation, thought the inmate had been moved to a booking cell.  Once there was an accurate understanding of the situation, the Compliance Commander intervened, and the inmate was moved to a booking cell. Total time in a restricted observation cell (cells 3 and 4) was 25 hours 11 minutes. The audit report for October 2023 indicated that there were five safety cell placements, 24 sobering protocol placements, and 24 observation cell placements for intermittent suicide watch.  None of these placements exceeded 24 hours.

Any instances of safety cell placements exceeding 24 hours are concerning.  However, there remains in place a robust system of monitoring and corrective action. The three cases exceeding 24 hours over the months of June through October are not considered to represent

systemic deviations from requirements.  The current monitoring and response system continues to warrant a finding of substantial compliance.

*•(j)  Inmates in safety cells whose condition deteriorates, or for whom the nurse is unable to complete a hands-on assessment including vital signs after 6 hours of placement shall be transferred to Natividad Medical Center for further assessment. [CFMG Plan at 16, 75]*

**Findings: Noncompliance**
  The finding on this requirement was substantial compliance in my last monitoring report from May 2023.  For that report, nine instances of safety cell placement were reviewed and all had completed vital signs entered into the healthcare record within the required timeframes.  For the current report, eight cases were reviewed, and only three of these cases had completed vital signs documented in the healthcare record within the required timeframe.  It is recommended that this become one of the functions regularly audited internally and reviewed as part of the QA/CQI and corrective action process.

**8. Medication Continuity**
*•(a)  All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that Wellpath provides evidence that this requirement has been incorporated into the Wellpath Policies and Procedures.  [Dkt. 751 at ECF 20].  The subsequent monitoring report of July 2022 found substantial compliance, in that Wellpath Monterey County Policies and Procedures HCD-110 E09B, Timely Initiation of Medication Upon Arrival, and HCD-110 E-09A, Medication Verification met this requirement.**

**This requirement had been released from further monitoring.  However, in the 9/26/23 Court Order granting the Plaintiffs' Motion to Enforce (Dkt. No. 838 at p. 27) which references 11/22/22 Joint Status Report (Dkt. No. 759 at page 5 – 6), this requirement was reinstated for monitoring.**

**Findings:  Partial Compliance**
  Although most cases reviewed for the current monitoring report showed documentation in the healthcare records that medications were verified and continued at the time of intake, several cases were identified where this did not occur (see e.g., cases #5 and #8 in the separate case reviews document).   It is recommended that this requirement become a routine internal audit item which is tracked and regularly reviewed in the QA/CAI process, with corrective actions implemented as needed.

*•(b)  By the end of the nursing shift, the booking RN will consult with the on-call psychiatrist regarding any verified or unverified psychotropic medications. The on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate. The on-call psychiatrist will then set the time to see the inmate within 5-7 days. The date of the appointment will be reflected on the written record of the order. [CFMG Plan at 19]*

**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that Wellpath provides evidence that this requirement has been incorporated into the Wellpath Policies and Procedures.  [Dkt. 751 at ECF 21]  The subsequent monitoring report of July 2022 found substantial compliance, in that Wellpath Monterey County Policies and Procedures HCD-110 E09B, Timely Initiation of Medication Upon Arrival, and HCD-110 E-09A, Medication Verification meet the requirements.**

**This requirement had been released from further monitoring.  However, in the 9/26/23 Court Order granting the Plaintiffs' Motion to Enforce (Dkt. No. 838 at p. 27) which references 11/22/22 Joint Status Report (Dkt. No. 759 at page 5 – 6), this requirement was reinstated for monitoring.**

**Findings:  Partial Compliance**

As noted in the preceding requirement, most but not all cases reviewed for the current monitoring report were compliant with this requirement; contact with the on-call psychiatrist was not always documented by the booking RN, resulting in instances where verified or unverified medications were not continued.  It was also noted that in some cases where the on-call psychiatrist was consulted and scheduled a follow-up appointment, the appointment was sometimes rescheduled and did not occur within the required 5 – 7 day timeframe.  It is recommended that this requirement become a routine internal audit item which is tracked and regularly reviewed in the QA/CAI process, with corrective actions implemented as needed.

*•(c)  No psychotropic medications shall be unilaterally discontinued without consultation with the facility physician or psychiatrist. Psychotropic medication shall not be ordered for longer than 90 days, new psychiatric medications will not exceed 30 days, until condition is documented stable by the ordering physician. The prescribing provider will renew medications only after a clinical evaluation of the individual is performed. [CFMG Plan at 19]*

**Findings: Partial Compliance**

In the last three monitoring reports, including the final report of the prior Mental Health Monitor in his report of May 2021 and my subsequent reports of July 2022 and May 2023, it was noted that new psychotropic medications continued to be ordered for greater than 30 days, and inmates were seen at intervals greater than 30 days after new medications were prescribed and prior to documentation of psychiatric stabilization.  Cases were observed in which medication follow-up appointments were scheduled for 90 days despite active symptoms of serious mental

23

illness, including psychosis, although more recent cases (from May and June 2023) in the last report showed some improvement in these areas.

These improvements have continued in the current review, with most cases scheduled for no more than 30 days after continued medications and 90 days thereafter if the inmate's condition was stable. However, not all inmates were seen as scheduled, with appointments sometimes rescheduled due to workload. One case was reviewed in which the inmate was not seen (the patient refused the scheduled 90 day appointment) but medications were continued. These improvements warrant a finding of partial compliance, but have not yet reached or sustained substantial compliance.

### 9. Discharge

*•(a)  Provision of psychotropic medications upon discharge from the jail. The Implementation Plan provides that a 30-day supply of medications be given to inmates upon discharge from the jail.*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that Wellpath provides evidence that this requirement has been incorporated into the Wellpath Policies and Procedures.  [Dkt. 751 at ECF 21]  The subsequent monitoring report of July 2022 found substantial compliance, in that Wellpath Monterey County Policy and Procedures document HCD-110 E-10, Discharge Planning and Release Medications, meets this requirement. This requirement has been released from further monitoring.**

*•(b)  Inmates who are released prior to resolution of a continuing medical/mental health condition shall be referred to public health and/or community clinics as appropriate, and shall be provided written instructions for continuity of essential care. [CFMG Plan at 38, 44]*
**This item has been released from monitoring. [Dkt. 751 at ECF 12]**

### 10. Involuntary Medication

*•(a)  Psychotropic medications may not be used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment. [CFMG Plan at 90, 96]*

**Findings: Substantial Compliance**

As observed in the last three monitoring reports, the current review again found no instances where psychotropic medications were used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment.

*•(b)  Absent an emergency, inmates will not be administered involuntary psychotropic medications at the Monterey County Jail. Psychotropic medication will not be administered for disciplinary purposes. [CFMG Plan at 19]*

**Findings: Substantial Compliance**

Consistent with the findings of the last three monitoring reports, the current review again found that instances of involuntary medication were in response to situations justifiably

considered an emergency or in accordance with an Involuntary Medication Order from the Court, and were not administered for disciplinary purposes.

*•(c)  Absent an emergency or court order for treatment with psychotropic medications, an inmate shall give his or her informed consent or refusal. [CFMG Plan at 20]*

**Findings: Substantial Compliance**

As found in previous monitoring reports, the current review of documentation in the electronic healthcare records consistently showed that inmates provided signed informed consent or refusal of mental health treatment.  There were no instances observed where an inmate was administered psychotropic medication in the absence of a psychiatric emergency or court order without their consent.

*•(d)  The Jail may only administer involuntary psychotropic medications in a psychiatric emergency (i.e., when administration is necessary to preserve life or prevent serious bodily harm, and it is impracticable to obtain consent), or when an inmate is found to lack capacity to consent at an Incapacity Hearing. The responsible physician, Program Manager, and Director of Nursing, with the Facility Manager, are to identify appropriate community resources and develop procedures to obtain an Incapacity Hearing, and transfer inmates requiring involuntary psychotropic medication administration to an appropriate community facility. If the inmate must remain at the jail for clinical or custodial reasons, the health services staff shall coordinate with County Mental Health Psychiatric Emergency Services to evaluate competency pursuant to Riese v. St. Mary's Hospital (Riese Hearing). [CFMG Plan at 96, 98]*

**Findings: Partial Compliance**

As reported in prior monitoring reports, no instances were found during the current review in which psychotropic medications were administered involuntarily in the absence of a psychiatric emergency when the inmate had refused to provide consent.  However, this Implementation Plan requirement also states that inmates requiring involuntary psychotropic medications are to be transferred to an appropriate community facility, and specifies a procedure to follow regarding evaluation of competency.  It appears that there continues to be no process in place whereby the responsible physician, Program Manager, Director of Nursing, and Facility Manager will obtain Incapacity Hearings and transfer inmates requiring involuntary medication administration to an appropriate community facility.  Reference is made in the CQI Committee Meeting minutes from September to clarifying or updating Involuntary Medication Order procedures, but no subsequent information was found.  It is recommended that discussions be held between defendants' and plaintiffs' attorneys regarding the process described in the requirements pertaining to involuntary psychiatric medications, which may result in clarification of the expectations in light of current legal considerations and logistical procedures.

It has been noted in prior monitoring reports that the intent of this requirement appears to focus primarily on constraining the use of psychotropic medications to legitimate psychiatric emergencies, and to create a process by which patients requiring involuntary medications are properly evaluated and cared for in an appropriate setting.  The inverse of these concerns is that

sometimes patients who require involuntary medications because of the seriousness of their mental health condition, and who are unwilling or unable to provide consent, are not receiving involuntary medications when they appear to be called for (e.g., Patient #11 in the separate case reviews document). Cases such as this suggest there is sometimes a reluctance to pursue involuntary medications when the condition of the patient appears to warrant this treatment approach.

     The current finding of partial compliance is based on the observation that involuntary psychotropic medications are only administered in psychiatric emergencies, as required.  The work which remains in order to achieve substantial compliance is in the pursuit of Incapacity Hearings and the transfer of inmates requiring involuntary medications to an appropriate community facility.  It is possible that improvements in these functions may also have a positive impact on compliance with requirements related to providing a higher level of care for patients whose acute and chronic conditions cannot be adequately managed in the jail setting, through improved early interventions that stabilize more patients before their conditions are so severe as to preclude effective jail-based treatment.

*•(e)  In a psychiatric emergency, psychotropic medications can only be involuntarily administered pursuant to a direct written or verbal one-time order from the responsible facility psychiatrist or physician after an on-site evaluation (never as needed, never standing order). A telephone order is sufficient only if the inmate has been personally evaluated by the prescribing physician no longer than 24 hours prior to the emergency. If none of above options are available, physical restraint should be used and the inmate transferred to the hospital emergency department for physician evaluation. [CFMG Plan at 96]*

**Findings:  Deferred**

     Noncompliance with this requirement was found in the last two monitoring reports. Instances were identified in those earlier reports where telephone orders were given for stat administration of involuntary medication by the on-call psychiatrist but the patient had not been personally evaluated by the prescribing physician within 24 hours prior to the emergency; in another case of involuntary medication administration an order was given by the on-call psychiatrist, who attempted to evaluate the patient via a Facetime contact at the time the order was given. The requirement, however, specifies that an on-site evaluation is necessary, or that the prescribing physician must have been personally evaluated by the prescribing physician not longer than 24 hours prior to the emergency.  There was no documentation found during prior monitoring reviews indicating that this was done.

     This requirement, as written, applies specifically to instances of involuntary medications administered in a psychiatric emergency, and not in cases where the inmate has an Involuntary Medication Order in place.  The language of this requirement raises questions about how it should be interpreted and applied to the procedures for the administration of psychotropic medications in a psychiatric emergency.  The first sentence calls for an on-site evaluation, taken to mean a face-to-face encounter occurring at the jail.  The second sentence allows for a telephone order only if the inmate has been "personally" evaluated by the prescribing physician no longer than 24 hours prior to the emergency.  This portion of the requirement does not

26

specifically state that an on-site evaluation is necessary, and may allow for telepsychiatry evaluation of the inmate.

As noted in the last monitoring report from May 2023, evaluation of compliance with this requirement had been hampered by the lack of routine tracking of involuntary medication administrations. A log is now maintained for involuntary medication administrations. However, the involuntary medication log provided for review only contained cases for which an Involuntary Medication Order issued by the Court was in place. It was confirmed by Wellpath staff that instances of emergency involuntary medication administration, in the absence of an Involuntary Medication order issued by the Court, are also tracked by the Mental Health Supervisor. Wellpath reported that there were no such instances during the review period for the current monitoring report. No instances of involuntary medication administration were identified in the cases reviewed for the current report. A review of such instances, when they do occur, will be the basis for determining compliance with these requirements.

•*(f)  Verbal orders for involuntarily psychotropic medications must be documented in the inmate's medical record and signed by prescribing physician within 72 hours. The Medical Program Manager and Custody Facility Manager shall be notified in writing, or by telephone if not available, within 24 hours of the involuntary administration of psychotropic medications. [CFMG Plan at 96-97]*

**Findings:  Deferred**

Prior monitoring reports have found noncompliance with this requirement based on information provided by the HSA, indicating that the respective Managers are not routinely notified of involuntary administrations of psychotropic medications, nor was a log kept of involuntary medication administrations which would allow verification of such notifications. A log for involuntary medication administrations has recently been initiated. All of the cases listed on the involuntary medication log that was provided for the current review were found to have an Involuntary Medication Order issued by the Court. This requirement appears to be intended for instances of emergency involuntary medication administration, rather than cases where an Involuntary Medication Order is in place. Wellpath reports that there were no emergency involuntary medication administrations during the current review period. No instances of emergency involuntary medication administration were identified in the cases reviewed for the current monitoring report. A review of such instances, when they do occur, will be the basis for determining compliance with these requirements.

•*(g)  Inmates receiving involuntary psychotropic medications must be admitted to an infirmary or safety cell, with intermittent supervision by custody staff at least every 30 minutes. Nursing staff must monitor (assessing response to medications, mental status, general physical appearance, behavior, and hydration) every 15 minutes during first hour, then every 30 minutes thereafter until otherwise ordered by the prescribing physician, documenting all findings in the inmate's medical record. The inmate must be evaluated by the responsible prescribing physician at least every 72 hours. [CFMG Plan at 97]*

**Findings: Deferred**

This requirement was found noncompliant in the last two monitoring reports, where instances were identified in which a patient received involuntary psychotropic medications but was not admitted to an infirmary or safety cell or in which the required nursing assessments following involuntary medication administration were not documented in the healthcare record. Upon closer consideration, it appears that this and other requirements for the use of involuntary medications are intended to apply to instances of emergency involuntary medication administration, rather than cases where an Involuntary Medication Order from the Court is in place. All of the cases listed on the Involuntary Medication Administrations log provided for review had such an Involuntary Medication Order documented in the healthcare record. Wellpath reported that there were no instances of emergency involuntary medication administration during the current review period. No instances of emergency involuntary medication administration were identified in the cases reviewed for the current monitoring report. A review of such instances, when they do occur, will be the basis for determining compliance with these requirements.

*•(h)  Inmates exhibiting any clinical deterioration at any time during involuntary therapy shall be transferred immediately to a clinically appropriate treatment facility. [CFMG Plan at 97]*

**Findings: Deferred**

Noncompliance with this requirement was found earlier monitoring reports, when cases were identified in which the patient's clinical condition periodically deteriorated despite the administration of involuntary medications but the patient was not transferred to a clinically appropriate treatment facility, i.e., an inpatient level of care. A finding was deferred in the last monitoring report from May 2023, as too few cases of involuntary medication administration were identified in the course of healthcare record reviews to reach a conclusion about this area of practice. A routine process to log and internally review all instances of involuntary medication administration was recommended. Such a log is now maintained and was provided for review. The cases listed in the log all had Involuntary Medication Orders issued by the Court documented in the healthcare record. It is not clear from the language of this requirement if it is intended to apply only to instances of emergency involuntary medication administration, or is intended to include inmates receiving involuntary medications under an Involuntary Medication Order from the Court. Most of the requirements pertaining to involuntary medications appear to address the use of involuntary medications in instances of psychiatric emergency, although this is not clearly specified in each of the requirements.

Five cases were listed on the involuntary medications log that was provided for review. All five cases were enrolled in the EASS program and all had Involuntary Medication Orders issued by the Court. In each of these cases, review of the healthcare record indicated that the inmate did not substantially deteriorate during the period of involuntary medication administrations; transfer to an outside treatment facility was not clinically required (although some of these inmates were eventually transferred to a state hospital for competency restoration treatment). Because there were no cases identified during the current review in which an inmate

receiving involuntary medications exhibited clinical deterioration, compliance with these requirements cannot be determined and a finding is therefore deferred.

As the parties consider the various requirements for involuntary medications, they are encouraged to specify whether this requirement applies to all cases of involuntary medication administration, or only those instances occurring in a psychiatric emergency and in the absence of an Involuntary Medication Order by the Court.

