# Exhibit A

**Monterey County Jail Mental Health Monitor's Final Report**
**For April 15 – 16, 2024 Site Visit**
**James Vess, Ph.D.**

**Overview**

A site visit was conducted in person on April 15 - 16, 2024 at the Monterey County Jail (MCJ) for the twelfth mental health monitoring tour. In attendance for this tour were Drs. Nicole Taylor and Cassandra Newkirk of Wellpath. Also participating in this tour were ████ ████, Mental Health Supervisor, and Compliance Commander ████████ Entrance and exit interviews were conducted, which were attended by various Wellpath and Custody staff, as well as County, Wellpath, and Plaintiff's attorneys.

This report is based upon interviews with institutional staff and inmates as well as discussions with the attorneys for the defendants and plaintiffs, in addition to healthcare record reviews, documentation provided by Wellpath, MCJ and the County, and direct observations of various parts of the jail facility. The report specifically addresses the jail's status and progress toward compliance with the United States District Court Northern District of California Settlement Agreement and the Implementation Plans between Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County Sheriff's Office; California Forensic Medical Group, Inc (CFMG) et al.

On 9/26/23, the Court issued an Order Granting Plaintiffs' Motion to Enforce Settlement Agreement and Wellpath Implementation Plan [Dkt. No. 838 at 13 – 19], which identified a range of requirements found to be in noncompliance. Appendix A of the current report organizes compliance findings for these requirements to correspond with the numbering assigned in the Court Order.

An important development during the current monitoring period has been Wellpath's implementation of a monthly internal monitoring process that is aligned with many of the Implementation Plan requirements. Where available, the results of these internal audits are presented in the current report. It is important to note that findings about compliance in the current report were not based on the results of Wellpath's internal audits alone for any of the requirements subject to monitoring. Portions of the samples used in the internal audits were reviewed to verify the results reported by Wellpath, and additional cases were reviewed which were not included in the internal audit samples to further assess the current level of compliance. It is my understanding that all of the audit results provided for my review have been made available to Plaintiffs' attorneys.

Greater attention has been given in the current report to the sampling procedures used to select cases for review in determining compliance. A few select cases have been described in a separate document included as Appendix B. These cases often reflect important issues noted in the mental health care provided at MCJ, but are not intended to provide a representative sample of inmates receiving such care. As with prior reports, these select cases were only a small fraction of the inmate healthcare records which were examined for the current monitoring review.

Questions have been raised and discussed recently among the parties regarding the sampling methods used by the monitors to determine compliance, as well as the cutoff scores for findings of noncompliance, partial compliance, or substantial compliance, and whether performance data from the end of a review period is weighted differently than data from earlier

1

in a review period.  I began to address some of these issues in my last report from the November 2023 monitoring review, where I included the following:

"An attempt has been made to use compliance ratings in a manner consistent with other relevant work in this field.  Based on consultation with Monitors in other cases and review of various monitoring reports issued in other jurisdictions (cited below), the following definitions were identified:

"Substantial Compliance, as set forth in the Settlement Agreement for this case, 'shall mean adherence to the requirements of the Settlement Agreement and the Implementation Plans in all material respects, recognizing that 100% compliance is not required.  Non-systematic deviations from the requirements of the Settlement Agreement and the Implementation Plans shall not prevent a finding of substantial compliance, provided that the Defendants demonstrate that they have (a) implemented a system for tracking compliance, where appropriate and practical, and for taking corrective measures in response to instances of non-compliance, and (b) that Defendants have instituted policies, procedures, practices, and resources that are capable of durable and sustained compliance.' [Dkt. 494 at ECF 10].

"This definition of Substantial Compliance is slightly more detailed than that used in the Monitors' reports from other cases, which typically define substantial compliance to indicate compliance with all or most components of the components of a particular provision, with one adding that no significant work remains to accomplish the goal of that provision (Murray v. County of Santa Barbara, Case No. 2:17-cv-08805).

"Partial Compliance, as defined in other reports reviewed, typically indicates that the responsible party has achieved compliance on some, but not all, of the material components of the relevant provision of the Agreement (e.g., U.S. v. County of Los Angeles, et al., CV No. 1505903 DDP).  Other Monitors have noted Partial Compliance to indicate compliance with some of the components of the relevant provision of the Remedial Plan, and work remains to reach Substantial Compliance (e.g., Murry v. County of Santa Barbara).  Other reports define partial compliance as meaning that the defendant has made notable progress in achieving compliance with the key components of the provision, but substantial work remains (U.S. vs City of Meridian, et al., C.A. No. 3:13-CV-978), or that the defendant has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance (Remick et al. vs. City of Philadelphia, U.S. District Court for the Eastern District of Pennsylvania, No.: 2:20-cv-01959-BMS).

"Non-Compliance has typically been defined as indicating that the responsible party has not met most or all components of the relevant provision, sometimes adding that the defendant has made no notable progress in achieving compliance on any of the key components of the provision (e.g., U.S. vs. City of Meridian et al.), or that work remains to reach Partial Compliance (Murry v. County of Santa Barbara).

"In reaching a determination of Partial Compliance in the [now prior] monitoring report, consideration was given to the various aspects of compliance identified by other Monitors, including indications of progress, observed compliance with some but not all of the components of a given requirement, the proportion of cases reviewed that demonstrated compliance with some or all of the components of a requirement, and the severity or risk involved in instances of failure to meet the various components of a requirement.  By considering these various factors, I did not utilize a strict cut-off percentage for the number of compliant vs. not compliant cases to determine compliance ratings. For some requirements, such as Medical Records, where there are multiple required elements listed, partial compliance may reflect failure to reach substantial

compliance with only a subset of those elements (e.g. individual treatment plans) while all or almost all cases reviewed contained the other required elements. For other requirements, such as those involving welfare checks, even a small number of failures to meet compliance standards can result in a rating of Partial Compliance due to the high risk for adverse outcomes."

The foregoing continues to reflect my approach to the current monitoring report. Regarding the question of cutoff scores for substantial compliance, partial compliance, and noncompliance, I do not believe there is a universal set of compliance rates that can be applied across all requirements and in all situations. I am aware that the Medical Monitor indicated in his report form February 2024 that he considered a compliance rate of over 80% to be tantamount to substantial compliance, 50% to 80% to be partially compliant, and less than 50% to be noncompliant. He also noted, however, that any number of serious lapses in care that place one or more inmates at substantial risk or harm may indicate that the jail's performance does not substantially comply with the Implementation Plan. Such compliance rate cutoffs are reasonable, but cannot be applied in a mechanical manner without regard to other sources of information or issues revealed by individual cases. These particular cutoff scores are not consistently applied in cases involving other jail systems I'm familiar with, where compliance rates of 85%, 90%, or even 95% have been designated as the threshold for substantial compliance with certain requirements.

There is also the issue that many requirements in the Implementation Plan contain multiple elements, so that is not possible to render a single percentage score for the requirement as a whole, except perhaps to score all cases as noncompliant if any single element of the requirement is not met. I do not believe this is the most appropriate or informative approach. Professional judgement and expertise must be applied to reach conclusions about compliance.

Regarding the question of determining a compliance percentage, and specifically whether different portions of the review period are weighted differently (e.g., the last month of the review period is weighted more heavily than earlier months), I do not weight the different months of the review period differently. I do, however, look at trends over time and the relative differences in compliance rates across the different months. If, for example, compliance has improved and been sustained over the review period, and depending on the observed level of compliance for each month, I would likely interpret that differently than a pattern in which the compliance rate has declined over the review period, even though the overall compliance average in these two scenarios may be similar. Importantly, a single month at the end of a review period will not be sufficient to reach a finding of substantial compliance if prior months in the review period are notably lower. Adequate levels of performance must be sustained to reach substantial compliance, in light of trends in the data and the effectiveness of procedures to identify and correct the causes of noncompliance.

The following table presents the compliance status of the various requirements. Letters identifying each requirement correspond to letters listed in the body of the report under the major requirement sections, which are numbered. Ratings consist of SC for Substantial Compliance, NC for Noncompliance, and PC for Partial Compliance. Operational definitions for these compliance ratings were provided in the last monitoring report from November 2023. Some ratings have been deferred and some have been released from monitoring.

| 1. Intake Screening | July 2022 | May 2023 | Nov. 2023 | April 2024 |
|---|---|---|---|---|
| a. | SC | SC | Released | Released |
| b. | SC | SC | Released | Released |
| c. | SC | SC | Released | Released |
| d. | SC | SC | Released | Released |
| e. | SC | NC | NC | PC |
| f. | SC | NC | NC | PC |
| g. | SC | NC | NC | PC |
| h. | NC | NC | NC | NC |
| 2. Mental Health Screen | | | | |
| a. | Deferred | NC | NC | NC |
| b. | NC | NC | PC | SC |
| 3. Sick Call | | | | |
| a. | SC | SC | Released | Released |
| b. | SC | SC | Released | Released |
| c. | SC | SC | Released | Released |
| d. | SC | NC | NC | NC |
| e. | NC | NC | NC | PC |
| 4. Chronic Care | | | | |
| a. | NC | NC | NC | NC |
| b. | NC | NC | PC | SC |
| 5. Acute Care | | | | |
| a. | NC | NC | NC | NC |
| b. | NC | NC | SC | SC |
| 6. Outpatient Services | | | | |
| a. | NC | NC | PC | PC |
| b. | NC | NC | PC | PC |
| 7. Safety & Sobering Cells | | | | |
| a. | SC | SC | Released | Released |
| b. | Deferred | NC | Not Rated | PC |
| c. | Deferred | Deferred | PC | SC |
| d. | SC | SC | SC | SC |
| e. | Deferred | SC | SC | SC |
| f. | Deferred | SC | SC | SC |
| g. | NC | NC | NC | NC |
| h. | SC | Released | Released | Released |
| i. | SC | SC | SC | SC |
| j. | Deferred | SC | NC | SC |
| 8. Medication Continuity | | | | |
| a. | SC | Released | PC | NC |
| b. | SC | Released | PC | NC |
| c. | NC | NC | PC | SC |
| 9. Discharge | | | | |
| a. | SC | Released | Released | Released |
| b. | Released | Released | Released | Released |

| | | | | |
|---|---|---|---|---|
| 10. Involuntary Medication | | | | |
| a. | SC | SC | SC | SC |
| b. | SC | SC | SC | SC |
| c. | Deferred | SC | SC | SC |
| d. | NC | NC | PC | PC |
| e. | NC | NC | Deferred | Deferred |
| f. | NC | NC | Deferred | Deferred |
| g. | NC | NC | Deferred | Deferred |
| h. | NC | Deferred | Deferred | Deferred |
| 11. Medication Refusals | | | | |
| a. | NC | NC | NC | NC |
| 12. Clinical Staffing | | | | |
| a. | NC | NC | NC | NC |
| b. | NC | NC | NC | NC |
| c. | NC | NC | NC | NC |
| d. | NC | SC | SC | SC |
| 13. Mental Health Training | | | | |
| a. | SC | SC | Released | Released |
| b. | Released | Released | Released | Released |
| c. | Released | Released | Released | Released |
| d. | Deferred | SC | Released | Released |
| e. | Released | Released | Released | Released |
| 14. Restraint Chairs | | | | |
| a. | Released | Released | Released | Released |
| b. | Released | Released | Released | Released |
| c. | SC | SC | SC | SC |
| d. | SC | SC | Released | Released |
| 15. Use of Force | | | | |
| a. | SC | SC | SC | SC |
| b. | SC | SC | SC | SC |
| 16. Mental Health Grants | | | | |
| a. | Released | Released | Released | Released |
| 17. Inmates IST | | | | |
| a. | Deferred | NC | NC | NC |
| 18. Treatment Plans | | | | |
| a. | NC | NC | PC | PC |
| b. | NC | NC | PC | PC |
| c. | NC | NC | PC | PC |
| d. | NC | NC | PC | NC |
| 19. Inmate Discipline | | | | |
| a. | NC | NC | NC | NC |
| 20. Space Issues | | | | |
| a. | SC | SC | Released | Released |
| 21. Administrative Segregation | | | | |
| a. | NC | NC | NC | NC |

| | | | | |
|---|---|---|---|---|
| b. | NC | NC | NC | NC |
| c. | SC | SC | SC | SC |
| d. | SC | NC | SC | SC |
| e. | NC | NC | NC | PC |
| f. | Deferred | Deferred | PC | SC |
| g. | Deferred | Deferred | PC | SC |
| h. | Deferred | SC | SC | Released |
| 22. Suicide Prevention | | | | |
| a. | Deferred | SC | SC | Released |
| b. | NC | NC | PC | PC |
| c. | Deferred | SC | SC | SC |
| d. | Deferred | SC | SC | SC |
| e. | Deferred | SC | SC | SC |
| f. | SC | NC | SC | PC |
| g. | Deferred | SC | SC | SC |
| h. | Deferred | Deferred | SC | SC |
| 23. Out of Cell/Program Time | | | | |
| a. | NC | NC | PC | PC |
| b. | NC | NC | PC | PC |
| c. | NC | NC | PC | PC |
| d. | SC | Released | Released | Released |
| 24. Telepsychiatry | | | | |
| a. | Deferred | NC | NC | PC |
| b. | Deferred | NC | NC | PC |
| 25. Medical Records | | | | |
| a. | NC | NC | PC | PC |
| 26. Quality Management | | | | |
| a. | NC | NC | PC | PC |
| b. | NC | NC | Deferred | Deferred |
| c. | NC | NC | PC | PC |
| 27. Corrective Action Plans | | | | |
| a. | NC | NC | NC | PC |
| b. | NC | NC | NC | PC |

**Compliance with Settlement Agreement and Implementation Plan Requirements**
**1. Intake Screening**
• *(a)  Upon arrival, an Initial Health Assessment will be performed by the intake nurse to determine whether the inmate should be excluded from the facility on medical or mental health grounds. Upon acceptance into the jail, all inmates will be screened by the intake nurse for urgent medical, mental health and dental needs. The intake nurse will have access to an inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail. [County Implementation Plan; Dkt. 528-1 at ECF 7]*
• *(b)  A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.*

*•(c)  The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive findings on the suicide assessment. [Settlement Agreement at 6]*
*•(d) The Booking RN shall begin initial treatment planning at the time of booking and schedule referrals for follow up evaluation as necessary. [CFMG Plan at 27]*

**Findings: These requirements were released from further monitoring by Court Order dated October 27, 2023 (Dkt. 844 at ECF 4).**

*•(e) If a patient's chronic condition is stable at booking, the Booking RN shall schedule a follow up with a medical provider within 5-7 days. If the patient is unstable or has unverified medications, the Booking RN must refer the patient to the on duty or on-call medical provider. [CFMG Plan at 19; Dkt. 532 at ECF 29]*

**Findings:  Partial Compliance**
This requirement was found noncompliant in the last two monitoring reports from May 2023 and November 2023, after a finding of substantial compliance in the July 2022 Monitor's report.  Tracking compliance with this and other requirements for the current report has been facilitated by the implementation of internal auditing procedures by staff at MCJ, and particularly the detailed audits conducted monthly by the Mental Health Coordinator.  The data generated by these audits were used as one basis for determining compliance, in addition to my verification of selected cases in the audit sample and review of additional cases not included in the internal auditing samples.  The following table shows results of these audits for the two elements of this requirement over the months of November 2023 through March 2024.

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Stable follow/up | 88.89% | 100.00% | 100.00% | 83.33% | 87.50% |
| Unstable/unverified | 0.00% | 25.00% | 50.00% | 20.00% | 50.00% |

My review of 10 selected cases from the internal audit sample were consistent with the reported audit results, and generally consistent with my review across additional cases. The current finding of partial compliance is based on an adequate level of performance on the element pertaining to patients with stable chronic conditions at intake but an inadequate level of performance on the element pertaining to patients with unstable chronic conditions, especially unverified medications.  Also supporting a finding of partial compliance are the recent steps taken to address this performance deficit, including the implementation of the internal auditing process and same day review of all intake screenings by virtual nurses, with efforts to achieve real-time or same day correction of any portions of the intake screenings that were initially missed. With these processes in place, it is hoped that continued progress toward substantial compliance with both elements of this requirement can be achieved prior to the next monitoring review.

*•(f) The Booking RN shall identify and assess at booking individuals with a history of chronic medical or psychiatric condition. The Booking RN must document and verify and continue all current medications, whether verified or unverified, formulary or non-formulary. [Dkt 532 at ECF 29]\**

*Examination of the Implementation Plan indicates that the language of this requirement, which has been the basis of evaluating compliance for these functions from the time of the prior mental health monitor, has combined the language from separate elements of the Implementation Plan. The language of the Implementation Plan from Dkt. 532 at ECF 29 includes:

*Section 1.a.(1)  Individuals giving a history of a chronic medical or psychiatric condition and/or are taking essential medication for the management of a chronic medical or mental condition will be identified at the time of the jail intake screening by the Booking RN.*

*Section 1.a.(3.a)  The nurse will contact the on-call medical provider by the end of the nursing shift to obtain an order for all medications, whether verified or unverified, formulary or non-formulary.*

For the current monitoring report, these two elements will continue to be examined separately but an overall combined compliance finding will be rendered, consistent with prior monitoring reports.  Consideration will be given to restructuring the organization of the monitoring of compliance for this and other requirements to more explicitly align with the organization and language of the Implementation Plan in future reports.

**Findings:  Partial Compliance**

This requirement was found noncompliant in the last two monitoring reports from May 2023 and November 2023, after a finding of substantial compliance in the July 2022 Monitor's report.  Internal Audit data provided by Wellpath showed the following results for the two elements of this requirement over the months of November 2023 through March 2024.

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Identify/assess | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Obtain order | 33.33% | 50.00% | 50.00% | 20.00% | 0.00% |

My review of 10 selected cases from the internal audit sample were consistent with the reported audit results, and generally consistent with my review of additional cases.  There was a high level of compliance with the element of the requirement pertaining to the identification of individuals giving a history of chronic psychiatric condition and/or taking essential medications for the management of a chronic mental condition during the intake screening. There has been difficulty achieving compliance with the element pertaining to contacting the on-call psychiatric provider to obtain an order for all medications.

The overall finding of partial compliance reflects the combined performance across these two elements, in addition to steps recently taken to monitor and improve performance.  These steps include the implementation of monthly internal audits, including the capacity to graphically display and track performance over time, and the recent implementation of daily reviews by virtual nurses of all intake screenings conducted at MCJ, with efforts to identify and correct omissions on the day of intake. These efforts should support the improvement of performance, although consistent follow-up and corrective action will be needed from the DON and HSA to ensure that intake nurses are familiar with the procedures to ensure compliance and consistently follow these procedures.

Consideration should be given to clarifying the procedures and performance expectations for verifying medications during hours when outside pharmacies are closed.  The language in this and similar requirements regarding medication verification and obtaining orders by the end of the nursing shift may be intended to ensure that these tasks are consistently completed, rather

than being passed on to the next nursing shift.  It is not, however, practical to do this when the pharmacies which could provide verification are closed. Orders for medications from the on-call medical provider under these circumstances are often likely to be deferred to the next sick call by onsite providers. These expectations should be accounted for in the relevant policy and procedures, as well as the requirements subject to monitoring.

•*(g) Booking RN must observe/query for signs/history of mental illness and use of psychiatric medications. The RN shall verify any medications and request outside treatment records as necessary. Any inmate who exhibits signs/history of mental illness shall be referred to mental health services for evaluation, and a physician's opinion must be secured within 24 hours or the next scheduled sick call. [CFMG Plan at 6, 19, 41; Dkt 532 at ECF 16]\**

*Examination of the Implementation Plan indicates that this requirement, which has been the basis of evaluating compliance for these functions from the time of the prior mental health monitor, has paraphrased the language of the Implementation Plan. The Implementation Plan [Dkt. 532 at ECF 16] states:

*All new inmates shall be observed and queried for signs/presence and history of mental illness, including suicidal behavior/ideations, and use of medication for psychiatric treatment as part of the intake health screening completed by the Booking RN. Verification of medications and request of treatment records will be initiated for inmates indicating current or recent treatment including medications, hospitalization, emergency department visits and/or outpatient services. Any inmate exhibiting or testifying to presence or history of mental illness is referred to mental health services staff for further evaluation. A physician's opinion is secured within 24 hours or the next scheduled sick call.*

**Findings: Partial Compliance**

This requirement was found noncompliant in the last two monitoring reports from May 2023 and November 2023, after a finding of substantial compliance in the July 2022 report. Internal Audit data provided by Wellpath showed the following results for the three elements of this requirement over the months of November 2023 through March 2024.

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Observe/query | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Verify/request | 33.33% | 80.00% | 50.00% | 20.00% | 33.33% |
| Refer to MH | 100.00% | 100.00% | 100.00% | 90.00% | 90.00% |

My review of 10 selected cases from the internal audit sample were consistent with the reported audit results, and generally consistent with my review of additional cases.  As observed with similar requirements for the intake process, there has been a high level of performance in the areas of observing and querying for mental illness and referring to mental health staff as needed.  The area where performance has not been adequate is primarily in verifying medications.  Consideration of performance across the elements of this requirement results in a finding of partial compliance, with substantial compliance with two elements and noncompliance with a third element. Partial compliance is also supported by the implementation of routine monthly internal audits and specific corrective actions, including daily reviews by virtual nurses of all intakes.  Ongoing attention to this area by the HSA and DON should facilitate improvement in the verification and continuation of medications as required.

9

*•(h)  The Booking RN will obtain a signed release for records and attempt to verify current prescriptions.  By the end of the nursing shift, the RN will consult with the on-call psychiatrist regarding any verified or unverified medications.  The on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate.  During this consultation, the on-call psychiatrist will set the time to see the inmate within 5 – 7 days. The date of the appointment will be reflected on the written record of the order*. [CFMG Implementation Plan; Dkt. 532 at ECF19]

**Findings: Noncompliance**

These requirements were found noncompliant in the last three monitoring reports dating back to July 2022.  Internal Audit data provided by Wellpath showed the following results for the three elements of this requirement over the months of November 2023 through March 2024.

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| ROI/verify meds | 33.33% | 80.00% | 50.00% | 20.00% | 0.00% |
| Consult on-call | 0.00% | 33.33% | 50.00% | 20.00% | 50.00% |
| Set appointment | 50.00% | 80.00% | 50.00% | 40.00% | 0.00% |

It should be noted that the number of qualifying cases in each months sample (i.e., inmates booked with current prescriptions for psychotropic medications) was typically small, ranging from one to six cases.  The reported results can therefore be significantly influenced by a single case. Nevertheless, the results for each of the elements of this requirement have been inadequate, and have in fact declined in recent months. My review of eight cases, only one of which appears in the internal audit samples, indicated that two of the eight cases (25%) were compliant with the requirements for obtaining a release for records, verifying prescriptions, consulting with the on-call psychiatrist, or setting the appointment as required. In light of these performance results, and the lack of recent improvement, a finding of noncompliance is warranted.

It has been previously recommended that the quality assurance process and associated corrective action plans focus specifically on all Implementation Plan requirements for the intake screening process and undertake to ensure that these requirements are consistently met.  It is again recommended that all of the requirements pertaining to the verification and continuation of medications at intake remain a particular focus for corrective action.  It is also recommended that procedures and monitoring expectations should be clarified for the verification of medications and consultation with on-call psychiatry during hours when outside pharmacies are not open (see comments under section 1(f) above).

## 2. Mental Health Screening

*•(a)  All inmates must undergo an initial mental health screening by a qualified mental health professional within 14 days of admission. The screening must consist of a structured interview inquiring into (1) history of psychiatric hospitalizations, substance use hospitalization, detoxification and outpatient treatment, suicidal behavior, violent behavior, victimization, special education placement, cerebral trauma or seizures, and sex offenses; (2) current psychotropic medications, suicidal ideations, drug or alcohol use and orientation to person, place and time; (3) emotional response to incarceration; and (4) screening for developmental*

*disability and learning disabilities. Any positive scores will be referred for follow up. [CFMG Plan at 36, 41-42]*

**Findings: Noncompliance**

This requirement was found noncompliant in my last two reports from May and November 2023, when few initial mental health assessments by a QMHP were completed within 14 days of intake.  For the current monitoring review, data for this requirement were available from internal auditing conducted between December 2023 and March 2024, which showed the following compliance figures:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| MHIA w/i 14 days | N/A | 100.00% | 50.00% | 57.14% | 25.00% |
| Positive scores referred | N/A | 100.00% | N/A | 100.00% | 100.00% |

Sample sizes of were often as small as two or three qualifying cases each month, as the remaining cases reviewed in the internal audits appear to have been released shortly after booking.  My own review of selected cases from the internal audit samples verified the accuracy of these results. However, it appears that the samples used in the internal audits were all cases which had been referred to mental health at or around the time of intake.  The requirement is that all inmates must undergo an initial mental health screening by a QMHP within 14 days, not only those who have been referred to mental health.  Wellpath recently clarified that the audit methodology was modified in March to include all inmates, not just those referred from intake. The compliance rate for completion of the initial mental health assessment in March was 25%, based on one of four qualifying cases where the assessment was completed (note: the compliance rates for these months were inaccurately transposed from Wellpath's audit data in the draft version of the current report, where March was initially reported at 100%. These figures have been corrected here.  All other tables in the current report have been rechecked and confirmed to contain the correct compliance rates reported in the Wellpath audit data).

Progress has been made by implementing consistent internal auditing of this function and the increased frequency of completed Initial Mental Health Assessment forms within the required timeframe for inmates referred to mental health services.  Wellpath reports that the samples used in the internal audits beginning in March now draw from all inmates booked into MCJ, which is the proper population to audit for compliance with this requirement as written. Using this methodology, the March compliance rate of 25% results in a current finding of noncompliance.

