1  SUSAN K. BLITCH – 187761
   County Counsel
2  ELLEN S. LYONS – 136011
   Deputy County Counsel
3  TUCKER WISDOM-STACK – 300927
   Deputy County Counsel
4  COUNTY OF MONTEREY,
   OFFICE OF THE COUNTY COUNSEL
5  168 West Alisal Street, Third Floor
   Salinas, California  93901
6  Telephone:    (831) 755-5045
   Facsimile:     (831) 755-5283
7  Email:          LyonsE@co.monterey.ca.us
                   Wisdom-StackTN@co.monterey.ca.us
8
   Attorneys for Defendant
9  COUNTY OF MONTEREY and
   MONTEREY COUNTY SHERRIFF'S OFFICE
10

11 LINDSEY M. ROMANO – 337600
   ALLISON J. BECKER – *pro hac vice*
12 GORDON REES SCULLY MANSUKHANI, LLP
   315 Pacific Avenue
13 San Francisco, California  94111
   Telephone:    (415) 875-4126
14 Facsimile:     (415) 986-8054
   Email:          lromano@grsm.com
15                 abecker@grsm.com

16 Attorneys for Defendant
   WELLPATH, INC.
17
    (*counsel continued on following page*)
18

19               UNITED STATES DISTRICT COURT

20            NORTHERN DISTRICT OF CALIFORNIA

21 JESSE HERNANDEZ et al., on behalf of          Case No. 5:13-cv-02354-BLF
   themselves and all others similarly situated,
22                                               **JOINT STATUS REPORT**
                   Plaintiffs,
23                                               Date:    August 1, 2024
           v.                                    Time:    11:00 a.m.
24
   COUNTY OF MONTEREY; MONTEREY                  Judge:   Beth Labson Freeman
25 COUNTY SHERRIFF'S OFFICE;
   CALIFORNIA FORENSIC MEDICAL
26 GROUP, INCORPORATED., a California
   corporation; and DOES 1 to 20, inclusive,
27
                   Defendants.
28

1   (*counsel continued from preceding page*)

2

3   MICHAEL W. BIEN – 096891              AVRAM D. FREY
    ERNEST GALVAN – 196065               (*admitted pro hac vice*)
    VAN SWEARINGEN – 259809              AMERICAN CIVIL LIBERTIES UNION
4   CAROLINE E. JACKSON – 329980         FOUNDATION OF NORTHERN
    MAYA E. CAMPBELL – 345180            CALIFORNIA, INC.
5   ROSEN BIEN                           39 Drumm Street
    GALVAN & GRUNFELD LLP                San Francisco, California  94111-4805
6   101 Mission Street, Sixth Floor      Telephone:   (415) 621-2493
    San Francisco, California  94105-1738 Facsimile:   (415) 255-8437
7   Telephone:   (415) 433-6830          Email:       afrey@aclunc.org
    Facsimile:   (415) 433-7104
8   Email:       mbien@rbgg.com
                 egalvan@rbgg.com
9                vswearingen@rbgg.com
                 cjackson@rbgg.com
10               mcampbell@rbgg.com

11  CORENE KENDRICK – 226642
    KYLE VIRGIEN – 278747
12  ACLU NATIONAL PRISON PROJECT
    425 California St., Ste. 700
13  San Francisco, CA 94104
    Telephone:   (202) 393-4930
14  Facsimile:   (202) 393-4931
    Email:       ckendrick@aclu.org
15               kvirgien@aclu.org

16

17

    Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

1    The parties submit the following joint statement in anticipation of the Status

2 Conference currently set for August 1, 2024:

3    Since the March 28, 2024 status conference (Dkt. 866), the Court-appointed neutral

4 monitors have done the following:

5 • Medical monitor Dr. Bruce Barnett, M.D., J.D., has submitted the 16th neutral

6    monitor medical monitor report, covering the time period January through March

7    2024.  This report has been filed with the Court as Dkt. No. 882.

8 • Mental health monitor Dr. James Vess, PhD., has submitted the 12th neutral monitor

9    mental health report, covering the time period November 2023 through April 15,

10    2024.  The parties received the report on July 23, 2024, and are currently preparing

11    the report for filing on the ECF docket.

