LINDSEY M. ROMANO (SBN: 337600)
lromano@grsm.com
ALLISON J. BECKER (PRO HAC VICE)
abecker@grsm.com
ELIZABETH B. MCGOWAN (PRO HAC VICE)
emcgowan@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111
Telephone: (415) 875-4126
Facsimile:  (415) 986-8054

Attorneys for Defendants
CALIFORNIA FORENSIC MEDICAL GROUP, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation, and DOES 1-20,<br><br>Defendants. | CASE NO.  5:13-cv-02354-BLF<br><br>**DEFENDANT CALIFORNIA FORENSIC MEDICAL GROUP, INC.'S SHOW CAUSE RESPONSE REGARDING IMPOSITION OF CONTEMPT SANCTIONS**<br><br>**Current Hearing Date:**<br>**Current Hearing Time:**<br>**Department: Courtroom 1**<br><br>Action Filed: May 23, 2013<br>Trial Date: December 16-17, 2024<br>Judge: Hon. Beth Labson Freeman |

Significant positive change has occurred in the system since 2016, when the settlement and implementation plans were started. The system has been transformed. However, CFMG recognizes there is more work to do.  This court gave CFMG six months to cure long-standing challenges. Defendant California Forensic Medical Group, Inc. ("CFMG") brings this response to the Court's request to show cause as to why CFMG should not be subject to sanctions for the forty-four items listed in its September 26, 2023 Enforcement Order (Enforcement Order) [Dkt. 838].

**I.   Introduction and General Objections.**

This Court's Enforcement Order created an expectation for significant systemic change in

a very short six-month timeframe; but systemic change does not occur within a six month period. Organizational change scholars recognize that system transformation in healthcare systems can take a decade or more to achieve. [Ex. B, Rafinski Decl. ¶ 14]. That said, CFMG has made great improvements towards substantial compliance over the years.[1] This is especially true in the last 6 months.

During its August 1, 2024 status conference in this matter, the Court recognized that the most recent monitor reports are inadmissible as evidence for sanctions because they do not represent a snapshot in time as of the end of the purge period on March 25, 2024. [Dkt. 903, 14:18]. Instead, this Court identified that the monitors' findings were based on averaged compliance scores across the entire audit period. [Id]. In fact, one of those reports has a lookback period which spans as far back as July 2023. [Dkt. 902-1, p 8]. CFMG agrees that these reports cannot be relied upon to provide evidence of compliance (or noncompliance) in the forty-three[2] enumerated enforcement areas sufficient to issue sanctions.[3]

In response to the Court's observation, CFMG completed a moment-in-time review and offers that review for the Court's consideration here. CFMG engaged independent experts to develop and conduct random chart audits to determine the level of its compliance on March 25, 2024 and immediately after thereafter, in accordance with the Court's Enforcement Order. Based on these reviews, CFMG will show that it was, in fact, substantially compliant in 30 areas of the Enforcement Order, and partially compliant in seven areas, at the end of the purge period. CFMG concedes it has not yet come into full compliance with the terms of the Implementation Plan in

---

[1] Defendants acknowledge that the Implementation Plan was approved in 2016 but the question of improvement vis a vis sanctions order triggers from the September 2023 Orders and not the 2016 agreement to begin implementation.

[2] The Court considered forty-four potential areas of noncompliance in its Enforcement Order, but only found CFMG to be noncompliant in forth-three.

[3] CFMG has serious concerns about the accuracy and reliability of the monitor reports in general and has engaged with the monitors and Plaintiffs' counsel about those concerns. CFMG has requested that the parties meet to work to improve the monitoring methodologies including sampling and selection and scoring of findings to create more accurate and unbiased results that will better help focus resources and develop appropriate corrective action plans to improve care. Unfortunately, some of the monitors and the Plaintiffs' counsel are unwilling to meaningfully engage in a monitoring improvement process. Instead, they say that CFMG is simultaneously too late in raising concerns due to the passage of time and premature in bringing concerns because CFMG has more work to do before an end goal is established. These arguments are not well taken by CFMG and the recalcitrance of Plaintiffs' counsel to improve the tools intended to inform the Court about the state of remediation is concerning. Notably, the audit submitted for the Court's consideration here, which uses random samples of adequate size, brings to light the significant skewing of compliance scores created by the Plaintiffs hand-selecting cases for the monitor's review samples.

