LINDSEY M. ROMANO (SBN: 337600)
lromano@grsm.com
ALLISON J. BECKER (PRO HAC VICE)
abecker@grsm.com
ELIZABETH B. MCGOWAN (PRO HAC VICE)
emcgowan@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111
Telephone: (415) 875-4126
Facsimile:  (415) 986-8054

Attorneys for Defendants
CALIFORNIA FORENSIC MEDICAL GROUP, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated, | ) ) ) | CASE NO.  5:13-cv-02354-BLF |
|---|---|---|
| Plaintiffs, | ) ) ) ) | **DECLARATION OF DR. ALEXANDER MEAGHER REGARDING MEDICAL AUDIT FINDINGS** |
| vs. | ) ) ) | |
| COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation, and DOES 1-20, | ) ) ) ) ) ) ) | Judge: Hon. Beth Labson Freeman |
| Defendants. | ) | |

I, Dr. Alexander Meagher, declare as follows:

1. I am a Doctor of Medicine, with a focus on family medicine and correctional medicine. I am currently employed as the medical director at the Travis County Jail in Austin, Texas. I have been providing clinical medical care to patients in a jail setting for 9 years. I have also been overseeing the provision of medical care at the Travis County Jail for 9 years; part of my responsibilities as medical director include internal chart reviews and quality assurance audits of the medical care provided by the staff at the Travis County Jail.  Please see my attached CV, **Exhibit 60**.

2. For the past three years, I have also provided services as a medical expert in correctional legal cases. I perform chart reviews and audits as part of those services.

-1-
DECLARATION OF DR. ALEXANDER MEAGHER

3. I base my findings on my experience in the correctional medical field, and also on the standards set by the National Commission on Correctional Health Care (NCCHC).

4. I was retained by CFMG to provide my expert opinion on the state of the medical care at the Monterey County Jail between March 25, 2024 and April 8, 2024 and asked to evaluate the system's compliance with the Implementation Plan [Dkt 532] and the Court's September 26, 2024 Order Granting Plaintiff's Motion to Enforce [Dkt 838].

5. In order to form my opinions and prepare this declaration, I reviewed the following documents:

   a. Patient medical charts (See **Exhibit 56**);

   b. Implementation Plan [Dkt. 532];

   c. Order to Enforce Settlement Agreement [Dkt. 838];

   d. Randomized Booking Number List (Exhibit 45)

   e. Medical Monitor Report and Audit Tool Dated March 25-26, 2024 [Dkt 882]

   f. Quarterly Continuous Quality Improvement (CQI) and Monthly Medical and Custody (MAC) meeting materials (Exhibit 46; Exhibit 47).

6. I was asked to audit randomized patient medical charts from the relevant time period, March 25, 2024 to April 8, 2024, and clinical indicators identified in the September 2023 Order and in the Implementation Plan and use my clinical judgment to determine whether the care provided to those patients complied with the terms of the Implementation Plan and applicable standards of care.

7. Specifically, I was asked to review the care in the following enumerated areas as stated in the September Enforcement Order:

   a. Medical Intake Screening (Dkt 838 Item 2)

   b. Sick Call (Dkt 838 Item 3)

   c. Chronic Care (Dkt 838 Item 4)

*Gordon Rees Scully Mansukhani, LLP*
*315 Pacific Avenue*
*San Francisco, CA 94111*

    d. Healthcare Maintenance (Dkt 838 Item 5)

    e. Continuity of Care (Dkt 838 Item 6)

    f. Outside Care Referrals (Dkt 838 Item 7)

    g. Treatment of Intoxicated Patients (Dkt 838 Item 8)

    h. Treatment of Communicable Diseases (Dkt 838 Item 9)

    i. Medical Quality Assurance (Dkt 838 Item 11)

    j. Medical Staffing (Dkt 828 Item 1)

8. I was asked to use the audit tool attached as Exhibit 56 in connection with my evaluation of the patient charts listed in Exhibit 45.

