1  LINDSEY M. ROMANO (SBN: 337600)
   lromano@grsm.com
2  ALLISON J. BECKER (PRO HAC VICE)
   abecker@grsm.com
3  ELIZABETH B. MCGOWAN (PRO HAC VICE)
   emcgowan@grsm.com
4  GORDON REES SCULLY MANSUKHANI, LLP
   315 Pacific Avenue
5  San Francisco, CA 94111
   Telephone: (415) 875-4126
6  Facsimile: (415) 986-8054

7  Attorneys for Defendants
   CALIFORNIA FORENSIC MEDICAL GROUP, INC.
8
                    UNITED STATES DISTRICT COURT
9
                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation, and DOES 1-20,<br><br>Defendants. | CASE NO. 5:13-cv-02354-BLF<br><br>**DECLARATION OF DR. MORTON ROSENBERG REGARDING DENTAL AUDIT FINDINGS**<br><br>Judge: Hon. Beth Labson Freeman |

I, Dr. Morton Rosenberg, declare as follows:

1.  I am a Doctor of Dental Surgery, with a focus on correctional dentistry. I was last employed by the California Department of Corrections and Rehabilitation (CDCR) as the Statewide Dental Director from August 20, 2014 to January 31, 2023. At present, I am retired from CDCR and work as a dental expert consultant. Please see my attached CV, **Exhibit 59**.

2.  For the past 15 years, I have provided services as a dental expert in correctional cases, including serving as a court-appointed neutral monitor.

3.  I have an extensive history and involvement with peer review locally and statewide. When I worked in corrections, I reviewed the results of peer reviews performed by dentists to

-1-
DECLARATION OF DR. MORT ROSENBERG

determine the accuracy of the reviews. Further, I served on the Council of Peer Review for the California Dental Association. On the council, I reviewed the work of other peer review committees to ensure that the reviews were adequate and accurate.

4. I was retained by CFMG to provide my expert opinion on the state of the dental care at the Monterey County Jail between March 25, 2024 and April 8, 2024 and evaluate the system's compliance with the Implementation Plan [Dkt 532] and the Court's September 26, 2024 Order Granting Plaintiff's Motion to Enforce [Dkt 838].

5. In order to form my opinions and prepare this declaration, I reviewed the following documents:

   a. Patient dental charts (See **Exhibit 58**);

   b. Implementation Plan [Dkt. 532];

   c. Order to Enforce Settlement Agreement [Dkt. 838];

   d. Randomized Booking Number List (Exhibit 51)

   e. Dental Monitor Report and Audit Tool Dated April 1-2, 2024 [Dkt 902]

   f. Quarterly Continuous Quality Improvement (CQI) and Monthly Medical And Custody (MAC) Materials (Exhibit 49; Exhibit 50).

6. I was asked to audit randomized patient dental charts from the relevant time period and relevant clinical indicators and use my clinical judgment and the terms of the Implementation Plan and Enforcement Order to determine whether the care provided to those patients complied with the terms of the Implementation Plan and applicable standards for the delivery of dental care in a correctional setting.

7. Specifically, I was asked to review the care in the following enumerated areas as stated in the September Enforcement Order:

   a. Dental Intake Screening (Dkt 838 Item 29)

   b. Initial Health Inventory (Dkt 838 Item 30)

-2-

DECLARATION OF DR. MORT ROSENBERG

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

    c.   Treatment for Urgent and Emergent Conditions (Dkt 838 Item 32)

    d.   Dental Sick Call (Dkt 838 Item 33)

    e.   Chronic Care (Dkt 838 Item 34)

    f.   Comprehensive Care (Dkt 838 Item 35)

    g.   Restorative and Palliative Care (Dkt 838 Item 36)

    h.   Extractions (Dkt 838 Item 37)

    i.   Specialty Care Referrals (Dkt 838 Item 38)

    j.   Endodontics (Dkt 838 Item 39)

    k.   Periodontics (Dkt 838 Item 40)

    l.   Informed Consent (Dkt 838 Item 41)

    m.   Electronic Medical Records (Dkt 838 Item 43)

    n.   Dental Quality Assurance (Dkt 838 Item 44)

8. I was asked to use the audit tool attached as Exhibit 58 in connection with my evaluation of the patient charts listed in Exhibit 51.

9. I have analyzed the patient charts listed in Exhibit 51 and I came to the following conclusions:

10. Overall, the dental care provided at the Monterey County Jail is adequate. Given the two week period for the audit, the dental team is functioning well. The care I reviewed in all patient charts for this audit was compliant with the applicable standard for the delivery of dental care in a correctional setting—in other words, all dental care I reviewed met acceptable levels of care in a correctional setting, regardless of whether that care was also in compliance with portions of the Implementation Plan.

