LINDSEY M. ROMANO (SBN: 337600)
lromano@grsm.com
ALLISON J. BECKER (PRO HAC VICE)
abecker@grsm.com
ELIZABETH B. MCGOWAN (PRO HAC VICE)
emcgowan@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111
Telephone: (415) 875-4126
Facsimile:  (415) 986-8054

Attorneys for Defendants
CALIFORNIA FORENSIC MEDICAL GROUP, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation, and DOES 1-20,<br><br>Defendants. | CASE NO.  5:13-cv-02354-BLF<br><br>**DECLARATION OF DR. BRIAN WAXLER REGARDING MENTAL HEALTH AUDIT FINDINGS**<br><br>Judge: Hon. Beth Labson Freeman |

I, Dr. Brian Waxler, declare as follows:

1. I am a Doctor of Psychology, with a focus in clinical psychology and a long history providing correctional mental healthcare. I am currently employed as the Behavioral Health Lead Medical Director at MDLIVE.  Prior to that, I served as the Chief Psychologist at the Cook County Jail in Chicago, Illinois. Please see my attached CV, **Exhibit 61**.

2. In my role as Chief Psychologist at the Cook County Jail, my responsibilities included frequent chart audits, peer review, and quality assurance review of the care provided by the mental health staff at the jail.

-1-
DECLARATION OF DR. BRIAN WAXLER

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

3. For the past 1 year, I have provided services as a mental health expert in legal cases. I base my findings and determinations on my own clinical experience in the correctional setting and on the National Commission on Correctional Health Care standards (NCCHC).

4. I was retained by CFMG to provide my expert opinion on the state of the mental health care at the Monterey County Jail between March 25, 2024 and April 8, 2024 and evaluate the system's compliance with the Implementation Plan [Dkt 532] and the Court's September 26, 2024 Order Granting Plaintiff's Motion to Enforce [Dkt 838].

5. In order to form my opinions and prepare this declaration, I reviewed the following documents:

   a. Patient medical charts (See **Exhibit 57**);

   b. Implementation Plan [Dkt. 532];

   c. Order to Enforce Settlement Agreement [Dkt. 838];

   d. Randomized Booking Number List (Exhibit 53);

   e. MCJ Mental Health Monitor Report Dated April 2024 [Dkt. 895].

6. I was asked to audit randomized patient medical charts from the relevant time period and relevant clinical indicators and use my clinical judgment and the terms of the Implementation Plan and Enforcement Order in order to determine whether the care provided to those patients complied with the terms of the Implementation Plan and applicable standards of care.

7. Specifically, I was asked to review the care in the following enumerated areas as stated in the September Enforcement Order:

   a. Initial Mental Health Screening (Dkt 838 Item 12)

   b. Nursing Rounds in Administrative Segregation (Dkt 838 Item 13)

   c. Treatment Planning (Dkt 838 Item 15)

-2-

DECLARATION OF DR. BRIAN WAXLER

    d.   Chronic Care (Dkt 838 Item 16)

    e.   Acute Care (Dkt 838 Item 17)

    f.   Outpatient Services (Dkt 838 Item 18)

    g.   Psychiatric Follow-Up Visit Intervals (Dkt 838 Item 19)

    h.   Consideration of Mental Health in Discipline (Dkt 838 Item 20)

    i.   Segregation Placement Screenings (Dkt 838 Item 21)

    j.   Mental Health Programming in Segregation (Dkt 838 Item 22)

    k.   Involuntary Medication (Dkt 838 Item 23)

    l.   Suicide Risk Assessment and Safety Planning (Dkt 838 Item 24)

    m.   Medical Records (Dkt 838 Item 25)

    n.   Provider Visits to Holding and Isolation Cells (Dkt 838 Item 27)

    o.   Mental Health Quality Assurance (Dkt 838 Item 28)

    p.   Staffing (Dkt 838 Item 1)

8. I was asked to use the audit tool attached as Exhibit 57 in connection with my evaluation of the patient charts listed in Exhibit 53.

