LINDSEY M. ROMANO – 337600
ALLISON J. BECKER – *pro hac vice*
ELIZABETH B. MCGOWAN – *pro hac vice*
GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, California  94111
Telephone:     (415) 875-4126
Facsimile:      (415) 986-8054
Email:           lromano@grsm.com
                     abecker@grsm.com

Attorneys for Defendant
CALIFORNIA FORENSIC MEDICAL GROUP, INC


SUSAN K. BLITCH – 187761
County Counsel
ELLEN S. LYONS – 136011
Deputy County Counsel
TUCKER WISDOM-STACK – 300927
Deputy County Counsel
COUNTY OF MONTEREY,
OFFICE OF THE COUNTY COUNSEL
168 West Alisal Street, Third Floor
Salinas, California  93901
Telephone:     (831) 755-5045
Facsimile:      (831) 755-5283
Email:           LyonsE@countyofmonterey.gov
                     Wisdom-StackTN@countyof.monterey.gov

Attorneys for Defendant
COUNTY OF MONTEREY and
MONTEREY COUNTY SHERIFF'S OFFICE

(*counsel continued on following page*)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED., a California | Case No. 5:13-cv-02354-BLF<br><br>**JOINT STATUS REPORT RE; DISCOVERY DISPUTE**<br><br>Date:      September 16, 2024<br>Time:     10:00 a.m.<br><br>Judge:    Nathanael Cousins |

1  corporation; and DOES 1 to 20, inclusive,

2          Defendants.

3

4  (*counsel continued from preceding page*)

5  MICHAEL W. BIEN – 096891                   AVRAM D. FREY
   ERNEST GALVAN – 196065                      (*admitted pro hac vice*)
6  VAN SWEARINGEN – 259809                     AMERICAN CIVIL LIBERTIES UNION
   CAROLINE E. JACKSON – 329980                FOUNDATION OF NORTHERN
7  MAYA E. CAMPBELL – 345180                   CALIFORNIA, INC.
   ROSEN BIEN                                  39 Drumm Street
8  GALVAN & GRUNFELD LLP                       San Francisco, California  94111-4805
   101 Mission Street, Sixth Floor            Telephone:   (415) 621-2493
9  San Francisco, California  94105-1738      Facsimile:   (415) 255-8437
   Telephone:   (415) 433-6830                Email:       afrey@aclunc.org
10 Facsimile:   (415) 433-7104
   Email:       mbien@rbgg.com
11              egalvan@rbgg.com
                vswearingen@rbgg.com
12              cjackson@rbgg.com
                mcampbell@rbgg.com
13
   CORENE KENDRICK – 226642
14 KYLE VIRGIEN – 278747
   ACLU NATIONAL PRISON PROJECT
15 425 California St., Ste. 700
   San Francisco, CA 94104
16 Telephone:   (202) 393-4930
   Facsimile:   (202) 393-4931
17 Email:       ckendrick@aclu.org
                kvirgien@aclu.org
18

19

20 Attorneys for Plaintiffs

21

22

23

24

25

26

27

28

The parties submit the following joint statement in anticipation of the Status Conference on discovery disputes currently set for September 16, 2024:

Since the August 28, 2024 status conference, the parties have done the following:

- On August 30, 2024, CFMG provided objections to Plaintiffs' Requests for Production and Interrogatories.

- On September 5, 2024, the parties met and conferred as to discovery issues, including depositions.

- On September 11, 2024, CFMG responded to Plaintiffs' Requests for Production, Interrogatories and Requests for Admission. CFMG also began producing documents to Plaintiffs, which will be produced on a rolling basis. As of the date of filing this statement, CFMG has produced 76,170 pages of documents to Plaintiffs. CFMG will complete its production by September 20, 2024. *See* Dkt. 918 at ECF 3.

- Also on September 11, 2024, CFMG provided Plaintiffs with dates for its expert depositions. Plaintiffs will serve Defendants with deposition notices for their experts on the dates indicated. CFMG has not received any dates of availability of Plaintiffs' proposed witnesses as of the date of filing this statement.

- On September 11, 2024, County provided a written response and documents in response to Plaintiffs' First Request for Production of Documents propounded on County.

## I.    Defendants' Statement

### A.  Introduction

On September 11, 2024, CFMG produced substantive responses to Plaintiffs' Requests for Production, Interrogatories and Requests for Admission. The parties were able to resolve many of the disputes, but a few remain. As a general matter, many of the disputes involve the scope and relevance of certain requests. CFMG takes seriously Judge Freeman's directives at the Status

Conference on August 1, 2024. Specifically, the Court stated, "I will not find contempt based on conduct that you can't establish was occurring on March 25th of 2024. I would be reversed on appeal in a nanosecond." *See* August 1, 2024 Transcript, p. 29-30. In addition, CFMG seeks to protect its rights to due process and seeks reasonable discovery from Plaintiffs' proposed witnesses, which Plaintiffs have thus far refused to provide.

CFMG outlines its positions on the discovery disputes below and requests guidance from the Court.

### B.  Requests For Production

#### i.   RFP No. 2

Request for Production No. 2 seeks read only access to CorEMR with the ability to generate reports. CFMG objects on the grounds that the request is overbroad and unduly burdensome. Moreover, CFMG objects that this request does not seek production of a document, but access to a system. *Novotech (Australia) PTY Ltd. v. SureClinical, Inc.*, No. 2:22-CV-01259 JAM AC, 2023 WL 4905982 (E.D. Cal. Aug. 1, 2023) (Denying access to Novotech's record keeping system). CFMG has committed to produce the patient charts for each patient reviewed by its experts; it has already produced many of these charts and is continuing to produce them on a rolling basis per agreement with Plaintiffs' counsel. It will complete this production by September 20, 2024. Plaintiffs state that the voluminous records are impossible to navigate.

