MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
VAN SWEARINGEN – 259809
CAROLINE E. JACKSON – 329980
MAYA E. CAMPBELL – 345180
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:    mbien@rbgg.com
    egalvan@rbgg.com
    vswearingen@rbgg.com
    cjackson@rbgg.com
    mcampbell@rbgg.com

CORENE KENDRICK – 226642
KYLE VIRGIEN – 278747
ACLU NATIONAL PRISON PROJECT
425 California St., Ste. 700
San Francisco, CA 94104
Telephone:    (202) 393-4930
Facsimile:    (202) 393-4931
Email:    ckendrick@aclu.org
    kvirgien@aclu.org

AVRAM D. FREY
(*admitted pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (415) 621-2493
Facsimile:    (415) 255-8437
Email:    afrey@aclunc.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED., a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 5:13-cv-02354-BLF<br><br>**NOTICE OF FILING OF MENTAL HEALTH NEUTRAL MONITOR REPORT**<br><br>Judge:  Beth Labson Freeman |

1        Pursuant to this Court's September 26, 2023 Order Granting Plaintiffs' Motion to

2   Enforce Settlement Agreement, Dkt No. 838 at 27, the parties hereby respectfully submit

3   the 13th neutral monitor mental health report prepared by Dr. James Vess (received by the

4   parties on February 25, 2025, and covering the time period of April through November

5   2024) (**Exhibit A**).

6        In accordance with the filing of previous neutral monitor reports subject to this

7   Court's prior orders, e.g., Dkt Nos. 802, 819, 867, the following information has been

8   redacted:

9        1.    Incarcerated persons' names, dates of birth, and booking numbers,

10              (initials are used to identify deceased class members); and

11       2.    The names of health care staff employed by CFMG/Wellpath, who are

12              directly involved in providing or supervising patient care at the Jail.

13

14

15  DATED:  March 4, 2025              Respectfully submitted,

16                                     ROSEN BIEN GALVAN & GRUNFELD LLP

17

18                                     By:  */s/ Caroline E. Jackson*

19                                          Caroline E. Jackson

20                                     Attorneys for Plaintiffs

21

22  DATED:  March 4, 2025              GORDON REES SCULLY MANSUKHANI

23

24                                     By:  */s/ Allison J. Becker*

25                                          Allison J. Becker

26                                     Attorneys for Defendant CALIFORNIA
                                       FORENSIC MEDICAL GROUP, INC.

27

28

1 | DATED:  March 4, 2025

COUNTY COUNSEL, COUNTY OF
MONTEREY

By:  */s/ Ellen S. Lyons*
Ellen S. Lyons
Deputy County Counsel

Attorneys for Defendants COUNTY OF
MONTEREY and MONTEREY COUNTY
SHERIFF'S OFFICE

# Exhibit A

**Monterey County Jail Mental Health Monitor's Final Report**
**For November 4 – 5, 2024 Site Visit**
**James Vess, Ph.D.**

**Overview**

A site visit was conducted in person on November 18 – 19, 2024 at the Monterey County Jail (MCJ) for the thirteenth mental health monitoring tour.  In attendance for this tour were Dr. Nicole Taylor, Regional Mental Health Vice President for Wellpath, and ████████████, Acting Mental Health Coordinator at MCJ.  Entrance and exit interviews were conducted, which were attended by various Wellpath and Custody staff, as well as County, Wellpath, and Plaintiff's attorneys.

The report specifically addresses the jail's status and progress toward compliance with the United States District Court Northern District of California Settlement Agreement and the Implementation Plans between Plaintiffs Jesse Hernandez et al., and Defendants, County of Monterey; Monterey County Sheriff's Office, and California Forensic Medical Group, Inc (CFMG) et al.  On 9/26/23, the Court issued an Order Granting Plaintiffs' Motion to Enforce Settlement Agreement and Wellpath Implementation Plan [Dkt. No. 838 at 13 – 19], which identified a range of requirements found to be in noncompliance.  Appendix A of the current report organizes compliance findings for these requirements to correspond with the numbering assigned in the Court Order.

Methodology: As with prior monitoring reports, this report is based upon interviews with institutional staff and inmates as well as discussions with the attorneys for the defendants and plaintiffs, in addition to healthcare record reviews, documentation provided by Wellpath, MCJ and the County, and direct observations of various parts of the jail facility.  Wellpath has provided the results of a monthly internal monitoring process that is aligned with many of the Implementation Plan requirements.  Where available, the results of these internal audits are presented in the current report.  It is important to note that findings about compliance in the current report were not based on the results of Wellpath's internal audits alone for any of the requirements subject to monitoring.  Portions of the samples used in the internal audits were reviewed to verify the results reported by Wellpath, and additional cases were reviewed which were not included in the internal audit samples to further assess the current level of compliance.  For each of the requirements where internal audit data and/or review of inmate records were reviewed in reaching a determination of compliance, the number of records I reviewed and how they were selected are described in the body of the current report.  Typically, I have randomly selected cases to review from within the monthly internal audit samples provided by Wellpath to verify whether my findings agree with those reported in their audit results, in addition to cases falling outside the Wellpath audit samples to determine whether such cases are consistent with the results from the monthly audit samples.  Cases reviewed which fell outside the monthly Wellpath audit samples were drawn randomly from larger lists of relevant cases which met the selection criteria for the requirement under consideration, i.e., from the population of relevant cases other than those selected by Wellpath for their monthly audit samples.

I have attempted to use compliance ratings in a manner consistent with other relevant work in this field.  Based on consultation with Monitors in other cases and review of various monitoring reports issued in other jurisdictions (cited below), the following definitions were identified:

Substantial Compliance, as set forth in the Settlement Agreement for the current case, "shall mean adherence to the requirements of the Settlement Agreement and the Implementation Plans in all material respects, recognizing that 100% compliance is not required. Non-systematic deviations from the requirements of the Settlement Agreement and the Implementation Plans shall not prevent a finding of substantial compliance, provided that the Defendants demonstrate that they have (a) implemented a system for tracking compliance, where appropriate and practical, and for taking corrective measures in response to instances of non-compliance, and (b) that Defendants have instituted policies, procedures, practices, and resources that are capable of durable and sustained compliance." [Dkt. 494 at ECF 10].

This definition of Substantial Compliance is slightly more detailed than that used in the Monitors' reports I have reviewed from other cases, which typically define substantial compliance to indicate compliance with all or most of the components of a particular provision, with one adding that no significant work remains to accomplish the goal of that provision (Murray v. County of Santa Barbara, Case No. 2:17-cv-08805).

Partial Compliance, as defined in other reports reviewed, typically indicates that the responsible party has achieved compliance on some, but not all, of the material components of the relevant provision of the Agreement (e.g., U.S. v. County of Los Angeles, et al., CV No. 1505903 DDP). Other Monitors have noted Partial Compliance to indicate compliance with some of the components of the relevant provision of the Remedial Plan, and work remains to reach Substantial Compliance (e.g., Murry v. County of Santa Barbara). Other reports define partial compliance as meaning that the defendant has made notable progress in achieving compliance with the key components of the provision, but substantial work remains (U.S. vs City of Meridian, et al., C.A. No. 3:13-CV-978), or that the defendant has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance (Remick et al. vs. City of Philadelphia, U.S. District Court for the Eastern District of Pennsylvania, No.: 2:20-cv-01959-BMS).

Non-Compliance has typically been defined as indicating that the responsible party has not met most or all components of the relevant provision, sometimes adding that the defendant has made no notable progress in achieving compliance on any of the key components of the provision (e.g., U.S. vs. City of Meridian et al.), or that work remains to reach Partial Compliance (Murry v. County of Santa Barbara).

In reaching a determination of Partial Compliance, consideration is given to the various aspects of compliance identified by Monitors in other cases, including indications of progress, observed compliance with some but not all of the components of a given requirement, the proportion of cases reviewed that demonstrated compliance with some or all of the components of a requirement, and the severity or risk involved in instances of failure to meet the various components of a requirement. By considering these various factors, I did not utilize a strict cut-off percentage for the number of compliant vs. not compliant cases to determine compliance ratings. For some requirements, such as Medical Records, where there are multiple required elements listed, partial compliance may reflect failure to reach substantial compliance with only a subset of those elements (e.g. individual treatment plans) while all or almost all cases reviewed contained the other required elements. For other requirements, such as those involving welfare checks, a relatively small number of failures to meet compliance standards can result in a rating of Partial Compliance due to the high risk for adverse outcomes.

Regarding the question of cutoff scores for substantial compliance, partial compliance, and noncompliance, I do not believe there is a universal set of compliance rates that can be

2

applied across all requirements and in all situations.  I am aware that the Medical Monitor indicated in his report form February 2024 that he considered a compliance rate of over 80% to be tantamount to substantial compliance, 50% to 80% to be partially compliant, and less than 50% to be noncompliant.  He also noted, however, that any number of serious lapses in care that place one or more inmates at substantial risk or harm may indicate that the jail's performance does not substantially comply with the Implementation Plan.  Such compliance rate cutoffs are reasonable, but cannot be applied in a mechanical manner without regard to other sources of information or issues revealed by individual cases.  It should be noted that particular cutoff scores are not consistently applied in cases involving other jail systems I'm familiar with, where compliance rates of 85%, 90%, or even 95% have been designated as the threshold for substantial compliance with certain requirements.

There is also the issue that many requirements in the Implementation Plan contain multiple elements, so that is not possible to render a single percentage score for the requirement as a whole, except perhaps to score all cases as noncompliant if any single element of the requirement is not met.  I do not believe this is the most appropriate or informative approach.  Some requirements also involve an evaluation of the quality of the documentation or clinical actions taken, and not simply whether a particular document is present in the healthcare record or a required action was completed.  Cases may be identified which are not contained in random samples, for example cases observed during a site visit, which provide important information about the facility's performance in relation to specific requirements.  Such cases should not be ignored because they fall outside of a randomized sample of cases.  Professional judgement and expertise must be applied to reach conclusions about compliance.

Regarding the question of determining a compliance percentage, and specifically whether different portions of the review period are weighted differently, I do not specifically weight the various months of the review period.  I look at trends over time and the relative differences in compliance rates across the months of the review period.  If, for example, compliance has improved and been sustained over the course of the review period, and depending on the observed level of compliance for each month, I would interpret that differently than a pattern in which the compliance rate has declined over the review period, even though the overall compliance average in these two scenarios may be similar.  Importantly, a single month at the end of a review period will not be sufficient to reach a finding of substantial compliance if prior months in the review period are notably lower.  Adequate levels of performance must be sustained to reach substantial compliance, in light of trends in the data and the effectiveness of procedures to identify and correct the causes of any noncompliance.

The following table presents the compliance status of the various requirements.  Letters identifying each requirement correspond to letters listed in the body of the report under the major requirement sections, which are numbered.  Ratings consist of SC for Substantial Compliance, NC for Noncompliance, and PC for Partial Compliance.  Some ratings have been deferred for reasons explained in the report, and some have been released from monitoring.

| 1. Intake Screening | May 2023 | Nov. 2023 | April 2024 | Nov. 2024 |
|---|---|---|---|---|
| a. | SC | Released | Released | Released |
| b. | SC | Released | Released | Released |
| c. | SC | Released | Released | Released |
| d. | SC | Released | Released | Released |
| e. | NC | NC | PC | PC |
| f. | NC | NC | PC | PC |
| g. | NC | NC | PC | PC |
| h. | NC | NC | NC | PC |
| 2. Mental Health Screen | | | | |
| a. | NC | NC | NC | NC |
| b. | NC | PC | SC | SC |
| 3. Sick Call | | | | |
| a. | SC | Released | Released | Released |
| b. | SC | Released | Released | Released |
| c. | SC | Released | Released | Released |
| d. | NC | NC | NC | PC |
| e. | NC | NC | PC | PC |
| 4. Chronic Care | | | | |
| a. | NC | NC | NC | NC |
| b. | NC | PC | SC | SC |
| 5. Acute Care | | | | |
| a. | NC | NC | NC | NC |
| b. | NC | SC | SC | SC |
| 6. Outpatient Services | | | | |
| a. | NC | PC | PC | PC |
| b. | NC | PC | PC | PC |
| 7. Safety & Sobering Cells | | | | |
| a. | SC | Released | Released | Released |
| b. | NC | Not Rated | PC | PC |
| c. | Deferred | PC | SC | SC |
| d. | SC | SC | SC | SC |
| e. | SC | SC | SC | SC |
| f. | SC | SC | SC | SC |
| g. | NC | NC | NC | NC |
| h. | Released | Released | Released | Released |
| i. | SC | SC | SC | SC |
| j. | SC | NC | SC | SC |
| 8. Medication Continuity | | | | |
| a. | Released | PC | NC | PC |
| b. | Released | PC | NC | PC |
| c. | NC | PC | SC | SC |
| 9. Discharge | | | | |
| a. | Released | Released | Released | Released |
| b. | Released | Released | Released | Released |

| 10. Involuntary Medication | | | | |
|---|---|---|---|---|
| a. | SC | SC | SC | SC |
| b. | SC | SC | SC | SC |
| c. | SC | SC | SC | SC |
| d. | NC | PC | PC | PC |
| e. | NC | Deferred | Deferred | Deferred |
| f. | NC | Deferred | Deferred | Deferred |
| g. | NC | Deferred | Deferred | Deferred |
| h. | Deferred | Deferred | Deferred | SC |
| 11. Medication Refusals | | | | |
| a. | NC | NC | NC | NC |
| 12. Clinical Staffing | | | | |
| a. | NC | NC | NC | NC |
| b. | NC | NC | NC | NC |
| c. | NC | NC | NC | NC |
| d. | SC | SC | SC | SC |
| 13. Mental Health Training | | | | |
| a. | SC | Released | Released | Released |
| b. | Released | Released | Released | Released |
| c. | Released | Released | Released | Released |
| d. | SC | Released | Released | Released |
| e. | Released | Released | Released | Released |
| 14. Restraint Chairs | | | | |
| a. | Released | Released | Released | Released |
| b. | Released | Released | Released | Released |
| c. | SC | SC | SC | SC |
| d. | SC | Released | Released | Released |
| 15. Use of Force | | | | |
| a. | SC | SC | SC | SC |
| b. | SC | SC | SC | SC |
| 16. Mental Health Grants | | | | |
| a. | Released | Released | Released | Released |
| 17. Inmates IST | | | | |
| a. | NC | NC | NC | NC |
| 18. Treatment Plans | | | | |
| a. | NC | PC | PC | PC |
| b. | NC | PC | PC | PC |
| c. | NC | PC | PC | PC |
| d. | NC | PC | NC | NC |
| 19. Inmate Discipline | | | | |
| a. | NC | NC | NC | NC |
| 20. Space Issues | | | | |
| a. | SC | Released | Released | Released |
| 21. Administrative Segregation | | | | |
| a. | NC | NC | NC | NC |

| | | | | |
|---|---|---|---|---|
| b. | NC | NC | NC | NC |
| c. | SC | SC | SC | SC |
| d. | NC | SC | SC | SC |
| e. | NC | NC | PC | PC |
| f. | Deferred | PC | SC | SC |
| g. | Deferred | PC | SC | SC |
| h. | SC | SC | Not Rated* | SC |
| 22. Suicide Prevention | | | | |
| a. | SC | SC | Released | SC |
| b. | NC | PC | PC | PC |
| c. | SC | SC | SC | SC |
| d. | SC | SC | SC | SC |
| e. | SC | SC | SC | SC |
| f. | NC | SC | PC | PC |
| g. | SC | SC | SC | SC |
| h. | Deferred | SC | SC | SC |
| 23. Out of Cell/Program Time | | | | |
| a. | NC | PC | PC | PC |
| b. | NC | PC | PC | PC |
| c. | NC | PC | PC | PC |
| d. | Released | Released | Released | Released |
| 24. Telepsychiatry | | | | |
| a. | NC | NC | PC | PC |
| b. | NC | NC | PC | PC |
| 25. Medical Records | | | | |
| a. | NC | PC | PC | PC |
| 26. Quality Management | | | | |
| a. | NC | PC | PC | PC |
| b. | NC | Deferred | Deferred | Deferred |
| c. | NC | PC | PC | PC |
| 27. Corrective Action Plans | | | | |
| a. | NC | NC | PC | PC |
| b. | NC | NC | PC | PC |

* Requirement 21(h) was assumed to be released during the April 2024 review and therefore not rated in that report.


**Compliance with Settlement Agreement and Implementation Plan Requirements**
**1. Intake Screening**
• *(a)  Upon arrival, an Initial Health Assessment will be performed by the intake nurse to determine whether the inmate should be excluded from the facility on medical or mental health grounds. Upon acceptance into the jail, all inmates will be screened by the intake nurse for urgent medical, mental health and dental needs. The intake nurse will have access to an inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail. [County Implementation Plan; Dkt. 528-1 at ECF 7]*

6

• *(b)  A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.*
•*(c)  The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive findings on the suicide assessment. [Settlement Agreement at 6]*
•*(d) The Booking RN shall begin initial treatment planning at the time of booking and schedule referrals for follow up evaluation as necessary. [CFMG Plan at 27]*

**Findings: These requirements were released from further monitoring by Court Order dated October 27, 2023 (Dkt. 844 at ECF 4).**

•*(e) If a patient's chronic condition is stable at booking, the Booking RN shall schedule a follow up with a medical provider within 5-7 days. If the patient is unstable or has unverified medications, the Booking RN must refer the patient to the on duty or on-call medical provider. [CFMG Plan at 19; Dkt. 532 at ECF 29]*

**Findings:  Partial Compliance**

This requirement was found in partial compliance in the last monitoring report of April 2024, after findings of noncompliance in the prior two monitoring reports from May 2023 and November 2023.  Wellpath provided the results of their internal monthly audits for this requirement, as shown in the following table.  The results generated by these audits were used as one basis for examining compliance, in addition to my verification of selected cases in the audit sample and review of additional cases not included in the internal auditing samples.  The following table shows results of these audits for the two elements of this requirement over the months of April 2024 through November 2024.

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Stable follow/up | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Unstable/unverified | 40% | 16% | 60% | 33% | 60% | 50% | 100% | 100% |

Wellpath conducts monthly audits of 10 cases selected at random to examine compliance with requirements associated with the intake process, including requirements 1(*e*) through 1(*h*).  I reviewed 16 cases selected at random from among the cases included in these monthly internal audits.  In every case I examined, my findings agreed with those reported in the internal audits.  I also examined 12 additional cases selected at random which were not included in the Wellpath monthly audit samples. Of these cases, I observed 100% compliance with the element of the requirement regarding patient's whose chronic condition was stable at booking, and 71% compliance with the element of the requirement associated with patients who were unstable or had unverified medications.  These findings are generally consistent with those reported in the Wellpath monthly internal audits.  The current finding of partial compliance is based on an adequate level of performance on the element pertaining to patients with stable chronic conditions at intake but an inconsistent level of performance on the element pertaining to patients with unstable chronic conditions, especially unverified medications.  There appears to be a recent improvement in this area during October and November.  If this level of performance is maintained during the next review period, substantial compliance should be achieved.

•*(f)  The Booking RN shall identify and assess at booking individuals with a history of chronic medical or psychiatric condition. The Booking RN must document and verify and continue all current medications, whether verified or unverified, formulary or non-formulary. [Dkt 532 at ECF 29]\**

*Examination of the Implementation Plan indicates that the language of this requirement, which has been the basis of evaluating compliance for these functions from the time of the prior mental health monitor, has combined the language from separate elements of the Implementation Plan. The language of the Implementation Plan from Dkt. 532 at ECF 29 includes:

*Section 1.a.(1)  Individuals giving a history of a chronic medical or psychiatric condition and/or are taking essential medication for the management of a chronic medical or mental condition will be identified at the time of the jail intake screening by the Booking RN.*

*Section 1.a.(3.a)  The nurse will contact the on-call medical provider by the end of the nursing shift to obtain an order for all medications, whether verified or unverified, formulary or non-formulary.*

For the current monitoring report, these two elements will continue to be examined separately but an overall combined compliance finding will be rendered, consistent with prior monitoring reports.

**Findings:  Partial Compliance**

This requirement was found partially compliant in the last monitoring report from April 2024 after being found noncompliant in the prior two monitoring reports from May 2023 and November 2023.  Internal Audit data provided by Wellpath showed the following results for the two elements of this requirement over the months of April 2024 through November 2024.

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Identify/assess | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Obtain order | 63% | 38% | 60% | 71% | 88% | 71% | 100% | 89% |

My review of 16 cases selected from the internal audit samples were consistent with the reported audit results.  I reviewed an additional 12 cases selected at random that were not included in the Wellpath monthly audit samples.  These cases showed 100% compliance with the element of the requirement regarding identification of individuals giving a history of a psychiatric condition.  I found a compliance rate of 80% for the element of the requirement regarding contacting a provider by the end of the nursing shift.  As noted in the last report, there was a high level of compliance with the element of the requirement pertaining to the identification of individuals giving a history of chronic psychiatric condition and/or taking essential medications for the management of a chronic mental condition during the intake screening. There is inconsistent compliance with the element pertaining to contacting the on-call psychiatric provider to obtain an order for all medications, although there was improvement during October and November.

The overall finding of partial compliance reflects the combined performance across these two elements.  Steps taken to monitor and improve performance have included the implementation of the monthly internal audits, including the capacity to graphically display and track performance over time, and the implementation of daily reviews by virtual nurses of all intake screenings conducted at MCJ, with efforts to identify and correct omissions on the day of intake.  Consistent follow-up and corrective actions are needed from the DON and HSA to

ensure that intake nurses are familiar with the procedures to ensure compliance and consistently follow these procedures to obtain orders as required.

As noted in the last monitoring report, consideration should be given to clarifying the procedures and performance expectations for verifying medications during hours when outside pharmacies are closed.  The language in this and similar requirements regarding medication verification and obtaining orders by the end of the nursing shift may be intended to ensure that these tasks are consistently completed, rather than being passed on to the next nursing shift. However, it is not practical to do this when the pharmacies which could provide verification are closed. Orders for medications from the on-call medical provider under these circumstances are likely to be deferred to the next sick call by onsite providers. These expectations should be accounted for in the relevant policy and procedures, as well as the requirements subject to monitoring.  If recent improvements can be sustained in the next review period, substantial compliance should be obtained.

*•(g) Booking RN must observe/query for signs/history of mental illness and use of psychiatric medications. The RN shall verify any medications and request outside treatment records as necessary. Any inmate who exhibits signs/history of mental illness shall be referred to mental health services for evaluation, and a physician's opinion must be secured within 24 hours or the next scheduled sick call. [CFMG Plan at 6, 19, 41; Dkt 532 at ECF 16]*

*Examination of the Implementation Plan indicates that this requirement, which has been the basis of evaluating compliance for these functions from the time of the prior mental health monitor, has paraphrased the language of the Implementation Plan. The Implementation Plan [Dkt. 532 at ECF 16] states:

*All new inmates shall be observed and queried for signs/presence and history of mental illness, including suicidal behavior/ideations, and use of medication for psychiatric treatment as part of the intake health screening completed by the Booking RN. Verification of medications and request of treatment records will be initiated for inmates indicating current or recent treatment including medications, hospitalization, emergency department visits and/or outpatient services. Any inmate exhibiting or testifying to presence or history of mental illness is referred to mental health services staff for further evaluation. A physician's opinion is secured within 24 hours or the next scheduled sick call.*

**Findings: Partial Compliance**

This requirement was found in partial compliance in the last monitoring report from April 2024, after findings of noncompliance in the two prior monitoring reports from May 2023 and November 2023.  Internal Audit data provided by Wellpath showed the following results for the three elements of this requirement over the months of April 2024 through November 2024.

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Observe/query | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Verify/request | 63% | 22% | 78% | 89% | 86% | 89% | 100% | 100% |
| Refer to MH | 100% | 100% | 100% | 100% | 100% | 90% | 100% | 100% |

My review of 16 cases selected randomly from the internal audit sample were consistent with the reported audit results.  I reviewed an additional 12 cases that were not included in the monthly Wellpath audits.  For these cases, 100% were compliant with the requirement to observe

and query for presence and history of mental illness, 82% were compliant with the requirement to initiate verification of medications and request of treatment records, and 100% were compliant with the requirement to refer to mental health. These results are generally consistent with those reported in the monthly Wellpath audits. The area where performance has not been consistently adequate until recently is in verifying medications. It was also observed in several of the healthcare records that psychiatric medications were marked as inactive, even though documentation available in the healthcare record and/or the inmate's self-report indicated that medications had been taken as recently as three or four days to two weeks prior. Such cases should not be considered as demonstrating inactive medications, and effort should be made to consistently verify and continue these medications, including consultation with the on-call psychiatric provider. Consideration of performance across the elements of this requirement results in a finding of partial compliance, although these requirements are shown improvement over the course of the current review period. If this improved level of performance is sustained in the next review period, substantial compliance should be achieved.

•*(h) The Booking RN will obtain a signed release for records and attempt to verify current prescriptions. By the end of the nursing shift, the RN will consult with the on-call psychiatrist regarding any verified or unverified medications. The on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate. During this consultation, the on-call psychiatrist will set the time to see the inmate within 5 – 7 days. The date of the appointment will be reflected on the written record of the order*. [CFMG Implementation Plan; Dkt. 532 at ECF19]

**Findings: Partial Compliance**

These requirements were found noncompliant in the last four monitoring reports dating back to July 2022. Internal Audit data provided by Wellpath showed the following results for the three elements of this requirement over the months of April 2024 through November 2024.

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| ROI/verify meds | 63% | 38% | 86% | 75% | 83% | 89% | 100% | 100% |
| Consult on-call | 40% | 44% | 60% | 60% | 88% | 78% | 100% | 89% |
| Set appointment | 100% | 100% | 100% | 89% | 83% | 100% | 71% | 100% |

My review of 16 cases selected randomly from the internal audit sample were consistent with the reported audit results. I reviewed an additional 12 cases that were not included in the monthly Wellpath audits. For these cases, 91% were compliant with the requirement to obtain a release of information and initiate verification of current prescriptions; 73% were compliant with the requirement to consult the on-call psychiatrist regarding medications (when contacted, the psychiatrist gave orders to continue, discontinue, or substitute medications); and 73% were compliant with the requirement to set an appointment for the inmate to be seen as written in the Implementation Plan. These results represent an improvement over the results of prior reviews. In light of the performance during the current review period, a finding of partial compliance is warranted.

It has been previously recommended that the quality assurance process and associated corrective action plans focus specifically on all Implementation Plan requirements for the intake screening process and undertake to ensure that these requirements are consistently met. It is

again recommended that all of the requirements pertaining to the verification and continuation of medications at intake remain a particular focus for performance improvement.

## 2. Mental Health Screening

*•(a)   All inmates must undergo an initial mental health screening by a qualified mental health professional within 14 days of admission. The screening must consist of a structured interview inquiring into (1) history of psychiatric hospitalizations, substance use hospitalization, detoxification and outpatient treatment, suicidal behavior, violent behavior, victimization, special education placement, cerebral trauma or seizures, and sex offenses; (2) current psychotropic medications, suicidal ideations, drug or alcohol use and orientation to person, place and time; (3) emotional response to incarceration; and (4) screening for developmental disability and learning disabilities. Any positive scores will be referred for follow up. [CFMG Plan at 36, 41-42]*

### Findings: Noncompliance

This requirement was found noncompliant in my last three reports.  For the current monitoring review, data for this requirement were available from internal auditing conducted between April 2024 and November 2024, which showed the following compliance figures:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| MHIA w/i 14 days | 100% | 67% | 50% | 0% | 0% | 100% | 10% | 60% |
| Positive scores referred | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 67% |

It was again noted that sample sizes for each month were small, ranging from two to four cases each month, as the remaining cases reviewed in the internal audits appear to have been released shortly after booking.  While onsite, we discussed ways to select samples that would result in 10 qualifying cases for each month's audit in order to provide more robust samples, so that the results for one or two cases will not affect the compliance rates so dramatically.  The sampling process was modified in October and November, resulting in samples of 10 relevant cases for these months.

