# Exhibit A

**Winthrop Dental Consulting, LLC**
Viviane G. Winthrop, DDS, CEO
Dental Neutral Court Monitor



## Dental Audit Tour

## Monterey County Jail (MCJ) and Wellpath
**On Site Audit Review: March 26-27, 2025**

**Final Dental Report #13**

---

**See the Attachments below which are an Integral part of this Final Report #13:**

1. Dental Audit Tool Excel Spreadsheet containing the following:
   a. Dental Audit Tool Results
   b. Summary
   c. Dental Schedule
   d. Statistics
   e. Database
   f. Findings - Sources, Monitor Findings, Recommendations and Methodology
2. Dental Corrective Action Plan (CAP)
3. Dental Class Case Reviews (CCR)
4. Court-Designated Dental Monitoring Provisions – within the Final Dental Report #13

---

Jesse Hernandez et al

v.

County of Monterey,
Monterey County Sheriff's Office,
California Forensic Medical Group, Incorporated.
(Now Wellpath)



Case No. 5:13-cv-02354-PSG

Table of Contents

**Introduction** ..................................................................................................................... 6

    **Objective and Purpose for Dental Tour #13 – March 26-27, 2025** ................................ 6

    **Site Overview** ..................................................................................................................... 7

    **In Attendance for Dental Tour #13** .................................................................................... 7

    **Previous Reports and Current and Past Attachments** ...................................................... 8

    **Chart and Statistics Span of Review** ................................................................................. 8

    **Enhanced Monitoring Sessions for Dental Audit Tour #13** ............................................. 9

    **Next Planned Upcoming Dental Audit Tour #14** .............................................................. 9

    **Enhanced Monitoring Sessions - To Address the Transition to the New Health Care Vendor** 9

**Executive Summary** ......................................................................................................... 10

    **Summary Results - Dental Audit Tour #13** ..................................................................... 10

    **Category Results – Dental Audit Tool Summary** ............................................................ 11

    **Understanding and Navigating the Attached Dental Audit Tool** ................................... 12

    **Action Items for Dr. ▮▮▮▮ to Complete by September 19ᵗʰ, 2025** ........................... 13

    **Monthly Production Reports – Requested and Still Not Receiving** ................................ 13

    **The Dental Standard of Care** .......................................................................................... 14

    **Highlights From the Dental Audit Tour #13** ................................................................... 15

        **Departures from the Dental Standard of Care** ......................................................... 15

        **Documentation, Process, and Compliance Deficiencies** .......................................... 17

        **Uploaded Video and Education for Activities of Daily Living (ADLs)** ....................... 18

        **System Improvements and Positive Developments** ................................................. 19

    **Dentist Productivity** ........................................................................................................ 19

    **Statistical Review of MCJ's Dental Clinical Program** ...................................................... 20

    **CorEMR Data Inconsistencies** ........................................................................................ 25

    **Why Use Statistics - "If you can't measure it, you can't improve it."** ........................... 26

    **Reschedules – Dental CAP #50 and #51 – Immediate Attention Required** ................... 27

    **Dental Priority Code (DPC) Compliance** ......................................................................... 28

    **Global P & Ps, LOPs, Informed Consents and Informed Refusals** ................................. 29

    **Continuous Quality Improvement (CQI)** ........................................................................ 29

    **CorEMR vs an Electronic Dental Records System (EDRS)** .............................................. 31

    **Nurse Training – Targeted Training Recommendations** ................................................ 32

    **Looking Ahead** ............................................................................................................... 33

**Methodology for the Chart Audits within the Dental Audit Tool**............................................34

    **Priority Dental Level (DL) / Priority DL1 and DL2**..................................................34

    **Dental Priority Code (DPC) / Priority 1 through 5**................................................34

    **Scoring Criteria**....................................................................................................34

    **Systems and Chart Audit Questions**....................................................................35

    **Methodology for Chart Pulls for the Chart Audit Reviews**..................................35

    **Wellpath Randomized Samples**...........................................................................36

    **Statistical Methodology**......................................................................................37

    **Dental Class Case Reviews Methodology**............................................................37

**The Deficiencies & Recommendations are in the Dental Audit Tool**...........................38

**Access to Dental Care: Sections A.1 through A.20**.................................................39

    **A.1**    **Certified Language Interpreter/Translator Services – 26.0% - NC**...................39

    **A.2**    **Oral Hygiene Supplies – 83.3% - PC**............................................................41

    **A.3**    **Oral Hygiene Instruction/Education – 75.0% - PC**........................................42

    **A.4**    **Inmate Handbook – 92.9% - SC**...................................................................44

    **A.5**    **Intake Form – 78.0% - PC**............................................................................46

    **A.6**    **Intake - Urgent/Emergent Dental Level 1 – 77.9% - PC**...............................49

    **A.7**    **Intake - Routine Dental Level 2 – 63.5% - NC**.............................................50

    **A.8**    **14-Day Exam / Health Appraisal Form – 41.7% - NC**....................................52

    **A.9**    **Health Assessment / 14-Day Exam - Urgent/Emergent Dental Level 1 – 38.9% - NC**.........54

    **A.10**    **Health Assessment / 14-Day Exam - Routine Dental Level 2 – 53.7% - NC**.....................55

    **A.11**    **Dental Sick Call Requests – 15.6% - NC**........................................................56

    **A.12**    **Dental Sick Call - Urgent/Emergent DL1 – 81.1% - PC**..................................58

    **A.13**    **Dental Sick Call - Routine DL2 – 52.7% - NC**................................................59

    **A.14**    **Physician on Call (POC) – 50.0% - NC**...........................................................60

    **A.15**    **Referred to Outside Specialist/Specialty Care – 89.7% - SC**.........................61

    **A.16**    **Chronic Care – 77.8% - PC**............................................................................63

    **A.17**    **Comprehensive Dental Examination – 35.4% - NC**......................................65

    **A.18**    **Periodontal Disease Program – 25.0% - NC**..................................................66

    **A.19**    **Refusals and Refusal Form – 70.8% - NC**.....................................................67

    **A.20**    **Grievances – 45.8% - NC**..............................................................................69

**Timeliness of Dental Care: Sections B.1 through B.9**.............................................70

    **B.1**    **Dental Level Priority 1 - Urgent/Emergent – 58.3% - NC**.............................70

**B.1A**  **Dental Level Priority 2 – Routine – 51.4% - NC** ................................................. 71

**B.2**  **Dental Priority Code (DPC) - Priority 1 thru 5 – 55.6% - NC** ............................ 71

**B.3**  **Chronic Care – 64.3% - NC** ................................................................................. 73

**B.4**  **Comprehensive Dental Care – 70.8% - NC** ........................................................ 74

**B.5**  **Periodontal Disease Program – Deferred Findings - DF** .................................... 76

**B.6**  **Refusals – 87.5% - SC** .......................................................................................... 78

**B.7**  **Reschedules – 52.9% - NC** ................................................................................... 79

**B.8**  **Cancelled by Staff – 73.1% - NC** ......................................................................... 79

**B.9**  **Custody – 100% - SC** ............................................................................................ 80

**Quality of Dental Care: Sections C.1 through C.13** ................................................. 81

   **Radiograph Interpretation** .................................................................................. 81

**C.1**  **Dental Triage from a Dental Sick Call Request – 75.3% - PC** ............................. 83

**C.2**  **Comprehensive Dental Care - Examination & Treatment Plan – 60.7% - NC** ..... 86

**C.3**  **Chronic Care – HIV – NA & DF** ............................................................................. 90

**C.4**  **Chronic Care – Seizures – NA & DF** ..................................................................... 90

**C.5**  **Chronic Care – Diabetes – NA & DF** .................................................................... 90

**C.6**  **Chronic Care – Pregnancy – NA & DF** ................................................................. 91

**C.7**  **Chronic Care – SMI – NA & DF** ............................................................................ 91

**C.8**  **Periodontal Treatment - DF** ............................................................................... 92

**C.9**  **Restorative and Palliative Care - 88.7% - SC** ...................................................... 92

**C.10**  **Extractions / Oral Surgery – 80.2% - PC** ............................................................ 94

**C.11**  **Endodontics (Root Canal Treatment) – 50.0% - NC** .......................................... 95

**C.12**  **Prosthodontics (Dentures) – 28.6% - NC** ........................................................... 96

**C.13**  **Progress Notes (SOAPE) – 50.0% - NC** ............................................................... 97

**Infection Control and Regulatory Compliance: Sections D.1 through D.85 – 94.4% - SC** ...... 98

   **Spore Test** ............................................................................................................ 98

   **Turnaround Time for Spore Test Results** ............................................................ 99

   **Radiation Monitoring Via Dosimetry Reports** .................................................... 99

   **CDA Recommendations After One Year of Dosimetry Monitoring** ..................... 99

**Dental Management and Self-Governance: Sections E.1 through E.17** .............................. 107

**E.1**  **Chief Dental Officer, Corporate and Local Management – 83.3.% - PC** ............. 107

**E.2**  **Dashboard & Documented Qualitative Self Review Process – 50.0% - NC** ........ 109

**E.3**  **Electronic Dental Record System (EDRS) – 50.0% - NC** ..................................... 111

E.4       Digital X-Rays – 83.3% - PC ............................................................................ 113

E.5       Panoramic X-Ray Unit – 83.3% - PC .............................................................. 115

E.6       Equipment and Supplies – 100.0% - SC ......................................................... 117

E.7       Nurse Training by DON, HSA and Dentist – 50.0% - NC ................................. 118

E.8       Staffing and Staffing Analysis – Clinical and Administrative – 50.0% - NC ......... 122

E.9       Illness and Injury Prevention Plan (IIPP) – 87.5% - SC .................................... 125

E.10      Policies and Procedures, Including Dental, Corporate and Local – 50.0% - NC ......... 127

E.11      Licenses, Credentialing, CURES & Job Performance – 100.0% - SC ................. 130

E.12      OSHA Review and Infection Control Training – 100.0% - SC .......................... 131

E.13      Hepatitis B Vaccination Record – 50.0% - NC ............................................... 131

E.14      Pharmacy & Medication Management – 87.5% - SC ....................................... 131

E.15      Peer Review and Monthly Supervisory Audit Reports – 50.0% - NC ................. 133

E.16      Monthly Dental Subcommittee Meeting – 50.0% - NC .................................... 134

E.17      Quality Assurance (QA) – 50.0% - NC ........................................................... 138

Dental Class Case Reviews (CCR): 13 Class Members Reviewed – 43.7% - NC .................. 139

Court-Designated Dental Monitoring Provisions ......................................................... 145

Priorities and Phasing for Self-Governance ............................................................... 169

Phase 1: Stabilize Core Compliance (Immediate – Next 3–6 Months) ........................ 169

Phase 2: Strengthen Quality of Care (6–12 Months) ............................................... 170

Phase 3: Sustain Through Self-Governance (12–18+ Months) ................................... 170

Post-Implementation Monitoring, Self-Monitoring and Self-Governance ....................... 171

Risk Elimination / Corrective Action Plan (CAP) ........................................................ 172

Closing Statement .................................................................................................. 174

Appendix I – Response to Defendants correspondence re Dental March 2025 MCJ site visit 176

# Introduction

## Objective and Purpose for Dental Tour #13 – March 26-27, 2025

**Objective:** To evaluate the dental team's capacity for self-governance, including their ability to independently uphold clinical standards, ethical practices, and operational excellence through implemented systems using policies, procedures, protocols, resources and practices for tracking and sustaining compliance.

*Non-systemic deviations from the requirements of the Settlement Agreement and the Implementation Plans shall not prevent a finding of substantial compliance, provided that the Defendants demonstrate that they have **(a)** implemented a system for tracking compliance, where appropriate and practical, and for taking corrective measures in response to instances of non-compliance, and **(b)** that Defendants have instituted policies, procedures, practices, and resources that are capable of durable and sustained compliance.* (Settlement Agreement ¶ 10)

**Purpose:** To identify strengths and areas for improvement in the team's self-regulatory practices, ensuring patient safety, quality outcomes, and compliance are maintained through accountable, evidence-based decision-making without reliance on external oversight.

**Self-governance in dentistry** refers to a dental practice, or professional's ability to regulate its own clinical, ethical, and operational standards without external enforcement. It emphasizes accountability, continuous improvement, and adherence to professional guidelines, ensuring that patient care, safety, and ethical conduct are consistently maintained.

**Key elements of achieving self-governance:**

1. **Clinical Competence:** Maintain up-to-date knowledge of dental science, techniques, and evidence-based best practices. Regular continuing education is essential.
2. **Ethical Practice:** Adhere strictly to professional codes of ethics, placing patient welfare above all.
3. **Quality Assurance:** Implement internal audits, peer reviews, and performance monitoring to identify gaps and improve care delivery.
4. **Regulatory Compliance:** Proactively comply with laws, licensing requirements, and infection control standards rather than waiting for inspections.
5. **Decision-Making Autonomy:** Empower dentists and staff to make informed, independent clinical decisions guided by best practices.
6. **Continuous Improvement:** Foster a culture of learning, feedback, and innovation to advance patient care and operational efficiency.

In essence self-governance is achieved when a dental team consistently holds itself accountable to the highest standards of care, ethics, and management—minimizing reliance on external oversight while maximizing patient safety and quality outcomes.

*Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit findings will be reported to the Quality Management Committee at its quarterly meetings.* (Wellpath IP, Exhibit A, p. 8)

## Site Overview

This audit was conducted in person at MCJ. The audit was performed with "read only access" to CorEMR. The assessment for quality of dental care is made primarily through:

1. Chart reviews, tasks and reports from CorEMR, Wellpath and MCJ and data provided by the Dental Operations Specialist.
2. Access to the software where incarcerated persons request dental care services and grievances was denied this Monitor; however, the files from Smart Communication, formerly ViaPath and Intelmate) were provided for review.
3. Access to ERMA, the system for outside referrals was denied this Monitor; however, information was provided by Wellpath for review.
4. Clinical and management data was provided by the Dental Operations Specialist, Implementation Specialist and the Chief Dental Officer (CDO).
5. Custody participated fully in the dental audit tour and provided data and statistics as requested.
6. The Clinical Dental Facility, located in the newer portion of the jail was reviewed and evaluated – See Section D for Infection Control and Regulatory Compliance.

No incarcerated persons were clinically examined by me or my colleague during any part of Dental Audit Tour #13. Three (3) incarcerated persons (I/Ps) were selected to answer questions about accessing dental care at Monterey County Jail. However, due to a miscommunication between the Dental Operations Specialist and myself regarding the time selected for the interviews, Dr. ███ Chief Dental Officer (CDO) and I were not able to conduct the interviews. This will be achieved during the next dental audit tour.

## In Attendance for Dental Tour #13

The onsite and corporate dental staff graciously, enthusiastically and professionally participated in the two day Dental Tour:

- Dr. ███ ███ and Registered Dental Assistant RDA ███ ███ on Wednesday March 26th.
- Dr. ███ ███ and RDA ███ ███ on Thursday March 27th.
- Dr. Don ███ Chief Dental Officer (CDO) for Wellpath.
- ███ ███ Dental Operations Specialist.
- Thank you to the countless others who also participated in the Dental Audit Tour.

The following attended the exit interview, either in person or by Zoom on March 27th, 2025:

**Wellpath:** Dr. ████████ Chief Dental Officer (CDO); ████████ Dental Operations Specialist; ████████ HSA Wellpath; ████████ Implementation Specialist; Hector Ruiz, Chief Deputy; Tinishia Branch, Director of Partner Risk Strategies; ████████ Vice President of Partner Risk Strategies.

**MCJ:** Captain Rebecca Smith, Monterey County Sheriff's Office Jail Operations Division; Chief Timothy Lanquist, Chief Deputy, Monterey County Sherriff's Office, Corrections Operations Bureau; Commander Rodriquez.

**Counsel for the Plaintiffs:** Caroline Jackson, Senior Counsel, RBGG; Maya Campbell, Associate Counsel, RBGG.

**Counsel for the Defendants:** Katherine TeBrock, Vice President Associate General Counsel Regulatory Compliance; Allison J. Becker, Managing Partner – North Carolina GRSM50; and Elizabeth B. McGowan, Associate Counsel GRSM50.

**Counsel for Defendant County of Monterey and Monterey County Sheriff's Office:** Ellen S. Lyons, Deputy County Counsel; Tucker Wisdom Stack, Deputy County Counsel, County of Monterey.

**Monitor:** Dr. Viviane G. Winthrop, Court Appointed Dental Neutral Monitor, accompanied by Dr. Harjeet Dhillon, assistant and monitor in training. Dr. Dhillon was a previous Chief at the Bureau of Prisons and is currently Dentist, CF and Acting Supervising Dentist with the California Correctional Health Care Services (CCHCS) of the California Department of Corrections and Rehabilitation (CDCR).

## Previous Reports and Current and Past Attachments

The attached three Excel documents: Dental Audit Tool, Dental Class Case Reviews and the Dental Corrective Action Plan (CAP) are a fundamental and central part of this dental audit tour #13 and are to be reviewed in conjunction with this Dental Audit Tour Final report.

**Please refer to this and all prior dental audit reports and attachments for any and all additional information.**

## Chart and Statistics Span of Review

- The scope of review and the charts audited span October 1st, 2024, through March 31st, 2025. The review of charts and systems of care continue to be evaluated consecutively and chronologically as seen in this and all previous reports.

- Two charts are randomly selected for each month of the audit period; therefore, twelve (12) charts are audited <u>for each clinical outcome measure category</u> as seen in the Dental Audit Tool Results. When provided for the specific Outcome Measures, the second (2nd) chart of each month is a Wellpath Randomized Sample chart.

- **Consequently, there are approximately 332 unique patient charts reviewed and audited this audit period.** See the Unique Chart Counts tab in the Dental Audit Tool.

- See the "Methodology for the Chart Audits within the Dental Audit Tool, section on "Systems and Chart Audit Questions" as well as "Chart Pulls for the Chart Audit Reviews" for how the charts are picked for each month, pages 32 through 35.

- The methodology outlined in each of the clinical outcome measure categories, is found within the Dental Audit Tool, in both the Dental Audit Tool Results tab Column V and Findings tab Column H.

- The parameters outlined in the Implementation Plan, Settlement Agreement, Federal, State, County and OSHA guidelines, as well as in the statewide dental standard of care, are used to review and evaluate both the systems and the individual patient's dental care in the overall assessment of the dental program and dental care provided at MCJ.

## Enhanced Monitoring Sessions for Dental Audit Tour #13

- Training, Mentoring, Shadowing, Guidance[1] occurred both *off-site* and *onsite* for this audit period.

- Off-site Enhanced Monitoring sessions for Dental Audit Tour #13 began by a Zoom meeting on February 17th, 2025, with the CDO, Dental Operations Specialist and Defendant's Counsel. Onsite Enhanced Monitoring occurred on March 24, 25, 28.

## Next Planned Upcoming Dental Audit Tour #14

- The on-site Dental Audit Tour #14 is planned for December 2-3, 2025. As in the previous tours, I am requesting at a minimum the presence of Dr. ▮▮▮▮ Chief Dental Officer (CDO) and ▮▮▮▮ ▮▮▮▮ Dental Operations Specialist. If possible, the H.S.A, DON and the Implementation Specialist's attendance will be beneficial.

- The charts and statistics to be reviewed for the Dental Audit Tour #14 will be for a six (6) month period, spanning April 1st, 2025, through September 30th, 2025.

- Two (2) charts for each month, therefore, 12 charts for **each** clinical outcome measure, will be selected as mentioned in the methodology section of the Executive Summary. Approximately 250 or more charts will be reviewed for this upcoming dental audit tour #14. When provided, for the specific Outcome Measures, the second (2nd) chart of each month will be a Wellpath Randomized Sample chart if sent by Wellpath.

## Enhanced Monitoring Sessions - To Address the Transition to the New Health Care Vendor

- In conjunction with the County of Monterey, December 15-19, 2025, is planned for Enhanced Monitoring to address the transition from Wellpath to the new health care vendor. As of right now, the County will provide more information regarding the timing of the contract award as we get closer to the December 2025 site visit.

---

[1] [Dkt 751] Joint Status Report and ORDER_ 6-3-2022_ 1187-8

## Executive Summary

MCJ's Dental Department was found to be in **Non-Compliance (NC) overall with a score of 67.1%.** Compliance is up from 66.7%, found during the last dental audit tour.

In the area of Infection Control and Regulatory Compliance, MCJ's Dental Clinic achieved Substantial Compliance (SC) with a score of **94.4%, up from 92.0%. Great job!**

Protecting patients and preventing the spread of infectious diseases are fundamental responsibilities of the dental team and management. Ensuring patient safety and minimizing the risk of infectious disease transmission are top priorities in the dental clinical environment.

*All dental services will be provided in a safe and sanitary environment. (Wellpath IP, p. 103)*

### Summary Results - Dental Audit Tour #13

| Category | Category Title | # Of Questions | % Compliance Report #11 | % Compliance Report #12 | % Compliance Report #13 | SC, PC, NC, N/A |
|---|---|---|---|---|---|---|
| A | Access to Care | 20 questions - 20 questions evaluated | 55.8% | 50.0% | **58.7%** | **NC** |
| B | Timeliness of Care | 10 questions - 8 questions evaluated | 47.4% | 67.4% | **61.6%** | **NC** |
| C | Quality of Care | 13 questions - 13 questions evaluated | 73.0% | 77.0% | **74.8%** | **PC** |
| D | Infection Control/ Regulatory Compliance | 85 questions - 81 questions evaluated | 93.8% | 92.0% | **94.4%** | **SC** |
| E | Dental Program Management / Self-Governance | 17 questions - 17 questions evaluated | 64.9% | 66.0% | **69.1%** | **NC** |
| F | Class Case Reviews | 13 class case reviews - 13 evaluated | 50.5% | 47.6% | **43.7%** | **NC** |
| | | **OVERALL TOTAL:** | 64.2% | 66.7% | **67.1%** | **NC** |

## Category Results – Dental Audit Tool Summary

| Class | Category | Name | Percent Compliance | Substantial Compliance (Y / N) |
|---|---|---|---|---|
| A | A.1 | Access to Care Audit Tool Data - Certified Language Interpreter/Translator Services | 26.0% | N |
| A | A.2 | Access to Care Audit Tool Data - Oral Hygiene Supplies | 83.3% | N |
| A | A.3 | Access to Care Audit Tool Data - Oral Hygiene Instruction/Education | 75.0% | N |
| A | A.4 | Access to Care Audit Tool Data - Inmate Handbook | 92.9% | Y |
| A | A.5 | Access to Care Audit Tool Data - Intake Form | 78.0% | N |
| A | A.6 | Access to Care Audit Tool Data - Intake - Urgent/Emergent Dental Level 1 | 77.9% | N |
| A | A.7 | Access to Care Audit Tool Data - Intake - Routine Dental Level 2 | 63.5% | N |
| A | A.8 | Access to Care Audit Tool Data - 14-Day Exam (Health Appraisal) Form | 41.7% | N |
| A | A.9 | Access to Care Audit Tool Data - 14-Day Exam - Urgent/Emergent Dental Level 1 | 38.9% | N |
| A | A.10 | Access to Care Audit Tool Data - 14-Day Exam - Routine Dental Level 2 | 53.7% | N |
| A | A.11 | Access to Care Audit Tool Data - Dental Sick Call Requests | 15.6% | N |
| A | A.12 | Access to Care Audit Tool Data - Dental Sick Call - Urgent/Emergent DL1 | 81.1% | N |
| A | A.13 | Access to Care Audit Tool Data - Dental Sick Call - Routine DL2 | 52.7% | N |
| A | A.14 | Access to Care Audit Tool Data - Physician on Call (POC) | 50.0% | N |
| A | A.15 | Access to Care Audit Tool Data - Referred to Outside Specialist/Specialty Care | 88.2% | Y |
| A | A.16 | Access to Care Audit Tool Data - Chronic Care | 77.8% | N |
| A | A.17 | Access to Care Audit Tool Data - Comprehensive Dental Examination | 35.4% | N |
| A | A.18 | Access to Care Audit Tool Data - Periodontal Disease Program | 25.0% | N |
| A | A.19 | Access to Care Audit Tool Data - Refusals and Refusal Form | 70.8% | N |
| A | A.20 | Access to Care Audit Tool Data - Grievances | 45.8% | N |
| B | B.1 | Timeliness of Care Audit Tool Data - Dental Level Priority 1 - Urgent/Emergent - Seen Within Timeframe? | 58.3% | N |
| B | B.1A | Timeliness of Care Audit Tool Data - Dental Level Priority 2 - Routine - Seen Within Timeframe? | 51.4% | N |
| B | B.2 | Timeliness of Care Audit Tool Data - Dental Priority Code (DPC) - Priority 1 thru 5 | 55.6% | N |
| B | B.3 | Timeliness of Care Audit Tool Data - Chronic Care | 64.3% | N |
| B | B.4 | Timeliness of Care Audit Tool Data - Comprehensive Dental Care | 70.8% | N |
| B | B.5 | Timeliness of Care Audit Tool Data - Periodontal Disease Program | DF | DF |
| B | B.6 | Timeliness of Care Audit Tool Data - Refusals | 87.5% | Y |
| B | B.7 | Timeliness of Care Audit Tool Data - Reschedules | 52.9% | N |
| B | B.8 | Timeliness of Care Audit Tool Data - Cancelled by Staff | 73.1% | N |
| B | B.9 | Timeliness of Care Audit Tool Data - Custody | 100.0% | Y |
| C | C.1 | Quality of Care Audit Tool Data - Dental Triage | 75.3% | N |
| C | C.2 | Quality of Care Audit Tool Data - Comprehensive Dental Care | 60.7% | N |
| C | C.3 | Quality of Care Audit Tool Data - Chronic Care - HIV | NA,DF | NA,DF |
| C | C.4 | Quality of Care Audit Tool Data - Chronic Care - Seizures | NA | NA |
| C | C.5 | Quality of Care Audit Tool Data - Chronic Care - Diabetes | NA,DF | NA,DF |
| C | C.6 | Quality of Care Audit Tool Data - Chronic Care - Pregnancy | NA,DF | NA,DF |
| C | C.7 | Quality of Care Audit Tool Data - Chronic Care - SMI | NA,DF | NA,DF |
| C | C.8 | Quality of Care Audit Tool Data - Periodontal Treatment | DF | DF |
| C | C.9 | Quality of Care Audit Tool Data - Restorative and Palliative Care | 88.7% | Y |
| C | C.10 | Quality of Care Audit Tool Data - Extractions / Oral Surgery | 80.2% | N |
| C | C.11 | Quality of Care Audit Tool Data - Endodontics (Root Canal Treatment) | 50.0% | N |
| C | C.12 | Quality of Care Audit Tool Data - Prosthodontics | 28.6% | N |
| C | C.13 | Quality of Care Audit Tool Data - Progress Notes | 50.0% | N |
| D | D.1 | Clinic 1: Infection Control / Regulatory Compliance Audit Tool Data - Summary Table of Compliance - Facility | 94.4% | Y |
| E | E.1 | Dental Program Management Audit Tool Data - Chief Dental Officer, Corporate and Local Management | 83.3% | N |
| E | E.2 | Dental Program Management Audit Tool - Dashboard & Documented Qualitative Self Review Process | 50.0% | N |
| E | E.3 | Dental Program Management Audit Tool - Electronic Dental Record System (EDRS) | 50.0% | N |
| E | E.4 | Dental Program Management Audit Tool - Digital X-Rays | 83.3% | N |
| E | E.5 | Dental Program Management Audit Tool - Panoramic X-Ray Unit | 83.3% | N |
| E | E.6 | Dental Program Management Audit Tool - Equipment and Supplies | 100.0% | Y |
| E | E.7 | Dental Program Management Audit Tool - Nurse Training by DON, HSA and Dentist | 50.0% | N |
| E | E.8 | Dental Program Management Audit Tool - Staffing and Staffing Analysis – Clinical and Administrative | 50.0% | N |
| E | E.9 | Dental Program Management Audit Tool - Staffing – Illness and Injury Prevention Plan (IIPP) | 87.5% | Y |
| E | E.10 | Dental Program Management Audit Tool - Policies and Procedures, Including Dental, Corporate and Local | 50.0% | N |
| E | E.11 | Dental Program Management Audit Tool - Licenses, Credentialing, CURES & Job Performance | 100.0% | Y |
| E | E.12 | Dental Program Management Audit Tool - OSHA Review and Infection Control Training | 100.0% | Y |
| E | E.13 | Dental Program Management Audit Tool - Hepatitis B Vaccination Record | 50.0% | N |
| E | E.14 | Dental Program Management Audit Tool - Pharmacy & Medication Management | 87.5% | Y |
| E | E.15 | Dental Program Management Audit Tool - Peer Review | 50.0% | N |
| E | E.16 | Dental Program Management Audit Tool - Monthly Dental Subcommittee | 50.0% | N |
| E | E.17 | Dental Program Management Audit Tool - Quality Assurance (QA) | 50.0% | N |

## Understanding and Navigating the Attached Dental Audit Tool

The **Dental Audit Tool** spreadsheet is an intrinsic component of this Final Report #13 which includes a review of the systems implemented at MCJ, an evaluation of the dental clinical facility as well as individual chart audit reviews.  Within the Dental Audit Tool are several tabs to address various sections of review.

The <u>Dental Audit Tool Results</u> tab is divided into six (6) sections, with outcome measure categories within each of the six sections below:
- Section A – Access to Care
- Section B – Timeliness of Care
- Section C – Quality of Care
- Section D – Infection Control and Regulatory Compliance
- Section E – Dental Management and Self-Governance
- Section F – Class Case Reviews – in a separate Excel spreadsheet attachment

The <u>Dental Audit Tool Results</u> tab includes the **Source, Monitor Findings, Monitor Recommendations and Methodology**, attached to each section's outcome measure, so the results can be reviewed as a whole. If you want to view these areas in greater detail, look in the <u>Database</u> and <u>Findings</u> tab from which to print or copy.

The <u>Summary</u> tab of the attached Dental Audit Tool, as seen in the Summary Results on page 10 and the Category Results on page 11, is a summary of all the data from the audited outcome measures.

The <u>Dental Schedule</u> tab displays daily patient activity for each Dentists, including Dental Sick Calls that were inadvertently completed by nursing. Scroll to the right to find the overall statistics of the dental schedule report.

The <u>Statistics</u> tab are statistics pulled from CorEMR's software. This is a non-graded section which highlights MCJ's Dental Program as a whole. Statistics help to understand trends in care.

The <u>Database</u> tab is the audited data, disseminated into the <u>Dental Audit Tool Results</u> tab, which also identifies the **system** and individual **chart audit** questions.

The <u>Findings</u> tab coalesces the individual deficiencies and findings found during the audit tour. The Findings themselves are also found in the <u>Dental Audit Tool Results</u> tab in the **Monitor Findings and Monitor Recommendations, Columns U & T respectively.**

The <u>Unique Chart Count</u> tab shows which of the 13 Class Case Review's booking numbers are seen in the Dental Audit Tool. Since the charts are picked at random, these are the number of times and the specific rows the Class Case Review patients are seen in the Dental Audit Tool.

For additional information, on understanding and navigating the attached Dental Audit Tool, please also review Appendix I found in the previous Final Report #12.

### Action Items for Dr. ███ to Complete by September 19th, 2025

Please carefully review each entry in the Database tab of the Dental Audit Tool, highlighted in Red and Pink. Provide a written response to the clinical situations in the Dental Audit Tool's MCJ/Wellpath Updates section. UPDATE: for this audit tour #13, no comments were made by the CDO in the Red and Pink areas highlighted in the Dental Audit Tool's Database tab.

Ongoing deficiencies in certain areas of care at MCJ were found to negatively impact patients, including instances that did not meet the accepted dental standard of care nor the mandates of the Implementation Plan and Settlement Agreement.

The number of patient Harm and Potential Harm to the patient is included in each outcome measure of the Dental Audit Tool Results tab. The individual results of the audit are seen in the Database tab.

There are departures from the dental standard of care which are concerning. Please also review the Class Case Reviews. Ongoing development and consistent implementation of documented training, incorporating policies, procedures, protocols, processes, flowcharts, and case-based examples, are required to correct these and related deficiencies. See also the Training section in the Executive Summary.

I am requesting that supervisory monthly chart audits, along with the resulting trainings outlined in the Dental CAP #102, be reinstated and submitted to me on a monthly basis. Should documented training fail to correct recurring practices that fall below the standard of care, progressive discipline must be considered and implemented.

### Monthly Production Reports – Requested and Still Not Receiving

Please have the Dental Operations Specialist provide the **Monthly Dental Production Reports** starting on September 1st, 2025. **UPDATE:** no monthly dental production reports as outlined below have been sent since September 1st, 2025.

Receiving monthly production reports is vital to reviewing charts and data timely. Receiving the monthly production reports in a timely manner will also significantly decrease the accumulation of data all at once needed prior to a dental audit tour.

I also request to be included in the existing monthly distribution list received by the Plaintiffs in conjunction with the requested dental monthly production reports. These requests have been made in multiple previous reports.

**Dental Production Reports, due by the 15th of each <u>month</u>:**

1. Dental Subcommittee: Monthly Agenda, Minutes, Statistics, CQIs, Sign in sheets and PowerPoints. See the areas of improvement for the Dental Subcommittee in Section E.16 of this report on page 133.
2. QA Meeting: Agenda, Minutes, Statistics , Sign in sheets and PowerPoints
3. Offsite Referrals:
    a) ERMA Care Management Report Dental Specific
    b) Referrals and Return to the Facility from an outside specialist report
4. ER Send Outs report, dental specific and Physician on Call logs for all Dental related after hours calls, including those patients sent to a higher level of care.
5. Dental Sick Call requests Excel file from Smart Communications.
6. Grievances Excel file from Smart Communications.
7. Infection Control and Regulatory Compliance logs, including the Housekeeping logs, Spore Test logs, etc.
8. All new and updated P & Ps and LOPs with their scheduled review.
9. Training logs for Nursing and Physicians for Dental related trainings, as well as all training logs for Dentists and Dental Assistants.
10. The Dental Schedule and Hours Worked for all onsite permanent dental staff, including PRN and other temporary dentist and dental assistant contract or temporary employees.
11. Custody statistics for the total number of bookings for men and women per month; the average length of stay and the number of patients at MCJ at the beginning of each month. Please include those number of incarcerated persons booked with over one year of incarceration. If possible, include the number of bookings still at MCJ on the 14th day of their incarceration per month.
12. Custody Staffing log for Dental Officers and any Interruption of Service forms.
13. Monthly Dental Compliance reports for:
    a) Referrals from Nursing - Intake, 14-Day Health Appraisal, Dental Sick Calls
    b) Referrals from Physicians, after hours POC as well as referrals from Chronic Care to Dental
    c) Timeliness of care report for Dental Priority Code System (DPC) compliance
    d) Backlog.

## The Dental Standard of Care

"Clinicians need to understand the concept of the standard of care. The standard of care is the benchmark that determines whether professional obligations to patients have been met. Failure to meet the standard of care is negligence, which can carry significant consequences for clinicians."[2]

---

[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8667701/

The dental standard of care is statewide and not regional by county[3]. The Dental Practice Act[4], published by the Dental Board of California[5], is statewide, supported on page 508 of the Judicial Council of California Civil Jury Instructions[6], which only references statewide cases. Therefore, MCJ's dental standard of care is statewide and not localized by county.[7]

*Health services shall be provided by licensed health care professionals in accordance with community standards and professional ethical codes for confidential and appropriate practices. (Wellpath IP, Exhibit A, p. 20)*

## Highlights From the Dental Audit Tour #13

**The findings of this audit highlight the dual reality at MCJ: on one hand, real and commendable progress in staffing, systems development, and transparency;** on the other, ongoing and serious gaps in care, documentation, and compliance that continue to create barriers to timely access and quality of dental care.

**\*\*\*This report focuses on the continuing deficiencies identified through this dental audit tour but please realize it does not and is not intended to minimize the efforts the dental team puts into the care of their dental patients, day in and day out** while working with only one dental operatory, an electronic medical record not geared for dental clinical care and with only one dental assistant per dentist. Please know that you are gratefully appreciated!

## Departures from the Dental Standard of Care

Please review the Dental Audit Tool Database tab for individual charts where harm and potential harm to the patient occurred. Review the Deficiencies and Recommendations section of this report. These represent direct patient safety risks and require immediate remediation:

- **Failure to provide prescribed post-surgical medications**, leaving patients in unmanaged pain. This is harm to the patient and a departure from the dental standard of care. See the Extractions section at section C.10 and the Class Case Reviews deficiencies and findings.

- **The lack of a premedication alert** for a patient recommended by the cardiologist to be premedicated for the presence of a prosthetic heart valve. **The failure of the patient to receive prophylactic antibiotics** prior to periodontal probings being performed, is harm to the patient , is a departure from the dental standard of care and can cause bacterial endocarditis. See section A.18.2M.

---

[3] *https://www.professionals-law.com/attorneys/ Mr. Curley is on faculty at the University of the Pacific, Arthur A. Dugoni School of Dentistry and UCSF and has contributed to dental textbooks."*
[4] https://www.dbc.ca.gov/about_us/lawsregs/index.shtml
[5] https://www.dbc.ca.gov/
[6] https://www.courts.ca.gov/partners/317.htm
[7] https://www.courts.ca.gov/partners/documents/Judicial_Council_of_California_Civil_Jury_Instructions.pdf.

- Incidental finding that history of endocarditis is also not included in the problem list but was found while looking for the task for a reschedule.

- **Unscheduled treatment plans, where the task was never scheduled, and the patient was never seen for a diagnosed treatment plan.** Since CorEMR is unable to locate unscheduled treatment, **this patient was abandoned and his dental care lost in the system.** This is harm to the patient and a departure from the Implementation Plan and dental standard of care.

- **Failure to state a patient's rescheduled appointment and a reason for the reschedule.** Without the reschedule, there is no audit trail. CorEMR does not have a stop gap measure to make the clinician reschedule an appointment when the due date has passed. It was discovered that patients who should have been seen within timeframe, "timed out" and were released from the facility without receiving their mandated dental care.

- Missing or incomplete RBACs in the general informed consent for medications including analgesics, antibiotics, medicated mouth rinses, and so forth.

- **Failure to transfer radiographs from the digital x-ray system into CorEMR.** X-rays were stated as being taken in the progress notes but not scanned into CorEMR. Subsequent Dental Treatment was completed without the x-rays scanned and reviewed into CorEMR. This is a departure from the dental standard of care and can possibly cause harm to the patient.

- Performing an irreversible procedure without consent.

- **Repeated lack of identification and diagnoses of radiographic pathology** as mandated in the California Dental Practice Act and in the Dental CAP #46. This is harm to the patient and a departure from the dental standard of care.

- **Lack of staffing perhaps where the Implementation Plan stating the Dental Sick Call requests will be seen by the RN within one day of the request.** There were rarely any completed Nurse Sick Calls for each dental sick call requests, nor were the requests filled out in Smart Communication scanned into the individual patient's chart in CorEMR to establish and audit trail. And there were times when the identification of the Priority Dental Level was not accurately identified.

*All dental complaints are assessed, provided treatment for obvious infection and pain relief at regularly scheduled medical sick call by the MD, PA or RN to be seen within one day of the request. The complaint is prioritized and referred to Dental Sick call as deemed necessary. Interim treatment for pain and infection is provided until the patient is seen by the dentist. (Wellpath IP, page 101).*

- **Failure to refer** patients from the 14-Day Exam. This is harm to the patient, a delay in care if the patient does not fill out a dental sick call request when not referred and a significant departure from the Implementation Plan.

*Perform an initial health screening on each inmate at the time of the health inventory <u>and communicable disease screening</u>, the general condition of the patient's dentition, missing or broken teeth, evidence of gingival disease, mucosal lesions, trauma, infection, facial swelling, exudate production, difficulty swallowing, chewing and/or other functional impairment will be noted; urgent/emergent dental needs identified. All screening findings will be documented on the health inventory form including the odontogram. Follow up referral and/or consultation with on-site or on call medical provider and/or dental provider (if on-site) will determine treatment plan and schedule for initial provider evaluation. (Wellpath IP, p. 98)*

*At the time of the <u>health inventory</u>, examination includes notation of the general condition of the patient's dentition, missing or broken teeth, evidence of gingival disease, mucosal lesions, evidence of infection, recent trauma, difficulty swallowing, chewing or other functional impairment. (Wellpath IP, p. 99)*

*A qualified health care professional who has been trained by the dentist shall obtain a dental history regarding any current or recent dental problems, treatment including medications during the <u>Receiving Health Screening at intake</u> with follow up to positive findings. (Wellpath IP, p. 98)*

*Results of the Initial Health Screening: a. In the case of a dental/medical emergency, in which a licensed dentist is not present, the patient will be seen, treated and managed immediately by medical provider staff. If in the opinion of the medical staff/licensed health care provider, the dental condition is likely to respond to immediate administration with antibiotic and/or analgesic medication this will be given. If in the opinion of the medical staff person/licensed health care professional in charge, the acute dental emergency is life threatening, the patient will be transported to an urgent care facility or hospital to protect the life of the patient. The contracted dentist will be notified and provide necessary post-discharge dental care at the next scheduled dental clinic. (Wellpath IP, p. 98 & 99)*

*If the medical staff/licensed health care professional determines the dental issue to be urgent, the patient shall be referred to and evaluated by the dentist at the next scheduled dental clinic. (Wellpath IP, Exhibit A, p. 99)*

## Documentation, Process, and Compliance Deficiencies
These systemic failures compromise and undermine transparency, accountability, and self-governance:

- Inconsistent and inaccurate charting, including incomplete entries and reschedule discrepancies.

- Breakdown of the flow of dental care and audit trail as outlined in the Implementation Plan, from the patient request for dental care, to nurse triage, through the dentist diagnosis, treatment plan and treatment of care outlined in the Implementation Plan and through the dental standard of care.
- CQI processes remain underdeveloped in some areas of the Implementation Plan.
- No plan yet to provide contracted or temporary employees to fill in when the Dentist(s) and/or Dental Assistant(s) are on leave. See also the Dental CAP #113 regarding adding dental staff to Wellpath's Rapid Response Team for staffing emergencies. Dr. ███████ had a planned leave for 1.5 months between December 2024 and mid-January 2025 and a concerted effort was made to add additional dental days prior to his leave. However, should this have occurred without notice or when Dr. ████ takes a well-deserved two week vacation, there is no Dentist or Dental Assistant contracted to fill in in the provision of dental care at MCJ.
- No plan yet is submitted to cross train someone to fill in for non-clinical dental staff who are on leave.

## Uploaded Video and Education for Activities of Daily Living (ADLs)

Per the Dental Operations Specialist, the video on brushing and flossing was uploaded to the tablet. **Brushing and flossing are considered Activities of Daily Living (ADLs).** Why are brushing and flossing ADLs:

- ADLs encompass the basic self-care tasks essential for maintaining personal hygiene and health.
- Brushing and flossing are crucial components of oral care and hygiene, helping to remove plaque, prevent gum disease (bleeding gums), and maintain overall oral health.
- Difficulty with these tasks can indicate a need for assistance to ensure proper self-care and prevent potential health issues.

Impact of struggling with ADLs:

- If someone has difficulty with ADLs like brushing and flossing, it can impact their overall well-being and independence.
- This might indicate the need for assistance from family, caregivers, or home health aides.
- Difficulty with ADLs can be a factor in determining the appropriate level of care for an individual, such as home care services, assisted living, or supportive services within correctional facilities.
- It is important to discuss any challenges with a healthcare provider to explore potential solutions and support options.[8]

In essence, brushing and flossing are essential for personal care and maintaining a healthy life, making them crucial ADLs to monitor and address if difficulties arise.

---

[8] https://my.clevelandclinic.org/health/articles/activities-of-daily-living-adls

Dental ADLs are not mentioned during the Mental Health initial review nor is there a section where the patient can be referred to dental from this form.

**System Improvements and Positive Developments**

Other areas of progress:

- Addition of a PRN Dentist and PRN Dental Assistant has expanded access and reduced backlog. These positions must now be ratified into the permanent MCJ staffing plan to ensure sustainability, particularly in light of Wellpath's Chapter 11 status and the change of health care vendor.
- Appointment of a Wellpath headquarter, dedicated Dental Operations Specialist is a major accomplishment. ████ ████ continues to improve workflows, address deficiencies, perform self-audits for compliance oversight, organize, communicate with the dental staff, and oversee policies, procedures, protocols and processes in conjunction with the Chief Dental Office.
- Chronic care referrals to dental has improved, with 12 incarcerated patients referred for a variety of chronic care conditions including HIV, diabetes, pregnancy, seizure disorders, and SMI are preferred. The referral to dental box is incorporated within the initial and follow-up chronic care forms. I recommend an area in all the chronic care forms for the intra and extra oral evaluation.
- Development of P&Ps and LOPs, combined with continued internal chart audits for their CQIs, shows movement toward a repeatable and reliable system of care. Additional CQIs and the refinement of the questions within the CQIs are being discussed and per the CDO will be implemented.
- Leadership's work towards transparency in acknowledging non-compliance reflects a maturing culture of accountability.

The intent of this report with the Excel attachments is to provide a roadmap. Progress is evident, but sustained self-governance, transparency, and adherence to the Implementation Plan and Dental CAP remain non-negotiable. By building on recent staffing and system improvements, closing the remaining gaps in care and documentation, and committing to consistent use of data for CQIs, Wellpath and therefore, MCJ, can achieve a durable, compliant, and patient-centered dental program.

## Dentist Productivity

Dr. ████ who works three days per week at MCJ, focuses on Dental Sick Calls (DSC) and the incarcerated patient's episodic diagnosed dental treatment. Dr. ████ who works 2 days per week during this audit period, focuses on Annual Comprehensive Dental Examinations (DAE) and subsequent diagnosed treatment, the dental Chronic Care (DCC) referrals to dental for both episodic and comprehensive care and the dental Periodontal Disease Program (DPP) examinations and treatment.

From the data accumulated from Custody, 3471 bookings this audit period, and from CorEMR, 2487 scheduled dental tasks, as well as 1861 total completed dental tasks performed for 1271 individual patients: this equals approximately 1.5 tasks per unique patients between October 1st, 2024, and March 30th, 2025.

Dental utilization looks at **efficiency vs. under-reporting:** If the number seems low compared to clinical needs, then it might reflect **under-utilization of the dental program** or gaps in **task tracking** rather than true patient access to dental care.

When reviewing the implications for quality improvement when reviewing dental utilization, the Dental Subcommittee and QA meeting can review and rectify missed opportunities for referrals to dental care, delayed diagnoses and delayed treatment leading to worse outcomes as well as potential non-compliance with standards and mandates from the Implementation Plan, to improve dental utilization and therefore, access, timelines and quality of care at MCJ.

| Summary by Month | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Month Num | Month | Confirmed Days | Dr. ▮ | Dr. ▮ | Nurse (Error) | Total Completed Tasks | Total Individual Patients | Total Scheduled Tasks |
| 10 | October | 23 | 187 | 59 | 0 | 246 | 210 | 404 |
| 11 | November | 24 | 177 | 113 | 0 | 290 | 201 | 395 |
| 12 | December | 16.5 | 237 | 39 | 8 | 284 | 224 | 405 |
| 1 | January | 17 | 298 | 75 | 4 | 377 | 237 | 471 |
| 2 | February | 17 | 217 | 105 | 1 | 323 | 191 | 401 |
| 3 | March | 21 | 266 | 74 | 1 | 341 | 208 | 411 |
| **Total** | | **118.5** | **1382** | **465** | **14** | **1861** | **1271** | **2487** |

## Statistical Review of MCJ's Dental Clinical Program

Please refer to the <u>Statistics</u> tab of the Dental Audit Tool for additional information.

For this six (6) month audit period, October 1st, 2024, through March 31st, 2025, there were **3471 total bookings.** Of the 3471 total bookings, it is unknown how many are for the same unique person, as the rate of recidivism is not disclosed, nor do I believe, measured by the County. Therefore, 3471 total <u>bookings</u> does not equal 3471 total <u>unique</u> incarcerated persons. A unique incarcerated person may be booked several times during this six month period and receive a new booking ID for every new period of incarceration.

There were **2487 scheduled dental tasks** and **1861 completed dental tasks (seen in the dental clinic)**. The total number of scheduled dental tasks compared to the total number of bookings, 2487/3471 = **71.7%,** and the total number of completed dental tasks compared to the total number of bookings, 1861/3471 = **53.6%,** which does not wholly reflect dental utilization at MCJ. More than one task (i.e., exam, cleaning, filling, extraction) can be scheduled per patient and there may be individual patients booked more than one time.

**Therefore, the observed dental service utilization rates at MCJ (71.7% and 53.6%) likely overestimate true utilization.** This uncertainty can arise from the potential lack of consistent, quantifiable data for example as captured through Custody, (i.e. recidivism rates, lack of 14 day statistics), Smart Communications, (i.e. dental sick call requests and grievances necessitating a word search to locate the requests and lack of communication and integration with CorEMR), CorEMR (i.e. lack of an electronic clinical dental system capable of locating unscheduled dental treatment or other dental tasks, information found in the task reports, forms and form question reports) as well as the manual accumulation of data through the dental staff.

There was a total of **118.5 dental days** on an eight (8) hour per day schedule. On average, with opening and closing of the dental clinic, sterilization processes and accessible custody hours, the dental staff see patients for an average of 6.5 to 7.0 hours per day for their eight (8) hour shift.

Dental <u>scheduled</u> on average 21.0 patients per day and <u>saw</u> 15.7 patients per day. Using 7.0 hours per day, the Dental staff scheduled 3.0 patients and completed **on average 2.2 patients per hour. For one operatory this is a significant number of patients seen and this is commendable!**

Per the Dental Operations Specialist, there is consistent and timely Custody coverage with no Interruptions of Service identified during this six month timespan, although no proof of practice was submitted by Custody for this statement.

Once Custody has assigned their personnel to Medical, the H.S.A. makes the determination of which officer is allocated to what department and for what hours. Custody remains scheduled in Dental one hour later than the dental staff's start of their shift, as Custody is assigned elsewhere earlier in the morning. This may be to provide dental with enough time for their morning task preparations; however, this area will be revisited at the next audit tour, as the length of the dental's morning routine for patient preparation was not examined during this audit period.

Therefore, I recommend the CDO, with the H.S.A., discuss the hours for Custody's Dental coverage in addition to the time the dental staff are ready to see their first patient. <u>Please forward the result of this discussion including the beginning and end times Custody is assigned to Dental.</u>

Of the **2487 scheduled** and **1861 seen (completed) dental tasks, there were 626 tasks not seen (not completed) in dental.** Therefore, **74.8% (1861/2487 = 74.8%)** of the patients <u>scheduled</u> in dental were <u>seen</u> during this six month audit period. Conversely **25.2% were not seen as scheduled due to Refusals** (11.8%, up from 8.4%), **\*Reschedules** (1.4%, down from 2.2%) and **Cancelled by Staff** (11.9% down from 26.8%).

Please carefully review the discussion of CorEMR's statistical discrepancies, including the Reschedules section in the Executive Summary on page 25 and 26. The issue regarding their reschedule process needs immediate attention from the dental management.

From CorEMR, of the **2487 scheduled** dental tasks, there are **297 tasks Cancelled by Staff.** Of this number, **101 dental tasks are Cancelled by Staff for "Eligibility for Annual Dental Exam" (50) and "Eligible for Annual Exam, Add to Eligibility List" (51).** These type of dental tasks are no longer being automatically scheduled as patients with one year of incarceration are to request their annual exams through the dental sick call system. These types of cancelled by staff tasks should continue to fall off CorEMR's statistical information and a truer picture of the actual cancelled by staff tasks should become evident during the next dental audit tour.

Of the 297 total Cancelled by Staff discussed above, there are **192 Dental Sick Call (DSC) tasks Cancelled by Staff.** Some tasks are cancelled due to being duplicate tasks. Determining whether these are true duplicate tasks requires further review, and analyzing the remaining staff-cancelled tasks to identify other reasons for deletion.

Of these Cancelled by Staff DSCs, some were for Emergent/Urgent and Routine dental needs, not due to duplicate tasks. This is a departure from the Implementation Plan and will require training and improved CQIs to identify and prevent.

The Dental Operations Specialist is to perform a deep dive into all of the Cancelled by Staff tasks to identify if any patients were cancelled and not seen in error, those patients are to be re-appointed and seen in dental immediately if they are still incarcerated at MCJ. An explanation is to be written in their dental record; documented training is to occur and identified in the monthly Dental Subcommittee meeting minutes. I recommend a QIT (Quality Improvement Team) be put together during the Quality Assurance meeting to study and prevent patients from experiencing delayed or non-existent dental care.

The evaluation of Cancelled by System has not been conducted but due to a discovery when reviewing reschedules, or lack of rescheduling, and patients not seen within timeframe, this will occur during the following dental audit tour.

On March 24th, 2025, there were **820 incarcerated persons** at MCJ of which **7.9% or 65** (down from 12.0% or 97) were incarcerated for more than 1 year, and eligible for an annual comprehensive dental exam. As written in the Incarcerated Persons Orientation Manual, the incarcerated person must request their annual comprehensive dental examination after one year of incarceration. **Only 19 patients, or 4.2% of the patients with over one year of incarceration received a completed Comprehensive Dental Examination**.

Note that the number of patients with over one year of incarceration is a **fluid** number which changes depending on the number of years the patient is sentenced. As more patients reach their 365th day of incarceration, more patients become eligible and can therefore request comprehensive dental care.

61.0% (1517) of the overall scheduled tasks (2487) were for Dental Sick Calls. There were 1441 dental sick call requests. **Fourteen (14) Dental Sick Calls, of which one was a test patient, were completed by Nursing in error.** See table 4A and the Dental Schedule, Column F and I for additional information. There were some however who were not seen by the dentist for a complaint of pain. A deep dive into these patients' records is necessary to make sure they were ultimately seen by the Dentists **RNs are not to complete any dental tasks as this is outside the scope of their license.**

**23.4% (583)** of the overall scheduled tasks were for **Dental Treatment and of those 82.7% (482) were seen (completed) for their dental treatment.** See Table 4B.

**4.1% (101)** of the overall scheduled tasks were for the **Dental Periodontal Program (DPP).** However, as both the exams and treatments are still included in this category (instead of just the DPP exam as previously requested), the number of patients seen for a periodontal examination is much smaller than 4.1% and the number of completed dental treatments is higher.

**0.5% (12) of the Chronic Care patients with HIV, Seizures, Diabetes, Pregnancy and Severe Mental Illness were referred to dental.** During the Audit Tour, the Medical Director stated she will begin performing intra and extra oral exams for these chronic care patients more frequently and refer patients to dental through the dental chronic care category when indicated. Per the Operations Specialist, the Chronic Care forms, both initial and follow-up, have been updated to reflect an area for patients to be referred to dental by the physicians. It was requested that a section for the intra and extra oral exam be added to the initial and follow-up forms so an audit trail can be reviewed for documentation of dental screenings.

*Inmates with chronic medical conditions will be referred to and seen by a medical provider within five to seven days of arrival." (Wellpath IP, Exhibit A, p. 13)*

*Chronic illness is any health problem/condition lasting at least six months which has the potential to, or actually does, impact an individual's functioning and long term prognosis. Such conditions may include, but are not limited to, cardiovascular disease, diabetes mellitus, gynecological disorders or diseases, chronic infectious diseases, chronic pulmonary diseases, seizure disorders and psychiatric disorders." (Wellpath IP, Exhibit A, p. 27)*

*Routinely scheduled Chronic Care Clinic monitoring shall apply to the following conditions: diabetes; cardiac disorders, hypertension, seizure disorders, communicable diseases, respiratory disorders, and psychiatric disorders. Other conditions may be included as appropriate at the discretion of the medical provider." (Wellpath IP, Exhibit A, p. 27)*

*MCJ will maintain a periodontal disease program for the diagnosis and treatment of periodontal disease. Periodontal screening shall be available to all patients, regardless of length of stay. Treatment will be based on periodontal disease classification, Dental Priority*

*code, and special medical needs (i.e. pregnancy, diabetes, HIV/AIDS).* (Wellpath IP, Exhibit A, p. 100 and p.103).

**There were 347 total referrals to Dental from Intake, DL1 (40) and DL2 (307) respectively.** Of the 3471 bookings and subsequent intake screenings performed at MCJ there were **1089 Evidence or complaints of the following:** pain, difficulty swallowing, etc. but only 387 Dental Level 1 and Dental Level 2 referrals to dental. **This may be a barrier to access to care, and a deep dive should be evaluated for the reason(s) those patients were not referred to dental.**

In contrast there were 1517 Dental Sick Calls scheduled in dental for 1441 requests for dental care. **1108 total Dental Sick Calls were seen and completed in dental.** See page Table 4A and 8. This indicates 95.0% of the requests for dental care were scheduled. This is encouraging. I do not have the overall (combined) number of total sick call requests from Medical, Mental Health and Dental to give the percentage of dental requests as compared with all the requests for health care overall. Also, there are dental sick calls from Intake, 14-Day Exam, and physician referrals in the overall 1517 scheduled Dental Sick Calls.

**The 14-Day Exam/Health Appraisal dental screening is mandated to be performed by Wellpath's Implementation Plan, p. 98 and p.99.** To complete the 14-Day Exam or also called the Health Assessment, both the medical form must include the dental portion of the screening as the forms, as the two forms were not merged into one form by CorEMR as requested. **Therefore, the two forms must be used together, in conjunction, for each 14-Day Exam.**

Of the 3471 bookings, there are no statistics provided to show how many patients were present 14 days from booking. 1049 incarcerated persons during this six month audit timeframe received a 14-Day Exam/Health Assessment screening with the medical form. 872 received the dental portion of the 14-Day Exam, **therefore 16.9% or 177 did not receive a dental screening per the IP at their 14 Day Exam.** See table 9B of the Statistics tab in the Dental Audit Tool.

However, the Initial Health History & Physical Exam Dental Screening form (dental form) was used **83.1%** of the time in conjunction with the Initial Health History and Physical Exam (NCCHC) form (medical form). **From the dental form, 216 patients or 24.8% were referred to dental from the dental form; from the medical form, twenty (20) patients, or 1.9% were referred to dental.**

Since the dental screening form of the 14-Day Exam does not automatically create a task for the referral to dental at the 14-Day Exam as it does for Intake, it appears that the **216 patients may not have received a dental task appointment for their identified dental problem(s), and therefore may not have been seen by the dentist as indicated on the form.** The Dental Operations Specialist performed a deep dive of the 216 patients and over 40% of those patients did not receive a scheduled task and were therefore not seen as indicated. This constitutes a failure to refer. The referral box is checked on the dental screening form, but not all the referral tasks are created nor scheduled within the priority assignment. **This is a barrier to access to**

**dental care. Being unaware of a problem is still a problem. Being aware of the problem and not doing anything about the problem is observed neglect. Let this not be the case at MCJ.**

*There shall be, at all times, sufficient staff to ensure compliance with the CFMG Implementation Plan". [Wellpath IP, Exhibit A, p.115]*

**Regarding submitted grievances by the incarcerated person, 10.8% or 103 of the overall grievances submitted (958) for medical, mental health and dental were for a dental.** There were several issues with the data submitted by Smart Communication, such as responses occurred prior to the grievance being submitted, or there was missing information in several sections of the grievance request. Just as with Dental Sick Call requests, there is a difference between when a grievance is "read" and when the patient is "seen" face to face for the complaint during a Nurse Sick Call. **From the individual audits, 45.8% were addressed within one day of the complaint although cannot definitively state if they were seen by the RN face to face as per the Wellpath IP below.** Access to Smart Communication or close working with the Dental Operations Specialist will need to occur to determine full proof of practice.

*All dental complaints are assessed, provided treatment for obvious infection and pain relief at regularly scheduled medical sick call by the MD, PA or RN <u>to be seen within one day of the request.</u> The complaint is prioritized and referred to Dental Sick call as deemed necessary. Interim treatment for pain and infection is provided until the patient is seen by the dentist. (Wellpath IP, p. 101)*

The **Monterey Compliance Report, as required by the Dental CAP,** has current limitations on accuracy and viability as it appears to not fully sync with CorEMR's data. Isolating timeliness of care compliance from referrals to Dental from Intake, 14-Day Exam, Dental Sick Calls, for Priority Dental Levels 1 and 2, and for Dental Priority Codes, including from the Task Report, Form Report and Form Question Report continues to not be a current capability of the Monterey Compliance Report. This may be a mapping issue or just an incomplete product in development.

The Dental Operations Specialists states, "In relation to the Monterey Compliance report, I wanted to mention that it may take a long time to attempt syncing this report with CorEMR. This particular report does not reside in CorEMR, and our IT team had to create a custom backend process to extract that information, so we would have to work with them to make that happen. Also, given the transition, the new vendor might not have something like this available or will need to design their version of this report within their platform."

## CorEMR Data Inconsistencies

When looking at CorEMR, there are differences in time between <u>Created to Completed</u> versus <u>Task Date to Completed</u>, (see VS in the chart below) as there is a difference in calculation which is not immediately evident. Therefore, **to avoid any discrepancies between the differences in**

types of completion timeframes, all calculations within this report on compliance uses <u>Created to Completed</u> timeframes.

| Created to Completed | Task Date to Completed | Priority | Entered By Date | Last Mod By Date |
|---|---|---|---|---|
| 14d 1h 31m | 15h 32m | 3 | 10/21/24 15:00 | 11/4/24 15:32 |
| 42s | 11h 42m | 3 | 11/5/24 11:42 | 11/5/24 11:42 |
| 23s | 11h 42m | 3 | 11/5/24 11:42 | 11/5/24 11:42 |
| 5d 20h 16m | 12h 28m | 3 | 10/30/24 17:12 | 11/5/24 12:28 |
| 22d 3h 4m | 14h 34m | 3 | 10/14/24 12:30 | 11/5/24 14:34 |
| 28d 18h 16m | 10h | 3 | 10/7/24 16:44 | 11/5/24 10:00 |
| 3m | 9h 58m | 3 | 11/5/24 9:54 | 11/5/24 9:58 |
| 26d 20h 14m | 10h 48m | 3 | 10/9/24 15:33 | 11/5/24 10:48 |
| 18s | 15h 54m | 3 | 11/5/24 15:54 | 11/5/24 15:54 |
| 20d 23h 48m | 15h 54m | 3 | 10/15/24 17:05 | 11/5/24 15:54 |
| 21d 23h 3m | 12h | 3 | 10/15/24 13:56 | 11/6/24 12:00 |
| 3h 11m | 15h 8m | 3 | 11/6/24 11:56 | 11/6/24 15:08 |
| 22d 17m | 15h 57m | 3 | 10/15/24 16:39 | 11/6/24 15:57 |
| 28d 27m | 15h 6m | 3 | 10/9/24 15:39 | 11/6/24 15:06 |
| 27d 3h 23m | 15h 30m | 3 | 10/16/24 13:06 | 11/12/24 15:30 |
| 57s | 13h 23m | 3 | 11/13/24 13:22 | 11/13/24 13:23 |
| 22d 1h 33m | 14h 56m | 3 | 10/22/24 14:22 | 11/13/24 14:56 |
| 55s | 14h 31m | 3 | 11/14/24 14:30 | 11/14/24 14:31 |
| 5d 40m | 14h 30m | 3 | 11/9/24 13:49 | 11/14/24 14:30 |
| 8d 22h 39m | 12h 29m | 3 | 11/7/24 13:50 | 11/16/24 12:29 |

## Why Use Statistics - "If you can't measure it, you can't improve it."[9]

Statistics give credibility and trends give context; and together they can guide solid and sound, evidence-based decision-making. I suggest the following framework be used in the development of self-governance parameters when using statistics and trends.

**Statistics and Trends – In Decision-Making and Self-Governance**

1. **Identify Patterns:**
   Statistics transform raw data into meaningful information, revealing trends in access, timeliness, quality of care, compliance, and patient outcomes. This allows teams to see beyond individual cases and identify systemic issues.

---

[9] A Peter Drucker quote. https://www.growthink.com/content/two-most-important-quotes-business

2. **Benchmark Performance:**
   Trends allow comparison across time periods, facilities, or providers. By benchmarking against standards of care, regulatory expectations, and peer performance, leadership can assess whether care is improving, declining, or remaining stagnant.

3. **Guide Resource Allocation:**
   Statistical trends highlight where staffing, training, or equipment investments are most needed. For example, persistent delays in sick call responses may justify workflow changes or additional staff.

4. **Support Evidence-Based Decisions:**
   Decisions grounded in statistical trends are less subjective and more defensible. In audits, this strengthens recommendations by showing measurable gaps rather than anecdotal concerns.

5. **Predict Future Needs:**
   Trend analysis is not only retrospective; it is predictive. For instance, a rising trend in endodontic referrals may indicate a need for earlier caries management strategies or preventive programs.

6. **Monitor Corrective Actions:**
   Statistics allow evaluators to measure whether Corrective Action Plans (CAPs) are effective. If the numbers do not shift in the desired direction, and transparent discussions are noted in the Dental Subcommittee meeting minutes, leadership knows further intervention is needed.

## Reschedules – Dental CAP #50 and #51 – <u>Immediate Attention Required</u>

See also the <u>Statistics</u> tab within the Dental Audit Tool. Originally, I took the low reschedule rate at face value and was excited that this aspect of the dental care at MCJ was improving significantly. However, when auditing the charts for the Class Case Reviews, **it appeared that some patients, scheduled within timeframe, were not rescheduled and re-appointed. Instead, the patient, without having a completed reschedule and reason performed for a missed timeframe was released and never seen for treatment, although it was originally scheduled within timeframe.** <u>Tracking of compliance for timeliness of care does not get tracked in CorEMR in these cases as the patient's task is deleted, not Cancelled by Staff but Cancelled by System when the patient "times out" and is released. Compliance is not measured because the task was never Rescheduled</u>. **Without the Rescheduled task, there is no audit trail. Without an audit trail, there is no way to know that the patient ever got rescheduled when it is Cancelled by the System. This makes the compliance appear better than it truly is.** <u>Therefore, this is a failure of the dental department for patients to be seen within timeframe as per the Implementation Plan.</u>

This happened several more times during the review such that it began to look suspicious and more of these types of issues surfaced…**more than a few patients were left to "time out" without receiving their diagnosed and treatment planned dental care prescribed using a DOPC.** This is very concerning. One patient even was released with an open treatment task where the patient could have been seen within timeframe but because the task was not

rescheduled when originally scheduled, the task was Cancelled by the System when the patient was released. Hence the patient was never calculated in the reschedule nor in the seen within DPC timeframes! Perform an updated workflow and staffing analysis such that:

*There shall be, at all times, sufficient staff to ensure compliance with the CFMG Implementation Plan". [Wellpath IP, Exhibit A, p.115]*

Historically, I did not track Cancelled by the System, only Cancelled by Staff, however, this area will be tracked and monitored now to assess if this situation of delayed care is further occurring. An analysis will need to occur to evaluate if those who were released without getting dental care are even measured in CorEMR. The Dentists must be trained to reschedule tasks appropriately in CorEMR, provide a reason for the reschedule and track all scheduled tasks, so the patient is seen for their mandated dental care, even if out of compliance.

## Dental Priority Code (DPC) Compliance

When evaluating **only** the timeliness of Dental Treatment, the overall score = **82.8% - PC.**

| DPC 1 | Emergency Care – Treated immediately Emergent Care – Seen today | Incarcerated patients requiring treatment of an acute oral or maxilla-facial condition, which is likely to remain acute, worsen, or become life threatening without immediate intervention. | To be seen the same day as diagnosed – **75.0% compliance** |
|---|---|---|---|
| DPC 2 | Urgent Care – Treatment within 1 calendar day/24 hours | Incarcerated patients with a dental condition of sudden onset or in severe pain, which prevents them from carrying out essential activities of daily living. | To be seen within 24 hours of diagnosis – **91.3% compliance** |
| DPC 3 | Treatment within 30 calendar days | Incarcerated patients requiring treatment for a sub-acute hard or soft tissue condition that is likely to become acute without early intervention. | To be seen within 30 days of diagnosis – **81.7% compliance** |
| DPC 4 | Treatment within 60 calendar days | Incarcerated patients requiring early treatment for any unusual hard or soft tissue pathology. | To be seen within 60 days of diagnosis – **None, therefore N/A** |
| DPC 5 | Treatment within 120 calendar days | Advanced caries or advanced periodontal pathology requiring the use of intermediate therapeutic or palliative agents or restorative materials, mechanical debridement, or surgical intervention. Moderate or advanced periodontitis requiring non-surgical periodontal treatment (scaling and/or root planing). | To be seen within 120 days of diagnosis – **83.0% compliance** |

(Wellpath IP, Exhibit A, p. 101 and 102)

**However, if there is a loophole in the reschedules process, where the reschedules are not completed and the treatment goes past the due date until the patient is released, then this may affect the overall timeliness of care for dental treatment.**

See Section B.2 in the Dental Audit Tool Results tab. The System questions review the compliance above but also request that a system is available to track compliance at MCJ per the Dental CAP. As mentioned previously, the Monterey Compliance Report needs additional work to be fully functional. The audit questions combine these scores above to the development of a compliance report. The combined compliance of all the DPC compliance scores plus the lack of a completed and accurate Monterey Compliance report shows a total grade of 55.6% which is noncompliance of DPC timeframes overall.

## Global P & Ps, LOPs, Informed Consents and Informed Refusals

Separately, global, Wellpath headquarter Policies & Procedures (P&Ps) and MCJ's Dental Local Operating Protocols (LOPs), including for informed refusals and informed consents are nearly completed in the draft format.

Coordination of the local operating protocols; however, are not all in parallel with the policies and procedures. Additional review of this area will be performed during the following audit tour. Please also review the previous reports and attachments for any and all additional information relating to P&Ps and LOPs.

## Continuous Quality Improvement (CQI)

**Purpose of CQI**

When there are departures from the dental standard of care—such as a lack of prescribed medication following an extraction or absence of informed consent, or inefficiencies in the system of care, the CQI process is the appropriate starting point. CQIs provide a structured, cyclical method for identifying problems, testing solutions, measuring results, and repeating improvements until goals are achieved.

CQIs focus on progressive, incremental improvement in processes, safety, patient care, work environment, and regulatory compliance. CQI projects typically involve defining the problem, benchmarking, setting goals, and conducting iterative quality improvement cycles.

**Current CQI Progress at MCJ**
- In early 2024, the CDO and Operations Specialist initiated CQI tracking for referral-related outcome measures (intake, Dental Sick Call, and the 14-Day Exam referrals to dental).
- By April 2024, CQI tracking had become established, supported by weekly staff meetings to review results.

- This represented an encouraging step toward self-governance and demonstrates leadership in using CQI to drive improvements. **Recognition is due to Dr. ▇▇▇ CDO, and Ms. ▇▇▇▇▇ ▇▇▇▇ Operations Specialist, for initiating and sustaining this process!**

**Strengths and Limitations of Current CQI Use**
- **Strengths**:
  - CQI questions are driving useful discussions.
  - Chart reviews provide insights into recurring deficiencies.
- **Limitations**:
  - The quality of CQI questions and the number of charts reviewed directly impact usefulness.
  - CQIs currently cover only a few outcome measures; broader coverage is needed.
  - CQI alone does not provide a comprehensive picture of care—statistics, metrics, and audits must also be integrated.

**Identified Gaps**
- **Nurse Sick Call Process**:
  - Declining performance noted this audit period due to fewer completed Nurse Sick Calls, with missing or delayed documentation in CorEMR.
  - Lack of an audit trail and scanned dental sick call requests prevents tracking timeliness of referrals from the request for dental care to the Nurse Sick Call and from the Nurse Sick Call to the Dental Sick Call.
  - CQI has not been fully implemented for this process.
- **Dental Priority Coding (DPC) vs. Dental Level (DL):**
  - CQI does not yet evaluate DPC compliance, though I understand this will be scheduled for implementation.
  - Important distinctions:
    - *DL* is assigned by an RN at Nurse Sick Call (emergent, urgent, or routine). Dentists should not alter these assignments. Concerns about DL accuracy should be addressed through RN training, the DON and the CDO.
    - *DPC* is assigned by the Dentist after diagnosis and treatment planning; it dictates treatment completion timelines. Dentists may adjust DPCs based on clinical changes but are not to extend them beyond the date of diagnosis.

**Recommendations for CQI Expansion**
1. **Broaden Scope**: Expand CQIs to cover all outcome measures required by the Implementation Plan, including DPC compliance.
2. **Refine Questions**: Develop more nuanced and targeted CQI questions to identify specific system weaknesses.
3. **Improve Audit Trails**: Ensure Nurse Sick Call and Dental Sick Call tasks are consistently linked and documented in CorEMR to allow compliance tracking.

4. **Enhance Data Integrity**: Address inaccuracies and inconsistencies in data entry, as skewed statistics create a false sense of compliance.
5. **Integrate with QA Structures**: Use CQI findings as a standing agenda item for Dental Subcommittee and QA Committee meetings, ensuring system-level responses to identified issues.

**System Limitations**

CorEMR is not an Electronic Dental Record System (EDRS) and cannot:

- Track episodic or comprehensive treatment plans via a patient specific odontogram.
- Locate unscheduled patients and automatically schedule them.
- Generate real-time compliance or scheduling reports.

This makes expanded CQIs even more essential, until a full EDRS (e.g., Dentrix Enterprise Correctional Edition or other EDRS) is adopted.

The current CQI process shows promising early success. To reach substantial compliance, MCJ must broaden and deepen CQI use, refine audit questions, and ensure accurate data pathways. CQI should be viewed not as a single solution but as one part of a larger self-monitoring framework that integrates data, statistics, audits, and staff training. With sustained effort, CQIs can become a cornerstone of MCJ's self-governance system, supporting access, timeliness, and quality of care across the dental program.

## CorEMR vs an Electronic Dental Records System (EDRS)

The ultimate goal for MCJ and Wellpath is to achieve and sustain self-governance without external oversight. A key marker of readiness will be the ability to **verify compliance through proof of practice**—demonstrating not only that standards are met, but that staff understand their program metrics, statistics, and how to choose when and how to act upon the information.

While Continuous Quality Improvement (CQI) data has been developed for some aspects of the Implementation Plan (IP), it must be expanded to encompass the entire IP. The sooner this occurs, the sooner MCJ can systematically identify and remove barriers to access, timeliness, and quality of care. This in turn allows the clinic to move beyond baseline compliance and focus on **efficiency, patient-centered care, and sustained improvement**, all under the guiding principle: *"If you can't measure it, you can't improve it."*

At present, CorEMR is not a true Electronic Dental Record System (EDRS) and therefore lacks the integrated functionality required for comprehensive dental care reporting and program oversight. It is critical for MCJ and Wellpath to understand both the strengths and limitations of CorEMR, and to develop methods for ensuring **data integrity and consistency** within its framework. Reliable data begins with consistent entry and organization, which in turn supports sound clinical and administrative decision-making.

For long-term effectiveness, an EDRS such as Dentrix Enterprise, correctional edition, remains a viable solution. An EDRS of this type provides integrated radiographs, real-time odontograms, diagnosis entry, phased and schedulable treatment plans, with powerful reporting capabilities addressing issues within a correctional system. By allowing clinicians and administrators to assess treatment notes, radiographs, and compliance data in real time—whether onsite or remotely—Dentrix Enterprise or another EDRS can minimize errors, prevents omissions, track unscheduled care, and produce accurate reports to track barriers to care and CQI metrics.

Until such a system is adopted, the facility must maximize its use of CorEMR by creating **Local Operating Protocols (LOPs), flowcharts, and data pathways** aligned with global headquarter policies and procedures to track care accurately. The P&Ps and LOPs should be regularly reviewed in the monthly **Dental Subcommittee meetings**, where data integrity issues and inflated or missing numbers can be identified and corrected. The **Quality Assurance Committee** should also serve as a venue for collaboration, problem-solving, and accountability in addressing data-related gaps.

By strengthening data systems, embracing transparency, and embedding CQIs across the entire IP, MCJ and Wellpath will create a durable framework for **independent, self-sustaining governance of their dental program**.

## Nurse Training – Targeted Training Recommendations

Instead of repeating the similar general training, consider shifting toward a **case-based, deficiency-driven training model if you haven't started this already**. This makes the education more relevant, helps nurses connect the training to real-world scenarios, and directly addresses the gaps you've been identifying in your own staff training.

- **Deficiency-Driven Training Approach**
  - Transition from broad refresher sessions to focused trainings that use *specific deficiencies* uncovered during this and previous audits and the CQI reviews.
  - Example: If an audit shows missing pain scales in Dental Sick Call referrals, hold a short in-service where nurses practice documenting descriptions and notes in the referral forms as well as in the task notes, which for example, should have the same pain scale information when practicing with sample cases.
  - Example: If duplicate referral is identified, use that case to walk through the correct workflow and highlight where errors occurred.
- **Case-Based Learning**
  - Develop brief case studies based on actual (de-identified) patient scenarios.
  - Use these to role-play proper DL1 vs. DL2 prioritization, referral documentation, and appropriate CorEMR scheduling.
  - Incorporate feedback and group discussion to reinforce correct practice.
- **Ongoing Reinforcement**

- - Document each targeted training session and include it in the monthly Dental Subcommittee meeting minutes with a roster of attendees. In the roster show not only who is attending but who is missing.
  - Track whether the same deficiencies recur after training — if they do, escalate to the DON for corrective action. Since there is no DON currently hired at MCJ, advise the Chief Dental Officer and the local Medical Director in charge of the DON.
- **Integration with CQI**
  - Align training topics with CQI findings so the most common or high-risk deficiencies are addressed first.
  - Monitor effectiveness by measuring improvements in compliance rates for the specific issue trained on.

This way, instead of a generic "nursing training session," you'd have a **living, responsive training program** that adapts to the very problems this audit uncovered.

## Looking Ahead

██████ ████ Dental Assistant, gave her two week notice on February 24th and resigned on March 7th, 2025, to pursue more administrative type work. She will be missed, and she was very much appreciated for her initial organization of the new dental clinic. ██████ position was a permanent Wellpath position, part of the MCJ's Staffing Plan. This position was canvased, and after successfully interviewing, the Registered Dental Assistant ██████ ██████ was offered the position, and she accepted the position. This is excellent news for the dental clinic at MCJ. Therefore, the PRN Dental Assistant position became available.

A new PRN Dental Assistant position was flown, and a DA was hired, unknown of the exact date of hire. However, after about one to two months it became obvious to the CDO that this was not a good fit, and the PRN Dental Assistant was let go on August 18th, 2025. The PRN position will be flown again for a new PRN Dental Assistant. As of now, the PRN DA position is vacant.

Dr. ████ performed a second Performance Improvement Plan (PIP) on Dr. ██████ and found that the training he had been given was not effective in remediating the deviations from the dental standard of care. Dr. ██████ was let go on June 6, 2025.

A new PRN Dentist was recently hired, with California Department of Corrections and Rehabilitation (CDCR) experience. However, this new PRN Dentist is only available on weekends and so far, is scheduled to see patients approximately twice per month on Fridays, Saturdays and Sundays. This is a reduction of 2 dental days from previous arrangements.

The correctional healthcare contract between Wellpath and Monterey County Jail is due to expire at the end of 12/31/25. Following the competitive bidding process, Wellpath was not selected. Therefore, Wellpath/CFMG will not be renewing their contract with MCJ, and it was indicated there will be a new healthcare vendor starting January 1, 2026.

Per the County Counsel, "When a new vendor contract is approved, Custody leadership, County Counsel, and CFMG leadership and site staff will collaborate to ensure a smooth transition from one health services provider to another."[10]

## Methodology for the Chart Audits within the Dental Audit Tool

The following is the summary of the methodology used in this report for the attached Dental Audit Tool, Dental CAP and Class Case Reviews Excel spreadsheets. Randomized samples are utilized for this audit tour.

### Priority Dental Level (DL) / Priority DL1 and DL2
- Assigned by the <u>Nurses (RN),</u> Nurse Practitioners (NP), Physician Assistants (PA) and Physicians after screening the incarcerated person for a referral to the dental clinic from:
  - Intake, 14-Day Exam/Health Appraisal, Dental Sick Call, RN screening for the Dental Periodontal Program, Physician referral from Chronic Care, and Physician on Call (POC).
- DL Priority 1 – Emergent/Urgent condition
  - Is scheduled for a Dental Sick Call for the next dental day.
- DL Priority 2 – Routine condition
  - Is scheduled for a Dental Sick Call within 14 calendar days.

### Dental Priority Code (DPC) / Priority 1 through 5
- Is assigned by the <u>Dentist(s)</u> at the time of diagnosis and treatment planning.
- Each line item of treatment receives a DPC to identify the condition (when that treatment is indicated) and scheduled accordingly. [<u>Wellpath IP, p. 100-103</u>].
- If the task for the diagnosed treatment plan is not scheduled, then the patient is "lost in the system" and will not be seen by the Dentist. CorEMR cannot locate unscheduled treatment plans. This is an important area where the CQIs must be used in the programs self-audits.

### Scoring Criteria

Substantial Compliance (SC) = 86% - 100%
Partial Compliance (PC) = 75% - 85%
Non-Compliance (NC) = 74% and below

I modeled my scoring criteria on NCCHC standards.[11]

---

[10] County Response to Dr. Winthrop Draft Dental Report #13
[11] https://www.ncchc.org/the-many-benefits-of-accreditation/

"To earn accreditation, a facility must demonstrate compliance with 100% of applicable essential standards and at least 85% of applicable important standards. Compliance plays a crucial role in improving the quality of care and can lead to better patient outcomes. We have found consistent application reduces variability, thus minimizing errors, while efficient processes lead to quicker diagnoses. Patient safety also is promoted by establishing policies and procedures for infection control, medication administration, suicide prevention, emergency preparedness, and more, reducing the risk of medical errors and adverse events. The standards facilitate interoperability in health information technology, streamline administrative processes, and foster accountability."[12]

### Systems and Chart Audit Questions

Creating global Policies and Procedures (P&Ps) with Local Operating Protocols (LOPs) and making these available to train existing and new staff in their system of dental care is instrumental to a solid dental program system, based on defined and repeatable processes.

**As mentioned in previous audit reports, as Monitor, I believe that an evaluation of the systems used to provide dental care at MCJ is an important component of the audit process.** In the Dental Audit Tool Results and Database, you will see System and Chart Audit questions, plus the facility Clinic Audit questions used to evaluate the Defendants' established and emerging systems.

The System questions are in the Monitor Comments #1. The Chart Audits start in Monitor Comments #2 through #13 for a total of two (2) charts per month for each month of the six month period, which equals 12 charts **per metric for each of the outcome measure categories.** Therefore, **332 unique patient charts** were reviewed within the Dental Audit Tool plus the 13 Class Case Reviews.

For a more in-depth review of specific System questions and individual Chart Audit evaluations with the booking numbers and the LAR number below it, see the Database tab in the Dental Audit Tool Excel spreadsheet. Also review the attached Class Case Reviews and the Dental Corrective Action Plan (CAP).

### Methodology for Chart Pulls for the Chart Audit Reviews

The **methodology** for each outcome measure section is, located to the right of the Findings and Recommendations, within the Dental Audit Tool Results tab, **Column V.**

A list of potential patients is run **for each outcome measure**, as detailed in the methodology section of the Dental Audit Tool Results tab in **Column V.** Since not all clinical outcome categories have a corresponding task in CorEMR, then a word search is done in the Task Report

---

[12] https://www.ncchc.org/the-many-benefits-of-accreditation/

within CorEMR or another method, **as outlined in the Dental Audit Tool Results, Column V, of the Methodology.**

For this audit tour, once the parameters of the outcome measure category being audited have been located, the monthly data set of the applicable selection of the located queried charts, unless otherwise stated, <u>are placed in Excel's Random Generator</u>. **The count of records in the data set is applied to the MS Excel RANDBETWEEN() function: RANDBETWEEN(1, recount).** This function uses the Mersenne Twister (M19937 variant) pseudo-random number generator to produce a high quality randomized result.

The Defendants continue to disagree with the methodology used by this Monitor[13], which was reviewed by the statistician as seen in the Dental Report #12. As previously stated on page 34 and 35 of the Executive Summary, the grading criteria is modeled on the NCCHC guidelines.

### Wellpath Randomized Samples

Wellpath did not provide specific randomized samples from their report list as they had done during the previous audit tour #12. For this audit tour #13 they sent their list of patients from the files numbered #1, #2, #3, #4, #6 and #8. From this list of <u>Wellpath Reports</u> specific charts from these Wellpath Reports, were randomized and are found in Monitor Comments #3, 5, 7, 9, 11, and 13. As a reminder, Monitor Comments #1 are for the <u>System</u> questions, and the <u>Chart Audit questions</u> start in Monitor Comments #2 through 13 of the Dental Audit Tool <u>Database</u>.

The "3# Dental Treatment Task Report" was not separated into the dental categories of care as seen in the Quality of Care, Section C of this report.

Below is a table of the chart results between this Monitor and MCJ/Wellpath's chart pulls for the previous audit tour #12. **This Monitor's Final % Compliance was 67.8% and MCJ/Wellpath's was 65.4%.** Therefore, the findings from the randomized charts pulled by Wellpath demonstrate a close alignment with the findings of this Monitor's findings, with only a 2.4 percentage point variance, suggesting statistical consistency between independent (Monitor) and internal (MCJ/Wellpath) sampling methods.

| Class | Category | Name | All Percent Compliance | All Substantial Compliance (Y / N) | Monitor Final % Compliance (Monitor) | MCJ Final % Compliance (MCJ) |
|---|---|---|---|---|---|---|
| A | | Access Data | 50.0% | N | 55.3% | 46.3% |
| B | | Timeliness Data | 67.4% | N | 69.4% | 63.3% |
| C | | Quality Data | 77.0% | N | 76.6% | 77.4% |
| D | | Infection Control Data | 92.0% | Y | 92.0% | 92.0% |
| E | | Dental Program Data | 66.0% | N | 66.0% | 66.0% |
| F | | Class Case Reviews - See the separate attachment for the summary of the twelve (12) Class Case Reviews | 47.6% | N | 47.6% | 47.6% |
| | | | | | | |
| | | | Overall w/o Spore Test override | Overall score with Spore Test override | Overall w/o Spore Test override: **Monitor** | Overall w/o Spore Test override: MCJ |
| | | | 66.7% | N/A | 67.8% | 65.4% |

_____

[13] 2025-09-22 -- CFMG Response to 13th Draft Report(106738599.1).

## Statistical Methodology

The methodology for each statistical table is located to the right of the Findings and Recommendations in the **Dental Audit Tool, Statistics tab, in Column K & L respectively.**

The statistics provided in the **Statistics** tab measure different parameters than those captured by the Dental Audit Tool Database tab. Specifically, the Statistics tab reflects a count of patient charts that document specific events as recorded from CorEMR. For example, it includes counts for the total number of patients scheduled for comprehensive care, those seen in the dental clinic, and those who refused a particular type of exam, were rescheduled, or had appointments canceled (deleted) by staff.

This Statistical data is not intended to assess the quality of care delivered, nor does it track multiple events per patient chart. **As such, the figures in the Statistics tab are not expected to align with the percentages presented in the Dental Audit Tool, as the two tools serve distinct purposes and measure different aspects of care.**

The primary function of the Statistics section is descriptive. It offers a high-level overview of how the dental program operates and can help identify systemic issues or operational gaps that may not be evident through the sampled chart review process.

Additionally, please review the Plaintiffs' comments regarding this and the methodology for chart pulls and the grading process.[14,15]

## Dental Class Case Reviews Methodology

The Class Case Reviews patients were selected based on the Plaintiff's requests, which are provided in their pre-tour letter. Class Case Reviews account for 1/6th of the overall grade. For this tour, there are 13 charts reviewed, and the overall grade is **43.7%  which is in non-compliance.**

**If the Class Case Reviews were not consolidated into the overall score, the score would be 71.7% which is still in non-compliance.**

Due to the random sampling technique, it is possible to randomly draw a chart that also appears on the list which Plaintiff's Counsel have provided. Please review the Unique Chart Count tab in the Dental Audit Tool. If a segment of the chronological aspect of care is randomly selected, then it is flagged in this Unique Chart Count tab and made not applicable in the Dental Audit Tool if the grade was not given a SC/Substantial Compliance for that particular outcome measure question. If the grade is SC, then I left the grade as is and placed an N/A for anything less than a SC.

---

[14] MEC-Winthrop Re Response to Draft 13th Dental Report 09-19-2025 1187-8
[15] MEC-Winthrop Re Pls Reply to Defs Comments on Draft 13th Dental Audit Report 09-24-2025 1187-8

A chronological overview of a patient's dental care history is shown in the Class Case Reviews. Relevant clinical notes, forms, documents, and tasks—along with the patient's completion dates of dental treatment, reschedules, cancelled by staff and/or refusals—are gathered and organized sequentially within the spreadsheet for each patient.

This review process also helps identify any barriers to access, timeliness, and the overall quality of care provided to the incarcerated persons at MCJ. **The goal with this methodology is to visualize patterns which may interfere with the effective delivery of care,** such as issues with referrals, timeliness, reschedules, cancelled by staff, dental treatment, and continuity of care. By organizing the information chronologically, it is easier to identify potential gaps in the dental care delivery process at MCJ.

**Currently, there is no comprehensive, chronological report that tracks all of an incarcerated person's dental care in one area of CorEMR**, i.e., requests for dental care, subsequent nurse screenings, dental triages, and treatment within CorEMR. Since requests for dental care and grievances are entered into a separate software system, Smart Communications, (formerly ViaPath and Intlemate), the grievances and dental sick call requests are not linked and integrated in CorEMR. **Therefore, there is <u>no</u> mechanism I am aware of to track these requests in a unified way, and these requests are not specifically defined in the chronological format of the Class Case Reviews if an incarcerated person's request is not scanned into CorEMR.**

## The Deficiencies & Recommendations are in the Dental Audit Tool

Review all previous dental audit reports and attachments, for any and all information. Several of the deficiencies are the same as in previous audit tour reports and are included with the same or similar language until the deficiencies are rectified.

For each section below, review <u>Dental Audit Tool Results</u> **tab** in the Dental Audit Tool, for:
- Source (**Column S**),
- Monitor Findings/Deficiencies (**Column T**),
- Monitor Recommendations (**Column U**) and
- Methodology (**Column V**).

An overall compliance score has been determined by averaging the scores within each of the sections in the <u>Dental Audit Tool Results</u> tab. Averaging however does not consider individual incidents that are problematic **and therefore averaging could still be a risk to patient health even if a section of the audit achieves substantial compliance.** This is evident in the C.10 Extraction section of the Dental Audit Tool.

The **Deficiencies and Recommendations** can be seen in both the <u>Dental Audit Tool Results</u> tab (Column T & U) and the <u>Findings</u> tab (Column F & G) of the Dental Audit Tool. **The Deficiencies and Recommendations in the <u>Findings</u> tab can be printed or copied.**

See the individual patient charts audited in the <u>Database</u> tab of the Dental Audit Tool:

As mentioned previously, System Audit Questions and Clinic Audit Questions are found in the – Monitor Comments #1. Chart Audit Questions are found in the – Monitor Comments #2 through #13.

## Access to Dental Care: Sections A.1 through A.20

### A.1    Certified Language Interpreter/Translator Services – 26.0% - NC

---

**Deficiency:**

- Section 1557 of the Affordable Care Act (ACA) prohibits discrimination on the basis of national origin in healthcare including in dental care. One form of national origin discrimination is failure to provide meaningful access to individuals with limited English proficiency (LEP) when required by law.
- For A1.1 through A1.3, Sign Language:
  County has a video sign language interpreter service available on the tablet with the purple border, which the patients carry with them during their incarceration period. Per the Custody Captain, the County also has an in-person sign language interpreter. Wellpath has VOYCE Remote Interpretation Services which handles their video ASL, and it is available to the dental department.
- The Forms Question Report identified one person needing a sign language interpreter.
  - During Intake, there is a question in the Receiving Screening Monterey County stating: "Translation need and provided": Yes or No.
  - An Alert is generated if the answer is yes.
  - Spanish, Sign Language or Other:" are the available options.
  - In some instances, the answer is stated as "No" for translation needed, but the preferred language is checked. When this happens, and an Alert is not generated, CorEMR does not show that an interpreter is needed. **This can prevent an incarcerated person from having meaningful access to dental care.**
- For A1.4 through A1.6, Certified Language Interpreter:
  Dental staff have failed to use a certified language interpreter, as identified in CorEMR with "interpreter needed", to ensure patient understanding occurs during their dental related visits.
- The certified language interpreted/translator service is available, and the Interpreter Language Line information is posted in the dental clinical area binder.
- There may be a barrier to access to dental care for patients who need interpreter services for effective communication:
- Between October 1st, 2024, through March 31st, 2025, there were 707 patients in the Form Question Report identified as needing an interpreter for Spanish, Sign Language, or Other. Of the 707, 451 had booking numbers and the remaining were "ZZZ" unassigned.

---

Of the 451 with booking numbers, one (1) was for sign language, 25 for "Other" languages and 681 for Spanish.

- Of the 451 patients in the Forms Question Report, 43 had a dental appointment of which 15 were cancelled by staff, 28 had a completed appointment, 3 refused and 2 were rescheduled. Therefore, 9.5% (up from 9.2%) of patients needing an interpreter utilized dental services.
- There appears to be a discrepancy between the number of patients requiring an interpreter as reported in the Form Question Report (707 minus the ZZZ numbers is 451) vs the Alerts Report (410).
- Of the 410 patients in the Alerts Report, 12 had a dental appointment of which 2 were cancelled by staff, 7 were completed, 1 refused and 2 were rescheduled. Therefore, 3.2% of the 410 who needed interpreter services utilized dental services.

**Recommendation:**

- Follow the mandates of Section 1557 of the Affordable Care Act (ACA) and provide meaningful access to dental care to individuals with limited English proficiency (LEP) when required by law.
- Title VI of the Civil Rights Act mandates that healthcare providers offer qualified interpreters for patients with limited English proficiency (LEP). Certified interpreters are trained to ensure clear, accurate communication, especially for sensitive information and legal documentation.
- In dental settings, for example, it is important to distinguish between **a Spanish speaker** and **a certified Spanish interpreter.**
- A Spanish speaker may assist with basic communication, but **certified interpreters are necessary for critical interactions,** such as explaining informed consent, treatment options, and clinical diagnoses. This ensures accurate understanding of medical terminology and prevents misinterpretations.
- A Spanish speaker who is not certified for complex or clinical conversations can lead to misunderstandings and legal issues, undermining the validity of informed consent and creating potential risks for the provider.
- **Utilize a certified sign language interpreter and/or a certified language interpreter and translator for all critical care discussions, informed consent, diagnosis, treatment, continuity of care and documentation.** And additionally, for all dental referrals and dental requests for services, when "Interpreter needed" is indicated in the alerts section of CorEMR as well as when "language or preferred form of communication" is stated by the patient.
- When using the certified sign language and language interpreter services, **note both the name and certification number of the interpreter in the clinical notes,** in order to assure the accuracy of the translation.
- Evaluate if there is a barrier to access to care for patients who need interpreter services for effective communication since:
- From the Forms Question Report, it appears that 9.5% (up from 9.2%) of the 451 of those needing an interpreter utilized dental services.

- From the Alerts Report only 12 or 3.2% of the 410 who needed interpreter services had a dental task created.
- This may be an access to Dental care issue and worth doing a deep dive into why this area is so low when considering that 71.7%, up from 53.7% of the bookings this audit period resulted in a scheduled dental task.
- Continue to perform internal audit (CQI - Continuous Quality Improvement) to identify any barriers to access to dental care and document the results in the Dental Subcommittee meeting minutes. Review the questions asked in the CQI to see if they address other areas of barriers to care.

### A.2   Oral Hygiene Supplies – 83.3% - PC

**Deficiency:**
- It appears there are no limitations for indigent incarcerated patients with or without full or partial dentures to request and receive denture adhesive. There is no formal Policy and Procedure (P&P) and Local Operating Protocol (LOP) specifically addressing the eligibility, distribution, frequency and one for one exchange, for the use of denture adhesive for indigent patients.
- There is no Policy & Procedure and Local Operating Protocol (LOP) for the ordering of oral hygiene supplies which is to include the purchase and distribution of oral hygiene products carrying the ADA Seal of Acceptance. This is not included in the existing oral care policy.
- The Commissary offers correctional toothbrushes, toothpaste, zero-alcohol fluoridated mouthwash and floss loops for purchase.
- Toothbrushes, toothpaste, and floss loops (floss loops are available upon request), are provided at no cost to indigent incarcerated persons. The Commissary stocks ADA Seal of Acceptance toothpaste, including small tubes of Fresh Mint distributed to incoming individuals and larger tubes of Colgate available for purchase.
- Observed that the denture adhesive, with a zinc-free formulation and the ADA Seal of Acceptance, is no longer distributed in the Commissary but is available to incarcerated patients, including those who are indigent, through Med Pass.
- **The Full Denture (upper and lower) option in the Intake form has still not been added.** During the Intake screening, only patients with partial dentures are identified because the "full denture" option on the intake form is missing. There is no eligibility list or report available in CorEMR to identify which patients have full dentures and therefore who can receive denture adhesive.

**Recommendation:**
- Reinstate "full denture" in the Intake form with the option of marking upper and lower full denture or a combination of upper denture and lower partial for example. Update the Form Question Report to be able to query who has a full or partial upper and/or a full or partial lower removable denture. As a result, it is not possible to track which patients have full or partial upper and/or full or partial

lower dentures based on the intake process and therefore who should receive denture adhesive.

- LOPs serve as the foundational framework for self-governance and form the basis for the development of training modules. They are intended to establish standardized, repeatable procedures that staff can consistently rely upon in the delivery of care to incarcerated individuals at MCJ.

- **Please provide the Incarcerated Person P&P and LOP which addresses ordering and distributing of oral hygiene supplies.** See recommendations A.2.1A. Develop and have approved a comprehensive P&P and LOP, or amend the existing oral care policy, to include ordering of oral hygiene supplies, which includes the purchase and distribution of oral hygiene products containing the ADA Seal of Acceptance.

- Purpose: This LOP provides guidance for staff responsible for ordering supplies for both incarcerated individuals' hygiene kits and Commissary inventory, specifically concerning oral hygiene products.

- Protocol: When ordering toothpaste (mouthwash and zinc-free formulation of denture adhesive) for incarcerated individuals, staff must ensure that all products carry the American Dental Association (ADA) Seal of Acceptance. The ADA Seal confirms that the product meets safety and efficacy standards as defined by dental professionals.

- Rationale: Ordering toothpaste, mouthwash or denture adhesive without the ADA Seal of Acceptance poses a potential risk to patient health, including the possibility of providing substandard or ineffective products. To maintain the standard of care and mitigate risk, only ADA-accepted oral hygiene products are to be purchased and distributed.

- Include how denture adhesive will be dispensed to incarcerated persons with full or partial dentures, indigent or not.
  Denture adhesive is for incarcerated persons with full or partial dentures.

- The benefit of using the ADA Seal of Acceptance is that the process of validating products the incarcerated persons will utilize for their oral health care needs is already done by having a product which meets the following criteria:

- "The ADA Seal of Acceptance is awarded to products that meet the ADA's rigorous guidelines for testing, acceptance, and marketing. These guidelines include:
  - Providing evidence of proper supervision of manufacturing and laboratory facilities
  - Submitting objective data from clinical and/or laboratory studies
  - Providing scientific proof to support the product's claims".

**A.3  Oral Hygiene Instruction/Education – 75.0% - PC**

**Deficiency:**

- Although not visualized and confirmed by this Monitor, a brushing and flossing video endorsed by the American Dental Association (ADA) was uploaded to the tablet. Per the Dental Operations Specialist, "I have confirmed with custody that videos are in the tablet and active since end of march- beginning of April."

- "Videos are processed by the brain 60,000 times faster than text and are overall easier to cognitively process, which helps you consume large amounts information in shorter periods of time. Videos are also much more dynamic because they can explain things in much simpler forms through engaging graphics." "Videos create a more engaging sensory experience than using print materials alone." Therefore, for those with learning disabilities who cannot process the information from a brochure, there is now a video on oral care instruction available on the tablet at this time.

- ADA Accepted brochures are also available to patients on the tablet for oral hygiene education.

- No meaningful oral hygiene instruction is given at 14-Day Exam during this audit period. Patients can be referred to Dental should an RN notice a patient has difficulty with brushing and flossing as an ADL. There were 1049 completed medical 14-Day exams during the auditing timeframe and 872 concurrent dental forms were filled out. The number of OHI given is not a query the Form Question Report is able to provide at this time.

- Patients can be referred to Dental should an RN notice a patient has difficulty with brushing and flossing as an ADL at the 14-Day Exam.

- Visual aids are available in the dental clinic for one on one instruction and are utilized by the Dental Assistants to provide meaningful oral hygiene education to the patients, when instructed by the Dentists to do so, following cleanings, exams and other dental services.

- The following is not listed as an available service in the Incarcerated Person Orientation Manual. Per the Implementation Plan (IP). Patients can request oral hygiene instruction through the dental sick call system, "Inmates are given toothbrushes and can receive instruction in proper brushing technique from the medical staff upon request." [Wellpath IP, p. 99].

- Brushing and flossing as an ADL is not listed in all the screening documentation pertaining to the ADLs at MCJ. Brushing is an Activity of Daily Living (ADL). Difficulty performing ADLs can contribute to depression and anxiety among incarcerated individuals, especially older adults. [16]

**Recommendation:**

- Please see the Dental CAP #5 which states, "Oral hygiene instruction, both brushing and flossing videos from the American Dental Association (ADA) are available on the inmate/patient's tablet, otherwise an oral hygiene instruction pamphlet is to be available to each booked inmate/patient." Therefore, this area is subject to monitoring.

- Provide meaningful oral hygiene instruction to the I/P during the 14-day exam.

- To assist the nurses in providing effective oral hygiene instructions, review the oral hygiene video and brochures on brushing and flossing with the incarcerated person and

---

[16] https://pmc.ncbi.nlm.nih.gov/articles/PMC7864224/

ask them if they have any questions or barriers to performing this Activity of Daily Living (ADL). Difficulty performing ADLs can contribute to depression and anxiety among incarcerated individuals, especially older adults.

- Meet with Mental Health during your monthly Dental Subcommittee meeting and discuss any patients having difficulty with their ADLs who may need additional OHI, as brushing and flossing is an activity of daily living (ADL). Locate the areas relating to ADLs which do not list brushing and flossing, and discuss with medical and mental health to have it incorporated.
- Incarcerated persons should be advised they can request additional OHI by submitting a dental sick call request. Please update the Incarcerated Persons Orientation Manual to state I/Ps can request oral hygiene instruction through the dental sick call system upon request.
- For those patients who need more individualized one on one oral hygiene instruction, when requested by the patient, nurse or identified by the dental staff, create a task within CorEMR for them to return and receive this more dedicated time of OHI instructions.

## A.4   Inmate Handbook – 92.9% - SC

**Deficiency:**
- Received the digital and printed version of the Incarcerated Persons Orientation Manual in both English and Spanish. There is a mention in the Manual that Custody will post any new changes to the Orientation Manual on bulletin boards, in the housing and in the tablet.
- **The following is not listed as an available service in the Incarcerated Person Orientation Manual. Per the Implementation Plan (IP), patients can request oral hygiene instruction through the dental sick call system, "Inmates are given toothbrushes and can receive instruction in proper brushing technique from the medical staff upon request." [Wellpath IP, p. 99].**
- Observed the registered nurse, during the intake process, advise the patient of the sick call system using effective communication.
- The Incarcerated Person Orientation Manual states in the Health Services section that patients refusing care, can reinstate care by placing a new dental sick call request.
- It states in the Health Services section that every patient, no matter the length of incarceration, is eligible for a "Periodontal Screening" as part of the Periodontal Disease Program.
- The Manual also states that incarcerated individuals held for 12 months or more may request a comprehensive dental examination, which will result in an individualized treatment plan and appropriate dental care. The dental care will be completed within a timeframe identified in the Implementation Plan.
- It was agreed that the handbook would not explicitly state that those I/Ps with chronic care diseases (HIV, Seizures, Diabetes, Pregnancy, patients on more than 4 psych meds, special needs and or Severe Mental Illness (SMI)) are eligible for comprehensive care

within 90 days of their referral to dental from the physician's chronic care appointment. **From this premise, it was agreed that the Dental Department would develop a Local Operating Protocol (LOP) to guide physicians during chronic care in referring, when clinically indicated, the identified patients listed above for further dental care following an oral evaluation.**

- The Wellpath Monterey County Jail Dental Clinic Policies & Procedures, DEN – Monterey Access To Care – Routine Care has been submitted, and it includes referrals to dental by the physicians during the patient's chronic care exam.

- **The LOP incorrectly states, "Chronic care patients are seen within 90 days after any emergent/urgent conditions are resolved." The referral was agreed to be within 90 days of the referral. The emergent/urgent conditions are to be resolved during this time period and should not affect the 90 day referral period for the Periodontal Disease Program.**

- Training has not been documented as being given by the dentist to the physicians to equip physicians with the foundational knowledge to recognize signs and symptoms of common and potentially serious dental conditions.

**Recommendation:**

- Amend the LOP for physicians to perform, as part of their chronic care exam, an intraoral evaluation and refer the patients to dental if/when indicated at the time of the chronic care appointment for patients with HIV, Seizures, Diabetes, Pregnancy, and patients on 4 or more psych meds, special needs and/or those with Severe Mental Illness (SMI).

- Please update the Incarcerated Persons Orientation Manual to include that I/Ps can request additional oral hygiene instruction (OHI) by submitting a dental sick call request. "Inmates are given toothbrushes and can receive instruction in proper brushing technique from the medical staff upon request." [Wellpath IP, p. 99]

- **Regarding referrals by the physicians at the Chronic Care visit, the Chief Dental Officer is well positioned to recommend or help develop a targeted training program for physicians where early identification of dental issues by non-dental providers can improve patient outcomes.**

- To equip physicians with the foundational knowledge to recognize signs and symptoms of common and potentially serious dental conditions, and to understand when referral to dental services is appropriate, a core training module is suggested to be developed for both acute and routine referrals. The training module can include hands-on/visual components, photographic examples of common dental pathology, video walkthroughs of basic oral exams to name a few. The following is a partial list of suggestions for the training:

- Recognizing normal vs. abnormal oral tissues. Include a review of oral lesions suspicious for malignancy.

- Common dental problems: caries, periodontal disease, abscesses, broken teeth, oral lesions.

- Red flags for urgent dental referrals: facial swelling, difficulty swallowing or breathing, lymphadenopathy, systemic infections of dental origin (fever + oral swelling).

- Medical conditions with oral manifestations such as in diabetes, HIV, seizures, pregnancy, anemia, and their oral signs.
- Medication-related oral side effects (e.g., xerostomia, gingival hyperplasia).
- Oral pain assessment differentiating dental from non-dental pain and when to suspect nerve involvement.

## A.5    Intake Form – 78.0% - PC

*A qualified health care professional who has been trained by the dentist shall obtain a dental history regarding any current or recent dental problems, treatment including medications during the <u>Receiving Health Screening at intake</u> with follow up to positive findings. (Wellpath IP, p. 98)*

*If the medical staff/licensed health care professional determines the dental issue to be <u>urgent</u>, the patient shall be referred to and evaluated by the dentist at the <u>next scheduled dental clinic</u>. (Wellpath IP, p. 99)*

**Deficiency:**
- Not all Priority Dental Level 1 conditions for an urgent/emergent conditions are identified correctly and/or are scheduled for the next dental day.
- Not all Priority Dental Level 2 conditions for routine conditions are scheduled within 14 calendar days. See patient # ▓▓▓▓▓ and # ▓▓▓▓▓
- Failure to update the Denture Section of the Intake Form - Full Upper and/or Lower Denture options are not on the Intake form and affect future access to denture adhesive.
- The intake form in CorEMR has not been updated to require standardized yes/no responses to the dental screening questions, which has resulted in inconsistent completion. There is significant variation in how RNs respond to these questions and in whether they provide descriptive information. This lack of standardization can lead to incomplete or unclear documentation, impacting the accuracy of dental assessments and follow-up care.
- There are discrepancies between RNs, for the evaluations of the denture type. Additional training is necessary for RNs to identify denture types.
- "Missing/Broken teeth" are in one category in the Intake form and should be separated for clarity. Missing teeth may not always be an indicator of a referral to dental however visibly evident decayed/broken teeth are an indicator for a referral to dental.
- The intake form does not provide a space to capture information regarding medications prescribed for dental issues prior to Intake. Including this information would support continuity of care and ensure that dental needs are identified and addressed promptly upon arrival.
- **Failure to document:**
  - The nurses fail to routinely provide a pain scale in the description of the patient's dental problem(s) on the intake form. There is a lack of consistent description,

history, location and pain scale of the dental condition(s) found during the intake screening.

- o There are patients who report pain, and/or pain to hot and cold and/or can't sleep at night due to the pain. The pain scale is missing. The designation is not always correctly determined, and many patient's pain is downgraded to a DL2 rather than a DL1 for an urgent and even possibly emergent condition.
- o Failure to accurately document, assign, and schedule the correct dental condition screened at intake is a departure from the mandates of the Implementation Plan.
- o Priority levels and dental issues are not consistently aligned between the intake form and the referral task, leading to discrepancies in documentation. For patient #███████ there is no description in the intake form, but the task reads, "2/24 - Due 2/25 - DSC - Urgent Referral from intake
  Level 1 - Right upper broken tooth 8/10 pain constant."
- o The intake form indicates no dental concerns and no referral, see patient #███████ and #███████ while a separate referral task is simultaneously created with dental issues listed. Additionally, the form may initial a dental referral, but the description is not present, but it is listed on the task. The intake form and referral task should consistently reflect the same information.
- o Referrals made outside of the intake form are not captured in the Form Question Report, making it difficult to evaluate compliance.
- o Duplicate tasks negatively impact care statistics, increase staff workload, and cause confusion, as one of the tasks is typically deleted and recorded as cancelled by staff.
- o Two separate Dental Sick Call tasks created for the same condition. Both tasks were marked as refused instead of deleted. No refusal form as patient was released 03/28/25. Not seen in dental. See patient #███████

- **Failure to refer:**
  - o Not all Urgent referrals were assigned a Priority 1 task as is indicated on the Intake form. There is lack of consistency in the screening process and in the assignment of the dental problem on the intake form. For patient #███████ a DL1 was identified on the form but the task says priority 2. There is no audit trail to indicate who made the change above and why. There is a risk the patient can be made to wait unnecessarily with pain and discomfort to see the dentist.
  - o Failure to refer from the Intake form. In the case of patient #███████ the task was created and then deleted, and the patient was not seen in dental. This is a departure from the Implementation Plan and directly affects the patient's access to dental care.
  - o Failure to refer as the Dental Sick Call (DSC) is completed by the RN and there was no other DSC created. This occurred for patient #███████ would was therefore, not seen for "...Top upper decayed and broken. Intermittent pain 5/10" due to the RN completing the DSC. Only the Dentist is to complete a DSC.

**Recommendation:**
1. **Denture Documentation and Functionality**

- Reinstate the option to select "Full" denture type (upper and/or lower) in the Intake form, which was previously available.
- Update the form to allow for clear combinations of denture types, such as:
    - Full upper and full lower
    - Full upper with partial lower
    - Partial upper and partial lower
    - Without this information, dental staff cannot identify patients with full dentures, impacting their ability to determine eligibility for denture adhesive via med pass. This hinders self-governance and compliance tracking.

**2. Intake Form Accuracy and Functionality**

- Separate "Missing Teeth" and "Broken Teeth" into distinct, selectable categories. Include a required description for each when selected. Note: Broken teeth are a referral indicator.
- Add a section to document any medications taken for dental conditions prior to intake.
- Require mandatory responses to all dental questions in the Intake form. If any answer is marked "Yes," corresponding details must be completed.
- Ensure uniform documentation of dental issues across the Dental Section of the Intake form and referral task:
    - Description
    - History of the condition/dental problem
    - Duration
    - Location (UR, LR, UL, LL)
    - Pain scale
    - Clearly identify and apply the appropriate priority level for each dental condition:
        - Priority 1 – Emergent/Urgent: Schedule next dental day
        - Priority 2 – Routine: Schedule within 14 days
    - Fix the 14-Day Exam form so referrals function automatically, mirroring the Intake form. This eliminates inconsistency and confusion over when to create separate tasks.

**3. Task Creation and Duplication**

- Ensure that checking the dental referral box in the Intake form automatically creates the referral task. Ensure uniform documentation of the Intake form and referral task.
- Do not create separate tasks outside of the Intake form; this results in duplication and disrupts tracking.
- Duplicate tasks distort care statistics, increase workload, and often result in one task being deleted and marked "cancelled," causing confusion.
- In some cases, deleting a task for a patient with no original intake form results in the patient being lost in the system.
- Eliminate task duplication by relying solely on the Intake form for dental referrals from Intake.

**4. Training and Compliance**

- Provide documented nurse training on:

> - o   Denture types (full vs. partial; upper vs. lower)
> - o   When and how to refer based on dental conditions
> - o   Proper Intake form and task documentation and completion
> - o   Consistent use of terminology and documentation format
> - o   All RNs must follow a standardized format when documenting dental findings:
>     1. Condition description
>     2. History
>     3. Duration
>     4. Location
>     5. Pain scale
> - In cases where a dental issue is noted but the referral box is not checked, no task is created, resulting in missed referrals and lack of an audit trail. This directly impacts compliance and communication.

## A.6   Intake - Urgent/Emergent Dental Level 1 – 77.9% - PC

> **Deficiency:**
> - For patient #2047405, information documented in the dental section of the Intake form does not match the details entered in the referral task, leading to inconsistencies in patient records and communication. For patient #███████ more information is in the intake form rather than in the task, including the pain profile. For patient #███████ and #███████ what is written in the task note is not written in the Intake Form.
> - What was stated as a duplicate task was deleted for patient #███████ and the patient was never referred for, "Level 1- 10/10 Pain for Right lower back molar pain Urgent Referral from intake".
> - For patient #███████ the dental referral box was checked for a DL1 referral, but the task was changed to a DL2. Therefore, the patient was not scheduled according to the Urgent DL1/Priority 1 marked on the intake form and was seen outside of the timeframe for compliance.
> - Lack of visualizing the oral environment during the intake screening. A Dental Sick Call for a painful toothache, which was requested by the patient soon after Intake, shows a dental condition at the Dental Sick Call which would have been visible during Intake but was not documented nor referred to dental.
> - Failure to document the pain scale on the intake form and referral task.
> - Creation of a duplicate task which had to be deleted for patient #███████
> - Lack of any documentation of a dental problem on the Intake form but a separate referral task is completed for an Urgent Priority 1 problem.
> - For patient #███████ and #███████ there is lack of proper documentation. A patient was released prior to the task date however the task was documented as "refusing" a DSC. This affects statistical documentation.
> - For patient #███████ failure to refer due to RN error. The RN completed the Dental Sick Call stating it was a duplicate however it was not a duplicate, and completing the Dental Sick Call is outside the scope of the RN. Failing to complete a necessary referral or ensure

follow-up may be considered patient abandonment. This is a continuing error, highlighted in previous reports. Only a Dentist can complete the DSC. Therefore, the patient was not referred nor seen for this urgent dental referral. A non-dentist completing a dental procedure is outside the scope of practice for an RN.

**Recommendation:**

- Train nursing staff to complete the Intake form thoroughly, including the dental problem, description, history, duration, location, and pain scale.
- The Intake form and referral task must match, including the dental condition details and priority level, to ensure accurate communication and proper scheduling.
- Provide documented training so nurses do not complete DSC. This is the responsibility of the dentist only! Completing DSC is outside the scope of the nursing staff and continues to highlight a systemic failure of the system.
- Provide training to RNs to ensure only one referral task is created directly through the Intake form. Duplicate tasks for the same condition distort care statistics and should be avoided.
- Priority Dental Level 1 delineation is for urgent and emergent cases, not only emergent problems.
- Schedule the patients according to their assigned priority level.
  - Priority 1 is next scheduled for the next dental clinic day.
  - Priority 2 is scheduled within 14 days.
- CorEMR is not an electronic dental record system (EDRS). Please provide resources to program CorEMR in order to quickly find the data necessary to run a transparent dental program with the ability to self-monitor. Or purchase an EDRS such as Dentrix Enterprise already programmed for correctional care.
- Complete the LOP for Intake and referrals to dental and train according to the LOP. Provide documentation of training.

## A.7   Intake - Routine Dental Level 2 – 63.5% - NC

**Deficiency:**

- Wellpath has submitted a Monterey Compliance Report per the Dental CAP to measure compliance. It identifies a task as compliant or non-compliant. However, this report has several inconsistencies not matching with the data in CorEMR's reporting and **does not address the issue of compliance overall, which was part of its intended purpose. Also review the Dental CAP.**
- There is a Form Question Report for pulling Urgent/Emergent as well as Routine referrals to dental however if a task is created outside of the referral from the Intake form, then it cannot be tracked using the Form Question Report.
- Failure to document. There is a regular lack of documentation of the dental problem, description, history, location, and pain scale in the intake form and subsequently in the referral task. See patient # ████████ and # ████████ The intake form and the task should identify the identical dental problems.

- For patient # ███████ the intake form states problem with "right upper molar" but the task states #16 which is on the upper left. Please bring the patient back to address any remaining issues between the right and left side.
- Patient # ███████ lists the description of the problem in the intake form, but it is not listed in the task.
- Lack of proper documentation. For patient # ███████ a routine referral from intake is not marked on the intake form but a separate task is created three days later. Similar situation for patient # ███████ No pain profile is identified in the intake form for # ███████ # ████████████████ Patient # ███████ has the pain profile in the intake form but not in the task.
- Failure to refer. The dental referral box for a condition listed on the intake form is not checked. Patient is not scheduled and therefore not seen in dental for a referrable condition.
- Failure to schedule within timeframe. See patient # ███████
- There was an incidental finding for patient # ███████ who was seen in dental where a radiograph was not taken to identify a specific chief complaint on 11/21/24. Also, there is a discrepancy in the labeling of the teeth. In the DSTR on 12/18/24 it says teeth #8 & 9 but the informed consent form states #9 & 10. Please place an addendum with the correct teeth.
- There were two other incidental findings where no x-rays were taken but a diagnosis was provided. For patient # ███████ no x-ray was taken during the diagnosis of #18. Was the x-ray taken and not transferred to CorEMR? For patient # ███████ no x-ray was taken for the chief complaint. This is the third time this has occurred. Please review as this may be a pattern of practice outside of the standard of care.

**Recommendation:**

- Update the Monterey Compliance report such that overall compliance is determined. For example, it should be able to identify the overall compliance of DL2 patients referred to Dental from Intake.
- Identify and update the form to CorEMR's reporting to establish overall compliance.
- Please provide training to the nursing staff to fill out the intake form completely so that it **has the same description, history, location and pain scale as the task** used to schedule the patient to dental. The form and the task must both state the same information and the same priority level for consistency in communication.
- Train staff so separate tasks are not created aside from the form at Intake. Track any task that comes from Intake as well as from Sick Call, 14-Day Exam (Health Appraisal) and Physicians in the Forms Question Report and make sure they are scheduled and seen in dental as referred.
- Fill out the intake form and check the referral box when a referrable dental condition is stated in the form. Do not create a separate task as the form automatically creates a task when the referral box is checked on the form. Duplicate tasks create more work for the dental staff and affect the statistics of the dental care provided at MCJ.
- When making a dental referral, identify the Priority Level so that an Emergent/Urgent referral is marked a Priority 1 and a Routine / Dental Level 2 referral is marked Priority 2.

- If the Dentists disagree with the designation, then provide additional and/or individual training for the nurses.
- Clearly describe any condition marked on the intake form. Missing teeth may not always be an indicator of a referral to dental however visibly evident decayed and /or broken teeth are an indicator for a referral to dental.
- The RN is not to complete a Dental Sick Call no matter the reason. Provide documented one on one training. Only a dentist is to mark a dental sick call complete.
- Use the monthly Dental Subcommittee meetings to facilitate integrative care discussions among medical, mental health, and dental teams. This collaborative approach will help improve the quality and continuity of care for incarcerated individuals at MCJ.

## A.8   14-Day Exam / Health Appraisal Form – 41.7% - NC

*Perform an initial health screening on each inmate at the time of the <u>health inventory and communicable disease screening</u>, the general condition of the patient's dentition, missing or broken teeth, evidence of gingival disease, mucosal lesions, trauma, infection, facial swelling, exudate production, difficulty swallowing, chewing and/or other functional impairment will be noted; urgent/emergent dental needs identified. All screening findings will be documented on the health inventory form including the odontogram. Follow up referral and/or consultation with on-site or on call medical provider and/or dental provider (if on-site) will determine treatment plan and schedule for initial provider evaluation. (Wellpath IP, p. 98)*

*At the time of the <u>health inventory</u>, examination includes notation of the general condition of the patient's dentition, missing or broken teeth, evidence of gingival disease, mucosal lesions, evidence of infection, recent trauma, difficulty swallowing, chewing or other functional impairment. (Wellpath IP, p. 99)*

*Results of the Initial Health Screening: a. In the case of a dental/medical emergency, in which a licensed dentist is not present, the patient will be seen, treated and managed immediately by medical provider staff. If in the opinion of the medical staff/licensed health care provider, the dental condition is likely to respond to immediate administration with antibiotic and/or analgesic medication this will be given. If in the opinion of the medical staff person/licensed health care professional in charge, the acute dental emergency is life threatening, the patient will be transported to an urgent care facility or hospital to protect the life of the patient. The contracted dentist will be notified and provide necessary post-discharge dental care at the next scheduled dental clinic. (Wellpath IP, p. 98 & 99)*

*If the medical staff/licensed health care professional determines the dental issue to be urgent, the patient shall be referred to and evaluated by the dentist at the next scheduled dental clinic. (Wellpath IP, p. 99)*

**Deficiency:**
- The 14-Day Exam form - Initial Health History & Physical Exam Dental Screening form, does not automatically create a task when the box is checked for referral to dental. This is for both Priority 1 Emergent/Urgent conditions where the RNs are to schedule the patients for the next dental day and for Priority 2 Routine referrals to dental where the RNs are to schedule the patients within 14 calendar days of the 14-Day Exam.
- Wellpath has not completed the update in CorEMR to merge the two forms. There is a Form Question Report for the Initial Health History & Physical Exam Dental Screening. If a task is created from the Initial Health History & Physical Exam Dental Screening it does show up in the Form Question Report, but this does not state if the task was created for the referral.
- Not all of the Initial Health History & Physical Exam Dental Screening form (872) were completed in conjunction with the Initial Health History and Physical Exam (NCCHC) form (1049) at the time of the 14-day exam. 83.1% of the patients received the screening however, 177 patients did not receive the 14-Day Exam/Health Appraisal dental portion as mandated in the IP.
- In the six (6) month time span, 24.8% (216) of the patients who received a dental screening at the 14-Day Exam were referred to dental. However, the task is not created automatically at the 14-Day Exam through the dental screening form. **See patient #▮▮▮▮▮ #▮▮▮▮▮ #▮▮▮▮▮ #▮▮▮▮▮ #▮▮▮▮▮ #▮▮▮▮▮ #▮▮▮▮▮ whose urgent referral is not completed as the task is not created, and the patient is not seen in dental for this condition.**
- In contrast, there were 1838 referrals for a Dental Sick Call request. How many of those requests were for dental conditions which could have been screened at the 14-Day Exam, prior to the patient putting in a sick call request for dental care? This needs to be determined.
- Failure to refer. The referral box is checked on the dental screening form, but not all the referral tasks are created nor scheduled within the priority assignment. **This is a barrier to access to dental care.**
- **Being unaware of a problem is still a problem. Being aware of the problem and not doing anything about the problem is observed neglect. Let this not be the case at MCJ.**
- Per the Wellpath IP, page 98, "All screening findings will be documented on the health inventory form including the odontogram". There is an odontogram on the Initial Health History & Physical Exam Dental Screening form, but it is not fillable.
- Failure to document. The form is not consistently filled out. Rarely is a pain scale included in the form. The description, history, location, pain scale at a minimum is not always placed when a dental condition is identified on the form nor in the task. An urgent referral box is checked but is given a Priority 2 task designation.

**Recommendation:**
- **Perform the 14-Day Exam on all I/Ps still incarcerated within 14 days of their booking per the IP.** CREATE the task for referral, SCHEDULE the referral within the assigned timeframe and SEE the patient as scheduled.

- **AMEND AND MERGE the two forms in CorEMR**, to combine the two forms into one. Perform the 14-Day Exam using the Initial Health History & Physical Exam Dental Screening form in conjunction with the Initial Health History and Physical Exam (NCCHC) form.
- Provide nurse training so referrals to dental have a task created and are scheduled within the DL1 and DL2 timeframe.
- For those I/Ps who are still at the Jail and who did not receive a dental evaluation during this period, schedule the I/Ps to receive the 14-Day Exam screening as soon as possible. During the screening, look in each I/P's mouth, regardless of their pain status and answer the questions listed in the 14-Day portion of Wellpath's Implementation Plan on p. 98 and 99.
- **If I as Monitor can spot these issues, then the dental staff and management must also be able to spot these issues and be transparent about any departures from the Wellpath IP and/or the dental standard of care. This is part of self-governance.**
- Review your CQI and determine where the breakdown is located to access to care and resolve it. Any findings are to be listed in the monthly Dental Subcommittee meeting where they are to have a running action list and status of unresolved dental issues, of which this 14-Day Exam is one of them.
- Self-governance is to benefit the patients receiving care at MCJ. CorEMR does not automatically pull these statistics for the dental team to utilize but since Defendant's are not willing or able to switch to a full electronic dental records system to run their dental program, then a concerted effort should be made to address deficiencies within their dental program and attach the statistical relevance to each deficiency when attempting to find a solution to resolve the deficiency.
- Understand and identify issues using P & Ps, LOPs and statistics to identify any barriers to access to dental care. Not having the 14-Day Exam for all those patients still incarcerated at MCJ.
- Provide a fillable odontogram per the mandates of the Implementation Plan on page 98. CorEMR is not an electronic dental record system and is not capable at this time of providing a fillable odontogram per the mandates of the Implementation Plan. An active, fillable odontogram where the RNs can identify conditions found during the 14-Day Exam screening creates a visual audit trail with the patient's dental history available for review.
- Provide nurse training. Write the dental LOP (with the nursing component) to address multiple referrals for episodic care to dental from the 14-Day Exam and how to refer and schedule within the parameters of the priority Dental Level.

## A.9    Health Assessment / 14-Day Exam - Urgent/Emergent Dental Level 1 – 38.9% - NC

**Deficiency:**
- See A.8 above for additional information.
- Inconsistent documentation. No pain scale, sometimes no description in the form but seen in the task.

- Inconsistent RN findings in describing the dental level, priority designation and pain scale between the form and the task. See patient # ▮▮▮▮▮ where not scheduled according to the Urgent referral stated on the 14-Day Exam form.
- INCIDENTAL FINDING: **See patient # ▮▮▮▮▮ X-ray taken on 12/11/24 but not read or documented by the dentist.** The clinical note is still open.
  Implement a clear protocol: Every radiograph taken should be reviewed and documented by the dentist within a specified timeframe — ideally, the same day.
- **See patient # ▮▮▮▮▮ No audit trail, no reason why the patient was due on 3/7 but not scheduled until 03/26/25. This appears to be a case where the patient should have been shown to have a reschedule but was either not scheduled properly or the date was extended somehow.** Please review and advise regarding this audit trail.

**Recommendation:**

- **Perform the 14-Day Exam on all I/Ps still incarcerated within 14 days of their booking per the IP.** CREATE the task for referral, SCHEDULE the referral within the assigned timeframe and SEE the patient as scheduled.
- Provide nurse training for uniform documentation of the form, task and priority level, for the creation of the task from the referral and schedule according to the assigned timeframe.
- Train staff when making a dental referral, to identify the Priority Level so that an Emergent/Urgent referral is marked as a Priority 1 referral and scheduled for the next dental clinic day; and a Routine/Dental Level 2 referral is marked Priority 2 and scheduled within 14 calendar days.
- Training is needed for nursing staff, and reinforced by dentist, such that instances of pain, toothache, hurt, hurting, abscess, bleeding or swollen gums and so forth, receive a pain scale with the description, history, location, and duration of the dental chief complaint.
- Track any task that comes from the 14-Day Exam as well as from Intake, Sick Call and Physicians and make sure they are scheduled and seen in dental as referred.

### A.10  Health Assessment / 14-Day Exam - Routine Dental Level 2 – 53.7% - NC

See A.8 and A.9 above for additional information.

**Deficiency:**

- **Failure to refer and schedule a routine referral to dental** from the 14-Day Exam Health Appraisal. See patient # ▮▮▮▮▮ # ▮▮▮▮▮ where the task was not created or scheduled in dental.
- # ▮▮▮▮▮ there is a referral from 11/12/24 but not from this health appraisal. **Therefore, the referral from the health appraisal was not made, a task not created, nor the patient scheduled.**
- For patient # ▮▮▮▮▮ and # ▮▮▮▮▮ **there is a referral from chronic care for the same day however the referral from the health appraisal was not made**, a task not created, nor the patient scheduled.

- For patient #████████ where it states, "facial swelling". Dental sick call from the day prior with a DL1 completed but this is not the dental sick call from the health appraisal referral. **That task referral was never created and therefore patient not scheduled.**
- See patient #████████ **No audit trail, no reason why the patient was due on 3/7 but not scheduled until 03/26/25.** This appears to be a case where the patient should have been shown to have a reschedule but was either not scheduled properly or the date was extended somehow. Please review and advise of the audit trail.

**Recommendation:**

- Provide nurse training for uniform documentation of the form, task and priority level, for the creation of the task from the referral and scheduling according to the assigned timeframe.
- Train staff when making a dental referral, to identify the Priority Level so that an Emergent/Urgent referral is marked as a Priority 1 referral and scheduled for the next dental clinic day; and a Routine/Dental Level 2 referral is marked Priority 2 and scheduled within 14 calendar days.
- Training is needed for nursing staff, and reinforced by dentist, such that instances of pain, toothache, hurt, hurting, abscess, bleeding or swollen gums and so forth receive a pain scale with the description, history, location, and duration of the dental chief complaint.
- Train staff so separate tasks are not created aside from the form unless the form does not automatically create a Task. Contact IT if the form does not automatically generate a Task and have that amended.
- Review the CQI and track any task that comes from the 14-Day Exam as well as from Intake, Sick Call and Physicians and make sure they are scheduled and seen in dental as referred.

## A.11  Dental Sick Call Requests – 15.6% - NC

*All dental complaints are assessed, provided treatment for obvious infection and pain relief at regularly scheduled medical sick call by the MD, PA or RN <u>to be seen within one day of the request.</u> The complaint is prioritized and referred to Dental Sick call as deemed necessary. Interim treatment for pain and infection is provided until the patient is seen by the dentist. (Wellpath IP, p. 101)*

**Deficiency:**

• Access to the system used to verify this timeline, Smart Communication, formerly Intelmate and ViaPath, has been denied this Monitor. The patient submits a Dental Sick Call request and also a Grievance through this system. There is no automated connection to CorEMR from Smart Communications. Once the request is processed in Smart Communication, then the Dental Sick Call is entered into CorEMR, from where the Nurse is mandated to see the patient within one day of the complaint.  See Wellpath IP, p. 101.

• There is a difference between when the request is "read" by the RN vs when the patient is actually "seen" face to face at the Nurse Sick Call. Although the patient's request is generally "read" timely, the patient is rarely "seen" within the one day of the request requirement as

mandated in the Implementation Plan. In the Dental Audit Tool, question A.11.5 shows that 12 charts were reviewed, and the patient's requests were seen within compliance by the RN **only 20.8% of the time. Either the lack of nursing staff and/or the lack of training affects the ability of MCJ to be compliant with this Implementation Plan requirement.**

• In the files provided by Wellpath for the Smart Communication system, there is no identification of the request being segregated individually into Dental. When a request for dental services is in the medical or mental health section of Smart Communication for example, the dental request is not placed in the dental drop down. When this happens a word search is used to identify the dental requests found within Medical and Mental Health. By doing a heuristic search, it is also possible that not all dental incarcerated requests are found and addressed if the spelling of the word searched is incorrectly spelled by the patient or is requested in a different language.

• There is also a lack of a completed Nurse Sick Call task, where the patient is seen face to face, for each request for dental care, which removes an important aspect of the audit trail and the ability to determine compliance without having to refer to a different system.

• Once the Nurse has screened the patient face to face for the Dental Sick Call request during the Nurse Sick Call, the nurse is to assign a Priority Dental Level 1 for Emergent/Urgent conditions and schedule the patient on the next dental day. Or, if a Routine dental condition is screened, then the RN is to assign a Priority Dental Level of 2 and the patient is to be scheduled within 14 calendar days to see the Dentist.

• The actual incarcerated person's complaint/request for dental care is **not routinely scanned** into the document section of CorEMR. Therefore, the timeframe from the request to the completion of the Nurse Sick Call cannot be verified within the patient's chart. **Without this documentation, there is no substantiation of compliance without looking at the Smart Communication file. Part of the dental program's ability to show self-governance is to evaluate this provision and provide a system and audit trail to meet the requirements for compliance.**

• There were 1441 Dental Sick Call requests and 1108 completed Dental Sick Call tasks this audit period. There were 118.5 dental days, therefore, 10.7 patients per day on average were seen by the dentist just for Dental Sick Call triages per day with one dental operatory. This does not take into account dental treatment, comprehensive dental examinations, chronic care referrals, the periodontal disease program and referrals from the physician, PA or NP. A new staffing analysis is recommended to evaluate and assess if additional dental days or dental staff are necessary to meet the Implementation Plan's staffing requirements.

• There is no LOP for this mandate. Although a reference ID is attached to each incarcerated person requests for dental care for a specific issue requested in Smart Communication, CorEMR does not have the integration with the Smart Communication software and therefore, there currently is no way to track and automatically generate a report to confirm that the patient is screened by the RN and referred to dental to be seen by the dentist.

• The lack of consistent documentation in the Nurse Sick Call's referral task, which should include at a minimum the chief complaint, description and history of the condition/problem, location, and pain scale, is not always stated nor included in the Nurse Sick Call notes.

• There is no Form Question Report for the referrals from Dental Sick Calls for Emergent/Urgent priority DL1 patients and Routine priority DL2 patients as there is for Intake

and the 14-Day Exam. This information is instead located in the Task Report where one of the ways to locate patients with a Dental Sick Call request is to do a word search is to gather information.

**Recommendation:**

- Scan the incarcerated person requests for dental care timely into the Document section of CorEMR, best would be right after the completion of the Nurse Sick Call for that patient's request. **Determine for self-governance, if the incarcerated person is seen within 24 hours of the request for dental care by the nursing staff. (Wellpath IP p. 101).**
- Address the request and see the incarcerated persons who submitted the request within one day of their request per the IP on page 101.
- Complete the Nurse Sick Call screening and schedule the task for a Dental Sick Call.
    - o Place the same documentation when referring a patient to dental in both the Nurse Sick Call task and in the Dental Sick Call task.
    - o Include a description of the dental problem, history, location and pain scale.
    - o Assign the priority dental level
    - o Schedule the Dental Sick Call per the assigned Priority level and schedule with Dental accordingly and within timeframe.
      **Priority Dental Level 1 – Emergent – schedule same day**
      **Priority Dental Level 1 – Urgent – schedule next dental day**
      **Priority Dental Level 2 – Routine – schedule within 14 calendar days.**
- Track the referrals for compliance.
- Finish the LOP for the Nurse Sick Call to Dental Sick Call process. Train the RN, MD, NP, PA according to the LOP.
- Determine if there is a way to link the ID generated in Smart Communication to be tracked in CorEMR so that the requests for dental care are accounted for and tracked for compliance.
- Provide this Monitor access to Smart Communication.

## A.12  Dental Sick Call - Urgent/Emergent DL1 – 81.1% - PC

**Deficiency:**

- **Failure to schedule within DL1 timeframe.** See patients #▮▮▮▮▮ who is not scheduled by nursing for the next dental day. See patient #▮▮▮▮▮ who originally was created a task on 02/02/25 with a DL2 although the note stated DL1. This dental sick call was deleted by the Dentist saying it was a duplicate and recreated on 02/06/25 with the priority DL1. Unfortunately, this created a delay in referral, and the patient was not scheduled or seen within timeframe.
- **Failure to refer to Dental due to an RN completing the Dental Sick Call. Completing the dental sick call is outside the scope of nursing.**
- There is inconsistent assignment of the priority level and therefore patients are not always scheduled within timeframe. There were instances when an urgent referral was stated but a priority 2 was assigned. Inconsistent use of the priority system, and subsequent scheduling, of a dental referral is a barrier to access to care.

- Lack of documentation. A description of the condition of the problem, the location and the pain scale, is not always given to substantiate the priority designation.
- Conversely, a priority designation is changed from Priority 1 to Priority 2 after it was assigned as a priority 1 during the nurse sick call process.
- Lack of an easily to follow audit trail. Not all Nurse Sick Calls are completed prior to creating the Dental Sick Call.

**Recommendation:**
- Include a description of the dental problem, history, location and pain scale at the Nurse Sick Call so it is also present in the DSC.
- Complete the Nurse Sick Call. Create a Dental Sick Call with the assigned priority dental level and schedule accordingly:
    - Priority 1/Dental Level 1 delineation is for urgent and emergent cases, not only emergent problems.
    - Priority Dental Level 1 – Emergent – schedule same day. Priority Dental Level 1 – Urgent – schedule next dental day. Priority Dental Level 2 – Routine – schedule within 14 calendar days.
- Remove the barriers to access to care.
- Train the RN, MD, NP, PA according to the LOP.
- Update CorEMR's reporting capabilities per the Dental CAP, to report on emergent, urgent and routine referrals to dental from the Dental Sick Call request. Track any task that comes from Intake, Sick Call, 14-Day Exam, Physicians and Physicians on Call and make sure the patients are scheduled and seen in dental as referred and within timeframe.
- Dental is to provide documented training, internal self-audit, documented retraining to the nurses in order to accurately assign and schedule the priority 1 or 2 assignment. Include these internal audits, results and type of training given in the Dental Subcommittee meeting minutes.
- RNs are not to complete any Dental Sick Call tasks. Provide documented training and review the reasons for these continuing problems. Do a root cause analysis of these issues and provide a solution to this barrier to access to care.

### A.13  Dental Sick Call - Routine DL2 – 52.7% - NC

**Deficiency:**
- Failure to schedule within DL2 timeframe. See patients #███████ ██████  ████████ are not scheduled by nursing to see the dentist within 14 calendar days.
- Delay of dental care is a barrier to access to care. "Inmates shall have access to emergent and medically necessary non-emergent health care services as deemed appropriate by qualified health services professionals to maintain health and safety of the inmate during his/her period of incarceration." [Wellpath's IP, Exhibit A, P. 20].
- Failure to refer to Dental due to an RN completing the Dental Sick Call. "If the medical staff/licensed health care professional determines the dental issue to be

urgent, the patient shall be referred to and evaluated by the dentist at the next scheduled dental clinic." [Wellpath IP, p. 99].

- Lack of an easy to follow audit trail can cause a delay in achieving compliance and self-governance. Without careful assessment of the underlying system of CorEMR, these reschedules occurring between the request for dental care and the Nurse Sick Call can easily be missed as the dental care history is not chronological in the dental progress notes. If you query a task report for nurse sick call and do a dental search, then will find where a nurse sick call is completed. HOWEVER, the majority of the dental sick calls do not have a completed nurse sick call this audit period, and this is only found by auditing the charts as there's no mechanism in place to identify that the completed Nurse Sick Call is missing. In other words, if counting the Nurse Sick Call query from the Form Question Report then it appears there are no problems. It is not until you look at the audit trail from reviewing a chart that one sees the lack of completed Nurse Sick Calls. The lack of scanned documentation to assess when the patient wrote the request for dental care is also part of the missing audit trail.
- There is no Form Question Report for the referrals from Dental Sick Calls for Routine DL2 patients as there are for Intake and the 14-Day Exam. However, one can run a Task report and word search for pain, toothache, swelling, abscess, jaw, gums or swollen as some examples and screen for the priority dental level.

**Recommendation:**
- Create an audit trail.
- Identify when the incarcerated person's request for dental care is submitted for a Nurse Sick Call.
- See the patient and complete the Nurse Sick Call.
- Create the Dental Sick Call from the Nurse Sick Call and schedule according to the selected Priority Dental Level.
- Provide training to the RNs regarding what category of dental care the requests for care belong in.
- Continue to update the LOP for situations such as these.
- Include a flowchart within the LOP to assist with training.
- A definition of urgent dental needs is to be written so there is no confusion by the nurses as to what a priority dental level is assigned is for urgent priority 1 assignment.
- A description is given but the condition of the problem, location and pain scale are not. These descriptives should be to be included in the referral to remove any doubt that this request for care is not a priority dental level 1.
- Create and complete the LOP for patient flow to dental.


## A.14  Physician on Call (POC) – 50.0% - NC

**Deficiency:**
- The log for patient referrals from a MD, NP and PA are not available through CorEMR for physician referrals **for after-hours care.** This is located in the Wellpath Now software and must be sent by Wellpath for review rather than being accessed directly.

- There is no immediate log from CorEMR for after-hours emergency care/POC dental issues, nor a log of physician referrals for send outs to a higher level of care, hospital, dental emergency or urgent/emergent DL1 referrals back to dental from after-hours Physician on Call.
- There is no completed P&P and LOP available to train physicians on how to schedule a DL1 next dental day follow-up in dental after a POC emergency onsite or POC higher level of care offsite.
- Nor is there an LOP to teach nurses when to call the POC.
- Lack of scheduling an after-hours POC with dental for the next dental day. See patients #▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

**Recommendation:**

- There is a POC system in place however with frequent change of personnel, the consistency and training should be repeated in order for the physicians to know how to schedule patients with the dentist for a priority 1 assignment for the next dental day, following an after-hours call to the POC.
- Please provide the Physician On Call logs for physician referrals, dental emergencies and after-hours dental emergencies.
- After-hours Physician on Call patients should be referred as a priority 1 and seen in dental by a Dentist at the latest the next dental day.
- Provide training to the medical staff as to when to contact the POC for dental issues, especially as it relates to pain from procedures which occurred during the day.
- Create a Policy and Procedure and LOP to outline the POC process as it relates to dental emergencies. Have a local operating policy and procedure available for physician training in order to make training easier for staff as they might be the ones to schedule the dental follow-up.

## A.15  Referred to Outside Specialist/Specialty Care – 89.7% - SC

**Deficiency:**

- Offsite referrals use a system called ERMA which is not accessible to this Monitor. There is no separate dental priority code (DPC) assigned to the patients referred to outside specialists in order to track them to and from dental, however they are using a DPC 3 to assess for timeliness of the referral which is helpful. Although access to ERMA has been denied, overall, the system appears to function according to the established LOP. The overall grade is substantially compliant although there remains clinical and administrative issues such as:
- Patient #▮▮▮▮▮▮s entry into ERMA stated, "note #14 was put in twice for ERMA should have been #13". **PLEASE CHECK the referral to see if #13 was requested to be extracted on the ERMA referral, as the OS note does not include the extraction #13.**
- The patient is not always scheduled and seen within 30 days of the referral to the outside specialist, see patient #▮▮▮▮▮ #▮▮▮▮▮
- **The report and enclosed radiographs from the offsite specialist are not always reviewed, with any pathology** and/or other findings identified and discussed with the

patient. The appropriate course of action is not always determined and integrated into the treatment plan based on the specialist's recommendations and the patient's individual needs; nor a chronological SOAPE progress note entered in the patient's record during the incarcerated person's patient's follow-up appointment on the next dental day following the return from offsite. See patients # ▓▓▓▓▓ On 11/14/24, in addition to the teeth #15, 16, 17, 32 being treatment planned, it was found that "revealing decay under large amalgam restorations on teeth #13 and #14" was not mentioned to the patient.

- If further care is indicated, identify it in the progress notes and treatment plan with a DPC and inform the patient of any and all findings. Make sure any follow-up care task is scheduled.
- Patients were generally seen for their follow-up appointment on the next dental day following the return from offsite.
- The date of the completed treatment from the outside specialist on the dental treatment form is not always entered in the Dental Treatment record and scanned into CorEMR.
- As CorEMR is not an EDRS, there is no way to track in CorEMR if a referral is identified and treatment planned but actually not referred.

**Recommendation:**
- Schedule and see the patient with the outside specialist within 30 days of the referral.
- The Dentist is to see the patient at the next dental day following the offsite appointment per the IP.
- An LOP has been created and is effective in training the new offsite clerk. Include that the Dentist must review the outside specialist's report and document the review with the patient as well as state the discussion in the progress notes.
- Include in the LOP how biopsies will be handled onsite and offsite and the flow of patient care including the reading to the patient of the biopsy results and any subsequent care and follow-up with the oral surgeon will be scheduled.
- One can see the scheduled offsite dental referrals by running a report from offsite in CorEMR using the Dentists' names. However, referrals made directly from nursing or physicians to the outside dental specialist are not clearly accessible as one must do a word search and look through all the offsite appointments to find the dental referrals if they are not made by the Dentists.
- For self-governance, perform internal reviews and document findings in the monthly Dental Subcommittee meeting.
- Acknowledge and review the report and integrate any findings into the treatment plan, including a DPC. Include the discussion the Dentist had with the patient in the progress notes.
- The Dentist is to evaluate any radiograph and/or panoramic x-ray returned with the report and identify any pathology and/or any other findings in the progress notes. Inform the patient and discuss the follow-up care. Document this in the progress notes.
- Show the date of the completed treatment from the outside specialist on the dental treatment form and scan it into CorEMR.

- If further care is indicated, identify it in the progress notes and treatment plan with a DPC and inform the patient of any and all findings. Make sure any follow-up care task is scheduled.
- Please provide the audit trail by scanning the original referral into CorEMR's document section. The referral report to ERMA is not scanned into CorEMR to confirm compliance that the patient is referred and scheduled within the 30 days of the referral.
- For a referral from the Comprehensive Exam, Chronic Care and/or the Periodontal Disease Program, document the referral in the progress notes and in the Dental Treatment Plan form including the DPC. When the treatment is completed, add the date of the treatment and scan the form back into CorEMR.
- Requesting access to ERMA and/or the ability to see how ERMA tracks the referrals and links them to CorEMR when the patient returns and how compliance can be monitored overall as a system.

## A.16  Chronic Care – 77.8% - PC

*Inmates with chronic medical conditions will be referred to and seen by a medical provider within five to seven days of arrival."* (Wellpath IP, p. 13)

*Chronic illness is any health problem/condition lasting at least six months which has the potential to, or actually does, impact an individual's functioning and long term prognosis. Such conditions may include, but are not limited to, cardiovascular disease, diabetes mellitus, gynecological disorders or diseases, chronic infectious diseases, chronic pulmonary diseases, seizure disorders and psychiatric disorders."* (Wellpath IP, p. 27)

*Routinely scheduled Chronic Care Clinic monitoring shall apply to the following conditions: diabetes; cardiac disorders, hypertension, seizure disorders, communicable diseases, respiratory disorders, and psychiatric disorders. Other conditions may be included as appropriate at the discretion of the medical provider."* (Wellpath IP, p. 27)

**Deficiency:**
- There were 12 patients referred from various conditions from the Chronic Care exam performed by the physician. This is an improvement from the previous dental audit tour.
- Therefore, some patients with HIV, Seizures, Diabetes, Pregnancy and for patients on four or more psychotropic medications and/or with Serious Mental Illness (SMI) were identified as referred to dental from the 5-7 day Chronic Care initial or follow-up exam.
- To see if any patients were referred to dental from chronic care, a search of patients with each condition was located through the Report function and then an audit of the chart's task to see if a referral was made to dental.
- Spoke with the Medical Director during the audit tour and she indicated that she has started to refer patients to dental, when indicated, for those patients with HIV, Seizures, Diabetes, Pregnancy and for patients on four or more psych meds and/or Serious Mental Illness (SMI).

- There is no training showing the Dentist has reviewed the parameters for referral to dental with the Physician for urgent, emergent and routine conditions.
- There are very few chronic care forms, for the patients mentioned above, which have an area for a meaningful oral evaluation. The current Chronic Care forms utilize the HEENT/NECK evaluation for the head and neck evaluation. The HEENT (Head, Ears, Eyes, Nose, and Throat) /NECK examination does not look as closely at the oral environment as the HEENOT. The HEENOT looks at "teeth, gums, mucosa, tongue, and palate examination (HEENOT) for assessment, diagnosis, and treatment of oral–systemic health." While a traditional HEENT exam doesn't explicitly include a comprehensive dental evaluation, there's a growing movement to incorporate oral health assessment into what's being called HEENOT (adding "O" for oral cavity). The HEENOT is a newer approach which advocates for integrating oral health into the head and neck assessment, recognizing the connection between oral health and overall well-being. It promotes a more comprehensive evaluation of the oral cavity, including teeth, gums, tongue, palate, and mucosa.
- In essence, while a traditional HEENT/NECK exam might involve a brief look at the mouth and throat, a comprehensive dental evaluation is typically considered separate. However, the HEENOT/NECK approach aims to bridge this gap and integrate oral health assessment into routine clinical practice.
- Oral health is increasingly recognized as a crucial component of overall health. MCJ is a setting where interprofessional collaboration between medical, mental health and dental professionals is emphasized. Conditions like periodontal disease have been linked to various systemic health problems, highlighting the need for a more integrated approach to assessment. Oral health is increasingly recognized as a crucial component of overall health. The World Health Organization (WHO) emphasizes that oral health is a key indicator of overall health, well-being, and quality of life. Similarly, the Mayo Clinic highlights that your oral health offers clues about your general health, noting that problems in the mouth can affect the rest of the body. Furthermore, the National Institutes of Health (NIH) asserts that oral health plays a vital role in the physical, mental, social, and economic well-being of individuals and populations.
- Patient seen for "Mental Health-Special Needs" on the Mental Health Initial Assessment, have no mention of oral hygiene habits, or review of patient's mouth as part of patient's mental health goals of good self-care. My concern has always been that this patient population, SMI, may not always be able to advocate for their oral health care needs nor be always able to request dental care services. Please determine if this patient understands the annual comprehensive dental examination is available and/or is able to request it.
- The Mental Health Initial Assessment does not have a section for a referral to dental.

**Recommendation:**

- Refer I/Ps to dental with these chronic care issues when indicated by the physician (HIV, Diabetes, Seizures, Pregnancy, and patients on 4 or more psychiatric medications and/or with serious mental illness/SMI) during the initial 7 day chronic care appointment or during the follow up chronic care appointment when indicated.

- Provide documented training to the MD, PA, NP by the CDO, that the parameters for referral to dental for urgent, emergent and routine conditions are reviewed and documented. Finalize the LOP for referrals from Chronic Care and include the training module.
- Complete a self-audit of patients and communication with the physician(s) who perform the chronic care exam for those patients in the findings with the mentioned conditions. Ensure there are no barriers to access to care.
- Track the referrals from chronic care to dental so patients are seen within timeframe. CAP #101.
- **Amend the LOP to reflect that DL1 and DL2 conditions are taken care of during the 90 referral to dental for comprehensive care, not after.**
- There also is no real place within the form, initial and/or follow up chronic care, for an oral screening. Please update the chronic care forms to include a section for the oral evaluation to include teeth, gums, mucosa, tongue, and palate examination (HEENOT/NECK).
- Please update the Mental Health Initial Assessment form to include a referral to dental section.

### A.17  Comprehensive Dental Examination – 35.4% - NC

**Deficiency:**
- Failure to schedule the Comprehensive Dental Annual Examination (DAE) within the 30 day timeframe. For compliance purposes, a Priority Dental Level 3 is given by the RN for those examination requests which are to be scheduled within 30 days of the request.
- For example, see patients # ███████ were scheduled outside of the 30 day timeframe. # ███████ (122 days).
- For patient # ███████ the appointment task was Cancelled by staff, but the patient is still in custody - not a duplicate. **Bring patient back for annual exam and treatment. Patient abandonment is a departure from the dental standard of care.**
- There is a general failure to state and schedule the **exam recall and frequency i**n the progress notes and on the dental treatment form.
- There is a general failure to state and schedule the **periodontal recall and frequency (3 months recall, 4 months recall, 6 months recall).** This affects the continuity of dental care for the patients.
- During the Comprehensive Dental Examination, the periodontal probings, mobility, attachment loss due to recessions and other periodontal findings as stated in the American Dental Association (ADA), CDT code D0180, are not always charted at the time of the periodontal dental examination.

**Recommendation:**
- Schedule the patients for their comprehensive dental examinations within 30 days of the request.

- Provide documented training and perform routine self-audits to confirm patients are being seen for the referrals for a comprehensive dental examination with 30 days of the request.
- For each comprehensive dental examination:
  - Identify and place the <u>exam recall and frequency</u> in the Dental Treatment form and in the progress notes.
  - Identify and place the <u>periodontal recall and frequency</u> in the Dental Treatment form and in the progress notes.
- Place completed dental treatment in the Dental Treatment category of CorEMR. Run a statistical analysis monthly.
- Review the findings of the comprehensive dental examination with the patient and note the discussion in the progress notes. Phase and schedule the treatment plan according to the findings.
- In the Comprehensive Dental Examination, the periodontal probings, mobility, attachment loss due to recessions and other periodontal findings as stated in the American Dental Association (ADA), CDT code D0180, are to be charted at the time of the periodontal dental examination.
- The CDO must provide training on caries identification and treatment planning to the dentists. If any accommodations or workflow analysis can assist the Dentist, please provide it.

## A.18  Periodontal Disease Program – 25.0% - NC

*MCJ will maintain a periodontal disease program for the diagnosis and treatment of periodontal disease. Periodontal screening shall be available to all patients, regardless of length of stay. Treatment will be based on periodontal disease classification, Dental Priority code, and special medical needs (i.e. pregnancy, diabetes, HIV/AIDS).* (Wellpath IP, p. 100 and p.103).

**Deficiency:**
- Deferred findings due to the same issues within the structure of the Periodontal Disease Program as discussed in Report #12.
- See patient # ▮▮▮▮▮▮ Patient received a periodontal probing without the indicated PREMED Antibiotic Prophylaxis as stated in the Alerts "CARDIAC. NEEDS PREMED". **The CDO is to follow up with the physician and patient to rule out any history of endocarditis from the lack of antibiotic prophylaxis. Place an addendum in the patient's chart to document any further findings.**
- Amend the LOP to state the DL1 and DL2 conditions are to be completed during the 90 day wait period for the periodontal disease program examination, not after.

**Recommendation:**
- Per the Wellpath IP, see the patients within one day of the request for dental care.
- Schedule the patients for their periodontal examinations within 30 days of the request.

- Provide documented training to the RN and include the training in the monthly Dental Subcommittee meeting.
- Complete a Nurse Sick Call as part of the audit trail to evaluate for compliance.
- Scan the request into CorEMR.
- Chart accurately and scan the treatment form into CorEMR.
- Chart all visible pathology seen in a radiograph and inform the patient of the findings and to submit a dental sick call if the patient wants to proceed with this information.
- Caries and periapical lucencies must be in the charting as seen in the radiograph. Chart existing restorations.
- Establish the treatment plan and DPC at the time of the periodontal examination and schedule the tasks accordingly.
- Should a patient have more severe and active periodontal disease, please schedule accordingly. Not all treatments have a DPC 5, the DPC is per the patient's condition.
- Make sure the Periodontal staging form has the same diagnosis as what is written in the clinical notes.
- Complete the task request for this service in the <u>Dental Periodontal Program category</u> in CorEMR and complete the <u>treatment in the Dental Treatment category</u> for statistical relevance.
- Update the P & P and LOP. Provide documented training to the Dentist and staff and include it in the monthly Dental Subcommittee meeting.
- Update the Periodontal Consent form to include a space for the treatment being rendered. Update the General Informed consent to include a space for the RBACs of receiving medication and local anesthetic. Include an area for gross debridement, as well as occlusal and denture adjustments.

## A.19  Refusals and Refusal Form – 70.8% - NC

This metric audits refusals for **Dental Treatment only**. No evaluation or review of refusals have been done for Dental Sick Call (DSC), Dental Annual Exam (DAE), Dental Periodontal Program (DOO) or Dental Chronic Care (DCC).

The California Dental Practice Act requires that informed consent (or refusal) be obtained from a patient before any treatment is initiated. It is typically required that the dentist ensure the patient has all the information necessary to make an informed decision and enter this discussion in the chronological progress note.

**Therefore,** when self-auditing, make sure there is a signed informed consent for the prescribed treatment addressed in the progress note and scanned into CorEMR. Identify the discussion with the patient including any questions the patient may have in regard to understanding the Risks, Benefits, Alternatives and Consequences (RBACs). **Consequently, there must also be a discussion in the progress note identifying that the patient was informed of the consequences of not doing the treatment so that if the patient refuses, there is full understanding of the RBACs.**

**Deficiency:**

- See the Statistics Table 3, Row 27 and 37 - Overall the refusal rate is 11.8% up from 8.4%.
- **For all cellside refusals there is a lack of a chronological progress note in a SOAPE format. There is a lack of the specific RBAC discussion documented in the progress note.**
- Chairside refusals do however have a chronological progress note in a SOAPE format as the patient is able to ask the Dentist questions face to face of their understanding of the informed consent and the informed refusal discussion.
- Not all refusals have the RBACs in the form. Not all the refusals have the prescribed dental treatment being refused and the reason for the refusal.
- The LOP for informed refusal is in process of being completed. The patient must understand the informed consent for Risks, Benefits, Alternatives and Consequences (RBACs) of the treatment and also must be informed of the consequences of not doing the treatment so that if the patient refuses, there is full understanding of the RBACs.

**Recommendation:**

- According to the ADA, "The recording of accurate patient information and treatment in the dental record, sometimes referred to as the patient chart, is essential for good risk management. **As a result, the value of maintaining thorough and accurate dental records cannot be overstated.**"
- Write a chronological progress note regarding the refusal in the SOAPE format, rather than just in a task.
- Place a discussion of the patient's individualized risk, benefit, alternative and consequences in the patient's clinical notes and in the refusal form. Make sure to have all this information explained to the patient so that it is an "informed refusal". Although a task is part of the overall record, a clinical note (progress note) should be written so anyone looking at the chart can see the chronological progression of care.
- Refer to the ADA's guide to writing the informed refusal.
- Include the procedure(s) being refused and the reason for the refusal on the refusal form.
- Use effective communication when discussing any RBACs and refusals with the patient.
- The California Dental Practice Act requires that informed consent (or refusal) be obtained from a patient before any treatment is initiated. It is required that the dentist ensure the patient has all the information necessary to make an informed decision.
    - Informed refusal for Dental Treatment means the patient has been fully informed of the treatment options, the risks of not proceeding with the treatment, and any consequences of refusal.
    - The dentist doesn't necessarily need to be physically present when the informed refusal is signed but MUST ensure that the patient has been adequately informed, has the necessary information about the RBACs and understands their decision to refuse.
    - The process often involves the dental assistant discussing the options with the patient and having them sign a document. However, the dentist should ensure the patient is given adequate time and opportunity to ask questions of the dentist and understand the consequences of refusing treatment.

- o Witness to an informed refusal for dental treatment or DSC is best done by a healthcare professional or a neutral third party trained in the informed consent process to serve as the witness to best protect the integrity of the process. While a custody officer could be a witness to an informed refusal for dental treatment or DSC, it is not ideal and could raise concerns regarding neutrality and coercion.
- A refusal progress note should contain:
  - o "Information the practitioner gave to the patient concerning the patient's condition and the proposed treatment or test. Also note the reasons for the treatment or test.
  - o Documentation that the patient was advised of the possible risks and consequences of failing to undergo the treatment or test, including the loss of life or impairment of bodily functions adversely affecting the routine activities of daily living, if appropriate.
  - o Details about the practitioner's referral to a specialist, including the reasons for the referral and the possible risks of not seeing the specialist.
  - o A record of the patient's refusal of the treatment/testing plan or advice. In this circumstance, consider asking the patient to sign a specific refusal form. Although a form is optional, it offers practitioners the strongest protection against subsequent claims that allege a lack of informed refusal."[17]

## A.20  Grievances – 45.8% - NC

*All dental complaints are assessed, provided treatment for obvious infection and pain relief at regularly scheduled medical sick call by the MD, PA or RN <u>to be seen within one day of the request.</u> The complaint is prioritized and referred to Dental Sick call as deemed necessary. Interim treatment for pain and infection is provided until the patient is seen by the dentist. (Wellpath IP, p. 101)*

**Deficiency:**
- See Table 12 in the Statistics tab for Grievances for additional information. Dental grievances account for approximately 10.8% of the overall grievances at MCJ.
- It appears that 45.8% of the dental grievances were read, but the patient not always seen for a resulting Nurse Sick Call within 24 hours as stated in the Implementation Plan.
- Grievances for dental, mental health or medical sick calls are not always separated independently by individual categories. For example, there are times when a dental grievance is in a medical category. The file sent did not have dental grievances independent of other grievances. Perhaps this happens but was not identified in the Smart Communication file sent for review.

---

[17] https://www.thedoctors.com/articles/informed-refusal

Final Report 2025-10-31                                            Dental Neutral Court Monitor
69

- For individual reviews of compliance to this Implementation Plan mandate, few if any requests for dental services were scanned into the document section of CorEMR. Few Nurse Sick Calls were completed for each grievance.

**Recommendation:**
- Provide the overall grievance file performed by Wellpath monthly with the production reports.
- See the grievances within one day of the grievance request per Wellpath's IP.
- Complete a Nurse Sick Call, assign a Priority Dental Level 1 or 2 per the conditions screened during the NSC. Schedule in accordingly.
- Schedule the patient in the dental clinic by assigning a priority dental level 1 or 2 according to the patient's condition.
- Dentist is to address the patient's chief complaint(s).
- Please review parameters and objective findings needed to substantiate a priority 2 referral and include them in the P & P and LOP for grievances.
- Scan the grievance into CorEMR to provide an audit trail.
- Perform a self-audit and enter the results into the monthly Dental Subcommittee meeting.

## Timeliness of Dental Care: Sections B.1 through B.9

### B.1  Dental Level Priority 1 - Urgent/Emergent – 58.3% - NC

**Deficiency:**
- Wellpath has submitted a Monterey Compliance Report per the Dental CAP #50 & #51 to measure compliance. It identifies a task as compliant or non-compliant. However, this report has several inconsistencies not matching with the data in CorEMR's reporting and does not address the issue of compliance overall, nor separates Priority Dental Levels and Dental Priority Codes (DPC), which was part of its intended purpose.
- In the Form Question Report and in the Form Report, they can see tasks created within the forms but not see dental care scheduled and seen outside of the forms.
- Therefore, the timeliness of care compliance reports for all referrals to dental from Intake, Sick Call, 14-Day Exam, Physician visit and Physician on Call (POC) have not been completed yet by CorEMR per the Dental CAP #51, although it is in the testing and vetting stages per the Operations Specialist.
- See patient # ▮▮▮▮▮ who was not seen for this urgent referral / DL1 from intake, but a new task was created on the same day and changed to a DL2, then the patient refused.
- Refer to the Database tab within this spreadsheet to view the individual results of each audit.

**Recommendation:**
- Update CorEMR to report timeliness of care compliance for Dental Level referrals from nursing to dental, to also include if the patients are seen within timeframe.

- If possible, include the referrals from the outside specialist in the Monterey Compliance Report, CAP #31-35.
- Perform the Initial Health History & Physical Exam and the Initial Health History & Physical Exam Dental Screening within timeframe (within 14 days of booking) so patients are referred to dental for identified Priority Dental Level 1 and 2 conditions.
- See screened, identified and scheduled urgent/emergent patients within the Priority 1 timeframe on the next dental day.
- Please provide the audit trail for why patients with a Priority 1 timeframe are changed to a Priority 2.
- Dental Sick Calls can only be completed by the Dentists.
- Documented training is still needed.
- Please review and let me know how this situation can happen in CorEMR to see if there are any flags to attach to the task when tracking compliance.
- Make sure that each and every patient has a visual inspection of their oral cavity in order to assess their mouth condition, irrespective of pain. Assign a priority level commensurate with the evaluation and refer and schedule accordingly.

## B.1A  Dental Level Priority 2 – Routine – 51.4% - NC

**Deficiency:**
- Priority 2 designation by the RN and scheduled for Routine conditions from Intake, 14-Day, Sick Call and Physician referrals to dental, are not always seen within timeframe.
- Perform the Initial Health History & Physical Exam and the Initial Health History & Physical Exam Dental Screening within timeframe, within 14 days of booking, so patients are referred to dental for care when appropriate and seen within the Priority Dental Level 1 and 2 designation.
- Refer to the Database tab within this spreadsheet to view the individual results of each audit outcome measure.

**Recommendation:**
- See B.1 above for additional information.
- See the patients in dental within the Priority 2 Dental Level timeframe, and within 14 days of the referral.
- Make sure that each and every patient has a visual inspection of their oral cavity in order to assess their mouth condition, irrespective of pain. Assign a priority level commensurate with the evaluation and refer and schedule accordingly.

## B.2  Dental Priority Code (DPC) - Priority 1 thru 5 – 55.6% - NC

"*Dental Priority System*
*a. Dental treatment will be provided in accordance with the following Dental Priority System:*
*(1) Emergency Care (Immediate Treatment):*
*Inmate-patients requiring treatment of an acute oral or maxilla-facial condition, which is likely to remain acute, worsen, or become life threatening without immediate intervention.*

*(2) Treatment within 1 calendar day:*
*Inmate-patients with a dental condition of sudden onset or in severe pain, which prevents*
*them from carrying out essential activities of daily living.*
*(3) Treatment within 30 calendar days:*
*Inmate-patients requiring treatment for a sub-acute hard or soft tissue condition that is likely*
*to become acute without early intervention.*
*(4) Treatment within 60 calendar days:*
*Inmate-patients requiring early treatment for any unusual*
*hard or soft tissue pathology.*
*(5) Treatment within 120 calendar days:*
*Advanced caries or advanced periodontal pathology requiring the use of intermediate*
*therapeutic or palliative agents or restorative materials, mechanical debridement, or surgical*
*intervention. Moderate or advanced periodontitis requiring non-surgical periodontal treatment*
*(scaling and/or root planing)*.” (Wellpath IP, p. 101 and 102)

---

**Deficiency:**
- Wellpath has submitted a Monterey Compliance Report per the Dental CAP to measure compliance. It identifies a task as compliant or non-compliant. However, this report has several inconsistencies not matching with the data in CorEMR's reporting and does not address the issue of compliance overall, which was part of its intended purpose.
- **DPC 1** is partially within timeframe with 75.0% and therefore partial compliance for patients seen for treatment the same day as diagnosis.
- **DPC 2** is within timeframe with 91.3% and substantial compliance for patients seen for treatment within one day of diagnosis.
- **DPC 3** is partially within timeframe with 81.7% and therefore partial compliance for patients seen for treatment within 30 days of diagnosis.
- **DPC 4** is not used this audit period.
- **DPC 5** is partially within timeframe with 83.0% and therefore partial compliance with patients seen for treatment within 120 days of diagnosis.
- The DPC and next visit are not always listed in the progress notes following a Dental Sick Call.
- Refer to the Database tab within this spreadsheet to view the individual results of each audit outcome measure.
- Please review the Reschedules discussion in the Executive Summary on page 27.

**Recommendation:**
- See the patients within the DPC parameters.
- All treatment plans are to be completed within the longest DPC.
- For continuity of care and consistency in the SOAPE notes, please list the DPC and the next visit in the progress notes.
- Provide training when necessary.
- Update CorEMR to report on treatment compliance using the DPC timeframes.
- Once the report is fully available, utilize it to locate barriers to timeliness of care for dental treatment and dental referrals from Intake, 14-Day, Sick Call, Physicians and POC.

---

---

- Perform self-audits to identify any inefficiencies to the timeliness of dental care. Include this information into the monthly Dental Subcommittee minutes.
- Now that all the programs are implemented, there may be increased barriers to the timeliness of care. Perform a workload analysis prior to and after the workflows in the LOPs have all been drafted. Report the results to the monthly Dental Subcommittee.

---

## B.3  Chronic Care – 64.3% - NC

---

**Deficiency:**
- See A.16.
- 12 patients were referred from Chronic Care and were seen 64.3% of the time within referral timeline. Some patients were not referred to dental as indicated per a completed HEENT/NECK screening and/or a clinical note.
- The chronic care forms are varied, and not all the chronic care forms have a place for a review of normal or abnormal findings in the Oral/Dental portion of the chronic care exam. Please add this section or add the HEENOT to the HEENT/NECK examination.
- Dr. Vaid, Medical Director, stated during this audit tour that she will begin referring patients to dental when indicated.
- For patients with HIV:
  - See patient # ▇▇▇▇▇ whose radiographs were taken but not reviewed by the Dentist. **Place an AMENDMENT in the chart upon review of the x-rays.**
  - See patient # ▇▇▇▇▇ where there was no mention of an intraoral review or condition. No referral to dental from Chronic Care was stated.
- For patients with Seizures:
  - See # ▇▇▇▇▇ whose HEENT/NECK screening was stated as being performed but there was no description that the intraoral evaluation was performed. Not referred to dental.
  - # ▇▇▇▇▇ received a routine referral from Chronic Care but was scheduled under Dental Sick Call rather than Dental Chronic Care. Patient not seen in dental as patient was released. # ▇▇▇▇▇ also received a referral under a dental Sick Call rather than as a Dental Chronic Care. The patient was seen for the episodic care but was not referred to dental through Chronic Care and therefore, did not receive a comprehensive dental examination. Also, patient # ▇▇▇▇▇ seen as a Dental Sick Call but was scheduled for a Comprehensive Dental Examination within 90 days however, the patient was released.
  - # ▇▇▇▇▇ HEENT/NECK not performed, and patient not referred to dental.
  - # ▇▇▇▇▇ , # ▇▇▇▇▇ # ▇▇▇▇▇ # ▇▇▇▇▇ HEENT/NECK performed but no mention that intraoral evaluation performed and no description placed. No referral indicated on the form.
- For patients with Diabetes:
  - Similar issues, HEENT/NECK performed but no description of the condition of the oral cavity, even if it is within normal limits, to show it was conducted.

---

- o **Patient #▮▮▮▮▮ Has a 2mm "bump" noted on the floor of the mouth, but the patient is not referred to dental. Please find and schedule the patient for a re-evaluation of the oral lesion.**
- o #▮▮▮▮▮ #▮▮▮▮▮ referred to dental as a DSC, not as a Chronic Care referral, so patient only received routine referral for episodic care and then was not scheduled for comprehensive dental examination through Chronic Care.

**For patients with Pregnancy:**
- o #▮▮▮▮ referred to dental on 03/01/25 but no Dental Chronic Care referral was completed. Please schedule the patient if still at MCJ.

**For patients with SMI and/or on four or more psychotropic medications:**
- o None of the patients who received a Mental Health Initial Evaluation were screened for their intraoral condition, there is no dental referral section within the form, and the patient were not screened for ADLs for dental care.
- o **#▮▮▮▮ received a Dental Sick Call for a DL2 condition but not scheduled within DL2 timeframe. A Dental Chronic Care referral was made but the patient did not receive the Dental Chronic Care comprehensive dental examination on 03/13/25, please schedule the patient if still at MCJ.**

**Recommendation:**
- Training by Dentist or CDO is recommended for the physician(s) who performs the Chronic Care Examinations to review the criteria for referral to dental for patients with HIV, Seizures, Diabetes, Pregnancy and Serious Mental Illness to Dental when indicated.
- Please update the chronic care form(s) to include a section for oral evaluation if it is not already in the form. If that is not possible with CorEMR, then please add the HEENOT to the HEENT/NECK examination as the HEENOT look at "teeth, gums, mucosa, tongue, and palate examination (HEENOT) for assessment, diagnosis, and treatment of oral–systemic health." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4330841/
- Finding patients who were referred to dental from chronic care was challenging. I request a review of CorEMR with the Operations Specialist to locate how to find the patients for auditing.
- Please update the LOP for dental chronic care. If a patient's condition warrants an earlier appointment, please schedule accordingly.

## B.4  Comprehensive Dental Care – 70.8% - NC

**Deficiency:**
- See Table 4C in the Statistical portion of this audit tour for additional information.
- See A.17
- 19 incarcerated persons received a requested comprehensive annual dental examination (DAE). They no longer track how many are eligible for a comprehensive dental examination.
- It is unknown how many requested the exam. Without doing a word search in the inmate requests in Smart Communication and Nurse Sick Calls, there is no report to show the

exact number of patients who requested the DAE nor the exact number of completed Nurse Sick Calls for a DAE. More than 19 may have requested an annual comprehensive dental examination but without the list of patients referred to dental it is an unknown. Since there is virtually no scanned incarcerated person request in CorEMR, nor is there a completed Nurse Sick Call, compliance for the overall system of compliance is not currently something CorEMR can calculate.

- Refer to the Database tab within this spreadsheet to view the individual results of each audit outcome measure.
- However, this question for compliance also asks if they received the full exam including radiographs, periodontal probing, an individualized treatment plan and DPC and these were the patterns of care:
    o Most of the patients did not receive the following items:
    o Missing the full mouth periodontal probings, especially when there is a measurement of 3 or more in the PSR. (See p. 62-65, A.18).
    o Missing perio mobility (also attachment loss, bleeding on probing, furcation involvement) in the perio probing form.
    o Missing the 4-6 weeks periodontal re-evaluation timeframe for establishing frequency of periodontal maintenance or another round of SRPs.
    o Generally, the periodontal recall frequency could be every 3, 4, 6 month recall. First however, the periodontal 4-6 week re-evaluation is to establish if the periodontal disease program therapy was successful.
- The timeliness of care can only use scheduled tasks to build the compliance report for dental treatment; therefore, any unscheduled tasks are not measured in CorEMR. If a treatment is left unattended and not scheduled, there is no way in CorEMR to find unscheduled dental tasks and the timeliness of care cannot be measured. See the DPC section B.2.
- There is a general failure to state and schedule the exam and periodontal, recall and frequency, in the progress notes and on the dental treatment form.
    o The exam recall is yearly unless stated otherwise.
    o The periodontal frequency can be (3 months recall, 4 months recall, 6 months recall).
    o No tasks were created for exam or periodontal, recall and frequency, in order for there to be continuity of dental care for the patients.

**Recommendation:**
- Every incarcerated request for dental care in ViaPath should have the same number of completed Nurse Sick Calls and subsequently the same number of Dental Periodontal Examinations.
- Without this full audit trail, the timeliness of care cannot be fully identified in the system of dental care. This is an important aspect of compliance for self-governance to achieve as this is a primary mandate in the Wellpath Implementation Plan.
- Therefore, see if the DAE, as well as the DPP and DCC referrals can be included in the Monterey Compliance Report and separated into these different categories as you will be doing for Intake, 14-Day, Sick Call, MD and POC referrals to Dental.

- Perform the full periodontal probings for the diagnosis. (See p. 62-65, A.18). Fill out the periodontal evaluation fully to the periodontal probings, mobility, attachment loss, bleeding on probing and furcation involvement.
- Perform the 4-6 week periodontal re-evaluation. This section in also in the Dental CAP.
- Once the periodontal re-evaluation is completed and assign the recall frequency.
- If another round of SRP's is indicated during the perio re-evaluation, state the reasons why and if the diagnosis has changed.
- Schedule all the treatment plan tasks in the appropriate timeframe understanding that all treatment must be completed by the longest DPC in the treatment plan.
- For each comprehensive dental examination: Identify and place the exam recall and periodontal recall and frequency in the Dental Treatment form and in the progress notes.
- Establish a system of recall such that periodontal treatment received includes the ability for the patients to receive a periodontal re-evaluation, periodontal recall and maintenance on a schedule prescribed by the Dentist, in conjunction with their individualized treatment received during their incarceration at MCJ.
- Provide a clinical and periodontal examination, provide a pulpal diagnosis when appropriate, phase the treatment plan with a Dental Priority Code (DPC ) for each line of treatment. Utilize the DPC to schedule and see the patients within timeframe. The timeframe is all treatment is to be completed no later than the longest DPC. Also be mindful when placing the DPC that often the clinician will want to schedule the deep cleaning prior to any restorations. As of this audit most all DPCs were set at DPC 5 although some treatment should have been done within 30 days due to the severity of the dental problem.
- Perform a workflow analysis to see if there are any barriers to timeliness of care by looking in the incarcerated persons request for dental care file and by making sure there is just as many completed Nurse Sick Calls and subsequent Dental Sick Calls scheduled in order for comprehensive dental care examination and treatment to occur timely.

## B.5  Periodontal Disease Program – Deferred Findings - DF

**Deficiency:**
- See also A.18.
- Deferred findings however, a general review of the Periodontal Disease Program found that the deficiencies are similar to the issues found in the previous dental audit tour. Review the Dental Report #12 for more information. Essentially, the workflow needs to be reframed and updated to reflect the right categories of referral to the Dental Periodontal Program are completed with the treatment plan completed in the Dental Treatment category.
- Dr. ███████ is giving patients a periodontal diagnosis on the first visit without the full periodontal examination and radiographs. It is below the standard of care to provide a diagnosis without the objective findings completed to substantiate the diagnosis. Subsequently, the treatment plan cannot be prescribed without a diagnosis.
**Recommendation:**

Deferred findings but the same issues are found from the previous dental audit tour. Please review the Dental Report #12 for information.

- Review the American Dental Association 2024 CDT codes D0180 and also the Diagnostic Imaging section. For the comprehensive periodontal evaluation: "D0180 comprehensive periodontal evaluation - new or established patient. This procedure is indicated for patients showing signs or symptoms of periodontal disease and for patients with risk factors such as smoking or diabetes. It includes evaluation of periodontal conditions, probing and charting, an evaluation for oral cancer, the evaluation and recording of the patient's dental and medical history and general health assessment. It may include the evaluation and recording of dental caries, missing or unerupted teeth, restorations, and occlusal relationships." [ADA CDT 2024 - Code on Dental Procedures and Nomenclature - Current Dental Terminology, Diagnostic p. 5]

These are the steps which must occur on the first appointment. Depending on the clinical presentation, the following generally takes between 15-30 minutes:

- The Dentist is to see the patient within 30 days of the request. Therefore, the RN is to schedule a patient for a DPP within 30 days of the request, where generally the patient requests a cleaning.
- Obtain written consent prior to the periodontal examination and radiographs.
- Make sure to review the health history and allergies prior to ordering the radiographs.
- The Dentist is to obtain diagnostic radiographs. At a minimum four bitewings and upper and lower anterior teeth, canine to canine. If additional x-rays are indicated from these, then take them as clinically indicated.
- From the radiographs, chart existing restorations, identify and chart pathology, note the bone level and determine if there is any radiographic calculus.
- Perform and chart the full periodontal probings. See the discussion at A.18.
- Perform and chart mobility, furcation involvement, attachment loss and any bleeding on probing.
- Perform an oral cancer check. Describe the condition of the gingiva and other findings and note these in the treatment record as well.
- Review the objective findings and provide a diagnosis.
- Determine the treatment plan to be commensurate with the diagnosis. Generally, in most cases, the treatment plan will either be a prophy/cleaning or a deep cleaning/Scaling and Root Planning (SRP).
- Assign a DPC to each line of the treatment plan. Not all treatment is going to be a DPC 5 (within 120 days). All treatment DPCs must be substantiated by the patient's gingival and periodontal condition. All treatment must be completed by the longest DPC.
- Inform and document the conversation with the patient of the diagnosis and treatment plan and provide the diagnosis paperwork for the patient to understand and sign.
- Write the progress note in a SOAPE format, including the RBACs and discussion with the patient.
- If there is time, perform the prophy/cleaning, floss and polish.
- Assign a recall schedule/frequency.

- For those patients who receive an SRP, assign a task for the patient to return in 4-6 weeks for a periodontal re-evaluation following the completion of the deep cleaning/SRP. This is where the patient will be evaluated for either another round of SRP if indicated or placed on recall.
- If the patient who received an SRP is placed on recall, vs receiving another round of SRP, then polish the patient's teeth and assign a clinically relevant recall. 3 months, 4 months or 6 months is generally the accepted standard of care recall for a periodontal diagnosis.

## B.6  Refusals – 87.5% - SC

**Deficiency:**
- See also A.19.
- Refer to the Database tab within this spreadsheet to view the individual results of each audit outcome measure.
- Refused, Rescheduled and Cancelled by Staff are only found in the Task notes and are not listed chronologically in the patients progress notes.
- Generally, the dental staff have the refusals signed the same day as the day of the refusal. If the patient does not refuse at the dental clinic the dentist does not have a face to face discussion with the patient cell side. Please address this in the LOP as an informed refusal is an important part of discussing the RBACs associated with the refusal of a prescribed treatment.
- The refusal forms are generally scanned timely into the document section of CorEMR.

**Recommendation:**
- Under California law and Title 22, patients have the right to refuse treatment (as long as they are mentally competent to do so).
- This documentation in the patient's medical record helps ensure the refusal is acknowledged and that there is no misunderstanding or confusion about the patient's decision and protects both the healthcare provider and the patient legally.
- Monitoring refusals can help identify recurring trends and patterns or areas where patients are frequently refusing treatments, which could point to larger systemic issues and subsequently improve patient care practices.
- CCR Title 22, Section 72511 – Patient Rights
- CCR Title 22, Section 70707 – Medical Records
- CCR Title 22, Section 72513 – Informed Consent
- California Code of Regulations (CCR), Title 16, Section 1005 – Professional Conduct
- California Business and Professions Code – Section 1680-1690 (Dentist's Code of Ethics)
- California Health and Safety Code – Section 123100-123149 (Patient Rights)
- Create the LOP for refusals. Include refusals for treatment as well as dental sick call, comprehensive dental exam, etc.
- Write what procedure is being refused on the form and review the RBACs with the patient for the informed refusal.
- Scan the refusal form and write the date of the refusal on the comprehensive treatment plan form when applicable.

## B.7  Reschedules – 52.9% - NC

**Deficiency:**
- See the discussion within the Executive Summary regarding reschedules.
- Overall reschedule rate is 1.4%, however this number may be ambiguous as Cancelled by System will need to be added to the measure of compliance.
- Oftentimes the reason for a reschedule is not always given in the task notes. Reschedules as well as Refused and Cancelled by Staff are only found in the Task notes and are not listed chronologically in the patients dental record progress notes.
- Rescheduled, Refused and Cancelled by Staff are only found in the Task notes and are not listed chronologically in the patient's dental record progress notes.
- Refer to the Database tab within this spreadsheet to view the individual results of each audit outcome measure.

**Recommendation:**
- Write a progress note in chronological order to identify why the specific scheduled patient wasn't seen, identify the DPC and next visit. Do not extend the DPC. See the patient within the original identified timeframe.
- Continue to minimize dental reschedules and state the reason why the dental appointment was rescheduled. Create a new task to reappoint them.
- Minimize nursing sick call reschedules for dental appointments. See the patients within one day of the inmate requests per the Wellpath IP, p. 101.

## B.8  Cancelled by Staff – 73.1% - NC

**Deficiency:**
- Refer to the Database tab within this spreadsheet to view the individual results of each audit outcome measure.
- The majority of the 297 Cancelled by Staff, of which 101 patients were previously set up automatic eligibility tasks for the annual comprehensive dental examination. Per the Operations Specialist this setting has been turned off. The Incarcerated Persons Orientation Manual now states that the comprehensive dental exams are for those patients who request it after one year of incarceration. By removing these automatic tasks, a more accurate number of scheduled vs seen tasks will come to light during the next audit tour.
- Another set of reasons for a high number of patients cancelled by staff may be due to duplicate tasks, created outside of the intake form. The actual number of duplicate tasks is not measured by CorEMR.
- **What was stated as a duplicate task was deleted for patient #████ and the patient was never referred for, "Level 1- 10/10 Pain for Right lower back molar pain Urgent Referral from intake".**
- The Operations Specialist stated she will do a deep dive into the list of patients cancelled by staff to see the reason for the cancellation.

- Cancelled by Staff are only found in the Task notes and are not listed chronologically in the patients progress notes. Every scheduled patient encounter should have a clinical note to see the full chronological aspect of a patient's dental history without having to go to various tasks to see the care previously provided.

**Recommendation:**

- Minimize Cancelled by Staff appointments, see the patients within timeframe and state in the clinical notes the reason why the dental appointment was cancelled by staff.
- Hopefully by addressing these issues and providing training, a more accurate number of scheduled vs completed (seen) tasks will come to light by the next audit tour and there will be fewer cancelled by staff. The Operations Specialist will do a deep dive into the Cancelled by Staff to identify if any patients were cancelled inadvertently.
- Minimize duplicate appointments by providing more nurse trainings in this area.
- Do a deep dive into the remaining reasons for the deleted / cancelled by staff task and begin to eliminate any barriers to access and timeliness of care.
- I recommend the dental staff evaluate thoroughly this category and address any issues that occur outside of the duplicate and eligibility for annual exam tasks.

### B.9  Custody – 100% - SC

**Deficiency:**

- The officer stays outside the dental operatory but within the dental clinic and is able to visualize both the patient receiving a dental exam or treatment as well as visualize the patients in the waiting room.
- Although there appears to be no interruption of dental care due to Custody, this area does not have a proof of practice from Custody.
    - Per the Counsel for Defendant County of Monterey and Monterey County Sherriff's Office, there are daily rosters that confirm a deputy is assigned to dental escort duties, however these were not provided. From the Custody Captain, a digital log may be forthcoming to more easily and further substantiate this category of access to care.
    - There were no attendance logs provided to review if there were any Custody delays or missed days affecting the delivery of patients to the dental clinic for this six (6) month audit period.
    - Per the Operations Specialist, Dental's proof of practice for Custody is an "Interruption of Services" form. The Interruption of Service form did not indicate any interruption in delivery of patients to the dental clinic. Please provide this monthly as one portion of proof of practice, with the monthly production documents from now on.
    - Per the Operations Specialist, Deputies have been available with no disruption of Deputy services during this audit timespan. "In the event of a service

interruption or an inability to access the patient for care provision due to circumstances beyond the control of healthcare personnel, the Dental team documents in the patient's medical record within CorEMR the reason. If there is not Deputy available, they also document in a "Interruption of Services" form."

- o The dental staff stated they have not had any difficulty getting their patients to come for their appointments and have not had to use the Interruption of Service form during this audit review period.

- In the County of Monterey's response to the draft report, Counsel states, "In addition, Plaintiffs' comment that the dental escort deputy is scheduled one hour later than the start of the dental staff's shift "appeared to be entirely due to custody staffing" is pure speculation. The dental staff have created this schedule, with deputy escorting starting one hour into their shift by design. This allows dental staff to prepare for their day, huddle to discuss the day's appointments and tasks, and prepare for their patients. Dental staff have determined this is the best schedule."
  - o This statement appears slightly incongruent with other information provided where the "one hour later than the start of the dental staff's shift" is due to the Psychiatrist utilizing this hour for patient care.
  - o **Nonetheless, it will be the CDO's responsibility to discuss with the HSA how the Custody Officers will be allocated to the Dental Clinic. Please provide the Custody schedule once this item is reviewed and determined.**

**Recommendation:**

- In order to verify substantial compliance moving forward, please have the daily rosters and/or the digital attendance logs available for review to confirm there are no interruption of dental care due to Custody.
- Operations Specialist to provide the Interruption of Services form, if any, during future dental audit tours.
- CDO to discuss with the HSA and Custody if additional information is needed, how the Custody Officers will be allocated to the Dental Clinic.
- Continue to establish open lines of communication with Custody by having a Custody representative at the Dental Subcommittee meeting in order to discuss any Custody related barriers to access and timeliness of care.

## Quality of Dental Care: Sections C.1 through C.13

### Radiograph Interpretation

Failure to address pathology in an x-ray continues despite training, and could be considered negligent, in addition may violate both professional standards and the duty of care owed to the patient. For example, if a dentist neglects to notice a condition like a tumor, cyst, or infection visible on a radiograph, it could be considered a breach of the dental standard of care.

It is the dentist's responsibility under the **California Dental Practice Act to review all diagnostic records**, including radiographs, in order to provide an accurate diagnosis and treatment plan. This includes identifying any pathology shown in an x-ray and informing the patient of the finding. "A dentist licensed under this chapter is authorized to practice dentistry, including the making of a diagnosis of the condition of the human teeth, jaws, and mouth, and to prescribe and administer treatment as necessary."

The **California Dental Practice Act** requires that all clinical procedures be under the direct supervision of a licensed dentist, especially when it comes to the interpretation of **diagnostic records such as x-rays.**

"A dentist is responsible for the diagnosis, treatment planning, and treatment provided to a patient. All work performed by auxiliary personnel must be done under the supervision of a licensed dentist."

This regulation establishes that the dentist is ultimately responsible for interpreting and addressing **any findings** in radiographs, including pathology, to ensure that the patient receives appropriate care.

According to the **California Dental Practice Act** and **American Dental Association (ADA) guidelines**, the dentist is required to use appropriate radiographs to detect conditions like caries, bone loss, or other pathologies.

**The California Dental Practice Act** is the section of the **California Business and Professions Code, Division 2, Chapter 4 starting with Section 1600** which governs the licensure, regulation, and practice of dentistry in California, outlining the responsibilities and regulations for dental professionals. See Section 1625 and 1646 of the Code.

Therefore, if pathology exists in an x-ray, it must be addressed as part of the diagnosis and treatment plan. The patient must be informed.

**Section 1680 of the Code** indicates that a dentist has the ultimate responsibility for any clinical decisions made, even if performed by auxiliary personnel (like dental hygienists or dental assistants). This includes reviewing diagnostic materials such as x-rays.

**See the California Code of Regulations (CCR), Title 16, Division 10**, which requires that radiographs taken as part of a patient's care, must be reviewed by the treating dentist. This is also implied through regulations regarding record-keeping, clinical judgment, and the need for the dentist to ensure the accuracy of diagnosis. The dentist must interpret the radiographs to identify any abnormalities or pathology that can affect the patient's treatment.

**California Code of Regulations (CCR), Title 16, Division 10, Section 1005 (Practice of Dentistry** While this regulation primarily focuses on standards for dental procedures, it

emphasizes the responsibility of the dentist in diagnosing dental conditions, including the interpretation of radiographs.

"A dentist shall conduct and be responsible for all examinations and diagnoses of the oral cavity and associated structures, including the interpretation of diagnostic records, such as X-rays."

This regulation reinforces the idea that dentists are responsible for interpreting diagnostic materials, which include dental x-rays, and addressing any pathology found within them.

## California Dental Association (CDA) and Ethical Guidelines:

The **California Dental Association** (CDA) outlines ethical standards and best practices for dental professionals in the State of California. Though the CDA does not provide specific laws, it provides guidance that dentists must exercise reasonable care in interpreting diagnostic tools like x-rays and addressing any potential pathology.

**CDA Ethical Guidelines:** The CDA's standards emphasize that dental professionals have an ethical obligation to diagnose and treat all conditions that could potentially impact a patient's health, including those seen on diagnostic images.

"Dentists have a responsibility to ensure that all diagnostic images, including radiographs, are interpreted and acted upon in a manner that safeguards the patient's health."

This aligns with the expectation that pathology detected in a dental x-ray must be recognized, addressed, and incorporated into the treatment plan.

**Therefore, this continued lack of identification of pathology in a radiograph, taken for episodic or comprehensive care, must be addressed and resolved.** Consider a documented Performance Improvement Plan (PIP) with documented training and a timeline for resolution for this current and continuing problem. Include the evaluation of missing pathology, diagnosis and treatment planning in the Supervisory Chart Audit Reviews to be sent monthly.

## C.1  Dental Triage from a Dental Sick Call Request – 75.3% - PC

---

**Deficiency:**

Informed Consent:

- The general informed consent form has not been updated to include a discussion of risks, benefits, alternatives and consequences (RBACs) for prescribed medications and local anesthetic. Nor gross debridement, enamelplasty or denture adjustment.
- Gross debridement may be needed to remove large supragingival calculus so periodontal measurements can be performed. You should also be clear that the informed consent for examinations include focused exams to address episodic care, periodontal and comprehensive exams and x-rays.

---

- The general consent form has not been updated to include a line for the witness to print their name.
- There is no available, established or approved consent form created for the removal of orthodontic braces, brackets and wires.
- For mentally incapacitated or incompetent patients, or if a patient is unable to understand the proposed exam, x-rays and/or treatment (i.e., due to a disability, cognitive impairment, or language barrier), consent must be obtained from a legally authorized representative, such as a guardian or conservator.

Dental Triage:

- Failure to identify and document radiographic findings. Radiographs, per the Dental Practice Act, must be of diagnostic quality and the clinician must address any pathology within the radiograph. See also the Dental CAP.
- They are not using a treatment plan form for episodic care, only for comprehensive care. The patients with undiagnosed caries were not informed to submit a request for further treatment for one of the cavities visible on the radiograph. If it was identified on a treatment form or on an electronic treatment form, it is possible that the pathology would not have been missed when writing the clinical note.
- Some radiographs are not fully of diagnostic quality although this area has much improved since digital x-rays have been installed. Incisal not completely visible in the radiograph. Ideally there should be 1-2mm visibility past the crown and apex of the tooth.

**Recommendation:**

Informed Consent:

- Update the informed consent forms with RBACs for medication, local anesthetic, prosthodontic and occlusal adjustment (enamelplasty) as well as for gross debridement so there can be a documented review, and discussion between the patient and dentist, and witnessed by the dental assistant.
- Obtaining an informed consent for a procedure(s) must include a discussion of RBACs with the patient. Obtaining general consent also means the patient has given permission to proceed with the examination and x-rays and/or treatment mentioned in the general consent form after the patient's understanding of the RBACs, questions answered for the Dentist to be released from the possibility of being charged with malpractice.[18,19]
- Add a print line for the witness, in addition to the existing signature line.
- Consent form discussion between the patient and healthcare provider should be noted in the progress note (SOAPE format) that the patient attests to understanding the information in the consent form and treatment agreement.
- Performing a procedure on an incarcerated person without a documented, completed, accurate, reviewed and signed informed consent form, can become a liability for MCJ and Wellpath.
- Have a separate orthodontic removal consent form completed and implemented (all approved by the forms committee), and provide documented training and use

---

[18] https://journalofethics.ama-assn.org/article/informed-consent-what-must-physician-disclose-patient/2012-07
[19] https://www.ada.org/resources/practice/practice-management/types-of-consent

consistently, as directed by the CDO in the dental clinic. Within this informed consent, there should be a place where a discussion occurred with the orthodontist informing the clinician of the status of their patient and the plan within MCJ.

- If in doubt as to how to handle this situation, contact your Chief Dental Officer (CDO) for additional information.

Dental Triage:

- Caries identified early and treated early can prevent a patient from losing a tooth.
- Obtain open contacts and radiographic apex and crown of teeth prior to diagnosis and treatment planning to prevent unforeseen events due to the lack of visualization.
- When anticipating a tooth will need a restoration, take a periapical (PA) and a bitewing (BWX) x-ray to assess for caries. Use this objective finding with the other objective findings to provide an accurate assessment and diagnosis for the patient's chief complaint. Identify all pathology in a radiograph and inform the patient. Add the DPC and schedule accordingly. See the discussion above on radiographic interpretation.
- Update the consent form. The General informed consent form should include dental examination and radiographs which it does. However, it does not include at a minimum an informed consent and discussion of risks, benefits, alternatives and consequences (RBACs) for medications and local anesthetic, prosthodontic and occlusal adjustments or gross debridement. There is no place identified for the witness to print their name although the signature line is there.
- Make sure to have the RBAC discussion identified in the progress notes regarding informed consent prior to beginning the exam and x-rays.
- Review and provide documented training to the clinician to address all pathology within the radiograph. Include this training and expectation of care in the monthly Dental Subcommittee meeting.
- Scan all documents and x-rays in a timely manner within CorEMR, preferably within 24 hours. Provide an accurate description of the scanned item to facilitate identifying the document.
- List the Objective findings in the SOAPE notes so they are used to substantiate the Assessment/Diagnosis, i.e., pain or sensitivity, duration, pain scale, hot/cold (lingering or not), percussion, palpation, swelling, exudate, lymphadenopathy, condition of tooth, decay, etc.
- Some of the reported medical history identified during the dental visit is not listed in the problem list of the medical file. *Shortness of breath with limited activity or when resting and *Chest pains or angina pectoris. Please review and advise the Medical provider in cases of inconsistent information and include the information in the clinical progress notes including if there are any contraindications to dental treatment.
- Only the Dentist can complete a Dental Sick Call. Provide training to the RNs.
- Document the objective findings, identify the diagnosis, treatment plan, assign a DPC, schedule the task for the patient.
- As with any program, Dental should not operate in a vacuum, and the results of internal audits and self-monitoring should be memorialized in their Dental Subcommittee meeting

> minutes and given to the Quality Assurance committee meeting for their input and accountability.
> - For all the items listed in the findings, please address them, and also provide documented training to remedy any deficiencies. Provide self-audits and self-monitoring to continuously re-evaluate training and re-train when indicated. List items in the policies and procedures and local operating protocol to minimize continuous oversights. Success leaves clues. Identify the successes and make them repeatable and place systems that work in the P&P and LOPs.
> - Give the pulpal diagnosis when appropriate during episodic care/dental sick call:
>   - https://www.aae.org/specialty/wp-content/uploads/sites/2/2017/07/endodonticdiagnosisfall2013.pdf
>   - https://www.aae.org/specialty/wp-content/uploads/sites/2/2017/07/aaeconsensusconferencerecommendeddiagnosticterminology

## C.2  Comprehensive Dental Care - Examination & Treatment Plan – 60.7% - NC

Per the American Dental Association (ADA), these Current Dental Terminology (CDT) codes are used during the Comprehensive Dental Examination: D0150, D0180 and D0210.[20]

There were 19 patients who received a Comprehensive Dental Examination from October 1st, 2024, through March 31st, 2025.

As mentioned previously, if a dentist **fails to diagnose caries (tooth decay)** or any other pathology, in this case from a **full-mouth X-ray (FMX)**, it could be considered a **departure from the dental standard of care**.

**Delayed treatment is one consequence of failing to diagnose caries.** Caries that go undiagnosed and untreated can lead to more severe dental issues, including tooth pain**,** abscesses, or loss of the tooth. This delay in diagnosis and treatment may result in greater harm to the patient's oral health, which is a critical concern for the dentist.

Even if a dentist is inexperienced, due to a lack of training or familiarity with reading radiographs, this would not absolve the dentist from meeting the standard of care, as all dentists are expected to have competence in radiographic diagnosis.

If the dentist lacks proper training in interpreting radiographs or has inadequate equipment, this might be considered a contributing factor. However, the dentist may still be held accountable for not ensuring proper diagnostic procedures were followed or for failing to seek consultation from a more experienced colleague.

---

[20] ADA CDT 2024 I. Diagnostic p. 4 and 5

There may be mitigating factors such as if the x-ray is of poor quality or if the caries are in very early stages and are not easily detectable. However, in most situations, failing to diagnose easily visible caries on an FMX would still likely be seen as substandard care.

The following should be done if caries are identified later. The dentist can take corrective actions such as providing treatment of the caries, providing appropriate follow-up care, and documenting the missed diagnosis to avoid future liability. Missed caries and missed pathology should not be a repeating pattern of practice.

**Therefore, not diagnosing caries from an FMX can be considered a departure from the standard of care in California**. This is particularly true if the caries were visible on the radiograph and the failure to diagnose them resulted in harm or delayed treatment. It may be classified as substandard care**,** negligence, or even malpractice if it leads to more significant dental problems for the patient. **Dentists are expected to thoroughly evaluate radiographs and make accurate diagnoses to ensure that patients receive proper and timely treatment.**

---

**Deficiency:**
- Not diagnosing caries from an FMX can be considered a departure from the standard of care in California. This is particularly true if the caries were visible on the radiograph and the failure to diagnose them resulted in harm or delayed treatment. It may be classified as substandard care, negligence, or even malpractice if it leads to more significant dental problems for the patient. Dentists are expected to thoroughly evaluate radiographs and make accurate diagnoses to ensure that patients receive proper and timely treatment.
- All pathology visible in a radiograph is not consistently identified, documented, treatment planned with the appropriate DPC in the chart and/or the information shared with the patient. CAP #46.
- The patients are entitled per the IP to a comprehensive dental examination to include the ADA CDT code D0150, D0180 and D0210.
- The Dentist is routinely failing to chart existing restorations during the comprehensive dental examination.
- There is failure to document. The periodontal diagnosis stated in the clinical notes is often not the same as what is given to the patient. The clinical notes are not always consistent.
- The treatment plan is not always updated to reflect the new dates of completion.
- A task is not always created for future treatment planned dental care. If a task is not created, the patient is essentially "lost" in the system.
- Failure to perform and document the 4-6 week periodontal re-evaluation and provide continuity of care following the results.
- There is no recall exam and periodontal recall type, and frequency listed on the treatment plan, stated for the next visit or scheduled.
- Mobility and furcation involvements are not always charted on the periodontal form.
- The Annual Exam treatment form does not handle perio well. Please adjust the form for conformity.

---

- The medical history is not always reviewed, and the review of the health history is not always noted in the clinical note. Review the medical history, allergies, medications and lab work. Document the findings in the clinical notes.
- When radiographic calculus is visible on the x-ray, it is not always stated in the objective portion of the clinical note.
- Failure to document. When the treatment is completed, the treatment dates are not always entered and rescanned into CorEMR. This type of documentation is labor intensive, however CorEMR is not an electronic dental record system so there must be accountability in this manner to show the progress of the treatment plan. Note any changes to the treatment plan and state it in the clinical notes.
    - The clinical notes are not always consistent. For example, the periodontal diagnosis is listed as moderate periodontitis but, on the form, given to the patient, the periodontal diagnosis is slight periodontitis. Please confirm the diagnosis prior to performing a treatment.
    - Place the periodontal diagnosis in the Assessment portion of the clinical note when performing a comprehensive dental examination. Mobility and furcation involvements are not always charted on the periodontal form. The Annual Exam treatment form does not handle perio well. It states periodontal health on one side of the form but on the other area states mild periodontitis. Please adjust the form for conformity.
    - Failure to document and provide continuity of care. The treatment plan is missing the periodontal probings with mobility, the perio re-eval at 4-6 weeks, the recall exam and periodontal type and frequency. The next visit procedure(s) and DPC are not always included in the clinical progress notes. The tasks are not always created and scheduled for each line of the treatment plan. Treatment must be phased and completed by the longest DPC assigned.

**Recommendation:**
- See C.1 above for additional findings and recommendations.
  Update the general informed consent form as previously discussed.
- All pathology in a radiograph is to be charted, documented, treatment planned and a DPC included as well as discussed with the patient.
- Review the radiographs and clinical presentation and indicate all the pathology clinically and from the radiographs on the treatment form. Please chart existing restorations in blue pen and problems (caries, etc.) in red. Indicate on the form the treatment and assign the DPC code. Remember that all treatment is to be concluded within the DPC 5 (120 days). Phase accordingly.
- Review and discuss the risks, benefits, alternatives and consequences (RBACs) for the periodontal diagnosis and proposed treatment plan with the patient and indicate the discussion in the clinical progress notes.
- Perform the informed consent conversation, sign, date, witness. Add a line for the witness's printed name.
- Refer to an outside provider or specialist when a panoramic x-ray is necessary, as this type of x-ray is not available on-site. [See Wellpath IP at p.103]

- To prevent harm to the patient, chart existing restorations in blue and problems, decay, and pathology in red. Obtain the proper diagnosis and thus the proposed dental treatment must correlate with the established diagnosis. Dr. ███ CDO to provide training in charting.
- Update the Annual Dental Exam especially the periodontal section. Contradictory form development. Remove the existing shading for occlusal restorations.
- Some of the x-rays have overlap, are foreshortened, or elongated. Obtain the apex of wisdom teeth prior to extractions in order to visualize the clinical field and not miss any pathology. ***Discuss between Dental Assistant and Dentist if any retakes are necessary prior to releasing the patient. Utilize feedback and ask for training when necessary.
- Make sure the wisdom teeth are included in the radiographic series and treatment planned if indicated on the treatment form. The radiographic visualization of the wisdom teeth is part of the comprehensive dental examination to include the ADA CDT codes D0150, D0180 and D0210.
- Send out for a panoramic x-ray when indicated per the Wellpath IP, p. 103. "Panoramic radiograph may be requested from an outside source when, in the discretion of the dentist, it will assist in diagnosis and treatment planning."
- Print the dental treatment form and enter the date of the completed treatment and rescan into CorEMR. Without an EDRS, this scanning method keeps track of completed treatment.
- Periodontal probings, mobility, attachment loss due to recessions and other periodontal findings as stated in the American Dental Association (ADA), CDT code D0180, are to be charted at the time of the periodontal and comprehensive dental examination.
- At the comprehensive dental examination, place the periodontal diagnosis in the assessment portion of the SOAPE note. Review the previous clinical notes for consistency and accuracy.
- Assign the DPC to each line of treatment. Please provide training to the dentists that all the treatment plans must be completed within the longest assigned DPC. Please phase and create tasks/appointments for the treatment plan.
- Set a periodontal maintenance recall schedule for those who received a comprehensive dental examination. Also set the annual exam recall on the treatment plan, and schedule accordingly. Periodontal maintenance recall is not limited to yearly. Here are some recommended options per the clinical situation and assign a DPC: 3 months recall (3MRC), 4 months recall (4MRC), 6 months recall (6MRC).
- Perform the periodontal probings as one of the objective factors for diagnosis.
- Place the periodontal diagnosis in the Assessment portion of the clinical note when performing a comprehensive dental examination.
- The perio re-eval at 4-6 weeks, the recall exam and periodontal type and frequency. The next visit procedure(s) and DPC are not always included in the clinical progress notes. The tasks are not always created and scheduled for each line of the treatment plan.
- Treatment must be phased and completed by the longest DPC assigned.

> - Train from the P&P and LOP. Submit the training records to the monthly Dental Subcommittee meeting and have it noted in the minutes. Continue to strive for continuous improvement.

### C.3  Chronic Care – HIV – NA & DF

> **Deficiency:**
> - N/A and Deferred findings. The majority of the patients diagnosed with HIV who were referred to dental from Chronic Care were not seen for comprehensive care.
>
> **Recommendation:**
> - Perform an oral assessment at the Chronic Care initial and Follow-up appointment and refer the patients when indicated.
> - The condition of the oral environment can affect the person's overall health and wellbeing. The patient is not segmented into parts; medical, mental health and dental, they are all interrelated and integrated into one. Please invite a representative from each division of medical, mental health, and pharmacy to attend the monthly Dental Subcommittee in order to discuss cases, barriers to access to care and to nurture open lines of communication.
> - Have the CDO provide a training session for the physicians regarding often seen dental conditions which are best to refer to dental.

### C.4  Chronic Care – Seizures – NA & DF

> **Deficiency:**
> - N/A and Deferred findings. The majority of the patients diagnosed with Seizures who were referred to dental from Chronic Care were not seen for comprehensive care.
>
> **Recommendation:**
> - Perform an oral assessment at the Chronic Care initial and Follow-up appointment and refer the patients when indicated.
> - The condition of the oral environment can affect the person's overall health and wellbeing. The patient is not segmented into parts; medical, mental health and dental, they are all interrelated and integrated into one. Please invite a representative from each division of medical, mental health, and pharmacy to attend the monthly Dental Subcommittee in order to discuss cases, barriers to access to care and to nurture open lines of communication.
> - Have the CDO provide a training session for the physicians regarding often seen dental conditions which are best to refer to dental.

### C.5  Chronic Care – Diabetes – NA & DF

> **Deficiency:**
> - N/A and Deferred findings. The majority of the patients diagnosed with Diabetes who were referred to dental from Chronic Care were not seen for comprehensive care.

**Recommendation:**
- Perform an oral assessment at the Chronic Care initial and Follow-up appointment and refer the patients when indicated.
- The condition of the oral environment can affect the person's overall health and wellbeing. The patient is not segmented into parts; medical, mental health and dental, they are all interrelated and integrated into one. Please invite a representative from each division of medical, mental health, and pharmacy to attend the monthly Dental Subcommittee in order to discuss cases, barriers to access to care and to nurture open lines of communication.
- Have the CDO provide a training session for the physicians regarding often seen dental conditions which are best to refer to dental.

## C.6 Chronic Care – Pregnancy – NA & DF

**Deficiency:**
- N/A and Deferred findings. The majority of the patients diagnosed with Pregnancy who were referred to dental from Chronic Care were not seen for comprehensive care.
- According to the American Pregnancy Association, "Pregnancy and dental work questions are common for expecting moms. Preventive dental cleanings and annual exams during pregnancy are not only safe but are recommended. The rise in hormone levels during pregnancy causes the gums to swell, bleed, and trap food causing increased irritation to your gums. Preventive dental work while pregnant is essential to avoid oral infections such as gum disease, which has been linked to preterm birth."[21]

**Recommendation:**
- Perform an oral assessment at the Chronic Care initial and Follow-up appointment and refer the patients when indicated.
- The condition of the oral environment can affect the person's overall health and wellbeing. The patient is not segmented into parts; medical, mental health and dental, they are all interrelated and integrated into one. Please invite a representative from each division of medical, mental health, and pharmacy to attend the monthly Dental Subcommittee in order to discuss cases, barriers to access to care and to nurture open lines of communication.
- Have the CDO provide a training session for the physicians regarding often seen dental conditions which are best to refer to dental.

## C.7 Chronic Care – SMI – NA & DF

**Deficiency:**

---

[21] https://americanpregnancy.org/healthy-pregnancy/is-it-safe/dental-work-and-pregnancy/

- N/A and Deferred findings. The majority of the patients diagnosed with SMI and/or were on four or more psychotropic medications who were referred to dental from Chronic Care were not seen for comprehensive care.

**Recommendation:**

- Perform an oral assessment at the Chronic Care initial and Follow-up appointment and refer the patients when indicated.
- The condition of the oral environment can affect the person's overall health and wellbeing. The patient is not segmented into parts; medical, mental health and dental, they are all interrelated and integrated into one. Please invite a representative from each division of medical, mental health, and pharmacy to attend the monthly Dental Subcommittee in order to discuss cases, barriers to access to care and to nurture open lines of communication.
- Have the CDO provide a training session for the physicians regarding often seen dental conditions which are best to refer to dental.

## C.8  Periodontal Treatment - DF

Deferred Findings - See also A.18 and B.5

## C.9  Restorative and Palliative Care – 88.7% - SC

**Deficiency:**

- Well done in achieving Substantial Compliance. Refer to the Database tab within this spreadsheet to view the individual results of each audit outcome measure.
- The Dental Material Fact Sheet (DMFS) is missing for patient #████████ The DMFS is a mandatory form to be given to the patient with a signed acknowledgement of the receipt of the DMFS, per the Dental Board of California.
- If the dentist takes only a periapical (PA) x-ray and does not adequately assess the interproximal areas, it could be considered a failure to meet the standard of care in a routine or preventive care scenario. Bitewings are typically necessary for detecting cavities between teeth that aren't visible in a PA radiograph. If there is a failure to detect caries or another issue because bitewings were not taken when they were clinically indicated, it could lead to misdiagnosis, delayed treatment, or harm to the patient. Therefore, all pathology visible in a radiograph is to be consistently identified, documented and treatment planned in the chart and the information shared with the patient.
- Additional training to the dental staff is necessary to instruct them that excavation of caries and the placement of a sedative or temporary restoration; a composite buildup; and stainless steel crowns are an allowable alternative treatment options. Although not the most ideal and very technique sensitive, however, in certain circumstances it is better to use these IP stated procedures than lose a tooth. A patient should not have to wait until the decay is into the dental pulp and forgo saving a tooth if the pulp is still viable and a restorative procedure could have been placed.

- o "Fixed prosthetics: a. Shall not be utilized to restore missing or defective teeth if an adequate restoration can be placed, (e.g., a stainless steel crown, polycarbonate crown, a bonded composite, or an amalgam with cuspal coverage), or if a removable partial denture can be fabricated to replace the missing teeth." (Wellpath IP, p. 110)
- The Dental Priority Code (DPC) is not always identified. The DPC assignment and phasing is not always identified correctly during the dental sick call or comprehensive dental examination. Generally, it is better if the periodontal cleaning is completed prior to restorative treatment in order to minimize leakage of the restoration, especially since only composite restorations a performed at MCJ.
- The time out protocol is not always used and stated in the clinical notes. Utilize a timeout protocol for all irreversible procedures. Place the time out protocol in the Plan section of the SOAPE note. See patient #███████
- The manufacture of the flowable and packable composite material is not always listed in the clinical notes.
- The next visit with a DPC is not always included in the clinical progress notes.

**Recommendation:**
- See C.1 and C.2 above for additional findings and recommendations.
- Update the restorative form so that there is only one form to include temporary and permanent filling with a space for the diagnosis, tooth number and type of restorative procedure being completed. This will take care of any issues surrounding temporary and permanent fillings. Placed Temporary or Sedative fillings must be re-evaluated and a current pulpal diagnosis given with an appropriate treatment plan and DPC for a permanent restoration.
- Update the general informed consent form to include at a minimum medications and Include a line for the witness to print their name although the signature line is there.
- Fill out and scan the Dental Material Fact Sheet (DMFS) acknowledgment, which is mandated by the Dental Board of California. Provide patients with comprehensive information about the materials used, including potential risks and benefits, to align with California's commitment to informed consent and patient autonomy in dental care.
- As a reminder, review the medical history, allergies medications and lab work results prior to performing an irreversible procedure.
- When indicated, take a diagnostic bitewing radiograph to assess for interproximal caries. See the radiographic interpretation section.
- Obtain diagnostic radiographs with open contacts, the radiographic apex and the crown of teeth prior to diagnosis and treatment planning to prevent unforeseen events due to the lack of visualization.

- Describe all the pathology in the x-rays taken and inform the patient. All pathology within a radiograph is to be charted, documented, treatment planned and assigned a DPC as well as discussed with the patient.
- Complete a pulpal and periodontal diagnosis prior to performing a restoration.
- Assess the pulpal condition first prior to placing a temporary or permanent restoration. Place the pulpal diagnosis in the assessment portion of the SOAPE note.
- Perform a time out protocol to make sure the proper teeth are restored.
- Include the manufacture of the restorative material used during a procedure. Identifying the material that was placed in the patient's mouth is helpful in case of a recall of the material or an allergy.
- The Dental Board of California oversees the licensure and regulation of dental professionals in the state, ensuring adherence to standards that prioritize patient health and safety.
- Buildups and stainless steel crowns are part of the allowable restorative procedures. Please do not let a tooth decay to the pulp because it needs a buildup and temporary crown. Caries removal is key. A stainless steel crown although technique sensitive is a viable long term temporary option.
- Please provide documented training and identify the training given in the monthly Dental Subcommittee meeting.

## C.10  Extractions / Oral Surgery – 80.2% - PC

**Deficiency:**
- **There were significant departures from the dental standard of care due to failing to prescribe an analgesic (pain medication) following oral surgery. Post-surgical pain management is the responsibility of the Dentist. See patients #███████ #███████ and #███████ Not receiving post-surgical pain management following oral surgery is a departure from the dental standard of care and is harmful to the patient.**
- Refer to the Database tab within this spreadsheet to view the individual results of each audit outcome measure.
- **The timeout protocol was not always performed and documented.**
- The general informed consent form does not include an informed consent and discussion of risks, benefits, alternatives and consequences (RBACs) for medications including local anesthetic, analgesics, antibiotics, and mouth rinses.
- **Confirm the pulpal and periodontal diagnosis prior to an extraction.**
- When providing an objective finding and subsequent diagnosis, please evaluate the opposing occlusion for any trauma from occlusion which could contribute to the mobility of a tooth, prior to recommending an extraction.
- Continuity of care is not always listed including the next visit and DPC.
- Sutures are listed but does not always state the quantity or type of sutures placed, i.e. is the suture resorbable or not.

**Recommendation:**
- Provide Wellpath's plan to address this departure from the standard of care for the lack of prescribing medication following oral surgery.
- Confirm and document which teeth are to be extracted by performing a time out protocol. "Indicate the tooth number(s) or mark the tooth site or surgical site on the odontogram or radiograph to be included as part of the patient record. Ensure that radiographs are properly oriented and visually confirm that the correct teeth or tissues have been charted. Conduct a time out to verify patient, tooth, and procedure, with assistant present at the time of the extraction." -Joint Commission.
- The standard of care in dentistry requires dentists to maintain accurate and legible records that reflect the patient's treatment history, including the specific tooth or teeth that were treated. Be mindful that all areas including the progress notes, the consent form and the Dental Service Treatment Record (DSTR), all have the same information.
- Confirm that all pathology in a radiograph was identified, diagnosed and treatment planned when reviewing the x-ray during the time out protocol.
- Include the suture type and quantity in the progress notes and if the patient needs to return for suture removal.
- Please update the DSTR to indicate both verbal and written post-op instructions are to be given.
- Provide continuity of care by placing the next visit and DPC in the progress notes and create a new task, if it is not already done so, to appoint the patient for future care indicated in the progress notes and/or in the dental treatment record.

## C.11  Endodontics (Root Canal Treatment) – 50.0% - NC

*All patients in custody of county detention centers with CFMG dental contracts shall be eligible to receive palliative endodontic therapy limited to upper and lower anterior teeth. Endodontic services shall be performed in accordance with established criteria and within the specific guidelines of this section. Palliative endodontic therapy-the procedure in which pulpal debridement is performed to relieve acute pain shall be provided to all inmate-patients.*
(Wellpath IP, Exhibit A, p. 108)

**Deficiency:**
- Refer to the Database tab within this spreadsheet to view the individual results of each audit outcome measure.
- There were no endodontic procedures, i.e. root canals referred to an outside specialist this audit period.
- There is no consent form for pulpotomies and pulpectomies, to relieve acute pain onsite.
- There was however, a failed RCT where the recommended treatment was extraction as re-treatments are not offered as a covered benefit. The patient declined the extraction, but no refusal was filled out or signed for patient # ████████

- The Implementation Plan states a specialist will be located, however only a general dentist was found to perform endodontic procedures. "*A local contract dentist will be available for referral when in the opinion of the treating dentist the procedure could be handled more predictably by an endodontic specialist.*" (Wellpath IP, p. 109)

**Recommendation:**
- Update the endodontic consent form to include pulpotomies and pulpectomies to relieve acute pain. Review and update the endo consent form when updating the other consent forms for consistency.
- CDO to address within the endodontic LOP how the recommendation for a crown following a root canal from the specialist will be handled at MCJ.
- Although a general dentist was found in the community to perform root canals, a specialist is identified in the Implementation Plan, therefore, attempt to locate an endodontist to provide endodontic care, when indicated, to the patients at MCJ.
- When performing a restorative procedure following a root canal, scan the DMFS, if not there from a previous restoration, including the restorative consent form with the specific procedure the patient is consenting to, into the document section of the patient record in CorEMR.

### C.12  Prosthodontics (Dentures) – 28.6% - NC

**Deficiency:**
- Refer to the Database tab within this spreadsheet to view the individual results of each audit outcome measure.
- No patients were stated by MCJ/Wellpath as referred to the prosthodontist for this audit period.
- Several patient's chief complaint regarding dentures and denture fabrication were not addressed, nor the discussion entered in the SOAPE note.
- The General Informed Consent form does not include at a minimum an informed consent and discussion of risks, benefits, alternatives and consequences (RBACs) for medications and local anesthetic, prosthodontic (denture) and occlusal adjustments.

**Recommendation:**
- Full and partial dentures are benefits of the Implementation Plan if the patient meets certain timeframes when receiving a comprehensive dental examination. [Wellpath IP, p.104-106]
- Address all the patient's chief complaints and note the discussion in the progress notes.
- Update the general informed consent form to include denture adjustment.
- Add to the Comprehensive Care LOP, denture adjustment, repair and fabrication of dental prosthetics including the lab, types of relines and number of appointments to schedule for the specialist within the LOP.
- A patient can be offered the opportunity to pay for their own transportation to a dentist or prosthodontist for the denture fabrication if they have less than one year of incarceration. A note should be placed in the clinical progress notes indicating this was offered and the status of the patient's decision.

- Recommend that referrals with the outside specialist for the fabrication of partial and full dentures is tracked by dental so that all of the steps necessary to obtain the dentures are documented and the patient is seen timely.

## C.13  Progress Notes (SOAPE) – 50.0% - NC

**Deficiency:**
- Dr. ████ has written an SOAPE training guide and has made it into an LOP. There are a few areas which need updating, including for the comprehensive care, periodontal disease program and referrals from chronic care.
- The DSTR is not always filled out to reflect the appointment. The SOAPE LOP does not indicate how the DSTR is to be filled out by the clinician.
- There are times when clinicians use a templated progress note which is not patient and/or procedure specific.
- Not all SOAPE clinical notes have a next visit and DPC listed.
- A chronological progress note is not written for an informed refusal in the Dental Sick Call notes. This is not reflected in the SOAPE LOP and training guide.
- A chronological progress note is not written for a medication prescription in the Dental Sick Call notes. This is not reflected in the SOAPE LOP and training guide.
- A chronological progress note is not written for a rescheduled or cancelled by staff task. A Task note is indicated although  but not in the clinical note of the Dental Sick Call notes).
- The SOAPE progress note is not always completely filled out. The areas of continuing lack of consistency include the objective findings, the pulpal and periodontal diagnosis, as well as the education component.
- The assessment is not always substantiated by the objective findings for a pulpal and periodontal diagnosis.
- Late entries do not always have ""late entry"" indicated in the progress note nor state when the patient is seen for the completed dental appointment.

**Recommendation:**
- Amend and update the SOAPE and Comprehensive Care LOP to reflect the areas of deficiencies. Include workflows for training purposes, within the SOAPE and Comprehensive care LOP. Train staff and provide documented training, which is to be reflected in the monthly Dental Subcommittee meeting minutes.
- Fill out the SOAPE progress notes according to the updated LOP. If using a template, make sure to make it patient and procedure specific, otherwise the progress note becomes below the standard of care.
- For chronological purposes, write a sequential progress notes rather than chart notes, tasks, and documents in various locations as it is time consuming to go back and forth to see the events. Write a chronological clinical progress notes for refused, rescheduled, cancelled by staff and medication refills or initial medication requests. (located in the task but not the clinical note). Include these standards in the SOAPE LOP.

- Late entries are not addressed in the LOP. The SOAPE LOP does not have an instruction for the clinician to enter ""late entry"" in the progress note and state when the patient was seen for the completed dental appointment.
- Please review deficiencies found during the audit and make sure the LOP addresses any areas of recurring lack of documentation. Provide documented training in all areas of deficiencies and include the documented training in the monthly Dental Subcommittee meeting minutes.
  • https://www.ada.org/resources/practice/practice-management/managing-patients-informed-consent-refusal
  • https://www.ada.org/resources/practice/practice-management/writing-in-the-dental-record
  • https://www.dbc.ca.gov/about_us/lawsregs/index.shtml

## Infection Control and Regulatory Compliance: Sections D.1 through D.85 – 94.4% - SC

*All dental services will be provided in a safe and sanitary environment.* (Wellpath IP, p. 98)

Congratulations on achieving substantial compliance! There are certain items marked as non-compliance and partial compliance within the clinical review, and **these still need to be addressed.** Please see the <u>Dental Audit Tool Results</u> and <u>Database</u> tab, Section D Infection Control and Regulatory Compliance, for the specific findings and recommendations.

Implementing and following rigorous sanitation and sterilization protocols.

### Spore Test

There was a Failed spore test of the Statim sterilizer. Dental was advised of the failure, positive for growth, on 03/31/25. Per the Dental Operations Specialist, they contacted Crosstex which is the vendor for the spore test. They ran another spore test on the Statim, which came back as PASS, negative for growth.

Ms. ▆▆▆ stated, "We were not using that sterilizer previously to the test, so we are good on the instruments." She also stated, "not in use since and before the test". Per my conversation with the Dental Operations Specialist, the dental staff followed the LOP entitled, "DEN – IC and RC - Monterey - Autoclave & Spore Testing".

Since the documentation has not arrived yet, I'm issuing a NC but will change it to SC once I see the documentation following the LOP. **UPDATE: The documentation arrived subsequent to the submission of the draft of this report; therefore, the grade has been changed to SC for the spore test results.**

## Turnaround Time for Spore Test Results

A two-week turnaround for biologic spore testing results is outside the standard of best practice and introduces unnecessary risk to patient safety. The purpose of biologic monitoring is to provide timely verification that sterilization cycles are effective; a delay of over 14 days greatly diminishes its value as a quality assurance measure.

If this delay were to coincide with a failure in the main large-capacity sterilizer, the facility could unknowingly continue to use non-sterile instruments for weeks, placing patients at significant risk of cross-contamination and infection.

Industry best practice, supported by CDC, ADA, and OSAP (Organization for Safety, Asepsis, and Prevention), recommends **weekly biologic monitoring** with a rapid turnaround—ideally within 24–72 hours. Although there is no mandated turnaround time, many practices now use mail-in services with expedited shipping (FedEx/UPS overnight) to ensure compliance and timely decision-making.

Using a FedEx service with tracking is sound practice. It reduces the turnaround time from more than two weeks to approximately three days, restoring the usefulness of the monitoring process and providing accountability in case of lost or delayed envelopes. I recommend this tighter reporting window, which allows the dental team to promptly identify sterilizer malfunction, quarantine affected instruments, and mitigate patient risk in accordance with infection control standards.

## Radiation Monitoring Via Dosimetry Reports

Regarding the radiological monitoring using the dosimetry badges, **the correct placement of the control and area monitoring badges was corrected, with proper placement starting on 09/23/24.** The dosimetry February 2025 onward dosimetry results were not sent as MCJ receives the results quarterly. **UPDATE:** Also subsequent to the delivery of the draft of this report, the dosimetry report was received for the February and March 2025 results and are filed in the radiation safety binder in the clinic.

**The following is guidance from the California Dental Association (CDA)** regarding the steps to follow once the one year of radiation monitoring via dosimetry reports has concluded:

## CDA Recommendations After One Year of Dosimetry Monitoring

### 1. Monitoring Period & Annual Exposure Evaluation
The CDA's *Radiation Safety in Dental Practice: A Study Guide* specifies that dental staff should wear dosimeters for **one year**, or for a shorter three-month period, with results extrapolated to estimate annual exposure. If the extrapolated annual dose is **less than 10%** of the occupational

limit (which is 5 rem/year), monitoring may be suspended. This evaluation must be conducted periodically and whenever changes in the practice occur.[22]

## 2. Mandatory Written Determination & Record Retention

If a practice decides to discontinue monitoring because exposure is well below the regulatory threshold, that decision **must be documented**. This written record should include:

- Dosimetry results,
- Rationale for discontinuing monitoring, and
- Supporting analyses or calculations.

These records must be retained on-site for **employment plus 30 years**, per Cal/OSHA requirements (8 CCR §3204). Area monitoring records and health physicist reports must be kept for as long as the facility remains operational.

## 3. Annual Audit of the Radiation Protection Program

California regulations require that the **Radiation Protection Program** be audited **at least annually**. This audit must ensure that all procedures and controls—such as ALARA standards, dosimetry protocols, signage, training, and emergency preparedness—remain current and effective relative to the facility's scope of operations.[23]

## 4. Re-evaluation Triggered by Operational Changes

Even if monitoring is discontinued, if anything in the practice changes—**such as new staff**, equipment, workflows, or an increase in radiation use—then exposure estimates must be **re-assessed**, and dosimetry monitoring reinitiated if necessary. This reassessment must also be documented.

## 5. Overall Program Documentation Requirements

The California Department of Public Health (via Title 17 CCR) mandates that all aspects of the radiation safety program—including organizational roles, dosimetry, controls, postings, emergency protocols, training, and internal audits—be **written, implemented, and maintained for inspection**.

| Action | Summary Table - CDA / State Requirement |
|---|---|
| **Dosimetry Duration** | Wear badges for one year (or 3 months with extrapolation); evaluate whether <10% of limit. |
| **Written Determination** | Document rationale/analysis before discontinuing monitoring; retain for employment + 30 years. |
| **Annual Audit** | Audit radiation protection program yearly (ALARA, training, controls, signage, etc.). |

---

[22] https://www.aapd.org/globalassets/media/safety-toolkit/radiation-safety-in-dental-practice-cda.pdf
[23] https://www.cdph.ca.gov/Programs/CEH/DRSEM/CDPH%20Document%20Library/RHB/X-ray/RHB-Guide-RadProtectionProgram.pdf

| Action | Summary Table - CDA / State Requirement |
|---|---|
| **Reevaluation upon Change** | Reassess and restart monitoring when equipment, staffing, or operations change. |
| **Comprehensive Documentation** | Keep all program elements documented, implemented, and inspection ready. |

---

**Deficiency:** D.1.13A - PC

- There is an eyewash station, although there is no mixing valve as recommended in the report #10 and #12.
- **Cal/OSHA requires the unit to meet ANSI/ISEA Z358.1 performance, including "tepid" water for the full flush.** "Tepid" is **60–100 °F (16–38 °C)**. Cal/OSHA's §5162 ties employers to the ANSI eyewash/shower performance (access within ~10 seconds, **flow/duration**, etc.).[24]
- The eyewash station and the mixing valve fall under the Cal/OSHA under CCR Title 8, Section 5162 and OSHA's requirements under 29 CFR 1910.151(c). **Even without a specific thermostatic "mixing valve" mandate, Cal/OSHA inspectors will likely ask how the temperature and flow rate are maintained consistently.**
- OSHA Review: OSHA Requirements for Eyewash Stations" (June 3, 2025) — explains that under Occupational Safety and Health Administration (OSHA) rule 29 CFR 1910.151(c), plumbed or self-contained eyewash equipment must meet ANSI/ISEA Z358.1-2014 (R2020) including tepid water between 60-100 °F.[25]
- Although the water stayed within tepid range of 60 - 100 degrees Fahrenheit after several minutes of continuous running (It must be tested for greater or equal to 15 minutes[26]), there is, however, no temperature measurements during either really cold or really hot summer/winter months which could provide an above or below measurement.
- Per the Maintenance crew, the high temp was 92.7 degrees Fahrenheit, and the low was 68 degrees Fahrenheit. They obtained this information by using an industrial infrared thermometer.
- **The velocity was not tested or verified**. "The water flow must meet a minimum rate of 0.4 gallons per minute (1.5 liters per minute) for eyewash stations, and the station must be free of barriers to ensure direct access."[27]
- **ASSE 1071 (not 1016/1017/1070):** emergency-rated mixing valves provide the required fail-safe and flow characteristics for eyewashes/showers.[28]

**Recommendation:**

---

[24] https://blog.ansi.org/ansi/ansi-z358-1-emergency-eyewash-station-shower/

[25] https://oshareview.com/2025/06/osha-requirements-for-eyewash-stations/

[26] https://safetyequipment.org/emergency-eyewash-shower-equipment/

[27] https://oshareview.com/2025/06/osha-requirements-for-eyewash-stations/

[28] https://www.phcppros.com/articles/1730-emergency-fixtures-and-emergency-fixture-mixing-valve-standards-part-1

- Therefore, the recommendation remains the same as in prior audits, which is to install a thermostatic mixing valve to ensure the temperature always stays in the tepid range of 60 - 100 degrees Fahrenheit and the flow rate always meets the minimum rate of 0.4 gallons per minute.
- See Monitor Response in Dental Audit Tool in Dental Audit Tour Report #12 for additional information.
- If a mixing valve is absent, but no other control mechanism exists, and tepid water cannot be guaranteed at all times, your facility may still be cited for noncompliance with ANSI standards (which CCR Title 8, Section 5162 incorporates).
- **Therefore, since I cannot guarantee the water from the eyewash station will always be within tepid range and the flow rate at the minimum recommended rate, the PC remains.**
- Please review the following – OSHA Standard 29 CFR 1910.151 C:
    - https://blog.ansi.org/when-to-use-safety-showers-and-emergency-eyewashes/
    - https://www.eyewashdirect.com/collections/ansi-eyewash-z358-eyewash-standard-guide
    - https://www.dir.ca.gov/title8/5162.html

---

**Deficiency:** D.1.31A - PC
- Safety cover was loose and not fully attached to the amalgamator during the site visit.

**Recommendation:**
- Make sure the amalgamator/triturator cover is securely attached to the unit, replace the cover if it cannot be repaired.
- As mentioned previously, there may be a clinician or clinical situation where amalgam or a composite buildup material dispensed using a triturator may be the material of choice.
- The Occupational Safety and Health Administration (OSHA) and similar regulations specify guarding requirements for machinery, including triturators, to prevent employee and/or patient injuries. OSHA's regulations, such as 1910.212, focus on guarding the point of operation of machines, which would include the moving parts of a triturator.

---

**Deficiency:** D.1.37A - PC
- Blue Tab is used for daily water treatment.
- Shock treatments are documented in the Housekeeping log.
- Quick Pass water tests are done monthly and confirmed in the housekeeping log.
- Outside lab testing is done quarterly through ProEdge. ProEdge result was only submitted for 10/24/24 although staff stated it was performed during this audit period.

**Recommendation:**
- There is an LOP for DEN – Monterey Monitoring Water Quality in Dental Unit Lines.
- **Include in the LOP what to do if there is a positive growth test when testing the water lines with an inside Quick Pass and outside ProEdge**
- Send the remaining ProEdge. Only 10/24/24 was received.

---

**Deficiency:** D.1.40A - PC

- Per Custody, the Evacuation Plan cannot be posted for safety and security reasons and cannot be posted in the dental clinic or kept in a binder where it can or could be seen. Custody has declined to allow them to post the plan in the clinic or store it in the binder as it could be seen by incarcerated persons, thereby endangering the safety and security of the facility.
- The facility does have regular drills to keep staff aware of evacuation routes and emergency exits however there is no signed attestation of this training.

**Recommendation:**
- Provide an attestation of training for all dental staff members.
- Keep training records for a period of three years showing when drills are performed to show that staff has been trained in the evacuation procedures.
- Provide confirmation that staff has been trained on the evacuation route in their disaster preparedness training and can confirm the location where they will meet.
- Confirm staff receives this training at least yearly for disaster preparedness.

---

**Deficiency:** D.1.41A – PC; Updated - SC
- During the audit, the tag stated the last annual checkup of the fire extinguisher was November 2023.
- Per the Dental Operations Specialist, this was updated and is now current. Proof of practice as sent.

**Recommendation:**
- Please stay current on checking the fire extinguisher.
  Cal/OSHA 8 CCR Section 6151
- Provide documented training on use of the fire extinguisher in case of an emergency.

---

**Deficiency:** D.1.57A - **Dosimetry Testing and Reports** – NC; **Updated to PC**
**Deficiency:** D.1.60A - **Updated to SC.**
- A control badge is being used as the area monitoring badge. Please discontinue this practice and order both an area monitoring badge and control badge. The dosimetry monitoring results reports were published on 08/24/24. **The control badge was used as the area monitoring badge. This, as stated below, affects the result of the individual badges. UPDATE: The control and monitoring badges are in their recommended location.**
- "The control badge should be kept in a low background location at your facility, never in the room where your source of radiation is located. Also, as the control badge is used in the calculation of dose, it should never be worn or re-assigned."[29]
- Therefore, on 09/23/24 one full year of radiation monitoring is to begin anew when both a control badge is placed in a draw in the administrative portion of the clinic (DA or Dentist desk), and an area monitoring badge is placed no more than 6 feet from the source of the beam.

---

[29] Radiation Detection Co.

- "Monitoring shall be performed for a period of 12 consecutive months. Radiation monitoring badges shall be worn at chest level by participating staff and the badges are not to be worn outside the dental treatment area."[30] Please review:
  - o Dental Board of California, Dental Practice Act, Chapter 4 Dentistry, Article 3, and Section 1656, Radiation Safety Requirements
  - o Code of Federal Regulations Title 10 (Energy), Chapter 1 (Nuclear Regulatory Commission), Part 20 (Standards for Protection Against Radiation), Subpart F (Surveys and Monitoring) Sec. 20.1502
  - o California Health and Safety Code, Section 114870, Subdivision (b) or (c), or Section 114885

**Recommendation:**
- Order the appropriate dosimetry badges. Perform one full year of radiation monitoring to begin anew when both a control badge is placed in a draw in the administrative portion of the clinic (DA or Dentist desk), and an area monitoring badge is placed no more than 6 feet from the source of the beam. Include dosimetry monitoring protocols, including those for pregnant staff, in the site specific radiation safety LOP.
- Include dosimetry protocols, including for pregnant staff, in the site specific radiation safety LOP.
- Please provide the dosimetry results from the Radiation Monitoring company timely to the staff and document the results in the monthly Dental Subcommittee meeting minutes.

---

**Deficiency:** D.1.66A - **Spore Test – Biological Indicator Test** – NC; **Updated to SC**
- The Biological monitoring, spore testing, is performed and mailed weekly from MCJ for both sterilizers. There initially was a missing results as seen in this file:
  1. IC&RC- Spore Test Results - October 2024 - March 2025
- **Missing spore tests and results for both sterilizers on 02/24/25, 03/10, 25, 03/17/25, 03/24/25, 03/31/25 were missing. Documentation was sent after the distribution of the draft of this report.**
- There was a FAILED test on 03/03/25, positive for growth on the Statim. They ran another test, and it came back PASS, negative for growth. The sterilizer has not been being used and per the Dental Operations Specialist, there were no instruments run in it for some time before and then none since. Wellpath is to send the missing spore tests and the documentation of how they followed the LOP and the steps they took to correct the issue. Then they have to find out why the test failed since there were no instruments in the sterilizer.
- For example, spore test results for both sterilizers was sent on 03/03/25 but not received and processed until 03/14/25 and 03/17/25, creating a 11 and 14-day gap respectively where critical instruments were used without assurance of sterilization effectiveness. This delay poses a significant patient safety concern.

---

[30] https://cchcs.ca.gov/wp-content/uploads/sites/60/HC/HCDOM-ch03-art3.3.3.pdf

- There is no sterilization log as has been requested. **Update your logs to include the following:** Per the CDC, they recommend the following log keeping protocols, "For each sterilization cycle, record the type of sterilizer and cycle used; the load identification number; the load contents; the exposure parameters (e.g., time and temperature); the operator's name or initials; and the results of mechanical, chemical, and biological monitoring." https://www.cdc.gov/oral health/infection control/FAQs/monitoring. Html https://www.cdc.gov/oral health/infection control/pdf/safe-care2.pdf

**Recommendation:**

- Please review the "Turnaround Time for Spore Test Results" discussion above.
- By using an overnight carrier, results could be obtained within about 3 days, substantially reducing the window of uncertainty and the potential for a 15-day patient recall if a sterilization breach were confirmed.
- If the recommendation of obtaining an overnight carrier, i.e. FedEx or UPS is not taken, then I recommend taking a picture of both sterilization spore tests before mailing to confirm it was sent.
- **Send the documentation of the missing spore test results and the documentation of the protocol followed to put the Statim sterilizer back into service.  UPDATE: the Statim is not in use, but they are testing it weekly.**
- "Critical instruments, such as surgical instruments and periodontal scalers, are those used to penetrate soft tissue or bone. They have the greatest risk of transmitting infection and should always be sterilized using heat." In the unlikely event of a confirmed breach, please review the following for healthcare facilities. Healthcare-Associated Infections (HAIs). **https://www.cdc.gov/hai/outbreaks/steps_for_eval_ic_breach.html**
- Spore tests are crucial for ensuring the effectiveness of sterilization procedures and preventing infections. Lost or mishandled spore tests can lead to inaccurate readings and potential infection control failures. Taking extra precautions to prevent a spore test from being lost or mishandled is essential for maintaining effective sterilization procedures and reducing the risk of infections. It is a proactive step that can contribute to safer patient care and better infection control practices.
  **• https://www.cdc.gov/dental-infection-control/hcp/dental-ipc-faqs/sterilization-monitoring.html**
  **• https://www.cdc.gov/dental-infection-control/hcp/summary/sterilization-disinfection.html#:~:text=A%20spore%20test%20should%20be,monitoring%20should%20also%20be%20performed.**
- Review and perform any necessary to stay current with sterilization practices and document the training in the Dental Subcommittee meeting minutes.

---

**Deficiency:** D.1.70A - Pharmaceutical Log (Complete entries) - NC
- There are stock medications, antibiotics and analgesics, in the dental clinic.
- There are no individualized patient entries of medications ordered and dispensed in the dental clinic. See Dental CAP.
- Amend the pharmaceutical log to include prescribed medications, even antibiotics and analgesics, and note the specific patient to whom the medication is prescribed.

**Recommendation:**
- Amend the pharmaceutical log to include prescribed medications, even antibiotics and analgesics, and note the specific patient to whom the medication is prescribed.
- Include this metric in internal self-audits and LOP for the dental clinic and report the results and any training in the Dental Subcommittee meeting minutes.
  - https://www.cdcr.ca.gov/hcdom/dom/chapter-3-health-care-operations/article-3-dental-care-5-dental-clinic-operations/3-3-5-12-pharmaceuticals/
  - https://cchcs.ca.gov/policies/
  - https://corrections.az.gov/sites/default/files/documents/Medical%20Services/TM%201101%20-%20MDSTM%20-%20Eff.%2010-1-24.pdf. See 1.3.2 Clinic Stock

---

**Deficiency:** D.1.71A – SDS Binder (Accessible and current for materials used in clinic) - PC
- Binder #7 was not current. Went through it with the DA and she started updating the binder to match the materials found in the dental clinic.

**Recommendation:**
- Please confirm monthly that all materials used in the clinic are listed in the SDS and remove any which are not used and place any new SDS sheets. See Housekeeping log and LOP.
- Make sure all dental staff are aware of the location of the SDS binder as it contains information on how to address an emergency with a chemical/material used in the dental clinic.
- Include this metric in internal self-audits for the dental clinic and report the results and any training in the Dental Subcommittee meeting minutes.

---

**Deficiency:** D.1.81A – Written infection prevention policies and procedures available, current & based on evidence-based guidelines?- PC
- Binder 4 (Infection Control), 11 (P&P).
- Align and update the global P&Ps and LOPs to ensure consistency and coherence.

**Recommendation:**
- Align and update the global P&Ps and LOPs to ensure consistency and coherence.
- Also, add auditing your chemical inventory, make sure SDSs reflect the new classifications/sections as suppliers update them, and plan brief delta-training for staff before those dates. OSHA's summary of changes (small-container labeling, trade secrets, SDS content refinements, etc.) is on their HazCom page.
- CDC/NIOSH updated eye-protection content in Feb 2025 (helpful background on when and why to use eye/face protection). Use this to fine-tune task-based PPE matrices in your plan.https://www.cdc.gov/niosh/ppe/eye-safety/infection-control.html

## Dental Management and Self-Governance: Sections E.1 through E.17

**Regulatory compliance and self-governance in dental clinical programs** require adherence to all applicable local, state, and federal laws, regulations, and professional standards. This ensures that operations are ethical, legally sound and safe.

Examples of such include proper licensing, maintaining and improving methods of accurate documentation, safeguarding patient privacy and confidentiality of medical records, ensuring the safe use and monitoring of x-ray equipment and compliance with radiation safety guidelines, following OSHA and other workplace safety regulations, including following rigorous sanitation and sterilization protocols to protect staff and patients, and performing and training staff for and in emergency preparedness.

Establishing and routinely updating policies and procedures, local operating protocols, reviewing logs and other clinic documentation, providing and documenting training to establish consistency and efficiency in the systems of care, maintaining equipment for staff and patient safety, engaging in continuous quality improvement to enhance patient care and clinic operations, and having places, such as the monthly Dental Subcommittee and Quality Assurance meeting, to record, identify and take action are just a few examples of the importance of dental management and self-governance in the provision of access, timeliness, quality and infection control practices for the patients of Monterey County Jail.

By embedding self-governance—where the clinic and management proactively monitors and corrects its own practices—compliance not only protects patients and staff but also supports operational efficiency and long-term accountability.

### E.1  Chief Dental Officer, Corporate and Local Management – 83.3.% - PC

**Deficiencies and Findings:**
- At the corporate level, Dr. ███ Chief Dental Officer, is actively supporting MCJ's dental program and is the clinical supervisor in the chain of command. Dr. ███ reports to the head clinical VP. Dr. ███ is instrumental in MCJ Dental's success.
- A Dental Operations Specialist was hired to support Dr. ███ bringing valuable expertise to help identify solutions and strengthen the dental program. The Dental Operations Specialist provides strong problem-solving support for the CDO and is an important resource.
- There is a new Regional VP.
- Dr. ███ still leads the weekly and biweekly alignment meetings with medical, mental health and dental. Dr. ███ also leads a biweekly dental staff meeting and the monthly Dental Subcommittee meeting.
- The Medical Director, HSA and the Implementation Specialist positions are all permanently filled.
- The Director of Nursing (DON) is no longer at MCJ, and the position is vacant since December 2024.

- Dr. ███ does not have a dedicated budget for the dental department, as operations controls the budget, but he reports receiving necessary resources when requested.
- The impact of the current bankruptcy filing on resource availability remains unclear, though Wellpath appears committed to continuing improvements in dental care, including at MCJ.
- Dr. ███ does not have full autonomy in his role, particularly regarding hiring, firing, and implementing broader changes due to corporate restrictions. While he notes that resource support has improved, he still lacks dedicated administrative resources to effectively support his position.
- There is no identification or system process of who will fill in for the CDO if/when the CDO is on vacation or on leave.
- The organizational charts for the chain of command are partially completed for Wellpath and the County. Wellpath Operations has an org chart, but the Wellpath corporate clinical organizational chart does not show Dr. ███ as part of the organization.
- MCJ County has not provided an org chart.

**Recommendation:**

- Prioritizing Key Roles: All listed positions are critical to the success of Dental, particularly the HSA, whose support is essential for strengthening and improving MCJ's Dental program in daily operations.
- Training & Retention: Continue to train and retain the qualified HSA, as well as hire and retain nursing staff and the DON, all of whom are vital to ensuring patient access to dental care.
- Operational Continuity & Compliance: Continue to establish durable systems to achieve and maintain compliance and ensure continuity of care. This includes cross-coverage plans so that key positions are filled during any employee's leave of absence, allowing Dental to continue providing uninterrupted services.
- Leadership Support: Wellpath to continue to support Dr. ███ in his role as a leader, driving positive change and ongoing improvement within MCJ's Dental program.
- Provide Resources and Authority: Corporate should allocate Dr. ███ a dedicated budget, administrative support staff, and greater autonomy as Chief Dental Officer. This will allow him to implement and sustain the changes necessary to bring MCJ into full compliance and maintain long-term improvements.
- Maintain Clinical Oversight: Continue monthly supervisory oversight and chart auditing by the CDO, ensuring he remains closely connected to the clinical operations at MCJ.
- Support Collaborative Roles: Wellpath should continue enabling the Operations Specialist to work alongside the CDO, particularly in advancing the Dental Subcommittee and CQI initiatives, which have already demonstrated significant progress.
- Strengthen Systems & Infrastructure: Dr. ███ requires access to an EDRS capable of generating meaningful reports. Current limitations in data systems and staffing restrict his ability to independently drive change. While he has partnered with CorEMR to build systems that identify strengths and weaknesses, additional infrastructure is necessary for him to fully exercise his role and authority.

- Rationale: Organizational charts visually clarify roles, responsibilities, and reporting lines, improving communication, decision-making, and resource allocation. They also support onboarding and establish a clear chain of command, facilitating accountability.
- Develop an Organizational Chart: Create a current organizational chart for the corporate and local dental program, including the chain of command and oversight at MCJ, especially as the HSA is the administrative supervisor in the chain of command and Dr. ███ is the clinical supervisor to the Dentists and Dental Assistants.
- Update and Provide Charts: Due to multiple changes across the organization, existing organizational charts at Wellpath are outdated, and the County has not provided one. Up-to-date charts should be furnished.

## E.2  Dashboard & Documented Qualitative Self Review Process – 50.0% - NC

**Deficiencies and Findings:**
- Clinically and administratively, supervisory audit reviews were conducted in June, July and August 2024, although, these are outside of this audit period. The August 2024 was more of a Performance Improvement Plan (PIP). Per Dr. ███ he has worked with the PRN Dentist in the expectations of care in multiple areas of clinical dentistry and with the writing of SOAPE notes, both during biweekly meetings and through one on one training.
- There is limited evidence of an external or corporate auditing system from supervisor to subordinate. A supervisory audit report has not been provided this Monitor for any of the Dentists at MCJ during this audit period. See the Dental CAP #102.
- Self-monitoring, self-auditing and self-governance is challenging with CorEMR as it does not easily provide reports to the CDO for analysis.
- There was a 2nd performance improvement plan completed after this audit period for dentist Dr. ███ and consequently the dentist was let go on June 6th, 2025.
- At present, there is no centralized dashboard within or outside of CorEMR to track metrics, statistics, priority dental levels or dental priority codes (DPC) compliance timeframes. There is no "bird's eye view" of any barriers to care.
- CorEMR does not have a current dashboard to quickly visualize the areas of self-monitoring, self-auditing and self-governance for the CDO's analysis of compliance. Although the monthly Dental Subcommittee is the receptacle for dental's data, leadership lacks a clear overview of continued barriers related to access, timeliness, and quality of dental care at MCJ.
- The Dental Operations Specialist uses reports and CQI systems for some of the metrics of care.
- Not all metrics of care are being evaluated by the CQIs.
- They are refining some of the questions within the CQIs as they advance in their investigation of compliance.
- The P & P and draft LOP for self-governance, is in process by the CDO. An expansion of the systems to perform and evaluate all areas identified in the Implementation Plan and within the California Code of Regulations is still in progress.

- They have weekly dental strategy meetings, biweekly staff meetings and monthly Dental Subcommittee and quarterly QA meetings.
- Transparency remains limited, as clinical and management data is not easily retrievable from CorEMR, hindering effective monitoring and oversight.
- Data for certain metrics are being gathered from multiple sources, with no EMR functionality available. Graphs are provided to the Dental Subcommittee, and reporting for episodic and comprehensive care is still in development.
- CorEMR uses the "Form Question Report" to calculate some of the clinical statistics; however, it is a cumbersome process which necessitates multiple steps and looking within several versions, in order to get information.
- The Forms Question Report does not capture all information and only works when the RNs use and enter data within the forms to refer patients to dental.
- The Dental CAP directed Monterey Compliance Report is not designed to allow efficient or accurate data extraction from CorEMR and remains only partially completed.
- The Monterey Compliance Report does not have the ability to extricate data from CorEMR to assess for compliance for Priority Dental Levels and all Dental Priority Codes. The report does not provide an accurate count of this data, nor does it track reschedules for compliance.

**Recommendation:**

- Perform chart audits by the CDO. This is an important function in order to stay current with the clinical situation at MCJ. Provide self-audits and subsequent documented training with the results of the audits sent to the monthly Dental Subcommittee. Formulate action plans for continuous improvement. Completing monthly supervisory auditing provides direct clinical oversight to the existing dentist and for any new dentist onboarding at MCJ.
- Complete the draft LOP for self-governance, self-monitoring and self-auditing to include monthly supervisory audits to outline the clinical expectations.
- See the Dental CAP #102 for the performance of the supervisory audits. "A supervisory audit report from the CDO is due to this monitor as part of Wellpath's monthly document production and is to include two of each of the following categories: triages and diagnoses, comprehensive dental examinations, periodontics, restorative, oral surgery, endodontics, as available, as well as an evaluation of refusals, reschedules, OTM, OTC and NIC. Dr. ████████ Chief Dental Officer (CDO) to audit multiple charts as well as provide routine, monthly supervisory oversight.  The H.S.A. may perform these tasks, as appropriate. ***Use the Peer Review audit tool as a guideline when performing the supervisory audit review." With the CQI process, continue to update the questions to be as relevant to the clinical issues as possible.
- Establish a dashboard, preferably within CorEMR, to visualize the current metrics/statistics relevant to finding barriers to access, timeliness and quality of care at MCJ.
- Expand CQI Metrics: Broaden the scope of CQI reviews to include all key clinical and operational metrics of care, ensuring comprehensive monitoring of performance and compliance.

- Develop Corrective Action Plans: For any deficiencies identified through CQI reviews, formulate clear corrective action plans with measurable outcomes. These should be documented and tracked as standing action items in the monthly Dental Subcommittee meeting minutes.
- Standardize CQI Tools: Finalize and implement standardized CQI questions and tools to ensure consistent monitoring, tracking, and reporting across all areas of dental compliance.
- Strengthen Governance Framework: Complete and adopt the Policies & Procedures (P&P) and Local Operating Protocols (LOP) currently being drafted by the CDO to establish a durable framework for self-governance and accountability.
- Ongoing Refinement: Continue the monthly refinement of CQI processes to improve accuracy and ensure alignment with compliance requirements and evolving best practices.
- Enhance Statistical Transparency: Continue improving the dental program through transparent use of statistics in collaboration with the QA team. This should include routine reporting from the Dental Subcommittee to the QA Committee. Make clinical, management, and statistical data more accessible within CorEMR (or the chosen system) to ensure program performance is transparent to providers, administrators, and oversight committees.
- Upgrade or Replace CorEMR: Complete the CAP-directed enhancements to CorEMR to allow efficient, accurate reporting. If CorEMR cannot meet these needs, invest in a true electronic dental records system capable of supporting both clinical and administrative functions.
- Develop a Centralized Dashboard: Create a dental-specific dashboard within CorEMR (or a replacement system) to track metrics, statistics, priority codes, trends, and outcome measures. This would allow leadership to monitor access, timeliness, and quality of care in real time.
- Ensure Compliance with Implementation Plan: Review the Nurse Sick Call process to confirm that requests for dental care are tracked as required. Establish an audit trail from each incarcerated person's request through to resolution of care.
- Address Data Inconsistencies: Standardize reporting processes within CorEMR to resolve inconsistencies between reports, especially when tasks are created outside of structured forms.
- Reduce Manual Data Burden: Alleviate the need for staff to manually track statistics, which reduces valuable clinical time. Assign the Operations Specialist to lead the effort in transitioning data management into automated electronic systems.

### E.3  Electronic Dental Record System (EDRS) – 50.0% - NC

**Deficiencies and Findings:**
- There is no interactive, fully clinically available electronic dental record system within CorEMR for charting episodic and comprehensive dental care. CorEMR is not a full

electronic dental record system (EDRS) and lacks complete clinical charting capabilities and integrated dental management tools.

- Tracking episodic and comprehensive dental care metrics remains time-consuming and cumbersome within CorEMR. Despite these limitations, the CDO and Dental Operations Specialist are leveraging CorEMR functions—by looking at their CQIs for nursing referrals to dental by reviewing priority dental levels to locate barriers to access, timeliness, and quality of care. They have not started evaluating dental priority codes (DPCs) for compliance to the dentists treatment plans yet.

- CorEMR does not allow for identification or retrieval of **unscheduled patients**, as scheduling relies on clinician-created Tasks. If the clinician does not create the task, the patient does not have a scheduled appointment visit and therefore no treatment is performed. This falls below the standard of care.

- Sick call requests for dental care are rarely scanned into the document section, resulting in an incomplete audit trail and reduced transparency.

- Nurse Sick Calls are rarely completed for dental care and is another reduction in data transparency and compliance monitoring.

- Tracking of urgent/emergent and routine referrals is minimal, currently relying on the Forms Question Report and Task Reports. Dental management uses a CQI process to consolidate referral data from multiple sources, including intake, the 14-day health appraisal, sick call, offsite referrals, and returns from offsite. **However, the 14-Day Exam referrals to dental has not improved and continues to be a significant deviation from the mandates of the Implementation Plan.**

- CorEMR initially implemented a forms-based referral tracking process, but IT has not maintained system upgrades. Efforts to track referrals through the World of Wellpath Monterey Compliance Report remain inaccurate.

- Accurate and timely data and statistics are essential for informed operational decisions and effective self-audits, particularly to identify barriers to access, timeliness, and quality of dental care. Dental staff currently collect data manually. While they are consistent in accumulating monthly metrics, the results do not always align with CorEMR's reported data. The Dental Operations Specialist is consolidating multiple data sources into an Excel spreadsheet. Ideally, all data should be captured and readily accessible through a full electronic dental record system (EDRS) to allow rapid, efficient reporting.

- On at least one occasion, a patient was treatment planned and determined to require treatment, was given a DPC, but the treatment was never scheduled. See the section under Class Case Reviews.

**Recommendation:**

- The system of chart audits and peer review only catches errors after the fact. An electronic dental records system (EDRS) contains safeguards that can prevent continuing errors from happening. See CAP #60, 62, 63.

- Implement a Comprehensive EDRS: Upgrade to a full electronic dental record system with complete clinical charting capabilities and integrated dental management tools to support accurate, efficient, and comprehensive documentation of patient care.

- Implement a Full EDRS: Adopt an electronic dental records system to manage the clinical, administrative, and statistical functions of the dental clinic, ensuring accurate and efficient data capture.
- Integrate digital x-rays into the clinical record, where the diagnosis and treatment plan is visible on an odontogram and actively charted to the patient's individualized clinical situation.
- Optimize Interim EMR Use: Until a full EDRS is implemented, continue leveraging available CorEMR functions to monitor access, timeliness, and quality of care.
- Improve Patient Scheduling Processes: Establish reliable processes within CorEMR (or a new system) to identify unscheduled patients and ensure that all care results in scheduled appointments. This will prevent lapses in treatment and bring scheduling in line with the dental standard of care.
- Streamline Data Tracking and Enhance Audit Trails and Transparency: To maintain a full audit trail in order to support compliance monitoring, ensure all sick call requests for dental care are properly documented and scanned into CorEMR as the Smart Communication system is not linked to CorEMR. Clearly see the patient within 24 hours of the request the Wellpath IP, complete the Nurse Sick Calls to document the visit and schedule the referral within DL 1 and DL2 timeframes.
- Enhance Nursing Documentation: Provide continued nursing education to ensure referral forms and tasks include key details such as description of the problem, location, severity, pain profile/scale, duration, and an appropriate dental priority level aligned with the patient's clinical presentation.
- Upgrade CorEMR Reporting as identified in the Dental CAP: Improve CorEMR to provide consistent, reliable reports. Address discrepancies caused by appointment types, timing of report generation, and delayed closure of clinical notes to ensure accurate statistics for operational decision-making and self-audits.
- There is a system/software using ERMA to refer patients to the outside specialist. Some documentation is available through a task report in CorEMR. If another clinician, other than the Dentist, makes a referral to an outside dental specialist, then a word search must occur to locate a dental patient. I recommend the ERMA dental referral is scanned into CorEMR and that there is a dental specific referral system in place to track dental referrals to the outside specialist.
- Update the LOP and train using the LOP for any deficiencies in the system. Perform internal self-audits to make sure the system is working, and the patients are scheduled in dental the next dental day following the referral to an offsite specialist. Report any barriers to access to this care to the Dental Subcommittee and provide training when indicated.

## E.4  Digital X-Rays – 83.3% - PC

**Deficiencies and Findings:**

- There is no LOP to address the step by step process to correctly export and upload the radiograph(s) from the Planmeca digital x-ray system into the right patient's chart in CorEMR.
  - The LOP must ensure the patient records are accessible and secure, with a mechanism to prevent the radiograph from being uploaded to the wrong patient or the radiograph altered once inputted.
  - There are some patients whom the clinical progress notes stated had radiographs taken **but were either not taken or not transferred into CorEMR's clinical record.** See patient #█████
- There is no back up system for the stand alone laptop which takes the digital x-rays and stores them. The Dental Board of California (DBCA) mandates that if electronic recordkeeping systems are used, they must include offsite backup storage.
  - The standalone laptop storing digital x-rays does not have a separate backup system. As x-rays are routinely uploaded to CorEMR from the Planmeca system, the cloud-based storage serves as the primary data backup, ensuring the images are securely preserved. **However, if the radiographs are not transferred to CorEMR then they are not backed up, therefore, causing the lack of a backup to not meet this regulatory requirement from the Dental Board of California.**
  - There is no reliable way to determine which dental x-rays have been uploaded to the CorEMR system and which have not. This means that some radiographs might remain stored only on the local laptop and never make it into the patient's official electronic record, **creating gaps in documentation, and potential risks for patient care.**
  - This matters because without such a system, there is no assurance that all diagnostic images are available for clinical review, which can compromise both the quality of care and compliance with recordkeeping standards.
  - **This must be rectified immediately.** Because of these findings, I am downgrading the previous substantial compliance to partial compliance for the lack of storage to the backup question at E.4.2.
- There is no yearly plan to provide maintenance to the Planmeca digital x-ray system when it is needed.
- **Per the Dental Practice Act of California, x-rays should be of diagnostic quality, which includes capturing the root apex of teeth, and identifying and noting any and all pathology found within the radiograph.**
  - In essence, the quality of the dental x-rays is directly related to the accuracy of the diagnosis and the effectiveness of treatment.[31]
  - During this audit, there are some radiographs which overlap, are foreshortened and/or elongated. Not all x-rays taken during this audit tour are of diagnostic quality although most are. For example, see patient #█████
  - Because the digital radiographs are not integrated directly into CorEMR, as one would with an electronic dental records system, once the x-ray is exported into

---

[31] https://www.ada.org/resources/ada-library/oral-health-topics/x-rays-radiographs#:~:text=Dentists%20use%20X%2Drays%20to,or%20symptoms%20of%20oral%20disease.

CorEMR it can no longer be adjusted to increase or decrease contrast and/or color.

o   Removing teeth without full radiographic visualization can cause potential harm to the patient, i.e., increasing the possibility of jaw fracture, root fracture, damage to the mandibular nerve.

o   There are **multiple examples throughout this report of unidentified and undiagnosed pathology.** This practice must stop, and all pathology within a radiograph is to be identified. A performance improvement plan (PIP) must be established with subsequent documented training and confirmation with internal chart audits must occur in order to prevent patient harm due to this repeated deviation from the dental standard of care.

**Recommendation:**

- Complete the LOP to address the California Dental Practice Act requirements to back up the original radiographs, and to describe how to identify if there are any radiographs not scanned into CorEMR. **The failure to scan the radiographs into CorEMR must be rectified immediately!**

- The Defendants must develop a process or tool that can:
    o   Identify all x-rays that are not yet attached to a specific patient record in CorEMR.
    o   Ensure every radiograph taken is properly linked to the correct patient's chart.
    o   Provide a way to audit or track x-ray uploads, so missing images can be quickly found and addressed.

- Address who is to repair and provide maintenance to this Planmeca system for its yearly maintenance and when it is needed. when it is needed.

- I recommend the Dentist provide the Dental Assistant with instant feedback following the capture of a radiograph(s) if it is of undiagnostic quality. By doing so, the DA may continue to improve and provide ongoing diagnostic quality x-rays.

- Continue to identify, inform the patient and write in the progress notes of any pathology noted, with at a minimum a differential diagnosis, in an x-ray taken at the dental clinic.
    o   All pathology within a radiograph must be identified and noted. A performance improvement plan (PIP) shall be established with subsequent documented training and confirmation with internal chart audits, that this repeated deviation from the dental standard of care is rectified.
    o   Provide a monthly supervisory audit report to include internal auditing and results to substantiate this issue is resolved. Provide proof of practice and documentation in the Dental Subcommittee meeting minutes.

### E.5  Panoramic X-Ray Unit – 83.3% - PC

**Deficiencies and Findings:**

- For patients with over 12 months or greater of incarceration, patients can be sent offsite, i.e. to the oral surgeon's office for a panoramic radiograph. "Panoramic radiograph may be requested from an outside source when, in the discretion of the dentist, it will assist in diagnosis and treatment planning."[Wellpath IP, Exhibit A, p. 103]

- Panoramic radiographs are rarely requested by the dentist during a comprehensive dental evaluation, as per the IP, even when indicated.
- When a panoramic radiograph is returned with the patient following an oral surgery procedure, from the offsite oral surgeon, the panoramic radiograph is not always reviewed with the patient nor are incidental findings always documented in the clinical notes.
- There is no onsite leased or purchased panoramic x-ray available for the dentist to utilize at this time. The oral surgeon, who is utilized by MCJ for complex extractions, biopsies and other oral surgery needs, has a panoramic radiograph at their office. Therefore, MCJ Dental can refer patients to the offsite oral surgeon and request the OS to take a panoramic radiograph and return it to be read and scanned into CorEMR by the onsite dentist.
- Although MCJ Dental can also send patients out to a higher level of care, if indicated, for a specific radiographic series depending on the nature and reason for the radiograph, this is to be discussed and approved by the CDO.
- There is a system called ERMA, not linked with CorEMR, which is utilized for referrals to outside specialists, including to the oral surgeon. The initial ERMA referral is not always scanned into the patient's document section of CorEMR.
- Currently, there is no compliance framework beyond manual tracing to confirm referrals are sent and completed.
- Upon return from offsite appointment, the RN fills out a "Return from Offsite" form and processes the patient, report and orders from the outside specialist/OS, including scanning of the panoramic x-ray upon return from the offsite appointment.
- The clerk handling offsite appointments schedules a priority 1 (DL1) appointment with the Dentist for a post op checkup for the next dental day following the patient's return from offsite.
- The Dentist does not always review and note the results and discussion with the patient of any radiographic discovery, in the progress notes, preferably in a SOAPE format. This review of the panoramic x-ray, or other type of radiograph is not always performed and/or documented during the follow-up task appointment following the offsite appointment.

**Recommendation:**

- The Implementation Plan states that for a comprehensive dental examination, if a panoramic x-ray is necessary, it can be taken for this examination. This should be included in the LOP for comprehensive care that the patient can be referred to the outside oral surgeon's office for a panoramic x-ray. It is very important that should this be done for the comprehensive dental examination, that any pathology is identified and included in the object findings and subsequently attached to the assessment with the correct diagnosis.
- Update the Offsite Referral LOP to include the expectation that the review of any x-rays, including a panoramic radiograph, will be reviewed and noted in the progress notes during the next dental day's post-op task appointment, upon return from the oral surgeon's office or higher level of care.

- The Dentist is to review, identify pathology, and discuss the results of the radiograph with the patient as well as record the review and results in a SOAPE format in the progress notes, at the time of the follow-up patient's Return From Offsite. Also advise the patient to submit a Dental Sick Call for any follow-up or continuity of care.
- Review the offsite panoramic radiograph and document any pathology within the x-ray. Discuss it with the patient and advise the patient to submit a new dental sick call when ready to address any new or incidental findings.
- If indicated, the use of the panoramic radiograph can be utilized during a comprehensive dental examination. "Panoramic radiograph may be requested from an outside source when, in the discretion of the dentist, it will assist in diagnosis and treatment planning." [Wellpath IP, p. 103]
- Implement a Dental-Specific Referral System: Ensure all ERMA referrals are scanned into CorEMR. Establish a standardized, dental-specific referral workflow so referrals are easily trackable, regardless of which clinician initiates them.
- Clarify Specialist Report Review Responsibilities: Include in the LOP a clear process for dentists to review specialist reports and radiographs, identify pathology, incorporate recommendations into the treatment plan, discuss with the patient, and document appropriately. Train staff accordingly.
- Perform Internal Audits: Regularly audit the referral system to confirm patients are scheduled promptly following offsite specialist visits and that all orders and recommendations are completed.
- Use CQIs to Monitor Access and Compliance: Continue leveraging CQIs to identify barriers to care, report findings to the Dental Subcommittee, and implement course corrections or additional training as needed.

## E.6  Equipment and Supplies – 100.0% - SC

**Deficiencies and Findings:**
- Per Wellpath's IP, "All dental services will be provided in a safe and sanitary environment." [Wellpath IP, Exhibit A, p.98]
- Dental orders from Henry Schein and McKesson are placed proactively, including PPE, to ensure adequate stock. There is enough room for supplies, although one of the shelving area should be replaced with a closed cabinet as it houses sterile surgical supplies.
- Materials are organized by expiration date, with the oldest in front and newest in the back, supporting proper rotation.
- MCJ has only one dental operatory, which limits efficiency and scheduling flexibility. The single operatory may have an impact on access and workflow and may restrict the number of patients treated per day and could create delays in care, especially for urgent or follow-up procedures. Despite this limitation, the dental staff are managing to provide care within these constraints.
- MCJ does not have an in-house dental equipment repair department; however, Henry Schein provides maintenance and repair services when called.

- Per Dr. ▮▮▮ MCJ/Wellpath maintains an account with Henry Schein, allowing orders to be placed according to his instructions and OSHA requirements.
- Scheduled equipment maintenance is performed and logged into the Housekeeping log.
- Preventive maintenance is routinely scheduled by the Dental Assistant, who plays a key role in keeping the equipment in good working order.
- There are occasional supply chain interruptions - whether due to financial constraints, resource limitations, or other factors. There currently is no LOP to guide MCJ Dental in ensuring patient safety and continuity of care during a supply chain interruption.

**Recommendation:**

- Develop a site-specific local operating protocol for MCJ to address procedures for managing supply chain disruptions, including unexpected delays or unavailability of supplies and equipment. Outlining procedures during a supply chain disruption can ensure continuity of patient care and mitigate potential risks.
  - o I suggest you develop a written equipment maintenance protocol that clearly defines responsibilities, response times, and documentation requirements to strengthen accountability and ensure readiness in case of emergencies or equipment failure.
- Consider assigning two Dental Assistants per day to maximize productivity within the one-operatory limitation. Conduct a staffing and workflow analysis to determine whether adjustments in staffing levels, scheduling, or clinic operations could further improve efficiency and patient access.
- Consider reviewing the benefits and possible cost savings of a repair/service contract with Henry Schein or another similar company, which would guarantee responsiveness and timely repairs and maintenance in the event of an unexpected equipment breakdown.
- Ensure preventive maintenance by the Dental Assistant remains routine and well-documented. Continue maintaining a strong relationship with Henry Schein for responsive service and repairs.

## E.7  Nurse Training by DON, HSA and Dentist – 50.0% - NC

**Providing training** ensures that all staff members understand the correct procedures, protocols, and standards expected in their roles. **Documenting training** creates a record that staff have received the necessary instruction, which is important for accountability, regulatory compliance, and quality assurance.

Together, these actions help to:
- Standardize practices across the dental and nursing teams,
- Reduce variability and errors,
- Improve efficiency by ensuring everyone follows the same processes,
- Demonstrate compliance during audits or inspections,
- Support continuous improvement by identifying and addressing training gaps.

**Deficiencies and Findings:**

- Nursing workflows for dental referrals remain inconsistent despite multiple rounds of training. See the Dental CAP #108.
- Nurse Sick Calls are often not completed, with requests not consistently scanned into CorEMR, creating gaps in audit timelines.
- Duplicate referrals are still common, and priority level designations (DL1, DL2) are inconsistently applied. Many referrals lack required documentation such as description of the problem, history, location of the pain, pain scale, severity, and duration. Both the form and task should have the same information.
- Although training has been routinely provided—with documented sign-in sheets and annual updates—the results remain inconsistent, possibly due to ongoing staff turnover.
- CQI monitoring is in place and individual coaching occurs, but there is not yet a reliable system to identify and correct spot offenders. Perhaps a different training approach such as case-based learning will assist in remediating this training issue.
- The Dentist provides occasional individualized training, but this is not formally documented.
- Communication with the DON is now nonexistent since the position is vacant. The Dentist contacts the Dental Operations Specialist and the CDO for nurse related challenges.
- **I found that patients with pain, toothaches, swelling, infection, bleeding and abscesses are not always referred timely to Dental by using the Priority Dental Level 1 parameter, to be seen next dental day. They are often assigned a Priority Dental Level 2 (patients to be scheduled within 14 calendar days) without substantiating the Priority 2 assignment.**
- From Dr. Barnett, Medical Monitor, "Complications from dental and oral infections may have dire consequences affecting other parts of the body or even lead to death. I have previously communicated my concerns that patients suffering the symptoms of dental abscess should be viewed as having a condition that merits urgent if not emergency care". **Therefore, identifying the correct dental level is important in order for patients to receive care in the appropriate timeframe and without delay.**
- Regarding evaluating the timeframe of compliance for Dental Sick Call requests, there is a difference between "reading" the Dental Sick Call requests within one day of the request vs "seeing" the patient face to face to screen the patient's dental condition, per Wellpath's IP "within one day of the request".
- The data shows that the requests are read 98.0% of the time, within one day of the request, but there are no reference IDs to show the percentage of patients seen face to face for the patient's dental requests as mandated by the Implementation Plan.
- As Nurse Sick Calls are now rarely completed for dental problems, Wellpath sent a list of 49 completed dental Nurse Sick Calls, out of 1441 dental sick call requests. This is an area which remains a barrier to access to care.
- Training has occurred repeatedly, the roster shows training is being given, however the description, history, location and pain scale, at a minimum, is not entered in both the form and the task. There is still inconsistency in placing a pain scale as part of the description of the dental problem.
- **There were instances where no description was given on the form but a task referring the patient to dental occurred and information was placed in the task, but not entered**

**in the form.** Conversely, there are instances when the form has the necessary information, but no information is conveyed in the task note.

- There are several instances when only partial information is noted in the task and the chief complaint, history of the dental problem(s), pain scale, location of the problem(s) is not always consistently placed.

- There is a concerted effort to provide the training. However, there are a multitude of situations showing the RNs have a lack of understanding of some of the components of the referral process. Please refer to the Dental Audit Tool Results and the list of deficiencies which must be corrected. Perhaps more example based training may be useful.

- There continue to be instances where nurses are completing dental sick call appointments themselves instead of properly routing the patient to dental. This is a critical issue, as it creates a risk that patients may not receive their mandated dental care following a request to address a dental problem. **When a nurse independently closes a dental sick call without routing it to Dental, the patient may be deprived of timely assessment and treatment by a licensed dentist.**

- Dental is using the CQI in the dental monthly subcommittee for intake, 14 days and dental sick calls and are noting deficiencies and improvements. They are updating the CQI questions as compliance is achieved with some of the initial parameters. They are continuing to add relevant questions relating to compliance in the CQI, although the 14-Day Exam lack of indicated referrals still continue.

- Dental submitted the results of their CQIs as well as their dental subcommittee meeting minutes and statistics to the QA meeting. Not all CQIs for compliance have been created, the dental department is in process of expanding their CQI process to other areas of dental care. QA has not yet implemented a QIT to address deficiencies and barriers to access, timeliness and quality of care and subsequent training.

- There has not been successful training relating to the 14-Day Exam and referrals to dental. **Since there are two forms and the medical form creates the task and the dental form does not, patients have not received their mandated access to dental care, and the patients are often not seen in dental due to the lack of a referral task. Training must occur and either the forms are combined, or the training becomes effective, and this situation is remediated immediately!**

**Recommendation:**

- Update and Standardize Training Protocols: Revise the LOPs to include a flow chart outlining referral pathways, DL1/DL2 criteria, and documentation standards.

- Provide ongoing, documented training for nurses, physicians, nurse practitioners, and physician assistants specifically focused on proper DL1/DL2 designation at Intake, Sick Call, 14-Day Exams, and during provider encounters. See the Dental CAP #108.

- Implement competency-based training with post-tests or case reviews to validate understanding.

- Ensure Consistent Documentation: Require completion of all Nurse Sick Calls and scanning of the requests for dental care into CorEMR to establish a verifiable audit trail.

- Standardize documentation fields so referrals always include description, history, location, severity, duration, pain scale, and clinical justification for the assigned priority level.
- Address Variability and Duplicates: Use CorEMR reporting and CQI audits to identify duplicate referrals and analyze root causes.
- Provide targeted retraining when patterns of duplication or misclassification are found.
- Enhance Oversight and Accountability: Document all dentist-led trainings and integrate them into staff education records.
- Require that nurse training, performance feedback, and monitoring results be reported and included in the monthly Dental Subcommittee meeting minutes for transparency and accountability.
- Involve the DON directly in monitoring compliance and follow-up of dental referral workflows. Is there an acting DON?
- Continuous Quality Improvement (CQI): Continue to track compliance with referral documentation, timeliness, and DL1/DL2 accuracy through CQI reviews. Use CQI findings to inform immediate course corrections, additional training, or workflow redesign as needed.
- Include referral compliance and training effectiveness as a standing agenda items at Dental Subcommittee meetings.
- As there are times when the nurses are completing dental sick call appointments, even if this is due to a duplicate appointment, only the Dentist is to complete any dental sick call and dental annual exam. **Train that only the Dentists are to complete Dental Sick Calls and Dental Annual Exams. Completing dental sick calls is outside the scope of the RNs.**
- Amend, update the LOP when necessary and train the nurses against the LOP and document the training.
- Continue to provide documented nurse training, feedback and monitoring for designations of dental problems at Intake, Sick Call, 14-Day Exam and for Physicians, Nurse Practitioners and Physician Assistants. This is necessary in order for the patients to be screened and assessed correctly and hence scheduled in Dental according to their assigned timelines.
    - Priority 1/Dental Level 1 (DL1) – **emergent/urgent**, priority 1 DL1, **next dental day**.
    - Priority 2/Dental Level 2 (DL2) - **routine**, priority 2 DL2 **scheduled within 14 calendar days.**
- **To strengthen the nurse training process, it should incorporate deficiency-driven, case-based learning, using actual audit findings** (e.g., missing pain scales, duplicate referrals, or incomplete SOAPE notes) as training cases to reinforce correct practice. Some of the nurses understand these parameters well. Some need more individualized training.
- Fill the DON position. The CDO to provide training to the new DON upon hire regarding dental training.
- Perform a self-audit to assess for deficiencies. Provide documented, follow up, one-on-one nurse training to address any ongoing issues. Include the deficiency and training in the Dental Subcommittee meeting.
- Provide an audit trail for all areas of compliance mandated by the Implementation Plan.

- Establish consistent, fully attended Dental Subcommittee meetings with all required participants.
- Integrate findings from internal self-audits, self-evaluations, and monitoring into the monthly dental Subcommittee's discussions.
- Ensure meeting minutes and supporting materials (e.g., PowerPoints) are submitted to the QA Committee for review and inclusion in its agenda.
- Develop a Quality Improvement Team (QIT) to support continuous improvement in and sustainment of corrective actions.

### E.8  Staffing and Staffing Analysis – Clinical and Administrative – 50.0% - NC

Not all requested comprehensive dental examinations and cleanings are seen timely even with the addition of the PRN staff.

> *Inmates incarcerated for 12 months or greater are eligible to receive a comprehensive dental exam. The purpose of the dental examinations shall be for the identification, diagnosis, and treatment of dental pathology which impacts the health and welfare of inmate patients.* (Wellpath IP, p. 103)

The Periodontal Disease Program is generally conducted by the new PRN Dentist and PRN Dental Assistant. The flow of patients into the Periodontal Disease Program is causing a barrier to access to care as there is a significant delay in patients being scheduled and seen for this program. Therefore, not all requested periodontal disease program requests are seen timely despite the PRN staff.

> *MCJ will maintain a periodontal disease program for the diagnosis and treatment of periodontal disease. Periodontal screening shall be available to all patients, regardless of length of stay. Treatment will be based on periodontal disease classification, Dental Priority code, and special medical needs (i.e. pregnancy, diabetes, HIV/AIDS).* (Wellpath IP, p. 103)

There is currently no rescue plan in place for dental staffing emergencies. See the Dental CAP #113. "Add dental services to Wellpath's existing 'rapid response team' for staffing shortages."

> *There shall be, at all times, sufficient staff to ensure compliance with the CFMG Implementation Plan. The CFMG Staffing Plan for the Monterey County Jail is attached hereto as Exhibit I. CFMG will ensure that staffing levels are sufficient to consistently and adequately fill all positions identified in the CFMG Staffing Plan. Relief factors for each position will be calculated into the staffing analysis to ensure staffing levels consistently meet requirements. CFMG will evaluate on an on-going basis its staffing levels to ensure that all staffing positions are filled and sufficient staff is employed to ensure compliance with the CFMG Implementation Plan.* [Wellpath IP, Exhibit A, p. 115]

Many Kudos to Wellpath for seeing the need through a staffing analysis and consequently filling the need by hiring a PRN Dentist and PRN Dental Assistant. Although the IP states there will be "*sufficient staff to ensure compliance",* this was a proactive step which helped the timeliness of care come one step closer toward compliance. This is in addition to Monterey's staffing plan for a Dentist which originally stated, "12 hours To Be Determined". Between the permanent Dentist, Dr. ███ and the PRN Dentist, Dr. ████████ there was fulltime dental care at MCJ from January 2024 through June 6th, 2025. Therefore, this decision was commendable.

Dr. ████████ the PRN Dentist was out on leave for approximately a month and a half during this audit period and there was no available or contracted dentist to cover his position. The Defendants worked diligently to find a solution and added extra days to Dr. ████████ schedule prior to his leave. Dr. ████████ returned to MCJ in mid-January. However, his absence created a backlog of patients and started affected compliance, especially in late March 2025.

**Outside of this audit period, the PRN Dentist, Dr. ████████ was let go of employment with Wellpath at MCJ on June 6th, 2025.** A new PRN Dentist, with correctional experience, Dr. ████████ was hired on August 3, 2025, and was fully onboarded prior to seeing patients. He will be available on Friday, Saturdays and Sundays, once or twice per month, starting August 18, 2025.

As indicated in the Dental Audit Tour Report #12, the permanent Wellpath Dental Assistant resigned in February 2025 and the PRN Dental Assistant has been filling in, working in the vacant position, until a permanent Dental Assistant can fill the position.

The PRN DA applied for the permanent DA position and was the successful candidate for the position. The position was offered to ████████ "█████████ and she accepted the position. Congratulations to a hard working new member of the permanent dental team!

Subsequently, the PRN Dental Assistant position became vacant, and a new PRN DA was hired, but only briefly, and was let go on 08/18/25. They will be canvasing for a new PRN DA position. Thus, ██ has been working, filling in for the PRN DA position, in addition to her new permanent position, and started working with the new PRN Dentist, Dr. ████████

Please keep in mind that the County has not officially accepted, nor ratified into their contract, the full time dental care recommendation from Dr. ████████ staffing analysis. **These PRN Dentist and Dental Assistant positions are not permanent positions under the Monterey Staffing Plan and may be eliminated at the discretion of the County or Wellpath.**

**Additionally, outside of this audit period, the healthcare contract between Wellpath and MCJ will be up for bid for a new healthcare vendor.** Wellpath's end of contract is 12/31/25 and as of August 2025, per GRSM50, "As for the vendor transition, we have no information to share at this time. The contract has not been officially awarded, and we have no information regarding who the new vendor will be."

**Deficiencies and Findings:**
- The PRN Dentist and PRN Dental Assistant are temporary employees only and are not made part of the Monterey's Staffing Plan yet. Since these are PRN positions, the stability of the dental program is yet to be determined.
- Not all requested comprehensive dental examinations and cleanings are seen timely even with the addition of PRN staff. "Inmates incarcerated for 12 months or greater are eligible to receive a comprehensive dental exam. The purpose of the dental examinations shall be for the identification, diagnosis, and treatment of dental pathology which impacts the health and welfare of inmate patients." (Wellpath IP, p. 103)
- The HSA position is filled. The Implementation Specialist position is filled. The DON position is vacant.
- The Hygienist position is not filled and continues to be a vacant position although the PRN Dentist is taking over the periodontal aspects of this position, as well as performing the Dentist duties.
- There is no registry or a rescue plan in place for dental. Contrary to the Dental CAP #113, there is no plan/policy and procedure at this time to handle emergency provisioning of dental care locally at MCJ. They do, however, have a disaster plan from which a PRN Dentist and/or Dental Assistant from San Benito and Santa Cruz can be called, although this will leave those Counties without a dentist.

**Recommendation:**
- It is positive that following the staffing and workflow analysis, the PRN Dentist and Dental Assistant positions were added by Wellpath to help meet the Implementation Plan requirement: "There shall be, at all times, sufficient staff to ensure compliance with the CFMG Implementation Plan." [Wellpath IP, Exhibit A, p.115]
- Prioritize formal inclusion of the PRN Dentist and PRN Dental Assistant positions into the MCJ Staffing Plan to ensure continuity of dental care.
- Develop and provide a plan to comply with the Implementation Plan requirement for a per diem Registered Dental Hygienist (RDH) to deliver dental hygiene education and periodontal treatment consistent with dentists' recommendations. [Wellpath IP, Exhibit A, p.103-104]
- Complete the job description for the Hygienist including a list of expectations and adherence to the IP and any forthcoming policies, procedures and local operating protocols.
- Hire a DON.
- Conduct an additional staffing analysis and incorporate a workflow analysis to determine if improved efficiency, patient flow, and productivity is possible.
- Consider implementing an EDRS or enhanced tracking system to monitor pending treatments and optimize scheduling.
- Address the Dental CAP #113 which states, "Add dental services to Wellpath's existing 'rapid response team' for staffing shortages.
- Create an LOP to handle the provisioning of dental care at MCJ. Have a staffing plan in place and ready to be implemented, as it is currently unknown if the new PRN Dentist and

Dental Assistant position will be ratified and included in the Monterey County staffing plan.
- CAP #122. Perform another Staffing Analysis and timed Workflow Analysis to assess the dental program now that the Periodontal Disease Program, Chronic Care and the Comprehensive Dental Examinations are receiving their exam and subsequent dental treatment plans and treatment. Adjust staffing accordingly.
- Dr. ████ is asking for the dentists to perform quadrant dentistry whenever possible. They still have a backlog although many of the patients have been released, and their incomplete dental treatment plans have been dropped from the backlog.
- Schedule and see the patients timely within the Dental Periodontal Program, and for the requested Annual Comprehensive Examinations and Chronic Care referrals.
- Schedule and see the patients timely for Intake referrals to dental, Dental Sick Call requests, the 14-Day examination Health Appraisal referrals to dental. As well as for any and all referrals from providers within MCJ to dental. Additionally schedule and see the patients timely for patients returning from offsite, from the Physician on Call (POC), and patients returning from higher levels of dental care.

## E.9  Illness and Injury Prevention Plan (IIPP) – 87.5% - SC

**Deficiencies and Findings:**
- During the site review, multiple large/heavy items were stored on top of two tall shelving units (visibly >6 ft). The units were not anchored to the wall. This observation is within scope because California's Injury and Illness Prevention Program (IIPP) standard requires employers to identify and correct unsafe conditions in the work environment; unsecured tall shelving and heavy overhead storage present a foreseeable tip-over/struck-by hazard to staff, custody and patients who enter the dental clinic areas. See the attached photos in the Appendix I. The cabinets are to the right of the patient seating area, and the incarcerated person(s) face the side of the cabinets, which were unsecured to the wall.[32]
- Separately, the items stored overhead included dental supplies used in patient care. Infection-prevention guidance directs that sterile supplies be stored to maintain integrity—ideally in covered or closed cabinets—and not in locations where they can be contaminated or damaged by falling. Thus, the storage practice implicates both patient safety and regulatory compliance (IIPP and infection-control).[33]
- The concern does not hinge on an exact cabinet-to-ceiling measurement; it arises from two plainly observable conditions: (1) unanchored tall shelving, and (2) heavy items stored high overhead. These are recognized physical hazards in healthcare workplaces; OSHA has cited employers when racks/shelving were not anchored, and national safety guidance recommends anchoring tall furniture and relocating heavy items from high shelves to prevent injuries, including during emergencies.[34]

---

[32] CalDIR. https://www.dir.ca.gov/dosh/dosh_publications/iipp.pdf
[33] CDC. https://www.cdc.gov/dental-infection-control/media/pdfs/2024/07/safe-care2.pdf
[34] https://www.osha.gov/ords/imis/generalsearch.citation_detail?cit_id=01001&id=1060970.015

- These observations falls squarely under the IIPP's hazard-identification and correction duties and the dental setting's obligation to store patient-care supplies in a manner that preserves safety and sterility. Accordingly, the inclusion in this monitoring report is appropriate.
- Documentation on the hazard assessment and corrective steps were not listed in the facility's IIPP records.[35]
- The IIPP is completed, and the binder is in the dental clinic. The staff are aware of its location. Although these issues listed above were not discovered through self-governance but rather through this audit tour, training has been completed.
- No injuries are reported from October 1st, 2024, through March 31st, 2025.
- There is a worker's comp process, and a global policy is in place.
- The evacuation plan is not posted in the dental clinic, nor in the Emergency Procedures binder as requested by Custody.  The evacuation plan is not allowed to be posted in plain view of incarcerated persons as it could jeopardize the safety and security of the institution.
- Although no attestation of training has been provided, the dental staff has stated they were trained on the Exposure Control Plan, Hazard Communication, Fire Emergency, General Office Safety and Ergonomics and the evacuation plan.
- Training through World of Wellpath has occurred in this area under OSHA training although there is no site specific training documented.
- The DA has been trained on transporting waste per Stericycle although there is no documentation of this training nor is there a site specific LOP created until January 2025 to indicate the protocol and documentation of training.
- The x-ray unit is in the new dental clinic and is registered with CDPH with the certificate posted appropriately. The registration is due January 2025, and the renewal was completed.
- The dosimetry monitoring results reports were previously incomplete as the control badge was used as the area monitoring badge for the new staff in the new dental clinic, therefore, the past year could not be used as the adequate one year of monitoring per the radiation guidelines. However, the new dosimetry reports were received following the submission of the draft report. The location of the control badge and monitoring badge are confirmed to be placed according to the guidelines.
  - "The control badge should be kept in a low background location at your facility, never in the room where your source of radiation is located. Also, as the control badge is used in the calculation of dose, it should never be worn or re-assigned."
  - As of 09/23/24 the control badge and an area monitoring badge for the staff is located in their designed areas. One full year of dosimetry monitoring is mandatory from that day. The control badge is now placed in a draw outside the clinic (DA or Dentist desk), and the area monitoring badge is placed no more than 6 feet from the source of the beam.

**Recommendation:**

---

[35] https://www.fema.gov/sites/default/files/2020-08/fema_home-business-earthquake-safety-mitigation_p-909.pdf

MCJ/CFMG – Dental Audit Tour #13                                      Dr. Viviane G. Winthrop
Final Report 2025-10-31                                               Dental Neutral Court Monitor

- Anchor the three shelving units to wall studs or other suitable structural members per manufacturer and safety guidance. **Completed,** when I asked the Dental Operations Specialist to take care of this issue, she contacted the maintenance department and they came and anchored the shelves to the wall.
- Relocate heavy/bulky items to lower shelving (preferably below ~4 ft) and keep the tops of tall units free of heavy objects. **Completed.** The Dental Assistant removed the items that were stacked high above the shelving and found an alternative location.
- Move patient-care supplies to closed cabinetry or otherwise protected storage consistent with infection-prevention guidance. **Partially completed**. The black cabinet is a closed cabinet, in line with the infection prevention guidance, the other is not. I recommend another close cabinet replace the open shelving. The County responded, stating they will review the matter and see if they can obtain another closed cabinet to house the supplies.
- Document the hazard assessment and corrective steps in the facility's IIPP records. **Not completed.** Please document the hazard assessment and the corrective steps in the facility's IIPP records.
- Continue to complete annual training on the IIPP for all dental staff.
- Please provide an attestation from the dental staff that they have been trained and know what to do and where to meet in case of an emergency or a disaster.
- A written policy and procedure is written but the site specific local operating procedures needs to be completed to identify how exactly the wastes and in what containers will the medical waste, biohazard, sharps and universal waste, be transported from the dental clinic to the area for disposal at MCJ and how the wastes will be stored until Stericycle arrives to pick up the waste.
- Review this link from the ADA regarding ADA Tip Sheet on Exposure Control Plans for additional information.[36]
- Place the dosimetry badge results quarterly, both current and past in the radiation safety binder, informing the employees of any radiation exposures.
- Perform internal monitoring to comply with these regulations and document in the monthly Dental Subcommittee meeting minutes.

### E.10  Policies and Procedures, Including Dental, Corporate and Local – 50.0% - NC

This section is also applicable to section E.7, for monitoring performance and outcomes of training. I recommend these steps should be taken and discussed regularly in the monthly Dental Subcommittee meeting and minutes:

- Review your global policies and procedures and local operating protocols regularly, including a review of clinical outcomes, audit results, and staff performance to spot inconsistencies and/or recurring issues.

---

[36] https://www.ada.org/-/media/project/ada-organization/ada/ada-org/files/publications/guidelines-for-practice-success/gps-regulatory/exposure_control_plan.pdf?rev=e2702a78c47d4c69aeaba9d896f78e7f&hash=9E4378C9314B033F0BC0D3039878C3BE

- Use tools like chart audits, peer reviews, and Continuous Quality Improvement (CQI) processes to gather data to identify training gaps or gaps in policies, procedures and local operating protocols.
- Analyze the data to determine where staff may lack knowledge or skills.
- Look for patterns such as repeated documentation errors, missed protocols, or non-compliance with standards.
- Routinely review and amend Policies & Procedures, and Local Operating Protocols.
- Have a schedule to update existing P&Ps and LOPs to address the identified gaps.
- Document updates to policies and protocols, and communicate these changes to all relevant staff.
- Ensure that new or revised protocols are clear, actionable, and accessible to all staff.
- Provide targeted and documented training when indicated.
- Develop and deliver training sessions focused on the specific deficiencies uncovered.
- Use real-world case studies and examples from recent audits to make training relevant and practical.
- Keep thorough records of all training provided, including attendance and content covered.
- **Evaluate Effectiveness**. After implementing new training and protocol changes, monitor for improvement.
- Use follow-up audits and feedback to ensure the changes are effective and sustainable.
- **Repeat the cycle**. Continuous improvement is an ongoing process. Regularly revisit steps 1–6 to maintain high standards and adapt to new challenges.

---

**Deficiencies and Findings:**
- There is much improvement in this area! Global (Headquarter) policies and procedures and many of the site specific local operating protocols, are near draft completion.
- See CAP #114. Policies and Procedures (P&Ps) and Local Operating Protocols (LOPs).
  - Per the National Commission on Correctional Health Care, "Policies and procedures are essential to outlining a facility's mission and providing clarity when dealing with correctional health care issues. An up-to-date, accurate manual is an important reference for new and established health staff alike."[37]
- Policies and Procedures and Local Operating Protocols are foundational to day to day operations. They ensure compliance with the Implementation Plan, Settlement Agreement and state and federal laws and regulations. They also help to streamline internal processes.
  - "Well-written policy and procedure is the core of modern correctional operations. It **informs and governs staff behavior, sets clear expectations, and confirms that the administration has performed its role**. It is also the basis for staff supervision, training, and supporting a defense when things go wrong."[38]
- "The Policies and Procedures standard (A-05) requires that a manual or compilation of written policies and defined procedures regarding health care services at the facility

---

[37] https://www.ncchc.org/spotlight-on-the-standards/policies-and-procedures/
[38] https://nicic.gov/resources/resources-topics-and-roles/topics/correctional-policy-and-procedure

addresses each applicable standard, and that the policies and procedures are site specific."[39]

- "The site-specific policies should be viewed as documents that would provide clarity as to what services are provided at the facility if read by an individual who knows nothing about your operation (e.g., new hires, attorneys, surveyors)."[40]

**Recommendation:**

- Continue improvements with completing the draft LOPs and link them all to the global policies and procedures. Wellpath and MCJ to formulate and approve localized dental P&Ps and LOPs, train staff upon these consistently and document the training accordingly. (Settlement Agreement ¶ 10).
- Continue to update your global policies and procedures and site specific local operating protocols and confirm they match your internal processes.
- Continue to create and standardize the local operating protocols based on the Implementation Plan, Settlement Agreement, and community standards. CAP #114. P&Ps and LOPs are foundational to an established, systematic, efficient, transparent, standardized and functioning dental program.
- Once approved by Wellpath, make sure the dental staff have read, state their understanding of the training by signing a training sheet for each Policy and Procedures and corresponding LOP. Include the documented training in the monthly Dental Subcommittee meeting minutes.
- Create a yearly schedule to review existing, amended, and new P & Ps and LOPs. Establish a structured, repeatable process that ensures all documents remain current, compliant, and effective.
  - o Inventory All P&Ps and LOPs
    1. Compile a comprehensive list of all current P&Ps and LOPs, including their last review or revision dates.
    2. Maintain this inventory in a centralized, accessible location (e.g., a shared drive or compliance management system).
  - o Assign Responsibility
    1. Designate a compliance officer, committee, or responsible staff member to oversee the review process.
    2. Assign specific documents to relevant subject matter experts for detailed review.
  - o Develop a Review Calendar
    1. Create a 12-month calendar that spaces out the review of all documents across the year.
    2. Prioritize high-risk or frequently updated policies for earlier or more frequent review.
    3. Schedule reviews to avoid overlap with major audits or operational peaks.
  - o Set Review Criteria
    1. For each document, check for:

---

[39] CorrectCare Volume 23, Issue 3, Summer 2009
[40] https://www.ncchc.org/standards-q-a-corporate-vs-site-specific-policies/

MCJ/CFMG – Dental Audit Tour #13                                      Dr. Viviane G. Winthrop
Final Report 2025-10-31                                               Dental Neutral Court Monitor
129

> - Regulatory and legal compliance (local, state, federal)
> - Alignment with current best practices and organizational goals
> - Clarity, accuracy, and relevance
> - Evidence of effectiveness (e.g., audit findings, incident reports)
> - Feedback from staff and stakeholders
> o Conduct the Review
>   1. Review each P&P/LOP according to the schedule.
>   2. Document any changes, updates, or recommendations.
>   3. Solicit feedback from staff who use the documents in daily operations.
> o Approve and Communicate Updates
>   1. Route amended documents through the appropriate approval channels (e.g., leadership, legal, compliance).
>   2. Communicate changes to all affected staff.
>   3. Provide training or refresher sessions as needed.
> o Document the Process
>   1. Keep records of review dates, participants, findings, and actions taken.
>   2. Update the inventory with new review dates and version numbers.
> o Continuous Improvement
>   1. After each cycle, assess the review process for efficiency and effectiveness.
>   2. Adjust the schedule or process based on lessons learned or organizational changes.

## E.11  Licenses, Credentialing, CURES & Job Performance – 100.0% - SC

> **Deficiencies and Findings:**
> • The Dentist's dental license, DEA and BLS are current. The dental license is unrestricted and posted in the dental clinic. The other licenses and certifications are in the binder including the CURES 2.0 registration.
> • A joint performance evaluation by the clinical and administrative supervisors have been completed for the Dentist per the Dental Operations Specialist, however, there is no record of this, and no attestation of the review placed in the binder for the date of the performance review.
> • The Registered Dental Assistant (RDA) has her x-ray licenses, Registered Dental Assistant (RDA) license, and BLS with the other current certifications in the binder.
> • A joint performance evaluation by the clinical and administrative supervisor for the Dental Assistant has been completed, however there is no record of this, and no attestation of the review placed in the binder for the date of the performance review.
> • There is no hygienist currently hired at MCJ per the Implementation Plan; therefore, no licensing information is available.
> **Recommendation:**
> - Perform a clinical and administrative job performance review for the Dentists annually.
> - Perform a clinical and administrative job performance review for the Dental Assistants annually.

- • Submit for review the licensing information for the hygienist once hired.

### E.12  OSHA Review and Infection Control Training – 100.0% - SC

**Deficiencies and Findings:**
• The Wellpath dental staff have a completed certificate showing they took the OSHA and Infection Control classes from World of Wellpath education.
• The proof of practice certificates are located in the training binder.
**Recommendation:**
• Please continue to provide certificates for annual training in infection control and OSHA, and/or provide access to the World of Wellpath (Wow) for proof of practice.
• Recommend purchasing OSHA Review as it is a good source of dental information and continuing education as well as the dental clinic would be provided all necessary and timely regulatory posters and necessary trainings with updated information. [41]

### E.13  Hepatitis B Vaccination Record – 50.0% - NC

**Deficiencies and Findings:**
• An attestation has not been submitted to show the Hepatitis B Vaccination was offered, and/or a declination form was made available although verbally, the permanent staff stated it was offered.
• It is unknown if the new PRN Dentist and PRN Dental Assistant were offered the Hepatitis B vaccination and/or declination, as there is no attestation, and therefore, no the proof of practice.
https://www.osha.gov/sites/default/files/publications/bbfact05.pdf
**Recommendation:**
- • An attestation is to be submitted to show a record of the Hepatitis B Vaccination has been offered, and a declination form was made available if indicated.

### E.14  Pharmacy & Medication Management – 87.5% - SC

**Deficiencies and Findings:**
- • Although substantial compliance is given as an overall grade, **the stock medications are not accounted for nor logged in the Dental Clinic when dispensed directly to the individual patients per the Dental CAP #116.**
    - o "Identify which stock medications will be at the dental clinic and the stock medications are to be **fully accounted for including to whom the medication is prescribed in both the on-site log and in CorEMR**. See report for details."
- • There is a medication room. The main pharmacy is offsite. The back up pharmacy is the Safeway Pharmacy behind the jail, where the patients pick up their medications upon discharge. Should there be a problem with the prescription or patient compliance, the

---

[41] https://oshareview.com/

Dentists communicate through the MAR and the LVN calls dental, including if there are any issues with patient compliance.

- There are no opioids used as stock medications in the dental clinic, only nonopioid analgesics and antibiotics.
- The pharmacy LVN and DA sign for the receipt of large "bubble packs" of various analgesics and antibiotics. The bubble packs of analgesics and antibiotics are dispensed by the Pharmacy to the Dental Clinic. The medications are held in the fire cabinet, which is double locked.
- The Dentists do prescribe analgesics and antibiotics chairside when indicated, and dispense these medication to a specific patient within the dental clinic. Although the prescription is entered into the MAR, there is no indication that any of the medications prescribed are dispensed to the patient as they are not logged per the Dental CAP #116. There is no audit trail. The **prescriptions are not logged, patient specific, in a central dental clinic log of daily patients, the name of the patient, the name of the medication and quantity of the stock medication dispensed, nor is the overall medication count adjusted per day, therefore, there is no accountability for each medication prescribed.** Without accountability of the medications dispensed, there is nothing to prove that the medications were dispensed for patient use only.
- Although the MARS is available to look at individual patients, accountability for the overall stock medications dispensed in the Dental Clinic is not, see the Dental CAP #116. Said in a different way, **without knowing which patient received the stock medications from the pharmacy's large bubble pack, there is no accountability or proof of practice that the patients received the prescribed medication, especially in the case of prophylactic premedication.**
- An LOP for stock medications has not been completed for the dental clinic stock medication accountability, nor has the Pharmacy P&P been updated to reflect dental's stock medication count and accountability.
- For the charts audited this audit period in the Extraction portion of the Quality of Care Section C in the Dental Audit Tool, and the Class Case Reviews, the Dentist has on several occasions failed to submit a prescription for analgesic coverage following oral surgery. Should this be due to the need for additional training on the MARs in CorEMR, please provide the documented training. Otherwise, a performance improvement plan should be created to determine the cause of the lack of medication coverage following oral surgery.

**Recommendation:**

- Perform the daily itemization and recording of the stock medications within the Dental Clinic.
- Due to the failure to prescribe post-operative pain medication for several patients following oral surgery, I recommend Pharmacy provide an updated documented training on the use of the MAR, to assist the Dentist(s) should there be any difficulty in using the system as a reason for the lack of prescribed post-operative medications.
- Complete the LOP and update the pharmacy P&P for the dispensing and accountability of stock medications in the Dental Clinic and provide documented training from the LOP.

- Stock medications of analgesics and antibiotics are provided by Pharmacy and should be fully accounted for including to whom they are prescribed in both the on-site log and in CorEMR, see the Dental CAP #116.
- The pharmacy must have an open line of communication with the dental department in order for patient communication to occur timely. This is to include any problems with prescription orders. Please provide the pharmacy and dental LOP for pharmacy to include how the dental staff is informed of a patient's refusal to take their prescribed medication and the responsibility of the Dentist to enter a note into the dental record.
- Review the following links for accountability of stock medications given as prescriptions in the Dental Clinic.
  - https://www.cdcr.ca.gov/hcdom/dom/chapter-3-health-care-operations/article-3-dental-care-5-dental-clinic-operations/3-3-5-12-pharmaceuticals/
  - https://cchcs.ca.gov/policies/
  - See 1.3.2 Clinic Stock https://corrections.az.gov/sites/default/files/documents/Medical%20Services/TM%201101%20-%20MDSTM%20-%20Eff.%2010-1-24.pdf.

## E.15  Peer Review and Monthly Supervisory Audit Reports – 50.0% - NC

**Deficiencies and Findings:**
- There is a Peer Review system in place.
- There is a policy and procedure in place however **the policy does not conform to the Dental CAP #117** which states, "Establish a peer review system with a peer review performed at least once every 6 months on the dentist at MCJ, using dentist peer from other Wellpath facilities or hire a contracted Peer Review examine." **They are only performing one Peer Review per year.**
- Dr. ▇▇▇▇ performs the peer review.
- There are no written Peer Review minutes.
- The Peer Review minutes, nor any training recommendations from the Peer Review, are not being submitted to the monthly Dental Subcommittee.
- The new PRN Dentist nor the permanent Dentist has received a Peer Review during this audit period.
- **No Supervisory Chart Audit reviews have been conducted per the Dental CAP #102 for either the PRN and/or the permanent Dentist this audit period.**
- The grading system within the sample peer review was nonsensical and the form did not allow much space for comments. An improved form is being updated by the CDO.
- Include in the Policy and Procedure and LOP how corrective action and if indicated, training, is to be taken, should a serious clinical violation arise through the Peer Review system.

**Recommendation:**
- Update the Peer Review P & P for Peer Review to occur twice a year and not only once a year per the Dental CAP #117. Perform the Peer Review once every six month, twice per year.

- Provide the Peer Review minutes, including if any training is necessary and/or was given.
- Submit the Peer Review minutes to the monthly Dental Subcommittee with any requested training and document the receipt of any training received. These Peer Review minutes (not the worksheets) are to be included in the Dental Subcommittee meeting minutes and sent QA.
- Although there is a peer review system established, it is more of a supervisory audit as it is performed by the CDO to his subordinate. Establish a peer to peer system of peers for peer review. Include the frequency of this peer to peer, peer review to be once every six months and twice per year in the policy and procedure.
- Provide monthly supervisory chart audits.
- Include in the Policy and Procedure how corrective action is to be taken, should a serious clinical violation arise through the peer review system and/or the supervisory chart audits.
- Provide the documentation and results of the monthly supervisory chart audits.
- Update the peer review worksheet to include adequate grading parameters for the consistent evaluation and grading of the clinician during peer review.

## E.16  Monthly Dental Subcommittee Meeting – 50.0% - NC

Strengths of the current Dental Subcommittee minutes:
- **Comprehensive Coverage:** The minutes cover a wide range of topics, including staffing, site dynamics, compliance, equipment issues, backlog, quality of care, grievances, and training.
- **Action Items Identified:** Several action items are clearly stated, such as hiring updates, backlog management, and merging forms for health appraisals.
- **Regulatory Compliance:** Deadlines for required trainings are documented, showing attention to compliance.
- **Quantitative Data:** Compliance percentages and backlog explanations are included, providing measurable insights.

Areas for Improvement:
1. Formatting and Structure
- **Increase Consistency.** The use of numbering, lettering, and indentation can be more consistent. For example, some sections use numbers, others use letters, and some use both. Consider standardizing the format for clarity.
- **Headings:** Use bold or underlined headings for major sections (e.g., Housekeeping, Dashboard/Compliance, New Business) to improve readability.
- **Subsections:** Clearly separate subtopics with bullet points or subheadings.
2. Clarity and Completeness
- **Attendee Roles:** List attendee roles and/or titles (e.g., Chair, Secretary, Members) to clarify responsibilities. List the expected attendees and who was not present. Was a quorum present? At a minimum:
  - The dental staff should be present

- o  Chief Dental Officer, Dental Operations Specialist and HSA
- o  Administrative staff who assist Dental
- o  Implementation Specialist
- o  Custody, Pharmacy, Medical and Mental Health representatives present?
- **Vote to accept the minutes and agenda of the previous meeting:** Was a quorum present? Were the minutes of the previous meeting accepted? **I suggest you use Roberts Rules for meetings** and include who motioned (see the various types of motions) and if the motion was accepted.
- **Is the Agenda being followed:** Include the agenda when voting on the previous minutes. Recommend consistent Agenda items to discuss, address and include in the monthly Dental Subcommittee meeting and minutes. Add any recurring items to this agenda as needed. This list was included in the Dental Audit Tour #6.
    - o  Roll call with member list and sign in sheet – note time.
    - o  Approval of prior meeting minutes - include the agenda associated with the minutes being voted on. Identify who motioned and if the minutes were accepted.
    - o  Open/Pending Action Items
    - o  Personnel (Vacancies/Recruitment/Vacation Coverage)
    - o  Access to care issues
    - o  Timeliness of care issues
    - o  Quality of care issues
    - o  Continuity of care issues
    - o  Regulatory compliance issues (x-ray unit registration, postings, infection control, etc.)
    - o  Dental grievances, # & resolution
    - o  Incidences including dental medication errors, sharps exposure, including the root cause analysis and sentinel events.
    - o  Audits & Trainings
    - o  Operational Policies and Procedures - see the suggested scheduling for section E.10 for reviewing and updating P&Ps and LOPs.
    - o  Peer Review and Supervisory Chart Audits
    - o  Dental Supplies/Dental Equipment
    - o  Review Statistics and Monthly Reports
        - ▪  Hospital admissions due to dental/dental emergency and date seen by dentist for follow up upon patient return.
        - ▪  Outside specialty referrals (including endodontist, oral surgeon, etc.), when patient was seen by the specialist and the date the patient was seen by dentist for next dental day follow up.
        - ▪  Biopsies consultations was the patient informed of the outcome of the biopsy and/or consultation and was this documented in the patient progress notes.
        - ▪  Medical consultations was the patient informed of the outcome of the biopsy and/or consultation and was this documented in the patient progress notes.

- Patients referred from Intake, broken down by Dental Level (DL) 1 and 2 and if they were seen in dental within timeframe. Were these patients assigned the right priority dental level.
- Patients referred from 14-Day Exam, broken down by DL 1 and 2 and if they were seen in dental within timeframe. Were these patients assigned the right priority dental level.
- Patients referred from Sick Call, broken down by DL 1 and 2 and if they were seen in dental within timeframe. Were these patients assigned the right priority dental level.
- Patients scheduled.
- Patients seen for their appointment
- Patients rescheduled.
- Patients refused.
- Patients transferred, out to court, out to medical, NIC.
- Patients cancelled due to custody.
- Comprehensive dental exams (annual exam)
- Dental triages
- Dental treatments (i.e., exams, extractions, fillings, periodontal treatment)
- Dental treatments, # seen within DPC timeframe and number seen out of compliance. How many were released without being seen, timed out.
    - Unfinished Business – address items carried over from prior meetings
    - Other business / New Business / Open forum / Update Action Item List.
    - Announcements – share relevant updates. Include the date/time of the next meeting.
    - Meeting adjourned, note time.
- **Action Item Ownership:** Assign responsible persons to each action item. For example, specify who will submit the proposal for catch-up Saturdays or who will merge the HA forms.
- **Follow-Up on Previous Actions:** Indicate the status of action items from previous meetings (e.g., completed, in progress, pending).
- **Meeting Times:** The meeting is called to order at 12 pm CDT and concluded at 10:30 AM PST. This suggests a time zone or typographical error—clarify the actual meeting duration and time zone.

3. Detail and Context
- **Acronyms:** Define acronyms (e.g., DAE, Tx, DPP, CQI, HA, IIPP) at least once for clarity, especially for new members.
- **Slide References:** When referencing slides (e.g., Slide #5 Productivity Report), briefly summarize key points or attach the slides as an appendix.
- **Content and Context:** Provide more context on the nature of the content being discuss, i.e. grievances and any resolutions or follow-up actions.

4. Action Plan and Next Steps
- **SMART Goals:** Where possible, make action items Specific, Measurable, Achievable, Relevant, and Time-bound (SMART).

- **Tracking Progress:** Include a section for tracking progress on ongoing initiatives (e.g., hiring, training, backlog reduction).
- **Next Meeting Agenda:** Suggest preliminary topics for the next meeting to ensure continuity.

---

**Deficiencies and Findings:**
- The Dental Department holds regular monthly Dental Subcommittee meetings and is actively progressing through the stages of team development to enhance consistency and quality in clinical operations.
- Documentation is being submitted for inclusion in the QA meeting. This includes the Dental Subcommittee meeting minutes, statistics, CQIs and other PowerPoints.
- Internal self-audits are conducted through the Continuous Quality Improvement (CQI) process, which involves systematically identifying deficiencies, implementing targeted interventions, and monitoring outcomes to drive ongoing improvements in patient care and clinic performance.
- **See Areas for Improvement noted above.**
- **Not all recommended members are present for the meeting. A quorum is not identified.** Voting to accept the minutes and agenda of the previous meeting does not yet occur.
- **Not all areas of care identified in the Implementation Plan currently have an associated CQI.** To achieve comprehensive quality management, the department should expand both the number of CQIs and the scope and specificity of CQI questions. This will help capture additional program deficiencies and support the development of effective corrective actions.
- **Production document delivery lacks consistency.**
- Information from the Dental Subcommittee is not consistently integrated into the outcomes of the Quality Assurance (QA) meetings, which limits effective follow-through on identified issues. There remains a lack of continuity in ensuring that action items discussed in the Dental Subcommittee are fully addressed and resolved during QA meetings.

**Recommendation:**
- Integrate Continuous Improvement: Use weekly dental strategy meetings, monthly Dental Subcommittee meetings, and quarterly QA sessions not only to review CQI findings but also to monitor progress on corrective action items, assign responsibility, and verify timely resolution.
- Provide meaningful data and statistics to support the transparency of the dental program. Self-monitor and self-audit various portions of the dental program including the screening provided by the Nurses and include the results and resolution in the Dental Subcommittee meeting minutes.
- To achieve comprehensive quality management, the department should expand both the number of CQIs and the scope and specificity of CQI questions. This will help capture additional program deficiencies and support the development of effective corrective actions.

---

- Review the Dental CAP #119. Update the LOP to reflect the expected attendance and what is needed for a quorum to vote and accept the minutes of the meeting. Continue to improve the Dental Subcommittee meeting by reviewing the Areas for Improvement.

### E.17  Quality Assurance (QA) – 50.0% - NC

**Deficiencies and Findings:**
- The QA process, overseen by the Implementation Specialist, meets quarterly, but dental action items on the agenda are limited and often lack clear and specific follow-up instructions for the Dental Subcommittee.
- There is insufficient continuity to ensure that action items from the Dental Subcommittee are fully addressed and resolved during QA meetings.
- Integration of Dental Subcommittee information into QA meeting outcomes is inconsistent, which limits effective follow-through on identified issues.
- To strengthen accountability and drive improvement, the QA Committee should establish a Quality Improvement Team (QIT) and hold the Dental Subcommittee accountable for implementing recommendations and completing assigned actions.
- There is a lack of meaningful information in the dental portion of the Quality Assurance (QA) meeting minutes regarding the review of the Dental Subcommittee minutes and attached PowerPoints.
- While dental CQIs are being used to address select Implementation Plan mandates, additional CQIs are needed across more areas to achieve full compliance.
- Local dental staff are not consistently present at QA meetings, which can impact the effectiveness of discussions and decision-making. The current Local Operating Protocol (LOP) does not clearly specify who is required to attend, nor does it define what constitutes a quorum for voting and accepting meeting minutes.

**Recommendation:**
- The QA Committee is to develop key performance indicators for the dental program. Review all the Dental Subcommittee meetings during the QA meeting. If QA meets quarterly, then they should have 3 months of Dental Subcommittee meetings to review. Provide feedback to the Dental Subcommittee and have it noted in the minutes of the QA for review at the Dental Subcommittee.
- Improve the content and meaningful dental information within QA meeting minutes.
- Leverage the Peer Review, Dental Subcommittee, and Quality Assurance processes to systematically assess and improve the dental program.
- Establish a dedicated Quality Improvement Team (QIT) to conduct ongoing studies and internal audits, ensuring continuous enhancement of access, timeliness, and quality of dental care at MCJ. These measures will support compliance with court mandates, promote self-governance, and advance the overall health of the dental program
- Consistent attendance and clear quorum rules are essential for effective governance, accountability, and compliance with both internal protocols and external monitoring requirements. Updating the LOP will help ensure that QA decisions are enforceable, and follow-up actions are properly tracked.

- This Monitor reserves the right to present information at the QA meetings as well as at the Monthly Dental Subcommittee meetings if the Dental Subcommittee and QA minutes are not informational, structured with usable data, or content.

### Dental Class Case Reviews (CCR): 13 Class Members Reviewed – 43.7% - NC

Please carefully review the attached Dental Class Case Reviews Excel file containing the chronological chart content, deficiencies, comments/recommendations and conclusion summaries. Concerns raised by Class Members in the Plaintiffs' Pre-Tour letter, are addressed in this section of Class Case Reviews.

The Defendants have requested the Pre-Tour letter from the Plaintiffs be included in the attachments to this report, and the Plaintiffs have requested not to provide the letter, stating it is ex-parte communication. **I have declined to include the Plaintiff's Pre-Tour letter, as I believe this is an issue between Counsels to resolve.[42,43,44]**

The Class Case Reviews grade, see Executive Summary page 10, Section F, accounts for 1/6[th] of the overall grade for this audit tour. The overall Class Case Reviews score is 43.7%. The Class Case Reviews are kept separate from the other findings in the Dental Audit Tool and if there is overlap, as sometimes with randomized pulls this can occur, this is stated in the Unique Chart Counts tab of the Dental Audit Tool and on page 37 and 38 of this report.

The Class Case Reviews identified deviations from the Implementation Plan and from the dental standard of care among the audited patients.
- There was a case of failure to provide post-operative medication, in a patient's pain management, following onsite extractions of two lower posterior molars. **Therefore, there is one (1) Class Case Reviews patient and three (3) patients in the Dental Audit Tool whom the PRN Dentist did not provide timely post-operative pain control following onsite oral surgery.** These patients experienced a departure from the dental standard of care. This is harm to the patient no matter where or when it is found, either in the Class Case Reviews or in the audited charts found in the Dental Audit Tool. Deviations from the dental standard of care must be addressed, and it is the responsibility of the Defendants to incorporate corrective measures into policies and procedures (P&Ps) and local operating protocols (LOPs) to prevent recurrence.
  - **Patient Safety Risks:** Unaddressed deviations may result in harm to patients, including inadequate pain management, delayed treatment, or missed diagnoses.
  - **Regulatory Exposure:** Persistent non-compliance can lead to legal liability, regulatory sanctions, and/or loss of accreditation.

---

[42] MEC-Winthrop Re Response to Draft 13th Dental Report 09-19-2025 1187-8
[43] MEC-Winthrop Re Pls Reply to Defs Comments on Draft 13th Dental Audit Report 09-24-2025 1187-8
[44] 2025-09-22 -- CFMG Response to 13th Draft Report(106738599.1)

- o **Erosion of Trust:** Failure to correct deficiencies can undermine confidence among patients, staff, and oversight bodies.
- o **Operational Inefficiency:** Repeated errors may increase workload, cause workflow disruptions, and reduce overall quality of care.
- o **Barriers to Self-Governance:** Ongoing deviations hinder progress toward independent, sustainable compliance and may prolong external monitoring.

- **Repeated failures to visualize and identify all the pathology within the radiograph is a significant departure from the dental standard of care.** Certainly, a tooth which could have been saved with an earlier diagnosis and treatment, is a preventable loss that underscores the importance of timely intervention! Additionally, without a definitive diagnosis, treatment plan and treatment, the patient cannot fully make informed decisions about their care.

- **Failure to see the patient within timeframe, and failure to refer the patient within timeframe from the 14-Day Exam, are deviations from the Implementation Plan.** There were several patients who were screened and dental problems identified on the Initial Health History & Physical Exam Dental Screening form, however, tasks were not created nor scheduled, and the patient was never seen in dental for the indicated referral.

Use the enclosed deficiencies and recommendations within the Dental Class Case Reviews Excel spreadsheet to formulate solutions to any barriers to access to care, timeliness and quality of dental care. Similar deficiencies found in the Class Case Reviews are also found within the sections of the Dental Audit Tool. Discuss these overall deficiencies in the monthly Dental Subcommittee meeting minutes and provide solutions, documented training and additional self-monitoring to prevent recurrence.

---

**Deficiency:**

- Failure to prescribe an analgesic, for post-operative pain management following onsite oral surgery, i.e., extractions of two lower posterior molars. **This is a significant deviation from the dental standard of care and can cause patient harm.**
  - o See patient # ███████ Although the patient was given a not applicable grade, as the patient was seen approximately two weeks prior to the audit look back period, it is still a deviation from the standard of care is noted here, although the entry was not graded.
- This is the fourth event found during this audit tour, where a post-operative analgesic was not given following an oral surgical procedure. Due to the frequency with which this has occurred, this could be viewed as a pattern of practice, one not conducive with the mandates of the California Dental Practice Act and a severe departure from the dental standard of care.
  - o See the Dental Audit Tool, patients # ███████ # ███████ # ███████

---

- Additionally, these patients were not given a review of the risk, benefit, alternative and consequences of taking medication, including analgesic medications, nor did the patients sign an informed consent form for medication(s), as it is not included in the general informed consent form.

**Recommendation:**

- Perform a PIP – Performance Improvement Plan. Upon review of these identified patients and the PIP, take decisive and immediate steps to resolve any issues that interfere with patient care.
- Identify how Wellpath will rectify this issue moving forward regarding the provision of analgesic following onsite oral surgery and provide documented training on the use the medication management software, making sure all the Dentist(s) are fully aware of how to navigate the MARS program.
- Discuss and document the action steps taken within the monthly Dental Subcommittee meeting, making sure the information is sent to the Quality Assurance committee where any additional action items are returned to the Dental Department for completion and documentation within the meeting minutes.
- Update the informed consent form to include the RBACs for taking medication in the general informed consent form.

---

**Deficiency:**

- Failure to identify all pathology within a radiograph. Failure to diagnose, or at least provide a differential diagnosis. There is, consequently, no identification of the pathology written in the progress note, no treatment plan or treatment and the patient is not advised of the disease process. **Failure to visualize and identify all the pathology within the radiograph is a significant departure from the dental standard of care. Certainly, a tooth which could have been saved with an earlier diagnosis and treatment, is a preventable loss that underscores the importance of timely intervention! Additionally, without a definitive treatment, then the patient cannot make an informed decision about their care.** See patients:
  - #⬛⬛⬛ #17 recommended for extraction with a DPC 3, however, the adjacent tooth, #18 has carries and radiographic calculus not mentioned in the progress notes, nor diagnosed, treatment planned, scheduled for treatment, nor identified to the patient.
  - #⬛⬛⬛ There were no radiographic findings documented in the progress note for teeth #30 and #29. There was a lack of diagnosis on the tooth adjacent to the failed root canal, #30, which may have contributed to the symptoms reported by the patient at the dental sick call. Therefore, no diagnosis or differential diagnosis and reviewed with the patient.
  - #⬛⬛⬛ No treatment plan was given for #3. Without caries removal, then it is possible for the tooth to need root canal and crown, or worse yet an extraction. Additionally, tooth #4 has a large recurring decay under an existing MOD amalgam and the pathology was not identified within the radiograph. Had a BWX x-ray been taken, the proximity of the caries to the pulp would have been better evaluated.

- o #4 did not receive objective findings, no diagnosis, no differential diagnosis, no treatment plan and no future appointment or treatment.
- o #███████ #2 has deep caries to the pulp and is not addressed, diagnosed or treatment plan. in this case, this tooth should have been treatment planned for extraction. This is a departure from the standard of care.
- o #███████ #31 MO caries not identified in the progress notes on 02/24/25 and 03/25/25.

**Recommendation:**

- Address all pathology in a radiograph. All pathology seen on radiographs must be diagnosed or at least a differential diagnosis entered. Treatment planning (or referral) must follow, tying findings into a clinical management strategy.
- Provide documented training to the Dentists that all pathology visible in the radiograph is to be documented, if not diagnosed, treatment planned and scheduled, then at the very least a differential diagnosis stated in the clinical notes and the patient advised.
- Any charting error(s) found during a self-audit, or during an audit tour is to be addressed by the onsite Dentist by placing an amendment into CorEMR, in the specific patient's chart. The Dentist is to state the error and note the correction in the chart, stating if the patient is to be brought back. Schedule and see the patient accordingly.
- Do not use a progress note template without customizing it accurately and appropriately to the patient and to the clinical situation.

---

**Deficiency:**

Other common deficiencies found in the Class Case Reviews, also similarly found in the Dental Audit Tool:

- Lack of completing a Nurse Sick Call for a dental sick call request. This creates the lack of an audit trail for a dental sick call request.
- The data lacks transparency due to the absence of an audit trail, including the omission of rescheduling events and the reasons for those changes!
- Lack of scanning the dental sick call request into CorEMR.
- No chronological progress note is written for a refusal or dental medication management.
  - o #███████ Refusal signed however RBACs not described and a progress note is not written for the refusal.
  - o #███████ Two refusals indicated the patient has "Fear of Dentist" and "I'm afraid of the dentist." The Dentist did not refer the patient to Mental Health to evaluate this fear, which is affecting her ability to receive dental care and treatment. Nor was the patient discussed with the Chief Dental Officer to possibly refer the patient to the oral surgeon for possible treatment under sedation.
  - o #███████ The refusal form is scanned but does not indicate what is being refused. There are no RBACs, nor a chronological progress note written regarding this refusal.
  - o #███████ The RBACs of refusing care is not discussed, nor are the RBACs discussed in the form and in the progress note, as there is no chronological progress note.

- o # ███████ No chronological progress note regarding stopping/discontinuing of the Amoxicillin.
- o # ███████ On 02/03/25, the refusal is signed one day outside of timeframe, RBACs not described, the refusal states post op rather than post op #3, and a progress note is not written for the refusal.
  On 02/05/25 Acetaminophen (Tylenol 500 mg) 1 tab by mouth TID was ordered from 02/05/25 through 02/14/25. There was no chronological progress note written to indicate the reason, duration, frequency of a medication being ordered. On 02/19/25 the patient refuses the post op with the oral surgeon. The refusal is obtained by offsite scheduling and is not signed by the clinician or witness. This appointment should have been cancelled by the Dentist on 02/14/25, prior to having the patient refuse with the OS, as no pain, swelling or clinical condition was identified as needing a post op on 02/14/25.
- Failure to see the patient within timeframe.
  - o # ███████ Not seen within timeframe for a DL1 priority referral.
  - o # ███████ Not seen within timeframe for a DL1 priority referral due to a typographical error in scheduling the patient. Not seen within timeframe for the 14-Day Exam.
  - o # ███████ Not seen within timeframe for the 14-Day Exam, from a chronic care referral and for a dental sick call request. **\*\*\*This patient was also never scheduled for the treatment for #8 although was given a DPC 3**. With a DPC 3 the patient would have been seen before being released. **This is a significant departure from the Implementation Plan.**
  - o # ███████ Ext - #3 Sx (3) is seen outside of timeframe. Also, the periodontal disease program task was created 12/9 - Due 3/9/25 but the patient was not seen until 05/02/25. There was no rescheduled task, nor a reason for the reschedule. There is no audit trail to indicate why the patient was not seen within timeframe. **By not documenting patient reschedules or the rationale for those adjustments, the dataset may present an incomplete or misleading picture.**
  - o # ███████ The 14-Day Exam was not performed within timeframe.
  - o # ███████ Patient due 03/24/25. Was not rescheduled on 03/24/25 but rather was left unscheduled and on 04/24/25 the task was deleted when the patient was released. There was ample time for the patient to receive the dental treatment.
  - o # ███████ Not seen within timeframe for Filling - #3-L, due 03/04/25. No history of any reschedules or reasons for the reschedules - 69 days out of compliance.
  - o # ███████ Not seen within timeframe for a dental sick call, the 14-Day Exam and dental treatment for extraction #13 & #14. **The omission of the audit trail and rescheduling details results in statistics that may not accurately reflect actual patient flow and outcomes.**
- Failure to refer the patient within timeframe. **This is a departure from the Implementation Plan.**
  - o # ███████ Seen within timeframe for the 14-Day Exam but the referral is not made, and the patient is not referred as a task was never created and therefore, the patient was not seen by the dentist as indicated in the screening form.

- ○ # ██████ The patient filled out a dental sick call request but was incorrectly denied the referral to dental. Not only was the patient not seen by the RN within 24 hours of the request per the IP, the RN did not ask the reason for the requested exam and incorrectly assumed the patient was asking about the annual exam. Patient was never seen in dental for the dental sick call request.
- Lack of a diagnostic x-ray.
  - ○ # ██████ The x-ray is nondiagnostic. The Assessment/diagnosis states, "Recommend monitoring tooth for now since there is no decay around margin." **Without the diagnostic radiograph, this diagnosis and subsequent treatment is not substantiated.**
  - ○ # ██████ It states FMX was taken but there is no FMX scanned into CorEMR. Review the laptop where digital x-rays are taken and scan into CorEMR.
  - ○ # ██████ No radiograph taken for area #4 on 12/02/24. The existing #4 DO was completed on 07/19/24. The Dentist states "#4 has an existing DO comp. Pt is pointing to the occl pit of the filling. No decay noted." At a minimum, a BWX radiograph of #4 should have been taken to evaluate the interproximal area for caries and/or marginal integrity, as one cannot see interproximally without a radiograph.
- The RN completed the Dental Sick Call in error.
  - ○ # ██████ This completed DSC was deleted stating -"duplicate" and a second referral task was correctly created on the same day from intake.
- Lack of a pain scale as an objective finding, not noted during the nurse sick call for the patient's request for dental care.
  - ○ # ██████ # ██████ # ██████ # ██████ # ██████
- Failure to address the entire chief complaint. Failure to document accurately and appropriately.
  - ○ # ██████ There was no documented response for a portion of the patient's chief complaint.
  - ○ # ██████ DSC completed for "sore tooth" dental care request but was not included in the progress notes on this day. On 12/09/24, the next visit states, "NV per pt GC". This is inaccurate as the next visit is the Dental Periodontal Program.

**Recommendation:**
- Complete a Nurse Sick Call for every dental sick call request. This will create an audit trail for compliance timelines and information on the continuity of care.
- Scan the requests for dental services into the document section of CorEMR.
- Write a chronological progress note for every refusal, entering the specific RBACs discussed with the patient, including any other information reviewed with the patient during the dental visit.
- Write a chronological progress note to indicate the reason, duration, frequency of a medication being ordered.
- See the patient within timeframe.

- Refer the patient within timeframe, especially in regard to the 14-Day Exam where the problem was listed on the form, but a task was never created, and therefore scheduled, and the patient was never seen for the dental problem.
- Completing a DSC is outside the scope of the nursing staff. Please provide individual training if indicated.
- Include the pain scale in the note as discussed with the patient during the Nurse Sick Call for a request for dental care.
- Review identification of DL1 and DL2 parameters including scheduling timelines with the RN for referrals to dental.
- Locate and schedule unscheduled treatment plans. Without an EDRC, an electronic dental record system which can locate unscheduled treatment, this lack of continuity of care and therefore, patient abandonment continues to be an issue. No other solution from the Defendants have been proposed to locate and schedule unscheduled dental treatment plans.
- Address the entire chief complaint and document it in the clinical progress notes.

## Court-Designated Dental Monitoring Provisions

| No. | Requirement | Implementation Plan Provisions | Finding |
|---|---|---|---|
| 1 | Medical, Mental Health, and Dental Staffing | The Settlement Agreement requires Wellpath to maintain adequate [dental] staff sufficient to ensure compliance with the Implementation Plan and must evaluate its staffing levels on an ongoing basis. See Dkt. 494 at 16; Dkt. 532 at 116.<br><br>Wellpath's current staffing plan requires Wellpath to maintain, at minimum, a 0.6 FTE dentist, a 0.8 FTE dental assistant, and a 0.1 FTE dental hygienist. | **Partial Compliance**<br>• Dr. ▆▆ Chief Dental Officer, serves as clinical supervisor and has been instrumental in advancing MCJ Dental's operations. In September 2023, Dr. ▆▆ recommended a full-time staffing model (1.0 FTE Dentist, 1.4 FTE Dental Assistant) and he and Wellpath facilitated the hiring of PRN dental staff.<br>• However, this updated plan has not yet been adopted by the County, leaving PRN positions less secure, especially in light of Wellpath's Chapter 11 bankruptcy.<br>• The permanent dentist, Dr. ▆▆ and a permanent Dental Assistant cover Monday–Wednesday, with the assistant also handling administrative duties on Thursdays. PRN staff (Dr. ▆▆ and a PRN dental assistant) provide |

coverage Wednesday–Friday. The stability of these PRN roles remains uncertain.

• Additionally, the permanent Dental Assistant gave her resignation in February 2025, and a replacement was advertised but the position has not yet been filled. In the meantime, the PRN Dental Assistant has been covering for the permanent Dental Assistant.

• The HSA position is filled, and the Dental Operations Specialist is actively supporting program administration. The PRN Hygienist position is vacant. The DON position has been vacant since December 2024.

• There is currently no dental backup plan for the Chief Dental Officer (CDO), Dentists, or Dental Assistants at MCJ. While Wellpath has temporarily addressed coverage gaps by having dental staff add extra days to compensate for a 1.5-month leave taken by the PRN Dentist, no solution was found to cover the permanent Dentist's vacation. As of now, there is no formal dental staffing rescue or contingency plan in place.

• Given the current workload—347 intake referrals, 236 referrals from the 14-Day Exams, 1,441 Sick Call requests, 482 completed dental treatments, 19 comprehensive dental examinations, and a total of 1,867 various completed dental tasks over 118.5 dental days (averaging 15.7 completed patient tasks per day with only one dental chair)—a new staffing and workflow analysis is recommended to ensure adequate coverage and compliance.

| 29 | Dental Intake Screening | The Settlement Agreement requires Defendants to specify "standards and timelines to ensure that arriving prisoners are promptly screened for urgent … dental needs, with prompt follow-up." Dkt. 494 at 13.<br><br>The Settlement Agreement further provides that "Defendants shall develop and implement a Dental Care Implementation Plan to ensure timely access to necessary treatment for dental and oral health conditions, including but not limited to Intake Screening." Id. at 18.<br><br>Wellpath's Implementation Plan requires that: "A qualified health care professional who has been trained by the dentist shall obtain a dental history regarding any current or recent dental problems, treatment including medications during the Receiving Health Screening at intake with follow up to positive findings." Dkt. 532 at 99.<br><br>Wellpath's Implementation Plan further requires that: "If the medical staff/licensed health care professional determines the dental issue to be urgent, the patient shall be referred to and | **Non-Compliance**<br>• During this audit period, the combined Audit Tool Intake evaluations produced the following scores:<br>• Out of 3,471 bookings**,** 347 patients (9.4%) were referred to Dental from Intake (40 Emergent/Urgent, 307 Routine).<br>• Intake Form: **78.0%**<br>• Emergent/Urgent (DL1): **77.9%**<br>• Routine (DL2): **63.5%**<br>• Overall Intake Score: **73.1%** — which falls below the 75% partial compliance threshold.<br>• Dental screenings are now routinely performed at Intake, regardless of patient-reported pain.<br>• Nurses continue to inconsistently document critical details (description, history, duration, location, pain scale) and do not always assign the correct Dental Priority Level (DL1 or DL2).<br>• 25.0% of DL1 (Emergent/Urgent) cases were not scheduled for the next dental day, although 87.5% were correctly assigned the DL1 designation.<br>• 33.3% of DL2 (Routine) cases were not scheduled within 14 days and 58.3% were correctly assigned the DL2 designation.<br>• The Intake Form has not been updated as previously requested. The Full Upper and/or Full Lower Denture options are not on the Intake form and affect future access to denture adhesive; "Missing/Broken teeth" are in one category in the Intake form and are not separated for clarity; (missing teeth are generally not necessarily a referral condition but broken teeth |

| | | evaluated by the dentist at the next scheduled dental clinic." Id. at 100. | are); the pain scale is missing from the form, as a question to be answered.<br>• Ongoing dental training is provided monthly by the Dental Operations Specialist, with flowcharts to guide proper DL1 and DL2 classification and scheduling.<br>**DL1**- Emergent/Urgent conditions -  to be scheduled and seen by the dentist the next dental day.<br>**DL2** - Routine conditions - to be scheduled and seen by the dentist within 14 calendar days of the referral.<br>• There is an improvement from the last audit period in the nurse's ability to screen for the Emergent/Urgent dental conditions and assign the appropriate priority level. However, not all patients with pain, toothache, swelling, infection, bleeding and abscesses are referred to dental per the Implementation Plan mandates for Dental Level 1 conditions.<br>• Inconsistent nursing oversight (absence of a stable DON) results in dentists reporting referral issues directly to the Dental Operations Specialist or CDO.<br>• Nursing staff play a critical role as the link between patients and the dental clinic. Accurate assessment, documentation, and scheduling per Dental Priority Levels are essential to ensure timely and appropriate dental care. |
| 30 | Initial Health Inventory | Wellpath's Implementation Plan requires that "[a] complete gender specific health history inventory and communicable disease screening shall be completed on all inmates | **Non-Compliance**<br>• The 14-Day Exam is comprised of two forms, a medical form and a dental screening form, and both are to be filled out in CorEMR for the Health Assessment to be complete. CorEMR |

within 14 days of arrival at the facility by a Registered Nurse who has completed appropriate training that is approved or provided by the responsible physician." Dkt. 532 at 33-34. The registered nurse at the 14-day exam identifies patients' urgent and emergent dental conditions as a Dental Level 1, Dental Level 2, or as a non-urgent/emergent dental condition. See, e.g., Ex. 41 (4th Dental Report) at 17.

Wellpath's Implementation Plan provides further requirements concerning the 14-day exam:
"A qualified health care professional who has been trained by the dentist shall … perform an initial health screening on each inmate at the time of the health inventory and communicable disease screening, the general condition of the patient's dentition, missing or broken teeth, evidence of gingival disease, mucosal lesions, trauma, infection, facial swelling, exudate production, difficulty swallowing, chewing and/or other functional impairment will be noted; urgent/emergent dental needs identified. All screening findings will be documented on the health inventory form including the

has yet to merge these two forms into one.
• From October 1st, 2024, through March 31st, 2025, there were 1049 medical forms completed, and 872 dental screening forms completed, or 83.1% of the dental forms were filled in conjunction with the medical forms, for the overall 14-Day Exam (Health Assessments).
• The medical form has an automatic task creation for referrals to dental, however the dental form does not. If a patient is indicated as needing a referral to dental and it is done on the dental screening form, a task is not automatically created, and the patient is not referred to dental. There were 236 referrals made to dental, of which 20 or 1.9% was done through the medical form and 216 or 24.8% from the dental screening form.
• There is the potential that 216 referrals, from the dental screening form, are not sent to dental due to this error in programming. **A cross sectional study indicated that only 46.8% were scheduled to see the dentist and 53.2% were not referred to dental as a separate task was never created. This is a significant departure from the Implementation Plan.**
• Without the DON, the manner in which nurse training will occur is be decided by the CDO. If the RN determines there is a referral dental condition, either the RN will both the dental screening form and check the referral to dental in the medical box or the RN will fill out the dental screening form and manually create a task to reflect the referral.

| | | | |
|---|---|---|---|
| | | odontogram. Follow up referral and/or consultation with onsite or on call medical provider and/or dental provider (if onsite) will determine treatment plan and schedule for initial provider evaluation." Dkt. 532 at 99. | • Although there were 3471 bookings during this audit period, Custody stated they do not keep the statistics of how many patients, per month, are still at MCJ at 14-Days of booking. Therefore, compliance to the 14-Day Exam requirement from the total number of bookings is currently arbitrary and unavailable. Assuming that all patients at 14 days is 1049, then 30.2% of the patients were still at MCJ for the 14-Day Exam.<br>• There is no data provided by Custody yet stating how many incarcerated persons were at MCJ at 14 days in order to correlate how many 14-Day exam Health Assessments are expected.<br>• The Dental Operations Specialist stated that she has asked CorEMR's IT to merge the medical and dental screening form into a main Initial Health History & Physical form; however, this merger of forms has not occurred.<br>• Additional Nurse training will need to be completed for this aspect of the 14-Day Exam referrals to Dental. The CQI for this area is not effective in identifying the referral problem and the questions must be upgraded to address this significant deficiency. |
| 31 | Dental Training for Intake Staff | All CFMG health services staff will participate in classroom orientation and training regarding compliance with all aspects of [Wellpath's] Implementation Plan. Orientation and training will be conducted by a qualified health services instructor. Counseling, | **Partial Compliance**<br>• Although nurse training is not fully effective for the dental referrals, training is occurring and part of the responsibility for the lack of referrals falls on CorEMR IT to solve some of the issues. Therefore, partial compliance remains.<br>• There are 14 permanent RN positions, 7 day and 7 night, at MCJ. |

| | | training or appropriate discipline may ensue from failure to comply with the Implementation Plan. Dkt. 532 at 9.<br><br>The Plan further provides that the registered nurse who performs the intake screening and the 14-day dental evaluation during the initial health history must be trained by the dentist. Id. at 99. | • Per the Dental Operations Specialist, training is given monthly to the RNs who perform the dental component of the Intake process, the 14-Day Exam and dental sick call requests, during their RN staff meetings by the Operations Specialist.[45]<br>• Training continues to not be fully effective during this audit period. For example, some of the nurses are still completing the Dental Sick Call, which is to be completed only by the Dentist. When the RNs complete these Dental Sick Calls, patients are not always tasked again to see the Dentist. Essentially, some patients were lost in the system because CorEMR does not capture these types of errors and the patients were therefore, not seen by the dentist for their eligible dental care requests.<br>• Additionally, there are a multitude of situations showing the RNs have a lack of understanding of some of the components of the referral process. Please refer to the Dental Audit Tool Results and the list of deficiencies which must be corrected.<br>• Additionally, the challenge of identifying who in particular has received or not received the training, is that not all nurses are present at each meeting, nor are all nurses still hired at MCJ.<br>• Per the Dental Operations Specialist, there is an administrative assistant manually attaching the roster of nurses to their training to ensure training reaches both day and night staff. |

---

[45] Data from the Operations Specialist

| | | | • Perhaps more example based training may be useful. |
|---|---|---|---|
| 32 | Treatment for Urgent and Emergent Conditions | Wellpath's Implementation Plan requires that when a patient is found in the initial health screening to be experiencing a dental emergency, and "a licensed dentist is not present, the patient will be seen, treated and managed immediately by medical provider staff." Dkt. 532 at 99. If "the acute dental emergency is life threatening, the patient will be transported to an urgent care facility or hospital." Id. at 99-100. If the dental issue is found "to be urgent, the patient shall be referred to and evaluated by the dentist at the next scheduled dental clinic." Id. at 100.<br><br>The Implementation Plan further requires Wellpath to give its highest treatment priority to "[r]elief of pain and treatment of acute infections and other urgent conditions." *Id.*<br><br>The Implementation Plan also requires "Emergency Care (Immediate Treatment)" for any "acute oral or maxilla-facial condition, which is likely to remain acute, worsen, or become life threatening without immediate intervention," as well as treatment within one | **Non-Compliance**<br>• I found that patients with pain, toothaches, swelling, infection, bleeding and abscesses are not always referred timely to Dental by using the Dental Level 1 parameters, and which are to be scheduled and seen the next dental day by the dentist.<br>• Rather, they are at times assigned a Priority Dental Level 2 (patients to be scheduled within 14 calendar days) without substantiating the Priority Dental Level 2 designation. For example, a pain scale is an objective finding not included with every screening. Although the training has occurred, not all RNs provide a pain scale with each dental request.<br>• From Dr. Barnett, Medical Monitor, "Complications from dental and oral infections may have dire consequences affecting other parts of the body or even lead to death. I have previously communicated my concerns that patients suffering the symptoms of dental abscess should be viewed as having a condition that merits urgent if not emergency care". Therefore, identifying the correct dental level is important in order for patients to be scheduled and then seen in dental for their dental conditions, in the appropriate timeframe and without delay.<br>• When taking the three areas of nursing referrals to dental below into consideration,<br>Intake = 77.9%<br>14-Day Exam = 38.9%<br>Sick Call = 81.1% |

| | | | |
|---|---|---|---|
| | | calendar day for patients "with a dental condition of sudden onset or severe pain, which prevents them from carrying out essential activities of daily living." Id. at 102.<br><br>It additionally requires treatment within 30 days for patients with "a sub-acute hard or soft tissue condition that is likely to become acute without early intervention," id. at 103, a requirement that refers to urgent treatment, see Ex. 40 (3rd Dental Report) at 18. | the average score for Emergent/ Urgent referrals to dental = 66.0% which is non-compliance.<br>• Regarding dental treatment for the emergent/urgent referrals, the Dental Priority Code (DPC) assigned to the patient after the triage and diagnosis is completed; the cumulative score for this area is 82.7% which is partial compliance, to indicate the patients were treated within the following timelines.<br>DPC 1 – Seen Same Day = 75.0%,<br>DPC 2 – Seen within 24 hours = 91.3%,<br>DPC 3 – Seen within 30 days = 81.7%.<br>**• When taking into account that the Routine/DL2 patients were not always correctly designated during the screening and a DL1 should have been assigned to the patient, 45.8% of the time, therefore, the grade within this provision remains non-compliance.**<br>(See the Dental Audit Tool A.7.2, A.9.2, A.13.2)<br>Intake: 100 - 58.3 = 41.7%<br>14-Day Exam: 100 - 79.2 = 20.8%<br>Dental Sick Call: 100 - 25.0 = 75% |
| 33 | Dental Sick Call | Wellpath's Implementation Plan requires that: "All dental complaints are assessed, provided treatment for obvious infection and pain relief at regularly scheduled medical sick call by the MD, PA or RN to be seen within one day of the request. The complaint is prioritized and referred to Dental Sick call as deemed necessary. Interim treatment for pain and infection is provided until | **Non-Compliance**<br>• The main evaluation of this provision is if the patients were "seen within one day of the request".<br>• Access to the system used to verify this timeline, Smart Communication, formerly Intelmate and ViaPath, has been denied this Monitor. The patient submits a Dental Sick Call request and also a Grievance through this system.<br>• There is no automated connection to CorEMR, from Smart Communications. Therefore, once the request is processed in Smart Communication, then the Dental Sick |

| | | the patient is seen by the dentist." Dkt. 532 at 102. | Call is entered into CorEMR where the Nurse is mandated to see the patient within one day of the request and/or complaint. [46]<br><br>• When reviewing the Dental Sick Call request file provided by the Dental Operations Specialist, there is a difference between when the request is "read" vs when the patient is actually "seen" face to face, per the Implementation Plan.<br><br>• Although the patient's request is generally "read" timely, the patient is rarely "seen" within the one day of the request as mandated in the Implementation Plan. In the Dental Audit Tool, question A.11.5 shows that 12 charts were reviewed, and the patient's requests were seen within compliance by the RN only 20.8% of the time. Either the lack of nursing staff and/or the lack of training affects the ability of MCJ to be compliant with this Implementation Plan requirement.<br><br>• It is during the Nurse Sick Call that the patient is to seen face to face, to screen the patient and designate a DL1 or DL2 dental condition to the dental problem "within one day of the request".<br><br>• The Nurse Sick Call tasks for dental care requests are not all being routinely "completed" in CorEMR and therefore, the timeline and audit trail of the request are not always available for review to determine the compliance to this timeframe.<br><br>• Additionally, the actual incarcerated person's complaint and/or request for dental care is not routinely scanned into the document section of CorEMR. |
|---|---|---|---|

---

[46] Wellpath IP, Exhibit A, p. 101

Therefore, the timeframe from the request to the completion of the Nurse Sick Call cannot be verified. Without this documentation, there is no substantiation of compliance.

• There is no system to easily calculate this timeframe between the two systems, Smart Communication and CorEMR. Therefore, part of MCJ's proof of practice for a viable and verifiable system for self-governance, is not met for this provision of the IP.

• Once the Nurse has screened the patient for the Dental Sick Call request, the nurse is to assign a Priority Dental Level 1 for Emergent/Urgent conditions and schedule the patient on the next dental day. Or, if a Routine dental condition is screened, then the RN is to assign a Priority Dental Level of 2 and the patient is to be scheduled within 14 calendar days to see the Dentist.

• Although a reference ID is attached to each incarcerated person requests/complaint for dental care for a specific issue requested in Smart Communication, CorEMR does not have the integration with the Smart Communication software and therefore, no way to track and automatically generate a report to confirm that the patient is screened by the RN and ultimately referred to dental to be seen by the dentist.

• The actual incarcerated person's complaint/request for dental care is not routinely scanned into the document section of CorEMR. Therefore, the timeframe from the request to the completion of the Nurse Sick Call cannot be verified within the patient's chart. Without

| | | | this documentation, there is no substantiation of compliance without looking at the Smart Communication file. Part of the dental program's ability to show self-governance is to evaluate this provision and provide a system and audit trail to meet the requirements for compliance.<br>• Within CorEMR, there were 1441 Dental Sick Call requests and 1108 completed Dental Sick Call tasks this audit period. There were 118.5 dental days, therefore, 10.7 patients on average were seen for just Dental Sick Call triages per day with one dental operatory. This does not take into account dental treatment, comprehensive dental examinations, chronic care referrals, the periodontal disease program and referrals from the MD. A new staffing analysis is recommended to evaluate the flow of care to the Dental clinic to assess if additional dental days or dental staff are necessary to meet the Implementation Plan's requirements.<br>• Per the Operations Specialist, the nursing sick call process was revamped towards the end of May 2024; however, Nurse Sick Call tasks are still rarely completed for dental conditions, removing an important aspect of the audit trail and the ability to determine compliance to this mandate of the Implementation Plan. |
|---|---|---|---|
| 34 | Chronic Care | Wellpath's Implementation Plan requires that "[i]nmates with chronic care conditions will be managed pursuant to chronic care protocols and standardized procedures that are consistent with | **Non-Compliance**<br>• Although there is improvement in this area, not all of the chronic care conditions listed below received an oral evaluation during the Chronic Care examination.<br>• The Dental Audit Tool shows the physician referred 12 patients to |

| | | national practice guidelines." Dkt. 532 at 28.<br><br>Pursuant to the Court's May 2020 Order (Dkt. 671), Wellpath created a dental care CAP, which was approved by Dr. Winthrop, that required Wellpath to "[p]erform and chart a full comprehensive dental examination for patients referred from chronic care with the following issues: HIV, Seizures, Diabetes, Pregnancy, and Patients on over 4 psych medications." Ex. 49 (Dental CAP) at 5. | dental from chronic care for patients with HIV, Diabetes, Seizures, Pregnancy and for those with Serious Mental Illness (SMI) and/or on four (4) or more psychotropic medications, referred to dental when indicated.<br>• 64.3% of the chronic care referrals were seen within timeframe.<br>• The Dental Operations Specialist worked with CorEMR IT to update all the initial and follow-up chronic care forms to carry a box for referrals to Dental.<br>• Rarely did the patients receive a comprehensive dental examination for these referrals.<br>• Additional training is needed for dental to identify when a referral for an acute condition from chronic care is also to be placed in line for the comprehensive dental examination. |
| 35 | Comprehensive Care | The Settlement Agreement requires Wellpath "to ensure timely access to necessary treatment for dental and oral health conditions, including … periodic dental care for long-term prisoners." Dkt. 494 at 18.<br><br>Wellpath's Implementation Plan requires that: "Inmates incarcerated for 12 months or greater are eligible to receive a comprehensive dental exam. The purpose of the dental examinations shall be for the identification, diagnosis, and treatment of dental pathology which impacts the health and welfare of | **Non-Compliance**<br>• Comprehensive dental examinations are requested by the patient following 12 months of incarceration.<br>• 19 patients were seen for this eligible service and 70.8% of those requests were seen within timeframe.<br>• Conversely 29.2% of the patients were not scheduled within timeframe for their request for comprehensive examination.<br>• Patients are no longer scheduled automatically for their comprehensive exam and must go through the Sick Call process to request their annual comprehensive examinations, following a year of incarceration. Therefore, there remains a barrier to access to care for the annual exams to be seen within timeframe.<br>• A PRN Dentist and PRN Dental Assistant have been hired mainly to |

inmate patients." Dkt. 532 at 104.

Wellpath's Implementation Plan further requires that "[e]xamination findings and proposed treatment plan will be documented on standardized comprehensive dental exam, periodontal exam and treatment planning forms which will be filed in the patient medical record." Id.

provide care for the patient's Comprehensive Annual Dental Examinations and treatment as well as for the Periodontal Disease Program and Chronic Care referrals.

• No recall exam frequency was established within the comprehensive exam treatment plan.

• Additionally, the Dental Audit Tool reflected some of the quality of care issues found during this audit period for patients with a score of 60.7% during the receipt of the incarcerated person's comprehensive dental examination. Mainly missing pathology within the radiographs, the lack of charting existing restorations, lack of a diagnosis supported by objective findings, missing carious lesions (decay). These affect the diagnosis and therefore, lack of a treatment to be placed in the treatment plan. Training and supervisory chart audit reviews are requested of the CDO.

• The Dental Priority Codes (DPC) are being added to each line of the treatment plan and tasks are created to schedule the care within timelines.

• However, there are instances when the treatment plan is not completed within timeframe. Additional training regarding the continuity of care necessary.

• There are portions of the Dental Annual Exam (Comprehensive Dental Examination) which have not been instituted. In particular the exam recall examination frequency, as well as the periodontal recall frequency portion of the treatment. Nor is there a 4-6 week periodontal re-evaluation following scaling and root planing (SRP). This portion of the recall system

| | | | must be implemented ASAP for continuity of care. |
|---|---|---|---|
| 36 | Restorative and Palliative Care | Wellpath's Implementation Plan requires that patients "with comprehensive examinations and treatment plans" must be "eligible to receive permanent restorations in accordance with their established treatment plan." Dkt. 532 at 107.<br><br>The Plan further requires dental staff to verify that patients have received the Dental Material Fact Sheet "[p]rior to initiating any restorative procedure." Id. at 108. | **Substantial Compliance**<br>• There is an increase in compliance in this area. The Dental Audit Tool Results reflect a quality of care score of 88.7%.<br>• Eleven of the twelve patients received the Dental Material Fact Sheet (DMFS) and acknowledgement of the receipt of the DMFS mandated by the Dental Board of California.<br>• The restorative consent forms identified which teeth and generally the surfaces the patient is consenting to for treatment.<br>• It is noted that the deep cleaning, SRP, is not often completed prior to placing the restorations. The DPC appears to be given equally for the periodontal condition as it is for the restorative condition. Having healthy, or healthier gingiva makes for a better adapted restoration, especially as only composite restorations are being placed at MCJ (silver fillings are not being placed, only the "white" fillings). Therefore, it is recommended that the phasing using the DPC is adjusted so the cleaning is done prior to the restorations.<br>• When a sedative restoration is place, a follow-up appointment for a permanent filling is rarely treatment planned or scheduled. Place definitive treatment when possible and schedule for a follow-up for a permanent restoration where applicable.<br>• Additional training to the dental staff is necessary to instruct them that excavation of caries and the placement of a sedative or temporary |

| | | | |
|---|---|---|---|
| | | | restoration; a composite buildup; and stainless steel crowns are an allowable alternative treatment options. Although not the most ideal and very technique sensitive, however in certain circumstances it is better to use these IP stated procedures than lose a tooth. A patient should not have to wait until the decay is into the dental pulp and forgo saving a tooth if the pulp is still viable and a restorative procedure could have been placed. "*Fixed prosthetics: a. Shall not be utilized to restore missing or defective teeth **if an adequate restoration can be placed, (e.g., a stainless steel crown, polycarbonate crown, a bonded composite, or an amalgam with cuspal coverage**), or if a removable partial denture can be fabricated to replace the missing teeth.*" (Wellpath IP, p. 110) |
| 37 | Extractions | Wellpath's Implementation Plan requires dental staff to "provide necessary oral surgery services to all inmate-patients onsite or through a local community provider." Wellpath Implementation Plan at 101. The plan also requires Wellpath to provide "[e]xtraction of unsalvageable teeth" as a treatment priority. Id. at 100-01.<br><br>Dr. Winthrop found that Wellpath is noncompliant with these requirements in multiple reports, observing in her latest report that the dental team performing a | **Partial Compliance**<br>• The Dentists are providing onsite oral surgical treatment, oftentimes on the same day as diagnosis, which helps the patients minimize the long term use of antibiotics and analgesics. There is a dip in the timeliness of care, 75.0%, for dental treatment, including extractions for patients given a Dental Priority Code (DPC) of 3 which are for patients to be seen within 30 days of diagnosis.<br>• The pain management area of extractions encountered several issues in regard to the lack of medication prescribed following oral surgery. Four patients, one from the Class Case Reviews and three from the dental audit tool did not receive analgesics for their pain management following oral surgery. This is harm to the |

| | | surgical extraction without the use of a sterile irrigant, and that such procedure risked infection. Trapani Decl. ¶ 133 & Ex. 45 (8th Dental Report) at 13. | patient and a significant departure from the dental standard of care.<br>• The evaluation of adequate medication post surgically, is only one portion of each patient's evaluation for overall care for an extraction procedure. Extraction procedures received an 80.2% overall. The lack of medication RBACs in the consent form and lack of a timeout protocol also affected the overall score. Should the lack of pain management following oral surgery continue to affect a patient's dental care at MCJ, then the partial compliance will be re-examined and possibly overridden. This must be rectified immediately!<br>• There has not been a delay reported or seen in the supply chain this audit period and the dental team was observed using sterile irrigants during surgery.<br>• The Dentist are referring patients, generally timely, to the oral surgeon when needed for more complex dental care situations. There was an instance where the referral was not completed timely and there was subsequent delay in referring the patient offsite for their oral surgery needs within timeframe. |
|---|---|---|---|
| 38 | Specialty Care Referrals | Wellpath's Implementation Plan requires Wellpath to "provide necessary oral surgery services to all inmate-patients onsite or through a local community provider." Dkt. 532 at 101. "Complicated dental problems" must be "referred to an oral surgeon as deemed necessary." Id. at 103. The Plan also requires | **Substantial Compliance**<br>• The Dental Audit Tool shows an overall compliance score of 88.2%, with improvements noted throughout the audit period, with the patients seen by the offsite specialist mostly within timeframe, seen by the return from offsite RN, orders filled according to the oral surgeon, dental post-op appointments following the return from offsite and the reports are generally scanned into CorEMR. |

| | | | |
|---|---|---|---|
| | | that "[r]eferral to and priority of offsite oral surgeon" must be conducted in accordance with the timelines and treatment priorities required by the Implementation Plan. Id. at 102.<br><br>For root canal services, procedures that "cannot be accomplished by [Wellpath's] dentist at MCJ will be referred to a contracted dentist in the outside facility" and that "[a] local contract dentist will be available for referral when in the opinion of the treating dentist the procedure could be handled more predictably by an endodontic specialist." Id. at 109-10. Patients with failing dental implants "shall be referred to a dental specialist experienced in the management and placement of dental implants" for evaluation. Id. at 112. | • MCJ does provide the necessary offsite oral surgery through a community provider and does so for complicated dental problems.<br>• The offsite clerk routinely schedules the post-op appointment following the patient's return from the specialist for the next dental clinic day.<br>• Although this Monitor was not granted access to ERMA, the system used by the offsite clerk for referrals to outside clinicians, the Dentists appear to have correctly sent the ERMA referral timely, except for one instance, to the offsite clerk for an offsite appointment request to be seen within the 30 day timeframe.<br>• The LOP was not updated to reflect how referral errors from the dentist or clerk, or what to do in cases of a lack of staffing upon the patient's return from offsite are to be handled, nor does it instruct the clerk to scan the dentist's referral into the document section of CorEMR.<br>• The reports from the oral surgeon and other offsite specialists are being scanned timely by the RN. However, the Dentist does not always fully review the report and the attached radiograph(s) with the patient's discussion in their progress notes. By ensuring a clear understanding between the dentist and specialist, co-signing or acknowledging the report can help improve the overall quality of care for the patient. It can also help to alleviate any concerns the patient may have had about the treatment and/or treatment plan.<br>• The patient is to be instructed about any remaining areas of pathology visible on the returned panoramic radiograph from the oral surgeon. |

| | | | When pathology is visualized, the Dentist is to indicate it in the clinical notes and advise the patient of the information as well as inform the patient to submit a sick call slip when they are ready to address the areas shown to them by the Dentist.<br>• A prosthodontist, a denture specialist, has been found to offer denture fabrication when prescribed by the Dentist. Should an existing denture break or is need of a denture repair, they have not identified a dental laboratory to perform the denture repairs or that the offsite specialist will address the issue.<br>• Training by the CDO in conjunction with the LOP is required to address how implants, from cleaning to removal, if indicated, are to be handled at MCJ.<br>• A general dentist who performs endodontic procedures was located but it is not an "endodontic specialist". Therefore, I recommend MCJ continue to look for an endodontic specialist. |
|---|---|---|---|
| 39 | Endodontics | Wellpath's Implementation Plan requires that all patients at the Jail must be "eligible to receive palliative endodontic therapy limited to upper and lower anterior teeth." Dkt. 532 at 109. Individuals incarcerated for 12 months or longer must also be "eligible to receive root canal therapy limited to upper and lower anterior teeth." Id. Both palliative endodontic therapy and root canal treatments must be "performed in accordance | **Partial Compliance**<br>• Wellpath declined Dr. ███ request for root canals to be performed at MCJ. Dr. ███ is well versed in providing this service. The Implementation Plan states, "*Any routine root canal procedure that cannot be accomplished by CFMG dentist at MCJ will be referred to a contracted dentist in the outside facility.*" [Wellpath IP, p.108]<br>• Since Wellpath denied the equipment necessary to perform root canals onsite, the Dental Clinic has located an outside clinician, although |

| | | with established criteria and within the specific guidelines" of the Implementation Plan. Id. The Implementation Plan imposes a series of requirements for when and how these procedures must be performed. Id. at 109-10. | not an endodontic specialist, to perform endodontic care.<br>• There are instances where patients would have benefited from palliative endodontic therapy, including for onsite pulpotomies and pulpectomies of the upper and lower anterior dentition, however, these were not discussed as possible therapies for the patients. Training is recommended to remedy this area.<br>• There is no endodontic consent form for onsite pulpotomies and pulpectomies to relieve acute pain, which is a benefit outlined in the IP. Complete the endodontic consent form.<br>• The LOP does not state how it will handle different clinical situations, such as palliative and endodontic services, to relieve pain for those patients eligible to receive these services. |
|---|---|---|---|
| 40 | Periodontics | Wellpath's Implementation Plan requires that: "MCJ will maintain a periodontal disease program for the diagnosis and treatment of periodontal disease. Periodontal screening shall be available to all patients, regardless of length of stay. Treatment will be based on periodontal disease classification, Dental Priority code, and special medical needs (i.e. pregnancy, diabetes, HIV/AIDS)." Dkt. 532 at 104. | **Partial Compliance**<br>• The Periodontal Disease Program has been implemented with the hiring of the new PRN Dentist and Dental Assistant. This is the main reason for maintaining the PC rating. There are multiple reasons why this should be lowered to non-compliance but am honoring that Wellpath has hired outside of the staffing matrix to implement this program.<br>• That said there are many out of compliance issues which will need to be rectified. Many of the same issues from the last audit tour are found in this one. Deferred findings of the clinical care of the periodontal referral and treatment need to be performed, and training given to update this system of care. |

| | | | |
|---|---|---|---|
| | | | • One of the patients needed to be premedicated for a prosthetic heart valve prior to dental care. **No premed alert was placed in the alert section of CorEMR, and the patient was not premediated prior to receiving perio probings.**<br>• For those with treatment planned deep cleaning appointments, a periodontal re-evaluation and recall frequency was not given. This must be implemented immediately.<br>• They are providing a periodontal diagnosis for each patient before a planned treatment is performed. However, the information they have given the patient regarding their diagnosis is often different than the diagnosis outlined in the progress notes.<br>• The LOP was not updated to reflect phasing of the periodontal care and the assignment of the Dental Priority Code (DPC). A DPC 5 was given for the majority of the dental treatment despite a diagnosis indicating the treatment should be done earlier than 120 days from the date of diagnosis.<br>• The screening process from nursing to the patient seen by the dentist should be updated to provide the adequate workflow for access, timeliness and quality of care for the Periodontal Disease Program. |
| 41 | Informed Consent | Wellpath's Implementation Plan contains numerous provisions concerning informed consent related to dental procedures. See Dkt. 532 at 21 ("Written informed consent shall be obtained for all invasive and other procedures in | **Partial Compliance**<br>• The general informed consent only contains consent for a dental examination and x-rays. There is neither mention of informed consent and RBACs for local anesthetic or medication, nor gross debridement, prosthodontic (denture) or occlusal adjustments. |

| | | accordance with established [Wellpath] procedure and community standards of practice"); 23 ("Inmates retain all the recognized rights of an ordinary citizen relative to informed consent and self-determination of health care"); 108 ("[Wellpath] dental staff shall verify that every patient has received a copy of the Dental Materials Fact Sheet. Prior to initiating any restorative procedure the patient shall sign the Acknowledgement of Receipt of Dental Material Fact Sheet. This signature acknowledges acceptance of possible risks, denial of alternate procedures, and consents to the proposed procedure and use of the materials as recorded in the dental record."); 110 ("A Consent for Root Canal Treatment Form must be completed by the dentist and signed by the patient and witness (dentist) prior to the provision of root canal treatment"); 112 (Wellpath "shall obtain informed consent from all inmates who request removal of orthodontic bands/brackets and discontinuation of their orthodontic treatment"); 114 ("The health record of an inmate contains the following items as applicable | • There were several instances of a general consent form and even a surgical consent form which were not filled out prior to an irreversible procedure.<br>• The oral surgery, restorative and periodontal consents have an area of consent for local anesthetic but do not have consents for medications. This should be entered into the general consent form.<br>• There is no area for the witness to print their name on the general consent form.<br>• There is no area dedicated on the Periodontal consent form for what quadrants are being performed or if it is periodontal maintenance or prophy.<br>• The Dental Material Fact Sheet (DMFS) acknowledgement form has been updated in both English and Spanish and is being offered with the Dental Material Fact Sheet prior to a restorative treatment.<br>• The Dental Operations Specialist is permanent and full-time assigned to Dental and begun working on formatting and updating consent forms. The first priority is to format the general consent form to include consent to medications, local anesthetic, gross debridement, occlusal adjustments and denture adjustments.<br>• Implant, orthodontic removal and endodontic consent forms have not been updated. Although rare, when a consent for the above is necessary, it should be available for use. |

| | | to his/her case: ... Consent and Refusal forms"). | |
|---|---|---|---|
| 42 | Sanitary Treatment Space | The Settlement Agreement requires "a safe and sanitary on or off-site facility for necessary dental care." Dkt. 494 at 18. Wellpath's Implementation Plan similarly requires that "[a]ll dental services will be provided in a safe and sanitary environment." Dkt. 532 at 99. | **Substantial Compliance**<br>• They achieved an overall compliance score of 94.9%. Well done!<br>• Some areas remain which are to be addressed, as found in the section of Infection Control and Regulatory Compliance, found in the Dental Audit Tool.<br>• The documentation for the Radiation Safety program and the Spore Test results were received subsequent to the submission of the draft of this report.<br>• Radiation Monitoring is now in the completion of the of 12 consecutive months of monitoring as the control badge and area monitoring badges are now correctly placed according to the regulatory requirements.<br>• They are to provide the dosimetry, spore test and water test reports timely for review. |
| 43 | Electronic Medical Records | The Settlement Agreement requires Defendants to ensure "that appropriate and complete medical records are maintained to ensure adequate treatment of prisoners' serious medical and mental health needs. Medical records shall include all records, results, and orders received from off-site consultations and treatment conducted while the prisoner is in the Jail custody." Dkt. 494 at 17. | **Partial Compliance**<br>•CorEMR is not an EDRS and is not capable of fully charting clinically relevant information. There are no full clinical charting capabilities or dental management applications available in CorEMR.<br>• Data and statistics are both necessary for operational decisions to be made and for self-audits to be effective in identifying any barriers to access, timeliness and quality of care. CorEMR does not have a dashboard available for review of the above.<br>• That being said, the CDO and the Dental Operations Specialist try to find solutions to many of the barriers to access, timeliness and quality of care |

Wellpath's Implementation Plan requires that: "Health care staff will use the [electronic medical record] to closely track all requests for health care including the date of submission, date of triage, date of evaluation, disposition and date of any necessary follow-up care. … The [electronic medical record] will identify any inmates who require Chronic Disease Management and health care staff will use it to closely track the condition/s that need to be monitored, the nature of the treatment required and the frequency of any required follow-up care." Dkt. 532 at 113.

Wellpath's Implementation Plan also provides for a "Dental Priority System" that determines when patients will be seen for immediate treatment or treatment within 1, 30, 60, or 120 days, with scheduling for follow up appointments. Id. at 103.

issues by finding ways within CorEMR to track dental care using the dental levels (for nurses) and the dental priority codes (for dentists).

• Statistics are accumulated from various reports within CorEMR and manually from the dental team and discussed during the monthly Dental Subcommittee meeting. Not all manual accumulation of data is congruent with the CorEMR data.

• There is also no way of locating and retrieving unscheduled patients as the existing system runs on Tasks created by the clinicians. If the RN or dentist do not create the task for referral or treatment, then the patient is lost in the system. This unfortunately occurs and no method has been identified by the dental management on how to resolve these errors.

• The tracking of Emergent/Urgent and Routine referrals is done primarily through the Form Question Report. With the updates in the versions, this report is cumbersome at best. If the RN does not enter information in the form for intake or the 14-Day Exam, then the information is not visible or tracked through the Form Question Report.

• Dental management uses CQIs to track multiple areas of referrals to dental, in particular intake, the 14-day health assessment, offsite referrals and returns from offsite. However, the questions do not always locate systemic issues, such as the lack of referral due to a forms error during the 14-Day Exam.

• CorEMR began tracking referrals through a forms process per the Dental CAP, but their IT department has not continued any upgrading of

| | | | the system. As a result, the reports they have initiated in World of Wellpath are not fully functional nor accurate as of yet. |
|---|---|---|---|
| 44 | Dental Quality Assurance | Wellpath's Implementation Plan requires "[a]ll monitoring and audit findings" to be "reported to the Quality Management Committee at its quarterly meetings." Dkt. 532 at 9.<br><br>The Dental CAP further requires that "Daily, weekly and monthly data is to be included in the Dental Subcommittee meeting and taken from the dental excel spreadsheet and CorEMR to be reviewed, discussed and provided to the dental monthly subcommittee meeting minutes and given to the Quality Assurance (QA) meeting." Ex. 49 (Dental CAP) at 8. | **Partial Compliance**<br>• Dental Subcommittee minutes, statistics and CQI PowerPoints were submitted to the QA meeting for review.<br>• Please review the Dental Audit Tool Dental Subcommittee section at E.16 and E.17 for full comments regarding this provision.<br>•The CQI internal audits are in progress, and they are actively working on this through the Dental Subcommittee and will have more CQIs for the areas of non-compliance, hopefully in the near future.<br>• The QA meets regularly and quarterly now. The Implementation Specialist is in charge of the QA. There are no specific dental action items listed and returned for accountability in the QA minutes. Do dental QIT has been formed to address continuing dental issues with access, timeliness and quality of care at MCJ. |

## Priorities and Phasing for Self-Governance

To achieve sustained compliance and eventual self-governance without oversight, MCJ and Wellpath should approach improvements in structured phases. Each phase builds on the last, ensuring that progress is both measurable and sustainable.

### Phase 1: Stabilize Core Compliance (Immediate – Next 3–6 Months)

**Goal:** Secure the foundation by addressing urgent compliance risks, patient safety, and regulatory requirements.
**Priorities:**
- **Infection Control & Regulatory Compliance**

- - Maintain infection control standards and regulatory compliance as top priorities.
  - Initiate radiation safety monitoring, with appropriate use of dosimetry badges.
- **Nurse Sick Call and Dental Sick Call Process**
  - Standardize documentation (form + task alignment, pain scale, history, priority levels).
  - Ensure emergent/urgent cases are scheduled within mandated timeframes.
  - Develop and implement the LOP for Nurse and Dental Sick Call.
- **14-Day Exam / Health Appraisal**
  - Eliminate delays by aligning medical and dental forms.
  - Ensure referrals are documented consistently and tracked for compliance.
  - Begin CorEMR updates to enable automatic task generation for referrals.
- **Nurse Training**
  - Train nurses to identify emergent vs. urgent vs. routine dental needs.
  - Ensure consistent documentation across intake, 14-day exams, and sick call referrals.

## Phase 2: Strengthen Quality of Care (6–12 Months)

**Goal:** Move from compliance to quality by embedding consistent clinical practices and building reliable data systems.
**Priorities:**

- **Quality of Dental Care (Episodic, Comprehensive, Periodontal)**
  - Standardize SOAPE documentation and informed consent.
  - Revise forms (Annual Exam, Medical History, Consult Requests).
  - Use checklists to reinforce compliance and accuracy in diagnoses and treatment planning.
  - Implement recall systems for exams and periodontal care.
- **Comprehensive, Periodontal, and Chronic Care Exams**
  - Ensure patients requesting annual, periodontal, or chronic care-related exams receive them within required timeframes.
  - Create treatment plans with proper DPC coding and complete care within 120 days.
- **Data Transparency**
  - Begin generating usable compliance and performance reports within CorEMR.
  - Link dental CQIs to Quality Assurance reporting.

## Phase 3: Sustain Through Self-Governance (12–18+ Months)

**Goal:** Institutionalize continuous improvement and accountability structures to function independently of external monitoring.
**Priorities:**

- **Dental Subcommittee Meetings**
  - Hold consistent monthly meetings with published agendas and distributed minutes.

- o Track progress against CQIs, CAP items, and audit findings.
- o Maintain an accessible library of CQIs, P&Ps, and LOPs with update schedules.
- **Quality Assurance Meetings**
  - o Integrate dental data into QA Committee discussions.
  - o Use outcome measures and audit findings to drive corrective actions.
- **Culture of Continuous Improvement**
  - o Establish routine internal audits with corrective action follow-up.
  - o Promote staff ownership of outcomes through feedback loops and ongoing training.
  - o Ensure system reliance shifts from external oversight to internal accountability

By approaching self-governance in **phases of stabilization, strengthening, and sustainability**, MCJ and Wellpath can prioritize urgent needs, embed consistent clinical quality, and ultimately institutionalize accountability. This phased plan allows leadership to focus resources effectively, track progress against measurable benchmarks, and ensure that once external monitoring concludes, MCJ is equipped to provide timely, safe, and high-quality dental care independently.

## Post-Implementation Monitoring, Self-Monitoring and Self-Governance

*Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit findings will be reported to the Quality Management Committee at its quarterly meetings. (Wellpath IP, p. 8)*

The issues contributing to non-compliance in this report mirror those noted in prior audits, though some progress is evident—particularly in access to care, infection control and regulatory compliance. While deficiencies remain, these improvements provide a solid foundation for continued advancement. Detailed findings and recommendations are outlined in the Dental Audit Tool Results tab of the Dental Audit Tool.

Self-assessment, self-auditing, and self-monitoring are essential functions that require time, effort, and resources, but they are the cornerstones of self-governance. Internal and external self-audits, data-driven transparency, and the use of outcome measures to identify and address clinical deficiencies are integral to achieving sustained progress. The monthly Dental Subcommittee and Quality Assurance meetings remain critical forums for tracking results and translating them into action.

As the saying goes, "If you can't measure it, you can't improve it." At present, data collection within CorEMR is not yet fully developed into a functional Monterey Compliance Report as required by the Dental Corrective Action Plan (CAP). This gap limits the ability to confirm compliance, particularly with the timeliness of care. Nevertheless, I remain optimistic, as leadership has prioritized resolving these issues and improvements are anticipated.

Sustained improvement in the dental program will depend on reliable data and structured accountability through the quarterly QA Committee and monthly Dental Subcommittee. By embracing transparency, collaboration, and continuous self-monitoring, MCJ is building the framework necessary for effective self-governance. These efforts, if consistently maintained, will ensure that progress achieved under monitoring evolves into long-term, independent success.

## Risk Elimination / Corrective Action Plan (CAP)

The CAP requirements and its implementation and progress toward compliance are tracked in the enclosed Dental CAP spreadsheet.

> *Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame.* (Wellpath IP, p. 8)

For <u>Custody, there is a 3.8% improvement</u> towards full compliance of their 13 CAP items, #1-12 and #49. Eleven (11) are "Complete" and the remaining two (2) CAP items are in "Progress".

For <u>Wellpath, there was a 3.3% improvement</u> towards compliance of their 108 CAP items in March 2025 as compared to October 2024. Zero CAP items (0) have "No plan", and zero (0) items have a "Plan". Thirty-nine (39) CAP items are in "Progress", and sixty nine (69) CAP items are "Complete".

The overall completion of the CAP Items for both Custody and Wellpath is in the Tables below. Eleven (11) of the combined 121 CAP items have reached Substantial Compliance (SC) for over one year.

The chart below identifies improvement in the deficiencies listed in the Dental Corrective Action Plan.

| Oct '24 | Comp Score | March '25 | Comp Score |
|---|---|---|---|
| SC>1 yr | 11 | SC>1 yr | 11 |
| SC | 14 | SC | 31 |
| PC | 94 | PC | 78 |
| NC | 2 | NC | 1 |

Please see the charted Dental CAP progress below: The first two charts are MCJ and Wellpath's <u>self-assessment</u>, followed by the next two charts being this <u>Court Monitor's report</u> for MCJ and Wellpath respectively.

*Note below, CAP item #4 for Custody's Self-Assessment was inadvertently not completed by Defendants; therefore, showing a total of twelve instead of thirteen CAP items in the March 2025 section. See the Court Monitor Report – MCJ Custody (13) for the full list of Dental CAP items on the following page.

### MCJ Custody Self-Assessment Report (13)

| Implementation Specialist | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Assessment | Description | Jan 2022 | May 2022 | Dec 2022 | Jun 2023 | Apr 2024 | Oct 2024 | Mar 2025 |
| No Plan | not started, not completed | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plan | have developed a plan | 10 | 0 | 0 | 0 | 1 | 0 | 0 |
| Progress | have started to implement the plan | 3 | 13 | 12 | 3 | 2 | 3 | 1 |
| Complete | achieved the goal of the CAP item | 0 | 0 | 1 | 10 | 10 | 10 | 11 |



### Wellpath Self-Assessment Report (108)

| Implementation Specialist | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Assessment | Description | Jan 2022 | May 2022 | Dec 2022 | Jun 2023 | Apr 2024 | Oct 2024 | Mar 2025 |
| No Plan | not started, not completed | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Plan | have developed a plan | 3 | 2 | 1 | 4 | 1 | 0 | 0 |
| Progress | have started to implement the plan | 101 | 102 | 92 | 72 | 55 | 17 | 17 |
| Complete | achieved the goal of the CAP item | 4 | 3 | 15 | 32 | 52 | 91 | 91 |



### Court Monitor Report - MCJ Custody (13)

| Court Monitor Assessment | Description | Jan 2022 | May 2022 | Dec 2022 | Jun 2023 | Apr 2024 | Oct 2024 | Mar 2025 |
|---|---|---|---|---|---|---|---|---|
| No Plan | not started, not completed | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plan | have developed a plan | 11 | 2 | 0 | 0 | 0 | 0 | 0 |
| Progress | have started to implement the plan | 2 | 11 | 12 | 12 | 4 | 3 | 2 |
| Complete | achieved the goal of the CAP item | 0 | 0 | 1 | 1 | 9 | 10 | 11 |



### Court Monitor Report - Wellpath (108)

| Court Monitor Assessment | Description | Jan 2022 | May 2022 | Dec 2022 | Jun 2023 | Apr 2024 | Oct 2024 | Mar 2025 |
|---|---|---|---|---|---|---|---|---|
| No Plan | not started, not completed | 5 | 20 | 6 | 1 | 0 | 0 | 0 |
| Plan | have developed a plan | 13 | 12 | 5 | 4 | 1 | 2 | 0 |
| Progress | have started to implement the plan | 87 | 74 | 95 | 90 | 70 | 43 | 39 |
| Complete | achieved the goal of the CAP item | 3 | 2 | 2 | 13 | 37 | 63 | 69 |



## Closing Statement

In closing, the ultimate goal of court-appointed monitoring is not indefinite oversight, but the establishment of systems that allow MCJ and Wellpath to govern themselves with accountability, transparency, and consistency.

The foundation for self-governance lies in fully developed Policies and Procedures, Local Operating Protocols, Continuous Quality Indicators, and a functioning Quality Assurance program that is data-driven, staff-informed, and patient-centered.

Unaddressed deviations may result in harm to patients, including inadequate pain management, delayed treatment, or missed diagnoses. Persistent non-compliance can lead to legal liability, regulatory sanctions, or loss of accreditation. Failure to correct deficiencies can undermine confidence among patients, staff, and oversight bodies. Repeated errors may increase workload, cause workflow disruptions, and reduce overall quality of care. Ongoing

deviations hinder progress toward self-governance and independent, sustainable compliance and may prolong external monitoring.

To achieve, maintain and sustain lasting compliance and meaningful improvement, MCJ's dental program must embrace a culture of transparency, self-assessment and self-correction—where chart audits, training, and statistical review are not external mandates but internal habits of excellence. Success will be demonstrated when CQI processes are carried out consistently, staff feel ownership of outcomes, and patient care reflects timely, safe, and high-quality standards without reliance on court monitoring.

The commitment to self-governance is both the responsibility and the opportunity of Monterey County Jail and Wellpath. By embedding these systems into daily practice, the facility can not only meet the requirements of the Implementation Plan and Settlement Agreement, but also build a sustainable framework of continuous improvement that ensures dignity, safety, and equitable care for the incarcerated persons at MCJ.

## Appendix I – Response to Defendants correspondence re Dental March 2025 MCJ site visit

Good evening,

This a response to your letter, "Defendants correspondence re Dental March 2025 MCJ site visit.pdf". I was present at MCJ for both the Enhanced Monitoring sessions and the Audit Tour from March 24-28.

During this site visit, I observed multiple large/heavy items stored on top of two tall shelving units (visibly >6 ft). The units were not anchored to the wall. This observation is within scope because California's Injury and Illness Prevention Program (IIPP) standard requires employers to **identify and correct unsafe conditions** in the work environment; unsecured tall shelving and heavy overhead storage present a foreseeable tip-over/struck-by hazard to staff, custody and patients who enter the dental clinic areas. See the attached photos. The cabinets are to the right of the patient seating area and the incarcerated persons face the side of the cabinets, which were unsecured to the wall. https://www.dir.ca.gov/dosh/dosh_publications/iipp.pdf

Separately, the items stored overhead included **dental supplies used in patient care**. Infection-prevention guidance directs that sterile supplies be stored to maintain integrity—**ideally in covered or closed cabinets**—and not in locations where they can be contaminated or damaged by falling. Thus, the storage practice implicates both **patient safety** and **regulatory compliance** (IIPP and infection-control). https://www.cdc.gov/dental-infection-control/media/pdfs/2024/07/safe-care2.pdf

The concern does not hinge on an exact cabinet-to-ceiling measurement; it arises from two plainly observable conditions: (1) **unanchored tall shelving**, and (2) **heavy items stored high overhead**. These are recognized physical hazards in healthcare workplaces; OSHA has cited employers when racks/shelving went not anchored, and national safety guidance recommends **anchoring tall furniture and relocating heavy items from high shelves** to prevent injuries, including during emergencies. https://www.osha.gov/ords/imis/generalsearch.citation_detail?cit_id=01001&id=1060970.015

**Corrective actions requested (minimal and feasible):**

1. Anchor the three shelving units to wall studs or other suitable structural members per manufacturer and safety guidance. **Completed,** when I asked the Dental Operations Specialist to take care of this issue she contacted the maintenance department and they came and anchored the shelves to the wall.
2. Relocate heavy/bulky items to lower shelving (preferably below ~4 ft) and keep the tops of tall units free of heavy objects. **Completed.** The Dental Assistant removed the items that were stacked high above the shelving.
3. Move patient-care supplies to closed cabinetry or otherwise protected storage consistent with infection-prevention guidance. **Partially completed.** The black cabinet is a closed cabinet, in line with the infection prevention guidance, the other is not. I recommend another closed cabinet replace the open shelving.
4. Document the hazard assessment and corrective steps in the facility's IIPP records. **Not completed. Please document the hazard assessment and the corrective steps in the facility's IIPP records.**

For these reasons, the observation is **not** "wholly untethered to patient care," nor is it outside of my scope of review. It falls squarely under the IIPP's hazard-identification and correction duties and the dental setting's obligation to store patient-care supplies in a manner that preserves safety and sterility. Accordingly, inclusion in monitoring reports is appropriate.

Best regards,

Viviane G. Winthrop, DDS
Winthrop Dental Consulting, LLC
1-520-241-2089
winthropdentalconsulting@gmail.com





