# Exhibit A

# MONTEREY COUNTY JAIL

# MEDICAL CARE VISIT – October 21-22, 2025

## FINAL AUDIT REPORT

December 31, 2025



Bruce P. Barnett, MD, JD – expert medical monitor

# TABLE OF CONTENTS

INTRODUCTION ...............................................................  ...........................................................................3

METHODOLOGY  .........................................................................................................................3

BRIEF REPORT OF FINDINGS - SUMMARY TABLES .............. .................................................   ...............6

FINDINGS ...............................................................................................................................13

SUMMARY OF CASE REVIEWS; OTHER NOTABLE CASES..............................................  ...........................24

DEATHS .............................................................................................  .......................29

 PLAINTIFF'S INQUIRIES              ....................        ...................... ...  .............. ..................................... 30

STAFF INTERVIEWS...........................................................................................................31

INMATE/PATIENT INTERVIEWS                .............................................................................32

RECOMMENDATONS........................................................................................  ......32

DISCUSSION AND CONCLUSIONS ..................................  .......................................................34

LIST OF ATTACHMENTS ................................................................................................35

# INTRODUCTION

Based upon my review of medical records and my site visit on October 21-22, 2025 I find that medical care services at Monterey County Jail (MCJ) for the period of June 2025 through October 2025 were not in substantial compliance with the Implementation Plan (IP) requirements,

This report includes:  a) assessment of MCJ performance regarding implementation plan categories, as cited in the court-approved Implementation Plan,[1] b) analysis of care provided to a sample population of incarcerated persons who required medical care[2]  c) care provided to a sample of incarcerated persons brought to my attention by Plaintiffs' attorneys, and patients selected from logs submitted to me by the Defendants[3] d) notable departures from Implementation Plan f) matters brought to my attention by party attorneys, g) adequacy of quality assurance (QA)  h) interview of MCJ patients on site, i) interviews of MCJ,  j) facility inspection and k) recommendations for actions to bring MCJ performance into substantial compliance with IP provisions.

## METHODOLOGY

I determine compliance with the Implementation Plan by reference to California Forensic Medical Group (CFMG) Implementation Plan (2015), Wellpath Policy and Procedure Manual Monterey County California (2020) and Wellpath Professional Nursing Protocols (2023).[4] Wellpath Policies make frequent reference to guidelines from the  National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails (2018), and to California Code of Regulations, Title 15, Minimum Standards for Local Detention Facilities 2019.

The Court order dated September 26, 2023, identified the following Implementation Plan Categories for medical care:  Medical Staffing, Medical Intake, Sick Call (Access to Care), Chronic Care (CC), Health Care Maintenance, Continuity of Care After Release, Outside (specialty and hospital) Care, Treatment of Intoxicated Patients/Withdrawal, Communicable Disease Control (especially Tuberculosis),  Pharmaceutical Services and Medical Quality Assurance (QA/QM).

---

[1] See September 26, 2023, Order Granting Plaintiffs' Motion to Enforce Settlement Agreement and Wellpath Implementation Plan, page 9 – 13; see also, Settlement Agreement (August 18, 2015) page 8-10, 13- 15.
[2] See "Physician Case Review" (Ex. A).
[3] See "Monitoring Tool" (Ex. B) and "Random Defendant Audit Tool" (Ex. C).
[4] CFMG provides medical services to Monterey County as an affiliate of Wellpath.

The Implementation Plan describes within each of these categories performance components also known as "compliance indicators."[5] Care is "substantially compliant" with the IP when all or nearly all indicators are satisfactorily performed.  Serious departures from the IP may preclude a finding of substantial compliance.

The Settlement Agreement does not direct me to look at any specific number of cases to reach a determination of compliance with the Implementation Plan.[6] However, the Agreement does direct my attention to incarcerated people who evidently need care. "Defendants shall develop and implement a Health Care Plan to expand the provision of care for inmates with serious medical and/or mental health needs …"  (emphasis added). Settlement Agreement, Paragraph 31.

This audit employs "non-statistical sampling" or "targeted review" to ensure consideration of all medical care parameters cited in the Implementation Plan. [7]   Thus, the reviewed sample includes inmates sent to the hospital, inmates brought to my attention by Plaintiffs' attorneys, and inmates selected at random from MCJ patient logs.

Exhibit A summarizes my findings regarding the care provided to 30 individual patients residing in MCJ, from end of May 2025 through end of October 2025. These "case reviews" assess whether MCJ patient care met applicable standards of care over the time period at issue.[8]

Exhibit B (Monitoring Tool) describes MCJ performance regarding compliance indicators in encounters mostly brought to my attention by Plaintiff attorneys and in grievances, grouped according to IP category.  The template entitled Exhibit B (in use since 2017) collates data.  Exhibit B summaries do not by themselves determine whether medical services are in substantial compliance with the IP.

---

[5] "Compliance Indicator"  is a term of art used by accrediting agencies to describe performances required to meet a defined standard of care.

[6] This audit reports findings from my review of 588 encounters documented in the EMR.

[7] For a brief description of sampling techniques see "Good Practice for Quality Assurance Reviewers:  Audit Sampling Planning, Documentation and Reporting,"   June 2021,The United States Department of Health and Human Services.

[8] See Implementation Plan page 8. (medical services shall  be provided "in accordance with community standards").  Publications I refer to in determining applicable community standards of care include but are not limited to UpToDate, Centers for Disease Control (CDC), United States Preventive Task Force (USPTF), Cochrane Reviews/Cochrane Library, American Family Physician and New England Journal of Medicine

Exhibit C (Random Defendant Audit) reports for the same categories as in Exhibit B, encounters sampled randomly from logs that Defendant submitted for my review.    Like Exhibit B, this audit tool collates relevant data but does not alone determine substantial compliance.

There are multiple inquiries listed in Exhibit B and Exhibit C that in the domain of mental health or other monitors for which I report NA, which does not affect my determination of compliance with medical care.[9]

Table 1 summarizes for each IP category <u>the percentage of clinical encounters in which all pertinent compliance indicators are satisfied.</u>  Encounters are "compliant" where virtually all quality indicators are met.  In this analysis, encounters are "not compliant" where one or more significant quality indicator is not met.  See Exhibit A, spreadsheet 1 (Summary of Encounters). See also Settlement Agreement, page 2, paragraph 10. *"Substantial compliance" shall mean adherence to the requirement of the Settlement Agreement and the Implementation Plan in all material respects*…

Table 2 summarizes for each IP category <u>the percentage of compliance indicator performances meeting IP requirements.</u>  Table 2 shows the degree of compliance with indicators notwithstanding lapses that may have precluded a finding of "compliant" in Table 1. The percentage of compliance is generally higher in table 2, which credits performance in all indicators compared to table 1, which reports compliance in each category only if all indicators are satisfied.  See Exhibit A, spreadsheet 2 (Percentage of Compliance of Questions/Quality Measures by Medical Quality Indicator). [10]

Table 3 lists <u>percentages of compliance combining Exhibit A, B  and C.</u>  This table summarizes MCJ performance in accordance with the Settlement Agreement which defines "substantial compliance," as adherence to all material respects of the Implementation Plan.

There is no universal compliance threshold for clinical performance objectives.  NCCHC cites 85% as a minimum required compliance for custody staff health training.  See 2026 NCCHC Standards, page 77.   Healthcare systems in the free world  (MetroHealth - Cleveland and Kaiser-Foundation) report a range for satisfactory compliance with required clinical performance regarding cancer surveillance to be 80- 90%.

---

[9] The IP requirements reported in exhibits B and C are unchanged since being listed in my 2017 audit.

[10] Whereas Table 1 shows the percentage of encounters I found satisfactory in "all material respects"  (criteria posited by the Settlement Agreement), table 2 shows details of performance that may contribute to or detract from my finding substantial compliance. I summarize in Table 3 the percentage of encounters that are adequate in all material respects by reference to data in Exhibits A, B and C.

The calculated scores provided in this audit are provided to compare performances from one audit to the next.  **The scores do not by themselves describe compliance with the Implementation Plan.**  Compliance rates above 50%  may demonstrate partial compliance with the Implementation Plan.[11] Compliance rates above 80% may be consistent with substantial compliance provided that MCJ demonstrates effective corrective measures to address instances of non-compliance.  See Settlement Agreement page 2, paragraph 10.   *"Substantial compliance" shall mean adherence to the requirements of the Settlement Agreement and the Implementation Plans in all material respects….100% compliance is not required …provided that the Defendants demonstrate that they have (a) implemented a system for tracking compliance…and for taking corrective measures…  and (b) that Defendants have instituted policies, procedures, practices, and resources that are capable of durable and sustained compliance.[12]*

## BRIEF REPORT OF FINDINGS – SUMMARY TABLES

This audit, like its predecessors, measures MCJ performance from multiple vantage points.  In some categories MCJ meets up to 90% of the quality measures called for by the Implementation Plan. However, crucial departures from Implementation Plan including lapses in quality assurance processes dissuade me from finding substantial compliance.

