MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
VAN SWEARINGEN – 259809
CAROLINE E. JACKSON – 329980
MAYA E. CAMPBELL – 345180
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104
Email:      mbien@rbgg.com
             egalvan@rbgg.com
             vswearingen@rbgg.com
             cjackson@rbgg.com
             mcampbell@rbgg.com

CORENE KENDRICK – 226642
KYLE VIRGIEN – 278747
ACLU NATIONAL PRISON PROJECT
425 California St., Ste. 700
San Francisco, CA 94104
Telephone:   (202) 393-4930
Facsimile:   (202) 393-4931
Email:      ckendrick@aclu.org
             kvirgien@aclu.org

AVRAM D. FREY
(*admitted pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:   (415) 621-2493
Facsimile:   (415) 255-8437
Email:      afrey@aclunc.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE HERNANDEZ et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; MONTEREY COUNTY SHERIFF'S OFFICE; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED., a California corporation; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 5:13-cv-02354-BLF<br><br>**NOTICE OF FILING OF MENTAL HEALTH NEUTRAL MONITOR REPORT**<br><br>Judge:  Beth Labson Freeman |

Pursuant to this Court's September 26, 2023 Order Granting Plaintiffs' Motion to Enforce Settlement Agreement, Dkt. No. 838 at 27, the parties hereby respectfully submit the 20th medical care neutral monitor dental report prepared by Dr. E. Carolina Montoya (received by the parties on January 28, 2026) (**Exhibit A**).

In accordance with this Court's prior orders, Dkt. Nos. 802, 819 & 867, and the parties' filing of previous neutral monitor reports, the parties reviewed the report and identified no information requiring redaction.[1]

Respectfully submitted,

DATED:  February 4, 2026

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Maya E. Campbell*

Maya E. Campbell

Attorneys for Plaintiffs

DATED:  February 4, 2026

GORDON REES SCULLY MANSUKHANI

By:  */s/ Allison J. Becker*

Allison J. Becker

Attorneys for Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC.

---

[1] Such information includes: incarcerated persons' names, dates of birth, and booking numbers, (initials are used to identify deceased class members) and the names of health care staff employed by CFMG/Wellpath, who are directly involved in providing or supervising patient care at the Jail are generally redacted from neutral monitor reports.

1  DATED:  February 4, 2026

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNTY COUNSEL, COUNTY OF
MONTEREY

By:  */s/ Ellen S. Lyons*
     Ellen S. Lyons
     Deputy County Counsel

Attorneys for Defendants COUNTY OF
MONTEREY and MONTEREY COUNTY
SHERIFF'S OFFICE

# Exhibit A

**Hernandez et al. v. County of Monterey**
**Settlement Agreement**
**Case No. CV 13 2354 PSG**

**First Status Report**

**E. Carolina Montoya, Psy.D.**
**Miami, Florida**

**January 26, 2025**

**Overview**

This document addresses the provisions of the Hernandez et al. v. County of Monterey Settlement Agreement (SA) assigned to Dr. E. Carolina Montoya as the Mental Health Neutral Monitor. Monitoring addresses the Monterey County Jail's (MCJ) status and progress toward compliance with the United States District Court Northern District of California SA and the Implementation Plans between Plaintiffs Jesse Hernandez et al. and Defendants, County of Monterey; Monterey County Sheriff's Office, and California Forensic Medical Group, Inc (CFMG) et al. Additionally, on September 26, 2023, the Court issued an Order Granting Plaintiffs' Motion to Enforce Settlement Agreement and CFMG Implementation Plan which identified a range of requirements found to be in noncompliance.

The rating period for this report covers information obtained and reviewed for the period April 1st through July 30th, 2025. The report also addresses the findings of a site visit conducted on August 25¨26, 2025. The site visit was the first for this Monitor, having assumed the duties in July 2025. The two-day tour was attended by attorneys for the County, Plaintiffs, CFMG and MCJ staff, and entailed a tour of the facility and discussions surrounding numerous operational/performance areas in the SA and Implementation Plans.

This report builds upon the efforts towards compliance with the SA and Implementation Plans that have been occurring since 2015 and reported by the two prior mental health Monitors, Dr. Kerry Hughes and Dr. James Vess. For perspective and continuity, Dr. Vess's last report dated February 25, 2025, was considered for monitoring compliance in this report.

Following Dr. Vess's leave-taking, no monitoring was conducted between November 2024 and July 2025 in the absence of an assigned Neutral Monitor. When I assumed the role in July, I determined that my first monitoring report would cover a reasonable portion of the period, specifically from April through July 2025 but performance between the months of November 2024 and April 2025 would not be assessed. However, following this report, there will be no lapses in the review timeline.

It is important to note that this report is essentially this Monitor's baseline evaluation of the SA compliance efforts. Some requirements have been rated in Substantial Compliance for the first time. Some requirements rated in Substantial Compliance in this report have also been rated in prior reports as being in Substantial Compliance. However, no recommendations for releasing provisions from monitoring are being made at this time due to the lack of consistent monitoring since November 2024.

In this report, the specific provision language is presented followed by this Monitor's findings and recommendations. Connected provisions have been combined for this status report. However, several will likely be separated in future reports as compliance and monitoring efforts progress. Additional recommendations may also be added in subsequent reports as monitoring continues.

Compliance ratings for this report have been applied in a manner consistent with Dr. Vess's descriptions in the last report (February 2025). Specifically:

- "Substantial Compliance" (SC) as stated in the SA means "adherence to the requirements of the SA and the Implementation Plans in all material respects, recognizing that 100% compliance is not required.  Non-systematic deviations may be present and do not prevent a finding of Substantial Compliance, provided that the Defendants demonstrate that they have (a) implemented a system for tracking compliance, where appropriate and practical, and for taking corrective measures in response to instances of non-compliance, and (b) that Defendants have instituted policies, procedures, practices, and resources that are capable of durable and sustained compliance."

- "Partial Compliance" (PC) typically indicates that the responsible party has achieved compliance on some, but not all, of the material components of the relevant provision of the Settlement Agreement, has made notable progress in achieving compliance but work remains to reach Substantial Compliance. Determinants for the rating of Partial Compliance will vary from provision to provision given the nature of the issues, e.g., qualitative vs. quantitative measures of compliance. But, irrespective of the compliance measure, the responsible party will have demonstrated efforts and practices that are consistent with efforts to fulfill the provision requirements.

- "Non-Compliance" (NC) indicates that the responsible party has not met most or all components of the relevant provision and/or made no notable progress in achieving compliance on any of the key components of the provision.

**Methodology**

Given that this is this Monitor's first report, the findings presented in this report are primarily based upon healthcare record reviews, i.e., direct review of information in CorEMR, the CFMG electronic health record, documentation provided by CFMG and MCJ and conversations with CFMG and MCJ leadership . Some observations from the brief tour in August have also been incorporated into the findings along with information obtained during the tour from CFMG and MCJ staff.

CFMG has provided the results of a monthly internal monitoring process that is aligned with many of the Implementation Plan requirements. Where appropriate, the results of these internal audits are presented in the current report. Monthly reports were considered individually and collectively for trends. Following Dr. Vess's process for conducting compliance reviews, it is important to note that findings about compliance in the current report were not based on the results of CFMG's internal audits alone for any of the requirements subject to monitoring. Portions of the samples used in the internal audits were reviewed to verify the results reported by CFMG, and additional cases were reviewed, which were not included in the internal audit samples, to further assess the current level of compliance. For each of the requirements where internal audit data and/or review of inmate records was reviewed in reaching a determination of compliance, the number of records reviewed and how they were selected are described in the body of the current report. To assess the reliability of the samples drawn for review by CFMG, the sampling process (i.e., parameters)

used for each of the Implementation Plan requirements was reviewed. That is, CFMG was requested to provide the variables for each of the "population pulls" and to describe the audit process and how scoring was for compliance was conducted. This review found the parameters for the numerous samples to be appropriate.

From within the monthly internal audit samples, cases were randomly selected for review/verification to assess whether findings agree with those reported in the agency's audit results. Additional cases falling outside the CFMG audit samples were also selected and reviewed to assess compliance and consistency with the results of the CFMG monthly audit samples. Cases reviewed which fell outside the monthly CFMG audit samples were drawn randomly from larger lists of relevant cases which met the selection criteria for the requirement under consideration, i.e., from the population of relevant cases other than those selected by CFMG for their monthly audit samples. Over 350 charts were reviewed in the preparation of this monitoring report both in the process of confirming the findings of CFMG as well as the additional, independent audit reviews.

The following table presents the compliance status of the various requirements for this period and, for comparison purposes, the last four reporting periods. Letters identifying each requirement correspond to letters listed in the body of the report under the major requirement sections, which are numbered. Ratings consist of SC for Substantial Compliance, NC for Noncompliance, and PC for Partial Compliance. Some ratings have been deferred for reasons explained in the report, and some have been released from monitoring.

| Provision | Report | | | | | Page # |
|---|---|---|---|---|---|---|
| | 5/2023 | 11/2023 | 4/2024 | 11/2024 | 1/2026 | |
| 1. Intake Screenings | | | | | | |
| a. | SC | Released | Released | Released | Released | 7 |
| b. | SC | Released | Released | Released | Released | 7 |
| c. | SC | Released | Released | Released | Released | 7 |
| d. | SC | Released | Released | Released | Released | 7 |
| e. | NC | NC | PC | PC | PC | 7 |
| f. | NC | NC | PC | PC | PC | 8 |
| g. | NC | NC | PC | PC | SC | 10 |
| h. | NC | NC | NC | PC | PC | 11 |
| 2. Mental Health Screen | | | | | | |
| a. | NC | NC | NC | NC | PC | 12 |
| b. | NC | PC | SC | SC | SC | 13 |
| 3. Sick Call | | | | | | |
| a. | SC | Released | Released | Released | Released | 14 |
| b. | SC | Released | Released | Released | Released | 14 |
| c. | SC | Released | Released | Released | Released | 14 |
| d. | NC | NC | NC | PC | PC | 15 |
| e. | NC | NC | PC | PC | PC | 15 |
| 4. Chronic Care | | | | | | |
| a. | NC | NC | NC | NC | SC | 16 |
| b. | NC | PC | SC | SC | SC | 17 |
| 5. Acute Care | | | | | | |
| a. | NC | NC | NC | NC | SC | 18 |
| b. | NC | SC | SC | SC | SC | 19 |
| 6. Outpatient Services | | | | | | |
| a. | NC | PC | PC | PC | PC | 19 |
| b. | NC | PC | PC | PC | PC | 19 |
| 7. Safety & Sobering Cells | 8 | | | | | |
| a. | SC | Released | Released | Released | Released | 20 |
| b. | NC | Not Rated | PC | PC | PC | 20 |
| c. | Deferred | PC | SC | SC | SC | 21 |
| d. | SC | SC | SC | SC | SC | 22 |
| e. | SC | SC | SC | SC | SC | 22 |
| f. | SC | SC | SC | SC | SC | 22 |
| g. | NC | NC | NC | NC | PC | 22 |
| h. | Released | Released | Released | Released | Released | 23 |
| i. | SC | SC | SC | SC | SC | 23 |
| j. | SC | NC | SC | SC | SC | 24 |
| 8. Medication Continuity | | | | | | |
| a. | Released | PC | NC | PC | PC | 25 |
| b. | Released | PC | NC | PC | PC | 26 |
| c. | NC | PC | SC | SC | SC | 26 |
| 9. Discharge | | | | | | |
| a. | Released | Released | Released | Released | Released | 27 |
| b. | Released | Released | Released | Released | Released | 28 |
| 10. Involuntary Medication | | | | | | |
| a. | SC | SC | SC | SC | SC | 28 |
| b. | SC | SC | SC | SC | SC | 28 |
| c. | SC | SC | SC | SC | SC | 28 |
| d. | NC | PC | PC | PC | PC | 29 |

| Provision | Report | | | | | Page # |
|---|---|---|---|---|---|---|
| | 5/2023 | 11/2023 | 4/2024 | 11/2024 | 1/2026 | |
| e. | NC | Deferred | Deferred | Deferred | SC | 29 |
| f. | NC | Deferred | Deferred | Deferred | SC | 30 |
| g. | NC | Deferred | Deferred | Deferred | PC | 30 |
| h. | Deferred | Deferred | Deferred | SC | SC | 31 |
| 11. Medication Refusals | | | | | | |
| a. | NC | NC | NC | NC | NC | 31 |
| 12. Clinical Staffing | | | | | | |
| a. | NC | NC | NC | NC | NC | 32 |
| b. | NC | NC | NC | NC | PC | 32 |
| c. | NC | NC | NC | NC | NC | 33 |
| d. | SC | SC | SC | SC | SC | 33 |
| 13. Mental Health Training | | | | | | |
| a. | SC | Released | Released | Released | Released | 34 |
| b. | Released | Released | Released | Released | Released | 34 |
| c. | Released | Released | Released | Released | Released | 34 |
| d. | SC | Released | Released | Released | Released | 34 |
| e. | Released | Released | Released | Released | Released | 34 |
| 14. Restraint Chairs | | | | | | |
| a. | Released | Released | Released | Released | Released | 34 |
| b. | Released | Released | Released | Released | Released | 34 |
| c. | SC | SC | SC | SC | SC | 35 |
| d. | SC | Released | Released | Released | Released | 35 |
| 15. Use of Force | | | | | | |
| a. | SC | SC | SC | SC | SC | 35 |
| b. | SC | SC | SC | SC | SC | 35 |
| 16. Mental Health Grants | | | | | | |
| a. | Released | Released | Released | Released | Released | 36 |
| 17. Inmates IST | | | | | | |
| a. | NC | NC | NC | NC | PC | 36 |
| 18. Treatment Plans | | | | | | |
| a. | NC | PC | PC | PC | PC | 37 |
| b. | NC | PC | PC | PC | PC | 37 |
| c. | NC | PC | PC | PC | PC | 37 |
| d. | NC | PC | NC | NC | NC | 38 |
| 19. Inmate Discipline | | | | | | |
| a. | NC | NC | NC | NC | PC | 38 |
| 20. Space Issues | | | | | | |
| a. | SC | Released | Released | Released | Released | 39 |
| 21. Administrative Segregation | | | | | | |
| a. | NC | NC | NC | NC | PC | 39 |
| b. | NC | NC | NC | NC | PC | 39 |
| c. | SC | SC | SC | SC | SC | 41 |
| d. | NC | SC | SC | SC | PC | 41 |
| e. | NC | NC | PC | PC | PC | 42 |
| f. | Deferred | PC | SC | SC | SC | 42 |
| g. | Deferred | PC | SC | SC | SC | 43 |
| h. | SC | SC | Not Rated | SC | SC | 43 |