## 11. Medication Refusals
*•(a)  The on-call psychiatrist must be contacted whenever an inmate refuses his or her medications on three consecutive occasions. [CFMG Plan at 20]*

**Findings: Noncompliance**

The last two monitoring reports found noncompliance with this requirement, noting a lack of documentation demonstrating that a psychiatrist was contacted for patients whose Medication Administration Record showed three or more consecutive refusals, nor were the patients consistently seen by a psychiatrist around the time of such refusals.  For the current report, Medication Administration Records were again reviewed to identify instances of three or more consecutive refusals of psychotropic medications. Documentation that the psychiatrist was notified was again not found in most cases.  In no cases was the on-call psychiatrist notified, although it is not clear why that would be the preferred option over notifying the regular treating psychiatrist. The first step in cases of repeated medication refusal is typically contact by a mental health clinician to evaluate the inmate's condition and reasons for referral.  This, however, also requires consistent notification by nursing staff that medications have been refused on three consecutive occasions.  It is noted that this is now an area of internal auditing to be routinely conducted by Wellpath.  It is recommended that performance deficits in this area result in corrective actions as needed.

## 12. Clinical Staffing
*•(a)  Defendants will maintain Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to ensure adequate staffing to provide all necessary medical and mental health care. The plan will identify all needed positions based on current and projected Jail population, and the number and qualifications of medical and mental health care staff to cover each position, with shift relief.*
*•(b)  Mental health services provided on-site shall include crisis evaluation, socialization programs, group therapy, medication management, psychiatric evaluations and individual therapy. [CFMG Plan at 42]*
*•(c)  At all times, there shall be sufficient staff to ensure compliance with the Implementation Plan. The CFMG Staffing Plan is attached to the Implementation Plan as Exhibit I. CFMG must ensure that all positions are filled. Relief factors for each position shall be calculated into the staffing analysis to ensure staffing levels consistently meet requirements. CFMG must continuously evaluate staffing levels to ensure sufficiency for compliance. [CFMG Plan at 116. ]*

**Findings: Noncompliance**

Although staffing levels have improved, clinical staffing has remained inadequate to fully meet the requirements of the Implementation Plan during the period of review for this monitoring report.  The current staffing allocation is as follows:

- 1 MH Director working 4 x 10-hour shifts: 1.0 FTE
- 4 Mental Health Clinicians working 3 x 12-hour shifts: 3.6 FTE
- 2 psych techs working 5 x 8-hour shifts: 2.0 FTE; currently vacant
- 1 discharge planner working 5 x 8-hour shifts: 1.0 FTE; currently vacant
- (1 psychiatrist working 4 x 10-hour shifts: 1.0 FTE)
    - TOTAL: 7.9 FTE, plus 1.0 FTE psychiatrist

At the time of the last monitoring report from May 2023, two additional mental health clinicians had recently been hired. Wellpath reports that there are now four Mental Health Clinicians in addition to the Mental Health Director.  One full-time psychiatrist continues to work a 4 x 10 hour schedule Mondays through Thursdays, and an on-call psychiatrist provides additional psychiatry coverage.  A contract with Precise telepsychiatry services in now in place to provide evening and weekend on-call psychiatry coverage.  Currently unfilled positions include the discharge planner and two psychiatric technicians.  Ongoing difficulties in recruiting psychiatric technicians have led to consideration of hiring LVNs into these positions, and to provide them with training and supervision to allow them to fulfill the necessary duties.  If properly executed, this could provide a reasonable alternative to ongoing vacancies in these psychiatric technician positions.  Wellpath has also recently been made with the psychiatric technician training program in San Luis Obispo in order to promote awareness of the open positions and facilitate recruitment.

It was noted in the last monitoring report that the frequency of rescheduled appointments due to workload continued to demonstrate that mental health staffing levels could not meet demand, despite continual triage and the consistent efforts of the mental health clinicians. Similar observations were made in the current monitoring review (see e.g., cases #3, #5, #7, #9, and #10).  Filling the remaining allocated mental health positions will be essential for continued progress across a range of requirements, including sick call, mental health screenings, outpatient services, suicide prevention, treatment planning, inmate discipline, and administrative segregation screenings. It will also be essential that adequate clinical staffing is achieved to allow the Mental Health Director to fully assume the necessary administrative, supervisory, quality monitoring, and professional development duties of that role, rather than continuing to provide a substantial level of front-line mental health services. The recently added mental health clinicians could help alleviate some of the shortcomings noted in the current report, although ongoing monitoring will be required to determine if the needs of the inmate population are adequately met in accordance to Implementation Plan requirements.

Other positions will also have an impact on the jail's capacity to provide adequate medical and mental health services and achieve substantial compliance with various requirements of the implementation plan.  These include the Health Services Administrator and Director of Nursing positions.  These positions have not been consistently filled, which directly affects several functions necessary for compliance.  The Implementation Specialist is frequently called on to fulfill or assist with the duties of the HSA and DON when these positions are vacant.

This prevents the Implementation Specialist from dedicating the time and focus needed to come into compliance with requirements of the Implementation Plan.  I witnessed this firsthand during the recent site visit, when the Implementation Specialist was frequently called upon to assist with other functions. I am concerned that if this pattern continues, insufficient progress will be made in the areas requiring improvement to achieve compliance. As I emphasized in the exit interview of the recent site visit, the next six to 12 months will be a particularly demanding period to develop, implement, and monitor the changes needed to comply with requirements. It is essential that the Implementation Specialist not be pulled into other duties during this time.

      A second impact of the HSA and DON positions not being consistently filled is that there is a lack of supervisory follow-through when staff need to demonstrate better adherence to policies and procedures.  When deficiencies are noted, as with continuing medications at intake or conducting required nursing rounds in administrative segregation housing, consistent feedback, additional training, and sometimes disciplinary actions are necessary.  Stability in these supervisory positions will be crucial for the overall progress needed at this stage.

*•(d)  Mental health staff shall be available on-site 7 days per week and on-call for assessment on an inmate's level of suicide risk upon referral by health services and/or custody staff. [CFMG Plan at 72]*

**Findings: Substantial Compliance**
      This requirement was found to be in substantial compliance in the last monitoring report. Review of staffing schedules again showed that mental health staff were available on-site seven days per week for the months of August and September 2023.  Staff were also available on-call for assessment of suicide risk upon referral.

**13. Mental Health Care Training**
*•(a)  All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.*

**Findings: This requirement was released from further monitoring by Court Order dated October 27, 2023 (Dkt. 844 at ECF 5).**

*•(b)  In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.*
*• (c) All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates, identifying warning signs specific to inmates, and how to recognize individuals who are in mental distress and/or suicidal.*
**Defendants have been released from monitoring on these items. [Dkt. 751 at ECF 10]**

*•(d)  Once a year, custody staff will conduct a situational training such as a mock suicide attempt or a medical emergency. CFMG staff will also participate in the annual situational training. At the conclusion of the situational training, command staff will meet with CFMG to determine if any changes in policies or operations are warranted as a result of the exercise. [Dkt. 528-1 at 17 of 90]*

**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance. [Dkt. 751 at ECF 19]**

**Findings: Substantial Compliance**

Documentation was provided of a situational training conducted by custody staff on 5/18/23 based on a mock suicide attempt by hanging.  This documentation reflected the involvement of Wellpath staff and custody command staff as required, and included a post-drill review which identified areas for performance improvement.  It is my understanding that on this basis, this requirement has been released from further monitoring.

*•(e)  All medication nurses must be trained to recognize common side effects associated with use of psychotropic medications, and upon observing such side effects must document observation in the medical record and schedule the patient to see a medical provider at the next available sick call. [CFMG Plan at 90]*

**This item has been released from monitoring. [Dkt. 751 at ECF 12]**

**14. Restraint Chairs**

*•(a)  Physical restraint devices can only be used on inmates who display bizarre behavior that results in the destruction of property or reveals an intent to cause physical harm to others, and cannot be used when there are less restrictive alternatives. [CFMG Plan at 47]*

**This item has been released from monitoring. [Dkt. 751 at ECF 12]**

*•(b)  Use of a restraint chair will be documented in an observation log which will be reviewed and signed by a supervisor. Inmates shall not be placed in a restraint chair for longer than six consecutive hours.*

**This item has been released from monitoring. [Dkt. 751 at ECF 11]**

*•(c)  Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A shift supervisor and medical staff shall oversee the exercise. If unsuccessful in allowing inmates to exercise their arms and hands in a range of motion exercise, safety staff shall explain on the observation log why extremities could not be exercised and a shift supervisor shall be notified.*

**Findings: Substantial Compliance**

The last two monitoring reports of July 2022 and May 2023 have found substantial compliance with this requirement.  There continues to be relatively few incidents of restraint use.

32

The Compliance Commander continues to oversee a robust system of monitoring and reporting on use of restraints, including the WRAP devise, which now includes review of surveillance video to confirm compliance with requirements.  Review of audit reports and restraint logs dating from June through October 2023 showed ongoing substantial compliance.

*•(d)  On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.*

**Findings: This requirement was released from further monitoring by Court Order dated October 27, 2023 (Dkt. 844 at ECF 5).**

### 15. Use of Force
*•(a)  Medical and mental health staff shall be consulted before any planned use of force on an inmate. Custody staff in concert with medical staff will develop the most effective and appropriate means of imposing compliance with rules and regulation, including attempts at de-escalation. It is understood that it is the goal of custody staff to use the least amount of force necessary to ensure compliance with rules and regulations. Planned use of force will only be used after verbal attempts to obtain compliance.*
*•(b)  Any use of force will be documented on a use of force form.*

**Findings: Substantial Compliance**
         The last two monitoring reports found substantial compliance with this requirement.  The current review of use of force reports from September and October 2023 found continuing substantial compliance. Medical and mental health staff were involved and responded appropriately, and custody attempted verbal de-escalation where circumstances allowed.

### 16. Mental Health Grants
*•(a)  Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.*
**This item has been released from monitoring. [Dkt. 751 at ECF 10]**

### 17. Inmates Who Have Been Declared Incompetent to Stand Trial
*•(a)  The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period. As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment. The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for orders to show cause to be directed*

33

*the State of California) to expedite the transfer of inmates who have been determined to be incompetent to stand trial to an appropriate State facility. [Dkt. 582-1 at ECF 13]*

**Findings: Noncompliance**

The prior Mental Health Monitor found substantial compliance for this requirement in his last report of May 2021. He concluded that, "The process developed for the identification, referral and monitoring of inmates who were considered or declared incompetent appeared to be adequate and sufficient to allow for a continued determination of substantial compliance."

In my subsequent monitoring review of July 2022, I deferred a finding on this requirement, pending clarification of the process involved. In my most recent past monitoring report of May 2023, I found noncompliance with this requirement. Concerns were noted that the Court did not always appear to provide timely notification when inmates are declared incompetent to stand trial. It had since been reported by the Compliance Commander that the Court does in fact notify the jail on a daily basis regarding inmates found incompetent to stand trial. He also noted that many incompetent to stand trial inmates are already in Administrative Segregation. Once notified by custody, mental health staff will see patients and place them on a follow-up schedule as needed.

What appears to remain missing is timely communication between custody and mental health staff, such as would allow for the required evaluation of the inmate's condition within 24 hours of the change in their legal status.

The primary intent of this requirement appears to be the close monitoring of inmates during a period of potentially heightened vulnerability following a finding of incompetence to stand trial. It has been previously noted that this may be as simple as having a designated custody staff (e.g., the Compliance Commander or one of the Compliance Sergeants) notify mental health staff (e.g., the mental health supervisor) on a daily basis regarding newly classified PC 1370s, as received from the courts. Such inmates could be added to the daily sick call list, and evaluated as required. A housing determination should follow established procedures, including discussion between classification and mental health staff, and review of inmates found incompetent to stand trial in the Multidisciplinary Team meetings. It is recognized that this process would have implications for staffing levels and workload.

It has been previously noted by County Counsel that there are no longer "administrative segregation transition cells" and that in misdemeanor cases, charges are now typically dismissed or the judge releases the defendant. It is also noted that a small Jail Based Competency Treatment program is located within MCJ, and that a program of early access to enhanced mental health treatment (EASS) has been implemented. It is recognized that the EASS program is not specifically a part of the implementation plan requirements and associated monitoring process. However, this program may facilitate the early detection and clinical response to inmates where competency is a factor. It should be coordinated with the other aspects of the process involved in meeting this requirement.

**18. Treatment Plans**

•*(a)  Qualified health services staff must develop a written individualized treatment plan for inmates requiring close medical and/or mental health supervision. A treatment plan must specify*

34

*a particular course of treatment and shall be included in the plan portion of the S.O.A.P.
progress note. The treatment plan shall reflect current problems or conditions being followed.
The treatment plan shall include monitoring of the efficacy of treatment and discharge planning.
[CFMG Plan at 27, 75]*

*•(b)  Treatment plans shall include specific medical and/or psychiatric problems, nursing
interventions, housing, dietary, medication, observation and monitoring, and follow-up referral
and/or evaluation as appropriate. [CFMG Plan at 27]*

*•(c)  Mental health providers must work with the Program Manager or designee to develop a
treatment plan and meet the outpatient needs of inmates with mental illness, including
opportunity for social interaction and participation in community activities. If an inmate is
unable to participate, the reason must be documented. [CFMG Plan at 43, 75]*

*•(d)  CFMG will inform classification through medical treatment orders as to any classification
issues an inmate has due to a mental illness. [County Plan at 11]*

**Findings: Partial Compliance**

Prior monitoring reports have found noncompliance with the requirements for treatment
plans.  Although a few instances of improved documentation had been observed in the last
monitoring review of May 2023, many of the deficiencies noted in earlier reports remained
evident at that time. Previous reviews of treatment plans had indicated that the required elements
were seldom adequately addressed. Prior monitoring reports also noted that integration of the
interventions provided by various professional disciplines (e.g., mental health clinicians,
psychiatrist, nursing, custody, etc.) was lacking.  Specifically, the role of psychiatry appeared
limited to the prescription of psychotropic medications, without further involvement in an
interdisciplinary treatment process; coordinated efforts to address problems such as medication
compliance or reduction of self-injurious behavior were not evident in the documentation.
Treatment plans by mental health clinicians, which were documented primarily in SOAPE notes,
typically did not address the required elements.

Improvements were noted in the current review.  Several, but not all, of the healthcare
records that were reviewed contained a completed Treatment Plan for Non-Acute Patients form,
which consists of a series of checkboxes for problems associated with various psychiatric
disorders, with associated goals and interventions. Consistent use of this form would represent a
significant step toward substantial compliance with the treatment plan requirements of the
Implementation Plan.  Some of the treatment plan elements specified by the Implementation
Plan, such as nursing and dietary interventions, are typically not seen as essential to include in
the mental health treatment plan; the expectation should be that these aspects of healthcare will
be addressed in other parts of the healthcare record.

As noted in the last monitoring report, two aspects of treatment planning must be in place
to achieve substantial compliance with Implementation Plan requirements.  One is the process of
treatment planning, the other is the resulting documentation of a treatment plan.  Best practice in
the process of treatment planning involves active participation of an interdisciplinary team of
service providers to produce an individualized treatment plan which guides interventions and
case management, based on an adequate, ongoing assessment of the patient. The written

35

treatment plan must then be sufficiently specific, readily accessible to relevant staff, and revised as needed based on the patient's current condition and behavior.

Another specific requirement in the Implementation Plan pertaining to treatment plans is that CFMG/Wellpath with inform classification through medical treatment orders as to any classification issues an inmate has due to a mental illness. Discussions with Wellpath staff during the recent MCJ site visit indicated that mental health staff do not write medical treatment orders. Mental health staff report that they typically communicate directly with custody classification staff regarding any housing issues stemming from mental health concerns. Such mental health input into classification considerations should be documented in the health care record; if local policies and procedures do not provide for mental health staff to write medical treatment orders as specified in the requirement, alternatives for documenting the mental health input should be identified in other sections of the healthcare record.

The requirements for treatment plans as written appear to envision a single, comprehensive treatment plan document that covers the mental health, medical, nursing, dietary, socialization and housing needs of inmates. It also specifies that such a plan shall be included in the SOAP progress notes, which are to be written by staff following every patient contact. These expectations are unrealistic; such documentation practices are not used in any jail or correctional system that I am familiar with.  It is reasonable, however, to expect that the various required elements of treatment plans specified in the Implementation Plan will be documented somewhere in the healthcare record.  The challenge is for these various elements to be sufficiently coordinated, and the resulting documentation to be efficiently accessible to be of practical use to staff providing care. To be effective in guiding treatment, written treatment plans must be used in conjunction with the information contained in the SOAPE notes regarding the patient's current status and response to treatment.  Access to the necessary information should be as efficient and convenient for staff as the format and functions of the electronic healthcare record can allow. For mental health purposes, consistent use of the treatment plan form, in combination with adequate information documented in the progress notes, should be sufficient to achieve substantial compliance with requirements.