Prior monitoring reports have addressed the issue of the definition of Qualified Mental Health Professional (QMHP) for the purposes of the initial Mental Health Screening, and specifically whether nursing staff are qualified.  It was noted that the Settlement Agreement defines Qualified Mental Health Professional as "an individual with training in psychology, social work, psychiatric nursing, or marriage and family therapy, who is currently licensed by the State of California to deliver those mental health services he or she has undertaken to provide" [Dkt. 494 at 12].  As written, this requirement specifies that a qualified mental health professional must conduct the initial mental health screening. Therefore, nursing staff who are not licensed psychiatric nurses would not be qualified to conduct this screening within the current language of the requirement.

11

I continue to believe that nurses or licensed psychiatric technicians, with adequate training and supervision, could conduct an initial mental health screening at the time of booking or within 14 days of booking and thereby fulfill this requirement.  The relevant standard from the National Commission on Correctional Healthcare states that the mental health screening can be conducted by qualified mental health professionals or qualified health care professionals who have received documented training (Standard J-E-05, NCCHC, Standards for Health Services in Jails, 2018).

I have previously noted that the primary purpose of this requirement is to screen inmates and identify those who require follow-up by mental health staff.  A screening is not the same as a full assessment.  The purpose of a screening should be to reliably detect cases that should receive more focused in-depth assessment and treatment services as needed.  A definition from the National Institutes of Health is relevant here: "Screening is a process for evaluating the possible presence of a particular problem.  The outcome is normally a simple yes or no.  Assessment is a process for defining the nature of that problem, determining a diagnosis, and developing specific treatment recommendations for addressing the problem or diagnosis." [Treatment Improvement Protocol 51, SAMHSA].  The National Council of Juvenile and Family Court Judges distinguishes screenings from assessments as follows, (Differences-between-screening-and-assessment.pdf (ncjfcj.org)):

"Screenings are done as an evaluation to determine if there is a particular issue. Screenings are designed with established criteria to inform decision making on if an assessment is merited. Below are the standard characteristics of a screening tool:
1. Broader and used to identify conditions that may warrant further assessment
2. Used to identify individuals who need immediate assistance
3. Used to identify individuals who may need further evaluation
4. Can be administered by anyone who has been trained to administer a specific tool
5. Used to track change over time
6. Not intended to be conclusive or diagnostic
"Conversely, assessments are intended to provide a more in-depth review and evaluation for issues identified by a screening. Therefore, assessments are more comprehensive because they are intended to gain a deep understanding of a need in order to make connections with an appropriate service. . . Below are the standard characteristics of an assessment tool:
1. Scope is more focused on specific topic areas
2. Used to define the nature of a particular issue
3. Used to determine the severity of a particular issue
4. Should only be administered by topic specific professionals (e.g. substance abuse assessments should be administered by professional clinicians)
5. Can be conclusive and used to inform diagnoses
6. Used to inform formal solutions"

These definitions reflect my perspective on the nature and purpose of screenings. I have encouraged the parties to revisit the language of the requirement and consider options that would allow staff other than a QMHP to conduct these screenings, with referral for a QMHP assessment when needed. This would allow the QMHPs at MCJ to focus on the assessments and treatment interventions which require their qualifications and skills.

Alternatively, a Licensed Psychiatric Technician could conduct such screenings, and would fall within the definition of a QMHP.  Hiring staff into the allocated Psychiatric Technician positions, however, continues to prove difficult, and the allocated positions remain unfilled.  At this stage, further progress in the overall level of compliance with the requirement as written, determined by auditing samples drawn from the entire inmate population, is necessary to reach substantial compliance.

*•(b)   The medical or psychiatric provider will complete a baseline history and physical or psychiatric examination; order a therapeutic regimen, as appropriate; and schedule the patient to be seen for chronic care clinic at least every ninety days for the length of the jail stay. Patients on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every 60 to 90 days.*

**Findings: Substantial Compliance**

The last monitoring report from November 2023 found partial compliance with this requirement, following a finding of noncompliance in the two prior monitoring reports. Progress was noted in the last report in the psychiatric documentation.  Improvement was also noted in the number of patients on psychiatric medications who were scheduled as required, which was observed in a majority of the overall healthcare records reviewed for that monitoring report.

Significant additional progress was observed in the current review, supported by the implementation of monthly internal Wellpath audits of 10 selected cases for compliance with these functions. Audit data were reviewed from December 2023 through March 2024, which reported compliance figures as follows:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| History & exam | 100.00% | 100.00% | 100.00% | 100.00% | 90.00% |
| Order med regime | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| 30 days until stable | 80.00% | 28.57% | 80.00% | 90.00% | 100.00% |
| 90 days when stable | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

The results from the internal audits were verified by my own review of three cases from each month's sample, for which my findings matched those reported in the audits.  I also examined 15 additional cases that were not included in the internal audit samples.  Of these 15 cases, three (20%) were found deficient for these requirements.  Although several of the cases showed rescheduled psychiatry appointments, subsequent appointments were typically conducted within required timeframes.  One exception to this pattern was a patient whose medications were repeatedly renewed over a period of nine months apparently without evaluations by a psychiatric provider, although he was seen regularly by MHPs during this period and appeared clinically stable based on the clinical documentation.  Based on all of the data reviewed, this case is considered an outlier and does not appear to represent a systemic deviation from compliance. Another case considered non-compliant involved a patient who refused to be seen by the psychiatrist for a 30 day follow-up, had the prescribed medications continued, but was scheduled for appointments after an additional 30 days without being seen by a psychiatric provider.  The language of the requirement is that patients will be seen by the psychiatrist, rather than simply scheduled to be seen. This issue was discussed with the Supervising Psychiatrist during the recent site visit, and it was agreed that while it is often better

13

to continue medications when a patient refuses to be seen on the date scheduled, a follow-up appointment should be scheduled and conducted as soon thereafter as possible, rather than waiting for an additional 30 days.

There has been significant progress in meeting this requirement during the current monitoring period, supported by monthly internal audits and collaborative efforts by the MCJ psychiatrist and the Wellpath Supervising Psychiatrist. Overall performance during the past three months has been sufficient to warrant a finding of substantial compliance. One recommendation for maintaining substantial compliance concerns the methodology for the monthly internal audits conducted by Wellpath; it appears that for most of the cases reviewed in these audits, only a single encounter date is reviewed, with some cases showing up to three encounter dates. Insofar as the requirement involves seeing patients within specified periods over time, compliance should be evaluated by following cases over multiple contacts to ensure that appointments are both scheduled and completed as required.

**3. Sick Call**
*•(a)   Inmates' health and mental health complaints must be collected, processed, and documented daily and triaged as appropriate by medical and mental health providers. [CFMG Plan at 25]*
*•(b)   The on-duty medical provider shall see urgent sick call requests Monday through Friday. On weekends and holidays, the on duty nurse shall communicate urgent complaints/requests to the on-call provider, who will treat or refer the patient as necessary. [CFMG Plan at 25]*
*•(c)   Health care staff must note (1) the date and time the sick call request slip is reviewed; (2) the signature of medical staff; and (3) the disposition. The sick call slip must be filed in the inmates' medical record. The sick call roster must be kept on file in the medical record room. Providers must record sick call visits in the inmate's medical record. [CFMG Plan at 25-26]*

**Findings: These requirements were released from further monitoring by Court Order dated October 27, 2023 (Dkt. 844 at ECF 4).**

*•(d)   Sick call must be conducted 5 days/week in a private clinical environment. Health services staff must triage sick call slips daily and schedule patients for the next sick call if the slip was received prior to 2300 hours. [CFMG Plan at 26]*

**Findings: Noncompliance**

This requirement was found to be in noncompliance in the last two monitoring reports from May 2023 and November 2023, after a finding of substantial compliance in the earlier monitoring report of July 2022. It was noted that mental health clinicians review and triage sick call requests daily. Mental health sick calls were conducted daily, and patients were scheduled to be seen based on the level of urgency determined by triage. The current review again indicated that sick calls are typically reviewed, triaged, and initially scheduled as required. The last two findings of noncompliance was based on the frequency and duration of rescheduled sick call appointments due to workload constraints. Rescheduled appointments are not held as originally scheduled, i.e., the patient was not seen on the date they were supposed to be seen, and thus the sick call was not conducted.

Wellpath has again raised a question about the definition of sick call, suggesting that it should only apply to appointments made in response to health service requests submitted by inmates, in contrast to contacts that have been scheduled by mental health staff or in response to referrals by other staff.  I have instead again considered all scheduled appointments with mental health staff to be conducted as part of sick call, to include contacts scheduled in response to referrals made during the intake process and contacts made in response to subsequent referrals by nursing or custody staff due to concerns about an inmate's condition, as well as appointments made by clinicians in follow-up to services initially request by inmates or the contacts required by, for example, removal from suicide watch.  All of these contacts are part of the mental health staff's clinical care of patients at the jail.  The urgency and relative priority of all of these types of contacts must be considered by mental health staff when conducting triage and creating a daily schedule for clinicians, which I have viewed collectively as their sick call procedure.

The approach taken to determining compliance with this requirement was to review the electronic healthcare record of 11 inmates who received mental health care between December 2023 and April 2024.  Seven of these inmates were identified by Plaintiffs' attorneys based on concerns raised from their site visit at MCJ on March 7, 2023.  The other four inmates were selected randomly from the Mental Health Alerts report during the relevant timeframe, which shows inmates on the mental health caseload. The dates of rescheduled and completed sick calls were reviewed for each case, and consideration was given to type of appointment scheduled, the acuity of the inmate's condition, as well as policy requirements for the completion of specific types of referrals (e.g., urgent vs. routine, the time period of the scheduled follow-up, the clinical status of the patient, etc.); some rescheduled appointments may still fall within required timeframes, and missing a scheduled 30 day or 90 day follow-up appointment with a relatively stable patient by two to three days is not viewed in the same way as missing shorter term follow-up with an unstable patient by the same amount of time.  Urgent, emergent, and routine referrals are assessed based on the timeframes specified in policy.

Nine of the 11 cases in the current review were found noncompliant. One of the compliant cases had no rescheduled appointments, but this inmate's period of incarceration was relatively short at less than seven weeks.  The other case considered compliant had several rescheduled MHP and Psychiatry appointments, but was still seen within reasonable timeframes based on the nature of the appointments and the inmate's clinical acuity.  In contrast, one of the noncompliant cases had 53 consecutive MHP appointments rescheduled and was not seen by a clinician for three months, nor was the inmate seen by psychiatry for a period of over nine months despite receiving psychotropic medications.  A different case had 47 consecutive rescheduled MHP appointments, and another showed 36 consecutive rescheduled MHP appointments. The remaining cases were not as extreme but were nevertheless problematic.  It should be noted that all four of the cases selected randomly were noncompliant, including the case with 36 consecutive rescheduled MHP appointments.

The problem is staffing.  It is recognized that this requirement is not about staffing levels per se.  The current finding of noncompliance is again based on the number of sick call appointments that were not conducted in a sufficiently timely manner, but the appointments are not being completed because there are not enough staff to complete them.  The triage process utilized by the Mental Health Coordinator and the MHPs appears generally sound, although the

scheduling of follow-up appointments is not always clearly justified based on the available clinical documentation.  Discussions with mental health clinicians and direct observations of clinical practice at MJC indicate that the staff consistently make an effort to see the patients most in need of service as soon as possible with available staffing resources.  However, the workload associated with the current staffing levels appears untenable.  Healthcare notes associated with rescheduled appoints often demonstrate this challenge; in one example (Case #4 in the separate case reviews document), the notes indicated that the workload on these dates ranged from 58 tasks (typically scheduled appointments with inmates) to be completed with one clinician and one escort deputy on duty, up to 184 tasks and a group for two clinicians.

The Mental Health Coordinator stated that the most extreme cases are taken first, and then the patients with the most overdue appointments are seen as time allows.  This is a reasonable and clinically appropriate approach, but it is not an adequate solution. It was also discussed that the mental health groups run by clinicians, recently restarted, will be suspended in order to devote more time to completing the scheduled clinical appointments.  I agree with this prioritization in the short term, but it is robbing Peter to pay Paul, and not an adequate solution to meeting all of the requirements of the Implementation Plan.

Wellpath has implemented an internal auditing process to monitor performance in relation to the various requirements of the Implementation Plan. It is recommended that a specific area of internal monitoring should be the frequency of rescheduled appointments and the length of time between the originally scheduled appointment and the date the inmate is actually seen by mental health staff.  This information would also be useful for a detailed analysis of staffing requirements based on trends in meeting local workload demands.

•*(e)  An MD or an RN shall visit inmates housed in holding and isolation cells on Monday, Wednesday and Friday. [CFMG Plan at 26]*

**Findings:  Partial Compliance**

The last three monitoring reports found noncompliance with this requirement, noting that there were lapses in the documentation of daily nursing rounds.  It has consistently been observed that there are very few instances of visits by an MD (psychiatry or medical), although this requirement can also be met through RN visits.  Review of monthly internal audit data for the period of November 2023 through March 2024 showed the following results:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Visits M, W, F | 51.19% | 60.00% | 52.43% | 63.16% | 94.67% |

These Wellpath audit results appear to report compliance as the percentage of the required visits that were completed on Mondays, Wednesdays, and Fridays for a sample of 10 inmates in holding and isolation cells for each month, rather than the percentage of cases in which all required visits were completed.  Five cases were selected from the audit samples for verification, and my results were similar, with compliance for each case ranging from 67% to 85% of the checks conducted on Mondays, Wednesdays, and Fridays as required.  Five additional cases were reviewed that were not included in the Wellpath internal audit samples.

Compliance for these cases ranged from 64% to 100% of the checks conducted on Mondays, Wednesdays, and Fridays as required.  It should also be noted that in each case, nursing rounds were completed on days adjacent to a Monday, Wednesday, or Friday, but these instances were counted as noncompliant, based on the specific language of the requirement.  Based on these results and the general trend of improvement they reflect, a finding of partial compliance is warranted.  Focused attention on the ongoing internal audit results, with additional training and corrective action where required, should lead to substantial compliance.

### 4. Chronic Care

*•(a)  Any patient whose chronic condition cannot be managed at MCJ shall be transferred offsite for appropriate treatment and care. [CFMG Plan at 30]*

**Findings:  Noncompliance**

As the prior Mental Health Monitor stated in his final report of May 2021, "Although inmates were routinely referred to NMC for crisis evaluation and stabilization, some inmates with severe and chronic mental illness that could not be managed at MCJ remained at the jail." Dr. Hughes further noted, "The acceptance and adequate treatment of such inmates at NMC remained problematic; and as has been previously noted, referrals for needed inpatient mental health care did not always occur due to the lack of access to inpatient treatment at NMC."  My prior reports from July 2022, May 2023, and November 2023 found that these issues remained unchanged.

In the current monitoring report, a list was requested of all send outs to NMC for mentally ill inmates between December 2023 and early April 2024.  This resulted in a list of 10 unique inmates with 13 total instances of sending the inmate to NMC for crisis evaluation and/or treatment.  Review of each instance showed that two inmates were admitted briefly to the NMC inpatient psychiatric unit, one upon her first and only referral (case #6 in the separate case reviews document) and the other on his second of two referrals (case #7 in the case reviews document).  These two admissions appeared to be beneficial for the stabilization of the patients, although one inmate was referred twice and admitted on the second referral but not the first, 10 days earlier, which had occurred in immediate response to a likely suicide attempt by drinking cleaning fluid.  In the remaining cases and instances of referral to NMC, it did not appear that admission to an inpatient level of care was necessary, although for one patient (case #5 in the case reviews document), the need for inpatient psychiatric care was ambiguous based the available documentation. At the very least, better communication, documentation, and coordination of care for this patient between NMC and MCJ was needed.

Part of the reason for reviewing all instances of mental health referrals to NMC was to better determine the frequency of need for an inpatient level of care in cases which cannot be adequately treated at the jail.  Although this review does not involve an adequate sample over a sufficient period of time to draw empirically supported inferences, it begins to suggest that the number of jail inmates requiring mental health care that cannot be provided at the jail is small. As I noted in my last monitoring report from November 2023:

"Solutions [for meeting the intent of this requirement] should focus on both minimizing the number of inmates whose conditions deteriorate to the point where they cannot be effectively

17

treated in jail, and finding ways to expediently transfer a patient for psychiatric inpatient care when needed (i.e., gain admission for the inmate to an appropriate offsite facility).

"It has been noted in prior monitoring reports that a potentially promising development with chronically, severely mentally ill inmates is the Early Access and Stabilization Program (EASS). Once again in the current monitoring review, documentation for several patients who were enrolled in this program showed that during the period of their treatment by EASS staff, their mental health needs were more frequently and more adequately addressed than when they were not being followed by the program. Although this is a promising program for the treatment of inmates who have been found incompetent to stand trial while they await competency restoration services, it is becoming apparent that EASS is unlikely to be an adequate solution to the overall need for a higher level of care in all cases whose chronic mental health condition is too severe to treat in the jail. This program will also not address the needs of inmates who have been sent to a DSH facility for treatment and returned to the jail as unrestorable to competence, as has been observed in cases reviewed for earlier monitoring reports.

"The question arises as to what can realistically be done to meet the requirement for inmates whose chronic condition cannot be managed at MCJ if there are no viable alternatives for transferring these inmates offsite for treatment and care. Some, perhaps many, of these inmates may be effectively treated in the EASS program if certain assumptions are met. This would include sufficiently early detection of an inmate's condition as one that cannot be effectively treated by the jail's standard mental health program and is likely to result in incompetency to stand trial. There would need to be a fast and efficient response in such cases to get the inmate enrolled in the EASS program and begin more intensive psychiatric treatment than can otherwise be provided by MCJ mental health staff, including the use of involuntary psychotropic medications as needed, thereby preventing the inmate from languishing with a severe mental illness that is not being adequately treated. Another necessary element would be that the EASS program has sufficient capacity to ensure that all inmates requiring this level of intervention can be enrolled and maintained in the program, although it has been explained to me that decisions regarding enrollment in EASS is made by the Department of State Hospitals, and therefore is not directly under the control of Wellpath.

Wellpath has raised concerns regarding whether the EASS and JBCT programs at Monterey County Jail are appropriately considered to be within the scope of monitoring for *Hernandez*. For the purposes of this portion of the current report, it should be noted that my consideration of EASS and JBTC is part of a search for solutions to the problem of obtaining the proper level of care for patients whose conditions cannot be managed at the jail. My perspective has been that the earlier and more intensive treatment provided through these programs may minimize the number of patients who develop or continue to manifest a level of psychiatric impairment that requires transfer to an outside facility. Exclusion of consideration of these programs may be appropriate for evaluation of compliance with the requirement for acute and chronic care, but solutions to the challenges faced in reaching compliance with these requirements are nevertheless still needed.

Another mechanism which could minimize the need for inpatient care is the use of involuntary medication in appropriate cases, with inmates who are chronically, severely mentally ill to the extent that they present a danger to self, a danger to others, or are gravely disabled as a

result of their mental illness.  As noted in earlier reports, mechanisms exist to provide involuntary medications, such as the provisions of PC2603, when the inmate's condition requires such intervention and they are unable to give informed consent.  This approach would require early detection and decisive action to initiate the necessary steps involved. This would be best supported by an effective interdisciplinary patient review and treatment planning process where such cases are routinely discussed and all available treatment options vigorously pursued in a coordinated manner.  Documented treatment plans should reflect these interdisciplinary clinical considerations and guide the various approaches to treatment being pursued. Consideration should also be given to more extensive use of behavioral treatment plans with inmates whose mental illness results in self-injurious or otherwise health-jeopardizing behaviors.

In one of the cases reviewed in detail (case #6 in the case reviews document), the patient was briefly admitted to the NMC psychiatric inpatient unit and provided involuntary medications, which appeared to be effective in stabilizing the patient and allowing her to be adequately cared for in the jail.  A capacity hearing was quickly conducted and the petition was granted, resulting in an involuntary medication order allowing for the administration of needed medications.  However, this case also appeared to indicate that the conditions of the 5150 hold at NMC which allowed for involuntary medications would not continue following return of the patient to MCJ.  Although continuing involuntary medications did not appear called for in this case, in cases requiring ongoing involuntary medications, such treatment would not continue at MCJ following the patient's return from NMC.

The provisions of PC 2603 may be the relevant mechanism for involuntary medication administration at MCJ in cases where such medications are needed beyond the initial treatment in a psychiatric emergency.  It is not clear at this stage how quickly the process required by PC 2603 can unfold. Sections 7(a) and 8(a) of the statute require that the inmate and counsel are to be provided with written notice of a hearing at least 21 days prior to the hearing, unless emergency or interim medication is being administered, in which case the inmate would receive an expedited hearing.  Otherwise the hearing is to take place within 30 days after the filing of the notice.  The primary concern here is that such timeframes will often be too long to be useful in responding to a severely mentally ill and gravely disabled patient. The key will be how quickly an expedited hearing can take place, and whether the internal procedures at MCJ can efficiently arrange such a hearing. Further exploration is recommended of the use of PC 2603 and the associated procedures required to quickly provide involuntary medications at the jail when this may represent the most effective treatment approach with patients who are gravely disabled, a danger to self, or a danger to others and who lack the capacity to consent to necessary medications.

The current finding of noncompliance is based on the conclusion that effective mechanisms do not yet exist for transferring patients whose chronic condition cannot be managed at MCJ offsite for appropriate treatment and care.  It has been noted in earlier monitoring reports that this requirement is interpreted to mean transfer of the patient's care to an outside facility, i.e., admission to an inpatient service, rather than simply transporting the patient to an outside facility, when (typically) the patient is refused admission and returned to jail, even while recognizing that neither Wellpath nor the jail control admissions to such facilities. Wellpath has disagreed with this interpretation, arguing that the obligations of this requirement are met by the attempt to gain admission of the patient to an outside facility, even though those attempts typically fail.  I continue to view compliance as requiring access to the necessary level

19

of care, with access meaning the patient actually receives that care.  As noted in the Settlement Agreement [Dkt. 494 at ECF 17] "Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including . . . access to hospitalization and inpatient care . . ."

•*(b)  At every 90-day chronic care appointment, the medical/psychiatric provider shall (1) assess the patient's current medications, complaints, and compliance with treatment plan; (2) examine vital signs and weight; (3) assess the patient's diagnosis, degree of control, compliance with treatment plan and clinical status as compared to prior visits; and (4) conduct lab and diagnostic tests as necessary, develop strategies to improve outcomes if the condition has worsened, educate the patient, and refer to MD or specialist, and/or conduct discharge planning as necessary. All of the above must be documented in the patient's health record. [CFMG Plan at 32-33]*

**Findings:  Substantial Compliance**

The last Mental Health Monitoring report from November 2023 found partial compliance with this set of requirements, whereas prior reports had found noncompliance.  The prior Mental Health Monitor had noted in his report of May 2021 that documentation of treatment planning was essentially nonexistent in the healthcare record; there was no documentation or comparison of patient weights by the psychiatrist; documentation was lacking regarding the patient's diagnosis, degree of control, compliance with the treatment plan and clinical status compared to prior visits; there was no documentation of Abnormal Involuntary Movements Scale (AIMS) testing or monitoring of metabolic factors for patients prescribed psychotropic medications; and a lack of documentation of appropriate therapeutic interventions for patients who were decompensating or not participating in treatment.

Improvements in the clinical documentation were noted in the monitoring report from May 2023.  It was observed that some of the most recent psychiatry notes from that review period were more complete and the standardized forms for psychiatry progress notes and AIMS testing had been entered into the healthcare record in some of the cases reviewed, although deficits in the chart entries were still common.  During the subsequent monitoring review for November 2023, standardized forms such as the Psychiatric Provider Progress Note and the Assessment of Involuntary Movement Scale were used more frequently, but were still not found consistently in the healthcare records across all of the cases that were reviewed.  It was concluded during the last review that more consistent documentation of all required elements was needed to move from partial compliance to substantial compliance.

During the current monitoring review period, monthly internal audits were conducted by Wellpath across the various elements of this requirement for 10 patients each month.  Results from these audits for the months of November 2023 through March 2024 showed the following:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Assess meds, etc. | 90.00% | 100.00% | 90.00% | 100.00% | 100.00% |
| Examine VS & weight | 0.00% | 0.00% | 50.00% | 70.00% | 100.00% |
| Diagnosis, degree control | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

| Conduct labs | 100.00% | 100.00% | 50.00% | 100.00% | 100.00% |
| Develop strategies | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Educate patient | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

I reviewed 10 cases from the internal audit samples, in addition to other cases not contained in these samples.  My results confirmed those reported by Wellpath. There has been significant continued improvement in the documentation of the psychiatric chronic care appointments during the current review period.  Documentation of vital signs and weight has been the only area of performance requiring significant improvement, and has now shown consistent improvement.  Taking all elements of this requirement into consideration, a finding of substantial compliance is warranted.

## 5. Acute Care

•*(a)  Inmates who require acute mental health services beyond what is available at the Jail must be transferred to an appropriate facility. [CFMG Plan at 36, 42] CFMG PLAN AT 26*

**Findings:  Noncompliance**

The observations made in the preceding section of the current report pertaining to the requirements for chronic care are once again relevant here.  MCJ continues to send out patients to NMC-ER as needed, but does not reliably have access to the level of care needed for such patients, as neither MCJ nor Wellpath can control admissions to NMC or other outside facilities.  Review of the available documentation indicates that the communication and coordination of care between NMC and MCJ needs improvement.  This includes not only the written documentation associated with patient send outs and the care provided at NMC, but also the integration of this information in the treatment planning and associated documentation at MCJ.  The cursory recommendations often provided by NMC (e.g., safety cell placement and see the jail psychiatrist) do not appear to reflect a clear understanding of the jail environment and the limitations of the care available at MCJ.  It is not always clear why some patients are admitted and others are not, or why an individual patient is admitted on one occasion but not another.  A fuller understanding by those involved of the jail's limitations, as well as a realistic understanding of the resources and competing demands at NMC, may help improve communication and the coordination of care, although staff familiar with this situation report that these problems are long-standing.  The current finding of noncompliance is based on the conclusion that effective mechanisms do not yet exist for transferring patients whose acute condition cannot be managed at MCJ offsite for appropriate treatment and care.   Please refer to the preceding section 4(a) on Chronic Care for a more extensive explanation of my interpretation of the requirements for transferring inmates requiring mental health care beyond what is available at the jail.