12 • Dental monitor Dr. Viviane Winthrop, D.D.S., has submitted a draft 11th neutral

13    monitor dental report, covering the time period July 2023 through March 2024.  The

14    parties have each provided comments on the report.  The parties expect to receive

15    the final report on or about July 25, 2024.

16    Dr. Barnett's and Dr. Vess's findings are set forth in a chart, included as **Exhibit A**.

17 The parties will provide updated information regarding Dr. Winthrop's findings once she

18 submits the final report.

19 **I.    Plaintiffs' Statement**

20    **A.    Introduction**

21    Over eight years after the Court-ordered remedial plans ("Implementation Plans"),

22 *see* Dkt. 549, Wellpath remains out of compliance[1] with the vast majority of

---

[1]  The Settlement Agreement defines substantial compliance as:

> [A]dherence to the requirements of the Settlement Agreement and the Implementation Plans in all material respects, recognizing that 100% compliance is not required.  Non-systemic deviations from the requirements of the Settlement Agreement and the Implementation Plans shall not prevent a finding of substantial compliance, provided that the Defendants demonstrate that they have (a) implemented a system for tracking compliance, where appropriate and practical, and for taking corrective measures in response to instances of non-compliance, and (b) that Defendants have instituted policies, procedures, practices, and resources that are capable of durable and sustained

1   Implementation Plan and Settlement Agreement requirements.  Despite Wellpath's

2   assertion at the August 24, 2024 hearing on Plaintiffs' enforcement motion that "there has

3   been substantial improvement" (Tr. at 15:1-2), the medical monitor has found Wellpath to

4   be in substantial compliance with just one of the eleven areas of non-compliance identified

5   in the Enforcement Order that he monitors.  *See* **Exhibit A**, p.1.  Dr. Vess found Wellpath

6   to be in substantial compliance with just one of the seventeen areas identified in the

7   Enforcement Order that he monitors.  *See id.*, pp. 2-3.  Dr. Winthrop's draft report

8   currently finds Wellpath to be in substantial compliance with just two of the seventeen

9   areas she monitors.  Assuming Dr. Winthrop's final report contains similar findings as her

10  draft report, the monitors will have found Defendants in substantial compliance with just

11  four of the 43 areas in the Court's Enforcement Order.

12         Wellpath continues to jeopardize the health and wellbeing of the thousands of

13  people who are incarcerated in the Monterey County Jail every year.  For example,

14  immediately following this Court's Enforcement Order, Wellpath suspended the routine

15  14-day medical exams designed to identify medical, mental health and dental needs, and

16  did not reinstate them until April 2024.  During the same period, nurse evaluations

17  performed at intake remained inadequate, and Wellpath failed to develop a procedure to

18

---

19         compliance.  Substantial compliance shall be assessed by the subject-area
20         monitors and shall govern all requirements for the Settlement Agreement and
       Implementation Plans.

21  Dkt. No. 494 ¶ 10.  The Court's September 26, 2023 Order finding Defendants in civil
   contempt, Dkt. No. 838 ("Enforcement Order"), required Wellpath to come "into
22  substantial compliance with each and every one of requirements 1-13 and 15-44" within
   six months.  *Id.* at ECF p. 26.  Since then, Dr. Barnett and Dr. Vess implemented a "partial
23  compliance" rating at Wellpath's request.  Dr. Barnett uses "partial compliance" to
   indicate that Defendants "approached but were not yet substantially compliant."  *See* Dkt.
24  No. 882 at 17 n.7.  Dr. Vess awarded a "partial compliance" rating based on "indications
   of progress, observed compliance with some but not all of the components of a given
25  requirement, the proportion of cases reviewed that demonstrated compliance with some or
   all of the components of a requirement, and the severity or risk involved in instances of
26  failure to meet the various components of a requirement."  *See* 12th Mental Health
   Monitoring Report at 2 (to be filed no later than July 30, 2024).  Because partial
27  compliance does not amount to substantial compliance under the Settlement Agreement
   and the Enforcement Order, partial compliance findings warrant the imposition of civil
28  contempt fines as do noncompliance findings.

screen all patients for mental health needs within their first 14 days, as the Implementation Plan requires.  As a result, Wellpath failed to identify the chronic and urgent needs of an untold number of incarcerated people, many of whom went without care; those who requested it often faced long waits and received inadequate care once seen.