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

three of the Enforcement Areas. In an additional three areas, the experts did not have enough data to form a reliable opinion.

Notably, none of the clinical experts found an instance in their randomized chart review when a technical deviation from the Implementation Plan resulted in any harm to a patient. And, even where the experts found a departure from the Implementation Plan requirements, they still found that CFMG was providing care consistent with applicable standards. This is largely because the clinical experts found that, as written, many of the Implementation Plan requirements are beyond the community standards of care, overly burdensome, and onerous such that strict compliance has an unintended consequence of putting an unnecessary strain on the system, which can actually cause more harm than good.

## II. Audit Process

In order to determine compliance in the areas of medical, mental health, and dental, CFMG engaged four experts to develop and perform a focused, randomized, and statistically sound audit. First, CFMG engaged a healthcare data analytics expert, Joshua Rafinski, with experience in developing audit tools for use in monitoring compliance pursuant to a court-ordered implementation plan. [Ex. B, ¶ 3]. In fact, Mr. Rafinski's tools were used in helping the Cook County Jail come into compliance with its own implementation plan. [Id.]. Mr. Rafinski reviewed the Monterey County Jail Implementation Plan, this Court's Enforcement Order, and raw data pulled by CMFG and Custody staff in order to create randomized data sets of patients who were treated at the MCJ between March 25, 2024 and April 8, 2024. [Ex. B, ¶¶ 15-18]. This two-week period was selected to ensure proper review of Enforcement Areas that required 14-day follow ups. Mr. Rafinski randomized lists of targeted patient populations, which were provided to the clinical experts to complete chart reviews. [Id.] Mr. Rafinski developed lists of 40 randomized patient charts based on specific targeted population searches for each indicator with the goal that each expert should review at least 30 of those charts. [Ex. B, ¶¶ 10-12; 15-18]. Where a particular indicator had fewer than 30 patients, the clinical expert audited the entire patient population. [Ex. B, ¶ 19]. Mr. Rafinski also contributed to the creation of and validated audit tools tracking the Court's Enforcement Order and Implementation Plan language, which

the clinical experts used for their chart reviews. [Ex. B, ¶ 21]

The medical, mental health, and dental experts (Dr. Meagher, Dr. Waxler, and Dr. Rosenberg, respectively) audited charts and reviewed materials, including the Court's orders and the Implementation Plan, to determine compliance with the forty-three areas of noncompliance identified by this Court in its Enforcement Order. [Ex A, ¶¶ 4-7; Ex. D, ¶¶ 4-7; Ex C, ¶¶ 4-7]. They also reviewed the most recent monitor reports for their discipline. [Id.]

The chart below outlines CFMG's compliance with each of the forty-four Enforcement Areas as of March 25, 2024 based on the expert's audits and reviews.

### III. Summary of Expert Findings on Enforcement Order Items

#### A. Medical

| Item Number from ECF 838 | Compliance Finding |
|---|---|
| 1. Clinical Staffing | Substantial Compliance |
| 2. Medical Intake Screening | Substantial Compliance |
| 3. Sick Call | Partial Compliance |
| 4. Chronic Care | Substantial Compliance |
| 5. Health Care Maintenance | Substantial Compliance |
| 6. Continuity of Care | Substantial Compliance |
| 7. Outside Care Referrals | Substantial Compliance |
| 8. Treatment of Intoxicated Patients | Substantial Compliance |
| 9. Treatment of Communicable Diseases | Substantial Compliance |
| 10. Pharmaceutical Practices | Substantial Compliance |
| 11. Medical Quality Assurance | Partial Compliance |

Overall, while the levels of compliance with the Implementation Plan requirements may vary, Dr. Meagher, the medical director of the Travis County Jail, in Austin, Texas, found that all medical care he reviewed audit period was within applicable standards of care. See Exhibit A (Declaration of Dr. Alexander Meagher).