9. I have analyzed the patient charts listed in Exhibit 45 and I came to the following conclusions:

10. My overall opinion is that all the care I reviewed was provided in accordance with all applicable medical standards of care in the correctional setting. In addition, I conclude that the medical care provided within the audit period was overall substantially compliant with the terms of the Implementation Plan. Even when some of the care fell outside the restrictive terms of the Implementation Plan, the care was adequate and appropriate and in compliance with correctional medical standards. While there are some areas with room for improvement, those areas do not preclude a finding of overall medical compliance nor does it negate the overall finding of compliance during the audit period of March 25-April 8, 2024.

11. My findings are summarized in the following Chart and attached as Exhibit 48:

| Area of Compliance from Enforcement Order | Percentage of Compliance | Compliance Level |
|---|---|---|
| 2. Medical Intake Screening | 100% | Substantial Compliance |
| 3. Sick Call | 82.8% | Partial Compliance |
| 4. Chronic Care | 97.6% | Substantial Compliance |
| 5. Health Care Maintenance | 14-day: 82.1% 6-month: 99.1% Total %: 90.6% | Substantial Compliance |
| 6. Continuity of Care | 86.4% | Substantial Compliance |
| 7. Outside Care Referrals | 92% | Substantial Compliance |
| 8. Treatment of Intoxicated Patients | 87.2% | Substantial Compliance |
| 9. Treatment of Communicable Diseases | 100% | Substantial Compliance |
| **Overall System Score** | **92.9%** | **Substantial Compliance** |

12. With regard to Medical Intake Screening (Item 2), I reviewed the 30 randomized patient charts as indicated in Exhibit 45. My audit conclusions are summarized in the Audit tool produced as Exhibit 56. I also made the following observations about the care:

   a. I found that all elements of the medical intake screening during the audit period were met and in line with the Implementation Plan.

   b. Based on my clinical review of the charts, labs were ordered when appropriate. It is apparent that the medical team consistently considered labs and ordered labs in situations where it is necessary and appropriate.

   c. The term "NA" is utilized in the tool to demonstrate that labs were not medically necessary for this patient. Therefore, it was appropriate for the medical professional to not order labs in these cases.

   d. CFMG was substantially compliant with medical intake as defined by the Implementation Plan during the audit period of March 25 – April 8, 2024.

-4-
DECLARATION OF DR. ALEXANDER MEAGHER

*Gordon Rees Scully Mansukhani, LLP*
*315 Pacific Avenue*
*San Francisco, CA 94111*

13. With regard to Sick Call (Item 3), I reviewed the 30 randomized patient charts as indicated in Exhibit 45. My audit conclusions are summarized in the Audit tool produced as Exhibit 56. I also made the following observations about the care:

   a. Based on my clinical review of the charts, CFMG is partially compliant with this requirement.

   b. Out of the thirty charts, only one patient was not triaged within the timeframe required by the Implementation Plan; however that patient was triaged two days later. While this falls outside the requirements of the Implementation Plan, the treatment delay is within applicable standards of care, and did not cause any harm to the patient. A delay of this nature is common, and does not demonstrate a problem with the medical system at the jail.

   c. There were a few instances where the patient was not seen by a qualified medical professional. Instead, the medical professional performed a chart review instead of an independent physical exam. In all charts I reviewed where this occurred, the clinical decision for a chart review instead of exam was appropriate based on the presentation of the particular patient, and was within applicable standards of care in corrections. Not all sick call patients require a physical exam. For example, one sick call patient requested STD testing. The labs were ordered without a physical exam. This clinical decision was appropriate under the circumstances. Again, while this technically deviates from the Implementation Plan, it does not fall below the applicable standard of care.

   d. Indeed, the requirement imposed by the Implementation Plan that all sick call patients must have a physical exam by a qualified medical professional, regardless of the nature of the sick call unnecessarily restricts the medical professionals' ability to use their clinical judgment when determining if a patient needs to be seen or if a chart review

-5-

DECLARATION OF DR. ALEXANDER MEAGHER

will suffice. This requirement also unnecessarily diverts time and resources that could be better spent on other, more seriously ill patients. Chart reviews for minor sick calls are well within the standard of care and should be considered compliant care under the circumstances. However, I have scored them as non-compliant for purposes of this audit given the restrictive terms of the Implementation Plan.