11. I evaluate the delivery of dental care in a correctional setting based only on my professional experience in the correctional setting.

-3-
DECLARATION OF DR. MORT ROSENBERG

12. It is my professional opinion that many requirements of the Implementation Plan and the Court's Enforcement Order go beyond what the level of care is expected in a correctional setting, which can make compliance in a jail setting difficult to achieve.

13. Nevertheless, my audit revealed that the dental care provided at the Monterey County Jail during March 25, 2024 through April 8, 2024 was substantially compliant with the Implementation Plan in 8 of the areas of the Enforcement Order I was asked to review, partially compliant in 2 of the areas, and not compliant in only one area. There was not sufficient data in two categories for me to make any findings.

14. My findings are summarized in the following Chart and summary in Exhibit 52:

| Area of Compliance | Percentage of Compliance | Compliance Level |
|---|---|---|
| 29. Dental Intake Screening | 100% | Substantially Compliant |
| 30. Initial Health Inventory | 33% | Not Compliant |
| 32. Treatment for Urgent and Emergent Conditions | 85.7% | Partially Compliant |
| 33. Dental Sick Call | 100% | Substantially Compliant |
| 34. Chronic Care | N/A | Could Not Evaluate |
| 35. Comprehensive Care | 100% | Substantially Compliant |
| 36. Restorative and Palliative Care | 71.4% | Partially Compliant |
| 37. Extractions | 100% | Substantially Compliant |
| 38. Specialty Care Referrals | 100% | Substantially Compliant |
| 39. Endodontics | N/A | Could Not Evaluate |
| 40. Periodontics | 95.8% | Substantially Compliant |
| 41. Informed Consent | 100% | Substantially Compliant |
| 43. Electronic Medical Records | 100% | Substantially Compliant |
| **Overall System Score** | **95.3%** | **Substantially Compliant** |

*Gordon Rees Scully Mansukhani, LLP*
*315 Pacific Avenue*
*San Francisco, CA 94111*

-4-
DECLARATION OF DR. MORT ROSENBERG

15. With regard to Dental Intake Screening (Item 29), I reviewed the 39 randomized patient charts as indicated in Exhibit 51. My audit conclusions are summarized in the Audit tool produced as Exhibit 58. I also made the following observations about the care:

    a. CMFG is substantially compliant with this provision.

    b. The audit data indicates that the nursing staff are consistently screening patients for dental needs during the intake process. This process is sufficient to determine if a patient has an urgent, routine or no need for dental care. The below initial health inventory process is duplicative of the intake process. Therefore, it unnecessarily reduces needed nursing resources.

16. With regard to Initial Health Inventory (Item 30), I reviewed the 42 randomized patient charts as indicated in Exhibit 51. My audit conclusions are summarized in the Audit tool produced as Exhibit 58. I also made the following observations about the care:

    a. The overall score in this area is not compliant with the Implementation Plan, but that compliance score does not mean that the delivery of dental care in this area is below any applicable standards or causing any risk of harm to patients.

    b. Specifically, the present dental initial health inventory is unique to dental at Monterey; in other words, the jail is using a system that was created for this clinical team and greatly exceeds the level of care expected in a correctional setting. At Monterey, the nurses at the jail are for some unknown reason required to perform a separate assessment for dental in addition to the general health history form, which itself already includes dental questions. In my opinion, the dental questions in the general initial health inventory form adequately address a patient's dental needs. The addition of a second dental-specific form is duplicative and clinically unnecessary for the provision of care to the patients, and risks wasting valuable time and resources that could be better used elsewhere.

     c. In addition, nurses—even with proper dental training, are not best suited to do comprehensive dental evaluations. As such, having nurses complete the secondary dental assessment risks errors and further delays care when the dentist often has to modify the original dental priority level assigned by nursing staff.

     d. In sum, the additional dental-specific screening does not provide any additional information that would change the course of care for the patient. The additional screening simply overloads the nursing staff—unnecessarily depleting valuable resources. The initial screening alone is sufficient to create a baseline for a patient's dental needs. Further, the dental staff are best suited to make dental care decisions. A nurse, regardless of training, may incorrectly assign a dental priority to a patient. This is burdensome on the dental staff who are forced to reconsider the work of the nursing staff to determine the correct dental priority.