9. I have analyzed the patient charts listed in Exhibit 53 and the other materials provided to me, and I came to the following conclusions:

10. Overall, the mental healthcare provided at the jail is compliant with correctional community standards. Further, I conclude that the overall mental healthcare provided at the jail was in partial compliance with the Implementation Plan. While there are areas where the mental health team can improve, it is apparent that the mental health staff is working to meet the needs of the patients at the jail. Even when the care fell below the explicit terms of the Implementation Plan, it did not go so far as to violate any community standards of care for mental health in a correctional setting.

11. My findings are summarized in the following Chart and attached as Exhibit 54:

-3-

DECLARATION OF DR. BRIAN WAXLER

| Area of Compliance | Percentage of Compliance | Compliance Level |
|---|---|---|
| 12. Initial Mental Health Screening | 71.3% | Partially Compliant |
| 13. Nursing Rounds in Administrative Segregation | 100% | Substantially Compliant |
| 15. Treatment Planning | 96.4% | Substantially Compliant |
| 16. Chronic Care | 77.2% | Partial Compliance |
| 17. Acute Care | 100% | Substantially Compliant |
| 18. Outpatient Services | 94.4% | Substantially Compliant |
| 19. Psychiatric Follow-Up Visit Intervals | 89.3% | Substantially Compliant |
| 20. Consideration of Mental Health in Discipline | NA | Unable to Audit |
| 21. Segregation Placement Screenings | 26.6% | Not Compliant |
| 22. Mental Health Programming in Segregation | 80.5% | Partial Compliance |
| 23. Involuntary Medication | 100% | Substantially Compliant |
| 24. Suicide Risk Assessment and Safety Planning | 98.7% | Substantially Compliant |
| 25. Medical Records | 91.1% | Substantially Compliant |
| 27. Provider Visits to Holding and Isolation Cells | 100% | Substantially Compliant |
| **Overall System Score** | **79.2%** | **Partially Compliant** |

12. With regard to Initial Mental Health Screening (Item 12), I reviewed the 42 randomized patient charts as indicated in Exhibit 53. My audit conclusions are summarized in the Audit tool produced as Exhibit 57. I also made the following observations about the care:

   a. CFMG was partially compliant in this area.

-4-
DECLARATION OF DR. BRIAN WAXLER

    b. Overall, the initial mental health screening is being consistently completed by the nursing staff. A nurse who is properly trained in mental health can perform an initial mental health screening. All screenings were appropriately completed by nurses.

    c. The current wording of the Implementation Plan prohibits a nurse from performing the initial mental health screening. The initial mental health screening may only be performed by a Qualified Mental Health Professional (QMHP). This requirement is unnecessarily restrictive and a poor use of resources. I agree with Dr. Vess that this requirement should be revisited and rewritten to comply with applicable standards of care which allow a nurse to complete the initial mental health screening.

    d. This area is only partially compliant because nursing staff is prohibited to perform the initial mental health exam. In my opinion, this requirement is an unnecessary roadblock to CFMG's ability to achieve substantial compliance. If nurses were permitted by the Implementation Plan to complete the mental health screenings (as they are in most jail settings), my finding on this area would be substantial compliance.

13. With regard to Nursing Rounds in Administrative Segregation (Item 13), I reviewed the 29 randomized patient charts as indicated in Exhibit 53. My audit conclusions are summarized in the Audit tool produced as Exhibit 57. I also made the following observations about the care:

    a. CFMG was substantially compliant in this area.

    b. In each chart reviewed, 90% of the nursing rounds in segregation were completed. While this does mean that some segregation rounds were missed, it does not negate the fact that the nurses completed a substantially compliant portion of the required checks. In all cases I reviewed where a check was missed, the patient was not harmed by the missed check.