It was not until late on September 13, 2024, when Plaintiffs shared their portion of the Joint Status Statement, that they expressed that the records are impossible to navigate.  On September 12, 2024, Plaintiffs' counsel indicated in a letter that the records are "very disorganized and difficult to review." This language did not put CFMG on notice that the records were "impossible to navigate" as they now assert. CFMG, by agreement with the Plaintiffs, are producing a huge amount of data and doing so in a very short timeframe. CFMG is willing to

continue to work with the Plaintiffs' to identify a workable alternative and ask the Court to defer a ruling on this matter so that the parties can meet and confer regarding a mutually acceptable resolution.

### ii.  RFP No. 16

Request for Production No. 16 seeks communications between CFMG and any health care staff who began working at the jail in September 2023 and ended employment in December 2023 or January 2024. Plaintiffs have indicated that this request does not arise out of the Court's 2023 Enforcement Order or CFMG's Show Cause Briefing, but instead stems from a news story published in August 2024. CFMG objects to this request on many grounds, including scope, vagueness, privacy, potential privilege, and relevance.

CFMG is unsure what these communications, if any even exist, have to do with patient care on March 25, 2024. Most importantly, Plaintiffs' request seeks information prior to the expiration of the purge period, which is irrelevant to the Court's inquiry on sanctions. The request expressly states that the employment of the individuals would have ended months before March 2024. At 2:10pm PST today, Plaintiffs' counsel provided for the first time the name of an employee at issue. As Plaintiffs are well aware, in house counsel, and national outside counsel for CFMG and Wellpath are located on the east coast, and Wellpath's corporate offices are located in Nashville, Tennessee, in the central time zone. CFMG had no reasonable opportunity to investigate and consider this request in light of this new information at such a late hour before this joint statement was due. CFMG requests that the Court sustain its objections to this request and rule that it is not required to produce any documents in response. If the Court is inclined to allow discovery on this issue, CFMG requests that the Court defer ruling the parties an opportunity to meet and confer further on a reasonable list of custodians and search terms.

### iii.  RFP No. 17

Request for Production No. 17 is similar to No. 16. It requests communications between

CFMG and health care staff where the staff member expressed concern or disapproval regarding care at the jail from March 1, 2024 to April 15, 2024. Again, CFMG objected to this request due to the scope, vagueness, relevance, and the burdensome nature of the request. CFMG also objected on potential privacy and privilege grounds. Again, the request seeks information prior to the expiration of the purge period (March 1-March 24), which is irrelevant for an evaluation regarding the state of care on March 25, 2024. Moreover, this request seeks potentially confidential communications between employees that encourage candor for purposes of development and quality assessment. As stated above, CFMG does not understand how any such communications are relevant to the care provided on March 25, 2024 and the forty-three areas listed in the Court's Enforcement Order.

Furthermore, while appropriately narrowed as to time, Plaintiffs' proposed search terms for narrowing the scope of this request remain broad and burdensome. Plaintiffs have also not narrowed the scope of individual custodians they ask CFMG to search. CFMG requests that the Court sustain its objections to this request and rule that it is not required to produce any documents in response. If the Court is inclined to allow discovery on this issue, CFMG requests that the Court defer ruling the parties an opportunity to meet and confer further on a reasonable list of custodians and search terms

### iv.   RFP No. 22

Request for Production No. 22 seeks drafts of the experts' audit tools. CFMG objected to this request on the grounds that it seeks documents protected by the work product privilege and Federal Rule of Civil Procedure 26(b)(4)(C). Specifically, draft audit tools are protected by the work product privilege and therefore, protected from disclosure. *See In re Application of Republic of Ecuador*, 280 F.R.D. 506 (N.D. Cal. 2012), *aff'd sub nom. Republic of Ecuador v. Mackay*, 742 F.3d 860 (9th Cir. 2014) (Holding that draft worksheets are treated as qualified work product).

Therefore, CFMG takes the position that Plaintiffs are not entitled to any draft audit tools as it is qualified work product of the experts. Notably, Plaintiffs have not provided any justification for their request through meet and confer or otherwise. CFMG requests that the Court sustain its objections to this request and rule that it is not required to produce any documents in response.

### C.  Neutral Monitor Reports

Plaintiffs make numerous requests for information regarding CFMG's position on the neutral monitor reports admissibility and findings. *See* RFA No. 23; RFP Nos. 21, 23; Interrogatory Nos. 8, 9. Based on the Court's comments at the August 1, 2024 status conference, CFMG understands that the most recent monitor reports ("Final Report(s)") from Dr. Vess, Dr. Barnett, and Dr. Winthrop are inadmissible. Specifically, each Final Report is based on an average of evaluations of care provided over a number of months; the Final Reports do not make findings based on care provided on March 25, 2024 or immediately after. For example, Dr. Winthrop's Final Report reviewed care from July 2023 to March 2024, and she averages her findings together to come to conclusions. *See* Dkt. 902. It is not easy to interpret from Dr. Winthrop's audit tool when these patients were treated or whether any patients she reviewed received care on or after March 25, 2024. Similarly, it is impossible to tell from Dr. Vess's report which patients he reviewed or when exactly they were treated, but his report appears to be based on care provided in February and March of 2024. Because his visit was on April 15-16, 2024, the majority of care he could have reviewed was provided before the end of the purge period. Dr. Barnett's report indicates that he reviewed patient care on the following days: February 1-2, 9, 25 and March 4, 2024—all dates before the end of the purge period. *See* Dkt. 882, p. 44.