To verify the reported results, I reviewed 12 cases from the samples used in the Wellpath monthly audits.  My findings agreed with those reported in the audits, with the exception of the one out of four cases reported as compliant for July, which I found noncompliant (the inmate was released soon after booking and no initial mental health assessment was completed.  This was subsequently corrected in the Wellpath audit results, and dropped the compliance rate from 25% to 0% for July as currently reflected in the table above. It should be noted that the 100% compliance rate reported for September is based on three cases, all of which were referred to Mental Health at the time of intake.

Looking across the audits from April through September, there were a total of 18 cases. Eight of these were compliant, for an overall compliance rate of 44%.  All eight cases that were compliant had been referred to mental health at the time of intake.  The requirement, however, is that all inmates must have an initial mental health screening within 14 days, not only those referred for mental health services.   During October, with a sample of 10 cases, one was noted to be compliant.  November, with 10 relevant cases, improved to 60% compliance.

I also reviewed 16 cases selected at random which were not included in the Wellpath monthly audit samples.  Five of these cases were compliant, for a compliance rate of 31%.  All

five compliant cases were referred to mental health at the time of intake.  Two additional cases had an initial mental health assessment completed, but not within the 14 day time limit. These cases also had a referral to mental health.  Five cases in my sample did not have mental health referrals, and none of these cases had a completed initial mental health assessment as required.

The pattern that emerges from these results is that a portion of inmates referred to mental health receive an initial mental health assessment as required, but few inmates who are not referred to mental health appear to receive such an assessment. As the requirement states that all inmates must undergo an initial mental health screening by a QMHP within 14 days of admission, this requirement remains noncompliant.

Wellpath reports that the samples used in the internal audits beginning in March now draw from all inmates booked into MCJ, which is the proper population to audit for compliance with this requirement as written.  Further modifications of the sampling process have recently resulted in larger samples of qualifying cases each month.

Prior monitoring reports have addressed the issue of the definition of Qualified Mental Health Professional (QMHP) for the purposes of the initial Mental Health Screening, and specifically whether nursing staff are qualified.  It was noted that the Settlement Agreement defines Qualified Mental Health Professional as "an individual with training in psychology, social work, psychiatric nursing, or marriage and family therapy, who is currently licensed by the State of California to deliver those mental health services he or she has undertaken to provide" [Dkt. 494 at 12].  As written, this requirement specifies that a qualified mental health professional must conduct the initial mental health screening. Therefore, nursing staff who are not licensed psychiatric nurses would not be qualified to conduct this screening within the current language of the requirement.

I continue to believe that nurses or licensed psychiatric technicians, with adequate training and supervision, could conduct an initial mental health screening at the time of booking or within 14 days of booking and thereby fulfill this requirement.  The relevant standard from the National Commission on Correctional Healthcare states that the mental health screening can be conducted by qualified mental health professionals or qualified health care professionals who have received documented training (Standard J-E-05, NCCHC, Standards for Health Services in Jails, 2018).

I have previously noted that the primary purpose of this requirement is to screen inmates and identify those who require follow-up by mental health staff.  A screening is not the same as a full assessment.  The purpose of a screening should be to reliably detect cases that should receive more focused in-depth assessment and treatment services as needed.  A definition from the National Institutes of Health is relevant here: "Screening is a process for evaluating the possible presence of a particular problem.  The outcome is normally a simple yes or no.  Assessment is a process for defining the nature of that problem, determining a diagnosis, and developing specific treatment recommendations for addressing the problem or diagnosis." [Treatment Improvement Protocol 51, SAMHSA].  The National Council of Juvenile and Family Court Judges distinguishes screenings from assessments as follows, (Differences-between-screening-and-assessment.pdf (ncjfcj.org)):

"Screenings are done as an evaluation to determine if there is a particular issue. Screenings are designed with established criteria to inform decision making on if an assessment is merited. Below are the standard characteristics of a screening tool:
1. Broader and used to identify conditions that may warrant further assessment

12

2. Used to identify individuals who need immediate assistance
3. Used to identify individuals who may need further evaluation
4. Can be administered by anyone who has been trained to administer a specific tool
5. Used to track change over time
6. Not intended to be conclusive or diagnostic

"Conversely, assessments are intended to provide a more in-depth review and evaluation for issues identified by a screening. Therefore, assessments are more comprehensive because they are intended to gain a deep understanding of a need in order to make connections with an appropriate service. . . Below are the standard characteristics of an assessment tool:

1. Scope is more focused on specific topic areas
2. Used to define the nature of a particular issue
3. Used to determine the severity of a particular issue
4. Should only be administered by topic specific professionals (e.g. substance abuse assessments should be administered by professional clinicians)
5. Can be conclusive and used to inform diagnoses
6. Used to inform formal solutions"

These definitions reflect my perspective on the nature and purpose of screenings. I have encouraged the parties to revisit the language of the requirement and consider options that would allow staff other than a QMHP to conduct these screenings, with referral for a QMHP assessment when needed. This would allow the QMHPs at MCJ to focus on the assessments and treatment interventions which require their qualifications and skills.

Alternatively, a Licensed Psychiatric Technician could conduct such screenings, and would fall within the definition of a QMHP. Hiring staff into the allocated Psychiatric Technician positions, however, continues to prove difficult, and the allocated positions remain unfilled. At this stage, further progress in the overall level of compliance with the requirement as written, determined by auditing samples drawn from the entire inmate population, is necessary to reach substantial compliance.

•*(b)   The medical or psychiatric provider will complete a baseline history and physical or psychiatric examination; order a therapeutic regimen, as appropriate; and schedule the patient to be seen for chronic care clinic at least every ninety days for the length of the jail stay. Patients on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every 60 to 90 days.*

**Findings: Substantial Compliance**

The last monitoring report from April 2024 found in substantial compliance with this requirement. Progress was noted in the psychiatric documentation and in the number of patients on psychiatric medications who were scheduled as required. Wellpath audit data were reviewed for April 2024 through November 2024, which reported compliance figures as follows:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| History & exam | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Order med regime | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 30 days until stable | 100% | 100% | 88% | 100% | 100% | 100% | 100% | 88% |
| 90 days when stable | 90% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

13

The results from the internal audits were verified by my own review of 20 cases from the Wellpath audit samples, whereby my findings matched those reported in the audits, with the exception of one case in the August sample which was scheduled to be seen in 30 days but the psychiatric contact did not occur within that timeframe. Review of the healthcare record indicated that this inmate remained stable and there were no adverse consequences from this late 30 – day follow up.  I also examined 12 additional cases that were not included in the internal audit samples.  All of these cases were found compliant with these requirements.

There has been significant progress in meeting this requirement during the past two monitoring periods, supported by monthly internal audits and collaborative efforts by the MCJ psychiatrist and the Wellpath Supervising Psychiatrist. Overall performance during the current review period has been sufficient to warrant a finding of substantial compliance.  One recommendation for maintaining substantial compliance was made previously and concerns the methodology for the monthly internal audits conducted by Wellpath; it appears that for most of the cases reviewed in these audits, only a single encounter date is reviewed, with some cases showing up to three encounter dates.  Insofar as the requirement involves seeing patients within specified periods over time, compliance should be evaluated by following cases over multiple contacts to ensure that appointments are both scheduled and completed as required.  This is the approach I took in evaluating cases for the current report.

### 3. Sick Call
*•(a)   Inmates' health and mental health complaints must be collected, processed, and documented daily and triaged as appropriate by medical and mental health providers. [CFMG Plan at 25]*
*•(b)   The on-duty medical provider shall see urgent sick call requests Monday through Friday. On weekends and holidays, the on duty nurse shall communicate urgent complaints/requests to the on-call provider, who will treat or refer the patient as necessary. [CFMG Plan at 25]*
*•(c)   Health care staff must note (1) the date and time the sick call request slip is reviewed; (2) the signature of medical staff; and (3) the disposition. The sick call slip must be filed in the inmates' medical record. The sick call roster must be kept on file in the medical record room. Providers must record sick call visits in the inmate's medical record. [CFMG Plan at 25-26]*

**Findings: These requirements were released from further monitoring by Court Order dated October 27, 2023 (Dkt. 844 at ECF 4).**

*•(d)  Sick call must be conducted 5 days/week in a private clinical environment. Health services staff must triage sick call slips daily and schedule patients for the next sick call if the slip was received prior to 2300 hours. [CFMG Plan at 26]*

**Findings: Partial Compliance**
This requirement was found to be in noncompliance in the last three monitoring reports, after a finding of substantial compliance in an earlier monitoring report of July 2022.  It has been noted that mental health clinicians review and triage sick call requests daily.  Mental health sick calls continue to be conducted daily, and patients are scheduled to be seen based on the level of urgency determined by triage.  The current review again found that sick calls are typically reviewed, triaged, and initially scheduled as required.  The last three findings of noncompliance

have been based on the frequency and duration of rescheduled sick call appointments due to workload constraints.  Rescheduled appointments are not held as originally scheduled, i.e., the patient was not seen on the date they were supposed to be seen, and thus the sick call was not conducted.

Wellpath has again raised a question about the definition of sick call, suggesting that it should only apply to appointments made in response to health service requests submitted by inmates, in contrast to contacts that have been scheduled by mental health staff or in response to referrals by other staff.  I have instead again considered all scheduled appointments with mental health staff to be conducted as part of sick call, to include contacts scheduled in response to referrals made during the intake process and contacts made in response to subsequent referrals by nursing or custody staff due to concerns about an inmate's condition, as well as appointments made by clinicians in follow-up to services initially request by inmates or the contacts required by, for example, removal from suicide watch.  All of these contacts are part of the mental health staff's clinical care of patients at the jail.  The urgency and relative priority of all of these types of contacts must be considered by mental health staff when conducting triage and creating a daily schedule for clinicians, which I have viewed collectively as their sick call procedure.

The approach taken to determining compliance with this requirement was to review the electronic healthcare record of 20 inmates who received mental health care during the current review period.  Eight of these inmates were selected at random from the Wellpath monthly audits of intakes.  The other twelve inmates were selected randomly from inmates on the mental health caseload which were not included in the monthly Wellpath audit samples. As in prior monitoring reports, the dates of rescheduled and completed sick calls were reviewed for each case, and consideration was given to type of appointment scheduled, the acuity of the inmate's condition, as well as policy requirements for the completion of specific types of referrals (e.g., urgent vs. routine, the time period of the scheduled follow-up, the clinical status of the patient, etc.); some rescheduled appointments may still fall within required timeframes, and missing a scheduled 30 day or 90 day follow-up appointment with a relatively stable patient by two to three days is not viewed in the same way as missing shorter term follow-up with an unstable patient by the same amount of time.  Urgent, emergent, and routine referrals are assessed based on the timeframes specified in policy.

A re-examination of the 20 cases following the draft version of the current report found that 10 were compliant, for a compliance rate of 50%.  All but two cases showed rescheduled appointments; those two cases were in custody for brief periods.  Rescheduled appointments were not considered problematic unless the scheduled or required timeframes for seeing the inmate were missed.  Notes were provided by the clinician at the time of the rescheduling consistently indicated that it was due to workload issues, with too many tasks to complete for the clinician(s) on duty.

The problem appears to remain one of staffing.  It is recognized that this requirement is not about staffing levels per se.  The current finding of partial compliance is based on the number of sick call appointments that were not conducted in a sufficiently timely manner.  The triage process utilized by the acting Mental Health Coordinator and the MHPs appears generally sound, but the available staff cannot see all of the inmates who need to be seen in the timeframes required.  Discussions with mental health staff and direct observations of clinical practice at MJC

again indicated that the staff consistently make an effort to see the patients most in need of service as soon as possible with available staffing resources.  However, the workload associated with the current staffing levels remains untenable.

Wellpath has implemented an internal auditing process to monitor performance in relation to the various requirements of the Implementation Plan. It is again recommended that a specific area of internal monitoring should be the frequency of rescheduled appointments and the length of time between the originally scheduled appointment and the date the inmate is actually seen by mental health staff.  This information would also be useful for a detailed analysis of staffing requirements based on trends in meeting local workload demands.

*•(e)  An MD or an RN shall visit inmates housed in holding and isolation cells on Monday, Wednesday and Friday. [CFMG Plan at 26]*

**Findings:  Partial Compliance**

The last monitoring report found partial compliance with this requirement, following three prior monitoring reports which found noncompliance.  It has consistently been observed that there are very few instances of visits by an MD (psychiatry or medical), although this requirement can also be met through RN visits.  Review of monthly internal audit data for the period of April 2024 through November 2024 showed the following results:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|-------|-------|-----|------|------|-----|------|-----|-----|
| Visits M, W, F | 84% | 72% | 48% | 55% | 73% | 92% | 71% | 87% |

These Wellpath audit results report compliance as the percentage of the required visits that were completed on Mondays, Wednesdays, and Fridays for a sample of 10 inmates in holding and isolation cells for each month.  I reviewed 12 cases selected at random from the monthly Wellpath audit samples.  My findings generally agreed with those reported in the audit results, with the exception of one case in the August sample for which I found fewer missed visits (i.e., a higher rate of compliance than reported), and another case in the July sample which did not appear to audit all of the dates in which the inmate was in restricted housing.

I also reviewed 14 additional cases which were not contained in the Wellpath monthly audit samples.  The compliance rates for these cases ranged from 50% to 100%.  The overall compliance rate for these 14 cases was 82% of all required checks completed.  Based on the combined results for the current review period, this requirement is found in partial compliance.  Continued attention on the ongoing internal audit results, with additional training and corrective action where required, should lead to substantial compliance.

**4. Chronic Care**
*•(a)  Any patient whose chronic condition cannot be managed at MCJ shall be transferred offsite for appropriate treatment and care. [CFMG Plan at 30]*

**Findings:  Noncompliance**

16

The prior Mental Health Monitor stated in his final report of May 2021, "Although inmates were routinely referred to NMC for crisis evaluation and stabilization, some inmates with severe and chronic mental illness that could not be managed at MCJ remained at the jail." Dr. Hughes further noted, "The acceptance and adequate treatment of such inmates at NMC remained problematic; and as has been previously noted, referrals for needed inpatient mental health care did not always occur due to the lack of access to inpatient treatment at NMC." All of my prior reports dating from July 2022 through April 2024 have found that these issues remained unchanged.

For the current monitoring report, a list of all suicide attempts was also requested and provided, which included 12 incidents across 10 unique inmates between 4/17/24 and 10/16/24. In 10 of these 12 incidents the inmate was sent out to NMC for crisis evaluation and stabilization. In none of these incidents was the inmate admitted for inpatient treatment; most cases resulted in medical evaluation of the inmate for possible injuries sustained in the suicide attempt, with some cases including the one-time administration of psychotropic medications, followed by return to the jail for follow-up. Treatment recommendations typically included placement on suicide watch in a safety cell and referral to the jail psychiatrist.

The clinical documentation I reviewed indicated that in 10 of the 12 incidents, an inpatient level of care was likely not required. Several of the cases appeared to involve use of or withdrawal from substances such as methamphetamine, and the inmate's condition improved within one to three days. In one of the two remaining incidents, the need for inpatient level of care was harder to assess based on the available documentation. This case involved an inmate who attempted to drown himself in the toilet. This inmate's clinical condition may have been caused or exacerbated by substance use, and he was noted to be significantly improved over the following two days. The other case involved a serious hanging attempt that was interrupted by deputies conducting safety checks. This inmate was enrolled in the EASS program at the time, and he was transferred to Metropolitan State Hospital six days after the incident. However, the clinical documentation indicated that the patient was overtly psychotic, with delusions, tangential and disorganized thought, poor hygiene and a strong odor of urine. This suggests the inmate may have been gravely disabled prior to his transfer to the state hospital.

Part of the reason for reviewing instances of mental health referrals to NMC has been to better determine the frequency of need for an inpatient level of care in cases which cannot be adequately treated at the jail. Although this review does not involve an adequate sample over a sufficient period of time to draw empirically supported inferences, it begins to suggest that the number of jail inmates requiring mental health care that cannot be provided at the jail is small. As I noted in prior monitoring reports:

"Solutions [for meeting the intent of this requirement] should focus on both minimizing the number of inmates whose conditions deteriorate to the point where they cannot be effectively treated in jail, and finding ways to expediently transfer a patient for psychiatric inpatient care when needed (i.e., gain admission for the inmate to an appropriate offsite facility).

"It has been noted in prior monitoring reports that a potentially promising development with chronically, severely mentally ill inmates is the Early Access and Stabilization Program (EASS). Once again in the current monitoring review, documentation for several patients who were enrolled in this program showed that during the period of their treatment by EASS staff,

their mental health needs were more frequently and more adequately addressed than when they were not being followed by the program.  Although this is a promising program for the treatment of inmates who have been found incompetent to stand trial while they await competency restoration services, it is becoming apparent that EASS is unlikely to be an adequate solution to the overall need for a higher level of care in all cases whose chronic mental health condition is too severe to treat in the jail.  This program will also not address the needs of inmates who have been sent to a DSH facility for treatment and returned to the jail as unrestorable to competence, as has been observed in cases reviewed for earlier monitoring reports.

"The question arises as to what can realistically be done to meet the requirement for inmates whose chronic condition cannot be managed at MCJ if there are no viable alternatives for transferring these inmates offsite for treatment and care.  Some, perhaps many, of these inmates may be effectively treated in the EASS program if certain assumptions are met. This would include sufficiently early detection of an inmate's condition as one that cannot be effectively treated by the jail's standard mental health program and is likely to result in incompetency to stand trial. There would need to be a fast and efficient response in such cases to get the inmate enrolled in the EASS program and begin more intensive psychiatric treatment than can otherwise be provided by MCJ mental health staff, including the use of involuntary psychotropic medications as needed, thereby preventing the inmate from languishing with a severe mental illness that is not being adequately treated.  Another necessary element would be that the EASS program has sufficient capacity to ensure that all inmates requiring this level of intervention can be enrolled and maintained in the program, although it has been explained to me that decisions regarding enrollment in EASS is made by the Department of State Hospitals, and therefore is not directly under the control of Wellpath.

Wellpath has previously raised concerns regarding whether the EASS and JBCT programs at Monterey County Jail are appropriately considered to be within the scope of monitoring for *Hernandez*.  For the purposes of this portion of the current report, it should be noted that my consideration of EASS and JBTC is part of a search for solutions to the problem of obtaining the proper level of care for patients whose conditions cannot be managed at the jail. My perspective has been that earlier and more intensive treatment provided through these programs may minimize the number of patients who develop or continue to manifest a level of psychiatric impairment that requires transfer to an outside facility.  Exclusion of consideration of these programs may be appropriate for evaluation of compliance with the requirement for acute and chronic care, but solutions to the challenges faced in reaching compliance with these requirements are nevertheless still needed.

Another mechanism which could minimize the need for inpatient care is the use of involuntary medication in appropriate cases, with inmates who are chronically, severely mentally ill to the extent that they present a danger to self, a danger to others, or are gravely disabled as a result of their mental illness.  As noted in earlier reports, mechanisms exist to provide involuntary medications, such as the provisions of PC2603, when the inmate's condition requires such intervention and they are unable to give informed consent.  This approach would require early detection and decisive action to initiate the necessary steps involved. This would be best supported by an effective interdisciplinary patient review and treatment planning process where such cases are routinely discussed and all available treatment options vigorously pursued in a

coordinated manner.  Documented treatment plans should reflect these interdisciplinary clinical considerations and guide the various approaches to treatment being pursued. Consideration should also be given to more extensive use of behavioral treatment plans with inmates whose mental illness results in self-injurious or otherwise health-jeopardizing behaviors.

In my last report from April 2024, I described a patient who was briefly admitted to the NMC psychiatric inpatient unit and provided involuntary medications, which appeared to be effective in stabilizing the patient and allowing her to be adequately cared for in the jail.  A capacity hearing was quickly conducted and the petition was granted, resulting in an involuntary medication order allowing for the administration of needed medications.  However, this case also appeared to indicate that the provisions of the 5150 hold at NMC which allowed for involuntary medications would not apply following return of the patient to MCJ.  Although continuing involuntary medications did not appear called for in this case, in cases requiring ongoing involuntary medications, such treatment would not continue at MCJ following the patient's return from NMC.

The provisions of PC 2603 may be the relevant mechanism for involuntary medication administration at MCJ in cases where such medications are needed beyond the initial treatment in a psychiatric emergency.  It is not clear at this stage how quickly the process required by PC 2603 can unfold.  Sections 7(a) and 8(a) of the statute require that the inmate and counsel are to be provided with written notice of a hearing at least 21 days prior to the hearing, unless emergency or interim medication is being administered, in which case the inmate would receive an expedited hearing.  Otherwise the hearing is to take place within 30 days after the filing of the notice.  The primary concern here is that such timeframes will often be too long to be useful in responding to a severely mentally ill and gravely disabled patient. The key will be how quickly an expedited hearing can take place, and whether the internal procedures at MCJ can efficiently arrange such a hearing. Further exploration is recommended of the use of PC 2603 and the associated procedures required to quickly provide involuntary medications at the jail when this may represent the most effective treatment approach with patients who are gravely disabled, a danger to self, or a danger to others and who lack the capacity to consent to necessary medications.

The current finding of noncompliance is again based on the conclusion that effective mechanisms do not yet exist for transferring patients whose chronic condition cannot be managed at MCJ offsite for appropriate treatment and care.  It has been noted in earlier monitoring reports that this requirement is interpreted to mean transfer of the patient's care to an outside facility, i.e., admission to an inpatient service, rather than simply transporting the patient to an outside facility, when (typically) the patient is refused admission and returned to jail, even while recognizing that neither Wellpath nor the jail control admissions to such facilities. Wellpath has disagreed with this interpretation, arguing that the obligations of this requirement are met by the attempt to gain admission of the patient to an outside facility, even though those attempts typically fail.  I continue to view compliance as requiring access to the necessary level of care, with access meaning the patient actually receives that care.  As noted in the Settlement Agreement [Dkt. 494 at ECF 17] "Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including . . . access to hospitalization and inpatient care . . ."

*•(b)  At every 90-day chronic care appointment, the medical/psychiatric provider shall (1) assess the patient's current medications, complaints, and compliance with treatment plan; (2) examine vital signs and weight; (3) assess the patient's diagnosis, degree of control, compliance with treatment plan and clinical status as compared to prior visits; and (4) conduct lab and diagnostic tests as necessary, develop strategies to improve outcomes if the condition has worsened, educate the patient, and refer to MD or specialist, and/or conduct discharge planning as necessary. All of the above must be documented in the patient's health record. [CFMG Plan at 32-33]*

**Findings:  Substantial Compliance**

The last Mental Health Monitoring report from April 2024 found substantial compliance with this set of requirements.  Improvements in the clinical documentation were noted over the past two reporting periods.  Standardized forms such as the Psychiatric Provider Progress Note and the Assessment of Involuntary Movement Scale have been used more consistently, and the required information was more frequently found in the healthcare records.

Monthly internal audits were conducted by Wellpath across the various elements of this requirement for 10 patients each month.  Results from these audits for the months of April 2024 through November 2024 showed the following:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Assess meds, etc. | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Examine VS & weight | 100% | 100% | 100% | 80% | 100% | 100% | 100% | 100% |
| Diagnosis, degree control | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Conduct labs | 100% | 100% | N/A | N/A | 100% | N/A | N/A | 100% |
| Develop strategies | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Educate patient | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

I reviewed 15 cases from the internal audit samples.  My results confirmed those reported by Wellpath.  I also reviewed an additional 12 cases that were not included in the Wellpath monthly audit samples.  These cases were found in compliance with the various elements of this requirement.

**5. Acute Care**

*•(a)  Inmates who require acute mental health services beyond what is available at the Jail must be transferred to an appropriate facility. [CFMG Plan at 36, 42] CFMG PLAN AT 26*

**Findings:  Noncompliance**

The status of this requirement remains unchanged.  The observations made in the preceding section of the current report pertaining to the preceding requirements for chronic care are once again relevant here.  MCJ continues to send out patients to NMC-ER as needed, but does not reliably have access to the level of care needed for such patients, as neither MCJ nor Wellpath can control admissions to NMC or other outside facilities. Review of the available

documentation indicates that the communication and coordination of care between NMC and MCJ could still be improved. This includes not only the written documentation associated with patient send outs and the care provided at NMC, but also the integration of this information in the treatment planning and associated documentation at MCJ. The current finding of noncompliance is again based on the conclusion that effective mechanisms do not yet exist for transferring patients whose acute condition cannot be managed at MCJ offsite for appropriate treatment and care. Please refer to the preceding section 4(a) on Chronic Care for a more extensive explanation of my interpretation of the requirements for transferring inmates requiring mental health care beyond what is available at the jail.

*•(b) Crisis intervention and management of acute psychiatric episodes shall be handled initially by on-duty medical/mental health staff with referral to psychologist and/or psychiatrist on a 24 hour per day basis. [CFMG Plan at 43]*

**Findings: Substantial Compliance**

This element of the acute care requirements, which specifically addresses the initial onsite response to acute psychiatric episodes, was found in substantial compliance in the last two monitoring reports. Review of relevant cases for these prior reports indicated that such situations were initially handled by on-duty medical and mental health staff, or with the involvement of on-call mental health staff if occurring outside of scheduled mental health coverage hours. Referral could be made to a psychiatrist as needed, and on-call psychiatry coverage was available.

During the current monitoring period, monthly internal audits were conducted by Wellpath for this requirement. Results of these audits showed the following:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Handled onsite | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Referred as needed | 100% | 100% | 100% | 50% | 100% | N/A | 75% | 100% |

I reviewed 19 cases from the internal audit samples, and my results matched those reported in the audits. I also reviewed 12 additional cases that were not included in the Wellpath internal audit samples. In each of these 12 cases the initial staff response to the acute psychiatric episode was clinically appropriate, although in one case a referral to psychiatry was not made when it likely should have been. In light of this consistent level of performance, the current finding is again substantial compliance.

**6. Outpatient Services**
*•(a) The Jail shall make outpatient mental health services, provided by a qualified mental health provider, available to all inmates. [CFMG Plan at 41]*
*•(b) Inmates requiring mental health services beyond the on-site capability of the Jail shall be referred to appropriate off-site providers. [CFMG Plan at 41, 43, 46]*

**Findings: Partial Compliance**

The last two monitoring reports from November 2023 and April 2024 found partial compliance with these requirements, following findings of noncompliance in earlier reports. The November 2023 report noted that additional mental health staff had been hired, but staff were still struggling to keep up with workloads as of the April 2024 report. There has been significant mental health staff turnover since the time of these prior reports, as described in Section 12 below regarding clinical staffing.

For the current monitoring review, 20 cases were reviewed for the provision of outpatient services, including a particular focus on the number and timing of rescheduled mental health professional and psychiatry appointments. Eight of these cases were selected at random from the Wellpath monthly audit samples, and the remaining 12 cases were selected at random from mental health cases not included in the Wellpath monthly audit samples. Ten of the 20 cases reviewed (50%) were considered compliant in terms of providing adequate sick call services. Although the cases considered compliant typically had mental health or psychiatry appointments that were rescheduled, these cases did not referral or follow-up appointment time frames. The 10 cases considered noncompliant had rescheduled appointments that missed required time frames, including three cases where an urgent referral was not completed within the 24 hour time limit.

Similar to observations made in prior monitoring reports, the current review noted that certain tasks were consistently completed as scheduled, such as follow-up appointments with patients on or recently released from suicide watch. Discussions with mental health staff during the site visit indicate that the triage process is properly prioritizing contacts with the most acutely ill and vulnerable patients. After these most urgent cases are seen, attempts are made to see those who have been waiting the longest between contacts, although this remains an insufficient solution in light of the frequency and duration of rescheduled appointments that are still observed.