### TABLE 1 – Percentage of Encounters in Substantial Compliance with IP

| | Summary of Encounters | | | | | | | | | | | | | |
| Medical Quality Indicator | Case Review Findings | | | | | Monitor (At Risk) Audit Tool | | | | Random Audit Tool | | | | Combined Percentage Compliance |
| | Number of Encounters | Number of Appropriate | Number of Deficient | Number of N/A | Percentage Compliance | Number of Encounters | Number of Appropriate | Number of Deficient | Percentage Compliance | Number of Encounters | Number of Appropriate | Number of Deficient | Percentage Compliance | |
| Intake Screening | 30 | 17 | 12 | 1 | 58.6% | 16 | 5 | 11 | 31.3% | 24 | 12 | 12 | 50.0% | 49.3% |
| Access to Care | 107 | 77 | 30 | 0 | 72.0% | 24 | 18 | 6 | 75.0% | 23 | 15 | 8 | 65.2% | 71.4% |
| Chronic Care | 47 | 18 | 28 | 1 | 39.1% | 14 | 4 | 10 | 28.6% | 19 | 6 | 13 | 31.6% | 35.4% |
| Health Care Inventory | 24 | 13 | 11 | 0 | 54.2% | 15 | 7 | 8 | 46.7% | 24 | 10 | 14 | 41.7% | 47.6% |
| Continuity of Care After Release | 7 | 3 | 4 | 0 | 42.9% | 13 | 8 | 6 | 57.1% | 12 | 6 | 6 | 50.0% | 51.5% |
| Outside Medical Care/Referrals | 60 | 38 | 19 | 3 | 66.7% | 9 | 6 | 3 | 66.7% | 14 | 10 | 4 | 71.4% | 67.5% |
| Detoxification/Withdrawal | 25 | 16 | 8 | 1 | 66.7% | 8 | 6 | 2 | 75.0% | 12 | 10 | 2 | 83.3% | 72.7% |
| Tuberculosis & Other Infections | 24 | 20 | 4 | 0 | 83.3% | 15 | 14 | 1 | 93.3% | 20 | 16 | 4 | 80.0% | 84.7% |
| Pharmaceutical Administration | 2 | 1 | 1 | 0 | 50.0% | 4 | 3 | 1 | 75.0% | 1 | 1 | 0 | 100.0% | 71.4% |
| Totals | 326 | 203 | 117 | 6 | 63.4% | 118 | 71 | 48 | 59.7% | 149 | 86 | 63 | 57.7% | 61.2% |

---

[11] I am required to assess whether MCJ is in "substantial compliance" with the Settlement Agreement and Implementation Plan.  The court does not use the term "partial compliance." I use the term "partially compliant" when I find most patients receive adequate/appropriate care in the category discussed.  Partially compliant does not equate to substantial compliance.  Substantial compliance requires a) nearly all patients receive appropriate care b) robust peer review processes to assess and correct departures from the IP and c) rare if any episodes of deficient care exposing patients to risk of life-threatening harm.

[12] See discussion below regarding Quality Assurance

## TABLE 2 – Percentage of Compliance Indicators Meeting IP Requirements

| | MCJ Risk Audit Tool | | | | | MCJ HC Random Audit Tool | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Summary** **Percentage of Compliance of Questions/Quality Measures by Medical Quality Indicator** | | | | | | | | | | | |
| Medical Quality Indicator | Quality Indicators Reviewed | Number of Yes (Compliant) | Number of No (Non-compliant) | Number of N/A | Percentage Compliance | Quality Indicators Reviewed | Number of Yes (Compliant) | Number of No (Non-compliant) | Number of N/A | Percentage Compliance | Combined Percentage Compliance |
| Intake Screening | 240 | 101 | 18 | 121 | 84.9% | 360 | 151 | 25 | 184 | 85.8% | 85.4% |
| Access to Care | 125 | 97 | 25 | 3 | 79.5% | 120 | 91 | 22 | 7 | 80.6% | 80.0% |
| Chronic Care | 56 | 24 | 18 | 14 | 57.1% | 76 | 30 | 32 | 14 | 48.4% | 51.9% |
| Health Care Inventory | 45 | 34 | 11 | 0 | 75.6% | 72 | 41 | 31 | 0 | 56.9% | 64.1% |
| Continuity of Care After Release | 56 | 19 | 10 | 27 | 65.5% | 48 | 12 | 9 | 27 | 57.1% | 62.0% |
| Outside Medical Care/Referrals | 36 | 22 | 4 | 10 | 84.6% | 54 | 35 | 5 | 14 | 87.5% | 86.4% |
| Detoxification/Withdrawal | 96 | 28 | 2 | 66 | 93.3% | 144 | 40 | 5 | 99 | 88.9% | 90.7% |
| Tuberculosis & Other Infections | 75 | 28 | 1 | 46 | 96.6% | 100 | 43 | 6 | 51 | 87.8% | 91.0% |
| Pharmaceutical Administration | 12 | 3 | 1 | 8 | 75.0% | 3 | 1 | 0 | 2 | 100.0% | 80.0% |
| **Totals** | **741** | **356** | **90** | **295** | **79.8%** | **977** | **444** | **135** | **398** | **76.7%** | **78.0%** |

## TABLE 3 – Combined Encounter Compliance  Ex.  A, B and C [13]

| TABLE 3              IP  Category | Compliant/Not Compliant | % Compliant | Comments |
|---|---|---|---|
| 1.  Intake Screening | Partially Compliant | 49.3% | see text and worksheets |
| 2.  Access to Care | Partially Compliant | 71.4% | see text and worksheets |
| 3. Chronic Care | Not Compliant | 35.4% | see text and worksheets |
| 4. Health Care Inventory | Not Compliant | 47.6% | see text and worksheets |
| 5. Continuity of Care | Partially Compliant | 51.5% | see text and worksheets |
| 6. Outside Care Referrals | Partially Compliant | 67.5% | see text and worksheets |
| 7. Detox/Withdrawal | Partially  Compliant | 72.7% | see text and worksheets |
| 8. Tuberculosis/Infection Control | Substantially Compliant | 84.7% | see text and worksheets |
| 9. Pharmaceutical  dispensing and refusals | Partially  Compliant | 71.4% | distinguished from dispensing |
| 10.Operational Aspects:  Administration and Medical Staff, Facilities, Quality Assurance | Partially Compliant | NA | see text |
| 11. RN Medication Dispensing On Site | Partially Compliant | 100.0% | see text and worksheets |
| 12. Physician/Provider Case Review | Partially Compliant | NA | I found 8 out of 30 cases described in Ex A to be managed adequately |
| Overal Audit Score | | 65.2% | |

---

[13]  I continue the same categories in these tables as described in the initial audits.  The court-designated categories I address below differ slightly.

MCJ care in the following areas is improved:

1) Tuberculosis (TB)  screening and counseling regarding treatment of latent tuberculosis infections.
2) Access to care.
3) Withdrawal/Detoxification.
4) Specialist services.
5) Pharmacy management

MCJ departures from the Implementation Plan include the following:[14]

A. Patients were not consistently or timely screened for sexually transmitted diseases (STD). [15]
B. Patients did not consistently and/or timely receive appropriate medical care for chronic medical conditions.  Chronic care visits were sometimes delayed or incomplete.  Problem lists were incomplete.
C. Nurses did not consistently follow applicable protocols.
D. Examinations for eye complaints were often insufficient [16]
E. Specialty care was in some serious matters unduly delayed. [17]
F. Electronic medical record (EMR)  documentation and instructions upon release and/or transfer were at times incomplete and/or inaccurate.
G. The MCJ/Wellpath documentation of its QA/QM process was not in substantial compliance with the IP.  Critical Clinical Events (CCE) were not monitored.  Peer reviews and corrective actions to address lapses were insufficient.

SUMMARY - (Reiterating court designated categories and definitions)

| Category | Requirements | Monitor Findings |
|---|---|---|
| 1.  Medical Staffing | MCJ must maintain "adequate staffing to provide all necessary medical and mental health care[.]" Settlement Agreement at 16. Wellpath's | **Not  Compliant** MCJ recently hired a director of nursing.  I am informed that nurse and LVN positions called |

---

[14] The Implementation Plan requires reasonably consistent performance to find substantial compliance.

[15] The STD screening panel implemented in 2025 by CFMG complies with the CDC recommendations.  I found multiple instances during this audit  period where screening was delayed or not performed.

[16] I do not believe all patients need ophthalmoscopy. MCJ attention to eye complaints falls seriously below community standards when multiple lapses are evident, including incomplete assessment of visual acuity, inadequately documented eye examination, and/or delayed specialty services that includes ophthalmoscopy.

[17] See, e.g. NCCHC Standards for Health Services in Jails (2026), p. 119:"…wait times should not exceed average wait times in community ty practice."

| | | |
|---|---|---|
| | Implementation Plan requires Wellpath to maintain "sufficient staff to ensure compliance" with the other mandates of the Plan. Wellpath Implementation Plan at 116. | for by the IP are not filled. There is no medical records supervisor. |
| 2.  Intake | The intake screening must include, among other things, taking of vital signs and inquiry into medical issues, medications, and substance use. Id. at 13-14, 29; Dkt. 494 at 15 (same); Dkt. 460 at 11-12."Inmates with medical … conditions identified during intake screening … shall be assessed by the Booking RN who will begin initial treatment planning … and schedul[e] referrals for follow up evaluation | **Partially Compliant**<br><br>Table 2 shows that many of the intake inquiries are made in accordance with the IP. However, the intake evaluations are nevertheless often inaccurate and frequently fail to ensure patients receive necessary treatment and/or chronic care. |
| 3 Access to Care – Sick Call |  Inmates must have timely access to necessary treatment by Qualified Medical Professionals for prisoners with medical issues." Health complaints shall be collected, processed, and documented daily, and patients must be scheduled for the next sick call.  Sick call must be conducted Monday through Friday in a private clinical environment. Sick call slips must be "filed in the inmate's medical record." MD or RN must visit individuals housed in holding and isolation cells on Monday, Wednesday, and Friday. | **Partially Compliant.**<br>Inmates' requests for sick calls are not scanned into the medical record. I relied upon the paraphrased requests reiterated in Tasks and Summary portions EMR tabs to assess adequacy of attention provided to sick call requests.<br><br>I found delayed attention to serious conditions such as rectal bleeding, markedly elevated blood pressure, persistent misdiagnosed rash, abnormal lab tests, and interruptions in critical medications.<br><br>RN encounters did not consistently adhere to established protocols. Abnormal vital  signs were not assessed and/or not acted upon. Visual disturbances were not appropriately evaluated. |