| Provision | Report | | | | | Page # |
|---|---|---|---|---|---|---|
| | 5/2023 | 11/2023 | 4/2024 | 11/2024 | 1/2026 | |
| 22. Suicide Prevention | | | | | | |
| a. | SC | SC | Released | SC | SC | 44 |
| b. | NC | PC | PC | PC | PC | 44 |
| c. | SC | SC | SC | SC | SC | 45 |
| d. | SC | SC | SC | SC | SC | 45 |
| e. | SC | SC | SC | SC | SC | 45 |
| f. | NC | SC | PC | PC | PC | 46 |
| g. | SC | SC | SC | SC | SC | 47 |
| h. | Deferred | SC | SC | SC | SC | 47 |
| 23. Out of Cell/Program Time | | | | | | |
| a. | NC | PC | PC | PC | PC | 48 |
| b. | NC | PC | PC | PC | PC | 48 |
| c. | NC | PC | PC | PC | PC | 48 |
| d. | Released | Released | Released | Released | Released | 49 |
| 24. Telepsychiatry | | | | | | |
| a. | NC | NC | PC | PC | SC | 49 |
| b. | NC | NC | PC | PC | Deferred | 50 |
| 25. Medical Records | | | | | | |
| a. | NC | PC | PC | PC | PC | 50 |
| 26. Quality Management | | | | | | |
| a. | NC | PC | PC | PC | PC | 51 |
| b. | NC | Deferred | Deferred | Deferred | NC | 52 |
| c. | NC | PC | PC | PC | Deferred | 53 |
| 27. Corrective Action Plans | | | | | | |
| a. | NC | NC | PC | PC | PC | 53 |
| b. | NC | NC | PC | PC | PC | 53 |

* Requirement 21(h) was assumed to be released during the April 2024 review and therefore not rated in that report.

**Compliance Findings**

## 1. Intake Screening

*(a)     Upon arrival, an Initial Health Assessment will be performed by the intake nurse to determine whether the inmate should be excluded from the facility on medical or mental health grounds. Upon acceptance into the jail, all inmates will be screened by the intake nurse for urgent medical, mental health and dental needs. The intake nurse will have access to an inmate's medical records if the inmate has been previously incarcerated in the Monterey County jail. [County Implementation Plan. Dkt. 528-1 at ECF 7]*

*(b)     A mental health assessment tool will be used at intake to determine which prisoners need Psychological or Psychiatric evaluation and on what time frame.*

*(c)     The Intake Screening Implementation Plan shall also provide for the use of a suicide risk assessment tool, with psychological evaluation for those with positive findings on the suicide assessment. [Settlement Agreement at 6]*

*(d)     The Booking RN shall begin initial treatment planning at the time of booking and schedule referrals for follow up evaluation as necessary. [CFMG Plan at 27]*

**Finding:**  These four requirements were released from further monitoring by Court Order dated October 27, 2023. (Dkt. 844 at ECF 4)

*(e)     If a patient's chronic condition is stable at booking, the Booking RN shall schedule a follow up with a medical provider within 5-7 days. If the patient is unstable or has unverified medications, the Booking RN must refer the patient to the on duty or on-call medical provider. [CFMG Plan at 19; Dkt. 532 at ECF 29]*

**Finding:**  Partial Compliance

This requirement was found in Partial Compliance in the last two monitoring reports (in 2024) after findings of Non-Compliance in the prior two monitoring reports from 2023.

The current finding of Partial Compliance incorporates the results of the monthly CFMG audits, this monitor's verification of selected cases in the CFMG audit samples, and a separate review of additional cases not included in the internal auditing samples.

CFMG provided the results of their internal monthly audits for the two (2) elements of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| Stable/Follow up | 100% | 100% | 100% | 100% |
| Unstable/Unverified | 67% | 0% | 50% | 50% |

The CFMG audits support continued compliance with the requirement for the Booking RN to schedule a follow up with a medical provider within 5-7 days if a patient's chronic condition is stable at booking. One hundred percent (100%) compliance was found for all four months of audits.

The second requirement of this provision was that the Booking RN must refer the patient to the on duty or on-call medical provider if the patient is unstable or has unverified medications. On this issue, the CFMG audits continue to show inconsistent compliance with this requirement as shown on the table above. The audit results show a noncompliance of 100% in the month of May. It is unknown the cause of this but a review of training and or supervision is recommended.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was 100% compliance with the element of the requirement for the Booking RN to schedule a follow up with a medical provider within 5-7 days if a patient's chronic condition is stable at booking and 87% compliance with the element that the Booking RN refer the patient to the on duty or on-call medical provider if the patient is unstable or has unverified medications.

In this reporting period, the finding of Partial Compliance is based on an adequate level of performance on the element pertaining to follow-up of patients with stable conditions at intake, but the continued inconsistent level of performance on the element pertaining to referral of patients with unstable chronic conditions.


*(f)      The Booking RN shall identify and assess at booking individuals with a history of chronic medical or psychiatric condition. The Booking RN must document and verify and continue all current medications, whether verified or unverified, formulary or non-formulary. [Dkt 532 at ECF 29]*

As previously reported by Dr. Vess, examination of the Implementation Plan indicates that the language of this requirement, which has been the basis of evaluating compliance for these functions from the time of the prior mental health monitor, has combined the language from separate elements of the Implementation Plan from Dkt. 532 at ECF 29 as follows:

> *Section 1.a.(1)  Individuals giving a history of a chronic medical or psychiatric condition and/or are taking essential medication for the management of a chronic medical or mental condition will be identified at the time of the jail intake screening by the Booking RN.*
>
> *Section 1.a.(3.a)  The nurse will contact the on-call medical provider by the end of the nursing shift to obtain an order for all medications, whether verified or unverified, formulary or non-formulary.*

These two elements will continue to be examined separately but an overall combined compliance finding will be rendered, consistent with prior monitoring reports.

**Finding:** Partial Compliance

This requirement was found in Partial Compliance in the last two monitoring reports (in 2024) after findings of Non-Compliance in the prior two monitoring reports in 2023.

CFMG provided the results of their internal monthly audits for the two (2) elements of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| Identify/Assess | 100% | 100% | 100% | 100% |
| Obtain Order | 100% | 40% | 67% | 40% |

The CFMG audits support continued compliance with the requirement that the Booking RN shall identify and assess individuals for a history of chronic medical or psychiatric conditions. One hundred percent (100%) compliance was found for all four months of audits.

The second requirement of this provision is that the Booking RN must document and verify and continue all current medications, whether verified or unverified, formulary or non-formulary. On this issue, the CFMG audits continue to show inconsistent compliance with this requirement, with significant variability over the months, as shown on the table above.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was 100% compliance with the element of identifying and assessing individuals with a history of chronic medical or psychiatric condition at booking, and 75% on the requirement that the Booking RN must document and verify and continue all current medications, whether verified or unverified, formulary or non-formulary. These findings are generally consistent with those reported in the CFMG monthly internal audits.

In this reporting period, the finding of Partial Compliance is based on an adequate level of performance on the element pertaining to the identification and assessment at booking of individuals with a history of chronic medical or psychiatric condition but the continued inconsistent level of performance on the element pertaining to the nurse's documentation and verification and continuation of all current medications, whether verified or unverified, formulary or non-formulary.

The overall finding of Partial Compliance reflects the combined performance across these two elements. The prior recommendations made by Dr. Vess still stand. Daily reviews by "virtual nurses" of all intake screenings conducted at MCJ, with efforts to identify and correct omissions on the day of intake (within 12 hours) are important. Follow-up and corrective actions by the Director of Nursing (DON) and Health Services Administrator (HSA) to ensure that intake nurses are familiar with the procedures to ensure consistent compliance are necessary. As noted in Dr. Vess's last monitoring report, consideration should be given to clarifying the procedures and performance expectations for verifying medications during hours when outside pharmacies are closed.

*(g)     Booking RN must observe/query for signs/history of mental illness and use of psychiatric medications. The RN shall verify any medications and request outside treatment records as necessary. Any inmate who exhibits signs/history of mental illness shall be referred to mental health services for evaluation, and a physician's opinion must be secured within 24 hours or the next scheduled sick call. [CFMG Plan at 6, 19, 41; Dkt 532 at ECF 16]\**

As previously reported by Dr. Vess, this requirement, which has been the basis of evaluating compliance for these functions from the time of the initial mental health monitor, paraphrases the language of the Implementation Plan which states [Dkt. 532 at ECF 16]:

*All new inmates shall be observed and queried for signs/presence and history of mental illness, including suicidal behavior/ideations, and use of medication for psychiatric treatment as part of the intake health screening completed by the Booking RN. Verification of medications and request of treatment records will be initiated for inmates indicating current or recent treatment including medications, hospitalization, emergency department visits and/or outpatient services. Any inmate exhibiting or testifying to presence or history of mental illness is referred to mental health services staff for further evaluation. A physician's opinion is secured within 24 hours or the next scheduled sick call.*

**Finding:** Substantial Compliance

This requirement was found in Partial Compliance in the last two monitoring reports (in 2024) after findings of Non-Compliance in the prior two monitoring reports in 2023.

CFMG provided the results of their internal monthly audits for the three (3) elements of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| Observe/Query | 100% | 100% | 100% | 100% |
| Verify/Request | 100% | 86% | 86% | 88% |
| Refer to MH | 100% | 90% | 100% | 100% |

The CFMG audits support continued compliance with the requirement that the Booking RN must observe/query for signs/history of mental illness and use of psychiatric medications. One hundred percent (100%) compliance was found for all four months of audits. Significant compliance with this part of the requirement has continued since the prior monitoring report.

The second requirement of this provision is that the RN shall verify any medications and request outside treatment records as necessary. Compliance with this requirement has been consistently high over the monitoring period.

Improved compliance is also evident on the third component of the requirement, i.e., that any inmate who exhibits signs/history of mental illness shall be referred to mental health services for evaluation, and a physician's opinion must be secured within 24 hours or the next scheduled sick call.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was 100% compliance with the element that the Booking RN observe/query for signs/history of mental illness and use of psychiatric medications; 100% compliance on the requirement that the RN shall verify any medications and request outside treatment records as necessary, and 100% that any inmate who exhibits signs/history of mental illness shall be referred to mental health services for evaluation, and a physician's opinion must be secured within 24 hours or the next scheduled sick call.

In this reporting period, the finding of Partial Compliance is based on an adequate level of performance on all three elements pertaining to this requirement. Emphasis should be placed on the verification of medications process, mirroring the findings of requirements 1e and 1f. Improved and consistent compliance with this section of the requirement can lead to Significant Compliance of the entire provision in the next monitoring period.

The overall finding of Partial Compliance reflects the combined performance across these three elements. Substantial Compliance may be achieved in the next monitoring period if the performance is sustained and compliance with the second component improved.


***(h)*** *The Booking RN will obtain a signed release for records and attempt to verify current prescriptions. By the end of the nursing shift, the RN will consult with the on-call psychiatrist regarding any verified or unverified medications. The on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate. During this consultation, the on-call psychiatrist will set the time to see the inmate within 5 – 7 days. The date of the appointment will be reflected on the written record of the order.* [CFMG Implementation Plan; Dkt. 532 at ECF19]

**Finding:** Partial Compliance

This requirement was found in Partial Compliance in the last two monitoring reports in 2024 after findings of Non-Compliance in prior monitoring reports.

CFMG provided the results of their internal monthly audits for the three (3) elements of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| ROI/Verify meds | 100% | 100% | 100% | 86% |
| Consult On-call | 86% | 25% | 86% | 50% |
| Set Appointment | 100% | 100% | 67% | 100% |

The CFMG audits support improved performance in all three sections of this requirement. The requirement that the Booking RN obtain a signed release for records and attempt to verify current

prescriptions and the third requirement that the on-call psychiatrist give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate and set the time to see the inmate within 5–7 days continue to be in significant compliance although a few inconsistencies are evident.

The second requirement of this provision that the RN consult with the on-call psychiatrist regarding any verified or unverified medications continues to vary in compliance and reflects the findings of the earlier, similar requirements (1f and 1g).

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was 85% compliance with the element that the Booking RN obtain a signed release for records and attempt to verify current prescriptions, and 100% compliance on the other two components of the requirement, i.e., that the RN will consult with the on-call psychiatrist regarding any verified or unverified medications and that the psychiatrist will give an order regarding the medications and set an appointment.

In this reporting period, the finding of Partial Compliance is based on an adequate level of performance on two of the elements pertaining to this requirement but inconsistent performance in one of the requirements. Mirroring the findings of requirements 1f and 1g and as expressed in the last monitoring report by Dr. Vess, emphasis should be placed on the verification of medications process. Improved and consistent compliance with this section of the requirement can lead to Significant Compliance of the entire provision in the next monitoring period.


## 2. Mental Health Screening

*(a)    All inmates must undergo an initial mental health screening by a qualified mental health professional within 14 days of admission. The screening must consist of a structured interview inquiring into (1) history of psychiatric hospitalizations, substance use hospitalization, detoxification and outpatient treatment, suicidal behavior, violent behavior, victimization, special education placement, cerebral trauma or seizures, and sex offenses; (2) current psychotropic medications, suicidal ideations, drug or alcohol use and orientation to person, place and time; (3) emotional response to incarceration; and (4) screening for developmental disability and learning disabilities. Any positive scores will be referred for followup. [CFMG Plan at 36, 41-42]*

**Finding:** Partial Compliance

This requirement was found in Non-Compliance in the last four reports (2023, 2024).

CFMG provided the results of their internal monthly audits for the two (2) elements of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| MHIA w/in 14 Days | 70% | 70% | 90% | 100% |
| Positive Scores Referred | 100% | 100% | 100% | 80% |

The CFMG audits support improved performance in both sections of this requirement. The first requirement that all inmates must undergo an initial mental health screening (MHIA) by a qualified mental health professional within 14 days of admission has improved since the last monitoring report, and performance, over time, is more consistently satisfactory.