Regarding the process of treatment planning, it was noted in the last monitoring report that various staff participate in a weekly Multidisciplinary Team Meeting.  Also as noted last time, it does not appear that this meeting systematically addresses all relevant cases (e.g., all cases on the Special Needs or Seriously Mentally ill list), nor does it appear to consistently inform a written treatment plan for the cases that are reviewed.  Wellpath staff report that a new meeting structure has been under development.  The focus, membership, and outputs from these meetings appear to require further refinement. An effective Multidisciplinary Team Meeting would also provide a mechanism for better integration and coordination of medical and mental health care.  This would require consistent representation and participation by both medical and mental health staff, and a process by which coordinated treatment considerations are documented in the healthcare record.  A stand-alone mental health treatment plan document, filed under a tab in the healthcare record that is readily identifiable and accessible, should allow for the inclusion of relevant comorbid medical conditions, especially as these may impact the clinical presentation and treatment approach for individual patients.

The current finding of partial compliance with these requirements reflects the recent progress that has been observed in implementing a standardized treatment planning form.  As noted in the preceding discussion, much work remains to be done in order to achieve substantial compliance.  In pursuit of completing the remaining work, a common vision is needed for both the process and written products of treatment planning.  I anticipate ongoing collaboration with the parties to further define this vision.

### 19. Consideration of Mental Illness in Inmate Discipline

*•(a)  Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff shall contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness. (*Dkt. 532 at ECF 47*)*

**Findings: Noncompliance**

The last three monitoring reports have found noncompliance with this requirement.  The prior Mental Health Monitor noted that while some Disciplinary Action Reports (DARs) were completed in their entirety, many forms were not completed by checking boxes on the form that noted whether inmates received mental health services or if custody staff consulted with medical staff.  Similar deficiencies were found in my last report from May 2023.  Review of DARs for the current report found some forms which checked boxes related to whether inmates were receiving mental health services, although a majority of forms were not so marked.  For those inmates whose DAR form was checked for receiving mental health services, the DARs once again contained no information related to consulting with mental health staff.  Review of electronic healthcare records again showed no documentation of such consultations by mental health staff regarding the evaluation of discipline for inmates with mental illness.

During the current review, some incident reports again indicated that charges are recommended for patients with known mental health problems.  It is recommended that a mental health patient's clinical condition should be consistently taken into consideration when decisions are made about filing charges for infractions while incarcerated.

### 20. Space Issues

*•(a)  Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including . . .adequate clinical and administrative treatment space....* [Dkt. 494 at ECF 17]

**Findings: This requirement was released from further monitoring by Court Order dated October 27, 2023 (Dkt. 844 at ECF 5).**

### 21. Administrative Segregation

*•(a)  The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation, and require procedures to mitigate the impact of administrative segregation on*

*persons with mental illness, including but not limited to structured therapeutic activity outside the segregation cell and where feasible assignment of cell mates.* [Dkt. 494 at ECF 9-10]
*•(b) Inmates being moved from general population to an administrative segregation cell will be screened for suicide risk within 24 hours of placement.* [Dkt. 528-1 at ECF 12]

**Findings: Noncompliance**

The last two monitoring reports of July 2022 and May 2023 found noncompliance with both elements of these requirements: the need for screening all inmates placed in administrative segregation and the need to provide structured therapeutic activity outside the segregation cell. These findings have again not changed. Discussion with the Mental Health Supervisor still indicated that mental health staff do not routinely screen inmates placed in administrative segregation housing. There is no process by which mental health staff are notified of all administrative segregation placements, and there has been insufficient mental health staffing to conduct the resulting volume of screenings should such notifications be made. However, this requirement, as written, does not specify that the screenings are to be conducted by a qualified mental health provider, unlike the requirement under Suicide Prevention, which states that a QMHP must perform a suicide risk assessment using the Risk Assessment Tool, "after placement in Administrative Segregation." Procedures to meet both of these requirements should be pursued. Groups are still not being held on a regular basis to meet out of cell programming requirements due to mental health staffing limitations, although in-cell materials continue to be provided.

*•(c) Inmates shall not be placed in administrative segregation solely because of having a mental illness. Classification is to assess a totality of factors when assigning inmates to administrative segregation units. The goal of the County is to limit the use of administrative segregation for inmates with mental illness.* [Dkt. 528-1 at ECF 12]

**Findings: Substantial Compliance**

The last two monitoring reports of July 2022 and May 2023 found substantial compliance with this requirement. These findings were based on the interpretation of the requirement to mean that the classification process must not result in placing an inmate in administrative segregation only ("solely") because of the presence of mental illness. During the current review, there continued to be no indications that inmates were placed in administrative segregation solely because of having a mental illness. As in previous reviews, there were cases in the current review where a severe and chronic mental illness contributed to the behaviors leading to placement in administrative segregation, and such cases can sometimes exceed the capacity of MCJ to adequately treat the inmate's mental illness. Such problems are addressed in the sections of the monitoring report covering chronic and acute care.

The Plaintiffs' attorneys have consistently raised the concern that because a disproportionate percentage of inmates in administrative segregation have mental illness and cannot be housed elsewhere, they are being placed in administrative segregation solely because they have a mental illness. I have not requested or reviewed specific statistics regarding the percentage of inmates with mental illness in administrative segregation housing, but I believe the

observation that there are many such inmates is accurate. I do not believe review of such statistics is necessary; the question is not whether mentally ill inmates are disproportionately represented in administrative segregation, but why they are there. I have reviewed a substantial number of cases at this stage, and throughout my experience as monitor in this case I have not observed a single case in which it appeared that an inmate was placed in administrative segregation *solely* due to mental illness, i.e., that once an inmate is diagnosed with a mental illness, this and this alone is the reason they are so housed. Many inmates with mental illness are not housed in administrative segregation. Those mentally ill inmates who have been housed in administrative segregation have also presented with behaviors or other classification factors which required segregated housing.

•*(d)  Inmates with a serious mental illness who are housed in Administrative Segregation will be scheduled for a weekly appointment with a qualified mental health provider.* [CFMG Implementation Plan at 42]

**Findings: Substantial Compliance**

The last monitoring report found noncompliance with this requirement, after the two prior monitoring reports had found substantial compliance. In the last report it was observed that some mentally ill inmates in Administrative Segregation did not appear to be scheduled to see mental health clinician at all; others who were scheduled were repeatedly rescheduled without being seen for several weeks and in some cases for over a month.

Wellpath has previously noted that mental health staff routinely conduct weekly Administrative Segregation rounds, and in the last monitoring report I stated that consideration would be given to whether this practice is sufficient to meet the requirement for a scheduled weekly appointment with a QMHP. I have since been informed that these weekly mental health rounds are now always conducted by a QMHP, who documents the contacts in the healthcare record on a flowsheet, with brief observations about the inmate's clinical presentation, behaviors, and the condition of the cell. When clinically needed based on these observations, or at the request of the inmate, a more extensive clinical encounter is conducted and documented in a progress note. Healthcare record reviews for the current monitoring report showed that these weekly contacts were consistently conducted and documented as described. I believe this practice sufficiently meets the intent of the requirement, which is to ensure the well-being of seriously mentally ill inmates housed in Administrative Segregation, to warrant a finding of substantial compliance.

•*(e)  Nursing staff shall conduct mental health rounds in Administrative Segregation daily, separate and apart from medication distribution.* [CFMG Implementation Plan at 42]

**Findings: Noncompliance**

The last three monitoring reports found noncompliance with this requirement, noting that nursing rounds were not always documented daily in segregation units. Review of healthcare records for the current report found a similar pattern whereby nursing rounds were not documented daily across administrative segregation housing areas. The CQI Committee Meeting

minutes from July noted that Ad Seg checks were not occurring regularly due to a need for education for nursing and mental health staff, and that education had been recently provided. However there was no further mention of this issue in subsequent CQI Committee Meeting minutes.  Performance issues such as this should be tracked and reported until substantial compliance is achieved, and periodically thereafter, with additional corrective action as needed.

*•(f)  Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior. Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal. [Dkt. 528-1 at ECF 15]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance.  [Dkt. 751 at ECF 19]**

*•(g)  Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.*

**Findings: Partial Compliance**

The prior Mental Health Monitor had found Substantial Compliance on these requirements, and my last two monitoring reviews of July 2022 and May 2023 indicated that audits of the documented completion of welfare checks continued to show high levels of compliance.  It was noted that the Compliance Commander has developed a thorough and effective process for monitoring the recording of welfare checks, with routine reports and feedback to deputies, including correctional action as needed. The current review found similar compliance with this aspect of the requirement.

Findings for these requirements were deferred in my last report.  The area of concern which prevented a finding of Substantial Compliance was the requirement that welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior.  Concerns about this aspect of welfare checks remain, as noted in the review of case #1 in the separate case reviews document. Although this incident took place in a booking cell, concerns about the quality of welfare checks extend to the Administrative Segregation housing areas covered by this section of requirements. And although this was a single, extreme event, and may not generalize more broadly to the quality of welfare checks throughout the areas covered by various Implementation Plan requirements, the concerns it raises are of sufficient magnitude as to prevent a current finding of substantial compliance.

Leadership at MCJ are taking steps to address these concerns.  The prior Compliance Sergeant has been promoted to Compliance Commander, and two additional sergeant positions have been allocated to his compliance team.  The Compliance Commander continues to monitor the conducting and documentation of welfare checks via the Guardian system; the auditing, reporting and corrective action aspects of this internal monitoring process have been commented upon favorably in my prior reports.  Review of surveillance video has recently been added to the

Compliance Commander's internal auditing of welfare checks.  I reviewed such videos with the Compliance Commander during the recent site visit conducted November 6 – 8, 2023, and concluded that this provides a useful new component to the quality assurance of welfare checks.

Another step taken by custody leadership is the development of additional training focused on the correct procedures for conducting welfare checks.  This training has been provided for my review, and includes demonstration videos, a PowerPoint presentation, and associated documents that address concerns about the quality of checks.  This training, in combination with the ongoing monitoring, feedback, and supervision process led by the Compliance Commander, should make a significant contribution toward achieving substantial compliance with the qualitative aspects of requirements involving welfare checks.

*•(h)  All welfare checks shall be documented on a welfare check log.  The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance.  Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week.  On a monthly basis, the Compliance Sergeant will randomly select five log entries and use the door entry logs to verify that the deputy entered the administrative segregation  pod, to conduct a welfare check.  The Compliance Sergeant will track all of his findings through reports which will be sent to the Jail Ops Commander.  Monthly audits of the Compliance Sergeant's reports will be conducted by the Jail Operations Commander.  The Jail Operations Commander will generate a monthly report to document their audit findings. [Dkt. 528-1 at ECF 16]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance.  [Dkt 751 at ECF 20]**

**Findings: Substantial Compliance**

The prior Mental Health Monitor found substantial compliance with this requirement during his last report of May 2021, noting that the Compliance Sergeant continued to audit welfare checks monthly, and that areas of concern that were identified resulted in notifications and corrective actions when indicated. Review of logs by Dr. Hughes indicated timely documentation of custody welfare checks.  My last two reviews of July 2022 and May 2023, as well as the current review, produced the same findings in this regard.  The Compliance Commander continues to conduct thorough and timely audits of welfare checks as required, with regular monthly reports to the Jail Operations Commander.  The Corrections Operations Commander provides a thorough monthly compliance report to the Chief of the Corrections Operations Bureau.  Review of welfare check logs and example reports by both the Sergeant and the Commander, in addition to discussions with the Compliance Commander about the procedures used in this process, demonstrated ongoing substantial compliance with this aspect of the requirement.

As noted in prior monitoring reports, this requirement is interpreted as pertaining primarily to the process of recording when welfare checks took place, and the associated internal monitoring process by the on-duty sergeants and Compliance Commander to ensure that welfare checks took place.  These aspects of the welfare check process have remained in substantial

compliance, i.e., the welfare checks are consistently documented in a log, and the required reviews and reports are completed.

**22. Suicide Prevention**

*•(a)  Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.*

**The County has been released from monitoring for the reduction of tie-off points within administrative segregation cells in units A, B, R, and S. (Dkt. 751 at ECF 11)**

**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance for reduction of tie-off points in Pods D, G, H, I and J.  [Dkt. 751 at ECF 19].  This requirement was found in substantial compliance in the last monitoring report of July 2022, and has been released from further monitoring.**

**A footnote in Dkt. 751 at ECF 19 states that the Mental Health Monitor will evaluate the new jail for reduction of tie-off points.  If substantial compliance is found for reduction of tie-off points in the new jail, Plaintiffs have agreed to release Defendants from further neutral monitoring for these cells.**

**Findings: Substantial Compliance.**

      Reduction of tie-off points in N Block of the new jail were verified to be in substantial compliance in the last monitoring report from May 2023.  Questions remained regarding whether the remaining cell blocks in the new jail areas were also in substantial compliance, although information provided by the County indicated that all cell blocks had been built to the same specifications. Cells in Blocks X; Y; V; K; L; and M were visually inspected during the site visit for the current monitoring report.  All were found to be built to the same specifications, and all were therefore considered to be in substantial compliance with this requirement.  Specifically, there were no open holes in the metal bunk beds; there were no gaps between the bunks and the wall; the air vent grate holes were of small diameter; light fixtures, air vents, and sink units were caulked to eliminate gaps.

*•(b)  A qualified mental health professional must perform a suicide risk assessment using the Suicide Risk Assessment Tool (attached as Exhibit G to Implementation Plan) in all the following circumstances: (1) if the RN identifies suicidality during the Initial Health Screen; (2) within 4 hours of placement in a safety cell and before release from a safety cell; (3) after placement in Administrative Segregation. [CFMG Plan at 43, 72, 75]*

**Findings: Partial Compliance**

This requirement was found noncompliant in prior monitoring reports, based primarily on the determination that structured suicide risk assessments are not routinely completed with inmates placed in administrative segregation housing. The Mental Health Supervisor has reported that there is no reliable and consistent way by which mental health staff are informed of all administrative segregation placements, nor are there enough mental health clinicians on staff to respond adequately to this requirement. This situation continues.

Regarding other elements of this requirement, adequate suicide risk assessments are routinely conducted when the RN identifies suicidality during the Initial Health Screen.  Suicide risk assessments are routinely conducted when inmates on continuous Suicide Watch are placed in a safety cell and prior to release from a safety cell.  For inmates on intermittent Suicide Watch who are placed in safety cells due to a lack of other observation cell housing, it is interpreted that they do not need a suicide risk assessment prior to removal from a safety cell as specified in this requirement, as they did not require placement in the safety cell due to suicide risk, and their removal from a safety cell should be expedited to the greatest extent possible. For these patients, a structured suicide risk assessment is completed during the regular daily work shift; for patients placed on Level 2 Suicide Watch outside of daily mental health work shift hours (including those placed in a safety cell), the suicide risk assessment is completed the following day during the regular mental health work shift.  Alternatives to placing inmates on Level 2/intermittent Suicide Watch in safety cells is under consideration by Wellpath and custody staff.  This continues to be strongly encouraged.

Looking at the various elements of this requirement, parts one and two are in substantial compliance, while part three (suicide risk assessment after placement in Administrative Segregation) is noncompliant.  Partial Compliance, as defined at the beginning of the current report to indicate that the responsible party has achieved compliance on some, but not all, of the material components of the relevant provision of the Agreement, is the overall finding for this requirement.

*•(c)  Whenever an inmate is placed in a safety cell due to suicide risk, CFMG shall immediately, and no later than within 4 hours, determine what level of suicide precautions are necessary and decide whether the inmate needs to be transferred to an inpatient mental health facility. If CFMG determines that more than 24 hours of suicide watch/precautions is necessary, CFMG shall work with custody to place the inmate in an inpatient mental health facility, the Outpatient Housing Unit, a receiving cell located in the booking unit, or dorm A. Whenever possible, the inmate will be transitioned from a safety cell to an open dormitory setting until the inmate has stabilized. [CFMG Plan at 73, 75]*
*•(d)  Custody must transfer patients to NMC or another appropriate inpatient mental health facility if the patient has been housed in a safety cell for 24 consecutive hours or for more than 36 cumulative hours in any 3-day period. If exigent circumstances prevent such transfer, a memo must be written to the Custody Operations Manager. [CFMG Plan at 73, 75]*
*•(e)  Once CFMG determines that an inmate is no longer suicidal, CFMG shall work with custody staff to place the inmate in the most appropriate setting. Mental health clinicians must follow-up with the patient until a step-down plan is no longer necessary. [CFMG Plan at 73]*

**Findings: Substantial Compliance**

The last monitoring report from May 2023 found substantial compliance with these requirements. The current review found continuing substantial compliance.  Healthcare record documentation showed consistent evaluations completed by mental health clinicians for inmates placed in a safety cell due to suicide risk within four hours with a determination of necessary suicide precautions.  Cases requiring transfer to an outside facility for crisis evaluation or other emergency treatment were appropriately referred to NMC ER.