•*(b)  Crisis intervention and management of acute psychiatric episodes shall be handled initially by on-duty medical/mental health staff with referral to psychologist and/or psychiatrist on a 24 hour per day basis. [CFMG Plan at 43]*

**Findings:  Substantial Compliance**

This element of the acute care requirements, which specifically addresses the initial onsite response to acute psychiatric episodes, was found in substantial compliance in the last monitoring report from November 2023.  Review of relevant cases for that report indicated that such situations were initially handled by on-duty medical and mental health staff, or with the involvement of on-call mental health staff if occurring outside of scheduled mental health coverage hours. Referral could be made to a psychiatrist as needed (regular mental health staffing does not currently include psychologists), and on-call psychiatry coverage was available.

During the current monitoring period, monthly internal audits were conducted by Wellpath this requirement. Results of these audits showed the following:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Handled onsite | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Referred as needed | 80.00% | 100.00% | 66.67% | 100.00% | 100.00% |

I reviewed a total of 12 crisis incidents across 10 different patients from the internal audit samples, and my results matched those reported in the audits. The lower compliance figure in January regarding referral to a psychiatrist was the result of one out of three relevant cases that month when a referral was needed but not made.  This single case does not significantly alter the overall high level of compliance with requirements.

I reviewed ten additional cases that were not included in the Wellpath internal audit samples.  In all of these cases the initial staff response to the acute psychiatric episode was clinically appropriate, although in one case it appeared that a referral to psychiatry was not made when it likely should have been.  In light of this consistent level of performance, the current finding is again substantial compliance.


**6. Outpatient Services**
•*(a)  The Jail shall make outpatient mental health services, provided by a qualified mental health provider, available to all inmates. [CFMG Plan at 41]*
•*(b) Inmates requiring mental health services beyond the on-site capability of the Jail shall be referred to appropriate off-site providers. [CFMG Plan at 41, 43, 46]*


**Findings: Partial Compliance**

The last monitoring report from November 2023 found partial compliance with these requirements, following findings of noncompliance in earlier reports. The November 2023 report noted that additional mental health staff had been hired, but staff are still struggling to keep up with workloads. According to information provided by Wellpath, there were 3.7 full-time equivalent clinician positions covered by four mental health professionals, in addition to the Mental Health Coordinator.  This includes mental health professionals who began work at the jail on 5/30/23 and 9/24/23.  Another mental health clinician had recently returned from maternity leave, so that all allocations for mental health clinician positions were filled.

For the current monitoring review, eight cases were selected for close examination of the outpatient services delivered, including a particular focus on the number and timing of

22

rescheduled mental health appointments.  Five of these cases were selected at random from the list of patients included in the internal monthly audits conducted by Wellpath (although it should be noted that rescheduled vs. completed appointments is not a metric covered by these internal audits), and three cases were included which had been identified by the Plaintiffs' attorneys and closely reviewed in response to concerns that were raised. Of these eight cases, all had rescheduled appointments with mental health clinicians, although in four cases the number of rescheduled appointments was relatively small and the delays between completed appointments were not long enough to interfere with the course of care (e.g., case #2 in the separate case reviews document).  In the remaining cases, however, a substantial number of appointments were rescheduled and the period between completed appointments was clearly problematic (e.g. case #4 in the case reviews document).  Other cases reviewed included one in which a patient had a 30 day follow-up appointment rescheduled 66 consecutive times over a period of three months between completed MHP appointments.  Another case had 11 consecutive rescheduled appointments for a routine referral from intake, resulting in failure to meet required timeframes or a sound standard of practice.

In the cases that were reviewed for the current monitoring report, it was noted that certain tasks were consistently completed as scheduled, such as follow-up appointments with patients on or recently released from suicide watch.  Available information suggests that the triage process is properly prioritizing contacts with the most acutely ill and vulnerable patients.  This is consistent with the daily triage process as described by the Mental Health Coordinator and mental health clinicians I spoke with during the most recent site visit.  After these most urgent cases are seen, attempts are made to see those who have been waiting the longest between contacts, although this is clearly not a sufficient solution in light of the frequency and duration of rescheduled appointments.

Rescheduled appointments are almost always attributed to workload issues, which directly reflect a problem with staffing levels. Some chart entries record the number of tasks (primarily scheduled appointments) and the number of staff on duty.  Examples include workloads ranging from 58 tasks with one clinician and one escort deputy on duty up to 184 tasks and a group for two clinicians.  Such workloads are not realistically achievable.

The Implementation Plan states, "Outpatient mental health services to include screening, evaluation, diagnosis, treatment and referral services shall be available to all inmates in the Monterey County Jail" [Dkt. 532 at p. 41].  The last monitoring report noted that, unlike the services needed for some of the more severely mentally ill inmates, which are considered under the requirements for chronic and acute care, outpatient services could be effectively delivered by mental health staff within the existing jail environment, assuming sufficient staff are available to consistently deliver these services.  It remains difficult to envision a situation in which an inmate would need to be sent to off-site providers for outpatient services as defined in the Implementation Plan, if there were sufficient mental health staff onsite to address the level of need for these outpatient services.  Adequate staffing, including adequate custody staffing to provide the necessary escorts, is again seen as the primary obstacle to achieving substantial compliance with the requirements for outpatient services.  It should be noted that the outpatient services identified in the Implementation Plan do not include treatment groups.  Most inmates

who require outpatient services, as defined, are seen by mental health staff, but not yet in a sufficiently timely manner to achieve substantial compliance.

**7. Safety and Sobering Cells**

*•(a)  The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall responsibility for safety and security of prisoners, prompt reviews by medical of all placements, and a process of resolving disagreements between medical and custody. [Settlement Agreement Dkt. 494 at ECF 14]*

**Findings: This requirement was released from further monitoring by Court Order dated October 27, 2023 (Dkt. 844 at ECF 4 - 5).**

*•(b)  Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical professional will see an inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.*

**FINDINGS:  Partial Compliance**

As noted in the last monitoring report, I have raised concerns about the appropriateness of reviewing this requirement from a mental health perspective, as it primarily involves the involvement of and decision-making by medical staff.  After consulting with the Medical Monitor, I have reviewed documentation in the healthcare record of inmates placed in sobering cells to determine whether the inmate was seen by medical staff within an hour of placement, and whether they were cleared by medical staff for release from a sobering cell.  I reviewed 10 such sobering cell placements from the current monitoring period.  All of these cases were seen by a Registered Nurse at the time of initiating a sobering protocol and placement in a sobering cell.  In six cases, there was documentation that an RN saw the patient at the time of release from the sobering cell, as documented in the Flow Sheets tab under the Sobering/Safety/Restraints sub-tab.  It should be noted that in two of these six cases, the only notation was that the sobering protocol was "removed" or "discontinued" with no further medical observations or information. Of the remaining four cases, three had no documentation from medical staff regarding release from the sobering cell, and one was indeterminate based on the healthcare record (the inmate was sent to NMC, and I could not determine the course of the sobering cell clearance upon his return to MCJ).

These aspects of the requirement are straightforward, involving only whether there is documentation in the medical record that an inmate was seen within an hour of placement in a safety or sobering cell, and upon clearance by medical staff for release from a sobering cell. Findings involving the adequacy of these procedures falls within the purview of the Medical Monitor.  I have discussed this matter with Dr. Barnett, and he is in agreement with this perspective.  In this regard, I refer to page 19 of his draft report dated 4/12/24, which states, "Patients displaying signs of withdrawal (uncooperative, ataxia, abnormal vital signs) or

described as overtly impaired were housed in sobering cells or sent to the general population (GP) without medical consultation to ensure such placement was safe." I defer to the medical monitor regarding the adequacy of medical involvement in the placement of inmates in sobering cells and clearance for their release.

•*(c)  A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his findings through a report which will be sent to the Jail Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.*

**Findings: Substantial Compliance**

The prior Mental Health Monitor found substantial compliance with this requirement in his last report of May 2021. He focused primarily on the audits conducted by the Compliance Sergeant, which are based on the Guardian System of welfare check logging.  This system has continued to demonstrate compliance with the requirement that custody staff make safety check rounds at the specified intervals, and the Compliance Commander has a well-established system of auditing and feedback to address any detected compliance issues based on the timing of the checks. The auditing system also includes the routine reports specified in this requirement.

My subsequent monitoring reviews of July 2022 and May 2023 deferred findings on this requirement, having identified concerns regarding the requirement that safety checks consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior.  My last report from November 2023 found partial compliance with this set of requirements, based on progress that had been made in augmenting the compliance checks by the Compliance Commander with routine review of surveillance video samples of welfare checks.  I reviewed such surveillance videos with the Compliance Commander, as he described how he conducts his audits.  Such reviews have been a useful addition in the jail's efforts to ensure that welfare checks meet the requirements of the Implementation Plan.

The finding of partial compliance in November 2023 was also based on additional training in the proper conducting of welfare checks which had been developed but not fully implemented.  I have reviewed these training materials and corresponded with the Compliance Commander regarding the content of the training, as well as the process for providing this training to custody staff.  The training materials consist of demonstration videos, portions of surveillance videos drawn from incidents involving welfare checks, a PowerPoint presentation, and various reference documents regarding policies and procedures. This training and associated materials address the necessary quality of effective welfare checks, and should make a valuable

contribution in the jail's ongoing efforts to ensure that welfare checks meet the requirements of the Implementation Plan.

This training has now been provided to deputies and sergeants through six days of team briefings occurring between 5/27/24 and 6/1/24.  Training rosters were provided for my review. Welfare check training is provided to all new deputies and sergeants who have transferred from patrol. Another opportunity for ongoing training is the use of training bulletins at staff meetings conducted by team sergeants, in which training on the quality of welfare checks can be periodically revisited. A briefing training bulletin platform is under development and expected to launch in August 2024.  Training bulletins will be added to a library via SharePoint.  Team sergeants will cover the training bulletins related to the Hernandez case, including review of welfare check procedures, at regular staff briefings.

Points made in earlier monitoring reports remain relevant, and I repeat them here for ease of reference: The core concern in evaluating this and other requirements related to welfare checks is finding a reasonable balance between adequately assessing an inmate's wellbeing and insisting on procedures that would unduly interfere with the inmate's sleep or create unnecessary agitation within the inmate population. Consultation has been sought with a number of subject matter experts, former custody and jail administrative staff from other jurisdictions, and monitors involved in similar cases at other jails.

Several points emerged from these discussions.  One is that this is an issue many, perhaps most, jail systems struggle with.  A clear consensus on a specific procedure which would explicitly address the balance of ensuring wellbeing vs. overly intrusive and disruptive interactions with inmates was not identified during discussions with various experts.  A consensus did emerge, however, regarding the need to somehow ensure that an inmate was alive, and not merely showing no signs of distress. Finally, there was agreement that any procedure for adequately assessing inmate wellbeing will depend to some degree on the judgment and situational awareness of the deputies conducting the checks. It is recognized that reliance upon individual judgment and adaptation to specific circumstances introduces potential variation into a procedure that must also be standardized.

Key elements to ensuring substantial compliance with the Implementation Plan requirements for welfare checks include training, monitoring, and corrective action. The mechanics of ensuring that welfare checks occur and are recorded as required has been well established over the course of several monitoring reports. The Compliance Commander in charge of this process continues to maintain an effective monitoring, reporting, and response process based on reviews of the Guardian System data; he also now reviews samples of video that correspond with the times of welfare checks in order to observe whether checks appear to be completed in accordance to training and performance expectations.  Instances of inadequately performed welfare checks are addressed by the Compliance Commander through the chain of command.  Now that the recent welfare check training has been deployed, I believe MCJ has taken the available, feasible steps to ensuring substantial compliance with requirements.  Based on consideration of the actions taken over the course of the past two monitoring review periods and the practices currently in place, a finding of substantial compliance is warranted.

*•(d)  Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11 p.m. and 7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.*

**Findings: Substantial Compliance**

Substantial compliance was found for this requirement in the last three monitoring reports. Review of safety cell logs and audits for the current review period again showed that inmates are consistently provided safety smocks and safety blankets as required while in safety cells.  The safety blankets that are used as a sleeping bag, which can be closed by Velcro and have a sewn-in pillow, have been observed and found to be adequate for the intended purpose. A sufficient number of such safety blankets were again observed to be available in the current inventory during the recent site visit.

*•(e)  Inmates in sobering cells may have access to mattresses at the discretion of custody staff.*
*•(f)  Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.*

**Findings: Substantial Compliance**

These requirements were found to be in substantial compliance in the last two monitoring reports from May 2023 and November 2023.  No issues regarding these requirements were observed during the most recent mental health monitoring tour.  A sufficient number of safety sleeping bags were observed in the intake area.  Policies and procedures continue in the same manner as have been found substantially compliant in prior mental health monitoring reports.

*•(g)  Patients withdrawing from benzodiazepines must be evaluated by a medical provider within 3 days, and a psychiatrist or psychiatric NP within 7 days. [CFMG Plan at 68]*

**Findings: Noncompliance**

An issue which has hampered the evaluation of compliance with this requirement in prior monitoring reports has been the identification of an appropriate sample of inmates withdrawing from benzodiazepines, separate from those placed on a similar protocol for alcohol withdrawal. Wellpath reports that they have now determined a method to accurately identify inmates who are placed specifically on a benzodiazepine withdrawal protocol.  Monthly internal audit data for this requirement for the months of November 2023 through March 2024 showed the following results:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Medical 3 days | 0.00% | 25.00% | 66.67% | 16.67% | N/A* |
| Psychiatry 7 days | 0.00% | 0.00% | 0.00% | 0.00% | N/A* |

*No cases were identified for March 2024

27

It should be noted that the sample sizes for this requirement were small.  No cases were identified for March 2024; for November through February the sample sizes ranged from two to six patients per month. With sample sizes this small, the results of an individual case can significantly influence the reported compliance figure.  Based on the reported rates of compliance (i.e., no cases were seen by psychiatry as required during this monitoring period), the current finding is noncompliance.  It will be necessary to develop and implement procedures to ensure compliance.  It is recommended that the HSA and DON are directly involved in the development and implementation of the necessary procedures, the monitoring of performance, and any corrective actions needed to achieve substantial compliance.

•*(h)  Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.*
**This requirement is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance.  This requirement was found in substantial compliance in the most recent prior monitoring report of July 2022, and is no longer subject to monitoring.**

•*(i)  For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.*

**Findings: Substantial Compliance**

As noted in previous monitoring reports, the Compliance Commander continues to maintain a thorough system to track and respond as needed to patients placed in safety cells. This system involves a status board that reflects when a patient enters a safety cell and the time at which they will reach the 24 hour mark.  This status board is audited daily by the Compliance Commander, with daily prompts to floor deputies to ensure these patients are moved as required.

The Compliance Commander has previously explained that safety cells are most frequently used to house inmates on Level 2/Intermittent Suicide Watch (defined as those with suicidal ideation but no active self-harm) due to a lack of alternative observation housing, or inmates requiring a single cell in the booking area who are not on any level of suicide watch. Inmates on Level 1/Continuous Suicide Watch must be transferred out to inpatient care or the NMC emergency room after 24 hours, while Level 2 inmates can be moved to other appropriate observation cells as available without requiring transfer to another facility.  It is also noted that two safety cells have been designated as observations cells; former Safety Cells 4 and 5 are now Observation Cells 3 and 4, respectively, although the design of these cells has not been altered (e.g., there is no toilet, running water, bench or bedding in these cells).  The Implementation Plan requirements that apply to safety cells are therefore also applicable to these redesignated observation cells, including that inmates cannot be transferred from safety cells to Observation Cell 3 or 4 to avoid the 24 hour restriction on safety cell placement.

Safety Cell audits conducted by the Compliance Commander for December 2023 through April 2024 were reviewed.  These audits reported the following results:

- December: 6 safety cell placements, 18 sobering protocol placements, 19 observation cell intermittent suicide watch placements (no booking cell available). No placements over 24 hours.
- November: 6 safety cell placements, 17 sobering protocol placements, 23 observation cell intermittent suicide watch placements (no booking cell available). No placements over 24 hours.
- January: 6 safety cell placements, 18 sobering protocol placements, 19 observation cell intermittent suicide watch placements (no booking cell available). No placements over 24 hours.
- February: 7 safety cell placements, 12 sobering protocol placements, 32 observation cell intermittent suicide watch placements (no booking cell available). No placements over 24 hours.
- March: 7 safety cell placements, 12 sobering protocol placements, 50 observation cell intermittent suicide watch placements (no booking cell available). No placements over 24 hours.
- April: 38 safety cell placements, 15 sobering protocol placements, 0 observation cell intermittent suicide watch placements (no booking cell available). No placements over 24 hours.

The substantial increase in safety cell placements in April was apparently due to two observation cells being out of service for repairs.  The current monitoring and response system continues to operate effectively, and the results for this reporting period warrant another finding of substantial compliance.

A concern has been raised by plaintiffs as to whether inmates are removed from safety cells within 24 hours and then returned to a safety cell a short time later to avoid triggering the requirement to transfer the inmate to an off-site facility.  I see no evidence of this.  The Compliance Commander maintains a rigorous monitoring system for safety cell placements, which has been effective at detecting when inmates are approaching the 24 hour limit and ensuring that appropriate actions are taken.  Such inmates are consistently removed from the safety cell and sent out to NMC-ER as required.  It has been noted that NMC will frequently return such inmates to the jail with a recommendation that they be placed in a safety cell.

•*(j)  Inmates in safety cells whose condition deteriorates, or for whom the nurse is unable to complete a hands-on assessment including vital signs after 6 hours of placement shall be transferred to Natividad Medical Center for further assessment. [CFMG Plan at 16, 75]*

**Findings:  Substantial Compliance**

The finding on this requirement was found in noncompliance in the last monitoring report from November 2023, after having been found in substantial compliance the prior report from May 2023.  For the November report, eight cases were reviewed, and only three of these cases had completed vital signs documented in the healthcare record within the required timeframe.  In the current review, the healthcare records for 10 cases from the safety cell logs were examined.

All had vital signs recorded within six hours as required, although one case did not record blood pressure measurements (other vital signs were entered).  In none of these cases did the patient's condition deteriorate while in a safety cell to a degree that required transfer to NMC.  These results reflect a return to substantial compliance for this requirement.

## 8. Medication Continuity

*•(a)  All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.*

**This requirement is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that Wellpath provides evidence that this requirement has been incorporated into the Wellpath Policies and Procedures.  [Dkt. 751 at ECF 20].  The subsequent monitoring report of July 2022 found substantial compliance, in that Wellpath Monterey County Policies and Procedures HCD-110 E09B, Timely Initiation of Medication Upon Arrival, and HCD-110 E-09A, Medication Verification met this requirement.**

**This requirement had been released from further monitoring.  However, in the 9/26/23 Court Order granting the Plaintiffs' Motion to Enforce (Dkt. No. 838 at p. 27) which references 11/22/22 Joint Status Report (Dkt. No. 759 at page 5 – 6), this requirement was reinstated for monitoring.**

**Findings:  Noncompliance**

This requirement was found in partial compliance in the last monitoring report from November 2023.  Although most cases reviewed for that monitoring report showed documentation in the healthcare records that medications were verified and continued at the time of intake, several cases were identified where this did not occur.

For the current monitoring review, the monthly internal audits conducted by Wellpath do not directly address this requirement, but two of the audit items for the intake process appear relevant.  These include an item pertaining to the verification of medications and an item pertaining to consulting with the on-call psychiatrist by the end of the shift to obtain a medication order.  The monthly compliance figures for these two items showed the following:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Verify meds | 33% | 50% | 50% | 20% | 0% |
| Consult, get orders | 0% | 33% | 50% | 20% | 50% |

These results are generally consistent with the cases I have reviewed for the current report.  Some cases in the separate case reviews document were compliant with this requirement (Cases # 2, #3, #4) while others were not (Cases #5, #6, #7).  Of a total of eight cases I specifically reviewed for this requirement, three (37.5%) were compliant.

It should be noted that the sample size for each month's internal audits was typically 10 cases, but only a subset of these cases were relevant for these items, so that sample sizes for evaluating these particular functions were small. Performance for a single case can therefore significantly influence each month's compliance figure. Nevertheless, performance in this area has been consistently below an acceptable threshold, and has steadily declined since December 2023 for the verification of medications at intake. A finding of partial compliance cannot be supported in the presence of deficient and declining performance. It is recommended that this requirement become a routine internal audit item which is tracked and regularly reviewed in the QA/CAI process, with corrective actions implemented as needed.

•*(b)  By the end of the nursing shift, the booking RN will consult with the on-call psychiatrist regarding any verified or unverified psychotropic medications. The on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate. The on-call psychiatrist will then set the time to see the inmate within 5-7 days. The date of the appointment will be reflected on the written record of the order.* [Dkt. 532 at ECF 19]

**This requirement is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that Wellpath provides evidence that this requirement has been incorporated into the Wellpath Policies and Procedures.  [Dkt. 751 at ECF 21]  The subsequent monitoring report of July 2022 found substantial compliance, in that Wellpath Monterey County Policies and Procedures HCD-110 E09B, Timely Initiation of Medication Upon Arrival, and HCD-110 E-09A, Medication Verification meet the requirements.**

**This requirement had been released from further monitoring.  However, in the 9/26/23 Court Order granting the Plaintiffs' Motion to Enforce (Dkt. No. 838 at p. 27) which references 11/22/22 Joint Status Report (Dkt. No. 759 at page 5 – 6), this requirement was reinstated for monitoring.**

**Findings:  Noncompliance**

This set of requirements was found in partial compliance in the last monitoring report from November 2023.  For the current monitoring review, results from monthly internal audits conducted by Wellpath between November 2023 and March 2024 are relevant.  These results showed the following:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Consult, get orders | 0% | 33% | 50% | 20% | 50% |
| Set appointment* | 50% | 80% | 50% | 40% | 0% |

*The compliance rate reported for setting appointments that are reflected in the written record of the order appear to apply only to cases where consultation with the on-call psychiatrist was completed.  Compliance with this element of this element of the requirement is therefore lower when considered as a function of the entire monthly sample.

31

The results presented here are similar to the results for requirement 1(h), which covers a similar set of functions. Based on the internal audit data reported by Wellpath, which is consistent with selected cases that I reviewed, these functions have remained problematic during the current monitoring period.  In view of the lack of progress made, a finding of noncompliance is warranted. Recent discussions with Wellpath leadership have identified this as an area requiring focused attention in the CQI process, and the involvement of the HSA and DON to ensure consistent completion of these tasks by the intake nurses.

•*(c)  No psychotropic medications shall be unilaterally discontinued without consultation with the facility physician or psychiatrist. Psychotropic medication shall not be ordered for longer than 90 days, new psychiatric medications will not exceed 30 days, until condition is documented stable by the ordering physician. The prescribing provider will renew medications only after a clinical evaluation of the individual is performed.* [Dkt 532 at ECF 19]

**Findings: Substantial Compliance**

Following the format begun under the prior Mental Health Monitor, this item combines the elements of two separate requirements from the Implementation Plan, one of which states that no psychotropic medications shall be unilaterally discontinued without consultation with the facility physician or psychiatrist, and another which states that psychotropic medication shall not be ordered for longer than 90 days, new psychiatric medications will not exceed 30 days until condition is documented stable by the ordering physician, and the prescribing provider will renew medications only after a clinical evaluation of the individual is performed.

The results of monthly internal audits with samples of 10 cases per month were conducted by Wellpath for the months of November 2023 through March 2024 and provided for review.  These results showed the following:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Meds dc with consult | N/A* | 100.00% | 100.00% | N/A* | 100.00% |
| Order for < 90 days | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| New meds < 30 days | 88.89% | 66.67% | 71.43% | 100.00% | 87.50% |
| Renewed after eval | 100.00% | 100.00% | 75.00% | 100.00% | 100.00% |

*N/A indicates that no cases in the sample for that month had medications discontinued.

My review of 10 cases selected at random from among those included in the Wellpath audit samples showed complete agreement in scoring, with the exception of one instance where it appeared that medications were renewed prior to a face-to-face evaluation with the patient but was scored in the Wellpath audit as compliant.  I also reviewed 10 additional cases not included in the Wellpath audit samples, which revealed a similarly high level of compliance, with the exception of another instance in which medications appeared to be repeatedly renewed without psychiatric evaluation of the patient.  This issue was discussed with Wellpath psychiatry leadership during the recent site visit.  In most such cases, the inmate has refused an appointment with the psychiatrist but it is considered better to continue the medication until an evaluation can

be conducted, rather than to discontinue a medication that is clinically beneficial. In such cases, attempts should be made to complete such an evaluation at the soonest opportunity.  In only one case which I reviewed was the medication repeatedly renewed without an evaluation for an extended period of time, representing 5% of the 20 healthcare records I reviewed for this requirement.

It should be noted that this requirement was evaluated for the prescribing of psychotropic medications after the intake process.  The continuation of medications at the time of intake is covered in other sections of the current report (requirements 1.e, f, g, h; requirements 8.a, b), where performance deficits have been noted.

There have been significant improvements in compliance with these requirements during the current review period, continuing the improvements that began approximately one year ago and were noted in the last monitoring report from November 2023.  Earlier reports had found that new psychotropic medications continued to be ordered for greater than 30 days, and inmates were seen at intervals greater than 30 days after new medications were prescribed and prior to documentation of psychiatric stabilization.  Cases were previously observed in which medication follow-up appointments were scheduled for 90 days despite active symptoms of serious mental illness, including psychosis.  This began to improve in cases reviewed from May and June 2023, and continued in cases reviewed for the November 2023 report. Such cases were not observed in the current review.  Based on the current results, the implementation of an ongoing monthly internal audit process, and the associated performance improvement actions in this area involving review and consultation by Wellpath psychiatry leadership, a finding of substantial compliance is warranted.