### B.    Medical Monitor Findings

Medical care at the Jail remains woefully inadequate.  Dr. Barnett concluded that Wellpath failed to obtain substantial compliance in every area of patient care that he monitors, with the exception of pharmaceutical services.  *See* Dkt. No. 882 at 11-16.  In his review of 30 patients' care, he found that 22 people—or 73%—received inadequate care.  Medical Report, Dkt. No. 882 at ECF p. 27.  For the monitoring period ending in March 2024, Dr. Barnett found, among other things, that:

- Medical care did not consistently comport with community standards.
- Patients were not timely screened for sexually transmitted diseases, including HIV, HCV, Hepatitis B and syphilis.
- Patients who tested positive for latent TB infection did not receive counseling.
- Lab tests were not performed weeks after being ordered (especially screens for sexually transmitted diseases and tuberculosis).
- Sick call visits were not timely and were often incomplete.
- Nurses did not consistently follow applicable protocols.
- Many sick call visits were conducted via telehealth, and did not include necessary physical exams.
- Visits to patients housed in segregation were often cursory and insufficient to assess medical condition.
- In person visits and treatment plans required by the IP for chronic care patients were delayed or not performed.
- The medical director did not consistently oversee care for the most complex patients.

- Staff was not sufficient to provide necessary medical services in February and March.

- Some specialty services were seriously delayed or unavailable.

- Wellpath has not instituted corrective actions that adequately addressed delays in STD testing, counseling for latent tuberculosis, timely access to care, nurse education, and discharge planning.

- Wellpath did not provide full death reviews and autopsy for Dr. Barnett's review.

*See id.* at ECF pp. 10-16.

    **C.**    **Mental Health Monitor Findings**

      Dr. Vess likewise found widespread non-compliance or partial compliance (indicating compliance with some but not all of Implementation Plan requirements, *see supra*, n.1).  For the monitoring period ending in March 2024, Dr. Vess's final report found, among other things, that:

- Staffing levels were insufficient to meet the Jail's needs, affecting many areas of care, including initial mental health screenings, consideration of mental health in discipline, mental health and suicidality screenings of individuals placed in segregation, and treatment planning (12th Mental Health Monitoring Report ("Report") at 39-40).

- Incarcerated persons did not routinely receive a mental health screening within their first fourteen days of incarceration (Report at 11-12).

- Patients requesting sick call visits are not timely seen (Report at 14).

- There were no instances of mental health staff screening patients placed in segregation for mental illness and suicidality (Report at 48-49).

- No records reflected the consideration of mental health in discipline, even for patients who were actively symptomatic at the time of the disciplinary incident (Report at 48).

- Patients were not timely continued on psychiatric medications they had been

prescribed in the community (Report at 30).

- Patients with chronic conditions as well as those with acute needs beyond what could be managed onsite were not transferred to an appropriate off-site treatment facility (Report at 17, 21).

- Wellpath did not consistently develop treatment plans for patients who require them, and the treatment plans they develop were often incomplete (Report at 45-46).

**D.     Dental Monitor Draft Findings**

In her draft dental report, Dr. Winthrop found Wellpath out of compliance in all but two of the seventeen areas she monitors:

| No. | Requirement | 11th Dental Monitor Report (preliminary) |
|---|---|---|
| 1 | Medical, Mental Health, and Dental Staffing | Partial Compliance |
| 29 | Dental Intake Screening | Partial Compliance |
| 30 | Initial Health Inventory | Non-Compliance |
| 31 | Dental Training for Intake Staff | Partial Compliance |
| 32 | Treatment for Urgent and Emergent Conditions | Partial Compliance |
| 33 | Dental Sick Call | Non-Compliance |
| 34 | Chronic Care | Partial Compliance |
| 35 | Comprehensive Care | Partial Compliance |
| 36 | Restorative and Palliative Care | Partial Compliance |
| 37 | Extractions | Substantial Compliance |
| 38 | Specialty Care Referrals | Partial Compliance |

| 39 | Endodontics | Partial Compliance |
| 40 | Periodontics | Partial Compliance |
| 41 | Informed Consent | Partial Compliance |
| 42 | Sanitary Treatment Space | Substantial Compliance |
| 43 | Electronic Medical Records | Partial Compliance |
| 44 | Dental Quality Assurance | Partial Compliance |