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

B.  Mental Health

| Item Number from ECF 838 | Compliance Finding |
|---|---|
| 1. Clinical Staffing | Substantial Compliance |
| 12. Initial Mental Health Screening | Partial Compliance |
| 13. Nursing Rounds in Segregation | Substantial Compliance |
| 15. Treatment Planning | Substantial Compliance |
| 16. Chronic Care | Partial Compliance |
| 17. Acute Care | Substantial Compliance |
| 18. Outpatient Services | Substantial Compliance |
| 19. Psychiatric Follow-Up Intervals | Substantial Compliance |
| 20. Consideration of Mental Health in Discipline | Not Compliant |
| 21. Segregation Placement Screenings | Not Compliant |
| 22. Mental Health Programming in Segregation | Partial Compliance |
| 23. Involuntary Medication | Substantial Compliance |
| 24. Suicide Risk and Safety Assessment | Substantial Compliance |
| 25. Medical Records | Substantial Compliance |
| 26. Corrective Action Plans | Unable to Evaluate |
| 27. Provider Visits in Holding and Isolation Cells | Substantial Compliance |
| 28. Mental Health Quality Assurance | Substantial Compliance |

Overall, while the levels of compliance with the Implementation Plan requirements may vary, Dr. Waxler, former Chief Psychologist for the Cook County Jail, found that all mental

1  healthcare he reviewed during the audit period was within applicable standards of care. See
2  Exhibit D (Declaration of Dr. Brian Waxler).

### C. Dental

| Item Number from ECF 838 | Compliance Finding |
|---|---|
| 1. Clinical Staff | Substantial Compliance |
| 29. Dental Intake Screening | Substantial Compliance |
| 30. Initial Health Inventory | Not Compliant |
| 31. Dental Training for Intake Staff | Substantial Compliance |
| 32. Treatment for Urgent and Emergent Conditions | Partial Compliance |
| 33. Dental Sick Call | Substantial Compliance |
| 34. Chronic Care | Unable to Evaluate |
| 35. Comprehensive Care | Substantial Compliance |
| 36. Restorative and Palliative Care | Partial Compliance |
| 37. Extractions | Substantial Compliance |
| 38. Specialty Care Referrals | Substantial Compliance |
| 39. Endodontics | Unable to Evaluate |
| 40. Periodontics | Substantial Compliance |
| 41. Informed Consent | Substantial Compliance |
| 42. Sanitary Treatment Space | Substantial Compliance |
| 43. Electronic Medical Records | Substantial Compliance |
| 44. Dental Quality Assurance | Substantial Compliance |

Overall, while the levels of compliance with the Implementation Plan requirements may vary, Dr. Mort Rosenberg, former statewide dental director for California Department of

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

1 Corrections and Rehabilitation, found that all dental care he reviewed during the audit period
2 was within applicable standards of care. See Exhibit C (Declaration of Dr. Mort Rosenberg).

## IV. Medical Compliance

### A. Medical Intake Screening (Item 2)

CFMG was substantially compliant with this provision. [Ex A, ☐ 12a]. As of the end of the purge period, nursing staff were properly screening patients for medical needs during the intake process. [Id.]. Moreover, the nursing staff appropriately ordered labs and other necessary items when it was clinically necessary, in line with the Implementation Plan. [Ex A, ☐12c].

### B. Sick Call (Item 3)

CFMG was partially compliant with this provision during the audit period. [Ex A, ☐ 13a]. CFMG routinely sees patients within the applicable timeframe and for in person visits. [Ex A, ☐ 13b]. Out of the thirty charts, only one patient was not triaged within the timeframe required by the Implementation Plan; however that patient was triaged two days later. [Ex A, ☐ 13b]. Such a delay is within applicable standards of care, if outside the bounds of the Implementation Plan. Further, the Implementation Plan requirement that all sick call patients are seen in person regardless of circumstances is clinically unnecessary. [Ex A, ☐ 13d]. For example, a patient who fills out a sick call slip requesting STD testing does not need an in person visit before labs can be ordered. [Ex A, ☐ 13c]. None of the patients reviewed in this area received treatment below the applicable standard of care.

### C. Chronic Care (Item 4)

CFMG was substantially compliant with this provision during the audit period. [Ex A, ☐ 14a]. When a chronic illness was diagnosed, the patient was appropriately and timely referred to chronic care throughout his or her time at the jail. [Ex A, ☐ 14b].