14. With regard to Chronic Care (Item 4), I reviewed the 27 randomized patient charts as indicated in Exhibit 45. My audit conclusions are summarized in the Audit tool produced as Exhibit 56. I also made the following observations about the care:

   a. CFMG is substantially compliant with this requirement.

   b. There were numerous incidents where the patient's chronic care condition was not disclosed or apparent until well after the patient was booked into the jail. Therefore, that patient did not meet the five to seven day referral from booking and received NA's for this section. This does not demonstrate a failure on the medical team's ability to treat chronic care conditions. Instead, it demonstrates that the medical team was able to diagnose the patient with a chronic disease and task him or her for chronic care appointments in line with community standards.

   c. The five to seven day referral requirement for Chronic Care is not a necessary requirement to meet the community standard of care. While it is important for a patient with a chronic illness to be timely scheduled for follow up care, it is not always necessary for a patient, especially if stable, to be seen within a five to seven day window. Such a requirement can strain the medical team and unnecessarily divert them away from more acute medical issues. If a patient was not seen during the five to seven window, it is likely due to the fact that the medical team was prioritizing their resources to provide care to the entire jail. While I marked such delays as non-compliant due to the restrictive terms of the Implementation Plan, I do not believe any such delays

-6-

DECLARATION OF DR. ALEXANDER MEAGHER

should be considered when determining whether the program was providing adequate medical care. Further, any delays noted in the audit tool did not cause any harm to the patient.

    d. Nevertheless, overall, the program is meeting this unnecessarily restrictive requirement.

15. With regard to Health Care Maintenance (Item 5), I reviewed the 53 randomized patient charts as indicated in Exhibit 45. My audit conclusions are summarized in the Audit tool produced as Exhibit 56. I also made the following observations about the care:

    a. CFMG is substantially compliant with this requirement.

    b. Patients consistently received a communicable disease screening and were consistently scheduled for a 14-day follow up.

    c. It is important to note that many patients in this audit did not receive a 14-day health assessment because he or she was released prior to their scheduled appointment.

    d. CFMG consistently scheduled qualifying patients for a six-month exam. There were many instances where patients did not receive a six-month exam. However, those patients were booked out of the jail.

    e. There were a few patients who did not receive a 14-day or six-month exam as scheduled, but these patients were seen for sick call or a chronic care condition during that time; no patients were harmed by the lack of a follow up exam in these few cases.

16. With regard to Continuity of Care (Item 6), I reviewed the 30 randomized patient charts as indicated in Exhibit 45. My audit conclusions are summarized in the Audit tool produced as Exhibit 56. I also made the following observations about the care:

    a. CFMG is substantially compliant with this requirement.

    b. Patients are routinely provided with a list of community resources upon release from the jail.

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

    c. Patients who were prescribed medication at the time of their release were provided with an adequate amount of medication by the CFMG staff. An NA in this section does not mean that CFMG staff failed to provide that patient with medication. It means that the patient was not prescribed any medication at the time of his or her release from the jail.

    d. In many cases, the CFMG staff attempted to make the patient an appointment at a community facility following his or her release from the jail.

17. With regard to Outside Care Referrals (Item 7), I reviewed the 30 randomized patient charts as indicated in Exhibit 45. My audit conclusions are summarized in the Audit tool produced as Exhibit 56. I also made the following observations about the care:

    a. CFMG is substantially compliant with this requirement.

    b. When relevant, the patient's chart contained ER and specialty clinic notes, as required by the Implementation Plan.

    c. CFMG should continue to work on improving the inclusion of radiology records in the patient chart. However, the lack of radiology charts does not preclude a finding of substantial compliance.

    d. In one instance, CFMG only included part of the outside orthopedic records; however, this singular deviation from the Implementation Plan does not fall below the medical standard of care.