17. With regard to Treatment for Urgent and Emergent Conditions (Item 32), I reviewed the 8 randomized patient charts as indicated in Exhibit 51. My audit conclusions are summarized in the Audit tool produced as Exhibit 58. I also made the following observations about the care:

     a. CFMG is partially compliant in this area, however, part of the reason for this score is that the Implementation Plan requires more than what the level of care expected in a correctional setting requires. All charts reviewed in this category provided care within applicable standards and any findings of noncompliance with the Implementation Plan did not result in harm to the patient.

     b. In my review, I came across only two instances of the eight where a patient was untimely seen per the Implementation Plan standards. However, the patients were seen one and three days late, respectively, after the Implementation Plan required timelines. It is in my clinical opinion that no harm came to these patients from these brief delays

-6-

DECLARATION OF DR. MORT ROSENBERG

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

      in treatment. These brief delays in care were neither undue nor below the standards for a correctional setting.

  c. The present requirements of the Implementation Plan for Urgent and Emergent Conditions are overly restrictive. Specifically, this section of the Implementation Plan restricts the clinical judgment of the providers and confines them to artificial timelines which is a roadblock to their ability to provide adequate dental care.

  d. For dental care, an urgent or emergent condition appears when a patient is at risk of getting very sick or in unbearable pain and is unable to perform the essential daily functions of eating and sleeping. In a dental context, those types of emergencies are rare—especially in this type of setting. In a jail setting, it is unlikely that a patient will experience a dental emergency where a patient needs to be seen immediately or needs to be sent out to the hospital. Based on my experience overseeing dental care in a correctional setting, dental patients are typically sent out for emergency care due to complications from a dental procedure itself or, more commonly, as a result of sustaining gross bodily injury due to an assault, not due to a failure to provide adequate care. Even more unlikely is that a dental emergency or hospitalization leads to death.

  e. While there were only a few cases to review, this was to be expected because dental emergencies necessitating urgent or emergent response or hospital send-outs are rare.

18. With regard to Dental Sick Call (Item 33), I reviewed the 42 randomized patient charts as indicated in Exhibit 51. My audit conclusions are summarized in the Audit tool produced as Exhibit 58. I also made the following observations about the care:

  a. CFMG is substantially compliant with this requirement.

  b. Dental sick calls in a jail setting are typically low in number, which is evidenced by the low number of charts available to me to audit for the relevant time period. However,

-7-
DECLARATION OF DR. MORT ROSENBERG

my audit revealed that when there were dental sick calls, the patient was properly triaged and assigned to the dental clinic.

    c. I disagree with the Court appointed monitor's approach to auditing and reviewing this indicator in her most recent report. Specifically, the role of an expert monitor is to assess whether the patient was seen timely and treated. It is not the role of the monitor to comment on the clinical decision-making of the provider or nurse; many reasonable clinicians can have differing opinions as to the most appropriate treatment for a patient. The relevant inquiry is whether the patient received treatment at all and within established timeframes. Defining clinical care is outside the scope of a monitor's work, and it prevents the provider on-site from utilizing his or her own clinical judgment.

    d. For example, proper interim treatment in one case could be antibiotics; however, another dentist could believe that in order for the care to be deemed adequate, he or she must pull the patient's tooth. It is not within the role of an expert to opine on the adequacy of interim care because they are not viewing the patient in real-time. The monitor's role is not to substitute her own clinical judgment for the provider on-site at the time.

    e. For the data set I reviewed, all patients were triaged by a nurse in line with the Implementation Plan. Therefore, this section is substantially compliant with the Implementation Plan on or around March 25, 2024.

19. There were not enough patients with Chronic Care conditions seen during the audit period for me to make any findings or conclusions about compliance in this area. This is not surprising due to the transient nature of a jail population, much of which is typically released within 48 hours of booking. It is not uncommon or problematic for the jail to have no chronic care dental patients available for audit during the relevant time period.

20. With regard to Comprehensive Care (Item 35), I reviewed the 40 randomized patient charts as indicated in Exhibit 51. My audit conclusions are summarized in the Audit tool produced as Exhibit 58. I also made the following observations about the care:

   a. CMFG is substantially compliant in this area.

   b. It is my opinion, that Comprehensive Care is an unfair requirement for an Implementation Plan and does not address the reality of providing dental care in a jail (versus a prison). In my experience, patients simply do not stay in jail long enough to receive comprehensive periodic dental care.

   c. However, when an eligible patient did request periodic comprehensive dental care, the dental team provided the care in line with not only the Implementation Plan but also the level of care is expected in a correctional setting. Therefore, I find this area to be substantially compliant with the Implementation Plan.