-5-

DECLARATION OF DR. BRIAN WAXLER

c. While this may fall outside the written requirements of the Implementation Plan, it does not fall outside the relevant standard of care. Nurses conduct visits with patients during med pass and many other times outside these specific rounds. It was apparent from my chart review that patients still maintained access to care while in administrative segregation. Therefore, one missed nursing round does not change the fact that CFMG is providing adequate care to the patient.

14. With regard to Treatment Planning (Item 15), I reviewed the 27 randomized patient charts as indicated in Exhibit 53. My audit conclusions are summarized in the Audit tool produced as Exhibit 57. I also made the following observations about the care:

a. CFMG was substantially compliant with this area.

b. The mental health staff were consistently and timely providing patients with treatment planning services and documenting it in their charts.

c. Out of the 27 patient charts, only three patients received untimely treatment plans. The patients were not harmed by any delays, nor were these delays below the standard of care. While treatment planning is important, treatment planning can often be reasonably delayed due to urgent mental health needs that require a diversion of resources. While the treatment planning delays I reviewed may fall outside of the strict requirements of the Implementation Plan, the delays were well within the applicable standard of care.

15. With regard to Chronic Care (Item 16), I reviewed the 29 randomized patient charts as indicated in Exhibit 53. My audit conclusions are summarized in the Audit tool produced as Exhibit 57. I also made the following observations about the care:

a. CFMG was partially compliant in this area during the audit period.

b. Overall, the mental health providers consistently documented their findings in the patient charts. However, patients were not consistently seen by psychiatry within the

-6-
DECLARATION OF DR. BRIAN WAXLER

required 30- to 60-day timeframe depending on their stability or medication status. This falls outside of the requirements imposed by the Implementation Plan.

c. Ultimately, in all my chart reviews, the patient was eventually seen and there was no resulting harm from the delay. All care reviewed for this area still abides by the applicable community standards.

16. With regard to Acute Care (Item 17), I reviewed the 27 randomized patient charts as indicated in Exhibit 53. My audit conclusions are summarized in the Audit tool produced as Exhibit 57. I also made the following observations about the care:

a. CFMG was substantially compliant in this area.

b. In this audit period, the mental health staff consistently and appropriately evaluated each patient's need for potential acute care services; however, there were no instances in this audit period where the patient needed to be sent to the hospital for outpatient services. This is not uncommon for a transient jail population and an audit period of this size. Nevertheless, I agreed with the clinical judgment of the mental health staff in all chart reviews for this area.

c. Each patient was evaluated and the team used appropriate screening and assessment tools while conducting their evaluations. All documentation was complete.

d. Overall, CFMG provided care in compliance with the Implementation Plan requirements and the applicable community standard of care.

17. With regard to Outpatient Services (Item 18), I reviewed the 29 randomized patient charts as indicated in Exhibit 53. My audit conclusions are summarized in the Audit tool produced as Exhibit 57. I also made the following observations about the care:

a. CFMG was substantially compliant with this area during the audit period.

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

    b. Patients were properly identified and scheduled for a meeting with mental health. After meeting with mental health, the patient was then timely provided with outpatient services.

    c. Out of the 29 patient charts I reviewed, only one patient was not properly scheduled for mental health services or outpatient services; however, this one deviation is not enough to affect my overall rating of compliance for the system as a whole.

18. With regard to Psychiatric Follow-Up Visit Intervals (Item 19), I reviewed the 29 randomized patient charts as indicated in Exhibit 53. My audit conclusions are summarized in the Audit tool produced as Exhibit 57. I also made the following observations about the care:

    a. CFMG was substantially compliant with this area during the audit period.

    b. CFMG was able to provide consistent psychiatric follow ups with the onsite physiatrist. Overall, patients were timely seen for their psychiatric needs and follow up visits. There were only five patients, out of the twenty-nine patient charts audited, where the patients did not receive a psychiatric follow up visit within the thirty day timeframe. While these five instances do not meet the requirements of the Implementation Plan, their delay in follow up was reasonable and still complies with community standards of care.

    c. Patients were consistently seen for their 60 and 90 day psychiatric follow up exams. I found only one instance where a patient was not seen within the required time imposed by the Implementation Plan. Regardless, the patient was not harmed by this delay, nor was this delay below the standard of care.