The monitors did not base their findings in their Final Reports only on care provided on March 25, 2024 or immediately thereafter. Most, if not all, of the care reviewed by the monitors was necessarily provided prior to the end of the purge period. Because of this, the findings in the Final

Reports—especially if they are based on a retrospective review or historical averages—cannot form the basis for any sanctions per Judge Freeman's explicit direction at the August 1 status conference. Accordingly, discovery requesting CFMG's position on the Final Reports or any other information regarding the Final Reports is not likely to lead to the discovery of admissible evidence and is not proportional to the needs of the current dispute. The Court made clear that scope of the evidence presented at the December 16-17, 2024 hearing should be limited to patient care provided on or shortly after March 25, 2024.

CFMG requests that the Court sustain its objections to this request and rule that it is not required to produce any documents or information in response.

### D. Witnesses

CFMG has the following objections to Plaintiffs' requests for depositions and to their proposed witnesses for the evidentiary hearing.

### i. Records Custodians

Plaintiffs have requested to depose the following records custodians: Jamie Silveira, Paulette Torres Collazo, Dr. Nicole Taylor, and Captain Rebecca Smith. CFMG filed a three-page declaration for each records custodian with its Show Cause Brief. *See* Dkt. 905. The declarations lay out how each custodian pulled the raw data and which documents they were responsible for producing. The parties agreed to limit testimony from these witnesses to only the information in the declarations. *See* Dkt. 918, p. 4. Plaintiffs have requested four hour depositions of each witness, but have provided no explanation as to why they need four hours to depose witnesses whose declarations are each no more than three pages, where they have already stipulated that the scope of the deposition should be limited to the declarations. In addition, the parties are seeking to schedule depositions of CFMG's experts between now and October 11 and also may need to schedule depositions of any number of unknown individual fact witnesses that Plaintiffs may call. Plaintiffs' request for 16 hours of deposition testimony from records custodians in a discovery

time period that is supposed to close in 30 days is unreasonable and not proportional to the needs of the dispute or the testimony these witnesses will be offering.

CFMG has requested that the parties stipulate as to the authenticity of the data based on the declarations produced with the Show Cause Brief in order to conserve resources and possibly avoid the need for depositions of these witnesses altogether. Specifically, these witnesses all have an important role in providing direct care at the Monterey County Jail. It is unduly burdensome to pull them away from their clinical responsibilities in order to testify consistent with a declaration that has already been provided. Therefore, CFMG requests that the Court rule that depositions of the records custodians are unnecessary and unduly burdensome. If the Court finds that depositions are necessary, CFMG requests that the Court limit the deposition time to no more than one hour per witness given the limited scope of their testimony.

### ii.  Neutral Monitors

Based on the Court's statements during August 1, 2024 hearing and the reasons stated above, the neutral monitors' Final Reports are inadmissible and not probative of the state of the delivery of healthcare on March 25, 2024 or immediately after. CFMG never intended to call the monitors at the evidentiary hearing during its case in chief. Plaintiffs have indicated that they intend to call the neutral monitors as witnesses at the evidentiary hearing, but have not forecasted what their testimony might be, not provided their availability for a deposition, and not provided any framework for how discovery of the monitors' opinions might be accomplished. If CFMG is not permitted some discovery into the anticipated testimony of the monitors, it would be a violation of CFMG's due process rights. CFMG cannot propound discovery directly on the monitors, who are not parties to this action, and are not currently represented.

For the reasons stated above, any testimony from the monitors would be irrelevant to the current dispute given that their Final Reports were generated from data that was gathered before

the end of the purge period. CFMG therefore requests that this Court rule that the monitors are not proper witnesses in this case. CFMG requests this ruling not only to conserve resources in a limited and expedited dispute where the testimony is unlikely to be relevant or probative of the issues at hand, but also to preserve the monitors' positions as neutrals in this case. Putting CFMG in the position of having to cross examine its neutral monitors will transform the relationship into an unnecessarily adversarial one, erode the relationship between CFMG and the monitors, and potentially lead to a loss of trust and collaboration between CFMG and the monitors who are Court-appointed to help it come into compliance.

If the Court agrees that monitors can testify, CFMG requests the Court's guidance on the following issues regarding the involvement of the neutral monitors as witnesses to ensure that CFMG has a full and fair opportunity to defend itself in this dispute. Specifically, we request that the Court determine:

1) Will the monitors be assigned counsel? If so, who will it be, how will counsel be selected, and who will pay for this outside counsel? Will an extension of time and continuance of the hearing be granted to allow for outside counsel to get up to speed?

2) How should CFMG propound written discovery on the monitors? Does it need to issue subpoenas? Who will respond on the monitors' behalf?

3) If CFMG must depose the monitors, what is the deadline for those depositions? Will the scope of the depositions be limited in any way? Who will pay for the monitors' time in depositions?

The complexity of these issues makes it difficult for CMFG to understand how the limited testimony that the monitors could possibly have to offer in this dispute could ever outweigh the burdens summarized above.

### iii.  Plaintiffs' Witnesses

Plaintiffs' have not yet disclosed any fact witnesses. CFMG requested that Plaintiffs begin disclosing their witnesses by September 23, 2024. CFMG has also requested that Plaintiffs provide a deposition date for each witness and a written declaration for each witness at the time of disclosure so that CFMG may promptly evaluate the need for any written discovery or depositions of those witnesses. Plaintiffs have refused to do so, claiming that they have insufficient information to begin identifying witnesses by September 23. CFMG finds this position incredible.