Rescheduled appointments are almost always attributed to workload issues, which directly reflect a problem with staffing levels. Some chart entries record the number of tasks (primarily scheduled appointments) and the number of staff on duty, and indicated that such workloads are not realistically achievable.

The Implementation Plan states, "Outpatient mental health services to include screening, evaluation, diagnosis, treatment and referral services shall be available to all inmates in the Monterey County Jail" [Dkt. 532 at p. 41]. Prior monitoring reports noted that, unlike the services needed for some of the more severely mentally ill inmates, which are considered under the requirements for chronic and acute care, outpatient services could be effectively delivered by mental health staff within the existing jail environment, assuming sufficient staff are available to consistently deliver these services. It remains difficult to envision a situation in which an inmate would need to be sent to off-site providers for outpatient services as defined in the Implementation Plan, if there were sufficient mental health staff onsite to address the level of need for these outpatient services. Adequate staffing, including adequate custody staffing to provide the necessary escorts, is again seen as the primary necessity for achieving substantial compliance with the requirements for outpatient services. It should be noted that the outpatient services identified in the Implementation Plan do not include treatment groups. Most inmates who require outpatient services, as defined, are seen by mental health staff, but not yet in a sufficiently timely manner to achieve substantial compliance.

**7. Safety and Sobering Cells**

•*(a)  The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall responsibility for safety and security of prisoners, prompt reviews by medical of all placements, and a process of resolving disagreements between medical and custody. [Settlement Agreement Dkt. 494 at ECF 14]*

**Findings: This requirement was released from further monitoring by Court Order dated October 27, 2023 (Dkt. 844 at ECF 4 - 5).**

•*(b)  Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical professional will see an inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.*

**FINDINGS:  Partial Compliance**

      As noted in prior monitoring reports, I have raised concerns about the appropriateness of reviewing this requirement from a mental health perspective, as it primarily involves the involvement of and decision-making by medical staff.  After consulting with the Medical Monitor, I reviewed 10 such sobering cell placements from the current monitoring period.  All of these cases were seen by a Registered Nurse at the time of initiating a sobering protocol and placement in a sobering cell.  In four cases, there was documentation that an RN saw the patient at the time of release from the sobering cell, as documented in the Flow Sheets tab under the Sobering Cell Monitoring sub-tab, or in the sick call notes.  For the remaining six cases, no documentation was found from medical staff regarding release from the sobering cell.

      These aspects of the requirement are straightforward, involving only whether there is documentation in the medical record that an inmate was seen within an hour of placement in a safety or sobering cell, and upon clearance by medical staff for release from a sobering cell. Findings involving the adequacy of these procedures falls within the purview of the Medical Monitor.  I have previously discussed this matter with Dr. Barnett, and he is in agreement with this perspective.  I defer to the medical monitor regarding the adequacy of medical involvement in the placement of inmates in sobering cells and clearance for their release.

•*(c)  A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his findings through a report which will be sent to the Jail*

*Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.*

## Findings: Substantial Compliance

The adequacy of safety checks has been a focus of extensive discussion during my tenure as the mental health monitor in this case. For the sake of continuity with the next mental health monitor, I include the following background information.

This requirement was found in substantial compliance in my last report from April 2024. The prior Mental Health Monitor found substantial compliance with this requirement in his last report of May 2021. He focused primarily on the audits conducted by the Compliance Sergeant, which are based on the Guardian System of welfare check logging. This system has continued to demonstrate compliance with the requirement that custody staff make safety check rounds at the specified intervals, and the Compliance Commander has a well-established system of auditing and feedback to address any detected compliance issues based on the timing of the checks. The auditing system also includes the routine reports specified in this requirement.

My subsequent monitoring reviews of July 2022 and May 2023 deferred findings on this requirement, having identified concerns regarding the requirement that safety checks consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior. My report from November 2023 found partial compliance with this set of requirements, based on progress that had been made in augmenting the compliance checks by the Compliance Commander with routine review of surveillance video samples of welfare checks. I reviewed such surveillance videos with the Compliance Commander, as he described how he conducts his audits. Such reviews have been a useful addition in the jail's efforts to ensure that welfare checks meet the requirements of the Implementation Plan.

The finding of partial compliance in November 2023 was also based on additional training in the proper conducting of welfare checks which had been developed but not fully implemented at that time. I have reviewed these training materials and corresponded with the Compliance Commander regarding the content of the training, as well as the process for providing this training to custody staff. The training materials consist of demonstration videos, portions of surveillance videos drawn from incidents involving welfare checks, a PowerPoint presentation, and various reference documents regarding policies and procedures. This training and the associated materials address the necessary quality of effective welfare checks, and should make a valuable contribution in the jail's ongoing efforts to ensure that welfare checks meet the requirements of the Implementation Plan.

This training has now been provided to deputies and sergeants through six days of team briefings occurring between 5/27/24 and 6/1/24. Training rosters were provided for my review. Welfare check training is provided to all new deputies and sergeants who have transferred from patrol. Another opportunity for ongoing training is the use of training bulletins at staff meetings conducted by team sergeants, in which training on the quality of welfare checks can be periodically revisited. A briefing training bulletin platform is under development and was expected to launch in August 2024. Training bulletins will be added to a library via SharePoint.

24

Team sergeants will cover the training bulletins related to the Hernandez case, including review of welfare check procedures, at regular staff briefings.

Points made in earlier monitoring reports remain relevant, and I repeat them here for ease of reference: The core concern in evaluating this and other requirements related to welfare checks is finding a reasonable balance between adequately assessing an inmate's wellbeing and insisting on procedures that would unduly interfere with the inmate's sleep or create unnecessary agitation within the inmate population. Consultation has been sought with a number of subject matter experts, former custody and jail administrative staff from other jurisdictions, and monitors involved in similar cases at other jails.

Several points emerged from these discussions. One is that this is an issue many, perhaps most, jail systems struggle with. A clear consensus on a specific procedure which would explicitly address the balance of ensuring wellbeing vs. overly intrusive and disruptive interactions with inmates was not identified during discussions with various experts. A consensus did emerge, however, regarding the need to somehow ensure that an inmate was alive, and not merely showing no signs of distress. Finally, there was agreement that any procedure for adequately assessing inmate wellbeing will depend to some degree on the judgment and situational awareness of the deputies conducting the checks. It is recognized that reliance upon individual judgment and adaptation to specific circumstances introduces potential variation into a procedure that must also be standardized.

Key elements to ensuring substantial compliance with the Implementation Plan requirements for welfare checks include training, monitoring, and corrective action. The mechanics of ensuring that welfare checks occur and are recorded as required has been well established over the course of several monitoring reports. The Compliance Commander in charge of this process continues to maintain an effective monitoring, reporting, and response process based on reviews of the Guardian System data; he also now reviews samples of video that correspond with the times of welfare checks in order to observe whether checks appear to be completed in accordance to training and performance expectations. Instances of inadequately performed welfare checks are addressed by the Compliance Commander through the chain of command. Now that the recent welfare check training has been deployed, I believe MCJ has taken the available, feasible steps to ensuring substantial compliance with requirements. Based on consideration of the actions taken over the course of the past three monitoring review periods and the practices currently in place, a finding of substantial compliance is again warranted.

*•(d)  Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11 p.m. and 7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.*

**Findings: Substantial Compliance**

Substantial compliance was found for this requirement in the last three monitoring reports. Review of safety cell logs and audits for the current review period again showed that inmates are consistently provided safety smocks and safety blankets as required while in safety cells. The safety blankets that are used as a sleeping bag, which can be closed by Velcro and

have a sewn-in pillow, have been observed and found to be adequate for the intended purpose. A sufficient number of such safety blankets were again confirmed to be available in the current inventory during the recent site visit.

*•(e)  Inmates in sobering cells may have access to mattresses at the discretion of custody staff.*
*•(f)  Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.*

**Findings: Substantial Compliance**

These requirements were found to be in substantial compliance in the last three monitoring reports.  No issues regarding these requirements were observed during the most recent mental health monitoring tour.  A sufficient number of safety sleeping bags were confirmed to be available for distribution as needed.  Policies and procedures continue in the same manner as have been found substantially compliant in prior mental health monitoring reports.

*•(g)  Patients withdrawing from benzodiazepines must be evaluated by a medical provider within 3 days, and a psychiatrist or psychiatric NP within 7 days. [CFMG Plan at 68]*

**Findings: Noncompliance**

An issue which has hampered the evaluation of compliance with this requirement prior to the last monitoring report has been the identification of an appropriate sample of inmates withdrawing from benzodiazepines, separate from those placed on a similar protocol for alcohol withdrawal.  Wellpath reports that they have now determined a method to accurately identify inmates who are placed specifically on a benzodiazepine withdrawal protocol.  Monthly internal audit data for this requirement for the months of April 2024 through November 2024 showed the following results:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Psychiatry 7 days | 0% | 13% | 33% | 0% | 0% | 0% | 33% | 20% |

It should be noted that the sample sizes for this requirement were small, ranging from two to eight cases per month during the current review period, although these appear to represent all relevant cases during these months.  With sample sizes this small, the results of an individual case can significantly influence the reported compliance figure.

I reviewed all cases scored as compliant from the July through November audit samples, for a total of 12 cases.  My findings agreed with those reported in the audits in each case.  Based on the reported rates of compliance, the current finding is noncompliance.  It will be necessary to develop and implement procedures to ensure compliance.  It is again recommended that the HSA, DON, and relevant clinical supervisors become directly involved in any corrective actions needed to achieve substantial compliance with this requirement.

It should be noted that this requirement was evaluated independently from 2(*b*), which requires the psychiatric provider to complete a baseline history and physical or psychiatric examination; order a therapeutic regimen, as appropriate; and schedule the patient to be seen for chronic care clinic at least every ninety days for the length of the jail stay. Patients on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every 60 to 90 days. That requirement was found in substantial compliance in the current report. The specific function of psychiatric evaluation of inmates withdrawing from benzodiazepines remains noncompliant, and appears to represent a problem with identifying and referring such inmates to psychiatry in a consistent and timely manner during intake and assignment to a safety or sobering cell.

•*(h)  Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.*
**This requirement is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance. This requirement was found in substantial compliance in the most recent prior monitoring report of July 2022. This requirement was released from monitoring as noted in Dkt. 759 at ECF 5.**

•*(i)  For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.*

**Findings: Substantial Compliance**

This requirement has been found in substantial compliance for the last three monitoring reports. As noted in previous monitoring reports, the Compliance Commander continues to maintain a thorough system to track and respond as needed to patients placed in safety cells. This system involves a status board that reflects when a patient enters a safety cell and the time at which they will reach the 24 hour mark. This status board is audited daily by the Compliance Commander, with daily prompts to floor deputies to ensure these patients are moved as required.

The Compliance Commander has previously explained that safety cells are most frequently used to house inmates on Level 2/Intermittent Suicide Watch (defined as those with suicidal ideation but no active self-harm) due to a lack of alternative observation housing, or inmates requiring a single cell in the booking area who are not on any level of suicide watch. Inmates on Level 1/Continuous Suicide Watch must be transferred out to inpatient care or the NMC emergency room after 24 hours, while Level 2 inmates can be moved to other appropriate observation cells as available without requiring transfer to another facility. It is also noted that two safety cells have been designated as observations cells; former Safety Cells 4 and 5 are now Observation Cells 3 and 4, respectively, although the design of these cells has not been altered (e.g., there is no toilet, running water, bench or bedding in these cells). The Implementation Plan requirements that apply to safety cells are therefore also applicable to these redesignated

27

observation cells, including that inmates cannot be transferred from safety cells to Observation Cell 3 or 4 to avoid the 24 hour restriction on safety cell placement.

Safety Cell audits conducted by the Compliance Commander for April 2024 through September 2024 were reviewed. These audits reported the following results:

- April: 38 safety cell placements, 15 sobering protocol placements, 0 observation cell 3 or 4 intermittent suicide watch placements (no booking cell available). No placements over 24 hours.
- May: 14 safety cell placements, 16 sobering protocol placements, 0 observation cell 3 or 4 intermittent suicide watch placements (no booking cell available). No placements over 24 hours.
- June: 17 safety cell placements, 11 sobering protocol placements, 0 observation cell 3 or 4 intermittent suicide watch placements (no booking cell available). No placements over 24 hours.
- July: 12 safety cell placements, 9 sobering protocol placements, 0 observation cell 3 or 4 intermittent suicide watch placements (no booking cell available). No placements over 24 hours.
- August: 9 safety cell placements, 14 sobering protocol placements, 0 observation cell 3 or 4 intermittent suicide watch placements (no booking cell available). No placements over 24 hours.
- September: 10 safety cell placements, 10 sobering protocol placements, 0 observation cell intermittent suicide watch placements (no booking cell available). No placements over 24 hours.

A concern was previously raised by plaintiffs as to whether inmates are removed from safety cells within 24 hours and then returned to a safety cell a short time later to avoid triggering the requirement to transfer the inmate to an off-site facility. I again see no evidence of this. The Compliance Commander maintains a rigorous monitoring system for safety cell placements, which has been effective at detecting when inmates are approaching the 24 hour limit and ensuring that appropriate actions are taken. Such inmates are consistently removed from the safety cell and sent out to NMC-ER as required. It has been noted that NMC will frequently return such inmates to the jail with a recommendation that they be placed in a safety cell. This requirement remains in substantial compliance.

*•(j)  Inmates in safety cells whose condition deteriorates, or for whom the nurse is unable to complete a hands-on assessment including vital signs after 6 hours of placement shall be transferred to Natividad Medical Center for further assessment. [CFMG Plan at 16, 75]*

**Findings:  Substantial Compliance**

This requirement was found in substantial compliance in the last monitoring report from April 2024. In the current review, the healthcare records for 20 placements from the safety cell logs were examined. In 18 of these cases (90%), a nurse completed a hands on assessment including vital signs within 6 hours of placement in a safety cell. In none of these cases did the patient's condition appear to deteriorate while in a safety cell to a degree that required transfer to

NMC.  Where a requirement has been found substantially compliant in the most recent prior report, and where there have been no subsequent cases that demonstrate lack of compliance, the finding of substantial compliance is continued.  The current results reflect continued substantial compliance for this requirement.

### 8. Medication Continuity

•*(a)  All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.*

**This requirement is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that Wellpath provides evidence that this requirement has been incorporated into the Wellpath Policies and Procedures.  [Dkt. 751 at ECF 20].  The subsequent monitoring report of July 2022 found substantial compliance, in that Wellpath Monterey County Policies and Procedures HCD-110 E09B, Timely Initiation of Medication Upon Arrival, and HCD-110 E-09A, Medication Verification met this requirement.**

**This requirement had been released from further monitoring.  However, in the 9/26/23 Court Order granting the Plaintiffs' Motion to Enforce (Dkt. No. 838 at p. 27) which references 11/22/22 Joint Status Report (Dkt. No. 759 at page 5 – 6), this requirement was reinstated for monitoring.**

**Findings:  Partial Compliance**

This requirement was found noncompliant in the last monitoring report from April 2024, with compliance rates for verifying medications and obtaining medication orders at intake ranging from 0% to 50% for the months of November 2023 through March 2024.

The monthly internal audits conducted by Wellpath include two audit items for the intake process that are relevant, including an item pertaining to the verification of medications and an item pertaining to consulting with the on-call psychiatrist by the end of the shift to obtain a medication order.  The monthly compliance figures for these two items showed the following:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Verify meds | 63% | 38% | 86% | 75% | 83% | 89% | 100% | 100% |
| Consult, get orders | 40% | 44% | 60% | 60% | 88% | 78% | 100% | 89% |

I reviewed 16 cases selected at random from the Wellpath monthly audit samples in order to verify the reported results.  My findings for each of these cases agreed with those reported in the audits.  I also reviewed an additional 12 intake cases that were not included in the Wellpath monthly audit samples.  Medications were verified in 82% of these cases, and consultation with a provider to get medication orders was completed in 73% of these cases.  Based on these results, this requirement was found in partial compliance.  It is again recommended that this requirement become a routine focus in the QA/CAI process, with corrective actions implemented as needed.

*•(b)  By the end of the nursing shift, the booking RN will consult with the on-call psychiatrist regarding any verified or unverified psychotropic medications. The on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate. The on-call psychiatrist will then set the time to see the inmate within 5-7 days. The date of the appointment will be reflected on the written record of the order.* [Dkt. 532 at ECF 19]

**This requirement is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that Wellpath provides evidence that this requirement has been incorporated into the Wellpath Policies and Procedures.  [Dkt. 751 at ECF 21]  The subsequent monitoring report of July 2022 found substantial compliance, in that Wellpath Monterey County Policies and Procedures HCD-110 E09B, Timely Initiation of Medication Upon Arrival, and HCD-110 E-09A, Medication Verification meet the requirements.**

**This requirement had been released from further monitoring.  However, in the 9/26/23 Court Order granting the Plaintiffs' Motion to Enforce (Dkt. No. 838 at p. 27) which references 11/22/22 Joint Status Report (Dkt. No. 759 at page 5 – 6), this requirement was reinstated for monitoring.**

**Findings:  Partial Compliance**

This set of requirements was found noncompliant in the last monitoring report from November 2023.  For the current monitoring review, results from monthly internal audits conducted by Wellpath between April 2024 and November 2024 are relevant.  These results showed the following:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Consult, get orders | 40% | 44% | 60% | 60% | 88% | 78% | 100% | 89% |
| Set appointment* | 100% | 100% | 100% | 89% | 83% | 100% | 71% | 100% |

*The compliance rate reported for setting appointments that are reflected in the written record of the order appear to apply only to cases where consultation with the on-call psychiatrist was completed.  Compliance with this element of this element of the requirement is therefore lower when considered as a function of the entire monthly sample.

The results presented here are similar to the results for requirement 1(h), which covers a similar set of functions. Based on the internal audit data reported by Wellpath, which is consistent with cases that I reviewed as described in the preceding requirement, these functions have improved during the current monitoring period, but have not yet consistently reached a level reflecting substantial compliance.  In view of the progress made, a finding of partial compliance is warranted. This as an area requiring focused attention in the CQI process, and the involvement of the HSA and DON to ensure consistent completion of these tasks by the intake nurses.

*•(c)  No psychotropic medications shall be unilaterally discontinued without consultation with the facility physician or psychiatrist. Psychotropic medication shall not be ordered for longer than 90 days, new psychiatric medications will not exceed 30 days, until condition is documented stable by the ordering physician. The prescribing provider will renew medications only after a clinical evaluation of the individual is performed.* [Dkt 532 at ECF 19]

**Findings: Substantial Compliance**

Following the format which began under the prior Mental Health Monitor, this item combines the elements of two separate requirements from the Implementation Plan, one of which states that no psychotropic medications shall be unilaterally discontinued without consultation with the facility physician or psychiatrist, and another which states that psychotropic medication shall not be ordered for longer than 90 days, new psychiatric medications will not exceed 30 days until condition is documented stable by the ordering physician, and the prescribing provider will renew medications only after a clinical evaluation of the individual is performed.

The results of monthly internal audits with samples of 10 cases per month were conducted by Wellpath for the months of April 2024 through November 2024 and provided for review.  These results of these audits showed the following:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Meds dc with consult | 100% | 100% | 100% | N/A | 100% | N/A | 100% | 100% |
| Order for < 90 days | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| New meds < 30 days | 80% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Renewed after eval | 100% | 100% | 100% | 100% | 100% | 100% | 90% | 100% |

*N/A indicates that no cases in the sample for that month had medications discontinued.

My review of 15 cases selected at random from among those included in the Wellpath audit samples showed agreement in scoring, with the exception of one instance where the audit had recorded a case in the July sample as non-compliant for medication orders not to exceed 90 days, but no medications were found to have been ordered.  This case was therefore not applicable rather than noncompliant, based on my review of the healthcare record.  This result was subsequently corrected in the Wellpath audit data.

I also reviewed 12 additional cases not included in the Wellpath audit samples, which demonstrated a similarly high level of compliance.  Based on these current results, a finding of substantial compliance is warranted.

It should again be noted that this requirement was evaluated for the prescribing of psychotropic medications after the intake process.  The continuation of medications at the time of intake is covered in other sections of the current report (requirements 1.e, f, g, h; requirements 8.a, b), where performance deficits have been noted.

**9. Discharge**

•*(a)  Provision of psychotropic medications upon discharge from the jail. The Implementation Plan provides that a 30-day supply of medications be given to inmates upon discharge from the jail.*

**This requirement has been released from further monitoring.**

•*(b)  Inmates who are released prior to resolution of a continuing medical/mental health condition shall be referred to public health and/or community clinics as appropriate, and shall be provided written instructions for continuity of essential care. [CFMG Plan at 38, 44]*

**This requirement has been released from monitoring. [Dkt. 759 at ECF 6]**

**10. Involuntary Medication**

•*(a)  Psychotropic medications may not be used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment. [CFMG Plan at 90, 96]*

**Findings: Substantial Compliance**

As observed in the last five consecutive monitoring reports, the current review again found no instances where psychotropic medications were used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment.

•*(b)  Absent an emergency, inmates will not be administered involuntary psychotropic medications at the Monterey County Jail. Psychotropic medication will not be administered for disciplinary purposes. [CFMG Plan at 19]*

**Findings: Substantial Compliance**

Consistent with the findings of prior monitoring reports, the current review again found that involuntary medications were administered in accordance with an Involuntary Medication Order from the Court, and were not administered for disciplinary purposes.

•*(c)  Absent an emergency or court order for treatment with psychotropic medications, an inmate shall give his or her informed consent or refusal. [CFMG Plan at 20]*

**Findings: Substantial Compliance**

As found in the three prior monitoring reports, the current review of documentation in the electronic healthcare records consistently showed that inmates had an involuntary medication order on file, provided informed consent, or refused psychotropic medications.  A review of 10 randomly selected cases showed that nine had either signed consent forms or documented verbal consent, and the other case had an involuntary medication order in the healthcare record. Review of the involuntary medication log showed that there were nine instances of involuntary medication administration with seven different inmates during the current monitoring period. All of these cases referenced an Involuntary Medication Order issued by the court, although the actual court order was not located in the healthcare record for one of these inmates.  There were

no instances observed where an inmate was administered psychotropic medication without their consent in the absence of a court order.

•*(d)  The Jail may only administer involuntary psychotropic medications in a psychiatric emergency (i.e., when administration is necessary to preserve life or prevent serious bodily harm, and it is impracticable to obtain consent), or when an inmate is found to lack capacity to consent at an Incapacity Hearing. The responsible physician, Program Manager, and Director of Nursing, with the Facility Manager, are to identify appropriate community resources and develop procedures to obtain an Incapacity Hearing, and transfer inmates requiring involuntary psychotropic medication administration to an appropriate community facility. If the inmate must remain at the jail for clinical or custodial reasons, the health services staff shall coordinate with County Mental Health Psychiatric Emergency Services to evaluate competency pursuant to Riese v. St. Mary's Hospital (Riese Hearing). [CFMG Plan at 96, 98]*

**Findings:  Partial Compliance**

Nothing has changed regarding this requirement.  As reported in prior monitoring reports, no instances were found during the current review in which psychotropic medications were administered involuntarily in the absence of a psychiatric emergency when the inmate had refused to provide consent.  All involuntary medication administrations during the current monitoring period were conducted with inmates who had Involuntary Medication Orders from the Court, as part of the Early Access (EASS) or Jail Based Competency Treatment (JBCT) programs.  This portion of the requirement remains in substantial compliance.

However, as noted in prior monitoring reports, this Implementation Plan requirement also states that inmates requiring involuntary psychotropic medications are to be transferred to an appropriate community facility, and specifies a procedure to follow regarding evaluation of competency.  There continues to be no process in place whereby the responsible physician, Program Manager, Director of Nursing, and Facility Manager will obtain Incapacity Hearings and transfer inmates requiring involuntary medication administration to an appropriate community facility.

As stated in prior monitoring reports, the current finding of partial compliance is based on the observation that involuntary psychotropic medications are only administered in psychiatric emergencies or in accordance with an Involuntary Medication Order from the Court, as required.  The work which remains in order to achieve substantial compliance is the pursuit of Incapacity Hearings and the transfer of inmates to an appropriate community facility when they require involuntary medications in the absence of a Court Order, if these actions remain the most viable and effective means of achieving the intended goals of this requirement.  I encourage the parties to discuss the intended goal of this requirement and consider the most effective means of accomplishing this intent in the context of current jail and community resources.

It has been previously noted that EASS is a California Department of State Hospital (DSH) program, which is in some ways separate from the MCJ foundational mental health program.  I recognize that CFMG does not control who is admitted to the EASS program.  However, my understanding continues to be that Wellpath staff are responsible for the mental health treatment services provided to patients in this program, including the care provided by

psychiatrists and psychiatric nurse practitioners during enrollment in EASS. To this extent, requirements pertaining to the standards for care, such as informed consent or the administration of involuntary medications, are considered to fall within the scope of monitoring.

•*(e)  In a psychiatric emergency, psychotropic medications can only be involuntarily administered pursuant to a direct written or verbal one-time order from the responsible facility psychiatrist or physician after an on-site evaluation (never as needed, never standing order). A telephone order is sufficient only if the inmate has been personally evaluated by the prescribing physician no longer than 24 hours prior to the emergency. If none of above options are available, physical restraint should be used and the inmate transferred to the hospital emergency department for physician evaluation. [CFMG Plan at 96]*

**Findings:  Deferred**

  A finding for this requirement was deferred in the last two monitoring reports, as there were no instances of involuntary medications administered in a psychiatric emergency in the absence of an Involuntary Medication Order issued by the Court. Wellpath again reported that there were no such instances during the review period for the current monitoring report.  No instances of involuntary medication administration in the absence of a court-issued Involuntary Medication Order were identified in the cases reviewed for the current report.  A review of such instances, when they do occur, will be the basis for determining compliance with these requirements.

  It is again noted that this requirement, as written, applies specifically to instances of involuntary medications administered in a psychiatric emergency, and not in cases where the inmate has an Involuntary Medication Order in place.  The language of this requirement raises questions about how it should be interpreted when applied to the procedures for the administration of psychotropic medications in a psychiatric emergency.  The first sentence calls for an on-site evaluation, taken to mean a face-to-face encounter occurring at the jail.  The second sentence allows for a telephone order only if the inmate has been "personally" evaluated by the prescribing physician no longer than 24 hours prior to the emergency.  This portion of the requirement does not specifically state that an on-site evaluation is necessary, and appears to allow for telepsychiatry evaluation of the inmate.

•*(f)  Verbal orders for involuntarily psychotropic medications must be documented in the inmate's medical record and signed by prescribing physician within 72 hours. The Medical Program Manager and Custody Facility Manager shall be notified in writing, or by telephone if not available, within 24 hours of the involuntary administration of psychotropic medications. [CFMG Plan at 96-97]*

**Findings:  Deferred**

  A finding for this requirement was deferred in the last two monitoring reports.  This requirement is interpreted as being intended for instances of emergency involuntary medication administration, rather than cases where an Involuntary Medication Order is in place.  A log for involuntary medication administrations continues to be maintained.  Wellpath reported that there

were no emergency involuntary medication administrations during the current review period in the absence of an IMO. No instances of emergency involuntary medication administration were identified in any of the cases reviewed for the current monitoring report. A review of such instances, when they do occur, will be the basis for determining compliance with these requirements.