| 4 Chronic Care | "Inmates with chronic medical conditions will be referred to and seen by a medical provider within five to seven days of arrival, " to be " managed pursuant to chronic care protocols and standardized procedures that are consistent with national practice guidelines." Chronic care visits shall  (1) assess the patient's medications, complaints, and compliance with the treatment plan; (2) examine vital signs and weight; (3) assess diagnosis, degree of control, compliance with the treatment plan and clinical status as compared to prior visits; and (4) conduct lab and diagnostic tests as necessary, develop strategies to improve outcomes if the condition has worsened, educate the patient, and refer to an MD or specialist, and/or conduct discharge planning as necessary. | **Not  Compliant** Chronic care frequently did not satisfy the requirements set forth in the IP.  Visits and treatment plans required by the IP were delayed or not performed.  Screening tests and laboratory studies recommended by national practice guidelines were not ordered.  Treatment plans were not developed with necessary input from on-site medical and mental health experts. Problem lists were not updated. |
| --- | --- | --- |
| 5. Health Care Maintenance | All patients must receive both a 14-day health inventory and communicable disease screening, using designated forms to record temperature, pulse, respirations, blood pressure, height and weight. Assessment shall include screening for sexually transmitted diseases, noting all positive findings on a "problem list.  The six-month physical examination, documented on a designated form,   must include: i) review of the health inventory and communicable disease screening; ii) vital signs with height and weight; iii)  a full body system review and assessment and iv)  assessment of the individual's health | **Not  Compliant.** Health inventory screening and health maintenance exams were delayed and incomplete. |

| | | |
|---|---|---|
| 6. Continuity of Care After Release | Inmates released to the community will be provided with written instructions for the continuity of essential care, including, but not limited to, name and contact information of community providers for follow up appointments, prescriptions and/or adequate supply of medication for psychiatric patients. | **Partially  Compliant.** The electronic medical record (EMR) failed to consistently document referrals or continuation of medications for unresolved medical conditions that needed follow up.  I found multiple instances of inmates transferred to other facilities with inaccurate and incomplete reports. [18] |
| 7. Outside Care | Inmates will have access (presumed timely) to outside health care providers; records, results, and orders received from [such]off-site consultations and treatment shall be maintained in the patient's medical record. | **Partially  Compliant** Specialty services were seriously delayed in a few cases.  Lab tests were not performed timely, especially screening for sexually transmitted disease and TB. |
| 8. Treatment of Intoxicated Patients - Detoxification/ Withdrawal | Medical providers shall be timely involved in assessing and treating inmates potentially undergoing withdrawal, and non-provider medical staff shall timely refer to providers those inmates undergoing withdrawals when clinically indicated. | **Partially  Compliant.** MCJ patients did not consistently undergo the monitoring called for by the Implementation Plan and required by Wellpath policies. |
| 9. Communicable Disease (Tuberculosis, Methicillin Resistant Staphylococcus Infection Control) | MCJ shall provide appropriate infectious disease screening and follow-up, including but not limited to screening for tuberculosis and methicillin resistant staphylococcus aureus (MRSA).The tuberculosis identification, control and treatment program shall comply with [U.S. Centers for Disease Control and Prevention ("CDC")guidelines]. MCJ shall have a reliable system to track whether all newly booked | **Partially Compliant.** Tuberculosis screening was largely compliant with IP requirements.  QuantiFERON testing for TB was delayed on occasion with no adverse consequences to patient or staff.  Skin infections were treated appropriately with antibiotics effective against methicillin resistant bacteria. |

---

[18] The IP, in keeping with generally accepted standards of care,  explicitly requires communication and/or transfer of medical information to the released patient, community center or receiving detention systems.

| | inmates have received tuberculosis screening and appropriate follow-up testing and treatment. | |
|---|---|---|
| 10. Pharmaceutical Services<br><br>The requirement for dispensing necessary medications upon release is also addressed as an element in the "continuity of care" category. | Monterey County Jail pharmaceuticals shall be managed to ensure appropriate containers, and labels.  Inmates on essential medications will receive medication while in court.  Controlled substances will be kept under maximum security storage and counted at each shift change by the nursing going off duty together with the nurse coming on duty. The medication nurse is responsible for and will verify whether each patient takes their prescribed medication, including by recording it on the inmate's medication administration record. | **Partially Compliant**<br>Necessary medications were in some cases delayed, interrupted or not provided.<br>I did not find any instances of patients denied medications while in court.<br>Medication nurses verified patients' identifications and ingestion of medications.<br><br>Confusion understandably may arise from the consolidation in this category of two independent measures for nurse delivery process that I found 100% compliant, and the administration which was 71% compliant. |
| 11. Medical Quality Assurance | All monitoring and audit findings will be reported to the Quality Management Committee at its quarterly meetings.  There must be corrective action measures to address lapses in the application of the policy. The responsible physician must provide appropriate supervision of the PA, NP, and RNs.  Wellpath must provide access to death reviews of post-Settlement in-custody deaths within thirty days from the date the review is completed. | **Not Compliant**<br>Critical Clinical Events (CCE) were not documented and/or acted upon in accordance with community standards, IP requirements  and  Wellpath policy. I describe in the case reports circumstances wherein PA, NP and RN care did not appear to be adequately supervised by Wellpath physicians and managers. |

//

## FINDINGS [19]

**Intake Screening** was <u>partially compliant</u>  with the Implementation Plan.

I noted the following departures from the IP:  a) abnormal vital signs were not repeated; b) patients described as intoxicated or otherwise unstable were sometimes approved for general population  (GP) without documentation of appropriate medical clearance; c) Intake data was sometimes incomplete with lack of required blood sugar tests, or vague substance abuse information d) Adaptive Needs Screens (using form for Americans Disability Act or ADA) were not consistently performed, e) referrals for needed chronic care were not documented, and/or did not occur. [20]

1.1 <u>- Did the inmate receive an initial health screening upon arrival at the facility by the registered nurse? (on same day unless otherwise noted). IP I</u>.  **Yes.**

1.2 <u>- If during the initial intake screening the registered nurse determined or should have discerned  that the inmate required medical evaluation and clearance prior to incarceration, was the inmate transported for medical clearance? IP I  A</u>.  **No.** ████ (6/7/25); ████ (8/10/25); ████ (7/10/25)

1.3 <u>- Did booking include accurate vital signs, finger-stick blood sugar (FBS) as indicated,  and electronic medical record (EMR)  inquiry regarding past and current health problems? IP I C, and intake Form</u>. **No**  Required blood sugars were not always measured. ████ (9/3/25); ████ (7/14/25); ████ (6/28/15); ████ (8/14/25)  Abnormal vital signs were often not repeated or reported. ████ (9/3/25); ████ (6/27/25); ████ (6/7/25)

1.4 <u>- If during the initial intake screening process the inmate was identified with an acute or  chronic medical condition deteriorated, did the booking nurse refer the inmate to the primary care provider (PCP)[21] for immediate care? IP I C 1,2,3; See also Wellpath Policy and Procedure (hereinafter WPP) E-02</u> .  **No.** ████ (6/7/25); ████ (8/25/25)

1.5  <u>Was the inmate with a chronic medical condition seen by a primary care provider within seven days or reasonably after arrival at the facility? IP I C 1,2,3; See also</u>

---

[19] Cases cited do not include all pertinent findings. Please refer to attached Exhibits for more information about detected deviations from IP requirements.

[20] The Implementation Plan assigns requires that the Intake process promote timely chronic care (CC) visits following admission. See Implementation Plan page 4: "**Inmates with chronic medical conditions will be referred to <u>and seen by a medical provider within five to seven days of arrival</u>**."(Emphasis in original).

[21] PCP (primary care provider) refers to "front-line" health care delivery professionals – Physicians (MD), Family Nurse Practitioners (FNP or NP), and physician assistants (PA) - who are certified to diagnose and prescribe treatments.

<u>WPP E-02</u> . **No.**  (6/4/25); ▮▮▮ (6/26/25); ▮▮▮ (6/25/25); ▮▮▮ (8/14/25); ▮▮▮ (8/25/25); ▮▮▮ (8/21/25); ▮▮▮ (6/1/25); (8/26/25); ▮▮▮ (9/3/25); ▮▮▮ (9/3/25); ▮▮▮ (7/14/25); ▮▮▮ (7/16/25); ▮▮▮ (6/4/25); ▮▮▮ (8/27/25); ▮▮▮ (8/18/25); (7/10/25) ▮▮▮ (7/16/25); ▮▮▮ (9/18/25); ▮▮▮ (8/11/25); ▮▮▮ (9/16/25); ▮▮▮ (8/10/25)

1.6 <u>Did  booking screen the inmate utilizing the Quick Reference Guide to Developmental Disabilities form?– IP I D.</u>  **No**. ▮▮▮ (6/27/25 – ADA form incorrectly states no disability when patient dependent upon walker after knee surgery); ▮▮▮ (7/23/25 form delayed, not done); ▮▮▮ ▮▮▮ ▮▮▮ (delayed assessments not done after released from withdrawal protocols); ▮▮▮ (not performed);

1.7 <u>If during the intake screening process an inmate was believed to have a developmental disability, did the facility contact San Andreas Regional Center within 24 hours? IP I D.</u>  –  **I refer this question to the ADA monitor.**