The second requirement of this provision that any positive scores will be referred for follow up continues to be majorly in compliance, i.e., 100% for three of the four months in this monitoring period.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was 75% compliance with the element that all inmates must undergo an initial mental health screening by a qualified mental health professional within 14 days of admission and 100% compliance on the second component that any positive scores will be referred for follow up. (100% is achieved on this element as only six of the additional cases were considered.)

In this reporting period, the finding of Partial Compliance is based on improved levels of performance on the two elements pertaining to this requirement but continued inconsistencies in compliance over the monitoring period. The element of conducting the 14-day MHIA is most likely reflecting limitations in mental health staffing. In Dr. Vess's last report, he discussed ways in which compliance as well as services overall could be improved if staff other than a Qualified Mental Health Professional (QMHP) were permitted to conduct the MHIA. I support his opinion that, with appropriate training, nurses and licensed psychiatric technicians could conduct the MHIAs and obtain the same results as a QMHP given the assessment tool currently in use which is well-structured and comprehensive. Further, the relevant standard from the National Commission on Correctional Healthcare (NCCHC) states that the mental health screening can be conducted by QMHP or qualified health care professionals who have received documented training (Standard J-E-05, NCCHC, Standards for Health Services in Jails, 2018).

Further progress in the overall level of compliance with the requirement as written, determined by auditing samples drawn from the entire inmate population, is necessary to reach Substantial Compliance.

**(b)**    *The medical or psychiatric provider will complete a baseline history and physical or psychiatric examination; order a therapeutic regimen, as appropriate; and schedule the patient to be seen for chronic care clinic at least every ninety days for the length of the jail stay. Patients on psychiatric medications will be seen by the psychiatrist every thirty days until determined stable and then at least every 60 to 90 days.*

**Finding:** Substantial Compliance

13

This requirement was found in Substantial Compliance in the last two monitoring reports (in 2024).

CFMG provided the results of their internal monthly audits for the four (4) elements of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| History & Exam | 100% | 100% | 78% | 100% |
| Order Med Regime | 100% | 100% | 89% | 100% |
| 30 Days Until Stable | 100% | 100% | 100% | 100% |
| 90 Days Until Stable | 100% | 100% | 89% | 100% |

The CFMG audits support the continued rating of Substantial Compliance. With exceptions noted only in the month of July, CFMG obtained 100% compliance on the four elements for the four months of audits.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was 100% compliance on all four elements of this requirement.

In keeping with the prior monitoring periods in 2024, progress in meeting this requirement has been sustained, supported by monthly internal audits and collaborative efforts of MCJ/CFMG Psychiatry . Overall performance during the current review period has been sufficient to warrant a finding of Substantial Compliance.


**3. Sick Call**

*(a)      Inmates' health and mental health complaints must be collected, processed, and documented daily and triaged as appropriate by medical and mental health providers. [CFMG Plan at 25]*

*(b)      The on-duty medical provider shall see urgent sick call requests Monday through Friday. On weekends and holidays, the on duty nurse shall communicate urgent complaints/requests to the on-call provider, who will treat or refer the patient as necessary. [CFMG Plan at 25]*

*(c)      Health care staff must note (1) the date and time the sick call request slip is reviewed; (2) the signature of medical staff; and (3) the disposition. The sick call slip must be filed in the inmates' medical record. The sick call roster must be kept on file in the medical record room. Providers must record sick call visits in the inmate's medical record. [CFMG Plan at 25-26]*

**Finding:**  These three requirements were released from further monitoring by Court Order dated October 27, 2023. [Dkt. 844 at ECF 4]

*(d)* *Sick call must be conducted 5 days/week in a private clinical environment. Health services staff must triage sick call slips daily and schedule patients for the next sick call if the slip was received prior to 2300 hours. [CFMG Plan at 26]*

**Findings:** Partial Compliance

This requirement was found to be in Partial Compliance in the last monitoring report after three reports with ratings of Non-Compliance.

CFMG leadership, as well as data in CorEMR, indicate that mental health clinicians review and triage sick call requests daily. Sick calls apply to all appointments made in response to health services requests from incarcerated persons (IPs).

Determining compliance with this requirement involved review of the electronic healthcare records of eight (8) IPs who received mental health care during the current review period; two (2) per month selected at random from the CFMG monthly audits of intakes. A general review of the engagement and treatment history was conducted with attention paid to the timeliness of required activities throughout the current monitoring period (e.g., psychiatry follow-up, completion of Mental Health Initial Assessments) with consideration given to the presenting/evolving mental health symptoms.

In keeping with the prior monitoring reports, the dates of rescheduled and completed sick calls were reviewed for each case, and consideration was given to type of appointment scheduled, the acuity of the inmate's condition, as well as policy requirements for the completion of specific types of referrals (e.g., urgent vs. routine, the time period of the scheduled follow-up, the clinical status of the patient, etc.).

A review of the eight cases found an 83% compliance, not including two that were in custody for a brief period. There was limited evidence during this review of rescheduled appointments or notations of excessive workloads as limiting the provision of services. CFMG leadership has explained their daily triage process of all incoming sick call requests and their prioritization of these requests. Improvement in these requirements is noted.

*(e)* *An MD or an RN shall visit inmates housed in holding and isolation cells on Monday, Wednesday and Friday. [CFMG Plan at 26]*

**Finding:** Partial Compliance

This requirement was found in Partial Compliance in the last report.

CFMG provided the results of their internal monthly audits for the element of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

15

| Month | April | May | June | July |
|---|---|---|---|---|
| MD/RN Visits M, W & F | 75% | 50% | 46% | 57% |

The CFMG audits show a notable decline in compliance with this requirement and variability over the months of the reporting period. There has been a drop in completing the medical visits as required from an average of 73% compliance per month in the prior report to an average of 57% compliance over per month in this monitoring period.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was a mere 12% compliance with the element that IPs be provided an MD or RN visit on Mondays, Wednesdays and Fridays while IPs are housed in holding/isolation cells. As previously reported by Dr. Vess, these visits are conducted by RN/nursing staff.

It is concerning that compliance with this requirement appears to be declining. Partial Compliance is maintained as a 75% completion rate was achieved in the month of April. Leadership is encouraged to assess factors that are contributing to this decline In performance.


**4. Chronic Care**

*(a)      Any patient whose chronic condition cannot be managed at MCJ shall be transferred offsite for appropriate treatment and care. [CFMG Plan at 30]*

**Finding:** Substantial Compliance

All of Dr. Vess's reports between 2022 and 2024 reported that IPs determined to need inpatient treatment at Natividad Medical Center (NMC) were not being transferred and treated at NMC but remained at the MCJ. However, in this monitoring report, the SA requirement is interpreted to mean transfer of the patient's care to an outside facility based on CFMG and MCJ determination that the IPs behavior/symptomatology appears to indicate that treatment beyond the scope of that available in MCJ is necessary. Admission to the receiving facility (NMC) is not a requirement.

Certain IPs, especially those that refuse to comply with medications (and may be engaging in self-destructive behaviors as a result), would likely benefit from a treatment intervention at the inpatient level which often includes the administration of involuntary medications. Involuntary medications often initiate treatment compliance. An agreement/understanding with NMC for the provision of inpatient level of care services could be a clinical tool for MCJ, offering an alternative intervention for certain IPs with intractable mental health conditions. However, the SA and Implementation Plan do not require admission for treatment to a facility outside of the MCJ nor for establishing an inpatient level of care.

For the current monitoring report, in keeping with the prior monitoring process, a list of all suicide attempts and incidents of serious self-injury for the months of April through July was reviewed. The list included eight (8) incidents which involved six (6) IPs. Three (3) of the incidents were classified as attempted suicides and five (5) as self-injurious events. The three attempted suicide incidents involved the same IP. A clinical review of these incidents was conducted to assess extent of injuries, how the incidents were handled medically, and whether referral to NMC was determined to be warranted and, if so, the outcome of the referral.

Transfer to NMC was initiated in the three suicide attempts (involving the one IP) within an approximate eight-day period and self-injury event because the IP had "ingested a foreign object" and required radiology, and another self-injury event where the IP required treatment of a cut on their forehead subsequent to head-banging. All these events were classified as "ER Visits" and none required an overnight stay according to NMC. Otherwise, the events were handled by CFMG and MCJ staff and appropriately included placement on suicide watch in a safety cell and referral to the medical staff for ongoing assessment. The findings of this monitoring period on the requirement continue to support the opinion expressed by Dr. Vess in his last 2024 report that "the number of jail inmates requiring mental health care that cannot be provided at the jail is small."

Clinical review of the cases also support that the incidents involved IPs which repeatedly challenge systems of mental health care likely to "manipulate" facility operations and rules. Unfortunately, attention-seeking behaviors are often seen in IPs but must be attended to and taken as serious events. Some of these situations are often the result of poor/limited coping skills on the part of the IP vis-à-vis the stressors of a jail environment.

*(b)*    *At every 90-day chronic care appointment, the medical/psychiatric provider shall (1) assess the patient's current medications, complaints, and compliance with treatment plan; (2) examine vital signs and weight; (3) assess the patient's diagnosis, degree of control, compliance with treatment plan and clinical status as compared to prior visits; and (4) conduct lab and diagnostic tests as necessary, develop strategies to improve outcomes if the condition has worsened, educate the patient, and refer to MD or specialist, and/or conduct discharge planning as necessary. All of the above must be documented in the patient's health record. [CFMG Plan at 32-33]*

**Finding:** Substantial Compliance

This requirement was found in Substantial Compliance in the last two monitoring reports (in 2024).

CFMG provided the results of their internal monthly audits for the four (4) elements of this requirement for the months of April through July 2025, as shown in the following table.

| Month | April | May | June | July |
|---|---|---|---|---|
| Assess Meds, etc. | 100% | 100% | 89% | 100% |
| Examine VS & Weight | 100% | 100% | 56% | 100% |
| Diagnosis, Control, Compliance & Status | 100% | 100% | 89% | 100% |
| Conduct Labs | 100% | 100% | 72% | 60% |
| Develop Strategies | 100% | 100% | 89% | 100% |
| Educate Patient & Refer | 100% | 100% | 89% | 100% |
| Refer to MD/Specialists | 100% | N/A | N/A | N/A |
| Discharge Planning, if necessary | 100% | N/A | 100% | N/A |

The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements. The audits support the continued rating of Substantial Compliance. With exceptions noted only in the months of June and July, CFMG obtained 100% compliance on all elements for the four months of audits.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was 100% compliance on all eight (8) elements of this requirement.

## 5. Acute Care

*(a)      Inmates who require acute mental health services beyond what is available at the Jail must be transferred to an appropriate facility. [CFMG Plan at 36, 42, CFMG PLAN AT 26]*

**Finding:** Substantial Compliance

This requirement has been in Non-Compliance for the past four rating periods (2023, 2024) based on Dr. Vess's interpretation of the Implementation Plan requirement. Specifically, that a transfer should also result in an admission to NMC for treatment beyond the scope available at MCJ. The discussion in section 4(a) on Chronic Care applies to this requirement. For this reporting period, this requirement is interpreted to mean transfer of the patient's care to an outside facility based on CFMG and MCJ determination that the IPs behavior/symptomatology appears to indicate that treatment beyond the scope of that available in MCJ is necessary. Admission for treatment to a facility outside of the MCJ is the purview of the receiving facility, not in the control of MCJ. An inpatient level of treatment can afford an intensity of effort not offered at MCJ and can be a stabilizing factor, especially in cases where medications are rejected by the IP but not a requirement of this SA.

Nevertheless, according to CFMH leadership, in those cases where admission to NMC occurs, communication between the entities has improved since the last monitoring report. There is now agreement regarding what discharge documentation/information MCJ requires following a referral to NMC. A cooperative agreement between the agencies of some type would be valuable but not

18

required by this SA. A regularly scheduled meeting between the agencies to discuss the referral, treatment and discharge process would likely be a great benefit.

*(b)     Crisis intervention and management of acute psychiatric episodes shall be handled initially by on-duty medical/mental health staff with referral to psychologist and/or psychiatrist on a 24 hour per day basis. [CFMG Plan at 43]*

**Finding:** Substantial Compliance

This requirement has been in Substantial Compliance for the past three rating periods.

CFMG provided the results of their internal monthly audits for the two (2) elements of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| Handled On-site | 100% | 100% | 100% | 100% |
| Referred as Needed | 100% | 100% | 100% | 75% |

The CFMG audits support continued Substantial Compliance with this requirement with one rating exception. The first requirement that crisis intervention and management of acute psychiatric episodes be handled initially by on-duty medical/mental health staff continues to be in 100% compliance for the four months of this monitoring period. The second requirement of this provision achieved a rating of 75% in the month of July due to one incident where a referral to psychiatry was not made.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was 100% compliance with the two elements in this requirement.

Healthcare record reviews support that incidents warranting crisis intervention are being managed by in-house clinical staff and appropriate referrals for additional services are being made.

## 6. Outpatient Services

*(a)     The Jail shall make outpatient mental health services, provided by a qualified mental health provider available to all inmates. [CFMG Plan at 41]*

*(b)     Inmates requiring mental health services beyond the on-site capability of the Jail shall be referred to appropriate off-site providers. [CFMG Plan at 41, 43, 46]*

19

**Finding:** Partial Compliance

This requirement has been in Partial Compliance for the past four rating periods (2023, 2024).

Determining compliance with this requirement involved review of the electronic healthcare records of eight (8) IPs who received mental health care during the current review period; two (2) per month selected at random from the CFMG monthly audits of intakes. A general review of the engagement and treatment history was conducted with attention paid to the timeliness of required activities throughout the current monitoring period (e.g., psychiatry follow-up, completion of Mental Health Initial Assessments) with consideration given to the presenting/evolving mental health symptoms.

In keeping with the prior monitoring reports, the dates of rescheduled and completed services were reviewed for each case, and consideration was given to type of appointment scheduled, the acuity of the inmate's condition, as well as policy requirements for the completion of specific types of referrals (e.g., urgent vs. routine, the time period of the scheduled follow-up, the clinical status of the patient, etc.).