Regarding the requirement that custody must transfer patients to NMC or another appropriate treatment facility for cases exceeding 24 hours of safety cell housing, there were three cases from June through September 2023 in which patients placed in Observation Cells 3 or 4 exceeded 24 hours.  It should be noted that for the purposes of these safety cell requirements, Observation Cells 3 and 4 are treated as safety cells, in that they were converted from former safety cells and still provide the same housing environment as a safety cell.  The three incidents in question are reviewed under Section 7 of the current report regarding Safety and Sobering Cells.  These instances represent a small fraction of the total safety and sobering cell placements during this review period, and are not considered to represent systemic deviations from compliance. As noted in Section 7, a robust monitoring system remains in place and corrective actions were quickly taken.

A question was raised in response to the draft version of the current report regarding the current inability of mental health staff to conduct suicide risk assessments for all inmates placed in administrative segregation, and whether this precludes a finding of substantial compliance for requirement 22(e) which states that once CFMG determines that an inmate is no longer suicidal, CFMG shall work with custody staff to place the inmate in the most appropriate setting, and that mental health clinicians must follow-up with the patient until a step-down plan is no longer necessary.  Reference to the Implementation Plan (Dkt. 532 at ECF 73) indicates that this requirement applies specifically to inmates placed in a safety cell on suicide watch or suicide precautions.

For inmates in this circumstance who are determined to no longer be suicidal, review of healthcare records and discussions with the mental health clinicians during the recent site visit indicate that adequate communication and collaboration occurs regarding placement of the inmate in the most appropriate setting. Review of healthcare records consistently showed that clinicians documented and followed a step-down plan as needed.

As noted in the last monitoring report, mental health clinicians consistently document suicide risk assessment and collaborative safety planning using the structured forms titled "Suicide Watch Initial Assessment for Mental Health" and "Suicide Watch Daily Follow-up and Discharge for Mental Health."  Decisions about placing inmates on and releasing them from suicide watch were adequately based on the information and clinical reasoning documented on these forms and reflected in progress notes. Direct observation of clinicians performing these duties during the recent site visit showed adequate clinical practice.

•*(f)  Custody must conduct welfare checks of patients on suicide watch/precaution twice every 30 minutes. Health services staff must conduct welfare checks every 6 hours. Mental health staff must conduct welfare checks once per duty shift. The checks must be documented in the appropriate log (sobering/suicide watch/safety cell/restraints log). The inmate may not have access to materials that could be used to inflict harm on his/her self or others, and may be dressed in an approved safety garment if necessary. [CFMG Plan at 74, 76]*

**Findings: Substantial Compliance**

Earlier monitoring reports had found substantial compliance with this requirement, although the last report from May 2023 found noncompliance due to several cases in which health services staff (i.e., nursing) did not consistently complete and document welfare checks every six hours as required.  In the current review, welfare check logs and healthcare records showed that custody recorded welfare checks at least twice every 30 minutes as required, mental health staff conducted welfare checks daily, and nursing staff conducted checks more often than the required six hours, with checks documented approximately every four hours. Appropriate safety precautions were noted based on the assess level of suicide risk.

As has been noted in prior monitoring reports, this set of requirements is interpreted to refer to the issue of whether welfare checks were conducted and documented according to the specified schedule.  It does not consider the quality of welfare checks that were conducted, which is addressed in the findings of other relevant requirements.

*•(g)  The CFMG Program Manager and the Facility Manager shall have joint responsibility to report completed suicides in accordance with CFMG Inmate Deaths Policy and Procedure. [CFMG Plan at 76]*

**Findings:  Substantial Compliance**

A finding for this requirement was found to be in substantial compliance in the last monitoring report from May 2023.  Documentation provided by Wellpath, including internal emails, demonstrated that the most recent suicide in June 2023 was reported as required.

*•(h)  The CFMG Program Manager or nursing staff on duty shall report all potential and/or attempted and completed suicides to the Facility Manager or Shift Supervisor. CFMG management will be notified of any completed suicides within one working day. Family members must be notified in accordance with the CFMG Notification of Next of Kin Policy and Procedure. CFMG Plan at 76-77.*

**Findings: Substantial Compliance**

A finding for this requirement was deferred in the last two monitoring reports of July 2022 and May 2023, pending a better understanding of the processes involved and the availability of documented information to evaluate.  One question involved how attempted suicides are distinguished from other incidents of self-injurious behavior.  It has since been explained that incidents of self-injury are assessed by a clinician regarding, among other things, the severity of the self-injurious behavior and the inmate's intent.  If the inmate had any intention to end their life, it is classified as an attempted suicide. Another question involved the notification of next of kin in cases of completed suicides.  It has been explained that according to MCJ procedures, this is the responsibility of the Coroner.

Documentation has previously been provided by Wellpath for critical clinical events that included two completed suicide and four suicide attempts.  Review of this documentation showed that the internal reporting of completed suicides was compliant with the 24-hour

reporting requirement.  For the current monitoring review, additional information was provided regarding the notification of required staff in the event of attempted suicides.  The mental health supervisor enters information into an internal system referred to as DataTrk, which sends the information to a number of individuals, including the Facility Manager.  Wellpath staff oriented me to this process, and pointed out the relevant documentation for ten instances of attempted suicide over the period of July through October 2023. Based on this information, a finding of substantial compliance is warranted.

### 23. Increase in Time Outside of Cell and/or Increasing Programs

•*(a)  Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:*

- *3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)*
- *14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time*
- *2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail)*

•*(b)  Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking and receiving area will be guaranteed the following weekly times out of their cell:*

- *3 hours a week for exercise*
- *14 hours a week in the common area*
- *2 hours a week of programming will be offered to each inmate*

•*(c)  If approved by classification, inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services [County Plan, Dkt. 528-1 at ECF 19]*

### Findings: Partial Compliance

The last three monitoring reports have found noncompliance for these requirements. It has been noted that the Compliance Commander continues to oversee a thorough and detailed system of routine audits, which includes notification of custody staff and further training when deficiencies in out of cell time are identified.  Prior monitoring reviews of these audits indicated that inmates in segregated housing are consistently offered the required amounts of exercise time (yard time) and time in the common area (socialization time).  It was the amount of programming time, which is not tracked by the Compliance Commander in his auditing procedures, that prevented a finding of substantial compliance in prior monitoring reports.

The current monitoring review again found that inmates in the administrative segregation pods are consistently offered the required amount of yard time and socialization time.  Routine group programming offered by mental health staff has not resumed due to staffing inadequacies, although it should be noted that this Implementation Plan requirement does not specify that two hours a week of programming must be offered by mental health staff.  Custody programming staff continue to provide various classes and activities to inmates across the jail, including those

in administrative segregation.  Program attendance reports were provided for review, and it appeared that more than two hours per week of such programming were consistently being offered.  It could not, however, be determined if these programming opportunities were offered to each inmate in the housing areas designated by these requirements. As noted in prior monitoring reports, if two or more hours of programming are offered in designated housing areas as required, a finding of substantial compliance is possible prior to the restarting of groups by mental health staff.

*(d)  Working with the Monterey County Probation Office and the Monterey County Superior Court, the Office of the Sheriff has and will continue to support evidence based programs such as the Work Alternatives Program; Involuntary Home Detention; Pretrial Release through Probation; Own Recognizance; educational early release kickouts such as Choices/Liberty Pride; and Penal Code sections 4018.6 and 4024.1 kickouts. [County Plan at 15; Dkt. 528-1 at ECF 19]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance.  [Dkt. 751 at ECF 20].  The subsequent monitor's report of July 2022 found substantial compliance.  This requirement has been released from further monitoring.**

## 24. Telepsychiatry
*(a)  The telepsychiatrist must obtain informed consent and explain all medications before prescribing. [CFMG Plan at 45]*
*(b)  The policies contain numerous provisions regulating the use of telepsychiatry at the jail, including requiring that a psychiatric nurse be present during telepsychiatry encounters where the patient is in a safety cell as well as requiring a local assessment by a physician or mid-level provider within 24 hours of an initial assessment that is conducted by telepsychiatry. [Dkts. 622 and 632].*

**Findings: Noncompliance**

Previous monitoring reports have found noncompliance with these requirements. The prior Mental Health Monitor in his last report of May 2021 noted problems with completion of the informed consent forms, a lack of documentation that a qualified clinician assisted, or that a physician or mid-level provider saw patients within 24 hours of an initial psychiatric assessment. He also noted concerns regarding provision of involuntary medications involving telepsychiatry. In my last report from May 2023, cases were identified who had received telepsychiatry services via telephone or Facetime.  Documentation of informed consent for telepsychiatry was not found in any of the healthcare records for these patients.  Cases where the patient was in a safety cell or received an initial assessment conducted by telepsychiatry were not identified.  It was not clear that telepsychiatry contacts are routinely logged and reviewed for compliance with these requirements. It was noted that such a monitoring procedure, as part of the Quality Management process, would better facilitate substantial compliance with telepsychiatry requirements.

47

The current review again identified multiple cases where informed consent for telepsychiatry was not found in the healthcare record. Cases were also identified where an initial assessment was conducted by telepsychiatry but a local assessment by a physician or mid-level provider within 24 hours was not documented in the healthcare record. Discussions with Wellpath Corporate staff indicated that telepsychiatry providers was unaware of these Implementation Plan requirements, and that corrective action to ensure awareness and compliance would be undertaken. There were again no cases identified in which the inmate was seen by a telepsychiatrist while in a safety cell.

## 25. Medical Records
*•(a)  Each inmate's medical record shall contain (as applicable):*
  - *The completed Receiving Screening form*
  - *Health Inventory/Communicable Disease Screening forms*
  - *Problem list*
  - *All findings, diagnosis, treatments, dispositions*
  - *Prescribed medications and their administration*
  - *Laboratory, x-ray and diagnostic studies*
  - *Consent and Refusal forms*
  - *Release of Information forms*
  - *Place and date of health encounters (time, when pertinent)*
  - *Health service reports (i.e., dental, psychiatric, and other consultations)*
  - *Hospital Discharge Summaries*
  - *Jail Medical Record Summaries (transfer forms)*
  - *Individual treatment plan [CFMG Plan at 114]*

### Findings: Partial Compliance
The last three monitoring reports have found noncompliance with this requirement, noting that the healthcare records included the required items except for the individual treatment plans. When treatment plans were found in the healthcare record, they not include the necessary documentation.

Individual treatment plans remain the one item in the list of required documents that prevents a finding of substantial compliance in the current monitoring review, although there have been recent improvements in this area. As noted in Section 18 of this report regarding treatment plans, staff have started to complete the standardized treatment plan form more consistently. Once such treatment plans are routinely completed for each applicable inmate (i.e., those with serious mental illness) along with the other required documentation, substantial compliance with this requirement will be achieved.

## 26. Quality Management
*•(a)  Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a*

*stipulated time frame. All monitoring and audit Findings will be reported to the Quality Management Committee at its quarterly meetings. [Dkt. 532 at ECF 9]*

**Findings: Partial Compliance**

The prior three monitoring reports have found noncompliance with these requirements. It was noted that post-implementation monitoring, including focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan, had not been adequately developed.  The last monitoring report from May 2023 stated that there had been some recent progress toward the design of a more adequate Quality Management and Continuous Quality Improvement process at MCJ.  Discussions at that time with Dr. ███████ of Wellpath and subsequent discussions with Drs. ███████ and ███████ supported by documents provided for review, described a revised CQI structure involving the implementation of a Sitewide Continuous Quality Improvement Committee.  As stated in the last monitoring report:

"The Sitewide CQI Committee is to receive and review reports from various subcommittees, including a Mental Health Subcommittee, to identify and address barriers to progress on the corrective action plans. These CAPs are to be directly linked to the various requirements of the Implementation Plans (see below).  Membership of the proposed Mental Health Subcommittee is to include the Mental Health Coordinator, JBTC Program Director, Site Psychiatrist, Custody Captain for Healthcare, DON or nursing designee, and the Site Compliance Coordinator.  The subcommittee is to meet monthly, with weekly meetings considered optimal, at least until sustained progress is demonstrated on the CAPs."

There has been significant progress in the internal QA auditing of various mental health requirements from the Implementation Plan since the time of the last monitoring report. Wellpath recently shared documentation showing the audit items that have been developed, and results of the internal audits conducted using inmate healthcare records from August, September, and October 2023.  This is a key development not only for the requirements related to QM functions but also across a range of Implementation Plan requirements, to the extent that such internal auditing focuses sustained attention on and generates compliance data about these functions.

What remains to be accomplished is full implementation of the QM/CQI process and related Corrective Action Plans. Review of the minutes from July through November 2023 indicated that the CQI Committee has been meeting monthly, and appears to follow a structured agenda of functions and topics to review which are not limited to mental health.  It appears, however, that significant progress is still needed to achieve a robust CQI process which addresses the requirements of the Implementation Plan and supports substantial compliance with the Corrective Action Plans, as addressed in the following section of this report.

The CQI minutes reviewed for this monitoring report follow a standard format and contain a section labeled Risk Management Report, which briefly lists significant incidents such as suicide attempts and various episodes of self-injurious behavior.  The information presented in the minutes, however, is minimal, with no findings or resulting action plans (or a determination that no specific actions are needed, and the basis for such a determination), nor is there reference to other reports or documents where such information may be found. There is a section in the minutes for CQI Routine Monitoring, (with a table that includes columns labeled "Study

Completed"; "Findings"; and "IP required? Yes or No"), but this section was blank in all of the minutes reviewed.  There is a separate section labeled Improvement Plans, which was also blank in all of the minutes reviewed.

Minutes for the July CQI meeting noted that Ad Seg checks were not occurring regularly due to a need for education for nursing and mental health staff.  It was noted that education was provided during the preceding week and tasks had been created to ensure patients were seen in a timely fashion.  This is the type of internal monitoring and corrective action that is needed in a well-functioning CQI and CAP process.  However, there was no further mention of this issue in any of the subsequent monthly CQI minutes.  A process is needed whereby issues like this continue to be monitored and reported, with further corrective action taken or modifications made to the monitoring process.  For functions such as this, I recommend ongoing routine internal monitoring, with clear identification of the responsible individuals, rather than ceasing the monitoring and reporting process once compliance is achieved.  This process would be appropriately documented in the Routine Monitoring and/or Improvement Plans sections of the CQI minutes.

Minutes for the September meeting has an entry regarding forced medications under New Issues Identified, reporting that the jail is considered a treatment facility and can administer IMOs. It is noted that Wellpath corporate and legal staff followed up with County Counsel, who were to reach out to the Jail Captain.  Further follow-up with Wellpath legal staff and other internal Wellpath meetings were to be scheduled.  These are important developments, but there has been no follow-up noted in the minutes from October or November.  Items such as this should be closely followed by the CQI Committee and regularly documented in the minutes. A specific requirement in the Implementation Plan is that all cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met.  A log of involuntary medication administrations is now maintained, but the required reviews are not reflected in any of the CQI Committee meeting minutes for the current monitoring period.  It is noted that there were no cases of emergency administration of involuntary medications during the period of the current monitoring review.

It does not appear that the Mental Health Subcommittee described in earlier discussions is yet operational. This will be a valuable, and probably essential, aspect of the QA/CQI process at MCJ.  The broad range of areas reviewed in the Sitewide CQI Committee meetings will likely preclude adequate time to review the various functions specifically pertaining to mental health that require monitoring and corrective action planning.  To be most effective, internal audits of mental health functions covered by the requirements of the Implementation Plan should be regularly reviewed by the Mental Health Subcommittee for QA/CQI, with the implementation or modification of corrective action plans as needed.

It has been noted in prior monitoring reports that effective CAPs should be dynamic and responsive to the findings of the QA process, and should not remain fixed and unchanging, so that any review will represent only a point in time for a system that continues to evolve and adjust in response to current performance issues. Plaintiffs' Attorneys have previously noted their involvement in the prior set of CAPs as required by the Court's May 2020 Order, and stated their intent to coordinate with Wellpath on any revised CAPs.  My recommendation has been

that once Wellpath staff complete the current process of revising the CAPs, along with the QA/CQI process (e.g. the staff composition, tracking, reporting, and data review structure, schedule of meetings, etc.), the revised process and initial set of revised CAPs should then be shared with Plaintiffs' Attorneys for review and comment. Plaintiffs' degree of involvement in each subsequent iteration of CAPs that are responsive to the changing nature of the internal auditing data will need to be determined. Regular updates of the internal audit findings and any new or modified CAPs could be periodically shared with Plaintiffs, although I would caution against any process that unnecessarily encumbers what should be a responsive and evolving process. Part of the role of the monitor will also be to regularly review, evaluate, and provide feedback on the QA/CQI process and associated CAPs.