## 9. Discharge
*•(a)  Provision of psychotropic medications upon discharge from the jail. The Implementation Plan provides that a 30-day supply of medications be given to inmates upon discharge from the jail.*
**This requirement has been released from further monitoring.**

*•(b)  Inmates who are released prior to resolution of a continuing medical/mental health condition shall be referred to public health and/or community clinics as appropriate, and shall be provided written instructions for continuity of essential care. [CFMG Plan at 38, 44]*
**This requirement has been released from monitoring. [Dkt. 751 at ECF 12]**

## 10. Involuntary Medication
*•(a)  Psychotropic medications may not be used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment. [CFMG Plan at 90, 96]*

**Findings: Substantial Compliance**
As observed in the last four consecutive monitoring reports, the current review again found no instances where psychotropic medications were used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment.

*•(b)  Absent an emergency, inmates will not be administered involuntary psychotropic medications at the Monterey County Jail. Psychotropic medication will not be administered for disciplinary purposes. [CFMG Plan at 19]*

**Findings: Substantial Compliance**

Consistent with the findings of prior monitoring reports, the current review again found that involuntary medications were administered in accordance with an Involuntary Medication Order from the Court, and were not administered for disciplinary purposes.

*•(c)  Absent an emergency or court order for treatment with psychotropic medications, an inmate shall give his or her informed consent or refusal. [CFMG Plan at 20]*

**Findings: Substantial Compliance**

As found in the two prior monitoring reports, the current review of documentation in the electronic healthcare records consistently showed that inmates provided informed consent or refusal of mental health treatment.  A review of 10 randomly selected cases showed that eight had signed consent forms, and the other two provided verbal consent as documented in the psychiatrist's notes. There were no instances observed where an inmate was administered psychotropic medication in the absence of a psychiatric emergency or court order without their consent.

*•(d)  The Jail may only administer involuntary psychotropic medications in a psychiatric emergency (i.e., when administration is necessary to preserve life or prevent serious bodily harm, and it is impracticable to obtain consent), or when an inmate is found to lack capacity to consent at an Incapacity Hearing. The responsible physician, Program Manager, and Director of Nursing, with the Facility Manager, are to identify appropriate community resources and develop procedures to obtain an Incapacity Hearing, and transfer inmates requiring involuntary psychotropic medication administration to an appropriate community facility. If the inmate must remain at the jail for clinical or custodial reasons, the health services staff shall coordinate with County Mental Health Psychiatric Emergency Services to evaluate competency pursuant to Riese v. St. Mary's Hospital (Riese Hearing). [CFMG Plan at 96, 98]*

**Findings:  Partial Compliance**

As reported in prior monitoring reports, no instances were found during the current review in which psychotropic medications were administered involuntarily in the absence of a psychiatric emergency when the inmate had refused to provide consent.  All involuntary medication administrations during the current monitoring period were conducted with inmates who had Involuntary Medication Orders from the Court, as part of the Early Access (EASS) or Jail Based Competency Treatment (JBCT) programs.  This portion of the requirement remains in substantial compliance.  However, as noted in prior monitoring reports, this Implementation Plan requirement also states that inmates requiring involuntary psychotropic medications are to be transferred to an appropriate community facility, and specifies a procedure to follow regarding evaluation of competency.  It appears that there continues to be no process in place whereby the

responsible physician, Program Manager, Director of Nursing, and Facility Manager will obtain Incapacity Hearings and transfer inmates requiring involuntary medication administration to an appropriate community facility.  Reference was made in the CQI Mental Health Subcommittee meeting minutes from August 2023 and the Sitewide CQI Committee Meeting minutes from September 2023 regarding clarifying or updating Involuntary Medication Order procedures, but no subsequent information regarding these efforts has been found in any of the documentation made available for review.  It is again recommended that discussions be held between the parties regarding the process described in the requirements pertaining to involuntary psychiatric medications, which may result in clarification of expectations in light of current legal considerations and logistical procedures and the original intent of the requirements.  I am available to participate in any portions of such discussions as may be helpful.

As stated in the last monitoring report from November 2023, the current finding of partial compliance is based on the observation that involuntary psychotropic medications are only administered in psychiatric emergencies or in accordance with an Involuntary Medication Order from the Court, as required.  The work which remains in order to achieve substantial compliance is the pursuit of Incapacity Hearings and the transfer of inmates to an appropriate community facility when they require involuntary medications in the absence of a Court Order, if these actions remain the most viable and effective means of achieving the intended goals of this requirement.

Wellpath has asserted that consideration of the EASS program in the context of the mental health monitoring report and evaluation of compliance with the Implementation Plan requirements.  They note that EASS is a California Department of State Hospital (DSH) program, which is untethered from the MCJ foundational mental health program.  I recognize that CFMG does not control who is admitted to the EASS program.  However, my understanding is that Wellpath staff are responsible for the mental health treatment services provided to patients in this program, including the care provided by psychiatrists and psychiatric nurse practitioners during enrollment in EASS.  To this extent, requirements pertaining to the standards for care, such as informed consent or the administration of involuntary medications, are considered to fall within the scope of monitoring.

•*(e)  In a psychiatric emergency, psychotropic medications can only be involuntarily administered pursuant to a direct written or verbal one-time order from the responsible facility psychiatrist or physician after an on-site evaluation (never as needed, never standing order). A telephone order is sufficient only if the inmate has been personally evaluated by the prescribing physician no longer than 24 hours prior to the emergency. If none of above options are available, physical restraint should be used and the inmate transferred to the hospital emergency department for physician evaluation. [CFMG Plan at 96]*

**Findings:  Deferred**

A finding for this requirement was deferred in the last monitoring report, as there were no instances of involuntary medications administered in a psychiatric emergency in the absence of an Involuntary Medication Order issued by the Court. A log is now maintained for involuntary medication administrations.  Similar to the last monitoring report from November 2023, the

involuntary medication log provided for review only contained cases for which an Involuntary Medication Order issued by the Court was in place.  It was confirmed by Wellpath staff that instances of emergency involuntary medication administration, in the absence of an Involuntary Medication order issued by the Court, are also tracked by the Mental Health Supervisor. Wellpath reported that there were no such instances during the review period for the current monitoring report.  No instances of involuntary medication administration were identified in the cases reviewed for the current report.  A review of such instances, when they do occur, will be the basis for determining compliance with these requirements.

It is again noted that this requirement, as written, applies specifically to instances of involuntary medications administered in a psychiatric emergency, and not in cases where the inmate has an Involuntary Medication Order in place.  The language of this requirement raises questions about how it should be interpreted when applied to the procedures for the administration of psychotropic medications in a psychiatric emergency.  The first sentence calls for an on-site evaluation, taken to mean a face-to-face encounter occurring at the jail.  The second sentence allows for a telephone order only if the inmate has been "personally" evaluated by the prescribing physician no longer than 24 hours prior to the emergency.  This portion of the requirement does not specifically state that an on-site evaluation is necessary, and appears to allow for telepsychiatry evaluation of the inmate.

•*(f)  Verbal orders for involuntarily psychotropic medications must be documented in the inmate's medical record and signed by prescribing physician within 72 hours. The Medical Program Manager and Custody Facility Manager shall be notified in writing, or by telephone if not available, within 24 hours of the involuntary administration of psychotropic medications. [CFMG Plan at 96-97]*

**Findings:  Deferred**

This requirement is interpreted as intended for instances of emergency involuntary medication administration, rather than cases where an Involuntary Medication Order is in place. A finding for this requirement was deferred in the last monitoring report from November 2023, as all of the cases listed on the involuntary medication log provided for that review were found to have an Involuntary Medication Order issued by the Court.  A log for involuntary medication administrations continues to be maintained.  Wellpath reported that there were no emergency involuntary medication administrations during the current review period. No instances of emergency involuntary medication administration were identified in any of the cases reviewed for the current monitoring report.  A review of such instances, when they do occur, will be the basis for determining compliance with these requirements.

•*(g)  Inmates receiving involuntary psychotropic medications must be admitted to an infirmary or safety cell, with intermittent supervision by custody staff at least every 30 minutes. Nursing staff must monitor (assessing response to medications, mental status, general physical appearance, behavior, and hydration) every 15 minutes during first hour, then every 30 minutes thereafter until otherwise ordered by the prescribing physician, documenting all findings in the*

36

*inmate's medical record. The inmate must be evaluated by the responsible prescribing physician at least every 72 hours. [CFMG Plan at 97]*

**Findings: Deferred**

 A finding for this requirement was deferred in the last monitoring report from November 2023.  The requirement as written is interpreted to apply to instances of emergency involuntary medication administration, rather than cases where an Involuntary Medication Order from the Court is in place.  As was observed in the last monitoring report, all of the cases listed on the Involuntary Medication Administrations log provided for review again noted to have such an Involuntary Medication Order documented in the healthcare record during the current review. No instances of emergency involuntary medication administration were identified in the cases reviewed for the current monitoring report.  A review of such instances, when they do occur, will be the basis for determining compliance with these requirements.

*•(h)  Inmates exhibiting any clinical deterioration at any time during involuntary therapy shall be transferred immediately to a clinically appropriate treatment facility. [CFMG Plan at 97]*

**Findings: Deferred**

 A finding was deferred in the last monitoring report from November 2023, as no cases involving involuntary medications exhibited clinical deterioration, thereby preventing an evaluation of compliance.  Wellpath staff at MCJ continue to maintain a log of all involuntary medication administrations, which showed that for the current monitoring period there were eight cases involving involuntary medications.  I reviewed the healthcare records for each of these cases  All cases were enrolled in the Early Access (EASS) or Jail-Based Competency Treatment (JBCT) programs, and all had an involuntary medication order in place at the time of the administration of involuntary medications.  In most cases, the patients were actively symptomatic, and in at least one case the patient appeared significantly decompensated.  The clinical status of these patients, however, was not a deterioration from their previous baseline at the time of the involuntary treatment.  All were being treated and closely followed in the EASS or JBCT program.

 It is not clear from the language of this requirement if it is intended to apply only to instances of emergency involuntary medication administration in the absence of an Involuntary Medication Order, or is also intended to include inmates receiving involuntary medications under an Involuntary Medication Order from the Court. Most of the requirements pertaining to involuntary medications appear to address the use of involuntary medications in instances of psychiatric emergency, although this is not clearly specified in each of the requirements.  The requirement was also written prior to the establishment of the EASS and JBCT programs at MCJ, which seems likely to affect the intent of sending patients enrolled in these programs to a "clinically appropriate treatment facility."

 Because there were no cases identified during the current review in which an inmate received involuntary medications in the absence of an Involuntary Medication Order issued by the Court, and those receiving involuntary medications did not exhibit clinical deterioration from

a prior baseline, compliance with these requirements cannot be determined and a finding is therefore again deferred.

As the parties consider the various requirements for involuntary medications, they are encouraged to specify whether this requirement is intended to apply to all cases of involuntary medication administration, or only those instances occurring in a psychiatric emergency and in the absence of an Involuntary Medication Order by the Court.  The effect of having the EASS and JBCT programs at MCJ should also be taken into consideration regarding the intent of this requirement.

## 11. Medication Refusals

•*(a)  The on-call psychiatrist must be contacted whenever an inmate refuses his or her medications on three consecutive occasions. [CFMG Plan at 20]*

**Findings: Noncompliance**

The last three monitoring reports found noncompliance with this requirement, noting a lack of documentation demonstrating that a psychiatrist was contacted for patients whose Medication Administration Record showed three or more consecutive refusals, nor were the patients consistently seen by a psychiatrist around the time of such refusals.  For the current monitoring period, internal monthly audits were conducted by Wellpath for the months of November 2023 through March 2024.  Results of these audits showed the following:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Psychiatrist contact | 30.00% | 50.00% | 50.00% | 10.00% | 10.00% |

Sample sizes for each of these months was 10 cases.  These results are consistent with the healthcare records I reviewed.  In the few instances I found where the psychiatrist had been notified following three or more consecutive medication refusals, it was typically a mental health clinician rather than a nurse who had become aware of the medication noncompliance and notified the psychiatrist.  Corrective action is necessary to bring this requirement into substantial compliance.  This should be an ongoing focus of the CQI process at MCJ.

## 12. Clinical Staffing

•*(a)  Defendants will maintain Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to ensure adequate staffing to provide all necessary medical and mental health care. The plan will identify all needed positions based on current and projected Jail population, and the number and qualifications of medical and mental health care staff to cover each position, with shift relief.*
•*(b)  Mental health services provided on-site shall include crisis evaluation, socialization programs, group therapy, medication management, psychiatric evaluations and individual therapy. [CFMG Plan at 42]*

**Findings:  Noncompliance**

Prior monitoring reports have found noncompliance In the last monitoring report of November 2023 it was observed that although staffing levels had improved, clinical staffing has remained inadequate to fully meet the requirements of the Implementation Plan during the period of review for this monitoring report.  The current staffing allocation remains as follows:

- 1 MH Director working 4 x 10-hour shifts: 1.0 FTE
- 4 Mental Health Clinicians working 3 x 12-hour shifts: 3.6 FTE
- 2 psych techs working 5 x 8-hour shifts: 2.0 FTE; currently vacant
- 1 discharge planner working 5 x 8-hour shifts: 1.0 FTE; currently filled
- (1 psychiatrist working 4 x 10-hour shifts: 1.0 FTE)
  - TOTAL: 7.9 FTE, plus 1.0 FTE psychiatrist

At the time of the last monitoring report from May 2023, two additional mental health clinicians had recently been hired. Wellpath reports that there are now four Mental Health Clinicians in addition to the Mental Health Director.  One full-time psychiatrist continues to work a 4 x 10 hour schedule Mondays through Thursdays, and an on-call psychiatrist provides additional psychiatry coverage.  A contract with Precision Psychiatry Services in now in place to provide evening and weekend on-call psychiatry coverage.  Currently unfilled positions are the two psychiatric technicians.  Ongoing difficulties in recruiting psychiatric technicians have led to consideration of hiring LVNs into these positions, and to provide them with training and supervision to allow them to fulfill the necessary duties.  If properly executed, this could provide a reasonable alternative to ongoing vacancies in these psychiatric technician positions.

Prior monitoring reports have noted that the frequency of rescheduled appointments due to workload consistently demonstrated that mental health staffing levels could not meet demand, despite continual triage and the determined efforts of the mental health clinicians.  Similar observations were made in the current monitoring review, whereby almost every case I reviewed had multiple rescheduled appointments due to workload, sometimes for extended periods that fell well below acceptable standards of care. For example, one case was reviewed in which a patient's MHP appointments were rescheduled 66 consecutive times, resulting in a three month gap in completed appointments; in another case, mental health sick call appointments were rescheduled 47 consecutive times, with over seven weeks between completed appointments. Entries in the healthcare record sometime showed the extent of the staffing deficits, including instances where there were 58 tasks (mostly scheduled appointments) with one clinician and one escort deputy on duty, with another instance of 184 tasks and a group for two clinicians on duty (Case 4 in the case reviews document).  In another case, there were 123 tasks to be completed by two clinicians (Case # 2 in the case reviews document); another case noted 122 tasks for one clinician on duty on one date and 133 tasks for one clinician on another date (Case #3).

Inadequate mental health staffing at this time negatively affects compliance with several requirements of the Implementation Plan.  These include requirements addressed in the current report under section 2(*a*) regarding completion of the initial mental health screening (noncompliant); 17(*a*) regarding inmates being evaluated for housing and seen daily after being found incompetent to stand trial (noncompliant); 19(*a*) regarding consideration of mental health input for inmate discipline (noncompliant); 21(*a*) regarding placement screening of all inmates for mental illness and suicidality before or promptly after placement in administrative segregation (noncompliant); 21(*b*) regarding inmates moved from general population to

administrative segregation being screened for suicide risk within 24 hours (noncompliant). Staffing levels also affect requirement 6(*a*) regarding provision of outpatient mental health services to all inmates by qualified mental health providers (partial compliance); and 22(*b*) regarding completion of a suicide risk assessment by a qualified mental health professional under various circumstances, which is currently partially compliant overall but noncompliant with the element pertaining to such assessments after placement in administrative segregation.  Other requirements dependent on staffing levels currently show substantial compliance, including 2(*b*) regarding psychiatry contacts; 21(*d*) regarding weekly QMHP appointments with inmates in administrative segregation; and 22(*c*) regarding conducting a suicide risk assessment within four hours of placement in a safety cell. There are less direct but still significant impacts in areas associated with quality management (which has been improving and is currently in partial compliance), treatment planning (partial compliance) and the overall quality of clinical documentation, all of which require sufficient staffing to do adequately.

Other staffing considerations also contribute to the challenges of achieving adequate staffing.  I have noted in prior reports that sufficient deputy staffing to provide escort is necessary for the available mental health staff to function to capacity.  Additional clinical staff will not effectively improve compliance with requirements if they are limited by insufficient custody support; even current mental health staffing levels have sometimes appeared to be limited in their output because of the constraints of available deputy escort. County Counsel has recently explained in detail the process by which custody staff are made available to assist Wellpath healthcare providers, including mental health staff.  This includes five deputies assigned during daytime hours, one of which is dedicated to assisting mental health staff, and two of which are designated as "floaters" to assist as needed.  County Counsel also explained that during the evening shift, there is one Clinic Deputy dedicated to assist Wellpath staff operations. It was noted that this is typically the same group of deputies assigned to the Medical Deputy and Clinic Deputy positions which allows them to develop a routine and rapport with both the Wellpath medical staff and providers and the incarcerated population they serve. County Counsel and custody leadership at the jail also noted that if clinical staff, including mental health, projects that they will need more than the usual assigned deputies to accomplish their daily tasks, they can request additional staffing by contacting the Captain in advance so that more deputy staffing can be arranged.  It was emphasized that if multiple mental health staff are working, multiple escort officers can be designated for mental health, and that if additional deputies beyond the usual five are needed, the sergeants and/or captain can supply more resources to help Wellpath staff.

As noted in prior monitoring reports, other positions will also have an impact on the jail's capacity to provide adequate mental health services and achieve substantial compliance with various requirements of the Implementation Plan.  These include the Health Services Administrator and Director of Nursing positions.  Until recently, these positions have not been consistently filled, which directly affects several functions necessary for compliance.  The Implementation Specialist has frequently been called on to fulfill or assist with the duties of the HSA and DON when these positions are vacant. This prevents the Implementation Specialist from dedicating the time and focus needed to come into compliance with requirements of the Implementation Plan.  Stability in the HSA and DON positions will be important to provide the

training, supervision, and corrective actions necessary to achieve substantial compliance across a variety of requirements.

On the basis of the foregoing observations, I have concluded that current staffing levels remain inadequate to provide all necessary mental health care as specified in the Implementation Plan, and that these requirements are in noncompliance. Additional staffing resources need to be identified, hired, and maintained. Consideration should be given to the utility of administrative support staff for mental health, which could relieve some of the burden of administrative tasks currently carried by clinicians and the Mental Health Coordinator. An updated staffing analysis is recommended, taking into consideration local data regarding the level of need for mental health services at MCJ and the resources that will realistically be necessary to meet all requirements. I am available to participate in this process in any way that would be useful.

*•(c) At all times, there shall be sufficient staff to ensure compliance with the Implementation Plan. The CFMG Staffing Plan is attached to the Implementation Plan as Exhibit I. CFMG must ensure that all positions are filled. Relief factors for each position shall be calculated into the staffing analysis to ensure staffing levels consistently meet requirements. CFMG must continuously evaluate staffing levels to ensure sufficiency for compliance. [CFMG Plan at 116. ]*

**Findings: Noncompliance**

Current mental health staffing levels allow compliance with some but not all requirements of the Implementation Plan. However, at no time has there been sufficient staff to ensure compliance with all elements of the Implementation plan. Based on the continuing inability to reach a staffing level that ensures compliance with the Implementation Plan at all times, this requirement remains in noncompliance.

*•(d) Mental health staff shall be available on-site 7 days per week and on-call for assessment on an inmate's level of suicide risk upon referral by health services and/or custody staff. [CFMG Plan at 72]*

**Findings: Substantial Compliance**

This requirement was found to be in substantial compliance in the last two monitoring reports. Review of staffing schedules again showed that mental health staff were available on-site seven days per week for the months of November 2023 through March 2024. Staff were also available on-call for assessment of suicide risk upon referral.

**13. Mental Health Care Training**
*•(a) All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.*
**This requirement was released from further monitoring. [Dkt. 844 at ECF 5)]**

•*(b)  In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.*

• *(c) All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates, identifying warning signs specific to inmates, and how to recognize individuals who are in mental distress and/or suicidal.*

•*(d)  Once a year, custody staff will conduct a situational training such as a mock suicide attempt or a medical emergency. CFMG staff will also participate in the annual situational training. At the conclusion of the situational training, command staff will meet with CFMG to determine if any changes in policies or operations are warranted as a result of the exercise. [Dkt. 528-1 at 17 of 90]*

**Defendants have been released from monitoring on these requirements. [Dkt. 751 at ECF 10 - 11]**

•*(e)  All medication nurses must be trained to recognize common side effects associated with use of psychotropic medications, and upon observing such side effects must document observation in the medical record and schedule the patient to see a medical provider at the next available sick call. [CFMG Plan at 90]*

**This requirement has been released from monitoring. [Dkt. 751 at ECF 12]**

## 14. Restraint Chairs

•*(a)  Physical restraint devices can only be used on inmates who display bizarre behavior that results in the destruction of property or reveals an intent to cause physical harm to others, and cannot be used when there are less restrictive alternatives. [CFMG Plan at 47]*

**This item has been released from monitoring. [Dkt. 751 at ECF 12]**

•*(b)  Use of a restraint chair will be documented in an observation log which will be reviewed and signed by a supervisor. Inmates shall not be placed in a restraint chair for longer than six consecutive hours.*

**This requirement has been released from monitoring. [Dkt. 751 at ECF 11]**

•*(c)  Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A shift supervisor and medical staff shall oversee the exercise. If unsuccessful in allowing inmates to exercise their arms and hands in a range of motion exercise, safety staff shall explain on the observation log why extremities could not be exercised and a shift supervisor shall be notified.*

## Findings: Substantial Compliance

The last three consecutive monitoring reports have found substantial compliance with this requirement.  The Compliance Commander continues to oversee a robust system of monitoring and reporting on use of restraints, including the WRAP device.  There continues to be relatively

few incidents of restraint use.  Review of audit reports and restraint logs dating from December 2023 through April 2024 showed that throughout this period there were only two uses of a restraint chair/WRAP restraint device, one in December and one in January.  Both incidents were compliant with requirements, resulting in a finding of substantial compliance.

*•(d)  On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.*
**This requirement was released from further monitoring.  [Dkt. 844 at ECF 5]**

### 15. Use of Force
*•(a)  Medical and mental health staff shall be consulted before any planned use of force on an inmate. Custody staff in concert with medical staff will develop the most effective and appropriate means of imposing compliance with rules and regulation, including attempts at de-escalation. It is understood that it is the goal of custody staff to use the least amount of force necessary to ensure compliance with rules and regulations. Planned use of force will only be used after verbal attempts to obtain compliance.*
*•(b)  Any use of force will be documented on a use of force form.*

### Findings:  Substantial Compliance
The last three consecutive monitoring reports have found substantial compliance with this requirement.  The current review of use of force reports from November 2023 through April 2024 found continuing substantial compliance.  At my request, the Compliance Commander conducted a review of 141 incident reports completed during this period.  These reports included 18 uses of force, none of which were considered to meet criteria for a planned use of force.  My own review of 10 use of force incident reports indicated that medical and mental health staff were consulted appropriately in an incident that resulted in a cell extraction. Incident reports indicated that custody staff also attempted verbal de-escalation to the extent that circumstances allowed in all cases I reviewed.

### 16. Mental Health Grants
*•(a)  Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.*
**This item has been released from monitoring. [Dkt. 751 at ECF 10]**

### 17. Inmates Who Have Been Declared Incompetent to Stand Trial
*•(a)  The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period. As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment. The*

*Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for orders to show cause to be directed the State of California) to expedite the transfer of inmates who have been determined to be incompetent to stand trial to an appropriate State facility. [Dkt. 582-1 at ECF 13]*

**Findings: Noncompliance**

  The prior Mental Health Monitor found substantial compliance for this requirement in his last report of May 2021. He concluded that, "The process developed for the identification, referral and monitoring of inmates who were considered or declared incompetent appeared to be adequate and sufficient to allow for a continued determination of substantial compliance." In my subsequent monitoring review of July 2022, I deferred a finding on this requirement, pending clarification of the process involved. In the following reports of May 2023 and November 2023, I found noncompliance with this requirement. Concerns were noted that the Court did not always appear to provide timely notification when inmates are declared incompetent to stand trial, and there was no procedure to address the inmates' housing within 24 hours and assess suicide risk daily.

  It had subsequently been reported by the Compliance Commander that the Court does in fact notify the jail on a daily basis regarding inmates found incompetent to stand trial. He also noted that many incompetent to stand trial inmates are already in Administrative Segregation. Once notified by custody, mental health staff will see patients and place them on a follow-up schedule as needed. What had appeared to remain missing was timely communication between custody and mental health staff, such as would allow for the required evaluation of the inmate's condition within 24 hours of the change in their legal status. It is my current understanding that mental health staff are now included in the email notifications from the Court regarding determinations of incompetence to stand trial.

  As noted in prior monitoring reports, the primary intent of this requirement appears to be the close monitoring of inmates during a period of potentially heightened vulnerability following a finding of incompetence to stand trial. It appears that mental health staff are now notified in a timely manner regarding competency decisions by the Court. The remaining elements of the requirement as written, and pertinent to MCJ and Wellpath staff, deal with placement of the inmate in an administrative transition cell and daily contacts with medical staff trained in suicide risk assessment. It has been previously pointed out by County Counsel that there are no longer "administrative segregation transition cells" and that in misdemeanor cases, charges are now typically dismissed or the judge releases the defendant. Placement in administrative housing for inmates who are not already so placed should not be the default procedure, unless determined necessary by a mental health clinician; inmates should remain in the least restrictive housing environment unless there are compelling reasons to the contrary.