### E.    Wellpath's Concerns re Monitor Reports

Neutral monitors selected by the parties and appointed by the Court to determine substantial compliance have been evaluating Wellpath's compliance with the Settlement Agreement and Implementation Plans for almost eight years. For the first seven years, Wellpath accepted the neutral monitors' findings. Indeed, Wellpath's Opposition to Plaintiffs' Motion to Enforce (Dkt. 788) acknowledged that "Drs. Barnett, Vess, and Winthrop are proactively working with Wellpath's clinical and supervisory staff, through enhanced monitoring and mentoring, to identify what specifically needs to be done for Wellpath to achieve substantial compliance with the IP." Dkt. No. 790 at ECF 13. At oral argument on Plaintiffs' Enforcement motion, Wellpath's counsel told the Court that Wellpath's evidence of compliance was the neutral monitor reports themselves: "[T]he evidence that I can provide to you is based on the neutral monitors that the Court has approved…. That's the kind of evidence that [Wellpath] can use to show the Court that there is substantial compliance with a number of the issues that are at play here." August 24, 2023 Tr. at 16:4-12.

It was only after the Court's Enforcement Order finding Wellpath in civil contempt that Wellpath began questioning the neutral monitors' methodology and scoring. Since the Court's September 26, 2023 Enforcement Order, Wellpath has mounted a campaign challenging each of the neutral monitor's methodological approaches. At Wellpath's request, Plaintiffs' counsel and the neutral monitors have participated over the course of

1   months in many emails, letters, and Zoom meetings addressing Wellpath's inchoate attacks

2   on the monitors' methodology and scoring.  Wellpath has urged the neutral monitors to

3   make changes, and Plaintiffs have responded with their perspectives.  In addition,

4   Plaintiffs and Wellpath have, pursuant to the process outlined in Settlement Agreement

5   paragraph 40(e), provided written responses to the monitors' Draft reports as well as to

6   each others' written responses to the Draft reports.  The monitors—selected by the parties

7   and appointed by the Court for their knowledge, experience, and skills—have considered

8   *all* of the parties' arguments about their methodology and subsequently finalized their

9   reports (Dr. Winthrop's report is in the finalization process now).  Plaintiffs do not agree to

10  delay Wellpath's OSC briefing, to delay these proceedings, or to have Judge Cousins "help

11  narrow disputes before they come back before this Court for any hearing."  *See infra* at 11.

12  The Settlement Agreement and Order Appointing Monitors (Dkt. 563) are crystal clear that

13  the monitors are responsible for assessing substantial compliance.  Wellpath has had ample

14  opportunity to convince the monitors to change their methodology; the fact that the

15  monitors may not agree with Wellpath is not reason for further delay.

16          Wellpath also argues that the neutral monitor reports are unreliable because they

17  include an "improper lookback period," suggesting that the reports rely on stale data.  This

18  is, of course, a recycling of the same argument that Wellpath presented in its Opposition

19  briefing and argument—and that the Court rejected.  *See* Enforcement Order at ECF 6

20  ("Wellpath nonetheless urges the Court to disregard Plaintiffs' evidence, arguing that the

21  neutral monitor reports and mentoring reports submitted by Plaintiffs are so outdated as to

22  be 'antiquated.'…  The Court finds Wellpath's request to be not only frivolous, but also

23  offensive.").  The Court should disregard this argument, as Wellpath (along with Plaintiffs)

24  specifically agreed "that the neutral monitors for medical care, mental health care, and

25  dental care shall each schedule a site audit to occur at the end of the six-month period (on

26  or after March 25, 2024) to evaluate Wellpath's progress on achieving substantial

27  compliance with the forty-three requirements."  January 9, 2024 JSR, Dkt. 851 at 3.