### D. Health Care Maintenance (Item 5)

CFMG was substantially compliant with this provision during the audit period. [Ex A, ☐15a]. Patients were consistently scheduled for 14-day follow ups and received communicable disease screenings. [Ex A, ☐ 15b]. For the six-month exam, qualifying patients were consistently seen and provided the exam as required by the Implementation Plan. [Ex A, ☐15e].

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

### E.  Continuity of Care (Item 6)

CFMG was substantially compliant with this provision during the audit period. [Ex A, ☐ 16a]. Patients were routinely provided with information and medication, when needed, upon release from the jail. [Ex A, ☐ 16b-d].

### F.  Outside Care Referrals (Item 7)

CFMG was substantially compliant with this provision during the audit period. [Ex A, ☐ 17a]. Patient charts consistently contained notes from the ER, outside clinics, specialty care facilities and other outside appointments. [Ex A, ☐ 17b].

### G.  Treatment of Intoxicated Patients (Item 8)

CFMG was substantially compliant with this requirement during the audit period. [Ex A, ☐ 18a]. Patients were routinely assessed and treated in compliance with the Implementation Plan. [Id]. Notably, Dr. Meagher believes that the requirement to send all patients reported to be using synthetic drugs for a mental health referral absent other mental health issues may be clinically unnecessary and unduly burden mental health resources. [Ex A, ☐ 18a].

### H.  Treatment of Communicable Diseases (Item 9)

CFMG was substantially compliant with this provision during the audit period. [Ex A, ☐ 19a]. CFMG consistently performed the proper tests and assessments for patients. [Ex A, ☐ 19b].

### I.  Medical Quality Assurance (Item 11)

CFMG was substantially complaint with this provision during the audit period. [Ex A, ☐ 20]. CFMG had consistent Continuous Quality Improvement (CQI) and monthly Medical and Custody (MAC) meetings. [Id]. The meetings address medical issues, patients, and areas for improvements. [Id].

### J.  Medical Clinical Staffing (Item 1)

Dr. Meagher was unable to assess this Enforcement Area via direct review of the materials provided, but he was able to infer that due to the substantially compliant medical care provided to patients at the jail, CFMG had sufficient staffing levels at the time of the audit period. [Ex A, ☐21].

### K.  Pharmaceutical Services (Item 10)

-8-
DEFENDANT CALIFORNIA FORENSIC MEDICAL GROUP, INC.'S SHOW CAUSE BRIEFING

From his review of medications across all patients he considered during the audit, Dr. Meagher was able to determine patient that medications were appropriately managed during the March 25, 2024 to April 8, 2024 audit period. [Ex A, ☐22]. Further, neither CFMG nor Dr. Meagher have reason to dispute Dr. Barnett's observations from his most recent tour of the jail on March 25-26, 2024, which found CFMG to be in substantial compliance in this area. [Dkt. 882, p 15].

**V.   Mental Health Compliance**

   **A.   Initial Mental Health Screening (Item 12)**

CFMG was partially compliant with this provision during the audit period. [Ex. D ¶ 12a]. The initial mental screening is consistently performed by the nursing staff. [Ex. D ¶ 12b]. One of the reasons for a partial compliance finding, instead of substantially compliant score, however, is that the Implementation Plan restricts the ability of a nurse, trained in mental health, to perform this exam. [Ex. D ¶ 12c]. Both Dr. Vess and Dr. Waxler noted this issue in their respective reviews, explaining that the standard practice in correctional settings is to have nurses perform these assessments. the expert and Dr. Vess agree that this assessment can be performed by a trained nurse. [Id; see also Dkt. 895-1, pp 12-14]. At the present, the wording of the Implementation Plan itself is a roadblock to compliance and CFMG should not be penalized for completing initial mental health screenings in compliance with applicable standards of care.[4]

   **B.   Nursing Rounds in Administrative Segregation (Item 13)**

CFMG was substantially compliant with this provision during the audit period. [Ex. D ¶ 13a]. The nursing staff completed around 90% of the rounds required by the Implementation Plan. [Ex. D ¶ 13b]. All care for the charts reviewed in this area was provided within applicable standards of care. [Ex. D ¶ 13c].