18. With regard to Treatment of Intoxicated Patients (Item 8), I reviewed the 28 randomized patient charts as indicated in Exhibit 45. My audit conclusions are summarized in the Audit tool produced as Exhibit 56. I also made the following observations about the care:

    a. CFMG is substantially compliant with this requirement. Patients were routinely assessed and treated in compliance with the Implementation Plan.

    b. The main area for improvement in this item was in scheduling patients on methamphetamines or synthetic drugs to see a mental health clinician. However, in my opinion, this requirement in the Implementation Plan is too restrictive and not in line with applicable standards of care. It is not absolutely necessary that every patient on synthetic drugs see a mental health clinician absent other known mental health problems, and this could put a strain on mental health resources, which could be better spent on patients with true mental health needs.

    c. While I disagree that this requirement of scheduling synthetic drug patients for mental health should preclude a finding of overall compliance in providing adequate treatment to intoxicated patients, I did mark these items non-compliant during my review in accordance with the terms of the Implementation Plan.

    d. It is also important to note that when a patient was scheduled for a mental health appointment, most of the time the patient was released prior to the appointment date. Therefore, the NAs represent those patients who were scheduled but not seen by a CFMG staff member due to their release.

19. With regard to Treatment of Communicable Diseases (Item 9), I reviewed the 30 randomized patient charts as indicated in Exhibit 45. My audit conclusions are summarized in the Audit tool produced as Exhibit 56. I also made the following observations about the care:

    a. CFMG is substantially compliant with this requirement.

    b. CFMG staff consistently performed the Tuberculosis Risk (TB) assessment on the patients during the audit period. CFMG's TB assessment performance is in line with not only the Implementation Plan but the community standard of care.

20. With regard to Medical Quality Assurance requirement (Item 11), I reviewed the quarterly CQI and monthly Medical and Custody meeting materials developed by the Monterey County

-9-

DECLARATION OF DR. ALEXANDER MEAGHER

Jail during the audit period (Exhibit 46; Exhibit 47). These materials address and discuss medical issues, and the meeting minutes reflect that discussions occurred to identify solutions. Necessary stakeholders attended and participated in the meeting. While the PowerPoints could be more precise and could identify next steps for corrective action more clearly, the process exists. It should, however, be refined. Also, because the medical care provided by system itself is in overall compliance with the terms of the Implementation Plan and applicable standards of care during the audit period, I can infer that mid-level providers are receiving appropriate training, supervision, and oversight. Overall, I conclude that the medical quality assurance process at the Monterey County Jail is substantially compliant with the terms of the Implementation Plan.

21. As for Clinical Staffing on the medical side (Item 1), while I was not specifically asked to audit this item, I can infer from the overall performance of the medical system at the Monterey County Jail that the staffing levels are sufficient to provide a compliant level of medical care to patients at the jail.

22. I was also not specifically asked to audit Pharmaceutical Services (Item 10), however, during my chart reviews; I noticed that patients' medications were appropriately managed. I also note that Dr. Barnett found this area to be substantially compliant in his last report over a 6-month lookback period, so I can infer that this item was also substantially compliant during the audit period from March 25 – April 8, 2024.

23. Finally, I reviewed the most recent neutral medical monitor report prepared by Dr. Barnett from his visit on March 25-26, 2024. [Dkt. 882]. It is my opinion that the process and tool utilized by Dr. Barnett is overcomplicated, and sets expectations beyond the normal standard of care. At times, it appears Dr. Barnett is substituting his own clinical judgment for that of the onsite providers; in other words, Dr. Barnet is opining more on whether the quality of care was provided in line with his own expectations versus whether the care was provided in line

-10-
DECLARATION OF DR. ALEXANDER MEAGHER

with the requirements of the Implementation Plan or whether patients received adequate medical care in compliance with applicable standards of care.

24. During the audit period, the medical system at the Monterey County Jail was functioning quite well for a correctional setting, and even satisfying restrictive requirements that went above and beyond applicable community standards of care. Jails present a challenging medical environment due to the nature of the transient population and the lack of medical history available to the CFMG staff. Overall, the care was appropriate and well within the community standard of care. While there are always outliers in a system, it does not mean that the system is a failure. In this case, the overall system is able to provide adequate medical care to the population with the resources they have.

25. Overall, I found the delivery of medical care by CFMG at the Monterey County Jail between March 25 and April 8, 2024 to be in SUBSTANTIAL COMPLIANCE with the terms of the Implementation Plan and the Court's September Enforcement Order.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct, and that this declaration is executed on August 16, 2024 in Austin, Texas _____, _____

By: /s/ *Dr. Alexander Meagher*
Dr. Alexander Meagher, Declarant

-11-
DECLARATION OF DR. ALEXANDER MEAGHER