21. With regard to Restorative and Palliative Care (Item 36), I reviewed the 29 randomized patient charts as indicated in Exhibit 51. My audit conclusions are summarized in the Audit tool produced as Exhibit 58. I also made the following observations about the care:

   a. CFMG is partially compliant in this area; however, part of the reason for this score is that the requirement, as written, is outdated due to the developments of dental care in the past decade.

   b. The Implementation Plan does not take into account the fact that interim measures are not utilized or necessary in current dental practice. Many modern dental materials provide reasonable longevity when used as interim or palliative restorations. The requirements of the Implementation Plan in this area restrict the dental team to outdated measures and inhibit their ability to provide dental care in line with the ever-evolving practice of dentistry. The fact that the dental team is not currently utilizing outdated practices in their treatment of patients should not be the reason to penalize them.

-9-
DECLARATION OF DR. MORT ROSENBERG

However, due to the language in the Implementation Plan, I was required to mark certain charts as not compliant with the Implementation Plan.

c. While the dental team may not be substantially compliant with the exact terms of the Implementation Plan, it is my opinion that the care provided by the team in this area complies with the applicable level of care is expected in a correctional setting. Therefore, the dental team is substantially compliant with the standards in this area, if not substantially compliant with the literal terms of the Implementation Plan.

22. With regard to Extractions (Item 37), I reviewed 2 randomized patient charts as indicated in Exhibit 51. My audit conclusions are summarized in the Audit tool produced as Exhibit 58. I also made the following observations about the care:

a. CFMG is substantially compliant in this area.

b. When necessary, patients were sent for outside oral surgery in line with the requirements of the Implementation Plan.

c. Given the nature of this population, it is unlikely that there will be a large number of patients in need of extractions for the time period under review. Extractions are not performed every day and therefore, a snapshot in time is difficult to review.

23. With regard to Specialty Care Referrals (Item 38), I reviewed 2 randomized patient charts as indicated in Exhibit 51. My audit conclusions are summarized in the Audit tool produced as Exhibit 58. I also made the following observations about the care:

a. CFMG was substantially compliant with specialty care referrals as of March 25, 2024 to April 8, 2024.

b. The patient population for the area of compliance is small, which is not surprising. However, those patients sent out for specialty care were done so in a manner and timeframe consistent with the Implementation Plan and community standards.

-10-
DECLARATION OF DR. MORT ROSENBERG

24. With regard to Endodontics (Item 39), I reviewed the 40 randomized patient charts as indicated in Exhibit 51. My audit conclusions are summarized in the Audit tool produced as Exhibit 58. I also made the following observations about the care:

   a. I was not able to determine a compliance score for this area due to the limited time frame of the audit period.

   b. There were no examples of root canals performed on qualifying patients at the jail. Specifically, no patients met the qualifications were in need of a root canal. This is not uncommon in a correctional setting. It is likely that you will find very few patients who meet the qualifications laid out in the Implementation Plan because of the transient nature of the jail population.

25. With regard to Periodontics (Item 40), I reviewed the 12 randomized patient charts as indicated in Exhibit 51. My audit conclusions are summarized in the Audit tool produced as Exhibit 58. I also made the following observations about the care:

   a. CFMG was substantially compliant with periodontics during the audit period.

   b. First, the intake staff performed the receiving screening on the patient, including the dental portion. Second, when requested by the patient, the dental staff performed a periodontal exam. Moreover, the charts indicated that the dentist performed a periodontal examination on numerous patients during the audit period.

   c. In my review of the patient charts, the dentist provided the necessary periodontal care to each patient. There was only one instance where the documentation did not match, meaning the care deviated from the Implementation Plan requirements. However, one deviation from the Implementation Plan does not negatively impact the entire system.

   d. The classifications utilized by the dental team are in line with the American Academy of Periodontology. The Academy is the leading body on gum disease.

    e. It is my opinion that the periodontal treatment provided by CFMG during the audit period was compliant with both the terms of the Implementation Plan and the level of care expected in a correctional setting.