19. There was not sufficient data during the audit period for me to audit or come to any conclusions with regard to Consideration of Mental Health in Discipline (Item 20).

-8-

DECLARATION OF DR. BRIAN WAXLER

20. With regard to Segregation Placement Screenings (Item 21), I reviewed the 29 randomized patient charts as indicated in Exhibit 53. My audit conclusions are summarized in the Audit tool produced as Exhibit 57. I also made the following observations about the care:

    a. CFMG was not compliant with this area during the audit period.

    b. This is an area where CFMG could focus more resources. For example, I would recommend diverting qualified mental health professionals away from performing initial mental health screenings so their time could better be used for segregation placement screening.

    c. Based on my review of the charts, it appears that mental health was not often timely notified when a patient was placed in administrative segregation, which often led to a delay in suicide assessments. CFMG needs to ensure mental health staff are timely notified of transfers to administrative segregation by custody.

21. With regard to Mental Health Programming in Segregation (Item 22), I reviewed the 40 randomized patient charts as indicated in Exhibit 53. My audit conclusions are summarized in the Audit tool produced as Exhibit 57. I also made the following observations about the care:

    a. CFMG was partially compliant in this area as of the end of the purge period.

    b. CFMG is timely scheduling patients for weekly sessions with a qualified mental health professional while in segregated housing.

    c. Patients were not consistently provided with therapeutic activities outside their cell. Moreover, patients were also not consistently provided with sufficient group programming in the relevant timeframe.

    d. The nature of the Implementation Plan requires a finding of partial compliance. However, no harm came to the patients in any instance where mental health failed to

-9-

DECLARATION OF DR. BRIAN WAXLER

provide group programming or therapeutic activities. The care was within the applicable standard of care.

22. With regard to Involuntary Medication (Item 23), I reviewed the 9 randomized patient charts as indicated in Exhibit 53. My audit conclusions are summarized in the Audit tool produced as Exhibit 57. I also made the following observations about the care:

  a. CFMG was substantially compliant with this area during the audit period.

  b. It is unlikely, within this short of an audit timeframe that I would have a large group of patient charts to review. All patients were appropriately evaluated for involuntary medications. Out of the nine patient charts I reviewed, only one patient clinically qualified for involuntary medication. That one instance was handled in accordance with the Implementation Plan and the community standard of care.

  c. The remaining portions of the Implementation Plan in this area, such as 2603 orders and offsite transfers, did not appear within this audit period. Again, this is not uncommon given the nature of a jail setting and the limited timeframe of the audit period.

23. With regard to Suicide Risk Assessment and Safety Planning (Item 24), I reviewed the 34 randomized patient charts as indicated in Exhibit 53. My audit conclusions are summarized in the Audit tool produced as Exhibit 57. I also made the following observations about the care:

  a. CFMG was substantially compliant in this area during the audit period.

  b. The mental health team conducted complete suicide assessments on patients and documented their findings in the patients' charts. Moreover, a QMHP performed the suicide assessment, as required by the Implementation Plan and in line with the applicable community standard of care.

-10-
DECLARATION OF DR. BRIAN WAXLER

    c. Only one patient was identified as suicidal at intake and the mental health team timely completed the suicide risk assessment tool as required by the Implementation Plan and in line with the applicable community standard of care.

    d. When a patient was placed in a safety cell, the mental health team timely performed the suicide assessment as required by the Implementation Plan.

    e. Prior to release from the safety cell, a QMHP consistently performed an assessment prior to discharge from the safety cell. There was one instance where a patient was released from the safety cell without an assessment by a QMHP. However, based on my review, that instance was an outlier and does not reflect the workings of the entire system.