First, CFMG has already produced information sufficient for Plaintiffs' counsel to identify by name and booking number every individual reviewed by its experts in their audit of the system. Second, Plaintiffs will be interviewing potential witnesses during their scheduled tour on September 18 and 19. Third, CFMG has already begun producing patient charts to Plaintiffs' counsel and has committed to producing all charts by September 20. There is no reason that Plaintiffs cannot begin to disclose witnesses beginning on September 23 after having received information sufficient to identify patients as early as August 16, and after having received patient charts on a rolling basis beginning September 11. Plaintiffs have also offered no explanation as to why they cannot provide a reasonable forecast of their witnesses' testimony via declaration on a rolling basis as well. Plaintiffs have already stipulated that CFMG is entitled to some discovery of their witnesses—certainly serving an interrogatory seeking that Plaintiffs identify their witnesses and provide a summary of the subject matter of their anticipated testimony would not be objectionable.

Given the expedited timeframe and the fact that CFMG provided declarations for each of its own witnesses without the need for formal discovery, a request for Plaintiffs to provide this information is reasonable and proportional. Plaintiffs claim that they do not want to further delay the case but seem insistent on delaying CFMG's access to the information they intend to present at the hearing. CFMG, however, will not waive or compromise its right to due process or its rights to

fully evaluate the evidence against it before proceeding to a hearing at which sanctions and contempt will be evaluated. If Plaintiffs need additional time to review records and interview their clients, CFMG is willing to consent to a continuance of the evidentiary hearing in this matter to allow Plaintiffs sufficient time to investigate. In fact, Judge Freeman proposed this very idea at the status conference on August 1. [August 1, 2024 Transcript, p. 23:9-1 "…if you get into this over the next 60 days and realize that even the Plaintiff would like more time to develop the information you need, I'm pretty sure [defendant] will be amenable to recommending a later date…"].

CFMG requests the Court order Plaintiffs to begin identifying their fact witnesses no later than September 23 and order Plaintiffs to produce declarations of those fact witnesses on a rolling basis with a set deadline for disclosure of all witnesses. CFMG also requests that the Court set a reasonable timeframe for depositions of Plaintiffs fact witnesses.

**E. Conclusion**

CFMG requests that the Court assist in resolving the above discovery disputes.

**II.    Plaintiffs' Statement**

On August 1, 2024, Judge Freeman told Defendants' counsel that Wellpath's contention that the neutral monitors' methodology was inappropriate and needed to be changed was "frivolous" and made in "bad faith."  Hearing Tr. at 21-22.  Nevertheless, Wellpath hired auditors to criticize the neutral monitors' methodology, and have suggested that the different methodology used by their experts should be determinative of Wellpath's substantial compliance.  Plaintiffs' discovery seeks in part to better understand how Wellpath developed and conducted its audit using a different methodology.

Plaintiffs' requests are proportional to the issues in this case, involving a certified class of people incarcerated who have historically been exposed to harrowing conditions of confinement in a Jail that has a death and suicide rate substantially higher than other jails in California and across the nation.  Plaintiffs are indigent individuals who have no access to the information sought

1   herein.  Wellpath is a for-profit company that contracts with hundreds of jurisdictions to provide

2   care in correctional facilities.  Given the parties' relative access to this information, the parties'

3   resources, and the vital importance of this information to resolving the issue of Defendants'

4   compliance, and the minor burden of providing the information sought, Plaintiffs' requests are

5   appropriate and proportional under Fed. R. Civ. P. Rule 26(b)(1).

6       Plaintiffs RFPs, Rogs, and RFAs are attached as **Exhibit A**.  Defendants' objections are

7   attached as **Exhibit B**.

8       **A.      Request for Production No. 2: CorEMR Access**

9       Request for Production No. 2 requests: "Read-only access to CorEMR, including the

10  ability to generate reports."  CorEMR is Wellpath's electronic medical record system, which

11  contains medical records reflecting all medical, mental health and dental care provided at the Jail,

12  and which has the capacity to generate reports summarizing care.

13      Wellpath[1] refused to Provide Plaintiffs with CorEMR access, objecting "on the basis that it

14  is overbroad and unduly burdensome and does not seek the production of a document, but access

15  to a system."

16      As explained further below, read-only access to CorEMR is necessary for Plaintiffs to

17  review the 1,000+ patient records on which Defendants' experts allegedly relied in developing

18  their opinions about Wellpath's compliance with the Court's orders.

19      The access Plaintiffs seek is the same as was provided to Defendants' experts, all of whom

20  were granted CorEMR access.  Wellpath also provides the neutral monitors with CorEMR access

21  under the Settlement Agreement, which contains similar language for the neutral monitors and

22  Plaintiffs' counsel to review relevant documents.  *See* Dkt. No. 494 ¶¶ 40(b) & 41.  And Plaintiffs'

23  counsel have access to the electronic medical record systems of other entities where we have

24  similar monitoring duties, *see* **Exhibit C**, Declaration of Caroline E. Jackson; **Exhibit D**,

25  Declaration of Maya E. Campbell; **Exhibit E,** Declaration of Corene Kendrick.

26      In lieu of providing the requested CorEMR access, on September 11, Defendants began

27

28  _____
[1] Throughout, Plaintiffs use "Wellpath" to refer both to CFMG and to Wellpath.

their rolling production of patient records in PDF form, providing records for 23 patients.  These records, *for only 23 patients*, included over 500 separate PDFs totaling more than 22,000 pages.  If Defendants continue to produce patient records as PDFs for the 1,000+ patients at hand, this will amount to over 1,200,000 pages of PDF files that Plaintiffs must review to have a meaningful opportunity to respond to Defendants' claims.