*•(g)  Inmates receiving involuntary psychotropic medications must be admitted to an infirmary or safety cell, with intermittent supervision by custody staff at least every 30 minutes. Nursing staff must monitor (assessing response to medications, mental status, general physical appearance, behavior, and hydration) every 15 minutes during first hour, then every 30 minutes thereafter until otherwise ordered by the prescribing physician, documenting all findings in the inmate's medical record. The inmate must be evaluated by the responsible prescribing physician at least every 72 hours. [CFMG Plan at 97]*

**Findings: Deferred**

A finding for this requirement was deferred in the last two monitoring reports. The requirement as written is interpreted to apply to instances of emergency involuntary medication administration, rather than cases where an Involuntary Medication Order from the Court is in place. All of the seven cases listed on the Involuntary Medication Administrations log provided for review were again noted to have such an Involuntary Medication Order referenced in the healthcare record, although in one case the actual court order was not located in the chart. No instances of emergency involuntary medication administration were identified in the cases reviewed for the current monitoring report. A review of such instances, when they do occur, will be the basis for determining compliance with these requirements.

*•(h)  Inmates exhibiting any clinical deterioration at any time during involuntary therapy shall be transferred immediately to a clinically appropriate treatment facility. [CFMG Plan at 97]*

**Findings: Substantial Compliance**

A finding was deferred in the last three monitoring reports, as no cases involving involuntary medications exhibited clinical deterioration, thereby preventing an evaluation of compliance. Wellpath staff at MCJ continue to maintain a log of all involuntary medication administrations, which showed that for the current monitoring period there were seven cases involving involuntary medications. I reviewed the healthcare records for each of these cases. All cases were enrolled in the Early Access (EASS) or Jail-Based Competency Treatment (JBCT) programs, and all had an involuntary medication order in place at the time of the administration of involuntary medications. In most cases, the patients were actively symptomatic. The psychiatric status of these patients, however, was not a deterioration from their previous baseline at the time of the involuntary treatment. All were being treated and closely followed in the EASS or JBCT program.

In one case, the inmate had what appeared to be a medical deterioration in response to the involuntary medication; this inmate was promptly transferred to a medical facility for evaluation and stabilization. This may have been an allergic reaction to the medication, although the

documentation was not clear as to whether this was a reaction to the psychotropic medications. It appears that the patient had been administered the same medications in the past without ill-effect.  Regardless of the etiology, this case demonstrated compliance with the requirement that inmates demonstrating any clinical deterioration at any time during involuntary treatment are to be transferred immediately to a clinically appropriate treatment facility.

It is not clear from the language of this requirement if it is intended to apply only to instances of emergency involuntary medication administration in the absence of an Involuntary Medication Order, or is also intended to include inmates receiving involuntary medications under an Involuntary Medication Order from the Court. Most of the requirements pertaining to involuntary medications appear to address the use of involuntary medications in instances of psychiatric emergency, although this is not clearly specified in each of the requirements.  The requirement was also written prior to the establishment of the EASS and JBCT programs at MCJ, which seems likely to affect the intent of sending patients enrolled in these programs to a "clinically appropriate treatment facility."

As the parties consider the various requirements for involuntary medications, they are encouraged to specify whether this requirement is intended to apply to all cases of involuntary medication administration, or only those instances occurring in a psychiatric emergency and in the absence of an Involuntary Medication Order by the Court.  The effect of having the EASS and JBCT programs at MCJ should also be taken into consideration regarding the intent of this requirement.

## 11. Medication Refusals
•*(a)  The on-call psychiatrist must be contacted whenever an inmate refuses his or her medications on three consecutive occasions. [CFMG Plan at 20]*

### Findings: Noncompliance
The last four monitoring reports found noncompliance with this requirement, noting a lack of documentation demonstrating that a psychiatrist was contacted for patients whose Medication Administration Record showed three or more consecutive refusals, nor were the patients consistently seen by a psychiatrist around the time of such refusals.  For the current monitoring period, internal monthly audits were conducted by Wellpath for the months of April 2024 through November 2024.  Results of these audits showed the following:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Psychiatrist contacted | 20% | 40% | 40% | 50% | 40% | 40% | 0% | 0% |

Sample sizes for each of these months was 10 cases, with the exception of July, which included eight cases.  I reviewed 12 cases from these samples, which included all cases scored as compliant in the internal Wellpath audits for the months of July, August, and September. Review of the healthcare records revealed several issues with the audit results as reported. Although the dates that psychiatrists were notified, as listed in the audit results, were verified to have occurred, in eight of the 12 cases noted as compliant these notifications were not timely, in that instances of three or more consecutive refusals occurred within the audit month but prior to

the dates on which the psychiatrist was notified.  In other words, instances in which the psychiatrist should have been notified during the month of the audit did not result in such notification, although a later instance of three or more consecutive refusals did result in notification.  This indicates that the process is not consistently detecting and responding to all of the instances of medication refusal that should result in notification of the psychiatrist.  When corrected for these missed instances, the observed rates of compliance drop to 10% to 20% for the months of July, August, and September.

   Another issued noted in the documentation associated with this requirement is that the nursing staff do not appear to be applying the same criteria for medication refusals as stated in the requirement.  The requirement specifies that the psychiatrist must be notified whenever an inmate refuses his or her medication on three consecutive occasions.  However, in the tasks set by nursing staff, it is noted that the patient "has missed three or more doses in the last seven days."  So while some notifications may be initiated unnecessarily (at least in terms of this requirement), other instances that should have resulted in notification of the psychiatrist are being missed.

   A third issue is that some of the notifications to psychiatry about medication noncompliance are being initiated by the MHPs.  While it is commendable that the mental health clinicians are attending to the patients' medication compliance and communicating with psychiatry, this is not the most efficient or consist mechanism for doing so.

   During the recent site visit, it was explained that the current version of the electronic healthcare record does not allow the nurses conducting med pass to view the Medicine Administration Record (MAR) for more than the past 24 hours, which prevents them from checking in real time to see if a patient who refuses medication has refused the prior two or more doses.  Time constraints make it unrealistic for the nurses to do subsequent searches of the MAR for every medication refusal observed during med passes on their shift to detect instances of three consecutive refusals.  One possible solution may be the development of an automated process for examining the MAR and flagging instances of medication refusal that require notification of the psychiatrist.  Other jail systems (e.g., Los Angeles County Jail) are pursuing such a solution for identifying medication refusals.

   Corrective action is necessary to bring this requirement into substantial compliance.  This should be an ongoing focus of the CQI process at MCJ.

## 12. Clinical Staffing

*•(a)  Defendants will maintain Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to ensure adequate staffing to provide all necessary medical and mental health care. The plan will identify all needed positions based on current and projected Jail population, and the number and qualifications of medical and mental health care staff to cover each position, with shift relief.*

*•(b)  Mental health services provided on-site shall include crisis evaluation, socialization programs, group therapy, medication management, psychiatric evaluations and individual therapy. [CFMG Plan at 42]*

**Findings:  Noncompliance**

These requirements have found noncompliant in the last three monitoring reports, as clinical staffing has remained inadequate to fully meet the requirements of the Implementation Plan.  The current staffing allocation remains as follows:

- 1 MH Coordinator working 4 x 10-hour shifts: 1.0 FTE
- 4 Mental Health Clinicians working 3 x 12-hour shifts: 3.6 FTE
- 2 psych techs working 5 x 8-hour shifts: 2.0 FTE; currently vacant
- 1 discharge planner working 5 x 8-hour shifts: 1.0 FTE; currently filled
- (1 psychiatrist working 4 x 10-hour shifts: 1.0 FTE)
    - TOTAL: 7.9 FTE, plus 1.0 FTE psychiatrist

There has been significant turnover in the mental health staffing since the last monitoring report.  Four Mental Health Professionals have left, including the Mental Health Coordinator.  One MHP has been on maternity leave, and is expected to return to duty in January.  There is a psychologist currently working as the interim full-time Coordinator.  There is one full-time agency MHP, who is expected to transition to full-time status as a Wellpath clinician.  There are seven PRN Mental Health Professionals currently contributing to staffing the facility.

Once the MHP on maternity leave returns, there will be one Mental Health Coordinator and three MHP positions unfilled.  Wellpath reports that they have interviewed two candidates in the previous month; one is awaiting issuance of their license, and the other will have a final site visit and is expected to receive an offer in December.  A site visit for a third candidate is being coordinated.  The two psych tech positions remain unfilled, and Wellpath informs that it has submitted a request to the County to transition these positions into additional MHP positions.

The full-time onsite psychiatrist remains in place, although he was temporarily seeing patients via telepsychiatry due to a medical issue.  A contract with Precision Psychiatry Services remains in place to provide evening and weekend on-call psychiatry coverage.

Prior monitoring reports have noted that the frequency of rescheduled appointments due to workload consistently demonstrated that mental health staffing levels could not meet demand, despite continual triage and the determined efforts of the mental health clinicians.  Similar observations were made in the current monitoring review, as described under Requirement 3(*d*) regarding sick call.  Once again, the majority of cases I reviewed had multiple rescheduled appointments due to workload, frequently with repeated sequential rescheduled appointments, which in some cases resulted in failure to meet the required timeframes based on the urgency of the referral.  Entries in the healthcare record sometimes showed the extent of the understaffing, with far more tasks (mostly scheduled appointments) than the clinician on duty could possible cover.

Inadequate mental health staffing continues to negatively affect compliance with several requirements of the Implementation Plan.  These include requirements addressed in the current report under section 2(*a*) regarding completion of the initial mental health screening (noncompliant); 17(*a*) regarding inmates being evaluated for housing and seen daily after being found incompetent to stand trial (noncompliant); 21(*a*) regarding placement screening of all inmates for mental illness and suicidality before or promptly after placement in administrative segregation (noncompliant); 21(*b*) regarding inmates moved from general population to administrative segregation being screened for suicide risk within 24 hours (noncompliant).  Staffing levels also affect requirement 6(*a*) regarding provision of outpatient mental health

services to all inmates by qualified mental health providers (partial compliance); and 22(*b*) regarding completion of a suicide risk assessment by a qualified health professional under various circumstances, which is currently partially compliant overall but noncompliant with the element pertaining to such assessments after placement in administrative segregation. Other requirements dependent on staffing levels continue to show substantial compliance, including 2(*b*) regarding psychiatry contacts; and 22(*c*) regarding conducting a suicide risk assessment within four hours of placement in a safety cell.

As noted in prior monitoring reports, other positions will also have an impact on the jail's capacity to provide adequate mental health services and achieve substantial compliance with various requirements of the Implementation Plan. Stability in the HSA and DON positions will be important to provide the training, supervision, and corrective actions necessary to achieve substantial compliance across a variety of requirements.

On the basis of the foregoing observations, it is again concluded that current staffing levels remain inadequate to provide all necessary mental health care as specified in the Implementation Plan, and that these requirements are in noncompliance. Additional staffing resources need to be identified, hired, and maintained. Consideration should be given to the utility of administrative support staff for mental health, which could relieve some of the burden of administrative tasks currently carried by clinicians and the Mental Health Coordinator. An updated staffing analysis is again recommended, taking into consideration local data regarding the level of need for mental health services at MCJ and the resources that will realistically be necessary to meet all requirements.

*•(c)  At all times, there shall be sufficient staff to ensure compliance with the Implementation Plan. The CFMG Staffing Plan is attached to the Implementation Plan as Exhibit I. CFMG must ensure that all positions are filled. Relief factors for each position shall be calculated into the staffing analysis to ensure staffing levels consistently meet requirements. CFMG must continuously evaluate staffing levels to ensure sufficiency for compliance. [CFMG Plan at 116. ]*

**Findings: Noncompliance**

This requirement has been found noncompliant in the last four monitoring reports. Current mental health staffing levels again allow compliance with some but not all requirements of the Implementation Plan. However, at no time has there been sufficient staff to ensure compliance with all elements of the Implementation plan. Based on the continuing inability to reach and sustain a staffing level that ensures compliance with the Implementation Plan at all times as specified, this requirement remains in noncompliance.

*•(d)  Mental health staff shall be available on-site 7 days per week and on-call for assessment on an inmate's level of suicide risk upon referral by health services and/or custody staff. [CFMG Plan at 72]*

**Findings: Substantial Compliance**

This requirement was found to be in substantial compliance in the last three monitoring reports. Review of staffing schedules for the months of April 2024 through November 2024

showed that mental health staff were stationed onsite seven days per week with the exception of October. During that month, services were provided by telehealth on 14 days, meaning that mental health clinicians were stationed onsite for 55% of the days during that month. The mental health coordinator remained available to come onsite if needed during the days in which other mental health professionals were not stationed onsite. On-call coverage was available seven days per week throughout the current review period. This requirement remains in substantial compliance.

## 13. Mental Health Care Training

*•(a)  All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.*
**This requirement was released from further monitoring. [Dkt. 844 at ECF 5)]**

*•(b)  In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.*
*• (c) All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates, identifying warning signs specific to inmates, and how to recognize individuals who are in mental distress and/or suicidal.*
*•(d)  Once a year, custody staff will conduct a situational training such as a mock suicide attempt or a medical emergency. CFMG staff will also participate in the annual situational training. At the conclusion of the situational training, command staff will meet with CFMG to determine if any changes in policies or operations are warranted as a result of the exercise. [Dkt. 528-1 at 17 of 90]*
**Defendants have been released from monitoring on these requirements. [Dkt. 751 at ECF 10 - 11]**

*•(e)  All medication nurses must be trained to recognize common side effects associated with use of psychotropic medications, and upon observing such side effects must document observation in the medical record and schedule the patient to see a medical provider at the next available sick call. [CFMG Plan at 90]*
**This requirement has been released from monitoring. [Dkt. 751 at ECF 12]**

## 14. Restraint Chairs

*•(a)  Physical restraint devices can only be used on inmates who display bizarre behavior that results in the destruction of property or reveals an intent to cause physical harm to others, and cannot be used when there are less restrictive alternatives. [CFMG Plan at 47]*
**This item has been released from monitoring. [Dkt. 751 at ECF 12]**

*•(b)  Use of a restraint chair will be documented in an observation log which will be reviewed and signed by a supervisor. Inmates shall not be placed in a restraint chair for longer than six consecutive hours.*
**This requirement has been released from monitoring. [Dkt. 751 at ECF 11]**

*•(c)  Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A shift supervisor and medical staff shall oversee the exercise. If unsuccessful in allowing inmates to exercise their arms and hands in a range of motion exercise, safety staff shall explain on the observation log why extremities could not be exercised and a shift supervisor shall be notified.*

**Findings: Substantial Compliance**

   The last four monitoring reports have found substantial compliance with this requirement. The Compliance Commander continues to oversee a robust system of monitoring and reporting on use of restraints, including the WRAP device.  There continues to be few incidents of restraint use at Monterey County Jail.  Review of audit reports and restraint logs dating from April 2024 through September 2024 showed that throughout this period there one use of a restraint chair/WRAP restraint device in July.  This incident was compliant with requirements, resulting in a finding of substantial compliance.

*•(d)  On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.*
**This requirement was released from further monitoring.  [Dkt. 844 at ECF 5]**

**15. Use of Force**
*•(a)  Medical and mental health staff shall be consulted before any planned use of force on an inmate. Custody staff in concert with medical staff will develop the most effective and appropriate means of imposing compliance with rules and regulation, including attempts at de-escalation. It is understood that it is the goal of custody staff to use the least amount of force necessary to ensure compliance with rules and regulations. Planned use of force will only be used after verbal attempts to obtain compliance.*
*•(b)  Any use of force will be documented on a use of force form.*

**Findings:  Substantial Compliance**

   The last three consecutive monitoring reports have found substantial compliance with this requirement.  The current review of use of force reports from April 2024 through November 2024 found continuing substantial compliance.  The Compliance Sergeants conducted a review of  incident reports completed during this period and identified one instance of a planned use of force.  Review of the incident report documentation for this planned use of force showed compliance with requirements.  Custody staff waited for the arrival of a mental health professional who attempted to de-escalate the inmate and gain his cooperation with following custody staff directives.  Both custody and mental health staff verbally attempted to obtain compliance prior to a cell extraction, which at that stage appeared appropriate to the situation.

I reviewed an additional 12 use of force incidents. Incident reports indicated that custody staff attempted verbal de-escalation to the extent that circumstances allowed in all of these cases. In each of these cases a review of available documentation indicated that the circumstances of the incident did not allow for a planned use of force.

## 16. Mental Health Grants

*•(a)  Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.*
**This item has been released from monitoring. [Dkt. 751 at ECF 10]**

## 17. Inmates Who Have Been Declared Incompetent to Stand Trial

*•(a)  The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period. As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment. The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for orders to show cause to be directed the State of California) to expedite the transfer of inmates who have been determined to be incompetent to stand trial to an appropriate State facility. [Dkt. 582-1 at ECF 13]*

**Findings: Noncompliance**

The prior Mental Health Monitor found substantial compliance for this requirement in his last report of May 2021. He concluded that, "The process developed for the identification, referral and monitoring of inmates who were considered or declared incompetent appeared to be adequate and sufficient to allow for a continued determination of substantial compliance."  In my subsequent monitoring review of July 2022, I deferred a finding on this requirement, pending clarification of the process involved.  In the following three reports, I found noncompliance with this requirement.  Concerns were noted that the Court did not always appear to provide timely notification when inmates are declared incompetent to stand trial, and there was no procedure to address the inmates' housing within 24 hours and assess suicide risk daily.

It has been reported by the Compliance Commander that the Court does in fact notify the jail on a daily basis regarding inmates found incompetent to stand trial. He also noted that many incompetent to stand trial inmates are already in Administrative Segregation. Once notified by custody, mental health staff will see patients and place them on a follow-up schedule as needed. What had appeared to remain missing was timely communication between custody and mental health staff, such as would allow for the required evaluation of the inmate's condition within 24 hours of the change in their legal status.  It remains my current understanding that mental health staff are now included in the email notifications from the Court regarding determinations of incompetence to stand trial.

As noted in prior monitoring reports, the primary intent of this requirement appears to be the close monitoring of inmates during a period of potentially heightened vulnerability following a finding of incompetence to stand trial.  It appears that mental health staff are now notified in a timely manner regarding competency decisions by the Court.  The remaining elements of the requirement as written, and pertinent to MCJ and Wellpath staff, deal with placement of the inmate in an administrative transition cell and daily contacts with medical staff trained in suicide risk assessment.  It has been previously pointed out by County Counsel that there are no longer "administrative segregation transition cells" and that in misdemeanor cases, charges are now typically dismissed or the judge releases the defendant.  Placement in administrative housing for inmates who are not already so placed should not be the default procedure, unless determined necessary by a mental health clinician; inmates should remain in the least restrictive housing environment unless there are compelling reasons to the contrary.

The current finding of noncompliance is based on the lack of a procedure to ensure that inmates who have been declared incompetent to stand trial are quickly identified, assessed by mental health staff, and a determination is documented regarding appropriate housing.  This requirement could be met with brief documentation by mental health staff that the inmate is either appropriately housed or that a change in housing is indicated.

The requirement as written also includes that such inmates in administrative segregation housing are to be seen daily by medical staff trained in suicide risk assessment, apparently to reassess suicide risk.  This requirement as written appears to extend indefinitely, as long as the inmate remains in administrative segregation.  Once an initial determination is made that an inmate is not at high risk for suicide, this requirement appears excessive.  This, however, is currently the requirement as written for which compliance must be determined. It is recommended that the parties give consideration to the original intent of this requirement, which appears to be primarily to ensure the safety and wellbeing of inmates declared incompetent to stand trial, and determine the best way to accomplish this goal within the current jail environment.

## 18. Treatment Plans

*•(a)  Qualified health services staff must develop a written individualized treatment plan for inmates requiring close medical and/or mental health supervision. A treatment plan must specify a particular course of treatment and shall be included in the plan portion of the S.O.A.P. progress note. The treatment plan shall reflect current problems or conditions being followed. The treatment plan shall include monitoring of the efficacy of treatment and discharge planning. [CFMG Plan at 27, 75]*

*•(b)  Treatment plans shall include specific medical and/or psychiatric problems, nursing interventions, housing, dietary, medication, observation and monitoring, and follow-up referral and/or evaluation as appropriate. [CFMG Plan at 27]*

*•(c)  Mental health providers must work with the Program Manager or designee to develop a treatment plan and meet the outpatient needs of inmates with mental illness, including opportunity for social interaction and participation in community activities. If an inmate is unable to participate, the reason must be documented. [CFMG Plan at 43, 75]*

**Findings: Partial Compliance**

The last monitoring two monitoring reports found partial compliance with these requirements.  It was noted that in several, but not all, of the healthcare records reviewed at that time contained a completed Treatment Plan for Non-Acute Patients form, which consists of a series of checkboxes for problems associated with various psychiatric disorders, with associated goals and interventions. It was noted that consistent use of this form would represent a significant step toward substantial compliance with the treatment plan requirements of the Implementation Plan.

Additional progress has been made in the current review period.  Treatment planning has been the focus of monthly internal audits by Wellpath. Data for the months of April 2023 through November 2024 were reviewed.  Results of these audits showed the following:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Treatment Plan Completed | 100% | 80% | 80% | 100% | 100% | 80% | 90% | 100% |
| Course of tx identified* | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 90% |
| Current Problems/conditions* | 80% | 100% | 100% | 90% | 100% | 87% | 100% | 90% |
| Monitoring effectiveness* | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 90% |
| Discharge planning** | N/A | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Specific psych. Problems* | 100% | 100% | 100% | 90% | 100% | 87% | 100% | 90% |
| Specific interventions* | 100% | 100% | 100% | 70% | 90% | 87% | 88% | 90% |
| Referral/evaluation* | 100% | 100% | 75% | 50% | 100% | 100% | 66% | 100% |

*The compliance figures regarding specific elements of the treatment plan were scored only for those cases where a treatment plan was completed.  This allows for a more accurate evaluation of the completed treatment plans, but it must be recognized that not all cases reviewed had a treatment plan in the healthcare record.  The top row of the table provides the appropriate compliance metric for the rate of completed treatment plans.

**Data for the April discharge planning requirement indicated that there were no qualifying cases where discharge planning was necessary.

For this requirement, I reviewed audit data for the months of April through November, and examined 20 cases drawn from the monthly Wellpath audit samples.  All cases had completed treatment plans in the healthcare record. My findings on the content of the plans agreed with the results reported in the audits, with the exception of one case in which I found insufficient detail in the treatment plan and associated documentation to guide treatment.

I reviewed an additional 22 cases that were not included in the Wellpath monthly audit samples. Nineteen of these 22 cases (86%) had completed treatment plan forms in the healthcare record.  Of the 19 cases with treatment plans, 12 (63%) were considered to have adequately included the required content when viewed in combination with the progress notes. Overall, 12 of these 22 cases (55%) were considered to have treatment plans and associated clinical documentation with content that was adequate for the inmate's diagnosis and clinical presentation.

There is room for improvement in the treatment planning documentation I reviewed. Those found not compliant included cases where the treatment plan did not include the current primary presenting symptoms and associated focus of treatment, or where the basic treatment

44

plan form, even in combination with the mental health evaluation form and progress notes, did not provide sufficient information to guide treatment, especially when other mental health clinicians would be conducting subsequent treatment sessions. The treatment plans which were most effective in this regard were those which supplemented the available options on the standardized form with brief narrative descriptions of the current presenting symptoms and specific, individualized interventions to be provided.

It has been noted in prior monitoring reports that the requirements for treatment plans as written appear to envision a single, comprehensive treatment plan document that covers the mental health, medical, nursing, dietary, socialization and housing needs of inmates. The requirements also specify that such a plan shall be included in the SOAP progress notes, which are to be written by staff following every patient contact.  I have stated before that I view these expectations as unrealistic, and noted that such documentation practices are not used in any jail or correctional system with which I am familiar.  It is reasonable, however, to expect that the various required elements of treatment plans specified in the Implementation Plan will be documented somewhere in the healthcare record.  The challenge is for these various elements to be sufficiently coordinated, and the resulting documentation to be efficiently accessible to be of practical use to staff providing care. To be effective in guiding treatment, written treatment plans must be used in conjunction with the information contained in the SOAPE notes regarding the patient's current status and response to treatment.  Access to the necessary information should be as efficient and convenient for staff as the format and functions of the electronic healthcare record can allow.  For mental health purposes, consistent use of the treatment plan form, in combination with adequate information documented in other assessments and the progress notes, should be sufficient to achieve substantial compliance with requirements.

Regarding the process of treatment planning, it was noted in the last monitoring report that various staff participate in a weekly Multidisciplinary Team Meeting.  A clear link between the review of cases in this meeting and the documented treatment plan is needed.  Ideally, this meeting would involve consistent representation and participation by both medical and mental health staff, and provide a process by which coordinated treatment considerations are documented in the healthcare record.  A stand-alone mental health treatment plan document, filed under a tab in the healthcare record that is readily identifiable and accessible, should allow for the inclusion of relevant comorbid medical conditions, especially as these may impact the clinical presentation and treatment approach for individual patients.

The current finding is again partial compliance with these requirements, while also recognizing the continued progress that has been observed in implementing a standardized treatment planning form.  A higher rate of the cases reviewed during this monitoring period had treatment plans in the healthcare record.  Improvement was also noted in the content of some treatment plans, with a higher percentage of treatment plans including all or most of the required elements.  An important consideration for compliance at this stage is the internal monitoring and ongoing guidance in this area provided by the Regional Mental Health Vice President.  She and I have discussed in detail the standards for the internal monthly auditing of treatment plans, and the feedback she has been giving to mental health staff in order to improve the quality of the documentation.  I believe this process can provide the necessary quality management to support improved compliance with treatment plan requirements.

45

Mental health staff should continue to focus on implementing a process whereby all patients have a completed treatment plan in the healthcare record, recognizing that 100% compliance is not necessary to maintain substantial compliance. Additional information regarding the patients' current clinical status, progress in treatment, and any adjustments to goals or interventions should be clearly documented and readily accessible by those providing care. Regular multidisciplinary discussion of complex and challenging cases should be documented and should clearly inform the written treatment plan. In light of the recent turnover in mental health staffing, it is essential that a robust process of internal auditing and focused feedback to MHPs continue as currently implemented by the Regional Mental Health Vice President.

*•(d) CFMG will inform classification through medical treatment orders as to any classification issues an inmate has due to a mental illness. [County Plan at 11]*

**Findings: Noncompliance**

This requirement was found noncompliant in the last monitoring report. The specifies that CFMG/Wellpath with inform classification through medical treatment orders as to any classification issues an inmate has due to a mental illness. However, Wellpath staff have indicated that mental health staff do not write medical treatment orders. Mental health staff report that they typically communicate directly with custody classification staff regarding any housing issues stemming from mental health concerns. Such mental health input into classification considerations should be documented in the health care record; if local policies and procedures do not provide for mental health staff to write medical treatment orders as specified in the requirement, alternatives for documenting the mental health input should be identified in other sections of the healthcare record, and there should be a written procedure for this process.

The County has pointed out that in December 2024, a "treat as" protocol was implemented, whereby a form equivalent to a medical treatment order is being provided to the classification unit after each intake. They also note that mental health staff regularly provide mental health related issues to classification via e-mail, which are added to the Special Conditions list. This appears to be a promising development that may provide a mechanism for compliance with this requirement. However, the change in procedure occurred outside the review period for the current report. The next mental health monitor can consider the state of compliance in the next report.

## 19. Consideration of Mental Illness in Inmate Discipline

*•(a) Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff shall contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness. (Dkt. 532 at ECF 47)*

**Findings: Noncompliance**

Prior monitoring reports have found noncompliance with this requirement, noting that some Disciplinary Acton Report forms had checked boxes as to whether inmates were receiving mental health services, although a majority of forms were not so marked. For those inmates whose DAR form was checked for receiving mental health services, the DARs contained no

information related to consulting with mental health staff.  Prior reviews of electronic healthcare records showed no documentation of such consultations by mental health staff regarding the evaluation of discipline for inmates with mental illness.

During the current monitoring period, a new set of forms and a new process of review has been implemented.  This process involves stamping the DAR form to flag inmates who are receiving mental health services, and an email is sent to notify mental health staff.  This should trigger a review by a Mental Health Professional to evaluate the inmate and complete a form indicating whether any of the proposed discipline would be contraindicated based on the inmate's mental health condition.  This input is then considered prior to imposing discipline.