1.8 <u>If during the intake screening process an inmate exhibited or testified to presence or history of mental illness, was the inmate referred to a mental health services staff for further evaluation? IP I E 1.</u> **Yes.**

1.9 <u>Did the booking registered nurse complete a Nursing Assessment of Psychiatric & Suicidal Inmate form on an inmate with a positive mental health history? IP I E 2.</u> **Yes.**

1.10 <u>If an inmate had an existing medication order upon arrival at the facility, was the medication administered without undo interruption? IP II.</u> **Yes.**  Exception ▮▮▮ (see Case 21, Crohn's disease referred for Chronic Care not seen by PCP until 11 days after admission**).**

1.11 <u>Was the inmate (with verified and/or unverified medication order) seen by a medical provider within seven days of the registered nurse's consultation with the facility's primary care provider? IP II</u> **Yes.**  Exception ▮▮▮ (Case 21, medications for Crohn's disease not continued)

1.12 <u>For inmates prescribed psychotropic medications: Did the booking registered nurse obtain from the inmate a signed release for medical records to verify the inmate's current prescriptions?</u>   **Deferred to Mental Health expert.**

1.13 <u>For inmates prescribed psychotropic medications:Was an inmate seen by a psychiatrist within seven days of arrival at the facility?</u>  **Deferred to Mental Health expert.**

1.14 <u>For inmates prescribed psychotropic medications: If an inmate refused prescribed psychotropic medication on three consecutive occasions, did the registered nurse refer the inmate to the psychiatrist?</u> **Deferred to Mental Health expert.**

1.15    At the time of booking, was the inmate verbally and in writing informed by a registered nurse of the sick call procedures?  **Yes.**

**Access to Care** was underlined partially compliant with the Implementation Plan.

Assessments were at times incomplete or not in accord with applicable protocols. Many assessments and treatments were provided without appropriate physical examination, especially when care was provided by telehealth encounter,   Patients needing PCP appointments were sometimes not timely referred.  The care for complex patients was frequently provided by physician extenders without sufficient physician collaboration.

2.1 - Did the licensed health care staff review the sick call slip on the day it was received? IP III D 1. **Yes.**[22]

2.2 – Following the review of the sick call slip, did the registered nurse or PCP complete a face-to-face assessment of the inmate within the required time frame? IP D2 . **No.** ████ (9/3/25 eye complaint not addressed until 9/11/25); ████ (foot fungal infection complaint 8/31/25  addressed 9/29/25); ████ (6/4/25 complaint of skin lesion not seen at 6/6 telehealth visit or thereafter);

2.3 –  Did the registered nurse or PCP document the face-to-face encounter in Subjective, Objective, Assessment, and Plan (SOAP) format? IP III A  **No.** ████ (7/14/25 no Snellen performed for vision complaint); ████ (Case 14, 8/14/25 possibly early pancreatitis, no objective/exam documented); ████ (Case 17, 7/18/25 blood in bowel movements, no objective/exam documented)

2.4 Did the registered nurse or PCP document an appropriate treatment plan including appropriate referral to PCP that is within the practitioner's scope of practice and supported by the sick call Nursing Protocols? IP III F. **No.** ████ (Case 17, antibiotic prescribed with no indication and no MD collaboration); ████ (Case 20, severe hypertension not addressed at nurse sick call 6/13/25); ████ (Case 21, insufficient plan to treat deteriorating Chron's disease); ████ (Case 22, plan for pregnancy care insufficient and delayed).

2.5  If referral to  primary care provider was necessary, was the inmate seen within the specified/appropriate time frame? IP III A, B1, D 1,2; F1 G 12  (Health services shall be provided in accordance with community standards, pursuant to physician approved protocols consistent with scope of practices. Urgent conditions will be referred to on-site or on-call provider resources.) **No.** ████ (Case 23, antibiotics ordered without

---

[22] I do not have access to patients' written requests for services.  I rely upon the medical EMR "summary" and "task" entries.

supporting diagnosis or follow up by prescribing physician); ██████ (Case 24, PCP exam ordered on 10/10/25  does not occur); ██████ (Case 26, No plan or PCP care provided for abnormal blood pressure (BP) and blood sugar). ██████ (10/2/25 visit should generate referral to MD for colonoscopy). ██████ (7/20/25 prescription for UTI not provided and not followed up with PCP)

2.6 - <u>Does the registered nurse or provider conduct rounds in administrative segregation, holding, isolation cells and infirmary as needed ?  See IP III E4 (Inmates housed in holding and isolation are visited by MD or RN every Monday, Wednesday and Friday);  MPP HCD 110 F-02 (frequency of physician and nursing rounds for patients who need infirmary-level care is specified based upon clinical acuity and the categories of care provided.)</u>  **Yes.**


**Chronic Care**  was <u>not compliant</u> with the Implementation Plan.

Chronic care visits were frequently delayed beyond time required for completion by the Implementation Plan. Major medical problems were often not documented in the problem list.  The care for complex patients was sometimes provided by nurses and physician extenders without physician collaboration.  Patients at high risk for STD were not consistently screened in accord with community standards.

3.1  <u>Was the inmate's chronic care follow-up visit completed as indicated and/or following 14 day health inventory if needed or as ordered? IP III C, G  (chronic medical conditions observed at intake will see medical provider within 5-7 days of arrival or next medical provider line); III G 2, 5  (requires 14 day health inventory & communicable disease screening).</u>  **No.** See 1.5 above. See also, ██████ ██████ ██████



3.2 <u>For patients on psychiatric medications: Was an inmate seen by the psychiatrist every thirty days until determined stable and then at least every 60 to 90 days?</u>  **Deferred to Mental health monitor.**

3.3 <u>Was the inmate's chronic care clinic interaction appropriately documented in the Subjective, Objective, Assessment, and Plan (SOAP) format on the progress note or on</u>

approved, standardized, condition specific Chronic Care Clinic form? IP III G 3,4.[23]  **No.**



3.4 <u>Are the patient's chronic medical/mental conditions and other pertinent problems recorded on the Patient Problem List? IP III G 4b (Chronic medical/mental conditions and other pertinent problems will be recorded on the Patient Problem List).</u>  **No.**

**Healthcare Inventory/Maintenance**  was  <u>not compliant</u> with the Implementation Plan.[24]

The initial health inventory called for by the Implementation Plan was often not performed within 14 days of admission.  STD screening ordered at the intake exam was often not performed for many weeks and on occasion not done at all before the patient was released.

4.1 <u>Did the inmate receive the  required 14- day health inventory and/or complete physical examination within six months of the date of incarceration? IP III I.</u> **No.**



4.2 -  <u>Did the physical examination include all the required components as listed in CFMG's Implementation Plan, Exhibit A? IP III I 3.</u>  **No.**

4.3 - <u>Were the findings of the physical examination (when performed) recorded on an approved CFMG'S physical examination form? IP III I 4</u>   **Yes.**

**Continuity of Care after Release**  was  <u>partially compliant</u> with the Implementation Plan. The EMR did not consistently document instructions for released inmates to ensure continued treatment of active or unresolved medical problems. Transfer forms were sometimes incomplete or inaccurate.

---

[23] See IP page 18, "…chronic care conditions will be managed pursuant to chronic care protocols and standardized procedures that are consistent with national practice guidelines."
[24] See discussion below suggesting modifications to the Implementation Plan to address duplicative IP requirements for health care screening at intake, health inventory, and chronic care visits.

5.1 <u>For inmates transferring to another detention/corrections system:</u>
<u>Was a Transfer of Medical Information form accurately completed for an inmate</u>
<u>transferring to another detention/corrections system?</u> IP III G J2; G 3b (4) c vi **No.**
████████  ████████  ████████  ████████ (inaccurately reports no STD testing done);
████████ (incorrectly states no treatment provided before
transfer)

5.2 <u>Was there a documented 30-day supply of medications provided to the patient upon</u>
<u>discharge? IP IX F (nursing and medical staff  will notify custody of the need to ensure</u>
<u>up  to 30 days supply of essential medication or a prescription upon release.</u>   **Yes.**
Exception ████████  ████████ (documentation of meds provided not found in the EMR)

5.3 <u>For an inmate who was released prior to resolution of a continuing medical/mental</u>
<u>health condition, was the referral to public health and/or community clinic completed by</u>
<u>the facility as appropriate? IP III G J2; G 3b (4) c vi (Chronic care includes discharge</u>
<u>planning in preparation for release and transfer of information);</u>   **No .** ████████ (no
documented instructions for wound care or hepatitis); ████████ and ████████ (no
documented instructions regarding new diagnosis of Syphilis); ████████ (no
documented instructions for new diagnosis of diabetes and uncontrolled hypertension);
████████ (no documented referral date for treatment of suspected ovarian cancer that
needs surgery ASAP); ████████ (Case 4, insufficient instructions and/or referrals to treat
chronic hepatitis C infection diagnosed at this admission).

5.4 <u>For an inmate who was released to community, was the inmate provided with</u>
<u>written instructions for the continuity of essential care?</u>  IP III G J2; G 3b (4) c vi  **No.**
See above, 5.3.


**Outside Referrals** were <u>partially compliant</u> with the Implementation Plan.

Appropriate specialty care, including laboratory testing and radiology was not
consistently provided in timely fashion.