A review of the eight cases found an 83% compliance, not including two that were in custody for a brief period. The cases showed initial screenings, mental health assessments and initial psychiatric assessments. However, if the patient refused services, it was noted that an excessive time period followed before another attempt to complete the service occurred.

Regarding requirement 6(b), as pointed out in prior monitoring reports, it is highly unlikely that an IP in need of outpatient level of treatment would need to be sent to off-site providers for outpatient services as defined in the Implementation Plan. However, "outpatient" level of services should be available at the MCJ. At this point, outpatient services is defined by a timeframe for follow up when an IP has been identified with mental health issues. Therapeutic contacts beyond the initial assessments were very limited.

## 7. Safety and Sobering Cells

*(a)       The Health Care and Mental Health Implementation Plans shall provide for necessary coordination between medical staff and custody regarding placement of prisoners in a safety cell, addressing the prisoner's medical and mental health needs, custody's overall responsibility for safety and security of prisoners, prompt reviews by medical of all placements, and a process of resolving disagreements between medical and custody. [Settlement Agreement Dkt. 494 at ECF 14]*

**Finding:** This requirement was released from further monitoring by Court Order dated October 27, 2023. (Dkt. 844 at ECF 4 - 5)

*(b)       Placement of an inmate in a safety or sobering cell, whether it be from housing or upon intake, should be in concert with medical staff. A qualified medical professional will see an*

20

*inmate within one hour of placement in a sobering cell. Inmates will be released from a sobering cell upon clearance by medical staff.*

**Finding:** Partial Compliance

In accordance with prior reports, this requirement is being reviewed although the process addressed is a medical staff process. For this reporting period, eight (8) sobering cell placements were reviewed. The requirements are straightforward, involving whether there is documentation in the medical record that an inmate was seen within an hour of placement in a safety or sobering cell, and upon clearance by medical staff for release from a sobering cell. However, the adequacy of these procedures and decisions fall within the purview of the Medical Monitor.

In all eight cases, documentation supports that CFMG medical staff performed an assessment and were engaged in the process of placing the IP in the sobering/safety cell (100% compliance). Ongoing notations of required checks by medical staff were also noted. However, documentation by medical staff at the time of the IP release from the safety/sobering cells was not always in place. It is recommended that the medical documentation processes clearly indicate medical staff involvement when safety/sobering cell placement is discontinued.

*(c)      A safety check for inmates in safety and sobering cells, consisting of direct visual observation that is sufficient to assess the inmate's well-being and behavior, shall occur twice every 30 minutes. Each time a deputy or sergeant conducts a welfare check it shall be documented in the welfare check log. A sergeant shall verify whether deputies are completing their checks, at least one time per shift. The sergeants will initial the welfare check logs to indicate that they have reviewed the welfare check log, at least one time per shift. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. Once a month, the Compliance Sergeant will track his findings through a report which will be sent to the Jail Operations Commander. Any deputy or sergeant who demonstrates consistent difficulty in adhering to welfare check log requirements will be subject to additional training and/or disciplinary action at the discretion of their supervisor.*

**Finding:** Substantial Compliance

This requirement was found in Substantial Compliance in the last two reports.

Review of this function is primarily based upon information on welfare checks conducted by MCJ custody staff utilizing the Guardian Radio Frequency Identification (RFID) system of inmate checks.  In prior reports, audits conducted by the Compliance Sergeant, based on information collected by this system, have demonstrated compliance with the requirement that custody staff make safety check rounds at the specified intervals. The Compliance Commander has a well-established system of auditing and feedback to address any compliance issues detected based on the timing of the checks. The auditing system also includes the routine reports specified in this requirement.

However, while the Guardian system provides the concrete information regarding when checks take place, it does not provide information regarding the "quality" of the direct visual observation

to assess the IPs' well-being and behavior. To address the quality of the welfare checks, training was developed (reviewed by Dr. Vess) and delivered to deputies and sergeants at team briefings in May and June 2024. Furthermore, in 2023, the Compliance Commander added routine review of surveillance video samples, corresponding with the times of welfare checks, to the MCJ audit process to observe whether checks appear to be completed in accordance with training and performance expectations. Instances of inadequately performed welfare checks are addressed by the Compliance Commander through the chain of command. Additional trainings for all new deputies and sergeants have taken place since then and ongoing training has been provided with the use of training bulletins at staff meetings conducted by team sergeants, in which training on the quality of welfare checks can be periodically revisited.

Based on consideration of the actions to address the requirements, the practices currently in place and review of the Compliance Commander's audits reports for the monitoring period, a finding of Substantial Compliance is warranted.


*(d)      Unless contraindicated by security and safety needs, inmates who are in a safety cell for more than 14 hours will receive a mattress or safety sleeping bag between the hours of 11 p.m. and 7:00 a.m. The Operations Commander will ensure that a sufficient number of safety sleeping bags for use are available.*

*(e)      Inmates in sobering cells may have access to mattresses at the discretion of custody staff.*

*(f)      Mattresses have been and will continue to be available in the intake and receiving area for this use. The Operations Commander will ensure that a sufficient number of mattresses for use are available.*

**Finding:** Substantial Compliance

Substantial Compliance was found for these three requirements in the last four monitoring reports (2023, 2024).

Safety cell logs and audits for the current review period indicate that inmates are consistently provided safety smocks and safety sleeping bags as required while in safety cells.  The safety sleeping bags are consistent with a safety blanket which can be closed by Velcro and have a sewn-in pillow.

These requirements have been found to be in Substantial Compliance since 2023, with no issues regarding these requirements since the last monitoring. A sufficient number of safety sleeping bags have been confirmed to be available for distribution as needed.


*(g)      Patients withdrawing from benzodiazepines must be evaluated by a medical provider within 3 days, and a psychiatrist or psychiatric NP within 7 days. [CFMG Plan at 68]*

**Finding:** Partial Compliance

This requirement was rated Non-Compliance in the last monitoring report.

CFMG provided the results of their internal monthly audits for the element of this requirement for the months of April through July 2025, as shown in the following table. The total sample for the four months was 29 cases an average of seven (7) cases per month, that met the criteria of withdrawal from benzodiazepines separate from alcohol.

| Month | April | May | June | July |
|---|---|---|---|---|
| Medical within 3 days | 100% | 75% | 33% | 75% |
| Psychiatry within 7 days | 100% | 43% | 33% | 100% |

The CFMG audits show significant variability between the months of the reporting period. Nevertheless, the compliance rates for this requirement have markedly improved from the prior monitoring period. The current average monthly compliance rate for the psychiatric evaluations is 69% compared to the average compliance of 13% in the prior reporting period.

To verify the CFMG audits, 16 of the total 29 cases in the CFMG audit sample were reviewed. In every case examined, the findings agreed with those reported in the internal audits.

Verification of additional cases not included in the CFMG monthly audit samples was not possible given the very limited audit population size.

The reasons for the significant variability in compliance ranging from 100% to 33% on this requirement should be investigated. It is recommended that the HSA, DON, and relevant clinical supervisors become directly involved in any corrective actions needed to achieve Substantial Compliance with this requirement.

*(h)      Safety cells shall be cleaned whenever there is a change in the inmate housed in the cell in addition to the regular cleaning schedule. Sobering cells shall be cleaned on a regular cleaning schedule. Custody staffing will be maintained to allow medical staff to enter the sobering cells to make vital checks.*

**Finding:** This requirement is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's last tour report found the requirement in Substantial Compliance This requirement was released from monitoring as noted in Dkt. 759 at ECF 5.

*(i)      For any inmate who has been housed in a safety cell for 24 consecutive hours, custody shall promptly begin processing the inmate for transfer to either an appropriate in-patient mental health facility or the Natividad Medical Center emergency room for assessment.*

**Findings:** Substantial Compliance

This requirement has been found in Substantial Compliance for the last four monitoring reports (2023, 2024).

As noted in previous monitoring reports, the Compliance Unit continues to maintain a thorough system to track and respond as needed to IPs placed in safety cells. There are three safety cells used most frequently to house inmates on Level 2/Intermittent Suicide Watch (defined as those with suicidal ideation but no active self-harm) due to a lack of alternative observation housing, or inmates requiring a single cell in the booking area who are not on any level of suicide watch. Inmates on Level 1/Continuous Suicide Watch are also placed in safety cells but must be transferred out to inpatient care or the NMC emergency room after 24 hours, while Level 2 inmates can be moved to other appropriate observation cells as available without requiring transfer to another facility.

Safety Cell audits conducted by the Compliance Unit for this monitoring period of April through July 2025 were reviewed.  These audits reported the following results:
- April:  5 safety cell placements, 13 sobering protocol placements, 13 observation cell 3 or 4 suicide watch Level 2 placements (no booking cell available). One (1) placement over 24 hours.
- May:  3 safety cell placements, 14 sobering protocol placements, 9 observation cell 3 or 4 suicide watch Level 2 placements (no booking cell available). One (1) placement over 24 hours.
- June:  5 safety cell placements, 10 sobering protocol placements, 7 observation cell 3 or 4 suicide watch Level 2 placements (no booking cell available). No placements over 24 hours.
- July:  3 safety cell placements, 3 sobering protocol placements, 11 observation cell 3 or 4 suicide watch Level 2 placements (no booking cell available).  No placements over 24 hours.

The Level 1 IP in the month of April who went beyond 24-hours in a safety cell was transferred to NMC at the 28 hour, 13 minute mark. The IP in the month of May who went beyond 24-hours was a Level 2 suicide watch (which did not require transfer to NMC). However, during the attempt to move the IP to a single cell, he became agitated; a situation that resulted in a planned use-of-force.

Despite these two deviations in procedure, the average compliance rate for these months was 98%, supporting a finding of Substantial Compliance for this requirement.


*(j)    Inmates in safety cells whose condition deteriorates, or for whom the nurse is unable to complete a hands-on assessment including vital signs after 6 hours of placement shall be transferred to Natividad Medical Center for further assessment. [CFMG Plan at 16, 75]*

**Finding:** Substantial Compliance

This requirement was found in Substantial Compliance in the past two monitoring reports.

24

In the current review, the healthcare records for eight (8) placements from the safety cell logs were examined. In seven (7) of these cases (87%), a nurse completed a hands-on assessment including vital signs within six hours of placement in a safety cell. In none of these cases did the patient's condition appear to deteriorate while in a safety cell to a degree that required transfer to NMC. The current results reflect continued Substantial Compliance for this requirement.

## 8. Medication Continuity

*(a)      All inmates newly booked into the jail, who at the time of booking are prescribed medications in the community, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a medical provider makes an appropriate clinical determination that medications are not necessary for treatment.*

**Note:** This requirement had been released from monitoring but was reinstated for monitoring in the 9/26/23 Court Order granting the Plaintiffs' Motion to Enforce (Dkt. No. 838 at p. 27) which references 11/22/22 Joint Status Report. (Dkt. No. 759 at page 5 – 6)

**Finding:** Partial Compliance.

This requirement was found in Partial Compliance in the last monitoring report.

CFMG provided the results of their internal monthly audits for the two (2) elements of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|-------|-------|-----|------|------|
| Verify Meds | 100% | 100% | 86% | 86% |
| Consult, Get Orders | 86% | 25% | 67% | 50% |

The CFMG audits support continued Partial Compliance with this requirement that medications be verified at intake and that the on-call psychiatrist be consulted by the end of the shift to obtain a medication order. While in most cases (77%) over the four months, where appropriate, nursing staff verified medications at intake, the requirement that a psychiatrist be contacted to determine whether medications would be continued was only completed in 57% of the cases reviewed.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was 88% compliance with the two elements in this requirement.

*(b)    By the end of the nursing shift, the booking RN will consult with the on-call psychiatrist regarding any verified or unverified psychotropic medications. The on-call psychiatrist will give an order to either continue, discontinue or substitute the medication with a clinically equivalent formulary alternate. The on-call psychiatrist will then set the time to see the inmate within 5-7 days. The date of the appointment will be reflected on the written record of the order.* [Dkt. 532 at ECF 19]

**Note:** This requirement had been released from further monitoring.  However, in the 9/26/23 Court Order granting the Plaintiffs' Motion to Enforce (Dkt. No. 838 at p. 27) which references 11/22/22 Joint Status Report (Dkt. No. 759 at page 5 – 6), this requirement was reinstated for monitoring.

**Finding:** Partial Compliance

This requirement was found in Partial Compliance in the last monitoring report.

CFMG provided the results of their internal monthly audits for the two (2) elements of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| Consult, Get Orders | 86% | 25% | 67% | 50% |
| Set Appointment | 100% | 100% | 100% | 100% |

The CFMG audits support continued Partial Compliance with this requirement that the RN will consult with the on-call psychiatrist regarding any verified or unverified psychotropic medications and that subsequently the on-call psychiatrist will then set the time to see the inmate within 5-7 days.  As explained in the discussion of requirement 8(b), a psychiatrist was contacted to continue medications in only 57% of the cases reviewed. However, when contacted, an appointment for a subsequent visit with the psychiatrist within seven (7) days was set in 100% of the cases reviewed.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was 88% compliance with the two elements in this requirement.

*(c)    No psychotropic medications shall be unilaterally discontinued without consultation with the facility physician or psychiatrist. Psychotropic medication shall not be ordered for longer than 90 days, new psychiatric medications will not exceed 30 days, until condition is documented stable by the ordering physician. The prescribing provider will renew medications only after a clinical evaluation of the individual is performed.* [Dkt 532 at ECF 19]

Following the format used by Dr. Vess, two separate requirements from the Implementation Plan are combined for this finding; one which states that no psychotropic medications shall be unilaterally discontinued without consultation with the facility physician or psychiatrist, and the other which states that psychotropic medication shall not be ordered for longer than 90 days, new psychiatric medications will not exceed 30 days until condition is documented stable by the ordering physician, and the prescribing provider will renew medications only after a clinical evaluation of the individual is performed.

**Finding:** Substantial Compliance

This requirement was found in Substantial Compliance in the last monitoring report.