A current finding of partial compliance is based on the development and recent implementation of an internal auditing process linked directly to the requirements of the Implementation Plan. This represents a foundational element for a robust and effective system of quality management and quality improvement. Much work remains, however, to reach substantial compliance with requirements in this area. The focus of next steps should include routinely reviewing the findings of the internal audits in the appropriate committees and subcommittees, the development and implementation of corrective action plans for identified performance deficits, adequate documentation of meeting minutes and actions taken, and consistent follow-through based on ongoing collection and review of data.

*•(b)  All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met. [CFMG Plan at 98]*

**Findings:  Deferred**

This requirement is interpreted as applying to involuntary medication administrations in a psychiatric emergency, rather than involuntary medications administered under an Involuntary Medication Order issued by the Court. There were no such cases reported by Wellpath during the period of the current monitoring review, and no such cases were identified during my review of healthcare records for the current report. Compliance with this requirement will be determined when there are relevant cases to review.

*•(c)  All completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure.  [Dkt. 532 at ECF 77]*

**Findings:  Partial Compliance**

There was one completed suicide that occurred during an earlier review period for the monitoring report of July 2022. For that case, documents were reviewed titled Suicide Safety Gap Analysis and a Psychological Autopsy. Additional documents related to this suicide made available for that review included Wellpath Mortality and Morbidity Report and Review, Parts I, II, and III. Considered collectively, these documents did not contain sufficient information to

reflect a detailed or in-depth analysis of the factors contributing to this suicide or corrective actions to be taken.  For the last monitoring review from May 2023, there was again one case of confirmed death by suicide.  The deficits noted in the earlier review of post-suicide documentation were again present in the May 2023 review.  The recommendations offered, although potentially useful, were too generic and not tied to specific aspects of the individual suicide under review. The psychological autopsy document was again observed to be cursory and lacking in sufficient analysis or narrative detail to be useful in guiding quality management or performance improvement.

There was one case of confirmed suicide during the monitoring period for the current report.  The current relevant policy for evaluating compliance with this Implementation Plan requirement appears to be the one titled HCD-110_A-09: Procedure in the Event of a Patient Death – California.  This policy requires, among other things, a Clinical Mortality Review, which involves completion of a Psychological Autopsy, and an Administrative Mortality Review, which includes recommendations for any future improvements, submission of such improvements to the CQI Committee, and informing staff of the findings of the Mortality Review meeting. Finally, the Regional Director of Operations, Regional Director of Nursing, Regional Vice President, and Regional Medical Director, works with appropriate personnel to implement changes.  The CQI Program Manager is to request and track supporting documentation for improvement plans.

Three documents related to the most recent suicide in June 2023 were provided for review: A completed Psychological Autopsy form, a Psychological Autopsy Confirmation form, and a Recommendations form.  The documents provided show that this suicide was reviewed as required by the relevant subsections of the Wellpath Policy and Procedure, although the information contained in these documents was relatively brief.  It is possible that additional information was compiled in other internal documents that are considered Patient Safety Work Products as part of the Patient Safety Evaluation System, whereby information developed through the internal mortality review process may not be released outside of Wellpath.

What appears to be missing in the documentation made available for review is the sharing of information within the local CQI Committee, as required by policy.  Nothing about this suicide was reflected in the CQI minutes of July through November 2023.  Nor was any documentation identified which reflected working with appropriate personnel to implement changes arising from the clinical or administrative reviews. My own review of this suicide indicated that opportunities for improvement should have been identified and pursued.  Such actions should be clearly tracked and documented by the local CQI Committee and other responsible personnel as needed.

**27. Corrective Action Plans (CAP)**
*•(a)  Defendants' implementation of a policy requires that there are corrective action measures to address lapses in application of the policy. [Dkt. 494 at ECF 11]*
*•(b)  Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. [Dkt. 671 at ECF 5; Dkt. 532 at ECF 9]*

**Findings: Noncompliance**

As noted in the last monitoring report from May 2023, the prior Mental Health Monitor found noncompliance with these requirements in his last report of May 2021. Dr. Hughes noted that the County and Wellpath had worked with the monitor to develop a combined CAP to address identified deficiencies, but that despite these efforts, the CAP had not been fully implemented. My subsequent review of July 2022 found that little had changed. My last monitoring report noted that, in addition to the observation that the CAPs had largely become stagnant and were essentially neglected, the more fundamental problem was that the CAPs are not meaningfully connected to an effective and responsive Quality Management process. Many of the actions listed in the CAPs provided no process or data regarding whether the observed deficiencies were effectively remedied, i.e., they are not sensitive or responsive to the impact of corrective action. This should be the function of the Quality Management or Continuous Quality Improvement Committee and the proposed Mental Health Subcommittee (see above).

Draft documents shared by Wellpath have been reviewed which explicitly link the requirements of the Implementation Plans to the CAPs. These CAPs are intended to be the primary focus for the proposed QA/CQI committee structure. Such developments remain promising, but actual implementation is still required, and the same caveats apply to both the QA/CQI process and the closely related topic of the CAPs; consistent focus on the CAPs by those in positions to enact and sustain change will be essential for achieving substantial compliance with requirements, based on current internal auditing data about performance. As noted in earlier monitoring reports, if the necessary staff are pulled in too many directions, with too many competing responsibilities, or if there is no clearly assigned responsibility for achieving compliance, it is unlikely that sufficient progress will be made in this area, despite the potential utility of revised QM and CAPs processes.

## Summary

At the time of the last monitoring report from May 2023, 12 compliance items had been released from monitoring, 31 were found to be in substantial compliance, 38 to be noncompliant, and five were deferred. In the current draft report, a rating of partial compliance has been used for the first time, in order to more accurately reflect the status of compliance with various requirements. With this approach, 22 items were found to be in substantial compliance; 22 items showed partial compliance; 24 items were noncompliant; 22 items had been released from monitoring; 5 items were deferred; and one item was not rated.

Three items moved from noncompliance in the last report to substantial compliance. The requirement that crisis intervention and management of acute psychiatric episodes shall be handled initially by on-duty medical/mental health staff with referral to psychologist and/or psychiatrist on a 24 hour per day basis had previously been considered in combination with other requirements in the area of acute care, such as transfer to an appropriate facility when the needs of an inmate cannot be adequately addressed by services available at the jail. A focused review of procedures and practice patterns showed that the initial onsite response to acute psychiatric episodes were substantially compliant with requirements.

A second item moving from noncompliance to substantial compliance requires inmates with a serious mental illness who are housed in Administrative Segregation to be scheduled for a

53

weekly appointment with a qualified mental health provider.  It was found that the weekly rounds conducted by mental health clinicians were sufficient to be substantially compliant with this requirement.

The third item moving from noncompliance to substantial compliance was the requirement concerning welfare checks conducted by custody, mental health and health services staff with inmates on suicide watch.  The last monitoring report found that nursing staff had not consistently conducted welfare checks every six hours as required (although custody and mental health staff had been found compliant with their respective requirements in the last report).  The current report found that nursing staff had returned to substantial compliance with their required welfare checks, and that custody and mental health staff maintained substantial compliance with their requirements in this area.

The requirement for nurses to complete a hands-on assessment including vital signs within the first six hours of placement in a safety cell fell from substantial compliance to noncompliance.  It is recommended that this requirement become a focus of routine internal monitoring with corrective action as needed to return to substantial compliance.

Two requirements pertaining to medication continuity which had previously been released from monitoring were reinstated as a result of the 9/26/23 Court Order granting the Plaintiffs' Motion to Enforce.  One is the requirement that all inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.  This item was again reviewed in the current report, and found to be in partial compliance.  The second item is the requirement that by the end of the nursing shift, the booking RN will consult with the on-call psychiatrist regarding any verified or unverified psychotropic medications; the on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate; the on-call psychiatrist will then set the time to see the inmate within 5-7 days; and the date of the appointment will be reflected on the written record of the order.  This item was again reviewed for the current report, and found to be in partial compliance. It is recommended that these requirements become a focus for routine internal audits which are tracked and regularly reviewed in the QA/CAI process, with corrective actions implemented as needed.

Compliance findings were deferred for five requirements in the current report.  Four of these deferred requirements pertain to involuntary medications.  The four requirements in question are interpreted to apply to instances of involuntary medications administered during a psychiatric emergency in the absence of an Involuntary Medication Order issued by the Court. Wellpath reported that there were no such instances during the review period for the current monitoring report. No instances of involuntary medication administration in the absence of a Court Order were identified in the cases reviewed for the current report.  In the absence of relevant cases to evaluate, findings for these requirements were deferred.  A review of such instances, when they do occur, will be the basis for determining compliance with these requirements. Further clarification and updating of the requirements related to involuntary medications would be a useful outcome of discussions between the parties that I understand to be underway.

One item related to safety and sobering cells was not rated in the current report.  The requirements under this item state that placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical professional will see an inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.  This requirement, specifically refers to the actions of medical staff.  In cases of sobering cell placement, it specifies that a qualified medical professional will see the inmate within one hour. Cases reviewed for this requirement included inmates whose intake screening was conducted by telehealth nursing. Sobering protocols were initiated and telephone orders were received from a Nurse Practitioner at the time of intake. Entries into the Sobering/Safety/Restraints flow sheets document observations of the inmate, but not within one hour of placement in the sobering cell.  I defer to the medical monitor as to whether this process demonstrates compliance with requirements as written, which I believe fall within the area of medical practice.  The medical monitor agrees.

Some areas previously noted as problematic remain a concern.  Appointments with mental health clinicians and the psychiatrist are still frequently rescheduled due to workload issues and limited availability of escort deputies.  This raises questions regarding staffing levels in relation to the demand for mental health services among the inmate population.  Mental health staffing has improved, and there are currently only three vacancies in the allocated staffing numbers, including two psychiatric technicians and a discharge planner.  However, the requirements are that Wellpath will maintain adequate Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to provide all necessary medical and mental health care, and that there shall be sufficient staff to ensure compliance with the Implementation Plan.  It is hoped that once all positions are filled, and optimal efficiency is achieved in the utilization of the allocated staff positions, substantial compliance with all relevant requirements can be achieved.  Further evaluation of staffing needs may be necessary in light of future compliance findings.  Stability in positions such as the Director of Nursing and the Health Services Administrator will also be important in providing the supervision and professional development of staff that is needed to achieve and maintain substantial compliance with requirements. This in turn should allow the Implementation Specialist to focus on the very considerable amount of work that will be required of her to track and ensure compliance with Implementation Plan requirements.

Significant progress was noted during the current review in the area of QM/CQI.  Internal audits have been developed which correspond directly to Implementation Plan requirements, and an initial round of audits was completed by the Mental Health Supervisor.  These developments are essential not only for achieving compliance with the requirements for QM and the associated Corrective Action Plans, but should also facilitate progress toward substantial compliance across all requirements subject to the internal audits.  What remains to be achieved is implementation of an effective process whereby the internal audit results are consistently reviewed by a Mental Health Subcommittee and the Sitewide CQI teams, leading to CAPs that are tracked and modified as needed.

Another area showing progress is treatment planning. Completed treatment plan forms were found in a higher number of the cases in the current review, although such forms were not completed in all cases. Ways to improve the utility of treatment plans are discussed in the body

of the current report, along with suggestions for improving the interdisciplinary case review and treatment planning process.  If done effectively, such reviews (especially of the most severely mentally ill inmates), in conjunction with an efficient process for utilizing involuntary medications when needed, may also address at least part of the deficiencies in providing treatment to the inmates who require a level of care not heretofore available at the jail.

## Recommendations

1.  <u>Staffing</u>.  The remaining vacancies among the allocation positions for mental health staff are two psychiatric technicians and the discharge planner.  Additional efforts to recruit psych techs from existing programs such as Atascadero State Hospital are encouraged.  As noted in prior monitoring reports, substantial compliance with the Implementation Plan requirements for staff will depend not only on filling all allocated positions, but must also involve demonstrating that staffing levels enable compliance with the remaining requirements, including those involving nursing staff.

2.  <u>Access to inpatient care</u>.  This continues to be an area of concern. Adequate access to higher levels of care than can be provided at MCJ is needed. Prior recommendations remain relevant: The EASS program for those who are incompetent to stand trial may provide the necessary services to some, but likely not all such inmates. Additional communication, coordination, and collaboration with NMC is recommended, although the current NMC admission criteria will continue to exclude some MCJ inmates who require inpatient care.  Alternative treatment resources will ultimately be required.  More effective interdisciplinary treatment team review and treatment planning, in combination with an early and efficient process for using involuntary medications, may also reduce the number of cases who cannot be adequately treated in the jail.

3.  <u>Nursing intake procedures</u>.  Continued attention is needed to ensure that medications are consistently verified and continued as required at the time of intake, including timely consultation with on-call psychiatry.  This area should be a consistent focus of internal auditing, with review in QM/CQI meetings and corrective action plans as needed.

4.  <u>Nursing rounds</u>.  Daily nursing rounds should be consistently conducted and documented in Administrative Segregation housing areas and with inmates on suicide watch as required.  This should also be an ongoing focus for internal auditing and corrective action.

5.  <u>Mental Health screening</u>.  A procedure is needed to achieve compliance with this requirement as written.  Please see the discussion of this item in the body of the current report.

6.  <u>Telepsychiatry and on-call psychiatry services</u>.  Telepsychiatry and support staff should be fully aware of the requirements of the Implementation Plan and all relevant Wellpath policies and procedures.  Additional training/orientation and ongoing internal auditing may be required.

7.  <u>Treatment planning</u>.  Improvement in the documentation of treatment planning was noted in the current review, but further improvement is still needed.  Please see the discussion of this area in the body of the current report. Beyond the need for continuing improvement in the

documentation of treatment plans, more consistent and focused interdisciplinary treatment team review and collaboration is needed, especially with the most severe and complex mental health cases.  As noted in prior monitoring reports, psychiatry notes should include all required elements.  Recent developments in the forms to be used, combined with further development of the multidisciplinary team process, have the potential to achieve substantial compliance with requirements if effectively and consistently implemented.

8.  Inmate discipline.  As noted in prior monitoring reports, custody staff should consistently indicate in their documentation that mental health staff are consulted prior to imposing discipline on inmates with mental illness.  Mental health staff should consistently document that they have been consulted and the nature of the input or guidance they provided.

9.  Out of cell programming.  It has been reported that delivery of group treatment programming by mental health staff has recently resumed in some housing units.  It remains possible that programming offered by assigned custody staff may meet requirements, independent of programming services provided by clinicians.  A clear system of tracking and reporting hours of programming offered to inmates that explicitly addresses the Implementation Plan requirements is needed to demonstrate substantial compliance through this source of service delivery.

10.  Involuntary medications.  Progress has been made in this area in that there is now a mechanism for logging the use of involuntary medications.  This process should include both involuntary medications administered under an Involuntary Medication Order issued by the Court and involuntary medications administered in a psychiatric emergency without a Court issued IMO.  Procedures should be enacted to ensure compliance with the relevant notification, review, inmate monitoring and housing requirements.

The language of the Implementation Plan requirements pertaining to involuntary medications appear to apply primarily to instances of involuntary medications administered in psychiatric emergencies.  My understanding is that discussions between the parties regarding the requirements for involuntary medications are either planned or already underway.  Any resulting clarification or modification of the requirements will be the basis for future monitoring.

11.  Administrative Segregation Screening and Suicide Risk Assessment.  It has been noted in prior monitoring reports that in order to meet the requirements as specified in the Settlement Agreement, a process is needed whereby mental health staff are routinely notified of all Administrative Segregation housing placements, and sufficient staffing will be needed to respond to the volume of screenings and risk assessments this will entail.

12.  QM and CAPs.  Significant progress has recently been made with the development and implementation of an internal auditing process that is aligned with various requirements of the Implementation Plan.  The results of these audits should directly inform further corrective action plans to address areas where performance is found to be deficient. Performance issues and the related CAPs should be regularly reviewed in the CQI Committee meetings and clearly documented in the minutes of these meetings. A Mental Health Subcommittee is recommended in order to allow sufficient time to cover the range of performance concerns which currently exist.  This subcommittee should report up to the Sitewide CQI Committee, but should have the

latitude and sufficient staff resources to effectively address performance deficits as they are identified.


Respectfully submitted,


James Vess, Ph.D.                                           March 8, 2024
Mental Health Monitor

**Appendix A:  Compliance Status of Requirements Identified in Motion to Enforce**

The following addresses the compliance status of various requirements for which noncompliance was established in the 9/26/23 Order Granting Plaintiffs' Motion to Enforce Settlement Agreement and Wellpath Implementation Plan (Dkt. No. 838 at 13 – 19), as organized and numbered in that document.  Numbers for each item correspond to the number assigned in  the Court Order; preceding the compliance status is the relevant section of the current monitoring report.