  The current finding of noncompliance is based on the ongoing lack of a procedure to ensure that inmates who have been declared incompetent to stand trial are quickly identified, assessed by mental health staff, and a determination made regarding appropriate housing. The requirement as written also includes that such inmates in administrative segregation housing are to be seen daily by medical staff trained in suicide risk assessment, which means, in practical terms, that they must be seen daily by a QMHP, apparently to reassess suicide risk. This

requirement as written appears to extend indefinitely, as long as the inmate remains in administrative segregation.  Once an initial determination is made that an inmate is not at high risk for suicide, this requirement appears excessive.  This, however, is currently the requirement for which compliance must be determined. It is recommended that consideration be given to the original intent of this requirement, which appears to be primarily to ensure the safety and wellbeing of inmates declared incompetent to stand trial, and determine the best way to accomplish this goal within the current jail environment.

### 18. Treatment Plans

*•(a)  Qualified health services staff must develop a written individualized treatment plan for inmates requiring close medical and/or mental health supervision. A treatment plan must specify a particular course of treatment and shall be included in the plan portion of the S.O.A.P. progress note. The treatment plan shall reflect current problems or conditions being followed. The treatment plan shall include monitoring of the efficacy of treatment and discharge planning. [CFMG Plan at 27, 75]*

*•(b)  Treatment plans shall include specific medical and/or psychiatric problems, nursing interventions, housing, dietary, medication, observation and monitoring, and follow-up referral and/or evaluation as appropriate. [CFMG Plan at 27]*

*•(c)  Mental health providers must work with the Program Manager or designee to develop a treatment plan and meet the outpatient needs of inmates with mental illness, including opportunity for social interaction and participation in community activities. If an inmate is unable to participate, the reason must be documented. [CFMG Plan at 43, 75]*

### Findings: Partial Compliance

The last monitoring report from November 2023 found partial compliance with these requirements, after prior reports had found noncompliance.  Improvements were noted, in that several, but not all, of the healthcare records reviewed at that time contained a completed Treatment Plan for Non-Acute Patients form, which consists of a series of checkboxes for problems associated with various psychiatric disorders, with associated goals and interventions. It was noted that consistent use of this form would represent a significant step toward substantial compliance with the treatment plan requirements of the Implementation Plan.

As I have pointed out in prior reports, two aspects of treatment planning must be in place to achieve substantial compliance with Implementation Plan requirements.  One is the process of treatment planning, the other is the resulting documentation of a treatment plan.  Best practice in the process of treatment planning involves active participation of an interdisciplinary team of service providers to produce an individualized treatment plan which guides interventions and case management, based on an adequate, ongoing assessment of the patient. The written treatment plan must then be sufficiently specific, readily accessible to relevant staff, and revised as needed based on the patient's current condition and behavior.

Additional progress has been made in the current review period.  Treatment planning has been the focus of monthly internal audits by Wellpath for the months of November 2023 through March 2024.  Results of these audits showed the following:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Treatment Plan Completed | 100.00% | 70.00% | 30.00% | 60.00% | 70.00% |
| Course of tx identified* | 100.00% | 100.00% | 100.00% | 100.00% | 85.71% |
| Current Problems/conditions* | 60.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Monitoring effectiveness* | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Discharge planning* | N/A | 100.00% | N/A | N/A | 100.00% |
| Specific psych. Problems* | 70.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Specific interventions* | 90.00% | 100.00% | 100.00% | 100.00% | 71.43% |
| Referral/evaluation* | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

*The compliance figures regarding specific elements of the treatment plan were scored only for those cases where a treatment plan was completed.  This allows for a more accurate evaluation of the completed treatment plans, but it must be recognized that not all cases reviewed had a treatment plan in the healthcare record.  The top row of the table provides the appropriate compliance metric for the rate of completed treatment plans.

The internal audit results provided by Wellpath were based on their review of 10 randomly selected cases each month (total = 50).  From these 50 cases, I reviewed ten cases to evaluate the consistency between my scoring of the items and the audit scores; this showed complete agreement in scoring.  Completed treatment plans were present in some of but not all of the healthcare record records I reviewed that were not drawn from the internal audit samples.

It has been noted in prior monitoring reports that the requirements for treatment plans as written appear to envision a single, comprehensive treatment plan document that covers the mental health, medical, nursing, dietary, socialization and housing needs of inmates. The requirements also specify that such a plan shall be included in the SOAP progress notes, which are to be written by staff following every patient contact.  I have stated before that I view these expectations as unrealistic, and noted that such documentation practices are not used in any jail or correctional system with which I am familiar.  It is reasonable, however, to expect that the various required elements of treatment plans specified in the Implementation Plan will be documented somewhere in the healthcare record.  The challenge is for these various elements to be sufficiently coordinated, and the resulting documentation to be efficiently accessible to be of practical use to staff providing care. To be effective in guiding treatment, written treatment plans must be used in conjunction with the information contained in the SOAPE notes regarding the patient's current status and response to treatment.  Access to the necessary information should be as efficient and convenient for staff as the format and functions of the electronic healthcare record can allow.  For mental health purposes, consistent use of the treatment plan form, in combination with adequate information documented in other assessments and the progress notes, should be sufficient to achieve substantial compliance with requirements.

Regarding the process of treatment planning, it was noted in the last monitoring report that various staff participate in a weekly Multidisciplinary Team Meeting.  Also as noted before, it does not appear that this meeting systematically addresses all relevant cases (e.g., all cases on the Special Needs or Seriously Mentally ill list), nor does it appear to inform the written

treatment plan for the cases that are reviewed. Wellpath staff report that a new meeting structure has been under development. This meeting now appears to be held consistently, but remains a work in progress. A clear link between the review of cases in this meeting and the documented treatment plan is needed. Ideally, this meeting would involve consistent representation and participation by both medical and mental health staff, and a process by which coordinated treatment considerations are documented in the healthcare record. A stand-alone mental health treatment plan document, filed under a tab in the healthcare record that is readily identifiable and accessible, should allow for the inclusion of relevant comorbid medical conditions, especially as these may impact the clinical presentation and treatment approach for individual patients.

The current finding of partial compliance with these requirements reflects the continued progress that has been observed in implementing a standardized treatment planning form. A finding of substantial compliance is prevented by the current rate of completed treatment plans in the healthcare records, which was 70% in March 2024. As noted in the preceding discussion, work remains to be done in order to achieve substantial compliance. Mental health staff should focus on implementing a process whereby all patients have a completed treatment plan in the healthcare record, recognizing that 100% compliance is not necessary to achieve substantial compliance. Additional information regarding the patients' current clinical status, progress in treatment, and any adjustments to goals or interventions should be clearly documented and readily accessible by those providing care. Regular multidisciplinary discussion of complex and challenging cases should be documented and should clearly inform the written treatment plan.

•*(d) CFMG will inform classification through medical treatment orders as to any classification issues an inmate has due to a mental illness. [County Plan at 11]*

**Findings:  Noncompliance**

Another specific requirement in the Implementation Plan pertaining to treatment plans is that CFMG/Wellpath with inform classification through medical treatment orders as to any classification issues an inmate has due to a mental illness. Prior discussions with Wellpath staff indicated that mental health staff do not write medical treatment orders. Mental health staff report that they typically communicate directly with custody classification staff regarding any housing issues stemming from mental health concerns. Such mental health input into classification considerations should be documented in the health care record; if local policies and procedures do not provide for mental health staff to write medical treatment orders as specified in the requirement, alternatives for documenting the mental health input should be identified in other sections of the healthcare record.

**19. Consideration of Mental Illness in Inmate Discipline**
•*(a) Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff shall contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness. (*Dkt. 532 at ECF 47*)*

**Findings: Noncompliance:**

47

Prior monitoring reports have found noncompliance with this requirement, noting that some forms had checked boxes as to whether inmates were receiving mental health services, although a majority of forms were not so marked.  For those inmates whose DAR form was checked for receiving mental health services, the DARs contained no information related to consulting with mental health staff.  Review of electronic healthcare records showed no documentation of such consultations by mental health staff regarding the evaluation of discipline for inmates with mental illness.

For the current monitoring period, 12 Disciplinary Action Reports were reviewed.  In some but not all instances, boxes on the forms were checked indicating whether the inmate was receiving mental health services and that the inmate's mental illness did not impact the discipline given.  In no instance was any information documented regarding consultation with or input from mental health staff, either on the DAR or in the healthcare record, despite the fact that mental health progress notes from around the time of the DAR showed some inmates were actively symptomatic.

A new Disciplinary Action Report form and a new review process is currently under development.  The Compliance Commander shared a draft version of the form and the associated flow sheet for this revised disciplinary process.  Additional levels of review built into this process should help ensure that input from mental health clinicians is consistently obtained and documented.  There is currently no specific implementation date for this new procedure.

## 20. Space Issues

•(a)  Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including . . .adequate clinical and administrative treatment space.... [Dkt. 494 at ECF 17]

**Findings: This requirement was released from further monitoring.  [Dkt. 844 at ECF 5]**

## 21. Administrative Segregation

•(a)  The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation, and require procedures to mitigate the impact of administrative segregation on persons with mental illness, including but not limited to structured therapeutic activity outside the segregation cell and where feasible assignment of cell mates.   [Dkt. 494 at ECF 9-10]
•(b)  Inmates being moved from general population to an administrative segregation cell will be screened for suicide risk within 24 hours of placement. [Dkt. 528-1 at ECF 12]

**Findings: Noncompliance**

The last three monitoring reports have found noncompliance with both elements of these requirements: the need for screening all inmates placed in administrative segregation and the need to provide structured therapeutic activity outside the segregation cell.  Wellpath provided internal monthly audit data based on 10 randomly selected cases per month.  Results for these audits showed the following:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Placement screening | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

These results are consistent with my own review of healthcare records for the current monitoring period, in which no cases were observed that complied with the requirement to conduct screenings more mental illness and suicide risk before or promptly after (within 24 hours) placement in administrative segregation.

Prior discussions with the Mental Health Coordinator had indicated that mental health staff do not routinely screen inmates placed in administrative segregation housing. Historically there has been no process by which mental health staff were notified of all administrative segregation placements, and there has been insufficient mental health staffing to conduct the resulting volume of screenings should such notifications have been made. Further discussions with the Mental Health Coordinator during the recent site visit for the current report, however, indicated an important point of progress, in that classification staff have begun to notify the mental health team by e-mail before or at the time of an inmate's placement in administrative segregation. The inmate is then scheduled to evaluated using the Columbia Suicide Severity Rating Scale. This assessment is reported to be completed at the next scheduled round of administrative segregation mental health contacts, which occur weekly, and are often completed within two to three days of placement. This is a positive development. It will typically not, however, meet the requirement as written that a suicide risk screening will be completed within 24 hours of placement. But the language of this requirement does not specify that the screenings are to be conducted by a qualified mental health provider, unlike the requirement under Suicide Prevention, which states that a QMHP must perform a suicide risk assessment using the Risk Assessment Tool, "after placement in Administrative Segregation." Procedures to meet both of these requirements should be pursued.

Prior monitoring reports have noted that mental health groups were not being held on a regular basis to meet out of cell programming requirements due to mental health staffing limitations, although in-cell materials continue to be provided. During the current review period, mental health clinicians began holding groups with administrative segregation inmates, but a recent decision was made to temporarily suspend these groups in order to focus on other priorities, such as reducing the number and duration of rescheduled sick call appointments (a decision with which I agree under the current circumstances). The language of the requirement calls for structured therapeutic activities, and does not specify that these must take the form of groups conducted by MHPs. Alternative ways to meet this requirement, or an increase in staffing for mental health clinicians, will be necessary to reach substantial compliance with this element of the requirement.

•*(c) Inmates shall not be placed in administrative segregation solely because of having a mental illness. Classification is to assess a totality of factors when assigning inmates to administrative segregation units. The goal of the County is to limit the use of administrative segregation for inmates with mental illness.* [Dkt. 528-1 at ECF 12]

**Findings: Substantial Compliance**

The last three monitoring reports have found substantial compliance with this requirement.  These findings have been based on the interpretation of the requirement to mean that the classification process must not result in placing an inmate in administrative segregation only ("solely") because of the presence of mental illness.  As in previous reviews, there were cases in the current review where a severe and chronic mental illness contributed to the behaviors leading to placement in administrative segregation.  However, during the current review there continued to be no indications that inmates were placed in administrative segregation solely because of having a mental illness.

The Plaintiffs' attorneys continue to raise concerns about the placement of mentally ill inmates in administrative segregation.  I have explained my reasoning on this issue in prior monitoring reports.  As I noted in my last report from November 2023, "I have reviewed a substantial number of cases at this stage, and throughout my experience as monitor in this case I have not observed a single case in which it appeared that an inmate was placed in administrative segregation *solely* due to mental illness, i.e., that once an inmate is diagnosed with a mental illness, this and this alone is the reason they are so housed."

I have reviewed the policy and procedures that pertain to housing of inmates in administrative segregation, and discussed with jail staff the process they use in cases of inmates who are mentally ill.  The relevant portion of Section 1110.08 of the Monterey County Sheriff's Office Custody Operations Manual states the following:

1110.08   Administrative Segregation

A. Incarcerated persons shall not be placed in administrative segregation solely because of having a mental illness.
B. Administrative Segregation units are Pods A, B, R, and S as well as all Men's and Women's Holding cells and any single holding cell outside of the booking and receiving area.
C. When incarcerated persons are placed in administrative segregation, Classification shall conduct a classification review within seven (7) days of the placement and every fourteen (14) days thereafter.
D. Upon reviewing placement of an incarcerated person in administrative segregation, Classification shall consult medical staff concerning each incarcerated person's progress toward the goal of placing the incarcerated person in general population.

Custody staff on the classification team explained that they must consider the totality of the inmate's circumstances when making placement decisions, including disruptive behavior, disciplinary history, and "keep away" status, which may bear on where an inmate can be safely housed. At the regularly scheduled classification reviews, mental health and medical staff provide input. Staff consistently emphasize that the goal is to minimize the frequency and duration of placement of mentally ill inmates in administrative segregation.  Based on my interpretation of the literal language of this requirement, I again reach a finding of substantial compliance.

•*(d)  Inmates with a serious mental illness who are housed in Administrative Segregation will be scheduled for a weekly appointment with a qualified mental health provider.* [CFMG Implementation Plan at 42]

**Findings: Substantial Compliance**

The last monitoring report found substantial compliance with this requirement.  Wellpath has noted that mental health staff routinely conduct weekly Administrative Segregation rounds. These weekly mental health rounds are always conducted by a QMHP, who documents the contacts in the healthcare record on a flowsheet, with brief observations about the inmate's clinical presentation, behaviors, and the condition of the cell. When clinically needed based on these observations, or at the request of the inmate, a more extensive clinical encounter is conducted and documented in a progress note.

Wellpath provided internal audit data based on 10 randomly selected cases per month for the months of November 2023 through March 2024.  Results of these audits showed the following:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Weekly contact completed | 100.00% | 97.14% | 100.00% | 100.00% | 100.00% |

Healthcare record reviews for the current monitoring report confirmed that these weekly contacts were consistently conducted and documented as described.  I believe this practice sufficiently meets the intent of the requirement, which is to ensure the well-being of seriously mentally ill inmates housed in Administrative Segregation, and again warrants a finding of substantial compliance.

•*(e)  Nursing staff shall conduct mental health rounds in Administrative Segregation daily, separate and apart from medication distribution.* [CFMG Implementation Plan at 42]

**Findings:  Partial Compliance**

Prior monitoring reports found noncompliance with this requirement, noting that nursing rounds were not consistently documented daily in segregation units. As noted in the last report from November 2023, the CQI Committee Meeting minutes from July noted that Ad Seg checks were not occurring regularly due to a need for education for nursing and mental health staff to ensure that staff are aware of the need to consistently complete daily rounds, and that education had been recently provided.  For the current monitoring period, Wellpath monthly internal audit data based on 10 randomly selected cases covering the months of November 2023 through March 2024 were provided for review;  Results of these audits showed the following:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Daily RN rounds completed | 70.98% | 67.14% | 59.19% | 68.89% | 81.61% |

These figures were calculated as a percentage of the combined total number of nursing rounds due that were documented as completed for the 10 monthly audit cases. To verify the

results reported, I reviewed the healthcare records of 10 patients in administrative segregation, consisting of six cases drawn from the monthly samples audited by Wellpath and four cases drawn randomly from cases not included in the Wellpath samples.  My results were very similar to those reported for the internal audits.  In one case from the Wellpath sample, I counted two more completed rounds than reported in the audit results (22 vs. 20), and in another I counted one less (24 vs. 25).  The cases I reviewed that were outside the internal Wellpath audit samples, my results were in a similar range, with each of cases showing a compliance rate of 57% to 78%, and a total compliance rate (all daily contacts completed out of all daily contacts due) of 67%.  These results are sufficient to warrant a current finding of partial compliance. Ongoing attention through the CQI process, with additional corrective action as needed, will be necessary to achieve substantial compliance with this requirement.

•*(f)  Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior. Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal. [Dkt. 528-1 at ECF 15]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance.  [Dkt. 751 at ECF 19]**

•*(g)  Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.*

**Findings: Substantial Compliance**

The prior Mental Health Monitor had found Substantial Compliance on these requirements, and my last three monitoring reviews of July 2022, May 2023, and November 2023 found that audits of the documented completion of welfare checks continued to show high levels of compliance.  It has been previously noted that the Compliance Commander has developed a thorough and effective process for monitoring the recording of welfare checks, with routine reports and feedback to deputies, including correctional action as needed. The current review found similar compliance with this aspect of the requirement.

Partial compliance for these findings was found in my last report from November 2023. The area of concern which prevented a finding of Substantial Compliance was the requirement that welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior.  Concerns were raised about the quality of the welfare checks stemming from an incident which took place in a booking cell, and these concerns extended to the Administrative Segregation housing areas covered by this section of requirements. And although this was a single, extreme event, and may not generalize more broadly to the quality of welfare checks throughout the areas covered by various Implementation Plan requirements, the concerns it raises were of sufficient magnitude as to prevent a finding of substantial compliance at that time.

Leadership at MCJ have taken steps to address these concerns.  The Compliance Commander continues to monitor the conducting and documentation of welfare checks via the Guardian system; the auditing, reporting and corrective action aspects of this internal monitoring process have been commented upon favorably in my prior reports.  Review of surveillance video has been added to the Compliance Commander's internal auditing of welfare checks.  I have reviewed such videos with the Compliance Commander, and concluded that this provides a useful new component to the quality assurance of welfare checks.

Another step taken by custody leadership is the development of additional training focused on the correct procedures for conducting welfare checks.  Materials for this training have been provided for my review, which included demonstration videos, a PowerPoint presentation, and associated documents that address concerns about the quality of checks.  This training, in combination with the ongoing monitoring, feedback, and supervision process led by the Compliance Commander, should make a significant contribution to the qualitative aspects of requirements involving welfare checks.  This training has now been finalized and delivered to custody staff; see the discussion of findings under section 7(c) above for more information.  A finding of substantial compliance is now warranted.

*•(h)  All welfare checks shall be documented on a welfare check log.  The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance.  Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week.  On a monthly basis, the Compliance Sergeant will randomly select five log entries and use the door entry logs to verify that the deputy entered the administrative segregation  pod, to conduct a welfare check.  The Compliance Sergeant will track all of his findings through reports which will be sent to the Jail Ops Commander.  Monthly audits of the Compliance Sergeant's reports will be conducted by the Jail Operations Commander.  The Jail Operations Commander will generate a monthly report to document their audit findings. [Dkt. 528-1 at ECF 16]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance [Dkt 751 at ECF 20].  This requirement has been found in substantial compliance in the last two monitoring reports; it is my understanding that it has been released from monitoring.**

## 22. Suicide Prevention
*•(a)  Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.*
**The County has been released from monitoring for the reduction of tie-off points within administrative segregation cells in units A, B, R, and S. (Dkt. 751 at ECF 11)**

**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance for reduction of tie-off points in Pods D, G, H, I and J.  [Dkt. 751 at ECF 19].  This requirement was found in substantial**

**compliance in the last monitoring report of July 2022, and has been released from further monitoring.**

**A footnote in Dkt. 751 at ECF 19 states that the Mental Health Monitor will evaluate the new jail for reduction of tie-off points.  If substantial compliance was found for reduction of tie-off points in the new jail, Plaintiffs had agreed to release Defendants from further neutral monitoring for these cells.  Substantial compliance was found in the last monitoring report from the November 2023 site visit, and this requirement is understood to be released from monitoring.**

*•(b)  A qualified mental health professional must perform a suicide risk assessment using the Suicide Risk Assessment Tool (attached as Exhibit G to Implementation Plan) in all the following circumstances: (1) if the RN identifies suicidality during the Initial Health Screen; (2) within 4 hours of placement in a safety cell and before release from a safety cell; (3) after placement in Administrative Segregation. [CFMG Plan at 43, 72, 75]*

**Findings: Partial Compliance**

This requirement was found in partial compliance in the last monitoring report from November 2023, based on a determination of substantial compliance with part 1 (when the RN identifies suicidality during the Initial Health Screen) and part 2 (within four hours of placement in a safety cell and before release from a safety cell), but that structured suicide risk assessments were not routinely completed with inmates placed in administrative segregation housing (part 3). The Mental Health Supervisor had reported at that time that there was no reliable and consistent way by which mental health staff are informed of all administrative segregation placements, nor were there enough mental health clinicians on staff to respond adequately to this requirement.

For the current review period, Wellpath provided internal monthly audit data for parts 1 and 3 of this requirement, based on 10 randomly selected cases per month and covering the months from November 2023 through March 2024.  Results of these audits showed the following:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| RN identifies at intake | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| After ad seg placement | 0.00% | 0.00% | 0.00% | 25.00% | 60.00% |

It should be noted that not all cases in the monthly sample were relevant for the determination of compliance with part 1, e.g., for the March sample, there were only two cases where the RN identified suicidality at intake; both of these were found in compliance, resulting in the 100% compliance figure for that month. A similar concern was observed regarding the samples for the internal audits of suicide risk assessments completed following placement in administrative segregation, whereby many cases were marked as "not applicable."  Such cases resulted from the inmate being initially placed in administrative segregation during a month prior to the month of the audit.  Results based on small sample sizes of cases meeting the relevant criteria can be substantially influenced by the ratings for one or two cases, although the way the

54

samples are currently drawn provides more information about the level of performance in the month being audited, and therefore is a useful metric for tracking performance over time.

To evaluate the results reported in the monthly Wellpath intern audits, I selected 10 cases where the RN identified suicidality at intake and 10 cases where the inmate was placed in administrative segregation. For the intake sample, five cases corresponded to cases audited by Wellpath, and five cases came from outside the sample they audited. For those identified by the intake RN, my results agreed with the internal audit results, with 100% of cases assessed by a QMHP as required.

For the administrative segregation sample, eight of the cases I reviewed came from the Wellpath internal audit samples, and two additional cases were administrative segregation inmates not included in the internal audit samples. Of these 10 cases, four were assessed using the Columbia Suicide Severity Rating Scale, but it appeared that all four of these cases were already being followed from having recently been placed on suicide watch, or had been recently identified at intake as a suicidal. One case marked as compliant in the internal audit was not seen by the MHP until 11 days after placement in administrative segregation, and although there was a collaborative safety plan completed at that time, a completed suicide risk assessment tool was not located in the healthcare record. The remaining cases did not have a completed suicide assessment at or around the time of placement in administrative segregation.

For the element of the requirement pertaining to placement in and release from a safety cell, review of 10 relevant cases drawn from safety cell logs indicated that suicide risk assessments were routinely conducted when inmates on continuous Suicide Watch are placed in a safety cell and prior to release from a safety cell during the current review monitoring period. For inmates on intermittent Suicide Watch who are placed in safety cells due to a lack of other observation cell housing, it has been my interpretation that they do not need a suicide risk assessment prior to removal from a safety cell as specified in this requirement, as they did not require placement in the safety cell due to suicide risk, and their removal from a safety cell should be expedited to the greatest extent possible. For these patients, a structured suicide risk assessment is completed during the regular daily work shift; for patients placed on Level 2 Suicide Watch outside of daily mental health work shift hours (including those placed in a safety cell), the suicide risk assessment is completed the following day during the regular mental health work shift.

Based on the preceding combination of results, whereby compliance has been achieved in some but not all of the components of the requirement, the current finding is again partial compliance. In the same pattern observed in the last monitoring report, there continues to be a consistently high level of compliance with the parts of the requirement dealing with inmates identified as suicidal at intake and those placed in safety cells. The challenge remains with those placed in administrative segregation. As noted above under requirements 21(a and b), classification staff have begun to notify the mental health team by e-mail before or at the time of an inmate's placement in administrative segregation. The inmate is then scheduled to assessed using the Columbia Suicide Severity Rating Scale at the next scheduled round of administrative segregation mental health contacts, which occur weekly. At the current time, however, these assessments are not being completed at a sufficiently high rate to warrant a finding of substantial compliance.