28  Pursuant to that request, the Court ordered the monitors to conduct their site visits on

1   specific days in March and April 2024, and to produce their final reports as currently

2   scheduled.  *Id.* at 5-6.  That is exactly what the monitors have done in evaluating

3   substantial compliance in their most recent reports.

4        **F.**     **Next Steps**

5        The Enforcement Order requires Wellpath to show cause in writing within ten days

6   after issuance of Dr. Winthrop's final report why Wellpath should not be required to pay

7   civil contempt fines.  Dkt. 838 at ECF p. 27.  Assuming Dr. Winthrop's final report is

8   submitted on July 25, 2024, Wellpath's show cause briefing will be due August 4, 2024.

9   In the event that Wellpath's show cause briefing raises disputable issues of fact, Plaintiffs

10  will respectfully request that this Court (1) allow Plaintiffs an opportunity for expedited

11  written and deposition discovery, and (2) set a date as soon as possible for an evidentiary

12  hearing.

13  **II.**     **Defendants' Statement**

14       **A. Introduction**

15

16       Since September 2023, CFMG has been working diligently to come into substantial

17  compliance. In fact, there have been no in custody deaths at the MCJ in 2024. CFMG has

18  made significant strides towards compliance, specifically in staffing, intake, and training.

19  However, after reviewing the last two sets of monitor reports in detail, CFMG has global

20  and specific concerns regarding the monitor process, including methodology and scoring—

21

22  each of which call into question the reliability and accuracy of the monitor reports. These

23  methods have remained in place over the Defendants' express objections and requests for

24  reconsideration. Importantly, the findings of compliance described in the reports are not

25  based on the level of compliance at the end of March 2024, after the purge period. Instead,

26  the findings are based on a review over several months, some which reflect information

27  and findings from care provided *before* the Court's September 2023 order. This

28

information does not comply with the court's September 2023 Order, mischaracterizes compliance, and does not provide the Court with actionable information.

Notwithstanding these general concerns, each of the monitors has also acknowledged measured improvement by CFMG during the purge period in many areas. While CFMG expects to dispute many findings in the reports, CFMG will not dispute *all* findings by the monitors and believes that a resolution can be developed through the use of a settlement negotiation to determine the applicability and amount of any sanctions, how those sanctions might be used to further improve the delivery of care, whether disputes can be narrowed before being brought back before this Court, and what issues to prioritize for system improvement in the future.

**B. Plaintiffs' Request to Place Draft Findings from Monitor Reports is Improper.**

As noted above, at the time of filing this statement, the parties have not received final reports from all monitors. The Court expressly acknowledged this possibility at the last status conference. [March 28, 2024 Transcript, p. 11, lines 23-25]. Nevertheless, Plaintiffs are improperly trying to summarize findings from a draft, non-final report, in this public filing on the record. This tactic is unfair to the Court, monitors, and Defendants, because it ignores the monitor's authority to make changes to their draft reports after consideration of input from the parties. CFMG objects to Plaintiffs' inclusion of the draft findings on the public record; as the information is subject to change and is confidential expert work product, it does not reflect the final considered opinion of the experts after having taken the parties input to their draft reports into consideration.[2] CFMG respects the

---

[2] Indeed, findings changed between the draft reports and the final reports.

Court approved monitoring process, which includes production of a draft report with opportunity for the parties to provide input, and then time for the monitors to consider and amend their reports as needed. As a result, CFMG requests that any draft report findings and conclusions described by Plaintiffs be filed under seal; Defendants have filed a motion to seal contemporaneously herewith.

## C.  CFMG Concerns With the Monitor Reports

### a.  Methodology Concerns

CFMG has foundational concerns with the manner in which monitoring is conducted. Specifically, CFMG asked that the monitors establish clear, consistent, and measurable monitoring, which can help guide CFMG's remedial efforts. We have discussed with the monitors our concerns that the patient sampling and selection processes are not appropriate. For example, each of the monitors draw a significant sample of patient charts from those identified by Plaintiffs' counsel rather than choosing sample charts in an unbiased manner.