   **C.   Treatment Planning (Item 15)**

CFMG was substantially compliant with this provision during the audit period. [Ex. D ¶ 14a]. The mental health staff timely provided the patients with treatment planning services and

---

[4] CFMG has asked for a meet and confer with Plaintiffs' counsel and the court mental health monitor for modification of this requirement, but the parties have not yet settled on a date or time for this discussion. This is an issue that CFMG thinks is ripe for settlement negotiations before Judge Cousins.

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

documented those plans in the charts. [Ex. D ¶ 14b]. Only a few patients out of the twenty-seven charts reviewed, received untimely treatment plans. However, in those cases where there was a delay, no harm resulted. [Ex. D ¶ 14c].

### D.  Chronic Care (Item 16)

CFMG was partially compliant with this provision during the audit period. [Ex. D ¶ 15a]. The mental health team consistently documented their findings in the patient charts. [Ex. D ¶ 15b]. However, the patients were not consistently seen by psychiatry within the timeframes set by the Implementation Plan. [Id]. All patients were ultimately seen by psychiatry and no apparent harm came from any delays. [Ex. D ¶15 c]. Moreover, the mental health care provided by CFMG within the audit period was within the appropriate standard of care. [Id].

### E.  Acute Care (Item 17)

CFMG was substantially compliant in this area during the audit period. [Ex. D ¶ 16a]. the mental health staff consistently and appropriately evaluated each patient's need for potential acute care services. [Ex. D ¶ 16b]. Each patient was evaluated and the team used appropriate screening and assessment tools while conducting their evaluations. All documentation was complete. [Ex. D ¶ 16d].

### F.  Outpatient Services (Item 18)

CFMG was substantially compliant in this area during the audit period. [Ex. D ¶ 17a]. Overall, patients were properly identified and scheduled for a meeting with mental health. [Ex. D ¶ 17b]. After meeting with mental health, the patient was timely provided with the appropriate outpatient services. [Id].

### G.  Psychiatric Follow-Up Intervals (Item 19)

CFMG was substantially compliant in this area during the audit period. [Ex. D ¶ 18a]. CFMG provided consistent psychiatric follow up visits with the onsite psychiatrist within the timeframe imposed by the Implementation Plan. [Ex. D ¶ 18b]. Some patients were seen outside the timeframe required by the Implementation Plan, however, the delay did not harm the patient, nor did it fall below the standard of care. [Ex. D ¶ 18c].

### H.  Consideration of Mental Health in Discipline (Item 20)

1 CFMG was unable to find evidence of compliance in this area at the end of he purge
2 period. [Ex. D ¶ 19]. CFMG will continue to work internally to focus its current mental health
3 resources on improvement in this area. CFMG requests that the parties discuss this matter during
4 the upcoming settlement conferences before the Magistrate Judge.

### I. Segregation Placement Screenings (Item 21)

CFMG was not compliant with this provision during the audit period. [Ex. D ¶ 20a]. CFMG will continue to work internally to focus its current mental health resources on improvement in this area. CFMG requests that the parties discuss this matter during the upcoming settlement conferences before the Magistrate Judge.

### J. Mental Health Programming in Segregation (Item 22)

CFMG was partially compliant in this area during the audit period. [Ex. D ¶ 21a]. Patients in segregation were consistently scheduled for weekly mental health appointments. [Ex. D ¶ 21b]. However, patients were not consistently provided with therapeutic activities outside his or her cell, or consistent group programming. [Ex. D ¶ 21c].

### K. Involuntary Medication (Item 23)

CFMG was substantially compliant with this area during the audit period. [Ex. D ¶ 22a]. All patients were appropriately evaluated for involuntary medications. [Id.] Out of the nine patient charts reviewed by Dr. Waxler, only one patient clinically qualified for involuntary medication. That instance was handled in accordance with both the Implementation Plan and the community standard of care. [Id].

### L. Suicide Risk Assessment and Safety Planning (Item 24)

CFMG was substantially compliant in this area during the audit period. [Ex. D ¶ 23a]. The mental health team conducted complete suicide assessments on patients and documented their findings in the patients' charts. [Ex. D ¶ 23b]. QMHPs performed suicide assessments, as required by the Implementation Plan and in line with the applicable community standard of care. [Id.] When patients were placed into and discharged from safety cells, appropriate assessments were performed. [Ex. D ¶ 23d-e].