26. With regard to Informed Consent (Item 41), I reviewed the 42 randomized patient charts as indicated in Exhibit 51. My audit conclusions are summarized in the Audit tool produced as Exhibit 58. I also made the following observations about the care:

    a. CFMG is substantially compliant in this area.

    b. The informed consent requirement in the Implementation Plan is too restrictive. Specifically, it is not necessary for a patient to sign a consent form for treatment each time he or she sees the dentist. There are times when general consent is needed, such as an x-ray or procedure. However, for a general dental visit, it is unnecessary for the patient to sign a consent form at each clinical encounter. If the patient is released and then ends up back in jail, then it is appropriate for the patient to sign a new general consent form to restart dental care during that incarceration period.

    c. In all of the areas I reviewed, when clinically applicable, written informed consent was in the patient file. However, the vast majority of patients during the audit period did not receive dental procedures invasive enough to require written informed consent in their files. This is not surprising due to the transient nature of the jail population.

27. With regard to Electronic Medical Records (Item 43), I reviewed the 39 randomized patient charts as indicated in Exhibit 51. My audit conclusions are summarized in the Audit tool produced as Exhibit 58. I also made the following observations about the care:

    a. CFMG is substantially compliant in this area.

    b. After my review of the dental records for the relevant audit period, it is my opinion that CFMG was substantially compliant with this requirement during the audit period.

-12-
DECLARATION OF DR. MORT ROSENBERG

> Specifically, the chart notes regarding the patient's treatments, orders, and offsite records were complete, as required by the Implementation Plan.
>
> c. CFMG's care in this area is compliant not only with the terms of the Implementation Plan, but also with all applicable standards of care.

28. With regard to Dental Quality Assurance requirement (Item 44), I reviewed the monthly CQI and MAC meeting materials developed by the Monterey County Jail during the audit period (Exhibit 49; Exhibit 50). These materials and meeting minutes address dental issues and show that these items were discussed in order to identify solutions. Necessary dental staff attended and participated in the meeting. While there is room for improvement in this process, the process exists. Overall, I conclude that the medical quality assurance process as it relates to dental care at the Monterey County Jail is substantially compliant with the terms of the Implementation Plan.

29. As for Clinical Staffing on the dental side (Item 1), while I was not specifically asked to audit this item, I can infer from the overall performance of the dental system at the Monterey County Jail that the staffing levels in the dental clinic are sufficient to provide a compliant level of dental care to patients at the jail.

30. As for Dental Training for Intake Staff (Item 31), while I was not specifically asked to audit this item, I can infer from the overall performance of the dental system at the Monterey County Jail that the dental training for the intake staff is sufficient to provide a compliant level of dental care to patients at the jail.

31. As for Sanitary Treatment Space (Item 42), I was not able to audit this area through a chart review. I reviewed Dr. Winthrop's observations in this area from her most recent monitor report. [Dkt. 902]. I have no reason to dispute Dr. Winthrop's finding of substantial compliance for this area.

-13-
DECLARATION OF DR. MORT ROSENBERG

32. Finally, I reviewed the most recent neutral dental monitor report prepared by Dr. Winthrop from her visit on April 1-2, 2024. [Dkt. 902]. It is my opinion that the process and tool utilized by Dr. Winthrop is overcomplicated, biased, and requires performance beyond the normal level of dental care required in a correctional setting. In addition, Dr. Winthrop does not review sufficient sample sizes for her audit to be of any use or help to the dental team to identify systemic issues or areas for improvement. It would be nearly impossible for any dental system to ever be reviewed as in substantial compliance with the framework Dr. Winthrop has set up. Further, Dr. Winthrop appears to be substituting her own clinical judgment for that of the onsite providers and using outdated expectations regarding dental care, which unfairly penalizes the dental team for using their own clinical judgment or more modern treatment options that are in line with current levels of care is expected in a correctional setting.

33. The dental team at the Monterey County Jail is providing adequate care to its patients. While the charts I reviewed were not all perfect, and there is always room for improvement, that does not preclude a finding of substantial compliance during the audit period I reviewed. All dental care that I reviewed was provided in accordance with applicable standards for the delivery of dental care in a correctional setting. The current system is able to adequately function to provide the patients with necessary dental care.

34. Overall, I found the delivery of dental care by CFMG at the Monterey County Jail between March 25 and April 8, 2024 to be in compliance with all applicable standards regarding the delivery of dental care expected in a correctional setting and in SUBSTANTIAL COMPLIANCE with the terms of the Implementation Plan and the Court's September Enforcement Order.

1  I declare under penalty of perjury under the laws of the United States of America and the

2  State of California that the foregoing is true and correct, and that this declaration is executed on

3  August 16, 2024 at _____Waikoloa,_____, _____Hawai'i_____

By: /s/ *Mort Rosenberg, DDS*
Dr. Morton Rosenberg, Declarant

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

-15-
DECLARATION OF DR. MORT ROSENBERG