24. With regard to Medical Records (Item 25), I reviewed the 30 randomized patient charts as indicated in Exhibit 53. My audit conclusions are summarized in the Audit tool produced as Exhibit 57. I also made the following observations about the care:

    a. CFMG was substantially compliant in this area during the audit period.

    b. The patients' medical charts consistently contain records of all known mental health diagnoses. I only found five instances where the chart did not contain all known mental health diagnoses. The overall charting system is working in line with the requirements of the Implementation Plan and the applicable community standards.

    c. All patient charts reviewed included a treatment plan for mental health. This is in line with the Implementation Plan and the applicable standard of care.

25. With regard to Provider Visits to Holding and Isolation Cells (Item 27), I reviewed the 30 randomized patient charts as indicated in Exhibit 53. My audit conclusions are summarized in the Audit tool produced as Exhibit 57. I also made the following observations about the care:

    a. CFMG was substantially compliant with this area.

     b.  Every patient in the audit was seen by a MD or RN every Monday, Wednesday, and Friday in isolation. CFMG was consistently meeting the expectations of the Implementation Plan and community standards of care in this area.

26.    As for Clinical Staffing on the mental health side (Item 1), I was not specifically asked to review materials for this section. However, the mental health staff is able to provide adequate mental health services to the patients at MCJ in line with applicable community standards of care. As discussed above, there are areas where the Implementation Plan requires that QMHPs perform certain duties where a properly trained nurse would be perfectly appropriate. In order to strengthen the available resources at the jail, it would be prudent to allow nurses with the proper training to conduct the initial mental health screening.

27.    With regard to Corrective Action Plans (Item 26), I reviewed the Mental Health Subcommittee Meeting notes from March 26, 2024. It is evident that mental health staff was in the process of developing corrective action plans to address low performing audit areas. (Exhibit 55). However, given the limited audit period, I have to defer any findings of compliance, as I did not see any corrective action plans implemented in the jail during the March 25, 2024 to April 8, 2024 timeframe. However, based on my numerous chart reviews it is evident that there are improvements being made in many areas like timeliness of care and charting.

28.    With regard to Mental Health Quality Assurance (Item 28), I reviewed the Continuous Quality Improvement and Medical and Custody meeting materials developed by the Monterey County Jail during the audit period. (Exhibit 55). These materials demonstrate that the mental health team regularly meets to discuss patient needs, challenging cases, and how to improve the provision of care. The necessary members of the mental health team attended these meetings. While there is always room for improvement in this process, it exists and is functioning as intended. Therefore, CFMG is substantially compliant in this area.

-12-
DECLARATION OF DR. BRIAN WAXLER

29. I reviewed Dr. Vess's monitor report dated April 1-2, 2024. [Dkt. 895]. I find that his report does not focus on whether the mental health providers met the requirements of the Implementation Plan, but instead provides clinical notes on the care. As a monitor, it is our job to determine if the provider or nurse met with and treated the patient, not to impose our clinical way of practice on another capable clinician. However, I do agree with his comment that nurses with the right training should be allowed to perform the initial mental health screening. This would give the QMHPs more time to treat mental health patients.

30. Overall, I found the delivery of mental health care by CFMG at the Monterey County Jail between March 25 and April 8, 2024 to be in PARTIAL COMPLIANCE with the terms of the Implementation Plan and the Court's September Enforcement Order.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct, and that this declaration is executed on August 16, 2024 in Fox River Grove, IL _____, _____

By: _/s/_ _____
Dr. Brian Waxler, Declarant

**Gordon Rees Scully Mansukhani, LLP**
**315 Pacific Avenue**
**San Francisco, CA 94111**

-13-
DECLARATION OF DR. BRIAN WAXLER