Worse still, these PDF records are nearly impossible to navigate.  The records Defendants have produced are divided across hundreds of individual PDF files with randomly generated file names that bear no relation to their contents.  The folder of PDF files for a class member identified as "001140"[2], for instance, contains 157 separate PDF files with no evident organizational structure.  All but one of these files carry titles such as "1b35164dd8e248dc9560a3e74dd88aec" and "457a2ac1e11e0a55f36845256bbc0c3e.pdf," which carry no discernible indication of their content.  The file beginning "1b351" is a single dental x-ray, with no indication of the associated exam; and the file beginning "457a2" appears to be a medical order placing the patient on suicide watch and adjusting his psychiatric medications.  None of the records are organized by date or event.  Within a single PDF, records from 2024 appear both before and after records from 2019, records from completely different bookings appear on the same page without clear separation, and identical records appear in multiple locations.  Simply finding this person's most recent receiving screening involves sifting through hundreds of pages of documents that contain multiple accounts of multiple receiving screenings for different bookings.  And it is impossible to use these records to identify other highly relevant information, such as: when was this person referred for specialty care?  (There is no document with that title and Defendants have refused to provide the information otherwise.)  What information or referrals did this patient receive on discharge?  (Plaintiffs were not able to locate any relevant records, despite evidence that this patient has been discharged from the Jail at least three times in the past year.)

Simply put: it is unduly burdensome—indeed, impossible—for Plaintiffs to meaningfully review an audit of the records of over 1,000 patients by sifting through tens or hundreds of

---

[2] Defendants disclosed the patient's name; Plaintiffs have omitted it to avoid the necessity of sealing patient information.

thousands of randomly titled PDFs, totaling over a million pages, with no discernible organization. Being unable to meaningfully review these records severely prejudices Plaintiffs' ability to prepare for the December evidentiary hearing.

By contrast, electronic medical records systems are designed to provide efficient access to specific information, such as a particular exam, procedure or test result. Prior to receiving their position today, the only reason Defendants gave for not providing read-only CorEMR access to Plaintiffs is the burden of training Plaintiffs' counsel on using the system. Yet, Defendants have attested that they trained all three of their experts on using CorEMR in a single day. *See* Declaration of Katherine Tebrock ¶ 19. An invoice produced by one of Defendants' experts, Dr. Waxler, shows the CorEMR training lasted exactly *one hour*. Given Plaintiffs' existing experience navigating the electronic medical record systems of other correctional institutions, it will not require an unreasonable level of training to gain a basic command. The minor inconvenience of orienting experienced counsel to Wellpath's electronic medical record system cannot exceed the burden of downloading, Bates stamping, and producing tens of thousands of files.

Defendants never claimed security concerns or the need to "sit and supervise Plaintiffs' access during each use" in meet and confer. Nor do they substantiate these red herring claims in their position statement. Defendants fail to identify why their experts and the neutral monitors do not pose a similar threat. Plaintiffs' counsel is already obligated to protect the confidentiality of "medical records" under the protective order. *See* Dkt. 401.

Finally, Defendants' reliance on *Novotech (Australia) PTY Ltd. v. SureClinical, Inc.*, 2023 WL 4905982, is misplaced. In *Novotech*, "the legal standard applicable to motions to compel compliance with requests for production and interrogatories [was] not implicated because no interrogatories or requests for production ha[d] been issued. *Novotech (Australia) PTY Ltd. v. SureClinical, Inc.*, 2023 WL 4905982, at *3. Moreover, the court held SureClinical's request for system access "is premature" and denied it "without prejudice." *See id.* at *6.

**B.     Request for Production No. 16: Emails of Specific Employee**

Plaintiffs requested:

Any and all DOCUMENTS reflecting COMMUNICATIONS between DEFENDANTS and any member of the HEALTH CARE STAFF who began working at the JAIL in September 2023 and whose employment ended in December 2023 or January 2024.

On August 8, 2024, news station KSBW published a deeply concerning report regarding the state of medical care at the Monterey County Jail.  *See* Paul Dudley, *Monterey County Jail nurses allege abusive practices and inmate neglect amid staffing crisis*, KSBW Action News, (Aug. 8, 2024), https://www.ksbw.com/article/monterey-county-jail-nurses-allege-abusive-practices-and-inmate-neglect-amid-staffing-crisis/61808340  (last visited Sept. 12, 2024).  This report featured two anonymous nurses, one of whom was employed at the Jail from September to December 2023 and the other of whom was still employed at the Jail at the time of the report. Both nurses gave alarming accounts about the state of care provided at the Jail, including that: (1) staffing was dangerously inadequate to meet the medical needs of the patient population; (2) nurses received deeply insufficient training at the time of hire; (3) nurses and custody staff were made to work long hours with insufficient breaks; (4) patients faced lengthy delays in receiving care, with potentially life-long consequences; (5) patients with serious mental health conditions faced shocking neglect, including being left for days in feces-covered cells; (6) custody officers actively discouraged nurses from placing qualifying patients on suicide watch to avoid increasing the deputies' workload; and (7) nurses who complained about conditions were fired.