For the current monitoring period, 29 Disciplinary Action Reports for 27 different inmates were reviewed.  The rate of compliance with the new procedures for these 29 DARs was 24%.  In most noncompliant cases, there was no documented input from mental health staff.  One DAR form indicated that mental health staffing was "short" and the form for mental health input was not completed.  No other noncompliant cases provided information regarding the lack of mental health input.  Information provided by the Compliance Commander indicated that a problem was discovered whereby DARs for mental health inmates have not been consistently provided to the compliance division for mental health review. Corrective actions have been initiated, including the following:

All ADA and MH DARs are now hand delivered to the compliance division for review & processing.  This now allows the compliance division to verify compliance has been met through the initial review process, and custody can correct DARs or discontinue DARs failing to meet DAR hearing standards.  Digital copies of ADA and MH DARs are now being retained by the compliance division to safeguard and streamline the proof of practice phase of compliance.  Based on the Compliance Commander's review, Dar documents were not fully competed as required per policy.  He is working on a second "DAR hearing" training video for sergeants to fully understand documentation requirements for the DAR hearing process.  There is currently only a training video that explains the process, but the new video will show the forms and explain what must be reviewed and required documentation for each section.

In response to the draft version of this report, Wellpath asserted that seven of the inmates reviewed for this requirement were improper for inclusion in the sample because they were not considered Seriously Mentally Ill (i.e., not so designated in their healthcare records).  However, the requirement as written (Dkt. 532 at ECF 47) does not specify that the relevant inmates must be so designated, but speaks of "an inmate with mental illness."  Re-examination of the healthcare records for the seven inmates in question confirmed that they were identified as inmates with mental illness, and were therefore retained in the sample.

The new process and associated forms, if consistently and properly completed, would support a finding of substantial compliance with this requirement.  However, it does not appear that the process has been fully or consistently implemented.  The new process and forms reflect progress in this area, and should provide a viable path to substantial compliance.  However, the problems noted with initial implementation and the observed 24% compliance rate currently results in a finding of noncompliance.

**20. Space Issues**
•*(a)  Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including . . .adequate clinical and administrative treatment space....* [Dkt. 494 at ECF 17]

**Findings: This requirement was released from further monitoring.  [Dkt. 844 at ECF 5]**

**21. Administrative Segregation**
•*(a)  The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation, and require procedures to mitigate the impact of administrative segregation on persons with mental illness, including but not limited to structured therapeutic activity outside the segregation cell and where feasible assignment of cell mates.*   [Dkt. 494 at ECF 9-10]
•*(b)  Inmates being moved from general population to an administrative segregation cell will be screened for suicide risk within 24 hours of placement.* [Dkt. 528-1 at ECF 12]

**Findings: Noncompliance**
        The last four monitoring reports have found noncompliance with both elements of these requirements: the need for screening all inmates placed in administrative segregation and the need to provide structured therapeutic activity outside the segregation cell.  Wellpath provided internal monthly audit data based on 10 randomly selected cases per month.  Results for these audits showed the following:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Placement screening | 0% | 50% | 67% | 50% | 0% | 0% | 13% | 22% |

        It should be noted that the sample sizes for each of the monthly audits are less than 10 relevant or qualifying cases due to the way in which the samples are drawn; if the placement in administrative segregation began in the prior month, those cases were considered not applicable for auditing of the current month. This results in monthly sample sizes of two to four cases, which are strongly influenced by the results for any given case, and do not provide for an informative audit.  Sampling methods were discussed which may allow for larger and more informative samples in future audits.
        I reviewed 12 cases selected at random from the Wellpath monthly audits for verification.  My findings matched those reported in the audits.  It should be noted that for each of the seven cases I reviewed which had been marked as not applicable (due to starting the period of administrative segregation in the month prior to the Wellpath audit) would have been noncompliant, in that the required screening was not completed at or around the time of initial placement in administrative segregation.  I also reviewed 19 additional cases that were not included in the Wellpath monthly samples.  Three of these, three (16%) had the proper screening documented in the healthcare record as completed within three days of placement in administrative segregation, which I would consider as the outside limit of "promptly" in the

context of this requirement.  There were eight additional cases where a mental health screening was completed following placement in administrative segregation, but these were completed between six to 20 days after ad seg placement, and therefore were not considered to have been completed promptly.  The remaining eight cases did not have the required mental health screening which could be located in the healthcare records.

Discussions with the prior Mental Health Coordinator had indicated that mental health staff had not been routinely screening inmates placed in administrative segregation housing. Historically there has been no process by which mental health staff were notified of all administrative segregation placements, and there has been insufficient mental health staffing to conduct the resulting volume of screenings should such notifications have been made.  More recent discussions with the Mental Health Coordinator, however, indicated that classification staff have begun to notify the mental health team by e-mail before or at the time of an inmate's placement in administrative segregation.  The inmate is then scheduled to evaluated using the Columbia Suicide Severity Rating Scale.  This assessment is reported to be completed at the next scheduled round of administrative segregation mental health contacts, which occur weekly, and are often completed within two to three days of placement.  This was a positive development.  It will typically not, however, meet the requirement as written that a suicide risk screening will be completed within 24 hours of placement.  The increased rates of compliance noted for May, June, and July (again, based on small sample sizes), were apparently related to this change in procedure.  Loss of staff, however, has diminished this progress in more recent months.

The language of this requirement does not specify that the screenings are to be conducted by a qualified mental health provider, unlike the requirement under Suicide Prevention, which states that a QMHP must perform a suicide risk assessment using the Risk Assessment Tool, "after placement in Administrative Segregation."  Procedures to meet both of these requirements should be pursued.  For the current requirements (21.*a* and 21.*b*), nursing staff could conduct such a screening.  Procedures were discussed during the site visit that would ensure screening by nursing staff at the time of an inmate's placement in administrative segregation.

Prior monitoring reports have noted that mental health groups were not being held on a regular basis to meet out of cell programming requirements due to mental health staffing limitations, although in-cell materials continue to be provided.  During the last review period, mental health clinicians began holding groups with administrative segregation inmates, but a decision was made to temporarily suspend these groups in order to focus on other priorities, such as reducing the number and duration of rescheduled sick call appointments (a decision that I agreed with under the circumstances at that time).  The language of the requirement calls for structured therapeutic activities, and does not specify that these must take the form of groups conducted by MHPs.  It should be noted that custody staff conduct programming, including structured activities outside the segregation cells.  This may satisfy the portion of the requirement regarding procedures to mitigate the impact of administrative segregation on persons with mental illness, if it can be demonstrated that structured therapeutic activities are consistently offered to all eligible inmates in administrative segregation.

Based on the results for the current review period, these requirements are noncompliant.

•*(c)  Inmates shall not be placed in administrative segregation solely because of having a mental illness.  Classification is to assess a totality of factors when assigning inmates to administrative segregation units.  The goal of the County is to limit the use of administrative segregation for inmates with mental illness.* [Dkt. 528-1 at ECF 12]

**Findings: Substantial Compliance**

The last four monitoring reports have found substantial compliance with this requirement. These findings have been based on the interpretation of the requirement to mean that the classification process must not result in placing an inmate in administrative segregation only ("solely") because of the presence of mental illness.  As in previous reviews, there were cases in the current review where a severe and chronic mental illness contributed to the behaviors leading to placement in administrative segregation.  However, during the current review there continued to be no indications that inmates were placed in administrative segregation solely because of having a mental illness.

The Plaintiffs' attorneys have previously raised concerns about the placement of mentally ill inmates in administrative segregation.  I have explained my reasoning on this issue in prior monitoring reports.  As I noted in my report from November 2023, "I have reviewed a substantial number of cases at this stage, and throughout my experience as monitor in this case I have not observed a single case in which it appeared that an inmate was placed in administrative segregation *solely* due to mental illness, i.e., that once an inmate is diagnosed with a mental illness, this and this alone is the reason they are so housed."

I have previously reviewed the policy and procedures that pertain to housing of inmates in administrative segregation, and discussed with jail staff the process they use in cases of inmates who are mentally ill.  The relevant portion of Section 1110.08 of the Monterey County Sheriff's Office Custody Operations Manual states the following:

1110.08    Administrative Segregation

   A.  Incarcerated persons shall not be placed in administrative segregation solely because of having a mental illness.

   B.  Administrative Segregation units are Pods A, B, R, and S as well as all Men's and Women's Holding cells and any single holding cell outside of the booking and receiving area.

   C.  When incarcerated persons are placed in administrative segregation, Classification shall conduct a classification review within seven (7) days of the placement and every fourteen (14) days thereafter.

   D.  Upon reviewing placement of an incarcerated person in administrative segregation, Classification shall consult medical staff concerning each incarcerated person's progress toward the goal of placing the incarcerated person in general population.

Custody staff on the classification team explained that they must consider the totality of the inmate's circumstances when making placement decisions, including disruptive behavior, disciplinary history, and "keep away" status, which may bear on where an inmate can be safely housed. At the regularly scheduled classification reviews, mental health and medical staff provide input. Staff consistently emphasize that the goal is to minimize the frequency and duration of placement of mentally ill inmates in administrative segregation.  Based on my

interpretation of the literal language of this requirement, I again reach a finding of substantial compliance.

•*(d)  Inmates with a serious mental illness who are housed in Administrative Segregation will be scheduled for a weekly appointment with a qualified mental health provider.* [CFMG Implementation Plan at 42]

**Findings: Substantial Compliance**

The last two monitoring reports found substantial compliance with this requirement. Wellpath has noted that mental health staff routinely conduct weekly Administrative Segregation rounds.  These weekly mental health rounds are always conducted by a QMHP, who documents the contacts in the healthcare record on a flowsheet, with brief observations about the inmate's clinical presentation, behaviors, and the condition of the cell. When clinically needed based on these observations, or at the request of the inmate, a more extensive clinical encounter is conducted and documented in a progress note.

Wellpath provided internal audit data based on 10 randomly selected cases per month for the months of April 2024 through November 2024.  Results of these audits showed the following:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Weekly contacts | 95% | 100% | 100% | 100% | 80% | 100% | 100% | 100% |

It is important to note that although 10 cases selected for review each month for the Wellpath internal audit, not all cases are considered applicable for this measure; if the case did not start the placement in administrative segregation during the month under review, the case was considered not applicable.  The compliance rate for the Wellpath monthly audits were calculated on the total number of contacts completed out of those that should have been completed during that month, rather than the percentage of cases where all contacts were completed as required. Therefore, the September audit was based on one contact with one patient, all others were marked as not applicable; August was based on five scheduled contacts for two patients; July was based on 10 scheduled contacts for three patients; June was based on eight scheduled contacts for three patients; May was based on 24 scheduled contacts for 10 patients; and April was based on 21 scheduled contacts for eight patients.  Starting with the October 2024 audit, Wellpath's case selection procedures were modified to ensure that the 10 cases selected each month were all relevant for this requirement.   I reviewed 18 cases from the monthly audit samples, and my results matched those reported in the audits.

I reviewed an additional 14 SMI cases that were not included in the monthly Wellpath audit samples for this measure.  In nine of these cases there was 100% compliance The compliance rate for the remaining cases ranged from 50% to 75%.  Across these 14 cases, there were 46 completed contacts out of 52 that should have been completed, for a compliance rate of 88%.  My sample included six cases from October and November, which were all 100% compliant.  Based on the combined results of the Wellpath audit, as verified by the cases I

reviewed, and the results of my review of cases not included in the Wellpath monthly samples, this requirement is found in substantial compliance.

*•(e)  Nursing staff shall conduct mental health rounds in Administrative Segregation daily, separate and apart from medication distribution.* [CFMG Implementation Plan at 42]

**Findings:  Partial Compliance**

The last monitoring report found partial compliance with this requirement.  For the current monitoring period, Wellpath monthly internal audit data based on 10 randomly selected cases covering the months of April 2024 through November 2024 were provided for review. Results of these audits showed the following:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Daily RN rounds completed | 79% | 74% | 55% | 39% | 76% | 87% | 75% | 87% |

These figures were calculated as a percentage of the combined total number of nursing rounds due that were documented as completed for the 10 cases audited each month.  To verify the results reported, I reviewed the healthcare records of 12 patients selected randomly from the monthly Wellpath audit samples. My findings agreed with those reported in the audit results.  I also reviewed 19 additional cases that were not included in the monthly Wellpath audit samples. Compliance rates for these 19 individual cases ranged from 54% to 93%, with an overall compliance rate of 79% for the daily nursing rounds completed across all 19 cases.  Based on this pattern of results, this requirement is found in partial compliance.

*•(f)  Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior. Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal. [Dkt. 528-1 at ECF 15]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance.  [Dkt. 751 at ECF 19].  Substantial compliance was found in the last monitoring report from April 2024, although this requirement has apparently not been formally released from monitoring.**

**Findings: Substantial Compliance**

This requirement was found in substantial compliance in my most recent report from April 2024.  It has been previously noted that the Compliance Commander has developed a thorough and effective process for monitoring the recording of welfare checks, with routine reports and feedback to deputies, including correctional action as needed. The current review again found similar compliance with this aspect of the requirement.  It has also been noted that steps have been taken to address the qualitative aspects of welfare checks to ensure that they consist of direct visual observation sufficient to assess the inmate's well-being and behavior, as

described under the following requirement.  A finding of substantial compliance is again warranted.

*•(g)  Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.*

**Findings: Substantial Compliance**

This requirement was found in substantial compliance in my last monitoring report from April 2024.  It has been previously noted that the Compliance Commander has developed a thorough and effective process for monitoring the recording of welfare checks, with routine reports and feedback to deputies, including correctional action as needed. The current review found similar compliance with this aspect of the requirement.

Partial compliance for these findings was found in a prior report from November 2023. The area of concern which prevented a finding of Substantial Compliance was the requirement that welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior.  Concerns were raised about the quality of the welfare checks stemming from an incident which took place in a booking cell, and these concerns extended to the Administrative Segregation housing areas covered by this section of requirements. Although this was a single, extreme event, and may not generalize more broadly to the quality of welfare checks throughout the areas covered by various Implementation Plan requirements, the concerns it raises were of sufficient magnitude as to prevent a finding of substantial compliance at that time.

Leadership at MCJ have since taken steps to address these concerns.  The Compliance Commander continues to monitor the conducting and documentation of welfare checks via the Guardian system; the auditing, reporting and corrective action aspects of this internal monitoring process have been commented upon favorably in my prior reports.  Review of surveillance video has been added to the Compliance Commander's internal auditing of welfare checks.  I have reviewed such videos with the Compliance Commander, and concluded that this provides a useful new component to the quality assurance of welfare checks.

Another step taken by custody leadership is the development of additional training focused on the correct procedures for conducting welfare checks.  Materials for this training were provided for my review, which included demonstration videos, a PowerPoint presentation, and associated documents that address concerns about the quality of checks.  This training, in combination with the ongoing monitoring, feedback, and supervision process led by the Compliance Commander, is designed to enhance the qualitative aspects of requirements of welfare checks.  This training has been finalized and delivered to custody staff; see the discussion of findings under section 7(c) above for more information.  The Compliance Commander has also explained that newly hired deputies receive this training as part of their orientation to the jail, are evaluated daily as part of the onboarding process.  Newly hired sergeants also receive the training as part of their orientation to jail operations.  Sergeants also receive two weeks of on the job training regarding welfare check documentation, supervision and

management in the Receiving Area and Administrative Segregation.  In addition, The compliance division reviews video footage of 40 welfare checks to audit for quality and timely completion, provides a daily report to all staff flagged for welfare checks missing a memorandum explaining why the check was late, and sends a monthly e-mail report to all staff regarding their welfare check performance and (if necessary) areas needing improvement.  A finding of substantial compliance is again warranted.

•*(h)  All welfare checks shall be documented on a welfare check log.  The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance.  Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week.  On a monthly basis, the Compliance Sergeant will randomly select five log entries and use the door entry logs to verify that the deputy entered the administrative segregation  pod, to conduct a welfare check.  The Compliance Sergeant will track all of his findings through reports which will be sent to the Jail Ops Commander.  Monthly audits of the Compliance Sergeant's reports will be conducted by the Jail Operations Commander.  The Jail Operations Commander will generate a monthly report to document their audit findings. [Dkt. 528-1 at ECF 16]*
**This item is one of the Implementation Plan requirements for which the Plaintiffs agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance [Dkt 751 at ECF 20].  This requirement has been found in substantial compliance in the last two monitoring reports, although it does not appear to have been formally released from monitoring.**

**Findings: Substantial Compliance**

As noted in prior monitoring reports, the Compliance Commander and his team continue to conduct thorough and timely audits of welfare checks as required, with regular monthly reports to the Jail Operations Commander.  The Corrections Operations Commander provides a monthly compliance report to the Chief of the Corrections Operations Bureau.  Review of welfare check logs and example reports from the current review period by both the Sergeant and the Commander, in addition to discussions with the Compliance Commander about the procedures used in this process, demonstrated ongoing substantial compliance with this aspect of the requirement.

## 22. Suicide Prevention
•*(a)  Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.*

**Finding: Substantial Compliance**

I had assumed the County had been released from monitoring for the reduction of tie-off points within administrative segregation cells in units A, B, R, and S. (Dkt. 751 at ECF 11).

This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds substantial compliance for reduction of tie-off points in Pods D, G, H, I and J. [Dkt. 751 at ECF 19; Dkt. 759 at ECF 5]. This requirement was found in substantial compliance in the last monitoring report of July 2022, and was assumed to be released from further monitoring.

A footnote in Dkt. 751 at ECF 19 states that the Mental Health Monitor will evaluate the new jail for reduction of tie-off points. If substantial compliance was found for reduction of tie-off points in the new jail, Plaintiffs had agreed to release Defendants from further neutral monitoring for these cells. Substantial compliance was found in the monitoring report from the November 2023 site visit, and this requirement was understood to be released from monitoring. Plaintiffs have noted that this requirement has not been formally released from monitoring. I reviewed compliance with this requirement in November 2023 and found substantial compliance. As this requirement has to do with structural elements of the new jail areas, there is no reason to believe that the compliance status has since changed.

*•(b)  A qualified mental health professional must perform a suicide risk assessment using the Suicide Risk Assessment Tool (attached as Exhibit G to Implementation Plan) in all the following circumstances: (1) if the RN identifies suicidality during the Initial Health Screen; (2) within 4 hours of placement in a safety cell and before release from a safety cell; (3) after placement in Administrative Segregation. [CFMG Plan at 43, 72, 75]*

**Findings: Partial Compliance**

This requirement was found in partial compliance in the last two monitoring reports, based on a determination of substantial compliance with part 1 (when the RN identifies suicidality during the Initial Health Screen) and part 2 (within four hours of placement in a safety cell and before release from a safety cell), but that structured suicide risk assessments were not routinely completed with inmates placed in administrative segregation housing (part 3). The prior Mental Health Supervisor had previously reported that there was no reliable and consistent way by which mental health staff are informed of all administrative segregation placements, nor were there enough mental health clinicians on staff to respond adequately to this requirement.

For the current review period, Wellpath provided internal monthly audit data for parts 1 and 3 of this requirement, based on 10 randomly selected cases per month and covering the months from April 2024 through November 2024. Results of these audits showed the following:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| RN identifies at intake | 100% | 100% | 100% | 100% | 100% | 100% | 56% | 33% |
| After ad seg placement | 71% | 33% | 83% | 50% | 33% | 0% | 13% | 22% |

It should be noted that not all cases in the monthly sample were relevant for the determination of compliance with part 1, with sample sizes ranging from one in May and August to three in April. A similar concern was observed regarding the samples for the internal audits

for part 3 of this requirement, suicide risk assessments completed following placement in administrative segregation, with sample sizes for this indicator ranging from two cases in September to seven cases in April. Having fewer than 10 cases per month in the internal Wellpath audits for part 1 resulted from inmates being initially placed in administrative segregation during a month prior to the month of the audit. Results based on small sample sizes of cases meeting the relevant criteria can be substantially influenced by the ratings for one or two cases, although the way the samples have been drawn provides more information about the level of performance in the month being audited, which is a useful metric for tracking performance over time.

To verify the results reported in the monthly Wellpath internal audits, I selected 11 cases where the RN identified suicidality at intake. As noted above, sample sizes within each month's audit were small, ranging from one to three cases per month. The 11 cases I reviewed represents all of the cases in the Wellpath monthly audit samples for the months of April through September 2024 where suicidality was identified by the RN at intake. My results agreed with the internal audit results, with 100% of cases assessed by a QMHP as required from April through September. However, the sampling process was modified starting with the October audit, resulting in a larger relevant number of cases identified for the sample. Recent discussion with the Regional Mental Health VP indicated that the decline in performance seen for October and November resulted from MHPs seeing inmates as required but failing to complete the structured suicide risk assessment. It is reported that a number of re-trainings have been conducted, and audits from December and January (which fall outside the scope of the current review) are improving. The next mental health monitor can determine if these corrective actions have resulted in compliant performance for this requirement.

For the second element of the requirement pertaining to placement in and release from a safety cell, I reviewed 14 cases drawn from safety cell logs. All of these inmates had been placed on intermittent suicide watch when no other observation cells were available. There were no continuous suicide watch cases in this sample. Suicide risk assessments were routinely conducted when inmates were placed in a safety cell and prior to the discontinuation of suicide watch. For inmates on intermittent Suicide Watch (previously referred to as Level 2 Suicide Watch) who are placed in safety cells due to a lack of other observation cell housing, it has been my interpretation that they do not need a suicide risk assessment prior to removal from a safety cell as specified in this requirement, as they did not require placement in the safety cell due to suicide risk, and their removal from a safety cell should be expedited to the greatest extent possible. For these patients, a structured suicide risk assessment is completed during the regular daily work shift; for patients placed on intermittent Suicide Watch outside of daily mental health work shift hours (including those placed in a safety cell), the suicide risk assessment is completed the following day during the regular mental health work shift.

For the second element of the requirement pertaining to placement in and release from a safety cell, I also reviewed a list of all incidents identified as a suicide attempt, which included 12 incidents across 10 unique inmates between 4/17/24 and 10/16/24, as described under Requirement 4(a) above. In 10 of these 12 incidents the inmate was sent out to NMC for crisis evaluation and stabilization. In none of these incidents was the inmate admitted for inpatient treatment. For each of these incidents, the inmate was properly evaluated using the standardized

56

suicide risk assessment tool and placed on staggered suicide watch, which appeared appropriate in light of the clinical presentation and results of the risk assessment. The inmates were subsequently evaluated as required by protocol, and released from suicide watch when appropriate.

For the third element of this requirement regarding suicide risk assessment after placement in administrative segregation, I reviewed 12 cases from the Wellpath monthly audit samples to verify the reported results. Following clarification with Wellpath staff in response to the draft report regarding the location of documents in the healthcare records, my findings agreed with the audit results of these 12 cases. I also reviewed 13 additional cases that were not included in the monthly Wellpath audit samples. After clarification from Wellpath staff regarding where in the healthcare record the assessments could be found, nine of the 13 cases (69%) were seen and a suicide risk assessment was completed following placement in administrative segregation housing. However, three of these nine cases were considered as not having been completed timely (at 18, 20, and 42 days after placement), yielding a compliance rate of 6/13 = 46%.

Based on the preceding combination of results, whereby compliance has been achieved in some but not all of the components of the requirement, the current finding is again partial compliance. In a similar pattern to the results observed in past monitoring reports, there continues to be an overall high level of compliance with the parts of the requirement dealing with inmates identified as suicidal at intake and those placed in safety cells. The challenge remains with those placed in administrative segregation. As noted above under requirements 21(*a* and *b*), classification staff have begun to notify the mental health team by e-mail before or at the time of an inmate's placement in administrative segregation. The inmate is then scheduled to assessed using the Columbia Suicide Severity Rating Scale at the next scheduled round of administrative segregation mental health contacts, which occur weekly. At the current time, however, these assessments are not being completed at a sufficiently high rate to warrant a finding of substantial compliance.

•*(c) Whenever an inmate is placed in a safety cell due to suicide risk, CFMG shall immediately, and no later than within 4 hours, determine what level of suicide precautions are necessary and decide whether the inmate needs to be transferred to an inpatient mental health facility. If CFMG determines that more than 24 hours of suicide watch/precautions is necessary, CFMG shall work with custody to place the inmate in an inpatient mental health facility, the Outpatient Housing Unit, a receiving cell located in the booking unit, or dorm A. Whenever possible, the inmate will be transitioned from a safety cell to an open dormitory setting until the inmate has stabilized. [DKT 532 at ECF 73]*

•*(d) Custody must transfer patients to NMC or another appropriate inpatient mental health facility if the patient has been housed in a safety cell for 24 consecutive hours or for more than 36 cumulative hours in any 3-day period. If exigent circumstances prevent such transfer, a memo must be written to the Custody Operations Manager. [DKT 532 at ECF 73-74]*

•*(e) Once CFMG determines that an inmate is no longer suicidal, CFMG shall work with custody staff to place the inmate in the most appropriate setting. Mental health clinicians must follow-up with the patient until a step-down plan is no longer necessary. [DKT 532 at ECF 73]*

**Findings: Substantial Compliance**

The last three monitoring reports have found substantial compliance with these requirements. The current review found continuing substantial compliance.  Healthcare records of 14 relevant cases were reviewed, all showing compliance.  Healthcare record documentation showed evaluations completed by nursing staff and mental health clinicians for inmates placed in a safety cell due to suicide risk as required with a determination of necessary suicide precautions. Review of safety cell logs and healthcare record reviews indicated that there were no cases in which inmates remained in safety cells for 24 consecutive hours and therefore requiring transfer to NMC for crisis evaluation or other emergency treatment.  There were no cases in which an inmate was housed in a safety cell for more than 36 cumulative hours in any three day period and therefore requiring transfer to NMC.  As noted under requirement 7(*i*), a robust monitoring system for safety cell placements remains in place. Regarding requirement 22(*d*), which has consistently been found substantially compliant in several consecutive prior reports, and where there have been no subsequent cases that demonstrate lack of compliance, the finding of substantial compliance is continued.

For inmates in this circumstance who are determined to no longer be suicidal, review of healthcare records and observation of the mental health clinicians during the recent site visit indicated that adequate communication and collaboration occurs regarding placement of the inmate in the most appropriate setting. The Compliance Commander has previously explained that once an inmate is placed on intermittent suicide watch (formerly referred to as Level 2 Suicide Watch), a lockdown form is generated.  The classification unit will interview the inmate and assign appropriate housing.  There is ongoing communication with medical and mental health staff when classification staff are determining housing, which also includes consideration of a number of factors such as gang affiliations and the inmate's history of violence or rule violations.  Review of healthcare records consistently showed that clinicians documented and followed a step-down plan as needed.  Step-down plans consist of the frequency of follow-up contacts by a mental health clinician, when the inmate's clinical condition and risk for suicide is re-evaluated. This process appears adequate.

As noted in prior monitoring reports, mental health clinicians consistently document suicide risk assessment and collaborative safety planning using the structured forms titled "Suicide Watch Initial Assessment for Mental Health" and "Suicide Watch Daily Follow-up and Discharge for Mental Health." Direct observation of clinicians performing these duties during the most recent site visit continued to show adequate clinical practice.

•*(f)  Custody must conduct welfare checks of patients on suicide watch/precaution twice every 30 minutes. Health services staff must conduct welfare checks every 6 hours. Mental health staff must conduct welfare checks once per duty shift. The checks must be documented in the appropriate log (sobering/suicide watch/safety cell/restraints log). The inmate may not have access to materials that could be used to inflict harm on his/her self or others, and may be dressed in an approved safety garment if necessary. [CFMG Plan at 74, 76]*

**Findings: Partial Compliance**

The last monitoring report from April 2024 found partial compliance with this requirement, based on welfare check logs and healthcare records which showed that custody recorded welfare checks at least twice every 30 minutes as required, mental health staff

58

conducted welfare checks daily as required, but nursing staff did not consistently conduct checks every six hours as required.