6.1 - <u>For inmates referred to outside provider for higher level of care:</u>
<u>Did health care staff complete the CFMG's Medical Referral Form? IP III L.</u> **Yes.**

6.2 -  <u>If an inmate was referred to an outside provider for a higher level of care, was the</u>
<u>inmate seen within the time frame specified by the ordering physician? IP III A</u>
<u>(Medically necessary services which are not provided on site shall be made available by</u>
<u>referral… in accordance with community standards).  NCCHC Standards for Health</u>
<u>Services in Jails 2018 J-D-08 (standard of care services include appropriate and timely</u>
<u>access to necessary hospital and specialist care).</u> **No.** A great many cases are cited in
the attached exhibits wherein orders for STD screening, QuantiFeron (to rule out latent

TB) and other important laboratory studies were not performed for many weeks after requested or not performed at all.  Some radiological studies were not performed when requested. Examples of consultations not timely acquired include: ▮▮▮▮ (Case 17, dermatology consultation delayed for prolonged rash); ▮▮▮▮ (Case 18, delayed specialty eye exam needed promptly for acute vision loss); ▮▮▮▮ (Case 20, undue delay in sleep study appointment for patient with severe hypertension possibly caused by obstructive sleep apnea); ▮▮▮▮ (Case 21, recommended consultation with GI specialist to assess Crohn's disease is unduly delayed); ▮▮▮▮ (Case 22, ultrasound needed and recommended in progress note was not ordered); ▮▮▮▮ (diabetic eye exam not scheduled after complaint of vision loss in one eye); ▮▮▮▮ (inordinate delay in consultations to assess and treat possible ovarian cancer). ▮▮▮▮ (inordinate delay in consultation to podiatry for diabetic with unresolved foot pain).

6.3 - <u>For inmates transported to outside provider via ambulance, did the health care staff complete two medical referral forms, one for the hospital and one for the ambulance company?  IP III L2.</u>  **Unknown.** Ambulance transport is relatively unusual. The forms documenting ambulance instructions and activity are retained by custody and have not been provided to me.

6.4 - <u>Did the Medical Referral Form with recommendations for follow-up accompany the inmate upon his/her return from outside provider with appropriate follow up on these recommendations? IP III A, NCCHC Standards for Health Services in Jails 2018 J-E-09 (standard of care services include visit to jail health staff upon return from hospital or specialty visit to review recommendations)</u> **Yes. However, significant exceptions noted:** ▮▮▮▮ (a substantially different medication is provided in jail to inmate upon return from the hospital than had been recommended, without an explanation for change); ▮▮▮▮ (no apparent notification was provided to the inmate or action taken on lab test returned 10/18/25 showing the inmate has a either new syphilis infection or prior treated infection); ▮▮▮▮ (patient likely to have ovarian cancer does not have expedited care while incarcerated).

## Detoxification and Withdrawal Care was <u>partially compliant</u> with the Implementation Plan.

Patients displaying signs of withdrawal  (uncooperative, ataxia, abnormal vital signs) or described as overtly impaired were sometimes approved by intake nurses for housing in the general population (GP) before sufficient medical consultation ensured that such placement was safe. I found a few patients not followed by appropriate withdrawal protocols.

7.1 - <u>For inmates who were intoxicated at the time of booking into MCJ:
Was the inmate placed in the protective environment of the sobering cell for close observation by custody and health care staff? IP V.A. ("[patients] placed in the protective environment of the sobering cell will be under close observation by custody</u>

and health services staff."). **No.** ███████ (Case 8, 47-year-old male at risk for heart disease from meth/synthetics abuse was placed in GP even though described at intake as unstable, and afterwards elevated blood pressure not properly managed.); ███████ (Case 26, severe anxiety/panic not brought to PCP attention)

7.2 - For inmates who were intoxicated at the time of booking into MCJ: Did the medical staff document an assessment/evaluation of the inmate in the SOAP format? IP I C3 (Assessment shall include vital signs and inquiry into substance abuse including type/methods/amount/etc)  IP V.D. (note must provide following data _ or Subjective, Objective, Assessment and Plan). **Yes.**

7.3 - Was the appropriate alcohol withdrawal treatment protocol followed by medical staff based on the identified risk factors? IP V. **No.** ███████ (Case 11, pulse over 110 not repeated and not referred for PCP evaluation); ███████ (Case 13, refuses vital signs, not referred for PCP evaluation) ███████ (pulse 121 not repeated and not reported); ███████ (Case 28, vital signs not recorded or reported)

7.4 - Did the facility initiate an appropriate drug withdrawal treatment protocol based on the identified symptoms?  IP VI. **Yes**.  Exception ███████ (not enrolled in protocols despite acknowledged substance abuse)**;** also see 7.6 ███████ below.

7.5 - For inmates withdrawing from Opiates: In addition to taking vital signs and completing an assessment for dehydration, did the medical staff utilize the Clinical Opiate Withdrawal Scale to assess the inmate with history of opiate use and/or withdrawal? IP VI C. **Yes.**

7.6 - For inmates withdrawing from Opiates: Did the health care staff implement an appropriate opioid withdrawal monitoring and treatment/plan for an inmate withdrawing from opiates? IP VI C 1. **Yes**.  Exception: ███████ (patient abusing heroin - a short acting opiate – was enrolled in the protocol for long acting opiates)

7.7 - For inmates withdrawing from Benzodiazepines/Barbiturates: Prior to starting the withdrawal protocol, did the health care staff conduct an initial assessment of the inmate that included current symptoms, physical findings, and full vital signs? IP VI C 2. **No cases at issue.**

7.8 - For inmates withdrawing from Benzodiazepines/Barbiturates: Was the inmate seen by a medical provider within three days the Benzodiazepine and Barbiturate Withdrawal treatment was initiated? IP VI C 2. Page 58.    **No cases at issue.**

7.9 - For inmates withdrawing from Benzodiazepines/Barbiturates:Was the inmate seen by a psychiatrist or psychiatric nurse practitioner for evaluation within seven days the Barbiturate Withdrawal treatment was initiated.  **No cases at issue.**

7.10 - <u>If the inmate was using both alcohol and benzodiazepines, was the alcohol withdrawal protocol followed and was the inmate seen by a provider within three days? IP VI C 2. Page 58.</u> **No cases at issue.**


7.11 - <u>If the inmate was using both opioids and benzodiazepines, was the opiate withdrawal protocol utilized and the on-call provider contacted? IP VI C 2. Page 58.</u>  **No cases at issue.**


7.12 - <u>- If the inmate exhibited signs of severe drug withdrawal, was the patient immediately transported to the emergency room with notification of the on call medical provider as needed? IP I A, IP VI. See also MPP HCD 110-E-02 6.4 (Purpose of receiving screening is to identify patients requiring emergency treatment and wil will require immediate care upon entry to the jail).</u>  **No.** ███████ (Case 8, 47 year old male at risk for heart disease from meth/synthetics abuse was placed in GP even though described at intake as unstable, and afterwards elevated blood pressure not properly managed.);  ████████ (Case 26, severe anxiety/panic not brought to PCP attention); ███████ (Case 28, patient uncooperative and refusing vital sings not brought to MD attention).

## Communicable Disease Management (Tuberculosis and Methicillin Resistant Infections Control) was <u>partially compliant</u> with the Implementation Plan.


8.1 <u>Did the inmate receive appropriate STD  screening not later than 14 days after booking, and tuberculosis screening within seven days of inmate's admission to the facility? ( IP  1; III G 5</u> **No.**   A great many cases are cited in this report wherein STD screening and other lab tests are delayed or not performed at all despite orders.  See, e.g., ███████ (Case 9, mistakes negative Chest X ray as sufficient; no PPD in the EMR); ████████ (Case 17, QuantiFERON ordered but not performed); ███████ (Case 24, negative screening 6 months prior to admission mistakenly considered sufficient – tests required unless negative screening within 3 months).

8.2 - <u>For an inmate screening positive for active TB: Was the inmate seen by PCP and moved to an Airborne Infection Isolation room for isolation and further evaluation?</u>  **NA.** I did not see any such cases.

8.3 - <u>Were positive TB skin tests followed by X ray and/or QuantiFERON testing within 72 hours and consultation thereafter  regarding latent TB treatment options. or an inmate screening positive for active TB:</u> **Yes[25].**

---

[25] I report the occasional failure to perform and/or report ordered QF tests as lapses in outside medical referrals.  See 6.2, above.

8.4  - Did the facility contact the local public health department within 24 hours of inmate's positive TB symptom screen?  **NA.**   I did not see such cases.

8.5   Are inmates screened annually for signs and symptoms of tuberculosis with TB skin tests as indicated? IP VII H (screen for TB symptoms annually);  .  **Yes.** Exception: ██████ TB screening not done.


 **Pharmaceutical Administration and Dispensing** was  <u>partially compliant</u> with the Implementation Plan. I combine in this assessment a) medication storage/management.  and b) medication dispensing.

I observed some spilled OTC tablets loose in medicine cabinets, and incomplete titles on the narcotic logs.  These minor lapses were corrected while I was on site.  I will report in my finalized audit my review of quarterly inspections.

Nurses verify patient identities and confirm ingestion of dispensed drugs.  PCP counseling was documented for instances when patients refused prescribed medications.  I did not observe any lapses in medication administration while patients were out to court.

I observed four instances in which medications were not appropriately provided:  1) ██████ (Case 9)  - necessary thyroid medication was discontinued for no apparent reason; 2) ██████ (Case 15)  – Human Immunodeficiency Virus (HIV) treatment was interrupted for 5 days; 3) ██████ (Case 21)  - medication for Crohn's disease was delayed; and 4) ██████  – Nitrofurantoin was prescribed to treat a urine infection, but was not dispensed.

## Administration, Facilities,  Staffing and Quality Assurance Processes
were  <u>not compliant</u> with the Implementation Plan.

**Staffing – Administrative, PCP, RN, medical records, and support**  –  MCJ does not have a Medical Records Supervisor.  I am informed that vacant registered nurse and LVN positions have not been filled. A substantial backlog of unfinished items/tasks seems attributable to insufficient staff.