CFMG provided the results of their internal monthly audits for the four (4) elements of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements. This requirement evaluates the prescribing of psychotropic medications after the intake process. (The continuation of medications at the time of intake is covered in other sections of the report.) Since the requirement pertains to cases where the IP was receiving medications, it is important to note that the results do not include cases in which there were no medications. As such, the results are based on one to nine cases per month.

| Month | April | May | June | July |
|---|---|---|---|---|
| Meds D/C with Consult | 100% | 100% | 100% | N/A |
| Order for < 90 days | 100% | 100% | 100% | 100% |
| New Meds < 30 days | 80% | 100% | 100% | 100% |
| Renewed After Eval | 100% | 100% | 100% | 100% |

The CFMG audits support the finding of Substantial Compliance with this requirement that: medications be discontinued only with the consultation of a psychiatrist, new medications can only be prescribed for 30 days, no medication can be prescribed for more than 90 days, and medications can only be renewed after an evaluation is conducted. One hundred percent (100%) compliance was reported for all four (4) elements, for all four (4) months.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, a similarly high level of compliance was found. Based on these current results, a finding of Substantial Compliance is warranted.

**9. Discharge**

*(a)      Provision of psychotropic medications upon discharge from the jail. The Implementation Plan provides that a 30-day supply of medications be given to inmates upon discharge from the jail.*

**(b)**     *Inmates who are released prior to resolution of a continuing medical/mental health condition shall be referred to public health and/or community clinics as appropriate and shall be provided written instructions for continuity of essential care. [CFMG Plan at 38, 44]*

**Finding:**  These two requirements have been released from monitoring. [Dkt. 759 at ECF 6]


**10. Involuntary Medication**

**(a)**     *Psychotropic medications may not be used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment. [CFMG Plan at 90, 96]*

**Finding:**  Substantial Compliance

This requirement has been rating to be in Substantial Compliance for the last six monitoring reports.

In keeping with the prior reports, current healthcare record reviews found no instances where psychotropic medications were used for punishment, convenience, as a substitute for program, or in quantities that interfere with treatment.


**(b)**     *Absent an emergency, inmates will not be administered involuntary psychotropic medications at the Monterey County Jail. Psychotropic medication will not be administered for disciplinary purposes. [CFMG Plan at 19]*

**Finding:**  Substantial Compliance

Review of healthcare records for this monitoring period found one instance of involuntary medications being administered. Clinical and custody records indicate that the IP was agitated, combative and at risk of self-harm. There were no instances where medication was administered for disciplinary purposes.


**(c)**     *Absent an emergency or court order for treatment with psychotropic medications, an inmate shall give his or her informed consent or refusal. [CFMG Plan at 20]*

**Finding:**  Substantial Compliance

This requirement has been found in Substantial Compliance in the last four monitoring reports.

A review of nine (9) randomly selected cases showed that eight (8) nine had signed consent forms or documented verbal consent in the healthcare record for a 89% compliance rate.

28

**(d)**    The Jail may only administer involuntary psychotropic medications in a psychiatric emergency (i.e., when administration is necessary to preserve life or prevent serious bodily harm, and it is impracticable to obtain consent), or when an inmate is found to lack capacity to consent at an Incapacity Hearing. The responsible physician, Program Manager, and Director of Nursing, with the Facility Manager, are to identify appropriate community resources and develop procedures to obtain an Incapacity Hearing, and transfer inmates requiring involuntary psychotropic medication administration to an appropriate community facility. If the inmate must remain at the jail for clinical or custodial reasons, the health services staff shall coordinate with County Mental Health Psychiatric Emergency Services to evaluate competency pursuant to Riese v. St. Mary's Hospital (Riese Hearing). [CFMG Plan at 96, 98]

**Findings:** Partial Compliance

This requirement has been in Partial Compliance in the last four (4) monitoring reports (2023, 2024).

The Implementation Plan also states that IPs requiring involuntary psychotropic medications are to be transferred to an appropriate community facility and specifies a procedure to follow regarding evaluation of competency.  As reported by Dr. Vess, "There continues to be no process in place whereby the responsible physician, Program Manager, Director of Nursing, and Facility Manager obtain Incapacity Hearings and transfer inmates requiring involuntary medication administration to an appropriate community facility." It is recommended that a process to pursue Incapacity Hearings and the transfer of inmates to an appropriate community facility when they require involuntary medications in the absence of a Court Order be developed.

During this monitoring period, there was one incident of involuntary medication administration. In this situation, the IP had been on suicide watch and was refusing to comply with directives and became increasingly agitated, aggressive, incoherent and at risk of self-harm presenting a psychiatric emergency. A dose of medication was ordered and administered, and the IP was sent to NMC for further evaluation.

**(e)**    In a psychiatric emergency, psychotropic medications can only be involuntarily administered pursuant to a direct written or verbal one-time order from the responsible facility psychiatrist or physician after an on-site evaluation (never as needed, never standing order). A telephone order is sufficient only if the inmate has been personally evaluated by the prescribing physician no longer than 24 hours prior to the emergency. If none of above options are available, physical restraint should be used and the inmate transferred to the hospital emergency department for physician evaluation. [CFMG Plan at 96]

**Finding:** Substantial Compliance

This requirement has been deferred from monitoring in the last three (3) reports since there were no instances of involuntary medications administered in a psychiatric emergency in the absence of an IMO issued by the Court.

During this monitoring period, there was one incident of involuntary medication administration. In this situation, the IP had been on suicide watch and was refusing to comply with directives and became increasingly agitated, aggressive, incoherent and at risk of self-harm presenting a psychiatric emergency. Psychiatric staff provided a verbal order for a dose of medication. The IP was sent to NMC for further evaluation.

*(f)    Verbal orders for involuntarily psychotropic medications must be documented in the inmate's medical record and signed by prescribing physician within 72 hours. The Medical Program Manager and Custody Facility Manager shall be notified in writing, or by telephone if not available, within 24 hours of the involuntary administration of psychotropic medications. [CFMG Plan at 96-97]*

**Findings:** Substantial Compliance

This requirement has been deferred from monitoring in the last three (3) reports since there were no instances of involuntary medications administered in a psychiatric emergency in the absence of an IMO issued by the Court.

During this monitoring period, there was one incident of involuntary medication administration. In this situation, the IP had been on suicide watch and was refusing to comply with directives and became increasingly agitated, aggressive, incoherent and at risk of self-harm presenting a psychiatric emergency. Psychiatric staff provided a verbal order for a dose of medication. The verbal order is documented in the healthcare record. However, there is no physician signature nor specific documentation that the medication was administered pursuant to the verbal order.

*(g)    Inmates receiving involuntary psychotropic medications must be admitted to an infirmary or safety cell, with intermittent supervision by custody staff at least every 30 minutes. Nursing staff must monitor (assessing response to medications, mental status, general physical appearance, behavior, and hydration) every 15 minutes during first hour, then every 30 minutes thereafter until otherwise ordered by the prescribing physician, documenting all findings in the inmate's medical record. The inmate must be evaluated by the responsible prescribing physician at least every 72 hours. [CFMG Plan at 97]*

**Finding:** Partial Compliance

This requirement has been deferred from monitoring in the last three (3) reports since there were no instances of involuntary medications administered in a psychiatric emergency in the absence of an IMO issued by the Court.

The requirement as written is interpreted to apply to instances of emergency involuntary medication administration, rather than cases where an IMO from the Court is in place.

During this monitoring period, there was one incident of involuntary medication administration. In this situation, the IP had been on suicide watch and was refusing to comply with directives and became increasingly agitated, aggressive, incoherent and at risk of self-harm presenting a

psychiatric emergency. Psychiatric staff provided a verbal order for a dose of medication. The verbal order is documented in the healthcare record. However, there is no physician signature nor specific documentation that the medication was administered pursuant to the verbal order. The IP was transported to NMC for evaluation. Upon return from NMC, the IP received medical staff attention in accordance with the requirement.

*(h)      Inmates exhibiting any clinical deterioration at any time during involuntary therapy shall be transferred immediately to a clinically appropriate treatment facility. [CFMG Plan at 97]*

**Finding:** Substantial Compliance

This requirement had been found to be in Substantial Compliance by Dr. Vess in his last report. His review of this requirement was based on the involuntary medication administration pursuant to an IMO issued by the Court. For this report, it is assumed that all the requirements related to the involuntary administration of medication refer to emergency situations, not to situations related to the administration of medications related to an existing IMO.

## 11. Medication Refusals

*(a)      The on-call psychiatrist must be contacted whenever an inmate refuses his or her medications on three consecutive occasions. [CFMG Plan at 20]*

**Finding:** Non-Compliance

This requirement has been rated in Non-Compliance for the last five monitoring reports.

CFMG provided the results of their internal monthly audits for the element of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements, except for the month of June in which seven (7) cases were included.

| Month | April | May | June | July |
|---|---|---|---|---|
| Psychiatrist Contacted | 40% | 20% | 14% | 10% |

The CFMG audits indicate continued Non-Compliance in this requirement with no improvement noted in the reporting period compared to the prior monitoring report. Healthcare records do not indicate that psychiatrists were contacted/referred in situations when the IP refused three consecutive doses of psychotropic medications as identified on the Medication Administration Record (MAR).

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional four (4) cases which were not included in the CFMG monthly audit samples were selected at random from very limited sample lists. Of these cases, two had not refused medications for at least three times. Of the remaining two, one (50%) was referred to psychiatry.

Compliance with this requirement appears to necessitate a modification in the CorEMR system that will allow nurses to view medication refusals over a span beyond 24 hours so that necessary referrals to psychiatry can be identified.

## 12. Clinical Staffing

*(a)    Defendants will maintain Qualified Medical Professional and Qualified Mental Health Professional staffing at the Jail to ensure adequate staffing to provide all necessary medical and mental health care. The plan will identify all needed positions based on current and projected Jail population, and the number and qualifications of medical and mental health care staff to cover each position, with shift relief.*

*(b)    Mental health services provided on-site shall include crisis evaluation, socialization programs, group therapy, medication management, psychiatric evaluations and individual therapy. [CFMG Plan at 42]*

**Findings:**  Partial Compliance

These requirements have been rated Non-Compliance in the last four monitoring reports (2023, 2024).

The CFMG staffing allocation for mental health includes:
- 1 Mental Health Coordinator, 4 x 10-hour shifts: 1.0 FTE
- 4 Mental Health Providers, two – 4 x 10-hour shifts, one (currently vacant) – 5 x 8-hour shifts, one – 3 x 8-hour shifts: 3.6 FTE
- 1 Discharge Planner, 5 x 8-hour shifts: 1.0 FTE
- 1 Psychiatrist, four x 10-hour shifts: 1.0 FTE

Although this is the contracted staffing pattern, it appears to be insufficient for compliance with the SA. Over the course of the four-month monitoring period, CFMG has provided additional on-site and telehealth Mental Health Professionals on an as-needed (PRN) basis to assist with the mental health workload. However, even with these additional PRN MHPs, compliance on many provisions is not substantial.

CFMG has a contract with Precision Psychiatry Services in place to provide evening and weekend on-call psychiatry coverage.

CFMG operations at MCJ are also greatly assisted by leadership staff including Dr. Johannes Dalmasy, CFMG Chief Psychiatric Officer and Dr. Nicole Taylor, CFMG Vice President for Mental Health who perform healthcare record reviews and audit functions.

Also, the CFMG "virtual nurses" that perform daily reviews of all intake screenings conducted at MCJ, with efforts to identify and correct omissions on the day of intake (within 12 hours), are important in the compliance efforts.

Nevertheless, the front-line staffing allocation is inadequate if MCJ is expected to comply with many of the provisions of this SA and Implementation Plan, especially those with time-sensitive requirements. An updated staffing analysis is recommended, taking into consideration local data regarding the level of need for mental health services at MCJ and the resources that will realistically be necessary to meet all requirements including some that are not currently offered, e.g., group therapy. Review of the allocation findings should be discussed with the County and consideration given to contractual modifications.

*(c)      At all times, there shall be sufficient staff to ensure compliance with the Implementation Plan. The CFMG Staffing Plan is attached to the Implementation Plan as Exhibit I. CFMG must ensure that all positions are filled. Relief factors for each position shall be calculated into the staffing analysis to ensure staffing levels consistently meet requirements. CFMG must continuously evaluate staffing levels to ensure sufficiency for compliance. [CFMG Plan at 116. ]*

**Finding:** Non-Compliance

This requirement continues to be found in Non-Compliance as in the last four (4) monitoring reports.

The ongoing inability to comply with many of the requirements of this SA are indicative of the lack of sufficient staff to complete the required clinical service, referral and documentation processes. As reported by CFMG and evident in healthcare records reviews, current staff are working diligently to comply with certain requirements such as assessments at intake, but ongoing chronic care seems to be the most difficult area to comply with the requirements of the SA and Implementation Plan. This limitation in staffing is ongoing and, as expressed by Dr. Vess in his prior reports, "at no time has there been sufficient staff to ensure compliance with all elements of the Implementation Plan." As such, this requirement remains in Non-Compliance.

*(d)      Mental health staff shall be available on-site 7 days per week and on-call for assessment on an inmate's level of suicide risk upon referral by health services and/or custody staff. [CFMG Plan at 72]*

**Finding:** Substantial Compliance

This requirement was found to be in Substantial Compliance in the last four (4) monitoring reports.

Review of staffing schedules for the months of April 2025 through July 2025 showed that mental health staff were stationed onsite seven days per week. In addition to onsite staff, mental health clinicians were on-call and on most days each month another clinician was providing telehealth services. Review of healthcare records indicate cases of suicide risk were handled within

appropriate timeframes by either on-site of on-call health services staff. This requirement remains in Substantial Compliance.