1. Clinical Staffing
    Section 12 of current report: Partial Compliance
12. Initial Mental Health Screening
    Section 2a:  Noncompliance
13. Nursing Rounds in Administrative Segregation
    Section 21e:  Noncompliance
15. Treatment Planning
    Section 18a-c:  Partial Compliance
16. Chronic Care
    Section 4a:  Noncompliance
    Section 4b:  Partial Compliance
17. Acute Care
    Section 5a:  Noncompliance
18. Outpatient Services
    Section 6a:  Partial Compliance
19. Psychiatric Follow-Up Visit Intervals
    Section 2b:  Partial Compliance
20. Consideration of Mental Health in Discipline
    Section 19a:  Noncompliance
21. Segregation Placement Screenings
    Section 21a:  Noncompliance
    Section 22b:  Partial Compliance
22. Mental Health Programming in Segregation
    Section 21a:  Noncompliance
23. Involuntary Medication
    Section 10a:  Substantial Compliance
    Section 10b:  Substantial Compliance
    Section 10c:  Substantial Compliance
    Section 10d:  Partial Compliance
    Section 10e:  Deferred
    Section 10f:  Deferred
    Section 10g:  Deferred
    Section 10h:  Deferred
24. Suicide Risk Assessments and Safety Planning
    Section 22b:  Partial Compliance
25. Medical Records
    Section 25a:  Partial Compliance

26. <u>Corrective Action Plans</u>
       Section 27a: Noncompliance
       Section 27b: Noncompliance
27. <u>Provider Visits to Holding and Isolation Cells</u>
       Section 3e:  Noncompliance
28. <u>Mental Health Quality Assurance</u>
       Section 26a: Noncompliance
       Section 26b: Noncompliance
       Section 26c: Partial Compliance

APPENDIX B OMITTED

**Appendix C: Healthcare Record Reviews for Monterey County Jail Mental Health Monitoring Visit, November 2023**

**Patient 1**

Inmate death:  This inmate died by suicide on ███████████  Available records indicate that he was admitted to MCJ on 6/9/23, with a history of previous incarcerations, including July and September 2018, June 2022, and March 2023.  The intake screening from 9/30/2018 reported a history of physical and psychological or emotional abuse, but past intakes were otherwise negative for signs, symptoms, or history or mental illness. A Mental Health Initial Assessment of 10/2/2018 noted signs of depression and the inmate's report of a previous suicide attempt in which he jumped off a bridge but did not sustain any injuries. The inmate verbalized some history of suicidal ideation during this assessment, but reported that he wanted to stay strong for his children and was receptive to psychoeducation about coping skills.

The intake screening of 6/9/23 at 1354 hours indicated that the inmate was dirty, disheveled, and sweating at upon arrival at the jail. His speech was described as clear and coherent, and his mood was unremarkable. According to the healthcare record entries for this screening, the inmate denied any history of mental health diagnoses, current or past mental health treatment or hospitalizations, or suicide attempts.  He denied any signs or symptoms of current mental illness and none were observed.  He denied any current suicidal ideation.  All screening items associated with risk of suicide were recorded as negative.  The inmate reported drinking alcohol 1 – 3 times per month and using methamphetamine "rarely."  No signs of withdrawal were reported or documented, although the Medical Monitor noted that the inmate's pulse rate was 114 at 1644 hours. The housing disposition following intake was General Population.

Video recordings of the nursing intake process for this inmate were reviewed.  These appeared to show that a number of the screening questions related to mental health were not asked, including those regarding specific symptoms of mental illness or suicide risk.  Entries were made in the healthcare record for all such questions as "No".  Those screening questions which were asked of the inmate were conducted out in the open area amongst the custody officers rather than in the nursing station, which eliminated any degree of privacy or confidentiality and may compromise the inmate's willingness to disclose sensitive information. The nurse spent approximately 90 seconds inside the nursing station with the inmate. There was no sound available for this video. This time appears to have been entirely spent measuring the inmate's weight and blood pressure.

A supplemental incident report describes an interaction between a deputy and the inmate while the inmate was still in the patrol car prior to booking in order to ask questions from the pre-classification intake screening questionnaire.  The inmate is reported to have responded that he had been in MCJ before, and that he was the influence of alcohol and marijuana, although he was described as alert, cooperative, and able to answer all questions "with no issues."  Review of the inmate's history by one of the deputies indicated that the inmate had been housed in SNY/Protected Custody during a prior admission.  This type of housing is typically used with inmates who are somehow vulnerable or at risk of assault from other inmates.

Other supplemental incident reports described custody's review of available video showing the Booking Cell 3.  From the description provided, it appears that the inmate began several unsuccessful attempts to strangle himself with the cord of the phone within the first few minutes after he was placed in the cell.  A deputy is described as conducting a welfare check and

appeared to look into Booking Cell 3 at a point when the inmate was not actively attempting to hang himself and was sitting by the phone.  The inmate subsequently wrapped the phone cord around his neck.  Using a combination of pulling the phone cord tight with his hands and lowering his body weight against the cord, the inmate lost consciousness, and soon appeared to stop breathing.

The supplemental incident report describing review of available video indicates that a deputy conducted welfare checks during the period in which the inmate died by suicide, but did not detect or respond to the inmate's behavior. Another inmate who was present in the cell showed no reaction to the events in the cell and did not notify custody of any concerns.

Incident reports indicate that a deputy subsequently observed the inmate to be hanging from the telephone cord in Booking Cell 3.  The deputy lowered the hanging inmate to the ground, radioed for additional deputies to respond, contacted the Custody Control Specialist to call for an emergency medical response, and then began CPR.  After approximately two rounds of chest compressions, another deputy took over.  A nurse arrived and began assisting with placement of the AED.  A deputy administered Narcan to the inmate nasally.  A rebreather oxygen mask was applied and held in place until emergency medical personnel arrived. AMR and Fire personal placed the inmate on a gurney and transported him to Natividad Medical Center. A supplemental incident report stated that the inmate was pronounced deceased at 1540 hours by NMC medical staff. Postmortem examination included toxicology that were positive for methamphetamine and alcohol.   The coroner's report states that the deceased inmate was in "a hybrid laying/seated position until he is discovered by corrections staff."  Cause of death was determined to be suicide by hanging.

Surveillance videos showing a view inside Booking Cell 3 and a simultaneous view of the hallway outside the cell were reviewed by this monitor.  The videos showed that two welfare checks were conducted during and after the inmate's suicide, but failed to detect the inmate's behavior and did not intervene.  The quality of these welfare checks were clearly inadequate.

Review of available video and written documentation indicates that the intake screening was not adequately conducted, in that not all of the substance use, mental health and suicide risk questions were asked.  It is not possible to determine how the inmate would have responded to these questions had they been asked, or if the answers would have prompted a referral to mental health staff.  In any event, had a mental health referral been made, there was no indication from available information that an urgent or immediate mental health response was required, nor would a contact from mental health staff have been made prior to the inmate's suicide, which began very shortly after his placement in the booking cell.

Regarding the adequacy of the nursing intake and subsequent medical monitoring from a medical perspective, I defer to the Medical Monitor.  Dr. Barnett has noted concerns regarding the inmate's elevated pulse rate recorded at 1644 hours and history of methamphetamine use, indicating that a referral should have been made to a medical provider.  Had an adequate intake screening been conducted, it is possible that the inmate would have been placed in a sobering cell rather than a booking cell. Had the inmate been referred to an on-site or on-call medical provider, it is possible that additional monitoring would have been initiated.  A chart note was entered showing that the HSA made the proper notifications of the inmate's death as required.

**Patient 2**

Inmate death: Records indicate that this inmate was brought into custody at MCJ at approximately 0335 hours on 5/22/23.  Information on the Inmate Movement Form of that date

stated that the inmate was displaying bizarre behavior.  This form also indicated that the inmate reported that he used to take medications for schizophrenia but had stopped taking them.  He reported suffering from visual hallucinations and paranoia.  The inmate reported that he was an informant for Santa Cruz County and they were "getting him back," which is why he was arrested.

A copy of the electronic healthcare record contains entries from the nurse's receiving screening conducted at intake.  These entries reflect two different time stamps, some for 5/22/23 at 0332 hours, and some for 5/21/23 at 1946 hours.  The cause of this discrepancy could not be determined, but other records indicate that 5/22/23 was the date of the arrest and booking. The receiving screening indicated that the inmate did not appear acutely intoxicated. The inmate reported having blood pressure medications but not taking them. The receiving screening indicated that the inmate denied being prescribed psychotropic medications. Entries for alcohol use, drug use, current withdrawal were all marked "No".  The inmate denied current or past mental health diagnoses or treatment.  He denied any current symptoms of mental illness or suicidal risk factors.

A task was created in the electronic healthcare record by the intake nurse for the inmate to be seen by mental health staff.  The appointment description indicates that the inmate stated he had medications at CVS pharmacy but was not taking them because he believed he was being poisoned.  The inmate stated that he was not suicidal but was depressed, that he appeared to be delusional, with no suicidal or homicidal ideation.  The inmate was reported as positive for visual hallucinations at 0500 hours, as he was observed responding to internal stimuli, described as "yelling at something that is not there."

A mental health clinician' notes entered at 1614 hours on 5/22/23 document contact with the inmate.  The inmate responded that he had mental health issues but refused to answer any further questions from the mental health clinician as he was demanding to speak with medical staff. The clinician got the nurse to come speak with the inmate, but the inmate would not engage further with the mental health clinician.  The clinician observed that the inmate appeared to be in distress and upset about his medical issues.  Further assessment was recommended and follow-up contact in two days was scheduled.  Given the available information regarding the inmate's clinical presentation, this course of action by mental health staff appears reasonable.

Review of the available incident reports indicated that the inmate was housed in a booking cell in the receiving area, where it was noted that his behavior had been erratic throughout the evening.  The inmate was observed yelling, cursing at deputies, and banging on the cell door.  Supplemental incident reports indicate that an hourly welfare check was conducted at 2204 hours.  At approximately 2221 hours, surveillance video of inside the booking cell showed the inmate lying on the floor and his left arm is observed moving.  No further movement was observed.  At approximately 2300 hours, the inmate was observed lying on the floor of the cell and did not respond during a routine welfare check by deputies.  The deputies initiated a call for Fire and AMR personnel to respond, notified the floor nurse to respond to the booking cell, and began life-saving measures.  Fire and AMR staff were reported as arriving between approximately 2309 and 2310 hours and continued resuscitation efforts.  The inmate was pronounced dead by Fire/AMR personnel at approximately 2314 hours.

Postmortem toxicology testing revealed methamphetamine and amphetamine in the inmate's blood.  According to the Coroner's report, the inmate died as a result of the toxic effects of methamphetamine, with hypertension listed as a contributing condition.  The death was ruled as accidental.  I defer to the medical monitor regarding the adequacy of the medical screening

and monitoring in this case.  Based on the available information regarding the inmate's clinical presentation, the mental health response was adequate.

## Patient 3

Inmate death:  Records indicate that this inmate was booked into MCJ on 5/22/23.  It appears that the intake screening was not completed at that time and the inmate was psychotic at intake. No documentation was found in the healthcare record showing that the intake screening was subsequently completed. A note entry dated 6/24/23 stated that the inmate "does not want to be assessed by a non american educated RN AC RN."  The inmate was placed on an alcohol and benzodiazepine withdrawal protocol.

Contact with a mental health clinician was documented on 5/23/23 after referral by nursing staff.  The inmate was noted to be rambling at intake, was a poor historian, and indicated alcohol abuse.  The NMC jail check paperwork was noted to have reported schizophrenia as a prior diagnosis. During this mental health encounter the inmate was described as irritable and minimally cooperative. The inmate became increasingly sarcastic and agitated as the clinician attempted ask questions about his mental health history, so that the interaction was terminated. Entries from this encounter indicate the inmate was fully oriented, without overt signs of thought disorder, with poor judgement and insight. Follow-up with a mental health clinician was scheduled for two weeks and a referral to psychiatry was made.

Notes indicate that an appointment with a psychiatrist was completed on 5/24/23.  The inmate was irritable, uncooperative and hostile during this encounter.  The plan was to continue to monitor the inmate.  It appears that a follow-up psychiatry appointment was scheduled for 6/19/23 but this appointment was repeatedly rescheduled without further explanation. A note dated 6/13/23 was entered in the healthcare record that appears to have been by a psychiatric provider, but the credentials of the practitioner were not documented.  It appears this entry was based on a chart review.  Citing the inmate's earlier refusal to engage with a psychiatry evaluation and statement that he did not take psychiatric medications, no antipsychotic medications were started at this time.  A note was made for the MHP to schedule a psychiatric provider appointment if indicated during a follow-up appointment that was noted to be scheduled during that week.

Chart entries indicated that follow-up appointments with a mental health clinician were rescheduled on 6/6/23; 6/7/23; 6/8/23; 6/9/23; 6/10/23; 6/11/23; 6/12/23; and 6/13/23 due to workload issues. A completed follow-up appointment is documented as completed on 6/17/23, when a Mental Health Initial Assessment was conducted.  Entries in the healthcare record from this assessment indicated a past hospitalization for psychiatric treatment; the inmate was unable to recall much information about this hospitalization but reported that he was self-admitted. He reported a history of taking Zyprexa, an antipsychotic medication.  He reported current visual and auditory hallucinations, although his description of these appears to have been vague.  He denied any history of self-harm or current suicidal ideation. The inmate reported a history of substance use treatment and daily consumption of alcohol from age 15 to 38.  His speech was described as pressured and slurred, with anxious and irritable mood and hostile affect. He was fully oriented but appeared to be responding to internal stimuli.  Chart entries indicate that the inmate was referred to the psychiatric provider at the conclusion of this Mental Health Initial Assessment. It appears the inmate was not seen again by psychiatry.

Mental Health Unit Rounds in Administrative Segregation were documented for 6/1/23; 6/8/23; 6/16/23 (when the inmate was recorded as being out of cell for a medical contact); and

6/21/23.  Chart entries for 6/1/23 indicated that the inmate was suspicious and irritable, with blunted affect, but was eating and drinking, with no evidence of self-injury or suicidal thoughts. His speech was described as rambling and mumbling, making it difficult to understand him, other than his requests for Depakote (often used in the treatment of Bipolar Disorder), which the notes indicate he was already prescribed. On 6/8/23 the inmate was noted to be sleeping and appears not to have responded to the clinician.  Delusions were noted on 6/21/23, and the patient remained irritable and uncooperative, alert but delusional. Chart entries on this date indicated he was eating and drinking.

Documentation in the healthcare record indicates that the inmate was sent out to NMC ER for evaluation on 6/16/23 and returned to MCJ the same day.  This appears to be in relation to the inmate's physical/medical problems, including edema and wounds in his legs. I defer to the medical monitor regarding the adequacy of the medical care provided.

Nursing rounds in administrative segregation were documented on 6/27/23.  I could not determine the exact dates for the period the inmate was housed in segregated housing, but it appears from the mental health chart entries to have included most or all of the days between 6/1/23 and 6/27/23.  This would indicate that the nursing rounds were not completed daily as required by the Implementation Plan. Two separate entries for nursing rounds were noted for 6/27/23, with time stamps of 12:56 am and 11:04 pm.  The first entry indicated that the room was clean and the inmate's hygiene was described as "groomed."  The second entry described the room and the inmate's hygiene as "unkempt."

Documentation in the healthcare record indicated an onsite medical emergency occurred on 6/29/23, with the inmate displaying a decreased level of consciousness and inability to walk. It was noted that the inmate was brought to a medical provider at the nurse's request related to history of refusing wound care.  The inmate required the assistance of deputies to come down the stairs, presumably referring to the stairs in the housing unit. Descriptions in the healthcare record indicate the inmate appeared to be in significant medical distress at this stage.  I again defer to the medical monitor regarding the significance of the medical issues and the nature of the medical response.  Emergency medical personnel arrived and transported the inmate to the ER at Salinas Valley Memorial Hospital.  Records indicate the inmate subsequently died at the hospital on ████ from a combination of medical conditions.

Several concerns were identified in the review of this inmate's mental health care. The nursing intake screening was repeatedly deferred and appears to have never been completed. Appointments with mental health staff were repeatedly rescheduled due to workload issues. Follow-up with psychiatry did not occur in a timely manner, especially given the deteriorating condition that appears to be reflected in the healthcare record. Nursing rounds did not occur as required while the inmate was housed in administrative segregation; only one day of rounds were documented in the records that were reviewed. The two entries made on that date appear inconsistent, raising concerns about the quality of the observations made and the associated clinical documentation.