*•(c)  Whenever an inmate is placed in a safety cell due to suicide risk, CFMG shall immediately, and no later than within 4 hours, determine what level of suicide precautions are necessary and decide whether the inmate needs to be transferred to an inpatient mental health facility. If CFMG determines that more than 24 hours of suicide watch/precautions is necessary, CFMG shall work with custody to place the inmate in an inpatient mental health facility, the Outpatient Housing Unit, a receiving cell located in the booking unit, or dorm A. Whenever possible, the inmate will be transitioned from a safety cell to an open dormitory setting until the inmate has stabilized. [DKT 532 at ECF 73]*

*•(d)  Custody must transfer patients to NMC or another appropriate inpatient mental health facility if the patient has been housed in a safety cell for 24 consecutive hours or for more than 36 cumulative hours in any 3-day period. If exigent circumstances prevent such transfer, a memo must be written to the Custody Operations Manager. [DKT 532 at ECF 73-74]*

*•(e)  Once CFMG determines that an inmate is no longer suicidal, CFMG shall work with custody staff to place the inmate in the most appropriate setting. Mental health clinicians must follow-up with the patient until a step-down plan is no longer necessary. [DKT 532 at ECF 73]*

**Findings: Substantial Compliance**

The last two monitoring reports have found substantial compliance with these requirements. The current review again found continuing substantial compliance.  Healthcare record documentation showed consistent evaluations completed by mental health clinicians for inmates placed in a safety cell due to suicide risk within four hours with a determination of necessary suicide precautions.  Healthcare records of nine such cases were reviewed, showing compliance with this requirement in eight of these cases; the remaining case was evaluated by a QMHP 6.5 hours after placement in a safety cell, rather than within four hours.  Review of safety cell logs and healthcare record reviews indicated that there were no cases in which inmates remained in safety cells for 24 consecutive hours and therefore requiring transfer to NMC for crisis evaluation or other emergency treatment.  There were no cases in which an inmate was housed in a safety cell for more than 36 cumulative hours in any three day period and therefore requiring transfer to NMC.  As noted under requirement 7(i), a robust monitoring system for safety cell placements remains in place.

For inmates in this circumstance who are determined to no longer be suicidal, review of healthcare records and observation of the mental health clinicians during the recent site visit indicated that adequate communication and collaboration occurs regarding placement of the inmate in the most appropriate setting. The Compliance Commander has explained that once an inmate is placed on intermittent suicide watch (formerly referred to as Level 2 Suicide Watch), a lockdown form is generated.  The classification unit will interview the inmate and assign appropriate housing.  There is ongoing communication with medical and mental health staff when classification staff are determining housing, which also includes consideration of a number of factors such as gang affiliations and the inmate's history of violence or rule violations.

Review of healthcare records consistently showed that clinicians documented and followed a step-down plan as needed.  Step-down plans consist of the frequency of follow-up contacts by a mental health clinician, when the inmate's clinical condition and risk for suicide is re-evaluated. This process appears adequate.

As noted in prior monitoring reports, mental health clinicians consistently document suicide risk assessment and collaborative safety planning using the structured forms titled "Suicide Watch Initial Assessment for Mental Health" and "Suicide Watch Daily Follow-up and Discharge for Mental Health." Direct observation of clinicians performing these duties during the most recent site visit showed adequate clinical practice.

•*(f) Custody must conduct welfare checks of patients on suicide watch/precaution twice every 30 minutes. Health services staff must conduct welfare checks every 6 hours. Mental health staff must conduct welfare checks once per duty shift. The checks must be documented in the appropriate log (sobering/suicide watch/safety cell/restraints log). The inmate may not have access to materials that could be used to inflict harm on his/her self or others, and may be dressed in an approved safety garment if necessary. [CFMG Plan at 74, 76]*

**Findings: Partial Compliance**

The last monitoring report from November 2023 found substantial compliance with this requirement, although the prior report from May 2023 found noncompliance due to several cases in which health services staff (i.e., nursing) did not consistently complete and document welfare checks every six hours as required. In the current review, welfare check logs and healthcare records showed that custody recorded welfare checks at least twice every 30 minutes as required, mental health staff conducted welfare checks daily as required. Nursing staff, however, did not conduct checks every six hours as required. Review of healthcare records for eight cases drawn from inmates placed on suicide watch during the current monitoring period showed that seven of these cases did not document checks by healthcare staff (i.e. nursing) every six hours as required.

For the current review period, Wellpath provided internal monthly audit data for parts 1 and 3 of this requirement, based on 10 randomly selected cases per month and covering the months from November 2023 through March 2024. Results of these audits showed the following:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| RN contact every 6 hours | 82.46% | 93.02% | 87.67% | 87.30% | 91.04% |
| MH contact once per shift | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

The compliance figures reported by Wellpath for nursing contacts appear to be derived by looking at the number of six hour checks that were completed divided by the number that were due across all cases in the monthly sample. The approach I took was to examine the proportion of cases where all six hour checks were completed as required, i.e., the number of cases in compliance, not the number of checks that were in compliance. Because of the clinical importance of nursing checks with patients on suicide watch, I consider looking at the proportion of compliant cases to be the more appropriate measure of compliance. In looking at compliant cases (i.e. where all checks were completed as required) among the healthcare records I reviewed on this metric, the compliance rate was 1/8 = 12.5%. The current finding of partial compliance is based on results showing compliance with some but not all of the elements of the requirement. Custody and mental health checks were conducted as required; nursing checks were not.

As has been noted in prior monitoring reports, this set of requirements is interpreted to refer to the issue of whether custody welfare checks were conducted and documented according to the specified schedule.  It does not consider the quality of welfare checks that were conducted, which is addressed in the findings of other relevant requirements.

*•(g)  The CFMG Program Manager and the Facility Manager shall have joint responsibility to report completed suicides in accordance with CFMG Inmate Deaths Policy and Procedure. [CFMG Plan at 76]*

**Findings:  Substantial Compliance**

This requirement was found to be in substantial compliance in the last two monitoring reports from May 2023 and November 2023.  There have been no further cases of inmate suicide at MCJ since June 2023.  Documentation provided by Wellpath, including internal emails, demonstrated compliance with the reporting requirements for that suicide.

*•(h)  The CFMG Program Manager or nursing staff on duty shall report all potential and/or attempted and completed suicides to the Facility Manager or Shift Supervisor. CFMG management will be notified of any completed suicides within one working day. Family members must be notified in accordance with the CFMG Notification of Next of Kin Policy and Procedure. CFMG Plan at 76-77.*

**Findings: Substantial Compliance**

This requirement was found in substantial compliance in the last monitoring report from November 2023.  There have been no completed suicides during the current monitoring period. There were 11 events classified as a suicide attempt during the current monitoring period.  The notification of required staff in the event of attempted suicides is accomplished when information about the incident is entered into a tracking process for Critical Clinical Events, which sends the information to a number of individuals, including the Facility Manager as required.  Documentation provided by Wellpath for the current review period again indicated that this process was completed within the required timeframe.  It has previously been clarified that the notification of next of kin in cases of completed suicides, according to MCJ procedures, is the responsibility of the Coroner.  Based on this information, a finding of substantial compliance is warranted.

### 23. Increase in Time Outside of Cell and/or Increasing Programs

*•(a)  Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:*

- *3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)*
- *14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time*

> ▪ *2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail)*

*•(b)  Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking and receiving area will be guaranteed the following weekly times out of their cell:*

> ▪ *3 hours a week for exercise*
> ▪ *14 hours a week in the common area*
> ▪ *2 hours a week of programming will be offered to each inmate*

*•(c)  If approved by classification, inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services [County Plan, Dkt. 528-1 at ECF 19]*

**Findings:  Partial Compliance**

  The last monitoring report from November 2023 found partial compliance with these requirements.  It has been noted that the Compliance Commander continues to oversee a thorough and detailed system of routine audits, which includes notification of custody staff and further training when deficiencies in out of cell time are identified.  Prior monitoring reviews of these audits indicated that inmates in segregated housing are consistently offered the required amounts of exercise time (yard time) and time in the common area (socialization time).  It was the amount of programming time, which is not tracked by the Compliance Commander in his auditing procedures, that prevented a finding of substantial compliance in prior monitoring reports.

  The current monitoring review again found that inmates in the administrative segregation pods are consistently offered the required amount of yard time and socialization time.  Routine group programming offered by mental health staff was recently resumed but the decision was made to discontinue these groups so that available mental health staff could focus on other priorities, such as completing sick call appointments in a more timely manner.  I agree with this prioritization of staff resources.  Mental health staffing will need to become sufficient to cover all relevant Implementation Plan requirements, although it should be noted that this Implementation Plan requirement does not specify that two hours a week of programming must be offered by mental health staff.

  Custody programming staff continue to provide various classes and activities to inmates across the jail, including those in administrative segregation.  Program attendance reports were again provided for review, and it appeared that more than two hours per week of such programming were consistently being offered.  It could not, however, be determined if these programming opportunities were offered to each inmate in the housing areas designated by these requirements. As noted in prior monitoring reports, if two or more hours of programming are offered in designated housing areas as required, a finding of substantial compliance is possible prior to the consistent provision of groups by mental health staff.  The current finding of partial compliance is based on substantial compliance with some elements of the requirement (exercise and socialization time) and a lack of confirmed substantial compliance with element pertaining to programming time.

It should be noted that questions have been raised as to whether units A, B, R, and S continue to be properly considered as administrative segregation housing. It is my current understanding that they continue to operate as such, and are considered in the evaluation of requirements involving administrative segregation for the current monitoring report. The parties are encouraged to seek clarification regarding which units constitute administrative segregation, if there is reason to believe that A, B, R, and S should not be so designated.

*(d) Working with the Monterey County Probation Office and the Monterey County Superior Court, the Office of the Sheriff has and will continue to support evidence based programs such as the Work Alternatives Program; Involuntary Home Detention; Pretrial Release through Probation; Own Recognizance; educational early release kickouts such as Choices/Liberty Pride; and Penal Code sections 4018.6 and 4024.1 kickouts. [County Plan at 15; Dkt. 528-1 at ECF 19]*
**This requirement has been released from further monitoring.**

### 24. Telepsychiatry
*(a) The telepsychiatrist must obtain informed consent and explain all medications before prescribing. [CFMG Plan at 45]*

**Findings:  Partial Compliance**

This requirement was found in noncompliance in the last two monitoring reports, based on a lack of completed informed consent forms in the healthcare records of inmates receiving telepsychiatry services. Wellpath has suggested that the EASS and JBCT programs should not fall within the scope of monitoring the mental health services at Monterey County Jail. However, the current monitoring review interprets this requirement for informed consent to apply to inmates enrolled in the Early Access (EASS) and Jail – Based Competency Treatment (JBCT) programs, as well as any other telepsychiatry services provided at MCJ (see discussion of this interpretation under the following requirement).

Wellpath provided a list of 22 inmates enrolled in the EASS program between November 2023 and early May 2024. I reviewed the healthcare records of 10 of these inmates, and found that the telepsychiatrist's documentation made reference to the inmate's consent or agreement to telepsychiatry services in five cases, although there were no signed informed consent forms specific to telepsychiatry found in the healthcare records for any of the 10 cases reviewed. It should be recognized that in some cases, the inmate was acutely mentally ill at the time that telepsychiatry services began, and several had an involuntary medication order issued by the Court allowing for treatment without consent.

I have reviewed a consent form specific to telepsychiatry services. It appears that this consent form is relevant to inmates treated by telepsychiatry in the EASS and JBCT programs. These forms, or something similar, should be completed and filed in the healthcare records of all inmates receiving telepsychiatry services. If an inmate in the EASS or JBCT programs refuses to provide informed consent and/or is unable to sign the relevant form, this should be clearly noted in the healthcare record, along with the basis for involuntary treatment under an Involuntary Medication Order. Concerns have been raised regarding whether the EASS and JBCT programs

60

fall within the scope of mental health monitoring.  This issue is addressed more directly under the following requirement.

*•(b)  The policies contain numerous provisions regulating the use of telepsychiatry at the jail, including requiring that a psychiatric nurse be present during telepsychiatry encounters where the patient is in a safety cell as well as requiring a local assessment by a physician or mid-level provider within 24 hours of an initial assessment that is conducted by telepsychiatry. [Dkts. 622 and 632].*

**Findings:  Partial Compliance**

      Previous monitoring reports have found noncompliance with these requirements. The prior Mental Health Monitor in his last report of May 2021 noted problems with completion of the informed consent forms, a lack of documentation that a qualified clinician assisted, or that a physician or mid-level provider saw patients within 24 hours of an initial psychiatric assessment. He also noted concerns regarding provision of involuntary medications involving telepsychiatry. In my report from May 2023, cases were identified who had received telepsychiatry services via telephone or Facetime.  Documentation of informed consent for telepsychiatry was not found in any of the healthcare records for these patients.  No cases were identified where the patient was in a safety cell or received an initial assessment conducted by telepsychiatry.  It was not clear that telepsychiatry contacts are routinely logged and reviewed for compliance with these requirements. It was noted that such a monitoring procedure, as part of the Quality Management process, would better facilitate substantial compliance with telepsychiatry requirements.

      The subsequent monitoring report from November 2023 again identified multiple cases where informed consent for telepsychiatry was not found in the healthcare record.  Cases were also identified where an initial assessment was conducted by telepsychiatry but a local assessment by a physician or mid-level provider within 24 hours was not documented in the healthcare record.  There were again no cases identified in which the inmate was seen by a telepsychiatrist while in a safety cell.

      For the current monitoring review, Wellpath provided results of internal audits covering telepsychiatry services for the months of November 2023 through March 2024.  These results showed the following:

| Month | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|
| Telepsych informed consent | 100.00% | 90.00% | N/A | N/A | N/A |
| Med education | 100.00% | 90.00% | N/A | N/A | N/A |
| RN present for safety cell | N/A | N/A | N/A | N/A | N/A |
| 24 hr f/u after initial assess | N/A | N/A | N/A | N/A | N/A |

      The entries marked N/A for Not Applicable indicate that no relevant telepsychiatry services were provided during that month.  However, telepsychiatry currently appears to be the primary modality for providing psychiatry services for inmates enrolled in the Early Access (EASS) and Jail Based Competency Treatment (JBCT) programs, and such telepsychiatry contacts were observed in a number of the healthcare records reviewed throughout the current

monitoring period.  This raises the question of whether these services fall within the scope of the requirements for telepsychiatry as articulated in the implementation plan and relevant court documents (Dkt. 622; Dkt. 632; Dkt. 633).

Dkt. 622 at ECF 2 seems to suggest they do, where it states, "any use of telepsychiatry services with patients at the Monterey County Jail must comply with the following requirements: . . ."  This document goes on to list six specific requirements.  These requirements include:

1. Informed consent – with specific information to be provided to patients – see findings above.

2. Access to relevant clinical data about the patient – this appears to be provided by telepsychiatrists having access to the electronic healthcare record.

3. Telepsychiatrists must adequately document each patient session – this appears to be covered by completing progress notes in the electronic healthcare record.  The progress notes and standardized forms completed for telepsychiatry contacts were adequate in all cases reviewed for the current monitoring report, and many were very thorough.

4. Telepsychiatry facilities and technological capabilities must be regularly vetted, with specific areas to review.

5. Telepsychiatry must be subject to Quality Assurance monitoring.

6. Telepsychiatry sessions shall be conducted so that clinical discussion cannot be overheard by other patients, with additional considerations for custody staff.

Dkt 632 at ECF 6 – 17 also reiterates the preceding requirements, and articulates additional standards.  These standards include having the telepsychiatrist participate in an in-person tour of the jail once in their first year of employment, within six months of substantial architectural changes, and participation in quarterly Quality Assurance meetings.  Where telepsychiatry is used for medication management and there is a history of antipsychotic prescribing, telepsychiatry sessions shall either be preceded by a movement disorder screening by a qualified medical clinician using the Abnormal Involuntary Movement Scale (AIMS), or, if pre-screening is not practicable, then the patient shall be accompanied in the telepsychiatry session by a qualified medical clinician who can assist the telepsychiatrist in conducting the AIMS screening [Dkt. 632 at ECF 9].  In six of the 10 cases I reviewed for inmates enrolled in the EASS program during the current monitoring period, six cases had documentation of the AIMS as required.

Dkt. 632 goes on to list a series of examples of the most common types of psychiatric encounters at the jail, and the steps ordinarily necessary to ensure coordination of on-site care.  The CFMG Implementation Plan also addresses telepsychiatry services [Dkt. 532 at ECG 44 – 47], which includes a description of the Tele-Psych Clinic Procedure.  This procedure includes the role of a mental health worker to set up and facilitate the process, and provide onsite monitoring of the patient.

An additional consideration for the evaluation of compliance with requirements pertaining to telepsychiatry services is the role of the contract with Precision Psychiatry Services for telepsychiatry services which include, for example, bridging orders for psychotropic medications at intake.  It is less clear that these services fall with the scope of the preceding requirements, but this remains an issue to be determined.  Relevant here may be the language used in Dkt. 632 at ECF 6 – 7, which states, "Tele-psychiatry may be used to provide psychiatric services which include, but are not limited to: initial psychiatric consultations; diagnostic and

treatment evaluations; formulation of individual treatment plans; medication management; emergency psychiatric assessments including patients who are suicidal or at risk for suicide; patients who are a danger to themselves or others; patients who may require the administration of involuntary medications; other interventions and patient education."

      I have been informed by Wellpath staff that telepsychiatry is no longer used to conduct initial psychiatric evaluations or encounters with patients in safety cells. This accounts for the Not Applicable entries for those items in the internal audits.

      The current finding of partial compliance is based on compliance with some but not all of the elements of the requirement.  Greater clarity is needed regarding the applicability of the full range of telepsychiatry requirements as specified in the various documents referenced above, including inmates who receive such services through their enrollment in the EASS and JBCT programs.  Even though, as Wellpath has pointed out, the Department of Mental Health controls admissions to these programs, the clinical services for these programs are delivered at Monterey County Jail by Wellpath staff.  The basic Implementation Plan requirements for telepsychiatry, such as informed consent in the preceding requirement, appear to apply to the clinical services provided to inmates enrolled in the EASS and JBCT programs. Procedures for evaluating compliance with these requirements will need to be identified.

## 25. Medical Records
•*(a)  Each inmate's medical record shall contain (as applicable):*
- *The completed Receiving Screening form*
- *Health Inventory/Communicable Disease Screening forms*
- *Problem list*
- *All findings, diagnosis, treatments, dispositions*
- *Prescribed medications and their administration*
- *Laboratory, x-ray and diagnostic studies*
- *Consent and Refusal forms*
- *Release of Information forms*
- *Place and date of health encounters (time, when pertinent)*
- *Health service reports (i.e., dental, psychiatric, and other consultations)*
- *Hospital Discharge Summaries*
- *Jail Medical Record Summaries (transfer forms)*
- *Individual treatment plan [CFMG Plan at 114]*

## Findings: Partial Compliance
      The last monitoring report from November 2023 found partial compliance with this requirement, noting that the healthcare records included the required items except for the individual treatment plans.  Improvements were noted in the rate at which treatment plans appeared in the healthcare records during that prior review, and further improvements were noted during the current review period (see Section 18 above regarding compliance with treatment plan requirements), although treatment plans remain in partial compliance at this time.  Treatment plans are considered an essential element of the medical records.  Once adequate treatment plans

are routinely completed for applicable inmates (i.e., those with serious mental illness) along with the other required documentation, substantial compliance with this requirement will be achieved.

## 26. Quality Management

*•(a)  Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit Findings will be reported to the Quality Management Committee at its quarterly meetings. [Dkt. 532 at ECF 9]*

## Findings: Partial Compliance

The prior monitoring report from the November 2023 site visit found partial compliance with this requirement.  As I noted in that earlier report, "There has been significant progress in the internal QA auditing of various mental health requirements from the Implementation Plan since the time of the last monitoring report.  Wellpath recently shared documentation showing the audit items that have been developed, and results of the internal audits conducted using inmate healthcare records from August, September, and October 2023.  This is a key development not only for the requirements related to QM functions but also across a range of Implementation Plan requirements, to the extent that such internal auditing focuses sustained attention on and generates compliance data about these functions."

It was also noted in that earlier report that, "What remains to be accomplished is full implementation of the QM/CQI process and related Corrective Action Plans.  Review of the minutes from July through November 2023 indicated that the CQI Committee has been meeting monthly, and appears to follow a structured agenda of functions and topics to review which are not limited to mental health.  It appears, however, that significant progress is still needed to achieve a robust CQI process which addresses the requirements of the Implementation Plan and supports substantial compliance with the Corrective Action Plans . . ."

Progress has continued since the time of the last monitoring review.  Internal audits that are explicitly aligned with Implementation Plan requirements now appear to be well established and are completed on a monthly basis. The results of these audits, which are completed primarily by the local Mental Health Coordinator, have begun to be reviewed in a monthly Mental Health QM subcommittee.  Significant findings and associated corrective action plans are to be reported out to a monthly site-wide Quality Assurance meeting, and to be reviewed in a more comprehensive site-wide Quarterly QA meeting.  This meeting structure and review process has been developed over the first quarter of 2024, and is still in the early phases of implementation.

These are important and necessary steps in the pursuit of substantial compliance with the requirements for Quality Management and Corrective Action Plans.  Additional progress is needed to demonstrate the functionality of this process in achieving necessary improvements in the performance areas that remain deficient.  Progress will be supported by more complete and detailed documentation than has been provided for reviewed to date, in the form of meeting minutes and specific corrective action plans.

The Quality Assurance Mental Health Subcommittee minutes for February and March 2024 appear to follow a standardized format which lists those in attendance, the topics to be

covered, and a list of action items, with the person responsible and brief notes for each item.  The notes are not adequate to convey the nature of the discussion or the potential solutions that are identified.  For example, in the February 2024 meeting minutes, a  brief note indicates that there was discussion with the DON regarding how nursing staff can better identify three consecutive medication refusals (which requires notification of a psychiatric provider).  There is no further indication of the nature of this discussion, the causes of the deficits consistently observed in this function, potential solutions or corrective action plans, or next steps to achieve compliance. A number of the notes appear again verbatim in the minutes for the March 2024 Quality Assurance Mental Health Subcommittee meeting, which appear to have copied and pasted from the earlier meeting. There is no indication of the actions planned or taken, or any results of such actions.

Similar concerns are noted in the monthly site-wide CQI meeting minutes.  There is a section in the formatted minutes for CQI Routine Monitoring, but this section is blank in both the January and February 2024 minutes.  In the February minutes, there were brief entries regarding inmates who were found incompetent to stand trial and involuntary medication orders, but there was no indication of whether these functions were performed adequately, what improvements were needed, what further actions are planned or under consideration, or what barriers remained to achieved an adequate level of performance.  It was noted in the section of the minutes labeled "Review of incident reports" that there were two suicide attempts, but no further information was documented, such as the nature and severity of the attempts, any factors that contributed to the attempts, the adequacy of staff responses to the attempts, and any actions taken or contemplated to reduce the likelihood or improve the response to such attempts. If information such as this is documented elsewhere, reference should be made to that documentation, and a brief summary included in the CQI minutes, especially concerning any quality improvement efforts or the lack of need for such efforts in light of the available information.  New issues identified included site specific CQI studies, noting that once completed, the data would be collected monthly and reported to the monthly QA meetings. This again appears to reflect the current early stages of development for these processes.

Once fully implemented, the documentation for these functions of the QA/CQI process will need to be more thorough, probably most effectively at the Mental Health Subcommittee level.  Minutes and supporting documentation (e.g., written CAPs, review of progress and barriers, next steps, etc.) will need to be more complete.  Responsibly for this documentation may reside with the Implementation Specialist, although her role in these meetings may preclude her from being able to take effective minutes and develop other documentation as needed.  The need for a mental health administrative assistant was briefly discussed during the most recent site visit, and could provide the needed support for this and other functions which currently fall to the Implementation Specialist and clinical staff.

The quarterly site-wide QA meeting of March 2024 was documented in a PowerPoint slide deck, and contained somewhat more of the information necessary for adequate documentation of the QA efforts that are underway.  The goals of the meeting were listed as reviewing the Monitor's report for the overall Wellpath program; have a transparent conversation about process improvements currently in progress; set goals to accomplished by next quarter; and asking for feedback to improve the report (assumed to mean the internal reporting of performance data), as this was the first time that data were being reviewed in this format. This

meeting reviewed strengths recently identified by each monitor, and noted that prioritized topics for identified weaknesses are to be addressed in the second quarter of 2024.  Priority topics for mental health and psychiatry were listed, including the internal audits and the various meetings being implemented.  These are positive developments, and this meeting appeared to serve largely as an orientation to the new process and a review of some of the areas identified for improvement efforts.

The PowerPoint presentation did not, however, serve as minutes for the meeting, which will be necessary for future meetings that will, it is assumed, include reviews of actual performance data and discussions of specific corrective action plans.  If specific goals were set during the March quarterly QA meeting, those were not contained in documentation made available for the current monitoring review. As I have identified earlier, and noted again in the exit meeting of the April 2024 site visit, the site-wide QA meetings and the Quarterly QA meetings will have a wide scope, as they will need to cover all of the monitoring areas, including medical, dental, and ADA in addition to mental health.  Time will be limited, so the process will need to be well-organized, focused, efficient, and well-documented.  The bulk of the detailed work involving audit data review, problem-solving, and CAP development, tracking, and documentation, will need to occur in the Mental Health Subcommittee meetings.  Time allotted to mental health in the broader site-wide monthly and quarterly QA meetings will need to be used strategically, to ensure awareness/support and to coordinate with other disciplines as needed.

The current finding of partial compliance is based on the continued progress observed in the development and implementation of a focused internal auditing process linked directly to the requirements of the Implementation Plan.  Work remains to reach substantial compliance with requirements in this area.  As noted in the last monitoring report, next steps should include routinely reviewing the findings of the internal audits in the appropriate committees and subcommittees, the development and implementation of corrective action plans for identified performance deficits, adequate documentation of meeting minutes and actions taken, and consistent follow-through based on ongoing collection and review of data.  Success in meeting the requirements for quality management/continuous quality improvement and correction action plans should directly facilitate progress in achieving substantial compliance with the requirements in other areas of the Implementation Plan.

*•(b)  All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met. [CFMG Plan at 98]*

**Findings:  Deferred**

This requirement is interpreted as applying to involuntary medication administrations in a psychiatric emergency, rather than involuntary medications administered under an Involuntary Medication Order issued by the Court.  There were again no such cases reported by Wellpath during the period of the current monitoring review, and no such cases were identified during my

review of healthcare records for the current report. Compliance with this requirement will be determined when there are relevant cases to review.