Neither CFMG nor the Court can get a fair or accurate understanding of the care provided by the entire medical, mental health, or dental system at the MCJ if the reviews are focused on those patients with bad outcomes or complaints about their care. Further, by reviewing charts in this way, it is difficult to know whether such cases are anomalies in an otherwise well-functioning system, or whether such cases represent larger systemic problems with compliance. CFMG also has concerns that the monitors are not reviewing a sufficient number of charts for each indicator of the Implementation Plan to constitute a fair and representative sample of any particular patient population at the jail.

CFMG has discussed these concerns openly with the monitors and the Plaintiffs' counsel to collaboratively develop clear, consistent, and appropriate monitoring methodologies. These discussions are in the early stages of development and the parties should be given additional time to consider adjustments that will provide more complete and clear information for the Court to base its conclusions about compliance before issuing any sanctions.

### a. Improper Lookback Period

In addition to the improperly skewed data, the findings in the monitor reports to date are not based on the state of CFMG's compliance at the end of the purge period as the Court contemplated in its September 2023 order. Instead, the findings are based on care which spans several months, with the longest lookback period extending from July 2023 to March 2024. Findings based on care that occurred a year ago do not fairly evaluate the compliance at the end of the purge period, and fail to present an accurate picture of compliance for the Court. CFMG will address these concerns regarding the objectivity and accuracy of the monitor report findings in more detail its upcoming Show Cause briefing.

CFMG requests the Court reject any findings based on information and data from before the expiration of the purge period. The Court allowed six months to purge deficiencies and, for the purposes of issuing sanctions, any review of compliance prior to the end of the purge period is necessarily incorrect as it does not comport with the Court's expectation that CFMG would come into substantial compliance at the end of the six month purge period.

### D. Next Steps

Given the aforementioned concerns with the monitoring reports, CFMG anticipates filing objections to some of the findings and conclusions of the monitor reports in upcoming Show Cause briefing. However, in the interest of judicial efficiency, CFMG proposes that the Court direct the parties to a settlement conference with the magistrate judge to help narrow disputes before they come back before this Court for any hearing, including resolution of any requests for discovery.[3] Defendants are prepared to begin settlement conferences with the magistrate as soon as the magistrate is available. If the Court chooses to adopt this approach, CFMG requests an extension of time to file its Show Cause briefing to allow the parties time to reach a resolution of these issues through a settlement conference before any such briefing would be required. Should this Court determine that an evidentiary hearing is ultimately necessary, the Defendants request that this Court consider utilizing the magistrate judge to avoid delaying the proceedings any more than necessary.

Respectfully submitted,

DATED:  August 1, 2024          ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Caroline E. Jackson*
     Caroline E. Jackson

Attorneys for Plaintiffs

---

[3] CFMG does not believe any discovery should be necessary and opposes any requests for discovery made by Plaintiffs, given the great volume of documents sent to Plaintiffs' counsel each month and their ability to interview jail personnel during their quarterly tours.

1    DATED:  August 1, 2024          COUNTY COUNSEL,
2                                    COUNTY OF MONTEREY

3                                    By:  /s/ Ellen S. Lyons
                                         ───────────────────────
4                                        Ellen S. Lyons
                                         Deputy County Counsel
5
                                     Attorneys for Defendants
6                                    COUNTY OF MONTEREY and MONTEREY
7                                    COUNTY SHERRIFF'S OFFICE

8    DATED:  August 1, 2024          GORDON REES SCULLY MANSUKHANI
9
                                     By:  /s/ Allison J. Becker
10                                       ───────────────────────
                                         Allison J. Becker
11
                                     Attorneys for Defendant WELLPATH, INC.
12

13          Pursuant to Northern District General Order 45(X)(B), I hereby attest that I have on
14   file approvals for any signatures indicated by a "conformed" signature (/s/) within this e-
15   filed document.

16   DATED:  August 1, 2024          Gordon Rees Scully Mansukhani
17
                                     By:  /s/ Allison J. Becker
18                                       ───────────────────────
                                         Allison J. Becker
19
                                     Attorneys for Defendant WELLPATH, INC.
20

21

22

23

24

25

26

27

28