### M. Medical Records (Item 25)

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

CFMG was substantially compliant in this area during the audit period. [Ex. D ¶ 24a]. The patients' medical charts consistently contained records of all known mental health diagnoses, and all patient charts included a mental health treatment plan. [Ex. D ¶ 24b-c].

### N.  Corrective Action Plans (Item 26)

CFMG is developing corrective action plans to address low performing audit areas. [Ex. D ¶ 27]. This is an area where CFMG is continuing to improve—those improvements are evident in the experts findings regarding timeliness of care and completeness in medical charting. [Id.] However, given the inability to produce evidence of compliance in this area by the end of the purge period, CFMG requests that the parties discuss this matter during the settlement conference with the Magistrate Judge.

### O.  Provider Visits to Holding and Isolation Cells (Item 27)

CFMG was substantially compliant with this area. [Ex. D ¶ 25a]. Every patient in the audit was seen by a physician or registered nurse every Monday, Wednesday, and Friday in isolation. [Ex. D ¶ 25bb]. CFMG was consistently meeting the expectations of the Implementation Plan and community standards of care in this area. [Id].

### P.  Mental Health Quality Assurance (Item 28)

CFMG's process for mental health quality assurance at the end of the purge period was substantially compliant. [Ex. D ¶ 28]. The mental health team regularly met to discuss patient needs, challenging cases, and how to improve the provision of care. The necessary members of the mental health team attended these meetings.

### Q.  Mental Health Clinical Staffing (Item 1)

CFMG had sufficient mental health staffing to provide a compliant level of mental health care to patients at the jail in line with all applicable standards of care as described in detail above. [Ex. D ¶ 26].

## VI. Dental Compliance

### A. Dental Intake Screening (Item 29)

CMFG was substantially compliant with this provision. [Ex C ¶ 15a]. As of the end of the purge period, nursing staff were consistently screening patients for dental needs during the intake process. This process is sufficient to determine if a patient has an urgent, routine or no need for dental care. [Ex C ¶ 15b].

### B. Initial Health Inventory (Item 30)

CFMG was not in compliance with this provision as of the end of the purge period, but that compliance score does not mean that the delivery of dental care in this area is below any applicable standards of care or causing any risk of harm to patients. [Ex C ¶ 16a]. The nursing staff at the jail are currently required to use a separate dental assessment form during intake, which Dr. Rosenberg concludes is duplicative and clinically unnecessary. [Ex C ¶ 16b]. Further, Dr. Rosenberg believes the use of this process increases the risk for dental classification errors and wasted resources. [Ex C ¶ 16b-c]. Specifically, requiring nursing to fill out this separate form unduly burdens nursing staff, and often leads to reclassification of dental levels by the dentist. [Id]. Nurses, no matter how well-trained, are not best suited to classify dental patients; dental staff is. [Ex C ¶ 16c]. The additional dental-specific screening does not provide any additional information that would change the course of care for the patient, but instead unnecessarily overloads the nursing staff and depletes valuable resources. [Ex C ¶ 16d]. Accordingly, because all dental treatment was being provided within applicable standards of care at the end of the purge period, sanctions should not be issued for this technical deviation from the Implementation Plan. The deviations from the Implementation Plan in this category did not pose any risk of harm—let alone a risk of serious harm—to patients. [Ex C ¶ 16a].

### C. Dental Training for Intake Staff (Item 31)

Dental training for the intake staff was sufficient to provide a compliant level of dental care to patients at the jail. [Ex C ¶ 30].

### D. Treatment for Urgent and Emergent Conditions (Item 32)

CFMG was partially compliant in this area at the end of the purge period. All charts reviewed in this category demonstrated dental care within applicable standards and any findings of noncompliance with the Implementation Plan did not result in harm to the patient. [Id]. Any delays in care present in the chart audits were neither undue nor below the standard of care. [Ex C ¶ 17b]. Dr. Rosenberg found that the dental care provided in this Enforcement Area was overall appropriate, but he has assigned a partial compliance rating only because of the strict language of the Implementation Plan. [Ex C ¶ 17b-c]. In any other jail setting, the care he reviewed in this area was appropriate and consistent with applicable standard of care. [Ex C ¶ 17a].