These issues are highly relevant to the requirements for which Wellpath has been found non-compliant by the neutral monitors.  Indeed, the neutral monitors themselves have made similar findings.  Even if the responsive documents pre-date the end of the purge period, they are relevant not only to Wellpath's policies and practices during the purge period, but also potentially after the purge period given that correctional reforms tend to take considerable time.  *See* August 1, 2024 Hearing Tr. at 32 (Judge Freeman stating "in this case it's not realistic that CFMG could turn on a dime and come into compliance tomorrow where they weren't today."); Declaration of CFMG Expert Joshua Rafinski, Dkt. No. 905-2, ¶ 14 ("measurable changes in organizational culture in healthcare settings typically require at least a decade to achieve").  Indeed, the neutral monitors' reports consistently show that the problems that the Monterey County Jail are

entrenched—little changes from report to report, making events that may have occurred in November or December valid indicators of what may still be happening a few short months later. *Compare* 15th Medical Audit Report at 7 (staffing at the Jail was "inadequate to meet demand for services") *with* 16th Medical Audit Report at 6 (same); *and compare* 15th Medical Audit Report at 9 (patients did not receive the required 14-day or six month health exams and physician care was often delayed) *with* 16th Medical Audit Report at 9 (same); *and compare* 15th Medical Audit Report at 33 (patients with complex needs do not receive adequate care) *with* 16th Medical Audit Report at 36 (same).

Wellpath's contention that they do not know the name of the employee in the news report is itself incredible.  In any event, on September 13, 2024, Plaintiffs provided the name of the nurse for whom they seek responsive documents and communications.

### C.    Request for Production No. 17: Email Communications Regarding Patient Care

Plaintiffs requested:

> For the time period January 1, 2024 to April 30, 2024, any and all DOCUMENTS reflecting COMMUNICATIONS between DEFENDANTS and any member of the HEALTH CARE STAFF in which the member of the HEALTH CARE STAFF expressed concern or disapproval regarding the care provided to individuals at the JAIL or the training the HEALTH CARE STAFF member had received upon hire.

After meeting and conferring with Defendants, Plaintiffs "agree[d] to limit scope to March 1 – April 15, 2024, and to communications between healthcare personnel and any other healthcare personnel or superior that includes one or more of the following terms, including variations of the terms listed: 'trouble' (including 'troubles,' 'troubled' and 'troubling,' etc.), 'harm' (including 'harms,' 'harmed,' etc.), 'sue' (including 'sued'), 'lawsuit,' 'standard of care,' 'protocol' (including 'protocols'), and 'malpractice.'"

In their Show-Cause Briefing, Defendants maintain that none of the deviations from the Implementation Plan that their experts identified "resulted in harm to any patient" and that Wellpath was still "providing care consistent with applicable standards."  *See* Dkt. No. 905 at 3. The KSBW report cited above suggests otherwise: it describes deeply disturbing conditions at the Jail that are still ongoing and that are known to healthcare staff.  Plaintiffs have crafted a narrow

discovery request designed to bring to light evidence of serious departures from applicable standards of care that result in patient harm, to the extent that these are discussed by healthcare staff.

In response to Defendants' objections, Plaintiffs limited this request to communications including just seven specified key words that took place in the three weeks immediately leading up to and immediately following the expiration of the purge period. With the limitations to which Plaintiffs' have already agreed, this request is not vague or overbroad. Defendants' continued objections to this narrowed request are meritless.

**D.      Request for Production No. 22: Audit tools**

In Request for Production No. 22, Plaintiffs requested:

> All DOCUMENTS related to the AUDIT TOOLS used in Exhibits 56-58 to DEFENDANTS' SHOW CAUSE BRIEF, Dkt. No. 905, including non-final drafts of the AUDIT TOOLS, COMMUNICATIONS regarding the AUDIT TOOLS, the qualifications of the individual primarily responsible for developing each AUDIT TOOL, and all DOCUMENTS showing facts or data considered during the development of the AUDIT TOOLS.

Defendants objected to this request as overbroad, compound, vague, and seeks information protected by the work product privilege and Federal Rule of Civil Procedure 26(b)(4)(C). Ultimately, Defendants produced the declaration of Katherine Tebrock, Wellpath's Associate General Counsel Regulatory Compliance, which is attached **Exhibit F**, and no other documents.

Plaintiffs are entitled to documents concerning how the audit tool was developed. First, Defendants assert unspecified "work product privilege." Attorney work product is discoverable when the party seeking discovery "has substantial need for the materials . . . and cannot, without undue hardship, obtain their substantial equivalent by other means." *ACLU of N. Cal. v. U.S. Dep't of Justice*, 880 F.3d 473, 484 n.8 (9th Cir. 2018) (alteration in original) (quoting Fed. R. Civ. P. 26(b)(3)(A)(ii)). Obtaining draft audit tools and communications about the audit tools' development is critical to Plaintiffs' ability to challenge the reliability of those audit tools. Because Wellpath's case rests entirely on reports generated from those audit tools, how the audit tool was developed and what information was communicated about it is highly relevant. Ms. Tebrock's declaration makes clear that Ms. Tebrock (Wellpath's Vice President and Associate

General Counsel) and Ms. McGowan (Wellpath's outside counsel) were the only people involved in drafting the audit tools, there is no equivalent to this work product that Plaintiffs could obtain by other means.