For the current review period, Wellpath provided internal monthly audit data for parts 2 and 3 of this requirement, based on 10 randomly selected cases per month and covering the months from April 2204 through November 2024.  Results of these audits showed the following:

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| RN contact every 6 hours | 96% | 93% | 85% | 81% | 61% | 95% | 82% | 91% |
| MH contact once per shift | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

For the requirement that custody conduct welfare checks on inmates on suicide watch twice every 30 minutes, I reviewed 10 cases selected at random from among inmates placed on suicide watch.  All cases were compliant with this custody requirement. As has been noted in prior monitoring reports, this set of requirements is interpreted to refer to the issue of whether custody welfare checks were conducted and documented according to the specified schedule.  It does not consider the quality of welfare checks that were conducted, which is addressed in the findings of other relevant requirements.

For the requirement that mental health staff conduct welfare checks once per shift (daily), I reviewed 12 cases selected at random from the monthly Wellpath audit samples.  I also reviewed an additional 12 incidents across 10 unique individuals selected at random from among inmates placed on suicide watch which were not included in the Wellpath monthly audit samples.  All of the cases I reviewed were compliant with mental health welfare checks.

For the requirement of RN welfare checks every 6 hours, I reviewed 12 cases selected at random from the monthly Wellpath audit samples.  I also reviewed an additional 15 incidents across 13 unique individuals selected at random from among inmates placed on suicide watch which were not included in the Wellpath monthly audit samples.

The nursing welfare checks documentation in the healthcare records was not consistent and sometimes difficult to follow, so that for some cases it was difficult to determine the specific times when welfare checks were completed.  My initial findings appeared to agree with the results reported in the Wellpath monthly audits, with the exception of two cases where I found an additional missed welfare check compared to the results reported in the audits.  These differences may be due to an apparent 12 hour gap observed in the recorded welfare checks, which I counted as two consecutive missed checks.  The audit results for these two cases were subsequently corrected by Wellpath, yielding the results reflected in the table above.  For the 15 incidents I reviewed which were not included in the Wellpath monthly audit samples, the overall compliance rate was 80% of required checks completed.  In nine of the 12 incidents, all required checks were completed, with the remaining cases showing 50% to 75% of the required checks completed.  In four incidents, it appeared that two consecutive nursing checks were missed, resulting in 12 or more hours between checks.  It was also noted that some entries in the nursing suicide observation log appear to have been documented later in the nursing shift, and the time listed for the checks were exactly on the hour due, which causes some concern about the exact time that the check occurred.

59

Based on this pattern of results, whereby custody and mental health checks were substantially compliant but nursing checks were not yet in substantial compliance, the overall finding for this set of requirements is again partial compliance.

*•(g)  The CFMG Program Manager and the Facility Manager shall have joint responsibility to report completed suicides in accordance with CFMG Inmate Deaths Policy and Procedure. [CFMG Plan at 76]*

**Findings:  Substantial Compliance**

This requirement was found to be in substantial compliance in the last three monitoring reports dating back to May 2023.  There have been no further cases of inmate suicide at MCJ since June 2023.  Documentation provided by Wellpath demonstrated compliance with the reporting requirements for that suicide.  Where a requirement has been found substantially compliant in the most recent prior report, and where there have been no subsequent cases that demonstrate lack of compliance, the finding of substantial compliance is continued.  The current results reflect continued substantial compliance for this requirement.

*•(h)  The CFMG Program Manager or nursing staff on duty shall report all potential and/or attempted and completed suicides to the Facility Manager or Shift Supervisor. CFMG management will be notified of any completed suicides within one working day. Family members must be notified in accordance with the CFMG Notification of Next of Kin Policy and Procedure. CFMG Plan at 76-77.*

**Findings: Substantial Compliance**

This requirement was found in substantial compliance in the last three monitoring reports.  There have been no completed suicides during the current monitoring period. There were 12 events classified as a suicide attempt during the current monitoring period.  The notification of required staff in the event of attempted suicides is accomplished when information about the incident is entered into a tracking process for Critical Clinical Events, which sends the information to a number of individuals, including the Facility Manager as required.  Documentation provided by Wellpath for the current review period again showed that this process was completed within the required timeframe.  It has previously been clarified that the notification of next of kin in cases of completed suicides, according to MCJ procedures, is the responsibility of the Coroner.  Based on this information, a finding of substantial compliance is warranted.

### 23. Increase in Time Outside of Cell and/or Increasing Programs

*•(a)  Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:*

- *3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)*

- *14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time*
- *2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail)*

*•(b)  Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking and receiving area will be guaranteed the following weekly times out of their cell:*

- *3 hours a week for exercise*
- *14 hours a week in the common area*
- *2 hours a week of programming will be offered to each inmate*

*•(c)  If approved by classification, inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services [County Plan, Dkt. 528-1 at ECF 19]*

**Findings:  Partial Compliance**

The last two monitoring reports found partial compliance with these requirements.  It has been noted that the Compliance Commander continues to oversee a thorough and detailed system of routine audits, which includes notification of custody staff and further training when deficiencies in out of cell time are identified.  Prior monitoring reviews of these audits indicated that inmates in segregated housing are consistently offered the required amounts of exercise time (yard time) and time in the common area (socialization time).  It was the amount of programming time, which has not been tracked by the Compliance Commander in his auditing procedures, that prevented a finding of substantial compliance in prior monitoring reports.

The current monitoring review again found that inmates in the administrative segregation pods are consistently offered the required amount of yard time and socialization time.  Routine group programming offered by mental health staff was not delivered during the current review period due to staffing limitations and the prioritization of other duties, such as completing sick call appointments.  I again agree with this prioritization of staff resources.  Mental health staffing will need to become sufficient to cover all relevant Implementation Plan requirements, although it should be noted that this Implementation Plan requirement does not specify that two hours a week of programming must be offered by mental health staff.

Custody programming staff continue to provide various classes and activities to inmates across the jail, including those in administrative segregation.  Program attendance reports were again provided for review, and it appeared that more than two hours per week of such programming were consistently being offered.  Once again, however, it could not be determined whether these programming opportunities were offered to each inmate in the housing areas designated by these requirements.  As noted in prior monitoring reports, if two or more hours of programming are offered in designated housing areas as required, a finding of substantial compliance is possible even in the absence of groups by mental health staff.  The current finding of partial compliance is based on substantial compliance with some elements of the requirement (exercise and socialization time) and a lack of confirmed substantial compliance with element pertaining to programming time.

It should be noted that questions have been raised as to whether units A, B, R, and S continue to be properly considered as administrative segregation housing. It remains my understanding that they continue to operate as such, and are considered in the evaluation of requirements involving administrative segregation for the current monitoring report. The parties are encouraged to seek clarification regarding which units constitute administrative segregation, if there is reason to believe that A, B, R, and S should not be so designated.

•*(d)  Working with the Monterey County Probation Office and the Monterey County Superior Court, the Office of the Sheriff has and will continue to support evidence based programs such as the Work Alternatives Program; Involuntary Home Detention; Pretrial Release through Probation; Own Recognizance; educational early release kickouts such as Choices/Liberty Pride; and Penal Code sections 4018.6 and 4024.1 kickouts. [County Plan at 15; Dkt. 528-1 at ECF 19]*
**This requirement has been released from further monitoring.** (Dkt. 759 at ECF5)

## 24. Telepsychiatry
•*(a)  The telepsychiatrist must obtain informed consent and explain all medications before prescribing. [CFMG Plan, Dkt 532 at ECF 45; Dkt 622 at ECF2*
•*(b)  The policies contain numerous provisions regulating the use of telepsychiatry at the jail, including requiring that a psychiatric nurse be present during telepsychiatry encounters where the patient is in a safety cell as well as requiring a local assessment by a physician or mid-level provider within 24 hours of an initial assessment that is conducted by telepsychiatry. [Dkts. 622 and 632].*

**Findings:  Partial Compliance**
It should be noted that in the current and prior reports, the portion of this requirement regarding informed consent has been interpreted to mean informed consent for the use of telepsychiatry, in contrast to informed consent for medications. Informed consent as referenced in the Implementation Plan (Dkt 532 at 45) in the context of informed consent for medications. However, the Stipulation and Order Regarding Telepsychiatry (Dkt 622 at ECF 2) refers specifically to the requirement for informed consent for the use of telepsychiatry. This requirement for informed consent for the use of telepsychiatry is the basis for evaluating compliance.
These requirements were found in partial compliance in the last report, based on a low rate of completed informed consent forms in the healthcare records of inmates receiving telepsychiatry services, combined with a high rate of compliance with explaining medications. Wellpath provided the following results of monthly internal audits conducted with samples of 10 cases per month.

| Month | April | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|
| Informed consent | N/A | N/A | 100% | 80% | 0% | 0% | 80% | 80% |
| Med education | N/A | N/A | 100% | 100% | 100% | 100% | 100% | 100% |
| RN present safety cell | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 24 hr f/u | N/A | N/A | 0% | 0% | 0% | 0% | 0% | 0% |

For the current monitoring period, I reviewed 18 cases drawn from the monthly Wellpath audit samples, and 18 additional cases drawn at random from cases that were not included in the monthly audit samples. For the 18 cases drawn from the monthly audit samples, my results agreed with the audits; I found 12 cases (67%) with either signed consent forms for telepsychiatry or where verbal consent was indicated in the psychiatrist's progress note, and six with no documentation of informed consent. Sixteen cases documented medication education; one was not applicable as no medications were prescribed, and one case did not include documentation of medication education. Seven cases were initial psychiatric evaluations, and none of these had a 24 hour local assessment. None of these 18 cases were in a safety cell at the time of the telepsychiatry contact.

For the 18 cases that were not from the monthly audit samples, I found 10 cases (56%) where either verbal or written consent for telepsychiatry was noted in the healthcare record; the remaining 8 cases had no documentation of informed consent. Fifteen of 17 relevant cases (88%) had documentation of medication education; two cases did not have such documentation, and one case was not applicable as no medications were prescribed. Eight cases were initial psychiatric evaluations via telepsychiatry, and none of these had a 24 hour local assessment. None of these cases were in a safety cell at the time of the telepsychiatry contact.

Taken together, the 36 cases I reviewed showed that 22 (61%) had either verbal or written informed consent. Of the 34 cases with prescribed medications, 31 (91%) had documentation of medication education. Of the 14 cases which were initial psychiatric evaluations, none had a local follow-up within 24 hours (0% compliance). None of the 36 cases reviewed were in a safety cell at the time of the telepsychiatry contact.

The current finding of partial compliance is based on the overall pattern of results for the period under review. The months of August and September were problematic in that the psychiatrist consistently failed to obtain informed consent for telepsychiatry. It should be noted that this deficit was detected through the monthly internal audits conducted by Wellpath and corrective action was taken. Sustained, consistent documentation of informed consent for telepsychiatry is needed for a finding of substantial compliance. The requirement as written also calls for an onsite follow-up with any initial psychiatric evaluations conducted by telepsychiatry. The need for this requirement is unclear, but the requirement remains as written. A process for ensuring this follow-up occurs is needed, or the original intent could be revisited; I am not aware of similar requirements in other jail systems.

It appears that, at least in the early portion of the current review period, cases from the EASS and JBCT programs were not audited. It should be noted that in prior review periods, telepsychiatry services were limited primarily to the EASS and JBCT programs. During the current review period, the regular onsite psychiatrist was working via telepsychiatry as he recovered from a medical condition. Some of the noncompliant cases in the audit data result from a failure to obtain informed consent during the provision of these telepsychiatry services, although some cases from the EASS and JBCT programs also failed to document such consent.

Wellpath has previously suggested that the EASS and JBCT programs should not fall within the scope of monitoring the mental health services at Monterey County Jail. However, I interpret this requirement for informed consent as applying to inmates enrolled in the Early Access (EASS) and Jail – Based Competency Treatment (JBCT) programs, as well as any other

telepsychiatry services provided at MCJ.  This issue was addressed in the last monitoring report, and I include this discussion here for the sake of continuity with the next mental health monitor:

The entries marked N/A for Not Applicable in the Wellpath monthly audit results indicate that no relevant telepsychiatry services were provided during that month.  However, telepsychiatry currently appears to be the primary modality for providing psychiatry services for inmates enrolled in the Early Access (EASS) and Jail Based Competency Treatment (JBCT) programs, and telepsychiatry contacts were observed in the healthcare records of such patients reviewed during the current monitoring period.  This highlights the question of whether these services fall within the scope of the requirements for telepsychiatry as articulated in the implementation plan and relevant court documents (Dkt. 622; Dkt. 632; Dkt. 633).

Dkt. 622 at ECF 2 seems to suggest they do, where it states, "any use of telepsychiatry services with patients at the Monterey County Jail must comply with the following requirements: . . ."  This document goes on to list six specific requirements.  These requirements include:

1. Informed consent – with specific information to be provided to patients – see findings above.

2. Access to relevant clinical data about the patient – this appears to be provided by telepsychiatrists having access to the electronic healthcare record.

3. Telepsychiatrists must adequately document each patient session – this appears to be covered by completing progress notes in the electronic healthcare record.  The progress notes and standardized forms completed for telepsychiatry contacts were adequate in all cases reviewed for the current monitoring report, and many were very thorough.

4. Telepsychiatry facilities and technological capabilities must be regularly vetted, with specific areas to review.

5. Telepsychiatry must be subject to Quality Assurance monitoring.

6. Telepsychiatry sessions shall be conducted so that clinical discussion cannot be overheard by other patients, with additional considerations for custody staff.

Dkt 632 at ECF 6 – 17 also reiterates the preceding requirements, and articulates additional standards.  These standards include having the telepsychiatrist participate in an in-person tour of the jail once in their first year of employment, within six months of substantial architectural changes, and participation in quarterly Quality Assurance meetings.  Where telepsychiatry is used for medication management and there is a history of antipsychotic prescribing, telepsychiatry sessions shall either be preceded by a movement disorder screening by a qualified medical clinician using the Abnormal Involuntary Movement Scale (AIMS), or, if pre-screening is not practicable, then the patient shall be accompanied in the telepsychiatry session by a qualified medical clinician who can assist the telepsychiatrist in conducting the AIMS screening [Dkt. 632 at ECF 9].

Dkt. 632 goes on to list a series of examples of the most common types of psychiatric encounters at the jail, and the steps ordinarily necessary to ensure coordination of on-site care.  The CFMG Implementation Plan also addresses telepsychiatry services [Dkt. 532 at ECG 44 – 47], which includes a description of the Tele-Psych Clinic Procedure.  This procedure includes the role of a mental health worker to set up and facilitate the process, and provide onsite monitoring of the patient.

An additional consideration for the evaluation of compliance with requirements pertaining to telepsychiatry services is the role of the contract with Precision Psychiatry Services

64

for telepsychiatry services which include, for example, bridging orders for psychotropic medications at intake.  It is less clear that these services fall within the scope of the preceding requirements, but this remains an issue to be determined.  Relevant here may be the language used in Dkt. 632 at ECF 6 – 7, which states, "Tele-psychiatry may be used to provide psychiatric services which include, but are not limited to: initial psychiatric consultations; diagnostic and treatment evaluations; formulation of individual treatment plans; medication management; emergency psychiatric assessments including patients who are suicidal or at risk for suicide; patients who are a danger to themselves or others; patients who may require the administration of involuntary medications; other interventions and patient education."

      Greater clarity is needed regarding the applicability of the full range of telepsychiatry requirements as specified in the various documents referenced above, including inmates who receive such services through their enrollment in the EASS and JBCT programs.  Even though, as Wellpath has pointed out, the Department of Mental Health controls admissions to these programs, the clinical services for these programs are delivered at Monterey County Jail by Wellpath staff.  The basic Implementation Plan requirements for telepsychiatry, such as informed consent in the preceding requirement, appear to apply to the clinical services provided to inmates enrolled in the EASS and JBCT programs. Procedures for evaluating compliance with these requirements will need to be identified.

      I have reviewed a consent form specific to telepsychiatry services.  It appears that this consent form is relevant to inmates treated by telepsychiatry in the EASS and JBCT programs.  This form, or something similar, should be completed and filed in the healthcare records of inmates receiving telepsychiatry services.  The intended goal or purpose of the requirement that an initial psychiatric evaluation via telepsychiatry must be followed by a local evaluation within 24 hours, apparently meaning an in-person evaluation, is not clear.  I am not aware of a similar requirement in other settings.  I encourage the parties to revisit this requirement to clarify the intended goal and need for such a standard.

## 25. Medical Records

•*(a)  Each inmate's medical record shall contain (as applicable):*
- *The completed Receiving Screening form*
- *Health Inventory/Communicable Disease Screening forms*
- *Problem list*
- *All findings, diagnosis, treatments, dispositions*
- *Prescribed medications and their administration*
- *Laboratory, x-ray and diagnostic studies*
- *Consent and Refusal forms*
- *Release of Information forms*
- *Place and date of health encounters (time, when pertinent)*
- *Health service reports (i.e., dental, psychiatric, and other consultations)*
- *Hospital Discharge Summaries*
- *Jail Medical Record Summaries (transfer forms)*
- *Individual treatment plan [CFMG Plan at 114]*

**Findings: Partial Compliance**

The last two monitoring reports have found partial compliance with this requirement, noting that the healthcare records included the required items except for the individual treatment plans. My last report stated that once adequate treatment plans were routinely completed for applicable inmates (i.e., those with serious mental illness) along with the other required documentation, substantial compliance with this requirement will have been achieved. Treatment plans were found in partial compliance during the current monitoring period, as noted in Section 18 above. The current finding for the medical records requirement therefore remains partial compliance.

## 26. Quality Management

*•(a)  Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit Findings will be reported to the Quality Management Committee at its quarterly meetings. [Dkt. 532 at ECF 9]*

**Findings: Partial Compliance**

The last two monitoring reports found partial compliance with this requirement. There has been significant progress in the internal Quality Management auditing of various mental health requirements from the Implementation Plan. Wellpath has developed and implemented a monthly internal audit process that aligns with many of the Implementation Plan requirements. The results from these audits provide for a data-driven process for tracking performance in key functions across time. Corrective actions and quality improvement initiatives can now be implemented, tracked, and modified based on changes in the audit results.

The remaining concerns are related to the utilization of these data sources for quality management and performance improvement, as reflected in the available documentation. There are currently several meetings, with different composition and purposes, in the area of QM and Continuous Quality Improvement (CQI), with possible overlap with meetings intended to address treatment planning and the management of inmate needs. A Multidisciplinary Team meeting occurs weekly, attended by custody staff and the various healthcare disciplines, including mental health. This meeting is primarily focused on inmate care, although aspects of how the system is functioning to meet these needs may also arise. There is also a weekly mental health treatment team meeting, which reviews an average of approximately five mental health patients a week, where treatment planning and problem solving around patient care occurs. My understanding is that there is also a weekly leadership meeting, which is focused more on jail operations, intended to provide information sharing and problem solving among various staff in leadership positions at the jail. There is also a corporate level weekly meeting which reviews various performance issues.

There is a monthly Mental Health Subcommittee meeting, currently facilitated by the Regional Mental Health Vice President, which is focused on various requirements of the Implementation Plan. This is where data from the monthly internal audits are reviewed and corrective action plans are developed or modified to address performance deficits. The work of

this subcommittee is reported up to a quarterly site-wide Quality Assurance Committee, which is intended to review QA issues from across the jail's functions. There is also a monthly MAC meeting, which appears to be a meeting of medical, mental health, and custody staff. The function of this meeting in relation to the other meetings described here is somewhat unclear. Minutes for these meetings were not available for review at the time of this report.

For the purposes of this Implementation Plan requirement, the work of the Mental Health Subcommittee and the site-wide QA meeting appear to be most relevant. Documentation associated with the Mental Health Subcommittee meetings was made available for review, including meeting agendas and PowerPoint slide decks labeled CQI Improvement Plans. This documentation appears to have evolved over the course of the current monitoring period. The CQI Improvement Plan slides include data from the monthly internal audits for various performance metrics, and some areas had Improvement Plan slides that provide tables which briefly identified the issue or deficiency; the goal or targeted change; action steps; the responsible party; a target date; a completion date; and a re-evaluation date. The notes in these tables are somewhat limited, and it is difficult to track the process of following through on the action steps identified. It is possible that there is a more focused and robust discussion of the impact of actions taken, the remaining barriers, and any adjustments needed in the action plans, but this is not sufficiently reflected in the slides, which appear to also serve as the minutes for these meetings. What is needed is a more clearly documented trail of actions, results, and modifications or additions to the action plans in response to the ongoing performance data. The Mental Health Subcommittee meeting provides a valuable mechanism for quality improvement.

The value of the Quarterly CQI meeting for performance improvement in mental health functions is less clear. The documentation for these meetings appears to be primarily a series of PowerPoint slide decks. The slides present data from the various internal audits and a set of bullet points for priority topics. From the information contained in these slide decks, it appears that the primary purpose of these meetings is to report out information to a broader group of participants. It is not clear what discussions, decisions, or action items emerge from these meetings, or how action plans are tracked and/or modified as needed over time, based on the available documentation.

It was noted in the last monitoring report that, "Additional progress is needed to demonstrate the functionality of this process in achieving necessary improvements in the performance areas that remain deficient. Progress will be supported by more complete and detailed documentation than has been provided for reviewed to date, in the form of meeting minutes and specific corrective action plans." This observation remains relevant. It was also noted in the last report that documentation for QA/CQI process will need to be more thorough, probably most effectively at the Mental Health Subcommittee level. Minutes and supporting documentation (e.g., written CAPs, review of progress and barriers, next steps, etc.) will need to be more complete. Responsibly for this documentation may reside with the Implementation Specialist, although her role in these meetings may preclude her from being able to take effective minutes and develop other documentation as needed. The need for a mental health administrative assistant has been briefly discussed, and could provide the needed support for this and other functions which currently fall to the Implementation Specialist and clinical staff.

Please refer to the last monitoring report from April 2024 for a more detailed discussion of the QA/CQI process.

In light of the various meetings that appear relevant to the QA/CQI process at MCJ, it is recommend that a brief written statement be prepared for each that specifies the purpose, scope, frequency of meetings, and expected attendance, as well as the relationship with other meetings (e.g., the relationship between the Mental Health Subgroup and the Quarterly CAI meetings).  A flowchart may be useful to clearly  define and illustrate the functions of the various meetings.

The current finding of partial compliance is based on the continued progress observed in the development and implementation of a focused internal auditing process linked directly to the requirements of the Implementation Plan.  Work remains to reach substantial compliance with requirements in this area.  The role of the MAC meeting should be clearly defined in relation to the Mental Health Subcommittee and Quarterly CQI meetings. Minutes should more clearly reflect the discussions, decisions, and action plans that emerge from these meetings, to provide a clear trail of the quality improvement efforts being made. Success in meeting the requirements for quality management/continuous quality improvement and correction action plans should also directly facilitate progress in achieving substantial compliance with the requirements in other areas of the Implementation Plan.

•*(b)  All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met. [CFMG Plan at 98]*

**Findings:  Deferred**

This requirement is interpreted as applying to involuntary medication administrations in a psychiatric emergency, rather than involuntary medications administered under an Involuntary Medication Order issued by the Court.  There were again no such cases reported by Wellpath during the period of the current monitoring review, and no such cases were identified during my review of healthcare records for the current report. Compliance with this requirement will be determined when there are relevant cases to review.

•*(c)  All completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure.  [Dkt. 532 at ECF 77]*

**Findings:  Partial Compliance**

The monitoring report from November 2023 found this requirement in partial compliance, and noted the following:

"There was one case of confirmed suicide during the monitoring period for the current report.  The current relevant policy for evaluating compliance with this Implementation Plan requirement appears to be the one titled HCD-110_A-09: Procedure in the Event of a Patient Death – California.  This policy requires, among other things, a Clinical Mortality Review, which involves completion of a Psychological Autopsy, and an Administrative Mortality

Review, which includes recommendations for any future improvements, submission of such improvements to the CQI Committee, and informing staff of the findings of the Mortality Review meeting. Finally, the Regional Director of Operations, Regional Director of Nursing, Regional Vice President, and Regional Medical Director, works with appropriate personnel to implement changes.  The CQI Program Manager is to request and track supporting documentation for improvement plans.

"Three documents related to the most recent suicide in June 2023 were provided for review: A completed Psychological Autopsy form, a Psychological Autopsy Confirmation form, and a Recommendations form.  The documents provided show that this suicide was reviewed as required by the relevant subsections of the Wellpath Policy and Procedure, although the information contained in these documents was relatively brief.  It is possible that additional information was compiled in other internal documents that are considered Patient Safety Work Products as part of the Patient Safety Evaluation System, whereby information developed through the internal mortality review process may not be released outside of Wellpath.

"What appears to be missing in the documentation made available for review is the sharing of information within the local CQI Committee, as required by policy.  Nothing about this suicide was reflected in the CQI minutes of July through November 2023.  Nor was any documentation identified which reflected working with appropriate personnel to implement changes arising from the clinical or administrative reviews. My own review of this suicide indicated that opportunities for improvement should have been identified and pursued.  Such actions should be clearly tracked and documented by the local CQI Committee and other responsible personnel as needed."

Once again, there have been no further deaths from suicide reported since the June 2023 case, which formed the basis of the prior finding of partial compliance.  This is of course very positive.  In the absence of subsequent information with which to evaluate compliance with this requirement, a finding of partial compliance is currently maintained in view of the last available performance information.

## 27. Corrective Action Plans (CAPs)
•*(a)  Defendants' implementation of a policy requires that there are corrective action measures to address lapses in application of the policy. [Dkt. 494 at ECF 11]*
•*(b)  Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. [Dkt. 671 at ECF 5; Dkt. 532 at ECF 9]*

### Findings:  Partial Compliance

These requirements have been found in partial compliance in the last monitoring report.  It has been noted in prior reports that the CAPs developed earlier in the monitoring process had largely become stagnant and were essentially neglected, while the more fundamental problem was that the CAPs are not meaningfully connected to an effective and responsive Quality Management process.  Many of the actions listed in the original CAPs provided no process or data regarding whether the observed deficiencies were effectively remedied, i.e., they are not sensitive or responsive to the impact of corrective action.

There has been significant progress in the QA/CQI process during the recent monitoring periods (see above). Although progress has been noted in the development, implementation, and tracking of corrective action plans, further progress is needed, at least in the documentation. A Corrective Action Plan needs to specifically state the nature and extent of the performance deficit to be corrected, the specific steps to be taken to correct the performance deficit, the specific personnel responsible, the method for assessing changes in performance, and the mechanism for review and follow-up as needed. Most of these essential elements are reflected in a PowerPoint slide decks for the recent Mental Health Subcommittee meetings. These are promising developments. Once again, demonstration of follow-through is needed. This should consist of clear documentation showing subsequent review of the audit data in each performance area, reports of the progress made in the action steps taken and any barriers to progress that have been encountered, any revisions or additions to the action steps that may be needed, and plans for ongoing monitor and intervention as needed. It may be that this process is being followed, but there needs to be a better documentation trail.

The current finding of partial compliance is again based on the ongoing progress that has been made in this area. Work remains to be done to demonstrate substantial compliance with the requirements, but a process is being established which provides a viable and sustainable path to compliance.

## Summary

The current draft monitoring report finds the following results: 22 compliance requirements have been released from monitoring; 29 requirements were in substantial compliance; 28 requirements were in partial compliance; 13 requirements were in noncompliance; and four requirements were deferred. Changes in compliance ratings occurred in several areas. Substantial compliance was shown for the requirement that inmates exhibiting any clinical deterioration at any time during involuntary therapy shall be transferred immediately to a clinically appropriate treatment facility (see requirement 10.*h*). Several aspects of medication continuity moved from noncompliance to partial compliance, although further progress is needed in the intake process and continuation of medications (see requirements 1.*h*); 8.*a* & *b*). Partial compliance was also achieved in some aspects of sick call (3.*d*), despite ongoing challenges with staffing levels.