**Clinic Facilities –**  Wall-mounted ophthalmoscopes and otoscopes were non-functional in two clinic exam rooms. There was no ophthalmoscope/otoscope available in the

treatment room. [26]  Assessment of visual acuity with Snellen eye charts was often performed days or weeks following patients' complaints.

**Quality Assurance[27] –**

Physician Chart Review:

The Implementation Plan requires that "a minimum of ten percent (10%) of all [charted] protocol/standardized procedures [and/or] … treatment provided by a physician assistant, nurse practitioner and registered nurse …shall be reviewed and countersigned by the responsible physician."  IP page 14.  This directive was not followed.

Peer Review

Wellpath Monterey County California Policies & Procedures requires regular "assessment of a health care professional's compliance with discipline-specific and community standards." HCD-110_C-02, Clinical Performance Enhancement.  This directive was not followed.

Critical Clinical Events -

In accordance with national standards for monitoring critical clinic events (CCE, also known as "Sentinel Events") Wellpath instructs MCJ staff to timely refer for quality assurance review and possible corrective actions significant clinical matter.

I did not see documents showing CCE monitoring and/or reporting and/or corrective actions for the following cases in which MCJ patients were hospitalized:

████████    (Case 3 ) 34-year-old male **admitted to hospital** for presumed fentanyl overdose.

███████  (Case 4) 34-year-old male **admitted to hospital** for leg abscess.

██████   (Case 8)  47-year-old male **admitted to hospital** with heart attack following 10 days in jail with alarmingly high blood pressures.

███████  (Case 9) 42-year-old female determined to be hypothyroid at **hospital admission** on ██████ after thyroid medication had been in jail was discontinued for  no apparent reason.

████████  (Case 11) 55-year-old male **sent to hospital** more than a week after jail admission despite persistently elevated pulse rate suggesting blood loss during incarceration.

---

[26] Ophthalmoscopes are not being used at  MCJ by RN, PA or NP staff.
[27] Also referred to as "Quality Management" or "Quality Improvement."



_____ (Case 13) 47-year-old with delirium symptoms at admission, **sent to the emergency room** for psychosis 2 days later.

_____.  Case 14) 33-year-old male **treated at hospital** with apparent pancreatitis approximately 9 days after being prescribed ibuprofen and Zofran for abdominal pain and nausea.

_____ (Case 21)   59-year-old with Crohn's disease **requiring hospital care** for abdominal pain and bloody diarrhea three weeks after admission to MCJ.

_____  - (Case 22) 26-year-old female **admitted to the emergency room** for hypotension and  UTI,  2 weeks after jail admission and delayed care for pregnancy.

_____ (Case 27)  -  37-year-old male **admitted to emergency room** for incision and drainage of rectal abscess preceded by 2 months complaints in jail of bloody stools. .

## SUMMARY OF CASE REVIEWS [28]

I found the care was inadequate[29]  for 22 out of 30 patients described in Exhibit A (case reviews).

Case 1,  **Inadequate care.** 43 yo-male was admitted on ▆▆▆ after NMC clearance following a minor injury during his arrest.  His medical problems include homelessness, substance abuse (methamphetamines) and obesity (BMI 31). The chronic care visit and health care inventory visits  required by the IP were delayed.  He received no treatment for his Triglyceride level over 500. [30]  His eye complaint was not addressed with exam or Snellen chart screening.

Case 2  **Adequate**. 49 yo homeless male with a history of chronic Hepatitis C infection and poly substance abuse appeared to be under the influence or withdrawing but seemed medically stable for admission and housing with the General Population. I noted incomplete documentation of some delays in care.  But the patient suffered no harm.

Case 3 **Adequate care**. 34-year-old male was admitted ▆▆▆ with alcoholic liver disease and cirrhosis with deteriorated hepatic function confirmed by lab tests showing low platelets, elevated Pro Time and glucose intolerance.  His August hepatology

---

[28]  Please see Exhibit A for details.

[29] I deem medical care that does not comport with community standards and places a patient at substantial risk of harm to be "inadequate."

[30] Triglyceride levels over 500 should be treated to reduce risk for fatty liver and pancreatitis.

appointment missed when out to court was rescheduled for December 2025.
appointment when out to court.

Case  4.  **Adequate**. 34-year-old homeless male was admitted ▮▮▮▮  with opiate abuse disorder (OUD). He was sent to GP for Clinical Opiate Withdrawal Scale (COWS) monitoring, mental health referral, and routine Chronic Care. He was released without documented referral to treat his diagnosed hepatitis C infection.  His care was otherwise compliant with the Implementation Plan and without undue risk of harm.

Case  5    **Inadequate care.** 32-year-old female with polysubstance abuse and schizophrenia was admitted ▮▮▮▮  while refusing the usual intake process and without documented medical clearance for admission. Her vital signs were not recorded for nearly 24 hours after admission.  Many of her subsequent MCJ encounters were appropriately managed. However, TB testing was not done according to protocol. Chronic Care assessments were delayed and lab, including thyroid studies were delayed. Chart entries were not proofread for typographical errors.  The care provided to this patient did not meet IP requirements in all material aspects. There was no evident quality assurance process that identified and/or corrected lapses.

Case 6  **Inadequate care.** 64-year-old homeless male who had been repeatedly incarcerated at MCJ was admitted ▮▮▮▮  needing a walker 2 weeks after knee surgery.  He was admitted to (GP)  for usual mental health and medical visit.  However, The ADA form incorrectly stated he has no disability.  Evaluation of his red eye and blurred vision did not include Snellen testing.  Initial treatment of chronic leg pain with 50 mg of nortriptyline was a  dangerously high dose considering his BP of 90, age and frailty. There was no evident quality assurance process that identified and/or corrected lapses.

Case 7.  **Adequate care.** 47-year-old female admitted ▮▮▮▮  with history of alcohol abuse, schizophrenia and anxiety received medical attention for sports and work injuries.   Albuterol prescribed by the on-call PCP with marginal indications, and without sufficient PCP follow- up, caused no apparent harm.

Case 8.  **Inadequate care.** 47-year-old male described as angry and uncooperative was admitted on ▮▮▮▮ , needing detoxification from synthetics/meth abuse and detox, with uncontrolled blood pressure and elevated blood sugar.  He was sent to GP with synthetics monitoring,  routine referral for mental health and chronic care referral.    His blood pressure was not controlled after admissions.  Seriously elevated readings were also noted upon his hospital admission for chest pain ▮▮▮▮ , and upon his return ▮▮▮▮   This patient needed hospitalization on the day of admission when BP was 185/133.  Yet he did not see PCP in jail and had no lab done prior to his hospital admission 10 days after jail intake.

Case 9:  **Inadequate care.**  42-year-old female with hypothyroidism, was referred for routine chronic care when admitted ▮▮▮▮ .  Her thyroid medication was discontinued

improperly on ▮▮▮▮ before evaluation and laboratory tests. Her hypothyroidism was noted during her hospitalization ▮▮▮▮.  Her hypothyroidism was not reported in her transfer from MCJ to prison.  Her STD test results and TB status were inaccurately reported in the transfer form.  Chronic care was not provided.  Her problem list was incomplete.  Health care inventory was delayed.

Case 10.  **Adequate care.** 27-year-old male was admitted ▮▮▮▮ and referred to mental health.  He was uncooperative but did not seem overtly under influence of drugs or withdrawing.   His abdominal pain was promptly assessed.   STD screening was delayed but completed.  The positive chlamydia test was treated.

Case 11.  **Inadequate care.** 55-year-old male was referred at ▮▮▮▮ intake for chronic care and synthetics monitoring. His persistently elevated pulse at intake and afterwards was not referred for PCP evaluation.  His visit for chronic care was delayed despite persistent abnormal vital signs following admission.  He collapsed on ▮▮▮▮ after complaining about black stools and sent to the emergency room.  In the hospital his peptic ulcer, which was suggested by tachycardia in jail, was diagnosed and treated.

Case 12. **Adequate care.**  54-year-old male was admitted on ▮▮▮▮ on meds for hypertension.  An urgent hospital visit ruled out coccidiomycosis. His elevated blood pressure was monitored and treated.

Case 13. **Inadequate care.** 47-year-old male with admitted on ▮▮▮▮ with polysubstance abuse, bipolar, psychotic disorder  and agitation.  His pulse rate was 118.  He required a spit mask and was described as under the influence.  The on-call PCP cleared him for admission "based on vital signs."   He was referred to medical follow up. He remained uncooperative and refused vital signs on ▮▮▮▮ and ▮▮▮▮. He was  admitted to the hospital ▮▮▮▮ for psychosis and possible delirium.  He should have been hospitalized on ▮▮▮▮ or ▮▮▮▮ as he was unstable and not fit for admission to jail.  Delayed hospital care exposed this patient to inordinate risks for myocardial infarction, renal failure and suicide.

Case 14. **Inadequate care.**  33-year-old homeless male was admitted ▮▮▮▮ with methamphetamine abuse, colostomy and ureter tubes. . At intake he is described as under the influence.  He was entered into synthetics protocol with urgent medical consultation requested for "tomorrow." Medical evaluation was provided 4 days later. His persistent hypertension was not treated and was not entered into the problem list. Zofran was ordered on ▮▮▮▮ for abdominal pain and nausea with no physical examination.  He was admitted to the hospital 9 days later with severe pain, diagnosed with UTI and pancreatitis.  Nausea and abdominal pains were not properly assessed on ▮▮▮▮.  Urology consultation was delayed.  HIs discharge instructions were incomplete.