### 13. Mental Health Care Training

*(a)*      *All correctional staff will receive training through staff briefings on any new requirements or procedures imposed by the Implementation plans. All new correctional staff will receive training on the requirements imposed by the Implementation plans.*

*(b)*      *In coordination with CFMG, all new deputies within one month of being stationed at the Monterey County jail will participate in an orientation training session with CFMG staff on how to recognize individuals who are in mental distress and/or suicidal.*

*(c)*      *All deputies, sergeants, and commanders will receive 24 hours of Standards and Training for Corrections ("STC") certified training per year. Every two years, all deputies, sergeants and commanders will receive eight hours of training regarding medical issues central to inmates, which will include identifying risk factors specific to inmates, identifying warning signs specific to inmates, and how to recognize individuals who are in mental distress and/or suicidal.*

*(d)*      *Once a year, custody staff will conduct a situational training such as a mock suicide attempt or a medical emergency. CFMG staff will also participate in the annual situational training. At the conclusion of the situational training, command staff will meet with CFMG to determine if any changes in policies or operations are warranted as a result of the exercise*

*(e)*      *All medication nurses must be trained to recognize common side effects associated with use of psychotropic medications, and upon observing such side effects must document observation in the medical record and schedule the patient to see a medical provider at the next available sick call. [CFMG Plan at 90]*

**Finding:**  These five (5) requirements were released from monitoring. [Dkt. 844 at ECF 5, Dkt. 751 at ECF 10 – 11, . Dkt. 528-1 at 17 of 90, Dkt. 751 at ECF 12]

### 14. Restraint Chairs

*(a)*      *Physical restraint devices can only be used on inmates who display bizarre behavior that results in the destruction of property or reveals an intent to cause physical harm to others, and cannot be used when there are less restrictive alternatives. [CFMG Plan at 47]*

*(b)*      *Use of a restraint chair will be documented in an observation log which will be reviewed and signed by a supervisor. Inmates shall not be placed in a restraint chair for longer than six consecutive hours.*

**Finding:**  These two (2) requirements have been released from monitoring. This item has been released from monitoring. [Dkt. 751 at ECF 12; Dkt. 751 at ECF 11]

*(c)    Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A shift supervisor and medical staff shall oversee the exercise. If unsuccessful in allowing inmates to exercise their arms and hands in a range of motion exercise, safety staff shall explain on the observation log why extremities could not be exercised and a shift supervisor shall be notified.*

**Finding:** Substantial Compliance

The last four monitoring reports have found Substantial Compliance with this requirement.

As in the past, the MCJ Compliance Unit continues to oversee, monitor and report on the use of restraints, including the WRAP device.  In this reporting period (April through July), there was one incident of WRAP restraint use. Review of the audit report and related incident report indicates that the extremity exercises were completed in accordance with this requirement, supporting the finding of Substantial Compliance.

*(d)    On a monthly basis, the compliance sergeant will audit one incident of use of a restraint chair, if any existed in that month, to determine if proper documentation has been maintained.*

**Finding:** This requirement was released from further monitoring.  [Dkt. 844 at ECF 5]

## 15. Use of Force

*(a)    Medical and mental health staff shall be consulted before any planned use of force on an inmate. Custody staff in concert with medical staff will develop the most effective and appropriate means of imposing compliance with rules and regulation, including attempts at de-escalation. It is understood that it is the goal of custody staff to use the least amount of force necessary to ensure compliance with rules and regulations. Planned use of force will only be used after verbal attempts to obtain compliance.*

*(b)    Any use of force will be documented on a use of force form.*

**Finding:** Substantial Compliance

The last four consecutive monitoring reports have found this requirement to be in Substantial Compliance.

Review of planned use of force reports from April 2025 through July 2025 found continuing Substantial Compliance on this requirement. The Compliance Unit conducted a review of incident reports completed during this period and identified three planned use of force incidents involving cell extractions. Review of the incident report documentation for these planned uses of force detail how both mental health and medical staff were contacted and consulted before the use of force was initiated and made attempts to obtain compliance with the Implementation Plan prior to the use of force for cell extraction.

**16. Mental Health Grants**

*(a)     Monterey County Office of the Sheriff will in good faith continue to pursue state funding for mental health and programming space at the jail. The Monterey County Public Defender will cooperate in those efforts.*

**Finding:** This requirement has been released from monitoring. [Dkt. 751 at ECF 10]

**17. Inmates Who Have Been Declared Incompetent to Stand Trial**

*(a)     The County and Plaintiffs recognize that there is often a waiting period from the time a Court has found an inmate to be incompetent to stand trial and when a State facility is able to receive the transfer of such inmate. The parties recognize that inmates can be particularly vulnerable during this time period. As such, within 24 hours of a Court determining that an inmate is mentally incompetent to stand trial, the inmate will be placed in an administrative segregation transition cell unless contraindicated by medical staff. Inmates in transition cells shall be seen by medical staff on a daily basis, who are trained in suicide risk assessment. The Monterey County Office of the Public Defender shall take all appropriate measures (including filing requests to the Monterey County Superior Court for orders to show cause to be directed the State of California) to expedite the transfer of inmates who have been determined to be incompetent to stand trial to an appropriate State facility. [Dkt. 582-1 at ECF 13]*

**Finding:** Partial Compliance

This requirement has been found to be in Non-Compliance in the last four reports (2023, 2024).

The requirement addresses the need to assess persons declared Incompetent to Stand Trial (IST) for suicide risk within 24 hours of the IST determination. Prior monitors have noted concerns that the Court did not always appear to provide timely notification when inmates are declared IST and a lack of procedure to address the inmates' placement in Administrative Segregation (AS) within 24 hours and assess suicide risk daily.

There has been improvement in addressing this requirement since the last report. Currently, the MCJ Compliance Unit prepares a monthly "1370PC Audit," which lists all IPs found to be IST in the month and the actions taken to ensure that suicide risk is assessed and that the IP is relocated to Administrative Segregation, if necessary. Specifically, MCJ reportedly receives daily notifications when an IP is declared IST. Upon notification, MCJ staff notify CFMG mental health staff to assess suicide risk and make a placement recommendation. Review of the monthly audits for the monitoring period, shows that a number of these IPs were already in AS at the time of the IST determination. For those that were not already in AS, CFMG mental health staff are either conducting a chart review or meeting with the IP to assess suicide risk and determining whether placement in AS is in their best interest. A review of the healthcare records of eight (8) of these IST IPs supports the process.

Regarding the portion of the requirement that IPs "in transition cells be seen by medical staff on a daily basis, who are trained in suicide risk assessment," the average compliance rate for this monitoring period was 59% as discussed in section 21(d).

## 18. Treatment Plans

*(a)      Qualified health services staff must develop a written individualized treatment plan for inmates requiring close medical and/or mental health supervision. A treatment plan must specify a particular course of treatment and shall be included in the plan portion of the S.O.A.P. progress note. The treatment plan shall reflect current problems or conditions being followed. The treatment plan shall include monitoring of the efficacy of treatment and discharge planning. [CFMG Plan at 27, 75]*

*(b)      Treatment plans shall include specific medical and/or psychiatric problems, nursing interventions, housing, dietary, medication, observation and monitoring, and follow-up referral and/or evaluation as appropriate. [CFMG Plan at 27]*

*(c)      Mental health providers must work with the Program Manager or designee to develop a treatment plan and meet the outpatient needs of inmates with mental illness, including opportunity for social interaction and participation in community activities. If an inmate is unable to participate, the reason must be documented. [CFMG Plan at 43, 75]*

**Finding:** Partial Compliance

The last monitoring two (2) monitoring reports found this requirement to be in Partial Compliance.

CFMG provided the results of their internal monthly audits for the eight (8) elements of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| Treatment Plan Completed | 80% | 80% | 70% | 90% |
| *Course of Tx Identified* | *100%* | *100%* | *100%* | *89%* |
| *Current Problems/Conditions* | *100%* | *100%* | *100%* | *100%* |
| *Monitoring Tx Effectiveness* | *100%* | *100%* | *100%* | *100%* |
| *Discharge Planning* | *100%* | *100%* | *100%* | *100%* |
| *Specific Tx Problems* | *100%* | *100%* | *100%* | *100%* |
| *Specified Interventions* | *100%* | *100%* | *100%* | *89%* |
| *Referral/Evaluation* | *100%* | *100%* | *100%* | *100%* |

*Note: the compliance %ages for the italicized requirements are based on completed treatment plans.*

The CFMG audits indicate continued Partial Compliance with this requirement consistent with the prior reporting period. Completed treatment plans were found in the majority of the randomly-selected cases and all the important elements of the treatment plans are being addressed.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional nine (9) cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was 88% compliance with a completed treatment plan in the healthcare record.

Mental health staff should continue to focus on implementing a process whereby all IPs have a completed treatment plan in the healthcare record, recognizing that 100% compliance is not necessary to achieve SC. Additional information regarding the patients' current clinical status, progress in treatment, and any adjustments to goals or interventions should be clearly documented and readily accessible to those providing care. Regular multidisciplinary discussion of complex and challenging cases should be documented and should clearly inform the written treatment plan.

*(d)     CFMG will inform classification through medical treatment orders as to any classification issues an inmate has due to a mental illness. [County Plan at 11]*

**Finding:** Non-Compliance

This requirement was rated in Non-Compliance in the last monitoring report.

The requirement specifies that CFMG/CFMG will inform MCJ Classification through medical treatment orders as to any classification issues an inmate has due to a mental illness. At intake following assessment, nursing staff complete and provide MCJ Classification staff with information regarding mental health issues and placement concerns using the Monterey County Jail Assistance & Accommodation Form.

However, after intake when these decisions/recommendations are made by the CFMG mental health staff (not medical staff) who cannot provide a medical treatment order, CFMH staff advise Classification verbally and complete a clinical process note. IPs with mental health issues are designated as "Special Condition" and identified as such in the MCJ jail management system. Unfortunately, there is no proof-of-practice process for this requirement other than clinical notations in the case records of IPs on the CFMH caseload.

**19. Consideration of Mental Illness in Inmate Discipline**

*(a)     Mental illness will be considered in administering any disciplinary measures against an inmate. Custody staff shall contact the appropriate qualified mental health care staff when evaluating the level of discipline for an inmate with mental illness. (*Dkt. 532 at ECF 47*)*

**Finding:** Partial Compliance

The last monitoring period report indicated that a new set of Disciplinary Action Report (DAR) forms and a new process of review had been implemented by the MCJ Compliance Division. However, it was found that the new procedures were not being followed and the requirement was found to continue in Non-Compliance. This process involved stamping the DAR form to "flag" inmates who are receiving mental health services and sending an email to notify mental health staff. This would trigger a review by a Mental Health Professional to evaluate the inmate and complete a form indicating whether any of the proposed discipline would be contraindicated based on the inmate's mental health condition. This input is then considered prior to imposing discipline.

For this monitoring period, this requirement is in Partial Compliance. According to the Compliance Commander, the DAR process has been increasingly improved since the last report. Review of DAR process records kept by the MCJ Compliance Unit show that IPs with SMI are being referred to CFMG for determination of appropriateness. According to the CFMG Mental Health Coordinator, mental health staff are either conducting chart reviews or meeting with IPs. For this monitoring period, the following compliance rates were found and indicate increasing compliance with this requirement. Review of the documentation indicates that the recommendations of mental health staff are being considered in the disciplinary process.

| Month | # of SMI Infractions | # of MH Reviews | Compliance Rate |
|-------|---------------------|-----------------|-----------------|
| April | 7 | 3 | 43% |
| May | 4 | 2 | 50% |
| June | 7 | 4 | 57% |
| July | 3 | 3 | 100% |

## 20. Space Issues

*(a)      Defendants shall develop and implement a Mental Health Care Implementation Plan to more thoroughly ensure timely access to necessary treatment by Qualified Mental Health Professionals for prisoners with mental illness, including adequate clinical and administrative treatment space.* [Dkt. 494 at ECF 17]

**Finding:** This requirement was released from further monitoring. [Dkt. 844 at ECF 5**]**

## 21. Administrative Segregation

*(a)      The Mental Health Implementation Plan shall require placement screening of all prisoners for mental illness and suicidality before or promptly after they are housed in administrative segregation, and require procedures to mitigate the impact of administrative segregation on persons with mental illness, including but not limited to structured therapeutic activity outside the segregation cell and where feasible assignment of cell mates.* [Dkt. 494 at ECF 9-10]

*(b)      Inmates being moved from general population to an administrative segregation cell will be screened for suicide risk within 24 hours of placement.* [Dkt. 528-1 at ECF 12]

**Finding:** Partial Compliance

The last four monitoring reports have found these two requirements to be in Non-Compliance.

These two requirements state that all inmates placed in Administrative Segregation will be assessed for mental illness and suicidality. On this requirement, CFMG provided the results of their internal monthly audits for the element of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| RH Placement Screening | 60% | 70% | 80% | 60% |

The CFMG audits indicate marked improvement in compliance with the requirement of placement screenings for Restrictive Housing although still in Partial Compliance with this overall requirement.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight (8) cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was 100% compliance with the requirement of a RH placement screening within two (2) days of placement in Administrative Segregation. Review of these additional cases support the finding of marked improvement in compliance with this requirement.

Regarding the portion of 21(a) that "*require procedures to mitigate the impact of administrative segregation on persons with mental illness, including but not limited to structured therapeutic activity outside the segregation cell and where feasible assignment of cell mates,*" all IPs in AdSeg are offered two hours per week of programming by MCJ custody. Audit reviews for the months in this monitoring period indicate 100% compliance in this requirement. However, it must be clearly stated that IPs may refuse to participate in the offered programming.

The MCJ Compliance Unit keeps records of CFMG reviews prior to placement in Administrative Segregation. Review of these records for the monitoring period show how mental health staff are assessing the IP prior to placement and considering the impact of disciplinary housing on the person's current and potential mental health. If the CFMG assessment determines that mental health will be adversely impacted by the placement, records indicate that disciplinary placement is cancelled.

These requirements are in Partial Compliance given the marked improvement in the completion of the placement screenings for mental illness and suicidality in the healthcare records for the monitoring period.

*(c)*     *Inmates shall not be placed in administrative segregation solely because of having a mental illness. Classification is to assess a totality of factors when assigning inmates to administrative segregation units. The goal of the County is to limit the use of administrative segregation for inmates with mental illness.* [Dkt. 528-1 at ECF 12]

**Finding:** Substantial Compliance

The last four (4) monitoring reports (2023, 2024) have found Substantial Compliance with this requirement. As explained in prior monitoring reports, these findings have been based on the interpretation of the requirement to mean that the classification process must not result in placing an inmate in Administrative Segregation only ("solely") due to the presence of mental illness.

As in previous reviews, there were cases in the current review where a severe and chronic mental illness contributed to the behaviors which led to placement in administrative segregation. However, in these situations, the findings indicate that care is taken to ensure that persons with mental illness are not placed in Administrative Segregation if the placement will be harmful to their functioning and that efforts are made to identify adverse effects to a person's mental health due to placement in Administrative Segregation. As such, during the current review of healthcare records, there continued to be no indications that inmates were placed in Administrative Segregation solely because of having a mental illness.