It is not clear that these issues in the quality of the mental healthcare for this inmate directly contributed to his death, which appears to have been primarily due to his medical conditions.  As noted above, I defer to the medical monitor regarding the adequacy of the medical care provided in this case.  However, better communication and coordination between medical and mental health services were needed, including more consistent and timely evaluations and monitoring on the part of mental health staff.

**Patient 4**

Inmate death: Available records indicate this inmate was admitted to MCJ on 11/21/22. The intake screening indicated that he was transferred from SATF state prison. He denied current or past psychiatric medication or treatment. No current symptoms of mental illness or distress were noted.  Medications at intake included Buprenorphine for opiate dependence. He was placed on a COWS protocol.  He reported back pain from a previous surgical procedure to his spine. Housing disposition at intake was GP.  Staff responded to a man down emergency on 9/21/23 for a possible overdose. No pulse was palpable.  The patient was administered four intranasal doses of Narcan and administered CPR.  Narcan was administered IM.  The patient was taken by EMT to ER for further monitoring. Subsequent Utox was positive for fentanyl.

A physician's note of 9/25/23 indicated that inductions for the MAT program were not being conducted at that time and that the patient would be placed on a waitlist.  The first contact with mental health staff was documented on 10/8/23. On the completed Mental Health Initial Assessment form the patient reported a history of auditory, visual, and tactile hallucinations when using methamphetamine.  Risk and protective factors were assessed and the current level of risk for self-harm or suicide was estimated as low. He denied any current suicidal ideation and any previous suicide attempts.  The patient was described as having pressured speech, anxious mood, and blunted affect, with appropriate thought processes and content. He described personal and professional sources of support available to him, as well as plans for his future depending on whether he was released from custody or returned to prison.  He was fully oriented and coherent. He reported being afraid of dying and was worried about relapsing (it is assumed this refers to his drug use).  He stated that this was the first time he had ever received any type of mental health therapy. The plan was to follow up with the patient after his 11/6/23 court date, and a referral was made to a psychiatric provider.

The patient was seen by a psychiatrist on 10/16/23.  The patient's history of polysubstance dependence was noted.  The patient reported experiencing anxiety and insomnia for several years, but denied current depression, suicidal ideation, or hallucinations.  The Psychiatric Evaluation form indicated the patient was fully oriented and cooperative.  The mental status examination reported anxious mood but was otherwise negative for signs or symptoms of mental illness or distress.  The Assessment of Involuntary Movement Scale (AIMS) was completed and results were negative.  Diagnoses of anxiety disorder NOS and polysubstance dependence were offered, with a rule out of substance induced anxiety disorder. The patient was started on Zoloft and Atarax.

On 10/24/23 a medical emergency was called at 0551 hours for the patient, who as unresponsive and not breathing.  Additional information regarding the death of this inmate has not yet been made available.

**Patient 5**

Records indicate this inmate was booked into MCJ as a state hospital returnee on 6/15/23. No intake screening could be located in the healthcare record.  A nursing note on 6/15/23 records a plan to follow up with the on-call psychiatrist regarding medications, but no further information is provided, so that confirmation and continuation of prescribed medications was not documented as required.  Review of the Medication Administration Record showed that Clozapine was begun on 6/16/23, but three consecutive doses were refused between 6/18/23 – 6/21/23.  Documentation could not be located in the inmate's healthcare record showing that the psychiatrist was notified of these refused medication administrations as required. The nursing

note of 6/15/23 also states that the patient acknowledged serious mental health issues.  However, no referral to mental health staff appears to have been made.  The first recorded contact with mental health staff is a chart entry by psychiatry on 7/18/23.  It states "Citalopram 20 mg Clozapine 200 mg clozapine 25 mg expires on 7/15/23" with a plan to renew Celexa and clozapine.  No other information is documented.

Contact with a mental health clinician is documented on 8/9/23.  The chart entry states that the patient returned from a state hospital on 6/15/23 but was not referred to mental health upon return.  The inmate reported that he was doing well, that he continued to hear voices but they were "less."  The inmate reported daily contact with his parents, who were supportive, and denied the need for additional mental health support at that time.  The plan was to follow-up with the inmate in 30 days.

A "chart review for chronic meds" was noted by the psychiatrist on 8/17/23.  The plan was to continue clozapine and Celexa.  No further information was noted. A mental health clinician saw the patient on 8/31/23.  The clinician noted that per the MAR, the patient had not taken Clozaril for the past seven days.  An LVN had reported that the patient was confused, and that the psychiatrist had been notified, although it was not clear by whom. The mental health clinician reported the patient to be confused and internally preoccupied. The patient reported hearing voices.  The note states that it was unclear whether the patient stopped getting up to receive the medications, or if staff stopped bringing them. Review of the MAR for this period shows repeated doses of Clozaril not given starting on 8/21/23, with the notation that the medication was "on order."  A task was created by an LVN for the psychiatrist on 8/26/23 stating the patient had not received his Clozapine for 5 days and the medication was on order, asking to restart the medication once it was received. An updated note of 9/11/23 stated that the medications were not ordered correctly, and the psychiatrist had started orders on that date (9/11/23).

Appointments with a mental health clinician were rescheduled four times between 9/2/23 and 9/5/23 due to workload.  It was noted, e.g., that on one day there were 147 patients to see and two clinicians on duty, with one deputy to serve as the custody escort.  On another day there were 133 tasks to complete (typically involving patients to see) and one clinician.  Lack of access to an escorting deputy was also cited, including one day in which one deputy was available until 11:00 am and after that none were available, with one clinician on duty and 130 tasks to complete. Another period of concern for similar reasons was 9/21/23 – 9/27/23, when appointments with a mental health clinician were rescheduled eight consecutive times. This is not as extreme as some of the cases reviewed in the last monitoring report, but are nonetheless worrisome.

Notes indicate that the patient was seen by a mental health clinician on 8/31/23; 9/6/23; 9/13/23; and 9/28/23.  Confusion about the status of the patient's medications are reflected in the notes, on the part of both the patient and the clinician.  This is an example of a case that would benefit from regular review in an interdisciplinary case review and treatment planning meeting. Better communication and coordination across the clinical disciplines are necessary.

A psychiatry note on 9/19/23 stated that the patient's Clozaril had still not restarted, followed by "Chart reviewed. Clozapine restarted."  No other information is noted. On 9/27/23 a psychiatry notes that the inmate was noncompliant with clozapine for four days, claiming that the medication caused various side effects, and wanting to discontinue psychotropic medications. The plan was to discontinue clozapine per the patient's request and continue to monitor.  The patient was subsequently started on Zyprexa on 10/11/23.

Mental health staff have continued to monitor the patient recently through periodic contacts.  He continues to display symptoms of active mental illness, e.g., hearing voices, preoccupied with internal stimuli, but appears stable in in no substantial distress.  He is reported to manage his daily activities (e.g. personal hygiene).  His appetite and sleep are reported as good.

Review of this case raises several concerns about his mental health care. The intake screening, including verification and continuation of medications, and referral to mental health staff, were not completed as required.  This is particularly important for a patient returning from a state hospital on a medication such as Clozapine, which requires regular close monitoring.  I could not be certain from my review of the available healthcare record if the proper labs were conducted for the periods the patient was taking Clozapine.  Problems with obtaining and providing the prescribed medications were identified.  Monitoring, communication, and follow-up for medication continuity and compliance were lacking.  Communication and coordination across the clinical disciplines, including nursing, psychiatry, and mental health clinicians, were lacking.  Clinical documentation could be improved to provide better communication of patient care information across staff providing care.  A consistent interdisciplinary treatment review and planning meeting would be the optimal forum for communicating about and coordinating the care of patients such as this.

## Patient 6

This inmate was booked into MCJ on 10/6/23 as a CDCR transfer. The intake screening noted that the inmate's behavior was appropriate and his speech and mood were unremarkable. The inmate acknowledged attempting suicide in the past and being hospitalized for substance use and treatment of psychiatric problems following an overdose in 2022.  A diagnosis of bipolar disorder and history of autism were noted. A active prescription for Zyprexa was noted. Medications were noted to be verified and were continued as required.  All current signs and symptoms for mental illness were recorded as negative, including factors related to self-harm or suicide. An urgent referral to mental health was noted, resulting from the past suicide attempt.

The inmate was contacted by a mental health clinician the following day on 10/7/23, but declined to engage with the clinician, stating that he did not need mental health services.  The clinician observed that the inmate did not appear to be in acute psychiatric distress or to pose an immediate danger to self or others. The mental health problems of stimulant abuse and stimulant-induced psychotic disorder were noted.  Follow-up was scheduled for one week.

On 10/13 a crisis call was received by mental health staff from a floor deputy after the inmate reported he wanted to bite himself, that he "liked the taste of blood" but was not going to bite himself.  He reported that his current housing was making him anxious. He reported current auditory hallucinations. He denied current suicidal ideation. Coping skills and sources of support were identified. Follow-up with classification was noted.  Next-day follow-up was planned.

The inmate was seen by two different mental health clinicians on 10/14/23, one to complete the Mental Health Initial Assessment, and subsequently in response to a crisis call. The Mental  Health Initial Assessment indicated that the inmate as fully oriented, with appropriate speech, mood, affect, and behavior, and no overt signs of thought disorder.  The subsequent crisis response indicated that the inmate was tired and could not sleep, making him made, and threatening to bite himself. The clinician was able to assist the inmate in finding ways to remain safe from self-injury. No other overt signs of acute mental illness were noted.

The inmate was again seen by a mental health clinician on 10/15/23 after engaging in biting himself on the arm causing bleeding. He was immediately escorted to the infirmary. The inmate denied that this was a suicide attempt and reported that he had engaged in this type of self-harming behavior since he was six years old, stating that it calms him down. The inmate was not receptive to alternative coping methods, and that he would continue biting himself unless he received the medications he was requesting, specifically Seroquel and sleeping medications. The inmate was sent out to NMC for emergency evaluation. Adequate plans to ensure the inmate's safety upon his return from the hospital were developed. The inmate was evaluated by mental health staff and closely monitored upon his return from NMC later that day.

The inmate was seen by the psychiatrist on 10/16/23. Diagnoses of bipolar disorder, autism spectrum disorder per patient's report, and polysubstance dependence were noted, including methamphetamine and marijuana. A prescription of Seroquel was restarted. A Psychiatric Initial Evaluation and Assessment of Involuntary Movement Scale were documented. Psychiatry follow-up was scheduled in 30 days.

Mental health has continued to monitor the patient regularly, seeing him daily and sometimes more than once per day until 10/26, and thereafter seeing the patient at least every two to five days depending on his behavior. A diagnosis of borderline personality disorder was recently noted. This diagnosis appears to accurately fit the clinical presentation repeatedly described in the healthcare record. A written treatment plan was present in the chart. It identified appropriate problems associated with borderline personality disorder, and had boxes checked for appropriate goals and interventions. In combination with the written progress notes, this provided adequate information for an individualized treatment plan. Reference is made to a behavior plan, although a document of this sort was not located in the healthcare record. An optimal organization of the information relevant to the treatment plan would combine the narrative description information derived from the various assessments of the patient in the progress notes with the ongoing problems, goals, and interventions of the treatment plan form. It would be advantageous if a way could be found to integrate these sources of information in the electronic healthcare record. This is also a case that could benefit from regular review in an interdisciplinary treatment planning meeting amongst clinical staff. Clarification of the diagnosis, and coordination of the treatment approach to address the inmate's probable borderline personality disorder, could have been better facilitated through such an interdisciplinary review.

Mental health staff have made consistent efforts to engage and support this inmate to reduce his self-injurious behaviors in reaction to stress and frustration. This is a very challenging task with individuals who manifest borderline personality disorder, especially in a jail environment. Transfer to an inpatient level of care is typically not the recommended course of treatment, and is often contraindicated in the long-term management of such cases. Under the prevailing circumstances, the mental health care provided to this inmate appears to be as appropriate as could be reasonably expected.

**Patient 7**

This inmate was booked into MCJ on 10/9/23. The receiving screening noted that the inmate reported having a prescription for Geodon/Depakote and identified the pharmacy used, but that he had not taken the medications in "several weeks." A task was created in the healthcare record to verify medications with the identified pharmacy, but this task was rescheduled and does not appear to have been completed until 10/16/23. On 10/17/23 a chart

note was entered indicating that no medication records for this inmate were found at the identify pharmacy.  The inmate's speech was noted to be clear and coherent, with unremarkable mood, but that he appeared to intoxicated or under the influence and stated that he had been drinking whiskey.  He reported a history of outpatient treatment and hospitalization for psychiatric problems but further information was not documented on the intake screening form. He reported past diagnoses of ADHD, Bipolar Disorder, PTSD, and Schizoaffective Disorder.  The inmate reported that he could hear other people's thoughts, taken to represent auditory hallucinations. He denied any history of or current risk factors for suicide or self-harm.  A routine referral to mental health staff was made.

A routine referral to mental health should have resulted in contact by a clinician within five days.  The healthcare record shows that appointments were rescheduled on 10/14/23; 10/15/23; 10/16/23; 10/17/23; 10/18/23; 10/19/23; 10/20/23; 10/21/23; and 10/22/23, all citing workload issues and some noting limited availability of an escort deputy.  The inmate was seen by a mental health clinician on 10/23/23.  A Mental Health Initial Assessment, a Mental Health Initial Special Needs Assessment, and a Mental Health Treatment Plan for Non-Acute Patients were documented in the healthcare record.  The inmate reported that he had received mental health treatment throughout his lifetime. He acknowledged use of methamphetamine.  The clinical presentation as described in the notes appeared overtly delusional, with trouble maintaining a linear thought process. Auditory and visual hallucinations were suspected.  The treatment plan addressed problems associated with schizoaffective disorder.  Goals and interventions chosen from a set of checkboxes were appropriate to this condition and the presenting symptoms of the patient.  As noted in other cases reviewed for the current monitoring report, integration of the narrative information provided in the progress notes with the checkbox format of the mental health treatment plan could improve the utility of the plan.

A referral to psychiatry was made and the patient was seen by a psychiatrist on 10/26/23. The Psychiatric Initial Evaluation and the Assessment of Involuntary Movements Scale were documented in the chart. The inmate's presentation during this assessment appears to have been overtly psychotic, with possible manic or hypomanic symptoms. The patient was restarted on Abilify, an antipsychotic medication. Documentation that a follow-up psychiatry appointment has been scheduled could not be located.

Given a recent history of prior incarceration in MCJ (notes indicated mental health contacts in June 2023), references to recent treatment by a community behavioral health provider (Sacramento Behavioral Health), and the inmate's report of actively prescribed psychotropic medications, quicker follow-up was needed at intake to verify and continue the medications, although subsequent attempts did not show the medications described by the inmate.  The number of rescheduled appointments with mental health staff remains concerning.  Follow-up with psychiatry following prescription of psychotropic medications as required by the Implementation Plan appeared to be lacking.

**Patient 8**

This inmate was booked into MCJ on 10/15/23.  The receiving screening completed on that date indicated that the inmate was dirty and disheveled, with uncooperative and "insensible" behavior.  His speech was described as clear and coherent; mood was tearful. The inmate reported current or past diagnoses of bipolar disorder and schizophrenia.  He reported taking injections for mental health treatment every four weeks but could not recall which medication he received nor the date of his last dose.  A task was created for medication verification; it appears

72

this task was completed on 10/20/23, and information was received that the inmate had received an injection of Aristada, a long-acting injectable medication used in the treatment of schizophrenia, on 9/18/23.  The inmate reported past psychiatric hospitalizations but could not recall the date. He denied current or past suicidal ideation or attempts. The inmate acknowledged opioid use and was placed on a COWS monitoring protocol.  An urgent referral to mental health was made.

The inmate was seen by a mental health clinician the following day, 10/16/23.  The inmate was described in the progress note as anxious and labile, but fully oriented, with appropriate speech and coherent thinking.  A referral to psychiatry was made and a follow-up appointment with a mental health clinician scheduled for two weeks.  The inmate was placed on the special needs list.

It appears that the jail psychiatrist ordered an Aristada injection for 10/17/23 but that is was not administered as the medication was not in stock, and the psychiatrist was informed.  A Medication Administration Record entry for 10/18/23 indicated the injection was again not given, with the notation "expired."   An injection of Aristada was administered on 10/25/23.

The inmate was seen onsite by psychiatry 10/24/23 by a psychiatrist who continues to provide coverage at the jail.  Progress notes from this encounter were more thorough than has been typical, and included relevant history and a more detailed plan. The notes stated that the patient was polite and cooperative, with no formal psychotic thought disorder, noting that his thoughts were not loose, tangential, or circumferential.  Diagnoses of schizophrenia, bipolar disorder (by history) and methamphetamine use disorder were noted.  The notes indicate that the inmate's next injection of Aristada was supposed to have been administered on 10/16/23, that it had been ordered by the jail psychiatrist on 10/19/23, but had not yet been received.  Medical staff were asked to follow up with the jail psychiatrist to get the injectable medication as soon as possible.