*•(c)  All completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure.  [Dkt. 532 at ECF 77]*

**Findings:  Partial Compliance**

The last monitoring report from November 2023 found this requirement in partial compliance, and noted the following:

"There was one case of confirmed suicide during the monitoring period for the current report.  The current relevant policy for evaluating compliance with this Implementation Plan requirement appears to be the one titled HCD-110_A-09: Procedure in the Event of a Patient Death – California.  This policy requires, among other things, a Clinical Mortality Review, which involves completion of a Psychological Autopsy, and an Administrative Mortality Review, which includes recommendations for any future improvements, submission of such improvements to the CQI Committee, and informing staff of the findings of the Mortality Review meeting. Finally, the Regional Director of Operations, Regional Director of Nursing, Regional Vice President, and Regional Medical Director, works with appropriate personnel to implement changes.  The CQI Program Manager is to request and track supporting documentation for improvement plans.

"Three documents related to the most recent suicide in June 2023 were provided for review: A completed Psychological Autopsy form, a Psychological Autopsy Confirmation form, and a Recommendations form.  The documents provided show that this suicide was reviewed as required by the relevant subsections of the Wellpath Policy and Procedure, although the information contained in these documents was relatively brief.  It is possible that additional information was compiled in other internal documents that are considered Patient Safety Work Products as part of the Patient Safety Evaluation System, whereby information developed through the internal mortality review process may not be released outside of Wellpath.

"What appears to be missing in the documentation made available for review is the sharing of information within the local CQI Committee, as required by policy.  Nothing about this suicide was reflected in the CQI minutes of July through November 2023.  Nor was any documentation identified which reflected working with appropriate personnel to implement changes arising from the clinical or administrative reviews. My own review of this suicide indicated that opportunities for improvement should have been identified and pursued.  Such actions should be clearly tracked and documented by the local CQI Committee and other responsible personnel as needed."

There have been no further deaths from suicide reported since the June 2023 case, which formed the basis of the prior finding of partial compliance.  This is of course very positive.  In the absence of subsequent information with which to evaluate compliance with this requirement, a finding of partial compliance is currently maintained.

**27. Corrective Action Plans (CAP)**
•*(a)  Defendants' implementation of a policy requires that there are corrective action measures to address lapses in application of the policy. [Dkt. 494 at ECF 11]*
•*(b)  Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. [Dkt. 671 at ECF 5; Dkt. 532 at ECF 9]*

**Findings:  Partial Compliance**

These requirements have been found in noncompliance in prior monitoring reports. The CAPs developed earlier in the monitoring process had largely become stagnant and were essentially neglected, while the more fundamental problem was that the CAPs are not meaningfully connected to an effective and responsive Quality Management process.  Many of the actions listed in the CAPs provided no process or data regarding whether the observed deficiencies were effectively remedied, i.e., they are not sensitive or responsive to the impact of corrective action.

There has been significant progress in the QA/CQI process during the current monitoring period (see above).  Progress has also been recently noted in the development, implementation, and tracking of corrective action plans. The Mental Health Subcommittee Meeting Agenda from 4/30/24, which does not adequately serve as minutes for the meeting in the absence of supporting documentation, lists five action items to appear to be areas that are the focus of corrective action (including development of CAPs for nursing staff functions; re-education regarding forms to be completed during encounters; training on treatment plan integration; administrative segregation screenings and daily contacts by nursing; and benzodiazepine withdrawals), with very brief notes about what is to be accomplished.

A Corrective Action Plan needs to specifically state the nature and extent of the performance deficit to be corrected, the specific steps to be taken to correct the performance deficit, the specific personnel responsible, the method for assessing changes in performance, and the mechanism for review and follow-up as needed.  Most of these essential elements are reflected in a PowerPoint slide deck for the Mental Health Subcommittee meeting of 4/30/24. These slides identify 10 areas of performance tracking, including various aspects of the intake process; treatment plans; administrative segregation; suicide prevention; crisis intervention; psychiatry; telepsychiatry; medication refusals; and benzodiazepine withdrawal.  The relevant Implementation Plan criteria are listed, and the results of monthly internal audits are presented. Corrective actions are listed in an Improvement Plan slide for each area where performance deficits have been identified through the audit data, with a responsible staff member identified and a target date for completion, typically by or before the end of May 2024.

These are promising developments. Demonstration of follow-through is needed. Ideally, this will consist of clear documentation showing subsequent review of the audit data in each performance area, reports of the progress made in the action steps taken and any barriers to progress that have been encountered, any revisions or additions to the action steps that may be needed, and plans for ongoing monitor and intervention as needed.

The current finding of partial compliance is based on the recent progress that has been made in this area.  Work remains to be done to demonstrate substantial compliance with the

requirements, but the process that is being established provides a viable and sustainable path to compliance.

## Summary

The current draft monitoring report finds the following results: 24 compliance requirements have been released from monitoring; 26 requirements were in substantial compliance; 24 requirements were in partial compliance; 17 requirements were in noncompliance; and five requirements were deferred.  Changes in compliance ratings occurred in a number of areas, whereby six requirements moved from partial compliance to substantial compliance and nine requirements moved from noncompliance to partial compliance, although one requirement moved from substantial compliance to partial compliance and three requirements moved from partial compliance to noncompliance. The areas of positive change in compliance ratings included aspects of the intake screening, mental health screening, sick call, chronic care, administrative segregation, telepsychiatry, and corrective action plans.  Areas showing negative change included aspects of medication continuity, treatment plans, and suicide prevention.

Two primary areas remain essential for continued progress toward substantial compliance across the requirements of the Implementation Plan. These are staffing, and the integration of Quality Management and Corrective action plans.  Significant additional progress has been made during the current monitoring period in QA/CQI with the implementation of monthly internal audits that are aligned with the Implementation Plan requirements.  Recent progress was noted with the development of corrective action plans through the Mental Health QA Subcommittee. Full implementation of the QA/CQI and CAP process, with consistent follow-through and clear documentation, is needed to achieve substantial compliance.

The intake screening process, which has been an area of concern, has begun to benefit from the internal auditing and corrective actions which have been undertaken. Problems remain with the consistent verification and continuation of psychotropic medications at intake.  Deficits in these procedures also account for the movement from partial compliance to noncompliance with two of the requirements under medication continuity.  Further clarification of the procedures and expectations of medication verification and seeking of bridging orders when outside pharmacies are closed would be useful in reaching a viable standard with which to evaluate performance in this area.

Wellpath is required to maintain adequate Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to provide all necessary medical and mental health care, and it is required that there shall be sufficient staff to ensure compliance with the Implementation Plan.  Current staffing levels do not appear adequate, and some of the performance deficits previously noted as problematic remain a concern.  One indicator of insufficient staffing is that appointments with mental health clinicians and the psychiatrist are still frequently rescheduled due to workload issues.  Further evaluation of staffing needs is necessary using local performance data and accounting for all staff responsibilities.  Stability in positions such as the Director of Nursing and the Health Services Administrator will continue to be important in providing the supervision and corrective actions needed to achieve and maintain

substantial compliance with requirements.  This should allow the Implementation Specialist to focus on the very considerable amount of work required to track and ensure compliance with Implementation Plan requirements.

Compliance findings were deferred for five requirements in the current report, all of which pertain to involuntary medications.  Wellpath again reported that there were no such instances during the current review period.  No instances of involuntary medication administration in the absence of a Court Order were identified in any of the cases reviewed for the current report.  In the absence of relevant cases to evaluate, findings for these requirements were again deferred.  A review of such instances, when they do occur, will be the basis for determining compliance with these requirements. Further clarification and updating of the requirements related to involuntary medications would be a useful.

Recent improvement has been noted in the clinical documentation by the MHPs and psychiatry, including treatment plans, assessment forms, and associated entries in the healthcare records.  My understanding is that this has been a focus for supervisory staff working with clinicians to better understand the necessary elements of good clinical documentation and to succinctly provide more relevant information in the healthcare records of patients.  More progress is needed for the documentation to be consistently compliant across staff and across patients, but change in this area is moving in the right direction.

## Recommendations

1.  <u>Staffing</u>.  This remains a fundamental area of concern.  Vacancies among the allocation positions for mental health staff are currently the two psychiatric technicians.  As noted in prior monitoring reports, substantial compliance with the Implementation Plan requirements for staffing will depend not only on filling all allocated positions, but must also involve demonstrating that staffing levels enable compliance with the remaining requirements, including those involving nursing staff.  Further analysis of staffing needs is recommended.  This analysis should be based on an empirical assessment of local work demands and data on the volume of required tasks.

2.  <u>Access to inpatient care</u>.  Adequate access is needed to higher levels of care than can be provided at MCJ.  Additional communication, coordination, and collaboration with NMC is again recommended, although the NMC admission criteria will continue to exclude some MCJ inmates who require inpatient care.  More effective interdisciplinary treatment team review and treatment planning, in combination with an early and efficient process for using involuntary medications, may also reduce the number of cases who cannot be adequately treated in the jail.

3.  <u>Verification and continuation of psychotropic medications</u>.  Continued attention is needed to ensure that medications are consistently verified and continued as required at the time of intake, including timely consultation with on-call psychiatry.  This area should remain a focus of internal auditing, with review in QM/CQI meetings and corrective action plans as needed.  Clarification of procedures and performance expectations is needed, especially when outside pharmacies are closed and cannot respond during the intake nurse's shift, which is the timeframe written into several Implementation Plan requirements.

4.  Nursing rounds.  It is again recommended that daily nursing rounds should be consistently conducted and documented in Administrative Segregation housing areas and with inmates on suicide watch as required.  This should remain an ongoing focus for internal auditing and corrective action.

5.  Mental Health screening.  Although more initial mental health screenings are being completed, it appears that until March, these were being audited with inmates referred to mental health, rather than with all inmates as required.  Wellpath notes that since March, completion of an initial Mental Health Screening is now audited for samples that included all inmates, not just those referred to mental health.  A procedure is needed to achieve compliance with this requirement will all inmates.  Please see the discussion of this item in the body of the current report, which addresses the distinction between screenings and full assessments, with implications about who can conduct such screenings to meet the intent of this requirement.

6.  Telepsychiatry and on-call psychiatry services.  The requirements as written reference a variety of standards to be met for telepsychiatry services.  An attempt was made in the current report to list these requirements and identify their source.  Clarification may be needed regarding which telepsychiatry services are covered by these requirements (e.g., the services provided through the contract with Precision Psychiatric Services, and services provided through the EASS and JBCT programs).  Internal auditing to ensure consistent compliance across the full range of requirements is recommended.

7.  Treatment planning.  Continued improvement in the documentation of treatment planning was noted in the current review, although further improvement is still needed.  This should remain a focus of internal auditing and coaching provided by the Mental Health Coordinator.  Focused interdisciplinary treatment team review and collaboration is needed, especially with the most severe and complex mental health cases, and interdisciplinary reviews should directly inform the written treatment plans.  Consistent completion of the treatment plan form, associated assessments, and sufficiently informative progress notes, combined with further development of the interdisciplinary treatment planning process, have the potential to achieve substantial compliance with requirements.

8.  Inmate discipline.  The Compliance Commander shared a new Disciplinary Action Report form and a new review process that is still under development.  Once fully implemented, this new procedure should address the performance concerns that have been noted in this and prior monitoring reports.  Documentation is needed which clearly shows that mental health staff were consulted and provided relevant input in cases of inmate discipline.

9.  Involuntary medications.  The language of the Implementation Plan requirements pertaining to involuntary medications appear to apply primarily to instances of involuntary medications administered in psychiatric emergencies.  There have been no instances of involuntary medication administration in the absence of Involuntary Medication Order from the Court during the current monitoring period.  Further clarification of the requirements is recommended in light of current procedures, such as the availability of the EASS and JBCT programs.

10.  <u>QM and CAPs</u>.  Further progress has been made with the development and implementation of an internal auditing procedure that is aligned with various requirements of the Implementation Plan.  As noted in the last monitoring report, the results of these audits should directly inform corrective action plans to address areas where performance is found to be deficient.  Initial indications of this process were found in the PowerPoint slides for the Mental Health QM Subcommittee meeting of 4/30/24.  Clearly documented follow-through for these initial corrective action plans is needed.  Effective implementation of the QM and CAP process should facilitate compliance across the full range of Implementation Plan requirements.

Respectfully submitted,

James Vess, Ph.D.                                                    July 23, 2024
Mental Health Monitor

**Appendix A:  Compliance Status of Requirements Identified in Motion to Enforce**

The following addresses the compliance status of various requirements for which noncompliance was established in the 9/26/23 Order Granting Plaintiffs' Motion to Enforce Settlement Agreement and Wellpath Implementation Plan [Dkt. No. 838 at 13 – 19], as organized and numbered in that document.  Numbers for each item correspond to the number assigned in the Court Order; preceding the compliance status is the relevant section of the current monitoring report.

1. Clinical Staffing
    Section 12*a*:  Noncompliance
    Section 12*b*:  Noncompliance
    Section 12*c*:  Noncompliance
    Section 12*d*:  Substantial Compliance
12. Initial Mental Health Screening
    Section 2*a*:  Noncompliance
13. Nursing Rounds in Administrative Segregation
    Section 21*e*:  Partial Compliance
15. Treatment Planning
    Section 18*a-c*:  Partial Compliance
16. Chronic Care
    Section 4*a*:  Noncompliance
    Section 4*b*:  Substantial Compliance
17. Acute Care
    Section 5*a*:  Noncompliance
18. Outpatient Services
    Section 6*a*:  Partial Compliance
19. Psychiatric Follow-Up Visit Intervals
    Section 2*b*:  Substantial Compliance
20. Consideration of Mental Health in Discipline
    Section 19*a*:  Noncompliance
21. Segregation Placement Screenings
    Section 21*a*:  Noncompliance
    Section 22*b*:  Partial Compliance
22. Mental Health Programming in Segregation
    Section 21*a*:  Noncompliance
23. Involuntary Medication
    Section 10*a*:  Substantial Compliance
    Section 10*b*:  Substantial Compliance
    Section 10*c*:  Substantial Compliance
    Section 10*d*:  Partial Compliance
    Section 10*e*:  Deferred
    Section 10*f*:  Deferred
    Section 10*g*:  Deferred
    Section 10*h*:  Deferred

24. <u>Suicide Risk Assessments and Safety Planning</u>
    Section 22*b*:  Partial Compliance
25. <u>Medical Records</u>
    Section 25*a*:  Partial Compliance
26. <u>Corrective Action Plans</u>
    Section 27*a*:  Partial Compliance
    Section 27*b*:  Partial Compliance
27. <u>Provider Visits to Holding and Isolation Cells</u>
    Section 3*e*:  Partial Compliance
28. <u>Mental Health Quality Assurance</u>
    Section 26*a*:  Partial Compliance
    Section 26*b*:  Deferred
    Section 26*c*:  Partial Compliance

**Appendix B: Healthcare Record Reviews for**
**Monterey County Jail Mental Health Monitoring Visit, April 2024**

Case selection:  It is important to recognize that the cases reviewed here were not selected randomly and should not be considered to provide a representative sample of the inmate population receiving mental health care at Monterey County Jail.  Inmate deaths are reviewed, even though these are rare in the jail. Cases currently reviewed also include inmates who were sent out to NMC-ER and admitted to the NMC Mental Health Unit, although such cases, too, are disproportionately few among inmates with serious mental illness.  Some cases were selected for review in response to concerns raised by the plaintiffs' attorneys, which are also not representative of all inmates receiving mental health care.  Cases are typically reviewed in depth in order to closely evaluate important elements of the mental health program in relation to Implementation Plan requirements, and for the instructional value these reviews may have in identifying opportunities for improvement in the services provided.  It is also important to note that the following cases represent only a small portion of the cases that were reviewed to determine compliance with the various Implementation Plan requirements.  As with all prior monitoring reports, additional cases were also reviewed in order to gain a broader perspective on performance for each requirement.

**Patient 1**

Inmate death: Records indicate this inmate was admitted to MCJ on 11/21/22 upon transfer from SATF state prison. He denied current or past psychiatric medication or treatment. No current signs or symptoms of mental illness or distress were noted. Medications listed at intake included Lipitor, Elavil (30 mg), Naproxen, and Buprenorphine for opiate dependence. He was placed on a COWS protocol.  It is not clear whether this relatively low dose of Elavil was prescribed in CDCR for the treatment of depression or pain.  He reported chronic back pain from a previous surgical procedure to his spine. Housing disposition at intake was GP.  Notes from a chronic care visit on 12/19/22 stated that the patient complained of sleep disturbance and anxiety, but that he had not been seen by mental health.  There was no indication in the available record that a referral to mental health was made at that time. The patient also complained at that time that he was not receiving all of the medications he had been provided in CDCR.  He was described as calm, but focused on complaints of needing more and stronger pain medications. However, he was observed to demonstrate a non-antalgic gate without grimacing and quick, smooth, independent movements through various position changes.

Staff responded to a man down emergency on 9/21/23 for a possible overdose. No pulse was palpable. The patient was administered four intranasal doses of Narcan and administered CPR. Narcan was administered IM. The patient was taken by EMT to ER for further monitoring. Subsequent urine toxicology testing was positive for fentanyl.  A physician's note of 9/26/23 indicated that the patient was educated that he had tested positive for fentanyl, and was advised that inductions for Medication – Assisted Treatment (MAT) for the treatment of opioid use disorder were not being conducted at that time.  The patient was advised to consider NA (Narcotics Anonymous) via correspondence and to speak with a social worker on arranging possible counseling for substance use disorder. It was noted that time was spent counseling the patient, advising that he would be placed on a waitlist for the MAT program, and that he would be considered to begin treatment hopefully in the near future.

A task described as a MAT referral from intake scheduled for the 11/21/22 for NP/PA sick call with a priority rating of "1" (the highest on a five point scale) was shown as created and deleted on that date without further explanation.  The chart entry indicated that this appointment was not requested by the patient.  Subsequent entries show a request for MAT medications, in which the patient reported that he was on MAT medications in prison but taken off when he came into custody in November 2022.  Chart entries stated that the patient believed he will be released soon and was worried about cravings and relapse. An MD sick call appoint was scheduled for 5/25/23 but rescheduled with no further explanation.  There were similar entries for 24 subsequently rescheduled appointments related to MAT services between 5/26/23 and 9/12/23.  No appointments addressing MAT medications or related services appear to have been completed.  A chart note dated 9/12/23 indicated that the patient was to be placed on a waitlist as the MAT program was in the early stages and not doing inductions at this time.

The first contact with mental health staff was documented in a Mental Health Sick Call note on 10/8/23. On the completed Mental Health Initial Assessment form the patient reported a history of auditory, visual, and tactile hallucinations when using methamphetamine. Risk and protective factors were assessed and the current level of risk for self-harm or suicide was estimated as low. He denied any current suicidal ideation and any previous suicide attempts. The patient was described as having pressured speech, anxious mood, and blunted affect, with appropriate thought processes and content. Worry, fidgeting, and rapid breathing were observed. The patient described personal and professional sources of support available to him, as well as plans for his future depending on whether he was released from custody or returned to prison. He was fully oriented and coherent. It was noted that the patient overdosed on substances while in custody, an apparent reference to the incident on 9/21/23.  He reported being afraid of dying and was worried about relapsing (it is assumed this is in relation to his drug use). The patient was noted to became argumentative when the clinician explained that she did not have control over who was admitted to the MAT program.  He stated that this was the first time he had ever received any type of mental health therapy. The plan was to follow up with the patient after his 11/6/23 court date, and a referral was made to a psychiatric provider.

The patient was seen by a psychiatrist on 10/16/23. The patient's history of polysubstance dependence was noted. The patient reported experiencing anxiety and insomnia for several years, but denied current depression, suicidal ideation, or hallucinations. The Psychiatric Evaluation form indicated the patient was fully oriented and cooperative. The mental status examination reported anxious mood but was otherwise negative for signs or symptoms of mental illness or distress. The Assessment of Involuntary Movement Scale (AIMS) was completed and results were negative. Diagnoses of anxiety disorder NOS and polysubstance dependence were offered, with a rule out of substance induced anxiety disorder. The psychiatrist ordered Atarax 50 mg and Zoloft 50 mg on 10/16/23; these medications were administered as ordered beginning on that date and continuing through 10/23/23.  Psychiatric follow-up was scheduled for 30 days.

An entry dated 10/16/23 indicated that a nurse sick call appointment for 10/13/23 was deleted, noting that the patient was seen by a nurse practitioner on 10/11/23, but that Subutex (a medication used for MAT) was not addressed by the nurses.

On ▮▮▮▮▮▮ a medical emergency was called at 0551 hours for the patient, who was unresponsive and not breathing.  Medical staff arrived on scene at 0553.  Deputies were already conducting CPR.  A total of six intranasal doses of Narcan were administered. Oxygen was provided for rescue breathing. The patient remained unresponsive.  It appears that staff continued CPR until paramedics arrived at approximately 0607 hours.  Documentation indicated that

paramedics did not perform CPR nor did they administer Narcan.   Declared time of death was 0608 hours. The portion of the Mortality and Morbidity Report made available for review indicated the death was unexpected and due to overdose.

Based on a review of the available records, it does not appear that this patient demonstrated acute symptoms of severe mental illness, nor was there any indication of suicidal ideation or intent. Anxiety and insomnia were reported.  His primary problem was substance use, which placed him at elevated risk for overdose and contributed to his fear of dying in relation to his worry about relapsing in his use of opioids.  A referral to mental health should have been made earlier in his jail incarceration, at least from the time of his 12/19/22 disclosure of insomnia and anxiety during a chronic care contact with nursing.

A more direct concern is the lack of treatment of his opioid use disorder.  The patient had made it clear from the time of his jail intake that he had been receiving MAT in prison, including Suboxone.  This treatment was not continued in the jail, nor were adequate alternative approaches to providing treatment for his substance use disorder provided.  He clearly expressed his fear of relapse and the possibility of dying in relation to his drug dependency.  This calls into question the adequacy of the resources available for the MAT program, and raises concerns about the adequacy of communication and coordination between the medical and mental health treatment services.

## Patient 2

This inmate's electronic healthcare record dates back to an intake screening conducted on 6/1/20, which noted self-reported learning and intellectual disabilities, including illiteracy and difficulty understanding staff.  He reported prior hospitalization related to ADHD and "retardation."  Daily methamphetamine and cannabis use were noted.  A subsequent jail intake dated 11/21/21 noted a self-reported suicide attempt during the past year which the inmate refused to discuss. The next jail intake dated 7/1/22 did not reflect these previously reported problems. In another jail intake screening dated 4/7/23 the inmate denied any current or historical mental health problems or treatment, and reported that he was able to read and write. A jail intake screening of 6/28/23 indicated that the patient was receiving Buprenorphine for Medication – Assisted Treatment for opioid use disorder in the community at the time of admission, but otherwise denied current or historical mental health problems or treatment.  The inmate was evaluated for the jail's MAT program on 7/6/23 and started on Buprenorphine.

His most recent jail intake occurred on 11/21/23.  The intake screening indicated the inmate presented as dirty/disheveled, sweating and anxious, but otherwise with appropriate behavior and clear/coherent speech.  He reported taking Abilify, an antipsychotic medication used with conditions such as bipolar disorder, major depressive disorder, and schizophrenia. Abilify, Depakote, and Buspar were among the medications ordered by the psychiatrist at the time of intake, although two different responses on the intake form appear contradictory regarding current medications.  Medications were ordered as required by the jail psychiatrist.  Daily use of fentanyl, methamphetamine, and cannabis were noted. He was noted to be experiencing withdrawal symptoms.  MAT treatment with Buprenorphine was noted, but this medication does not appear to have been verified or continued.  A Nurse Practitioner note of 11/27/23 indicated that the patient was being evaluated for request to be placed on the MAT program, but there was no recent prescription for Suboxone. Review of the MAR showed Buprenorphine prescribed and administered throughout October 2023 but not in November 2023. No further follow-up appears to be have been done at that time.

Prior mental health diagnoses of bipolar disorder and polysubstance dependence were noted.  He reported taking medications for depression and bipolar disorder.  The inmate also reported taking Divalproex, an antiseizure medication. He reported prior psychiatric hospitalization at NMC for mental health problems.  He reported earlier suicidal ideation because he did not want to return to jail.  The intake screening form indicated that an urgent referral was made to mental health, but other parts of the intake screening form indicated that routine referrals were made to mental health and psychiatry.  This may be a function of referrals automatically generated by responses to different items on the intake screening form.

This inmate has an extensive history of contacts with mental health staff while in the jail. Following his most recent intake of 11/21/23, he was seen by a mental health clinician the following day.  A Special Needs Progress Note indicated that the inmate's appearance, behavior, and thought content were appropriate.  He was coherent and fully oriented. His affect was described as flat and his memory was noted as impaired. He was scheduled for follow-up in 30 days.  He was seen by the psychiatrist on 11/28/23.  He presented with no complaints, reported good appetite and sleep.  No signs or symptoms of serious mental illness or distress were noted. Prior psychiatric medications were continued, and follow-up was scheduled for 30 days. The patient was also seen again by the clinician on this date per the patient's request; he was noted to appear stable and emotionally well-regulated.

Records indicate that this inmate was subsequently seen by a mental health clinician or psychiatrist on 40 occasions between 11/28/23 and 4/4/23, the last entry at the time of the current review. This has included several episodes of reported suicidal ideation and placement on suicide watch.  In light of the inmate's diagnoses of mild intellectual disability, chronic substance use disorder, and bipolar disorder, which contribute to his problems of emotion regulation and chronic difficulties in coping effectively with the challenges of the jail environment, the response of the mental health staff and the overall quality of the mental health care provided appears appropriate.  Sick call appointments with a mental health clinician were occasionally rescheduled, but for not more than 2-3 days, and never such that the inmate was seen within a reasonable timeframe.  However, a clinician's note of 4/9/23 indicated that there were 123 tasks to be completed that day with two clinicians on duty, which raises concerns about staffing levels in relation to workload.