### E. Dental Sick Call (Item 33)

CFMG was substantially compliant with this requirement during the audit period. [Ex C ¶18a]. Dental sick calls reviewed by the expert revealed that patients were both properly triaged and assigned to the dental clinic. [Ex C ¶ 18b].

### F. Chronic Care (Item 34)

There were not enough patients with chronic care conditions seen during the audit period for Dr. Rosenberg to make any findings about compliance in this area. [Ex C ¶ 19]. This is not surprising due to the transient nature of a jail population, many of whom released soon after arrest, many within 48 hours of booking. [Id]. Because the Court was very specific that the audit period should only include a timeframe as close to March 25 as possible [Dkt 903, pp 29-30, 33], CFMG respectfully requests that the Court defer ruling on this Enforcement Area until the parties can meet and confer on a reasonable audit period for chronic care patients that would result in a viable patient sample size.

### G. Comprehensive Care (Item 35)

CMFG was substantially compliant in this area at the end of the purge period. [Ex C ¶ 20a]. While it is exceedingly rare for dental patients to require comprehensive care in a jail

-14-

setting (versus a prison), when a patient did request periodic comprehensive dental care, the dental team provided the care in line with not only the Implementation Plan but also the community dental standard of care. [Ex C ¶ 20b-c].

### H.   Restorative and Palliative Care (Item 36)

CFMG was partially compliant in this area at the end of the purge period, however, part of the reason for this score is the requirements of the Implementation Plan are outdated and do not account for developments in dental care in the past decade. [Ex C ¶ 21a]. Specifically, Many modern dental materials provide reasonable longevity when used as interim or palliative restorations. [Ex C ¶ 21b]. The fact that the dental team is not currently utilizing outdated practices in their treatment of patients should not be reason to penalize them. [Id.]. Once again, while CFMG may not be substantially compliant with technical terms of the Implementation Plan, the dental care provided in this area at the end of the purge period complies with applicable community standards of care. [Ex C ¶ 21c].

### I.   Extractions (Item 37)

CFMG was substantially compliant in this area at the end of the purge period. [Ex C ¶ 22a]. When necessary, patients were sent for outside oral surgery consistent with the requirements of the Implementation Plan. [Ex C ¶ 22b].

### J.   Specialty Care Referrals (Item 38)

CFMG was substantially compliant with specialty care referrals at the end of the purge period. [Ex C ¶ 23a]. Those patients sent out for specialty care were referred out in a manner and timeframe consistent with the Implementation Plan and applicable standards of care.

### K.   Endodontics (Item 39)

There was insufficient data during the audit period for Dr. Rosenberg to determine a compliance score in this area. [Ex C ¶24a]. No dental patients during the relevant time period were in need of a root canal; however, this is not uncommon in a correctional setting. [Ex C ¶ 24b]. CFMG respectfully requests that the Court defer ruling on this Enforcement Area until the

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

parties can meet and confer on a reasonable audit period for endodontic patients that would result in a viable patient sample size.

### L.  Periodontics (Item 40)

CFMG was substantially compliant with periodontics during the audit period. [Ex C ¶ 25a]. Patients were appropriately screened, examined, classified and treated. [Ex C ¶ 25b, d]. The only deviation from the Implementation Plan noted was a documentation error. [Ex C ¶ 24c]. The periodontal treatment provided by CFMG during the audit period was compliant with both the terms of the Implementation Plan and applicable standards of dental care in a correctional environment. [Ex C ¶ 24e]

### M.  Informed Consent (Item 41)

CFMG was substantially compliant in this area during the audit period. [Ex C ¶ 26a]. When clinically applicable, a written informed consent was in the patient file. [Ex C ¶ 26c].

### N.  Sanitary Treatment Space (Item 42)

Dr. Rosenberg could not evaluate this measure through chart or materials reviews. [Ex C ¶31]. However, Dr. Winthrop found this area to be in substantial compliance during her last monitor tour on April 1-2, 2024. [Dkt. 902-1, pp. 63-4]. Neither CFMG nor Dr. Rosenberg have any reason to dispute her observations of the treatment space during her tour. [Ex C ¶ 31] Based on those observations, CFMG was in substantial compliance with this area as of the end of the purge period.

### O.  Electronic Medical Records (Item 43)

CFMG was substantially compliant in this area during the audit period. [Ex C ¶ 27a]. All chart notes regarding the patient's treatments, orders, and offsite records were complete, as required by the Implementation Plan.