Second, to the extent Ms. Tebrock's and Ms. McGowan's draft audit tools and communications about those tools reflect their opinions and mental impressions, those documents are discoverable under Ninth Circuit law because their "mental impressions are at issue in [this] case and the need for the material is compelling." *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992).  Whether Defendants' experts' opinions are based on reliable methods is one of the central issues before the Court in the December evidentiary hearing, and the process for developing the audit tool is central to the reliability of the experts' opinions.  Ms. Tebrock and Ms. McGowan placed at issue their opinions and impressions about the development of those audit tools by choosing to draft the audit tools themselves.  Plaintiffs have a compelling need for information about how the audit tools were developed and have no other means of obtaining this information because, according to Defendants, Ms. Tebrock and Ms. McGowan acted alone in drafting the audit tools.  These drafts and communications are therefore discoverable.

Finally, Ms. Tebrock's declaration indicates that the draft medical audit tool was provided by Ms. Tebrock and Ms. McGowan to Defendants' expert Joshua Rafinski to review.  Based on the audit tools, including this draft medical audit tool, Mr. Rafinski then rendered his opinion that Defendants' audit process was "in compliance with best practices for statistical methods and should contain statistically valid results."  Rafinski Decl., ¶ 22.  Rule 26(b)(4)(C)(ii) makes discoverable all communications between counsel and experts that identify facts or data that the experts relied on in forming their opinions.  Because the content of the audit tools was part of the factual basis for Mr. Rafinski's opinion that Defendants' audit process was statistically valid, Ms. Tebrock's and Ms. McGowan's communications with Mr. Rafinski about those audit tools are discoverable under Rule 26(b)(4)(C)(ii), including the communications in which they provided the draft medical audit tool to Mr. Rafinski for his review.

**E.      Neutral Monitor Reports**

The Court has not held that the Neutral Monitor Reports will be inadmissible at the December Hearing.  At the status conference held on August 1, 2024, the Court stated: "I didn't read the monitor reports because I want your briefing on it."  Tr. at 7:10-11.  The Court did state in passing that "averages" of Defendant's performance during the purge period "ultimately won't even be admissible evidence."  *See* tr. at 14:18.  However, it is not reasonable to interpret this statement as a ruling on the admissibility of reports the Court had yet to review.

Rather, at the August 1 Conference, the Court stated an intent to consider the neutral monitors' most recent reports in determining whether Wellpath has purged their contempt.  Specifically, the Court stated:

> [T]hey're experts, and so the basis on which they render that opinion will be the conduct they've observed over the prior number of months of their study . And, so, it's -- and I know that may sound a little different than what I just said about I'm not going to hear evidence of noncompliance in September as evidence of -- as proof that there's noncompliance on March 25.  **I need the monitors' opinion that there was not compliance on the purge date.**  And I don't tell -- I don't tell the experts what the foundation for their opinion is.  I get to decide whether I find it's sufficient.  So, if all of their evidence, in fact, as Ms. Becker suggests, is -- is really outdated, I might find an absence of support for the opinion given or I may find that there's continued evidence that nothing has changed.
>
> So, I hope that gives you a little guidance on this.  I'm not expecting a new monitor report, but I need -- there'll need to be opinions as of the purge date, and how the expert reaches the opinion, you know, they're the expert.  They -- they're teaching me.  That's why I need an expert in the case.

Tr. at 33:4-24 (emphasis added).  These statements are consistent with the Court's prior order that:

> The neutral monitors will provide reports regarding Wellpath's compliance with requirements 1-13 and 15-44 at the end of the six-month purge period.  If the neutral monitors find that Wellpath is not in substantial compliance with one or more of these requirements, Wellpath shall be required to show cause, in writing and within ten days after issuance of the reports of non-compliance, why Wellpath should not be required to pay civil contempt fines in the amount of $25,000 per requirement.

Dkt. No. 838 at 27.

Far from being irrelevant, the neutral monitor reports are the best evidence available to either party regarding the neutral monitors' opinions as to Defendants' compliance with the requirements listed in Dkt. No. 838 ("Enforcement Requirements") at the expiration of the purge period.  And it is simply not true that the neutral monitors limited their review to an audit of

patient charts.  Given that Defendants' compliance with the Enforcement Requirements is the entire focus of the December Hearing, Plaintiffs' counsel is entitled to discovery regarding Defendants' position as to these reports.

We do not request additional written discovery beyond what Defendants have provided. However, we oppose any ruling by this Court as to the admissibility or relevance of these reports.

**F.     Witnesses:  Neutral Monitors**

Defendants object to the fact that Plaintiffs' counsel has not provided dates with the Court-appointed neutral monitors can be available for deposition, while protesting the fact that they cannot propound discovery on the neutral monitors and do not wish to cross-examine them.

Regarding the monitors' availability for deposition: Plaintiffs' counsel do not represent the neutral monitors.  Defendants have the same opportunity as Plaintiffs to request their availability and arrange a deposition.  Defendants have not explained why they are unable to do so.

Regarding Wellpath's assertion that the neutral monitors' testimony would be irrelevant: Judge Freeman has made clear that she expects her Court-appointed monitors to appear at the hearing, stating:

> I think the monitors may have a little bit of a problem. They're going to have to go back through their data if they have to prepare for this hearing and extract what was happening in March....
>
> I need the monitors' opinion that there was not compliance on the purge date. And I don't tell -- I don't tell the experts what the foundation for their opinion is. I get to decide whether I find it's sufficient....
>
> I'm not expecting a new monitor report, but I need -- There'll need to be opinions as of the purge date, and how the expert reaches the opinion.

Tr. at 20:7-10, 33:10-14, 33:20-22.