Two primary areas remain essential for continued progress toward substantial compliance across all requirements of the Implementation Plan. These are staffing, and the integration of Quality Management and Corrective action plans. Further progress has been made during the current monitoring period in QA/CQI with the recent functioning of the Mental Health QM Subcommittee. Additional progress is needed in the documentation of the various committee meetings associated with Quality Management, especially in the discussion and tracking of corrective actions taken to address the remaining performance deficits reflected in the ongoing audit data. There has been significant turnover in mental health staffing during the current monitoring period. It will be essential to recruit and retain sufficient staff to achieve and maintain substantial compliance with all Implementation Plan requirements. Current staffing allocations do not appear adequate to meet the mental health needs of the jail population. Further

evaluation of staffing needs is necessary using local performance data and accounting for all staff responsibilities. Stability in positions such as the Director of Nursing and the Health Services Administrator will be important for providing the supervision and corrective actions needed to address performance deficits.

The intake screening process remains an area of concern, although it has continued to benefit from the internal auditing and corrective actions which have been undertaken. Problems remain with the consistent verification and continuation of psychotropic medications at intake. Further clarification of the procedures and expectations for medication verification and obtaining bridging orders when outside pharmacies are closed would be useful in reaching a viable standard with which to evaluate performance in this area.

Compliance findings were again deferred for four requirements in the current report, all of which pertain to involuntary medications. Wellpath again reported that there were no such instances during the current review period. No instances of involuntary medication administration in the absence of a Court Order were identified in any of the cases reviewed for the current report. In the absence of relevant cases to evaluate, findings for these requirements were again deferred. A review of such instances, when they do occur, will be the basis for determining compliance with these requirements. Further clarification and updating of the requirements related to involuntary medications would be a useful.

This will be my last report as the mental health monitor for this case. I want to express my appreciation for the assistance and collaboration of the parties. Significant progress has been made in some areas, although further work is need to bring the remaining requirements into substantial compliance. I have attempted to include sufficient background and contextual information in this report to enable the next monitor to efficiently step into this role. I can be available to provide additional information as needed during this transition.

## Recommendations

1. <u>Staffing</u>. This is a fundamental area of concern. Substantial compliance with staffing requirements will be essential for achieving and maintaining compliance with most other requirements. There has been significant turnover in the MHP positions, and Wellpath must continue to work toward complete and stable staffing. An up-to-date staffing analysis, based on the available performance data and resulting in a realistic staff allocation package to meet current needs at the Monterey County Jail, should be the basis for meeting requirements in this area.

2. <u>Access to inpatient care</u>. Recommendations in this area remain the same. Adequate access to higher levels of care than can be provided at MCJ is still needed. Additional communication, coordination, and collaboration with NMC is again recommended, although the NMC admission criteria will continue to exclude some MCJ inmates who require inpatient care. More effective interdisciplinary treatment team review and treatment planning, in combination with an early and efficient process for using involuntary medications, may also reduce the number of cases who cannot be adequately treated in the jail.

3. <u>Intake: Verification and continuation of psychotropic medications</u>. Recommendations in this area remain unchanged. Additional attention is still needed to ensure that medications are

consistently verified and continued as required at the time of intake, including timely consultation with on-call psychiatry. This area should remain a focus of internal auditing, with review in QM/CQI meetings and corrective action plans as needed. Clarification of procedures and performance expectations is needed, especially when outside pharmacies are closed and cannot respond during the intake nurse's shift, which is the timeframe written into several Implementation Plan requirements.

4. Medication refusals. An efficient and reliable process for timely identification of medication refusals is needed. Potential solutions involving automated data searches of the electronic health care record should be explored.

5. Mental Health screening. A procedure is still needed to achieve compliance with this requirement will all inmates. Please see the discussion of this item in the body of the current report, which addresses the distinction between screenings and full assessments, with implications about who can conduct such screenings to meet the intent of this requirement.

6. Telepsychiatry and on-call psychiatry services. The requirements as written reference a variety of standards to be met for telepsychiatry services. Performance in this area was affected by the regular on-site psychiatrist changing to telepsychiatry during the current review period due to a temporary medical issue. Any psychiatric provider should be thoroughly familiar with and abide by all requirements for telepsychiatry. Clarification may still be needed regarding which telepsychiatry services are covered by these requirements (e.g., the services provided through the contract with Precision Psychiatric Services, and services provided through the EASS and JBCT programs). Internal auditing to ensure consistent compliance across the full range of requirements is recommended.

7. Treatment planning. Wellpath is required to inform classification through medical treatment orders as to any classification issues an inmate has due to a mental illness. However, Wellpath mental health staff do not write medical treatment orders. Mental health input into classification considerations should be documented in the health care record; if local policies and procedures do not provide for mental health staff to write medical treatment orders as specified in the requirement, alternatives for documenting the mental health input should be identified in other sections of the healthcare record, and there should be a written procedure for this process. Mental health treatment plans and the associated clinical documentation (e.g., evaluations and progress notes) should consistently include enough narrative information in addition to the checkboxes on the forms to clearly indicate specific interventions in relation to the inmates' assessed needs and responsiveness to treatment.

8. Inmate discipline. Although there is a new Disciplinary Action Report form and a new review process, performance in this area still falls below compliance. Consistent documentation is still needed which clearly shows that mental health staff were consulted and provided relevant input in cases of inmate discipline.

9. Incompetent to Stand Trial. A procedure is needed to ensure that inmates who have been declared incompetent to stand trial are quickly identified, assessed by mental health staff, and a

determination is documented regarding appropriate housing. This requirement could be met with brief documentation by mental health staff that the inmate is either appropriately housed or that a change in housing is indicated. It is also recommended that the parties give consideration to the original intent of this requirement, which appears to be primarily to ensure the safety and wellbeing of inmates declared incompetent to stand trial, and determine the best way to accomplish this goal within the current jail environment.

10. <u>QM and CAPs</u>. Additional progress has been made with the implementation of an internal auditing procedure that is aligned with various requirements of the Implementation Plan. As noted in the prior monitoring reports, the results of these audits should directly inform corrective action plans to address areas where performance is found to be deficient. More clearly documented tracking and follow-through for corrective action plans is needed; minutes should reflect the nature of relevant discussions, any barriers identified, resources or actions needed, and the effectiveness of corrective actions. It is also recommended that a brief written description be developed regarding the purpose, composition, and schedule of the various meetings that touch on QM/CQI, and their functional relationship to one another. Effective implementation of the QM and CAP process should facilitate compliance across the full range of Implementation Plan requirements.

11. <u>Areas for further discussion and clarification</u>. Finally, there are several areas where the requirements as written may benefit from further consideration by the parties. These include:
- Mental Health Screening. As discussed in Section 2(*a*), I encouraged the parties to revisit the language of the requirement and consider options that would allow staff other than a QMHP to conduct these screenings, with referral for a QMHP assessment when needed.
- Involuntary medications. As discussed in Sections 10(*d*) and 10(*h*), I encourage the parties to discuss the intended goal of these requirements and consider the most effective means of accomplishing this intent in the context of current jail and community resources.
- Incompetent to Stand Trial. As discussed in Section 17, it is recommended that the parties give consideration to the original intent of this requirement, which appears to be primarily to ensure the safety and wellbeing of inmates declared incompetent to stand trial, and determine the best way to accomplish this goal within the current jail environment.
- Out of cell and programming time. As mentioned in Section 23, questions have been raised as to whether units A, B, R, and S continue to be properly considered as administrative segregation housing. My current understanding is that they continue to operate as such, and are considered in the evaluation of requirements involving administrative segregation for the current monitoring report. The parties are encouraged to seek clarification regarding which units constitute administrative segregation, if there is reason to believe that A, B, R, and S should not be so designated.
- Telepsychiatry. As discussed in Section 24, greater clarity is needed regarding the applicability of the full range of telepsychiatry requirements as specified in the various documents which are referenced, including inmates who receive such services through their enrollment in the EASS and JBCT programs. Also, the intended goal or purpose of

the requirement that an initial psychiatric evaluation via telepsychiatry must be followed by a local evaluation within 24 hours, apparently meaning an in-person evaluation, is not clear.  I encourage the parties to revisit this requirement to clarify the intended goal and need for such a standard.


Respectfully submitted,


James Vess, Ph.D.                                        February 25, 2025
Mental Health Monitor

**Appendix A:  Compliance Status of Requirements Identified in Motion to Enforce**

The following addresses the compliance status of various requirements for which noncompliance was established in the 9/26/23 Order Granting Plaintiffs' Motion to Enforce Settlement Agreement and Wellpath Implementation Plan [Dkt. No. 838 at 13 – 19], as organized and numbered in that document.  Numbers for each item correspond to the number assigned in  the Court Order; preceding the compliance status is the relevant section of the current monitoring report.

1.  <u>Clinical Staffing</u>
     Section 12*a*:  Noncompliance
     Section 12*b*:  Noncompliance
     Section 12*c*:  Noncompliance
     Section 12*d*:  Substantial Compliance
12. <u>Initial Mental Health Screening</u>
      Section 2*a*:  Noncompliance
13. <u>Nursing Rounds in Administrative Segregation</u>
     Section 21*e*:  Partial Compliance
15. <u>Treatment Planning</u>
     Section 18*a-c*:  Partial Compliance
16. <u>Chronic Care</u>
     Section 4*a*:  Noncompliance
     Section 4*b*:  Substantial Compliance
17. <u>Acute Care</u>
     Section 5*a*:  Noncompliance
18. <u>Outpatient Services</u>
     Section 6*a*:  Partial Compliance
19. <u>Psychiatric Follow-Up Visit Intervals</u>
     Section 2*b*:  Substantial Compliance
20. <u>Consideration of Mental Health in Discipline</u>
     Section 19*a*:  Noncompliance
21. <u>Segregation Placement Screenings</u>
     Section 21*a*:  Noncompliance
     Section 22*b*:  Partial Compliance
22. <u>Mental Health Programming in Segregation</u>
     Section 21*a*:  Noncompliance
23. <u>Involuntary Medication</u>
     Section 10*a*:  Substantial Compliance
     Section 10*b*:  Substantial Compliance
     Section 10*c*:  Substantial Compliance
     Section 10*d*:  Partial Compliance
     Section 10*e*:  Deferred
     Section 10*f*:  Deferred
     Section 10*g*:  Deferred
     Section 10*h*:  Substantial Compliance

24. <u>Suicide Risk Assessments and Safety Planning</u>
      Section 22*b*:  Partial Compliance
25. <u>Medical Records</u>
      Section 25*a*:  Partial Compliance
26. <u>Corrective Action Plans</u>
      Section 27*a*:  Partial Compliance
      Section 27*b*:  Partial Compliance
27. <u>Provider Visits to Holding and Isolation Cells</u>
      Section 3*e*:  Partial Compliance
28. <u>Mental Health Quality Assurance</u>
      Section 26*a*:  Partial Compliance
      Section 26*b*:  Deferred
      Section 26*c*:  Partial Compliance

Healthcare records reviewed for Mental Health Monitoring Report from Nov 2024 site visit

INTAKE.  Cases from Wellpath internal audits reviewed for Requirements 1(e, f, g, h); examined to determine if my findings matched the internal audit results reported

| Patient | Period | Finding |
|---|---|---|
| ███████ | 6/18/24 & 6/27/24 | Matched audit |
| ███████ | 6/7/24 | Matched audit |
| ███████ | 7/5/24 | Matched audit |
| ███████ | 7/13/24 | Matched audit |
| ███████ | 7/2/24 | Matched audit |
| ███████ | 8/16/24 | Matched audit |
| ███████ | 8/24/24 | Matched audit |
| ███████ | 8/7/24 | Matched audit |
| ███████ | 9/16/24 | Matched audit |
| ███████ | 9/6/24 | Matched audit |
| ███████ | 9/16/24 | Matched audit |
| ███████ | 9/6/24 | Matched audit |
| ███████ | 10/21/24 | Matched audit |
| ███████ | 10/1/24 | Matched audit |
| ███████ | 11/10/24 | Matched audit |
| ███████ | 11/13/24 | Matched audit |

INTAKE.  Cases not in Wellpath audits reviewed for Requirements 1(e, f)

| Patient | Period | e. stable | .e unverified | f. identify | f. order |
|---|---|---|---|---|---|
| ███████ | 9/29/24 | ✓ | X | ✓ | ✓ |
| ███████ | 9/28/24 | ✓ | ✓ | ✓ | n/a |
| ███████ | 9/13/24 | ✓ | ✓ | ✓ | ✓ |
| ███████ | 8/16/24 | ✓ | n/a | ✓ | ✓ |
| ███████ | 8/14/24 | ✓ | n/a | ✓ | ✓ |
| ███████ | 8/8/24 | ✓ | n/a | ✓ | ✓ |
| ███████ | 7/24/24 | ✓ | ✓ | ✓ | X |
| ███████ | 7/18/24 | ✓ | X | ✓ | X |
| ███████ | 10/10/24 | ✓ | ✓ | ✓ | ✓ |
| ███████ | 10/8/24 | ✓ | n/a | ✓ | n/a |
| ███████ | 11/21/24 | ✓ | n/a | ✓ | ✓ |
| ███████ | 11/23/24 | ✓ | ✓ | ✓ | ✓ |

INTAKE.  Cases not in Wellpath audits reviewed for Requirements 1(g, h)

| Patient | Period | Observe Query | Verify/ request | Refer | ROI/ verify | Consult | Set Appt. |
|---|---|---|---|---|---|---|---|
| ███████ | 9/29/24 | ✓ | X | ✓ | X | ✓ | ✓ |
| ███████ | 9/28/24 | ✓ | X | ✓ | ✓ | ✓ | ✓ |
| ███████ | 9/13/24 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ███████ | 8/16/24 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ███████ | 8/14/24 | ✓ | ✓ | ✓ | ✓ | X | ✓ |
| ███████ | 8/8/24 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ███████ | 7/24/24 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ██████ | 7/18/24 | ✓ | ✓ | ✓ | ✓ | X | ✓ |
| ██████ | 10/10/24 | ✓ | ✓ | ✓ | ✓ | ✓ | X |
| ██████ | 10/8/24 | ✓ | n/a | ✓ | n/a | n/a | n/a |
| ██████ | 11/21/24 | ✓ | ✓ | ✓ | ✓ | ✓ | X |
| ██████ | 11/23/24 | ✓ | ✓ | ✓ | ✓ | X | X |

Cases reviewed for Requirement 2(a) Mental Health Screening; from Wellpath internal audits

| Patient | Period | Finding |
|---|---|---|
| ██████ | 9/29/24 | Agreed with audit |
| ██████ | 9/18/24 | Agreed with audit |
| ██████ | 8/22/24 | Agreed with audit |
| ██████ | 8/17/24 | Agreed with audit |
| ██████ | 7/15/24 | Did  not agree with initial audit |
| ██████ | 6/11/24 | Agreed with audit |
| ██████ | 5/29/24 | Agreed with audit |
| ██████ | 5/7/24 | Agreed with audit |
| ██████ | 5/2/24 | Agreed with audit |
| ██████ | 4/9/24 | Agreed with audit |
| ██████ | 11/4/24 | Agreed with audit |
| ██████ | 11/14/24 | Agreed with audit |

Cases reviewed for Requirement 2(a) Mental Health Screening; not in Wellpath internal audits

| Patient | Period | Finding |
|---|---|---|
| ██████ | 6/26-8/21 & 9/1-9/29 | X  (MHIA on 7/12 was late) |
| ██████ | 9/11/24 | ✓  (intake referral) |
| ██████ | 9/4/24 – 10/18/24 | X |
| ██████ | 10/7/24 | X  (MHIA on 10/7 was late) |
| ██████ | 8/3/24 - | X |
| ██████ | 8/12/24 – 10/8/24 | X |
| ██████ | 8/16/24 | ✓  (intake referral) |
| ██████ | 5/31/24 – 7/22/24 | X |
| ██████ | 8/1/24 – 10/16/24 | X |
| ██████ | 5/21/24 – 8/2/24 | X |
| ██████ | 8/13/24 - | X |
| ██████ | 8/20/24 – 10/14/24 | X |
| ██████ | 11/7/24 - | X |
| ██████ | 11/24/24 | ✓  (intake referral) |
| ██████ | 10/18/24 | ✓  (intake referral) |
| ██████ | 10/11/24 | ✓  (intake referral) |

Cases reviewed for Requirement 2(b); Psychiatry provider, included in Wellpath internal audits

| Patient | Period | Finding |
|---|---|---|
| ██████ | 9/17/24 | Agreed with audit |
| ██████ | 9/4/24 | Agreed with audit |
| ██████ | 9/30/24 | Agreed with audit |

| | | |
|---|---|---|
| ██████████ ████ | 9/5/24 | Agreed with audit |
| █████ ████ | 9/3/24 | Agreed with audit |
| ████ ████ | 8/27/24 | Agreed with audit |
| ████ ████ | 8/1/24 – 8/2/24 | Agreed with audit |
| ████ ████ | 8/6/24 | Agreed with audit |
| ██████ ████ | 8/14/24 | X:  30 day contact was late |
| ████████ ████ | 8/29/24 | Agreed with audit |
| ████████ | 7/31/24 | Agreed with audit |
| ████ ████ | 7/2/24 | Agreed with audit |
| ██ ███ | 7/17/24 | Agreed with audit |
| ████ ████ | 7/15/24 | Agreed with audit |
| ████ ████ | 7/12/24 | Agreed with audit |
| ████ ████ | 10/3/24 | Agreed with audit |
| ████ ████ | 10/7/24 – 10/30/24 | Agreed with audit |
| ████ ███ | 11/18/24 | Agreed with audit |
| ████ ███ | 11/19/24 | Agreed with audit |
| ████ ████ | 11/12/24 | Agreed with audit |

Cases reviewed for Requirement 2(b); not included in Wellpath internal audits

| Patient | Period | Finding |
|---|---|---|
| █████ ████ | 7/25/24 – 9/18/24 | ✓ |
| ████ ████ | 7/31/24 – 9/12/24 | ✓ |
| ████ ████ | 6/10/24 – 9/3/24 | ✓ |
| ██████ █ | 8/20/24 – 10/28/24 | ✓ |
| ███ ███ | 8/5/24 – 8/28/24 | ✓ |
| ██ ████ | 5/29/24 – 9/16/24 | ✓ |
| ███ ███ | 5/21/24 – 8/13/24 | ✓ |
| ██ ████ | 7/18/24 – 8/13/24 | ✓ |
| ████ ███ | 4/23/24 – 10/16/24 | ✓ |
| ████ ███ | 4/1/24 – 6/25/24 | ✓ |
| ████ ████ | 8/13/24 – 11/5/24 | ✓ |
| ████ ████ | 9/17/24 – 11/26/24 | ✓ |

Cases reviewed for Requirement 3(d); sick call.  Cases selected from Wellpath audit samples for intake

| Patient | Period | Finding |
|---|---|---|
| ████ ███ | 8/16/24 – 9/19/24 | X (missed urgent referral timeframe) |
| ████ ███ | 8/24/28 – | X (missed referral & f/u timeframes) |
| ████ ███ | 8/7 – 8/16 & 10/2/24 – | ✓ |
| ████ ████ | 8/1/24 – | X (missed f/u timeframe) |
| ████ ████ | 7/5 – 7/26 & 10/6/24 – | X (not seen timely after initial refusal 10/12/24) |
| ████ ████ | 6/18/24 – 10/23/24 | ✓ |
| ██ ████ | 6/27/24 – 10/14/24 | ✓ |
| ████ ████ | 5/17/24 – 10/7/24 | ✓ |

Cases reviewed for 3(d); sick call.  Cases selected from inmates not included in Wellpath audit samples

| Patient | Period | Finding |
|---|---|---|
| ████████ | 9/29/24 – | X (follow-up not completed |
| ████████ | 9/29/24 – 11/13/24 | ✓ |
| ████████ | 9/13/24 – 9/25/24 | ✓ |
| ████████ | 8/16 – 9/10 | X (psychiatry missed timeframe) |
| ████████ | 8/14/24 – 8/21/24 | ✓ |
| ████████ | 8/8/24 – 9/18/24 | X (psychiatry missed urgent ref timeframe) |
| ████████ | 7/18/24 – 8/15/24 | X (psychiatry late on routine referral) |
| ████████ | 9/3/24 – 10/16/24 | X (psychiatry missed routine ref timeframe) |
| ████████ | 9/27/24 – 10/21/24 | X (psychiatry missed routine ref timeframe) |
| ████████ | 8/8/24 – | ✓ |
| ████████ | 8/8/24 – 8/26/24 | ✓ |
| ████████ | 7/1/24 – 7/24/24 | ✓ |

Cases reviewed for Requirement 3(e); MD/RN rounds (cases from Wellpath internal audit samples).  Reported as percentage of required rounds completed

| Patient | Period | Finding |
|---|---|---|
| ████████ | 9/1/24 – 9/4/24 | Agreed with audit |
| ████████ | 9/1/24 – 9/30/24 | Agreed with audit |
| ████████ | 9/27/24 – 9/30/24 | Agreed with audit |
| ████████ | 9/1/24 – 9/30/24 | Agreed with audit |
| ████████ | 9/25/24 – 9/30/24 | Agreed with audit |
| ████████ | 8/18/24 – 8/31/24 | Agreed with audit |
| ████████ | 8/1/24 – 8/31/24 | Agreed with audit |
| ████████ | 8/15/24 – 8/31/24 | Agreed with audit |
| ████████ | 8/1/24 – 8/31/24 | Agreed with audit |
| ████████ | 8/1/24 – 8/31/24 | Higher compliance than audit |
| ████████ | 7/2/24 – 7/17/24 | Agreed with audit; not all dates audited |
| ████████ | 7/21/24 – 7/31/24 | Agreed with audit |

Cases reviewed for Requirement 3(e); cases not included in Wellpath internal audit samples

| Patient | Period | Finding |
|---|---|---|
| ████████ | 9/1/24 – 9/22/24 | 100% (9/9) |
| ████████ | 9/1/24 – 9/29/24 | 50% (6/12) |
| ████████ | 9/1/24 – 9/30/24 | 85% (11/13) |
| ████████ | 9/1/24 – 9/30/24 | 92% (12/13) |
| ████████ | 8/2/24 – 8/31/24 | 92% (12/13) |
| ████████ | 8/1/24 – 8/12/24 | 100% (5/5) |
| ████████ | 8/1/24 – 8/31/24 | 85% (11/13) |
| ████████ | 8/1/24 – 8/22/24 | 100% (9/9) |
| ████████ | 8/2/24 – 8/31/24 | 85% (11/13) |
| ████████ | 10/1/24 – 10/31/24 | 69% (9/13) |
| ████████ | 10/1/24 – 10/8/24 | 33% (2/3) |

| | 10/1/24 – 10/14/24 | 67% (4/6) |
|---|---|---|
| | 11/1/24 – 11/30/24 | 69% (9/13) |
| | 11/1/24 – 11/30/24 | 85% (11/13) |

Cases reviewed for Requirement 4(b); psychiatry 90 day appointments, from Wellpath internal audits

| Patient | Period | Finding |
|---|---|---|
| | 9/17/24 | Agreed with audit |
| | 9/4/24 | Agreed with audit |
| | 9/30/24 | Agreed with audit |
| | 9/5/24 | Agreed with audit |
| | 9/3/24 | Agreed with audit |
| | 8/27/24 | Agreed with audit |
| | 8/1/24 – 8/2/24 | Agreed with audit |
| | 8/6/24 | Agreed with audit |
| | 8/14/24 | Agreed with audit |
| | 8/29/24 | Agreed with audit |
| | 7/31/24 | Agreed with audit |
| | 7/2/24 | Agreed with audit |
| | 7/17/24 | Agreed with audit |
| | 7/15/24 | Agreed with audit |
| | 7/12/24 | Agreed with audit |

Cases reviewed for Requirement 4(b); cases not in Wellpath internal audits

| Patient | Period | Finding |
|---|---|---|
| | 7/25/24 – 9/18/24 | ✓ |
| | 7/31/24 – 9/12/24 | ✓ |
| | 6/10/24 – 9/3/24 | ✓ |
| | 8/20/24 – 10/28/24 | ✓ |
| | 8/5/24 – 8/28/24 | ✓ |
| | 5/29/24 – 9/16/24 | ✓ |
| | 5/21/24 – 8/13/24 | ✓ |
| | 7/18/24 – 8/13/24 | ✓ |
| | 4/23/24 – 10/16/24 | ✓ |
| | 4/1/24 – 6/25/24 | ✓ |
| | 8/13/24 – 11/5/24 | ✓ |
| | 9/17/24 – 11/26/24 | ✓ |

Cases reviewed for Requirement 5(b); Crisis intervention (cases included in Wellpath internal audit samples; examined to determine if my findings matched the internal audit results reported)

| Patient | Period | Finding |
|---|---|---|
| | 8/23/24 | Agreed with audit |
| | 8/4/24 & 8/9/24 | Agreed |
| | 8/9/24 | Agreed |
| | 8/11/24 | Agreed |

| | 8/16/24 | Agreed |
|---|---|---|
| | 9/6/24 | Agreed |
| | 9/10/24 | Agreed |
| | 9/7/24 | Agreed |
| | 9/23/24 | Agreed |
| | 9/10/24 | Agreed |
| | 9/2/24 | Agreed |
| | 7/12/24 | Agreed |
| | 7/10/24 | Agreed |
| | 7/14/24 | Agreed |
| | 7/25/24 | Agreed |
| | 7/18/24 | Agreed |
| | 6/7/24 | Agreed |
| | 6/12/24 | Agreed |
| | 6/10/24 | Agreed |

Cases reviewed for Requirement 5(b); cases not included in Wellpath internal audit samples

| Patient | Period | Finding |
|---|---|---|
| | 9/9/24 | ✓ |
| | 9/25/24 | ✓ |
| | 8/24/24 | ✓ |
| | 8/5/24 | ✓ but no psych referral |
| | 7/7/24 | ✓ |
| | 7/12/24 | ✓ |
| | 6/12/24 | ✓ |
| | 6/3/24 | ✓ |
| | 10/21/24 | ✓ |
| | 10/28/24 | ✓ |
| | 11/26/24 | ✓ |
| | 11/14/24 | ✓ |

Cases reviewed for Requirements 6(a & b); Outpatient services (cases from Wellpath audit samples)

| Patient | Period | Finding |
|---|---|---|
| | 8/16/24 – 9/19/24 | X |
| | 8/24/28 – | X |
| | 8/7 – 8/16 & 10/2/24 – | ✓ |
| | 8/1/24 – | X |
| | 7/5 – 7/26 & 10/6/24 – | X |
| | 6/18/24 – 10/23/24 | ✓ |
| | 6/27/24 – 10/14/24 | ✓ |
| | 5/17/24 – 10/7/24 | ✓ |

Cases reviewed for Requirements 6(a & b); Outpatient services (cases not from Wellpath audit samples)

| Patient | Period | Finding |
|---|---|---|
| | 9/29/24 – | X |

| ███ ████████ | 9/29/24 – 11/13/24 | ✓ |
|---|---|---|
| ███ █ ████ | 9/13/24 – | ✓ |
| █████████ ██████ | 8/16 – 9/10 | X |
| █████ ██████ | 8/14/24 – 8/21/24 | ✓ |
| ██████ ███████ | 8/8/24 – 9/18/24 | X |
| ████████ ██████ ███ | 7/18/24 – 8/15/24 | X |
| ████ █ ████ | 9/3/24 – 10/16/24 | X |
| █████ ████ | 9/27/24 – 10/21/24 | X |
| ██████ ██████ | 8/8/24 – | ✓ |
| ██████ █ ████ | 8/8/24 – 8/26/24 | ✓ |
| ██████ ██████ ██ | 7/1/24 – 7/24/24 | ✓ |