Case 15. **Inadequate care.** 34-year-old male transferred from prison on ▮▮▮▮, prescribed buprenorphine for opiate use disorder (OUD), with HIV infection under

treatment.  His bridge order for HIV meds administered from  to ███ was not refilled until ███ so he went 5 days without HIV meds.  NP exam on ███ did not address missing lab work.  This patient should have been followed by the infectious disease specialist on site at MCJ.  Health inventory forms were not used.

Case 16. **Adequate care**. 35-year-old male admitted ███ with OUD had labs ordered but not drawn.  The patient's refusal of labs was documented.  ADA form was not filled out. The care otherwise met IP requirements, and the patient suffered no harm.

Case 17  **Inadequate care**. 30-year-old obese (BMI 37) homeless male with OUD released from Wasco State Prison on ███, was admitted ███ to MCJ. Records from Wasco did not report TB status.  The QuantiFERON test scheduled at MCJ was not done.  Persistent rash appeared to have been mistreated at MCJ without timely specialist consultation.  The assessment regarding his complaint of bloody stool was incomplete and inadequate. Drug screens ordered for MAT were not timely done. Problem list was not updated. Repeated visits to onsite physicians did not address the lapses described.

Case 18. **Inadequate care.** 59-year-old diabetic male was admitted to MCJ for one day  and again on ███. Medical care fell below applicable community standards: 1) BP was not properly controlled. 2) eye exam was unduly delayed until ███ for diabetic with vision impairment, clouding of anterior chamber, unknown intraocular pressure 3) chronic care and health inventory were delayed and incomplete. Retinal specialty care requested by the eye specialist on ███ has not been scheduled as of December 31, 2025.

Case 19 **Inadequate care**.  52-year-old homeless female with history of chronic hepatitis C infection, prior deep vein thrombosis, and gastro-intestinal bypass.  There was undue delay in performing chronic care exam and health inventory. The prescription of clonidine for A single episode of high blood pressure was contrary to medical standards and unnecessarily exposed the patient to risk of harm by hypotension or rebound hypertension. Zofran ordered for dubious complaint of abdominal pain (10/10) without nausea was off-label and contrary to best practices.

Case 20. **Inadequate care**. 41-year-old male on dialysis was admitted to MCJ on ███.  MD oversight was insufficient as this patient did not have adequate attention to his out-of-control blood pressure and was thus unduly placed at high risk for stroke, heart damage. Chronic care and follow up from specialty care was not in substantial compliance with the IP.

Case 21.  **Inadequate care**. 59-year-old obese male with Chron's disease treated with medications known from prior MCJ admissions was readmitted to MCJ on ███ at which time he reported unknown meds and synthetics abuse. He was referred for MH, and routine chronic care. His Crohn's disease medications were not

prescribed/continued at intake. His chronic care visit and necessary medications were delayed.  His symptoms flared and required hospitalization.  Hospitalization was avoidable by continuing his medications at admission to MCJ.  Consultation needed to properly treat this patient was not provided.

Case 22  **Inadequate care.** 26-year-old female was admitted ███████ with 13 1/2 weeks intrauterine pregnancy. Her obstetrics care was inordinately delayed.  Chlamydia and trichomonas infections were not treated timely. Chronic care visits were incomplete without lab review. Antibiotics were unnecessary to treat a purported infection considering the normal urine analysis on ████████. Tylenol was not needed as patient had no pain.[31] Ultrasound was not ordered timely and not done timely.

Case 23 **Inadequate care.** 28-year-old female was admitted June 26, 2025, with clearance after reported head injury, and alcohol abuse. No referral to monitor alcohol withdrawal symptoms was made at Intake. She received no chronic care or health inventory assessments.  Her problem list was incomplete. She had inadequate access to medical care for her complaint of sore throat which was unnecessarily treated with an antibiotic.

Case 24 – **Inadequate Care.** 34-year-old male admitted █████████ complained about pain at his hernia site.  He recalled not having a full course of treatment for previously diagnosed syphilis. Chronic care exam was not performed.  His problem list was not updated.  Tests for syphilis and TB were not updated. MCJ did not schedule general surgery to evaluate his hernia.

Case 25 – **Inadequate Care.** 69-year-old was admitted to MCJ on █████████ with chronic pain on medications for diabetes, hypertension and hyperlipidemia. His medications were not verified or ordered until 5 days after admission. Chronic care and health inventory visits were incomplete:  1) extent of substance abuse was not described, 2) no diabetic eye or foot exam was documented or referred out for specialty care, 3) laboratory tests were not timely reviewed, and 4) problem list was empty. Alarming lab results on ████████ included significantly elevated serum Potassium (5.8).  This reading, if accurate and not corrected, can lead to complications including death.  The hemoglobin A1C 11.6 result indicated poor diabetes control in past three months and should have been repeated.

Case 26 – **Inadequate Care.**  58-year-old male was admitted ████████ with methamphetamine abuse and severe obesity.  His blood sugar was not tested on admission.  There was no referral at intake for CC or routine medical visits.  The withdrawal protocol was not followed as MD was not notified of patient's severe anxiety and panic. Chronic care and health inventory visits were delayed more than a month

---

[31] All non-essential drugs, including medications available over the counter, should be avoided during pregnancy.

after intake.  His complaint of blurry vision in the right eye was not adequately assessed.  There was no fundoscopic exam or eye specialty referral.

Case 27 – **Inadequate Care.**   37-year-old male with methamphetamine abuse and thrombosed hemorrhoids was sent to the ER for drainage of peri rectal abscess.  Prior to being sent to the hospital his pain and bleeding from rectum for months was inadequately assessed.

Case 28 – **Inadequate Care.**  59-year-old alcoholic male booked after jail check, was described as intoxicated and referred for emergency mental health and medical consultations for high CIWA score (14).  Chronic care was not provided.   The problem list was not updated to show alcoholism.  2000 mg of Tylenol daily was prescribed without lab tests to establish safety of this prescription in context of possible hepatic dysfunction associated with alcohol abuse.[32]   He was also prescribed nortriptyline without justification. The EMR has no lab or STD screening, and no documentation of informed consent for the patient's refusal of lab testing.

Case 29 – **Inadequate Care**. 36-year-old male admitted ▮▮▮▮with alcoholism, depression on psych meds was referred to CIWA, chronic care and mental health care. Chronic care and progress notes are incomplete.  Treatments are recommended without evidence of need.

Case 30 – **Adequate Care.** 43-year-old male was admitted ▮▮▮▮with prediabetes. STD screening is delayed more than one year after intake.  But care was otherwise adequate with no harm to the patient.

## OTHER NOTABLE CASES  –



▮▮▮ ▮▮▮▮ – Pulse rate measured during dizzy spell was 145, not repeated and not reported to on call PCP.

▮▮ ▮▮▮  –57-year-old patient with blood in stool wss not referred for colonoscopy to rule out colon cancer .

▮▮ ▮▮▮▮ – Patient housed in infirmary to control psychogenic polydipsia has chronic hepatitis C with high viral count.  There was no chronic care visit or assessment of need for treatment of hepatitis. Chronic hepatitis C can aggravate mental illness.

▮▮ ▮▮▮▮ – 47-year-old female informed the intake nurse on ▮▮▮ of that she had been diagnosed with ovarian cancer at Fresno before transfer to MCJ.  Review of medical records show ovarian cancer was suspected in radiological studies on ▮▮▮ . The patient was seen by gynecology oncologist on ▮▮▮ who recommended surgery.

---

[32] 2,000 mg daily is upper limit for adults with liver disease or regular alcohol use.  But even this dose may be too high if the extent of liver disease is unknown.

The patient was released from jail on ████ .  On ████ major cancer surgery was scheduled for ████ as an outpatient, same day procedure.  This patient needed hospital admission for cancer surgery shortly after intake.  The patient was released from MCJ with no documented instructions, and with no apparent advocacy from MCJ PCP to obtain appropriate and timely care for her ovarian cancer.

████ ████  -   29-year-old female was prescribed Nitrofurantoin by the on-call PCP. But the medication was not dispensed to the patient.  There was no follow up to ensure resolution of the apparent infection. No STD screening was done during the patient's 4 month-long incarceration.

## PATIENT DEATHS, since June, 2025 – None reported.

## PLAINTIFFS' INQUIRIES AND COMMENTS

Plaintiffs' attorneys have raised the following concerns:

| Plaintiffs' expressed concerns | Expert Medical Monitor Response |
|---|---|
| Is medical staff sufficient to meet sick call requests and meet the need for follow up to patient complaints? | Staffing is not adequate in numbers or deployment to provide needed attention to patients' requests for services and for follow up to patient complaints. This circumstance appears to have caused an increase in backlogged  tasks. |
| Did patients require emergency services because their conditions were not adequately managed in the jail? | This audit reports emergency room visits and hospitalizations that followed care in the jail that departed from Implementation Plan requirements. See above. |
| Are medications adequately administered? | Inmates' complaints about pain medication or medical therapy are usually addressed appropriately by medical staff. However, this audit describes four significant unnecessary interruptions in medication administration. |
| Are MCJ inmates contracting Hepatitis A infections while incarcerated? | Most MCJ inmates have antibodies to Hepatitis A that indicate a prior infection or immunity from vaccination.  I found no evidence of lapses in sanitation have caused any new infections in the jail. |
| Are health care visits conducted with appropriate safeguards for patient confidentiality? | The white noise machine at the Intake area that seemed to have fallen off its mooring was replaced and activated when I toured the facility.  Custody appeared to be in reasonable proximity to inmates undergoing medical care only as needed to ensure safety.  I saw no indication that MCJ custody |

|  |  |
|---|---|
|  | officers eavesdrop or have any inappropriate interest in inmates' medical concerns. |
| Is the new director of  nursing and implementation plan specialists able to monitor and maintain compliance with the Implementation Plan? | The new director of nursing installed about two weeks before my site visit has worked at MCJ for years. He appears to have an excellent understanding of the challenges in meeting Implementation Plan requirements.  I understand a new vendor for medical services will be appointing its specialist for monitoring compliance with the Implementation Plan.  I anticipate meeting with new medical care services management before submitting my finalized audit report. |
| Are inmates exposed to inordinate stress from heat and poor ventilation. | Based upon my site visit or review of many medical records it appears temperature control and ventilation is not problematic at MCJ. |

## STAFF INTERVIEWS

I discussed with staff my observations that lapses noted in the prior audit have not been corrected.