Efforts will be made by this Monitor to attend a classification review during the next tour. Attending the review will provide an opportunity to assess how information regarding the mental health state/status of the IPs is discussed for possible recommendations.

*(d)*     *Inmates with a serious mental illness who are housed in Administrative Segregation will be scheduled for a weekly appointment with a qualified mental health provider.* [CFMG IP at 42]

**Finding:** Partial Compliance

The last three (3) monitoring reports found Substantial Compliance with this requirement.

CFMG provided the results of their internal monthly audits for the element of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| Weekly Contacts | 100% | 83% | 22% | 84% |

The CFMG audits indicate performance consistent with the prior monitoring period except for the month of June. This variability warrants a rating of Partial Compliance.

41

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional nine (9) cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was 33% compliance with the requirement of weekly contacts with a QMHP while in RH.

This is an area that requires attention to compliance. IPs in RH are considered at risk of decompensation/exacerbation of mental health issues. Leadership should identify the reasons for the variability in compliance.


*(e)      Nursing staff shall conduct mental health rounds in Administrative Segregation daily, separate and apart from medication distribution.* [CFMG IP at 42]

**Finding:** Partial Compliance

The last monitoring report established a rating of Partial Compliance with this requirement.

CFMG provided the results of their internal monthly audits for the element of this requirement for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| Daily RN Rounds Completed in RH | 72% | 54% | 54% | 58% |

The CFMG audits indicate performance consistent with the prior monitoring period except for the month of June. This variability warrants a rating of Partial Compliance.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits with slight variation that did not change the rating of Partial Compliance.

An additional eight (8) cases which were not included in the CFMG monthly audit samples were selected at random. Of these cases, there was only 25% compliance with the requirement of daily RN rounds in RH.


*(f)      Welfare checks will consist of direct visual observation that is sufficient to assess the inmate's well-being and behavior. Custody staff will conduct hourly checks supplemented with random additional checks which when added together should achieve the every 30 minute goal.* [Dkt. 528-1 at ECF 15]

**Note:** This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral

monitor's next tour report finds Substantial Compliance. [Dkt. 751 at ECF 19]. Although Substantial Compliance was found in the last monitoring report from April 2024, this requirement has apparently not been formally released from monitoring.

**Finding:** Substantial Compliance

This requirement was found in Substantial Compliance in the last two (2) monitoring reports. Details regarding compliance with this requirement can be found in section 7(c) of this report.

*(g)    Deputies shall continue to conduct hourly welfare checks, but will add an additional three checks per shift at random intervals, during the day and night shifts and an additional six checks per shift at random intervals during the midnight shift. Welfare checks shall include a visual observation of each inmate in the unit with verbal interaction if necessary.*

**Finding:** Substantial Compliance

This requirement was found in Substantial Compliance in the last two (2) monitoring reports.

Audits conducted and reports from the Compliance Commander attest to a thorough and effective process for monitoring the recording of welfare checks based upon data from the Guardian RFID system, with routine reports and feedback to deputies, including correctional action as needed. The current review found similar compliance with this aspect of the requirement. Reviews of surveillance videos have been added to the Compliance Commander's internal auditing of welfare checks.

*(h)    All welfare checks shall be documented on a welfare check log. The logs will be reviewed and initialed by the on-duty sergeants at least one time per shift to insure compliance. Spot checks for compliance will be conducted by the Compliance Sergeant at least once per week. On a monthly basis, the Compliance Sergeant will randomly select five log entries and use the door entry logs to verify that the deputy entered the administrative segregation  pod, to conduct a welfare check. The Compliance Sergeant will track all of his findings through reports which will be sent to the Jail Ops Commander. Monthly audits of the Compliance Sergeant's reports will be conducted by the Jail Operations Commander. The Jail Operations Commander will generate a monthly report to document their audit findings. [Dkt. 528-1 at ECF 16]*

**Note:** This item is one of the Implementation Plan requirements for which the Plaintiffs agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds Substantial Compliance [Dkt 751 at ECF 20]. This requirement has been found in Substantial Compliance in the last two monitoring reports, although it does not appear to have been formally released from monitoring.

**Finding:** Substantial Compliance

As noted in prior monitoring reports, the Compliance Unit continues to conduct thorough and timely audits of welfare checks as required, with regular monthly reports to leadership. Review of

welfare check logs and example reports from the current review in addition to discussions with the Compliance Commander about the procedures used in this process, demonstrated ongoing Substantial Compliance with this aspect of the requirement.


## 22. Suicide Prevention

*(a)      Defendants shall remove hanging points and other hazards in jail administrative segregation cells that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide.*

**Note:** From Dr. Vess's November 2024 report, "This item is one of the Implementation Plan requirements for which the Plaintiffs have agreed to release the Defendants from further monitoring on the condition that the neutral monitor's next tour report finds Substantial Compliance for reduction of tie-off points in Pods D, G, H, I and J. [Dkt. 751 at ECF 19; Dkt. 759 at ECF 5]. This requirement was found in Substantial Compliance in the monitoring report of July 2022, and was assumed to be released from further monitoring.

**Finding:** Substantial Compliance

From Dr. Vess's November 24 report, "A footnote in Dkt. 751 at ECF 19 states that the Mental Health Monitor will evaluate the new jail for reduction of tie-off points. If Substantial Compliance was found for reduction of tie-off points in the new jail, Plaintiffs had agreed to release Defendants from further neutral monitoring for these cells. Substantial Compliance was found in the monitoring report from the November 2023 site visit, and this requirement was understood to be released from monitoring. Plaintiffs have noted that this requirement has not been formally released from monitoring. As this requirement has to do with structural elements of the new jail areas, there is no reason to believe that the compliance status has since changed. "


*(b)      A qualified mental health professional must perform a suicide risk assessment using the Suicide Risk Assessment Tool (attached as Exhibit G to Implementation Plan) in all the following circumstances: (1) if the RN identifies suicidality during the Initial Health Screen; (2) within 4 hours of placement in a safety cell and before release from a safety cell; (3) after placement in Administrative Segregation. [CFMG Plan at 43, 72, 75]*

**Finding:** Partial Compliance

This requirement was found in Partial Compliance in the last three (3) monitoring reports.

CFMG provided the results of their internal monthly audits for parts 1 and 3 of this requirement, for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random (except for seven (7) cases in the month of June) to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| RN Identifies at Intake | 100% | 90% | 83% | 100% |
| After Ad Seg Placement | 40% | 80% | 78% | 80% |

The CFMG audits indicate performance consistent with the prior monitoring period for part 1, i.e., the assessment of suicide risk at intake and improved compliance with part 3, the assessment of suicidality after placement in Administrative Segregation.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits with slight variation that did not change the rating of Partial Compliance.

An additional eight (8) cases which were not included in the CFMG monthly audit samples were selected at random and show a 88% compliance on the risk assessment after Ad Seg placement. However, the CFMG sample for the independent review of risk assessment after RN identification at intake was limited to three persons; with 100% compliance for the requirement on the three cases.

For the second element of the requirement pertaining to assessment following placement in and release from a safety cell, I reviewed eight (8) cases drawn from safety cell logs. All IPs had been placed on intermittent suicide watch (Level 2). Suicide risk assessments were conducted when inmates were placed in a safety cell (100%) and in 75% of the cases prior to the discontinuation of suicide watch. Even in those cases where an assessment wasn't clearly provided prior to discontinuation of the safety cell placement, mental health staff were involved in the process.

*(c)    Whenever an inmate is placed in a safety cell due to suicide risk, CFMG shall immediately, and no later than within 4 hours, determine what level of suicide precautions are necessary and decide whether the inmate needs to be transferred to an inpatient mental health facility. If CFMG determines that more than 24 hours of suicide watch/precautions is necessary, CFMG shall work with custody to place the inmate in an inpatient mental health facility, the Outpatient Housing Unit, a receiving cell located in the booking unit, or dorm A. Whenever possible, the inmate will be transitioned from a safety cell to an open dormitory setting until the inmate has stabilized. [DKT 532 at ECF 73]*

*(d)    Custody must transfer patients to NMC or another appropriate inpatient mental health facility if the patient has been housed in a safety cell for 24 consecutive hours or for more than 36 cumulative hours in any 3-day period. If exigent circumstances prevent such transfer, a memo must be written to the Custody Operations Manager. [DKT 532 at ECF 73-74]*

*(e)    Once CFMG determines that an inmate is no longer suicidal, CFMG shall work with custody staff to place the inmate in the most appropriate setting. Mental health clinicians must follow-up with the patient until a step-down plan is no longer necessary. [DKT 532 at ECF 73]*

**Finding:** Substantial Compliance

45

The last four (4) monitoring reports (2023, 2024) have found Substantial Compliance with these requirements.

For the current monitoring report, in keeping with the prior monitoring process, a list of all suicide attempts and incidents of serious self-injury for the months of April through July was reviewed. The list included eight (8) incidents which involved six (6) IPs. Three (3) of the incidents were classified as attempted suicides and five (5) as self-injurious events. The three attempted suicide incidents involved the same IP. A clinical review of these incidents was conducted to assess extent of injuries, how the incidents were handled medically, and whether referral to NMC was determined to be warranted and, if so, the outcome of the referral.

Transfer to NMC was initiated in the three suicide attempts (involving the one IP) within an approximate eight-day period and self-injury event because the IP had "ingested a foreign object" and required radiology, and another self-injury event where the IP required treatment of a cut on their forehead after head-banging. All these events were classified as "ER Visits" and none required an overnight stay. Otherwise, the events were handled by CFMG and MCJ staff and appropriately included placement on suicide watch in a safety cell and referral to the medical staff for ongoing assessment. For each of these incidents, the inmate was properly evaluated using the standardized suicide risk assessment tool and placed on staggered suicide watch, which appeared appropriate considering the clinical presentation and results of the risk assessment. The inmates were subsequently evaluated as required by protocol and released from suicide watch when appropriate.

As noted in prior monitoring reports, mental health clinicians consistently document suicide risk assessment and collaborative safety planning using the structured forms titled "Suicide Watch Initial Assessment for Mental Health" and "Suicide Watch Daily Follow-up and Discharge for Mental Health."


*(f)      Custody must conduct welfare checks of patients on suicide watch/precaution twice every 30 minutes. Health services staff must conduct welfare checks every 6 hours. Mental health staff must conduct welfare checks once per duty shift. The checks must be documented in the appropriate log (sobering/suicide watch/safety cell/restraints log). The inmate may not have access to materials that could be used to inflict harm on his/her self or others, and may be dressed in an approved safety garment if necessary. [CFMG Plan at 74, 76]*

**Finding:** Partial Compliance

The requirement has been in Partial Compliance for the last two (2) monitoring reports.

CFMG provided the results of their internal monthly audits for requirement, for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with these requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| RN Contacts Completed Every 6 Hours | 85% | 85% | 90% | 77% |
| MH Contacts Completed Once Per Shift | 100% | 100% | 100% | 100% |

The CFMG audits indicate performance consistent with the prior monitoring period for both elements of this requirement.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits with slight variation that did not change the rating of Partial Compliance.

An additional seven (7) cases which were not included in the CFMG monthly audit samples were selected at random and show a 37% compliance on the completion of the RN welfare checks every six hours and 100% compliance on the mental health contacts once per shift.

For the requirement that custody conduct welfare checks on inmates on suicide watch twice every 30 minutes, eight (8) cases selected at random from among IPs placed on suicide watch were reviewed. All cases were compliant with this custody requirement. As has been noted in prior monitoring reports, this set of requirements is interpreted to refer to the issue of whether custody welfare checks were conducted and documented according to the specified schedule. It does not consider the quality of welfare checks that were conducted, which is addressed in the findings of other relevant requirements.

In keeping with the last monitoring report, whereby custody and mental health checks were substantially compliant, but nursing checks were not yet in Substantial Compliance, the overall finding for this set of requirements is again Partial Compliance.


***(g)*** *The CFMG Program Manager and the Facility Manager shall have joint responsibility to report completed suicides in accordance with CFMG Inmate Deaths Policy and Procedure. [CFMG Plan at 76]*

**Finding:** Substantial Compliance

This requirement was found to be in Substantial Compliance in the last four (4) monitoring reports (203, 2024). There have been no cases of inmate suicide at MCJ since June 2023. In keeping with Dr. Vess's prior reports, where a requirement has been found substantially compliant in the most recent prior report, and where there have been no subsequent cases that demonstrate lack of compliance, the finding of Substantial Compliance is continued. However, to further address this requirement, the CFMG policy "Procedure in the Event of a Patient Death" has been reviewed and found to include the required notifications.


***(h)*** *The CFMG Program Manager or nursing staff on duty shall report all potential and/or attempted and completed suicides to the Facility Manager or Shift Supervisor. CFMG management will be notified of any completed suicides within one working day. Family members must be notified in accordance with the CFMG Notification of Next of Kin Policy and Procedure. CFMG Plan at 76-77.*

**Finding:** Substantial Compliance

This requirement was found in Substantial Compliance in the last four (4) monitoring reports (2023, 2024).

There have been no completed suicides during the current monitoring period. However, there were three (3) events classified as suicide attempts during the period involving one (1) IP.  The notification procedure in the event of attempted or completed suicides is described in policy which involves a tracking process for Critical Clinical Events and includes required notification to a number of individuals, including the Facility Manager. Documentation provided by CFMG for the current review period related to attempted suicides again showed that this process was completed within the required timeframe.  Based on this information, a finding of Substantial Compliance is warranted.