A brief chart entry by psychiatry on 10/26/23 notes that the last injection of Aristada was 9/18/23 and the next dose due 10/16/23, which was now set up for the following week. A subsequent psychiatry progress note dated 10/31/23 indicated the injection had been given on 10/25/23.  The inmate complained of feeling sad, but no other signs or symptoms of active mental illness were noted; appetite and sleep were reported as good, the inmate was fully oriented, and mental status items were unremarkable.  The inmate agreed to try Zoloft, often used in the treatment of depression, in addition to continuing Aristada. Follow up with psychiatry was scheduled for 30 days.

The inmate was seen by a mental health clinician on 11/1/23.  He reported being a little sad sometimes but was otherwise functioning well.  No active signs or symptoms of serious mental illness were noted.  Follow-up with a mental health clinician was scheduled for 30 days.

Other than the delay in providing this inmate's long-acting injectable medication following intake, the mental health care provided appeared adequate to the clinical presentation as described in the healthcare record.

**Patient 9**

From the available healthcare records, this inmate was brought into MCJ on 10/5/23, when he appeared to be under the influence of alcohol and/or drugs and was placed on an alcohol and benzodiazepine monitoring protocol and housed in a sobering cell. It appears the inmate was released on 10/6/23.  Records indicate that a receiving screening was completed on 10/12/23, after the inmate had been cleared from CHOMP for suicidal ideation.  He was again intoxicated,

with slurred speech and disorganized thought process. He was suspected by the intake nurse to be experiencing visual hallucinations.  He denied that he was currently suicidal. He denied taking psychotropic medications, stating, "no, only the ones when I'm forced to take them."  He was placed on a CIWA protocol and housed in a sobering cell.  Urgent referrals to mental health staff and psychiatry were made.

An appointment with a mental health clinician was rescheduled on 10/12/23.  The inmate was evaluated by a mental health clinician on 10/13/23, when a Mental Health Initial Assessment was completed. The inmate was noted to still be intoxicated and appeared to be actively psychotic, responding to internal stimuli and showing some disorganization of thought. The inmate reported that he had been diagnosed with schizophrenia, and that he had been hospitalized "more times than he could count" and had been prescribed Haldol and Cogentin. Follow up with a mental health clinician was scheduled for three days and referral to psychiatry was made.

The inmate was seen again by a mental health clinician on 10/16/23. He again appeared to be overtly psychotic, with possible visual hallucinations and delusional thought content. He denied any current suicidal ideation or intent. It was noted that the patient refused to meet with psychiatry.  Follow up with a mental health clinician was scheduled for seven days.

Appointments with psychiatry were rescheduled on 10/13/23 and 10/16/23.  A brief note on 10/18/23 indicated that the inmate refused to meet with the psychiatrist, that that the patient reported taking Haldol and Cogentin, but "not currently prescribed anything."

The inmate was seen again by a mental health clinician on 10/23/23, when he remained actively delusional and to show flight of ideas. Supportive counseling and encouragement to take medications were provided. A follow-up appointment was scheduled for two weeks, and a question was noted as to whether the inmate had started psychotropic medications.

The inmate was seen by psychiatry on 10/26/23. A Psychiatric Initial Evaluation and Assessment of Involuntary Movements Scale were completed.  The inmate presented as rambling and delusional. He was reported to be fully oriented, but his appearance was described as disheveled with poor hygiene. A diagnoses of unspecified schizophrenia was noted.  The inmate stated that he had not been on psychotropic medication for a very long time, adding that he had been "treated with beer."  Haldol and Cogentin were prescribed for 30 days and the patient has been compliant with those medication. The note indicated that the inmate should return to the clinic in two weeks, but tasks/appointments for this could not be located in the healthcare record.

The inmate was again seen by a mental health clinician on 11/2/23.  The inmate remained delusional, but was fully oriented, with appropriate appearance. His hygiene was not commented upon. The chart entry for this encounter indicated that the inmate would reach out to mental health as needed. However, appointments with a Mental Health Clinician were rescheduled on 11/6/23; 11/7/23; 11/8/23; 11/9/23; 11/10/23; 11/11/23; 11/12/23; 11/13/23; 11/14/23; and 11/15/23 due to workload issues and limited availability of deputy escorts. It may be that the mental health contact on 11/2/23 was in response to a health services request submitted by the patient and the subsequent rescheduled appointments were initiated by a previously scheduled two week follow up.  Regardless, given the inmate's recent mental health condition, he should have been seen in a more timely manner.  As of the date of this case review (11/17/23), the inmate has not been seen again by mental health staff.  No mental health treatment plan was located in the healthcare record.

**Patient 10**

      This inmate was booked into MCJ on 10/12/23 as a transfer from Folsom Prison.  The intake screening indicated that his appearance and behavior were appropriate, speech was clear and coherent, and mood was unremarkable. The inmate reported mental health treatment while in prison.  A number of psychotropic medications were noted, including Zyprexa, Effexor, and Remeron.  The intake documentation and Medication Administration Record indicate these medications were verified and continued at intake.  The inmate denied any past or current suicidal ideation. He reported a diagnosis of paranoid schizophrenia which was currently under control.  A routine referral to mental health was made.

      An appointment with psychiatry for 10/16/23 was rescheduled due to workload.  An appointment with a mental health clinician for 10/17/23 was reschedule due to workload. The inmate was seen by a mental health clinician on 10/19/23, when the Mental Health Initial Assessment was completed.  The inmate was fully oriented and appeared to be free of active symptoms of severe mental illness.  Follow up was scheduled for 30 days.

      The inmate was seen by psychiatry on 10/23/23, when a Psychiatric Initial Evaluation and an Assessment of Involuntary Movements Scale were completed.  Although the psychiatry appointment was scheduled within the 5-7 day timeframe required after the continuation of medications at intake, this psychiatry contact did not actually occur within the required timeframe.  The inmate again denied current symptoms of severe mental illness. Sleep and appetite were reported as good. No side effects to medications were reported. Follow up with psychiatry was scheduled for 30 days, and although an appointment for 11/15/23 was rescheduled with a notation of "court",  a psychiatry follow-up contact was completed on 11/22/23. The inmate remained psychiatrically stable, and a follow-up appointment was scheduled for 90 days.  A mental health treatment plan was not located in the healthcare record. Other than these issues, the mental health care provided to this inmate to date appears adequate.

**Patient 11**

      This inmate was booked into MCJ on 7/4/23. Upon intake, the inmate resisted the arresting officers and jail deputies.  Methamphetamine intoxication was noted. He attempted to assault jail staff while taking vital signs.  The inmate arrived following a jail check at NMC ER. He was placed in a safety cell upon a telephone order by a Nurse Practitioner due to danger to others. It was unsafe to complete the intake screening at the time of intake. The inmate was placed on a synthetic drug monitoring protocol.

      The inmate was seen by a mental health clinician on 7/5/23. It was noted that the inmate appeared to continue to be too much under the influence of substances to complete an assessment.  The inmate responded to questions by aggressively hitting the cell window, yelling and threatening staff.  Follow up was scheduled for seven days. The inmate was seen again by a mental health clinician on 7/8/23, as requested by custody due to the inmate's behaviors.  The inmate appeared to be overtly psychotic, responding to internal stimuli, with bizarre appearance, pressured speech, and irritable mood.  The inmate's condition prevented further assessment. Upon consultation with the sergeant on duty, it was decided to send the inmate out to NMC for crisis evaluation.  The inmate had to be placed in the wrap restraining device with a spit mask due to his unwillingness to cooperate and aggressive behavior.

      The inmate returned from NMC and a receiving screening was completed on 7/9/23.  At that time the inmate was noted to be dirty and disheveled in appearance, with clear and coherent speech, anxious mood, and behavior that included yelling and screaming at times. The inmate

denied taking any medications outside of MCJ.  He denied current or past mental health conditions or treatment.  He denied any risk factors associated with suicide or self-harm.  A routine referral to mental health staff was made.  A telephone order for Zyprexa was given by the on-call psychiatrist.  Review of the MAR indicated that the inmate was not consistently compliant with this medication.  Documentation was not found in the healthcare record that the psychiatrist was informed after three consecutive medication refusals.

The inmate was seen again by a mental health clinician on 7/13/23, when his presentation appeared to have stabilized.  His appearance, speech, and mood were described as appropriate, thoughts were coherent, and he was fully oriented.  He stated that he did not need mental health services, and shared a letter from his family expressing their support.  Further follow-up was scheduled for seven days.

A psychiatry chart entry on 7/17/23 indicated that the inmate was not seen for a follow-up on the telephone order for Zyprexa, as there were 179 patients on the psychiatry sick call list.  No further information was entered.  The psychiatrist met with the inmate on 7/19/23, when a Psychiatric Initial Evaluation and an Assessment of Involuntary Movement Scale was completed.  The inmate denied all symptoms of mental illness or distress.  He denied any history of mental illness or related treatment.  He also denied a history of abusing methamphetamine or other drugs, despite indications to the contrary.  He refused psychotropic medications.  An assessment of amphetamine abuse was entered.

The inmate was again seen by a mental health clinician on 7/20/23 when a Mental Health Initial Assessment was completed.  The inmate was described as calm, cooperative, alert and fully oriented. He reported no mental health concerns.  Follow up was scheduled for two weeks.  However, on 7/24/23 the inmate was observed by custody to be "playing in his toilet full of feces."  A mental health clinician responded.  The progress note indicated that the on-duty psychiatrist also attempted to engage with the inmate, who did not respond to these efforts. The inmate was extracted from his cell and sent to NMC for crisis evaluation of grave disability and danger to others.  Review of documentation from NMC from this encounter indicated that the patient was seen by the telepsychiatrist, who recommended Zyprexa, placement in a safety cell, and follow-up the next day by the jail psychiatrist, recommending the patient be returned to the jail.  The hospital documentation indicated that 10 mg Zyprexa IM was to be administered before discharge.

MCJ healthcare record entries indicate that the inmate was placed on staggered suicide watch on 7/24/23 at 2257 hours.  Review of the MAR indicated that the inmate was prescribed oral Olanzapine by the on-call telepsychiatrist but refused most of the initial doses over the following days.  Further documentation of this telepsychiatry encounter could not be located in the healthcare record.  An in-person psychiatry evaluation following this telephone order was rescheduled on 7/25/23.  A psychiatry progress note on 7/27/23 indicated that the inmate was not seen, citing 56 patients on the psychiatrist's sick call list; the next psychiatry contact occurred on 8/2/23 when the plan was to continue Zyprexa and encourage medication compliance.

The inmate was seen by a mental health clinician at 0824 hours on 7/25/23.  The inmate would not engage with the clinician, so that the structured suicide assessment and necessary safety planning could not be completed.  Staggered suicide watch was continued.  The inmate was seen daily by mental health clinicians between 7/25/23 and 7/30/23 while on staggered suicide watch. The inmate appears to have remained severely psychotic during this period. On 7/27/23 the inmate was again sent out to NMC for crisis evaluation after being observed to stand on the short wall of the observation cell while beating on the light in the ceiling, refusing to

follow directions, and appearing to respond to internal stimuli. The NMC ER note of that date found, "No acute concerning findings, no indications for imaging studies. Psychiatrist: Return to jail safety cell – follow up with psychiatry." A diagnosis of antisocial personality disorder was noted.  A psychiatry entry in the MCJ healthcare record on 7/27/23 indicated that the inmate was not seen that date as there were 56 patients on the psychiatrist's sick call list.

The inmate was again seen for psychiatry consultation at NMC ER on 7/29/23, following a jail referral stating that the patient was acutely psychotic, responding to internal stimuli, with self-injurious behavior and feces all over his face and body.  It noted that the patient was not performing his ADLs (activities of daily living, pertaining mostly to personal hygiene), and requested that he be assessed for 5150 as gravely disabled.  The resulting NMC documentation described that the inmate presented with stool on his face, after smearing feces all over his body and his cell at MCJ.  The NMC notes emphasized that the patient ate a sandwich without hesitation in the emergency department, and reported that he had smeared feces out of boredom. The hospital notes pointed out that he is cared for at the jail where he is given shelter, food and also has a jail psychiatrist and mental health team.  A diagnosis of unspecified psychosis was noted. The disposition was to return the patient to jail and place in a safety cell with follow up by the jail psychiatrist.

The inmate was released from staggered suicide watch on 7/30/23 and was seen on that date, again on 7/31/23, 8/2/23, 8/8/23 and 8/9/23 as part of the follow-up protocol. The inmate was seen by a telepsychiatrist on 8/2/23.  This appears to be in follow-up to the 7/24/23 telephone order for Zyprexa by the telepsychiatrist.  The chart entry for the 8/2/23 psychiatry contact notes less than 30% medication compliance. The patient is described as disheveled with poor hygiene, agitated and uncooperative, loud, agitated and angry, with poor insight and judgment, and unable to engage in the evaluation. The plan was to continue Zyprexa and encourage the patient to take medications as prescribed, with follow-up scheduled for 30 days. A chart entry by a mental health clinician on 8/9/23 noted that the inmate was 17% compliant with medications.

Mental health progress notes were entered into the healthcare record on 8/12/23, 8/14/23, and 8/23/23, during which time he appears to have remained overtly psychotic and largely refused to engage with the clinicians. The 8/23/23 chart entry noted that the inmate's cell was wet and his clothes were soaked with what appeared to be a combination of urine and water. There was urine soaked garbage pushed under the cell door.  These are potentially signs of grave disability, requiring a higher level of care than can be provided at the jail.

On 8/31/23 the inmate was seen via telehealth by an APRN for an initial Early Access and Stabilization (EASS) Psychiatric Evaluation following a 1370 commitment as incompetent to stand trial. The evaluation documentation described the inmate as floridly psychotic, and notes that there had been five jail checks at NMC between 7/4/23 and 7/29/23.  An Involuntary Medication Order was in place; medication compliance to date was noted to be around 30%.  It was noted that the inmate lacked the capacity to provide informed consent for medications at that time. Follow up through EASS was scheduled for weekly.  An EASS treatment plan was not completed, apparently due the severity of the inmate's psychotic symptoms which precluded meaningful interaction.  No other mental health treatment plan was located in the healthcare record.  An EASS chart entry of 9/5/23 described an overall improved clinical presentation, but the information documented in the note was somewhat sparse. Notes from a 9/7/23 EASS encounter were more informative, describing the inmate as becoming increasingly disorganized with recent incidents of smashing a pair of hair clippers and shredding his bible.  It was noted

that the inmate refused his oral Zyprexa on 9/2/23 and 9/4/23, but the APRN could not verify if the inmate received the involuntary Haldol injection on 9/4/23 per an involuntary medication order. A Court Minute Order dated 8/18/23 noted that the inmate was not competent to stand trial. The Court found that he was not suitable for outpatient treatment, lacked the capacity to make decisions regarding antipsychotic medications, and, as a result of his psychotic condition, presented a danger of inflicting harm to others. The Minute order provided for the inmate to be involuntarily medicated.

Documentation of EASS contacts on 9/7/23 and 9/12/23 were again somewhat sparse, but suggest that the inmate remained overtly psychotic. An EASS discharge note of 9/13/23 indicated that the inmate had been discharged to a DSH program.

It appears from the available documentation that the inmate was in administrative segregation housing between 7/13/23 and at least 9/9/23. Weekly contact during mental health rounds were documented during this period. Nursing rounds were noted for 7/12/23; 7/16/23; 7/17/23; 7/18/23; and 7/19/23, but not thereafter.

This case was reviewed here in greater detail because it raises several concerns about the care provided in light of the requirements of the Implementation Plan. One concern is the ongoing lack of viable alternatives when an inmate's mental illness is so severe that it requires a higher level of care than the jail can provide. Although the inmate was referred to NMC on several occasions, as required by policy, MCJ and Wellpath cannot control admission to outside treatment facilities, while at the same time they cannot provide the required level of care. This situation continues to preclude a finding of substantial compliance for the requirements of acute and chronic care, as noted in similar cases reviewed for prior monitoring reports. A related issue is the apparent delay in the administration of involuntary medications, both in pursuing the necessary authorizations to do so and in the actual use of involuntary medications once a court order was obtained. This inmate remained severely mentally ill over an extended period of time, presenting a danger to others and apparent grave disability which posed risks to his health and well-being. No mental health treatment plan was found in the healthcare record, either before or after enrollment in the Early Access and Stabilization program. Clinical documentation in the healthcare record did not reflect the level of interdisciplinary consultation and coordination that a complex case such as this requires (recognizing that the level of care required could not at times be provided at the jail). This included an apparent lack of consistent notification to psychiatric providers regarding the inmate's frequent refusal of psychotropic medications. It does not appear that timely psychiatry evaluation occurred following a telephone order by the on-call telepsychiatrist. A more consistent and effective interdisciplinary treatment team process is needed for planning and coordination of care.