Another source of concern is the lack of continuity in the inmate's treatment for his opioid use disorder.  Chart entries indicate that he was previously treated at the jail with Subutex at the time of his release in November 2023, and returned to jail within 30 days.  The inmate was seen for a MAT evaluation on 2/27/24.  The physician's note indicated The inmate reported that his last use was in November 2023, but that he did not start experiencing cravings until just prior to this MAT evaluation and did not request MAT services until this time. It was noted that the inmate was not continued on Subutex at the time of his readmission to the jail in November 2023.  It is not clear why the recent prior medications were not continued upon his readmission, or a referral made to the medical providers of the MAT program for an updated evaluation.  The inmate was begun on naltrexone (a drug used to treat opioid addiction) on 2/27/24 and counseling was provided regarding his substance use.  A physician's note of 3/25/24 indicated that the inmate had become noncompliant with naltrexone and was experiencing intense cravings.  His medication was changed to Buprenorphine at that time.  The MAT program is an important element in the treatment of mentally ill inmates with comorbid opioid use disorders. Wellpath is encouraged to examine the capacity of this program, as well as the communication and coordination of care with nursing and mental health.

**Patient 3**

Intake for this inmate occurred on 6/20/23. She was taken to NMC ER for jail check in a WRAP restraint device, although her behavior was noted as appropriate on the intake screening form. It is possible that this note about her behavior was based on observations following her return from NMC; explanation of the use of restraints was not provided in the available documentation, but it appears she was brought to the jail in restraints. She was placed on an alcohol withdrawal protocol as recommended by NMC ER. Current medications were verified and continued with the exception of a reported use of valium in the community. She denied prior treatment for mental or emotional problems. There were no current thoughts of suicide or self-harm. A routine referral was made to mental health. It should be noted that this intake occurred outside of the timeframe for the current monitoring review.

She presented with multiple physical/medical complaints. Throughout her stay at MCJ she submitted multiple requests regarding her psychotropic medications. She was seen by a mental health clinician 6/26/23, when a Mental Health Initial Assessment was completed. A psychiatry note from 7/18/23 stated that the patient was not seen as there were 179 patients on the psychiatrist's sick call list. This note stated that the patient was seen by a psychiatrist on 6/28 but no corresponding note was found in the chart. Psychiatry contact 7/27/23 says the patient was seen by another psychiatrist on 6/28 but no corresponding note was found in chart. Initial psychiatric evaluation form and AIMS form completed on 7/27/23 and the inmate's medications were increased. Follow-up scheduled for 90 days. On 8/29/23 the inmate was seen by a Psychiatric NP after she had been caught hoarding her medication, which were then ordered as crush and float. The patient was seen by a psychiatrist on 9/21/23 and 10/12/23. The patient had demanded that her medications be administered at midnight. It should again be noted that these events occurred prior to the current monitoring period, but are reviewed here to provide an understanding of this inmate's clinical presentation and overall course of care. She continued to make requests and complaints about medication adjustments throughout her period of incarceration, to which staff responded on an adequate basis. She was seen by a psychiatrist on 12/16/23, when she was described as very polite, cooperative, and articulate, with no observed or reported signs or symptoms of mental illness. This is not consistent with her subsequent complaints regarding psychiatry and her medications. She reported she was not taking her medications as prescribed at that time.

Mental health sick call follow-up appointments were rescheduled eight times from 2/11/24 – 2/18/24. The 2/18/24 note indicated 122 tasks with one clinician on duty. The inmate was seen 2/21/24 by the mental health coordinator regarding complaints about psychiatry. A follow up appointment was rescheduled 2/26/24 with note indicating 133 tasks and one clinician on duty. The inmate seen by a mental health clinician 2/27/24 and by a psychiatrist on 2/21/24 and 3/5/24, when she denied depression or anxiety, reported good sleep and appetite, no suicidal ideation, no complaints, and stated she wanted to continue current medications. This was again inconsistent with her prior and subsequent complaints. Other than the rescheduled appointments which suggest that staffing levels are not sufficient to meet demand for mental health services at MCJ, the care provided to this somewhat challenging patient appeared adequate.

**Patient 4**

This inmate has multiple admissions to MCJ dating back to at least 2018. His most recent intake was on 12/22/23 after what appears to have been a brief stay in the community

between arrests. Psychotropic medications were confirmed and orders were obtained to continue medications at the same levels as previously prescribed.  Orders were given to provide medications as crush and float due to prior hoarding of medications. The inmate was placed on a opioid withdrawal protocol due to his daily use of fentanyl and heroin. He reported that he had previously taken the MAT medication Subutex but records indicated that the last prescription was from July 2023. An evaluation by a nurse practitioner on 12/27/23 in response to a MAT referral from intake indicated that this medication was not restarted.

This inmate has an extensive history of contacts with mental health staff at MCJ dating back to at least 2018.  The patient has submitted multiple sick call requests, primarily focused on requested adjustments to his medications. Records indicate that these requests were responded to in a timely and appropriate manner.  Review of the Medication Administration Record indicated that all medications were administered as order, with the exception of on occasion when the inmate did not respond to med call and one occasion when the inmate refused his medications.  It appears that the inmate sometimes believed that his medications were not being provided at the same level as previously prescribed because of the crush and float order, which prevented him from seeing the actual pills.  Documentation of patient education on this issue may have been useful.

Contact with a mental health clinician occurred on 12/23/23. The inmate reported a history of depression, anxiety, and drug use, but no current signs or symptoms of mental illness were recorded.  A diagnosis of stimulant use disorder was noted.  A follow up period was not specified, and no further contacts with a mental health clinician were documented.  Mental health sick call appointments for a 30 day follow-up and completion of the Mental Health Initial Assessment were noted to be rescheduled 47 times between 1/20/24 and 3/12/24.  Update notes associated with these rescheduled appointments stated that the workload on these dates ranged from 58 tasks with one clinician and one escort deputy on duty up to 184 tasks and a group for two clinicians.  This suggests that current staffing resources are likely not sufficient to meet demand for mental health services.

## Patient 5

This inmate was booked into MCJ on 2/10/24.  The intake screening noted self-reported auditory and visual hallucinations, prior inpatient and outpatient treatment for mental health problems, including a recent hospitalization at the Palo Alto VA.  Diagnoses of bipolar disorder, generalized anxiety disorder, and psychosis were noted. The inmate reported a history of suicide attempts. He reported a traumatic brain injury from a military training exercise. Current psychiatric medication of Latuda was listed but not verified at intake. He reported current suicidal ideation. A jail check at NMC was conducted prior to booking, where he was cleared for jail intake with recommendations for a safety cell and to see the jail psychiatrist in the morning. At MCJ he was placed on suicide watch and an urgent referral to mental health was made. His clinical presentation at intake was otherwise described as unremarkable, with appropriate behavior and clear/coherent speech.  Medications were not verified and continued as required; the patient was evaluated by a jail psychiatrist on 2/13/24 and medications were ordered at that time.

The inmate was seen on the day of intake by a mental health clinician, when he reported that he had PTSD.  He also reported impulsive thoughts to buy a firearm or other weapon with the intent to harm a former girlfriend.  The appropriate police agency was informed of this threat. Contact was also made with staff at the VA, who reported worries that the patient may be a

danger to others if released and suggested evaluation for 5150 at the time of release from jail. The VA staff member reported that the Palo Alto VA would facilitate a transfer to their psychiatric hospital if allowed.

The clinical presentation of this inmate has been complex and challenging throughout his incarceration at NMC.  He has frequently been unwilling to engage with treatment staff, and has often been hostile and verbally abusive. He has repeatedly threatened violence toward others and has appeared preoccupied with thought of violence when released to the community. He has engaged in sexually inappropriate behavior while at the jail. He has typically refused to be evaluated and has not been compliant with prescribed psychotropic medication. He has spent most of his time on suicide watch.  He has appeared resistant to and indifferent about any treatment offered.

The inmate made what he described as a suicide attempt on 3/3/24, which appears to have consisted of a superficial wound to his neck and scratches on his hand made with a pencil during one of the periods that he was not on suicide watch. He was again placed on suicide watch, where he remained until he was apparently sent out to NMC-ER on 3/13/24, according to a brief chart entry.  Documentation from NMC for that date indicates that the patient reported he had been starving himself for five days. However, the patient requested and consumed a sandwich and over a liter of fluids while at NMC. He was described as not having psychosis or suicidal ideation, and returned to jail.  NMC notes indicated that the patient was considered for admission but had stable vital signs and no complaints at that time.  Chart entries by mental health staff make brief mention of this send out but offer no other indication of communication or coordination between NMC and MCJ treatment staff. The inmate was again placed on suicide watch following his return from NMC.

The inmate remained on suicide watch until 4/1/24, when he was again sent out to NMC-ER for evaluation.  He had declined any attempts to engage in treatment interventions and remained medication noncompliant.  He remained either indifferent or hostile and repeatedly threatened violence.  During transport to NMC it was noted that the inmate appeared to have lost weight and was visibly weak.  It had been noted that he sometimes went for significant periods without moving about his cell and was not eating the food provided. The available documentation from NMC regarding this visit was limited to the mostly generic information provided to the patient at the time of discharge.  It noted that the patient cooperated with medical questioning and had no acute medical complaints.  It noted that the patient will require ongoing psychiatric evaluation while in the jail and must continue in a safety cell with suicide precautions. It was recommended that the patient be evaluated by the jail psychiatrist in one to two days. The patient's weight, vital signs, or any lab values were not reported in the available documentation.  The inmate was maintained on staggered suicide watch following return from NMC.  The NMC-ER visit was mentioned in a chart entry of 4/2/24, but there was little to indicate that it was useful or informative in the treatment or management of the patient.

The inmate remained on staggered suicide watch until 4/10/24.  He was placed back on suicide watch 4/12/24, when he said he needed to get out of his housing unit and go to a "suicide cell."  This suicide watch appears to have ended 4/13/24, although the inmate continued to be housed in receiving after refusing housing elsewhere.  Chart notes of 4/15/24 indicated that the patient did not meet criteria for grave disability, although notes from 4/16/24 may reflect delusional beliefs.  Notes from 4/17/24 indicated the inmate had been found competent, which suggests that competency to stand trial had been evaluated, although no documentation about

that was located in the healthcare record.  His condition appears somewhat improved since that time, with better attention to his hygiene, although his mood and hostility remain variable.

This inmate presents a complex in terms of diagnoses and appropriate treatment approaches.  Besides his self-report of bipolar disorder, He reported PTSD and a traumatic brain injury while in the military.  He has also periodically reported to jail staff that he is transgender, although there is no further evidence of this.  His mother reported to a mental health clinician that he functioned at a very high level prior to a car accident at age 16 from which he had also suffered a head injury resulting in profound changes in his behavior and personality.  She also reported his use of methamphetamine and resulting problems, including inappropriate sexual behavior.  Jail mental health staff also diagnosed antisocial personality disorder, based on diagnostic criteria including impulsivity, recklessness, high risk behaviors including sexual behavior, emotional detachment and empathy deficits.  It is not clear that the inmate has a history of the juvenile offending or severe behavioral problems necessary for a diagnosis of antisocial personality disorder, but it seems clear that he displays several antisocial traits.  Whether these traits may have their etiology in his traumatic brain injuries remains open to speculation.

Unfortunately, there is currently no empirically validated treatment for antisocial personality disorder.  If this inmate's behaviors are in part the result of traumatic brain injuries, this also limits effective modes of treatment.  If most or all of the elements mentioned in the healthcare record are present, including bipolar disorder, PTSD, traumatic brain injury, antisocial personality disorder, and methamphetamine use, effective treatment will be particularly challenging, especially in a jail environment. Given these challenges, the care provided to this inmate has largely been adequate, and it is clear that staff have made a consistent effort to engage the inmate and address his needs, despite his consistent hostility and verbal threats.

There are, however, areas of concern and opportunities for improvement in the face of such challenging cases.  One area is treatment planning; there was a Mental Health Treatment Plan form completed on 3/4/23, which consisted of a series of checkboxes for problems, goals, and interventions, and listed diagnoses of PTSD and antisocial personality disorder.  There was no additional narrative information regarding the unique set of symptoms, traits, and behaviors that make up the patient's clinical presentation and the associated challenges of treating him effectively.  There is substantial information contained in the numerous sick call entries, but none of these tie together directly with the treatment plan.  A potentially crucial clinical factor is this inmate's reported history of traumatic brain injury, which may significantly complicate the clinical formulation and treatment.  Information on this factor is limited due in part to the inmate's refusal to sign a release of information for his treatment at the Palo Alto VA, where important information may be available.

There were chart notes for treatment team meetings on 3/18/24, 3/20/24, 3/27/24, 4/3/24, and 4/10/24 indicated that this patient was discussed.  It is a significant step forward that patients such as this are now reviewed by a multidisciplinary team.  The chart note of 4/10/24 was particularly useful in that it listed triggers, coping skills, supports, reasons for living, recent actions taken by staff, and possible interventions.  My concern is that this important information is not otherwise linked to the written treatment plan.  It is not clear how effectively the information in the chart note is communicated to staff who would need to be aware in order to better treat or manage this patient.  One option may be to update the written treatment plan in light of this more recent and more specific information as needed.

Another area for improvement is in the communication and coordination of care both within MCJ and between MCJ and NMC.  During periods when the patient appeared physically

inactive and was refusing to eat or drink, there should have been more explicit documented communication between nursing, medical, and mental health staff.  It appears that there was a brief period starting on 4/10/24 when weekly weights were to be taken, but this was after a documented loss of close to 30 pounds over a two month period, and the inmate's earlier stated intention to starve himself to death. Entries for input/output monitoring were recorded on 4/14/14 and 4/14/24, but no other documentation regarding weight or food and fluid intake were found in the healthcare record. Information from the patient's NMC evals were not clearly integrated in the MCJ clinical documentation or treatment planning, although admittedly the recommendations made by NMC were not particularly useful. Documentation from the 4/1/24 NMC-ER visit did not appear to be complete in the NMC healthcare record; it is assumed that there was more NMC documentation than largely generic form released with the patient, although perhaps there was not.

This case also reflects the challenges of addressing the Implementation Plan requirements under Acute and Chronic Care regarding access to inpatient care.  The need for inpatient care for this patient is somewhat ambiguous.  His diagnostic profile is unclear, given the range of potential factors that may influence his clinical presentation.  The presence or severity of psychotic symptoms appears to vary; both evaluations at NMC reported no psychotic symptoms, although various notes by MCJ clinicians indicate possible delusions.  The role of traumatic brain injury and likely personality disorder (or at least prominent antisocial features) are unclear. Of more immediate concern are the periods of reduced physical activity and food or fluid intake, with significant weight loss, to the extent that these may have jeopardized his health and well-being.  It does not appear that these concerns reached life-threatening levels, but better communication, coordination, and follow-up were needed.  The patient was consistently noncompliant with prescribed medications, but he did not appear to be severely psychotic to the extent that involuntary medications were indicated. Some of his lack of self-care may have been related to depression.  This does not appear to have been explored in depth, but the patient was consistently unwilling to engage with treatment staff and resisted all attempts to provide care. Again, involuntary medications were likely not justified.  Although the patient was not admitted to inpatient care while incarcerated at MCJ, there is a plan to pursue a 5150 evaluation at the time of his release, at which point admission to the Palo Alto VA inpatient psychiatric program may be justified.

## Patient 6

This inmate was booked into MCJ on 2/24/24.  An initial nursing entry indicated that the inmate was too emotional to complete the intake questions, but the intake screening was completed later that day. Her presentation on the intake screening was noted as unremarkable, with appropriate behavior and clear/coherent speech.  She reported taking Abilify, with Seroquel as a PRN for bipolar disorder, and had been off her medications for three days. She provided the name of the pharmacy she used and the name of her mental health provider.  It appears that the medications were not verified nor was a physician's order sought or received at the time of admission, although a release of information was obtained and pharmacy records were requested. Psychotropic medication administration began at MCJ on 2/26/24 by order of a jail psychiatrist.

The inmate was seen by a mental health clinician on the day of intake, when she reported a history of suicide attempts but denied current suicidal ideation. The inmate's clinical presentation was described as agitated about being in custody but otherwise free of current signs or symptoms of mental illness.  The inmate was seen by a jail psychiatrist on 2/26/24, who

described her at that time as very polite and cooperative, with no formal psychotic thought disorder or other active mental health symptoms. Follow-up was scheduled in four days, but this appointment was rescheduled twice and completed on 3/6/24. At that time the inmate was observed to be standing on the cell bench naked, agitated, and responding to internal stimuli. She was unable to engage with the mental health clinician. The clinician requested an evaluation by the jail psychiatrist, who responded quickly to assess the patient and decided to send her out to NMC for crisis evaluation.

Documentation from the NMC-ER appear to indicate that the patient was assessed via telepsychiatry for grave disability. The On Duty note states that the patient needed multiple IM medication administrations and required several custody staff to control her. The plan was to re-consult psychiatry in the morning. Additional documentation appears to indicate that the patient was admitted to the NMC-MHU for inpatient treatment under PC5150. A petition for a capacity hearing was filed on 3/6/24 and the hearing was held on 3/7/24. The declaration and petition form filed electronically with the Superior Court of Monterey County was straightforward and could be quickly completed. The capacity hearing determined that the patient lacked capacity to give informed consent to medication and could be required to accept medication. The capacity hearing decision noted that the order shall remain in effect until the patient's capacity is restored of until the patient is no longer receiving psychiatric treatment pursuant to California Welfare & Institutions Code sections 5150 or 5250. It also noted that the order will be terminated by transfer of the patient to voluntary status or to treatment pursuant to California W&I Code sections 5260 or 5270.15. A psychiatric follow-up note from NMC dated 5/8/24 stated that the treating physician had spoken with the Patient Advocate, who indicated that the Reise (Incapacity Hearing) would not be upheld in jail.

There is a lack of continuity of care reflected in the clinical documentation following the patient's return to MCJ. There is no reference to the inpatient treatment or the capacity hearing in the initial contact with a mental health clinician following her brief inpatient treatment at NMC beyond noting that she had been sent to NMC for crisis evaluation on 3/6/24. A follow-up appointment was set for 30 days, which is too long to wait following an intense episode such as this patient had just experienced. No specific treatment or supportive interventions were noted. It was as if this were the initial mental health contact with this patient. A referral was made to psychiatry, who saw the patient on 3/12/24. The patient reported feeling better. Her medications were adjusted. The patient was released from jail on 3/19/24.

This case illustrates some of the benefits of even short term inpatient treatment when necessary, and may provide insights into the effective treatment of similar patients. A petition for a capacity hearing was quickly filed and the hearing conducted the next day. Involuntary medications were administered which stabilized the patient and allowed for her prompt return to MCJ, where she remained stable until her release approximately two week later. Notwithstanding the limitations of the communication and coordination of care between NMC and MCJ noted in this and other cases reviewed, this appears to have been a successful intervention for this patient. It is recognized that not all patients will respond as quickly and effectively as this one, and will require longer term treatment at a higher level of care than can be provided at the jail. It also appears that the Involuntary Medication Order provided for under PC 5150 at NMC does not transfer following the patient's return to MCJ. Further exploration is recommended of the use of PC 2603 and the associated procedures required to quickly and efficient provide involuntary medications at the jail when this may represent the most effective treatment approach with

patients who are gravely disabled, a danger to self, or a danger to others and who lack the capacity to consent to necessary medications.

## Patient 7

This inmate was booked into MCJ on 2/18/24.  The intake screening noted that his presentation was unremarkable, with appropriate behavior and clear/coherent speech.  He reported a mental health diagnosis of schizophrenia, with prior psychiatric hospitalization. He reported taking or being prescribed current psychotropic medications, but these were not identified in on the intake screening form.  On the Nurse Evaluation of Suicidal Inmate form completed at the time of intake, it was noted that the inmate reported he was prescribed the mediation Adventa at the San Leandro Psychiatric Ward.  An initial psychiatry order was found for 2/21/24, but no medications were ordered; the order called for referral to a mental health professional for risk assessment and follow-up PRN.  A subsequent psychiatrist's order for Zyprexa was dated 2/26/27 after notification by mental health clinicians that the inmate had previously been on medications.  The MAR indicates that psychiatric medications were started at MCJ on 2/27/24. After receiving the first dose, there were three consecutive medication refusals.  A sick call entry by a mental health clinician dated 2/29/24 noted that the inmate was not medication compliant and created a psychiatry sick call appointment.  It does not appear from the available documentation that the three consecutive medication refusals were noted by nursing and reported to the psychiatrist.

At the time of intake, he reported current suicidal ideation.  An urgent referral to mental health was made.  The inmate was seen by a mental health clinician on 2/19/24.  He reported that he had been prescribed Zyprexa.  Although the inmate's cognition appeared impaired, with slow responses, speaking in sentence fragments and loose associations, possibly responding to internal stimuli, he denied any history of suicidal ideation and stated he was not currently suicidal.  He did not remember making suicidal statements at intake.  He completed a collaborative safety plan.  He was released from suicide watch and scheduled for follow-up the next day per protocol.  A referral to psychiatry was made.

Nursing entries later on 2/19/24 indicate that the inmate ingested approximately two cups of disinfectant neutral cleaning solution.  He was sent out to NMC-ER for evaluation per poison control protocol.  He was medically cleared and returned to MCJ with recommendations for a safety cell and to be rechecked by the jail psychiatrist.  In retrospect, the decision to remove the inmate from suicide watch in light of his inconsistent answers during intake and the subsequent evaluation, in combination with his signs of cognitive impairment and possible active symptoms of psychosis, appears clinically questionable.

Upon his return from the NMC evaluation, the inmate was placed on staggered suicide watch.  He remained actively symptomatic, appearing to respond to internal stimuli and engaging in odd behaviors. He minimized his apparent suicide attempt with the cleaning fluid and could provide no rational explanation of that incident.  The inmate remained on suicide watch until 2/29/24, when after consultation with the jail psychiatrist, he was again sent out to NMC for crisis evaluation, apparently in response to his lack of clinical improvement and the duration of his placement on suicide watch.

On this occasion the inmate was admitted to NMC-MHU on 2/29/24 and released back to MCJ on 3/1/24 (although part of the NMC documentation also lists a date of admission as 3/1/24).  The NMC documentation listed psychosis as the reason for the visit and provided a diagnosis of unspecified adjustment disorder.  The NMC documentation available in the MCJ

healthcare record did not include a discharge summary, there was no information about the course of treatment provided at the hospital beyond "Individual Therapy, Occupational Therapy." The recommended treatment to minimize future hospitalization was "Individual Therapy."

Upon his return from this brief NMC-MHU admission, the inmate was again placed on staggered suicide watch. Mental health clinician notes indicate that he remained actively psychotic, but he consistently denied suicidal ideation or intent; he was reported to have engaged in safety planning but the specifics of the safety plan were not listed. He was released from suicide watch on 3/3/24 with follow-up the next day per protocol. A Mental Health Treatment Plan for Non-Acute Patients was completed on 3/4/25. It is preliminary in nature, as the patient was too psychotic to meaningfully participate, with flat affect, lack of insight, poverty of thought, loose associations, possibly responding to internal stimuli. In light of the patient's condition and the additional information provided in the Mental Health Initial Special Needs Assessment and the Mental Health Initial Assessment, treatment planning documentation is considered adequate for that point in time. Of concern, however, is the date provided for the next update of the treatment plan, listed as 3/4/25. A year is far too long to schedule an update of the mental health treatment plan in cases such as this.

By 3/9/24 the inmate's condition had started to improve. He was noted to be partially medication compliant. He was seen by the psychiatrist on 3/12/24. Weight and recent vital signs were noted. Partial medication compliance was noted and the patient encouraged to take medications as prescribed. On 3/16/24 the patient appeared sufficiently stable to schedule a follow-up appointment with a mental health clinician in three weeks, to include a medication compliance check. He was seen again by psychiatry on 3/28/24 after the patient was found cheeking his medications. An order for crush and float was given. Weight and recent vital signs were again noted. The patient denied depression, anxiety, or hallucinations. Sleep and appetite were good.

He was seen again by psychiatry and a mental health clinician again on 4/24/24 after notification by custody that the inmate was running around the dorm yelling that he wanted to hurt others. He was reported to be in a safety cell after becoming aggressive with custody staff. Upon approach, the inmate was described as sitting down and calm, reporting that he had an anxiety attack which made him paranoid. An updated treatment plan was completed, mitigating the concern raised above regarding the need for more frequent review of treatment plans. In combination with the information contained in a Mental Health Special Needs Progress Note of the same date, the treatment planning documentation is considered adequate. Further brief description of the anxiety management techniques that were discussed would have strengthened the treatment planning documentation.

Most of the responses by mental health staff in this case were appropriate to the patient's clinical presentation. Treatment planning documentation and psychiatry notes were improved in comparison to prior monitoring reviews. My review identified opportunities for improvement in the verification and continuation of medications at intake, and the clinical reasoning about the discontinuation of suicide watch just before the inmate ingested cleaning fluid. Review of the minutes from March and April for the weekly mental health treatment meeting do not reflect that this patient was discussed, although he appears to be a prime candidate for such meetings. It was also noted that there were minutes for two meetings in March and two meetings in April; it is assumed that there were no other meetings, and that the meeting actually occurs twice per month.

The inmate was appropriately referred to NMC based on his clinical condition. On the occasion that immediately followed his ingestion of cleaning fluid, which may have been a suicide attempt (his subsequent accounts of the incident were inconsistent and he was persistently psychotic), he was medically cleared and returned to jail.  When he was subsequently referred to NMC due to his lack of improvement and the duration of his placement on suicide watch, he was admitted to the NMC inpatient psychiatry unit for a brief stay.  It is not clear from the available documentation why the inmate was admitted on one occasion but not the other.  Discharge documentation did not contain much information regarding the findings of the NMC evaluations, the course of care provided, or useful recommendations regarding the continuation of care following his return to jail  These represent further opportunities for improvement in communication and coordination between NMC and MCJ.  It is noted that MCJ does not have control and perhaps has little influence regarding decisions and procedures at NMC; according to discussions with MCJ staff familiar with the situation, this is an issue of long standing, dating back to the 1970's.