### P.  Dental Quality Assurance (Item 44)

CFMG's process for dental quality assurance at the end of the purge period was substantially compliant. [Ex C ¶ 28]. CQI and MAC meeting materials addressed dental issues

-16-

and showed that these items were discussed in order to identify solutions. [CITE]. All necessary dental staff attended and participated in the meetings. [Id].

### Q. Dental Clinical Staffing (Item 1)

CFMG had sufficient dental staffing to provide a compliant level of dental care to patients at the jail in line with all applicable standards of care as described in detail above. [Ex C ¶29]

## VII. Next Steps

At the August 1, 2024 Status Conference, the Court directed the parties to contact Judge Cousins as soon as practicable to schedule mediation of any disputes on areas of compliance. [Dkt 903]. The Court was also clear that the process may be "lengthy" and that the Court expected that the parties would be done with any settlement discussions "well in advance" of the next status conference set for November 8, 2024. [Dkt 903, 39:13-14]. CFMG proposes that the settlement conference be dealt with in three separate days—one for medical, one for dental, and one for mental health—and has requested that these discussions begin as soon as possible. Plaintiffs have requested that the settlement conference be conducted in one day at the end of October. CFMG does not find Plaintiffs' proposal practical or in accordance with the Court's directive to narrow the issues as much as possible prior to any trial on these issues on December 16-17, 2024.

Ultimately, while CFMG is proud of the progress it has made during the purge period, if the Court decides that sanctions should be imposed, the Court's Enforcement Order does not include guidance on how or where any sanctions that might apply would be paid. CFMG requests the opportunity to raise this issue during the settlement discussions before Judge Cousins. In the alternative, CFMG requests the opportunity to brief this Court on the issue prior to any ruling on sanctions.

## VIII. Sanctions Should not be Imposed Because the Care is Adequate.

The purpose of sanctions is not to punish but rather to encourage behavior modification. *Skaff v. Meridien N. Am. Beverly Hills*, LLC, 506 F.3d 832, n. 11 (9th Cir. 2007). When the

1 Enforcement Order issued, CFMG changed its behavior, as evidenced by the results from the 2 attached reviews. In fact, CFMG was substantially compliant with the majority of the areas in 3 the Enforcement Order at the end of the purge period.

4 Even in instances of noncompliance, still no sanctions should levy because there was no 5 harm to the patients and because the care provided was within applicable standards of care. 6 Instead, the Court should allow a brief extension of time for CFMG to cure any departures from 7 the technical terms of the Implementation Plan.

**X.    Conclusion**

In sum, the compliance scores above show tremendous progress by CFMG during the six month purge period. As of the end of the purge period, CFMG was in substantial compliance with the majority of all areas identified in the Court's September Enforcement Order (30) and in partial compliance with several more (7). CFMG was only noncompliant in three areas as of the end of the purge period. Even where the experts made findings of noncompliance, they still found that the clinical care provided was adequate. As such, sanctions should not issue for these departures from the terms of the Implementation Plan, especially in the absence of any evidence of harm to any patients.

In the meantime, as discussed at the last status conference on August 1, 2024, CFMG will enter confidential settlement negotiations with Plaintiffs' counsel and the Magistrate Judge to narrow or eliminate disputed issues before returning to this Court.

Dated: August 16, 2024            GORDON REES SCULLY MANSUKHANI, LLP

By:   */s/ Allison J. Becker*
      Lindsey M. Romano
      Allison J. Becker, (pro hac vice)
      Elizabeth B. McGowan (pro hac vice)
      Attorneys for Defendant CFMG.

-18-
DEFENDANT CALIFORNIA FORENSIC MEDICAL GROUP, INC.'S SHOW CAUSE BRIEFING

# CERTIFICATE OF SERVICE

*Jesse Hernandez, et al. v. County of Monterey, et al.*
U.S.D.C., Northern District of California - Case No. 5:13-cv-02354-BLF
**[C.C.P. § 1013, C.R.C. §2008, F.R.C.P. Rule 5]**

I, Todd Yoho certify that this document, filed through the court's ECF system, will be sent electronically to the registered participants, as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Date:   August 16, 2024                              By:  */s/ Todd Yoho*