Defendants' concern about "transform[ing] the relationship" with the neutral monitors "into an unnecessarily adversarial one" is a crisis Defendants created when they chose to hire their own experts to refute the neutral monitors' methodology and findings, instead of asking the neutral monitors to explain or update their findings.  Defendants cannot now turn it into a reason to prevent the monitors from explaining their findings to the Court.

1    Finally, it is for the trial court to decide whether one party's concerns about offending a

2    neutral party outweighs the court's need for information from that party.

3    **G.    Witnesses:  Records Custodians**

4    Defendants' request to stipulate to the authenticity of the information proffered in the

5    declarations misrepresents the depth and utility of the four record custodian depositions.  As

6    Defendants stated, each declaration is no more than three pages in length, identifying each record

7    custodian as the individual who compiled class member information based on a number of

8    specified "queries" provided by Wellpath's attorneys.  The declarations are wholly silent as to

9    each custodian's process for selecting the relevant patient files.

10   The custodians' selection process and specific expertise are necessary for Plaintiffs' to

11   understand the creation and function of Defendants' audit tools.  Indeed, other information

12   provided to Plaintiffs in the course of discovery has made it clear that these four custodians are the

13   only individuals knowledgeable about the protocol used in pulling the information at issue.  *See*

14   Decl. of Katherine Tebrock, Ex. F, ¶ 11 ("Jamie Silveira, Paulette Torres Collazo, Dr. Nicole

15   Taylor, and Captain Rebecca Smith can provide more details on how each document was pulled or

16   created.").

17   Further, Plaintiffs' request for four hours of deposition time is neither unduly burdensome

18   nor egregious.  Each custodian pulled patient information relevant to numerous exhibits submitted

19   in support of Defendants' Show Cause briefing, meaning that the deposition will span the

20   selection process for over a dozen separate queries.  *See, e.g*., Decl. of Jamie Silveira, Dkt. No.

21   905-5, at 2-3 (representing that Ms. Silveira pulled patient information relevant to fifteen separate

22   exhibits).  Curtailing these depositions to one hour each will not allow for a robust inquiry.  And

23   while Plaintiffs are sympathetic to the integral roles that Ms. Silveira, Ms. Collazo, Dr. Taylor,

24   and Captain Smith play in the Jail's administration, Plaintiffs' offer of a shortened deposition is

25   fully reasonable under these circumstances.

26   **H.    Witnesses:  Plaintiffs' Witnesses**

27   Defendants have requested that Plaintiffs start disclosing potential fact witnesses on

28   September 23, along with deposition dates and declarations for each disclosed witness.  Plaintiffs

Case No. 5:13-cv-02354-BLF

have asked for patient records for the patients whose charts were reviewed by Defendants' experts

so that Plaintiffs can start identifying potential fact witnesses based on those records.

Instead of providing electronic record access that would allow Plaintiffs to begin

identifying fact witnesses, Defendants insist on providing these records in thousands upon

thousands of PDF pages spread across various PDF files with no evident organizational structure

and randomly generated, nondescriptive titles.  As of 4:00 pm on September 13, Defendants had

produced only a tiny fraction of the patient records Plaintiffs have requested (about 2%, or 23 of

1,000+ records)), and even the records that have been produced were provided in a format that

will take an enormous amount of labor to parse for Plaintiffs to determine which patients may

have testimony that would be helpful to the Court.  Plaintiffs are not guaranteed to receive the

entire production until September 20.

Because of the unreasonably burdensome way in which Defendants have insisted on

producing these records, it is not reasonable to expect Plaintiffs to identify any fact witnesses by

Monday, September 23.  Plaintiffs have taken the proactive step of scheduling a Jail visit on

September 18 and 19; however, we will not have received all medical records by that time.

Further, any additional communication after Thursday, September 19 requires Plaintiffs to (1)

contact those potential witnesses through the Jail's frequently nonfunctional communications

system, (2) meet with those potential witnesses, and (3) obtain declarations and deposition

availability from those witnesses—all in just four days, with the understanding that the Jail may

prevent us from communicating with our clients at all on weekends.

That is plainly infeasible.  This problem is entirely of Defendants' making because of the

unreasonably burdensome way in which Defendants have insisted on producing patient records.

This is yet another way in which Defendants' unreasonable production of patient records is

prejudicing Plaintiffs' ability to prepare for the December hearing.

### I.      Conclusion

For the reasons set forth above, Plaintiffs request that this Court order Defendants to

ensure Plaintiffs' access to the information sought.

Respectfully submitted,

DATED:  September 13, 2024

GORDON REES SCULLY MANSUKHANI

By:  */s/ Allison J. Becker*
Allison J. Becker

Attorneys for Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC.

DATED:  September 13, 2024

COUNTY COUNSEL,
COUNTY OF MONTEREY

By:  */s/ Ellen S. Lyons*
Ellen S. Lyons
Deputy County Counsel

Attorneys for Defendants
COUNTY OF MONTEREY and MONTEREY COUNTY SHERIFF'S OFFICE

DATED:  September 13, 2024

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Caroline E. Jackson*
Caroline E. Jackson

Attorneys for Plaintiffs

1        Pursuant to Northern District General Order 45(X)(B), I hereby attest that I have on file

2    approvals for any signatures indicated by a "conformed" signature (*/s/*) within this e-filed

3    document.

4    DATED:  September 13, 2024          Gordon Rees Scully Mansukhani

5                                     By:   /s/ Allison J. Becker

6                                             Allison J. Becker

7                                  Attorneys for Defendant CALIFORNIA FORENSIC
MEDICAL GROUP, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28