Cases reviewed for Requirement 7(b); Medical staff see inmate upon placement and release from sobering cell

| Patient | Period | Finding |
|---|---|---|
| ████ █ █████ | 9/18/24 | ✓ placement   X release |
| █████ ████ | 9/19/24 | ✓ placement   X release |
| █████ █ ███ | 9/17/24 | ✓ placement   ✓ release |
| █████ █ ███ | 9/16/24 | ✓ placement   ✓ release |
| ███ █ ███ | 10/4/24 | ✓ placement   ✓ release |
| ███ █ ████ | 10/10/24 | ✓ placement   X release |
| █████ █ █████ | 10/7/24 | ✓ placement   X release |
| █████ █ █████ | 10/5/24 | ✓ placement   X release |
| ██████ █ ████ | 8/6/24 | ✓ placement   X release |
| ████ █ █████ | 8/8/24 | ✓ placement   ✓ release |

Cases reviewed for Requirement 7(g); Benzo withdrawal (all relevant cases from Wellpath audits)

| Patient | Period | Finding |
|---|---|---|
| ████ █ █████ | 9/26/24 | Agreed with audit |
| █████ ████ | 9/28/24 | Agreed |
| ████ █ ███ | 9/6/24 | Agreed |
| ████ ████ | 9/27/24 | Agreed |
| ████ ████ | 8/7/24 | Agreed |
| █████ ████ | 8/27/24 | Agreed |
| █████ █████ | 8/30/24 | Agreed |
| ██ █ ████ | 6/10/24 | Agreed |
| ██████ █ ████ | 6/28/24 | Agreed |
| █████ █ ███ | 6/27/24 | Agreed |
| ████ █ ████ | 11/24/24 | Agreed |
| ██████ ██████ | 10/14/24 | Agreed |

Cases reviewed for Requirement 7(j); RN assessment in safety cells

| Patient | Period | Finding |
|---|---|---|
| ████ █ ████ | 9/2/24 | ✓ |

| | | |
|---|---|---|
| ███████████ | 9/2/24 | ✓ |
| ███████████ | 9/13/24 & 10/3/24 | ✓ |
| ████████████ | 9/13/24 | ✓ |
| ██████████ | 8/9/24 | ✓ |
| ████████████ | 8/10/24 | ✓ |
| ██████████ | 8/17/24 | ✓ |
| ██████████ | 8/24/24 | ✓ |
| █████████ | 7/4/24 | X pt refused; not completed; not sent out |
| ██████████ | 7/7/24 | ✓ |
| ███████████ | 7/12/24 | ✓ |
| ██████████ | 7/15/24 & 10/2/24 | X for 7/15; ✓ for 10/2 |
| ███████████ | 6/25/24 | ✓ |
| █████████████ | 6/4/24 | ✓ |
| ██████████ | 10/12/24 | ✓ |
| ██████████ | 9/3/24 | ✓ |
| ████████████ | 8/30/24 | ✓ |
| ████████████ | 8/30/24 | ✓ |

Cases reviewed for Requirement 8(a & b); medication continuity – see cases reviewed for Requirement 1(e, f, g ,h)

Cases reviewed for Requirement 8(c); psychiatric medications (cases included in Wellpath internal audit samples; examined to determine if my findings matched the internal audit results reported)

| Patient | Period | Finding |
|---|---|---|
| ██████████ | 9/17/24 | Agreed with audit |
| ██████████ | 9/4/24 | Agreed with audit |
| █████████ | 9/30/24 | Agreed with audit |
| █████████████ | 9/5/24 | Agreed with audit |
| ████████████ | 9/3/24 | Agreed with audit |
| ██████████ | 8/27/24 | Agreed with audit |
| ██████████ | 8/1/24 – 8/2/24 | Agreed with audit |
| █████████ | 8/6/24 | Agreed with audit |
| █████████ | 8/14/24 | Agreed with audit |
| █████████████ | 8/29/24 | Agreed with audit |
| ██████████ | 7/31/24 | Agreed with audit |
| ██████████ | 7/2/24 | Case was n/a; audit said nc |
| ████████ | 7/17/24 | Agreed with audit |
| ██████████ | 7/15/24 | Agreed with audit |
| █████████ | 7/12/24 | Agreed with audit |

Cases reviewed for Requirement 8(c); cases not included in Wellpath internal audit samples

| Patient | Period | Finding |
|---|---|---|
| █████████ | 7/25/24 – 9/18/24 | ✓ |
| ██████████ | 7/31/24 – 9/12/24 | ✓ |
| █████████ | 6/10/24 – 9/3/24 | ✓ |

| | | |
|---|---|---|
| ███████ ████ | 8/20/24 – 10/28/24 | ✓ |
| ████ ████ | 8/5/24 – 8/28/24 | ✓ |
| ████ ████ | 5/29/24 – 9/16/24 | ✓ |
| ████ ████ | 5/21/24 – 8/13/24 | ✓ |
| ██ █████ | 7/18/24 – 8/13/24 | ✓ |
| ████ ████ | 4/23/24 – 10/16/24 | ✓ |
| ████ █ | 4/1/24 – 6/25/24 | ✓ |
| ██████ █████ | 10/8/24 – 10/31/24 | ✓ |
| ████ █████ | 10/3/24 – 11/21/24 | ✓ |

Cases reviewed for 10(c); informed consent

| Patient | Period | Finding |
|---|---|---|
| ████ ███ | 9/1/24 | ✓ IMO |
| ████ ████ | 9/2/24 | ✓ Consent form |
| ████ ████ | 9/9/24 | ✓ Verbal consent noted |
| ████ ████ | 10/12/24 | ✓ Verbal consent noted |
| ████ ████ | 10/3/24 | ✓ Verbal consent noted |
| ████ ████ | 8/30/24 | ✓ Verbal consent noted |
| ███ ███ | 7/5/24 | ✓ Consent form |
| ████ ████ | 9/17 | ✓ Verbal consent noted |
| ███ ████ | 9/3/24 | ✓ Consent form |
| ████ ████ | 9/9/24 | ✓ Consent form |

Cases reviewed for Requirement 10(c); Review of IMO log

| Patient | Period | Finding |
|---|---|---|
| ████ ████ | 12/5/24 | IMO in chart |
| ████ ████ | 11/22/24 & 11/23/24 | IMO in chart |
| ████ ████ | 10/6/24 | IMO referenced but not in chart |
| ████ ████ | 10/16/24 | IMO in chart |
| ████ ████ | 9/4/24 | IMO in chart |
| ███ ████ | 8/6/24 | IMO in chart |
| ██████ ████ | 7/24/24 & 8/6/24 | IMO in chart |

Cases reviewed for 11(a); med refusals

| Patient | Period | Finding |
|---|---|---|
| ████ ████ | 7/22/24 | X |
| ████ ████ | 7/16/24 | X |
| ████ ████ | 7/4/24 | ✓ |
| ████ ████ | 7/16/24 | X |
| ██ █████ | 8/10/24 | X |
| ████ █████ | 8/2/24 | ✓ |
| ████ ████ | 9/6/24 | X |
| ████ ████ | 8/10/24 | ✓ |
| █████ ████ | 9/21/24 | ✓ |
| ████ ████ | 9/21/24 | X |
| ████ ████ | 9/6/24 | X |

| ███ ███ | 9/21/24 | X |
|---|---|---|

Cases reviewed for Requirement 15 (a, b); use of force

| Patient | Period | Finding |
|---|---|---|
| ██ ███ | 9/11/24 | ✓ |
| ███ ███ | 10/25/24 | ✓ |
| ███ ██ | 9/14/24 | ✓ |
| ███ ██ | 10/4/24 | ✓ |
| ███ ██ | 10/15/24 | ✓ |
| ██ ██ | 10/18/24 | ✓ |
| ███ ██ | 10/21/24 | ✓ |
| ███ ██ | 10/25/24 | ✓ |
| ███ ██ | 10/29/24 | ✓ |
| ███ ██ | 11/6/24 | ✓ |
| ██ ██ | 11/21/24 | ✓ (planned UoF) |
| ███ ██ | 11/10/24 | ✓ |
| ███ ██ | 11/12/24 | ✓ |

Cases reviewed for Requirement 18(a, b, c); Treatment plans (cases from Wellpath audit samples, examined to determine if my findings matched the internal audit results reported)

| Patient | Period | Finding |
|---|---|---|
| ████ ████ | 7/12/24 | Agreed with audit |
| ████ ███ | 5/18/24 | Agreed |
| ██ ███ | 6/28/24 | Agreed |
| ██ ███ | 6/14/24 | Agreed |
| ███ ██ | 7/26/24 | Agreed |
| ██ ██ | 6/28/24 | Agreed |
| ██ ██ | 6/19/24 | Agreed |
| ██ ██ | 6/21/24 | Agreed |
| ██ ██ | 7/5/24 | Agreed |
| █ ██ | 7/19/24 | Agreed |
| ██ ██ | 10/7/24 | Agreed |
| ██ ██ | 5/6/24 | Agreed |
| ██ ██ | 6/14/24 | Agreed |
| ██ ███ | 6/28/24 | Agreed |
| ██ ██ | 6/24/24 | Agreed |
| ██ ██ | 10/3/24 | Agreed |
| ███ ██ | 10/24/24 | Agreed |
| ███ ██ | 11/27/24 | Agreed |
| ██ ██ | 10/7/24 | Disagreed; insufficient detail |
| ██ ██ | 11/9/24 | Agreed |

Cases reviewed for Requirement 18 (a, b, C); Treatment plans (cases not in Wellpath audit samples)

| Patient | Period | Finding |
|---|---|---|
| ██ ██ | 10/31/24 | ✓ treatment plan present;  X content insufficient |

| | 11/5/24 | ✓ treatment plan present; ✓ content sufficient |
|---|---|---|
| | 12/2/24 | ✓ treatment plan present; ✓ content sufficient |
| | 11/8/24 | ✓ treatment plan present;  X content insufficient |
| | 5/14/24 | ✓ treatment plan present; ✓ content sufficient |
| | 7/19/24 | ✓ treatment plan present; ✓ content sufficient |
| | 7/15/24 | X no treatment plan |
| | 9/24/25 | ✓ treatment plan present; ✓ content sufficient |
| | 6/5/24 | ✓ treatment plan present; ✓ content sufficient |
| | 10/7/24 | ✓ treatment plan present; ✓ content sufficient |
| | 8/2/24 | ✓ treatment plan present; ✓ content sufficient |
| | 6/4/24 | ✓ treatment plan present; ✓ content sufficient |
| | 5/1 – 11/30/24 | X no treatment plan |
| | 10/29/24 | ✓ treatment plan present; X content insufficient |
| | 5/27/24 | ✓ treatment plan present; ✓ content sufficient |
| | 10/17/24 | ✓treatment plan present; ✓ content sufficient |
| | 10/17/24 | ✓ treatment plan present; ✓ content sufficient |
| | 11/4/24 - | X no treatment plan |
| | 11/4/24 | ✓ treatment plan present; X content insufficient |
| | 7/18/24 | ✓ treatment plan present; X content insufficient |
| | 6/11/24 | ✓ treatment plan present; X content insufficient |
| | 11/22/24 | ✓ treatment plan present; X content insufficient |

Cases reviewed for Requirement 19(a); Inmate Discipline

| Patient | Period | Finding |
|---|---|---|
| | 9/14/24 | ✓ |
| | 9/15/24 | X |
| | 9/3/24 | X |
| | 9/10/24 | X |
| | 9/21/24 | ✓ |
| | 8/11/24 | X |
| | 8/10/24 | X |
| | 8/8/24 | X |
| | 8/7/24 | X |
| | 8/11/24 | X |
| | 8/7/24 | X |
| | 8/15/24 | ✓ |
| | 8/21/24 | X |
| | 8/31/24 | ✓ |
| | 8/10/24 | X |
| | 8/5/24 | ✓ |
| | 8/10/24 | X |
| | 7/11/24 | X |
| | 7/21/24 | X |
| | 7/21/24 | X |
| | 11/17/24 | ✓ |

| | 11/13/24 | X |
|---|---|---|
| | 11/12/24 | X |
| | 11/13/24 | X |
| | 11/17/24 | ✓ |
| | 11/25/24 | X |
| | 11/25/24 | X |
| | 11/6/24 | X |
| | 11/30/24 | X |

Cases reviewed for Requirement 21(a) Ad seg placement screening; 21(d) Ad seg weekly MH appointment; 21(e) RN rounds in Administrative Segregation (cases included in Wellpath internal audit samples, to see if my results agreed with the audit)

| Patient | Period | 21(a) | 21(d) | 21(e) |
|---|---|---|---|---|
| | 9/1/24 – 9/9/24 | Agree | Agree | Agree |
| | 9/1/24 – 9/30/24 | Agree | Agree | Agree |
| | 9/27/24 – 9/30/24 | Agree | Agree | Agree |
| | 9/1/24 – 9/30/24 | Agree | Agree | Agree |
| | 9/25/24 – 9/30/24 | Agree | Agree | Agree |
| | 8/18/24 – 8/31/24 | Agree | Agree | Agree |
| | 8/1/24 – 8/31/24 | Agree | Agree | Agree |
| | 8/15/24 – 8/31/24 | Agree | Agree | Agree |
| | 8/1/24 – 831/24 | Agree | Agree | Agree |
| | 8/1/31 – 8/31/24 | Agree | Agree | Agree |
| | 7/21/24 – 7/31/24 | Agree | Agree | Agree |
| | 7/2/24 – 7/15/24 | Agree | Agree | Agree |
| | 10/1/24 – 10/31/24 | | Agree | |
| | 10/1/24 – 10/31/24 | | Agree | |
| | 10/1/24 – 10/31/24 | | Agree | |
| | 10/31/24 – 11/30/24 | | Agree | |
| | 11/13/24 – 11/29/24 | | Agree | |
| | 10/31/24 – 11/30/24 | | Agree | |

Cases reviewed for Requirement 21(a) Ad seg placement screening; 21(d) Ad seg weekly MH appointment; 21(e) RN rounds in Administrative Segregation (cases not included in Wellpath internal audit samples)

| Patient | Period | 21(a) | 21(d) | 21(e) |
|---|---|---|---|---|
| | 9/1/24 – 9/22/24 | ✓ | N/A not SMI | 90% (19/21) |
| | 9/1/24 – 9/29/24 | ✓ | 75% (3/4) | 54% (15/28) |
| | 9/1/24 – 9/30/24 | X | 50% (2/4) | 90% (27/30) |
| | 9/1/24 – 9/30/24 | X completed late | 75% (3/4) | 83% (25/30) |
| | 8/2/24 – 8/31/24 | X completed late | 100% (4/4) | 83% (24/29) |
| | 8/1/24 – 8/12/24 | X completed late | 100% (2/2) | 92% (11/12) |
| | 8/1/24 – 8/31/24 | X completed late | N/A not SMI | 84% (26/31) |
| | 8/1/24 – 8/31/24 | ✓ | 75% (3/4) | 74% (23/31) |
| | 8/2/24 – 8/31/24 | X completed late | 75% (3/4) | 77% (23/30) |
| | 9/4/24 – 9/30/24 | X completed late | N/A not SMI | 88% (23/26) |

12

| | | | | |
|---|---|---|---|---|
| ███ | 8/2/24 – 8/31/24 | X completed late | N/A not SMI | 76% (22/29) |
| ███ | 7/8/24 – 7/17/24 | X | N/A not SMI | 70% (7/10) |
| ███ | 7/1/24 – 7/31/24 | X completed late | 100% (4/4) | 56% (13/23) |
| ███ | 10/1/24 – 11/2/24 | X | 100% (5/5) | 77% (24/31) |
| ███ | 10/4/24 – 11/2/24 | X | N/A not SMI | 81% (25/31) |
| ███ | 10/1/24 – 11/2/24 | X | N/A not SMI | 65% (20/31) |
| ███ | 11/13/24 – 11/27/24 | X | N/S not SMI | 89% (16/18) |
| ███ | 11/4/24 – 11/30/24 | X | 100% (3/3) | 84% (26/31) |
| ███ | 11/15/24 – 11/30/24 | X | N/A not SMI | 93% (14/15) |
| ███ | 10/1 – 10/16/24 | | 100% (2/2) | |
| ███ | 11/1 – 11/30/24 | | 100% (4/4) | |
| ███ | 11/1 – 11/24/24 | | 100% (4/4) | |
| ███ | 10/1 – 10/23/24 | | 100% (4/4) | |

Cases reviewed for Requirement 22(b) part 1; suicide risk assessment if RN identifies at intake

| Patient | Period | Finding |
|---|---|---|
| ███ | 9/16/24 | ✓ agreed with audit |
| ███ | 9/29/24 | ✓ agreed with audit |
| ███ | 8/28/24 | ✓ agreed with audit |
| ███ | 7/19/24 | ✓ agreed with audit |
| ███ | 7/29/24 | ✓ agreed with audit |
| ███ | 6/18/24 | ✓ agreed with audit |
| ███ | 6/19/24 | ✓ agreed with audit |
| ███ | 5/27/24 | ✓ agreed with audit |
| ███ | 4/21/224 | ✓ agreed with audit |
| ███ | 4/23/24 | ✓ agreed with audit |
| ███ | 4/21/24 | ✓ agreed with audit |

Cases reviewed for Requirement 22(b) part 2: suicide risk assessment for Safety cell placements, and Requirement 22(c): determine level of suicide precautions

| Patient | Period | Finding |
|---|---|---|
| ███ | 9/1/24 | ✓ |
| ███ | 9/2/24 | ✓ |
| ███ | 9/13/24 | ✓ |
| ███ | 9/13/24 | ✓ |
| ███ | 8/9/24 | ✓ |
| ███ | 8/10/24 | ✓ |
| ███ | 8/17/24 | ✓ |
| ███ | 8/24/24 | ✓ |
| ███ | 7/4/24 | ✓ |
| ███ | 7/7/24 | ✓ |
| ███ | 7/12/24 | ✓ |
| ███ | 7/15/24 | ✓ |
| ███ | 6/25/24 | SRA attempted; pt too psychotic |
| ███ | 6/4/24 | ✓ |

13

Cases reviewed for Requirement 22(b) part 3; suicide risk assessment after Ad Seg placement; cases from Wellpath audit samples

| Patient | Period | Finding |
|---|---|---|
| ██ ███ | 9/27/24 | Agreed (SRA not done) |
| ████ ████ | 9/25/24 | Agreed (SRA not done) |
| ████ ███ | 8/18/24 | Agreed (SRA completed) |
| ████ ████ | 8/15/24 | Agreed (SRA not done) |
| ██ ███ | 7/15/24 | Agreed (SRA completed) |
| ███ ███ | 7/21/24 | Agreed (SRA done) |
| ███ ███ | 5/22/24 | Agreed (SRA not done) |
| ███ ███ | 7/17/24 | Agreed (SRA not done) |
| ████ ███ | 6/19/24 | Agreed (SRA completed) |
| ████ ███ | 6/11/24 | Agreed (SRA completed) |
| ███ ████ | 6/18/24 | Agreed (SRA completed) |
| ████ ████ | 5/30/24 | Agreed (SRA completed) |

Cases reviewed for Requirement 22(b) part 3; suicide risk assessment after Ad Seg placement; cases not included in Wellpath audit samples

| Patient | Period | Finding |
|---|---|---|
| ████ ████ | 7/2/24 | ✓ |
| ████ ████ | 7/8/24 | ✓ |
| ████ ███ | 9/1/24 | X |
| ████ ████ | 6/3/24 | ✓ |
| ██ ███ | 7/1/24 | ✓ |
| ████ ███ | 7/15/24 | ✓ |
| ████ ███ | 7/8/24 | X SRA completed 20 days after placement |
| ███ ███ | 5/29/24 | ✓ |
| ██ ███ | 5/31/24 | X SRA completed 18 days after placement |
| ████ ███ | 8/29 – 10/18/24 | X |
| █████ ███ | 9/5 – 10/18/24 | X |
| ████ ████ | 4/1/24 – 5/12/24 | X SRA completed 42 days after placement |
| ████ ████ | 8/8/24 – 11/30/24 | X |

Cases reviewed for Requirement 22(f): Custody checks

| Patient | Period | Finding |
|---|---|---|
| ██ ███ | 9/1/24 | ✓ |
| ████ ███ | 9/2/24 | ✓ |
| ████ ███ | 9/9/24 | ✓ |
| ████ ███ | 9/3/24 | ✓ |
| ████ ███ | 10/3/24 | ✓ |
| ████ ███ | 8/30/24 | ✓ |
| ████ ████ | 8/30/24 | ✓ |
| ████ ███ | 8/30/24 | ✓ |
| ███ ███ | 7/5/24 | ✓ |
| █████ ████ | 7/30/24 | ✓ |

Cases reviewed for Requirement 22(f); RN checks on suicide watch every six hours; cases from Wellpath audit samples

| Patient | Period | Finding |
|---|---|---|
| ███ ███ | 9/20/24 – 9/22/24 | X  Missed two additional checks |
| ███ ███ | 9/29/24 – 9/30/24 | Agreed with audit |
| ███ ███ | 9/16/24 – 9/18/24 | Agreed |
| ███ ███ | 9/6/24 – 9/8/24 | Agreed |
| ███ ███ | 8/9/24 – 8/10/24 | Agreed |
| ███ ███ | 8/28/24 – 8/30/24 | Agreed |
| ███ ███ | 8/1/24 – 8/3/24 | Agreed |
| ███ ███ | 7/13/24 – 7/15/24 | X missed one additional check |
| ███ ███ | 7/29/24 – 8/5/24 | ✓ |
| ███ ███ | 6/2/24 – 6/5/24 | ✓ |
| ███ ███ | 6/18/24 – 6/21/24 | ✓ |
| ███ ███ | 5/9/24 – 5/11/24 | ✓ |

Cases reviewed for Requirement 22(f); RN checks on suicide watch every six hours; cases not from Wellpath audit samples

| Patient | Period | Finding |
|---|---|---|
| ███ ███ | 9/17/24 | 100% (1/1) |
| ███ ███ | 9/2/24 | 100% (5/5) |
| ███ ███ | 9/8/24 | 100% (3/3) |
| ███ ███ | 9/10/24 | 100% (4/4) |
| ███ ███ | 8/23/24 | 50% (2/4) |
| ███ ███ | 8/24/24 | 100% (1/1) |
| ███ ███ | 8/11/24 – 8/12/24 | 75% (3/4) |
| ███ ███ | 8/12/24 – 8/13/24 | 100% (5/5) |
| ███ ███ | 8/27/24 | 100% (3/3) |
| ███ ███ | 7/8/24 – 7/10/24 | 57% (4/7) |
| ███ ███ | 7/1/24 – 7/4/24 | 60% (6/10) |
| ███ ███ | 7/25/24 | 100% (5/5) |
| ███ ███ | 10/19 – 10/20/24 | 100% (8/8) |
| ███ ███ | 10/16 – 11/17/24 | 67% (4/6) |
| ███ ███ | 10/21 – 10/22/24 | 60% (3/5) |

Cases reviewed for Requirement 22(f); Mental health checks on suicide watch daily; cases from Wellpath audit samples

| Patient | Period | Finding |
|---|---|---|
| ███ ███ | 9/20/24 – 9/22/24 | ✓  agreed with audit |
| ███ ███ | 9/29/24 – 9/30/24 | ✓  agreed |
| ███ ███ | 9/16/24 – 9/18/24 | ✓  agreed |
| ███ ███ | 9/6/24 – 9/8/24 | ✓  agreed |
| ███ ███ | 8/9/24 – 8/10/24 | ✓  agreed |
| ███ ███ | 8/28/24 – 8/30/24 | ✓  agreed |
| ███ ███ | 8/1/24 – 8/3/24 | ✓  agreed |

| ███████ | 7/13/24 – 7/15/24 | ✓ agreed |
| ███████ | 7/29/24 – 8/5/24 | ✓ agreed |
| ███████ | 6/2/24 – 6/5/24 | ✓ agreed |
| ███████ | 6/18/24 – 6/21/24 | ✓ agreed |
| ███████ | 5/9/24 – 5/11/24 | ✓ agreed |

Cases for Requirement 22(f); Mental health checks on suicide watch daily; cases not from Wellpath audit samples

| Patient | Period | Finding |
| --- | --- | --- |
| ███████ | 9/17/24 | ✓ |
| ███████ | 9/2/24 | ✓ |
| ███████ | 9/8/24 | ✓ |
| ███████ | 9/10/24 | ✓ |
| ███████ | 8/23/24 | ✓ |
| ███████ | 8/24/24 | ✓ |
| ███████ | 8/11/24 – 8/12/24 | ✓ |
| ███████ | 8/12/24 – 8/13/24 | ✓ |
| ███████ | 8/27/24 | ✓ |
| ███████ | 7/8/24 – 7/10/24 | ✓ |
| ███████ | 7/1/24 – 7/4/24 | ✓ |
| ███████ | 7/25/24 | ✓ |

Cases reviewed for Requirement 24(a); Telepsychiatry informed consent; cases from Wellpath audit samples

| Patient | Period | Finding |
| --- | --- | --- |
| ███████ | 9/4/24 | Agreed with audit |
| ███████ | 9/24/24 | Agreed |
| ███████ | 9/4/24 | Agreed |
| ███████ | 9/23/24 | Agreed |
| ███████ | 9/10/24 | Agreed |
| ███████ | 8/14/24 | Agreed |
| ███████ | 8/26/24 | Agreed |
| ███████ | 8/27/24 | Agreed |
| ███████ | 7/10/24 | Agreed |
| ███████ | 7/2/24 | Agreed |
| ███████ | 6/27/24 | Agreed |
| ███████ | 6/20/24 | Agreed |
| ███████ | 11/4/24 | Agreed |
| ███████ | 10/15/24 | Agreed |
| ███████ | 11/7/24 | Agreed |
| ███████ | 11/5/24 | Agreed |
| ███████ | 11/11/24 | Agreed |
| ███████ | 10/17/24 | Agreed |

Cases reviewed for Requirement 24(a); Telepsychiatry informed consent; cases not from Wellpath audit samples

| Patient | Period | Consent | Med ed | Safety | 24 hr f/u |
| --- | --- | --- | --- | --- | --- |

| | | | | | |
|---|---|---|---|---|---|
| ███ | 9/3/24 | X | ✓ | n/a | X |
| ███ | 8/21/24 | X | ✓ | n/a | n/a |
| ███ | 9/4/24 | X | n/a | n/a | X |
| ███ | 9/3/24 | X | ✓ | n/a | n/a |
| ███ | 8/26/24 | X | X | n/a | n/a |
| ███ | 8/14/24 | X | ✓ | n/a | n/a |
| ███ | 8/29/24 | ✓  verbal | ✓ | n/a | X |
| ███ | 8/29/24 | X | ✓ | n/a | X |
| ███ | 8/8/24 | ✓  verbal | X | n/a | X |
| ███ | 7/4/24 | ✓  verbal | ✓ | n/a | X |
| ███ | 7/4/24 | ✓  verbal | ✓ | n/a | n/a |
| ███ | 7/9/24 | ✓  verbal | ✓ | n/a | X |
| ███ | 10/24/24 | ✓  verbal | ✓ | n/a | n/a |
| ███ | 11/21/24 | ✓  verbal | ✓ | n/a | n/a |
| ███ | 11/12/24 | ✓  verbal | ✓ | n/a | n/a |
| ███ | 10/21/24 | ✓ verbal | ✓ | n/a | n/a |
| ███ | 10/24/24 | X | ✓ | n/a | n/a |
| ███ | 10/14/24 | ✓ | ✓ | n/a | X |

17