1. Quality Assurance processes do not meet requirements for Implementation Plan and fall short of community standards.  I was not provided with documentation to show investigation and corrective action for cases that require CCE (critical clinical event) reviews.  I did not see formal annual reviews for all nurses and PCPs employed at MCJ.  MCJ did not show me month-to-month documentation of PA and NP encounters signed by the Medical Director or physician designee.
2. Clinic facilities did not have functional otoscopes, ophthalmoscopes and clocks.
3. Clinicians do not generally look for the results of the lab tests they ordered. Many tests are delayed or not performed.   MCJ does not automatically return lab results to the clinicians who ordered the tests.
4. The MCJ medical director, Wellpath supervisors and/or designees do not routinely inspect all hospital visits/admissions, grievances and other potential critical clinical events.
5. The newly developed discharge form should be used for all patients released to the community.  The form for transfers to other facilities should accurately communicate the inmate's significant medical conditions.
6. Medical staff did not regularly access on-line resources to support clinical decisions.

//

## INMATE/PATIENT  INTERVIEWS -

I interviewed 3 female inmates and 4 male inmates.  They did not report problems with their own medical care, or problems they knew of for others.

## RECOMMENDED CORRECTIVE ACTIONS

### Deficiency

### Recommendation

| Deficiency | Recommendation |
|---|---|
| Intake processes did not comply with the IP.   Intake nurses approved housing patients in the general population who were described as under the influence. Medications taken before admission were  sometimes not continued. Medical care ordered "urgently" or "next day"  was not consistently provided timely. | Staff should aim for 100% compliance in seeking jail clearance and/or PCP authorization before housing admission with alarming vital signs or other signs of acute illness.  MCJ should designate a pharmacy manager on site or available 24/7 to deliver the necessary medications. |
| Access to care is not sufficient to meet the demands.  Clinic facilities are not used efficiently. Care provided by RN, PA and NP are not reviewed by supervising physicians in the manner required by the IP. Encounters without physical examination do not satisfy IP requirements. | **Daily "huddles" and weekly staff meetings should address areas of concern raised in this report, including but not limited to:**<br>-requirements for admitting patients with unstable medical or mental conditions:<br>-withdrawal flow sheet vital sign frequency and PCP notification<br>-STD testing, and lab follow up responsibility<br>-prompt OB referrals<br>-avoid inappropriate/unnecessary antibiotics<br>-proper use of exam table, ophthalmoscope and other medical equipment.<br>-how computers improves patient care and record keeping<br>-appropriate off label uses for Zofran<br>-treating seriously elevated blood pressure<br>-evaluation of vision complaints.<br>**Nurses, Nurse Practitioners, and Physician Assistants should regularly request consultation by the medical director to assist in treatment of cases beyond non-physician expertise.** |
| Chronic care and health care maintenance did not consistently comply with the IP. The problem | MCJ needs to assess and improve accuracy of problem lists. National guidelines from CDC and United States Preventative Services Task |

| | |
|---|---|
| lists were not up to date. Patients with long standing drug abuse diagnoses did not always receive needed attention from PCP after booking.  The mental health team and medical providers are not collaborating to develop a treatment plan for patients with comorbid medical and mental health issues. Direct ophthalmoscopy has not been performed on site, even when visual acuity is very poor and for diabetics. | Force (USPSTF) should be incorporated (as practicable) into the chronic care and health maintenance protocols.  Best practices can be researched by accessing UpToDate and other authoritative resources using office computers. Mental health and medical teams should meet weekly to discuss the most challenging patients and develop multi-disciplinary treatment plans. Patients with diabetes or visual complaints should have a direct ophthalmoscopic exam and Snellen visual acuity check on site and be scheduled to see optometry according to the findings. Diabetic foot exams should be documented and/or referred to podiatry when needed.  Persistent foot pain should be managed as diabetic neuropathy. |
| Continuity of Care after Release did not Comply with the IP. Documentation of care for released patients did not meet Implementation Plan requirements or applicable community standards. | Discharge planning should document instructions given to all inmates released with active medical problems.  Transfer forms should be audited to ensure completeness and accuracy. |
| Patients are not timely assessed for STD in accord with best practices and community standards.  TB screening needs is not consistently done on all inmates at admission who did not have negative testing within the past 3 months. Necessary lab tests are not timely performed and abnormal results are not promptly acted upon. | STD screening and other needed lab tests should be performed timely after ordered by PCP.  Staff should be reminded that the IP requires TB screening when prior testing was more than 3 months before intake. Admissions with negative tests 6 months before intake still need a new TB screening. Abnormal lab results (especially positive STD screens) should be reported to the ordering PCP and/or medical director for prompt action. |
| Patients are not consistently provided with necessary specialty care. | Leadership should assist MCJ staff to obtain timely expert care by telephone or video link if local resources are insufficient. The medical record department should ensure that requests for specialty care are processed promptly. |
| Quality assurance programs were not performed in accordance with Wellpath policies and the Implementation Plan. Peer review has not been documented. | Peer review should include an evaluation of clinical performance within the first month of hire and no less than annually thereafter.   The medical director or assignee should audit and countersign  10% of the patient encounters with physician assistants, nurse practitioners and |

| | registered nurses. Critical Clinical Events should be submitted for analysis and action as required by applicable Policies & Procedures. The medical director or assignee should review all  hospital admissions and all patient grievances. |
|---|---|
| MCJ Staffing is not in substantial compliance with the Implementation Plan. | MCJ needs to hire a full-time medical records supervisor, Open nurse and LVN positions should be filled with qualified professionals as soon as possible.  Additional physician staff may be needed to address backlogs and instruct non physician staff. |

## DISCUSSION and CONCLUSIONS

Notwithstanding the many examples of adequate and considerate medical care, this audit observed delayed clinical assessments, insufficient screening for communicable disease, delays in specialty services, inattention to alarming laboratory findings, inattention to abnormal vital signs, departures from withdrawal protocols, inaccurate transfer documents, and incomplete counseling upon release.  Medical services by nurses, nurse practitioners and physician assistants provided without physician consultations at times exceed their expertise and legal scope of practice.

The Settlement Agreement makes clear that substantial compliance cannot be found unless MCJ has "instituted policies, procedures, practices, and resources that are capable of durable and sustained compliance." Settlement Agreement page 2, paragraph 10.  However, I found many instances of deficiencies that were also identified in prior audits.  For this reason and as stated above, MCJ is not in substantial compliance with the requirements for medical care under the Implementation Plan.

Table 6 – Comparison of MCJ Performance in October 2025 and April 2025.[33]

| IP Categories | % Encounter Compliance April 2025 | % Encounter Compliance October 2025 | % Indicator Compliance April 2025 | % Indicator Compliance October 2025 |
|---|---|---|---|---|
| Med Staff | See text | See text | NA | NA |
| Intake | 55.7 | 49.4 | 88.5 | 85.4 |
| Access | 67.4 | 71.4 | 75.4 | 80.0 |
| Chronic Care | 58.8 | 35.4 | 78.5 | 51.4 |
| Health Inventory | 56.4 | 47.6 | 72.1 | 64.1 |

---

[33] See methodology above for discussion about how compliance is determined for encounters versus compliance indicators.

| Continuity | 60.0 | **51.5** | 66.7 | **62.0** |
|---|---|---|---|---|
| Outside Care | 69.7 | **67.5** | 78.0 | **86.4** |
| Detoxification | 69.4 | **72.7** | 88.6 | **90.7** |
| TB/Infection | 53.5 | **84.7** | 78.7 | **91.0** |
| Pharmacy Management | 62.5 | **71.4** | 66.7 | **80.0** |
| Medication Dispensing | 100.0 | **100.0** | NA | **NA** |
| QA | Partially Compliant | **Not Compliant** | NA | **NA** |
| Facilities | Partially Compliant | **Not Compliant** | NA | **NA** |
| **TOTALS** | 62.5% | **65.2** | 79.6% | **78.0%** |

I reiterate the following recommendations for MCJ actions to bring medical services into substantial compliance with the Implementation Plan:

- Screen all inmates for STD and TB in accordance with Implementation Plan guidelines. Track and treat all significant results from the screening.
- Complete accurate forms at Intake, sick calls, chronic care, transfer and release. Update Problem Lists
- Obtain jail clearance or explicit PCP authorization before admitting intoxicated persons to jail.
- Provide timely specialty referrals and act promptly in accordance with specialists' reports from outside care.
- Promptly review all emergency room admissions and other critical clinical events to determine adequacy of care and/or need for corrective actions.
- Review all grievances as soon as practicable to identify possible departures in care required by the Implementation Plan required.
- Document review by Medical Director or designee of 10%  of nurse and physician extender (PA, NP) encounters and provide appropriate training to improve performance.
- Modify intake documentation to promote effective health inventory and chronic care visit documents.  The current MCJ process seems inefficient and unduly burdensome to staff.


## Attachments:

Ex. A:  MCJ HC Case Review

Ex. B:  MCJ HC Audit Monitoring Tool (targeted)

Ex. C MCJ HC Audit Monitoring Tool (randomly selected)