**23.  Increase in Time Outside of Cell and/or Increasing Programs**

*(a)      Unless exigent circumstances or safety and security concerns exist, each inmate in administrative segregation pods A, B, R, and S will be guaranteed the following weekly times out of their cell:*
- *3 hours a week for exercise and socialization (exercise time will include exercise with one or more other inmates)*
- *14 hours a week of "socialization time" where at least one other inmate is in the common area at the same time*
- *2 hours a week of programming will be offered to each inmate (it is understood that inmates may refuse to participate in programs offered at the County jail)*

*(b)      Unless exigent circumstances or safety and security concerns exist, each inmate in isolation cells and single holding cells outside of the booking and receiving area will be guaranteed the following weekly times out of their cell:*
- *3 hours a week for exercise*
- *14 hours a week in the common area*
- *2 hours a week of programming will be offered to each inmate*

*(c)      If approved by classification, inmates in administrative segregation will have access to the normal group programs provided at the County jail such as NA/AA, religious services [County Plan, Dkt. 528-1 at ECF 19]*

**Finding:** Partial Compliance

The last three (3) monitoring reports found these requirements to be in Partial Compliance. The Compliance Unit continues to oversee a thorough and detailed system of routine audits. As reported by Dr. Vess, "Prior monitoring reviews of these audits indicated that inmates in segregated housing are consistently offered the required amounts of exercise time (yard time) and time in the common area (socialization time). It was the amount of programming time, which has not been tracked by the Compliance Commander in his auditing procedures, that prevented the finding of substantial compliance in prior monitoring reports."

Utilizing information drawn from the OnDemand system, the Compliance Unit's monitoring review has demonstrated that IPs in the administrative segregation pods are consistently offered the required amount of yard time and socialization time.

Custody programming staff continue to provide classes and activities to inmates in administrative segregation. Program attendance reports were again provided for review, and it appeared that more than two hours per week of such programming were consistently being offered. As in the past, it could not be determined whether these programming opportunities were offered to each inmate in the housing areas designated by these requirements. The current finding of partial compliance is based on substantial compliance with some elements of the requirement (exercise and socialization time) and a lack of confirmed substantial compliance with element pertaining to programming time.

*(d)*    *Working with the Monterey County Probation Office and the Monterey County Superior Court, the Office of the Sheriff has and will continue to support evidence based programs such as the Work Alternatives Program; Involuntary Home Detention; Pretrial Release through Probation; Own Recognizance; educational early release kickouts such as Choices/Liberty Pride; and Penal Code sections 4018.6 and 4024.1 kickouts. [County Plan at 15; Dkt. 528-1 at ECF 19]*

**Finding:**  This requirement has been released from further monitoring. (Dkt. 759 at ECF5)

## 24. Telepsychiatry

*(a)*    *The telepsychiatrist must obtain informed consent and explain all medications before prescribing. [CFMG Plan, Dkt 532 at ECF 45; Dkt 622 at ECF2*

**Finding:**  Substantial Compliance

This requirement has been in Partial Compliance for the last three (3) reports.

In keeping with prior reports, the portion of this requirement regarding informed consent has been interpreted to mean informed consent specifically for the use of telepsychiatry.

CFMG provided the results of their internal monthly audits of this requirement, for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with the requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| Informed Consent | 100% | 100% | 80% | 100% |
| Med Education | 100% | 100% | 100% | 100% |

The CFMG audits indicate performance consistent with the prior monitoring period on the two elements of this requirement. High and consistent ratings were found regarding obtaining informed consent and providing medication education during telepsychiatry encounters.

49

Consistent with prior reports, verbal consents were acceptable for rating but must have been clearly stated in healthcare record notes.

To verify the CFMG audits, two cases from the CFMG audit of ten (per month) were randomly selected and reviewed, for a total of eight cases for the monitoring period (April through July). In every case examined, the findings agreed with those reported in the internal audits.

An additional eight (8) cases which were not included in the CFMG monthly audit samples were selected at random and show a 75% compliance (two records did not include a signed or verbal consent) on the elements.

*(b)    The policies contain numerous provisions regulating the use of telepsychiatry at the jail, including requiring that a psychiatric nurse be present during telepsychiatry encounters where the patient is in a safety cell as well as requiring a local assessment by a physician or mid-level provider within 24 hours of an initial assessment that is conducted by telepsychiatry. [Dkts. 622 and 632].*

**Finding:** Deferred

This requirement has been in Partial Compliance for the last three (3) reports.

CFMG provided the results of their internal monthly audits of this requirement, for the months of April through July 2025, as shown in the following table. The CFMG monthly audits were comprised of ten (10) cases selected at random to examine compliance with the requirements.

| Month | April | May | June | July |
|---|---|---|---|---|
| RN Present in Safety Cell | N/A | N/A | N/A | N/A |
| 24 hr Follow up | N/A | N/A | N/A | N/A |

These two elements concerned telepsychiatry provided in a safety cell require that, in those situations, an RN be present during the encounter and that a local psychiatric encounter be provided within 24 hours of the telepsychiatry appointment. In the CFMG audits, ratings of "Not Applicable" on the third element (RN Present in Safety Cell) were used to denote that the encounters did not occur in safety cells. The interpretation of the final element, that an assessment by a local psychiatrist be conducted within 24-hour of the telepsychiatry event, is different in this than prior reports. This report views the post-telepsychiatry contact as required only in cases where the telepsychiatry occurred while the inmate was in a safety cell. Whereas, in prior reports, it was interpreted that all telepsychiatry events required an encounter with a local psychiatrist within 24 hours.

Ratings on these two requirements are deferred since no telepsychiatry occurred in safety cells.

## 25. Medical Records

*(a)    Each inmate's medical record shall contain (as applicable):*

- *The completed Receiving Screening form*
- *Health Inventory/Communicable Disease Screening forms*
- *Problem list*
- *All findings, diagnosis, treatments, dispositions*
- *Prescribed medications and their administration*
- *Laboratory, x-ray and diagnostic studies*
- *Consent and Refusal forms*
- *Release of Information forms*
- *Place and date of health encounters (time, when pertinent)*
- *Health service reports (i.e., dental, psychiatric, and other consultations)*
- *Hospital Discharge Summaries*
- *Jail Medical Record Summaries (transfer forms)*
- *Individual treatment plan [CFMG Plan at 114]*

**Finding:** Partial Compliance

The last three (3) monitoring reports have found Partial Compliance with this requirement.

The required healthcare record items were found except for the individual treatment plans as discussed in section 18 of this report. The current finding for the medical records requirement therefore remains Partial Compliance.


**26. Quality Management**

*(a)     Post-implementation monitoring will include focused process and outcome audits to measure compliance with the elements of the CFMG Implementation Plan. Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. All monitoring and audit Findings will be reported to the Quality Management Committee at its quarterly meetings. [Dkt. 532 at ECF 9]*

**Finding:** Partial Compliance

The last three monitoring reports have found this requirement to be in Partial Compliance.

CFMG has established a tiered review and performance improvement system. These Quality Management (QM) and Continuous Quality Improvement (CQI) efforts if implemented as established will continue to address all medical and mental health requirements of the SA and provide the necessary audit processes to support findings of Substantial Compliance on the requirements. Tracking of these efforts, over time, with identified corrective actions and quality improvement initiatives will support the finding of Substantial Compliance.

These efforts include:
- Reporting of "**Critical Clinical Events**" (CCE): daily, patient/incident specific
- **Medical & Custody Meetings**: held on-site, three times per week to discuss CCEs and other facility-level concerns

- **Multi-Disciplinary Team Meetings** (MDT): held weekly; patient-focused reviews with discussion of related process/operational issues that require review and follow up; attended by MCJ and CFMG
- **Mental Health Subcommittee Meetings**: monthly reviews of audited service delivery data; focus on "global" population issues for month-to-month comparison of SA compliance and Implementation Plan requirements; corrective action plans are developed or modified to address performance deficits
- **Medical and Corrections Meeting (MAC)**: held monthly; focused on the CFMG system of care at MCJ; review of processes and patient population issues; monthly basis with a quarterly round-up meeting; attended by medical, mental health and custody staff

Documentation from the audits prepared for the Mental Health Subcommittee Meeting are the basis for assessing many of the medical/mental health SA requirements that form this report. It is suggested that "instructions" for how the data elements were reviewed be prepared to assist any level of monitoring.

At the time of Dr. Vess's last report, these QA/CQI processes were still being developed. The current finding of Partial Compliance is based on the continued progress observed in the development and implementation of a focused internal auditing process linked directly to the requirements of the Implementation Plan.

Minutes of the various levels of meetings would assist in understanding how issues are "carried over" from one effort to the next. Minutes will more clearly reflect the discussions, decisions, and action plans that emerge from these meetings, to provide a clear trail of the quality improvement efforts being made.


*(b)* *All cases involving the need for involuntary psychiatric medication administration will be reviewed by the Quality Management Committee to evaluate the appropriateness of treatment, the process and whether or not the criteria for psychiatric emergency were met. [CFMG Plan at 98]*

**Finding:** Non-Compliance

This requirement has been interpreted in prior reports as applying to involuntary medication administrations in a psychiatric emergency, rather than involuntary medications administered under an Involuntary Medication Order issued by the Court.

During this reporting period there was one incident of involuntary medication administration in the month of May involving a IP in a safety cell that resulted in a planned use-of-force. The IP was agitated, aggressive, incoherent and at risk of self-harm. Involuntary medication appears to have been warranted. However, review of information from the Multidisciplinary Team (MDT) Meetings and Medical and Corrections (MAC) Meetings for the relevant time period do not indicate that the case/events were discussed or reviewed as required by this provision.

*(c)    All completed suicides shall be subject to a medical and psychiatric review and review by the Quality Management and Peer Review Committees in accordance with CFMG Inmate Deaths Policy and Procedure. [Dkt. 532 at ECF 77]*

**Finding:** Deferred

The last monitoring reports (2023, 2024) have found this requirement in partial compliance noting that the last completed suicide occurred in June 2023.

According to Dr. Vess, the appropriate reviews by the various committees took place following the suicide in June 2023. His report further explained, "The current relevant policy for evaluating compliance with this Implementation Plan requirement appears to be the one titled HCD-110_A-09: Procedure in the Event of a Patient Death – California. This policy requires, among other things, a Clinical Mortality Review, which involves completion of a Psychological Autopsy, and an Administrative Mortality Review, which includes recommendations for any future improvements, submission of such improvements to the CQI Committee, and informing staff of the findings of the Mortality Review meeting. Finally, the Regional Director of Operations, Regional Director of Nursing, Regional Vice President, and Regional Medical Director, works with appropriate personnel to implement changes. The CQI Program Manager is to request and track supporting documentation for improvement plans." The report by Dr. Vess also explained the rating of Partial Compliance was related to there being no indication in the documentation of "the sharing of information within the local CQI Committee, as required by policy."

As, fortunately, no other completed suicides have occurred, this requirement cannot be rated and is Deferred in this reporting period.


**27. Corrective Action Plans (CAPs)**
*(a)    Defendants' implementation of a policy requires that there are corrective action measures to address lapses in application of the policy. [Dkt. 494 at ECF 11]*

*(b)    Corrective action plans will be developed and instituted for identified deficiencies, including re-audits within a stipulated time frame. [Dkt. 671 at ECF 5; Dkt. 532 at ECF 9]*

**Findings:** Partial Compliance

These requirements have been found in Partial Compliance in the last two (2) monitoring reports.

As stated in Dr. Vess's last report, "A Corrective Action Plan needs to specifically state the nature and extent of the performance deficit to be corrected, the specific steps to be taken to correct the performance deficit, the specific personnel responsible, the method for assessing changes in performance, and the mechanism for review and follow-up as needed."

Corrective Action Plans (CAPs) are presented, as necessary, in the Mental Health Subcommittee meetings pursuant to the monthly audit findings. These Plans should be reviewed monthly, modified as necessary and monitored on an ongoing basis until satisfied.

At this time, CAPs are being developed and implemented. Future monitoring reports will address the use and effectiveness of the CAPs.

### Summary

This monitoring report addresses 74 outstanding requirements of the Settlement Agreement. Twenty-two (22) additional requirements have already been "released" from monitoring. Of the 74 remaining requirements:

- o  4 are rated in Non-Compliance,
- o  34 are rated in Partial Compliance,
- o  34 are rated In Substantial Compliance, and
- o  2 requirements have been Deferred from rating in this report.

Compared to the last report in November 2024, there is notable improvement in the number of Substantial Compliance requirements, increasing from 29 to 34; requirements in Partial Compliance, increasing from 28 to 34; and in the requirements in Non-Compliance which have decreased from 13 to 4.

### Recommendations

Recommendations for achieving Substantial Compliance in the remaining requirements are stated throughout the report. However, certain recommendations are highlighted below.

1.    Staffing. As stated in prior monitoring reports, inadequate staffing is a fundamental area of concern. While CFMH may be staffed according to their contract, Substantial Compliance with numerous requirements will not be achieved and maintained without additional staffing. In addition to apparent insufficient/consistent staffing at the time of the most recent tour, there is concern regarding the impending change in the medical/mental health provider in early 2026 and the staffing allocation that will be forthcoming. An up-to-date staffing analysis, based on the available performance data, resulting in a realistic staff allocation package to meet current needs at the MCJ should be the basis for meeting requirements in this area.

2.    Chronic Care/Inpatient Care. To ensure adequate access to higher levels of care than can be provided at MCJ, additional communication, coordination, and collaboration with NMC is again recommended. More effective, interdisciplinary treatment team review and treatment planning, in combination with an early and efficient process for using involuntary medications may also reduce the number of cases that cannot be adequately treated in the MCJ.

3.    Verification and Continuation of Psychotropic Medications at Intake. Additional attention is still needed to ensure that medications are consistently verified and continued as required at the time of intake, including timely consultation with on-call psychiatry.  This area should remain a focus of internal auditing, with review in QM/CQI meetings and CAPs as needed. Clarification of procedures and performance expectations is needed, especially when outside pharmacies are closed and cannot respond during the intake nurse's shift, which is the timeframe written into several Implementation Plan requirements.

54

4.    <u>Medication Refusals</u>. An efficient and reliable process for timely identification of medication refusals is needed. Potential solutions may involve modification to the electronic health care record functionality.

5.    <u>QM and CAPs</u>. Additional progress has been made in this area. If all components of the QM process (as described in section 26) are in operation, significant process towards Substantial Compliance with the outstanding requirements can be achieved.

6.    <u>Continuation of Audit Processes</u>. The foundation for much of this report is the audits and documentation provided by both CFMG and the MCJ Compliance Unit. Concern is expressed regarding the upcoming change in the agency's medical/mental health provider and the possible termination of these auditing processes. It is strongly recommended that the incoming service provider be expected to continue these regular, monthly audit processes and related reporting efforts.

Respectfully submitted,

E. Carolina Montoya, Psy.D.
Mental Health Monitor